No. 19-2005

## UNITED STATES COURT OF APPEALS
## FOR THE FIRST CIRCUIT

STUDENTS FOR FAIR ADMISSIONS, INC.,
*Plaintiff-Appellant,*

v.

PRESIDENT AND FELLOWS OF HARVARD COLLEGE,
*Defendant-Appellee.*

On Appeal from the United States District Court
for the District of Massachusetts

## BRIEF OF APPELLANT
## STUDENTS FOR FAIR ADMISSIONS, INC.

Adam K. Mortara
BARTLIT BECK LLP
54 W. Hubbard St., Ste. 300
Chicago, IL 60654
(312) 494-4469

John M. Hughes
BARTLIT BECK LLP
1801 Wewatta St., Ste. 1200
Denver, CO 80202
(303) 592-3140

William S. Consovoy
Thomas R. McCarthy
J. Michael Connolly
Cameron T. Norris
CONSOVOY MCCARTHY PLLC
1600 Wilson Blvd., Ste. 700
Arlington, VA 22209
(703) 243-9423
will@consovoymccarthy.com

Patrick Strawbridge
CONSOVOY MCCARTHY PLLC
10 Post Office Sq., 8th Fl., PMB #706
Boston, MA 02109
(617) 227-0548

*Counsel for Appellant Students for Fair Admissions, Inc.*

## RULE 26.1 DISCLOSURE STATEMENT

Appellant, Students for Fair Admissions, Inc., is a nonprofit corporation organized under the laws of Virginia. It has no parent corporation, and no publicly held corporation owns 10% or more of its stock.

# TABLE OF CONTENTS

Table of Authorities .................................................................................................. iv

Reasons Why Oral Argument Should Be Heard ................................................. x

Jurisdiction .................................................................................................................. 1

Issues ............................................................................................................................ 1

Statement of the Case ............................................................................................... 1

    A.    Harvard's Admissions System ...................................................... 1

    B.    Harvard's Use of Race in Admissions ........................................ 6

    C.    Harvard's Treatment of Asian-American Applicants ............... 9

    D.    The Experts .................................................................................. 13

    E.    Harvard's Response to SFFA's Lawsuit .................................. 15

    F.    The District Court's Rulings ...................................................... 18

Summary of Argument ............................................................................................. 22

Standard of Review .................................................................................................. 24

Argument .................................................................................................................... 25

    I.    Harvard penalizes Asian-American applicants. ...................... 26

        A.    The district court's serious doubts about whether Harvard treats Asian Americans fairly means Harvard cannot carry its burden under strict scrutiny. .............................................................. 27

        B.    There is overwhelming statistical evidence that Harvard penalizes Asian-American applicants. ..................................... 29

        C.    The ample non-statistical evidence confirms that Harvard penalizes Asian-American applicants. .................................... 43

    II.    Harvard engages in racial balancing. ....................................... 46

    III.    Harvard does not use race as a mere plus to achieve overall diversity. ........ 48

        A.    Harvard does not pursue student-body diversity. .................. 49

        B.    Harvard places too much weight on race. .............................. 51

        C.    Harvard's use of race has no end point. ................................ 53

    IV.    Harvard disregards race-neutral alternatives ......................... 56

Conclusion .................................................................................................................. 62

Certificate of Compliance ................................................................................. 63

Certificate of Service ....................................................................................... 64

Addendum

# TABLE OF AUTHORITIES

## Cases

*Adarand Constructors, Inc. v. Pena,*
515 U.S. 200 (1995) ............................................................................ 25, 39

*Adorno v. Port Auth.,*
258 F.R.D. 217 (S.D.N.Y. 2009) ................................................................ 45

*Aiken v. Memphis,*
37 F.3d 1155 (6th Cir. 1994) (en banc) ...................................................... 62

*Alexander v. Louisiana,*
405 U.S. 625 (1972) ................................................................................ 38

*Aman v. Cort Furniture Rental Corp.,*
85 F.3d 1074 (3d Cir. 1996) ..................................................................... 38

*Bazemore v. Friday,*
478 U.S. 385 (1986) ................................................................................ 33

*Bhd. of Maint. of Way Emps. Div. of the Int'l Broth. of Teamsters v. Ind. Harbor Belt R. Co.,*
2014 WL 4987972 (N.D. Ind. 2014)............................................................ 27

*Bolton v. Murray Envelope Corp.,*
493 F.2d 191 (5th Cir. 1974) .................................................................... 44

*Bridgeport Guardians, Inc. v. Bridgeport,*
933 F.2d 1140 (2d Cir. 1991) ................................................................... 33

*Castaneda v. Partida,*
430 U.S. 482 (1977) ............................................................................ 38, 44

*Chadwick v. WellPoint, Inc.,*
561 F.3d 38 (1st Cir. 2009) ...................................................................... 40

*Chin v. Runnels,*
343 F. Supp. 2d 891 (N.D. Cal. 2004) ........................................................ 43

*Richmond v. J.A. Croson Co.,*
488 U.S. 469 (1989) ........................................................................53, 58, 61

*Comfort v. Lynn Sch. Comm.*,
    418 F.3d 1 (1st Cir. 2005) (en banc) ............................................................ 42

*Connecticut v. Teal*,
    457 U.S. 440 (1982) ...................................................................................... 40

*Cypress v. Newport News Gen. & Nonsectarian Hosp. Ass'n*,
    375 F.2d 648 (4th Cir. 1967) ........................................................................ 45

*Detroit Police Officers Ass'n v. Young*,
    989 F.2d 225 (6th Cir. 1993) ........................................................................ 55

*Eisenberg ex rel. Eisenberg v. Montgomery Cty. Pub. Sch.*,
    197 F.3d 123 (4th Cir. 1999) .................................................................. 47, 48

*Fisher v. Univ. of Tex. at Austin (Fisher I)*,
    570 U.S. 297 (2013) ..............................................................................passim

*Fisher v. Univ. of Tex. at Austin (Fisher II)*,
    136 S. Ct. 2198 (2016) ...........................................................................passim

*Franchina v. Providence*,
    881 F.3d 32 (1st Cir. 2018) ........................................................................... 40

*Fudge v. Providence Fire Dep't*,
    766 F.2d 650 (1st Cir. 1985) ......................................................................... 32

*Gratz v. Bollinger*,
    539 U.S. 244 (2003) ................................................................................ 25, 51

*Grutter v. Bollinger*,
    539 U.S. 306 (2003) ..............................................................................passim

*Hamilton v. Geithner*,
    666 F.3d 1344 (D.C. Cir. 2012) .................................................................... 43

*Hassan v. N.Y.C.*,
    804 F.3d 277 (3d Cir. 2015) .......................................................................... 49

*Hebert v. Mohawk Rubber Co.*,
    872 F.2d 1104 (1st Cir. 1989) ....................................................................... 38

*Heller v. Doe,*
      509 U.S. 312 (1993) ........................................................................... 28

*Hemmings v. Tidyman's Inc.,*
      285 F.3d 1174 (9th Cir. 2002) ........................................................ 33

*In re Neurontin Mktg. & Sales Practices Litig.,*
      712 F.3d 21 (1st Cir. 2013) ............................................................ 32

*Int'l Bhd. of Teamsters v. United States,*
      431 U.S. 324 (1977) ................................................................... 33, 38

*Johnson v. Bd. of Regents of Univ. of Ga.,*
      263 F.3d 1234 (11th Cir. 2001) ...................................................... 53

*Johnson v. California,*
      543 U.S. 499 (2005) ........................................................................ 25

*Jones v. Boston,*
      752 F.3d 38 (1st Cir. 2014) ............................................................ 32

*Korematsu v. United States,*
      323 U.S. 214 (1944) ........................................................................ 42

*Lam v. Univ. of Hawai'i,*
      40 F.3d 1551 (9th Cir. 1994) .......................................................... 40

*Lamprecht v. FCC,*
      958 F.2d 382 (D.C. Cir. 1992) ....................................................... 35

*Lehman v. Yellow Freight Sys., Inc.,*
      651 F.2d 520 (7th Cir. 1981) .................................................... 54, 55

*Liberty Envtl. Sys., Inc. v. Cty. of Westchester,*
      2000 WL 1341403 (S.D.N.Y. 2000) .............................................. 44

*Lowery v. Circuit City Stores, Inc.,*
      206 F.3d 431 (4th Cir. 2000) ......................................................... 44

*Miller v. Johnson,*
      515 U.S. 900 (1995) ............................................................ 25, 35, 39

*Mister v. Ill. Cent. Gulf R. Co.*,
    832 F.2d 1427 (7th Cir. 1987) ........................................................ 34

*Norris v. Alabama*,
    294 U.S. 587 (1935) ........................................................................ 39

*Palmer v. Shultz*,
    815 F.2d 84 (D.C. Cir. 1987) ......................................................... 33

*Parents Involved in Cmty. Sch. v. Seattle Sch. Dist. No. 1*,
    551 U.S. 701 (2007) ................................................................. passim

*Patterson v. Strippoli*,
    639 F. App'x 137 (3d Cir. 2016) .................................................... 45

*Pegues v. Miss. State Emp't Serv. of Miss. Emp't Sec. Comm'n*,
    699 F.2d 760 (5th Cir. 1983) ......................................................... 43

*Quinn v. Boston*,
    325 F.3d 18 (1st Cir. 2003) ............................................................ 54

*Regents of Univ. of Cal. v. Bakke*,
    438 U.S. 265 (1978) ................................................... 25, 48, 50, 60

*Republican Party of Minn. v. White*,
    536 U.S. 765 (2002) ........................................................................ 29

*Rice v. Cayetano*,
    528 U.S. 495 (2000) ........................................................................ 25

*Rich v. Martin Marietta Corp.*,
    522 F.2d 333 (10th Cir. 1975) ....................................................... 44

*Rosen v. Thornburgh*,
    928 F.2d 528 (2d Cir. 1991) ........................................................... 38

*Schuette v. BAMN*,
    572 U.S. 291 (2014) ........................................................................ 25

*Segar v. Smith*,
    738 F.2d 1249 (D.C. Cir. 1984) ............................................... passim

*Shaw v. Reno,*
    509 U.S. 630 (1993) ............................................................................... 25, 26

*Sobel v. Yeshiva Univ.,*
    839 F.2d 18 (2d Cir. 1988) ..................................................................... 33, 34

*Taxman v. Bd. of Educ. of Piscataway,*
    91 F.3d 1547 (3d Cir. 1996) ................................................................... 53, 54

*Thomas v. Eastman Kodak Co.,*
    183 F.3d 38 (1st Cir. 1999) ............................................................................ 39

*Turner v. Fouche,*
    396 U.S. 346 (1970) ....................................................................................... 38

*United States v. Bd. of Educ. of Piscataway,*
    832 F. Supp. 836 (D.N.J. 1993) ............................................................ 53, 54

*United States v. Burghardt,*
    939 F.3d 397 (1st Cir. 2019) ........................................................................ 26

*United States v. Playboy Entertainment Group, Inc.,*
    529 U.S. 803 (2000). ........................................................................ 26, 28, 29

*Wessmann v. Gittens,*
    160 F.3d 790 (1st Cir. 1998) .................................................................. passim

*Woods v. Greensboro,*
    855 F.3d 639 (4th Cir. 2017) ........................................................................ 40

**Statutes**

28 U.S.C. §1291 ................................................................................................... 1

28 U.S.C. §1331 ................................................................................................... 1

28 U.S.C. §1343 ................................................................................................... 1

42 U.S.C. §2000d ............................................................................................... 25

**Other Authorities**

Fed. Judicial Ctr.,
    *Reference Manual on Scientific Evidence* (3d ed. 2011) ....................................................... 32

Karabel, *The Chosen: The Hidden History of Admission and Exclusion at Harvard, Yale, and*
    *Princeton* (2005) ..................................................................................................................... 41

Rhode, *The Subtle Side of Sexism,*
    16 Colum. J. Gender & L. 613 (2007) .......................................................................... 40

Williams, *The Social Psychology of Stereotyping,*
    7 Emp. Rts. & Emp. Pol'y J. 401 (2003) ..................................................................... 40

**REASONS WHY ORAL ARGUMENT SHOULD BE HEARD**

Harvard has been held up as an "exemplar[]" for how to use race in college admissions. *Fisher v. Univ. of Tex. at Austin* (*Fisher I*), 570 U.S. 297, 334 (2013) (Ginsburg, J., dissenting). But until this case, Harvard was never asked to provide "evidence of how [its] process works in practice." *Id.* at 312 (majority opinion). This Court should hear oral argument to determine whether Harvard's use of race is truly exemplary, or whether it violates Supreme Court precedent.

## JURISDICTION

The district court had jurisdiction because Students for Fair Admissions (SFFA) alleges violations of Title VI of the Civil Rights Act of 1964. 28 U.S.C. §§1331; 1343. This Court has jurisdiction because SFFA appeals from a final judgment disposing of all parties' claims. *Id.* §1291. The district court entered judgment on September 30, 2019, and SFFA timely appealed on October 4, 2019.

## ISSUES

**I.**    Does Harvard impose a racial penalty on Asian-American applicants?

**II.**    Does Harvard engage in racial balancing?

**III.**    Does Harvard use race as more than a mere "plus" factor to achieve diversity?

**IV.**    Does Harvard have workable race-neutral alternatives?

## STATEMENT OF THE CASE

In November 2014, SFFA filed suit against Harvard alleging violations of Title VI of the Civil Rights Act of 1964. The district court denied Harvard's motion to dismiss, granted Harvard's motion for partial judgment on the pleadings, and denied cross-motions for summary judgment. A three-week trial began in October 2018. In September 2019, the district court issued findings of fact and conclusions of law, held that Harvard's use of race in admissions does not violate Title VI, and entered final judgment. This appeal followed.

### A.    Harvard's Admissions System

Until the 1920s, Harvard selected its students by admitting applicants who passed a required examination. Joint Appendix (JA) 426. In the early 1920s, however, Harvard's

leaders, including President Abbott Lawrence Lowell, became alarmed by the growing number of Jewish students who were passing the examinations. JA428-30. President Lowell eventually recognized that his preference—a quota on the number of Jews admitted—would trigger opposition. Harvard's faculty and governing boards instead preferred "a rule whose motive was less obvious on its face, by giving to the Committee on Admission authority to refuse admittance to persons who possess qualities described with more or less distinctness and believed to be characteristic of the Jews." JA429. To that end, Harvard implemented a system designed to "reduce the number of Jews by talking about other qualifications than those of admission examinations." JA432-35.

Harvard made three fundamental changes to its admissions policy. First, Harvard limited its incoming class to 1,000 students. Second, Harvard stopped automatically accepting students who were in the top seventh of their graduating class. Third, Harvard resolved to place "greater emphasis on selection based on character and fitness, and the promise of the greatest usefulness in the future as result of a Harvard education." JA3688-90. Thus, "holistic admissions" was born at Harvard.

After making these changes, Harvard issued a public statement denying that its new admissions policy racially discriminated:

> The whole record does include evidences of the candidate's character, personality, and promise …. Race is a part of the record. It is by no means the whole record and no man will be kept out on grounds of race…. [I]f there should result in fact any substantial change in the proportion of groups in the College following application of [this] test, this will be due, not to race discrimination or any quota system, but to the failure of particular individuals to possess as individuals those evidence of character,

personality and promise which weighed with other evidences render them more fit than other individuals to receive all that Harvard has to offer. Of course there will be criticisms. It will be said that Harvard is discriminating on grounds of race. That will not be true.

JA438-41. In this litigation, Harvard finally admitted that this "holistic" system had its roots in antisemitism. JA1666:9-14; JA3688-89.

Yet that system remains in place. By the 1940s, President Lowell's "character and fitness" criteria remained one of the five pillars of Harvard's admissions policy, which included "(1) academic promise; (2) personal qualities of character, all-round effectiveness, stability, and purpose; (3) health and participation in athletic activities; (4) geographical distribution; and (5) Harvard parentage." JA419-20. Harvard stressed that the "personal qualities of character" criterion was of "major importance" in its admissions decisions. *Id.* Still today, Harvard emphasizes that an applicant's "personal qualities," including "strength of character," are "factors in our decision-making that are as significant as academic ability." JA4036; Addendum (ADD) 25.

To implement its current admissions policy, Harvard provides written guidelines for how admissions officers should review files, which are known as the "Reading Procedures." That document is distributed to the admissions officers each year. It includes criteria for assigning numerical ratings to applicants—scores in various categories on a scale from 1 to 6 (with 1 being the highest). Admissions officers also can assign a plus or a minus for scores with a 2 or 3 to indicate strength. For example,

a "2+" is better than a "2," which is better than a "2-." The key categories—or "profile" ratings—are academic, extracurricular, personal, and athletic. ADD18-19; JA3727-29.

The "academic" rating is an assessment of the applicant's grades, test scores, and other typical markers of scholastic achievement, such as winning nationally recognized competitions or awards. The "extracurricular" score is an assessment of the applicant's activities, community service, employment, and family commitments. The "athletic" rating does not significantly factor into admissions decisions unless the applicant is a recruited athlete, which is denoted by a rating of "1." The academic, extracurricular, and athletic ratings are largely objective measures of performance that are based on detailed scoring instructions issued by Harvard's Admissions Office. ADD19-20; JA3727-29.

In contrast to the other profile ratings, the "personal" rating is largely subjective. Admissions officers are given almost no instructions on how to evaluate the applicant's "personal qualities." ADD20; JA3728-29. Until 2019, the sole instructions were to provide a "1" for "outstanding," a "2" for "very strong," a "3" for "generally positive," and a "4" for "bland or somewhat negative or immature." *Id.* According to Harvard, the personal rating measures "integrity, helpfulness, courage, kindness, fortitude, empathy, self-confidence, leadership ability, maturity, or grit." ADD20. "Attempts to define and to identify precise elements of character, and to determine how much weight they should be given in the admissions process, require discretion and judiciousness," according to Harvard. ADD25.

Each applicant is also assigned "school support" ratings, which are Harvard's admissions officers' assessments of written guidance counselor reports and teacher recommendations. ADD21; JA3729. Nearly all Harvard applicants also have an alumni interview.[1] The alum will rate the applicant in four categories: academic, extracurricular, personal, and overall. ADD13-15. But only the alumni interviewer's "overall" and "personal" scores are recorded on the applicant's summary sheet—the two to three page document that the Admissions Office assembles for each applicant. ADD14 n.14. The summary sheet is prepopulated with information from the application, including high school, citizenship, test scores, GPA, class rank, profile ratings, and race. ADD22.

Ultimately, each applicant is assigned an "overall" score. A student who is "tops for admission" and "exceptional—a clear admit with very strong objective and subjective support (90+% admission)" should receive a "1" in the overall rating; a student who has "strong credentials but not quite tops (50-90% admission)" should receive a "2"; a student who is a "solid contender … with good credentials and support (20-40% admission)" should receive a "3"; a student who is "neutral" with "respectable credentials" should receive a "4"; and a student who is "negative" with "credentials [that] are generally below those of other candidates" should receive a "5." JA3727. The overall rating is not a formulaic average of the other ratings. Instead, it "reflects the

---

[1] A small percentage of applicants—most of whom are "well-connected," such as legacies and the children of donors—also interview with an Admissions Office staff member. ADD15.

admissions officer's impression of the strength of the application, taking account of all information available at the time the rating is assigned." ADD21.

## B.    Harvard's Use of Race in Admissions

Harvard uses race at each stage of the admissions process. Harvard's use of race begins with recruitment. In deciding who to recruit, Harvard requires some racial groups to perform better academically than others. ADD42-43. African-American and Hispanic students can score as low as 1100 on the PSAT to receive a recruitment letter from Harvard. JA585:15-595:9; JA3741; JA4002-10. White applicants must score at least 1310, while Asian-American applicants from certain regions (called "Sparse Country")—including more than twenty states and cities like Las Vegas, New Orleans, and Phoenix—must score a 1380. *Id.* When asked why Asian Americans from Sparse Country must outperform their white peers, Dean Fitzsimmons testified that Harvard is more interested in recruiting students who "have lived there for their entire lives" than students who "have only lived in the Sparse Country state for a year or two." JA590:24-591:17. Neither Harvard nor the district court tried to justify Dean Fitzsimmons' stereotyping of Asian Americans from Sparse Country as immigrants.

In the admissions process itself, Harvard's official position is that race can be a "tip" for African Americans and Hispanics in assigning the overall rating and in making final admission decisions. ADD21-22. Harvard denies that race infiltrates any other part of its admissions process, including the personal rating. ADD29. The Reading Procedures, however, gave admissions officers no instructions on how to use race in

the admissions process—at least until just before this case went to trial. ADD29-30. And Harvard admits that it "may take race into account, regardless of whether applicants write about that aspect of their backgrounds or otherwise indicate that it is an important component of who they are." ADD13; JA655:14-658:7; JA2503:13-2504:1; JA3282:7-3283:15.

The Admissions Office also uses race to create the "target number" of how many applicants to admit. Harvard has enough housing to enroll roughly 1,660 students each year and it calculates the target number to admit based on the projected yield rate. ADD26; JA904:8-14; JA1394:21-1395:14; JA4147-53. But Harvard breaks down the yield rate by race, predicting the final racial makeup of the admitted class and calculating a yield rate specific to each racial group. Harvard predicts the final racial makeup of the class based, in part, on the number of students of each race who were admitted the year before. JA1394:21-1395:14; JA1889:3-10; JA3718; JA4150-51. If these projections are off, Harvard may have an over-enrollment problem. ADD26; JA603:21-25; JA3719-20.

To monitor the racial makeup of the class, Dean Fitzsimmons and Director McGrath regularly review "one pagers." JA1031:2-5. A one-pager is a document that compares select admissions statistics (including racial percentages) for the current year and the prior year. JA1867:24-1868:10; *e.g.*, JA4142-44. Because Harvard's database is updated daily, a one-pager provides a real-time assessment of the current racial makeup of the tentatively admitted class. JA1871:14-1875:4. Admissions leaders receive one-pagers during key points of the admissions cycle, including after the early-action

deadline, at the start of early-action full committee meetings, during early-action full committee meetings, the day after the regular-decision application deadline, the day before the start of regular-decision full committee meetings, and during regular-action full committee meetings. ADD27-28; JA1873:12-1883:10; JA4113-46; JA5982.

On the first day of full committee meetings, Fitzsimmons announces the racial makeup of the tentatively admitted class, which he reads from a one-pager. ADD28; JA1392:21-24; JA2000:2-16; JA2516:22-2518:14. He also reads aloud the admissions statistics by race of the prior year's class. ADD28; JA2516:22-2518:14; JA4011; JA4090; *compare* JA4084 *with* JA4135. If a racial group is "underrepresented," Fitzsimmons and McGrath will "talk about it and give it attention." JA1393:9-16; ADD28. As those meetings progress and decisions are made, Fitzsimmons and McGrath continue to review the updated one-pagers, JA1879:2-1880:15; *e.g.*, JA4138-4141, and Fitzsimmons continues to share the racial breakdown with the full committee, JA2516:22-2518:14; ADD28. If the process is nearing the end and the share of a certain racial group is "surprisingly or notably underrepresented," the full committee will "go back and look at those cases." JA1394:6-20. The goal is "to make sure that we're not having a dramatic drop-off in some group who we did at a certain level with last year." JA1396:4-1397:10; ADD30.

Last, race is a factor in the "lop" process—the winnowing of the admitted class to the target number. ADD26; ADD28. Applicants removed in this process are recorded on a "lop list," which includes only five datapoints: name, legacy status, race,

recruited-athlete status, and eligibility for financial aid. *Id.*; JA2048:12-2049:1; JA4156. Before the full committee begins lopping, Fitzsimmons again reads aloud the admitted class's current racial composition. JA2113:1-2117:16; JA4011; *compare* JA4089 *with* JA4138-41. Fitzsimmons' focus on the class's racial makeup continues until final decisions are made. JA4011; JA4138-46. As the admissions process neared conclusion in 2013, for example, Fitzsimmons asked for "a one pager and his ethnic stats" because the full committee needed to lop 28 more applicants. JA1868:22-1871:1; JA4112.

## C.    Harvard's Treatment of Asian-American Applicants

The mistreatment of Asian Americans by elite universities has been a source of deep concern for nearly fifty years. The United States has a long history of racial discrimination against Asian Americans. Today, Asian Americans continue to face explicit and implicit racial bias. ADD46; JA2105:17-25; JA2569:2-6; JA2589:20-2590:15; JA2694:24-2695:24. They are stereotyped as timid, quiet, shy, passive, withdrawn, one dimensional, hard workers, perpetual foreigners, and "model minorities." ADD46; JA2585:20-2590:15; JA3287:3-6; JA4498. "These views" naturally "translate into barriers in the workplace, where Asian Americans are the group least likely to be promoted to management even in industries where they are employed in high numbers, such as the tech industry." JA2590:3-15.

Asian Americans applying to college have not escaped this discrimination. JA2583:11-2589:13. Many universities, like Harvard, have employed some form of a "personal rating" that "hinges on the subjective evaluation of a particular admissions

officer." JA2584:12-2585:1. This subjective rating has been the "downfall of many Asian-American applicants" because "many admissions officers believe in stereotypes that work against Asian-American applicants." JA2585:2-11. Many believe that Asian Americans are "over-represented," have "narrow career interests" like medicine and science, are "passive," and are "model minorities." JA2583:11-2589:13. Asian Americans are told that "writing an Asian immigrant story" is "overdone, … not compelling, not interesting." JA2734:13-21.

Before this litigation, two investigations were conducted into whether Harvard discriminates against Asian Americans. In 1990, the Department of Education's Office of Civil Rights (OCR) investigated the issue. During that investigation, admissions officers admitted to using race in assigning the personal rating. ADD43; JA4489-90. OCR also found that some admissions officers were deploying "recurring characterizations attributed to Asian-American applicants," such as "quiet, shy, science/math oriented, and hard workers." ADD43-44; JA4498-99. One admissions officer, for example, described an Asian-American applicant as "quiet and of course wants to be a doctor." JA4498. Yet, in the aftermath of OCR's findings, Harvard "did not hold a meeting or otherwise require that its admissions officers modify their evaluation practices to avoid actual stereotyping or the appearance of stereotyping." ADD44-45. Harvard instead warned admissions officers to be more careful because their "comments may be open to public view at a later time." JA1116:20-1117:17. Harvard claimed that no remedial action was needed because OCR found that Asian-

American applicants were not suffering an admissions penalty as a result of its blatant racial stereotyping. JA688:17-692:2.

The issue arose again in December 2012, when the New York Times covered a study that accused Harvard of discriminating against Asian Americans. ADD31-32. To mount a defense, Harvard tasked its Office of Institutional Research (OIR) to examine the issue. OIR created two reports in early 2013. The first report found "evidence that Asians are disadvantaged in the admissions process," JA1963:19-1964:9, and determined that the personal rating was "driv[ing] some of the demographic differences we see" between whites and Asian Americans, JA3742-58; ADD33 n.28. OIR's second report addressed the following question: "Does the admissions process disadvantage Asians?" JA3761; JA785:20-786:5.

Based on its statistical analysis, OIR found that preferences for legacies and athletes could not explain why white applicants were faring better in admissions than Asian Americans. JA3790-93; JA791:24-800:25; JA1981:13-1982:8; JA1990:20-1995:8. OIR concluded that "with current data, we explain a significant amount of the variation in admission, but further details (especially around the personal rating) may provide further insight." JA3794. OIR suggested possible "next steps" of sharing the report with President Faust and other members of Harvard's leadership, as well as acquiring "more data" to do further research into these issues. JA3794-96. OIR presented this report to Dean Fitzsimmons and other members of the Admissions Office. ADD35; JA784:13-785:10. Fitzsimmons did not show the report to anyone else in the

Admissions Office; nor did he discuss it with any other Harvard leaders. ADD35; JA803:9-804:14; JA829:8-830:19.

A few weeks later, however, Fitzsimmons asked OIR to investigate a different issue: whether OIR could provide "empirical proof" that Harvard gives an admissions "tip" to low-income applicants. JA810:23-817:4. Fitzsimmons was pleased with draft reports showing that Harvard did, in fact, give a tip to low-income applicants, and was "excited to share [the findings] more broadly." JA4522. The final draft, which OIR shared with Fitzsimmons, also found statistically significant proof that being Asian American is "negatively correlated with the admission rate." JA1174:9-1177:19; JA3957. OIR warned against "sharing these results publicly" because "there are demographic groups that have negative effects." JA3957. Asian Americans were the only "demographic group" with "negative effects." JA3957; ADD37; JA844:8-845:11. Fitzsimmons shared OIR's finding on low-income applicants with admissions staff, but he did not share OIR's findings about Asian Americans with anyone. JA846:10-847:23.

Shortly thereafter, OIR sent Fitzsimmons a follow-up report that, once again, showed a statistically significant negative coefficient for being Asian American—*i.e.*, a "negative chance of getting into Harvard by virtue of being Asian." JA853:10-18; JA3969-70; ADD38. Fitzsimmons once again did nothing. Fitzsimmons did not ask any questions, request additional work from OIR on this subject, or share OIR's findings with anyone else. ADD38; JA854:24-855:2; JA859:18-24.

D.    **The Experts**

Both parties retained "highly respected economists" to model Harvard's admissions system. ADD50 n.40. SFFA retained Professor Peter Arcidiacono of Duke University; Harvard retained Professor David Card from the University of California. The experts' models were built using an electronic database, maintained by Harvard, that records extensive information about each applicant. ADD50-51. This database includes the gender, race, high school, city, state, GPA, test scores, academic rating, athlete rating, extracurricular rating, personal rating, overall rating, alumni interviewer ratings, guidance counselor ratings, teacher ratings, and whether the applicant is an ALDC (*i.e.*, a recruited athlete, a child of Harvard alum, a child of Harvard faculty or staff, or on the Dean's/Director's Interest List),[2] a first-generation college student, economically disadvantaged, or received a waiver of the application fee. JA2185:16-2186:12; JA6010. Harvard produced this data for each applicant over a six-year period (the admissions cycles from the Class of 2014 to the Class of 2019). ADD50-51.

Professors Arcidiacono and Card—both of whom the district court found to be "very well-qualified experts"—agreed on certain modeling choices and disagreed on others. ADD50. They disagreed, *inter alia*, on whether race and disadvantaged status should be interacted; whether ALDCs should be excluded given the enormous "tip"

---

[2] The Dean's/Director's Interest List is a list that identifies applicants, primarily the children of donors and alumni, who receive special attention from Fitzsimmons. ADD22; JA733:10-735:3; JA740:21-742:18; JA4109.

they receive; whether the data should be pooled or evaluated on a year-by-year basis; and whether variables for parental occupation, intended career, and staff interviews should be excluded because of flaws in the dataset. ADD75.

Importantly, though, the experts agreed that any variable influenced by race "should generally be excluded from regression models." ADD63. "Including such variables dilutes the implied effect of race by allowing that effect to be partially captured by the race-influenced variable itself." ADD63. Hence, the experts agreed "that the academic and extracurricular variables should be included in the admissions outcome model," since neither expert found that race influences the academic or extracurricular rating. ADD73. The experts also agreed that "the overall rating should not be included because Harvard acknowledges that it is directly affected by racial identity." ADD73.

The experts disagreed, however, about the personal rating. Both experts found that Asian-American applicants outperform all other racial groups in academics and extracurriculars but finish last in the personal rating. ADD57-62. After measuring the effect of race on the personal rating and concluding that it's influenced by race, Professor Arcidiacono excluded the personal rating from his model. ADD75-76; JA2253:17-2254:11; JA2257:20-2258:11; JA6006-07. Professor Card assumed, based primarily on a conversation with Dean Fitzsimmons, that race did not influence the personal rating. JA3222:19-3223:1. Taking Harvard's denial of wrongdoing as conclusive evidence of nondiscrimination, Professor Card assumed that Asian Americans deserved lower personal ratings and included those ratings in his model.

14

ADD75-76. This dispute is pivotal because, even using all of Professor Card's other modeling choices, once the personal rating is excluded his own model shows statistically significant discrimination against Asian Americans. ADD79; JA2317:24-2318:2; JA3149:1-3152:3; JA3223:2-13.

### E.     Harvard's Response to SFFA's Lawsuit

Before this lawsuit, Asian-American enrollment at Harvard had stagnated. Indeed, the racial makeup of the admitted class varied little year to year. In the decade before SFFA filed suit (Harvard Classes of 2009-2018), the share of African-American admits was always between 10.0% and 11.7% (a 1.7% range); the share of Hispanic admits was always between 8.2% and 11.5% (a 3.3% range); and the share of Asian-American admits was always between 17.5% and 20.3% (a 2.8% range). JA5744. Things changed after SFFA filed suit. The only year in the dataset where Asian-American applicants are admitted at a higher rate than whites, to a statistically significant degree, is the Class of 2019—the first admissions cycle "after the allegations of discrimination that led to this lawsuit emerged." ADD54 n.44; JA2230:10-2231:1; JA6007.

Harvard also made changes to its admissions policies in response to this lawsuit. In the decades preceding this lawsuit, Harvard had not made any meaningful changes to its Reading Procedures. ADD18; *compare* JA3728 *with* JA4489. Just weeks before the trial began, however, the Admissions Office made three significant changes. JA3291:4-3295:2; J4565-4605. First, the Reading Procedures now provide substantially more guidance on the criteria for assigning the personal rating. *Compare* JA4590 *with*

JA3728. Second, the Procedures now provide written guidance—for the first time ever—on how and when admissions officers should use race: admissions officers "should not take an applicant's race or ethnicity into account in making any of the ratings other than the overall rating"; race should be "considered **only** as one factor among many"; and "an applicant's race or ethnicity should not be considered in assigning the personal rating." JA4588-90. Third, the Procedures warn admissions officers not to downgrade applicants for personality traits often associated with Asian-American stereotypes: "It is important to keep in mind that characteristics not always synonymous with extroversion are similarly valued. Applicants who seem to be particularly reflective, insightful, and/or dedicated should receive higher personal ratings as well." JA4590. These changes were designed to "make sure that [Harvard's] admissions officers do not fall prey to implicit bias or racial stereotyping about Asians." JA3287:18-3288:23.[3]

---

[3] SFFA only learned of these changes when a Harvard witness mentioned them (seemingly by accident) while testifying at trial. Until then, every Harvard witness had denied that any changes were needed—let alone that changes had already been made. For example, when asked whether he could "think of anywhere where Harvard provides written guidance telling its admissions officers not to use race or ethnicity in awarding the personal score," Fitzsimmons testified: "I have not seen any written guidance." JA676:2-7. When McGrath was asked "Does it say anywhere in the admissions office, in any written form, training material, memo, email, or any kind of writing down to a Post-it on the coffee maker, that race should not be used in the personal rating? Is it written anywhere?" she testified, in error: "In written form, no." JA1426:19-1427:4. And when asked whether it would be "a good idea to develop written guidance so you could ensure the consistency of people using race in Harvard's admissions process," she testified that she did not "think that the right remedy for that is more written

16

Finally, Harvard only considered abandoning its use of race after being threatened by these allegations of discrimination. Before this controversy, "Harvard had not ... conducted a detailed empirical analysis of the viability of race-neutral alternatives for at least fifteen years." ADD41. "Apparently in response to the prospect of litigation," Harvard "formed a committee to examine race-neutral alternatives to its race-conscious admissions practices (the 'Ryan Committee')." ADD39. "After meeting only a few times," though, the Ryan Committee "disbanded in December 2014, shortly after this lawsuit was filed. No substantive analysis of any race-neutral alternatives examined by the Ryan Committee was entered into evidence." ADD39.

It was not until June 2017—more than two years after this suit was filed—that Harvard formed the Smith Committee to examine "whether race-neutral means, singly or in combination, would enable Harvard to achieve its diversity-related educational objectives." ADD40. The Smith Committee had three members: Dean Smith, Dean Khurana, and Dean Fitzsimmons. It did not collect data, take testimony, or run simulations. JA1765:20-1766:18; J4413-31. It instead "worked with Harvard's attorneys and had access to the analyses done by the experts in this case." ADD41. In a report "drafted by Harvard's attorneys," the Smith Committee found that Harvard did not have any workable race-neutral alternatives. ADD41. The Smith Committee reached

---

guidance." JA1429:7-13. The district court could not reconcile this "seemingly contradictory testimony by various witnesses." ADD5 n.2.

this conclusion even though, under at least one race-neutral alternative,[4] "Harvard could achieve a significant increase in socioeconomic diversity and an increase in the total representation of African American, Hispanic and other [underrepresented minority] students." ADD90; JA1504:2-1505:3; JA5983; JA5988.

## F.    The District Court's Rulings

After SFFA filed this suit, Harvard moved to dismiss for lack of standing. The district court rejected the motion. SFFA met the three-part test for associational standing set forth in *Hunt v. Washington State Apple Advertising Commission*, 432 U.S. 333 (1977). Namely, "SFFA demonstrated that its members included individuals who had standing to pursue this litigation on their own, that this litigation was germane to SFFA's purpose, and that the injunctive relief SFFA seeks does not require the participation of those members in this lawsuit." ADD94; ADD174-90. In the alternative, the court held that SFFA would satisfy the "indicia-of-membership test" that Harvard incorrectly argued should apply to this case. ADD188-90.

During discovery, Harvard moved for partial judgment on the pleadings on two of SFFA's counts—Count IV, which alleged that Harvard does not use race to fill only the last few seats in the class; and Count VI, which alleged that Harvard should not be

---

[4]   SFFA presented race-neutral alternatives through its expert, Richard Kahlenberg. A double Harvard graduate, Kahlenberg is a senior fellow at The Century Foundation, a non-profit, progressive research organization. He has spent decades studying and writing about race-neutral alternatives, affirmative action, and college admissions, and is one of the leading experts on these subjects. JA1465:15-1470:10.

allowed to use race at all. The motion was granted. First, in the district court's view, "Count IV presumes a legal requirement for race-conscious admissions … that the case law does not support." ADD173. Second, "SFFA acknowledges that ruling on Count VI would require this Court to overrule Supreme Court precedent, something it decidedly cannot do." ADD172.

After the close of discovery, the parties each moved for summary judgment. The district court rejected both motions. Harvard argued that the case was moot "on the grounds that the individual members on whom SFFA's standing rests are no longer eligible to transfer to Harvard or lack 'any serious interest in doing so.'" ADD150. The district court disagreed. ADD150-51. SFFA had at least two members who had been rejected for admission, remained eligible for transfer, and were interested in applying for transfer if Harvard eliminated its use of race in admissions. ADD151-53. Nor did Harvard offer any other "evidence that warrants reconsideration" of SFFA's associational standing. ADD153. On the merits, the court held that the four remaining counts—discrimination against Asian Americans, racial balancing, using race as more than a "plus" factor, and failing to employ workable race-neutral alternatives—all raised material factual disputes that required a trial. ADD153-71.

On September 30, 2019, the district court issued post-trial findings of fact and conclusions of law. The district court—for the third time—ruled that SFFA has Article III standing and again rejected Harvard's argument that the dispute "had become moot." ADD94. The district court then ruled for Harvard on the merits. The court

19

recognized that Harvard needed to prove that its use of race satisfied strict scrutiny. ADD103. But the court found that Harvard had met its burden. ADD131.

First, the district court found that Harvard had not intentionally discriminated against Asian Americans. ADD122-27. The court recognized that Asian Americans were admitted at lower rates than whites despite receiving higher academic and extracurricular scores. ADD53; ADD55; ADD124. The court acknowledged that Asian Americans received the lowest scores in the personal rating among all races, ADD55, and that there was a "a statistically significant and negative relationship between Asian American identity and the personal rating," ADD69; ADD124. And, using its own "preferred model," the court found a "statistically significant" penalty in admissions outcomes against Asian Americans. ADD79. It nevertheless found no intentional discrimination because any biases affecting Harvard's ratings were "unintentional," any Asian-American penalty was "slight," and the non-statistical evidence did not sufficiently "corroborate" the statistical inference of discrimination. ADD79; ADD122-26.

Second, the district court held that Harvard had not engaged in racial balancing. ADD112-16. The court did not dispute that the percentage of each racial group in Harvard's admitted classes fell within narrow ranges in recent years; and it acknowledged that Harvard's leaders diligently tracked the racial composition of the admitted class through one-pagers to ensure racial representation did not differ dramatically from year-to-year. ADD28-29. Yet the court found no racial balancing

because there was "considerable year-to-year variation" in admit rates by race since 1980, ADD81-82, and because using one-pagers to achieve "goals for minority enrollment" was permissible under Supreme Court precedent, ADD115-16.

Third, the district court found that Harvard had not used race as more than a "plus" factor. Even though the court concluded that race was "determinative" for "45% of all admitted African American and Hispanic applicants" and that "eliminating consideration of race would cause … the numbers of African American and Hispanic students at Harvard [to] fall by nearly 1,000 students," ADD84, this use of race was deemed "modest," ADD119. And because Harvard's use of race was not "rigid and mechanical" like a "quota system" or a system that "assign[ed] some specified value to applicants' racial identity," it was permissible. ADD117.

Finally, the court found that Harvard had not failed to adopt workable race-neutral alternatives. ADD119-22. The court did not dispute that a race-neutral alternative existed that would increase the number of underrepresented minorities on campus, increase the number of Asian Americans, and dramatically increase socioeconomic diversity. ADD90. Yet the court rejected this alternative because it would require Harvard to stop giving preferences to legacies, applicants on the Dean's/Director's Interests List (children of donors), and the children of faculty and staff; there would be a one-percentile decrease in average SAT scores; and African-American admits would drop from 14% of the class to 10% of the class. ADD90-92.

21

## SUMMARY OF ARGUMENT

The judgment below should be reversed for four main reasons.

*First*, Harvard imposes a racial penalty on Asian-American applicants. The district court's own "preferred" model proves that Harvard's admissions system has a disproportionately negative effect on Asian Americans vis-à-vis similarly situated white applicants—a penalty that cannot be explained on non-discriminatory grounds under strict scrutiny. But not only did the court find this penalty, Harvard did too. Harvard was aware that admissions officers racially stereotyped Asian-American applicants and, by 2013, it knew that those applicants were suffering an admissions penalty. But Harvard took no steps to remedy the problem—at least not until it was sued. It was then that the admissions numbers for Asian Americans began to sharply rise, Harvard revised its procedures to address racial stereotyping and its broader misuse of race in the personal rating, and Harvard suddenly feigned interest in race-neutral alternatives. It turns out, then, that the suspicions of Asian-American alumni, students, and applicants were right all along: Harvard today engages in the same kind of discrimination and stereotyping that it used to justify quotas on Jewish applicants in the 1920s and 1930s. The district court's decision to accept Harvard's self-serving testimony over this mountain of evidence was reversible error.

*Second*, Harvard engages in racial balancing. It is quite unusual for a civil-rights defendant to confess. Yet Harvard admits that its goal is to ensure racial balance, and that it has engineered the admissions process to achieve that illegal pursuit. Moreover,

Harvard's system for achieving racial balance is straightforward. Harvard uses "ethnic stats" and other tools to manipulate the process so that it achieves essentially the same racial balance year over year. If, at the end of the admissions process, Harvard has admitted more (or less) of any racial group than it did the year before, then it reshapes the class to remedy the problem. This transparent regime of racial balancing flagrantly violates settled law.

**Third**, Harvard is not using race in any way that *Bakke* or *Grutter* permits. Here too, Harvard's brazenness is astonishing. It confesses no interest in critical mass or the kind of broader diversity (including religious) that the Supreme Court has endorsed as a compelling interest. Harvard is adamant that racial preferences are indispensable to its mission—and always will be. What Harvard will not admit (but the record shows) is that race is not only an important factor, it is the dominant consideration in admitting Hispanics and African Americans. Harvard understands that, under Supreme Court precedent, racial preferences must have a logical stopping point and can be no more than a "plus" factor in admissions. It just does not seem to care. The district court misread precedent in allowing race to be used in this heavy-handed, limitless way.

**Fourth**, Harvard has not considered race-neutral alternatives in good faith—let alone availed itself of workable alternatives. It is hard to fathom a less serious, after-the-fact charade. Harvard never even considered race-neutral alternatives until this litigation was threatened. It then formed a committee, quickly abandoned it, and then formed a new committee at the close of discovery that, almost comically, was comprised

23

of only three people and whose work was almost entirely outsourced to outside litigation counsel. And when that committee was presented with alternatives to racial preferences—alternatives that would make Harvard more racially, socioeconomically, and geographically diverse—the response was cynical, self-serving, and self-contradictory. The whole process, in sum, was emblematic of Harvard's approach to racial preferences: dissembling from top to bottom to ensure that it can continue to racially engineer its admissions process in contravention of Title VI.

## STANDARD OF REVIEW

"When a district court conducts a bench trial, its legal determinations engender de novo review. This includes its determinations about the sufficiency of the evidence." *United States v. 15 Bosworth Street*, 236 F.3d 50, 53 (1st Cir. 2001). The district court's findings of fact are reviewed for clear error. *Id.* But "that respect does not mean blind allegiance.... Moreover, when a trial court bases its findings of fact on an inaccurate appraisal of controlling legal principles, the rationale for deference evaporates entirely." *Id.* at 53-54. And the district court "may not insulate a decision from plenary review by characterizing a determination of law as a factual finding." *Id.* at 54.

# ARGUMENT

Because Harvard accepts federal funds, it must comply with Title VI. 42 U.S.C. §2000d. Title VI prohibits any racial discrimination that, if done by a state actor, would violate the Equal Protection Clause. *Gratz v. Bollinger*, 539 U.S. 244, 276 n.23 (2003).[5] The "central mandate" of the Equal Protection Clause is "racial neutrality." *Miller v. Johnson*, 515 U.S. 900, 904 (1995). "'Distinctions between citizens solely because of their ancestry are by their very nature odious to a free people.'" *Rice v. Cayetano*, 528 U.S. 495, 517 (2000). There are no "benign" racial classifications; sorting people by race always "'stimulate[s] our society's latent race consciousness,'" "'delay[s] the time when race will become … truly irrelevant,'" and "perpetuat[es] the very racial divisions the polity seeks to transcend." *Shaw v. Reno*, 509 U.S. 630, 643 (1993); *Adarand Constructors, Inc. v. Pena*, 515 U.S. 200, 227-29 (1995); *Schuette v. BAMN*, 572 U.S. 291, 308 (2014) (opinion of Kennedy, J.). Courts "therefore apply strict scrutiny to *all* racial classifications," *Johnson v. California*, 543 U.S. 499, 506 (2005), including "any admissions program using racial categories or classifications," *Fisher I*, 570 U.S. at 310.

---

[5] Harvard has not "identif[ied] any specific reasons for distinguishing public universities from federally-funded private universities, or explain[ed] how the analytical framework would differ for private versus public litigants." ADD154. That is because precedent recognizes no such distinction. If the prevailing interpretation of Title VI is revisited, SFFA will argue that Title VI is "colorblind" and forbids any use of race by any federally funded school. *Regents of Univ. of Cal. v. Bakke*, 438 U.S. 265, 415-18 (1978) (Stevens, J., concurring in the judgment in part and dissenting in part).

Harvard concedes that its admissions program uses racial classifications, ADD103, so it must satisfy strict scrutiny. "The higher education dynamic does not change the narrow tailoring analysis of strict scrutiny applicable in other contexts." *Fisher I*, 570 U.S. at 314. Harvard thus shoulders a heavy burden. Its admissions system is "'presumptively invalid and can be upheld only upon an extraordinary justification.'" *Shaw*, 509 U.S. at 643-44. "[T]he risk of non-persuasion—operative in all trials—must rest with [Harvard], not with [SFFA]." *United States v. Playboy Entertainment Group, Inc.*, 529 U.S. 803, 818 (2000). That means Harvard needed to prove that its use of race is "narrowly tailored to achieve the only interest … approved in this context: the benefits of … student body diversity." *Fisher I*, 570 U.S. at 314-15. SFFA should have prevailed at trial under this "'most rigid scrutiny.'" *Id.* at 310.[6]

## I.    Harvard penalizes Asian-American applicants.

Harvard violates Title VI if it imposes *any* penalty on Asian Americans because of their race. *Fisher v. Univ. of Tex. at Austin* (*Fisher II*), 136 S. Ct. 2198, 2207 (2016). The district court could not rule out that Asian Americans are penalized in Harvard's admissions process. That should have been the end of the matter, as Harvard bears the burden under strict scrutiny. In all events, the court's finding that Harvard does not

---

[6] Because Count VI challenges Supreme Court precedent, the Court should simply acknowledge that SFFA has preserved it for Supreme Court review. *E.g.*, *United States v. Burghardt*, 939 F.3d 397, 401 (1st Cir. 2019).

discriminate against Asian-American applicants is rife with legal error and is, therefore, unsustainable on appeal.[7]

### A.  The district court's serious doubts about whether Harvard treats Asian Americans fairly means Harvard cannot carry its burden under strict scrutiny.

The district court's own reasoning shows why Harvard's admissions system fails strict scrutiny. There is significant record evidence that being Asian American has a negative effect on an applicant's personal rating, JA2257:20-2258:11; JA6012; JA6005; the applicant's school-support rating, JA2263:17-2264:17; the applicant's overall rating, JA2255:14-18; JA6011; and ultimately the applicant's chance of being admitted to Harvard, JA2277:15-2279:23; JA6016-6022.

The district court was candid that it could not rule out racial discrimination as the cause. As the court explained, "it may be that there is overt discrimination or implicit bias at work to the disadvantage of Asian American applicants." ADD110. More specifically, the district court found that competing "statistical analyses"—one of which found that Harvard discriminates against Asian-American applicants—were "inconclusive" and that "the data does not clearly say what accounts for [the]

---

[7] Because strict scrutiny applies, this Court need not wade into the parties' dispute over whether the pattern-and-practice framework applies to Title VI claims like this one. The district court was incorrect, however, to hold that membership associations like SFFA cannot invoke the pattern-or-practice framework. *Compare* ADD105 n.57 *with Bhd. of Maint. of Way Emps. Div. of the Int'l Broth. of Teamsters v. Ind. Harbor Belt R. Co.*, 2014 WL 4987972 (N.D. Ind. 2014).

difference" in the personal ratings of white and Asian-American applicants. ADD126. It's "possible" that Asian Americans' lower "admissions probability" is the product of racial bias, the court found, and the reason why Asian Americans fare worse than their white peers in the personal rating "has not been fully and satisfactorily explained." ADD80; ADD72. The court similarly found that there "are several conceivable explanations for the disparity" in certain other ratings, including "biased Harvard admissions officers." ADD67.

This analysis is irreconcilable with strict scrutiny. *Fisher I*, 570 U.S. at 311. Given the serious doubts that the district court harbored, Harvard by definition has not "offered sufficient evidence that would *prove* that its admissions program is narrowly tailored to obtain the educational benefits of diversity." *Id.* at 314 (emphasis added). The case should have ended there.

The district court nevertheless sided with Harvard because, in its view, it is "more likely" that non-racial factors caused the observed anti-Asian disparities. ADD72. As explained below, those conclusions were unsupported by the record, legally erroneous, based on speculation, or all three. But that is mostly beside the point. Harvard's admissions system is not subject to rational-basis review, where Harvard wins so long as "'there is any reasonably conceivable state of facts'" supporting its position. *Heller v. Doe ex rel. Doe*, 509 U.S. 312, 320 (1993). This is strict scrutiny. Harvard thus is not entitled to "the benefit of the doubt." *Playboy*, 529 U.S. at 818. If, as here, two "possibilities were 'equally consistent' with the record" or if "the record was 'not clear,'"

Harvard loses. *Id.* at 819. The "burden imposed by [the] strict-scrutiny test" is far too heavy for Harvard to prevail against a claim of racial discrimination based on "'little more than assertion and conjecture.'" *Republican Party of Minn. v. White*, 536 U.S. 765, 781 (2002).

Yet that is what happened. At every critical juncture, the court (like Professor Card) gave Harvard the benefit of the doubt—and it still could not confidently find that Harvard treats Asian Americans fairly. Ruling in Harvard's favor was thus legal error. The point of narrow tailoring, after all, is to ensure there is "little or no possibility" that racial programs are infected with "'illegitimate racial prejudice or stereotype.'" *Grutter v. Bollinger*, 539 U.S. 306, 333 (2003); *accord Wessmann v. Gittens*, 160 F.3d 790, 808 (1st Cir. 1998). Not only did the court fail to dispel this concern, it again affirmatively found that "it may be that there is overt discrimination or implicit bias at work to the disadvantage of Asian American applicants." ADD110. No further judicial inquiry is needed to hold that Harvard's system fails strict scrutiny.

### B.    There is overwhelming statistical evidence that Harvard penalizes Asian-American applicants.

The district court's conclusion that Harvard does not penalize Asian Americans also fails on its own terms. The court correctly recognized that "the statistical evidence is perhaps the most important evidence in reaching a resolution of this case" and that the question of which "variables belong in the admission outcome model are pivotal." ADD50. The district court further understood that one of those modeling disputes was

more important than all the rest combined: "whether the personal rating should be included." ADD63. That is because under *every* regression model—Harvard's, SFFA's, and the district court's "preferred model"—there is a statistically significant admissions penalty against Asian-American applicants relative to white applicants when the personal rating is excluded. ADD79; JA2317:24-2318:2; JA3149:1-3152:3; JA3223:2-13; JA6098.

Whether to exclude the personal rating turns on a straightforward question: Is it influenced by race? ADD63. The district court found "a reasonable econometric basis" for concluding that it is. ADD76. That was an understatement. Since "Harvard did not offer a competing regression model to show that no statistically significant relationship between Asian American identity and the personal rating exists," the court was required to find "that the data demonstrates a statistically significant and negative relationship between Asian American identity and the personal rating assigned by Harvard admissions officers." ADD69. To reject *unrebutted* regression analysis from SFFA's "highly respected" and "well-qualified" expert, ADD50 & n.40, would have been textbook clear error. This statistically significant negative relationship, in turn, "strongly suggest[s] that Asian American as opposed to white racial identity affects an applicant's chances of admission." ADD66. The court needed to look no further than its own factfinding to hold that this robust statistical evidence created an inference of discrimination.

Even if there had not been an econometric model of the personal rating, it is easy to see that this rating is influenced by race. Neither the district court nor Harvard ever provided any explanation—let alone a nonracial one—for why African Americans and Hispanics performed significantly better than whites and Asian Americans on the personal rating, or why the personal rating closely tracks the overall rating (which Harvard *admits* is influenced by race). JA2227:18-2229:12; JA6005-06; ADD55-56. When the distributions for the overall and personal ratings are compared side by side, the shapes are nearly identical: African Americans score the highest in each decile, followed by Hispanics, then whites, then Asian Americans.



JA6006; *see* ADD 61-62.

That race influences the personal rating is plain from these undisputed models, common sense, and Harvard's deafening silence on why it systematically found that African Americans and Hispanics have better personal qualities than other racial groups. Because race influences the personal rating, all agree that it must come out of the model and, once it comes out, all agree that Asian Americans suffer a statistically significant admissions penalty vis-à-vis whites. Yet the district court still, somehow, found Harvard not liable. Its decision to simply shut its eyes to this hard evidence is reversible error.

The district court's mistrust of statistical analysis is a red flag. To be sure, "no model is perfect." ADD63. But statistical analysis rightly plays a leading role in civil-rights litigation. "Discrimination cases using multiple regression analysis are legion." Fed. Judicial Ctr., *Reference Manual on Scientific Evidence* 306 n.5 (3d ed. 2011). As this Court has explained, "regression analysis is a well-recognized and scientifically valid approach to understanding statistical data, and courts have long permitted parties to use statistical data to establish causal relationships." *In re Neurontin Mktg. & Sales Practices Litig.*, 712 F.3d 21, 42 (1st Cir. 2013). When a regression analysis uncovers "a disparity between racial groups" that is "statistically significant," courts will "presume[]" the difference "is attributable to discriminatory bias." *Jones v. Boston*, 752 F.3d 38, 43, 47 n.9 (1st Cir. 2014); *Fudge v. Providence Fire Dep't*, 766 F.2d 650, 658 & nn.8-9 (1st Cir. 1985).

"A statistically significant coefficient may be the result of random variation, omitted variables, or other flaws in the model." ADD65. But those concerns are not

32

always present or a legitimate basis for discounting statistical analysis writ large. As the district court itself explained, statistical significance means that the coefficient—here, the relationship between being Asian American and getting penalized in Harvard's admissions process—"would occur infrequently due to random variation." ADD64. Indeed, a bare finding of statistical significance means "the possibility that the result could have occurred by chance was at most one in 20." *Segar v. Smith*, 738 F.2d 1249, 1262 (D.C. Cir. 1984). Thus, because the models show penalties against Asian Americans that are statistically significant, it is "unlikely that the pattern of results is mere coincidence." *Bridgeport Guardians, Inc. v. Bridgeport*, 933 F.2d 1140, 1147 (2d Cir. 1991).

The district court blamed the "statistical findings" of anti-Asian discrimination on possible "omitted variable biases." ADD111. But "mere conjecture or assertion … that some missing factor" could explain statistical disparities "cannot defeat the inference of discrimination created by plaintiffs' statistics." *Palmer v. Shultz*, 815 F.2d 84, 101 & n.13 (D.C. Cir. 1987); *accord Bazemore v. Friday*, 478 U.S. 385, 404 n.14 (1986). All regression analyses omit variables, *Hemmings v. Tidyman's Inc.*, 285 F.3d 1174, 1188 (9th Cir. 2002) (citing *Bazemore*, 478 U.S. at 400), yet regression analysis remains "the accepted means" for modeling discrimination, *Sobel v. Yeshiva Univ.*, 839 F.2d 18, 35 (2d Cir. 1988); *accord Int'l Bhd. of Teamsters v. United States*, 431 U.S. 324, 339 n.20 (1977). While variables that are "subjective" and unmeasurable cannot be included in a regression analysis, "[t]he law is clear" that their exclusion "is entirely proper." *Segar*,

738 F.2d at 1276. The absence of these variables "will not affect the validity" of the regression analysis unless there is reason to believe they "correlate[] with race." *Id.* at 1277; *accord Sobel*, 839 F.2d at 36.

Harvard never identified what omitted information the personal rating conveys that correlates with race—*i.e.*, Harvard never explained why Asian-American applicants *deserved* lower personal ratings than whites. For good reason. The rating purports to measure "the extent to which an applicant demonstrates character, leadership ability, self-confidence, grit, or other distinctive qualities that might benefit the Harvard community." ADD64. The notion that such qualities correlate with race should be offensive. Moreover, it is without *any* basis in the record. The court found that these qualities are "unrelated to race," ADD64; no Harvard witness testified that Asian Americans lack these qualities as compared to their white, African-American, and Hispanic peers; and alumni interviewers "assign personal ratings of 1 or 2 to ... Asian American and white applicants with a similar frequency," ADD55. That should have ended any debate over omitted variables. *See Mister v. Ill. Cent. Gulf R. Co.*, 832 F.2d 1427, 1431 (7th Cir. 1987) ("We are not about to discount the plaintiffs' statistical work on grounds that the [defendant], with the best access to data, chose not to raise.").

Unfortunately, the district court was willing to postulate that Asian-American applicants to Harvard might "not possess the personal qualities that Harvard is looking for at the same rate as white applicants." ADD109. Apparently, Harvard missed a potentially winning argument by refusing "to overtly argue that Asian American

applicants were actually weaker in personal criteria." ADD110 n.59. The court thought, moreover, that "a partial cause" of the statistical penalties against Asian Americans is they are less "multidimensional[]" than white applicants—that their "disproportionate strength in academics comes at the expense of other skills and traits." ADD58. The district court surmised that "the relationship between race and the personal rating is likely partially reflective of ... characteristics that are correlated with race, and life experiences that are impacted by race." ADD76. In other words, maybe the stereotypes about Asian Americans are true.

      This is unfortunate. The court should have heeded its own warning: "Speculating on how unobserved variables may be influencing the model's implied effect of race on the personal ratings is fraught with difficulty." ADD70 n.48. That is putting it mildly. Courts should "'not accept as a defense to racial discrimination the very stereotype the law condemns.'" *Miller*, 515 U.S. at 920. Any suggestion that the pernicious stereotypes against Asian-American applicants to Harvard are actually true "must … be sustained by meaningful evidence." *Lamprecht v. FCC*, 958 F.2d 382, 393 (D.C. Cir. 1992); *accord Wessmann*, 160 F.3d at 800. Elsewhere, the district court admitted that its generalizations have "little evidentiary support," that Harvard did not "develop" them, and that Asian Americans on the whole "are not inherently less personable than any other demographic group." ADD109; ADD110 n.59; ADD124. Needless to say, it should have stopped there.

The court's speculation that "stereotypes and biases … favor" Asian Americans in the academic and extracurricular ratings is similarly problematic. ADD68. There is no evidence that Harvard "advantaged Asian Americans over whites in the academic rating." ADD72. As the district court itself recognized, the statistical evidence showed that "Asian Americans have traits, *other than their racial identity*, that make them likely to score well in academic and extracurricular ratings." ADD73 (emphasis added). Those traits are, of course, better grades, better test scores, better scores on AP exams, and greater participation in extracurricular activities. JA5991-92; JA5997; JA2203:10-2205:10; JA2211:17-2212:5. Unlike the personal score, there is no mystery why Asian Americans outperform white applicants in these largely objective ratings. The court was wrong to insinuate otherwise.[8]

The district court's pained effort to make high-school teachers and guidance counselors the culprit is also troubling. According to the district court, "a partial cause of the disparity in personal ratings between Asian American and white applicants appears to be teacher and guidance counselor recommendations, with white applicants tending to score slightly stronger than Asian Americans on the school support ratings." ADD56. But, as the court itself explained, "school support ratings can be included in

---

[8] The district court noted that white applicants outperform Asian Americans in the athletic rating. ADD56. But except for recruited athletes, the athletic rating does not play a key role in admissions. ADD59-60; JA2214:23-2215:22; JA5997. Regardless, the statistical models control for any differences in athletic ratings. ADD66-67.

admissions outcome models," and so "any racial effect that impacts admissions decisions … can be controlled for." ADD68. Indeed, the court's "preferred" model included the school-support ratings, ADD67, as did Professor's Arcidiacono's *unrebutted* model of the personal rating, JA2484:21-2585:21. By definition, then, the school-support ratings cannot be responsible for the penalties that Asian Americans suffer in the personal rating and admissions decisions.

The court remained troubled by the school-support ratings because "the stronger high school academic and extracurricular performance of Asian American applicants on average would lead one to expect that those applicants would receive stronger teacher and guidance counselor recommendations than white applicants." ADD56. The court was right to be concerned. It just pointed the finger in the wrong direction. The court assumed that "Asian Americans are presented by guidance counselors and high school teachers as weaker in personal characteristics that Harvard values," ADD68, and that this "apparent race-related or race-correlated difference in the strength of guidance counselor and teacher recommendations is significant," ADD71. The problem is that there was no record evidence substantiating this assertion; it is more speculation. The only record evidence was Professor Arcidiacono's *unrebutted* model of the school-support rating—a rating that is assigned by Harvard—showing that it penalizes Asian-American applicants in the same way as the personal and overall ratings. JA2229:13-21; JA2263:23-2264:17; JA3230:5-21. The court had zero evidentiary basis for accusing

high-school teachers and guidance counselors of making "race-affected inputs to the admissions process" that lowered Asian-American personal ratings. ADD72.

The district court reasoned that any discrimination embedded in school-support ratings must be attributable to the teachers and guidance counselors (not the admissions officers who read those recommendations and assign those scores) because Harvard's witnesses said so. ADD68. Indeed, throughout its opinion, the court pointed to the assurances of Harvard admissions officers proclaiming their innocence as the crucial exonerating evidence. ADD69; ADD125-26.

It is no overstatement to say that crediting this self-serving testimony would undo decades of antidiscrimination law. A defendant's insistence that it does not discriminate, however credible or indignant, is not evidence in its favor; such denials are a given in "this rights conscious era." *Hebert v. Mohawk Rubber Co.*, 872 F.2d 1104, 1115-16 (1st Cir. 1989). Courts understand that civil-rights "violators have learned not to leave the proverbial 'smoking gun' behind.… '[D]efendants of even minimal sophistication will neither admit discriminatory animus [n]or leave a paper trail demonstrating it.'" *Aman v. Cort Furniture Rental Corp.*, 85 F.3d 1074, 1082 (3d Cir. 1996); *accord Rosen v. Thornburgh*, 928 F.2d 528, 533 (2d Cir. 1991); *Segar*, 738 F.2d at 1278-79. A defendant's testimony, the Supreme Court has held "on several occasions," does not weaken a showing of statistically significant discrimination. *Castaneda v. Partida*, 430 U.S. 482, 498 n.19 (1977); *see Teamsters*, 431 U.S. at 343 n.24; *Alexander v. Louisiana*, 405 U.S. 625, 632 (1972); *Turner v. Fouche*, 396 U.S. 346, 361 & n.21 (1970) (collecting cases). If

"such testimony ... were to be accepted as adequate," the command of racial equality "would be but a vain and illusory requirement." *Norris v. Alabama*, 294 U.S. 587, 598 (1935).

One important reason why such denials are not probative is that "unlawful discrimination can stem," not just from "conscious animus," but "from stereotypes and other types of cognitive biases." *Thomas v. Eastman Kodak Co.*, 183 F.3d 38, 59 (1st Cir. 1999); *accord Miller*, 515 U.S. at 928 ("the Fourteenth Amendment forbids" "racial stereotyping"). A court need not find that witnesses are "'perjurers and liars'" to hold the defendant liable for intentional discrimination; "[t]he ultimate question is whether the [plaintiff] has been treated disparately 'because of race,'" which the defendant can do "consciously" or through "unthinking stereotypes or bias." *Thomas*, 183 F.3d at 58. "[S]ince 'unwitting or ingrained bias is no less injurious or worthy of eradication than blatant or calculated discrimination,'" that defendants "'may have been unaware of that motivation, even within themselves, neither alters the fact of its existence nor excuses it.'" *Id.* at 60. Over and over, the district court recognized that one likely explanation for why Asian Americans are penalized in the admissions process is Harvard's "implicit bias." ADD72; ADD80; ADD110; ADD124-25 & n.62; ADD127. But calling the bias "implicit" does not make it legal. This bias remains a form of "'racial prejudice or stereotype'" that strict scrutiny exists to "'smoke out.'" *Adarand Constructors, Inc. v. Pena*, 515 U.S. 200, 226 (1995).

The district court's remaining reasons for rejecting the clear implications of the statistical evidence are similarly unpersuasive. In the district court's view, that the anti-Asian penalty was not "uniform across the Asian American applicant population" undermined SFFA's case. ADD 75 n.49. For instance, because the tiny fraction of Asian Americans who received the enormous ALDC preference did not suffer a penalty at the point of admission, the court found it unlikely that Harvard engaged in *any* discrimination against Asian Americans. ADD77.

But "it is unlikely today that an actor would explicitly discriminate under all conditions." *Woods v. Greensboro*, 855 F.3d 639, 651 (4th Cir. 2017). Because discrimination today often takes the form of stereotyping and implicit bias, it is unsurprising that minorities who break the stereotypical mold often receive better treatment. Williams, *The Social Psychology of Stereotyping*, 7 Emp. Rts. & Emp. Pol'y J. 401, 418-19 & n.94, 434-35 (2003); Rhode, *The Subtle Side of Sexism*, 16 Colum. J. Gender & L. 613, 620 (2007). A defendant who "'does not discriminate against the class … as a whole'" but discriminates against only "'a subclass'" is liable all the same. *Chadwick v. WellPoint, Inc.*, 561 F.3d 38, 43 (1st Cir. 2009); *accord Franchina v. Providence*, 881 F.3d 32, 53 (1st Cir. 2018). In other words, a defendant does not have a "license to discriminate against some … merely because he favorably treats other members of the [same] group." *Connecticut v. Teal*, 457 U.S. 440, 455 (1982); *e.g., Phillips v. Martin Marietta Corp.*, 400 U.S. 542 (1971); *Lam v. Univ. of Hawai'i,* 40 F.3d 1551, 1562 (9th Cir. 1994). The Court need look no further than Harvard's own differential treatment of Jewish

40

applicants based on legacy status to know that this kind of discrimination has historical precedent. *Supra* 2-3; ADD54 n.45; Karabel, *The Chosen: The Hidden History of Admission and Exclusion at Harvard, Yale, and Princeton* 98-99 (2005). And regardless, the "subclass" of Asian-American applicants that Harvard penalized here is hardly a subclass at all; it is approximately *98% of all Asian-American applicants*. ADD16 n.16.

The court's focus on the absence of "any individual applicant whose admissions decision was affected" by the penalty was also legal error. ADD111. SFFA identified statistically significant discrimination against Asian Americans in a dataset spanning thousands of applicants across six years. The court's unwillingness to believe that Harvard imposed a racial penalty unless SFFA could produce a specific Asian-American applicant who lost out to a specific white applicant reflects "a superstitious hostility to statistical proof, a preference for the intuitionistic and individualistic over the scientific and systemic." *Segar*, 738 F.2d 1278. Further, *every* Asian American who applied to Harvard suffered an injury under Title VI when, as the district court itself recognized in affirming SFFA's standing, they were forced to compete in Harvard's discriminatory process. *Parents Involved in Cmty. Sch. v. Seattle Sch. Dist. No. 1*, 551 U.S. 701, 719 (2007). There was no need to prove that any particular individual would have been admitted or denied in the absence of discrimination because it is irrelevant to the legal inquiry. *Ne. Fla. Chapter of Assoc. Gen. Contractors of Am. v. Jacksonville*, 508 U.S. 656, 666 (1993). "The 'injury in fact' ... is the denial of equal treatment resulting from the imposition of the barrier, not the ultimate inability to obtain the benefit.'" *Id.*

41

Finally, the district court concluded that, even if there is a statistically significant anti-Asian penalty, it is "slight" and therefore not persuasive evidence of discrimination. ADD79. But there is nothing slight about this penalty. Even under the district court's "preferred" regression model, the penalty that Harvard imposed against Asian Americans has sharply reduced their presence on campus, by more than 150 students over a six-year period. JA3149:4-3152:3; JA5743-44. In no other circumstance would discrimination of this magnitude be brushed off as insignificant. It should not be tolerated here either, in the name of diversity or otherwise. ADD125. The "harm" of racial discrimination "cannot be ignored simply because it serves what others … perceive as a greater good." *Comfort v. Lynn Sch. Comm.*, 418 F.3d 1, 31 (1st Cir. 2005) (en banc) (Selya, J., dissenting), *abrogated by Parents Involved*, 551 U.S. 701.[9]

The district court's emphasis on the penalty's supposed "slightness" also fails to tell the whole story. It does not take into account the *unrebutted* evidence that Asian Americans are also penalized in the overall rating and school-support ratings. ADD61-

---

[9] Any suggestion that Harvard's interest in student-body diversity could justify imposing a penalty on Asian-American applicants vis-à-vis white applicants has no basis in law. It is one thing to argue that non-favored groups (*i.e.*, whites and Asian-Americans) must bear some burden in the name of enrolling more African Americans and Hispanics—so long as Harvard complies with strict scrutiny and the burden is not "undu[e]." *Grutter*, 539 U.S. at 341. It is another to argue that Asian Americans must bear a penalty in order to enroll enough *white* applicants. Hegemonic "racial antagonism" against Asian Americans by the white majority could "never" be legal. *Korematsu v. United States*, 323 U.S. 214, 216 (1944), *abrogated by Trump v. Hawaii*, 138 S. Ct. 2392 (2018).

62; ADD74. It fails to take into account that, because the chance of admission to Harvard is incredibly small for any applicant, ADD53, the effect of any penalty is substantially magnified, JA2279:16-23. And the "marginal effect" of discrimination, ADD65, increases as applicants become more competitive for admission. JA6110-12. Asian-American applicants are disproportionately competitive for admission compared to other racial groups. ADD48. Collectively, these factors make the penalty far more onerous than the district court suggested.

### C.    The ample non-statistical evidence confirms that Harvard penalizes Asian-American applicants.

That Harvard imposes a statistically significant penalty on Asian Americans is sufficient to rule for SFFA. But if any doubts remain, SFFA presented other evidence that corroborates its statistical case. All of SFFA's evidence "should … be considered as cumulative." *Segar*, 738 F.2d at 1278.

***First***, Harvard's admissions criteria—and the personal rating in particular—are highly subjective. "Selection processes which rely on subjective judgments, despite the corralling by objective standards, provide the opportunity for … intentional discrimination" and "'lend themselves to racially discriminatory abuse.'" *Pegues v. Miss. State Emp't Serv. of Miss. Emp't Sec. Comm'n*, 699 F.2d 760, 765 (5th Cir. 1983); *Hamilton v. Geithner*, 666 F.3d 1344, 1356 (D.C. Cir. 2012). Indeed, "Asian-Americans have been particularly vulnerable to stereotyping and exclusion when subjective selection criteria center on 'leadership' and 'people skills,'" "in part because they are widely stereotyped

as 'passive,' and 'unassertive,' as well as 'more equipped for technical than people-oriented work.'" *Chin v. Runnels*, 343 F. Supp. 2d 891, 907 (N.D. Cal. 2004). This opportunity for abuse in the subjectivity of Harvard's process "magnifie[s]" the inference of intentional discrimination from SFFA's statistical evidence. *Bolton v. Murray Envelope Corp.*, 493 F.2d 191, 195 (5th Cir. 1974); *accord Castaneda*, 430 U.S. at 497.

**Second**, Harvard ignored warnings that its admissions process discriminates against Asian Americans. It took *no* remedial steps after OCR found that admissions officers had racially stereotyped Asian-American applicants. Similarly, Dean Fitzsimmons took no action after OIR found that Harvard was penalizing Asian Americans in the admissions process. Even assuming OIR's findings were "preliminary" or "incomplete," that Fitzsimmons did not even *investigate* them further is strong evidence of intentional discrimination. *Lowery v. Circuit City Stores, Inc.*, 206 F.3d 431, 439 (4th Cir. 2000). The idea that Fitzsimmons was confident that there was no discrimination "based on the relatively modest negative Asian coefficient ... given the limitations of OIR's model," ADD38, is self-refuting. As this case's battle of experts shows, Harvard's admissions process raises sophisticated statistical issues. Fitzsimmons could not eyeball regression studies from Harvard economists raising red flags about an Asian-American penalty and instantly determine that there was no problem warranting *any* follow up—not a question, not a phone call, not a meeting.

**Third**, Harvard's "post filing conduct" suggests "the existence of prior discrimination." *Rich v. Martin Marietta Corp.*, 522 F.2d 333, 346 (10th Cir. 1975); *accord*

*Liberty Envtl. Sys., Inc. v. Cty. of Westchester*, 2000 WL 1341403, at *2 (S.D.N.Y. 2000) ("post-event evidence" can "demonstrate intentional discrimination" and "can prove 'highly probative' of a pre-existing illegal custom or practice"). Notably, the number of Asian Americans admitted to Harvard spiked the first cycle after SFFA filed suit. ADD80. Harvard also amended its reading procedures, for the first time in decades, and disclosed those amendments by accident after its lead witnesses gave "seemingly contradictory testimony." ADD5 n.2. So while Harvard was vehemently denying any stereotyping of Asian Americans or any need for clearer reading procedures, it was adopting new reading procedures to remedy the exact allegations SFFA had raised. These post-litigation steps "to conceal past discrimination" are telltale signs of prior unlawful intent. *Adorno v. Port Auth.*, 258 F.R.D. 217, 233 (S.D.N.Y. 2009); *accord Cypress v. Newport News Gen. & Nonsectarian Hosp. Ass'n*, 375 F.2d 648, 658 (4th Cir. 1967); *Patterson v. Strippoli*, 639 F. App'x 137, 143 (3d Cir. 2016).

\*     \*     \*     \*

Harvard imposes racial penalties on Asian Americans vis-à-vis white applicants. The record shows that those penalties are statistically significant and occur in the parts of Harvard's process that are subjective and invite anti-Asian stereotyping; that Harvard knew about this problem for years and did nothing about it; and that Harvard tried to cover its tracks after SFFA filed suit. If this case involved hiring discrimination against African Americans by a Fortune 500 company, a court would easily rule for the plaintiff on this record. A court should not rule differently because this case involves admissions

discrimination against Asian Americans by Harvard—and it especially should not rule for Harvard on grounds that suggest the antiquated stereotypes about Asian Americans may be true.

## II.    Harvard engages in racial balancing.

Harvard must prove that it does not engage in "racial balancing"—a practice that is "'patently'" illegal. *Fisher I*, 570 U.S. at 311. Racial balancing occurs when the university's goal is to achieve "'some specified percentage of a particular [racial] group'" or some "racial/ethnic 'mix' that it consider[s] desirable." *Grutter*, 539 U.S. at 329; *Wessmann*, 160 F.3d at 798. Universities can pay "'[s]ome attention to numbers,'" *Grutter*, 539 U.S. at 336, but that attention must be "tied" to a "pedagogic concept of the level of diversity needed to obtain the asserted educational benefits." *Parents Involved*, 551 U.S. at 726. "[W]orking forward from some demonstration of the level of diversity that provides the purported benefits" is permissible; "working backward to achieve a particular type of racial balance" violates Title VI. *Id.* at 729.

Harvard works backward to obtain preordained racial balance. Over the ten-year period between *Grutter* and this suit (Harvard Classes of 2009-2018), the percentage of the class by race always fell within a narrow range:

|  | African-American Share of Class | Hispanic Share of Class | Asian-American Share of Class |
|---|---|---|---|
| Class of 2009 | 10.5% | 8.2% | 17.6% |
| Class of 2010 | 10.4% | 9.7% | 17.6% |
| Class of 2011 | 10.5% | 9.9% | 19.5% |
| Class of 2012 | 10.0% | 8.9% | 19.1% |
| Class of 2013 | 10.4% | 10.6% | 17.5% |
| Class of 2014 | 11.1% | 8.8% | 19.8% |
| Class of 2015 | 11.6% | 11.1% | 19.3% |
| Class of 2016 | 10.0% | 9.3% | 20.3% |
| Class of 2017 | 11.4% | 10.4% | 19.5% |
| Class of 2018 | 11.7% | 11.5% | 19.1% |

JA5744. The district court offered no explanation for why it swept in admissions statistics from as far back as 1980. ADD81. The conclusion that there is too much "year-to-year variation" for Harvard to be engaging in racial balancing, *id.*, is incorrect. SFFA is not required to show that Harvard has pursued racial balance with laser-point precision. *Eisenberg ex rel. Eisenberg v. Montgomery Cty. Pub. Sch.*, 197 F.3d 123, 131 (4th Cir. 1999).

It is also clear that Harvard is engaged in racial balancing from the way its process works. Harvard uses "one-pagers" to closely monitor the racial makeup of the class throughout the process, and it uses the "lop list" to course correct as the admitted class is finalized. *Supra* 7-9. Harvard does this—at least in part—to ensure it does not miss the racial "targets" that keep the class from becoming overenrolled. Setting racial targets and then engineering the admissions process to make sure you hit them is, contra the district court, "the functional equivalent of a quota." ADD116.

Harvard, in short, does not monitor its racial numbers because it is "working forward" to achieve educational benefits. *Parents Involved*, 551 U.S. at 729. Harvard's admissions personnel admitted under oath that they engaged in what would be called racial balancing under any reasonable understanding of that concept. Specifically, rather than "holistic evaluation" and "whole person review," ADD115, Harvard testified that it focuses on the "ethnic stats," it will not tolerate "a dramatic drop-off in some group [from] last year," and it will thus "go back and look at those cases" again if a racial group is "underrepresented." JA1394-97; JA1868-71; JA4112. Unlike in *Grutter*, then, Harvard *does* give race "more or less weight based on the information contained in [the one-pagers]." 539 U.S. at 336. "This is, by definition, racial balancing." *Eisenberg*, 197 F.3d at 131.

## III.    Harvard does not use race as a mere plus to achieve overall diversity.

Harvard does not use race when there are "only a few places left to fill" in the class. *Bakke*, 438 U.S. at 324 (opinion of Powell, J.). Nor does it use race to enroll a "critical mass" of minority students. *Grutter*, 539 U.S. at 329; *see* ADD166. Harvard nevertheless claims its use of race comports with *Bakke* and *Grutter*. That is incorrect. *Grutter* clarified that schools can consider the race of "each and every applicant," but only if they do so in a limited fashion. *Grutter*, 539 U.S. at 334. Race cannot be considered for "'its own sake,'" but only as a means to obtain the "educational benefits" of "student body diversity." *Id.* at 329-30. Race cannot be the "defining feature" of the application; it can be only a "'plus' in a particular applicant's file." *Id.* at 337, 334. And

"all" race-based admissions systems must be temporary: they cannot rest on logic "[e]nshrining a permanent justification for racial preferences," and they must impose "'reasonable durational limits.'" *Id.* at 342. Harvard violates each of these rules.

### A.    Harvard does not pursue student-body diversity.

The burden is on Harvard to "establish[] that its goal of diversity is consistent with strict scrutiny"—*i.e.*, to "demonstrate with clarity that its 'purpose or interest is both constitutionally permissible and substantial.'" *Fisher I*, 570 U.S. at 309-11. The "only interest" that can justify the use of race in admissions is "student body diversity." *Id.* at 314-15. Student-body diversity is not "racial diversity"; it is a "'far broader array of qualifications and characteristics' in which race [i]s but a single element." *Id.* at 311; *Parents Involved*, 551 U.S. at 740. Accordingly, Harvard must give "serious consideration" to "all the ways" an applicant might contribute to diversity and ensure that "all" such factors are "meaningfully considered alongside race." *Grutter*, 539 U.S. at 337. It cannot "limit in any way the broad range of qualities and experiences that may be considered valuable." *Id.* at 338.

While the district court noted that Harvard *says* it pursues all forms of diversity, ADD108, Harvard's process works differently "in practice." *Fisher I*, 570 U.S. at 313. An applicant's religion, for example, fundamentally shapes his background, experiences, culture, and his views on God, morality, the meaning of life, and how to treat others. Far more than his skin color, an applicant's chosen faith is often "'the most fundamental part of his identity.'" *Hassan v. N.Y.C.*, 804 F.3d 277, 302 n.14 (3d Cir. 2015). Yet when

applicants self-report their religion, Harvard *blinds itself* to this information. JA1383:3-1384:22; JA1389:22-1390:7. Similarly, Harvard claims to value socioeconomic and geographic diversity, yet both are sorely missing; northeasterners and wealthy students dominate the campus. JA1475:16-25. For example, nearly one-third of Harvard students come from households with an income above $150,000 a year, JA1681:2-1686:4, and there are 23 times as many wealthy students on campus as poor students, JA1474:16-22; *accord* JA1699:2-1702:2.

Contrast how Harvard approaches race. Unlike socioeconomics and geography, Harvard never misses its racial diversity goals. *Supra* 7-9, 47. And while Harvard blinds itself to applicants' faith but believes it will still obtain a religiously diverse class, Harvard obsesses over applicants' race. Harvard awards a giant racial preference to *every* applicant who checks the box for "Hispanic or Latino" or "Black or African-American"—regardless whether they "write about that aspect of their backgrounds or otherwise indicate that it is an important component of who they are." ADD13. In fact, Harvard does not even verify whether applicants are really the race that they check. JA3723. There's only one reason to run admissions this way: because the goal is to get the right racial numbers, not to "examine[]" the "file of a particular [minority] applicant … for his potential contribution to diversity." *Bakke*, 438 U.S. at 317 (Powell, J.). This "single-minded focus on ethnic diversity hinders rather than furthers attainment of genuine diversity." *Wessmann*, 160 F.3d at 798 (cleaned up).

### B.    Harvard places too much weight on race.

To satisfy narrow tailoring, Harvard must prove that it uses race "flexibly as a 'plus' factor in the context of individualized consideration of each and every applicant." *Grutter*, 539 U.S. at 334; *see Fisher I*, 570 U.S. at 311-12. Even if race is not used mechanically and "does not operate as a quota," an admissions program fails strict scrutiny if "race is decisive in practice." *Grutter*, 539 U.S. at 336; *Gratz*, 539 U.S. at 272 n.19. In other words, race can be only "a 'factor of a factor of a factor' in the holistic-review calculus." *Fisher II*, 136 S. Ct. at 2207. Universities can give "greater 'weight' to race than to some other factors," but race cannot be "the defining feature" of an application or "the predominant factor" that decides whether an applicant gets in. *Grutter*, 539 U.S. at 335, 337, 320; *id.* at 393 (Kennedy, J., dissenting).

Race predominates at Harvard. In absolute terms, race is "determinative" for at least "45% of all admitted African American and Hispanic applicants," or "nearly 1,000 students" over a four-year period. ADD84; *see* JA2363. This is not "a small portion of admissions decisions." *Fisher II*, 136 S. Ct. at 2212. Ignoring momentarily that schools are supposed to be *decreasing* their use of race over time, the size of Harvard's racial preferences dwarf the size of Michigan Law School's preferences in 2000 and Texas's preferences in 2008. *Grutter*, 539 U.S. at 320 (race determinative for 25% of under-represented minorities); *Fisher II*, 136 S. Ct. at 2237 (Alito, J., dissenting) (race determin-ative for "15 African-American students and 18 Hispanic students"). If Harvard's tip is "modest," ADD119, it's difficult to fathom what an immodest tip would look like.

51

Race predominates in relative terms as well. For students who have a real shot at getting into Harvard—essentially the top quarter of applications—the boost for being African American is comparable to getting a 1 on the academic, extracurricular, or personal rating. JA6112. These "1" ratings are incredibly rare; less than one half of one percent of applicants receive them. JA4527, 4530. But Harvard equates having the right skin color with authoring "original scholarship," obtaining "near-perfect scores and grades," and winning "national-level" awards. JA3727-28. Harvard also uses race to take noncompetitive applicants and make them competitive. An Asian American in the fourth lowest academic decile has virtually no chance at Harvard, but an African American in that decile has a higher chance of admission than an Asian American in the *top* decile:

### Admit Rates by Race/Ethnicity and Academic Decile

| Academic Decile | White | Asian American | African American | Hispanic | All Applicants |
|---|---|---|---|---|---|
| 10 | 15.3% | 12.7% | 56.1% | 31.3% | 14.6% |
| 9 | 10.8% | 7.6% | 54.6% | 26.2% | 10.4% |
| 8 | 7.5% | 5.1% | 44.5% | 22.9% | 8.2% |
| 7 | 4.8% | 4.0% | 41.1% | 17.3% | 6.6% |
| 6 | 4.2% | 2.5% | 29.7% | 13.7% | 5.6% |
| 5 | 2.6% | 1.9% | 22.4% | 9.1% | 4.4% |
| 4 | 1.8% | 0.9% | 12.8% | 5.5% | 3.3% |
| 3 | 0.6% | 0.6% | 5.2% | 2.0% | 1.7% |
| 2 | 0.4% | 0.2% | 1.0% | 0.3% | 0.5% |
| 1 | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% |

ADD60-62; JA6008-09. These "racial groups" are operating "on separate admissions tracks." *Grutter*, 539 U.S. at 334.

"Among the non-academic factors that correspond to diversity," moreover, "*no single factor is worth more*" for African Americans than race. *Johnson v. Bd. of Regents of Univ. of Ga.*, 263 F.3d 1234, 1257 (11th Cir. 2001). The only bigger factor that the district court could find is Harvard's "tip" for recruited athletes. ADD118. But even assuming Ivy League schools recruit athletes to improve student-body diversity (recent scandals notwithstanding), those recruits account for less than 1% of all applicants. JA5989. And recruited athletes do not receive a "tip"; their admission is virtually guaranteed. JA5989; JA2190:21-2192:12. For everyone else, including most African-American and Hispanic applicants, race is the predominant factor driving Harvard's admissions process.

### C.    Harvard's use of race has no end point.

The Supreme Court has been emphatic that "all" race-based admissions policies "must have a logical end point." *Grutter*, 539 U.S. at 342. Racial classifications cannot rest on a "permanent justification" that could "'justify' race-based decisionmaking essentially limitless in scope and duration." *Id.*; *Richmond v. J.A. Croson Co.*, 488 U.S. 469, 498 (1989). Cases like *Grutter* permit race-based admissions "to enrich the educational experience of students," and "this goal will be achieved at some point." *United States v. Bd. of Educ. of Piscataway*, 832 F. Supp. 836, 850 (D.N.J. 1993), *aff'd sub nom. Taxman v. Bd. of Educ. of Piscataway*, 91 F.3d 1547 (3d Cir. 1996). Harvard cannot claim that it uses race to achieve "the educational benefits of diversity writ large"; its "goals" must be

"sufficiently measurable," not "elusory or amorphous." *Fisher II*, 136 S. Ct. at 2211. And Harvard must "indicate that [its use of race] will end when diversity is achieved." *Piscataway*, 832 F. Supp. at 850; *accord Quinn v. Boston*, 325 F.3d 18, 37 (1st Cir. 2003) ("[C]ontinued resort to race-based preferences … after the time when [the goal] was achieved fails … strict scrutiny.").

The district court's comparison of Harvard's goals to the ones approved in *Fisher* and *Grutter*, ADD106-07, breaks down. The Supreme Court found that the universities in those cases had a logical stopping point for their use of race because they were trying to achieve a "critical mass"—a sufficient number of underrepresented minorities to alleviate racial isolation, break down racial stereotypes, and promote cross-racial understanding. *Grutter*, 539 U.S. at 329; *Fisher I*, 570 U.S. at 301; *Fisher II*, 136 S. Ct. at 2211. But Harvard does not use race to achieve a "critical mass" of minority students— the only logical stopping point that the Supreme Court has ever endorsed. JA3710-11. Harvard has never articulated another "sufficiently measurable" yardstick that ensures its use of race will end. *Fisher II*, 136 S. Ct. at 2211. When asked to identify one at trial, it came up empty. JA660:4-10; JA1750:12-23. Yet strict scrutiny requires Harvard to "define" its goals, to "determine what degree of racial diversity … is sufficient" to meet them, and to articulate some "idea of when such a level [i]s reached." *Taxman*, 91 F.3d at 1564; *Lehman v. Yellow Freight Sys., Inc.*, 651 F.2d 520, 527 (7th Cir. 1981).

Tellingly, Harvard admits it has not decreased its use of race since 2003. JA695:8-11. If Harvard truly hasn't scaled back its racial preferences in seventeen years,

then one of two things must be true: either racial preferences are not helping Harvard make progress toward its goals, or its diversity goals are too "elusory or amorphous" to be objectively "measur[ed]." *Fisher II*, 136 S. Ct. at 2211. Or, even more likely, Harvard has no plans to ever abandon racial preferences because it believes race should always be a relevant factor in admissions. The problem for Harvard is that the Supreme Court feels differently. The "'acid test'" of race-based admissions is "'their efficacy in eliminating the need for any racial or ethnic preferences at all.'" *Grutter*, 539 U.S. at 343. Harvard's admissions program fails that most basic metric.

Harvard's refusal to place a durational limit on its use of race cements its endless nature. A "termination point" ensures that "'the deviation from the norm of equal treatment of all racial and ethnic groups is a temporary matter, a measure taken in the service of the goal of equality itself.'" *Id.* at 342. This "durational requirement" commands "sunset provisions in race-conscious admissions policies *and* periodic reviews to determine whether racial preferences are still necessary to achieve student body diversity." *Id.* (emphasis added). Yet Harvard refuses to impose a "sunset" on its use of race. JA3709. It won't even accept the Supreme Court's proposed sunset of 2028. *Grutter*, 539 U.S. at 343. Harvard, accordingly, is missing "a keystone of a narrowly tailored plan." *Detroit Police Officers Ass'n v. Young*, 989 F.2d 225, 228 (6th Cir. 1993); *see Lehman*, 651 F.2d at 528.

## IV.  Harvard disregards race-neutral alternatives.

To withstand strict scrutiny, a university's use of race must be "'necessary'" to achieve "the educational benefits of diversity." *Fisher I*, 570 U.S. at 312. Race is not necessary if a "race-neutral alternative" is available—*i.e.*, if the university "could achieve sufficient diversity without using racial classifications." *Id.* Because race can be used "only 'as a last resort,'" *Parents Involved*, 551 U.S. at 735, schools must consider race-neutral alternatives "before turning to racial classifications," *Fisher I*, 570 U.S. at 312. The university must prove it "consider[ed]" race-neutral alternatives "serious[ly]" and in "good faith." *Grutter*, 539 U.S. at 339; *Fisher II*, 136 S. Ct. at 2211. Strict scrutiny also requires the "reviewing court" to conclude, based on a "searching" review, that "no workable race-neutral alternatives would produce the educational benefits of diversity." *Fisher I*, 570 U.S. at 312. "Workable" does not mean perfect; it means a race-neutral alternative would produce the benefits of diversity "'about as well and at tolerable administrative expense.'" *Id.*

Harvard has workable race-neutral alternatives. JA1491:15-1505:18; JA5983-88. SFFA's "Simulation D," for example, would have Harvard increase its tip for low-income students and eliminate its tips for the children of alumni, donors, faculty, and staff. *Id.* This would slightly increase the number of underrepresented minorities on campus, increase the number of Asian Americans, and drastically increase socioeconomic diversity:







JA1504:2-1505:18; JA5983; JA5988; JA5789 (Kahlenberg's Simulation 7).

As Harvard is the richest university in the world, JA1514:7-24, this alternative would not be an "'[in]tolerable administrative expense.'" *Fisher II*, 136 S. Ct. at 2208. Harvard could afford the additional financial aid, JA1514:7-1516:25; JA3708, and there is no evidence that individuals will not teach at, donate to, or otherwise support Harvard if their children no longer receive an admissions advantage, JA1481:8-17; JA2787:7-2791:11. Nor would SFFA's alternative prioritize "one characteristic" of diversity "above all others." *Fisher II*, 136 S. Ct. at 2213. The increased preference for low-income students would be only half the size of Harvard's preference for athletes. JA1499:15-19. And it would create the socioeconomic diversity that Harvard currently lacks.

Simulation D projects that the percentage of Harvard's class that would be from an economically advantaged background would decline from 88% to 51%. ADD91; ADD5983; ADD5988.

The district court nevertheless rejected this alternative because it would not allow Harvard "to reach the level of racial diversity that it believes necessary to achieve its educational mission without significant consequences to the strength of its admitted class." ADD85. That is incorrect. For starters, Harvard does not have a compelling interest in reaching a particular "*level* of *racial* diversity." ADD85 (emphases added). A race-neutral alternative is not unworkable just because it may not achieve the "current degree of diversity within a given class year." ADD83. After all, that would be a quota. What matters is whether the alternative works "about as well" as racial preferences at creating student-body diversity. And that is a much broader concept than racial diversity. SFFA's proposal would, if anything, drastically *increase* student-body diversity at Harvard by creating badly needed socioeconomic diversity and by increasing the total number of underrepresented racial minorities on campus.

Contrary to the ruling below, then, Harvard cannot meet strict scrutiny "merely by declaring" that enrollment of African Americans will drop from 14% percent of the class to 10%. *Croson*, 488 U.S. at 501. Harvard has never "concretely demonstrated" that a four-percentage-point decrease in the share of African-American enrollment is "significant in any [educational] way, such as students' capacity and willingness to learn," *Wessmann*, 160 F.3d at 800, or that any "negative" effects would not be

outweighed by other "positive" increases in diversity, *Fisher II*, 136 S. Ct. at 2215. In fact, the Smith Committee's report never even mentions this decrease as a basis for rejecting Simulation D. JA4413-31. The Smith Committee thus had no choice but to admit that SFFA's alternative would "achieve a significant degree of racial diversity." JA4426. Indeed, Harvard touted its racial diversity in prior years where the African-American share of the class was at least 4% lower than it is now. JA5744.

The first time Harvard argued otherwise was at trial. JA1844:5-1845:7. But since it had never studied the issue, there was no evidentiary support for the supposition that this decrease in African-American enrollment would keep Harvard from achieving the educational benefits of diversity. The district court was profoundly mistaken in giving credence to Harvard's rank speculation. "Given ... the potential dangers of stereotyping, [this Court] cannot allow generalities emanating from the subjective judgments of [Harvard] officials to dictate whether a particular percentage of a particular racial or ethnic group is sufficient or insufficient for individual students to avoid isolation and express ideas." *Wessmann*, 160 F.3d at 800.

The district court similarly erred in concluding that Simulation D would have "significant consequences to the strength of [Harvard's] admitted class." ADD85. Precedent does not require universities to adopt alternatives that would require a "dramatic sacrifice of ... academic quality"—for example, a "lottery system" or "decreasing the emphasis for all applicants on ... GPA and [test] scores." *Grutter*, 539 U.S. at 340. But SFFA's alternative requires nothing remotely like that. The average

59

GPA of Harvard's incoming class remains unchanged, and average SAT scores would dip only slightly to the 98th percentile. JA5988. Harvard could implement SFFA's alternative and still admit every applicant with an academic rating of 1. JA1510:11-1512:1. There is no evidence that these minimal changes would undermine Harvard's status as one of the most elite universities in the world.

In fact, when convenient, Harvard itself minimizes the importance of test scores, *e.g.*, ADD25; *Bakke*, 438 U.S. at 321-22 (Powell, J.), and it insists that every student it admits (including many who score below the 98th percentile) is qualified and can succeed on campus, JA1674:18-19; ADD84; JA5478. Harvard also knows that SAT scores would dip under SFFA's proposal not because low-income students are less academically gifted, but because wealthy students likely have advantages that allow them to perform better on standardized tests. JA4430; *see Fisher II*, 136 S. Ct. at 2234 & n.12 (Alito, J., dissenting).[10]

Finally, contrary to the district court's framing, it does not matter what *Harvard* "believes [is] necessary to achieve its educational mission." ADD85. Courts may "not defer" to a university's analysis of race-neutral alternatives. *Fisher I*, 570 U.S. at 312; *see*

---

[10] The district court suggested that SFFA's race-neutral alternative "would pose administrative and staffing challenges" because it would lead to more students pursuing engineering and fewer pursuing the humanities. ADD91. That is misleading. Harvard projected that engineering admits would increase from 13% to 14%, while humanities admits would dip from 15% to 12%. JA5789. These marginal changes obviously would not "require Harvard to expand and contract its academic programs accordingly." ADD91.

*Croson*, 488 U.S. at 501 ("The history of racial classifications in this country suggests that blind judicial deference to [defendants'] pronouncements of necessity has no place"). And unlike Texas, Harvard cannot say that it "tried, and failed," for "seven years" to "increase diversity through enhanced consideration of socioeconomic and other [race-neutral] factors." *Fisher II*, 136 S. Ct. at 2213.

Until this litigation, Harvard had *never* considered race-neutral alternatives. While it might have layered certain race-neutral policies on top of its explicit use of race, Harvard *never* attempted to do what the law requires: consider "whether [it] could achieve sufficient diversity *without* using racial classifications." *Fisher I*, 570 U.S. at 312 (emphasis added); *accord Parents Involved*, 551 U.S. at 735 (that the defendant simultaneously pursued "its goals … through means other than the racial classifications" is not "evidence that it considered alternatives"). That's remarkable. It means that, after *Grutter* clearly instructed universities to consider race-neutral alternatives, Harvard thumbed its nose at the Supreme Court for *fifteen years*.

In short, Harvard has no credibility. The Smith Committee—which convened only after this litigation was filed, was staffed with officials who have a vested interest in the existing admissions program, and who worked closely with the lawyers defending Harvard in this litigation—was never going to admit that Harvard had workable race-neutral alternatives. That would be tantamount to admitting violations of Title VI. And it would be tantamount to confessing that Harvard has never complied with Supreme Court precedents—the same precedents that exalt Harvard as a model. Given these

"political pressures" on Harvard and its longtime refusal to even try race-neutral alternatives, this Court "must take special care as [it] engage[s] in [its] 'most searching examination' of whether racial preferences have been shown to be necessary." *Aiken v. Memphis*, 37 F.3d 1155, 1164 (6th Cir. 1994) (en banc). This "examination will not be undertaken by any other body." *Id.*

## CONCLUSION

The district court's judgment should be reversed.

Respectfully submitted,

*s/ William S. Consovoy*

Adam K. Mortara
BARTLIT BECK LLP
54 W. Hubbard St., Ste. 300
Chicago, IL 60654
(312) 494-4469

John M. Hughes
BARTLIT BECK LLP
1801 Wewatta St., Ste. 1200
Denver, CO 80202
(303) 592-3140

William S. Consovoy
Thomas R. McCarthy
J. Michael Connolly
Cameron T. Norris
CONSOVOY MCCARTHY PLLC
1600 Wilson Blvd., Ste. 700
Arlington, VA 22209
(703) 243-9423
will@consovoymccarthy.com

Patrick Strawbridge
CONSOVOY MCCARTHY PLLC
10 Post Office Sq., 8th Fl.,
PMB #706
Boston, MA 02109
(617) 227-0548

*Counsel for Appellant Students for Fair Admissions, Inc.*

## CERTIFICATE OF COMPLIANCE

This brief complies with this Court's order granting SFFA's motion to file an oversized brief because it contains 14,986 words, excluding the parts that can be excluded. This brief also complies with Rule 32(a)(5)-(6) because it has been prepared in a proportionally spaced face using Microsoft Word 2016 in 14-point Garamond font.

Dated: February 18, 2020    _s/ William S. Consovoy_

## CERTIFICATE OF SERVICE

I filed this brief via the Court's ECF system, which will electronically notify the

following:

William F. Lee
Felicia H. Ellsworth
Andrew S. Dulberg
Elizabeth Connell Mooney
Joseph H. Mueller
WILMER CUTLER PICKERING
HALE AND DORR LLP
60 State Street
Boston, MA 02109
Tel: (617) 526-6687
Fax: (617) 526-5000
william.lee@wilmerhale.com
felicia.ellsworth@wilmerhale.com
andrew.dulberg@wilmerhale.com
elizabeth.mooney@wilmerhale.com
sarah.frazier@wilmerhale.com
joseph.mueller@wilmerhale.com

Debo P. Adegbile
WILMER CUTLER PICKERING
HALE AND DORR LLP
7 World Trade Center
250 Greenwich Street
New York, NY 10007
Tel: (212) 295-6717
Fax: (212) 230-8888
debo.adegbile@wilmerhale.com

Seth P. Waxman
Paul R.Q. Wolfson
Danielle Conley
Brittany Amadi
WILMER CUTLER PICKERING
HALE AND DORR LLP
1875 Pennsylvania Ave. NW
Washington, D.C. 20006
Tel: (202) 663-6800
Fax: (202) 663-6363
seth.waxman@wilmerhale.com
paul.wolfson@wilmerhale.com
danielle.conley@wilmerhale.com
brittany.amadi@wilmerhale.com
daniel.winik@wilmerhale.com

Ara B. Gershengorn
HARVARD UNIVERSITY
OFFICE OF THE GENERAL COUNSEL
1350 Massachusetts Ave, Ste 980
Cambridge, MA 02138-3826
ara_gershengorn@harvard.edu

Dated: February 18, 2020                    _s/ William S. Consovoy_

64

**ADDENDUM**

| __Document__ | __Page #__ |
|---|---|
| Findings of Fact and Conclusion of Law (Doc. 672) | ADD1 |
| Final Judgment (Doc. 673) | ADD13 |
| Memorandum and Order on Cross-Motions for Summary Judgment (Doc. 566) | ADD132 |
| Memorandum and Order Granting Motion for Partial Judgment on the Pleadings (Doc. 325) | ADD172 |
| Memorandum and Order Denying Motion to Dismiss (Doc. 324) | ADD174 |

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| STUDENTS FOR FAIR ADMISSIONS, INC., | * | |
| | * | |
| Plaintiff, | * | |
| | * | |
| v. | * | |
| | * | Civil Action No. 14-cv-14176-ADB |
| PRESIDENT AND FELLOWS OF | * | |
| HARVARD COLLEGE (HARVARD | * | |
| CORPORATION), | * | |
| | * | |
| Defendant. | * | |

**FINDINGS OF FACT AND CONCLUSIONS OF LAW**

## Table of Contents

I. INTRODUCTION ................................................................................................ 4

II. PROCEDURAL HISTORY .............................................................................. 4

III. FINDINGS OF FACT: DIVERSITY, ADMISSIONS PROCESS, AND LITIGATION ........ 6

   A. Diversity at Harvard ..................................................................................... 6

      1. Harvard's Interest in Diversity ............................................................... 6

      2. Admissions Office's Efforts to Obtain a Diverse Applicant Pool .............. 8

   B. The Admissions Process ............................................................................... 11

      1. The Application .................................................................................... 12

      2. Alumni and Staff Interviews ................................................................. 13

      3. Application Review Process ................................................................... 16

         i.    Admissions Office and Personnel .............................................. 16

         ii.   Reading Procedures .................................................................. 18

         iii.  Committee Meetings and Admissions Decisions ........................ 23

      4. Harvard's Use of Race in Admissions ................................................... 27

   C. Prelude to this Lawsuit ................................................................................. 31

      1. The Unz Article .................................................................................... 31

      2. Analysis by Office of Institutional Research .......................................... 32

         i.    Mark Hansen's Admissions Models ........................................... 32

         ii.   Low-Income Admissions Models ............................................... 35

      3. The Ryan Committee ............................................................................ 38

      4. The Khurana Committee ....................................................................... 39

      5. The Smith Committee ........................................................................... 40

IV. FINDINGS OF FACT: NON-STATISTICAL EVIDENCE OF DISCRIMINATION .......... 41

   A. Sparse Country ............................................................................................. 41

   B. The OCR Report ........................................................................................... 43

   C. More Recent Allegations of Stereotyping and Bias ...................................... 45

V. FINDINGS OF FACT: STATISTICAL ANALYSIS .......................................... 50

   A. Sources of Statistical Evidence ..................................................................... 50

   B. Admission Rates and Ratings by Race .......................................................... 53

   C. Descriptive Statistics .................................................................................... 57

      1. Professor Card's Multidimensionality Analysis ..................................... 57

      2. Professor Arcidiacono's Academic Index Decile Analysis ...................... 60

D. Overview of Logistic Regression Models........................................................ 62

E. Regression Models of School Support, Profile, and Overall Ratings............................ 67

    1. Relationship Between Race and School Support Ratings ........................................ 67

    2. Relationship Between Race and Personal Ratings .................................... 68

    3. Regression Models of the Academic, Extracurricular, and Overall Ratings.............. 73

F. Regression Models of Admissions Outcome ..................................................... 74

G. Absence of Statistical Support for Racial Balancing or Quotas ...................................... 80

VI. FINDINGS OF FACT: RACE-NEUTRAL ALTERNATIVES ............................................. 83

A. Eliminating Early Action .............................................................. 85

B. ALDC Tips....................................................................................... 86

C. Augmenting Recruiting Efforts and Financial Aid ................................................... 87

D. Increasing Diversity by Admitting More Transfer Students....................................... 88

E. Eliminating Standardized Testing ................................................................. 88

F. Place-Based Quotas ................................................................. 89

G. SFFA's Proposed Combinations of Various Race-Neutral Alternatives........................ 90

VII. CONCLUSIONS OF LAW ............................................................ 92

A. Overview .......................................................................... 92

B. SFFA Has Standing.......................................................................... 93

C. The Supreme Court and Race-Conscious Admissions .................................................. 94

D. Harvard's Admission Program and Strict Scrutiny ...................................... 102

    1. Compelling Interest ....................................................... 106

    2. Narrowly Tailored ................................................................. 107

E. Count II:  Harvard Does Not Engage in Racial Balancing ............................................ 112

F. Count III: Harvard Uses Race as a Non-Mechanical Plus Factor................................ 116

G. Count V:  No Adequate, Workable, and Sufficient Fully Race-Neutral Alternatives Are Available .................................................................. 119

H. Count I: Harvard Does Not Intentionally Discriminate................................................. 122

VIII. CONCLUSION ............................................................ 127

BURROUGHS, D.J.

## I.     INTRODUCTION

Plaintiff Students for Fair Admissions, Inc. ("SFFA") alleges that Defendant President

and Fellows of Harvard College ("Harvard") discriminates against Asian American applicants in

the undergraduate admissions process to Harvard College in violation of Title VI of the Civil

Rights Act of 1964, 42 U.S.C. §§ 2000d *et seq.* ("Title VI").[1]  Harvard acknowledges that its

undergraduate admissions process considers race as one factor among many, but claims that its

use of race is consistent with applicable law.

## II.     PROCEDURAL HISTORY

On November 17, 2014, SFFA initiated this lawsuit by filing a complaint that alleged that

Harvard violates Title VI by intentionally discriminating against Asian Americans ("Count I"),

using racial balancing ("Count II"), failing to use race merely as a "plus" factor in admissions

decisions ("Court III"), failing to use race merely to fill the last "few places" in the incoming

freshman class ("Count IV"), using race where there are available and workable race-neutral

alternatives ("Count V"), and using race as a factor in admissions ("Count VI").  [ECF No. 1

¶¶ 428–505].  SFFA seeks declaratory judgment, injunctive relief, attorneys' fees, and costs.  Id.

at 119.  On February 18, 2015, Harvard filed its answer, in which it denied any liability.  See

[ECF No. 17].  On April 29, 2015, several prospective and then-current Harvard students filed a

motion to intervene.  [ECF No. 30].  Although the Court denied the motion to intervene, it

---

[1] There is considerable variation in the terminology individuals use to describe their racial and
ethnic identities.  This opinion uses the terms Hispanic, African American, Asian American, and
white to describe the four racial or ethnic identities that account for the majority of applicants to
Harvard because those are the terms the parties have used in litigating this case.  The term Asian
American, as opposed to Asian, is used because SFFA alleges that Harvard discriminates against
United States citizens who identify as Asian American.  Where "Asian" alone is used, this
generally reflects the language used by others in their own analyses which are referred to herein
and may include Asian applicants who would not identify as Asian American.

allowed the students to participate in the action as *amici curiae* (friends of the court). Students for Fair Admissions, Inc. v. President & Fellows of Harvard Coll., 308 F.R.D. 39, 51–53 (D. Mass.), ECF No. 52, aff'd, 807 F.3d 472 (1st Cir. 2015).

On September 23, 2016, Harvard moved (1) to dismiss the lawsuit for lack of standing and (2) for judgment on the pleadings as to Counts IV and VI. [ECF Nos. 185, 187]. On June 2, 2017, the Court found that SFFA had the associational standing required to pursue this litigation, because it was an organization whose membership included Asian Americans who had applied to Harvard, been denied admission, and were prepared to apply to transfer to Harvard. Students for Fair Admissions, Inc. v. President & Fellows of Harvard Coll. (Harvard Corp.), 261 F. Supp. 3d 99, 111 (D. Mass. 2017), ECF No. 324. On the same date, the Court granted Harvard's motion for judgment on the pleadings and dismissed Counts IV and VI, namely the failure to use race only to fill the last few places in the incoming freshman class and the use of race as a factor in admissions. Students for Fair Admissions, Inc. v. President & Fellows of Harvard Coll. (Harvard Corp.), No. 14-CV-14176-ADB, 2017 WL 2407254, at *1 (D. Mass. June 2, 2017), ECF No. 325.[2]

Following the conclusion of discovery, on June 15, 2018, the parties filed cross motions for summary judgment on the four remaining counts, [ECF Nos. 412, 417], which the Court denied on September 28, 2018. Students for Fair Admissions, Inc. v. President & Fellows of Harvard Coll., 346 F. Supp. 3d 174, 180 (D. Mass. 2018), ECF No. 566. The case proceeded to trial on Counts I (intentional discrimination), II (racial balancing), III (failure to use race merely

---

[2] Although discovery ended on May 1, 2018, [ECF Nos. 363, 364], the Court ordered supplemental document productions during trial when it became apparent that Harvard had modified its admissions procedures to provide admissions officers with more explicit guidance on the use of race despite seemingly contradictory testimony by various witnesses. See [ECF No. 645 at 7:20–19:24].

as a "plus" factor), and V (race-neutral alternatives), and from October 15 through November 2, 2018, the Court heard testimony from eighteen current and former Harvard employees, four expert witnesses, and eight current or former Harvard College students who testified as *amici curiae*. On February 13, 2019, following the parties' submissions of proposed findings of fact and conclusions of law and responses to each other's respective submissions, see [ECF Nos. 619, 620], the Court heard final closing arguments.

The Court now makes the following findings of fact and conclusions of law in accordance with Federal Rule of Civil Procedure 52(a).

## III.    FINDINGS OF FACT: DIVERSITY, ADMISSIONS PROCESS, AND LITIGATION

### A.    Diversity at Harvard

#### 1.    Harvard's Interest in Diversity

It is somewhat axiomatic at this point that diversity of all sorts, including racial diversity, is an important aspect of education. See Brown v. Bd. of Educ., 347 U.S. 483 (1954).[3] The

---

[3] On October 30, 2018, the Court heard testimony from Dr. Ruth Simmons, the current President of Prairie View A&M University. President Simmons was born in a sharecropper's shack on a plantation in Grapeland, Texas. She attended primary and secondary school in a completely segregated environment in Houston, and then Dillard University, an African American institution supported by the Methodist Church in New Orleans. President Simmons was selected to spend her junior year of college at Wellesley, where she studied alongside white students in the United States for the first time. After graduating from Dillard University, President Simmons traveled to France, where she studied as a Fulbright Scholar. She then returned to the United States and earned a Ph.D. from Harvard's Department of Romance Languages and Literatures. President Simmons held positions at Princeton University, Spelman College, and Smith College before becoming President of Brown University. She retired from Brown University after eleven years and returned to Texas, where she worked on nonprofit projects in the Houston area before being persuaded to come out of retirement to serve as the president of Prairie View A&M. President Simmons offered expert testimony on Harvard's interest in diversity. Her testimony and her life story, perhaps the most cogent and compelling testimony presented at this trial, demonstrate the extraordinary benefits that diversity in education can achieve, for students and institutions alike. See [Oct. 30 Tr. 6:11–70:23].

evidence at trial was clear that a heterogeneous student body promotes a more robust academic environment with a greater depth and breadth of learning, encourages learning outside the classroom, and creates a richer sense of community.  See [Oct. 19 Tr. 185:23–187:24; Oct. 23 Tr. 24:13-20, 31:2–34:11, 59:8–14; Oct. 30 Tr. 27:20–28:8].  The benefits of a diverse student body are also likely to be reflected by the accomplishments of graduates and improved faculty scholarship following exposure to varying perspectives.  See [Oct. 30 Tr. 28:9–30:11].

Harvard College's mission, as articulated in its mission statement, is "to educate the citizens and citizen-leaders for our society" and it seeks to accomplish this "through . . . the transformative power of a liberal arts and sciences education."  [DX109 at 1].[4]  In aid of realizing its mission, Harvard values and pursues many kinds of diversity within its classes, including different academic interests, belief systems, political views, geographic origins, family circumstances, and racial identities.  See [Oct. 17 Tr. 182:17–183:7; Oct. 23 Tr. 24:13–20].  This interest in diversity and the wide-ranging benefits of diversity were echoed by all of the Harvard admissions officers, faculty, students, and alumni that testified at trial.  SFFA does not contest the importance of diversity in education, but argues that Harvard's emphasis on racial diversity is too narrow and that the full benefits of diversity can be better achieved by placing more emphasis on economic diversity.  See [ECF No. 620 ¶¶ 216, 231].

Consistent with Harvard's view of the benefits of diversity in and out of the classroom, Harvard tries to create opportunities for interactions between students from different backgrounds and with different experiences to stimulate both academic and non-academic learning.  [Oct. 23 Tr. 39:3–17; Oct. 30 Tr. 25:11–26:6, 27:20–28:8].  As examples, student living assignments, the available extracurricular opportunities, and Harvard's athletic programs

_____

[4] "DX" refers to an exhibit offered by Harvard.

are all intended to promote a sense of community and encourage exposure to diverse individuals and viewpoints.  [Oct. 23 Tr. 39:18–41:23].

Harvard has evaluated and affirmed its interest in diversity on multiple occasions.  See [Oct. 17 Tr. 182:4–14]; see, e.g., [PX302; DX26; DX53].[5]  Most recently, in 2015, Harvard established the Committee to Study the Importance of Student Body Diversity, which was chaired by Dean Rakesh Khurana[6] (the "Khurana Committee").  [Oct. 23 Tr. 34:12–22].  The Khurana Committee reached the credible and well-reasoned conclusion that the benefits of diversity at Harvard are "real and profound."  [PX302 at 17].  It endorsed Harvard's efforts to enroll a diverse student body to "enhance[] the education of [its] students of all races and backgrounds [to] prepare[] them to assume leadership roles in the increasingly pluralistic society into which they will graduate," achieve the "benefits that flow from [its] students' exposure to people of different backgrounds, races, and life experiences" by teaching students to engage across differences through immersion in a diverse community, and broaden the perspectives of teachers, to expand the reach of the curriculum and the range of scholarly interests.  [PX302 at 1–2, 6]; see also [Oct. 23 Tr. 37:14–38:17].  The Khurana Committee "emphatically embrace[d] and reaffirm[ed] the University's long-held view that student body diversity – including racial diversity – is essential to [its] pedagogical objectives and institutional mission."  [PX302 at 22].

        2.    Admissions Office's Efforts to Obtain a Diverse Applicant Pool

Harvard's Office of Admissions and Financial Aid (the "Admissions Office") is tasked with deciding which students to accept to the College and which to reject or waitlist.  [Oct. 15

---

[5] "PX" refers to an exhibit offered by SFFA.

[6] Dean of Harvard College Rakesh Khurana attended SUNY-Binghamton and Cornell University for his undergraduate studies.  He received a Ph.D. in organizational behavior from Harvard University.  [Oct. 22 Tr. 192:17–193:11].

Tr. 64:1–70:8]. Deciding which applicants to admit is challenging given the overall talent and size of the applicant pool. For example, there were approximately 35,000 applications for admission to the class of 2019. [Oct. 17 Tr. 184:2–4]. Harvard, targeting a class size of roughly 1,600 students, admitted only about 2,000 of those applicants, based on its expectation that approximately 80% of admitted students would matriculate. [Id. at 184:22–185:11].[7] Among the applicants for that class, approximately 2,700 had a perfect verbal SAT score, 3,400 had a perfect math SAT score, and more than 8,000 had perfect GPAs. [Id. at 184:14–21]. Clearly, given the size and strength of its applicant pool, Harvard cannot admit every applicant with exceptional academic credentials. To admit every applicant with a perfect GPA, Harvard would need to expand its class size by approximately 400% and then reject every applicant with an imperfect GPA without regard to their athletic, extracurricular, and other academic achievements, or their life experiences. Because academic excellence is necessary but not alone sufficient for admission to Harvard College, the Admissions Office seeks to attract applicants who are exceptional across multiple dimensions or who demonstrate a truly unusual potential for scholarship through more than just standardized test scores or high school grades. [Id. at 181:12–183:7].

To help attract exceptionally strong and diverse annual applicant pools, Harvard engages in extensive and multifaceted outreach efforts. Each year, roughly 100,000 students make it onto Harvard's "search list" through data, including test scores, that the college purchases from ACT[8] which administers the ACT, and the College Board, which administers the PSAT and the SAT.

_____

[7] Harvard admitted 5.8% of applicants to its class of 2017 and 5.7% to its class of 2018. [Oct. 15 Tr. 157:21–25].

[8] The American College Testing Company changed its name to ACT in the 1990s.

[Oct. 15 Tr. 130:2–131:1; Oct. 17 Tr. 146:2–16].  High school students who make the search list receive a letter that encourages them to consider Harvard and may also receive follow-up communications.  See [Oct. 15 Tr. 131:5–134:16; Oct. 17 Tr. 146:3–12; PX55].  Harvard also uses the search list to target students as part of its extensive in-person recruiting efforts, which includes Harvard admissions officers travelling to over 100 locations across the United States to speak with potential applicants and encourage them to consider Harvard.  [Oct. 15 Tr. 131:13–20; Oct. 17 Tr. 146:7–12, 179:8–21].  The search list is also sent to Harvard's "schools committee," which is comprised of more than 10,000 alumni who help recruit and interview applicants and help persuade admitted students to attend Harvard.  [Oct. 15 Tr. 131:21–132:7].

In addition to recruiting students based largely on test scores, Harvard places particular emphasis on communicating with potential low-income and minority applicants whose academic potential might not be fully reflected in their scores.  Since the 1970s, Harvard has recruited minority students, including Asian Americans, through its Undergraduate Minority Recruitment Program ("UMRP").  [Oct. 24 Tr. 95:15–21].  The UMRP writes letters, calls, and sends current Harvard undergraduates to their hometowns to speak with prospective applicants.  [Id. at 95:12–102:3].  The program, led by a full-time director and an assistant director, employs between two and ten Harvard students for most of the year, with twenty-five to thirty students working for the program during its peak season.  [Id. at 201:1–204:22].

Despite these efforts, African American and Hispanic applicants remain a relatively modest portion of Harvard's applicant pool, together accounting for only about 20% of domestic applicants to Harvard each year, even though those groups make up slightly more than 30% of the population of the United States.  See [PX623; DX713]; U.S. Census Bureau, QuickFacts, Census.gov, https://www.census.gov/quickfacts/fact/table/US/RHI225218.  In contrast, Asian

American high school students have accounted for approximately 22% of total applicants in

recent years, although Asian Americans make up less than 6% of the national population.  See

[DX713]; U.S. Census Bureau, QuickFacts, Census.gov,

https://www.census.gov/quickfacts/fact/table/US/RHI225218.

Harvard's recruiting efforts also target low-income and first-generation college students

irrespective of racial identity through a recruiting program that operates in conjunction with the

Harvard Financial Aid Initiative ("HFAI").  Harvard's financial aid program guarantees full

funding of a Harvard education for students from families earning $65,000 or less per year and

also caps contributions at 10% of income for families making up to $150,000 per year.  [Oct. 24

Tr. 102:10–104:19; PX316 at 6].  Harvard, through the HFAI recruitment program, employs

students who return to their hometowns and visit high schools to talk about the affordability of

Harvard and other colleges with need-blind admissions programs.  [Oct. 24 Tr. 144:1–22].

Today, more than half of Harvard students receive need-based aid.  [Id. at 150:3–6].

## B.    The Admissions Process

Several Harvard admissions officers testified generally about reviewing application files

as well as about their review of specific files.  The Court credits this testimony.  They each

described a time-consuming, whole-person review process where every applicant is evaluated as

a unique individual.  See, e.g., [Oct. 17 Tr. 205:6–223:10; Oct. 24 Tr. 174:19–175:23]; see also

[DD1].[9]  Admissions officers attempt to make collective judgments about each applicant's

personality, intellectual curiosity, character, intelligence, perspective, and skillset and to evaluate

each applicant's accomplishments in the context of his or her personal and socioeconomic

circumstances, all with the aim of making admissions decisions based on a more complete

---

[9] "DD" refers to demonstrative evidence presented by Harvard.

understanding of an applicant's potential than can be achieved by relying solely on objective criteria.  [Oct. 16 Tr. 16:15–22; Oct. 17 Tr. 182:17–183:7, 209:16–223:10]; see, e.g., [Oct. 18 Tr. 22:9–48:4; DX293].

### 1.    The Application

Students apply to Harvard either through the early action program or the regular decision program.[10]  All applications are reviewed in the same way regardless of whether a student has applied for early action or regular decision.  [Oct. 18 Tr. 15:5–10]; see [PX1].  The Admissions Office may accept, reject, or waitlist applicants, or, in the case of early action applicants, defer them into the regular decision applicant pool.  [Oct. 18 Tr. 124:14–125:9].  Students who apply for early action are admitted at a higher rate than regular decision applicants.  [Oct. 25 Tr. 242:19–243:17].

Students apply to Harvard by submitting the Common Application or the Universal College Application.  [Oct. 17 Tr. 186:1–10; Nov. 1 Tr. 27:13–19].  A complete application generally includes standardized test scores, high school transcript(s), information about extracurricular and athletic activities, intended concentration and career, a personal statement, supplemental essays, teacher and guidance counselor recommendations, and other information about the applicant, including high school and personal and family background, such as place of birth, citizenship, disciplinary or criminal history, race, siblings' names and educations, and

---

[10] Harvard eliminated its early action program for the classes of 2012 through 2015, in part to improve the socioeconomic diversity of its students.  [PX316 at 15]; see [DX728].  Eliminating early action, however, did not have the expected effect on class diversity, and Harvard's peer institutions largely continued with their early action and early decision programs.  [PX316 at 15].  Harvard became concerned that it was losing some of the most competitive applicants to other colleges that offered early decision or early action and decided to reverse course and reinstate its early action program for the class of 2016.  [Oct. 17 Tr. 163:9–164:1; Oct. 18 Tr. 89:13–91:19; Oct. 22 Tr. 100:6–101:15, 185:2–186:8; Oct. 23 Tr. 158:14–160:19; DX39 at 4].

parents' education, occupation, and marital status.  See, e.g., [DX195, DX262, DX276, DX293,

DX527, SA1, SA2, SA3, SA4].[11]  Applicants can also supplement their applications with

samples of their academic or artistic work, which may be reviewed and evaluated by Harvard

faculty.  [Oct. 17 Tr. 189:5–14; Oct. 18 Tr. 31:21–32:13]; see, e.g., [DX276 at 41; DX293 at 42].

Applicants may, but are not required to, identify their race in their application by discussing their

racial or ethnic identity in their personal statement or essays or by checking the box on the

application form for one or more preset racial groups (e.g. American Indian or Alaskan Native,

Asian, Black or African American, Native Hawaiian or Other Pacific Islander, or White) and

may also select or indicate a subcategory of these groups.  See [Oct. 18 Tr. 52:8–14; Oct. 26 Tr.

98:2–6; SA2 at 4; SA3 at 8].[12]  If applicants disclose their racial identities, Harvard may take

race into account, regardless of whether applicants write about that aspect of their backgrounds

or otherwise indicate that it is an important component of who they are.  [Oct. 26 Tr. 91:17–

92:1].

## 2.   Alumni and Staff Interviews

Most applicants interview with a Harvard alumnus.  [Oct. 15 Tr. 128:2–6].  Harvard

selects alumni to interview candidates based predominantly on geographic considerations.

Alumni interviewers are provided with an Interviewer Handbook that describes the admissions

process.  [Id. at 127:9–128:1]; see [DX5].  Although interviewers have broad discretion in

deciding where to conduct the interview, what information to request in advance, and what to

---

[11] "SA" refers to evidence offered by student amici.

[12] Harvard could elect not to receive information about applicants' race for all applicants or some
racial subgroups.  In fact, Harvard no longer receives information about applicants' religious
affiliation, [Oct. 19 Tr. 186:7–187:18], although it does continue to receive some information
about applicants' religions and beliefs from applicants who choose to write about their religious
identities in their essays or their personal statements, [id. at 246:25–247:17].

ask, Harvard specifies several questions that alumni interviewers should not ask and also

instructs alumni not to advise applicants on their chances of admission, given that "this analysis

can only be accomplished with full access to all the material in an applicant's file and through

the extensive discussions shared and comparisons made through the Committee process."  [DX5

at 30–34].  Alumni interviews generally last from 45 minutes to an hour.  [Oct. 17 Tr. 218:25–

219:9].

Alumni interviewers do not have all of the information that is available to admissions

officers at the time of admissions decisions, but their evaluations can be uniquely helpful to

admissions officers, as alumni interviews are often an applicant's sole in-person interaction with

a Harvard representative.  [Id. at 219:17–220:10].[13]  Alumni interviewers complete an evaluation

form that requests numerical ratings for applicants in academic, personal, and overall categories

that align with the rating categories later used by Harvard admissions officers.  See [PX88 at 50–

52].[14]  Alumni interviewers also score applicants in a single category that captures

extracurricular and athletic activities, community involvement, employment, and family

commitments, while admissions officers score applicants in separate extracurricular and athletic

categories.  See [PX88 at 51; SA1 at 29]; see also infra Section III.B.3.  Ratings generally fall

between 1 and 4, with 1 being the strongest.  The ratings criteria used by alumni (i.e. when to

---

[13] Alumni interviewers may ask students about their standardized test scores, interests, and high
schools, but alumni generally do not have access to teacher recommendations, counselor reports,
and transcripts, all of which are critical to admissions officers' evaluation of applicants.  [Oct. 17
Tr. 218:25–219:9].

[14] Alumni ratings for applicants' personal and overall qualities may be reprinted by admissions
officers on the summary sheets that sit at the front of application files.  See [Oct. 17 Tr. 219:10–
13; DD1 at 15]; e.g. [DX276 at 1].  Some applicants are scored by admissions officers before
alumni ratings are available.  See [Oct. 24 Tr. 119:7–25].

rate applicants 1, 2, 3, 4, or worse for the various rating categories) roughly correspond to the criteria used by the admissions officers.  Compare [PX1 at 5–7], with [PX88 at 50–52].

Beyond providing numerical ratings, alumni interviewers write comments explaining their ratings on the interview evaluation form, which is then placed in the applicant's file.  See, e.g., [SA1 at 29].  Although the Interviewer Handbook contains a section on distinguishing excellences including "ethnic . . . factors," alumni interviewers are not explicitly told to boost the ratings they assign to applicants based on race or ethnicity.  [DX5 at 11].  Alumni interviewers are, however, told to "[b]e aware of, and suspect, your own biases" and that awareness of one's biases is important because "no one can really be 'objective' in attempting to evaluate another person . . . ."  [Id. at 35].

In addition to alumni interviews, which are offered to most applicants, a small percentage of applicants interview with an Admissions Office staff member.  [Oct. 19 Tr. 177:14–19].  Although some staff interviews are offered on a first come, first served basis, many applicants secure staff interviews because they are well-connected or particularly attractive candidates, or because they are from a part of the country where an alumni interview may be unavailable.  [Oct. 17 Tr. 219:14–220:12; Oct. 19 Tr. 175:8–181:14].  Students who have staff interviews tend to be among the strongest applicants and are admitted at a comparatively high rate.  See [Oct. 19 Tr. 178:24–182:18].[15]  Asian American applicants are less likely to have a staff interview than white, African American, or Hispanic applicants.  [PX619].  Among applicants who receive a staff interview, 59% of African Americans, 48% of Hispanics, 53% of whites and 44% of Asian

---

[15] Less than 3% of all applicants, but more than 20% of recruited athletes, legacies, applicants on the dean's or director's interest lists, and children of faculty or staff ("ALDCs") receive a staff interview.  [PX619].  Approximately 52% of all applicants and 79% of ALDC applicants who receive staff interviews are admitted.  [Id.].

15

**ADD15**

Americans are admitted.  [Id.].  The lower admission rate for staff-interviewed Asian Americans

is driven primarily by the fact that Asian American applicants are less likely than African

American and Hispanic applicants, and far less likely than white applicants, to be recruited

Athletes, Legacies, on the Dean's or Director's interest list, or Children of faculty and staff

("ALDCs"), all of whom  are advantaged in Harvard's admissions process.  See [id.]. [16]

### 3.    Application Review Process

#### i.    Admissions Office and Personnel

The Admissions Office is tasked with deciding which applicants to admit and which to

reject or waitlist.  See [Oct. 19 Tr. 160:1–11].  Dean of Admissions and Financial Aid William

Fitzsimmons,[17] Admissions Director Marlyn McGrath,[18] and Financial Aid Director Sally

Donahue[19] oversee the Admissions Office, which has approximately seventy employees,

including the forty admissions officers who read applicant files and directly participate in the

process of deciding which applicants to admit (the "Admissions Committee").  [Oct. 17 Tr.

180:3–13; Oct. 19 Tr. 232:18–20].  Harvard's admissions staff is a diverse group of individuals

that includes Asian Americans.  [Oct. 18 Tr. 20:22–21:2].  Several admissions officers testified

at trial and forcefully denied the suggestion that racial animus or conscious prejudice against

---

[16] ALDCs are disproportionately white, with 8% of white applicants being ALDCs compared to 2.7% of African American, 2.2% of Hispanic, and 2% of Asian American applicants.  [PX619].

[17] Dean Fitzsimmons began working in the Admissions Office in 1972 as an Assistant Director of Admissions.  He later served as Director of Admissions and worked for the Harvard Fund, before becoming Dean of the Admissions Office in 1986.  [Oct. 15 Tr. 123:6–124:13].

[18] Director McGrath received a Ph.D. in 1978 and became a Residential Dean at Harvard the same year.  She also worked in academic planning for the Faculty of Arts and Sciences at Harvard, before becoming the Director of Admissions in 1987.  [Oct. 19 Tr. 156:6–157:8].

[19] Director Donahue recently retired from her leadership role but continues to assist the Admissions Office, including by reading applications.  [Oct. 19 Tr. 242:11–17].  Director Donahue did not testify at trial.

Asian Americans infect Harvard's admissions process.  See, e.g., [Oct. 24 Tr. 175:11–17].

Consistent with this, the Court finds no persuasive documentary evidence of any racial animus or

conscious prejudice against Asian Americans.

There is significant turnover in the Admissions Office, which frequently hires relatively

young admissions officers who leave to pursue other opportunities after a few years.  [Oct. 19 Tr.

233:4–240:3]; see [DX25 at 117–20].  New admissions officers go through an orientation

process that includes training on evaluating applicants and how to consider race.  [Oct. 18 Tr.

187:13–188:18; Oct. 19 Tr. 43:18–44:2; Oct. 24 Tr. 139:7–24, 222:12–223:14].  The training

utilizes a casebook that contains lightly edited application files from past years, and new

admissions officers are guided on how to evaluate and score applicants based on those files.  See

[Oct. 19 Tr. 257:2–20].  The first fifty or one hundred application files reviewed by a new

admissions officer are also reviewed by a more senior admissions officer who gives feedback to

the less-experienced colleague as part of the training process.  See [Oct. 16 Tr. 13:16–20; Oct. 24

Tr. 139:18–22].  The Admissions Office holds an annual retreat that sometimes includes

professional development sessions on evaluating applicants, and admissions officers receive an

annual training from Harvard's general counsel that covers the permissible use of race in the

admissions process.  [Oct. 19 Tr. 45:12–47:10].  The Admissions Office has not historically

provided new admissions officers with any written guidance on how to consider race in the

admissions process, although Harvard amended its admissions reading procedures in 2018 for

the class of 2023 to explicitly instruct admissions officers that they "should not take an

applicant's race or ethnicity into account in making any of the ratings other than the Overall

rating" and that for the overall rating "[t]he consideration of race or ethnicity may be considered

only as one factor among many."  [PX723 at 3 (emphasis omitted)]; see [Oct. 16 Tr. 19:12–17].

## ii.   Reading Procedures

Applications are divided into geographic dockets based on high school location.  [Oct. 16

Tr. 8:2–20; DX5 at 16].  A subcommittee of the full Admissions Committee is responsible for

the initial evaluation of applications within each docket.  [DX5 at 16–17].  Docket

subcommittees generally include a senior admissions officer who serves as docket chair and

three to six additional admissions officers.  [Id. at 17].  Each subcommittee member is

responsible for reading all applications from a subset of the docket's high schools.  [Oct. 17 Tr.

204:6–205:5].  Because the same reader and subcommittee review all applicants from the same

high school, admissions officers develop a familiarity with their respective high schools' grading

practices, academic rigor, and recommendation styles, all of which help them to fairly and

consistently evaluate applicants, both from particular high schools and across high schools

within their docket.  [Id.]; see [Oct. 24 Tr. 110:17–111:17].

Applications are initially reviewed by an admissions officer or "first reader" who assigns

the applicant ratings based on reading procedures that are updated on an annual basis.  See [PX1;

DX5 at 17].  Except for the recent changes to the reading procedures to provide more explicit

guidance on the use of race, the substantive guidance on rating applicants has remained largely

the same in recent years.  [Nov. 1 Tr. 123:19–124:21, 128:19–129:10, 168:16–172:25]; see

[PX720; PX721; PX722; PX723; DX742; DX743; DX744].  First readers, and any subsequent

readers, assign an overall rating; four profile ratings: (1) academic, (2) extracurricular, (3)

athletic, and (4) personal; and at least three school support ratings that reflect the strength of each

teacher and guidance counselor recommendation submitted on behalf of an applicant.  [Oct. 17

Tr. 206:14–209:8, 217:15–218:3].  Application readers may also rate the strength of any

additional recommendations submitted by an applicant.  [Id. at 218:4–10].  The ratings generally

range from 1 to 4, with 1 being the strongest rating.  [Oct. 16 Tr. 10:19–11:17; Oct. 17 Tr.

207:13–16].  Ratings of 5 and 6 are also available and indicate either weakness or special

circumstances, for example where family responsibilities prevent the applicant from participating

in extracurricular activities.  [Oct. 16 Tr. 10:21–11:1; PX1 at 5–7].  Admissions officers may

also use "+" (stronger) and "–" (weaker) signs to fine tune a rating, with a rating of 2+ being

stronger than a rating of 2, which is stronger than a rating of 2–.  [Oct. 16 Tr. 11:11–17]; see

[Oct. 18 Tr. 31:2–8].  Each of the profile ratings assigned by the first reader and any subsequent

readers are preliminary and used as a starting point for any later consideration of the applicant by

a docket subcommittee or the full Admissions Committee.  [Oct. 17 Tr. 221:6–19].

The academic rating reflects the applicant's academic strength and potential based on

grades, standardized test scores, letters of recommendation, academic prizes, any submitted

academic work, and the strength of the applicant's high school.  See [id. at 209:16–210:14; Oct.

19 Tr. 55:4–9; Oct. 24 Tr. 113:5–12].  An academic rating of 1 indicates *summa cum laude*

potential, a genuine scholar, and near-perfect scores and grades (in most cases) combined with

unusual creativity and possible evidence of original scholarship; an academic rating of 2

indicates *magna cum laude* potential, superb grades, and mid- to high-700 SAT scores or a score

above 33 on the ACT; an academic rating of 3 indicates *cum laude* potential, excellent grades,

and mid-600 to low-700 SAT scores or an ACT score of 29 to 32; and an academic 4 indicates

adequate preparation, respectable grades, and low- to mid-600 SAT scores or an ACT score of

26 to 29.  [PX1 at 5–6].

The extracurricular rating is an assessment of an applicant's involvement in activities

during high school and his or her potential to contribute to the extracurricular student life at

Harvard.  [Oct. 17 Tr. 212:4–213:1].  It may also account for family or personal circumstances

that have limited the applicant's participation in extracurricular activities.  [Id. at 207:13–23].
An extracurricular rating of 1 indicates national-level, professional or other truly unusual
achievement that suggests an applicant may be a major contributor at Harvard; an extracurricular
rating of 2 indicates strong contributions to an applicant's high school in one or more areas, such
as being class president or achieving recognition for extracurricular accomplishments on a local
or regional level; an extracurricular rating of 3 indicates solid participation but without special
distinction; and an extracurricular rating of 4 indicates little or no participation.  [PX1 at 6].

An athletic rating of 1 indicates that an applicant is a recruited athlete, an athletic rating
of 2 indicates strong high school contribution and possibly leadership roles in athletics, an
athletic rating of 3 indicates active participation, and an athletic rating of 4 indicates little or no
participation in athletics.  [Id.].

The personal rating reflects the admissions officer's assessment of what kind of
contribution the applicant would make to the Harvard community based on their personal
qualities.  [Oct. 17 Tr. 213:22–216:1; Oct. 18 Tr. 39:1–25].  Although the reading procedures
have not historically provided detailed guidance on what qualities should be considered in
assigning a personal rating, relevant qualities might include integrity, helpfulness, courage,
kindness, fortitude, empathy, self-confidence, leadership ability, maturity, or grit.  See [Oct. 17
Tr. 213:22–214:19; Oct. 19 Tr. 227:6–228:2; Oct. 24 Tr. 117:4–24].  For the application cycles
that were the subject of the statistical analysis performed in this case, the reading procedures
specified that a personal rating of 1 meant "outstanding," 2 meant "very strong," 3 meant
"generally positive," and 4 meant "bland or somewhat negative or immature."  [PX1 at 6; PX71
at 6].  The personal rating criteria, perhaps in response to this lawsuit, were overhauled for the
class of 2023, and the reading procedures now explicitly state that "an applicant's race or

ethnicity should not be considered in assigning the personal rating" and encourage admissions officers to consider "qualities of character" such as "courage in the face of seemingly insurmountable obstacles," "leadership," "maturity," "genuineness, selflessness[,] humility," "resiliency," "judgment," "citizenship," and "spirit and camaraderie with peers."  [PX723 at 5].

The overall rating reflects the admissions officer's impression of the strength of the application, taking account of all information available at the time the rating is assigned.  [Oct. 18 Tr. 186:12–15; Oct. 19 Tr. 49:3–15; PX1 at 5].  An overall rating of 1 is exceptional and a clear admit, an overall 2 reflects strong credentials, an overall 3 indicates good credentials, and an overall 4 indicates respectable credentials.  [PX1 at 5; DX744 at 3].[20]  Admissions officers are permitted to take an applicant's race into account when assigning the overall rating.  [Oct. 17 Tr. 221:3–5].

Applicants are also assigned school support ratings that indicate the strength of their teacher and guidance counselor recommendations.  [Oct. 17 Tr. 217:15–218:10; Oct. 18 Tr. 204:3–22].  A school support rating of 1 indicates strikingly unusual support, a 2 indicates very strong support, a 3 indicates above average positive support, and a 4 indicates somewhat neutral or slightly negative support.  [PX1 at 7].  Teacher and guidance counsel recommendations may inform the profile ratings, for example if a teacher discusses a student's academic or extracurricular commitments, but the school support ratings are distinct from the profile ratings and do not impact the profile ratings in a formulaic manner.  See [Oct. 31 Tr. 36:10–37:16].

Harvard also considers whether applicants will offer a diverse perspective or are exceptional in ways that do not lend themselves to quantifiable metrics.  Harvard may give

---

[20] The summaries here reflect the Class of 2018 reading procedures.  Although the ratings guidelines are routinely revised, the guidelines and reading procedures for the classes of 2014 through 2019 do not differ in material respects.

applicants a "tip" for "distinguishing excellences," such as capacity for leadership, creative

ability, and geographic, economic, and racial or ethnic factors.  See [Oct. 17 Tr. 191:8–200:20;

DX5 at 9–11].  The Admissions Committee gives some applicants large tips for non-academic

reasons where an individual's talents or background suggests that admitting them will be

especially beneficial to the Harvard community.  See [DX5 at 11].  ALDCs are the four most

notable groups of applicants, other than racial minorities, who receive such tips.  [Oct. 17 Tr.

12:10–14:23, 198:22–201:17; Oct. 18 Tr. 48:14–21; Oct. 23 Tr. 204:10–16; PX104; PX106;

PX111].  Recruited athletes receive a tip in the admissions process because they are being

recruited by one of Harvard's varsity sports teams and are presumably exceptionally talented, but

legacy applicants, those on the dean's or director's interest lists, and children of faculty and staff

obtain an admissions tip that is primarily or exclusively a product of family circumstances.

Harvard's objective in giving tips to applicants based on criteria other than individual merit, such

as to legacies and the children of its faculty and staff, is to promote the institution and is

unrelated to the racial composition of those applicant groups.  [Oct. 17 Tr. 198:22–200:11].

When reviewing an application, "first readers" generally begin with the application

summary sheet, which is a two to three page document that is prepopulated with much of the key

information about an applicant, including the applicant's high school, citizenship, test scores,

GPA, class rank, and race.  E.g. [DX195 at 2].  The summary sheet also contains blank spaces

for ratings and notes, to be filled in by the first reader and a potential second reader.  [Oct. 18 Tr.

22:18–23:3]; e.g. [DX195 at 2–4].  After reviewing an application file, the first reader rates the

strength of the teacher and guidance counselor letters of recommendation, assigns the academic,

extracurricular, athletic, personal, and overall ratings to the applicant, and writes any notes about

the applicant.  [Oct. 17 Tr. 206:24–207:12].  The reader then sends the application to the docket

chair if it merits further review, at which point the docket chair will review the file, record his or

her own ratings of the applicant based on the same criteria, and add written comments.  See [Oct.

19 Tr. 250:12–251:2]; e.g. [DX195 at 2–3].  Even if the first reader does not pass an application

on for further review, the application and the first reader's scoring remain available to all

admissions officers and may be discussed later in the admissions process.  [Oct. 18 Tr. 12:1–13,

16:7–17:5].  Although docket chairs are frequently the "second reader," other admissions officers

may also serve as a second reader as circumstances require, for example when the first reader is

new to the Admissions Office.  [Oct. 17 Tr. 206:1–13].

### iii.    Committee Meetings and Admissions Decisions

After the application files for the early action or regular decision cycle have been

reviewed by the early readers, the docket subcommittees meet as a group to collectively evaluate

the applications in their dockets and come up with a list of recommended admits for the full

Admissions Committee.  [Id. at 204:10–12; Oct. 18 Tr. 12:14–13:5].  The subcommittees

consider early admission applicants in November and meet again to consider regular decision

applicants in late January or February.  See [DX41].  First readers act as the advocate for the

applicants whose applications they initially reviewed.  [Oct. 16 Tr. 8:7–9:2; Oct. 17 Tr. 204:10–

12].  Subcommittees generally go through their docket of applications high school by high

school, with the first readers for each high school presenting the applicants they view as

legitimate contenders for admission.  [Oct. 18 Tr. 9:20–10:7].  All applications on a

subcommittee's docket, including those that the first readers view as legitimate contenders and

those that they do not intend to present to the subcommittee, are included in a binder which helps

the subcommittee members compare and contrast applicants.  [Id. at 108:8–11:25].  In some

subcommittee meetings, summary information about the applicant under discussion, including

race, is projected on a screen so that it can be easily viewed by all subcommittee members during the discussion of that applicant.  [Oct. 24 Tr. 191:23–192:24].  The subcommittees make recommendations on applicants, including to admit, waitlist, and reject, and may also place applications on hold to await additional information or defer an early decision applicant to the regular admissions pool.  [Oct. 18 Tr. 12:14–13:5].  Subcommittees may take race into account in making these initial recommendations.  [Oct. 24 Tr. 128:12–25].  The initial recommendations are not final, and the application review process is fluid.  It is common for some applicants who are not initially recommended for admission by a subcommittee to be admitted, and for some applicants who are initially recommended for admission to be waitlisted or rejected, especially where more information about an applicant becomes available later in the admissions process.  [Oct. 18 Tr. 13:6–15].

As the process progresses and after the subcommittees decide more definitively which applicants to recommend for admission, the full Admissions Committee, comprised of all forty admissions officers who read applications, meets to collectively decide which applicants to admit.  [Id. at 13:18–21].  Additionally, there is a standing committee, which includes faculty members, that assists the Admissions Office in its review and evaluation of applications, and those faculty members are also invited to attend the full Admissions Committee meetings.  [Id. at 13:19–14:8].  The full committee meets in late November and early December to discuss early action applicants and in March to consider regular decision applicants.  [Id. at 14:9–11; DX41].

Almost all applicants who are recommended for admission by the subcommittees are discussed by the full committee.  [Oct. 18 Tr. 15:17–19].  Additionally, every admissions officer has access to every application file and may call the full committee's attention to applicants who have not been recommended by a subcommittee.  [Id. at 12:1–13, 16:7–9].  Applications are

projected on a screen while the full committee discusses the applicant, and the full application file is available to committee members electronically. [Id. at 17:6–11]. At the time of the full committee meeting, there is often more information available to the full committee than was available to the application's earlier readers and the applicable subcommittee because additional high school grades, alumni interview evaluations, and other information frequently becomes available later in the admissions process. [Id. at 17:12–20]. The full Admissions Committee makes decisions by in-person majority votes. [Id. at 17:21–18:2].

In making admissions decisions, Harvard's goal is to admit the best freshman class for Harvard College, not merely a class composed of the strongest applicants based solely on academic qualifications. [DX5 at 9–10]. Although the reading procedures reflect the traits that Harvard looks for in applicants, Harvard does not decide which applicants to admit based on any formula. See [Oct. 17 Tr. 221:20–223:6]. As the Interviewer Handbook describes:

> The Admissions Committee values objective criteria, but holds a more expansive view of excellence. Test scores and grades indicate students' academic aptitude and achievement. The Committee also scrutinizes applications for extracurricular distinction and personal qualities. Students' intellectual imagination, strength of character, and their ability to exercise good judgment—these are other, critical factors in the admissions process, and they are revealed not by test scores but by students' activity outside the classroom, the testimony of teachers and guidance counselors, and by alumni/ae interview reports. Seeking evidence of these three criteria—academic excellence, extracurricular distinction, and personal qualities— the Committee reads with care all the components of each applicant's file: the high school transcript, standardized test scores, extracurricular activities, personal statement, teacher and secondary school recommendations, and the personal interview report.

> Attempts to define and to identify precise elements of character, and to determine how much weight they should be given in the admissions process, require discretion and judiciousness. But the Committee believes that the "best" freshman class is more likely to result if we bring evaluation of character and personality into decisions than if we do not. We believe that a diversity of backgrounds, academic interests, extracurricular talents, and career goals among students who live and learn together affects the quality of education as much as a great faculty or vast material resources.

[DX5 at 10].

The Admissions Office sets a target number of students to admit based on the roughly 1,600 spots available each year and the expected matriculation or yield rate for admitted applicants. See [Oct. 15 Tr. 160:18–161:5]. After the full committee completes its review of all applicants recommended for admission, Harvard often needs to remove some students from the admit list to reach its target number of admitted students. [Oct. 23 Tr. 191:1–4]. When it becomes necessary to reduce the list of prospective "admits", the Admissions Committee uses a "lop process" in the closing days of the full committee meetings that involves discussing candidates again and then "lopping" some from the admit list. [Oct. 24 Tr. 130:22–131:10; Nov. 1 Tr. 244:3–245:15].[21] In aid of  this, a potential lop list is prepared that may contain the HFAI status, athletic rating, legacy status, gender, and race of the applicants whom the committee is expected to consider lopping. [Oct. 24 Tr. 131:16–24]. Dean Fitzsimmons then informs the Admissions Committee of the characteristics of the admitted class, which may include racial composition, and the committee decides, as a group, which students to lop off the admit list based on many factors, which may include race. See [id. at 196:1–200:16].

After the Admissions Committee concludes the full committee meetings, applicants are notified whether they have been admitted, wait-listed, or rejected, or in the case of early action students, whether they have been deferred into the regular decision process. See [Oct. 18 Tr. 124:16–125:9]. Additionally, some applicants may be offered deferred admission or "z-listed," meaning they are offered a spot in the class following the class year for which they applied. [Oct. 19 Tr. 167:25–168:23].

---

[21] Some subcommittees engage in a similar lop process, as they select students to be recommended to the full committee for admission. [Oct. 24 Tr. 130:22–131:6].

**Application Review Process [DD1 at 4].**



#### 4. <u>Harvard's Use of Race in Admissions</u>

Throughout the admissions process, the Admissions Office leadership tracks the racial composition of the applicant pool, the students recommended for admission to the full committee, and the students admitted by the full committee. The composition of applicants and admitted students helps the Admissions Office see how well its efforts to achieve a diverse class are working by showing, for example, whether Harvard is seeing increases in applications from students with the backgrounds that it has placed a special emphasis on recruiting, and whether minority students have been admitted in numbers that will likely lead to a racially diverse entering class. <u>See</u> [Oct. 18 Tr. 81:20–82:18].

To do this tracking, Dean Fitzsimmons, Director McGrath, and a few other admissions officers receive "one-pagers" that provide a snapshot of the projected class and compare it to the prior year. [<u>Id.</u> at 80:2–5; Oct. 23 Tr. 178:21–179:10]. The one-pagers contain statistics on applications and admission rates by gender, geography, academic interest, legacy status, financial aid circumstances, citizenship status, racial or ethnic group, and on recruited athlete status and applicants flagged as disadvantaged. [Oct. 18 Tr. at 77:5–78:2]; <u>e.g.</u> [PX165 at 2].

The racial breakdown shown on the one-pagers is provided based on three methodologies, the "old methodology," the "new methodology," and the federal government's "Integrated Postsecondary Educational Data System" ("IPEDS"), [Oct. 18 Tr. 78:3–13]; e.g. [PX165 at 3], with the Admissions Office preferring the new methodology.[22]  [Oct. 18 Tr. 81:6–19, 85:5–7].

Dean Fitzsimmons shares the breakdown of the admitted class as reflected on the one-pagers with the full committee from time to time.  [Id. at 80:6–18; Oct. 19 Tr. 195:21–196:16]. For example, at the start of the full Admissions Committee meetings, he usually states how many students are being recommended for admission by the subcommittees and how the breakdown of the class compares to the prior year in terms of racial identities and other demographics.  [Oct. 24 Tr. 83:7–16; Oct. 26 Tr. 104:22–106:14].  The leadership of the Admissions Office monitors the breakdown of the class as the full committee meetings progress and through the lop process. See [Oct. 23 Tr. 181:4–23].  Although there are no quotas for subcategories of admitted students, if at some point in the admissions process it appears that a group is notably underrepresented or has suffered a dramatic drop off relative to the prior year, the Admissions Committee may decide to give additional attention to applications from students within that group.  [Oct. 19 Tr. 198:23–200:10].[23]

---

[22] The new methodology better reflects the racial diversity that results from students who identify with multiple racial groups than the IPEDS methodology.  [Oct. 18 Tr. 83:17–84:9].  Harvard has found the IPEDS methodology less reflective of the actual diversity of its class because, for example, it classifies all applicants who identify as Hispanic as only Hispanic irrespective of other racial groups they may also identify with.  [Id. at 84:10–24].  This avoids double counting but results in the underreporting of the representation of minority racial and ethnic groups because many students identify with two or more racial groups.  [Id. at 84:10–85:7].

[23] Harvard also shares statistics on admissions by race with the Association of Black Admission and Financial Aid Officers at the Ivy League and Sister Schools to learn about the practices of other schools.  [Oct. 24 Tr. 83:17–85:17].

In addition to giving the Admissions Office some perspective on whether it is admitting a diverse class, the collective racial composition of applicants and admitted students helps Harvard better forecast its overall yield rate because different racial groups historically accept offers to attend Harvard at differing rates. [Oct. 15 Tr. 160:18–162:7]. As examples, admitted Asian American students usually matriculate at a higher rate than white students, while admitted Hispanic, African American, Native American, and multiracial applicants matriculate at a lower rate. [Oct. 18 Tr. 80:21–81:5]; see [PX324]. Because of these variations in yield rates by racial group, Harvard uses the racial makeup of admitted students to help determine how many students it should admit overall to avoid overfilling or underfilling its class. See [Oct. 15 Tr. 162:1–15].

In addition to monitoring the likely racial makeup of the admitted class, admissions officers use race in evaluating applicants and assigning an overall rating. [Oct. 17 Tr. 221:3–5; Oct. 18 Tr. 49:20–50:3, 186:16–25]. Although race may act as a tip or plus factor when making admissions decisions, it is only ever one factor among many used to evaluate an applicant. [Oct. 18 Tr. 49:10–16, 167:2–169:24]; see [DX5 at 11]. Race is only intentionally considered as a positive attribute. [Oct. 16 Tr. 22:18–23:4; Oct. 18 Tr. 197:5–11]; see [Oct. 30 Tr. 80:1–23].

Admissions officers are not supposed to, and do not intentionally, take a student's race directly into account when assigning ratings other than the overall rating, but Harvard's reading procedures did not instruct readers not to consider race in assigning those ratings until 2018, when Harvard amended the reading procedures for the class of 2023 to provide more explicit guidance on the appropriate use and non-use of race. See [Oct. 18 Tr. 49:20–50:3; Oct. 19 Tr. 252:21–253:13; Oct. 24 Tr. 121:21–122:4, 140:6–25; Nov. 1 Tr. 124:3–125:11; PX723 at 1, 3]. Further, some admissions officers may take an applicant's race into account indirectly, for

example when an applicant's race has influenced other personal qualities that the admissions officer believes will add to the Harvard community.  [Oct. 19 Tr. 48:11–49:1; Oct. 24 Tr. 138:1–10].

No admission officer who testified perceived Harvard to be engaged in discrimination against Asian Americans.  For example, Senior Admission Officer Charlene Kim[24] was asked what her reaction was to the allegation that Harvard discriminated against Asian Americans.  She responded:

> I think now just concern.  It's not what I know our office to be.  It's not who I am.  . . .  I would never be part of a process that would discriminate against anybody, let alone people that looked like me, like my family, like my friends, like my daughter.  And so I'm actually really grateful to be able to be here to share my little bit of my experience on the admissions committee . . . .  I'm not here to say that it's perfect, but I know that we don't discriminate against anyone.

[Oct. 24 Tr. 175:11–22].

To summarize the use of race in the admissions process, Harvard does not have a quota for students from any racial group, but it tracks how each class is shaping up relative to previous years with an eye towards achieving a level of racial diversity that will provide its students with the richest possible experience.  It monitors the racial distribution of admitted students in part to ensure that it is admitting a racially diverse class that will not be overenrolled based on historic matriculation rates which vary by racial group.  Although racial identity may be considered by admissions officers when they are assigning an applicant's overall rating, including when an applicant discloses their race but does not otherwise discuss it in their application, race has no specified value in the admissions process and is never viewed as a negative attribute.

---

[24] Ms. Kim is a senior admissions officer, the assistant director of financial aid, and the director of Harvard's first-generation program.  She graduated from the University of California at Berkeley and received a master's degree from New York University.  She began working in the Admissions Office in 2008.  [Oct. 24 Tr. 125:12–25, 141:18–142:1].

Admissions officers are not supposed to, and do not intentionally, consider race in assigning ratings other than the overall rating.

### C.    Prelude to this Lawsuit

#### 1.    The Unz Article

This lawsuit followed magazine and news articles that raised the specter of Asian American students being penalized in college admissions based on their racial identity. Harvard's response to that controversy demonstrates Harvard's concern about the perception that its admissions process was racially biased but also the complexity of the statistical evidence upon which the allegations here are based.

On or about November 28, 2012, Ron Unz, a Harvard alumnus, published an article titled "The Myth of American Meritocracy" in *The American Conservative* (the "Unz Article"). [PX218].  Unz asserted that elite universities were biased against Asian Americans and employed "*de facto* Asian quotas" as evidenced by a gap between Asian American representation among America's most academically accomplished high school students and their comparatively low representation at elite colleges.  [Id. at 9].  The Unz Article, which itself included language that suggested certain unsavory biases,[25] did not attract much attention until approximately one month later when David Brooks of the *New York Times* published an article that promoted the Unz Article as one of the best magazine articles of the year and argued that stagnant Asian American representation at Harvard between 1995 and 2011 smelled like a quota system.  See [Oct. 17 Tr. 24:19–25:17].  The two articles together and their allegations of racial

---

[25] The article relies in part on data based on perceptions about the proportion of national merit scholarship semifinalists from California whose "names seem to be Jewish."  [PX218 at 12]. Although the Court recognizes that this article might have interested some sociologists, it was not unreasonable for some Harvard admissions officials to view the article as "profoundly anti-Semitic" and, as a result, to view it as less than serious scholarship.  [Oct. 17 Tr. 158:2–159:10].

bias sparked concern among Harvard's leadership and some of its alumni, who encouraged

Harvard to respond to the allegations.  See [id. at 25:8–37:25; PX227; PX238].

        2.     Analysis by Office of Institutional Research

        i.     Mark Hansen's Admissions Models

Following the 2012 Christmas and 2013 New Year's holidays, Dean Fitzsimmons

attempted to develop a response to the Unz Article, including soliciting input from Harvard's

Office of Institutional Research ("OIR").  [Oct. 17 Tr. 37:14–38:16; Oct. 23 Tr. 208:13–209:21;

PX230; PX236; PX238].[26]  As part of OIR's initial evaluation of the statistical evidence,

research analyst Mark Hansen[27] prepared four rough logistic regression models, using data on

applicants and admission outcomes for the classes of 2007 through 2016, to project Harvard's

admitted classes using a limited set of variables, including applicants' race.  [Oct. 24 Tr. 14:5–

---

[26] OIR is a university-wide office that provides statistical analysis in response to requests from across Harvard University and sometimes on its own initiative when it anticipates a need for such work.  During the relevant time period, the office typically had approximately 30 ongoing projects and received numerous additional *ad hoc* requests each year.  [Oct. 19 Tr. 126:5–23].  OIR's objective was and remains to offer accurate, timely, and digestible research that is tailored to diverse audiences with the goal of promoting informed decision-making and furthering the core missions of the university.  [Oct. 18 Tr. 210:9–14; PX465].

[27] Mr. Hansen studied mathematics at Boston University before obtaining a master's degree from Harvard's Graduate School of Education.  He was hired as a management fellow by OIR in the summer of 2010 and was promoted to research analyst in 2011.  He left OIR in the summer of 2013 to work for MIT's Office of Institutional Research.  [Oct. 24 Tr. 10:19–11:25].

24]; see [PX12 at 32–35].[28]  His most expansive model used applicants' academic index,[29]

academic rating, legacy and recruited athlete status, personal rating, extracurricular rating,

gender, and race as inputs to predict the admitted class.  See [PX12 at 33].  The classes projected

by this model had racial demographics that approximated the actual class based on the

probability of admission assigned to applicants by the model.  See [id. at 34–35].  Mr. Hansen's

less complete models, which did not include variables for racial identities, projected admitted

classes with far more Asian students than Harvard's actual admitted classes, suggesting either

that racial tips resulted in fewer Asian students being admitted or that factors correlated with

Asian identity that were not included in Mr. Hansen's models were significantly affecting which

applicants Harvard chose to admit.  See [id. at 33–34].

---

[28] At trial, SFFA emphasized a 17-page draft presentation, replete with blank spaces and typographical errors, that Mr. Hansen prepared in February 2013 but did not circulate to others. See [PX9].  In this draft presentation, Mr. Hansen summarized his findings as follows:

- Athletes and Legacies explain the difference in raw admit rates for Asian and White applicants.
- Asian applicants have higher average ratings and test scores (excluding the personal rating).
- Differences exist in the raw admit rates of Asian and White students with similar test scores and academic indices. Even top scores and ratings don't guarantee admission.
- Personal rating is important in models of the admissions process and drive some of the demographic differences we see.

[Id. at 2].  Much of the information in the draft presentation, including the above summary, was never shared with the Admissions Office.  See [PX12].  Further, it does not appear that anyone affiliated with Harvard other than Mr. Hansen, saw the draft report prior to this litigation.  [Oct. 19 Tr. 111:14–22; Oct. 24 Tr. 50:9–14].

[29] The academic index is a metric that provides an indication of overall strength by taking account of standardized test scores and high school grades.  [Oct. 16 Tr. 84:9–23].

Mr. Hansen's models could lead a casual observer to conclude that race plays a significantly larger role in Harvard's admissions process than it actually does.  The models incorporate far fewer variables than those prepared by the parties' economic experts for this litigation and omit many variables that are important to the admissions process.  Compare [PX12 at 33], with [PD38 at 26].[30]  Even Mr. Hansen's most complete model almost certainly suffers from considerable omitted variable bias in light of the likely correlation between race and important variables that Mr. Hansen did not include.  Most notably, his models contain no controls for socioeconomic and family circumstances that correlate with race and also affect admissions decisions.  See [PX12 at 33].  Given these deficiencies in the models, they are entitled to little weight for the purpose of determining whether Harvard discriminates against Asian American applicants, particularly given the availability of the experts' far more comprehensive models and the testimony offered by fact witnesses in this case.  See [Oct. 19 Tr. 19:19–20:8].  Mr. Hansen's models do suggest, consistent with other evidence, that Asian Americans applicants excel in academic metrics; that tips for legacies and recruited athletes result in more white students being admitted; that a projection of Harvard's class based only on the profile ratings, academic metrics, and athlete and legacy statuses is incomplete and results in a projected class that is vastly less racially diverse than the one Harvard achieves; and that, absent any consideration of race, Harvard's classes would have drastically fewer African American and Hispanic students.  See [PX12 at 33–34].[31]

---

[30] "PD" refers to demonstrative evidence presented by SFFA.

[31] The Court notes that Mr. Hansen's models suggest that any increase in Asian American admits would come largely at the expense of African Americans and Hispanics.

A limited selection of slides depicting Mr. Hansen's logistic regression models were included in a February 25, 2013, presentation for Dean Fitzsimmons that focused on and included much more information on the reintroduction of Harvard's early action program and an analysis of issues related to the accessibility and affordability of a Harvard education. [Oct. 17 Tr. 83:24–84:16; PX12 at 32–37]. The slides on Mr. Hansen's models that were shared with Dean Fitzsimmons included a statement that they were "preliminary and for discussion," and they were not presented or understood as evidence of discrimination. See [Oct. 17 Tr. 83:24–84:16; PX12 at 32–36]. Dean Fitzsimmons concluded that Mr. Hansen's models were incomplete, and he elected not to discuss those slides or the information they contained with Harvard's leadership at that time. [Oct. 17 Tr. 84:3–85:1]. More than a year later, Mr. Hansen's models were shared with Dean Khurana, shortly after he became the dean, in advance of a "high-level meet-and-greet type meeting" that was intended to generally familiarize Dean Khurana with OIR's work. [Oct. 23 Tr. 44:3–8, 45:6–10, 46:12–17]; see [PX41 at 50]. Dean Khurana also found Mr. Hansen's models incomplete and viewed them as a puzzling approach to understanding Harvard's admissions process. [Oct. 23 Tr. 47:4–49:18].

ii.    Low-Income Admissions Models

Following the February 2013 meeting with OIR, Dean Fitzsimmons requested that Dr. Erin Driver-Linn[32] and Ms. Erica Bever[33] further analyze the effect of low-income status, which Dean Fitzsimmons hoped and expected would confirm that Harvard was providing a tip to low-income applicants. [Oct. 17 Tr. 172:22–173:21]. This analysis was intended to respond, at least

---

[32] During the relevant period, OIR was led by Dr. Driver-Linn, who holds a Ph.D. in social psychology from Harvard. [Oct. 19 Tr. 69:9–70:7].

[33] Ms. Bever joined OIR in 2007 and transitioned to the Admissions Office where she now serves as a senior admissions officer and the director of research. [Oct. 18 Tr. 200:7–201:1].

in part, to criticism that elite colleges, like Harvard, were not doing enough to attract low-income

students.  See [PX26 at 2].  On May 1, 2013, Ms. Bever, Dr. Driver-Linn, and Mr. Hansen sent

Dean Fitzsimmons a summary of their initial findings in a memorandum titled "Harvard College

Admissions and Low Income Students."  [Id.].  Their analysis found that Harvard students from

lower income backgrounds generally have lower SAT scores but that they are admitted at higher

rates when controlling for their SAT scores.  [Id. at 2–3, 6–7].

After reviewing the distribution of SAT scores by family income, OIR's memorandum

discussed the need to model the admissions process to better evaluate whether the Admissions

Office was providing a tip to low-income students, given that the relationship between income

and admission, controlling only for SAT scores, could have been the result of a relationship

between income and other factors, such as race.  [PX26 at 3–4]; see [PX28 at 4 (indicating that

applicants with family incomes of less than $60,000 accounted for 25% of Hispanic, 24% of

African American, 18% of Asian American, and 10% of white applicants)].  As OIR's memo to

Dean Fitzsimmons summarized:

> The differences [in students' SAT scores by income] could be related to other factors important in the admissions process.  In order to control for those potential issues, we implement a logistic regression model to predict the probability of admission, controlling for demographic characteristics and a variety of metrics used to asses qualification for admission.  Demographic characteristics include gender and race/ethnicity. Qualifications used in admission include academic index, academic rating, extracurricular rating, personal rating, athletic rating, and legacy status.
>
> This approach has several limitations; we picked a small set of variables that would factor in admissions decisions.  The selection of a wider set of variables might result in a better fitting model, one that accounts for more of the variation in individual applicants and their potentially unique contributions to the entering class.  For example, the model does not capture exceptional talent in art or music explicitly (although ratings may capture some aspect of these attributes).  In addition, our model is limited to main effects, not examining interactions between variables.  Our analysis should not be considered exhaustive.

[PX26 at 3].  To the extent that OIR's initial analysis suggested that Harvard was providing an admissions tip to applicants from low-income backgrounds, that tip appeared less significant than tips for legacies and recruited athletes.  See [id. at 8–9].  OIR explained that:

> To get a sense of the size of the admissions advantage conferred to low-income applicants relative to other groups of applicants, the so-called "thumb on the scale," we include low-income status in a second logistic regression model. . . .  The variables with the largest effects on the probability of admission are athletic rating, personal rating, and legacy status.  Compared to athletes and legacies, the size of the advantage for low income students is relatively small.

[Id. at 3].

The memorandum also noted that "Asian applicants with an academic 1 or 2 are admitted 12% of the time compared against an admit rate of 18% for non-Asian applicants" and provided a chart illustrating this disparity.  [Id. at 4, 9].  Further, the memo stated that certain "issues" should be considered before sharing the analysis publicly, including that there are "demographic groups that have negative effects," although the only demographic group for which OIR's analysis returned a negative coefficient was "Asian."  [Id. at 4].  Although the model returned a negative coefficient for Asian applicants, neither OIR nor Dean Fitzsimmons viewed the report as indicative of discrimination.  [Oct. 17 Tr. 109:15–19; Oct. 19 Tr. 152:22–153:15].

After receiving the May 1, 2013 memorandum, Dean Fitzsimmons asked OIR to examine the effect of Asian racial identity on admissions outcomes to confirm that the low-income tip was being fairly and consistently applied to all groups, but he did not ask OIR to further examine the effect of being Asian on admissions outcomes across the board.  [Oct. 17 Tr. 127:22–128:12, 129:13–17].  OIR added an interaction term for Asian and Low Income which allowed the model to return coefficients that accounted for the possibility that the tip for low income varied by race.  See [PX28 at 7–8].  On June 3, 2013, OIR shared with Dean Fitzsimmons its additional analysis, [Oct. 17 Tr. 129:13–130:13], which showed a coefficient for the interaction term of "Asian and

Low Income" that was positive and statistically significant but of a lesser magnitude than the negative coefficient for Asian identity, see [PX28 at 7; PX29].  This updated analysis suggested that although low-income Asian American applicants were provided a tip relative to their higher income Asian American peers, the magnitude of that tip might not overcome the negative relationship between Asian racial identity and admissions outcome, when holding constant some variation in the profile ratings, gender, and applicants' academic index.  [Id. at 7]; see also [DD10 at 27].  Nevertheless, the data reassured Dean Fitzsimmons that the Admissions Office was "treating Asian Americans in an evenhanded manner."  [Oct. 17 Tr. 134:3–11].  As with Mr. Hansen's February 2013 models, OIR's May 2013 models suffer from significant omitted variable bias, and the magnitude of the negative coefficient for Asian applicants is relatively modest considering the number and significance of omitted observable and unobservable factors. See [PX28 at 7].  As a result, the OIR analysis is weak evidence of bias against Asian American applicants, particularly relative to the more thorough econometric analysis that has been done by the parties' economic experts in connection with this litigation.

Dean Fitzsimmons' non-inference of actual discrimination based on the relatively modest negative Asian coefficient was reasonable given the limitations of OIR's model and his own experience with and confidence in the Admissions Office's process.  Dean Fitzsimmons did not ask for additional analysis based on OIR's results, nor did he make any changes to Harvard's admissions process in response to that analysis, because his review of the data did not lead him to believe that the Admissions Office was biased against Asian American applicants.  [Oct. 17 Tr. 137:11–17, 138:7–24].

### 3.   The Ryan Committee

In April 2014, Harvard learned of a website that had launched with the url harvardnotfair.com.  Harvard's staff recognized that the website was being promoted by some of

the same individuals who had financed <u>Fisher v. University of Texas at Austin</u>, 570 U.S. 297

(2013) ("<u>Fisher I</u>"), and 136 S. Ct. 2198 (2016) ("<u>Fisher II</u>").  [Oct. 23 Tr. 211:7–15]; <u>see</u>

[PX283].  Apparently in response to the prospect of litigation, Harvard University formed a

committee to examine race-neutral alternatives to its race-conscious admissions practices (the

"Ryan Committee").  <u>See</u> [Oct. 22 Tr. 13:14–19, 129:13–130:17].  The Ryan Committee, chaired

by Jim Ryan, the Dean of the Graduate School of Education, included more than two dozen

members from across the university.  [Oct. 16 Tr. 69:3–7; Oct. 22 Tr. 13:20–14:2]; <u>see</u> [PX300;

PD19].  The committee's work never really got "off the ground," owing at least in part to its

broad membership and the conflicting scheduling demands of many committee members.  [Oct.

16 Tr. 69:10–70:15; Oct. 19 Tr. 76:8–77:10].  After meeting only a few times, it disbanded in

December 2014, shortly after this lawsuit was filed.  [Oct. 16 Tr. 70:2–6; PX316 at 2]; <u>see</u> [ECF

No. 1].  No substantive analysis of any race-neutral alternatives examined by the Ryan

Committee was entered into evidence.  <u>See</u> [Oct. 19 Tr. 77:14–24 ("I believe the team did some

work, under privilege. . . .  Under direction of counsel.")].

4.    The Khurana Committee

In 2015, following the filing of this lawsuit and the disbandment of the Ryan Committee,

Harvard established the Khurana Committee, officially titled "the Committee to Study the

Importance of Student Body Diversity," which was chaired by Dean Khurana.[34]  [Oct. 22 Tr.

210:23–211:21; PX302 at 22].  The Khurana Committee "sought to examine and restate the

---

[34] In addition to Dean Khurana, the members of the Committee to Study the Importance of
Student Body Diversity included Mahzarin R. Banaji, the Richard Clarke Cabot Professor of
Social Ethics; Emma Dench, the McLean Professor of Ancient and Modern History and of the
Classics; Yukio Lippit, the Harris K. Weston Associate Professor of the Humanities; David R.
Pilbeam, the Henry Ford II Professor of Human Evolution; and, Jonathan L. Walton, the
Plummer Professor of Christian Morals and Pusey Minister of the Memorial Church.  [Oct. 23
Tr. 35:14–18; PX302 at 22].

benefits that the College derives – as an institution, and for its students and faculty – from student body diversity of all kinds, including racial diversity." [PX302 at 1]. The Khurana Committee's report, referenced <u>supra</u> at Part III.A, was prepared with the assistance of counsel and in the face of litigation, but nonetheless reflects an extensive and thoughtful examination of the benefits of diversity to Harvard College. [Oct. 22 Tr. 211:10–212:11]. The committee concluded its report by stating:

> We emphatically embrace and reaffirm the University's long-held view that student body diversity – including racial diversity – is essential to our pedagogical objectives and institutional mission. It enhances the education of all of our students, it prepares them to assume leadership roles in the increasingly pluralistic society into which they will graduate, and it is fundamental to the effective education of the men and women of Harvard College.

[PX302 at 22]. In February 2016, Harvard's Faculty of Arts and Sciences voted unanimously to adopt the report. [Nov. 1 Tr. 198:19–24]. Although the Khurana Committee was keenly aware that it was addressing a question that "the Supreme Court has asked public institutions of higher education to answer in connection with the consideration of an applicant's race in the admissions processes as one factor among many in an individualized review," its focus was limited to Harvard's interest in diversity, rather than the viability of race-neutral alternatives. <u>See</u> [PX302 at 1].

     5.   <u>The Smith Committee</u>

In June 2017, Harvard established the "Committee to Study Race Neutral Alternatives in Harvard College Admissions," chaired by Michael Smith, the Dean of the Faculty of Arts and Sciences, with Dean Fitzsimmons and Dean Khurana serving as the other committee members (the "Smith Committee"). [PX316 at 1, 3]. The Smith Committee evaluated whether race-neutral means, singly or in combination, would enable Harvard to achieve its diversity-related educational objectives. [<u>Id.</u> at 8–9]. Prior to 2017, Harvard had repeatedly expressed the

importance of its race-conscious admissions policy and its understanding that diversity across multiple dimensions was critical.  See generally [id.].  Harvard had not, however, conducted a detailed empirical analysis of the viability of race-neutral alternatives for at least fifteen years. See [Oct. 16 Tr. 66:21–67:6; Oct. 19 Tr. 194:3–195:3].

The Smith Committee worked with Harvard's attorneys and had access to the analyses done by the experts in this case.  [PX316 at 3].  The committee held seven meetings between August 2017 and April 2018 and then issued a report that was drafted by Harvard's attorneys. [Oct. 23 Tr. 65:20–66:4; PX316 at 1, 3].  It examined all of the race-neutral alternatives proposed by SFFA, and additionally considered eliminating preferences for athletes and the use of test scores in the admissions process.  See [PX316 at 6–18].  The Smith Committee concluded that no workable race-neutral admissions practices could, at that time, promote Harvard's diversity-related educational objectives while also maintaining the standards of excellence that Harvard seeks in its student body through its whole-person, race-conscious admissions program, and recommended that Harvard reexamine the issue in five years.  [Oct. 22 Tr. 133:21–134:15; Oct. 23 Tr. 126:25–127:6, 134:15–19; PX316 at 18–19].

## IV.    FINDINGS OF FACT: NON-STATISTICAL EVIDENCE OF DISCRIMINATION

As will be more fully discussed, the parties rely heavily on statistical evidence related to the admissions process.  Additionally, to corroborate its statistical evidence, SFFA makes several other arguments in support of its contention that Harvard discriminates against Asian American applicants.

### A.    Sparse Country

First, as discussed above, Harvard uses a search list, which is primarily compiled based on potential applicants' ACT, SAT, or PSAT test scores to help Harvard market itself to a diverse array of high school students.  The ACT, SAT, or PSAT score that students need to make

the search list varies by gender, high school GPA, geography, and race.  See [Oct. 15 Tr. 136:5–139:21; PX2].  For example, to make Harvard's class of 2018 search list, a white male high school student from outside "sparse country"[35] needed an SAT score of 1380, while black, Chicano, Hispanic, Native American, and Puerto Rican students needed only an 1100.  See [PX2]; see also [PX50].

As SFFA points out, there are some anomalies in the search list selection criteria that are difficult to explain.  As an example, assuming an applicant reported a sufficiently high GPA, for the class of 2018, Harvard lowered the SAT score required to make the search list to 1310 for students from "sparse country" who identified their race as white, other, or unidentified while not simultaneously lowering the required score for Asian American students from the same states to the same level.  Consequently, Asian American students from the same states needed to score 1350 or 1380, depending on their gender, to make the search list.  See [Oct. 15 Tr. 150:3–9; PX2; PX50].  Some Asian American students therefore did not make the search list, when white students from the same area who had similar grades and SAT scores did.  See [Oct. 15 Tr. 151:22–152:2].  SFFA, while recognizing that the list is a marketing tool, would have the Court consider this "sparse country" disparity between the scores required for Asian Americans and whites to make the search list as evidence of Harvard's intent to impose more selective admissions criteria on Asian Americans for the purpose of artificially suppressing Asian American representation at Harvard.

---

[35] Sparse country for the purposes of the PSAT search includes twenty predominantly rural states: Alabama, Alaska, Arizona, Arkansas, Idaho, Louisiana, Maine, Mississippi, Montana, Nebraska, Nevada, New Hampshire, New Mexico, North Dakota, Oklahoma, South Dakota, Utah, Vermont, West Virginia, and Wyoming.  [Oct. 15 Tr. 144:25–147:20; PX2].

Notably, however, in some of the same years that Harvard did not lower the sparse country SAT search list score for Asian Americans commensurate with the lower requirement for whites, it selected Asian Americans for the search list based on lower ACT scores than similarly situated white students from more urban states.  See [Oct. 17 Tr. 151:13–152:4; PX2]. Overall, the inconsistencies in the search criteria do not seem to be linked to efforts to advantage or disadvantage any particular racial group, and it was unclear from the testimony at trial whether these variations were accidental or intentional.  At root, although being placed on the search list results in recruitment and is correlated with a higher likelihood of admission, the search list is fundamentally a marketing tool that does not affect individual admissions decisions. [Oct. 15 Tr. 129:24–132:25].

### B.        The OCR Report

SFFA next points out that the specter of Harvard discriminating against Asian Americans in its admission process has been raised before.  The argument is, at least in part, that repeated instances of smoke should heighten concerns about a fire.

In the late 1980s, Harvard faced allegations of bias against Asian American applicants in its admissions process that culminated in a 1990 report by the United State Department of Justice Office of Civil Rights ("OCR") ("OCR Report").  [PX555 at 2, 15–16].  The OCR Report reached an "overall conclusion that Harvard did not discriminate against Asian American applicants to its undergraduate program in violation of Title VI of the Civil Rights Act," but its findings indicated that some admissions officers took race into account when assigning the personal rating during the period preceding the 1990 report.  See [id. at 45–46].  Further, The OCR Report found recurring characterizations of Asian American applicants that were broadly consistent with stereotypes, noting that:

In addition to examining the ethnic reader's comments, OCR's concern for the potential stereotyping of Asian American applicants prompted a review of reader comments for negative characterizations which could have an impact on the admissions decision and ratings.  On its face, reader comments revealed several recurring characterizations attributed to Asian American applicants.  Quite often Asian American applicants were described as being quiet/shy, science/math oriented, and hard workers.  For example, one reader's comment embraced all of these in describing an Asian American applicant when she wrote:

> "[A]pplicant seems like a reserved, hard-working, aspiring woman scientist/doctor."

While such descriptions may not seem damaging, OCR was conscious that problems of "model minority" stereotypes could negatively impact Asian American applicants as a whole.  This concern was also raised when OCR's file review came upon comments such as:

> "He's quiet and, of course, wants to be a doctor . . ."

suggesting that most or all Asian American applicants "want to be a doctor."  Or more pointedly:

> "[A]pplicant's scores and application seem so typical of other Asian applications I've read: extraordinarily gifted in math with the opposite extreme in English."

OCR noted that in a number of cases, Asian American applicants were described as "quiet, shy, reserved, self-contained, soft spoken" and that these characteristics were underlined for added emphasis by the reader.  While white applicants were similarly described, OCR found such descriptions ascribed to Asian American applicants more frequently.  In some cases these comments actually originated from the interviews, teacher or counselor recommendations, or self-descriptions given by the applicant.

. . . .

OCR recognized that reader comments were also sometimes echoes of other reviewers' commentaries related to the applicant.  OCR also noted a few cases in which the readers referred to an applicant as "a classic V.N. [Vietnamese] bootstrap case" or "a classic BC/NC (blue collar/non-college background) Asian American from the inner-city."  While it was clear from the context of the statement that the readers were not criticizing the applicants, and that there was no negative intention, the comments do suggest a tendency to stereotype by calling the applicants "classic."

[Id. at 24–25].  Following the conclusion that Harvard did not discriminate against Asian

American applicants and despite some of the specific findings, Harvard did not hold a meeting or

otherwise require that its admissions officers modify their evaluation practices to avoid actual stereotyping or the appearance of stereotyping. [Oct. 16 Tr. 59:17–24].

In the instant case, the admissions officers who testified at trial uniformly asserted that they do not and have not directly considered race in assigning ratings, other than the overall rating.[36]  The Court credits the admissions officers' testimony and concludes that Harvard has made clear to its admissions officers in more recent years that they should not use race in assigning the profile ratings.  Harvard perhaps should have instituted an explicit written policy stating which ratings could take race into account before 2018, but that error has now been remedied.  See [PX723 at 3, 5].

## C.    More Recent Allegations of Stereotyping and Bias

SFFA also points to more recent examples of admissions officers referring to Asian American applicants as "quiet," "hard worker," "bright," but "bland," "flat," or "not exciting." See, e.g., [DX50 at 186, 178, 693, 1040, 1062].

Harvard's admissions officers are tasked with carrying out a particularly delicate job in that they are instructed to consider race in the admissions process, including for applicants who

---

[36] Senior Admissions Officer Christopher Looby's deposition testimony is the sole instance in which an admissions officer allegedly admitted that race was directly used in assigning a personal rating between the 1990 OCR Report and the present.  SFFA relied on Mr. Looby's deposition testimony in its opening argument, stating, "he'll tell the truth that he's been using race in the personal rating for ten years." [Oct. 15 Tr. 27:22–24].  Mr. Looby joined Harvard's financial aid office in 2008 and has been reading admissions files since approximately 2010.  See [Oct. 18 Tr. 148:16–25].  When asked during his deposition if he would "take a student's race into account when assessing his or her personal qualities," Mr. Looby answered that "just like with the academic rating, it's one factor of many I consider." [Id. at 182:8–19]; see also [Looby Dep. 51:12–17, June 30, 2017].  Mr. Looby testified at trial that he misunderstood the deposition question, and that he meant to state that he used race as one factor in assessing an applicant's overall rating just as he considered the academic rating in assigning the overall rating. [Oct. 18 Tr. 185:19–23].  His response to the deposition question appears to have been a misstatement, and the Court concludes that Mr. Looby meant to indicate at his deposition that he would consider the academic rating and race in assigning the overall rating, not the personal rating.  See [id. at 182:18–184:8].

have indicated a race or ethnicity but have not elaborated on the importance of that identity,

without engaging in unlawful discrimination.  This job is especially sensitive due to the lengthy

history of discrimination against many racial minorities in the United States, including Asian

Americans, as well as Harvard's own history of discriminating against Jewish applicants

beginning in the 1920s.  [Oct. 24 Tr. 188:17–25; Oct. 29 Tr. 34:22–35:13, 161:17–162:16]; see

Korematsu v. United States, 323 U.S. 214 (1944), abrogated by Trump v. Hawaii, 138 S. Ct.

2392 (2018).

It is true that Asian American applicants continue to face both positive and negative

stereotypes, such as perceptions that they are timid, hard-working, and are inclined towards

medicine and science.  See [Oct. 29 Tr. 56:1–56:20].  It is also true that Asian Americans have

significantly higher median incomes (perhaps indicative of the strong work ethic in many Asian

American communities)[37] and are more likely to hold science, technology, engineering, and

mathematics occupations than the United States population more broadly.[38]  Therefore, in

reviewing applicant files and comments made by admissions officers, the Court is sensitive to

the challenge of differentiating among discriminatory comments that evidence actual

stereotyping, animus, or racism and comments about a particular applicant that may incidentally

---

[37] Although Asian Americans tend to have higher incomes than Americans with other racial identities, the evidence suggests that Asian American applicants to Harvard are more likely to come from modest socioeconomic backgrounds than white applicants.  [PX28 at 2–5].

[38] See Anthony Martínez & Asiah Gayfield, The Intersectionality of Sex, Race, and Hispanic Origin in the STEM Workforce 8 (U.S. Census Bureau, Social, Econ., and Hous. Statistics Div., Working Paper No. 2018-27, Feb. 2019), https://www.census.gov/content/dam/Census/library /working-papers/2019/demo/sehsd-wp2018-27.pdf; Kayla Fontenot, Jessica Semega & Melissa Kollar, Income and Poverty in the United States: 2017 at 2–5, (U.S. Census Bureau Current Population Reports, Sept. 2018), https://www.census.gov/content/dam/Census/library/ publications/2018/demo/p60-263.pdf; Liana C. Landivar, Disparities in STEM Employment by Sex, Race and Hispanic Origin at 2, 7, 12, 16 (U.S. Census Bureau Am. Cmty. Survey Reports, Sept. 2013), https://www2.census.gov/library/publications/2013/acs/acs-24.pdf.

reference a stereotypical characteristic, like "hard working," but which may also reflect an actual strength or weakness of that particular applicant.

SFFA has not shown that any applicant was referred to by these types of descriptors because of their race or that there was any sort of systemic reliance on racial stereotypes. The docket binder that contains notes to the effect that several Asian American applicants were "quiet" or "flat" also includes notes for white, African American, and Hispanic applicants who were also described as "quiet," "shy," or "understated." [DX50 at 620, 975, 1054]. In the absence of a pattern or a more pervasive use of stereotypes, the Court accepts that there are Asian American applicants who were "quiet" and that the use of this word with regard to such an applicant would be truthful and accurate rather than reflective of impermissible stereotyping.

In addition to SFFA's concerns about Asian American applicants being referred to as "quiet" and the like, SFFA also points out that there is a statistical relationship between race and the use of the term "standard strong," which some admissions officers use to indicate a strong applicant who is nonetheless unlikely to be admitted because he or she is not sufficiently distinguished within Harvard's exceptional applicant pool. [Oct. 25 Tr. 133:20–134:1]. Asian Americans were labeled "standard strong" more frequently than white applicants, and significantly more frequently than African American or Hispanic applicants. See [id. at 135:4–10]. In a sample of 10% of the applicants to the class of 2018, admissions officers noted that 255 students were "standard strong." [Id. at 134:6–11]. Not one of the 255 standard strong applicants in the sample was admitted. [Id. at 135:16–18]. The standard strong applicants included 126 white applicants, 114 Asian American applicants, 12 Hispanic applicants, and 3 African American applicants. [Id. at 134:23–135:3]. Approximately 15% of Asian American applicants in the original 10% sample were labeled standard strong, compared to 12% of white

applicants, 4% of Hispanic applicants, and 1% of African American applicants.  [Id. at 135:4–10; PD38 at 41].  Additionally, the Asian American applicants considered standard strong averaged higher academic indexes, math SAT scores and academic ratings than standard strong applicants from other racial groups.  See [Oct. 25 Tr. 135:4–136:9]; see also [PD38 at 41].

These statistics on the use of "standard strong" are consistent with the profile ratings Harvard admissions officers assigned to Asian American applicants and white applicants, which show that Asian American applicants excelled, on average, on academic and extracurricular ratings, but were weaker when evaluated on personal and athletic criteria.  See [PX621; PX622]. There is not a significant difference, however, between the white and Asian American applicants who were labeled "standard strong" as reflected by the sum of their profile ratings.  See [Oct. 31 Tr. 94:16–97:18]; see also [DX709].  Further, the higher proportion of standard strong Asian American applicants is consistent with the fact that Asian American applicants to Harvard's class are disproportionately unlikely to be among the weakest applicants: less than 21% of Asian American applicants received an overall rating of 4 or worse, compared to 24% of white applicants, 41% of Hispanic applicants, and 52% of African American applicants.  [PX621].  As such, it is not surprising that a higher proportion of Asian Americans than white applicants were labeled standard strong.

In addition to the use of phrases that align with stereotypes of Asian American applicants and the use of the words "standard strong," SFFA has identified a few instances in which Harvard's Admissions Office's leadership acted in a manner that SFFA argues shows some degree of racial bias.  Although the Court concludes that none of these incidents reflects any actual bias against Asian Americans by Harvard's admissions officers, they do merit brief mention.

In April 2012, Director McGrath was asked to respond to a letter to President Drew

Gilpin Faust from an elderly alumnus.  See [PX461 at 3–6].  The alumnus' letter argued that

Harvard should be admitting more students from Massachusetts, proposed admissions quotas

based on religious affiliation and skin color, and stated that Harvard has "a large number of

oriental students." [Id. at 5].  Director McGrath wrote a polite response, stating that the

alumnus' "comments on the importance of attracting a strong representation of students from

Massachusetts resonates well in the Admissions Committee," but also that Harvard "has become

more representative of the ethnic and economic diversity of the country and, the University

believes, better positioned to make significant contributions to the country." [Id. at 1].  Director

McGrath's carefully crafted response rejected a proposal that was inconsistent with Harvard's

values and did not endorse the suggestions made in the letter, while seemingly trying not to

alienate its author.

In a January 2014 exchange, Director McGrath sent her daughter, who served as an

alumni interviewer for Harvard, a list of the top applicants from Utah prepared by the alumni

interviewers for that state, noting that she was "sending this along for your amusement.  Pure

Utah." [PX265].  In responding, Director McGrath's daughter wrote back, "Hahaha. Very

Thorough!! I also love that the top-tier list is, as you've told me before, all Asians except for a

couple . . . ." [Id.].  The email, which reflects amusement at the unusual degree of thoroughness

of the Utah alumni interviewers, does not reflect a negative view of Asian Americans.[39]

---

[39] Director McGrath testified that she thought it notable that the Utah schools committee put all
Asian Americans at the top of their list because it "confounds the stereotype that many people
have of the population of Utah." [Oct. 19 Tr. 221:3–11].

**ADD49**

In sum, comments on application files and Admissions Office correspondence do not suggest any pervasive bias against Asian Americans among Harvard's admissions officers or its admissions leadership, nor has the Court identified any individual applicant whom it can determine was discriminated against or intentionally stereotyped by an admissions officer, including by the use of the words "standard strong."

## V.    FINDINGS OF FACT: STATISTICAL ANALYSIS

### A.    Sources of Statistical Evidence

In addition to testimony based on the lived experiences of witnesses, the parties introduced statistics and econometric models through expert witnesses.  This statistical evidence is perhaps the most important evidence in reaching a resolution of this case, given SFFA's heavy reliance on the data to make out its claims.  Harvard presented its statistical evidence primarily through Professor David Card, and SFFA presented its statistical evidence primarily through Professor Peter Arcidiacono.[40]  Both Professors Card and Arcidiacono are very well-qualified experts, but they fundamentally disagree about whether the statistics show that Asian Americans are discriminated against in the Harvard admissions process.  Their disagreement results from differences in their respective statistical models of admissions outcomes, based on their inclusion of different applicants and use of different control variables.  Therefore, decisions by the Court as to which applicants and control variables belong in the admission outcome model are pivotal.

---

[40] Harvard's expert, Professor David Card, and SFFA's economist, Professor Peter Arcidiacono, are both highly respected economists.  Professor Card is an economics professor at the University of California at Berkeley, where he teaches undergraduate and graduate level economic courses.  He has published numerous articles and books and is a winner of the John Bates Clark Prize.  [Oct. 30 Tr. 73:7–76:2; DX133].  Professor Arcidiacono is a professor of labor economics at Duke University.  He teaches undergraduate and graduate-level economic courses and has published numerous peer-reviewed articles.  His research is focused on labor economics, and more narrowly, higher education.  [Oct. 25 Tr. 14:7–17:14].

In sum, as discussed more fully below, Professor Arcidiacono excludes ALDCs from his model despite the fact that they make up about 30% of each admitted class, analyzes the data in aggregate rather than independently modeling each admissions cycle, excludes certain variables that he contends are unreliable and have unexpected effects on the model, selectively interacts certain variables, omits the personal rating based on his finding that it is influenced by race, and then, based on that data and approach, concludes that Asian Americans are discriminated against in the admissions process.  See [Oct. 26 Tr. 62:9–63:25; Oct. 30 Tr. 145:15–148:11; DX695; PD38 at 45].  Professor Card creates an independent model for each admissions cycle, includes the personal rating because he concludes that it does not reflect race and, in any event, includes information that is important to the admissions process such that omitting it skews the outcome, includes the other variables that Professor Arcidiacono omits, and does not interact variables. Using this approach, he comes out with a very slight, and not statistically significant, negative coefficient for Asian American identity and concludes, based on that data and approach, that Asian Americans are not discriminated against in Harvard's admissions process.  See [Oct. 31 Tr. 172:19–173:15; DX695; DD10 at 34–35].

The statistics and econometric models used by Professors Arcidiacono and Card were generated using primarily data produced by Harvard in this litigation.  Consistent with this Court's orders, Harvard provided applicant-by-applicant admissions data for more than 150,000 domestic applicants to Harvard's classes of 2014 through 2019,[41] as well as aggregate

---

[41] Because this lawsuit concerns only allegations of discrimination against United States citizens or permanent residents, foreign applicants were removed from the data set.  Further, transfer applicants and those who submitted incomplete applications or for whom Harvard's database was for some other reason incomplete were also removed.  [Oct. 25 Tr. 25:3–26:24; Nov. 1 Tr. 99:12–100:10].  Statistics on "applicants" referred to by these findings of fact are therefore based on data for the approximately 150,000 domestic applicants to Harvard's 2014 to 2019 classes for whom Harvard's database contained a single, complete record.  See [PD38 at 1].

information for the classes of 2000 through 2017, and a sample of actual application files and summary sheets from the classes of 2018 and 2019.  [Oct. 25 Tr. 23:8–26:13; PD38 at 1].  For each applicant to the classes of 2014 through 2019, Harvard's database includes hundreds of variables relating to each applicant's demographic characteristics, personal background, geographic information, test scores, high school grades, ratings assigned by Harvard's admissions officers, and Harvard's admissions decision.  [Oct. 25 Tr. 23:16–24:8; Oct. 26 Tr. 73:22–74:2].  On behalf of SFFA, Professor Arcidiacono supplemented this data by merging it with College Board data on applicants' high schools and neighborhoods.  [Oct. 25 Tr. 24:9–12].

The parties dispute whether ALDC applicants should be included when computing admissions statistics and modeling Harvard's admissions process.  ALDC applicants are admitted at higher rates than the applicant pool more broadly.  SFFA argues that because ALDC applicants are granted significant tips that are not available to most applicants, they are not typical.  [Id. at 27:2–25, 29:4–30:7].  SFFA therefore presented numerous statistics based on non-ALDC applicants which it identifies as the "Baseline Dataset."  [Id. at Tr. 27:2–25].  The Baseline Dataset excludes approximately 7,400 ALDCs, leaving a total of 142,728 applicants in the dataset.  [Oct. 25 Tr. 30:8–31:3; PD38 at 1–2].  SFFA has also presented data based on a subgroup of dataset applicants that include legacies, dean's and director's list applicants, and children of faculty and staff ("LDCs"), but not recruited athletes, which SFFA refers to as the "Expanded Dataset."  [Oct. 25 Tr. 40:17–41:7].

Although ALDCs represent only a small portion of applicants and are admitted or rejected through the same admissions process that applies to other applicants, they account for approximately 30% of Harvard's admitted class.  [Oct. 30 Tr. 153:6–154:8, DX706; DD10 at 38, 40].  For reasons discussed more fully infra at Section V.F, the Court agrees with Professor Card

that including ALDCs in the statistics and econometric models leads to more probative evidence of the alleged discrimination or lack thereof. Nevertheless, the Court has referenced numerous statistics based on data that excludes some or all ALDCs because SFFA used those metrics at trial.

In addition to statistics based on Harvard's admissions database, Harvard presented statistics on the racial make-up of its admitted classes from 1980 to 2019, [Oct. 31 Tr. 119:23–124:6; DX711; DX713; DD10 at 100–04], and SFFA used statistics based on an analysis of 480 sample application files, two-thirds of which were selected by SFFA and one-third by Harvard, [Oct. 25 Tr. 24:21–24]. Both Harvard and SFFA also relied on statistics and models that were prepared by OIR before this lawsuit was filed. See, e.g., [PX9; PX12; PX21].

### B.    Admission Rates and Ratings by Race

Asian Americans were admitted to Harvard at slightly lower rates than white applicants in the years leading up to this lawsuit, with between 5% and 6% of Asian American and between 7% and 8% of white applicants being admitted to the classes of 2014 through 2017. See [PX319 at 15–16]; see also [PD38 at 20].[42] The admissions rates differ more significantly among certain subgroups, but the admissions rates for Asian American ALDCs are generally similar to or higher than those for white ALDCs. 88.6% of Asian American recruited athletes, 48.1% of Asian American children of faculty or staff, and 47.7% of Asian Americans on the dean's or director's interest lists are admitted, compared to 88.1%, 47.9%, and 43.1% of white applicants in those groups, respectively. [PX634]. Asian American legacies are admitted at a rate of

---

[42] Overall admission rates for Asian American applicants are lowered slightly because they are underrepresented among ALDCs, who are admitted at a rate of 43.6% or nearly eight times the 5.5% admissions rate for non-ALDC applicants. [Oct. 30 Tr. 154:17–155:19; DX679; DD10 at 39].

35.2%, as are white legacies.  [Oct. 25 Tr. 121:7–122:4; PX634].  SFFA's economic expert,

Professor Arcidiacono, acknowledges that Asian American ALDCs were likely not discriminated

against.[43]  [Oct. 25 Tr. 122:16–123:17, 126:1–8].  Non-ALDC Asian American applicants have

admission rates that are similar to white applicants, although the admission rates relative to

whites varies by year from between 0.2 percentage points lower to 0.9 percentage points higher.

[Id. at 68:2–70:2; PD38 at 20].[44]  With the exception of 2019 where the admission rates favored

Asian American applicants, the differences in admission rates for non-ALDC white and Asian

American applicants was not statistically significant.  See [PD38 at 20].  The gist of SFFA's

argument, however, is not that Asian Americans were excluded altogether, but rather that the

non-ALDC Asian American applicants were stronger than the non-ALDC white applicants and

should have been admitted at a higher rate. [45]

---

[43] Although its expert agrees that Asian American ALDCs were not discriminated against, SFFA continues to argue that they were, but that the strength of their applications overcame the bias. The Court ultimately finds that excluding ALDCs distorts the analysis.

[44] The highest annual admissions rate for Asian American applicants relative to white applicants, and the only year for which the admission rates for Asian American and white applicants differed to a statistically significant degree, was the class of 2019, which was selected after the allegations of discrimination that led to this lawsuit emerged.  [Oct. 25 Tr. 68:2–22; PD38 at 20].

[45] As reflected by the data, Harvard does not systematically exclude Asian Americans, nor does SFFA claim that it does.  As of 2016, the United States population was approximately 60% white and 5.9% Asian.  U.S. Census Bureau, Quick Facts, Census.gov, https://www.census.gov/ quickfacts/fact/table/US/RHI225218.  Among applicants to Harvard's class of 2019, 21.2% were Asian American and 57.6% were white.  [DX713].  Among those domestic applicants who Harvard admitted, 40% of the class identified as white and 24% identified as Asian American.  It is entirely possible, and not without historical precedent, that an admissions process could discriminate against Asian Americans (or Jews) despite their over-representation in a class as compared to the general population.  The Court nonetheless includes these numbers to give some context to the overall admissions data.

Asian Americans would likely be admitted at a higher rate than white applicants if admissions decisions were made based solely on the academic and extracurricular ratings. Among Expanded Dataset applicants, more than 60% of Asian American applicants received academic ratings of 1 or 2, compared to 46% of white applicants, 9% of African American applicants, and 17% of Hispanic applicants. [Oct. 25 Tr. 49:17–50:5; PX623]. Overall, strong academic applicants are particularly abundant, with a higher percentage of applicants (42%) scoring a 1 or 2 on the academic rating as compared to the percent that score a 1 or 2 on any other rating. [DD10 at 4].[46] Asian American applicants' stronger academic ratings broadly align with their stronger performance across a range of qualitative indicators of academic strength. [Oct. 25 Tr. 41:18–46:9; PD38 at 4–7]. Asian American applicants also average relatively high extracurricular ratings. More than 28% of Expanded Dataset Asian American applicants receive an extracurricular rating of 1 or 2, compared to 25% of white applicants, 16% of African American applicants, and 17% of Hispanic applicants. [Oct. 25 Tr. 52:12–22; PX623].

Although Harvard admissions officers do not believe that Asian American applicants, as a group, have worse personal qualities than other applicants and Harvard alumni interviewers assign personal ratings of 1 or 2 to Expanded Dataset Asian American and white applicants with a similar frequency, [Oct. 23 Tr. 204:1–9; Oct. 24 Tr. 138:11–16; Oct. 25 Tr. 55:7–12], Harvard admissions officers assign Asian American applicants personal ratings that are, on average, slightly weaker than those assigned to applicants from other racial groups, [PX623]. Among Expanded Dataset applicants, 22.6% of white applicants receive a personal rating of 1 or 2, compared to 18% of Asian Americans, 19.4% of African Americans, and 19.1% of Hispanics.

---

[46] 24% of applicants receive an extracurricular rating of 1 or 2, 21% of applicants receive a personal rating of 1 or 2, and 10% of applicants receive an athletic rating of 1 or 2. [Oct. 30 Tr. 86:25–88:2; DD10 at 4].

**ADD55**

[Id.].  The statistics are similar for Baseline Dataset applicants, with 17.6% of Asian Americans receiving a personal rating of 1 or 2, compared to 18.7% of Hispanics, 19% of African Americans, and 21.3% of whites.  [Oct. 25 Tr. 55:13–22; PX621].

At least a partial cause of the disparity in personal ratings between Asian American and white applicants appears to be teacher and guidance counselor recommendations, with white applicants tending to score slightly stronger than Asian Americans on the school support ratings. [PX621; PX623; PD38 at 4–5, 8–10].  Among Expanded Dataset applicants, 31.9% of white applicants received a "teacher 1" rating (the rating for the first of two teacher recommendations submitted) of 1 or 2 compared to 31.6% of Asian American applicants.  [PX 623].  For the "teacher 2" rating (the rating for the second teacher recommendation), 33.6% of white applicants received a rating of 1 or 2 compared to 32.3% of Asian American applicants.  [Id.].  In the Expanded Dataset, 27.4% of white applicants and 26.4% of Asian American applicants receive a guidance counselor rating of 1 or 2. [Id.].  Although these differences may appear slight, they are significant in that the stronger high school academic and extracurricular performance of Asian American applicants on average would lead one to expect that those applicants would receive stronger teacher and guidance counselor recommendations than white applicants.

On average, Asian American applicants are also assigned lower athletic ratings, particularly compared to white applicants, who average especially strong athletic ratings.  See [PX621; PX623; DX692 at 2].  Among non-recruited athlete applicants, only 5% of Asian Americans received an athletic rating of 2, compared to 14% of whites, 7% of African Americans, and 8% of Hispanics.  [PX623].  When recruited athletes are included in the calculation, the disparity between white and Asian American applicants receiving strong athletic

ratings increases, with white applicants receiving athletic ratings of 1 or 2 at roughly three times the rate of Asian American applicants.  [Oct. 30 Tr. 96:25–97:19; DX692 at 2; DD10 at 10].

### C.    Descriptive Statistics

In addition to the regression analyses used in this case, Professors Card and Arcidiacono also offered descriptive statistics that support their respective arguments on the question of discrimination.  In constructing these statistics, both experts used the same dataset consisting of applicants to the classes of 2014 through 2019 (except that Professor Arcidiacono prefers to remove ALDCs).  Professor Card uses the dataset to compare admission rates by racial group for applicants who scored 1s and 2s across similar numbers of profile ratings.  He, on behalf of Harvard, uses this multidimensionality analysis to argue that the statistical evidence does not support a conclusion that Harvard discriminates against Asian Americans relative to whites.  Meanwhile, Professor Arcidiacono uses an academic decile analysis in which he divides applicants into deciles based on applicant academic index score and then shows that Asian Americans in the top academic deciles are receiving strong personal and overall ratings at lower rates than applicants from other racial groups with similar academic qualifications.  He, on behalf of SFFA, argues that the lower average overall and personal ratings for Asian American applicants who have similar levels of academic strength to non-Asian American applicants suggest that Harvard is engaged in a discriminatory admissions process.

### 1.    Professor Card's Multidimensionality Analysis

Professor Card's statistical analysis shows that the students most likely to be admitted to Harvard are those that do well across the profile and school support ratings, rather than merely excelling on just one rating.  In coming to this conclusion, Professor Card analyzed the relationship between race and applicant strength across multiple profile ratings, which he terms an analysis of "multidimensional accomplishments."  [Oct. 30 Tr. 89:3].  Only 7,000 applicants

per year, or roughly 27%, receive a rating of 1 or 2 in at least two profile ratings, and only 7% of applicants receive ratings of 1 or 2 in three or all four profile ratings. [Id. at 89:19–90:17; DX672; DD10 at 5]. The 7% of applicants who score highly in three or four of the four profile ratings are seemingly the most multidimensional under Harvard's scoring system; 70% of those applicants are admitted and make up 46% of all admitted applicants. [Oct. 30 Tr. 93:15–94:12; DX672; DD10 at 8]. The 20% of applicants who receive two profile ratings of 1 or 2 account for 38% of admitted students. [Oct. 30 Tr. 93:15–94:12; DX672; DD10 at 8]. Meanwhile, applicants with one or no ratings of 1 or 2 account for 73% of applicants but only 15% of admitted students. [DX672; DD10 at 8]. White applicants are slightly more likely than Asian American students to receive three profile ratings of 1 or 2, with approximately 900 or 9% of all white applicants receiving three such scores relative to 500 or 8% of all Asian American applicants. [Oct. 30 Tr. 95:18–96:10; DX692 at 2; DD10 at 9].

Professor Card has also offered support for his conclusion that white applicants are disproportionately strong in non-academic traits by removing all academic inputs from his model of admissions probability to rank applicants to Harvard. See [Oct. 31 Tr. 69:20–71:5; DD10 at 77]. By doing so, he creates a "non-academic index," and his analysis shows that white students do disproportionately well in this metric, with 12% of white applicants ranking in the top decile compared to only 7.8% of Asian American applicants. See [Oct. 31 Tr. 70:17–19; DD10 at 77]. Professor Card's multidimensionality analysis thus suggests that a partial cause of the race-related disparities in admission rates, when controlling for academic performance, is that Asian American applicants' disproportionate strength in academics comes at the expense of other skills and traits that Harvard values. See [DX692 at 2–4].

The Court notes, however, that the profile ratings are not equally distributed in terms of the number of 1s, 2s, 3s, or 4s assigned, nor are they equally correlated with an applicant's chances of admission. For example, being a recruited athlete (and therefore receiving an athletic rating of 1) vastly improves an applicant's odds of admission, with 86% of recruited athletes typically admitted and Asian Americans especially underrepresented in that group. [Oct. 25 Tr. 31:11–23; PD38 at 2]. Although Harvard highly values applicants who will contribute to its varsity sports, it also admits a significant number of applicants who do not participate in high school athletics, and who therefore receive an athletic rating of 4 or lower. [Oct. 25 Tr. 28:21–29:8, 31:11–23; PD38 at 10]. Academic, extracurricular, or personal ratings of 4 or lower are relatively rare and more likely to result in rejection than an athletic rating of 4 or lower. [Oct. 25 Tr. 52:6–54:12; PD38 at 8–10]. 39% of admitted non-ALDC applicants are scored as athletic 4s or lower, while less than 1% of admitted Baseline Dataset applicants are scored as academic, extracurricular, or personal 4s. [Oct. 25 Tr. 52:23–53:13; PD38 at 10]. Further, personal ratings of 1 are exceptionally rare and are awarded to fewer than 10 applicants in a typical year, whereas athletic, extracurricular, and academic ratings of 1 are more common, though they are still each awarded to less than 1% of applicants. See [PX623; PD38 at 2].

Although the profile ratings are not of equal importance, are not assigned on a set curve, and do not have any assigned mechanical weight, receiving multiple ratings of 1 or 2 is strongly correlated with admission. [Oct. 30 Tr. 88:12–89:3, 90:18–92:12; DX672; DD10 at 6, 8]. Because the number of 1s and 2s awarded in each of the four profile ratings every year vastly exceeds the number of students Harvard can admit, Harvard tends to admit applicants with multiple profile ratings of 1 or 2 who are also significantly distinguished in some other way— which, as discussed supra at Part III.B.3, may include accomplishments or characteristics that are

remarkable even when measured against a very accomplished applicant pool or that are likely to be underrepresented in Harvard's class.

To summarize, Professor Card uses his multidimensionality analysis to show that the Harvard admissions process favors applicants who score well across the profile and school support ratings and to counter the argument that Harvard's admissions process is biased based on a comparison of admission rates for students who are similarly-situated academically. Professor Card is correct that an analysis predicated on an applicant's academic profile ignores statistical disparities between racial groups across other dimensions that favor non-Asian American applicants. Most notably, white applicants are significantly more likely to have made strong high school contributions to athletics, and this disparity counteracts the effect that Asian American applicants' relative academic and extracurricular strength would otherwise have on their admission rate. Professor Card's analysis shows that strength across multiple dimensions is highly correlated with admission to Harvard and results in fewer admitted Asian American applicants.

That being said, because Professor Card's multidimensional analysis gives equal weight to each profile rating, it overvalues the athletic rating which favors white applicants, despite the fact that it is seemingly less important than the academic, personal, and extracurricular ratings for obtaining admission to Harvard, at least for applicants who are not recruited athletes. See [DX692 at 2]. Further, because the multidimensionality analysis uses all the profile ratings, any bias in the ratings, including in the personal rating, is baked into his analysis.

2.    Professor Arcidiacono's Academic Index Decile Analysis

In contrast, for his descriptive statistics analysis, Professor Arcidiacono compared applicants by analyzing the relationship between race and various ratings, including school support, academic, extracurricular, personal, and overall ratings for applicants who are

academically similarly-situated—that is who fall into the same academic index deciles. For this analysis, he splits Baseline Dataset applicants into ten equally sized groups based on their academic index, which reflects the strength of an applicant's standardized test scores and high school grades, with "Decile 10" containing the 10% of applicants to Harvard who had the strongest academic index scores and "Decile 1" containing the applicants with the weakest scores. See [PD38 at 6]. The deciles reflect only numerical academic metrics in contrast to the academic ratings assigned by Harvard, which incorporate an assessment of academic potential and other non-numerical factors. [Oct. 22 Tr. 137:12–24]. Professor Arcidiacono's deciles show that Asian American applicants are disproportionately represented in the top academic deciles. See [Oct. 25 Tr. 44:12–48:8; PX624; PX626; PD38 at 6–8]. More than a third of Baseline Dataset Asian American applicants fall in the strongest two academic index deciles, while African American and Hispanic applicants are underrepresented among applicants with the highest academic indexes. [Oct. 25 Tr. 47:22–48:5; PD38 at 8].

Professor Arcidiacono's academic decile analysis shows a racial disparity in applicants' personal and overall ratings that appears to favor white applicants based on a comparison of applicants within the same academic decile. See [PD38 at 16, 18–19]. For example, among Baseline Dataset applicants, 22.2% of Asian Americans in the top decile of applicants by academic index (i.e. those with the strongest high school GPA and standardized test scores) receive personal ratings of 1 or 2, compared to 29.6% of whites, 34.2% of Hispanics, and 47% of African Americans; similar variances by race are also present for students in the second and third strongest academic deciles. [Id. at 19]. Similarly, only 12.9% of Baseline Dataset Asian Americans in the top academic index decile receive an overall rating of 1 or 2, compared to 15.6% of whites, 27.4% of Hispanics, and 47% of African Americans. [Id.].

Professor Arcidiacono's decile analysis also shows that the disparities between Asian American and white applicants' school support ratings are magnified when comparing applicants within the same academic index deciles. Among non-recruited athletes, white applicants are only approximately 1 percentage point more likely to receive teacher or guidance counselor ratings of 1 or 2 than Asian American applicants. [PX623]. White applicants in the top academic deciles, however, receive school support ratings of 1 or 2 at a rate that is 4 to 6 percentage points higher than Asian Americans in the same academic deciles. [Oct. 26 Tr. 37:25–40:17].

In sum, Professor Arcidiacono bases his decile analysis on the academic index, which only accounts for test scores and grades—criteria in which Asian American applicants are, on average, especially strong. He argues that the personal rating is compromised, that the athletic rating is not that important, and that Asian American applicants do well on the limited measures that remain and should therefore be admitted at a higher rate than they are. This approach likely over emphasizes grades and test scores and undervalues other less quantifiable qualities and characteristics that are valued by Harvard and important to the admissions process.

### D. Overview of Logistic Regression Models

Professors Card and Arcidiacono both believe that the descriptive statistics discussed above help to provide context, but also agree that logistic regressions are the most useful econometric tool in evaluating the probable effect of race and other traits on Harvard's admissions process. See [Oct. 25 Tr. 79:11–83:24; Oct. 30 Tr. 101:5–17]. Their respective logistic regression models seek to isolate the effects of race through models that include, and thereby control for, other variables that affect the modeled outcome. [Oct. 25 Tr. 215:12–19; Oct. 30 Tr. 176:18–179:3].

The Court notes at the outset that although logistic regression models are seemingly the best available econometric tool, they cannot capture all of the factors that Harvard considers and can therefore account for only part of the variation in admissions decisions, or other modeled outcomes. See [Oct. 25 Tr. 80:13–24; Oct. 30 Tr. 114:10–23]. Further, no model is perfect, and models can be affected by biases that are inherent in the control variables that they use. See [Oct. 25 Tr. 91:17–92:11, 215:16–19]. To limit the impact of variables affected by bias, variables that are themselves impacted by the independent variable of primary interest, which is race, should generally be excluded from regression models. Including such variables dilutes the implied effect of race by allowing that effect to be partially captured by the race-influenced variable itself. See [id. at 215:16–19; Nov. 1 Tr. 77:22–78:4]. Excluding variables for this reason may, however, make a model less accurate because it also results in the removal of information relevant to the modeled outcomes.

Here, although Professors Arcidiacono and Card both endorse the use of regression models, they disagree on whether the personal rating should be included as a control variable. Professor Arcidiacono contends that personal ratings are themselves affected by race and that they should therefore not be used in the admissions model. [Oct. 25 Tr. 99:11–18]. Professor Card argues that the personal rating variable should be included, and thereby implicitly contends that race correlates with personal qualities that affect personal ratings, but that race does not itself affect the personal ratings assigned by admissions officers, or at least that any causal effect of race on the personal rating is insignificant relative to the value of the variable in controlling for a race-correlated, but not directly race-caused, relationship. [Nov. 1 Tr. 79:9–14].[47] Further,

---

[47] Directly race-caused means a cause internal to the Harvard admissions process, as distinct from the potential for an effect of race on inputs to that process.

the personal rating captures other relevant characteristics unrelated to race that will not be taken into account at all by the modeling if the personal rating is excluded, such as the extent to which an applicant demonstrates character, leadership ability, self-confidence, grit, or other distinctive qualities that might benefit the Harvard community.

Logistic regressions result in two metrics that are relevant here: "coefficient" and "marginal effect." Coefficients indicate how much weight the model suggests each variable has in determining the modeled variable (here, admissions outcome or an assigned rating), holding the other included variables constant. [Oct. 25 Tr. 76:22–78:8]. To generate a coefficient for a discrete variable such as race (*e.g.* where an applicant is white, Asian American, African American, or Hispanic), a model omits one of those characteristics to create a baseline group (*e.g.* white applicants) and the coefficients that the model generates for the included groups (*e.g.* Asian American, African American, and Hispanic) then indicate the implied effect of each of those characteristics on the dependent variable (*e.g.* admissions outcome) relative to the baseline group, holding constant the control variables that are included in the model (*e.g.* academic rating, disadvantaged status, parental occupation, etc.). [Id. at 77:24–78:8]. In the experts' models, a positive coefficient is associated with a higher probability of admission or a stronger rating, and a negative coefficient is associated with a lower probability of admission or a weaker rating. [Id. at 77:3–78:23]. The Court has and will continue to note when race appears "statistically significant" in an analysis, which indicates that the coefficient for some racial group is of a magnitude that would occur infrequently due to random variation if race and the modeled variable were not related when controlling for the other variables included in the model. It is critical to understand that a statistically significant variable in an econometric model is not proof

of a causal relationship.  A statistically significant coefficient may be the result of random variation, omitted variables, or other flaws in the model.

A marginal effect is a measurement of the change in the projected outcome of the model (*e.g.* odds of admission to Harvard) that is associated with changing a given variable, while holding other variables constant.  The magnitude of the change in probability will depend on the other variables.  For example, a model might not suggest a large effect on an applicant's probability of being admitted based on being African American, as opposed to being white, for a student who is academically unprepared (*i.e.* race won't make a difference for an unprepared student), but might imply a significantly increased probability of admission associated with being African American rather than white for an applicant who is well-prepared.  See [id. at 78:24–80:6; PD38 at 25].  An "average marginal effect" is the average of the marginal effect associated with the variable of interest for that group.  For example, one could calculate the average marginal effect of African American racial identity relative to white identity on the odds of admission or of achieving a given rating by averaging the probability changes attributable to the coefficient for African American identity in a relevant model.  See [Oct. 25 Tr. 21:18–22:17, 80:8–12, 96:19–97:24; PD38 at 24–25, 31].  Again, it must be understood that the average marginal effect reflects an average statistical relationship between a variable of interest (such as race) and a modeled variable (such as admissions outcome), and that relationship may or may not be causal in nature.

Professors Card and Arcidiacono each prepared models of the admissions process in which the dependent variable is the admissions decision (admitted or rejected).  [Oct. 25 Tr. 216:22–217:7; Oct. 30 Tr. 101:15–17].  Their admissions models are broadly similar and predict the probability of admission for domestic non-transfer applicants by accounting for a wide range

of observable variables including gender, disadvantaged status, first generation college applicant status, fee waiver, whether the applicant applied for financial aid, academic index, intended major, secondary school type, indicators of parental education, whether parents attended an Ivy League school, whether parents are alive, geographic indicators, and standardized test results. See [Oct. 30 Tr. 143:16–25]; see also [PD38 at 26].

There are, however, several critical differences in the structure and control variables utilized by Professor Card's and Professor Arcidiacono's respective models. As a result of these differences, Professors Card's model returns a coefficient for Asian American identity that is negative but not statistically significant, meaning that the model does not strongly suggest that Asian American as opposed to white racial identity affects an applicant's chances of admission, whereas Professor Arcidiacono's model returns a negative coefficient for Asian American identity that is statistically significant, meaning that his model suggests that Asian American identity is associated with a lower chance of admission, when controlling for the other variables he includes. [Oct. 25 Tr. 115:1–11; Oct. 30 Tr. 129:9–16, 132:21–134:11]. The modeling differences that result in these disparate conclusions are discussed infra at Section V.F.

Professor Arcidiacono also prepared a series of ordered logit estimates that SFFA contends show how well the ratings assigned for the academic, extracurricular, personal, overall, and school support ratings can be predicted. [Oct. 25 Tr. 90:10–91:23, 150:2–6; Oct. 30 Tr. 101:15–17; Oct. 31 Tr. 188:22–189:1; Nov. 1 Tr. 76:3–11, 79:15–19; PD38 at 28]. These models are similar to Professor Arcidiacono's model of admissions decisions, except that they are intended to be probative of the effect of race on the ratings assigned by admissions officers rather than the applicants' probability of admission. [Oct. 25 Tr. 90:16–91:10]. Professor Arcidiacono's preferred ordered logit models control for application year, application docket,

academic index, SAT scores, SAT II scores, high school GPA, extremely low-grade applicants,

parental education level, including whether a parent attended an Ivy League school, whether the

applicant's parents are alive, expected college major, gender, high school type, neighborhood,

disadvantaged status, receipt of an application fee waiver, first generation college applicant

status, whether the applicant applied for financial aid, profile ratings other than the dependent

variable, teacher recommendation ratings, guidance counselor rating, alumni ratings, and certain

interactions among those variables.  See [id. at 82:13–85:3; PD38].  To the extent that Professor

Arcidiacono's models imply that Asian American identity is associated with the ratings assigned

by admissions officers, his models suggest that the magnitude and direction of the relationship

(bonus or penalty) varies by rating and depends on whether an Asian American applicant is male

or female and whether or not they are economically disadvantaged.  See [PD38 at 28–35].

### E.    Regression Models of School Support, Profile, and Overall Ratings

Although the experts' models of admissions outcomes are most probative of whether

Harvard has engaged in discrimination against Asian Americans relative to white applicants,

there are also related statistical relationships between race and the profile and school support

ratings.  Because those ratings serve as inputs for the proposed admissions outcome models, the

Court will briefly address the extent to which race might appear to impact the ratings assigned by

admissions officers before turning to the admissions outcome models themselves.

### 1.    Relationship Between Race and School Support Ratings

As discussed supra at Section V.C, Asian American applicants have lower average school

support ratings than white applicants.  There are several conceivable explanations for the

disparity including actual differences in non-academic strengths, a correlation between the

quality of the guidance counselor or teacher recommenders and the racial makeup of high

schools, biased teachers and guidance counselors, or biased Harvard admissions officers.

Considering the testimony of Harvard's admissions officers and the admissions process itself, the Court views Harvard admissions officer bias as an unlikely explanation for the disparity in school support ratings and concludes that race-related variance in the school support ratings result from some combination of the other potential causes, all of which are beyond Harvard's control. Further, when considering regression analyses, because school support ratings can be included in admissions outcome models, any racial effect that impacts admissions decisions through the school support ratings can be controlled for.

Importantly, however, although the school support ratings themselves provide only an overall numeric evaluation of recommendations, the school support materials are in fact more nuanced and the substance of them informs perceptions about applicants across numerous dimensions. [Oct. 31 Tr. 36:16–37:16]. Considering the stereotypes and biases that favor and disfavor Asian American applicants in different evaluation dimensions, the impact of race on the school support ratings could be understood to suggest that the overall numeric score masks more subjective disparities in how applicants from different racial groups are presented by their recommenders. See [id.]. Therefore, to the extent Asian Americans are presented by guidance counselors and high school teachers as weaker in personal characteristics that Harvard values and those presentations inform the personal rating, omission of the personal rating results in an omitted variable bias that cannot be fully captured by including a school support rating control variable.

2.    Relationship Between Race and Personal Ratings

Professor Arcidiacono's preferred model suggests that Asian American identity reduced a Baseline Dataset applicant's probability of receiving a personal rating of 2 or higher. The model implies that when holding constant nearly all of the available observable variables, Asian American identity is associated with a lower probability of being assigned a strong personal

rating by an admission officer.   More precisely, his model suggests that an average Baseline

Dataset Asian American applicant has a 17.8% probability of receiving a 2 or higher on the

personal rating, which is lower than the 21.6% chance that the model suggests the applicant

would have in the absence of any racial preference.  [Oct. 25 Tr. 96:24–97:24; PD38 at 31].

Harvard did not offer a competing regression model to show that no statistically significant

relationship between Asian American identity and the personal rating exists, and the Court

therefore concludes that the data demonstrates a statistically significant and negative relationship

between Asian American identity and the personal rating assigned by Harvard admissions

officers, holding constant any reasonable set of observable characteristics.

The Court finds, however, that Professor Arcidiacono's preferred model likely overstates

the direct effect of Asian American identity on the personal rating.  First, as discussed <u>supra</u> at

Section III.B.4, Harvard's witnesses credibly testified that they did not use race in assigning

personal ratings (or any of the profile ratings) and did not observe any improper discrimination

in the admissions process.  [Oct. 18 Tr. 49:17–19; Oct. 19 Tr. 48:24–49:19, 253:4–17; Oct. 23

Tr. 50:24–51:4, 219:21–24; Oct. 24 Tr. 122:5–8; Nov. 1 Tr. 246:18–247:4, 253:18–25].  The

uniformity of these observations is persuasive given the collective manner in which admissions

decisions are made, with all members of the Admissions Committee participating in all decisions

and having real-time visibility into the process for each applicant.  Any causal relationship

between Asian American identity and the personal rating must therefore have been sufficiently

subtle to go unnoticed by numerous considerate, diligent, and intelligent admissions officers who

were immersed in the admissions process.

Second, Professor Arcidiacono's model explains only a portion of the variation in

personal ratings and likely suffers from considerable omitted variable bias.  The model does not

include variables for several factors that influence personal ratings and may correlate with race, such as the extent to which applicants' essays and personal statements demonstrated their abilities to overcome obstacles or personal achievements that might reasonably be perceived as an indication of leadership ability or other personal strengths. [Oct. 31 Tr. 35:15–36:9].[48]

Third, as discussed supra at Section V.C, E, teacher and guidance counselor recommendations seemingly presented Asian Americans as having less favorable personal characteristics than similarly situated non-Asian American applicants, and the school support ratings do not fully reflect more subtle racial disparities. As the experts' analyses demonstrate, some race-correlated variation in teacher and guidance counselor recommendations is likely a cause of at least part of the disparity in the personal ratings. See supra at Sections V.C, E. Professor Card's analysis shows that the school support ratings for Asian American applicants are generally weaker than the ratings for white students when comparing white and Asian American students who receive the same academic rating. [DX692 at 4]; see [DD10 at 68]. For example, approximately 43% of white students who receive an academic score of 2 have school support ratings (from their two teacher and one guidance counselor recommendations) that sum

---

[48] Speculating on how unobserved variables may be influencing the model's implied effect of race on the personal ratings is fraught with difficulty. Although the Court has not received statistical evidence on the effect of race on specific high school achievements, it is likely that some high school achievements are themselves effected by racial biases. One might question the effect, positive or negative, of being Asian American on the probability of being selected to a leadership position such as class president, captain of a sports, math, or debate team, or the likelihood of being identified as an outspoken advocate, a natural leader, or an intellectual superstar. Professor Arcidiacono's models account for some of these considerations, to some degree, through inclusion of the school support ratings, but much of the variation in applicants' qualities cannot easily be boiled down to econometrically digestible variables. [Oct. 31 Tr. 35:15–36:9]. It is possible that Asian American applicants to Harvard are being disadvantaged by biases in their high schools that affect their college applications. Admissions officers have no easy mechanism to measure or correct for these biases, except to carefully review individual applicants in a holistic way and to recognize and consider applicants' accounts of how their racial identities have shaped their pre-college experiences.

to 7 or less (indicating very strong recommendations), while only about 37% of Asian American applicants with an academic score of 2 receive similarly strong school support ratings.  [Oct. 31 Tr. 55:11–56:2].  Because teacher and guidance counselor recommendation letters are among the most significant inputs for the personal rating, the apparent race-related or race-correlated difference in the strength of guidance counselor and teacher recommendations is significant.  See [id. at 54:6–56:2; DD10 at 67–68].  The Court reiterates that to the extent that disparities in the personal ratings are explained by teacher and guidance counselor recommendation letters, Harvard's admissions officers are not responsible for any race-related or race-correlated impact that those letters may have.

Additionally, correlation between race and the personal and school support ratings does not clearly demonstrate a causal relationship, given the correlation between race and numerous factors that likely influence teacher and guidance counselor recommendations and admissions officers' evaluation of personal and overall strength.  For example, a privileged student and a disadvantaged student with the same academic performance may well not receive similar teacher and guidance counselor recommendations.  Similarly, a student that works part time and a student that does not may receive different recommendations even with the same academic performance and without reference to race, but if working outside of school correlates to race and informs teacher, guidance counselor, and admissions officers' evaluation of applicants, the school support and personal ratings may correlate with race, although race might not be the cause of the differential.  In other words, race-correlated disparities in personal ratings for applicants who have similar academic qualifications may reflect underlying differences in the backgrounds and experiences of applicants that happen to correlate with race but are not racially motivated.  That being said, it is not clear that these sorts of considerations adequately explain the difference

in personal ratings between white and Asian American applicants in Professor Arcidiacono's decile analysis or the similar analysis Professor Card has offered.

Overall, the disparity between white and Asian American applicants' personal ratings has not been fully and satisfactorily explained. Because some of the disparity in personal ratings is due to teacher and guidance counselor recommendations, the issue becomes whether the remaining disparity reflects discrimination. The disparity in personal ratings between Asian American and other minority groups is considerably larger than between Asian American and white applicants and suggests that at least some admissions officers might have subconsciously provided tips in the personal rating, particularly to African American and Hispanic applicants, to create an alignment between the profile ratings and the race-conscious overall ratings that they were assigning. See [PD38 at 33]. It is also possible, although unsupported by any direct evidence before the Court, that part of the statistical disparity resulted from admissions officers' implicit biases that disadvantaged Asian American applicants in the personal rating relative to white applicants, but advantaged Asian Americans over whites in the academic rating.

Further, the Court cannot accurately estimate what portion of the difference in the personal ratings resulted from the strength of the personal qualities that Harvard seeks to measure or from differences in how Asian American applicants are presented to Harvard by high schools relative to other applicants, as opposed to being the effect of implicit biases. Taking account of all the available evidence, it is possible that implicit biases had a slight negative effect on average Asian American personal ratings, but the Court concludes that the majority of the disparity in the personal rating between white and Asian American applicants was more likely caused by race-affected inputs to the admissions process (*e.g.* recommendations or high school

accomplishments) or underlying differences in the attributes that may have resulted in stronger personal ratings.

3.    Regression Models of the Academic, Extracurricular, and Overall Ratings

Unlike the personal ratings, the experts agree that the academic and extracurricular variables should be included in the admissions outcome model and that the overall rating should not be included because Harvard acknowledges that it is directly affected by racial identity.  See [PD38 at 26; DD10 at 46–47].  Nevertheless, because the profile ratings may all be impacted by race in a very marginal manner, the Court will briefly discuss the econometric models of these variables.  Professor Arcidiacono's logistic regression models for the academic, extracurricular, and overall ratings suggest a non-uniform effect of Asian American identity on those ratings. [Oct. 25 Tr. 91:11–92:20, 109:23–110:13; PD38 at 28–33].  The academic and extracurricular ratings models return positive coefficients for Asian American identity, while the overall rating model returns a negative coefficient for Asian Americans (with the exception of disadvantaged Asian American females).  See [Oct. 25 Tr. 92:24–94:10, 107:8–13, PD38 at 29, 32–33].

A comparison between the strength of Asian American applicants on the observable characteristics included in Professor Arcidiacono's academic and extracurricular rating models and the coefficients for Asian American groups suggests that Asian Americans have traits, other than their racial identity, that make them likely to score well in academic and extracurricular ratings.  [Oct. 25 Tr. 107:8–110:17; PD38 at 32–33].  This implies that the positive coefficients for Asian American identity in the academic and extracurricular ratings models are likely at least partially the result of unobservable characteristics that correlate with race, and Professor Arcidiacono has posited that is indeed likely the cause.  [Oct. 25 Tr. 108:24–109:8, 110:14–17]. The Court finds, however, that although omitted variables are likely partially responsible for the positive coefficients for Asian American identity in Professor Arcidiacono's models for the

academic and extracurricular ratings, those coefficients could also partially be the result of slight implicit bias that favors Asian Americans in these areas.

Professor Arcidiacono's model of the overall rating yields negative coefficients for Asian American males and non-disadvantaged Asian Americans females. [PD38 at 29]. This suggests that Asian Americans who are not also disadvantaged females might receive lower overall ratings because of their racial identity relative to similarly-situated white applicants, see [Oct. 25 Tr. 92:20–94:10; PD38 at 29], but the result is subject to substantially the same criticism that Harvard lodges against Professor Arcidiacono's admissions outcome model, namely that Professor Arcidiacono's modeling choices do not fully reflect the actual admissions process and that his decision to exclude ALDC applicants was results-driven. Regardless, the Court finds it unnecessary to delve further into the overall rating disparity because it is the odds of admission, not an apparent disparity in the odds of receiving a high overall rating, that is primarily at issue, and Harvard acknowledges and intends that race may be factored into the overall rating. See [Oct. 18 Tr. 167:17–168:6].

## F.    Regression Models of Admissions Outcome

As noted supra at Section V.D, both Professors Arcidiacono and Card prepared models of domestic non-transfer applicants' probability of admission to Harvard based on a wide array of variables. [Oct. 25 Tr. 21:18–23:23, 215:12–15; Oct. 30 Tr. 176:18–177:7]. Professor Card's preferred model returns a negative coefficient for Asian American identity (suggesting a lower likelihood of admission), but the relationship is slight, not statistically significant, and is positive (suggesting an increased likelihood of admission) for some class years. [Oct. 30 Tr. 129:9–16,

132:21–134:11; DX685; DD10 at 30].[49]  Professor Arcidiacono's preferred model returns a

statistically significant negative coefficient for non-ALDC Asian American applicants, which

implies a penalty for non-ALDC Asian American applicants relative to non-ALDC white

applicants.  [Oct. 25 Tr. 115:1–118:10; PD38 at 34].

Professors Card's and Professor Arcidiacono's preferred models differ in the following

significant respects: (1) Professor Arcidiacono interacts race and disadvantaged status; (2)

Professor Arcidiacono excludes the personal rating from the model; (3) Professor Arcidiacono

excludes ALDC applicants; (4) Professor Arcidiacono pooled the 2014–2019 applicant data into

a single model with effects for class years, whereas Professor Card used separate year-by-year

models and thereby allowed the effect of variables to vary by admissions cycle; and (5) Professor

Arcidiacono excludes parental occupation, intended career, and an indicator for whether

applicants interviewed with a staff member.  See [Oct. 31 Tr. 88:21–91:23; DD10 at 84].  For the

reasons discussed below, the Court finds both experts' approaches to be econometrically

defensible, but prefers Professor Arcidiacono's approach with respect to interacting race and

disadvantaged status and prefers Professor Card's inclusion of ALDC applicants, use of year-by-

year models, and inclusion of parental occupation, intended career, and staff interview variables,

and finds models with and without the personal rating to be worthy of consideration.

Professor Arcidiacono reasonably interacted race and disadvantaged status.  [Oct. 25 Tr.

150:11–19].  This approach is consistent with the approach taken by OIR in response to Dean

---

[49] Professor Card also modeled the admissions outcomes for two subgroups of Asian Americans:
females and applicants from California.  He found that Asian American identity within these
subgroups returned positive coefficients that were not statistically significant.  [Oct. 25 Tr.
154:7–155:3; Oct. 30 Tr. 136:8–137:8].  These models show that to the extent biases influenced
the admissions process, those biases were not uniform across the Asian American applicant
population.

Fitzsimmons' request and reflects the possibility of some interaction between race and disadvantaged status. See [Oct. 17 Tr. 127:22–129:17; Oct. 25 Tr. 150:11–151:1; PX26]. It was not unreasonable, however, for Professor Card not to interact the selected variables. The inclusion of these interaction terms has only a modest impact on the average marginal effects of Asian American identity generated by the admissions models, and their inclusion alone does not result in Asian American identity having a statistically significant effect when the terms are added to Professor Card's model. [Oct. 31 Tr. 89:11–18; DD10 at 84].

There is a reasonable econometric basis for removing the personal ratings from the admissions models given the possibility that the personal ratings are affected by race. See [Oct. 25 Tr. 91:17–92:1]. Removing the personal rating, however, expands the omitted variable bias because the relationship between race and the personal rating is likely partially reflective of biases external to the Admissions Office, characteristics that are correlated with race, and life experiences that are impacted by race. See supra at Section V.C. Therefore, although the Court believes that including the personal rating results in a more comprehensive analysis, models with and without the personal rating are econometrically reasonable and provide evidence that is probative of the effect of race on the admissions process.

Professor Card's inclusion of ALDCs in the admissions model is preferred by the Court. Although ALDCs benefit from sizable tips owing to their respective statuses as recruited athletes, legacies, dean's or director's list members, or children of faculty or staff, they are evaluated through the same basic admissions process as other applicants and their admission outcomes provide data that is probative of whether Harvard is discriminating against Asian Americans. [Oct. 17 Tr. 203:19–22; Oct. 25 Tr. 30:13–31:3, 233:25–234:3]. Including ALDCs in the model is particularly warranted where they account for approximately 30% of Harvard's

admitted students and therefore provide a significant portion of the datapoints for admitted

students.  [DX706, DD10 at 38].

Professor Arcidiacono acknowledges that Asian American ALDCs are not discriminated

against.  See [Oct. 25 Tr. 120:23–126:8].  His corresponding suggestion that only non-ALDC

Asian Americans face discrimination in the admissions process is inadequately supported by

non-statistical evidence.  Further, it does not seem likely that Harvard would discriminate against

non-ALDC Asian Americans, but not discriminate against ALDC Asian American applicants or

that there would be a race-related explanation for treating the two groups differently, especially

given the Court's conclusion based on the testimony of Harvard's admission officers that any

race-related discrimination against Asian American applicants relative to white applicants is

unintentional.  Additionally, the tips that only ALDCs receive, for example for being recruited

athletes, can be adequately accounted for through the inclusion of variables for those

characteristics.  See [Oct. 30 Tr. 157:24–158:14].  Overall, including ALDCs leads to a model

that more accurately reflects how the admissions process works and takes into account a larger

percentage of the admitted class.  In the view of the Court, looking at only a portion of a class or

carving out the segments where there is less likely to be discrimination distorts the analysis just

as carving out the segments where there is mostly likely to be discrimination would do the same

but to the benefit of the other party.  [Id. at 166:21–167:20].

For similar reasons, Professor Card's modelling of each individual admissions cycle is

preferable to Professor Arcidiacono's pooling of applicants from the six admissions cycles of

available data.  Professor Card's year-by-year approach conforms to the reality that the effect of

various characteristics in the admissions process may change slightly between years, as

Harvard's institutional interests or admissions policies shift or when the composition of the

applicant pool changes.  [Id. at 167:25–170:15]; see, e.g., [DX703; DX704].  Further, modeling each annual admission cycle independently recognizes that having a class that is 30% African American one year and 0% the next is not the same as having 15% each of those years. Professor Arcidiacono pooled the admissions cycles to achieve a more precise estimate of the effect of Asian American racial identity, but Professor Card's model achieves a lower standard error, which is an indication of the precision of the model.  [Oct. 30 Tr. 172:21–175:18; DD10 at 45].

Professor Arcidiacono omitted intended career, staff interview indicator, and parental occupation from his model.  [Oct. 25 Tr. 145:21–148:12].  The Court prefers a model that includes these variables because they play a role in the admissions process.  [Oct. 26 Tr. 8:25– 9:21, 10:17–11:6; Oct. 31 Tr. 9:3–7].  Further, these variables correlate with race and therefore create a significant potential for omitted variable bias if excluded.  [Oct. 31 Tr. 10:16–18, 11:15– 12:21, 21:19–22:14; DX677; DX681; DD10 at 54].  Professor Arcidiacono excluded these variables primarily because of data issues, including unexplained year-to-year fluctuations in the distribution of parental occupation and intended career categorizations.  [Oct. 25 Tr. 145:21– 148:12; DD10 at 50–52, 56].  As examples, numerous parents who were categorized as having low-skill jobs for the class of 2014 would likely have been categorized as being self-employed for the class of 2015, and there is a substantial decrease in the number of parents categorized as unemployed among applicants to the class of 2017 versus the class of 2018.  [Oct. 25 Tr. 146:4– 147:9; DD10 at 51–52].  Although the data for parental education and intended career are not as consistent year-to-year as would be ideal, including the variables is preferable because their exclusion results in omitted variable bias that exaggerates the effect of race that is implied by the models.  [Oct. 30 Tr. 146:18–147:6; DX695; DD10 at 35].  Professor Card's model deals

effectively with data categorization inconsistencies by treating each admission cycle separately, and SFFA has not shown that the data is unreliable within any admissions cycle.  [Oct. 30 Tr. 169:12–24].  This data might well need to be excluded if using one data pool for all admission years, but there is no need to exclude it when modeling admissions decisions year-by-year.

Professor Card included a staff interview indicator variable, while Professor Arcidiacono excluded the indicator based on his conclusion that the score from an interview should matter, not whether an applicant was interviewed.  [Oct. 25 Tr. 148:13–18].  Interviewing with an Admissions Office staff member seemingly affects an applicant's probability of admission to Harvard, perhaps because it provides an applicant with a potential advocate in the Admissions Office irrespective of how well the applicant performs in that interview, and the Court concludes that including the indicator variable is preferable.  See [Oct. 31 Tr. 25:7–27:8].

The Court finds that Professors Card and Arcidiacono each presented a viable econometric model but will rely on Professor Card's model with the interaction terms utilized by Professor Arcidiacono and then consider results both with and without the personal rating variable included.  This model would return a slightly negative coefficient and average marginal effect for Asian American identity, but that coefficient is only statistically significant in the version of the model where the personal rating variable is excluded.  See [Oct. 30 Tr. 146:6–17; DD10 at 35].  In fact, without any modifications, Professor Card's model returns a slight positive average marginal effect for Asian American identity in three of the six admission cycles that the experts analyzed.  [DD10 at 30].  Whether the personal rating variable is included or not, the lower probability of admission to Harvard that appears associated with Asian American identity is slight, with an average marginal effect of Asian American racial identity on admissions probability that is well below minus one percentage point (i.e. closer to zero).  The model does

not demonstrate any intent by admissions officers to discriminate based on racial identity, and

the implied effect is so slight that it is possible that the coefficient would be positive, at least

with the personal rating included, if the model was better able to account for unobserved factors.

It is also possible that the negative coefficient and average marginal effect reflect a very slight

implicit bias that could have played a modest role in lowering Asian Americans' admissions

probability in some of the 2014–2019 admissions cycles.  If so, the effect was so slight that it

went unnoticed by careful and conscientious observers within the Admissions Office.  The

implied effect varies by admissions cycle and, with the personal rating variable included, results

in a positive, statistically insignificant effect for the 2019 class year, which suggests, even

though the change is not statistically significant, that any implicit biases against Asian

Americans dissipated or were eliminated after the Admissions Office was confronted with the

allegations at issue here.  See [Oct. 30 Tr. 163:22–164:22; DD10 at 41].

## G.    Absence of Statistical Support for Racial Balancing or Quotas

Harvard does not have any racial quotas and has not attempted to achieve classes with

any specified racial composition.  [Oct. 18 Tr. 112:1–21, 197:16–19; Oct. 19 Tr. 65:13–25,

197:14–20; Oct. 24 Tr. 123:15–18, 174:10–18, 210:2–9; Nov. 1 Tr. 249:24–250:6].  As

discussed supra at Section III.B.4, Harvard evaluates the likely racial composition of its class and

provides tips to applicants to help it achieve a diverse class.  Those tips are necessary to achieve

a diverse class given the relative paucity of minority applicants that would be admitted without

such a tip.  In trying to assure a diverse class, when reviewing an individual applicant, the

admissions officers consider various qualitative and numerical indicators of diversity, including

the racial composition of the group of students who are expected to be admitted.

Although Harvard tracks and considers various indicators of diversity in the admissions

process, including race, the racial composition of Harvard's admitted classes has varied in a

manner inconsistent with the imposition of a racial quota or racial balancing.  See [Oct. 31 Tr. 119:10–121:10; DX711].  As *Figures 1* and *2* show, there has been considerable year-to-year variation in the portion of Harvard's class that identifies as Asian American since at least 1980. See [DX711 at 2; DD10 at 100–101].

*Figure 1*: Percent Change in Year-to-Year Admittance of Students by Race. [DD10 at 100; DX711].



**ADD81**

***Figure 2****: Percent of Applicants and Admitted Students by Race 1980 through 2019.*
***[DD10 at 100; DX713].***



The demographic makeup of Harvard's classes from 1980 through 2019 show significant

changes to the composition of each class, and there has been more year-to-year variation in

admitted Asian American applicants than year-to-year variation in the number of applicants.

[DX713; DD10 at 104]. From 1980 to 2019, Asian Americans went from 4.1% of applicants and

3.4% of admitted students to 21.2% of applicants and 20.6% of admitted students. [DX713].

Since 1980, the Asian American proportion of the admitted class has increased roughly five-fold,

and since 1990 the Asian American proportion of the admitted class has increased roughly two-

fold. [Id.]. SFFA did not offer expert testimony on racial balancing and instead asserts that the

claim can be resolved without any expert analysis. [Oct. 25 Tr. 202:6–203:1; ECF No. 627

¶ 84].

The Court finds that the statistical evidence shows that Harvard has not imposed racial quotas or otherwise engaged in impermissible racial balancing.

## VI.    FINDINGS OF FACT: RACE-NEUTRAL ALTERNATIVES

Under the strict scrutiny rubric established by the Supreme Court, Harvard may consider race to achieve diversity only if there is no workable race-neutral alternative to the consideration of race to ensure a sufficiently diverse class.  SFFA introduced models on race-neutral alternatives through an expert, Richard Kahlenberg.[50]  The Smith Committee's conclusions and the analysis performed by Professor Card and Mr. Kahlenberg all convincingly establish that no workable race-neutral alternatives will currently permit Harvard to achieve the level of racial diversity it has credibly found necessary for its educational mission.

Harvard's race-conscious admissions policy has a significant impact on the racial diversity of its class, with African American and Hispanic applicants being the primary beneficiaries in terms of their admissions probabilities.  The policy of considering applicants' race may improve the admission chances of some Asian Americans who connect their racial identities with particularly compelling narratives, but overall results in fewer Asian American and white students being admitted.  See [Oct. 31 Tr. 127:22–128:15].  Any race-neutral alternative will be deemed workable only if it would allow Harvard to achieve the benefits that it derives from its current degree of diversity within a given class year, while also being practicable, affordable, and not requiring a material decline in academic quality or any of the other measures of excellence valued by Harvard.

---

[50] Mr. Kahlenberg is a senior fellow at The Century Foundation, where he has worked for the last twenty years.  He graduated from Harvard College in 1985 and received a juris doctor from Harvard Law School in 1989.  Mr. Kahlenberg has published works on numerous socioeconomic subjects, including the use of race-neutral alternatives in college admissions.  [Oct. 22 Tr. 7:15–12:10].

Currently, although always considered in conjunction with other factors and metrics, race is a determinative tip for approximately 45% of all admitted African American and Hispanic applicants.  See [DX721 at 1].  At least 10% of Harvard's admitted class, including more than one third of the admitted Hispanics and more than half of the admitted African Americans, would most likely not be admitted in the absence of Harvard's race-conscious admissions process.  See [Oct. 31 Tr. 127:22–129:2; DX721; DD10 at 107].[51]  In the absence of any other adjustments to Harvard's admissions policy, eliminating consideration of race would cause the African American representation at Harvard to decline from approximately 14% to 6% of the student population and Hispanic representation to decline from 14% to 9%.  [Oct. 31 Tr. 126:21–129:2].  Over the course of four years, the number of African American and Hispanic students at Harvard would fall by nearly 1,000 students.  See [Oct. 25 Tr. 167:20–168:4; PD38 at 39].

The Court notes that Harvard's current admissions policy does not result in under-qualified students being admitted in the name of diversity—rather, the tip given for race impacts who among the highly-qualified students in the applicant pool will be selected for admission to a class that is too small to accommodate more than a small percentage of those qualified for admission.[52]  Therefore, removing attention to race, without a workable race-neutral alternative,

---

[51] The econometric models fail to fully reflect the number of students for whom race is determinative.  Among other factors, the increased Asian American representation that the models project would likely not include all Asian American students who are admitted under the current race-conscious approach.  In the total absence of a race-conscious policy, some Asian American applicants who excelled on academic, athletic, or other metrics of success would likely replace some number of Asian American students from disproportionately less advantaged backgrounds who tell compelling stories about their personal identities that require an understanding of their race.  See, e.g., [Oct. 18 Tr. 52:19–56:21; Oct. 29 Tr. 147:6–152:12].

[52] Moreover, other tips in the admissions process, like so many facets of modern-day American life, disproportionately benefit individuals in the majority and more affluent group.

would cause a sharp decline in the percentage of African American and Hispanic students at Harvard without resulting in a particularly significant increase in the overall academic strength of the class.[53]

The parties' experts, as well at the Smith Committee, examined numerous race-neutral alternatives to determine if they, alone or in combination, could conceivably limit the decline in racial diversity in Harvard's class in the absence of a race-conscious admissions policy.  See [Oct. 22 Tr. 18:1–11; Oct. 31 Tr. 129:3–130:4; PX316 at 6–18].  These alternatives included eliminating early action, tips for ALDC applicants, the practice of offering deferred admissions or z-listing applicants, and consideration of standardized test scores, as well as expanding recruiting and partnership efforts, admitting more transfer students, utilizing a place-based quota system, and expanding preferences for economically disadvantaged applicants.  [Oct. 22 Tr. 33:15–49:8; Oct. 31 Tr. 130:5–130:23, 133:10–20; PX316 at 6–18; DD10 at 109].  As more fully set forth below, Harvard has demonstrated that none of these approaches, individually or in combination, would allow it to reach the level of racial diversity that it believes necessary to achieve its educational mission without significant consequences to the strength of its admitted class.

## A.    Eliminating Early Action

In an earlier effort to both increase diversity and level the admissions playing field for less advantaged applicants, Harvard eliminated its early action program for the classes of 2012 through 2015, believing that early action disproportionately benefitted affluent applicants and hoping that other elite colleges would follow its lead, which they largely did not.  [PX316 at 15].

---

[53] Similarly, removing the tips for recruited athletes would result in a sharp decline in admitted athletes, removing the tips for children of faculty or staff would reduce their representation, and eliminating the tip for legacies would decrease their numbers as well.  In other words, removing any tips changes the make-up of the admitted class, but not necessarily its overall quality.

This actually had the unintended consequence of decreasing matriculation rates among some categories of African American and Hispanic applicants, apparently because the most qualified of those prospective applicants were choosing to attend other colleges that offered early admission or early decision. [Oct. 23 Tr. 156:17–157:22; DX39 at 2–4]. As a result, Harvard reinstituted an early action program for the class of 2016. [PX316 at 15; DX39 at 4]. Harvard's actual experience is more probative of the probable result of such a change than econometric prognostications and shows that the likely effect of removing early action on African American and Hispanic enrollment is negative or near zero. [Oct. 31 Tr. 133:20–135:24; DX728 at 3]. As such, eliminating early action does not present a viable race-neutral option for achieving student body diversity.

### B.    ALDC Tips

Preferences or tips for ALDC applicants and related deferred admissions also disproportionately benefit socioeconomically advantaged applicants. See [PX316 at 16–17]. Although removing tips for these applicants would improve socioeconomic diversity at Harvard and increase the number of Asian American students, it would not significantly increase the number of African American and Hispanic students if implemented alone. [Oct. 31 Tr. 131:8–133:8; DX720; DD10 at 112]. Professor Card reasonably estimated that eliminating tips for race and ALDC status, along with eliminating deferred admissions, would cause African American enrollment to decline from 14% to 5% and Hispanic enrollment to decline from 14% to 9%. [Oct. 31 Tr. 132:15–133:19; DX720; DD10 at 112]. Eliminating tips for ALDC applicants would have the effect of opening spots in Harvard's class that could then be filled through an admissions policy more favorable to non-white students, but Harvard would be far less competitive in Ivy League intercollegiate sports, which would adversely impact Harvard and the student experience. [Oct. 30 Tr. 40:12–41:21]. Eliminating tips for legacies, applicants on the

dean's and director's interest lists, and children of faculty or staff would also come at considerable costs, and would adversely affect Harvard's ability to attract top quality faculty and staff and to achieve desired benefits from relationships with its alumni and other individuals who have made significant contributions to Harvard.  [Oct. 23 Tr. 164:19–167:2; Oct. 30 Tr. 20:17–21:8, 35:25–43:13; PX316 at 16–17].

Therefore, eliminating tips for ALDC applicants and related deferred admissions practices is not alone an adequate race-neutral alternative given the limited probable impact on racial diversity and the likely adverse consequences for Harvard and student life.  The Court notes that reasonable minds can differ on the importance of college athletics, alumni relations, and admitting the children of faculty and staff, but takes no position on these issues other than to note that these are topics best left to schools to figure out for themselves.  As relevant here, eliminating these tips or preferences is largely unrelated to the goal of diversity or the issue of race, and in any event, is not a race-neutral alternative that would obviate the need for considering race in admissions.

### C.    Augmenting Recruiting Efforts and Financial Aid

Harvard looked at expanding recruiting and partnership efforts and providing more financial aid as a way to increase diversity without having to consider race in the application process.  The college already makes significant outreach efforts and provides exceptionally generous financial aid.  [PX316 at 9–11].  In addition to the HFAI and UMRP programs discussed supra at Section III.A.2, the Smith Committee's report describes additional community-based outreach efforts and considered but rejected the potential for pipeline programs that are inconsistent with Harvard's recruitment goals.  [PX316 at 10].  Harvard has already reached, or at least very nearly reached, the maximum returns in increased socioeconomic and racial diversity that can reasonably be achieved through outreach and

reducing the cost of a Harvard education.  See [Oct. 31 Tr. 158:15–161:2; PX316 at 10–11;

DD10 at 131–133].

### D.    Increasing Diversity by Admitting More Transfer Students

Harvard might also increase diversity by admitting, as transfers, students who might not

have applied or been accepted to Harvard at the outset.  For example, it is conceivable that if

Harvard expanded its efforts to attract and admit transfer students, it might be able to admit some

transfer applicants who did not have the perspective to see attending Harvard as an option or who

excelled during two years at another college, thereby demonstrating an academic prowess that

might not have been evident right out of high school.  Despite the facial appeal of these

scenarios, Harvard has demonstrated that accepting an increased number of transfer applicants is

also not a viable race-neutral alternative because these applicants are, on average, less diverse

and less qualified than applicants to its freshman class.  [Oct. 31 Tr. 146:24–149:21; DX730;

DD10 at 124–125].  Further, Harvard operates as a four-year residential college and the number

of transfer students that it can admit is constrained by the number of available beds, meaning that

there is not room for transfer students unless other class members drop out.  [PX316 at 12–13].

### E.    Eliminating Standardized Testing

Eliminating consideration of standardized testing is likewise not an adequate race-neutral

alternative to considering race in the admissions process.  Harvard considers standardized tests to

be reflective of academic or intellectual strength and uses SAT and ACT test scores in assigning

academic ratings.  [PX721 at 4].  Harvard has demonstrated that eliminating consideration of

standardized test scores in the admissions process would lead to a reduction in the academic

qualifications of its admitted class, at least as measured by the criteria Harvard presently uses.

[Oct. 31 Tr. 143:23–146:11; DX722 at 3; DD10 at 121].  As the Smith Committee found,

standardized tests are "imperfect measures," but they can be a useful metric when considered in

tandem with an applicant's background.  [PX316 at 18].  Although eliminating consideration of standardized test scores might improve diversity slightly, the effects on the academic strength of Harvard's admitted class makes eliminating the consideration of standardized test scores an unviable race-neutral alternative.  See [Oct. 31 Tr. 153:4–154:17; DX723 at 3].

### F.    Place-Based Quotas

The Smith Committee considered place-based quotas, such as admitting the top student from each high school class or from each zip code.  [PX316 at 11–12].  Harvard's evaluation and rejection of these ideas reflects the reality that Harvard is far too selective and high schools and zip codes in the United States too numerous for such an admissions policy to be even close to workable.  [Oct. 22 Tr. 107:6–108:2].

Harvard could achieve somewhat improved racial diversity in the absence of a race-conscious admissions policy by increasing the tips for students from disadvantaged economic backgrounds and areas.  Under any reasonable implementation, however, this race-neutral approach would result in fewer African Americans than are admitted under the current system and would also come at the expense of traditional measures of academic strength, such as SAT scores.  See [Oct. 22 Tr. 125:6–10, 126:17–127:23; PD27; PD29; PD31; PD33].

Mr. Kahlenberg proposes a quota system where Harvard commits to enrolling students from broad neighborhood clusters constructed to generate more representation from racially diverse and disproportionately economically disadvantaged areas, [Oct. 22 Tr. 35:23–36:16], but given the logistical challenges of such an arrangement coupled with the questionable legality of any sort of quota system, as discussed infra at Section VII.G, place-based quotas are not an available and workable race-neutral alternative.

89

**ADD89**

### G.    SFFA's Proposed Combinations of Various Race-Neutral Alternatives

Mr. Kahlenberg presented four simulations, labeled A, B, C, and D, that model the combined effect of various allegedly race-neutral alternatives on Harvard's class.  [Oct. 22 Tr. 16:7–14, 29:20–47:6].  The simulations, using the admissions models developed by Professors Card and Arcidiacono with the models' implied racial tips removed, project the diversity of Harvard's class with various modifications to the models that are aimed at increasing racial diversity by increasing the tip given to economically disadvantaged applicants, further preferencing applicants from disadvantaged geographic areas, and by removing preferences currently used in Harvard's admissions process for ALDC students or LDC students that disproportionately benefit white applicants.  [Oct 22 Tr. 27:11–27:7].[54]  These simulations show that Harvard could achieve a significant increase in socioeconomic diversity and an increase in the total representation of African American, Hispanic and other (*i.e.* non-white and non-Asian American) students in its classes but only if it abandoned all preferences for legacies, applicants on the dean's or director's interest lists, and children of faculty or staff, and implemented a sizable tip based on economic and geographic indicators of disadvantage.  See [PD27; PD29;

---

[54] In all of the simulations, the implied effects of tips given to LDCs are removed.  [Oct. 22 Tr. 34:17–35:9; PD32].  Simulation B, which utilizes Professor Card's model and simulation, projects the effect of removing preferences for recruited athletes as well.  [Id. at 41:3–42:9].  The simulations all impose some form of a socioeconomic and/or geographic status boost.  [PD32].  Model A expands the boost associated with disadvantaged status such that it is half the magnitude of the tip that the model suggests is currently granted to recruited athletes and forces equal selection of applicants from 33 neighborhood clusters, [Oct. 22 Tr. 35:23–36:16]; Model B boosts for socioeconomically disadvantaged students based on census tract income, [id. at 41:20–42:1]; and Simulations C and D modify the socioeconomic and census tract boost used in Simulation B and consider whether an applicant attended a disadvantaged high school, [id. at 43:7–44:16].  Models A and C also remove the admissions models' implied preference for early action applicants, while models B and D include that preference.  [Id. at 42:2–3, 46:10–12; PD32].

**ADD90**

PD31; PD33]. For example, Simulation D projects that 49% of Harvard's class would be from an economically disadvantaged background, relative to the 12% in the class of 2019. [PD33].

Mr. Kahlenberg's changes to the admissions policy would come at significant costs. In addition to the loss of benefits provided by tips for ALDCs or LDCs, the simulations show a 53 to 71-point decline in average SAT scores. [PD27; PD29; PD31; PD33]. These declines in average SAT score would be associated with more significant declines in the expected strength of Harvard's class across the profile ratings, with the amount of the expected decline varying depending on the simulation selected. For example, under Simulation C, the portion of the admitted class achieving a 1 or 2 in each profile rating falls by between 13% and 26%. [DX729 at 11; DD10 at 141]. The simulations also imply substantial changes to the academic interests of Harvard's admitted classes that would pose administrative and staffing challenges. [DX729]. For example, Mr. Kahlenberg's models would likely lead to more students being admitted who indicated an intended concentration in engineering and fewer admitted students who intend to concentrate in the humanities, which would likely require Harvard to expand and contract its academic programs accordingly.

Finally, and perhaps most significantly for present purposes, Mr. Kahlenberg's simulations uniformly suggest that African American representation in Harvard's incoming class would fall nearly one-third to approximately 10% of the class. [Oct. 22 Tr. 127:16–23]. In order to achieve, without race-conscious policies, comparable numbers of African American students in its admitted classes to those Harvard currently achieves, Harvard would likely need to eliminate all ALDC preferences, eliminate consideration of standardized tests, significantly expand the tip for disadvantaged applicants, and find a way to increase the number of disadvantaged applicants so that more of those disproportionately minority applicants could be

admitted.  [Oct. 31 Tr. 153:4–154:3; DX723 at 1].  These changes, even assuming they could be achieved, would result in a significant decline in the strength of Harvard's admitted classes across multiple dimensions, including its potential for academic and scholarly achievement.  See [Oct. 31 Tr. 154:2–24; DX723 at 3; DD10 at 127].

Harvard plausibly concludes that reshaping its incoming classes in this way would have negative effects on Harvard's attractiveness to potential students, adversely affect the educational experience at Harvard generally, and that the resulting decrease in the number of African American students would exacerbate "feelings of isolation and alienation among racial minorities in Harvard's community."  See supra at Section III.A.1; [PX316 at 8].

The Court therefore concludes that Harvard has demonstrated that there are no workable and available race-neutral alternatives, singly or taken in combination, that would allow it to achieve an adequately diverse student body while still perpetuating its standards for academic and other measures of excellence.  This conclusion is corroborated by the work of the experts retained by both sides, none of whom have proposed alternatives that would allow Harvard to meet its diversity goals while not unduly compromising on its other legitimate institutional objectives.

## VII.    CONCLUSIONS OF LAW

### A.      Overview

The Court first affirms its previously expressed view that SFFA has standing and then turns to SFFA's four pending Title VI claims: impermissible racial balancing (Count II), failure to use race merely as a "plus factor" (Count III) the availability of race-neutral alternatives (Count V), and intentional discrimination (Count I).  Ultimately, the Court finds that Harvard has met its burden of showing that its admissions process complies with the principles articulated by

the Supreme Court in <u>Fisher II</u>, 136 S. Ct. at 2208, and concludes that judgment must issue for

Harvard on each of the remaining claims.

### B.    SFFA Has Standing

The constitutional extent of federal court jurisdiction is limited by Article III, which

provides that "judicial power" extends to "Cases" and "Controversies" that, *inter alia*, arise

"under this Constitution [or] the Laws of the United States." U.S. Const. Art. III § 2, cl. 1.

"Over the years, [Supreme Court] cases have established that the irreducible constitutional

minimum of standing contains three elements:" (1) "an injury in fact—an invasion of a legally

protected interest which is (a) concrete and particularized and (b) actual or imminent, not

conjectural or hypothetical;" (2) "a causal connection between the injury and the conduct

complained of—the injury has to be fairly traceable to the challenged action of the defendant,

and not the result of the independent action of some third party not before the court;" and (3) "it

must be likely, as opposed to merely speculative, that the injury will be redressed by a favorable

decision." <u>Lujan v. Defenders of Wildlife</u>, 504 U.S. 555, 561 (1992) (citations and modifying

punctuation omitted). "The party invoking federal jurisdiction bears the burden of establishing

these elements." <u>Id.</u>

Under the doctrine of associational standing, "an association may have standing solely as

the representative of its members even in the absence of injury to itself, in certain

circumstances." <u>Camel Hair & Cashmere Inst. of Am., Inc. v. Associated Dry Goods Corp.</u>, 799

F.2d 6, 10 (1st Cir. 1986). As the Supreme Court has held:

> [A]n association has standing to bring suit on behalf of its members when: (a) its
> members would otherwise have standing to sue in their own right; (b) the interests
> it seeks to protect are germane to the organization's purpose; and (c) neither the
> claim asserted nor the relief requested requires the participation of individual
> members in the lawsuit.

<u>Hunt v. Wash. State Apple Advert. Comm'n</u>, 432 U.S. 333, 343 (1977).

During this litigation, SFFA demonstrated that its members included individuals who had

standing to pursue this litigation on their own, that this litigation was germane to SFFA's

purpose, and that the injunctive relief SFFA seeks does not require the participation of those

members in this lawsuit.  See Students for Fair Admissions, 261 F. Supp. 3d at 110–11.  Harvard

argued at the summary judgment stage that the case had become moot because the SFFA

members who the Court found had individual standing were no longer participating in the

college admissions process or seriously interested in transferring.  "Mootness usually results

when a plaintiff has standing at the beginning of a case, but, due to intervening events, loses one

of the elements of standing during litigation . . . ."  Wild Earth Guardians v. Pub. Serv. Co. of

Colo., 690 F.3d 1174, 1182 (10th Cir. 2012) (citing Arizonans for Official English v. Arizona,

520 U.S. 45, 68 n.22 (1997)).  At summary judgment, the Court found that "Harvard ha[d] not

established that the case ha[d] become moot based on the [members'] alleged disinterest in

transferring."  Students for Fair Admissions, 346 F. Supp. 3d at 191 (D. Mass. 2018).  Harvard

now asserts that the Court should have applied a more stringent standard, including requiring

SFFA to show that its members control its conduct and possess certain "indicia of membership."

[ECF No. 619 ¶¶ 326–30].  Harvard's standing arguments are preserved for appeal.

## C.    The Supreme Court and Race-Conscious Admissions

Although this Court, as it must, relies principally on the Supreme Court's most recent

guidance as set forth in Fisher II, a brief synopsis of the case law which culminated in Fisher II

follows.

The Supreme Court directly confronted the issue of affirmative action or race-conscious

admissions in the context of higher education for the first time in Regents of University of

California v. Bakke, 438 U.S. 265 (1978) (plurality opinion).  In that case, the Supreme Court

struck down an admissions policy at the University of California at Davis Medical School

pursuant to Title VI and the Equal Protection Clause.  Bakke, 438 U.S. at 271 (1978).  At that

time, the Medical School admitted most of its minority students through a "special admissions

program" that filled 16 of the class' 100 spots with economically or educationally disadvantaged

applicants who were members of a minority group.  Id. at 272–75.  White applicants could

compete for 84 of the seats in the Medical School's class, while all 100 seats were potentially

open to minority students.  Id. at 289.

Justices Brennan, White, Marshall, and Blackmun would have found Title VI coextensive

with the Equal Protection Clause and upheld the medical school's policy on the basis that the

government may use race to remedy disadvantages to minorities caused by past racial prejudice.

Id. at 355, 324–79 (concurring in part and dissenting in part).  Chief Justice Burger and Justices

Stevens, Stewart, and Rehnquist would have found the special admissions program in violation

of Title VI, irrespective of the Equal Protection Clause.  Id. at 408–21.  Justice Powell, who

announced the judgment of the Supreme Court, agreed with Justices Brennan, White, Marshall,

and Blackmun that Title VI proscribes only those racial classifications that would violate the

Equal Protection Clause, but unlike his fellow justices, concluded that diversity was an asserted

state interest that could withstand strict scrutiny and that to satisfy strict scrutiny, the medical

school's approach to diversity had to "encompass[ a broad] array of qualifications and

characteristics of which racial or ethnic origin is but a single though important element."  Id. at

315.  Although no majority agreed on a particular rationale, the Supreme Court determined that

the medical school's special admissions program was unconstitutional because it involved "the

use of an explicit racial classification" that told "applicants who are not Negro, Asian, or

Chicano that they [were] totally excluded from a specific percentage of the seats in an entering

class."  Id. at 319.

Nevertheless, a majority of the Supreme Court believed that race could be used in higher education admissions, and it was understood that Justice Powell's opinion in Bakke permitted the use of race or ethnic background as a "plus" factor to further the goal of diversity in education. Justice Powell attached the Harvard College Admissions Program as an appendix to his opinion in Bakke and used it as a basis to conclude that the "assignment of a fixed number of places to a minority group is not a necessary means toward" diversity. Id. at 316, 321–24. In contrast with Harvard's admissions process, which purported to treat "each applicant as an individual in the admissions process" and did not foreclose applicants from competing for the last available seat "simply because he was not the right color or had the wrong surname," id. at 318, the "fatal flaw" in the medical school's "preferential program" was its "disregard of individual rights," id. at 320.

Twenty-five years later, the Supreme Court revisited the subject of racial preferences in higher education admissions in a pair of cases concerning the University of Michigan's Law School and its College of Literature, Science, and the Arts. In Grutter v. Bollinger, 539 U.S. 306 (2003), the Supreme Court concluded that the admissions process at the University of Michigan Law School was constitutionally permissible. 539 U.S. at 325. The law school considered applicants with a focus on academic ability coupled with a flexible assessment of applicants' talents, experiences, and potential to contribute to the learning of those around them. Id. at 315. Admissions officials were required to consider all the information available in an applicant's file, including a personal statement, letters of recommendation, undergraduate grades, admissions test scores, and an essay describing the ways the applicant would contribute to the life and diversity of the law school. Id. at 315. While not restricting the types of diversity eligible for consideration or defining diversity solely in terms of racial or ethnic status, the law school was

committed to "racial and ethnic diversity with special reference to the inclusion of students from groups which have been historically discriminated against." Id. at 316.

In deciding Grutter, the Supreme Court clarified that strict scrutiny applies to the use of race in college admissions, agreed that the law school had a compelling interest in obtaining the educational benefits that flow from a diverse student body, and concluded that the law school's race-conscious admissions process was sufficiently narrowly tailored. Id. at 333–34. The Supreme Court found that the law school's goal of "enroll[ing] a critical-mass of minority students," did not run afoul of the requirement that a school not attempt to attain "some specified percentage of a particular group merely because of its race or ethnic origin," which would "amount to outright racial balancing" and be "patently unconstitutional." Id. at 329–30 (quoting Bakke, 438 U.S. at 307). Instead, as distinct from a quota, the concept of "critical mass [was] defined by reference to the educational benefits that diversity is designed to produce," including racial understanding, breaking down stereotypes, advancing learning outcomes, and preparing students for a diverse workforce and society. Id. at 330. The Supreme Court noted that the law school's admissions program bore the hallmarks of a narrowly tailored plan: truly individualized consideration including the use of race in a "flexible, nonmechanical way," no quotas or separate admissions tracks for members of certain racial groups, and no insulating "applicants who belong to certain racial or ethnic groups from the competition for admission." Id. at 334.

In upholding the law school's admissions process in Grutter, the Supreme Court again approved of "the Harvard plan," as described by Justice Powell in Bakke. See id. at 335. Like Harvard, the University of Michigan Law School did not have a "quota," meaning "a program in which a certain fixed number or proportion of opportunities are 'reserved exclusively for certain minority groups.'" Id. (quoting Richmond v. J.A. Croson Co., 488 U.S. 469, 496 (1989)

(plurality opinion)).  Rather, the law school pursued a "permissible goal" that "require[d] only a good-faith effort to come within a range demarcated by the goal itself," and "permit[ed] consideration of race as a 'plus' factor in any given case while still ensuring that each candidate 'competes with all other qualified applicants.'"  Id. (punctuation omitted) (first quoting Sheet Metal Workers v. EEOC, 478 U.S. 421, 495 (1986) and then quoting Johnson v. Transp. Agency, Santa Clara Cty., 480 U.S. 616, 638 (1987)).  The Court noted that the Harvard plan, previously endorsed by Justice Powell in Bakke, "certainly had minimum *goals* for minority enrollment, even if it had no specific number firmly in mind," but it reiterated that Justice Powell had "flatly rejected the argument that Harvard's program was 'the functional equivalent of a quota' merely because it had some 'plus' for race, or gave greater 'weight' to race than to some other factors, in order to achieve student body diversity."  Id. (quoting Bakke, 438 U.S. 317–18, 323).

Further, like the Harvard plan, Michigan Law's admissions process was "flexible enough to consider all pertinent elements of diversity in light of the particular qualifications of each applicant, and to place them on the same footing for consideration, although not necessarily according them the same weight."  Id. (quoting Bakke, 438 U.S. at 317).  Although race was given substantial weight in the admissions process, the law school also considered "the broad range of qualities and experiences that may be considered valuable contributions to student body diversity," including fluency in several languages, a history of overcoming personal adversity and family hardship, exceptional records of extensive community service, and successful careers in other fields, and "actually [gave] substantial weight to diversity factors besides race."  Id. at 338.

While race may have been "'outcome determinative for many members of minority groups[]' who do not fall within the upper range of LSAT scores and grades," that possibility

was not dispositive given that "the same could be said of the Harvard plan discussed approvingly by Justice Powell in Bakke." Id. at 338 (quoting Grutter, 539 U.S. at 389 (Kennedy, J., dissenting)). The Supreme Court noted in Grutter that "all underrepresented minority students admitted by the Law School [had] been deemed qualified," although minority applicants were "less likely to be admitted in meaningful numbers on criteria that ignore[d]" race and experiences with racial inequality, which were of "particular importance to the Law School's mission." Id.

On the same day the Supreme Court decided Grutter, it held in Gratz v. Bollinger, 539 U.S. 244 (2003), that the admissions process at the University of Michigan College of Literature, Science, and the Arts violated Title VI and the Equal Protection Clause. Gratz, 539 U.S. at 275. The University of Michigan admitted or rejected applicants to the College of Literature, Science, and the Arts based on the number of points that an applicant scored under a rubric that offered points for high school GPA, standardized test scores, the academic strength of the applicant's high school, the applicant's high school curriculum, in-state residency, alumni relationship, personal essay, and other achievements. Id. at 255. Underrepresented minority applicants received an additional 20 points scored in a "miscellaneous" category which provided a significant bump towards the 75 to 100 points that were, depending on the year and the applicant's in-state residency status, generally required for admission. Id. at 255–56, & n.8. The Supreme Court in Gratz concluded that the admissions policy was impermissible under Justice Powell's opinion in Bakke because giving every underrepresented minority applicant 20 points did not provide the necessary "individualized consideration" and instead had "the effect of making 'the factor of race . . . decisive' for virtually every minimally qualified underrepresented minority applicant." Id. at 271–72 (quoting Bakke, 438 U.S. at 317). The university's use of

Case 1:14-cv-14176-ADB   Document 672   Filed 09/30/19   Page 100 of 130

race was therefore not narrowly tailored to achieve the asserted compelling interest in diversity and thus violated the Equal Protection Clause and Title VI. Id. at 275–76.

More recently, in the Fisher cases, the Supreme Court reviewed the undergraduate admissions program at the University of Texas at Austin ("UT Austin"), which considered race as one factor among many in assigning a personal achievement index which, together with an academic index, determined whether applicants who were not in the top 10% of their Texas high school class would be admitted or rejected. Fisher I, 570 U.S. at 304–07. In 2013 in Fisher I, the Supreme Court vacated the Fifth Circuit's decision upholding UT Austin's admissions program because the appeals court had not properly conducted the strict scrutiny analysis. Id. at 303. The Fifth Circuit had undertaken the narrow tailoring analysis with a degree of deference to the university, presuming that the school had made a good-faith decision to use race and then imposing the burden of rebutting that presumption on the plaintiff. Id. at 311–15. The Supreme Court concluded that no such deference to a university was permitted in undertaking the narrow tailoring analysis. Id.

Following remand, the Fifth Circuit found that UT Austin had demonstrated that the use of race in its admissions program was narrowly tailored to achieve the rich diversity that contributed to UT Austin's academic mission and once again affirmed the district court's judgment that UT Austin's admissions program did not violate the Equal Protection Clause. Fisher v. Univ. of Tex. at Austin, 758 F.3d 633, 657, 659–61 (5th Cir. 2014). The Supreme Court granted certiorari once more, and in 2016 it affirmed the Fifth Circuit's ruling. Fisher II, 136 S. Ct. at 2214–15.

In Fisher II, the Supreme Court stated the following three controlling principles:

> First, because racial characteristics so seldom provide a relevant basis for
> disparate treatment, race may not be considered . . . unless the admissions process

can withstand strict scrutiny.  Strict scrutiny requires the university to demonstrate with clarity that its purpose or interest is both constitutionally permissible and substantial, and that its use of the classification is necessary to the accomplishment of its purpose.

Second, . . . the decision to pursue the educational benefits that flow from student body diversity is, in substantial measure, an academic judgment to which some, but not complete, judicial deference is proper.  A university cannot impose a fixed quota or otherwise define diversity as some specified percentage of a particular group merely because of its race or ethnic origin.  Once, however, a university gives a reasoned, principled explanation for its decision, deference must be given to the University's conclusion, based on its experience and expertise, that a diverse student body would serve its educational goals.

Third, . . . no deference is owed when determining whether the use of race is narrowly tailored to achieve the university's permissible goals.  A university . . . bears the burden of proving a nonracial approach would not promote its interest in the educational benefits of diversity about as well and at tolerable administrative expense.  Though narrow tailoring does not require exhaustion of every conceivable race-neutral alternative or require a university to choose between maintaining a reputation for excellence and fulfilling a commitment to provide educational opportunities to members of all racial groups, it does impose on the university the ultimate burden of demonstrating that race-neutral alternatives that are both available and workable do not suffice.

Id. at 2208 (citations and modifying punctuation omitted).

In applying these principles in Fisher II, the Supreme Court determined that UT Austin had provided a reasoned and principled articulation of concrete and precise goals for its race-conscious admissions program, including destroying racial stereotypes, promoting cross-racial understanding, preparing the student body for an increasingly diverse workforce and society, cultivating leaders with legitimacy in the eyes of the citizenry, providing an educational environment that fosters the robust exchange of ideas, exposure to different cultures, and the acquisition of the competencies required of future leaders.  Id. at 2211.  The Supreme Court noted "that a university bears a heavy burden in showing that it had not obtained the educational benefits of diversity before it turned to a race-conscious plan," but found that UT Austin had engaged in good faith studies from which it reasonably "concluded that '[t]he use of race-neutral

policies and programs ha[d] not been successful in achieving' sufficient racial diversity at the University," and that this position was supported by both statistical and anecdotal evidence.  Id. at 2211–12 (quoting the record).  Lastly, none of the plaintiff's proposed race-neutral alternatives, or any of the other proposals discussed in the course of the litigation, was shown to have been an "'available' and 'workable' means through which the University could have met its educational goals, as it then understood and defined them" without considering race, because "the Equal Protection Clause does not force universities to choose between a diverse student body and a reputation for academic excellence."  Id. at 2213–14 (quoting Fisher I, 570 U.S. at 312).

Most significantly, the controlling principles articulated by the Supreme Court in Fisher II reflect the sum of its holdings in cases concerning higher education admissions over the last forty years and now guide the application of Title VI in this case.

### D.    Harvard's Admission Program and Strict Scrutiny

Title VI provides, "No person in the United States shall, on the ground of race, color, or national origin, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance."  42 U.S.C. § 2000d.  In the higher education admissions context, the contours of Title VI claims are largely shaped by the Equal Protection Clause of the Fourteenth Amendment.  The "intentional discrimination proscribed by Title VI is discrimination that violates the Equal Protection Clause of the Fourteenth Amendment."  Weser v. Glen, 190 F. Supp. 2d 384, 396 (E.D.N.Y.), aff'd, 41 F. App'x 521 (2d Cir. 2002); see Bakke, 438 U.S. at 284, 286 (noting that Title VI reflects a "congressional intent to halt federal funding of entities that violate a prohibition of racial discrimination similar to that of the Constitution," but "proscribe[s] only those racial classifications that would violate the Equal Protection Clause or the Fifth Amendment"); see also

Grutter, 539 U.S. at 343 (adopting reasoning in Bakke); Gratz, 539 U.S. at 276 n.23 ("We have

explained that discrimination that violates the Equal Protection Clause of the Fourteenth

Amendment committed by an institution that accepts federal funds also constitutes a violation of

Title VI." (first citing Alexander v. Sandoval, 532 U.S. 275, 281 (2001), then citing United

States v. Fordice, 505 U.S. 717, 732, n.7 (1992), and then citing Alexander v. Choate, 469 U.S.

287, 293 (1985))).

Although Harvard is not a state actor, Harvard College is a component of Harvard

University which receives federal funds and intentionally provides tips in its admissions process

based on students' race.  See [ECF No. 570 at 9–10].  Harvard College is therefore subject to the

same standards that the Equal Protection Clause imposes upon state actors for the purposes of a

Title VI claim.  See Students for Fair Admissions, 346 F. Supp. 3d at 192 n.16 ("Harvard does

not identify any specific reasons for distinguishing public universities from federally-funded

private universities, or explain how the analytical framework would differ for private versus

public litigants . . . .").  Under Grutter, "strict scrutiny must be applied to any admissions

program using racial categories or classifications."  Fisher I, 570 U.S. at 310; see also Grutter

539 U.S. at 326.  Because Harvard both accepts federal funds and uses race in making

admissions decisions, its admissions program is subject to strict scrutiny.

Harvard argues that the test for a "facially neutral policy" should be applied,[55] but

Harvard's admissions process is not facially neutral.  Fisher I, 570 U.S. at 307 ("It is . . .

---

[55] The analysis of a facially neutral policy that has a disparate impact by race is different from
the analysis of a policy that admittedly considers race.  "In reviewing a uniformly applied
facially neutral policy, '[d]etermining whether invidious discriminatory purpose was a
motivating factor [in its adoption] demands a sensitive inquiry into such circumstantial and direct
evidence of intent as may be available.'"  Students for Fair Admissions, Inc. v. President &
Fellows of Harvard Coll., 346 F. Supp. 3d 174, 193 (D. Mass. 2018) (quoting Anderson ex rel.

irrelevant that a system of racial preferences in admissions may seem benign. Any racial classification must meet strict scrutiny."). Although Harvard's reading procedures do not explicitly preference particular racial groups, Harvard pursues its interest in diversity in part by considering the race of applicants, and its admissions officers may take an applicant's race into account when making an admissions decision even when the applicant has not discussed their racial or ethnic identity in their application. [Oct. 18 Tr. 52:15–53:13; 167:10–168:11].

Harvard's acknowledged consideration of race is unlike a facially neutral policy which requires plaintiffs to prove racial discrimination. Cf. Vill. of Arlington Heights v. Metro. Hous. Dev. Corp., 429 U.S. 252, 270–71 (1977) (plaintiffs "failed to carry their burden of proving that discriminatory purpose was a motivating factor" for a rezoning decision that did not explicitly rely on race). Here, the use of race in and of itself is admitted, and the issue becomes whether it is permissible given the justification and the means used to achieve the sought-after diversity—in other words, whether Harvard's use of race survives strict scrutiny. Notably, the Supreme Court has consistently used strict scrutiny when reviewing school admissions programs that consider race.[56]

---

Dowd v. City of Boston, 375 F.3d 71, 83 (1st Cir. 2004)). Policies that do not explicitly consider race are facially neutral and violate the Equal Protection Clause based on statistical evidence only where they form a clear pattern, unexplainable on grounds other than race. See Yick Wo v. Hopkins, 118 U.S. 356, 374 (1886) (finding unconstitutional the administration of a facially neutral policy for licensing laundries where permits had been denied to 200 Chinese applicants but granted to all but one of 80-odd others permit applicants who were not Chinese); see also Gomillion v. Lightfoot, 364 U.S. 339 (1960) (finding unconstitutional an alteration to the shape of Tuskegee, Alabama "to remove from the city all save four or five of its 400 Negro voters while not removing a single white voter or resident"). A policy that relies on race at least in part is subject to strict scrutiny regardless of its impact. Therefore, cases like Gomillion v. Lightfoot, 364 U.S. 339, 340–41 (1960) and Yick Wo v. Hopkins, 118 U.S. 356 (1886) are inapposite.
[56] Where a school admissions program is subject to strict scrutiny, the Court understands this to mean that the admissions program in its entirety is subject to strict scrutiny and not just the admissions decisions that involve the students that it seeks to advantage. Here, Harvard presses

Strict scrutiny requires that classifications used by Harvard in its admissions program be

narrowly tailored to further a compelling interest. [57]  See id. ("Strict scrutiny requires the

---

the idea that its admissions program is facially neutral and should be evaluated by a less demanding standard than strict scrutiny.  Harvard's admissions program is facially neutral in that it does not explicitly prioritize any particular racial group over any other and permits its admissions officers to evaluate the racial and ethnic identity of every student in the context of his or her background and circumstances.  The policy cannot, however, be considered facially neutral from a Title VI perspective given that admissions officers provide tips to African American and Hispanic applicants, while white and Asian American applicants are unlikely to receive a meaningful race-based tip.  In this circumstance, the standard for facially neutral policies could arguably be applied in evaluating any disparate outcomes as between whites and Asian Americans, keeping in mind that the purpose of strict scrutiny is to ferret out inappropriate racial classifications, and given that there is no suggestion of a racially motivated classification involving whites and Asian Americans.  See Richmond v. J. A. Croson Co., 488 U.S. 469, 493 (1989) (plurality opinion) (noting that the purpose of subjecting a racial classification to strict scrutiny is to determine "what classifications are 'benign' or 'remedial' and what classifications are in fact motivated by illegitimate notions of racial inferiority or simple racial politics"); Grutter, 539 U.S. at 326 ("We apply strict scrutiny to all racial classifications to smoke out illegitimate uses of race by assuring that government is pursuing a goal important enough to warrant use of a highly suspect tool." (quotation marks omitted and modifying punctuation omitted)).  In the case of a facially neutral policy, "[p]roof of racially discriminatory intent or purpose is required to show a violation of the Equal Protection Clause."  Vill. of Arlington Heights v. Metro. Hous. Dev. Corp., 429 U.S. 252, 265 (1977).  Were that standard to be applied here, the Court would easily find in favor of Harvard on SFFA's claim of intentional discrimination as there has been no showing of discriminatory intent or purpose.

[57] SFFA contends that it may also succeed on its intentional discrimination claim by showing a "pattern or practice" of discrimination through statistically significant evidence of discrimination that then shifts to Harvard the burden of disproving the alleged pattern or practice.  [ECF No. 620 ¶¶ 167–76].  This burden shifting framework, which is rooted in the statutory provisions of Title VII, see 42 U.S.C. § 2000e-6, is inapplicable to a non-class, private plaintiff such as SFFA, even assuming that it could apply in a Title VI case.  See Chin v. Port Auth. of N.Y. & N.J., 685 F.3d 135, 149–50 (2d Cir. 2012) (holding "that the pattern-or-practice method of proof is not available to nonclass, private plaintiffs in cases such as the one before us" and noting that "all of our sister circuits to consider the question have held that the pattern-or-practice method of proof is not available to private, nonclass plaintiffs"); see also Semsroth v. City of Wichita, 304 Fed. Appx. 707, 715 (10th Cir. 2008); Davis v. Coca-Cola Bottling Co. Consol., 516 F.3d 955, 967–69 (11th Cir. 2008); Bacon v. Honda of Am. Mfg., 370 F.3d 565, 575 (6th Cir. 2004); Celestine v. Petroleos de Venezuella SA, 266 F.3d 343, 355–56 (5th Cir. 2001), abrogated on other grounds by, Health v. Bd. of Supervisors for the S. Univ. of Agric. & Mech. Coll., 850 F.3d 731 (5th Cir. 2017); Gilty v. Vill. of Oak Park, 919 F.2d 1247, 1252 (7th Cir. 1990); Lowery v. Circuit City Stores, Inc., 158 F.3d 742, 761 (4th Cir. 1998), vacated on other grounds, 527 U.S. 1031 (1999).

university to demonstrate with clarity that its 'purpose or interest is both constitutionally

permissible and substantial, and that its use of the classification is necessary . . . to the

accomplishment of its purpose.'" (quoting Bakke, 438 U.S. at 305)).

### 1.    Compelling Interest

In Bakke, Justice Powell found that student body diversity and the educational benefits

that flow from a diverse student body was a compelling interest that could justify the

consideration of race.  438 U.S. at 315 ("As the interest of diversity is compelling in the context

of a university's admissions program," the remaining question is "whether the program's racial

classification is necessary to promote this interest.").  Importantly, he went on to explain that

"[t]he diversity that furthers a compelling state interest encompasses a far broader array of

qualifications and characteristics of which racial or ethnic origin is but a single though important

element." Bakke, 438 U.S. at 315.  Twenty-five years later, the Supreme Court, in Grutter,

reaffirmed that "student body diversity is a compelling state interest that can justify the use of

race in university admissions."  Grutter, 539 U.S. at 325; see also Fisher I, 570 U.S. at 308–09

(reiterating that prior cases had found that "obtaining the educational benefits of student body

diversity is a compelling state interest" (citation and internal quotation marks omitted)).

Here, for the reasons discussed supra at Section III.A.1, Harvard's interest in student

body diversity is substantial and compelling.  Its goals are not "elusory or amorphous," and are

instead "sufficiently measurable to permit judicial scrutiny of the policies adopted to reach

them."  Fisher II, 136 S. Ct. at 2211.  These goals include "enhance[ing] the education of [its]

students of all races and background [to] prepare them to assume leadership roles in the

increasingly pluralistic society into which they will graduate," achieving the "benefits that flow

from [its] students' exposure to people of different background, races, and life experiences" by

teaching them to engage across differences through immersion in a diverse community, and

"broaden[ing] the perspectives of teachers[, and] thus tend[ing] to expand the reach of the

curriculum and the range of scholarly interests of [its] faculty."  [PX302 at 1–2, 9].  Harvard's

goals are similar in specificity to goals the Supreme Court found "concrete and precise" in Fisher

II.  See 136 S. Ct. 2211.  Racial categorizations are necessary to achieve those goals.  In the

absence of such categorizations, racial diversity at Harvard would likely decline so precipitously

that Harvard would be unable to offer students the diverse environment that it reasonably finds

necessary to its mission.  See infra at Section VII.G.

## 2.  Narrowly Tailored

Even in the limited circumstance when drawing racial distinctions is permissible to

further a compelling state interest, a university is still "constrained in how it may pursue that

end: 'The means chosen to accomplish the [university's] asserted purpose must be specifically

and narrowly framed to accomplish that purpose.'"  Shaw v. Hunt, 517 U.S. 899, 908 (1996)

(quoting Wygant v. Jackson Bd. of Ed., 476 U.S. 267, 280 (1986)).  Therefore, to satisfy strict

scrutiny, "a university must make a showing that its plan is narrowly tailored to achieve the only

interest that this Court has approved in this context: the benefits of a student body diversity that

'encompasses a . . . broa[d] array of qualifications and characteristics of which racial or ethnic

origin is but a single though important element.'"  Fisher I, 570 U.S. at 308 (quoting Bakke, 438

U.S. at 315).  "When race-based action is necessary to further a compelling governmental

interest, such action does not violate the constitutional guarantee of equal protection so long as

the narrow-tailoring requirement is also satisfied."  Grutter, 539 U.S. at 327; see also J.A. Croson

Co., 488 U.S. at 493 (plurality opinion) ("The purpose of strict scrutiny is to ensure that "the

means chosen 'fit' . . . th[e] compelling goal so closely that there is little or no possibility that the

motive for the classification was illegitimate racial prejudice or stereotype.").

"To be narrowly tailored, a race-conscious admissions program cannot use a quota system," Grutter, 539 U.S. at 334, but instead must "remain flexible enough to ensure that each applicant is evaluated as an individual and not in a way that makes an applicant's race or ethnicity the defining feature of his or her application," Fisher I, 570 U.S. at 309 (quoting Gratz, 539 U.S. at 337). "In other words, an admissions program must be 'flexible enough to consider all pertinent elements of diversity in light of the particular qualifications of each applicant.'" Grutter, 539 U.S. at 334 (quoting Bakke, 438 U.S. at 317). Thus, individualized consideration in the context of a race-conscious admissions program is paramount. See id.; Bakke, 438 U.S. at 318 n.52 (identifying the "denial . . . of th[e] right to individualized consideration" as the "principal evil" of the medical school's admissions program).

The Court finds that Harvard's admissions program "bears the hallmarks of a narrowly tailored plan" in that "race [is] used in a flexible, nonmechanical way" and considered "as a 'plus' factor in the context of individualized consideration of each and every applicant." Grutter, 539 U.S. at 334. Like the University of Michigan Law School in Grutter, Harvard "engages in a highly individualized, holistic review of each applicant's file, giving serious consideration to all the ways an applicant might contribute to a diverse educational environment," "this individualized consideration [is afforded] to applicants of all races," and its "race-conscious admissions program adequately ensures that all factors that may contribute to student body diversity are meaningfully considered alongside race in admissions decisions." Id. at 337–38.

The nature of the allegations in this case however, requires that the analysis go further.[58] Given the "serious problems of justice connected with the idea of preference itself," Bakke, 438

---

[58] Even though Harvard has shown that its admissions policy must consider race to serve its substantial and compelling interests, the application of strict scrutiny requires a "a further

U.S. at 298, narrow tailoring further requires "that a race-conscious admissions program not unduly harm members of any racial group," Grutter, 539 U.S. at 341; see also Metro Broad., Inc. v. FCC, 497 U.S. 547, 630 (1990) (O'Connor, J., dissenting) (a race-conscious admissions program must not "unduly burden individuals who are not members of the favored racial and ethnic groups").

The remaining issue is whether Harvard's admissions program unduly burdens Asian American applicants. Based on Professor Card's model and the Court's preferred model with the personal rating included, there is not a statistically significant difference between the chances of admission for similarly situated Asian American and white applicants. Under this rubric, the lack of a statistically significant penalty against Asian American applicants relative to white applicants suggests that the burden Harvard's race-conscious admissions policy places on Asian American applicants is not undue. However, Professor Arcidiacono's analysis, and the Court's preferred model with the personal rating excluded, imply that Asian American applicants are disadvantaged relative to white applicants. The questions in the context of this case then become: why do Asian American applicants score lower on the personal rating, does it unfairly affect their chances of admission, and if so, is this an undue burden on them when measured against Harvard's compelling interest in diversity?

It is possible that the self-selected group of Asian Americans that applied to Harvard during the years included in the data set used in this case did not possess the personal qualities that Harvard is looking for at the same rate as white applicants, just as it is possible that the self-selected white applicants tend to have somewhat weaker academic qualifications than Asian

---

judicial determination that the admissions process meets strict scrutiny in its implementation." Fisher I, 570 U.S. at 311. Strict scrutiny affords a plaintiff "close analysis to the evidence of how the [admission] process works in practice." Id. at 312–13.

American applicants. In other words, assuming Asian American and white applicants have the same academic and extracurricular potential and the same quality of personal attributes as demographic groups, it could be that asymmetric portions of each of these groups apply to Harvard. This would explain why Asian American applicants to Harvard did better than white applicants on the academic and extracurricular ratings and why white applicants to Harvard did better on the personal rating despite the likelihood that Asian Americans are not inherently more intelligent and white applicants are not inherently more personable. This scenario has little evidentiary support, but it, like Professor Card's model and the Court's preferred model including the personal ratings, would result in a finding of no undue burden and a narrowly tailored process that satisfied strict scrutiny.[59]

Alternatively, it may be that there is overt discrimination or implicit bias at work to the disadvantage of Asian American applicants. To begin at the end, the Court sees no evidence of discrimination in the personal ratings save for the slight numerical disparity itself. The statistical disparity is relatively minor and can be at least partially explained by a variety of factors including race-correlated inputs to the rating such as teacher and guidance counselor recommendations. Just as the Court cannot explain the variations in the academic and extracurricular ratings, it cannot definitively explain the difference in the personal ratings, but it

---

[59] There may be little evidentiary support for this hypothesis because it was not in the interest of either party to develop this scenario. SFFA was wedded to the idea that the Asian American applicants were superior in two profiles and discriminated against on a third, while Harvard was unwilling to overtly argue that Asian American applicants were actually weaker in personal criteria, notwithstanding their stronger average academic performance and Harvard's acknowledgment that Asian American applicants tend to be stronger in their extracurricular pursuits. The Court does not think, however, that demonstrable, disproportionate strength of a racial group in one area necessarily implies that the same racial group should be strong in all areas. If one assumes that raw talent and race are unrelated, it would be unsurprising to find that applicants that excel in one area, tend to be somewhat weaker in other areas.

finds that the disparity is small and reflects neither intentional discrimination against Asian American applicants nor a process that was insufficiently tailored to avoid the potential for unintended discrimination.

Even if there is an unwarranted disparity in the personal ratings, the Court is unable to identify any individual applicant whose admissions decision was affected and finds that the disparity in the personal ratings did not burden Asian American applicants significantly more than Harvard's race-conscious policies burdened white applicants. Further, there is no evidence of any discriminatory animus or conscious prejudice. To the contrary, certain statistics can be interpreted to suggest that Harvard's admissions process unintentionally favored some subsets of Asian Americans, including the ALDCs and certain other discrete demographic groups like disadvantaged Asian females. The most likely causes of these statistical findings, however, is random variation in the admissions process or omitted variable biases, not selective discrimination that favored some Asian Americans and disfavored others.

In terms of burden, it is likely that eliminating consideration of race would significantly disadvantage at least some Asian American applicants, as evidenced by the testimony of the *amici* at trial, all of whom viewed their race or ethnicity as a critical aspect of their life experiences and applications to Harvard. Further, it is vital that Asian Americans and other racial minorities be able to discuss their racial identities in their applications. As the Court has seen and heard, race can profoundly influence applicants' sense of self and outward perspective. See, e.g., [Oct. 29 Tr. 30:23–33:17, 81:16–82:14, 85:24–90:3. 113:23–117:6, 140:9–148:3, 166:19–172:18, 199:18–204:9]. Removing considerations of race and ethnicity from Harvard's admissions process entirely would deprive applicants, including Asian American applicants, of their right to advocate the value of their unique background, heritage, and perspective and would

likely also deprive Harvard of exceptional students who would be less likely to be admitted without a comprehensive understanding of their background.  Further, throughout this trial, SFFA did not present a single admissions file that reflected any discriminatory animus, or even an application of an Asian American who it contended should have or would have been admitted absent an unfairly deflated personal rating.  There thus remains the distinct possibility that a review of the available applications did not turn up a rejected Asian American applicant who was clearly more qualified than the white applicants who were admitted, or an applicant who received an obviously unjustified personal rating.  This would strongly suggest that Asian American applicants were not discriminated against relative to white applicants and were therefore not unduly burdened by Harvard's admissions program.

Although the Court evaluates each of SFFA's four counts separately below, it concludes that Harvard's admissions program has been designed and implemented in a manner that allows every application to be reviewed in a holistic manner consistent with the guidance set forth by the Supreme Court.  Further, the Court concludes that while the admissions process may be imperfect, the statistical disparities between applicants from different racial groups on which SFFA's case rests are not the result of any racial animus or conscious prejudice and finds that Harvard's admissions program is narrowly tailored to achieve a diverse class and the benefits that flow therefrom.

### E.    Count II:  Harvard Does Not Engage in Racial Balancing

Count II alleges that Harvard engaged in impermissible racial balancing, that is, racial balancing that does not adhere to the parameters established by the Supreme Court.  To maintain a permissible race-conscious admissions policy, Harvard may not "impose a fixed quota," Fisher II, 136 S. Ct. at 2208, or otherwise "'assure within its student body some specified percentage of a particular group merely because of its race or ethnic origin,'" as such a practice "would amount

to outright racial balancing, which is patently unconstitutional" under the Equal Protection

Clause and therefore prohibited by Title VI.  Grutter, 539 U.S. at 329–30 (quoting Bakke, 438

U.S. at 307).  The requirement that colleges and universities that accept federal funds abstain

from such quota systems stems from the "simple command that the Government must treat

citizens as individuals, not as simply components of a racial, religious, sexual or national class."

Parents Involved in Cmty. Sch. v. Seattle Sch. Dist. No. 1, 551 U.S. 701, 730 (2007) (quoting

Miller v. Johnson, 515 U.S. 900, 911 (1995)).  Quota systems are impermissible because they

insulate some "category of applicants with certain desired qualifications from competition with

all other applicants."  Grutter, 539 U.S. at 334 (quoting Bakke, 438 U.S. at 315); see Wessmann

v. Gittens, 160 F.3d 790, 798 (1st Cir. 1998) ("A single-minded focus on ethnic diversity

'hinder[s] rather than further[s] attainment of genuine diversity.'" (quoting Bakke, 438 U.S. at

315)).

Harvard's admissions program intends to treat every applicant as an individual.  Harvard

does not employ a race-based quota, set aside seats for minority students, or otherwise "define

diversity as 'some specified percentage of a particular group merely because of its race or ethnic

origin.'"  Fisher I, 570 U.S. at 311 (quoting Bakke, 438 U.S. at 307).  Every applicant competes

for every seat.  See [Oct. 18 Tr. 112:1–21].  Although a university could run afoul of Title VI's

prohibition on quotas even where it stopped short of defining a specific percentage and instead

allowed some fluctuation around a particular number, see Parents Involved, 551 U.S. at 712

(striking down school district student allocation plan that allowed for 10% variation from the

district's overall white/nonwhite racial balance), Harvard's admissions policy has no such target

number or specified level of permissible fluctuation.  As Justice Powell recognized in Bakke and

as was affirmed in Grutter, "minimum *goals* for minority enrollment . . . [without a] specific

number firmly in mind" did not make Harvard's program "the functional equivalent of a quota merely because it had some 'plus' for race, or gave greater 'weight' to race than to some other factors, in order to achieve student body diversity." Grutter, 539 U.S. at 335 (quoting Bakke, 438 U.S. 317–318, 323). As the Court also held in Grutter:

> The . . . goal of attaining a critical mass of underrepresented minority students does not transform its program into a quota. As the Harvard plan described by Justice Powell recognized, there is of course "some relationship between numbers and achieving the benefits to be derived from a diverse student body, and between numbers and providing a reasonable environment for those students admitted."

Id. at 335–36 (quoting Bakke, 438 U.S. at 323).

SFFA argues that its racial balancing claim is supported by non-statistical evidence, principally that Harvard's admissions leadership too frequently looked at the "one-pagers" that showed the racial composition of admitted applicants or applicants whom Harvard was likely to admit and that Harvard placed students on its "search list" and sent recruitment letters to applicants based on criteria that disfavored Asian American applicants. The recruitment letters, however, did not affect admissions decisions, and SFFA cannot maintain a viable claim for intentional discrimination based merely on the allegation that some limited number of Asian American applicants did not receive certain pieces of marketing mail. See Weser, 190 F. Supp. 2d at 399 (holding that race-conscious recruiting efforts do "not constitute discrimination"); see also Allen v. Ala. State Bd. of Educ., 164 F.3d 1347, 1352 (11th Cir. 1999), vacated per stipulation, 216 F.3d 1263 (11th Cir. 2000) ("[W]here the government does not exclude persons from benefits based on race, but chooses to undertake outreach efforts to persons of one race, broadening the pool of applicants, but disadvantaging no one, strict scrutiny is generally inapplicable."); Lutheran Church-Mo. Synod v. FCC, 154 F.3d 487, 492 (D.C. Cir. 1998) (noting that "broad outreach to, as opposed to the actual hiring of, a particular race" would not necessarily trigger strict scrutiny); Honadle v. Univ. of Vt. and State Agric. Coll., 56 F. Supp. 2d

419, 428 (D. Vt. 1999) (distinguishing "'inclusive' forms of affirmative action, such as recruitment and other forms of outreach" from "'exclusive' forms of affirmative action, such as quotas, set asides and layoffs" and holding that monitoring racial composition and encouraging recruitment of diverse candidates were not discriminatory practices subject to strict scrutiny). Even if non-receipt of an invitation to apply to Harvard could constitute discrimination, there was no evidence presented at trial that any SFFA member fell into the group of Asian American applicants who did not receive such an invitation because of their race, nor is there any evidence that they suffered an injury as a result.

Further, as in Grutter, consulting the one-pagers "which keep track of the racial and ethnic composition of the class" (among other statistics) does not "sugges[t] there was no further attempt at individual review save for race itself during the final stages of the admissions process." 539 U.S. at 336 (quotation marks omitted). Throughout the process, Harvard remains committed to its holistic evaluation and its whole person review. Harvard's use of the one-pagers as part of its admissions process and to evaluate whether it would be able to achieve its "*goals* for minority enrollment" is permissible and does not establish the existence of a quota or impermissible racial balancing. Id. at 335 (emphasis in original). As the Supreme Court has held, "'[s]ome attention to numbers,' without more, does not transform a flexible admissions system into a rigid quota." Id. at 336 (quoting Bakke 438 U.S. at 323).[60]

---

[60] In fact, the law requires a "reasoned, principled explanation" for a decision to use race in admissions, and courts examine numerical evidence when evaluating whether race-conscious plans are narrowly tailored to serve a compelling interest. See, e.g., Fisher II, 136 S. Ct. at 2211–12 (considering "anecdotal evidence" including racial representation in enrolled classes and "more nuanced quantitative data" reflecting African American and Hispanic representation in undergraduate classes).

Further, it may well be necessary to give attention to numerical indicators of racial diversity when an institution elects to adopt a race-conscious admissions program so as to remain compliant with the dictates of strict scrutiny, including monitoring the ongoing need for a race-conscious admissions process and the availability of race-neutral alternatives.  See Fisher II, 136 S. Ct. at 2214–15 (requiring UT Austin to "continue to use [] data to scrutinize the fairness of its admissions program; to assess whether changing demographics have undermined the need for a race-conscious policy; and to identify the effects, both positive and negative, of the affirmative-action measures it deems necessary").  Harvard's awareness and consideration of the number of minority students likely to enroll throughout its annual admissions cycle is consistent with the fact that there is "some relationship between numbers and achieving the benefits to be derived from a diverse student body, and between numbers and providing a reasonable environment for those students admitted." Grutter, 539 U.S. at 336 (quoting Bakke 438 U.S. at 323). Additionally, Harvard also considers the racial distribution of its admitted students to assist it in predicting its yield rate and thereby avoid overenrolling its freshman class because students from some racial groups historically matriculate at higher rates than others.  These practices do not violate Title VI.

As Justice Powell did in 1978, the Court "flatly reject[s] the argument that Harvard's program [is] 'the functional equivalent of a quota'" system or an otherwise impermissible means of racial balancing.  Id. at 335 (quoting Bakke 38 U.S. at 317–18).  Accordingly, judgment for Harvard shall enter on Count II, racial balancing.

### F.    Count III: Harvard Uses Race as a Non-Mechanical Plus Factor

Count III alleges that Harvard fails to use race merely as a "plus" factor in admissions decisions.  Consistent with what is required by Supreme Court precedent, Harvard has demonstrated that it uses race as a factor that can act as a "plus" or a "tip" in making admissions

decisions, and that its admissions program is "flexible enough to consider all pertinent elements

of diversity in light of the particular qualifications of each applicant, and to place them on the

same footing for consideration, although not necessarily according them the same weight."

Grutter, 539 U.S. at 334 (quoting Bakke, 438 U.S. at 317).  Although race is an important

consideration in deciding to admit many African American and Hispanic applicants, it remains

an "individualized consideration in the context of [Harvard's] race-conscious admissions

program" and never becomes "the defining feature" of applications.  Id. at 337 (citing Bakke,

438 U.S. at 318 n.52).

Admissions policies that fail to use race only as a plus factor typically either employ a

quota system or assign some specified value to applicants' racial identity, and thereby use race in

a rigid and mechanical manner that deprives applicants of the truly individualized consideration

required by the Supreme Court.  See Gratz, 539 U.S. at 270 (finding unconstitutional "the

University [of Michigan]'s . . . policy, which automatically distribute[d] 20 points, or one-fifth of

the points needed to guarantee admission, to every single 'underrepresented minority' applicant

solely because of race"); Bakke, 438 U.S. at 272 (striking down quota system); Johnson v. Bd. of

Regents of Univ. of Ga., 263 F.3d 1234, 1254 (11th Cir. 2001) (finding University of Georgia's

admissions policy not narrowly tailored where it employed a rigid, mechanical approach that

awarded "every non-white applicant [] a 0.5 point bonus, regardless of his or her background and

regardless of whether a white applicant with a far more 'diverse' background" was available).

Although the parties' experts have estimated the average magnitude of Harvard's race-related

tips based on past admissions decisions and the effect those tips have on the diversity of its

classes, the magnitude of the tip for an individual applicant cannot be precisely determined

because race is considered in a contextual manner as part of Harvard's holistic evaluation of each

applicant.  The estimated average magnitude of the tips and the impact of the race-related tips or

plus factors on the racial composition of Harvard's classes, however, are comparable to the size

and effect of tips that have been upheld by the Supreme Court.

For example, in <u>Fisher II</u>, the Supreme Court noted that the proportion of Hispanic and

African American applicants admitted through UT Austin's holistic review process in 2007,

when race was considered, had increased 54% and 94%, respectively, relative to 2003, when the

holistic review process had been race-neutral.  <u>Fisher II</u>, 136 S. Ct. at 2212.  Those figures

showed that "race has had a meaningful, if still limited, effect on the diversity of the University's

freshman class."  <u>Id.</u>  The impact of UT Austin's holistic process is comparable to the decline in

combined African American and Hispanic enrollment that Harvard would likely experience in

the absence of the consideration of race, which is estimated to be approximately 45%, absent

alternative measures.

In addition, the Supreme Court upheld the University of Michigan Law School's

admissions program where "underrepresented minority students would have constituted 4

percent of the entering class in 2000 instead of the actual figure of 14.5 percent," and African

American applicants to the law school were "nearly guaranteed admissions if they score above

155 on the LSAT," while "[w]hites scoring [below] 167 . . . on the LSAT [were] routinely

rejected."  <u>Grutter</u>, 539 U.S. at 320, 377 (Thomas, J., dissenting).  The plus-factor or tips that

Harvard employs to achieve racial diversity for its educational mission are not nearly as large.

Additionally, the magnitude of race-based tips is not disproportionate to the magnitude of other

tips applicants may receive.  The effect of African American and Hispanic racial identity on an

applicant's probability of admission has been estimated at a significantly lower magnitude than

tips offered to recruited athletes, and is comparable to tips for legacies, applicants on the dean's

or director's interest lists, children of faculty or staff, and strengths that are reflected by

Harvard's profile ratings.

Finally, the magnitude of race-based tips as indicated by the relative academic

qualifications of admitted minority students at Harvard is modest.  Every student Harvard admits

is academically prepared for the educational challenges offered at Harvard, and a majority of

admitted applicants from every major racial group scores in the 2 range on Harvard's academic

ratings.  [PX623].[61]  In other words, most Harvard students from every racial group have a

roughly similar level of academic potential, although the average SAT scores and high school

grades of admitted applicants from each racial group differ significantly.

Accordingly, judgment for Harvard shall enter on Count III, using race as a non-

mechanical plus factor.

### G.    Count V:  No Adequate, Workable, and Sufficient Fully Race-Neutral Alternatives Are Available

Count V alleges that Harvard, in constructing an admissions process that considers race

to ensure a diverse class, failed to consider and adopt race-neutral alternatives that would allow it

to achieve diversity.  Strict scrutiny requires that the Court "verify that it is 'necessary' for a

university to use race to achieve the educational benefits of diversity."  Fisher I, 570 U.S. at 312

(quoting Bakke, 438 U.S. at 305).  "This involves a careful judicial inquiry into whether a

university could achieve sufficient diversity without using racial classifications.  Although

'[n]arrow tailoring does not require exhaustion of every conceivable race-neutral alternative,'"

id. (quoting Grutter, 539 U.S. at 339–40), or choosing "between maintaining a reputation for

excellence or fulfilling a commitment to provide educational opportunities to members of all

---

[61] An academic rating of 2 indicates *magna cum laude* potential, superb grades, and mid- to high-700 SAT scores or a score above 33 on the ACT.  See supra at Section III.B.3.ii.  The "2 range" includes applicants who were assigned a "2+" or "2-."

racial groups," <u>Grutter</u>, 539 U.S. at 339, "strict scrutiny does require a court to examine with care, and not defer to, a university's 'serious, good faith consideration of workable race-neutral alternatives,'" <u>Fisher I</u>, 570 U.S. at 312 (quoting <u>Grutter</u>, 539 U.S. at 339–340). "Consideration by the university is of course necessary, but it is not sufficient to satisfy strict scrutiny: The reviewing court must ultimately be satisfied that no workable race-neutral alternatives would produce the educational benefits of diversity." <u>Id.</u> If "'a nonracial approach . . . could promote the substantial interest about as well and at tolerable administrative expense,' . . . then the university may not consider race." <u>Id.</u> (citation omitted). In considering the proffered race-neutral alternatives, the Court is mindful of Justice Ginsburg's astute observation that "only an ostrich could regard the supposedly neutral alternatives as race unconscious." <u>Id.</u> at 335 (Ginsburg, J., dissenting).

Here, as more fully discussed in Section VI, Harvard has demonstrated "that 'race-neutral alternatives' that are both 'available' and 'workable' 'do not suffice.'" <u>Fisher II</u>, 136 S. Ct. at 2208. In sum, eliminating early action and tips for ALDCs, increasing outreach and community partnerships, offering more financial aid, or admitting more transfer students are all "available" and "workable" in some form and at varying costs, but they would likely have no meaningful impact on racial diversity. Further, any minimal effect that these alternative admissions practices might have on racial diversity, if implemented individually or in combination, would be offset by the decline in African American and Hispanic students that would result if race-conscious admissions practices were eliminated. Several other conceivable alternatives, such as admitting only students who rank at top of their high school class after their junior year or admitting the top student from each zip code, are not workable for Harvard because such programs would vastly over enroll its class. <u>See</u> <u>supra</u> at Section III.A.2; <u>see also</u> <u>Fisher II</u>, 136 S. Ct. at 2213 ("Class

rank is a single metric, and like any single metric, it will capture certain types of people and miss others. . . . [P]rivileging one characteristic above all others does not lead to a diverse student body.").

SFFA's expert, Mr. Kahlenberg, proposes a geographic-based quota system using "neighborhood clusters" that is seemingly designed to achieve racial diversity based on socioeconomics rather than attention to race. This proposal has some of the earmarks of impermissible racial balancing, albeit without an explicit, articulated reliance on race. Further, it poses significant logistical challenges, such as how to form the clusters, and how to account for wealthy households in a generally lower income cluster, as well as difficult institutional and philosophical questions such as whether economics can fairly be considered a proxy for race.

These issues aside, although Harvard could theoretically impose some form of geographic, place-based quota system, it could not achieve comparable racial diversity through such a program without a significant decline in the academic strength of its class. Further, the legality of the proposed place-based quota system is uncertain. In Fisher II, the Supreme Court upheld the constitutionality of UT Austin's holistic review program but did not speak to the overall permissibility of place-based admissions policies. 136 S. Ct. at 2213–15. Unlike Harvard's holistic process which considers every applicant individually, UT Austin admitted most of its class by automatically admitting applicants who graduated in the top 10% of their Texas high school class pursuant to a state law requiring it to admit those students. Id. at 2209. The plaintiff advocated the expansion of the automatic admission percentage, claiming it to be a race-neutral way of increasing diversity. Id. at 2213. The Supreme Court refused to require the expansion of the program, stating, "'It is race consciousness, not blindness to race, that drives such plans.' Consequently, petitioner cannot assert simply that increasing the University's

reliance on a percentage plan would make its admissions policy more race neutral." Id. at 2213 (citation omitted) (quoting Fisher I, 570 U.S. at 335–36 (Ginsburg, J., dissenting)). Here, just as in Fisher II, the Court is not persuaded that such a plan would actually be "more race neutral," id. at 2213. Place-based plans therefore do not suffice, pose complex challenges, and may not even qualify as available race-neutral alternatives.

Harvard could adopt a more significant tip for economically disadvantaged students, but every such proposal presented to the Court would result in a significant decline in African American representation. Achieving even roughly comparable levels of combined African American and Hispanic representation to those Harvard presently achieves would require Harvard to sacrifice the academic strength of its class and forgo other admissions policies from which it derives financial, reputational, and academic benefits. See supra at Section III.B.3. As such, Harvard would compromise some degree of its reputation for academic excellence and still be less diverse than it is currently. Title VI does not require such an outcome. See Fisher II, 136 S. Ct. at 2213 (explaining that the Supreme "Court's precedent [makes] clear that the Equal Protection Clause does not force universities to choose between a diverse student body and a reputation for academic excellence").

Harvard has demonstrated that no workable and available race-neutral alternatives would allow it to achieve a diverse student body while still maintaining its standards for academic excellence. Judgment shall therefore enter in Harvard's favor on Count IV, race-neutral alternatives.

### H.    Count I: Harvard Does Not Intentionally Discriminate

SFFA's intentional discrimination claim, Count I, requires the Court to determine whether Harvard's admissions program violates Title VI through intentional discrimination against Asian Americans notwithstanding the Court's conclusion that Harvard has shown that its

admissions program serves its compelling interest in diversity, that some racial categorizations are necessary to serve that interest, that it does not engage in proscribed racial balancing, and that no workable and available, fully race-neutral alternatives would suffice to meet Harvard's goals. SFFA is not claiming that Harvard excludes Asian Americans and in fact, Asian Americans are admitted at virtually the same rate as white applicants. What it does claim is that, based solely on the quantifiable aspects of admissions, Asian Americans should be admitted at an even higher rate and that, if the personal ratings were not depressed, there would be more Asian Americans admitted.

In undertaking its analysis, the Court begins with certain fundamentals. First, "given the important purposes of public education and the expansive freedoms of speech and thought associated with the university environment, universities occupy a special niche in our constitutional tradition." Grutter 539 U.S. at 328–29. Second, a university is free to "make its own judgments as to . . . the selection of its student body." Id. at 329 (quoting Bakke, 438 U.S. at 312). And third, although deference is owed to a university's decision to pursue the educational benefits that flow from diversity, the university must show that its use of race is narrowly tailored to achieve its permissible goals. Fisher II, 136 S. Ct. at 2208.

To these, the Court reiterates the following findings specific to this case:

1. Throughout this trial and after a careful review of all exhibits and written submissions, there is no evidence of any racial animus whatsoever or intentional discrimination on the part of Harvard beyond its use of a race conscious admissions policy, nor is there

evidence that any particular admissions decision was negatively affected by Asian American identity.[62]

2.  A race-conscious admissions program allows Harvard to achieve a level of robust diversity that would not otherwise be possible, at least at this time.

3.  The Court firmly believes that Asian Americans are not inherently less personable than any other demographic group, just as it believes that Asian Americans are not more intelligent or more gifted in extracurricular pursuits than any other group.

4.  There is a statistical difference in the personal ratings with white applicants faring better that Asian American applicants.  Asian American applicants, however, do better on the extracurricular and academic ratings than their white counterparts.  All three ratings incorporate subjective and objective elements, and while implicit biases may be affecting

---

[62] The Court notes that under the Title VI standard applicable outside the higher education admissions context, SFFA's intentional discrimination claim would fail because SFFA has not shown, by a preponderance of the evidence, that (1) Harvard discriminated on the basis of race, (2) that the discrimination was intentional, and (3) that the discrimination was a substantial or motivating factor for admissions decisions.  See Goodman v. Bowdoin Coll., 380 F.3d 33, 43 (1st Cir. 2004) (citing Tolbert v. Queens Coll., 242 F.3d 58, 69 (2d Cir. 2001)).  The requirement for a "substantial or motivating factor" requires "evidence of racial animus," id. at 43, and no racial animus was present here.

Further, under the standard articulated in Goodman v. Bowdoin College, 380 F.3d 33 (1st Cir. 2004), the Court would enter judgment for Harvard because it has shown that its admissions program was employed to promote diversity, which is not an invidious discriminatory purpose.  See supra at Section III.D.  Admissions decisions are made only after a careful process that considers and appreciates the diversity that applicants from diverse racial backgrounds, including Asian Americans, provide at Harvard.  Harvard's only intentional consideration of race views increased racial diversity as a positive attribute of its admitted class, which it achieves by considering an individual's race through an individualized, holistic evaluation of every applicant in the manner envisioned by the Supreme Court.  Further, the Court feels confident stating that the statistical disparities in personal ratings and admissions probabilities that have been identified are the result of some external race-correlated factors and perhaps some slight implicit biases among some admissions officers that, while regrettable, cannot be completely eliminated in a process that must rely on judgments about individuals.

**ADD124**

Harvard's ratings at the margins, to the extent that the disparities are the result of race, they are unintentional and would not be cured by a judicial dictate that Harvard abandon considerations of race in its admission process.

5.  Harvard's admissions program is conceptually narrowly tailored to meet its interest in diversity.  In practice, as more fully discussed above, it does not seem to unduly burden Asian Americans despite the fact that some percentage of Asian American applicants have received lower personal ratings than white applicants who seem similarly situated. The reason for these lower scores is unclear, but they are not the result of intentional discrimination.  They might be the result of qualitative factors that are harder to quantify, such as teacher and guidance counselor recommendations, or they may reflect some implicit biases.  Race conscious admissions will always penalize to some extent the groups that are not being advantaged by the process, but this is justified by the compelling interest in diversity and all the benefits that flow from a diverse college population.  Here, any relative burden on Asian Americans (and it is not clear that there is a disproportionate burden) is not enough to warrant a finding that Harvard's admissions process fails to survive strict scrutiny or to require it to move to an admissions model that foregoes diversity in favor of parity based solely on quantifiable metrics.

The testimony of the admissions officers that there was no discrimination against Asian American applicants with respect to the admissions process as a whole and the personal ratings in particular was consistent, unambiguous, and convincing.  Not one of them had seen or heard anything disparaging about an Asian American applicant despite the fact that decisions were made collectively and after open discussion about each applicant in the docket and full committee meetings.  Similarly, there is no credible evidence that corroborates the improper

discrimination suggested by Professor Arcidiacono's statistical model.  Asian American

applicants are accepted at the same rate as other applicants and now make up more than 20% of

Harvard's admitted classes, up from 3.4% in 1980.  Although Asian Americans can and do bring

important and diverse perspectives to Harvard, because only about 6% of the United States

population is Asian American compared to nearly a quarter of Harvard's class, it is reasonable

for Harvard to determine that students from other minority backgrounds are more likely to offer

perspectives that are less abundant in its classes and to therefore primarily offer race-based tips

to those students.  Finally, SFFA did not present a single Asian American applicant who was

overtly discriminated against or who was better qualified than an admitted white applicant when

considering the full range of factors that Harvard values in its admissions process.

The statistics themselves are alone not enough to cause the Court to conclude that

Harvard has engaged in improper intentional discrimination where Harvard has shown that its

admissions policy uses race only in a permissible and narrowly tailored way.  Further, although

Professor Arcidiacono's statistics suggest discrimination against certain subsets of Asian

American applicants, Professor Card's analysis of this same data suggests the opposite, thereby

leaving the statistical analyses inconclusive.  Even assuming that there is a statistically

significant difference between how Asian American and white applicants score on the personal

rating, the data does not clearly say what accounts for that difference.  In other words, although

the statistics perhaps tell "what," they do not tell "why," and here the "why" is critically

important.  Further, by its very nature, the personal score includes, and should include, aspects of

an applicant and his or her application that are not easily quantifiable and therefore cannot be

fully captured by the statistical data.

Harvard's admissions process survives strict scrutiny.  It serves a compelling, permissible and substantial interest, and it is necessary and narrowly tailored to achieve diversity and the academic benefits that flow from diversity.  Consistent with the hallmarks of a narrowly tailored program, applicants are afforded a holistic, individualized review, diversity is understood to embrace a broad range of qualities and experiences, and race is used as a plus factor, in a flexible, non-mechanical way.  See Fisher, 136 S. Ct. at 2214; Grutter, 539 U.S. at 337–38.  The Admissions program also satisfies the other principles articulated in Fisher II in that it does not have a quota or use a fixed percentage and all applicants compete for all available seats.  Further, Harvard has met its burden of showing that there are not currently any available or workable race-neutral alternatives.  Finally, there is nothing about Harvard's admissions process that is at odds with the reason for subjecting racial classifications to strict scrutiny—to ensure "little or no possibility that the motive for the classification was illegitimate racial prejudice or stereotype." J.A. Croson Co., 488 U.S. at 493.   The use of race benefits certain racial and ethnic groups that would otherwise be underrepresented at Harvard and is therefore neither an illegitimate use of race or reflective of racial prejudice.  Accordingly, judgment for Harvard shall enter on Count I, intentional discrimination.

## VIII.   CONCLUSION

Notwithstanding the fact that Harvard's admissions program survives strict scrutiny, it is not perfect.  The process would likely benefit from conducting implicit bias trainings for admissions officers, maintaining clear guidelines on the use of race in the admissions process, which were developed during this litigation, and monitoring and making admissions officers aware of any significant race-related statistical disparities in the rating process.  That being said, the Court will not dismantle a very fine admissions program that passes constitutional muster, solely because it could do better.  There is always the specter of perfection, but strict scrutiny

does not require it and a few identified imperfections, after years of litigating and sifting through applications and metrics, do not alone require a finding that Harvard's admissions program is not narrowly tailored.

Further, the Court emphatically repeats what the Supreme Court said in <u>Fisher II</u>:

> The University now has at its disposal valuable data about the manner in which different approaches to admissions may foster diversity or instead dilute it. The University must continue to use this data to scrutinize the fairness of its admissions program; to assess whether changing demographics have undermined the need for a race-conscious policy; and to identify the effects, both positive and negative, of the affirmative-action measures it deems necessary.

> The Court's affirmance of the University's admissions policy today does not necessarily mean the University may rely on that same policy without refinement. It is the University's ongoing obligation to engage in constant deliberation and continued reflection regarding its admissions policies.

136 S. Ct. at 2213–15.

The Court here stops well short of requiring an admissions process that is overly data driven. Using statistics to ensure that the distribution of profile ratings or any other measure is exact even among various groups would potentially run afoul of the prohibition on quotas and, more importantly, defeat the purpose of a comprehensive, holistic review process that allows the admission of applicants with virtues that are not always quantifiable. But now that Harvard and other schools can see how statistical analyses can reveal perhaps otherwise imperceptible statistical anomalies, these sorts of statistics should be used as a check on the process and as a way to recognize when implicit bias might be affecting outcomes.

It was always intended that affirmative action programs be limited in duration. In 2003, the Supreme Court articulated its expectation that in twenty-five years, it would not be necessary to use racial preferences to achieve a diverse student body. <u>Grutter</u>, 539 U.S. at 343. As time marches on and the effects of entrenched racism and unequal opportunity remain obvious, this

goal might be optimistic and may need to change, but it remains imperative that Harvard and other schools that make use of racial preferences to achieve a diverse learning environment ensure, through data and experience, that "race plays no greater role than is necessary to meet its compelling interest" in diversity and to keep in mind that "racial classifications may sometimes fail to capture diversity in all of its dimensions." Fisher II, 136 S. Ct. at 2210.

The wise and esteemed author Toni Morrison observed, "Race is the least reliable information you can have about someone. It's real information, but it tells you next to nothing." Emily Langer, From heart of black America, a voice for the voiceless, Boston Globe, Aug. 7, 2019, at C11 (quoting Paul Gray, Books: Paradise Found, Time (Jan. 19, 1998), http://content.time.com/time/subscriber/article/0,33009,987690-5,00.html). Although this has been said, it must become accepted and understood before we close the curtain on race conscious admissions policies. The rich diversity at Harvard and other colleges and universities and the benefits that flow from that diversity will foster the tolerance, acceptance and understanding that will ultimately make race conscious admissions obsolete.

As President Ruth Simmons said from the witness stand in this case when asked about the importance of diversity:

> It's very hard for me to overstate my conviction about the benefits that flow to all of these areas from a diverse undergraduate student body. I know something about the lack of diversity in one's education. . . . My father was a janitor, my mother was a maid. They had been sharecroppers, they had few opportunities. I lived through that. I remember it. So to me, the benefits that flow to students is they get a better education, a deeper education, a truer education to deal with what they're going to have to deal with in life.
>
> To the institution, it makes for not just an enhanced learning environment but for the opportunity to be unparalleled in their standing because they offer something that is so indispensable for society.
>
> And for society, my goodness, I've spoken about the conflicts in society, how deeply they run, how they resurface from time to time. How can we imagine a world in which we are not creating leaders and citizens who have the capacity to

mediate those differences?  I cannot imagine it.  And so it's with great conviction that I say that we must continue to offer diverse undergraduate education to our young people to save our nation.

[Oct. 30 Tr. 54:11–55:15].

That eloquent testimony captures what is important about diversity in education.  For purposes of this case, at least for now, ensuring diversity at Harvard relies, in part, on race conscious admissions.  Harvard's admission program passes constitutional muster in that it satisfies the dictates of strict scrutiny.  The students who are admitted to Harvard and choose to attend will live and learn surrounded by all sorts of people, with all sorts of experiences, beliefs and talents.  They will have the opportunity to know and understand one another beyond race, as whole individuals with unique histories and experiences.  It is this, at Harvard and elsewhere that will move us, one day, to the point where we see that race is a fact, but not the defining fact and not the fact that tells us what is important, but we are not there yet.  Until we are, race conscious admissions programs that survive strict scrutiny will have an important place in society and help ensure that colleges and universities can offer a diverse atmosphere that fosters learning, improves scholarship, and encourages mutual respect and understanding.

**SO ORDERED.**

September 30, 2019                                                    /s/ Allison D. Burroughs
                                                                     ALLISON D. BURROUGHS
                                                                     U.S. DISTRICT JUDGE

# UNITED STATES DISTRICT COURT
# DISTRICT OF MASSACHUSETTS

___Students for Fair Admissions, Inc.___
**Plaintiff**

v.                                    CIVIL ACTION NO.___14-14176-ADB___

___President and Fellows of Harvard College___
**Defendant**

## JUDGMENT IN A CIVIL CASE

**Burroughs, D.J.**

**_____**      **Jury Verdict.**  This action came before the court for a trial by jury.  The issues have been tried and the jury has rendered its verdict.

**___X___**      **Decision by the Court**.  This action came to Bench Trial before the Court. The issues have been tried or heard and a decision has been rendered pursuant to the FINDINGS OF FACT AND CONCLUSIONS OF LAW entered September 30, 2019.

    **IT IS  ORDERED AND ADJUDGED: Judgment for the Defendant President and Fellows of Harvard College (Harvard Corporation).**

ROBERT M. FARRELL
CLERK OF COURT

/s/ Christina McDonagh

Dated:___September 30, 2019___          By _____
Deputy Clerk

**ADD131**

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| STUDENTS FOR FAIR ADMISSIONS, INC. | * | |
| | * | |
| | * | |
| Plaintiff, | * | |
| | * | |
| v. | * | Civil Action No. 14-cv-14176-ADB |
| | * | |
| PRESIDENT AND FELLOWS OF HARVARD COLLEGE (HARVARD CORPORATION), | * | |
| | * | |
| | * | |
| | * | |
| Defendant. | * | |

### MEMORANDUM AND ORDER ON CROSS-MOTIONS FOR SUMMARY JUDGMENT

BURROUGHS, D.J.

This case involves allegations that Defendant President and Fellows of Harvard College ("Harvard") maintains an undergraduate admissions program that discriminates against Asian Americans in violation of Title VI of the Civil Rights Act of 1964, 42 U.S.C. § 2000d *et seq.* ("Title VI"). The remaining claims asserted by Plaintiff Students for Fair Admissions Inc. ("SFFA") are: "Intentional Discrimination against Asian Americans" (Count I); "Racial Balancing" (Count II); "Failure to Use Race Merely as a 'Plus' Factor in Admissions Decisions" (Count III); and "Race-Neutral Alternatives" (Count V). [ECF Nos. 1, 325]. On June 15, 2018, the parties filed cross-motions for summary judgment on all counts. [ECF Nos. 412, 417]. The motions were opposed on July 27 and July 30, 2018 [ECF Nos. 435, 449], and reply briefs were filed on August 27 and August 30, 2018. [ECF Nos. 484, 510]. Several interested non-parties have appeared as *amici curiae* in support of or in opposition to the summary judgment motions. A bench trial on the issue of liability is scheduled to begin on October 15, 2018.[1] [ECF No. 405].

---

[1] The parties have agreed to defer any further litigation of the issue of remedies until after liability is determined. [ECF Nos. 386, 387].

**ADD132**

For the reasons stated herein, the cross-motions for summary judgment are <u>denied</u> on all counts without prejudice to the parties reasserting their arguments at trial, consistent with this order. The Court will also further consider the arguments raised in the amicus briefs at trial.[2]

## I.    BACKGROUND

In February and April 2018, prior to the June 15 deadline for filing dispositive motions, the Court suggested to the parties that since the remaining claims appeared to require a fact-intensive inquiry, as well as the evaluation of conflicting expert testimony, summary judgment could be a time-consuming and duplicative effort for the parties and the Court, and perhaps not warranted in light of the upcoming bench trial. [ECF Nos. 384, 402]. Although Harvard agreed, SFFA contended that some or all of the claims could be resolved on summary judgment, while acknowledging that it would be reasonable for the Court to take any dispositive motions under advisement and proceed to trial. [ECF No. 384]. <u>See</u> <u>Grutter v. Bollinger</u>, 539 U.S. 306, 317–18 (2003) (district court took cross-motions for summary judgment under advisement and conducted 15-day bench trial before ruling on the motions). The Court ultimately permitted the parties to file dispositive motions [ECF No. 387], but cautioned that if the motions presented material factual disputes, the parties should expect a summary order of denial. [ECF No. 402].

Both parties have now moved for summary judgment on all counts. SFFA submitted in support of its motion a 900-paragraph statement of allegedly undisputed facts [ECF No. 414-2] ("SFFA Facts"), approximately 700 of which are at least partially in dispute [ECF No. 437]

---

[2] Certain organizations that are affiliated with Harvard were permitted to appear as *amici curiae* [ECF No. 465] under the same or similar terms as the individual students who were previously allowed to participate in dispositive motion practice. [ECF Nos. 52, 244]. SFFA has since sought to strike portions of these organizations' amicus briefs and their related sworn declarations. [ECF Nos. 471, 479]. The Court declines to strike these documents at this time, as their inclusion in the record does not bear on the resolution of the summary judgment motions. The Court will further assess the extent to which the students and other organizations may participate at trial, if at all. [ECF Nos. 52, 518, 532].

**ADD133**

("Harvard Response"). SFFA disputes [ECF No. 452] ("SFFA Response") approximately half of Harvard's 278-paragraphs of allegedly undisputed facts [ECF No. 420] ("Harvard Facts"), and nearly all of Harvard's 45-paragraph supplemental statement of material facts that allegedly preclude summary judgment for SFFA. [ECF Nos. 437, 511]. Further, the parties' expert witnesses—David Card [ECF Nos. 419-33, 419-37], Ruth Simmons [ECF Nos. 419-28, 419-34], Peter S. Arcidiacono [ECF Nos. 415-1, 415-2, 415-3], and Richard D. Kahlenberg [ECF Nos. 416-1, 416-2, 416-3]—have each produced multiple expert reports that raise a plethora of conflicting opinions on key substantive issues in the case.

Except as otherwise noted, the following facts are not in dispute.

### A.    Harvard's Admissions Office

Located in Cambridge, Massachusetts, Harvard is a liberal arts college and the oldest institution of higher learning in the United States. SFFA Facts ¶ 4. It receives federal financial assistance and is therefore subject to Title VI. SFFA Facts ¶ 9. For the Class of 2019, more than 37,000 people applied for undergraduate admission to Harvard, 26,000 of whom were domestic applicants.[3] Harvard Facts ¶¶ 1, 5. Over 8,000 domestic applicants had perfect converted GPAs and over 5,000 domestic applicants achieved a perfect math or verbal SAT score. Harvard Facts ¶¶ 6−8. Harvard offered admission to 2,003 applicants for the Class of 2019. Harvard Facts ¶ 2.

The Office of Admissions and Financial Aid at Harvard ("Admissions Office") is tasked with making admissions decisions. SFFA Facts ¶ 6. This office employs approximately 40 admissions officers who, under the guidance of the Admissions Office's leadership, handle most of the day-to-day operations of the admissions program.[4] SFFA Facts ¶¶ 6, 13−14.

---

[3] SFFA does not challenge Harvard's undergraduate admissions program with respect to international applicants.

[4] For the purposes of this litigation, the leadership of the Admissions Office includes William Fitzsimmons as the Dean of Admissions and Financial Aid, Marlyn McGrath as the Director of

**ADD134**

### B.      Applying to Harvard

Students apply to Harvard either through the Early Action program, which typically has a November 1 deadline, or through the Regular Decision program, which typically has a January 1 deadline, but the same procedures for reviewing applications generally apply regardless of whether a student has applied for Early Action or Regular Decision. Harvard Facts ¶¶ 11–12. Students apply by submitting a Common Application, Universal College Application, or Coalition Application. Harvard Facts ¶ 13. They must complete a short supplement to indicate their interest and the strength of that interest in an academic field, a career, and extracurricular activities. Harvard Facts ¶ 14. Applicants may submit scholarly work, artwork, or recordings of music or dance performances. Harvard Facts ¶ 15. The Common Application, Universal College Application, and Coalition Application permit all students to identify their race (and students may choose more than one), but Harvard does not require them to do so. Harvard Facts ¶¶ 16–18, 20. Applicants may also include information about their race in other parts of the application, such as in their personal essay. Harvard Facts ¶ 17. After submitting an application, most students are interviewed in person by a Harvard alumnus who reports his or her feedback to the Admissions Office. Harvard Facts ¶ 21. In sum, a complete application file typically includes:

---

Admissions, and Sally Donahue as the Director of Financial Aid, although Ms. Donahue retired in July 2018 and Jake Kaufman now serves as Director of Financial Aid. SFFA Facts ¶¶ 13–15; Harvard Response ¶ 15. Other members of Harvard's leadership include Drew G. Faust, the former President of Harvard from 2007 to June 30, 2018, and Lawrence Bacow, the current President of Harvard, who were or are responsible for overseeing all of Harvard's degree-granting schools; Michael D. Smith, the Dean of the Faculty of Arts and Sciences, who is responsible for overseeing the administrative, financial, and human resources aspects of Harvard's Faculty of Arts and Sciences and the Admissions Office, among other schools and departments; and Rakesh Khurana, the Dean of Harvard College, who reports to Dean Smith and is responsible for the undergraduate education and residential experience of Harvard students. SFFA Facts ¶¶ 10–15; Harvard Response ¶¶ 10–11.

4

**ADD135**

1. The applicant's name, age, sex, address, citizenship, place of birth, and race (if disclosed);
2. Information about the applicant's family;
3. The applicant's standardized test scores;
4. The applicant's high school transcripts and reported grade point average;
5. Information provided by the applicant's high school about the school itself, such as the number of students that attend college, the available courses, the percentage of students that receive free or reduced-price lunch, and the economic and demographic profile of the community;
6. One or more essays written by the applicant;
7. A letter from the applicant's high school guidance counselor;
8. At least two letters of recommendation from high school teachers, and often additional recommendation letters from teachers, supervisors, or others;
9. In many cases, a detailed, multi-page evaluation from a Harvard alumni interviewer; and
10. The applicant's answers to questions about his or her intended academic concentration, extracurricular and athletic participation, and post-college career.

Harvard Facts ¶ 22.

### C. Application Review

Harvard organizes its review of application files into approximately twenty (eighteen domestic and two international) geographical regions referred to as "dockets," which vary widely in geographic scope but cover a roughly similar number of applications. Harvard Facts ¶¶ 36−37; SFFA Facts ¶¶ 65−66. A subcommittee of admissions officers—usually three to six "first readers" that are assigned to specific areas within the docket and a senior admissions officer serving as the "docket chair"—is responsible for the initial evaluation of all candidates within a particular docket. Harvard Facts ¶¶ 38−40.

The written guidelines as to how admissions officers should review application files are contained in the Admissions Office's "Reading Procedures," which are distributed to the admissions officers each year. SFFA Facts ¶ 68. The Reading Procedures set forth, among other things, criteria for assigning numerical ratings to each application. SFFA Facts ¶ 69. Harvard also conducts an in-person orientation and training program for all newly hired admissions

**ADD136**

officers. SFFA Facts ¶ 70. After participating in orientation, new admissions officers are typically required to share the first 50 to 100 application files that they read with a more senior admissions officer who provides feedback on the ratings assigned by the new admissions officer. Harvard Facts ¶ 30; SFFA Facts ¶ 71. The work of new admissions officers is closely monitored by more senior admissions officers during their first few years of employment. SFFA Facts ¶ 71.

       1.    First Reader and Docket Chair

      To begin the application evaluation process, a first reader reviews the application files from the high schools in his or her area within the docket. Harvard Facts ¶ 41. First readers conduct the review using a "summary sheet," which is a two to three-page document that is prepopulated with information from a particular student's application, including that student's high school, citizenship, test scores, GPA, class rank, and race. SFFA Facts ¶ 74. The summary sheet also contains three blank sections that may be completed by the first reader: "Ratings," "Notes," and "Reader Comments." SFFA Facts ¶ 74. The Ratings section contains fourteen boxes representing the following categories in which an applicant may receive numerical scores: overall, academic, extracurricular, athletic, personal, teacher recommendation (up to four possible), a school support recommendation, two staff interview ratings (overall and personal), and two alumni interview ratings (overall and personal).[5] SFFA Facts ¶ 75. The Notes section may be used to briefly summarize the application or other pertinent information, and the Comments section may be used to provide a more extensive discussion of the application. SFFA Facts ¶¶ 76–77.

---

[5] Alumni and admissions officers assign ratings following an interview with an applicant based on criteria similar to the criteria used by first readers to assign their ratings. SFFA Facts ¶¶ 92–95.

**ADD137**

After reviewing an application file, the first reader assigns academic, extracurricular, athletic, personal, and overall ratings to the applicant, and rates the strength of the teacher and guidance counselor letters of recommendation. Harvard Facts ¶¶ 43−45. The numerical ratings generally range between 1 and 4 in all categories, with 1 being the best rating. Harvard Facts ¶¶ 46−47. Admissions officers may add a plus or a minus to a numerical rating of 2 or 3; a 2+ is better than a 2 which is better than a 2-. Harvard Facts ¶ 48; SFFA Response ¶ 48.

The academic rating summarizes the applicant's academic achievement and potential based on grades, test scores, letters of recommendation, academic prizes, and any submitted academic work. Harvard Facts ¶ 49. The extracurricular rating captures the strength of the applicant's involvement in activities during high school and his or her potential to contribute at Harvard outside of the classroom. Harvard Facts ¶ 53. The athletic rating takes into account the strength of the applicant's potential contributions to athletics at Harvard, as well as the applicant's athletic activity in high school. Harvard Facts ¶ 57. According to Harvard, the personal rating "summarizes the applicant's personal qualities based on all aspects of the application, including essays, letters of recommendation, the alumni interview report, personal and family hardship, and any other relevant information in the application," and admissions officers assign the personal rating based on their assessment of the applicant's "humor, sensitivity, grit, leadership, integrity, helpfulness, courage, kindness and many other qualities."[6] Harvard Facts ¶¶ 59−60. The ratings for recommendations, referred to as "school support," are meant to evaluate the strength of counselor and teacher recommendations. Harvard Facts ¶ 62; SFFA Response ¶ 62. Finally, the overall rating is intended to summarize the strength of the

---

[6] SFFA admits that first readers determine the personal rating by examining a variety of subjective factors, but also contends that other unlisted factors, such as an applicant's race, affect the personal rating. SFFA Response ¶ 60.

**ADD138**

application as a whole, although it is not determined by a formula and does not involve adding

up the other ratings. Harvard Facts ¶¶ 64−65. Harvard instructs first readers to assign the overall

rating by "stepping back and taking all the factors into account." SFFA Facts ¶ 99. Admissions

officers may consider race in assigning the overall rating, but are not supposed to consider race

when assigning the academic, extracurricular, athletic, and personal ratings. Harvard Facts ¶ 119;

SFFA Facts ¶ 214; Harvard Response ¶ 214.

After the first reader completes his or her evaluation, the application file may be sent to

the docket chair for further review. Harvard Facts ¶ 67. The docket chair may assign ratings in

the same categories as the first reader and add written comments. Harvard Facts ¶¶ 68−69. The

first reader and the docket chair's scores, as well as any comments from other readers, are

reflected in the application file. Harvard Facts ¶ 70.

2.    Subcommittee and Full Committee Meetings

After each application has been reviewed by a first reader, the subcommittees meet to

further evaluate the applications in their dockets. SFFA Facts ¶ 113. The first reader of an

application pending before the subcommittee summarizes the strengths and weaknesses of that

applicant's candidacy. Harvard Facts ¶ 72. Subcommittee members then discuss the applicant

and decide as a group what recommendation and level of support to convey to the full

admissions committee regarding admission. Harvard Facts ¶¶ 73, 75. Dean Fitzsimmons also

allegedly visits the subcommittee meetings to support applicants on the "Dean's Interest List,"

which is a list of applicants that may be of interest to Harvard. SFFA Facts ¶¶ 294−295; SFFA

Response ¶ 73.

After all of the subcommittees have decided which applications to recommend for

admission, the full admissions committee (approximately 40 people) meets to make the final

decisions on those applications.[8] Harvard Facts ¶ 76; SFFA Facts ¶ 125. The full committee

includes, among others, all the admissions officers who read application files, as well as Dean

Fitzsimmons, Director McGrath, and the Director of Financial Aid. Harvard Facts ¶¶ 77−78.[9] At

a full committee meeting, the first reader of the application being discussed makes a presentation

to the committee, typically emphasizing the applicant's strengths. Harvard Facts ¶ 79. After the

discussion is complete, the full committee decides whether to admit, reject, or waitlist the

candidate. Harvard Facts ¶ 80. In both the subcommittee and full committee meetings, each

admissions officer has one vote, and a majority vote controls whether a student is admitted, wait-

listed, or rejected. Harvard Facts ¶ 81; SFFA Facts ¶ 128. The subcommittee and full committee

members can potentially consider race as a factor in deciding which candidates to recommend or

vote to admit, deny, or waitlist. SFFA Facts ¶¶ 236, 250; Harvard Response ¶¶ 251, 264; [ECF

No. 419-1 at 52−53].

Near the end of the full committee meetings, Dean Fitzsimmons and Director McGrath

confirm the final target number of admitted students and determine whether any applicants must

be "lopped" or removed from the class of students on the "admit" list to reach that target. SFFA

Facts ¶ 134; Harvard Response ¶ 134.

---

[8] The parties dispute whether every application is discussed at the full committee meetings or
only those that the subcommittees recommend for admission or that are otherwise competitive.
See SFFA Facts ¶¶ 125−26; Harvard Response ¶¶ 125−26.
[9] Prior to beginning the full committee process, Dean Fitzsimmons and Director McGrath receive
a document referred to as a "one-pager" that contains statistics and information about the to-be
admitted class and the prior year's admitted class, including information about gender,
geographic region, expected concentration, financial aid, citizenship, race, and other
characteristics. SFFA Facts ¶¶ 130, 239; Harvard Response ¶¶ 130, 239. The parties dispute the
extent to which one-pagers are used in the admissions process.

**ADD140**

### 3.    Post-Admission Review

After the admissions decisions are made, Harvard undertakes certain recruiting efforts to encourage admitted students to attend Harvard, including through the Visitas Program which allows admitted students to visit the campus and learn about Harvard. SFFA Facts ¶¶ 138−139; Harvard Facts ¶ 142. Admitted students have until May 1 to accept their offers of admission. SFFA Facts ¶ 140. If there are spaces available in the incoming class after May 1, the full admissions committee meets to fill the remaining spots with applicants from the waitlist. SFFA Facts ¶ 141. Harvard also offers some applicants deferred admission for the following class year. SFFA Facts ¶¶ 145−146; Harvard Response ¶¶ 145−146.

### D.    Harvard's Stated Mission and Pursuit of Diversity

Harvard states that its mission "is to educate the citizens and citizen-leaders for our society . . . through . . . the transformative power of a liberal arts and sciences education," and believes that "[t]hrough a diverse living environment, where students live with people who are studying different topics, who come from different walks of life and have evolving identities, intellectual transformation is deepened and conditions for social transformation are created." Harvard Facts ¶¶ 82−83. "From this [Harvard] hope[s] that students will begin to fashion their lives by gaining a sense of what they want to do with their gifts and talents, assessing their values and interests, and learning how they can best serve the world." Harvard Facts ¶ 83. According to Harvard, to achieve its educational mission, it "seeks to admit a class with diverse socioeconomic, geographic, and racial backgrounds; a broad range of academic, intellectual, and extracurricular interests and talents; and a variety of different life experiences that include overcoming hardship, engaging in public service, and much more." Harvard Facts ¶¶ 84−85. In

**ADD141**

1996, Harvard's then-President, Neil Rudenstine, drafted a report in which he explained the

importance of diversity to Harvard's mission:

> Our commitment to excellence also means that we will seek out—in all corners of
> the nation, and indeed the world—a diversity of talented and promising students.
> Such diversity is not an end in itself, or a pleasant but dispensable accessory. It is
> the substance from which much human learning, understanding, and wisdom
> derive. It offers one of the most powerful ways of creating the intellectual energy
> and robustness that lead to greater knowledge, as well as the tolerance and mutual
> respect that are so essential to the maintenance of our civic society.

Harvard Facts ¶ 86; [ECF No. 419-41 at 56]. In 2015, Harvard established a Committee to Study

the Importance of Student Body Diversity, chaired by Dean Khurana, which was tasked with

examining how "diversity in the student body helps catalyze the intellectual, social, and personal

transformations that are central to Harvard's liberal arts and science education." Harvard Facts

¶¶ 87−88.[10] The committee endorsed former President Rudenstine's report and "emphatically

embrace[d] and reaffirm[ed] [Harvard's] long-held view that student body diversity—including

racial diversity—is essential to [Harvard's] pedagogical objectives and institutional mission."

Harvard Facts ¶ 89; [ECF No. 419-45 at 3]. The committee's report described the ways in which

student body diversity positively impacts the curriculum, residential and classroom experiences,

extra-curricular activities, athletics, and other learning experiences at Harvard. [ECF No. 419-45

at 8−18]. The committee ultimately concluded that student body diversity "enhances the

education of all of our students, it prepares them to assume leadership roles in the increasingly

pluralistic society into which they will graduate, and it is fundamental to the effective education

---

[10] Harvard also had previously, in June 2014, convened a university-wide committee chaired by
James Ryan, Dean of the Graduate School of Education, which was charged with examining the
importance of student-body diversity at Harvard and with evaluating whether Harvard could
achieve the educational benefits of a diverse student body without considering race (the "Ryan
Committee"). Harvard Facts ¶ 145. The Ryan Committee ceased meeting in late 2014. Harvard
Facts ¶ 146; SFFA Response ¶ 146.

**ADD142**

of the men and women of Harvard College." Harvard Facts ¶ 90. The full Harvard Faculty of Arts and Sciences unanimously adopted the committee's report. Harvard Facts ¶ 91.

In 2017, Harvard established a separate committee to Study Race Neutral Alternatives in Harvard College Admissions, which was chaired by Dean Smith, with Dean Fitzsimmons and Dean Khurana serving as the other committee members (the "Smith Committee"). Harvard Facts ¶ 147. The Smith Committee was charged with evaluating whether race-neutral alternatives are available and workable for achieving the benefits that flow from student body diversity at Harvard. Harvard Facts ¶ 151. In April 2018, after meeting seven times over the course of nine months, Harvard Facts ¶ 154, the Smith Committee produced a report explaining that it considered social science and other literature, the Complaint and the expert reports produced in this litigation, as well as other information collected from several offices of Harvard, in reaching the following conclusions:

(1) If Harvard stopped considering race in the admissions process, the proportion of African American and Latin American students in the admitted class would dramatically decline, notwithstanding all the other efforts that Harvard makes to enroll a diverse class, while the proportion of white students would dramatically increase and the proportion of Asian American students would slightly increase. Harvard Facts ¶¶ 156−57.

(2) The "significant decline in racial diversity that would flow from eliminating the consideration of race in the admissions process would prevent Harvard from achieving its diversity-related educational objectives" because "students in a significantly less diverse class will have diminished opportunities to engage with and learn from classmates who come from widely different backgrounds and circumstances . . . [which] would leave students ill prepared to contribute to and lead in our diverse and interconnected nation and world." Harvard Facts ¶ 159.

(3) No combination of race-neutral practices,[11] including broader efforts to recruit a diverse class; increased financial aid; further emphasis on geographic diversity; admitting more transfer students; eliminating Early Action or deferred admission; affording greater weight to applicants' modest socioeconomic background; and ceasing to consider applicants' test scores, legacy status, parents' employment at Harvard, recruited athlete status, or inclusion on the Dean's or Director's interest list,[12] would practicably allow Harvard to achieve the educational benefits of a diverse student body without unacceptably sacrificing other important educational and institutional objectives. Harvard Facts ¶¶ 164−212.

### E.    Alleged Discrimination against Asian Americans

The following facts are largely in dispute, but warrant discussion to provide a more complete view of the case. In November 2012, Harvard came under pressure to respond to allegations of perpetuating an "anti-Asian admissions bias" following the publication of a magazine article written by a Harvard alumnus, which described anecdotal and statistical evidence of prejudice against Asian Americans in Harvard's admissions program. SFFA Facts ¶¶ 348−357. Harvard's Office of Institutional Research ("OIR") conducted an analysis of the

---

[11] Harvard currently employs certain race-neutral practices to achieve diversity: (1) mailing materials about Harvard and its financial aid program to certain applicants of modest economic backgrounds; (2) holding recruitment events throughout the United States, including in geographic areas that do not frequently send students to Harvard; (3) maintaining a First Generation program to encourage students who are from the first generation in their families to attend a four-year college to apply to Harvard; (4) implementing an Undergraduate Minority Recruitment Program to encourage a racially diverse applicant pool; (5) offering an entirely need-based financial aid program, and (6) hosting admitted students for the Visitas program which is designed to expose admitted students to life at Harvard. Harvard Facts ¶¶ 127−144. SFFA largely disputes the effectiveness of Harvard's implementation of these practices. SFFA Response ¶¶ 127−144.

[12] Dean Fitzsimmons keeps a list of applicants that may be of interest to Harvard. SFFA Facts ¶¶ 294−295. Although the parties refer to a "Director's Interest List" that also allegedly identifies candidates of particular interest to Harvard, it is unclear from the record who creates the Director's List or how that list compares to the Dean's Interest List. [ECF No. 415-1 at 6].

**ADD144**

article's allegations of discrimination. SFFA Facts ¶¶ 362−364.

In February 2013, the OIR produced a report showing that the admission rate for Asian Americans was highest in a simulation where the criteria for admission was academics only, and that the admission rate for Asian Americans progressively declined as more variables were added to the simulation, such as extracurricular activities, personal rating, legacy status, recruited athlete status, gender, and race. SFFA Facts ¶¶ 399−421. The OIR found that when adding the consideration of race to the admissions criteria, "the share of Asian American students . . . fall[s] by more than 8 percentage points, representing a 32 percent decrease in their share of the overall class. This . . . represent[s] the largest drop of any racial group." SFFA Facts ¶ 416. Dean Fitzsimmons and Dean Khurana were apparently presented with the findings in this report but neither of them requested additional research from the OIR or discussed the February 2013 report with anyone else in the Admissions Office. SFFA Facts ¶¶ 427−431, 537−543.

In a second report completed in 2013, the OIR found that non-legacy, non-athlete ("NLNA") Asian American applicants performed significantly better than NLNA White applicants in SAT scores, the alumni overall rating, and the academic rating, as well as slightly better than NLNA White applicants in the extracurricular rating, and the same as NLNA White applicants in the alumni personal rating, the guidance counselor rating, and teacher ratings. SFFA Facts ¶ 438. The only category in which NLNA White applicants performed significantly better than NLNA Asian American applicants was the personal rating, and the OIR provided no explanation as to why NLNA White applicants received higher personal ratings than NLNA Asian American applicants. SFFA Facts ¶¶ 439−440. The OIR also found that NLNA White applicants were admitted at a higher rate than NLNA Asian American applicants with roughly the same academic scores, and found a negative association between being admitted to Harvard

**ADD145**

and being Asian American, although no similar link was observed with any other racial group.
SFFA Facts ¶¶ 442−446, 450−51. Dean Fitzsimmons received this second 2013 report, but again
did not request any additional research from the OIR or discuss the report with anyone in the
Admissions Office. SFFA Facts ¶¶ 466−471. Dean Fitzsimmons and Dean Khurana were
similarly nonresponsive when the OIR presented them with a separate memorandum created in
May 2013 that found that being Asian American was negatively associated with the likelihood of
admission to Harvard. SFFA Facts ¶¶ 504−509, 513−517, 537−543.

In addition to the 2012 and 2013 OIR documents, SFFA contends that the admissions
data produced in this litigation confirms Harvard's bias against Asian Americans. SFFA Facts ¶¶
581−82. Consistent with this Court's orders, Harvard produced applicant-by-applicant
admissions data for the Classes of 2014 through 2019, aggregate information on the Classes of
2000 through 2017, and 480 application files and 640 summary sheets from the Classes of 2018
and 2019. SFFA Facts ¶¶ 582−584. In analyzing this data, SFFA's statistical expert, Professor
Arcidiacono, concluded that while Asian American applicants are, as a group, stronger than
applicants of other racial backgrounds in the academic and extracurricular ratings, SFFA Facts
¶¶ 595−601, and receive personal ratings from alumni interviewers comparable to White
applicants, SFFA Facts ¶ 610, they have the lowest share of applicants receiving better than 3+
on the personal ratings given by admissions officers. SFFA Facts ¶ 609. Further, Asian
Americans at every level of academic achievement receive lower personal ratings than applicants
of all other racial groups. SFFA Facts ¶ 613. Professor Arcidiacono similarly found bias against
Asian American applicants in the overall ratings assigned by admissions officers, SFFA Facts ¶¶
624−26, and that Asian Americans were ultimately admitted into Harvard at rates lower than any
other racial group from the Class of 2000 through the Class of 2019, even though Asian

**ADD146**

Americans had higher test scores than all other racial groups during this period of time. SFFA

Facts ¶¶ 630−632. In short, Professor Arcidiacono concludes, based on his analysis, that the

assignment of personal ratings and overall ratings is biased against Asian Americans and that all

things being equal, an Asian American applicant has a lower chance of admission than a White

applicant. SFFA Facts ¶¶ 656−669.

     As discussed further below, SFFA's assertions are allegedly supported by other statistics,

documents, and testimonial evidence of Harvard's discrimination or impermissible consideration

of race in admissions.

## II.    PROCEDURAL HISTORY

     On November 17, 2014, SFFA filed the operative complaint asserting six causes of action

based on Harvard's alleged violation of Title VI: "Intentional Discrimination against Asian

Americans" (Count I); "Racial Balancing" (Count II); "Failure to Use Race Merely as a 'Plus'

Factor in Admissions Decisions" (Count III); "Failure to Use Race to Merely Fill the Last 'Few

Places' in the Incoming Freshman Class" (Count IV); "Race-Neutral Alternatives" (Count V);

and "Any Use of Race as a Factor in Admissions" (Count VI). [ECF No. 1]. On March 11, 2016,

the Court stayed this action pending the Supreme Court's ruling in <u>Fisher v. University of Texas</u>

<u>at Austin</u>, 136 S. Ct. 2198 (2016). [ECF No. 146]. After the Supreme Court issued its ruling on

June 23, 2016, Harvard moved to dismiss this case for lack of standing [ECF No. 187] and

separately moved for judgment on the pleadings as to Counts IV and VI because those claims

were inconsistent with Supreme Court precedent [ECF No. 185]. On June 2, 2017, the Court

denied the motion to dismiss [ECF No. 324] but granted judgment on the pleadings for Counts

IV and VI [ECF No. 325]. The remaining claims (Counts I, II, III, and V) are the subject of the

pending cross-motions for summary judgment.

**ADD147**

III.    **LEGAL STANDARD**

Neither party has suggested that this Court should deviate from the ordinary standard of

review for summary judgment. This is also not a case in which "the parties cross-moved for

summary judgment, yet both agreed that there was no dispute over the basic facts of the case,"

United Paperworkers Int'l Union Local 14, AFL-CIO-CLC v. Int'l Paper Co., 64 F.3d 28, 31 (1st

Cir. 1995), such that the Court may be "entitled to 'engage in a certain amount of factfinding,

including the drawing of inferences.'" TLT Constr. Corp. v. RI, Inc., 484 F.3d 130, 135 n.6 (1st

Cir. 2007) (quoting United Paperworkers, 64 F.3d at 31). Here, the parties filed summary

judgment motions to resolve the case or to potentially narrow the scope of fact-finding at the

upcoming bench trial. Accordingly, they "have intended to treat summary judgment as a separate

phase," before "proceed[ing] to a bench trial." Jewelers Mut. Ins. Co. v. N. Barquet, Inc., 410

F.3d 2, 10 (1st Cir. 2005). As another district court has suitably described the interplay between

the summary judgment and bench trial phases of a case:

> In ruling on motions for summary judgment, the Court's role is limited. "[A]t the
> summary judgment stage the judge's function is not . . . to weigh the evidence and
> determine the truth of the matter but to determine whether there is a genuine issue
> for trial." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249 (1986). "A judge
> does not sit as a trier of fact when deciding a motion for summary judgment even
> if the case is scheduled to be heard without a jury." Med. Inst. Of Minn. v. Nat'l
> Ass'n of Trade & Technical Schs., 817 F.2d 1310, 1315 (8th Cir. 1987).
> Furthermore, "even if the facts are undisputed, summary judgment may not be
> granted where there is disagreement over inferences that can be reasonably be
> drawn from those facts." In re Unisys Sav. Plan Litig., 74 F.3d 420, 433 (3rd Cir.
> 1996).
>
> In contrast, after a bench trial, the Court is required to weigh the evidence and make
> credibility determinations. In re French, 499 F.3d 345, 359 (4th Cir.2007). Rather
> than deciding whether a genuine issue of material fact exists, the Court makes
> findings of fact by evaluating the persuasiveness of conflicting evidence and
> "decid[ing] which is more likely true." Kearney v. Standard Ins. Co., 175 F.3d
> 1084, 1095 (9th Cir. 1999) (en banc).

**ADD148**

F.T.C. v. Ross, No. 08-cv-3233-RDB, 2012 WL 2126533, at *4 (D. Md. June 11, 2012) (quoting

Waterkeeper Alliance, Inc. v. Alan & Kristin Hudson Farm, No. 10-cv-487-WMN, 2012 WL

13005672, at *1–2 (D. Md. Mar. 1, 2012)). Under the circumstances here, summary judgment is

appropriate "if there is no genuine issue as to any material fact and the undisputed facts show

that the moving party is entitled to judgment as a matter of law." Borges ex rel. S.M.B.W. v.

Serrano-Isern, 605 F.3d 1, 4 (1st Cir. 2010) (citing Fed. R. Civ. P. 56(c)(2)). "An issue is

'genuine' if the evidence of record permits a rational factfinder to resolve it in favor of either

party. A fact is 'material' if its existence or nonexistence has the potential to change the outcome

of the suit." Id. at 4–5 (citation omitted). The Court "must view 'the facts in the light most

favorable to the non-moving party, drawing all reasonable inferences in that party's favor.'"

Bienkowski v. Northeastern Univ., 285 F.3d 138, 140 (1st Cir. 2002) (quoting Barbour v.

Dynamics Research Corp., 63 F.3d 32, 36 (1st Cir. 1995)). Given that both parties have moved

for summary judgment, the Court "consider[s] each motion separately, drawing inferences

against each movant in turn." United Paperworkers, 64 F.3d at 31 n.2 (quoting E.E.O.C. v.

Steamship Clerks Union, Local 1066, 48 F.3d 594, 603 n.8 (1st Cir. 1995)).

## IV.    DISCUSSION

### A.    Subject Matter Jurisdiction

On June 2, 2017, the Court denied Harvard's motion to dismiss for lack of subject matter

jurisdiction [ECF No. 324], concluding that SFFA had the associational standing necessary to

litigate this action. See Students for Fair Admissions, Inc. v. President & Fellows of Harvard

Coll. (Harvard Corp.), 261 F. Supp. 3d 99, 111 (D. Mass. 2017). SFFA filed this lawsuit on

behalf of its membership which included, among others, applicants and prospective applicants to

institutions of higher education, including at least one Asian American student who was denied

admission to Harvard but intended to apply to transfer there if Harvard stopped using its race-conscious admissions policy (the "Applicant"). Id. at 103. "Following the filing of the Complaint, SFFA's membership continued to grow and it added additional members, including several that it identifie[d] as 'Standing Members,'" some of whom were Asian American applicants that were rejected from Harvard.[13] Id. at 103 n.4. Based on their affidavits, the Court concluded that these Standing Members had individual standing to sue Harvard, which SFFA was required to demonstrate to establish associational standing. Id. at 109−10. Harvard now reasserts its Article III challenge on the grounds that the individual members on whom SFFA's standing rests are no longer eligible to transfer to Harvard or lack "any serious interest in doing so." [ECF No. 418 at 20]. See Gratz v. Bollinger, 539 U.S. 244, 262–63 (2003) (holding that rejected applicant "able and ready" to transfer "has standing to seek prospective relief with respect to the [u]niversity's continued use of race in undergraduate admissions").

As SFFA recognizes, Harvard's motion does not challenge whether SFFA had standing when it initiated this action but whether the case has become moot as SFFA's Standing Members have arguably become ineligible or disinterested in transferring to Harvard. Mootness is "the doctrine of standing set in a time frame: [t]he requisite personal interest that must exist at the commencement of the litigation (standing) must continue throughout its existence (mootness)." Arizonans for Official English v. Arizona, 520 U.S. 43, 68 n.22 (1997) (quoting United States Parole Comm'n v. Geraghty, 445 U.S. 388, 397 (1980)). "Mootness usually results when a plaintiff has standing at the beginning of a case, but, due to intervening events, loses one of the

---

[13] Other than the Applicant's father, the Applicant was the only Standing Member at the time that the Complaint was filed. Harvard Facts ¶ 258; SFFA Response ¶ 258. As the Court previously stated, "the Court does not address the issue of whether prospective college students, who have not yet applied, or the parents of applicants have standing to sue." Students for Fair Admissions, Inc. v. President & Fellows of Harvard Coll. (Harvard Corp.), 261 F. Supp. 3d 99, 110 n.12 (D. Mass. 2017).

elements of standing during litigation." WildEarth Guardians v. Pub. Serv. Co. of Colorado, 690 F.3d 1174, 1182 (10th Cir. 2012). "Intervening events must 'have completely and irrevocably eradicated the effects' of the parties' conduct in order for a case to be deemed moot." Town of Barnstable v. O'Connor, 786 F.3d 130, 142 (1st Cir. 2015) (quoting Cnty. of Los Angeles v. Davis, 440 U.S. 625, 631 (1979)); see Ramirez v. Sanchez Ramos, 438 F.3d 92, 100 (1st Cir. 2006) ("[I]ntervening events [must] have blotted out the alleged injury and established that the conduct complained of cannot reasonably be expected to recur."). "The Supreme Court has placed the 'heavy burden of persuasion' with respect to mootness on the party advocating for it." Town of Barnstable, 786 F.3d at 142 (quoting United States v. Concentrated Phosphate Exp. Ass'n, 393 U.S. 199, 203 (1968)).

Harvard asserts, and SFFA does not dispute, that the Applicant is no longer eligible to transfer to Harvard. Harvard nonetheless acknowledges that two Standing Members, who applied and were rejected from Harvard, remain eligible for transfer admission. Harvard nonetheless argues that, based on their deposition testimony, these members have no serious intention of transferring to Harvard. When asked, "Do you intend to apply to transfer . . . to any other college or university," Standing Member #1 said, "I don't anticipate that at the moment, no." [ECF 419-15 at 4]. Standing Member #2 was asked a similar question and responded, "I mean . . . this is highly speculative. You never know what the circumstances are" that would make him or her willing to transfer. [ECF No. 419-19 at 5]. Standing Member #2 also stated in a deposition that he or she would consider applying to transfer to Harvard "[i]f it was not a burden." Id.

These discrete statements, culled from the deposition transcripts, do not satisfy Harvard's heavy burden. Standing Member #1 also testified that he or she remains "able and ready to transfer to Harvard were it to cease the use of race or ethnicity as an admissions preference and

**ADD151**

to cease its intentional discrimination against Asian Americans." [ECF No. 454-14 at 5–6]. That member explained, "if Harvard were to stop using its use of race and ethnicity in admissions, I would think my chances of being admitted had risen enough, because of that change, that I would apply again for transfer to see if I could get in under the new system." Id. at 6. The testimony that Standing Member #1 did not anticipate transferring from his or her current enrollment "at the moment," while Harvard maintains its race-conscious admissions policy, presents no inconsistency with being able and ready to transfer if Harvard's admissions policy were to be materially revised.

Standing Member #2 similarly testified, "I'm able and ready to apply to transfer [to Harvard], were it to cease the use of race," and further explained that "were [Harvard] to cease the use of race or ethnicity, I think those chances [of admission] would be improved and it would be worth the effort to apply for a transfer at that point." [ECF No. 454-15 at 5–6]. The testimony that he or she would be willing to transfer to Harvard "[i]f it was not a burden" and might depend on circumstances that are "highly speculative" at this point, does not adequately show that this student does not seriously intend to transfer. After noting the speculative nature of the question about his or her willingness to transfer, Standing Member #2 responded "Yes" when asked "Do you think you would apply to transfer to Harvard?" [ECF No. 419-19 at 5].

Accordingly, Harvard has not established that the case has become moot based on the Standing Members' alleged disinterest in transferring. Harvard's other challenges—(1) that SFFA amended its bylaws after filing this lawsuit to enlarge the board of directors and allow its membership to fill just one seat; (2) that only a fraction of SFFA's members pay dues in comparison to the substantial number of unidentified donors that make contributions; and (3) that SFFA's founder controls the organization's daily operations—were considered at the motion to

dismiss stage and ultimately deemed insufficient to undermine SFFA's associational standing

under the circumstances.[14] Harvard has not presented any evidence that warrants reconsideration

of the Court's prior conclusion that this case is not a situation "in which the adequacy of an

organization's representativeness is so seriously in doubt" that the Court should consider

additional criteria to evaluate associational standing. Students for Fair Admissions, Inc., 261 F.

Supp. 3d at 110. Therefore, Harvard's motion for summary judgment for lack of subject matter

jurisdiction is denied.[15]

### B.    SFFA's Claims

SFFA's remaining claims challenge several aspects of Harvard's race-conscious

admissions program that allegedly violate Title VI and Supreme Court precedent on the

consideration of race in the higher education admissions process. Title VI states that "[n]o person

in the United States shall, on the ground of race, color, or national origin, be excluded from

participation in, be denied the benefits of, or be subjected to discrimination under any program or

activity receiving Federal financial assistance." 42 U.S.C. § 2000d. "The statute allows a private

---

[14] Harvard also adds here that the Standing Members "have not attended any SFFA meetings and refused on counsel's instructions to testify about whether they have voted in any SFFA election." [ECF No. 418 at 18]. Even assuming that these assertions were accurate, they do not demonstrate that SFFA fails to adequately represent its membership or that SFFA members do not participate in the organization. As the Court stated in its prior order, the Standing Members' declarations showed "that SFFA leadership communicates with members about this litigation and that the Standing Members have given input concerning the case." Students for Fair Admissions, Inc., 261 F. Supp. 3d at 111. For example, Standing Member #1 testified that he or she participated in a telephone conference to which all SFFA members were invited in December 2016 and that SFFA has thoroughly answered Standing Member #1's questions about the case and afforded Standing Member #1 the opportunity to have input and provide direction concerning this litigation. [ECF No. 454-14 at 7−8].

[15] The Court need not address at this time the question of whether the seven new Standing Members identified by SFFA have standing. SFFA may renew its argument at trial, should Harvard raise a meritorious jurisdictional challenge to Standing Members #1 and #2. The Court might also consider under such circumstances whether an exception to mootness applies if the alleged wrongful conduct is reasonably expected to recur.

plaintiff to obtain both injunctive relief and damages when intentionally discriminated against by

a federal-funds recipient on account of race, color, or national origin." Branson v. St. Elizabeth

Sch. of Nursing, No. 15-cv-87-TLS, 2017 WL 2418396, at *3 (N.D. Ind. June 5, 2017) (citing

Alexander v. Sandoval, 532 U.S. 275, 280 (2001)). Harvard does not dispute that it receives

federal funds and is subject to Title VI.[16] Harvard Response ¶ 9. In the context of Harvard's

undergraduate admissions program, "because racial characteristics so seldom provide a relevant

basis for disparate treatment, . . . [r]ace may not be considered [by a university] unless the

admissions process can withstand strict scrutiny." Fisher v. Univ. of Texas at Austin, 136 S. Ct.

2198, 2207–08 (2016) ("Fisher II") (quoting Fisher v. Univ. of Texas at Austin, 570 U.S. 297,

309 (2013) ("Fisher I")). "Strict scrutiny requires the university to demonstrate with clarity that

its 'purpose or interest is both constitutionally permissible and substantial, and that its use of the

classification is necessary . . . to the accomplishment of its purpose.'" Id. (quoting Fisher I, 570

U.S. at 309).

    1.    Count I: Intentional Discrimination

To state a claim for intentional discrimination under Title VI, the plaintiff "must

demonstrate, *inter alia,* that the defendant discriminated on the basis of race, the discrimination

---

[16] Harvard notes that the Supreme Court has only addressed race-conscious admissions policies of public universities, and suggests that there are "good reasons to think that" the applicable Supreme Court precedent does not apply in the same manner to private universities like Harvard that are subject to Title VI. Because Harvard does not identify any specific reasons for distinguishing public universities from federally-funded private universities, or explain how the analytical framework would differ for private versus public litigants, the Court at this stage places Harvard on equal footing with a public university in applying Grutter and its progeny. See Grutter, 539 U.S. at 343 ("[T]he Equal Protection Clause does not prohibit the Law School's narrowly tailored use of race in admissions decisions to further a compelling interest in obtaining the educational benefits that flow from a diverse student body. Consequently, petitioner's statutory claims based on Title VI . . . also fail."); id. ("Title VI . . . proscribe[s] only those racial classifications that would violate the Equal Protection Clause or the Fifth Amendment" (citing Regents of Univ. of California v. Bakke, 438 U.S. 265, 287 (1978))).

**ADD154**

was intentional, and the discrimination was a substantial or motivating factor for the defendant's actions." Goodman v. Bowdoin Coll., 380 F.3d 33, 43 (1st Cir. 2004) (citing Tolbert v. Queens Coll., 242 F.3d 58, 69 (2d Cir. 2001)); see Scaggs v. New York Dep't of Educ., No. 06-cv-0799-JFB-VVP, 2007 WL 1456221, at *11 (E.D.N.Y. May 16, 2007) (same). In reviewing a uniformly applied facially neutral policy, "[d]etermining whether invidious discriminatory purpose was a motivating factor [in its adoption] demands a sensitive inquiry into such circumstantial and direct evidence of intent as may be available." Anderson ex rel. Dowd v. City of Boston, 375 F.3d 71, 83 (1st Cir. 2004) (quoting Vill. of Arlington Heights v. Metro. Hous. Dev. Corp., 429 U.S. 252, 266 (1977)). Here, SFFA and Harvard's cross-motions for summary judgment on Count I are essentially mirror images of one another. Each party relies on its own expert reports to show the presence or absence of a negative effect of being Asian American on the likelihood of admission, highlights the purported flaws of its opponent's statistical analysis, and claims that there is substantial—or zero—documentary and testimonial evidence of discriminatory intent.

Under the circumstances of this case, the parties' heavy reliance on statistical evidence and expert testimony precludes summary judgment on Count I. Each nonmoving party at this stage is "entitled 'to have the credibility of *[its]* evidence as forecast assumed, [its] version of all that is in [genuine] dispute accepted, [and] all internal conflicts in [the evidence] resolved favorably to [it] . . . .'" Blanchard v. Peerless Ins. Co., 958 F.2d 483, 489 (1st Cir. 1992) (quoting Rodriguez–Garcia v. Davila*, 904 F.2d 90, 94 (1st Cir.1990)). It is likewise "not the Court's role on summary judgment to assess the relative credibility of expert testimony." Tamposi v. Denby, 136 F. Supp. 3d 77, 128 (D. Mass. 2015). "At summary judgment, . . . courts normally assume that the trier of fact would credit the expert testimony proffered by the nonmovant." Den Norske Bank AS v. First Nat'l Bank of Bos., 75 F.3d 49, 58 (1st Cir. 1996). "Even assuming, *arguendo,*

**ADD155**

that this Court were to conclude that 'the factual underpinning of [either party's] expert's opinion [was] weak,'" the challenges by SFFA and Harvard affect "the weight and credibility of the testimony" to be evaluated at trial when the Court assumes its fact-finding role. Pac. Indem. Co. v. Dalla Pola, 65 F. Supp. 3d 296, 304 (D. Mass. 2014) (quoting Milward v. Acuity Specialty Prods. Group, Inc., 639 F.3d 11, 22 (1st Cir.2011)); see Casas Office Machines, Inc. v. Mita Copystar Am., Inc., 42 F.3d 668, 686 (1st Cir. 1994) ("[w]eighing the evidence" and "assessing the credibility of the experts" are tasks "that must be left to the trier of fact" after summary judgment); S. Shore Hellenic Church, Inc. v. Artech Church Interiors, Inc., 183 F. Supp. 3d 197, 225 (D. Mass. 2016) (same).

Although competing expert reports alone do not necessarily preclude summary judgment, where, as here, SFFA and Harvard's statistical experts each present more than "merely conclusory allegations," City of Chanute, Kan. v. Williams Nat. Gas Co., 743 F. Supp. 1437, 1445 (D. Kan. 1990), aff'd, 955 F.2d 641 (10th Cir. 1992), and the "indisputable record facts" at this stage do not sufficiently "contradict or otherwise render [either side's expert] opinion[s] unreasonable," summary judgment is not appropriate. Brooke Grp. Ltd. v. Brown & Williamson Tobacco Corp., 509 U.S. 209, 242 (1993). On behalf of SFFA, Professor Arcidiacono concluded that the Admissions Office gives lower personal and overall ratings to Asian Americans than to any other racial group, despite finding that Asian American applicants are comparatively strong in the academic and extracurricular ratings, and that teachers, guidance counselors, and alumni interviewers score Asian American applicants roughly the same as White applicants on the personal and overall ratings. SFFA Facts ¶¶ 595−616, 624−628. He further found that Asian American applicants were admitted to Harvard at lower rates than other racial groups, and that among applicants with the same overall rating, Asian Americans were the least likely to be

**ADD156**

admitted. SFFA Facts ¶¶ 629−647. Dr. Card, on behalf of Harvard, reviewed the same data but found no negative effect of being Asian American on the likelihood of admission to Harvard, and even noted that in certain years and geographic areas, being Asian American had a positive effect on the likelihood of admission. Harvard Facts ¶¶ 216−220. To the extent that Asian Americans are admitted at lower rates or receive lower ratings than White applicants, SFFA attributes the disparity to discrimination while Harvard points to, among other things, Dr. Card's determination that the applications of Asian Americans were "slightly less strong than those submitted by White applicants across a range of *observable* non-academic measures" and other "statistically unobserved factors." [ECF No. 435 at 10, 17].

These contradictory conclusions are at least in part the result of the experts' divergent modeling choices, including as to (1) whether to pool data across admissions cycles (Harvard Facts and SFFA Response ¶¶ 233−34); (2) whether to exclude from the regression analysis the personal rating (Harvard Facts and SFFA Response ¶¶ 230−232), the applicant's intended career (Harvard Facts and SFFA Response ¶¶ 237−38), and the occupation of an applicant's parents (Harvard Facts and SFFA Response ¶¶ 235−36); and (3) whether to include in the data pool recruited athletes, legacy applicants, children of Harvard faculty and staff members, and applicants on the Dean or Director's Interest Lists (SFFA Facts and Harvard Response ¶¶ 750−58). The parties also disagree over the probative value of statistically comparing Asian American applicants to applicants of other races with the same or similar academic credentials, and whether the personal and overall ratings from the Admissions Office can be meaningfully compared against the corresponding scores assigned by alumni interviewers, teachers, and guidance counselors. The credibility of the expert witnesses in making these critical modeling and analytical choices is best evaluated at the upcoming bench trial. See also Friends of

**ADD157**

Merrymeeting Bay v. NextEra Energy Res., LLC, No. 11-cv-38-GZS, 2013 WL 149641, at *1

(D. Me. Jan. 14, 2013) ("At this point, the Court believes that Defendants' arguments are best

addressed at trial with question-specific objections and 'the adversary process' of 'competing

expert testimony and active cross-examination.'" (quoting Ruiz-Troche v. Pepsi Cola of P.R.

Bottling Co., 161 F.3d 77, 85 (1st Cir. 1998))).

For substantially the same reasons, the OIR reports do not justify granting summary

judgment in favor of SFFA. SFFA contends that in 2013, Harvard's in-house research division

evaluated the treatment of Asian Americans in Harvard's admissions program and reached

conclusions that were consistent with Professor Arcidiacono's analysis. SFFA Facts ¶¶ 389–390,

399–465, 492−572. Moreover, SFFA argues that Dean Fitzsimmons and Dean Khurana received

the OIR's reports but took no steps to further investigate the evidence of an admissions bias

against Asian Americans. SFFA Facts ¶¶ 426−431, 468−471, 525−528. Determining the

appropriate weight to attribute to the OIR's findings requires the consideration of opposing

expert testimony. See [ECF No. 435 at 23] (asserting that Dr. Card's "far more comprehensive,

informed, and reliable work" contradicts and subverts the conclusions reached by the OIR).

Moreover, while SFFA claims that Harvard's inaction in response to the OIR reports suggests an

intent to "bury" the reports and "kill" an internal investigation, Harvard presents evidence that no

further investigation took place because Harvard recognized that the OIR reports were

preliminary and incomplete and were therefore insufficient to warrant additional inquiry.

Determining whether Harvard's explanation for its response to the OIR reports is credible, or as

SFFA submits, an implausible post-hoc justification in light of this lawsuit, requires the Court to

assess the credibility of Harvard's witnesses and to consider expert testimony regarding the OIR

reports. Drawing all inferences in favor of each non-moving party, there are disputed material

**ADD158**

facts based on Harvard's fact witnesses, the statistical evidence, and the expert opinions presented by each side that cannot be resolved before trial.[17]

SFFA's remaining non-statistical, non-expert evidence of intentional discrimination, standing alone, is insufficient to warrant summary judgment. This evidence, which includes some discrete comments in the summary sheets (SFFA Facts ¶¶ 678−686), the fact that admissions officers more often positively characterized the racial identity of African American and Latin American applicants than that of Asian American applicants (SFFA Facts ¶¶ 691−692), and Harvard's response to the complaints or comments of one OIR employee (SFFA Facts ¶ 333), a few alumni interviewers (SFFA Facts ¶¶ 325, 331), a high-school student (SFFA Facts ¶¶ 335−336), and one Harvard alumnus who made racist statements in a letter to former President Faust (SFFA Facts ¶¶ 341−42), does not constitute sufficient evidence of discriminatory intent for summary judgment. To credit SFFA's view that Harvard's inaction in response to complaints from its employees or alumni, many of which did not directly relate to any admission decision, would require drawing premature inferences in SFFA's favor. Cf. Gonzalez v. El Dia, Inc., 304 F.3d 63, 69 (1st Cir. 2002) ("In the first place, 'stray workplace remarks,' as well as statements made either by nondecisionmakers or by decisionmakers not involved in the decisional process, normally are insufficient, standing alone, to establish either pretext or the requisite discriminatory animus."); Straughn v. Delta Air Lines, Inc., 250 F.3d 23, 36 (1st Cir. 2001) (probative value of "stray remarks" is circumscribed "if they were made in a situation temporally remote from the date of the employment decision"); Fernandes v. Costa Bros. Masonry, Inc., 199 F.3d 572, 583 (1st Cir. 1999) ("statement that plausibly can be

---

[17] Professor Arcidiacono's analysis of the frequency of the use of "Standard Strong" to characterize Asian American applicants also requires consideration of the competing expert testimony at trial. SFFA Facts ¶¶ 678−686.

interpreted two different ways . . . one discriminatory and the other benign" is not direct

evidence of discriminatory animus), abrogated on other grounds by Desert Palace, Inc. v. Costa,

539 U.S. 90 (2003). Harvard presents evidence that its admissions officers' comments on the

summary sheets about Asian American applicants were on par with comments made about

applicants of other races, and that the summary sheets often contained remarks that referred

positively to an applicant's identity as Asian American. Moreover, as Harvard notes, the

Admissions Office procedures and training documents, and the deposition testimony of its

current and former employees, do not appear to suggest any intent to discriminate against Asian

Americans.

In sum, whether SFFA may prove its intentional discrimination claim requires a close

review of the conflicting expert testimony, the available documents, and the testimony of the

Admissions Office employees in the context of a trial. See Equal Employment Opportunity

Comm'n v. Texas Roadhouse, Inc., 215 F. Supp. 3d 140, 172 (D. Mass. 2016) (whether fact

finder finds one party's expert more persuasive than an opposing expert "is a question for trial

and not for summary judgment"); Peng-Fei Chang v. Univ. of Rhode Island, 554 F. Supp. 1203,

1206 (D.R.I. 1983) ("The Court would be remiss in granting defendants' motion for summary

judgment based solely on [their expert's] statistical indices (even in the absence of [the opposing

expert's] critique thereof) without subjecting those findings to the in-depth scrutiny given other

types of evidence at a trial on the merits."). Therefore, the cross-motions for summary judgment

are denied on Count I.[18]

---

[18] SFFA presents evidence of Harvard's discrimination against Jewish students in the early
1920s, almost a century before this case was filed. At best, the historical background of the
admissions policy at issue "is one evidentiary source" of intent, and this Court has already ruled
in the context of the parties' discovery disputes that such evidence has limited relevance, if any,
to the claims at issue. Vill. of Arlington Heights, 429 U.S. at 267. SFFA recognizes that such
evidence from the 1920s "is more distant than in many cases in which history is used as an

**ADD160**

2.    Count II: Racial Balancing

SFFA next contends that Harvard impermissibly caps the number of Asian Americans in an admitted class. To maintain a permissible race-conscious admissions policy, Harvard may not "impose a fixed quota," Fisher II, 136 S. Ct. at 2208, or otherwise "'assure within its student body some specified percentage of a particular group merely because of its race or ethnic origin,'" as such a practice "would amount to outright racial balancing, which is patently unconstitutional." Grutter, 539 U.S. at 329 (quoting Bakke, 438 U.S. at 307). "Racial balancing is not transformed from 'patently unconstitutional' to a compelling state interest simply by relabeling it 'racial diversity.'" Fisher I, 570 U.S. at 311 (quoting Parents Involved in Cmty. Schs. v. Seattle Sch. Dist. No. 1, 551 U.S. 701, 732 (2007)).

SFFA and Harvard again present plausible but conflicting interpretations of the admissions data and testimonial evidence concerning whether Harvard uses a quota system. According to SFFA, Harvard tracks the representation of racial groups, and uses the statistics from the prior year's class as a benchmark against which the to-be admitted class is matched. During the full committee phase of the admissions process, "one-pagers" are distributed to Dean Fitzsimmons and Director McGrath to make them aware of the present representation of various racial groups as compared to the prior year. Harvard allegedly then reconsiders applications from particular racial groups, if necessary to align the current class demographics with those of the prior year. The admissions committee also allegedly takes into account whether a student is from

---

Arlington Heights factor." [ECF No. 413 at 31]. In accordance with its prior rulings, the Court is unlikely to admit evidence of Harvard's admissions policy from the 1920s, but will reserve a final evidentiary ruling for trial. [See ECF No. 547]. The Court would also consider taking judicial notice of past discrimination if the parties did not object, or would accept a joint stipulation to this effect.

30

**ADD161**

a racial group that is currently underrepresented in the prospective class when trimming the number of offers of admission during the lopping process.[19]

Harvard disclaims SFFA's theory as a skewed portrayal of its admissions process. According to Harvard, what SFFA calls racial balancing is better understood as an ordinary weighing of offers of admission against available beds, with an eye toward diversity. Harvard explains that it reviews demographic information from prior classes to estimate the likely yield of acceptances from those it offers admission, which amounts at most to paying "some attention to numbers" as the Supreme Court found permissible in <u>Grutter</u>, 539 U.S. at 336. The one-pagers break down the number of applicants by race, but also by "gender, geography, intended concentration, whether the applicant is a recruited athlete, whether the applicant's parent attended Harvard, whether Harvard waived the applicant's application fee, whether the applicant was flagged as socioeconomically 'disadvantaged' by Harvard's admissions staff, whether the applicant applied for financial aid, citizenship, [and] permanent residency." [ECF No. 435 at 33]. Rather than using the one-pagers to precisely match the racial demographics year after year, Harvard contends that the one-pagers are used "to ascertain whether there are any significant trends worth noting and to make sure the Admissions Committee is not overlooking strong candidates." <u>Id.</u> The lopping process is similarly a curative measure applied when, based on the likely yield rate and the available spaces in the admitted class, Harvard has an overabundance of qualified applicants to whom it has tentatively decided to offer admission.

---

[19] SFFA accuses of Harvard of engaging in racial balancing through its alleged practice of purchasing potential applicant information based on PSAT scores and GPAs that differ by race and its participation in the conference of the Association of Black Admissions and Financial Aid Officers of the Ivy League and Sister Schools. Although the Court may allow SFFA to present evidence to support these assertions at trial to some extent, there appears to be little to no connection between the allegations of racial balancing and Harvard's purchasing of "potential applicant information" or its mere attendance and participation in the conference.

31

**ADD162**

With respect to the admissions data, SFFA shows that for the classes of 2014, 2015, 2016, and 2017, the percentage of the admitted class has remained at least somewhat consistent for each racial group: Asian Americans comprised 18% of the share of the Class of 2014, 18% of the Class of 2015, 21% of the Class 2016, and 20% of the Class of 2017. SFFA Facts ¶ 699. A similar level of consistency was shown for other racial groups with White students comprising between 48% and 53% of the class, Native Americans between 2% and 3%, and Hispanic Americans and African Americans each between 10% and 12% over that same time period. SFFA Facts ¶ 699. Harvard does not dispute these percentages but asserts that they actually demonstrate significant fluctuations in the admissions of various racial groups.[20] In Harvard's view, the increase in the Asian American share of the class from 18% to 20% is a substantial "11% increase." [ECF No. 435 at 30].

The resolution of Count II depends in part on the credibility of Harvard's admissions officers and leadership as to whether its admissions procedures, including lopping, reviewing one-pagers, and setting target numbers, were intended to balance the racial demographics year after year, or to merely pay "some attention to numbers" in enrolling a diverse student body. The class share of each racial group has not been so plainly consistent or varied over time that the Court can conclude that the numbers alone establish or refute the presence of a quota. See, e.g., Grutter, 539 U.S. at 336 (noting that variation of 13.5% to 20.1% in the class shares for African American, Latin, and Native American students was "a range inconsistent with a quota"); Smith v. Univ. of Washington, 392 F.3d 367, 375 (9th Cir. 2004) (percentage of minorities varying

---

[20] SFFA also highlights Professor Arcidiacono's conclusion that Harvard "maintained a floor on the admission rate for single-race African Americans in the classes of 2017, 2018, and 2019," in which the admissions rate for single-race African Americans was "virtually identical" to the admission rate of all other domestic applicants. Harvard meanwhile notes that Dr. Card considered these findings to be unremarkable. The experts may address the significance of the alleged floor at trial.

**ADD163**

each year from a high of 38.5% of admittees and 43.3% of enrollees to a low of 24.7% of

admittees and 24.4% of enrollees was "inconsistent with the existence of a quota"). Given the

material factual disputes and the need to make certain credibility determinations, the cross-

motions for summary judgment on Count II are denied.

3.    Count III: Race as a "Plus" Factor

SFFA moves for summary judgment on Count III on the grounds that Harvard is (1) not

using its race-conscious admissions policy for the specific purpose of achieving a "critical mass"

of underrepresented minority students and (2) considering race as more than a mere "plus" factor

when making admissions decisions. The Supreme Court has clarified that "'the decision to

pursue 'the educational benefits that flow from student body diversity' . . . is, in substantial

measure, an academic judgment to which some, but not complete, judicial deference [to the

university] is proper.'" Fisher II, 136 S. Ct. at 2208 (quoting Fisher I, 570 U.S. at 310). Once a

university gives "'a reasoned, principled explanation' for its decision" to pursue the educational

benefits that flow from student body diversity, "deference must be given 'to the [u]niversity's

conclusion, based on its experience and expertise, that a diverse student body would serve its

educational goals.'" Id. (quoting Fisher I, 570 U.S. at 310-11). As discussed further below, the

deference owed to the university's decision to pursue the educational benefits of a diverse

student body does not carry over when the Court evaluates whether the use of race in pursuit of

such benefits is narrowly tailored to pass strict scrutiny.

SFFA argues that Harvard's admissions program fails the test of strict scrutiny because

Harvard does not expressly tailor its pursuit of the educational benefits that flow from a diverse

student body to the idea of reaching a "critical mass," a term that was used in the University of

Michigan Law School's admission policy at issue in Grutter and in the University of Texas at

Austin's policy at issue in Fisher. SFFA notes that "[t]he words 'critical mass' never even appear in Harvard's memorandum or statement of facts," [ECF No. 449 at 31], and that "Harvard leadership has never heard the term critical mass used in the context of admissions," [ECF No. 413 at 46]. Because Harvard fails to consider race specifically in pursuit of reaching a "critical mass," SFFA argues that its decision to pursue student body diversity is not well reasoned.

Contrary to SFFA's claim that the "Supreme Court has held that critical mass is the only interest compelling enough to permit the use of race," [ECF No. 413 at 46], the Fisher II court explained that the interest that justifies consideration of race in admissions "is not an interest in enrolling a certain number of minority students," but rather a broader interest in "obtaining 'the educational benefits that flow from student body diversity.'" Fisher II, 136 S. Ct. at 2210 (quoting Fisher I, 570 U.S. at 310). "[E]nrolling a diverse student body 'promotes cross-racial understanding, helps to break down racial stereotypes, and enables students to better understand persons of different races.'" Id. (quoting Grutter, 539 U.S. at 330). "Equally important, 'student body diversity promotes learning outcomes, and better prepares students for an increasingly diverse workforce and society.'" Id. (quoting Grutter, 539 U.S. at 330). Although "[i]ncreasing minority enrollment may be instrumental to these educational benefits, . . . it is not . . . a goal that can or should be reduced to pure numbers." Id. at 2210. "Critical mass" was a term used in the specific policies at issue in Grutter and Fisher, but one that the Supreme Court left undefined. See Grutter v. Bollinger, 137 F. Supp. 2d 821, 828 (E.D. Mich. 2001), rev'd, 288 F.3d 732 (6th Cir. 2002), aff'd, 539 U.S. 306 (2003); Grutter, 539 U.S. at 316; Fisher I, 570 U.S. at 301; Fisher II, 136 S. Ct. at 2211; see also Fisher II, 136 S. Ct. at 2216 (Alito, J. dissenting) (noting that University of Texas at Austin "never explained what this term [critical mass] means" and that the term "remains undefined"). The Supreme Court has not imbued the phrase "critical mass" with

34

**ADD165**

any special force or meaning that would make it essential to the survival of a university's race-conscious admissions policy under strict scrutiny, and this Court declines to do so here.[21]

SFFA also contends that because Harvard is not pursuing a "critical mass," its admissions policy will be used in perpetuity in violation of the Supreme Court's expectation that at some point in time "'use of racial preferences will no longer be necessary to further the interest' in diversity." Grutter, 539 U.S. at 343. The Supreme Court has not held that a "critical mass" or any specific enrollment number is what obviates the need for a university to consider race. Although Harvard "must continually reassess its need for race-conscious review" and "scrutinize the fairness of its admissions program; . . . assess whether changing demographics have undermined the need for a race-conscious policy; and . . . identify the effects, both positive and negative, of the affirmative-action measures it deems necessary," as part of its "ongoing obligation to engage in constant deliberation and continued reflection regarding its admissions policies," there is no requirement that the consideration of race be eliminated within a specific time frame. Fisher II, 136 S. Ct. at 2212, 2214–15. Here, Harvard's Committee to Study Race-Neutral Alternatives in Harvard College Admissions recommended reevaluating the need to consider race in five years. Harvard's lack of express focus on achieving a "critical mass" does not mean that it will not

---

[21] SFFA also asserts that Harvard has taken "irreconcilable" positions in claiming that it (1) considers race on a case-by-case basis and targets "no specific number of students" of any racial or ethnic background, but (2) must use race in its admissions policy to avoid "a significant decline in African-American and Hispanic enrollment." [ECF No. 449 at 33]. It is possible, however, to seek to enroll a diverse student body without the use of specific target numbers and in compliance with Grutter and its progeny. As the Supreme Court explained in Fisher II, 136 S. Ct. at 2210, "since the [u]niversity is prohibited from seeking a particular number or quota of minority students, it cannot be faulted for failing to specify the particular level of minority enrollment at which it believes the educational benefits of diversity will be obtained." Fisher II, 136 S. Ct. at 2210. Whether Harvard's consideration of race complies with Grutter and its progeny remains a question for trial, but summary judgment in favor of SFFA is not warranted when, reading the facts in the light most favorable to Harvard, its admissions policy adequately balances the need to avoid using quotas with permissibly seeking to enroll a diverse student body.

**ADD166**

continually assess the need for its race-conscious admissions policy. There is no basis at this stage to find that Harvard does not intend to follow its committee's recommendation or that Harvard's conception of the benefits of student body diversity is too amorphous to satisfy strict scrutiny. Accordingly, SFFA's motion for summary judgment is denied with respect to SFFA's arguments that Harvard fails to seek a "critical mass" or ignores its continuing obligation to evaluate its admissions policies to satisfy strict scrutiny.

While Harvard's decision to pursue the educational benefits of student body diversity is entitled to deference, no deference is owed when the Court evaluates "whether the use of race is narrowly tailored to achieve the university's permissible goals." Fisher II, 136 S. Ct. at 2208 (citing Fisher I, 570 U.S. at 311). To be narrowly tailored, "[a] university may consider race or ethnicity only as a 'plus' in a particular applicant's file," while "still ensuring that each candidate 'compete[s] with all other qualified applicants.'" Grutter, 539 U.S at 334–35 (citations omitted). "In other words, an admissions program must be 'flexible enough to consider all pertinent elements of diversity in light of the particular qualifications of each applicant, and to place them on the same footing for consideration, although not necessarily according them the same weight.'" Id. at 334 (quoting Bakke, 438 U.S. at 317). The university must "ensure that each applicant is evaluated as an individual and not in a way that makes an applicant's race or ethnicity the defining feature of his or her application. The importance of this individualized consideration in the context of a race-conscious admissions program is paramount." Grutter, 539 U.S. at 336–37.

Here, deciding the issue of whether Harvard considers race only as a plus factor in its admissions decisions is dependent upon resolving material questions of fact and credibility. Harvard moves for summary judgment based on the consistent testimony of its admissions

**ADD167**

officers and training documents showing that Harvard considers race flexibly along with numerous other factors. Harvard further contends that its expert, Dr. Card, found that "to be admitted to Harvard, applicants must have multiple areas of strength," and race alone is not a determinative factor. Harvard Facts ¶¶ 121, 122. Dr. Card also concluded that an applicant's academic, athletic, extracurricular, and personal ratings collectively explain a much larger proportion of the variability in admissions outcomes than race. Harvard Facts ¶¶ 123, 124. According to SFFA, however, Dr. Arcidiacono's reports and the OIR's research show that race plays a predominant role in the likelihood of admissions for certain groups of students, that race plays such a decisive role in the admissions chances of Hispanics and African Americans, and that "removing all racial preferences and penalties—treating everyone as though they were white—would raise the number of Asian Americans by [40%]." SFFA Facts ¶¶ 417−18, 448, 737−740. Like the material disputes that preclude summary judgment on Count I, the issue of whether Harvard considers race as a plus factor or more turns on the competing expert testimony regarding Harvard's admissions data, the accuracy and reliability of the OIR's research, and the credibility of the testimony of Admissions Office employees regarding the weight attributed to an applicant's race. The cross-motions for summary judgment are therefore denied on Count III.

### 4.    Count V: Race-Neutral Alternatives

SFFA asserts in Count V that Harvard has failed to fulfill its obligation to consider race-neutral alternatives to a race-conscious admissions policy. Strict scrutiny requires that the Court "verify that it is 'necessary' for a university to use race to achieve the educational benefits of diversity." Fisher I, 570 U.S. at 312. "This involves a careful judicial inquiry into whether a university could achieve sufficient diversity without using racial classifications. Although '[n]arrow tailoring does not require exhaustion of every *conceivable* race-neutral alternative,'"

**ADD168**

id. (quoting Grutter, 539 U.S., at 339–340), nor does it require choosing "between maintaining a

reputation for excellence or fulfilling a commitment to provide educational opportunities to

members of all racial groups," Grutter, 539 U.S. at 339, "strict scrutiny does require a court to

examine with care, and not defer to, a university's 'serious, good faith consideration of workable

race-neutral alternatives.'" Fisher I, 570 U.S. at 312 (quoting Grutter, 539 U.S., at 339–340).

"Consideration by the university is of course necessary, but it is not sufficient to satisfy strict

scrutiny: The reviewing court must ultimately be satisfied that no workable race-neutral

alternatives would produce the educational benefits of diversity." Id. If "'a nonracial

approach . . . could promote the substantial interest about as well and at tolerable administrative

expense,' . . . then the university may not consider race." Id. (citation omitted).

 Harvard asserts that it satisfied strict scrutiny through the work of the Smith Committee,

which reviewed published social science literature, the Complaint and the expert reports in this

case, and "met throughout 2017 and early 2018 to examine the extensive efforts Harvard already

undertakes to attract and admit a diverse student body, as well as numerous possible alternatives

to considering race in admissions." [ECF No. 418 at 31]. The Smith Committee unanimously

concluded that "at present, no available, workable race-neutral alternatives could promote

Harvard's diversity-related educational objectives as well as Harvard's current whole-person

race-conscious admissions program while also maintaining the standards of excellence that

Harvard seeks in its student body." Harvard Facts ¶ 212. Dr. Card also found that even if

Harvard maintained all of its existing race-neutral efforts to achieve diversity—financial aid,

recruitment of first generation and economically and racially diverse applicants, and post-

admission recruitment efforts—eliminating the consideration of race would cause "the

proportion of African-American and Hispanic students in the admitted class [to] decline

**ADD169**

dramatically." Harvard Facts ¶ 156. According to Dr. Card's simulated models, if Harvard did

not consider race, the proportion of African American students in the Class of 2019 would have

dropped from 14% to 6%, and the proportion of Latin American or "Other" students would have

dropped from 14% to 9%. Harvard Facts ¶ 156. At the same time, the proportion of White

students would have dramatically increased from 40% to 48% of the class, and the proportion of

Asian American students would have slightly increased from 24% to 27% of the class. Harvard

Facts ¶ 157. The Smith Committee and Dr. Card also found that implementing or eliminating the

following race-neutral measures or existing admissions practices—(1) increased preference for

modest socioeconomic background; (2) increased recruiting of socioeconomically disadvantaged

students; (3) increased financial aid; (4) implementing a place-based preference similar to the top

10% plan in Fisher; (5) increasing the number of transfer students; (6) eliminating the Early

Action program; (7) eliminating consideration of legacy; (8) eliminating deferred admission; and

(9) eliminating the consideration of test scores—would not sufficiently promote Harvard's

interest in the educational benefits of diversity.

SFFA's expert, Mr. Kahlenberg, reached the opposite conclusion, finding that Harvard

can easily achieve diversity by increasing socioeconomic preferences; increasing financial aid;

reducing or eliminating preferences for legacies, donors, and relatives of faculty and staff;

adopting policies using geographic diversity; increasing recruitment efforts; increasing

community college transfers; and/or eliminating early action. SFFA Facts ¶¶ 858–882.

In addition, SFFA has raised a material issue as to whether Harvard's efforts to consider

race-neutral alternatives have been undertaken in serious good faith, because Harvard apparently

did not examine such alternatives until 2014, after Harvard was aware of the imminence of this

lawsuit. See Fisher I, 570 U.S. at 312 ("[S]trict scrutiny imposes on the university the ultimate

**ADD170**

burden of demonstrating, before turning to racial classifications, that available, workable race-neutral alternatives do not suffice."). Indeed, while Harvard has implemented several race-neutral alternatives over time, there is little evidence in the record of Harvard formally evaluating race-neutral alternatives to its race-conscious policy following the issuance of <u>Grutter</u> until around the time this case was filed.[22] In light of Harvard's recent efforts to consider race-neutral alternatives, which arguably coincided with the filing of this lawsuit, Harvard's alleged past failure to comply with <u>Grutter</u> raises a material dispute as to whether Harvard's consideration of race-neutral alternatives was undertaken seriously and in good faith. Given this material factual dispute, and that the experts have reached plausible but conflicting conclusions based on simulated models of the effectiveness of numerous race-neutral practices, the cross-motions for summary judgment are denied on Count V.

## V.    CONCLUSION

Accordingly, the cross-motions for summary judgment [ECF Nos. 412, 417] are <u>denied</u> without prejudice. Consistent with this order, the parties may renew their arguments at trial.

**SO ORDERED.**

September 28, 2018                                          /s/ Allison D. Burroughs
                                                                   ALLISON D. BURROUGHS
                                                                   U.S. DISTRICT JUDGE

---

[22] This may be of little relevance given that SFFA is seeking prospective relief, but "not seeking to impose independent liability on Harvard for its non-compliance with <u>Grutter</u> between 2003 and 2017." [ECF No. 510 at 26−27].

**ADD171**

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| STUDENTS FOR FAIR ADMISSIONS, INC. | * | |
| | * | |
| | * | |
| Plaintiff, | * | |
| | * | |
| v. | * | Civil Action No. 14-cv-14176-ADB |
| | * | |
| PRESIDENT AND FELLOWS OF HARVARD COLLEGE (HARVARD CORPORATION), | * | |
| | * | |
| | * | |
| | * | |
| Defendant. | * | |

**MEMORANDUM AND ORDER
GRANTING MOTION FOR PARTIAL JUDGMENT ON THE PLEADINGS**

BURROUGHS, D.J.

On September 23, 2016, Harvard moved for partial judgment on the pleadings on Counts IV and VI pursuant to Fed. R. Civ. P. 12(c) and 12(h)(2). [ECF Nos. 185, 186]. SFFA opposed the motion on October 21, 2016 [ECF Nos. 202, 203], and Harvard filed its reply brief on November 4, 2016 [ECF NO. 218]. The intervenors also filed a memorandum in support of Harvard's motion on October 19, 2016. [ECF No. 199].

For the reasons set forth below and more fully articulated by Harvard and the intervenors in their briefs, the Court grants the motion. The First Circuit recognizes, at least implicitly, the permissibility of partial judgments under Fed. R. Civ. P. 12. See, e.g., Najas Realty, LLC v. Seekonk Water Dist., 821 F.3d 134, 146 (1st Cir. 2016) (affirming district court's grant of motion for partial judgment on pleadings pursuant to Fed. R. Civ. P. 12(c)). Further, SFFA acknowledges that ruling on Count VI would require this Court to overrule Supreme Court precedent, something it decidedly cannot do, and the Court does not find persuasive SFFA's

1

**ADD172**

rationale that it should wait to enter judgment on the Count VI until the close of discovery simply because discovery will not be impacted one way or another. Finally, Count IV presumes a legal requirement for race-conscious admissions—that Harvard may only consider race for the "last few places left"—that the case law does not support.

Accordingly, Harvard's motion for partial judgment on the pleadings as to Count IV and VI [ECF No. 185] is <u>GRANTED</u>.

**SO ORDERED.**

Dated: June 2, 2017                                    /s/ Allison D. Burroughs
                                                      ALLISON D. BURROUGHS
                                                      U.S. DISTRICT JUDGE

**ADD173**

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| STUDENTS FOR FAIR ADMISSIONS, INC. | * * * | |
| Plaintiff, | * * | |
| v. | * * | Civil Action No. 14-cv-14176-ADB |
| PRESIDENT AND FELLOWS OF HARVARD COLLEGE (HARVARD CORPORATION), | * * * * | |
| Defendant. | * * | |

**MEMORANDUM AND ORDER DENYING MOTION TO DISMISS**

BURROUGHS, D.J.

## I.    INTRODUCTION

In this action, Students for Fair Admissions, Inc. ("SFFA") alleges that Harvard College ("Harvard") employs racially and ethnically discriminatory policies and procedures in administering its undergraduate admissions program, in violation of Title VI of the Civil Rights Act of 1964 and the Equal Protection Clause of the Fourteenth Amendment to the United States Constitution. Presently pending before this Court is Harvard's motion to dismiss for lack of standing pursuant to Federal Rule of Civil Procedure 12(b)(1). [ECF No. 187]. Harvard filed the instant motion on September 23, 2016, and SFFA opposed it on October 21, 2016 [ECF No. 204].[1] For the reasons stated below, the motion is DENIED.

---

[1] Both parties also filed declarations and exhibits in support of their positions. [ECF Nos. 188, 205].

**ADD174**

## II.      RELEVANT BACKGROUND[2]

SFFA filed its Complaint with this Court on November 17, 2014 [ECF No. 1], and

Harvard filed its Answer on February 18, 2015 [ECF No. 17]. SFFA's Complaint sets forth two

types of allegations. First, SFFA contends that the general manner in which Harvard considers

race in its undergraduate admissions program violates the Equal Protection Clause. As opposed

to using race as a mere "plus" factor in admissions decisions, SFFA claims that Harvard engages

in prohibited "racial balancing." Second, SFFA alleges that Harvard's policies invidiously

discriminate against Asian-American applicants in particular because, by admitting only a

limited number of Asian-American applicants each year, Harvard, in effect, forces Asian-

American applicants to compete against each other for those spots. Consequently, a large number

of otherwise highly-qualified Asian-American applicants are allegedly denied admission to

Harvard on the basis of their race or ethnicity.

SFFA is an Internal Revenue Code Section 501(c)(3) organization whose claimed

mission is to defend human and civil rights secured by law, including equal protection rights,

through litigation or other lawful means.[3] SFFA brings this action on behalf of its members. Its

membership is composed of a coalition of applicants and prospective applicants to institutions of

higher education, along with their parents and other individuals, including at least one Asian-

American student member who applied for and was denied admission to Harvard's 2014 entering

---

[2] There are other motions pending before this Court, including Harvard's motion for judgment on
the pleadings pursuant to Rules 12(c) and 12(h)(2) [ECF No. 185]. In this Memorandum and
Order, the Court addresses only the motion to dismiss for lack of jurisdiction and tailors its
discussion accordingly.

[3] The Court includes additional facts regarding SFFA's membership and organizational structure
infra at 6–7.

**ADD175**

class (the "Applicant"). Complaint ¶¶ 12–24.[4] According to SFFA, this Applicant intends to transfer to Harvard when the school stops using its race-based discrimination admissions policy.

The Complaint requests the following relief: declaratory judgments that Harvard's admissions policies and procedures violate Title VI of the Civil Rights Act of 1964 and that any use of race or ethnicity in the educational setting violates the Fourteenth Amendment and Title VI; permanent injunctions prohibiting Harvard from using race as a factor in future undergraduate admission decisions and requiring it to make its admissions decisions in a race-blind manner; attorneys' fees and costs; and any other relief this Court finds appropriate.

## III.    LEGAL STANDARD

Because Harvard's Rule 12(b)(1) challenge to SFFA's constitutional standing implicates this Court's subject matter jurisdiction, see P.R. Tel. Co. v. T-Mobile P.R. LLC, 678 F.3d 49, 57 (1st Cir. 2012), the Court is not restricted to the four corners of the Complaint and "may consider whatever evidence has been submitted, such as the depositions and exhibits," Aversa v. United States, 99 F.3d 1200, 1210 (1st Cir. 1996); see also Torres-Negron v. J & N Records, LLC, 504 F.3d 151, 163 (1st Cir. 2007); Katz v. Pershing, LLC, 806 F. Supp. 2d 452, 456 (D. Mass. 2011), aff'd, 672 F.3d 64 (1st Cir. 2012) ("A court is permitted to look beyond the pleadings to determine jurisdiction on a 12(b)(1) motion, hence the formality of converting the motion to one for summary judgment need not be observed.").

---

[4] Following the filing of the Complaint, SFFA's membership continued to grow and it added additional members, including several that it identifies as "Standing Members," who have submitted signed declarations in connection with this motion. See Exhibits to [ECF No. 205]. The Standing Members include Asian-American applicants who were rejected from Harvard, Asian-American high school students who claim they will apply to Harvard, and parents of applicants and prospective applicants.

## IV.    DISCUSSION

### A.    Associational Standing

The Constitution gives the judiciary power to hear only "Cases" and "Controversies."

U.S. Const. art. III, § 2, cl. 1. The Supreme Court has interpreted this requirement to mean that

courts may decide only "cases and controversies of the sort traditionally amenable to, and

resolved by, the judicial process." Steel Co. v. Citizens for a Better Env't, 523 U.S. 83, 102

(1998). A plaintiff's standing to sue is "part of the common understanding of what it takes to

make a justiciable case." Id. Therefore, "the absence of standing sounds the death knell for a

case." Microsystems Software, Inc.v. Scandinavia Online AB, 226 F.3d 35, 39 (1st Cir. 2000).

The standing determination is "claim-specific," meaning that an individual plaintiff "must have

standing to bring each and every claim that [he or] she asserts." Katz v. Pershing, LLC, 672 F.3d

64, 71 (1st Cir. 2012).

Article III standing requires that three conditions be satisfied. "First and foremost, there

must be alleged (and ultimately proved) an 'injury in fact.'" Steel Co., 523 U.S. at 103 (quoting

Whitmore v. Arkansas, 495 U.S. 149, 155 (1990)). This injury "must be concrete in both a

qualitative and temporal sense," "distinct and palpable" as opposed to "abstract," and "actual or

imminent" as opposed to "conjectural or hypothetical." Whitmore, 495 U.S. at 155 (internal

quotations and citations omitted). Second, standing requires causation, defined as a "fairly

traceable connection between the plaintiff's injury and the complained-of conduct of the

defendant." Steel Co., 523 U.S. at 103. Finally, standing requires "redressability—a likelihood

that the requested relief will redress the alleged injury." Id.

 "[A]n association may have standing solely as the representative of its members even in

the absence of injury to itself, in certain circumstances." Camel Hair & Cashmere Inst. of Am.,

4

**ADD177**

Inc. v. Associated Dry Goods Corp., 799 F.2d 6, 10 (1st Cir. 1986) (citing Warth v. Seldin, 422 U.S. 490, 511 (1975)). Specifically, "an association has standing to bring suit on behalf of its members when: (a) its members would otherwise have standing to sue in their own right; (b) the interests it seeks to protect are germane to the organization's purpose; and (c) neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit." Hunt v. Wash. State Apple Advert. Comm'n, 432 U.S. 333, 343 (1977). The first two Hunt prongs are constitutional, and the third is prudential. United Food & Com. Workers Union Local 751 v. Brown Grp., Inc., 517 U.S. 544, 555–57 (1996). Only one member need have individual standing in order for an organization to satisfy the first Hunt factor. See Playboy Enters., Inc. v. Pub. Serv. Comm'n of P.R., 906 F.2d 25, 34 (1st Cir. 1990) ("[T]he Supreme Court has never required that every member of an association have standing before it can sue on behalf of its members. 'The association must allege that its members, or any one of them, are suffering immediate or threatened injury as a result of the challenged action of the sort that would make out a justiciable case had the members themselves brought suit.'" (quoting Warth, 422 U.S. at 511)).

The Hunt Court also held that an organization that was not "a traditional voluntary membership organization" because it did not have any formal members could still have associational standing if its constituents "possess[ed] all of the indicia of membership in an organization." Hunt, 432 U.S. at 344–45.[5] Indicia of membership, as identified by the Hunt Court, include that the purported members "alone elect the members of the Commission; they

---

[5] The Hunt Court discussed two other reasons justifying its holding that the organization at issue in that case had associational standing: that it "serves a specialized segment of the State's economic community which is the primary beneficiary of its activities, including the prosecution of this kind of litigation" and "the interests of the Commission itself may be adversely affected by the outcome of this litigation." Hunt, 432 U.S. at 344–45. Here, the parties focus only on the indicia-of-membership rationale.

5

**ADD178**

alone may serve on the Commission; they alone finance its activities, including the costs of this lawsuit, through assessments levied upon them." Id. Ultimately, the Hunt Court found that the Commission at issue in that case had associational standing even though it was not a typical membership organization, at least in part because "[i]n a very real sense . . . the Commission represents the State's [apple] growers and dealers and provides the means by which they express their collective views and protect their collective interests." Id. at 345. Harvard argues that the indicia-of-membership test articulated in Hunt should be applied to all organizations, while SFFA argues that it is not applicable to membership organizations, like the SFFA.

### B.   Nature of the SFFA

The SFFA, a nonstock corporation, was formed under the laws of Virginia on July 30, 2014. [ECF No. 188, Ex. A ("Blum Tr.") at 11:23–25]. According to SFFA's bylaws, as amended on June 19, 2015 (hereinafter, the "Bylaws"),[6] the organization's purpose is "to defend human and civil rights secured by law, including the right of individuals to equal protection under the law, through litigation and other lawful means." [ECF No. 188, Ex. B ("Bylaws"), art. II]. The Board of Directors, which manages the business and affairs of SFFA, is composed of four Board-Elected Directors and one Member-Elected Director. Bylaws, art. IV, §§ 4.01, 4.02. The Board-Elected Directors are elected by a majority vote of the directors then in office, and the Member-Elected Director is elected by a majority vote of the members. Id. § 4.04. Actions by the Board of Directors generally require a majority vote of the Directors present at any given meeting (where there is a quorum, defined as a majority of all Directors). Id. § 4.08.

SFFA has formal members, referred to as "General Members." According to the SFFA Bylaws, an individual qualifies as a General Member if he or she "seeks to support the purposes

---

[6] Prior to the June 19, 2015 amendment, SFFA members had no voting rights and were not required to make any financial contributions to join.

and mission of the Corporation, pays membership dues as prescribed by the Board of Directors, and meets any additional standards and procedures that may be prescribed from time to time." Bylaws, art. III, § 3.02. The Bylaws further specify that General Members are not "members" within the meaning of the Virginia Nonstock Corporation Act.[7] Bylaws, art. III, § 3.01. Initially, SFFA did not require a membership fee and a person became a member by providing their first and last name and e-mail address through the SFFA website, Blum Tr. at 130:16–133:22, but SFFA has since begun requiring an initial, one-time contribution of ten dollars, see [ECF No. 188, Ex. B at 2].

SFFA now has approximately 20,000 members, although for present purposes it only asserts associational standing based on the circumstances of thirteen of its members, most of whom have submitted signed declarations in support of SFFA's opposition to the motion to dismiss. See [ECF No. 204 at 6]; see also Exhibits to [ECF No. 205]. Seven of these 13 members are Asian-American students who applied to and were rejected from Harvard [ECF Nos. 205-26, 34, 35, 38, 39, 40, 41] and two are Asian-American high school students who intend to apply to Harvard in the future [ECF Nos. 205-36, 42]. Their declarations state that they have voluntarily joined SFFA, support its mission, have been in contact with SFFA, and had the opportunity to express their views on the direction of this litigation.

---

[7] The Virginia Nonstock Corporation Act defines a "member" as "one having a membership interest in a corporation in accordance with the provisions of its articles of incorporation or bylaws." Va. Code § 13.1-803. "Membership interest" is defined as the "interest of a member in a domestic or foreign corporation, including voting and all other rights associated with membership." Id.

**ADD180**

## C. Applicability of the Indicia-of-Membership Test to SFFA

The thrust of Harvard's argument is that SFFA's General Members play no meaningful role in the organization and thus SFFA does not genuinely represent them such that it has associational standing to sue on their behalf. Harvard interprets the cases on associational standing following <u>Hunt</u> to require that an association's constituents exhibit "indicia of membership," in addition to the three <u>Hunt</u> prerequisites commonly cited in these cases, in order for the association to have standing to represent them.[8] <u>See, e.g.,</u> [ECF Nos. 188 at 8; 220 at 7 n.5]. SFFA responds that the Court need not undertake an indicia-of-membership inquiry where an organization has actual members and satisfies the three <u>Hunt</u> prerequisites, but that it would nonetheless withstand such an inquiry.

Generally speaking, the indicia-of-membership test for associational standing purposes is applied when a case requires a functional analysis of whether an association has standing to sue on behalf of its constituents, often in situations when the organization does not have any actual members, such as the state agency involved in <u>Hunt</u>. <u>See Hunt</u>, 432 U.S. at 344 ("[W]hile the apple growers and dealers are not 'members' of the Commission in the traditional trade association sense, they possess all of the indicia of membership in an organization."); <u>see also</u> <u>Funeral Consumers All., Inc. v. Serv. Corp. Int'l</u>, 695 F.3d 330, 344 n.9 (5th Cir. 2012) ("If the association seeking standing does not have traditional members, as here, the association establishes its standing by proving that it has 'indicia of membership'. . . ." (citing <u>Hunt</u>, 432 U.S. at 344–45)); <u>Disability Advocates, Inc. v. N.Y. Coal. for Quality Assisted Living, Inc.</u>, 675

---

[8] "'Individuals identified for standing purposes by an organization who are not legally 'members' [are] referred to as . . . 'constituents[.]'" <u>Citizens Coal Council v. Matt Canestrale Contracting, Inc.</u>, 40 F. Supp. 3d 632, 639 (W.D. Pa. 2014) (quoting <u>See</u> Karl S. Coplan, <u>Is Voting Necessary? Organization Standing and Non-Voting Members of Environmental Advocacy Organizations</u>, 14 Southeastern Envtl. L.J. 47, 52 n. 26 (2005)).

**ADD181**

F.3d 149, 159 (2d Cir. 2012) ("Hunt held that the Constitution requires that the constituents of a non-membership organization manifest the 'indicia of membership' for that organization to have associational standing to sue on their behalf."); Ball by Burba v. Kasich, No. 2:16-CV-00282, 2017 WL 1102688, at *13 (S.D. Ohio Mar. 23, 2017) ("With respect to the first [Hunt] prong, when an association lacks traditional members, the association may nonetheless have standing where its constituents 'possess all of the indicia of membership in an organization.'" (quoting Hunt, 432 U.S. at 344)); AARP v. U.S. Equal Emp't Opportunity Comm'n, No. CV 16-2113 (JDB), 2016 WL 7646358, at *5 (D.D.C. Dec. 29, 2016) ("[M]any of the cases that do discuss indicia of membership are those in which the organization at issue clearly does not have members."); Sylvia's Haven, Inc. v. Mass. Dev. Fin. Agency, 397 F. Supp. 2d 202, 207–08 (D. Mass. 2005) (conducting indicia-of-membership analysis in context of informal association, but concluding that it did not meet the other Hunt prerequisites). Thus, Hunt's indicia-of-membership test clearly applies in determining the associational standing of organizations that lack actual members.

It is less clear, however, whether Hunt's indicia-of-membership test can or should ever be undertaken in connection with associations that actually have identifiable members, such as SFFA, and, if so, under what circumstances. Several judges have noted that this issue is unresolved. See Citizens Coal Council v. Matt Canestrale Contracting, Inc., 40 F. Supp. 3d 632, 643 (W.D. Pa. 2014) ("It is questionable whether the 'indicia of membership' test applies at all where, as here, the organization is clearly a volunteer membership organization . . . ."); AARP, 2016 WL 7646358, at *5 ("There appears to be a gap in the associational standing case law about when or how the indicia of membership inquiry should be applied."). Without expressly addressing it, courts in this Circuit have routinely not applied the indicia-of-membership test, and

9

**ADD182**

instead simply considered the three delineated <u>Hunt</u> prerequisites, when the associations were

membership organizations. <u>See, e.g.</u>, <u>Merit Const. All. v. City of Quincy</u>, 759 F.3d 122, 126–27

(1st Cir. 2014) (holding that organization had associational standing without conducting indicia-

of-membership test); <u>Camel Hair & Cashmere Inst. of Am., Inc.</u>, 799 F.2d at 10–12 (same);

<u>Sexual Minorities Uganda v. Lively</u>, 960 F. Supp. 2d 304, 325–28 (D. Mass. 2013) (same).[9]

Furthermore, several judges have explicitly noted that <u>Hunt</u>'s indicia-of-membership test applies

*only* when an organization is a non-membership organization. <u>See</u> <u>Brady Campaign to Prevent</u>

<u>Gun Violence v. Salazar</u>, 612 F. Supp. 2d 1, 29 (D.D.C. 2009) ("The inquiry into the 'indicia of

membership'. . . is necessary only when an organization is not a 'traditional membership

organization.'" (quoting <u>Gettman v. DEA</u>, 290 F.3d 430, 435 (D.C. Cir. 2002))); <u>Cal.</u>

<u>Sportfishing Prot. All. v. Diablo Grande</u>, 209 F. Supp. 2d 1059, 1066 (E.D. Ca. 2002) ("[T]he

'indicia of membership' requirement in <u>Hunt</u> applies only to situations in which an organization

is attempting to bring suit on behalf of individuals who are not members.").[10]

Although Harvard argues that <u>Hunt</u> and its progeny support the application of an indicia-

of-membership test to all organizations asserting associational standing, regardless of whether

they formally have members, the Court is not aware of any case that explicitly stands for this

proposition. Under such a formulation, associational standing would turn on a subjective

---

[9] Harvard reconciles such cases with its legal position by claiming that courts can ignore the indicia-of-membership test when the issue of whether an association is a genuine membership organization is undisputed. This view, however, is not discussed or endorsed in the case law. Further, courts have "an independent obligation to assure that standing exists, regardless of whether it is challenged by any of the parties." <u>Summers v. Earth Island Inst.</u>, 555 U.S. 488, 499 (2009).

[10] Harvard argues that both these cases are inapposite because they do not involve organizations in which members had as little control as in SFFA's case. [ECF No. 220 at 5]. Even if factually distinguishable, however, the legal reasoning is relevant.

**ADD183**

evaluation of whether "members" are "genuine" members or not, with the organization's view of its own members being only one factor in the analysis.

In Hunt, the Supreme Court concluded that the Washington State Apple Advertising Commission was "not a traditional voluntary membership organization such as a trade association, for it ha[d] no members at all." Hunt, 432 U.S. at 342. The Commission was created by statute and was "composed of 13 Washington apple growers and dealers who [we]re nominated and elected within electoral districts by their fellow growers and dealers." Id. at 337. The Hunt Court nonetheless concluded that, although the Commission had no members "in the traditional trade association sense," its constituents "possess[ed] all the indicia of membership in an organization," which permitted associational standing. Id. at 344–45. There, the indicia of membership established that "the Commission represent[ed] the State's growers and dealers and provide[d] the means by which they express[ed] their collective views and protect[ed] their collective interests." Id. at 345.

The Court reads Hunt as standing for the following propositions: (1) a membership organization has standing to sue on behalf of its members if it satisfies the three Hunt prerequisites (in short, that at least one member has a personal injury-in-fact, germaneness, and no need for individual member participation); and (2) a non-membership organization might still have associational standing provided it has sufficient indicia of membership as more fully set forth in Hunt and its progeny. In introducing the indicia-of-membership test, Hunt expanded the category of organizations that could have associational standing, rather than limiting it.

Harvard cites Wash. Legal Found. v. Leavitt, 477 F. Supp. 2d 202, 208–09 (D.D.C. 2007) and Package Shop, Inc. v. Anheuser-Busch, Inc., No. 83-513, 1984 WL 6618, at *41 (D.N.J. Sept. 25, 1986) in support of the proposition that "courts have held that organizations referring to

**ADD184**

their supporters as 'members' nevertheless lacked standing to represent those members in

litigation." Harvard then cites the following cases to argue that courts have applied the indicia-

of-membership test in determining whether organizations should be allowed "to sue on behalf of

their members:" Friends of the Earth Inc. v. Chevron Chemical Co., 129 F.3d 826, 829 (5th Cir.

1997); Playboy Enters., Inc., 906 F. 2d at 25; and Concerned Citizens Around Murphy v.

Murphy Oil USA, Inc., 686 F. Supp. 2d 663, 675–76 (E.D. La. 2010).

None of these cases require or even recommend the application of the indicia-of-

membership test to all associational standing cases. For example, in Washington Legal

Foundation v. Leavitt, an organization tried to assert associational standing on behalf of

individuals who were not formally WLF members, which led the court to undertake a functional

analysis of the organization's ability to sue on behalf of those individuals. 477 F. Supp. 2d at

208. Thus, the court applied the functional indicia-of-membership analysis in determining

whether the organization could assert associational standing on behalf of non-members. Here, in

contrast, SFFA seeks to represent individuals who are clearly members as defined by its Bylaws.

The other cases similarly do not hold that the indicia-of-membership test applies to membership

organizations like SFFA and the factual circumstances triggering the indicia-of-membership

analysis in those cases are not present here.[11] See Package Shop, Inc., 1984 WL 6618, at *39–40

(using indicia-of-membership analysis to determine whether organization was truly a

membership organization for purposes of the lawsuit where organization had been formed long

before for another purpose and members had shown no support for organization's current

purpose); Friends of the Earth, Inc., 129 F.3d at 829 ("[T]he 'indicia of membership' test is the

---

[11] Playboy Enterprises is inapposite because the First Circuit did not undertake the indicia-of-membership analysis as outlined in Hunt. Playboy Enters., Inc., 906 F.2d at 34–35 (rebutting party's argument that organization was just an "empty husk" and did not represent its members' interests, but without applying the Hunt indicia-of-membership test).

correct one to apply to determine whether a purported corporation, *despite the failure to meet state law requirements*, has 'members' whose interests it can represent in federal court." (emphasis added)); <u>Concerned Citizens Around Murphy</u>, 686 F. Supp. 2d at 675–77 (E.D. La. 2010) (holding that organization lacking some corporate formalities and formal membership structure had associational standing because it met <u>Hunt</u>'s indicia-of-membership test).

Thus, the key cases Harvard relies on to support the proposition that <u>Hunt</u>'s membership test should be applied to actual membership organizations all involved organizations that, unlike SFFA, asserted standing on behalf of non-members or had factual circumstances, not present here, that called for a functional analysis of its constituents. Further, the Court's conclusion— that the indicia-of-membership inquiry should not be applied to SFFA under the circumstances of this case—is consistent with the rationale underlying associational standing. In <u>Int'l Union, United Auto., Aerospace & Agr. Implement Workers of Am. v. Brock</u>, the Supreme Court reaffirmed the principles in <u>Hunt</u> and rejected the Secretary of Labor's argument that litigation based on associational standing would not guarantee adequacy of representation. 477 U.S. 274, 288–89 (1986). The Supreme Court noted that "the doctrine of associational standing recognizes that the primary reason people join an organization is often to create an effective vehicle for vindicating interests that they share with others." <u>Id.</u> at 290. The circumstances here do not call for a functional analysis of SFFA's membership. Where SFFA has clearly stated its mission in its Bylaws and website, where it has consistently, and recently, in highly public ways, pursued efforts to end alleged racial discrimination in college admissions through litigation, and where its members voluntarily associate themselves with the organization, it can be presumed for the purposes of standing that SFFA adequately represents the interests of its current members without needing to test this further based on the indicia-of-membership factors.

13

**ADD186**

### D. **Hunt**'s Prerequisites

Therefore, it is sufficient, for associational standing in this case, if SFFA meets the three criteria outlined in <u>Hunt</u>: that "(a) its members would otherwise have standing to sue in their own right; (b) the interests it seeks to protect are germane to the organization's purpose; and (c) neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit." <u>Hunt</u>, 432 U.S. at 343. Because Harvard does not dispute that the three <u>Hunt</u> prerequisites are met here, apart from the argument that the indicia-of-membership test should be applied to determine whether the SFFA is a membership organization in the first place, the Court addresses them only briefly.

To satisfy the first <u>Hunt</u> requirement, "an organization suing as representative [must] include at least one member with standing to present, in his or her own right, the claim (or the type of claim) pleaded by the association." <u>United Food and Com. Workers Union Local</u>, 517 U.S. at 555. SFFA has provided the affidavits of a subset of its members, referred to as Standing Members, which demonstrate that at least some of these individuals, the rejected applicants, would have standing to sue on their own.[12] <u>See</u> <u>Gratz v. Bollinger</u>, 539 U.S. 244, 262–63 (2003) (holding that rejected applicant "able and ready" to transfer "has standing to seek prospective relief with respect to the University's continued use of race in undergraduate admissions").

Second, the lawsuit is germane to SFFA's purpose because, as stated in its Bylaws, SFFA's mission is "to defend human and civil rights secured by law, including the right of individuals to equal protection under the law." Pursuing litigation to end alleged racial discrimination in higher education admission furthers that purpose.

---

[12] Because it was not raised by the parties and it is sufficient for associational standing that at least one member have standing to sue on his own, the Court does not address the issue of whether prospective college students, who have not yet applied, or the parents of applicants have standing to sue.

**ADD187**

Finally, SFFA requests only declaratory and injunctive relief, and obtaining such relief, based on the claims in this case, would not require individual participation by its members. See Camel Hair & Cashmere Inst. of Am., Inc., 799 F.2d at 12 ("Actions for declaratory, injunctive and other forms of prospective relief have generally been held particularly suited to group representation."); see also Playboy Enters., 906 F.2d at 35 ("[J]ust because a claim may require proof specific to individual members of an association does not mean the members are required to participate as parties in the lawsuit."). Here, the injunctive and declaratory relief requested need not be tailored to or require any individualized proof from any particular member.

Although the Court disagrees with Harvard that Hunt and subsequent cases require that membership organizations be subjected to an indicia-of-membership test as a matter of course, it recognizes that there may be situations in the future in which the adequacy of an organization's representativeness is so seriously in doubt that the Court should consider Hunt's indicia-of-membership analysis or some other criteria to further evaluate the issue of associational standing. See Brock, 477 U.S. at 290 ("Should an association be deficient in this regard [i.e., adequacy of representation], a judgment won against it might not preclude subsequent claims by the association's members without offending due process principles. And were we presented with evidence that such a problem existed either here or in cases of this type, we would have to consider how it might be alleviated."); see also Camel Hair & Cashmere Inst. of Am., Inc., 799 F.2d at 11. This is, however, not one of those situations. A substantial part of SFFA's mission is to end race-based admissions policies at American universities. Blum Tr. 47:16–25. SFFA clearly communicated its mission, which has stayed consistent since its founding, to prospective members through its website and in its outreach efforts. See, e.g., Blum Tr. 110:2–7. Further,

**ADD188**

SFFA's endeavors—both here and in North Carolina—are highly public.[13] SFFA's members voluntarily join the organization, presumably knowing its purpose, by providing their name and contact information and paying a small fee.[14] See Friends of the Earth, 129 F.3d at 829. The Bylaws plainly lay out who qualifies as a member and what a member's role is and permit members to vote for one member of the Board of Directors, who participates in Board decisions, thereby granting members more direct access to SFFA's management. Further, to support the organization, members can voluntarily donate funds, in addition to the one-time, ten dollar contribution (required since June 2015) as a way of influencing the organization. Moreover, the voluntary nature of SFFA's membership constitutes a form of influence by the members that Harvard seems to underestimate. See Karl S. Coplan, Is Voting Necessary? Organization Standing and Non-Voting Members of Environmental Advocacy Organizations, 14 Southeastern Envtl. L.J. 47, 79 (2005) ("The ability of an organization's constituents to join or quit the group would appear to be a very effective means of ensuring the responsiveness of the organization's management—and also ensuring the 'concrete adverseness' required for organizational

---

[13] SFFA also initiated a case against the University of North Carolina and members of its board of governors, the University of North Carolina at Chapel Hill and members of its board of trustees and various school officials, alleging that the university's admissions process violates the Fourteenth Amendment of the U.S. Constitution and Title VI of the Federal Civil Rights Act of 1964. See Students for Fair Admissions, Inc. v. University of North Carolina, et al., No. 1:14-cv-00954 (M.D.N.C. Nov. 17, 2014), [ECF No. 1].

[14] The First Circuit has held that "[w]here . . . there are no allegations of manipulative abuse of the rule, the time-of-filing rule is inapposite to the federal question context." U.S. ex rel. Gadbois v. PharMerica Corp., 809 F.3d 1, 5 (1st Cir. 2015), cert. denied, 136 S. Ct. 2517 (2016). Although Harvard suggests that the circumstances surrounding the amendment of the Bylaws might indicate manipulation, it stops short of actually alleging that it occurred in this case. The Court notes that the Bylaws were amended over a year *before* Harvard filed its motion to dismiss for lack of standing. Finally, where SFFA could move to dismiss the lawsuit and possibly re-file it to avoid this issue, dismissal on this ground would only waste judicial and party resources. Accordingly, the Court examines SFFA's current membership structure, rather than the structure that existed at the time the Complaint was filed, although it is not at all clear that the structures are so materially different as to significantly alter the analysis.

**ADD189**

standing." (quoting <u>Baker v. Carr</u>, 369 U.S. 186, 204 (1962))). The Court also notes that courts have found associational standing even in situations where members had no voting majority. <u>See, e.g.</u>, <u>Or. Advocacy Ctr. v. Mink</u>, 322 F.3d 1101, 1111 (9th Cir. 2003).

Finally, SFFA has submitted declarations of certain members whom it specifically identifies for standing purposes. <u>See</u> Exhibits to [ECF No. 205]. Harvard attempts to minimize the relevance of these declarations by arguing that assessing the genuineness of SFFA's membership should be done with reference to the entire membership, rather than just a few select members. The Court has already highlighted certain general characteristics of SFFA that ensure its representation of its members as a whole. The individual declarations, which show that SFFA leadership communicates with members about this litigation and that the Standing Members have given input concerning the case, further bolster SFFA's claim that it is representing the interests of its members. <u>See, e.g.</u>, [ECF No. 205-26]. Finally, the Standing Members each stated that the SFFA does in fact represent their interests. <u>See, e.g.</u>, <u>id.</u>

The Court therefore finds that SFFA meets the prerequisites laid out in <u>Hunt</u> and has the associational standing necessary to pursue this litigation.

## V.    CONCLUSION

Accordingly, Harvard's motion to dismiss for lack of subject matter jurisdiction [ECF No. 187] is <u>DENIED</u>.[15]

**SO ORDERED.**

Dated: June 2, 2017                                    /s/ Allison D. Burroughs
                                                       ALLISON D. BURROUGHS
                                                       U.S. DISTRICT JUDGE

---

[15] For substantially the same reasons presented in this Memorandum and Order and in light of the standard for a motion for reconsideration, the Court also denies Harvard's request to reconsider [ECF No. 154] its earlier discovery ruling bearing on SFFA's standing [ECF No. 151].