No. 19-2005

# United States Court Of Appeals
## for the First Circuit

---

**STUDENTS FOR FAIR ADMISSIONS, INC.,**

*Plaintiff-Appellant,*

**- against -**

**PRESIDENT AND FELLOWS OF HARVARD COLLEGE,**

*Defendant-Appellee,*

**THE HONORABLE AND REVEREND THE BOARD OF OVERSEERS,**

*Defendant.*

---

*On Appeal From the United States District Court
for the District of Massachusetts*

---

## BRIEF FOR *AMICUS CURIAE*
## NATIONAL ASSOCIATION OF SCHOLARS
## IN SUPPORT OF PLAINTIFF-APPELLANT

---

Dennis J. Saffran
38-18 West Drive
Douglaston, NY 11363
718-428-7156
djsaffranlaw@gmail.com

Dwight Duncan
*Counsel of Record*
First Circuit Bar No. 36470
333 Faunce Corner Road
Dartmouth, MA 02747-1252
508-985-1124
dduncan@umassd.edu

February 25, 2020

**DISCLOSURE STATEMENT**
**PURSUANT TO RULES 26.1(a) and 29(a)(4)(A)**

Amicus Curiae National Association of Scholars is a nongovernmental entity incorporated under Section 402 of the New York State Not-for-Profit Corporation Law.  As such it is prohibited from issuing stock and thus no parent corporation or publicly held corporation owns 10% or more of such stock.


**STATEMENT PURSUANT TO RULE 29(a)(4)(E)**

Amicus and counsel state pursuant to Fed. R. App. P. 29(a)(4)(E) that no party's counsel authored this brief in whole or in part; and no party, party's counsel or other person contributed money that was intended to fund preparing or submitting the brief.

# **TABLE OF CONTENTS**

Disclosure Statement Pursuant to Rules 26.1(a) and 29(a)(4)(A) ............................ i

Statement Pursuant to Rule 29(a)(4)(E).................................................................. i

Table of Authorities .................................................................................................. iii

Identity and Interest of Amicus Curiae .................................................................... 1

Consent to Filing of This Brief ................................................................................. 2

Facts ......................................................................................................................... 2

POINT I
    The District Court Erred in the Extraordinary Deference It Accorded To
    Harvard.................................................................................................................. 2

POINT II
    The District Court's Decision is Fatally Flawed in That it "Accepts as a
    Defense to Racial Discrimination the Very Stereotypes the Law Condemns" ..... 8

POINT III
    The District Court Erred in Rejecting Historical Evidence That Harvard's
    "Holistic" Admissions Policies Were Instituted to Exclude Jews Who Were
    Stereotyped in Much the Same Way as Asians are Today .................................. 15

Conclusion ............................................................................................................... 23

Certificate of Compliance Pursuant to Rule 32(g)(1)............................................. 24

Certificate of Service

# TABLE OF AUTHORITIES

## Cases

*Alexander v. Louisiana*, 405 U.S. 625 (1972) ...........................................................6

*Batson v. Kentucky*, 476 U.S. 79 (1986) ..................................................................6

*Bush v. Vera*, 517 U.S. 952 (1996) ........................................................................13

*Carrera v. Ayers*, 670 F.3d 938 (9th Cir. 2011) ....................................................14

*City of Richmond v. J. A. Croson Co.*, 488 U. S. 469 (1989) ................................22

*Fisher v. Univ. of Texas at Austin*, 570 U.S. 297 ("*Fisher I*") (2013)............. *passim*

*Fisher v. Univ. of Texas at Austin*, 579 U.S. __, 136 S. Ct. 2198 (2016) ("*Fisher II*") ....................................................................................................2, 6

*Fisher v. Univ. of Texas at Austin*, 631 F.3d 213, 231-32 (5th Cir. 2011), *vacated and remanded*, 570 U.S. 297 (2013) ......................................................6

*Grutter v. Bollinger*, 539 U.S. 306 (2003)............................................... 5, 6, 16, 22

*Johnson v. Bd. of Regents*, 106 F. Supp. 2d 1362 (S.D. Ga. 2000), *aff'd*, 263 F.3d 1234 (11th Cir. 2001) ..................................................................................14

*Maw v. Bd. of Trs. of the Univ. of the Dist. of Columbia*, 926 F.3d 859 (D.C. Cir. 2019) .............................................................................................................7

*Miller v. Johnson*, 515 U.S. 900 (1995)..................................................................14

*Norris v. Alabama*, 294 U.S. 587 (1935) ..................................................................6

*Powers v. Ohio*, 499 U.S. 400 (1991) ............................................................... 13, 14

*Regents of the Univ. of Cal. v. Bakke*, 438 U.S. 265 (1978)............................. 14, 16

*Sweeney v. Bd. of Trustees*, 569 F.2d 169 (1st Cir. 1978) ........................................6

*United States v. Playboy Ent. Group, Inc.*, 529 U.S. 803, 818 (2000) .....................7

*Vill. of Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252 (1977) .........22

