No. 19-2005

# IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIRST CIRCUIT

### STUDENTS FOR FAIR ADMISSIONS, INC,

*Plaintiff-Appellant,*

v.

### THE PRESIDENT AND FELLOWS OF HARVARD COLLEGE,

*Defendant-Appellee.*

### On Appeal from the United States District Court
### for the District of Massachusetts

### BRIEF OF *AMICI CURIAE*, THE ASIAN AMERICAN COALITION FOR EDUCATION, AND THE ASIAN AMERICAN LEGAL FOUNDATION, IN SUPPORT OF *PLAINTIFF-APPELLANT*, SEEKING REVERSAL

Lee C. Cheng
Asian American Legal Foundation
11 Malta Street
San Francisco, CA 94131
Tel: (510) 238-9610
Fax: (510) 473-0603

Gordon M. Fauth, Jr.*
Litigation Law Group
1935 Addison Street, Suite A
Berkeley, CA 94704
Tel: (510) 238-9610
Fax: (510) 473-0603

*Attorneys for Amici Curiae*

i

## Rule 26.1 Disclosure Statements

*Amicus Curiae,* Asian American Coalition for Education is a nonprofit national organization, and not a corporation  It has no parent corporation and no stock

*Amicus Curiae,* Asian American Legal Foundation is a nonprofit corporation organized under the laws of California.  It has no parent corporation and no publically held corporation owns 10% or more of its stock.

## Statement Of Party Consent To Filing Of
## Amici Curiae Brief

Both Parties to the Appeal have expressly consented to the filing of this brief by *Amici Curiae pursuant to* Fed. R. App. P. 29(a)(2)

## Rule 29 Statement

No party's counsel authored this brief in whole or in part; no party or party's counsel contributed money that was intended to fund preparing or submitting this brief; and no person, other than amici curiae, their members, or their counsel, contributed money that was intended to fund preparing or submitting this brief.

Date:  February 25, 2020          /s Gordon M. Fauth, Jr.

## TABLE OF CONTENTS

I.    The Interest of Amici Curiae ...........................................................1

II.   Summary of Argument ...................................................................2

III.  THERE IS OVERWHELMING EVIDENCE THAT HARVARD
      MAINTAINS A DE FACTO QUOTA FOR ASIANS BY ASSIGNING
      ASIAN AMERICAN APPLICANTS LOWER "PERSONAL" RATINGS. .5

      A.    Asian-American Applicants Are Given "Personal" Scores Significant
            Lower Than Applicants of Other Ethnicities .......................................5

      B.    The Low Personal Ratings Given Asian American Applicants Are
            Baseless And Insulting, And Are Contradicted by the Assessments of
            Harvard's Own Alumni Interviewers. ...................................................8

      C.    Asian American Applicants Are The Most Discriminated-Against
            Racial Group at Harvard .......................................................................9

IV.   THE DISTRICT COURT FAILED TO APPLY STRICT SCRUTINY
      PROPERLY AND WITH THE NECESSARY "SKEPTICISM" WHEN IT
      EXAMINED HARVARD'S ADMISSIONS PROGRAM ..........................10

      A.    The District Court Improperly Deferred to Harvard's Assurances That
            It Did Not Discriminate Against Asian Americans ...........................10

      B.    Harvard Failed To Show That Race-Neutral Alternatives Would Not
            Suffice ..............................................................................................12

V.    THE INJURY CAUSED BY HARVARD'S DISCRIMINATION
      AGAINST ASIAN-AMERICAN APPLICANTS .......................................13

      A.    The Burden Of Harvard's "Handicapping" of Asian Americans Falls
            Heaviest on Those Individuals Least Able to Bear It ........................13

      B.    Imposing Higher Admissions Standards On Asian-American Children
            Leads To Unbearable Study Loads, Stress, Depression. and Other
            Psychological Harm ..........................................................................14

iii

C.    The Terrible Effect on the Dignity and Self Worth of Asian Americans Who Know They Will Be Subjected To Unequal Treatment if They Are Seen as Asian ................................................15

VI.    HARVARD IS PROMOTING THE SAME REPELLANT STEREOTYPES HISTORICALLY USED TO JUSTIFY DISCRIMINATION AGAINST ASIAN AMERICANS ..................................................................................18

A.    Persecution of Asian Americans as Members of a Faceless Group Was the Norm Throughout Most of American History ..............................18

B.    The History of Discrimination Against Asian Americans in Education.

C.    The Chinese Exclusion Act ...................................................................22

D.    Internment of Japanese-Americans .......................................................23

VII.    ASIAN AMERICANS' CONTINUING BATTLE AGAINST DISCRIMINATION TODAY ..........................................................................24

A.    The Ongoing Battle Against Discrimination in Education ................24

B.    Ongoing Efforts to Legalize Racism Nationwide ..............................26

VIII.    THIS COURT SHOULD FIND THAT HARVARD MAY NOT USE RACE..................................................................................................................27

A.    Harvard's Race-Balancing Program Is Different From the Narrow Uses of Race Allowed by the Supreme Court....................................27

B.    The Court Should Find Harvard's Treatment of Asian Americans Unlawful...............................................................................................29

IX.    CONCLUSION............................................................................................30

# TABLE OF AUTHORITIES

## CASES

Page

### Federal

*Adarand Constructors, Inc. v. Pena,* 515 U.S. 200 (1995) ...............10, 29, 30

*Brown v. Board of Education*, 347 U.S. 483 (1954) ...............................*22, 30*

*Fisher v. Univ. of Tex. at Austin,* 133 S. Ct. 2411 (2013) .......................11, 12

*Fisher v. Univ. of Tex. at Austin*, 136 S. Ct. 2198 (2016) ........................27,28

*Fla. Ch. of the Associated Gen. Contractors v. City of Jacksonville,*
      508 U.S. 656 (1993) ..................................................................................13

*Gong Lum v. Rice*,
      275 U.S. 78 (1927) ...................................................................................21

*Gratz v. Bollinger,* 539 U.S. 244 (2003) ......................................................28

*Hirabayashi v. United States*,
      320 U.S. 81 (1943) ...................................................................................23

*Hirabayashi v. United States*,
      828 F. 2d 591 (9th Cir. 1987) ..................................................................23

*Ho Ah Kow v. Nunan*,
      12 F. Cal. 252 (C.C.D. Cal. 1879) ...........................................................19

*Ho v. San Francisco Unified Sch. Dist.*,
      147 F. 3d 854 (1998) ........................................................................2, 21, 24

*In re Ah Chong*,
      2 F. 733 (C.C.D. Cal. 1880) ....................................................................19

*In re Lee Sing*,
      43 F. 359 (C.C.D. Cal. 1890) ..................................................................20

*In re Tiburcio Parrott*,
    1 F. 481 (C.C.D. Cal. 1880) ....................................................................20

*Korematsu v. United States*,
    584 F. Supp. 1406 (N.D. Cal. 1984)........................................................23

*Lee v. Johnson*,
    404 U.S. 1215 (1971) ..............................................................................22

*Parents Inv. In Comm. Sch. v. Seattle School No. 1*,
    551 U.S. 701, 127 S. Ct. 2738 (2007) .......................................................7

*Plessy v. Ferguson*,
    163 U.S. 537 (1896) ................................................................................21

*Regents of the Univ. of Calif. v. Bakke*, 438 U.S. 265 (1978) .......................28

*Rice v. Cayetano*,
    528 U.S. 495 (2000) ..................................................................................7

*Richmond v. Croson*,
    488 U.S. 469 (1989) .................................................................11, 15, 29

San Francisco NAACP v. San Francisco Unified. Sch. Dist., 59 F.
    Supp. 2d 1021 (1999) ..............................................................................24

*Students for Fair Admissions, Inc. v. Harvard Corp.,* 397 F. Supp. 3d
    126 (2019).........................................................................................*Passim*

*United States v. Wong Kim Ark*,
    169 U.S. 649 (1898) ................................................................................20

*Wong Him v. Callahan*,
    119 F. 381 (C.C.N.D. Cal. 1902) ...........................................................21

*Yick Wo v. Hopkins*,
    118 U.S. 356 (1886) ................................................................................20

**State**

*People v. Hall*,
   4 Cal. 399 (1854).......................................................................19

*Tape v. Hurley*,
   66 Cal. 473, 6 P. 12 (1885)......................................................21

