No. 19-2005
————————————————

## UNITED STATES COURT OF APPEALS
## FOR THE FIRST CIRCUIT
————————————————

STUDENTS FOR FAIR ADMISSIONS, INC.,

Plaintiff–Appellant,

v.

PRESIDENT AND FELLOWS OF HARVARD COLLEGE,

Defendant–Appellee,

and

THE HONORABLE AND REVEREND THE BOARD OF OVERSEERS,

Defendant.
————————————————————————

On Appeal from the United States District Court
for the District of Massachusetts, Boston
Before the Honorable Allison D. Burroughs, District Judge
————————————————————————

## AMICUS BRIEF OF PACIFIC LEGAL FOUNDATION,
## REASON FOUNDATION, CENTER FOR EQUAL OPPORTUNITY,
## INDIVIDUAL RIGHTS FOUNDATION, AND THE CHINESE
## AMERICAN CITIZENS ALLIANCE – GREATER NEW YORK
## IN SUPPORT OF PLAINTIFF–APPELLANT STUDENTS
## FOR FAIR ADMISSIONS, INC. AND REVERSAL
————————————————————————

JOSHUA P. THOMPSON
First Circuit Bar No. 1190963
E-mail: JThompson@pacificlegal.org
WENCONG FA
First Circuit Bar No. 1190964
E-mail: WFa@pacificlegal.org
Pacific Legal Foundation
930 G Street
Sacramento, California 95814
Telephone: (916) 419-7111
Facsimile: (916) 419-7747

*Attorneys for Amici Curiae*
*Pacific Legal Foundation, et al.*

## CORPORATE DISCLOSURE STATEMENT

Pursuant to Federal Rule of Appellate Procedure 26.1, Amici state that there is no parent corporation or any publicly held corporation that owns ten percent or more of its stock.

Pacific Legal Foundation, Reason Foundation, and the Individual Rights Foundation are nonprofit organizations organized under the laws of California. None of these organizations have parent companies, subsidiaries, or affiliates that have issued shares to the public.

Center for Equal Opportunity (CEO) is a nonprofit organization organized under the laws of Virginia. CEO has no parent companies, subsidiaries, or affiliates that have issued shares to the public.

The Chinese American Citizens Alliance–Greater New York (CACAGNY) is a 501(c)(8) organization incorporated under the laws of Delaware. CACAGNY has no parent companies, subsidiaries, or affiliates that have issued shares to the public.

# TABLE OF CONTENTS

CORPORATE DISCLOSURE STATEMENT ........................................................2

TABLE OF CONTENTS ......................................................................................3

TABLE OF AUTHORITIES ................................................................................4

IDENTITY AND INTEREST OF AMICI CURIAE .............................................6

RULE 29(a)(4)(E) STATEMENT .........................................................................8

SUMMARY OF ARGUMENT ............................................................................8

ARGUMENT .......................................................................................................12

I
THE USE OF RACIAL CLASSIFICATIONS IN COLLEGE
ADMISSIONS IMPOSE UNDENIABLE COSTS ON STUDENTS....................12

      A.    Racial Classifications Are Inherently Arbitrary...................................12

      B.    Harvard's Use of Racial Classifications in
             Admissions Perpetuates Harmful Stereotypes .....................................14

      C.    Harvard's Admissions Policy Exacerbates
             Past Discrimination Against Asians....................................................17

II
HARVARD HAS FAILED TO MEET ITS BURDEN TO DEMONSTRATE
A COMPELLING INTEREST TO JUSTIFY ITS USE OF RACE .......................18

CONCLUSION ....................................................................................................21

CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME LIMIT..................22

CERTIFICATE OF SERVICE FORM FOR ELECTRONIC FILINGS ...............23

# TABLE OF AUTHORITIES

**Page(s)**

## <u>Cases</u>

*Adarand Constructors, Inc. v. Pena*, 515 U.S. 200 (1995) ..................................6, 10

*Brown v. Bd. of Educ. of Topeka, Shawnee Cnty., Kan.*,
347 U.S. 483 (1954)...................................................................................17

*City of Richmond v. J.A. Croson Co.*, 488 U.S. 469 (1989) ..........................6, 11, 19

*E.E.O.C. v. Kaplan Higher Educ. Corp.*, 748 F.3d 749 (6th Cir. 2014) .................14

