No. 19-2005

═══════════════════════════════════════

UNITED STATES COURT OF APPEALS
FOR THE FIRST CIRCUIT

═══════════════════════════════════════

STUDENTS FOR FAIR ADMISSIONS, INC.,
*Plaintiffs – Appellants*

v.

PRESIDENT AND FELLOWS OF HARVARD COLLEGE,
*Defendants – Appellees*

_____

On Appeal from the United States District Court
for the District of Massachusetts

═══════════════════════════════════════

**_AMICUS CURIAE_ BRIEF OF JUDICIAL WATCH, INC. IN
SUPPORT OF PLAINTIFFS-APPELLANTS AND REVERSAL OF
THE DISTRICT COURT'S JUDGMENT**

═══════════════════════════════════════

T. Russell Nobile*
JUDICIAL WATCH, INC.
Post Office Box 6592
Gulfport, Mississippi 39506
(202) 527-9866
Rnobile@judicialwatch.org

Robert D. Popper*
Eric Lee*
JUDICIAL WATCH, INC.
425 Third Street SW, Suite 800
Washington, DC 20024

Timothy J. Perry
PERRY KRUMSIEK, LLP
One Boston Place, Suite 2600
Boston, MA 02108
(617) 720-4300
tperry@pkdllp.com

*  Application for admission pro hac
vice forthcoming

*Attorneys for Amicus Curiae*

## TABLE OF CONTENTS

**Page**

TABLE OF CONTENTS............................................................................i

TABLE OF AUTHORITIES ................................................................. ii

CORPORATE DISCLOSURE STATEMENT ......................................iv

RULE 29(a)(4)(E) STATEMENT ........................................................v

IDENTITY AND INTERESTS OF *AMICUS CURIAE* ...........................1

ARGUMENT ......................................................................................2

The Court Should Hold That Harvard Intentionally Discriminated
Against Asian Americans ...................................................................2

CONCLUSION...................................................................................12

CERTIFICATE OF COMPLIANCE ...................................................14

CERTIFICATE OF SERVICE ............................................................15

i

# TABLE OF AUTHORITIES

**Cases**                                                                                          **Page(s)**

*Akina v. State of Hawaii*, 835 F.3d 1003 (9th Cir. 2016) ...........................................1

*Alexander v. Louisiana*, 405 U.S. 625 (1972) ...........................................................9

*Cine SK8, Inc. v. Town of Henrietta*, 507 F.3d 778 (2d Cir. 2007).................. 10-11

*Cmtys. for Equity v. Mich. High Sch. Athletic Ass'n*,
    459 F.3d 676 (6th Cir. 2006) .............................................................................3

*Evans v. Connecticut*, 935 F. Supp. 145 (D. Conn. 1996).......................................11

*Ferrill v. Parker Grp., Inc*., 168 F.3d 468 (11th Cir. 1999) .....................................3

*Fisher v. Univ. of Tx. at Austin*, 136 S. Ct. 2198 (2016) ...........................................1

*Garza v. County of Los Angeles*, 918 F.2d 763 (9th Cir. 1990) ...........................4, 5

*Goodman v. Bowdoin Coll.*, 380 F.3d 33 (1st Cir. 2004) ......................................3, 4

*Goodman v. Lukens Steel Co*., 482 U.S. 656 (1987) .................................................2

*Hassan v. City of N.Y.*, 804 F.3d 277 (3rd Cir. 2015)................................................3

*North Carolina v. N.C. State Conf. of the NAACP*,
    137 S. Ct. 1399 (2017).......................................................................................1

*Students for Fair Admissions, Inc. v. President & Fellows of Harvard Coll.*,
    397 F. Supp. 3d 126 (D. Mass. 2019)......................................................*passim*

*Taggart v. Time, Inc.*, 924 F.2d 43 (2d Cir. 1991)...................................................11

*Tolbert v. Queens Coll.*, 242 F.3d 58 (2d Cir. 2001)............................................3, 4

*Wygant v. Jackson Bd. of Educ.*, 476 U.S. 267 (1986) ...........................................12

## Other Authorities

Ron Unz, *The Myth of American Meritocracy*, THE AMERICAN
CONSERVATIVE, Nov. 28, 2012.........................................................................8

Carolyn Chen, *Asians: Too Smart for Their Own Good?*,
NEW YORK TIMES, Dec. 19, 2012.....................................................................8

## <u>RULE 26.1 DISCLOSURE STATEMENT</u>

*Amicus* Judicial Watch, Inc., is a nonprofit corporation organized under the laws of the District of Columbia. It has no parent corporation, and no publicly held corporation owns 10% or more of its stock.

