No. 19-2005

---

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIRST CIRCUIT

---

STUDENTS FOR FAIR ADMISSIONS, INC.
*Plaintiff-Appellant*,

v.

PRESIDENT AND FELLOWS OF HARVARD COLLEGE,
*Defendant-Appellee*.

---

On Appeal from the United States District Court
for the District of Massachusetts,
Case No. 14-cv-14176-ADB

---

## BRIEF OF *AMICUS CURIAE*
## MOUNTAIN STATES LEGAL FOUNDATION
## IN SUPPORT OF APPELLANT AND REVERSAL

---

Cody J. Wisniewski
  Bar No. 1193502
MOUNTAIN STATES LEGAL FOUNDATION
2596 South Lewis Way
Lakewood, Colorado 80227
(303) 292-2021
cody@mslegal.org

*Attorney for* Amicus Curiae

## CORPORATE DISCLOSURE STATEMENT

Pursuant to Fed. R. App. P. 26.1(a) and 29(a)(4)(A), Mountain States Legal Foundation is a nonprofit corporation organized under the laws of Colorado. It has no parent corporation and no publicly held corporation owns 10% or more of its stock.

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................. iv

IDENTITY AND INTEREST OF *AMICUS CURIAE* .............................................1

SUMMARY OF THE ARGUMENT .....................................................................2

ARGUMENT ...................................................................................................4

I.   RACIAL DISCRIMINATION FOR THE ADVANCEMENT OF
     PEDAGOGICAL OBJECTIVES IS NOT A COMPELLING
     INTEREST..................................................................................................4

II.  EVEN IF HARVARD HAS A COMPELLING INTEREST IN
     OBTAINING A "CRITICAL MASS" OF DIVERSITY, ITS
     CHOSEN MEANS ARE NOT NARROWLY TAILORED.............................13

     A.   Harvard Makes Race a Defining Feature of Many Admitted
          Minority Students in Violation of Supreme Court Precedent ..................14

     B.   "Critical Mass" is a Euphemism for Impermissible Racial
          Balancing ...................................................................................17

     C.   SFFA's Race-Neutral Alternatives Need Only Work "About
          as Well" as Harvard's Current Racially Discriminatory
          Practices in Achieving its Interest in Diversity .........................................20

III. HARVARD'S RACIAL BALANCING WOULD BE ILLEGAL
     UNDER TITLE VII ...................................................................................23

     A.   Harvard's Admissions Process is Equivalent to Disparate
          Treatment under Title VII .........................................................................24

     B.   Harvard's use of the "Personal Rating" Score is Equivalent to
          Disparate Impact Under Title VII ............................................................26

CONCLUSION .................................................................................................28

CERTIFICATE OF COMPLIANCE.....................................................................29

# TABLE OF AUTHORITIES

## **Cases**

*Adarand Constructors, Inc. v. Pena*,
  515 U.S. 200 (1995) .................................................................... *passim*

*Anderson ex rel. Dowd v. City of Boston*,
  375 F.3d 71 (1st. Cir. 2004) ................................................................4

*City of Richmond v. J.A. Croson Co.*,
  488 U.S. 469 (1989) .................................................................... *passim*

*Cleburne v. Cleburne Living Center, Inc.*,
  473 U.S. 432 (1985) ...............................................................12

*Concrete Works of Colorado v. City and County of Denver*,
  321 F.3d 950 (10th Cir. 2003) ...............................................................1

*Cotter v. City of Boston*,
  323 F.3d 160 (1st Cir. 2003) ...............................................................21

*DeFunis v. Odegaard*,
  416 U.S. 312 (1974) ................................................................ 5, 15, 16

*E.E.O.C. v. Steamship Clerks Union, Local 1066*,
  48 F.3d 594 (1st Cir. 1995) ...............................................................27

*Fisher v. Univ. of Texas at Austin ("Fisher II")*,
  136 S. Ct. 2198 (2016) .................................................................... *passim*

*Fisher v. Univ. of Texas at Austin ("Fisher I")*,
  570 U.S. 297 (2013) .................................................................... *passim*

*Fullilove v. Klutznick*,
  448 U.S. 448 (1980) ................................................................ 8, 9, 12

*Gratz v. Bollinger*,
  539 U.S. 244 (2003) ................................................................ 14, 15, 18

*Griggs v. Duke Power Co.*,
  401 U.S. 424 (1971) ...............................................................27

*Grutter v. Bollinger*,
    539 U.S. 306 (2003) ................................................................................ *passim*

*Hazelwood School Dist. v. U.S.*,
    433 U.S. 299 (1977) ........................................................................27

*Hirabayashi v. U.S.*,
    320 U.S. 81 (1943) ........................................................................11

*Jones v. City of Boston*,
    752 F.3d 38 (1st Cir. 2014) ............................................................27

*Korematsu v. U.S.*,
    323 U.S. 214 (1944) ............................................................ 7, 10, 11

*Metro Broadcasting, Inc v. F.C.C.*,
    497 U.S. 547 (1990) ........................................................................10

*Palmore v. Sidoti*,
    466 U.S. 429 (1984) ........................................................................25

*Parents Involved in Community Schs. v. Seattle Sch. Dist. No. 1*,
    551 U.S. 701 (2007) ........................................................................20

*Plessy v. Ferguson*,
    163 U.S. 537 (1896) ........................................................................11

*Raso v. Lago*,
    135 F.3d 11 (1st Cir. 1998) ..............................................................4

*Regents of Univ. of California v. Bakke*,
    438 U.S. 265 (1978) ................................................................ *passim*

*Ricci v. DeStefano*,
    557 U.S. 557 (2009) ................................................................ *passim*

*Rice v. Cayetano*,
    528 U.S. 495 (2000) ..........................................................................4

*Rudin v. Lincoln Land Community College*,
    420 F.3d 712 (7th Cir. 2005) ..........................................................24

*Shaw v. Hunt*,
    517 U.S. 899 (1996) ........................................................................21

