No. 19-2005

# UNITED STATES COURT OF APPEALS
# FOR THE FIRST CIRCUIT

STUDENTS FOR FAIR ADMISSIONS, INC.,

*Plaintiff-Appellant*,

*v.*

PRESIDENT AND FELLOWS OF HARVARD COLLEGE,

*Defendant-Appellee*,

On Appeal from the United States District Court for the District of Massachusetts
in Case No. 1:14-cv-14176-ADB, Judge Allison D. Burroughs

**BRIEF FOR DEFENDANT-APPELLEE
PRESIDENT AND FELLOWS OF HARVARD COLLEGE**

WILLIAM F. LEE
FELICIA H. ELLSWORTH
ANDREW S. DULBERG
WILMER CUTLER PICKERING
    HALE AND DORR LLP
60 State Street
Boston, MA  02109
(617) 526-6000

ARA B. GERSHENGORN
HARVARD UNIVERSITY,
  OFFICE OF THE GENERAL COUNSEL
1350 Massachusetts Avenue
Cambridge, MA  02138
(617) 495-8210

May 14, 2020

SETH P. WAXMAN
PAUL R.Q. WOLFSON
DANIELLE Y. CONLEY
BRITTANY BLUEITT AMADI
WILMER CUTLER PICKERING
    HALE AND DORR LLP
1875 Pennsylvania Avenue, NW
Washington, DC  20006
(202) 663-6000
Seth.Waxman@wilmerhale.com

DEBO P. ADEGBILE
WILMER CUTLER PICKERING
    HALE AND DORR LLP
7 World Trade Center
250 Greenwich Street
New York, NY  10007
(212) 230-8800

*Additional Counsel for Defendant-Appellee Listed on Inside Cover*

MICHELLE LISZT SANDALS
GREG SCHMIDT
WILMER CUTLER PICKERING
   HALE AND DORR LLP
60 State Street
Boston, MA  02109
(617) 526-6000

EMMA SIMSON
ALEX HEMMER
WILMER CUTLER PICKERING
   HALE AND DORR LLP
1875 Pennsylvania Avenue, NW
Washington, DC  20006
(202) 663-6000

## CORPORATE DISCLOSURE STATEMENT

Pursuant to Federal Rule of Appellate Procedure 26.1, Defendant-Appellee President and Fellows of Harvard College certifies that it is a non-profit corporation with no parent corporation and that no public company owns any interest in it.

# TABLE OF CONTENTS

Page

CORPORATE DISCLOSURE STATEMENT ........................................................i

TABLE OF AUTHORITIES ...............................................................................v

INTRODUCTION ...............................................................................................1

STATEMENT OF ISSUES ................................................................................4

STATEMENT OF THE CASE ..........................................................................4

    A.    Harvard's Fundamental Interest In Diversity........................................4

    B.    Harvard's Individualized Admissions Process......................................6

          1.    Initial evaluation of applicants....................................................7

          2.    Committee meetings ...................................................................10

    C.    Harvard's Efforts To Recruit And Admit A Class That Is Diverse And Extraordinary Across Many Dimensions......................12

          1.    Harvard's efforts to obtain a diverse applicant pool................12

          2.    Harvard's consideration of race .................................................14

          3.    Admissions officer training about consideration of race .........................................................................................15

    D.    Harvard's Consideration Of Race-Neutral Alternatives ....................16

    E.    U.S. Department Of Education Review And Harvard Office Of Institutional Research Documents ......................................17

          1.    U.S. Department of Education review .......................................17

          2.    Harvard Office of Institutional Research documents ................................................................................19

    F.    This Litigation .....................................................................................21

        1.     Pre-trial proceedings ................................................22

        2.     Trial and the district court's comprehensive ruling .................22

STANDARD OF REVIEW ...........................................................26

SUMMARY OF ARGUMENT .......................................................26

ARGUMENT ..............................................................................29

I.     SFFA LACKS ARTICLE III STANDING TO PURSUE ITS CLAIMS ......................29

II.    HARVARD DOES NOT DISCRIMINATE AGAINST ASIAN-AMERICAN
     APPLICANTS .......................................................................34

     A.    Under Any Standard, The Court Correctly Rejected
          SFFA's Allegation Of Intentional Discrimination ..............35

     B.    The Non-Statistical Evidence Showed That Harvard
          Does Not Discriminate Against Asian-American
          Applicants.......................................................................38

          1.     The non-statistical evidence affirmatively showed
               that Harvard's admissions process operates fairly
               and transparently ......................................................39

          2.     The district court properly rejected SFFA's
               theories that discriminatory intent should be
               inferred .....................................................................41

     C.    The Statistical Evidence Did Not Show Discrimination ....................43

          1.     The district court recognized both the value and
               limitations of statistics in assessing each party's
               statistical evidence ....................................................44

          2.     The district court correctly found that the statistical
               evidence did not show discrimination in the
               admissions process ....................................................46

3.    The district court correctly found that the statistical evidence did not show discrimination in the personal rating ............................................................50

D.    The District Court Correctly Considered Both Statistical And Non-Statistical Evidence ............................................................55

III.    HARVARD'S ADMISSIONS PROGRAM COMPLIES WITH SUPREME COURT PRECEDENT ............................................................58

A.    Harvard Has Substantial, Compelling, And Specific Reasons For Pursuing Student-Body Diversity In Multiple Forms ............................................................59

B.    Harvard Permissibly Considers Race Flexibly And Only As A "Plus Factor" ............................................................62

C.    Harvard Does Not Place An Undue Burden On Any Racial Group ............................................................65

D.    Harvard Does Not Racially Balance Its Class ............................................................68

E.    Harvard Has Properly Considered Race-Neutral Alternatives ............................................................74

F.    Harvard Will Continue To Reevaluate Its Use Of Race ............................................................81

CONCLUSION ............................................................82

CERTIFICATE OF COMPLIANCE

CERTIFICATE OF SERVICE

# TABLE OF AUTHORITIES

## CASES

Page(s)

*Ahern v. Shinseki,*
    629 F.3d 49 (1st Cir. 2010)..............................................................35

*Aman v. Cort Furniture Rental Corp.,*
    85 F.3d 1074 (3d Cir. 1996) ...........................................................57

*Anderson ex rel. Dowd v. City of Boston,*
    375 F.3d 71 (1st Cir. 2004)........................................................38, 56

*Bina v. Providence College,*
    39 F.3d 21 (1st Cir. 1994)..........................................................37, 46

*Brown v. Nucor Corp.,*
    785 F.3d 895 (4th Cir. 2015) .........................................................46

*Camel Hair & Cashmere Institute of America, Inc. v. Associated Dry
    Goods Corp.,*
    799 F.2d 6 (1st Cir. 1986)..............................................................29

*Castaneda v. Partida,*
    430 U.S. 482 (1977).......................................................................57

*Diamond v. Charles,*
    476 U.S. 54 (1986).........................................................................29

*Díaz-Alarcón v. Flández-Marcel,*
    944 F.3d 303 (1st Cir. 2019)..........................................................26

*Equal Employment Opportunity Commission v. Chicago Miniature
    Lamp Works,*
    947 F.2d 292 (7th Cir. 1991) .........................................................45

*Fisher v. University of Texas* (*Fisher I*),
    570 U.S. 297 (2013)................................................................*passim*

*Fisher v. University of Texas* (*Fisher II*),
    136 S. Ct. 2198 (2016).............................................................*passim*

*Friends of the Earth, Inc. v. Chevron Chemical Co.*,
129 F.3d 826 (5th Cir. 1997) ...............................................................33

*Friends of the Earth, Inc. v. Laidlaw Environmental Services (TOC), Inc.*,
528 U.S. 167 (2000)............................................................................30

*Goodman v. Bowdoin College*,
380 F.3d 33 (1st Cir. 2004)...........................................................35, 36

*Gratz v. Bollinger*,
539 U.S. 244 (2003)............................................................................63

*Grutter v. Bollinger*,
539 U.S. 306 (2003)......................................................................*passim*

*Heap v. Cater*,
112 F. Supp. 3d 402 (E.D. Va. 2015) ................................................32

*Hebert v. Mohawk Rubber Co.*,
872 F.2d 1104 (1st Cir. 1989)............................................................57

*Hunt v. Washington State Apple Advertising Commission*,
432 U.S. 333 (1977).............................................................................30

*In re Zoloft (Sertraline Hydrochloride) Products Liability Litigation*,
858 F.3d 787 (3d Cir. 2017) ..............................................................46

*International Brotherhood of Teamsters v. United States*,
431 U.S. 324 (1977)................................................................38, 56, 57

*Package Shop, Inc. v. Anheuser-Busch, Inc.*,
No. 83-513, 1984 WL 6618 (D.N.J. Sept. 25, 1984).................... 32-33

*Parents Involved in Community Schools v. Seattle School District No. 1*,
551 U.S. 701 (2007)............................................................................71

*Playboy Enterprises, Inc. v. Public Service Commission of Puerto Rico*,
906 F.2d 25 (1st Cir. 1990).................................................................33

*Portland Natural Gas Transmission System v. 19.2 Acres of Land*,
318 F.3d 279 (1st Cir. 2003)...............................................................41

*Regents of University of California v. Bakke*,
   438 U.S. 265 (1978) ........................................................................1, 58

*Rojas-Buscaglia v. Taburno-Vasarhelyi*,
   897 F.3d 15 (1st Cir. 2018) .................................................................26

*Rosen v. Thornburgh*,
   928 F.2d 528 (2d Cir. 1991) ...............................................................57

*Segar v. Smith*,
   738 F.2d 1249 (D.C. Cir. 1984) ..........................................................57

*Sorenson Communications, LLC v. Federal Communications Commission*,
   897 F.3d 214 (D.C. Cir. 2018) .....................................................32, 33

*UAW v. Brock*,
   477 U.S. 274 (1986) ............................................................................29

*United States ex rel. Gadbois v. PharMerica Corp.*,
   809 F.3d 1 (1st Cir. 2015) ...................................................................30

*Village of Arlington Heights v. Metropolitan Housing Development Corp.*,
   429 U.S. 252 (1977) .....................................................................35, 38

*Wessmann v. Gittens*,
   160 F.3d 790 (1st Cir. 1998) ..............................................................45

## OTHER AUTHORITIES

*Federal Judicial Center Reference Manual on Scientific Evidence*
   (3d ed. 2011) .........................................................................44, 45, 46

**INTRODUCTION**

For decades, Harvard College has been committed to seeking an exceptional student body that is diverse across many dimensions.  Recognizing the extensive opportunities its students have to learn from one another, Harvard considers many aspects of students' backgrounds and experiences in assembling its entering class—including academic achievement, extracurricular pursuits, geographic origins, family circumstances, and race.  The words of then-Harvard University President Neil Rudenstine decades ago underpin Harvard's admissions process today:  Diversity at Harvard "is not an end in itself, or a pleasant but dispensable accessory"; rather, "[i]t offers one of the most powerful ways of creating the intellectual energy and robustness that lead to greater knowledge, as well as the tolerance and mutual respect that are so essential to the maintenance of our civic society."

The Supreme Court has consistently upheld universities' consideration of race to achieve the benefits that flow from student body diversity, *Fisher v. University of Texas* (*Fisher II*), 136 S. Ct. 2198 (2016); *Grutter v. Bollinger*, 539 U.S. 306 (2003); *Regents of Univ. of Cal. v. Bakke*, 438 U.S. 265 (1978), and in doing so has regularly invoked the Harvard College admissions process as a model, *see Bakke*, 438 U.S. at 316-319 (opinion of Powell, J.) (Harvard process "[a]n illuminating example" of permissible race-conscious program); *Grutter*, 539 U.S.

at 335 ("We are satisfied that the Law School's admissions program, like the Harvard plan described by Justice Powell, does not operate as a quota.").  The Supreme Court has explained that universities have a compelling interest in pursuing the educational benefits that flow from student body diversity, and held that they may consider race as part of an individualized admissions process.

This case seeks to overturn these precedents by striking down the very policy the Supreme Court has endorsed as a model.  The plaintiff, Students for Fair Admissions, Inc. ("SFFA"), was formed for the express purpose of ending race-conscious admissions.  SFFA argues that Harvard fails to comply with Supreme Court precedent governing the consideration of race in admissions and intentionally discriminates against Asian-American applicants.  But after conducting a three-week bench trial, hearing testimony from twenty-five witnesses, and reviewing hundreds of exhibits, the district court issued a 130-page decision, encompassing more than 80 pages of factual findings, that carefully considered and rejected all of SFFA's claims.

On appeal, SFFA largely attempts to relitigate the facts.  But this Court reviews the district court's factual findings for clear error, a bar SFFA makes no serious effort to meet.  Among other factual findings, the court found that Harvard evaluates each applicant as an individual; that it considers an applicant's race only for highly qualified applicants and as one of many factors; that it does not employ

quotas; and—critically—that it does not harbor any discriminatory intent.  Rather than engage with these factual findings, SFFA largely ignores or misstates them.

This Court should affirm.  In rejecting SFFA's intentional discrimination claim, the trial court carefully reviewed Harvard's admissions process, in which a forty-person committee makes decisions openly, with each person's vote carrying equal weight.  The court found no document, witness, or any other evidence supporting SFFA's contention that Harvard intentionally discriminates against Asian-American applicants.  In contrast, it found extensive evidence, including the consistent and credible testimony of Admissions Office witnesses, that Harvard considers all applicants as individuals in its effort to assemble a student body diverse across many dimensions, so that all students benefit from living and learning alongside those who are different from themselves.  And as to SFFA's claims that Harvard fails to follow Supreme Court precedent governing the consideration of race in admissions, the district court correctly found that Harvard has established a compelling interest in diversity, considers race as one factor among many, does not pursue racial balancing, and cannot presently achieve its goal of assembling an exceptional and diverse student body using race-neutral alternatives.  SFFA provides no reason to discard these conclusions or the careful findings of fact on which they rely.

## STATEMENT OF ISSUES

1.     Whether SFFA lacks standing.

2.     Whether the district court correctly found that Harvard does not intentionally discriminate against Asian-American applicants.

3.     Whether the district court correctly found that Harvard's admissions process comports with Supreme Court precedent governing the consideration of race.

