No. 19-2005

# UNITED STATES COURT OF APPEALS FOR THE FIRST CIRCUIT

STUDENTS FOR FAIR ADMISSIONS, INC.,

*Plaintiff-Appellant*,

*v.*

PRESIDENT AND FELLOWS OF HARVARD COLLEGE,

*Defendant-Appellee*,

On Appeal from the United States District Court for the District of Massachusetts
in Case No. 1:14-cv-14176-ADB, Judge Allison D. Burroughs

**AMICI CURIAE BRIEF OF
COALITION FOR A DIVERSE HARVARD, ASSOCIATION OF BLACK
HARVARD WOMEN, FIRST GENERATION HARVARD ALUMNI,
FUERZA LATINA OF HARVARD, HARVARD ASIAN AMERICAN
ALUMNI ALLIANCE, HARVARD ASIAN AMERICAN BROTHERHOOD,
HARVARD BLACK ALUMNI SOCIETY, HARVARD ISLAMIC SOCIETY,
HARVARD JAPAN SOCIETY, HARVARD KOREAN ASSOCIATION,
HARVARD LATINO ALUMNI ALLIANCE, HARVARD MINORITY
ASSOCIATION OF PRE-MEDICAL STUDENTS, HARVARD PHILLIPS
BROOKS HOUSE ASSOCIATION, HARVARD PROGRESSIVE JEWISH
ALUMNI, HARVARD SOUTH ASIAN ASSOCIATION,
HARVARD UNIVERSITY MUSLIM ALUMNI, HARVARD VIETNAMESE
ASSOCIATION, HARVARD-RADCLIFFE ASIAN AMERICAN
ASSOCIATION, HARVARD-RADCLIFFE ASIAN AMERICAN WOMEN'S
ASSOCIATION, HARVARD-RADCLIFFE BLACK STUDENTS
ASSOCIATION, HARVARD-RADCLIFFE CHINESE STUDENTS
ASSOCIATION, KUUMBA SINGERS OF HARVARD COLLEGE,
NATIVE AMERICAN ALUMNI OF HARVARD UNIVERSITY,
NATIVE AMERICANS AT HARVARD COLLEGE, TASK FORCE ON
ASIAN AMERICAN PROGRESSIVE ADVOCACY AND STUDIES,
AND 21 COLORFUL CRIMSON
IN SUPPORT OF DEFENDANT-APPELLEE AND AFFIRMANCE**

Sherrilyn Ifill
Janai Nelson
Samuel Spital
Jin Hee Lee
Rachel Kleinman
Cara McClellan
NAACP Legal Defense and
    Educational Fund, Inc.
40 Rector Street, 5th floor
New York, NY 10006
Tel: (212) 965-2200
Fax: (212) 226-7592
jlee@naacpldf.org

Michaele N. Turnage Young
Jennifer A. Holmes
NAACP Legal Defense and
    Educational Fund, Inc.
700 14th Street NW, Suite 600
Washington, DC 20005
Tel: (202) 682-1300
Fax: (202) 682-1312
mturnageyoung@naacpldf.org

Kate R. Cook, No. 99103
Kenneth N. Thayer, No. 1186658
Sugarman, Rogers, Barshak &
    Cohen, P.C.
101 Merrimac Street, 9th floor
Boston, MA 02114-4737
Tel.: (617) 227-3030
cook@sugarmanrogers.com
thayer@sugarmanrogers.com

## TABLE OF CONTENTS

**PAGE**

TABLE OF AUTHORITIES ...................................................................... ii

CORPORATE DISCLOSURE STATEMENT ....................................... 1

INTERESTS OF AMICI CURIAE ............................................................. 1

RULE 29(a)(4)(E) STATEMENT .............................................................. 2

SUMMARY OF ARGUMENT ................................................................. 3

ARGUMENT ............................................................................................ 5

I.     Harvard's Admissions Program, Which Uses Race in a Limited Way to Advance Its Compelling Interest in Diversity, Is Consistent with Supreme Court Precedent and Does Not Create A Presumption of Intentional Discrimination. .............................................................. 5

II.    Due to Persistent Inequality in Educational Opportunity, Harvard Cannot Assemble a Diverse Student Body Without Considering Race. ........ 11

III.   Eliminating Race-Conscious Admissions Would Impair the Educational Experience of All Students and Risk Regression of the Significant Advances That Have Been Achieved. ....................................... 18

IV.   Students of Color and Their Organizations Have Transformed Harvard to the Benefit of All Students. ...................................................... 24

CONCLUSION ....................................................................................... 30

CERTIFICATE OF COMPLIANCE ...................................................... 33

CERTIFICATE OF SERVICE ............................................................... 34

i

# TABLE OF AUTHORITIES

**PAGE(S)**

## CASES

*Fisher v. Univ. of Texas at Austin*,
   570 U.S. 297 (2013) ..........................................................................6

*Fisher v. Univ. of Texas at Austin*,
   136 S. Ct. 2198 (2016)......................................................................6

*Grutter v. Bollinger*,
   288 F.3d 732 (6th Cir. 2002) (Clay, J., concurring), *aff'd*, 539 U.S.
   306....................................................................................................*passim*

*Regents of University of California v. Bakke*,
   438 U.S. 265 (1978)..........................................................*passim*

## OTHER AUTHORITIES

Adam Harris, *What Happens When a College's Affirmative-Action
   Policy Is Found Illegal*, The Atlantic (Oct. 26, 2018),
   https://www.theatlantic.com/education/archive/2018/10/when-
   college-cant-use-race-admissions/574126/ ......................................10

Ajmel Quereshi et al., LDF, *Locked Out of the Classroom: How
   Implicit Bias Contributes to Disparities in School Discipline*
   (2017), https://www.naacpldf.org/files/about-
   us/Bias_Reportv2017_30_11_FINAL.pdf ......................................14

Alexander J. Dubbs, *Coming Into Their Own*, Harv. Crimson (Apr.
   19, 2006), https://www.thecrimson.com/article/2006/4/19/coming-
   into-their-own-when-you/.................................................................27

Amanda Lewis et al., *Despite the Best Intentions: How Racial
   Inequality Thrives in Good Schools* (2015)......................................14

<u>**TABLE OF AUTHORITIES**</u>
(CONTINUED)

**PAGE(S)**

<u>**OTHER AUTHORITIES**</u>

Anna Chiang et al., *(Mis)Labeled: The Challenge of Academic Capital Formation for Hmong American High School Students in an Urban Setting*, 10 J. of Se. Asian Am. Educ. & Advancement 10 (2015), https://docs.lib.purdue.edu/cgi/viewcontent.cgi?article=1118&context=jsaaea ..................................................................................... 13

Bethonie Butler, *'I, Too, Am Harvard': Black students show they belong*, Wash. Post (Mar. 5, 2014), https://www.washingtonpost.com/blogs/she-the-people/wp/2014/03/05/i-too-am-harvard-black-students-show-they-belong/. .................................................................................. 27

Beverly Tatum, *Why Are All the Black Kids Sitting Together in the Cafeteria? And Other Conversations About Race* (3d ed. 2017) ....................... 12

Bryan McKinley et al., *K-12 Achievement for Indigenous Students*, J. of Am. Indian Educ. 75 (Spring 2015), https://www.jstor.org/stable/10.5749/jamerindieduc.54.1.0063?seq=1#page_scan_ tab_contents. ................................................................................... 13

David A. Acosta et al., *Trends in Racial and Ethnic Minority Applicants and Matriculants to U.S. Medical Schools, 1980–2016* (Nov. 2017), https://www.aamc.org/system/files/reports/1/november2017trendsi nracialand ethnicminorityapplicantsandmatricu.pdf ........................................... 10

Fabio Rojas, *From Black Power to Black Studies: How a Radical Social Movement Became an Academic Discipline* (2010) ............................... 26

