No. 19-2005

# United States Court of Appeals
## for the First Circuit

STUDENTS FOR FAIR ADMISSIONS, INC.,
*Plaintiff-Appellant*,

*v.*

PRESIDENT AND FELLOWS OF HARVARD COLLEGE,
*Defendant-Appellee*.

ON APPEAL FROM A JUDGMENT OF THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

**BRIEF OF MASSACHUSETTS, CALIFORNIA, COLORADO, DELAWARE, THE DISTRICT OF COLUMBIA, HAWAI'I, ILLINOIS, MAINE, MARYLAND, MINNESOTA, NEVADA, NEW MEXICO, NEW YORK, PENNSYLVANIA, RHODE ISLAND, AND VIRGINIA AS *AMICI CURIAE* IN SUPPORT OF HARVARD AND AFFIRMANCE**

MAURA HEALEY
  *Attorney General of Massachusetts*
Elizabeth N. Dewar, 1st Cir. No. 1149723
  *State Solicitor*
Ann E. Lynch
David Ureña
  *Assistant Attorneys General*
One Ashburton Place
Boston, Massachusetts 02108
(617) 963-2204
bessie.dewar@mass.gov

*(Additional counsel on signature pages.)*

# TABLE OF CONTENTS

INTEREST OF *AMICI* ...................................................................................1

ARGUMENT ...............................................................................................3

    I.    The States Have a Compelling Interest in Ensuring Our
        Students Receive the Benefits of Diversity in Higher Education. ........3

        A.    Diversity in higher education confers essential
                educational benefits......................................................................3

        B.    The legitimacy of our governmental and civic institutions
                rests on educating future leaders as diverse as the
                communities they will serve. ......................................................8

    II.    Colleges and Universities Must Retain the Flexibility to Choose
        to Consider Race in Admissions to Ensure Our Students Gain
        the Educational Benefits of Diversity. ................................................14

        A.    Segregation and inequities in our neighborhoods and K-
                12 schools necessitate a particular focus on racial
                diversity in higher education......................................................15

        B.    In the States that have banned race-conscious admissions,
                institutions of higher education have often struggled to
                attain the full educational benefits of a diverse student
                body through race-neutral means............................................23

CONCLUSION.......................................................................................31

CERTIFICATES OF COMPLIANCE AND SERVICE ........................................33

# TABLE OF AUTHORITIES

**Cases**

*Adarand Constructors, Inc. v. Pena*, 515 U.S. 200 (1995) .....................................32

*Fisher v. Univ. of Texas at Austin*, 136 S. Ct. 2198 (2016)............................ *passim*

*Grutter v. Bollinger*, 539 U.S. 306 (2003)...................................................... *passim*

*Plyler v. Doe*, 457 U.S. 202 (1982)..........................................................................3

*Regents of Univ. of Cal. v. Bakke*, 438 U.S. 265 (1978)...........................................9

**Constitutional Provisions, Statutes, and Rules**

Ariz. Const. art. II, § 36 (2010)..................................................................................24

Cal. Const., art I, § 31, subdiv. (a) (1996) ................................................................24

Fed. R. App. P. 29(a)(2).............................................................................................1

Fla. Exec. Order No. 11-04 (2011) ...........................................................................24

H.B. 623, 162d Leg., 2011 Sess. (N.H. 2011) .........................................................24

Mich. Const. art. I, § 26 (2006)..................................................................................24

Neb. Const. art. I, § 30 (2008) ...................................................................................24

Wash. Rev. Code Ann. §49.60.400(1) (1998) ..........................................................24

**Miscellaneous**

Alicia Bannon & Janna Adelstein, Brennan Center for Justice, *State Supreme Court Diversity – February 2020 Update* (2020) .........................................10

American Association of Colleges of Nursing, *Enhancing Diversity in the Workforce* (Apr. 2019) ................................................................... 13

American Association of Medical Colleges, *Diversity in Medicine: Facts and Figures 2019* (2019) ..................................................... 12

Ben Backes, *Do Affirmative Action Bans Lower Minority College Enrollment and Attainment? Evidence from Statewide Bans*, 47 J. of Hum. Resources 435 (2012) .................................................... 29

Kristen Bialik, Pew Research Center, *For the Fifth Time in a Row, the New Congress is the Most Racially Diverse Ever* (Feb. 8, 2019) ......................... 10

Dowain H. Boatright et al., *Association Between the Liaison Medical Committee on Education's Diversity Standards and Changes in Percentage of Medical Student Sex, Race, and Ethnicity*, 320 J. of the Am. Med. Ass'n 2267 (2018) ................................................................ 12

Brief of Fortune-100 Companies and Other Leading American Businesses as *Amici Curiae* in Support of Respondents, *Fisher v. Univ. of Tex. at Austin*, 136 S. Ct. 2198 (2016) (No. 14-891). ............................. 8

Brief of the President and the Chancellors of the University of California as *Amici Curiae*, *Fisher v. Univ. of Tex. at Austin*, 136 S. Ct. 2198 (2016) (No. 14-891) ..................................................... 25

Sahil Chinoy & Jessie Ma, *How Every Member Got to Congress*, N.Y. Times (Jan. 26, 2019) ........................................................... 5

Leslie Davis & Richard Fry, Pew Research Center, *College Faculty Have Become More Racially and Ethnically Diverse, but Remain Far Less So Than Students* (July 31, 2019) ....................................... 13

Federal Judicial Center, *Biographical Directory of Article III Federal Judges, 1789-Present: Advanced Search Criteria* ..................................... 10

Erica Frankenberg, Center for Education and Civil Rights, *Segregation at an Early Age* (updated 2019) .............................................................................20

Erica Frankenberg, Center for Education and Civil Rights, *Segregation at an Early Age* (2016) ...........................................................................................20

Erica Frankenberg et al., Civil Rights Project, *Harming Our Common Future: America's Segregated Schools 65 Years after Brown* (2019) .......... 17, 18, 19

William H. Frey, *Diversity Explosion How New Racial Demographics Are Remaking America* (Brookings Institution Press rev. & updated ed. 2018) ..................................................................................................... 16, 17

Richard Fry & Kim Parker, Pew Research Center, *Early Benchmarks Show Post-Millennials on Track to Be Most Diverse, Best Educated Generation Yet* (2018) .......................................................................................................9

Liliana M. Garces & David Mickey-Pabello, *Racial Diversity in the Medical Profession: The Impact of Affirmative Action Bans on Underrepresented Student of Color Matriculation in Medical Schools*, 86 J. of Higher Educ. 264 (2015) ..................................................................................................29

Liliana M. Garces, *Racial Diversity, Legitimacy, and the Citizenry: The Impact of Affirmative Action Bans on Graduate School Enrollment*, 36 Rev. Higher Educ. 93 (Fall 2012 Supp.) .................................................. 27, 29, 30

Liliana M. Garces, *Understanding the Impact of Affirmative Action Bans in Different Graduate Fields of Study*, 50 Am. Educ. Res. J. 251 (2013) .........30

Mara Gordon, *A Push for Diversity in Medical Schools is Slowly Paying Off*, NPR (Dec. 4, 2018) ........................................................................... 12, 13

