No. 19-2005

## UNITED STATES COURT OF APPEALS
## FOR THE FIRST CIRCUIT

STUDENTS FOR FAIR ADMISSIONS, INC.,

*Plaintiff-Appellant*,

*v.*

PRESIDENT AND FELLOWS OF HARVARD COLLEGE,

*Defendant-Appellee.*

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS IN CASE NO. 1:14-CV-14176-ADB,
JUDGE ALLISON D. BURROUGHS

## BRIEF OF *AMICUS CURIAE* WALTER DELLINGER
## IN SUPPORT OF DEFENDANT-APPELLEE ON THE ISSUE OF
## STANDING

APALLA U. CHOPRA
O'MELVENY & MYERS LLP
400 SOUTH HOPE STREET
LOS ANGELES, CALIFORNIA 90071
(213) 430-6000

ANTON METLITSKY
PATRICK D. MCKEGNEY
O'MELVENY & MYERS LLP
TIMES SQUARE TOWER
7 TIMES SQUARE
NEW YORK, NEW YORK 10036
(212) 326-2000

BRADLEY N. GARCIA
ANNA O. MOHAN*
O'MELVENY & MYERS LLP
1625 EYE STREET, N.W.
WASHINGTON, D.C. 20006
(202) 383-5300

*Admitted only in Virginia; supervised by
principals of the firm*

*Attorneys for Amicus Curiae*

### STATEMENT REGARDING LEAVE TO FILE, AUTHORSHIP, AND MONETARY CONTRIBUTIONS

Both parties to the appeal have expressly consented to the filing of this brief by *amicus curiae* pursuant to Fed. R. App. P. 29(a)(2).  *See* Fed. R. App. P. 29(a)(2).

Pursuant to Federal Rule of Appellate Procedure 29(a)(4)(E), *amicus curiae* states that no counsel for any of the parties authored this brief in whole or in part; neither the parties nor their counsel contributed money that was intended to fund the preparation or submission of this brief; and no person, other than the *amicus curiae*, or his counsel, contributed money that was intended to fund this brief's preparation or submission. *See* Fed. R. App. P. 29(a)(4)(E).

# TABLE OF CONTENTS

**Page**

STATEMENT REGARDING LEAVE TO FILE, AUTHORSHIP, AND MONETARY CONTRIBUTIONS ................................................................................................i

INTEREST OF *AMICUS CURIAE* ..........................................................................vi

INTRODUCTION ...................................................................................................1

ARGUMENT ..........................................................................................................2

I.      Article III's Standing Requirement Limits Federal Courts To Adjudicating Concrete Disputes And Precludes Them From Resolving Individuals' Generalized, Ideological Grievances. .......................................2

II.     These Important Limits On Federal Court Jurisdiction Cannot Be Avoided Through Artificial Means. ...............................................................8

III.    The District Court Erred In Treating SFFA As A Genuine Membership Organization Instead Of Probing The Nature Of SFFA's Relationship With Its Purported Members. ................................................10

CONCLUSION .....................................................................................................17

# TABLE OF AUTHORITIES

**Page(s)**

## Cases

*Allen v. Wright*,
   468 U.S. 737 (1984) ............................................................... 3, 9, 10

*Ariz. Christian Sch. Tuition Org. v. Winn*,
   563 U.S. 125 (2011) ....................................................................3

*Arizonans for Official English v. Arizona*,
   520 U.S. 43 (1997) ......................................................................4

*Camel Hair & Cashmere Inst. of Am., Inc. v. Associated Dry Goods Corp.*,
   799 F.2d 6 (1st Cir. 1986) ......................................................... 12, 14

*Clapper v. Amnesty Int'l USA*,
   568 U.S. 398 (2013) ....................................................................3

*DaimlerChrysler Corp. v. Cuno*,
   547 U.S. 332 (2006) ....................................................................4

*Diamond v. Charles*,
   476 U.S. 54 (1986) ........................................................... 1, 5, 6, 16

