No. 19-2005

# IN THE UNITED STATES COURT OF APPEALS
# FOR THE FIRST CIRCUIT

STUDENTS FOR FAIR ADMISSIONS, INC.,

*Plaintiff-Appellant*,

v.

PRESIDENT AND FELLOWS OF HARVARD COLLEGE

*Defendant-Appellee.*

_____

On Appeal from the United States District Court for the District of Massachusetts
No. 1:14-cv-14176 (Hon. Allison D. Burroughs)
_____

**BRIEF OF AMICI CURIAE ASIAN AMERICAN LEGAL DEFENSE AND
EDUCATION FUND AND OTHER ASIAN AMERICAN EDUCATION
AND YOUTH-SERVING ORGANIZATIONS AND HIGHER
EDUCATION FACULTY IN SUPPORT OF DEFENDANT-APPELLEE
AND AFFIRMANCE**

_____

Dean Richlin
Hemmie Chang
Sarah Burg
Madeleine K. Rodriguez
Rachel Hutchinson
Jacqueline Chávez
FOLEY HOAG LLP
155 Seaport Boulevard
Boston, MA 02210
Tel: 617- 832-1000

Kenneth Kimerling
ASIAN AMERICAN LEGAL
DEFENSE AND EDUCATION FUND
99 Hudson Street, 12th Floor
New York, NY  10013-2815
Tel: (212) 966-5932

*Counsel for Amici Curiae*

## Table of Contents

**Corporate Disclosure** ..................................................................... vii

**Rule 29(A)(4)(E) Statement** ............................................................ viii

**Interests of Amici Curiae** .................................................................. ix

**Introduction** ...................................................................................... 1

**Argument** ............................................................................................ 3

**I.   Asian Americans Benefit From Race-Conscious Admissions** .................. 3

  A.  There Is Substantial Diversity Within the Asian American Community ..... 3
  B.  Individualized Admissions Policies Prevent Asian Americans from Being Grouped Into A Single "Asian" Category ........................................ 6

**II.  SFFA's Arguments Do Not Advance the Goals of Asian Applicants** ........ 8

  A.  SFFA's Arguments Continue a Longstanding Tradition of Using the Asian Community as a Wedge .................................................... 9
  B.  SFFA Conflates Negative Action and Race-Conscious Admissions Policies ........................................................................ 12
  C.  SFFA's Requested Remedy Does Not Benefit the Asian American Community ...................................................................... 13

**III. SFFA and Its Amici Have Not Established Negative Action Against Asian Americans**. ......................................................................... 16

  A.  SFFA's Circumstantial Evidence Does Not Prove Intentional Discrimination. .................................................................... 17
  B.  Standardized Test Score Data at Harvard Do Not Show Negative Action Against Asian Americans. ...................................................... 21
  C.  SFFA's Assumed Bias in the Personal Score is Not Supported by the Data. ................................................................................ 26

**Conclusion** ....................................................................................... 29

**Addendum** ....................................................................................... A1

# Table of Authorities

## Cases

*Adarand Constructors v. Pefia*,
   515 U.S. 200 (1995) ................................................................. 12

*Alexander v. Sandoval*,
   532 U.S. 275 (2001) ................................................................. 17

*Fisher v. Univ. of Tex.*,
   136 S. Ct. 2198 (2016) .............................................................. 1

*Grutter v. Bollinger*,
   539 U.S. 306 (2003) ................................................................. 1

*McGuire v. Reilly*,
   386 F.3d 45 (1st Cir. 2004) ....................................................... 19

*Regents of the Univ. of Cal. v. Bakke*,
   438 U.S. 265 (1978) ................................................................. 1

*Spath v. NCAA*,
   728 F.2d 25 (1st Cir. 1984) ....................................................... 19

*Spencer v. Zant*,
   715 F.2d 1562 (11th Cir. 1983) ................................................. 19

*Sylvia Dev. Corp. v. Calvert Cty.*,
   48 F.3d 810 (4th Cir. 1995) ....................................................... 21

*Washington v. Seattle Sch. District No. 1*,
   458 U.S. 457 (1982) ................................................................. 12

## Statutory Authorities

Immigration Act of 1990, Pub. L. 101-649, 104 Stat. 4978 .......................... 4

**Additional Authorities**

Sigal Alon & Marta Tienda, Diversity, Opportunity, and the Shifting Meritocracy in Higher Education, 72 Am. Soc. Rev. 487 (2007) ................................. 24

Joan Biskupic, *Special Report: Behind U.S. Race Cases, a Little Known Recruiter*, REUTERS, Dec. 4, 2012, http://www. reuters.com/article/us-usa-court-casemaker-idUSBRE8B30V220121204............................................ 2

William G. Bowen & Derek Bok, *The Shape of the River: Long-Term Consequences of Considering Race in College and University Admissions* (2d ed. 2000) ................................................................................................. 22

William T. Dickens & Thomas J. Kane, Racial Test Score Differences as Evidence of Reverse Discrimination: Less Than Meets the Eye, 38 Indus. Rel. 331 (1999)................................................................................................. 23

FairTest, National Center for Fair and Open testing, "Optional List," (Current as of May 2020), http://www.fairtest.org/university/optional ...................... 22

Claude S. Fischer et al., *Inequality by Design: Cracking the Bell Curve Myth* 46 (1996) ......................................................................................... 22

Liliana M. Garces and OiYan Poon, *Asian Americans and Race-Conscious Admissions: Understanding the Conservative Opposition's Strategy of Misinformation, Intimidation, and Racial Division*, The Civil Rights Project at 6 (2018)................................................................................................. 2

W.C. Hiss and V.W. Franks, *Defining Promise: Optional Standardized testing Policies in American College and University Admissions*, National Association for College Admissions Counseling (Feb. 5, 2014) ................................... 22

William C. Kidder, *Misshaping the River: Proposition 209 and Lessons for the Fisher Case* 39 J.C. & U.L. 53 (2013) ...................................................... 23

Claire Jean Kim, *The Racial Triangulation of Asian Americans*, 27 Pol. Soc. 105 (1999).......................................................................................................... 9

Isok Kim and Wooksoo Kim, *Post-resettlement Challenges and Mental Health of Southeast Asian Refugees in the United States*, 10 Best Practices in Mental Health 63 (2014) ........................................................................................ 5

Jennifer L. Kobrin et al., *A Historical View of Subgroup Performance Differences on the SAT Reasoning Test* 19 (The College Board 2007), http://research.collegeboard.org/sites/default/files/ publications/2012/7/researchreport-2006-5-historical-view-subgroup- performance-sat.pdf ................................................................................... 23

Rakesh Kochhar and Anthony Cilluffo*, Income Inequality in the U.S. Is Rising Most Rapidly Among Asians, Pew Research Center: Social & Demographic Trends* (2018) ............................................................................................ 7

Stacy M. Kula and Susan J. Paik, *A Historical Analysis of Southeast Asian Refugee Communities,* 11 J. of Southeast Asian Am. Ed. And Advancement, 1 (2016)......................................................................................................... 5

Stacey Lee and Kevin Kumashiro, A Report on the Status of Asian Americans and Pacific Islander in Education: Beyond the "Model Minority" Stereotype, National Education Association, at xi (2005)................................................................................. 3, 4, 10, 11

Goodwin Liu, The Causation Fallacy: Bakke and the Basic Arithmetic of Selective Admissions, 100 Mich. L. Rev. 1045 (2002) ........................... 23

Melody Manchi Chao et al., *The Model Minority as a Shared Reality and Its Implication for Interracial Perceptions*, 4 Asian Am. J. of Psychology 84 (2013)....................................................................................................... 3

Stephanie Mencimer, *Meet the Brains Behind the Effort to Get the Supreme Court to Rethink Civil Rights*, Mother Jones, March/April 2016, https://www.motherjones.com/politics/2016/04/edward-blum-supreme-court- affirmative-action-civil-rights/ ................................................................. 2

