No. 19-2005

## UNITED STATES COURT OF APPEALS
## FOR THE FIRST CIRCUIT

————

STUDENTS FOR FAIR ADMISSIONS, INC.,
*Plaintiff-Appellant,*

*v.*

PRESIDENT AND FELLOWS OF HARVARD COLLEGE
*Defendant-Appellee.*

————

**On Appeal from the United States District Court
for the District of Massachusetts**

————

**AMICUS BRIEF OF BROWN UNIVERSITY,
COLUMBIA UNIVERSITY, CORNELL UNIVERSITY,
DARTMOUTH COLLEGE, DUKE UNIVERSITY,
EMORY UNIVERSITY, JOHNS HOPKINS UNIVERSITY,
MASSACHUSETTS INSTITUTE OF TECHNOLOGY,
PRINCETON UNIVERSITY, STANFORD UNIVERSITY,
UNIVERSITY OF CHICAGO, UNIVERSITY OF
PENNSYLVANIA, VANDERBILT UNIVERSITY,
WASHINGTON UNIVERSITY IN ST. LOUIS, AND
YALE UNIVERSITY IN SUPPORT OF APPELLEE**

————

MATTHEW S. HELLMAN
ISHAN K. BHABHA
JENNER & BLOCK LLP
1099 New York Avenue, NW
Suite 900
Washington, DC 20001-4412
+1 202 639 6000 (telephone)
+1 202 639 6066 (facsimile)
Mhellman@jenner.com

## TABLE OF CONTENTS

TABLE OF AUTHORITIES.................................................................. ii

CORPORATE DISCLOSURE STATEMENT ............................................. iv

STATEMENT OF INTEREST AND INTRODUCTION ...........................1

ARGUMENT..........................................................................................3

I.   Student Body Diversity Is Essential to Achieving *Amici's* Educational Missions..........................................................................3

II.  Individualized, Holistic Evaluation of Applications, with Consideration of Race, Is Necessary to Achieve the Benefits of Diversity. ........................................................................................8

     A.   Holistic Review of Individual Applications Enables *Amici* to Consider How Each Individual Student Can Contribute to the Diversity of the Student Body.............................................8

     B.   Facially Race-Neutral Approaches to Admissions Do Not Provide *Amici* with a Meaningful Alternative for Obtaining a Diversity Student Body.............................................13

III. It Would Be an Extraordinary Intrusion into *Amici's* Operations to Mandate the Use of One Particular Method of Selection, or Prohibit All Consideration of Race in the Admissions Process. .........17

CONCLUSION .....................................................................................22

# TABLE OF AUTHORITIES

CASES

*Doe v. St. Francis School District*, 694 F.3d 869 (7th Cir. 2012) .................20

*Fisher v. University of Texas at Austin*, 570 U.S. 297 (2013)..............9, 18, 21

*Fisher v. University of Texas at Austin*, 136 S. Ct. 2198 (2016)........................................................................4, 5, 7, 13, 18

*Gratz v. Bollinger*, 539 U.S. 244 (2003) .............................................................21

*Grutter v. Bollinger*, 539 U.S. 306 (2003)........................................*passim*

*Parents Involved in Community Schools v. Seattle School District Number 1*, 551 U.S. 701 (2007) .............................11, 15, 19

*Regents of University of California v. Bakke*, 438 U.S. 265 (1978)....................................................................................4, 19

*Regents of University of Michigan v. Ewing*, 474 U.S. 214 (1985).......................................................................................... 19-20

*University of Pennsylvania v. EEOC*, 493 U.S. 182 (1990)..........................19

*Wynne v. Tufts University School of Medicine*, 932 F.2d 19 (1st Cir. 1991) ........................................................................................20

OTHER AUTHORITIES

Brief of the President and the Chancellors of the University of California as *Amici Curiae* in Support of Respondents, *Fisher v. University of Texas at Austin*, 136 S. Ct. 2198 (2016) (No. 14-981), 2015 WL 6735847........................................................14, 16

Martha Minow, *After* Brown: *What Would Martin Luther King Say?*, 12 Lewis & Clark L. Rev. 599 (2008) ........................................... 14-15

Adriane Kayoko Peralta, *A Market Analysis of Race-Conscious University Admissions for Students of Color*, 93 Denv. L. Rev. 173 (2015) ...............................................................................16

*What Yale Looks For*, Yale College Undergraduate Admissions, https://admissions.yale.edu/what-yale-looks-for (last visited May 20, 2020) ..................................................................................9

## CORPORATE DISCLOSURE STATEMENT

Pursuant to Federal Rule of Appellate Procedure 26.1, *Amici* state that they are all institutions of higher education.  None of *Amici* have any parent corporation, and there is no publicly-held corporation that has a 10% or greater ownership interest in any of the institutions.

