No. 19-2005

## UNITED STATES COURT OF APPEALS
## FOR THE FIRST CIRCUIT

STUDENTS FOR FAIR ADMISSIONS, INC.,
*Plaintiff-Appellant*,

vs.

PRESIDENT AND FELLOWS OF HARVARD COLLEGE,
*Defendant-Appellee*.

On Appeal from the United States District Court
for the District of Massachusetts

## BRIEF *AMICUS CURIAE* OF ANTI-DEFAMATION LEAGUE IN
## SUPPORT OF DEFENDANT-APPELLEE AND AFFIRMANCE

SAMUEL P. GRONER (*Counsel of Record*)
HARRISON D. POLANS
FRIED, FRANK, HARRIS, SHRIVER & JACOBSON, LLP
One New York Plaza
New York, New York 10004
(212) 859-8000
samuel.groner@friedfrank.com

STEVEN M. FREEMAN (not admitted in the First Circuit)
ANTI-DEFAMATION LEAGUE
605 Third Avenue
New York, New York 10158
(212) 885-7700
sfreeman@adl.org

AMY FEINMAN (not admitted in the First Circuit)
ANTI-DEFAMATION LEAGUE
40 Court Street, 12th Floor
Boston, Massachusetts 02108
(617) 406-6303
afreeman@adl.org

*Attorneys for Amicus Curiae Anti-Defamation League*

## <u>TABLE OF CONTENTS</u>

CORPORATE DISCLOSURE STATEMENT ...................................................... IV

INTEREST OF *AMICUS CURIAE*.............................................................................1

SUMMARY OF ARGUMENT ................................................................................3

ARGUMENT ..........................................................................................................5

I.    ADL'S EXPERIENCE DEMONSTRATES THE IMPORTANCE OF
      DIVERSITY IN HIGHER EDUCATION ........................................................5

II.   HARVARD'S CURRENT ADMISSIONS PRACTICES ARE NOT
      ANALOGOUS TO ITS HISTORIC DISCRIMINATORY
      PRACTICES USED TO EXCLUDE JEWISH APPLICANTS ..................11

      a.    In the Early 1920s, Harvard Intentionally Discriminated Against
            Jewish Applicants by Design and Through Quotas ...........................11

      b.    Plaintiff-Appellant's Comparison Between Harvard's Historic
            and Current Admissions Practices Is Fundamentally Flawed.............16

CONCLUSION ....................................................................................................24

CERTIFICATE OF COMPLIANCE....................................................................26

CERTIFICATE OF SERVICE .............................................................................27

# <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*Fisher v. University of Texas at Austin*,
   136 S. Ct. 2198 (2016)........................................................................9

*Fisher v. University of Texas at Austin*,
   570 U.S. 297 (2013)..........................................................................9

*Gratz v. Bollinger*,
   539 U.S. 244 (2003)........................................................................21

*Grutter v. Bollinger*,
   539 U.S. 306 (2003)........................................................................21

*Parents Involved in Cmty. Schools v. Seattle Sch. Dist. No. 1*,
   551 U.S. 701 (2007)........................................................................11

*Students for Fair Admissions, Inc. v. President & Fellows of Harvard
   Coll. (Harvard Corp.)*,
   397 F. Supp. 3d 126 (D. Mass. 2019).......................................*passim*

**Other Authorities**

American Council on Education, *On the Importance of Diversity in
   Higher Education,*
   http://www.acenet.edu/news-
   room/Documents/BoardDiversityStatement-June2012.pdf.................8

Jeffrey S. Gurock, *Jews in Gotham: New York Jews in a Changing
   City, 1920-2010* (2012).....................................................................12

William H. Honan, *Dartmouth Reveals Anti-Semitic Past*,
   N.Y. Times, Nov. 11, 1997................................................................12

Jerome Karabel, *No, Affirmative Action Has Not Made Asian-
   Americans The 'New Jews'*, The Huffington Post (Oct. 11, 2018
   5:45 AM, updated Oct. 13, 2018),
   https://www.huffpost.com/entry/opinion-harvard-affirmative-
   action-lawsuit_n_5bbe62b8e4b0c8fa1367c1c1..................................23

ii

Jerome Karabel, *The Chosen: The History of Admission and Exclusion at Harvard, Yale, and Princeton* (2005)......................................................*passim*

Larry M. Lavinsky, DeFunis v. Odegaard: *The 'Non-Decision' With a Message*,
75 COLUM. L. REV. 520 (1975)............................................................................11

Kathryn A. McDermott, *Diversity or Desegregation? Implications of Arguments for Diversity in K-12 and Higher Education*,
15 EDUC POLICY 452 (2001).................................................................................7

Jeffrey F. Milem, *The Educational Benefits of Diversity: Evidence from Multiple Sectors*, *in* COMPELLING INTEREST: EXAMINING THE EVIDENCE ON RACIAL DYNAMICS IN COLLEGES AND UNIVERSITIES,
Chapter 5-11 (Mitchell Chang, et al. eds., 2003)..................................................7

Oliver B. Pollak, *Antisemitism, the Harvard Plan, and the Roots of Reverse Discrimination*,
45 JEWISH SOC. STUDS. 2 (1983)..................................................................13, 14

Gerald Sorin, *Tradition Transformed: The Jewish Experience in America* 184 (1997)..............................................................................................12

Marcia A. Synnott, *The Half-Opened Door: Discrimination and Admission at Harvard, Yale, and Princeton* (1979) ........................13, 14, 15, 16

## CORPORATE DISCLOSURE STATEMENT

Amicus is a nonprofit corporation that does not have a parent corporation and does not issue stock.

