No. 19-2005

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIRST CIRCUIT

STUDENTS FOR FAIR ADMISSIONS, INC.,

*Plaintiff-Appellant*,

v.

PRESIDENT AND FELLOWS OF HARVARD COLLEGE,

*Defendant-Appellee.*

———————————————

On Appeal from the United States District Court for the District of Massachusetts
No. 1:14-cv-14176 (Hon. Allison D. Burroughs)

———————————————

**BRIEF OF AMICI CURIAE STUDENTS, ALUMNI, AND PROSPECTIVE STUDENTS OF HARVARD COLLEGE SUPPORTING DEFENDANT-APPELLEE AND SUPPORTING AFFIRMANCE**

———————————————

Jon M. Greenbaum
David Hinojosa
Genevieve Bonadies Torres
LAWYERS' COMMITTEE FOR
  CIVIL RIGHTS UNDER LAW
1500 K Street, NW, Suite 900
Washington, DC 20005
(202) 662-8600

(Additional counsel listed on inside cover)

Lawrence E. Culleen
Elisabeth S. Theodore
Nancy L. Perkins
Janine M. Lopez*
Emma Dinan
Camille Heyboer
ARNOLD & PORTER
  KAYE SCHOLER LLP
601 Massachusetts Ave., NW
Washington, DC 20001
(202) 942-5000
lawrence.culleen@arnoldporter.com

*Counsel for Amici Curiae*

Niyati Shah
Marita Etcubanez
Eri Andriola\*\*
ASIAN AMERICANS
  ADVANCING JUSTICE - AAJC
1620 L Street, NW, Suite 1050
Washington, DC 20036
(202) 296-2300

Oren M. Sellstrom
LAWYERS FOR CIVIL RIGHTS
61 Batterymarch Street, Fifth Floor
Boston, MA 02110
(617) 988-0608

\*Admitted only in Massachusetts; practicing law in the District of Columbia during the pendency of her application for admission to the D.C. Bar and under the supervision of lawyers who are members in good standing of the D.C. Bar

\*\*Admitted only in New York. DC practice limited to federal courts.

*Counsel for Amici Curiae*

# TABLE OF CONTENTS

Page

TABLE OF AUTHORITIES .................................................................................... iv

INTEREST OF AMICI CURIAE .............................................................................1

SUMMARY OF THE ARGUMENT ........................................................................3

ARGUMENT ............................................................................................................5

I. Student-Amici's Experience Demonstrates That Harvard's Consideration of Race Is Narrowly Tailored and Remains Necessary to Pursue Its Compelling Interest in Diversity ....................................................................5

    A. Harvard's Admissions Process Allows Racially Diverse Students, including Student-Amici, to Fully Disclose Their Identities and Reveal Their Potential for Academic Success ......................................6

    B. Harvard's Admissions Process Is Necessary to Harness the Educational Benefits That Flow from a Diverse Student Body ..........12

        1. Student-amici's testimony demonstrates the continuing importance of student body diversity .......................................12

        2. SFFA's proposed alternatives could not achieve the breadth and depth of student body diversity necessary to realize these benefits ......................................................................................15

II. The District Court Correctly Rejected SFFA's Claim That Harvard Unlawfully Discriminates Against Asian American Applicants ..................20

    A. SFFA Did Not Meet Its Burden of Proving That Harvard Discriminates Against Asian American Applicants vis-à-vis White Applicants ...........................................................................................21

    B. Harvard Satisfied Strict Scrutiny by Showing That its Admissions Policy Does Not Engage in Illegitimate Racial Stereotyping or Discriminate Against Asian American Applicants .............................25

III. SFFA's Request for Injunctive Relief Prohibiting the Use of Race Is Unmoored from Its Claims ............................................................................29

CONCLUSION .......................................................................................................31

CERTIFICATE OF COMPLIANCE ......................................................................33

CERTIFICATE OF SERVICE ...............................................................................34

iii

# TABLE OF AUTHORITIES

**Page(s)**

## Cases

*Cooper v. Harris*,
137 S. Ct. 1455 (2017)........................................................................................21

*Feliciano de la Cruz v. El Conquistador Resort & Country Club*,
218 F.3d 1 (1st Cir. 2000)...................................................................................24

*Fisher v. Univ. of Tex. at Austin (Fisher II)*,
136 S. Ct. 2198 (2016)..................................................................................13, 29

*Fisher v. Univ. of Tex. at Austin (Fisher I)*,
570 U.S. 297 (2013)..............................................................................13, 26, 28

*Gratz v. Bollinger*,
539 U.S. 244 (2003)............................................................................................30

*Grutter v. Bollinger*,
539 U.S. 306 (2003)....................................................................................*passim*

*Pers. Adm'r of Mass. v. Feeney*,
442 U.S. 256 (1979)....................................................................................22, 23

*Regents of Univ. of Cal. v. Bakke*,
438 U.S. 265 (1978) (opinion of Powell, J.)............................................5, 13, 30

*Thomas v. Eastman Kodak Co.*,
183 F.3d 38 (1st Cir. 1999).................................................................................24

*United States v. Stokes*,
124 F.3d 39 (1st Cir. 1997).................................................................................29

*Vill. of Arlington Heights v. Metropolitan Hous. Dev. Corp.*,
429 U.S. 252 (1977)..............................................................................20, 23, 24

*Washington v. Davis*,
426 U.S. 229 (1976)............................................................................................24

iv

*Wygant v. Jackson Bd. of Educ.*,
476 U.S. 267 (1986) (O'Connor, J., concurring)................................................29

## Other Authorities

Amanda Lewis & John Diamond, Despite the Best Intentions: How
Racial Inequality Thrives in Good Schools (2015) ...........................................11

Harriet Tenenbaum & Martin Ruck, *Are Teachers' Expectations*
*Different for Racial Minority Than for European American*
*Students?*: *A Meta-Analysis*, 99 J. of Educ. Psychol. 253 (2007) .....................11

