No. 19-2005

IN THE

# United States Court of Appeals
## for the First Circuit

---

STUDENTS FOR FAIR ADMISSIONS, INC.,

*Plaintiff-Appellant,*

v.

PRESIDENT AND FELLOWS OF HARVARD COLLEGE,

*Defendant-Appellee.*

---

On Appeal from the United States District Court
for the District of Massachusetts
Case No. 1:14-cv-14176-ADB

---

## BRIEF *AMICI CURIAE* OF THE AMERICAN COUNCIL ON EDUCATION AND 40 OTHER HIGHER EDUCATION ORGANIZATIONS IN SUPPORT OF DEFENDANT-APPELLEE AND AFFIRMANCE

---

PETER MCDONOUGH
VICE PRESIDENT AND GENERAL COUNSEL
AMERICAN COUNCIL ON EDUCATION
One Dupont Circle N.W.
Washington, D.C. 20036
(202) 939-9361
OGC@acenet.edu

*Counsel for American Council on Education*

JESSICA L. ELLSWORTH
STEPHANIE J. GOLD
JO-ANN TAMILA SAGAR
HOGAN LOVELLS US LLP
555 Thirteenth Street, N.W.
Washington, D.C. 20004
(202) 637-5600
jessica.ellsworth@hoganlovells.com

*Counsel for Amici Curiae*

May 21, 2020

# RULE 26.1 DISCLOSURE STATEMENT

*Amici curiae* American Council on Education and the 40 other higher

education associations listed in the Addendum each states that it is a non-profit

association, with no parent corporation, and no publicly held corporation owns 10

percent or more of its stock.


<u>/s/ Jessica L. Ellsworth</u>
Jessica L. Ellsworth

# TABLE OF CONTENTS

Page

RULE 26.1 DISCLOSURE STATEMENT................................................................i

TABLE OF AUTHORITIES .....................................................................iv

STATEMENT OF INTEREST OF *AMICI CURIAE* ................................................1

ARGUMENT ........................................................................................4

  I.   THE SUPREME COURT HAS MADE CLEAR THAT COLLEGES
      AND UNIVERSITIES MAY, WITHIN BROAD LIMITS, DEFINE
      THE DIVERSITY THAT WILL PRODUCE THE EDUCATION
      BENEFITS THEY SEEK FOR ALL STUDENTS AND USE THEIR
      ADMISSION PROCESS TO FURTHER THAT GOAL ..............................4

      A.    Student Diversity, Including Racial Diversity, Advances
            Learning, Enriches Campus Environments, And Prepares
            Students To Thrive In An Increasingly Diverse Workforce And
            Society ....................................................................................4

      B.    For That Reason, Student Diversity Is A Compelling Interest
            That Can Justify The Consideration And Use Of Race In
            College And University Admissions....................................................7

      C.    Because The Compelling Interest At Stake Is Fundamentally
            Educational In Nature And Requires Educational Judgment,
            Courts Owe Considerable Deference To Each Institution's
            Concept Of Diversity.............................................................9

 II.   THE SUPREME COURT HAS ALSO MADE CLEAR THAT
      COLLEGES AND UNIVERSITIES MAY CONDUCT A HOLISTIC
      REVIEW OF APPLICANTS, RECOGNIZING THAT HOLISTIC
      REVIEW IS A CRITICAL TOOL FOR ACHIEVING THE
      EDUCATIONAL BENEFITS OF DIVERSITY ..........................................13

      A.    Holistic Review, Which Involves The Consideration Of Many
            Academic And Non-Academic Factors, Allows Institutions To
            Fully Evaluate Each Applicant, Including His Or Her Potential
            To Contribute Through Varying Experiences And Perspectives........13

# TABLE OF CONTENTS—Continued

Page

    B.    Admissions Decisions Under A Holistic Review
Framework Cannot Be Reduced To An Easy-To-Predict
Formula ...............................................................................18

III.  BECAUSE THE DISTRICT COURT CORRECTLY APPLIED
SUPREME COURT PRECEDENT, THIS COURT SHOULD
AFFIRM THE JUDGMENT BELOW...........................................23

    A.    Decades Ago, Harvard Helped Establish The Basic Framework
For Holistic Review That Has Been Repeatedly Approved By
The Supreme Court ..............................................................23

    B.    Harvard's Current-Day Admissions Policies—Which Are Also
Based In Individualized, Holistic Review—Are Consistent
With Well-Established Supreme Court Precedent .............................24

CONCLUSION .......................................................................27

CERTIFICATE OF COMPLIANCE

CERTIFICATE OF SERVICE

ADDENDUM

# TABLE OF AUTHORITIES

Page

CASES:

*Fisher v. University of Texas*,
    570 U.S. 297 (2013)....................................................................8, 10

*Fisher v. University of Texas*,
    136 S. Ct. 2198 (2016).................................................................*passim*

*Goodman v. Bowdoin Coll.*,
    380 F.3d 33 (1st Cir. 2004)................................................................24

*Gratz v. Bollinger*,
    539 U.S. 244 (2003)..........................................................................24

*Grutter v. Bollinger*,
    539 U.S. 306 (2003).....................................................................*passim*

*Keyishian v. Bd. of Regents of Univ. of State of N.Y.*,
    385 U.S. 589 (1967)......................................................................7, 10

*Parents Involved in Cmty. Sch. v. Seattle Sch. Dist. No. 1*,
    551 U.S. 701 (2007)....................................................................10, 11

*Regents of University of California v. Bakke*,
    438 U.S. 265 (1978).....................................................................*passim*

*Regents of University of Michigan v. Ewing*,
    474 U.S. 214 (1985)..........................................................................10

*Sweezy v. New Hampshire*,
    354 U.S. 234 (1957)...................................................................7, 9, 10

*United States v. Lopez*,
    514 U.S. 549 (1995)....................................................................12, 13

OTHER AUTHORITIES:

*About NMMI*, New Mexico Military Inst.,
    https://www.nmmi.edu/about-nmmi/ (last visited May 21, 2020) ....................21

## TABLE OF AUTHORITIES—Continued

Page(s)

Amy N. Addams et al., Ass'n of Am. Med. Colls., Roadmap to
   Diversity: Integrating Holistic Review Practices into Medical
   School Admissions Processes (2010), *available at*
   http://www.cossa.org/diversity/reports/Integrating_Holistic_Revie
   w_Practices.pdf. ....................................................................................11

*Admission Review Factors and Process*, Univ. of Md.,
   https://admissions.umd.edu/apply/admission-review-factors-and-
   process (last visited May 21, 2020) ....................................................16

