No. 19-2005

## UNITED STATES COURT OF APPEALS
## FOR THE FIRST CIRCUIT

STUDENTS FOR FAIR ADMISSIONS, INC.,
*Plaintiff-Appellant,*

v.

PRESIDENT AND FELLOWS OF HARVARD COLLEGE,
*Defendant-Appellee.*

On Appeal from the United States District Court
for the District of Massachusetts

## REPLY BRIEF OF APPELLANT
## STUDENTS FOR FAIR ADMISSIONS, INC.

Adam K. Mortara
BARTLIT BECK LLP
54 W. Hubbard St., Ste. 300
Chicago, IL 60654
(312) 494-4469

John M. Hughes
BARTLIT BECK LLP
1801 Wewatta St., Ste. 1200
Denver, CO 80202
(303) 592-3140

William S. Consovoy
Thomas R. McCarthy
J. Michael Connolly
Cameron T. Norris
CONSOVOY MCCARTHY PLLC
1600 Wilson Blvd., Ste. 700
Arlington, VA 22209
(703) 243-9423
will@consovoymccarthy.com

Patrick Strawbridge
CONSOVOY MCCARTHY PLLC
10 Post Office Sq., 8th Fl., PMB #706
Boston, MA 02109
(617) 227-0548

*Counsel for Appellant Students for Fair Admissions, Inc.*

# TABLE OF CONTENTS

Table of Authorities ..................................................................................................ii

Introduction ..........................................................................................................1

Argument ..............................................................................................................2

    I.      The district court should be affirmed on Article III standing. .......................2

           A.     The indicia-of-membership test does not apply to SFFA. ...................3

           B.     SFFA satisfies the indicia-of-membership test anyway. ........................9

    II.     The district court should be reversed on the merits. ...............................14

           A.     Harvard bears the burden under strict scrutiny. ..............................14

           B.     Harvard penalizes Asian-American applicants. ...................................16

           C.     Harvard engages in racial balancing. ..................................................31

           D.     Harvard does not use race as a plus to achieve overall diversity. .......33

           E.     Harvard disregards race-neutral alternatives. .......................................35

Conclusion ..........................................................................................................39

Certificate of Compliance ....................................................................................41

Certificate of Service ...........................................................................................42

# TABLE OF AUTHORITIES

## Cases

*Adarand Constructors, Inc. v. Pena,*
515 U.S. 200 (1995) ........................................................................ 14, 16

*Alexander v. Louisiana,*
405 U.S. 625 (1972) ................................................................................ 25

*Am. Legal Found. v. FCC,*
808 F.2d 84 (D.C. Cir. 1987) ................................................................. 12

*Aman v. Cort Furniture Rental Corp.,*
85 F.3d 1074 (3d Cir. 1996) .................................................................. 26

*Assoc. Gen. Contractors of Ohio, Inc. v. Drabik,*
214 F.3d 730 (6th Cir. 2000) ................................................................. 19

*AT&T Corp. v. Hulteen,*
556 U.S. 701 (2009) ................................................................................ 16

*Bangerter v. Orem City Corp.,*
46 F.3d 1491 (10th Cir. 1995) ............................................................... 16

*Bazemore v. Friday,*
478 U.S. 385 (1986) ................................................................................ 19

*Bing v. Roadway Exp., Inc.,*
444 F.2d 687 (5th Cir. 1971) ................................................................. 26

*Brady Campaign to Prevent Gun Violence v. Salazar,*
612 F. Supp. 2d 1 (D.D.C. 2009) ............................................................. 4

*Bush v. Vera,*
517 U.S. 952 (1996) ................................................................................ 15

*Butler v. Home Depot, Inc.,*
No. C-94-4335, 1997 WL 605754 (N.D. Cal. Aug. 29, 1997) ................... 19

*Camel Hair & Cashmere Inst. of Am., Inc. v. Associated Dry Goods Corp.,*
799 F.2d 6 (1st Cir. 1986) .............................................................. 4, 5, 8

*Cavalier ex rel. Cavalier v. Caddo Par. Sch. Bd.*,
    403 F.3d 246 (5th Cir. 2005) ................................................................... 31

*Citizens Coal Council v. Matt Canestrale Contracting, Inc.*,
    40 F. Supp. 3d 632 (W.D. Pa. 2014) ...................................................10, 11, 12

*Concerned Citizens Around Murphy v. Murphy Oil USA, Inc.*,
    686 F. Supp. 2d 663 (E.D. La. 2010) .......................................................... 10

*Conservation Law Found. v. Jackson*,
    964 F. Supp. 2d 152 (D. Mass. 2013) ........................................................ 12

*De Medina v. Reinhardt*,
    686 F.2d 997 (D.C. Cir. 1982) ................................................................... 18

*Doe v. Stincer*,
    175 F.3d 879 (11th Cir. 1999) ............................................................... 10, 11

*Fisher v. Univ. of Tex. at Austin* (*Fisher I*),
    570 U.S. 297 (2013) ..........................................................................passim

*Fisher v. Univ. of Tex. at Austin* (*Fisher II*),
    136 S. Ct. 2198 (2016) ......................................................................... 34, 35

*Friends of the Earth, Inc. v. Chevron Chemical Co.*,
    129 F.3d 826 (5th Cir. 1997) ................................................................. 7, 10

*Fudge v. Providence Fire Dep't*,
    766 F.2d 650 (1st Cir. 1985) ...................................................................... 17

*Gay-Straight Alliance of Okeechobee High Sch. v. Sch. Bd. of Okeechobee Cty.*,
    477 F. Supp. 2d 1246 (S.D. Fla. 2007) .........................................................9

*Goodman v. Bowdoin Coll.*,
    380 F.3d 33 (1st Cir. 2004) ................................................................... 15, 16

*Gratz v. Bollinger*,
    539 U.S. 244 (2003) .................................................................................. 16

*Grutter v. Bollinger*,
    539 U.S. 306 (2003) ..........................................................................passim

*Heap v. Carter*,
  112 F. Supp. 3d 402 (E.D. Va. 2015) ................................................................6

*Hunt v. Washington State Apple Advertising Commission*,
  432 U.S. 333 (1977) .............................................................................2, 3, 7, 9

*In re Live Concert Antitrust Litig.*,
  863 F. Supp. 2d 966 (C.D. Cal. 2012)...............................................................18

*In re Neurontin Mktg. & Sales Practices Litig.*,
  712 F.3d 21 (1st Cir. 2013)................................................................................18

*Int'l Bhd. of Teamsters v. United States*,
  431 U.S. 324 (1977) .......................................................................25, 26, 29

*James v. Stockham Valves & Fittings Co.*,
  559 F.2d 310 (5th Cir. 1977) ............................................................................20

*Johnson v. California*,
  543 U.S. 499 (2005) ..........................................................................................14

*Jones v. Boston*,
  752 F.3d 38 (1st Cir. 2014) ...............................................................................17

*Jones v. Lee Way Motor Freight, Inc.*,
  431 F.2d 245 (10th Cir. 1970)...........................................................................26

*Lam v. Univ. of Hawai'i*,
  40 F.3d 1551 (9th Cir. 1994) .............................................................................25

*Larkin v. State of Mich. Dep't of Soc. Servs.*,
  89 F.3d 285 (6th Cir. 1996) ..............................................................................16

*Lipsett v. Univ. of P.R.*,
  864 F.2d 881 (1st Cir. 1988) .............................................................................16

*Lovell v. Chandler*,
  303 F.3d 1039 (9th Cir. 2002)...........................................................................16

*Lynn v. Regents of Univ. of Calif.*,
  656 F.2d 1337 (9th Cir. 1981)...........................................................................26

*McGowan v. United States,*
    296 F.2d 252 (5th Cir. 1961) ........................................................... 24

*McReynolds v. Sodexho Marriott Servs., Inc.,*
    349 F. Supp. 2d 1 (D.D.C. 2004) .................................................... 27

*Miller v. Johnson,*
    515 U.S. 900 (1995) ........................................................................ 16

*N.M. ex rel. Richardson v. Bureau of Land Mgmt.,*
    565 F.3d 683 (10th Cir. 2009) ....................................................... 11

*NAACP v. Alabama,*
    357 U.S. 449 (1958) ..................................................................... 5, 9

*Norris v. Alabama,*
    294 U.S. 587 (1935) ........................................................................ 25

*Or. Advocacy Ctr. v. Mink,*
    322 F.3d 1101 (9th Cir. 2003) ..............................................10, 11, 13

*Package Shop, Inc. v. Anheuser-Busch, Inc.,*
    No. 83-513, 1984 WL 6618 (D.N.J. Sept. 25, 1984) .....................6

*Palmer v. Shultz,*
    815 F.2d 84 (D.C. Cir. 1987) .................................................... 19, 23

*Parents Involved in Community Schools v. Seattle School District No. 1,*
    551 U.S. 701 (2007) ..................................................................... 8, 31

*Perrea v. Cincinnati Public Schools,*
    709 F. Supp. 2d 628 (S.D. Ohio 2010) ......................................... 31

*Playboy Enterprises, Inc. v. Public Service Commission of Puerto Rico,*
    906 F.2d 25 (1st Cir. 1990) .............................................................7

*Police Officers for Equal Rights v. City of Columbus,*
    644 F. Supp. 393 (S.D. Ohio 1985) ............................................... 27

*Ramos v. Louisiana,*
    140 S. Ct. 1390 (2020) ............................................................26, 27

*Reed v. Quarterman,*
    555 F.3d 364 (5th Cir. 2009) ....................................... 20

*Schuette v. BAMN,*
    572 U.S. 291 (2014) .................................................. 14

*Segar v. Smith,*
    738 F.2d 1249 (D.C. Cir. 1984) ........................18, 22, 29