**Statutes and Rules**

Fed. R. App. P. 26.1(a) ........................................................................ i

Fed. R. App. P. 29(a)(2) .........................................................................2

Fed. R. App. P. 29(a)(4)(A) .................................................................. i

Fed. R. App. P. 29(a)(4)(E) .................................................................. i

Fed. R. App. P. 29(a)(5) ......................................................................24

Fed. R. App. P. 32(a)(5) ......................................................................24

Fed. R. App. P. 32(a)(6) ......................................................................24

Fed. R. App. P. 32(a)(7)(B)(i) .............................................................24

Fed. R. App. P. 32(f) ...........................................................................24

Fed. R. App. P. 32(g)(1) ......................................................................24

N.Y. Not-for-Profit Corporation Law § 402 ....................................... i

Title VII of the Civil Rights Act of 1964, 42 U.S.C.S. § 2000e et seq. ...................7

**Other Authorities**

Alan M. Dershowitz & Laura Hanft, *Affirmative Action and the Harvard College Diversity Discretion Model: Paradigm or Pretext?*, 1 Cardozo L. Rev. 379 (1979) ...........................................................................17

Althea Nagai, Center for Equal Opportunity, *Too Many Asian Americans: Affirmative Discrimination in Elite College Admissions* (2018), http://www.ceousa.org/attachments/article/1209/AN.Too%20Many%20AsianAms.Final.pdf .................................................................................1

Daniel Golden, *The Price of Admission: How America's Ruling Class Buys Its Way into Elite Colleges—and Who Gets Left Outside the Gates* (2006) ......12

Dennis Saffran, *Fewer Asians Need Apply*, City J., Winter 2016, at 38,
https://www.city-journal.org/html/fewer-asians-need-apply-14180.html ..........21

Jerome Karabel, *The Chosen: The Hidden History of Admission and Exclusion at Harvard, Yale and Princeton* (2005) .............................................17

Ron Unz, *The Myth of American Meritocracy: How corrupt are Ivy League admissions?*, The American Conservative, Dec. 2012, at 14,
http://www.theamericanconservative.com/articles/the-myth-of-american-meritocracy/ ................................................................................................ 16, 21

## IDENTITY AND INTEREST OF AMICUS CURIAE

Amicus Curiae National Association of Scholars ("NAS") is an independent membership association of academics working to foster intellectual freedom and to sustain the tradition of reasoned scholarship, civil debate and intellectual integrity in America's colleges and universities. It is dedicated to the principle of individual merit and opposes race, sex, and other group preferences. As a group comprised of professors, graduate students, administrators, and trustees, NAS is intimately familiar with the concerns relevant to this case. NAS joined an *amicus* brief to the United States Supreme Court supporting the plaintiff in *Fisher v. Univ. of Texas at Austin*, 570 U.S. 297 (2013) ("*Fisher I*"), and also filed an *amicus* brief in the district court supporting plaintiff Students for Fair Admissions ("SFFA") in the present litigation. NAS member Althea Nagai, Ph.D., has published *Too Many Asian Americans: Affirmative Discrimination in Elite College Admissions* (Center for Equal Opportunity, 2018)[1], documenting discrimination by the defendant and other prestigious colleges and universities against Asian applicants.

Amicus is authorized to file this brief by its governing board and By-Laws.

---

[1] http://www.ceousa.org/attachments/article/1209/AN.Too%20Many%20Asian Ams.Final.pdf

## CONSENT TO FILING OF THIS BRIEF

All parties have consented to the filing of this amicus brief pursuant to Fed. R. App. P. 29(a)(2).

## FACTS

Amicus adopts the Statement of Facts contained in the Brief for Plaintiff-Appellant.

## POINT I

### The District Court Erred in the Extraordinary Deference it Accorded to Harvard

The decision below is marked by an extraordinary deference to Harvard and a presumption that it acted in good faith, in violation of both the express dictate of the Supreme Court in its two *Fisher* decisions, *Fisher I*, *supra*; *Fisher v. Univ. of Texas at Austin*, 579 U.S. __, 136 S. Ct. 2198 (2016) ("*Fisher II*"), and the general rule regularly reiterated by the Supreme Court and the circuit courts in racial discrimination cases.

In ruling that Harvard did not discriminate against Asian-American applicants, and dismissing evidence that Asians received lower personal ratings than other groups, the court credited at face value the self-interested assertions of "numerous considerate, diligent, and intelligent admissions officers" and "careful and conscientious observers within the Admissions Office" that they did not discrim-

- 2 -

inate.  Addendum to Appellant's Br. ("Add.") 69, 80.  The court found no evidence of bias because "Harvard's admissions staff is a diverse group of individuals that includes Asian Americans" and admissions officials "credibly testified that they did not use race in assigning personal ratings."  Add. 16, 69.  Indeed, they "force-fully denied" that "racial animus or conscious prejudice against Asian Americans infect Harvard's admissions process."  Add. 16-17.  *See also*, *e.g.*, Add. 30 (apparently crediting the testimony of an Asian-American admissions official that "I would never be part of a process that would discriminate against anybody, let alone people that looked like me.")