### CONSTITUTION, STATUTES, AND LEGISLATIVE MATERIALS

18 U.S.C. § 97a...........................................................................23

Cal. Const. Art. I § 31(a) ...........................................................24

United States Constitution, 14th Amendment .....................*Passim*

### TRIAL RECORD AND MATERIALS

Joint Appendix (JA)..............................................................*Passim*

Office of Institutional Research [Harvard], May 30 2013 Report ........*Passim*

### BOOKS

McClain, Charles. In Search of Equality (Univ. of Cal. Press 1994) .....18, 21

Low, Victor. The Unimpressible Race (East/West Publishing Co.
   1982)......................................................................................18

Sandmeyer, Elmer Clarence. The Anti-Chinese Movement in
   California, (Univ. of Ill. Press 1991) ....................................18

### MISCELLANEOUS

A Conversation on the Nature, Effects, and Future of Affirmative
   Action in Higher Education Admissions, 17 U. Pa. J. Const. L. 683

(2015), *available at*
https://scholarship.law.upenn.edu/jcl/vol17/iss3/2 .................................8

Admission Considerations in Higher Education Among Asian
Americans, Yi-Chen (Jenny) Wu, American Psychological
Association, *available at*
http://www.apa.org/pi/oema/resources/ethnicity-health/asian-
american/article-admission.aspx .............................................................15

California Affirmative Action Revival Bill Is Dead, Kate Murphy
(San Jose Mercury News, March 18, 2014), *available at*
http://www.mercurynews.com/education/ci_25361339/california-
affirmative-action-challenge-is-dead? ....................................................26

California Senate Constitutional Amendment No. 5, *available at*
https://en.wikipedia.org/ wiki/Senate _Constitutional_
Amendment_No.5 ....................................................................................26

Chinese Immigration and the Chinese Exclusion Acts, *available at*
https://history.state.gov/milestones/1866-1898/chinese-
immigration ............................................................................................22

Free Dictionary, The, *available at*
https://idioms.thefreedictionary.com/ Chinaman%27s+chance...............18

Group Preferences and the Law, U.S. House of Representatives Sub-
Committee on the Constitution Hearings, Lee Cheng (June 1,
1995), *available at*
http://www.archive.org/stream/grouppreferences00unit/
grouppreferences00unit_djvu.txt.............................................................16

'Lopping,' 'Tips' and the 'Z-List': Bias Lawsuit Explores Harvard's
Admissions Secrets, The New York Times, July 29, 2018,
Anemona Hartocollis, Amy Harmon and Mitch Smith, found at
https://www.nytimes.com/ 2018/07/29/us/harvard-admissions-
asian-americans.html ................................................................................5

*State Sen. John Liu clashes with Richard Carranza over DOE
treatment of Asian New Yorkers*, New York Post, Feb. 11, 2020,
found at https://nypost.com/2020/02/11/state-sen-john-liu-clashes-

with-richard-carranza-over-doe-treatment-of-asian-new-yorkers/
(last visited 2/22/2020). ........................................................................27

The Founding Fathers Made Our Schools Public. We Should Keep
Them That Way, The Washington Post (Aug. 20, 2017) *available
at* https://www.washingtonpost.com/news/ made-by-
history/wp/2017/08/20/early-america-had-school-choice-the-
founders-rejected-it/?utm_term=.815adf5587ba......................................20

The Myth of American Meritocracy: How Corrupt are Ivy League
Admissions?, Ron Unz (The American Conservative, Dec. 2012),
*available at* http://www.theamericanconservative
.com/articles/the-myth-of-american-meritocracy/...........................*Passim*

Tips From the Princeton Review: Act Less Asian, Add Pics if You're
Black, Akane Otani, Bloomberg (Nov. 21, 2014), *available at*
https://www.bloomberg. com/news/articles/2014-11-21/princeton-
review-tells-asians-to-act-less-asian-and-black-students-to-attach-
photos....................................................................................................17

To Get Into Elite Colleges, Some Advised To 'Appear Less Asian,'
Bella English, The Boston Globe (June 1, 2015), *available at*
https://www.bostonglobe.com/lifestyle/2015/06/01/ college-
counselors-advise-some-asian-students-appear-less-
asian/Ew7g4JiQMiqYNQ lIwqEIuO/story.html......................................16

*Washington Voters Narrowly Reject Effort To Bring Back Affirmative
Action*, Northwest News Network (Nov. 13, 2019), *found at*
https://www.opb.org/news/article/washington-state-affirmative-
action-referendum-88-fails-results/ .........................................................27

Why Are Asian Americans Kids Killing Themselves?, George Oiao,
Plan A Magazine (Oct. 3, 2017), *available at
https://planamag.com/why-are-asian-american-kids-killing-
themselves-477a3f6ea3f2* ......................................................................14

## I.     THE INTEREST OF AMICI CURIAE.

The outcome of this appeal is of critical importance to *amici curiae* and their constituents, most of whom are Americans of Asian ethnic origin. Asian Americans have historically faced discrimination in education in this country.  In modern times, members and constituents of *amici curiae* went through admissions processes at institutions where, as at Harvard College, their Asian ethnicity was considered less desirable because it was regarded as less "diverse."  Many of them have children who may one day aspire to attend Harvard or a school with similar discriminatory admissions practices.

The Asian American Coalition for Education ("AACE") is an apolitical, non-profit, national organization devoted to promoting equal rights for Asian Americans in education and education-related activities.  The leaders of AACE and its supporting organizations are Asian-American community leaders, business leaders and, most importantly, parents. They are not professional "civil rights advocates" and do not get funding from large corporations or multibillion dollar foundations, but were forced to become civil rights advocates to expose, stop and prevent the discrimination against their children that the "professionals" ignore, downplay and facilitate.

In this *amici* filing, AACE represents the 289 Asian-American organizations listed in Exhibit A hereto.  More information on AACE can be found at

http://asianamericanforeducation.org.

The Asian American Legal Foundation ("AALF"), a non-profit organization based in San Francisco, was founded to protect and promote the civil rights of Asian Americans. AALF focuses its work on situations where Asian Americans are discriminated against for a purportedly benign purpose and where high profile groups and individuals often deny that discrimination even exists. Members of AALF were instrumental in the struggle to end discrimination against Chinese American students in the San Francisco, California public school system. *See Ho v. San Francisco Unified Sch. Dist.,* 147 F.3d 854 (1998). More information on AALF can be found at http://www.asianamericanlegal.com.

*Amici Curiae* ask this Court to hear their arguments in support of Appellant.

## II.    SUMMARY OF ARGUMENT.

*Amici Curiae* AACE and AALF are appalled by Harvard's blatant discrimination against Asian-American applicants in the college admissions process.

Harvard admits it uses race as a "plus" factor. The evidence proves it also maintains *de facto* racial quotas by giving candidates of less "desirable" races—particularly Asian Americans—lower "Personal" ratings in a covert "closed door" process. The lowered Personal rating drastically diminishes the chances of admission. As the percentage of highly-qualified Asian American applicants in the

admission pool has risen over time, Harvard has artificially depressed the Personal ratings assigned to Asian-American applicants, so as to maintain their percentage in the student body at a roughly constant level.[1]

The result is that Asian-American applicants are assigned Personal ratings significantly lower on average than the ratings assigned to applicants *of all other ethnic groups.* The only way an Asian-American candidate has any chance of admission to Harvard is to score higher than candidates of all other ethnicities on the remaining admission metrics.

The method Harvard uses to accomplish its racial balancing is particularly troubling. The Personal rating purportedly reflects the candidate's human attributes such as "integrity, helpfulness, courage, kindness, fortitude, empathy, self-confidence, leadership ability, maturity, and grit." Assigning Asian Americans significantly lower Personal ratings falsely labels them as deficient in those qualities, and echoes the negative stereotypes that were once used to justify persecution of this historically disadvantaged group. It is also a mirror image of

---

[1] The percentage of Asian Americans applicants admitted to Harvard remained remarkably constant at slightly under 20 percent during a multi-decade period of time in which the number of Asian American applicants grew dramatically. JA5744; Ron Unz, *The Myth of American Meritocracy: How Corrupt are Ivy League Admissions?,* pgs. 17-22 (The American Conservative, Dec. 2012), *at* https://www.theamericanconservative.com/articles/the-myth-of-american-meritocracy/ (last checked 2/23/2020). Significantly, each time Harvard has been subject to a complaint or investigation, the percentage of Asian Americans admitted has increased slightly the following year.

what Harvard did in the 1920s to Jewish-American candidates to maintain a very similar quota for that ethnic group.