*Fisher v. Univ. of Texas at Austin*,
136 S. Ct. 2198 (2016) (*Fisher II*) ...............................................6, 8, 10

*Fisher v. Univ. of Texas at Austin*,
570 U.S. 297 (2013) (*Fisher* I) ............................................6, 8, 13, 19

*Fullilove v. Klutznick*, 448 U.S. 448 (1980) ............................................................10

*Gong Lum v. Rice*, 275 U.S. 78 (1927)....................................................................17

*Gratz v. Bollinger*, 539 U.S. 244 (2003).............................................................6, 11

*Grutter v. Bollinger*, 539 U.S. 306 (2003).........................................7-8, 11, 18-20

*League of United Latin Am. Citizens v. Perry*, 548 U.S. 399 (2006) .....................14

*Metro Broadcasting, Inc. v. FCC*, 497 U.S. 547 (1990).........................................18

*Miller v. Johnson*, 515 U.S. 900 (1995)........................................................8, 12, 14

*Parents Involved in Cmty. Schs. v. Seattle Sch. Dist. No. 1*,
551 U.S. 701 (2007)........................................................................... 6-8, 12

*People v. Hall*, 4 Cal. 399 (Cal. 1854)...............................................................10, 17

*Plessy v. Ferguson*, 163 U.S. 537 (1896) ......................................................... 17-18

*Regents of the Univ. of Cal. v. Bakke*,
438 U.S. 265 (1978)......................................................................... 6, 11, 19-20

*Ricci v. DeStefano*, 557 U.S. 557 (2009) ............................................................. 7-8

**Statutes**

1913 Cal. Stat. 113 ................................................................................17

Chinese Exclusion Act, Law of May 6, 1882,
   Ch. 126, 22 Stat. 58 (repealed 1943) ...............................................17

Immigration Act of 1924, Ch. 190, 43 Stat. 153 (repealed 1952) ..........................17

**Miscellaneous**

Arcidiacono, Peter, et al., *A Conversation on the Nature, Effects, and
   Future of Affirmative Action in Higher Education Admissions*,
   17 U. Pa. J. Const. L. 683 (Feb. 2015) ..............................................15

Exec. Order No. 589 (1907)................................................................17

Nagai, Althea, *Harvard Investigates Harvard: "Does the Admissions Process
   Disadvantage Asians?,"* Center for Equal Opportunity, Aug. 30, 2018............15

Nagai, Althea, *Too Many Asian Americans: Affirmative Discrimination in Elite
   College Admissions*, Center for Equal Opportunity, May 22, 2018,
   http://www.ceousa.org/attachments/article/1209/AN.Too%20Many%20
   AsianAms.Final.pdf ..........................................................16

Pager, Sean A., *Antisubordination of Whom? What India's Answer
   Tells Us About the Meaning of Equality in Affirmative Action*,
   41 U.C. Davis L. Rev. 289 (Nov. 2007)..............................................13

Princeton Review, *Cracking College Admissions* (2d ed. 2004)......................10, 16

Pub. Util. Comm'n of Cal., Gen. Order 156 (May 30, 1988)..................................14

United Nations, *Population*, https://www.un.org/en/sections/issues-
   depth/population/index.html ...............................................................9

Wood, Peter, *Diversity: The Invention of a Concept* (2003) ..............................9, 13

## IDENTITY AND INTEREST OF AMICI CURIAE[1]

Founded in 1973, Pacific Legal Foundation (PLF) is a nonprofit legal foundation that defends the principles of liberty and limited government, including equality before the law. For over 40 years, PLF has litigated in support of the rights of individuals to be free of racial discrimination. PLF is currently litigating to vindicate the equal protection rights of children in Connecticut and New York. PLF has also participated as amicus curiae in nearly every major Supreme Court case involving racial classifications in the past three decades, including *Fisher v. Univ. of Texas at Austin*, 570 U.S. 297 (2013) (*Fisher* I); *Fisher v. Univ. of Texas at Austin*, 136 S. Ct. 2198 (2016) (*Fisher II*); *Parents Involved in Cmty. Schs. v. Seattle Sch. Dist. No. 1*, 551 U.S. 701 (2007); *Gratz v. Bollinger*, 539 U.S. 244 (2003); *Adarand Constructors, Inc. v. Pena*, 515 U.S. 200 (1995); *City of Richmond v. J.A. Croson Co.*, 488 U.S. 469 (1989); and *Regents of the Univ. of Cal. v. Bakke*, 438 U.S. 265 (1978).