## RULE 29(a)(4)(E) STATEMENT

This brief was authored by the undersigned counsel and no party's counsel authored this brief, in whole or in part. No party or party's counsel contributed money that was intended to fund preparing or submitting this brief. Only Judicial Watch, Inc. contributed money that was intended to fund preparing or submitting this brief.

## IDENTITY AND INTERESTS OF *AMICUS CURIAE*

*Amicus* Judicial Watch, Inc. ("Judicial Watch") is a non-partisan, public interest organization headquartered in Washington, DC. Founded in 1994, Judicial Watch seeks to promote accountability, transparency and integrity in government, and fidelity to the rule of law. In furtherance of these goals, Judicial Watch files amicus curiae briefs on issues involving civil rights cases and prosecutes lawsuits on matters it believes are of public importance. *See, e.g., Akina v. State of Hawaii*, 835 F.3d 1003 (9th Cir. 2016) (representing voters challenging racially restricted state election); Brief of Amici Curiae Judicial Watch, Inc. and Allied Educational Foundation in Support of Petitioner, *Fisher v. Univ. of Tx. at Austin*, 136 S. Ct. 2198 (2016) (No. 14-981) (challenge to the use of race in college admissions); Brief of Amici Curiae Judicial Watch, Inc. and Allied Educational Foundation in Support of Petitioners, *North Carolina v. N.C. State Conf. of the NAACP*, 137 S. Ct. 1399 (2017) (No. 16-833) (Voting Rights Act challenge to state election laws).

Judicial Watch has authority to file this brief pursuant to Fed. R. App. P. 29(a)(2), because all parties have consented to its filing.

Judicial Watch advocates for reversing the trial court's judgment.

## ARGUMENT

**The Court Should Hold That Harvard Intentionally
Discriminated Against Asian Americans.**

The district court correctly held that Harvard's race-conscious admissions policies were subject to strict scrutiny. *Students for Fair Admissions, Inc. v. President & Fellows of Harvard Coll. (Harvard Corp.)*, 397 F. Supp. 3d 126, 190 (D. Mass. 2019). But the district court also ruled, incongruously, that there had been "no showing of discriminatory intent or purpose" by the plaintiff. *Id*. at 191 n.56. More specifically, in its findings of fact, the district court determined that "there is no evidence of any racial animus whatsoever or intentional discrimination on the part of Harvard *beyond its use of a race conscious admissions policy*." *Id.* at 201-02 (emphasis added).

This statement shows that the district court erred by misapprehending the nature of a claim of racial discrimination. The use of a "race conscious admissions policy" was enough both to warrant a finding of intentional discrimination and to trigger strict scrutiny. There is no requirement that one engaged in discrimination show racial "animus," that is, a reflexive dislike or adverse personal judgment based on race. *See Goodman v. Lukens Steel Co*., 482 U.S. 656, 668-69 (1987), *superseded on other grounds by statute*, 28 U.S.C. § 1658(a) (while there was "no suggestion" that "Unions held any racial animus against or denigrated blacks generally," a "policy of refusing to file grievable racial discrimination claims . . . intentionally

2

discriminated against blacks"); *Hassan v. City of N.Y.*, 804 F.3d 277, 298 (3rd Cir. 2015) ("'intentional discrimination' need not be motivated by 'ill will, enmity, or hostility' to contravene the Equal Protection Clause"), citing, *inter alia*, *Cmtys. for Equity v. Mich. High Sch. Athletic Ass'n*, 459 F.3d 676, 694 (6th Cir. 2006) (argument that there was no evidence of "sexual stereotypes" or "discriminatory purpose or intent" "appears to confuse intentional discrimination—*i.e.*, an intent to treat two groups differently—with an intent to harm") (internal quotations omitted); *Ferrill v. Parker Grp., Inc*., 168 F.3d 468, 473 & n. 7 (11th Cir. 1999) ("The crucial issue then is whether a defendant who acts with no racial animus but makes job assignments on the basis of race can be held liable for intentional discrimination under § 1981. Clearly, the answer is yes.").