*Students for Fair Admissions, Inc. v. Harvard Corp.*,
    397 F. Supp. 3d 126 (D. Mass. 2019) ....................................... *passim*

*Troupe v. May Dep't Stores*,
    20 F.3d 734 (7th Cir. 1994) ............................................................24

*Trump v. Hawaii*,
    138 S.Ct. 2392 (2018) ......................................................................7

*Wessmann v. Gittens*,
    160 F.3d 790 (1st Cir. 1998) ......................................................4, 22

*Wygant v. Jackson Bd. of Educ.*,
    476 U.S. 267 (1986) .....................................................................1, 9

*Yick Wo v. Hopkins*,
    118 U.S. 356 (1886) ........................................................................11

## Statutes

42 U.S.C. § 2000d ...............................................................................6

42 U.S.C. § 2000e-2 (a) ....................................................................23

## Other Authorities

ALEXANDER BICKEL, THE MORALITY OF CONSENT,
    (1975) ...............................................................................................7

Gail L. Heriot, *A "Dubious Expediency": How Race-Preferential
Admissions Policies on Campus Hurt Minority Students*,
    Univ. of San Diego Legal Studies Research Paper No. 17-2422017
    (2017) .............................................................................................17

Matthew Gaertner & Melissa Hart, *Considering Class: College Access and
Diversity*, Univ. of Colo. Law Legal Studies Research Paper No. 12-18 ..........22

MERRIAM-WEBSTER DICTIONARY ...........................................................18

Richard A. Primus, *Equal Protection and Disparate Impact: Round Three*, 117 HARV. L.REV. 493 (2003) ............................................................24

RICHARD SANDER & STUART TAYLOR JR., MISMATCH: HOW AFFIRMATIVE ACTION HURTS STUDENTS IT'S INTENDED TO HELP, AND WHY UNIVERSITIES WON'T ADMIT IT (2012) .............................................23

William E. Thro, *No Angels in Academe: Ending the Constitutional Deference to Public Higher Education*, 5 BELMONT L. REV. 27 (2018).........................................................12

## IDENTITY AND INTEREST OF *AMICUS CURIAE*[1]

Mountain States Legal Foundation ("MSLF") is a nonprofit, public-interest legal foundation organized under the laws of the State of Colorado. MSLF is dedicated to bringing before the courts issues vital to the defense and preservation of individual liberties, the right to own and use property, the free enterprise system, and limited and ethical government. Since its creation in 1977, MSLF has litigated for the equality of all persons, regardless of race, and for the application of strict scrutiny to all governmental racial classifications. *See, e.g.*, *Adarand Constructors, Inc. v. Peña*, 515 U.S. 200 (1995); *Wygant v. Jackson Bd. of Ed.*, 476 U.S. 267 (1986); *Concrete Works of Colo. v. City and County of Denver*, 321 F.3d 950 (10th Cir. 2003). Because this case concerns important matters of equal protection before the law, with profound ramifications for MSLF's clients and mission, MSLF respectfully submits this *amicus curiae* brief in support of Plaintiff-Appellant.

---

[1] Pursuant to Fed. R. App. P. 29(a)(2), MSLF submitted requests for consent to file this *amicus curiae* brief to counsel for both parties. Counsel for both parties consented.

Pursuant to Fed. R. App. P. 29(a)(4)(E), MSLF certifies that no counsel for a party authored this brief in whole or in part, and no person or entity, other than MSLF, its members, or its counsel, made a monetary contribution specifically for the preparation or submission of this brief.

## SUMMARY OF THE ARGUMENT

Almost two decades ago, Justice O'Connor predicted that in twenty-five years the need for racial discrimination in university admissions would cease. But as we rapidly approach her speculative end date, courts are empowering universities— including Harvard—to continue their racially discriminatory admissions programs. As it stands, this last vestige of judicially approved racial discrimination will not be eliminated from society by 2028. Harvard should not be permitted to drag this antiquated and unconstitutional discrimination into the future. There is no place for racial discrimination of any kind in the twenty-first century.

First, well intentioned as they may be, it is undisputed Harvard's admissions practices are deliberately racially discriminatory. Nevertheless, Harvard believes its practices are justified by a compelling interest in diversity. Although the educational benefits stemming from a "critical mass" of racial diversity in the student body may be a worthwhile goal, from a constitutional perspective, it does not justify judging prospective students based on their racial makeup.

Second, irrespective of its reasons for discriminating, Harvard's means implemented to achieve its goal are not narrowly tailored. Harvard's outcome-determinative "tips" based on race make race the defining feature of many applications—in direct conflict with Supreme Court precedent. Further, Students for Fair Admissions, Inc. has presented many workable, race-neutral alternatives.

2

Regardless, the district court simply deferred to Harvard's assessment that these alternatives will not achieve Harvard's goals instead of independently evaluating those alternatives.

Third, so-called "affirmative action" is the rare area of the law where intentional racial discrimination has been permitted. Title VII case law addressing affirmative action highlights the double standard that exists between universities and employers when it comes to admissions versus hiring based on race. If Harvard employed its current admissions policies and practices to hire faculty and staff, there is little doubt the practice would run afoul of Title VII. Accordingly, Harvard should not be permitted to racially discriminate in its "hiring" procedures for students—especially when Title VI and the Equal Protection Clause so explicitly forbid it.

Affirmative racial discrimination has long been held to have a built-in termination date. It is time for universities, including Harvard, to end their absurd practice of *perpetuating racism* in the name of ending racism.