## STATEMENT OF THE CASE

### A.     Harvard's Fundamental Interest In Diversity

Harvard College's mission is "to educate … citizens and citizen-leaders for our society."  Joint Appendix ("JA") 5620.  Essential to that mission is "a diverse living environment, where students live with people who are studying different topics, who come from different walks of life and have evolving identities." Addendum ("ADD") 7; JA5620.  Harvard pursues diversity of all kinds, including in academic interests, extracurricular pursuits, geographic origins, family circumstances, and racial identities.  ADD7.  As a residential college, Harvard strives to realize the full benefits of its diverse student body by creating opportunities for interactions between students from different backgrounds through coursework, living assignments, extracurricular activities, and athletic programs. ADD7-8.

Harvard has repeatedly concluded that a diverse student body is critical to its mission.  ADD8.  It has explained that diversity helps students "think more rigorously and imaginatively," "learn to relate better to people from different backgrounds," and "become better citizens."  JA5522 (*Grutter* amicus brief); *see also* JA5562-5565, JA5592-5593 (*Bakke* amicus brief); JA5217-5224 (*Fisher I* amicus brief).  In 1996, then-University President Neil Rudenstine wrote an 84-page report concluding that diversity is "fundamental to the basic mission of colleges and universities" like Harvard, in part because "little if anything can substitute for the experience of continued association with others who are different from ourselves."  JA5421; JA5430.

In 2015, Harvard established a Committee to Study the Importance of Student Body Diversity, chaired by Harvard College Dean Rakesh Khurana.  ADD8.  The committee evaluated the ways diversity supports Harvard College's mission, the measures Harvard takes to realize the benefits of diversity, and data reflecting those benefits.  *Id.*; JA4400-4411.  The committee concluded that diversity "enhances the education of all of [Harvard College's] students, it prepares them to assume leadership roles in the increasingly pluralistic society in which they will graduate, and it is fundamental to the effective education of the men and women of Harvard College."  JA4411.  The committee "embrace[d] and reaffirm[ed] the University's long-held view that student body diversity—

including racial diversity—is essential to [Harvard's] pedagogical objectives and institutional mission." *Id.*

Harvard's "interest in diversity and the wide-ranging benefits of diversity were echoed by all of the Harvard admissions officers, faculty, students, and alumni that testified at trial." ADD7. "The evidence at trial was clear that a heterogeneous student body promotes a more robust academic environment with a greater depth and breadth of learning, encourages learning outside the classroom, and creates a richer sense of community." ADD6-7.

### B.    Harvard's Individualized Admissions Process

Harvard College receives more than 35,000 applications each year for admission to its approximately 1,600-seat first-year class. ADD9. Nearly all applicants have strong academic credentials. For example, 2,700 applicants to the Class of 2019 had perfect SAT verbal scores, 3,400 had perfect math scores, and over 8,000 had perfect GPAs. *Id.*; JA5686. As a result, "[t]o admit every applicant with a perfect GPA, Harvard would need to expand its class size by approximately 400% and then reject every applicant with an imperfect GPA without regard to their athletic, extracurricular, and other academic achievements, or their life experiences." ADD9.

"In making admissions decisions," the district court found, "Harvard's goal is to admit the best [first-year] class … , not merely a class composed of the

- 6 -

strongest applicants based solely on academic qualifications." ADD25.  In addition to valuing academic strength, Harvard seeks to admit a class of students who will significantly contribute to and benefit from the educational experience on campus. To that end, Harvard "seeks to attract applicants who are exceptional across multiple dimensions or who demonstrate a truly unusual potential for scholarship through more than just standardized test scores or high school grades."  ADD9.

Harvard employs a "time-consuming, whole-person review process" that considers all available information about each applicant.  ADD11.  Admissions officers consider each applicant's intellectual curiosity, character, intelligence, perspective, and skills, and "evaluate each applicant's accomplishments in the context of his or her personal and socioeconomic circumstances."  ADD11-12.[1]

### 1.    Initial evaluation of applicants

A completed application file includes information submitted by the applicant's high school, including an overview of the school, transcript, and recommendation letters; information about extracurricular activities, athletics, honors, and prizes; student essays; an applicant's indication of intended academic

---

[1] SFFA dedicates pages to the history of discrimination against Jewish applicants to Harvard a century ago.  Br. 1-3.  As the district court found, that history has no relevance to SFFA's claims.  ADD160-161 n.18.  Indeed, SFFA's contention that Harvard's admissions approach has been a pretext for discrimination is wholly inconsistent with the Supreme Court's reliance on the Harvard process in *Bakke* more than 40 years ago.

concentration and career; standardized test scores; family and demographic information; and a report from an in-person alumni or staff interview.  ADD12-13; *see, e.g.*, Sealed Supplemental Appendix ("SA") 404-448.  A file may also include additional recommendation letters, academic or artistic work, and a faculty evaluation of that work.  ADD13; ADD18.

The Admissions Committee organizes applications into geographic regions or "dockets."  ADD18; JA4904.  Subcommittees of three to six admissions officers initially evaluate candidates from each docket, allowing the group to develop an understanding of the area schools—including grading practices, academic rigor, and recommendation styles—and evaluate applications fairly within and across schools.  ADD18.

As an initial step, an application's first reader assigns a series of ratings to the application file and adds written notes about the applicant.  ADD18; ADD22. The ratings reflect a tentative assessment—often made before the file is complete—of the strengths and weaknesses of an application and are used as a starting point for later consideration of applicants; students are not admitted or denied on the basis of these ratings.  ADD19; JA943:2-944:10.  All ratings incorporate qualitative information, and none are based on a formula.  ADD124; JA930:25-931:14; JA933:2-934:1; JA934:22-935:9; JA942:20-23.

The academic rating summarizes the applicant's academic achievement and potential based on factors including grades, standardized test scores, recommendation letters, academic work and prizes, and the strength of the applicant's academic program.  ADD19.  The extracurricular rating reflects the strength of the applicant's involvement in activities during high school and potential to contribute outside the classroom.  ADD19-20.  The athletic rating summarizes the applicant's participation in high school athletics and potential contributions to athletics.  ADD20.  The personal rating reflects "the admissions officer's assessment of what kind of contribution the applicant would make to the Harvard community based on their personal qualities," *id.*, including "what kind of contribution" the applicant would "make to the dining hall conversation, to study groups, and to society as a whole after graduation," JA4590.

First readers also rate the strength of teacher and guidance counselor recommendation letters.  ADD21.  Harvard alumni or Admissions Office staff who interview applicants provide their own sets of ratings.  ADD14.  Finally, the preliminary overall rating summarizes an application's overall strength, taking into account all information available at the time the rating is assigned.  ADD21.  It is not a formulaic combination of other ratings.  JA942:20-23.

In striving to admit the best first-year class, admissions officers may provide a "tip"—a factor that contributes to the admission of an applicant—for highly

- 9 -

qualified applicants who, as the district court described, "will offer a diverse perspective or are exceptional in ways that do not lend themselves to quantifiable metrics."  ADD21-22.  For example, Harvard may give a tip for unusual intellectual ability; strong personal qualities; the capacity to contribute to racial, ethnic, socioeconomic, or geographic diversity; outstanding creative or athletic ability; or excellence on other dimensions.  *Id.*; JA4897-4899.  Children of Harvard College alumni and Harvard faculty or staff may also receive a tip.  ADD22.

If the first reader believes an applicant is a competitive candidate for admission, the reader sends the file for further review by the subcommittee chair, who then reviews the file, assigns ratings in the same categories, and can provide additional written comments.  ADD22-23.  Even if the first reader does not pass an application to the subcommittee chair, the application and the first reader's ratings and comments remain available to all admissions officers for discussion later in the process.  ADD23; JA1259:11-1261:10.

## 2. Committee meetings

Following initial review of applications, subcommittees meet for several days to discuss which applicants to recommend for admission.  ADD23; JA4754.  Subcommittee members have access to all applications from their docket and can raise any application for discussion.  ADD23-24.  Subcommittees decide by

majority vote whether to recommend applicants for admission.  JA4905;
JA963:14-964:7.

The full Admissions Committee, comprising approximately 40 admissions
officers, then decides which applicants to admit.  ADD24.  Over several weeks,
first readers present individual applicants, the committee discusses applicants, and
the full committee decides, by open vote in which each member's vote carries
equal weight, which applicants to admit, reject, and waitlist.  ADD23-26.  The full
committee also considers and admits applicants not recommended for admission
by the subcommittees.  ADD24-25.

All of these discussions and decisions focus on the underlying information in
applicant files, not the ratings initially assigned by the first readers.  ADD23-25;
JA943:2-944:6.  This is in part because "additional high school grades, alumni
interview evaluations, and other information frequently becomes available later in
the admissions process," so the full committee often has access to more
information than first readers had.  ADD25.

During the admissions process, senior Admissions Office leaders, including
Dean of Admissions William Fitzsimmons, periodically review documents known
as "one-pagers."  One-pagers summarize a range of characteristics of Harvard's
applicant pool and tentatively admitted class, including geography, intended field
of concentration, children of Harvard alumni, recruited athlete status, gender,

citizenship, race, and measures of socioeconomic background.  ADD27; JA4135.

Dean Fitzsimmons may occasionally share information from the one-pagers with

admissions officers, but one-pagers are not distributed.  ADD28.

The review process—from initial evaluation to final decision—contains

checks and balances to ensure admissions officers give all applicants fair

consideration.  For example, all admissions officers have access to every

application and can raise any applicant for discussion, ADD23-24; JA1259:11-

1261:10; JA963:1-13, and the full 40-member committee discusses and decides in

person whom to admit, reject, or waitlist, ADD24-25.

### C.    Harvard's Efforts To Recruit And Admit A Class That Is Diverse And Extraordinary Across Many Dimensions

#### 1.    Harvard's efforts to obtain a diverse applicant pool

Harvard's efforts to obtain a diverse and extraordinary applicant pool and

class begin long before the application cycle begins.  Each year, admissions

officers travel widely to meet prospective students, parents, and guidance

counselors.  ADD10.  Harvard also sends approximately 100,000 letters annually

to high-school students with standardized test scores and grades above certain

thresholds, encouraging them to consider applying.  ADD9-10.  These efforts are

directed to students of all demographic and socioeconomic backgrounds.  *E.g.*,

ADD10; JA4002.[2]

Harvard also recruits racial and ethnic minority applicants, applicants from

modest socioeconomic backgrounds, and applicants who are in the first generation

of their family to attend college.  The Undergraduate Minority Recruitment

Program recruits applicants who identify as Asian-American, African-American,

Hispanic, Mexican-American, and Native American.  ADD10; JA5485-5487.  The

Harvard Financial Aid Initiative and the Harvard College Connection facilitate

outreach to low-income high school students, ADD11; JA2024:7-2025:6; and the

First Generation program encourages applications from students who will be in the

first generation in their family to attend college, ADD11; JA4416; JA2060:2-10.

Harvard's financial aid program is among the most generous in the country.

Financial aid is entirely need-based to ensure that finances will not prevent any

admitted student from attending.  JA5617-5618.  Harvard expects no financial

---

[2] SFFA wrongly contends that Asian-American applicants must score higher on standardized tests than white applicants to receive a letter.  Br. 6.  Harvard determines where to send letters using standardized test score thresholds that may vary based on region, gender, and racial and ethnic background.  The evidence showed that the thresholds for Asian-American applicants to receive letters variously were lower than, equal to, or—for a limited time in one region—higher than those for white applicants.  ADD42-43; JA3741; JA4007.  The district court found that any "inconsistencies … do not seem to be linked to efforts to advantage or disadvantage any particular racial group," ADD43, and whether an applicant receives a letter does not affect admissions decisions, *id.*; JA574:19-25.

contribution from families with incomes below $65,000, and only a modest

contribution from families with incomes between $65,000 and $150,000.

ADD11. More than half of Harvard students receive need-based aid, including

20% for whom no financial contribution is required; those who receive aid pay an

average of $12,000 per year for tuition, room, and board. *Id.*; JA5617. Harvard

spends approximately $200 million per year on undergraduate financial aid.

JA3343:23-25.

### 2.    Harvard's consideration of race

Harvard gives applicants the option to identify their race or ethnicity in their

application. ADD12-13. Applicants may do so in the demographics section of the

application form, elsewhere in the application (*e.g.*, essays), or both. ADD13.

Admissions officers may consider an applicant's race or ethnicity as one

factor among many; race or ethnicity may function as a "tip" or "plus" that

contributes to admission. ADD29. As the admissions officers who testified at trial

uniformly and credibly attested, and as the district court found, a tip for race or

ethnicity may be reflected in the applicant's preliminary overall rating, but

admissions officers do not consider race when assigning other ratings. *Id.*;

ADD45; ADD69; JA4540; JA1000:17-1001:3; JA1137:4-25; JA1245:5-1246:19;

JA1450:4-13; JA2038:21-2039:8; JA2057:6-25; JA2106:6-2108:14. An

applicant's race, if the applicant chooses to disclose it, can factor into a

- 14 -

subcommittee or committee discussion about the applicant and the ultimate

decision to admit the applicant, ADD24-26, but as the district court explained,

"race has no specified value in the admissions process," ADD30.

### 3.    Admissions officer training about consideration of race

New admissions officers participate in a weeks-long training during which

they learn how to read and evaluate files.  The training materials include past

application files and a "casebook" of lightly edited files.  ADD17; JA4628-4737;

JA5031-5043; JA4743-4744.  Senior admissions officers also provide new officers

with feedback on the first 50 to 100 application files that they review.  ADD17.

Training for all admissions officers also includes guidance on how to

consider race in the process.  New staff training includes instructions on

considering race, professional development sessions for all officers have focused

on the consideration of race and the consistent assignment of ratings, and all

officers receive annual training from Harvard's General Counsel's Office on the

use of race in admissions.  ADD17.  Admissions officers also receive training on

diversity within racial and ethnic groups.  JA5272-5345; JA4978-5030;

JA2144:12-2147:10.

Each year the Admissions Office distributes "reading procedures" to

admissions officers that provide guidelines on reviewing application files.