<u>**TABLE OF AUTHORITIES**</u>
(CONTINUED)

**PAGE(S)**

<u>**OTHER AUTHORITIES**</u>

Frank Hobbs & Nicole Stoops, *Demographic Trends in the 20th Century: Census 2000 Special Reports* (Nov. 2002), https://www.census.gov/prod/2002pubs/censr-4.pdf ........................................17

Harriett Tenenbaum et al., *Are Teachers' Expectations Different for Racial Minority Than for European American Students?: A Meta-Analysis*, 99:2 J. Educ. Psychol. 253-73 (2007), http://psycnet.apa.org/record/2007-06672-003 ..................................................13

Harv. Faculty of Arts & Sci. Dep't of African & African Am. Studies, *About*, https://aaas.fas.harvard.edu/about. ...........................................................26

Jeannette Soriano, *Updates: Harvard's Latin@ Community: Thirty Years and Counting*, ReVista: Harv. R. of Latin Am., https://revista.drclas.harvard.edu/book/updates-harvards-latin-community ......................................................................................25, 26

Jerome Karabel, *How Affirmative Action Took Hold at Harvard, Yale, and Princeton*, 48 J. of Blacks in Higher Educ. 58 (Summer 2005) ........................................................................................24, 25, 26

Jim Loewen, *Here We Go Again: Tests for the Common Core May Be Unfair to Some and Boring to All*, Hist. News Network (Nov. 18, 2014), https://historynewsnetwork.org/ blog/153543...................................16, 17

Joel McFarland et al., U.S. Dep't of Educ., Nat'l Ctr. for Educ. Statistics, *The Condition of Education 2018* at 82 (May 2018), https://nces.ed.gov/pubs2018/2018144.pdf ..................................................12, 13

Jonah S. Berger & Molly C. McCafferty, *Gay Announces Plans to Hire New Ethnic Studies Faculty*, Harv. Crimson (June 18, 2019), https://www.thecrimson.com/ article/2019/6/18/gay-senior-ethnic-studies-hires/ .................................................................................................30

iv

## <u>TABLE OF AUTHORITIES</u>
(CONTINUED)

**PAGE(S)**

## <u>OTHER AUTHORITIES</u>

Kaisa Snellman et al., *Inequity Outside the Classroom: Growing Class Differences in Participation in Extracurricular Activities*, 40 Voices Urban Educ. 7 (2015), https://files.eric.ed.gov/fulltext/EJ1056739.pdf. ................................................13

Kate Taylor, *Denying a Professor Tenure, Harvard Sparks a Debate Over Ethnic Studies*, N.Y. Times (Jan. 2, 2020) https://www.nytimes.com/2020/01/02/us/harvard-latinos-diversity-debate.html..................................................................................................27

Kent Garrett & Jeanne Ellsworth, *The Last Negroes at Harvard: The Class of 1963 and the 18 Young Men Who Changed Harvard Forever* (2020) ....................................................................................24

Krista Malott, *Being Mexican: Strengths and Challenges of Mexican-Origin Adolescents*, 8:12 J. Sch. Counseling (2010), https://files.eric.ed.gov/fulltext/EJ885087.pdf ..................................................13

Letitia C. Chan & Matteo N. Wong, *An Asian-American Awakening*, Harv. Crimson (Mar. 14, 2019), https://www.thecrimson.com/article/2019/3/14/asian-american-awakening/ ........................................................................25, 27, 30

Maria Veronica Santelices & Mark Wilson, *Unfair Treatment? The Case of Freedle, the SAT, and the Standardization Approach to Differential Item Functioning*, 80 Harv. Educ. Rev. 106 (2010). ......................16

Peabody Museum of Archaeology & Ethnology at Harv. Univ., *The Harvard Indian College: History*, https://www.peabody.harvard.edu/node/477. ....................................................27

*President Nathan Pusey: Under His Watch Harvard Opened Its Doors to Large Numbers of Black Students*, 35 J. of Blacks in Higher Educ. 73 (Spring 2002);....................................................24, 25

v

<u>**TABLE OF AUTHORITIES**</u>
(CONTINUED)

**PAGE(S)**

<u>**OTHER AUTHORITIES**</u>

*Prop. 209 Lands On UC*, L.A. Times (Apr. 1, 1998),
   http://articles.latimes.com/ 1998/apr/01/local/me-3486 .....................................10

Roy O. Freedle, *Correcting the SAT's Ethnic and Social-Class Bias: A
   Method for Reestimating SAT Scores*, 73 Harv. Educ. Rev. 1
   (2003) .............................................................................................................15

Russell J. Skiba & Natasha T. Williams, *Are Black Kids Worse?
   Myths and Facts About Racial Differences in Behavior: A
   Summary of the Literature*, Ind. Univ. (Mar. 2014),
   https://indrc.indiana.edu/tools-resources/pdf-
   disciplineseries/african_american_differential_
   behavior_031214.pdf .........................................................................................14

Ruth A. Hailu, *Revisiting the 'Four Demands,' Fifty Years Later*,
   Harv. Crimson (May 20, 2018),
   https://www.thecrimson.com/article/2018/5/20/four-demands-
   revisited/.....................................................................................................25, 26

U.S. Dep't of Educ., *2015-2016 Civil Rights Data Collection: STEM
   Course Taking* (2018),
   https://www2.ed.gov/about/offices/list/ocr/docs/stem-course-
   taking.pdf ........................................................................................................13

W. Kidder et al., *How the SAT Creates "Built-In Headwinds": An
   Educational and Legal Analysis of Disparate Impact*, 43 Santa
   Clara L. Rev. 131, (2002) ...........................................................................16, 17

## CORPORATE DISCLOSURE STATEMENT

Pursuant to Federal Rule of Appellate Procedure 26.1, Amici Curiae state that none of the Amici Curiae has a parent corporation and there is no publicly held corporation that owns 10% or more of any of their stock.

## INTERESTS OF AMICI CURIAE[1]

Amici Curiae are 26 Harvard student and alumni organizations comprised of thousands of Asian American, Black, Latinx,[2] Native American, and white Harvard students, alumni (including some who are parents of current Harvard students and prospective applicants), faculty, and alumni interviewers.[3] Amici Curiae's alumni members have graduation years that span at least seven decades. Amici Curiae include many longstanding organizations, some of whom have served Harvard students for more than a century.

---

[1] Local counsel for Amici Curiae in this action, the law firm of Sugarman Rogers Barshak & Cohen, P.C. ("Sugarman Rogers"), also represents Defendant-Appellee President and Fellows of Harvard College ("Harvard") in matters wholly unrelated to the legal and factual issues presented by this action. Neither Harvard nor its litigation counsel in this action have provided any financial support for the preparation of Amici Curiae's brief or authored this brief in whole or in part.

[2] The gender-neutral term "Latinx" is used herein to refer collectively to Latinos, Latinas, and non-binary persons of Latin American background.

[3] *See* Mot. to Participate as Amici Curiae, *SFFA v. Harvard*, No. 1:14-cv-14176 (D. Mass. July 30, 2018) ECF No. 455 (describing 21 amici); Mot. of Additional Harvard Student & Alumni Organizations to Participate as Amici Curiae, *SFFA v. Harvard*, No. 1:14-cv-14176 (D. Mass. Aug. 30, 2018) ECF No. 503 (describing four amici).

1

Amici Curiae offer the Court vast institutional knowledge pertinent to this case and presented argument, evidence, and testimony at trial below. Amici Curiae know firsthand what has been gained through race-conscious admissions and what would be lost if race were no longer a consideration in Harvard's admissions process. Some have experienced the Harvard of old when students of color were a mere novelty; others fear the dramatically diminished Harvard educational experience that would result if student diversity significantly decreased. Amici Curiae, therefore, have direct knowledge about why it is crucial for Harvard to provide students with the critically important benefits of diversity and to continue considering race as one of many factors in its holistic admissions process.