Jamie Halper, *The Massachusetts Legislature is Not Diverse, and That's Probably Not Going to Change Next Year*, Bos. Globe., Aug. 7, 2018 ........11

Brenda Iasevoli, *Making Colleges More Diverse Even Without Affirmative Action: Lessons from California's Early Academic Outreach Program*, The Atlantic, Feb. 28, 2014 ..........................................................................24

Sherrilyn A. Ifill, *Racial Diversity on the Bench: Beyond Role Models and Public Confidence*, 57 Wash. & Lee L. Rev. 405 (2000)..............................13

Institute of Medicine, National Acadamies of Sciences, Engineering, and Medicine, *Unequal Treatment: Confronting Racial and Ethnic Disparities in Health Care* (2003).....................................................................................7

W.C. Kidder, *The Struggle for Access from Sweatt to Grutter: A History of African American, Latino, and American Indian Law School Admissions, 1950-2000*, 19 Harv. BlackLetter L.J. 1 (2003) ............................................29

William C. Kidder & Patricia Gándara, Civil Rights Project, *Two Decades After the Affirmative Action Ban: Evaluating the University of California's Race-Neutral Efforts* (2015) .................................................................. 26, 27

Allison E. Laffey & Allison Ng, American Bar Association, *Diversity and Inclusion in the Law: Challenges and Initiatives* (2018) ..............................11

María C. Ledesma, *California Sunset: O'Connor's Post-Affirmative Action Ideal Comes of Age in California*, 42 Rev. of Higher Educ. (Supp. 2019) 227 (2019)....................................................................................................26

Rocio Lorenzo & Martin Reeves, *How and Where Diversity Drives Financial Performance*, Harv. Bus. Rev. (Jan. 30, 2018)................................................7

Jennifer E. Manning, Congressional Research Service, R45583, *Membership of the 116th Congress: A Profile* (2020) ............................................................5

Massachusetts Trial Court, *Annual Diversity Report: Fiscal Year 2019* (2019) ....10

Jeffrey F. Milem et al., Arizona Medical Education Research Institute, *The Important Role that Diverse Student Bodies Play in Shaping the Medical School Curriculum* (2012) ................................................................................7

National Equity Atlas, *Percent of Students by School Poverty Level, as Defined by the Share of Students in the School Eligible for Free- or Reduced-price Lunch (FRPL): United States, All Public Schools*, 2016, PolicyLink and the USC Program for Environmental and Regional Equity (2020) ..............21

Office of Planning, Evaluation and Policy Development, U.S. Department of Education, *The State of Racial Diversity in the Educator Workforce* (2016).............................................................................................13

sean f. reardon et al., *Is Separate Still Unequal? New Evidence on School Segregation and Racial Academic Achievement Gaps (Stanford Center for Education Policy Analysis Working Paper No. 19-06 2019)*.................22

Laila Robbins, Alicia Bannon & Malia Reddick, Brennan Center for Justice, *State Supreme Court Diversity: Across the Country, Courts Fail to Reflect the Racial, Ethnic, and Gender Diversity of the Communities They Serve* (2019) ...........................................................................................10

Somnath Saha et al., *Student Body Racial and Ethnic Composition and Diversity-Related Outcomes in US Medical Schools*, 300 J. Am. Med. Ass'n 1135 (2008) ............................................................................................7

Fadia T. Shaya & Confidence M. Gbarayor, *The Case for Cultural Competence in Health Professions Education*, 70 Am. J. Pharm. Educ. 124 (2006)..........6

Paul Taylor et al., Pew Research Center, *The Rising Cost of Not Going to College* (Feb. 11, 2014) ................................................................................4

Taylor Miller Thomas, *Alma Maters of the 116th Congress*, Politico Pro Datapoint (Mar. 6, 2019) ................................................................................5

U.S. Census Bureau, *Data Links*............................................................................12

U.S. Commission on Civil Rights, *Public Education Funding Inequity in an Era of Increasing Concentration of Poverty and Resegregation* (2018) .............21

University of California Admissions, *Blue and Gold Opportunity Plan* ................25

University of California Berkley Center for Educational Partnerships,
The Puente Project .........................................................................24

University of California Office of the President, *Eligibility in the Local
Context Program* ..........................................................................25

University of California Office of the President, *Student Academic Preparation
and Educational Partnerships: 2017-18 Program Outcomes* (2019)...........24

University of Michigan, *Diversity, Equity & Inclusion Strategic Plan*
(Oct. 2016) .......................................................................... 27, 28

Jonathan Wai & Heiner Rindermann, *The Myth of the College Dropout*,
The Conversation (Apr. 17, 2017)..............................................5, 6

Jonathan Wai & Heiner Rindermann, *What Goes Into High Educational and
Occupational Achievement? Education, Brains, Hard Work, Networks, and
Other Factors*, 28 High Ability Studies 127 (2017) ..................................5, 6

Danny Yagan, *Supply vs. Demand Under an Affirmative Action Ban: Estimates
from UC Law Schools*, 137 J. Pub. Econ. 38 (2016).....................................27

Richard L. Zweigenhaft & G. William Domhoff, *Diversity in the Power Elite:
Ironies and Unfulfilled Promises* (3d ed. 2018) .............................................5

Richard L. Zweigenhaft, *The Role of Elite Education for White Men, White
Women, and People of Color in the U.S. Corporate Elite* (2015)...................5

**INTEREST OF *AMICI***

*Amici* States Massachusetts, California, Colorado, Delaware, the District of
Columbia, Hawaiʻi, Illinois, Maine, Maryland, Minnesota, Nevada, New Mexico,
New York, Pennsylvania, Rhode Island, and Virginia file this brief pursuant to
Fed. R. App. P. 29(a)(2) in support of the President and Fellows of Harvard
College because we share a compelling interest in ensuring that students at
colleges and universities receive the educational benefits that flow from diversity
of all kinds amongst their peers—including racial diversity.  By ensuring that our
students go forth into their adult lives with these educational benefits, we also
strengthen our society, our democracy, and our economy.

The *Amici* States' compelling interest stems from the basic fact that colleges
and universities are responsible for educating a significant portion of our state
workforces and, in particular, are gateways to leadership in both the private and
public sectors.  Our colleges and universities must provide students with an
education that prepares them to work in an increasingly diverse country and a
multicultural, global economy, and to participate in our democracy, including as
voters, civic leaders, and public servants.  Today, such an education requires the
benefits that come from learning amidst a diverse student body bringing diverse
experiences, perspectives, and ideas to the classroom and daily life of the school.

While this case focuses on admissions policies at a private university, the plaintiff's constitutional claims aim more broadly, threatening our own public colleges and universities' ability to implement admissions policies carefully designed to ensure that our institutions confer the educational benefits that can only be realized through diversity.

And there can be no doubt that colleges and universities—and, in particular, their admissions policies that take race into account among other dimensions of diversity—play a crucial role in ensuring that our students obtain the educational benefits of diversity.  For many college students, their experience of higher education will be their first exposure to meaningful racial diversity, because many children continue to attend elementary and secondary schools that, as a result of residential segregation and other factors, do not reflect the diversity of our country. And, while some of the States have experimented with methods of achieving meaningful diversity in higher education without considering race at all in admissions, those alternate methods have often fallen short, particularly at the selective institutions that produce a disproportionate number of our leaders in both the private and public sectors.