*Duke Power Co. v. Carolina Envtl. Study Grp., Inc.*,
   438 U.S. 59 (1978) ......................................................................6

*Fisher v. Univ. of Texas at Austin*,
   570 U.S. 297 (2013) ...................................................................10

*Heap v. Carter*,
   112 F. Supp. 3d 402 (E.D. Va. 2015) .............................................14

*Hollingsworth v. Perry*,
   570 U.S. 693 (2013) .............................................................. passim

*Hunt v. Wash. State Apple Advert. Comm'n*,
   432 U.S. 333 (1977) ......................................................... 11, 12, 13

*Ill. Dep't of Transp. v. Hinson*,
   122 F.3d 370 (7th Cir. 1997) .........................................................5

# TABLE OF AUTHORITIES
## (continued)

Page(s)

*Kowalski v. Tesmer*,
 543 U.S. 125 (2004)................................................................6, 7

*Lujan v. Defs. of Wildlife*,
 504 U.S. 555 (1992)........................................................ 4, 5, 6, 9

*Massachusetts v. Mellon*,
 262 U.S. 447 (1923)..................................................................6

*NAACP v. Alabama ex rel. Patterson*,
 357 U.S. 449 (1958).................................................................12

*Powers v. Ohio*,
 499 U.S. 400 (1991)..................................................................7

*Schlesinger v. Reservists Comm. to Stop the War*,
 418 U.S. 208 (1974)........................................................ 3, 4, 6

*Simon v. E. Ky. Welfare Rights Org.*,
 426 U.S. 26 (1976)....................................................................3

*Singleton v. Wulff*,
 428 U.S. 106 (1976)...................................................................7

*Sorenson Communications, LLC v. Federal Communications Commission*,
 897 F.3d 214 (D.C. Cir. 2018) ...............................................13

*Steel Co. v. Citizens for a Better Env't*,
 523 U.S. 83 (1998)....................................................................5

*Students for Fair Admissions, Inc. v. President & Fellows of Harvard Coll.*,
 261 F. Supp. 3d 99 (D. Mass. 2017) ......................................11

*United States v. SCRAP*,
 412 U.S. 669 (1973)..................................................................6

*Valley Forge Christian Coll. v. Americans United for Separation of Church and
 State, Inc.*,
 454 U.S. 464 (1982) ......................................................... 4, 6, 15

iv

# TABLE OF AUTHORITIES
## (continued)

**Page(s)**

*Warth v. Seldin*,
   422 U.S. 490 (1975) ...................................................................... 6, 7, 11

*Whitmore v. Arkansas*,
   495 U.S. 149 (1990) ...............................................................................7

## Other Authorities

13A Wright & Miller, Federal Practice and Procedure § 3531.9.5 (3d ed. 2012) ..12

4 Papers of John Marshall 95 (C. Cullen ed., 1984)..................................................3

*About*, Students for Fair Admissions, https://studentsforfairadmissions.org/about/
   (last visited May 20, 2020) ..................................................................15

Anemona Hartocollis, *He Took On The Voting Rights Act and Won.  Now He's
   Taking On Harvard*, N.Y. Times, Nov. 19, 2017,
   https://www.nytimes.com/2017/11/19/us/affirmative-action-lawsuits.html .......10

*Legal Issues*, Students for Fair Admissions,
   https://studentsforfairadmissions.org/legal-issues/ (last visited May 20, 2020)..15

## Constitutional Provisions

U.S. Const. art. III, § 2 .............................................................................................3

## INTEREST OF *AMICUS CURIAE*

Walter Dellinger is the Douglas B. Maggs Professor Emeritus of Law at Duke University and a partner at O'Melveny & Myers LLP.[1]  Professor Dellinger has throughout his career studied the scope of the Article III jurisdiction of federal courts, including issues relating to Article III standing, and filed a brief of amicus curiae related to standing in *Hollingsworth v. Perry*, 570 U.S. 693 (2013).  He is committed to the public interest and to the enforcement of proper limits on the scope of judicial power.  Based on his study of the applicable precedent and principles, he believes that Students for Fair Admissions has no standing to bring this suit in federal court.