Samuel Museus and Peter Kiang, *Deconstructing the Model Minority Myth and How It Contributes to the Invisible Minority Reality in Higher Education Research*, 142 New Directions for Inst. Res. 5, 6 (2009) ......................... 10

Mike Hoa Nguyen , Beyond Compositional Diversity: Examining the Campus Climate Experiences of Asian American and Pacific Islander Students, 11 J. of Diversity in Higher Ed. 484 (2018).............................................................. 4

J. Owens and D.S. Massey, Stereotype Threat and College Academic Performance: A Latent Variables Approach, 40 Soc. Sci. Res. 150 (2011)......................................................................... 25

OiYan Poon et al., *A Critical Review of the Model Minority Myth in Selected Literature on Asian Americans and Pacific Islanders in Higher Education*, 86 Rev. of Educational Research 469 (2016)........................................ 4, 9, 10

V. Purdie-Vaughns , Social Identity Contingencies: How Diversity Cues Signal Threat or Safety for African Americans in Mainstream Institutions, 94 J. Pers. Soc. Psychol. 615 (2008).......................................................... 25

Jay Rosner, Disparate Outcomes by Design: University Admissions Test, 12 Berkeley La Raza L.J. 377 (2001)......................................................... 24

Maria Veronica Santelices & Mark Wilson, Unfair Treatment?: The Case of Freedle, the SAT, and the Standardization Approach to Differential Item Functioning, 80 Harv. Educ. Rev. 106 (2010) .......................................... 23

T. Schmader et al., *An Integrated Process Model of Stereotype Threat Effects on Performance*, 115 Psychol. Rev. 336 (2008) ............................................ 25

Robert T. Teranishi, *Asians in the Ivory Tower: Dilemmas of Racial Inequality in American Higher Education* (2010) ............................................................ 4

Robert T. Teranishi et al., *Heterogeneity among Asian Americans: Implications for Using Standardized Test Scores to Estimate Discriminatory College Admissions Practices*, CARE (Nov. 2015) ........................................ 10, 24

The Southeast Asian Resource Action Center, *Southeast Asian American Journeys: A Snapshot of Our Communities* (2020).................................... 5

Tung Yin, A Carbolic Smoke Ball for the Nineties: Class-Based Affirmative Action, 31 Loy. L. A. L. Rev. 213 (1997)........................................... 14, 15

# CORPORATE DISCLOSURE

Pursuant to Federal Rule of Appellate Procedure 26.1, counsel for *amici curiae* certifies that all *amici* do not have a parent corporation, and no publicly held corporation owns ten percent or more of *amici's* stock.

Dated: May 21, 2020

/s/ *Madeleine K. Rodriguez*

Dean Richlin
Hemmie Chang
Sarah Burg
Madeleine K. Rodriguez
Rachel Hutchinson
Jacqueline Chávez
FOLEY HOAG LLP
155 Seaport Boulevard
Boston, MA 02210
Tel: 617- 832-1000
Fax: 617-832-7000
drichlin@foleyhoag.com
hchang@foleyhoag.com
sburg@foleyhoag.com
mrodriguez@foleyhoag.com
rhutchinson@folehoag.com
jchavez@foleyhoag.com

Kenneth Kimerling
ASIAN AMERICAN LEGAL DEFENSE
AND EDUCATION FUND
99 Hudson Street, 12th Floor
New York, NY  10013-2815
Tel: (212) 966-5932
kkimerling@aaldef.org

*Counsel for Asian American Legal
Defense and Education Fund, et al.*

## RULE 29(A)(4)(E) STATEMENT

No counsel for a party authored this brief in whole or in part and no person or entity, other than amici curiae, their members, or their counsel, has contributed money that was intended to fund preparing or submitting the brief.

## INTERESTS OF AMICI CURIAE

The Asian American Legal Defense and Education Fund ("AALDEF"), headquartered in New York City and founded in 1974, is a national organization that promotes the civil rights of Asian Americans.[1]  Through litigation, advocacy, and education, AALDEF protects the rights of Asian Americans and supports educational equity in higher education.  AALDEF has an interest in this litigation because its work with community-based youth advocates across the country demonstrates that Asian American students benefit from individualized race-conscious admissions policies as well as from diverse educational settings. AALDEF opposes any cap, quota, or negative action against Asian Americans.

AALDEF is joined in this amicus brief by the following organizational entities and higher education faculty members, who are described in more detail in the Addendum: 18MillionRising.org; the Asian American Federation; the Asian American Psychological Association; Asian American Students in Action; Asian American Youth Leadership Empowerment and Development; Asian Americans United; the Asian Law Alliance; Asian Pacific American Labor Alliance; the Asian

---

[1] While AALDEF also promotes the rights of Pacific Islanders, Harvard's admissions policy correctly distinguishes between Pacific Islanders and Asian Americans, grouping the two separately.  Because SFFA's claims only implicate Harvard's treatment of Asian Americans, this brief does not discuss Pacific Islanders.

Pacific American Women Lawyers Alliance; Asian Pacific Islander Americans for Civic Empowerment; Chinese for Affirmative Action; the Chinese Progressive Association; Coalition for Asian American Children & Families; Coalition of Asian American Leaders; GAPIMNY; the Japanese American Citizens League; LEAP; the National Coalition for Asian Pacific American Community Development; the National Korean American Service & Education Consortium; the National Queer Asian Pacific Islander Alliance; OCA – Asian Pacific American Advocates; South Asian Americans Leading Together; Southeast Asia Resource Action Center; Stewart Chang; Ming Hsu Chen; Vichet Chhuon; Gabriel J. Chin; Emily M.S. Houh; Marina Hsieh; Tarry Hum; Lisa C. Ikemoto; Anil Kalhan; Pauline T. Kim; Shirley Lin; Shirley Lung; Mari J. Matsuda; Kevin Nadal; Philip Tajitsu Nash; Natsu Taylor Saito; Cathy J. Schlund-Vials; John Kuo Wei Tchen; Scott Wong; Margaret Y.K. Woo; and K. Wayne Yang.

All parties to this appeal have consented to the filing of this amicus curiae brief.

## INTRODUCTION

AALDEF and its co-amici ("Amici") strongly support race-conscious admissions policies like Harvard's, which benefit Asian American applicants and other applicants of color alike. Individualized admissions policies are best equipped to recognize the vast diversity within the Asian community, including the stark differences in socioeconomic and education attainment among different ethnic subgroups. Such policies also prevent the perpetuation of the harmful "model minority" myth. The Supreme Court has long held such policies to be constitutional. *See, e.g.*, *Regents of the Univ. of Cal. v. Bakke*, 438 U.S. 265 (1978), *Grutter v. Bollinger*, 539 U.S. 306 (2003) *Fisher v. Univ. of Tex.*, 136 S. Ct. 2198, 2207 (2016) ("Fisher II") ("the consideration of race, within the full context of the entire application, may be beneficial to any UT Austin applicant—including whites and Asian-Americans") (citing Brief for AALDEF et al. as *Amici Curiae* at 12).

Although SFFA professes to advocate for Asian applicants, it is not an Asian rights organization. Edward Blum, a white anti-affirmative action strategist, created SFFA to advance his campaign against race-conscious admissions. Since the 1990s, Blum has orchestrated over two dozen lawsuits opposing the

enforcement of anti-discrimination laws and diversity programs.[2]  Now, through SFFA, Blum is cherry-picking data and exploiting the model minority myth to further his own agenda.

Contrary to SFFA's claims, a majority of Asian Americans support race-conscious admissions.[3]  These policies directly benefit Asian applicants, particularly Southeast Asians and recent immigrants who struggle with poverty, language barriers, and educational attainment.  Ending race-conscious admissions will not help these students.  Instead, it will reinforce the privileges of white applicants by ignoring structural racial inequality and its impact on applicants of color.  Class-based affirmative action, SFFA's proposed alternative, will similarly entrench white privilege.