## STATEMENT OF INTEREST AND INTRODUCTION[1]

*Amici* Brown University, Columbia University, Cornell University, Dartmouth College, Duke University, Emory University, Johns Hopkins University, Massachusetts Institute of Technology, Princeton University, Stanford University, University of Chicago, University of Pennsylvania, Vanderbilt University, Washington University in St. Louis, and Yale University are American institutions of higher education. *Amici* have longstanding admissions policies similar to those that the Supreme Court upheld in *Grutter v. Bollinger*, 539 U.S. 306 (2003). Accordingly, *Amici* have substantial experience with admissions policies that consider an applicant's background and experience, including the applicant's racial or ethnic background.

*Amici* speak with one voice to emphasize the profound importance of a diverse student body for their educational missions. The diversity that *Amici* seek in their admissions policies is nuanced and multifaceted, and it

---

[1] Under Federal Rule of Appellate Procedure 29(a)(2), counsel for the *Amici* state that all parties have consented to the filing of this brief.

Under Federal Rule of Appellate Procedure 29(a)(4)(E), counsel for the *Amici* state that no counsel for a party authored this brief in whole or in part, no counsel or party made a monetary contribution intended to fund the preparation or submission of this brief, and no person other than the Amici or their counsel made a monetary contribution for its preparation or submission.

encompasses a diversity of perspectives, experiences, goals, backgrounds, races, ethnicities, and interests. *Amici* strive to enroll a diverse student body because *Amici* have found that doing so significantly deepens students' educational experience. Diversity encourages students to question their own assumptions, to test received truths, and to appreciate the complexity of the modern world. This larger understanding prepares *Amici*'s graduates to pursue innovation in every field, to be active and engaged citizens equipped to wrestle with the great questions of the day, and to expand humanity's learning and accomplishment.

The record below confirms what *Amici* know to be true based on decades of experience: that individualized and holistic review of applications is the best means that universities can employ to achieve meaningful diversity. *Amici* consider race and ethnicity as one factor among many in order to better understand each applicant and the contributions each applicant might make to the university environment. The appellant here contends that holistic review should be conducted without regard to race, but it is artificial to consider an applicant's experiences and perspectives while turning a blind eye to race. For many applicants their race has

influenced, and will continue to influence, their experiences and perspectives.

A decision by this Court forbidding all consideration of race in the admissions process would compromise *Amici*'s efforts to attain diverse student bodies, and it would be inconsistent with the letter and spirit of the Supreme Court's jurisprudence, which has for decades upheld holistic admissions policies like *Amici*'s.  In light of the momentous interests at stake, *Amici* urge the court to affirm the right of educational institutions to structure admissions programs that appropriately consider race and ethnicity within the context of an individualized and holistic review.

## ARGUMENT

### I.     Student Body Diversity Is Essential to Achieving *Amici's* Educational Missions.

The Supreme Court has long recognized that universities "ha[ve] a compelling interest in attaining a diverse student body."  *Grutter v. Bollinger*, 539 U.S. 306, 328 (2003).  In the Court's most recent statement on the subject, the Court agreed with the University of Texas's argument that a diverse student body "provid[es] an academic environment that offers a robust exchange of ideas, exposure to differing cultures, preparation for the challenges of an increasingly diverse workforce, and acquisition of

competencies required of future leaders." *Fisher v. Univ. of Tex. at Austin*, 136 S. Ct. 2198, 2211 (2016) (hereinafter *Fisher II*) (internal quotation marks omitted).