# INTEREST OF *AMICUS CURIAE*

ADL (the "Anti-Defamation League"), as *amicus curiae*, submits this brief in support of the defendant-appellee.[1]

Founded in 1913 in response to an escalating climate of antisemitism and bigotry, ADL's timeless mission is to stop the defamation of the Jewish people and to secure justice and fair treatment for all. ADL continues to fight all forms of hate with the same vigor and passion and is very often the first call when acts of antisemitism occur. A global leader in exposing extremism, delivering anti-bias education, and fighting hate online, ADL's ultimate goal is a world in which no group or individual suffers from bias, discrimination, or hate. Today, ADL is one of the world's leading civil and human rights organizations, and its history is marked by a commitment to protecting the civil rights of all persons, regardless of who they are, where they are from, how they worship, or whom they love.

ADL believes that each person in our country has the constitutional right to receive equal treatment under the law and to be treated as an individual, rather than as simply part of a racial, ethnic, religious, or gender-defined group. In this context, ADL has often filed briefs *amicus curiae* in the U.S. Supreme Court and

---

[1]    Pursuant to Fed. R. App. P. 29(a)(4)(E), no counsel for a party authored this brief in whole or in part, and no such counsel or party made a monetary contribution intended to fund the preparation or submission of this brief. No person other than the *amicus curiae*, its members, or its counsel made a monetary contribution to its preparation or submission. The parties have consented to the filing of this brief pursuant to Fed. R. App. P. 29(a)(2).

1

the U.S. Circuit Courts of Appeals in cases arising under the Equal Protection

Clause of the Fourteenth Amendment to the Constitution and our nation's civil

rights laws.[2]

With respect to consideration of race as one factor (among many) in

decisions about access to opportunities such as employment and education, ADL

has long wrestled with whether such considerations can be reconciled with its core

mission—"to secure justice and fair treatment to all citizens alike and to put an end

forever to unjust and unfair discrimination against . . . any sect or body of

---

[2]     *See*, *e.g.*, ADL briefs *amicus curiae* filed in *Shelley v. Kraemer*, 334 U.S. 1 (1948); *Sweatt v. Painter*, 339 U.S. 629 (1950); *Brown v. Board of Educ.*, 347 U.S. 483 (1954); *Cardona v. Power*, 384 U.S. 672 (1966); *Jones v. Alfred H. Mayer Co.*, 392 U.S. 409 (1968); *Sullivan v. Little Hunting Park, Inc.*, 396 U.S. 229 (1969); *DeFunis v. Odegaard*, 416 U.S. 312 (1974); *Runyon v. McCrary*, 427 U.S. 160 (1976); *McDonald v. Santa Fe Trail Transp. Co.*, 427 U.S. 273 (1976); *United Jewish Orgs. of Williamsburg, Inc. v. Carey*, 430 U.S. 144 (1977); *Regents of Univ. of Cal. v. Bakke*, 438 U.S. 265 (1978); *United Steelworkers v. Weber*, 443 U.S. 193 (1979); *Fullilove v. Klutznick*, 448 U.S. 448 (1980); *Boston Firefighters Union, Local 718 v. Boston Chapter, NAACP*, 461 U.S. 477 (1983); *Palmore v. Sidoti*, 466 U.S. 429 (1984); *Firefighters Local Union No. 1784 v. Stotts*, 467 U.S. 561 (1984); *Wygant v. Jackson Bd. of Educ.*, 476 U.S. 267 (1986); *City of Richmond v. J.A. Croson Co.*, 488 U.S. 469 (1989); *Metro Broadcasting, Inc. v. FCC*, 497 U.S. 547 (1990); *Johnson v. De Grandy*, 512 U.S. 997 (1994); *Miller v. Johnson*, 515 U.S. 900 (1995); *Taxman v. Bd. of Educ.*, 92 F.3d 1547 (3d Cir. 1996), *cert. granted*, 521 U.S. 1117, *appeal dismissed per stipulation*, 522 U.S. 1010 (1997); *Alexander v. Sandoval*, 532 U.S. 275 (2001); *Grutter v. Bollinger*, 539 U.S. 306 (2003); *Gratz v. Bollinger*, 539 U.S. 244 (2003); *Parents Involved in Cmty. Schools v. Seattle Sch. Dist. No. 1*, 551 U.S. 701 (2007); *Ricci v. DeStefano*, 557 U.S. 557 (2009); *Fisher v. University of Texas at Austin*, 570 U.S. 297 (2013); *Schuette v. Coalition to Defend Affirmative Action*, 572 U.S. 291 (2014); and *Fisher v. University of Texas at Austin*, 136 S. Ct. 2198 (2016).

citizens." *Anti-Defamation League 1913 Charter* (1913).  And, while ADL has endorsed consideration of race in some circumstances in order to remedy specific discrimination, it has consistently opposed the non-remedial use of race-based criteria, except under highly limited circumstances in the educational context where the government can identify a compelling interest to justify them and has narrowly tailored their use to meet those legitimate interests.

ADL has long maintained that when government uses race as a decisive factor in allocating opportunity or benefits, it improperly classifies individuals on the basis of immutable characteristics that are, or should be, irrelevant in a free and democratic society.  As such, ADL's longstanding position has been that affirmative action programs are invalid when they impose quotas, use race as a determinative factor in making admissions decisions, or act in a manner that assigns persons to categories based on their race.  ADL also believes, however, that those concerns are not implicated when a university considers race as just one factor among many others as part of a holistic review of applicants.