Saul Geiser, Norm-Referenced Tests and Race-Blind Admissions: The
Case for Eliminating the SAT and ACT at the University of
California, UC Berkeley CSHE 15.17 (Dec. 2017)...........................................11

U.S. Dep't of Educ., Office for Civil Rights, 2013-2014 Civil Rights
Data Collection: A First Look (rev. Oct. 2016)..................................................11

## INTEREST OF AMICI CURIAE[1]

Student-amici are a racially diverse group of students, alumni, and prospective students who seek to protect Harvard College's freedom to consider race in admissions to the full extent allowed by law. Student-amici have contributed to this case not only through briefing, but also by providing direct testimony. The district court, acknowledging the uniquely valuable perspective Student-amici offer, permitted the following four Student-amici to testify at trial about their experiences with Harvard's admissions process and as students on Harvard's campus:

- **Thang Diep**, who identifies as Vietnamese American, immigrated to the United States when he was eight. He grew up in Los Angeles, in a low-income, predominantly Black and Latinx community.[2] As a child, he was bullied because of his name, accent, and limited English, leading him to distance himself from his Vietnamese identity. Only in high school did he fully grapple with and embrace his culture. Mr. Diep graduated as the valedictorian of his magnet high school and studied neurobiology as a member of Harvard's class of 2019. He hopes to become a pediatrician working in immigrant communities and communities of color.

---

[1] All parties have consented to the filing of this brief. No party's counsel authored this brief in whole or in part, and no person, other than amici or their counsel, contributed money intended to fund the preparation or submission of this brief.

[2] Student-amici use the terms "Black" and "African American" interchangeably and the term "White" to mean White/Non-Hispanic. Student-amici use the term "Hispanic" interchangeably with the gender-neutral term "Latinx."

- **Sarah Cole**, who identifies as Black, experienced significant financial instability throughout her childhood in Kansas City, Missouri. She pushed herself to excel academically and earned a scholarship to an excellent private high school. She not only earned straight As and A pluses; she helped develop a citywide initiative to decrease youth violence in Kansas City after losing a friend to gun violence. At Harvard, Ms. Cole developed her own major in Education and American Society and served as president of the Black Students Association. Since graduating in 2016, Ms. Cole received a degree from the Harvard Graduate School of Education and has taught at two public schools with overwhelmingly minority student bodies.

- **Itzel Vasquez-Rodriguez**, who identifies as Xicana (indigenous Mexican American), grew up in a diverse community in southern California. She graduated in the top 1% of her high school class after pursuing a rigorous curriculum that included summer community college courses and ten Advanced Placement exams. At Harvard, Ms. Vasquez-Rodriguez belonged to several cross-racial student groups and helped lead a coalition that persuaded the college to approve an Ethnic Studies track. After graduating, she spent a year volunteering with nonprofits in indigenous communities in Peru and has since begun a fellowship as a legislative aide in California.

- **Sally Chen**, who identifies as Chinese American, was raised in a working-class immigrant family in San Francisco. Growing up, she served as her parents' translator and advocate in many different settings, helping them overcome cultural and linguistic barriers. She served as the student body president of her high school and participated in a citywide youth leadership program. Ms. Chen studied history, literature, and women, gender, and sexuality studies as a member of Harvard's class of 2019, and remains dedicated to community advocacy work.

These students, like all Student-amici, have a significant interest in ensuring that Harvard can continue to consider race in the admissions process in order to

achieve its educational mission.  Only by considering race alongside many other factors can Harvard recognize the full potential of many exceptional students, attract a truly diverse student body, and harness the many benefits that diversity produces on campus and beyond.

## SUMMARY OF THE ARGUMENT

Harvard's undergraduate admissions process is unquestionably consistent with the commands of the Supreme Court's framework for evaluating race-conscious higher education admissions.  The district court's ruling upholding that process as necessary and narrowly tailored is fully corroborated by the experiences that Student-amici described at trial.   Absent consideration of race, Harvard would miss out on extraordinary students like Student-amici whose ethno-racial identities were central to their applications and who might otherwise have been undervalued or overlooked.  And under every "race-blind" alternative proposed by SFFA, Harvard would lose a significant number of the underrepresented students whose presence on campus is critical to reducing racial isolation, improving cross-racial understanding, and producing the myriad other benefits that the Supreme Court has recognized flow from student body diversity.

The district court also correctly held that SFFA's intentional discrimination claim fails under any legal framework.  The crux of the allegation is that Harvard

3

intentionally treats Asian American applicants *worse* than similarly situated White applicants. That claim is distinct from SFFA's broader challenge to Harvard's race-conscious admissions policy. Put simply, Harvard openly considers race in admissions for the purpose of promoting diversity, but it categorically denies using race to advantage White applicants vis-à-vis Asian American applicants, and there was no evidence presented at trial suggesting it does so. Absent proof of a race-based policy or practice disadvantaging Asian American applicants, SFFA cannot obtain the benefit of strict scrutiny on this claim. The district court, nevertheless, applied strict scrutiny. After exhaustively reviewing the record, the district court correctly found no evidence that Harvard's race-conscious admissions policy intentionally disadvantages Asian American applicants. Thus, under any standard, SFFA's intentional discrimination claim fails. Indeed, the application files of Student-amici Mr. Diep and Ms. Chen further undermine SFFA's claim, as Harvard admissions officers recognized that their Asian American identities and rich life experiences would contribute greatly to the campus environment.

Even if this Court finds in favor of SFFA on one of its claims (which it should not), SFFA would not be entitled to the remedy it seeks—an injunction forbidding Harvard's admissions officers from even learning an applicant's race. Such an injunction would not address any underlying violation and would

4

unnecessarily harm talented students like Student-amici whose lives have been

shaped by race and whose participation on Harvard's campus enriches the

educational experiences of all students.