Natasha Bach, *Why the University of Chicago Is Dropping Its
   SAT/ACT Test Requirement*, Fortune (June 15, 2018),
   http://fortune.com/2018/06/15/university-of-chicago-drops-act-sat-
   test-requirement-for-admissions/ .......................................................20

Joseph R. Betancourt et al., *Defining Cultural Competence: A
   Practical Framework for Addressing Racial/Ethnic Disparities in
   Health and Health Care*, 118 Pub. Health Rep. 293 (2003) .............................21

Arthur L. Coleman & Jamie Lewis Keith, CollegeBoard &
   EducationCounsel, *Understanding Holistic Review in Higher
   Education Admissions: Guiding Principles and Model Illustrations*
   (2018), *available at*
   https://professionals.collegeboard.org/pdf/understanding-holistic-
   review-he-admissions.pdf .................................................................18

Lorelle L. Espinosa et al., Am. Council on Educ., Race, Class, &
   College Access: Achieving Diversity in a Shifting Legal
   Landscape (2015), *available at* http://www.acenet.edu/news-
   room/Documents/Race-Class-and-College-Access-Achieving-
   Diversity-in-a-Shifting-Legal-Landscape.pdf .............................................19, 20

Nisha C. Gottfredson et al., *Does Diversity at Undergraduate
   Institutions Influence Student Outcomes?*, 1 J. Diversity Higher
   Educ. 80 (2008)..............................................................................4

Patricia Gurin et al., *Diversity and Higher Education: Theory and
   Impact on Educational Outcomes*, 72 Harv. Educ. Rev. 330 (2002) ...............5, 6

# TABLE OF AUTHORITIES—Continued

Page(s)

Sylvia Hurtado & Linda DeAngelo, Linking Diversity and Civic-
    Minded Practices with Student Outcomes: New Evidence from
    National Surveys, 98 Liberal Educ., no. 2, 2012 at 14 .........................................6

David F. Labaree, *A System Without A Plan: Emergence of An
    American System of Higher Education in the Twentieth Century*, 3
    Int'l J. Historiography Educ. 46 (2013) ..............................................................13

Letter from Timothy C.J. Blanchard, U.S. Dep't of Educ., Office for
    Civil Rights, Region II, to Christopher L. Eisgruber, President,
    Princeton Univ. (Sept. 9, 2015), *available at*
    https://www2.ed.gov/about/offices/list/ocr/docs/investigations/020
    86002-a.pdf ....................................................................................................19, 22

Jerome A. Lucido, How Admissions Decisions Get Made, in
    Handbook of Strategic Enrollment Management (Don Hollser, Bob
    Bontrager & Assocs. eds., 2015) ..........................................................15, 16, 17

*Penn State Undergraduate Admissions: Application Review Process
    for First-Year Students*, Penn. State Univ.,
    https://admissions.psu.edu/info/future/firstyear/applicationreview/
    (last visited May 21, 2020) ...............................................................................17, 20

Dawn Rhodes, *University of Chicago To Stop Requiring ACT and
    SAT Scores for Prospective Undergraduates*, Chi. Trib. (June 14,
    2018), http://www.chicagotribune.com/news/local/breaking/ct-
    university-chicago-sat-act-20180614-story.html................................................20

Gretchen W. Rigol, Coll. Bd., Admissions Decision-Making Models:
    How U.S. Institutions of Higher Education Select Undergraduate
    Students (2003), *available at*
    https://files.eric.ed.gov/fulltext/ED562589.pdf ...........................................14, 15

Cecilia Capuzzi Simon, *The Test-Optional Surge*, N.Y. Times (Oct.
    28, 2015),
    https://www.nytimes.com/2015/11/01/education/edlife/the-test-
    optional-surge.html .............................................................................................20

## TABLE OF AUTHORITIES—Continued

Page(s)

Patrick T. Terenzini et al., *Racial and Ethnic Diversity in the
Classroom: Does It Promote Student Learning?* 72 J. Higher Educ.
509 (2001) ............................................................................................5

*The Brown Degree: Grade Options*, Brown Univ.,
https://www.brown.edu/academics/college/degree/policies/grade-
options (last visited May 21, 2020) ...................................................22

*Undergraduate Admission: Admission Philosophy*, Carnegie Mellon
Univ.,
http://coursecatalog.web.cmu.edu/servicesandoptions/undergraduat
eadmission/ (last visited May 21, 2020) ...........................................16

*Undergraduate Admission*, Brown Univ.,
https://www.brown.edu/admission/undergraduate/undergraduate-
admission (last visited May 21, 2020) ...............................................22

## STATEMENT OF INTEREST OF *AMICI CURIAE*[1]

*Amici* are 41 associations of colleges, universities, educators, trustees, and other representatives of higher education in the United States. *Amici* represent public, independent, large, small, urban, rural, denominational, non-denominational, graduate, and undergraduate institutions and faculty. For decades, *amici* have worked to advance student diversity and to open wide the gates of higher education to talented students of all races and backgrounds.

*Amicus* American Council on Education ("ACE") represents all higher education sectors. The more than 1,500 institutions who are members of ACE reflect the extraordinary breadth and contributions of degree-granting colleges and universities in the United States. Founded in 1918, ACE seeks to foster high standards in higher education, believing a strong higher education system to be the cornerstone of a democratic society. Among its initiatives, ACE had a major role in establishing the Commission on Minority Participation in Education and American Life, chaired by former Presidents Ford and Carter, which issued One-Third of a Nation (1988), a report on minority matriculation, retention, and graduation.

---

[1] All parties have consented to the filing of this brief. No party's counsel authored this brief in whole or in part; no party or party's counsel contributed money intended to fund the brief's preparation or submission; and no person other than *amici* contributed money intended to fund the brief's preparation or submission.