*SFFA v. Univ. of N.C. (UNC),*
    No. 14-954, 2018 WL 4688388 (M.D.N.C. Sept. 29, 2018).................................... 2, 4

*Sierra Forest Legacy v. Sherman,*
    646 F.3d 1161 (9th Cir. 2011) ...................................... 11

*Smith v. Univ. of Wash.,*
    392 F.3d 367 (9th Cir. 2004) ....................................... 33

*Sobel v. Yeshiva Univ.,*
    839 F.2d 18 (2d Cir. 1988) ......................................... 19

*Sorenson Communications, LLC v. FCC,*
    897 F.3d 214 (D.C. Cir. 2018) ..................................... 5, 6

*Stender v. Lucky Stores, Inc.,*
    803 F. Supp. 259 (N.D. Cal. 1992)................................. 27

*Summers v. Earth Island Inst.,*
    555 U.S. 488 (2009) ................................................... 8

*Sylvia's Haven, Inc. v. Mass. Dev. Fin.,*
    397 F. Supp. 2d 202 (D. Mass. 2005) ...................... 10, 13

*Thomas v. Eastman Kodak Co.,*
    183 F.3d 38 (1st Cir. 1999)..................................... 16, 25

*Trout v. Garrett,*
    780 F. Supp. 1396 (D.D.C. 1991) .......................... 19, 20

*Turner v. Fouche,*
    396 U.S. 346 (1970) ............................................... 25, 29

*UAW v. Brock,*
   477 U.S. 274 (1986) ................................................................ 4, 5

*United States v. 15 Bosworth Street,*
   236 F.3d 50 (1st Cir. 2001) ......................................................... 25

*United States v. Fordice,*
   505 U.S. 717 (1992) ................................................................... 27

*United States v. Virginia,*
   518 U.S. 515 (1996) ................................................................... 24

*Unwired Planet LLC v. Google, Inc.,*
   660 F. App'x 974 (Fed. Cir. 2016) ................................................ 20

*Wash. Legal Found. v. Leavitt,*
   477 F. Supp. 2d 202 (D.D.C. 2007) ................................................ 6

*Wessmann v. Gittens,*
   160 F.3d 790 (1st Cir. 1998) ....................................................... 37

*Woods v. City of Greensboro,*
   855 F.3d 639 (4th Cir. 2017) ....................................................... 16

*Yusuf v. Vassar Coll.,*
   35 F.3d 709 (2d Cir. 1994) .......................................................... 16

## Other Authorities

13A Wright & Miller,
   *Fed. Prac. & Proc.* §3531.9.5 ....................................................... 8

Alexander, *An Army of Lions:*
   *The Civil Rights Struggle Before the NAACP*, xv (2012) .................. 13

Bylaws of Conservation Law Foundation, Inc. ................................. 11

Carlson, *Standing for the Environment,*
   45 UCLA L. Rev. 931 (1998) ....................................................... 11

Fed. Jud. Ctr.,
   *Reference Manual on Scientific Evidence* (3d ed. 2011) .............. 17, 18

*Hundreds Gather for Dueling Rallies Ahead of Trial Challenging Harvard Admissions*,
The Crimson (Oct. 15, 2018), bit.ly/3dRSFgj ............................................................. 13

Knickerbocker, *A 'Hostile' Takeover Bid at the Sierra Club*,
Christian Sci. Monitor (Feb. 20, 2004) ....................................................................... 11

NAACP, bit.ly/3dfHaPQ .................................................................................................... 12

*Our Bylaws*, Wilderness Soc'y ........................................................................................... 11

Sierra Club, sforce.co/2MhGPjW ..................................................................................... 12

# INTRODUCTION

Harvard has so much confidence in the district court's decision that it leads with the two issues it *lost* below—whether SFFA has Article III standing and whether strict scrutiny applies to SFFA's allegation that Harvard imposes anti-Asian penalties. These arguments are mistaken. The district court correctly refused to rewrite fifty years of associational-standing law for Harvard's special benefit, and the district court correctly recognized that strict scrutiny requires Harvard to disprove that it misuses race to penalize a minority group. But Harvard is right to be concerned about the durability of the judgment below. After more than five years of litigation, it still has no answer to the question at the heart of this case: Why does Harvard systemically give Asian-American applicants lower scores on the personal rating?

Unsurprisingly, Harvard offers a boilerplate defense of the decision below and accuses SFFA of seeking to overturn Supreme Court "precedents by striking down the very policy the Supreme Court has endorsed as a model." Brief of Appellee (Harvard-Br.) 2. At this stage, however, the focus of the appeal is whether Harvard is violating those precedents—and it is, for the reasons SFFA gives. But it is true that, if this Court upholds Harvard's meager showing under *Grutter* and *Fisher II*, then those precedents cannot be salvaged. Ruling for Harvard would confirm suspicions that, when it comes to race-based admissions, judicial review is "strict in theory but feeble in fact." *Fisher v. Univ. of Tex. at Austin* (*Fisher I*), 570 U.S. 297, 314 (2013). This Court should reverse the judgment below.

1

## ARGUMENT

Harvard wrongly claims (at 2) that SFFA "attempts to relitigate the facts." SFFA largely accepts the district court's factual findings, especially its finding that the personal rating penalizes Asian-American applicants. SFFA's arguments on appeal focus on the district court's *legal* errors. Ironically, the only issue that is dictated by the district court's factual findings is Article III standing—an issue that Harvard raises. The district court's decision on Article III standing should be affirmed, but its decision on the merits should be reversed.

## I.      The district court should be affirmed on Article III standing.

The district court held that SFFA satisfied Article III because it meets the test for associational standing from *Hunt v. Washington State Apple Advertising Commission*, 432 U.S. 333 (1977): "SFFA demonstrated that its members included individuals who had standing to pursue this litigation on their own, that this litigation was germane to SFFA's purpose, and that the injunctive relief SFFA seeks does not require the participation of those members in this lawsuit." ADD94. Harvard doesn't dispute that SFFA meets this test. Instead, it argues (at 29) that "SFFA is not a genuine membership organization." Two courts have considered and correctly rejected this exact argument. ADD177-90; *SFFA v. Univ. of N.C. (UNC)*, No. 14-954, 2018 WL 4688388 (M.D.N.C. Sept. 29, 2018).

### A.    The indicia-of-membership test does not apply to SFFA.

Quoting *Hunt*, Harvard argues (at 30) that SFFA lacks standing because it "does not possess any of the 'indicia' of a true membership organization." But *Hunt* imposes no such burden on a voluntary membership association like SFFA.

In *Hunt*, the Washington State Apple Advertising Commission, a state agency, sued on behalf of local apple growers and dealers. The three-part test for associational standing did not fit the Commission because it was "not a traditional voluntary membership organization such as a trade association, for it [had] no members at all." *Hunt*, 432 U.S. at 342. Thus, the "question" was whether "the Commission's status as a state agency, rather than a traditional voluntary membership organization, preclude[d] it from asserting the claims of the Washington apple growers and dealers who form[ed] its constituency." *Id.* at 344. The Commission had standing because its constituents "possess[ed] all of the indicia of membership." *Id.*

But the Court never suggested that this indicia-of-membership test should apply to every organization asserting associational standing. Precisely the opposite: "If the Commission were a voluntary membership organization," the Court explained, then "its standing to bring this action as the representative of its constituents would be clear" because it would have satisfied the traditional three-part test for associational standing. *Id.* at 342-43; *accord* ADD184 ("*Hunt* expanded the category of organizations that could have associational standing, rather than limiting it."). Hence, courts "need not undertake an indicia-of-membership inquiry where an organization has actual members

3

and satisfies the three *Hunt* prerequisites." ADD181; *accord* ADD181-83 (collecting cases); *UNC*, 2018 WL 4688388, at *2-6. The "'indicia of membership' ... is necessary only when an organization is not a 'traditional membership organization.'" *Brady Campaign to Prevent Gun Violence v. Salazar*, 612 F. Supp. 2d 1, 29 (D.D.C. 2009).

The district court found that SFFA is a traditional membership association. "SFFA is an Internal Revenue Code Section 501(c)(3) organization," it explained, "whose claimed mission is to defend human and civil rights secured by law, including equal protection rights, through litigation or other lawful means" and whose "membership is composed of a coalition of applicants and prospective applicants to institutions of higher education, along with their parents and other individuals." ADD175. "Where SFFA has clearly stated its mission in its Bylaws and website, where it has consistently, and recently, in highly public ways, pursued efforts to end alleged racial discrimination in college admissions through litigation, and where its members voluntarily associate themselves with the organization, it can be presumed for the purposes of standing that SFFA adequately represents the interests of its current members without needing to test this further based on the indicia-of-membership factors." ADD186; *see* ADD179-80. Those findings are not clearly erroneous—they are plainly correct.

Harvard's cases do not suggest otherwise. *UAW v. Brock*, 477 U.S. 274 (1986), and *Camel Hair & Cashmere Institute of America, Inc. v. Associated Dry Goods Corp.*, 799 F.2d 6 (1st Cir. 1986), support the district court's reasoning. Neither even suggests that the

indicia-of-membership test would apply here; rather, both applied the *Hunt* three-part test without further inquiry into the plaintiff's operations. *Brock*, 477 U.S. at 282-88; *Camel Hair*, 799 F.2d at 10-12. More broadly, these decisions explain why the law favors these kinds of suits. The Supreme Court has given "associational standing" a "strong endorsement." *Camel Hair*, 799 F.2d at 11. Suits by associations are "advantageous both to the individuals represented and to the judicial system as a whole" because an association can provide a "'medium through which its individual members seek to make more effective the expression of their views.'" *Brock*, 477 U.S. at 289-90 (quoting *NAACP v. Alabama*, 357 U.S. 449, 459 (1958)). Forming an organization to vindicate the rights of individuals—including through litigation—is neither unusual nor undesirable; "the doctrine of associational standing recognizes that the primary reason people join an organization is often to create an effective vehicle for vindicating interests that they share with others." *Id.* at 290.