In a similar vein, the court discounted the complete failure of Dean of Admissions William Fitzsimmons to respond to or follow up on Harvard's own internal findings of significant discrimination against Asian applicants.  (As SFFA recounts, when briefed on these findings by Harvard's Office of Institutional Research ("OIR"), Fitzsimmons sat silently, asked no questions, did not request any additional information or study, did not report the OIR findings to anyone or take any action on them, and did not express any concern about the unfairness to Asian-American applicants revealed in the reports.  J.A. 854:24-855:2; 859:18-24; Add. 38.)    To the court, this non-response was "reasonable" in view of Fitzsimmons's "experience with and confidence in the Admissions Office's

- 3 -

process." Add. 38.[2]

It is also noteworthy that Harvard's statistical expert, Professor David Card, demonstrated similar deference to Harvard's conclusions in his analysis, and that the court largely adopted his models despite this deference. Despite the correlation of the highly amorphous personal rating with race, Professor Card kept it in his models of a race-neutral admissions metric (thus essentially contaminating those models with the very bias they were supposed to test for; *see* Point II *infra*), based on a phone conversation in which Dean Fitzsimmons told him that race was not a factor in assigning personal rating scores. Professor Card took Fitzsimmons's word on this without taking any steps to verify it. J.A. 3222:19-3223:1. While not fully accepting Professor Card's use of the personal rating in his modeling, the court nonetheless utilized these models – giving them at least equal weight to and indeed deeming them "more comprehensive" than models excluding the biased personal ratings scores. Add. 76; *see infra* p. 10. Thus the court effectively deferred to Professor Card's deference to Dean Fitzsimmons.

In *Fisher I* the Court rejected just such deference to university officials in determining if the means they have chosen to achieve diversity have been carefully

---

[2] The court also stated that Fitzsimmons's "review of the data did not lead him to believe that the Admissions Office was biased against Asian American applicants." *Id.* However, there is no indication in the portions of the trial transcript cited by the court, J.A. 858:11-17, 859:7-24, nor anywhere else in the record, that Fitzsimmons did in fact review the OIR data.

and narrowly crafted to achieve that goal without undue discrimination against non-favored groups. The Court first ruled that even "a university's 'educational judgment that such diversity is essential to its educational mission'" is entitled only to "some, but not complete, judicial deference." 570 U.S. at 310 (quoting *Grutter v. Bollinger*, 539 U.S. 306, 328 (2003)). That is not the end of the inquiry, however: "there must still be a further judicial determination that the admissions process meets strict scrutiny in its implementation" and "on this point, **the University receives no deference**." 570 U.S. at 311 (emphasis added).

This is a "searching examination," the Court held, *id.* at 312, and one in which "**it remains at all times the University's obligation to demonstrate** … that admissions processes 'ensure that each applicant is evaluated as an individual and not in a way that makes an applicant's race or ethnicity the defining feature of his or her application,'" *id.* at 311-12 (quoting *Grutter*, 539 U.S. at 337) (emphasis added).

The key flaw in the lower court decisions in the case, the Court stated, was that "[t]he District Court and Court of Appeals confined the strict scrutiny inquiry in too narrow a way by deferring to the University's good faith." 570 U.S. at 314. The circuit court erred, the Court found, in "'presum[ing] the University acted in good faith' and plac[ing] on petitioner the burden of rebutting that presumption," and in according "'a degree of deference to the Universit[y].'" *Id.* at 313 (quoting

631 F.3d 213, 231-32 (5th Cir. 2011).  But "*Grutter* did not hold that good faith would forgive an impermissible consideration of race" and a court may not merely "accept a school's assertion that its admissions process uses race in a permissible way."  570 U.S. at 313.

While ultimately upholding the Texas program at issue, the *Fisher II* court reaffirmed these holdings, reiterating that "no deference is owed when determining whether the use of race is narrowly tailored to achieve the university's permissible goals," and that the fundamental error of the original lower court decisions in the case was in "deferring to the University's good faith."  136 S. Ct. at 2208.

The *Fisher* holdings reflect the general rule applicable in discrimination cases that "affirmations of good faith in making individual selections are insufficient to dispel a prima facie case of systematic exclusion." *Sweeney v. Bd. of Trustees*, 569 F.2d 169, 179 (1st Cir. 1978) (quoting *Alexander v. Louisiana*, 405 U.S. 625, 632 (1972)).  "If these general assertions were accepted" as a defense, the civil rights laws would be "'vain and illusory.'"  *Batson v. Kentucky*, 476 U.S. 79, 98 (1986) (quoting *Norris v. Alabama*, 294 U.S. 587, 598 (1935)).  *See generally* Appellant's Br. 38-39 and cases cited there for the proposition that "[a] defendant's insistence that it does not discriminate, however credible or indignant, is not evidence in its favor."