Throughout much of their long history in this country, Asian Americans faced discrimination rationalized through use of negative stereotypes that labeled them faceless members of a "yellow horde," lacking the values and human attributes of other Americans.   Case after case in America's history bears witness to their long struggle to obtain fair treatment.  It is thus disheartening to see Asian Americans once again subjected to negative stereotypes and discrimination—this time by one of America's most respected educational institutions.

Harvard's discrimination is also being emulated by other selective colleges. It is causing real and tangible harm throughout the nation, causing many young Asian Americans to feel a sense of inferiority, anger, and hopelessness in their academic endeavors.

Harvard's racial stereotyping and discrimination have no place in America today.  If equal protection of law is to mean something in this country, this Court should find Harvard's use of race unlawful and should reverse the judgment of the district court.

# ARGUMENT

**III.** **THERE IS OVERWHELMING EVIDENCE THAT HARVARD MAINTAINS AN UNLAWFUL *DE FACTO* QUOTA FOR ASIAN AMERICANSS BY ASSIGNING ASIAN AMERICAN APPLICANTS LOWER "PERSONAL" RATINGS.**

### A. Asian-American Applicants Are Given "Personal" Scores Significant Lower Than Applicants of Other Ethnicities.

Harvard College imposes an unconstitutional quota on Asian Americans that it maintains by assigning artificially low "Personal" ratings to applicants of this ethnicity, reducing the percentage admitted to Harvard.[2]  "The personal score is dramatically important to admissions to Harvard College."  Joint Appendix ("JA") 465.  Significantly, during a multi-decade period in which the percentage of qualified Asian Americans in the applicant pool steadily increased, the average Personal score given Asian-American applicants steadily decreased, so as to keep

---

[2] The entire Harvard admissions process is preoccupied with race. Harvard maintains racial quotas by assigning materially and obviously higher Personal scores to applicants from desired races and lower Personal ratings to those of less desired races. The final race-based adjustment occurs at the end of the process, by "lopping" applicants of disfavored races from the admit pool until it reaches its goals. *Students for Fair Admissions, Inc. v. Harvard Corp.,* 397 F. Supp. 3d 126, 144,146 (2019); JA2048:12-2049:1; JA4156; JA4011; JA4138-46. *See 'Lopping,' 'Tips' and the 'Z-List': Bias Lawsuit Explores Harvard's Admissions Secrets,* The New York Times, July 29, 2018, found at https://www.nytimes.com/ 2018/07/29/us/harvard-admissions-asian-americans.html (last visited 2/22/20). "Lopping" is typically done and controlled by the most senior, and arguably most entrenched, members of Harvard's admissions staff with little objectivity or transparency, to consistently achieve the institution's racial admission and enrollment targets.

the percentage of Asian Americans in the Harvard student body relatively constant at around 20 per cent.  JA5744.

The Personal rating (scored 1-6 with "1" being the highest) supposedly measures human attributes such as "integrity, helpfulness, courage, kindness, fortitude, empathy, self-confidence, leadership ability, maturity, and grit." *See Harvard,* 397 F. Supp. 3d at 141 (2019).[3]  Harvard's use of the Personal rating to "devalue" Asian American applicants is thus not only unconstitutional, it demeans and dehumanizes members of this ethnic group.

The court below found "a statistical difference in the personal ratings with white applicants faring better tha[n] Asian American applicants," *Harvard,* at 202. However, it improperly resolved doubts in Harvard's favor, deferring to the statements of Harvard  and its experts that there was no discrimination against Asian Americans. JA3222-3223.  The district court should have attached more significance to the fact that Asian Americans are given Personal ratings inexplicably on average significantly lower than the ratings given to applicants *of all other ethnic groups,* not just those of whites.  JA466-JA468.

The district court should have recognized that there is no non-discriminatory explanation for the fact that, as the percentage of highly-qualified Asian Americans in the applicant pool rose over time, the average Personal rating given members of

---

[3] The Personal rating is added to ratings for Academics, Extracurricular, and Athletics to produce an overall rating. *Harvard,* 397 F. Supp. 3d at 140.

6

this ethnic group declined, so as to keep the percentage of Asian Americans in the student body relatively constant. The effect of Harvard's manipulation of Personal ratings is not subtle.  <u>Fewer than 20% of applicants receive a 1 or 2, yet they represent 78% of the admitted class</u>.  JA4525; JA463-464.  For applicants in the top academic decile, the percentage of each group receiving a 1-2 Personal rating is:  Asian American 22%, White 30%, Hispanic 34%, African American 47%. JA4535; JA463-468.  The same hierarchy persists for the other deciles.  *Id.  Amici* make no claim that Asian Americans are special, but it defies logic that applicants from their community can be that deficient in character compared with white, Hispanic and African-American applicants.

Harvard's use of the Personal rating to control admissions of Asian Americans is appalling and reinforces negative stereotypes historically used to justify discrimination against this ethnic community.  Harvard "demeans the dignity and worth" of Asian Americans by judging them by ancestry instead of by their "own merit and essential qualities." *Rice v. Cayetano,* 528 U.S. 495, 517 (2000).  Harvard is also engaged in racial balancing, exactly what the Supreme Court has warned against. "We have many times over reaffirmed that '[r]acial balance is not to be achieved for its own sake.'" *Parents Inv. In Comm. Sch. v. Seattle School No. 1*, 127 S. Ct. 2738, 2757 (2007) (citing cases).

At trial, Harvard was unable to present any credible race-neutral explanation

for the discrepancy in Personal scores.

**B.    The Low Personal Ratings Given To Asian American-Applicants Are Baseless And Insulting, And Are Contradicted by the Assessments of Harvard's Own Alumni Interviewers.**

Significantly, Harvard alumni interviewers, who actually meet with most applicants in person (unlike the internal admissions staff), rate Asian-American applicants on average as high as applicants of other ethnicities in terms of character and personal attributes. *See Harvard, 397 F. Supp. 3d at 162.* That the in-person interview assessment is the correct one is supported by common sense, by Harvard's failure to provide evidence of the purportedly deficient personalities of Asian Americans, and by outside studies, such as a study of 100,000 undergraduate applicants to UCLA over three years that found "essentially no correlation" between race and personal attributes. Peter Arcidiacono, Thomas Espenshade, Stacy Hawkins & Richard Sander, *A Conversation on the Nature, Effects, and Future of Affirmative Action in Higher Education Admissions,* 17 U. Pa. J. Const. L. 683, 694-695 (2015)., *located at* https://scholarship.law.upenn.edu/ jcl/ vol17/iss3/2 (lasted visited 2/23/2020).

Harvard obviously finds the institutionalization of lower Personal ratings for Asian-American applicants an effective way to maintain a "proper" racial balance. However, because the Personal rating supposedly reflects the personal attributes of the applicant, the use of it to devalue Asian-Americans unfairly stigmatizes them

8

as racially inferior and deficient as human beings.

### C.  Asian-American Applicants Are The Most Discriminated-Against Racial Group at Harvard

Through use of the Personal rating, Harvard essentially imposes a racial hierarchy, where African Americans are the most preferred, followed by Hispanics, followed by whites, and with Asians at the bottom as the least favored and the least likely to be admitted.  JA4535; JA463-468. At trial, Harvard failed to provide any race-neutral explanation, and the district court found none, for the existence of this hierarchy or for why African Americans and Hispanics are scored so much higher in their Personal ratings than whites and Asian Americans.  *See* JA2227-2229; JA6005-06; *Harvard,* 397 F. Supp. 3d at 162.

Harvard has long been on notice of its discrimination.  In a 1990 investigation by the Department of Education's Office of Civil Rights, Harvard admissions officers admitted to using race in assigning the Personal rating. *Harvard,* 397 F. Supp. 3d at 154-55; JA4489-90.  In 2013, an internal investigation by Harvard's own Office of Institutional Research ("OIR") confirmed systematic discrimination against Asian-American applicants. JA1963-1964; JA3742-3758; *Harvard,* at 151.  Harvard did nothing to stop the discrimination.

Even when an Asian-American applicant is in a category that would normally receive preference--such as living in an underrepresented geographical area, or from a disadvantaged socioeconomic background--the applicant receives

no preference but is discriminated *against.* As the OIR investigation concluded,

"While we find that low income students clearly receive a 'tip' in the admissions

process, … we see a negative effect for Asian applicants." JA3953; JA3957;

JA1174-1177;  JA844-845.