The Center for Equal Opportunity (CEO) is a research and education organization formed pursuant to Section 501(c)(3) of the Internal Revenue Code and devoted to issues of race and ethnicity. Its fundamental vision is straightforward: America has always been a multiethnic and multiracial nation, and it is becoming even more so. This makes it imperative that our national policies do not divide our

---

[1] All parties to this appeal have consented to the filing of this *amicus curiae* brief.

people according to skin color and national origin. Rather, these policies should emphasize and nurture the principles that unify us. *E pluribus unum*: out of many, one. CEO supports colorblind policies and seeks to block the expansion of racial preferences in all areas. CEO has participated as amicus curiae in numerous cases relevant to the analysis of this case. *See Ricci v. DeStefano*, 557 U.S. 557 (2009); *Parents Involved*, 551 U.S. 701; *Grutter v. Bollinger*, 539 U.S. 306 (2003).

Reason Foundation (Reason) is a national, nonpartisan, and nonprofit public policy think tank, founded in 1978. Reason's mission is to advance a free society by applying and promoting libertarian principles and policies—including free markets, individual liberty, and the rule of law. Reason supports dynamic market-based public policies that allow and encourage individuals and voluntary institutions to flourish. Reason advances its mission by publishing *Reason* magazine, as well as commentary on its websites, and by issuing policy research reports. To further Reason's commitment to "Free Minds and Free Markets" and equality before the law, Reason selectively participates as amicus curiae in cases raising significant constitutional issues.

The Individual Rights Foundation (IRF) was founded in 1993 and is the legal arm of the David Horowitz Freedom Center. The IRF is dedicated to supporting free speech, associational rights, and equality of rights. To further these goals, the IRF has filed amicus curiae briefs in cases involving fundamental equal protection issues,

including *Fisher I*, 570 U.S. at 297; *Fisher II*, 136 S. Ct. at 2198; *Ricci*, 557 U.S. at 557, and *Grutter*, 539 U.S. at 306

The Chinese American Citizens Alliance–Greater New York (CACAGNY) is a chapter of the Chinese American Citizens Alliance, the oldest Asian American Advocacy group in the country. CACAGNY's mission is to empower Chinese Americans, as citizens of the United States of America, by advocating for Chinese-American interests based on the principles of fairness and equal opportunity, and guided by the ideals of patriotism, civility, dedication to family and culture, and the highest ethical and moral standards.

## RULE 29(a)(4)(E) STATEMENT

No counsel for any party authored this brief in whole or in part, and no counsel or party made a monetary contribution intended to fund the preparation or submission of this brief. No person other than Amici Curiae, their members, or their counsel made a monetary contribution to its preparation or submission.

## SUMMARY OF ARGUMENT

The need for racial classifications is unclear, but "the costs are undeniable." *Parents Involved*, 551 U.S. at 745 (plurality opinion). Race-based admissions policies do not treat people as individuals, but "as simply components of a racial . . . class." *Miller v. Johnson*, 515 U.S. 900, 911 (1995) (internal quotation marks and citations omitted).

Racial classifications are inherently arbitrary. Like many universities, Harvard uses broad racial categories such as African-American, Hispanic, and Asian. ADD 103. But there is nothing intrinsic in these categories to assure a commonality of experience. The term "Hispanic," for instance, does not describe a common background, designate a common language, or even describe gross physical appearance. *See* Peter Wood, *Diversity: The Invention of a Concept* 25 (2003). The same can be said of the term "Asian," which make up roughly 60 percent of the world's population and encompasses people of Chinese, Indian, Filipino, and many more backgrounds. *See* United Nations, *Population*.[2]