The district court here erroneously ruled that, for discrimination to be "a substantial or motivating factor for admissions decisions," there must be "evidence of racial animus." *Students for Fair Admissions*, 397 F. Supp. 3d at 202 n. 62, citing *Goodman v. Bowdoin Coll*., 380 F.3d 33, 43 (1st Cir. 2004), and *Tolbert v. Queens Coll*., 242 F.3d 58, 69 (2d Cir. 2001). Neither of the cited cases stands for that proposition. *Tolbert* contains no such requirement. In *Goodman*, a student who was severely disciplined for a violent altercation with another student alleged discrimination by the hearing board. The Court did state that there was "no direct or circumstantial evidence of racial animus toward Goodman, *a necessary component*

3

*of his claims* under 42 U.S.C. § 1981, 42 U.S.C. § 2000d, and Me. Rev. Stat. Ann. tit. 5, §§ 4601-4602." 380 F.3d at 43 (emphasis added), citing *Tolbert*, 242 F.3d at 69. But the Court was clearly using "animus" as shorthand for discrimination of any kind. This broader meaning is made clear when the Court characterizes the district court as "concluding that there had been no direct or circumstantial evidence of racial animus *and that no reasonable jury could conclude that the events leading to Goodman's dismissal were motivated by racial considerations*." *Id.* at 42 (emphasis added).

A convincing demonstration of why a particular "animus," as such, is not necessary for a finding of intentional discrimination was set forth in *Garza v. County of Los Angeles*, 918 F.2d 763 (9th Cir. 1990). The court there affirmed a finding of intentional discrimination in districting in violation of the Voting Rights Act and the Fourteenth Amendment. *Id.* at 771. Concurring in the finding of liability, Judge Kozinski noted that "there is no indication that what the district court found to be intentional discrimination was based on any dislike, mistrust, hatred or bigotry against Hispanics or any other minority group. Indeed, the district court seems to have found to the contrary." *Id.* at 778 (Kozinski, J., concurring in part and dissenting in part) (citation omitted). He explained:

> The lay reader might wonder if there can be intentional discrimination without an invidious motive. Indeed there can. . . . Assume you are an anglo homeowner who lives in an all-white neighborhood. Suppose,

also, that you harbor no ill feelings toward minorities. Suppose further, however, that some of your neighbors persuade you that having an integrated neighborhood would lower property values . . . On the basis of that belief, you join a pact not to sell your house to minorities. Have you engaged in intentional racial and ethnic discrimination? Of course you have. Your personal feelings toward minorities don't matter; what matters is that you intentionally took actions calculated to keep them out of your neighborhood.

*Id.* at 778 n.1. Surely the district court—surely any federal court—would agree with this conclusion.

The district court's erroneous interpretation of the law may help to explain how it managed to discount a virtual mountain of evidence showing intentional discrimination. At every turn, Harvard received the benefit of the doubt, with the trial court repeatedly crediting the self-serving testimony of Harvard officials. For example, the district court noted that "at the start of the full Admissions Committee meetings," the dean of admissions "usually states . . . how the breakdown of the class compares to the prior year in terms of racial identities and other demographics." *Students for Fair Admissions*, 397 F. Supp. 3d at 145-46. "The leadership of the Admissions Office monitors the breakdown of the class," and if "a group is notably underrepresented or has suffered a dramatic drop off relative to the prior year, the Admissions Committee may decide to give additional attention to applications from

students within that group."[1] *Id.* at 146. In any other civil rights context, this kind of "monitor[ing]" and "additional attention" to race would prove intentional discrimination. Yet here the district court simply credited the proffered explanation that this racial information was used to forecast acceptance rates. *Id.* It observed that "[n]o admission officer who testified perceived Harvard to be engaged in discrimination against Asian Americans," and was persuaded. *Id.* It accepted at face value testimony that "[r]ace is only intentionally considered as a positive attribute." *Id.* Indeed, the latter point is not even credible as a matter of logic. If a particular racial or ethnic background is a positive attribute for some applicants, then it necessarily is a negative attribute for applicants who do not share it—who, to put it plainly, are the wrong race.