## ARGUMENT

## I. RACIAL DISCRIMINATION FOR THE ADVANCEMENT OF PEDAGOGICAL OBJECTIVES IS NOT A COMPELLING INTEREST

Harvard explicitly engages in racial discrimination. This is not in dispute. *Students for Fair Admissions, Inc. v. Harvard Corp.*, 397 F. Supp. 3d 126, 189–90 (D. Mass. 2019) ("*SFFA*") ("Harvard's admission process is not facially neutral."); *see Anderson ex rel. Dowd v. City of Boston*, 375 F.3d 71, 82 (1st Cir. 2004) ("The term racial classification 'normally refers to a governmental standard, preferentially favorable to one race or another for the distribution of benefits.'") (quoting *Raso v. Lago*, 135 F.3d 11, 16 (1st Cir. 1998)). Harvard's asserted "compelling" reason for this discrimination is "that student body diversity—including racial diversity—is essential to [Harvard's] pedagogical objectives." *SFFA*, 397 F. Supp. 3d at 152. As the United States Supreme Court has long held, racial classifications are inherently suspect: "distinctions between citizens solely because of their ancestry are by their very nature odious to a free people whose institutions are founded upon the doctrine of equality." *Adarand Constructors, Inc. v. Pena*, 515 U.S. 200, 214 (1995); *see Rice v. Cayetano*, 528 U.S. 495, 517 (2000) ("[O]ne of the principal reasons race is treated as a forbidden classification is that it demeans the dignity and worth of a person to be judged by ancestry instead of by his or her own merit and essential qualities."); *Wessmann v. Gittens*, 160 F.3d 790, 796 (1st Cir. 1998) ("[I]t would be cause for consternation were a court, without more, free to accept a term as malleable as

4

'diversity' in satisfaction of the compelling interest needed to justify governmentally-sponsored racial distinctions."); s*ee also DeFunis v. Odegaard*, 416 U.S. 312, 342 (1974) (Douglas, J., dissenting) ("The Equal Protection Clause commands the elimination of racial barriers, not their creation in order to satisfy our theory as to how society ought to be organized.").

Accordingly, all racial classifications imposed by government—directly or through Title VI—must survive strict scrutiny. *Grutter v. Bollinger*, 539 U.S. 306, 326 (2003). To survive strict scrutiny, racial classifications must be "narrowly tailored" to further a "compelling governmental interest." *Id*. Under Equal Protection, there is no distinction between "benign" and invidious racial classifications. *See City of Richmond v. J.A. Croson Co.*, 488 U.S. 469, 493 (1989) ("We apply strict scrutiny to all racial classifications to 'smoke out' illegitimate uses of race by assuring that [government] is pursuing a goal important enough to warrant use of a highly suspect tool.").

Here, Harvard asserts a compelling interest in "the racial diversity" of its student body to advance its "pedagogical objectives." *SFFA*, 397 F. Supp. 3d at 152. While Harvard asserts it is "benign" on the surface, *id.*, in reality it is an instance of "illegitimate notions of racial inferiority or simple racial politics," *Croson*, 488 U.S. at 493 (citing *Bakke*, 438 U.S. at 298). Although promoting diversity and enhancing higher education may be laudable goals, they are not compelling enough to justify

racial discrimination. In every other context, the only valid compelling interest for any racial discrimination is the remediation of past discrimination—a justification which would indeed not justify Harvard's discrimination against Asian-American applicants. *Croson*, 488 U.S. at 493 ("Unless [classifications based on race] are strictly reserved for remedial settings, they may in fact promote notions of racial inferiority and lead to politics of racial hostility.").

Harvard's stated purpose for its racial discrimination is not compelling in the context of the purpose of the Fourteenth Amendment. *See id*. at 518 (Kennedy, J., concurring in part and concurring in judgment) ("The moral imperative of racial neutrality is the driving force of the Equal Protection Clause."). Harvard does have an interest in fostering the richest educational environment it can muster—but using racial discrimination to achieve these goals is offensive to the objectives of Title VI and the Constitution. *See* 42 U.S.C. § 2000d ("No person in the United States shall, on the ground of race, color, or national origin, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance."); *Croson*, 488 U.S. at 521 (Scalia, J., concurring in the judgment) ("[T]he lesson of the great decisions of the Supreme Court and the lesson of contemporary history have been the same for at least a generation: discrimination on the basis of race is illegal, immoral, unconstitutional,

inherently wrong, and destructive of democratic society.") (quoting ALEXANDER BICKEL, THE MORALITY OF CONSENT 133 (1975)).

Consequently, it is almost impossible for racial classifications to pass strict scrutiny. Of the handful of racial classifications approved by the Supreme Court, two different theories of compelling interest exist: "pressing public necessity" or remediation of "past discrimination" for which a governmental entity is directly responsible. *See Korematsu v. U.S.*, 323 U.S. 214, 216 (1944) (as to the former)[2]; *Croson*, 488 U.S. at 504 (1989) (as to the latter).

The first instance of the Court assessing the interests involved in racially discriminatory admission policies came in *Regents of University of California v. Bakke*, 438 U.S. 265, 315 (1978). Writing for a split court, Justice Powell struck down the U.C. Davis Medical School's "special admissions program" due to its impermissible racial balancing. *Id.* at 320. The most influential portion of Justice Powell's opinion, however, was his notion of "attainment of a diverse student body" as a compelling interest for universities. *Id.* at 311–12. This idea went on to be embraced by the Supreme Court in *Grutter* and *Fisher I*, but not without criticism.

---

[2]     In *Trump v. Hawaii*, the Court stated: "Korematsu was gravely wrong the day it was decided, has been overruled in the court of history, and—to be clear—has no place in law under the Constitution." 138 S.Ct. 2392, 2423 (2018) (citation omitted). The Court also specified *Korematsu* "has nothing to do with [*Trump v. Hawaii*]." *Id.* The constitutionality of the pressing public necessity justification remains unclear, but regardless, is not directly relevant in this matter.

*Grutter*, 539 U.S. 306 (5-4 decision for the Court with two concurrences in part and two dissents); *Fisher v. Univ. of Texas at Austin*, 570 U.S. 297, 315 (2013) ("*Fisher I*") (Thomas, J. concurring) ("I would overrule *Grutter v. Bollinger*.").