ADD18; JA3310:11-15.  Before 2018, the reading procedures did not explicitly

discuss how to consider race in assigning ratings or evaluating applicants. The consistent practice, however, was to consider race, if at all, as one factor in the preliminary overall rating but not the other ratings. ADD45. In 2018, the reading procedures were revised to explicitly address the consideration of race. The procedures state that, in assigning the preliminary overall rating, "[t]he consideration of race or ethnicity may be considered **only** as one factor among many," JA4588, and that "readers should not take an applicant's race or ethnicity into account in making any of the ratings other than the Overall rating," *id.* The district court recognized that the 2018 revisions codified existing practices and did not reflect any change in policy. ADD29; ADD45; JA3317:21-3319:24; JA2123:15-2124:14.

### D.    Harvard's Consideration Of Race-Neutral Alternatives

In 2017, Harvard College established a Committee to Study Race-Neutral Alternatives, chaired by then-Dean of the Faculty of Arts and Sciences Michael Smith; Dean Fitzsimmons and Dean Khurana also served on the committee. JA4415.

Over nine months, the committee reviewed literature on race-neutral alternatives, SFFA's complaint, and the reports prepared by the parties' experts on race-neutral alternatives. It examined all of the race-neutral alternatives proposed by SFFA's expert and two additional alternatives not proposed by SFFA. ADD41;

JA5597-5602; JA4412; JA4418-4419; JA5611.  It considered the feasibility of implementing the alternatives; their impact on the student body's diversity of backgrounds, experiences, and interests; and their effect on Harvard's other institutional goals.  JA4415.

The committee issued its report in April 2018.  ADD41; JA4413-4431.  It "concluded that no workable race-neutral admissions practices could, at that time, promote Harvard's diversity-related educational objectives while also maintaining the standards of excellence that Harvard seeks in its student body through its whole-person, race-conscious admissions program."  ADD41; *see also* JA4419.  It also noted race-neutral practices Harvard already employs, such as significant recruitment efforts, tips to students from modest socioeconomic backgrounds, and generous financial aid.  JA4416-4418.  The committee recommended that Harvard College reexamine in five years whether it could achieve its diversity-related educational goals without considering race.  ADD41.

### E.    U.S. Department Of Education Review And Harvard Office Of Institutional Research Documents

#### 1.    U.S. Department of Education review

In 1988, the Department of Education's Office for Civil Rights ("OCR") initiated an investigation into possible bias against Asian-American applicants in Harvard College's admissions process.  ADD43; JA4476.  At the conclusion of the

investigation, OCR concluded—as the district court did here—that Harvard did not discriminate against Asian-American applicants.

Over the course of two years, OCR interviewed current and former Admissions Office staff, students who worked in the Office, and alumni interviewers; reviewed 400 complete application files and 2,000 additional application "summary sheets"; analyzed the Office's implementation of its policies and procedures; and conducted a statistical analysis on ten years of admissions data.  JA4477-4480; JA4483-4484; JA4493.

OCR's 46-page report found that Harvard did not set a quota for the number of Asian-American admitted students, JA4517; the ratings assigned to applicants were generally consistent with their applications, JA4496; and the "tip" for race or ethnicity provided an "opportunity for Asian American ethnicity to be positively weighed in the admissions process," JA4518.  Although OCR identified a few comments in application files that might be consistent with stereotyping of Asian-American applicants, it found those comments "could not be shown to have negatively impacted the ratings given to these applicants."  JA4500.  OCR ultimately "conclu[ded] that Harvard did not discriminate against Asian American applicants."  ADD43; JA4520.

## 2.    Harvard Office of Institutional Research documents

In late 2012, an article accusing Harvard of employing an admissions quota for Asian-American applicants garnered media attention.  ADD31.[3]  Harvard's Office of Institutional Research ("OIR") subsequently conducted a series of analyses based on a limited set of admissions data.  ADD32 & n.26.  On appeal, SFFA relies on OIR's internal analyses to support its claims, Br. 44, notwithstanding the district court's rejection of those arguments, ADD32-38.

In early 2013, an OIR employee created four "rough" statistical models in an attempt to project the racial composition of the admitted class.  ADD32.  The models included as inputs only a "limited set of variables" used in admissions decisions, such as SAT scores, legacy status, gender, and race, rather than the entire range of qualitative and quantitative factors the Admissions Office considers.  ADD32-33.  Unsurprisingly, the models showed that, as more factors were included in the simulation, the simulated class's racial composition more closely resembled that of the actual admitted class.  ADD33-34.  The models also showed that the share of Asian-American applicants in the simulated class decreased as non-academic factors were added.  JA3792.  But, as the district court

---

[3] Although the article received media attention and was discussed internally by Harvard leadership, the district court found that "it was not unreasonable for some Harvard admissions officials to view the article as 'profoundly anti-Semitic' and … as less than serious scholarship."  ADD31 & n.25.

found, the models did not estimate the effect of any particular factor on an

applicant's chances of admission, and they omitted many factors critical to the

admissions process, such as socioeconomic status, essays, and recommendations.

ADD34.  The district court accordingly found that the models "are entitled to little

weight for purposes of determining whether Harvard discriminates" against Asian-

American applicants.  ADD34.[4]

Months later, OIR undertook to assess whether low-income applicants

receive a "tip" in the admissions process, and whether that tip was applied to

applicants of all races.  ADD35-38.  Those analyses, which again considered only

a small set of factors, showed a negative association between Asian-American

ethnicity and admissions outcomes, but also showed that low-income applicants of

all races, including Asian-American applicants, receive tips relative to higher-

income applicants of the same race.  ADD36-38; JA3968.

OIR shared its evaluations—the four models and the low-income review—

with Dean Fitzsimmons.  The district court found that OIR never suggested to

Dean Fitzsimmons that its work investigated or showed bias or discrimination

---

[4] SFFA also relies (Br. 11) on a draft document containing similar models
created by the same OIR employee in early 2013; that draft was "replete with
blank spaces and typographical errors."  ADD33 n.28; JA3742-3758.  The district
court found that the document was never shared with anyone before this litigation
and afforded it no weight in considering SFFA's claims.  ADD33 n.28.

against Asian-American applicants (ADD34-35; ADD37-38; JA1331:20-1332:10;

JA1981:1-6; JA1983:9-24), and that Dean Fitzsimmons did not understand the

results to show any such discrimination or bias (ADD34-35; ADD37-38; JA855:3-

11).  First, Dean Fitzsimmons viewed the four-model simulation as incomplete.

ADD35.  Second, he understood the low-income analysis to show "that the

Admissions office was 'treating Asian Americans in an evenhanded manner,'"

based on the finding that low-income Asian-American applicants were provided a

tip relative to higher-income Asian-American applicants.  ADD38 (quoting

JA855:3-11).  The district court credited Dean Fitzsimmons's testimony on these

points and found that his reaction to the OIR analyses "was reasonable given the

limitations of OIR's model and his own experience with and confidence in the

Admissions Office's process."  ADD38.

### F.    This Litigation

In November 2014, SFFA sued, challenging Harvard's consideration of race

in undergraduate admissions.  SFFA claims to be a membership organization with

Asian-American members adversely affected by Harvard's race-conscious

admissions program.

SFFA asserted six counts for relief.  First, SFFA alleged that Harvard

"intentionally discriminate[s]" against Asian-American applicants (Count I).

Second, SFFA alleged that Harvard violates Supreme Court precedent on the

- 21 -

permissible consideration of race in admissions.  Specifically, it alleged that

Harvard engages in racial balancing (Count II), uses race as more than a "plus"

factor (Count III), uses race to fill more than the last "few places" in its class

(Count IV), and employs a race-conscious admissions program despite the

availability of race-neutral alternatives (Count V).  Finally, SFFA alleged that any

consideration of race in admissions should be unlawful (Count VI).  JA208-226.

### 1.     Pre-trial proceedings

Harvard moved to dismiss the complaint, arguing SFFA lacked standing.

The district court denied the motion.  ADD174-190.  Harvard also moved for

judgment on the pleadings as to Counts IV and VI.  ADD172-173.  The court

granted that motion, holding that both counts failed as a matter of law and that

Count VI would require the court to overrule Supreme Court precedent.  *Id.*

SFFA took extensive discovery.  Harvard produced admissions data on more

than 200,000 applicants over six admissions cycles, 480 application files selected

by the parties, and tens of thousands of pages of documents.  SFFA took

depositions of 19 fact witnesses currently or formerly employed by Harvard, four

third parties, and Harvard's two experts.

### 2.     Trial and the district court's comprehensive ruling

A three-week bench trial began in October 2018.  Twenty-one fact witnesses

testified live: thirteen current or former Harvard employees, and eight Harvard

College students and alumni (called by amici).  Five additional former Harvard

employees testified by deposition.  SFFA called no fact witness affiliated with its

organization, and the court heard no testimony from any applicant who complained

of discrimination in the admissions process.

Harvard presented testimony from two experts.  Dr. Ruth Simmons, who

served as President of Smith College and Brown University (where she was the

first African-American president of an Ivy League university) and is currently the

President of Prairie View A&M University, testified to "the extraordinary benefits

that diversity in education can achieve, for students and institutions alike."  ADD6

n.3; ADD129-130.  Harvard also presented statistical testimony from Professor

David Card, an economist at the University of California-Berkeley and winner of

the John Bates Clark Medal (awarded annually to the American economist under

age 40 who has made the most significant contribution to economics), as part of its

showing that Harvard does not discriminate against Asian-American applicants and

that no race-neutral alternative would be feasible.  ADD50.

SFFA did not produce an expert to contest President Simmons's expert

testimony about diversity.  SFFA presented statistical testimony from Professor

Peter Arcidiacono, an economist at Duke University.  ADD50.  SFFA also

presented testimony on race-neutral alternatives from Richard Kahlenberg,

ADD83, who has long advocated for the use of socioeconomic status, rather than race, to achieve diversity in college admissions, JA1521:7-18.

After trial, the parties submitted proposed findings of fact and conclusions of law, and the court heard further argument in February 2019.  In September 2019, the district court issued detailed findings of fact and conclusions of law.  ADD1-130.  On Count I, the court found "no evidence of any racial animus whatsoever," ADD123, and deemed the admissions officers' testimony that Harvard does not discriminate against Asian-American applicants "consistent, unambiguous, and convincing," ADD125.  The court also concluded that the statistical analyses failed to show intentional discrimination.  *Id.*

On the other counts, the district court found that Harvard had established a "substantial and compelling" interest in pursuing the benefits of student body diversity.  ADD106.  The court credited the assessment of the committee chaired by Dean Khurana and the testimony of Dr. Simmons that the benefits of a diverse student body are "real and profound."  ADD8.

The district court further concluded that Harvard's admissions process "bears the hallmarks of a narrowly tailored plan."  ADD108 (quoting *Grutter*, 539 U.S. at 334).  Like the admissions process upheld in *Grutter*, the court found, "Harvard 'engages in a highly individualized, holistic review of each applicant's file, giving serious consideration to all the ways an applicant might contribute to a

diverse educational environment'"; "this individualized consideration [is afforded] to applicants of all races"; and its "race-conscious admissions program adequately ensures that all factors that may contribute to student body diversity are meaningfully considered alongside race."  ADD108 (quoting *Grutter*, 539 U.S. at 337-338).

The district court rejected SFFA's claim that Harvard engages in racial balancing, finding that Harvard "does not have any racial quotas and has not attempted to achieve classes with any specified racial composition."  ADD80; ADD116.  The court also rejected SFFA's argument that Harvard uses race as more than a "plus" factor, finding that Harvard does not consider race in a "rigid and mechanical manner," but rather permits admissions officers to consider race as a "tip" in a "holistic evaluation" of each applicant's potential contributions to its educational program.  ADD116-117.  Finally, the court held that Harvard had "convincingly" established that no workable race-neutral alternatives are presently available.  ADD83; ADD119-122.  The court noted that, were Harvard to cease considering race, the racial diversity of the admitted class would suffer a precipitous decline and none of the proffered race-neutral alternatives could adequately or feasibly make up for that loss.  ADD119-122.

## STANDARD OF REVIEW

This Court reviews the district court's legal conclusions de novo. *Rojas-Buscaglia v. Taburno-Vasarhelyi*, 897 F.3d 15, 23 (1st Cir. 2018). It reviews the district court's factual findings "with deference, overturning them only when clearly erroneous." *Id.* The Court will not deem a factual finding "clearly erroneous" unless it "prompt[s] a strong, unyielding belief, based on the whole of the record, that the [district court] made a mistake." *Id.* at 24. Given the district court's superior ability to evaluate witness credibility, "plausible findings based on witness credibility 'can virtually never be clear error.'" *Díaz-Alarcón v. Flández-Marcel*, 944 F.3d 303, 312 (1st Cir. 2019).

## SUMMARY OF ARGUMENT

The Court should reject SFFA's attack on Harvard's longstanding and lawful admissions policy, under which students are considered as individuals and race is considered only as one factor among many. SFFA lacks standing, and on the merits its claims fail, as the district court correctly held.

First, SFFA does not have standing to bring suit. The concept of associational standing sometimes allows membership organizations to sue on behalf of their members, when they effectively embody and genuinely represent their members' interests. But SFFA is not a true membership organization. SFFA's purported members have never played a meaningful role in the

organization: they do not direct, control, or finance its activities in any meaningful way.  The district court permitted SFFA to proceed on the theory that an organization can invoke associational standing as long as it calls the individuals it purports to represent "members."  But that logic elevates form over substance. Assessed under the appropriate standard, SFFA lacks standing, and the courts lack jurisdiction over this case.

On the merits, SFFA's claims fail.  As the district court correctly found, Harvard does not discriminate against Asian-American applicants.  After hearing from twenty-five witnesses and reviewing hundreds of exhibits, the court found that SFFA had shown no evidence of discriminatory intent.  Because SFFA bears the burden on its claim of intentional discrimination, that finding alone—which this Court reviews for clear error and which SFFA makes no real attempt to overturn—requires affirmance on Count I.  And even if Harvard bore the burden on this claim, as SFFA insists, the district court found that Harvard showed that it does not discriminate against Asian-American applicants and so survives strict scrutiny.  SFFA's arguments on appeal amount to no more than an unsuccessful effort to relitigate the facts, and they rely almost entirely on statistical analyses prepared by its expert that the district court largely rejected.  In addition to largely crediting the expert analysis of Professor Card, the district court found Professor Arcidiacono's analyses too weak in the face of the extensive non-statistical

evidence—including the testimony of numerous current and former Admissions Office witnesses, all of whom the court found credible—showing that Harvard treats all applicants fairly.