All parties to this appeal have consented to the filing of this amicus curiae brief.

## RULE 29(a)(4)(E) STATEMENT

No counsel for any party authored this brief in whole or in part, and no counsel or party made a monetary contribution intended to fund the preparation or submission of this brief. In addition, no person—other than Amici Curiae, its members, or its counsel—contributed money that was intended to fund preparing or submitting the brief.

## SUMMARY OF ARGUMENT

SFFA's arguments are nothing short of a direct attack on more than 41 years of well-settled law, establishing that colleges may consider race, as one of many factors, in achieving the compelling interest of fostering the educational benefits of diversity. SFFA cannot circumvent precedent by disguising the same arguments that have been repeatedly rejected by the Supreme Court under the cloak of an intentional discrimination claim. SFFA, and this Court, are bound by the law. Applying that law, the District Court below exhaustively reviewed the evidence presented, and correctly held that Harvard's race-conscious admissions program was narrowly tailored to advance Harvard's compelling interest in the educational benefits of diversity and was not motivated by intentional discrimination. The law compels this Court to affirm those rulings and factual findings.

The District Court rightly concluded that Harvard's interest in fostering the educational benefits of diversity is core to its institutional mission. In reaching this conclusion, the District Court heard from the students and alumni most directly impacted by Harvard's admissions policy. These witnesses persuasively described the importance of Harvard considering a wide array of student experiences, including the students' racial and ethnic identity, in its admissions process and the devastating consequences that would result if race were no longer considered. Even with significant race-neutral changes intended to mitigate the blow to Harvard's

racial diversity, there would still be a significant reduction of Black students, which would drastically affect the educational experience of all students by depriving them of the diverse academic environment for which Harvard has long been admired.

Prior to Harvard's commitment to race-conscious admissions, it was a place reserved for the white elite that presented a narrow world view for its students and graduates. If forced to abandon race-conscious admissions, Harvard would become a markedly less diverse institution due to persistent barriers to equal K-12 educational opportunities and discriminatory standardized tests that prevent many highly qualified Black, Latinx, Native American, Asian American, and Pacific Islander applicants from achieving the traditional indicia of a competitive college application. The Supreme Court has consistently affirmed the ability of colleges to take affirmative steps to break the cycle of racial exclusion so that all students—and, in turn, the rest of society—can benefit from the many talents and perspectives that our diverse society offers.

Accordingly, for the reasons set forth below, Amici Curiae respectfully ask this Court to affirm the District Court's well-reasoned decision.

**ARGUMENT**

I.  **Harvard's Admissions Program, Which Uses Race in a Limited Way to Advance Its Compelling Interest in Diversity, Is Consistent with Supreme Court Precedent and Does Not Create A Presumption of Intentional Discrimination.**

The District Court correctly rejected SFFA's attempt to paint a valid race-conscious admissions program as a form of intentional discrimination in contravention of more than 41 years of Supreme Court precedent and the record in this case. SFFA's ultimate goal has been clear throughout this litigation: to upend the Supreme Court's unequivocal decisions that colleges may consider race within a holistic admissions process for the compelling—indeed, laudable—interest of fostering the important benefits of educational diversity. Unable to prove intentional discrimination, SFFA instead subverts the Title VI analysis by treating a race-conscious admissions program—that has passed the stringent standard of strict scrutiny—as nevertheless inherently and presumptively discriminatory. This Court should reject SFFA's efforts to rewrite binding precedent.

*Regents of University of California v. Bakke*, 438 U.S. 265 (1978), and its progeny establish that a college does not engage in intentional discrimination when it adopts a narrowly-tailored, race-conscious admissions program motivated by the goal of achieving the educational benefits of diversity. *Bakke* and every subsequent Supreme Court case have made clear that colleges and universities may have a "constitutionally permissible" goal of "attain[ing] . . . a diverse student body" that

5

"will contribute the most to the 'robust exchange of ideas'" that "is of paramount importance in the fulfillment of [the school's] mission." *Bakke*, 438 U.S. at 311-13; *see also Grutter*, 539 U.S. at 325 ("[S]tudent body diversity is a compelling state interest that can justify the use of race in university admissions."); *Fisher v. Univ. of Texas at Austin*, 570 U.S. 297, 311 (2013) ("*Fisher I*") ("*Grutter* calls for deference to the University's conclusion . . . that a diverse student body would serve its educational goals." (citation omitted)); *Fisher v. Univ. of Texas at Austin*, 136 S. Ct. 2198, 2210 (2016) ("*Fisher II*") ("[A] university may institute a race-conscious admissions program as a means of obtaining 'the educational benefits that flow from student body diversity.'" (citations omitted)).

The Supreme Court has held that "[w]hen race-based action is necessary to further a compelling governmental interest," like the educational benefits of diversity, "such action does not violate the constitutional guarantee of equal protection so long as the narrow-tailoring requirement is also satisfied." *Grutter*, 539 U.S. at 327. Narrow tailoring ensures that courts can "determine what classifications are benign or remedial and what classifications are in fact motivated by illegitimate notions of racial inferiority or simple racial politics." *Id.* at 326 (quoting *Richmond v. J.A. Croson Co.*, 488 U.S. 469, 493 (1989) (plurality opinion) (internal quotation marks omitted)). The District Court properly considered and rejected SFFA's allegations that Harvard's race-conscious admissions program engaged in racial

balancing, used race as more than a non-mechanical plus factor, and did not utilize adequate, workable, and sufficient race-neutral alternatives. Addendum ("ADD") 112-121.

Unable to show that these factual findings are erroneous, SFFA asserts that Harvard's operation of its race-conscious admissions program is categorically illegal by claiming that Harvard "imposes a racial penalty on Asian-American applicants." Appellant Br. at 22; *see id.* at 26-45. But SFFA does not contend that Harvard's race-conscious admissions program involves any explicit or overt penalty against Asian American applicants, *see id.* at 26-29, nor could it. SFFA instead points to statistical evidence—which, in its view, supports a presumption that Harvard's policy was administered in way that intentionally disadvantaged Asian American applicants, thereby shifting the burden to Harvard to disprove discrimination. But unlike explicit and overt race classifications, such arguments based on circumstantial evidence of racial bias do not automatically trigger strict scrutiny. As with any claim of intentional discrimination that relies on circumstantial evidence, rather than an overt and explicit racial penalty, the burden is on the plaintiff to prove that such racial bias exists.

SFFA failed to meet its burden here. Nor does SFFA explain how any such bias would justify the relief it seeks, *i.e.* dismantling an admissions program designed to achieve a racially diverse student body. After carefully reviewing the

evidence, the District Court made factual findings, supported in every instance by the record, and ultimately found that "there is no evidence of any racial animus whatsoever or intentional discrimination on the part of Harvard beyond its use of a race-conscious admission policy, nor is there evidence that any particular admissions decision was negatively affected by Asian American identity." ADD123-24 (footnote omitted); *see also id.* at 125 (finding witnesses' testimony refuting discrimination claim to be "consistent, unambiguous, and convincing"); *id.* at 126 (noting that "SFFA did not present a single Asian American applicant who was overtly discriminated against . . . ."). Of particular note is the District Court's finding, based on the testimony of Harvard students, that "eliminating consideration of race would significantly disadvantage at least some Asian American applicants," who "view[] their race or ethnicity as a critical aspect of their life experiences and applications to Harvard." ADD111.

SFFA presents this Court with an extraordinary proposition: that a race-conscious admissions program motivated by the compelling interest of educational diversity is presumptively motivated by a discriminatory purpose based on pernicious racial stereotypes. This contention undermines and diminishes the compelling nature of the interest at hand. The educational benefits that flow from diversity, including racial and ethnic diversity, "are not theoretical" but are "substantial," "important[,] and laudable." *Grutter*, 539 U.S. at 330. And because

education plays "a fundamental role in maintaining the fabric of society" and serves as "'the very foundation of good citizenship,'" a university's efforts to cultivate a diverse student body are paramount to its mission. *Grutter*, 539 U.S. at 331 (quoting *Brown v. Board of Educ.*, 347 U.S. 483, 493 (1954)).