For these reasons, the *Amici* States ask this Court to recognize and reaffirm our compelling governmental interest—shared by Harvard College in its capacity

as a recipient of federal funds, and correctly recognized by the District Court

below, Appellant's Add. 106-07—in ensuring that public and private institutions of

higher education have sufficient flexibility to craft admissions policies to achieve

meaningful diversity.

## ARGUMENT

### I.    The States Have a Compelling Interest in Ensuring Our Students Receive the Benefits of Diversity in Higher Education.

Education is "pivotal to 'sustaining our political and cultural heritage' with a

fundamental role in maintaining the fabric of society."  *Grutter v. Bollinger*, 539

U.S. 306, 331 (2003) (quoting *Plyler v. Doe*, 457 U.S. 202, 221 (1982)).  To fulfill

this role, our colleges and universities must confer the educational benefits that

flow from diversity in the student body, including meaningful racial diversity: both

to prepare all of our students to succeed, and to ensure that our future leaders

reflect, and have had an opportunity to learn from, the full diversity of our society.

#### A.    Diversity in higher education confers essential educational benefits.

The benefits of a diverse student body are well established.  As the Supreme

Court itself has repeatedly recognized, "enrolling a diverse student body 'promotes

cross-racial understanding, helps to break down racial stereotypes, and enables

students to better understand persons of different races.'"  *Fisher v. Univ. of Texas

at Austin*, 136 S. Ct. 2198, 2210 (2016) (quoting *Grutter*, 539 U.S. at 330).

"Equally important, 'student body diversity promotes learning outcomes, and better prepares students for an increasingly diverse workforce and society.'"  *Id.* (quoting *Grutter*, 539 U.S. at 330).  And, for students from underrepresented minorities, a meaningful level of diversity not only increases the number of opportunities available to them, but also helps decrease the "loneliness and isolation" that may occur when, for an example, a student is nearly always the sole African-American in class.  *Id.* at 2212.  Conferring these educational benefits in higher education has never been more important to the *Amici* States.

To begin with, higher education itself is increasingly important to our workforce.  The earnings gap between students who have the benefit of a postsecondary education, and those who do not, continues to grow, reflecting the value that employers—including the States themselves—assign to the experiences students have at colleges and universities.[1]  Business leaders today are also overwhelmingly college graduates: In 2011, for example, 98.4 percent of directors on Fortune 500 company boards and 95.1 percent of those companies' CEOs had a

---

[1] *See* Paul Taylor et al., Pew Research Center, *The Rising Cost of Not Going to College* (Feb. 11, 2014), http://www.pewsocialtrends.org/2014/02/11/the-rising-cost-of-not-going-to-college/.

bachelor's degree.[2]  Indeed, in the United States, the vast majority of individuals in

positions of occupational leadership have earned undergraduate degrees; for

example, in the 116th Congress, over ninety-four percent of House of

Representatives members and every single Senator attended college, a marked

increase from the past.[3]  And top-ranked selective colleges and universities in

particular, like Harvard College, serve as a pipeline for their graduates to leading

roles in the public and private sectors, including in federal and state governments

and judiciaries, the media, and national and global corporations.[4]  Although these

---

[2] Richard L. Zweigenhaft, *The Role of Elite Education for White Men, White Women, and People of Color in the U.S. Corporate Elite* (2015), https://whorulesamerica.ucsc.edu/power/elite_education.html; *see generally* Richard L. Zweigenhaft & G. William Domhoff, *Diversity in the Power Elite: Ironies and Unfulfilled Promises* (3d ed. 2018) (detailing the backgrounds, including educational backgrounds, of business leaders).

[3] Jennifer E. Manning, Congressional Research Service, R45583, *Membership of the 116th Congress: A Profile* 5 (2020), https://fas.org/sgp/crs/misc/R45583.pdf (comparing educational backgrounds with prior Congresses); Sahil Chinoy & Jessie Ma, *How Every Member Got to Congress*, N.Y. Times (Jan. 26, 2019), https://www.nytimes.com/interactive/2019/01/26/opinion/sunday/paths-to-congress.html; Taylor Miller Thomas, *Alma Maters of the 116th Congress*, Politico Pro Datapoint (Mar. 6, 2019), https://www.accesslex.org/sites/default/files/2019-03/POLITICO%20Data%20Point%20-%20116%20Congress%20Education.pdf; *see also* Jonathan Wai & Heiner Rindermann, *What Goes Into High Educational and Occupational Achievement? Education, Brains, Hard Work, Networks, and Other Factors*, 28 High Ability Studies 127 (2017).

[4] Wai & Rindermann, *supra* n.3; Jonathan Wai & Heiner Rindermann, *The Myth of the College Dropout*, The Conversation (Apr. 17, 2017), https://theconversation.com/the-myth-of-the-college-dropout-75760.

selective institutions educate only two to five percent of all undergraduates in the United States, by some estimates their graduates occupy almost fifty percent of these leading occupational roles.[5]

It is thus all the more important that our institutions of higher education are enriched by the full diversity of our country, including racial diversity.  As the Supreme Court has recognized, "[j]ust as growing up in a particular region . . . is likely to affect an individual's views, so too is one's own, unique experience of being a racial minority in a society, like our own, in which race unfortunately still matters."  *Grutter*, 539 U.S. at 333.

Continuing research shows the benefits that diversity can bring our students—and the grave necessity of conferring these benefits.  In the field of medicine, for example, the quality of patient care is closely tied to medical professionals' ability to communicate with patients, which can be enhanced if the professional either comes from a patient's community or has learned the capacity to work with different communities.[6]  Concerned about persistent and even increasing racial and ethnic disparities in access to health care and health

---

[5] Wai & Rindermann, *supra* n.3, at 136; Wai & Rindermann, *supra* n.4.

[6] *See generally* Fadia T. Shaya & Confidence M. Gbarayor, *The Case for Cultural Competence in Health Professions Education*, 70 Am. J. Pharm. Educ. 124 (2006), https://www.ncbi.nlm.nih.gov/pmc/articles/PMC1803701/pdf/ajpe124.pdf.

outcomes, the Institute of Medicine in 2003 recommended that all medical students receive training in cross-cultural communication.[7]  Research since then, examining the various modes by which such training has been delivered, suggests "the pivotal role that [fellow] students from diverse racial and ethnic backgrounds play[]" in ensuring that medical students indeed gain the necessary crosscultural knowledge and skills.[8]  The broader implications for many fields—including, for example, our States' public employees and the communities they serve—are obvious.

Moreover, continuing research confirms that diversity also improves the performance of businesses in our economy.[9]  Indeed, for leading companies, it is a "business and economic imperative" that they "be able to hire highly trained

---

[7] Institute of Medicine, National Acadamies of Sciences, Engineering, and Medicine, *Unequal Treatment: Confronting Racial and Ethnic Disparities in Health Care* 19-20, 213-14 (2003).