---

[1] Institutional affiliations are listed for identification purposes only.

# INTRODUCTION

Article III's standing requirement serves to ensure that the remedial power of federal courts is "placed in the hands of those who have a direct stake in the outcome," rather than "in the hands of concerned bystanders, who will use it simply as a vehicle for the vindication of value interests." *Diamond v. Charles*, 476 U.S. 54, 62 (1986) (quotations and citations omitted); *see Hollingsworth v. Perry*, 570 U.S. 693, 707 (2013).

Edward Blum is an admitted ideological opponent of race-conscious university admissions policies. But because he is not a college student or applicant, he indisputably has no standing to challenge such policies in court. Mr. Blum instead formed Students for Fair Admissions ("SFFA") with the avowed, exclusive purpose of pursuing his own ideological interests through litigation, in defiance of Article III's limits on his own ability to bring such lawsuits. In particular, he identified Asian-American Harvard applicants, made them SFFA "members," and brought this lawsuit purportedly on their behalf. In practice, however, SFFA provides its "members" no remotely meaningful role in the governance of the organization and, in turn, no remotely meaningful role in the litigation supposedly being conducted on their behalf.

Amicus is aware of no similar organization created for the exclusive purpose of litigation, which provides no other benefits or services to its "members" but that

1

has nevertheless been granted the ability to sue in its own name. These unique circumstances call for heightened skepticism and scrutiny of the nature of the relationship between SFFA and its "members" to protect the core Article III interest in ensuring that federal lawsuits are litigated by those with an actual, concrete stake in the outcome. Allowing such transparent efforts to side-step Article III requirements to pass without scrutiny would drain of all practical meaning the Article III principle that federal courts cannot serve as a forum for the airing of generalized grievances.

That rule is one of substance, not simply of semantics: It ensures that federal courts stay within their constitutionally prescribed role. Mr. Blum's transparent attempt to draw federal courts into resolving one of the most divisive questions of recent years is as troubling as it is novel. The maneuver should not be permitted, and Article III's prohibition on the litigation of generalized grievances—as Mr. Blum is attempting to do here—should be enforced.

## ARGUMENT

## I.    ARTICLE III'S STANDING REQUIREMENT LIMITS FEDERAL COURTS TO ADJUDICATING CONCRETE DISPUTES AND PRECLUDES THEM FROM RESOLVING INDIVIDUALS' GENERALIZED, IDEOLOGICAL GRIEVANCES.

The Constitution does not give federal courts an unrestrained power to decide every constitutional question that a party wishes to have them resolve. Rather, Article III limits the federal judicial power to deciding "Cases" and "Controversies."

U.S. Const. art. III, § 2.  This limitation "defines with respect to the Judicial Branch the idea of separation of powers on which the Federal Government is founded." *Allen v. Wright*, 468 U.S. 737, 750 (1984).  "No principle is more fundamental to the judiciary's proper role in our system of government . . . ."  *Simon v. E. Ky. Welfare Rights Org.*, 426 U.S. 26, 37 (1976).  Permitting federal courts to decide legal questions outside the context of cases or controversies "would be inimical to the Constitution's democratic character," *Ariz. Christian Sch. Tuition Org. v. Winn*, 563 U.S. 125, 133 (2011), because the "federal courts might take possession of 'almost every subject proper for legislative discussion and decision,'" *id*. (quoting 4 Papers of John Marshall 95 (C. Cullen ed., 1984)).  Thus, "[c]ontinued adherence to the case-or-controversy [limitation] of Article III maintains the public's confidence in an unelected but restrained Federal Judiciary."  *Id*.