Amici are mindful of stereotypes about Asian Americans and the danger that they may affect admissions decisions.  But neither the district court nor Amici have

---

[2] *See* Joan Biskupic, *Special Report: Behind U.S. Race Cases, a Little Known Recruiter*, REUTERS, Dec. 4, 2012, http://www. reuters.com/article/us-usa-court-casemaker-idUSBRE8B30V220121204; Stephanie Mencimer, *Meet the Brains Behind the Effort to Get the Supreme Court to Rethink Civil Rights*, Mother Jones, March/April 2016, https://www.motherjones.com/politics/2016/04/edward-blum-supreme-court-affirmative-action-civil-rights/.

[3] Liliana M. Garces and OiYan Poon, *Asian Americans and Race-Conscious Admissions: Understanding the Conservative Opposition's Strategy of Misinformation, Intimidation, and Racial Division*, The Civil Rights Project at 6 (2018) (collecting studies and polling data).

identified any evidence that Harvard intentionally discriminates against Asian applicants. Amici believe that SFFA's blunt attack on race-conscious admissions will harm all minorities, including Asian Americans. Amici accordingly urge this Court to affirm the judgment below.

## ARGUMENT

### I.  Asian Americans Benefit From Race-Conscious Admissions

Individualized admissions programs like Harvard's directly benefit Asian applicants by considering the diversity within the Asian community. Asian American subgroups differ significantly by ethnicity, language, socioeconomic status, immigrant status, and religion. Harvard's admissions process specifically recognizes these differences by treating Asian applicants as individuals.

### A.  There Is Substantial Diversity Within the Asian American Community.

The term "Asian American" refers to a diverse population with over fifty ethnic subgroups, 300 languages, and a broad range of socio-historical, cultural, religious, and political experiences.[4] Some Asian Americans are multi-generation

---

[4] Melody Manchi Chao et al., *The Model Minority as a Shared Reality and Its Implication for Interracial Perceptions*, 4 Asian Am. J. of Psychology 84, 85 (2013); *see also* Stacey Lee and Kevin Kumashiro, *A Report on the Status of Asian Americans and Pacific Islander in Education: Beyond the "Model Minority"* Stereotype, National Education Association, at xi (2005).

Americans, some are from immigrant families, some are refugees, and some are the adopted children of non-Asian parents. Asian students face vastly differing socioeconomic and educational realities. While some achieve great academic and professional success, others struggle to graduate high school.[5] It is impossible to generalize a single "typical" Asian experience.[6]

Immigration patterns often shape socioeconomic experience. Many East Asian and South Asian immigrants from India, Korea, China, and Taiwan traveled voluntarily to the United States as highly-educated professionals.[7] They spoke fluent English before arriving, and entered through immigration policies giving employment preference to professionals who "hold[] advanced degrees" or have "exceptional ability." *E.g.*, Immigration Act of 1990, Pub. L. 101-649, 104 Stat. 4978. These immigrants arrived with substantial social capital that "often correlated with educational and social mobility."[8]

---

[5] OiYan Poon et al., *A Critical Review of the Model Minority Myth in Selected Literature on Asian Americans and Pacific Islanders in Higher Education*, 86 Rev. of Educational Research 469, 472 (2016).

[6] Mike Hoa Nguyen et al., *Beyond Compositional Diversity: Examining the Campus Climate Experiences of Asian American and Pacific Islander Students*, 11 J. of Diversity in Higher Ed. 484, 497 (2018); Robert T. Teranishi, *Asians in the Ivory Tower: Dilemmas of Racial Inequality in American Higher Education* 26 (2010).

[7] Lee and Kumashiro, *Report, supra,* at 2.

[8] Teranishi, *Asians in the Ivory Tower*, *supra*, at 31.

By contrast, many Southeast Asian Americans arrived as refugees from Cambodia, Laos, Vietnam, and Myanmar.[9] Most started their new lives in America with few possessions, and many were traumatized by war, their escape, or years in refugee camps. Today, decades after Southeast Asian refugees began arriving in America, many continue to struggle with long-term poverty, illiteracy, and post-traumatic stress disorder. A 2020 report found that nearly thirty percent of all Southeast Asian Americans have not completed high school or obtained a GED, more than double the national average.[10] Ninety percent of Southeast Asian Americans speak a language other than English at home, meaning even American-born Southeast Asian children may have limited English skills when they begin school.[11] This can affect SAT scores, which require a high level of English proficiency.[12]

---

[9] Stacy M. Kula and Susan J. Paik, *A Historical Analysis of Southeast Asian Refugee Communities,* 11 J. of Southeast Asian Am. Ed. And Advancement, 1 (2016); Isok Kim and Wooksoo Kim, *Post-resettlement Challenges and Mental Health of Southeast Asian Refugees in the United States*, 10 Best Practices in Mental Health 63, 64 (2014).

[10] The Southeast Asian Resource Action Center, *Southeast Asian American Journeys: A Snapshot of Our Communities,* at 23 (2020).

[11] *Southeast Asian American Journeys*, at 22.

[12] *Id.*

**B.    Individualized Admissions Policies Prevent Asian Americans from Being Grouped Into A Single "Asian" Category**

Individualized admissions like Harvard's are particularly equipped to take into account the diversity of the Asian American community. Harvard's admissions process considers each applicant as a whole person, comparing their qualifications with those of all other applicants, and assessing them in the context of the opportunities and challenges they have faced. *See* JA871. Race is one consideration among multiple variables, including standardized test scores, alumni interviewer evaluations, letters of recommendation, applicant essays, intended concentration, academic strength of applicants' high schools, economic and demographic profile of applicants' communities, parents' level of education, extracurricular activities, and optional submissions of scholarly work, artwork, or recordings of music or dance performances. *See* JA503-11; JA651-52.

Individualized admissions programs guard against grouping Asian Americans into one monolithic "Asian" category and blurring the distinct socioeconomic realities faced by different subgroups. Indeed, Harvard specifically considers these differences when examining Asian American applicants. As Dean Fitzsimmons testified, low-income Asian applicants receive an admissions 'tip' designed to account for the structural inequality they face. *See* JA1643. While all low-income applicants receive similar tips, the tip given to low-income Asian

6

applicants benefits them more than almost any other racial group—ten percent of low-income Asian applicants are admitted, as opposed to seven percent of non-low-income Asian applicants. *Id.* These numbers reflect greater income inequality among Asian Americans.[13]

Other Amici, Students in Support of Harvard, provided testimony that illustrates how Harvard's individualized admissions process takes into account the vast diversity within the Asian community. For example, Thang Diep, a Harvard senior who emigrated at age eight, explained that he structured his admissions essay around his Vietnamese identity, his struggles with English, and the racial slurs he endured growing up. JA2674-75. According to Diep, he chose to write about these experiences because his other achievements—like his high GPA and commitment to public service—could not be understood without reference to his racial and ethnic identity. JA2681. Diep's admissions reviewers evidently agreed; his applicant file contained positive comments about his Vietnamese identity. JA2681-82.

---

[13] Rakesh Kochhar and Anthony Cilluffo, *Income Inequality in the U.S. Is Rising Most Rapidly Among Asians*, Pew Research Center: Social & Demographic Trends (2018), *available at* http://www.pewsocialtrends.org/2018/07/12/income-inequality-in-the-u-s-is-rising-most-rapidly-among-asians/.

Sally Chen, a Harvard senior, also testified about how her Asian identity shaped her admissions package. Like Diep, she chose to write her admissions essay about her identity, particularly her experience being a translator and advocate for her parents, both working class Chinese immigrants. *Id.* at 200:01-14. Although Chen had received advice from a high school guidance counsellor that Asian immigrant stories were "overdone," she chose to write about being the daughter of immigrants because "it was fundamental to explaining who I am." JA2734-35. She too received positive comments in her application file about her ethnicity and experiences. JA2736-27.