Decades of experience with admissions policies have convinced *Amici* that a diverse student body provides irreplaceable value to the quality of their students' education. *Amici* strive for the type of student body diversity that "encompasses a ... broad[] array of qualifications and characteristics of which racial or ethnic origin is but a single though important element." *Regents of Univ. of Cal. v. Bakke*, 438 U.S. 265, 315 (1978) (opinion of Powell, J.). Enrolling a diverse student body "promotes cross-racial understanding, helps to break down racial stereotypes, and enables students to better understand persons of different races," while also "promot[ing] learning outcomes" and "better prepar[ing] students for an increasingly diverse workforce and society." *Grutter*, 539 U.S. at 330 (internal quotation marks and alterations omitted). The admissions policies of *Amici* vary somewhat, but they share a common commitment to the basic principle that student body diversity is one of those "intangible 'qualities which are incapable of objective measurement but which make for

greatness.'" *Fisher II*, 136 S. Ct. at 2214 (quoting *Sweatt v. Painter*, 339 U.S. 629, 634 (1950)).

Essential to the educational missions of *Amici* is a commitment to "prepar[e] students for work and citizenship," a core component of which is "exposure to widely diverse people, cultures, ideas, and viewpoints." *Grutter*, 539 U.S. at 330, 331. *Amici* embrace diversity as a key part of their educational missions because they recognize that diversity promotes a more robust spirit of free inquiry and encourages students and faculty to engage in dialogue that results in the creation and dissemination of knowledge. Diversity enlivens classroom discussions by exposing students and teachers to new perspectives and experiences that challenge pre-existing expectations. In doing so, it broadens the range of intellectual endeavors and sharpens the rigors of academic enterprise. *Amici*'s intellectual communities grow stronger when students, faculty, and administrators are able to engage with a meaningful variety of ideas and perspectives; enrolling a diverse student body is critical to this goal. As the court below found, "[t]he evidence at trial was clear that a heterogeneous student body promotes a more robust academic environment with a greater depth and

breadth of learning, encourages learning outside the classroom, and creates a richer sense of community." ADD6-7.

For *Amici*, diversity benefits the student body both inside and outside the classroom. *Amici* aim to create an environment in which students learn as much from one another outside the classroom as within. A student's immersion in a diverse community is a unique and irreplaceable benefit, one that transforms all aspects of university life into opportunities for students to collaborate with—and learn from—people whose backgrounds, experiences, and perspectives are different from their own.

As Ruth Simmons, former president of *Amicus* Brown University, testified in the proceedings below, "we know that difference is one of the primary means for students to test themselves, to test their background, to test their ideas, to challenge assumptions. And in that context, it is in coming in contact with difference that we tend to deepen our learning." JA2774:8-12. *Amici* take seriously the educational benefits that result from "having different students live on your hallway, encountering different students who come from backgrounds that are so different from yours that you have no choice but to learn about the complexity of the world that you're going into when you graduate." JA2774:25-JA2775:5.

*Amici*'s admissions policies are based on the principle that in a free society, inquiry proceeds best when views and goals must withstand examination from the widest possible range of perspectives. *Amici*'s experiences bear this out: a student body that is diverse in many dimensions, including racial and ethnic background, produces enormous educational benefits. Like the University of Texas and Harvard, *Amici* seek the type of diversity that "provid[es] an educational setting that fosters cross-racial understanding, provid[es] enlightened discussion and learning, [and] prepar[es] students to function in an increasingly diverse workforce and society." *Fisher II*, 136 S. Ct. at 2211 (quotation marks omitted). Such diversity significantly improves the quality of students' educational experiences by leading them to examine themselves and confront their tenets from many different points of view. It also prepares them for life, work, and leadership in a nation and world that are constantly facing new challenges. Indeed, as Justice O'Connor wrote in *Grutter*, "[i]n order to cultivate a set of leaders with legitimacy in the eyes of the citizenry, it is necessary that the path to leadership be visibly open to talented and qualified individuals of every race and ethnicity." *Grutter*, 539 U.S. at 332.

7

In short, for many students, a university may be the first place in which they are exposed to others whose experiences, opinions, faiths, and backgrounds differ markedly from their own. Through that exposure, students are encouraged to question their own assumptions and biases and to appreciate the full texture of our society and our world. That is why the court below found that it was "axiomatic" that "diversity of all sorts, including racial diversity, is an important aspect of education." ADD6.