## SUMMARY OF ARGUMENT

ADL agrees with Harvard College ("Harvard") that diversity in higher education is a compelling government interest.  Through its work in a variety of education-related settings, including its front-line experience on college campuses, ADL has found that diversity in higher education is critical, not only because a

diverse faculty and student body brings different experiences and viewpoints to the campus, but also because diversity can help foster a just and inclusive society free of racial and ethnic hatred and the discrimination that flows from it.

Concurrent with its commitment to diversity, ADL also believes that the Equal Protection Clause obligates government to refrain from racial discrimination in all forms. For that reason, ADL has historically opposed racial classifications that impose quotas in affirmative action programs, arguing that they discriminate impermissibly on the basis of protected characteristics and thus violate this core value of equal protection. Here, ADL believes that Harvard's admissions practices pass muster because the extensive record developed at trial shows that Harvard does not use overt or covert quotas, and the voluminous discovery into all aspects of Harvard's admissions practices and procedures did not uncover any evidence that Harvard's admissions practices are driven by, or rooted in, animus toward Asian Americans or that that they are designed to diminish Asian American admissions. Indeed, plaintiff-appellant could not point to a single Asian American applicant who was overtly discriminated against or who was better qualified than an admitted white applicant when considering the full range of factors that Harvard values in its admissions process.

The lack of racial animus, intent to discriminate, or imposition of quotas, as well as the fact that Harvard's admissions practices today promote (rather than

inhibit) diversity, distinguish those practices from Harvard's admissions practices in the 1920s and 1930s, which were motivated by antisemitism, were explicitly designed to decrease Jewish enrollment, and which imposed a quota on Jews. In light of those key distinctions, plaintiff-appellant's attempt to draw a comparison between Harvard's discriminatory practices against Jews in the 1920s and 1930s and its current admissions practices is fundamentally flawed. Based on its decades of experience as one of the world's leading organizations fighting hate, bigotry, and antisemitism, ADL is well-positioned to evaluate, compare, and contrast Harvard's discriminatory practices against Jews in the 1920s and 1930s and its current admissions practices. In ADL's view, it trivializes the tremendous hate, bigotry, and antisemitism faced by many Americans, including American Jews, in the 1920s and 1930s to suggest or imply that race-conscious admissions practices like those used by Harvard today are akin to the odious practices that were rampant at Harvard and other institutions of higher learning a century ago.

## **ARGUMENT**

### I. **ADL'S EXPERIENCE DEMONSTRATES THE IMPORTANCE OF DIVERSITY IN HIGHER EDUCATION**

For over 100 years, amicus ADL has fought to eradicate racial, ethnic, and religious bias in our nation and to promote justice and fair treatment to all. ADL has vigorously supported the enactment and enforcement of our nation's major anti-discrimination laws and continues to play a lead role in efforts to strengthen

and improve hate crime laws at the state and federal levels.[3]  ADL is also a leader in producing educational materials and programs designed to fight hate, bias, and prejudice in K-12 schools and on college campuses, and ADL's education programming has reached hundreds of thousands of students and educators as part of its efforts both to promote diversity and pluralism and to eradicate bias and hate before it hardens.

ADL's real-world, front-line experience on college campuses, in particular, has demonstrated that efforts to further diversity bear educational fruit.  For example, ADL's A Campus of Difference™ programming—which provides college and university students, staff, faculty, and administrators with practical, experiential, hands-on training to work toward diversity, equity, and inclusion policies and practices, reinforcing that antisemitism and all forms of bias need intervention at early stages to promote an environment where all members of the community can succeed in a diverse living and learning environment—has reinforced ADL's belief that diversity enriches the educational experience.  ADL has found that a diverse educational environment challenges all students to explore

---

[3]    ADL is a pioneer in the promulgation of hate crime statutes; variations of its model hate crime statute have been adopted as law in 45 states as well as the District of Columbia.  In addition, ADL led a broad coalition in support of the Matthew Shepard and James Byrd, Jr. Hate Crimes Prevention Act, which included more than 250 civil rights, education, religious, civic and professional organizations, and virtually every major law enforcement organization in the country.

new ideas, perspectives, and experiences that they might not otherwise explore, to

see issues from other points of view, to rethink their own premises and prejudices,

and to achieve the kind of understanding that comes only from testing their own

hypotheses against those of people with other or differing beliefs.  It is not just

ADL that has reached this conclusion: there is a growing body of literature

demonstrating that "diverse student populations enhance educational outcomes in

undergraduate and graduate higher education . . . ."  *See* Kathryn A. McDermott,

*Diversity or Desegregation? Implications of Arguments for Diversity in K-12 and*

*Higher Education*, 15 EDUC. POLICY, no. 3, 2001 at 452, 456.[4]

In addition to aiding colleges and universities in achieving these educational

goals, a diverse campus environment can also create opportunities for people from

diverse backgrounds, with different life experiences, to come to know one another

outside the classroom as more than passing acquaintances and to develop mutual

respect for one another.  As the American Council on Education has recognized:

learning in a diverse educational environment promotes personal growth by

---

[4]     Specifically regarding racial diversity as a component of diversity,
"[r]esearch indicates that cross-race interaction has positive impacts on a range of
important outcomes and that the greater the structural diversity of an institution,
the more likely that students are to engage in these types of interaction."  *See*
Jeffrey F. Milem, *The Educational Benefits of Diversity: Evidence from Multiple
Sectors*, *in* COMPELLING INTEREST: EXAMINING THE EVIDENCE ON RACIAL
DYNAMICS IN COLLEGES AND UNIVERSITIES, Ch. 5-11 (Mitchell Chang, et al. eds.,
2003).