## ARGUMENT

### I. Student-Amici's Experience Demonstrates That Harvard's Consideration of Race Is Narrowly Tailored and Remains Necessary to Pursue Its Compelling Interest in Diversity

For more than forty years, the Supreme Court has recognized that

universities have a compelling interest in attaining the "substantial, … important

and laudable" benefits that flow from a diverse student body. *Grutter v. Bollinger*,

539 U.S. 306, 330 (2003); *Regents of Univ. of Cal. v. Bakke*, 438 U.S. 265, 311-15

(1978) (opinion of Powell, J.). A university seeking to achieve these benefits may

therefore consider race in the admissions process, so long as the use of race is

necessary and "narrowly tailored" to that end. *Grutter*, 539 U.S. at 333-34.

Student-amici's testimony and files, combined with the ample evidence offered by

Harvard and SFFA's own experts, demonstrate that Harvard's limited, flexible

consideration of race is critical to achieving the benefits of student body diversity.

**A.**     **Harvard's Admissions Process Allows Racially Diverse Students, including Student-Amici, to Fully Disclose Their Identities and Reveal Their Potential for Academic Success**

Harvard employs a "whole-person" admissions process that considers all available information about an applicant in an effort to identify exceptional students who will enrich the educational experience on campus. Addendum (ADD) 9, 11. The district court correctly found that eliminating race-conscious admissions would undermine that effort by (i) "depriv[ing] applicants, including Asian American applicants, of their right to advocate the value of their unique background, heritage, and perspective," and (ii) "depriv[ing] Harvard of exceptional students who would be less likely to be admitted without a comprehensive understanding of their background." ADD111-12. These findings are amply supported by Student-amici's testimony and application files and should not be disturbed on appeal.

All four testifying Student-amici stated at trial that sharing their ethno-racial identity on their applications was necessary to portray themselves fully and authentically. They explained that their ethno-racial identities are inextricably tied to their experiences, viewpoints, interests, and future ambitions. Joint Appendix (JA) 2544-48; JA2615-16; JA2674-76; JA2733-35. Their files uniformly show that Harvard's consideration of race is consistent with Supreme Court precedent.

6

Harvard's admissions officers consider race only as a "plus" factor and only alongside many other attributes, and they flexibly apply this consideration to applicants of all racial backgrounds, including Asian American applicants.

For Mr. Diep, for example, ethno-racial identity was central to his personal essay. He explained that his name and accent caused him to be bullied as a child, but also motivated him to succeed. JA2674-75; Sealed Supplemental Appendix (SA) 538. He recalled perfecting his pronunciation by reading with "pencil[s] between [his] teeth," pursuing a rigorous linguistics curriculum, and learning to embrace his identity. SA538. Mr. Diep's application file reflects the many factors that Harvard considers in its flexible, individualized process: the same reader who commented on his "Vietnamese identity & pencils as tools" also praised him for "pushing himself academically and personally." SA530. His file also illustrates how race and identity can help contextualize other aspects of a student's application. In his case, the discussion of the language barriers he faced growing up likely helped contextualize his SAT score, which was "on the lower end of the Harvard average." SA557.

Ms. Vasquez-Rodriguez similarly wrote about her "experiences as a young [X]icana in Southern California," where she often felt like an "ethnic outsider." JA2544-45; SA577. She described attending schools where Latinx students were

often placed in special education and where many viewed being "Latina and being smart as mutually exclusive." SA577; JA2544. Ms. Vasquez-Rodriguez explained that her culture ultimately "gave [her] the motivation to succeed and inspire others." SA577. Harvard's admissions officers noted her connection to her Latinx heritage, SA565-66, but did not reduce Ms. Vasquez-Rodriguez to her race. Many of the markups on her file focus on Ms. Vasquez-Rodriguez's extraordinary achievements across multiple domains, including her class rank, her strong AP scores, her athletic success, and her work as a newspaper editor and volunteer. SA565-66, 586, 603. Other notations make clear that her success is all the more impressive in light of the fact that her father was unemployed, that she lived between two homes for years, and that only a quarter of students at her school attend four-year colleges. SA565-66.

Student-amici's experience thus demonstrates that SFFA's proposed "colorblind" admissions policy, which would forbid Harvard's admissions officers from "be[ing] aware of or learn[ing] the race or ethnicity of any applicant for admission," JA226, is both unnecessary and deeply misguided. Had Student-amici been forced to remove race entirely from their applications, their applications would have been conspicuously incomplete. To start, the students may have needed to excise references to important extracurricular activities (e.g., Latino

8

Club), academic distinctions (e.g., National Hispanic Scholar), and potentially even surnames. Precluding applicants from mentioning such activities, or in any way discussing their race or heritage in their essays and interviews, would have made it difficult, if not impossible, for Harvard to accurately evaluate their academic potential, likely contributions to campus, and promise as future citizen-leaders in line with its mission. As the district court correctly noted, "race can profoundly influence applicants' sense of self and outward perspective." ADD111; *see also Grutter*, 539 U.S. at 333 (acknowledging that a person's "own, unique experience" of race "is likely to affect [his or her] views" in light of present-day racial inequities). Many applicants' ambitions and passions are therefore deeply informed by their race. Ms. Vasquez-Rodriguez, for example, spoke powerfully in her essay about her desire to "inspire [her] fellow Latinos to embrace [their] culture"—a promise she kept on campus by participating in numerous affinity groups and co-leading a cross-cultural coalition. SA577; JA2551-53.