ACE is joined in this *amicus* brief by the following organizations:

- The Accreditation Council for Pharmacy Education;
- American Association of Colleges of Nursing;
- American Association of Community Colleges;
- American Association of State Colleges and Universities;
- American Association of University Professors;
- American Dental Education Association;
- American Indian Higher Education Consortium;
- American Speech-Language-Hearing Association;
- Association of American Colleges and Universities;
- Association of American Law Schools;
- Association of American Medical Colleges;
- Association of American Universities;
- Association of Catholic Colleges and Universities;
- Association of Community College Trustees;
- Association of Governing Boards of Universities and Colleges;
- Association of Jesuit Colleges and Universities;
- Association of Public and Land-grant Universities;
- College Board;
- College and University Professional Association for Human Resources;
- Council for Christian Colleges & Universities;
- Council for Opportunity in Education;
- Council of Graduate Schools;
- Council of Independent Colleges;
- EDUCAUSE;
- Hispanic Association of Colleges and Universities;
- Law School Admission Council;
- Middle States Commission on Higher Education;
- NASPA - Student Affairs Administrators in Higher Education;
- National Association for College Admission Counseling;

- National Association of College and University Business Officers;
- National Association of Diversity Officers in Higher Education;
- National Association of Independent Colleges and Universities;
- National Association of Student Financial Aid Administrators;
- National Collegiate Athletic Association;
- New England Commission of Higher Education;
- Phi Beta Kappa;
- Southern Association of Colleges and Schools Commission on Colleges;
- The Common Application;
- University Risk Management and Insurance Association; and
- WASC Senior College and University Commission.

The Addendum explains where to find more information about each amicus.

*Amici* submit this brief to share perspectives and experience on issues of diversity, and admissions in higher education overall, that are important to understand as the Court evaluates the parties' positions. *Amici* believe that a diverse student body is essential to educational objectives of colleges and universities, and that each institution should be able to exercise its academic judgment to determine within broad limits the diversity that will advance its own particular mission. *Amici* also believe that holistic review remains a cornerstone for the consideration of race in admissions because it gives each applicant individualized consideration and reduces no one to his or her race. These principles, taken together with the evidence adduced by the parties at trial, lead *amici* to conclude that the District Court's judgment should be affirmed.

**ARGUMENT**

I. **THE SUPREME COURT HAS MADE CLEAR THAT COLLEGES AND UNIVERSITIES MAY, WITHIN BROAD LIMITS, DEFINE THE DIVERSITY THAT WILL PRODUCE THE EDUCATION BENEFITS THEY SEEK FOR ALL STUDENTS AND USE THEIR ADMISSION PROCESS TO FURTHER THAT GOAL.**

A. **Student Diversity, Including Racial Diversity, Advances Learning, Enriches Campus Environments, And Prepares Students To Thrive In An Increasingly Diverse Workforce And Society.**

Student diversity improves learning outcomes and promotes academic success—the core of higher education's mission. "Educational policies that support daily interactions of students with diverse peers and encourage curricular requirements for multicultural education are shown to have the benefit of producing academically stronger students," that is, "students who are able to hold more complex viewpoints that take multiple perspectives in to account." Nisha C. Gottfredson et al., *Does Diversity at Undergraduate Institutions Influence Student Outcomes?*, 1 J. Diversity Higher Educ. 80, 94 (2008).

Both inside and outside the classroom, interactions among students of different backgrounds introduce them to new perspectives and prompt them to reconsider their own views in a reasoned and analytical way. Studies show that in-class diversity significantly enhances students' abilities both to problem-solve and to work on group projects. *See* Patrick T. Terenzini et al., *Racial and Ethnic Diversity in the Classroom: Does It Promote Student Learning?* 72 J. Higher Educ.

4

509, 527 (2001). And the educational gains of student diversity in less formal settings—like dormitories or dining halls—are often even greater. Studies show that "informal interaction with diverse peers [is] consistently influential [and positive] on all educational outcomes," but is "especially influential in accounting for higher levels of intellectual engagement and self-assessed academic skills." Patricia Gurin et al., *Diversity and Higher Education: Theory and Impact on Educational Outcomes*, 72 Harv. Educ. Rev. 330, 351, 359 (2002).

Student diversity also prepares students for an increasingly diverse workforce—another one of higher education's core missions. As the Supreme Court has noted, "major American businesses have made clear that the skills needed in today's increasingly global marketplace can only be developed through exposure to widely diverse people, cultures, ideas, and viewpoints." *Grutter v. Bollinger*, 539 U.S. 306, 330 (2003). And as these businesses themselves recognize, "[t]he rich variety of ideas, perspectives, and experiences to which both minority and nonminority students are exposed in a diverse university setting, and the cross-cultural interactions that they experience, are essential to the students' ability to function in and contribute to the increasingly diverse community in the United States." Brief of Fortune-100 and Other Leading American Businesses as

*Amici Curiae* in Support of Respondents 9-10, *Fisher II*, 136 S. Ct. 2198 (No. 14-981).[2]

Finally, student diversity prepares students to participate more effectively in our increasingly diverse and interconnected society—yet another core higher education mission. *See* Gurin et al., 72 Harv. Educ. Rev. at 353. Studies have shown that the "quality of students' interactions with peers from different racial or ethnic groups is associated with students' pluralistic orientation skills, civic awareness, and complex thinking skills for a diverse democracy." Sylvia Hurtado & Linda DeAngelo, *Linking Diversity and Civic-Minded Practices with Student Outcomes: New Evidence from National Surveys*, 98 Liberal Educ., no. 2, 2012 at 22. In other words, effective civic participation requires exposure to a variety of viewpoints; a robust exchange of ideas makes students better-informed jurors, voters, and leaders. *See Grutter*, 539 U.S. at 331-332. When college students learn how to break down racial and other stereotypes and consider different perspectives, they carry those lessons with them their whole lives. The individual students and society-at-large then reap the benefits, as our citizens are better able to consider different perspectives or opposing viewpoints and see commonality with those from different backgrounds.

---

[2] *See also* Brief of DuPont, IBM, Intel, and the National Action Council for Minorities in Engineering in Support of Respondents 9-12, *Fisher II*, 136 S. Ct. 2198 (No. 14-981) (applying similar argument to underrepresentation of women and minorities in STEM fields).

**B.    For That Reason, Student Diversity Is A Compelling Interest That Can Justify The Consideration And Use Of Race In College And University Admissions.**

Forty years ago, in *Regents of University of California v. Bakke*, Justice Powell explained that "the attainment of a diverse student body . . . clearly is a constitutionally permissible goal for an institution of higher education."  438 U.S. 265, 311-312 (1978) (Opinion of Powell, J.).  He recognized that a diverse student body promotes an atmosphere of "speculation, experiment and creation" that is "essential to the quality of higher education." *Id.* at 312 (quoting *Sweezy v. New Hampshire*, 354 U.S. 234, 263 (1957) (Frankfurter, J. concurring in the result)).  Moreover, he noted that, by enriching students' education with a variety of perspectives, experiences, and ideas, a university with a diverse student body helps equip its students to be productive members of society.  *Id.* at 313 ("[I]t is not too much to say that the 'nation's future depends upon leaders trained through wide exposure' to the ideas and mores of students as diverse as this Nation of many peoples.") (quoting *Keyishian v. Bd. of Regents of Univ. of State of N.Y.*, 385 U.S. 589, 603 (1967)).  Accordingly, he concluded "the interest of diversity is compelling in the context of a university's admission program." *Id.* at 314.