Harvard's other cases "all involved organizations that, unlike SFFA, asserted standing on behalf of non-members or had factual circumstances, not present here, that called for a functional analysis of its constituents." ADD186. In *Sorenson Communications, LLC v. FCC*, 897 F.3d 214 (D.C. Cir. 2018), "the Video Relay Services Consumer Association (VRSCA), an unincorporated information forum for VRS users," claimed associational standing. *Id.* at 218. VRSCA did not have traditional members; it provided "'an information forum' for VRS users with a primary purpose of integrating VRS into daily life." *Id.* at 223. Since it was thus "unclear if VRSCA is the sort of organization

that would qualify as a 'membership association,'" the D.C. Circuit used the indicia-of-membership test to evaluate its associational standing. *Id.* at 225.

*Heap v. Carter*, 112 F. Supp. 3d 402 (E.D. Va. 2015), is the same. The Humanist Society, "a §501(c)(3) tax-exempt organization [that] qualified as a church under the Internal Revenue Code," claimed standing on behalf of a theology teacher who it had "certified as a Humanist Celebrant." *Id.* at 409. The court explained that an organization has associational standing if it is "a membership organization or a functional equivalent. '[A]n organization with no formal members can still have associational standing if it is the functional equivalent of a traditional membership organization.'" *Id.* at 418 (quoting *Wash. Legal Found. v. Leavitt*, 477 F. Supp. 2d 202, 208 (D.D.C. 2007)). But the society couldn't establish that it was a traditional membership association as opposed to "an accreditation organization." *Id.* The court examined if its "leadership and financial structure ... is closely tied to that of its members" and whether "its members exert any control over the direction of the organization" to determine whether it was a *functional equivalent* of a membership association. *Id.* at 418-19.

Last, Harvard relies on *Package Shop, Inc. v. Anheuser-Busch, Inc.*, No. 83-513, 1984 WL 6618 (D.N.J. Sept. 25, 1984). There, too, it was doubtful "whether the organization, in fact, does have a true membership." *Id.* at *39. That doubt was resolved against the organization, which "consist[ed] exclusively of a group of contributors to [an unrelated] 1979 anti-deregulation [campaign]." *Id.* at *40. Nor was the organization the functional equivalent of a traditional membership association. *Id.* at *40-41. *Package Shop*—like the

other cases Harvard discards on appeal—doesn't support application of the indicia-of-membership test here. ADD184-85.[1]

Harvard lacks supportive authority for a reason. The traditional three-part test for associational standing neither "elevates form over substance" nor turns on "artificial distinctions." Harvard-Br. 33-34. Rather, plucking the indicia-of-membership test from cases involving non-membership groups and applying it to a membership association like SFFA would force a square peg into a round hole. After all, a membership organization need not prove that "for all *practical* purposes, [it] performs the functions of a traditional [membership organization]," *Hunt*, 432 U.S. at 344 (emphasis added), because it already is a voluntary membership organization. And its members need not exhibit "indicia of membership," *id.*, because they are in fact members of the association they joined.

If Harvard were right, there would be countless cases applying the indicia-of-membership test to membership organizations. They don't exist. ADD183-84. Neither the Supreme Court nor this Circuit has required a membership organization to satisfy

---

[1] Harvard also incorrectly points (at 33 n.6) to *Friends of the Earth, Inc. v. Chevron Chemical Co.*, 129 F.3d 826 (5th Cir. 1997), and *Playboy Enterprises, Inc. v. Public Service Commission of Puerto Rico*, 906 F.2d 25 (1st Cir. 1990). *Chevron Chemical* applied the indicia-of-membership test because the organization "had never taken any ... action to comply with its responsibility and authority to determine membership requirements." 129 F.3d at 827. *Playboy* rejected an argument that the association flunked *Hunt*'s "germaneness" requirement without even mentioning the indicia-of-membership test—let alone requiring the association to meet it. 906 F.2d at 34-35.

anything other than the three-part test for associational standing. Harvard thus would have this Court conclude that courts across the country have failed to apply the indicia-of-membership test to membership organizations because sophisticated litigants kept missing the issue. But courts have "an independent obligation to assure that standing exists, regardless of whether it is challenged by any of the parties." *Summers v. Earth Island Inst.*, 555 U.S. 488, 499 (2009). It is implausible that the issue was carelessly overlooked in cases like *Parents Involved in Community Schools v. Seattle School District No. 1*, 551 U.S. 701 (2007). The many cases addressing associational standing instead express "little concern" over the "nature of the organization" because "most organization plaintiffs exist in traditional voluntary forms with knowing and willing members." 13A Wright & Miller, *Fed. Prac. & Proc.* §3531.9.5; *see id.* (*Hunt* "does not provide any general lessons" because "most cases involve representation by environmental, neighborhood, political action, civil rights, trade, or like familiar organizations in traditional forms"). As the district court correctly found, SFFA has this traditional, familiar form.

Finally, Harvard's position would put associational standing on a collision course with the First Amendment. If the indicia-of-membership test were impartially applied in every case, then traditional membership organizations—like the ACLU, NAACP, and the Sierra Club—would be threatened with the type of inquiry that Harvard sought to conduct of SFFA. As would less traditional groups. *See, e.g.*, *Camel Hair*, 799 F.2d at 7, 11-12 (membership association with no employees and six members had standing under traditional test); *Gay-Straight Alliance of Okeechobee High Sch. v. Sch. Bd. of Okeechobee*

*Cty.*, 477 F. Supp. 2d 1246, 1248, 1251-52 (S.D. Fla. 2007) ("unincorporated, voluntary" group of high-schoolers had standing under traditional test). Under Harvard's view, in every case brought by a membership association, the defendant could conduct a full-scale audit—unlocking discovery of everything from membership lists to details about the innermost workings of the organization—merely by contesting standing. Worse, this intrusive audit would repeat itself *every* time these groups brought a new case, since each defendant in each case could contest the association's standing. The chilling effect on First Amendment freedoms would be constitutionally intolerable. *NAACP*, 357 U.S. at 462-63. It is not the law.

## B.    SFFA satisfies the indicia-of-membership test anyway.

SFFA has standing even if the indicia-of-membership test applies. According to Harvard, this Court should ask if an organization "in a very real sense … represents the [injured individuals] and provides the means by which they express their collective views and protect their collective interests." *Hunt*, 432 U.S. at 344-45; Harvard-Br. 29-30. SFFA easily passes this test.

Based on the record evidence, the district court found that:

- SFFA has approximately 20,000 members.

- "SFFA seeks to represent individuals who are clearly members as defined by its Bylaws."

- At least 14 members have declared, under penalty of perjury, that they "are Asian-American students who applied to and were rejected from Harvard" and "have voluntarily joined SFFA, support its mission, have been in contact with SFFA, and had the opportunity to express their views on the direction of this litigation."

9

- "SFFA's members voluntarily join the organization, presumably knowing its purpose, by providing their name and contact information and paying a small fee."

- "The Board of Directors, which manages the business and affairs of SFFA, is composed of four Board-Elected Directors and one Member-Elected Director. The Board-Elected Directors are elected by a majority vote of the directors then in office, and the Member-Elected Director is elected by a majority vote of the members."

- "The Bylaws plainly lay out who qualifies as a member and what a member's role is and permit members to vote for one member of the Board of Directors, who participates in Board decisions, thereby granting members more direct access to SFFA's management."

- "SFFA clearly communicated its mission, which has stayed consistent since its founding, to prospective members through its website and in its outreach efforts."

- "Further, to support the organization, members can voluntarily donate funds, in addition to the one-time, ten dollar contribution (required since June 2015) as a way of influencing the organization."

ADD153; ADD179-80; ADD185; ADD188-89; Doc. 452 at 84-95.

These unchallenged findings confirm that SFFA is a membership association in every sense. *See, e.g.*, *Or. Advocacy Ctr. v. Mink*, 322 F.3d 1101, 1111 (9th Cir. 2003); *Chevron Chemical*, 129 F.3d at 829; *Doe v. Stincer*, 175 F.3d 879, 886 (11th Cir. 1999); *Citizens Coal Council v. Matt Canestrale Contracting, Inc.*, 40 F. Supp. 3d 632, 639-42 (W.D. Pa. 2014); *Concerned Citizens Around Murphy v. Murphy Oil USA, Inc.*, 686 F. Supp. 2d 663, 675-77 (E.D. La. 2010); *Sylvia's Haven, Inc. v. Mass. Dev. Fin.*, 397 F. Supp. 2d 202, 207-08 (D. Mass. 2005). Yet Harvard incorrectly claims (at 30) that SFFA lacks "'indicia' of a true membership organization" because its members purportedly "do not direct, control, or finance the organization's activities in any significant way."

To begin, Harvard objects (at 31) that "[t]he four leadership-appointed directors can outvote the member-elected director, remove that director for any reason, or simply meet and conduct business without that director." But Harvard cites no case where the degree of control of leadership was decisive. Many courts have held the opposite. ADD189-90; *e.g.*, *Or. Advocacy*, 322 F.3d at 1111-12; *Stincer*, 175 F.3d at 886; *Citizens Coal*, 40 F. Supp. 3d at 638, 642.