Applying similar principles in a decision last year, the Court of Appeals for

the District of Columbia Circuit held that universities were not entitled to defer-ence or a presumption of good faith in cases brought under Title VII of the Civil Rights Act of 1964, 42 U.S.C.S. § 2000e et seq. *Maw v. Bd. of Trs. of the Univ. of the Dist. of Columbia*, 926 F.3d 859, 863-66 (D.C. Cir. 2019). Good faith, the court held, "cannot be assumed in a Title VII case, where the question is **whether** the employer acted in good faith." *Id.* at 865 (emphasis in original).

In light of these precedents, amicus respectfully submits that, like the lower courts in the original *Fisher* litigation, the district court here seriously erred in "deferring to the University's good faith." We do not mean to suggest in asserting this that Harvard was not required by the court to put on a case; obviously it was, as was the University of Texas in *Fisher* and as were the defendants in the other cases cited. But in its effusive praise of Harvard's admissions officials, in credit-ing their denials of bias or discriminatory intent without further "searching exami-nation," and in consistently giving Harvard "the benefit of the doubt" on the statis-tical evidence (*see* Appellant's Br. 28-29 (quoting *United States v. Playboy Ent. Group, Inc.*, 529 U.S. 803, 818 (2000))), the court, like the lower courts in *Fisher*, improperly shifted to SFFA "the burden of rebutting [a] presumption" that Harvard had acted in good faith. *Fisher I*, 570 U.S. at 313 (*see supra* p. 5). This alone was reversible error.

## POINT II

### The District Court's Decision is Fatally Flawed in that it "Accepts As A Defense to Racial Discrimination the Very Stereotypes the Law Condemns"

Sometimes the blur of statistical dispute can obscure as much as, or more than, it clarifies. There is a danger of that, amicus fears, in wading through the 130-page decision below, with its tale of dueling econometric experts and war of competing regression analyses. But when one stands back, the overarching statistical dispute here reduces, as SFFA notes, to the simple and straightforward question of whether personal ratings scores should be excluded from models designed to test whether Harvard discriminates against Asian-Americans because these ratings themselves embody that discrimination. Appellant's Br. 29-30. Or, as the district court phrased it, because "any bias in the ratings … is baked into [the] analysis." Add. 60.

To put this even more in layman's terms, the point of a regression analysis in a discrimination case is to model how the selection process at issue would work in the absence of the alleged discrimination, and then compare these ideal results to the actual results to determine if there is a statistically significant difference. To do this, of course, the elements of the model must themselves be uncontaminated by the alleged bias. Otherwise the model would reflect the very discrimination it was designed to test for and would thus be useless at revealing that discrimination. *I.e.*,

it would predict an "ideal" result not significantly different from the actual result; but rather than proving non-discrimination this finding would be what statisticians call a "false negative" that merely reflected the corruption of the model.

Thus here both sides' experts agreed that the overall rating had to be excluded from their models because Harvard acknowledges that it takes race into account in assigning it. Add. 21, 29, 73. Rather, both sides' models consisted largely of objective, race-neutral academic factors (or, at least, factors not directly influenced by racial bias or favoritism) such as high school grades and standardized test scores. Add. 65-67. The only major difference was Professor Card's inclusion of the personal rating. [3] But this difference was determinative since, as SFFA notes, **every** regression model, including Professor Card's, found a statistically significant admissions penalty against Asian-American applicants relative to whites when the personal rating is excluded. Appellant's Br. 30 and citations there.

Professor Card included the personal rating in his models even though it is undisputed that it correlates with race. Specifically, Asian-Americans consistently receive the lowest personal ratings of any racial group from admissions officials in

---

[3] The personal rating is a subjective and vague measure described by different Harvard officials as potentially including such impressions as whether a student has qualities such as "integrity, helpfulness, courage, kindness, fortitude, empathy, self-confidence, leadership ability, maturity, or grit." Add. 20.

Cambridge, who have not met them, even though the local alumni interviewers who actually do meet with them face-to-face rank them similarly to whites. Add. 55, 69 ("statistically significant and negative relationship between Asian American identity and the personal rating assigned by Harvard admissions officers"), 124; J.A. 6006 (table reproduced at Appellant's Br. 31).[4] Despite this clear racial skewing against Asian-Americans the district court gave at least equal weight to models that included the personal rating as to models that excluded it. Add. 75, 76.[5] In fact, the court strongly suggested a preference for such models, stating that it "believes that including the personal rating results in a more comprehensive analysis," Add. 76, and, as discussed below, repeatedly justifying this inclusion on grounds that are ironically and improperly resonant of the very bias at issue in this case.