Harvard's bias against Asian Americans extends even to outreach. When

Harvard sends letters inviting  high school students in underserved rural regions to

apply for admission, Asian Americans must score significantly higher on the PSAT

than students of other races to receive an invitation. *Harvard,* 397 F. Supp. 3d at

153-54.

*Amici Curiae* are deeply disturbed by the nature and scope of Harvard's

discrimination.

## IV.    THE DISTRICT COURT FAILED TO APPLY STRICT SCRUTINY PROPERLY AND WITH THE NECESSARY "SKEPTICISM" WHEN IT EXAMINED HARVARD'S ADMISSIONS.

### A.    The District Court Improperly Deferred to Harvard's Assurances That It Did Not Discriminate Against Asian Americans.

The district court failed to examine Harvard's admission program with the

"skepticism" demanded under strict scrutiny and improperly deferred to the

declarations of Harvard's employees and experts to resolve doubts in favor of

Harvard, the alleged racial discriminator.  In *Adarand Constructors, Inc. v. Pena,*

515 U.S. 200 (1995), the Supreme Court rejected the idea that "benign" use of race

merited lenient review, and confirmed that the first principle in examining *any* use

10

of race is "skepticism: 'Any preference based on racial or ethnic criteria must

necessarily receive a most searching examination.'" *Adarand,* at 223 (cite

omitted); *Id.* at 227-28. Otherwise, there is no way to know "what classifications

are in fact motivated by illegitimate notions of racial inferiority or simple racial

politics." *Adarand,* at 226 (quoting *Richmond v. Croson,* 488 U.S. 469, 493

(1989).)

Harvard failed in its burden, under strict scrutiny, "to demonstrate with

clarity that its purpose or interest is both constitutionally permissible . . . and that

its use of the classification is necessary . . . to . . . its purpose," and "narrowly

tailored to that goal." *Fisher v. Univ. of Tex. at Austin,* 133 S. Ct. 2411, 2418,

2420 (2013) (internal quotes and citation omitted). The evidence establishes

Harvard assigns Asian American applicants lower Personal ratings than applicants

of other races, reducing or eliminating their chances of admission. JA2257:20-

2258:11; JA6012; JA6005; JA2263:17-2264:17; JA2255:14-18; JA6011;

JA2277:15-2279:23; JA6016-6022. Harvard did not demonstrate a lawful

explanation for the lower Personal ratings; and the district court found they *might*

be due to biased admissions officers and overt discrimination. *Harvard,* 397 F.

Supp. 3d at 168, 194. Therefore, Harvard failed to meet its burden, and the district

court should have found Harvard's use of race unlawful.

11

### B. Harvard Failed To Show That Race-Neutral Alternatives Would Not Suffice.

Harvard also failed to prove that use of race was necessary to achieve diversity. "[S]trict scrutiny imposes on the university the ultimate burden of demonstrating, before turning to racial classifications, that available, workable race-neutral alternatives do not suffice." *Fisher,* 133 S. Ct. at 2420. *See Grutter v. Bollinger*, 539 U.S. 306, 339 (2003). "Workable" does not mean perfection; it means "about as well and at tolerable administrative expense." *Fisher* at 2420. In this analysis, "the University receives no deference." *Id.*

Harvard did not even consider alternatives to use of race until after this case was filed. *Harvard,* 397 F. Supp. 3d at 153. The district court improperly deferred to Harvard for the "level of diversity" required, rather than making its own inquiry, in finding that race-neutral alternatives would not suffice because they would not produce precisely the same results as Harvard's racial engineering. *Harvard,* at 179. It also ignored that there are workable race-neutral alternatives that would produce roughly comparable racial diversity and superior economic diversity. JA1491:15-1505:18; JA5983-88.

Harvard's failure to use race-neutral alternatives is particularly inexcusable given its unmatched resources, which would enable it easily to do what less well-endowed institutions have done. *See Race-Neutral Alternatives in Postsecondary*

12

*Education: Innovative Approaches to Diversity, U.S. Department of Education Office for Civil Rights,* March 2003, *found at* https://www2.ed.gov/ about/ offices/list/ocr/edlite-raceneutralreport.html (last visited 2/22/2020). Instead of discriminating by race, Harvard could have increased both racial *and* socioeconomic diversity on its campus, while positively influencing the social mobility of students of all races coming from poor and disadvantaged backgrounds. Instead, because of "racial politics," Harvard chose to use race in the first instance rather than as a last resort, and did so in a manner that degrades Asian-American applicants.

## V.     THE INJURY CAUSED BY HARVARD'S DISCRIMINATION AGAINST ASIAN-AMERICAN APPLICANTS.

### A.     The Burden Of Harvard's "Handicapping" of Asian Americans Falls Heaviest on Those Individuals Least Able to Bear It.

Perversely, the burden imposed by Harvard falls heaviest on the most disadvantaged Asian American individuals.

It would be a mistake to reason that because Asian-American applicants on average apply with higher GPAs and test scores, conditions are merely being "equalized" by Harvard's discrimination and that no one is really being "hurt." First, the constitutional injury lies in the absence of equal treatment. *Northeastern Fla. Ch. of the Associated Gen. Contractors v. City of Jacksonville,* 508 U.S. 656, 666 (1993). But here, what happens is that the best prepared, typically more

13

socioeconomically advantaged Asian-American candidates may still gain entry to Harvard in spite of the ethnic handicap and fill the "Asian" quota, precluding admission by less advantaged Asian-American candidates who are not as well prepared.  That this is indeed what is happening is shown by the 2013 OIR study, which found that, while socioeconomically disadvantaged applicants of all other races received a "tip" in the admissions process, the reverse was true for Asian-American applicants, who were less likely to gain entry. JA3953; 3957; *Harvard,* 397 F. Supp. 3d at 151 ("only demographic group for which OIR's analysis returned a negative coefficient was "Asian").

### B.    Imposing Higher Admissions Standards On Asian-American Children Leads To Unbearable Study Loads, Stress, Depression. and Other Psychological Harm.

Preparing for college is daunting for all high school students. Harvard's *de facto* higher admissions standard for Asian Americans, which is emulated by other highly selective colleges, makes the pressure even worse. Filled with despair because they have learned they will be judged by near impossible standards in the admissions process, many Asian-American students undertake overwhelming study loads, literally working themselves into ill health. They suffer high rates of anxiety and depression, and increased incidence of suicide.

"Asian American college students are 1.6 times more likely than all others to make a serious suicide attempt." George Qiao, *Why Are Asian American Kids*

*Killing Themselves?* Plan A Magazine, Oct. 3, 2017, *found at https://planamag.com/why-are-asian-american-kids-killing-themselves-477a3f6ea3f2* (last visited 2/24/2020); *see* Unz, Ron, *supra, The Myth of American Meritocracy*, at 21 ("[T]hese leading academic institutions have placed a rather strict upper limit on actual Asian enrollment, forcing these Asian students to compete more and more fiercely for a very restricted number of openings. . . .")

When Asian-American kids learn that being of Asian descent creates lawful barriers, or that they contribute "less" to the constantly promoted societal value of "diversity," they often want to deny or repudiate their ethnic heritage.

Many researchers have documented the pernicious effects that are felt throughout the Asian-American community.  *See* Yi-Chen (Jenny) Wu, *Admission Considerations in Higher Education Among Asian Americans,* American Psychological Association, *found at* https://www.apa.org/pi/oema/resources/ethnicity-health/asian-american/article-admission (last checked 2/24/2020) (citing journal articles and reports).

### C. The Terrible Effect on the Dignity and Self Worth of Asian Americans Who Know They Will Be Subjected To Unequal Treatment if They Are Seen as Asian.

Classification by race, especially for the purpose of scoring Asian-American candidates as deficient in Personal characteristics, as happens at Harvard and certain other institutions, inevitably promotes feelings of "racial inferiority" and

"racial hostility." *Croson*, 488 U.S. at 493-94.  It also leads to a regime in which it is viewed as somehow shameful to be seen as "Asian."