Harvard's use of racial classifications perpetuates harmful stereotypes. Asian applicants were described as lacking in leadership, grit, and other factors that contributes to their low "personal ratings." ADD 20 ("Although [Harvard's] reading procedures have not historically provided detailed guidance on what qualities should be considered in assigning a personal rating, relevant qualities might include integrity, helpfulness, courage, kindness, fortitude, empathy, self-confidence, leadership ability, maturity, or grit."). These stereotypes flow beyond campus boundaries. For decades, college admissions guides like the Princeton Review have taken Harvard's race-based admissions policies into account in its guidance to aspiring high school students. One guide advises Asian students to "get involved in

---

[2] https://www.un.org/en/sections/issues-depth/population/index.html.

activities other than math club, chess club, and computer club." Princeton Review, *Cracking College Admissions*, at 175 (2d ed. 2004). It implores Asian students to avoid telling schools their race, but encourages non-Asian students with "Asian-sounding surname[s]" to "report [their] race and attach a photograph." *Id.* In all, Harvard's race-based admissions policy "can only exacerbate rather than reduce racial prejudice," and "delay the time when race will become [ ] truly irrelevant." *Adarand*, 515 U.S. at 229 (quoting *Fullilove v. Klutznick*, 448 U.S. 448, 545 (1980) (Stevens, J., dissenting)).

Harvard's discrimination against Asian American applicants prolongs a long history of discrimination against Asian Americans in the United States. Cases dating back to the 19th century have memorialized centuries of discrimination against Asian Americans. *People v. Hall*, 4 Cal. 399, 404-05 (Cal. 1854). Those cases were animated by the same kind of "unthinking stereotypes" that are prevalent today at Harvard.

Harvard has failed to meet its high burden to demonstrate a compelling interest in discriminating on the basis of race. Because Harvard expressly treats applicants differently based on their race, its admissions policy "must be analyzed by a reviewing court under strict scrutiny." *Adarand*, 515 U.S. at 227.[3] A court must

---

[3] Most of the recent Supreme Court cases involving racial discrimination have involved government discrimination on the basis of race. *See, e.g.*, *Fisher II*, 136 S. Ct. 2198. Discrimination that violates the Equal Protection Clause of the Fourteenth

apply this searching standard of review to "'smoke out' illegitimate uses of race by assuring that [Harvard] is pursuing a goal important enough to warrant use of a highly suspect tool." *Croson*, 488 U.S. at 493. To this end, the court conducts a thorough "examination of the factual basis" for the University's use of race, "and the nexus between its scope and that factual basis." *Id.* at 494-95. Although the Supreme Court has held that some deference to a university's "educational judgment that [ ] diversity is essential to its educational mission" is proper, *Grutter*, 539 U.S. at 328, it has never endorsed unqualified judicial deference to a university's assertion of a compelling interest in diversity. Here, the record indicates that Harvard failed to give "serious consideration to all the ways an applicant might contribute to a diverse educational environment," *id.* at 337, and is instead using race as a factor "for its own sake." *Bakke*, 438 U.S. at 307 (Powell, J.).

---

Amendment also violates Title VI when committed by an institution that, like Harvard, accepts federal funds. *See Gratz v. Bollinger*, 539 U.S. 244, 276 n.23 (2003)

# ARGUMENT

## I

## THE USE OF RACIAL CLASSIFICATIONS IN COLLEGE ADMISSIONS IMPOSE UNDENIABLE COSTS ON STUDENTS

### A.　Racial Classifications Are Inherently Arbitrary

"[S]tate-mandated racial label[s] [are] inconsistent with the dignity of individuals in our society." *Parents Involved*, 551 U.S. at 797 (Kennedy, J. concurring). The Constitution embodies the right of every individual to "find his own identity," and "define her own persona, without state intervention that classifies on the basis of his race or the color of her skin." *Id.* The dangers presented by racial classifications are well-presented in this case. Racial classifications require the entity making them to "first define what it means to be of a race." *Id.*

These racial definitions are crude and arbitrary. Like many universities, Harvard classifies students in broad racial groups such as white, Asian, Hispanic, and African American. APP 103. Yet members of the same racial group may have vastly different backgrounds, skills, and aspirations. The use of race in admissions policies presents the risk that Harvard evaluates applicants not as individuals but as members of a broadly defined racial group. *See Miller*, 515 U.S. at 911-12 ("Race-based assignments embody stereotypes that treat individuals as the product of their race, evaluating their thoughts and efforts—their very worth as citizens—according

12

to a criterion barred to the Government by history and the Constitution.") (internal citation and quotation marks omitted).