The district court even found that a disparity in personal scores "is likely partially reflective of biases external to the Admissions Office" (*id.* at 173), such as "race-correlated inputs to the rating such as teacher and guidance counselor recommendations." *Id.* at 194. In plain English, the district court found that biased high school teachers and guidance counselors across the nation partly explain why Harvard's *own* statistical evidence suggested that its admission process was biased

---

[1]    Even where a Harvard admissions officer testified under oath that he impermissibly considered race in evaluating personal ratings, the court excused the admission at trial as simply a "misstatement," which ultimately did not affect Harvard's credibility. *Id.* at 155-56 & fn. 36.

against Asians. Harvard's ability to avoid institutional responsibility for its own race-conscious admissions process is quite an achievement. Now that it has exposed a nationwide bias by secondary education officials against their top Asian students, will Harvard continue to use this tainted input?

Both parties' experts found that being Asian negatively affects an applicant's chances of admission, though they disagreed on the significance of this Asian penalty. *Id.* at 166-167. According to the Court, the statistical proof merely identifies "statistical anomalies" that afford Harvard and other similar schools a way to identify "implicit bias" that "might be affecting outcomes." *Id.* at 204.

In any case, Harvard clearly knew that its admission process incorporated a penalty for Asian American applicants. It simply chose to ignore this fact. Harvard received *several* reports that its admissions process discriminated against Asian applicants. After an internal study corroborated these reports, Harvard administrators affirmatively chose to stop the further internal review or make any changes to its admission process. The first report, by the U.S. Department of Education's Office of Civil Rights, found that Harvard's admission officers were using improper racial stereotyping to describe Asian applicants as far back as 1990. *Id.* at 154-56. Harvard did nothing in response to this report. *Id.* at 155. Years later, in 2012, Harvard was again the subject of public reports that its admissions process

discriminated against Asians.[2] Following these reports, Harvard's Office of Institutional Research ("OIR") conducted a statistical analysis of its admission process, which corroborated their conclusions. *Id.* at 148-50. Despite the reports and corroboration, Harvard made no changes to its admissions process, and stopped examining it. *Id*. 148-50. After the unrebutted internal and external reports compelled Harvard's leadership to examine its admission process again, it again chose to do nothing. *Id.* at 151.

In excusing Harvard's failure to act on its OIR's internal report, the District Court noted that its statistical models were "preliminary" and "could lead a casual observer to conclude the race plays a significantly larger role" in admissions. *Id.* at 149. Even if true, those concerns do not explain Harvard's decision to stop evaluating whether it discriminated against Asian applicants. In any other civil rights context, an organization's decision to stop looking into credible indications that it discriminated against minorities would all but convict it of intentional discrimination.

Though the district court determined that OIR's statistical analysis was "weak" evidence of bias *at trial*, *id.* at 151, it showed at a minimum that Harvard

---

[2] Ron Unz, *The Myth of American Meritocracy*, THE AMERICAN CONSERVATIVE, Nov. 28, 2012; Carolyn Chen, *Asians: Too Smart for Their Own Good?*, NEW YORK TIMES, Dec. 19, 2012.

knew that its admission process penalized Asian applicants. It is impossible to reconcile the district court's view that Harvard's response to these reports demonstrated Harvard's "concern about the perception" that its admission process was racially biased with the reality that Harvard repeatedly failed to act. *Id.* at 147. Likewise, Harvard's failure to meaningfully respond to these reports diminishes the credibility of the testimony of the admissions officers the district court chose to credit. *Id.* at 139, 155, 169. Ordinarily, such self-serving testimony is not given much weight, especially where there is contrary objective evidence. "The Court has squarely held . . . that affirmations of good faith in making individual selections are insufficient to dispel a prima facie case of systematic exclusion." *Alexander v. Louisiana*, 405 U.S. 625, 632 (1972) (citations omitted). An outcome may establish discrimination "whether or not it was a conscious decision." *Id*. (citations omitted). The trial court here, however, went to great lengths to absolve Harvard's "considerate, diligent, and intelligent" admissions officers. *Students for Fair Admissions*, 397 F. Supp. 3d at 169.