To begin, Justice Powell's opinion contradicts itself. Despite holding the Constitution forbids "preferring members of any one group for no reason other than race or ethnic origin," Justice Powell simultaneously states universities are permitted to adopt such preferences under the guise of "diversity." *Grutter*, 539 U.S. at 307, 311–12. For decades now, this logic has permitted universities to draw racial distinctions between prospective students—so long as the university attaches some pedagogical objective to its racial labeling. Further, other opinions by Justice Powell substantially contradict his takeaway from *Bakke* that racial discrimination is acceptable to advance educational objectives. *See, e.g.*, *Fullilove v. Klutznick,* 448 U.S. 448, 498 (1980) (Powell, J., concurring) ("[N]o compelling interest was present to justify the use of a racial quota."). Notably, Justice Powell was alone in his assessment of the compelling nature of the educational benefits of diversity. *See Adarand*, 515 U.S. at 214 ("*Bakke* did not produce an opinion for the Court.").

Justice Brennan's *Bakke* concurrence sought to clarify "the central meaning" of the holdings. The only permissible use of race in university admissions is to remedy "disadvantages cast on minorities by past racial prejudice." *Bakke*, 438 U.S. at 324–25 (Brennan, J., concurring); *see Wygant v. Jackson Bd. of Educ.*, 476 U.S.

8

267, 301 (1986) (Marshall, J., dissenting) ("[R]acial distinctions are irrelevant to nearly all legitimate state objectives . . . [but] they are highly relevant to the one legitimate state objective of eliminating the pernicious vestiges of past discrimination."). To illustrate this point further, the Harvard plan at issue in this case was attached as an appendix to the Powell opinion. *Bakke*, 438 U.S. at 321. But Justices Brennan, White, Marshall, and Blackmun approved of such a plan only "so long as the use of race to achieve an integrated student body is necessitated by the lingering effects of past discrimination." *Id.* at 326 n.1.; *but see Adarand,* 515 U.S. at 239 (Thomas, J., dissenting) ("In my view, government can never have a 'compelling interest' in discriminating on the basis of race in order to 'make up' for past racial discrimination in the opposite direction.); *Croson*, 488 U.S. at 524 (Scalia, J., concurring in the judgment) ("In my view there is only one circumstance in which the States may act *by race* to undo the effects of past discrimination: where that is necessary to eliminate their own maintenance of a system of unlawful racial classification.") (emphasis in original); *Fullilove*, 448 U.S. at 526 (Stewart, J., dissenting) ("Racial discrimination is by definition invidious discrimination."). Finally, the remaining justices in *Bakke*, in an opinion authored by Justice Stevens, would have held Title VI allows no consideration of race. *Bakke*, 438 U.S. at 418 (Stevens, J., concurring in the judgment and dissenting in part) ("[U]nder Title VI it

is not permissible to say 'yes' to one person; but to say 'no' to another person, only because of the color of his skin.").

In light of this self-contradictory and uncertain standard, universities such as Harvard are presently afforded wide deference in judging whether racial diversity is essential to an educational mission. *See Grutter*, 539 U.S. at 328–29 (deferring to the University of Michigan Law School that diversity is essential to its educational mission). Deference, however, should not be given when a policy or program is so clearly antithetical to the language of the Equal Protection Clause. *See, e.g.*, *Fisher v. Univ. of Texas at Austin*, 136 S. Ct. 2198, 2215 (2016) ("*Fisher II*") (Thomas, J., dissenting) ("[E]very time the government . . . makes race relevant to the provision of burdens or benefits, it demeans us all."). Further, deference is not warranted where the discrimination in question is harming a race of people who have faced a history of discrimination in this country. *Bakke*, 738 U.S. at 326 n.1; *see Fisher II*, 136 S. Ct. at 2228 (Alito, J., dissenting) ("[W]hile the Court repeatedly refers to the preferences as favoring 'minorities,' . . . it must be emphasized that the discriminatory policies upheld today operate to exclude Asian-American students, who 'have not made [University of Texas's] list' of favored groups.") (quoting *Metro Broadcasting*, *Inc v. F.C.C.*, 497 U.S. 547, 632 (1990)); *see also Korematsu*, 323 U.S. 214 (1944) (approving the internment of people of Japanese ancestry during World War II); *Hirabayashi v. U.S.*, 320 U.S. 81 (1943) (approving curfews

for people of Japanese ancestry during World War II); *Plessy v. Ferguson*, 163 U.S. 537, 561 (1896) (Harlan, J., dissenting) ("There is a race so different from our own that we do not permit those belonging it to become citizens of the United States . . . I allude to the Chinese race."); *Yick Wo v. Hopkins*, 118 U.S. 356 (1886) (determining animus towards Asians was the only explanation for unequal enforcement of a city ordinance). If Harvard's racial discrimination was aimed at remediating past discrimination, it would need to award raced based points to the descendants of American citizens unlawfully held in internment camps and given mandatory curfews during World War II—not the opposite. *See Korematsu*, 323 U.S. 214; *Hirabayashi*, 320 U.S. 81.

Harvard is not attempting to cure past discrimination. Instead, it judges applicants based on their race, and determines Asian Americans are not worthy of preferential treatment afforded to other races. *See Fisher II*, 136 S. Ct. at 2227 n.4 (Alito, J., dissenting) ("[P]roviding a boost to African-Americans and Hispanics inevitably harms [Asian-Americans] who do not receive the same boost by decreasing their odds of admission."). University admissions offices are the only place in America where this outright racial discrimination is permitted for any reason other than pressing national security concerns or good faith efforts to fix past discrimination. *See Korematsu*, 323 U.S. at 216 (pressing national security); *Croson*, 488 U.S. at 494 (remedying past discrimination); *but see* William E. Thro, *No Angels*

*in Academe: Ending the Constitutional Deference to Public Higher Education*, 5 BELMONT L. REV. 27, 33–34 (2018) (decrying judicial deference to discriminatory university admission practices). "There is only one Equal Protection Clause." *Adarand*, 515 U.S. at 246 (Stevens, J., dissenting) (citing *Cleburne v. Cleburne Living Center, Inc*, 473 U.S. 432, 451–55 (1985) (Stevens, J., concurring)). Accordingly, there should not be a carve out for universities to violate Equal Protection under pretenses that would constitute invidious discrimination in any other scenario. *See Fullilove*, 448 U.S. at 497 (Powell, J., concurring) ("Racial preference never can constitute a compelling state interest."). This Court should not rubber stamp Harvard's racially discriminatory practices absent a showing of a truly compelling interest.