Finally, Harvard's consideration of race in its admissions process fully complies with Supreme Court precedent. As the district court found, Harvard has articulated a compelling interest in obtaining the educational benefits of diversity, and its consideration of race is narrowly tailored to that end. SFFA attacks the district court's analysis, arguing that Harvard fails to comply with Supreme Court precedents, but its real targets are those precedents themselves. In any event, SFFA's arguments on those counts fail on the merits. SFFA argues that Harvard places too much emphasis on race and neglects other factors. But as the district court found, Harvard considers race as one factor among many and never in a mechanical way. SFFA likewise argues that Harvard "racially balances" its class. But as the district court found, the racial composition of Harvard's class varies from year to year. And the district court found that Harvard had seriously considered race-neutral alternatives and that those alternatives would either fail to achieve Harvard's interest in diversity or would significantly undermine its other institutional goals, including academic excellence. Those findings, none of which SFFA can successfully challenge, compel the conclusion that Harvard's admissions process complies with Supreme Court precedent.

## ARGUMENT

### I.     SFFA LACKS ARTICLE III STANDING TO PURSUE ITS CLAIMS

Article III standing requirements ensure that the power to seek judicial resolution of a dispute rests with "those who have a direct stake in the outcome," rather than "concerned bystanders, who will use it simply as a vehicle for the vindication of value interests." *Diamond v. Charles*, 476 U.S. 54, 62 (1986) (quotation marks omitted).  In this case, Edward Blum, a longtime opponent of race-conscious admissions, has attempted to circumvent that limitation.  Lacking a direct stake in Harvard's admissions process, Blum established SFFA, cast in search of Asian-American applicants to become "members" of his organization, JA240:1-25, and then sued in SFFA's name, purportedly on behalf of these "members."  Blum hopes to avail himself of the associational-standing doctrine, which sometimes allows membership organizations to stand in the shoes of their members in court, when those organizations are effectively embodiments of their members' interests.  *See UAW v. Brock*, 477 U.S. 274, 290 (1986); *Camel Hair & Cashmere Inst. of Am., Inc. v. Associated Dry Goods Corp.*, 799 F.2d 6, 10-11 (1st Cir. 1986).

But SFFA is not a genuine membership organization.  Whether the focus is on SFFA when it filed suit, or after it amended its bylaws following Harvard's indication that it would challenge SFFA's standing, *see* ECF No. 43, at 21-23,

SFFA does not possess any of the "indicia" of a true membership organization—its members do not direct, control, or finance the organization's activities in any significant way.  *See Hunt v. Washington State Apple Advertising Comm'n*, 432 U.S. 333, 342, 344-345 (1977).[5]

SFFA was incorporated shortly before this suit was filed.  JA248.  Blum, Abigail Fisher (the plaintiff in *Fisher I* and *Fisher II*) and her father, Richard Fisher, fully constituted SFFA's initial three-person Board of Directors, and they appointed themselves President, Secretary, and Treasurer, respectively.  JA252; JA255-260; JA236:9-237:19.  At the time SFFA sued, its Articles of Incorporation and bylaws stated that "[t]he Corporation shall have no members," although the bylaws established one class of "affiliate members."  JA245; JA262.  SFFA considered any person who supported its mission and provided it with a name and email address to be an "affiliate member."  ADD180.

---

[5] The Supreme Court has held that a plaintiff must have standing at the time a suit is filed.  *Friends of the Earth, Inc. v. Laidlaw Environmental Services (TOC), Inc.*, 528 U.S. 167, 180 (2000).  In *United States ex rel. Gadbois v. PharMerica Corp.*, 809 F.3d 1, 5 (1st Cir. 2015), this Court concluded that "the time-of-filing rule" for federal jurisdiction is "inapposite" in the federal-question context under certain circumstances.  But that case did not involve a standing defect and did not address whether such a defect can be cured post-filing.  This Court need not resolve that question here, because whether the proper focus is on the time of filing or today, SFFA is not a genuine membership organization.

SFFA's affiliate members were given no role in selecting or removing SFFA's Board or officers, and no right to vote on the organization's priorities or activities. JA262-268; JA238:11-239:16; ADD179 n.6. They also played no real role in financing the organization. SFFA did not impose a member-dues requirement or expect its affiliate members to provide meaningful financial support. ADD179 n.6; JA301. It instead anticipated that another organization run by Blum would be SFFA's initial and "primary" funder. JA324. Nor did SFFA's affiliate members participate in SFFA's day-to-day operations or activities; Blum handled those. JA233:23-25.

Seven months after filing this lawsuit, and after Harvard raised the issue of SFFA's standing, Blum and the Fishers attempted to bolster SFFA's appearance as a genuine membership organization. They replaced the term "affiliate member" with "general member," JA338, and granted SFFA's "general members" superficial involvement. The bylaws expanded the Board from three to five seats. JA339. Blum and the Fishers selected the fourth director, while the "membership" was allowed to select the fifth. *Id.* This gave SFFA's "members," however, no greater control. The four leadership-appointed directors can outvote the member-elected director, remove that director for any reason, or simply meet and conduct business without that director. JA340. And SFFA's members still have no power

to choose the organization's officers or vote on its priorities or activities.  JA338-344; *see also* SA22.

SFFA's members also continue to play virtually no role in funding the organization.  Although the revised bylaws require new members to make a one-time contribution of $10, ADD180, few "members" have had to pay dues:  A year after the fee took effect, only 0.4% of SFFA's roughly 20,000 claimed members had paid dues, *see* JA356; JA379; JA241.  Member dues also contribute infinitesimally to SFFA's budget:  In 2015 and 2016, SFFA received just $730 in member dues—less than 0.04% of its roughly $2 million in revenues.  JA356; JA379.

In short, SFFA is not a true membership organization and cannot rely on associational standing.  *See Sorenson Commc'ns, LLC v. FCC*, 897 F.3d 214, 225 (D.C. Cir. 2018) (consumer association could not claim associational standing because it "lack[ed] many of the indicia of a traditional membership association, such as a membership that finances the association's activities or plays a role in selecting its leadership"); *see also Heap v. Cater*, 112 F. Supp. 3d 402, 419 (E.D. Va. 2015) (organization could not rely on associational standing where it failed to allege that it "has the kind of leadership and financial structure that is closely tied to that of its members or that its members exert any control over the direction of the organization"); *Package Shop, Inc. v. Anheuser-Busch, Inc.*, No. 83-513, 1984

WL 6618, at *7-8, *40-41 (D.N.J. Sept. 25, 1984) (trade association could not

establish associational standing because, after its founding, it was "essentially []

run by people who [we]re self-appointed" and its purported members did not

control, direct, or finance it).[6]  The individuals on SFFA's email list may support

its stated mission, but that does not convert SFFA into an actual membership

organization.  *See Sorenson Commc'ns*, 897 F.3d at 225 (association could not

represent "passive subscribers to its email list").

　　　The district court allowed SFFA's suit to proceed because, in its view, if an

organization designates its supporters as "members," it is irrelevant whether those

members actually direct, control, or finance the organization.  ADD183-184.  But

that approach elevates form over substance.  Under that view, if an entity's

organizing documents refer to the individuals on its mailing list as "supporters"

instead of "members," a court must inquire into the extent to which those

individuals direct, control, and finance the organization.  But if the organization

---

[6] *Contrast Friends of the Earth, Inc. v. Chevron Chemical Co.*, 129 F.3d
826, 829 (5th Cir. 1997) (organization could rely on associational standing because
it had "a clearly articulated and understandable membership structure" and because
its members "elected the governing body of the organization" and "financed its
activities"); *Playboy Enterprises, Inc. v. Public Service Commission of Puerto
Rico*, 906 F.2d 25, 35 (1st Cir. 1990) (trade association could sue on behalf of
members because it was "organized prior to the filing of [the] suit, and for different
reasons," its members had the power to ratify or reject its activities, and, "[i]f the
members felt their interests were not being served by th[e] suit, they could vote to
end the Association's involvement").

instead refers to those same individuals as "members," no such inquiry, and no degree of "member" control, involvement, or support, is required. That approach does not comport with the premise of associational standing—that the organization must truly represent the members themselves—and Article III standing cannot turn on such artificial distinctions. Accordingly, the Court should hold that SFFA lacks standing.

## II.    HARVARD DOES NOT DISCRIMINATE AGAINST ASIAN-AMERICAN APPLICANTS

SFFA alleged in Count I that Harvard "intentionally discriminates against Asian-American applicants on the basis of race" in violation of Title VI of the Civil Rights Act of 1964. JA208. SFFA specifically asserted that Harvard intentionally discriminates against Asian-American applicants "based on prejudicial and stereotypical assumptions about their qualifications," and that "Harvard intentionally and artificially limits the number of Asian Americans to whom it will offer admission." JA150; JA209.

The district court correctly rejected those allegations. After exhaustively reviewing the statistical and non-statistical evidence offered by both parties and weighing the credibility of the witnesses, the court determined that, regardless of which party bears the burden on this claim, Harvard does not intentionally discriminate against Asian-American applicants. SFFA identifies no basis for concluding that the district court's thorough fact-finding is clearly erroneous.

### A.    Under Any Standard, The Court Correctly Rejected SFFA's Allegation Of Intentional Discrimination

A plaintiff alleging intentional discrimination in violation of Title VI must prove that the defendant acted with "racial animus" against members of a protected class. *Goodman v. Bowdoin Coll.*, 380 F.3d 33, 43 (1st Cir. 2004); *see Village of Arlington Heights v. Metropolitan Hous. Dev. Corp.*, 429 U.S. 252, 265-266 (1977) (plaintiff must establish "challenged action" was motivated by "invidious discriminatory purpose"). SFFA thus bears the burden of proving that Harvard acts with racial animus against Asian-American applicants. That burden "never shifts; it remains with the plaintiff throughout." *Ahern v. Shinseki*, 629 F.3d 49, 54 (1st Cir. 2010).

Throughout the first four years of this litigation, SFFA agreed that as the plaintiff, it must "meet [its] burden" of proving "intentional racial discrimination," ECF No. 413 at 5; *accord* ECF No. 510 at 7. SFFA maintained this position through trial, including in closing argument. *See* JA3446:3-9. Apparently realizing it had failed to elicit any persuasive evidence of intentional discrimination, SFFA made an about-face in its post-trial brief, arguing for the first time that Harvard must *disprove* any allegations of intentional discrimination. SFFA's argument is that because Harvard considers race in its admissions process, Harvard bears the burden of proving not only that its consideration of race in pursuit of a diverse student body is narrowly tailored, but also that it does not

intentionally discriminate against Asian-American applicants.  The district court

agreed, reasoning that because this case arises in "the higher education admissions

context," the ordinary "Title VI standard" does not apply.  ADD124 n.62.[7]

This reasoning is incorrect.  It conflates a university's burden to justify its

acknowledged consideration of race as one factor in its admissions process (the

standard governing the remaining counts of SFFA's complaint) with the plaintiff's

burden to prove that the university in fact administers its admissions process with

"racial animus," *Goodman*, 380 F.3d at 43—the standard applicable to Count I.

Under the standard pressed by SFFA and adopted by the district court, a university

that considers race in the admissions process would have to *disprove* any allegation

of invidious discrimination that arises from that "context," no matter how spurious.

That standard would turn the ordinary burden of proof in Title VI cases on its head.

That is not the law, and SFFA points to no case establishing that it is.

Nevertheless, regardless of whether SFFA or Harvard bore the burden of

proof on Count I, the district court correctly entered judgment for Harvard on this

claim.  If SFFA bore the burden of showing intentional discrimination, the district

---

[7] SFFA also argued at the post-trial stage that it could satisfy its burden by showing a "pattern or practice" of discrimination through statistical evidence.  *See* ADD105 n.57.  The district court rightly held that framework "inapplicable to a non-class, private plaintiff" like SFFA, *id.*, and SFFA does not renew that argument on appeal, *see* Br. 27 n.7.

court correctly found that SFFA did not meet it.  ADD104-105 n.56; ADD124

n.62.  And if Harvard bore the burden of showing that it does not discriminate

against Asian-American applicants, or more generally defending its treatment of

Asian-American applicants under strict scrutiny, the district court correctly found

that it met that burden.  ADD125-126.  The district court found "no evidence of

any racial animus whatsoever," ADD123; that Harvard's "admissions policy uses

race only in a permissible and narrowly tailored way," ADD125; and that Harvard

does not impose an undue burden on Asian-American applicants, *id.*; *see infra* pp.

65-68.  Thus, even if Harvard bears the burden under strict scrutiny, it has met that

burden.  The findings underpinning that conclusion are reviewed for clear error,

*Bina v. Providence Coll.*, 39 F.3d 21, 26 (1st Cir. 1994)—a bar SFFA cannot

possibly meet.

* * *

Before the district court and on appeal, SFFA chose to support its claim that

Harvard "intentionally discriminates" against Asian-American applicants primarily

through statistics.  Br. 30; JA2171:11-18.  Harvard showed that its admissions

process treats all applicants fairly (and indeed benefits many Asian-American

applicants) through both statistical evidence and non-statistical evidence, including

witness testimony ultimately credited by the district court.

SFFA's primary attack on the district court's findings is that the court erred in considering evidence beyond SFFA's statistics.  Br. 30, 38-39.  But the district court did not err in carefully weighing *all* of the admissible evidence—statistical, documentary, and testimonial.  That is precisely the sort of "sensitive inquiry into … circumstantial and direct evidence" required under *any* standard in assessing allegations of "intentional discrimination."  *Anderson ex rel. Dowd v. City of Bos.*, 375 F.3d 71, 83 (1st Cir. 2004) (quoting *Arlington Heights*, 429 U.S. at 266); *cf. International Bhd. of Teamsters v. United States*, 431 U.S. 324, 340 (1977) ("[S]tatistics are not irrefutable; … their usefulness depends on all of the surrounding facts and circumstances.").  After that comprehensive review, the court concluded that Harvard does not discriminate against Asian-American applicants and that its admissions process survives strict scrutiny.  SFFA fails to show any error—much less clear error—in that thorough analysis.

### B.    The Non-Statistical Evidence Showed That Harvard Does Not Discriminate Against Asian-American Applicants

The district court's finding that Harvard does not discriminate was supported both by extensive documentary and testimonial evidence that Harvard treats all applicants fairly and by the absence of evidence to the contrary.