When considering the vital importance of diversity in higher education, it is particularly salient to recall the long history of racially exclusive higher education and the very real prospect of a regression should race no longer be a permissible consideration in the admissions process. *Bakke* addressed the admissions process of the Medical School of the University of California at Davis in 1973 and 1974; before that time, "in the absence of affirmative efforts to recruit and admit qualified minority applicants, the medical profession remained an almost exclusively white domain . . . ."[4] Black and Latinx medical students accounted for only one percent of the total enrollment at predominantly white medical schools in the 1968-1969 academic year, a record high at the time.[5] Black physicians comprised only 2.2% of all physicians in the United States in 1970, the same proportion as in 1950.[6]

---

[4] Br. of Amicus Curiae Association of American Medical Colleges ("AAMA"), *Regents of Univ. of Cal. v. Bakke*, 438 U.S. 265 (1978) (No. 76-811), 1977 WL 187992, at *8.

[5] Br. of Petitioner, *Bakke*, 438 U.S. 265 (1978) (No. 76-811), 1977 WL 189474, at *27-28.

[6] Br. of AAMA at *8.

It was this stubborn lack of diversity that led Justice Powell to stress in *Bakke* that "the nation's future depends upon leaders trained through wide exposure to the ideas and mores of students as diverse as this Nation of many peoples." *Bakke*, 438 U.S. at 313 (internal quotation marks omitted); *accord Grutter*, 539 U.S. at 332 ("In order to cultivate a set of leaders with legitimacy in the eyes of the citizenry, it is necessary that the path to leadership be visibly open to talented and qualified individuals of every race and ethnicity."). While there has certainly been progress since *Bakke* was decided, persistent inequities in educational opportunities continue to disadvantage qualified students of color in accessing competitive higher education.[7] For example, after statewide referendums in California and Michigan banned the consideration of race in those states' university systems, the admission of Black and Latinx students dropped significantly, especially at the most selective schools.[8] That is why race-conscious admissions is as important now as ever

---

[7] *See*, *e.g.*, David A. Acosta et al., *Trends in Racial and Ethnic Minority Applicants and Matriculants to U.S. Medical Schools, 1980–2016*, Analysis in Brief, 17 Ass'n Am. Med. Cs., no. 3 (Nov. 2017), https://www.aamc.org/system/files/reports/1/november2017trendsinracialand ethnicminorityapplicantsandmatricu.pdf (noting that from 1980 to 2016, the percentage of medical school matriculants only rose from 6.0% to 7.1% for Black matriculants and 4.9% to 6.3% for Latinx matriculants, and actually decreased from 0.4% to 0.3% for American Indian or Alaska Native matriculants).

[8] *Prop. 209 Lands On UC*, L.A. Times (Apr. 1, 1998), http://articles.latimes.com/ 1998/apr/01/local/me-34867 (reporting that the number of Black and Latinx students admitted to UC Berkeley, as a part of the first freshman class since Proposition 209 went into effect, dropped by 66% and 53%, respectively, from the number of such students admitted the previous year); Adam Harris, *What Happens When a College's Affirmative-Action Policy Is Found Illegal*, The Atlantic (Oct. 26, 2018), https://www.theatlantic.com/education/archive/2018/10/when-college-

before—to ensure the "[e]ffective participation by members of all racial and ethnic groups in the civic life of our Nation . . . if the dream of one Nation, indivisible, is to be realized." *Grutter*, 539 U.S. at 332.

And the compelling nature of diversity in higher education under the Equal Protection analysis of race-conscious admissions in *Bakke*, *Grutter*, *Fisher I*, and *Fisher II* applies with equal, if not greater, force under Title VI of the Civil Rights Act of 1964. Indeed, the *Bakke* Court made clear that "Title VI must be held to proscribe only those racial classifications that would violate the Equal Protection Clause or the Fifth Amendment." *Bakke*, 438 U.S. at 287.[9]

## II. Due to Persistent Inequality in Educational Opportunity, Harvard Cannot Assemble a Diverse Student Body Without Considering Race.

Due to racial inequities in our nation's K-12 educational system, a student's race continues to affect their access to educational opportunities and performance on standardized tests irrespective of their talents and abilities.[10] Nevertheless, as found by the District Court, the consideration of race in Harvard's admissions process only

---

cant-use-race-admissions/574126/ (noting that "Black enrollment at the University of Michigan dropped by nearly 10 percent in the three years following Proposition 2").

[9] Because Harvard's race-conscious admissions program satisfies the legal standard for public colleges and universities under the Equal Protection Clause, this Court need not decide whether, as a private college, it should be subject to a different standard under Title VI. Amici Curiae preserve for future review any argument on this issue.

[10] *See* Br. of Amici at 8-15, *SFFA v. Harvard*, No. 1:14-cv-14176 (D. Mass. Aug. 3, 2018), ECF No. 471; Br. of Amici in Opp'n to SFFA's Mot. Summ. J. at 11-23, *SFFA v. Harvard*, No. 1:14-cv-14176 (D. Mass. Aug. 30, 2018), ECF No. 504.

"impacts who among the highly-qualified students in the applicant pool will be selected for admission to a class that is too small to accommodate more than a small percentage of those qualified for admission." ADD84; *see also* Joint Appendix ("JA") 3052:7-25 (Card); JA2362:1-17, JA2363:12-25 (Arcidiacono) (describing how race makes a difference only for applicants who would otherwise be competitive, and that other factors are just as consequential as race in admissions decisions). Thus, to eliminate even that limited consideration of race and rely solely on credentials that are skewed by entrenched racial inequality would unfairly penalize applicants of color and prevent Harvard from producing the educational benefits of diversity that are so essential to a high-caliber education.

Racial segregation in our nation's schools remains a persistent problem and prevents many talented students of color from accessing the same educational opportunities as their more privileged counterparts. Approximately 75% of Black K-12 students and 80% of Latinx K-12 students attend racially segregated schools.[11] Furthermore, nearly one-half of Black and Latinx students, more than one-third of Native American students, and one-quarter of Pacific Islander students attend high-poverty schools, compared to just eight percent of white students.[12] Black, Latinx,

---

[11] Beverly Tatum, *Why Are All the Black Kids Sitting Together in the Cafeteria? And Other Conversations About Race* 7-8 (3d ed. 2017).

[12] Joel McFarland et al., U.S. Dep't of Educ., Nat'l Ctr. for Educ. Statistics, *The Condition of Education 2018* at 82 (May 2018), https://nces.ed.gov/pubs2018/2018144.pdf. The National

Native American, and Pacific Islander students are three to six times more likely than white students to attend a high-poverty K-12 school, where students are more likely to be taught by "out-of-field" teachers and less likely to have access to extracurricular activities.[13] In addition, high schools with concentrated Black, Latinx, or Native American enrollment are less likely to offer advanced courses.[14]

In fact, studies have found that the explicit and implicit racial biases of educators negatively impact expectations of Black, Latinx, and Southeast Asian students relative to their white classmates, even in middle-class, integrated schools, regardless of those students' socioeconomic status. For example, research on implicit bias shows that educators are less likely to call on Black, Latinx, and Southeast Asian students in class, or to encourage and recommend them for college preparatory courses.[15] Even Black, Latinx, Southeast Asian, and Native American

_____

Center for Education Statistics defines a "high-poverty school" as one where 75% or more of the students are eligible for a free or reduced-price lunch. *See id.*

[13] *Id.*; Tatum, *supra* note 11, at 2; Kaisa Snellman et al., *Inequity Outside the Classroom: Growing Class Differences in Participation in Extracurricular Activities*, 40 Voices Urban Educ. 7, 13 (2015), https://files.eric.ed.gov/fulltext/EJ1056739.pdf.