[8] Jeffrey F. Milem et al., Arizona Medical Education Research Institute, *The Important Role that Diverse Student Bodies Play in Shaping the Medical School Curriculum* 1 (2012), https://www.coe.arizona.edu/sites/default/files/Milem, O'Brien,Miner,Bryan,Castillo-Page,Schoolcraft(2012)-The_Important_Role_that_Diverse_Students_Play_in_Shaping_the_Medical_School_Curriculum.pdf; *see also* Somnath Saha et al., *Student Body Racial and Ethnic Composition and Diversity-Related Outcomes in US Medical Schools*, 300 J. Am. Med. Ass'n 1135 (2008), https://jamanetwork.com/journals/jama/fullarticle/182528.

[9] *See*, *e.g.*, Rocio Lorenzo & Martin Reeves, *How and Where Diversity Drives Financial Performance*, Harv. Bus. Rev. (Jan. 30, 2018), https://hbr.org/2018/01/how-and-where-diversity-drives-financial-performance (finding statistically significant proportional relationship between diversity and innovation in survey of over 1,700 companies across eight countries).

employees of all races, religions, cultures, and economic backgrounds," and that "all of their university-trained employees have had the opportunity to share ideas, experiences, viewpoints, and approaches with a broadly diverse student body."[10] *See also Grutter*, 539 U.S. at 330 ("[M]ajor American businesses have made clear that the skills needed in today's increasingly global marketplace can only be developed through exposure to widely diverse people, cultures, ideas, and viewpoints.").

In short, it has never been more important that students in our colleges and universities have the opportunity to learn from peers who are diverse in many ways, including racially diverse.

**B.      The legitimacy of our governmental and civic institutions rests on educating future leaders as diverse as the communities they will serve.**

Institutions of higher education "represent the training ground for a large number of our Nation's leaders[.]" *Grutter*, 539 U.S. at 332.  The Supreme Court has recognized that, "[i]n order to cultivate a set of leaders with legitimacy in the eyes of the citizenry, it is necessary that the path to leadership be visibly open to talented and qualified individuals of every race and ethnicity."  *Id*.  Moreover, "the

---

[10] Brief of Fortune-100 Companies and Other Leading American Businesses as *Amici Curiae* in Support of Respondents at 2-3, *Fisher v. Univ. of Tex. at Austin*, 136 S. Ct. 2198 (2016) (No. 14-891).

[N]ation's future depends upon leaders trained through wide exposure to the ideas and mores of students as diverse as this Nation of many peoples." *Id.* at 324 (quoting *Regents of Univ. of Cal. v. Bakke*, 438 U.S. 265, 313 (1978) (opinion of Powell, J.) (citation and internal quotation marks omitted). Ensuring meaningful diversity, including racial diversity, in college and university admissions remains vital to the goal of increasing the diversity of our country's leaders.

Our country continues to grow ever more diverse. In 2018, nearly half of six- to twenty-one-year-olds were nonwhite, compared to 39 percent in 2002, and 30 percent in 1986.[11] Accordingly, achieving "[e]ffective participation by members of all racial and ethnic groups in the civic life of our Nation" to realize the "dream of one Nation, indivisible" requires training an increasingly diverse group of leaders. *Grutter*, 539 U.S. at 332.

Unfortunately, many of today's institutions do not fully reflect the diversity of our country. For example, 80 percent of sitting Article III federal judges are

---

[11] Richard Fry & Kim Parker, Pew Research Center, *Early Benchmarks Show Post-Millennials on Track to Be Most Diverse, Best Educated Generation Yet* 3 (2018), https://www.pewsocialtrends.org/wp-content/uploads/sites/3/2018/11/Post-Millennials-Report_final-11.13pm.pdf.

white, and only 27 percent are women.[12]  A study of the States' highest courts

found that since 1960, one quarter of all states have never had a person of color on

their supreme court, and currently there are supreme courts in 23 states that are

composed of only white judges.[13]  There is also a lack of diversity in trial courts.

For example, 89 percent of state trial court justices in Massachusetts are white.[14]

As in the judicial branches of our state and federal governments, there is also

a lack of diversity in our state and federal legislatures.  Despite becoming

increasingly diverse over five consecutive electoral cycles, the 116th Congress is

still made up of 78 percent non-Latinx, white members.[15]  Similarly, for example,

---

[12] Federal Judicial Center, *Biographical Directory of Article III Federal Judges, 1789-Present: Advanced Search Criteria*, https://www.fjc.gov/history/judges/search/advanced-search.

[13] Laila Robbins, Alicia Bannon & Malia Reddick, Brennan Center for Justice, *State Supreme Court Diversity: Across the Country, Courts Fail to Reflect the Racial, Ethnic, and Gender Diversity of the Communities They Serve* (2019), https://www.brennancenter.org/our-work/research-reports/state-supreme-court-diversity; Alicia Bannon & Janna Adelstein, Brennan Center for Justice, *State Supreme Court Diversity – February 2020 Update* (2020), https://www.brennancenter.org/our-work/research-reports/state-supreme-court-diversity-february-2020-update.

[14] *See* Massachusetts Trial Court, *Annual Diversity Report: Fiscal Year 2019* 6 (2019), https://www.mass.gov/doc/massachusetts-trial-court-annual-diversity-report-fiscal-year-2019/download.

[15] Kristen Bialik, Pew Research Center, *For the Fifth Time in a Row, the New Congress is the Most Racially Diverse Ever* (Feb. 8, 2019),

(footnote continued)

legislators of color account for only nine percent of the Massachusetts House of

Representatives and Senate, but communities of color make up nearly 28 percent

of the Commonwealth's population.[16]

Many judges and legislators come from the ranks of our nation's lawyers—

and the legal field, too, remains largely white.  The 2018 American Bar

Association's National Lawyer Population Survey showed that in 2007, among

active lawyers, four percent identified as Black, four percent identified as Latinx,

two percent identified as Asian, and around one percent identified as Native

American.[17]  These figures had hardly changed a decade later: five percent of

active lawyers identified as Black, five percent as Latinx, two percent as Asian,

and about one percent as Native American.[18]  In contrast, in 2016, the population

---

https://www.pewresearch.org/fact-tank/2019/02/08/for-the-fifth-time-in-a-row-the-new-congress-is-the-most-racially-and-ethnically-diverse-ever/.

[16] Jamie Halper, *The Massachusetts Legislature is Not Diverse, and That's Probably Not Going to Change Next Year*, Bos. Globe., Aug. 7, 2018, https://www.bostonglobe.com/metro/2018/08/07/the-mass-legislature-not-diverse-and-that-probably-not-going-change-next-year/zQERUxRQ0A8Z4VLYI1pjAM/story.html.

[17] Allison E. Laffey & Allison Ng, American Bar Association, *Diversity and Inclusion in the Law: Challenges and Initiatives* (2018), https://www.americanbar.org/groups/litigation/committees/jiop/articles/2018/diversity-and-inclusion-in-the-law-challenges-and-initiatives/.