An "essential aspect" of the case-or-controversy limitation is that "any person invoking the power of a federal court must demonstrate standing to do so." *Hollingsworth*, 570 U.S. at 704.  The standing requirement "serves to prevent the judicial process from being used to usurp the powers of the political branches." *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 408 (2013).  In cases implicating constitutional adjudication, the standing requirement takes on heightened significance, helping to ensure that such "important and delicate" questions are not decided unnecessarily.  *Schlesinger v. Reservists Comm. to Stop the War*, 418 U.S.

208, 221-22 (1974). To allow a litigant without standing to "require a court to rule on important constitutional issues in the abstract would create the potential for abuse of the judicial process." *Id.* at 222.[2] Where standing is lacking, in short, the "dispute is not a proper case or controversy, [and] the courts have no business deciding it, or expounding the law in the course of doing so." *DaimlerChrysler Corp. v. Cuno*, 547 U.S. 332, 341 (2006).

As relevant here, to establish standing, a party must show the invasion of a legally cognizable interest that is "concrete and particularized," *Arizonans for Official English v. Arizona*, 520 U.S. 43, 64 (1997), meaning that the injury must affect the plaintiff "in a personal and individual way," *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560 n.1 (1992). In expounding upon that injury requirement, the Supreme Court has recognized two limits on the class of individuals who can invoke the decisional and remedial powers of federal courts that are especially pertinent here.

First, the Supreme Court has made clear that courts must "refrain[] from adjudicating abstract questions of wide public significance which amount to generalized grievances, pervasively shared and most appropriately addressed in the representative branches." *Valley Forge Christian Coll. v. Americans United for*

---

[2] Although SFFA bases its challenge on Title VI, SFFA has argued that the statutory standard is equivalent to the constitutional standard under the Equal Protection Clause. *See* Appellant's Opening Br. at 25.

*Separation of Church & State, Inc.*, 454 U.S. 464, 475 (1982) (quotations omitted). As explained in *Lujan*, "a plaintiff raising only a generally available grievance . . . claiming only harm to his and every citizen's interest in proper application of the Constitution and laws, and seeking relief that no more directly and tangibly benefits him than it does the public at large . . . does not state an Article III case or controversy." 504 U.S. at 573-74. "Refusing to entertain generalized grievances ensures that . . . courts exercise power that is judicial in nature and ensures that the Federal Judiciary respects the proper—and properly limited—role of the courts in a democratic society." *Hollingsworth*, 570 U.S. at 715 (quotations and citations omitted). This prohibition "prevent[s] kibitzers, bureaucrats, publicity seekers, and 'cause' mongers from wresting control of litigation from the people directly affected . . . ." *Ill. Dep't of Transp. v. Hinson*, 122 F.3d 370, 373 (7th Cir. 1997). It embodies the notion that "the decision to seek review must be placed in the hands of those who have a direct stake in the outcome," rather than with "concerned bystanders, who will use it simply as a vehicle for the vindication of value interests." *Diamond*, 476 U.S. at 62 (quotations and citations omitted).

The rule applies regardless of the level of ideological commitment individuals have to the law whose enforcement they seek, and no matter how "zealous their advocacy." *Hollingsworth*, 570 U.S. at 707 (alteration and quotation omitted); *see Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 107 (1998). As the Court has

explained, the role of federal courts is not to referee debates between ideological opponents or to serve as a neutral forum "for the vindication of . . . value interests." *United States v. SCRAP*, 412 U.S. 669, 687 (1973). Instead, a federal court's sole constitutional role is to resolve real disputes between parties who have a *personal* stake in the outcome. *See Valley Forge*, 454 U.S. at 472. The Court has applied the rule that a generalized grievance does not establish Article III standing across the ideological spectrum, denying standing to taxpayers opposed to federal laws for the protection of mothers and infants, *Massachusetts v. Mellon*, 262 U.S. 447, 488-89 (1923); environmentalists committed to enforcement of laws protecting endangered species, *Lujan*, 504 U.S. at 573-76; antiwar activists opposed to members of Congress serving as reservists, *Schlesinger*, 418 U.S. at 217, 220; doctors ethically opposed to abortion, *Diamond*, 476 U.S. at 63-68; and proponents of a California ballot initiative precluding same-sex marriage, *Hollingsworth*, 570 U.S. at 706.