In addition to Diep and Chen, six other students and alumni of color testified about identity, race, ethnicity, and their admission to Harvard. All six stated that they could not accurately describe their life stories without referencing race. If Harvard adopts a race-blind admissions program, a fundamental part of their identity would be erased. One student explained, "[T]here is no part of my experience, no part of my journey, no part of my life that has been untouched by my race … To try not to see my race is to try not to see me." JA2617-18.

## II.    SFFA's Arguments Do Not Advance the Goals of Asian Applicants.

For perhaps the first time in this litigation, SFFA centers its arguments squarely on Asian applicants. Unlike its previous preoccupation with the "tip"

given to Black and Latino applicants,[14] SFFA's Appellate Brief focuses the supposed penalty Asian Americans receive in Harvard's personal ratings. But SFFA's latest theory is equally unavailing.

First, SFFA's arguments continue the longstanding tradition of using the Asian community as a wedge to punish other marginalized groups and undermine legitimate race-conscious admissions policies.[15] Second, SFFA continues to conflate whether Harvard's race-conscious admissions policy is permissible with whether Asian American applicants face bias during the admissions process. Third, SFFA's proposed remedy, the elimination of Harvard's race-conscious admissions process, will harm all communities of color, including Asian Americans.

### A. SFFA's Arguments Continue a Longstanding Tradition of Using the Asian Community as a Wedge.

The use of stereotypes about Asian Americans as a tool to divide communities of color and perpetuate structural inequality is not new.[16] For decades, America has simultaneously valorized Asian Americans as a model for

---

[14] JA2239; JA2255; JA2275; JA2339.

[15] OiYan Poon et al., *A Critical Review of the Model Minority Myth, supra*, at X.

[16] Claire Jean Kim, *The Racial Triangulation of Asian Americans*, 27 Pol. Soc. 105, 108 (1999).

other minorities and excluded them from American society as perpetually foreign.[17] This racial triangulation of Asian Americans—below white Americans, above other communities of color, and yet ostracized from American society—exploits Asian Americans and other Americans of color alike.[18]

The model minority myth, the notion that Asian Americans have achieved universal academic and professional success through hard work and adherence to Asian cultural norms,[19] is a key example of this phenomenon. Although the myth is often seen as harmless or even positive, it has numerous negative effects for Asian Americans and other communities of color. First, the myth hides the diversity of the Asian experience.[20] Second, Asian scholars have long noted that the myth has been used by opponents of race-conscious policies "to support the notion of meritocracy" and promote the idea that racial discrimination "does not impede the educational and occupational progress of racial/ethnic minorities."[21] It

---

[17] *Id.*

[18] OiYan Poon et al., *A Critical Review of the Model Minority Myth*, supra, at X.

[19] Lee and Kumashiro, *Report, supra,* at xi.

[20] *See* Robert T. Teranishi et al., *Heterogeneity among Asian Americans: Implications for Using Standardized Test Scores to Estimate Discriminatory College Admissions Practices*, CARE (Nov. 2015).

[21] Samuel Museus and Peter Kiang, *Deconstructing the Model Minority Myth and How It Contributes to the Invisible Minority Reality in Higher Education Research*, 142 New Directions for Inst. Res. 5, 6 (2009).

is no coincidence that the myth first gained widespread popularity during the civil rights movement, when it was used as a tool to silence Black activists' claims of racial inequality.[22]

Despite acknowledging the existence of the model minority myth, SFFA continues to invoke it.  SFFA focuses on Asian American applicants' supposedly universal academic success, failing to distinguish between the different levels of education attainment of different subgroups.  *See* JA1361-62; *see also* Section II.B.  Similarly, like other invocations of the myth throughout history, SFFA's goal—abolishing race-conscious admissions—will hurt Asian Americans and other communities of color while benefiting white students.

Amici recognize that SFFA has identified a handful comments by Harvard officials that could reflect Asian American stereotypes, such as Dean Fitzsimmons' testimony implying that Asian applicants from rural communities must be recent transplants.[23]  While disappointing, these comments do not change Amici's conclusion that SFFA has not proven that Harvard engages in intentional

---

[22] Lee and Kumashiro, *Report, supra,* at xi.

[23] Amici also take issue with the district court's speculation that "Asian American applicants' disproportionate strength in academics comes at the expense of other skills and traits that Harvard values."  D.E. 672, at 58.

discrimination.  *See* Section II.  These comments also do not change the fact that SFFA is using the Asian community as a tool to further its own goals.

### B.    SFFA Conflates Negative Action and Race-Conscious Admissions Policies.

While SFFA's earlier arguments were a conceptual mishmash, focusing on the "tip" given to Black and Latino students,[24] SFFA now alleges straightforward disparate treatment: Harvard intentionally penalizes Asian applicants because of their race.  But SFFA continues to conflate this discrimination claim with its broader assault on Harvard's use of race.  The two concepts are distinct.

Under SFFA's own theory of the case, Harvard's use of race does not cause the so-called Asian penalty.  SFFA points to a facially race-neutral part of Harvard's policy, the personal rating, as the source of the alleged discrimination. This *should* place SFFA's discrimination allegations entirely outside affirmative action jurisprudence.  It should also change the standard of review.  While facially race-conscious conduct is presumptively unlawful and must satisfy strict scrutiny,[25] facially-neutral conduct is presumptively lawful and requires a showing of intentional discrimination.  As the district court acknowledges, SFFA must

---

[24] *See* JA2239; JA2255; JA2275; *see also* JA2339 ("A white penalty is the same thing as an African-American or Hispanic tip. They mean the same thing.").

[25] *Adarand Constructors, Inc. v. Pena*, 515 U.S. 200, 227 (1995); *Washington v. Seattle Sch. Dist. No. 1*, 458 U.S. 457, 485 (1982).

therefore prove Harvard acted intentionally, with "invidious discriminatory purpose," to succeed on its discrimination claim.[26]

Disregarding this analytical distinction, SFFA continues to conflate its discrimination claim with its other claims, which attack Harvard's use of race as a plus factor. *See* SFFA Appl. Br. at 6; JA2239; JA2255; JA2275; JA2339. As SFFA has framed its arguments, these claims are not related. Harvard's conscious use of race as a plus factor in some portions of its admissions program has nothing to do with whether it discriminates against Asian Americans in the facially-neutral personal rating.

## C. SFFA's Requested Remedy Does Not Benefit the Asian American Community.

There is a fundamental disconnect between SFFA's claims and its proposed remedy. Although purporting to address harm to Asian American applicants, SFFA's proposed remedy—eliminating race-conscious admissions policies across America—does not advance the rights of Asian students. Like other racial minorities, Asian students benefit from individualized race-conscious admissions programs that allow admissions officers to consider how race and ethnicity have shaped their experiences. Eliminating race-conscious admissions will entrench

---

[26] D.E. 672 at 103.

white privilege by ignoring structural racial inequality and preventing applicants of color from discussing how it has impacted them.[27]

As the district court found, SFFA's race-neutral remedies are not viable alternatives to race-conscious admissions.[28]  SFFA focuses on "Simulation D," which has Harvard increase its tip for low-income students, a practice scholarship calls "class-based affirmative action."[29]  Although class-based affirmative action has long been championed by opponents of race-conscious admissions, research demonstrates that socioeconomic factors are not a proxy for race.  Race and class overlap but are not interchangeable, and class-based affirmative action can actually *hurt* applicants of color, both in admission numbers and other, more intangible ways.

First, there are more poor white Americans than poor Americans of color.[30] A randomly-selected poor person is more likely to be white than any other race.[31]

---

[27] *See* JA226 (seeking "A permanent injunction requiring Harvard to conduct all admissions in a manner that does not permit those engaged in the decisional process to be aware of or learn the race or ethnicity of any applicant for admission").