II. **Individualized, Holistic Evaluation of Applications, with Consideration of Race, Is Necessary to Achieve the Benefits of Diversity.**

A. **Holistic Review of Individual Applications Enables *Amici* to Consider How Each Individual Student Can Contribute to the Diversity of the Student Body.**

Under *Grutter* and *Fisher II*, individualized and holistic review of university applications is an appropriately narrowly tailored mechanism for taking into account racial and ethnic origin in support of the compelling interest in enrolling a diverse student body. Individualized and holistic consideration of each applicant presents universities the opportunity to evaluate all of the characteristics that determine that applicant's expected contributions to campus diversity. In both ambition and operation, such individualized and holistic review adheres to the Supreme Court's directive

8

that admissions processes "ensure that each applicant is evaluated as an individual and not in a way that makes an applicant's race or ethnicity the defining feature of his or her application." *Fisher v. Univ. of Tex. at Austin*, 570 U.S. 297, 309 (2013) (hereinafter *Fisher I*) (quoting *Grutter*, 539 U.S. at 337).

By design, *Amici's* admissions programs are "flexible enough to consider all pertinent elements of diversity in light of the particular qualifications of each applicant." *Grutter*, 539 U.S. at 334 (quotation marks omitted). In an effort to ensure that all applicants are examined on their individual merits, *Amici* engage in holistic reviews that consider a wide range of detail regarding each applicant. *Amici* obtain and review extensive information regarding each applicant's life experiences, accomplishments, talents, interests, and goals, to assess both the applicant's academic potential and the contribution the applicant may make to the class as a whole. *See, e.g.*, *What Yale Looks For*, Yale College Undergraduate Admissions, https://admissions.yale.edu/what-yale-looks-for (last visited May 20, 2020) ("As we carefully and respectfully review every application, two questions guide our admissions team: 'Who is likely to make the most of Yale's resources?' and 'Who will contribute most significantly to the Yale

9

community?'"). To best accomplish these goals, *Amici* have designed their application processes to allow—indeed, encourage—applicants to provide any information about themselves that the applicant thinks relevant. *Amici* proceed from an understanding that for many applicants, factors such as socioeconomic status, religion, and race may well be formative of worldviews that help challenge settled assumptions and generate new insights into society's most vexing problems.

As a result, *Amici* consider a wide range of race-neutral factors in seeking to compose broadly diverse and excellent student bodies. For example, *Amici* review applicants' socioeconomic background, parental education level, and whether languages other than English are spoken in the home. They consider the applicants' demonstrated leadership skills, their recommenders' assessment of their achievements and character, and all the other intangible characteristics that are crucial to ascertaining how an applicant will contribute to the university community. These admissions policies "weigh[] many other diversity factors besides race that can make a real and dispositive difference" for applicants of all races and ethnicities, "sufficiently tak[ing] into account, in practice as well as in theory, a wide

variety of characteristics besides race and ethnicity that contribute to a diverse student body." *Grutter*, 539 U.S. at 338-39.

These admissions reviews also consider the racial and ethnic backgrounds of applicants as "one factor among many." *Id.* at 340. Consistent with *Grutter* and *Fisher II*, *Amici*'s consideration of race and ethnicity does not "make[] race or ethnicity the defining feature of the application." *Id.* at 309. No seats in the class are reserved for applicants of any race or ethnic background, nor are applicants of any race or background limited to a certain number of places. Instead, *Amici* consider applicants' races and ethnicities with extraordinary care and only in the most limited fashion necessary to ensure a meaningful contribution to the diversity of their student bodies.

*Amici* take race into consideration because they understand that "the reality is that" "race [does] matter[]." *Parents Involved in Cmty. Sch. v. Seattle Sch. Dist. No. 1*, 551 U.S. 701, 787 (2007) (Kennedy, J., concurring in part and concurring in the judgment); *accord Grutter*, 539 U.S. at 332-33. To say that race continues to matter is to acknowledge forthrightly that for many reasons race continues to influence the backgrounds, perspectives, and experiences of many in our society, including *Amici*'s students.

11

Unsurprisingly, race and ethnic background may significantly impact applicants' experiences, perspectives, and areas of accomplishment. Under the admissions policies of *Amici,* no applicant is excluded from discussing how their race or ethnicity has influenced their interests, goals, and experiences. Instead, *Amici* leave to applicants themselves the decision of whether to invoke those identities as formative of a particular worldview, and *Amici* evaluate the relevance of those experiences in conjunction with other formative factors, like socioeconomic status. Such a flexible system of individualized and holistic review allows *Amici* to identify applicants who will contribute most significantly to *Amici*'s respective communities.