challenging stereotyped preconceptions, encouraging critical thinking, and helping students to communicate effectively with people of varied backgrounds, thereby preparing students to become good citizens in an increasingly complex, pluralistic society.[5]

In short, ADL's experience demonstrates that exposure to a diverse academic community not only reduces prejudice, but also improves education, better prepares our students for possible graduate education and career opportunities, and enhances the United States' ability to compete in a globalized economy.  Embracing diversity and promoting a just and inclusive society is crucial not only to the struggle to defeat discrimination, but also to the continued vitality of our nation.

ADL accordingly agrees with the District Court's conclusion that, as the evidence at trial overwhelmingly demonstrated, "a heterogeneous student body promotes a more robust academic environment with a greater depth and breadth of learning, encourages learning outside the classroom, and creates a richer sense of community."  *Students for Fair Admissions, Inc. v. President & Fellows of Harvard Coll. (Harvard Corp.*), 397 F. Supp. 3d 126, 133 (D. Mass. 2019).

---

[5]    American Council on Education, *On the Importance of Diversity in Higher Education,* http://www.acenet.edu/news-room/Documents/BoardDiversityStatement-June2012.pdf (last visited May 15, 2020).

ADL's experience is also consistent with Supreme Court precedent recognizing that diversity in the context of higher education is a compelling government interest because it serves those ends.  *See, e.g.*, *Fisher v. Univ. of Texas at Austin*, 136 S. Ct. 2198, 2210 (2016) (explaining that "a university may institute a race-conscious admissions programs as a means of obtaining the educational benefits that flow from student body diversity" because "enrolling a diverse student body promotes cross racial understanding, helps to break down racial stereotypes, [] enables students to better understand persons of different races[,] . . . promotes learning outcomes, and better prepares students for an increasingly diverse workforce and society.") (citations and quotations omitted); *Fisher v. Univ. of Texas at Austin*, 570 U.S. 297, 308 (2013) ("The attainment of a diverse student body . . . serves values beyond race alone, including enhanced classroom dialogue and the lessening of racial isolation and stereotypes.").

ADL's staunch commitment to diversity has not diminished its belief in the centrality of the precept that the Equal Protection Clause obligates government to refrain from racial discrimination in all forms.  For this reason, concurrent with its commitment to diversity, ADL has *opposed* racial classifications that impose quotas in affirmative action programs, arguing that they discriminate impermissibly on the basis of protected characteristics and thus violate this core value of equal protection.  For example, in *DeFunis*, ADL argued that the

9

University of Washington Law School violated the Fourteenth Amendment by

instituting a policy "that amounted to the establishment of a quota, no matter what

'cloak of language' was . . . used by the Law School to disguise the fact from itself

as well as from others."[6]  Similarly, in *Grutter*, ADL argued that the University of

Michigan's admissions systems "den[ied] to applicants who are not members of

designated minority groups fundamental equal protection because those systems

value persons for their race, not for relevant individual characteristics."[7]

But ADL also believes that affirmative action programs can be structured in

a manner that will not violate equal protection principles, and that, when

implemented properly, such programs can serve compelling government interests.

As the former Chairman of ADL's National Law Committee explained (in a law

review article that he wrote in his personal capacity), "[f]ew would argue against

the proposition that a diverse student body including qualified minority group

members is educationally enriching for those admitted to law school.  The issue is

not the desirability of a diverse student body but the means by which it is to be

achieved."  Larry M. Lavinsky, DeFunis v. Odegaard: *The 'Non-Decision' With a*

*Message*, 75 COLUM. L. REV. 520, 524 n.20 (1975); *see also* Brief Amicus Curiae

---

[6]    Brief of Anti-Defamation League of B'nai B'rith as Amicus Curiae at 22,
*DeFunis v. Odegaard*, 416 U.S. 312 (1974).

[7]    Brief Amicus Curiae of Anti-Defamation League in Support of Neither Party
at 4, *Grutter v. Bollinger*, 539 U.S. 306 (2003).

of Anti-Defamation League in Support of Neither Party at 18, *Grutter v. Bollinger*, 539 U.S. 306 (2003) (explaining that while race-conscious admissions policies can deny some applicants the individualized consideration that is at the core of equal protection, ADL could not say that in all cases any consciousness of the race of applicants would constitutionally nullify an admissions system); *Parents Involved in Cmty. Sch. v. Seattle Sch. Dist. No. 1*, 551 U.S. 701, 797 (2007) (Kennedy, J., concurring) (noting the "dangers presented by individual classifications, dangers that are not as pressing when the same ends are achieved by more indirect means"). As described below, one of the key reasons that ADL believes that the admissions practices at issue here pass muster is because they do not operate as overt or covert quotas. That also distinguishes those practices from the historical discriminatory practices used by Harvard to exclude Jewish students.