Student-amici's experience also rebuts SFFA's argument that race is "the predominant factor" in Harvard admissions. Br. 51-53. SFFA failed to identify a single application out of the 480 files that Harvard produced that reflects the "giant … preference" or "boost" that it alleges Harvard gives to Black and Latinx applicants. *Id.* at 50, 52. And Student-amici's files are strong evidence to the

9

contrary, as not one of those files reveals that the applicant received an outsized boost based on race. For example, the admissions officers reviewing Ms. Cole's file made no reference to the fact that she is Black, commenting instead on her "scholastic prowess," leadership roles, part-time employment, and impressive personal qualities. SA615, 643-44. To the extent that race played a limited role in admissions decisions for Ms. Cole and others, it was more than justified based on their unique talents and ability to meaningfully contribute to campus diversity.

SFFA also points (Br. 52) to its expert's analysis of admission rates for students by "academic decile"—a metric based exclusively on an applicant's SAT scores and grades, which is a far narrower approach to academic qualifications than Harvard's approach. The analysis shows that for each academic decile, admission rates vary by race. But this fact alone does not demonstrate that Harvard uses race to take "noncompetitive" Black and Latinx applicants and "make them competitive," as SFFA contends. *Id.* Because top academic scores are common among Harvard applicants, many students in lower deciles are still academically exceptional. For example, Mr. Diep fell in a mid-range decile that SFFA disparages as "noncompetitive," *id.*, but, in fact, Mr. Diep displayed great academic potential, graduating as valedictorian of his magnet program. JA2681; JA5993; SA552. As the district court correctly found, "[e]very student Harvard

10

admits is academically prepared for [its] educational challenges" and possesses a "similar level of academic potential." ADD119.[3]  After satisfying a basic threshold of strong grades and test scores, applicants must stand out by displaying additional strengths.  Moreover, academic credentials are subject to their own racial biases and are poor predictors of college success.  As trial testimony confirmed, Black and Latinx students have more limited access to advanced course offerings and standardized test preparation.  JA2701; JA2678; JA2600.[4]  In addition, elementary and secondary school educators tend to view Black and Latinx students as having less academic potential irrespective of their qualifications.  JA2678.[5]  Because

---

[3] SFFA elsewhere argues that low-income students' relatively lower SAT scores do not mean that those students "are less academically gifted," but rather that they lack the "advantages that allow [wealthy students] to perform better on standardized tests."  Br. 60.  It is undisputed that Black and Latinx applicants to Harvard are more likely than White or Asian American applicants to have lower family incomes.  ADD36.  SFFA's own reasoning thus supports the district court's finding that Black and Latinx students may fall within lower academic deciles but are just as "academically gifted."

[4] *See also* U.S. Dep't of Educ., Office for Civil Rights, 2013-2014 Civil Rights Data Collection: A First Look (rev. Oct. 2016); Saul Geiser, Norm-Referenced Tests and Race-Blind Admissions: The Case for Eliminating the SAT and ACT at the University of California, UC Berkeley CSHE 15.17 (Dec. 2017).

[5] *See also* Amanda Lewis & John Diamond, Despite the Best Intentions: How Racial Inequality Thrives in Good Schools 166-68 (2015); Harriet Tenenbaum & Martin Ruck, *Are Teachers' Expectations Different for Racial Minority Than for European American Students?*: *A Meta-Analysis*, 99 J. of Educ. Psychol. 253 (2007).

these factors deflate the grades and scores of talented Black and Latinx students, academic metrics alone systematically underpredict these students' true potential.

The district court therefore correctly found that some consideration of race is necessary to enable Harvard to admit exceptional students, like Student-amici, who might otherwise be overlooked but who are well prepared for Harvard's challenges. ADD111-12, 119.

### B.  Harvard's Admissions Process Is Necessary to Harness the Educational Benefits That Flow from a Diverse Student Body

As the district court concluded, "Harvard's interest in student body diversity is substantial and compelling." ADD106-07. Student-amici's testimony powerfully corroborates that finding, demonstrating that student body diversity continues to yield numerous benefits for the academic environment and for the nation more broadly. Student-amici further demonstrated that under the "race-blind" alternatives SFFA proposes, Harvard would not be able to achieve the level of representation—both across and within racial groups—necessary to produce these benefits.

#### 1.  Student-amici's testimony demonstrates the continuing importance of student body diversity

The Supreme Court has recognized the benefits of student body diversity for decades. A diverse student body "'promotes cross-racial understanding, helps to

break down racial stereotypes, and enables students to better understand persons of different races.'" *Fisher v. Univ. of Tex. at Austin (Fisher II)*, 136 S. Ct. 2198, 2210 (2016). It also facilitates "enhanced classroom dialogue and the lessening of racial isolation" on campus. *Fisher v. Univ. of Tex. at Austin (Fisher I)*, 570 U.S. 297, 308 (2013). And crucially, it helps "prepar[e] students for work and citizenship" in our extraordinarily diverse society. *Grutter*, 539 U.S. at 331; *see also Bakke*, 438 U.S. at 313 ("[T]he nation's future depends upon leaders trained through wide exposure to the ideas and mores of students as diverse as this Nation of many peoples." (internal quotation marks omitted)). Student-amici's testimony confirms that the diversity on Harvard's campus continues to produce these essential benefits.

*Enhancing classroom dialogue.* Student-amici's testimony illustrated that all students benefit when diverse experiences and perspectives are represented in the classroom. Ms. Cole testified, for example, that professors and classmates had repeatedly gone out of their way to thank her for sharing her perspective in class. JA2613. Ms. Vasquez-Rodriguez similarly confirmed that learning with students from different ethno-racial backgrounds "made [her] a much better listener, a more empathetic person, someone who is a [] critical thinker." JA2557; *see also* JA2686-87 (Mr. Diep).

13

*Combating racial isolation, hostility, and stereotyping.*  Student-amici further explained that, beyond the classroom, students of color often seek each other out to overcome feelings of intimidation and find belonging, inclusion, and community.  JA2550, JA2554-55; JA2607.  That sense of community is only possible if students of color exist in sufficient numbers on campus.  *See, e.g.*, JA2612.  In one powerful example, one student testified that she and her friends were called "wetbacks," but were able to overcome it without feeling too threatened because they were in "a large group of students."  JA2663.