Echoing Justice Powell's *Bakke* opinion, a majority of the Court held in *Grutter* that higher education institutions have "a compelling interest in obtaining the educational benefits that flow from a diverse student body."  *Grutter*, 539 U.S.

at 343; *see also Bakke*, 438 U.S. at 314 (opinion of Powell, J.) ("the interest of diversity is compelling in the context of a university's admissions program"). Those benefits, the Court recognized, are "substantial," and "not theoretical but real." *Grutter*, 539 U.S. at 330. "[N]umerous studies show that student body diversity promotes learning outcomes, . . . 'better prepares students for an increasingly diverse workforce and society, and better prepares them as professionals.'" *Id.* (citation omitted). Diversity also promotes cross-racial understanding, helps to break down stereotypes, and enables students to understand better those who are different. *Id.* To seek these benefits through diversity is properly understood to be at the core of institutions' academic mission. *Id.* at 329.

By 2013, student diversity's status as a compelling interest was so well established that the parties in *Fisher v. University of Texas* did not even "ask the Court to revisit that aspect of *Grutter*'s holding." 570 U.S. 297, 311 (2013) ("*Fisher I*"). Nevertheless, a few years later, the Court affirmed once more that "a university may institute a race-conscious admissions program as a means of obtaining 'the educational benefits that flow from student body diversity.'" *Fisher v. University of Texas*, 136 S. Ct. 2198, 2210 (2016) (quoting *Fisher I*, 570 U.S. at 310). And quoting *Grutter*, the Court reiterated that "enrolling a diverse student body 'promotes cross-racial understanding, helps to break down racial stereotypes, and enables students to better understand persons of different races.'" *Id.* (quoting

8

*Grutter*, 539 U.S. at 330). "Equally important," the Court said, was *Grutter*'s recognition that "student body diversity promotes learning outcomes, and better prepares students for an increasingly diverse workforce and society." *Id.* (quoting *Grutter*, 539 U.S. at 330).

In sum, in the last four decades, the Court has reaffirmed at least *four times* that student diversity is a compelling interest that can justify the use of race in college admissions. The importance of student diversity and its status as a compelling interest cannot be seriously disputed.

### C. Because The Compelling Interest At Stake Is Fundamentally Educational In Nature And Requires Educational Judgment, Courts Owe Considerable Deference To Each Institution's Concept Of Diversity.

Just as the Supreme Court has repeatedly reaffirmed that student diversity is a compelling interest that can justify the use of race in admissions, the Court has also repeatedly reaffirmed that courts should defer to a higher education institution's decision to pursue student diversity and to define the diversity that best serves the institution's needs. Justice Powell explained in *Bakke* that one of the "'four essential freedoms' of a university" is "to determine for itself on academic grounds . . . who may be admitted to study." 438 U.S. at 312 (opinion of Powell, J.) (quoting *Sweezy*, 354 U.S. at 263 (Frankfurter, J., concurring in the result)). The *Grutter* Court reaffirmed that a college or university's "educational judgment that such diversity is essential to its educational mission is one to which

we defer." 539 U.S. at 328. The *Fisher I* Court similarly held that "the decision to pursue the educational benefits that flow from student body diversity, that the University deems integral to its mission is, in substantial measure, an academic judgment to which . . . judicial deference is proper." 570 U.S. at 310 (internal quotation marks and citation omitted). And, most recently, the *Fisher II* Court reiterated that "[c]onsiderable deference is owed to a university in defining . . . intangible characteristics, like student body diversity, that are central to its identity and educational mission." 136 S. Ct. at 2214.

This deference flows from a higher education institution's First Amendment right to academic freedom. As the Supreme Court has explained, colleges and universities "occupy a special niche in our constitutional tradition." *Grutter*, 539 U.S. at 329. They protect the bedrock "freedoms of speech and thought." *Id.* Because of that important role, courts have long refrained from second-guessing the academic judgments of colleges and universities. And, as the Supreme Court has explained, the constitution's protection for academic judgments extends not only to "[t]eachers and students [who] must always remain free to inquire, to study and to evaluate," *Keyishian*, 385 U.S. at 603 (quoting *Sweezy*, 354 U.S. at 250 (plurality op.)), but also to "autonomous decisionmaking by the academy itself," *Regents of Univ. of Mich. v. Ewing*, 474 U.S. 214, 226 n.12 (1985), including admissions criteria and decisions. *See Parents Involved in Cmty. Sch. v. Seattle*

*Sch. Dist. No. 1*, 551 U.S. 701, 792 (2007) (Kennedy, J., concurring in part and concurring the judgment) (noting that the First Amendment affords universities "particular latitude in defining diversity"). As Justice Powell put it: "The freedom of a university to make its own judgments as to education includes the selection of its student body." *Bakke*, 438 U.S. at 312 (opinion of Powell, J.).

These legal principles are grounded in practical realities. Colleges and universities are, themselves, diverse. *Amicus* ACE alone represents more than 1,500 institutions, each of which has its own mission, history, geography, location, curriculum, capabilities, and faculty. They are public or private, small or large, urban or rural, focused on professions or the liberal arts, religious or secular, or anything in between—factors that shape how an institution interacts with and influences the broader world. Even within a single institution, school- or program-specific missions can vary tremendously. What works for one graduate or professional school may not work for an undergraduate college or even a different graduate school at the same university. *See* Amy N. Addams et al., Ass'n of Am. Med. Colls., Roadmap to Diversity: Integrating Holistic Review Practices into Medical School Admissions Processes ix-x (2010).[3] Each university's unique mission and context may call for the need to evaluate differently certain

---

[3] *Available at*
http://www.cossa.org/diversity/reports/Integrating_Holistic_Review_Practices.pdf.

characteristics, experiences, and backgrounds of various prospective students in order to achieve the university's educational mission.