Numerous associations limit the number of member-elected directors to prevent a "hostile takeover." Knickerbocker, *A 'Hostile' Takeover Bid at the Sierra Club*, Christian Sci. Monitor (Feb. 20, 2004); Carlson, *Standing for the Environment*, 45 UCLA L. Rev. 931, 961 n.160 (1998). The Wilderness Society, one of the largest and oldest conservationist organizations, has bylaws under which "[m]embers shall not have voting rights" and that gives total control to a self-perpetuating Governing Council. *Our Bylaws*, Wilderness Soc'y, art. II, §1.a; art. V, §1, bit.ly/3dadcwt. Yet courts repeatedly find that the Wilderness Society is "a membership organization." *Sierra Forest Legacy v. Sherman*, 646 F.3d 1161, 1171 (9th Cir. 2011); *accord N.M. ex rel. Richardson v. Bureau of Land Mgmt.*, 565 F.3d 683, 696 n.13 (10th Cir. 2009). The Conservation Law Foundation similarly is controlled by Trustees chosen by a self-perpetuating Board; "[m]embers shall have only such privileges as the Trustees may designate ... and shall in such capacity have no right to notice of or to vote at any meeting." Doc. 204 at 20 (quoting Bylaws of Conservation Law Foundation, Inc., art. III, §2; art. IV, §3, art. V, §1). No court has doubted that the

foundation represents its members. *Conservation Law Found. v. Jackson*, 964 F. Supp. 2d 152, 160-64 (D. Mass. 2013).

Harvard also complains (at 31-32) that "SFFA's members ... have no power to choose the organization's officers or vote on its priorities or activities." But Harvard ignores that SFFA's members have ultimate "control" over this litigation. *Citizens Coal*, 40 F. Supp. 3d at 639-40. If they "chose to terminate their membership in [SFFA], that would in effect terminate this litigation as associational standing would then be lacking." *Id.* at 641. The membership's ability to resign from SFFA is also a powerful mechanism of control over SFFA's broader priorities and activities. ADD189-90; *compare Citizens Coal*, 40 F. Supp. 3d at 640, *with Am. Legal Found. v. FCC*, 808 F.2d 84, 87-92 (D.C. Cir. 1987). Regardless, the district court found that SFFA's standing members can provide input and direction. ADD190.

Finally, Harvard criticizes SFFA (at 32) because its members purportedly "play virtually no role in funding the organization." But SFFA's members pay a $10 fee to join and, as of July 2015, "641 members had voluntarily donated to SFFA," a number that has only "increase[d] over time as SFFA's membership continues to grow and the organization continues to mature." Doc. 454-1 at 12.[2] Any assertion that members must provide a majority of an organization's funding finds no support. Courts have found

---

[2] Harvard's focus (at 32) on "dues," is misplaced. Many voluntary associations offer lifetime memberships, including the NAACP, bit.ly/3dfHaPQ, and the Sierra Club, sforce.co/2MhGPjW.

standing when members provide *no* funding. *See, e.g.*, *Or. Advocacy*, 322 F.3d at 1111; *Sylvia's Haven*, 397 F. Supp. 2d at 207. Harvard's invented rule also would shut out organizations serving the poor and underprivileged, as their members rarely provide "meaningful financial support." Harvard-Br. 31. The NAACP "initially set membership dues at one dollar for associates and two dollars for contributors" to "attract mass support," and survived "due in large measure to external financial support." Alexander, *An Army of Lions: The Civil Rights Struggle Before the NAACP*, xv (2012). SFFA is a young organization and its members are students and their families, many of whom are first-generation immigrants. There cannot be one rule for Harvard's ideological allies and another rule for SFFA.

*    *    *

Harvard is frustrated that SFFA's president has galvanized opposition to its admissions policies. But SFFA's support from the thousands of Asian Americans who have experienced and witnessed discrimination is real, widespread, and genuine. *See, e.g.*, *Hundreds Gather for Dueling Rallies Ahead of Trial Challenging Harvard Admissions*, The Crimson (Oct. 15, 2018), bit.ly/3dRSFgj; Amicus Br. of Asian Am. Coalition for Educ. *et al.* 13-17, Exhibit A. And Harvard's accusation (at 29) that SFFA is a litigation vehicle for individuals lacking a "direct stake in Harvard's admissions process" is baseless. SFFA's members claim injury from Harvard's admissions policies, voluntarily joined SFFA, want SFFA to represent them, support SFFA's mission, have been involved in this case, and financially support SFFA. No more is required.

13

II.   **The district court should be reversed on the merits.**

  A.   **Harvard bears the burden under strict scrutiny.**

Harvard doesn't contest that it "bears the burden of proving" under strict scrutiny "that its consideration of race in pursuit of a diverse student body is narrowly tailored." Harvard-Br. 25. But Harvard incorrectly resists (at 36-37) the district court's holding that whether it discriminates against Asian-American applicants is part of that strict-scrutiny inquiry. ADD104 & n.56. The Supreme Court has held that, "under *Grutter*, strict scrutiny must be applied to any admissions program using racial categories or classifications." *Fisher I*, 570 U.S. at 310; *see id.* at 309 ("Race may not be considered unless the admissions process can withstand strict scrutiny."). "Strict scrutiny does not permit a court to accept a school's assertion that its admissions process uses race in a permissible way without a court giving close analysis to the evidence of how the process works in practice." *Id.* at 312.

Strict scrutiny also applies to whether Harvard penalizes a racial minority. Brief of Appellant (SFFA-Br.) 25-26. Sorting high-schoolers by race is disfavored. Federal law "barely—and only provisionally—permits" it. *Schuette v. BAMN*, 572 U.S. 291, 317 (2014) (Scalia, J., concurring in the judgment). Accordingly, strict scrutiny is needed to "'smoke out' illegitimate uses" of race." *Adarand Constructors, Inc. v. Pena*, 515 U.S. 200, 226 (1995). Harvard bears the burden of proving that it doesn't use this dangerous tool to advance "illegitimate racial prejudice or stereotype" or "racial politics." *Id.*; *accord Johnson v. California*, 543 U.S. 499, 506 (2005).

14

Furthermore, Harvard concedes it must prove that using race does not "'unduly harm members of any racial group.'" Harvard-Br. 65 (quoting *Grutter v. Bollinger*, 539 U.S. 306, 341 (2003)). That burden includes whether Harvard is penalizing Asian Americans because of their race. In the terminology of *Grutter*, proving that their race isn't a *minus* for Asian-American applicants is necessarily an aspect of Harvard's narrow-tailoring burden. *Grutter*, 539 U.S. at 341; *accord id.* at 375 (Thomas, J., concurring in part and dissenting in part) (agreeing with the majority that strict scrutiny requires colleges to prove they do not "discriminate in admissions between similarly situated blacks and Hispanics, or between whites and Asians"). Harvard's attempt (at 35-36) to divorce its "burden of proving ... that its consideration of race ... is narrowly tailored" from whether it "intentionally discriminate[s] against Asian-American applicants" thus misses the mark. Harvard must prove it doesn't "misuse race" in admissions. *Bush v. Vera*, 517 U.S. 952, 984 (1996). Whether, in practice, Harvard uses an applicant's race "only as a positive attribute," Harvard-Br. 39, is part of that inquiry.

Finally, Harvard incorrectly argues that it is not liable under Title VI absent proof of "'racial animus.'" Harvard-Br. 36 (quoting *Goodman v. Bowdoin Coll.*, 380 F.3d 33, 43 (1st Cir. 2004)). As *Goodman* explained, Title VI bans all "intentional discrimination." 380 F.3d at 44 n.18; *accord id.* at 43 ("[T]o establish a claim under [Title VI], plaintiff must demonstrate, *inter alia*, that the defendant discriminated on the basis of race" and "the discrimination was intentional"). In this way, Title VI mirrors the Equal Protection Clause (which Title VI incorporates), Title VII, and other anti-discrimination statutes.

15

*Gratz v. Bollinger*, 539 U.S. 244, 276 n.23 (2003); *Lipsett v. Univ. of P.R.*, 864 F.2d 881, 896 (1st Cir. 1988); *Yusuf v. Vassar Coll.*, 35 F.3d 709, 714 (2d Cir. 1994). The intentional discrimination these laws forbid is more than "conscious animus." *Thomas v. Eastman Kodak Co.*, 183 F.3d 38, 59 (1st Cir. 1999). It includes "stereotypes and other types of cognitive biases." *Id.*; *accord Miller v. Johnson*, 515 U.S. 900, 928 (1995) (Equal Protection Clause "forbids" racial "stereotyping"); *Woods v. City of Greensboro*, 855 F.3d 639, 651-52 (4th Cir. 2017) ("stereotyping" and "implicit bias" are "no less intentional" than "illicit bias"). And it includes any racial classification that appears on the face of a policy, "even if not based on any underlying malevolence." *AT&T Corp. v. Hulteen*, 556 U.S. 701, 711 (2009).

Strict scrutiny applies here because Harvard's admissions policy draws racial classifications on its face. ADD104; *Adarand*, 515 U.S. at 227; *Larkin v. State of Mich. Dep't of Soc. Servs.*, 89 F.3d 285, 289 (6th Cir. 1996); *Goodman*, 380 F.3d at 43; *Bangerter v. Orem City Corp.*, 46 F.3d 1491, 1500 & n.16 (10th Cir. 1995); *Lovell v. Chandler*, 303 F.3d 1039, 1057 (9th Cir. 2002). To Harvard's chagrin, whether it can shoulder that heavy burden is the question that the district court decided, and the predominant issue before this Court as well.