The court accurately summarized Professor Card's rationale for including the personal rating in his models, despite its correlation with race, as follows: "Professor Card argues that the personal rating variable should be included, and thereby implicitly contends that **race correlates with personal qualities that affect personal ratings**, but that race does not itself affect the personal ratings assigned

---

[4] African-Americans consistently receive the highest personal scores, followed by Hispanics, then whites, then Asians. *Id.*

[5] The court largely sided with Professor Card on several other disputed issues. Add. 75.

by admissions officers." Add. 63 (emphasis added). And what are these "personal qualities" that correlate with race, and, more specifically, negatively correlate with being Asian? The court immediately lists some possibilities that it hastens to assure the reader are "**un**related to race": "character, leadership ability, self-confidence, grit, or other distinctive qualities that might benefit the Harvard community." Add. 64 (emphasis added). But these are essentially the exact same qualities that the court identified earlier in discussing **all** the factors that might impact the personal rating. *See supra* n. 3; Add. 20. So what then are the undisclosed "personal qualities," other than "character, leadership ability, self-confidence, grit," etc., that **do** correlate with race and in which Asian students are lacking?

The implication is strong, both in this passage and others throughout the court's decision, that there are no such mystery factors that might innocently explain the relationship between being Asian and receiving a low personal rating from the Harvard Admissions Office, and that rather the court and Professor Card are suggesting that, as SFFA puts it, "maybe the stereotypes about Asian Americans are true." Appellant's Br. 35. That is, maybe Asian students today, like the Jewish students targeted by Harvard's adoption of its holistic admissions plan in the 1920's (*see* Point III *infra*), are deficient in the "leadership" skills and "character" of a Harvard man or woman; that they are, as they have long been stereotyped, uninteresting, uncreative and one-dimensional: "quasi-robots programmed

by their parents to ace math and science tests."  Daniel Golden, *The Price of Admission: How America's Ruling Class Buys Its Way into Elite Colleges—and Who Gets Left Outside the Gates* 201; *See generally id.* 199-224 (Chapter 7: "The New Jews"); *see also* Add. 45-46 ("quiet," "bland," "flat," "not exciting" … "timid, hard-working, … inclined towards medicine and science").

The court's decision is replete with such intimations:

- OIR's finding that excluding the personal rating would result in the admission of far more Asian students may suggest that "factors correlated with Asian identity … were significantly affecting which applicants Harvard chose to admit."  Add. 33.

- Professor Card's "multidimensionality analysis" shows that whites are more likely than Asians to have "multidimensional accomplishments."  This analysis "suggests that a partial cause of the race-related disparities in admission rates … is that **Asian American applicants' disproportionate strength in academics comes at the expense of other skills and traits that Harvard values**."  Add. 57-58 (emphasis added).

- "Asian Americans are presented by guidance counselors and high school teachers as weaker in personal characteristics that Harvard values."  Add. 68.

- The model used by SFFA's expert, Professor Peter Arcidiacono, "does not include … several **factors that influence personal ratings and may correlate with race, such as** … applicants' … abilities to overcome obstacles or personal achievements that might reasonably be perceived as an indication of **leadership ability or other personal strengths**."  Add. 69-70 (emphasis added).

- "[T]he Court concludes that the majority of the disparity in the personal rating between white and Asian American applicants was more likely caused by race-affected inputs to the admissions process … or **underlying differences in the attributes that may have resulted in stronger personal ratings**."  Add. 72-73(emphasis added).

- "[T]he relationship between race and the personal rating is likely partially reflective of … characteristics that are correlated with race, and life experiences that are impacted by race." Add. 76.

- Race-neutral alternative proposed by SFFA for achieving diversity which would result in a large increase in Asian admissions "would likely lead to more students being admitted who indicated an intended concentration in engineering and fewer admitted students who intend to concentrate in the humanities." Add. 91.

- "It is possible that the self-selected group of Asian Americans that applied to Harvard … did not possess the personal qualities that Harvard is looking for at the same rate as white applicants." Add. 109.

- Though "Harvard was unwilling to overtly argue that Asian American applicants were … weaker in personal criteria, notwithstanding their stronger … academic performance … [t]he Court does not think … that … disproportionate strength of a racial group in one area necessarily implies that the same racial group should be strong in all areas." Add. 110 n. 59.

In light of these repeated insinuations, the court's awkward reassurance at the end of its opinion that it "firmly believes that Asian Americans are not inherently less personable than any other demographic group," Add. 124, has the character of Jerry Seinfeld's "Not that there's anything wrong with that."

The Supreme Court has held that "[w]e may not accept as a defense to racial discrimination the very stereotype the law condemns." *Bush v. Vera*, 517 U.S. 952, 985-986 (1996) (quoting *Powers v. Ohio*, 499 U.S. 400, 410 (1991)); *accord*, *e.g.*, *Carrera v. Ayers*, 670 F.3d 938, 950 (9th Cir. 2011). Most of these cases have

involved racially based redistricting plans or jury selection challenges.[6]    Thus while they prohibit even the benign or neutral assumption that all voters or jurors of a certain race will "think alike," *Miller v. Johnson*, 515 U.S. 900, 920 (1995), they do not, in a sense, directly support the enunciated rule that a civil rights defendant may not justify discrimination against a racial group with invidious assumptions, or "evidence," about the group's inferiority in certain areas.    Thus one might attempt to argue that these precedents are not directly on point.    Amicus submits, however, that in establishing a bright line rule barring even racial assumptions or stereotyping that are arguably not invidious they apply with even more force to those that are.    And we further submit that the only reason there is a dearth of "directly-on-point" precedents is that, before Harvard, no defendant in the modern era had invoked such an outrageous defense, and no lower court had accepted one.    This Court must not countenance it here.