As Lee Cheng, Secretary of AALF, testified in hearings held by the U.S. House of Representatives, Sub-Committee on the Constitution, "Many Chinese American children have internalized their anger and pain, confused about why they are treated differently from their non-Chinese friends. Often they become ashamed of their ethnic heritage . . . " *Group Preferences and the Law*, U.S. House of Representatives Sub-Committee on the Constitution Hearings (June 1, 1995), p. 241, *found at* http://www.archive.org/stream/grouppreferences00unit/ grouppreferences00unit_djvu.txt.

College admissions consultants openly advise that being Asian American is a liability and that applicants should try to conceal their race:

> "Brian Taylor is director of Ivy Coach, a Manhattan company that advises families on how to get their students into elite colleges. . . 'While it is controversial, this is what we do,' he says. 'We will make them appear less Asian when they apply.'"
> . . .
> Chen founded Asian Advantage College Consulting . . .  "The admissions officers are seeing a bunch of people who all look alike: high test scores, high grades, many play musical instruments and tend not to engage in more physical sports like football," Chen says.  If students come to him early in high school, Chen will direct them to "switch to another musical instrument" or "play a sport a little bit out of their element." And for the college essay, don't write about your immigrant family, he tells them . . ."

Bella English, *To Get Into Elite Colleges, Some Advised To 'Appear Less Asian,'*
The Boston Globe, June 1, 2015, *found at* https://www.bostonglobe.com/lifestyle/
2015/06/01/college-counselors-advise-some-asian-students-appear-less-
asian/Ew7g4JiQMiqYNQlIwqEIuO/story.html (last visited 2/24/2020).

The Princeton Review advises Asian Americans: "If you're given an option,
don't attach a photograph to your application and don't answer the optional
question about your ethnic background. This is especially important if you don't
have an Asian-sounding surname. (By the same token, if you do have an Asian-
sounding surname but aren't Asian, do attach a photograph)." Akane Otani, *Tips
From the Princeton Review: Act Less Asian, Add Pics if You're Black,* Bloomberg,
Nov. 21, 2014, *found at* https://www.bloomberg.com/news/articles/2014-11-
21/princeton-review-tells-asians-to-act-less-asian-and-black-students-to-attach-
photos (last visited 2/23/2020).

Only Asian-American children have to avoid aspiring to be violinists or
pianists, or doctors or scientists, for fear of appearing "too Asian." Only they are
told it might be fatal to their chances to provide a photograph that reveals their
race. This cannot be right. American children should not need to feel that they will
be discriminated against in college admissions unless they hide their ethnic
heritage.

17

## VI.  HARVARD IS PROMOTING THE SAME REPELLANT STEREOTYPES HISTORICALLY USED TO JUSTIFY DISCRIMINATION AGAINST ASIAN AMERICANS.

### A.  Persecution of Asian Americans as Members of a Faceless Group Was the Norm Throughout Most of American History.

Through the method it uses to "balance" its student body, Harvard is perpetuating the same odious stereotypes historically used to justify discrimination against Asian Americans—that they are "faceless" and lack the personal qualities possessed by other Americans. *See, e.g.,* Charles McClain, *In Search of Equality* (Univ. of Cal. Press 1994); Elmer Clarence Sandmeyer, *The Anti-Chinese Movement in California* (Univ. of Ill. Press 1991); Victor Low, *The Unimpressible Race* (East/West Publishing Co. 1982).

Throughout much of American history, Asian Americans were marginalized, forced into dangerous work that nobody else wanted, and denied opportunities open to other Americans. Their treatment was so dismal it gave rise to the expression "a Chinaman's Chance," a term meaning, "Little or no chance at all; a completely hopeless prospect."  The Free Dictionary, *found at* https://idioms.thefreedictionary.com/ Chinaman%27s+chance (last visited 2/24/2020).[4]

---

[4] There are various explanations for the origin of this phrase. "One is that they were given the most dangerous jobs, such as setting and igniting explosives. Another is that judges and juries routinely convicted Chinese defendants on the

The many court cases in which Asian Americans struggled for equal treatment provide a historical record that is tragic, outrageous and impossible to refute.

In 1854, in *People v. Hall,* 4 Cal. 399, 404-05 (1854), the California Supreme Court invalidated the testimony of Chinese-American witnesses to a murder, explaining that Chinese were "a distinct people . . . whose mendacity is proverbial; a race of people whom nature has marked as inferior, and who are incapable of progress or intellectual development beyond a certain point, as their history has shown; differing in language, opinions, color, and physical conformation; between whom and ourselves nature has placed an impassable difference."

In *Ho Ah Kow v. Nunan,* 12 F. Cal. 252 (C.C.D. Cal. 1879) (No. 6,546), a district court invalidated San Francisco's infamous "Queue Ordinance" on equal protection grounds.

In *In re Ah Chong,* 2 F. 733 (C.C.D. Cal. 1880), the court found unconstitutional a law forbidding Chinese Americans from fishing in California waters.

In *In re Tiburcio Parrott,* 1 F. 481 (C.C.D. Cal. 1880), the court declared unconstitutional a provision of California's 1879 constitution that forbade

---

flimsiest of evidence. A third is that Chinese miners were allowed to work gold claims only after others had taken the best ore." *Id.*

19

corporations and municipalities from hiring Chinese Americans.

In *Yick Wo v. Hopkins,* 118 U.S. 356 (1886), the Supreme Court ruled that Chinese were "persons" under the Fourteenth Amendment and could not be singled out for unequal burden under a San Francisco laundry licensing ordinance.

In *In re Lee Sing,* 43 F. 359 (C.C.D. Cal. 1890), the court found unconstitutional the "Bingham Ordinance," which had mandated residential segregation of Chinese Americans.

In *United States v. Wong Kim Ark,* 169 U.S. 649 (1898), the Supreme Court ruled that a Chinese American boy, born in San Francisco, could not be prevented by San Francisco officials from returning to the city from a trip abroad.

These and many other cases bear witness to a struggle for equal protection that is, unfortunately, still not finished.

### B.    The History of Discrimination Against Asian Americans in Education.

After the 1776 Revolution, Americans agreed with Thomas Jefferson "that the future of the republic depended on an educated citizenry," and that universal public education should be provided to all citizens. Johann N. Neem, *The Founding Fathers Made Our Schools Public. We Should Keep Them That Way,* The Washington Post, Aug. 20, 2017, *found at* https://www.washingtonpost.com/news/made-by-history/wp/2017/08/20/early-america-had-school-choice-the-founders-rejected-it/

20

(last visited 2/23/2020). Alas, the sentiment did not extend to Asian Americans. For most of the nation's history, they have faced formidable discrimination in education.

*In Tape v. Hurley,* 66 Cal. 473, 6 P. 12 (1885), it took a court battle to force San Francisco public schools to admit a Chinese-American girl denied entry because, as stated by the State Superintendent of Public Instruction, public schools were not open to "Mongolian" children. *McClain, supra,* at 137. In response, the California legislature authorized "Chinese" schools to which Chinese-American schoolchildren were restricted until well into the twentieth century. *See Ho,* 147 F.3d at 864.

Asian-American schoolchildren were among the first targets of the "separate-but-equal" doctrine created in *Plessy v. Ferguson,* 163 U.S. 537 (1896). The Supreme Court created the doctrine in a case where a black passenger attempted to board a "white" railway car. *Id.* In *Wong Him v. Callahan,* 119 F. 381 (C.C.N.D. Cal. 1902), this doctrine was applied to schools when a court ruled that Chinese-American children in San Francisco could be barred from "white" schools because the "Chinese" school in Chinatown was "separate but equal."

In *Gong Lum v. Rice,* 275 U.S. 78 (1927), the Supreme Court affirmed that the separate-but-equal doctrine applied to schools, finding that a nine-year-old Chinese-American girl in Mississippi could be denied entry to the local "white" school because she was a member of the "yellow" race. *Id.* at 87.

Recognizing this history, in *Lee v. Johnson,* 404 U.S. 1215, 1215-16 (1971), Justice Douglas wrote that: "Historically, California statutorily provided for the establishment of separate schools for children of Chinese ancestry. That was the classic case of *de jure* segregation involved in *Brown v. Board of Education* [347 U.S. 483 (1954)]. . . *Brown v. Board of Education* [which abolished the separate-but-equal doctrine] was not written for blacks alone. It rests on the Equal Protection Clause of the Fourteenth Amendment, one of the first beneficiaries of which were the Chinese people of San Francisco."