These broad racial categories are untenable, because there is nothing intrinsic in these categories that assures a commonality of experience. *See* Wood, *supra,* at 25. As one scholar explained, contemporary group classifications such as "black," "Asian," and "Hispanic" fail to identify any common factor inherent to individuals within those groups. *Id.* The term "Hispanic," for instance, covers people of different backgrounds. "The Mexican Americans of the southwest, the northeast's Puerto Ricans, and Florida's Cubans had rarely thought of themselves, or been thought of by others, as constituting a single group until somebody decided to lump them into a single statistical category of 'Spanish Americans.'" Sean A. Pager, *Antisubordination of Whom? What India's Answer Tells Us About the Meaning of Equality in Affirmative Action*, 41 U.C. Davis L. Rev. 289, 303-04 (Nov. 2007). The same problems plague the definition of "Asian," which includes individuals of Chinese, Indian, Japanese, Vietnamese, and other origins. *Id.* at 305.

There is no sound system for classifying on the basis of race. Many universities implement a system of self-identification. As counsel for the University of Texas in *Fisher* revealed, "[s]tudents check boxes based on their own determination" of their race. Transcript of Oral Argument at 32, *Fisher I*, 570 U.S. 297. The school's counsel added that he was unaware of any other "college in

America, the Ivy Leagues, the Little Ivy Leagues" that actually verifies a student's self-identification of her race. *See id.* at 33.

Yet a system of government verification of racial classifications fares no better. In California, minority-owned companies seeking to verify their race must provide recommendation letters from three members of that "racial community." *See* Pub. Util. Comm'n of Cal., Gen. Order 156 (May 30, 1988). In other instances, government officials scan driver's licenses to verify that an applicant is a member of a certain race. *See E.E.O.C. v. Kaplan Higher Educ. Corp.*, 748 F.3d 749, 751 (6th Cir. 2014). It is indeed a "sordid business, this divvying us by race." *League of United Latin Am. Citizens v. Perry*, 548 U.S. 399, 511 (2006) (Roberts, C.J., concurring in part and dissenting in part).

## B.    Harvard's Use of Racial Classifications in Admissions Perpetuates Harmful Stereotypes

"Race-based assignments embody stereotypes that treat individuals as the product of their race." *Miller*, 515 U.S. at 912 (citation omitted). This litigation is case in point. Harvard's admission officials assigned Asian American applicants the lowest personal ratings—a subjective assessment of whether the applicant has character traits such as "helpfulness, courage, [and] kindness," or is an "attractive person to be with," or is a "widely respected" person with good "human qualities."

SFFA's Statement of Material Facts ¶ 90.[4] Yet alumni interviewers—who actually meet the students—assigned the same applicants significantly higher personal ratings than the admissions officers. *Id.* ¶ 616. This is hardly surprising. Asian American applicants to Harvard received not just stronger academic scores, but also had higher extracurricular ratings than the rest of the applicant pool. ADD 57-62. Yet Harvard's race-based admissions policies has entrenched the incorrect stereotype that Asian American students are one-dimensional students lacking in personal attributes such as helpfulness, courage, and kindness.[5] As one Harvard admissions officer noted in an Asian-American applicant's file: "quiet and of course wants to be a doctor." JA 4498.

These pernicious stereotypes extend beyond campus. College guidebooks like the Princeton Review advise Asian American applicants to "be careful about what

---

[4] Notably, Harvard's Office of Institutional Research found that even taking personal rating into account, Asian American students should have comprised 26% of students admitted to Harvard over 10 years—higher than the 19% of Asian American students actually admitted during that period. Althea Nagai, *Harvard Investigates Harvard: "Does the Admissions Process Disadvantage Asians?,"* Center for Equal Opportunity, Aug. 30, 2018.