At the same time, the court slighted objective proof of bias. The evidence at trial showed that Harvard used a search list for "sparse" (rural) states to introduce itself to applicants. Asian applicants had to have higher SATs to make the search list. *Id.* at 153-54. Objective proof of bias should work against a defendant in a Title VI case, especially where, as here, the Defendant is unable to show to the court that

the disparate treatment of a racial minority is "accidental." *Id.*  But the trial court again afforded Harvard the benefit of the doubt, dismissing the search list as a "marketing tool" and simply referred to this statistical showing of bias as an "anomal[y]."[3] *Id.* at 154.

Plaintiffs produced statistical proof that Asians were disproportionately labeled "standard strong," which "some admissions officers use to indicate a strong applicant who is nonetheless unlikely to be admitted because he or she is not sufficiently distinguished within Harvard's exceptional applicant pool." *Id.* at 157. The court dismissed this showing on the basis of the startling rationale that this statistically unbalanced picture reflected reality—that Asian applicants "excelled, on average, on academic and extracurricular ratings, but were weaker when evaluated on personal and athletic criteria." *Id.* Thus, comments disproportionally describing Asian applicants as "standard strong," as well as "quiet," "flat," and "shy," were often "truthful and accurate descriptions rather than reflective of impermissible stereotyping." *Id.* at 157-58. Of course, all of this begs the question whether such findings are pretext. Further, courts are ordinarily more wary of euphemisms in discrimination cases. *See Cine SK8, Inc. v. Town of Henrietta*, 507 F.3d 778, 787

---

[3]     The trial court inexplicably bifurcated Harvard's intentional efforts to *recruit* students from its admission process. But surely it is reasonable to assume that Harvard primarily seeks to recruit only students from which it seeks applications for admission.

(2d Cir. 2007) (jury could reasonably conclude that "city kids" is a euphemism for African-American teenagers); *Evans v. Connecticut*, 935 F. Supp. 145, 160 (D. Conn. 1996) (characterizing a state police officer as having an "attitude of indifference" was a euphemism for "plaintiff was black" in a Title VII case); *Taggart v. Time, Inc.*, 924 F.2d 43, 47 (2d Cir. 1991) ("Denying employment to an older job applicant because he or she has too much experience, training or education is simply to employ a euphemism to mask the real reason for refusal, namely, in the eyes of the employer the applicant is too old.") (citations omitted).

Harvard never revealed until trial, and then apparently by accident, that it had indeed updated its admission procedures in 2018 following this lawsuit. *Id*. at 132 n.2 and 140. Despite finding that the newly revealed policy resulted in "seemingly contradictory testimony by various [Harvard] witnesses," the district court still found "credible" the testimony of Harvard's witnesses. *Id.* at 132. It seems the only penalty for Harvard failure to reveal to the trial court and plaintiffs that it had updated its procedures to address the claims brought in this action was that the court required Harvard to supplement its discovery during trial. *Id*. "Seemingly contradictory testimony" by Harvard's witnesses had no impact on their credibility.

In sum, the district court applied a higher legal standard to the plaintiff, requiring them to show a particular racial animus. This standard is contrary to existing law. The district court then proceeded to afford the defendant the benefit of

every doubt—accepting every self-serving claim, crediting every explanation, dismissing every claim of pretext, dismissing every statistic, and even accepting the truth of what appeared to be stereotyping. "The Court has recognized that the level of scrutiny does not change merely because the challenged classification operates against a group that historically has not been subject to governmental discrimination." *Wygant v. Jackson Bd. of Educ.*, 476 U.S. 267, 273 (1986) (citations omitted). The history of civil rights in this country would be radically different if the standards applied in this case were applied to every other civil rights case.[4] The Court should reverse the district court's judgment and remand for proceedings consistent with our nation's civil rights laws and precedents.