Such a compelling interest does not exist here. The desire for a diverse student body cannot support judging applicants by their race. *See Croson*, 488 U.S. at 494 ("[E]liminating entirely from governmental decision making such irrelevant factors as a human being's race" is the "ultimate goal" of equal protection."). Judicially approved racial discrimination "must have a logical endpoint." *Grutter*, 539 U.S. at 344 (Ginsburg, J., concurring). This point has been reached: "there is nothing 'pressing' or 'necessary' about obtaining whatever educational benefits may flow from racial diversity." *Fisher I,* 570 U.S. at 319 (Thomas, J., concurring).

## II. EVEN IF HARVARD HAS A COMPELLING INTEREST IN OBTAINING A "CRITICAL MASS" OF DIVERSITY, ITS CHOSEN MEANS ARE NOT NARROWLY TAILORED

Even if this Court is not persuaded that Harvard lacks a compelling reason for its racially discriminatory admissions program, the means Harvard has chosen to achieve its goals are not narrowly tailored. Racially discriminatory admissions programs must meet threshold requirements to satisfy narrow tailoring, and "no deference is owed when determining whether the use of race is narrowly tailored to achieve the university's permissible goals." *Fisher I*, 570 U.S. at 312. "Strict scrutiny must not be strict in theory and feeble in fact." *Id.* at 314.

First, racial "quotas" amounting to racial balancing stand on their own as patently unconstitutional. *Bakke*, 438 U.S. at 315 (1978); *see Fisher I*, 570 U.S. at 319–20 (Thomas, J., concurring) ("[D]iversity can only be the *means* by which the University obtains educational benefits; it cannot be an end for its own sake.") (emphasis in original).

Second, race must not be the "defining feature" of an application—each applicant must be evaluated as an "individual." *Fisher I*, 570 U.S. at 309. Race cannot be used in a "mechanical" way—that is, race may not be the "single characteristic" that "ensure[s]" admission. *See Grutter*, 539 U.S. at 337–38.

Third, narrow tailoring requires "serious, good faith consideration of workable race-neutral alternatives." *Id.* at 339–40. If race-neutral alternatives could

achieve the compelling interest "about as well" at "tolerable" expense, a challenged program is not narrowly tailored. *Fisher I*, 570 U.S. at 312.

Here, Harvard's admissions program fails at each of these standards. Harvard: (1) uses *de facto* quotas to determine what constitutes "enough" diversity; (2) makes race the defining feature of many applications by offering outcome "pluses" based on race; and (3) does not give serious, good-faith consideration of race-neutral alternatives.

### A. Harvard Makes Race a Defining Feature of Many Admitted Minority Students in Violation of Supreme Court Precedent

By making race outcome-determinative for roughly half of the non-Asian minority students it admits, Harvard is not engaging in a holistic, individual review of applicants. *SFFA*, 397 F. Supp. 3d at 178 ("[R]ace is a determinative for approximately 45% of all admitted African American and Hispanic applicants."). Rather, it is "foreclosing" seats from some because they are "not the right color or [have] the wrong surname." *Grutter*, 539 U.S. at 341 (quoting *Bakke*, 438 U.S. at 318). Under the Supreme Court's current analytical framework, race can only be considered as a "plus" factor in an otherwise individualized process. *Grutter*, 539 U.S. at 334. The use of race cannot be "mechanical"—universities may not award "automatic points" to applicants based on race. *Id.*; *Gratz v. Bollinger*, 539 U.S. 244, 275 (2003).

Harvard, the exemplar held out by Justice Powell in *Bakke* and Justice O'Connor in *Grutter*, uses race in "assigning an overall rating" to applicants as a "tip or a plus factor." *SFFA*, 397 F. Supp. 3d at 146. Had the justices known how extensively race was used at Harvard, they likely would not have held it as the standard-bearer. *See Bakke*, 438 U.S. at 406 (opinion of Blackmun, J.) ("I am not convinced, as Mr. Justice Powell seems to be, that the difference between the Davis program and the one employed by Harvard is very profound or constitutionally significant.").

On its face, this scheme appears to pass muster—race is just one factor Harvard considers as a "plus" in admitting a student. *SFFA*, 397 F. Supp. 3d at 178. But, in reality, these racial tips are outcome-determinative for "45% of all admitted black and Hispanic applicants." *Id.* A factor cannot be outcome determinative without being a defining characteristic. *See Fisher II*, 136 S. Ct. at 2212 ("The fact that race consciousness played a role only in a small portion of admissions decisions should be a hallmark of narrow tailoring, not evidence of unconstitutionality."); *Gratz*, 539 U.S. at 271 (granting applicants an automatic 20 points based on race made race too decisive of a metric).

What Harvard does is analogous to the what Washington Law School did in *DeFunis*. There, like Harvard:

> Although the committee did consider other information in the files of all applicants, the Law School has made no effort to show that it was

15

because of these additional factors that it admitted minority applicants who would otherwise have been rejected. To the contrary, the school appears to have conceded that by its own assessment—taking all factors into account—it admitted minority applicants who would have been rejected had they been white.

*DeFunis*, 416 U.S. at 330–31 (Douglas, J., dissenting). Here, Harvard has conceded that without considering race, it will admit a significantly lower percentage of blacks and Hispanics. *SFFA*, 397 F. Supp. 3d at 178. This concession shows Harvard does not engage in an "individualized" admissions process—non-Asian minorities are admitted who would be rejected if they were white or Asian. An applicant who does not receive a race based "tip" by definition cannot be on the "same footing" as an applicant who does. *Bakke*, 438 U.S. at 317 (opinion of Powell, J.).