    **1.     The non-statistical evidence affirmatively showed that Harvard's admissions process operates fairly and transparently**

The district court heard from eight current and former Admissions Office witnesses, including the four-day testimony of Dean Fitzsimmons.  Those witnesses testified to every aspect of the admissions process, including the fair and transparent manner in which decisions are made and the ways in which Asian-American applicants may benefit from the consideration of race.  By contrast, SFFA failed to present any documentary or testimonial evidence of discriminatory intent, or even a single applicant it contends was wrongfully rejected.

The district court's findings describe a meticulous, fair, and nondiscriminatory process.  The admissions process begins with a recruitment effort that includes recruitment of Asian-American applicants.  ADD10.  Each application file is carefully assessed along multiple dimensions.  ADD17-25.  Decisions are made by majority vote after discussion in a 40-person committee.  ADD24-25.  Admissions decisions are not "based on any formula," but rather are based on academic aptitude, extracurricular achievements, personal qualities, athletic excellence, and a wide variety of other characteristics.  ADD25-26.  Race is considered as one of many factors, and only as a positive attribute.  ADD29.

Each of these findings was supported by extensive evidence, including Admissions Office documents and the testimony of Admissions Office witnesses.

The district court found this testimony credible, ADD11, ADD45, ADD69, because of, *inter alia*, "the collective manner in which admissions decisions are made, with all members of the Admissions Committee participating in all decisions." ADD69.

SFFA failed to offer a single document suggesting discriminatory intent on the part of any Harvard employee. And it failed to offer any "evidence that any particular admissions decision was negatively affected by Asian American identity." ADD123-124; *see also* ADD112. Every Admissions Office witness was asked if he or she had ever observed discrimination in the admissions process— and every single one said no. ADD69; JA1059:3-11; JA1147:21-1148:15; JA1261:11-18; JA1633:2-7; JA1907:23-1908:5; JA2040:11-14; JA2090:12-17; JA2158:4-7. The district court found that testimony credible. ADD69. Admissions Office witnesses and Asian-American students and alumni testified that Asian-American ethnicity has served as a *positive* factor in the admissions process. *See* JA1007:2-21; JA1253:2-11; JA2736:1-11 (student "appreciated the ways in which [her] admissions reader saw what [she] was trying to say when [she] was talking about the significance of growing up in a culturally Chinese home"); JA2681:18-2682:1. The district court found "no evidence of any racial animus whatsoever." ADD123-124; *see also* ADD104-105 n.56.

On appeal, SFFA does not dispute that it failed to offer such evidence. Instead, it argues that it should not be required to show a "smoking gun." Br. 38. But the district court did not require a "smoking gun" (or even an alleged victim); it simply found that the complete absence of evidence to support SFFA's claim—especially when combined with contrary evidence the court expressly found credible—supported a finding for Harvard. ADD112; ADD123-125. SFFA has not shown any error—let alone clear error—in that finding.

### 2.     The district court properly rejected SFFA's theories that discriminatory intent should be inferred

Having failed to offer any direct evidence of discriminatory intent, SFFA asks this Court to re-weigh the evidence by crediting its theories for why discriminatory intent can be inferred. Br. 43-45. But this Court's "job is not to weigh the evidence anew, but simply to determine whether the decision reached by the trial court is 'plausible in light of the record viewed in its entirety.'" *Portland Natural Gas Transmission Sys. v. 19.2 Acres of Land*, 318 F.3d 279, 281 (1st Cir. 2003).

SFFA argues that the district court erred in rejecting its argument that discriminatory intent should be inferred from Harvard's response to analyses conducted by the federal Office for Civil Rights and by Harvard's Office of Institutional Research. Br. 44. But SFFA's argument regarding those analyses rests entirely on factual misstatements. As discussed above, *supra* pp. 17-18, the

1990 OCR report concluded that "Harvard *did not* discriminate against Asian American applicants." ADD43 (emphasis added). Regarding OIR's analyses, *supra* pp. 19-21, the district court credited the testimony of Dean Fitzsimmons that he did not understand those analyses to suggest discrimination. ADD35; ADD38. Dean Fitzsimmons's testimony was also consistent with the uniform testimony of all three OIR witnesses: They did not believe, or tell him, that their analyses assessed or showed discrimination. *See* ADD35; ADD37; JA1228:4-7; JA1331:24-1332:5; JA1342:3-10; JA1346:24-1347:4; JA1350:11-15; JA1982:17-1983:4. SFFA insists that Dean Fitzsimmons should have interpreted the analyses differently, but the court found his interpretation reasonable and credible, ADD35, ADD38, and what matters for SFFA's intentional discrimination claim is Dean Fitzsimmons's intent. The district court found that Dean Fitzsimmons's responses did not show any intent to discriminate against Asian-American applicants, and SFFA fails to show any error in that finding.

SFFA further argues that the district court erred in not inferring discriminatory intent from actions Harvard took after this lawsuit was filed. Br. 44-45. But SFFA baselessly reads sinister intent into routine operations. First, SFFA claims that Harvard began to admit more Asian-American applicants after the 2014 filing of this lawsuit. *Id.* This ignores the evidence that the Asian-American share of admitted students has been increasing for decades. *See* JA5744;

*infra* p. 70.  Second, SFFA claims that in 2018, the Admissions Office updated its reading procedures "for the first time in decades," in an effort to "conceal past discrimination."  Br. 45.  In fact, as the district court found, these procedures are updated "annual[ly]."  ADD18.  And, as the district court recognized, those changes simply aligned the written procedures with the Office's longstanding practice of not considering race when assigning the personal rating.  ADD29; ADD45.  SFFA has provided no basis for overturning the district court's well-supported findings.

### C.    The Statistical Evidence Did Not Show Discrimination

Having failed to advance its case through non-statistical evidence, SFFA faults the district court for not crediting its side of the statistical dispute.  SFFA wraps this argument in accusations that the district court harbored a "mistrust of statistical analysis," Br. 32, or a "superstitious hostility to statistical proof," Br. 41.  Those arguments do not reflect the reality of the district court's thorough analysis.  The court offered 33 pages of careful findings of fact on the statistical evidence.  ADD50-83.  While generally finding Harvard's expert's analysis more persuasive, it nonetheless considered aspects of each expert's statistical analysis, ADD74-80, ultimately concluding that the statistical evidence did not establish that Harvard discriminates against Asian-American applicants, ADD79-80; ADD126.  SFFA has shown no error in that determination.

### 1.   The district court recognized both the value and limitations of statistics in assessing each party's statistical evidence

Harvard's expert, Professor Card, and SFFA's expert, Professor

Arcidiacono, each presented statistical analyses including a regression model of the

admissions process.  The district court carefully outlined the purpose, value, and

limitations of regression analyses, based on fundamental principles agreed to by

both experts, articulated by the *Federal Judicial Center Reference Manual on*

*Scientific Evidence* (3d ed. 2011) ("*FJC Manual*"), and recognized by federal

courts.  *See infra* pp. 45-46.  The court concluded that regression models have

value in modeling complex decisionmaking processes, but that they also have

limitations, and that the results they generate must be understood in light of those

limitations.

As the district court explained, "regression models seek to isolate the effects

of [a given variable] through models that include, and thereby control for, other

variables that affect the modeled outcome."  ADD62; *see also FJC Manual* at 268.

Regression analyses assign numerical values to the estimated correlation between a

given variable and the outcome being analyzed.  ADD64.  These analyses may

identify such estimates as "statistically significant," meaning unlikely to occur by

chance.  *Id.*; JA2860:14-24.  In this case, the experts' models sought to isolate the

effect of an applicant's race on admissions outcomes, after controlling for other

characteristics captured as "variables" in the Admissions Office's database. JA2185:8-23; JA2835:3-6; JA2852:16-2853:2.

The district court recognized that, while regressions are "the best available econometric tool, they cannot capture all of the factors that Harvard considers," given the important role of non-quantitative factors in the process.  ADD63; *see* JA2242:13-20 (Arcidiacono); JA2874:1-17 (Card).  For example, the contents of personal essays, recommendation letters, and faculty evaluations of academic or artistic work were not reflected in the regression models.  JA902:25-903:3; JA913:8-15; JA2874:1-17.

When a regression model does not control for information important to a process, there is a significant risk of "omitted variable bias."  ADD69-70.  Omitted variable bias derives from the "[f]ailure to include a major explanatory variable that is correlated with the variable of interest"; the omission of such a variable "may cause an included variable to be credited with an effect that actually is caused by the excluded variable." *FJC Manual* at 314; JA2419:17-25 (Arcidiacono); JA2928:8-2929:4 (Card); *Wessmann v. Gittens*, 160 F.3d 790, 805 n.8 (1st Cir. 1998) (courts need not "accept[] … regressions from which clearly major variables have been omitted"); *E.E.O.C. v. Chicago Miniature Lamp Works*, 947 F.2d 292, 301 (7th Cir. 1991) (rejecting analysis where missing variables "are too important to be ignored").

- 45 -

Many courts have thus recognized that regression analysis is not the same as proof of causation; the results, even if statistically significant, must be understood in light of all the evidence in the case.  As the district court explained, "a statistically significant variable in an econometric model is not proof of a causal relationship" where the model is limited due to omitted variable bias or other factors.  ADD64-65; *FJC Manual* at 309-310; *In re Zoloft Prod. Liab. Litig.*, 858 F.3d 787, 793 (3d Cir. 2017) (cautioning that statistically "significant findings can still occur" even where "a causal connection does not actually exist"); *Brown v. Nucor Corp.*, 785 F.3d 895, 908 (4th Cir. 2015) ("[S]tatistical significance is not always synonymous with legal significance.").

In sum, contrary to SFFA's assertions, the district court did not err in declining to take a statistically significant result as irrefutable proof of discrimination—especially where the model generating that result was extensively rebutted by statistical and non-statistical evidence.  And the court's findings regarding whether statistical evidence shows intentional discrimination are, like any other factual finding, reviewed for clear error.  *Bina*, 39 F.3d at 27.

### 2.    The district court correctly found that the statistical evidence did not show discrimination in the admissions process

At trial, the statistical experts testified to their differing approaches to designing a regression model of the admissions process.  *See, e.g.*, JA6048.  The

district court resolved those disputes substantially in Harvard's favor, ADD74-80, and SFFA generally does not revisit them on appeal.  As to most of these disputes, the court found that Professor Arcidiacono "distort[ed] the analysis," ADD77, "create[d] a significant potential for omitted variable bias," ADD78, and "over emphasize[d] grades and test scores," ADD62.  The court sided with SFFA's expert on one modeling dispute but found that it had "only a modest impact." ADD76.

The only statistical dispute SFFA raises on appeal concerns whether to include the variable reflecting an applicant's personal rating in the regression model.  Professor Card included this variable, while Professor Arcidiacono excluded it.  After weighing the testimony of both experts and the fact witnesses, the court concluded that Harvard's approach "results in a more comprehensive analysis" because of the important information about applicant characteristics contained in that rating, but that both approaches may "provide evidence that is probative."  ADD76.

Accordingly, rather than consider the statistical evidence produced by only a single statistical model, the court considered the evidence produced by two regression models, each of which included aspects of each expert's preferred approaches.  ADD74-80.  Of primary relevance, one model included the personal rating (the approach favored by Professor Card), while the other model excluded

that rating (the approach favored by Professor Arcidiacono).  *Id.*  The court

considered the association between Asian-American ethnicity and admissions

outcomes under both of these models.  ADD79-80.  The court found that a model

adopting Professor Card's approach to the personal rating returned no statistically

significant association, whereas a model adopting Professor Arcidiacono's

approach returned a "slight" but statistically significant negative association.  *Id.*[8]

The district court found that the statistical evidence "does not demonstrate

any intent by admissions officers to discriminate," ADD79-80, or otherwise show

that "Harvard has engaged in improper intentional discrimination," ADD126.  This

finding was well supported.  First, one of the court's models—which it described

as "a more comprehensive analysis," ADD76—showed *no* statistically significant

negative effect of Asian-American ethnicity on admissions outcomes.  ADD79-80.

Second, although the other model showed a "slight" negative effect, that model

_____

[8] DOJ faults the district court for having favored "aspects of both experts' models" without running and publishing its own regression model.  DOJ Br. 7 n.1. DOJ offers no authority for the proposition that a court is required either to wholly credit one side's statistical analysis or to perform and publish its own regression analysis; indeed, such a requirement would be antithetical to the way evidence is assessed at trial.

The district court's discussion of its preferred approaches is, moreover, well supported.  The court's preferred approaches were based on two changes to Professor Card's model.  ADD74-80.  Professor Card presented statistical analyses of the effect of both those changes.  *See* JA3150:1-3152:3 (effect of excluding personal rating); JA2999:20-23; JA6049 (effect of employing statistical "interaction terms" favored by Professor Arcidiacono).

could not account for crucial "unobserved factors" like the contents of personal essays or recommendation letters, leaving a significant risk of omitted variable bias—attributing to race associations actually driven by factors missing from the model.  ADD79-80; ADD126.  Third, as discussed further below, SFFA's argument that there was discrimination in the admissions process rested largely on its argument that there was discrimination in assigning personal ratings, an argument the district court carefully considered and properly rejected.  *Infra* pp. 50-55.[9]

SFFA makes much of the district court's contemplation that it was "possible" that "a very slight implicit bias" had some effect on the likelihood of admission for Asian-American applicants in some years.  ADD80.  The district court was explicit, however, that it was acknowledging a "possib[ility]" and not making any finding, noting that SFFA's implicit-bias theory was "unsupported by any direct evidence before the Court."  ADD72.  SFFA did not present any expert testimony on implicit bias at trial or any factual evidence that implicit bias was driving admissions decisions.  In any event, to the extent this remark bears on the

---

[9] SFFA is incorrect that the court did not address its claim that the overall rating and ratings based on recommendations are biased (Br. 42-43).  *See* ADD74 (concluding that SFFA's expert's analysis of the overall rating was flawed and irrelevant); ADD67-68 ("conclud[ing] that race-related variance in the school support ratings result from some combination" of factors "beyond Harvard's control," and not "admissions officer bias").

analysis, the court concluded that even "[i]f" there was any "possib[ility]" of implicit bias, any such biases had "dissipated or were eliminated," making them irrelevant to SFFA's claim, which seeks only prospective relief.  ADD80; JA226.