[14] *See* U.S. Dep't of Educ., *2015-2016 Civil Rights Data Collection: STEM Course Taking* 5 (2018), https://www2.ed.gov/about/offices/list/ocr/docs/stem-course-taking.pdf; Bryan McKinley et al., *K-12 Achievement for Indigenous Students*, 54:1 J. of Am. Indian Educ. 75 (Spring 2015), https://www.jstor.org/stable/10.5749/jamerindieduc.54.1.0063?seq=1#page_scan_tab_contents.

[15] Harriett Tenenbaum et al., *Are Teachers' Expectations Different for Racial Minority Than for European American Students?: A Meta-Analysis*, 99:2 J. Educ. Psychol. 253-73 (2007), http://psycnet.apa.org/record/2007-06672-003 (finding that educators were less likely to offer encouragement and pose questions to Black and Latinx students than white students); Anna Chiang et al., *(Mis)Labeled: The Challenge of Academic Capital Formation for Hmong American High*

students attending middle class, racially-integrated schools are frequently tracked away from college preparatory coursework.[16] Moreover, while Black, Latinx, and Native American students are no more likely to misbehave than students of other races, educators are more likely to discipline these students more frequently and more harshly, depriving them of instructional time.[17] Entrenched biases against students of particular races and ethnicities, therefore, can diminish the realization of their full potential, preventing them from amassing competitive academic credentials.

The overreliance on standardized test scores also places certain students of color at severe disadvantage despite their abilities. As the District Court

---

*School Students in an Urban Setting*, 10 J. of Se. Asian Am. Educ. & Advancement 10 (2015), https://docs.lib.purdue.edu/cgi/viewcontent.cgi?article=1118&context=jsaaea ("Some researchers have found that Hmong American students have been tracked into lower level courses and were held to low expectations by their teachers"); Krista Malott, *Being Mexican: Strengths and Challenges of Mexican-Origin Adolescents*, 8:12 J. Sch. Counseling 1-39 (2010), https://files.eric.ed.gov/fulltext/EJ885087.pdf (finding that counselors had lower expectations of Mexican students' success in rigorous courses and selective colleges).

[16] *See generally* Amanda Lewis et al., *Despite the Best Intentions: How Racial Inequality Thrives in Good Schools* 166 (2015).

[17] Russell J. Skiba & Natasha T. Williams, *Are Black Kids Worse? Myths and Facts About Racial Differences in Behavior: A Summary of the Literature*, Ind. Univ. (Mar. 2014), https://indrc.indiana.edu/tools-resources/pdf-disciplineseries/african_american_differential_behavior_031214.pdf; Ajmel Quereshi et al., LDF, *Locked Out of the Classroom: How Implicit Bias Contributes to Disparities in School Discipline* at 4 (2017), https://www.naacpldf.org/files/about-us/Bias_Reportv2017_30_11_FINAL.pdf.

acknowledged, "standardized tests are 'imperfect measures . . . .'" ADD88.[18] Such tests underpredict the potential of many talented students of color.[19] For example, according to Roy Freedle—who served for 31 years as a cognitive psychologist for Educational Testing Services, the creator of the SAT—Black and Latinx examinees consistently outperformed white students on hard questions (which use vocabulary taught at school), while white students outperformed Black and Latinx examinees on easy questions (which use words with varying colloquial meanings, with the exam crediting answers that reflect the meaning most frequently used in white, middle class homes like those of the test creators).[20] Because correct answers on easy questions—those infected with cultural bias—yielded the same amount of credit as correct answers to hard questions, test scores for Black examinees were artificially depressed by as much as 200 or 300 points.[21] A 2010 study replicated Freedle's

---

[18] *See also Grutter v. Bollinger*, 288 F.3d 732, 771 (6th Cir. 2002) (Clay, J., concurring), *aff'd*, 539 U.S. 306 ("LSAT scores are neither race-neutral or gender-neutral criteria for admissions decisions.").

[19] *See* Br. of Amici at 8-15, *SFFA v. Harvard*, No. 1:14-cv-14176, ECF No. 471; Br. of Amici in Opp'n to SFFA's Mot. Summ. J. at 11-13, *SFFA v. Harvard*, No. 1:14-cv-14176, ECF No. 504.

[20] *See generally* Roy O. Freedle, *Correcting the SAT's Ethnic and Social-Class Bias: A Method for Reestimating SAT Scores*, 73 Harv. Educ. Rev. 1 (2003); *see also id.* at 28 (noting that there is "evidence for this bias pattern across a wide span of tests" and mentioning evidence of cultural bias on Advanced Placement exams, the GRE, and high school vocabulary exams).

[21] *Id*. at 12-13.

findings, showing that the SAT "favors one ethnic group over another" and calling into "question the validity of SAT verbal scores for Black examinees."[22]

Test makers' efforts to ensure "reliability"—meaning that new questions produce findings consistent with the findings of existing questions[23]—also significantly disadvantage students of color. Test manufacturers deem a question reliable when "high ability" examinees are more likely than "low ability" examinees to answer correctly.[24] But test manufacturers fail to use any independent measure of "ability."[25] Instead, test manufacturers define "high ability" as an examinee who performed well on the overall test and will discard—as "unreliable"—questions on which high scorers do not outperform low scorers.[26] If the test itself is biased and unfairly depresses the scores of some examinees—perhaps because those examinees are unfamiliar with the semantics used in white homes—test makers' reliability check will reproduce that bias.

---

[22] Maria Veronica Santelices & Mark Wilson, *Unfair Treatment? The Case of Freedle, the SAT, and the Standardization Approach to Differential Item Functioning*, 80 Harv. Educ. Rev. 106, 126 (2010).

[23] W. Kidder et al., *How the SAT Creates "Built-In Headwinds": An Educational and Legal Analysis of Disparate Impact*, 43 Santa Clara L. Rev. 131, 146, 156-57 (2002).

[24] *Id.* at 157.

[25] Jim Loewen, *Here We Go Again: Tests for the Common Core May Be Unfair to Some and Boring to All*, Hist. News Network (Nov. 18, 2014), https://historynewsnetwork.org/blog/153543.

[26] *Id.*; Kidder, *supra* note 23, at 157.

Both the SAT, created in 1926, and the ACT, created in 1959, were developed when the United States' population was 90% white.[27] "Like most other 'standardized' tests given widely in the U.S., researchers originally validated the SAT on affluent white students."[28] Since the "ability" of an examinee is measured by the yardstick of affluent white individuals' performance, experimental test questions are systematically discarded as "biased" when more Black or Latinx students answer correctly than white students, resulting in a scored test comprised entirely (or almost entirely) of questions that favor white students, sometimes by large margins.[29] As a consequence, "[a]ffluent white students have always done better on [the SAT] than have African Americans, Hispanics, Native Americans, Filipino Americans, or working-class whites."[30] If equally valid questions—but with a less racially disparate impact—were used, the Black-white score gap could be closed by 40%, while the Chicano-white score gap could be reduced by 25%.[31]

---

[27] *See* Figure 3-3 Distribution of Total Population by Race: 1900 to 2000 in Frank Hobbs & Nicole Stoops, *Demographic Trends in the 20th Century: Census 2000 Special Reports* 75 (Nov. 2002), https://www.census.gov/prod/2002pubs/censr-4.pdf.

[28] Loewen, *supra* note 25.

[29] *Id.*; Kidder, *supra* note 23, at 133-72.

[30] Loewen, *supra* note 25.

[31] Kidder, *supra* note 23, at 172; *Hidden Biases Continue to Produce Powerful Headwinds for College-Bound Blacks Aiming for Higher Scores on the SAT*, 41 J. of Blacks in Higher Educ. 90, 92 (2003).