[18] *Id.*

of the United States was 13.3 percent Black, 17.8 percent Latinx, 5.4 percent

Asian, and .8 percent Native American.[19]

Like the legal field, the medical field suffers from a lack of diversity. In

2018, approximately 56.2 percent of active physicians were white, 17.1 percent

Asian, 5.8 percent Latinx, and 5.0 percent Black.[20] As a result of this problem, in

2009, the Liaison Committee on Medical Education—the body that accredits

medical schools in the United States—added accreditation standards designed to

improve diversity among medical school matriculants, including a requirement that

medical schools implement policies to improve the admission and retention of

students from underrepresented groups.[21] These efforts have led to some gains,

including an almost ten percent increase in the number of students of color

[19] *Id.*; U.S. Census Bureau, *Data Links*, https://www.census.gov/about/partners/cic/ resources/data-links.html.

[20] American Association of Medical Colleges, *Diversity in Medicine: Facts and Figures 2019*, fig.18 (2019), https://www.aamc.org/data-reports/workforce/ interactive-data/figure-18-percentage-all-active-physicians-race/ethnicity-2018.

[21] Mara Gordon, *A Push for Diversity in Medical Schools is Slowly Paying Off*, NPR (Dec. 4, 2018), https://www.npr.org/sections/health-shots/2018/12/04/ 673318859/the-push-for-diversity-in-medical-school-is-slowly-paying-off; Dowain H. Boatright et al., *Association Between the Liaison Medical Committee on Education's Diversity Standards and Changes in Percentage of Medical Student Sex, Race, and Ethnicity*, 320 J. of the Am. Med. Ass'n 2267 (2018), https://jamanetwork.com/journals/jama/article-abstract/2717462.

between 2002 and 2017.[22]  But, as the 2018 figures demonstrate, further progress is needed.  And it is not just doctors who are majority white: four out of five registered nurses are white.[23]

Educators, too, do not fully reflect the diversity of our society.  Nationally, about 76 percent of faculty at colleges and universities are white.[24]  Between 1987 and 2012, the ranks of teachers in American elementary and secondary schools became only slightly more diverse, decreasing from 87 percent white to 82 percent white.[25]

These gaps in representation diminish the legitimacy these institutions and professions hold in the eyes of our residents.[26]  Ensuring that the student bodies in

---

[22] Gordon, *supra* n.21.

[23] *See* American Association of Colleges of Nursing, *Enhancing Diversity in the Workforce* (Apr. 2019), https://www.aacnnursing.org/News-Information/Fact-Sheets/Enhancing-Diversity.

[24] Leslie Davis & Richard Fry, Pew Research Center, *College Faculty Have Become More Racially and Ethnically Diverse, but Remain Far Less So Than Students* (July 31, 2019), https://www.pewresearch.org/fact-tank/2019/07/31/us-college-faculty-student-diversity/.

[25] Office of Planning, Evaluation and Policy Development, U.S. Department of Education, *The State of Racial Diversity in the Educator Workforce* 6 (2016), https://www2.ed.gov/rschstat/eval/highered/racial-diversity/state-racial-diversity-workforce.pdf.

[26] *See, e.g.*, Sherrilyn A. Ifill, *Racial Diversity on the Bench: Beyond Role Models and Public Confidence*, 57 Wash. & Lee L. Rev. 405 (2000), https://scholarlycommons.law.wlu.edu/wlulr/vol57/iss2/5.

our institutions of higher education are meaningfully diverse helps ameliorate this problem by enabling highly-qualified individuals from diverse backgrounds to earn the credentials required to enter and contribute to these fields. *See Grutter*, 539 U.S. at 331. It is thus vital that "all members of our heterogeneous society may participate in the educational institutions that provide the training and education necessary to succeed in America"— both for the betterment of the education provided in a diverse student body, and for the betterment of our country. *Id.* at 332-33.

## II.    Colleges and Universities Must Retain the Flexibility to Choose to Consider Race in Admissions to Ensure Our Students Gain the Educational Benefits of Diversity.

In order to provide our students with the critical educational benefits of meaningful diversity, our colleges and universities must retain the flexibility to choose to consider race, among other forms of diversity, in their admissions processes. The importance of maintaining this flexibility stems from at least two factors. First, residential segregation persists, and elementary and secondary schools are in many cases less diverse than they were decades ago. Young people in our nation are thus often deprived of the benefits of diversity where they live and learn as children. Consequently, attending an institution of higher education that has built a meaningfully diverse student body is often students' first and last

chance to experience the benefits that flow from diversity before the end of their formal education.  Second, in states where race-conscious admissions policies have been banned, public colleges and universities have often struggled to maintain diverse student bodies despite their efforts to do so through race-neutral means. Having the flexibility to be able to consider applicants' race among many other forms of diversity better enables colleges and universities to achieve meaningful diversity and enrich students' educational experiences before they graduate to the workforce and civil society.

A.      **Segregation and inequities in our neighborhoods and K-12 schools necessitate a particular focus on racial diversity in higher education.**

Notwithstanding some progress in recent years, *de facto* racial segregation continues today to a considerable degree across our nation's neighborhoods and schools.  As a result, many of our primary and secondary schools lack the meaningful diversity needed to promote learning outcomes and cross-racial understanding, help break down racial stereotypes, and prepare students for an increasingly diverse workforce and society.  *Fisher*, 136 S. Ct. at 2210 (citing *Grutter*, 539 U.S. at 330).  Higher education is thus often the first environment where our students have the opportunity to experience the benefits that flow from diversity.

The lack of diversity within many of the United States' public elementary and secondary schools is partly due to residential segregation. A statistical measure of racial dissimilarity among residents suggests that, while Black-white residential segregation appears to be decreasing since the postwar decades, it is far from eliminated: even the *least* segregated among the 100 largest metropolitan areas still do not qualify as having "low" levels of Black-white segregation.[27] Meanwhile, Latinx and Asian communities have actually experienced increased segregation in recent decades, though at levels less than those historically experienced by Black communities.[28] This is likely due to the increase in the Latinx population of the United States overall, as well as relocation within the country.[29]

Neighborhood makeup is another measure of segregation and likewise demonstrates its persistence in our society. In 2010, the average white resident in the United States lived in a neighborhood that was 77 percent white, nine percent Latinx, and seven percent Black. By contrast, the average Black resident lived in a neighborhood that was 45 percent Black, 36 percent white, and 14 percent Latinx.

---

[27] William H. Frey, *Diversity Explosion How New Racial Demographics Are Remaking America* 177 (Brookings Institution Press rev. & updated ed. 2018).

[28] *Id.* at 179.

[29] *Id.* at 178.

And the average Latinx resident lived in a neighborhood that was 45 percent Latinx, 37 percent white, and 10 percent Black.[30]

Despite the acknowledged benefits for our students of being educated among diverse peers, public elementary and secondary schools in the United States have not kept pace with our country's increasing diversity.  While the United States' population historically was 80 to 90 percent white, this percentage fell to 64 percent over the period 1980 to 2010.[31]  And the makeup of the country's school-age population is similarly changing:

**Percentage of School-Age U.S. Population by Race in 1970 and 2016**[32]

|      | White | Black | Latinx | Asian |
|------|-------|-------|--------|-------|
| **1970** | 79.1% | 15% | 5.1% | 0.5% |
| **2016** | 48.4% | 15.2% | 26.3% | 5.5% |

However, this increasing diversity overall is not fully reflected within the student bodies of our public elementary and secondary schools.  Rather, students of color

---

[30] *Id.* at 188 fig.9-6.