Second, and closely related, is the rule disfavoring third-party standing. *See Kowalski v. Tesmer*, 543 U.S. 125, 130 (2004) ("[W]e have not looked favorably upon third-party standing."). The Supreme Court has explained that a "plaintiff generally must assert his own legal rights and interests, and cannot rest his claim to relief on the legal rights or interests of third parties." *Warth v. Seldin*, 422 U.S. 490, 499 (1975). The rule provides "the assurance that the most effective advocate of the rights at issue is present to champion them." *Duke Power Co. v. Carolina Envtl.*

6

*Study Grp., Inc.*, 438 U.S. 59, 80 (1978).  In most cases, that advocate is the third

party itself.  *Singleton v. Wulff*, 428 U.S. 106, 114 (1976) (Blackmun, J.) (plurality

opinion).    Like   the   generalized   grievances   prohibition,   third-party   standing

restrictions help ensure that federal courts avoid deciding "abstract questions of wide

public   significance   even   though   other   governmental   institutions   may   be   more

competent to address the questions . . . ."  *Warth*, 422 U.S. at 500; *see also Whitmore*

*v. Arkansas*, 495 U.S. 149, 164 (1990) (announcing limits to "next friend" standing

in   habeas   context   because   otherwise,   "the   litigant   asserting   only   a   generalized

interest   in   constitutional   governance   could   circumvent   the   jurisdictional   limits   of

Art. III.").[3]

---

[3] Third-party standing   is   appropriate   in   very   different   situations,   such   as   where
"enforcement of the challenged restriction *against the litigant* would result indirectly
in the violation of third parties' rights," *Kowalski*, 543 U.S. at 130 (quoting *Warth*,
422 U.S. at 510), or where "the party asserting the right has a 'close' relationship
with   the   person   who   possesses   the   right"   and   "there   is   a   'hindrance'   to   the
possessor's ability to protect his own interests," *id.* (quoting *Powers v. Ohio*, 499
U.S. 400, 411 (1991)).  Mr. Blum is not impacted in any tangible way by Harvard's
admissions policies, and his relationship with SFFA's so-called "members" is
anything but close.

## II.  THESE IMPORTANT LIMITS ON FEDERAL COURT JURISDICTION CANNOT BE AVOIDED THROUGH ARTIFICIAL MEANS.

Because Article III itself prohibits litigants from asserting generalized grievances or third-party claims, the Supreme Court has properly rejected transparent attempts to circumvent those rules, like Mr. Blum's effort here.

In *Hollingsworth*, the Court confronted a rule of California law conferring on an initiative's proponents the authority to represent the state's own interest in the enforcement of an initiative when state officials decline to defend it.  570 U.S. at 703.  The proponents of Proposition 8, which amended the California Constitution to ban recognition of same-sex marriages, relied on that conferral of authority to appeal to the Ninth Circuit and eventually the Supreme Court.  But the Supreme Court held that the proponents did not have Article III standing.  California's decision to transfer its valid interest in enforcing its laws to the proponents could not transform the proponents' generalized grievance into a concrete and particularized one.  *Id*. at 714-15.  As the majority opinion succinctly noted, "States cannot alter [the limited role of courts] simply by issuing to private parties who otherwise lack standing a ticket to the federal courthouse."  *Id.* at 715; *see also id.* at 713 (citing Brief for Walter Dellinger as Amicus Curiae).

Similarly, in *Lujan*, the Court held that Congress could not, by enacting a "citizen suit" provision to make citizens private attorneys general, give every citizen

a right to seek enforcement of the Endangered Species Act.  The Court rejected the view that "the public interest in proper administration of the laws . . . can be converted into an individual right by a statute that denominates it as such."  504 U.S. at 576-77.