[28] D.E. 672 at 119.

[29] Tung Yin, *A Carbolic Smoke Ball for the Nineties: Class-Based Affirmative Action*, 31 LOY. L. A. L. REV. 213, 231 (1997).

[30] *Id.*

[31] *Id.*

In a system based solely on class, the majority of low-income applicants considered would be white. Second, class-based affirmative action rests on the assumption that all low-income students have comparable life experiences and academic profiles. It ignores the fact that although poor white applicants have been disadvantaged by their class, poor applicants of color have been disadvantaged by their class *and* race. White students outscore Black and Latino students on standardized tests at every income level, including the lowest.[32] A class-based system cannot correct for this inequity.

Third, class-based admission disadvantages students of color by erasing a significant part of their identity from the admissions process. As stated above, all six student-witnesses of color testified that they could not accurately describe their experiences without referencing race. By preventing students of color from mentioning their race, class-based admissions puts them at a disadvantage in the portions of the application where Harvard seeks to understand a student's relative merit and contributions to the incoming class beyond academic performance.

Together, these factors mean that a shift to class-based affirmative action program would result in a drop in the number of students of color. Even SFFA's model, which as discussed below is statistically flawed, shows that the number of

---

[32] *Id*.

15

Black students would drop by nearly a third.  Moreover, testimony by student amici suggest that these projections likely underestimate the decline.  For example, Iztel Vasquez Rodriguez explained that if Harvard's admissions process was race-neutral, she would never have applied.  JA2550.  The number of acceptances by students of color would likely also drop.  One student explained, race-neutral admissions "would be a signal to students of color that Harvard was disinterested in us." JA2617.

## III.  <u>SFFA and Its Amici Have Not Established Negative Action Against Asian Americans.</u>

SFFA's claim that Harvard has intentionally discriminated against Asian American applicants is now predicated on three pieces of circumstantial evidence—the statistical analysis reported by its expert witness, an internal Harvard study conducted by the Office of Institutional Research ("OIR"), and Harvard's "post-filing conduct"—and two central arguments.  First, SFFA argues that "Harvard's admissions criteria …. are highly subjective" and create an opportunity for discriminatory action against Asian Americans who otherwise merit admission based on test scores and other academic and extracurricular criteria.  Second, SFFA argues that Harvard takes negative action against Asian American applicants by intentionally awarding them lower scores on the personal category to limit the percentage of admitted Asian Americans.  SFFA's arguments

are flawed. Both the statistical analysis completed by SFFA's expert and OIR's analysis are incomplete and deficient in significant ways and therefore inadequate to support a compelling inference of intentional discrimination. Moreover, standardized test scores are inherently unreliable as a measure of comparative merit and provide no evidence that Harvard has established any quantitative objective for the admission of a particular group. Finally, SFFA's argument regarding the personal category rests on unsupported assumptions and a mistaken view of the evidence.

### A. SFFA's Circumstantial Evidence Does Not Prove Intentional Discrimination.

Regardless of the theory or language SFFA uses to couch its claims against Harvard, SFFA, as a private party seeking judicial enforcement of Title VI's nondiscrimination protections, still must prove Harvard engaged in intentional discrimination. *Alexander v. Sandoval*, 532 U.S. 275, 280–81 (2001). Suggesting intentional discrimination on the basis of implicit bias places greater weight on the remaining circumstantial evidence SFFA uses to create a compelling inference of intent. Neither the statistical analysis conducted by SFFA's expert nor OIR's analysis demonstrate an intent to discriminate.

Statistical models were featured extensively at the district court level as evidence illustrating the rates at which students are admitted to Harvard based on

17

a variety of factors. Yet SFFA's expert excluded from his statistical model applicants who were recruited athletes, children of Harvard College or Radcliffe alumni, children of Harvard faculty or staff members, and individuals on the Dean's or Director's interest lists (collectively, "ALDC applicants"). SFFA's expert claims to have done so because these applicants receive a "tip" based on their ALDC status. SFFA argues that these applicants should be ignored because they represent a minor subclass of applicants that "break the stereotypical mold" and "often receive better treatment." SFFA Br. at 40. These rationales are both unpersuasive and contradictory. ALDC candidates make up a significant—nearly one-third—portion of a Harvard admitted class. While they are identified as ALDC candidates throughout the admissions process, they must participate in the same admissions process as all other domestic applicants. As SFFA's expert himself concedes, JA2392:18-JA2396:6, ALDC applicants are also not the only candidates that receive "tips." Although SFFA's expert's model controls for these other "tips" (as Harvard's expert did with ALDC applicants), the ALDC category is the only "tipping" factor excluded completely from his modeling. JA2392:18-20, JA2396:11-JA2397:10, JA2405:13-JA2406:24.

SFFA's expert's decision is troubling given that, as SFFA's expert himself admits, Asian American ALDC applicants are shown to be more likely to be admitted than their white ALDC counterparts. JA2282:23-JA2283:3, JA2288:1-

9, JA2352:1-5. This is especially so for Asian American legacy applicants. JA2892:25-JA2893:5. These students represent the most highly competitive applications in the pool, and Asian Americans are shown to benefit more than any other group in this upper tier. SFFA's expert's unique exclusion of the ALDC category as compared to all other "tipping" factors is relevant, as it conveniently serves to overestimate any negative effect on Asian American applicants and underestimate their performance overall in the admissions process. JA2400:4-7, JA2402:10-20. The court properly rejected SFFA's expert's decision to exclude those categories for inappropriately distorting his analysis. It was also reasonable for the court to conclude that Harvard's model *including* ALDC applicants more accurately reflects how the admissions process works. D.E. 672 at 76-77.

Statistical evidence of disparate outcomes alone generally cannot prove an intent to discriminate unless the demonstrated impact is so strong that the results of the analysis permit no other inference but that they are the product of a racially discriminatory intent or purpose. *Spencer v. Zant*, 715 F.2d 1562, 1581 (11th Cir. 1983)); *see also*, *e.g., McGuire v. Reilly*, 386 F.3d 45, 63 (1st Cir. 2004) ("[C]ourts have been loath[] to infer intent from mere effect[.]"); *Spath v. NCAA*, 728 F.2d 25, 28 (1st Cir. 1984) ("[G]enerally courts must look to evidence other than statistical impact to support a finding of discriminatory purpose.") Viewed in even its most favorable light, the analysis conducted by SFFA's expert has not cleared

19

this high bar. SFFA impliedly acknowledges that its statistical evidence alone is inadequate to demonstrate a Title VI violation, because it devotes considerable space in its brief to discussing the analysis conducted by OIR, its findings, and Harvard's response to that analysis. OIR's study is not, however, sufficient to overcome the deficiency in Plaintiff's proof.

Trial witnesses testified that the analysis was based on limited data and variables. JA803:10-13; *see also* D.E. 672 at 34. Witnesses further acknowledged that the team had no experience working in admissions and lacked a sufficient understanding of how the admissions process works. JA1216:17-24; JA1965:7-12, JA1971:24-JA1972:1. Instead, OIR employed variables such as the Academic Index, which includes only board scores and GPA and is *not* considered in the admissions process. JA897:2-8; JA1219:6-JA1220:7.

Additionally, OIR's objective was not to evaluate any discriminatory practices based on race in Harvard's admission process, JA1333:21-JA1334:3, and was only later asked to assess Harvard's treatment of low-income applicants. D.E. 672 at 35-36. That evaluation actually concluded that Asian American applicants *benefit* from Harvard's efforts to admit low-income students, JA906:22-JA907:7, contrary to the arguments of SFFA and its Amici. SFFA Br. at 44; Br. of Amici Curiae, Asian Am. Coal. for Educ., et al. at 10, 12-13; *see also* JA3969-JA3970. SFFA's expert's analysis also showed that low-income Asian American applicants

tended to fare better in his modeling results. *See* JA6011-JA6012, JA6016, JA6019. This hardly qualifies as evidence of the type of "consistent pattern" of discrimination Title VI prohibits. *Sylvia Dev. Corp. v. Calvert Cty.*, 48 F.3d 810, 819 (4th Cir. 1995).