In *Amici*'s educational judgment, based on decades of experience, individualized and holistic review provides the most effective path toward ensuring that life on campus is enriched by a community that encompasses a diversity of backgrounds, perspectives, and interests. That review is intended to produce a student body that is talented and diverse in many ways, including in intellectual interests, goals, geographic origin, socioeconomic status, background and experience (including race and ethnicity), perspective, and areas of accomplishment.

**B.    Facially Race-Neutral Approaches to Admissions Do Not Provide *Amici* with a Meaningful Alternative for Obtaining a Diversity Student Body.**

Race-neutral approaches to admissions decisions do not provide *Amici* with "workable means" to attain "the benefits of diversity" they seek. *Fisher II*, 136 S. Ct. at 2212-13. Universities are not required to adopt race-neutral or race-blind means if they determine that such means "may preclude the university from conducting the individualized assessments necessary to assemble a student body that is not just racially diverse, but diverse along all the qualities valued by the university." *Grutter*, 539 U.S. at 340. Such is the case here: were *Amici* to adopt exclusively race-neutral means, they would no longer be able to pursue effectively the attainment of the type of diversity that advances their educational missions.

The record below bears this out. The district court found that the record "convincingly establish[ed] that no workable race-neutral alternatives [would yield] the level of racial diversity … necessary" to achieve Harvard's educational goals. ADD83. In particular, the record showed that the race-neutral alternatives proposed by appellant would lead to a near 33% reduction in the number of African-American students admitted, absent other admission policy changes that would "result in a

13

significant decline in the strength of Harvard's admitted classes across multiple dimensions, including its potential for academic and scholarly achievement." *Id.* at ADD92.

Those findings are consistent with the experiences of other institutions that have adopted race-blind admissions. For instance, the University of California's most selective campuses have been unable to attain the type of student body diversity that enriches students' educational experiences since the University system was barred from considering race in university admissions after Proposition 209 passed in 1997. As the President and the Chancellors of the University of California explained in an *amicus* brief filed in *Fisher II*, despite the implementation of numerous race-neutral approaches aimed at boosting minority representation, "the enrollment rates for underrepresented minorities still have not rebounded at UC's most selective campuses" since 1997, and "the overall enrollment figures at UC have not kept pace with the demographic changes in California." Br. of the President and the Chancellors of the Univ. of Cal. as *Amici Curiae* in Supp. of Resp's at 22, *Fisher v. Univ. of Tex. at Austin*, 136 S. Ct. 2198 (2016) (No. 14-981), 2015 WL 6735847; *see also* Martha Minow, *After* Brown: *What Would Martin Luther King Say?*, 12 Lewis & Clark L.

Rev. 599, 636 & n.192 (2008) (collecting studies showing that reliance on socioeconomic status as an admissions factor alone cannot produce racial diversity).

The harms of a "race-blind" holistic review cannot be fully captured by the numbers; a "race-blind" version of holistic review would defeat the purpose of a truly individualized assessment of an applicant. The central purpose of *Amici's* approach to admissions is to understand each applicant as a multifaceted individual, with unique talents, experiences, and opinions. It would be entirely antithetical to this approach to ignore a facet of an applicant's identity that, for a number of applicants, will play an essential role in shaping his or her outlook and experience. To state the obvious, a person's race often plays a role in shaping personal identity, *see Parents Involved*, 551 U.S. at 787 (Kennedy, J., concurring in part and concurring in the judgment), and a categorical bar on its consideration would severely hinder *Amici*'s ability to consider each individual applicant on his or her own terms. All applicants get the opportunity to have considered any characteristics that they deem relevant as part of their application. For many applicants, that includes their race and ethnicity, and universities

should not be ordered to blind themselves to an attribute an applicant might well consider integral to their identity and experience.