## II. HARVARD'S CURRENT ADMISSIONS PRACTICES ARE NOT ANALOGOUS TO ITS HISTORIC DISCRIMINATORY PRACTICES USED TO EXCLUDE JEWISH APPLICANTS

### a. In the Early 1920s, Harvard Intentionally Discriminated Against Jewish Applicants by Design and Through Quotas

Harvard's history of discriminating against Jewish applicants in the 1920s and 1930s, including its *de facto* imposition of quotas to limit the number of Jewish students at the college, is well-documented and undisputed in this

litigation.[8]  In its post-trial opinion, the District Court acknowledged "Harvard's

own history of discriminating against Jewish applicants beginning in the 1920s"

(*Students for Fair Admissions*, 397 F. Supp. 3d at 156), and Harvard's witnesses

conceded the existence of historic discrimination against Jewish applicants (*see,

e.g.*, JA652-53, JA1665-66, JA3365, JA3370-75).  Similarly, Harvard's 2015

Report of the College Working Group on Diversity and Inclusion at Harvard

recognized that "[u]nder the presidency of Abbott Lawrence Lowell (1909-1933),

the Harvard administration restricted the numbers of historic Jewish students. . . ."

*See* JA4945.  A fuller understanding of the intent behind those practices and how

---

[8]    Harvard was not alone in adopting discriminatory admissions practices at
that time.  Like Harvard, other elite universities, including Yale, Princeton,
Columbia, and Dartmouth (among others), implemented admissions policies in the
1920s and 1930s designed to reduce the number of admitted Jewish students.  *See,
e.g.*, Jerome Karabel, *The Chosen: The History of Admission and Exclusion at
Harvard, Yale, and Princeton* 2-3 (2005); Gerald Sorin, *Tradition Transformed:
The Jewish Experience in America* 184 (1997) ("Between 1920 and 1922, New
York University and Columbia University, whose Jewish enrollments had reached
nearly 40 percent, instituted quotas."); Jeffrey S. Gurock, *Jews in Gotham: New
York Jews in a Changing City, 1920-2010* 45 (2012) ("Informal and formal quota
systems severely limited the numbers of Jews who attended the nation's elite
schools.  The paltry and declining numbers of Jewish admissions to Ivy League
colleges in the 1920s–1930s chilled the dreams of many high school
valedictorians."); W. Honan, *Dartmouth Reveals Anti-Semitic Past*, N.Y. Times,
Nov. 11, 1997, at A16 (in response to a letter from an alumnus who was concerned
that "the campus seems more Jewish each time I arrive in Hanover" and that
"unfortunately many of them . . . seem to be the 'kike' type," Dartmouth's director
of admissions responded that he was "glad to have your comments on the Jewish
problem," that he "shall appreciate your help along this line in the future," and that
"[i]f we go beyond the 5 percent or 6 percent in the Class of 1938, I shall be
grieved beyond words").

they were executed demonstrates how incomparable they are to Harvard's current admissions practices.

In 1922, in the face of rising national antisemitism and questions about the increasing number of Jews at Harvard, at President Lowell's direction, Harvard began to evaluate whether to revise its admissions policies.  *See* Marcia A. Synnott, *The Half-Opened Door: Discrimination and Admission at Harvard, Yale, and Princeton, 1900-1970* 58-59, 61 (1979); *see also* Oliver B. Pollak, *Antisemitism, the Harvard Plan, and the Roots of Reverse Discrimination*, 45 JEWISH SOC. STUDS. 2 113-122, 114 (1983) (noting that the percentage of Jewish students at Harvard increased from 6% in 1908 to 22% in 1922).  Lowell "came to the conclusion that Harvard had a Jewish problem" and was "convinced that the only way to reduce anti-Semitism within the Harvard community, as within the nation, was to limit the number of Jews allowed to associate with Gentiles." Synnott, *supra*, at 59.  In a series of faculty meetings in May and June 1922, the faculty evaluated certain resolutions that proposed changes to Harvard's admission policies, including a proposal that expressly sought to impose a quota by limiting the proportional size of minority groups (including Jews) in the college's student body.  *See id.* at 64-68.  While the proposed quota ultimately was voted down in the face of public backlash, the faculty resolved to form a special committee "to consider principles and methods for more effectively sifting candidates for

admission," which was understood to be coded language for "consider[ing] the question of the Jews." *Id.* at 69, 73-74.

The special committee's report, which it issued in April 1923, disclaimed the formal adoption of a Jewish quota, but paved the way for reducing the proportion of Jewish students by passing a recommendation that Harvard automatically admit all students who graduated in the top seventh of their class. *See id.* at 105-06. The top-seventh plan was designed to recruit students from previously underrepresented regions of the country, such as the South and West, where there were comparatively fewer Jews, and the plan was viewed by some as "a thinly disguised attempt to lower the Jewish proportion of the student body by bringing in boys – some of them academically ill-equipped for Harvard – from regions of the country where there were few Jews." Karabel, *supra*, at 101. Thus, by "focusing on geographic representation, while ignoring blatant racial and religious characteristics, the plan obliquely discriminated against Jews." Pollak, *supra*, at 119.[9]

When the percentage of Jewish enrollment did not dramatically decrease in the ensuing years, in 1926, at Lowell's guidance, Harvard implemented additional

---

[9]    Ironically, despite Harvard's intention to reduce Jewish enrollment by implementing the top-seventh plan, the plan had the opposite effect, as it "was in fact admitting more Jews from the Middle Atlantic States and New England." Karabel, *supra*, at 105 (explaining that 42% of students admitted under the top-seventh plan in 1925 were Jewish).

measures designed to reduce the number of Jewish students at the college.  First,

Harvard "limited the size of the freshman class to 1,000 students."  Synnott, *supra*,

at 106.  Lowell recognized that "a ceiling on the size of the class . . . was the

necessary precondition for addressing the 'Jewish problem,'" because "as long as

Harvard had an absolute standard of admission, a discretionary selection policy

using nonacademic as well as academic criteria would not be possible."  Karabel,

*supra*, at 102.  Second, Harvard added precisely such a subjective component to its

admissions criteria, directing that "the rules for the admission of candidates be

amended to lay greater emphasis on selection based on character and fitness and

the promise of greater usefulness in the future as a result of a Harvard education."