The presence of sufficient students of color also helps reduce the likelihood that incidents like that will occur in the first place.  *See infra* pp.15-19.  It signals to students on campus that "discrimination and microaggressions are not something that the broader community would tolerate."  JA2711.  And it makes it "harder to have stereotypes" when there are more minority students participating in campus life and interacting with other students.  *Id*.  The testimony at trial demonstrated that affinity and cultural groups organize events that combine educational aspects with cultural activities.  These events are generally not limited to minority students, but are "very welcoming spaces for other students as well."  JA2669-70; *see also* JA2630-31, 2666-67.  The benefits of diversity thus flow to all students on campus.

14

*Preparing students for leadership.* Finally, the interactions among a diverse student body help prepare all students to assume leadership roles in an increasingly diverse society. Ms. Vasquez-Rodriguez, who currently serves as a legislative aide in California, recognized that Harvard's racial diversity "made [her] a better policy maker, a better policy thinker and much better equipped" to work with diverse populations. JA2557. Mr. Diep, an aspiring pediatrician, similarly recognized that his discussions on campus with other students of color provided him with a "tool set to think about cultural sensitivity and cultural competency." JA2687, 2690. Since then, he has reflected on how to design health studies that are inclusive of all communities. JA2687-88, 2690-91.

### 2. SFFA's proposed alternatives could not achieve the breadth and depth of student body diversity necessary to realize these benefits

SFFA does not directly dispute that racial diversity produces these benefits and many others. Instead, SFFA principally argues that a "colorblind" system could achieve these same benefits. Br. 25, 56. The district court correctly concluded, however, that no race-blind alternative would allow Harvard to "achieve the level of racial diversity it has credibly found necessary for its educational mission." ADD83.

As an initial matter, both parties' experts agreed that there would be a precipitous drop in diversity if Harvard stopped considering race. The share of Black students in the admitted class, for example, would decline from 14% to 6%. JA2293-94, JA2329-30; JA3062-65. The result would be 1,100 fewer underrepresented students on campus over four years. JA2329-30. As Student-amici's testimony confirmed, this drop would leave minority students "feel[ing] isolated or like spokespersons for their race." *Grutter*, 539 U.S. at 318-19; *see, e.g.*, JA2553; JA2612-13; JA2685; JA2672-73; JA2744-45. Ms. Cole, for example, testified that building a community for students of color would "become[] more exhausting" with fewer minority students on campus. JA2612.

SFFA argues that "non-racial" alternatives[6] could offset these declines. It specifically points to its expert's "Simulation D," which would require Harvard to increase its tip for low-income students and eliminate tips for legacies. Br. 56-62. But Simulation D reduces the proportion of Black students on campus from 14% to 10%. SFFA asserts "there was no evidentiary support" for the proposition that cutting the number of Black students by approximately one-third would impair

---

[6] Student-amici use the term "race-blind," "colorblind," or "non-racial" alternatives (rather than "race-neutral") to describe policies that seek to increase diversity without considering race, as those policies may in fact harm students of color.

16

Harvard's educational objectives.  Br. 59.  But at trial, multiple Student-amici testified that this decline in Black students would produce immediate, acute harms.  Mr. Diep testified it "would hurt [his] education dramatically" because Black organizations and friends had helped him "learn[] how to build coalition[s]" and "be aware of class differences."  JA2688.  Ms. Vasquez-Rodriguez similarly explained that a decreased Black presence would be "really problematic" for her work building cross-racial coalitions "because black student groups on campus tend to be more established."  JA2555-56; *see also* JA2612-13 (testimony of Ms. Cole).

Student-amici's testimony further explained that SFFA's models likely understate the impact that eliminating race-conscious admissions would have on Harvard's ability to enroll a diverse student body.  Multiple Student-amici testified that they would have had reservations about attending Harvard if it did not consider race in admissions, *see* JA2550-51; JA2603-04, as a "colorblind" policy would signal that Harvard does not value fostering a diverse community.  JA2656-57; JA2617-18.  As Ms. Chen explained, "I could not see myself being part of an institution that didn't value me and my experiences when I was fighting so hard to articulate them."  JA2745.

17

    SFFA's models also ignore that Harvard's consideration of race in admissions promotes diversity *within* racial groups, including Asian Americans. Harvard's holistic admissions process enables admissions officers to appreciate the diversity, for example, among Asian Americans, who vary widely in their ethnic, cultural, linguistic, socioeconomic, political, and religious backgrounds.  Indeed, while eliminating race-conscious admissions could produce a slight (i.e., less than 1%) increase in the likelihood of admission for some Asian American applicants, ADD79, it would *decrease* the odds for other "Asian American students from disproportionately less advantaged backgrounds who tell compelling stories about their personal identities that require an understanding of their race."  ADD84 n.51; *see also supra* p.7 (explaining that Mr. Diep's application contextualized his SAT score).

    Reducing diversity within diversity would harm all students at Harvard.  Ms. Chen testified that it is important to have different experiences reflected in the Asian American student population to "dispel … overarching myths about what it means to be Asian American."  JA2743-44.  Mr. Diep testified that he felt "marginalized" and "erased" when he did not see himself "reflected in the greater Asian community on campus," which he explained includes more East Asian

students than Southeast Asian students of Vietnamese, Cambodian, or Laotian backgrounds. JA2682-83.