The student diversity valued by these differing institutions "takes many forms," often including, but extending well beyond, race. *Fisher II*, 136 S. Ct. at 2210; *see also Bakke*, 438 U.S. at 315 (observing that "[t]he diversity that furthers a compelling state interest encompasses a far broader array of qualifications and characteristics of which racial or ethnic origin is but a single though important element"). As the Supreme Court has recognized, there are many different forms of student diversity, incorporating, for example, those who have "lived or traveled widely abroad, are fluent in several languages, have overcome personal adversity and family hardship, have exceptional records of extensive community service, and have had successful careers in other fields." *Grutter*, 539 U.S. at 338. Moreover, student diversity not only varies between institutions; it is also "multi-dimensional" and layered—flexible enough to allow the same college or graduate school to pursue several of its many different forms. *See Fisher II*, 136 S. Ct. at 2214 (internal quotation marks omitted).

As a result, colleges and universities use diversity in distinct ways to advance their vastly different identities, goals, and approaches to education. That freedom has made college campuses the "laboratories for experimentation" that they are. *Id.* (quoting *United States v. Lopez*, 514 U.S. 549, 581 (1995) (Kennedy,

J., concurring)). And it has helped establish American higher education as the greatest in the world. *See, e.g.*, David F. Labaree, *A System Without A Plan: Emergence of An American System of Higher Education in the Twentieth Century*, 3 Int'l J. Historiography Educ. 46, 46 (2013) (concluding that university autonomy has contributed to American higher education's "global reach and broad esteem").

## II.  THE SUPREME COURT HAS ALSO MADE CLEAR THAT COLLEGES AND UNIVERSITIES MAY CONDUCT A HOLISTIC REVIEW OF APPLICANTS, RECOGNIZING THAT HOLISTIC REVIEW IS A CRITICAL TOOL FOR ACHIEVING THE EDUCATIONAL BENEFITS OF DIVERSITY.

### A.  Holistic Review, Which Involves The Consideration Of Many Academic And Non-Academic Factors, Allows Institutions To Fully Evaluate Each Applicant, Including His Or Her Potential To Contribute Through Varying Experiences And Perspectives.

Higher education institutions apply holistic review in a variety of ways, given their different missions and enrollment aims, but at core, holistic review is a rigorous process involving a mix of academic, non-academic, and contextual factors that guide expert judgments about applicants and the institution's educational program. That is, holistic review is a "highly individualized" process that "giv[es] serious consideration to *all the ways* an applicant might contribute" to a campus community. *Grutter*, 539 U.S. at 337 (emphasis added). High school grades and standardized test scores alone cannot convey all that an applicant can offer to a campus community. These numbers say little, for example, about a student's character and may understate a student's potential. Extracurricular

activities as well are often only a "single metric . . . [that] will capture certain types of people and miss others." *Fisher II*, 136 S. Ct. at 2213. Individual subjective factors, too, often touch on only one piece of a candidate's overall profile and merit.

Each institution that uses holistic review therefore strives to consider the whole of each applicant, looking to a broad spectrum of academic and non-academic considerations. By way of example, the College Board's Admissions Models Project identified nearly 30 academic factors and almost 70 non-academic factors that are used by institutions in the admissions process. *See generally* Gretchen W. Rigol, Coll. Bd., Admissions Decision-Making Models: How U.S. Institutions of Higher Education Select Undergraduate Students (2003).[4] The academic factors considered by many institutions include quantitative metrics, such as class rank and standardized test scores, but also can incorporate qualitative measures, such as "[i]ntellectual curiosity" and "[g]rasp of world events." *Id.* at 75 (Appendix D). Non-academic factors are even more wide-ranging. They account for an applicant's personal background, like her upbringing and life experiences, or whether she will be the first generation in her family to go to college. *Id.* at 75-77. Extracurricular activities and achievements are often considered, along with unusual obstacles an applicant may have overcome, such as family problems,

---

[4] *Available at* https://files.eric.ed.gov/fulltext/ED562589.pdf.

health challenges, frequent moves, or responsibility for raising a family—to name just a few. *Id.* Holistic review can even look to geography, accounting for whether the prospective student is from a disadvantaged area, or far-away state, or went to a high school with few or no previous applicants. *Id.* Lastly, universities also may consider the race of an applicant, but only when treated in a narrowly tailored, individualized and flexible manner—for example, as one aspect of the student's background and life experience within the all-embracing contextual, holistic review of an individual applicant. *See Grutter*, 539 U.S. at 334.

Because every institution has a distinct mission, the factors that each considers—and how heavily they are weighed—vary across universities and even across academic years. *See* Jerome A. Lucido, *How Admissions Decisions Get Made*, *in* Handbook of Strategic Enrollment Management 147, 148-149 (Don Hollser, Bob Bontrager & Assocs. eds., 2015). Even though holistic review flexibly considers the totality of intersecting factors, it must begin within each institution's own context. As such, no two schools will have exactly the same holistic review criteria or process. *See* Rigol, *supra*, at 1 ("[T]here are almost as many different approaches to selection as there are institutions."). Indeed, each university's particular mission and characteristics, academic approaches and philosophies, academic and non-academic programs, and projections and targets

for the "yield" of admitted students are all taken into account. Lucido, *supra*, at 147-149.[5]

Although each institution applies holistic review differently in the particulars, "individualized consideration" of the applicant is always the lodestar. *Grutter*, 539 U.S. at 334, 337; *Bakke*, 438 U.S. at 318 n.52 ("denial . . . of this right to individualized consideration" is the "principle evil").[6] Accordingly, each applicant stands on equal "footing for consideration." *Grutter*, 539 U.S. at 334, 337 (citation omitted). Holistic review recognizes that each individual factor provides the most value when viewed in combination with other application elements. *See, e.g.*, *Fisher II*, 136 S. Ct. at 2213 (discussing the importance of considering non-quantitative factors, such as "a family crisis" that could have harmed a student's academic performance). For that reason, no single

---

[5] *See also* Brief of the College Board, AACRAO, NACAC, and LSAC *Amici Curiae*, Supporting Respondents, *Fisher II*, 136 S. Ct. 2198 (No. 14-981).

[6] This individualized review is critical to college admissions systems throughout the country. *See, e.g.*, *Undergraduate Admission: Admission Philosophy*, Carnegie Mellon Univ., http://coursecatalog.web.cmu.edu/servicesandoptions/undergraduateadmission/ (last visited May 21, 2020) (stating the university makes all necessary efforts to "treat every applicant as an individual and take great care to make [the university's] admission decisions fair, thorough and sensitive."); *Admission Review Factors and Process*, Univ. of Md., https://admissions.umd.edu/apply/admission-review-factors-and-process (last visited May 21, 2020) ("Our admission committee is comprised of a team of professionals who undertake an individualized, rigorous and holistic review of each application, assessing academic merit, achievements and potential in the context of the opportunities and challenges the student faced.").

consideration is sufficient to disqualify a candidate or guarantee their admission. *See Grutter*, 539 at 315 ("[E]ven the highest possible score does not guarantee admission to the Law School. Nor does a low score automatically disqualify an applicant." (internal citation omitted)); *id.* at 337 ("There is no policy, either *de jure* or *de facto,* of automatic acceptance or rejection based on any single 'soft' variable.").[7] Indeed, universities review applications not simply to evaluate a student's accomplishments or presentation, but to determine how an applicant took advantage of opportunities. *See* Lucido, *supra*, at 157 (Universities "seek to understand the conditions under which each applicant has performed and to make judgments based on the context of those conditions.").