## B. Harvard penalizes Asian-American applicants.

### 1. The statistical evidence demonstrates that Harvard penalizes Asian-American applicants.

Harvard disputes that the statistical evidence is proof it discriminates against Asian-American applicants. But most notable is what Harvard does *not* dispute. Harvard

16

doesn't dispute that Asian-American applicants receive significantly lower personal ratings. Harvard doesn't dispute that these lower ratings disproportionately undermine their admissions chances. And Harvard doesn't dispute that, if the personal rating is removed as a variable, *all* the admissions models—the court's, SFFA's, and Harvard's— show a statistically significant penalty that is unexplainable on non-racial grounds. SFFA-Br. 14-15. In other words, Harvard has rejected a significant number of Asian-American applicants *because they are Asian-American*. Harvard needed to—but couldn't— convincingly explain why this isn't strong evidence of discrimination. SFFA-Br. 26-46; Amicus Br. of Economist Michael Keane *et al.* 6-31 (Keane-Br.).

***First***, Harvard attempts to substantiate the district court's mistrust of regression models. Like the district court, Harvard emphasizes (at 44) that "regression models … have limitations, and that the results they generate must be understood in light of those limitations." But that observation is true of all types of evidence and offers no insight into whether the results of the regression models in *this* case should be discounted.

Harvard points out (at 46) that "regression analysis is not the same as proof of causation." But when a regression model unearths a statistically significant finding, as here, courts reliably infer causation because the odds of a random coincidence are so low (no more than 5%). *Fudge v. Providence Fire Dep't*, 766 F.2d 650, 657-58 & nn.8-9 (1st Cir. 1985); *Jones v. Boston*, 752 F.3d 38, 43, 47 & n.9 (1st Cir. 2014); *see* Fed. Jud. Ctr., *Reference Manual on Scientific Evidence* 213 (3d ed. 2011) ("Regression is often used to infer causation from association."). In suggesting otherwise, Harvard ignores that this Court

deems regression analysis a "permitted," "well-recognized," and "scientifically valid" way "to establish causal relationships." *In re Neurontin Mktg. & Sales Practices Litig.*, 712 F.3d 21, 42 (1st Cir. 2013). In fact, Harvard admits (at 44) that a "statistically significant" relationship between being Asian American and getting a lower personal score means it is "unlikely to occur by chance."

Harvard adds (at 45) that regression models can suffer from omitted-variable bias. But like the district court, Harvard has a "clearly erroneous understanding" of that concept. Keane-Br. 23. The general rule is that omitting variables from a regression analysis is "entirely proper." *Segar v. Smith*, 738 F.2d 1249, 1276 (D.C. Cir. 1984). It is only improper if "the excluded variables would have impacted the results." *In re Live Concert Antitrust Litig.*, 863 F. Supp. 2d 966, 974 (C.D. Cal. 2012); *accord* Keane-Br. 24 n.5 (collecting cases). "This means a model should not be rejected simply because it is missing data.... If the omission of any possible explanatory variable resulted in omitted variable bias, then every regression model could be disregarded for that reason." Keane-Br. 25.

Removing variables does not raise doubts about a regression analysis that models racial discrimination unless those variables are "'correlated with'" race. Harvard-Br. 45 (quoting FJC, *Manual* 314); *accord* Keane-Br. 25-26. But the law rightly presumes that desirable attributes—like "personal qualities"—are *not* correlated with race. *Segar*, 738 F.2d at 1276-77; *De Medina v. Reinhardt*, 686 F.2d 997, 1008 & n.7 (D.C. Cir. 1982). The burden thus is on "the defendant" to prove that they are correlated, and the defendant

18

must carry this burden with "evidence"—not "[m]ere conjectures and assertions," or conclusory pronouncements that "many factors go into" its selections. *Palmer v. Shultz*, 815 F.2d 84, 101 n.13 (D.C. Cir. 1987); *Bazemore v. Friday*, 478 U.S. 385, 404 n.14 (1986); *Sobel v. Yeshiva Univ.*, 839 F.2d 18, 36 (2d Cir. 1988). Strict scrutiny likewise requires "evidence," *Fisher I*, 570 U.S. at 313-14, rather than "mere speculation," *Assoc. Gen. Contractors of Ohio, Inc. v. Drabik*, 214 F.3d 730, 735 (6th Cir. 2000). Handwringing about omitted variables is no substitute.

**Second**, Harvard argues (at 50-54) that SFFA's expert had no basis for removing the personal rating from his model. The district court disagreed. It described Professor Arcidiacono as "very well-qualified," found his model "probative," and adopted several of his methodological choices in its two "preferred" models. ADD50; ADD74-76. While Harvard suggests Professor Card was right to include the personal rating in his model, Harvard concedes (at 43, 47-48) that the district court credited "two regression models"—one of which excluded the personal rating. In other words, the court found a regression model without the personal rating to be credible and probative of Harvard's admissions process. Harvard does not challenge that finding on appeal.

While it is thus immaterial, the district court's preferred model that included the personal rating was clearly erroneous. When measuring the effect of race in Harvard's admissions process, the personal rating is a "tainted" variable because it is influenced by race. *Trout v. Garrett*, 780 F. Supp. 1396, 1412 (D.D.C. 1991); *Butler v. Home Depot, Inc.*, No. C-94-4335, 1997 WL 605754, at *10 n.21 (N.D. Cal. Aug. 29, 1997); *see* SFFA-

19

Br. 30-32. Even if it has explanatory power, a tainted variable must be "excluded" from any model measuring racial discrimination, *Trout*, 780 F. Supp. at 1413—especially if it reflects "subjective" evaluations. *James v. Stockham Valves & Fittings Co.*, 559 F.2d 310, 332 (5th Cir. 1977). Leaving it in "would falsely suggest that disparities in [outcomes] were attributable to an objective factor rather than to the real source, discrimination." *Trout*, 780 F. Supp. at 1412-13. The overall rating, for example, plays a key role in admissions, but it was excluded from *every* model—including Harvard's—because it is influenced by race. ADD73. There is no basis for treating the personal rating differently.

Harvard retreats (at 50-52) to the district court's supposed "finding" that the Asian-American penalty was caused by omitted variables. But the court made no such finding. "Speculating," ADD70 n.48, the court surmised that omitted variables "may" exist, ADD70; ADD71; ADD73, but it also surmised that the penalties "may" reflect bias, ADD74; ADD110; ADD124; ADD125. The court could only say that the cause of Harvard's anti-Asian penalties was "unclear": "[t]hey might be the result of qualitative factors that are harder to quantify … or they may reflect some implicit biases." ADD125. This *non*-finding receives no deference. *Unwired Planet LLC v. Google, Inc.*, 660 F. App'x 974, 980 (Fed. Cir. 2016); *Reed v. Quarterman*, 555 F.3d 364, 368 n.1 (5th Cir. 2009).

On appeal, Harvard argues (at 53-55) that recommendation letters from teachers and guidance counselors is the omitted variable—*i.e.*, the factor outside the data that proves Asian-American applicants *deserve* lower personal scores than all other racial

groups. But this Court cannot make a finding that the district court would not. And any such finding would be wrong because the record is devoid of any evidence supporting this baseless speculation.

To begin, this variable is not *omitted*: Harvard quantifies recommendation letters in the "school support rating," and the school-support rating is included in the preferred models. ADD21; JA3133-34. Harvard admits (at 53) that, with that rating included, the regression models still show statistically significant penalties against Asian-Americans applicants. Harvard-Br. 9 (citing ADD21); *see* JA996-97; JA1155; JA1784; JA2487-88. The "slight" difference in school-support ratings between white and Asian-American applicants changes nothing. ADD56; Keane-Br. 17-19. As the district court put it, "any racial effect that impacts admissions decisions through the school support ratings can be"—and was—"controlled for." ADD68.[3]

Because it can't point to school support as an omitted variable, Harvard instead argues (at 53-54) that "the actual contents of recommendation letters" are the omitted variable, *viz.*, the letters themselves "suggest that Asian-American applicants have less favorable inputs on factors that inform the personal rating but were not captured in the

---

[3] "There are several conceivable explanations," in the district court's view, for the difference in school-support ratings. ADD67. Here, too, the issue is immaterial since the ratings are in the regression model. But there was no need to guess. The difference is attributable to the same bias that led Harvard to penalize Asian-American applicants in the personal and overall ratings. SFFA-Br. 37-38. SFFA thus would have been justified in excluding the school-support rating entirely (which would have shown that the size of Harvard's anti-Asian penalty is even *larger*).

data." But Harvard never submitted "evidence" that the quality of the letters "correlates with race," *Segar*, 738 F.2d at 1277, and, consequently, the district court made no such finding. To the contrary, the district court found that "it is not clear that these sorts of considerations adequately explain the difference in personal ratings between white and Asian American applicants," ADD71-72, and chided Harvard for not developing any evidence that "Asian American applicants were actually weaker in personal criteria," ADD110 n.59. "Overall," the district court held, "the disparity between white and Asian American applicants' personal ratings has *not* been fully and satisfactorily explained." ADD72 (emphasis added).

Harvard claims that Professor Card supplied the court with evidence. But this is misdirection. When Harvard says (at 53) that he "analyzed the limited available data on the recommendation letters," it means that Professor Card looked at the school-support *ratings*, and then speculated that those ratings support his theory that Asian-American applicants are less "multidimensional" than white applicants, ADD57. Again, however, the ratings have already been accounted for in the model and, as Harvard concedes (at 54 n.13), the court rejected Professor Card's multidimensionality analysis, ADD60. Professor Card didn't opine on the quality of recommendation letters for a sensible reason: he reviewed *five* application files and didn't testify about *any* of them. JA2971-73; Doc. 421-253 at 105-06. Harvard also never produced a statistically significant sample of those recommendation letters, or analyzed their strength by race. That is why Dean Fitzsimmons admitted that this is all "speculation." JA711-12. When pressed, he

testified: "We simply know that because it's our office and we're in the business and there's evidence of it." JA712. But since that supposed "evidence" was never introduced at trial, such "assertions" cannot overcome the presumption that the quality of the recommendation letters does not correlate with race. *Palmer*, 815 F.2d at 101.[4]

Harvard adds (at 54) that its admissions officers testified they did not use race when assigning the personal rating, so the significant anti-Asian penalties in the data *must be* caused by omitted variables. That testimony should not be credited. *See infra* II.B.2. But it also doesn't help Harvard. Every Harvard witness testified that Asian-American applicants do not deserve lower personal scores for any reason. JA711-12 (Fitzsimmons); JA1437-38 (McGrath); JA1893 (Yong); JA2055 (Kim). Harvard's witnesses thus uniformly support SFFA's position that there is no correlation between race and deserving a lower personal score.