---

[6] A notable exception is *Johnson v. Bd. of Regents*, 106 F. Supp. 2d 1362 (S.D. Ga. 2000), *aff'd*, 263 F.3d 1234 (11th Cir. 2001), in which the court struck down a race-conscious admissions plan "patterned on the Harvard Plan countenanced by Justice Powell in [*Regents of the Univ. of Cal. v.* ]*Bakke*[, 438 U.S. 265 (1978)]." 106 F. Supp. 2d at 1366.    The court held that the defendant university's "diversity rationale … treads upon constitutional prohibitions by relying on stereotypical beliefs about the contributions of members of particular races.    … '[Courts] may not accept as a defense to racial discrimination the very stereotype the law condemns.'" *Id.* at 1373 (quoting *Miller*, *supra*, and *Powers*, *supra*).

## POINT III

### The District Court Erred in Rejecting Historical Evidence that Harvard's "Holistic" Admissions Policies Were Instituted to Exclude Jews Who Were Stereotyped in Much the Same Way as Asians are Today

In its complaint and summary judgment motion SFFA submitted copious and indisputable historical evidence that the "holistic" admissions system which Harvard defends here was originally instituted to exclude Jewish students who were stereotyped in much the same way that Asian-Americans are today, and that there are uncanny parallels between the imposition of a de facto Jewish quota under this system in the 1920's and the Asian admission experience since the 1990's. *See*, *e.g.*, Pl's Statement of Undisputed Material Facts, ECF Doc. No. 414. Harvard moved to exclude this evidence at trial and the court allowed only "a very limited presentation of this topic." ECF Doc. No. 574.[7] In its decision the court made only two passing references to this subject (*see* Add. 46 & 54 n. 45), wholly ignoring the limited evidence that it did allow.

---

[7] The court allowed several of the documents from the summary judgment motion, J.A. 399-442, and limited questioning of Harvard officials regarding the origins of Harvard's admissions system, *see* J.A. 1666, 3370-75. In addition Harvard consented to judicial notice of a 1926 Board of Overseers recommendation that "the rules for the admission of candidates be amended to lay greater emphasis on selection based on character and fitness," and of two more recent Harvard reports acknowledging that Harvard restricted Jewish admissions at that time. J.A. 3688-90, 4945, 5401.

The court erred in excluding or ignoring this evidence because Harvard's holistic admissions plan was cited by the Supreme Court in *Bakke*, 438 U.S. at 316-18, 321-24, and *Grutter*, 539 U.S. at 335-36, as the model of an acceptable race-conscious program that does not invidiously discriminate or impose quotas, *see* Add. 96-98, and both Harvard and the district court have relied on this imprimatur in defending the plan. Harvard's Proposed Findings of Fact and Conclusions of Law (ECF Doc. No. 619) 71; Add. 112-14. But this historical evidence establishes that, in fact, the plan was the product of the most vile anti-Semitism and thus strongly supports the conclusion that it now cloaks similar anti-Asian prejudice.

This history was summarized by author Ron Unz in an exhaustive 2012 study of the racial composition of Harvard and other elite schools since 1980 (J.A. 4158-95)[8]:

> During the 1920s, the established Northeastern Anglo-Saxon elites who then dominated the Ivy League wished to sharply curtail the rapidly growing numbers of Jewish students, but their initial attempts to impose simple numerical quotas provoked…controversy…. Therefore, **the approach subsequently taken by Harvard President A. Lawrence Lowell and his peers was to transform the admissions process from a simple objective test of academic merit into a complex and holistic**

---

[8] Ron Unz, *The Myth of American Meritocracy: How corrupt are Ivy League admissions?*, The American Conservative, Dec. 2012, at 14, http://www.theamericanconservative.com/articles/the-myth-of-american-meritocracy.

> **consideration of all aspects of each individual appli-
> cant; the resulting opacity…allow[ed] the ethnicity of
> the student body to be shaped as desired. As a conse-
> quence, university leaders could honestly deny the
> existence of any racial or religious quotas, while still
> managing to reduce Jewish enrollment** to a much
> lower level, and thereafter hold it almost constant during
> the decades which followed.   [T]he Jewish portion of
> Harvard's entering class dropped from nearly 30 percent
> in 1925 to 15 percent the following year and remained
> roughly static until the period of the Second World War.

J.A. 4160 (emphasis added; footnotes omitted).

The anti-Semitism that gave rise to this is eye-popping.   *See generally* Jerome Karabel, *The Chosen: The Hidden History of Admission and Exclusion at Harvard, Yale and Princeton* 1-109 (2005); Alan M. Dershowitz & Laura Hanft, *Affirmative Action and the Harvard College Diversity Discretion Model: Paradigm or Pretext?*, 1 Cardozo L. Rev. 379 (1979).   The following discussion draws heavily on these sources to set out this history.