## C.    The Chinese Exclusion Act.

In 1882, in an extraordinary attack on equal protection, Congress passed the Chinese Exclusion Act, the first national law enacted to prevent an ethnic group from immigrating to the United States. *See Chinese Immigration and the Chinese Exclusion Acts,* at https://history.state.gov/milestones/1866-1898/chinese-immigration (last visited 2/23/2020).  Fueled by anti-Chinese hysteria and supported by societal leaders of the time, it prohibited all entry of "Chinese laborers."  *Id.*  As aptly described by opponent Republican Senator George Frisbie Hoar, this Act was "nothing less than the legalization of racial discrimination." *Id.*

The Act was not repealed until 1943, when China was an ally of the United States in the war against Japan.  *Id.*

22

### D.   Internment of Japanese-Americans.

One of the most egregious modern infringements of the constitutional rights

of Asian Americans occurred during World War II when entire families of

Japanese Americans were removed from their West Coast homes and placed in

internment camps.[5]  Backed up by the statements of authorities and experts, who

solemnly declared the discriminatory measure was necessary, the internment of

Americans on American soil was allowed by the United States Supreme Court. *See*

*Hirabayashi v. United States*, 320 U.S. 81 (1943).  Only decades later was it

acknowledged there was no justification for this abrogation of constitutional rights.

*See Korematsu v. United States,* 584 F. Supp. 1406, 1416-20 (N.D. Cal. 1984)

(motivation was "racism" and "hysteria" and not "military necessity");

*Hirabayashi v. United States*, 828 F.2d 591 (9th Cir. 1987).

The lesson taught, time and again, is that courts should be wary of the

statements of luminaries and experts who line up to support racial discrimination

for purportedly benign purposes.  History has always exposed their prejudice and

ignorance.  History has exposed Harvard's shameful treatment of Jewish students

---

[5] Executive Order No. 9066, issued February 19, 1942, authorized the Secretary of War and military commanders "to prescribe military areas from which any persons may be excluded as protection against espionage and sabotage." Congress enacted § 97a of Title 18 of the United States Code, making it a crime for anyone to remain in restricted zones in violation of such orders. Military commanders then issued proclamations excluding Japanese Americans from West Coast areas and sending them to internment camps. *See Korematsu v. United States*, 584 F. Supp. 1406, 1409 (N.D. Cal. 1984).

in the early 20th century and the pernicious lies of its anti-Semitic allies. *See Harvard*, 397 F. Supp. 3d at 156; JA428-JA435.  Those who make the same mistake concerning Asian Americans in the 21st century will be judged even more harshly.

## VII.  ASIAN AMERICANS'  CONTINUING BATTLE AGAINST DISCRIMINATION TODAY .

### A.     The Ongoing Battle Against Discrimination in Education.

Asian Americans are today at the forefront of the battle to stop schools at all levels that use supposedly "benign" racial balancing or diversity programs to discriminate on the basis of race..

Late in the 20th century, a striking example of such "good-intentioned" discrimination occurred in San Francisco, where the Chinese-American community was forced to engage in five years of vigorous litigation to end the school district's policy of assigning children to the city's K-12 schools based on their race. *See Ho, supra,* 147 F.3d 854; *San Francisco NAACP v. San Francisco Unified. Sch. Dist.,* 59 F. Supp. 2d 1021 (1999).

In 1996, founding members of *amici* and their constituents worked to help pass Proposition 209, a voter initiative that added language to the California Constitution prohibiting the use of race in education. Cal. Const. Art. I § 31(a).

In 2006, Jian Li, a Chinese-American student, filed a complaint against Princeton University. In 2012, an Indian-American student filed complaints against

Harvard University and Princeton University. In 2013, Michael Wang, another

Chinese-American student, filed a complaint against Yale University and Princeton

University.

On May 15, 2015, members of *amicus* AACE united 64 Asian-American

organizations and jointly filed a civil-rights complaint against Harvard University

with the Departments of Justice and Education, alleging that Harvard engaged in

discriminatory admissions practices.

In July 2015, on behalf of his daughter, an Asian-American father in New

England filed a complaint with the Department of Education against Yale

University, Columbia University, Duke University, the University of Pennsylvania,

Brown University, Dartmouth University, Cornell University, the University of

Chicago and Amherst College.

In September 2015, on behalf of his son, another Asian-American father

filed a complaint against Harvard University.

On May 23, 2016, *amicus* AACE, representing 132 Asian-American

organizations, filed civil-rights complaints against Yale University, Brown

University and Dartmouth College.

Since 2016, three additional Asian-American students have filed civil rights

complaints against Harvard and other Ivy League Colleges.

In response to the complaints of discrimination, the Department of Justice

has launched ongoing investigations of Harvard University and Yale University for civil-rights violations, and the Department of Education is investigating Yale University for suspected violations.

**B.    Ongoing Efforts to Legalize Racism Nationwide.**

Asian Americans are active in the fight against efforts by lawmakers to limit the constitutional rights of Americans based on ethnicity.

In 2014, California's citizens of Asian descent mobilized to defeat California Senate Constitutional Amendment No.5, which would have again allowed use of race in public education. *See* https://en.wikipedia.org/wiki/Senate _Constitutional_ Amendment_No.5 (last visited 2/21/2020); Kate Murphy, *California Affirmative Action Revival Bill Is Dead* (San Jose Mercury News, March 18, 2014) *at* https://www.mercurynews.com/2014/03/17/california-affirmative-action-revival-bill-is-dead/ (last visited 2/21/2020).  Amici are presently watching with great concern legislative efforts to introduce a bill in the California House that would have the same goal of removing protections against racial discrimination from the California constitution.

In New York, Asian Americans are battling to preserve race-neutral admissions to New York City's specialized high schools, where the current administration is seeking to change admission standards so as to reduce the percentage of Asian American and white students.  *State Sen. John Liu clashes*

*with Richard Carranza over DOE treatment of Asian New Yorkers*, New York Post, Feb. 11, 2020, found at https://nypost.com/2020/02/11/state-sen-john-liu-clashes-with-richard-carranza-over-doe-treatment-of-asian-new-yorkers/ (last visited 2/22/2020).

In Washington State, Asian Americans are engaged in a decades-long struggle to preserve the Washington Civil Rights Act, which protects against discrimination based on race, ethnicity and gender in public education. In November 2019, through Referendum 88, voters stopped a legislative bill (Initiative 1000), which would have reinstituted race-based discrimination under the guise of affirmative action. *See Washington Voters Narrowly Reject Effort To Bring Back Affirmative Action*, Northwest News Network (Nov. 13, 2019), *found at* https://www.opb.org/news/article/washington-state-affirmative-action-referendum-88-fails-results/ (last visited 2/22/2020).

## VIII. THIS COURT SHOULD FIND THAT HARVARD MAY NOT USE RACE.

### A. Harvard's Race-Balancing Program Is Different From the Narrow Uses of Race Allowed by the Supreme Court.

Harvard's use of race in college admissions cannot be justified under the holdings of *Grutter v. Bollinger*, 539 U.S. 306, and *Fisher v. University of Texas at Austin*, 136 S. Ct. 2198 (2016) (*Fisher II*), where the Supreme Court allowed the

narrow use of race.[6]  In *Grutter,* the issue was *law school* admissions, where the Court recognized pedagogical and other concerns not present with colleges. *Grutter,* 539 U.S. at 332.  In the companion case of *Gratz v. Bollinger,* 539 U.S. 244 (2003), which dealt with *college* admissions, the Supreme Court *rejected* the college's use of race. *Id.* at 275.  With Harvard, as in *Gratz* and unlike in *Grutter,* it is college admissions that are at stake.

In *Fisher II,* the Court's analysis and decision concerned only the 25 per cent of students admitted to UT Austin outside of Texas' Top Ten Percent Plan, under which most students were admitted.  *Fisher II,* 136 S. Ct. at 2206.  In Harvard's case, it is the entirety of the college's admissions that are at issue. Furthermore, the 4-3 decision in *Fisher II* came in the absence of two justices and, if taken to support Harvard's program, would run counter to more than a century of Supreme Court jurisprudence.  Moreover, in both *Grutter* and *Fisher II,* the admissions plans had the end goal of attaining a "critical mass" of minority students.  The Supreme Court has held that, "all governmental use of race must

---

[6] Justice Powell's statement in *Regents of the University of California v. Bakke*, 438 U.S. 265 (1978), that diversity could rise to a compelling government interest does not constitute a holding supporting use of race in education by the Supreme Court.  The medical school admission program at issue in that case was found unconstitutional; so the statement was *dicta* expressed in an opinion ascribed to only by Justice Powell.  *See* 438 U.S. at 272, 320. It is interesting to note that Justice Powell's dicta expressly lauded Harvard College's "soft" diversity-discretion model of affirmative action, failing to consider that the Harvard Plan had anti-Semitic roots, being designed to restrict enrollment of Jewish students. JA1666:9-14; JA3688-89.

have a logical end point." *Grutter,* 539 US at 342. Harvard has not shown that it

seeks "critical mass" or that there is any end point to its use of race.