[5] Empirical analysis from other universities further undercut Harvard's assertions. Professor Richard Sander's analysis of the publicly available data, which covers over 100,000 applicants to University of California-Los Angeles over three years, shows that there is essentially no correlation between race and "personal achievement," as measured by admissions file readers. *See* Peter Arcidiacono et al., *A Conversation on the Nature, Effects, and Future of Affirmative Action in Higher Education Admissions*, 17 U. Pa. J. Const. L. 683, 695 (Feb. 2015). Instead, the only strong predictor of personal-achievement scores in the data was academic achievement. *Id.*

[they] say and don't say in [their] application. Princeton Review, *supra*, at 174. Asian students who aspire to attend Harvard are encouraged to take steps to "avoid being an Asian Joe Bloggs." *Id.* at 175. Asian American applicants must "distance [themselves] as much as possible from" stereotypes about Asians. *Id.* at 176. The guide implores Asian American students to disavow any aspiration of being a doctor or an engineer, and to "get involved in activities other than math club, chess club, and computer club." *Id.* at 175.

The principle of equal protection before the law embodies the promise that race will not stand in the way between an individual and her dreams. Yet Asian American students who want to attend Harvard are incentivized to forgo a career in medicine, math, and sciences—all because there happens to be "too many "Asians" in those programs. This leads to devastating consequences. As one Chinese-American student at Yale recounted, "I quit piano, viewing the instrument as a totem of my race's overeager striving in America. I opted to spend much of my time writing plays and film reviews—pursuits I genuinely did find rewarding but which I also chose so I wouldn't be pigeonholed." Althea Nagai, *Too Many Asian Americans: Affirmative Discrimination in Elite College Admissions*, Center for Equal Opportunity, May 22, 2018.[6]

---

[6] http://www.ceousa.org/attachments/article/1209/AN.Too%20Many%20AsianAms.Final.pdf.

## C.    Harvard's Admissions Policy Exacerbates Past Discrimination Against Asians

Harvard's race-based admissions policy exacerbates a long history of discrimination against Asians. American history is replete with laws banning the entry of immigrants of Asian descent. *See, e.g.*, Chinese Exclusion Act, Law of May 6, 1882, Ch. 126, 22 Stat. 58 (repealed 1943) (banning Chinese immigration); Immigration Act of 1924, Ch. 190, 43 Stat. 153 (repealed 1952) (banning Japanese immigration); Exec. Order No. 589 (1907) (banning Japanese and Korean immigration). Alien land laws in various states restricted the ability of Asian immigrants to own property. *See, e.g.*, 1913 Cal. Stat. 113. And the separate-but-equal doctrine routinely applied to Asian students, who were forbidden from going to "white" schools. *Gong Lum v. Rice*, 275 U.S. 78, 81-82 (1927).

This nation's sad history of discrimination against Asians is attributable to the "unthinking stereotypes" the Supreme Court mentioned in *Croson*. In *People v. Hall*, the California Supreme Court invalidated the testimony of Chinese witnesses. The Chinese, the court reasoned, were "people whom nature has marked as inferior, and who are incapable of progress or intellectual development beyond a certain point." 4 Cal. 399, 404-05 (Cal. 1854). In *Plessy v. Ferguson*, the Supreme Court infamously upheld the constitutionality of racial segregation under the "separate but equal" doctrine. 163 U.S. 537, 550-51 (1896), overruled by *Brown v. Bd. of Educ. of Topeka, Shawnee Cnty., Kan.*, 347 U.S. 483, 494-95 (1954). Yet even Justice

17

Harlan's much-celebrated dissent in that case contained his unfortunate views that Asians were "a race so different from our own that we do not permit those belonging to it to become citizens of the United States." *Plessy*, 163 U.S. at 561 (Harlan, J. dissenting).

In all, Harvard's use of race in admissions pits its interest in diversity against an interest in remedying past discrimination. There is a long history of past discrimination against Asians with respect to immigration, property rights, and education. Yet, because Asian American students are "overrepresented" at Harvard, the school's admissions policies harms Asian American applicants who "have not made [Harvard's] list" of favored groups. *Metro Broadcasting, Inc. v. FCC*, 497 U.S. 547, 632 (1990) (Kennedy, J., dissenting).

## II

## HARVARD HAS FAILED TO MEET ITS BURDEN TO DEMONSTRATE A COMPELLING INTEREST TO JUSTIFY ITS USE OF RACE

Judicial deference to a university's proffered interests in diversity is incompatible with strict scrutiny. Even though the Supreme Court has allowed some deference to a university's "judgment that [ ] diversity is essential to its educational mission," *Grutter*, 539 U.S. at 328, it has never accepted unqualified deference to a university's assertion of a compelling interest in diversity.