## CONCLUSION

For the foregoing reasons, *amicus curiae* Judicial Watch, Inc. respectfully requests that the Court reverse the final judgment of the district court.

February 25, 2019                    Respectfully submitted,

                                     */s/ Tim J. Perry*
                                     Timothy J. Perry (First Cir. Bar No. 62295)
                                     PERRY KRUMSIEK LLP
                                     One Boston Place, Suite 2600
                                     Boston, MA 02108
                                     (617) 720-4300

---

[4]     Would such statistical and non-statistical evidence of racial bias have been rejected, and the self-serving testimony of school officials have been accepted so readily, if the admission practices of a southern university were on trial?

12

tperry@pkdllp.com

T. Russell Nobile*
JUDICIAL WATCH, INC.
Post Office Box 6592
Gulfport, Mississippi 39506
(202) 527-9866
Rnobile@judicialwatch.org

Robert D. Popper*
Eric Lee*
JUDICIAL WATCH, INC.
425 Third Street SW, Suite 800
Washington, DC 20024

*  *Application for admission pro hac vice
forthcoming*

*Attorneys for Amicus Curiae*

13

## <u>CERTIFICATE OF COMPLIANCE</u>

This document complies with Fed. R. App. P. 32(a)(7)(B) because, excluding the parts of the document exempted by the Fed. R. App. P. 32(f) this document contains 2806 words.  This document complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6)because this document has been prepared in a proportionally spaced typeface using Microsoft Word for Office 365 in 14-point Times New Roman.

February 25, 2020                              */s/ Tim J. Perry*                      
                                                        Timothy J. Perry

14

## CERTIFICATE OF SERVICE

I filed this brief via the Court's ECF system, which will electronically notify

the following:

William F. Lee
Felicia H. Ellsworth
Andrew S. Dulberg
Elizabeth Connell Mooney
Joseph H. Mueller
WILMER CUTLER PICKERING
HALE AND DOOR LLP
60 State Street
Boston, MA 02109
william.lee@wilmerhale.com
felicia.ellsworth@wilmerhale.com
andrew.dulberg@wilmerhale.com
elizabeth.mooney@wilmerhale.com
sarah.frazier@wilmerhale.com
joseph.mueller@wilmerhale.com

Debo P. Adegbile
WILMER CUTLER PICKERING
HALE AND DOOR LLP
7 World Trade Center
250 Greenwich Street
New York, NY 10007
debo.adegbile@wilmerhale.com

Ara B. Gershengorn
HARVARD UNIVERSITY
OFFICE OF GENERAL COUNSEL
1350 Massachusetts Ave, Ste 980
Cambridge, MA 02138-3826
sara_gershengorn@harvard.edu

Seth P. Waxman
Paul R.Q. Wolfson
Danielle Conley
Brittany Amadi
WILMER CUTLER PICKERING
HALE AND DOOR LLP
1875 Pennsylvania Ave. NW
Washington, D.C. 20006
seth.waxman@wilmerhale.com
paul.wolfson@wilmerhale.com
danielle.conley@wilmerhale.com
brittany.amadi@wilmerhale.com
daniel.winik@wilmerhale.com

William S. Consovoy
Thomas R. McCarthy
J. Michael Connolly
Cameron T. Norris
Consovoy McCarthy PLLC
1600 Wilson Blvd., Ste. 700
Arlington, VA 22209
will@consovoymccarthy.com
tom@consovoymccarthy.com
mike@consovoymccarthy.com
cam@consovoymccarthy.com

Patrick Strawbridge
CONSOVOY MCCARTHY PLLC
10 Post Office Sq., 8th Fl., PMB #706
Boston, MA 02109
Patrick@consovoymccarthy.com

15

Adam K. Mortara              John M. Hughes
BARTLIT BECK LLP        BARTLIT BECK LLP
54 W. Hubbard St., Ste. 300    1801 Wewatta St., Ste. 1200
Chicago, IL 60654          Denver, CO 80202
adam.mortara@bartlitbeck.com  john.hughes@bartlitbeck.com

February 25, 2020         */s/ Tim J. Perry*
                     Timothy J. Perry

16