A narrowly tailored admissions program cannot "unduly burden individuals who are not members of the favored racial and ethnic groups." *Grutter*, 539 U.S. at 341. A narrowly tailored admissions plan cannot "stamp blacks and Hispanics with a badge of inferiority." *Adarand*, 515 U.S. at 241 (Thomas, J., concurring). A narrowly tailored admissions program cannot award "absolute preferences based solely on race." *Croson*, 488 U.S. at 508–09. A truly individualized admissions process cannot reflexively admit students based on something as impersonal as their race. *See Fisher I*, 570 U.S. at 312. Harvard's admissions cannot be narrowly tailored because it does all of these things. This Court should not allow Harvard to continue to engage in practices that both demean students based on their race and harm

16

everyone in the long run. *See* Gail L. Heriot, *A "Dubious Expediency": How Race-Preferential Admissions Policies on Campus Hurt Minority Students*, Univ. of San Diego Legal Studies Research Paper No. 17-2422017 (2017) (asserting affirmative action may do more harm than good to minority students).

**B.    "Critical Mass" is a Euphemism for Impermissible Racial Balancing**

Harvard's desire to achieve a "critical mass" of diversity to advance its educational mission is a thinly veiled racial balancing scheme. Racial balancing is "patently unconstitutional." *Grutter*, 539 U.S. at 375 (Thomas, J., concurring in part and dissenting in part). But "some attention to numbers, without more, does not transform a flexible admissions system into a rigid quota." *Id*. at 335–36.

The Supreme Court has never specified "what more" would make "attention to numbers" akin to racial balancing, but some justices have offered strong opinions on the matter. *See, e.g.*, *id.* at 375 n.12 (Thomas, J., concurring in part and dissenting in part) ("A relative preference awarded to a black applicant over, for example, a similarly situated Native American applicant, does not lead to the enrollment of even one more underrepresented minority student, but only balances the races within the 'critical mass.'"); *Fisher II*, 136 S. Ct. at 2216 (Alito, J., dissenting) ("[Critical mass] remains undefined, but UT tells us that it will let us know when the desired end has been achieved.").

17

Because there is little caselaw demonstrating when a "critical mass" of diversity becomes a "quota" of diversity other than *Bakke* and *Gratz*, what the words "critical mass" and "quota" themselves mean may offer some insight. A "critical mass," is "a size, number, or amount large enough to produce a particular result." *Critical Mass*, MERRIAM-WEBSTER DICTIONARY, https://www.merriam-webster.com/dictionary/critical%20mass (last visited Feb. 25, 2020). A "quota" is "a proportional part or share." *Quota*, MERRIAM-WEBSTER DICTIONARY, https://www.merriam-webster.com/dictionary/quota (last visited Feb. 25, 2020). Interestingly, the third definition of "quota" is "a fixed number or percentage of minority group members or women needed to meet the requirements of affirmative action." *Id.* These terms connote a specified number—the only difference between a "critical mass" and a "quota" is the existence of a fixed number. So, as long as Harvard and other universities avoid setting a firm number of racial minorities they wish to admit, like in *Bakke*, they do not violate Equal Protection. *Bakke*, 438 U.S. at 320. But under the "critical mass" framework, they are free to implement functionally the same system as a quota. Allowing universities to maintain an ideal racial balance, so long as they do not specify it in writing, is antithetical to the Supreme Court's command against racial balancing.

Here, Harvard monitors the racial makeup of its incoming classes and will actually revisit the process and admit more minority students if Harvard is not

satisfied with the level of diversity. *SFFA*, 397 F. Supp. 3d at 145. Harvard's practice is unlike the program at issue in *Grutter*—Harvard gives race more weight. *See Grutter*, 539 U.S. at 335 ("[T]he Law School never gave race any more or less weight based on these reports."); *Id.* at 392 (Kennedy, J., dissenting) (the "bonus" factor of race "became divorced from individual review"). Harvard's practice is also unlike the University of Texas at Austin plan approved in *Fisher II*—Harvard knows exactly how many students it admits because of their race. *See Fisher II*, 136 S. Ct. at 2220 (Alito, J., dissenting) ("The University doesn't keep any statistics on how many students are affected by the consideration of race in admissions decisions."). Harvard explicitly determines what numbers of racial minorities are needed to "achieve an adequately diverse student body," but somehow the district court determined that is not a quota. *SFFA*, 397 F. Supp. 3d at 182. Contrary to how Harvard operates, diversity cannot be defined as "some specified percentage of a particular group." *Fisher II*, 136 S. Ct. at 2208; *Grutter*, 539 U.S. at 382 (Rehnquist, J., dissenting) ("Respondents have *never* offered any race-specific arguments explaining why significantly more individuals from one underrepresented minority group are needed in order to achieve 'critical mass' or further student body diversity."); *Gruter*, 539 U.S. at 389 (Kennedy, J., dissenting) ("The concept of critical mass is a delusion used by the Law School to mask its attempt to make race

an automatic factor in most instances and to achieve numerical goals indistinguishable from quotas.").

This Court should not allow Harvard to implement *de facto* quotas for racial minorities under the guise of a "critical mass of diversity" simply because Harvard has not specified a number on paper.

### C.   SFFA's Race-Neutral Alternatives Need Only Work "About as Well" as Harvard's Current Racially Discriminatory Practices in Achieving its Interest in Diversity

SFFA presented Harvard numerous race-neutral alternatives that enable it to achieve racial diversity without using a racially discriminatory approach. *SFFA*, 397 F. Supp. 3d at 177. Harvard bears the burden of proving a "nonracial approach" does not promote its interest in the educational benefits of diversity "about as well" as its current racially discriminatory approach. *Fisher II*, 136 S. Ct. at 2208. Harvard is owed no deference in this burden. *Id.; see Parents Involved in Community Schs. v. Seattle Sch. Dist. No. 1*, 551 U.S. 701, 786 (2007) (opinion of Kennedy, J.) ("[W]hen a court subjects [a] governmental action to strict scrutiny, it cannot construe ambiguities in favor of the State."). Here, Harvard has not met its burden to show that race-neutral alternatives were not "workable."