### 3.    The district court correctly found that the statistical evidence did not show discrimination in the personal rating

SFFA's brief focuses heavily on the personal rating, arguing that a separate regression analysis presented by its expert purportedly showed that admissions officers discriminated against Asian-American applicants in assigning this rating.[10] But SFFA has not shown that the district court erred, much less clearly erred, in finding that SFFA's regression analysis of the personal rating failed to account for important factors and thus did not show discrimination by the Admissions Office. SFFA's arguments ignore the evidence supporting these findings—going so far as to falsely assert that Professor Arcidiacono's analysis was "unrebutted" (Br. 30). In fact, the court's findings are well supported by the record.

At trial, Professor Arcidiacono presented regression models of the academic, extracurricular, and personal ratings.  JA6015.  Professor Arcidiacono's models

---

[10] Many of SFFA's and DOJ's arguments regarding the personal rating insist that the district court erred in not considering a regression model of the admissions process that excluded the personal rating.  Br. 32 (district court "shut its eyes" to such evidence); DOJ Br. 23 (district court's "view" was that "the personal rating should not be excluded").  But the court *did* consider the statistical evidence generated by such a model; it simply found that the model did not establish intentional discrimination.  ADD79-80; *supra* pp. 43-50.

attempted to use the limited quantifiable data in his model to assess whether Asian-American ethnicity was associated with better or worse scores on those ratings than would be expected based on the factors accounted for by the model. The district court found that Professor Arcidiacono's analyses indicated that Asian-American ethnicity was associated with better scores on two ratings (the extracurricular and academic ratings) and worse scores on one (the personal rating). ADD68-74; ADD124. Notably, the court found that all three ratings "incorporate subjective and objective elements." ADD124. That is, they reflect not only quantifiable information captured in the data and, therefore, included in the models (*e.g.*, test scores and GPAs), but also qualitative measures missing from the data (*e.g.*, personal essays and recommendation letters). After carefully reviewing the evidence on these ratings, the court correctly found that for *all* these ratings, the positive and negative statistical associations were largely the result of qualitative factors not included in the models and were therefore of limited utility in establishing discrimination. *See* ADD72-74.[11]

---

[11] SFFA suggests that the "subjectiv[ity]" of certain criteria, particularly the personal rating, is evidence of discrimination. Br. 43-44. That argument ignores the district court's finding that all the ratings, including those for which Professor Arcidiacono reported a positive association with Asian-American ethnicity, include subjective components. ADD124. The academic rating reflects recommendation letters and faculty evaluations. JA930:16-24. The extracurricular rating reflects the depth of involvement and leadership roles. JA933:2-934:1; JA1255:19-1256:21.

SFFA asserts that Professor Arcidiacono's analysis of the personal rating was "*unrebutted*." Br. 30. That is false. Harvard presented detailed evidence on this issue, and the district court credited that evidence in finding that Professor Arcidiacono's model "likely overstates the direct effect of Asian American identity," ADD69, and that "the majority of the disparity in the personal rating between white and Asian American applicants" was attributable to factors outside the data, ADD72-73.

As the district court found, Professor Arcidiacono's model of the personal rating "explains only a portion of the variation in personal ratings and likely suffers from considerable omitted variable bias." ADD69. A broad range of qualitative inputs inform the personal rating. ADD69-70; JA934:23-937:1; *supra* p. 9. Thus, the district court concluded, Professor Arcidiacono's model "does not include variables for several factors that influence the personal ratings and may correlate with race, such as the extent to which applicants' essays and personal statements demonstrated their abilities to overcome obstacles or personal achievements." ADD69-70. Professor Arcidiacono's model could account for only a small share (29%) of the variation in personal ratings, while the majority (71%) of that

---

In any event, the Admissions Office's consideration of factors beyond grades and standardized test scores is neither impermissible nor evidence of discrimination.

variation was driven by factors outside the data.  JA2311:11-13; JA2976:15-2980:21; JA6075.[12]

Moreover, the district court identified specific inputs missing from the data that contribute to the statistical association that Professor Arcidiacono's model erroneously attributed to race.  In particular, recommendation letters from teachers and guidance counselors explain in significant part why Asian-American applicants tend to perform slightly less well on that rating.  ADD70-72.  SFFA is wrong that the district court had "zero evidentiary basis," Br. 37-38, for this finding regarding recommendation letters.  Professor Card analyzed the limited available data on the recommendation letters, and concluded that, when looking at applicants with the same academic ratings, Asian-American applicants tended to receive lower recommendation ratings—indicating that recommendation letters for Asian-American applicants tend to provide less favorable information as to non-academic qualities.  ADD70-71; JA2990:6-2994:16; JA6082-6084.  Professor Card explained that although the data on recommendation ratings do not alone explain the difference in personal ratings, they suggest that Asian-American applicants

---

[12] SFFA attempts to bolster Professor Arcidiacono's regression model of the personal rating using a rudimentary analysis that accounts for only grades and test scores.  Br. 31; JA6006.  The district court correctly rejected analyses like those because they "over emphasize[] grades and test scores," ADD62, and further "distort[] the analysis" by selectively excluding certain groups of applicants, ADD77.

have less favorable inputs on factors that inform the personal rating but were not captured in the data, JA3010:7-23, such as the actual contents of recommendation letters. JA3004:16-3005:9.[13]

Finally, the district court's findings were supported by the consistent testimony of admissions officers that race was not a factor they consider when assigning the personal rating and that they had never observed any improper discrimination in the admissions process. ADD69; *supra* pp. 14-15. SFFA argues that the 30-year-old OCR report supports its claim that admissions officers take race into account in assigning the personal rating, but the court instead credited the "uniform[]" testimony to the contrary. ADD45.

The court acknowledged the "possib[ility]" of implicit bias in all the modeled profile ratings: both the positive associations between Asian-American ethnicity and the academic and extracurricular ratings, and the negative association with the personal rating. ADD72-74. But it found that "possib[ility]" was "unsupported by any direct evidence," and "conclude[d] that the majority of the disparity in the personal rating … was more likely caused by race-affected inputs

---

[13] Although not specifically relied on by the district court, the court's findings were further supported by an analysis Professor Card presented showing that Asian-American applicants are likely to score lower on non-academic factors that were missing from data but that inform the personal rating. JA3005:17-3006:9; JA3007:9-21; JA5711.

to the admissions process … or underlying differences in the attributes." ADD72-73. The district court correctly rejected SFFA's argument that a single statistical association must be taken as proof that Asian-American applicants are subject to discrimination.[14]

### D. The District Court Correctly Considered Both Statistical And Non-Statistical Evidence

Even putting aside the flaws of SFFA's statistical evidence, SFFA's discrimination argument rests on a fundamentally erroneous premise: that the district court was obliged to treat SFFA's statistical analysis as irrefutable proof and therefore could not consider the statistical, documentary, and testimonial evidence establishing that Harvard does *not* intentionally discriminate against Asian-American applicants. *See* Br. 27-43. But a trial court is, of course, supposed to consider all the evidence submitted over the course of the trial—including expert testimony, fact witness testimony, and documentary evidence—and make judgments about the credibility and weight of that evidence. That is what trials are for. The mere presentation of a statistical analysis by a plaintiff does not obviate the need to consider other evidence—particularly where a

---

[14] In any case, even if one were to assume—contrary to the foregoing evidence and findings—that race has some effect on these ratings, Professor Card performed an analysis in which he removed what Professor Arcidiacono claims is the effect of race from all three ratings. JA3014:9-3015:3; JA6095-6096. That analysis also showed that Asian-American ethnicity had no statistically significant effect on the likelihood of admission. JA3016:14-3017:11; JA6097.

defendant has rebutted that analysis through both statistical analysis and non-statistical evidence, and the district court has credited that evidence in substantially rejecting the plaintiff's statistical analysis. *See supra* p. 38, *infra* pp. 56-58.

Regardless of the framework under which SFFA's allegation of intentional discrimination is considered, the district court was not required to consider only one side's statistical evidence. *See Anderson*, 375 F.3d at 83 (under intentional-discrimination standard, courts should engage in "sensitive inquiry into such circumstantial and direct evidence of intent as may be available," including but not limited to "degree of disproportionate racial effect"); *cf. Teamsters*, 431 U.S. at 340 (cautioning that "statistics are not irrefutable" and "their usefulness depends on all of the surrounding facts and circumstances"); *Fisher II*, 136 S. Ct. at 2212 (under strict scrutiny standard, crediting "significant evidence, both statistical and anecdotal, in support of the University's position").

In particular, courts must make credibility determinations about the testimony of witnesses who were allegedly participants in, or witnesses to, discrimination. SFFA complains that the district court should have disregarded the testimony of eight current and former Admissions Office employees—every one of whom *SFFA* called to the stand—intoning that "crediting this self-serving testimony would undo decades of antidiscrimination law." Br. 38. But the very

cases SFFA cites on this issue (Br. 38-39) emphasize the importance of district court credibility determinations.

First, those cases hold that a district court should not credit a defendant's "self-declared innocence" in a *dispositive motion*, but should instead allow factual disputes to proceed to trial, "at which the credibility of witnesses can be assessed and the competing evidence can be weighed … to determine whether the defendants did or did not discriminate"—precisely what the district court did here. *Rosen v. Thornburgh*, 928 F.2d 528, 533-534 (2d Cir. 1991).[15]  Those cases further recognize the "potential usefulness" of testimony from multiple witnesses that "sets out in detail the procedures followed by the [defendant]"—precisely what the eight admissions officers who testified presented.  *Castaneda v. Partida*, 430 U.S. 482, 498 & n.19 (1977).[16]  And finally, appellate courts are "extremely reluctant to overturn a district court on a matter of credibility"—precisely what SFFA asks this Court to do.  *Segar v. Smith*, 738 F.2d 1249, 1295 (D.C. Cir. 1984).

SFFA had every right to present statistical evidence, and its evidence was carefully considered by the district court.  ADD50-83.  But SFFA is not entitled to have its statistical evidence considered to the exclusion of all other evidence,

---

[15] *See also Aman v. Cort Furniture Rental Corp.*, 85 F.3d 1074, 1080-1081, 1087-1088 (3d Cir. 1996); *Hebert v. Mohawk Rubber Co.*, 872 F.2d 1104, 1116 (1st Cir. 1989).

[16] *See also Teamsters*, 431 U.S. at 342 n.24.

especially where that statistical evidence was rebutted.  SFFA has shown no error—let alone clear error—in the district court's finding, based on all the evidence, that Harvard does not discriminate against Asian-American applicants.

## III.   HARVARD'S ADMISSIONS PROGRAM COMPLIES WITH SUPREME COURT PRECEDENT

SFFA's remaining claims (Br. 46-62) assert that Harvard's race-conscious admissions policy does not satisfy the requirements articulated in Supreme Court decisions—but SFFA's real quarrel is with those precedents.  As the district court found, Harvard considers race exactly in the manner endorsed by the Supreme Court.  The Court has held that universities may consider race in admissions when they articulate a compelling educational interest in pursuing diversity and narrowly tailor their consideration of race by evaluating applicants as individuals rather than making race the defining consideration.  *See Fisher II*, 136 S. Ct. 2198; *Fisher v. University of Texas* (*Fisher I*), 570 U.S. 297 (2013); *Grutter*, 539 U.S. 306; *Bakke*, 438 U.S. at 272 (opinion of Powell, J.).  In doing so, the Supreme Court has repeatedly invoked Harvard's own admissions process as a model for universities to follow.  *See Grutter*, 539 U.S. at 335; *Bakke*, 438 U.S. at 316-318 (opinion of Powell, J.).  Harvard continues to comply with these requirements.[17]

---

[17] The Supreme Court's decisions on race-conscious admissions were issued in the context of suits against public universities under both the Equal Protection Clause of the Fourteenth Amendment and Title VI.  The Court has not yet examined whether these precedents apply to private universities under Title VI in

### A.　Harvard Has Substantial, Compelling, And Specific Reasons For Pursuing Student-Body Diversity In Multiple Forms

The Supreme Court has long held that a university "may institute a race-conscious admissions program as a means of obtaining 'the educational benefits that flow from student body diversity.'" *Fisher II*, 136 S. Ct. at 2210.  Diversity "promotes cross-racial understanding, helps … break down racial stereotypes, and enables students to better understand persons of different races." *Grutter*, 539 U.S. at 330.  If a university establishes that its decision to pursue the benefits of diversity is grounded in a "reasoned, principled explanation," a court must defer "to the [u]niversity's conclusion … that a diverse student body would serve its educational goals." *Fisher II*, 136 S. Ct. at 2208.

Harvard has identified specific and compelling reasons for pursuing student-body diversity, as the district court found, and as SFFA does not seriously dispute. Harvard's consideration of race in admissions is based on its educational judgment that "diversity of all sorts, including racial diversity, is an important aspect of education."  ADD6.  Harvard "has evaluated and affirmed its interest in diversity on multiple occasions," ADD8—most recently in 2015, when it established a

---

the exact same manner, but for decades private universities have been allowed to admit classes that achieve their educational objectives.  Significant concerns of statutory construction, reliance, and academic freedom would arise if Title VI were interpreted to prevent private universities from realizing the educational benefits of diversity.

committee to study the importance of diversity to the College. That committee "reached the credible and well-reasoned conclusion that the benefits of diversity at Harvard are 'real and profound.'" *Id.* (quoting JA4406); *see* JA4390-4411 (report); *supra* pp. 4-6. The district court found the goals articulated in the committee's report "substantial and compelling." ADD106.

Harvard's longstanding interest in diversity was echoed by testimony at trial from University officials, admissions officers, faculty, and students. *E.g.*, JA903:4-904:7; JA1713:13-1715:3. The district court found that "all" of Harvard's witnesses spoke to the "wide-ranging benefits of diversity" that Harvard has long valued. ADD7. *See Fisher II*, 136 S. Ct. at 2211 ("all" the University's witnesses "articulated the same" interest in diversity). And Dr. Ruth Simmons— who was "born in a sharecropper's shack on a plantation in Grapeland, Texas," and who rose to serve as the first African-American president of an Ivy League institution—testified to the "extraordinary benefits that diversity in education can achieve, for students and institutions alike." ADD6 n.3; *see* JA2757-2821.