17

### III.  Eliminating Race-Conscious Admissions Would Impair the Educational Experience of All Students and Risk Regression of the Significant Advances That Have Been Achieved.

Given the foregoing, Harvard would be unable to accomplish its educational mission without the diversity that stems directly from race-conscious admissions. ADD10. As Harvard college student Catherine Ho pointed out: "as an individual student, we learn from other people [by] listening to their stories [and] perspectives. And if their perspectives and stories aren't present on campus . . . who are we supposed to be learning from?" JA2643:21-25 (Ho). Indeed, President Simmons testified that eliminating race-conscious admissions practices would "undermine the ability of Harvard to continue on its path of outperforming other universities," crediting Harvard's racial diversity "for the success that Harvard enjoys today." JA2805:2-4 (Simmons).

The District Court found that "[a]t least 10% of Harvard's admitted class, including more than one third of the admitted Hispanics and more than half of the admitted African Americans, would most likely not be admitted in the absence of Harvard's race-conscious admissions process." ADD84 (citations and footnote omitted). SFFA's own expert estimated that eliminating the consideration of race would reduce the number of Black, Latinx, Native American, Hawaiian, and Pacific Islander students by 1,100 students over four years, a 58% reduction. JA2329:20-JA2330:4. And the District Court further found that, even when considering SFFA's

18

proffered race-neutral alternatives, "African American representation in Harvard's incoming class would fall nearly one-third to approximately 10% of the class." ADD91 (citation omitted).

Each of the student and alumni witnesses who testified at trial recognized the ways in which a dramatic decline in the number of Black and Latinx students on campus would prevent Harvard students from obtaining the educational benefits of diversity. JA2551:8-20, JA2555:10-11 (Vasquez-Rodriguez); JA2564:18-22 (Chin); JA2612:25-2613:13 (Cole); JA2639:19-2642:25 (Ho); JA2662:14-22 (Nuñez); JA2687:3-2691:3 (Diep); JA2726:16-2727:7 (Trice); JA2744:15- 2745:6 (Chen). As Harvard student Madison Trice explained: "it's important for the broader Harvard community to be able to interact with a number of different black people who have very different experiences, whether that's in terms of religion or class or politics or national origin, and to be able to see that black people are not a monolith." JA2713:10-15 (Trice). Indeed, exposure to differences within Black and Latinx communities is important even for students who identify as Black and Latinx. For Harvard student Cecilia Nuñez, diversity within the Black and Latinx community has taught her "a lot more about what it means to identify as black or what it means to identify as Latinx." JA2658:20-22 (Nuñez).

Diversity within the Black and Latinx community at Harvard helps to create an environment where false racial stereotypes or discrimination are more likely to

be recognized and diminished. JA2710:22-2711:20 (Trice). Given the hyper-segregation that Black and Latinx people experience in this country, *see supra*, Section II, college is a rare opportunity for many Harvard students to develop close relationships across racial lines. Harvard student Catherine Ho poignantly described how, at Harvard, she was able to forge a closer relationship with her Black roommate than with Black friends in the past. JA2639:23-2640:15 (Ho). Her close proximity to her roommate enabled them to have more thoughtful and in-depth conversations about the mistreatment of a Black student by police; in addition to witnessing the emotional toll of the episode on her roommate, these conversations helped Ms. Ho to more fully understand the issue of police brutality. *Id.*

The loss of race-conscious admissions, and the resulting reduction in the number of Black, Latinx, Native American, Hawaiian, and Pacific Islander students on campus, also risks a significant increase in social isolation. JA2711:4-20 (Trice); JA2663:4-18 (Nuñez); JA2553:5-2554:8 (Vasquez-Rodriquez); JA2612:12-24 (Cole); JA2627:18-2673:2 (Nuñez). As Emily Van Dyke, President of Amicus Curiae Native American Alumni of Harvard University (NAAHU), explained: "Harvard provides enormous and thrilling opportunities, yet it can be alienating if absolutely no one else in your class, cohort, or school has experienced life as you have. There are only a few Native students, if any, in any given class. Having even

20

fewer Native students would be devastating."[32] Dean Smith also noted how Black students on campus "interacting with other students are bringing important perspectives to our educational process, but we're also very worried about their own educational experience." JA1845:4-7 (Smith). He described how "alienation and isolation" interfere "with an individual's ability to pursue their academic studies on our campus," and concluded that the university is "not looking to make that [isolation] worse" for students of color by ending race-conscious admissions. JA1844:24-1845:3 (Smith).

In addition, a significant reduction of Black, Latinx, Native, Hawaiian, and Pacific Islander students jeopardizes more nuanced and rewarding classroom discussion, which would be lost without the benefit of their participation. JA2658:25-2659:11 (Nuñez); JA2743:8-11 (Chen). For example, the perspectives of Black students have informed thought-provoking discussions about the public health consequences of biased medical studies that lack diverse participants, JA2686:25-2688:12 (Diep), and about urban violence experienced by some Black students living in a directly-impacted community. JA2612:25-2613:13 (Cole). According to Harvard alumna Sally Chen, a reduction in racial diversity on campus "would really rob students of that critical part of education where you learn from

---

[32] Decl. of NAAHU at 5, *SFFA v. Harvard*, No. 1:14-cv-14176 (D. Mass. July 30, 2018), ECF No. 455-15.

and with people who are different from you and have different experiences from you." JA2744:15-2745:6 (Chen).

A reduction in the diversity on campus would also greatly impact student groups and the role they play in helping Harvard realize the educational benefits of diversity. As discussed, *infra*, in Section IV, students of color and the organizations they lead have had a transformative impact on Harvard throughout its modern history. A decrease in the number of Black, Latinx, Native American, Hawaiian, and Pacific Islander students on campus would severely limit the ability of student groups to support students of color and enrich the broader Harvard community. JA2639:19-2642:25 (Ho); JA2570:8-23 (Chin). Some vitally important student groups would cease to exist or be significantly diminished if fewer diverse students were admitted each year. JA2644:23-2645:10 (Ho); JA2664:19-25 (Nuñez); JA2725:18-2726:3 (Trice). As Harvard student Cecilia Nuñez explained: "Certain sub-Latinx organizations cannot sustain themselves when there are not enough students from a particular background. A lot of Latinx clubs on campus have gone through periods of being defunct since their founding."[33]

Importantly, a significant reduction in the number of students of color at Harvard would further aggravate the challenge of recruiting students of color,

---

[33] Decl. of Fuerza Latina of Harvard at 4, *SFFA v. Harvard*, No. 1:14-cv-14176 (D. Mass. July 30, 2018), ECF No. 455-3.

thereby compounding the problem of insufficient student diversity. For many students, racial diversity was a crucial factor in the decision to apply to, and ultimately attend, Harvard; without this diversity, they might not have made the same decisions. *See, e.g.,* JA2706:17-2708:3 (Trice); JA2652:11-14 (Nuñez); JA2617:21-2618:2 (Cole). Alumna Itzel Libertad Vasquez-Rodriguez described how she "wanted to make sure that there would be other students who were people of color like myself who would be at that school so that I could have a more safe . . . welcoming . . . learning environment." JA2550:16-20 (Vasquez-Rodriguez). Harvard student Cecilia Nuñez explained that she would not have applied if the number of Black or Latinx students was substantially decreased, because the diversity suggested to her that the campus was a space welcoming to students of color. JA2653:9-18 (Nuñez).

Having heard the evidence at trial, including testimony from multiple Harvard students and alumni, the District Court concluded that "[t]he evidence at trial was clear that a heterogeneous student body promotes a more robust academic environment with a greater depth and breadth of learning, encourages learning outside the classroom, and creates a richer sense of community." ADD6-7. Indeed, Harvard's own literature states that "[t]he quality of the educational experience of all the students in Harvard College depends in part on the[] differences in the background and outlook that students bring with them." JA1015:8-11 (Fitzsimmons)

(quoting the Appendix to Harvard College Admissions Program, DX55). Without race-conscious admissions, Harvard could not maintain the diverse environment that is necessary to its educational mission. ADD106-07.