[31] *Id.* at 132.

[32] Erica Frankenberg et al., Civil Rights Project, *Harming Our Common Future: America's Segregated Schools 65 Years after Brown* 15, 16 fig.1 (2019), https://www.civilrightsproject.ucla.edu/research/k-12-education/integration-and-diversity/harming-our-common-future-americas-segregated-schools-65-years-after-brown/Brown-65-050919v4-final.pdf.

are concentrated in majority-nonwhite schools, and white students in majority-white schools:

**Racial Composition of School-Age U.S. Population Compared to Racial Composition of Typical Student's School**[33]

|  | Total School-Age Population | Typical White Student's School Composition | Typical Black Student's School Composition | Typical Latinx Student's School Composition | Typical Asian Student's School Composition |
|---|---|---|---|---|---|
| **White** | 48.4% | 69.3% | 25.8% | 25.2% | 37% |
| **Black** | 15.2% | 8.1% | 47.1% | 11.3% | 10.4% |
| **Latinx** | 26.3% | 13.7% | 19.6% | 55.1% | 23.3% |
| **Asian** | 5.5% | 4.2% | 3.7% | 4.9% | 24.1% |

Moreover, recent data suggests that our schools are actually becoming *less* diverse over time, despite the increasing diversity in the U.S. population overall. Nationally, in 2016, 40 percent of Black students attended schools that were composed of at least 90 percent students of color, often referred to as "intensely segregated schools."[34]  But, in 1988, only 32.1 percent of Black students nationally attended such schools.[35]  Even in the South and West, which were the least

---

[33] *Id.* at 22-23.

[34] *Id.* at 25.

[35] *Id.* at 26.

segregated regions for Black and Latinx students in 2016, 36.4 percent and 37.7

percent of students in the South and West, respectively, attended intensely

segregated schools.[36]

And while the diversity of the U.S. population residing in suburbs is

increasing, the diversity within suburban schools is not.  Black and Latinx

suburban students typically attend schools that are about three-fourths nonwhite,

while white suburban students are typically in schools in which two-thirds of the

enrollment is white.[37]  Similarly, in rural communities, a white student typically

attends a school in which 80 percent of students are white, while a Black or Latinx

student attends a school in which 57 percent of students are nonwhite.[38]  Overall,

urban schools are the most integrated for white students; suburban schools are

more segregated; and non-metropolitan schools are the most segregated for white

students.[39]

A lack of diversity pervades even early childhood education.  Nearly 50

percent of both Black and Latinx children enrolled in public preschools are in

---

[36] *Id.*

[37] *Id.* at 5.

[38] *Id.*

[39] *Id.* at 32.

preschools that are 10 percent or less white.[40]  At public preschools, the average

white preschool student attends a preschool that is 67 percent white, the average

Black preschool student attends a preschool that is 52.6 percent Black, and the

average Latinx preschool student attends a preschool that is 59.3 percent Latinx.[41]

One study found that "[o]nly 17% of preschool classrooms were racially/ethnically

diverse *and* had either middle-class or higher income students."[42]  Early childhood

education is, of course, distinct from public school because it is not compulsory

and is privatized to a greater degree.  However, again, the evidence suggests that

meaningful diversity is not being accomplished for children in their educational

environments.

This lack of diversity is also, unfortunately, correlated with significant

differences in the education and opportunities children receive.  In 2016, 75.4

percent of Black students and 74.5 percent of Latinx students attended schools in

which a majority of students were eligible for free or reduced-price lunch

---

[40] Erica Frankenberg, Center for Education and Civil Rights, *Segregation at an Early Age* 25 (updated 2019), https://cecr.ed.psu.edu/sites/default/files/ Segregation_At_An_Early_Age_Piazza_Frankenberg_2019.pdf.

[41] *Id.* at 18-20, 20 fig.2.

[42] Erica Frankenberg, Center for Education and Civil Rights, *Segregation at an Early Age* 3 (2016), https://school-diversity.org/wp-content/uploads/2016/10/ Segregation_At_An_Early_Age_Frankenberg_2016.pdf (emphasis in original).

compared to 34.4 percent of white students.[43]  High-poverty districts tend to spend

less per pupil than low-poverty districts.[44]  As a result of funding disparities, low-

income schools suffer from disparities in teacher credentialing and experience;[45]

teacher pay;[46] and facilities.[47]  Additionally, Black and Latinx students often do not

have the same opportunities for academic enrichment[48] and extracurriculars[49] as

their peers at majority white schools.  These opportunities that low-income,

majority-nonwhite schools often lack are exactly the kinds of things that higher

education admissions officers regard highly when making admissions decisions.  In

---

[43] National Equity Atlas, *Percent of Students by School Poverty Level, as Defined by the Share of Students in the School Eligible for Free- or Reduced-price Lunch (FRPL): United States, All Public Schools*, 2016, PolicyLink and the USC Program for Environmental and Regional Equity (2020), https://nationalequityatlas.org/indicators/School_poverty/By_race~ethnicity:35576 /United_States/false/Year(s):2016/School_type:All_public_schools/.

[44] U.S. Commission on Civil Rights, *Public Education Funding Inequity in an Era of Increasing Concentration of Poverty and Resegregation* 78 (2018) ("On the district level, the highest-poverty districts spend on average 15.6 percent less per-pupil than the lowest-poverty districts."), https://www.usccr.gov/pubs/2018/2018-01-10-Education-Inequity.pdf.

[45] *Id.* at 47, 71.

[46] *Id.*

[47] *Id.* at 48.

[48] *Id.* at 63 (noting, for example, that among high schools with high Black and Latinx student enrollment only 33% offered calculus, 48% offered physics, 65% offered chemistry, and 71% offered Algebra II, versus, schools with low Black and Latinx student enrollment, 56%, 67%, 78%, and 84%, respectively).

[49] *Id.* at 65 (citing, for example, fewer opportunities to participate in sports).

fact, a recent study found that the so-called "achievement gap" between white students and students of color appears to result from the effect of concentrating students of color into high-poverty schools.[50]  Thus, as the Supreme Court recognized in *Grutter* regarding the University of Michigan Law School, "[b]y virtue of our Nation's struggle with racial inequality, [underrepresented minority] students are both likely to have experiences of particular importance to the Law School's mission, and less likely to be admitted in meaningful numbers on criteria that ignore those experiences."  539 U.S. at 338.

This lack of diversity in our neighborhoods, public schools, and early childhood education makes diversity in higher education that much more important.  Higher education may be the first, and last, opportunity a student has to experience the benefits of a diverse educational environment.

---

[50] sean f. reardon et al., *Is Separate Still Unequal? New Evidence on School Segregation and Racial Academic Achievement Gaps* 33 (Stanford Center for Education Policy Analysis Working Paper No. 19-06 2019), https://cepa.stanford.edu/sites/default/files/wp19-06-v092019.pdf.