Although those cases involve congressional or state attempts to circumvent Article III requirements, Mr. Blum's private attempts at circumvention should be treated with at least the same skepticism.   In *Hollingsworth* and *Lujan*, a governmental entity sought to confer authority to bring suit in federal court on behalf of concerned bystanders who would otherwise lack it.  Here, a concerned bystander took steps to confer standing *on himself*.  Treating the latter situation differently drains the prohibition against generalized grievances of its practical significance: Any individual would be able to transform a generalized, non-personal grievance into a cognizable injury simply by recruiting "members" to an organization that then performs no function outside of litigation and gives those "members" no meaningful role in the litigation process.

Take, for instance, *Allen v. Wright*, where the Court held that stigmatic injury from racial discrimination could not form the basis for standing without further showing that the plaintiffs themselves were "personally . . . denied equal treatment." 468 U.S. at 755.  If abstract stigmatic injury were cognizable, the Court reasoned, "[a] black person in Hawaii could challenge the grant of a tax exemption to a racially

discriminatory school in Maine," *id*. at 756—exactly the kind of generalized grievance that standing doctrine was designed to avoid.  It would defy common sense, then, to permit that same Hawaiian to air his grievance merely because he succeeds in creating an organization of affected "members" from Maine that has no purpose other than to further his own litigation agenda.  In that scenario, the harm done to standing principles is at least the same as if one had allowed the claim based on abstract stigmatic harm to proceed in the first place.  No plausible conception of Article III would allow its strictures to be so easily undermined.

## III.  THE DISTRICT COURT ERRED IN TREATING SFFA AS A GENUINE MEMBERSHIP ORGANIZATION INSTEAD OF PROBING THE NATURE OF SFFA'S RELATIONSHIP WITH ITS PURPORTED MEMBERS.

The district court erred by taking at face value Mr. Blum's transparent attempt to manufacture standing in this case.  Mr. Blum would plainly be prohibited from bringing his own suit challenging race-conscious admissions.  In the past, Mr. Blum has identified individuals who would sue in their own name to challenge such policies.  *See, e.g.*, *Fisher v. Univ. of Texas at Austin*, 570 U.S. 297 (2013); Anemona Hartocollis, *He Took On The Voting Rights Act and Won.  Now He's Taking On Harvard*, N.Y. Times, Nov. 19, 2017,   https://www.nytimes.com/2017/11/19/us/affirmative-action-lawsuits.html (noting that Mr. Blum financed *Fisher*).  This time, however, Mr. Blum created SFFA as a workaround.  As explained in more detail below, *see infra* at 14-16, Mr. Blum recruited potential plaintiffs to become

"members" of SFFA so that he could effectively adopt their claims as his own while simultaneously precluding them from any meaningful control over the litigation. JA240 ("I needed plaintiffs; I needed Asian plaintiffs . . . so I started . . . HarvardNotFair.org.").

The district court here granted Mr. Blum and SFFA standing by woodenly applying the general test for "associational standing," reasoning that because SFFA's individual "members" had standing, SFFA could assert claims on behalf of those members. *See Students for Fair Admissions, Inc. v. President & Fellows of Harvard Coll.*, 261 F. Supp. 3d 99, 109–11 (D. Mass. 2017). That rationale was wrong.

It is true enough that in some circumstances, "an association may have standing . . . as the representative of its members." *Warth*, 422 U.S. at 511. Ordinarily, as the district court recognized, a genuine membership association seeking to sue on behalf of its members must always satisfy three prerequisites: "(a) its members [must] otherwise have standing to sue in their own right; (b) the interests it seeks to protect [must be] germane to the organization's purpose; and (c) neither the claim asserted nor the relief requested [can] require[] the participation of individual members in the lawsuit." *Hunt v. Wash. State Apple Advert. Comm'n*, 432 U.S. 333, 343 (1977). And SFFA does satisfy those criteria here.