Harvard's "post-filing conduct" amending its reading procedures likewise does not prove that it intentionally discriminates against Asian American applicants. Harvard reviews its reading procedures routinely. D.E. 672 at 21, n. 20. Harvard admissions officers testified throughout the trial that the amended reading procedures did not reflect a change in policy, but rather codified existing practices. JA2123:25-JA2124:6; JA3318:25-JA3319:23. These reading procedures were not, as SFFA argues, adopted to "remedy" or "conceal" discrimination or in reaction to any district court arguments or allegations. SFFA Br. at 45. Rather, the amended reading procedures formalized Harvard's existing commitment to its lawful admissions process.

## B. Standardized Test Score Data at Harvard Do Not Show Negative Action Against Asian Americans.

SAT score statistics at Harvard do not demonstrate negative action against Asian Americans, contrary to the emphasis placed on this and other purportedly objective academic scoring by SFFA. *See* JA3415:4-JA3416:12. Averaging SAT scores obscures the wide distribution of scores among Asian American candidates,

scores that are often tainted by outside factors.  Notably, more than 1100 accredited colleges and universities do not require standardized test scores to admit students into their bachelor-degree programs or otherwise de-emphasize the use of standardized tests.[33]

Claims about differential standardized test scores by race are often highly misleading, if not demonstrably false.  Differences in average scores among racial or ethnic groups at institutions such as Harvard reflect the racial/ethnic test score disparities already present in the applicant pool, resulting from socioeconomic differences, educational practices, and other environmental factors.[34]  They exist

---

[33] *See* FairTest, National Center for Fair and Open Testing, "Optional List," (Current as of May 2020), *available at* http://www.fairtest.org/university/optional. A four-year study of 33 private and public test-optional colleges and universities found that, of 123,000 students, 30 percent had been admitted without submitting test scores. The study concluded that there was no significant difference between nonsubmitters and submitters in graduation rates (0.6 percent lower for nonsubmitters) or cumulative GPA (2.83 for nonsubmitters, 2.88 with test scores). Data also showed that nonsubmitters are more likely than submitters to be first-generation-to-college enrollees, underrepresented minorities, women, Pell Grant recipients and students with learning differences.  *See* W.C. Hiss and V.W. Franks, *Defining Promise: Optional Standardized testing Policies in American College and University Admissions*, National Association for College Admissions Counseling (Feb. 5, 2014).

[34] See Claude S. Fischer et al., Inequality by Design: Cracking the Bell Curve Myth 46 (1996); William G. Bowen & Derek Bok, The Shape of the River: Long-Term Consequences of Considering Race in College and University Admissions 16 (2d ed. 2000).

regardless of whether race-neutral or race-conscious criteria are used.[35]  Disparities in racial/ethnic SAT score averages on par with Harvard's individualized admissions pool are found nationwide,[36] including at other leading universities like UC Berkeley and UCLA that use race-neutral admissions and have high Asian-American student populations.[37]

Additionally, students can improve test scores by attending test-preparation courses.  Such courses are, however, generally available only to those with financial means, as SFFA acknowledges (when convenient).[38]  Score differences

---

[35] See, e.g., Maria Veronica Santelices & Mark Wilson, Unfair Treatment?: The Case of Freedle, the SAT, and the Standardization Approach to Differential Item Functioning, 80 Harv. Educ. Rev. 106 (2010); William T. Dickens & Thomas J. Kane, Racial Test Score Differences as Evidence of Reverse Discrimination: Less Than Meets the Eye, 38 Indus. Rel. 331 (1999).

[36] These disparities would exist even in the extreme (but counterfactual) case of a university admitting students in rank order based *solely* on their SAT scores.  *See* Goodwin Liu, *The Causation Fallacy: Bakke and the Basic Arithmetic of Selective Admissions*, 100 Mich. L. Rev. 1045, 1064 (2002).

[37] William C. Kidder, *Misshaping the River: Proposition 209 and Lessons for the Fisher Case* 39 J.C. & U.L. 53, 95 (2013).  The College Board, which created the SAT, has itself acknowledged this phenomenon.  *See* Jennifer L. Kobrin et al., *A Historical View of Subgroup Performance Differences on the SAT Reasoning Test* 19 (The College Board 2007), *available at* http://research.collegeboard.org/sites/default/files/ publications/2012/7/researchreport-2006-5-historical-view-subgroup-performance-sat.pdf (finding that score gaps between different racial groups have "remained generally consistent" for 20 years).

[38] *Compare* SFFA Br. at 36 ("Those traits are, of course, better grades, better test scores, better scores on AP exams, and greater participation in extracurricular

might therefore result from socioeconomic disparities.[39]   Highlighting the on-average higher performance of Asian Americans in academic scoring also fails to account for the bimodal distribution of SAT scores among Asian Americans. Asian Americans have the widest distribution in standardized test scores and a higher standard deviation than white students.[40]   "Whites have a normal distribution that is consistent with how scores are distributed from the mean for other racial groups.  Asian Americans have a higher representation at the top scores, lower representation among middle-range scores, and higher representation among lower scores."[41]   Thus, a comparison between the mean SAT scores of whites compared to Asian Americans does not fully convey the distribution of SAT scores across those populations.

---

activities.") *with id*. at 60 ("Harvard also knows that SAT scores would dip under SFFA's proposal not because low-income students are less academically gifted, but because wealthy students likely have advantages that allow them to perform better on standardized tests.").

[39] *See* Jay Rosner, Disparate Outcomes by Design: University Admissions Test, 12 Berkeley La Raza L.J. 377, 383-84 (2001); Sigal Alon & Marta Tienda, Diversity, Opportunity, and the Shifting Meritocracy in Higher Education, 72 Am. Soc. Rev. 487, 490-91 (2007).

[40] *See* Robert T. Teranishi et al., Heterogeneity among Asian Americans: Implications for Using Standardized Test Scores to Estimate Discriminatory College Admissions Practices, CARE (Nov. 2015).

[41] *Id.*

Moreover, SAT scores are a poor proxy for the comparative merit of applicants because, inter alia, the SAT scores of minority students are tainted by what social scientists describe as "stereotype threats."[42]  "[A]ctivating negative stereotypes about a social identity one possesses motivates individuals to try to combat that stereotype but that this creates some sort of extra situational burden that interferes with the ability to perform as well at a task as might otherwise be possible."[43]  For example, when told questions are designed to test their intellectual ability, African American students perform worse than their white peers, but this gap diminishes when the students are told the same questions are non-diagnostic.[44] For this reason, SAT scores cannot be the whole story when evaluating potential students.[45]  A college or university like Harvard seeking to admit students with the

---

[42] Stereotype threat is a phenomenon whereby individuals fear confirming negative stereotypes of their racial or ethnic group and that fear hurts their performance. *See* T. Schmader et al., *An Integrated Process Model of Stereotype Threat Effects on Performance*, 115 Psychol. Rev. 336, 336 (2008) ("[A] large body of work now testifies to the reliability and generalizability of stereotype threat effects on performance.").

[43] *Id.*

[44] *Id.* at 336-337.

[45] Stereotype threats also harm the performance of students once enrolled in college.  *See* J. Owens and D.S. Massey, *Stereotype Threat and College Academic Performance: A Latent Variables Approach*, 40 Soc. Sci. Res. 150 (2011). Increased diversity minimizes the effect.  *See* V. Purdie-Vaughns et al., *Social Identity Contingencies: How Diversity Cues Signal Threat or Safety for African Americans in Mainstream Institutions*, 94 J. Pers. Soc. Psychol. 615 (2008).

most potential must look beyond standardized test scores and consider the whole applicant, including whether other factors (e.g. race-based stereotyping) may have affected those scores.