Predictably, at the University of California's most selective campuses the burdens of mandated race-blind admissions weigh most heavily on the shoulders of underrepresented minority students. A survey administered by the university showed that African-American and Latinx students at UC's most selective and least diverse campuses "report[ed] feeling that students of their race are not respected" at "substantially higher percentages" than at UC's most diverse campuses. Br. of the President and the Chancellors of the Univ. of Cal. as *Amici Curiae* in Supp. of Resp's at 31-32, *Fisher v. Univ. of Tex. at Austin*, 136 S. Ct. 2198 (2016) (No. 14-981), 2015 WL 6735847; *see also* Adriane Kayoko Peralta, *A Market Analysis of Race-Conscious University Admissions for Students of Color*, 93 Denv. L. Rev. 173, 217 (2015) ("[T]he hidden costs of racial isolation … are greater in race-neutral settings because there are fewer students of color. Considering all of these factors, a student of color has a better chance at thriving at a race-conscious college."). Educational institutions like *Amici* would face a similar fate if they were forced to implement entirely race-neutral admissions policies.

16

In sum, reliance on race-neutral measures alone is an inadequate substitute for individualized, holistic review that takes account of race and ethnicity in the manner approved of by *Grutter*. *Amici* share the hope that someday "progress toward nondiscrimination and genuinely equal opportunity will make it safe to sunset affirmative action," *Grutter*, 539 U.S. at 346 (Ginsburg, J., concurring). But as the District Court found, no race-neutral alternative can presently replace race-conscious individualized and holistic review in effectuating *Amici*'s compelling interest in the educational benefits that follow from a diverse student body.

### III. It Would Be an Extraordinary Intrusion into *Amici's* Operations to Mandate the Use of One Particular Method of Selection, or Prohibit All Consideration of Race in the Admissions Process.

Appellant asks this Court to effect an extraordinary intrusion into universities' conduct of their academic affairs by ordering the adoption of one of Appellant's non-viable alternatives to the consideration of race during the admissions process. Doing so would interfere with the ability of institutions of higher education to develop active and engaged citizens equipped to address the problems of a rapidly evolving world—training future city, state, national, and international leaders in every field of endeavor, including the arts, humanities, government, science, and business.

17

And, as explained above, it would effectively also force educational institutions like *Amici* to choose between their reputation for academic excellence and their ability to enroll a meaningfully diverse student body.

No Supreme Court decision prescribes that private institutions of higher education must employ any one particular set of criteria or method for admission, nor does any decision proscribe those institutions from considering race as one factor among many in seeking to obtain a diverse student body.  For good reason: the Supreme Court has repeatedly held that a university is entitled to "[c]onsiderable deference" in defining "intangible characteristics, like student body diversity, that are central to its identity and educational mission." *Fisher II*, 136 S. Ct. at 2214; *see also Fisher I*, 570 U.S. at 311 (acknowledging that "*Grutter* calls for deference to the University's conclusion, based on its experience and expertise, that a diverse student body would serve its educational goals." (internal quotation marks omitted)).  This deference offers universities the flexibility to "'provide that atmosphere which is most conducive to speculation, experiment, and creation,'" and *how* to create that "'atmosphere'" inevitably "leads to the question of 'who may be admitted to study.'"  *Fisher I*, 570 U.S. at 308

(quoting *Sweezy v. New Hampshire*, 354 U.S. 234, 263 (1957) (Frankfurter, J., concurring in the judgment) (internal quotation marks omitted)).

Courts have long accorded institutions of higher education the deference they need to make educational judgments, including as regards admissions. "Academic freedom . . . long has been viewed as a special concern of the First Amendment," and "[t]he freedom of a university to make its own judgments as to education includes the selection of its student body." *Bakke*, 438 U.S. at 312 (opinion of Powell, J.). Exercise of this inherently academic judgment is a core element of "the expansive freedoms of speech and thought associated with the university environment." *Grutter*, 539 U.S. at 329. As a result, it should be the institutions themselves that evaluate how diversity should be defined within their academic communities. *Parents Involved*, 551 U.S. at 792 (Kennedy, J., concurring in part and concurring in the judgment) ("[P]recedent support[s] the proposition that First Amendment interests give universities particular latitude in defining diversity"). And once the educational institutions make that inherently academic determination, courts should heed "the importance of avoiding second-guessing of legitimate academic judgments." *Univ. of Pa. v. EEOC*, 493 U.S. 182, 199 (1990). *Cf. Regents of*

*Univ. of Mich. v. Ewing*, 474 U.S. 214, 225 (1985) (noting that courts should offer "great respect for the faculty's professional judgment" when evaluating educational decisions); *Wynne v. Tufts Univ. Sch. of Med.*, 932 F.2d 19, 25 (1st Cir. 1991) (citing *Ewing*).