JA3690.  While Lowell "insisted that he was not proposing discrimination against

the Jews but rather 'discrimination against individuals in accordance with the

probable value of a college education to themselves, to the University, and the

community,'" he noted in correspondence with the chairman of a faculty

committee relating to the university's adoption of more subjective admissions

policies that "*a very large proportion of the less desirable . . . are at the present

Jews*," which prompted agreement from the chair of the committee that "*such a

discrimination would inevitably eliminate most of the Jewish element that was

making trouble*."  Karabel, *supra*, at 107-08 (emphases added).  Third, Harvard

made the top seventh rule "discretionary" in order to "make it possible to eliminate

schools that sent too many Jews to Harvard." *Id.* at 108.  Finally, Lowell installed

individuals on the Admissions Committee who "shared his views" regarding Jews

at Harvard, including appointing a leader of an anti-immigration group in addition

to the four pre-existing members of the committee who had voted in favor of

installing formal racial quotas in 1922.  *See id.* at 109.

Thus, "[b]y the mid 1920s, Harvard had yielded to a selective system of

admissions, which, with no apologies, aimed at reducing the percentage of Jews in

the college."  Synnott, *supra*, at 110.  As a result of these changes to its admission

policies, "the best available evidence shows that discrimination was widespread

and systematic.  On the basis of the quota that Lowell had quietly put into effect,

the record leaves little doubt that [Harvard] continued to set a ceiling on Jewish

enrollment for at least a decade," and the proportion of Jews in the freshman class

declined from 28% in 1925 to just 12% by 1933.  Karabel, *supra*, at 172.  That

proportion remained around 15% over the ensuing years and did not rise to 25%

again until 1952, after Harvard determined to "reduce discrimination against

Jews."  *See id.* at 196.

### b.  Plaintiff-Appellant's Comparison Between Harvard's Historic and Current Admissions Practices Is Fundamentally Flawed

During the course of this litigation, plaintiff-appellant has repeatedly sought

to draw comparisons between Harvard's historic discriminatory practices

implemented by Lowell in the 1920s and 1930s and its current admissions

practices, which plaintiff-appellant contends discriminate against Asian Americans.  *See, e.g.*, JA3600-01 (noting, during closing argument, Harvard's historical discriminatory practices against Jews and arguing "[i]t happened before, and it's happening again"); Br. for Appellant at 22 ("Harvard today engages in the same kind of discrimination and stereotyping that it used to justify quotas on Jewish applicants in the 1920s and 1930s"); *id.* at 1-3 (describing Lowell's role in seeking to decrease Jewish enrollment at Harvard and the changes to Harvard's admissions practices that he implemented to achieve that goal).  However, Lowell died more than 75 years ago.  To evaluate whether Harvard "today engages in the same kind of discrimination and stereotyping" as it did in the 1920s and whether "it's happening again" (*id.*), a closer look at what was happening then versus now is warranted.

Harvard's admissions practices in the 1920s and 1930s unambiguously intended to discriminate against Jewish applicants through the use of quotas to restrict the number of Jewish students.  Indeed, the very authority on which plaintiff-appellant relies to support its contention that "this kind of discrimination has historical precedent" (Br. for Appellant at 40-41, citing Karabel, *supra*, at 98-99) is replete with evidence revealing the invidiousness and intentionality of Harvard's past discrimination against Jews in its admissions practices.  For example:

17

- In seeking to revise Harvard's admissions policies, "Lowell's personal preference was 'to state frankly that we thought we could do the most good by not admitting more than a certain proportion of men in a group that did not intermingle with the rest, and to give our reasons for it to the public.' But he also anticipated quite presciently that 'the Faculty, and probably the Governing Boards, would prefer to make a rule whose motive was less obvious on its face, by giving to the Committee on Admission authority to refuse admittance to persons who possessed qualities described with more or less distinctness and believed to be characteristic of the Jews.' For Lowell, however, it was crucial that 'the Faculty should understand perfectly well what they are doing, and that any vote passed with the intent of limiting the number of Jews should not be supposed by anyone to be passed as a measurement of character really applicable to Jews and Gentiles alike.'"

- "In a letter to Julian Mack, a member of Harvard's Board of Overseers and a federal judge, Lowell made explicit some of the cultural assumptions behind his commitment to a Jewish quota: 'It is the duty of Harvard to receive just as many boys who have come, or whose parents have come, to this country without our background as it can effectively educate: including in education the imparting, not only of book knowledge, but of the ideas and traditions of our people. Experiences seem to place that proportion at about 15%.'"

- In a letter summarizing a June 2, 1922 faculty meeting wherein the possibility of imposing a quota on Jewish applicants was considered, Lowell wrote, "[w]e . . . attained by far the most important object, which was that of making substantially every member of the Faculty understand that we had before us a problem, and that the problem was a Jew problem and not something else. *We had also brought the Faculty to the point of being ready to accept a limitation on the number of Jews*. . . .'" (emphasis added).