Finally, any losses in racial diversity under SFFA's proposed alternatives would not be offset by gains in socioeconomic diversity. Socioeconomic diversity "makes Harvard's campus a richer place," JA2614-15, but race often plays a critical role in shaping personal identity that socioeconomic status alone cannot capture. JA2556; JA2615-16. Ms. Vasquez-Rodriguez testified that because ethno-racial identity is "more visibly salient," the discrimination she has experienced has been based on race, not socioeconomic status. JA2556. Ms. Cole similarly described the racial discrimination that she and her family have experienced over the years, including the difficulty her mother faced getting schools to "take … seriously that her black daughter might be gifted." JA2614-16; *see* JA2616 ("[R]egardless of whether we were struggling financially or not, our race has always shaped our experience[.]"). Thus, SFFA is simply wrong to suggest that Harvard should just exchange one type of diversity for another. Consistent with Supreme Court precedent, Harvard can and does take steps to cultivate both socioeconomic *and* racial diversity on campus.

## II. The District Court Correctly Rejected SFFA's Claim That Harvard Unlawfully Discriminates Against Asian American Applicants

After performing a searching analysis, the district court found "no evidence of any racial animus whatsoever or intentional discrimination on the part of Harvard" against Asian American applicants. ADD123. Under well-settled equal protection principles, SFFA cannot skip straight to strict scrutiny's demanding standard without first making a showing that Harvard's admissions program has racial classifications favoring White applicants over Asian American applicants. Accordingly, the district court should have first considered SFFA's separate intentional discrimination claim (Count I) under the *Arlington Heights* framework. *Vill. of Arlington Heights v. Metropolitan Hous. Dev. Corp.*, 429 U.S. 252, 265-68 (1977). Indeed, as Harvard notes (Br. 35), SFFA previously agreed that this standard applied to Count I. The district court correctly found that SFFA's claim would fail under *Arlington Heights*, ADD104-05 n.56; ADD124 n.62, but also applied strict scrutiny to the claim. Even applying a rigorous strict scrutiny analysis, the district court correctly rejected SFFA's claim on Count I. The evidence showed that Harvard does not intentionally discriminate against Asian American applicants vis-à-vis White applicants, and absent that showing, Harvard's program easily satisfies strict scrutiny and SFFA cannot satisfy

20

*Arlington Heights*.  ADD111-12, 123-24; ADD104-05 n.56; ADD124 n.62.  The district court's analysis is based on factual findings subject to clear error review, and SFFA provides no reason to disturb it on appeal.  *See Cooper v. Harris*, 137 S. Ct. 1455, 1465 (2017).

### A. SFFA Did Not Meet Its Burden of Proving That Harvard Discriminates Against Asian American Applicants vis-à-vis White Applicants

SFFA's intentional discrimination claim alleges that Harvard intentionally treats Asian American applicants worse than applicants who do not receive race-based "tips" in Harvard's admissions process—namely, White applicants.  This claim is legally and factually distinct from SFFA's other claims on appeal.  SFFA's claims about racial balancing, using race as more than a "plus" factor, and the availability of "race-blind" alternatives all challenge the implementation of a policy that Harvard openly acknowledges:  the consideration of race as one factor in a holistic admissions process designed to realize the benefits of student body diversity.  Strict scrutiny clearly applies to that policy, which *expressly* gives "tips" based on race.  *See* JA4540.

But SFFA's intentional discrimination claim is a different matter.  This claim accuses Harvard of a separate practice that Harvard has *never* admitted, and for which there is no proof:  using race to disadvantage Asian American applicants

21

vis-à-vis similarly situated White applicants—a practice that would not promote diversity.  Br. 22, 30, 32, 42, 45.  SFFA seeks to shift the burden to Harvard on the intentional discrimination claim, suggesting that strict scrutiny applies to any and all challenges to Harvard's admissions process because *some* aspects of Harvard's process involve the use of race.  Br. 25-26; *see also* ADD104.  But in intentional discrimination cases, a plaintiff carries the initial burden of showing that the defendant purposefully classifies individuals by race in the manner alleged.  *See, e.g.*, *Pers. Adm'r of Mass. v. Feeney*, 442 U.S. 256, 272-73, 279 (1979).

The fact that Harvard considers race to promote diversity does not presumptively demonstrate that Harvard purposefully discriminates between Asian American applicants and White applicants.  If SFFA's logic were correct, a rejected applicant could challenge *any* component of Harvard's admissions policy as racially discriminatory—say, its use of legacy preferences—and obtain the benefit of strict scrutiny without ever having to show discriminatory intent.  That rule would result in endless litigation and deter colleges from adopting lawful admissions policies that harness diversity's substantial benefits as permitted by the Supreme Court.

Given the absence of any policy or admitted practice of disadvantaging Asian American applicants, SFFA bore the burden of proving by a preponderance

of evidence that Harvard intentionally discriminated against Asian American applicants vis-à-vis White applicants. *See Arlington Heights*, 429 U.S. at 265-66. The record is devoid of such evidence, and the district court therefore did not commit reversible error by finding that SFFA failed to make such a showing. ADD111-12, 123-24; *see also* ADD104-05 n.56. Indeed, as the application files of Mr. Diep and Ms. Chen powerfully demonstrate, Harvard's program considers each Asian American applicant holistically, individually, and with sensitivity to how their ethnicity has shaped their perspective. Ms. Chen, for example, testified that when she "wrote about [her] experiences growing up Chinese-American" in her admissions essay, she was "very much seen and [her] story was heard." JA2745-46. The district court credited Student-amici's evidence, along with the "consistent, unambiguous, and convincing" testimony of Harvard's admissions officers, that Harvard never viewed race negatively, and never disparaged or stereotyped applicants, including Asian American applicants, based on race. ADD111-12, 125.