This individualized process is rigorous, with colleges and universities usually relying on multi-tiered review processes to assess an applicant's qualities on a case-by-case basis. Commonly, training and calibration are part of the process; after initial readers weigh dozens of factors to make preliminary determinations, second readers or admissions committees assess the ways an individual applicant is likely to contribute to a campus community. And universities are constantly re-evaluating their processes and decision-making,

---

[7] Once again, specific college admissions policies bear out these statements. *See, e.g.*, *Penn State Undergraduate Admissions: Application Review Process for First-Year Students*, Penn. State Univ., https://admissions.psu.edu/info/future/firstyear/applicationreview/ (last visited May 21, 2020) ("There are no such things as 'cut offs.' We review students in a holistic manner, taking into account a full range of factors.").

working to improve and build upon their outcomes year over year. This thorough, individualized, and ever-evolving process allows schools to identify and admit students who will further their own school-specific missions.[8]

Because holistic review focuses on individual applicants, the Supreme Court has held that consideration of race as one aspect of this process is permissible. *See Grutter*, 539 at 337; *Fisher II*, 136 S. Ct. at 2205 (reaffirming *Grutter*'s holding to allow "the University of Michigan Law School's system of holistic review"). In contrast to racial quotas or formulas, which the Court has struck down as overly broad and mechanical, holistic review does not treat "an applicant's race or ethnicity [as] the defining feature of his or her application." *Grutter*, 539 U.S. at 337. Holistic review reflects the consideration of multiple background factors that may include race, "ensur[ing] that all factors that may contribute to student body diversity are meaningfully considered alongside race in admissions decisions." *Id*.

**B.**  **Admissions Decisions Under A Holistic Review Framework Cannot Be Reduced To An Easy-To-Predict Formula.**

Admitting a class is both a science and an art. Although the process is informed by objective data, there are often qualitative factors that are decisive for

---

[8]  *See* Arthur L. Coleman & Jamie Lewis Keith, CollegeBoard & EducationCounsel, *Understanding Holistic Review in Higher Education Admissions: Guiding Principles and Model Illustrations* (2018), *available at* https://professionals.collegeboard.org/pdf/understanding-holistic-review-he-admissions.pdf.

one candidate or another. Thousands of applicants to Harvard and other highly selective colleges have literally perfect academic credentials, served as high school valedictorians, and earned the very top standardized test scores. *See* Def.'s Mot. Summ. J. 3-4 & n.4, ECF No. 418 (noting that more than 5,000 domestic applicants to the Class of 2019 had a perfect math or verbal SAT score, more than twice the number ultimately admitted (citing SMF ¶¶ 1-2, 5-9)); *see also* Letter from Timothy C.J. Blanchard, U.S. Dep't of Educ., Office for Civil Rights, Region II, to Christopher L. Eisgruber, President, Princeton Univ. 13 (Sept. 9, 2015) ("Princeton Compliance Review Letter") (noting similar statistics for Princeton).[9] There are more applicants with top academic scores than available seats. Because of that fact—and the fact that Harvard and other selective institutions are looking for students who can contribute more than quantitative academic acumen— admissions committees *must* look to a wide range of additional factors to assemble a class that best suits their needs and goals.

These additional factors are increasingly important across all of higher education; holistic review is not just for the Ivy League. According to a recent ACE study, 76 percent of all participating institutions, including 92 percent of more selective schools, reported using holistic review in their admissions process. *See* Lorelle L. Espinosa et al., Am. Council on Educ., Race, Class, & College

---

[9] *Available at* https://www2.ed.gov/about/offices/list/ocr/docs/investigations/02086002-a.pdf.

Access: Achieving Diversity in a Shifting Legal Landscape 31-32 (2015).[10]  Even

schools with unusually large student bodies and applicant pools use holistic review

to admit the students that will best further their educational missions.[11]  Over 1,000

accredited four-year undergraduate colleges no longer require applicants to submit

standardized test scores.[12]  Some institutions have even experimented with a

holistic review process that does not turn on test scores *at all*.[13]  These

institutions—like any other—must look to high school grades, grade trajectory and

qualitative criteria to decide whether to extend an offer of admission.

---

[10]  *Available at* http://www.acenet.edu/news-room/Documents/Race-Class-and-College-Access-Achieving-Diversity-in-a-Shifting-Legal-Landscape.pdf.

[11]  As just one example, Pennsylvania State University receives over 70,000 undergraduate applications, yet gives each a "holistic assessment," looking to "academic courses, grades and levels of those courses and standardized test scores, plus additional factors that may include an audition, a portfolio review, the geographic and cultural background of the student, the personal statement, and the activities list." *Penn State Undergraduate Admissions*, *supra* note 7.

[12]  Natasha Bach, *Why the University of Chicago Is Dropping Its SAT/ACT Test Requirement*, Fortune (June 15, 2018), http://fortune.com/2018/06/15/university-of-chicago-drops-act-sat-test-requirement-for-admissions/ ("More than 1,000 accredited, four year colleges and universities are now test-optional, including Bates College, Pitzer College, and Wesleyan University."); Dawn Rhodes, *University of Chicago To Stop Requiring ACT and SAT Scores for Prospective Undergraduates*, Chi. Trib. (June 14, 2018), http://www.chicagotribune.com/news/local/breaking/ct-university-chicago-sat-act-20180614-story.html.

[13]  Cecilia Capuzzi Simon, *The Test-Optional Surge*, N.Y. Times (Oct. 28, 2015), https://www.nytimes.com/2015/11/01/education/edlife/the-test-optional-surge.html.