Harvard's argument about the supposed contents of recommendation letters is little more than an invitation to engage in evidence-free stereotyping. Harvard has no idea whether Asian-American applicants have worse recommendation letters than all other racial groups. Without any evidence to substantiate the assertion, its omitted-variables argument reduces to "overbroad generalizations about the different talents, capacities, or preferences of" Asian Americans that could never satisfy heightened

---

[4] In passing, Harvard suggests (at 45, 49, 51) that Asian-American applicants submit worse personal essays than other applicants. That regretful assertion, *see* SFFA-Br. 10, fails for the same reasons.

scrutiny. *United States v. Virginia*, 518 U.S. 515, 533-34 (1996). The Court should not participate in this "fraught" exercise. ADD70 n.48.

**Third**, Harvard argues (at 48) that the district court was right to minimize the anti-Asian penalty as "'slight' but statistically significant." ADD79-80. But the model's statistically significant penalty means that over a six-year period—under the most conservative estimate—150 actual, real-life Asian Americans were denied admission to Harvard *because of their race*. SFFA-Br. 42. There is nothing "slight" about that. As Harvard admits (at 71 n.20) when defending itself against charges of racial balancing, a "difference" of 56 "Asian-American admitted students" over a ten-year period "is substantial." If that difference is substantial, this one is enormous.

### 2. The nonstatistical evidence corroborates the statistics.

Harvard reliance on non-statistical evidence is likewise misplaced. None of it— whether taken individually or collectively—offers a basis for exonerating Harvard. It cannot dispel the inference of discrimination created by the statistical evidence. SFFA-Br. 43-46.

**Admissions officers' testimony**: "Every Admissions Office witness," Harvard says (at 40), "was asked if he or she had ever observed discrimination in the admissions process—and every single one said no." But Harvard needed more than its own witnesses' "assertion that its admissions process uses race in a permissible way." *Fisher I*, 570 U.S. at 313. Strict scrutiny aside, the district court's logic misapprehends "the proper legal standards." *McGowan v. United States*, 296 F.2d 252, 254 (5th Cir. 1961); *see*

*United States v. 15 Bosworth Street*, 236 F.3d 50, 53-54 (1st Cir. 2001). When subjective selection criteria result in statistically significant racial penalties, the defendant's denials—no matter how credible—carry no weight. SFFA cited cases to this effect, SFFA-Br. 38-39, 43-44, and their reasoning applies even when the defendant testifies at trial, *see, e.g.*, *Thomas*, 183 F.3d at 58; *Int'l Bhd. of Teamsters v. United States*, 431 U.S. 324, 342-43 n.24 (1977); *Turner v. Fouche*, 396 U.S. 346, 361 (1970); *Norris v. Alabama*, 294 U.S. 587, 597-98 (1935).

As these cases explain, a trial court can find the defendant's witnesses credible, and yet still rule for the plaintiff because illegal stereotypes are often "unthinking," "unconscious," and "unwitting." *Thomas*, 183 F.3d at 58-60. That witnesses "'may have been unaware of that motivation, even within themselves, neither alters the fact of its existence nor excuses it.'" *Id.* at 60. The Supreme Court, too, has "squarely held" that "affirmations of good faith in making individual selections are insufficient to dispel" evidence of a racial penalty because "'[t]he result bespeaks discrimination, whether or not it was a conscious decision on the part of any individual.'" *Alexander v. Louisiana*, 405 U.S. 625, 632 (1972). This is true even when universities make decisions by committee. Implicit stereotyping can seep in undetected "at any stage of the … process" and "infect the ultimate [admissions] decision." *Lam v. Univ. of Hawai'i*, 40 F.3d 1551, 1560 (9th Cir. 1994).

A defendant's denials are not just irrelevant, but are unpersuasive too. Nowadays, "'defendants of even minimal sophistication will neither admit discriminatory animus

[n]or leave a paper trail demonstrating it.'" *Aman v. Cort Furniture Rental Corp.*, 85 F.3d 1074, 1082 (3d Cir. 1996). Indeed, courts allow plaintiffs to rely solely on statistical evidence precisely because defendants usually deny and conceal discrimination. *Teamsters*, 431 U.S. at 339-40 n.20; *Lynn v. Regents of Univ. of Calif.*, 656 F.2d 1337, 1342-43 & n.3 (9th Cir. 1981). Reliable statistics "demonstrate more than the testimony of many witnesses," moreover, because they utilize more variables and inputs than individuals could possibly know. *Jones v. Lee Way Motor Freight, Inc.*, 431 F.2d 245, 247 (10th Cir. 1970); *see id.* (reversing district court for accepting conclusory denials over plaintiff's statistics); *Bing v. Roadway Exp., Inc.*, 444 F.2d 687, 689 (5th Cir. 1971) (same). By crediting Harvard's testimony, the district court ignored these principles of modern discrimination law.

**History of discrimination**: Harvard no longer disputes the racist origins of its "holistic" admissions policy. Harvard admits its "discrimination against Jewish applicants," Harvard-Br. 7 n.1, and doesn't deny the parallels between Jewish applicants then and Asian-American applicants now, SFFA-Br. 1-3, 22, 40-41. Instead, Harvard insists (at 7 n.1) that this history "has no relevance to SFFA's claims." That assertion conflicts with *Ramos v. Louisiana*, 140 S. Ct. 1390 (2020).

Under *Ramos*, any "accounting" of Harvard's admissions process must include "the racially discriminatory *reasons*" that led Harvard to adopt that process "in the first place." *Id.* at 1401. Justice Sotomayor's concurrence put a finer point on it: "policies that are 'traceable'" to racial discrimination "and that still 'have discriminatory effects'

offend the Equal Protection Clause" and thus Title VI. *Id.* at 1410 (quoting *United States v. Fordice*, 505 U.S. 717, 729 (1992)). Harvard's history bolsters SFFA's other evidence and undermines Harvard's assertion that it would never use race to stereotype, penalize, or cap the admission of a minority group.

**OCR and OIR**: Harvard has long known of credible evidence that its admissions process discriminates against Asian Americans. But until this litigation, Harvard did nothing about it. When OCR found evidence of anti-Asian stereotyping, Harvard did nothing. SFFA-Br. 10-11. When OCR found disparities between the admission rates of whites and Asian Americans, Harvard did nothing because white applicants were more likely to be athletes and legacies. JA4519-20; JA597:20-98:10. When OIR found that this excuse was no longer true, Harvard again did nothing. SFFA-Br. 11-12.

True, Harvard's witnesses testified that they thought no action was warranted. ADD35. But that's the problem. Knowledge of potential discrimination, followed by disinterest and inaction, is evidence of discrimination. *See, e.g.*, *McReynolds v. Sodexho Marriott Servs., Inc.*, 349 F. Supp. 2d 1, 18 & n.21 (D.D.C. 2004) ("statements" and "corporate documents" "indicating an awareness of [the] problem" was "powerful support to plaintiffs' statistical showing of significantly low levels of African American promotions"); *Police Officers for Equal Rights v. City of Columbus*, 644 F. Supp. 393, 436 (S.D. Ohio 1985) ("Defendants' knowledge of and refusal to act upon evidence which indicated an underrepresentation of blacks ... supports an inference of intentional discrimination"); *Stender v. Lucky Stores, Inc.*, 803 F. Supp. 259, 331-32 (N.D. Cal. 1992)

(same). That Harvard knew Asian-American applicants were likely suffering and did nothing about it makes SFFA's case even stronger.

**Post-filing conduct**: Harvard does not dispute that, when a defendant makes changes to treat minorities better after it is sued for discrimination, those post-filing changes *confirm* the existence of prior discrimination. SFFA-Br. 44-45. Harvard instead denies that its changes were made in response to this litigation. It attributes the spike in Asian-American admissions to the fact that "the Asian-American share of admitted students has been increasing for decades." Harvard-Br. 42. But any increases were not "statistically significant"—except for 2019, the class admitted immediately after SFFA sued. JA2230-31. That is why the district court attributed the spike to Harvard being "confronted with the allegations at issue here." ADD80.

Contra Harvard's suggestion (at 43), recent changes to its reading procedures were no routine update either. While published annually, the procedures did "not differ in material respects" for many years. ADD21 n.20. They were "overhauled for the class of 2023," ADD20, adding specific guidance on how to use race for the "first time" ever, JA3284. Most notably, they added an instruction about "extroversion" that, as Harvard nowhere disputes, was meant to counteract anti-Asian stereotypes. SFFA-Br. 16, 45. That Harvard rewrote its procedures to warn against anti-Asian stereotyping—and concealed those changes until a trial blunder forced its hand, SFFA-Br. 16 n.3, 45—is strong evidence that Harvard stereotyped Asian-American applicants.

28

### 3.  The district court's legal errors require reversal.

Despite Harvard's characterization (at 55), SFFA does not argue that "the district court was obliged to treat SFFA's statistical analysis as irrefutable proof" or that it "obviate[s] the need to consider other evidence." Statistical evidence can be unreliable if it employs flawed methodology. It can be unpersuasive if it overlooks key explanatory variables. And it can be outweighed by more probative non-statistical evidence. That is not what happened here.