Prior to the early 1920's admission to Harvard and other Ivy League schools was based almost entirely on grades and an entrance examination.  Essays and per-sonal interviews were not required, and there was relatively little consideration of extracurricular activities or of the kind of subjective "character" traits and "leader-ship skills" included in today's amorphous personal rating.  While the admission criteria were objective, until about the turn of the century they were not particu-larly demanding, in keeping with the Ivy League reputation as a place for the social

rather than the intellectual elite.  Beginning in the 1890's, however, Harvard began to make its requirements more academically rigorous, just as increasing numbers of Jewish immigrants whose culture emphasized academics were arriving in America, and Jews began to comprise a growing share of the student population. Harvard was already 7 percent Jewish by 1900, a figure which increased to 10% in 1909, 15% in 1914 and 21.5% in 1922.

This trend did not sit well with many of Harvard's officials and alumni.  As early as 1907 the dean of financial aid expressed his preference for "sons of families that have been American for generations" rather than the "increasing class [of] foreigners, and especially the Russian Jews."  Some twenty years later, as Jewish enrollment reached its peak, a member of the Class of 1901 wrote to President Lowell after attending the Harvard-Yale game that "to find that one's University had become so Hebrewized was a fearful shock.  There were Jews to the right of me, Jews to the left of me."  Bemoaning that "[t]he Jew is undoubtedly of high mental order" and that therefore raising academic standards only increases their number, the anguished alum beseeched Lowell to "devise a way to bring Harvard back to the position it always held as a 'white man's' college."  ECF Doc. No. 245.

These concerns found a sympathetic ear in Lowell, who responded that he "had foreseen the peril of having too large of a number of an alien race and had tried to prevent it."  ECF Doc. No. 246.  Indeed he had.  Lowell first warned of the

"Jewish problem" in a 1920 letter expressing fear that the rising tide of Jews would "ruin the college" and suggesting a 15% cap on their enrollment.  In 1922 he formally proposed such a quota to the faculty, which rejected it but instead adopted a geographic diversity plan in an attempt to limit the enrollment of students from Jewish areas.

The geographic diversity effort did not work and the Jewish numbers continued to increase, reaching 27.6% in 1925.  At that point Lowell, rather than renewing the battle for an express Jewish quota, proposed the imposition of a de facto one by the institution of highly discretionary admissions criteria emphasizing subjective measures of "character and personality" rather than exam scores.  "To prevent a dangerous increase in the proportion of Jews," he wrote to the Admissions Committee, "I know at present only one way which is at the same time straightforward and effective, and that is a selection by a personal estimate of character."  Lowell was quite candid that "a very large proportion of the less desirable, upon this basis, are . . . the Jews."

This proposal was adopted by the faculty, with the chairman of the Admissions Committee stating in language strikingly akin to that used by Harvard in this case:

> If there should result…any substantial change in the proportion of groups in the College…, this will be due, not to race discrimination or any quota system, but to the

> failure of particular individuals to possess…those evidences of character [and] personality…which …render them more fit than other individuals to receive all that Harvard has to offer. … It will be said that Harvard is discriminating on grounds of race.  That will not be true.

J.A. 439.

The impact of the holistic policy was immediate and drastic.  The percentage of Jews in Harvard's freshman class plummeted from over 27% in 1925 to just 15% in 1926, and remained virtually unchanged at about that level until the 1940's.  During this time Harvard buttressed this quota by reinforcing the holistic elements of its admissions system, for the first time requiring candidates to submit personal essays and descriptions of their extracurricular activities in an attempt to further emphasize "leadership" skills and "character."  Jewish numbers at Harvard did not begin to rebound until after World War II, but even as late as 1952 an Admissions Committee report expressed concern that the impression that Harvard was "dominated by Jews" might cause a loss of "students from upper-income, business backgrounds."

Comparing the experience of Jewish students of that era and Asian students over the last several decades under Harvard's holistic admissions plan, Unz observed that the Asian experience "exactly replicates the historical pattern … in which Jewish enrollment rose very rapidly, leading to imposition of an informal quota system, after which the number of Jews fell substantially, and thereafter

remained roughly constant for decades." J.A. 4162. This is starkly illustrated in the chart below comparing Harvard's Jewish enrollment for the period from 1908 to 1942 with its Asian enrollment for the corresponding period from 1976 to 2010:



Dennis Saffran, *Fewer Asians Need Apply*, City J., Winter 2016, at 38, 43.[9]

This stunning parallel and the consistently low personal ratings given to Asian-American applicants make clear that, just as it did with the Jews eighty years ago, Harvard now deems another upstart, achievement-oriented minority that

---

[9] https://www.city-journal.org/html/fewer-asians-need-apply-14180.html.

has been too successful under the old academic standards to be deficient in the highly subjective and discretionary "personal estimate of character" favored by President Lowell.