**B.    The Court Should Find Harvard's Treatment of Asian Americans Unlawful.**

Harvard's use of race cannot be justified by a claimed interest in diversity.

As the Supreme Court warns, "Classifications of citizens solely on the basis of race

are by their very nature odious to a free people whose institutions are founded

upon the doctrine of equality." *Shaw v. Reno*, 509 U. S. 630, 643 (1993).

Harvard's reckless use of the Personal rating has caused the stigmatic harm

warned against in *Croson*: "Classification based on race carry a danger of

stigmatic harm. Unless they are strictly reserved for remedial settings, they may in

fact promote notions of racial inferiority and lead to politics of racial hostility."

*Croson*, 488 U.S. at 493. Between Harvard's stigmatization of Asian Americans

and its utter failure to prove any remedial or other purpose sufficient to justify its

use of race, the Court should find Harvard's admissions program unlawful.

Harvard argues its motives are benign. Leaving aside that even

segregationists claimed benign even divine justification for the evil they

committed, the Supreme Court has soundly rejected the notion that a claim of

"benign" use of race merits more lenient treatment. *Adarand,* 515 U.S. at 226. As

Justice Thomas aptly put it, "government sponsored racial discrimination based on

benign prejudice is just as noxious as discrimination inspired by malicious

29

prejudice.  In each instance, it is racial discrimination, plain and simple." *Id. at 241* [Thomas, J., concurring].

Over 60 years ago, in *Brown v. Board of Education*, 347 U.S. 483 (1954), the Supreme Court recognized the inherent injury to individuals when schools classified students by race to enable unequal treatment. There, as here, experts and luminaries justified and defended the discrimination.  The Court rejected their rationales and found that classification of students by race was unconstitutional, whatever the stated purpose.  That same reasoning should apply here. Harvard's blatant discrimination against individuals from the Asian-American community, a historically disadvantaged group, should end now.

## IX.    CONCLUSION

The Court should find in favor of Appellant and reverse the judgment of the district court.

Date:  February 25, 2020                  Respectfully submitted,

/s Gordon M. Fauth, Jr.

Lee C. Cheng                              Gordon M. Fauth, Jr.
Asian American Legal Foundation           Litigation Law Group
11 Malta Street                           1935 Addison Street, Suite A
San Francisco, CA 94131                   Berkeley, CA 94704
Tel: (510) 238-9610                       Tel: (510) 238-9610
Fax: (510) 473-0603                       Fax: (510) 473-0603
leechcheng@gmail.com                      gmf@classlitigation.com

Counsel for *Amicus Curiae* The Asian     Counsel for *Amici Curiae* The Asian
American Legal Foundation                 American Coalition for Education and
                                          The Asian American Legal Foundation

## CERTIFICATE OF COMPLIANCE
(Rule 32(g)(1))

This amici curiae brief complies with all requirements for form.  This brief complies with the type-volume limitations of Fed. R. App. P. 29(a)(5) and Fed. R. App. P. 32(a)(7)(B)(i) because, excluding the parts exempted by Fed. R. App. P. 32(f), it contains 6,409 words.  This brief complies with the typeface requirements of Fed. R. App. P.  32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because it has been prepared using Microsoft Word in a proportionally-spaced typeface in 14-point Times New Roman type.

Date:  February 25, 2020                    /s Gordon M. Fauth, Jr.

# Exhibit A

**List of organizations represented by the Asian American Coalition for Education:**

1441 Manufactured-Home Residents Association
80-20 Initive DC Chapter
American Civil Rights Institute
America GanSu Friendship Association
American Asian Contractor Association
American Chinese Art Collector Association
American Chinese Culinary Foundation
American Chinese Medicine Association
American Coalition for Equality
American Fujian Hinhou Association
American Hindu Coalition
American Langqi Student Association
American Society of Engineers of Indian Origin-NCC
American Sports Development Committee
American WZ Education Foundation
Asian American Civic Engagement Alliance
Asian American Cohesion Foundation
Asian American Community Association
Asian American GOP Coalition
Asian American Rights Association
Asian American Women Empowerment
Asian Americans Against Affirmative Action
Asian Americans for Equal Rights
Asian Culture Alliance
Asians Not Brainwashed by Media
Asian Parents for Educational Excellence
AsianAmericanVoters.org
Association for Education Fairness
Associations for Justice
Austin Chinese Professional Association
Bay Area Homeowner Network
Beijing Association of Northen California
Boston Forward Foundation
Brookline Asian American Foundation
Brooklyn On Fun Association U.S.A.
California Association of Scholars
Cambridge Center For Chinese Culture
Carolinas Asian American Alliance
Cast Vote
CeeHuang Daoist RC
Center for Chinese Learning at Stony Brook
CHESSanity
China Rainbow Network

Chinese American Alliance
Chinese American Alliance For Trump
Chinese American Association of Bedford
Chinese American Association of Orange County
Chinese American Association of the Andovers
Chinese American Association of Tulsa
Chinese American Citizens Alliance (CACA Boston Lodge)
Chinese American Citizens Alliance-Greater San Gabriel Valley Lodge
Chinese American Civic Action Alliance
Chinese American Economic & Culture Association
Chinese American Equalization Association (HQH)
Chinese American Heritage Association
Chinese -American Nail Salon Association
Chinese American Parent Association of Howard County
Chinese American Parents Association of Montgomery County
Chinese American Pofessional Development Association
Chinese American Republicans of Massachusetts
Chinese Americans of Lexington (CALex)
Chinese Americans Sport Shooting Club
Chinese Association for Progress and Equality
Chinese Association of Northwest Arkansas
Chinese Association of Science, Education and Culture of South Forida (CASEC)
Chinese Association, Inc.
Chinese Civil Rights League, Inc.
Chinese Freemasons (NY)
Chinese Freemasons in Las Vegas
Chinese School Andover
Chinese Social Service Center
Chinese Soprts Association Brooklyn
Coalition of Asian Americans for Civil Rights
Columbus Chinese association
Confucius Foundation
Councils of Maryland Korean Churches
Dallas Fort Worth Chinese Alliance (DFWCA)
Dallas Fort Worth Political Action Committee (DFWPAC)
Denver Chinese School
Emerald Parents Association
Evergreen Chinese American Association
Excellent Chinese School
Florida Acupuncture Association
Florida Guangdong Community Federation
Flying Fox Chinese Sports Council
Fujian Business Association
Fuzhou Tingjiang Huaqiao Alumni Associated USA
Gang Chen for City Council 2018
Global Exchange Education Center

Global Minority women Empowerment Organization
Global Organization of People of India Origin (GOPIO)
Greater Boston Fudan Alumni Association
Greater Charlotte Chinese American Conservatives
Greater Miami Asian Business Coalition
Greater Orlando Chinese Professionals Association
Greater San Antonio Chinese Society of Professionals
Greater Shanghai Alliance of American
Guangxi University Alumni Association of America
HaiNan Association of America
Harrison Chinese Association
Hotel Chinese Association of USA
Houston Chinese Alliance
Houston Guangxi Association
Huaxia Chinese School of Greater New York
Huaxie Edison Chinese School
Huazhong University of Sci and Tech Alumni Association of Southern California
Hubei Association of Florida
Hubei Fellow Association of Washington Metropolitan Area
Hunan Benevolent Association of America
INDOUS  Chamber of Commerce of NE  Florida
Inland Chinese-American Alliance
International Society for Environmental Education
Jilin Jilin Fellowship Group
Korean American Association of Arkansas
Korean American Association of Austin
Korean American Association of Chicago
Korean American Association of Cleveland
Korean American Association of Flushing
Korean American Association of Huston
Korean American Association of Killeen
Korean American Association of Los Angeles
Korean American Association of Michigan
Korean American Association of Minnesota
Korean American Association of Nevada
Korean American Association of New Jersey
Korean American Association of New Mexico
Korean American Association of New Orleans
Korean American Association of Ohio
Korean American Association of Peninsula, VA
Korean American Association of Pennsylvania
Korean American Association of Richmond
Korean American Association of Texas
Korean American Association of Washington
Korean American Association of Washington Metropolitan Area
Korean American Chamber of Commerce of San Diego County