Instead, Supreme Court precedent instructs courts to make detailed findings to ensure that any interest asserted to justify the use of race is compelling enough to

do so. When the government seeks to remedy past racial discrimination, for instance, it must prove that there is a "strong basis in evidence" that the remedial actions are necessary. *Croson*, 488 U.S. at 500. This requires "[p]roper findings" that "are necessary to define both the scope of the injury and the extent of the remedy necessary to cure its effects." *Id.* at 510.

This rule is no different in the context of higher education. There, too, courts "should ensure that there is a reasoned, principled explanation for the academic decision" that its interest in diversity is compelling enough to sustain discrimination on the basis of race. *Fisher I*, 570 U.S. at 310. A university cannot simply point to *Grutter*, but must show why there are compelling educational benefits in its own instance. After all, what is true of a state law school more than 20 years ago may not be true of, say, a private university's graduate chemistry program in 2020.

Just as the Equal Protection Clause requires "judicial, legislative, or administrative findings of constitutional or statutory violations necessary to justify remedial racial classification[s]" *Bakke*, 438 U.S. at 309, Harvard must proffer compelling evidence that its interest in diversity is necessary to justify its racial classifications in admissions. Yet a "strong basis in evidence" that Harvard's interest in diversity is compelling enough to justify its use of racial classifications is plainly lacking here.

For instance, Harvard bears the burden of demonstrating that it gives "serious consideration to all the ways an applicant might contribute to a diverse educational environment." *Grutter*, 539 U.S. at 337. The record, however, reflects Harvard's intense focus on racial diversity. Indeed, the district court acknowledged that Harvard tracked the racial composition of the admitted class to ensure that racial representation did not differ dramatically from year-to-year. ADD 28-29.

By the same token, socioeconomic and geographic diversity are sorely lacking at Harvard, T6:17-18:25, and the school does not track the religious identity of applicants at all.  ADD 13 n.12. For every low-income student on campus, there are 23 students who come from wealthy families. JA 1474:16-22. In all, the evidence shows that Harvard has failed to prove that it is pursuing the type of diversity the Supreme Court endorsed in *Grutter*. Rather, it is using race as a factor "for its own sake." *Bakke*, 438 U.S. at 307 (Powell, J.).

## CONCLUSION

The judgment of the district court should be reversed.

DATED:  February 25, 2020.

Respectfully submitted,

JOSHUA P. THOMPSON
WENCONG FA

_____ s/ Wencong Fa _____
WENCONG FA

*Attorneys for Amici Curiae*
*Pacific Legal Foundation, et al.*

# CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME LIMIT

Certificate of Compliance With Type-Volume Limit,
Typeface Requirements, and Type-Style Requirements

1.    This document complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B) because, excluding the parts of the document exempted by Fed. R. App. P. 32(a)(7)(B)(iii):

[✓]    this document contains 3,362 words, **or**

[ ]    this document uses a monospaced typeface and contains __ lines of text.

2.    This document complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because:

[✓]    this document has been prepared in a proportionally spaced typeface using MicrosoftWord 2013 in 14-point Times New Roman, **or**

[ ]    this document has been prepared in a monospaced typeface using _____ with _____.

DATED:  February 25, 2020.

_____ s/ Wencong Fa_____
WENCONG FA

**CERTIFICATE OF SERVICE FORM FOR ELECTRONIC FILINGS**

I hereby certify that on February 25, 2020, I electronically filed the foregoing

document with the United States Court of Appeals for the First Circuit by using the

CM/ECF system. I certify that the following parties or their counsel of record are

registered as ECF Filers and that they will be served by the CM/ECF system:

| | | |
|---|---|---|
| Debo P. Adegbile | Ara B. Gershengorn | Cameron T. Norris |
| Brittany Amadi | John M. Hughes | Paul M. Sanford |
| Danielle Conley | William F. Lee | Patrick N. Strawbridge |
| John M. Connolly | Thomas R. McCarthy | Seth P. Waxman |
| William S. Consovoy | Elizabeth C. Mooney | Paul R.Q. Wolfson |
| Andrew S. Dulberg | Adam K. Mortara | |
| Felicia H. Ellsworth | Joseph J. Mueller | |

s/ Wencong Fa
WENCONG FA