Narrow tailoring in this context requires "careful judicial inquiry into whether a university could achieve sufficient diversity without using racial classifications." *Fisher I*, 570 U.S. at 312. As demonstrated above, there is, in practice, no way of

20

determining what constitutes "sufficient" without engaging in unconstitutional racial balancing. Further, a university should consider race-neutral alternatives "*before* turning to racial classifications." *Id.* (emphasis added); *see Cotter v. City of Boston*, 323 F.3d 160, 168 (1st Cir. 2003) (an actor "must have a strong basis in evidence to support that [compelling] justification *before* it implements the [racially discriminatory] classification") (quoting *Shaw v. Hunt*, 517 U.S. 899, 908 n.4 (1996) (emphasis added)).

To begin, Harvard had not considered race-neutrality for fifteen years prior to this litigation. *SFFA*, 397 F. Supp. 3d at 153. This alone demonstrates Harvard is not engaged in "continued reflection regarding its admission policies" regarding race. *Fisher II*, 136 S. Ct. at 2215. SFFA presented numerous "workable" race-neutral alternatives that would promote Harvard's interests at least "about as well" as racial discrimination. *See SFFA*, 397 F. Supp. 3d at 199. For example, SFFA proposed the elimination of standardized test scores from consideration as well as increasing the "tip" for economically disadvantaged students. *Id.* at 180. But the district court simply deferred to Harvard and its experts that these alternatives will not "have meaningful impact on racial diversity." *Id.* at 199. Specifically, the district court noted: "Harvard could adopt a more significant tip for economically disadvantaged students, but every such proposal presented to the Court would result in a significant decline in African American representation." *Id.* at 201. Surely some decline in

representation of a racial group must be allowable within a framework requiring a race-neutral alternative to only work "about as well" as the race-based alternative. Otherwise, anytime a race-neutral alternative causes any drop in the representation of a racial minority, it is not workable. Further, if there is truly no racial balancing occurring at Harvard, they would not be as concerned about some decline in representation of some racial groups.

Here, the district court determined—based on statistical analysis done by Harvard experts—a drop in black representation from "14% to 6%" is enough to render race-neutral alternatives unworkable. *Id.* at 178. Nothing suggests 6% is not a "critical mass of diversity," unless Harvard believes the ideal racial balance for their campus includes a rough quota of around 15% of African Americans. This Court should not defer to Harvard that using race-neutral alternatives will not work "about as well" as its current racially discriminatory scheme where such alternatives only cause some decline in racial minority representation. *See Wessmann*, 160 F.3d at 809 (Boudin, J., concurring) ("If some specific higher level is needed to achieve diversity of views and backgrounds, this has not been demonstrated.").

Other universities have demonstrated that disregarding race altogether in the admissions process *does not* eliminate racial diversity on campus. *See* Matthew Gaertner & Melissa Hart, *Considering Class: College Access and Diversity*, Univ. of Colo. Law Legal Studies Research Paper No. 12-18 at 5 ("CU's admissions boost

based on class had significant positive impact on both socioeconomic and racial diversity of admitted students."); RICHARD SANDER & STUART TAYLOR JR., MISMATCH: HOW AFFIRMATIVE ACTION HURTS STUDENTS IT'S INTENDED TO HELP, AND WHY UNIVERSITIES WON'T ADMIT IT 132–33 (2012). Unlike what Harvard's experts claim, race-neutral alternatives can promote diversity. This Court should not continue to defer to Harvard that ceasing racial discrimination will not allow them to advance its educational objectives.

## III. HARVARD'S RACIAL BALANCING WOULD BE ILLEGAL UNDER TITLE VII

If Harvard used the same racially discriminatory policies it uses to admit students in order to hire faculty, the practice would violate Title VII of the Civil Rights Act. Title VII prohibits disparate treatment and disparate impact on the basis of race in employment. 42 U.S.C. §§ 2000e-2 (a) (1–2). Accordingly, Harvard does not and cannot consider race when hiring employees.

But because prospective college students are protected from racial discrimination by Title VI and the Equal Protection Clause, Harvard believes it is permitted to racially discriminate. Such a discrepancy cannot be tolerated. Two of our Nation's most prominent laws prohibiting racially discriminatory conduct should not be at such odds with one another. *See Ricci v. DeStefano*, 557 U.S. 557, 594 (2009) (Scalia, J., concurring) ("[T]o what extent, are the disparate-impact provisions of Title VII of the Civil Rights Act of 1964 consistent with the

Constitution's guarantee of equal protection?"); Richard A. Primus, *Equal Protection and Disparate Impact: Round Three*, 117 HARV. L.REV. 493 (2003).

### A. Harvard's Admissions Process is Equivalent to Disparate Treatment under Title VII

Harvard's use of race in its admission process is intentionally discriminatory, and in any scenario under Title VII would be illegal. Disparate treatment—intentional discrimination—occurs when an employer treats an employee "less favorably" because of a "protected trait," such as race. *Ricci*, 557 U.S. at 577. As noted by the district court, Harvard's admissions process is admittedly "*not* facially neutral." *SFFA*, 397 F. Supp. 3d at 189–90 (citing *Fisher I*, 570 U.S. at 307) (emphasis added). This fact alone would permit a Title VII claim for intentional discrimination to proceed. *See Rudin v. Lincoln Land Community College*, 420 F.3d 712, 720 (7th Cir. 2005) ("Direct evidence 'can be interpreted as an acknowledgment of discriminatory intent by the defendant or its agents.'") (quoting *Troupe v. May Dep't Stores*, 20 F.3d 734, 736 (7th Cir. 1994)).