SFFA does not seriously argue that Harvard has failed to articulate a compelling interest in diversity. Instead, it argues that Harvard pursues *racial* diversity to the exclusion of all other forms of diversity, including religious, socioeconomic, and geographic diversity. Br. 49-50. That is wrong, and SFFA certainly does not show that the district court erred (much less clearly erred) in

finding that Harvard "values and pursues *many* kinds of diversity within its classes," ADD7 (emphasis added)—a finding the district court entered in rejecting SFFA's argument that Harvard's interest in diversity was unduly "narrow," *id.*

SFFA relies on stray statistics to suggest that Harvard is not committed to other forms of diversity, Br. 50, but those attempts fall flat. For example, SFFA argues that Harvard undervalues socioeconomic diversity. *Id.* That is incorrect. Harvard makes extensive efforts to recruit students from low-income families. ADD10-11; *supra* p. 13. It considers whether applicants will contribute to socioeconomic diversity on campus and may give a "tip" to those who do. JA922:21-923:14; ADD21-22. And it offers one of the most generous need-based financial aid programs in the country to ensure that finances will not prevent any student from attending. *Supra* pp. 13-14; JA3342:11-3344:12.

SFFA and DOJ contend that Harvard's interest in diversity is insufficiently "measurable"—that it has not identified a "sufficient number of underrepresented minorities" to satisfy its objectives. Br. 53-54; DOJ Br. 29-31. But no Supreme Court precedent requires Harvard to adopt numerical goals of this sort; indeed, the Court rejected that argument in *Fisher II*. There, the plaintiff argued that the university had not "set forth" with sufficient precision "the level of minority enrollment that would constitute a 'critical mass.'" 136 S. Ct. at 2210. The Court explained that "the compelling interest that justifies consideration of race in

college admissions" is not one that "can or should be reduced to pure numbers."

*Id.* Since universities cannot "seek[] a particular number or quota of minority

students," the Court reasoned, they "cannot be faulted for" stating their educational

goals qualitatively rather than quantitatively. *Id.* The same is true here. SFFA

also criticizes Harvard for not adopting the term "critical mass" to measure its

interest in diversity, Br. 54, but *Fisher II* makes clear that there is no magic to that

phrase. A university must set forth "concrete and precise" goals to guide its use of

race. 136 S. Ct. at 2211. As the district court found, ADD106, Harvard has done

so.

## B.    Harvard Permissibly Considers Race Flexibly And Only As A "Plus Factor"

"To be narrowly tailored, a race-conscious admissions program … must

'remain flexible enough to ensure that each applicant is evaluated as an individual

and not in a way that makes an applicant's race or ethnicity the defining feature.'"

*Fisher I*, 570 U.S. at 309 (quoting *Grutter*, 539 U.S. at 334). The district court

found that Harvard "uses race as a factor that can act as a 'plus' or a 'tip' in

making admissions decisions, and that its admissions program is 'flexible enough

to consider all pertinent elements of diversity in light of the particular

qualifications of each applicant.'" ADD116-117 (quoting *Grutter*, 539 U.S. at

334). This finding is fully supported by the record.

Admissions Office witnesses testified in detail to the individualized factors that inform admissions decisions. *Supra* pp. 6-16. They testified that race is considered only as a positive factor and only for competitive applicants. *See id.* Professor Card corroborated this testimony, showing that race had virtually no effect for non-competitive applicants and an effect similar to several other factors for highly competitive applicants. JA5747; JA6111-6112; JA3043:7-3044:5; JA3046:13-3048:14; JA3108:1-5. Professor Arcidiacono acknowledged that race makes a difference only for a "competitive pool" of applicants that is "defined by a variety of variables and factors" other than race. JA2362:1-17.

SFFA does not challenge the district court's finding that race is not considered in the "mechanical manner" rejected in *Gratz v. Bollinger*, 539 U.S. 244 (2003). ADD117; ADD127. Instead, SFFA argues that the net effect of considering race is too high compared to the weight of other factors in Harvard's admissions process and to the use of race by other schools. Br. 51-53. The district court properly rejected that contention.

Comparing race to other factors in the admissions process, SFFA relies principally on a rudimentary statistical analysis, Br. 52, that the district court rejected because it "over emphasize[d] grades and test scores," ADD62. As Professor Card showed and as the district court found, "the magnitude of race-

based tips is not disproportionate to the magnitude of other tips applicants may receive." ADD118; JA6107-6112.

SFFA claims Harvard's consideration of race compares unfavorably to that of the universities in *Grutter* and *Fisher*, but its arguments misapprehend those cases. In *Grutter*, the Supreme Court noted that eliminating consideration of race would reduce the representation of minority students in the admitted class by approximately 70%. 539 U.S. at 320. Here, the district court found that Harvard's adoption of a race-neutral process would reduce the proportion of African-American and Hispanic admitted students by 45%. ADD84. SFFA's claim that Harvard's use of race "dwarf[s]" that considered in *Grutter* (Br. 51) is, thus, plainly wrong.[18]  And comparing this case to *Fisher*, SFFA focuses on the *number* of students for whom race affected admissions decisions (Br. 51) because in *Fisher*, the vast majority of students were admitted through a separate process. *See*

_____

[18] SFFA erroneously compares the district court's analysis to a different analysis in *Grutter*. Here, the district court analyzed the effect that eliminating race would have on the *racial composition of the admitted class*. *See* ADD84 (eliminating race would reduce African-American and Hispanic share of admitted class by 45%, from 28% to 15%). In the *Grutter* analysis invoked by SFFA, the analysis was of the effect that eliminating race would have on *admission rates by race*. *See* 539 U.S. at 320 (eliminating consideration of race would lower admission rate for underrepresented minority applicants from 35% to 10%). The relevant comparison to the district court's analysis is that in *Grutter*, eliminating race would have reduced the minority share of the admitted class by 70%, from 14.5% to 4%. *Id.*

*Fisher II*, 136 S. Ct. at 2208-2209.  But there is no requirement that a university

consider race only for some subset of its applicant pool.  *See Grutter*, 539 U.S. at

334 ("Universities can … consider race or ethnicity more flexibly as a 'plus' factor

in the context of individualized consideration of *each and every applicant*."

(emphasis added)).

Finally, DOJ attempts (Br. 16) to turn an isolated detail from the background

section of *Fisher II*—that race was considered "at one stage" in the university's

admissions process—into an ironclad rule.  But a university considering race in

admissions need not conform its process to the one at issue in *Fisher*.  The law

requires only that the admissions process "'remain flexible enough to ensure that

each applicant is evaluated as an individual and not in a way that makes an

applicant's race or ethnicity the defining feature.'"  *Fisher I*, 570 U.S. at 309

(quoting *Grutter*, 539 U.S. at 337).  Harvard meets that standard here.

### C.    Harvard Does Not Place An Undue Burden On Any Racial Group

While a university may consider race as part of an effort to ensure that the

student body includes students from a wide range of racial and ethnic groups,

including those that would otherwise be significantly underrepresented, *Grutter*,

539 U.S. at 316, those efforts must not "unduly harm members of any racial

group," *id.* at 341.  In assessing "undu[e] harm," a court must scrutinize whether

applicants of all races are assessed "fairly and competitively" and whether

- 65 -

applicants of all races may be admitted based on their "potential to enhance student body diversity." *Id.*

The district court's findings about Harvard's consideration of Asian-American applicants are dispositive here. As to intentional discrimination, the court found that Harvard does not discriminate against Asian-American applicants. *Supra* pp. 34-58. Addressing Harvard's consideration of Asian-American applicants under the rubric of "undue burden," the court acknowledged that Asian-American (and white) students make up a smaller share of Harvard's class than they might under a race-neutral system. ADD83; ADD125. But the court found that Harvard's admissions process does not place an undue burden on Asian-American applicants because Harvard reviews every applicant as an individual and recognizes that Asian-American applicants contribute to campus diversity. ADD111-112.

SFFA does not seriously challenge that finding. DOJ, for its part, offers a distorted version of the undue-burden analysis that would invalidate *any* race-conscious admissions program. DOJ Br. 24-26. DOJ contends that Harvard's consideration of race in its admissions process increases only the numbers of African-American and Hispanic students, and not also Asian-American students.

From that, DOJ leaps to the conclusion that "Harvard imposes a penalty on Asian Americans as compared to African Americans and Hispanics." DOJ Br. 24.[19]

DOJ's analysis warps *Grutter*'s undue-burden standard beyond recognition. The Supreme Court has never held that a race-conscious admissions program must result in an increased share of the admitted class for every racial group except white students. Rather, the Supreme Court has held that universities may consider race in an effort to increase the representation of racial groups that otherwise "might not be represented in … meaningful numbers." *Grutter*, 539 U.S. at 316; *see also Fisher II*, 136 S. Ct. at 2212. Acknowledging that such efforts may not necessarily increase every racial group's share of the class, the Court has required that members of every racial group be assessed based on their individual merits and their individual potential to contribute to campus life. *Grutter*, 539 U.S. at 334-335, 341. As the district court found, that is precisely what Harvard does.

Contrary to DOJ's claim that "[t]he district court never grappled with this issue" (DOJ Br. 25), the court painstakingly assessed the effect of Harvard's process on the racial composition of the class, ADD83, ADD125, and concluded

---

[19] DOJ does not argue that Harvard's efforts to increase diversity have burdened Asian-American applicants more than white applicants. Indeed, DOJ emphasizes an analysis showing that ending those efforts would increase the white share of the class substantially more than the Asian-American share. DOJ Br. 24-25; JA6121 (under race-neutral system, white share increases approximately 20%; Asian-American share increases approximately 12.5%).

that Asian-American applicants are not subject to an undue burden, ADD111-112.

Specifically, the court found that Harvard's admissions program "engages in a

highly individualized, holistic review of each applicant's file." ADD108. It found

that Harvard "giv[es] serious consideration to all the ways an applicant might

contribute to a diverse educational environment." *Id.* And it found that Asian-

American applicants benefit from being able to share important aspects of their

identity in their applications. *Supra* p. 40; ADD111-112; JA1007:2-21; JA1253:2-

11; JA2676:19-2677:3; JA2735:1-13. The court thus correctly concluded that

"eliminating consideration of race would significantly disadvantage at least some

Asian American applicants," and that Asian-American applicants are not subject to

an undue burden. ADD111-112.

### D.    Harvard Does Not Racially Balance Its Class

A university may not engage in "racial balancing"—that is, it must not

define diversity "as some specified percentage of" a racial or ethnic group. *Fisher

I*, 570 U.S. at 311. There is, nonetheless, "some relationship between numbers and

achieving the benefits to be derived from a diverse student body." *Grutter*, 539

U.S. at 336 (quotation marks omitted). "Some attention to numbers, without more,

does not transform a flexible admissions system into a rigid quota." *Id.* (brackets

and quotation marks omitted).

The district court correctly found that "Harvard does not have any racial quotas and has not attempted to achieve classes with any specified racial composition." ADD80. Indeed, the absence of evidence of racial balancing was so stark that SFFA offered no expert testimony to support its claim. ADD82; JA2175:18-21; JA2364:9-2365:1. SFFA's racial-balancing case instead rests on attorney argument about the racial composition of admitted students and the contention that Admissions Office leaders improperly use reports known as "one-pagers." Br. 46-48. Both arguments fail.

SFFA first claims (Br. 46) that the "the percentage of [Harvard's] class by race always fell within a narrow range." In fact, there is considerable variation in the racial composition of the admitted classes. Throughout the most recent decade of data available to the district court, the Asian-American share of admitted students varied by approximately 18%, from 17.5% to 20.6%; the African-American share varied by approximately 17%, from 10.0% to 11.7%; and the Hispanic share varied by approximately 40%, from 8.2% to 11.6%. ADD81-82; JA5744. The year-over-year change in admittance by race and composition of the admitted class demonstrate the meaningful variation:



ADD81; JA5735-5738; JA6114.



JA6117.[20]  On the basis of these undisputed numbers, the district court found that "the racial composition of Harvard's admitted classes has varied in a manner inconsistent with the imposition of a racial quota or racial balancing."  ADD80-81; *see also* ADD113.

SFFA argues that it need not show that "Harvard has pursued racial balance with laser-point precision."  Br. 47.  The district court agreed, explaining that "a university could run afoul of Title VI's prohibition on quotas even where it stopped short of defining a specific percentage and instead allowed some fluctuation around a particular number."  ADD113 (citing *Parents Involved in Cmty. Schools v. Seattle School Dist. No. 1*, 551 U.S. 701, 712 (2007)).  But it found that "Harvard's admissions policy has no such target number or specified level of permissible fluctuation."  *Id.*

Professor Card's unrebutted testimony additionally demonstrates a lack of racial balancing.  In particular, the racial composition of the *admitted class* fluctuates to a greater degree from year-to-year than that of the *applicant pool*:

---

[20] SFFA invokes *variation in percentage points*, rather than *percent variation* to support its contention that "the racial makeup of the admitted class varied little year to year."  Br. 15, 47.  For example, SFFA points to the fact that the share of Asian-American admits for the Classes of 2009-2018 was between 17.5% and 20.3%.  Br. 15.  But in a class of approximately 2,000 admitted students, that fluctuation—a 16% variation—is substantial; the difference is between 350 Asian-American admitted students and 406 Asian-American admitted students.



ADD82; JA6118; JA5743.  As Professor Card explained, the fluctuation in

admitted students is inconsistent with racial balancing.  If Harvard were attempting

to steer toward particular numbers or ranges for racial groups, the share of

admitted students of each race would be more stable, while the share of applicants

of each race would vary.  JA3058:7-3060:6.

SFFA next points to Dean Fitzsimmons's periodic consideration of "one-

pagers."  Br. 47.  But SFFA's account is misleading.  One-pagers are not focused

on "the racial makeup of the tentatively admitted class," as SFFA claims (Br. 8),

but instead include a broad "overview of the class," JA2046:16-25, on a range of

dimensions including gender, geography, race, intended concentration, and

measures of socioeconomic status.  ADD27-28; JA1027:18-1028:25; *supra* pp. 11-

12.  And while Dean Fitzsimmons may "share[] the breakdown of the admitted

class as reflected on the one-pagers with the full committee from time to time," that information is not limited to the racial composition of the tentatively admitted class. ADD28. Harvard's use of one-pagers is, at most, the sort of "attention to numbers" that the Supreme Court held permissible in *Grutter*.