## IV. Students of Color and Their Organizations Have Transformed Harvard to the Benefit of All Students.

Race-conscious admissions has been an important catalyst to diversifying Harvard's student body over the past several decades, and those students of color have pushed Harvard towards institutional reform that has had ramifications not only at Harvard, but also in colleges and universities nationwide. Students of color, and the organizations they lead, continue to play a formative role in shaping what Harvard is today—a critical contribution to Harvard that would be lost if race-conscious admissions were to be eliminated.

The Harvard of the past was unquestionably reserved for white, privileged students. In fact, the number of Black first-year students at Harvard generally did not exceed single digits until 1959, when 18 of approximately 1,100 students admitted to Harvard's Class of 1963 were Black; that same year, just one Black woman was admitted to Radcliffe.[34] As recently as 1972, there was only one Latinx

---

[34] Kent Garrett & Jeanne Ellsworth, *The Last Negroes at Harvard: The Class of 1963 and the 18 Young Men Who Changed Harvard Forever* 31 (2020); *President Nathan Pusey: Under His Watch Harvard Opened Its Doors to Large Numbers of Black Students*, 35 J. of Blacks in Higher Educ. 73, 73 (Spring 2002); Jerome Karabel, *How Affirmative Action Took Hold at Harvard, Yale, and Princeton*, 48 J. of Blacks in Higher Educ. 58, 71-72 (Summer 2005).

24

student in Harvard's graduating class.[35] And, in 1976, "Asian Americans comprised 2.5 percent of the student body."[36]

Harvard's current levels of diversity required a sustained, decades-long commitment to race-conscious admissions that resulted from continued advocacy, much of it organized by the Harvard students of color on campus. For example, the few Black students attending Harvard organized and pressured the administration to further diversify its student body and faculty. By 1963, Harvard's Black students founded the Association of African and Afro-American Students ("AFRO"), a predecessor to Amicus Curiae Harvard-Radcliffe Black Students Association.[37] In Fall 1968, Harvard's Admissions Office changed its admissions criteria in response to advocacy led by AFRO.[38] The number of Black Harvard first-year students nearly doubled that Fall, increasing from 63 Black first-year students in 1968 to 121 Black first-year students in 1969.[39]

---

[35] *See* Jeannette Soriano, *Updates: Harvard's Latin@ Community: Thirty Years and Counting*, ReVista: Harv. R. of Latin Am., https://revista.drclas.harvard.edu/book/updates-harvards-latin-community.

[36] Letitia C. Chan & Matteo N. Wong, *An Asian-American Awakening*, Harv. Crimson (Mar. 14, 2019), https://www.thecrimson.com/article/2019/3/14/asian-american-awakening/.

[37] Karabel, *supra* note 34, at 71-72; Decl. of the Harvard-Radcliffe Black Students Ass'n at 2, *SFFA v. Harvard*, No. 1:14-cv-14176 (D. Mass. July 30, 2018), ECF No. 455-2.

[38] Karabel, *supra* note 34, at 74.

[39] Ruth A. Hailu, *Revisiting the 'Four Demands,' Fifty Years Later*, Harv. Crimson (May 20, 2018), https://www.thecrimson.com/article/2018/5/20/four-demands-revisited/; *President Nathan Pusey*, *supra* note 34.

AFRO also pushed Harvard to diversify the faculty and broaden the curriculum.[40] In 1969, Harvard responded by creating the Afro-American Cultural Center, establishing the African and Afro-American Studies Department, hiring nine faculty appointments, and creating seven new courses.[41] A few years later, Harvard established the W.E.B. DuBois Institute for Afro-American Research.[42] Harvard's investment in its African American studies program has, in turn, influenced other universities across the country to invest in their own African American studies programs.[43]

Likewise, during the 1970-1971 school year, 14 Latinx students formed RAZA, the first of several Latinx student organizations at Harvard, including Amicus Curiae Fuerza Latina of Harvard,[44] which recognized "the need for extensive student recruitment."[45] And, in Fall 1976, students formed Amicus Curiae Harvard-Radcliffe Asian American Association ("AAA"), which "work[ed] with the

---

[40] Hailu, *supra* note 39.

[41] *Id*.; Karabel, *supra* note 34, at 73; Harv. Faculty of Arts & Sci. Dep't of African & African Am. Studies, *About*, https://aaas.fas.harvard.edu/about.

[42] Hailu, *supra* note 39.

[43] Fabio Rojas, *From Black Power to Black Studies: How a Radical Social Movement Became an Academic Discipline* 237 (2010) (discussing the "Harvard" effect).

[44] *See* Soriano, *supra* note 35.

[45] *Id*.

admissions office to establish Asian American recruitment initiatives."[46] AAA members flew all over the country recruiting Asian American public school students in low-income neighborhoods, "held panels, sent out letters, and corresponded with students" in sustained and ongoing recruitment efforts.[47]

For decades, members of Amicus Curiae Native Americans at Harvard College ("NAHC") have pushed Harvard to fulfill the commitment in the school's charter, dated 1650, which established the college for the "education of the English and Indian youth of this country."[48] In the last 25 years, NAHC members have met with admission officers about increasing the number of Native American students and traveled throughout Indian Country, recruiting new Native American students as a part of the Undergraduate Minority Recruitment Program.[49]

Although there is still much work to be done to improve diversity and inclusion at Harvard,[50] race-conscious admissions and the sustained activism and

---

[46] Chan & Wong, *supra* note 36.

[47] *Id*.

[48] Peabody Museum of Archaeology & Ethnology at Harv. Univ., *The Harvard Indian College: History*, https://www.peabody.harvard.edu/node/477.

[49] Alexander J. Dubbs, *Coming Into Their Own*, Harv. Crimson (Apr. 19, 2006), https://www.thecrimson.com/article/2006/4/19/coming-into-their-own-when-you/; Telephone Interview with Joan Kane, NAHC alumna (May 14, 2020); Telephone Interview with Natalie Landreth, NAHC alumna (May 14, 2020); Telephone Interview with Adam Bailey, NAHC Alumnus (May 14, 2020).

[50] *See, e.g.*, Kate Taylor, *Denying a Professor Tenure, Harvard Sparks a Debate Over Ethnic Studies*, N.Y. Times (Jan. 2, 2020), https://www.nytimes.com/2020/01/02/us/harvard-latinos-diversity-debate.html; Bethonie Butler, *'I, Too, Am Harvard': Black students show they*

recruiting efforts of students of color have unquestionably produced an even more racially diverse student body, to the benefit of all Harvard students and Harvard itself. "Of the students admitted from minority groups, 22.2% are Asians, 14.6% are African American, 11.6% are Latino and 2.5% are Native American or Pacific Islander."[51] And the student organizations led by these students of color continue the tradition of benefitting Harvard and all of its students in transformative ways.

For example, as a Latinx cultural organization, Amicus Curiae Fuerza Latina recognized that Harvard did not adequately address the particular mental health challenges of students of color. Fuerza Latina not only created a space to "make sure students feel safe and secure in talking about mental health in a way that they maybe weren't able to back home" but also lobbied the Harvard administration to expand culturally competent mental health resources on campus. JA2668:1-23 (Nuñez). As a result of these conversations, Harvard hired more clinicians of color to better address the diverse mental health needs of its students. JA2668:24-2669:4 (Nuñez).

Moreover, members of Amicus Curiae Black Student Association ("BSA") "were at the forefront of organizing" around an incident of police brutality against a

---

*belong*, Wash. Post (Mar. 5, 2014), at https://www.washingtonpost.com/blogs/she-the-people/wp/2014/03/05/i-too-am-harvard-black-students-show-they-belong/.