**B.    In the States that have banned race-conscious admissions, institutions of higher education have often struggled to attain the full educational benefits of a diverse student body through race-neutral means.**

Several States have banned race-conscious admissions in higher education, including Arizona, California, Florida, Michigan, Nebraska, New Hampshire, Oklahoma, and Washington.[51]  Texas also had a ban from 1997 until 2005.[52] Many of these states have instituted a variety of race-neutral means to build diverse student bodies in public higher education in the absence of race-conscious admissions.  But even long-standing, highly-regarded programs have been unable to maintain diversity at public institutions—belying the plaintiff's assertion here that "Harvard has race neutral alternatives," Br. 56, a contention correctly rejected by the District Court below, Appellant's Add. 119-22.

California, for example, has a long history of programs intended to build diverse student bodies at public institutions of higher education, including through additional outreach and funding, as well as automatic admissions.  The University

---

[51] *See* Ariz. Const. art. II, § 36 (2010); Cal. Const., art I, § 31, subdiv. (a) (1996); Fla. Exec. Order No. 11-04 (2011), https://www.flgov.com/wp-content/uploads/2011/01/scott.eo_.four_.pdf; Mich. Const. art. I, § 26 (2006); Neb. Const. art. I, § 30 (2008); H.B. 623, 162d Leg., 2011 Sess. (N.H. 2011), http://www.gencourt.state.nh.us/legislation/2011/HB0623.html; Okla. Const. art II, § 36A (2012); Wash. Rev. Code Ann. §49.60.400(1) (1998).

[52] *See Fisher*, 136 S. Ct. at 2204-2206.

of California tracks outcomes for fourteen different programs that attempt to engage with younger students and communities beyond the university.[53]  Its Early Academic Outreach Program, started in 1976, is now at every University of California campus,[54] and, as of the 2017-2018 school year, reached 218 California secondary schools.[55]  This program provides low-income and educationally-disadvantaged students with "individualized college counseling, help filling out applications and financial aid forms, free PSAT and SAT prep, campus visits, even enrichment classes on Saturdays and during the summer."[56]  Other programs target low-income and educationally-disadvantaged students at high schools and community colleges, focusing on those who are interested in pursuing mathematics, engineering, and science, or writing and community leadership.[57]

---

[53] *See* University of California Office of the President, *Student Academic Preparation and Educational Partnerships: 2017-18 Program Outcomes* 16-18 (2019), https://www.ucop.edu/diversity-engagement/_files/sapep-program-outcomes-report-ay2017-data.pdf.

[54] Brenda Iasevoli, *Making Colleges More Diverse Even Without Affirmative Action: Lessons from California's Early Academic Outreach Program*, The Atlantic, Feb. 28, 2014, https://www.theatlantic.com/education/archive/2014/02/making-colleges-more-diverse-even-without-affirmative-action/284063/.

[55] University of California Office of the President, *supra* n.53, at 21.

[56] Brenda Iasevoli, *supra* n.54.

[57] University of California Office of the President, *supra* n.53, at 8, 24-30; *see also* University of California Berkley Center for Educational Partnerships, The Puente Project, https://cep.berkeley.edu/the-puente-project.

The University of California system has also attempted to build diversity through automatic-admission and affordability programs.  One such program, for example, promises admission to students who have a grade-point average in the top nine percent at their participating high school, so long as they have completed the required core classes.[58]  Once admitted, a financial aid program waives tuition and fees for students who have a total family income of less than $80,000 and qualify for financial aid, and provides additional funding for students with greater need to help cover the cost of books, housing, and other education-related expenses.[59]

Despite California's long history of extraordinary efforts to enroll students of color through race-neutral means, it has struggled to sustain a diverse student body reflective of California as a whole at its public institutions of higher education since the ban on race-conscious admissions.[60]  In the immediate aftermath of the ban on race-conscious admissions in California, "[a]pplication and

---

[58] University of California Office of the President, *Eligibility in the Local Context (ELC) Program*, https://www.ucop.edu/student-affairs/programs-and-initiatives/undergraduate-admissions/eligibility-local-context.html.

[59] University of California Admissions, *Blue and Gold Opportunity Plan*, https://admission.universityofcalifornia.edu/tuition-financial-aid/types-of-aid/blue-and-gold-opportunity-plan.html.

[60] *See generally* Brief of the President and the Chancellors of the University of California as *Amici Curiae* at 16-34, *Fisher v. Univ. of Tex. at Austin*, 136 S. Ct. 2198 (2016) (No. 14-891) (describing the University of California's experience).

enrollment numbers for [Black] and [Latinx] students plummeted."[61]  Black student enrollment has not rebounded.[62]  Although the numbers have improved in the last two decades vis-à-vis Latinx student enrollment, this improvement is in part attributable to the overall growth in the Latinx population,[63] and, "despite some marginal improvement in enrollment, [Latinx] students remain under-enrolled in the UC system as a whole."[64]

Enrollment of nonwhite students at the University of California's elite institutions and graduate schools, in particular, has fallen since the ban on race-conscious admissions.  For example, in 1995, over seven percent of applicants from California admitted to Berkeley were Black, but in 2004 the number was less than three percent.[65]  It has since risen only slightly, ranging between three and

---

[61] María C. Ledesma, *California Sunset: O'Connor's Post-Affirmative Action Ideal Comes of Age in California*, 42 Rev. of Higher Educ. (Supp. 2019) 227, 230 (2019), https://muse.jhu.edu/article/724917/pdf.

[62] *Id.* at 232.

[63] *Id.* at 231.

[64] *Id.* at 232.

[65] William C. Kidder & Patricia Gándara, Civil Rights Project, *Two Decades After the Affirmative Action Ban: Evaluating the University of California's Race-Neutral Efforts* 16 (2015), https://civilrightsproject.ucla.edu/research/college-access/affirmative-action/two-decades-after-the-affirmative-action-ban-evaluating-the-university-of-california2019s-race-neutral-efforts/Kidder_PIC_paper.pdf.

four percent from 2005-2014.[66]  Similarly, at UCLA, the same study found that the

percentage of California admittees who were Black fell from nearly seven percent

to two percent in 2006, and in 2014 stood at slightly over four percent.[67]  At

UCLA's and Berkeley's law schools, one study found that admission rates for

Black applicants have been cut in half since the ban on race-conscious

admissions.[68]  And enrollment of Black and Latinx students at University of

California medical schools dropped by 38 percent and 29 percent, respectively.[69]

Other states with bans on considering race in admissions have tried to

implement comparable strategies to build diversity.  For example, since its ban

took effect in 2008, Michigan has worked to create outreach initiatives with

schools to support the enrollment of a diverse student body, including a K-12

Outreach Hub and an initiative concentrating on "highly effective urban schools."[70]

---

[66] *Id.*

[67] *Id.*

[68] Danny Yagan, *Supply vs. Demand Under an Affirmative Action Ban: Estimates from UC Law Schools*, 137 J. Pub. Econ. 38, 47 (2016), https://eml.berkeley.edu/~yagan/AffirmativeAction.pdf.

[69] Liliana M. Garces, *Racial Diversity, Legitimacy, and the Citizenry: The Impact of Affirmative Action Bans on Graduate School Enrollment*, 36 Rev. Higher Educ. (Fall 2012 Supp.) 93, 101 (2012), https://muse.jhu.edu/article/486187/pdf.