11

But what the district court overlooked is that those three prerequisites *presume* that the plaintiff organization is, in fact, a genuine membership organization; one organically formed by "pool[ing] [its members'] interests, activities and capital under a name and a form that will identify collective interests." *Camel Hair & Cashmere Inst. of Am., Inc. v. Associated Dry Goods Corp.,* 799 F.2d 6, 11 (1st Cir. 1986). In some cases, however, even if the prerequisites are satisfied, it is necessary to probe deeper into the nature of the association to ensure that "it and its members are in every practical sense identical," *NAACP v. Alabama ex rel. Patterson*, 357 U.S. 449, 459 (1958), and that it is not merely an artifice to evade Article III limitations, *see Hunt*, 432 U.S. at 344-45; *cf.* 13A Wright & Miller, Federal Practice and Procedure § 3531.9.5 (3d ed. 2012) ("Inquiry into the purpose of the organization also suggests that some inquiry be made into the nature of the organization.").

*Hunt* itself exemplifies that threshold analysis: In *Hunt*, the Court looked beyond the three prerequisites because the association at issue was a state agency— not a voluntary membership association—and so it was unclear whether it served the interests of the apple growers and dealers on whose behalf it sought to sue. *See Hunt*, 432 U.S. at 344-45. Further analysis is necessary, in other words, when there is some reason to doubt that the association in fact represents the interests of its

purported members—*i.e.*, that it "provides the means by which [its members] express their collective views and protect their collective interest." *Id.* at 345.

In *Hunt*, the Court ultimately concluded that the state agency had associational standing because its members "possess all of the indicia of membership in an organization. They alone elect the members of the Commission; they alone may serve on the Commission; they alone finance its activities, including the costs of this lawsuit, through assessments levied upon them." *Id.* at 344-45.

Following *Hunt*, other courts have applied this "indicia of membership" test when facing doubts about whether an association is a constitutionally viable representative of the interests of its "members." In *Sorenson Communications, LLC v. Federal Communications Commission*, 897 F.3d 214 (D.C. Cir. 2018), the D.C. Circuit concluded that the community association at issue lacked standing, in part because it "lack[ed] many of the 'indicia of a traditional membership' association": Its "members" were "passive subscribers to its e-mail list and individuals who 'follow' the group's Facebook page;" and those "members" did not financially support the organization. *Id.* at 225. Similarly, in *Heap v. Carter*, the court concluded that the organization did not have associational standing because it "alleged no information that would allow the Court to find that it has the kind of leadership and financial structure that is closely tied to that of its members or that its

13

members exert any control over the direction of the organization." 112 F. Supp. 3d 402, 419 (E.D. Va. 2015).

As in *Sorenson* and *Heap*, none of the "indicia of membership" are present here. The "members" of SFFA exert minimal control over the organization and its litigation. They have a right to elect only one member of SFFA's five-member Board (who may then be outvoted, removed, or excluded from Board meetings for any reason)—a marginal right they were granted only seven months *after* this lawsuit was filed. JA339-40. And they have no power to choose the organization's officers or vote on its priorities or activities. JA338-44. Nor do they finance the organization. SFFA "members" pay no ongoing dues to the organization, and although SFFA began requiring new "members" to pay a one-time fee of $10 in July 2015, JA332, only 0.4% of SFFA's purported 20,000-person membership had paid that fee one year after it took effect, *see* JA241, JA356, JA379. Instead, outside fundraising efforts provide almost all of the organization's funds. *See* JA356, JA379 (indicating that membership dues amounted to a total of $430 in 2015 and $300 in 2016, while unidentified donors provided SFFA with nearly $2 million in 2015 and 2016). In short, SFFA is not the type of genuine membership organization—one that pools its members' efforts and capital to pursue collective interests, *Camel Hair*, 799 F.2d at 11—to which ordinary associational standing principles apply.