### C.   SFFA's Assumed Bias in the Personal Score is Not Supported by the Data.

SFFA concludes that Harvard intentionally discriminates against Asian American applicants because Asian Americans receive the lowest average score in the personal category, despite higher than average scores in other areas evaluated in the admissions process (mainly, the academic score).  SFFA Br. at 7-9.  A key element of this argument is SFFA's contention that Harvard employs the qualitative elements of the personal category to effectuate a stereotypical view of Asian American applicants.  SFFA suggested throughout the trial that the personal category is a pretext for making judgments about a student's personality, and that Asian American students' lower-than-average scores in this category reveal that routine bias or stereotyping occurs when Harvard calculates personal scores for Asian Americans candidates.  JA2448:10-17, JA3531:6-16.

SFFA bolsters this contention with the assumption that high scores in the academic and extra-curricular categories should predict similarly high scores in the personal category.  SFFA offers no support for its perplexing assumption that a student's GPA is indicative of their personal qualities.  The academic and personal

scores capture separate variables for several factors, and SFFA ignores the fact that the academic category also includes qualitative criteria. For these reasons, SFFA's challenge based on the personal category is without merit.

The academic rating category includes a number of qualitative criteria such as criteria scored by Harvard admissions officers (the applicant's high school's characteristics, high school's curriculum, and academic prizes), Harvard faculty members (appraisals of the student's work), and the applicant's high school teachers and counselors (letters of recommendation). JA941:13-JA942:11. After considering the various criteria, the admission officer then assigns an overall numerical value to the category, an exercise based on judgment and not a formula. JA1137:11-15; JA1248:14-JA1249:2. It is illogical and unreasonable to assume that if Harvard were engaged in negative action, it would by design use qualitative factors to disfavor Asian Americans in the personal category, but use qualitative factors to favor them in the academic category. SFFA has repeatedly chosen not to address this point, insisting instead that the "traits" that make Asian American applicants likely to score well in the academic rating are "better grades, better test scores, [and] better scores on AP exams." SFFA Br. at 36. SFFA's response both camouflages the qualitative factors Harvard includes in the academic score and erases the attributes that go beyond mere scores and grades that Harvard considers valuable when scoring applicants highly in this category.

27

Furthermore, the personal category itself goes well beyond a mere look at an applicant's personality. JA990:1-25; JA1425:24-JA1426:17; JA2032:13-JA2036:6. In order to evaluate a student's potential contributions to the Harvard community and beyond, Harvard staff evaluate each applicant by identifying characteristics such as leadership, determination, and compassion, and collect information contained in teacher and guidance counselor recommendations, letters from other recommenders designated by the student, alumni interviews, and the student's personal statement. Contrary to SFFA's arguments, this is not a "cold record" far removed from the person seeking admission. In fact, Harvard's holistic approach and varied criteria helps paint a multi-dimensional picture of each student, as viewed through the eyes of those familiar with their achievements, neutral third parties, and the students themselves.

SFFA makes much of its argument that, while the overall score is the only admissions numerical where race is directly identified as a potentially relevant factor, race may still influence the other score categories, including the personal score. This practice, SFFA argues, disproportionately inflicts bias in the personal score and negatively affects the admissions rates of Asian American candidates. Testimony at trial demonstrated, however, that Harvard does not act intentionally either to solicit or consider a candidate's race in assigning a personal score. Instead, race comes up organically, as it is often a critical part of a

candidate's lived experiences and therefore necessary to comprehensively evaluate the qualities exemplified by the student.  For example, a Black candidate's attendance at a historically segregated high school might be considered in the student's academic score, the same way a Vietnamese immigrant's personal statement would naturally cause that candidate's race to influence the personal score.  *See* JA2676:19-JA2677:3, JA2730:10-JA2731:1.  Elimination of these considerations would only serve to sanitize the relevant life experiences Harvard's holistic admissions process seeks to identify and harm the many Asian American candidates, particularly those from underrepresented subgroups, who benefit from the consideration of race.

AALDEF and its co-Amici are well aware and disturbed by the history of discriminatory admission policies, particularly at elite private universities, affecting Jewish applicants, Black applicants, Asian Americans, women, and others.  The undersigned amici would vigorously oppose any cap, quota, bias, or other kind of negative action, formal or informal, affecting Asian Americans or any other group.  This record, however, does not support such a finding.

## CONCLUSION

For the reasons stated above, AALDEF and its co-Amici therefore urge this Court to affirm the judgment below.

Dated: May 21, 2020

Respectfully submitted,

*/s/ Madeleine K. Rodriguez*

Dean Richlin
Hemmie Chang
Sarah Burg
Madeleine K. Rodriguez
Rachel Hutchinson
Jacqueline Chávez
FOLEY HOAG LLP
155 Seaport Boulevard
Boston, MA 02210
Tel: 617- 832-1000
Fax: 617-832-7000
drichlin@foleyhoag.com
hchang@foleyhoag.com
sburg@foleyhoag.com
mrodriguez@foleyhoag.com
rhutchinson@folehoag.com
jchavez@foleyhoag.com

Kenneth Kimerling
ASIAN AMERICAN LEGAL DEFENSE
AND EDUCATION FUND
99 Hudson Street, 12th Floor
New York, NY  10013-2815
Tel: (212) 966-5932
kkimerling@aaldef.org

*Counsel for Asian American Legal
Defense and Education Fund, et al.*

30

## <u>CERTIFICATE OF COMPLIANCE</u>

This brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7) because this brief contains 6,500 words.

This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32 (a)(6) because this brief has been prepared in a proportionally spaced typeface using Microsoft Word 2016 in 14-point Times New Roman Font.

Dated:  May 21, 2020                     */s/ Madeleine K. Rodriguez*
                                        Madeleine K. Rodriguez

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on May 21, 2020 I electronically filed the foregoing document with the United States Court of Appeals for the First Circuit by using the CM/ECF system. I certify that this document filed through the CM/ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing.

*/s/ Madeleine K. Rodriguez*
Madeleine K. Rodriguez

# ADDENDUM – LIST OF *AMICI CURIAE*

<u>Organizational Entities</u>

**18MillionRising.org (18MR.org)** brings many disparate Asian American communities together online and offline to reimagine Asian American identity with nuance, specificity, and power. We are using this Asian American identity as the foundation to build a more just and creative world where our experiences are affirmed, our leadership is valued, and all of us have the opportunity to thrive.

The **Asian American Federation (AAF)** is a pan-Asian nonprofit leadership organization that represents and supports a network of nearly 70 Asian American community service organizations in New York City that work in health and human services, education, economic development, civic participation, and social justice. AAF's mission is to raise the influence and well-being of the pan-Asian American community through research, policy advocacy, public awareness, and organizational development.

The **Asian American Psychological Association** aims to promote the mental health and wellbeing of Asian Americans and Pacific Islanders across the United States.

**Asian American Students in Action** is the political organizing group for Asian American students at Williams College. We aim to both foster a sense of community amongst our members and mobilize that community in political action. In the spirit of the activism that has enabled our access to higher education, we are committed to facilitating and fortifying the role of Asian Americans in forwarding racial justice.

**Asian American Youth Leadership Empowerment and Development (AALEAD)** supports low-income and underserved Asian Pacific American youth with educational empowerment, identity development, and leadership opportunities through after school, summer, and mentoring programs.

Founded in 1985, the mission of **Asian Americans United** is to build leadership in Asian American communities to build neighborhoods and unite against oppression. AAU has worked in Philadelphia's Asian American communities and in broader multiracial coalitions around quality education,

A1

youth leadership, anti-Asian violence, immigrant rights, and folk arts and cultural maintenance.