Appellant asks this Court to override decades of deference to universities' good-faith consideration of race in admissions decisions by insisting that Harvard *must* adopt a race-neutral alternative, even if all the evidence produced at trial indicated that doing so would be an unworkable obstacle to the attainment of a truly diverse student body. Such a result would deprive educational institutions of the right to make inherently academic judgments on how to set criteria for their student admissions and, in particular, what kind, quality, or extent of diversity will best enhance the educational experience of students and allow those students to flourish. *See Grutter*, 539 U.S. at 328 ("The … educational judgment that such diversity is essential to its educational mission … [is a] complex educational judgment[] in an area that lies primarily within the expertise of the university."); *see also Doe v. St. Francis Sch. Dist.*, 694 F.3d 869, 873 (7th Cir. 2012) ("Judges must be sensitive to the effects on education of heavy-handed judicial intrusion"). It would be an extraordinary infringement on

universities' academic freedom to decree that institutions of higher education cannot consider race at all in seeking to obtain that diversity. And it would inflict even greater harm to require that a university implement an ineffective admissions policy instead of one that decades of experience have shown ensures a student body exposed to a meaningful breadth of perspectives, backgrounds, and experiences.

Of course, *Amici* acknowledge that there are clear boundaries regarding how goals of diversity may be *pursued*. A quota system "would amount to outright racial balancing, which is patently unconstitutional." *Fisher I*, 570 U.S. at 311 (quoting *Grutter*, 539 U.S. at 330). Likewise, an admissions program that treated race or ethnicity as "*automatically* ensur[ing] a specific and identifiable contribution to a university's diversity" would fall outside the scope of permissible consideration of race in university admissions. *Gratz v. Bollinger*, 539 U.S. 244, 271 (2003) (emphasis added). But neither of those concerns is triggered where admissions programs are specifically designed to take race into account *only* as "*one factor among many*," and advance the very types of diversity that institutions have determined most effectively contribute to students' educational experiences. *Grutter*, 539 U.S. at 340.

The admissions policies of *Amici* are reflective of an educational judgment that a student body that is diverse in perspectives, viewpoints, backgrounds, and experiences benefits students' educational experiences. The determination of what that diversity consists of is entitled to significant deference. *Amici's* policies, inspired by the Harvard Plan first extolled by Justice Powell in *Bakke* and adopted by the Court as constitutionally permissible in *Grutter*, are narrowly tailored to the compelling interest of enrolling a diverse student body. The Supreme Court has long held that independent universities like *Amici* are entitled to consider race and ethnicity as one factor among many in the admissions process; this Court should adhere to those rulings.

## CONCLUSION

The Court should affirm the that institutions of higher education may employ holistic admissions programs that are not blind to an applicant's race as approved by the Supreme Court in *Grutter* and *Fisher II*.

Respectfully Submitted,

/s/ Matthew S. Hellman
MATTHEW S. HELLMAN
ISHAN K. BHABHA
JENNER & BLOCK LLP
1099 New York Avenue, NW
Suite 900
Washington, DC 20001-4412
+1 202 639 6000 (telephone)
+1 202 639 6066 (facsimile)
Mhellman@jenner.com

## CERTIFICATE OF COMPLIANCE

This brief complies with the type-volume limitation of Federal Rule of Appellate Procedure 32 because the brief contains 4,291 words, excluding the parts of the brief exempted by Rule 32(f). This brief complies with the typeface and type style requirements of Rule 32(a)(5) and Rule 32(a)(6), respectively, because this brief has been prepared in a proportionately spaced typeface using Microsoft Word 2016 in Century Expanded LT Std in 14-point font.

Dated: May 21, 2020                           /s/ Matthew S. Hellman

                                              Matthew S. Hellman

## CERTIFICATE OF SERVICE

I hereby certify that on May 21, 2020, I electronically filed the foregoing with the United States Court of Appeals for the First Circuit by using the CM/ECF system, and that copies were served on all counsel of record by operation of the CM/ECF system on the same date.


Dated: May 21, 2020                    /s/ Matthew S. Hellman
                                       Matthew S. Hellman