- In confidential correspondence advocating for the adoption of discretionary admissions criteria, Lowell wrote that, "[t]o prevent a dangerous increase in the proportion of Jews, I know at present only one way which is at the same time straightforward and effective, and that is a selection by a personal estimate of character on the part of the Admission authorities, based upon the probable value to the

18

candidate, to the college and to the community of his admission. Now a selection of this kind can be carried out only in case the numbers are limited. If there is no limit, it is impossible to reject a candidate who passes the admission examinations without proof of defective character, which practically cannot be obtained. The only way to make a selection is to limit the numbers, accepting only those who appear to be the best."

- The Dean of Yale College characterized the admissions policies ultimately adopted by Harvard as designed to "reduce their 25% Hebrew total to 15% or less simply by rejecting with-out detailed explanation. They are giving no details to any candidate any longer."

- In 1925, a Harvard alumnus who had recently attended a Harvard-Yale football game wrote to President Lowell that, "[n]aturally, after twenty-five years, one expects to find many changes but to find that one's University had become so Hebrewized was a feaful [sic] shock. There were Jews to the right of me, Jews to the left of me, in fact that they were so obviously everywhere that instead of leaving the Yard with pleasant memories of the past I left with a feeling of utter disgust of the present and grave doubts about the future of my Alma Mater." He further bemoaned that "I was ushered to my seat at the game by a Jew and another of the same 'breed' followed me to my seat and required me to sign my ticket. And not one of these appeared to be of the same class as the few Jews that were in college in my day but distinctly of the class usually denominated 'Kikes.'"

  In response, Lowell did not condemn this example of blatant and odious antisemitism. Rather, he lamented that "he 'had foreseen the peril of having too large a number of an alien race and had tried to prevent it' but that 'not one of the alumni ventured to defend the policy publicly'" and stated that "he was 'glad to see from your letter, as I have from many other signs, that the alumni are beginning to appreciate that I was not wholly wrong three years ago in trying to limit the proportion of Jews.'"

*See* Karabel, *supra*, at 88-89, 93-94, 105-07, 109. Indeed, the fact that Lowell

noted in correspondence to the chair of the faculty committee relating to the

college's adoption of more subjective admissions policies that "a very large proportion of the less desirable . . . are at the present Jews," and that the chairman's response was that "such a discrimination would inevitably eliminate most of the Jewish element that was making trouble" (*id.* at 107-08), makes clear what Harvard's intentions were—to "eliminate most of the Jewish element." *Id.* at 108.

Here, in contrast, the evidence adduced at trial about Harvard's current admissions practices in no way resembles the evidence of Harvard's odious practices in the 1920s and 1930s. The District Court expressly found that "[t]hroughout the trial and after a careful review of all exhibits and written submissions, there is no evidence of any racial animus whatsoever or intentional discrimination on the part of Harvard beyond its use of a race conscious admissions policy." *Students for Fair Admissions*, 397 F. Supp. 3d at 201-02; *see also id.* at 203 ("The testimony of the admissions officers that there was no discrimination against Asian American applicants with respect to the admissions process as a whole and the personal ratings in particular, was consistent, unambiguous, and convincing").

Nor does Harvard impose "quotas"—(*i.e.*, "program[s] in which a certain fixed number or proportion of opportunities are 'reserved exclusively for certain minority groups,'" *Grutter*, 539 U.S. at 335 (quoting *Richmond v. J.A. Croson Co.*,

488 U.S. 469, 496 (1989))—on the number of Asian American applicants (or any other group) admitted. *See Students for Fair Admissions*, 397 F. Supp. 3d at 175-76 ("Harvard does not have any racial quotas and has not attempted to achieve classes with any specified racial composition"); *id.* at 196 ("Harvard does not employ a race-based quota, set aside seats for minority students, or otherwise define diversity as some specified percentage of a particular group merely because of its race or ethnic origin") (citations and quotations omitted).[10]  Indeed, "the racial composition of Harvard's admitted class has varied over the years in a manner inconsistent with the imposition of a racial quota or racial balancing." *Id.* at 176.  To the contrary, Harvard's consideration of race in its admissions process is "employed to promote diversity" in the college's student body and "allows Harvard to achieve a level of robust diversity that would not otherwise be possible, at least at this time." *Id.* at 202 & n.62.

Despite years of litigation, including extensive document discovery, depositions, and a three-week trial, plaintiff-appellant did not uncover a scintilla of evidence that Harvard's admissions practices are driven by, or rooted in, animus

---

[10]     Stated differently, there was no evidence presented at trial suggesting that Harvard considers race in the "non-individualized, mechanical" manner that the law prohibits. *See Gratz v. Bollinger*, 539 U.S. 244, 280 (2003) (O'Connor, J., concurring) (rejecting admissions program that provided an automatic 20-point bonus to the numerical index score of underrepresented minority applicants where the "mechanized selection index score, by and large, automatically determine[d] the admissions decision").

21

toward Asian Americans, that they are designed to diminish Asian American admissions, or that any quota has been overtly or covertly imposed by Harvard. Although Harvard provided extensive discovery into all aspects of its current admissions practices and procedures,[11] that discovery revealed nothing even remotely suggesting that anyone at Harvard was engaging in any intentional discrimination.[12]  Rather, the evidence at trial reflected that race was and is only one factor that Harvard considers "in a contextual manner as part of Harvard's holistic evaluation of each applicant."  *Students for Fair Admissions*, 397 F. Supp. 3d at 198.