The court was not obligated to find discrimination simply because SFFA's expert found a statistically significant difference in the personal ratings and admission rates of Asian American applicants (once the personal rating was removed). *See* ADD68-72, 74-80. A "discriminatory purpose" requires "more

23

than intent as volition or intent as awareness of consequences." *Feeney,* 442 U.S. at 279. Statistical disparities can, of course, be an "important starting point" in assessing whether officials were motivated by a discriminatory purpose. *Arlington Heights*, 429 U.S. at 266; *see also Washington v. Davis*, 426 U.S. 229, 242 (1976). Nonetheless, in the equal protection context, such disparities on their own will only "rare[ly]" support an inference of discriminatory intent and generally require corroborating evidence. *Arlington Heights*, 429 U.S. at 266. The evidence of disparate impact must reveal "a clear pattern, *unexplainable* on grounds other than race." *Id.* (emphasis added). SFFA did not come close to proving that a statistical disparity in the personal rating satisfied that standard, and, furthermore, the district court found SFFA's statistical evidence to be an imperfect analysis that ignored many factors that influenced the personal rating. ADD68-72, 74-80, 123-126.

SFFA's allegations of unconscious bias (Br. 39) must satisfy similar standards of proof. Student-amici recognize that in an appropriate case, a plaintiff can prove intentional discrimination by showing that the defendant acted "based on stereotyped thinking or other forms of less conscious bias." *Thomas v. Eastman Kodak Co.*, 183 F.3d 38, 42 (1st Cir. 1999). But no court has permitted a plaintiff to make its case simply by noting statistical disparities and merely alleging, as opposed to proving, that implicit bias is at work. *Cf. Feliciano de la Cruz v. El*

24

*Conquistador Resort & Country Club*, 218 F.3d 1, 9 (1st Cir. 2000) (requiring plaintiff who had alleged implicit bias to provide "evidence that [her employer's] evaluation of her performance was infected by stereotyped thinking or other types of unconscious national-origin bias"). Here, SFFA made no attempt to introduce evidence explaining the nature of implicit bias or the way it might be operating in Harvard's admissions office. In the district court's words, the allegation that admissions officers harbored implicit bias was entirely "unsupported by any direct evidence before the Court." ADD72.

SFFA must face the same standards as any other plaintiff bringing an intentional discrimination claim. It would defy the spirit, purpose, and plain text of Title VI to make plaintiffs suing colleges with lawful race-conscious admissions programs uniquely exempt from the general rule requiring proof of intentional discrimination.

### B. Harvard Satisfied Strict Scrutiny by Showing That its Admissions Policy Does Not Engage in Illegitimate Racial Stereotyping or Discriminate Against Asian American Applicants

Even assuming Harvard bore the burden on this claim under strict scrutiny, Harvard more than satisfied that burden. Harvard demonstrated both that it does not discriminate against Asian American applicants and that the reason for its race-conscious policy (to promote diversity) is sincere and not an illegitimate

mechanism for racial stereotyping or suppressing the number of Asian American students at Harvard.

Strict scrutiny requires a "searching" and "detailed judicial inquiry" to "'smoke out' illegitimate uses of race." *Grutter*, 539 U.S. at 326; *see also Fisher I*, 570 U.S. at 313 (explaining that, under *Grutter*, courts must apply strict scrutiny by "giving close analysis to the evidence of how the process works in practice"). The ultimate purpose of strict scrutiny is to "carefully examin[e] the importance and the sincerity" of the university's race-conscious policy to ensure "there is little or no possibility that the motive for the classification was illegitimate racial prejudice or stereotype." *Grutter*, 539 U.S. at 327, 333.

The district court performed precisely the searching and detailed analysis called for by strict scrutiny. After reviewing all the evidence, the court found no evidence of "systemic reliance on racial stereotypes" by Harvard admissions officers, ADD47; "no evidence of any discriminatory animus or conscious prejudice" against Asian Americans, ADD111; and "no evidence of discrimination in the personal ratings" beyond a slight statistical disparity, which "reflects neither intentional discrimination against Asian American applicants nor a process that

was insufficiently tailored to avoid the potential for unintended discrimination."
ADD110-11.[7]

SFFA argues that the district court erred by giving Harvard "the benefit of
the doubt" at every turn, despite competing evidence. Br. 28-29. But the court did
not find the evidence in equipoise as SFFA suggests. The court cited extensive
evidence showing that Harvard's race-conscious policy does not—in motivation or
in practice—intentionally discriminate against Asian American applicants vis-à-vis
White applicants. ADD111-12, 123-24. In certain cases, it *benefits* Asian
American applicants, as the application files of Mr. Diep and Ms. Chen vividly
demonstrate. *See supra* pp.22-23. SFFA points to a comment by a high school
counselor—not Harvard—discouraging Ms. Chen from "writing an Asian
immigrant story" for her personal essay because such stories were "overdone." Br.
10. But Ms. Chen did not heed this advice, and Harvard *admitted* Ms. Chen.
JA2745-46. The episode, if anything, disproves SFFA's claims. *See* ADD70-72.

---

[7] SFFA misstates the district court's findings, repeatedly asserting the court
"affirmatively found that 'it may be that there is overt discrimination or implicit
bias at work to the disadvantage of Asian American applicants.'" Br. 29 (quoting
ADD110). The court was describing a hypothetical possibility, before proceeding
to *reject* that possibility. ADD110-11. The paragraph ends by ultimately finding
that the disparity in the personal rating "reflects neither intentional discrimination
against Asian American applicants nor a process that was insufficiently tailored to
avoid the potential for unintended discrimination." *Id.*

The district court contrasted Student-amici's evidence and the testimony of dozens of Harvard admissions officers with the complete absence of counterexamples in any of the 480 application files that SFFA reviewed or any of its members' application files. *See supra* pp.22-23. SFFA failed to produce "a single admissions file that reflected any discriminatory animus, or even an application of an Asian American who it contended should have or would have been admitted absent an unfairly deflated personal rating." ADD112. Against this showing, Harvard's evidence was more than sufficient to prove the absence of discrimination against Asian American applicants and therefore "smoke out" the true, lawful purpose of Harvard's race-conscious policy.