Qualitative factors play an even greater role as institutions seek candidates that will best promote their unique "mission[s]." *Fisher II*, 136 S. Ct. at 2214; *see also Grutter*, 539 U.S. at 328. These judgments are typically not susceptible to formulaic decision-making and necessarily entail a degree of judgment by educators and admissions experts. For example, many medical schools advance their missions by selecting students with backgrounds and skill sets necessary to break socio-cultural barriers to access to healthcare. *See* Joseph R. Betancourt et al., *Defining Cultural Competence: A Practical Framework for Addressing Racial/Ethnic Disparities in Health and Health Care*, 118 Pub. Health Rep. 293, 297-300 (2003). Careful exercise of such judgment in examination of a prospective student's entire application is required to make admission decisions.

The same is true for undergraduate admissions criteria, where each school's distinctive mission drives qualitative factors it considers and emphasizes when assessing many more qualified students than can be admitted. For example, the New Mexico Military Institute (an ACE Member) seeks to instill military-type discipline into its students through a highly structured learning environment. To further its mission, the Institute specifically seeks students who will promote "qualities of honor, integrity, and responsibility" [14] —an inherently holistic assessment. On the other end of the spectrum, many schools seek to cultivate a

---

[14] *About NMMI*, New Mexico Military Inst., https://www.nmmi.edu/about-nmmi/ (last visited May 21, 2020).

21

less structured environment, imposing no curricular requirements and permitting students to take any class they wish pass/fail.[15]  Because not all students will thrive in that type of setting, these universities must actively identify students who "want to create and navigate their own intellectual journeys."[16]  This judgment again calls for the assessment of qualitative factors, which can be made only after considering how multiple elements of an application relate to one another.

Admissions decisions therefore cannot be reduced to a mathematical formula in which courts can look for a binary outcome based on one or a handful of characteristics alone.  Objective factors—like numerical measures of academic or extracurricular success—tell only part of the story.  And all students are evaluated individually, not as members of any particular group, racial or otherwise.  For that reason, universities "frequently accept[]" white applicants with grades and test scores lower than certain minority applicants.  *See Grutter*, 539 U.S. at 338.  Similarly, a thorough government compliance review showed that Princeton University "frequently" accepts "applicants from Asian backgrounds with grades and test scores lower than rejected non-Asian applicants."  *See* Princeton

---

[15]  *See The Brown Degree: Grade Options*, Brown Univ., https://www.brown.edu/academics/college/degree/policies/grade-options (last visited May 21, 2020).

[16]  *Undergraduate Admission*, Brown Univ., https://www.brown.edu/admission/undergraduate/undergraduate-admission (last visited May 21, 2020).

Compliance Review Letter, *supra*, at 13. In short, both quantitative data and qualitative assessments drive admissions decisions, no variables are dispositive in all cases, and every variable takes on new meaning when viewed in the context of an individual's entire application and in relation to other applications under review. Statistical analyses that fail to address or inadequately address the countless variables involved in admissions decisions can paint distorted pictures that courts should not accept.

Reversing the district court's judgment could upend this evolved and evolving system. In a nation that is more connected and racially and ethnically diverse than ever, such an outcome would deprive many students of the critical benefits of student diversity and thus the education they will need as citizens and leaders in the 21st Century.

## III. BECAUSE THE DISTRICT COURT CORRECTLY APPLIED SUPREME COURT PRECEDENT, THIS COURT SHOULD AFFIRM THE JUDGMENT BELOW.

### A. Decades Ago, Harvard Helped Establish The Basic Framework For Holistic Review That Has Been Repeatedly Approved By The Supreme Court.

Justice Powell in *Bakke* stated that Harvard's admissions policy offers an "illuminating example" of how to "treat[] each applicant as an individual in the admissions process." 438 U.S. at 316, 318. And in *Grutter*, the Supreme Court identified Harvard's admissions policy as a model other institutions should follow.

*See* 539 U.S. at 337 ("Like the Harvard plan, [Michigan] Law School's admissions policy 'is flexible enough to consider all pertinent elements of diversity in light of the particular qualifications of each applicant, and to place them on the same footing for consideration . . . .'" (quoting *Bakke*, 438 U.S. at 317)). *See also Gratz v. Bollinger*, 539 U.S. 244, 272 (2003) (favoring Harvard's admissions policy as "instructive in our consideration of" the University of Michigan's college admissions program). Harvard's system and similar ones in place at hundreds of institutions nationwide strike the delicate balance between "the pursuit of [educational] diversity [and] the constitutional promise of equal treatment and dignity." *Fisher II*, 136 S. Ct. at 2214.

> **B. Harvard's Current-Day Admissions Policies—Which Are Also Based In Individualized, Holistic Review—Are Consistent With Well-Established Supreme Court Precedent.**

As Harvard's brief explains, a plaintiff bringing an intentional discrimination case under Title VI "must prove that the defendant acted with 'racial animus' against members of a protected class." Harvard Br. 35 (quoting *Goodman v. Bowdoin Coll.*, 380 F.3d 33, 43 (1st Cir. 2004)). As Harvard's brief also explains, Plaintiff failed to do that. *Id.* at 35-38.

The District Court correctly concluded, based on the trial evidence, that Harvard's admission policy remains wholly consistent with forty years of Supreme Court precedent upholding holistic review. The Supreme Court has repeatedly

made clear that higher education institutions may, within broad limits, define the diversity that will produce the educational benefits they seek for all students and may use their admission processes to further that goal. The District Court recited evidence showing that Harvard is doing that. *See* ADD106-107. The Supreme Court has also approved the use of holistic review of applicants, recognizing that it is a critical component of achieving the educational benefits of diversity. The District Court recited evidence showing that Harvard's policy implements holistic review. *See* ADD108. The District Court also explained that the evidence showed that Harvard does not engage in racial balancing or use quotas, but rather it considers race flexibly, along with many other factors. *See* ADD113. And the District Court explained its conclusion, based on an extensive evaluation, that Harvard considered many race neutral alternatives and adopted those that workably limited its consideration of race in admissions while furthering its compelling interest in diversity and its fundamental institutional objectives, including academic excellence. *See* ADD120. Given the evidence that supports the District Court's findings and conclusions, there is no basis for this Court to second-guess those rulings. Affirming the decision below is consistent with Supreme Court precedent.

Plaintiff's arguments to the contrary rest on the assumption that college admissions decisions can be reduced to a formula. As explained above, that is

incorrect. Admissions criteria substantially vary between institutions and incorporate a range of quantitative and qualitative factors. The admissions process involves academic judgments, and the object of holistic review is to provide applicants with individualized consideration based on the totality of the circumstances. Reaching a final decision is far from a formulaic process. Plaintiff therefore asks the Court to require fundamental changes to university admissions processes that the Supreme Court has repeatedly endorsed, and to mandate a more mechanical process that would supplant academic judgments to which the Supreme Court has repeatedly deferred. That shift would undermine the recognized freedom of colleges and universities to assemble a class that, in the institution's judgment, will best advance that institution's particular mission. For that reason, *amici* ask the Court to reject Plaintiff's effort to upset decades of Supreme Court precedent that has approved of holistic and individualized admissions processes.