Even in a mine-run case, the non-statistical evidence needs to be "sufficient … to permit the trier of fact to decline to draw the inference of discrimination from the [statistical] proof"—a "much higher" bar than normal. *Segar*, 738 F.2d at 1269-70 & n.14; *Teamsters*, 431 U.S. at 343 n.24. Harvard's self-serving testimony didn't move the needle. *Turner*, 396 U.S. at 361 & n.21. And the other nonstatistical evidence supports SFFA. Harvard has no rebuttal to SFFA's powerful statistical showing.

Furthermore, Harvard refuses to defend many of the theories that the district court offered. Harvard doesn't argue that its treatment of Asian-American ALDCs is exonerating. SFFA-Br. 40-41.[5] Harvard doesn't argue that athletics or legacy status

---

[5] An amicus wrongly asserts that SFFA does not defend Professor Arcidiacono's exclusion of ALDC applicants from his model. Amicus Br. of Professors of Economics 24-25. Professor Arcidiacono's modeling choice was right. SFFA-Br. 40-41. But the dispute is immaterial because Professor Card conceded (and the district court found) that there is a statistically significant penalty against Asian-American applicants either way. *See* ADD76; ADD79.

explain the disparity between Asian-American and white applicants. SFFA-Br. 36 n.8. And Harvard doesn't argue that Asian penalties are justified by the benefits it gives to African Americans and Hispanics. SFFA-Br. 53-55. These arguments have wisely been abandoned on appeal.

Harvard thus finishes where it began: criticizing the use of statistics to analyze the "non-quanti[fiable]" and subjective criteria that supposedly pervade its admissions process. Harvard-Br. 45. But that kind of argument is routinely rejected. "While … subjectivity" can make it harder to model a selection process, "regression analysis is the accepted means for performing this difficult task." *Sobel*, 839 F.2d at 35. That is why *everyone*—OCR, OIR, SFFA, Harvard, and the district court—used regression analysis to model Harvard's system. Harvard's broadside against statistics "would have the practical effect of insulating universities from charges of discrimination." *Id.*; *accord Lynn*, 656 F.2d at 1343 & n.3.

This is not a recipe for upholding the use of race in admissions. When, as here, admissions policies "'touch upon an individual's race or ethnic background, he is entitled to a judicial determination that the burden he is asked to bear on that basis is precisely tailored to serve a compelling governmental interest.'" *Fisher I*, 570 U.S. at 307-08. But if self-serving testimony and speculation can defeat rigorous statistical analysis, that will prove to be all but impossible in cases like this one. That impossibility will, in turn, require reconsideration of whether racial preference are compatible with Title VI. "If strict scrutiny is abandoned or manipulated to distort its real and accepted meaning,

30

the Court lacks authority to approve the use of race even in this modest, limited way." *Grutter*, 539 U.S. at 387 (Kennedy, J., dissenting).

### C. Harvard engages in racial balancing.

The parties agree on the governing legal standard, *see* SFFA-Br. 46; Harvard-Br. 68, and there are no factual disputes. The issue is whether Harvard can disprove that it engages in racial balancing under controlling precedent. SFFA-Br. 46-48. To that end, Harvard chides SFFA for lacking "expert testimony to support its claim," Harvard-Br. 69, but "[t]he numbers speak for themselves," Amicus Br. of United States (U.S.-Br.) 14; SFFA-Br. 47. Miniscule variation in the racial composition of Harvard's admitted classes is classic evidence of racial balancing. *Parents Involved*, 551 U.S. at 710; *Cavalier ex rel. Cavalier v. Caddo Par. Sch. Bd.*, 403 F.3d 246, 248 (5th Cir. 2005); *Perrea v. Cincinnati Public Schools*, 709 F. Supp. 2d 628, 635, 645-46 (S.D. Ohio 2010).

Harvard artificially inflates the year-to-year fluctuation by focusing on the "*percent variation*" instead of the "*variation in percentage points.*" Harvard-Br. 71 n.20. The stability of the admitted class's racial composition is what matters. U.S.-Br. 14-15. Harvard also claims (at 71-72) that "the racial composition of the *admitted class* fluctuates to a greater degree from year-to-year than that of the *applicant pool.*" But Harvard's chosen metric cuts against it: the variance in the admitted class of African Americans is substantially smaller (10.0% to 11.7%), SFFA-Br. 47, than the variance in the African-American applicant pool over the same years (7.5% to 10.4%), JA5743-44.

Harvard also attempts to minimize the nonstatistical evidence of racial balancing, noting (at 72-74) that its "one-pagers" report more than just race. But the evidence of racial balancing goes far beyond one-pagers. At Harvard, the admissions process is racial balancing from start to finish. U.S.-Br. 15-22. Harvard does not deny, moreover, that Fitzsimmons refers to one-pagers as "ethnic stats," or that the admissions office will "go back and look" to see if a racial group is "underrepresented" because it won't allow "a dramatic drop-off in some group [from] last year." SFFA-Br. 48. The record "leaves little doubt what Harvard's admissions leaders are looking for: maintaining Harvard's current racial composition." U.S.-Br. 20.

While Harvard adds that these one-pagers don't help it achieve racial targets, its euphemistic language cannot hide the truth. When Harvard says (at 73) that "admitted students with different characteristics tend to accept offers of admission at different rates," Harvard means that admitted students of different *races* accept at different rates. So when Harvard says (at 73) that "the Admissions Office relies on one-pagers to help predict the yield rate and determine the total number of offers that can be extended" given its "finite amount of housing," Harvard means that it uses racial "yield" data to set admissions *targets*. Thus, Harvard will have an over-enrollment crisis if, for instance, it admits more Asian-American applicants and fewer African-American applicants than it projects at the outset. SFFA-Br. 7. This carefully worded explanation is no denial of racial balancing. It's a confession. U.S.-Br. 21-22.

### D.     Harvard does not use race as a plus to achieve overall diversity.

Harvard does not pursue student-body diversity. SFFA-Br. 49-50. Contrary to Harvard's belief (at 59-60), "asserting an interest in the educational benefits of diversity writ large is insufficient. A university's goals cannot be elusory or amorphous—they must be sufficiently measurable to permit judicial scrutiny of the policies adopted to reach them." *Fisher II*, 136 S. Ct. at 2211; U.S.-Br. 29-31. Harvard's admission (at 61-62) that it doesn't pursue "critical mass"—the only diversity goal the Supreme Court has endorsed as narrowly tailored, *Smith v. Univ. of Wash.*, 392 F.3d 367, 373 (9th Cir. 2004)—should be fatal.

Harvard also refuses to grapple with the troubling differences between the value it places on race and other "diversity" factors, especially religion. The idea that Harvard pursues "diversity of all sorts," ADD6, yet blinds itself to an applicant's religion, is unsustainable. Harvard responds that the district court's contrary findings are insulated by clear-error review. Harvard-Br. 60-61. But there is no factual disagreement. The dispute is over the *legal* significance of Harvard's decision to treat race and religion in radically different ways. "On this point, the University receives no deference." *Fisher I*, 570 U.S. at 311.

Harvard also uses race as far more than a "plus factor." SFFA-Br. 51-53. Harvard says that race has "an effect similar to several other factors for highly competitive applicants." Harvard-Br. 63 (citing JA6111-12). But Harvard won't dispute that those "other factors" are "tips for legacies, applicants on the dean's or director's interest lists,

children of faculty or staff," ADD118, as well as "getting a 1 on the academic, extracurricular, or personal rating," SFFA-Br. 52 (citing JA6112). These factors are rare and enormously beneficial.

Harvard's rejoinder "that race is not considered in [a] 'mechanical manner'" is non-responsive. Harvard-Br. 63 (quoting *Grutter*, 539 U.S. at 244). What matters is how the use of race works "in practice." *Grutter*, 539 U.S. at 339. Harvard also incorrectly argues (at 64-65) that the size of its racial preference compares favorably to those upheld in *Grutter* and *Fisher*. But neither decision supports using race to increase the chance of admission for African-American and Hispanic applicants by 324% and 141%. JA2280; SFFA-Br. 51-52. Had the University of Texas considered race across its entire applicant pool, like Harvard does, it would have been decisive for *half* as many African-American applicants as Harvard for an admitted class *six times* larger. *Compare* ADD9, *with Fisher I*, 570 U.S. at 304. The notion that Harvard's "tip" for African Americans is "a 'factor of a factor of a factor'" is meritless. *Fisher v. Univ. of Tex. at Austin* (*Fisher II*), 136 S. Ct. 2198, 2207 (2016).[6]

---

[6] SFFA is accused of wrongly treating "Asian Americans as a block" for purposes of examining racial preferences. Amicus Br. of Social Scientists *et al.* 7. But it is Harvard that gives *all* African-American and Hispanic applicants—but no Asian-American applicants regardless of their descent—an *automatic* preference. SFFA-Br. 50. Amici thus highlight another reason why Harvard's use of race is not narrowly tailored. These social scientists (and other amici) also make arguments that Harvard hasn't, based on evidence that isn't in the record. The Court cannot consider such arguments or evidence. *Brigham v. Sun Life of Canada*, 317 F.3d 72, 82, 86 (1st Cir. 2003); *Banerjee v. Bd. of Trustees of Smith Coll.*, 648 F.2d 61, 65 n.9 (1st Cir. 1981).