The Supreme Court has ruled that the "historical background" of a challenged action is an important consideration in a civil rights case, even when examining a policy such as a zoning code that is racially "neutral on its face," and that the "administrative history may be highly relevant, **especially where there are contemporary statements by members of the decisionmaking body**" indicating invidious intent. *Vill. of Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252, 267, 266, 268 (1977) (emphasis added). The present case involves not a facially neutral policy like the zoning ordinance in *Arlington Heights*, but an expressly race conscious one, and thus the substantive standard is that articulated in *Grutter*, 539 U.S. at 333, and *City of Richmond v. J. A. Croson Co.*, 488 U. S. 469, 493 (1989): that to survive strict scrutiny there must be "little or no possibility that the motive for the [policy] was illegitimate racial prejudice or stereotype." Here the contemporary statements of President Lowell and other Harvard officials in devising and instituting the holistic admissions policy offer damning proof that it was, and the court should have considered this proof.

## <u>CONCLUSION</u>

The Order and Judgment Below Should be Reversed

Dated: February 25, 2020          Respectfully submitted,

                                             Dennis J. Saffran
                                             38-18 West Drive
                                             Douglaston, NY 11363
                                             718-428-7156
                                             djsaffranlaw@gmail.com

/s/ Dwight Duncan
Dwight Duncan
*Counsel of Record*
First Circuit Bar No. 36470
333 Faunce Corner Road
Dartmouth, MA 02747-1252
508-985-1124
dduncan@umassd.edu

*Attorneys for Amicus Curiae*
   *National Association of Scholars*

**Certificate of Compliance Pursuant to Rule 32(g)(1)**

1. This amicus brief complies with the word and type volume limits of Fed. R. App. P. 29(a)(5) and Fed. R. App. P. 32(a)(7)(B)(i) because, excluding the parts exempted by Fed. R. App. P. 32(f), it contains 5,243 words.

2. The brief also complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because it has been prepared in a proportionally spaced typeface using Microsoft Word in 14-point Times New Roman type.

/s/ Dwight Duncan
*Counsel of Record for Amicus Curiae*
  *National Association of Scholars*

Dated: February 25, 2020

## CERTIFICATE OF SERVICE

I filed this brief on behalf of amicus National Association of Scholar via the

Court's ECF system, which will electronically notify the following:

William F. Lee
Felicia H. Ellsworth
Andrew S. Dulberg
Elizabeth Connell Mooney
Joseph H. Mueller
WILMER CUTLER PICKERING
HALE AND DORR LLP
60 State Street
Boston, MA 02109
Tel: (617) 526-6687
Fax: (617) 526-5000
william.lee@wilmerhale.com
felicia.ellsworth@wilmerhale.com
andrew.dulberg@wilmerhale.com
elizabeth.mooney@wilmerhale.com
sarah.frazier@wilmerhale.com
joseph.mueller@wilmerhale.com

Debo P. Adegbile
WILMER CUTLER PICKERING
HALE AND DORR LLP
7 World Trade Center
250 Greenwich Street
New York, NY 10007
Tel: (212) 295-6717
Fax: (212) 230-8888
debo.adegbile@wilmerhale.com

Adam K. Mortara
BARTLIT BECK LLP
54 W. Hubbard St., Ste. 300
Chicago, IL 60654
(312) 494-4469
mortara@bartlitbeck.com

Seth P. Waxman
Paul R.Q. Wolfson
Danielle Conley
Brittany Amadi
WILMER CUTLER PICKERING
HALE AND DORR LLP
1875 Pennsylvania Ave. NW
Washington, D.C. 20006
Tel: (202) 663-6800
Fax: (202) 663-6363
seth.waxman@wilmerhale.com
paul.wolfson@wilmerhale.com
danielle.conley@wilmerhale.com
brittany.amadi@wilmerhale.com
daniel.winik@wilmerhale.com

Ara B. Gershengorn
HARVARD UNIVERSITY
OFFICE OF THE GENERAL COUNSEL
1350 Massachusetts Ave, Ste 980
Cambridge, MA 02138-3826
ara_gershengorn@harvard.edu

William S. Consovoy
Thomas R. McCarthy
J. Michael Connolly
Cameron T. Norris
CONSOVOY MCCARTHY PLLC
1600 Wilson Blvd., Ste. 700
Arlington, VA 22209
(703) 243-9423
will@consovoymccarthy.com

John M. Hughes
Bᴀʀᴛʟɪᴛ Bᴇᴄᴋ LLP
1801 Wewatta St., Ste. 1200
Denver, CO 80202
(303) 592-3140
john.hughes@bartlitbeck.com

Patrick Strawbridge
Cᴏɴꜱᴏᴠᴏʏ Mᴄᴄᴀʀᴛʜʏ PLLC
10 Post Office Sq., 8th Fl., PMB #706
Boston, MA 02109
(617) 227-0548
patrick@consovoymccarthy.com


Dated: February 25, 2020                    *s/ Dwight G. Duncan*