Korean American Community of Metro Detroit
Korean American Greater Philadelphia Scholarship Foundation
Korean Association of Capital Region
Korean Association of Maryland
Korean Association of San Francisco CA
Korean Association Savannah
Lawrence Chinese Christian Fellowship
Legal Immigrants for America
Livingston Chinese Association
Long Island Chinese American Association (LICAA)
Long Island School of Chinese
Maryland Chinese American Network (MD-CAN)
Massachusetts Beijing Chinese Language School
Michigan Chinese Alliance
Michigan Chinese Conservatives Alliance
Millburn Short Hills Chinese Association
Mid-Missouri Chinese Association
Minnesota Chinese Association
Montgomery County GOP Asian American Association (MCGOP-AAA)
Montgomery County Korean Association
Morris Chinese Academy
Nanjing University Alumni Association Florida Chapter
National Council of Chinese Americans (NCCA)
National Federation of Indian American Associations
National Republican Asian Assembly
New Hyde Park Chinese Association
New Jersey Double Eagle Shooting Team
New York Chinese United League
New York City Residents Alliance
New York Fushan Association Inc.
New York Hai Nan Townsmen
New York Shandong Association
Newton Alliance of Chinese Americans
New Jersey Chinese Community Center
North America Nanning Association
North American Maple Cultural Center of Florida
Northern California Chinese Culture Athletic Federation (NCCCAF)
Northern California Shaanxi Association
Northern New Jersey Huaxia Chinese School
Orange County Chinese Ladies Group
Orange County Herald Center
Orlando Chinese Association
Overseas Alumni Association of Shanghai Second Medical University (SJTUMS)
Pakistan Policy Institute
Pakistani American Volunteers
Philadelphia Tristate Chines American Association (PTCAA)

Phoenix Us-China Arts and Educatipn Exchange Center
Plano Table Tennis Club
Rotary Club of Huaren in Silicon  Valley
San Antonio Chinese American Citizens Alliance
San Diego Asian Americans For Equality
SCV Chinese School
Shangder Academy of Classical Chinese
Shanxi  Association of Silicon Valley
Silicon Valley Chinese Association Foundation
Silicon Valley Foundation for Better Environment
Silicon Valley Women Alliance
Sino -America New York Brooklyn Archway Association Corp.
South Florida Chinese Business Association
Sunshine Chinese Language and Art School
Sunshine Homes of Ohio
SVCA Foundation
Texas Guizhou Association
The American Chinese School of Great Detroit
The Chinese Nail Salon Association of East American
The Federation of World Korean Woman Assoication
The Midwest Hunan Chamber of Commerce
The Orange Club
The Shanghai Association of America, Inc.
Tingling Hign School Alumnus Association of America
TLG Family Foundation
Tri Valley Asian Association
U.S. Bei Shuang Association
US-China Friendship City Network
U.S.Min Hou General Association
US Shandong Fellowship Association
United Chinese Association of Brooklyn
United Chinese Association of Utah
United Federation of Indo Americans of California
United for a Better Community (UBC)
University of California Alumni Association
Urban United Association
US Chinese Learning Fundation
USTC Alumni Association SoCal
UTPGE Chinese Alumni Association
Venus Chinese School
Virginia Korean American Society
Washington DC Chinese Network
Washington RiZing Economics And Fintech Educational Organization
WEL Education Group
West Windsor-Plainsboro Education Support Association
Westlake Chinese Culture Association

Women's  Charity Foundation
Xi'an Jiaotong university alumni association of Northern California
Xiangtan University Alumni Association of North America
Youth American Chinese Commerce Association
Zhengyuan Culture Bridge
Allstar Institute
America Earlier Education Center LLC
Denver Chinese School
Eastern Art Academy
Hua Gen Chinese School
HuaYi Education
Ivy Prep
Lead for Future Academy
Millburn Institute of Talent
Orange international Kindergarten
Palm Beach Chinese Academy
Student Partner In Learning
Wei Bo Learning Organization
Youth Education Success
AE & LY MEDICAL ASSOCIATES, PLLC
ANJ International
Bergen Chinese Group
Bowen Capital LLC
CodingKids
D4Sue Inc
DMC DMC  Corporation
Environment Online Instruments LLC
Epoch Investment LLC
Globalhanin Yendai Inc
Global Life System Extension, Inc.
Green Bees Multicultural LLC
Harrison Station LLC
iNegotiate LLC
Jade  Springs
J-Cheng Gene LLC
J Real Estate
JYC holdings, LLC
KAJI  & ASSOCIATES
LAVA Electronics Inc.
Law Offices of Michael W. Lu, LLC
Lonma Leather LLC
Metro Star Media
New Jersey Interational Stydents Service, LLC
NJ  Chinese Media LLC
Noah Decoration LLC
Noble Tree Publishing Inc.

North Ameircan Economic Herald
Pacific Vision LLC
Preventive Medicine Institute
Project and Knowledge Concepts
Promising Analytical Consisting
Queenberry, Inc
Redwood Technique
Resources International Care of America inc
Sally's Group
Star River Inc.
The First Wang, Inc
Tift Gymnastics
V Care Home Health Services
Welcome Family Medicine, PA
Wen's Pearls
Yi-radio

## CERTIFICATE OF SERVICE

I hereby certify that I electronically filed the foregoing document with the

Clerk of the Court for the United States Court of Appeals for the First Circuit by

using the Court's appellate CM/ECF system on February 25, 2020, thereby serving

all attorneys of record and participants in the case who are registered CM/ECF

users through the appellate CM/ECF system, including:

William F. Lee
Felicia H. Ellsworth
Andrew S. Dulberg
Elizabeth Connell Mooney
Joseph H. Mueller
WILMER CUTLER PICKERING
HALE AND DORR LLP
60 State Street
Boston, MA 02109
Tel: (617) 526-6687
Fax: (617) 526-5000
william.lee@wilmerhale.com
felicia.ellsworth@wilmerhale.com
andrew.dulberg@wilmerhale.com
elizabeth.mooney@wilmerhale.com
sarah.frazier@wilmerhale.com
joseph.mueller@wilmerhale.com

Debo P. Adegbile
WILMER CUTLER PICKERING
HALE AND DORR LLP
7 World Trade Center
250 Greenwich Street
New York, NY 10007
Tel: (212) 295-6717
Fax: (212) 230-8888
debo.adegbile@wilmerhale.com

Seth P. Waxman
Paul R.Q. Wolfson
Danielle Conley
Brittany Amadi
WILMER CUTLER PICKERING
HALE AND DORR LLP
1875 Pennsylvania Ave. NW
Washington, D.C. 20006
Tel: (202) 663-6800
Fax: (202) 663-6363
seth.waxman@wilmerhale.com
paul.wolfson@wilmerhale.com
danielle.conley@wilmerhale.com
brittany.amadi@wilmerhale.com
daniel.winik@wilmerhale.com

Ara B. Gershengorn
HARVARD UNIVERSITY
OFFICE OF THE GENERAL
COUNSEL
1350 Massachusetts Ave, Ste 980
Cambridge, MA 02138-3826
ara_gershengorn@harvard.edu

Adam K. Mortara
BARTLIT BECK LLP
54 W. Hubbard St., Ste. 300
Chicago, IL 60654
(312) 494-4469
mortara@bartlitbeck.com

john.hug John M. Hughes
BARTLIT BECK LLP
1801 Wewatta St., Ste. 1200
Denver, CO 80202
(303) 592-3140
hes@bartlitbeck.com

William S. Consovoy
Thomas R. McCarthy
J. Michael Connolly
Cameron T. Norris
CONSOVOY MCCARTHY PLLC
1600 Wilson Blvd., Ste. 700
Arlington, VA 22209
(703) 243-9423
will@consovoymccarthy.com

Patrick Strawbridge
CONSOVOY MCCARTHY PLLC
10 Post Office Sq., 8th Fl., PMB #706
Boston, MA 02109
(617) 227-0548
patrick@consovoymccarthy.com

Date: February 25, 2020          Signed: /s/ Gordon M. Fauth, Jr.
                                         Gordon M. Fauth, Jr.