Like the promotion decisions at issue in *Ricci*, Harvard makes admission decisions "because of race." *Ricci*, 557 U.S. at 579–80. In *Ricci*, the New Haven Connecticut Fire Department failed to certify the results of an examination to determine eligibility for promotion to lieutenant or captain. *Id.* at 574. There, the decision was made because "too many whites and not enough minorities would be promoted were the lists to be certified." *Id.* at 579. In *Ricci*, the "express, race-based

24

decisionmaking" violated Title VII; here, Harvard engages in a similar program of race-based decision making. *Id*. Harvard, by monitoring the racial makeup of its classes and offering outcome-determinative tips based on race to reach some non-specified "critical mass" of diversity, is making decisions based on race. If Harvard provided "tips" or "pluses" based on race to prospective faculty hires, there is little doubt it would open itself up to serious Title VII liability. But because these "tips" are governed by Title VI, they are somehow permissible. Such cognitive dissonance in the application of the Equal Protection Clause via Title VI and Title VII cannot stand.

This dissimilar application is particularly inappropriate given the Equal Protection Clause and Title VII serve similar goals. Equal Protection's "core purpose" is eliminating "*all* governmentally imposed discrimination based on race." *Palmore v. Sidoti*, 466 U.S. 429, 432 (1984) (emphasis added). Title VII requires "hiring" based on "qualifications," not "on the basis of race or color." *Ricci*, 557 U.S. at 582. With such intertwined goals of moving America away from treating people differently because of immutable characteristics like race, it is unthinkable that the laws do not command the same results.

Both laws claim to prohibit racial balancing in theory, but only Title VII does so in practice. *Compare Grutter*, 539 U.S. at 334 (allowing universities to have a floating quota for racial diversity so long as it is referred to as "critical mass");

*with Ricci*, 557 U.S. at 582 ("Title VII is express in disclaiming any interpretation of its requirements as calling for outright racial balancing."). Under Title VII, "good-faith" does not "justify race-conscious conduct." *Ricci*, 557 U.S. at 581. But under Equal Protection and strict scrutiny, Harvard's "good-faith" allows it to participate in outright racial discrimination.

As noted above, Harvard tracks the racial composition of its incoming freshmen classes at various points in the admissions process. If Harvard is unsatisfied with the racial composition of an incoming class, it will go back and insert more diversity. *SFFA*, 397 F. Supp. 3d at 176. Further, Asian American applicants are not afforded "pluses" based on their race at the same rate that black and Hispanic applicants are. *See id.* at 161 (Harvard's practice of considering race *only* improves the admission chances of Asian Americans who specifically connect their race to a compelling, personal narrative). Title VII expressly prohibits both a law firm from using this practice for first-year associates, and Walmart with its greeters. Similarly, Equal Protection should and does prohibit Harvard from using it to racially balance their incoming classes.

## B. Harvard's use of the "Personal Rating" Score is Equivalent to Disparate Impact Under Title VII

Harvard's use of the "personal rating" score in its admission process could constitute a disparate impact claim given the overall lower average scores Asian applicants receive. Title VII prohibits disparate impact—"facially neutral" practices

26

which are "discriminatory in operation." *Ricci*, 557 U.S. at 577–78 (citing *Griggs v. Duke Power Co.*, 401 U.S. 424, 431 (1971)). A *prima facie* showing of disparate impact requires three elements: "identification, impact, and causation." *E.E.O.C. v. Steamship Clerks Union, Local 1066*, 48 F.3d 594, 601 (1st Cir. 1995). Further, "good faith is not a defense to a disparate impact claim." *Id.* at 602. If SFFA was a labor union challenging an employer's use of a "personal rating" score as having a disparate impact on the hiring of Asian Americans, it could make a *prima facie* case.

The district court found the statistical difference in the "personal ratings" score between white and Asian applicants was not sufficient to establish intentional discrimination under Title VI. *SFFA*, 397 F. Supp. 3d at 203. Further, it assumed *arguendo*, that a statistically significant difference exists in "how white and Asian American applicants score on the personal rating." *Id.* If this is true—as it likely is— it is sufficient to establish at least a *prima facie* claim of disparate impact. *See Jones v. City of Boston*, 752 F.3d 38, 48 (1st Cir. 2014) ("Title VII does not require plaintiffs to prove that the observed differential is 'practically significant' in order to establish a prima facie case."); *Croson*, 488 U.S. at 501 (1989) ("[G]ross statistical disparities constitute prima facie proof of discrimination.") (quoting *Hazelwood School Dist. v. U.S.*, 433 U.S. 299, 307–08 (1977)).

27

Here, but for the fact the applicants are prospective students and not a labor union, SFFA establishes a *prima facie* case of disparate impact. There is a statistical difference in how Asian applicants score on "personal rating," and this disparity likely leads to admission of fewer Asian applicants. In the employment context, this statistically significant difference would merit a hard look for disparate impact. Similarly, this disparity should further weigh against Harvard's plan being narrowly tailored.

## CONCLUSION

For the foregoing reasons, this Court should reverse the district court's judgment.

## CERTIFICATE OF COMPLIANCE

1.    This document complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B)(i) and 32(g) because, excluding the parts of the document exempted by Fed. R. App. P. 32(f), this document contains 6,495 words.

2.    This document complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because this document has been prepared in a proportionally spaced typeface using Microsoft Word for Office 365 in 14-point Times New Roman.

*/s/ Cody Wisniewski*
Cody Wisniewski
Attorney for *Amicus Curiae*

**CERTIFICATE OF SERVICE**

I hereby certify that on February 25, 2020, I electronically filed the foregoing using the Court's CM/ECF system which will send notification of such filing to all counsel of record.

/s/ Cody Wisniewski
Cody Wisniewski
Attorney for *Amicus Curiae*