Nor does the record support SFFA's claim (Br. 47) that one-pagers indicate that the admissions process is "engineer[ed]" to achieve "racial targets." As the district court found, Admissions Office leaders use one-pagers to determine how many offers of admission to extend. ADD29. Because admitted students with different characteristics tend to accept offers of admission at different rates—and because Harvard has a finite amount of housing for first-year students—the Admissions Office relies on one-pagers to help predict the yield rate and determine the total number of offers that can be extended. *Id.*; JA1394:21-1395:14. Admissions Office leaders also may look closely at candidates from any group that one-pagers show "is notably underrepresented or has suffered a dramatic drop off relative to the prior year," but there are "no quotas for subcategories of admitted students." ADD28. And while Harvard pays "[s]ome attention to numbers," *Grutter*, 539 U.S. at 336, including to assess whether it is recruiting and admitting a class that is diverse on multiple dimensions, ADD27 (citing JA1032:20-1033:18), Harvard has never targeted a specific racial composition when making admissions decisions, ADD80. To the contrary, as the district court found,

Harvard remains "committed to … its whole person review," ADD115, and

"[e]very applicant competes for every seat," ADD113.[21]

### E.  Harvard Has Properly Considered Race-Neutral Alternatives

In applying strict scrutiny, a court must "verify that it is 'necessary' for a

university to use race to achieve the educational benefits of diversity." *Fisher I*,

570 U.S. at 312.  "This involves a careful judicial inquiry into whether a university

could achieve sufficient diversity without using racial classifications." *Id.*  Such an

inquiry does not, however, "require exhaustion of every conceivable race-neutral

alternative." *Id.* (emphasis omitted).  Nor does it require adoption of an alternative

that would sacrifice a university's "reputation for excellence" or its interest in

pursuing "all … aspects of diversity." *Fisher II*, 136 S. Ct. at 2208, 2213.

The district court heeded this instruction, carefully scrutinizing several race-

neutral alternatives before concluding that Harvard's consideration of race remains

necessary for it to achieve the benefits of a diverse student body.  ADD83-92;

ADD119-122.  As an initial matter, the court observed that if Harvard were to

abandon race-conscious admissions, the number of African-American and

---

[21] The "lop" process at the end of the admissions cycle, during which the
Admissions Committee reduces the number of tentatively admitted students to
avoid admitting more students than the campus can house, does not support a racial
balancing claim.  The lop process is no different than other points in the
admissions process, JA3396:1-10, and "[i]n the end it [is] the quality of the case
that decides" who is admitted, JA5596.

Hispanic students would significantly decline.  ADD84.  Specifically, the experts'

models of Harvard's admitted classes showed that the African-American and

Hispanic representation would drop from 14% to 6% and from 14% to 9%,

respectively, were Harvard to abandon race-conscious admissions, translating to

1,000 fewer African-American and Hispanic students on campus.  *Id.*; JA3063:1-

3065:2; JA5749; JA6121; JA4420.  SFFA's expert agreed that a decline of such

size would be unacceptable.  JA1490:20-1491:5.  And the district court concluded

that such dramatic declines would undermine Harvard's educational goals.

ADD83-84; ADD91-92.

The district court then considered whether Harvard could obtain a

sufficiently diverse student body if it implemented various race-neutral measures,

including augmenting recruiting efforts, expanding financial aid, eliminating early

action, admitting more transfer students, eliminating reliance on standardized tests,

eliminating tips for recruited athletes and the children of alumni, donors, faculty,

and staff, implementing place-based quotas, and increasing "tips" based on

indicators of socioeconomic disadvantage.  ADD85-92.  The court determined that

none of these options—singly or in combination—currently presents an available,

workable, and adequate alternative.  ADD85; ADD119-122.

The district court found that Harvard already employs, or has employed,

several of the race-neutral practices SFFA proposed.  For instance, the court found

that Harvard already engages in "significant outreach efforts" and already offers "exceptionally generous financial aid," making further efforts to augment recruiting and financial aid unlikely to yield increased socioeconomic or racial diversity.  ADD87-88.  It similarly observed that Harvard's recent, unsuccessful effort to increase student body diversity by eliminating early action indicated that trying again was unlikely to produce a different effect.  ADD85-86.

On appeal, SFFA challenges only the district court's conclusion that "Simulation D" (or "Simulation 7," JA1578:4-5) is not an adequate race-neutral alternative.[22]  In Simulation D, SFFA's expert estimated the likely composition of Harvard's admitted classes if Harvard were to give vastly increased tips to applicants with economic and geographic indicators of disadvantage, and if Harvard were to eliminate tips for children of alumni, donors, faculty, and staff. ADD90; JA5987.  The district court found that alternative inadequate on four principal grounds:  It would (1) adversely affect the strength of Harvard's admitted classes, ADD91; (2) decrease African-American representation by 30% and thereby hinder Harvard's ability to obtain the benefits of a racially diverse student body, ADD91-92; (3) impede Harvard's ability to attract top-quality faculty and

---

[22] Below, SFFA contended it was entitled to judgment because Harvard had not given serious, good-faith consideration to race-neutral alternatives.  While continuing to cast aspersions on the Smith Committee's work, Br. 60-62, SFFA has abandoned that contention on appeal, Br. 1, 56-62; *see supra* pp. 16-17.

staff and cultivate important relationships with alumni and donors, ADD86-87;

ADD91; ADD122; and (4) lead to "substantial changes" in admitted students'

academic concentrations and thereby "pose administrative and staffing

challenges," ADD91. SFFA fails to establish that the district court erred in

rejecting Simulation D on any of these grounds, let alone on all four.

On the first ground, SFFA acknowledges (Br. 59) that a university need not

sacrifice its "reputation for excellence" to pursue the educational benefits of a

diverse student body. *Fisher II*, 136 S. Ct. at 2208. SFFA merely contends that

the district court erred in its factual assessment that Simulation D would diminish

the strength of Harvard's admitted classes. SFFA asserts that the entering class's

average GPA would "remain[] unchanged," that "average SAT scores would dip

only slightly," and that Harvard could "still admit every applicant with an

academic rating of 1." Br. 59-60. But although Harvard regards GPAs and SAT

scores as valuable indicators, it does not regard them as the only important factors

in identifying stellar students. *Supra* pp. 6-7; *cf. Fisher II*, 136 S. Ct. at 2213

("Class rank is a single metric, and like any single metric, it will capture certain

types of people and miss others."). And even if Harvard could still admit the small

number of applicants who receive academic ratings of 1, *see* SFFA Br. 52, SFFA

has no answer to the district court's finding that Kahlenberg's models would

diminish the strength of Harvard's admitted classes by requiring it to admit

significantly fewer students with the highest academic, extracurricular, personal, and athletic ratings (*i.e.*, ratings of 1 or 2). ADD91; JA4426; JA5789. That is reason enough to reject SFFA's contention that Simulation D is an adequate alternative. *See Grutter*, 539 U.S. at 340.

Next, SFFA claims that the district court allowed Harvard to satisfy its burden "merely by declaring that enrollment of African Americans will drop from 14% of the class to 10%," without "evidentiary support for the supposition that this decrease … would keep Harvard from achieving the educational benefits of diversity." Br. 58-59. In fact, Harvard and amici presented ample evidence that a substantial decrease in African-American representation on campus (such as a more than 30% decrease) would undermine Harvard's educational goals by making the college less attractive to prospective students, curtailing opportunities for students of all races to learn from individuals different from themselves, and exacerbating feelings of isolation among African-American students. *See, e.g.*, JA4420; JA1829:16-1830:17; JA1840:14-1841:3; JA1844:15-1845:7; JA2549:11-2556:3; JA2612:12-2613:13; JA2617:17-2618:20; JA2643:1-2645:10; JA2686:25-2691:3; JA2710:9-2713:16; JA2725:11-2727:7. For instance, a student testified that a decrease in African-American and Hispanic representation on campus would, "[w]ithout a doubt," adversely affect her educational experience by decreasing the opportunities to learn from students with diverse perspectives.

JA2643:10-2644:3.  Another student testified that Harvard's racial diversity has

better prepared him to pursue a career as a pediatrician by giving him "a tool set to

think about cultural sensitivity and cultural competency," and that a 30% reduction

in African-American representation would have "hurt [his] education dramatically"

by limiting his opportunities to learn from students from different backgrounds.

JA2688:14-2691:3.  Given this evidence, the district court correctly concluded that

Simulation D would not allow Harvard to reap the benefits of diversity "about as

well" as its current admissions program.  *Fisher II*, 136 S. Ct. at 2208; ADD92;

ADD122.

On the third ground, SFFA does not contest that a race-neutral alternative

may be deemed unworkable if it would adversely affect a university's ability to

attract top faculty and staff or foster positive relationships with alumni and donors.

SFFA instead baldly asserts that there is "no evidence that individuals will not

teach at, donate to, or otherwise support Harvard if their children no longer receive

an admissions advantage."  Br. 57.  The district court, however, credited the

testimony of Dr. Simmons, based on her extensive experience in higher-education

administration, *supra* p. 23, that tips for children of alumni, donors, faculty, and

staff play important roles in enabling private institutions like Harvard to cultivate

alumni and donor support and compete in the "fierce, fierce battle … for faculty"

and staff.  JA2786:17-2791:11; JA2771:24-2772:8; ADD86-87.  Furthermore, the

district court credited the Smith Committee's conclusions, based on its members' considerable experience in higher-education administration, that these tips "serve important institutional values and interests," including encouraging alumni to "remain engaged" and enabling Harvard to compete effectively for talent. JA4428-4429; ADD86-87.  SFFA does not explain how the district court erred in crediting this evidence, and the court did not err.[23]

Finally, in a footnote, SFFA attempts to minimize the district court's assessment that Simulation D would pose administrative and staffing challenges. Br. 60 n.10.  SFFA insists that Simulation D would result in only "marginal" changes in admitted students' academic concentrations and "would not require Harvard to expand and contract its academic programs."  *Id.* (quotation marks omitted).  But a 14% drop in the number of humanities students, a 12% increase in the number of biological sciences students, and an 8% increase in the number of engineering students, JA5789, can hardly be described as "marginal" and would both pose administrative and staffing challenges and impinge on Harvard's educational prerogatives.

---

[23] The district court also agreed with the Smith Committee's determination that eliminating this tip would not significantly increase diversity.  ADD86; ADD120.

In sum, the district court carefully considered several race-neutral alternatives and properly concluded that, at present, Harvard cannot fully obtain the benefits of a broadly diverse student body without giving some consideration to race.

### F.     Harvard Will Continue To Reevaluate Its Use Of Race

Finally, the Supreme Court has held that a university's use of race in its admissions program should be "limited in time"—a requirement that "can be met" using "periodic reviews to determine whether racial preferences are still necessary." *Grutter*, 539 U.S. at 342.  As the district court found, ADD41, the Smith Committee recommended that Harvard "reassess, periodically, the necessity of considering race and ethnicity in the admissions process," and "re-evaluate its consideration of race-neutral alternatives" in 2023.  JA4431.

SFFA argues that Harvard has not identified a specific date at which it will stop considering race.  Br. 55.  That is not what *Grutter* requires.  The admissions policy upheld there did not contain a sunset date; instead, the Supreme Court "t[ook] the Law School at its word that it … w[ould] terminate its race-conscious admissions program as soon as practicable."  539 U.S. at 343.  Harvard has offered more than its word here:  It has identified a specific date by which its consideration of race should be reevaluated.  *Grutter* does not require more.

## CONCLUSION

The district court's judgment should be affirmed.

Respectfully submitted,

/s/ Seth P. Waxman

WILLIAM F. LEE
FELICIA H. ELLSWORTH
ANDREW S. DULBERG
MICHELLE LISZT SANDALS
GREG SCHMIDT
WILMER CUTLER PICKERING
   HALE AND DORR LLP
60 State Street
Boston, MA  02109
(617) 526-6000

ARA B. GERSHENGORN
HARVARD UNIVERSITY,
  OFFICE OF THE GENERAL COUNSEL
1350 Massachusetts Avenue
Cambridge, MA  02138
(617) 495-8210

SETH P. WAXMAN
PAUL R.Q. WOLFSON
DANIELLE Y. CONLEY
BRITTANY BLUEITT AMADI
EMMA SIMSON
ALEX HEMMER
WILMER CUTLER PICKERING
   HALE AND DORR LLP
1875 Pennsylvania Avenue, NW
Washington, DC  20006
(202) 663-6000
Seth.Waxman@wilmerhale.com

DEBO P. ADEGBILE
WILMER CUTLER PICKERING
   HALE AND DORR LLP
7 World Trade Center
250 Greenwich Street
New York, NY  10007
(212) 230-8800

*Attorneys for Defendant-Appellee*

May 14, 2020

- 82 -

## CERTIFICATE OF COMPLIANCE

Pursuant to Fed. R. App. P. 32(g), the undersigned hereby certifies that this brief complies with the type-volume limitation set out in this Court's order of April 21, 2020.

1.     Exclusive of the exempted portions of the brief, as provided in Fed. R. App. P. 32(f), the brief contains 17,479 words.

2.     The brief has been prepared in proportionally spaced typeface using Microsoft Word 2010 in 14-point Times New Roman font.  As permitted by Fed. R. App. P. 32(g), the undersigned has relied upon the word-count feature of this word processing system in preparing this certificate.

/s/ Seth P. Waxman
SETH P. WAXMAN
WILMER CUTLER PICKERING
   HALE AND DORR LLP
1875 Pennsylvania Avenue, NW
Washington, DC  20006
(202) 663-6000

May 14, 2020

## CERTIFICATE OF SERVICE

I hereby certify that on this 14th day of May, 2020, I electronically filed the

foregoing with the Clerk of the Court for the United States Court of Appeals for

the First Circuit using the appellate CM/ECF system. Counsel for all parties to the

case are registered CM/ECF users and will be served by the appellate CM/ECF

system.

/s/ Seth P. Waxman
SETH P. WAXMAN
WILMER CUTLER PICKERING
    HALE AND DORR LLP
1875 Pennsylvania Avenue, NW
Washington, DC  20006
(202) 663-6000

May 14, 2020