[51] Mahita Gajanan, *Harvard's Incoming Class Is Majority Nonwhite For the First Time*, Time.com (Aug. 3, 2017), at https://time.com/4886566/harvard-diversity-incoming-freshmen-nonwhite/.

Black student, "ensuring that the student was cared for" and having discussions with the Harvard administration and the Cambridge Police Department "to ensure that something like that didn't happen again." JA2715:15-24 (Trice). As a result, "the Cambridge Police Department, and BSA and the Harvard community in general now have more frequent meetings to discuss relationships between the communities" and how Harvard can "respond effectively to police interactions with students." JA2716:3-8 (Trice).

Student organizations also work to foster discussion about important topics. For example, Amici Curiae Harvard-Radcliffe Asian American Women's Association, Harvard-Radcliffe Chinese Students Association, and Harvard Vietnamese Association hosted a forum on combating anti-black racism in the Asian American community on campus and beyond. JA2632:15-2634:17 (Ho); JA5978. Moreover, like their predecessors, students of color and their organizations continue to play a crucial role in Harvard's recruiting efforts by contacting prospective students, hosting admitted students, and putting on events during Visitas, Harvard's official admitted students' weekend. JA2707:8-2708:6, JA2727:8-10 (Trice); JA2626:1-18 (Ho), JA2671:22-2672:9 (Nuñez), JA2573:22-2574:6 (Chin). And just last year, in June 2019, Harvard announced that it would "hire three to four senior faculty to specialize in Asian American, Latinx, and Muslim American studies" after approximately 47 years of advocacy by Harvard student organizations like Amici

Curiae Task Force on Asian American Progressive Advocacy and Studies and Harvard-Radcliffe Asian American Association. JA2741:21-2743:11 (Chen).[52]

Harvard's diversity has led to the creation and flourishing of a vibrant array of student and alumni cultural organizations, including Amici Curiae here, which have been critical in helping Harvard realize the educational benefits of diversity. These organizations, and their substantial contributions, would be drastically diminished if Harvard could no longer forge a diverse student body through race-conscious admissions.

## CONCLUSION

For the foregoing reasons, Amici Curiae respectfully urge this Court to affirm the District Court's ruling below.

Dated: May 20, 2020

---

[52] *See also* Jonah S. Berger & Molly C. McCafferty, *Gay Announces Plans to Hire New Ethnic Studies Faculty*, Harv. Crimson (June 18, 2019), https://www.thecrimson.com/article/2019/6/18/gay-senior-ethnic-studies-hires/; Chan & Wong, *supra* note 36.

Respectfully submitted,

/s/ Jin Hee Lee

Sherrilyn Ifill
Janai Nelson
Samuel Spital
Jin Hee Lee
Rachel Kleinman
Cara McClellan
NAACP Legal Defense and
    Educational Fund, Inc.
40 Rector Street, 5th floor
New York, NY 10006
Tel: (212) 965-2200
Fax: (212) 226-7592
jlee@naacpldf.org

Michaele N. Turnage Young
Jennifer A. Holmes
NAACP Legal Defense and
    Educational Fund, Inc.
700 14th Street NW, Suite 600
Washington, DC 20005
Tel: (202) 682-1300
Fax: (202) 682-1312
mturnageyoung@naacpldf.org

Kate R. Cook, No. 99103
Kenneth N. Thayer, No. 1186658
Sugarman, Rogers, Barshak &
    Cohen, P.C.
101 Merrimac Street, 9th floor
Boston, MA 02114-4737
Tel.: (617) 227-3030
cook@sugarmanrogers.com
thayer@sugarmanrogers.com

*Counsel for Amici Curiae Coalition
for a Diverse Harvard, Association*

31

*of Black Harvard Women, First
Generation Harvard Alumni, Fuerza
Latina of Harvard, Harvard Asian
American Alumni Alliance, Harvard
Asian American Brotherhood,
Harvard Black Alumni Society,
Harvard Islamic Society, Harvard
Japan Society, Harvard Korean
Association, Harvard Latino Alumni
Alliance, Harvard Minority
Association of Pre-Medical Students,
Harvard Phillips Brooks House
Association, Harvard Progressive
Jewish Alumni, Harvard South Asian
Association, Harvard University
Muslim Alumni, Harvard Vietnamese
Association, Harvard-Radcliffe
Asian American Association,
Harvard-Radcliffe Asian American
Women's Association,
Harvard-Radcliffe Black Students
Association, Harvard-Radcliffe
Chinese Students Association,
Kuumba Singers of Harvard College,
Native American Alumni of Harvard
University, Native Americans at
Harvard College, Task Force on
Asian American Progressive
Advocacy and Studies, and 21
Colorful Crimson.*

## CERTIFICATE OF COMPLIANCE

Pursuant to Fed. R. App. P. 29(a)(5), the undersigned hereby certifies that this brief complies with the type-volume limitation.

1.      Exclusive of the exempted portions of the brief, as provided in Fed. R. App. P. 32(f), the brief contains 6482 words.

2.      The brief has been prepared in proportionally spaced typeface using Microsoft Word 2010 in 14-point Times New Roman font.  As permitted by Fed. R. App. P. 32(g), the undersigned has relied upon the word-count feature of this word processing system in preparing this certificate.

Dated: May 20, 2020

/s/ Jin Hee Lee
Jin Hee Lee
NAACP Legal Defense and
     Educational Fund, Inc.
40 Rector Street, 5th floor
New York, NY 10006
Tel.: (212) 965-2200
Fax: (212) 226-7592
jlee@naacpldf.org

## CERTIFICATE OF SERVICE

I hereby certify that on the 20th of May 2020, a copy of the above and foregoing AMICI CURIAE BRIEF OF COALITION FOR A DIVERSE HARVARD, ASSOCIATION OF BLACK HARVARD WOMEN, COALITION FOR A DIVERSE HARVARD, FIRST GENERATION HARVARD ALUMNI, FUERZA LATINA OF HARVARD, HARVARD ASIAN AMERICAN ALUMNI ALLIANCE, HARVARD ASIAN AMERICAN BROTHERHOOD, HARVARD BLACK ALUMNI SOCIETY, HARVARD ISLAMIC SOCIETY, HARVARD JAPAN SOCIETY, HARVARD KOREAN ASSOCIATION, HARVARD LATINO ALUMNI ALLIANCE, HARVARD MINORITY ASSOCIATION OF PRE-MEDICAL STUDENTS, HARVARD PHILLIPS BROOKS HOUSE ASSOCIATION, HARVARD PROGRESSIVE JEWISH ALUMNI, HARVARD SOUTH ASIAN ASSOCIATION, HARVARD UNIVERSITY MUSLIM ALUMNI, HARVARD VIETNAMESE ASSOCIATION, HARVARD-RADCLIFFE ASIAN AMERICAN ASSOCIATION, HARVARD-RADCLIFFE ASIAN AMERICAN WOMEN'S ASSOCIATION, HARVARD-RADCLIFFE BLACK STUDENTS ASSOCIATION, HARVARD-RADCLIFFE CHINESE STUDENTS ASSOCIATION, KUUMBA SINGERS OF HARVARD COLLEGE, NATIVE AMERICAN ALUMNI OF HARVARD UNIVERSITY, NATIVE AMERICANS AT HARVARD COLLEGE, TASK FORCE ON ASIAN

34

AMERICAN PROGRESSIVE ADVOCACY AND STUDIES, AND 21 COLORFUL CRIMSON IN SUPPORT OF DEFENDANT-APPELLEE AND AFFIRMANCE was filed electronically with the Clerk of Court using the CM/ECF system. Notice of this filing will be sent to all counsel of record by operation of the court's electronic filing system.

/s/ Jin Hee Lee

Jin Hee Lee
NAACP Legal Defense and
    Educational Fund, Inc.
40 Rector Street, 5th floor
New York, NY 10006
Tel.: (212) 965-2200
Fax: (212) 226-7592
jlee@naacpldf.org