[70] University of Michigan, *Diversity, Equity & Inclusion Strategic Plan* 23 (Oct. 2016), https://diversity.umich.edu/wp-content/uploads/2016/10/strategic-plan.pdf.

Similarly, Michigan has attempted to build a diverse student body in its public graduate programs through building relationships with undergraduate institutions serving students of color.[71]  Like California, Michigan has also attempted to maintain diversity through scholarship programs.  One program, for example, is sited in majority-minority school districts and grants a full, four-year scholarship to students who complete the program and are admitted to the University of Michigan; another provides scholarships to high-achieving, low-income students in Michigan.[72]

Despite these States' robust efforts, studies have shown that, consistent with California's experience as well as Texas's experience recounted in the *Fisher* case, 136 S. Ct. at 2211-14, diversity in higher education has suffered under bans on race-conscious admissions.  One study found that there was little change in enrollment and graduation at "middle or low selectivity [public] institutions," but that selective public institutions saw a "highly significant drop" in enrollment—29 percent lower Black student enrollment and 20 percent lower Latinx student

---

[71] *Id.* at 25.
[72] *Id.* at 23, 24.

enrollment—as well as a drop in graduation rates. [73]  And the study found little evidence that these declines in enrollment in public institutions were in any way made up by increased enrollment at private institutions, two-year colleges, or out-of-state institutions.[74]

Minority enrollment has been hit even harder at public graduate schools. One study showed that enrollment of Black students dropped by nearly two-thirds, and Latinx student enrollment dropped by one-third at five selective public law schools in California, Texas, and Washington.[75]  Similarly, there was "a statistically significant decline in the percentage of first-time matriculant medical school students who are underrepresented students of color than would otherwise be expected if no bans had been in place—a decline of about three percentage points," with a "17.2% overall decline in the proportion of medical school students who are underrepresented students of color."[76]  Across graduate schools generally,

---

[73] Ben Backes, *Do Affirmative Action Bans Lower Minority College Enrollment and Attainment? Evidence from Statewide Bans*, 47 J. of Hum. Resources 435, 443, 445, 447, 450 (2012).

[74] *Id.* at 451.

[75] Liliana M. Garces, *supra* n.69, at 101 (citing W.C. Kidder, *The Struggle for Access from Sweatt to Grutter: A History of African American, Latino, and American Indian Law School Admissions, 1950-2000*, 19 Harv. BlackLetter L.J. 1 (2003)).

[76] Liliana M. Garces & David Mickey-Pabello, *Racial Diversity in the Medical Profession: The Impact of Affirmative Action Bans on Underrepresented Student of*
(footnote continued)

one study found "that the bans in Texas, California, Washington, and Florida have reduced by about 12.2% the average proportion of graduate students who are students of color across all the degree programs . . . included."[77]  The impact has been largest in engineering, natural sciences, and social sciences, where the percentage of students of color enrolled in engineering dropped 26 percent (from 6.2 percent to 4.6 percent); natural sciences dropped 19 percent (7.8 percent to 6.3 percent); and social sciences dropped 15.2 percent (from 12.1 percent to 10.2 percent).[78]

In sum, the States' experience shows that public institutions of higher education that use race-neutral approaches continue to struggle to ensure that students receive the educational benefits that flow from a meaingfully diverse student body—benefits all the more important as a result of the racial segregation that persists in our neighborhoods and K-12 schools.  These facts on the ground demonstrate that colleges and universities do need the flexibility to choose to use race-conscious admissions policies as part of their highly individualized consideration of students' applications in order to further the States' compelling

---

*Color Matriculation in Medical Schools*, 86 J. of Higher Educ. 264, 284, 287 (2015), https://muse.jhu.edu/article/572547/pdf.

[77] Liliana M. Garces, *supra* n.69, at 96.

[78] Liliana M. Garces, *Understanding the Impact of Affirmative Action Bans in Different Graduate Fields of Study*, 50 Am. Educ. Res. J. 251, 275 (2013).

interest in diversity in higher education. Because consideration of race as one dimension of diversity is thus "necessary to further [our] compelling interest," it is therefore well "within constitutional constraints." *Adarand Constructors, Inc. v. Pena*, 515 U.S. 200, 202 (1995).

## CONCLUSION

For the foregoing reasons, the Court should affirm the judgment below.

Respectfully submitted,

MAURA HEALEY
  *Attorney General of Massachusetts*
Elizabeth N. Dewar, 1st Cir. No. 1149723
  *State Solicitor*
Ann E. Lynch
David Ureña
  *Assistant Attorneys General*
One Ashburton Place
Boston, Massachusetts 02108
(617) 963-2204
bessie.dewar@mass.gov

Date: May 21, 2020

XAVIER BECERRA
*Attorney General of California*
1300 I Street
Sacramento, CA 95814

PHILIP J. WEISER
*Attorney General of Colorado*
1300 Broadway
10th Floor
Denver, CO 80203

KATHLEEN JENNINGS
*Attorney General of Delaware*
Department of Justice
Carvel State Building
6th Floor
820 North French Street
Wilmington, DE 19801

31

KARL A. RACINE
*Attorney General for the*
*District of Columbia*
One Judiciary Square
441 4th Street, NW
Suite 630 South
Washington, D.C. 20001

CLARE E. CONNORS
*Attorney General of*
*Hawaiʻi*
425 Queen Street
Honolulu, HI 96813

KWAME RAOUL
*Attorney General of Illinois*
100 West Randolph Street
Chicago, IL 60601

AARON M. FREY
*Attorney General of Maine*
6 State House Station
Augusta, ME 04333

BRIAN E. FROSH
*Attorney General of Maryland*
200 Saint Paul Place
Baltimore, MD 21202

KEITH ELLISON
*Attorney General of Minnesota*
102 State Capitol
75 Rev. Dr. Martin
Luther King Jr. Boulevard
St. Paul, MN 55155

AARON D. FORD
*Attorney General of*
*Nevada*
100 North Carson Street
Carson City, NV 89701

HECTOR BALDERAS
*Attorney General of*
*New Mexico*
408 Galisteo Street
Santa Fe, NM 87501

LETITIA JAMES
*Attorney General of*
*New York*
28 Liberty Street
New York, NY 10005

JOSH SHAPIRO
*Attorney General of Pennsylvania*
16th Floor
Strawberry Square
Harrisburg, PA 17120

PETER F. NERONHA
*Attorney General of*
*Rhode Island*
150 South Main Street
Providence, RI 02903

MARK R. HERRING
*Attorney General of Virginia*
202 North 9th Street
Richmond, VA 23219

## CERTIFICATES OF COMPLIANCE AND SERVICE

### Certificate of Compliance with Rule 32(a)

1.      This brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B) because this brief contains 6,192 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii).

2.      This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because this brief has been prepared in a proportionally spaced typeface using Microsoft Word 2016 in 14-point Times New Roman font.

/s/  Elizabeth N. Dewar
Dated:  May 21, 2020

### Certificate of Service

I hereby certify that on May 21, 2020, I electronically filed the foregoing document with the United States Court of Appeals for the First Circuit by using the CM/ECF system. Counsel of record for all parties are registered as ECF Filers and will therefore be served by the CM/ECF system.

/s/  Elizabeth N. Dewar
Dated:  May 21, 2020