SFFA not only lacks the indicia of genuine membership present in *Hunt* but is also unique in a way that is particularly offensive to Article III standing principles, *viz.*, it exists *solely* to pursue ideological litigation.  That is, SFFA's only apparent function is to bring lawsuits to advance its founder's ideological interest pressing the unconstitutionality of universities' admissions policies—an issue of "wide public significance," *Valley Forge*, 454 U.S. at 474-75 (quotation omitted)—in federal courts.  For example, SFFA's website states that its mission is "to support and participate in litigation that will restore the original principles of our nation's civil rights movement:  *A student's race and ethnicity should not be factors that either harm or help that student to gain admission to a competitive university*."  *About*, Students for Fair Admissions, https://studentsforfairadmissions.org/about/  (last visited May 20, 2020); *see also* JA319 (IRS filing stating that SFFA was "[f]ormed for the purpose of defending human and civil rights secured by law through the institution of litigation").  And the organization's only publicly advertised "legal issue" of interest is that "Harvard, UNC and most competitive universities are not in compliance with the Supreme Court's instructions" in *Fisher*.  *Legal Issues*, Students for Fair Admissions, https://studentsforfairadmissions.org/legal-issues/ (last visited May 20, 2020).  SFFA, in other words, is an organization transparently designed by a "concerned bystander" to be "a vehicle for the vindication of [his] value interests,"

15

*Diamond*, 476 U.S. at 62 (quotation omitted)—*i.e.*, an organization designed to evade the strictures of Article III.

Amicus is aware of no similar organization that has been granted the ability to sue in its own name when it was created for the exclusive purpose of litigation and provides no other benefits or services to its "members." Indeed, there is no plausible reason why lawsuits should be brought by this organization rather than by its individual "members," *except* to deny those affected individuals control over the litigation of their own claims and perhaps to avoid procedural requirements in multi-plaintiff litigation or Rule 23 class actions.

In these unusual circumstances, as in *Hunt*, the district court was required to further probe the relationship between the organization and its supposed "members" before permitting the organization to proceed in the shoes of those members. The district court's failure to do so—if left uncorrected—will provide concerned bystanders with a ready blueprint to conscript federal courts into resolving generalized ideological grievances—including over constitutional issues of widespread importance—without themselves having any personal or concrete injury related to the issue. It will undermine the principles animating Article III's standing requirement and necessarily force the judiciary into resolving precisely the types of general political disputes that Article III is meant to preclude.

Unlike in past cases where the Supreme Court has blessed associational standing, SFFA is *not* "in every practical sense identical" to its "members"—its only purpose is to further Edward Blum's ideological goals. The organization, in short, is concededly a mechanism designed solely to grant Mr. Blum standing through the rights and interests of third-party plaintiffs so that he can litigate his generalized grievance about race-conscious admissions in federal court. Such a transparent attempt to end-run Article III cannot be countenanced.

## CONCLUSION

For the foregoing reasons, the judgment of the district court should be vacated and remanded with instructions to dismiss the action for lack of standing.

Dated: May 21, 2020     Respectfully submitted,

           /s/  Anton Metlitsky
           Anton Metlitsky

           *Attorney for Amicus Curiae*

## CERTIFICATE OF COMPLIANCE

1. This brief complies with the type-volume limitations of Federal Rule of Appellate Procedure 29(a)(5) and Federal Rule of Appellate Procedure 32(a)(7)(B)(i) because this brief contains 4,019 words, excluding the parts of the brief exempted by Federal Rule of Appellate Procedure 32(f).

2. This brief complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5) and the type-style requirements of Federal Rule of Appellate Procedure 32(a)(6) because this brief has been prepared using Microsoft Word 2016 in Times New Roman, a proportionally spaced typeface, and 14-point font.

Dated: May 21, 2020                          /s/   Anton Metlitsky
                                             Anton Metlitsky

**CERTIFICATE OF SERVICE**

I hereby certify that on May 21, 2020, I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the First Circuit by using the CM/ECF system.  Participants in this case are registered CM/ECF users and will be served by the CM/ECF system.


Dated: May 21, 2020                    /s/   Anton Metlitsky
                                       Anton Metlitsky