The **Asian Law Alliance** is a non-profit law office founded in 1977 by law students from Santa Clara University School of Law. ALA's mission is to provide equal access to the justice system to Asian and Pacific Islanders and low-income residents of Santa Clara County, California. ALA provides legal services in the areas of public benefits, civil rights, domestic violence, landlord and tenant law and immigration law.

Founded in 1992, the **Asian Pacific American Labor Alliance (APALA)**, AFL-CIO, is the first and only national organization of Asian American and Pacific Islander (AAPI) workers, most of whom are union members, and our allies advancing worker, immigrant and civil rights.

The **Asian Pacific American Women Lawyers Alliance (APAWLA)** is an organization that promotes inclusion, empowerment and advancement of Asian Pacific American women in the legal profession. APAWLA is devoted to advocating, educating, mentoring, networking, and developing leadership within the profession and larger community. APAWLA members work in solo practices, law firms, state and federal courts; as prosecutors, defenders and civil practitioners; and in non-profits and government agencies; and, inspired by the great movement for Civil Rights, APAWLA shares a common goal of gender and racial equality.

**Asian Pacific Islander Americans for Civic Empowerment** envisions a just, inclusive, and progressive Washington State with racial, political, and economic equity for all people, including AAPIs. APACE expands democracy by identifying and removing barriers that prevent AAPIs from full civic engagement. We create pathways that educate and mobilize our diverse communities to take civic action across Washington State.

**Chinese for Affirmative Action** is a community-based civil rights organization in San Francisco.  The mission of the organization is to protect the political and civil rights of Chinese Americans and to advance multi-racial democracy in the United States.

Founded in 1972, the **Chinese Progressive Association** educates, organizes and empowers the low income and working class immigrant Chinese community in San Francisco to build collective power with other oppressed

communities to demand better living and working conditions and justice for all people.

**Coalition for Asian American Children & Families** is the nation's only pan-Asian children's advocacy organization. CACF improves the health and well-being of Asian Pacific American children, youth, and families in New York City by providing programs and policy campaigns that challenge stereotypes of the "Asian model minority"; speaking out on behalf of families in-need, especially immigrants struggling with poverty and limited English skills; and advocating for better policies, funding, and access to services at the city and state level.

**Coalition of Asian American Leaders (CAAL)** is a social justice network of over 3,000 Asian Minnesotan leaders who harness our collective power by connecting, learning, and acting together to improve the lives of community. We center our work on those who are most impacted by injustices and systemic inequities by working across sectors, generations and ethnicities to create shared agendas that we mobilize around to ensure every community is seen and included, and that they have access and power to participate in shaping the decisions that impact their lives.

**GAPIMNY** is an all-volunteer, membership-based community organization that empowers queer and transgender Asian Pacific Islander people in the greater New York metropolitan area. GAPIMNY is committed to advancing racial justice and LGBTQ rights for intersectionally marginalized communities, and supports affirmative action as a policy that equalizes opportunity.

The **Japanese American Citizens League**, founded in 1929, is a national organization whose ongoing mission is to secure and maintain the civil rights of Japanese Americans and all others who are victimized by injustice and bigotry. The leaders and members of the JACL also work to promote cultural, educational and social values and preserve the heritage and legacy of the Japanese American community.

**LEAP (Leadership Education for Asian Pacifics)** is a national, nonprofit organization, with a mission to achieve full participation and equality for Asian and Pacific Islanders (APIs) through leadership, empowerment, and policy.

The **National Coalition for Asian Pacific American Community Development (National CAPACD – pronounced "capacity")** is a coalition of more than 100 local organizations that advocate for and organize in low-income AAPI communities to further the economic and social empowerment of low income AAPIs and equitable development of AAPI neighborhoods. We strengthen and mobilize our members to build power nationally and further our vision of economic and social justice for all.

The **National Korean American Service & Education Consortium**'s mission is to organize Korean and Asian Americans to achieve social, racial and economic justice. Founded in 1994 by local community-based organizations, NAKASEC's affiliates are the Korean Resource Center (southern California), HANA Center (greater Chicago) and NAKASEC VA (northern Virginia).

The **National Queer Asian Pacific Islander Alliance (NQAPIA)** is a federation of lesbian, gay, bisexual, and transgender (LGBT) Asian American, South Asian, Southeast Asian, and Pacific Islander (AAPI) organizations. We seek to build the organizational capacity of local LGBT AAPI groups, develop leadership, promote visibility, educate our community, enhance grassroots organizing, expand collaborations, and challenge anti-LGBTQ bias and racism.

**OCA - Asian Pacific American Advocates** is a national Asian American and Pacific Islander civil rights organization dedicated to advancing the economic, political, and social well-being of AAPIs. Through its chapters, OCA works to ensure that minority and low-income students have equal and equitable access to educational opportunities and experiences.

**South Asian Americans Leading Together (SAALT)** is a national, nonpartisan, non-profit organization that fights for racial justice and advocates for the civil rights of all South Asians in the United States. We fulfill our mission by advocating for just and equitable public policies at the national and local level; strengthening grassroots South Asian organizations as catalysts for community change; informing and influencing the national dialogue on trends impacting our communities.

**Southeast Asia Resource Action Center (SEARAC)** is the only national civil rights organization devoted to empowering and uplifting the Southeast Asian American community. We represent the largest community of refugees

ever to be resettled to America from the countries of Cambodia, Laos, and Vietnam, and we work mindfully in solidarity with other communities of color and social justice movements.

Individuals

(Titles and institutional affiliations provided for identification purposes only)

**Stewart Chang**
Professor of Law
William S. Boyd School of Law
University of Nevada, Las Vegas

**Ming Hsu Chen**
Associate Professor of Law and Political Science
University of Colorado Boulder

**Vichet Chhuon**
Associate Professor, Department of Curriculum and Instruction
Faculty, Asian American Studies Program
University of Minnesota-Twin Cities

**Gabriel J. Chin**
Edward L. Barrett Jr. Chair and Martin Luther King Jr. Professor of Law
University of California, Davis School of Law

**Emily M.S. Houh**
Gustavus Henry Wald Professor of the Law and Contracts
Co-Director, Center for Race, Gender, and Social Justice
University of Cincinnati College of Law

**Marina Hsieh**
Senior Fellow and Faculty Director of Diversity
Santa Clara University School of Law

**Tarry Hum**, MCP, PhD
Professor and Chair, Department of Urban Studies
Queens College CUNY

**Lisa C. Ikemoto**
Martin Luther King, Jr. Professor
University of California, Davis School of Law

**Anil Kalhan**
Professor of Law
Drexel University Thomas R. Kline School of Law

**Pauline T. Kim**
Daniel Noyes Kirby Professor of Law
Co-Director, Center for Empirical Research in the Law
Washington University School of Law

**Shirley Lin**
Acting Assistant Professor Lawyering Program
New York University School of Law

**Shirley Lung**
Professor of Law
City University of New York School of Law

**Mari J. Matsuda**
Professor of Law
William S. Richardson School of Law
University of Hawai'i at Manoa

**Kevin Nadal**, PhD
Professor of Psychology
City University of New York

**Philip Tajitsu Nash**
Lecturer, Asian American Studies Program and Latin American Studies
Center
University of Maryland at College Park

**Natsu Taylor Saito**
Distinguished University Professor and Professor of Law
Georgia State University College of Law

**Cathy J. Schlund-Vials**
Professor of English and Asian/Asian American Studies
College of Liberal Arts and Sciences
University of Connecticut

**John Kuo Wei Tchen**
Inaugural Clement A. Price Chair of Public History and Humanities
Rutgers University - Newark

**Scott Wong**
Charles R. Keller Professor of History
Williams College

**Margaret Y.K. Woo**
Associate Dean for Research & Interdisciplinary Education
Northeastern University School of Law

**K. Wayne Yang**
Provost, John Muir College
Professor, Ethnic Studies
University of California, San Diego