---

[11]    *See Students for Fair Admissions*, 397 F. Supp. 3d at 159 (explaining that "Harvard provided applicant-by-applicant admissions data for more than 150,000 domestic applicants to Harvard's classes of 2014 through 2019"); *Students for Fair Admissions, Inc. v. President and Fellows of Harvard College (Harvard Corporation)*, No. 1:14-cv-14176-ADB (D. Mass.), ECF Nos. 110, 121, 181 (demonstrating that Harvard produced documents from 24 custodians, which included detailed information relating to its undergraduate admissions policies and procedures, such as training manuals and reader instructions and general information relating to its alumni interview program).

[12]    Despite the fact that some Asian American applicants to Harvard had received lower personal ratings relative to their white counterparts who appeared to be "similarly situated," there was no evidence presented at trial that this was due to intentional discrimination.  *See Students for Fair Admissions*, 397 F. Supp. 3d at 202.  Far to the contrary, plaintiff-appellant could not point to "a single Asian American applicant who was overtly discriminated against or who was better qualified than an admitted white applicant when considering the full range of factors that Harvard values in its admissions process."  *Id.* at 203.

The lack of racial animus, intent to discriminate, or imposition of quotas, as well as the fact that Harvard's admissions practices today promote (rather than inhibit) diversity, distinguish those practices from Harvard's admissions practices in the 1920s and 1930s, which were motivated by antisemitism, were explicitly designed to decrease Jewish enrollment, and which imposed a quota on Jews. Indeed, the author of the book cited by plaintiff-appellant in support of its argument about historical discrimination against Jews at Harvard has himself rebutted that comparison, explaining that "the analogy between Jews and Asians that frames the current case against Harvard obscures more than it illuminates" because "[u]nlike quotas, which substantially reduced Jewish enrollments, affirmative action has proved compatible with both an increase in Asian-American enrollments and expanded opportunities for African Americans and Latinos."[13] *See also* JA5744 (evidence presented at trial showing that the percentage of Asian Americans in Harvard's student body increased between 2009 and 2018).

In sum, there is no basis in the voluminous record to equate Harvard's blatantly antisemitic admissions practices in the 1920s and 1930s with its current admissions practices, which promote, rather than seek to limit, student body

---

[13]    *See* Jerome Karabel, *No, Affirmative Action Has Not Made Asian-Americans The 'New Jews'*, The Huffington Post (Oct. 11, 2018 5:45 AM, updated Oct. 13, 2018), https://www.huffpost.com/entry/opinion-harvard-affirmative-action-lawsuit_n_5bbe62b8e4b0c8fa1367c1c1.

diversity.  It trivializes the tremendous hate, bigotry, and antisemitism faced by many Americans, including American Jews, in the 1920s and 1930s to suggest or imply that race-conscious admissions practices used by colleges and universities today are akin to the odious practices that were rampant at Harvard and other institutions of higher learning a century ago.  Rather than learning the lessons of that historical discrimination, plaintiff-appellant's attempt to create such a false-equivalency misappropriates that history.

## CONCLUSION

For the foregoing reasons, the judgment of the U.S. District Court for the District of Massachusetts should be affirmed.

Dated:  May 21, 2020

Respectfully submitted,

By:  /s/ Samuel P. Groner

SAMUEL P. GRONER (*Counsel of Record*)
HARRISON D. POLANS
FRIED, FRANK, HARRIS,
SHRIVER & JACOBSON, LLP
One New York Plaza
New York, New York 10004
(212) 859-8000
samuel.groner@friedfrank.com

STEVEN M. FREEMAN (not admitted in the First Circuit)
ANTI-DEFAMATION LEAGUE
605 Third Avenue

New York, New York 10158
(212) 885-7700
sfreeman@adl.org

AMY FEINMAN (not admitted in
the First Circuit)
ANTI-DEFAMATION LEAGUE
40 Court Street, 12th Floor
Boston, Massachusetts 02108
(617) 406-6303
afeinman@adl.org

Attorneys for *Amicus Curiae*
Anti-Defamation League

## <u>CERTIFICATE OF COMPLIANCE</u>

This brief complies with the word limit of Federal Rule of Appellate Procedure 29(a)(5) and 32(a)(7)(B) because, excluding the parts of the brief exempted by Rule 32(f), it contains 6,187 words.

This brief complies with the typeface requirements of Rule 32(a)(5) and the type-style requirements of Rule 32(a)(6) because it has been prepared using Microsoft Word in 14-point Times New Roman font.

Date:   May 21, 2020                    By:  <u>/s/ Samuel P. Groner</u>
                                            Samuel P. Groner
                                            *Counsel for Amicus Curiae*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on May 21, 2020, I electronically filed the foregoing

brief with the Clerk of the Court of the United States Court of Appeals for the First

Circuit by using the appellate CM/ECF system.

I certify that all parties to this case will be served by the appellate CM/ECF

system, except for the following party who will be served by First Class Mail:

> Lawrence L. Crawford
> Lieber Correctional Institution
> P.O. Box 205
> Ridgeville, SC 29472


Date:  May 21, 2020                       By:  /s/ Samuel P. Groner
                                               Samuel P. Groner
                                               *Counsel for Amicus Curiae*

21855247