SFFA also argues that strict scrutiny's "heavy" burden required the district court to rule against Harvard because the record did not definitively resolve what accounts for differences in the personal rating. Br. 27-29. But even if strict scrutiny required Harvard to produce evidence that its policy does not impermissibly discriminate against Asian Americans, *but see* Section II.A, the district court did not have to resolve every factual dispute in Harvard's favor to rule against SFFA's discrimination claim. SFFA's contrary suggestion is legally mistaken and would effectively make strict scrutiny "fatal in fact," which it is not. *See Fisher I,* 570 U.S. at 314. Even under strict scrutiny, the plaintiff carries the

28

ultimate burden of persuading the court that it was denied equal treatment. *Fisher II,* 136 S. Ct. at 2210 (plaintiff must show "by a preponderance of the evidence that she was denied equal treatment"); *Wygant v. Jackson Bd. of Educ.*, 476 U.S. 267, 292 (1986) (O'Connor, J., concurring) ("In 'reverse discrimination' suits … it is the plaintiffs who must bear the [ultimate] burden of demonstrating that their rights have been violated."). Here, in light of all the evidence presented, the district court did not err by finding that SFFA failed to carry the burden of proving that Harvard impermissibly discriminates against Asian American applicants.

In sum, while the burden should not shift to Harvard on SFFA's intentional discrimination claim, *see supra* pp.21-22, the district court correctly held that SFFA's claim fails under any legal standard.

## III. SFFA's Request for Injunctive Relief Prohibiting the Use of Race Is Unmoored from Its Claims

As described above and as the district court found, some consideration of race remains "necessary" for Harvard to achieve its educational objectives. Even if this Court concludes that SFFA prevails on any of its claims (though it should not), the proper remedy would not be the blanket ban on considering race that SFFA seeks. A court must "tailor[]" any relief "to the injury suffered," without "unnecessarily infring[ing] on competing interests." *United States v. Stokes,* 124

F.3d 39, 44 (1st Cir. 1997) (quoting *United States v. Morrison*, 449 U.S. 361, 364 (1981)).  Here, an appropriately tailored remedy on any of SFFA's claims would simply direct Harvard to conform its practice to existing law, not to abandon the consideration of race altogether.

In *Bakke* and *Gratz*, for example, the Supreme Court found aspects of the university's race-conscious program unconstitutional.  *Bakke*, 438 U.S. at 319-320; *Gratz v. Bollinger*, 539 U.S. 244, 275 (2003).  The Supreme Court invalidated the offending practices but refrained from permanently enjoining the university from considering race in the future.  *Bakke*, 438 U.S. at 319-20; *Gratz*, 539 U.S. at 275. Indeed, both *Bakke* and *Gratz* affirmed a university's right to consider race so long as certain criteria were met.

A finding in SFFA's favor on its intentional discrimination claim similarly would not justify SFFA's proposed injunction forbidding Harvard's admissions officers from even learning an applicant's race. JA226.  That remedy would not be tailored to the injury and would severely infringe on important competing interests. As Student-amici have explained, Harvard's consideration of race as a plus factor, as permitted by *Grutter* and *Fisher*, advances important educational interests.  *See supra* pp.12-19.  SFFA's proposed "colorblind" system would undermine those interests and would not even address the alleged harms to Asian American

30

applicants vis-à-vis White applicants. As the district court expressly found, disparities in Asian American admission rates would "not be cured by a judicial dictate that Harvard abandon considerations of race in its admission process." ADD125. Thus, if the Court finds for SFFA on any claim, it should remand for the district court to craft an appropriately limited remedy that permits Harvard to consider race in admissions consistent with existing Supreme Court precedent.

## CONCLUSION

The Court should affirm the judgment of the district court.

Dated: May 18, 2020

Jon M. Greenbaum
David Hinojosa
Genevieve Bonadies Torres
LAWYERS' COMMITTEE FOR
  CIVIL RIGHTS UNDER LAW
1500 K Street, NW, Suite 900
Washington, DC 20005
(202) 662-8600

Respectfully submitted,

 /s/ *Lawrence E. Culleen*
Lawrence E. Culleen
Elisabeth S. Theodore
Nancy L. Perkins
Janine M. Lopez*
ARNOLD & PORTER
  KAYE SCHOLER LLP
601 Massachusetts Ave., NW
Washington, DC 20001
(202) 942-5000
lawrence.culleen@arnoldporter.com

Eri Andriola**
ASIAN AMERICANS
  ADVANCING JUSTICE - AAJC
1620 L Street, NW, Suite 1050
Washington, DC 20036
(202) 296-2300

*Admitted only in Massachusetts;
practicing law in the District of
Columbia during the pendency of her
application for admission to the D.C.
Bar and under the supervision of
lawyers of the firm who are members in
good standing of the D.C. Bar

**Admitted only in New York. DC
practice limited to Federal Courts.

*Counsel for Amici Curiae*

32

## **CERTIFICATE OF COMPLIANCE**

This brief complies with the type-volume limitation of Federal Rule of Appellate Procedure 32 because the brief contains 6,496 words, excluding the parts of the brief exempted by Rule 32(f).  This brief complies with the typeface and type style requirements of Rule 32(a)(5) and Rule 32(a)(6), respectively, because this brief has been prepared in a proportionately spaced typeface using Microsoft Word for Office 365 in Times New Roman 14-point font.


Dated:  May 18, 2020                    */s/ Lawrence E. Culleen*
                                        Lawrence E. Culleen

## **CERTIFICATE OF SERVICE**

I hereby certify that on May 18, 2020, the foregoing Brief of Amici Curiae

Students, Alumni, and Prospective Students of Harvard College Supporting

Defendant-Appellee and Supporting Affirmance was electronically filed with the

Court via the appellate CM/ECF system, and that copies were served on all counsel

of record by operation of the CM/ECF system on the same date.

*/s/ Lawrence E. Culleen*
      Lawrence E. Culleen