## CONCLUSION

For the foregoing reasons, this Court should affirm the District Court's judgment.

Respectfully submitted,

/s/ Jessica L. Ellsworth

PETER MCDONOUGH
VICE PRESIDENT AND GENERAL
  COUNSEL
AMERICAN COUNCIL ON EDUCATION
One Dupont Circle N.W.
Washington, D.C. 20036
(202) 939-9361
OGC@acenet.edu

*Counsel for American Council on Education*

JESSICA L. ELLSWORTH
STEPHANIE J. GOLD
JO-ANN TAMILA SAGAR
HOGAN LOVELLS US LLP
555 Thirteenth Street, N.W.
Washington, D.C. 20004
(202) 637-5491
jessica.ellsworth@hoganlovells.com

*Counsel for Amici Curiae*

May 21, 2020

# CERTIFICATE OF COMPLIANCE

1.      This document complies with the type-volume limits of Fed. R. App. P. 32(a)(7) and Fed. R. App. P. 29(a)(5) because, excluding the parts of the document exempted by Fed. R. App. P. 32(f), this document contains 6,500 words.

2.      This document complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6) because this document has been prepared in a proportionally spaced typeface using Microsoft Word 2010 in 14-point Times New Roman.


/s/ Jessica L. Ellsworth
Jessica L. Ellsworth

## CERTIFICATE OF SERVICE

I certify that on May 21, 2020, the foregoing was electronically filed through this Court's CM/ECF system, which will send a notice of filing to all registered users.

/s/ Jessica L. Ellsworth
Jessica L. Ellsworth

**ADDENDUM**

# ADDENDUM – LIST OF *AMICI CURIAE*

1. American Council on Education (ACE): More information about ACE can be found at: https://www.acenet.edu

2. The Accreditation Council for Pharmacy Education (ACPE): More information about ACPE can be found at: https://www.acpe-accredit.org/

3. American Association of Colleges of Nursing (AACN): More information about AACN can be found at: https://www.aacnnursing.org/

4. American Association of Community Colleges (AACC): More information about AACC can be found at: https://www.aacc.nche.edu/

5. American Association of State Colleges and Universities (AASCU): More information about AASCU can be found at: https://aascu.org/

6. American Association of University Professors (AAUP): More information about AAUP can be found at: https://www.aaup.org/

7. American Dental Education Association (ADEA): More information about ADEA can be found at: https://www.adea.org/

8. American Indian Higher Education Consortium (AIHEC): More information about AIHEC can be found at: http://www.aihec.org/

9. American Speech-Language-Hearing Association (ASHA): More information about ASHA can be found at: https://www.asha.org/

10. Association of American Colleges and Universities (AAC&U): More information about AAC&U can be found at: https://www.aacu.org/

11. Association of American Law Schools (AALS): More information about AALS can be found at: https://www.aals.org/

12. Association of American Medical Colleges (AAMC): More information about AAMC can be found at: https://www.aamc.org/

13. Association of American Universities (AAU): More information about AAU can be found at: https://www.aau.edu/

14. Association of Catholic Colleges and Universities (ACCU): More information about ACCU can be found at: https://www.accunet.org/

15. Association of Community College Trustees (ACCT): More information about ACCT can be found at: https://www.acct.org/

16. Association of Governing Boards of Universities and Colleges (AGB): More information about AGB can be found at: https://agb.org/

17. Association of Jesuit Colleges and Universities (AJCU): More information about AJCU can be found at: https://www.ajcunet.edu/

18. Association of Public and Land-grant Universities (APLU): More information about APLU can be found at: https://www.aplu.org/

19. The College Board: More information about The College Board can be found at: https://www.collegeboard.org/

20. College and University Professional Association for Human Resources (CUPA-HR): More information about CUPA-HR can be found at: https://www.cupahr.org/

21. Council for Christian Colleges & Universities (CCCU): More information about CCCU can be found at: https://www.cccu.org/

22. Council for Opportunity in Education (COE): More information about COE can be found at: http://www.coenet.org/

23. Council of Graduate Schools (CGS): More information about CGS can be found at: https://cgsnet.org/

24. Council of Independent Colleges (CIC): More information about CIC can be found at: https://www.cic.edu/

25. EDUCAUSE: More information about EDUCAUSE can be found at: https://www.educause.edu/

26. Hispanic Association of Colleges and Universities (HACU): More information about HACU can be found at: https://www.hacu.net

27. Law School Admission Council (LSAC): More information about LSAC can be found at: https://www.lsac.org/

28. Middle States Commission on Higher Education (MSCHE): More information about MSCHE can be found at: https://www.msche.org/

29. NASPA - Student Affairs Administrators in Higher Education: More information about NASPA can be found at: https://www.naspa.org/

30. National Association for College Admission Counseling (NACAC): More information about NACAC can be found at: https://www.nacacnet.org/

31. National Association of College and University Business Officers (NACUBO): More information about NACUBO can be found at: https://www.nacubo.org/

32. National Association of Diversity Officers in Higher Education (NADOHE): More information about NADOHE can be found at: https://www.nadohe.org/

33. National Association of Independent Colleges and Universities (NAICU): More information about NAICU can be found at: https://www.naicu.edu/

34. National Association of Student Financial Aid Administrators (NASFAA): More information about NASFAA can be found at: https://www.nasfaa.org/

35. National Collegiate Athletic Association (NCAA): More information about NCAA can be found at: http://www.ncaa.org/

36. New England Commission of Higher Education (NECHE): More information about NECHE can be found at: https://www.neche.org/

37.  Phi Beta Kappa: More information about Phi Beta Kappa can be found at: https://www.pbk.org/

38.  Southern Association of Colleges and Schools Commission on Colleges (SACSCOC): More information about SACSCOC can be found at: https://sacscoc.org/

39.  The Common Application: More information on The Common Application can be found at: https://www.commonapp.org/

40.  University Risk Management and Insurance Association (URMIA): More information about URMIA can be found at: https://www.urmia.org/home

41.  WASC Senior College and University Commission (WSCUC): More information about WSCUC can be found at: https://www.wscuc.org/