Finally, Harvard promises (at 81) that its use of race is "'limited in time,'" *Grutter*, 539 U.S. at 342, because it will engage in periodic review beginning in 2023. But that review is pointless because Harvard's use of race has no "logical end point." *Id.*; SFFA-Br. 53-55. Harvard's commitment to racial preferences is becoming more entrenched at a time when the Supreme Court expects these programs to be winding down. *Grutter*, 539 U.S. at 343; *id.* at 351 (Thomas, J., concurring in part and dissenting in part). If an applicant's race will always be "essential" to admissions, Amicus Br. of Brown Univ. *et. al.* 15, how can racial preferences ever be limited in time? For Harvard and its amici, there will never be a right time to stop.

### E.    Harvard disregards race-neutral alternatives.

On race-neutral alternatives, too, there is no dispute over controlling law, *see* SFFA-Br. 56; Harvard-Br. 74, or over material facts, *see* SFFA-Br. 56-57 (discussing Simulation D); Harvard-Br. 76-77 (same). The issue is whether, in light of SFFA's identified alternative, it is "'necessary'" for Harvard to use race to achieve "the educational benefits of diversity." *Fisher I*, 570 U.S. at 312. Harvard cannot shoulder this burden. SFFA-Br. 56-62.

***First***, Harvard tries to defend (at 76) the conclusion below that Simulation D would "adversely affect the strength of Harvard's admitted classes." True, "a university need not sacrifice its 'reputation for excellence' to pursue the educational benefits of a diverse student body." Harvard-Br. 77 (quoting *Fisher II*, 136 S. Ct. at 2208). But neither the district court nor Harvard tries to demonstrate that adopting Simulation D would

sacrifice Harvard's academic reputation. Harvard instead moves the goalposts by suggesting that Simulation D would "*diminish* the strength of Harvard's admitted classes." Harvard-Br. 77 (emphasis added). But the salient issue is not whether Simulation D clones Harvard's admitted class. What matters is whether it works "'about as well and at tolerable administrative expense.'" *Fisher I*, 570 U.S. at 312. As to academic qualifications, Simulation D easily passes this test. SFFA-Br. 57, 59-60. Nothing about this alternative would require Harvard to make a "dramatic sacrifice of diversity, the academic quality of all admitted students, or both." *Grutter*, 539 U.S. at 340.

**Second**, Harvard argues (at 78-79) that a dip in African-American enrollment from 14% to 10% would not allow it to achieve the educational benefits of diversity. But Harvard never explains why. Indeed, the Smith Committee *never* cited this as a ground for rejecting Simulation D; the committee instead conceded that this alternative would "achieve a significant degree of racial diversity." JA4426. It is telling that Harvard doesn't try to reconcile its litigation position with the findings made by the committee it has touted as having "considerable experience in higher-education administration." Harvard-Br. 80.

Harvard tries (at 78-79) to fill the evidentiary void with trial testimony. But that testimony doesn't say what Harvard needs it to regarding African-American enrollment. Some witnesses expressed concern about a dip in *overall* underrepresented-minority enrollment. *See* JA2552-55; JA2617-18; JA2643-44; JA2686; JA2690. But Simulation D

would *increase* overall underrepresented-minority enrollment, SFFA-Br. 56-57, and that is what matters, *Grutter*, 539 U.S. at 318.

Almost none of the remaining testimony Harvard cites speaks to this issue either. Dean Smith and others clearly oppose *any* race-neutral alternative that would lead to *any* reduction in African-American enrollment because Harvard won't "go backwards for any particular racial group." JA1841; *e.g.*, JA1844; JA2555; JA2612-13; JA2725-26. But that is not an argument for why this precise level of African-American enrollment is needed to achieve educational benefits. It's an admission that Harvard believes in quotas and racial balancing. SFFA-Br. 58; U.S.-Br. 20-21. Harvard "has provided absolutely no competent evidence that the proportional representation promoted by [its] Policy is in any way tied to the vigorous exchange of ideas." *Wessmann v. Gittens*, 160 F.3d 790, 799 (1st Cir. 1998).[7]

**Third**, Harvard says (at 79) that eliminating LDC preferences "would adversely affect [its] ability to attract top faculty and staff or foster positive relationships with alumni and donors." The trial record does not support this conclusion. SFFA-Br. 57. Regardless, any interest Harvard might have in giving preferences to the wealthy is not compelling enough to meet strict scrutiny. Workable is not synonymous with costless.

---

[7] The only trial testimony that was even pertinent to educational concerns over a dip in African-American enrollment was from a student. JA2688-89. But vague and speculative testimony from one student falls far short of "concretely demonstrat[ing]" a compelling need to preserve this precise level of African-American enrollment. *Wessmann*, 160 F.3d at 799.

It's possible that eliminating these regressive preferences might cost Harvard a few donors. Perhaps Harvard would have to dip into its $40 billion endowment to pay for coveted art collections, instead of buying them with admissions preferences. JA740-45. But that is a small price to pay to achieve diversity without using racial preferences. True, Harvard can choose to set aside roughly 20% of its seats for mostly white legacy and well-connected applicants. JA5731; JA5926; JA4558. But it cannot then claim that racial preferences are "necessary" to dig out of the diversity hole that this spoils system creates. *Fisher I*, 570 U.S. at 312.

**Fourth**, Harvard defends (at 80) "the district court's assessment that Simulation D would pose administrative and staffing challenges." But, again, the testimony doesn't substantiate that claim, SFFA-Br. 60 n.10, and any such finding would be immaterial anyway. An insignificant change in the share of students choosing engineering and biological science over humanities cannot supply the compelling justification Harvard needs to retain racial preferences.

In all, Simulation D makes Harvard *more* diverse racially and socioeconomically without jeopardizing its reputation for academic excellence or imposing intolerable administrative burdens. It might, however, inhibit Harvard from catering to the rich, famous, and well-connected. And it would keep Harvard from using racial preferences to "signal" its support for underrepresented minorities. JA3672. And that is more than Harvard and its amici can tolerate. Race-neutral admissions is "antithetical" to how these elite universities believe admissions should function. Amicus Br. of Brown Univ.

*et. al.* 15. As counsel for amici put it in closing argument: "Race-blind admissions is an act of erasure." JA3650. For Harvard, then, no race-neutral policy can ever be workable since, by definition, it's not race-based.

Harvard's problem is that the Supreme Court disagrees. The Court has explained that race in admissions is highly disfavored, *supra* II.A, and has rejected any "permanent justification for racial preferences," *Grutter*, 539 U.S. at 342. Validating Harvard's position would override the Supreme Court's judgment and render the promise of race-neutral alternatives a mirage. Harvard's institutional opposition to racial neutrality in admissions is not a reason why "race-neutral alternatives do not suffice." *Fisher I*, 570 U.S. at 312. It is avowed—and longstanding—resistance to a "core purpose" of Title VI. *Grutter*, 539 U.S. at 343.

## CONCLUSION

The district court's judgment should be reversed.

Respectfully submitted,

_s/ William S. Consovoy_

Adam K. Mortara
BARTLIT BECK LLP
54 W. Hubbard St., Ste. 300
Chicago, IL 60654
(312) 494-4469

John M. Hughes
BARTLIT BECK LLP
1801 Wewatta St., Ste. 1200
Denver, CO 80202
(303) 592-3140

William S. Consovoy
Thomas R. McCarthy
J. Michael Connolly
Cameron T. Norris
CONSOVOY MCCARTHY PLLC
1600 Wilson Blvd., Ste. 700
Arlington, VA 22209
(703) 243-9423
will@consovoymccarthy.com

Patrick Strawbridge
CONSOVOY MCCARTHY PLLC
10 Post Office Sq., 8th Fl.,
PMB #706
Boston, MA 02109
(617) 227-0548

*Counsel for Appellant Students for Fair Admissions, Inc.*

**CERTIFICATE OF COMPLIANCE**

This brief complies with this Court's order granting SFFA's motion to file an oversized brief of 10,000 words or less because it contains 9,975 words, excluding the parts that can be excluded. This brief also complies with Rule 32(a)(5)-(6) because it has been prepared in a proportionally spaced face using Microsoft Word 2016 in 14-point Garamond font.

Dated: June 4, 2020                                    _s/ William S. Consovoy_

## CERTIFICATE OF SERVICE

I filed this brief via the Court's ECF system, which will electronically notify the

following:

William F. Lee
Felicia H. Ellsworth
Andrew S. Dulberg
Michelle Liszt Sandals
Greg Schmidt
WILMER CUTLER PICKERING
HALE AND DORR LLP
60 State St.
Boston, MA 02109
Tel: (617) 526-6687
Fax: (617) 526-5000
william.lee@wilmerhale.com
felicia.ellsworth@wilmerhale.com
andrew.dulberg@wilmerhale.com

Debo P. Adegbile
WILMER CUTLER PICKERING
HALE AND DORR LLP
7 World Trade Center
250 Greenwich St.
New York, NY 10007
Tel: (212) 295-6717
Fax: (212) 230-8888
debo.adegbile@wilmerhale.com

Seth P. Waxman
Paul R.Q. Wolfson
Danielle Y. Conley
Brittany Blueitt Amadi
Emma Simson
Alex Hemmer
WILMER CUTLER PICKERING
HALE AND DORR LLP
1875 Pennsylvania Ave. NW
Washington, D.C. 20006
Tel: (202) 663-6800
Fax: (202) 663-6363
seth.waxman@wilmerhale.com
paul.wolfson@wilmerhale.com
danielle.conley@wilmerhale.com
brittany.amadi@wilmerhale.com

Ara B. Gershengorn
HARVARD UNIVERSITY
OFFICE OF THE GENERAL COUNSEL
1350 Massachusetts Ave, Ste. 980
Cambridge, MA 02138-3826
ara_gershengorn@harvard.edu

Dated: June 4, 2020                 _s/ William S. Consovoy_