No. 19-2005

## UNITED STATES COURT OF APPEALS
## FOR THE FIRST CIRCUIT

STUDENTS FOR FAIR ADMISSIONS, INC.,
*Plaintiff-Appellant*,

v.

PRESIDENT AND FELLOWS OF HARVARD COLLEGE,
*Defendant-Appellee.*

On Appeal from the United States District Court
for the District of Massachusetts

## JOINT APPENDIX
## VOLUME III

| | |
|---|---|
| Adam K. Mortara | William S. Consovoy |
| J. Scott McBride | Thomas R. McCarthy |
| Krista J. Perry | J. Michael Connolly |
| BARTLIT BECK LLP | Cameron T. Norris |
| 54 W. Hubbard St., Ste. 300 | CONSOVOY MCCARTHY PLLC |
| Chicago, IL 60654 | 1600 Wilson Blvd., Ste. 700 |
| (312) 494-4469 | Arlington, VA 22209 |
| | (703) 243-9423 |
| John M. Hughes | will@consovoymccarthy.com |
| Katherine L.I. Hacker | |
| Meg E. Fasulo | Patrick Strawbridge |
| BARTLIT BECK LLP | CONSOVOY MCCARTHY PLLC |
| 1801 Wewatta St., Ste. 1200 | 10 Post Office Sq., 8th Fl., PMB #706 |
| Denver, CO 80202 | Boston, MA 02109 |
| (303) 592-3140 | (617) 227-0548 |

*Counsel for Appellant Students for Fair Admissions, Inc.*

# TABLE OF CONTENTS

**Volume I**

Docket Sheet ...................................................................................................JA1

Notice of Appeal (Doc. 674) ......................................................................JA106

Complaint (Doc. 1) ....................................................................................JA108

Dispositive Motion Exhibits

    Motion to Dismiss for Lack of Subject-Matter Jurisdiction

        Declaration of William S. Consovoy

            Exhibit I (Doc. 205-9) ...................................................................JA228

    Cross-Motions for Summary Judgment

        Declaration of Felicia H. Ellsworth

            Exhibit 2 (Doc. 419-2) ...................................................................JA230

            Exhibit 85 (Doc. 419-85) ...............................................................JA244

            Exhibit 86 (Doc. 419-86) ...............................................................JA251

            Exhibit 87 (excerpts) (Doc. 419-87) ..............................................JA254

            Exhibit 88 (excerpts) (Doc. 419-89) ..............................................JA285

            Exhibit 89 (Doc. 419-89) ...............................................................JA330

            Exhibit 91 (Doc. 419-91) ...............................................................JA347

            Exhibit 92 (Doc. 419-92) ...............................................................JA370

        Declaration of Michael Connolly

            Exhibit 237 (Doc. 421-237) ...........................................................JA399

            Exhibit 238 (Doc. 421-238) ...........................................................JA418

            Exhibit 239 (Doc. 421-239) ...........................................................JA425

            Exhibit 240 (Doc. 421-240) ...........................................................JA427

            Exhibit 241 (Doc. 421-241) ...........................................................JA431

            Exhibit 242 (Doc. 421-242) ...........................................................JA434

            Exhibit 250 (Doc. 421-250) ...........................................................JA436

            Exhibit 251 (Doc. 421-251) ...........................................................JA440

Trial Transcripts

    Day 1 (Doc. 631) ....................................................................................JA443

    Day 2 (Doc. 632) ....................................................................................JA630

## Volume II

Trial Transcripts (cont.)

    Day 3 (Doc. 633) ....................................................................................JA722

    Day 4 (Doc. 635) ....................................................................................JA952

    Day 5 (Doc. 636) ..................................................................................JA1198

## Volume III

Trial Transcripts (cont.)

    Day 6 (Doc. 638) ..................................................................................JA1459

    Day 7 (Doc. 640) ..................................................................................JA1690

    Day 8 (Doc. 642) ..................................................................................JA1918

## Volume IV

Trial Transcripts (cont.)

    Day 9 (Doc. 644) ..................................................................................JA2163

    Day 10 (Doc. 646) ................................................................................JA2413

    Day 11 (Doc. 648) ................................................................................JA2535

    Day 12 (Doc. 650) ................................................................................JA2752

## Volume V

Trial Transcripts (cont.)

    Day 13 (Doc. 652) ...........................................................................JA2937

    Day 14 (Doc. 654) ...........................................................................JA3143

    Day 15 (Doc. 656) ...........................................................................JA3404

    Closing Arguments (Doc. 666)........................................................JA3559

Trial Exhibits

    Plaintiff's Trial Exhibits

        Request for Judicial Notice (excerpts) (Doc. 577).......................................JA3688

        Notice of Deposition Designations Played in Court (Doc. 597-1).............JA3708

## Volume VI

    Plaintiff's Trial Exhibits (cont.)

    PX1    .............................................................................................JA3723

    PX2    .............................................................................................JA3741

    PX9    .............................................................................................JA3742

    PX12   .............................................................................................JA3759

    PX13   .............................................................................................JA3802

    PX14   .............................................................................................JA3845

    PX15   .............................................................................................JA3848

    PX16   .............................................................................................JA3940

    PX17   .............................................................................................JA3941

    PX19   .............................................................................................JA3943

    PX21   .............................................................................................JA3944

    PX23   .............................................................................................JA3948

    PX24   .............................................................................................JA3951

    PX26   .............................................................................................JA3954

    PX28   .............................................................................................JA3963

PX29 .................................................................................................JA3971

PX35 .................................................................................................JA3972

PX36 .................................................................................................JA3979

PX41 (excerpts) ..............................................................................JA3980

PX50 .................................................................................................JA4002

PX57 .................................................................................................JA4008

PX68 .................................................................................................JA4011

PX71 .................................................................................................JA4012

PX72 .................................................................................................JA4028

PX75 .................................................................................................JA4075

PX81 .................................................................................................JA4079

PX88 (excerpts) ..............................................................................JA4080

PX95 .................................................................................................JA4084

PX96 .................................................................................................JA4090

PX99 .................................................................................................JA4097

PX106 ...............................................................................................JA4109

PX111 ...............................................................................................JA4110

PX147 ...............................................................................................JA4112

PX148 ...............................................................................................JA4113

PX149 ...............................................................................................JA4115

PX150 ...............................................................................................JA4116

PX152 ...............................................................................................JA4124

PX153 ...............................................................................................JA4128

PX154 ...............................................................................................JA4130

PX155 ...............................................................................................JA4131

PX156 ...............................................................................................JA4132

PX157 ...............................................................................................JA4133

PX163 ...............................................................................................JA4134

PX164 ................................................................................................ JA4138

PX165 ................................................................................................ JA4142

PX167 ................................................................................................ JA4145

PX177 ................................................................................................ JA4147

PX182 ................................................................................................ JA4154

PX200 ................................................................................................ JA4156

PX218 ................................................................................................ JA4158

PX225 ................................................................................................ JA4196

PX227 ................................................................................................ JA4199

PX230 ................................................................................................ JA4200

PX236 ................................................................................................ JA4201

PX238 ................................................................................................ JA4203

PX265 ................................................................................................ JA4206

PX279 ................................................................................................ JA4209

PX287 ................................................................................................ JA4212

PX288 (excerpts) ............................................................................. JA4214

PX299 ................................................................................................ JA4382

PX300 ................................................................................................ JA4389

PX302 ................................................................................................ JA4390

PX312 ................................................................................................ JA4412

PX316 ................................................................................................ JA4413

PX319 ................................................................................................ JA4432

PX324 ................................................................................................ JA4449

**Volume VII**

Plaintiff's Trial Exhibits (cont.)

PX340 ................................................................................................................. JA4451

PX461 ................................................................................................................. JA4454

PX465 ................................................................................................................. JA4460

PX467 ................................................................................................................. JA4461

PX509 ................................................................................................................. JA4464

PX555 ................................................................................................................. JA4475

PX604 ................................................................................................................. JA4521

PX618 ................................................................................................................. JA4523

PX619 ................................................................................................................. JA4524

PX620 ................................................................................................................. JA4525

PX621 ................................................................................................................. JA4527

PX622 ................................................................................................................. JA4528

PX623 ................................................................................................................. JA4530

PX624 ................................................................................................................. JA4531

PX625 ................................................................................................................. JA4532

PX626 ................................................................................................................. JA4533

PX628 ................................................................................................................. JA4534

PX629 ................................................................................................................. JA4535

PX630 ................................................................................................................. JA4536

PX631 ................................................................................................................. JA4537

PX633 ................................................................................................................. JA4538

PX634 ................................................................................................................. JA4558

PX656 ................................................................................................................. JA4559

PX657 ................................................................................................................. JA4561

PX659 ................................................................................................................. JA4562

PX696 ................................................................................................................. JA4563

PX705 ...................................................................................................JA4564

PX720 ...................................................................................................JA4565

PX721 ...................................................................................................JA4566

PX722 ...................................................................................................JA4585

PX723 ...................................................................................................JA4586

PX741 ...................................................................................................JA4606

PX749 ...................................................................................................JA4607

PX755 ...................................................................................................JA4625

PX767 ...................................................................................................JA4627

Defendant's Trial Exhibits

DX2 .....................................................................................................JA4628

DX3 (excerpts) ...................................................................................JA4738

DX4 .....................................................................................................JA4888

DX5 .....................................................................................................JA4889

DX12 ...................................................................................................JA4936

DX13 ...................................................................................................JA4939

DX19 ...................................................................................................JA4978

DX24 ...................................................................................................JA5031

DX25 ...................................................................................................JA5044

DX26 ...................................................................................................JA5205

**Volume VIII**

Defendant's Trial Exhibits (cont.)

DX27 ...................................................................................................JA5244

DX36 ...................................................................................................JA5272

DX39 ...................................................................................................JA5346

DX40 ...................................................................................................JA5376

DX41 ...................................................................................................JA5462

DX42 ...................................................................................................JA5463

DX44 ...................................................................................................JA5479

DX47 ...................................................................................................JA5484

DX53 ...................................................................................................JA5508

DX55 ...................................................................................................JA5546

DX56 ...................................................................................................JA5596

DX60 ...................................................................................................JA5597

DX76 ...................................................................................................JA5598

DX79 ...................................................................................................JA5599

DX80 ...................................................................................................JA5600

DX81 ...................................................................................................JA5601

DX82 ...................................................................................................JA5602

DX83 ...................................................................................................JA5603

DX84 ...................................................................................................JA5611

DX100 .................................................................................................JA5612

DX103 .................................................................................................JA5615

DX106 .................................................................................................JA5617

DX109 .................................................................................................JA5620

DX119 .................................................................................................JA5623

DX133 .................................................................................................JA5633

DX139 .................................................................................................JA5647

DX669 ..................................................................................JA5684

DX670 ..................................................................................JA5685

DX671 ..................................................................................JA5686

DX672 ..................................................................................JA5689

DX673 ..................................................................................JA5690

DX674 ..................................................................................JA5691

DX677 ..................................................................................JA5692

DX678 ..................................................................................JA5693

DX679 ..................................................................................JA5694

DX680 ..................................................................................JA5696

DX681 ..................................................................................JA5697

DX683 ..................................................................................JA5699

DX685 ..................................................................................JA5701

DX686 ..................................................................................JA5702

DX688 ..................................................................................JA5706

DX692 ..................................................................................JA5711

DX694 ..................................................................................JA5720

DX695 ..................................................................................JA5721

DX699 ..................................................................................JA5722

DX702 ..................................................................................JA5723

DX703 ..................................................................................JA5725

DX704 ..................................................................................JA5726

DX705 ..................................................................................JA5728

DX706 ..................................................................................JA5731

DX707 ..................................................................................JA5732

DX708 ..................................................................................JA5733

DX709 ..................................................................................JA5734

DX711 ..................................................................................JA5735

DX713 ..................................................................................................JA5743

DX715 ..................................................................................................JA5745

DX716 ..................................................................................................JA5746

DX718 ..................................................................................................JA5747

DX720 ..................................................................................................JA5748

DX721 ..................................................................................................JA5749

DX722 ..................................................................................................JA5754

DX723 ..................................................................................................JA5759

DX724 ..................................................................................................JA5764

DX725 ..................................................................................................JA5765

DX726 ..................................................................................................JA5767

DX727 ..................................................................................................JA5772

DX728 ..................................................................................................JA5776

DX729 ..................................................................................................JA5779

DX730 ..................................................................................................JA5791

DX740 ..................................................................................................JA5793

DX742 ..................................................................................................JA5875

DX743 ..................................................................................................JA5892

DX744 ..................................................................................................JA5908

DX746 ..................................................................................................JA5926

## Volume IX

Amici's Exhibits

AO4    ..................................................................................................JA5927

AO6    ..................................................................................................JA5978

AO17   ..................................................................................................JA5979

AO28   ..................................................................................................JA5980

AO31   ..................................................................................................JA5981

Trial Demonstratives

Plaintiff's Demonstratives

PD20 ...................................................................................JA5982

PD25 ...................................................................................JA5983

PD27 ...................................................................................JA5984

PD29 ...................................................................................JA5985

PD31 ...................................................................................JA5986

PD32 ...................................................................................JA5987

PD33 ...................................................................................JA5988

PD38 (excerpts) ................................................................JA5989

Defendant's Demonstratives

DD1 (excerpts) .................................................................JA6030

DD10 (excerpts) ...............................................................JA6032

DD10A ...............................................................................JA6156

DD10B ...............................................................................JA6157

DD12 ..................................................................................JA6158



1                UNITED STATES DISTRICT COURT

2                DISTRICT OF MASSACHUSETTS

3    _____

4    STUDENTS FOR FAIR ADMISSIONS, INC.,

5                    Plaintiff,          Civil Action
                                         No. 14-14176-ADB
6    v.
                                         October 22, 2018
7    PRESIDENT AND FELLOWS OF HARVARD
     COLLEGE, et al.,                    Pages 1 to 231
8
                    Defendants.
9    _____


11              TRANSCRIPT OF BENCH TRIAL - DAY 6
12        BEFORE THE HONORABLE ALLISON D. BURROUGHS
               UNITED STATES DISTRICT COURT
13           JOHN J. MOAKLEY U.S. COURTHOUSE
                   ONE COURTHOUSE WAY
14                 BOSTON, MA  02210

22                JOAN M. DALY, RMR, CRR
23                 Official Court Reporter
           John J. Moakley U.S. Courthouse
24         One Courthouse Way, Room 5507
                   Boston, MA  02210
25                 joanmdaly62@gmail.com

**JA1459**

Case: 19-2005    Document: 00117621840    Page: 14    Date Filed: 03/29/2020    Entry ID: 6356388
Case 1:14-cv-14176-ADB    Document 638    Filed 04/18/19    Page 2 of 231

2

```
 1     APPEARANCES:

 2
       COUNSEL FOR THE PLAINTIFF:
 3

 4            ADAM K. MORTARA, ESQUIRE
              J. SCOTT McBRIDE, ESQUIRE
 5            KRISTA J. PERRY, ESQUIRE
              Bartlit Beck Herman Palenchar & Scott
 6            54 West Hubbard Street
              Suite 300
 7            Chicago, Illinois 60654
              312.494.4400
 8            adam.mortara@bartlit-beck.com
              scott.mcbride@bartlit-beck.com
 9            krista.perry@bartlit-beck.com

10            JOHN M. HUGHES, ESQUIRE
              KATHERINE L.I. HACKER, ESQUIRE
11            MEG E. FASULO, ESQUIRE
              Bartlit Beck Herman Palenchar & Scott
12            1801 Wewatta Street
              Suite 1200
13            Denver, Colorado 80202
              303.592.3100
14            john.hughes@bartlit-beck.com
              kat.hacker@bartlit-beck.com
15            meg.fasulo@bartlit-beck.com

16            JOHN MICHAEL CONNOLLY, ESQUIRE
              THOMAS R. McCARTHY, ESQUIRE
17            WILLIAM S. CONSOVOY, ESQUIRE
              Consovoy McCarthy Park PLLC
18            3033 Wilson Boulevard
              Suite 700
19            Arlington, Virginia 22201
              703.243.9423
20            mike@consovoymccarthy.com
              tom@consovoymccarthy.com
21            will@consovoymccarthy.com

22

23

24

25
```

```
 1    APPEARANCES (cont.):

 2
              PATRICK STRAWBRIDGE, ESQUIRE
 3            Consovoy McCarthy Park PLLC
              Ten Post Office Square
 4            8th Floor, South, PMB #706
              Boston, Massachusetts 02109
 5            617.227.0548
              patrick@consovoymccarthy.com
 6
              MICHAEL H. PARK, ESQUIRE
 7            Consovoy McCarthy Park PLLC
              3 Columbus Circle
 8            15th Floor
              New York, New York 10024
 9            646.456.4432
              park@consovoymccarthy.com
10
              PAUL M. SANFORD ESQUIRE
11            BENJAMIN C. CALDWELL, ESQUIRE
              Burns & Levinson LLP
12            One Citizens Plaza
              Suite 110
13            Providence, Rhode Island 02903
              401.831.8330
14            psanford@burnslev.com
              bcaldwell@burnslev.com
15

16    COUNSEL FOR THE DEFENDANT:

17            WILLIAM F. LEE, ESQUIRE
              FELICIA H. ELLSWORTH, ESQUIRE
18            ANDREW S. DULBERG, ESQUIRE
              ELIZABETH C. MOONEY, ESQUIRE
19            SARAH R. FRAZIER, ESQUIRE
              Wilmer Cutler Pickering Hale and Dorr LLP
20            60 State Street
              Boston, Massachusetts 02109
21            617.526.6556
              william.lee@wilmerhale.com
22            felicia.ellsworth@wilmerhale.com
              andrew.dulberg@wilmerhale.com
23            elizabeth.mooney@wilmerhale.com
              sarah.frazier@wilmerhale.com
24

25
```

**JA1461**

```
 1    APPEARANCES (cont.):

 2
            SETH P. WAXMAN, ESQUIRE
 3          DANIELLE CONLEY, ESQUIRE
            DANIEL WINIK, ESQUIRE
 4          BRITTANY AMADI, ESQUIRE
            PAUL R.Q. WOLFSON, ESQUIRE
 5          Wilmer Cutler Pickering Hale and Dorr LLP
            1875 Pennsylvania Ave, NW
 6          Washington, DC 20006
            202.663.6006
 7          seth.waxman@wilmerhale.com
            danielle.conley@wilmerhale.com
 8          daniel.winik@wilmerhale.com
            brittany.amadi@wilmerhale.com
 9          paul.wolfson@wilmerhale.com

10          DEBO P. ADEGBILE, ESQUIRE
            Wilmer Cutler Pickering Hale and Dorr LLP
11          7 World Trade Center
            250 Greenwich Street
12          New York, New York 10007
            212.295.6717
13          debo.adegbile@wilmerhale.com

14          ARA B. GERSHENGORN, ESQUIRE
            Harvard Office of the General Counsel
15          Smith Campus Center
            Suite 980
16          1350 Massachusetts Avenue
            Cambridge, Massachusetts 02138
17          617.495.8210
            ara_gershengorn@harvard.edu

18
19    COUNSEL FOR AMICI STUDENTS:

20          JON M. GREENBAUM, ESQUIRE
            BRENDA L. SHUM, ESQUIRE
21          GENEVIEVE BONADIES TORRES, ESQUIRE
            KRISTEN CLARKE, ESQUIRE
22          1500 K Street NW, Suite 900
            Washington, DC 20005
23          202.662.8315
            jgreenbaum@lawyerscommittee.org
24          bshum@lawyerscommittee.org
            gtorres@lawyerscommittee.org
25          kclarke@lawyerscommittee.org
```

**JA1462**

```
1    APPEARANCES (cont.):

2
            LAWRENCE CULLEEN, ESQUIRE
3           EMMA DINAN, ESQUIRE
            Arnold & Porter LLP
4           555 Twelfth Street, NW
            Washington, DC 20004
5           202.942.5477
            gina.dean@aporter.com
6           emma.dinan@aporter.com

7
     COUNSEL FOR AMICI ORGANIZATIONS:
8
            JENNIFER A. HOLMES, ESQUIRE
9           CARA McCLELLAN, ESQUIRE
            JIN HEE LEE, ESQUIRE
10          MICHAELE M. TURNAGE YOUNG, ESQUIRE
            RACHEL N. KLEINMAN, ESQUIRE
11          NAACP Legal Defense and Educational Fund, Inc.
            700 14th Street NW
12          Suite 600
            Washington, DC 20005
13          jholmes@naacpldf.org
            cmcclellan@naacpldf.org
14          jlee@naacpldf.org
            myoung@naacpldf.org
15          rkleinman@naacpldf.org

16          KENNETH N. THAYER, ESQUIRE
            KATE R. COOK, ESQUIRE
17          Sugarman Rogers
            101 Merrimac Street
18          Suite 900
            Boston, Massachusetts 02114
19          617.227.3030
            thayer@sugarmanrogers.com
20          cook@sugarmanrogers.com

21

22

23

24

25
```

**JA1463**

P R O C E E D I N G S

1
2              (The following proceedings were held in open

3       court before the Honorable Allison D. Burroughs, United

4       States District Judge, United States District Court, District

5       of Massachusetts, at the John J. Moakley United States

6       Courthouse, One Courthouse Way, Boston, Massachusetts, on

7       October 22, 2018.)

8              THE CLERK:  All rise.  Court is in session.  Please

9       be seated.

10             THE COURT:  Good morning, everyone.  Karen just

11      gave me a copy of an email that you all had shared with her.

12      Do you want to discuss that at sidebar?

13             MR. LEE:  Briefly, sure.

14             THE COURT:  Come on up.

15             [Sidebar redacted.]

16             THE COURT:  Sorry for the slightly late start this

17      morning.  As I just noted to the parties at sidebar, and I

18      will reiterate, I am in receipt of their motion to admit P9.

19      The parties tell me it doesn't need to be resolved

20      immediately, so I'll read the motion at lunch and we can take

21      it up thereafter.

22             Other than that, I think we're ready to get going.

23             Is Ms. McGrath here?

24             MR. STRAWBRIDGE:  The parties have agreed to call

25      Mr. Kahlenberg out of order.

```
 1              THE COURT:  Yes.  That's fine.  Go ahead then.

 2              MR. STRAWBRIDGE:  The plaintiffs will call Richard

 3     Kahlenberg.

 4              THE CLERK:  Could you please raise your right hand.

 5              (RICHARD KAHLENBERG duly sworn by the Deputy

 6     Clerk.)

 7              THE CLERK:  Thank you.  You may be seated.  Can you

 8     please state your name and spell your last name for the

 9     record.

10              THE WITNESS:  Yes.  My name is Richard Kahlenberg.

11     It's K-A-H-L-E-N-B-E-R-G.

12              THE COURT:  When you're ready.

13                              EXAMINATION

14     BY MR. STRAWBRIDGE:

15     Q.   Good morning, Mr. Kahlenberg.  Could you please tell the

16     Court where you live and what you do for a living?

17     A.   I live outside of Washington, D.C., and I'm a senior

18     fellow at The Century Foundation.

19     Q.   What is The Century Foundation?

20     A.   The Century Foundation is a progressive think tank.  It

21     was founded in 1919 by Edward Filene, whose basement you may

22     have visited.

23     Q.   Some people have perhaps.

24              Let me ask you this, are you appearing here today

25     on behalf of The Century Foundation?
```

**JA1465**

Case: 19-2005    Document: 00117621840    Page: 23    Date Filed: 03/29/2020    Entry ID: 6356388
Case 1:14-cv-14176-ADB    Document 638    Filed 04/18/19    Page 8 of 231

8

1  **A.**  I am not.  I am here in my personal capacity.

2  **Q.**  And have you been asked to give opinions in this case

3  about the availability of race-neutral alternatives to

4  Harvard College in its admissions process?

5  **A.**  I have.

6  **Q.**  Before we get to this opinion, let's discuss your

7  qualifications.  Can you give the Court a synopsis of your

8  professional background, starting with your college

9  education?

10  **A.**  Yes.  I attended Harvard College from 1981 to 1985, and I

11  wrote any senior honors thesis on Robert Kennedy's 1968

12  campaign for president, in which he was able to bring

13  together working-class whites, African-Americans, and Latinos

14  by emphasizing kind of the common interests that they have.

15        I then went as a Rotary fellow to the University of

16  Nairobi in Kenya for a year and received a certificate of

17  mass communication.  Then I returned to Cambridge for Harvard

18  Law School, attended from 1986 to 1989.

19  **Q.**  Did you graduate from Harvard Law School?

20  **A.**  I did.

21  **Q.**  And did you decide to pursue a career in the noble

22  profession of being a lawyer?

23  **A.**  So I did not.  During law school, I became more

24  interested in issues of public policy than law per se.  And

25  so I came very close to going to Covington & Burling in

1    Washington, D.C., but then decided instead to go work for

2    Senator Charles Robb from Virginia.

3    **Q.**   What did you do for Senator Robb?

4    **A.**   For Senator Robb, I was a legislative assistant.  I

5    worked on a variety of issues from the environment to civil

6    rights.  I'd say one of my proudest moments there was having

7    the opportunity to be involved in the 1991 Civil Rights Act,

8    and Senator Robb with a number of other centrists supported

9    that act.

10    **Q.**   How long did you work for Senator Robb?

11    **A.**   I was with him for four years.

12    **Q.**   And then what was the next professional step in your

13    career?

14    **A.**   So then I went to teach at George Washington University

15    Law School.  I taught constitutional law for a year as a

16    visiting professor.

17           And then I went to a progressive think tank, called

18    the Center For National Policy, that was founded by Ed

19    Muskie, and worked there for about a little over a year.

20    **Q.**   And what work did you do at the Center For National

21    Policy?

22    **A.**   Well, I was primarily working and writing a book about

23    affirmative action, in which I made the argument that we

24    should shift the basis of preferences in college admissions

25    from race to socioeconomic status.

1   **Q.**   Why did you leave the Center For National Policy?

2   **A.**   Well, I was ready, quite frankly, to work for an

3   organization that had an endowment.  And so I moved to The

4   Century Foundation where I've been for the last 20 years.

5   **Q.**   You mentioned that you have written at least one book on

6   the use of race and affirmative action.  Have you written

7   other books covering the question of alternatives to race in

8   higher education admissions?

9   **A.**   Yes.  So I've been involved in editing a number of books

10  on the question of race-neutral alternatives and affirmative

11  action and college admissions generally.

12          So in 2004, I edited a book called "America's

13  Untapped Resource, Low-Income Students in Higher Education,"

14  that included some simulations that Professor Anthony

15  Carnevale did on what would happen if we stopped using race

16  at selective colleges and instead shifted to alternatives.

17          In 2010, I edited a volume called "Rewarding

18  Strivers:  Helping Low-Income Students Succeed in College,"

19  and that volume also included discussion of race-neutral

20  alternatives to affirmative action.

21          That same year, I edited a volume called

22  "Affirmative Action For the Rich," which dealt with legacy

23  preferences in college admissions.

24          And then in 2014, I edited a volume called "The

25  Future of Affirmative Action" that included a wide number of

1    scholars, some supportive of affirmative action, others

2    opposed, that was really forward-looking and trying to figure

3    out if there are new paths to diversity.

4    **Q.**   In addition to the books that you've discussed, have you

5    written any articles about race-neutral alternatives to

6    college admissions processes?

7    **A.**   I have.  I've written probably hundreds of articles on

8    the question of affirmative action and race-neutral

9    alternatives for law review journals, for -- I've written

10   book chapters, articles in the more popular press like The

11   New York Times or The Washington Post.

12   **Q.**   Have you ever spoken on the topic of race-neutral

13   alternatives at any seminars or conferences?

14   **A.**   Yes.  On dozens of occasions I've been asked to

15   participate in panel discussions on the future of affirmative

16   action and higher education admissions.

17   **Q.**   Have you ever served as a consultant to school systems on

18   questions regarding alternatives to the use of race?

19   **A.**   I have.  So in addition to writing about higher

20   education, I've written a fair amount about K-12 education

21   and have had the chance to work with a number of school

22   systems.  The Chicago Public Schools system,

23   Charlotte-Mecklenburg, Pasadena, New Haven, and others to

24   devise programs that integrate student bodies by

25   socioeconomic status.

1    **Q.**   Have you testified in court before as an expert witness?

2    **A.**   I have.

3    **Q.**   On what occasion?

4    **A.**   So I testified in federal court probably around 2008,

5    2009 on the question of whether the Chicago Public Schools

6    should be declared unitary in their desegregation plan and

7    whether it would be feasible in kind of a postracial

8    desegregation era to transition to socioeconomic integration.

9    And so that was of the only other time I testified in federal

10   court.

11   **Q.**   Let's discuss the methodology you employed in reaching

12   your opinions in this case.  What materials did you review in

13   preparing your opinion?

14   **A.**   I reviewed, I'd have to say, thousands of documents that

15   were produced in this case that helped shed light on

16   Harvard's admissions process, what factors are being used

17   today, and what sort of results they're getting.

18            I looked at probably 20 depositions in the case,

19   including some of the central figures.  So Dean Fitzsimmons,

20   Dean Khurana, Dean Smith, and others.

21            I was asked to review some of the latest research

22   on race-neutral alternatives.  So I did that as well.

23   **Q.**   Did you review any of the expert reports that were

24   submitted in this case?

25   **A.**   Yes.  So I reviewed expert reports on both sides.  So

1    Professor Arcidiacono's report for Students For Fair

2    Admission as well as Professor Card and President Simmons'

3    reports on behalf of Harvard.

4    **Q.**   Did you have occasion to review any reports from Harvard

5    with respect to its analysis for race-neutral alternatives?

6    **A.**   Yes.  I reviewed with great interest the committee that I

7    think is referred to as the Smith committee where this was an

8    analysis of Harvard officials on the viability of

9    race-neutral alternatives.

10   **Q.**   On that point, did you have the opportunity to review any

11   materials regarding the Ryan committee?

12   **A.**   There were just a few documents that I was able to review

13   about the Ryan committee.

14   **Q.**   What was the Ryan committee?

15   **A.**   So the Ryan committee was a universitywide committee that

16   was created shortly after the website appeared suggesting the

17   plaintiffs were being sought in a potential lawsuit against

18   Harvard.  The Ryan committee was charged with looking at

19   race-neutral alternatives.

20   **Q.**   Do you remember who was on the Ryan committee?

21   **A.**   It was chaired by Professor Jim Ryan and included -- I

22   think it was 28 or 29 individuals from across the university.

23   **Q.**   You helped review a slide, prepare a slide on that

24   question?

25   **A.**   I have.

**JA1471**

1    **Q.** Does this represent the Ryan committee?

2    **A.** It does.

3    **Q.** Do you know any of the individuals who served on the Ryan

4    committee, based on your professional experience?

5    **A.** Yes. Well, I know Jim Ryan quite well. I met him back

6    in 2001 when he was on a Century Foundation task force on

7    issues of race and class and inequality in K-12 education.

8         And I certainly know Randall Kennedy who is one of

9    the leading thinkers on affirmative action, race-based

10   affirmative action and alternatives at Harvard Law School.

11        I know more by reputation Raj Chetty, who is one of

12   the leading scholars in the country on inequality on higher

13   education on issues of race and class. In fact, in my

14   reports, I cite Professor Chetty.

15        And of course I know of Tommy Amaker, the

16   basketball coach, men's basketball coach at Harvard.

17   **Q.** Were you able to review any report that was prepared by

18   the Ryan committee regarding alternatives to the use of race

19   in the Harvard admissions office?

20   **A.** I was not. That was one of the disappointments in the

21   case.

22   **Q.** Why were you not able to review such a report.

23   **A.** Well, there was no real work product that was shared out

24   of the committee. It's my understanding that it was

25   instituted shortly after the website came up seeking

1  plaintiffs, potential plaintiffs in the case, and then was --

2  had a meeting or two and then disbanded shortly after

3  litigation was filed in this case.

4  **Q.**  You mentioned that you were able to eventually review a

5  report prepared by the Smith committee?

6  **A.**  That's correct.

7  **Q.**  When did the Smith committee begin its work?

8  **A.**  I believe that was about two and a half years after the

9  Ryan committee disbanded.

10  **Q.**  And do you recall when they issued their report?

11  **A.**  They issued their report I believe in April 2018.

12  **Q.**  And who was on the Smith committee?

13  **A.**  This was a much smaller committee.  So I can name them.

14  Dean Smith was the chair of the committee.  Dean Fitzsimmons

15  was part of the committee as well as Dean Khurana.

16  **Q.**  And do you know what role Dean Smith plays at Harvard?

17  **A.**  Yes.  He's the dean of the faculty of arts and sciences.

18  **Q.**  Were you able to review any deposition testimony

19  regarding the work of that particular committee?

20  **A.**  I was.

21  **Q.**  We'll come back to that committee's report a little bit

22  later.

23          Getting back to your work in preparing your

24  opinion, did you have occasion to review current literature

25  regarding the availability of race-neutral alternatives to

1    colleges?

2    **A.**   Yes.  So kind of as part of my day job at The Century

3    Foundation, I've tried to keep up with the latest literature

4    on race-neutral alternatives and socioeconomic affirmative

5    action.  And for this litigation, I wanted to be sure I was

6    up to speed on the latest literature as well.

7    **Q.**   In addition to reviewing the materials produced in this

8    case and that literature, did you do anything else to help

9    inform your opinions that you formed in this case?

10   **A.**   Yes.  So one of the central activities was to work with

11   Professor Arcidiacono on creating a number of simulations

12   using actual Harvard applicant data to find out what would

13   happen if Harvard were to discontinue using race and instead

14   pursue a number of race-neutral alternatives.

15   **Q.**   As you remember forming your opinions in this case, were

16   you able to form an understanding as to the benefits that

17   Harvard is seeking, or at least says that it is seeking, from

18   its use of race in the college admissions process?

19   **A.**   Yes.

20   **Q.**   What is that understanding?

21   **A.**   Well, Harvard argues, and I completely agree, that there

22   are numerous benefits to racial, ethnic, and socioeconomic,

23   geographic diversity in the college experience.

24          Students are not only learning from professors,

25   they're learning every day from one another.  And so the

1    conversations in classroom, in dining halls is much more

2    interesting and enriched, the learning is deeper when

3    students who bring different life experiences to the table

4    have a chance to interact.

5            I think, in addition, it's important for our

6    democracy to have people of different backgrounds getting to

7    know one another, reducing levels of intolerance and

8    prejudice.  So Harvard articulates those interests I think in

9    a powerful fashion, and I agree with those.

10   **Q.**  What is your assessment as to how well Harvard is doing

11   in obtaining the educational benefits of racial diversity

12   today?

13   **A.**  I think Harvard is doing a very good job of getting the

14   educational benefits of diversity.  Certainly their levels of

15   representation from various groups is impressive.

16   **Q.**  What is your view with respect to their obtaining the

17   benefits of other types of diversity?

18   **A.**  I think there it's much more of a mixed bag, frankly.

19   The socioeconomic diversity at Harvard, as I outlined in my

20   report, is deeply lacking.  Raj Chetty found that there

21   are -- have been 23 times as many rich kids on campus as poor

22   kids.  I could cite a lot of statistics on that question.

23           And in terms of geographic diversity, they clearly

24   are heavily weighted towards New England.  Other parts of the

25   country are underrepresented.

**JA1475**

Case: 19-2005    Document: 00117621846    Page: 30    Date Filed: 07/29/2020    Entry ID: 6356388
Case 1:14-cv-14176-ADB    Document 698    Filed 04/18/19    Page 18 of 251

18

1    **Q.**   Having reviewed the materials you are just described in

2    this case, were you able to form an opinion about whether

3    there were available race-neutral alternatives to Harvard's

4    admissions process that would allow it to achieve the

5    educational benefits of diversity?

6    **A.**   I was.

7    **Q.**   And what is that opinion?

8    **A.**   In my opinion, there are a number of race-neutral

9    alternatives available that would give Harvard the

10   opportunity to achieve the educational benefits of diversity

11   without compromising the excellence of the institution.

12   **Q.**   So let's break that down a little bit.

13          When you went about forming your opinion, how did

14   you determine what would constitute an acceptable level of

15   diversity to reach Harvard's goals?

16   **A.**   Well, that exercise was a little bit frustrating because

17   I had hoped that particularly the Smith committee would

18   articulate a standard of success.  So if you're going to be

19   judging an institution and saying are race-neutral

20   alternatives available, it's good to have a sense of what

21   they are seeking, what level of diversity they would like to

22   achieve in order to get the educational benefits of

23   diversity.  And the Smith committee did not articulate a

24   standard.

25          Implicitly, they suggested that some of my

1    simulations were comparable.  And so there's some implicit

2    sense of where they think success is, but there wasn't a

3    direct statement of what level of diversity is necessary to

4    achieve the educational benefits of diversity.

5    **Q.**  So how did you go about determining for yourself whether

6    or not the alternatives available to Harvard were sufficient?

7    **A.**  Right.  So in the absence of Harvard's definition, there

8    were a couple of guideposts that I looked to.  One is the

9    educational research that was cited by the U.S. Supreme Court

10   in the *Grutter v. Bollinger* case, in which the Supreme Court

11   held based on that research that a law school that was able

12   to achieve African-American and Latino representation at

13   14.5 percent was achieving the benefits of diversity.  So

14   that was one guidepost for me.

15            Another was to look at Harvard's historic levels of

16   racial diversity.  Going back several decades, Harvard has

17   suggested that diversity is the hallmark of a Harvard

18   education.  That was the mantra for many years.  I think it's

19   a good one.

20            And during those years, Harvard suggested --

21   Harvard had African-American representation at about 7 or

22   8 percent in the enrolled class.  And so that was another

23   benchmark for me of what Harvard had considered a level of

24   success in the past.

25            And I guess my third benchmark was the existing

1    levels of racial diversity at Harvard.  I don't think those

2    are necessarily dispositive, but that's another guideline to

3    look to, in the absence of a clearly articulated standard by

4    Harvard itself.

5    **Q.**   How did you go about identifying the race-neutral

6    strategies that you considered in determining that there were

7    some available to Harvard as an alternative to its use of

8    race in its admissions process?

9    **A.**   So going back to about 1996, a number of states have been

10   the subject of voter initiatives to ban race-based

11   affirmative action.  So over the last couple of decades,

12   there's been a fair amount of experience built up on what

13   universities can do when they're not using race to produce

14   the educational benefits of diversity.

15          And over the years, there's essentially a menu of

16   different options that a number of universities have

17   employed.  Socioeconomic preferences is one, to start with,

18   that a number of universities have used.

19   **Q.**   And have you generally been a supporter of socioeconomic

20   preferences as an alternative to the use of race?

21   **A.**   I have.

22   **Q.**   How come?

23   **A.**   I've been a longtime supporter of this approach, for a

24   couple of reasons.  First, as a matter of basic fairness, I

25   think most people believe that if someone has overcome

 1    obstacles in life, then it's worth considering that in the

 2    application process.  And furthermore, that those obstacles

 3    are most strongly associated with socioeconomic status.  So

 4    for example, President Obama has said his own daughters did

 5    not deserve a preference in college admissions but that

 6    low-income and working-class people of all races do.

 7         So I think there is that starting point.  If we're

 8    trying to create a genuinely fair meritocracy, then we would

 9    want to look at obstacles, the economic obstacles that

10    someone has had to overcome.

11         Anthony Carnevale, who I mentioned earlier, at

12    Georgetown, found that the most advantaged student is

13    expected to score 399 points higher on the SAT than the least

14    advantaged student economically.  And so the students who

15    have managed to overcome odds and do quite well despite the

16    obstacles I think are truly impressive.

17         A second reason I've supported socioeconomic

18    affirmative action has to do with the benefits of diversity,

19    that an institution is stronger when students are -- some of

20    the students include those who have been born on the

21    so-called wrong side of the tracks and have faced some

22    hardships, and that can educate all the students in an

23    institution.

24         I guess a third reason I'd cite would have to do

25    with the law.  For a number of years, the U.S. Supreme Court

1    has made clear that while the goal of racial diversity is

2    compelling, narrow means should be used because there are

3    costs to using race in deciding who gets ahead.  There can be

4    increased resentment that results.  Stigma can be associated

5    with the beneficiaries of racial preferences.

6            And so the law has long said if you can get the

7    benefits of racial diversity without using race, that's to be

8    the preferred method.  And I've advocated socioeconomic

9    preferences for that reason as well.

10            And the final thing I'll say is that I think it is

11   relevant in a democracy to look at where the public is on

12   these questions.  And continually, poll after poll after poll

13   has suggested that the vast majority of Americans are

14   uncomfortable or opposed to the idea that race should be a

15   factor in college admissions.

16            And by contrast, large majorities of Americans

17   support the notion of providing a preference to economically

18   disadvantaged students.

19            Maybe perhaps I went on for too long, but that's my

20   sense of why I've been at this for 30 years.

21   **Q.**  Besides increased socioeconomic preferences, are there

22   other race-neutral alternatives that are available to a

23   college like Harvard in considering its options as opposed to

24   the use of race in the admissions process?

25   **A.**  Yes.  So again, highly selective universities who have

1    faced the ban on race have used a number of other

2    alternatives.  They have sought to get more geographic

3    diversity as a way of getting the benefits of geographic

4    diversity but also indirectly increasing racial diversity.

5              A number of colleges have increased their

6    recruitment efforts to reach out to more disadvantaged

7    students.  Some have looked at community college transfers.

8    A number have tried to kind of pull down the impediments to

9    diversity; that is, the unfair preferences that exist within

10   the current system.  So that would be things like legacy

11   preferences.  There are a number of universities that have

12   removed that barrier to diversity as well.

13   **Q.**  Are there any selective universities that have removed

14   those types of barriers?

15   **A.**  Yeah.  Some of the world's greatest universities --

16   Oxford; Cambridge; Caltech; UC, Berkeley -- none of them use

17   legacy preferences.

18   **Q.**  Before we go any further, let me just ask you this:  Do

19   you oppose the use of race in all circumstances by a college

20   or university in its admissions process?

21   **A.**  So no, not broadly speaking.

22   **Q.**  What is your view as to when the use of race is

23   acceptable to achieve the benefits of diversity?

24   **A.**  Well, there are two instances that I would highlight.

25   One is I think it's perfectly acceptable for a university to

1   recruit students in a race-conscious fashion.  So I think

2   there's broad support for the idea that an institution which

3   is reaching out to make sure that students of all backgrounds

4   are applying, I think that makes a lot of sense.  That's

5   different than at the point of decision-making, but that

6   race-conscious effort is important.

7           The other thing I would mention is that in the

8   instance when a race-neutral alternative does not work, where

9   it does not produce sufficient racial diversity, then I would

10  support the use of race as a last resort.

11  **Q.**  Is that an area where you disagree in some respect with

12  Students for Fair Admissions?

13  **A.**  Yes.  I think that's fair to say.

14  **Q.**  Now, in this case, what did you do to try to reach a

15  conclusion as to whether or not there were available

16  race-neutral alternatives that Harvard could, in fact, employ

17  compared to its current admissions process?

18  **A.**  Well, as I mentioned earlier, I worked with Professor

19  Arcidiacono, who has the technical skills to run these

20  simulations, to try to -- using Harvard data to estimate what

21  would happen if race-neutral alternatives were adopted.

22  **Q.**  Just so we are all clear, are you an economist?

23  **A.**  I am not.

24  **Q.**  Are you a statistical modeling expert?

25  **A.**  By no means.

1  **Q.**  So it was necessary for you to rely on the work of others

2  in this particular aspect of your opinion?

3  **A.**  That's right.  This is something I'd done with Professor

4  Carnevale in the past and now with Professor Arcidiacono.

5  **Q.**  And have you prepared a slide that kind of helps explain

6  the understanding of how these models were used to put forth

7  the simulations upon which you relied?

8  **A.**  I have.

9  **Q.**  And is that the slide that's projected on the screen

10  right now?

11  **A.**  Yes.

12  **Q.**  So let's go through this step by step.

13          What is your understanding of the first step in the

14  process of creating the models that you ultimately used for

15  your simulations?

16  **A.**  Well, the idea of these simulations is to try to

17  replicate as best as possible a university's existing system

18  of admissions.  The attempt here is not to tell Harvard what

19  to do, what it should value, but rather to bring together the

20  data as a baseline of what Harvard currently does.

21  **Q.**  So what data was used to help construct the models, to

22  your understanding?

23  **A.**  Right.  So both Professor Card and Professor Arcidiacono

24  looked, had access to six years of data involving 150,000

25  applicants.

 1              And I want to be clear, the data set that we were
 2     working with in these race-neutral alternatives was what's
 3     been termed the expanded data sets.  So it including
 4     everyone, includes the legacies, includes the athletes.  It's
 5     the entire population -- domestic population, I should say,
 6     that's applying to Harvard.
 7     **Q.**  In forming your opinions, did you actually end up relying
 8     on the models that were used by both of the economists this
 9     case?
10     **A.**  I was.
11     **Q.**  And is it your understanding that they were essentially
12     working with the same data set for purposes of the
13     race-neutral alternatives model?
14     **A.**  That's correct.
15     **Q.**  The models take all this historical data from Harvard.
16     What did they do with it, in your understanding, to generate
17     a model of the admissions process?
18     **A.**  So my high-level, non-technical understanding is that
19     they feed in all the factors that now are used in the Harvard
20     admissions process, and they run regressions to see what
21     weights are currently provided to various aspects, various
22     characteristics of the admissions process.  So they know
23     who's admitted, they know who's rejected.  And so that's what
24     we looked at.
25              We looked at a variety of factors, some of which

Case: 19-2005    Document: 00117621846    Page: 39    Date Filed: 07/29/2020    Entry ID: 6356388
Case 1:14-cv-14176-ADB   Document 638   Filed 04/18/19   Page 27 of 231

27

1    are listed here.  So there are various inputs:  the recruited

2    athletes, legacies, race, socioeconomic status, those types

3    of things.

4    **Q.**  For purposes of the models that both sides used with

5    respect to the race-neutral alternatives that you reviewed,

6    did that include the overall rating?

7    **A.**   No.  So the overall rating both sides agreed has a racial

8    preference imbedded into it.  So in order to make this a

9    race-neutral alternative, we -- both Professor Card and

10   Professor Arcidiacono took the overall rating out.

11   **Q.**  With respect to both of the models that were used for the

12   race-neutral alternatives modeling, did both models include

13   the personal rating?

14   **A.**   They did.

15   **Q.**  Why was that?

16   **A.**   Well, there's some dispute about whether race is part of

17   the personal rating.  But unlike the overall rating, there

18   was not a consensus that race is part of that.

19   **Q.**  And so why did you leave the personal rating in your

20   models?

21   **A.**   Well, given that there was a dispute over the issue, I

22   took Harvard at its word that race was not part of the

23   personal rating.

24   **Q.**  Did the models, as you understand them, both sides also

25   include the other component ratings that Harvard uses in the

Case: 19-2005    Document: 00117621846    Page: 40    Date Filed: 07/29/2020    Entry ID: 6356388
Case 1:14-cv-14176-ADB    Document 638    Filed 04/18/19    Page 28 of 231

28

1    admissions process?

2    **A.**    Yes.

3    **Q.**    Did it include other data about the people who are

4    admitted or applied to Harvard?

5    **A.**    Yes.  This includes all of those ratings other than the

6    overall rating which clearly has a racial preference imbedded

7    in it.

8    **Q.**    Once those factors were in the model, what is your

9    understanding of what was done to help advance the simulation

10   process that you ultimately relied upon?

11   **A.**    So the point of putting all this data into the model was

12   to find out the weights that the institution currently places

13   on things like the academic rating, legacy status, race,

14   these types of things, so that we'd have a sense of what

15   Harvard's admissions process currently produces.

16   **Q.**    And then once you had that information, what was done to

17   help model a race-neutral alternative?

18   **A.**    So then the next step was to begin obviously by turning

19   off the racial preference, since we want this to be a

20   race-neutral alternative.  And then we would seek to

21   manipulate various of the preferences to see how they

22   would -- see what sort of results they would produce in terms

23   of racial diversity, socioeconomic diversity, geographic

24   diversity, and academic outcomes.

25   **Q.**    And once you manipulated the weights, as you said, to

1   test a certain alternative, how would you then go about

2   generating a simulated class?

3   **A.**   Right.  So then at that point, there was a set of

4   probabilities of student admissions that were generated based

5   on the new models.  And then from that, the economists are

6   able to project the likelihood that the class will be of a

7   certain -- you know, this will be the racial makeup of the

8   class, this will be the socioeconomic makeup of the class,

9   the academic strength of the class.

10  **Q.**   Okay.  And so have you helped prepare some slides that

11  describe some of the simulations upon which you relied for

12  your opinion in this case?

13  **A.**   I have.

14  **Q.**   Okay.  And do those simulations include work that was

15  done by both experts -- both economists in this case?

16  **A.**   Yes.

17  **Q.**   Does this slide here outline the basic approaches that

18  you relied upon in reaching your opinion?

19  **A.**   That's correct.

20  **Q.**   Why don't you just explain what we're looking at here.

21  **A.**   Okay.  So there were many, many simulations that were run

22  in this case.  I'm here highlighting four of them, which I'm

23  calling Simulation A, B, C, and D.  Three of them are based

24  on Professor Card's model of how the current Harvard

25  admissions system works, and one of them is based on

1    Professor Arcidiacono's model of how the current system

2    works.

3    **Q.**  And when you would run these simulations, did you have a

4    focal point as to the comparator was?

5    **A.**  Yes.  In each case, we want to look at the simulation and

6    compare it to the status quo.  We were looking at six years

7    of data, but we in these slides will focus on the class of

8    2019, since that's the most recent set of data we have.

9    **Q.**  All right.  So can you explain what data is being shown

10   here on the demonstrative with respect to the admitted class

11   of 2019?

12   **A.**  Yes.  This is again the status quo for the admitted

13   class.  And it's describing levels of racial ethnic

14   diversity, the academic characteristics of the class, and the

15   socioeconomic diversity.

16   **Q.**  Okay.  And starting with the racial and ethnic diversity,

17   what are we looking at here?

18   **A.**  Well, you can see that in the class of 2019 there's a

19   vibrant level of racial and ethnic diversity.  So that we

20   have white students are a minority in this class with

21   40 percent of the admits.

22          And various other groups have their shares outlined

23   here.  So Asian-American admits 24 percent, African-American

24   admits 14 percent, Hispanic and other admits 14 percent.

25          And then we include a bar that combines the

**JA1488**

1    African-American, Hispanic, and other admits to total what

2    Harvard refers to as the underrepresented minorities.  So

3    these are the non-Asian minorities.

4    **Q.**  And what is displayed here with respect to the academic

5    characteristics of the class?

6              THE COURT:  That's just bars 3 and 4 added

7    together?

8              THE WITNESS:  That's correct.

9    BY MR. STRAWBRIDGE:

10   **Q.**  What are we displaying here with respect to the academic

11   characteristics of the class?

12   **A.**  So kind of the standard indicators of academic strength

13   or academic preparation that are widely used in the college

14   admissions process include the SAT scores and the high school

15   GPA.

16              In this case, we're looking at SAT scores.  Back in

17   2019, there were three parts to the SAT that were all graded,

18   and so it's out of 2400 points.  And you can see here that

19   the average SAT is 2244, which is at the 99th percentile of

20   students.

21   **Q.**  Let me just clarify for the record so no one thinks we've

22   gone through a time warp.

23              When you "say back in 2019," you're referring to

24   applicants who would have been the graduating class of 2019?

25   **A.**  Yes.  Right.  Right.

1    And then in terms of the high school GPA, it's my

2    understanding Harvard receives different types of GPA scores

3    from different high schools.  And so they have a standard way

4    of converting the GPA to a different measure.  So 77.0 is the

5    existing high school GPA of admitted students from the class

6    of 2019.

7    **Q.**  And what is shown on this demonstrative with respect to

8    the socioeconomic diversity of the class?

9    **A.**  So this underlines the mixed bag I was talking about

10   earlier.  Harvard has a tag for disadvantaged students in the

11   admissions process.  So we used their definition of whether a

12   student was disadvantaged, socioeconomically disadvantaged.

13   And you can see here in the status quo an overwhelming

14   proportion, 82 percent, are advantaged and just 18 percent

15   disadvantaged among the class of 2019 admits.

16   **Q.**  Does Harvard have an advantaged tag or just a

17   disadvantaged tag?

18   **A.**  They used a disadvantaged tag, and we are interpreting

19   those who are not disadvantaged as advantaged.

20   **Q.**  Before we look at some of the simulations you ran, are

21   there simulations that were conducted in this case that you

22   rejected as race-neutral alternatives for Harvard?

23   **A.**  Yes.

24   **Q.**  Can you describe what those simulations were?

25   **A.**  So Professor Card had one simulation in which he provided

1    a very modest socioeconomic preference which resulted in a

2    class where the African-American proportion dropped from

3    14 percent to 6 percent.  And I think the evidence suggests

4    that that is not an acceptable level of racial and ethnic

5    diversity, so I rejected that one.

6         There was another simulation that Professor Card

7    embraced -- or not embraced but articulated -- in which the

8    focus would be on taking students from socioeconomically

9    disadvantaged high schools.  And that simulation resulted in

10   a fairly dramatic drop in what's called the academic index,

11   the combined measure of SAT and GPA, high school GPA, such

12   that it was below what Harvard athletes currently have.  And

13   I thought that was too large a drop in academic preparedness

14   and so rejected that simulation.

15   **Q.**  All right.  Have you prepared some slides that

16   demonstrate the simulations that you thought were, in fact,

17   workable and available to Harvard?

18   **A.**  I have.

19   **Q.**  Why don't we look at one of those.  Is that what we're

20   seeing on the screen here is what's labeled Simulation A?

21   **A.**  It is.

22   **Q.**  All right.  Can you describe the inputs for Simulation A,

23   starting with what its basis is?

24        THE COURT:  Do you have any hard copies on these I

25   can make notes on?

 1           MR. STRAWBRIDGE:  Yes, I do actually.  One moment.

 2       May I approach?

 3           THE COURT:  Yes.  Thanks.  I'm trying to write it

 4   down, but if I can make notes on this, it would be easier.

 5   BY MR. STRAWBRIDGE:

 6   **Q.**  Okay.  So why don't we start at the top.  What model is

 7   this simulation based upon?

 8   **A.**  So this is Professor Arcidiacono's model predicting the

 9   current system of admissions.

10   **Q.**  Okay.  And so the boxes on this chart explain the

11   adjustments you made to that model?

12   **A.**  That's correct.

13   **Q.**  This may be obvious, but why did you eliminate the racial

14   preference in the model in this simulation?

15   **A.**  That would be kind of the definition of a race-neutral

16   alternative.

17   **Q.**  Okay.  What was the next adjustment that was made?

18   **A.**  So the next one was to eliminate the legacy preference.

19   This is a preference which disproportionately benefits white

20   students and affluent students.  So in an effort to reduce

21   that impediment to diversity, we eliminated the legacy

22   preference.

23   **Q.**  What is the next adjustment that was made to the model?

24   **A.**  The next was to eliminate the preference for those who

25   appear on the special dean or director's list that Dean

1    Fitzsimmons has.  And so we removed that preference as well,

2    given that it disproportionately benefits white and wealthy

3    students.

4    **Q.**  Okay.  What is the next adjustment that was made?

5    **A.**  So Harvard currently has a system by which they

6    preference the children of faculty and staff.  Again, the

7    data suggested that those preferences disproportionately

8    benefit white and affluent students, and so we eliminated

9    that preference.

10   **Q.**  The next one refers to the athletic preference.  What

11   adjustment did you make there with respect to this

12   simulation?

13   **A.**  So in that case, we kept the athletic preference.  It was

14   my judgment that the athletic preference is basically bred

15   into the culture of higher education in America, and it would

16   be perceived as radical to eliminate that preference.  So we

17   kept that preference.

18           Of course, unlike the faculty staff preference, the

19   legacy preference, athletic preference also has to do with

20   the individual merit so someone can work harder to improve

21   their athletic skills.  They can't do anything to change

22   their parents or for those other preferences.

23   **Q.**  What is the next adjustment that is listed on this model?

24   **A.**  Okay.  So we provided a larger boost than Harvard

25   currently provides to socioeconomically disadvantaged

Case: 19-2005 Document: 00117621846 Page: 48 Date Filed: 07/29/2020 Entry ID: 6356388
Case 1:14-cv-14176-ADB Document 638 Filed 04/18/19 Page 36 of 251

36

 1    students.  And these are the students who Harvard has
 2    identified or tagged in the application process as
 3    disadvantaged.  And the size of the preference is roughly
 4    equal to half of what the athletes are currently given in
 5    terms of a preference under the Harvard system.
 6              Overlaid on top of that to boost sociogeographic
 7    diversity, we relied on some information that Harvard gave us
 8    about where students lived and what sort of neighborhoods
 9    they lived in.  Harvard gave us access to the College Board's
10    materials on neighborhood clusters.  So the College Board
11    identifies 33 different types of neighborhoods in the United
12    States.  And Harvard didn't give us the ZIP Code data, but
13    they did give us the code for where students line up among
14    these 33 clusters.  And so we used that data to take an equal
15    number of the very top students from each of the clusters
16    that the College Board -- these 33 clusters.
17    Q.  And then the last simulation adjustment here refers to an
18    early-action preference?
19    A.  That's correct.
20    Q.  What was the decision there?
21    A.  So once again, as Harvard's own data suggests, early
22    action is a method of admission that disproportionately
23    benefits wealthy and white students.  So they have access to
24    the high school counselors who can advise them that there is
25    a preference to applying early.  And so in this simulation,

1    although not in all the simulations, we eliminate the

2    early-action preference.

3    **Q.**   Okay.  And did you prepare a slide that shows the results

4    of the simulation?

5              THE COURT:  When you say that you give

6    socioeconomic status half the weight of an athletic

7    preference, are you talking about percentage?  Or you've been

8    able to quantify how much of an advantage an athlete gets?

9              THE WITNESS:  Yes.  As part of Professor

10   Arcidiacono's model, he is able to estimate the weights

11   currently provided to various preferences.  So athletic

12   preference is a substantial one.  There's legacy preference,

13   racial preference.  And so we're relying on his model which

14   identifies the size of those -- the magnitude of those

15   preferences.

16             THE COURT:  Okay.

17   BY MR. STRAWBRIDGE:

18   **Q.**   You did, in fact, prepare a slide that shows how this

19   result compares to 2019?

20   **A.**   I did.

21   **Q.**   Is that what we're seeing on the screen here?

22   **A.**   It is.

23   **Q.**   Why don't you explain what the results of this simulation

24   were and how they compared to 2019?

25   **A.**   Okay.  So the blue lines here are the results of the

**JA1495**

1    simulation.  And to make it easy to compare to the status

2    quo, you can see the dotted lines represent the status quo

3    numbers in these simulations.  So we can see that in terms of

4    racial and ethnic diversity, the white applicants get roughly

5    the same share of the class.  Asian-Americans do a little bit

6    better, there's a modest drop among African-American

7    students, Hispanic students are roughly flat, and the total

8    of the underrepresented minority students is 24 percent.

9              As I mentioned earlier, the Smith committee, the

10   race-neutral committee, suggested that these numbers are

11   comparable to Harvard's current levels of racial and ethnic

12   diversity.

13   **Q.**  Just in your own opinion, I want to talk about the

14   decline in the African-American percentage particularly.  How

15   come that does not render, in your view, this simulation

16   unworkable?

17   **A.**  Well, I would say a couple of things.  First is reference

18   to the Smith committee, which said that these levels of

19   diversity are comparable to existing levels of diversity.

20             In addition, you'll recall that I mentioned earlier

21   Harvard had 7 to 8 percent representation in its enrolled

22   class in the past, and these are numbers that don't fall

23   below that number.

24             In addition, it's important to point out that

25   Harvard did not provide us access with all the information we

1   needed to run simulations that would be completely fair to

2   African-American and Latino students.  And in particular, the

3   absence of access to wealth data means that we cannot give,

4   in this model, a preference to those who have low levels of

5   wealth.  The reason that's important is that wealth is, in

6   the academic literature, known to be a key predictor of

7   college-going and to life chances more generally.  And so it

8   would have been nice to have that information.

9          But in terms of the racial impact, this is

10  particularly important.  African-Americans on average have

11  incomes that are 60 to 70 percent of white income levels.

12  But the African-American wealth gap is much, much larger, so

13  that African-Americans on average have 10 percent, just

14  10 percent of the wealth of the median white family.

15         And so the absence of the wealth data in our

16  simulation doesn't tell us what -- it underestimates, in my

17  view, the potential of race-neutral alternatives.  Because if

18  you used a wealth variable, it would better capture the

19  history of slavery and segregation in this country, of

20  redlining.  Because all of that feeds into wealth, and that

21  helps -- this past discrimination, current discrimination

22  against African-Americans helps explain why the wealth gap is

23  so much larger than the income gap.

24         So the 10 percent figure doesn't represent the full

25  potential that Harvard has to produce higher levels of

1  African-American and Hispanic representation.

2  **Q.**  What does the simulation reveal with respect to the

3  academic characteristics of the class under this race-neutral

4  model?

5  **A.**  So the academic characteristics remain superb.  In the

6  status quo, the SATs are at the 99th percentile.  In the

7  simulation, they're at the 98th percentile.  High school GPA

8  actually goes up a fraction of a point.  So this is a highly

9  prepared, highly academically prepared student body in the

10  simulation.

11  **Q.**  And what does the simulation indicate with respect to the

12  effect on socioeconomic diversity?

13  **A.**  Obviously socioeconomic diversity expands greatly under

14  this model, perhaps not unexpected, since this is a

15  socioeconomic preference.  But you recall that about

16  18 percent of students were tagged as disadvantaged under the

17  status quo, and now that rises to 54 percent disadvantaged,

18  which I think could have a lot of benefits at a place where

19  you have currently 23 times as many rich kids as poor kids.

20  Now there would be a much more vibrant level of socioeconomic

21  diversity and the educational benefits that would flow from

22  that.

23  **Q.**  Let's talk about the next simulation that you performed.

24  **A.**  Okay.

25  **Q.**  Or I should say that you are highlighting with respect to

 1  your opinion in this case.

 2  **A.**   Mm-hmm.

 3  **Q.**   Can you just describe briefly the basis for Simulation B.

 4  **A.**   Simulation B is Professor Card's model, and it's also

 5  Professor Card's simulation.  So this is not something we

 6  adjusted in any respect.  This is Professor Card's -- his

 7  work entirely.

 8  **Q.**   Why don't we highlight the differences with respect to

 9  this simulation performed by Professor Card and the first

10  simulation that you conducted.

11  **A.**   Okay.  So Professor Card does many of the same things

12  that Professor Arcidiacono and I did.  But in addition, I

13  guess to highlight the changes, he takes out the athletic

14  preference, which I considered to be a radical thing to do.

15  And he used a different definition of socioeconomic

16  advantaged.

17          So rather than relying -- let me step back and say

18  the size of the preference was basically the same as the one

19  in Simulation A.  So it's half an athlete preference.

20          But he used a different approach to the geographic

21  question, the question what neighborhood students come from.

22  So rather than taking equal numbers from various clusters,

23  College Board clusters, Professor Card looks at the students

24  who -- provides a preference to students would come from

25  disadvantaged neighborhoods, which he defines as those which

Case: 19-2005    Document: 00117621846    Page: 54    Date Filed: 07/29/2020    Entry ID: 6356388
Case 1:14-cv-14176-ADB  Document 638   Filed 04/18/19   Page 42 of 231

42

1    have a census-tracked income of below $65,000.

2            And then the other change is Professor Card leaves

3    the early-action preference in place.

4    **Q.**   And what were the results of this simulation?

5    **A.**   Those results were also positive, in my view.

6            Boy, I'd be worried about that slide.

7    **Q.**   There we go.  Sorry about that.

8    **A.**   So this is Simulation B.  Again, this is entirely

9    Professor Card's model and simulation.

10   **Q.**   What does the simulation show with respect to racial and

11   ethnic diversity?

12   **A.**   Strong levels of racial and ethnic diversity, again

13   termed by the Smith committee to be comparable.  27 percent

14   overall underrepresented minority shares compared to

15   28 percent, so virtually indistinguishable.  We had the same

16   results with respect to African-American admits.  Even more

17   positive results with respect to Hispanic and other admits.

18   White admits go down, and Asian-American admits go up.

19   **Q.**   And what were the academic characteristics reflected in

20   this simulation?

21   **A.**   Virtually identical to Simulation A.  So again, we're

22   getting very, very well-prepared students, those at the 98th

23   percentile SATs.  Grade point average is slightly higher.

24   **Q.**   And again with respect to socioeconomic diversity, what

25   were the results of this simulation?

1    **A.**   A large jump in the socioeconomic diversity and therefore

2    the educational benefits that go along with that.

3    **Q.**   You did a third simulation performed in this case?

4    **A.**   That's correct.

5    **Q.**   That's Simulation C here?

6    **A.**   That's correct.

7    **Q.**   Why don't you explain what the differences were between

8    Simulation C and Simulation B?

9    **A.**   Okay.  So Simulation C was conducted in conjunction with

10   Professor Arcidiacono but based on Professor Card's model of

11   how the current system works.  Unlike the previous -- unlike

12   Simulation B, Simulation C includes the athletic preference.

13   It also makes some minor adjustments to Professor Card's

14   low-income -- low socioeconomic definition.

15         So Professor Card was defining as disadvantaged

16   those who were from -- had various family indicators of

17   disadvantaged, but was also looking at neighborhood.

18         And I asked Professor Arcidiacono to add in a

19   factor that looked at disadvantaged high schools that

20   students attended.  There's a large body of research to

21   suggest that attending a high school in which most of your

22   classmates or many of your classmates are low income provides

23   an obstacle to high levels of achievement.  And so I adjusted

24   the model in that fashion.

25         We also expanded the definition of disadvantaged

Case: 19-2005   Document: 00117681846   Page: 56   Date Filed: 07/29/2020   Entry ID: 6356388
Case 1:14-cv-14176-ADB   Document 638   Filed 04/18/19   Page 44 of 231

44

1    neighborhood, and in our case high school, to include

2    additional factors that are included in the educational

3    literature.  So we know it's a disadvantage to grow up in a

4    neighborhood where your neighbors are low income on average.

5    It's also a disadvantage to be in neighborhoods where there

6    are low levels of education among those peers in the

7    neighborhood and also where there are high levels of English

8    not spoken as a first language.  So we added those

9    characteristics in as well.

10           In addition, I guess the final minor adjustment to

11   mention is that we changed the threshold for what constitutes

12   a disadvantaged neighborhood.  Professor Card had used the

13   $65,000 cutoff, which I thought was too high and instead

14   really wanted to focus on these amazing kids who have

15   overcome disadvantages.  So used the bottom third rather than

16   the $65,000 cutoff.

17   **Q.**  Were these adjustments that you made to determine who

18   should get the socioeconomic preference that was applied in

19   this model?

20   **A.**  That's correct.

21   **Q.**  Did you adjust the size of the socioeconomic preference

22   itself?

23   **A.**  No.

24           THE COURT:  Bottom third of what?

25           THE WITNESS:  The bottom third.  It's the composite

**JA1502**

1    figure that looks at income, education, and the language.

2    Once you put all those in, it's the bottom third of

3    neighborhoods by census tracked in the entire country.

4    BY MR. STRAWBRIDGE:

5    Q.  Did you equally weight those three factors in order for

6    identifying the bottom third?

7    A.  Yes.  And I was going to say the final change was in this

8    model there's no early-action preference.

9    Q.  Does this display the results of this simulation?

10   A.  It does.

11   Q.  Can you just explain what the results here are with

12   respect to racial and ethnic diversity?

13   A.  So overall racial and ethnic diversity, the

14   underrepresented proportion, underrepresented minority

15   proportion actually exceeds the status quo.  Hispanic numbers

16   rise again without that wealth data we saw some modest drop

17   among the African-American admits.  Asian-American admits do

18   quite a bit better.  White admits decline under this

19   simulation.

20   Q.  And what were the academic characteristics of the

21   simulated class in this model?

22   A.  They remain superb, at the 98th percentile, and SATs and

23   high school GPA at the same level.

24   Q.  What about socioeconomic diversity?

25   A.  It's much more socioeconomically diverse than Harvard's

1    current class.

2    **Q.**   And there's one more model that we're discussing today

3    that you used in forming your opinions?

4    **A.**   Yes.

5    **Q.**   That would be Simulation D shown here?

6    **A.**   That's correct.  This one is a little easier to explain

7    in that the only distinction between C and D is that D

8    includes the early-action preference.  We put that one back

9    in.

10   **Q.**   So the only difference between C and D is just whether or

11   not there's any preference associated with early action?

12   **A.**   That's correct.

13   **Q.**   And what were the results of this simulation?

14   **A.**   So once again you saw strong results in the

15   underrepresented minority proportions, identical to the

16   current -- the status quo or baseline class.  Essentially the

17   same results as we saw in Simulation D with some minor

18   changes in terms of racial and ethnic diversity.

19   **Q.**   And specifically what effect did putting early action

20   back into the model have with respect to the racial and

21   ethnic diversity?

22   **A.**   It hurt Hispanics a little bit, about one percentage

23   point.

24   **Q.**   Academic characteristics under this model?

25   **A.**   Academic characteristics remain superb.

1    **Q.**  And what about socioeconomic diversity?

2    **A.**  There's a great deal of socioeconomic diversity here as

3    well.

4    **Q.**  The simulations that we've just been reviewing now, in

5    your view are they feasible to implement at Harvard?

6    **A.**  Yes.

7    **Q.**  And why do you say that?

8    **A.**  Well, Harvard currently has a system of admissions that

9    is holistic and based on various preferences that are

10   weighted in different fashions.  So this would essentially

11   replicate that type of system with the major difference being

12   what counts in admissions would shift.  So Harvard already

13   has a system of preferences and tips.  We would just adjust

14   them.

15           The other thing to point out is the data that are

16   necessary to implement these simulations are all readily

17   available to Harvard.  It has access to all the information

18   that we included in these simulations.

19   **Q.**  Are there some race-neutral strategies available to

20   Harvard that were not factored into the simulations that we

21   just looked at?

22   **A.**  Yes.

23   **Q.**  What would you consider those alternatives to be?

24   **A.**  So none of these simulations relied on Harvard's doing

25   any better than they currently are with respect to

Case: 19-2005    Document: 00117621846    Page: 60    Date Filed: 07/29/2020    Entry ID: 6356388
Case 1:14-cv-14176-ADB    Document 698    Filed 04/18/19    Page 48 of 251

48

 1    recruitment.  So even though Professor Hoxby from Stanford

 2    has identified 35,000 high-achieving low-income students of

 3    various races as able to do the work at places like Harvard,

 4    none of these simulations assume any change whatsoever in

 5    recruitment.  But that is something that if Harvard were to

 6    do a stronger job at they could see even better results.

 7    **Q.**  Are there other alternatives that Harvard could use with

 8    respect to race-neutral strategies that are not factored into

 9    the simulations we just looked at?

10    **A.**  Yes.  So in some instances, universities have used

11    greater reliance on community college students to transfer to

12    a place like Harvard.  Princeton, Amherst, other institutions

13    are now seeing community colleges as a source of a rich level

14    of ethnic, racial, and economic diversity and are admitting

15    more transfers from community colleges.

16            And that's -- we don't assume Harvard does any of

17    that in this simulation.

18    **Q.**  Was there any other socioeconomic data that was not

19    available for purposes of constructing these simulations?

20    **A.**  So I mentioned earlier that wealth was not available, and

21    that's critically important, particularly with respect to

22    African-American shares.

23            But in addition, we didn't have refined data with

24    respect to family income.  Harvard has a disadvantaged tag

25    that we used, which is a little bit amorphous.  It's

1    basically up to the admissions officer if they have a sense

2    that the individual is economically disadvantaged, they'll

3    tag them as disadvantaged.  But that doesn't tell us whether

4    this student is from a family where the parents are

5    struggling at $15,000 a year up to a much higher level that

6    still would be tagged as disadvantaged.  So having that

7    additional data would have allowed us to make a more refined

8    set of judgments.

9    **Q.**  Did Harvard respond to the simulations that you relied

10   upon in forming your opinions in this case?

11   **A.**  It did.

12   **Q.**  How did they respond to them?

13   **A.**  Primarily through the Smith committee.

14   **Q.**  You mentioned the Smith committee before.  This is the

15   committee on race-neutral strategies?

16   **A.**  That's correct.

17   **Q.**  And looking at what's on the screen -- I think you also

18   have a notebook in front of you, if you want to look at a

19   paper version.

20   **A.**  Good.  This is very fuzzy.

21   **Q.**  It should be under Tab 316.

22   **A.**  Okay.

23   **Q.**  Do you recognize that?

24   **A.**  I do.

25   **Q.**  What is it?

```
 1    A.   So this is the Smith committee's report.

 2    Q.   Let's start with what the committee said with respect

 3    to --

 4              THE COURT:  Do I have this notebook?

 5              MR. STRAWBRIDGE:  I put one up there for you, Your

 6    Honor.

 7              THE COURT:  Deposition designations.

 8              MR. STRAWBRIDGE:  May I approach?

 9              THE COURT:  Yes.

10              MR. STRAWBRIDGE:  Sorry about that.  We're on

11    Tab 316.

12    BY MR. STRAWBRIDGE:

13    Q.   Mr. Kahlenberg, did the committee respond to this report

14    with respect to the level of racial diversity in your

15    simulations?

16    A.   They termed the level of racial diversity as comparable.

17    Q.   If you would, turn to page 14.  Is this the language that

18    you were referring to with respect to the committee's

19    response?

20    A.   Yes.

21              MR. LEE:  I object.  We're now confusing two

22    things.  This is African-American, Hispanic, and others

23    grouped together as opposed to what he just testified to.

24              MR. STRAWBRIDGE:  The document will speak for

25    itself.  I just wanted to ask Mr. Kahlenberg --
```

1           MR. LEE:  I agree on that.

2           THE COURT:  You agree on that?

3           MR. LEE:  Yes.

4           THE COURT:  Okay.

5    BY MR. STRAWBRIDGE:

6    **Q.**  Is this the language in the report that you were

7    referring to?

8    **A.**  It is.

9    **Q.**  In particular, what is it about what the Smith committee

10   said here that makes you think that -- how did they respond

11   to your level of racial diversity?

12   **A.**  The Smith committee did make mention of racial diversity

13   with respect to an instance when Harvard wouldn't provide any

14   socioeconomic preferences.  They said African-American shares

15   would drop to 6 percent and that that was unacceptable to

16   them.  And I agree with that.

17          But they made no mention of the drop in

18   African-American percentages from 14 to 10.  That wasn't any

19   part of the Smith committee report that I saw.

20   **Q.**  Does this language indicate that, for example -- I direct

21   you to the last sentence here -- that some of the race

22   neutral practices reflected in the simulations could offer a

23   significant degree of racial diversity?

24   **A.**  That's correct.

25   **Q.**  Did you agree with the Smith committee on that point?

1    **A.** Yes.

2    **Q.** What did the Smith committee say with respect to the

3    disadvantages of the simulations that you performed in this

4    case?

5    **A.** Well, they had a couple of concerns. The first had to do

6    with the academic standing of the -- academic preparedness of

7    the class.

8    **Q.** And is that the language that's highlighted on the screen

9    right here?

10   **A.** Yes.

11   **Q.** This concern indicates that "The ultimate combination of

12   race-neutral alternatives that Mr. Kahlenberg deems workable

13   for Harvard would, if adopted, result in a 19 percent drop in

14   the proportion of admitted students with the highest academic

15   ratings." Is that right?

16   **A.** That's correct.

17   **Q.** Do you agree with that criticism?

18   **A.** I do not.

19   **Q.** Why not?

20   **A.** Well, to begin with, the objective factors, those that

21   look at SAT scores and GPA, which are kind of the standard in

22   the literature on race-neutral alternatives, remain high.

23   They're at the 98th percentile.

24        In addition, in terms of the -- so when they talk

25   about the proportion of admitted students with the highest

1    academic ratings and they reference the 76 percent to

2    66 percent, you can connect that to the simulations and infer

3    that they're talking about the drops in the numbers of

4    academic 1s and academic 2s combined.

5           And I just didn't find this particularly

6    persuasive.  I mean, to begin with there, are very, very few

7    academic 1s under Harvard's system.  And so this modest

8    decline in the proportion of academic 1s involves really a

9    handful of students.  At the deposition, I noted it was less

10   than 10.

11          So even if we were to adjust the model to make sure

12   they don't lose a single academic 1, it wouldn't change the

13   overall levels of racial, ethnic, and socioeconomic

14   diversity.

15          In terms of the academic 2s -- I'm trying to think

16   about how to say this politely.  These are not must-have

17   geniuses under the system.  80 percent of the academic 2s are

18   rejected currently.  So that, to me, was unpersuasive.

19          And I guess the other thing I would mention is the

20   students who would replace these academic 1s and 2s

21   presumably would include academic 3s, socioeconomically

22   disadvantaged academic 3s.  And it's my understanding there's

23   going to be testimony given from students who received

24   academic 3s and overcame incredible obstacles.  And I think

25   Harvard is enriched by having those students and would not

**JA1511**

1    see that as a negative in any sense.

2    **Q.**   Did the Smith committee have any other critiques of your

3    simulations, at least with respect to its report?

4    **A.**   Yes.  So another one of their complaints had to do with

5    this concept that sometimes has been called diversity within

6    diversity, where universities will raise the concern that

7    under a socioeconomic preference system, a larger number of

8    the underrepresented minority students will come from

9    economically disadvantaged backgrounds.  And for them, that

10   raises a red flag.

11   **Q.**   And is this the language you're referring to with respect

12   to that concern?

13   **A.**   Yes.

14   **Q.**   Okay.  This indicates that "Using socioeconomic status as

15   a proxy for race would also, by definition, yield a student

16   body in which many of the nonwhite students would come from

17   modest socioeconomic circumstances.  Thus, even if

18   socioeconomic status could be used to increase racial

19   diversity, it would do so at the cost of other forms of

20   diversity, undermining rather than advancing Harvard's

21   diversity-related educational objectives."

22            Is that correct?

23   **A.**   That's correct.

24   **Q.**   Do you find this critique of the simulations compelling?

25   **A.**   I don't.

1    **Q.**  Why not?

2           MR. LEE:  I object to the form of the question.  He

3    didn't say he agrees or disagrees.  Whether it's compelling

4    or not is --

5           THE COURT:  That's fair.

6           MR. STRAWBRIDGE:  I'll rephrase, Your Honor.

7    BY MR. STRAWBRIDGE:

8    **Q.**  Do you agree with this critique of the simulations?

9    **A.**  I do not.

10   **Q.**  Why not?

11   **A.**  Well, I guess to begin with, when I was talking about why

12   I support socioeconomic preferences in the first place, I

13   think the students who have overcome odds and manage to do

14   quite well despite those obstacles are especially impressive.

15          And so if the underrepresented -- I guess the

16   phrase here is nonwhite students who are admitted under the

17   new system are more likely to be those who have overcome

18   obstacles.  I'm even more impressed by those students than

19   those who are more advantaged.

20          Under the current system of admissions, some

21   70 percent of underrepresented minority students fall into

22   the advantaged category.  And if the point of having

23   diversity within diversity is to give a sense of -- a genuine

24   sense of the backgrounds of students in a college, then the

25   simulation provides a much better approximation of the real

1    world than does Harvard's current system, which is

2    disproportionately benefiting advantaged nonwhite students.

3    **Q.**  Were there other critiques that the Smith committee made

4    of your simulations?

5    **A.**  Yes.

6    **Q.**  What critiques are you thinking of?

7    **A.**  So the third major critique was that this would --

8    admitting more disadvantaged students would put financial

9    pressure on Harvard University.

10   **Q.**  Do you agree with that critique?

11   **A.**  I do not.

12   **Q.**  Why not?

13   **A.**  Well, where to start.  So to begin with, Harvard

14   University is literally the richest university in the entire

15   country.  Its $37 billion endowment is bigger than the gross

16   domestic product of half the world's countries.  They

17   recently raised $9 billion in a campaign.  And in The

18   Chronicle of Higher Education, someone said this was like

19   beating the 4-minute mile.

20        MR. LEE:  Your Honor, The Chronicle of Higher

21   Education, the capital campaign is neither in his report or

22   relevant to the issues here.

23        THE COURT:  Let's just leave it at Harvard is rich.

24        MR. LEE:  We'll stipulate.

25   **A.**  So that's to begin with.  Looking at the enormous

1    resources available to Harvard, I find it unpersuasive.  In

2    addition to that, it's not just kind of my view of this

3    issue.

4            There is testimony in the depositions from Dean

5    Fitzsimmons and Dean Donahue on this question of whether

6    Harvard could afford to bring in more socioeconomically

7    disadvantaged students and help provide them financial aid.

8    BY MR. STRAWBRIDGE:

9    **Q.**  And did you rely on that testimony in forming your

10    opinions?

11    **A.**  I did.

12    **Q.**  And is this some of the testimony on this demonstrative

13    here that you relied upon there?

14    **A.**  Yes.

15    **Q.**  And what does this testimony indicate?

16    **A.**  So this is Dean Fitzsimmons, who runs the admissions at

17    Harvard, suggesting in answer to a question about the budget:

18    We are not given a rigid limit on the amount of financial aid

19    that -- essentially says we have to meet.

20            The question is, then:  Is there any economic

21    restraint on the number of HFAI students?

22            So HFAI is, as you know, Your Honor, the Harvard

23    financial aid initiative.

24            The answer to that question, is there an economic

25    restraint, is no.

1    **Q.**  Did you also rely on the testimony from Sally Donahue?

2    **A.**  That's correct.

3    **Q.**  Who is Ms. Donahue?

4    **A.**  Until recently, at least, she was the director of the

5    financial aid department at Harvard University.

6    **Q.**  And is this the testimony that you relied upon?

7    **A.**  It is.

8    **Q.**  And what did Ms. Donahue indicate in the testimony you

9    relied upon in forming your opinion?

10   **A.**  She was asked the question, "Would there be any problem

11   if the number of HFAI awards doubled?"

12        And her answer was "No."

13   **Q.**  Is this some additional testimony that you relied upon

14   here?

15   **A.**  It is.

16   **Q.**  And does this inform your view with respect to the

17   alleged concerns about the financial aid impediments to the

18   simulations that you relied upon in this case?

19   **A.**  It does.  This is further evidence that the question is

20   asked:  Is there any restraint on Harvard's ability to

21   increase the number of HFAI?  Is it still your testimony that

22   you don't think there's any restraint on Harvard's ability to

23   increase the number of HFAI awards in a given admissions

24   cycle?

25        The answer is clearly yes.

```
 1              MR. STRAWBRIDGE:  With that, I pass the witness.
 2              MR. LEE:  Can we take a morning break and then we
 3     can set up and be ready to go?  Or we can do whatever Your
 4     Honor wants.
 5              THE COURT:  I'd rather go until noon and take the
 6     lunch break, but I'm happy to take as much time as you need
 7     to set up.
 8              MR. LEE:  May I proceed, Your Honor?
 9              THE COURT:  When you're ready.
10                              EXAMINATION
11     BY MR. LEE:
12     Q.  Good morning, Mr. Kahlenberg.
13     A.  Good morning.
14     Q.  You were retained by SFFA for this case, correct?
15     A.  That's correct.
16     Q.  Now, you haven't been here during the first week of the
17     trial, so you didn't hear the other witnesses testify,
18     correct?
19     A.  So I did read transcripts in the case.
20     Q.  My question was were you here.
21     A.  I was not here, no.
22     Q.  You do know, having read the transcripts, that the only
23     witnesses who have testified have been representatives of
24     Harvard, correct?
25     A.  I think that's right.
```

**JA1517**

1    **Q.**  So you're the first person that SFFA has called to

2    testify on direct examination on its behalf, correct?

3    **A.**  I didn't track carefully, but I don't have reason to

4    disagree with you.

5    **Q.**  And you're being compensated by SFFA, correct?

6    **A.**  That's correct.

7    **Q.**  You've been paid by them for over four years now,

8    correct?

9    **A.**  That's correct.

10    **Q.**  And the other -- the only other witness they're going to

11    call on direct is the person, Professor Arcidiacono, that you

12    referred to, correct?

13    **A.**  That's correct.

14    **Q.**  And he's being paid by SFFA as well, correct?

15    **A.**  I assume so.  I don't know his financial arrangements,

16    but I assume so.

17    **Q.**  You've known Mr. Blum, who is sitting right back here,

18    for some years, correct?

19    **A.**  I have known him.

20    **Q.**  You've known him for about 15 years, correct?

21    **A.**  Let's see.  I met him in I think around 2003, so that

22    sounds right.

23    **Q.**  So about 15 years, give or take?  Fair?

24    **A.**  Yes.

25    **Q.**  Now, during your direct testimony, you twice used the

 1    phrase "searching for plaintiffs," correct?

 2    **A.**  I may have, yes.

 3    **Q.**  What you were referring to is Mr. Blum's public statement

 4    after the first *Fisher* decision, correct?

 5    **A.**  I was referring to -- my understanding is there was a

 6    website called "Harvard Not Fair" that was asking for people

 7    to come forward if they felt as though they'd been poorly

 8    treated.

 9    **Q.**  And Mr. Blum said specifically he was searching for Asian

10    plaintiffs, correct?

11    **A.**  I have no idea.

12    **Q.**  You don't know one way or another, correct?

13    **A.**  No.

14    **Q.**  Now, have you spoken to a single member of SFFA?

15    **A.**  No.

16    **Q.**  Do you know anything about them, a single member of SFFA?

17    **A.**  Well, I mean, I know that there are a number of

18    Asian-American applicants who believe that they have been

19    discriminated against, but I haven't met any of them.

20    **Q.**  Can you identify one by name?

21    **A.**  No.

22    **Q.**  Have you read the application file of one?

23    **A.**  No.

24    **Q.**  Have you spoken to one?

25    **A.**  No.

|     |                                                                          |
| --- | ------------------------------------------------------------------------ |
| 1   | **Q.**  Have you met one?                                                |
| 2   | **A.**  No.                                                              |
| 3   | **Q.**  Have you asked to speak to one?                                  |
| 4   | **A.**  No.                                                              |
| 5   | **Q.**  Have you spoken -- now, you and Mr. Blum have a mutual           |
| 6   | interest in affirmative action, correct?                                 |
| 7   | **A.**  I think that's right.                                            |
| 8   | **Q.**  And you understand that Mr. Blum's interest is to               |
| 9   | eliminate affirmative action in all programs that consider               |
| 10  | race, correct?                                                           |
| 11  | **A.**  Well, I haven't -- I think that's probably right.               |
| 12  | **Q.**  Well, if you have any doubt, turn to Tab 4 and you'll           |
| 13  | find the first page of the web page of SFFA.                            |
| 14  | In the course of your work over the four-year                            |
| 15  | period, have you reviewed SFFA's website?                               |
| 16  | **A.**  I've been to the website.                                       |
| 17  | **Q.**  Good.  And you'll see in the second sentence of the first       |
| 18  | paragraph, "Our mission is to support and participate in                 |
| 19  | litigation that will restore the original principles of our              |
| 20  | nation's civil rights movement.  A student's race and                    |
| 21  | ethnicity should not be factors that either harm or help that            |
| 22  | student to gain admission to a competitive university."                  |
| 23  | You understand that that's SFFA's mission, correct?                      |
| 24  | **A.**  Correct.                                                        |
| 25  | **Q.**  Now, you have been a longtime advocate of using economic        |

**JA1520**

     1    status rather than race in college admissions, correct?

     2    **A.**   So let me respond in this way:  Advocate in the sense of

     3    supporter, but not advocate in the sense that I have a

     4    constituency that I'm representing or that I'm a lawyer who's

     5    working on behalf of -- mine is a research basis for the

     6    belief.

     7    **Q.**   Tell me if this is true or not:  You have been a longtime

     8    advocate of what you think is a fair system of admissions

     9    which would take into account class disadvantage rather than

    10    race.  True or false?

    11    **A.**   True.

    12    **Q.**   In fact, you've had that view since the 1980s, correct?

    13    **A.**   I think that's probably right.  That's right.

    14    **Q.**   You formed that view while you were in college, correct?

    15    **A.**   That's correct.

    16    **Q.**   And you've held that view since you attended Harvard

    17    College, correct?

    18    **A.**   That's correct.

    19    **Q.**   And as you told Mr. Strawbridge, you have spent a number

    20    of years researching and writing about those issues, correct?

    21    **A.**   That's correct.

    22    **Q.**   Now, the opinions you just gave to Her Honor is that

    23    Harvard could implement workable race-neutral alternatives,

    24    correct?

    25    **A.**   That's correct.

Case: 19-2005    Document: 00117621846    Page: 76    Date Filed: 07/29/2020    Entry ID: 6356388
Case 1:14-cv-14176-ADB  Document 638  Filed 04/18/19  Page 64 of 231

64

1   **Q.**  Now, Mr. Kahlenberg, you've never worked as a college

2   admissions officer, have you?

3   **A.**  I have not.

4   **Q.**  You've never worked as an admissions officer at a public

5   university, have you?

6   **A.**  No.

7   **Q.**  You've never worked as an admissions officer at a private

8   university, have you?

9   **A.**  No.

10  **Q.**  You've never had any involvement with the admissions

11  office or the admissions process at any university or

12  college, correct?

13  **A.**  That's correct.

14  **Q.**  You have never served in the administration of a college,

15  correct?

16  **A.**  That's correct.

17  **Q.**  You have never served in the administration of a public

18  university, correct?

19  **A.**  That's correct.

20  **Q.**  You have never served in the administration of a public

21  university, correct?

22  **A.**  Correct.

23  **Q.**  You have never served in the administration of a private

24  university, correct?

25  **A.**  Correct.

 1   **Q.**  And you've never been retained by a college, public

 2   university, or a private university to evaluate race-neutral

 3   alternatives for that particular institution, correct?

 4   **A.**  That's correct.

 5   **Q.**  You've never designed a financial aid program for a

 6   college, public university, or private university, correct?

 7   **A.**  That's correct.

 8   **Q.**  You've never implemented a financial aid program,

 9   correct?

10   **A.**  Correct.

11   **Q.**  You've never designed a college minority recruitment

12   program, correct?

13   **A.**  Correct.

14   **Q.**  You certainly have never implemented one, correct?

15   **A.**  Correct.

16   **Q.**  You never designed an early-action program, correct?

17   **A.**  Correct.

18   **Q.**  You've never implemented one, correct?

19   **A.**  That's correct.

20   **Q.**  And while you've attended Harvard, you have not worked

21   for Harvard, correct?

22   **A.**  That's correct.

23   **Q.**  You've heard of a concept of an independent expert coming

24   to court.  Do you have that concept in mind?

25   **A.**  I guess, I do, yeah.

1    **Q.**  Now, you're not an expert on Harvard's institutional

2    goals, are you?

3    **A.**  Well, I've been able to review the documents in this case

4    that give me a strong sense of what Harvard's institutional

5    goals are.

6    **Q.**  So based upon your experience and expertise, which you

7    reviewed with Mr. Strawbridge and you and I just reviewed in

8    part, you were able to review Harvard's institutional goals,

9    correct?

10    **A.**  That's correct.

11    **Q.**  Do you consider yourself to be an expert on Harvard's

12    institutional goals?

13    **A.**  I reference Harvard's goals rather than imposing my own.

14    **Q.**  Fair enough.

15             And you reference those goals in giving the opinion

16    you just gave to Mr. Strawbridge that Harvard could use

17    race-neutral alternatives to achieve its goals, correct?

18    **A.**  That's correct.

19    **Q.**  Now, you described for Mr. Strawbridge the documents you

20    read, the depositions you read, the exhibits you reviewed,

21    the simulations.

22             Do you recall that?

23    **A.**  Yes.

24    **Q.**  But, Mr. Kahlenberg, you reached the opinion you just

25    gave the Court before this case was even filed, didn't you?

Case: 19-2005    Document: 00117631846    Page: 79    Date Filed: 07/29/2026    Entry ID: 6356388
Case 1:14-cv-14176-ADB    Document 638    Filed 04/18/19    Page 67 of 231

67

1    **A.**   No.

2    **Q.**   Well, Mr. Kahlenberg, isn't it true that you were paid to

3    help SFFA draft the complaint in this very case?

4    **A.**   I was paid to give advice on the race-neutral alternative

5    section of the case.

6    **Q.**   Mr. Kahlenberg, can you answer my question?

7           Were you paid by the hour to help draft the

8    complaint that was filed against Harvard?  Yes or no.

9    **A.**   I wouldn't say draft, no.

10   **Q.**   Were you paid to consult on the complaint that was filed

11   in this court against Harvard?

12   **A.**   Yes.

13   **Q.**   And you know that that complaint after you consulted on

14   it was filed, correct?

15   **A.**   I'm sorry?

16   **Q.**   That complaint that you consulted on was filed in this

17   court, correct?

18   **A.**   Yes.

19   **Q.**   You were compensated for your work on the complaint,

20   consulting or otherwise, correct?

21   **A.**   Correct.

22   **Q.**   That complaint was filed on November 17, 2014, correct?

23   **A.**   Correct.

24   **Q.**   And that very week, you gave an interview to Fox News,

25   didn't you?

1    **A.**   So there were some documents sent over.  I didn't review

2    that document in particular.

3    **Q.**   Well, let me see if I can refresh your recollection.

4          Is it true or is it not that in the very week that

5    the complaint was filed you gave an interview to Fox News?

6    **A.**   So is there a document you can refer me to?

7    **Q.**   Sure.  Turn to Tab 6, and you'll find a November 18,

8    2014, Fox News interview.  Let me see if I can refresh your

9    recollection.  Turn, if you would -- first, do you see the

10   date November 18, 2014?

11   **A.**   I do.

12   **Q.**   And you have in mind the complaint was filed November 17,

13   2014?

14   **A.**   Okay.

15   **Q.**   Now, you and I can agree on this:  As of November 18,

16   there hadn't been a single document produced in the case,

17   correct?

18   **A.**   That's correct.

19   **Q.**   There hadn't been a single exhibit produced, correct?

20   **A.**   That's correct.

21   **Q.**   There hadn't been a single witness who testified under

22   oath or otherwise, correct?

23   **A.**   That's correct.

24   **Q.**   Harvard hadn't even been served with the complaint,

25   correct?

1    **A.**  I don't know about that.

2    **Q.**  Well, let's see what you said the day after the complaint

3    was filed.  Look on the second page.

4          "The plaintiffs present considerable evidence

5    suggesting that Harvard discriminates against Asian-American

6    applicants.  Richard Kahlenberg, a consultant for the

7    plaintiffs who studies education policy at The Century

8    Foundation, told foxnews.com."

9          Do you see that?

10   **A.**  I do.

11   **Q.**  So one day after the complaint's been filed, before

12   anything has happened in the case, you're talking to the

13   media and pronouncing judgment on Harvard, aren't you?

14   **A.**  Well, this is based on the -- what I said is "The

15   plaintiffs present considerable evidence," so that would be

16   referencing the complaint.

17   **Q.**  So what you were saying there is the complaint says it,

18   but it may or may not be true.  Is that what you'd like us to

19   believe?

20   **A.**  So I didn't say I have reached an opinion on whether

21   Harvard discriminates against Asian-Americans.  I'm just

22   saying the plaintiffs present considerable evidence.

23   **Q.**  So there's a complaint that you've consulted on filed

24   against Harvard on November 17, 2014, correct?

25   **A.**  Correct.

Case: 19-2005   Document: 00117621846   Page: 82   Date Filed: 07/29/2020   Entry ID: 6356388
Case 1:14-cv-14176-ADB   Document 638   Filed 04/18/19   Page 70 of 231

70

1    **Q.**   SFFA issues a press release, correct?

2    **A.**   I imagine there was one.

3    **Q.**   And then you speak to Fox News, correct?

4    **A.**   Yes.

5    **Q.**   And this is what you say, correct?

6    **A.**   Yes.

7    **Q.**   Before you had seen a single simulation, a single

8    exhibit, a single deposition, a single piece of paper,

9    correct?

10   **A.**   Yes.  So I didn't say the plaintiffs present considerable

11   evidence and the defendants have no position.  I just said

12   the plaintiffs present considerable evidence.

13   **Q.**   Well, actually, Mr. Kahlenberg, you went on to say more,

14   and you expressed your opinion on the very race-neutral

15   alternative concept or theories that you've just provided to

16   Her Honor.

17          Turn, if you would, to page 3 in the same

18   interview.  Third from the bottom paragraph.

19          "Harvard has as many students in the freshman class

20   from families in the top 1 percent by income nationally as

21   from the bottom 50 percent, he said.  It could produce

22   considerable racial and ethnic diversity without resorting to

23   racial preferences."

24          That's what you said to Fox News the day after the

25   complaint was filed, correct?

1    **A.**  Correct.

2    **Q.**  Then three years later you file your expert report,

3    correct, in this case?

4    **A.**  That would be right, three years later.

5    **Q.**  And your report says that race-neutral alternatives are

6    workable for Harvard, correct?

7    **A.**  Correct.

8    **Q.**  Now, I want to be sure I understand what you mean for

9    there to be a race-neutral alternative.

10            Let me ask you to assume that there is a

11   Chinese-American kid who is the son of immigrants growing up

12   in a middle class completely white neighborhood in Lincoln,

13   Nebraska.

14            Do you have that in mind?

15   **A.**  Yes.

16   **Q.**  That applicant doesn't self-identify their race on the

17   application.  Do you have that in mind?

18   **A.**  Yes.

19   **Q.**  But they provide an essay that describes how even in this

20   middle class neighborhood, being the only Chinese-American in

21   the neighborhood was a challenge, and there was

22   discrimination and there was taunting.  And the student then

23   describes all the things that he did to overcome those

24   issues.

25   **A.**  MmHm.

**Q.**  Can a college admissions officer consider that or not if they're not considering race?

**A.**  So my position would be it's fine for a college to consider discrimination as opposed to race.

**Q.**  And the fact that the discrimination occurred because of race, it would be fine for them to consider that, correct?

**A.**  In my view, yes.

**Q.**  Okay.  Thank you.  Now, I'm going to come to that issue in a little bit.

You have been hired in one other litigation to testify, correct?

**A.**  I mean, I've been hired in a few other.  But yes, I think I know where you're going with this one.

**Q.**  You've been hired in at least one, correct?

**A.**  Yes.

**Q.**  You've been hired in one other case by SFFA, correct?

**A.**  That's correct.

**Q.**  And you've been hired to testify in a case that it's filed against the University of North Carolina, correct?

**A.**  That's correct.

**Q.**  Now, Mr. Kahlenberg, there are other people in the academic or think-tank world who study race-neutral alternatives, correct?

**A.**  That's correct.

**Q.**  Marla Tienda is one, correct?

1  **A.**  Marta.  Yes.

2  **Q.**  John Brittain is another, correct?

3  **A.**  Yes.

4  **Q.**  Matt, is it Gartner, is another?

5  **A.**  Yes.

6  **Q.**  None of those folks would have expressed a view on

7  Harvard right after the complaint was filed, correct?

8  **A.**  Well, the -- what I said was it can produce --

9  **Q.**  Mr. Kahlenberg, I'm not asking what you said.

10         I'm just asking whether any of these other people

11  expressed a view the day after the complaint was filed?

12  **A.**  Whether they did, in fact, express a view?  I have no

13  idea if they did.

14  **Q.**  Those are people who could have come in and given an

15  opinion on race-neutral alternatives, but they're not,

16  correct?

17  **A.**  They're not involved in this case, correct.

18  **Q.**  Okay.  Now, let me go to a slightly different topic.  In

19  your opinion, race-neutral alternatives can always achieve

20  racial diversity, correct?

21  **A.**  No.  There may be instances when it can't.  I haven't

22  found a particular situation where race-neutral alternatives

23  would be unworkable, but I don't want to close the door to

24  saying they would always work.

25  **Q.**  You anticipated my next question, which is that you

1    cannot think of a single situation where race-neutral

2    alternatives would result in insufficient racial diversity,

3    correct?

4    **A.**   So sitting here right now, there could be instances when

5    a university faced a particular applicant pool and for

6    whatever reason wasn't able to overcome that, and maybe that

7    would result in an instance when a race-neutral alternative

8    would be unworkable.

9    **Q.**   Let's see what you said in your deposition.  It's at

10   Tab 2 of your notebook.  Let's turn to page 31, lines 17 to

11   23.  Tell me when you're there.

12   **A.**   I'm sorry.  17?

13   **Q.**   Page 31, lines 17 to 23.  Or it's on the screen as well.

14   **A.**   Yeah.

15   **Q.**   Ms. Ellsworth was asking you some questions.  Do you

16   recall that?

17   **A.**   Yes.

18   **Q.**   "QUESTION:  And I asked you earlier whether you would

19   oppose the use of race as a last resort if race-neutral

20   alternatives were unable to achieve the levels of racial

21   diversity that were deemed to be required."

22           And you said you couldn't think of an example where

23   that would come into play.

24           "ANSWER:  Right.  I can't think of an example."

25           Were you asked that question and did you give that

1    answer?

2    **A.**   I did, which is different than saying there would never

3    be an example.  I was just saying I couldn't think -- off the

4    top of my head, I couldn't think of an example.

5    **Q.**   So the answer was correct at the time you gave it,

6    correct?

7    **A.**   Yes.

8    **Q.**   And it's true today, correct?

9    **A.**   Well, I think -- I'd have to think more about it.

10   **Q.**   You understand my chance to question you is today.  So I

11   can only ask you my questions today.

12   **A.**   Let me answer is this way:  I think that there may well

13   be examples of situations where race-neutral alternatives

14   will not produce sufficient levels of racial diversity.

15          So if you're asking me to come up with off the top

16   of my head examples, maybe I'm more deliberative than I

17   should be, but that doesn't mean they don't exist.

18   **Q.**   And if those examples existed, then it would be

19   completely appropriate for a university to use race in its

20   admissions process to achieve what that university thinks is

21   the correct level of diversity, correct?

22   **A.**   No.  I wouldn't leave it up to the university to say -- I

23   mean, if a university said we need 80 percent Latino

24   representation in order to get the educational benefits of

25   diversity, I wouldn't go along with that.

1    **Q.**  Well, let's make it more specific.

2          You have described Harvard's racial diversity as --

3    and I have it written down here -- a vibrant level of racial

4    diversity, correct?

5    **A.**  That sounds right.

6    **Q.**  Harvard has made a decision to have a vibrant level of

7    racial diversity, correct?

8    **A.**  Right.

9    **Q.**  Harvard's made a decision that in order to have a vibrant

10   level of diversity it considers race as a factor in the

11   admissions process, correct?

12   **A.**  Correct.

13   **Q.**  Now, you agree that Harvard as an interest in achieving

14   that vibrant level of diversity, correct?

15   **A.**  Not the specific level that they have today, but in

16   general, yes, they have an interest in achieving racial

17   diversity.

18   **Q.**  Fair enough.  I understand what you're saying.  So let's

19   set aside the specific level.

20   **A.**  Right.

21   **Q.**  You agree that Harvard as an interest in having a vibrant

22   level of diversity, correct?

23   **A.**  So I guess the word "vibrant" is a little amorphous, but

24   I think it has a compelling interest in getting the

25   educational benefits of a diverse university.

 1   **Q.**  I'm using "vibrant" only because it was your word, but

 2   let's use "compelling."

 3         Harvard has a compelling interest in having a

 4   diverse community, correct?

 5   **A.**  Yes.

 6   **Q.**  Diverse along racial lines, corrects?

 7   **A.**  Among the many factors, yes.

 8   **Q.**  Racial, ethnic, religious, political, socioeconomic, it

 9   has a compelling interest in being diverse across all of

10   those different factors, correct?

11   **A.**  "Compelling" is kind of a term of art in this field.  So

12   I'm not sure all of those things -- I think the Supreme Court

13   has spoken to compelling interest in diversity.

14   **Q.**  I said it was vibrant because it was your word.  I was

15   trying to use "compelling" because it was your word.

16         But to be precise, at least as we focus on race,

17   you agree that Harvard has a compelling interest in having

18   racial diversity on its campus?

19   **A.**  There, we will agree, yes.

20   **Q.**  Now, and you agree that there are educational benefits to

21   having racial diversity on campus, correct?

22   **A.**  Correct.

23   **Q.**  And I think you told us it not only matters on campus, it

24   matters in our society, correct?

25   **A.**  That's correct.

Case: 19-2005    Document: 00117621846    Page: 90    Date Filed: 07/29/2020    Entry ID: 6356388
Case 1:14-cv-14176-ADB    Document 658    Filed 04/18/19    Page 78 of 231

78

1    **Q.**  It matters, if I have it written down correctly -- if I

2    have your words written down correctly, it matters to our

3    democracy, correct?

4    **A.**  That's correct.

5    **Q.**  Now, you know that Harvard considers race as one factor

6    among many in its admissions process, correct?

7    **A.**  I do.

8    **Q.**  For some applicants, race is used as a plus factor,

9    correct?

10   **A.**  That's correct.

11   **Q.**  Now, you told Her Honor you have a law degree, correct?

12   **A.**  I have a law degree, yes.

13   **Q.**  In your report -- you gave us two reports, an opening

14   report and a rebuttal report, correct?

15   **A.**  There are actually three.

16   **Q.**  Three.  I'm sorry.  I apologize.

17          In your rebuttal report, you specifically referred

18   to the *Bakke* decision, do you not?

19   **A.**  I don't remember specifically, but it sounds right.

20   **Q.**  Turn, if you would, to Tab 10 in your notebook, which is

21   your rebuttal report.  And I'd like to go to page 14,

22   Footnote 55.  This is your rebuttal report, correct?

23   **A.**  That's correct.

24   **Q.**  I'm putting page 14 on the screen, correct?

25   **A.**  Yes.

1    **Q.**  You prepared this report, correct?

2    **A.**  That's correct.

3    **Q.**  And note 55 specifically refers to *Bakke*, correct?

4    **A.**  Yes.

5    **Q.**  Specifically refers to *Bakke* describing the Harvard plan,

6    correct?

7    **A.**  That's correct.

8    **Q.**  And you quote the portion that says in that plan, "The

9    race of an applicant may tip the balance in his favor just as

10   geographic origin or a life spent on a farm may tip the

11   balance in other candidates' cases.  A farm boy from Idaho

12   can bring something from Harvard College that a Bostonian

13   cannot offer."

14           That's the quote that you decided to include in

15   your report, correct?

16   **A.**  That's correct.

17   **Q.**  And that's an accurate description of the Harvard's

18   admissions process as described in *Bakke*, correct?

19   **A.**  I'm not describing it.  It's *Bakke* describing it.

20   **Q.**  Right.  But you have no reason to disagree with what the

21   Supreme Court said, do you?

22   **A.**  No.

23   **Q.**  In fact, in *Bakke*, the Harvard admissions process as

24   described here is described as an illuminating example of a

25   constitutionally correct admissions process, correct?

**JA1537**

1   **A.**   So what the Supreme Court obviously had before it was the

2   Harvard plan, not all the data in this case.  But yes, that's

3   what the --

4   **Q.**   They called it an illuminating example, correct?

5   **A.**   You know, I don't remember that exact quote.  They

6   certainly cited it.  I remember that.

7   **Q.**   Let's see.  Since you cited it in your report, could I

8   have the *Bakke* opinion at page 316 -- at page 317.  See if I

9   can refresh your memory about what was said about the Harvard

10   program.

11          "An illuminating example is found in the Harvard

12   College program."

13   **A.**   I see that.

14   **Q.**   "In recent years, Harvard College has expanded the

15   concept of diversity to include students from disadvantaged

16   economic, racial, and ethnic groups.  Harvard College now

17   recruits not only Californians or Louisianans but also blacks

18   and Chicanos and other minority students."

19          Do you recall reading that?

20   **A.**   I've read *Bakke* many times, so I'm sure I've read that.

21   **Q.**   And you've read the appendix to *Bakke*, have you not?

22   **A.**   Yes.

23   **Q.**   And that describes the Harvard process specifically,

24   correct?

25   **A.**   That's correct.

1   **Q.**  And you also read *Grutter*, did you not?

2   **A.**  I did.

3   **Q.**  And you know the Harvard plan again was identified as an

4   example of the way to get things done constitutionally and

5   correctly, correct?

6   **A.**  Again with the caveat that they had no idea how the

7   Harvard plan worked in process.  But yes, they cited the --

8   **Q.**  They had no idea?  Have you read the appendix, sir?

9   **A.**  Yes.

10  **Q.**  How many pages is the appendix to *Bakke*?

11  **A.**  I don't know the exact number.

12  **Q.**  How much detail is there about the Harvard process?

13  **A.**  I guess what I'm trying to describe is the difference

14  between the way Harvard described the process and the reality

15  of -- the degree of racial preference provided, that sort of

16  thing.  That's all I'm saying.  They didn't have the

17  information that the Court today has.

18  **Q.**  And your phrase was what they didn't have was the degree

19  of racial preference, correct, among other things?  Is that

20  your testimony?

21  **A.**  I'm sorry?

22  **Q.**  What you just testified was that they didn't have some

23  information including the degree of racial preference.  Were

24  those your words?

25  **A.**  The degree of racial preference, they have didn't have

1    information about race-neutral alternatives.  There's a lot

2    of things they have --

3    **Q.**  Okay.  We'll come back to that.

4          Now, you agreed that there is no better way to

5    directly achieve racial integration than using race itself,

6    correct?

7    **A.**  By definition.

8    **Q.**  Employing race is, by definition, the most efficient

9    method of promoting racial diversity, correct?

10   **A.**  That's correct.

11   **Q.**  Now, as you told Mr. Strawbridge, you have studied the

12   effect of eliminating the consideration of race at some

13   universities, correct?

14   **A.**  That's correct.

15   **Q.**  Specifically you have studied eliminating the use of race

16   at ten public universities, correct?

17   **A.**  That's correct.

18   **Q.**  And you assessed whether those universities were able to

19   achieve the same level of racial diversity after the

20   prohibition on considering race as compared to before.

21   That's a poor question.  Let me break it down.

22          You focused on public universities, correct?

23   **A.**  That's correct.

24   **Q.**  You looked at the degree of their racial diversity

25   before, correct?

Case: 19-2005    Document: 00117621846    Page: 85    Date Filed: 07/29/2020    Entry ID: 6356388
Case 1:14-cv-14176-ADB  Document 638   Filed 04/18/19   Page 83 of 231

83

1    **A.**  Correct.

2    **Q.**  And you looked at the degree of racial diversity after

3    they were prohibited from using race, correct?

4    **A.**  That's correct.

5    **Q.**  Three of the universities were unable to replicate the

6    prior levels of racial diversity, according to your study,

7    correct?

8    **A.**  That's right.  Worked at seven, didn't work at three.

9    **Q.**  And I want to focus on the three and your explanation for

10   why it didn't work at three.  Now, the three employed

11   race-neutral strategies, didn't they?

12   **A.**  They applied some race-neutral strategies, yes.

13   **Q.**  Now, the three were University of California at Berkeley,

14   correct?

15   **A.**  Correct.

16   **Q.**  University of California at Los Angeles, correct?

17   **A.**  That's correct.

18   **Q.**  And the University of Michigan, correct?

19   **A.**  That's correct.

20   **Q.**  And when you published this article that you mentioned to

21   Mr. Strawbridge, you concluded that these three universities

22   had what you coined a special disadvantage, correct?

23   **A.**  Is there a document you can refer me to?

24   **Q.**  Pardon?

25   **A.**  Is there a document you can refer me to?

1    **Q.** Sure.  Look at your report, which is Tab 1 in the

2    notebook before you, at page 8, note 19.  Do you have it

3    before you?

4    **A.** I do.

5    **Q.** Now, again to be clear for the record, this is your

6    expert report, your opening report, correct?  These are your

7    words, correct?

8    **A.** Yes.  I wasn't doubting you.  I was just wanting to have

9    the context.

10   **Q.** Look, it's perfectly fair if you want to go to a specific

11   document.  You tell me and we'll be sure that you're there.

12   **A.** Okay.

13   **Q.** We're now at the document, correct?

14   **A.** Yes.

15   **Q.** What you said is, "UC Berkeley, UCLA, and University of

16   Michigan have also faced a special disadvantage in recruiting

17   minority students because they have a national pool of

18   applicants and restrictions on using race that were imposed

19   by a state referendum rather than federal court.  As a

20   result, out-of-state competitors could continue to use racial

21   preference."

22            Do you see that?

23   **A.** Yes.

24   **Q.** Now, you would agree that Harvard has a national pool of

25   applicants, correct?

1    **A.**  Correct.

2    **Q.**  And you also agree if Harvard stopped considering race as

3    a factor in its admissions process, the portion of

4    African-American students on campus would decrease, correct?

5    **A.**  I think it depends on what race-neutral alternatives are

6    put in place.

7    **Q.**  In all of your simulations, the number of

8    African-American -- the percentage of African-American

9    students decreased by at least 4 percent, from at least 14 to

10   10 percent, correct?

11   **A.**  So yes.  But as I explained, that's because we didn't

12   have access to the wealth data.  So I don't see those as the

13   final word.

14   **Q.**  Let me ask you about the wealth data, while we're there.

15          You were describing to Her Honor your

16   characterization of people as disadvantaged or not

17   disadvantaged, correct?

18   **A.**  That's correct.

19   **Q.**  And in the class of 2019, you suggested that I think

20   18 percent of that class was disadvantaged and 82 percent was

21   not, correct?

22   **A.**  That's correct.

23   **Q.**  You know that 50 percent of the class receives financial

24   aid, correct?

25   **A.**  Right.  You can receive financial aid and be fairly well

 1    off.

 2    **Q.**  Right.  But they're receiving financial aid, correct?

 3    **A.**  Yes.

 4    **Q.**  You know that the average cost of attending Harvard for

 5    that 50 percent is about $12,000 a year, correct?

 6    **A.**  That sounds familiar to me.

 7    **Q.**  You know that 20 percent of the class is paying has no

 8    parental contribution, correct?

 9    **A.**  You're asking me specific percentages.  That sounds about

10    right, but I like to be more cautious than just -- I'll leave

11    it at that.  That sounds about right.

12    **Q.**  Do you know?

13    **A.**  I feel like I read something recently, maybe in an email

14    from you, suggesting that there had been an advance in the

15    number of students who are below that 65,000.

16    **Q.**  I hope if the email was from me that it was accurate.

17    But wherever you got the information.

18           And you know that for those students there's no

19    parental contribution and they're not required to take any

20    loans, correct?

21    **A.**  Correct.

22    **Q.**  Now, Harvard uses a variety of what you've described as

23    race-neutral alternatives already, correct?

24    **A.**  So it uses some, not others.  So obviously the legacy

25    preference is still there.  The dean's, director's list is

1    still there.  It does provide, as you just said, financial

2    aid, which is a positive.  But there's a whole lot more they

3    could do.

4    **Q.**  So I want to talk to you about some of the things that

5    Harvard does.  And then we'll come back probably after lunch

6    and talk about what you say Harvard doesn't do.

7    **A.**  Okay.

8    **Q.**  You say Harvard could increase recruitment of

9    economically disadvantaged students, correct?

10   **A.**  That's correct.

11   **Q.**  You say Harvard could expand its financial aid program,

12   correct?

13   **A.**  That's correct.

14   **Q.**  You say that Harvard could increase the tip it gives to

15   socioeconomically disadvantaged applicants, correct?

16   **A.**  So I doubt I used the word "tip," but yes, they could

17   increase the preference.

18   **Q.**  Do you know if Harvard gives a preference to economically

19   disadvantaged Asian-Americans?

20   **A.**  Yes.

21   **Q.**  They do, don't they?

22   **A.**  Yes.

23   **Q.**  And how does that compare to the -- how does that compare

24   to the tip that is given to any other racial or ethnic

25   group -- low-income, racial, or ethnic group across the

 1    Harvard applicant pool?

 2    **A.**   You're saying within the tip given or preference given to

 3    low income, what's the comparison between the Asian tip and

 4    the African-American tip, say?

 5    **Q.**   Let's break it down.

 6    **A.**   Yeah.

 7    **Q.**   So let's just focus first on Asian-Americans.  You agree

 8    with me that Asian-Americans, low-income Asian-Americans

 9    receive a tip in the Harvard process, correct?

10    **A.**   So I think that's right.  What I know is that the

11    African-American disadvantaged students don't receive a tip,

12    according to Professor Arcidiacono's data.  So I'm inferring

13    that the Asian-American -- someone's getting the low-income

14    tip, but I should probably be less definitive than I'm

15    answering.

16    **Q.**   You're not sure, correct?  Is that fair?

17    **A.**   I would say I'm pretty confident that Asian-American

18    low-income students get a tip, but I don't want to say it

19    definitively.

20    **Q.**   Okay.  Fair enough.  Now, you would agree with this:

21    Under Dean Fitzsimmons's leadership, Harvard has made a

22    concerted effort to bring in low-income students, correct?

23    **A.**   Correct.

24    **Q.**   And, in fact, you gave -- you've given interviews in

25    which you've publicly complimented Dean Fitzsimmons for his

 1    efforts to bring in or open the doors to low-income students,

 2    correct?

 3    **A.**  That's correct.

 4    **Q.**  And in fact, you did it as far back as February 2013.  If

 5    you'd like to look at Tab 14 of your notebook.  Do you find

 6    an article from the Harvard Political Review?

 7    **A.**  I do.

 8    **Q.**  And this is February of 2013, correct?

 9    **A.**  That's correct.

10    **Q.**  It's before SFFA filed its complaint, correct?

11    **A.**  That's correct.

12    **Q.**  It's before your Fox News interview, correct, by year?

13    **A.**  Yes.

14    **Q.**  And what you say, if you turn to the second page, is the

15    following:  "Kahlenberg, himself a graduate of both Harvard

16    College and Harvard Law School, thinks that the contemporary

17    Harvard College model of admissions offers a blueprint for

18    the future of affirmative action.  He says, 'Under the

19    leadership of Larry Summers and Bill Fitzsimmons in the

20    admissions office, Harvard has made a concerted effort to

21    bring in low-income students of all races along with students

22    of color.  And in my mind, that's a big step forward in

23    making affirmative action more inclusive of socioeconomic

24    status.' "

25              That's what you said a year before the complaint

```
 1   was filed, correct?

 2   A.   Yes.  And I would say it today, too.

 3   Q.   Yeah.  And in fact, four years before the complaint was

 4   filed, you gave an interview where you talked about how Dean

 5   Fitzsimmons had been working doggedly to open up Harvard to

 6   different racial and ethnic groups, correct?

 7   A.   Correct.

 8   Q.   And let me show you your interview.  And my question is

 9   going to be:  Do you stand by your interview today?

10   A.   Okay.

11             (Interview played.)

12   BY MR. LEE:

13   Q.   That's what you said in 2010, correct?

14   A.   Yes.

15   Q.   You stand by it today, don't you?

16   A.   Definitely.

17   Q.   And you said it again in 2013, as we just said, correct?

18   A.   Yes.

19   Q.   And you stand by that again, correct?

20   A.   Correct.

21   Q.   Now, one of the race-neutral alternatives you identified

22   is increasing recruitment, correct?

23   A.   I'm sorry.  Increasing?

24   Q.   One of the race-neutral alternatives you have identified

25   was increasing recruitment, correct?
```

1    **A.** That's correct.

2    **Q.** If you can't hear me, Mr. Kahlenberg, let me know. I'm

3    wandering away from the microphone.

4    **A.** Okay.

5    **Q.** Now, Harvard already has a number of programs to recruit

6    students from different backgrounds, correct?

7    **A.** That's right.

8    **Q.** One of them is the undergraduate minority recruitment

9    program, correct?

10   **A.** That's correct.

11   **Q.** Now, when you prepared your reports in this case, you did

12   not know when the UMRP was first instituted, correct?

13   **A.** I wouldn't say that. I've reviewed various documents

14   about what Harvard is doing today. At the deposition I

15   couldn't remember off the top of my head the year it was

16   founded, but that's different than saying I had no general

17   knowledge of when it was founded.

18   **Q.** Well, what you said at your deposition was the following,

19   at page 69, lines 14 to 16.

20        "Do you know when the undergraduate recruitment

21   minority program first began?

22        "ANSWER: I don't."

23   **A.** Right. Which is a -- it's basically like a memory test.

24   At that time, I didn't remember the year.

25   **Q.** You didn't remember the year. You also didn't remember

1    what minority groups were included within the program,

2    correct?

3    **A.**  If you're saying so, I'm guessing there's something in

4    there, yes.

5    **Q.**  Yes.  And you didn't even know that Asian-Americans were

6    actually part of the undergraduate minority recruitment

7    program, correct?

8    **A.**  I'd have to look at the transcript, but I'm guessing if

9    you're asking that, that's probably true.

10   **Q.**  It is.  You didn't know how many people UMRP employed,

11   correct?

12   **A.**  Right.  So as I sat at my deposition, I had an

13   opportunity to review a lot of documents, thousands of pages

14   of documents.  I may not recall certain specific items.  What

15   I focused on was the fact that the proportion of applicants

16   from, say, first-generation family, first-generation college

17   families was strikingly low.

18         So I was focused more on the results than spending

19   time kind of trying to recall the various programs that

20   Harvard talks about.  It's in a number of documents.  It's in

21   the Smith committee and others.  But I did not on that

22   occasion recall the various aspects of that program.

23   **Q.**  Have you finished your answer?

24   **A.**  I have.

25   **Q.**  So I'd like to go back to where I started.  One of the

Case: 19-2005   Document: 00117631840   Page: 105   Date Filed: 07/29/2020   Entry ID: 6356388
Case 1:14-cv-14176-ADB   Document 638   Filed 04/18/19   Page 93 of 231

93

1    things you claim is that Harvard could do a better job of

2    recruiting minority candidates, correct?

3    **A.**   Correct.

4    **Q.**   You know that it has a program to recruit minority

5    candidates, correct?

6    **A.**   Correct.

7    **Q.**   In order to determine whether Harvard could do a better

8    job, it would be a good thing to know how that program works,

9    correct?

10   **A.**   Yes and no.  I think you can look at the results and

11   say -- if you're looking at the bottom line of what happens

12   at a place like Harvard, even if they have a program that's

13   doing a lot of good and interesting things, they could

14   probably do more.  So I don't think you need to know all the

15   details to make a judgment on whether they could do better.

16   **Q.**   And the truth of the matter is under the undergraduate

17   minority recruitment program, you knew none of the details,

18   correct?

19   **A.**   I wouldn't say none of the details.

20   **Q.**   Almost none.  You didn't know when it started, you didn't

21   know what ethnic groups or racial groups were recruited, you

22   didn't know who staffed the recruitment, you didn't know

23   whether students were involved, and you didn't know what the

24   results of that program were, correct?

25   **A.**   I'd have to look back at the deposition on the specifics

 1    of that.

 2    Q.  As you sit here today, which is my one chance to ask you

 3    questions --

 4    A.  Yes.

 5    Q.  -- you can't tell us today, can you?

 6    A.  About the undergraduate minority recruitment program?

 7    Q.  Right.  You can't answer any of the questions I just

 8    asked about when it started, what ethnic groups are

 9    recruited, who does the recruiting, when they do the

10    recruiting?

11    A.  I can answer them.

12    Q.  You can't as you sit here today?

13    A.  I can answer some of those.

14    Q.  When did it start?

15    A.  It started early in the early 1970s.

16    Q.  You've learned that since your deposition?

17    A.  Yes.

18    Q.  Now the important question.

19    A.  I'm sorry.  I didn't answer that correctly.

20         I learned that surely when I was reviewing the

21    documents.  When I was in a deposition, I didn't recall the

22    date.  So I would say I refreshed my memory.

23    Q.  Fair enough.  Are Asian-Americans one of the ethnic or

24    racial minority groups that are recruited as part of the

25    undergraduate minority recruitment program?

1    **A.**    Yes.

2    **Q.**    And that recruitment program for Asian-Americans has been

3    quite successful over a number of years, correct?

4    **A.**    I mean, I'd have to look at more data on that question.

5    **Q.**    Fair enough.

6              MR. LEE:  Your Honor, I think it's noon, and it

7    would be a good place to stop.

8              THE COURT:  That's fine.  Quarter of 1:00.  See

9    everyone back.

10             (Court recessed at 12:00 p.m.)

11                    *** AFTERNOON SESSION ***

12   BY MR. LEE:

13   **Q.**    Good afternoon, Mr. Kahlenberg.

14   **A.**    Good afternoon.

15   **Q.**    I want to return to discussing some of the race-neutral

16   alternatives you discussed during your direct examination.

17   Okay?

18   **A.**    Yes.

19   **Q.**    One that you mentioned was the suggestion that Harvard

20   could increase financial aid, correct?

21   **A.**    Correct.

22   **Q.**    I've asked you a couple of questions about the financial

23   aid program.  I just want to ask you a few more.  Okay?

24   **A.**    Yes.

25   **Q.**    You did not undertake an independent evaluation of

1    whether Harvard could increase its financial aid, correct?

2    **A.** Correct.

3    **Q.** You do know that beginning with the class of 2008,

4    students from families earning up to $40,000 were asked for

5    zero parental contribution, correct?

6    **A.** Correct.

7    **Q.** And zero parental contribution means, as you and I

8    discussed before, the parents or family contribute nothing to

9    tuition, room, and board, correct?

10    **A.** That's correct.

11    **Q.** Now beginning with the class of 2010, Harvard increased

12    the threshold for zero parental contribution to $60,000,

13    correct?

14    **A.** Correct.

15    **Q.** And beginning with the class of 2016, Harvard increased

16    the threshold to $65,000, correct?

17    **A.** Correct.

18    **Q.** Now, I'd like to focus you on that instance when Harvard

19    increased the cutoff for zero parental contribution to

20    $65,000.  Do you have that in mind?

21    **A.** Yes.

22    **Q.** It's true, is it not, Mr. Kahlenberg, that when Harvard

23    made that increase, the share of applicants who identified as

24    African-American, Hispanic, or other did not increase,

25    correct?

1   **A.**   So when we're going from --

2   **Q.**   When Harvard made the increase for the class of 2016, the

3   share of applicants who identified as African-American,

4   Hispanic, and other did not increase, correct?

5   **A.**   I think that's right.

6   **Q.**   Okay.  Now I'd like to move to a slightly different topic

7   but still related to financial aid.  Okay?

8          You're familiar with something called The New York

9   Times college index?

10  **A.**   I am.

11  **Q.**   In fact, you quote The New York Times college index in

12  your reports, correct?

13  **A.**   Right.

14  **Q.**   And you have relied upon them for your opinions in this

15  case, correct?

16  **A.**   Correct.

17  **Q.**   The New York Times, that index is a ranking of colleges

18  that are doing the most for low-income students, according to

19  that ranking, correct?

20  **A.**   That's right.

21  **Q.**   And it's relevant whether one of the institutions is top

22  ranked for social mobility, correct?

23  **A.**   Yeah.  I cited it in my report.

24  **Q.**   And one of the important things is whether an institution

25  is helping with what you've described as social mobility,

```
 1   correct?
 2   A.   That's correct.
 3   Q.   Now, you would agree with me that Harvard has done pretty
 4   well in the College Access Index, correct?
 5   A.   It's ranked fairly high.
 6   Q.   Turn if you would, to Tab 17 in the notebook that you
 7   have.
 8   A.   Okay.
 9   Q.   Will do you have that before you?
10   A.   Yes.
11   Q.   Do you find DX119?
12   A.   Yes.
13   Q.   This is the College Access Index for 2017?
14   A.   Yes.
15           MR. LEE:  Your Honor, we'd offer DX119.
16           MR. STRAWBRIDGE:  No objection, Your Honor.
17           THE COURT:  Admitted.
18           (Defendant Exhibit No. DX119 admitted.)
19   BY MR. LEE:
20   Q.   Turn, if you would, Mr. Kahlenberg, to the page at the
21   bottom middle.  You'll see it's .0001 to start.  I'd like to
22   take you to the one that's .0008.
23   A.   Right.
24   Q.   Do you have that before you?
25   A.   I do.
```

```
 1    Q.  And just so the Court is clear, in DX119, the highest
 2    ranked university, which is UC Irvine, is at the bottom,
 3    correct?
 4    A.  That's correct.
 5    Q.  And then as you move up the page, you go 1, 2, 3, 4, and
 6    so on, correct?
 7    A.  That's correct.
 8    Q.  Now, among private institutions -- sorry.  Withdrawn.
 9            Within all institutions, Harvard ranked Number 10,
10    correct?
11    A.  That's correct.
12    Q.  And only a couple of private universities, Pomona and
13    Amherst, ranked higher, correct?
14    A.  That's correct.
15    Q.  And among the top ten schools on this list, Harvard cost
16    the least amount for middle-income students to attend,
17    correct?
18    A.  I'm not sure which line you're looking at.
19    Q.  So we're at -- you're on that page, correct?
20    A.  Yes.  The 5K?
21    Q.  We'll see if we can blow it up a little bit.  And you see
22    in the third column from the left after the name of the
23    university?
24    A.  Right.  That price middle income we're talking about?
25    Q.  Right.
```

1    **A.**   Yes.

2    **Q.**   Okay.  Let me go to another one of your race-neutral

3    alternatives.  You suggested that Harvard could increase

4    diversity by ending its early admission program, correct?

5    **A.**   That's correct.

6    **Q.**   In fact, Harvard did end its early-action program for a

7    period of several years, correct?

8    **A.**   Right.  For precisely the reasons I talked about.

9    **Q.**   Right.  They stopped doing it for a while, correct?

10   **A.**   Right.  To open access to low-income and minority

11   students.

12   **Q.**   And that was one of the purposes was to see if it would

13   open access, correct?

14   **A.**   Correct.

15   **Q.**   And to see if other universities and colleges would

16   follow, correct?

17   **A.**   That's correct.

18   **Q.**   It made the decision in 2006, correct?

19   **A.**   That's right.

20   **Q.**   It re-instituted early action in 2011, correct?

21   **A.**   That sounds right.

22   **Q.**   And Harvard is early action rather than early decision,

23   correct?

24   **A.**   That's correct.

25   **Q.**   If you get into Harvard on early action, you can still

1    apply anywhere else you would like, correct?

2    **A.**  That's correct.

3    **Q.**  Now, during the period before early action was -- strike

4    that.

5          During the period after early action was ended or

6    suspended, the yield rate for African-American, Hispanic, and

7    other applicants at Harvard actually declined, correct?

8    **A.**  I think it declined for everyone, maybe except Asians,

9    yeah.

10   **Q.**  And it declined, in part, because Harvard was losing

11   African-Americans, Hispanics, and other applicants to

12   universities that had early decision or early action,

13   correct?

14   **A.**  It was losing, yeah, losing out among various racial

15   groups including the ones you're describing.

16   **Q.**  Because other universities that had early action, early

17   decision were basically accepting those students before

18   Harvard had a chance to do so, correct?

19   **A.**  Right.  Harvard had kind of unilaterally disarmed.

20   **Q.**  I think you said "unilaterally disarmed"?

21   **A.**  Yes.

22   **Q.**  And Princeton and University of Virginia followed but no

23   one else did, correct?

24   **A.**  Correct.

25   **Q.**  Turn, if you would, to Tab 18 in your binder.

1    **A.**   Okay.  I'm there.

2    **Q.**   Do you have P288?

3    **A.**   Yes.

4    **Q.**   Now, this is a document that you relied upon in

5    formulating your opinions, correct?

6    **A.**   That's right.

7              MR. LEE:  We offer P288.

8              MR. STRAWBRIDGE:  No objection.

9              THE COURT:  Admitted.

10             (Plaintiff Exhibit No. P288 admitted.)

11   BY MR. LEE:

12   **Q.**   Do you have it before you, Mr. Kahlenberg?

13   **A.**   I do.

14   **Q.**   Would you turn to page, the bottom right-hand corner, is

15   77586, and we'll put it on the screen for you.  It's a little

16   hard to read.  The hard copy may help you.

17             But to orient us, there are two charts on this

18   page, correct?

19   **A.**   Yes.

20   **Q.**   Both show yield rates for 2003 to 2007, correct?

21   **A.**   Yes.

22   **Q.**   That was before Harvard suspended early action, correct?

23   **A.**   Right.

24   **Q.**   They also show yield rates for 2008 to 2010, correct?

25   **A.**   Correct.

**JA1560**

1    **Q.**  And that was after Harvard suspended early action,

2    correct?

3    **A.**  Correct.

4    **Q.**  So we have a before-and-after comparison, correct?

5    **A.**  That's right.

6    **Q.**  On the left it shows results for what is described as

7    students with high academic and extracurricular ratings.  Do

8    you see that?

9    **A.**  I do.

10   **Q.**  Is that a yes?

11   **A.**  Yes.

12   **Q.**  You have to give a yes for the transcript.  Are?

13   **A.**  Yes.

14   **Q.**  Do you see the key to the right of that chart that says

15   black students are identified with a square?

16   **A.**  Yes.

17   **Q.**  The yield rate for African-American students with high

18   academic and extracurricular ratings declined after early

19   action was suspended, correct?

20   **A.**  That's correct.

21   **Q.**  It went from 65 percent to close to 50 percent, correct?

22   **A.**  Yeah.  Yes.

23   **Q.**  Now, you agree that Harvard ended early action but

24   restored it based upon concerns that the yield rate for

25   students of color was declining, correct?

1    **A.**  Well, when I remember reviewing the document, there was

2    concern about losing out from the top feeder schools.  And

3    there was mention of students -- African-American, Latino

4    students, but those were not the only students who we were

5    seeing decline.

6    **Q.**  Would you agree with this statement or not:  Harvard

7    reinstated early admissions because it was concerned that its

8    yield rate, those accepting their offer of admissions, had

9    declined.  True or not true?

10    **A.**  True.

11    **Q.**  Would you agree with this statement:  Of particular

12    interest, given the rationale for limiting early action, the

13    admissions office was becoming increasingly concerned that

14    not having an early admissions option was causing Harvard to

15    lose some of the most academically talented and prepared

16    low-income and underrepresented minority students.

17    Agree or disagree?

18    **A.**  I'm not sure I totally agree.

19    **Q.**  All right.  Turn, if you would, to the page that is 77565

20    in P288.  Again, this is the Harvard document that you rely

21    upon, correct?

22    **A.**  Right.

23    **Q.**  What it says in the second full paragraph is, "Of

24    particular interest, given the rationale for eliminating

25    early action, our admissions office is becoming increasingly

1    concerned that not having an early admission option is

2    causing us to lose some of the most academically talented and

3    prepared low-income and underrepresented minority students."

4           Have I read that correctly?

5    **A.**  Yes.  Maybe I should clarify my answer.

6           When I was hesitating, what I meant is clearly

7    early admissions hurts low-income and underrepresented

8    minority students.  So I'm not questioning that Harvard said

9    this.

10           I guess I'm questioning whether, in fact, the net

11   result is a program which is going to hurt -- a change which

12   will hurt low-income and minority students.  Net.  It's more

13   complicated than just the yield.

14   **Q.**  Sure enough.  Let's see if I can uncomplicate it a little

15   bit.

16           We can agree that he eliminating early action was

17   one of your race-neutral alternatives, correct?

18   **A.**  Yeah.  It's one.  In two of the simulations, we have

19   early action in there kind of precisely for this reason, that

20   there is an issue of yield when Harvard University

21   unilaterally disarms.  Other simulations, we do call for

22   eliminating early action.  We've got both sides in there.

23   **Q.**  You have both suggestions, correct?

24   **A.**  Yes.  Right.

25   **Q.**  So we can agree that one of your suggestions in some of

1    the simulations is to eliminate early action, correct?

2    **A.**    Yes.

3    **Q.**    Harvard, in fact, eliminated early action, correct?

4    **A.**    Correct.

5    **Q.**    It generated some statistical data on the consequence of

6    that in a document that you reviewed and relied upon,

7    correct?

8    **A.**    Correct.

9    **Q.**    And it came to a conclusion, including the conclusion

10   that's on the screen as we speak, correct?

11   **A.**    Correct.

12   **Q.**    And it made the institutional decision to reinstitute

13   early action, correct?

14   **A.**    Correct.

15   **Q.**    Now, another race-neutral alternative that you suggest in

16   your report is something that you described as place-based

17   preferences, correct?

18   **A.**    Right.

19   **Q.**    For the Court, a place-based reference is something

20   that's based upon geography, correct?

21   **A.**    Correct.

22   **Q.**    Now, you agree that Harvard already considers geography

23   in its admissions process, correct?

24   **A.**    It's one of the factors.

25   **Q.**    And, in fact, you know from having reviewed the Harvard

1    documents that there's a tip for geographic location for some

2    applicants, correct?

3    **A.**   So Harvard says there's a tip.  It didn't register on

4    our -- well, I'll let Professor Arcidiacono take on that.

5    Let me leave that.

6    **Q.**   Now, one of the approaches you discuss in your report is

7    admitting the highest performing applicants within specific

8    ZIP codes, correct?

9    **A.**   That's correct.

10   **Q.**   Just give me a chance to switch here.  And I want you to

11   keep in mind, that place-based alternative of using ZIP

12   codes.

13   **A.**   Yes.

14   **Q.**   There are more than 33,000 ZIP codes in America, correct?

15   **A.**   That's correct.

16   **Q.**   Harvard admits 2,000 students a year, correct?

17   **A.**   That's correct.

18   **Q.**   It has 1,660 or so beds, correct?

19   **A.**   That's correct.

20   **Q.**   You agree with me, just doing the simple math, Harvard

21   could not admit the top student from every ZIP Code in

22   America without increasing its student body by a factor of 15

23   times, right?

24   **A.**   Absolutely, correct.

25   **Q.**   So you're not suggesting that that would work for

1    Harvard, correct?

2    **A.**   Correct.

3    **Q.**   Now, you also suggested a race-neutral alternative which

4    is to enroll a percentage of students from a variety of high

5    schools, correct?

6    **A.**   Correct.

7    **Q.**   Now, there are literally tens of thousands of high

8    schools in America, correct?

9    **A.**   That's correct.

10   **Q.**   Harvard could not enroll the top student from every high

11   school in America, correct?

12   **A.**   That's correct.  They don't all apply, but even if --

13   yeah.  I agree with the basic point.

14   **Q.**   How many different high schools are represented in the

15   40,000 applicants that Harvard gets every year?

16   **A.**   Well, I remember reading in the data that something like

17   80 percent of high schools send no applications.  So working

18   back from that, it must be some 20 percent of the high

19   schools.

20   **Q.**   And so how many is that in absolute terms?

21   **A.**   I'm forgetting the first number you said, how many high

22   schools.

23   **Q.**   Could we agree that even with that math Harvard could not

24   accept the top student for every one of those?

25   **A.**   No.  I'm not asking for that, right.

1    **Q.**  So one thing you do suggest is that Harvard adopt a

2    policy based upon College Board neighborhood clusters,

3    correct?

4    **A.**  That's correct.

5    **Q.**  And you mentioned College Board neighborhood clusters

6    briefly to Mr. Strawbridge this morning, correct?

7    **A.**  That's correct.

8    **Q.**  In fact, using College Board clusters is your preferred

9    model, correct?

10   **A.**  I have four preferred models, but yes.

11   **Q.**  It's one of them?

12   **A.**  It's one of the four.

13   **Q.**  So let's talk about what a College Board cluster is.  A

14   College Board cluster is a combination of neighborhoods,

15   correct?

16   **A.**  That's correct.

17   **Q.**  There are 33 clusters in the United States, correct?

18   **A.**  That's correct.

19   **Q.**  They are not geographically contiguous, correct?

20   **A.**  That's correct.

21   **Q.**  One cluster can have neighborhoods from all over the

22   United States of America, correct?

23   **A.**  That's correct.

24   **Q.**  Your suggested race-neutral alternative is to admit an

25   equal number of students from each of the 33 College Board

Case: 19-2005    Document 00117631840    Page: 122    Date Filed: 07/29/2020    Entry ID: 6356388
Case 1:14-cv-14176-ADB    Document 638    Filed 04/18/19    Page 110 of 231

110

1    clusters, correct?

2    **A.**   That's correct.

3    **Q.**   So under your proposal, Harvard will admit roughly 50

4    students from each cluster each year, correct?

5    **A.**   That's right.  I think a little more than 50, right.

6    **Q.**   So let's talk about how these clusters are identified.

7    The fact of the matter is that the College Board uses race as

8    a factor in identifying these clusters, correct?

9    **A.**   That's correct.

10   **Q.**   Each cluster actually represents a group of students with

11   similar demographic attributes, correct?

12   **A.**   That's correct.

13   **Q.**   And, in fact, race is often the most dominant factor in

14   defining the clusters, correct?

15   **A.**   Right.  I mean, I think the point is that you have white

16   people living in the predominantly African-American clusters.

17   It's not race per se, but race is part of how they define the

18   clusters.

19   **Q.**   Let's see how -- in many of them, race is the dominant

20   way they define the clusters, isn't it?

21   **A.**   I have reviewed those data, and race can be an important

22   factor.

23   **Q.**   To be clear, let's turn to Tab 19, which is DX139.  Do

24   you recognize this?

25   **A.**   I do.

1    **Q.**  Are these the College Board clusters?

2    **A.**  They are.

3              MR. LEE:  Your Honor, we offer DX139.

4              MR. STRAWBRIDGE:  No objection.

5              THE COURT:  Admitted.

6              (Defendant Exhibit No. DX139 admitted.)

7    BY MR. LEE:

8    **Q.**  Now, if I turn you in DX139 to the page on the bottom

9    that is .0013.  Let's just take an example.  Do you see

10   neighborhood cluster 71?

11   **A.**  I do.

12   **Q.**  That is just one example of the 33, correct?

13   **A.**  That's right.

14   **Q.**  And what the College Board does is it takes a series of

15   cities, towns, places across the country and cluster them,

16   and it's described as primarily African-American, black inner

17   city, correct?

18   **A.**  That's correct.

19   **Q.**  And if we were to continue through the College Board

20   clusters, we would find predominantly Hispanic clusters,

21   correct?

22   **A.**  Correct.

23   **Q.**  Predominantly Asian clusters, correct?

24   **A.**  Offhand I don't remember that one, but I don't doubt you.

25   **Q.**  Turn to page .0006.

1    **A.**   It looks like it's large as opposed to predominant.

2    **Q.**   It's large, is it not?

3    **A.**   Yes.

4    **Q.**   It's phrased as largely Asian, correct?  Just so we're

5    all clear, these dots that are on the map of the United

6    States below is an indication of the geographies within these

7    clusters, correct?

8    **A.**   That's correct.

9    **Q.**   So we have these 33 clusters that are defined, at least

10   in part, on the basis of race, correct?

11   **A.**   That's correct.

12   **Q.**   That are described, in part, on the basis of race,

13   correct?

14   **A.**   That's correct.

15   **Q.**   And your suggestion is that it's a race-neutral

16   alternative for Harvard to resort to using these clusters to

17   define its admissions policies in a race-neutral way?

18   **A.**   Right.  I see this as analogous to the Texas top

19   10 percent plan where there are -- the legislature knows in

20   advance that certain high schools are predominantly

21   African-Americans, certain ones might be predominantly

22   Latino, certain ones might be predominantly white.  And that

23   is seen as a race-neutral plan because we don't look at the

24   individual race of the applicant.  And so there are some

25   Asian-American applicants who come from a predominantly black

1    high school.  There are some white applicants at those high

2    schools.  It's not race per se.  It's the racial

3    generalization about, in this case, a neighborhood or a high

4    school.

5    **Q.**  Fair enough.  Do you recall before lunch I asked you

6    about the hypothetical of the Chinese-American living in a

7    middle class community in the Midwest, right?  Do you

8    remember that?

9    **A.**  Yeah.

10   **Q.**  For these clusters, what you're suggesting is, for

11   example, that Harvard cap the number of students it would

12   take from any one cluster at 50, correct?

13   **A.**  So it's an allocation.  Right.

14   **Q.**  And what you're saying to us is if you were in cluster 58

15   and you capped it at 50, some of them might be Asian, some of

16   them might not be, correct?

17   **A.**  That's correct.

18   **Q.**  But the clusters that you are going to are defined in

19   large part by race, in the first instance, correct?

20   **A.**  There's a racial element to -- socioeconomic element as

21   well.  There are a number of things that factor into these.

22   Academic achievement -- there are a number of factors that go

23   into these.

24   **Q.**  Are you familiar with an article written by Ron Unz in

25   December 2012?

Case: 19-2005    Document 00117631840    Page: 126    Date Filed: 07/29/2020    Entry ID: 6356388
Case 1:14-cv-14176-ADB   Document 639   Filed 04/18/19   Page 114 of 231

114

1    **A.**  Vaguely.  Let me just -- if you can point me to it first.

2    **Q.**  Tab 22.  It's P218, which is --

3    **A.**  Yes.  I know this one.

4    **Q.**  -- in evidence.  You've reviewed the article before?

5    **A.**  So I wouldn't say I reviewed it.  At some point along the

6    way, I read this article, but it's been a number of years.

7    **Q.**  Did you agree with its criticism of Jewish students and

8    their mathematical abilities?

9    **A.**  No.

10   **Q.**  Did you agree with its criticism of Jewish students and

11   their work ethic?

12   **A.**  No.

13   **Q.**  Did you agree with its criticism of Japanese-Americans

14   and their work ethic?

15   **A.**  I don't remember that aspect of it, but I would not agree

16   with any criticism --

17   **Q.**  Did you agree with its criticism of East Asians in their

18   intellectual capacities?

19   **A.**  I don't agree.

20   **Q.**  Did you agree with his criticism of African-American

21   students?

22   **A.**  I wouldn't agree with that, no.

23   **Q.**  Did you agree with his methodology of identifying people

24   by race and ethnicity simply by looking at their last names?

25   **A.**  I think that would be problematic.  This is an article I

1    reviewed many, many years ago, so I'm not remembering a lot

2    of this.

3    **Q.**  You're giving us your best memory now, correct?

4    **A.**  Yes.

5    **Q.**  Okay.  Let's move on to your simulations.

6    **A.**  Okay.

7    **Q.**  As you told us, you did not run the simulations yourself,

8    correct?

9    **A.**  That's correct.

10   **Q.**  You relied on Professor Arcidiacono, if I pronounced his

11   name correctly?

12   **A.**  Arcidiacono is how I pronounced it.

13   **Q.**  All right.  We'll do it your way.  It's probably closer

14   to right.

15          And you also reviewed simulations prepared by

16   Harvard's expert Dr. David Card, correct?

17   **A.**  That's correct.

18   **Q.**  Now, I want to focus on your simulations that you

19   requested from Dr. Arcidiacono.  Okay?

20   **A.**  Yes.

21   **Q.**  You asked Dr. Arcidiacono to model the Harvard admissions

22   process -- withdrawn.

23          You asked him to model the admissions process

24   Harvard actually uses, correct?

25   **A.**  That's correct.

**JA1573**

1   **Q.**  So when he modeled that process -- and I want you to keep

2   that phrase in mind, the process that Harvard actually uses.

3   Do you have that in mind?

4   **A.**  Yes.

5   **Q.**  So when he modeled that process, he included the personal

6   rating, correct?

7   **A.**  That's correct.

8   **Q.**  He did that to replicate the existing Harvard system as

9   closely as possible, correct?

10  **A.**  That's correct.

11  **Q.**  And you would agree that most people consider personal

12  characteristics as legitimate information and criteria for

13  admission, correct?

14  **A.**  Correct.

15  **Q.**  And you believe that they are legitimate criteria for

16  admissions decisions, correct?

17  **A.**  Yes.

18  **Q.**  Now, you also agree that considering socioeconomic status

19  is a legitimate consideration in admissions process?

20  **A.**  Correct.

21  **Q.**  In fact, you encourage it, correct?

22  **A.**  Yes.

23  **Q.**  And if I hear you correctly, what you're saying is you

24  wish Harvard would do more, correct?

25  **A.**  I think Harvard could do more on that score, yes.

1    **Q.**  Fair enough.  You also agree that parents' occupation is

2    a legitimate consideration in the admissions process,

3    correct?

4    **A.**  Yes.

5    **Q.**  And you agree that parent's occupation provides you with

6    different information about the family and the background

7    than simply knowing someone's income, correct?

8    **A.**  Yes.  I mean, I should say, you know, if the information

9    is reliable, I think it should be included.

10   **Q.**  And if it's reliable, it should be included if it's used

11   as part of the admissions process, correct?

12   **A.**  That's correct.

13   **Q.**  The simulations that he did for you included legacies,

14   correct?

15   **A.**  That's right.

16   **Q.**  It included athletes, correct?

17   **A.**  Correct.

18   **Q.**  And as you told us earlier today, considering athletic

19   talent ability is a legitimate interest for American colleges

20   and universities today, correct?

21   **A.**  That's correct.

22   **Q.**  And I think you said eliminating preferences for athletes

23   would be too radical for our presently constituted

24   universities and colleges, correct?

25   **A.**  That's correct.

**JA1575**

```
 1   Q.   Now, for your simulations, you used only a single
 2   admissions cycle, correct?  You went year by year rather
 3   than --
 4   A.   I see.
 5   Q.   I'm sorry.  I may have been talking over you, so let me
 6   withdraw it and state it again.
 7              I'm focusing on your simulations.  Do you have
 8   those in mind?
 9   A.   Yes.
10   Q.   The ones you wanted to replicate the Harvard admissions
11   program as much as possible, correct?
12   A.   Corrects.
13   Q.   You went year by year, admissions cycle by admissions
14   cycle, correct?
15   A.   So it's my understanding that there was a disagreement
16   between Professor Arcidiacono and Professor Card on pooling
17   versus year by year.  I think the important point is I used
18   both models.  And because I'm relying on some of Professor
19   Card's model, some of Professor Arcidiacono's, I don't need
20   to make a judgment on that question.
21   Q.   Did any of your simulations actually rely upon a model
22   that pooled data over several years?
23   A.   So these are -- what I did was I instructed Professor
24   Arcidiacono to use the data as best he could to generate
25   race-neutral alternatives.  And some of the technical
```

1    questions are ones I think would be better for him.

2    **Q.**   To be precise, what you asked him to do was to try to

3    model what Harvard actually uses in its admissions process,

4    correct?

5    **A.**   That's correct.  We had to make manipulations to it, but

6    right.

7    **Q.**   And your simulations go year by year.  They don't pool

8    data, correct?

9    **A.**   The results are presented year by year.

10   **Q.**   Okay.  Fair enough.  So let's talk now about some of the

11   simulations.  Now, to assist the Court, in your report you

12   numbered your simulations 2, 3, 4, 5, 6, and 7, correct?

13   **A.**   That's correct.

14   **Q.**   You didn't call them, A, B, C, and D as you did today,

15   correct?

16   **A.**   So --

17   **Q.**   I'm just going to set up basically an index so we can

18   translate them.  That's all.

19   **A.**   We were trying to be helpful.

20   **Q.**   I understand.  So Simulation A is Simulation Number 4 in

21   your report, correct?

22   **A.**   Correct.

23   **Q.**   Simulation B is Simulation 4 with a little bit of an

24   adjustment, correct?

25   **A.**   No.  Simulation B is the card 4X.

1    **Q.**  Okay.  We'll call it the card 4X.

2            Simulation C is your Simulation 6, correct?

3    **A.**  That's correct.

4    **Q.**  And Simulation D is your Simulation 7, correct?

5    **A.**  That's correct.

6    **Q.**  But in addition to these four, you also had Simulation 2,

7    correct?

8    **A.**  That's correct.

9    **Q.**  Simulation 3, correct?

10   **A.**  Correct.

11   **Q.**  And Simulation 5, correct?

12   **A.**  That's correct.

13   **Q.**  To move this along, I am going to ask you to focus upon

14   your simulations for the class year 2019.

15   **A.**  Okay.

16   **Q.**  Do you have that in mind?

17   **A.**  Yes.

18   **Q.**  I think, Mr. Kahlenberg, that's the last year that you

19   had data for, correct?

20   **A.**  That's correct.

21   **Q.**  And that's the year that you reported data for in the

22   appendix to your rebuttal report, correct?  It's at Tab 10,

23   if you'd like to look at it, Appendix A.

24   **A.**  That's correct.

25   **Q.**  Do you have it?

1    **A.**  I do.

2    **Q.**  Now, first I'd like to talk about the class of 2019.  For

3    that class, African-American representation was 13.6 percent

4    of the admitted class, correct?

5    **A.**  So here we have it as rounded to 14 percent.

6    **Q.**  Pardon?

7    **A.**  Here we have it rounded to 14 percent.

8    **Q.**  Under Simulation 1, which doesn't correspond to any of A,

9    B, C, or D, African-American representation under your model

10   would fall from 13.6 percent or 14 percent to 6.6 percent,

11   correct?

12   **A.**  That's correct.

13   **Q.**  As you told us today, that would be, in your view,

14   unacceptable, correct?

15   **A.**  That's correct, yes.

16            THE COURT:  What page is this on in his report?

17            MR. LEE:  I'm sorry.  It's at Tab 1, Your Honor.

18            THE COURT:  Sorry.  I was at Tab 10.

19            MR. LEE:  Tab 1, Appendix C.  We can bring it up on

20   the screen right now.

21   BY MR. LEE:

22   **Q.**  Are you with me, Mr. Kahlenberg?

23   **A.**  I am.

24   **Q.**  What I'm trying to go through is go through each of the

25   simulations, and I'm trying to report what the impact of the

1    class of 2019 would have been on African-Americans, okay?

2    A.   Right.

3    Q.   We looked at Simulation 1 and you agreed it dropped from

4    14 percent to about 6.6 percent, correct?

5    A.   6.6 percent.

6    Q.   And as you said, that would be unacceptable?

7    A.   Yeah.   This is not one of the simulations that I thought

8    worked.

9    Q.   Right.   Simulation Number 2, which also doesn't have a

10   letter, would have African-American representation drop from

11   13.6 percent to approximately 8 percent, correct?

12   A.   Correct.

13   Q.   You consider that unacceptable as well, correct?

14   A.   So the way that I look at race-neutral alternatives is to

15   try to examine the educational benefits of diversity which

16   derive from a number of different factors.   So

17   African-American percent, Hispanic percent, percent low

18   income, geographic diversity.   And then you also want to look

19   at the academic levels of preparedness.   And so there are a

20   variety of factors.   I don't kind of just look at one tiny

21   aspect of the bigger picture without considering all those

22   factors.

23   Q.   I'm going to take you through a number of those factors,

24   but you just told me a few minutes ago that it dropped from

25   13.6 percent to 6 percent, which, as you said to

Case: 19-2005    Document: 00117638840    Page: 435    Date Filed: 07/29/2020    Entry ID: 6356388
Case 1:14-cv-14176-ADB   Document 638   Filed 04/18/19   Page 123 of 231

123

1    Mr. Strawbridge, was unacceptable?

2    **A.**   Yes.

3    **Q.**   Now we have to drop from 13.6 percent to 8 percent.

4    Acceptable, unacceptable, or you can't say without

5    considering these other factors?

6    **A.**   I think you want to talk about all the factors.  If you

7    recall earlier, unfortunately Harvard didn't tell us what

8    they want in terms of racial and ethnic diversity.

9    **Q.**   I am going to come back to that, the RNA report, and ask

10   you about it in light of what *Fisher* says.

11              For now, what you're saying is if I say "workable"

12   or "unworkable" or "you need to discuss it," it's the last

13   category, correct?

14   **A.**   I think this is one that one would want to discuss.

15   What's nice is there are other alternatives that are even

16   better.

17   **Q.**   Let's talk about them.

18   **A.**   Okay.

19   **Q.**   Under Simulation Number 3, African-American

20   representation would fall from 13.6 percent to 7.7 percent,

21   correct?

22   **A.**   That's the no SES boost.

23   **Q.**   Do you see it?

24   **A.**   The simulation is the half-athlete boost.

25   **Q.**   Pardon?

 1   **A.**   This is confusing.

 2         There's no SES boost, there's half-athlete boost,

 3   and status quo.  So the simulation is the second one, not the

 4   first.

 5   **Q.**   Let's see if we can do it this way.

 6         You do agree that Simulation Number 4 is the

 7   Simulation A you presented to Her Honor, correct?

 8   **A.**   Yes.

 9   **Q.**   Simulation Number 4, which you said is a workable

10   alternative, African-American representation in the class

11   would drop from 14 percent to 8.4 percent, correct?

12   **A.**   No.

13   **Q.**   Do you see that?  There are two scenarios, right?  Your

14   Simulation A, which is Simulation Number 4 in your report,

15   there are two different scenarios, and one of them,

16   African-American representation, drops to 8.4 percent and

17   another drops to 10.1 percent, correct?

18   **A.**   I'm not advocating the no SES boost.

19   **Q.**   Mr. Kahlenberg, all I'm trying to do is get on the record

20   what the numbers are from the simulations you described this

21   morning as you described them in your expert report.  Okay?

22   This is just to amplify the testimony you gave.

23         So for the report that you gave, your expert

24   report, you agree with me this is your report, correct?

25   **A.**   It is.

1    **Q.**  You agree with me this is your appendix, correct?

2    **A.**  Correct.

3    **Q.**  You agree with me that this is what you sponsored,

4    correct?

5    **A.**  Correct.

6    **Q.**  The data here shows that for Simulation A or 4, there are

7    two scenarios, and in one the African-American population

8    drops to 8.4 percent and in one to 10.1 percent.  That's what

9    your data shows, correct?

10    **A.**  Correct.

11    **Q.**  All right.  Now, Simulation Number 5 --

12    **A.**  Can I clarify something?  What I'm advocating is --

13    **Q.**  Mr. Strawbridge is going to have you have a chance to ask

14    you questions.  I've tried to let you answer broadly --

15    **A.**  But it's the 10.1 --

16    **Q.**  If you think it's important, go ahead.

17    **A.**  What I'm advocating is the half-athlete boost.  I don't

18    want to be confusing to people.  So the half-athlete boost

19    takes it to 10.1 percent.

20    **Q.**  If there's a half-athlete boost, the number of

21    African-American students on campus goes from 14 percent to

22    10 percent, correct?

23    **A.**  Correct.

24    **Q.**  The second scenario, which would take it from 14 percent

25    down to 8.4 percent, you wouldn't advocate that one, or you

126

1    have not advocated that one, have you?

2    **A.**  Let me put it that way.  I have not advocated.  As we

3    know, I'm the SES boost guy.  I'd rather have a half-athlete

4    boost than no SES boost.

5    **Q.**  Simulation Number 5 is in your expert report, but it's

6    not one that you talked about today, correct?

7    **A.**  Right.

8    **Q.**  In your expert report for Simulation Number 5,

9    African-American representation on campus would drop from

10   14.to 8.1 percent in one scenario.  Correct?

11   **A.**  Again, I don't know why we're focusing on the SES boost,

12   but --

13   **Q.**  I'm going to just focus on the two scenarios.  I'm going

14   to get them both into the record for us.  There are two

15   scenarios for Simulation Number 5, correct?

16   **A.**  Yes.

17   **Q.**  In one of them, the number of African-Americans dropped

18   from 14 percent to approximately 8.1 percent, correct?

19   **A.**  Right.

20   **Q.**  In the other, the number of African-Americans dropped

21   from 14 percent to about 10.6 percent, correct?

22   **A.**  Correct.

23   **Q.**  You sponsored the alternative, which is that would result

24   in the drop to 10.6 percent, correct?

25   **A.**  Correct.

1    **Q.**  You don't sponsor the one that would result in the drop

2    to 8.1 percent, do you?

3    **A.**  So I want to be clear here.  I'm not rejecting it based

4    on the fact that it's 8.1.  I'm rejecting it on the fact that

5    there's no SES boost.

6    **Q.**  So the answer is you reject it but not strictly on the

7    numbers, correct?

8    **A.**  Right.

9    **Q.**  Okay.  Now, for Simulations 6 and 7, 6 is Simulation C in

10   what you provided to Her Honor today, correct?

11   **A.**  That's correct.

12   **Q.**  And Simulation 7 is D, correct?

13   **A.**  That's correct.

14   **Q.**  Do you have that before you?

15   **A.**  I do.

16   **Q.**  In each of those simulations, the number of

17   African-American students, according to you and Professor

18   Arcidiacono, would drop from 14 percent to 10 percent,

19   correct?

20   **A.**  That's correct.

21   **Q.**  Even in those cases, a 48 percent or so reduction,

22   correct?

23   **A.**  It goes from 14 to 10.

24   **Q.**  Did you have talk to a single student on the Harvard

25   campus to see what a reduction in the population of

 1    African-American students by 40 percent would do to the

 2    campus?

 3    **A.**   I don't think it's 40 percent.  But as part of my

 4    research, I did not talk with students, no.

 5    **Q.**   Did you talk to any Harvard faculty member about what the

 6    impact would be on the Harvard campus if the number of

 7    African-American students fell from 14 percent to 10 percent?

 8    **A.**   That was not part of my research.

 9    **Q.**   In every single one of your simulations, the racial group

10    that bears the burden of your race-neutral alternatives with

11    a decrease is African-American students, correct?

12    **A.**   So let me return to the basic point that we did not have

13    access to wealth --

14    **Q.**   Mr. Kahlenberg, can you answer my question?

15           In every single one of your seven simulations, the

16    racial group that bore the burden of your race-neutral

17    alternatives by decreasing representation on campus was

18    African-American students.  Correct or not correct?

19    **A.**   So that was correct with the data limitations that we

20    had.

21    **Q.**   Thank you.

22           THE COURT:  Mr. Lee, where is this page?

23           MR. LEE:  It's in his rebuttal expert report, Your

24    Honor, and it's Appendix A.  It's at Tab 1.  If you go to

25    Tab 1, Tab 1 is his initial report and at the end are some of

1    appendixes we just looked at, and Tab 10 is his rebuttal

2    report.  I think the one you're looking for Ms. Frazier tells

3    me is Tab 10, Your Honor.

4         THE COURT:  I have it.

5         MR. LEE:  It's Tab 10, Appendix A.

6         THE COURT:  The very last page, right?

7         MR. LEE:  Yes.

8    BY MR. LEE:

9    Q.   Okay.  Let me move you to this question of the

10   race-neutral alternative committees at Harvard.  You talked

11   to Mr. Strawbridge about the Ryan committee, correct?

12   A.   That's correct.

13   Q.   The Ryan committee's charge was broader than the Smith

14   committee's charge, correct?

15   A.   I'd have to go back and review the data.

16   Q.   Let me ask you this way.  You know that Harvard has 13

17   schools or units, correct?

18   A.   That sounds about right.

19   Q.   You went to two of them.  You went to the college and you

20   went to the law school, correct?

21   A.   Right.

22   Q.   You understand that the Smith committee looked at

23   race-neutral alternatives for the college, correct?

24   A.   Correct.

25   Q.   Dean Ryan's committee, which had a broader group of

1    people, was looking at the concept of -- two concepts:

2    diversity and race-neutral alternatives across the entire

3    university, correct?  Is that right?

4    **A.**  I'd have to go back and double-check, but there's so

5    little information about the Ryan committee is the problem.

6    **Q.**  Can you tell me whether that's true or not?  Did the Ryan

7    committee have as its charge first looking at things across

8    the entire university?

9    **A.**  It may have.

10   **Q.**  Did the Ryan committee's charge also include looking at

11   the issue of diversity?

12   **A.**  I believe that's true.

13   **Q.**  And isn't it true that a separate committee at the

14   college looked at diversity?  Correct?

15   **A.**  Yes.

16   **Q.**  Chaired by Dean Khurana, correct?

17   **A.**  That's correct.

18   **Q.**  And that committee picked up that portion of the Ryan

19   committee charge and carried it forward, correct?

20   **A.**  Well, I know that they address the issue of diversity.

21   **Q.**  And they issued a report?

22   **A.**  Yes.

23   **Q.**  Did you read it?

24   **A.**  Yes.

25   **Q.**  Okay.  And ultimately the Smith committee picked up the

1    charge on RNAs for the college, correct?

2    **A.**    Correct.

3    **Q.**    It didn't pick up the charge for RNAs across the

4    university, correct?

5    **A.**    That's correct.

6    **Q.**    And in that chart you showed Her Honor, with several

7    people and faces, there are actually people on the Ryan

8    committee from across the university who had no association

9    with the college, correct?

10    **A.**    Right.  I mean, there were law professors who would have

11    lots of expertise on principles to apply to the college,

12    economists who would have relevant information for the

13    college, as well as other pieces of Harvard.

14    **Q.**    As well as other units, correct?

15    **A.**    Correct.

16    **Q.**    Now, I think you told Mr. Strawbridge today that the work

17    of the Ryan committee was suspended shortly after this

18    lawsuit was filed, correct?

19    **A.**    That's correct.

20    **Q.**    And in June 2017, Harvard formed a committee to study

21    race-neutral alternatives at the college, correct?

22    **A.**    That's correct.

23    **Q.**    Dean Khurana was on the committee, correct?

24    **A.**    That's correct.

25    **Q.**    He's the dean of the college, correct?

1    **A.**  Right.

2    **Q.**  Dean Smith was the dean of the faculty of arts and

3    sciences, correct?

4    **A.**  Correct.

5    **Q.**  That's one of Harvard's 13 units, correct?

6    **A.**  Correct.

7    **Q.**  He was the chair of the committee, correct?

8    **A.**  Correct.

9    **Q.**  Now, and Dean Fitzsimmons was also on the committee,

10   correct?

11   **A.**  That's correct.

12   **Q.**  The dean of admissions, correct?

13   **A.**  Correct.

14   **Q.**  Now, you said to us earlier today that one of the

15   disappointments was that the Smith committee didn't -- you

16   phrase it for me.  What was it precisely?  The disappointment

17   was they didn't provide you enough information about

18   something.

19   **A.**  So one of the key concepts in the Supreme Court decisions

20   on affirmative action is that universities bear the burden of

21   showing that race-neutral alternatives do not work.  A piece

22   of that is, in order to figure out what doesn't work, one

23   needs a measure of success.  And an element of that is what

24   levels of diversity constitute a critical mass.

25   **Q.**  Can I have the *Fisher* decision, which I'm going to --

```
 1              MR. LEE:  May I approach, Your Honor?

 2              THE COURT:  Yes.

 3     BY MR. LEE:

 4     Q.   I'm going to hand you a copy.  It's page 7 on the screen.

 5     Mr. Kahlenberg, if you can turn to page 7.  So I just want to

 6     be sure that -- you've read this decision before, correct?

 7     A.   I have.

 8     Q.   And I'm going to turn you to the middle of the first full

 9     paragraph.  Do you see the sentence which reads, "A

10     university cannot impose a fixed quota or otherwise 'define

11     diversity as some specified percentage of a particular group

12     merely because of its race or ethnic origin.'"

13     A.   That's correct.

14     Q.   Do you have that in mind?

15              You agree with that, correct?

16     A.   Yes.

17     Q.   Okay.  Now, the committee met seven times, correct?

18     A.   Yes.

19     Q.   It reviewed your expert reports, correct?

20     A.   Correct.

21     Q.   Now, I understand you disagree with some of their

22     conclusions, but it reviewed all the race-neutral

23     alternatives that you identified in this case, correct?

24     A.   That's what they said in their report, yes.

25     Q.   They also considered some race-neutral alternatives in
```

1    addition to the ones that you identified, correct?

2    **A.**  I think they looked at what would happen if you

3    eliminated test scores.  Right.

4    **Q.**  They considered the possibility of eliminating

5    standardized test scores as a race-neutral alternative,

6    correct?

7    **A.**  Correct.

8    **Q.**  That's not one that you proposed, correct?

9    **A.**  Correct.

10   **Q.**  They also considered eliminating the admissions tip for

11   athletes, correct?

12   **A.**  I believe that's true.

13   **Q.**  And as you said, for reasons you've described, you didn't

14   think that was workable, correct?

15   **A.**  Correct.

16   **Q.**  And then the committee sat back and looked at the impact

17   of the race-neutral alternatives alone or in combination on

18   the backgrounds, experiences, and interests of its students,

19   correct?

20   **A.**  Backgrounds, interests, and experience?  I'm trying to

21   think through those terms, but that sounds right.

22   **Q.**  Right.  And what they did is they evaluated the impact

23   that any one of these race-neutral alternatives, alone or in

24   combination, would have on the Harvard student community and

25   the broader Harvard community, correct?

1    **A.**  That's correct.

2    **Q.**  And it evaluated whether any of those race-neutral

3    alternatives, alone or in combination, would be consistent

4    with Harvard's institutional commitments and goals, correct?

5    **A.**  That's correct.

6    **Q.**  And you agree that that's an appropriate consideration

7    for a university like Harvard, correct?

8    **A.**  Yeah.  Broadly speaking, yes.

9    **Q.**  Broadly speaking, a university should identify its goals

10   and then determine whether in pursuing those goals what

11   impact you were having on your students, your faculty, your

12   staff, right?

13   **A.**  I guess I say "broadly speaking" because, you know, if

14   a -- if a university said it's in our interests to have no

15   black students or something, you wouldn't just give a

16   university carte blanche on these issues.

17   **Q.**  Harvard hasn't said that, has it?

18   **A.**  No.  But I wanted to make sure I was answering your

19   question accurately.

20   **Q.**  I appreciate it.  I just want to be sure that broadly, as

21   you've used the term, Harvard is considering the right

22   things.  It's correct in considering its goals, correct?

23   **A.**  Right.

24   **Q.**  You're rightly suggesting that its goals are not subject

25   to its complete discretion.  Someone needs to take a look at

1    them, correct?

2    **A.**   Correct.

3    **Q.**   It is doing the right thing in evaluating the pursuit of

4    its goals and the impact upon the community, including

5    students, faculty, and staff, correct?

6    **A.**   Yes.

7    **Q.**   And they have to do that evaluation fairly and squarely,

8    correct?

9    **A.**   Correct.

10   **Q.**   And evaluating race-neutral alternatives, the job of

11   people who are administrators like Dean Smith, like Dean

12   Khurana, like Dean Fitzsimmons is to do that evaluation and

13   to come to some conclusion as to whether the race-neutral

14   alternatives can achieve the university's goals, correct?

15   **A.**   That's correct.

16   **Q.**   Now, one of the goals that it's appropriate for a

17   university to have is maintaining its academic excellence, as

18   you said to Mr. Strawbridge, correct?

19   **A.**   That's correct.

20   **Q.**   And it's also a legitimate goal to maintain the diversity

21   in many different ways of its class, correct?

22   **A.**   Correct.

23   **Q.**   Now, would you agree that it was appropriate for the

24   committee to consider the impact of race-neutral alternatives

25   on the extracurricular achievement of the incoming class?

 1    **A.**   I think that's one factor that's fair to look at.

 2    **Q.**   I agree.  Would you agree with me that it was appropriate

 3    for the committee to consider the impact of race-neutral

 4    alternatives on the academic excellence of the class?

 5    **A.**   Yes.

 6    **Q.**   You're familiar, as you told Mr. Strawbridge, with what

 7    Harvard calls the academic rating, correct?

 8    **A.**   Yes.

 9    **Q.**   And you talked to him about academic ratings of 1s and

10    2s, correct?

11    **A.**   That's correct.

12    **Q.**   Now, Harvard uses the academic rating to evaluate the

13    academic potential of individual students, correct?

14    **A.**   Correct.

15    **Q.**   And you understand that the academic rating is not just a

16    formula based upon grades and board scores, correct?

17    **A.**   Correct.

18    **Q.**   It takes into account qualitative considerations like

19    intellectual capacity, creativity, intellectual curiosity,

20    correct?

21    **A.**   That's correct.

22    **Q.**   And you agree that it's appropriate for Harvard to

23    consider all of those things, correct?

24    **A.**   That's correct.

25    **Q.**   And it also might include faculty evaluation of the

1    student's work, correct?

2    **A.**    Yes.

3    **Q.**    Teacher recommendation?

4    **A.**    Yes.

5    **Q.**    The guidance counselor recommendation?

6    **A.**    Appropriate, yes.

7    **Q.**    All of those things, qualitative and quantitative, go

8    into the academic rating, correct?

9    **A.**    That's correct.

10    **Q.**    And it would be appropriate for the RNA committee, the

11    Smith committee, to look at the impact any of these

12    race-neutral alternatives would have on the academic rating

13    of the class, correct?

14    **A.**    I think it's one of the factors they should look at, yes.

15    **Q.**    Fair enough.  One of the factors.

16          But clearly for an institution of higher learning,

17    academic excellence is at least an important factor, correct?

18    **A.**    Yes.

19    **Q.**    Now, I want to return to Simulation Number 6, which is

20    your Simulation C from your testimony earlier today.  You

21    said that Simulation 6 was particularly viable because

22    Harvard could maintain its academic excellence while

23    promoting high levels of overall racial, ethnic, and

24    socioeconomic diversity, correct?

25    **A.**    That's correct.

1    **Q.**  So let's focus on that simulation, if we could.  If it

2    helps you, let me turn you to Tab 24 in your notebook.

3    **A.**  I'm there.

4    **Q.**  Do you find the card "Rebuttal Report"?

5    **A.**  I do.

6    **Q.**  Which you've seen before, correct?

7    **A.**  Yes.

8    **Q.**  Turn to page 96, which is Exhibit 26.  Do you have that

9    before you?

10   **A.**  I do.

11   **Q.**  I'm going to blow up the portion that is entitled

12   "Fraction With Profile Rating of 1 and 2."

13          Do you see that?

14   **A.**  I do.

15   **Q.**  Now, you correctly told us that a small fraction of the

16   applicant pool gets a 1, correct?

17   **A.**  Correct.

18   **Q.**  It's less than 100 people a year, correct?

19   **A.**  That's right.

20   **Q.**  But there are many people who are admitted who get a 2.

21   There have to be if there are only 100 1s, correct?

22   **A.**  As I said 80 percent of the 2s are rejected, but some of

23   them get in.

24   **Q.**  If there are only 100 1s and all the 1s don't get in,

25   there are an awful lot of 2s that are getting in, correct?

Case: 19-2005    Document: 00117631840    Page: 152    Date Filed: 07/29/2020    Entry ID: 6356388
Case 1:14-cv-14176-ADB    Document 638    Filed 04/18/19    Page 140 of 231

140

1    **A.**   2s, some 3's.

2    **Q.**   Fair enough.  I agree.  Fair enough.

3            So do you see that we have the fraction of the

4    profile rating of 1 and 2 in lines 10, 11, 12, and 13?  Do

5    you see the profile ratings?

6    **A.**   I do.

7    **Q.**   And for your Simulation Number 6 or your Simulation

8    Number C, the portion of the class receiving a 1 or 2 would

9    decrease from 76 percent, which I'll highlight now, to

10   61 percent.

11   **A.**   That's correct.

12   **Q.**   Correct?

13   **A.**   Yes.

14   **Q.**   And the RNA committee looked at those numbers from

15   Dr. Card's model and from your report, correct?

16   **A.**   Yes.

17   **Q.**   And they said that as an academic matter, decreasing the

18   number of people in the class by literally 20 percent, if you

19   go from 76 percent to 60 percent, a 20 percent decrease in

20   the number of people with 1s and 2s was not acceptable to

21   them, correct?

22   **A.**   That's what they said.  I disagree.

23   **Q.**   Fair enough.  You disagree.

24           But the RNA committee said that a decrease from

25   76 percent to 61 percent would be academically unacceptable

1    to them, correct?

2    **A.**   So they couldn't point to SAT's because they are at the

3    98th percentile.  So instead they talked about the 1s and 2s.

4        One thing I think they're missing here is that in

5    the rating system, the disadvantages that students face is

6    factored into some of these ratings but not into -- there's

7    nothing in the handbook about looking at obstacles overcome

8    in the academic rating.  So I think these numbers have to be

9    considered in context.

10   **Q.**   Let me ask you a couple of questions about that, then.

11       First, we can agree upon the numbers.  There's a

12   decrease from 76 percent to 61 percent, correct?

13   **A.**   Yes.

14   **Q.**   Your simulations that you testified to Her Honor about

15   earlier today address the issue of academic excellence by

16   focusing on SAT scores, correct?

17   **A.**   SATs and grades.

18   **Q.**   Right.  And you know that Harvard doesn't admit students

19   just on the basis of SAT scores and grades, correct?

20   **A.**   That's correct.

21   **Q.**   All of the qualitative information that you and I

22   discussed that goes into the academic rating -- teacher

23   recommendations, guidance counselor recommendations, faculty

24   reviews, academic, demonstrated intellectual curiosity -- all

25   of those qualitative factors go into these ratings, correct?

1    **A.**   That's correct.

2    **Q.**   What the RNA committee said, and I understand you

3    disagree, was that for us, we think this would be

4    unacceptable.  That's what they said, correct?

5    **A.**   That's what they said, yes.

6    **Q.**   Okay.  So I want to ask you about this.  And I'm getting

7    close to the end.  You said you've read some of the

8    transcripts, correct?

9    **A.**   That's correct.

10   **Q.**   And have you read the criticism of the Smith committee as

11   something undertaken not in good faith and a sham?

12   **A.**   I didn't use the word "sham" in my report.

13   **Q.**   My question was, have you heard SFFA say those words in

14   this courtroom?

15   **A.**   I haven't been here.  I've reviewed the transcript.  I

16   didn't see "sham."

17   **Q.**   Now, you would agree with me that Dean Smith, Dean

18   Khurana, and Dean Fitzsimmons have more than 40 years of

19   experience as faculty members at Harvard, correct?

20   **A.**   I think the issue isn't experience.  It's more are you

21   grading yourself.  I think that's what's --

22   **Q.**   Mr. Kahlenberg, my question is, would you agree with me

23   that the three of them have 40 years of experience?

24   **A.**   This is an experienced group.

25   **Q.**   They have more than -- close to 50 years of experience as

1    administrators at a major private university, correct?

2    **A.**   That sounds right.

3    **Q.**   They met on seven occasions over nine months, correct?

4    **A.**   Yes.

5    **Q.**   They reviewed literature, like you, correct?

6    **A.**   The report says that they reviewed literature.

7    **Q.**   They reviewed expert reports, correct?

8    **A.**   That's what their report says.

9    **Q.**   They issued a 19-page report, correct?

10    **A.**   That's correct.

11    **Q.**   Which you described in your report as disingenuous.  Do

12    you recall that word in your report?

13    **A.**   I don't recall saying that, but it was --

14    **Q.**   It's in your report.

15    **A.**   It was a -- I think what bothered me was that we had this

16    Ryan committee --

17    **Q.**   Mr. Kahlenberg, did you use that term or not?

18    **A.**   I may have, but --

19    **Q.**   Now, I just want to make sure that we got this right.

20    The work of these faculty members, these administrators over

21    nine months, reviewing all of this work is, according to you,

22    not to be relied upon, correct?

23    **A.**   I did not find it convincing.

24    **Q.**   But your opinion, which just happens to be identical to

25    the opinion you gave to Fox News the day after this complaint

1  was filed, is reliable.  Is that your testimony?

2  **A.**  I don't think my opinion is identical to the Fox News

3  opinion in any --

4  **Q.**  Someone else will judge that.  Your opinion is reliable

5  and their work is not.  That's your best judgment, right,

6  sir?

7  **A.**  I did not find their report convincing.  I mean, there

8  was evidence --

9  **Q.**  Mr. Kahlenberg, can you answer my question?

10  **A.**  Yes.

11  **Q.**  At the end of the day after all of this, your opinion --

12  and we'll make a judgment as to whether it's the same as that

13  in your Fox News interview or not.

14       Your opinion is to be relied upon, but all of their

15  work is not.  That's your best judgment.  Correct, sir?

16  **A.**  My best judgment is that in looking at the data on the

17  results of the ability of Harvard to use race-neutral

18  alternatives is -- I mean, the evidence laid out in my

19  reports is far more persuasive than the committee's

20  renderings.

21  **Q.**  So that would be a yes.  That's your best judgment,

22  correct, sir?

23  **A.**  Yes.  That's my best judgment.

24       MR. LEE:  Thank you.  Nothing further, Your Honor.

25       MR. STRAWBRIDGE:  No more questions, Your Honor.

**JA1602**

```
 1              THE COURT:  You're excused.

 2              THE WITNESS:  Thank you.

 3              MR. LEE:  Your Honor, if we could have a minute.

 4    Ms. McGrath is out there.

 5              THE COURT:  Absolutely.  I'm happy to take a recess

 6    if you want.

 7              MR. LEE:  Your Honor, we're working on a notebook

 8    from last Friday.

 9              THE COURT:  I have it.  Just to remind you, you're

10    under oath still.

11              THE WITNESS:  Yes.  Thank you.

12              (MARLYN MCGRATH previously sworn by the Deputy

13    Clerk.)

14                     EXAMINATION (resumed)

15    BY MR. LEE:

16    Q.  Good afternoon, Ms. McGrath.

17    A.  Good afternoon.

18    Q.  Welcome back is the best I can do.

19    A.  Thank you.

20    Q.  When we suspended last Friday, we were talking about

21    training materials.  Do you recall that?

22    A.  I do.

23    Q.  And you were describing the training that new admissions

24    officers and old admissions officers go through at the

25    office.  Do you recall that?
```

1    **A.**  I do.

2    **Q.**  And we were just about to start with written materials

3    that are provided to admissions officers.  Do you remember

4    that?

5    **A.**  Yes.

6    **Q.**  So turn, if you would, in Tab 2 of your notebook to DX5.

7    **A.**  I have two notebooks.  I guess this is the one that says

8    "McGrath Exhibits" or "Direct Exhibits."  I think it must be

9    the latter.  Would you repeat the number again?  I'm sorry.

10   I've already forgotten it.  D2?

11   **Q.**  Tab 2.

12   **A.**  I have D25.

13           MR. LEE:  Your Honor, may I approach?

14           THE COURT:  Yes.

15           THE WITNESS:  Thank you.  I have that.

16   BY MR. LEE:

17   **Q.**  Do you have DX5 before you?

18   **A.**  Yes.

19   **Q.**  What is it?

20   **A.**  It is the interviewer handbook for 2013-2014.

21   **Q.**  To whom is it provided?

22   **A.**  It's provided fundamentally to the alumni interviewers

23   and other interviewers.  It's chiefly alumni interviewers

24   around the world who interview -- whenever possible interview

25   candidates for admission.  We use it as here in the training

1    materials for our regular new staff when they arrive and for

2    others who would find it helpful to have a somewhat detailed

3    account of what we hope interviewing will achieve and how to

4    achieve it, a guide to how to achieve it.

5    **Q.**   Turn, if you would, to the page that has number .009 in

6    the bottom in the middle.

7    **A.**   Yes.

8    **Q.**   Do you see the category that refers to distinguishing

9    excellences?

10   **A.**   Yes, I do.

11   **Q.**   We've seen this before, so I am only going to ask you a

12   few questions.

13            What are distinguishing excellences in the Harvard

14   admissions process generally?

15   **A.**   Generally distinguishing excellence or excellences are

16   the features of a candidacy, the aspects of a person who's

17   applying that would receive positive attention from our

18   committee, features of the case that would help that person,

19   him or her, stand out against a sea of very qualified

20   candidates.

21   **Q.**   And in the pages that follow, are there factors that

22   might be used as tips in the process?

23   **A.**   Yes.

24   **Q.**   Now, we've gone through these with Dean Fitzsimmons, so

25   I'm not going to go through them individually.

Case: 19-2005    Document: 00117636840    Page: 160    Date Filed: 07/29/2020    Entry ID: 6356388
Case 1:14-cv-14176-ADB    Document 630    Filed 04/18/19    Page 148 of 231

148

1              But as director of admissions, I just want to ask

2    you this:  Are the tips listed in the interviewer handbook

3    the only factors the admissions office gives tips for?

4    **A.**   No.  Generally it's an overview.

5    **Q.**   Does any one tip guarantee admission?

6    **A.**   No one tip guarantees admission.

7    **Q.**   Can the presence of a tip make an important difference in

8    an admission decision?

9    **A.**   Yes, it may.

10   **Q.**   Do you see the last tip which is geographic, ethnic, or

11   economic factors?

12   **A.**   Yes.

13   **Q.**   Do some applicants receive a tip for race?

14   **A.**   Yes, some do.

15   **Q.**   As director of admissions, why do you believe it's

16   important that a tip be given for race?

17   **A.**   Our applicant pool is very strong.  The top half or top

18   portion of the applicant pool are quite easy to make a very

19   strong case for.  And one of the factors, race, for example,

20   that can set a candidate apart can be very clarifying and

21   helpful to us.  So that tip is to help us follow more

22   energetically otherwise very strong candidate through the

23   process.  That tip of course may not, even if it's present

24   for a good candidate, may not be sufficient for admission,

25   but it will help us keep the attention at a high level.

1    **Q.**  Is race ever a negative tip?

2    **A.**  No.  Race is never a negative tip.

3    **Q.**  Turn to Tab 3 in your binder.

4    **A.**  Yes.

5    **Q.**  Do you find DX3?

6    **A.**  Yes.

7    **Q.**  What is DX3?

8    **A.**  DX3 is a typical example of a new-staff training schedule

9    for people who have just joined the office as admissions

10   officers or as financial aid officers who will be carrying an

11   admissions load.

12   **Q.**  And in the materials that follow in DX3, what are the

13   materials that are included behind the new-staff training

14   schedule?

15   **A.**  There are further schedules, further lists of topics.  A

16   good deal of administrative information about what various

17   members of the staff do and what their initials mean and what

18   their assignments are.  And there are some more qualitative

19   memos also included.  Generally speaking, what this is is the

20   stuff that we hand -- along with the interviewer handbook

21   that you mentioned earlier, the material that we hand new

22   people to work with for basically the first four weeks in the

23   office.

24              MR. LEE:  Your Honor, we offer DX003.

25              MR. MORTARA:  No objection, Your Honor.

1              THE COURT:  Admitted.

2              (Defendant Exhibit No. DX003 admitted.)

3    BY MR. LEE:

4    **Q.**  Turn, if you would, to page 0009 in the bottom center.

5    At the top it's dated January 2015.

6    **A.**  Is this DX00 --

7    **Q.**  I'm sorry.  It's DX003.0009.

8    **A.**  Yes.  I can get there.  Thank you.

9    **Q.**  Let me know when you're there.

10   **A.**  Yes.  I'm there.

11   **Q.**  And do you see it's dated January 2015?

12   **A.**  Yes.

13   **Q.**  What is this?

14   **A.**  That is what I would describe as a tune-up schedule.

15   That's a schedule of meetings and events we expect new

16   members of the staff, the people who have typically begun in

17   the fall.  We expect them to come to this because it's a help

18   to them.  It's the week in which we teach them how to handle

19   regular action.

20             The first thing that happens to the new admissions

21   officer with respect to the cycle of selection is the early

22   action process which takes place in the fall.  When we get to

23   this one, January 2015, that year, this is to help them

24   manage the adjustment -- frankly, the operational adjustment

25   of how far to handle the volume that comes to us in regular

1    action.

2    **Q.**  Turn, if you would, to Tab 4 in your binder.

3    **A.**  Yes.  I am there.

4    **Q.**  Do you find DX16?

5    **A.**  Yes.

6    **Q.**  What is DX16?

7    **A.**  DX16 is a document called "Reading Procedures For the

8    Class of 2017."

9          May I comment that I've always thought that was a

10   somewhat unfortunately title?  It isn't much of a guide to

11   reading.  It's mostly a procedure for coding information, but

12   it does have some information about reading folders.

13            MR. LEE:  Your Honor, we offer DX16.

14            MR. MORTARA:  No objection.

15            THE COURT:  Admitted.

16            (Defendant Exhibit No. DX16 admitted.)

17   BY MR. LEE:

18   **Q.**  Turn, if you would, to Tab 5 in your binder.

19   **A.**  I'm there.

20   **Q.**  What is it?

21   **A.**  That is a casebook, as we call it.

22   **Q.**  And what is a casebook at the Harvard admissions office?

23   **A.**  A casebook is a group, as always, of cases boiled down to

24   manageable size.  They're actual people's cases redacted so,

25   we hope, that the identifiers are erased.  But in every case,

Case: 19-2005    Document: 00117631840    Page: 164    Date Filed: 07/29/2020    Entry ID: 6356388
Case 1:14-cv-14176-ADB    Document 638    Filed 04/18/19    Page 152 of 231

152

1    each detail of that case is part of an actual case.

2            In other words, we don't put them together, though

3    it's tempting to do it.  We use them for training.  We use

4    them here for training for new admissions people.

5            We also use them for alumni when we're trying to

6    orient them better about how interviews and other factors of

7    admissions are used.  We sometimes use them with school

8    personnel when they wish to understand our process better.

9    So it's a series of teaching devices.

10           MR. LEE:  Your Honor, we offer DX2.

11           MR. MORTARA:  No objection.

12           THE COURT:  Admitted.

13           (Defendant Exhibit No. DX2 admitted.)

14   BY MR. LEE:

15   Q.  Now, I know last Friday seems like a long time ago, but

16   when you and I were discussing written materials that are

17   used for training, is the casebook one of the written

18   materials that's used for training?

19   A.  Yes, it is.

20   Q.  As you use the casebook for training, is there a document

21   that is a guide to how the casebook is to be used for

22   training?

23   A.  Yes.  There's a document to assist the person running the

24   session in the discussion.

25   Q.  So turn to Tab 6, if you would, and tell me when you're

1    there.

2    **A.**   I am there.

3    **Q.**   Do you find DX24?

4    **A.**   Yes.

5    **Q.**   And what is it?

6    **A.**   That's the discussion guide to help the facilitator of

7    the casebook.

8            MR. LEE:  Your Honor, we offer DX24.

9            MR. MORTARA:  No objection.

10           THE COURT:  Admitted.

11           (Defendant Exhibit No. DX24 admitted.)

12   BY MR. LEE:

13   **Q.**   Director McGrath, I'd like you to help us just understand

14   how the cases are used to do the teaching and to put the two

15   exhibits together.  Okay?

16   **A.**   Yes.

17   **Q.**   In the casebook and discussion guide, are there cases

18   where the applicant's race or ethnicity is listed?

19   **A.**   Yes.

20   **Q.**   Are there cases where it's listed as a plus factor?

21   **A.**   Yes.

22   **Q.**   Are there cases where the candidate's race or ethnicity

23   was the only factor leading to admission?

24   **A.**   No.

25   **Q.**   Have you heard of the concept of a pause factor?

Case: 19-2005    Document: 00117631840    Page: 166    Date Filed: 07/29/2020    Entry ID: 6356388
Case 1:14-cv-14176-ADB   Document 638   Filed 04/18/19   Page 154 of 231

154

 1    **A.**  Yes.

 2    **Q.**  What is a pause factor in the Harvard admissions process?

 3    **A.**  As far as I'm concerned -- and this process is used only

 4    in these discussion guides -- they are questions that have

 5    arisen in the reading and perhaps discussion of the case that

 6    may, as we say, slow us down.  They are questions that need

 7    further information, further examination, or just further

 8    discussion and consideration.

 9    **Q.**  For those candidates in the discussion -- I'm sorry.

10    Withdrawn.

11           For those candidates in the casebook who identified

12    race or ethnicity, were they all admitted?

13    **A.**  No.

14    **Q.**  So let's take two examples, and I'd like you to help the

15    Court understand how the case studies are used to train

16    admissions officers.  Okay?

17    **A.**  Yes.

18    **Q.**  In Tab 5, turn, if you would, to page 89.

19           This is one of the cases used for training

20    purposes?

21    **A.**  Yes.  I have that here.

22    **Q.**  Now, is the information presented on this page based upon

23    on actual applicant to Harvard?

24    **A.**  Yes, it is.

25    **Q.**  But it has been anonymized in a way so people can't

1    recognize precisely who she is, correct?

2    **A.**  Yes.  We hope not.

3    **Q.**  What information was provided to the admission's

4    committee about Grace's ethnicity?

5    **A.**  The school from -- Grace is the candidate's name.  It

6    tells us what school she's from, and it tells us a little bit

7    about the school, day school, which grades, and so on, on the

8    West Coast.  Good school.  100 percent of the students go to

9    university.  It tells us her ethnicity, which she tells us is

10   Chinese and Afro-Caribbean.

11   **Q.**  Let me pause you there.

12          So that's a self-identification of her ethnicity,

13   correct?

14   **A.**  Yes.

15   **Q.**  Now, I'm not going to go through everything here, but on

16   this page is there information presented in the case study on

17   the occupation of Grace's parents?

18   **A.**  Yes.

19   **Q.**  What does it say about the occupation of Grace's parents?

20   **A.**  It says that her mother, who has a high school degree, is

21   a child care worker.  And it says that her father, who is a

22   psychiatric aide, has some college education.

23   **Q.**  Does Harvard consider parental occupation in evaluating

24   candidates?

25   **A.**  In the context of a case, we often do.

Case: 19-2005    Document: 00117631846    Page: 168    Date Filed: 07/29/2026    Entry ID: 6356388
Case 1:14-cv-14176-ADB    Document 638    Filed 04/18/19    Page 156 of 231

156

1  **Q.**  Staying with this page, is there information on Grace's

2  intended career?

3  **A.**  She tells us that she wants to study engineering.  And

4  there's a little more information on that because she tells

5  us that she has absolute certain commitment to that.  We ask

6  people to rate that 1 to 5.  She's a 1.  She also tells us

7  that she wishes to pursue a career in government and

8  politics, and that she is committed to that at a level of 2.

9  **Q.**  Now, an intended career is something that you may

10  consider in the admissions process, correct?

11  **A.**  We may.

12  **Q.**  Turn, if you would, to pages 92 and 93 of the case

13  notebook.  Let me go back to the page you were just on and

14  highlight the SAT scores.

15  **A.**  Her SAT scores were 720, 700, 690, verbal, math, and

16  writing.

17  **Q.**  So good but not perfect, correct?

18  **A.**  No.  Not perfect.

19  **Q.**  Let's go to page 92 to 93.  What do you find at page 92

20  to 93 of the casebook?

21  **A.**  Yes.

22  **Q.**  Are you at pages 92 and 93 of the casebook?

23  **A.**  Yes.

24  **Q.**  Let me turn you to the -- these are pages from the

25  secondary school report, correct?

Case: 19-2005    Document: 00117636840    Page: 169    Date Filed: 07/29/2020    Entry ID: 6356388
Case 1:14-cv-14176-ADB   Document 638   Filed 04/18/19   Page 157 of 231

157

1    **A.**   Yes.

2    **Q.**   Turn, if you would, to 93.

3             In the case study based upon the actual student,

4    let's look at the last paragraph on 93 and see what the

5    secondary school report says about her personal qualities.

6             Could I have Mr. Lee highlight the portion that

7    begins "Extremely compassionate, gentle, warm nature" and the

8    sentence that follows.

9             "Grace is a person of the highest integrity who is

10   not afraid to defend her values and to speak out against

11   injustice and wrongdoing at any forum, whether it is an

12   assembly or public meeting.  Her delivery is always gracious,

13   forthright, and sincere."

14            Two questions.  Is this the kind of information

15   that you use in assessing the personal qualities of an

16   applicant?

17   **A.**   Yes, it is.

18   **Q.**   Is this guidance counselor recommendation the type of

19   document you use to train your admissions officers on what to

20   be looking for?

21   **A.**   Yes.  This is an example of something we hope to get from

22   a school.

23   **Q.**   Turn, if you would, to page 94 and to the teacher

24   recommendation.

25   **A.**   Yes.

1    **Q.**  I'll ask Mr. Lee to blow up the first paragraph.

2          Do you see the sentence which reads, "Her strength

3    of character has inspired me to more frequently take a

4    stand"?

5    **A.**  Yes.

6    **Q.**  It goes on to say, "Grace challenges me to be the best

7    person I can be."

8    **A.**  Yes.

9    **Q.**  Is that the type of information you use in evaluating the

10   personal qualities of an applicant?

11   **A.**  Yes.

12   **Q.**  Is it the type of information you use to train your

13   admissions officers on what's important to the personal

14   qualities of an applicant?

15   **A.**  Yes.

16   **Q.**  Turn, if you would, to page 96.  Is this the second

17   teacher recommendation?

18   **A.**  Yes.

19   **Q.**  And go down to the second paragraph.

20   **A.**  Yes.

21   **Q.**  Actually third paragraph.  Do you see the sentence that

22   reads, "She has a larger-than-life personality, strong moral

23   character, and natural charisma that have made her an

24   exemplary leader"?

25   **A.**  Yes.

**JA1616**

1    **Q.**  Again same questions.  Are those the type of qualities

2    you're looking for, personal qualities, in an applicant to

3    Harvard?

4    **A.**  Yes.

5    **Q.**  Is this one of the cases you use to train people on what

6    you're looking for?

7    **A.**  Yes.

8    **Q.**  Now, Director McGrath, are there written guidelines on

9    how you're supposed to precisely judge strong moral

10   character?

11   **A.**  No.  We do not have written guidelines for that.

12   **Q.**  Are there written guidelines on how you gauge natural

13   charisma?

14   **A.**  No.

15   **Q.**  Or likability?

16   **A.**  No.

17   **Q.**  Or courage?

18   **A.**  No.

19   **Q.**  Or integrity?

20   **A.**  No.

21   **Q.**  Now, turn, if you would, to Tab 6.  I want to go to now

22   what the discussion guide tells the trainer on what he or she

23   should be teaching the admissions officer.  Do you have that?

24   **A.**  Yes.

25   **Q.**  And if we turn to page 12, can you tell Her Honor what's

```
 1    on page 12?
 2    A.   This is the discussion guide.  And these are the points
 3    that ideally a good discussion would be used for
 4    conversational purposes, for assessment purposes by the
 5    committee that you're trying to teach, the mock committee
 6    that you're trying to teach, whether it's new admissions
 7    officers or guidance counselors or people who interview for
 8    us.  So these are the points that we would like not to leave
 9    the room without making.
10    Q.   And so I won't go through them all, but under "Appeal,"
11    these are positive factors that someone should find in the
12    file, correct?
13    A.   Yes.
14    Q.   And one of them was, "Unusually appealing personal
15    qualities echoed throughout the entire application."
16    Correct?
17    A.   Yeah.
18    Q.   And a third was, "From a very modest socioeconomic and
19    ethnic background that we also don't see often in our student
20    body.  She would bring a unique life experience to Harvard,
21    and she seems eager to share her story and learn about others
22    in the process."
23    A.   Yes.
24    Q.   Now, under "Pause Factors," you told me pause factors are
25    things that you should consider that might cause you to
```

1    pause, correct?

2    **A.**   Yes.

3    **Q.**   And one of the pause factors was her test scores,

4    correct?

5    **A.**   Yes.

6    **Q.**   And then under "Other Information For Your Committee,"

7    the first sentence reads, "This case, unlike most in the

8    casebook, is a clear admit."  Correct?

9    **A.**   Yes.

10   **Q.**   And is that what you have tried to teach your admissions

11   officers?

12   **A.**   Yes.  We've tried to give them a model of something

13   that's undeniably very strong, comparatively.

14   **Q.**   And in fact, was Grace admitted?

15   **A.**   She was.

16   **Q.**   Whoever Grace is.

17   **A.**   She was.

18   **Q.**   Let's turn to another example of someone was not

19   admitted.  Turn, if you would, back to Tab 5 to DX2, and I'm

20   going to go to page 0101.

21          Do you have that before you?

22   **A.**   Yes.

23   **Q.**   The name is Peter Duran, a name made up for the teaching

24   guide, correct?

25   **A.**   Yes.

1    **Q.** Did he identify ethnicity?

2    **A.** He did.

3    **Q.** What did he identify?

4    **A.** He identified Hispanic from Guatemala and Caucasian.

5    **Q.** Now, if we go down to his class rank and SATs, could you

6    describe his academic -- his quantitative academic

7    qualifications?

8    **A.** His grades are very good.  He's in the top 95 percent of

9    his class of 700 people.  His scores, his SAT 1 scores are

10   800, 760, and 800.  And in addition to that, he has three

11   800's on subject tests, SAT IIs, and a 780 in physics.

12   **Q.** So by comparison to Grace, his scores were actually

13   stronger, correct?

14   **A.** He has higher scores.

15   **Q.** Now, let's go a little bit further down the page and look

16   at extracurricular activities.  The first two are university

17   IWST and first robotics team captain.  Do you see that?

18   **A.** I do.

19   **Q.** And if we turn over one page to page 0102 --

20   **A.** Yes.

21   **Q.** -- there is a section called "Activities Most

22   Meaningful."

23   **A.** Yes.

24   **Q.** And what does Peter write about?

25   **A.** He writes about his robotics team.  He was the captain or

1    leader of this team, and they did very well in a regional

2    competition.  He's clearly very excited about doing the work

3    and also, I think, about the teamwork aspect of it.  He tells

4    us about it in that little paragraph.

5    **Q.**  Now, let's turn to the discussion guide to see what the

6    teaching guide says about how you use this case study.

7    **A.**  Yes.

8    **Q.**  It would be at Tab 6, DX24, page 13.

9    **A.**  Yes.

10    **Q.**  Do you have that before you?

11    **A.**  I do.

12    **Q.**  Now, there is a section called "Appeal," correct?

13    **A.**  Yes.

14    **Q.**  Is there a note made about his ethnicity under one of the

15    factors that is an appealing factor for this candidate?

16    **A.**  Yes.

17    **Q.**  What does it say?

18    **A.**  "Peter's mixed race background is underrepresented at

19    elite colleges and is a growing demographic in the United

20    States."

21    **Q.**  Now, under "Pause Factors" there are a couple.

22    **A.**  Yes.

23    **Q.**  What does the first pause factor say about his academic

24    performance?

25    **A.**  It says that he's a strong student but that it's hard to

164

1    distinguish him from other strong students, of whom we have

2    many.  He would not be called what we call a 1 academic; that

3    is, somebody who is truly quite unique, relatively rare in

4    our process.

5    **Q.**  And for extracurriculars?

6    **A.**  And those look modest compared to lots of other people's

7    activities.  They themselves may not be a plus in the case.

8    **Q.**  And if we go down to "Action," Peter was discussed at

9    subcommittee, correct?

10   **A.**  Yes.

11   **Q.**  Discussed at the full committee, correct?

12   **A.**  Yes.

13   **Q.**  But ultimately what was the decision?

14   **A.**  He was not admitted.

15   **Q.**  And we've looked at a couple of cases now, both of which

16   self-identify race or ethnicity.

17         Are these studies the way that you teach your

18   admissions officers and others how to evaluate personal

19   qualities, race, ethnicity, all of the factors that are

20   described in a file?

21   **A.**  Yes.  This is a principal way we do that.  Intensive

22   conversation, attention to cases.  Whether their case is

23   under discussion or cases as this used for teaching, that is

24   how we teach people to reckon with these factors.

25   **Q.**  So I'd like to take you back now to an actual applicant's

**JA1622**

 1    file.  Turn, if you would, to Tab 1, which is DX276.

 2              MR. LEE:  And Your Honor, I'm going to do the same

 3    thing we did with Dean Fitzsimmons, which is not put it on

 4    the big screen, and take Director McGrath through in a way it

 5    doesn't identify personal information.

 6              THE COURT:  That's fine.

 7    BY MR. LEE:

 8    **Q.**  Do you have it before you?

 9    **A.**  I do.

10    **Q.**  This is an actual application file, correct?

11    **A.**  That is, yes.

12    **Q.**  It's DX276?

13    **A.**  Yes.

14              MR. LEE:  We offer it, Your Honor.

15              MR. MORTARA:  No objection, Your Honor.

16              THE COURT:  Admitted.

17              (Defendant Exhibit No. DX276 admitted.)

18    BY MR. LEE:

19    **Q.**  Now, Director McGrath, we're going to put it on your

20    screen.  You'll have the hard copy.  To protect the privacy

21    of the applicant, we're not going to display it on the other

22    screens.

23    **A.**  Thank you.

24    **Q.**  I would like you to answer my questions in a way that

25    doesn't disclose any information that will identify the

1    candidate.

2    **A.**   Good.  I'll try to do that.

3    **Q.**   I'll try to ask my questions precisely.

4    **A.**   Thanks.

5    **Q.**   Have the profile ratings been completed on this

6    application?

7    **A.**   Yes.

8    **Q.**   Was there a first reader?

9    **A.**   Yes.

10   **Q.**   Was there a second reader?

11   **A.**   Yes.

12   **Q.**   Who was the second reader?

13   **A.**   I was the second reader.

14   **Q.**   Are the initials MEM, you?

15   **A.**   Yes.

16   **Q.**   On what date did you read the file?

17   **A.**   On December 25.

18   **Q.**   Turn, if you would, to page 2 of the application.

19   **A.**   Yes.

20   **Q.**   I'm going to draw your attention to the box MEM on the

21   lower portion of the page.  Do you have that?

22   **A.**   I do.

23   **Q.**   Are those your comments?

24   **A.**   Yes, they are.

25   **Q.**   Now, I think you can read these comments literally

1    without disclosing any information.  So would you?

2    **A.**  Yes.  "Application," it stands for.  "App is moving and

3    offers an appealing sense of him personally.  Plenty of

4    talent and a record of using it effectively."

5    **Q.**  Turn now, if you would, to page .0009.  Do you have that

6    before you?

7    **A.**  I do.

8    **Q.**  What is it?

9    **A.**  It is his personal essay.

10   **Q.**  Now, again, I don't want you to reveal any details.  But

11   is there information in the personal essay that would be

12   relevant to the personal qualities or personal rating of the

13   applicant?

14   **A.**  Yes, there is.

15   **Q.**  Could you describe them for us generally?

16   **A.**  I think I can.  This is an essay.  Stop me if I'm

17   divulging anything.  It's hard to do it separate from the

18   actual.

19          He writes an essay about his memories of a space in

20   the family's residence, in the family's living, that reminds

21   him whenever he's there of the death of his brother who he

22   was very close to.  And he remembers the accident that took

23   his brother's life.

24          And you get by reading this a couple of things,

25   several things.  You get a good, wonderful sense of his

Case: 19-2005    Document: 00117631840    Page: 180    Date Filed: 07/29/2026    Entry ID: 6356388
Case 1:14-cv-14176-ADB   Document 638   Filed 04/18/19   Page 168 of 231

168

1    ability to recall emotion, and the emotion he felt is

2    expressed.  He writes beautifully, which is something we

3    don't see elsewhere in this application so much.

4    **Q.**  Turn, if you would, to page 14.  Do you have that before

5    you?

6    **A.**  I do.

7    **Q.**  What is this?

8    **A.**  It is his optional essay.

9    **Q.**  Did this also provide information about his personal

10   qualities?

11   **A.**  It does.

12   **Q.**  And again in general terms, what does it tell us?

13   **A.**  Well, it tells us something we knew already.  It reminds

14   us that he is a person who loves books and loves reading and

15   loves ideas.  We get that throughout the application and from

16   other people.

17            This second essay gives us as something of a new

18   twist on this.  He created essentially a book club.  He calls

19   it the Ulysses Club because they started off by reading James

20   Joyce.

21            What I remember surprised us in the discussion of

22   this case was his enthusiasm for talking about this book with

23   other students.  So as I think of this case, it's our first

24   sense of how he is with other people, at least in a school

25   and intellectual sense, and it added a dimension.  I think I

1    would call that a personal quality.  Perhaps I'd also call

2    that an academic quality.

3    **Q.**  Turn, if you would, to page 16.

4    **A.**  Yes.

5    **Q.**  What is this page?

6    **A.**  This is his secondary school report.

7    **Q.**  And if you turn to the bottom of the page, is there

8    information that would be relevant to the personal rating?

9    **A.**  There is a chart which is part of that form where the

10    person filling it out, the guidance counselor, for example,

11    is invited to comment on -- to rate academic achievement,

12    extracurricular accomplishments, and personal qualities and

13    character and then overall.  And in each of those cases the

14    person filling this out checked top few, 1 percent, for

15    example.

16    **Q.**  And for personal qualities and character, in particular,

17    rated in the top 1 percent?

18    **A.**  Yes.

19    **Q.**  Turn to the next page, which is page 17.

20    **A.**  Yes.

21    **Q.**  Is this a continuation of the school report?

22    **A.**  Yes, it is.

23    **Q.**  Is there information on this page that would be relevant

24    to the personal rating?

25    **A.**  Yes.  At the very top of that page it asks about

Case: 19-2005    Document: 00117632840    Page: 182    Date Filed: 07/29/2020    Entry ID: 6356388
Case 1:14-cv-14176-ADB   Document 638   Filed 04/18/19   Page 170 of 231

170

 1    disciplinary history.  There is no school discipline as

 2    reported by the counselor.  No criminal history as reported

 3    by the counselor.

 4    **Q.**  Do you see the portion under descriptors.  Brilliant,

 5    kind, kind-hearted, intellectually curious, strong, brave,

 6    responsive, mature?

 7    **A.**  Yes.

 8    **Q.**  Are those important personal qualities to Harvard?

 9    **A.**  Yes.

10    **Q.**  Are there written -- explicit written directions about

11    how to evaluate these qualitative factors?

12    **A.**  You mean to my staff?

13    **Q.**  Yes.

14    **A.**  No.  This is the kind of thing we consider in the context

15    of a case, in the context of discussion.

16    **Q.**  Turn, if you would, to page 22 in the file.  What do you

17    find?

18    **A.**  What we find there is the so-called school letter, the

19    counselor letter of a person who had been the adviser of this

20    student before he left and went to another school.

21    **Q.**  And in the third paragraph, do you see the sentence which

22    reads, "He is one of the kindest students I've met, but his

23    life has been shaped by great tragedy."

24    **A.**  Yes.

25    **Q.**  Is that the kind of information you consider in

 1   evaluating the personal qualities of an applicant?

 2   **A.**   Yes, it is.

 3   **Q.**   Turn to page 26.

 4   **A.**   Yes.

 5   **Q.**   Is this a teacher recommendation?

 6   **A.**   Yes.

 7   **Q.**   Again, does it provide information to you in assessing

 8   the personal qualities of the student?

 9   **A.**   Yes.

10   **Q.**   Now, let me get you to the right place.

11            Let me ask Mr. Lee to highlight the first sentence

12   of the third paragraph.  I'm sorry.  Wrong page.  26.  My

13   fault.  "I watched."

14            Now, there's been some suggestion in this case that

15   the word "quiet" is somehow a stereotype that leads

16   applicants getting rejected.

17            Do you see the sentence that reads here, "I watched

18   student grow from a shy, precocious student who had not found

19   his place in discussion into a confident, quiet leader whose

20   insight and persistent curiosity steered the class at his

21   every turn"?

22   **A.**   Yes.

23   **Q.**   Is that information about his quiet leadership the kind

24   of information that you would consider in the application

25   process?

1    **A.**   Yes.  And it was very important in this case.

2    **Q.**   Now turn back to page 2, and I'm going to refer you to

3    the box at the top of the page that says MEM.

4    **A.**   Yes.

5    **Q.**   What is the comment that you made in that box?

6    **A.**   I said, "A bright all-rounder who could do lots here and

7    if interview is positive might have the chance.  Faculty

8    perspective might help."

9    **Q.**   And you provided your second reader ratings before an

10   alumni interview?

11   **A.**   I did.

12   **Q.**   Before any faculty review?

13   **A.**   Both of those ratings were provided --

14               THE COURT:  While we're on page 2, what is H-U-M,

15   hum?

16               THE WITNESS:  Humanities.

17               THE COURT:  Thank you.

18   BY MR. LEE:

19   **Q.**   Now, if I go back to the first page, the personal rating

20   that you gave to the applicant, let me ask you this:  When

21   you left ratings blank, what did it mean?

22   **A.**   When the chair leaves ratings blank, it means that

23   chairman would not change the ratings given by the first

24   reader.  That's a confirmation, an agreement.

25   **Q.**   The personal here is 3+?

1    **A.**   That was what we thought at the time.

2    **Q.**   As you've given personal ratings over the years, do you

3    consider 3+ a strong personal rating?

4    **A.**   Yes.   That's a good personal rating, very good personal

5    rating.

6    **Q.**   Now, after you reviewed the application, after you

7    provided the ratings, was there, in fact, an alumni

8    interview?

9    **A.**   There was.

10   **Q.**   Turn, if you would, back to page 29.

11   **A.**   Yes.   I have that.

12   **Q.**   Is that the report of the alumni interview?

13   **A.**   Yes.

14   **Q.**   If I could, there's a section of the alumni interview

15   called "Personal Qualities."

16   **A.**   Yes.

17   **Q.**   Do you see the description, "Strong personal appeal and

18   character, openness to new ideas and new people.   Rating:

19   Truly unusual."

20   **A.**   Yes.

21   **Q.**   Important information to you in the evaluation process?

22   **A.**   Yes.   It was helpful.

23   **Q.**   And was there also, in fact, a faculty review of this

24   application?

25   **A.**   Yes, there was.

1    **Q.**  Turn, if you would, to page 41.  Is this redacted

2    document a report of the faculty review of this student's

3    application?

4    **A.**  Yes, it is.

5    **Q.**  And the faculty member reports, "A rare ability to

6    transmit his enthusiasm by sparking interest in others."

7    **A.**  Yes.

8    **Q.**  Important to the personal rating?

9    **A.**  Yes.  Important to the personal rating as well as to the

10   academic rating.

11   **Q.**  To both?

12   **A.**  Yes.

13   **Q.**  Now, how was the admissions decision made for this

14   applicant ultimately?

15   **A.**  It was made with a lot of discussion.  The interview

16   report did help us as well.

17   **Q.**  What was the ultimate decision on this candidate?

18   **A.**  The decision was to admit.

19   **Q.**  Now, just a few more questions, Director McGrath.

20           You've reviewed tens of thousands of applications

21   over the years?

22   **A.**  That's right.

23   **Q.**  How many subcommittee meetings have you attended?

24   **A.**  Hundreds.

25   **Q.**  How many full committee meetings have you attended?

**JA1632**

1    **A.**  Many hundreds.

2    **Q.**  You understand that SFFA has accused your admissions

3    office of intentionally discriminating against

4    Asian-Americans.  Do you know that?

5    **A.**  I understand that.

6    **Q.**  Do you?

7    **A.**  No.

8    **Q.**  And how do you know?

9    **A.**  My perspective on that question is the observation, the

10   chance I've had to observe it at close range for all of these

11   years.  The work of the committee is in the doing of it.  I

12   watch people discuss candidates.  I watch them -- I read what

13   they write about them.  I watch them vote.  I watch them rank

14   people.  So by paying close attention, which is my job, as to

15   how the process works, I see no evidence of discrimination of

16   that kind.

17   **Q.**  Director McGrath, during your 31 years in the admissions

18   office, has the demographic face of Harvard changed?

19   **A.**  Yes, it has.

20   **Q.**  Has the diversity of Harvard College changed under the

21   leadership of Dean Fitzsimmons and you?

22   **A.**  Yes, it has.

23   **Q.**  Have the decisions you made on admissions contributed to

24   that change?

25   **A.**  Yes.

1    **Q.**  Has the racial diversity of Harvard, in particular,

2    changed?

3    **A.**  Yes.

4    **Q.**  Do you view that as a good thing?

5    **A.**  We do.

6    **Q.**  Is Harvard a more robust and inclusive place because of

7    the increased diversity?

8    **A.**  We have learned that that has been true, yes.

9    **Q.**  Are you proud of your work?

10   **A.**  We're proud of the team, alumni and staff and supporters,

11   who have made this possible.

12   **Q.**  Thank you.

13           MR. LEE:  Nothing further, Your Honor.

14           MR. MORTARA:  Just a few minutes to set up, Your

15   Honor.

16           THE COURT:  Whenever you're ready.

17                     FURTHER EXAMINATION

18   BY MR. MORTARA:

19   **Q.**  Hello again, Director McGrath.

20   **A.**  Hello.

21   **Q.**  Did you have a good weekend?

22   **A.**  Yes.  Thank you.

23   **Q.**  I want to talk to you about a few of the things that

24   Mr. Lee was talking to you about with respect to training.

25   And he showed you the casebook and the instruction guide to

1    the casebook.  I'm sure you remember that.  We were just

2    talking about it, right?

3    **A.**  Yes.

4    **Q.**  Put up on the screen defendant's Exhibit 24, which is the

5    guidance to the casebook.  And you talked about how one of

6    the things that is going on with the casebook is your readers

7    are being instructed how to -- I think you said use race in

8    dealing with the applications, right?

9    **A.**  Yes.  How to consider race.

10   **Q.**  Yeah.  And one of the things that you talked about was a

11   couple of specific examples where race came up in the

12   casebook, right?

13   **A.**  Yes.

14   **Q.**  I wanted to go to one of the ones you talked about.  We

15   can choose Grace or Peter.  It's really up to you.  We'll

16   start with Peter.

17          You talked about Peter Duran with Mr. Lee, right?

18   **A.**  Yes.

19   **Q.**  I noticed something about the casebook instructions when

20   I was looking at it as Mr. Lee was talking to you about it,

21   and I was hoping you could illuminate for the Court.

22          What do these numbers mean up here?

23   **A.**  Those numbers are the numbers on the profile.  It might

24   be more clear just to look at them in the context of the last

25   case we talked about, which is an actual case with format.

1    They rate the committees, the readers' assessment of four

2    factors of a candidate's candidacy.

3    **Q.**  And those four factors, if I remember correctly, are

4    academic, extracurricular, athletic, and personal, right?

5    **A.**  Right, yes.

6    **Q.**  Those are the four ratings when you're training people

7    using the casebook.  I guess you discuss the application in

8    the context of these four ratings, right?

9    **A.**  We provide them because that's what the committee

10   considering this actual case at the time gave so that they

11   know where the committee was when they considered the case as

12   candidate.

13   **Q.**  I think you're getting to the help I needed.

14        Is there a discussion when you're using the

15   casebook of the committee and the ratings that were given?

16   **A.**  Really, in my experience in casebooks, it's a discussion

17   of all of those aspects of the case.  I don't remember

18   anybody really talking about the profile itself.  It's just

19   there as a kind of guide.  But yes, one could.

20   **Q.**  I want to just go on what actually happens.  If you don't

21   remember people discussing the profile, that's fine.

22        As far as you can remember in the use of the

23   casebook, is the applicant's race and its relation to these

24   profile ratings ever discussed?

25   **A.**  Not in relation to the profile ratings.

1    **Q.** And I noticed also that one rating doesn't appear in the

2    series of four that I've seen here, and it was on your review

3    of the application that Mr. Lee showed you.  And that's the

4    overall rating, right?

5    **A.** Yes.  It's absent from these I see, yes.

6    **Q.** So there's no discussion during the casebook review of

7    how the overall ratings should be given with respect to race,

8    is there?

9    **A.** The main topic of the discussion that the mock committee

10   or the group using this discussion guide has is what is the

11   overall assessment, competitive assessment of the candidate.

12          So in a sense, it's all about the judgment that

13   goes into calling it a 2- or a 3+.  So that's not there

14   because it's kind of the answer.  It's the sort of place that

15   you hope you will lead that committee to decide.

16   **Q.** So I think what I'm hearing, and correct me if I'm wrong,

17   is that the casebook use is kind of a mock full committee.

18   The ratings are already provided, and you're talking about

19   the case as you would discuss it in full committee.  Is that

20   right?

21   **A.** Yes.

22   **Q.** So it's not an instruction about how to assign the

23   ratings themselves per se.  Is that fair?

24   **A.** It is instruction about how one might.  And often

25   actually subcommittees disagree on some of these points.

 1   That's why it can be a lively discussion, why it's helpful

 2   for training.

 3   Q.   Interesting.  And with respect to race, there's no

 4   explicit discussion of how race should or should not impact

 5   the profile ratings, is that right?

 6   A.   In the course of a discussion of a candidate, there might

 7   well be some attention to that.

 8   Q.   Okay.  Now I want to talk a little bit about the training

 9   that you spoke about with Mr. Lee.  I think first I want to

10   talk about that application, though, that you were looking

11   at.

12           MR. MORTARA:  If we could turn off the gallery,

13   please?

14           THE CLERK:  Yes.

15   BY MR. MORTARA:

16   Q.   This is Defendant's 276, if you want to get the

17   application back out, Director McGrath.  There were some

18   things that you were shown and you were talking about how you

19   go through an application.  I have some questions.  I think

20   you're probably the single person who knows the most about

21   the admissions process.  Would you say that's probably right?

22   A.   I know a fair amount.  I've been doing it for a long

23   time.

24   Q.   I have some questions to ask you.  They're not

25   necessarily all directly related to this application, but

1    since you were talking about how this application was scored,

2    I thought I'd use it as a bouncing off point.

3              I notice that the applicant got an athletic rating

4    of 4.

5    **A.**  Yes.

6    **Q.**  I think you can review the application, but it seems like

7    maybe there wasn't much indication of interest or

8    participation of athletics in the application.

9    **A.**  That's right.

10   **Q.**  My daughter, who is eight, is a figure skater.  And I

11   wanted to know how you look at figure skating.  Just out of

12   curiosity, a nationally ranked figure skater, would they get

13   an athletic rating of 4?

14   **A.**  They might not get an athletic rating since we don't have

15   a figure skating team.  They would certainly get pretty heavy

16   credit for it in the course of the discussion, in the course

17   of the evaluation.

18   **Q.**  Wait.  This is interesting.  You only get an athletic

19   rating if you're participating in a sport that Harvard has a

20   team with, or is that meant to be a rating about your

21   athletics generally?  I'm confused.

22   **A.**  Traditionally that third part of the profile has done two

23   things at once for us.  Its original purpose, as I understand

24   it, before my time was to indicate those cases in which an

25   applicant was recruited by a varsity team.  In other words,

1    something we report to the Ivy League and ultimately to the

2    NCAA.  So it was a way of making it easy to flag in our data.

3          We also, though, try to record other nuance.  For

4    example, a 2 athletic person might be a captain of a team,

5    someone who might even see himself or herself as a walk-on to

6    our teams.  So it's a little bit team oriented.

7          I will say that in the course of the discussion of

8    the past few years that we've had about what could make our

9    rating process better -- we've always been trying to improve

10   it -- there are members of my staff who would think that it's

11   not fair to indicate -- for example, your daughter, were she

12   a candidate and so on and she were still a figure skating

13   champion, we would probably want to record that in some way

14   in that box.

15         Others of us would make her a 1 or a 2+ or

16   something in the extracurricular box, regarding it as an

17   extracurricular activities.  To be honest, there's some

18   flexibility about that.

19   **Q.**  It doesn't go unnoticed, though, just so I can report

20   back home.

21   **A.**  It does not.  It does not go unnoticed.

22   **Q.**  Thank you.  I'm glad we cleared that up.

23   **A.**  We'll be glad to see that when the time comes.

24   **Q.**  Thank you for that, Dr. McGrath.  Thank you for that.

25              THE COURT:  You owe her a consulting fee for that

1    five minutes.

2    BY MR. MORTARA:

3    Q.  I noticed you talked to Mr. Lee about some ratings that

4    were given in connection with one of the school support

5    items, and I've got it up on the screen.

6              Do you remember that?

7    A.  Yes.  Thank you.

8    Q.  If you skip ahead, I think it's 11 pages to 27, you'll

9    see another version of the similar thing in a teacher

10   evaluation.

11   A.  Yes.

12   Q.  And again, these are all things that Harvard considers to

13   be important when they're looking at teacher recommendations

14   and things of that nature, correct?

15   A.  You mean the items in the characteristics and the rating?

16   Q.  Yes.

17   A.  Yes.  That's part of the common application.  We look at

18   those.

19   Q.  I notice this applicant got a bunch of excellents, top

20   10 percent, and on this particular teacher recommendation got

21   a couple of "the top few's."  Do you see that?

22   A.  Yes.

23   Q.  I don't mean to try to mechanize how the teacher support

24   ratings are computed, but if somebody had a lot of those "top

25   few's," they're more likely to get a higher teacher support

Case: 19-2005    Document: 00117632840    Page: 196    Date Filed: 07/29/2020    Entry ID: 6356388
Case 1:14-cv-14176-ADB    Document 638    Filed 04/18/19    Page 184 of 231

184

1    rating.  Is that fair?

2    **A.**  Yes.  The prose is usually -- I think we all find that

3    the prose is more helpful.  This is a way of rating the

4    prose.  This is a way of gauging the prose.

5         If, for example, the letter said this was the best

6    student I ever had, I love her, and then it was checked sort

7    of in the middle or on the left, we would wonder how serious

8    the report was.  Those two things together are more helpful

9    than either one of them is separately.

10   **Q.**  I'm just going to put Plaintiff's Exhibit 1 on the screen

11   and turn the screen off.

12        MR. MORTARA:  Karen, you can reactivate the

13   gallery.

14   BY MR. MORTARA:

15   **Q.**  I'm not going to ask you about Plaintiff's Exhibit 1.  I

16   want to talk to you about a competition for candidates and

17   this question about Harvard's use of something called -- I

18   think it's early action.  Harvard has early -- is it called

19   early action?

20   **A.**  Yes, it's called early action.

21   **Q.**  Early action is when you apply but you're not committing

22   if you get in; is that right?

23   **A.**  That's correct.

24   **Q.**  And Harvard went through a period where it didn't have

25   early action and then brought it back; is that right?

**A.**  Yes.

**Q.**  What were the reasons that Harvard brought back early action?

**A.**  Over time, we thought we were losing some candidates who no matter what we did would not wait.  The reason we went into this hiatus was that we were hoping to encourage other colleges to think that it was viable not to have an early program, to get all students encouraged to think that it was normal to wait until one single period.

We noticed that we had lost the attention of a good number of people who we would have wished to have in the pool.  And our faculty asked us to review the question seriously, whether it was good going forward for us, and we concluded it might not be.  And we returned to what many other colleges still did, which was early action.

Sorry for the long answer, but it was a complicated question.

**Q.**  I'm just a little curious about sort of the thinking behind it.  I can intuit that maybe the thinking behind it was you get all these applications in the fall -- and you spoke with Mr. Lee about how sometimes you get material that comes in later -- maybe if we move everybody to regular action, we'll have more complete files in the first place?

**A.**  That was certainly one consideration we might have thought.  We do a pretty good job with completeness early,

 1  but we always thought more was better and later was better.

 2  Q.  You talked about missing out on some candidates.  Was it

 3  one of the factors that Harvard was missing out on some

 4  really talented minority candidates because they were some of

 5  the people that wouldn't wait?

 6  A.  I don't remember that as a special consideration, but

 7  certainly we were losing out on a number of candidates who

 8  were strong.

 9  Q.  Director McGrath, I wanted to talk to you about the

10  applicant pool.  I know you only read in certain dockets, but

11  do you think you have a pretty good sense of the applicant

12  pool as a whole in all the years you've been doing this?

13  A.  Yes.

14  Q.  I wanted to talk to you a little bit about some of the

15  distributions with respect to race in the applicant pool.

16  A.  I didn't hear you.  Which distributions?

17  Q.  Some of the distributions with respect to race.

18          I'm sorry.  I'm talking quietly.  My team asked me

19  to be a little quieter, actually, if you want to believe

20  that.

21          Are there a lot -- I think it's true that there's

22  many, many, many applicants to Harvard that have stupendous

23  SATs and grades, near-perfect board scores, very highly

24  ranked in the high school class.  Is that right?

25  A.  Yes.

1    **Q.**  I wanted to talk to you about differences there might be

2    in the applicant pool based on race on that subject.

3           Would you agree with me that there are many, many

4    more Asian applicants to Harvard that have incredibly high

5    SAT scores and are close to number 1 in the class than there

6    are under-represented minorities such as blacks and

7    Hispanics?

8    **A.**  You know, I don't have the numbers in front of me, so I'd

9    hate to vouch for that.  My impression is that we have many

10   very highly academically qualified Asian-American applicants

11   by those measures too.

12   **Q.**  Do you think there are more than there are, say,

13   African-American or Hispanic applicants?

14   **A.**  Well, there are large -- there are more people in that

15   pool.

16   **Q.**  So there's just more of them?

17   **A.**  Yes, that's correct.

18   **Q.**  And I want to ask you about your readers and whether you

19   think they're sensitive to certain things.

20          Do you think your readers are sensitive to the fact

21   that African-American applicants, for example, may have faced

22   certain disadvantages in test prep or other things so that

23   when you see an African-American applicant with incredibly

24   high SATs and near perfect grades, they're sensitive to what

25   may have been overcome in reaching that point?

 1    **A.**   In a given case, yes.  Not as a -- I wouldn't say that

 2    the general matter is the question.  In a given case they may

 3    be alert to that possibility.

 4    **Q.**   I guess what I'm asking is are your readers alert to what

 5    may be lying behind the performance or are they obstacles

 6    that may have been placed in somebody before they make those

 7    superstar achievements on something like SATs or grades?

 8    **A.**   We hope and expect that in every case they will do that.

 9    **Q.**   Now I want to finish up talking about the training again.

10          You went through an application that you even

11    reviewed on Christmas.  It looked like that was the one that

12    was on the screen a little while ago, right?

13    **A.**   Yes.

14    **Q.**   I got the impression from your discussion with Mr. Lee

15    and your discussion with me on Friday that you take your job

16    extremely very seriously.

17    **A.**   Yes, I think so.

18    **Q.**   Some of your readers, I think, review application numbers

19    into the thousand or even 1,400 range in a given cycle?

20    **A.**   Yes.

21    **Q.**   Is it possible to spend even 30 minutes or an hour on

22    each application?

23    **A.**   It is, yes, depending on the application.

24    **Q.**   Do your readers do that?  Do you think they spend an hour

25    or 30 minutes looking at every one, or do you think there's

1  some that they can deal with in a more cursory fashion?

2  **A.**  Some require more time, some less time.  I remember

3  calculating when I was new in the office that it took me

4  45 minutes on average to read my first-round folders.  One

5  gets a little better at it, and some of them don't take that

6  long at all.

7  **Q.**  So now, coming full circle back to some of the training

8  that was discussed, you talked about the casebook and the

9  casebook guidance with Mr. Lee, and you talked about how

10  there was discussions of race in connection with those cases,

11  right?

12  **A.**  Yes.

13  **Q.**  And we talked last Friday about a series of people who

14  were on the committee in spring 2011.  Do you remember that?

15  **A.**  I do.

16  **Q.**  And there are a couple of names.  One name that was on

17  there that I want to ask you about.

18          Lucerito Ortiz.  How long did she work in your

19  office?

20  **A.**  I can't tell you how many years.  Something like five or

21  six years, although previous to that she had been a student

22  worker for us.  I actually don't know how many.  I shouldn't

23  speculate.  Quite a while --

24  **Q.**  She worked there quite a while.  She would have sat on

25  these casebook reviews, right?

1    **A.**  Yes.

2    **Q.**  And Grace Chung.  Is it Grace Chung?

3    **A.**  Grace Cheng.

4    **Q.**  I'm sorry.  Just to explain, I speak Chinese -- I did as

5    a kid -- C-H-E-N-G in the Romanization of Chinese is

6    pronounced Chung, so I apologize for mispronouncing her name.

7    **A.**  I'm picking up her pronunciation.  I'm not familiar with

8    the language.

9    **Q.**  Grace Cheng.  Sorry.

10         How long did she work in your office?

11   **A.**  She worked in our office on more than one stint.  She

12   worked in our office for several years.  I don't want to

13   guess because I'll get it wrong.  And then she left to pursue

14   another professional opportunity and returned to our office

15   after what I think had been three years and worked with us

16   for another two or three years and then left.  I don't know

17   how many that totals to, and I don't know how many the first

18   stint was.  For quite a number of years.  Relatively on the

19   long ER side for a young staff member.

20   **Q.**  Would it surprise you if Ms. Ortiz and Ms. Cheng told

21   this Court that neither one of them could remember ever being

22   trained how to use race in the reading of applications?

23   **A.**  I would be surprised if they weren't able to remember

24   that it had occurred, but I can't comment beyond that.

25              MR. MORTARA:  Thank you, Director McGrath.  It's

```
 1    been a real pleasure.
 2              MR. LEE:  Nothing further, Your Honor.
 3              THE COURT:  You're excused.
 4              THE WITNESS:  Thank you.
 5              MR. MORTARA:  Your Honor, the plaintiffs call
 6    Rakesh Khurana.
 7              MR. LEE:  Your Honor.
 8              THE COURT:  Do you want to take a ten minute break?
 9              MR. LEE:  A ten minute break would be great.
10              THE COURT:  Okay.  Ten minute break.  See you at
11    3:00.
12              (Court recessed at 2:51 p.m.)
13              MR. MORTARA:  Your Honor, again, the plaintiffs
14    call Rakesh Khurana.
15              THE CLERK:  Can you please raise your right hand.
16              (RAKESH KHURANA duly sworn by the Deputy Clerk.)
17              THE CLERK:  Thank you.  You may be seated.
18              Can you please state your name and spell your last
19    name for the record.
20              THE WITNESS:  Rakesh Khurana, K-H-U-R-A-N-A.
21              MR. MORTARA:  Good afternoon, Dean Khurana.  Before
22    I get started with you, I actually have a question for the
23    Court.
24              When are we quitting work today, Your Honor?
25              THE COURT:  You mean in the courtroom?
```

**JA1649**

Case: 19-2005   Document: 00117603840   Page: 204   Date Filed: 07/29/2020   Entry ID: 6356388
Case 1:14-cv-14176-ADB   Document 638   Filed 04/18/19   Page 192 of 231

192

1          MR. MORTARA:  Yes.

2          THE COURT:  I have something else scheduled at

3     3:30, but I'm happy to have them wait for 15 minutes.  We can

4     go to quarter of 4:00.

5          MR. MORTARA:  I'm almost certain to be done by a

6     quarter of 4:00 and then I think maybe we'll get a chance to

7     get done with Dean Khurana today, but probably not.

8                              EXAMINATION

9     BY MR. MORTARA:

10    **Q.**  I'll do my best, Dean Khurana, to get you through with me

11    so you don't have to see me anymore.

12          Hi.  I'm Adam Mortara.  It's really nice to met

13    you.  Before we get started, I wanted to give you a chance to

14    introduce yourself to the Court a little bit.

15          I know you're the dean of Harvard College, correct?

16    **A.**  Yes.

17    **Q.**  Could you tell the Court a little bit about your

18    education and summarize your career leading up to that point.

19    **A.**  I went to Cornell University as an undergraduate, and

20    then I attended graduate school at Harvard in the joint

21    program between Harvard Business School and the Graduate

22    School of Arts and Sciences where I did my Ph.D. in

23    organizational behavior.

24    **Q.**  You actually transferred to Cornell, didn't you?

25    **A.**  I did.

1    **Q.**  Where from?

2    **A.**  SUNY Binghamton.

3    **Q.**  Would you be comfortable discussing the reasons you

4    transferred from SUNY Binghamton to Cornell?

5    **A.**  Sure.  I had a professor who took an interest in me when

6    I was there and suggested that I transfer.

7    **Q.**  You mentioned your thesis was on organizational behavior;

8    is that right?

9    **A.**  That's my degree.

10   **Q.**  What's the thesis on?

11   **A.**  It was on executive labor markets.

12   **Q.**  Do you remember your acknowledgments in your thesis, what

13   you wrote in there?

14   **A.**  I hope I partially dedicated it to my wife.

15   **Q.**  You did.  You wrote something about your parents.  I

16   wonder if you remember what you wrote.  Do you in any way?

17   **A.**  Yes.

18   **Q.**  Could you tell the Court what you wrote about your

19   parents in the acknowledgments in your thesis?

20   **A.**  I thanked my parents for their dedication and devotion to

21   my education.

22   **Q.**  And something about crossing oceans and continents for a

23   dream or something of that nature; is that right?

24   **A.**  Yes.

25   **Q.**  And what dream were you referring to?

 1    **A.**   That my parents left their home in India to come to take

 2    their children to a place where they hoped there would be

 3    more opportunity for them.

 4    **Q.**   And that's proven to be true, right?

 5    **A.**   Yes.

 6    **Q.**   For you and your two brothers, correct?

 7    **A.**   Yes.

 8    **Q.**   Excellent.  Now, let's talk about your job.  You're the

 9    dean of Harvard College, correct?

10    **A.**   Yes.

11    **Q.**   And that makes you a pretty senior official as senior

12    officials go at Harvard?

13    **A.**   Yes.

14    **Q.**   You're also an academic, right?

15    **A.**   Yes.

16    **Q.**   I have just an early question.

17          Do you feel comfortable sitting here today as the

18    dean of Harvard College being critical of Harvard if your

19    oath that you just took compels you to do so?

20    **A.**   Yes.

21    **Q.**   Great.  You understand this case is about Harvard

22    admissions, right?

23    **A.**   Yes.

24    **Q.**   And I'm going to start and end our substantive time

25    together on the same subject, sort of bookend it.

Case: 19-2005    Document: 00117638840    Page: 207    Date Filed: 07/29/2020    Entry ID: 6356388
Case 1:14-cv-14176-ADB   Document 638   Filed 04/18/19   Page 195 of 231

195

```
 1              THE COURT:  I see you're leaning forward to get to
 2     the microphone.  The whole thing moves.  It's easier if you
 3     pull it towards you to save some wear and tear on your neck.
 4     BY MR. MORTARA:
 5     Q.  You understand this is a case about Harvard admissions?
 6     A.  Yes.
 7     Q.  I'm going to bookend our time together with this
 8     question:  In 2017, you did not know whether Harvard
 9     College's admissions process disadvantaged Asians or not, did
10     you?
11     A.  I don't believe that Harvard College's admissions process
12     disadvantages Asians.
13     Q.  I understand that's what you think today.  I'm asking you
14     what you believed in 2017.
15              In 2017, you did not know whether Harvard College's
16     admissions process disadvantaged Asians or not, did you?
17     A.  I don't believe it disadvantaged Asians, but I'm not sure
18     I understand the question.
19     Q.  I'm going to try to help you.  Let me try to help you.
20              You gave a deposition under oath earlier in this
21     case, right?
22     A.  Yes.
23     Q.  And you did it with my friend Mr. Strawbridge, who is
24     sitting right there, right?
25     A.  Yes.
```

 1    **Q.**  And you testified in 2017, correct?

 2    **A.**  Yes.

 3    **Q.**  And in 2017, you did not know whether Harvard College's

 4    admissions process disadvantaged Asians, correct?

 5    **A.**  I don't believe Harvard College's admissions process

 6    disadvantaged Asians.

 7              MR. MORTARA:  Your Honor, may I approach the

 8    witness?

 9              THE COURT:  You may.

10    BY MR. MORTARA:

11    **Q.**  Dean Khurana, would you please turn to page 260 of your

12    deposition.  And at line 10, Mr. Strawbridge asked you, "Do

13    you think that the Harvard admissions process disadvantages

14    Asian-Americans?

15              "ANSWER:  I don't know.

16              "QUESTION:  You don't know?

17              "ANSWER:  I don't know."

18              Was that your sworn testimony in 2017?

19    **A.**  Yes.

20    **Q.**  We'll come back to this.  I want to make sure I get this

21    right though.  You're not directly responsible for the

22    policies of the admissions office, are you?

23    **A.**  I'm not.

24    **Q.**  And what I mean by that is that you don't have an active

25    role with respect to the admissions office, correct?

Case: 19-2005    Document: 00117638840    Page: 209    Date Filed: 07/29/2020    Entry ID: 6356388
Case 1:14-cv-14176-ADB    Document 638    Filed 04/18/19    Page 197 of 231

197

1    **A.**  I don't.

2    **Q.**  Part of Harvard College's mission and your responsibility

3    as dean, though, is to expose students to a diverse range of

4    perspective and viewpoints and experiences.  You agree with

5    that, right?

6    **A.**  Yes.

7    **Q.**  In fact, you're pretty passionate about it, I'd say?

8    **A.**  Yes.

9    **Q.**  And that's, in part, because it helps contribute to

10   Harvard's efforts to educate the citizens and citizen leaders

11   of society, right?

12   **A.**  Yes.

13   **Q.**  I want to focus first on the leaders piece of this.  Do

14   you think people make better decisions when they're exposed

15   to a variety of perspectives on that decision?

16   **A.**  Typically, yes.

17   **Q.**  The reason I ask is I think it's actually one of your

18   areas of research interests is how groups make decisions,

19   right, like a company board of directors?

20   **A.**  Yes.

21   **Q.**  And you've implemented your knowledge of group dynamics

22   in how to have productive discussions in your work as dean of

23   Harvard College?

24   **A.**  Yes.

25   **Q.**  And I think someone told me you start out every meeting

1    by reading the mission of Harvard College; is that right?

2    **A.**   Yes.   Typically.

3    **Q.**   Because you think that's an effective way to focus people

4    on what it is that we're actually trying to accomplish?

5    **A.**   Yes.

6    **Q.**   Which in your job is the mission of Harvard College,

7    right?

8    **A.**   Yes.   My job is to steward the mission.

9    **Q.**   Now, in your work as dean of the college and in your

10   experience, can the size of a group of people trying to come

11   to a decision impact whether diverse and opposing views are

12   expressed.

13   **A.**   What matters is the different perspectives and points of

14   view.   So I don't think size is always a good indicator.

15   **Q.**   In your research, for instance, have you ever found that

16   size of a group is known to be correlated with whether

17   dissenting views are heard or not?

18   **A.**   It's one of many different factors that can contribute to

19   the effectiveness of a group's decision-making abilities.

20   **Q.**   Can you just tell me how?

21   **A.**   The more diverse the perspectives and points of view are,

22   the less likely a group is to fall into groupthink, the more

23   a group is open to considering alternatives they would not

24   have otherwise imagined, and that typically leads to more

25   creative and effective decision-making.

**JA1656**

**Q.** And that correlates a little bit with the size of the

group. Although if you get, I guess, 50 people who all think

exactly the same thing, you're not going to get a better

result, right?

**A.** Yes. That's why the heterogeneity of the backgrounds and

experiences of people matter a lot. It's important to look

beneath the surface of what a group is.

**Q.** For people like me, "heterogeneity" means lots of

different people, right?

**A.** "Heterogeneity" means lots of different backgrounds and

experiences and perspectives and in an environment in which

those can be articulated.

**Q.** And way down at the other end, if I'm making a decision

say for my family and I have just one person, I only consult

myself, I cannot consult my daughter or my wife, there aren't

likely to be diverse perspectives, except the ones that I

bring to the table, right?

**A.** Some people are thoughtful and can be reflective and

consider different perspectives, but I wouldn't consider a

person of one a group.

**Q.** I appreciate the possibility that I'm thoughtful and

reflective.

I want to talk about your work on various

committees now. You've been on a lot of committees, haven't

you?

Case: 19-2005    Document: 00117631840    Page: 212    Date Filed: 07/29/2020    Entry ID: 6356388
Case 1:14-cv-14176-ADB   Document 638   Filed 04/18/19   Page 200 of 231

200

1    **A.**  Yes.

2    **Q.**  First I need to talk about a committee you didn't work

3    with but you needed to learn something about.

4            Importantly for this case, as I think you know, you

5    were on something called the Smith committee, which is the

6    committee to study race-neutral alternatives to Harvard's

7    current admissions system, right?

8    **A.**  Yes.

9    **Q.**  And that was a committee composed of you, Dean Smith, and

10   Bill Fitzsimmons, right, dean of admissions?

11   **A.**  Yes.

12   **Q.**  And why are we calling it the Smith committee?  Do you

13   call it the Smith committee?

14   **A.**  I called it race-neutral alternatives committee.

15   **Q.**  Let's do that.  We'll call it the race-neutral

16   alternatives committee.

17           In compiling your report on the race-neutral

18   alternatives committee, you referred to something else called

19   the Ryan committee, right?

20   **A.**  Yes.

21   **Q.**  That's actually in your report.  If you turn to your

22   binder that I've placed in front of you, there's Plaintiff's

23   Exhibit 316.

24           THE COURT:  Do I have one of these?

25           MR. MORTARA:  No, Your Honor.  We don't.  The real

1    problem here -- I'm going to give you have my copy.

2            THE COURT:  I'm happy to work off the screen.

3            MR. MORTARA:  I'm going to give you my copy because

4    when they're placed upside down in the box what's happening

5    is a lot of papers are falling out and I'd like to make sure

6    you get a full set.  I don't need them.  So here you go.

7    BY MR. MORTARA:

8    **Q.**  Do you have that, Dean Khurana?

9    **A.**  Yes.  Yes.

10   **Q.**  You see it's titled "Report of the Committee to Study

11   Race-Neutral Alternatives," so we'll stick to that name.

12           On the second page, there is discussion of this

13   universitywide committee chaired by James Ryan.  Do you see

14   that?

15   **A.**  I see that paragraph.

16   **Q.**  And you familiarized yourself a little bit with the Ryan

17   committee in order to write up the report of this committee

18   that you were on, correct?

19   **A.**  We were in touch with Dean Ryan as part of this

20   committee's work.

21   **Q.**  And in fact, as I understand it, you were asked actually

22   by the university to suggest some student members to be on

23   the Ryan committee; isn't that right?

24   **A.**  I can't recall that.

25   **Q.**  Let me see if I can refresh your recollection.

```
 1              MR. MORTARA:  May I approach, Your Honor?
 2              THE COURT:  You may.
 3    BY MR. MORTARA:
 4    Q.  Just take a look at the email I handed you, Dean Khurana,
 5    I'm not going to put it up on the screen.  Just look at the
 6    email on the bottom dated 6/10/14 from you to someone called
 7    Allen.  Do you see that?
 8    A.  Yes.
 9    Q.  I understood this email to be a reference for a request
10    from the university for you to suggest some student members
11    for the Ryan committee.  Do I have that wrong?
12    A.  That's what this email says.
13    Q.  So am I right in that now you recall that the university
14    actually asked you to suggest some members, some student
15    members of the Ryan committee?
16    A.  Yes.
17    Q.  Now, as far as you know, you would agree there was some
18    very serious people on the Ryan committee, serious scholars?
19    A.  I don't know the entire composition of the Ryan
20    committee.
21    Q.  My point is only you knew some of the people on the Ryan
22    committee.  You know James Ryan, right?
23    A.  Yes.
24    Q.  You regard James Ryan as a serious education scholar,
25    correct?
```

**JA1660**

1    **A.**  I do.

2    **Q.**  And the Ryan committee included faculty, students, and

3    staff, correct?

4    **A.**  I don't know the composition, but I imagine it did.

5    **Q.**  Well, we know at least the university was looking for

6    students to get on the Ryan committee.  We just established

7    that, right?

8    **A.**  Yes.

9    **Q.**  And there were faculty, correct?

10   **A.**  I imagine there were.

11   **Q.**  Well, James Ryan was faculty, right?

12   **A.**  And the dean of the graduate school of education.

13   **Q.**  Does that make him staff, too, or is he still faculty

14   when he's -- you're faculty, right?  Is that right?

15   **A.**  Yes.

16   **Q.**  And there may have been staff.  What's the basketball

17   coach?  Is he faculty, student -- he's not student.  Is he

18   faculty or staff?

19   **A.**  He would be regarded as staff.

20   **Q.**  Does it sounds right to you that the Ryan committee had

21   between 20 and 30 members?

22   **A.**  I can't tell you the details of that.  I don't remember.

23   **Q.**  No problem.  Let's skip to things you were really

24   involved with.

25          You were involved in the creation, formation, and

1    execution of the college working group on diversity and

2    inclusion, right?

3    **A.**  Yes.

4    **Q.**  And you helped recruit the members of the college working

5    group on diversity and inclusion?

6    **A.**  Yes.

7    **Q.**  And the membership of that committee was drawn from

8    faculty, students, and staff, right?

9    **A.**  Yes.

10   **Q.**  And you wanted to have a diverse set of perspectives and

11   backgrounds and experiences for the people serving on that

12   committee, correct?

13   **A.**  Yes.

14   **Q.**  You read the final report of the college working group on

15   diversity and inclusion, right?

16   **A.**  Yes.

17   **Q.**  You commented on the draft of the report, correct?

18   **A.**  Yes.

19   **Q.**  You submitted proposed revisions to that report?

20   **A.**  Yes.

21   **Q.**  I'm going to -- the report is actually in your binder at

22   Plaintiff's Exhibit 301.  If you wouldn't mind turning to it,

23   I'll get it up on the screen in a second.

24          I want to ask you do you consider yourself sort of

25   the -- withdrawn.

 1              This report is a direct result of your deanship,

 2    correct?

 3    **A.**  It's a report that was put together in consultation with

 4    the interim dean.  We formed this committee.

 5    **Q.**  You yourself are very responsible for the creation of

 6    this working group.  And while you weren't a part of the

 7    group yourself, this report might not be here were it not for

 8    you, is what I'm trying to say.

 9    **A.**  I would say that, yes.

10    **Q.**  Great.  Let's take a look at the report.

11              THE COURT:  Mr. Mortara, I'm missing the first 20

12    pages and the tab.

13              MR. MORTARA:  I'm so sorry, Your Honor.

14              THE COURT:  You're being so nice today, I hate to

15    even have to tell you that.  I'm just missing the first 20

16    pages and the tab.

17              MR. MORTARA:  I've got it right here.  I'm going to

18    hand you up the complete copy of the document from another

19    binder.

20              THE COURT:  You can trade with him, Karen.

21              MR. MORTARA:  And hopefully this is the only time

22    this happens.

23              THE COURT:  Is this the first tab in the book?

24              MR. MORTARA:  It's just the one document.  I'm

25    hoping the other documents are okay.

```
 1              THE COURT:  Is this the first one in the notebook?
 2              MR. MORTARA:  I believe it may be.  Yes, it is.
 3              THE COURT:  It should be fine then.  Thank you.
 4              MR. MORTARA:  Sorry, Your Honor.
 5   BY MR. MORTARA:
 6   Q.  And more importantly, sorry to you, Dean Khurana.  I
 7   don't want to keep you here any longer than you have to be,
 8   and it's my fault.
 9              Let's take a look at the report.  Do you have it in
10   front of you?
11   A.  Yes.
12   Q.  At least your binder hasn't lost pages, Dean Khurana.
13   First let's look at the first couple of pages, the
14   composition of the members of the committee.  Do you see
15   these names?  You're familiar with them, some of them, right?
16   A.  Yes.
17   Q.  And I think I counted a total of 17 people on the
18   committee; is that right?
19   A.  Yes.
20   Q.  Now I want to briefly talk through one section of the
21   report, and I will be brief, which is on page 5 of the
22   report.
23              There's a section titled "Historical Context."  Do
24   you see that?
25   A.  I see that.
```

Case: 19-2005    Document: 00117634846    Page: 219    Date Filed: 07/29/2020    Entry ID: 6356388
Case 1:14-cv-14176-ADB    Document 638    Filed 04/18/19    Page 207 of 231

207

 1    **Q.**  And I've highlighted on the screen a sentence from the

 2    middle, the lower middle of the second paragraph in this

 3    report.  And it says, "Under the presidency of Abbott

 4    Lawrence Lowell, the Harvard administration restricted the

 5    numbers of Jewish students and barred the handful of

 6    African-American men at the college from residing in freshman

 7    dormitories."

 8            Do you see that?

 9    **A.**  I see that sentence.

10    **Q.**  I'm going to take it off the screen, Dean Khurana.  You

11    are aware that Harvard discriminated against people who

12    identified as Jewish in that time period, correct?

13    **A.**  Yes.

14    **Q.**  And you know that, in part, from reading Jerome Karabel's

15    book, "The Chosen," correct?

16    **A.**  Yes, I know that.

17            MS. CONLEY:  Objection, Your Honor.  We have a

18    judicial notice that Your Honor has granted on this issue,

19    and Mr. Mortara said at the pretrial conference that he would

20    not get into this with any of the witnesses.

21            THE COURT:  I think what he said was that he would

22    get into it to the extent that it had anything to do with

23    credibility or sort of -- I think there were some limitations

24    on it.

25            MR. MORTARA:  There's just the one question coming

**JA1665**

1 up that I am going to ask and he's going to answer and then

2 we're going to move on.

3    THE COURT:  I'm going to give him the question.

4 I'm aware of what we've taken judicial notice of.  I don't

5 think it foreclosed all reference of it, although I do think

6 it foreclosed any extensive discussion of it.

7    He can have his question and then we'll move on.

8 BY MR. MORTARA:

9 **Q.**  I'm not going to dwell on this, Dean Khurana, but you

10 agree that one of the reasons that a holistic admissions

11 process was adopted was to identify who was Jewish in the

12 applicant pool, correct?

13 **A.**  Yes.  My understanding is that that was one of the

14 reasons that contributed to that process.

15 **Q.**  Let's finish with that and go back to the report on the

16 college working group on diversity and inclusion.

17    This report mentions unconscious or implicit bias.

18 Do you remember the references to that in this report?

19 **A.**  I can't recall specifically where it is in the report.

20 **Q.**  You're familiar with the phrases unconscious or implicit

21 bias, right?

22 **A.**  Yes.

23 **Q.**  One example of implicit bias could be where a person

24 makes assumptions about a minority student based on racial

25 stereotypes, correct?

1    **A.**  Yes.

2    **Q.**  It can also be implicit bias when someone is more likely

3    to credit what has been said about a minority student because

4    it confirms to a racial stereotype, right?

5    **A.**  Yes.  That's one aspect of implicit bias.

6    **Q.**  Based on your experience working as dean of Harvard

7    College, can people be reinforcing or responding to racial

8    stereotypes and still be able to deny that they are

9    discriminating on the basis of race?

10   **A.**  I'm sorry.  Could you repeat the question?

11   **Q.**  Based on your experience working as dean of Harvard

12   College -- you work with students, right?

13   **A.**  I do.

14   **Q.**  Can the students be reinforcing or responding to racial

15   stereotypes even while they're sitting there telling you I'm

16   not racist, I'm not discriminating on the basis of race?

17   **A.**  I think implicit bias works in a variety of several ways.

18   The way you tackle it is by making people conscientious and

19   having diverse perspectives around, which reduces its

20   likelihood.

21   **Q.**  One of the kind of pernicious aspects of implicit bias is

22   the person who is biased, himself or herself, may believe

23   that they are not?

24   **A.**  Or may be acting in a biased way, yes.

25   **Q.**  And may believe they're not even acting in a biased way,

1  right?

2  **A.**  Sometimes.

3  **Q.**  And this is something that you confront as dean of

4  Harvard College, correct?  Or someone on your staff does when

5  there's a bias reporting incident?

6  **A.**  When we encounter bias, we definitely take a great deal

7  of concern in any type of report around bias.

8  **Q.**  And that includes both -- I'm sure all colleges are alike

9  in some way.  I'm sure there's some actual express bias,

10  negative incidents that go on on campus where it's not

11  remotely a question that it has been express bias, right?

12  **A.**  We've had occasions where we've experienced bias on

13  campus.

14  **Q.**  Hopefully they're rare.

15  **A.**  Yes.  We hope so.

16  **Q.**  And there are also occasions where charges of are -- in

17  fact, true issues of implicit or conscious bias have occurred

18  on campus, correct?

19  **A.**  Yes.

20  **Q.**  And you would take each of those equally seriously,

21  express bias and unconscious or implicit bias, right?

22  **A.**  We take all reports of bias very seriously.

23  **Q.**  Now, another committee that you were involved in was the

24  committee to study the importance of student body diversity,

25  right?

1  **A.**  Yes.

2  **Q.**  And you were actually the chair of that committee, right?

3  **A.**  Yes.

4  **Q.**  If we're following the naming conventions, we call that

5  one the Khurana committee, but you had a role in suggesting

6  members of the committee to study the importance of

7  student-body diversity, right?

8  **A.**  Yes.  In consultation with the dean of faculty of arts

9  and sciences and the president.

10  **Q.**  You left out one group, right, because lawyers were

11  involved in the selection of the members of that committee,

12  too, right?

13  **A.**  I don't believe they chose members of that committee.

14  **Q.**  Would you say they were involved?

15  **A.**  Yes.  And counsel is often involved in many committees at

16  Harvard.

17  **Q.**  So again with this 2015 committee to study the importance

18  of student-body diversity, you were trying to assemble a

19  diverse group of people with different perspectives to be a

20  part of that committee, right?

21  **A.**  Yes.

22  **Q.**  And that's P302 in your binder.  Why don't we take a look

23  at it.  Let me know when you're there, sir.

24  **A.**  I'm there.

25  **Q.**  How many people were on this committee?

**A.** I believe there were six.

**Q.** I just want to keep track of where we are. You said you didn't know how many people were on the Ryan committee. I'm going to represent to you it was at least 29.

Then we get to the college working group on diversity and inclusion, and there's 17 people on that committee.

And now we're down to the committee to study the importance of student-body diversity, where the lawyers were involved, and there's six people on the committee, correct?

**A.** Yes.

**Q.** Now let's get to the committee to study race-neutral alternatives, which is P316. I think I already asked you this, but how many people were on this committee?

**A.** There were three of us.

**Q.** Now, this report analyzed proposed race-neutral alternatives to Harvard's current admissions policy, right?

**A.** Yes.

**Q.** And you understood that the Court is here to determine whether Harvard did its best to consider race-neutral alternatives, right?

**A.** Yes.

**Q.** Should the Court draw any conclusion between the very large number of people that I've told you were on the Ryan committee, the somewhat smaller but still quite large number

 1    of people on the college working group on diversity, and the

 2    relatively small number of people that are on the Smith

 3    committee?

 4    **A.**   No.  The Ryan committee was a university committee, which

 5    is to look at the entire university which consists of

 6    multiple schools and tens of thousands of students.

 7            You basically put a committee together based on the

 8    goal and the function of what you're trying to accomplish.

 9    You don't use size alone.  You really try to think through

10    how can you best create an effective working group that can

11    deliver on the remit or the charge for the committee.

12    **Q.**   Right.  Could you explain to the Court why it is that the

13    optimal group size for the college working group on diversity

14    and inclusion was around 17 people but for this important

15    mission you only needed three?

16    **A.**   Sure.  For the college working group committee, the

17    charge that we gave was to bring together students, faculty,

18    and staff to consider how we could strengthen the environment

19    for inclusion on campus.

20            We also asked them to look into the work of going

21    to peer schools.  We also asked them to engage with alumni

22    with surveys.  So it was a very large task that we asked them

23    to do that had to be done with subcommittees involved.  And

24    so you wanted to both have a variety of stakeholders in that

25    committee, but also you had a very large number of tasks that

1   that committee was charged with.

2   **Q.**  You didn't think the committee to study race-neutral

3   alternatives had a large number of tasks or could have looked

4   at peer institutions or involve the alumni community?

5   **A.**  So as I understood the race-neutral alternatives

6   committee, we spent time, first of all, familiarizing

7   ourselves with the literature around this topic.  We also had

8   benefit of the expert reports that were being done that had

9   suggested a variety of ways to consider race-neutral

10   alternatives as well as our own work and background.

11         And so we brought that to bear in terms of looking

12   at these issues.

13   **Q.**  Now -- thank you, Dean Khurana.

14         In the report, just to refresh your memory, you

15   rejected as an alternative to Harvard's current explicit use

16   of race and admissions increased socioeconomic preferences

17   and an elimination of some of Harvard's other practices,

18   including legacy preferences, correct?

19   **A.**  We considered a variety of different practices and

20   debated them and to understand their impact on the diversity

21   of the student body and, in context, other Harvard goals.

22   **Q.**  And one of the things that you rejected, broadly

23   speaking, was a boost in preferences for people from lower

24   socioeconomic backgrounds coupled with an elimination of some

25   of Harvard's preferences for, for instance, legacies?

1   **A.**  We did consider those alternatives.

2   **Q.**  And I want to talk to you why you rejected that premise.

3   Would you please turn to page 13 of the document.  It's under

4   a bullet.  It says, "Increased weight for socioeconomic

5   background."

6           Do you see that?

7   **A.**  I do.

8   **Q.**  It says "The simulations," and that refers to simulations

9   on some models that Harvard's expert had, right?

10  **A.**  Yes.

11  **Q.**  "The simulations show that Harvard could not both achieve

12  its diversity interests and achieve other equally important

13  educational objectives such as academic excellence."

14          Do you see that?

15  **A.**  I see that sentence.

16  **Q.**  Let's go to the next page and we'll get into the

17  discussion there.  I want to talk to you about the first full

18  paragraph on that page.  Do you see it?

19  **A.**  Yes.

20  **Q.**  Here it says that the course, which is referring to

21  increased socioeconomic preferences, would overwhelm other

22  considerations in the admissions process and that would lead

23  to significant changes.  Do you see that?

24  **A.**  I see that.

25  **Q.**  I want to talk about the changes.  Next full paragraph.

**JA1673**

1          "For example, if Harvard afforded weight sufficient

2     to produce a combined proportion of African-American,

3     Hispanic, and other students comparable to that of current

4     classes, the proportion of admitted students with the highest

5     academic ratings as assigned by admissions officers would be

6     expected to drop from 76 to 66 percent," right?

7          Do you see that?

8     **A.**   I do.

9     **Q.**   This refers to people who get academic 1s and 2s, right?

10    **A.**   I think it refers to the highest academic ratings, yes.

11    **Q.**   And that refers to people who get academic ratings of 1s

12    and 2s from the admissions office, right?

13    **A.**   I believe that was the way it was done.

14    **Q.**   Who told you that Harvard cared about the proportion of

15    admitted students with high academic ratings as given by

16    admissions officers?

17    **A.**   Well, we consider a number of different dimensions in

18    admitting our students.  First of all, all of our students

19    are academically qualified to be there.  And then we look in

20    context of that academic with respect to other aspects of,

21    you know, how they can contribute to the community and what

22    they're bringing to the community.

23          A lot of our goals are really to bring students of

24    very different perspectives and points of view.  And

25    different people bring different strengths and talents, and

1   that's really the goal of our process.  And so admissions has

2   to be understood in context with other aspects of what a

3   whole person brings to the community.

4   **Q.**  Fantastic.  Let's focus on what's in the document, which

5   is talking about people with academic ratings, right?  That's

6   the sentence I've highlighted.  Just focus there.

7          You're talking about the proportion of admitted

8   students with the highest academic ratings as assigned by

9   admissions officers would drop.

10          Do you see that?

11  **A.**  Yes.

12  **Q.**  Who told you that the proportion of admitted students

13  with high academic ratings was really important to Harvard?

14  Was if Bill Fitzsimmons?

15          MS. CONLEY:  Objection, Your Honor.  Hearsay.

16          THE COURT:  Hold on a second.  It's overruled.

17  **A.**  This is our committee's judgment.  The committee

18  consisted of Dean Fitzsimmons, who is responsible for the

19  admissions; Dean Smith, who is a faculty member also in the

20  engineering and computer science department, one of the great

21  quantitative analysts; myself, who is responsible for the

22  mission of the college.

23          And we along with others really are responsible for

24  carrying that mission forward, of which academics is one of

25  the very important qualities that defines the college's

1    character and culture.

2    BY MR. MORTARA:

3    **Q.**  Let's just focus on who is on the committee.

4         Which one of the three of you came up with the idea

5    that the academic rating as assigned by admissions officers

6    was an important thing to focus on?  Was that Dean

7    Fitzsimmons?

8    **A.**  Again, I would say that all of us believe that the

9    academic rating is really important but also in context with

10   other aspects of our students.

11   **Q.**  Sure.  I just want to stay with the highlighted stuff for

12   now, which is talk about the academic rating.

13        Isn't it correct that these profile ratings, as

14   they're called are not, in fact, important to the ultimate

15   admission decision and that they fade into the background

16   when the admissions committee meets?  Isn't that right?

17   **A.**  I'm not on the admissions committee.  I can't speak to

18   that.

19   **Q.**  Dean Fitzsimmons never told you that these ratings, in

20   fact, fade into the background when the full committee meets?

21   **A.**  I can't recall him saying anything like that.

22   **Q.**  You were here for my opening statement, right?

23   **A.**  Yes.

24   **Q.**  Do you remember a little bit about it?

25   **A.**  Yes.

```
 1    Q.  There were some other openings, too, including from some

 2    amicus groups.  Those are friends of the Court, right?

 3    A.  Yes.

 4    Q.  Do you remember them talking about some current Harvard

 5    students?

 6    A.  Yes.

 7    Q.  Including one called Thang, right?

 8    A.  Yes.

 9    Q.  And do you remember the slide that was used to introduce

10    Thang to the Court?

11    A.  At a very high level, but I can't remember the details.

12    Q.  Let me refresh your memory.

13             Do you remember this slide?

14    A.  Yes.

15    Q.  Do you know Thang?

16    A.  I do know Thang at a -- like a way that a dean might know

17    their students, at a distance.

18    Q.  I don't think I knew my dean of the college when I went

19    to college.  But great.  Let's take that off.

20             Do you know that Thang got an academic 3?

21    A.  I didn't know that.

22    Q.  I want to talk to you about what you believe on the

23    subject of socioeconomic preferences, not what's in the

24    report.  I want to talk to you about what you believe.  Do

25    you understand, Dean Khurana?
```

Case: 19-2005     Document: 00117638340     Page: 232     Date Filed: 07/29/2020     Entry ID: 6356388
Case 1:14-cv-14176-ADB   Document 638   Filed 04/18/19   Page 220 of 231

220

1    **A.**  Yes.

2    **Q.**  You believe what we know from sociology that a typical

3    student in an elite college includes that admission to elite

4    schools is highly correlated with parents' socioeconomic

5    standing, parents' educational attainment, and systematic

6    preferences for alumni children.

7            That's what you believe, right?

8    **A.**  I believe that our current educational system and

9    admissions to college very much favors, in one sense, people

10   who have advantages, are advantaged.

11   **Q.**  I don't mean to quibble here with what I -- is what you

12   just said the same thing as what I just said?

13   **A.**  I think people who have -- are fortunate enough to have

14   some of the advantages you described are better positioned to

15   be able to go to a selective school.

16   **Q.**  I'm just going to try to refresh your memory, Dean

17   Khurana.

18           MR. MORTARA:  Your Honor, may I approach?

19           THE COURT:  Sure.

20   BY MR. MORTARA:

21   **Q.**  Dean Khurana, I am not going to put this up on the

22   screen, But I just want you to be focused on an email that

23   you wrote that's at the bottom half of this.

24           Do you see it?

25   **A.**  Yes.

**JA1678**

1    **Q.**  I'm just going to ask you again.  You believe from what

2    we know from sociology about the typical student in an elite

3    college includes that admission to elite schools is high

4    correlated with parent's socioeconomic standing, parents'

5    educational attainment, and systematic preferences for alumni

6    children, right?

7    **A.**  I believe, yes, that's true.

8    **Q.**  You can put that down, Dean Khurana.  You also believe

9    there are several mechanisms for what we just described.  But

10   the one that seems to be at work is that affluent parents

11   translate their privileges into educational opportunities for

12   their children which subsequently produce the academic

13   achievement that is rewarded by selective colleges and

14   universities.  Right?

15   **A.**  It's a very general statement.  But on average, again, in

16   our country because of the way our educational system is set

17   up, people who are advantaged are better able to transmit

18   those advantages to their children.

19   **Q.**  Dean Khurana, could you just look back at the email I

20   just showed you.  I think it's the very next sentence.  Could

21   I just get a yes here?

22           You also believe that there are several mechanisms

23   for this, but the one that seems to be at work is that

24   affluent parents translate their privileges into educational

25   opportunities for their children, which subsequently produce

```
 1    the academic achievement that is awarded by selective

 2    colleges and universities.

 3              You agree with that, right?

 4    A.  Yes.

 5    Q.  I want to go back to the committee on diversity and

 6    inclusion report and what it says about Harvard financial

 7    aid.  That's P301.

 8              It's the one Your Honor got in loose form, and it's

 9    the beginning of your binder, sir.  Let me know when you're

10    there.  I'm going to page 8, sir.

11    A.  I'm there.

12    Q.  Great.  You see there's a discussion of "Underscoring its

13    commit to diversity that includes both racial and

14    socioeconomic background."

15              Do you see that?

16    A.  No, I'm afraid I don't.

17    Q.  At the bottom -- it's page 6.  I misread you the page,

18    sir.  It's page 6.  I'm so sorry.

19    A.  I see that paragraph.

20    Q.  Great.  And you see the middle sentence that says,

21    "Around 70 percent of Harvard students receive financial

22    assistance and over 20 percent pay no tuition at all."

23              Do you see that?

24    A.  I see that sentence.

25    Q.  Pretty proud of that, right?  That's pretty good, right?
```

1    **A.**  Yes.

2    **Q.**  If you just read the prior sentence, what that means is

3    about 30 percent of Harvard College comes from household

4    where the household income is above $150,000 a year.  That's

5    what this all means when you put it together, right?

6    **A.**  I don't have the income distribution, but that would

7    be -- you can infer that.

8    **Q.**  Just take a look.  Students from household earning less

9    than $65,000 per year pay nothing toward room and board.  Do

10   you see that?

11   **A.**  Yes.

12   **Q.**  And students from households earning 65,000 to 150,000

13   pay 10 percent or less of their yearly incomes.  Do you see

14   that?

15   **A.**  Yes.

16   **Q.**  And then the next sentence follows.  "Around 70 percent

17   receive financial assistance."  Do you see that?

18   **A.**  Yes.

19   **Q.**  So it follows that around 30 percent of Harvard's

20   students come from families whose household income receives

21   $150,000, right?

22   **A.**  Yes.

23   **Q.**  Now I want to talk about income and quality.

24          You've actually spoken a lot about income and

25   equality in your role as dean and in your research, right?

1    **A.**  I've done work in that area.

2    **Q.**  You're working on a book about how globalization and

3    class hierarchies reproduce income and other social

4    inequalities, aren't you?

5    **A.**  I am.

6    **Q.**  You know that Harvard College's student body does not

7    mirror the income distribution that we have here in the

8    United States, right?

9    **A.**  Yes.

10   **Q.**  I mean, you're aware that the percentage of U.S.

11   households that have an income above $150,000 a year is

12   around 4 percent?

13   **A.**  I don't have the exact statistics at my fingers.

14   **Q.**  Sounds right, though, doesn't it?

15   **A.**  Approximately.

16   **Q.**  So let's just take it -- let's take it as 5.  We can make

17   it 5.  So top 5 percent of income in the U.S. make up

18   30 percent of Harvard's class?

19   **A.**  Yes.

20   **Q.**  Don't you actually think that Harvard's class should have

21   a socioeconomic makeup that looks at lot more like America,

22   provided the students were academically qualified to be at

23   Harvard?  Your personal opinion, sir?

24   **A.**  I don't.

25   **Q.**  Wouldn't it be helpful to address the very issues you're

1    writing about in your book if Harvard had even greater

2    socioeconomic diversity rather than 30 percent of the class

3    coming from the top 5 percent of Americans by income?

4    **A.**   The mission of the college is to educate the citizens and

5    citizen leaders for our society, and that talent is

6    everywhere.  One of the things that I think we try to

7    accomplish is we know that talent is everywhere, but

8    opportunities are not.  And we want that talent to be able to

9    consider coming to a place like Harvard, and want to make

10   sure that they have the financial ability to come to Harvard.

11          But we begin with the talent that's out there and

12   then trying to get them to come to a place like Harvard

13   College.

14   **Q.**   And that's why I included the proviso qualified to be at

15   Harvard.  I want you to have in your mind what it means to be

16   qualified to be at Harvard.  All right?  You studied that a

17   little bit in connection with the report, right?

18   **A.**   Yes.

19   **Q.**   Great.  Thang's qualified to be at Harvard, isn't he?

20   **A.**   Yes.

21   **Q.**   All right.  Being rich has nothing to do with being at

22   Harvard, does it?

23   **A.**   One's socioeconomic status should not determine, whether

24   you're rich or poor.

25   **Q.**   Don't you actually think that Harvard's class should have

**JA1683**

1    a socioeconomic makeup that looked more like America than it

2    currently does, provided everybody who was there was

3    qualified to be at Harvard?

4    **A.**   I can't engage in that hypothetical because I don't know

5    how that actually would play out.  What we're looking for are

6    people who are committed also to the mission of the

7    institution and to try to make it possible regardless of the

8    circumstances of your birth to be able to come to a place

9    like Harvard without having to worry about financial

10   considerations.

11   **Q.**   I guess now I'm confused.

12        Does it have anything to do with how committed a

13   student can be to Harvard's mission how much money their

14   mother or father makes?

15   **A.**   Again, I would say that talent is everywhere.  And again,

16   students who are committed to that mission could be coming

17   from well-off backgrounds.  Students who are committed to

18   that mission could be coming from middle class backgrounds.

19   **Q.**   My question is they're not related.  Your socioeconomic

20   status isn't related to your ability to pursue the important

21   mission of Harvard College, is it?

22   **A.**   No.

23   **Q.**   So now I'm going to come back again.

24        What is special about wealthy people that Harvard

25   needs to have them overrepresented by a factor of six on its

Case: 19-2005    Document: 00117638840    Page: 239    Date Filed: 07/29/2020    Entry ID: 6356388
Case 1:14-cv-14176-ADB    Document 638    Filed 04/18/19    Page 227 of 231

227

1    campus?

2    **A.**   Again, all of our students are qualified to be there.

3    And I would say again, like other colleges and universities,

4    I think we are fortunate to have the resources to make sure

5    students can come here regardless of their ability to pay.

6         But we're not trying to mirror the socioeconomic or

7    income distribution of the United States.  What we're trying

8    to do is identify talent and make it possible for them to

9    come to a place like Harvard.

10   **Q.**   I'm going to have to leave you here because Her Honor has

11   a hearing and I want to be respectful of the other

12   participants in this courtroom.  But I'm going to ask one

13   more question right now.  Are you ready?

14        What is it about having wealthy people at Harvard

15   that perpetuates inequality in our society?  You write about

16   inequality, right, income inequality?

17   **A.**   It's a subject that I've written about.

18   **Q.**   Do you think having a third of the available spaces at

19   Harvard for only the richest amongst us perpetuates

20   inequality in America?

21        MS. CONLEY:  Objection, Your Honor, asked and

22   answered.  I'm not sure of the relevance of this whole line

23   of questioning.

24        THE COURT:  He can have it.

25   **A.**   It's not how the admissions --

1          THE COURT:  Last question.  I thought you only had

2     one.  Let him have it.

3          MR. MORTARA:  Last question.

4     **A.**  That's not how the admissions process works.

5     BY MR. MORTARA:

6     **Q.**  Respectfully, sir, that wasn't my question.  So that's

7     where we'll start tomorrow.

8          THE COURT:  All right.  Do you all want to start at

9     9:30 again tomorrow or do you want to push it until 10:00?

10    Whatever you want to do.

11         MR. MORTARA:  9:30.

12         THE COURT:  Can I see counsel at sidebar for a

13    minute before we recess.

14         [Sidebar redacted.]

15         (Court recessed at 4:48 p.m.)

16

17

18

19

20

21

22

23

24

25

Case: 19-2005  Document: 00117631840  Page: 241  Date Filed: 07/29/2020  Entry ID: 6356388
Case 1:14-cv-14176-ADB  Document 638  Filed 04/18/19  Page 229 of 231

229

1                    - - - - - - - - - - -

2                        CERTIFICATION

3

4            I certify that the foregoing is a correct

5    transcript of the record of proceedings in the above-entitled

6    matter to the best of my skill and ability.

7

8

9

10   /s/ Joan M. Daly                    October 22, 2018

11   _____         _____

12   Joan M. Daly, RMR, CRR              Date
     Official Court Reporter
13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1                      INDEX OF WITNESSES

 2   WITNESS                                             PAGE

 3
     RICHARD KAHLENBERG
 4
         Examination By Mr. Strawbridge.....................   7
 5       Examination By Mr. Lee.............................  59

 6
     MARLYN MCGRATH
 7
         Examination (Resumed) By Mr. Lee...................  145
 8       Further Examination By Mr. Mortara.................  176

 9
     RAKESH KHURANA
10
         Examination By Mr. Mortara.........................  192
11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

Case: 19-2005    Document: 00117631846    Page: 243    Date Filed: 07/29/2020    Entry ID: 6356388
Case 1:14-cv-14176-ADB    Document 638    Filed 04/18/19    Page 231 of 231

231

```
 1                        E X H I B I T S

 2
        Defendant Exhibit                               Received
 3
          DX2        ....................................   152
 4
          DX003      ....................................   150
 5
          DX16       ....................................   151
 6
          DX24       ....................................   153
 7
          DX119      ....................................    98
 8
          DX139      ....................................   111
 9
          DX276      ....................................   165
10

11

12

13      Plaintiff                                      Received
        Exhibit
14
          P288       ....................................   102
15

16

17

18

19

20

21

22

23

24

25
```

```
 1                UNITED STATES DISTRICT COURT

 2                 DISTRICT OF MASSACHUSETTS

 3     _____

 4     STUDENTS FOR FAIR ADMISSIONS, INC.,

 5                    Plaintiff,          Civil Action
                                          No. 14-14176-ADB
 6     v.
                                          October 23, 2018
 7     PRESIDENT AND FELLOWS OF HARVARD
       COLLEGE, et al.,                   Pages 1 to 228
 8
                      Defendants.
 9     _____

10


11              TRANSCRIPT OF BENCH TRIAL - DAY 7
12       BEFORE THE HONORABLE ALLISON D. BURROUGHS
                 UNITED STATES DISTRICT COURT
13           JOHN J. MOAKLEY U.S. COURTHOUSE
                   ONE COURTHOUSE WAY
14                 BOSTON, MA  02210

15

16

17

18

19

20

21

22              JOAN M. DALY, RMR, CRR
23               Official Court Reporter
            John J. Moakley U.S. Courthouse
24          One Courthouse Way, Room 5507
                  Boston, MA  02210
25               joanmdaly62@gmail.com
```

Case: 19-2005    Document: 00117620840    Page: 245    Date Filed: 07/29/2020    Entry ID: 6356388
Case 1:14-cv-14176-ADB   Document 640   Filed 04/18/19   Page 2 of 228

2

```
 1   APPEARANCES:

 2
     COUNSEL FOR THE PLAINTIFF:
 3

 4           ADAM K. MORTARA, ESQUIRE
             J. SCOTT McBRIDE, ESQUIRE
 5           KRISTA J. PERRY, ESQUIRE
             Bartlit Beck Herman Palenchar & Scott
 6           54 West Hubbard Street
             Suite 300
 7           Chicago, Illinois 60654
             312.494.4400
 8           adam.mortara@bartlit-beck.com
             scott.mcbride@bartlit-beck.com
 9           krista.perry@bartlit-beck.com

10           JOHN M. HUGHES, ESQUIRE
             KATHERINE L.I. HACKER, ESQUIRE
11           MEG E. FASULO, ESQUIRE
             Bartlit Beck Herman Palenchar & Scott
12           1801 Wewatta Street
             Suite 1200
13           Denver, Colorado 80202
             303.592.3100
14           john.hughes@bartlit-beck.com
             meg.fasulo@bartlit-beck.com
15           kat.hacker@bartlit-beck.com

16           JOHN MICHAEL CONNOLLY, ESQUIRE
             THOMAS R. McCARTHY, ESQUIRE
17           WILLIAM S. CONSOVOY, ESQUIRE
             Consovoy McCarthy Park PLLC
18           3033 Wilson Boulevard
             Suite 700
19           Arlington, Virginia 22201
             703.243.9423
20           mike@consovoymccarthy.com
             tom@consovoymccarthy.com
21           will@consovoymccarthy.com

22

23

24

25
```

**JA1691**

```
 1    APPEARANCES (cont.):

 2
            PATRICK STRAWBRIDGE, ESQUIRE
 3          Consovoy McCarthy Park PLLC
            Ten Post Office Square
 4          8th Floor, South, PMB #706
            Boston, Massachusetts 02109
 5          617.227.0548
            patrick@consovoymccarthy.com
 6
            MICHAEL H. PARK, ESQUIRE
 7          Consovoy McCarthy Park PLLC
            3 Columbus Circle
 8          15th Floor
            New York, New York 10024
 9          646.456.4432
            park@consovoymccarthy.com
10
            PAUL M. SANFORD ESQUIRE
11          BENJAMIN C. CALDWELL, ESQUIRE
            Burns & Levinson LLP
12          One Citizens Plaza
            Suite 110
13          Providence, Rhode Island 02903
            401.831.8330
14          psanford@burnslev.com
            bcaldwell@burnslev.com
15

16    COUNSEL FOR THE DEFENDANT:

17          WILLIAM F. LEE, ESQUIRE
            FELICIA H. ELLSWORTH, ESQUIRE
18          ANDREW S. DULBERG, ESQUIRE
            ELIZABETH C. MOONEY, ESQUIRE
19          SARAH R. FRAZIER, ESQUIRE
            Wilmer Cutler Pickering Hale and Dorr LLP
20          60 State Street
            Boston, Massachusetts 02109
21          617.526.6556
            william.lee@wilmerhale.com
22          felicia.ellsworth@wilmerhale.com
            andrew.dulberg@wilmerhale.com
23          elizabeth.mooney@wilmerhale.com
            sarah.frazier@wilmerhale.com
24

25
```

**JA1692**

```
 1    APPEARANCES (cont.):

 2
            SETH P. WAXMAN, ESQUIRE
 3          DANIELLE CONLEY, ESQUIRE
            DANIEL WINIK, ESQUIRE
 4          BRITTANY AMADI, ESQUIRE
            PAUL R.Q. WOLFSON, ESQUIRE
 5          Wilmer Cutler Pickering Hale and Dorr LLP
            1875 Pennsylvania Ave, NW
 6          Washington, DC 20006
            202.663.6006
 7          seth.waxman@wilmerhale.com
            danielle.conley@wilmerhale.com
 8          daniel.winik@wilmerhale.com
            brittany.amadi@wilmerhale.com
 9          paul.wolfson@wilmerhale.com

10          DEBO P. ADEGBILE, ESQUIRE
            Wilmer Cutler Pickering Hale and Dorr LLP
11          7 World Trade Center
            250 Greenwich Street
12          New York, New York 10007
            212.295.6717
13          debo.adegbile@wilmerhale.com

14          ARA B. GERSHENGORN, ESQUIRE
            Harvard Office of the General Counsel
15          Smith Campus Center
            Suite 980
16          1350 Massachusetts Avenue
            Cambridge, Massachusetts 02138
17          617.495.8210
            ara_gershengorn@harvard.edu

18

19    COUNSEL FOR AMICI STUDENTS:

20          JON M. GREENBAUM, ESQUIRE
            BRENDA L. SHUM, ESQUIRE
21          GENEVIEVE BONADIES TORRES, ESQUIRE
            KRISTEN CLARKE, ESQUIRE
22          1500 K Street NW, Suite 900
            Washington, DC 20005
23          202.662.8315
            jgreenbaum@lawyerscommittee.org
24          bshum@lawyerscommittee.org
            gtorres@lawyerscommittee.org
25          kclarke@lawyerscommittee.org
```

Case: 19-2005    Document: 00117620840    Page: 248    Date Filed: 07/29/2020    Entry ID: 6356388
Case 1:14-cv-14176-ADB   Document 640   Filed 04/18/19   Page 5 of 228

5

```
1    APPEARANCES (cont.):

2
            LAWRENCE CULLEEN, ESQUIRE
3           EMMA DINAN, ESQUIRE
            Arnold & Porter LLP
4           555 Twelfth Street, NW
            Washington, DC 20004
5           202.942.5477
            gina.dean@aporter.com
6           emma.dinan@aporter.com

7
     COUNSEL FOR AMICI ORGANIZATIONS:
8
            JENNIFER A. HOLMES, ESQUIRE
9           CARA McCLELLAN, ESQUIRE
            JIN HEE LEE, ESQUIRE
10          MICHAELE M. TURNAGE YOUNG, ESQUIRE
            RACHEL N. KLEINMAN, ESQUIRE
11          NAACP Legal Defense and Educational Fund, Inc.
            700 14th Street NW
12          Suite 600
            Washington, DC 20005
13          jholmes@naacpldf.org
            cmcclellan@naacpldf.org
14          jlee@naacpldf.org
            myoung@naacpldf.org
15          rkleinman@naacpldf.org

16          KENNETH N. THAYER, ESQUIRE
            KATE R. COOK, ESQUIRE
17          Sugarman Rogers
            101 Merrimac Street
18          Suite 900
            Boston, Massachusetts 02114
19          617.227.3030
            thayer@sugarmanrogers.com
20          cook@sugarmanrogers.com

21

22

23

24

25
```

**JA1694**

P R O C E E D I N G S

1                    (The following proceedings were held in open

2  court before the Honorable Allison D. Burroughs, United

3  States District Judge, United States District Court, District

4  of Massachusetts, at the John J. Moakley United States

5  Courthouse, One Courthouse Way, Boston, Massachusetts, on

6  October 23, 2018.)

7            THE COURT:  Do you guys want a sidebar?

8            MR. MORTARA:  Yes, Your Honor.

9            [Sidebar sealed and redacted.]

10           THE COURT:  Dean Khurana, I remind you you're under

11  oath.

12                   (RAKESH KHURANA previously sworn by the Deputy

13  Clerk.)

14                   EXAMINATION (resumed)

15  BY MR. MORTARA:

16  **Q.**  Good morning, Dean Khurana, how are you?

17  **A.**  Good morning.

18  **Q.**  We left off yesterday talking about socioeconomic --

19  **A.**  Yes.

20  **Q.**  -- diversity at Harvard.  Do you remember that?

21  **A.**  Yes.

22  **Q.**  And we talked about the fact about the top 4 to 5 percent

23  of incomes in the United States, people who make over 150

24  grand a year, they're 30 percent of the students at Harvard

     1    College.  Do you remember that?

     2    **A.**  Yes.

     3    **Q.**  And I asked you about your work, your research about

     4    inequality, and structures of privilege.  Do you remember

     5    that?

     6    **A.**  Yes.

     7    **Q.**  And so we left off yesterday with me asking you based on

     8    your research do you think the overrepresentation of wealthy

     9    people at Harvard is responsible for perpetuating structures

    10    of inequality and privilege?

    11    **A.**   I think higher education is part of the solution to

    12    addressing issues of inequality and privilege.  I wish we had

    13    a more equal society, though.

    14    **Q.**  And you also wish that we had a more equal Harvard, don't

    15    you?  I mean, you actually wish Harvard was more

    16    socioeconomically diverse, in your heart.  I'm asking you as

    17    your own self, not as the dean of Harvard College.

    18    **A.**   Yes.  I'd like us to continue to do better in that area.

    19    **Q.**  Okay.  Great.  Now, I want to talk about you mentioned

    20    yesterday that you're not trying at Harvard College to mirror

    21    the socioeconomic diversity of America.  I was making this

    22    point that 5 percent, top 5 percent or 4 percent of incomes,

    23    30 percent at Harvard.  And you said we're not trying to

    24    mimic the socioeconomic diversity of America.

    25              Do you remember that?

1    **A.**   Yes.

2    **Q.**   Now, Harvard College's student body does pretty closely

3    approximate the United States population with respect to the

4    proportion of African-Americans, Hispanics, and Native

5    Americans on campus, doesn't it?

6    **A.**   I can't say for certain on that.

7    **Q.**   You did the race-neutral alternatives report, right, sir?

8    **A.**   Yes.

9    **Q.**   You talked about percentages of African-Americans on

10   campus.  It's around 14 percent in the 2019 class, right?

11   **A.**   Yes.

12   **Q.**   You talked about the percentage of Hispanics on campus.

13   I can't remember.  I can put it up.  Is it 12 percent or

14   something?

15   **A.**   I can't recall the exact number.

16   **Q.**   Let's put it up so we're all clear on what we're talking

17   about.  Excuse me.  It's 14 percent for both, right,

18   African-Americans and Hispanics.  Do you see that?

19                THE COURT:  What tab are we at?

20                MR. MORTARA:  This is P316, Your Honor.  While I'm

21   at it, I'll move P301 and 302 from yesterday.

22                THE WITNESS:  Could you tell me what page you're

23   on?

24                THE COURT:  Hold on.  Any objection to P301 and

25   302?

Case: 19-2005    Document 00117621840    Page: 252    Date Filed: 07/29/2020    Entry ID: 6356388
Case 1:14-cv-14176-ADB Document 640 Filed 04/18/19 Page 9 of 228

9

```
 1              MS. CONLEY:  Thanks very much.
 2   BY MR. MORTARA:
 3   Q.  Do you see the numbers 14 percent for African-Americans
 4   and Hispanics?
 5              THE COURT:  Any objection to 301 and 302?
 6              MS. CONLEY:  No.
 7              THE COURT:  301 and 302 are admitted.
 8              (Plaintiff Exhibit Nos. 301 and 302 admitted.)
 9   BY MR. MORTARA:
10   Q.  Do you see the numbers for African-Americans and
11   Hispanics?
12   A.  I'm sorry.  Could you tell me what page you're on?
13   Q.  I'm on page 8.  It's on the screen as well.
14   A.  Yes.
15   Q.  You know that's approximately reflective of the United
16   States population, right?
17   A.  I can't say that for certain.
18   Q.  What's your best guess?
19   A.  I'd rather not guess.
20   Q.  You don't know the proportion of African-Americans and
21   Hispanics in the United States population?
22   A.  Not exactly.
23   Q.  Well, through your work on inequality and structures of
24   privilege, do you know whether or not the minority
25   populations at Harvard reflect the socioeconomic diversity of
```

**JA1698**

1    those minority populations?

2          Let me explain.  I mean do the African-American

3    students at Harvard reflect the socioeconomic diversity of

4    African-Americans in the United States?

5    **A.**  Again, diversity is one built on multiple dimensions.

6    And so socioeconomic diversity is one of many dimensions that

7    we consider when evaluating an individual.

8    **Q.**  That's not my question, and I'll try to be clearer.

9          African-Americans at Harvard, like Harvard students

10   generally, are richer than African-Americans in the United

11   States.  What I mean by that is you disproportionately have

12   wealthy African-Americans at Harvard College versus their

13   representation in the general African-American population.

14   You know that, don't you?

15   **A.**  I'll assume that that's true.  I don't have the exact

16   data.

17   **Q.**  You did the race-neutral alternatives report, right?

18   **A.**  Yes.

19   **Q.**  That involved increasing socioeconomic diversity, right?

20   **A.**  That was one of many factors that we considered.

21   **Q.**  And one of the problems that you had with an increase of

22   socioeconomic diversity was that it was going to increase the

23   number of nonwhite students from disadvantaged backgrounds.

24   Isn't that one of the problems you had?

25   **A.**  One of the problems that we have is that we don't have

 1    any sort of single characteristic that we over-weight in that

 2    sense.  What we're trying to do is look at the whole person

 3    that's made up of different characteristics, different

 4    backgrounds and experiences.  And socioeconomic diversity is

 5    one of many characteristics that we consider in context of

 6    the individual.

 7    **Q.**  Let's look at what you said in the report.  Please turn

 8    to page 14 of the report.  You're on this committee, right,

 9    sir?

10    **A.**  Yes.

11    **Q.**  Let's look at what you said about the number of nonwhite

12    students from modest socioeconomic circumstances.  This is

13    your report, your words, right?

14    **A.**  This is our report.

15    **Q.**  "Using socioeconomic status as a proxy for race in the

16    admissions process would also, by definition, yield a student

17    body in which many of the nonwhite students would come from

18    modest socioeconomic circumstances."

19            Would you explain to the Court what is meant by

20    that?

21    **A.**  So one of the goals that we have is to bring a diverse

22    student body together from different backgrounds and

23    experiences.  And while, you know, different groups have

24    different characteristics, we also think about each

25    individual.  We wouldn't want students to think that, for

1    example, students of color only come from modest

2    socioeconomic backgrounds; that people from different

3    backgrounds and experiences can come from families that are

4    coming from upper backgrounds; or that we wouldn't want

5    students to presume that just because somebody may be

6    historically Caucasian that that means that they come from we

7    well-off backgrounds.  They could also be coming from very

8    modest backgrounds.

9              So the goal there is to really overcome this notion

10   of stereotypes in which we sort of assume if you know

11   something about somebody's group characteristic, that tells

12   you who they are as an individual or the complexity of their

13   background.

14   **Q.**  Virtually nothing of what you just said is reflected in

15   this paragraph; isn't that right?

16   **A.**  I think that's what the intent of this paragraph was

17   meant to --

18   **Q.**  So what you intended when you said that using

19   socioeconomic status as a proxy for race in the admissions

20   process would yield a student body in which many of the

21   nonwhite students would come from modest socioeconomic

22   circumstances is that you were worried that if relatively

23   well-off African-Americans and Hispanics weren't present on

24   Harvard College's campus in greater numbers, it would

25   reinforce a stereotype about racial minorities.

```
 1              That's your testimony?
 2     A.   Yes.
 3     Q.   And you remember Thang again?
 4     A.   Yes.
 5     Q.   Do you remember the slide I showed you yesterday?
 6     A.   Yes.
 7     Q.   Do you remember that he comes from quite a modest
 8     socioeconomic background?
 9     A.   Yes.
10     Q.   And so remember I talked about how he was an academic 3?
11     That was in the earlier academic part of this discussion?
12     A.   I remember you talking about that.
13     Q.   I'm representing to you that he's an academic 3.  So
14     fewer 1s and 2s, more 3s, fewer wealthy minorities, more
15     disadvantaged minorities.
16              And so what you're really saying is the problem
17     that you have with the race-neutral alternative of boosting
18     socioeconomic preferences is there would be more students
19     who, like Thang, have academic 3s and come from very modest
20     backgrounds?
21     A.   Again, all of our students are academically qualified to
22     being there.  What we're looking at is the backgrounds, the
23     diversity of their backgrounds, things like their
24     socioeconomic status but also other types of dimensions.
25              There's public spiritedness, their academic
```

1    interests, their geographic background.  All of this as a

2    whole person, not reducing somebody to sort of category which

3    I think is not the approach for our educational philosophy.

4    **Q.**  Does the paragraph I have highlighted on the screen say

5    anything about looking at people as whole people?

6    **A.**  I think it does if you look at the second sentence.  When

7    we say, "It would do so at the cost of other forms of

8    diversity undermining rather than advancing Harvard's

9    diversity-related educational objectives," which we've sort

10   of described -- you eloquently described yesterday as people

11   with different backgrounds and experiences bringing them

12   together to overcome the chasms of difference to find common

13   ground with each other.

14   **Q.**  One of the other forms of diversity you're talking about

15   is the diversity granted by wealthier minority students being

16   at Harvard combatting a racial stereotype.  That's what you

17   said, right?

18   **A.**  Again, I think, yes, to have a variety of diversity along

19   multiple dimensions.

20   **Q.**  As the dean of Harvard College, if a student or student

21   group raised concerns with you that Harvard College's

22   admissions process was disadvantaging Asian-Americans, what

23   would you do with that?

24   **A.**  If I thought there was any kind of systematic

25   discrimination, any intentional discrimination, as the dean

1    of the college, as a professor, as a father, I would have

2    rung multiple alarm bells with multiple people.  And anybody

3    who knows me knows that my commitment to creating an

4    environment where all of our students can flourish.

5    **Q.**  I have no reason to doubt that, Dean Khurana.  You'd want

6    somebody from Harvard College to engage in a conversation

7    with any students that brought you those concerns, right?

8    **A.**  Yes.

9    **Q.**  And if it were particular to the question of whether

10   Asian-Americans were being disadvantaged by the admissions

11   process, the person that you would have in mind for that

12   student to speak to would be someone from the admissions

13   office, like Dean Fitzsimmons, right?

14   **A.**  I'd want them to feel comfortable to discuss this with

15   many of our senior leaders or any of the leaders on campus,

16   including Dean Fitzsimmons.

17   **Q.**  But you would refer them to speak to someone in the

18   admissions office, correct?

19   **A.**  I would suggest that that would be important to do.

20   **Q.**  And we started off our conversation with a discussion of

21   how you did not know in 2017 whether or not Harvard College's

22   admissions process disadvantaged Asian-Americans.  Do you

23   remember that was your sworn testimony back in 2017?

24   **A.**  Yes.

25   **Q.**  And the reason you didn't know is that you expected Dean

```
 1   Fitzsimmons in the admissions office to be responsible for
 2   figuring that out, correct?
 3   A.  Yes.
 4              MR. MORTARA:  No more questions, Your Honor.
 5                           EXAMINATION
 6   BY MS. CONLEY:
 7   Q.  Good morning, Dean Khurana.
 8   A.  Good morning.
 9   Q.  Just stepping back for a minute, when did you first start
10   working at Harvard?
11   A.  In 2000.
12   Q.  And what was your role at that time?
13   A.  I was appointed assistant professor of organizational
14   behavior and management at the Harvard Business School.
15   Q.  And did you receive tenure at some point?
16   A.  Yes.
17   Q.  And when was that?
18   A.  In or around 2008.
19   Q.  Do you hold any other teaching positions at Harvard?
20   A.  I also have a joint faculty appointment with the faculty
21   of arts and sciences in the department of sociology.
22   Q.  Dean Khurana, what did you do prior to joining the
23   faculty at Harvard?
24   A.  I was on the faculty of the Massachusetts Institute of
25   Technology, MIT.
```

1    **Q.**  And you testified yesterday that you went to Harvard for

2    graduate school; is that right?

3    **A.**  Yes.

4    **Q.**  And what degrees did you receive?

5    **A.**  I received a master's degree in sociology and a Ph.D. in

6    organizational behavior.

7    **Q.**  Focusing in as your role of the dean of the college, what

8    are your primary responsibilities in that role?

9    **A.**  I have three primary responsibilities:  the academic

10   curriculum; this residential -- second, residential and

11   co-curricular activities for our students; and third,

12   academic and social discipline.

13   **Q.**  In addition to your role as dean at the college, do you

14   have any other roles?

15   **A.**  Yes.

16   **Q.**  And what are they?

17   **A.**  I'm a faculty dean of one of Harvard's 12 residential

18   houses, Cabot House.

19   **Q.**  What is the Cabot House?

20   **A.**  Cabot House is one of the Harvard's 12 residential houses

21   in which students are assigned for their sophomore, junior,

22   and senior years.

23   **Q.**  And do all of Harvard College's students live in one of

24   the residential houses?

25   **A.**  98 percent of our students live in one of our residential

1    houses or in the first-year residential experience.

2    **Q.**   And Dean Khurana, why is it that the majority, the

3    overwhelming majority of Harvard College students live on

4    campus?

5    **A.**   The Harvard College philosophy is that education is not

6    only what happens in the classroom but it's also what happens

7    in the sort of whole-student undergraduate experience.  And

8    so students by living together, participating in

9    co-curricular activities together really learn from each

10   other, discuss the different subjects that they're learning

11   with each other, current events, participate in joint

12   interests.  And that's part of our educational philosophy.

13   **Q.**   What responsibilities do you have as a faculty dean at

14   the Cabot House?

15   **A.**   Primarily three responsibilities:  Our students' academic

16   well-being, their social well-being, their ability to connect

17   and interconnect across the class, and their personal

18   well-being, primarily their physical and mental health.

19   **Q.**   Dean Khurana, since you've become the dean of the

20   college, have you set any goals for improving the Harvard

21   College educational experience?

22   **A.**   Yes.

23   **Q.**   At a high level, what goals have you set for the college?

24   **A.**   First, that Harvard College should continue to strive to

25   set the standard for a residential liberal arts and sciences

1    program; second, that we should create a strong culture of

2    inclusion and belonging so that our students can fully

3    flourish and thrive and contribute; and third, to strengthen

4    our commitment to educating citizens and citizen leaders for

5    our society.

6    **Q.**   You mentioned creating a sense of inclusion on the

7    campus.  Why is it important to achieving the educational

8    goals at Harvard to foster that sense of inclusivity?

9    **A.**   As an educator, you know that in order for people to

10   really reach their full potential, they have to have a sense

11   that they'll be heard; that their points of view are

12   respected; that others are listening effectively to them so

13   that they bring forth their ideas, their perspectives,

14   debate, discuss different points of view, and learn from each

15   other.

16   **Q.**   And let's talk a little bit about Harvard, how Harvard

17   College fits into the university as a whole.  Did you prepare

18   a demonstrative to illustrate the various schools at the

19   university?

20   **A.**   Yes.

21   **Q.**   If we could pull up DDX2.2.

22              Dean Khurana, what does this show?

23   **A.**   These are the different schools that constitute the

24   overall university.

25   **Q.**   And looking at that demonstrative, how does Harvard

1   College fit into the university as a whole?

2   **A.** Well, we're made up of many schools, so professional

3   schools, graduate schools. And one of the schools that we're

4   made up of is the faculty of arts and sciences. And Harvard

5   College is one of the divisions of the Harvard faculty of

6   arts and sciences.

7   **Q.** Who's responsible for overseeing each of the schools that

8   make up Harvard University?

9   **A.** A dean.

10  **Q.** Now, do you recall Mr. Mortara asking you questions

11  yesterday about the number of people on the Ryan committee?

12  **A.** Yes.

13  **Q.** Which of these schools was the focus of the Ryan

14  committee?

15  **A.** I believe that the university was the overall focus, not

16  any individual school, but I don't have any details on that.

17  **Q.** And which of these schools was the focus of the RNA

18  committee?

19  **A.** Harvard College.

20  **Q.** Now, as the dean of the college, to whom do you report?

21  **A.** I report to the dean of the faculty of arts and sciences.

22  **Q.** And who is that?

23  **A.** Dean Claudine Gay.

24  **Q.** And prior to when Dean Claudine Gay became the dean of

25  the faculty of arts and sciences, who did you report to?

1    **A.**   Dean Michael Smith.

2    **Q.**   And as the dean of the college, are you involved in the

3    day-to-day work of the admissions office?

4    **A.**   No.

5    **Q.**   Are you familiar with what the admissions office does at

6    a high level?

7    **A.**   I am at a high level.

8    **Q.**   Now, Dean Khurana, yesterday in your testimony you

9    referenced Harvard College's mission statement.  Do you

10   recall that?

11   **A.**   Yes.

12   **Q.**   When did Harvard College adopt its currents mission

13   statement?

14   **A.**   The college has had a longstanding mission.  But in its

15   kind of current colloquial terms, around 2014.

16   **Q.**   Can you turn to Tab 2 in your binder?

17           THE COURT:  For identification do you have a number

18   on this demonstrative?

19           MS. CONLEY:  Oh, yes.  Sorry, Your Honor.  I

20   believe it's DD 2.3.

21   BY MS. CONLEY:

22   **Q.**   At Tab 2 you'll see Defendant's Exhibit 109.  Do you

23   recognize this document, Dean Khurana?

24   **A.**   Yes.

25   **Q.**   What is it?

1    **A.**   It's the mission of Harvard College.

2    **Q.**   Does the document accurately reflect the mission of

3    Harvard College?

4    **A.**   Yes, it does.

5            MS. CONLEY:  Your Honor, I'd like to offer

6    Defendant's Exhibit 109 into evidence.

7            MR. MORTARA:  No objection, Your Honor.

8            THE COURT:  It's admitted.

9            (Defendant Exhibit No. 109 admitted.)

10   BY MS. CONLEY:

11   **Q.**   And what is the mission of Harvard College?

12   **A.**   The mission of Harvard College has been for almost four

13   centuries now to educate the citizens and citizen leaders for

14   our society through the transformative power of a liberal

15   arts and sciences education.

16   **Q.**   And in your own words, what does that mean?

17   **A.**   It consists of three components, what we call the

18   intellectual transformation, which is new ways of knowing,

19   new ways of understanding, all toward helping our students

20   develop an open mind and independent mind.

21           Second, we embed that experience in a very diverse

22   living and learning experience where students study alongside

23   students who are different from them, who come from different

24   walks of life, and have different identities, which we

25   believe not only deepens the intellectual transformation but

 1   sets the conditions for social transformation, what their

 2   understanding of being in a community means, where they learn

 3   to see behind each other's eyes, to hear from another

 4   perspective.

 5          And then through those experiences, we hope our

 6   students are on a journey of answering three questions for

 7   themselves:  Who am I and who do I want to be?  How do I

 8   relate to others?  And what can I learn from others?  What

 9   are my gifts and talents, and how can I best use them to

10   serve the world?  So a personal transformation.

11   **Q.**   And, Dean Khurana, how does Harvard College ultimately

12   carry out that mission?

13   **A.**   Through exposing our students to a diversity of subjects

14   and fields that allow them to understand how they fit into

15   the world in the role of history, the different perspectives,

16   through a diversity of exposure to different types of

17   students and backgrounds where students learn from each other

18   who are studying different things, and then basically a

19   diversity of personal experiences.

20   **Q.**   Now, does the diversity of the student body play a role

21   in allowing Harvard College to achieve its educational

22   mission?

23   **A.**   Yes.

24   **Q.**   And how so?

25   **A.**   Well, the essence of education is an exposure to

1    diversity of perspectives and points of view where you

2    decenter yourself, where you start seeing --

3         There's like an old parable in my family about

4    seeing the elephant.  What you do is you learn to step back,

5    and you learn that you don't have a full picture that other

6    people can see different parts, that the same thing can look

7    different from somebody's background, their experience, their

8    understanding of a text.

9         And that -- all of that comes together to sort of

10   help people have perspective-taking and also that little bit

11   of humility that they don't have kind of a monopoly on the

12   truth.

13   **Q.**  Dean Khurana, what times of diversity are important for

14   Harvard fulfilling its educational mission?

15   **A.**  Multiple forms of diversity.  Diversity in academic

16   interests, diversity in backgrounds, diversity in racial

17   perspectives, diversity in belief systems, political points

18   of view, geography, diversity of parental occupations.

19        All of those things come together, just really kind

20   of the diversity of the human experience.

21   **Q.**  And I want to focus in on racial diversity for a minute.

22   Why is it that racial diversity, in particular, is important

23   to allowing Harvard College to achieve its educational

24   mission?

25   **A.**  Racial diversity, like many of our other sort of

 1   identities, can shape our experience of ourselves.  They

 2   connect to our traditions, our cultures.  They also shape how

 3   others experience us.  And as part of a kind of, you know,

 4   complexity of human identity, these are critical aspects

 5   because they shape our understanding and perspective on the

 6   world.

 7   **Q.**  And have your personal experiences informed your views on

 8   the benefits of diversity?

 9   **A.**  Yes.

10   **Q.**  And how so?

11   **A.**  Well, as a teacher and educator, I have a diverse

12   classroom.  I can give you a concrete example.

13          For example, in teaching a case study on a company

14   making a decision about whether it should outsource some of

15   its work or factory to a lower-cost area, a student might

16   advocate, well, we should do that because we don't have a

17   union in that other place and the cost will be lower.

18          And in that context of explanation, I'll have

19   another student saying, well, both my parents were in unions,

20   and unions helped elevate our family's wages, they gave us

21   access to a better life, and I wouldn't be at Harvard if it

22   wasn't for a union.

23          And at that moment as an educator, you can see all

24   sorts of perspectives being changed.  The students who were

25   listening, the student who made the original comment, the

1    student now who had made the second comment also appreciating

2    the other student's perspective.  And that's the kind of

3    perspective-taking having that diversity allows.

4    **Q.**  You talked a little bit about your personal experience

5    with the benefits of diversity inside of the classroom.

6            During your time as dean, have you personally seen

7    the benefits of diversity outside of the classroom at Harvard

8    College?

9    **A.**  Yes.

10   **Q.**  And how so?

11   **A.**  One of the great aspects of my job and life is as faculty

12   dean at Cabot House.  I live with the students.  So we live

13   with about 350 students.  And in that context, each of our

14   houses have their own dining hall and own libraries.

15           You see students coming together of different

16   backgrounds and experiences who have otherwise not interacted

17   with each other.  You see them talking to each other about

18   their classroom experiences, about current events at the

19   dining hall.  When something happens in our community that's

20   difficult, we come together and share in the grief.  When

21   something amazing happens to one of our students, we share in

22   that joy.

23           And I watch our students form friendships that not

24   only just last at Harvard but last a lifetime.  I watch them

25   learn to see from each other's perspective.  I watch them

 1    fall in love and later on become life partners.  It's really

 2    a gift.

 3    **Q.**  Dean Khurana, did Harvard College's interest in

 4    assembling a diverse student body start when you became the

 5    dean?

 6    **A.**  No.

 7    **Q.**  And how long did the college's interest in diversity

 8    begin?

 9    **A.**  You know, it's always been something from since I joined

10    Harvard that I've understood as part of its perspective.

11    Again, diversity, perspectives, and points of view.  And the

12    student body has been -- at least in my recent years has

13    always been of concern.

14    **Q.**  And in the time that you've been dean of the college, has

15    the college ever conducted any formal assessments or studies

16    about the importance of diversity to achieving its

17    educational mission?

18    **A.**  Yes.

19    **Q.**  And have you prepared a demonstrative to illustrate those

20    assessments?

21    **A.**  Yes, we have.

22    **Q.**  Let's turn to DD 2.8.  Now, looking at DD 2.8, Dean

23    Khurana, when was the first formal assessment during your

24    time as the dean of the college when you looked at the

25    importance of diversity?

1    **A.**   In the late spring of 2014.

2    **Q.**   And was that the committee that you briefly touched on

3    with Mr. Mortara yesterday, the Walton committee?

4    **A.**   Yes.  That was done in consultation with the interim

5    dean.  But it was the Walton committee to look at college

6    diversity inclusion.

7    **Q.**   Sorry.  I referred to it as the Walton committee.  It's

8    the college group on diversity and inclusion?

9    **A.**   Yes.

10   **Q.**   What was the catalyst for that particular working group?

11   **A.**   Well, there had been a lot of just general discussion

12   about belonging and inclusion.  But the specific catalyst was

13   in a student kind of performance, a student film and writings

14   on something called "I Too Am Harvard" in which students who

15   have been from historical minority groups talked about how

16   their presence at Harvard still often felt suspect to others,

17   and they didn't feel a full sense of inclusion at the

18   institution.

19   **Q.**   In addition to the "I Too Am Harvard" movement you just

20   described, were there any other incidents on campus that

21   sparked the formation of this particular committee?

22   **A.**   Yes.  As Harvard had made a commitment toward financial

23   inclusion, students from different socioeconomic backgrounds,

24   students from different, say, minority, political

25   perspectives, students from historical sexual minorities, all

**JA1717**

1    talked about ways that we could strengthen the sense of

2    inclusion and belonging.  We wanted to take a very

3    comprehensive look about how to do that in order to achieve

4    our educational objectives.

5    **Q.**   Who led the college working group on diversity and

6    inclusion?

7    **A.**   That would be Professor Jonathan Walton from Harvard

8    Divinity School and who also was the Christian Plummer

9    professor of Christian morals, the head of Memorial Church at

10   the university.

11   **Q.**   And is that why it's sometimes referred to as the Walton

12   committee?

13   **A.**   Yes.

14   **Q.**   Did the Walton committee issue a report?

15   **A.**   Yes.

16   **Q.**   Stepping back, what was your personal role on the Walton

17   committee?

18   **A.**   Working with the interim dean, wrote the charge and the

19   remit for the committee and then provided feedback on drafts

20   of the committee's report.

21   **Q.**   If you could, turn to defendant's Exhibit 13, which is

22   Tab 3 in your binder, Dean Khurana.  What is this document?

23   **A.**   This document is the report of the college working group

24   on diversity and inclusion.

25   **Q.**   And when was the report issued?

1    **A.**   In the late fall of 2015.

2    **Q.**   And did you have a role in preparing the report?

3    **A.**   Yes.

4          MS. CONLEY:  Your Honor, I'd like to offer

5    Defendant's Exhibit 13 into evidence.

6          MR. MORTARA:  No objection, Your Honor.

7          THE COURT:  It's admitted.

8          (Defendant Exhibit No. 13 admitted.)

9    BY MS. CONLEY:

10   **Q.**   And if you could, turn to pages 13 and 14.  Sorry.  I

11   believe it's actually pages 4 and 5 of this document, Dean

12   Khurana.

13   **A.**   Yes.

14   **Q.**   Who are the individuals who appear on those pages?

15   **A.**   These are faculty, students, and staff who were on the

16   committee.

17   **Q.**   And who are they?

18   **A.**   Well, they're really a remarkable group of individuals.

19   These are individuals who had a strong interest in

20   strengthening, belonging and inclusion in our classroom

21   experiences and our residential experiences and through our

22   student co-curricular activities.

23   **Q.**   And if you turn to page 6 of the report, you'll see a

24   section entitled "The Mission of Harvard College."  Do you

25   see that?

1    **A.**  Yes.

2    **Q.**  Okay.  And looking at the second paragraph in the second

3    sentence there, it states that "Harvard fosters the ability

4    to see the world through the eyes of others."

5    **A.**  Yes.

6    **Q.**  What did the committee mean by that?

7    **A.**  At the core of a liberal arts and sciences education is

8    the ability to see the world from somebody else's

9    perspective; to develop a narrative imagination of what it's

10   like to be someone else; to deepen the reservoirs of empathy

11   so that one can deparochialize their centeredness in the

12   world; and realize that they exist in context of a history

13   and context of others.

14   **Q.**  Let's turn to page 7.  Look at the next page there.

15           Now, yesterday Mr. Mortara asked you questions

16   about this particular section of the report and particularly

17   examples of periods in Harvard's history where it operated

18   contrary to its current mission of diversity and inclusion.

19           Do you recall those questions?

20   **A.**  Yes.

21   **Q.**  Why did the Walton committee reference those historical

22   periods in this particular report?

23   **A.**  If you don't know the mistakes you've made, if you don't

24   contextualize it, you're likely to make those mistakes again,

25   and so you have to constantly be aware of your own history.

 1    **Q.**  Now let's turn to page 9 and look at the section entitled

 2    "The Charge of the Working Group on Diversity and Inclusion."

 3              Do you see that?

 4    **A.**  Yes.

 5    **Q.**  What was the Walton committee's charge?

 6    **A.**  To assess Harvard College's learning environment in order

 7    to ensure that all students benefit equally from its liberal

 8    arts and sciences mission and experience.

 9    **Q.**  And after the Walton committee completed its work, did it

10    provide recommendations?

11    **A.**  Yes.

12    **Q.**  Let's turn to page 30.  Looking at that second full

13    paragraph, what are the categories of recommendations that

14    the Walton committee offered?

15    **A.**  We focused on both the short-term and long-term

16    recommendations.

17    **Q.**  And with respect to the short-term recommendations

18    proposed by the Walton committee, can you provide an example

19    of what one or two of those short-term recommendations were?

20    **A.**  Yes.  There were several.  But just to take one concrete

21    example, as we increased the socioeconomic diversity of our

22    student body, we became aware of certain practices that could

23    create a sense of just alienation or otherness.

24              Specifically, we provided students free tickets to

25    student social events.  But there was actually a separate

1    line for students who were on financial aid to get those

2    tickets.  I don't know why that ever existed, but it

3    shouldn't have been that way, and we very quickly corrected

4    that, that everybody could be just in one line and you just

5    pick up your ticket.

6            We also became aware that, you know, again, given

7    Harvard's commitment to socioeconomic diversity, certain

8    practices like closing the dining halls during spring break

9    didn't work for everyone.  Some people couldn't go away for

10   spring break, and we wanted to make sure that meals were

11   provided and activities during that time period.  So those

12   were the kinds of things we considered.

13   **Q.**  And if we turn to page 35 of the report, looking at the

14   recommendations for long-term interventions, did the college

15   adopt any of the long-term recommendations that were proposed

16   by the Walton committee?

17   **A.**  Yes.

18   **Q.**  And can you give an example of one of those?

19   **A.**  Some of the long-term recommendations we said is that we

20   need to consistently also be looking at our academic

21   curriculum, making sure that continually it's updated, that

22   it reflects the interests, but also the contemporary

23   literature in a lot of areas.  And so those were some of the

24   types of things that we began to consider.

25   **Q.**  And let's turn to page 38 of the report.  What was the

1    conclusion that was ultimately reached by the Walton

2    committee?

3    **A.**   The conclusion that we reached was that while we had made

4    much progress as an institution in increasing the diversity

5    of our student body, we hadn't yet created an environment

6    where we were able to ensure that we were able to realize its

7    full benefits.

8    **Q.**   Now, separate and apart from the Walton committee, were

9    you involved in any other studies or formal assessments of

10   the importance of student body diversity to Harvard College?

11   **A.**   Yes.

12   **Q.**   And if we pull up DD 2.9.  What other committee were you

13   involved in?

14   **A.**   The committee to study the importance of student body

15   diversity.

16   **Q.**   And you were the chair of that committee?

17   **A.**   I was.

18   **Q.**   So it's referred to as the Khurana committee?

19   **A.**   Okay.  That's fine.

20   **Q.**   When was that committee formed?

21   **A.**   That committee was formed in the early spring semester of

22   2015.

23   **Q.**   And, Dean Khurana, why was the Khurana committee formed?

24   **A.**   During the work that we had been doing at the college, I

25   stayed in constant communication with Dean Smith and

1    President Faust and continued to talk about the opportunities

2    we had to strengthen our commitment to belonging and

3    inclusion.  And they asked me to chair this committee.

4    **Q.**  Okay.  And I believe that Mr. Mortara referred you to

5    this document in his examination of you, but it's at Tab 4 of

6    your binder, Plaintiff's Exhibit 302.

7    **A.**  I have it.

8    **Q.**  And that's the report of the Khurana committee; is that

9    right?

10   **A.**  Yes, I believe it is.

11   **Q.**  Let's take a look at the last page of that report,

12   page 22.

13   **A.**  Yes.

14   **Q.**  Who are the individuals listed at the bottom of the page?

15   **A.**  These are faculty at Harvard University.

16   **Q.**  And are those faculty the members of the Khurana

17   committee?

18   **A.**  Yes.

19   **Q.**  Let's take a look at page 1 of the report.  So looking at

20   the first paragraph there under the introduction, what was

21   the ultimate goal of this committee?

22   **A.**  The goal of this committee was to underscore the

23   importance that student body diversity plays in the

24   achievement of our educational mission.

25   **Q.**  Let's turn to page 4.  If you look at the first indented

1    paragraph there, there's a quote from former President

2    Rudenstine regarding creating a community that includes "a

3    collision of views."

4          What is that referring to?

5    A.  Again, at the heart of an educational experience is that

6    different perspectives and points of view and ideas competing

7    with each other, in debate with each other, arguing with each

8    other respectfully is how we get to a closer approximation of

9    a true understanding of the world.

10   Q.  And, Dean Khurana, did your committee make any findings

11   regarding the benefits of diversity to the educational

12   curriculum at Harvard College?

13   A.  Yes.

14   Q.  Let's take a look at page 7.  Now, there's a section

15   there on the general education curriculum at the college.

16   What is the general education curriculum?

17   A.  The general education curriculum is a set of core courses

18   that we ask all our Harvard undergraduates to take.  Its aim

19   is to prepare our students to be responsible citizens and

20   citizen leaders in our society.

21   Q.  And looking at the last paragraph there, what did your

22   committee find regarding the benefits of diversity to the

23   general education curriculum at the college?

24   A.  Well, what we found is that, you know, since we're

25   preparing our students for a diverse society and a diverse

1    and interconnected world, that our general education

2    curriculum had to continually reflect that type of diversity

3    and those different perspectives.

4              And so part of what we were suggesting is that our

5    courses really step back and take advantage and reflect on

6    how we're doing that in our current curriculum.  And this

7    subsequently led to revisions in the gen ed cores.

8    **Q.**  If we take a look at page 8, the next page, there's also

9    a section on the broader curriculum.  What is the broader

10   curriculum at Harvard College?

11   **A.**  In addition to the required courses that we have, such as

12   in the gen ed, our students also have majors or what we call

13   concentrations and the elective courses that they take.

14   **Q.**  What were the committee's findings regarding the impact

15   of diversity to the broader curriculum at the college?

16   **A.**  That diversity was key to kind of renewing and ensuring

17   that our broader curriculum reflected the best knowledge of

18   the date.

19   **Q.**  So still on page 8, did the committee relay an example of

20   how diversity has made an impact on the broader curriculum?

21   **A.**  Yes.

22   **Q.**  Can you explain what that example was?

23   **A.**  So in this example, a professor made a comment in a class

24   that upset one of the African-American students in the class.

25             And then that student sort of made certain

1    assumptions about the nature of that information, why it was

2    presented, and was upset.

3         But then another student who is also

4    African-American actually agreed with the perspective that

5    the professor had put forward, then causing the first student

6    to kind of rethink their own point of view.

7         And then there's a third student who also had

8    another point of view who also happened to have been of

9    African-American descent.

10        Just something like that demonstrates that

11   stereotypes are broken; that you can't assume that you know

12   somebody just because of some shared group identity of how

13   they think; and that learning is not only for the students

14   within that, but it's the learnings for all students who are

15   benefiting from those perspectives and realizing that our

16   differences don't necessarily define us.  And neither do our

17   similarities tell you everything about us.

18   **Q.**   Now, Dean Khurana, let's turn to page 11 of the report.

19   There's a section there labeled "Residences and

20   Extracurricular Activities."

21   **A.**   Yes.

22   **Q.**   Did the committee make findings regarding the importance

23   of diversity outside of the classroom?

24   **A.**   Yes.

25   **Q.**   Looking at the section, if you scroll down a bit, labeled

1    "Freshman Rooming and the Harvard House System."

2    **A.**  Yes.

3    **Q.**  How does Harvard's housing system with respect to

4    freshman rooming and the overall housing system allow

5    students to benefit from diversity outside of the classroom?

6    **A.**  The entire college experience is curated around creating

7    encounters with people different from you and different

8    backgrounds and experiences.

9         In the case of freshmen, we don't let our students

10   decide their own roommate.  Rather, a student sends in a

11   description about themselves.  We also have family send in

12   family letters.  They're hand-by-hand, you know, resident

13   deans and the proctors begin to create a microcosm of the

14   college not only in the rooming situation but also the

15   surrounding rooms so the students can benefit from the

16   diversity of different backgrounds and experiences that are

17   at the college.

18   **Q.**  Let's turn to page -- the next page, page 14.  There's a

19   section that's labeled "Extracurricular Activities."  Do you

20   see that?

21   **A.**  Yes.

22   **Q.**  Did the committee make any specific findings regarding

23   the importance of diversity in extracurricular activities at

24   Harvard?

25   **A.**  Yes.

1    **Q.**  And could you provide just one example of how

2    extracurricular activities allow students to benefit from

3    diversity outside of the classroom?

4    **A.**  So our students are very energetic.  They belong to a lot

5    of student organizations, so we have many, many student clubs

6    across a variety of different interests.

7           In the case or the example here is a group called

8    Kuumba which is a longstanding student group that celebrates

9    the culture of black spiritual music.  And it's open to every

10   student.  And when you go to a Kuumba performance -- and you

11   will see many of them at Harvard -- you'll see students from

12   all different backgrounds and experiences singing from

13   different religious backgrounds -- racial, geographic,

14   ethnic -- all working together and honoring a culture that

15   for many people is important to them but also a culture that

16   students may not have been familiar with and yet respecting

17   and honoring that culture.

18          And I could give countless examples of this that

19   happen at the college.

20   **Q.**  Dean Khurana, let's move one more page forward to the

21   athletics section of the report.

22   **A.**  Yes.

23   **Q.**  Did the committee make any specific findings regarding

24   diversity for athletics at college?

25   **A.**  Yes.

1    **Q.**  How do athletics allow students to benefit from diversity

2    outside of the classroom?

3    **A.**  Being a student athlete is another form of background and

4    diversity and interest.  We saw three.  One is that athletics

5    created a strong sense of community identity for the college.

6             Just in a couple of weeks, for example, we're going

7    to have the Harvard-Yale football game in which tens of

8    thousands of alumni and students are coming together to

9    celebrate and reacquaint themselves with the institution.

10            Athletes also, you have a diverse backgrounds and

11   experiences on our athletic teams, and their students learn

12   to work together toward a common goal.

13            Our athletes also benefit all of our students

14   because they have to both balance a rigorous training

15   schedule but also their academic work.

16            But many of our students have -- all of us as

17   humans face challenges, but I would say that for our age

18   group, many of our students haven't yet perhaps confronted

19   all of the things that life sometimes brings you.  And having

20   athletes who have been injured, lost games, and have to be

21   resilient to recover from that also teaches all of our

22   students about the importance of that capacity and that

23   capability of being resilient.

24   **Q.**  Now, Dean Khurana, does Harvard have any offices that are

25   devoted to issues of diversity?

1  **A.**  Yes.

2  **Q.**  And what are those offices?

3  **A.**  This is part of the work that all of us do, but we do

4  have within the college an office of equity, diversity, and

5  inclusion in which we work together.  We have The Harvard

6  Foundation all to strengthen a common culture around equity,

7  diversity, and inclusion.

8  **Q.**  Now, let's turn to pages 21 and 22, looking at the

9  "Conclusion" section of the report.

10       What conclusion did the Khurana committee

11  ultimately reach regarding the benefits of student body

12  diversity?

13  **A.**  That student body diversity in all of its dimensions,

14  including racial diversity, is essential.  It's the oxygen by

15  which our institution progresses.  It's how our research

16  progresses.  It's how our teaching progresses, and it's how

17  ultimately we are able to do our part to contribute to

18  society.

19  **Q.**  And what happened after of the committee finalized its

20  report?

21  **A.**  This report was brought to the faculty council, which is

22  an elected body within the faculty of arts and sciences.

23  **Q.**  Did the faculty council vote on whether to endorse the

24  committee's report?

25  **A.**  Yes.  The faculty council voted to endorse the

1    committee's report and then it was brought to the full

2    committee to vote as well.  I believe that both votes were

3    unanimous.

4    **Q.**  Dean Khurana, in the two and a half years since this

5    report was endorsed by the full faculty, has Harvard College

6    achieved its goals for creating a diverse student body?

7    **A.**  Not yet.

8    **Q.**  How so or why not?

9    **A.**  I feel we have more work to do.  Given our society, I

10   know talent is everywhere, but our opportunities are not.

11   And we want that talent to feel like it has a place at

12   Harvard.

13   **Q.**  And is Harvard continuing to work toward creating a more

14   diverse and inclusive educational environment?

15   **A.**  Yes.  We are engaged in multiple dialogues about this.

16   We continue to invite students from different backgrounds and

17   experiences, and we hope they'll consider Harvard as an

18   option.  When students are here, we're trying to create an

19   environment in which they engage and encounter each other in

20   a variety of different contexts.  So yes.

21   **Q.**  Switching topics for a minute, Dean Khurana.

22          Do you interface with the Office of Institutional

23   Research in your role as dean of Harvard College?

24   **A.**  Yes.

25   **Q.**  And had you ever worked with OIR before you became dean

 1    of the college?

 2    **A.**   Not in any formal way.

 3    **Q.**   Now, when you first became dean, did OIR provide you with

 4    any of their work?

 5    **A.**   When I first became dean, there was a lot of material

 6    that was left in my office from a variety of different

 7    groups, and among that I think there was material from the

 8    Office of Institutional Research.

 9    **Q.**   And if you could, turn to Tab 1 in your binder, which is

10    Plaintiff's Exhibit 41.  Let me know when you're there.

11    **A.**   Yes, I'm there.

12    **Q.**   What is this document?

13    **A.**   It's an email.

14    **Q.**   And who is it from?

15    **A.**   Erica Bever.

16    **Q.**   And who is it to?

17    **A.**   Erin Driver-Linn.

18    **Q.**   And, Dean Khurana, what's the subject of the email?

19    **A.**   Agenda underscore for Khurana.

20    **Q.**   And what's the date?

21    **A.**   July 10, 2014.

22    **Q.**   And when did you formally become dean of the college?

23    **A.**   July 1, 2014.

24    **Q.**   So this email is about nine days after you formally

25    became the dean?

1    **A.**   Yes.

2    **Q.**   And in her email, Ms. Bever states that she's attaching

3    "a draft agenda for tomorrow's meeting with Dean Khurana."

4              Do you see that?

5    **A.**   Yes, I see that sentence.

6    **Q.**   And do you recall meeting with OIR around this time in

7    July of 2014?

8    **A.**   Yes.

9    **Q.**   And what was the subject matter of that meeting?

10   **A.**   It was a very high-level meet-and-greet type of meeting.

11   **Q.**   And at that meeting, did you discuss any of OIR's work

12   product?

13   **A.**   No.

14   **Q.**   Let's take a look at page 47 of P41.  The presentation is

15   entitled "Evaluating Factors That Play a Role in Harvard

16   College Admission."

17              Do you see that?

18   **A.**   Yes, I see that sentence.

19   **Q.**   Could you turn to Slide 2 in that presentation, which is

20   page 48 of P41.

21   **A.**   Yes.

22   **Q.**   And what is the stated goal there?

23   **A.**   It says, "Using various admissions ratings, how well can

24   we approximate admit rates by race/ethnicity and the

25   demographic composition of the admitted students pool?"

1    **Q.**  And sticking on that slide, if you'd go to the bottom

2    there, what do the notes say?

3    **A.**  Bullet Point 1 says, "Students with no academic index are

4    excluded from this analysis."

5            Bullet 2 says, "The following analysis is

6    preliminary," that's underscored and bolded, "and for

7    discussion."

8    **Q.**  Dean Khurana, on the same slide, what does the first

9    bullet under "Strategy" say?

10   **A.**  "Fit a series of basic logistic regression models using

11   data from classes of 2007 through 2016.

12   **Q.**  Now, can you please turn to page 50 of P41.

13   **A.**  I'm there.

14   **Q.**  Do you recall seeing a slide like this when you became

15   the dean of the college?

16   **A.**  I can't say I saw this exact slide, but I do remember

17   seeing a slide that looked like this.

18   **Q.**  Other than this slide or a slide that looked like this,

19   do you recall reviewing any other analysis by OIR related to

20   admissions when you became the dean?

21   **A.**  No.

22   **Q.**  And, Dean Khurana, are you familiar with how to run a

23   regression analysis?

24   **A.**  Yes.

25   **Q.**  And what's that familiarity based on?

1    **A.**  As part of my doctoral training, you learn regression

2    analysis.  And I've used that in my own research and also in

3    reviewing articles for journals.

4    **Q.**  And, Dean Khurana, what was your reaction when you saw

5    this particular slide?

6    **A.**  I didn't really have a reaction.  I had an impression,

7    which is I found this kind of incomplete and a little bit

8    puzzling approach to understanding how you got admitted to

9    Harvard.

10    **Q.**  And what, if anything, did these models suggest to you

11    regarding Harvard's admissions process?

12    **A.**  Well, if I put myself back in that time, even knowing

13    what I knew then, I know that Harvard's admissions process

14    actually looks, you know, at a role of, like, recommendation

15    letters; it looks at whether students have competed in

16    national science fair competitions; it looks at the personal

17    essay; and that these are things that are very important in

18    college admissions.  And that was not reflected in these

19    slides -- this slide.  Sorry.

20    **Q.**  What, if anything, did Model 1 show you?

21    **A.**  Again just with lots of caveats of not knowing what was

22    underneath this, the reading that you would give to this is

23    academics, however it's defined -- and I don't know what goes

24    into this other than if it's largely quantitative -- that

25    Asians as a group do better under that category relative to

1   other groups.

2   **Q.**   And if you take a look at Model 4, does the fact that

3   Model 4 is close to the actual composition of the class,

4   which is reflected in the final bar there, impact your view

5   of the models on this slide?

6   **A.**   A model fit is not always an indicator of a good model if

7   it doesn't actually reflect the underlying processes.  So you

8   have to be very cautious when you read into that.  I'd also

9   want to know as you added this data how was it filled in.

10   One way to get good model fit is if you know what the

11   outcome --

12        MR. MORTARA:  Your Honor, I object.  This goes to

13   the trial motion in limine.  He's not testifying as to his

14   percipient memory of the document.  He's now giving expert

15   testimony.

16        MS. CONLEY:  Your Honor, he's explaining what his

17   reaction was when he saw the slide and the basis for that

18   particular reaction.

19        MR. MORTARA:  That was not the question nor the

20   answer, Your Honor.

21        THE COURT:  So let's move on to your next question.

22   He answered it and went beyond.  So I'll stop him there and

23   you can ask your next question.

24        Hold on one second.  Sorry.  Technical difficulties

25   up here today.

**JA1737**

Case: 19-2005    Document: 00117631840    Page: 292    Date Filed: 07/29/2020    Entry ID: 6356388
Case 1:14-cv-14176-ADB  Document 640   Filed 04/18/19   Page 49 of 228

49

1    BY MS. CONLEY:

2    **Q.**  Dean Khurana, at the time when you looked at these

3    particular models, what was your reaction when you looked at

4    the difference between Model 4 and the actual class that's

5    reflected in the fifth bar?

6    **A.**  Well, because the title of this is "Projected Admitted

7    Student Pools," one of the things I'd want to know is how the

8    data was filled for -- if you already knew who got in, which

9    is you already knew the outcome and then that became part of

10   your input, that's actually problematic from a scientific

11   hypothesis testing perspective.

12            It would be as if, for example, if I already knew

13   what the Powerball numbers are going to be for tonight and I

14   put that into my model before that happened, I'm going to

15   have a pretty high similarity outcome in that way.  But that

16   violates how you do hypothesis testing.  So you can't know

17   the outcome or the result of an experiment before you

18   actually run the analysis.

19            MR. MORTARA:  Your Honor, I object and move to

20   strike.  I understand the question was his percipient

21   knowledge.  The answer was not restricted to that at all.  I

22   move to strike.

23            THE COURT:  I'm not going to strike it, but I'm

24   going to take that as his reaction to it and not impute it to

25   the expert testimony that's going to follow.

```
 1              MS. CONLEY:  Thank you, Your Honor.
 2              MR. MORTARA:  Thank you.
 3    BY MS. CONLEY:
 4    Q.  Now, did you ultimately discuss this OIR chart with
 5    anyone?
 6    A.  No.
 7    Q.  Why didn't you discuss this chart with anyone?
 8    A.  There was nothing to discuss.
 9    Q.  And what do you mean by that?
10    A.  It didn't reflect how Harvard College admissions process
11    works.  It's not the approach that I think you look at to
12    understand how students are admitted.  You want to have a
13    model that actually reflects the actual processes.  It didn't
14    have -- it had a very narrow set of variables.  Didn't really
15    say anything to me.
16    Q.  Dean Khurana, did anything in this chart suggest to you
17    that there was bias against Asian-American applicants in the
18    admissions process at Harvard College?
19    A.  No.
20    Q.  And have you ever seen any information that suggests that
21    the admissions office discriminates against Asian-American
22    applicants in the admissions process?
23    A.  I have not.
24    Q.  And I believe Mr. Mortara asked you a variation of this
25    question earlier, but if you had seen any evidence of
```

**JA1739**

1    discrimination against Asian-American applicants in the

2    admissions process, what would you have done?

3    **A.**  I would have raised multiple alarms with multiple people

4    without any hesitation.

5    **Q.**  Now, let's switch gears a little bit and talk about how

6    Harvard College goes about assembling a diverse student body.

7         Just stepping back, does Harvard consider race in

8    admissions in order to assemble a diverse student body?

9    **A.**  Race is one of many characteristics that are considered

10   in assembling our student body.  But again, it has to be

11   understood in context of other aspects of a student.

12   **Q.**  And why does Harvard consider race, or why might Harvard

13   consider race in an applicant's application when deciding

14   whether to admit that applicant?  What's the reason?

15   **A.**  Well, it's one of many characteristics, but often it

16   depends on how the applicant themselves thinks about their

17   racial identity or any other identity they might have and how

18   it reflects on the kind of person they are, what they hope to

19   contribute to the Harvard College community, and what the

20   Harvard College community can benefit from their presence.

21   **Q.**  And is one of the purposes to create -- well, let me back

22   up.

23         What would be one of the reasons that Harvard is

24   considering race in the admissions process?

25   **A.**  Well, we live in a diverse society, diverse along a

1    variety of different dimensions.  Race is a characteristic

2    that for some people shapes their sense of self and how

3    others experience them.

4            Our students benefit from understanding people of

5    all types, and that ultimately, I think, prepares our

6    students not only -- like many other colleges and

7    universities, not only to thrive in their educational

8    experience but also to be well-prepared for serving as

9    lawyers, as business leaders, as community leaders and public

10   servants because they know how to thrive in that kind of

11   environment and use it to its full potential.

12   **Q.**  And, Dean Khurana, have you ever studied the question as

13   to whether Harvard College could achieve a racially diverse

14   student body through race-neutral means?

15   **A.**  Yes.

16   **Q.**  And in what context did you consider that question?

17   **A.**  I was asked to serve on a committee to study race-neutral

18   alternatives.

19   **Q.**  Let's take a look at DD 2.1.  When did you serve on the

20   RNA committee?

21   **A.**  That was in the late spring of 2017.

22   **Q.**  And what specifically, in your own words, did the RNA

23   committee study?

24   **A.**  Specifically we looked at a variety of alternatives to

25   achieve student body diversity and examine that in the

```
 1    context of its impact on student body diversity and its
 2    impact on other institutional objectives.
 3    Q.  And how is it that you came to serve on the RNA
 4    committee?
 5    A.  I was asked to.
 6    Q.  By whom?
 7    A.  Then Dean Michael Smith.
 8    Q.  Ask you turn to Tab 5 in your binder, which is
 9    Defendant's Exhibit 60.
10            MS. CONLEY:  Your Honor, should we pause?
11            THE COURT:  No.  Go ahead.  I'm just relocating.
12            MS. CONLEY:  Okay.
13    BY MS. CONLEY:
14    Q.  Dean Khurana, are you at Tab 5, Defendant's Exhibit 60?
15    A.  Yes.
16    Q.  What is this document?
17    A.  This document looks like the letter of invitation to
18    serve on this committee.
19            MS. CONLEY:  Your Honor, we move to admit
20    Defendant's Exhibit 60 into evidence.
21            MR. MORTARA:  No objection, Your Honor.
22            THE COURT:  Admitted.
23            (Defendant Exhibit No. 60 admitted.)
24    BY MS. CONLEY:
25    Q.  Dean Khurana, does this document accurately reflect the
```

1    charge of the race-neutral alternatives committee?

2    **A.**   Yes.

3    **Q.**   And what was of the charge of that committee?

4    **A.**   To evaluate --

5            THE COURT:  Hold on one second.  Okay.  Sorry.

6    BY MS. CONLEY:

7    **Q.**   Dean Khurana, what was the charge of the RNA committee?

8    **A.**   To evaluate whether proposed race-neutral alternatives

9    are available and workable for achieving the benefits that

10   flow from our student body diversity.

11   **Q.**   And how did the RNA committee ultimately carry out that

12   charge?

13   **A.**   Well, we spent a lot of time doing a literature review.

14   There's a lot of readings that we prepared ourselves with,

15   including benefiting from some of the suggestions from the

16   expert witness reports like Professor Cavanaugh's --

17   Kahlenberg's ideas that helped inform our discussion and

18   dialogue.

19   **Q.**   Slip of the tongue.

20   **A.**   Sorry.

21   **Q.**   And you mentioned the expert reports.  What consideration

22   did the RNA committee give to the expert reports that were

23   submitted in this litigation?

24   **A.**   We looked at them in context of the literature.  It

25   helped inform our dialogue, but we ultimately also had to

Case: 19-2005    Document: 00117621840    Page: 298    Date Filed: 07/09/2020    Entry ID: 6356388
Case 1:14-cv-14176-ADB    Document 640    Filed 04/18/19    Page 55 of 228

55

1    apply our own judgment in considering all of the different

2    recommendations.

3    **Q.**   How many times did the RNA committee meet?

4    **A.**   I believe around seven.

5    **Q.**   Outside of the times that you formally met as a

6    committee, did you do any work on these issues on your own?

7    **A.**   Yes.

8    **Q.**   And did the committee ultimately -- we took a look at the

9    report that the committee issued regarding its findings.  And

10   so can you turn to that, which is at Tab P316?  Sorry.  It's

11   Tab 6 in your binder.

12   **A.**   Sorry.

13   **Q.**   Sorry about that.

14   **A.**   I'm there.

15   **Q.**   Could you please provide a high-level summary of the

16   report?

17   **A.**   Essentially we looked at a number of alternatives to look

18   at different ways that student body diversity could be

19   achieved and studied the impact of that diversity with

20   respect to our mission as well as with respect to other

21   institutional goals.

22   **Q.**   And, Dean Khurana, did the committee do a serious

23   evaluation of each of the race-neutral alternatives that it

24   considered?

25   **A.**   Yes.

1    **Q.**  And in the process of discussing and considering those

2    alternatives, were there any disagreements among members of

3    the committee?

4    **A.**  Yes.  There were debates and disagreements.  They were

5    civil, but we did have different perspectives.

6    **Q.**  Can you provide an example of one of those different

7    perspectives?

8    **A.**  One that stands out for me personally is that I had a

9    strong view that -- based on the literature that early

10   admissions actually worked against students from lower

11   socioeconomic backgrounds.  It was a kind of part of the

12   assertion in the literature, and I thought that it was true.

13        I didn't know at the time -- I had heard of it, but

14   I didn't realize how seriously actually Harvard College

15   admissions had actually taken that and, in fact, had removed

16   early admissions, unlike many other schools.  They did it

17   unilaterally.

18        And it actually had the exact opposite effect, that

19   it actually decreased the student body diversity rather than

20   increasing the student body diversity.  And that was

21   something that was really both interesting when you do really

22   do true analysis, but it was also heartening to know that

23   this was something that the institution took very seriously.

24   **Q.**  If you turn to page 8 of the report, looking at the first

25   paragraph there, what did the committee conclude would happen

1   if Harvard College stopped considering race altogether?

2   **A.**   That it would have a significant impact in the quality of

3   the Harvard College experience for our students; that

4   specifically it would be a very narrowing educational

5   experience for our students rather than expansive.

6   **Q.**   What conclusion did the committee reach regarding whether

7   Harvard College should simply stop considering race?

8   **A.**   Again, we thought it really would come at the expense of

9   our student's educational purpose.  If you don't have

10  different people from different perspectives, different

11  backgrounds studying across all of your different fields, you

12  are less likely to encounter those different perspectives and

13  points of view.

14          And so you really want to make sure that you are

15  constantly bringing a lot of diverse perspectives of all

16  types.  And you also want to be very conscious that if --

17  you're not creating a kind of what I would call a token or

18  minor experience for anyone as well.

19          And so you really need to again constantly be

20  rigorous and vigilant in making sure that you're bringing as

21  much diversity of perspectives and points of view into the

22  classroom.

23  **Q.**   Did the committee point to a particular -- to a drop-off

24  in particular racial or ethnic minorities as one of the

25  reasons that it couldn't stop the use of the consideration of

1   race all together?

2   **A.** Yes.  In our simulations, we did.

3   **Q.** And which racial and ethnic minorities?

4   **A.** So for example, on the page that we have, it would be a

5   significant drop in people who self-identified as

6   African-American or Hispanic or other.

7   **Q.** And how would such a drop-off in the enrollment of

8   African-American and Hispanic students impact the diverse

9   educational environment that you alluded to earlier?

10  **A.** It would be very narrowing for all of our students.  We

11  live in a society that's highly stratified among multiple

12  dimensions.  Part of our goal in our educational experience

13  in order to advance our mission is to bring students in

14  contact and encounter with people who are different from

15  them.

16          And this would be a significant decline and a very

17  negative experience in our classrooms, in our extracurricular

18  experience, for our residential experience, all of which we

19  very carefully curate to really allow for that encounter with

20  difference and that respect building as we cross chasms of

21  difference and learn to sort of find so much in common with

22  each other.

23  **Q.** And let's turn to page 14 of the report.

24          Focusing there on the second paragraph, did the

25  committee consider race-neutral alternatives that

1    Mr. Kahlenberg proposed?

2    **A.**   Yes, we did.

3    **Q.**   And what did the committee find regarding how the

4    race-neutral alternatives proposed by Mr. Kahlenberg would

5    impact the academic quality of the admitted class?

6    **A.**   That it would decrease the academic quality of our

7    overall class.

8    **Q.**   And why would the decrease in the academic or the drop in

9    the academic quality of the class be unacceptable to Harvard

10   College?

11   **A.**   That's part of our identity, that academic interest, the

12   quality of academic curiosity, and commitment to academic

13   quality is part of the identity of Harvard College and how we

14   advance our mission.

15   **Q.**   And did the committee find that the academic quality of

16   the admitted class would decline for each of the race-neutral

17   alternatives that Mr. Kahlenberg proposed?

18   **A.**   I believe that's what we did find.

19   **Q.**   Now, looking a little further down in the same paragraph,

20   what would be the impact for extracurricular, personal, and

21   athletic ratings of the admitted class under Mr. Kahlenberg's

22   proposals?

23   **A.**   Again, I think we would see declines in a variety of

24   these areas.  And in the sort of academic quality, the

25   extracurricular quality, the public-spirited orientation of

1    our students, all the other aspects that are really important

2    in composing our student body.

3    **Q.**  Let's turn to page 18 of the report to the "Conclusion"

4    section.

5            Dean Khurana, what was the committee's overall

6    conclusion regarding whether viable race-neutral alternatives

7    were available?

8    **A.**  We concluded that at present we couldn't identify a

9    race-neutral alternative that met our overall institutional

10   objectives and advance the mission at present.

11   **Q.**  Now, was it the view of the committee that race-neutral

12   alternatives would never work at Harvard College?

13   **A.**  It was not.

14   **Q.**  And if you look at the final paragraph on page 19, what

15   did the committee conclude regarding the consideration of

16   race-neutral alternatives in the future?

17   **A.**  That this is something that, again, our admissions

18   process and looking at different approaches, including

19   race-neutral alternatives, is something we should continue to

20   do.  And we made an explicit recommendation that this be

21   reevaluated in five years' time.

22   **Q.**  Now, Dean Khurana, if Harvard College had to stop

23   considering race today, what would be the consequence to the

24   college?

25   **A.**  It would significantly set us back as an institution.

**JA1749**

```
 1    Like other higher education institutions, the diversity of
 2    our student body, the diversity of their interactions with
 3    each other, the residential experience that we have curated
 4    would result -- it would just decline.  It would be a very
 5    narrowing effect on students.  The differences of experiences
 6    they had from home versus being at a college would decrease.
 7    And they would just basically be less well-prepared to be
 8    effective citizens and leaders in our diverse and
 9    interconnected world.
10          MS. CONLEY:  Thank you, Dean Khurana.  No further
11    questions.
12          THE COURT:  Can I ask you a question?  You talked
13    about you want to avoid a token experience.  How do you kind
14    of measure what's enough?
15          THE WITNESS:  I don't think there's like a
16    quantitative number.  What it is, is that when you have a lot
17    of people who share different backgrounds and experiences and
18    no one is more salient than others; that is, you have just a
19    lot of ways that you have to understand each person as an
20    individual, that you've had enough experiences where your
21    notions of stereotypes are broken, I think that educational
22    experience is what gets us do that point.
23          THE COURT:  Okay.
24          MS. CONLEY:  Thank you.
25          MR. MORTARA:  Your Honor, would you like to take a
```

 1    short morning break or do you want me to get set up and go?

 2              THE COURT:  Do you have more for him?

 3              MR. MORTARA:  I do.

 4              THE COURT:  It's up to you.  I'm happy to take a

 5    break or I'm happy to forge forward, whatever you want to do.

 6              MR. MORTARA:  Let's take a five-minute break.

 7    Ms. Hacker I think wants to talk to you about depositions.

 8              THE COURT:  Why don't we take a break until 11:00,

 9    then.  And anyone who wants to talk about depositions, they

10    can do it over here.

11              (The following was held at sidebar.)

12              THE COURT:  The ones that we had not done are

13    Pedrick, Walsh, Weaver and Lopez.  Do you want to do some of

14    those now or do them all at the same time at the end of

15    lunch?  What do you want to do?

16              MS. HACKER:  Whatever is Your Honor's preference.

17    We can wait and do them all at the end of lunch if that would

18    be easiest.

19              THE COURT:  I'm ready to go.

20              MS. HACKER:  Let do it.

21              THE COURT:  Starting at page 8 on Howrigan,

22    overruled.  Page 11, all overruled.  Page 12, overruled.  Is

23    this --

24              MS. ELLSWORTH:  It's fixed now.

25              THE COURT:  Those are all overruled.  Page 15,

**JA1751**

```
 1      they're all overruled.

 2              Lopez.

 3              MS. ELLSWORTH:  Lopez is another objection in full.

 4              THE COURT:  That's all out as far as I'm concerned.

 5      I don't see what that -- I'm happy to hear you on it, but --

 6              MS. HACKER:  As Your Honor knows, SFFA has a racial

 7      balancing claim in this case.  Ms. Lopez is the sister

 8      cochair of an organization called the Association of Black

 9      Admissions and Financial Aid Officers of the Ivy League and

10      Sister Schools.  What they do is they get together twice a

11      year and have something called a round robin where all of

12      these schools sit a table and read the demographics of each

13      minority of racial and ethnic group in their admitted pool so

14      far, and they share that information with each other.  It

15      goes to the racial balance claim that SFFA has in this case.

16              THE COURT:  I just don't see it.  Unless you can

17      show that it influences what Harvard does.

18              MS. HACKER:  It is circumstantial evidence that

19      Harvard -- Harvard wouldn't want these numbers and take these

20      numbers if it didn't have some control over how it is

21      affecting its admitted class and the percentages of these

22      minorities in the admitted class.

23              THE COURT:  Out.  We have Walsh and Weaver.  Let's

24      start with Walsh.  Page 8, both sustained.

25              Weaver, so on page 1 --
```

Case: 19-2005    Document: 00117631840    Page: 307    Date Filed: 07/29/2020    Entry ID: 6356388
Case 1:14-cv-14176-ADB   Document 640   Filed 04/18/19   Page 64 of 228

64

 1           MS. ELLSWORTH:  I might have a different version

 2    here.  Is that the second Weaver?  Her deposition stopped and

 3    restarted.  I'm there.  Sorry.

 4           THE COURT:  That one sort of lost me.  This is

 5    supposed to be the question, and then this is supposed to be

 6    the answer?

 7           MS. FASULO:  Yes, Your Honor.

 8           THE COURT:  I think the question is fine which is

 9    what you're objecting to.  The answer is nonresponsive, but I

10    guess they circle back to it.

11           MS. ELLSWORTH:  They get it later.

12           THE COURT:  I guess that I'll overrule that one.

13    Page 7, overruled.  Page 8, they're all overruled.  That's

14    it.

15           MS. HACKER:  We'll have two additional transcripts.

16    We'll probably get them to Your Honor tomorrow after we hear

17    from Harvard if there are any objections being withdrawn.

18           MS. ELLSWORTH:  The two transcripts are 30(b)(6)

19    transcripts testimony from Dean Fitzsimmons and

20    Ms. Driver-Linn both of which were here as you know.  So

21    we're going to take a look at them.  We just got them last

22    night.  We may be objecting to cumulative.

23           THE COURT:  I'm going to extend the break for five

24    minutes to give her a break.

25                (End of sidebar.)

```
 1              (Off the record.)

 2              THE COURT:  Mr. Mortara, any time you're ready.

 3              MR. MORTARA:  I'm ready to proceed, Your Honor.

 4              THE COURT:  Go ahead.

 5                         FURTHER EXAMINATION

 6    BY MR. MORTARA:

 7    Q.   Okay, Dean Khurana, only a few more questions, I think.

 8              Turning back to Plaintiff's 316, the report of the

 9    committee to study race-neutral alternatives.

10              Very simple question, sir.  Who wrote the first

11    draft of this report?

12    A.   Could you just tell me what --

13    Q.   You have two binders in front you.  One is the one I gave

14    you.  One is the one your lawyers gave you.  It's got a lot

15    more in front of it.  It's got the case caption at the top.

16    It looks like this.  I'll grab it.

17    A.   Okay.  Thank you.

18    Q.   This is Harvard's binder, sir.

19    A.   I've got it.

20    Q.   And the other one is the binder I gave you, and mine is

21    labeled by plaintiff's exhibit number, so you can look at

22    P316 in that one.  You found the document.

23              And the question is who drafted the first draft of

24    this report?

25    A.   It was drafted about our attorneys.
```

**JA1754**

**Q.** Who?

**A.** I don't know who specifically drafted it.

**Q.** Lawyers wrote the first draft of this report?

**A.** Yes.

**Q.** Now let's talk about some of the things you were discussing with my friend on the other side regarding Plaintiff's Exhibit 41, Ms. Conley. Remember you were discussing Plaintiff's Exhibit 41? That's in your Harvard binder. It's behind Tab 1. Take a look at it for a second.

            THE COURT: Which tab is it?

            MR. MORTARA: Tab 1 in the Harvard binder, Your Honor.

            THE COURT: Thank you.

BY MR. MORTARA:

**Q.** You talked about this email?

**A.** Yes.

**Q.** And what was attached to it?

**A.** Yes.

**Q.** And you reviewed Plaintiff's Exhibit 41 in preparation for your testimony today, right?

**A.** Only that exhibit that was pulled up earlier.

**Q.** Well, let's take a look at some other parts of it. Please turn to page 59 of 66 as you're reading pages at the bottom.

**A.** I apologize, but I don't think I'm looking at the right

1    thing.  If somebody could help me here.

2          MR. MORTARA:  Could I approach the witness and

3    assist?

4          THE COURT:  Yes.  Of course.

5    BY MR. MORTARA:

6    **Q.**  I'll try to be loud, Joan.

7          Dean Khurana, I think you and I have the same

8    binders from Harvard.  This is the Harvard binder.  Do you

9    see it?  And behind Tab 1 is Plaintiff's Exhibit 41.  If you

10   would now turn to page 59 of 66.  Let me know when you're

11   there, sir.

12   **A.**  I'm there.

13   **Q.**  You've never seen this memorandum to Bill Fitzsimmons

14   from Erica Bever, Erin Driver-Linn, and Mark Hansen, have

15   you?

16   **A.**  I've not seen this outside of this litigation.

17   **Q.**  Turn to the last page, sir.

18   **A.**  I'm there.

19   **Q.**  In 2013, 2014, you had never seen this analysis from OIR,

20   had you?

21   **A.**  No.

22   **Q.**  Down at the bottom you had never seen these statements:

23   "While we find that low-income students clearly receive a tip

24   in the admissions process, our descriptive analysis and

25   regression models also shows the tip for legacies and

1  athletes is larger and that there are demographic groups that

2  have negative effects."

3         You never saw that, did you?

4  **A.** No.

5  **Q.** If you had, you would have done something, right?

6  **A.** No.

7  **Q.** If you had seen this you would have done absolutely

8  nothing?

9  **A.** I'm not sure what it's saying.  I haven't studied this,

10  but not as it currently reads.

11  **Q.** At your deposition you were shown some slides from OIR.

12  Do you remember that?

13  **A.** You'd have to point me to something specific, please.

14  **Q.** Take a look at the other binder.  Please turn to

15  Plaintiff's Exhibit 632.

16  **A.** I'm there.

17  **Q.** You were shown this document at your deposition, correct?

18  **A.** I might have seen a document that looked like this, but I

19  can't tell you if it's this exact document.

20  **Q.** Please turn to Slide 38.  I've got it on the screen, sir.

21  I'm only going to ask you one question about it.

22  **A.** I'm there.

23  **Q.** Do you see at the top it talks about research questions

24  and next steps?  Number 3, it says, "Is there bias against

25  Asians in college admissions?"

1          Do you see that?

2     **A.**   I see at that sentence under part 1.  There's a Number 3

3     and that's where that sentence is.

4     **Q.**   You don't remember reviewing any presentation containing

5     tables or other similar information that was addressing

6     whether there was bias against Asians in college admissions,

7     do you?

8     **A.**   No.

9     **Q.**   And you don't remember discussing such tables or that

10    analysis with anybody, do you?

11    **A.**   No.

12    **Q.**   And you never discussed any of your concerns that you

13    expressed to Ms. Conley that you do remember with anyone at

14    OIR, did you?

15    **A.**   No.

16    **Q.**   You assume that the people who do institutional research

17    for the college and university have a background in

18    statistical modeling, correct?

19    **A.**   Yes, I hope.

20    **Q.**   And your background in statistical modeling came from

21    when you did your doctoral work, right?

22    **A.**   Yes.

23    **Q.**   You received your Ph.D. in 1998, correct?

24    **A.**   Yes.

25    **Q.**   Would you assume that the people doing institutional

1  research at the Office of Institutional Research at Harvard

2  maybe were a little bit more up to date on their knowledge of

3  statistical modeling?

4  **A.**  I can't answer that question for certain.

5  **Q.**  Well, you assume they're competent in their jobs,

6  correct?

7  **A.**  Yes.

8  **Q.**  And you personally took no steps to find out why these

9  OIR analyses you testified about were prepared, correct?

10 **A.**  Correct.

11 **Q.**  And despite the criticisms that you discussed with

12 Ms. Conley, you did not take any steps to determine what a

13 proper analysis would reveal with respect to this

14 information, did you?

15 **A.**  I did not.

16          MR. MORTARA:  No more questions, Your Honor.

17                    FURTHER EXAMINATION

18 BY MS. CONLEY:

19 **Q.**  Dean Khurana, just really quickly.  Mr. Mortara pointed

20 you to Plaintiff's Exhibit 632.

21 **A.**  Yes.

22 **Q.**  Other than at your deposition, do you recall ever seeing

23 this document?

24 **A.**  No.

25 **Q.**  And other than the slide that we talked about in P41, the

```
 1    bar graph with the Models 1 through 4 --

 2    A.  Yes.

 3    Q.  -- did you see any other presentation or slide prepared

 4    by OIR?

 5    A.  I don't believe so.

 6    Q.  So the slides that Mr. Mortara just directed you to in

 7    Plaintiff's Exhibit 632, had you ever seen those slides

 8    outside of the context of this particular litigation?

 9    A.  No.

10             MS. CONLEY:  No further questions.

11             THE COURT:  You're excused, sir.  Thank you.

12             MR. McBRIDE:  Your Honor, SFFA next calls Dean

13    Michael Smith.

14             MR. LEE:  Your Honor, Mr. Waxman is going to

15    represent us on Dean Smith, and I'm going to walk out with

16    Dean Khurana, if that's okay.

17             THE COURT:  I'm happy to wait until you get back,

18    Mr. Lee, if you want.

19             MR. WAXMAN:  Your Honor, my optimistic prediction

20    was wrong, and we have no objection to proceeding in

21    Mr. Lee's absence.

22             THE COURT:  I also don't have any objection to

23    waiting.  It looks like they're still setting up.

24             MR. McBRIDE:  Your Honor, if I could use this

25    opportunity, I'll pass out some binders.  May I approach the
```

```
 1    witness?

 2              THE COURT:  Absolutely fine.

 3              MR. McBRIDE:  I also have copies for the Court.

 4              THE COURT:  We'll start at 11:15.

 5              MR. McBRIDE:  I'll just cool my jets.

 6              MR. WAXMAN:  And I'll stretch my back.

 7              THE COURT:  That's exactly what I'm doing.  Nobody

 8    wanted to start without you, Mr. Lee.

 9              MR. WAXMAN:  I think for the record, I did.

10              MR. LEE:  Don't let that happen.

11              THE COURT:  We'd given you a limit of 11:15.

12              THE CLERK:  If you could please stand and raise

13    your right hand.

14              (MICHAEL SMITH duly sworn by the Deputy Clerk.)

15              THE CLERK:  Could you please state your name and

16    spell your last name for the record.

17              THE WITNESS:  Michael David Smith, S-M-I-T-H.

18              MR. McBRIDE:  May I proceed, Your Honor?

19              THE COURT:  You may.

20                            EXAMINATION

21    BY MR. McBRIDE:

22    Q.  Good morning, Dean Smith.

23    A.  Good morning.

24    Q.  What's your current position at Harvard?

25    A.  I'm a member of the faculty at Harvard.
```

**JA1761**

1　**Q.** You're no longer the dean of the faculty of arts and

2　sciences?

3　**A.** I am not.

4　**Q.** For how long were you the dean of the faculty of arts and

5　sciences?

6　**A.** For a little over 11 years.

7　**Q.** That was from when to when?

8　**A.** From July of 2007 to August of 2018.

9　**Q.** And at a broad level, what were the responsibilities that

10　you had as a dean of the faculty of arts and sciences?

11　**A.** So I had broad oversight of the faculty of arts and

12　sciences, everything from its financial and organizational

13　aspects to the educational program within the college,

14　Harvard College, the Graduate School of Arts and Sciences,

15　the School of Engineering and Applied Sciences, and what we

16　call the division of -- the division of -- I forget the name

17　of it -- anyway. It includes the extension school and the

18　summer school in it.

19　　There's a number of libraries that report up to the

20　dean of the faculty. There's a big portion of the museum

21　system reports up into that position. Athletics reports up

22　into that position. Those sorts of things.

23　**Q.** And the admissions office also reports to you directly?

24　**A.** The director of admissions and financial aid reports

25　directly to the dean of faculty and of arts and sciences.

**Q.**  And the dean of college, Dean Khurana, he also reported

directly to you when you were in that position?

**A.**  Yes.

**Q.**  In your position as dean, you understood that the

admissions department says that race is one factor among many

taken into account when they're considering a particular

student?

**A.**  I do.

**Q.**  But you can't explain how it's actually taken into

account as one factor by the admissions department, can you?

**A.**  No.  I don't know the details of the admissions process.

**Q.**  I want to talk about your work on the race-neutral

alternatives committee, if we could.  You're familiar with

that committee obviously?

**A.**  I am.

**Q.**  And who was on that committee?

**A.**  I was the chair of that committee.  Dean Khurana was a

member, and Dean Fitzsimmons was a member.

**Q.**  And that committee, that came out of a conversation

between you and the president of the university and your

counsel?

**A.**  Yes.

**Q.**  And that was in June of 2017?

**A.**  Yes.

**Q.**  About how many times did you meet before you issued your

 1    ultimate report?

 2    **A.**   The committee met seven times.

 3    **Q.**   And the report you issued, was that in April of 2014 was

 4    it?

 5    **A.**   I believe it's 2017.

 6    **Q.**   2017.  My apologies.  I'm going to put that up on the

 7    screen.  This is Plaintiff's Exhibit 316 which is already in

 8    evidence.

 9           Is this the final report of your committee that you

10    issued in 2017, you said?

11    **A.**   Yes.  Sorry.  No.  The final report was two-thousand --

12    **Q.**   2018.

13    **A.**   -- eighteen.  Sorry.

14    **Q.**   We'll all get our dates straight here.  April of 2018.

15    **A.**   I'll remember what year we're in.

16           MR. WAXMAN:  Stipulated.

17    **A.**   Mine is a little blurry, but it looks like --

18    BY MR. McBRIDE:

19    **Q.**   If you need to, you can turn in your binder to

20    Plaintiff's Exhibit 316.  It will have a clear copy.  I'll

21    also blow up anything particularly we look at so you can read

22    it on the screen as well.

23           I want to turn to the second page and look at the

24    third paragraph here.  You see in your report you say, "In

25    2014, Harvard convened a universitywide committee chaired by

1    James Ryan, dean of the graduate school of education.  That

2    committee was charged with examining the importance of

3    student body diversity at the university and with evaluating

4    whether the university could achieve the educational benefits

5    of a diverse student body without considering the race or

6    ethnicity of its applicants."

7          Do you see that?

8    **A.**  I do.

9    **Q.**  And so the Ryan committee, as you understood it, that was

10   not restricted to the college but was rather a universitywide

11   committee to look at race-neutral alternatives as

12   possibilities?

13   **A.**  That's correct.

14   **Q.**  And it continues to state, "That committee, the Ryan

15   committee, paused its work when Students For Fair Admission

16   filed a lawsuit against Harvard challenging Harvard College's

17   consideration of race in undergraduate admissions."

18          Do you see that?

19   **A.**  I do.

20   **Q.**  That's your understanding of what happened is that after

21   SFFA filed a suit against Harvard College, the committee

22   covering the entire university paused its work in exploring

23   race-neutral alternatives?

24   **A.**  That's my understanding.

25   **Q.**  And if you read on a bit further, "Recognizing that the

1    litigation would include an extensive discovery process in

2    which experts would conduct in-depth empirical analyses of

3    the college's admissions processes and proposed changes to

4    it, Harvard decided to evaluate whether it could achieve the

5    educational benefits of diversity without considering race in

6    admissions in the college in a way that would be informed by

7    the race-neutral alternatives proposed in the SFFA complaint

8    and the analysis of those and other alternatives anticipated

9    to be prepared by the parties' expert witnesses."

10            Do you see that?

11    **A.**   I do.

12    **Q.**   And so the idea was that because there had been this

13    lawsuit filed and race-neutral alternatives was going to be a

14    part of that lawsuit generating expert analysis, you and the

15    committee believed, and Harvard believed, that it could

16    leverage the benefits of that data for purposes of its own

17    evaluation of race-neutral alternatives.  Is that right?

18    **A.**   Yes.

19    **Q.**   And to be clear, that's something the Ryan committee

20    could have done, too, right?

21    **A.**   I can't speak to what the Ryan committee thought it

22    should or should not do.

23    **Q.**   Not what they should have done but what they could have

24    done.

25            You would agree that there was no barrier to the

1    Ryan committee already formed to consider diversity on a

2    universitywide basis to prevent them from considering exactly

3    the same expert analysis that you mentioned would be of

4    significance here; isn't that right?

5    **A.**  As a piece, as I understand your question, as a piece of

6    what they were trying to accomplish, college being one piece

7    of a larger university, they certainly could have used the

8    information that we ultimately used.

9         THE COURT:  Can you speak up?  Or pull the

10   microphone closer.  I'm having trouble hearing you.

11        THE WITNESS:  Sure.

12   BY MR. McBRIDE:

13   **Q.**  And the Ryan committee in doing its work could have also

14   generated a report on race-neutral alternatives as part of

15   its universitywide mandate that discussed the possibility for

16   race-neutral alternatives specific to the college informed by

17   these expert analyses.  Is that right?

18   **A.**  My understanding of the original charge of the Ryan

19   committee was that they were going to produce that kind of

20   information for the college.

21   **Q.**  And they could have generated that kind of information

22   for the college using exactly the same empirical analyses

23   that you mentioned here from this litigation, right?

24   **A.**  Certainly.

25   **Q.**  And so there was no barrier to the Ryan committee

 1    performing an analysis of race-neutral alternatives that

 2    would impact the college as a result of anything happening in

 3    this lawsuit, was there?

 4    **A.**   I'm not an expert in all aspects of the law and the

 5    reasons why or why not a particular lawsuit against one part

 6    of the university would cause us to take a particular tack.

 7    So I don't know how to answer the question.

 8    **Q.**   So you don't have any reason to believe or -- you have no

 9    understanding that the Ryan committee would in some way have

10    been unable to perform the task of identifying whether

11    race-neutral alternatives could be used at the college by

12    applying this empirical analysis, are you?

13    **A.**   I don't know.  I only know why -- the reason given here

14    why it paused its work.

15    **Q.**   So I want to turn to page 3.  And if we go to the bottom

16    of page 3, talk about the process that you followed.  In the

17    paragraph on the screen that discusses the seven meetings

18    that you held between August of 2017 and April of 2018, do

19    you see that?

20    **A.**   Yes.

21    **Q.**   And I don't want to read the whole paragraph, but just

22    focus on the highlights.

23          "To inform our work, the committee reviewed social

24    science and other literature on race-neutral means of

25    pursuing diversity and collected information from several

```
 1    offices of Harvard College including the office of admissions
 2    and financial aid."
 3              Do you see that?
 4    A.  I do.
 5    Q.  And so one of the first things that your committee did is
 6    it reviewed some background material in the field of
 7    race-neutral alternatives as well as information that had
 8    been collected by the office of admissions and financial aid?
 9    A.  That's correct.
10    Q.  And it goes on in the remaining highlights.  It talks in
11    between about the expert reports and the materials in the
12    ongoing litigation.
13              And it says, "Specifically, the committee reviewed
14    the reports submitted by SFFA's expert, Richard Kahlenberg,
15    which claim that Harvard could achieve its diversity-related
16    educational objectives without considering race, and reports
17    submitted by Harvard's expert, Professor David Card, which
18    illuminate the trade-offs associated with eliminating the
19    consideration of race and adopting various race-neutral
20    alternatives."
21              Do you see that?
22    A.  I do.
23    Q.  So you as part of your work and your committee's work,
24    the three of you reviewed all of expert reports from both
25    Harvard's expert as well as SFFA's expert in doing your work
```

1    with respect to exploring race-neutral alternatives; is that

2    right?

3    **A.**   Among the other information that we talked about, yes.

4    **Q.**   In fact, if you could turn to Plaintiff's 312.

5             MR. WAXMAN:  What tab?

6             MR. McBRIDE:  Plaintiff's 312.

7             MR. WAXMAN:  Which tab is it?

8             MR. McBRIDE:  I don't have your binder.

9             May I approach, Your Honor?

10            THE COURT:  Of course.

11            MR. McBRIDE:  Did you find them?

12            MR. WAXMAN:  Yes.

13            MR. McBRIDE:  I'll put Plaintiff's Exhibit 312 up

14   on the screen.  I'd like to offer 312 into evidence.

15            MR. WAXMAN:  No objection.

16            THE COURT:  Admitted.

17            (Plaintiff Exhibit No. 312 admitted.)

18   BY MR. McBRIDE:

19   **Q.**   Dean Smith, Plaintiff's Exhibit 312, does that reflect a

20   memo being sent with respect to a scheduled meeting of the

21   race-neutral alternatives committee?

22   **A.**   It does.

23   **Q.**   And that's for March 23, 2018?

24   **A.**   The meeting was scheduled for March 23, yes.

25   **Q.**   And what the goal of this meeting was, was to, in the

1    first instance, have a discussion of Dr. Card's rebuttal

2    report; is that right?

3    **A.**   Yes.

4    **Q.**   And not just in committee, but also outside of committee,

5    did you and the other committee members spend time analyzing

6    and reviewing materials including Dr. Card's rebuttal report?

7    **A.**   We certainly did.

8    **Q.**   And what these experts did, Mr. Kahlenberg and Dr. Card,

9    is they did simulations of how Harvard's admitted class would

10   look if Harvard did not consider race in admissions; is that

11   right?

12   **A.**   Yes.

13   **Q.**   And they did that looking at the consideration of -- I'm

14   sorry -- simulations of the class without race together with

15   changes of other types, like eliminating the preference for

16   legacies?

17   **A.**   Correct.

18   **Q.**   And they also added to that a strong boost to lower

19   socioeconomic status applicants as part of these simulations?

20   **A.**   As part of some of them, yes.

21   **Q.**   And at the end of the day both, Dr. Card and

22   Mr. Kahlenberg, they generated an output of what you could

23   expect the admitted classes to look like under these changes

24   of no racial preferences, no legacy preferences, and a strong

25   boost for lower socioeconomic status applicants, right?

1    **A.**  Among other items that they were considering, yes.

2    **Q.**  I want to go back to Plaintiff's Exhibit 316 and look on

3    page 13.  I want to look down at the third paragraph.  It's

4    under "Increased Weight For Socioeconomic Background."

5          And you see at the end of that first paragraph

6    under the section "Increased Weight For Socioeconomic

7    Background" you wrote, "The simulations show that Harvard

8    could not both achieve its diversity interests and achieve

9    other equally important educational objectives such as

10   academic excellence."

11         Do you see that?

12   **A.**  I do.

13   **Q.**  And when you talk about the simulations, you're talking

14   about the simulations that were done by Dr. Card and

15   Mr. Kahlenberg, right?

16   **A.**  Yes.

17   **Q.**  And if you turn to the next page, in the middle of the

18   page there's a paragraph that talks about some of the results

19   of these simulations and your opinions on it; is that

20   correct?

21   **A.**  Yes.

22   **Q.**  And what you write here is, "For example, if Harvard

23   afforded weight sufficient to produce a combined proportion

24   of African-American, Hispanic, and other students comparable

25   to that of current classes, the proportion of admitted

1  students with the highest academic ratings as assigned by

2  admissions officers would be expected to drop from 76 percent

3  to 66 percent."

4       Do you see that?

5  **A.**  I do.

6  **Q.**  And you go on to talk about other elements that would

7  happen under these simulations.  And then at the very end

8  what you state is, "Although some of the proposed

9  race-neutral practices reflected in those simulations could

10  therefore achieve a significant degree of racial diversity,

11  Harvard does not seek diversity to the exclusion of all its

12  other objectives, nor does the committee understand that

13  Harvard is required to do so.  Academic excellence across the

14  student body remains an institutional imperative."

15       Do you see that?

16  **A.**  Yes.

17  **Q.**  And that was the conclusion of your committee about

18  whether or not these simulations from Dr. Card and

19  Mr.  Kahlenberg represented a class that Harvard would

20  consider acceptable going forward under a race-neutral

21  regime; is that right?

22  **A.**  It is correct that we -- the judgment of the committee

23  after looking at all the simulations from both of the expert

24  witnesses and discussions of the different race-neutral

25  alternatives there, we felt that no race-neutral alternative

1   could substitute for our consideration of race as one

2   consideration among many in our admissions process by looking

3   at what happened to both the diversity in many different --

4   not just racial diversity, but all the kinds of diversity

5   that Harvard values and what we were trying to from an

6   intellectual point of view and an intellectual excellence and

7   broader excellence in many different categories that we were

8   trying to achieve.

9   **Q.**   What you concluded was is that under the scenarios

10   imagined by the simulations, you could achieve comparable

11   diversity to current classes, which you characterized as a

12   significant degree of racial diversity.  Isn't that right?

13   **A.**   There were certainly simulations that produced a racial

14   diversity.

15        We were also very concerned with what was happening

16   in each one of those.  It wasn't just total racial diversity,

17   but we were also looking at what happened to specific racial

18   groups throughout this.  And then once we understood with

19   some of these simulations if you, in this case, turn up

20   the -- I believe we're in socioeconomic diversity -- you can

21   get a significant amount of racial diversity, but it does

22   affect other characteristics of the class, and there's a

23   trade-off there.

24   **Q.**   We'll talk about the specific diversity within each

25   racial group here in a moment, but I want to make clear that

1    under the simulations that both your expert and SFFA's expert

2    ran, your committee found those simulations generated

3    potential admitted classes with diversity comparable to that

4    of the current classes, which you characterized as a

5    significant degree of racial diversity; is that right?

6    **A.**   I'm not certain exactly which simulation you're talking

7    about.  Certainly if you did some changes to the simulations,

8    you could produce quite a bit of racial diversity in the

9    simulated class.

10   **Q.**   And the cost of those was a cost you found unacceptable

11   to implement the policies reflected in those simulations; is

12   that right?

13   **A.**   There were aspects of those simulations that produced

14   either characteristics in the class, sometimes in the racial

15   characteristics, other times in other characteristics that we

16   value at Harvard, and we thought it was not going to work for

17   what we were trying to accomplish.

18   **Q.**   Well, the specific cost that you found unacceptable that

19   you describe in that first sentence is that the proportion of

20   admitted students with the highest academic ratings would be

21   expected to drop from 76 to 66 percent.  And this is true

22   under each of the simulations that SFFA's expert in the

23   litigation, Mr. Kahlenberg, embraces.  Isn't that right?

24   **A.**   One of the things that the committee and certainly I was

25   concerned about was a significant drop -- I consider this a

1    significant drop -- in the highest academic ratings when we

2    were looking at these classes.

3    **Q.**  So one of the costs that you found unacceptable in the

4    simulations that achieved comparable diversity was a decline

5    in the highest academic ratings that were assigned by

6    admissions officers from 76 percent to 66 percent?

7    **A.**  I'd like to be a little careful.  We're grouping a lot of

8    simulations together here.  The simulations had a number of

9    different effects to -- you were focused on racial

10    composition there for a moment.  Sometimes the overall racial

11    composition number was large.  Sometimes it was only large

12    but a particular racial category was excluded from that.

13          So I have a little hesitation in answering directly

14    your question because we're talking about a lot of different

15    simulations here.

16    **Q.**  Well, what you say in this report -- and we don't even

17    have to tie it to the specific numbers --

18    **A.**  Okay.

19    **Q.**  -- in this paragraph -- is that the cost that your

20    committee found unacceptable for purposes of looking at the

21    outcome of these simulations, that cost was the drop in the

22    highest ratings that were given to incoming applicants by the

23    admissions office; isn't that right?

24    **A.**  Certainly what's it says here in this sentence.

25          The committee also discussed other effects that

1    came out of these simulations.  I, for example, was

2    interested in what happened to all of the ratings because

3    we're looking for excellence across all of the different

4    rating categories that we evaluate as part of our admissions

5    process.

6              I was also interested in the other things that were

7    reported in these simulations:  What happened to the

8    geographic diversity; what happened to the different

9    interests of our incoming students and how they would choose

10   among the different humanities, social sciences, sciences,

11   engineering, taking place on our campus.  So I was looking at

12   all those different values.

13   Q.  To be clear, in this paragraph you don't talk about that

14   element of diversity.  You talk about your specific concern

15   with the drop in the ratings, both academic, extracurricular,

16   personal, and athletic.

17   A.  That's certainly something that the committee -- yes, the

18   committee certainly all felt that this was a significant

19   drop, and that's why it's here in this report.

20   Q.  And I just want to be clear, that cost that you felt was

21   unacceptable in terms of the decline in the dimension of

22   excellence that Harvard considers essential, that was a

23   decline in the ratings, top ratings assigned to applicants by

24   the admissions office?

25   A.  Yes.  This is the academic 1s and 2s rating that we're

1    talking about, if I understood your question.

2    **Q.** Looking on the screen, some demonstratives that we got

3    for you from Harvard that I anticipate Mr. Waxman will be

4    using with you. I just want to go to the seventh slide here.

5         This demonstrative that your lawyers have prepared

6    for you, this reflects the cost that you felt was

7    unacceptable coming out of your expert's analysis of

8    Mr. Kahlenberg's Simulation Number 6?

9    **A.** Yes.

10   **Q.** And this comes from the work of Dr. Card, as reflected in

11   the rebuttal reports that you studied both in the committee

12   as well as outside of the committee before writing your

13   report?

14   **A.** Yes.

15   **Q.** So I want to go to Dr. Card's rebuttal report. And this

16   is also in your binder as well. It should be. Do you see

17   this is Dr. Card's rebuttal report from March 15, which is

18   about eight days, I believe, before the committee meeting

19   where you were going to study it?

20   **A.** I do see it, yes.

21   **Q.** And if you go to page 96, do you see that there's an

22   Exhibit 26 there?

23   **A.** Yes.

24   **Q.** And this was one of the charts that you studied as part

25   of your committee's work where it reflects Dr. Card's

1    analysis of the outcomes from the different simulations?

2    **A.**  Yes.

3    **Q.**  I'll just highlight.  I'm pulling out here at the top for

4    you.  So this is Dr. Card's exhibit on "predicted class

5    without consideration of race and factors that allegedly

6    advantage white applicants."

7         Do you see that?

8    **A.**  Yes.

9    **Q.**  And when it says, "without consideration of race and

10   factors that allegedly advantage white applicants", the

11   "allegedly advantage white applicants" factors, that's

12   primarily things like the legacy preference?

13   **A.**  It includes the legacy preference.  I'm not sure I would

14   say primarily.  It takes out athletes, legacies, dean's and

15   director's list, and children of faculty and staff.

16   **Q.**  So this has all of those preferences associated with what

17   we've called the ALDCs, but specifically the legacies, dean's

18   and director's list, and the preferences to children of

19   faculty and staff.  That's what this includes?

20   **A.**  By "includes" you mean the -- with ties to be factors.

21   So they're taken out.

22   **Q.**  I apologize.  We have a directionality problem.  It

23   includes the fact that they are taken out of the simulations?

24   **A.**  Correct.

25   **Q.**  This now has the information in it specifically

1    referenced in that paragraph we're looking at, doesn't it,

2    when it talks about the drop in the academic ratings?

3              I'll just point you down here.  I did not create

4    this red box.  That was in the original report.  But I'll

5    highlight there.  Do you see that, the 76 and 66 percent?

6    **A.**  I do.

7    **Q.**  So this reflects here what you were referencing in your

8    report is the unacceptable cost to academic excellence.  That

9    was Dr. Card's simulation showing the supposed drop in a

10   76 percent admitted class with an academic rating of 1 or 2

11   to 66 percent.  Is that right?

12   **A.**  Yes.

13   **Q.**  I want to first look now at what the output of the

14   simulations that your expert produced, what that output looks

15   like in terms of class composition, okay?

16   **A.**  Okay.  Sorry.

17   **Q.**  That's what you referenced in your report when you talked

18   about these unacceptable costs going from 76 to 66.  You were

19   talking about what your own expert had identified as being

20   the drop in the expected academic ratings, right?

21   **A.**  For -- yes.

22   **Q.**  If we look at the top for Dr. Card's simulation, which is

23   labeled four times SES boost, at the top you have what

24   Dr. Card predicted for you would be the outcome under this

25   race-neutral simulation of the racial diversity of the class.

1              Do you see that?

2    **A.**   I do.

3    **Q.**   And this is the comparable diversity that your report was

4    talking about, right?

5    **A.**   By "comparable diversity" there, we were talking about

6    the fact that the number of nonwhite students is roughly

7    unchanged from the original class.

8    **Q.**   And if we look specifically at what Dr. Card had

9    determined, he determined that the white students under his

10   simulation would drop by about 13 percent.  Do you see that?

11   **A.**   Yes.

12   **Q.**   And that's probably attributable to taking away the

13   variety of legacy preferences that were associated and

14   children of staff and also the dean's and director's list?

15   **A.**   I couldn't say for certain without looking in more detail

16   at the simulation.  But --

17   **Q.**   And if we also look, we notice that the Asian-American

18   population in your class would be expected under these

19   race-neutral simulations that you were citing in the

20   race-neutral alternatives report would be expected to go up

21   by 26 percent; is that right?

22   **A.**   Yes.

23   **Q.**   And in fact, if you look below that, the Hispanic

24   applicant population would also be expected to go up by

25   around 26 percent?

1    **A.**   Yes.

2    **Q.**   And the one underrepresented minority group which I

3    believe you had mentioned before that you understood was

4    going to decline under these race-neutral policies was that

5    the African-American population in your applicant pool would

6    drop by around 30 percent, right?

7    **A.**   Yes.

8    **Q.**   Now, if we do the math in terms of the composition of the

9    student body, that would represent a drop from around

10   14 percent of the class to around 10 percent of the class?

11   **A.**   As I recall the numbers, yes.

12   **Q.**   And so the comparable diversity that was achievable under

13   your expert's race-neutral alternatives included an increase

14   in Hispanic and Asian admitted populations by 26 percent

15   each, a 13 percent decrease in the white admit population,

16   and a reduction in the African-American admitted population

17   from 14 percent to 10 percent; is that right?

18   **A.**   Yes.

19   **Q.**   So moving down, I wanted to look at the objective

20   academic qualifications of this simulated incoming class that

21   your committee found unacceptable.  You see here under

22   academics where we have a variety of average objective test

23   scores?

24   **A.**   Yes.

25   **Q.**   And we don't have to go through them all.  But is it

1    generally true that between SAT, ACT, GPA, and the average

2    academic index, this incoming simulated class would have a

3    reduction in those objective qualifications by 1 to

4    2 percent?

5    **A.**   That's correct.  We have a very strong applicant pool.

6    Many more perfect SAT scores, ACT scores, and GPAs than we

7    could possibly admit.

8    **Q.**   Then if we go down to the very bottom here, we have a

9    fraction with profile rating of 1 or 2.  Do you see that?

10   **A.**   I do.

11   **Q.**   And this is what you meant in your race-neutral

12   alternatives report about the expected drop in those ratings?

13   **A.**   Yes.  That's what I was referring to.  We're losing

14   students here that we have identified as truly exceptional

15   that we would love to have come to Harvard across these

16   different profiles.

17   **Q.**   And ignoring the athletic for the moment, but between the

18   academic, extracurricular, and personal, that drop would be

19   roughly 9 to 13 percent?

20   **A.**   Academic, extracurricular, and personal, 9 to 11 you

21   mean?

22   **Q.**   I'm looking at both academic, extracurricular, and

23   personal.  And they range from a drop of 9 percent to a drop

24   of 13 percent?

25   **A.**   Correct.

1    **Q.**  And that right there is the cost you cited specifically

2    in your race-neutral alternatives report as being the

3    unacceptable cost to bear, even for the comparable diversity

4    seen here; is that right?

5    **A.**  Yes.

6    **Q.**  To be clear, these ratings, these are ratings that you

7    get from the admissions office, right?

8    **A.**  Yes.

9    **Q.**  And these are not grades associated with how they

10   actually perform at Harvard, not from the registrar, right?

11   **A.**  No.  These are students that have not yet been admitted

12   to Harvard.

13   **Q.**  And you did no analysis to actually look at the

14   composition of grades of any incoming class under any kind of

15   simulation to predict what their grades might or might not

16   have been.  You focused just on the academic ratings?

17   **A.**  I'm not sure I'm following your question.

18   **Q.**  I'll withdraw that one.

19            To be clear, these are just the ratings from the

20   admissions office, not actual data of any performance that

21   took place at Harvard, right?

22   **A.**  That's right.  These are just ratings that are from the

23   materials that the applicants have sent to us or we have

24   gotten on their behalf from other parties, their high

25   schools, their guidance counselors, and their grade reports

1    from SATs and so forth.

2    **Q.**  The person on your committee who was directly responsible

3    for admissions, that was Dean Fitzsimmons; is that right?

4    **A.**  I'm not sure why -- I'm not sure the reference to on our

5    committee.  Dean Fitzsimmons was the head of admissions and

6    financial aid.

7    **Q.**  Your race-neutral alternatives committee.

8    **A.**  Yes.  What about it?

9    **Q.**  He was the only person on your committee who had any

10   responsibility directly for the admissions department that

11   generated these ratings?

12   **A.**  Sorry.  Yes, that is true.

13   **Q.**  And was it Fitzsimmons, Dean Fitzsimmons, who told the

14   committee that ratings of 1 and 2 from the admissions office

15   reflected the dimensions of excellence that you needed to

16   preserve that we saw earlier?

17   **A.**  He was certainly one of the individuals that spoke to

18   that.

19           I had my own small experience from visiting the

20   admissions area early in my deanship, and I certainly have

21   talked to faculty over time that have participated in the

22   admissions committee.  And I understand what we're trying to

23   accomplish with those academic 1s and 2s and what the

24   characteristics are of those individuals what when they get

25   rated with an academic 1 or 2.

1    **Q.**   So between Dean Fitzsimmons, the people you had talked to

2    on the admissions committee, and your own work or visiting to

3    the admissions office early in your tenure as dean, you had

4    an understanding that academic ratings of 1 and 2 were a

5    central element of the dimensions of excellence that you

6    needed to preserve going forward at Harvard College?

7    **A.**   That we would be looking carefully at any changes in any

8    of these top 1 and 2 profile ratings.  Those are individual

9    applicants that we would love to have at Harvard.  They add a

10   tremendous amount to the academic program as well as the

11   program that's taking place outside of our classroom, and

12   they're helping all of our students in terms of learning, and

13   they also interact terrifically with our faculty in terms of

14   the scholarship that is produced at Harvard.

15   **Q.**   Was it Dean Fitzsimmons from the admissions office who

16   told you that the decline in ratings of either 1 or 2 that

17   you saw in these simulations was simply too high of a cost

18   for these dimensions of excellence that you cared so much

19   about?

20   **A.**   Dean Fitzsimmons -- no.  Dean Fitzsimmons did not just

21   tell the committee that this was too high a drop.  I came to

22   it on my own judgment, based on the kinds of inputs that we

23   were just talking about and the discussions that took place

24   in the committee.

25   **Q.**   Another feature of the race-neutral alternatives report

1    that you got from your expert in terms of these simulations

2    had to do with, as we discussed, the elimination of the

3    legacy preferences in admissions?

4    **A.**   Yes.

5    **Q.**   And you would agree that legacy admissions preferences

6    disproportionately favor white applicants?

7    **A.**   I don't know all of the details in it, but that is

8    certainly changing over time.

9    **Q.**   That's why you included in what we discussed before as

10   the so-called factors that allegedly advantage white

11   applicants, right?

12   **A.**   It is included in there because it was one of the things

13   that is brought up in the literature, and it's also brought

14   up in the complaint in this case.  And so it was one of the

15   things that we looked at to see how much of a change would

16   occur if we eliminated that, among the other ALDC preferences

17   that are involved here.

18   **Q.**   Dean Smith, whether or not it's changing over time, you

19   would agree that at least as it stands today and going back

20   in time that the legacy preference at Harvard

21   disproportionately favors white applicants.  Isn't that true?

22   **A.**   For the data that was looked at in the classes here,

23   certainly that is true.  I don't know the data for today's

24   classes that are coming in.

25   **Q.**   Now, you discussed in your committee's report on

1    race-neutral alternatives your concerns with the possibility

2    of eliminating the legacy preference, right?

3    **A.**   Yes.

4    **Q.**   Let's go to page 16 back in your report, which is

5    Plaintiff's Exhibit 316.   If we can go to Plaintiff's

6    Exhibit 316 and turn to page 16.   Look down at the bottom,

7    there's the very last bullet point.   It carries over to the

8    next page.

9           And in this bullet point, you are discussing that

10   "The practice of considering, among many other factors,

11   whether an applicant's parents attended Harvard College or

12   Radcliffe College as an undergraduate also helps to cement

13   strong bonds between the university and its alumni.   Harvard

14   hopes that its alumni will remain engaged with the college

15   for the rest of their lives, and this consideration is one

16   way that it encourages them to do so.

17          "Harvard also relies to an unusual degree on the

18   participation of its alumni in the admissions process.   In

19   every state and almost every country around the world,

20   Harvard graduates volunteer their time to serve as alumni

21   interviewers.

22          "Harvard alumni also offer generous financial

23   support to their alma mater.   That financial support is

24   essential to Harvard's position as a leading institution of

25   higher learning.   Indeed, it helps make the financial aid

 1    policies possible that help the diversity and excellence of

 2    the college's student body."

 3              Do you see that?

 4    **A.**   I do.

 5    **Q.**   And you would agree that Harvard graduates provide a

 6    significant amount of support to the college; is that right?

 7    **A.**   Through their time, expertise, and resources.

 8    **Q.**   And it's not just their time and expertise but also their

 9    resources, meaning their financial contributions to Harvard,

10    right?

11    **A.**   Yes.

12    **Q.**   And Harvard believes that eliminating the legacy

13    preference in admission would put that financial support at

14    risk, doesn't it?

15    **A.**   I'm not sure who you mean by "Harvard" there.  That is

16    not the reason why we keep in our legacy preference.  It is

17    for the broader aspects of what we were just talking about.

18              I've seen a tremendous benefit to the university,

19    especially to the students and what we're trying to

20    accomplish in the college, by the participation of our alumni

21    in new initiatives that we're tying to launch and bringing

22    expertise to help us think through how we might launch them.

23              As this mentions here, time that our alumni spend

24    in evaluating candidates and applicants for our pool.  All of

25    these things matter.  It's not just financial donations.

1   **Q.**  What you write here -- you write, "The committee is

2   concerned that eliminating any consideration of whether an

3   applicant's parent attended Harvard or Radcliffe would

4   diminish this vital sense of engagement and support."

5        Do you see that?

6   **A.**  I do.

7   **Q.**  And the support that you are referring to includes

8   financial support, right?

9   **A.**  It includes financial, their time, their expertise.  All

10  of those things are what I meant by "support."

11  **Q.**  And the race-neutral alternatives committee in its report

12  is expressing its concern that eliminating the legacy

13  preference in admissions would put the financial support of

14  its alumni at risk.  Isn't that correct?

15  **A.**  No.  This paragraph is in here talking about even though

16  all of the considerations in ALDC, including the legacy, if

17  they're simulated as being eliminated, it doesn't do enough

18  to get to a point where we're getting back to the

19  diversity-related educational benefits and objectives we

20  want.

21        And then we took a further step here and say, while

22  we're talking about this, let's talk about even if it doesn't

23  make any difference what we're trying to do here, can we

24  still come up with good reasons why we should continue to do

25  this.

**JA1790**

1          And hence this is what we were trying to do in this

2     part here is talk about -- after discussion within the

3     committee about legacies and what legacies bring to our

4     academic program, to the support of the university, broadly

5     construed, it's important for us to continue to talk to our

6     alumni base and say we understand.  If you put time and

7     effort into what we're trying to do here, we will recognize

8     that as one piece of the larger review of if you happen to

9     have a child in the pool.

10    **Q.**  The flip is also true, which is you were concerned that

11    if you didn't give consideration to the child of a Harvard

12    alum in the applicant pool, that that would diminish that

13    vital sense of financial support that you get from them;

14    isn't that right?

15    **A.**  Again, no, because you're focused solely on the financial

16    support.  And I'm thinking much more broadly about all the

17    things that I do.  And my experience has been that alumni are

18    getting indications of we value what you're doing for other

19    universities, and we are stating that we value what they do

20    for us, too.

21    **Q.**  Isn't it true, Dean Smith, that one of the important

22    reasons why Harvard rejected the possibility of a

23    race-neutral admissions process is because such a process

24    would necessarily require eliminating the legacy preference

25    in order to achieve the so-called comparable diversity to

1    that of the current classes?  Isn't that right?

2    **A.**   So I can envision a simulation where you eliminate the

3    consideration of race as one factor among many, but you still

4    have a consideration and you let your alumni know that what

5    you do for us matters.  If your child happens to apply, we

6    will recognize that fact.  It's not something that will get

7    your child in.  It never is.  I'm not sure -- you're saying

8    if you have to eliminate one, you must eliminate the other?

9    **Q.**   My question was that one of the important reasons why

10   your committee rejected the possibility of a race-neutral

11   admissions process is because, through your work and through

12   your analysis, you realized that such a process would

13   necessarily require eliminating the legacy preference in

14   order for you to achieve sufficient diversity in an incoming

15   class.  Isn't that right?

16   **A.**   No.

17            MR. McBRIDE:  No further questions.

18            THE COURT:  Do you want to get started, Mr. Waxman,

19   or do you want to take the lunch break?

20            MR. WAXMAN:  It's really completely up to Your

21   Honor.

22            THE COURT:  I'm planning on breaking in like five

23   minutes.

24            MR. WAXMAN:  To my mind, you've answered your own

25   question, but I'm happy to work for another five minutes if

1    that would please the Court.

2              THE COURT:  Either way.  Why don't we take the

3    lunch break.  So we'll come back at like around 12:40 --

4    12:45.  Let's make it even.  Okay?

5              (Court recessed at 11:56 a.m.)

6                   *** AFTERNOON SESSION ***

7              MR. WAXMAN:  May I proceed, Your Honor?

8              THE COURT:  You may.

9                        EXAMINATION

10   BY MR. WAXMAN:

11   **Q.**  Good afternoon, Dean Smith.

12   **A.**  Good afternoon.

13   **Q.**  When did you begin working at Harvard?

14   **A.**  I began working at Harvard in 1992.

15   **Q.**  Was that also the year that you completed your doctoral

16   degree at Stanford?

17   **A.**  I completed most of my work.  I was actually given my

18   degree in January of 1993.

19   **Q.**  Were you hired by Harvard as an assistant professor?

20   **A.**  I actually officially started as an instructor.

21   **Q.**  Is that because you had not yet gotten your degree?

22   **A.**  That's correct.

23   **Q.**  Did you become an assistant professor on the tenured

24   track when you did finally receive your degree?

25   **A.**  I did.

1    **Q.**   When did you begin serving as the dean of the faculty of

2    arts and sciences?

3    **A.**   July of 2007.

4    **Q.**   What is your current position?

5    **A.**   I am the John H. Finley Jr. Professor of Engineering and

6    Applied Sciences within the School of Engineering and Applied

7    Sciences.

8    **Q.**   Are you also the Harvard University distinguished service

9    professor?

10   **A.**   I am.

11   **Q.**   What are you doing this year?

12   **A.**   I am on sabbatical right now pursuing my own interests.

13   **Q.**   You're on sabbatical preparing for and testifying at a

14   trial, correct?

15   **A.**   Yes.

16   **Q.**   Unusual sabbatical experience, I imagine.

17   **A.**   Yes, it is.

18   **Q.**   Let me ask you some questions about the reporting

19   structure here.  You have testified about what the faculty of

20   arts and sciences is and what your job is.  But is it fair to

21   say that both the dean of the college and the dean of the

22   admissions and financial aid office report to you, among many

23   other deans?

24   **A.**   That's correct.

25   **Q.**   Reported to you?

 1   **A.**   That's correct.

 2   **Q.**   Okay.  Let me ask you some questions about the office of

 3   admissions and financial aid.

 4           Did you oversee Dean Fitzsimmons?

 5   **A.**   I did.

 6   **Q.**   And how did you do that?

 7   **A.**   So we had regular meetings as I do with all of my direct

 8   reports.  The frequency of those regular meetings depends

 9   upon the unit, what we're trying to accomplish in that unit,

10   how long the person has been as the head of that unit.

11           In terms of Dean Fitzsimmons, he had been

12   long-serving in the office of the admissions and financial

13   aid.  I met mostly with him once a semester during the

14   academic year, and then I also met with him, as I did with

15   all of my direct reports, at the end of the academic year to

16   do a review of what took place in the office, how we

17   accomplished things, and what we would think about doing next

18   for the upcoming year.

19   **Q.**   And in the course of that particular meeting with

20   Dean Fitzsimmons, would you evaluate his performance and the

21   performance of the office that he was responsible for?

22   **A.**   I did.

23   **Q.**   Did you in any way evaluate him based on the racial

24   composition of the admitted classes?

25   **A.**   No.

**Q.** Did you ever give Dean Fitzsimmons feedback on his

performance, either constructive or critical?

**A.** Certainly. Yes, I did. As part of the performance

review I was mentioning a moment ago, I would have each of my

direct reports produce a report of what they accomplished in

the past year, what they had started out to try and

accomplish, how things had changed during the year. We would

go through that, talk about the success or whatever happened

in those different aspects.

And then we would look to the future. We would

talk about what was going to happen next. We would often

talk -- for example, I'm sure we'll do in a moment -- what

else can we do to explain what we're trying to accomplish

with our financial aid program, how can we get the word out

to all the students who should know about it so that they can

realize that they can be part of our pool, and they can come

to Harvard.

**Q.** Did you ever discuss, during the course of your duties,

the Harvard admissions office recruitment efforts and what

could be done to improve it?

**A.** Certainly. We talked about a number of different things.

In particular, for example, recently we had huge updates to

our website and thinking about other kinds of social media

outreach to applicants or prospective applicants and their

families.

1     We also talked about organization of the office and

2  how it might function better given the changing environments

3  that we all find ourselves into.  How can we get more

4  information to the admissions officers, not just through

5  paper means but through electronic means.

6  **Q.**  I think you testified you have a general understanding of

7  how Harvard College selects applicants for admission?

8  **A.**  I do.

9  **Q.**  What is that understanding?

10 **A.**  So we are looking at an individualized whole student

11 evaluation taking into account as much as we can about their

12 academic interests, their lived experiences.  All of that is

13 evaluated against what it is that they want to try and

14 accomplish.

15     And in particular we're looking for students who

16 not only have a broad range of interests that will take

17 advantage of the opportunities that we have on our campus but

18 will also add to the community that we're building on our

19 campus.  So those are very important aspects of what we look

20 for in the applicant's record.

21 **Q.**  In the course of familiarizing yourself with the

22 operation of the office and the admissions process, did you

23 make a point to sit through an admissions committee meeting?

24 **A.**  I did.

25 **Q.**  And do you have an understanding of how the office

1    considers race?

2    **A.**   It's one factor among many.

3    **Q.**   Do you think it's appropriate for the admissions officers

4    to consider an applicant's race as one factor?

5    **A.**   I do.

6    **Q.**   And why is that?

7    **A.**   I think it is part of the applicant's lived experiences

8    in many cases.  It's not necessarily an impact on every

9    applicant's record, but in many cases the experience that the

10   person has had through their cultural or racial background

11   has infected how they've gone through their schooling, how

12   their life has gone.  That kind of information is important

13   for us to have as context as we're looking at the rest of the

14   record.

15           We're also looking for how that can add to our

16   community, improving what's taking place on our campuses.

17   Much of what we're trying to do is break down stereotypes.

18   And having people with many different kinds of lived

19   experiences on our campus is an important way for that to

20   happen.

21   **Q.**   And are you aware that in some instances race can be a

22   "tip" in the holistic consideration of a particular

23   applicant's file?

24   **A.**   I am.

25   **Q.**   Do you have an understanding of whether applicants are

1    ever rejected from Harvard because of their race?

2    **A.**  My understanding is they're never rejected because of

3    their race.

4    **Q.**  How does diversity relate to Harvard's educational

5    mission?

6    **A.**  Certainly.  We are looking for, as I was mentioning

7    before, all kinds of different kinds of diversity on our

8    campus.  It is clear from my experiences in the classroom

9    that when students bring their own perspectives on a topic we

10   may be discussing that we get a much richer interaction among

11   our students.

12           It's one thing to read about something in a book.

13   It's much more impactful and a better learning environment if

14   the students can debate it from their own perspectives,

15   realize that there are multiple different perspectives and

16   come out of that class much stronger than they would have

17   been had we just discussed something in the abstract.

18           It also helps tremendously with the scholarship

19   that our faculty and our students are trying to undertake.

20   Many different perspectives with respect to how we might

21   approach a problem.  I'm an engineer by training.  So I

22   naturally gravitate to those sorts of societal issues.

23   Having a better understanding of how different people in our

24   society view issues that are confronting the United States,

25   help us to think through what possibly we might do, where we

1    can take our research, where we might publish some new

2    scholarship.  Those are just two examples.

3    **Q.**  During the course of your 26 years --

4    **A.**  Yes.

5    **Q.**  -- at Harvard in the faculty of arts and sciences, have

6    you had occasion to talk with alumni about their

7    recollections of what the most impactful learning experiences

8    were?

9    **A.**  Absolutely.

10    **Q.**  What do you hear?

11    **A.**  I hear a number of different things.  One of the first

12    things I often hear is that many of our alums when they first

13    came to campus, that was the first time they had ever been in

14    that diverse environment, and diverse in all perspectives.

15    That had a huge impact n many of our students who later

16    became alumni.

17          Then they talk often not just about what happened

18    in the classroom, but what happened in our houses, our

19    residential places where our students reside when they're not

20    in class.  The conversations that took place around the

21    classrooms; the conversations that took place in their

22    extracurricular events.  Events that they ended up going to

23    that they had no realization that those kinds of

24    perspectives, those kinds of ideas existed.

25          Those are all things that come up when I talk to

1    our alumni, and that they have good feelings about why

2    Harvard was so impactful for their life, and it had a huge

3    difference on what they learned and what they were able to do

4    later in life.

5    **Q.**  Were you the dean of the faculty of arts and sciences

6    when the Harvard College Working Group on Diversity and

7    Inclusion, which has been referred to here as the Walton

8    committee, was convened and prepared its report?

9    **A.**  I was.

10   **Q.**  And did you review that report?

11   **A.**  I reviewed it mostly as a faculty member.  It was not a

12   report that came to my office.

13   **Q.**  And were you also the dean of the faculty of arts and

14   sciences when President Faust convened the university-wide --

15   I don't know if it was a committee or a project -- the

16   university-wide committee to study racial diversity and

17   inclusion?

18   **A.**  I was.

19   **Q.**  And did you review that?

20   **A.**  I have seen it, too.  Again it was not a report that came

21   directly to my office.

22   **Q.**  Mr. McBride asked you several questions about the

23   committee chaired by Dean Ryan.  Do you recall that?

24   **A.**  I do.

25           MR. WAXMAN:  Mr. Lee, can we put up

1    Demonstrative 3.2.

2            Your Honor, I believe these are in the back of the

3    notebook that we provided you.

4    BY MR. WAXMAN:

5    **Q.**  So this is largely, I think, familiar to the Court, but

6    what does this show?

7    **A.**  This is a timeline that includes a number of committees

8    and important dates with respect to the study of the

9    importance of diversity to our educational process, but also

10   the evaluation of race-neutral alternatives and how they may

11   or may not work for what Harvard is trying to accomplish.

12   **Q.**  Okay.  Now, do you know what Dean Ryan's committee was

13   charged with?

14   **A.**  In general only.

15   **Q.**  You recall that they were -- that it was a

16   university-wide committee?

17   **A.**  Yes.

18   **Q.**  And do you recall that the committee was charged with,

19   number one, evaluating for all faculties and components of

20   the unit the extent to which diversity was important to the

21   mission of that particular component?

22   **A.**  Yes.

23   **Q.**  And do you also understand that for those components of

24   the university that took race into account in selecting

25   applicants for admission, that the committee was charged on a

1    university-wide basis to evaluate for each individual faculty

2    or school in the university whether the diversity-related

3    objectives could be accomplished through race-neutral means?

4    **A.**   That was my understanding.

5    **Q.**   And is it also your understanding -- I think you

6    testified in response to Mr. McBride's questions -- that the

7    committee paused its work at the time that this lawsuit was

8    filed?

9    **A.**   Yes.

10   **Q.**   Now, subsequent to the filing of this lawsuit, did

11   Harvard College undertake to answer for itself the two

12   questions that the Ryan committee was charged with exploring

13   for the entire university?

14   **A.**   Yes.  As it shows on this chart here, we had two

15   committees, as you're pointing out.  The first one separated

16   out the question of our diversity-related educational

17   objectives and goals and how that was impacting our

18   educational program and the other things we were trying to do

19   with our mission.

20          The Dean Khurana committee or committee here called

21   "Committee to Study Importance of student body Diversity."

22   And later the committee to study race-neutral alternatives,

23   which took advantage, as we talked a bit earlier, of

24   materials that were produced in this lawsuit.

25   **Q.**   So do you recall Mr. McBride asking you some questions

1    about whether the Ryan committee, if it had not been -- if

2    its work had not been paused, whether the Ryan committee

3    could answer the two questions, the question that the Khurana

4    committee was charged with answering, and the question that

5    the committee that you chaired was charged with answering,

6    those things could have been explored by the full Ryan

7    committee.  Do you recall that line of questioning?

8    **A.**   Yes.

9    **Q.**   Were you on Dean Ryan's committee?

10   **A.**   I was not.

11   **Q.**   Was the dean of Harvard College on Dean Ryan's committee?

12   **A.**   Not to the best of my knowledge.

13   **Q.**   How many members of Dean Ryan's university-wide committee

14   represented the leadership of Harvard College?

15   **A.**   I can't recall anyone except Dean Fitzsimmons on the Ryan

16   committee.

17   **Q.**   Now, the Khurana committee, the committee to study the

18   importance of student body diversity, who convened that?

19   **A.**   President Faust.

20   **Q.**   Were you also involved in that?

21   **A.**   I was.

22   **Q.**   Are you familiar with the committee's report?

23   **A.**   I am.

24   **Q.**   What role or roles did you personally play with respect

25   to that report?

1    **A.**  Certainly.  In cases like this I'm there to help support

2    the committee to make sure that whatever it is that they need

3    in order to have the conversations take place can take place.

4    And then I have a very formal role toward the end of such a

5    process where the committee is preparing to issue its final

6    report.

7            And in many cases what needs to occur then is it

8    needs to come eventually to the full faculty for a discussion

9    at one of our faculty meetings in order to get on the agenda

10   of one of our faculty meetings.  It needs to go through a

11   body called "faculty council."

12           Faculty council is a council that I chair as dean

13   of the faculty.  It's 18 elected members of the faculty,

14   faculty of arts and sciences.  It's got a number of different

15   things that it does, not only gives advice to the dean, but

16   it also helps to make sure that materials are prepared and

17   ready to be presented to the full faculty.

18           So I help shepherd the report through the faculty

19   council for a number of discussions, and then eventually

20   moved onto the faculty meeting where we had discussions in

21   the faculty meeting about that report, too.

22   **Q.**  Okay.  And was the Khurana report discussed by the full

23   faculty of arts and sciences on more than one occasion?

24   **A.**  It was.

25   **Q.**  Did various members of the faculty offer comments about

1   it?

2   **A.**  They did.  And the way we typically approach matters like

3   this, which we consider substantial matters is -- again, with

4   everything that I just explained, when it eventually comes to

5   the full faculty meeting, we'll have an initial meeting to

6   present the material to the faculty at the faculty of arts

7   and sciences.

8           Unfortunately not every faculty member can make

9   every one of our faculty meetings.  So an issue of substance

10   like this is first presented, and then there are

11   opportunities outside of the faculty meeting to continue to

12   get input from the community and the faculty.

13           And then eventually when the time is appropriate

14   and we are prepared, it will make it back to a faculty

15   meeting for further discussion and then hopefully a vote as

16   was taken in this case.

17   **Q.**  Okay.  And what was the vote in this case?

18   **A.**  It was unanimously in support of the committee's

19   findings.

20   **Q.**  Now, let's turn to the committee to study race-neutral

21   alternatives.  You chaired that committee, correct?

22   **A.**  I did.

23   **Q.**  And how did you come to chair it?

24   **A.**  President Faust asked me to chair it.

25   **Q.**  And who selected the other members of the committee?

 1   **A.**  As I typically have done in cases like this when

 2   President Faust asks me to lead a committee, I'll have some

 3   discussion with individuals about who might be good members

 4   of this committee, but I ask to go off and spend more time

 5   thinking about who we need, what we need on those committees.

 6          And then I'll bring a recommendation back, as I did

 7   in this case, a recommendation back to President Faust saying

 8   I've thought about this.  Here's the reasons why it is that I

 9   think we should have these individuals.  Here's who I would

10   like to ask first.  Do you have any more input.  Can I go

11   ahead and invite these individuals.

12   **Q.**  And were the two individuals that you presented as your

13   choices, in fact, Dean Khurana and Dean Fitzsimmons?

14   **A.**  They were.

15   **Q.**  And did President Faust indicate any -- ask any questions

16   about that or indicate any concerns about having these two

17   deans serve on the committee with you?

18   **A.**  She had no concerns.

19   **Q.**  And what were your reasons for asking Dean Khurana and

20   Dean Fitzsimmons to join the committee?

21   **A.**  Sure.  So I spent some time thinking about what we needed

22   to accomplish.  As the Court knows well, what we're trying to

23   do is understand whether or not these race-neutral

24   alternatives would work for Harvard College and do so in

25   place of the consideration of race as one factor among many.

1              So I was looking for initially certainly two kinds

2      of skills.  A skill that said I'm very well familiar with

3      what's going on in race-neutral alternative world.  I

4      understand the admissions process.  We can bring that

5      perspective to the committee.  So I was thinking about

6      someone from our office of financial aid and admissions.

7              Given Dean Fitzsimmons's long history, 30-plus,

8      almost 40 years or so of experience in admissions and dealing

9      with the issues in race-neutral alternatives, he was my first

10     choice.  If he had not agreed to serve on this committee, I

11     would have looked elsewhere in the office for someone with

12     that kind of sets of skills.

13             Second of all, this impacts greatly the educational

14     experience that's taking place in the college, and I needed

15     someone who was well aware of what it is we're trying to

16     accomplish in the college, what goes on inside of our

17     classroom, what goes on outside of our classrooms.

18             As you heard me talk about a moment ago, a lot of

19     the learning that comes out of our diversity-related

20     educational goals comes out of discussions and interactions

21     that take place outside the classroom.

22             Dean Khurana is not only dean of Harvard College

23     but he's also what we call faculty dean of one of our houses,

24     one of our residences.  He eats, lives with our students, and

25     sees things that are important to have brought forth to this

Case: 19-2005    Document: 00117631840    Page: 363    Date Filed: 07/29/2020    Entry ID: 6356388
Case 1:14-cv-14176-ADB    Document 640    Filed 04/18/19    Page 120 of 228

120

 1    committee.

 2            So, again, he was an ideal candidate.  I needed

 3    somebody like that from the college.

 4            Then what I was also looking for individuals who

 5    could bring a background in social science research.  As we

 6    were talking about earlier, we would be reading a lot of

 7    literature, looking at reports that are specific to social

 8    science kinds of questions.  And Dean Khurana has that

 9    background, too.

10    **Q.**   At the time you were thinking about who would serve on

11    this committee, did you consider inviting individuals who had

12    published research on race-neutral alternatives?

13    **A.**   I did.

14    **Q.**   And why did you decided -- I gather you decided not to

15    conclude them.

16    **A.**   That's correct.

17    **Q.**   Why is that?

18    **A.**   In the end I decided that we wouldn't do it for a number

19    of different reasons.  First of all, we were getting a lot of

20    support, as we were talking about earlier, in the court,

21    social science research experts that were working.  We had

22    our own knowledge of a lot of the race-neutral alternatives

23    that were being considered through this complaint in the

24    literature.

25            And also the timing was just difficult.  It was

1  just about to be summer.  Many of my faculty had already left

2  for the summer, already had commitments to go off.  And at

3  that time my understanding was we had to do the work fairly

4  quickly to get to a report.  That was my understanding of

5  when the expert witness reports would come in and so forth.

6  **Q.**  Let me ask you about that.  Did you at any time in the

7  process of conducting the work of the committee feel

8  pressured to issue your report at any point before you were

9  ready to issue your report?

10  **A.**  No.  I was very clear with people that were interested in

11  having the report done that the report would be done when we

12  had it done.  It's when the committee was satisfied that it

13  had looked at everything that it needed to look it, it had

14  evaluated it.

15          Certainly even toward the end, I can tell you when

16  I was being scheduled for my deposition with respect to the

17  race-neutral alternative committee, I said at that time I

18  hope this is done because it's going to be done when it's

19  done, and we may have to move the scheduling of that

20  deposition.

21  **Q.**  During your time as dean of faculty of arts and sciences,

22  did you have occasions to chair other committees?

23  **A.**  I did.

24  **Q.**  And did you also convene other committees?

25  **A.**  I have.

1    **Q.**  And during your 26-year tenure on the Harvard faculty,

2    have you served on other committees?

3    **A.**  I've served on plenty.

4    **Q.**  Is it unusual to have a committee with only three

5    members?

6    **A.**  It is not.

7    **Q.**  Now, were there lawyers involved with the committee's

8    work?

9    **A.**  There were.

10   **Q.**  And why?

11   **A.**  For a number of reasons.  Again, first and foremost,

12   because we were dealing with a topic that had a number of

13   opinions coming out of the Supreme Court, and I needed to

14   have individuals who would understand those opinions and

15   what -- both we were supposed to be doing and what the

16   framework within which we should be doing that.

17          And then this lawsuit itself was something that we

18   had to keep in mind as we went through our work.  And so

19   having access to someone who could help me understand the

20   issues and implications of the lawsuit with respect to what

21   the committee needed to accomplish was important.

22   **Q.**  And what role did the lawyers play in the committee?

23   **A.**  So I certainly -- anyone who attends one of my meetings,

24   I'm expecting them to participate in the discussion and

25   whatever they think they can bring to the discussion.  We

1    hold very open meetings that way.

2         But I also asked -- in particular I've always

3    looked for committees like this to someone staff the

4    committee.  That individual responsible for taking notes

5    during the committee meetings, preparing the materials so

6    that everyone has the materials in advance of the next

7    meeting and we're prepared to actually have a successful next

8    meeting.  And I ended up asking our general counsel's office

9    if someone could staff it.

10   Q.   And is it unusual in your experience for lawyers to

11   participate in the work of an FAS committee?

12   A.   It is not.  I look across our entire community when I'm

13   thinking about who could best staff a particular committee.

14   And our office of general counsel is just as good as somebody

15   from the staff of the college or elsewhere.  It all depends

16   on what we're trying to accomplish and how we can be -- how

17   much benefit we can get from a person with that kind of a

18   background being the staff member for us.

19   Q.   Dean Khurana was here earlier today, and he testified

20   that the first draft of the committee's report was actually

21   prepared by an attorney.  Is that your recollection?

22   A.   Yes.  I would have put it, it was prepared by the staff,

23   person staffing the committee.

24   Q.   And is it unusual for FAS committees that are staffed by

25   attorneys to ask that staff person to prepare -- after a

1   discussion of all the relevant issues, prepare a first

2   preliminary draft of the report?

3   **A.**   No, it is not unusual.  The way I run my committees is a

4   person who is staffing the committee, who in this case

5   happened to be a lawyer, has participated in all the

6   conversations, understands the surround, understands the

7   conversations that took place.

8          It's very natural for us to ask that person to pull

9   all the notes together, make a first draft.  It is just a

10  first draft.  It is fully expected that the committee could

11  reject it.  It could make major changes to it.  It could make

12  small changes to it.  I've just found it's much more

13  productive if we have something physical in front of us as we

14  start our discussions about what the final report, if the

15  committee calls for a final report, should look like.

16  **Q.**   Did the race-neutral alternatives committee have a

17  charge?

18  **A.**   It did.

19  **Q.**   And what was that charge?

20  **A.**   The charge was to, within the context of the

21  diversity-related educational objectives and goals that the

22  Khurana committee found, evaluate the race-neutral

23  alternatives, either singularly or in combination, and decide

24  whether or not they were going to work for us as a

25  replacement for race as one consideration among many in our

1     admissions process.

2     **Q.**  Please turn to Tab 2 of your book.  And do you find there

3     a document that's been marked as Defense Exhibit 60 now in

4     evidence?

5     **A.**  I do.

6     **Q.**  What is it?

7     **A.**  So this is the memo that I sent to Dean Khurana and

8     Dean Fitzsimmons asking them to be members of the

9     race-neutral alternatives committee and presenting them with

10    the charge, and I think a little bit of the timeline.

11    **Q.**  When the committee commenced its work, did you have a

12    view about whether Harvard could achieve the educational

13    benefits of diversity through race-neutral means?

14    **A.**  I did not have a definitive view on how that should be.

15    I approached it with an extremely open mind.

16    **Q.**  And do you know whether the other members of the

17    committee had preexisting opinions?

18    **A.**  Not that they expressed to me.  And I had expressed to

19    the members of the committee, Dean Khurana and

20    Dean Fitzsimmons, that they should come to this with an open

21    mind.

22    **Q.**  How did the committee begin its work?

23    **A.**  So we began our work before the official first meeting.

24    We spent time both getting ourselves a collection of

25    literature that the committee was going to review before our

1    first meeting, and we had an opportunity to sit down with the

2    office of general counsel and get a better understanding of

3    the surround, the lawsuit, how it might impact this and more

4    background on the opinions from the Supreme Court in this

5    space.

6    Q.   And once the committee had gotten the legal surround and

7    had collected and reviewed the -- is it fair to say a

8    groaning table of literature?

9    A.   It was a lot of literature that I didn't really think

10   about before that point having to read at the beginning of my

11   summer, yes.

12   Q.   Then having read the literature, what did the committee

13   do first?

14   A.   So one of the first things that we did was to have an

15   open meeting just trying to collect all the different

16   race-neutral alternatives that we would want to consider

17   throughout this process.

18           That was not the last time.  I tried to make it

19   certainly clear to the committee that, as we went through our

20   discussion of any of the race-neutral alternatives, if they

21   thought there was other combinations of them or other

22   race-neutral alternatives came up, I wanted to hear about

23   them as soon as possible so that we could get the support we

24   needed to evaluate them appropriately.

25   Q.   Did the committee evaluate all of the race-neutral

1    alternatives that were identified either in the complaint in

2    this case or in Mr. Kahlenberg's reports?

3    **A.**  We did.

4    **Q.**  And did it limit itself to those race-neutral

5    alternatives?

6    **A.**  We did not.

7    **Q.**  Did the committee carefully review the expert reports of

8    Mr. Kahlenberg and Dr. Card?

9    **A.**  We did.  One of the things that we did when we scheduled

10   the committee meetings is we tried to make sure we scheduled

11   the committee meetings soon after the reports themselves as

12   they came in during the year so that we had an opportunity to

13   review the reports, discuss them, think about what else we

14   might need in addition to the information that was coming out

15   of those reports.

16   **Q.**  And what role did the expert reports play in the

17   committee's evaluation of race-neutral alternatives?

18   **A.**  Certainly it was an important part of what we were

19   looking at.  I think it was very beneficial to the committee

20   to have both a set of -- an expert witness that was strongly

21   a proponent for a race-neutral alternative as well as

22   Dr. Card's broad-based look at all the implications that come

23   out of these.

24          So we benefited tremendously from them, but that

25   was not the end of our work.  We all knew that in addition to

1    understanding the effects on a simulated class, we then had

2    to think through does that accomplish our diversity-related

3    educational goals, what other impacts might that have on our

4    mission, both with Harvard College and the broader

5    university, and that was left up to the committee to discuss.

6    **Q.**  And did the committee ultimately issue a report?

7    **A.**  We did.

8    **Q.**  And does that report memorialize the committee's

9    institutional judgments?

10   **A.**  It does.

11   **Q.**  How would you compare the process that this committee

12   undertook with respect to its charge with the process

13   followed by other committees that you've chaired or

14   participated in?

15   **A.**  Yes.  As much as possible I tried to follow our normal

16   process.  Obviously it was tilted a little bit with the

17   lawsuit surround in it.  But as I was trying to mention

18   earlier, I followed the same kind of process that I would

19   follow if we did any kind of report like this for the

20   faculty, and that's the way I look at it.

21          The report that we came out at the end of this was

22   both the report, obviously, to be used as part of this

23   lawsuit, but importantly from the perspective of the members

24   of the committee, it's a report for the university and for

25   Harvard College, that it think through the implications of

1   race-neutral alternatives, what we found at this time, and

2   what our recommendation is at this time.

3   **Q.**   And I think you testified that the committee had seven

4   formal meetings.  Am I recalling that?

5   **A.**   Yes.

6   **Q.**   When did the committee first formally meet?

7   **A.**   The first formal meeting was in August of 2017, if I can

8   keep my years straight.

9   **Q.**   Now, did the committee do the work -- did the committee

10  members do the work of the committee -- that is, the process,

11  the work that led up to the finalization and issuance of the

12  report -- outside of the seven meetings that it held

13  formally?

14  **A.**   Yes.  In addition to the seven meetings, we all realized

15  that we would have to put in quite a bit of work between

16  those meetings.  And that's, again, one of the reasons why it

17  was important to carefully think through the members of this

18  committee.

19          So we spent a lot of time in the beginning with the

20  literature.  And then as each one of the expert witness

21  reports came out, it was my expectation for each of the

22  committee members to spend quite a bit of time with that

23  report, think through the implications of the simulations

24  that were in that report so that -- in case -- in this case

25  all hes -- he could come to the meeting prepared to discuss

 1   with his colleagues what their interpretations of what this

 2   meant and how it would affect our diversity-related

 3   educational objectives.

 4   **Q.**  Did you -- prior to each meeting, did you send out a

 5   formal agenda to the other committee members?

 6   **A.**  I did.

 7   **Q.**  Let me ask you to turn to Tabs 3 through 9 of your

 8   binder, which contains Defense Exhibits 79, 80, 81, 82, 86,

 9   and 84.  Tab through those.  I'm going to ask you whether you

10   recognize those documents.

11   **A.**  I do.

12   **Q.**  What are they?

13   **A.**  They are the agendas that I sent out from my office to

14   the members of this committee before each of our committee

15   meetings.

16        MR. WAXMAN:  Your Honor, we move to admit Defense

17   Exhibits 79, 80, 81, and 84.

18        I just note that 86, which is the agenda for the

19   March 23 meeting has already been introduced as Plaintiff's

20   Exhibit 312.

21        MR. McBRIDE:  No objection, Your Honor.

22        THE COURT:  They're all admitted.

23        (Defendant Exhibits Nos. 79, 80, 81, and 84

24   admitted.)

25

Case: 19-2005    Document: 00117631840    Page: 374    Date Filed: 07/29/2020    Entry ID: 6356388
Case 1:14-cv-14176-ADB    Document 640    Filed 04/18/19    Page 131 of 228

131

1    BY MR. WAXMAN:

2    **Q.**  Generally speaking, did the committee discuss the items

3    on the agenda?

4    **A.**  Generally speaking, yes.

5    **Q.**  Did you always complete the agenda?

6    **A.**  Unfortunately not.

7    **Q.**  Why not?

8    **A.**  First of all, there's a lot to be discussed through many

9    of these different race-neutral alternatives.  And in some

10   cases the conversation, which was a productive, good

11   conversation, generative conversation, I didn't want to cut

12   off just to move to another agenda item.  We would simply

13   move that agenda item to the next meeting.

14   **Q.**  Let's now talk about the committee's report itself.  And

15   before we explore its content, I just want to ask you a few

16   more questions about the process that the committee went

17   through in preparing that report.

18         You told us that you spent time in between the

19   meetings reviewing the literature and reviewing the reports,

20   the expert reports, and you met seven times.

21         How did the process of getting from reviewing the

22   literature and the reports to the issuance of the final

23   report proceed?

24   **A.**  Sure.  I'll do it at a high level, and please ask

25   whatever questions you like.

1    **Q.**  Yeah.

2    **A.**  So in the beginning we were honestly bouncing from one

3    race-neutral alternative to another, lots of comments were

4    being made.  As we made it farther through and we were

5    starting to see actual simulations, it helped us to start

6    thinking through, well, here's some that are interesting.

7    They might have some impact for us.  Let's focus some more on

8    those.

9           Other ones, as we got information from other

10   offices or other members of the committee understood what we

11   have done, for example, with early admissions in the past, we

12   had to more focus.

13          Toward later in the process, if that made sense --

14   I'm happy to talk about if it didn't.

15          Toward later in the process, then I started

16   mentioning how we think about pulling this together as a

17   report.  What's important for us to articulate based on the

18   conversations that we've had during this process.

19          So we started framing the basic outline of what a

20   report would look like.  Had some ideas about what we would

21   say in each of the areas, race-neutral alternatives.  But

22   then it was to a point where, as we were talking about a

23   little bit earlier, I felt we needed an actual document, a

24   draft in front of us so we could react to it and see is this

25   actually expressing what it is that we're thinking about

1    expressing here.

2            It's oftentimes true that one person will have one

3    idea in their mind and a different one will have a different

4    idea.  And having something concrete helps work out those

5    issues between individuals.

6            And then we got a first draft.  And then we worked

7    through that first draft all the way to the end of going

8    through it line by line, paragraph by paragraph to make sure

9    that every committee member was supportive of what the report

10   was saying, nothing had been left out, and we were confident

11   in our recommendations.

12   **Q.**  Did the committee meet outside the presence of the

13   lawyers that were staffing of the committee?

14   **A.**  We did.

15   **Q.**  And was that a session -- what happened in that session?

16   **A.**  So it was a session later in the process, one of the last

17   of our committee meetings where we had a report.  It was

18   mostly now time where it was the opinion of -- the judgment

19   of the committee that I was looking for.  I didn't have other

20   guests in the room, and the committee itself spent time -- I

21   think it was one of the agendas we talked about before --

22   both looking at one of the last expert witness reports, Dr.

23   Card's rebuttal report coming in, and then also going through

24   and specifically talking about each part of the draft of the

25   final report at that point to make sure that we were getting

1    in everyone's thoughts before we turned to something we would

2    hope would be close to a final version.

3    Q.   Whose views are reflected in the committee's final

4    report?

5    A.   It is the views of each member of the committee.

6    Q.   Now, were there some overarching conclusions that are

7    reflected in the committee report?

8    A.   Yeah.  There are two main conclusions in our report.  One

9    of which is, as I was discussing a little bit earlier, that

10   we did not find any race-neutral alternative or a combination

11   of race-neutral alternatives that provides the same

12   educational -- diversity-related educational benefits and

13   goals that we have today through our use of race as one

14   factor among many in the admissions process.

15        Second of all, that the landscape was changing.

16   Other ideas may come up in the future, and this is something

17   that we should look it at.  And the committee made a

18   recommendation that we should look at this within the next

19   five years.

20   Q.   And are you aware that after the committee end its

21   report, Mr. Kahlenberg wrote a response?

22   A.   I am.

23   Q.   Did you review his response?

24   A.   I did.

25   Q.   Do you know if the other members of the committee

1    reviewed it?

2    **A.**  I sent it off to the other members asking them to take a

3    look at it and contact me if they had anything that they had

4    a question about or that they wanted to speak further about

5    it.

6    **Q.**  Did Mr. Kahlenberg's response cause you or the other

7    members of the committee to change any of your conclusions?

8    **A.**  It did not.  I did not see anything new that we hadn't

9    already discussed in the committee meeting or had read in one

10    of the expert witness reports.

11    **Q.**  Let's talk about the substance of the report.  And please

12    turn to page tab in the -- page tab.

13          Please turn to Tab 10 in the notebook which

14    contains Plaintiff's Exhibit 316 in evidence.

15          Do you have it?

16    **A.**  I do.

17    **Q.**  Is that the committee's final report?

18    **A.**  Yes, it is.

19    **Q.**  Was there an intended audience for this report?

20    **A.**  It is.  We obviously knew that this was going to be used

21    in this lawsuit, too, but as we tried to do with reports like

22    this, we are thinking about this is important for our faculty

23    in general, leadership of the university, and hopefully as we

24    recommended in this case a future committee that will look at

25    these questions.

 1              MR. WAXMAN:  Let's put up Slide 3.3, Mr. Lee,

 2     please.

 3     BY MR. WAXMAN:

 4     Q.   What does this show?

 5     A.   This is a listing of the race-neutral alternatives that

 6     were considered as part of this process.

 7     Q.   And I see you have a listing of ten things, but then

 8     you've got some unnumbered bolded text.  Can you just explain

 9     what that signifies?

10     A.   Sure.  So this is also a structure of the back part, if

11     you will, the latter half of our report looking at how we

12     actually went through and discussed and came to conclusions

13     about each of the race-neutral alternatives.

14              The first thing that the committee looked at was

15     just what would happen to the different characteristics of

16     our class if you could no longer consider race as one factor

17     among many.  Make no other changes, just remove race as one

18     factor among many.  That came out of Dr. Card's report.

19     Q.   What's the second category?

20     A.   And then the other two categories are different

21     race-neutral alternative.  We broke it into, just for ease of

22     exposition, two kinds of things.

23              First, if you will, Numbers 2 through 7 are

24     policies that may promote diversity by doing more.  So

25     there's things here that we could, for example, increase

1    recruiting efforts.  If we did more there, we possibly could

2    improve our diversity in our admitted class if we did that.

3              And then the latter, 8, 9, and 10, are kind of the

4    opposite.  What could we do less of and possibly improve the

5    diversity and the diversity-related educational benefits that

6    we're choosing to pursue.

7    **Q.**  Dean Smith, this report is in evidence, and I'm not going

8    to try the Court's patience or the patience of anybody in

9    this room by going through the report in enormous detail.

10             Let me just ask you whether in your view this

11   report describes the committee's high level conclusions about

12   each of these alternatives?

13   **A.**  It does.

14   **Q.**  And in considering these alternatives, I guess 2 through

15   10, did the committee consider them individually or in

16   combination?

17   **A.**  We looked at both.  We looked at things individually, but

18   a lot of the simulations, as we were discussing earlier,

19   pulled multiple things together.  But we definitely did both

20   individually and in combination.

21   **Q.**  Let me direct your attention to the third page of the

22   report, Plaintiff's Exhibit 316.

23             MR. WAXMAN:  Mr. Lee, would you mind highlighting

24   the -- yes, the paragraph beginning "this committee held."

25   Yes, exactly.  There you are.

Case: 19-2005    Document: 00117631846    Page: 381    Date Filed: 07/29/2020    Entry ID: 6356388
Case 1:14-cv-14176-ADB    Document 640    Filed 04/18/19    Page 138 of 228

138

1    BY MR. WAXMAN:

2    **Q.**  Do you see the sentence that begins "Three

3    considerations"?

4    **A.**  I do.

5    **Q.**  You have the report in front of you?

6    **A.**  I have the report in front of me, yes.

7    **Q.**  We're not exactly getting the -- there we go.  All right.

8    Do you see the sentence -- the second sentence of the

9    paragraph that says "Three considerations"?

10   **A.**  Yes.

11   **Q.**  Would you mind reading into the record that entire

12   sentence?

13   **A.**  "Three considerations guided our discussions when

14   evaluating alternative admissions practices.

15           "1.  The impact of alternatives would have on the

16   overall diversity of backgrounds, experiences, and interests

17   of the entire group of students who share a common

18   educational experience;

19           "2.  Whether alternatives would be consistent with

20   other institutional commitments and goals; and

21           "3.  Whether alternatives could reasonably be

22   implemented given their resource and administrative

23   requirements."

24   **Q.**  Does that sentence accurately describe how the committee

25   organized the analysis of the race-neutral alternatives it

Case: 19-2005    Document 00117631846    Page: 383    Date Filed: 07/29/2020    Entry ID: 6356388
Case 1:14-cv-14176-ADB    Document 640    Filed 04/18/19    Page 139 of 228

139

1   considered?

2   **A.**  It does.  We were looking at what impact it would have on

3   the overall class characteristics.  We were interested to see

4   if that alternative would be consistent with our

5   institutional goals and the goals of Harvard College.  And

6   then whether or not we could implement that alternative.

7   **Q.**  Let's turn to the committee's analysis and look at

8   Number 1 on the list that you've prepared in the previous

9   demonstrative.

10          How did the committee analyze whether Harvard

11  should eliminate the consideration of race while leaving

12  unchanged its other policies?

13  **A.**  So we relied in this case on Dr. Card's analysis of

14  that -- he has a simulation where he just simply keeps

15  everything else about our admissions process, as he

16  understood it and could model, alone and then simply removed

17  race as one consideration among many.

18          The committee looked at the resulting demographics

19  of the class and were dismayed to see a large reduction in

20  the number of African-Americans that were admitted and the

21  number of Hispanic and other category that were actually

22  admitted.

23  **Q.**  Now, do you recall an exchange that you had with

24  Mr. McBride about -- and I think we will turn to this in a

25  little bit later -- the passage in the report in which the

 1    committee expresses the view that some of Mr. Kahlenberg's

 2    simulations approximated the total aggregate diversity of the

 3    existing class of 2019?

 4    **A.**   Yes.

 5    **Q.**   Was the committee focused on whether these simulations

 6    approximated the overall share of the class that was

 7    African-American, Hispanic, Pacific Islander,

 8    Native American, or other; or with respect to the particular

 9    ethnic and racial identities that are represented in the

10    class?

11    **A.**   We looked at both.  The overall ethnic portion, and we

12    also looked at the individual ones because we've learned

13    through some of the committees that you mentioned earlier

14    that there are different experiences across different racial

15    groups.

16    **Q.**   Is there a specific -- when you're thinking about the

17    overall share of African-Americans, Hispanics, Pacific

18    Islander, Native Americans, and otherwise, or the share in

19    the Harvard admitted class of any one of those groups, is

20    there a specific level of diversity that is required to

21    achieve the educational benefits of diversity?

22    **A.**   The committee had no specific number in mind.

23    **Q.**   So how do you, one, think about -- in light of Harvard's

24    educational mission, how does one -- how did the committee

25    think about what an appropriate or acceptable level of racial

 1    and ethnic diversity would be?

 2    **A.**   Right.  We had a number of different conversations along

 3    this.  I can try to simplify it into a statement of we were

 4    certainly not looking to move backwards.  We've made progress

 5    in some areas in terms of improving the racial diversity on

 6    our campus.  We've seen what a positive impact that had.  But

 7    through the kinds of conversations that are ongoing right now

 8    on campus, we know we still have more to do in that space.

 9            So there was just a, first of all, look at are we

10    moving backwards from where we are today knowing that this is

11    also already an issue for us to be dealing with.

12            How do we get to the kinds of numbers that we have

13    today, and what does that mean in terms of resources required

14    or other trade-offs with respect to the aspects of the

15    mission.

16            And then what benefits could we get if the

17    diversity was actually increased in a particular category.

18    **Q.**   Let's turn to Demonstrative 3.5.  And now look at the

19    second category of race-neutral alternatives.  How did the

20    committee assess Alternatives 2 through 7?

21    **A.**   So we first familiarized ourselves with the ongoing work

22    that's already going on within Harvard in each of these

23    areas.  Many of these areas are things that we have invested

24    heavily in, have experimented with, have some real experience

25    with.  And not all members of the committee had all that

1    background.  So we spent some time understanding exactly

2    where we were and what's working well and what hasn't worked

3    in the past.

4         And then whenever possible we were -- we took

5    advantage of the expert reports and looked at the kinds of

6    simulations that they did.  There was times when we had the

7    question before the committee is there any simulations that

8    the experts are producing that aren't answering the questions

9    that we want, are we going to ask them is there another

10   simulation that we want to have them do.

11        Actually the experts did a fantastic job of

12   producing the kinds of things that the committee was

13   interested in.

14        And then we had the discussion that you and I had a

15   little bit earlier.  All right.  What does that all mean

16   given the demographic change, the change in the

17   characteristics of the class, under the framework that we

18   talked about a little bit earlier.  If it has an actual

19   impact on the demographics, is that a positive impact, can we

20   afford to do it, can we make -- is it practical for us to do

21   this, and how does that interact with the other institutional

22   objectives and goals that we have.

23   Q.  I'm not going to take you through each one of these

24   orally both because it's in the report and because

25   Mr. Kahlenberg has not provided testimony about some of them.

1          But let's look at the first one, "Increasing

2     Recruiting Efforts."  How did the committee analyze the

3     proposal that Harvard increase its recruitment efforts?

4     **A.**   So, again, as I was mentioning a moment ago, we first

5     learned the extensive efforts that we already make in this

6     space, both before we even get to the admissions process,

7     what do we do for outreach.  We have groups and programs on

8     campus like the undergraduate minority recruitment program

9     that has been running for a long time, made sure that

10    everybody was aware of that.  The literatures that we send

11    out today, all the ways that we try to make outreach to

12    perspective students that we would like to have in our

13    applicant pool.

14          And then we got to the point, well, if we did more

15    in this space, what would happen to the composition of our

16    class.  We took advantage of the simulations that looked at

17    saying, here's our low socioeconomic applicants today.  What

18    happens if we just double them, assuming that changes in our

19    recruitment efforts could actually produce that same set of

20    students again.

21    **Q.**   I'm going to ask you separately about Number 7 which is

22    "Increasing the Weight For Socioeconomic Background"?

23          THE COURT:  Can I stop you for a second?  What is

24    Number 3?

25          THE WITNESS:  3 is "Partnerships."

**JA1832**

Case: 19-2005    Document: 00117631840    Page: 387    Date Filed: 07/29/2020    Entry ID: 6356388
Case 1:14-cv-14176-ADB   Document 640   Filed 04/18/19   Page 144 of 228

144

1          THE COURT:  It's the one we haven't discussed,

2     right?  No one's discussed it?

3          MR. WAXMAN:  No one's discussed it yet.  It's in

4     the report.  But I was going to ask Dean Smith what it is.

5          THE COURT:  Are you asking me if I read the report

6     yet?

7          MR. WAXMAN:  Is this the part where we give you a

8     quiz?

9          THE COURT:  I just don't know what Number 3 is.

10    BY MR. WAXMAN:

11    Q.  Why don't we take Number 3, and then we'll go back to

12    Number 2.

13    A.  Number 3 is another way of doing, if you will,

14    recruitment.  Partnerships.  And I won't be able to tell you

15    all the names of the different partnerships that exist, but

16    there are organizations in the world whose mission is to try

17    and take individuals who are having a hard time understanding

18    where they should go to college and giving them the

19    background that they need, and then they become on these

20    individuals' organization's list, which then they give to

21    institutions like us that say, we have this individual, who

22    is an outstanding individual.  Doesn't really understand the

23    application process.  You might want to consider him or her

24    moving forward.

25          And there's a lot of these partnerships in the

1    world.  I am not the expert on all these partnerships.  The

2    last thing I'll say on this is Harvard has a particular way

3    that we like to work with these partnerships.  We're not

4    looking to work with just one partner or two partner.

5         We're trying to partner with as many people as

6    possible because the individual students themselves, at least

7    one of the things I understand -- Dean Fitzsimmons would be

8    able to answer better than me -- you're not guaranteed to

9    have an applicant work with a particular organization.  So we

10   want to get as many outstanding applicants as we can.  So we

11   try to work with as many organizations as we possibly can.

12   **Q.**  Again, I'm not going to ask you for a compendium of all

13   the partnerships, but is it your understanding that many or

14   most of the community partnerships with which the Harvard

15   admissions office -- many or most of the community

16   organizations that the Harvard admissions office partners

17   with are organizations designed to serve either low income or

18   underrepresented minority student populations?

19   **A.**  That is my understanding.

20   **Q.**  Okay.  Now that we've checked off Number 3, let me just

21   ask you a few more questions about Number 2.

22        Do you recall the assertion in Mr. Kahlenberg's

23   reports that Harvard could double the number of equally

24   qualified low-income applicants if it simply increased its

25   recruitment efforts?

1    **A.**  I do.

2    **Q.**  And what was the committee's reaction to that assertion?

3    **A.**  Our reaction was that we're willing to look at the

4    results of that, but to actually have that happen in our

5    applicant pool we thought was very difficult.  My own

6    personal experience in that, as I may have mentioned earlier,

7    Dean Fitzsimmons and I had regular conversations, especially

8    around things like financial aid, where I wasn't certain the

9    message was getting out well enough, what else could we do to

10   improve.

11        And we're not looking to just increase the size of

12   our applicant pool.  It's very easy to increase the size of

13   your applicant pool by having people apply that have no

14   chance of getting in.  What we're really looking for is the

15   students that we duplicated there, the outstanding, low

16   socioeconomic, minority students that we want more of in the

17   pool.

18        Dean Fitzsimmons and I have been working on that

19   for a decade, and I did not find that to be easy.  We found

20   nothing that would easily improve that number tremendously.

21   **Q.**  Let's turn to Number 4, which is the proposal that

22   Harvard increase its financial aid.  How did the committee

23   address that contention?

24   **A.**  So, again, we reviewed the history of changes to our

25   financial aid policy, which has been a huge investment both

1      at the college as well as at the university.  We have made a

2      number of different changes from 2004 through 2007, '8, to

3      the more recent one.  And I forget the exact date, 2011,

4      something like that.

5             Initially the changes in the increased aid that we

6      provided to our students made not only a big difference to

7      the student and their ability to undertake their educational

8      goals on our campus, but it improved the characteristics of

9      our pool.

10            But in these later rounds, that has not been the

11     problem.  Putting more money into our financial aid program

12     alone is not making noticeable changes to the number of low

13     socioeconomic students that are applying or to them being

14     admitted and enrolling.

15     **Q.**  Did you review Dr. Card's analysis on the effects of

16     increasing financial aid?

17     **A.**  We did.

18     **Q.**  And what did it tell you about -- maybe you've covered

19     this already, but what did it tell you about the proposal

20     that by increasing financial aid Harvard could substantially

21     increase the number of qualified low-income applicants?

22     **A.**  Right.  Yes.  So just to go a little bit deeper.  In the

23     beginning we were seeing noticeable -- the beginning 2004

24     timeframe.  In the last change we're basically not seeing

25     any, and that's what Dr. Card said, any changes.

**JA1836**

Case: 19-2005    Document: 00117631846    Page: 391    Date Filed: 07/29/2020    Entry ID: 6356388
Case 1:14-cv-14176-ADB    Document 640    Filed 04/18/19    Page 148 of 228

148

1          So we're already at a level -- we moved in this

2     last change to the financial aid system from any family under

3     $60,000 not requiring to provide any support to their

4     student, either in tuition or room and board, to come to

5     Harvard.  We moved that to 65,000.  That's already covering a

6     majority of our low socioeconomic students in the United

7     States.

8          Moving that number up farther and investing more

9     there, we're not seeing any changes, and that's what Dr. Card

10     was telling us, too.

11     Q.  Well, I was going to turn to place-based preferences, but

12     I don't want to slight the Court's -- any interest the Court

13     has in Number 5, which also has not yet been discussed in

14     this trial, which is the proposal that Harvard could achieve

15     a more ethically and racially diverse class consistent with

16     its other goals by increasing transfer admissions.

17          Is that proposal discussed in your report?

18     A.  It is.

19          MR. WAXMAN:  Your Honor, would you like me to

20     question him on this, or would you prefer to?

21          THE COURT:  No.  That's fine.  I'll read the

22     report.  I knew what that one was.

23          MR. WAXMAN:  Let's look at place --

24          THE COURT:  You're supposed to remind me that

25     there's no such thing as a dumb question, right?

 1          MR. WAXMAN:  I have asked not only in my life but

 2     in the course of preparing witnesses to testify in this case

 3     so many dumb questions --

 4          THE COURT:  There's no such thing as a dumb

 5     question, Mr. Waxman.

 6          MR. WAXMAN:  There is no such thing as a dumb

 7     question unless perhaps, as has happened with me, you have

 8     asked that same question of the same person a dozen times.

 9          THE COURT:  I'm sure Mr. McBride will let you know

10     if that happens today.

11          MR. WAXMAN:  He's got a little poker right here.

12          THE COURT:  I just didn't know what Number 3 was.

13     I understand what Number 5 is, and I will read the report.

14     BY MR. WAXMAN:

15     Q.  All right.  Well, let's turn to Number 6, which is

16     "Place-Based Preferences."

17          And what did you understand Mr. Kahlenberg to be

18     proposing about place-based preferences?

19     A.  So the committee understood two general schemes for

20     place-based preferences.  The first being either admitting

21     the top student from every ZIP Code in the United States or

22     every high school in the United States, which has been a

23     race-neutral alternative that has been discussed in the

24     literature.

25          And then the second basic category is moving away

Case: 19-2005    Document: 00117631840    Page: 393    Date Filed: 07/29/2020    Entry ID: 6356388
Case 1:14-cv-14176-ADB    Document 640    Filed 04/18/19    Page 150 of 228

150

1    from admitting just a single student in each one of those, I

2    suppose I could generalize, and admit more than one student

3    from each.

4            But then looking at the College Board neighborhood

5    clusters, there's 33 of those as opposed to the many

6    thousands of ZIP Codes and high schools in the United States.

7    And then admitting a fixed number of individuals from each of

8    the College Board neighborhood clusters.

9            The first that I mentioned there, admitting the top

10   student from any ZIP Code, from ZIP Codes or from high

11   schools, honestly the committee didn't spend a lot of time

12   talking about because there are so many more ZIP Codes or

13   high schools than there are slots in our admitted class, that

14   it's just not a workable alternative for us.

15           Not to mention the problem of trying to understand

16   the single best student given that we're looking for

17   excellence across many different dimensions and in particular

18   looking for students who exhibit excellences in multiple

19   dimensions.  It's very hard for us to come up with that.

20           So it's more likely that we could do something in

21   the second place-based preference world where we could admit

22   at least a reasonable number.  I would say the committee is

23   still uncomfortable with that.  We have never looked for

24   excellence and talent in one place.  Say we've admitted five

25   students from that place.  There can't be any more good

1    talent from there, let's move to a different place.

2         That's why we're looking for talent wherever we can

3    find it.  We believe it exists everywhere, but we don't

4    believe necessarily it exists uniformly.

5    **Q.**  In the context of thinking about the proposal to admit

6    roughly -- I think it's 52 applicants from each of the

7    33 neighborhood clusters, did you evaluate any analyses that

8    Professor Card provided as to the predicted racial and ethnic

9    breakdown of the class and other characteristics of the class

10   such as 1s or 2s on the four profile ratings that admissions

11   officers assign?

12   **A.**  We did.  We did everything that you just mentioned with

13   respect to the simulations that were provided to us.

14   **Q.**  And what was the committee's conclusion with respect to

15   adopting a place-based preference that would admit an equal

16   number of students from each of the 33 clusters?

17   **A.**  All right.  Again, as I was discussing earlier, we looked

18   at, for example, the racial composition of the class.  And

19   though the overall nonwhite percentage of the class came back

20   to similar to what we have in our current class today, we

21   were worried about the fact that the African-American

22   representation in that simulated class was significantly

23   lower than what we have today.

24        And given the discussion I had a little bit

25   earlier, with respect to the things that we're learning

1    through our Inclusion and Belonging committees and task

2    forces, we weren't looking to go backwards for any particular

3    racial group.

4            And then we also took time to look carefully at the

5    other characteristics.  And in particular the discussion we

6    had earlier was the particular ratings, and the fall in the

7    ratings were something that worried the committee greatly.

8    **Q.**  Let's turn now to the proposal Number 7, which is that

9    Harvard increase the weight for socioeconomic background.

10           How did the committee analyze the suggestion to

11   place increased weight on socioeconomic status in the

12   admissions process?

13   **A.**  So we already are looking to tip low socioeconomic

14   students.  They're bringing an important perspective to have

15   on campus.  These simulations, as I understand them from

16   reading the expert witness reports, were taking and slowly

17   cranking up, if you will, the weight given to someone who is

18   disadvantaged, low socioeconomic in terms of the overall

19   evaluation of the characteristics of that individual.

20           So we were particularly looking at what weights are

21   required in these simulations in order to make significant

22   changes to the racial composition, to the kinds of other --

23   the profile ratings that we were talking about earlier.

24           And one of the things that came out is that there's

25   a significant weighting given to low socioeconomic background

1    to get back to the kinds of distributions that the committee

2    was looking for that Harvard values in its classes to the

3    point where it becomes the defining characteristic that in

4    our opinion was causing that student to be admitted.

5    **Q.**   Do you recall Mr. McBride asking you questions --

6            MR. WAXMAN:   And Mr. Lee, perhaps we could pull up

7    Exhibit 26 of Professor Card's rebuttal report, which was

8    used by Mr. McBride.   And in Exhibit 26 is that table -- yes,

9    exactly.

10           So Mr. McBride -- let's look down at the red box

11   that's identified there L.

12   BY MR. WAXMAN:

13   **Q.**   Do you recall -- do you see at the top that there are

14   three different simulations, "Card's Simulation 4X SES

15   Boost," "Kahlenberg's Simulation 6," and "Kahlenberg's

16   Simulation 7"?

17   **A.**   Yes, I do.

18   **Q.**   And Mr. McBride was asking you questions about what would

19   happen under Card's simulation of a 4X SES boost.   And the

20   Court will have the opportunity to hear from Professor Card

21   about what that model actually shows.

22           But do you have an understanding from reading

23   Dr. Card's report of how much of a boost a 4X boost in

24   Mr. Card's model would actually have?

25   **A.**   I do.   As I understand the simulation and the write-up in

Case: 19-2005    Document: 00117631846    Page: 397    Date Filed: 07/29/2020    Entry ID: 6356388
Case 1:14-cv-14176-ADB   Document 640   Filed 04/18/19   Page 154 of 228

154

1    Dr. Card's report, a 4X low socioeconomic boost provides you

2    with the same kind of record that one of our most talented

3    applicants would have that was getting a 1 and 2 rating in

4    multiple of our profile ratings.

5           So basically if I remember the number correctly,

6    it's someone who's going to be admitted with an 80 to

7    95 percent probability.

8    **Q.** So, in other words, a candidate who has a 7 percent

9    probability of being admitted, which is roughly the

10   probability of being admitted to the class of 2019, given a

11   4X boost, am I correct in doing the math that a 4X boost

12   essentially would admit every student who qualified for that

13   boost?

14   **A.** As I understood it.

15   **Q.** Look to the next column. Do you see where it says

16   "Kahlenberg's Simulation Number 6"?

17   **A.** Yes.

18   **Q.** Do you recognize this as the simulation that

19   Dr. Kahlenberg in his rebuttal report said was his preferred

20   simulation?

21   **A.** I do.

22   **Q.** Look at -- again, let's look at the -- first, let's look

23   under "Race."

24          What happens to the African-American share of the

25   class under Mr. Kahlenberg's preferred simulation?

1    **A.**   So it drops by 30 percent from the actual admitted class.

2    **Q.**   And that is the same as it would under Dr. Card's 4X

3    simulation, correct?

4    **A.**   The same percentage, one more person actually, but yes.

5    **Q.**   And what about Mr. Kahlenberg's Simulation Number 7?

6    **A.**   It drops even further.  It drops this time by 32 percent.

7    **Q.**   Okay.  And I won't ask you to recite all the other

8    numbers that are in here, but I want to ask you again about

9    this issue of whether the committee and Harvard College in

10   thinking about a diverse learning environment is concerned

11   with the aggregate share of the class of African-Americans,

12   Hispanics, or others or the individual components?  I think

13   you said it was both.

14   **A.**   It's definitely both.

15   **Q.**   What was the committee's concern about these kinds of

16   drops in the share of the admitted class of African-American

17   students at the present time given what's happening in the

18   college and the world?

19   **A.**   So this felt like, if you will, a bridge too far.  We're

20   going backwards from where we are today.  We've learned a

21   tremendous amount over the last couple of years as we've dug

22   farther into issues of diversity, inclusion, belonging.

23   There's already a sense as these committees have heard of

24   alienation and isolation that's interfering with an

25   individual's ability to pursue their academic studies on our

1    campus.  Those impacts are tremendously felt by individuals

2    here.

3         We're not looking to make that worse.  Certainly

4    the African-Americans in this category that are interacting

5    with other students are bringing important perspectives to

6    our educational process, but we're also very worried about

7    their own educational experience.

8    Q.  Thank you.

9         MR. WAXMAN:  Mr. Lee, can you put up

10   Demonstrative 3.6.

11   BY MR. WAXMAN:

12   Q.  And let's now talk about the third category, "Eliminating

13   Certain Other Policies."  And let me direct your attention to

14   what is listed as Number 8, which is "Eliminating Early

15   Action."  Do you see that?

16   A.  I do.

17   Q.  How did the committee assess Mr. Kahlenberg's proposal

18   that Harvard eliminate early action?

19   A.  We have a natural experiment that occurred in this space.

20   So we were bringing a lot of that learning, that experience

21   to our discussions.  So our experience there has been,

22   though, the elimination of early-action programs, in

23   particular early decision programs, has been said to allow

24   you to bring more diversity to your applicant pool and then

25   eventually into your admitted class, our experience in that

1    case when we eliminated at Harvard early action -- now I'm

2    forgetting off the top of my head what the date of that was,

3    but it was during my deanship.

4              We ran that experiment for four years and looked at

5    the results of what happened in that case.  And what we saw

6    was no change effectively in the number of -- in the

7    percentage of African-American, Hispanic, and other students

8    who were applying to our classes, but a drop in the actual

9    yield rate.

10             So fewer of the students that we were admitting

11   from those racial categories were actually choosing to come

12   from Harvard.  And we also looked -- we've talked a number of

13   times in this courtroom today about other things that we care

14   about.  In particular the profile ratings, academic 1s and

15   2s, and we were seeing that those students we would really

16   love to have on our campus, the academic 1s and 2s from those

17   racial minorities, were choosing to go to other institutions

18   that had an early an early-action program, an early decision

19   program.

20             And when we looked at the actual statistics, it was

21   not benefiting us to eliminate this.  In fact, it sometimes

22   was working against us when we eliminated it.

23   Q.  Were you involved in the decision to reinstate early

24   action?

25   A.  I was.

1    **Q.**  Please turn to Tab 11 of your binder, which is Defense

2    Exhibit 39.  Do you have that?

3    **A.**  I do.

4    **Q.**  What is it?

5    **A.**  It is the memorandum that President Faust and I prepared

6    for the Harvard Corporation discussing the reinstatement of

7    early action.

8              MR. WAXMAN:  Your Honor, we'd move defense

9    Exhibit 39 into evidence.

10             MR. McBRIDE:  No objection, Your Honor.

11             THE COURT:  It's admitted.

12             (Defendant Exhibit No. 39 admitted.)

13   BY MR. WAXMAN:

14   **Q.**  Please turn to the page marked DX039.0004.  And look at

15   the first full sentence of the paragraph.

16             Do you see the sentence that says "Of particular

17   interest"?

18   **A.**  I do.

19   **Q.**  Please read that.

20   **A.**  "Of particular interest given the rationale for

21   eliminating early action, our admissions office is becoming

22   increasingly concerned that not having an early admission

23   option is causing us to lose some of the most academically

24   talented and prepared low income and underrepresented

25   minority students."

1    **Q.**  Please turn to page DX 039.0025.  A page from an exhibit

2    that you and President Simmons presented to the Harvard

3    Corporation with a recommendation to eliminate early action?

4    **A.**  President Faust and I presented.

5    **Q.**  What did I say?

6    **A.**  Simmons.

7    **Q.**  Oh.  That's the witness next week.

8         President Faust.

9    **A.**  Yes.

10   **Q.**  The Court has heard something about this, but what is

11   shown in the box on the left on the page titled, "Change in

12   yield rates by academic and extracurricular rating and

13   ethnicity"?

14   **A.**  So the left graph here is the one you're asking about,

15   right?

16   **Q.**  Yes.

17   **A.**  The left graph shows for the period of time between 2003

18   and 2007, what the yield rates -- I'm assuming it's an

19   average; I don't actually remember off the top of my head --

20   for the different ethnic minorities or ethnicities, I should

21   say, here.

22        And then the gray portion from 2008 to 2010 is the

23   yield rates for those students, particularly -- sorry -- for

24   each of those racial categories.  Those students with high

25   academics and high extracurricular ratings, what the yield

1    rate was during the time that we did not have early action.

2    **Q.**  And again what does this show?

3    **A.**  It shows the decrease that I was talking about earlier in

4    Hispanic and black.

5    **Q.**  So we've heard in this case about yield rates, and we

6    have heard also about matriculants.

7         Does this decline in -- I think I'm asking you

8    something close to a tautology.  But just so we're clear on

9    the vocabulary.

10        Does the decline in the yield rate of these groups

11   translate into a decline in the share of each of these groups

12   in the admitted class -- in the matriculating class?

13   **A.**  Typically, yes.

14   **Q.**  Did the Harvard Corporation vote to end early action as

15   you and President Faust recommended?

16   **A.**  So it voted to end early action in 2007, and then voted,

17   I guess, in -- whatever the actual years are, and I think you

18   meant to ask me to did it vote to bring it back, and it did

19   bring it back.

20   **Q.**  Thank you for answering the question that I thought I was

21   asking.

22        And so how did the committee in light of this

23   experience evaluate Mr. Kahlenberg's proposal that Harvard

24   end early action in order to increase the underrepresented

25   minority share, or shall I say, the African-American,

Case: 19-2005    Document: 00117636840    Page: 404    Date Filed: 07/29/2020    Entry ID: 6356388
Case 1:14-cv-14176-ADB    Document 640    Filed 04/18/19    Page 161 of 228

161

 1   Hispanic, Pacific Islander, Native American, and other share

 2   of the matriculating class?

 3   **A.**   While this race-neutral alternative may work for other

 4   institutions, it's our experience, and our recent experience

 5   that it did not work for us, and we did not think we should

 6   be bringing it, redoing that experiment again at this point.

 7   **Q.**   Let's turn again to Demonstrative 3.6 and ask you to --

 8   we're going to address Number 9, "eliminating other practices

 9   that allegedly benefit white applicants."

10         What other practices allege to benefit white

11   applicants did you consider?

12   **A.**   So this category includes the practices that we referred

13   to before as ALDC, athletes, giving them a tip; legacies,

14   giving them a tip; individuals listed on the dean's and

15   director's list, and then children of faculty and staff at

16   Harvard.  Plus it also included the consideration of

17   individuals for deferred admission.

18   **Q.**   Okay.  That is eliminating the so-called "Z list"?

19   **A.**   Yes.  As I understand the Z list.

20   **Q.**   Okay.  And with respect to the proposal that Harvard

21   eliminate tips that are given to the so-called ALDC

22   applicants, and I guess I'll just ask about deferred

23   admission as well, what did the committee conclude about the

24   likely effects of eliminating those tips on the ethnic and

25   racial makeup of the matriculating class?

1    **A.**  So we looked carefully at Dr. Card's simulations in that

2    space, who -- he eliminated all the ALDC including deferred

3    admissions.  Every simulated student was given an opportunity

4    to be in the current class.  So there was no deferred

5    admissions.

6           And it did not change the racial composition from

7    the -- noticeably from the earlier experiment where we talked

8    about simply removing race as one consideration among many

9    when we had a 14 to 6 percent drop in the percentage of

10   African-Americans in our admitted class and a 14 to 9 percent

11   drop in the number of Hispanics and other that were in the

12   admitted class.

13          MR. WAXMAN:  Mr. Lee, would you please put up the

14   report, which is Plaintiff's Exhibit 316 and page 16.  And

15   let me ask you to highlight the second full paragraph on the

16   page.  That doesn't seem to be it.  The paragraph that

17   starts, "Thus, to the extent."  That entire paragraph.

18   BY MR. WAXMAN:

19   **Q.**  I want to focus you on the sentence that's just a little

20   more than halfway down the paragraph starting "Elimination."

21          Do you see that?

22   **A.**  Yes.

23   **Q.**  "Eliminating."

24   **A.**  Yes, I do.

25   **Q.**  By the way, do you understand this discussion to be in

Case: 19-2005   Document: 00117631840   Page: 406   Date Filed: 07/29/2020   Entry ID: 6356388
Case 1:14-cv-14176-ADB   Document 640   Filed 04/18/19   Page 163 of 228

163

 1   the context of the proposal to eliminate tips for ALDCs and

 2   eliminate the Z list?

 3   **A.**   Yes.

 4   **Q.**   What does that sentence beginning with the word

 5   "eliminating" say?

 6   **A.**   Would you like me to read it?

 7   **Q.**   Yes.

 8   **A.**   "Eliminating the consideration of race and eliminating

 9   these processes would have a negligible effect and not always

10   positive on diversity resulting in an admitted class that is

11   5.3 percent African-American down from an earlier 5.6 and

12   9.3 percent Hispanic or other from an 8.9 percent earlier.

13   **Q.**   And what is the next sentence?

14   **A.**   "That is reason enough for the committee to conclude that

15   these practices would not prevent Harvard from needing to

16   consider race in the admissions process to achieve its

17   racially -- its diversity-related educational objectives."

18          THE COURT:  Could you break out which of the ALDC

19   factors had that effect?

20          THE WITNESS:  The simulation that was done for the

21   committee through Dr. Card's work put them all in.

22          THE COURT:  Did you ever try and separate it out?

23          THE WITNESS:  You mean from the further reduction

24   in the African-Americans?  Is that what you're asking about?

25          THE COURT:  Yes.

Case: 19-2005    Document 00117631840    Page: 407    Date Filed: 07/29/2020    Entry ID: 6356388
Case 1:14-cv-14176-ADB    Document 640    Filed 04/18/19    Page 164 of 228

164

```
 1          THE WITNESS:  No.  I don't know.  Dr. Card might,
 2   but I don't.
 3   BY MR. WAXMAN:
 4   Q.  You were asked a number of questions by Mr. McBride about
 5   your perception of the impact of alumni giving or alumni
 6   contributions if a tip for lineage or legacy applicants was
 7   omitted, correct?
 8   A.  Correct.
 9   Q.  Was that the reason that you concluded that the proposal
10   to eliminate the tips for ALDC applicants and the Z list was
11   unworkable for Harvard?
12   A.  Absolutely not.
13   Q.  What about the effect of eliminating the tip for
14   athletic -- for recruited athletes?  Was that the reason that
15   the committee concluded that this proposal was unworkable for
16   Harvard?
17   A.  No.  We looked at what would happen if we eliminated
18   recruited athletes, the tip for recruited athletes.
19   Q.  And did you -- was the fact that the elimination -- that
20   eliminating ALDC preferences would eliminate special
21   consideration or a tip for the children and staff of
22   Harvard -- children of Harvard faculty and staff or
23   applicants who are listed on the dean's and director's list
24   the reason that you rejected Mr. Kahlenberg's proposal to
25   eliminate the tips for ALDCs and the Z list?
```

1   **A.**   No.

2   **Q.**   Did the committee nonetheless consider criticisms of

3   those practices?

4   **A.**   We did.

5   **Q.**   Okay.  And is the committee's analysis of the criticisms

6   of the practices -- that is, why should you give an athletic

7   tip; why should you give a tip to children of Harvard College

8   alumni or alumni; why should you give it a tip in considering

9   an application from a child of a Harvard staff or faculty

10   member; or why should you give an academic tip, if one is

11   given, to individuals that are listed in the dean or

12   director's list -- did your report -- did the committee

13   evaluate the criticisms of each of those practices?

14   **A.**   We did.  And we went further to discuss whether or not it

15   was important for us at Harvard as the community that we are

16   to continue to do or not continue to do those actions.

17   **Q.**   And I'm not going to ask you to explicate what's in the

18   report with respect to most of them, but Mr. McBride spent

19   quite a bit of time asking you about the connection between

20   legacy admissions and alumni giving.

21           Do you recall that?

22   **A.**   I do.

23   **Q.**   And the committee discussed the relationship between

24   legacy preferences and alumni giving?

25   **A.**   We definitely discussed that as part of our broader

1    discussion, too, but it wasn't the sole point of our

2    discussion.

3    **Q.**   And did you understand the discussion to concern alumni

4    financial donations or more broadly?

5    **A.**   I'm not sure I follow the question.

6    **Q.**   Okay.  When you're thinking about the relationship

7    between special consideration to the children of Harvard

8    College alumni or alumnae, and what's referred to broadly as

9    alumni giving or alumni contributions, were you focused

10   purely on financial contributions or did you look at other

11   contributions that alumni make?

12   **A.**   We were very concerned with the broader thought of all

13   kinds of contributions from our alumni.  As I mentioned

14   earlier, certainly the donating of their time to our

15   admissions process, we could not do our admissions process

16   without the generous donation of the time by so many

17   individuals in our alumni to give us detailed, thoughtful

18   reports back on the applicants to the times that I have

19   experienced real, useful, active advice that I could use as

20   we were thinking through, for example, the new generation of

21   the theatre dance and media concentration on our campus.

22           I benefited tremendously from talking to some of

23   our alumni in that space about how we should think about

24   doing this, where is the field going, what is the field going

25   to be doing next, how should we be best preparing our

1    students for someone who wants to concentrate in that area.

2    It wasn't just about financial donations.

3    Q.  So I just want to ask you, with respect to the donations

4    that are prospective or past donations, that are monetary

5    contributions to Harvard College or the faculties of arts and

6    sciences, does Harvard have a policy with respect to

7    soliciting contributions from a family member -- from a

8    family when a family member is applying for admission?

9    A.  We absolutely do.

10   Q.  And what is the policy?

11   A.  The policy is not to solicit any donations from a member

12   of our alumni base or anyone who has a child that's about to

13   enter into our admissions pool or is actually in our

14   admissions pool.

15   Q.  Let's finally turn to consideration of Mr. Kahlenberg's

16   simulations.  Do you recall that Mr. Kahlenberg's report

17   included many simulations?

18   A.  Yes.

19   Q.  Did you consider all of the simulations that

20   Mr. Kahlenberg proposed?

21   A.  We did.

22   Q.  And particularly did you consider -- did you consider

23   particularly Mr. Kahlenberg's proposal of his preferred

24   simulation, Simulation Number 6?

25   A.  We did.

**JA1856**

1  **Q.**  What was the committee's assessment of the demographic

2  results of this submission?

3  **A.**  As we were discussing a little bit earlier, we remained

4  concerned even though the overall percentage of minority

5  students resembles the current class, the distributions were

6  different and particularly different in ways that worried us

7  with respect to the African-American students.

8  **Q.**  And did you have in mind that a simulation --

9  Mr. Kahlenberg's simulation, we saw it earlier, would result

10  in a 30 percent drop in the African-American share of the

11  matriculating class?

12  **A.**  Yes.

13  **Q.**  And did Mr. Kahlenberg offer any simulations under which

14  the African-American share of the class was comparable to

15  current levels?

16  **A.**  Only under very high socioeconomic boosts.

17  **Q.**  And did Dr. Card's reports provide additional information

18  about the simulations that the committee considered?

19  **A.**  Yes.

20  **Q.**  Simulation of the preferred model?

21  **A.**  Yes.  We benefited tremendously from Dr. Card's full

22  description of how the different characteristics were

23  affected both under the simulations that he looked at and he

24  thought were interesting, plus the ones that he did for

25  Dr. Kahlenberg -- I'm sorry, Mr. Kahlenberg.

Case: 19-2005     Document: 00117628846     Page: 443     Date Filed: 07/29/2020     Entry ID: 6356388
Case 1:14-cv-14176-ADB   Document 640   Filed 04/18/19   Page 169 of 228

169

1          MR. WAXMAN:  Mr. Lee, would you put up

2     Demonstrative 3.7.

3     BY MR. WAXMAN:

4     Q.   What does this show?

5     A.   This is the comparison between the actual admitted class

6     for -- I believe it's class of 2019 and the percentage of the

7     simulated class under Mr. Kahlenberg's Simulation Number 6 as

8     reported in Dr. Card's, I believe, rebuttal report.

9     Q.   And what does it show with respect to the predicted

10    change in the number of academic 1s in the share of the class

11    that is academic 1s or 2s?

12    A.   So as this shows here, the predicted share of the class

13    of academic 1s and 2s has decreased from 76 percent of the

14    actual class of 2019 to a simulated class that would have

15    61 percent of its student coming from the academic 1s and 2s.

16          And this is the difference that, as I was

17    discussing earlier, made a huge impact on the committee and

18    what we're trying to accomplish at Harvard.  These are

19    students that add so much not only to the things that take

20    place in our classroom, the kinds of work that our faculty

21    do, to how they interact with the other students on campus.

22    This would be a noticeable drop in what's happening on our

23    campus and what Harvard strives to have these academic 1s and

24    2s on our campus.  We benefit greatly from their

25    participation.

1    **Q.**  Does the presence on Harvard's campus of 76 percent of

2    the admitted class having academic 1s and 2s have an effect

3    on Harvard's ability to recruit and retain faculty?

4    **A.**  I believe it does.  In my experience in 11 years in the

5    dean's office, much of that, one of my major responsibilities

6    is the upkeep and hiring of new faculty.  And I would

7    probably on a weekly basis have a faculty member come into my

8    office and tell me about another outstanding student that he

9    or she interacted with on our campus and how wonderful it is

10   to be at Harvard.

11          And this is what makes it exciting, not only the

12   interactions that he or she might have with their colleagues,

13   but especially with our Harvard College students.

14   **Q.**  So is Harvard College interested and interested in

15   enrolling 1s and 2s only on the academic rating to the

16   exclusion of other ratings?

17   **A.**  No.  We are looking for multitalented individuals.  Many

18   of our students are not just outstanding in their academic

19   work, but they're outstanding in some of these other profile

20   ratings, too.  And that's what we're really looking for to

21   having on our campus.

22   **Q.**  And what does Mr. Kahlenberg's simulation tell you of

23   what would happen to the share of extracurricular, personal,

24   and athletic 1s and 2s if his preferred simulation were

25   adopted by the Harvard admissions committee?

1    **A.**  They all drop.  Not as big as the academic 1s and 2s

2    drops, but there are drops in each one of them.

3    **Q.**  I have two final questions for you.

4         MR. WAXMAN:  Well, actually, Your Honor, I believe

5    I neglected to have the witness identify and admit Defense

6    Exhibit 76.

7    BY MR. WAXMAN:

8    **Q.**  Could you just turn to Tab 3 in your exhibit book.  Do

9    you recognize that?

10   **A.**  Yes, I do.

11   **Q.**  What is it?

12   **A.**  It's the agenda for our first official meeting of the RNA

13   committee.

14        MR. WAXMAN:  Your Honor, we'd move Defense

15   Exhibit 76.

16        MR. McBRIDE:  No objection.

17        THE COURT:  I think it's already in, but...

18        THE CLERK:  No, it's not.

19        THE COURT:  Karen says it's not.  I had it marked

20   as in.  It's admitted.

21        (Defendant Exhibit No. 76 admitted.)

22   BY MR. WAXMAN:

23   **Q.**  I have two final questions.  Was it the view of your

24   committee that race-neutrality alternatives would never work

25   at Harvard?

Case: 19-2005    Document: 00117636840    Page: 445    Date Filed: 07/29/2020    Entry ID: 6356388
Case 1:14-cv-14176-ADB   Document 640   Filed 04/18/19   Page 172 of 228

172

1   **A.**  No.

2   **Q.**  What in your view would the consequences be if Harvard

3   had to stop considering race in admissions at this time?

4   **A.**  After careful consideration of all the simulations and

5   the reports that we reviewed, it was the judgment of the

6   committee, as I mentioned a little bit earlier, that no

7   existing race-neutral alternative today or combination of

8   them could substitute for the consideration of race as one

9   factor among many in our admissions process.

10          And the reason we say that, as I mentioned earlier,

11  is because the effects that it has on all the characteristics

12  of our class.  The reduction in some of our minority student

13  percentages, the impact on the profile ratings, those are all

14  things that worry us greatly.

15          It showed us that through the use of race-neutral

16  alternatives today we could not admit a class that is both

17  excellent in the characteristics that we value on our campus

18  and broadly diverse that we get benefits from the

19  diversity-related educational goals that we have.

20          So this reduction in broad-based diversity is

21  something that the committee felt directly impacts the

22  educational process, and it would directly diminish the

23  education that's taking place, the learning that's taking

24  place on our campus.

25          And I can't overestimate the harm that this kind of

```
 1    a change would have to Harvard College's educational program,

 2    to the student experience on our campus, and to the

 3    institution's mission and goals.

 4    Q.  Thank you.

 5              MR. WAXMAN:  No further questions.

 6              MR. McBRIDE:  No additional questions, Your Honor.

 7              THE COURT:  You're excused.

 8              MR. WAXMAN:  Go back to your sabbatical.

 9              (Off the record.)

10              (Court recessed at 3:27 p.m.)

11              THE COURT:  When you're ready, Ms. Hacker.

12              MS. HACKER:  Your Honor, at this time SFFA calls

13    Elizabeth Yong.

14              (ELIZABETH YONG duly sworn by the Deputy Clerk.)

15              THE CLERK:  Can you, please state your name and

16    spell your last name for the record.

17              THE WITNESS:  It's Elizabeth Yong, Y-O-N-G.

18                        DIRECT EXAMINATION

19    BY MS. HACKER:

20    Q.  Good afternoon, Ms. Yong.

21    A.  Good afternoon.

22    Q.  My name is Kat Hacker.  We haven't had a chance to meet

23    yet.  So I wanted to introduce myself.

24              Let's start today by talking about how you fit into

25    the picture here from your time at Harvard.  Your time at
```

1    Harvard dates back to your own college years, right?

2    **A.**   That's correct.

3    **Q.**   You graduated with a degree from Harvard in applied math

4    in 1982?

5    **A.**   That's correct.

6    **Q.**   Then right after you graduated you took a full-time

7    position at Harvard?

8    **A.**   That's right.

9    **Q.**   You started as an administrative intern in the admissions

10   office?

11   **A.**   Yes.

12   **Q.**   A year later you got promoted up the ranks within the

13   admissions office, right?

14   **A.**   That is correct.

15   **Q.**   You had a series of promotions, but eventually you became

16   the special projects administrator for policy operations and

17   research.

18         Did I get that right?

19   **A.**   That is correct.

20   **Q.**   And that's the position you held until you left Harvard

21   in 2015?

22   **A.**   That's correct.

23   **Q.**   So you worked in the Harvard admissions office for

24   33 years?

25   **A.**   Yes.

```
1    Q.  In all the roles you held during your time at Harvard,

2    you would generate reports based on the electronic data that

3    the admissions office kept, right?

4    A.  That is correct.

5    Q.  Those reports included statistics about the applicant

6    pool?

7    A.  Yes.

8    Q.  Specifically the reports listed the ethnicities of the

9    applicant pool?

10   A.  They were sort of dashboards that gave a picture of what

11   the entire applicant pool was like.  In addition to that

12   there was gender and geography as well.

13   Q.  So that dashboard did include the ethnicities of the

14   applicant pool?

15   A.  In addition to other info, yes.

16   Q.  And it also included the ethnicities of the admitted

17   students, correct?

18   A.  In addition to the other info, yes.

19   Q.  So that we all know what we're talking about here, I'd

20   like to take a look at one of these reports together to start

21   out, and this is P163 that I'm putting up on the screen.

22        You also have a binder in front of you if you'd

23   like to look at it in hard copy.  I'll blow things up that

24   we're talking about to try to make it easier to see

25   everything.
```

 1          So you see P163 in front of you.  This is already
 2     in evidence.
 3          And down here at the bottom we see an email from
 4     you, right?
 5     **A.**   That is correct.
 6     **Q.**   And you say, "Attached are stats for tomorrow's
 7     meetings."
 8          Right?
 9     **A.**   That's what it says.
10     **Q.**   So let's turn to page 2 together.  And page 2 here
11     includes these reports I was referring to.  I've heard people
12     refer to these as "one-pagers."
13          Is that what you would call this?
14     **A.**   Yes.
15     **Q.**   And just so there's no confusion, we'll see some
16     documents today that include multiple pages, but when we hear
17     the term "one-pager," it's this piece of paper that's being
18     referred to; is that right?
19     **A.**   It is.
20     **Q.**   So let's start here on the top, and I'll zoom in a little
21     bit more so we can get a good view of this.  The one-pager
22     here lists the total number of applicants, right?  That's the
23     first column?
24     **A.**   It is.
25     **Q.**   And then we see the percentage of applicants that

1    accounts for?

2    **A.**   That's right.

3    **Q.**   And then we see the number of admits?

4    **A.**   Yes.

5    **Q.**   Next to that we have the admit rate?

6    **A.**   That's correct.

7    **Q.**   And then we have the percentage that that accounts for in

8    admits; is that right?

9    **A.**   That is correct.

10   **Q.**   We see a comparison of the prior year's class to the

11   admissions cycle.  Is that right?

12   **A.**   It is.

13   **Q.**   Then if we scroll down to the bottom of this one-pager,

14   we have some different rows for races; is that right?

15   **A.**   We do.

16   **Q.**   But this only includes minorities, correct?

17   **A.**   That's what it does, yes.

18   **Q.**   It doesn't list white applicants or white admits?

19   **A.**   It does not.

20   **Q.**   So looking just at the statistics about minorities on the

21   bottom of the one-pager doesn't give you information on how

22   the full class is shaping up because the full class, of

23   course, includes white applicants and admits, right?

24   **A.**   The number is included in total, and the gender numbers

25   and the geography numbers include all groups.

**JA1866**

1    **Q.** So focusing us just on the statistics on the bottom about

2    races and ethnicities, do you see I've put a square around

3    that on your screen?

4    **A.** Yes.

5    **Q.** And just focusing on those statistics about races and

6    ethnicities, we can't see how the full class is shaping up,

7    right, because this, of course, doesn't include the full

8    class?

9    **A.** Other numbers do, yes.

10   **Q.** I'm sorry?

11   **A.** But the other numbers do include the full class.

12   **Q.** I understand you're talking about the other numbers.

13   What I'd like to focus on is just the numbers of these races

14   and ethnicities at the bottom.

15           Do you see that?

16   **A.** Yes.

17   **Q.** So focusing just on those numbers, those don't give us a

18   full indication of how the class is shaping up because, of

19   course, it doesn't include the full class?

20   **A.** Not for those numbers.

21   **Q.** And then if we look down here at the bottom, all of the

22   one-pagers are dated, correct?

23   **A.** That is correct.

24   **Q.** Like the example we're looking at, the one-pagers would

25   always compare the current admissions cycle to the previous

**JA1867**

```
 1    year?

 2    A.   That is correct.

 3    Q.   They would always include this breakdown of minorities

 4    that we're looking at?

 5    A.   It included all of those.  It's a template that has all

 6    those fields, and this is generated every time one was

 7    requested.

 8    Q.   It was Dean Fitzsimmons himself who requested that you

 9    generate these reports, right?

10    A.   I believe, yes.

11    Q.   In fact, you never prepared these reports for

12    Dean Fitzsimmons's predecessor Fred Jewett?

13    A.   There wasn't the technology to do that for Dean Jewett

14    because we had an old key punch system.  And so it was harder

15    to create these reports.

16    Q.   But Dean Jewett never requested that you prepare any type

17    of report like this, right?

18    A.   Dean Jewett didn't really trust the database.  He did his

19    counting by hand.

20    Q.   But Dean Fitzsimmons did trust the database?

21    A.   Yes.

22    Q.   Let's turn now to P147.  Do you recognize this as an

23    email that Ms. Howrigan sent to you here at the bottom on

24    March 19, 2013?

25    A.   I do.
```

 1              MS. HACKER:  SFFA offers P149, Your Honor.

 2              MS. CONLEY:  No objection.

 3              THE COURT:  Admitted.

 4              (Plaintiff Exhibit No. P149 admitted.)

 5    BY MS. HACKER:

 6    Q.  Just so we know who Ms. Howrigan is, she was the database

 7    administrator at this time, right?

 8    A.  No.  Actually I was.  She had stepped down from that

 9    position and was a full-time admissions officer.

10    Q.  So Ms. Howrigan worked in the admissions office?

11    A.  Yes, she did.

12    Q.  This email was sent on March 19.  So this was around the

13    time of the full committee meetings, right?

14    A.  I'd have to see a calendar to fully confirm that.  But

15    it's March; so it could have been.

16    Q.  March is around the time when the full committee meets?

17    A.  Yes.

18    Q.  And the full committee meeting is where the entire

19    admissions committee comes together to discuss and review

20    applicants?

21    A.  It is.

22    Q.  Now, Ms. Howrigan in this email says to you, "We just

23    finished up our first pass, and WRF was hoping he could get a

24    one-pager and his ethnic stats."

25              Do you see that?

Case: 19-2005    Document: 00117631840    Page: 424    Date Filed: 07/29/2020    Entry ID: 6356388
Case 1:14-cv-14176-ADB    Document 640    Filed 04/18/19    Page 181 of 228

181

1    **A.**  I do.

2    **Q.**  "WRF" is Dean Fitzsimmons, right?

3    **A.**  He is.

4    **Q.**  And at the end of this email Ms. Howrigan says, "It looks

5    like we need to take 28 more right now from the lop mes."

6            The reference to the lop mes is a reference to the

7    group of provisionally admitted students that get suggested,

8    some get removed or lopped, right?

9    **A.**  They are the group of admits that are the most

10   vulnerable, yes.

11   **Q.**  So from this email it looks like the full committee has

12   gone through the applicants once and has a provisional group

13   of students, right?

14   **A.**  It does.

15   **Q.**  But before adjusting that group, Dean Fitzsimmons wants

16   to see his ethnic stats?

17   **A.**  He wants to see the one-pager, yes.

18   **Q.**  You would run these one-pagers throughout the admissions

19   cycle to provide to Dean Fitzsimmons, right?

20   **A.**  I would run them whenever it was requested.

21   **Q.**  And it was requested throughout the admissions cycle?

22   **A.**  It was requested whenever Dean Fitzsimmons needed them.

23   I can't tell you when.

24   **Q.**  It was your responsibility to prepare those one-pagers,

25   right?

1    **A.**   It was.

2    **Q.**   Let's see how often Dean Fitzsimmons needed those

3    one-pagers.  I'd like to start by taking a look at P68.  And

4    this is an admissions calendar you referenced just a minute

5    ago.

6            Do you recognize this as the admissions calendar

7    from 2013 to 2014?

8    **A.**   It is.

9            MS. HACKER:  Your Honor, I offer P68.

10            MS. CONLEY:  No objection, Your Honor.

11            THE COURT:  Admitted.

12            (Plaintiff Exhibit No. P68 admitted.)

13    BY MS. HACKER;

14    **Q.**   So, Ms. Yong, what I'm going to do is put up what I've

15    marked as PD20.  And what I've done here is taken that

16    admissions calendar that we looked at and put it onto a

17    timeline so that we can build out together exactly how many

18    one-pagers we see in an admissions cycle.

19            To do that, in your binder in front of it you, you

20    have the hard copies of all of the exhibits.  I'd like you to

21    start by turning to P148.

22            You see that P148 is an email that you sent to

23    Dean Fitzsimmons; is that right?

24    **A.**   It is.

25    **Q.**   It's dated November 5, 2013?

1    **A.**  It is.

2    **Q.**  And in that email you say, "The first one-pager of the

3    season is attached," right?

4    **A.**  I do.

5    **Q.**  So let's put that on our calendar as the first one-pager

6    of the season.  I've put a little P148 icon so that we can

7    see that.

8           And if you turn to the second page of P148, we see

9    the one-pager, right?

10   **A.**  We do.

11   **Q.**  Like the one-pager we looked at on the screen together,

12   we see a comparison of the class of 2017 to the class of

13   2018?

14   **A.**  For early-action applicants, yes.

15   **Q.**  And then down at the bottom we see a comparison of the

16   racial or ethnic breakdown of the applicant pool for the

17   class of 2017 versus the class of 2018?

18   **A.**  In addition to the other elements of the template, yes.

19   **Q.**  And like the example we looked at, the ethnic or racial

20   breakdown at the bottom of the one-pager only shows the

21   percentage of each minority, right?

22   **A.**  It does.

23   **Q.**  It doesn't list the percentage of white students for

24   either the class of 2017 or the class of 2018?

25   **A.**  It does not.

1    **Q.** And that last column shows us the change between the

2    racial makeup of those minorities in the applicant pool for

3    the class of 2017 to the class of 2018?

4    **A.** It does.

5    **Q.** Next I'd like you to turn to P150 in your binder.

6    There's a few sheets of statistics in this one. What I want

7    to turn your attention to is the fourth page in. If you see

8    the small number in the bottom right-hand corner, it says,

9    "HARV4232."

10           Do you see that, Ms. Yong?

11   **A.** I do.

12   **Q.** That one-pager was created on November 24, 2013?

13   **A.** I did create this, yes.

14   **Q.** And you created it on November 24, 2013?

15   **A.** I did. But I did not put that check mark on the page.

16   So this is not my report, but I did create the template.

17   **Q.** Great. So we'll add that to our calendar on November 24,

18   2013.

19           And if we look at the calendar, taking a step back,

20   this is the day before the beginning of the early-action full

21   committee meetings, right?

22   **A.** I need to go back and check.

23   **Q.** The timeline we have on the screen in front of you if

24   that helps.

25   **A.** It is.

1    **Q.**  So at this point the subcommittees have chosen the people

2    to admit in the early-action cycle, right?

3    **A.**  They have.

4    **Q.**  In your binder if you'll turn back to P149, and I promise

5    that's the last one we'll go out of order, P149 you see is a

6    one-pager that was prepared a few days later?

7    **A.**  It is.

8    **Q.**  And that one is dated 11/26/2013?

9    **A.**  Yes.

10   **Q.**  So we'll add that to our timeline.  That was the second

11   day of the early-action full committee meetings, right?

12   **A.**  Again, yes.

13   **Q.**  So these statistics would show how things changed based

14   on the first day of the early-action full committee meeting?

15   **A.**  That's what they reflect, yes.

16   **Q.**  Now, let's flip to P152.  This is a one-pager you

17   actually emailed to Dean Fitzsimmons instead of printing out,

18   right?

19   **A.**  Yes.

20   **Q.**  You emailed this on December 2, 2013?

21   **A.**  I did.

22   **Q.**  So we'll add that to our timeline as well.  That was also

23   during the early-action full committee meetings?

24   **A.**  Let me just go back.  December 2, yes.

25   **Q.**  So, again, we're seeing the changes of the percentage of

1    minorities in the class day to day based on the committee's

2    discussions?

3    **A.**    In addition to the breakdowns by gender and geographic

4    region and concentration, yes.

5    **Q.**    Flip with me to P153.  That's our next one-pager.  This

6    one is dated a few days later, December 5, 2013, right?

7    **A.**    It is.

8    **Q.**    We'll put that in our timeline.  And we see that was the

9    day before the end of the early-action full committee

10    meetings?

11    **A.**    Yes.

12    **Q.**    P154 is next.  That is a one-pager that was created the

13    very next day, December 6, 2013, right?

14    **A.**    Yes.

15    **Q.**    So we'll add that to our timeline, and we see that that

16    was the day of the -- that was the last day of the

17    early-action full committee meeting?

18    **A.**    According to the calendar, yes.

19    **Q.**    P155 is our next one-pager.  That one was created on

20    December 10, 2013?

21    **A.**    Yes.

22    **Q.**    So we'll add that.  This is now a few days after the full

23    committee meetings were complete, right?

24    **A.**    Yes.

25    **Q.**    P156 is next.  That was a one-pager again created just a

Case: 19-2005    Document: 00117631840    Page: 430    Date Filed: 07/29/2020    Entry ID: 6356388
Case 1:14-cv-14176-ADB    Document 640    Filed 04/18/19    Page 187 of 228

187

1    few days later on December 13, 2013, right?

2    **A.**   Yes.

3    **Q.**   We'll add that one as well.  And that takes us through

4    the end of 2013.

5           So flip to P157 next.  Can you see that as a

6    one-pager that was prepared on January 2, 2014, right?

7    **A.**   Yes.  But I did not put the slash marks on that.  So I

8    don't know whose this is.

9    **Q.**   But you prepared the one-pager itself.  You just didn't

10   write the "X" mark on it?

11   **A.**   That's correct.

12   **Q.**   And the one-pager itself was created on January 2, 2014?

13   **A.**   It was.

14   **Q.**   Let's add that one to our timeline.  And we can see that

15   now we finished up early action, right?

16   **A.**   Yes.

17   **Q.**   This is moving on to regular decision applicants?

18   **A.**   It is.

19   **Q.**   This one-pager was created the day after the regular

20   application deadline; is that right?

21   **A.**   It was.

22   **Q.**   Similar to the one-pager we saw after the early-action

23   deadline, this one, again, shows us the breakdown of the

24   minorities in the applicant pool between the classes of 2017

25   versus 2018?

1  **A.**   In addition to the information about gender, geography,

2  area of study, financial aid status, yes.

3  **Q.**   But nothing yet about the breakdown of admits because, of

4  course, we're just at the beginning of the regular action

5  cycle?

6  **A.**   That is correct.

7  **Q.**   Flip to P158.  That one-pager comes a few days later on

8  January 5, 2014, right?

9  **A.**   It does.

10  **Q.**   So we'll add that one.  And then P159 is next.  This is

11  an email that you sent on January 7, 2014, right?

12  **A.**   That's what it says.

13  **Q.**   We'll add that to our timeline as well.  But this one's a

14  little bit different.  This is a one-pager you sent to Roger

15  Banks, correct?

16  **A.**   It is.

17  **Q.**   This was in preparation for an ABAFAOILSS meeting?

18  **A.**   It was.

19  **Q.**   Just so we all understand, ABAFAOILSS is an organization,

20  the letters stand for the Association of Black Admissions

21  Financial Aid Officers of the Ivy League and Sister Schools,

22  right?

23  **A.**   Actually "seven sisters."

24  **Q.**   Seven sisters?

25  **A.**   Yes.

1    **Q.**  It's a group that a number of colleges participate in

2    that they get together to try to help historically

3    under-represented minorities, right?

4    **A.**  I've never been to an ABAFAOILSS meeting; so I can't

5    comment.

6    **Q.**  Is that your understanding of what ABAFAOILSS is?

7    **A.**  I know it's a group of people who meet.  I don't know why

8    they meet or what they discuss.  I've never been to a

9    meeting.

10   **Q.**  You just know that Mr. Banks requests these one-pagers

11   with all of the statistics on Harvard's applicants and admits

12   before he goes to ABAFAOILSS meetings?

13   **A.**  The admits are of the class that's already set and

14   finished, yes.

15   **Q.**  And on page 2 you see the attachment to your email to

16   Mr. Banks includes the one-pager, right?

17   **A.**  It does.

18   **Q.**  It's just like all the other one-pagers we've seen?

19   **A.**  It is.

20   **Q.**  So flip with me to P161.  That's our next one-pager.

21   That one was created on January 13, 2014, right?

22   **A.**  It was.

23   **Q.**  So if we add that to the timeline, we see it's just about

24   a week before the subcommittees are going to start meeting,

25   right?

**JA1878**

1    **A.**    Thereabouts, yes.

2    **Q.**    And then P163 is our next one-pager.  Again, this one is

3    attached to an email, right?

4    **A.**    It is.

5    **Q.**    And it's dated March 2, 2014?

6    **A.**    It is.

7    **Q.**    So if we add that to the timeline, we see that this is

8    the full committee -- this is when the full committee for

9    regular action was just about to start to meet, right?

10    **A.**    It is.

11    **Q.**    P164 is our next one-pager, and this one was created

12    during the full committee meetings, right?

13    **A.**    Yes.

14    **Q.**    That one is dated March 14, 2014?

15    **A.**    It is.

16    **Q.**    So we'll add that one as well.

17             P165 is our next one-pager.  This is an email that

18    you sent to Dean Fitzsimmons, Director McGrath, and Sally

19    Donahue, right?

20    **A.**    It is.

21    **Q.**    This is dated March 17, 2014?

22    **A.**    It was.

23    **Q.**    If we put that on our timeline, we see that that's the

24    day that the final review process began, right?

25    **A.**    It's the start of final review, yes.

1    **Q.** And final review is when the committees might have to lop

2    students to make sure Harvard doesn't admit too many people,

3    right?

4    **A.** To make sure that we come in on the target, yes.

5    **Q.** P 167 is our next one-pager.  And it's dated the very

6    next day, March 18, 2014, right?

7    **A.** It is.

8    **Q.** When we add that to our timeline, we see that's the

9    second day of the final review or lopping process, right?

10   **A.** Yes.

11   **Q.** So now we're getting towards the very end of the regular

12   decision part of the admissions cycle, right?

13   **A.** Yes.

14   **Q.** After this decision letters are sent to applicants?

15   **A.** A week or so later, yes.

16   **Q.** But that's not the end of the full admissions cycle,

17   right?

18   **A.** It is not.

19   **Q.** The admissions office still has to deal with the

20   wait-list process at some point?

21   **A.** It does.

22   **Q.** And you continued to prepare one-pagers throughout that

23   process, too?

24   **A.** I did.

25   **Q.** So turn with me to P168.  This is another email that you

 1    sent to Roger Banks.

 2              Do you see that?

 3    **A.**   I do.

 4    **Q.**   That you sent on May 5, 2014?

 5    **A.**   Yes.

 6    **Q.**   And again it attaches a one-pager?

 7    **A.**   That reflects the number of matriculants, yes.

 8    **Q.**   So we'll add that to our timeline as well.

 9              Would this have been around the time of year of the

10    second ABAFAOILSS meeting, or do you not know?

11    **A.**   I think it might have been, yes.

12    **Q.**   P169 is our next one-pager.  That one was prepared just a

13    few days later on May 7, 2014, right?

14    **A.**   It is.

15    **Q.**   When we add that to our calendar, we see this is leading

16    up to the wait-list meetings, correct?

17    **A.**   That is correct.

18    **Q.**   P170 is our next one-pager.  That one was prepared on

19    May 21, 2014, right?

20    **A.**   Yes.

21    **Q.**   So now we're in the middle of the wait-list review

22    process?

23    **A.**   Middle or start.  I would have to see a calendar for that

24    to be exactly sure.

25    **Q.**   This one-pager was created during the wait-list process,

1    right?

2    **A.**   Possibly or it could have been the start.  I don't know

3    if it was middle or start.

4    **Q.**   So P171 is our next one-pager.  And that one appears on

5    the second page of the document.

6            Do you see that?

7    **A.**   I do.

8    **Q.**   That was created on June 27, 2014?

9    **A.**   It was.

10   **Q.**   We'll add that to our timeline as well.  Now we're still

11   in the wait-list process, right?

12   **A.**   Yes.

13   **Q.**   But this is towards the end of the wait-list process?

14   **A.**   According to the calendar, yes.

15   **Q.**   The part of the process where the last few spots may be

16   being filled with people from the wait-list?

17   **A.**   Yes.

18   **Q.**   P172, I believe, takes us to our last one-pager of the

19   year.  Do you see that one?

20   **A.**   I do.

21   **Q.**   And that one is dated August 27, 2014, right?

22   **A.**   Yes.

23   **Q.**   We'll add that final one to our calendar.  That is right

24   before the start of the fall semester, isn't it?

25   **A.**   It is.

1   **Q.**  So this one-pager would be pretty close to what the

2   actual admitted class looks like, right?

3   **A.**  It is.

4   **Q.**  And it shows us the percentage of each minority group in

5   the class of 2018 compared to the class of 2017?

6   **A.**  In addition to all the other fields, yes.

7   **Q.**  Looking back to the timeline now that we've filled it

8   out, by my count during the admissions cycle we found

9   21 different one-pagers that you prepared; is that right?

10  **A.**  Looks like it, yes.

11  **Q.**  And you recognize all the documents we just flipped

12  through together as the one-pagers you were responsible for

13  while you worked at Harvard?

14  **A.**  I did.

15          MS. HACKER:  Your Honor, SFFA offers P148 through

16  P150, P152 through P159, P161, P164 through P165 and P167

17  through P172.

18          MS. CONLEY:  Your Honor, we'd object to several of

19  these because Ms. Yong testified that she didn't recognize

20  the handwriting on 150, 156, 157, and I believe 167.  We

21  don't have an issue with the data, but with respect to the

22  handwriting that was on the document, she said it wasn't

23  hers.

24          THE COURT:  What to you want to do about it?  Do

25  you want to substitute it?  Or do you want to --

```
 1              MS. HACKER:  Your Honor, my understanding is these
 2     one-pagers were kept in hard copy in Harvard's files.  So
 3     these were produced in discovery.  These were the only ones
 4     we have.
 5              To the extent there's handwriting on them, we're
 6     not offering the handwriting for the truth of the matter of
 7     what they assert, I guess, but it doesn't change the fact
 8     that there's foundation that the documents are authentic and
 9     can be admitted.
10              MS. CONLEY:  Your Honor, several of these documents
11     came from Dean Fitzsimmons files, and they could have offered
12     these exhibits with him when he was here, and he could have
13     authenticated here.
14              THE COURT:  All right.  You can bring
15     Dean Fitzsimmons back at your convenience and he can admit
16     those documents.
17              MR. LEE:  She's offering them without the
18     handwriting.
19              MS. CONLEY:  If you're offering just for the data
20     and not for the handwriting, that would be fine.
21              MS. HACKER:  We're offering this just for the data,
22     Your Honor.
23              THE COURT:  That's fine then.  They're admitted
24     with that understanding.
25              (Plaintiff Exhibits Nos. P148-P150, P152-P159,
```

1   P161, P164, P165, P167-P172 admitted.)

2   BY MS. HACKER:

3   Q.  All right.  Ms. Yong, now that we made it through all the

4   one-pagers from an admissions cycle, let's talk about some of

5   the other reports that you put together to help with the

6   admissions process.

7           We're going to look at P326 together.  And I've

8   blown it up on your screen.

9           Do you see that document, Ms. Yong?

10  A.  I do.

11  Q.  This is a report that you prepared, right?

12  A.  It is.

13          MS. HACKER:  SFFA offers P326.

14          MS. CONLEY:  No objection, Your Honor.

15          THE COURT:  Admitted.

16          (Plaintiff Exhibit No. P326 admitted.)

17  BY MS. HACKER:

18  Q.  Ms. Yong, you prepared this at the request of

19  Dean Fitzsimmons, right?

20  A.  No.  I prepared this -- I don't know why I prepared it,

21  for whom I prepared it.  There's no other -- there's no

22  context here.

23  Q.  Would this be something that Dean Fitzsimmons requested

24  from you?

25  A.  As I said, I don't remember why I prepared it and for

1    whom I prepared it because there's nothing around it that

2    explains why I did it.

3    **Q.**  Let me see if I can help remind you of why you prepared

4    it.

5              MS. HACKER:  May I approach, Your Honor?

6              THE COURT:  Sure.

7    BY MS. HACKER:

8    **Q.**  Ms. Yong, you remember giving testimony at a deposition

9    in this case, right?

10   **A.**  I do.

11   **Q.**  You were under oath to tell the truth during that

12   deposition?

13   **A.**  I was.

14   **Q.**  Turn with me to page 293 of your deposition and read to

15   yourself lines 14 through 16 there.  If it helps, on the

16   previous page you see the exhibit that's being referred to,

17   and you see the sticker on the exhibit on your screen that

18   says "Yong Exhibit 29."

19              Have you had a chance to read that, Ms. Yong?

20   **A.**  I'm almost done.  Okay.

21   **Q.**  Does that refresh your recollection that you prepared

22   this at the request of Dean Fitzsimmons?

23   **A.**  Yes.

24   **Q.**  And you did, indeed, prepare this at the request of

25   Dean Fitzsimmons?

1   **A.**  I guess I did.

2   **Q.**  Now, you see on the first two pages there's some

3   information about the demographic breakdown of applicants and

4   matriculants at Harvard, right?

5   **A.**  There is.

6   **Q.**  If we turn to the third page in this document, again we

7   have information on the demographic breakdown of applicants

8   and matriculants, but here the focus is solely on the

9   percentages of Asian-Americans in Harvard's classes, right?

10  **A.**  That's what it says.

11  **Q.**  The last class year that is included on this report is

12  the class of 2016, correct?

13  **A.**  That's what it says.

14  **Q.**  And it includes matriculant data for the class of 2016?

15  **A.**  It does.

16  **Q.**  So does that tell us that this would have been made

17  sometime late in 2012 or perhaps early in 2013?

18  **A.**  Not necessarily.  Any time after 2012, yes, but I don't

19  know exactly when I create -- I can't remember when I created

20  this.

21  **Q.**  It would have had to have been created after fall of 2012

22  to have matriculant data for the class of 2016, right?

23  **A.**  That is correct.

24  **Q.**  So let's focus together, I'm going to zoom in a little

25  bit here so we can see it.  Starting on the classes of 2010,

1    and I'd like to look at the percentage of Asian-American

2    students in those classes.  So the first one we see is about

3    19 percent Asian-Americans in the class of 2010; is that

4    right?

5    **A.**  Yes.

6    **Q.**  And then we see about 20 percent Asian-Americans in the

7    class of 2011?

8    **A.**  Yes.

9    **Q.**  Then we see 21 percent in the class of 2012?

10   **A.**  Yes.

11   **Q.**  19 percent in the class of 2013?

12   **A.**  Yes.

13   **Q.**  About 22 percent in the class of 2014?

14   **A.**  That's correct.

15   **Q.**  About 21 percent in the class of 2015?

16   **A.**  That's what it says.

17   **Q.**  And finally about 22 percent in the class of 2016, right?

18   **A.**  That's what it says, yes.

19   **Q.**  Let's turn now to Exhibit P182.  Do you recognize this as

20   the document that shows the targets for subcommittee

21   meetings, right?

22   **A.**  I do.

23           MS. HACKER:  SFFA offers P182.

24           MS. CONLEY:  No objection, Your Honor.

25           THE COURT:  It's admitted.

Case: 19-2005   Document 00117631840   Page: 443   Date Filed: 07/29/2020   Entry ID: 6356388
Case 1:14-cv-14176-ADB   Document 640   Filed 04/18/19   Page 200 of 228

200

1          (Plaintiff Exhibit No. P182 admitted.)

2    BY MS. HACKER:

3    **Q.**  And targets -- when we have here at the top, "Targets for

4    Subcommittee," what that means is how many admits each

5    subcommittee is supposed to try to come in at, right?

6    **A.**  That's the number they should try and come in at, at the

7    end of subcommittee, yes.

8    **Q.**  And the target is just based on what was done the year

9    before?

10   **A.**  That is correct.

11   **Q.**  So the goal is to try to stay consistent year to year?

12   **A.**  The target is a recommendation for subcommittee.  It may

13   or may not change by the end of the process, but it's a goal

14   for the chairperson to work towards in subcommittee.

15   **Q.**  Well, let's talk about that goal.  You take the target

16   numbers from documents like this each year and hand them to

17   the chairs of each subcommittee before the meeting started,

18   right?

19   **A.**  I would give them that number that's underneath the

20   column that says "Targets For Subcommittee."

21   **Q.**  These numbers that I've highlighted on the screen?

22   **A.**  Yes.

23   **Q.**  And you did that at Dean Fitzsimmons's direction, right?

24   **A.**  That is correct.

25   **Q.**  Then the subcommittees would observe those targets pretty

1   closely?

2   **A.**   They would try, yes.

3   **Q.**   They would try to observe them pretty closely, right?

4   **A.**   That is correct.

5   **Q.**   Now, if we flip to page 2 of this document, we have a

6   column here labeled "Asian-American" and "Asian-American As

7   Percentage of Admits," right?

8   **A.**   Yes.

9   **Q.**   Let's zoom in a little bit so we can see down here at the

10  bottom.  We see in the total column for the Asian-American as

11  percentage of admits is 19.8 percent, right?

12  **A.**   Yes.

13  **Q.**   That's right in line with the numbers we just walked

14  through on the last document, P326?

15  **A.**   Yes.

16  **Q.**   Let's look now at P319.  This is an email that you sent

17  to Dean Fitzsimmons; is that right?  And also

18  Director McGrath?

19  **A.**   It is.

20            MS. HACKER:  SFFA offers P319.

21            MS. CONLEY:  No objection, Your Honor.

22            THE COURT:  It's admitted.

23            (Plaintiff Exhibit No. P319 admitted.)

24  BY MS. HACKER:

25  **Q.**   Ms. Yong, I don't want to spend too much time on this

1    one, but I just want to confirm, like all the other reports

2    we've looked at, you pulled the reports in this document at

3    the request of Dean Fitzsimmons?

4    **A.**   I believe I did.

5    **Q.**   So now that we've talked a lot through -- a lot about the

6    data and statistics that you pulled together when you worked

7    at Harvard, I'd like to move to talking about the time you

8    spent reading application files.  Okay?

9              So you read applications from 1982 to 1992, right?

10   **A.**   That is correct.

11   **Q.**   You spent a decade reading and scoring applications?

12   **A.**   I did.

13   **Q.**   In that time you read and scored hundreds of

14   applications?

15   **A.**   I don't know the exact number.

16   **Q.**   Would it be in the hundreds at least?

17   **A.**   Possibly, yes.

18   **Q.**   While you were working at Harvard, you saw figures

19   suggesting that Asian-American applicants have on average

20   higher standardized test scores than other ethnic groups,

21   right?

22   **A.**   Possibly, yes.

23   **Q.**   You do remember seeing those statistics?

24   **A.**   I may have.

25   **Q.**   In the hundreds of applications that you read, did you

 1    find that Asian-American applicants were any worse at

 2    extracurricular activities than other races?

 3    **A.**   When I was evaluating applicants, I concentrated on each

 4    applicant.  I didn't group them together in any way, shape,

 5    or form.  So I would look at my applicants individually.  I

 6    never had the time to go back and see what my Asian

 7    applicants were like versus my white applicants were like.

 8    So as a reader I concentrated on the individual applicant.

 9    **Q.**  But you didn't think that Asian-American applicants are

10    not as good at extracurricular activities, right?

11    **A.**  As I said, I looked at each applicant as an individual,

12    not as a group.

13    **Q.**  Ms. Yong, if you'll turn with me to your deposition to

14    page 233.  And I'll put it up on the screen.  In your

15    deposition you were asked:  "Do you think that they are not

16    as good at extracurricular activities?"

17                 And you answered:  "No."

18                 Were you asked that question and did you give that

19    answer?

20    **A.**  Could you point me to this again?  I'm sorry.

21    **Q.**  Sure.  It's page 233, lines 2 through 4.

22    **A.**  Right.

23    **Q.**  Were you asked that question, and did you give that

24    answer?

25    **A.**  I did.

1    **Q.**  In the applications that you read at Harvard, did you

2    find that Asian-American applicants had worse personal

3    qualities than other races or ethnicities?

4    **A.**  I did not.

5    **Q.**  You don't remember specifically what you were told about

6    how to use race in scoring an applicant's file other than it

7    was just one of the factors you should look at among others,

8    right?

9    **A.**  That is correct.

10   **Q.**  In fact, you don't know why Harvard uses race in the

11   admissions process at all?

12   **A.**  It's used as a tip just the way we would use a tip for

13   concentration or area of the country they come from or

14   lineage or athletic ability.  It is a tip that you use after

15   the entire applicant is reviewed.  It's one of the many

16   factors that go into it.

17   **Q.**  I understand you to be saying that it is a tip that can

18   be used in the admissions process, but my question is

19   different.

20           You don't know why Harvard uses race as a tip in

21   the admissions process at all?

22   **A.**  It's to -- I do.  It is to provide -- it's to provide a

23   tip to students who have been disadvantaged by their

24   background who come from areas that may not be as

25   sophisticated as many other applicants, and they've had to

1    overcome more issues.  So it's one of the many things we look

2    at.

3    **Q.**  Let's take a look again at your deposition, Ms. Yong.

4    Flip with me to page 285.  And I'm going to direct your

5    attention to lines 20 to 23.  I've got them up on the screen

6    if that's easier to get to.

7            "QUESTION:  Do you know why Harvard uses race in

8    the admissions process?

9            "ANSWER:  I do not."

10            Were you asked that question, and did you give that

11   answer?

12   **A.**  I did at the time, but I've been prepping, doing a lot of

13   recalling of my past life in preparing for this trial.  So

14   I've been thinking more about my training as an admissions

15   officer.

16   **Q.**  And when you say you've been thinking more about your

17   training, I'm assuming that was in preparing for your

18   testimony today with some of Harvard's lawyers?

19   **A.**  It was.

20   **Q.**  How much time did you spend preparing for today's

21   testimony with Harvard's lawyers?

22   **A.**  A few weeks.

23   **Q.**  You spent a few weeks in full with Harvard's lawyers

24   preparing for today?

25   **A.**  Yeah.  A couple of hours every few days for the last

1    couple of weeks.

2    **Q.**  So you spent a couple of hours every few days over a

3    couple of weeks.  What would you say you spent 20 hours total

4    preparing with Harvard's attorneys?

5    **A.**  I'd have to sit down and think about it.  But possibly,

6    yes.

7    **Q.**  The deposition you gave in this case was about a year and

8    a half ago in March of 2017, right?

9    **A.**  Yes.

10   **Q.**  That was certainly closer in time to when you read

11   applications at Harvard, though it's still been quite a while

12   ago, right?

13   **A.**  It's been over 26 years.

14   **Q.**  And then after your deposition in March of 2017, you

15   filled out something called an errata, right?  You made

16   corrections to your deposition.  That was about a month after

17   the deposition?

18   **A.**  I guess, yes.

19   **Q.**  And at that time you didn't tell us that your testimony

20   about why Harvard uses race and admissions had changed?

21   **A.**  I don't recall.

22   **Q.**  But it's changed since you spent time preparing with

23   Harvard's lawyers to testify today here in this case?

24   **A.**  It has changed mainly because I've been thinking about it

25   more carefully, recalling my training.  Things are coming

1     back to me from the start of my career that I hadn't thought

2     about in 26 years.

3     **Q.**   Ms. Yong, you're aware that a gentleman named Ron Unz

4     wrote an article claiming that Harvard discriminates against

5     Asian-Americans in its admissions process, right?

6     **A.**   I am.

7     **Q.**   And then The New York Times issued a piece discussing

8     that article around Christmas of 2012?

9     **A.**   I don't know about The New York Times article.

10    **Q.**   You know about the Unz article being publicized around

11    the holidays in 2012, right?

12    **A.**   I believe so, yes.

13    **Q.**   I'm sure that led to some discussion internally at the

14    admissions office?

15    **A.**   That is correct.

16    **Q.**   I'd like to turn to P238.  I put that on the screen for

17    you.

18            Do you recognize this as a series of emails that

19    you and Dan Zupan, is that how you pronounce his name?

20    **A.**   It is.

21    **Q.**   So this is a series of emails that you and Dan Zupan

22    exchanged in January of 2013, right?

23    **A.**   It is.

24            MS. HACKER:  SFFA offers P238.

25            MS. CONLEY:  No objection, Your Honor.

**JA1896**

```
 1              THE COURT:  It's admitted.

 2              (Plaintiff Exhibit No. P238 admitted.)

 3    BY MS. HACKER:

 4    Q.  Mr. Zupan was the director of information services who

 5    took over after you were promoted, right?

 6    A.  He took over after I left the office for a while, yes.

 7    Q.  What I'd like to focus on is the third paragraph here,

 8    and it starts with you saying:  "Fitz is on a tear about this

 9    Asian-American thing."

10              "Fitz" refers, of course, to Dean Fitzsimmons,

11    right?

12    A.  It does.

13    Q.  So apparently Dean Fitzsimmons was on a tear in January

14    2013 about this Asian-American thing?

15    A.  That's what it says.

16    Q.  Then you continue:  "He's in Florida on a development

17    trip.  So he's micromanaging everything.  And yesterday had

18    to sit in a meeting with MEM and RMW about four articles he's

19    written."

20              Do you see that?

21    A.  I do.

22    Q.  "MEM" is a reference to Director McGrath, right?

23    A.  It is.

24    Q.  And "RMW" refers to Robin Worth?

25    A.  It does.
```

1    **Q.**  She was the director of international admissions, right?

2    **A.**  That's correct.

3    **Q.**  You referred in the sentence to four articles that

4    Dean Fitzsimmons wrote.  So let's take a look at P234.

5          Do you recognize this as an email that

6    Dean Fitzsimmons sent to you and a number of others on

7    January 19, 2013?

8    **A.**  I do.

9          MS. HACKER:  SFFA offers Exhibit P234.

10          MS. CONLEY:  No objection.

11          THE COURT:  Admitted.

12          (Plaintiff Exhibit No. P234 admitted.)

13    BY MS. HACKER:

14    **Q.**  We also see in the To line Director McGrath and Robin

15    Worth who were both mentioned in the last email we looked at,

16    right?

17    **A.**  Yes.

18    **Q.**  We also see Sally Donahue, right?

19    **A.**  Yes.

20    **Q.**  And Dean Fitzsimmons writes to you and these others,

21    subject:  "Enjoy the following four drafts."

22          Do you see that?

23    **A.**  I do.

24    **Q.**  If we flip to the fifth page of this document, what we

25    see is a draft of something called "Facts About

1    Asian-Americans At Harvard."

2            Do you see that?

3    **A.**  I do.

4    **Q.**  But you don't remember Dean Fitzsimmons writing the four

5    articles he sent you in this email?

6    **A.**  Could you --

7    **Q.**  You don't remember these articles that Dean Fitzsimmons

8    sent you, right?

9    **A.**  Not specifically, no.

10   **Q.**  So you don't remember whether or not this was published

11   or publicized in any way?

12   **A.**  I don't recall.

13   **Q.**  At some point after Mr. Unz's article came out you became

14   aware of a website called "Harvard Not Fair," right?

15   **A.**  Yes.

16   **Q.**  And that was website related to this case that was

17   eventually filed, right?

18   **A.**  Yes.

19   **Q.**  Does it sound right that that happened in about April of

20   2014?

21   **A.**  I don't recall exactly when.

22   **Q.**  Let's take a look at P283 together.  This is an email

23   between you and Grace Cheng on April 23, 2014, right?

24   **A.**  It is.

25            MS. HACKER:  SFFA offers P283.

**JA1899**

Case: 19-2005    Document 00117635840    Page: 454    Date Filed: 07/29/2020    Entry ID: 6356388
Case 1:14-cv-14176-ADB   Document 640   Filed 04/18/19   Page 211 of 228

211

```
 1              MS. CONLEY:  No objection.

 2              THE COURT:  It's admitted.

 3              (Plaintiff Exhibit No. P283 admitted.)

 4    BY MS. HACKER:

 5    Q.  Ms. Cheng was an admissions officer; is that right?

 6    A.  She was.

 7    Q.  These emails -- again, we're seeing in April of 2014.

 8    And what I want to start with is the second email where you

 9    say:  "The guy who financed the Fisher case is looking for

10    Asian-American kids who were rejected from Harvard."

11              Do you see that?

12    A.  I do.

13    Q.  So by this point in time you were aware of the Harvard

14    Not Fair website, right?

15    A.  Yes.

16    Q.  And then Ms. Cheng responds to you:  "P.S., I chair Z

17    docket, which is all of California except for LA and

18    San Fran.  Land of Asians-Americans.  You can single-handedly

19    blame me if you need to.  I've got a great response.  I can

20    tell you Friday.  Easily defensible.  My hobby is quickly

21    becoming telling people they are ridiculous."

22              You don't recall Ms. Cheng's great response, do

23    you?

24    A.  I do not.

25    Q.  And surely you don't think claims of potential
```

1    discrimination should be treated as ridiculous.  They should

2    be treated with respect and investigated, right?

3    **A.**  I take all claims of discrimination very seriously.  And

4    I know the Harvard admissions process.  And Grace and I

5    know -- well, I assume she knows -- it's a very careful

6    process, and nobody discriminates in that office.

7    **Q.**  So you'd agree that claims of potential discrimination

8    should be treated with respect and investigated?

9    **A.**  They should be taken seriously.

10                 MS. HACKER:  Pass the witness.

11                           EXAMINATION

12   BY MS. CONLEY:

13   **Q.**  Good afternoon, Ms. Yong.

14   **A.**  Good afternoon.

15   **Q.**  How are you?

16   **A.**  I've been better.

17   **Q.**  Now, you retired from Harvard in 2015?

18   **A.**  I did.

19   **Q.**  And what was your position at the time you retired?

20   **A.**  Special projects administrator.

21   **Q.**  And before holding your position as a special projects

22   administrator, there was a point in time when you read

23   application files?

24   **A.**  There was.

25   **Q.**  And when was the last time you read application files in

Case: 19-2005    Document: 00117631840    Page: 456    Date Filed: 07/29/2020    Entry ID: 6356388
Case 1:14-cv-14176-ADB   Document 640   Filed 04/18/19   Page 213 of 228

213

1    the Harvard admissions office?

2    **A.**   1992.

3    **Q.**   And was 1992 the last time you participated in

4    subcommittee meetings?

5    **A.**   It was.

6    **Q.**   And was 1992 the last time you participated in full

7    committee meetings?

8    **A.**   It was.

9    **Q.**   And after 1992 did you have any responsibilities relating

10   to admissions policies or practices?

11   **A.**   Only as how they would affect the database.

12   **Q.**   And since 1992 did you ever provide any substantive input

13   as to any admission policies or practices?

14   **A.**   Only as to how they would affect the database.

15   **Q.**   Since 1992, from 1992 to 2015, was your role in the

16   Harvard admissions office limited to maintaining the database

17   and generating data reports?

18   **A.**   It was.  In addition to maintaining our relationship with

19   third-party vendors like the College Board and the ACT and

20   the Common App.

21   **Q.**   With respect to your relationships with those vendors,

22   was that primarily a data-related function?

23   **A.**   It was.

24   **Q.**   Ms. Hacker asked you a series of questions about the

25   one-pagers that you prepared in your time in the admissions

Case: 19-2005    Document 00117631840    Page: 457    Date Filed: 07/29/2020    Entry ID: 6356388
Case 1:14-cv-14176-ADB    Document 640    Filed 04/18/19    Page 214 of 228

214

1    office.

2             Do you recall those questions?

3    **A.**  I do.

4    **Q.**  Let's take a look at Tab 7 in your binder, which is

5    Plaintiff's Exhibit 154.

6             Are you there?

7    **A.**  I am.

8    **Q.**  And is that an example of a one-pager that you discussed

9    with Ms. Hacker?

10   **A.**  It is.

11   **Q.**  Okay.  And can you just walk Your Honor through the

12   categories that are included on the one-pager?

13   **A.**  It goes through the total number of applicants.  There's

14   a breakdown by gender, by geographic region, by area of

15   study, by lineage status, financial aid status, disadvantage

16   and fee waiver, citizenship, and ethnicity.

17   **Q.**  And do all one-pagers contain this information?

18   **A.**  The one-pager -- this is a template of the information

19   that I would give.  And they all have that information on

20   there.

21   **Q.**  If you looked at the total number at the top, if you

22   wanted to know how many white applicants were reflected in

23   the one-pager, could you figure that out?

24   **A.**  By adding together the number of students and, I guess,

25   subtracting -- I mean, the number of minority students and

 1   subtracting them from the total.

 2   **Q.**  I'm sorry.  Does the total number represent the total

 3   number of admitted students in the pool?

 4   **A.**  It represented every student who has applied or been

 5   admitted, yes.

 6   **Q.**  And can you take a look at Plaintiff's Exhibit 149.

 7        Are you there?

 8   **A.**  Yes.

 9   **Q.**  Is that a one-pager?

10   **A.**  That is not a one-pager.  That is a -- I don't know what

11   to call it, but it's a set of statistics.  It has nowhere

12   near the amount of information that a one-pager generally

13   has.

14   **Q.**  And can you turn to Plaintiff's Exhibit 153.  Is that a

15   one-pager?

16   **A.**  That is not a one-pager.  Like the other one, it's got

17   nowhere near the information that a one-pager would reflect.

18   **Q.**  Now, earlier you mentioned that you haven't attended

19   subcommittee or full committee meetings since 1992.  That's

20   right?

21   **A.**  That is correct.

22   **Q.**  Do you know how, if at all, the one-pagers you generated

23   are used during the admissions process?

24   **A.**  I do not.

25   **Q.**  And during Ms. Hacker's examination, you stated that you

1   would provide one-pagers to Dean Fitzsimmons?

2   **A.**   That is correct.

3   **Q.**   And you would provide them to Director McGrath?

4   **A.**   Yes.

5   **Q.**   Is there anyone else you would provide one-pagers to?

6   **A.**   Director Donahue and as we saw to Roger Banks for

7   ABAFAOILSS.

8   **Q.**   And when were the ABAFAOILSS meetings?

9   **A.**   In January after the early-action letters had gone out

10  and in May after the students had replied.

11  **Q.**   And so what kind of one-pagers -- what information did

12  the one-pagers that you provided to Roger Banks have on them,

13  the ones that you would provide for the ABAFAOILSS meetings?

14  **A.**   They had the same information that we went over, but they

15  would be for the set class.  So is the EA numbers were set.

16  They were -- the one-pagers were meant to be a dashboard and

17  to provide information, a descriptor of the applicants and

18  admits.

19  **Q.**   But the one-pagers that you provided in connection with

20  ABAFAOILSS were provided once admissions decisions were

21  final?

22  **A.**   That is correct.

23  **Q.**   Can you turn to Tab 6, which is Plaintiff's Exhibit 182.

24  That's the subcommittee docket target sheet that you were

25  taking a look at with Ms. Hacker.

1              Do you recall that?

2    **A.**   I do.

3    **Q.**   When you were working in Harvard's admissions office, who

4    did you provide docket targets sheets like this to?

5    **A.**   This specific information only went to the dean and the

6    two directors.

7    **Q.**   And did you ever provide docket target sheets like

8    Plaintiff's Exhibit 182 to the subcommittee chairs?

9    **A.**   The only information I would give the subcommittee chairs

10   is the information on the second column.  So if you were the

11   chair of a docket, you would get a piece of paper that said

12   that your target would be 93.  And I would also include the

13   EA admits and previous admits for that class so you would

14   know what your wiggle room was.

15   **Q.**   And would the subcommittee chairs or the docket chairs

16   receive any of the other information on that particular

17   exhibit?

18   **A.**   No.  Just the numbers for their docket.

19   **Q.**   And would any admissions officers receive any of that

20   other information on that Plaintiff's Exhibit 182?

21   **A.**   No, they did not.

22   **Q.**   Now, Ms. Yong, can you take a look at Tabs 1, 2, and 3 in

23   your binder.  They're Defendants' Exhibits 30, 31, and 33.

24   We'll look quickly one by one.

25              What's at Tab 1, which is Defendants' Exhibit 30?

1    **A.**   It is the breakdown of numbers with the overall class for

2    apps, admits, and matrics for the classes of 1980 to 2018.

3    And then a breakdown for African-American app, admits and

4    matrics for those classes.

5    **Q.**   Take a look at Tab 2, which is Defendants' Exhibit 31.

6    What is that?

7    **A.**   That's the same format only for Hispanic-American

8    applicants.

9    **Q.**   And let's take a look at Tab 3, which is Defendants'

10   Exhibit 33.

11   **A.**   And that's the same thing only for Asian-American

12   applicants.

13   **Q.**   And who created those three documents?

14   **A.**   I believe I did.

15   **Q.**   And where do the data from the documents come from?

16   **A.**   They came from our database.

17           MS. CONLEY:  Your Honor, we offer Defendants'

18   Exhibit 30, 31, and 33 into evidence.

19           MS. HACKER:  No objection, Your Honor.

20           THE COURT:  They're admitted.

21           (Defendant Exhibit No. 30, 31, 33 admitted.)

22   BY MS. CONLEY:

23   **Q.**   Ms. Yong, you said you worked in the Harvard admissions

24   office for 33 years?

25   **A.**   I did.

1    **Q.**  During those 33 years, how many times have you seen an

2    admissions officer or anyone in the admissions office

3    demonstrate a bias against an applicant because of his or her

4    race?

5    **A.**  I have never seen that.

6    **Q.**  And during those 33 years, how many times have you heard

7    an applicant's race described as a negative factor?

8    **A.**  I have never heard that.

9    **Q.**  And during those 33 years, were you ever aware of any

10   effort to reach a target number of admitted students from a

11   particular racial or ethnic background?

12   **A.**  I -- never.

13   **Q.**  And during that timeframe, were you ever aware of any

14   effort to limit the number of admitted students from a

15   particular racial or ethnic background?

16   **A.**  Never.

17   **Q.**  Ms. Yong, in your 33 years in the admissions office, have

18   you ever seen anything to substantiate accusations of bias

19   against Asian-Americans in the admissions process?

20   **A.**  I have never.

21   **Q.**  Have you ever seen anything to substantiate accusations

22   of discrimination against Asian-Americans in the admissions

23   process?

24   **A.**  I have never.

25   **Q.**  Earlier you told Ms. Hacker that you attended Harvard

1    College; is that right?

2    **A.**    That is correct.

3    **Q.**    From your time working in the admissions office, do you

4    understand that the college considers a variety of different

5    factors and aspects of an applicant's background when

6    evaluating an applicant for admission?

7    **A.**    I do.

8    **Q.**    And do you believe that you benefited from Harvard's

9    admissions policies which take these things into account?

10   **A.**    Most definitely.

11   **Q.**    And why do you believe that you were benefited or you

12   benefited from Harvard's admissions policies?

13   **A.**    I snuck a look at my profile when I first started

14   working, which everybody does, and I could -- I knew I was a

15   capable student and able, but from the surface of it, you

16   wouldn't be able to really distinguish me from any other

17   solid applicant.

18           And I believe that the tip for being

19   Asian-American, for being from a City of Boston high school

20   and from a first-generation student, neither of my parents

21   graduated -- went beyond sixth grade.  So all of those

22   combined, I believe, helped me get into Harvard.

23   **Q.**    Ms. Yong, did you benefit from Harvard's diverse student

24   body while you were a student there?

25   **A.**    I most definitely did.  As I said, my parents didn't go

**JA1909**

1    beyond sixth grade.  And so I did not come from a very

2    sophisticated background, and I was not exposed to many

3    things.

4            And when I came to Harvard, I met people from all

5    over the world.  I met people from outside of Boston.  I had

6    never even met anybody from, like, Newton.  That's how

7    insular my upbringing was.

8            And the discussions we had about their interests,

9    their discussions that we had about what it was like to grow

10   up in different areas was just eye-opening and incredible.

11           MS. CONLEY:  Thank you, Ms. Yong.  No further

12   questions.

13           MS. HACKER:  We have no more questions for

14   Ms. Yong.

15           THE COURT:  You're excused.

16           THE WITNESS:  Thank you.

17           MR. HUGHES:  Your Honor, we've got 15 minutes left.

18   Our next live witness is Roger Banks.  I don't think we can

19   get him done in 15.  We can start him or we can start reading

20   some of the depositions.  I don't think we can get through an

21   entire one, I'm informed, in 15 minutes, but we're happy to

22   utilize the time, or we're happy to start again tomorrow.

23           THE COURT:  I'm happy to defer to you all on it.

24   We've been sitting long days.  If we don't fully utilize the

25   last 12 minutes of our day, that's fine with me.

 1           MR. HUGHES:  Let us start tomorrow with Mr. Banks.

 2           THE COURT:  Yeah.  That's fine.

 3           MR. HUGHES:  I'll defer --

 4           THE COURT:  That's fine with me.

 5           MS. ELLSWORTH:  Mr. Banks is here, but we're fine

 6    to start tomorrow as well.

 7           THE COURT:  What do you want to do for tomorrow,

 8    9:30 or 10:00?  Does anybody care?  9:30?

 9           MR. HUGHES:  9:30 is great.

10           THE COURT:  Where do you guys think we are in terms

11    of time, are we ahead, on or behind schedule?

12           MR. HUGHES:  I think with any luck, it will -- it's

13    hard for us to know because the remaining significant witness

14    in our case from our perspective is Dr. Arcidiacono.  That

15    will be a pretty robust direct, as you can imagine, several

16    hours.  I'm not sure how long Mr. Lee plans on

17    cross-examining him.

18           If we could start him first thing Thursday and hope

19    to finish Thursday or early Friday with him, then I think we

20    could be done with everything, including the depositions

21    hopefully by the end of Friday, assuming we have full days

22    between now and then.

23           And that would let the Amici, who are

24    participating, do their thing on Monday, which they've all

25    indicated is the most convenient for them.  And then I think

Case: 19-2005    Document 00117631846    Page: 466    Date Filed: 07/29/2020    Entry ID: 6356388
Case 1:14-cv-14176-ADB   Document 640   Filed 04/18/19   Page 223 of 228

223

1    Harvard only has two witnesses in their case, but they can

2    obviously correct me if I'm wrong.

3         MR. LEE:  Your Honor, without trying to disagree on

4    the granular portions of what Mr. Hughes says, I think we'll

5    be done by next Friday, but I think it's going to take us to

6    the end of the third week.

7         THE COURT:  That's fine.  Assuming we have time, I

8    would like to have closings unless anybody -- I don't want to

9    say "unless."  Does anybody strenuously object to closings?

10   We'll do them again after you submit your proposed findings

11   of fact and conclusions of law.

12        MR. HUGHES:  We certainly would love to have

13   closings at the end of the evidence so we can focus on what

14   we've all learned in the past by that time three weeks, and I

15   think we talked about doing the second closing at the

16   pretrial conference and that's --

17        THE COURT:  Yes.  That would be my preference, too,

18   but I'm willing to entertain objections to that.

19        MR. LEE:  That's good with us.  And we're happy to

20   do it next week.  And I think from our perspective the most

21   important thing is to have a second bite at the apple after

22   Your Honor the proposed findings and conclusions.

23        THE COURT:  Yes.  I'm happy to give you that, too.

24        All right.  I'll see everyone at 9:30, tomorrow.

25   Thank you.

1          (Court recessed at 3:36 p.m.)

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Case: 19-2005    Document: 00117631840    Page: 468    Date Filed: 07/29/2020    Entry ID: 6356388
Case 1:14-cv-14176-ADB    Document 640    Filed 04/18/19    Page 225 of 228

225

1                      - - - - - - - - - - -

2                         CERTIFICATION

3

4          I certify that the foregoing is a correct

5     transcript of the record of proceedings in the above-entitled

6     matter to the best of my skill and ability.

7

8

9

10    /s/ Joan M. Daly                    October 23, 2018

11    _____        _____

12    Joan M. Daly, RMR, CRR              Date
      Official Court Reporter
13

14

15

16

17

18

19

20

21

22

23

24

25

1                           INDEX OF WITNESSES

2    WITNESS                                                PAGE

3
     RAKESH KHURANA
4
         Examination (Resumed) By Mr. Mortara...............    6
5        Examination By Ms. Conley..........................   16
         Further Examination By Mr. Mortara.................   65
6        Further Examination By Ms. Conley..................   70

7
     MICHAEL SMITH
8
         Examination By Mr. McBride.........................   72
9        Examination By Mr. Waxman..........................  104

10
     ELIZABETH YONG
11
         Direct Examination By Ms. Hacker...................  173
12       Examination By Ms. Conley..........................  212

13

14

15

16

17

18

19

20

21

22

23

24

25

**JA1915**

EXHIBITS

Defendant Exhibit                                    Received

13      ...................................       30

30      ...................................      218

31      ...................................      218

33      ...................................      218

39      ...................................      158

60      ...................................       53

76      ...................................      171

79      ...................................      130

80      ...................................      130

81      ...................................      130

84      ...................................      130

109     ...................................       22


Plaintiff Exhibit                                    Received

P68       ...................................      182

P148      ...................................      195

P149      ...................................      180

P149 P150 ...................................      195

P152 P153 ...................................      195

P154      ...................................      195

P155                                               195

          ...................................

**JA1916**

| | | |
|---|---|---|
| 1 | P156 | |
| 2 | | ..................................... 195 |
| 3 | P157 | ..................................... 195 |
| 4 | P158 | ..................................... 195 |
| 5 | P159 | ..................................... 195 |
| 6 | P161 | ..................................... 195 |
| 7 | P164 | ..................................... 195 |
| 8 | P165 | ..................................... 195 |
| 9 | P167 | ..................................... 195 |
| 10 | P168 | ..................................... 195 |
| 11 | P169 | ..................................... 195 |
| 12 | P170 | ..................................... 195 |
| 13 | P171 | ..................................... 195 |
| 14 | P172 | ..................................... 195 |
| 15 | P182 | ..................................... 200 |
| 16 | P234 | ..................................... 209 |
| 17 | P238 | ..................................... 208 |
| 18 | P283 | ..................................... 211 |
| 19 | 301 | ..................................... 9 |
| 20 | 302 | ..................................... 9 |
| 21 | 312 | ..................................... 81 |
| 22 | P319 | ..................................... 201 |
| 23 | P326 | ..................................... 196 |
| 24 | | |
| 25 | | |



1              UNITED STATES DISTRICT COURT

2              DISTRICT OF MASSACHUSETTS

3    _____

4    STUDENTS FOR FAIR ADMISSIONS, INC.,

5                    Plaintiff,          Civil Action
                                         No. 14-14176-ADB
6    v.
                                         October 24, 2018
7    PRESIDENT AND FELLOWS OF HARVARD
     COLLEGE, et al.,                    Pages 1 to 245

8                    Defendants.

9    _____

10

11

12        TRANSCRIPT OF BENCH TRIAL - DAY 8
     BEFORE THE HONORABLE ALLISON D. BURROUGHS
             UNITED STATES DISTRICT COURT

13         JOHN J. MOAKLEY U.S. COURTHOUSE
                 ONE COURTHOUSE WAY

14               BOSTON, MA  02210

15

16

17

18

19

20

21          JOAN M. DALY, RMR, CRR
         KELLY MORTELLITE, RMR, CRR

22         Official Court Reporter
     John J. Moakley U.S. Courthouse

23   One Courthouse Way, Room 5507
             Boston, MA  02210

24         joanmdaly62@gmail.com

25

**JA1918**

```
 1   APPEARANCES:

 2
     COUNSEL FOR THE PLAINTIFF:
 3

 4           ADAM K. MORTARA, ESQUIRE
             J. SCOTT McBRIDE, ESQUIRE
 5           KRISTA J. PERRY, ESQUIRE
             Bartlit Beck Herman Palenchar & Scott
 6           54 West Hubbard Street
             Suite 300
 7           Chicago, Illinois 60654
             312.494.4400
 8           adam.mortara@bartlit-beck.com
             scott.mcbride@bartlit-beck.com
 9           krista.perry@bartlit-beck.com

10           JOHN M. HUGHES, ESQUIRE
             KATHERINE L.I. HACKER, ESQUIRE
11           MEG E. FASULO, ESQUIRE
             Bartlit Beck Herman Palenchar & Scott
12           1801 Wewatta Street
             Suite 1200
13           Denver, Colorado 80202
             303.592.3100
14           john.hughes@bartlit-beck.com
             kat.hacker@bartlit-beck.com
15           meg.fasulo@bartlit-beck.com

16           JOHN MICHAEL CONNOLLY, ESQUIRE
             THOMAS R. McCARTHY, ESQUIRE
17           WILLIAM S. CONSOVOY, ESQUIRE
             Consovoy McCarthy Park PLLC
18           3033 Wilson Boulevard
             Suite 700
19           Arlington, Virginia 22201
             703.243.9423
20           mike@consovoymccarthy.com
             tom@consovoymccarthy.com
21           will@consovoymccarthy.com

22

23

24

25
```

Case: 19-2005    Document: 00117621840    Page: 474    Date Filed: 07/29/2020    Entry ID: 6356388
Case 1:14-cv-14176-ADB    Document 642    Filed 04/18/19    Page 3 of 245

3

```
 1    APPEARANCES (cont.):

 2
             PATRICK STRAWBRIDGE, ESQUIRE
 3           Consovoy McCarthy Park PLLC
             Ten Post Office Square
 4           8th Floor, South, PMB #706
             Boston, Massachusetts 02109
 5           617.227.0548
             patrick@consovoymccarthy.com
 6
             MICHAEL H. PARK, ESQUIRE
 7           Consovoy McCarthy Park PLLC
             3 Columbus Circle
 8           15th Floor
             New York, New York 10024
 9           646.456.4432
             park@consovoymccarthy.com
10
             PAUL M. SANFORD ESQUIRE
11           BENJAMIN C. CALDWELL, ESQUIRE
             Burns & Levinson LLP
12           One Citizens Plaza
             Suite 110
13           Providence, Rhode Island 02903
             401.831.8330
14           psanford@burnslev.com
             bcaldwell@burnslev.com
15

16    COUNSEL FOR THE DEFENDANT:

17           WILLIAM F. LEE, ESQUIRE
             FELICIA H. ELLSWORTH, ESQUIRE
18           ANDREW S. DULBERG, ESQUIRE
             ELIZABETH C. MOONEY, ESQUIRE
19           SARAH R. FRAZIER, ESQUIRE
             Wilmer Cutler Pickering Hale and Dorr LLP
20           60 State Street
             Boston, Massachusetts 02109
21           617.526.6556
             william.lee@wilmerhale.com
22           felicia.ellsworth@wilmerhale.com
             andrew.dulberg@wilmerhale.com
23           elizabeth.mooney@wilmerhale.com
             sarah.frazier@wilmerhale.com
24

25
```

```
 1    APPEARANCES (cont.):

 2
             SETH P. WAXMAN, ESQUIRE
 3           DANIELLE CONLEY, ESQUIRE
             DANIEL WINIK, ESQUIRE
 4           BRITTANY AMADI, ESQUIRE
             PAUL R.Q. WOLFSON, ESQUIRE
 5           Wilmer Cutler Pickering Hale and Dorr LLP
             1875 Pennsylvania Ave, NW
 6           Washington, DC 20006
             202.663.6006
 7           seth.waxman@wilmerhale.com
             danielle.conley@wilmerhale.com
 8           daniel.winik@wilmerhale.com
             brittany.amadi@wilmerhale.com
 9           paul.wolfson@wilmerhale.com

10           DEBO P. ADEGBILE, ESQUIRE
             Wilmer Cutler Pickering Hale and Dorr LLP
11           7 World Trade Center
             250 Greenwich Street
12           New York, New York 10007
             212.295.6717
13           debo.adegbile@wilmerhale.com

14           ARA B. GERSHENGORN, ESQUIRE
             Harvard Office of the General Counsel
15           Smith Campus Center
             Suite 980
16           1350 Massachusetts Avenue
             Cambridge, Massachusetts 02138
17           617.495.8210
             ara_gershengorn@harvard.edu

18

19    COUNSEL FOR AMICI STUDENTS:

20           JON M. GREENBAUM, ESQUIRE
             BRENDA L. SHUM, ESQUIRE
21           GENEVIEVE BONADIES TORRES, ESQUIRE
             KRISTEN CLARKE, ESQUIRE
22           1500 K Street NW, Suite 900
             Washington, DC 20005
23           202.662.8315
             jgreenbaum@lawyerscommittee.org
24           bshum@lawyerscommittee.org
             gtorres@lawyerscommittee.org
25           kclarke@lawyerscommittee.org
```

**JA1921**

```
 1     APPEARANCES (cont.):

 2
            LAWRENCE CULLEEN, ESQUIRE
 3          EMMA DINAN, ESQUIRE
            Arnold & Porter LLP
 4          555 Twelfth Street, NW
            Washington, DC 20004
 5          202.942.5477
            gina.dean@aporter.com
 6          emma.dinan@aporter.com

 7
      COUNSEL FOR AMICI ORGANIZATIONS:
 8
            JENNIFER A. HOLMES, ESQUIRE
 9          CARA McCLELLAN, ESQUIRE
            JIN HEE LEE, ESQUIRE
10          MICHAELE M. TURNAGE YOUNG, ESQUIRE
            RACHEL N. KLEINMAN, ESQUIRE
11          NAACP Legal Defense and Educational Fund, Inc.
            700 14th Street NW
12          Suite 600
            Washington, DC 20005
13          jholmes@naacpldf.org
            cmcclellan@naacpldf.org
14          jlee@naacpldf.org
            myoung@naacpldf.org
15          rkleinman@naacpldf.org

16          KENNETH N. THAYER, ESQUIRE
            KATE R. COOK, ESQUIRE
17          Sugarman Rogers
            101 Merrimac Street
18          Suite 900
            Boston, Massachusetts 02114
19          617.227.3030
            thayer@sugarmanrogers.com
20          cook@sugarmanrogers.com

21

22

23

24

25
```

**JA1922**

Case: 19-2005    Document: 00117620840    Page: 477    Date Filed: 07/29/2020    Entry ID: 6356388
Case 1:14-cv-14176-ADB    Document 642    Filed 04/18/19    Page 6 of 245

6

P R O C E E D I N G S

1

2              (The following proceedings were held in open

3    court before the Honorable Allison D. Burroughs, United

4    States District Judge, United States District Court, District

5    of Massachusetts, at the John J. Moakley United States

6    Courthouse, One Courthouse Way, Boston, Massachusetts, on

7    October 25, 2018.)

8              THE COURT:  We're a couple of minutes early, but if

9    you guys are ready to start, we can start.

10             Just for scheduling purposes, I can go as late as

11   you want today.  So -- by which I mean really as late as you

12   want.  I could go to 4:00.  We can even go beyond that, if

13   you want to.  I don't have anything scheduled after this.

14   But I'll leave it up to you when you come to a good stopping

15   spot.

16             I would also like to take just a little bit longer

17   lunch today just so I can breathe some air in the middle of

18   the day.  So maybe we'll take an hour lunch today, but we'll

19   sit longer at the end of the day.

20             And also, I was thinking about this case last

21   night, and I know we're just about at the halfway point, and

22   I just want to take the opportunity to really thank and

23   compliment you all for the job that you're doing on this.

24   It's really -- the level of lawyering is exceptional, and as

25   we've all discussed at various points during this trial,

Case: 19-2005    Document: 00117620840    Page: 478    Date Filed: 07/29/2020    Entry ID: 6356388
Case 1:14-cv-14176-ADB   Document 642   Filed 04/18/19   Page 7 of 245

7

1    there are a lot of difficult issues that raise issues that

2    are personal to people and that people feel very strongly

3    about, and I really appreciate the level of professionalism

4    and civility that you guys are demonstrating, are

5    demonstrating throughout.  So I know -- I sort of thought

6    we're halfway, I thought I would take the time to mention it.

7         And really, I would like to go back and reiterate

8    that the level of lawyering in this case has really been

9    exceptional.  I hope that my level of judging lives up to the

10   level of lawyering.  But you guys are really just doing an

11   incredible job with what's a difficult case all the way

12   around.  So my appreciation and compliments for that.  And

13   when you want to go, feel free.

14        MR. HUGHES:  Thank you, Your Honor.  I thank you

15   and I try to speak for everyone for your kind words.  I'm not

16   sure if I'm fortunate or unfortunate to follow the

17   compliment.

18        THE COURT:  You've been unfailingly pleasant,

19   Mr. Hughes.  I'm sure you can --

20        MR. HUGHES:  Thank you, Your Honor.

21        MR. LEE:  On this issue, we're perfectly happy to

22   have Mr. Hughes speak for us.

23        MR. HUGHES:  Yesterday we suggested our next live

24   witness will be Roger Banks.  We've actually worked with

25   Harvard to call Mark Hansen, so we now call Mark Hansen as

 1    our next witness.

 2              And I'd like to approach, Your Honor.

 3              THE COURT:  Yes, that's fine.

 4               MR. LEE:  Your Honor, before we do direct on

 5    Mr. Hansen, just on the scheduling issue, as Your Honor looks

 6    into next week, I have a request that on Halloween -- we have

 7    some parents and grandparents who might like to end a little

 8    early.

 9              THE COURT:  I was going to suggest the same thing

10    because it's a big night at our house as well.  So let me

11    know what time you all want to stop and we can -- that's

12    fine.

13              MR. LEE:  I'll talk to Mr. Hughes and we can figure

14    it out.

15              MR. HUGHES:  Sounds good.

16              THE COURT:  And I know it's a big night at our

17    house, but I presume you all aren't traveling in honor of the

18    holiday.  But if you are, I'm happy to accommodate that.

19              MR. HUGHES:  We're going to have some sad boys in

20    Denver, but I will not be returning home.

21              THE COURT:  If you want to take my kids trick or

22    treating --

23              MR. HUGHES:  What are their outfits?

24              THE COURT:  They're -- one of them is Link from

25    Zelda, if anyone has any idea what that is, because I know I

Case: 19-2005   Document: 00117626840   Page: 460   Date Filed: 07/29/2020   Entry ID: 6356388
Case 1:14-cv-14176-ADB   Document 642   Filed 04/18/19   Page 9 of 245

9

```
 1    don't.  And the other is a mix of Spartan accoutrements that

 2    he has collected.

 3              With my kids, I don't really know what your boys

 4    are like, but with my kids it's actually all about the

 5    weapon.

 6              MR. HUGHES:  They're generally like that, although

 7    I think -- I've got five, and they're going as the various

 8    members of the cast of Hamilton.  If I were there, I guess I

 9    would be Hamilton, but yeah.

10              THE COURT:  That is very organized.  Our house has

11    been nothing like that and it is all about the weapon.

12              MR. HUGHES:  It is Mrs. Hughes that is responsible

13    for that.  All right.

14              THE COURT:  You probably have great holiday cards,

15    too.

16              MR. HUGHES:  Yes.

17              (MARK HANSEN duly sworn by the Deputy Clerk.).

18              THE CLERK:  Can you please state your name and

19    spell your last name for the record.

20              THE WITNESS:  Sure.  It Mark Hansen, H-a-n-s-e-n.

21    EXAMINATION BY MR. HUGHES:

22    Q.  Good morning, Mr. Hansen.

23    A.  Good morning.

24    Q.  My name is John Hughes.  We haven't met before.  It's

25    nice to meet you.
```

**JA1926**

1   **A.**  You as well.

2   **Q.**  I'm not going to ask you what you're going to be for

3   Halloween.

4            Now, I'd like you to just -- go over a little bit

5   of your background with you.  I understand that you went to

6   Boston University?

7   **A.**  Yes, I did.

8   **Q.**  And you majored in pure and applied mathematics at Boston

9   University?

10  **A.**  That's correct.

11  **Q.**  And then after you graduated from B.U., you continued

12  your education and you got your master's degree from the

13  Harvard Graduate School of Education, correct?

14  **A.**  Yes, a couple years after.

15  **Q.**  And then after you graduated from the Harvard Graduate

16  School of Education, you ultimately got a job at Harvard in

17  Harvard's Office of Institutional Research, correct?

18  **A.**  That's correct.

19  **Q.**  Okay.  And you started at OIR -- and OIR is a common way

20  people refer to the Office of Institutional Research,

21  correct?

22  **A.**  Yes.

23  **Q.**  Okay.  You started at OIR as a project management fellow,

24  correct?

25  **A.**  That's correct, yes.

1   **Q.**   And that was sometime in the summer of 2010, correct?

2   **A.**   Yes.

3   **Q.**   Okay.  And then after you had been there at OIR about a

4   year, you got the title, I assume it was a promotion, to

5   research analyst, correct?

6   **A.**   That's correct, yes.

7   **Q.**   Okay.  And that was in July 2011, correct?

8   **A.**   I'm not sure of the exact date.

9   **Q.**   Sometime that summer, right?

10   **A.**   Thereabouts, yes.

11   **Q.**   Okay.  And while you were at OIR, or at least for part of

12   the time you were at OIR, you reported directly to Erica

13   Bever, correct?

14   **A.**   Yes, for a portion of my time there.

15   **Q.**   Okay.  And you ended up leaving Harvard's Office of

16   Institutional Research in the middle of the summer of 2013,

17   correct?

18   **A.**   Yes.

19   **Q.**   And why -- where did you go after you left OIR?

20   **A.**   I went to MIT's Office of Institutional Research,

21   Massachusetts Institute of Technology.

22   **Q.**   And that's where you still work today?

23   **A.**   I work at MIT, yes.

24   **Q.**   Still in their Office of Institutional Research?

25   **A.**   No, I work for a research group on campus, COFHE.

1    **Q.**  And you've been with MIT since you left Harvard in 2013,

2    correct?

3    **A.**  That's correct.

4    **Q.**  I want to focus with you briefly this morning,

5    Mr. Hansen, about some work that you did at OIR in early

6    2013.  Do you have that timeframe in mind?

7    **A.**  Thereabouts, yes.

8    **Q.**  Okay.  And by the time 2013 rolled around, you had been

9    at Harvard's Office of Institutional Research for about two

10    and a half years, correct?

11    **A.**  I think that sounds right, yes.

12    **Q.**  Started in the middle of 2010.  By the time we get to

13    early 2013, that's about two and a half years, right?

14    **A.**  Sure, yes.

15    **Q.**  Okay.  And while you were at OIR, you did work regarding

16    Harvard's use of preferences in admissions.  That's part of

17    the work you did, right?

18    **A.**  I'm sorry.  Could you repeat the question?

19    **Q.**  While you were at OIR, some of the work that you did

20    related to Harvard's use of preferences in admissions,

21    correct?

22    **A.**  Preferences in the various kind of inputs that would go

23    into an admission's decision.

24    **Q.**  And one of the preferences that you looked at was

25    Harvard's use of race in its admissions process, correct?

1   **A.**   Yes.

2   **Q.**   Okay.  And part of the reason that you were looking at

3   race in Harvard admissions in the 2013 timeframe was because

4   of information in the popular press about race and college

5   admissions, correct?

6   **A.**   It was related to that, yes.

7   **Q.**   And one of the articles that you were at least aware of

8   was an article by a man named Ron Unz, correct?

9   **A.**   I was aware of it, yes.

10   **Q.**   And among other things, you were aware that in the Unz

11   article he raised concerns about Harvard's treatment of Asian

12   applicants in its admissions process, correct?

13   **A.**   Among other things, yes.

14   **Q.**   Okay.  And in early 2013, you did some work relating to

15   that -- the issues that Unz raised around Asian-American

16   applicants to Harvard, correct?

17   **A.**   I would say related to admissions preferences, but tied

18   to the Unz article.

19   **Q.**   And you did not do that analysis -- and we're going to

20   discuss it in more detail in a minute -- but you didn't do

21   that analysis on your own initiative.  Somebody asked you to

22   do that work, correct?

23   **A.**   Yes.

24   **Q.**   Now, you couldn't remember at your deposition who asked

25   you to do that work.  Do you remember now?

1  **A.**  No.  It likely would have been internal to the office,

2  though.

3  **Q.**  Internal to OIR?

4  **A.**  Yes.

5  **Q.**  Okay.  Now, the analysis of whether Asians were being

6  disadvantaged in the admissions process was a product of OIR,

7  correct?

8  **A.**  The study involving admissions preferences was a product

9  of OIR, yes.

10  **Q.**  You keep changing the word to "admissions preferences,"

11  but you agree that you did analysis related to whether Asians

12  were being disadvantaged in the admissions process and that

13  was a product of OIR, correct?

14  **A.**  I'm sorry.  Could you repeat the question?

15  **Q.**  The analysis of whether Asians were being disadvantaged

16  in the admissions process was a product of OIR, correct?

17  **A.**  The analysis of admissions preferences would have been a

18  product of OIR, and that would have included race as one of

19  those preferences.

20  **Q.**  I'll ask it again.  The analysis of whether Asians were

21  being disadvantaged in the admissions process was a product

22  of OIR, correct?

23  **A.**  The analysis that looked at admissions preferences that

24  included race and ethnicity was a product of OIR.

25  **Q.**  I've got a couple of things there next to you,

Case: 19-2005    Document: 00117631840    Page: 486    Date Filed: 07/29/2020    Entry ID: 6356388
Case 1:14-cv-14176-ADB   Document 642   Filed 04/18/19   Page 15 of 245

15

1   Mr. Hansen.  One of them is a spiral-bound copy of your

2   deposition transcript.

3   **A.**   Mm-hmm.

4   **Q.**   Okay.  I'd like you to turn to page 21 of that, line 24.

5         Are you there?

6   **A.**   I am.

7   **Q.**   "Question:  Sure.  Would you describe the analysis of

8   whether Asians were being" -- next page -- "disadvantaged in

9   the admissions process as a product of the Office of

10  Institutional Research?

11          "Answer:  I would, yes."

12          Were you asked that question and did you give that

13  answer?

14  **A.**   Yes.

15  **Q.**   The work you did at OIR regarding Asians in Harvard's

16  admissions process spanned multiple months, correct?

17  **A.**   Sorry.  Could you repeat the question.

18  **Q.**   The work you did at OIR regarding Asians in Harvard's

19  admissions process spanned multiple months, correct?

20  **A.**   It would be a little broader than that, so it would be a

21  number of different admissions analyses.

22  **Q.**   But it included this analysis of whether Asians were

23  disadvantaged in the admissions process, right?

24  **A.**   It included the admissions preferences analysis.

25  **Q.**   Is there a reason why in your deposition you used the

 1    language of Asians being disadvantaged in the admissions

 2    process over and over again and now you want to keep talking

 3    about preferences in the admissions process?  Is there a

 4    reason why you're making that distinction?

 5              MS. ELLSWORTH:  Your Honor, I object.  The language

 6    from the deposition that Mr. Hughes read was the language of

 7    the questioner, not Mr. Hansen.  I don't think it's an

 8    appropriate question.  I don't think it was proper

 9    impeachment either.

10              THE COURT:  I take your point, but I'll let him

11    have the question.

12              MR. HUGHES:  Thanks.

13    **Q.**  Do you want me to repeat it?

14    **A.**  Sure.

15    **Q.**  Is there a reason in your deposition that you agreed with

16    questions characterizing your work as analyzing whether

17    Asians were disadvantaged in the admissions process over and

18    over again and today you only want to talk about preferences

19    in the admissions process?

20              Is there a reason why you're adopting that

21    different language?

22    **A.**  I accepted the premise of the question, and it really

23    narrowed the description of the work a little further than

24    what it actually was.  So it covered race and ethnicity as

25    one component, but it also looked at legacy and athlete

1    status.

2    **Q.**   And you, in fact, recall multiple iterations into the

3    question of whether Asians were being disadvantaged in

4    Harvard's admissions process, correct?

5    **A.**   I recall multiple admissions projects where race would

6    have been a component in the analysis.

7    **Q.**   Is it your testimony that you remember multiple

8    iterations into whether Asians were being disadvantaged in

9    the admissions process?

10   **A.**   I recall multiple iterations where Asian would have

11   been -- or race ethnicity would have been a component in the

12   output from the analysis.

13   **Q.**   Why don't you turn to page 105 of your deposition, line

14   4.  Are you there?

15   **A.**   I am.

16   **Q.**   "Is it your testimony that you remember multiple

17   iterations into whether Asians were being disadvantaged in

18   the admissions process?

19           "Answer:  Yes."

20           Do you see that?

21   **A.**   I do.

22   **Q.**   Is that your sworn testimony?

23   **A.**   It is.

24   **Q.**   Now, I want to talk with you about some of the iterations

25   that you did into whether Asians were being disadvantaged in

1    the admissions process, and I'll start with Plaintiff's

2    Exhibit 12.

3              And you've got a binder, Mr. Hansen, and the tab

4    should say P12, if you want to look at the hard copy.  I've

5    also got an image of the document on the screen.  You can

6    look at either or both, okay?

7    **A.**  Okay.  Thank you.

8    **Q.**  Is P12 something that you've seen before?

9    **A.**  Is it okay if I flip through it?

10   **Q.**  Please do.

11   **A.**  Okay.  Thank you.

12   **Q.**  Have you seen this document before?

13   **A.**  Yes, in some form.

14   **Q.**  Okay.  And I want to show you -- we're going to look at

15   various pages, but I'm going to start with page 34.  I'm

16   going to put it up on the screen.

17             You're familiar with page 34 of this document,

18   correct?

19   **A.**  I am, yes.

20   **Q.**  We're going to come back and talk in a little bit more

21   detail about that in a minute, but I want to now show you

22   page 3.

23   **A.**  Sorry.  Page 3?

24   **Q.**  Yes, sir.

25             And you can see on page 3 there is kind of a --

1    somewhat of a summary of what is in the rest of this

2    PowerPoint deck, correct, some of the different topics that

3    are covered?

4    **A.**   It looks like it, yes.

5    **Q.**   And at the very top, the first one is "Access."  Do you

6    see that?

7    **A.**   I do.

8    **Q.**   And the first number under access has to do with

9    "Reintroducing early action," correct?

10   **A.**   Yes.

11   **Q.**   And then we've got a topic related to the "Shift in

12   gender balance at Harvard College due to increased interest

13   and recruitment for SEAS," correct?

14   **A.**   That's correct, yes.

15   **Q.**   Okay.  And then the third topic under "Access" is, "Does

16   the admissions process disadvantage Asians?"  Do you see

17   that?

18   **A.**   I do.

19   **Q.**   Do you see right here in OIR's document the language,

20   "Does the admissions process disadvantage Asians," correct?

21   **A.**   I do.

22   **Q.**   Okay.  Now, then, there's some other parts of the

23   PowerPoint deck, affordability and achievement, that relate

24   to different issues, correct?

25   **A.**   That's what it looks like, yes.

**JA1936**

 1   **Q.**  Okay.  And do you remember whether Erica Bever was the

 2   person who kind of assembled this PowerPoint deck and put it

 3   together?

 4   **A.**  Not specifically, no.

 5   **Q.**  All right.  I'm going to hand you a document that I hope

 6   will refresh your recollection.

 7            MR. HUGHES:  Your Honor, if I may approach?

 8            THE COURT:  Yes.

 9            THE WITNESS:  Thank you.

10            MR. HUGHES:  Your Honor, would you like a copy of

11   what I'm showing him?

12            THE COURT:  Sure.

13            MR. HUGHES:  Thank you.

14   **Q.**  Now, Mr. Hansen, I know these events occurred a while

15   ago, and this is not a memory test by any means.  I'm just

16   going to try to show you this email to see if I can refresh

17   your recollection on who assembled this PowerPoint deck.

18            I'd like you to just read the document to yourself

19   and then let me know when you finish reading it and I'll ask

20   you a few questions.

21   **A.**  (Witness reviews document.)  Okay.

22   **Q.**  Now that you've read it -- let me ask you one little

23   detail question.  Do you see this language here on page 3

24   that we've looked at together, slide 3?

25   **A.**  Yeah, I do.

**JA1937**

1  **Q.** It looks like you actually even suggested an edit to

2  slide 3, correct?

3  **A.** Yes.

4  **Q.** And having looked at this email, does it refresh your

5  recollection that Ms. Bever assembled the PowerPoint deck,

6  you made some edits to it, correct?

7  **A.** That seems likely, based on this email.

8  **Q.** You can set that aside now, Mr. Hansen.  Thank you.

9        Now let's go through -- we're going to start on

10  page 31 of Plaintiff's Exhibit 12.  If you want to follow

11  along in hard copy, just let me know when you get there.

12  **A.** Sorry.  The screen is just a little blurry.

13  **Q.** No.  It's not great resolution, so no problem at all,

14  sir.

15        So you see page 31 starts the section of the

16  PowerPoint "Evaluating factors that play a role in Harvard

17  College admission."  Do you see that?

18  **A.** I do, yes.

19  **Q.** And then we turn to page 32.  You see that, right?

20  **A.** Yeah.  The slide?

21  **Q.** You see the slide you have in front of you?

22  **A.** I do, yes.

23  **Q.** And this is a slide that you're familiar with, correct?

24  **A.** Yes, I believe I made it.

25  **Q.** Your slide, right?

1    **A.**  I think so.

2    **Q.**  Okay.  And the title of the slide is "Methods."  Do you

3    see that?

4    **A.**  Yes.

5    **Q.**  And then the goal is "Using various admissions ratings,

6    how well can we approximate admit rates by race, ethnicity

7    and the demographic composition of the admitted students

8    pool."

9          Do you see that as the goal of the OIR analysis?

10   **A.**  I do, yes.

11   **Q.**  And this relates -- and we're going to talk about it more

12   in a minute, this relates to -- or at least relates to a

13   regression, the logistic regression model that you and OIR

14   put together, correct?

15   **A.**  I believe so, yes.

16   **Q.**  And then you talk about "The strategy fit a series of

17   basic logistic regression models using data from classes of

18   2007 to 2016."  Do you see that?

19   **A.**  Yes, I do.

20   **Q.**  And what you had there was you had information about the

21   people who applied to Harvard for those years, correct?

22   **A.**  Yes.  It would have been mixed year to year, so some

23   years would have certain pieces of data, some years we

24   wouldn't, but overall, that's a good way of characterizing

25   it.

Case: 19-2005   Document: 00117631840   Page: 494   Date Filed: 07/29/2020   Entry ID: 6356388
Case 1:14-cv-14176-ADB   Document 642   Filed 04/18/19   Page 23 of 245

23

1   **Q.**   You took the data that Harvard had -- and I understand it

2   might have varied for some variables year to year, right?

3   **A.**   Yes.

4   **Q.**   Okay.  And you had ten years of that data for the

5   applicants that applied to Harvard, correct?

6   **A.**   I'm sorry.  I should have been more specific.  It would

7   have been data that we had internal to the office left over

8   from prior projects.

9   **Q.**   Yeah.  And I was just trying to get -- the very simple

10  point is that your analysis wasn't just limited to people who

11  actually got admitted to Harvard; your analysis included

12  people that applied to Harvard for those years, correct?

13  **A.**   Yes, it would have been the full.

14  **Q.**   Okay.  And then what you did is you generated "fitted

15  probabilities of admissions, given an applicant's

16  characteristics how likely are they to be admitted," right?

17  **A.**   I'm sorry.  Could you repeat --

18  **Q.**   I'm just reading the slide.

19  **A.**   Oh, all right then.

20  **Q.**   That's what the slide says, right?

21  **A.**   Yes.

22  **Q.**   And then for each class, you selected "2100 applicants

23  with the highest probability of admissions as your simulated

24  admitted class."  Do you see that?

25  **A.**   I do, yes.

1    **Q.**  So what you did, and we're going to look at it, you had a

2    model with four iterations, right?

3    **A.**  Yes.

4    **Q.**  And each of those four iterations had some different

5    variables, correct?

6    **A.**  As inputs, yes.

7    **Q.**  And then you would get -- and what you would do is you

8    would have those variables as inputs, then you'd run all the

9    applicants through the model, and you'd try to predict for

10   each of these years who would get admitted based on those

11   inputs, correct?

12   **A.**  Yes.

13   **Q.**  Okay.  And then what you did is you would compare that to

14   the actual admitted classes over that time for certain

15   comparisons that we'll look at in a minute, right?

16   **A.**  You would compare the hypothetical pool against the

17   actual in terms of -- in various demographic attributes.

18   **Q.**  And then, in fact, that's the very next bullet.  You

19   examine the resulting demographics and admit rates by

20   ethnicity, correct?

21   **A.**  That's correct, yes.

22   **Q.**  And then you made a couple of notes:  "Students with no

23   academic index are excluded from this analysis."

24        That was true of your analysis, correct?

25   **A.**  Yes.  So that would mean that it wasn't necessarily

Case: 19-2005    Document: 00117631840    Page: 496    Date Filed: 07/29/2020    Entry ID: 6356388
Case 1:14-cv-14176-ADB   Document 642   Filed 04/18/19   Page 25 of 245

25

1    considering the full applicant pool, but it -- it dropped

2    those cases.

3    **Q.**  And then you noted that:  "The following analysis is

4    preliminary," bold and underlined, "and for discussion,"

5    correct?

6    **A.**  Yes.

7    **Q.**  And then we get to the next page, and this is where you

8    identify the input variables for your different models,

9    correct?

10   **A.**  Yes.

11   **Q.**  Okay.  And model 1 just has two, academic index and

12   academic rating, correct?

13   **A.**  Yes, as inputs.

14   **Q.**  And then the other, then we get to model -- I might have

15   said model 2 just there.  I meant to say model 1.  That's my

16   fault, not yours, Mr. Hansen.

17          Model 1 just has academic index and academic

18   rating, correct?

19   **A.**  Yes, the first one.

20   **Q.**  And then the second one, model 2, keeps academic index

21   and rating, adds the legacy and athlete preference variables,

22   correct?

23   **A.**  That's correct, yes.

24   **Q.**  And then model 3 keeps everything that was in model 2,

25   but it adds the personal rating and the extracurricular

Case: 19-2005    Document: 00117631840    Page: 497    Date Filed: 07/29/2020    Entry ID: 6356388
Case 1:14-cv-14176-ADB   Document 642   Filed 04/18/19   Page 26 of 245

26

1  rating, correct?

2  **A.**  Yes.

3  **Q.**  And then model 4 keeps everything that was in model 3,

4  adds gender and ethnicity, correct?

5  **A.**  That's correct, yes.

6  **Q.**  And then if we turn the page, this shows the demograph --

7  the first four bars show the demographics of the hypothetical

8  admitted classes for the years that you had data, correct?

9  **A.**  Yes.

10  **Q.**  And in each of those models, the percentage of

11  Asian-American applicants that your model predicts would get

12  admitted decreases, correct?

13  **A.**  That's correct.

14  **Q.**  Okay.  And in the -- and when you compare the

15  hypothetical admitted classes, the demographics of that for

16  model 4 to the actual -- the demographics of the actual

17  admitted classes in model 5, those numbers are pretty close,

18  aren't they?

19          MS. ELLSWORTH:  Your Honor, there's no model 5.  I

20  think the question is a little confusing.

21          MR. HUGHES:  Thank you.  That was a bad question.

22  Following the compliments of the lawyering, I am sorry.  Let

23  me try again.

24  **Q.**  So when you compare --

25          THE COURT:  There's no such thing as a stupid

1    question.

2          MR. HUGHES:  There is such thing as an

3    incomprehensible question, so let me try to ask a

4    comprehensible one, Mr. Hansen.

5    **Q.**  If you look at the demographics of model 4, what that is

6    is the demographics based on the input variables to model 4

7    of the hypothetical admitted classes for the years that you

8    had data, correct?

9    **A.**  I'm sorry.  Could you repeat the question?  I'm really

10   sorry.

11   **Q.**  Focusing on model 4, what model 4 shows is demographic

12   breakdown, correct?

13   **A.**  It shows the hypothetical one generated by model 4.

14   **Q.**  Okay.  And that's for -- it's the hypothetical admitted

15   class for each of the classes that you had the data for,

16   right?

17   **A.**  It would be them all pooled together.

18   **Q.**  All pooled together, right; is that right?

19   **A.**  Yes.

20   **Q.**  And then you compare that to the actual admitted class,

21   correct?

22   **A.**  Yes.

23   **Q.**  And that's what's in the fifth column, correct?

24   **A.**  That's correct.

25   **Q.**  And you pooled all of the class years and got the

 1    demographics for those actual admitted classes as reflected

 2    in that fifth column, correct?

 3    **A.**   Yes.

 4    **Q.**   And then we can compare column 4 to column 5.  That's the

 5    purpose of this, correct?

 6    **A.**   Yes.

 7    **Q.**   And we can see that the demographics of your -- of model

 8    4 in terms of race and ethnicity are pretty close to the

 9    actual admitted classes for the years that you had data,

10    correct?

11    **A.**   Yes.  It's not unexpected, so there's a circular element

12    to this in that you're using demographic attributes to model

13    a hypothetical admitted student pool and then comparing them

14    to the actual.

15    **Q.**   Yeah, I appreciate that.  And you will get to answer your

16    lawyers' questions when it's their turn to ask you questions.

17          My question is, the demographics between these two,

18    the model and the actual, is pretty close, isn't it?

19    **A.**   On the attributes being measured, yes.

20    **Q.**   And the thing you just said about circular, that's

21    nowhere in this document, is it?

22    **A.**   I think the preliminary caveat up there was meant to

23    convey some of the methodological concerns that might come

24    with this.

25    **Q.**   Now, if we look at the -- you would agree with me that

1    all -- everything you just said about circular, that doesn't

2    appear anywhere in this document, does it?

3    **A.**  It would be covered by the preliminary piece.

4    **Q.**  All captured by the word "preliminary."  That's your

5    testimony.

6          MS. ELLSWORTH:  Your Honor, I'm going to object on

7    argumentative.  We can let the witness answers his questions.

8    We've got plenty time of here.

9          THE COURT:  You can have the question because I

10    don't think it's unduly argumentative, but let him finish his

11    answer before you ask it, okay?

12          MR. HUGHES:  Thank you, Your Honor.

13    **A.**  Sorry.  Could you repeat the --

14    **Q.**  All the testimony you just gave us about circular, that's

15    all captured by the word "preliminary."  That's your

16    testimony?

17    **A.**  It would convey any methodological concerns I would have

18    about this approach.

19    **Q.**  Now, you don't recall having a reaction to the numbers

20    produced by this model, correct?

21    **A.**  That's correct.

22    **Q.**  Okay.  And you do recall showing the information from

23    these models to Dean Fitzsimmons, correct?

24    **A.**  In some form, yes.

25    **Q.**  And you do not remember Dean Fitzsimmons' reaction upon

 1    seeing these numbers, correct?

 2    **A.**  I don't think so, no.

 3    **Q.**  Okay.  And now turning to page 35 --

 4         THE COURT:  May I ask you a question about this?

 5    Sorry.

 6         I know you haven't been here, and I may come pretty

 7    close to stupid questions on this graph, but I've been sort

 8    of wrestling with it to begin with.

 9         Can you -- does this mean that if you take the

10    numbers assigned for each of those four things, are you --

11    can you conclude from that that if you look just at those

12    numbers, you can accurately predict the demographics of the

13    class?

14         THE WITNESS:  Demographics on those attributes, so

15    if you were to look at something like income, which isn't

16    included here, it probably wouldn't mirror the actual income

17    distribution of the admitted student class.

18         And same thing with something like geography, where

19    it's entirely feasible that model 4 could have all students

20    from California.  I mean, that's on the edge of feasible, but

21    it's -- it wouldn't necessarily mirror the geographic

22    distribution of applicants or admitted students in the true

23    admitted student pool.

24         I apologize, Your Honor.  I'm not an expert on

25    statistics.

Case: 19-2005    Document: 00117621840    Page: 502    Date Filed: 07/29/2020    Entry ID: 6356388
Case 1:14-cv-14176-ADB   Document 642   Filed 04/18/19   Page 31 of 245

31

```
1              THE COURT:  I should be the one who apologizes.

2              The four thing in model -- the three things in

3      models 1, 2 and 3 are things that Harvard assigns a numerical

4      rating to, right?  That's where those come from, right?

5              THE WITNESS:  I believe so, yes.

6              THE COURT:  And so if you run just those numbers

7      and nothing else, you would come out with -- you would expect

8      to see a population in the class similar to model 3, right?

9              THE WITNESS:  I'm sorry.  Could you --

10             THE COURT:  If you put -- academics, legacy and

11     athlete -- well, I shouldn't say legacy.  But academics,

12     athlete, extracurricular and personal are all things that the

13     admissions reviewers give a number to, right?

14             THE WITNESS:  Yes.

15             THE COURT:  That's the input here, right?

16             THE WITNESS:  To the model 3, yes.

17             THE COURT:  Where does the legacy thing come from?

18     Is that a number?  Like, what's the input on that?

19             THE WITNESS:  It would be probably a binary flag.

20     So it's basically a yes or no.

21             THE COURT:  Okay.  And so if you put in academics,

22     the binary flag, the number for athletic, the number for

23     extracurricular and the number for personal and you just

24     based your decisions on those numbers, you would expect that

25     -- the income class to look like model 3, right?
```

```
 1              THE WITNESS:  On these attributes.

 2              THE COURT:  Just on those objective numbers.  I

 3     mean, we're hearing that there's other things that go into

 4     the process, but if there wasn't anything else going into the

 5     process, just the numbers, you would expect the class to look

 6     like model 3?

 7              THE WITNESS:  Theoretically, yes.

 8              THE COURT:  Okay.  I know you don't know who they

 9     are, right, so they --

10              THE WITNESS:  No.

11              THE COURT:  But then, what do you -- what are you

12     putting into model 4 that changes -- what about model 4

13     changes the number?

14              THE WITNESS:  It would be the inclusion of those

15     demographic variables, so it would more or less reflect the

16     demographics of the incoming class.

17              THE COURT:  So let's just take the number -- let's

18     just take the number for whites.  So you go just on the

19     objective numbers, and you would expect the incoming class to

20     be 51 percent white, right?

21              THE WITNESS:  This is model 3?

22              THE COURT:  Yeah, model 3.

23              So you take just those objective numbers we were

24     talking about, and you expect the class to be 51 percent

25     white, right?
```

```
 1              THE WITNESS:  Thereabouts.

 2              THE COURT:  What are you putting in that changes it

 3    to 44 percent?  You're putting in the demograph- -- is that

 4    the demographics of the actual class?

 5              THE WITNESS:  Yes.

 6              THE COURT:  So then if you're putting in the

 7    demographics of the actual class, why is there any difference

 8    at all between model 4 and actual?

 9              THE WITNESS:  So early on, I think on that initial

10    slide, I made what amounts to more or less an arbitrary

11    choice to say an incoming class would be 2100 students.  But

12    it's entirely possible over time that that number actually

13    varies year to year, and there's also the potential for just

14    some noise in fitting the models.

15              THE COURT:  So the model 4 is always going to look

16    like actual, right?

17              THE WITNESS:  I think it should be pretty close, at

18    least on the things we're looking at in the model.

19              THE COURT:  Okay.  All right.  Thank you.

20              If you want to do follow up from that, go ahead.

21              MR. HUGHES:  I think we're good, Your Honor.

22    BY MR. HUGHES:

23    Q.  Turning to page 35, this shows projected admission rates

24    based on the model, correct?

25    A.  I believe so, yes.
```

Case: 19-2005    Document: 00117631840    Page: 505    Date Filed: 07/29/2020    Entry ID: 6356388
Case 1:14-cv-14176-ADB  Document 642   Filed 04/18/19  Page 34 of 245

34

1   **Q.**  And, again, the projected admission rates for Asian

2   applicants goes down from -- keeps going down with every

3   iteration of the model, correct?

4   **A.**  I'm sorry.  Could you repeat the question?

5   **Q.**  You can see that there's -- this one is a little harder

6   to look at, but you can see that there's a color that's like

7   brown or olive green that's related to Asian applicants.  Do

8   you see that?

9   **A.**  I do, yes.

10  **Q.**  And then you can see there's the line that goes down that

11  reflects the admission rates, correct?

12  **A.**  Yes.

13  **Q.**  And in each iteration of the model, the projected

14  admission rates for Asian applicants goes down, correct?

15  **A.**  Yeah, those hypothetical rates.  Yes.

16          THE COURT:  Sorry, Mr. Hughes, one more question.

17          MR. HUGHES:  Sure.

18          THE COURT:  So the percentage -- if you take the

19  actual numbers, which are model 3, and I understand there's

20  other factors that go into it, but if you just take model 3,

21  the percentage of -- the percentage of the Asians and whites

22  goes down by basically the same, right?

23          THE WITNESS:  This is model 3 going to model 4?

24          THE COURT:  Yeah -- well, yeah.  Or actual.  I

25  mean, when you start moving in -- is that right?

1          THE WITNESS:  They're close-ish.  Sorry.  I don't

2     know that I could do the math real quickly in my head.

3          THE COURT:  Okay.  Thank you.

4     **Q.**  Then if we move to slide 36, we have a slide entitled

5     "What have we learned?"  Do you see that?

6     **A.**  Yes.

7     **Q.**  And you say, "Once we account for ratings and demographic

8     factors, we can closely predict what the admitted class will

9     look like."  Do you see that?

10    **A.**  I do.

11    **Q.**  And you say, "With current data" -- this is your slide,

12    right?

13    **A.**  I'd say likely, yes.

14    **Q.**  And then you say, "With current data, we explain a

15    significant amount of the variation in admission, but further

16    details, especially around the personal rating, may provide

17    further insight," correct?

18    **A.**  Yes.

19    **Q.**  And then you say, "There are a variety of factors a

20    quantitative data is likely to miss, the ratings do not

21    capture," and then you have a list of those, correct?

22    **A.**  Yes.

23    **Q.**  Okay.  And you don't say on this slide that the model is

24    unreliable or inaccurate, correct?

25    **A.**  I would have covered that in that first -- with the

 1  caveats that go with the models.

 2  **Q.**  And then look at slide 38.  This is an OIR presentation,

 3  and I think you've already told us this was in some form

 4  shared with Dean Fitzsimmons, correct?

 5  **A.**  Yes.

 6  **Q.**  And what OIR is saying here at the end of the analysis in

 7  these models, posing some research questions, correct?

 8  **A.**  Yes.

 9  **Q.**  And you can see I've got part of page 38 blown up on the

10  screen.  Do you see that?

11  **A.**  Oh, sorry.  Yes.

12  **Q.**  And then the third question is, "Is there bias against

13  Asians in college admissions?"  Do you see that?

14  **A.**  I do.

15  **Q.**  And then there's, "Next steps to further address the

16  question of bias.  Is there more data to elaborate our

17  understanding of the role of the personal essay and other

18  factors?"  Do you see that?

19  **A.**  I do.

20  **Q.**  Now I want to move on to a different document as

21  Plaintiff's Exhibit 9, and you've got that in your binder.

22  **A.**  Is it okay to flip through it?

23  **Q.**  Absolutely.  Yeah, I was kind of waiting for you.  Sorry,

24  Mr. Hansen.  I should have communicated that to you.  Just

25  let me know when you've kind of taken a look at it.

Case: 19-2005    Document: 00117631840    Page: 508    Date Filed: 07/29/2020    Entry ID: 6356388
Case 1:14-cv-14176-ADB    Document 642    Filed 04/18/19    Page 37 of 245

37

1   **A.**   Okay.

2   **Q.**   Take a look at P9.

3   **A.**   Yes.

4   **Q.**   And you saw in there, if you looked at, like, page 11,

5   you probably saw the model that we just talked about, right?

6   **A.**   Yes, in draft form.

7   **Q.**   And P9, Plaintiff's Exhibit 9, is one of the iterations

8   concerning whether Harvard's admissions process disadvantages

9   Asians, correct?

10   **A.**   It would be an early draft of some of the content that

11   went into that later presentation.

12            MR. HUGHES:  At this point, Your Honor, I'd like to

13   move for the admission of P9.

14            MS. ELLSWORTH:  No objection.

15            THE COURT:  P9 comes in.

16            MR. HUGHES:  At long last.

17            THE COURT:  And the motion is mooted?

18            MR. HUGHES:  The motion is mooted.  I'm told I get

19   a treat back at the war room tonight.

20            (Exhibit P9 admitted into evidence.)

21            MR. LEE:  Your treat is we don't have to respond.

22            MR. HUGHES:  Fair enough, Mr. Lee.

23   **Q.**   Now, as a general matter, this document was connected to

24   the research you were doing related to the concerns raised in

25   the Unz article, right?

1    **A.**   Related to the Unz article, yes.

2    **Q.**   Now, let's just look at a few pages of P9.  Turn to page

3    5, if you will.

4    **A.**   Okay.

5    **Q.**   Do you see page 5 in your binder?  And I've got it up on

6    the screen.

7              And what this shows is that -- some differences

8    between white applicants and Asian applicants, correct?

9    **A.**   Yes.

10   **Q.**   And if the bars are going to the -- do you see where I've

11   got highlighted the zero line?

12   **A.**   I do.

13   **Q.**   And if the bars are going to the right of the zero line,

14   that means Asians are doing better in the categories that are

15   listed here; and if the bars are going left, that means white

16   applicants are doing better, correct?

17   **A.**   The right would say the average would be higher for

18   Asians and the left would be higher for white.

19   **Q.**   For white applicants?

20   **A.**   Yes.

21   **Q.**   Okay.

22   **A.**   Sorry.  Yes.

23   **Q.**   So we have, on average, the Asian applicants are higher

24   for SAT II average, SAT average and alumni 2 rating, correct?

25   **A.**   Yes.

1   **Q.** And then for the next four categories, alumni rating 1,

2   guidance rating, teacher rating 2 and teacher rating 1. And

3   for the first three of those, white applicants do a little

4   bit better on average; and for the last one, teacher rating

5   1, the Asian applicants do a little bit better on average.

6   Correct?

7   **A.** Yes.

8   **Q.** And those differences are much smaller than the other

9   differences that we see on the screen, correct?

10   **A.** They're smaller, yes.

11   **Q.** And then we see the one category where the white

12   applicants do, you know, significantly better or better is

13   the personal rating, correct?

14   **A.** I'd just say that the personal ratings on average are

15   higher for white applicants.

16   **Q.** And it looks like that's about 1. -- or .13 standard

17   deviations on average, correct?

18   **A.** That sounds about right.

19   **Q.** And then we can look down and see for extracurricular and

20   academic, the Asian applicants on average are better than the

21   white applicants, correct?

22   **A.** They have a higher average rating, on average.

23   **Q.** And if we look down here in the notes, you've got some

24   different notes at the bottom of the slide, correct?

25   **A.** Yes.

Case: 19-2005   Document: 00117631840   Page: 511   Date Filed: 07/09/2020   Entry ID: 6356388
Case 1:14-cv-14176-ADB   Document 642   Filed 04/18/19   Page 40 of 245

40

1   **Q.** And the first one is that you excluded legacies and

2   athletes, correct?

3                    MR. HUGHES: Bless you, Your Honor.

4                    THE COURT: Thank you.

5   **A.** Yes.

6   **Q.** And the reason that you remove athletes and legacies is

7   because those are attributes that have been described as

8   favoring white students, correct?

9   **A.** Yes.

10  **Q.** And then your other notes you've got that you didn't have

11  the ratings for all the years, so there's -- the number of

12  applicants differs for each rating test score. Do you see

13  that?

14  **A.** Yes, I do.

15  **Q.** And what that means is there were a different number of

16  people that you had data for for certain variables, correct?

17  **A.** Certain -- yes. Essentially people, years, some years we

18  didn't have ratings.

19  **Q.** You averaged that all out to get your bar graph, right?

20  **A.** It would be the pool of whatever we had available.

21  **Q.** And then you've -- to the last bullet point is what we

22  already talked about, the differences that we see here are in

23  standard deviations, correct?

24  **A.** Yes.

25  **Q.** Now let's look at page 8. Here we have -- and let me

1    just remind you, I'm going to show you pages 10 and 11 real

2    quickly just to orient everybody.

3            You see page 10 we have a kind of description

4    similar but not perfectly identical to what we saw in P12,

5    describing your work in putting together this model, correct?

6    **A.**   Yeah, it looks like an earlier draft.

7    **Q.**   And if you look down at the bottom, the input variables

8    to the four models are the same here as they were in P12,

9    correct?

10   **A.**   They should be, yes.

11   **Q.**   And this bar graph is the same as in P12, correct?

12   **A.**   I think so, without looking.

13   **Q.**   And so we're not going to go through it twice.

14   **A.**   Yeah.

15   **Q.**   I want to turn back to page 8 where you're reporting some

16   odds ratios for the main effect of the logistic model.

17            Do you have page 8 in front of you?

18   **A.**   Yes.

19   **Q.**   Okay.  And then we see -- and these are odds ratios

20   related to chance of -- whether something is positively or

21   negatively associated with admissions, correct?

22   **A.**   With a probability of admission, yes.

23   **Q.**   So, for example, having a higher personal rating is

24   favorably associated with the chance of admission, correct?

25   **A.**   Yes, it's a positive relationship.

1    **Q.**  And there's a positive relationship, for example, between

2    being African-American and admission to Harvard, correct?

3    **A.**  In this model, yes.

4    **Q.**  Okay.  And it actually shows that the positive

5    relationship between being African-American and admission to

6    Harvard is greater than the positive relationship between

7    being Hispanic and admission to Harvard, correct?

8    **A.**  I'm sorry.  Could you repeat the question?

9    **Q.**  Let me try to --

10   **A.**  I'm sorry.

11   **Q.**  It's a lot of words on the screens.  Do you see the two

12   things I've got highlighted here on the screen?

13   **A.**  I do.

14   **Q.**  My question is, what this shows is that being

15   African-American is more positively associated with admission

16   to Harvard than the Hispanic variable, correct?

17   **A.**  In this particular model, yes.

18   **Q.**  And then if we get down -- and the line here, the line

19   here, if you're on the -- let me just ask you this:  Down

20   here where you see "Asian," being Asian in this model is

21   negatively associated with admission to Harvard, correct?

22   **A.**  In this model, yes.  I believe one is sort of equivalent

23   of zero.

24   **Q.**  I'm sorry?

25   **A.**  I believe one is the equivalent of being zero on this

Case: 19-2005 Document: 00117621840 Page: 514 Date Filed: 07/29/2020 Entry ID: 6356388
Case 1:14-cv-14176-ADB Document 642 Filed 04/18/19 Page 43 of 245

43

1  display being negative, anything to the left of one would be

2  negative.

3  **Q.**  So just to be clear, being Asian is negatively associated

4  with the probability of admissions in this model, correct?

5  **A.**  Yes.

6  **Q.**  Okay.  You would describe Plaintiff's Exhibit 9 as

7  providing evidence that Asians were disadvantaged in the

8  admissions process, but you're not sure whether it is

9  intentional, correct?

10  **A.**  I'm sorry.  Could you repeat the question?

11  **Q.**  You would describe this exhibit as providing evidence

12  that Asians were disadvantaged in the admissions process, but

13  you're not sure whether it's intentional, correct?

14  **A.**  It could provide evidence, but it's certainly not an

15  exhaustive look at all the factors in the admissions process.

16       THE COURT:  What do the class numbers mean on this?

17  Why are those in there?

18       THE WITNESS:  So it would be an attempt to control

19  for time.  So essentially you'd consider the class of -- pick

20  one, 2008, in isolation from 2012.  So as it gets -- over

21  time there are more applications, finite number of seats, so

22  over time it would get harder.  You would have a lower

23  probability of admission.

24       So an earlier class, because there were fewer

25  applications, might have a higher probability of admission.

Case: 19-2005    Document: 00117631840    Page: 515    Date Filed: 07/29/2020    Entry ID: 6356388
Case 1:14-cv-14176-ADB    Document 642    Filed 04/18/19    Page 44 of 245

44

1    I realize looking at it they're not necessarily perfectly in

2    order, but that's the general idea.

3            THE COURT:  So how would you, like -- how would you

4    say that?  Like, being in the class of 2016 is -- you have a

5    -- if you're in the class of 2016, you have less than one

6    probability of getting in?

7            THE WITNESS:  I'd say negatively associated.  And

8    this is in part due to -- it's been a while since I've done

9    this kind of work.  These are also relative to some reference

10   group, which I'm not quite sure what that would be in this

11   instance.

12           THE COURT:  What does it mean for a whole class to

13   be negatively associated with admissions?

14           THE WITNESS:  It's compared to some reference

15   point.  So it might have been either the earliest class in

16   this data so relative to the class -- I don't know if 2007's

17   in here, maybe that's the reference here -- but relative to

18   the class of 2007, being in the class of 2016 would be

19   negatively associated with the probability of admission.

20           THE COURT:  So does this have anything to do

21   with -- it doesn't have anything to do with the absolute

22   number of applications; you're just saying the more

23   applications there are, the harder it gets?

24           THE WITNESS:  Essentially, Your Honor, that sounds

25   right.

```
 1              MR. HUGHES:  Your Honor, were those all your

 2    questions on this part?

 3              THE COURT:  Yeah.

 4              MR. HUGHES:  I'm going to try to ask a follow-up

 5    question.

 6    BY MR. HUGHES:

 7    Q.  Based on your familiarity with the data relating to

 8    Harvard admissions, over time, generally speaking, more

 9    people apply to Harvard College, at least in this timeframe,

10    right?

11    A.  I think that's true without being 100 percent sure.  That

12    sounds --

13    Q.  Year after year --

14    A.  -- generally right.

15    Q.  And just as a matter of -- and you're comparing these

16    variables that you've got here to a baseline, correct?

17    A.  Yes.

18    Q.  And your baseline might be, I think you said, might be

19    2007, correct?

20    A.  Without -- I wouldn't know for sure, but that would seem

21    right, based on the years of data described.

22    Q.  And then if a whole bunch more people applied to Harvard

23    in 2016 instead of 2007, just, by virtue of the bigger class,

24    your odds are lower of getting in in '16 as in '07 just

25    because more people applied.  That's just the basic math,
```

 1   correct?

 2   **A.**  I think so, yes.

 3          THE COURT:  But you can't say, like -- this doesn't

 4   reflect the fact that there's fewer people with high personal

 5   ratings so more of them get in?

 6          THE WITNESS:  I'm sorry.  Could you repeat the

 7   question?

 8          THE COURT:  It's not a percentage, right?  Like,

 9   this doesn't reflect that there's -- could you extrapolate

10   from this that there's fewer high personal ratings so a

11   bigger percentage of them get in or there are fewer

12   African-American applicants so a bigger percentage of them

13   get in?  Can you read that like that, or no?

14          THE WITNESS:  I don't believe so, but I could be

15   mistaken.

16   BY MR. HUGHES:

17   **Q.**  I'll just return to the question that I asked you before,

18   but I am not sure that the record is clear.

19          You would describe P9 as providing evidence that

20   Asians were disadvantaged in the admissions process, but you

21   were not sure whether it was intentional, correct?

22   **A.**  It could provide evidence that Asians are disadvantaged

23   in the admissions process.  However, it's not necessarily a

24   comprehensive look at all the factors considered in

25   admissions.

1    **Q.** And, in fact, you cannot eliminate the possibility that

2    bias against Asians explained the fact that being Asian is

3    negatively associated with being admitted to Harvard,

4    correct?

5    **A.** I'm sorry. Could you repeat the question?

6    **Q.** You cannot eliminate the possibility that bias against

7    Asians explained the fact that being Asian is negatively

8    associated with being admitted to Harvard, correct?

9    **A.** I can't. However, these models don't establish causal

10   relationships between any of these inputs on the left-hand

11   side and in admissions outcome.

12   **Q.** Now, you met with Dean Fitzsimmons to discuss your

13   analysis of race in the admissions process on more than one

14   occasion, correct?

15   **A.** I think that would have been a topic.

16   **Q.** On more than one occasion, correct?

17   **A.** Potentially, yes.

18   **Q.** And the other people that you remember being at those

19   meetings were Ms. Bever and Dr. Driver-Linn, correct?

20   **A.** That sounds right, yes.

21   **Q.** And you don't recall any reaction by Dean Fitzsimmons

22   when he learned about OIR's analysis into whether Asians were

23   being disadvantaged in Harvard's admissions process, correct?

24   **A.** I think the analysis of admissions preferences was

25   probably presented with a docket of other things, so I'm not

Case: 19-2005    Document: 00117621840    Page: 519    Date Filed: 07/29/2020    Entry ID: 6356388
Case 1:14-cv-14176-ADB   Document 642   Filed 04/18/19   Page 48 of 245

48

 1    recalling specific reactions.

 2    **Q.**   And you're not aware of anyone ever criticizing the

 3    analysis that you did into whether Harvard's admissions

 4    process disadvantaged Asians, correct?

 5    **A.**   I don't know that any of these analyses would have been

 6    circulated beyond our office and Dean Fitzsimmons.

 7    **Q.**   Yes.  But just so the record is clear, you're not aware

 8    of anyone ever criticizing the analysis that you did into

 9    whether Harvard's admissions process disadvantaged Asians,

10    correct?

11    **A.**   No, but I don't think any of these analyses were

12    seriously vetted by anyone outside of our office.

13    **Q.**   And you don't recall anyone at Harvard taking any action

14    in response to OIR's analysis into whether Asians were being

15    disadvantaged in Harvard's admissions process, correct?

16    **A.**   I'm sorry.  Could you repeat the question?

17    **Q.**   You don't recall anyone at Harvard taking any action in

18    response to OIR's analysis into whether Asians were being

19    disadvantaged at Harvard's admissions process, correct?

20    **A.**   I don't know that I'd be aware of any action taken or not

21    taken due to any of the admissions analyses we're doing.

22    **Q.**   And you're not aware of any, right?

23    **A.**   I'm not aware of any action.

24    **Q.**   And you're not aware of any changes in the admissions

25    process that occurred as a result of OIR's analysis into

Case: 19-2005    Document: 00117631840    Page: 520    Date Filed: 07/29/2020    Entry ID: 6356388
Case 1:14-cv-14176-ADB    Document 642    Filed 04/18/19    Page 49 of 245

49

 1    whether Asians were being disadvantaged in the admissions

 2    process, correct?

 3    **A.**   I'm sorry.  Could you repeat the question?

 4    **Q.**   You're not aware of any changes in the admissions process

 5    that occurred as a result of OIR's analysis into whether

 6    Asians were being disadvantaged in the admissions process,

 7    correct?

 8    **A.**   I'm not aware of any changes as a result of any of these

 9    analyses.

10            MR. HUGHES:  No further questions.

11            MS. ELLSWORTH:  May I proceed, Your Honor?

12            THE COURT:  Yes.

13    EXAMINATION BY MS. ELLSWORTH:

14    **Q.**   Good morning, Mr. Hansen.

15    **A.**   Good morning.

16    **Q.**   Mr. Lee, can I have Plaintiff's Exhibit 9 up on the

17    screen, please.

18            And you can turn to Tab 1 in the binder that we

19    just gave you that has Plaintiff's Exhibit 9 in it, first

20    tab.  Are you there?

21    **A.**   I am.

22    **Q.**   All right.  Mr. Hughes was asking you some questions

23    about Plaintiff's Exhibit 9 just now.  Do you remember that?

24    **A.**   I do, yes.

25    **Q.**   How would you describe Plaintiff's Exhibit 9?

1    **A.**  Essentially as either my working notes or even like lab

2    notes.  So as I was familiarizing myself with admissions

3    data, essentially just drawing exhibits as a way of

4    understanding the numbers I was working with.

5    **Q.**  Is Plaintiff's Exhibit 9 a presentation of some sort?

6    **A.**  I don't believe so, no.

7    **Q.**  Is it a final work product of OIR?

8    **A.**  No.  I mean, there are typos on the very first page.

9    **Q.**  Did you show Plaintiff's Exhibit 9 to any of your

10   colleagues in the Office of Institutional Research?

11   **A.**  I doubt I would have, given the typos.  I would have

12   probably proofread.

13   **Q.**  Did you show Plaintiff's Exhibit 9 to Dean Fitzsimmons?

14   **A.**  I'd say very unlikely; again, given the typos.

15   **Q.**  In response to some of the questions from Mr. Hughes, you

16   described your work at OIR as relating to the factors in

17   Harvard admissions process.  Do I have that generally right?

18   **A.**  Some of the work, yes.

19   **Q.**  And Mr. Hughes characterized the work that you did at OIR

20   as an analysis into whether Asians were disadvantaged in the

21   admissions process.  Do you remember that?

22   **A.**  Yes.

23   **Q.**  All right.  How would you characterize the two work

24   products that Mr. Hughes showed you this morning, Plaintiff's

25   Exhibit 9 and Plaintiff's Exhibit 12?

Case: 19-2005    Document: 00117631840    Page: 522    Date Filed: 07/29/2020    Entry ID: 6356388
Case 1:14-cv-14176-ADB   Document 642   Filed 04/18/19   Page 51 of 245

51

1    **A.**   So probably a bit broader.  So looking at a number of

2    different factors used in the admissions process, not just

3    race and ethnicity.

4    **Q.**   So you don't agree with Mr. Hughes' characterization of

5    the work?

6    **A.**   No.

7    **Q.**   Mr. Hughes asked you some questions about your deposition

8    testimony.

9              Do you remember that?

10   **A.**   I do.

11   **Q.**   And he showed you some deposition testimony?

12   **A.**   Yes.

13   **Q.**   The questioner at your deposition described OIR projects

14   in language similar to Mr. Hughes, right?

15   **A.**   Yes.

16   **Q.**   Do you agree with the way the questioner at your

17   deposition characterized the work of OIR?

18   **A.**   I do not.

19   **Q.**   Did any of your work at OIR show bias or discrimination

20   against Asian-American applicants?

21   **A.**   No.  Those would imply causal inference, and that's not

22   something I have the training to do.

23   **Q.**   So let's talk a little bit about your background,

24   Mr. Hansen.  Do you consider yourself an expert in

25   statistics?

Case: 19-2005    Document: 00117631840    Page: 523    Date Filed: 07/09/2020    Entry ID: 6356388
Case 1:14-cv-14176-ADB   Document 642   Filed 04/18/19   Page 52 of 245

52

1    **A.**  No.

2    **Q.**  Do you consider yourself an expert in statistical

3    modeling?

4    **A.**  No.

5    **Q.**  In your professional career, when is the first time that

6    you ever did a logistic regression project?

7    **A.**  As far as I can recall, mostly associated with these

8    analyses.

9    **Q.**  So the work in Plaintiff's Exhibit 12 that we were

10   looking at earlier?

11   **A.**  Or P9.

12   **Q.**  Plaintiff's Exhibit 9?

13   **A.**  I think so, yes.

14   **Q.**  Okay.  And when is the last time that you did a logistic

15   regression analysis?

16   **A.**  While employed by Harvard.  So sometime in the spring or

17   early summer of 2013.

18   **Q.**  Do you do any statistical analysis as a part of your work

19   in your current position?

20   **A.**  Not really, no.

21   **Q.**  Can you look, please, in Tab 2 of your binder.

22   **A.**  Okay.

23   **Q.**  Do you have in front of you Plaintiff's Exhibit 46?

24   **A.**  I do.

25   **Q.**  What is this document?

```
 1    A.   It looks like a -- either email or draft of an email
 2    likely from myself to Erica Bever with essentially some
 3    follow-up analysis that had been requested.
 4    Q.   Do you believe that you drafted this email or portions of
 5    an email?
 6    A.   It seems pretty likely.
 7              MS. ELLSWORTH:  Your Honor, I move to admit
 8    Plaintiff's 46.
 9              MR. HUGHES:  No objection.
10              THE COURT:  Admitted.
11              (Exhibit P46 admitted into evidence.)
12    Q.   Mr. Hansen, if you can just look back at Plaintiff's 9,
13    which is the first tab in your binder.  And in particular,
14    please look at slide 5 of that exhibit.
15    A.   Okay.
16    Q.   Did you show slide 5 of Plaintiff's Exhibit 9 to Dean
17    Fitzsimmons?
18    A.   I don't think so.
19    Q.   Can you look at slide 8 of Plaintiff's Exhibit 9.  Did
20    you show slide 8 of Plaintiff's Exhibit 9 to Dean
21    Fitzsimmons?
22    A.   Again, I don't think so.
23    Q.   And look at slide 9 of Plaintiff's Exhibit 9, please.
24    Did you show slide 9 of Plaintiff's Exhibit 9 to Dean
25    Fitzsimmons?
```

Case: 19-2005    Document: 00117621840    Page: 525    Date Filed: 07/29/2020    Entry ID: 6356388
Case 1:14-cv-14176-ADB   Document 642   Filed 04/18/19   Page 54 of 245

54

1    **A.**  I don't think so.

2    **Q.**  All right.  Let's -- Mr. Lee, if we could have

3    Plaintiff's Exhibit 12, please, which is at Tab 4 in your

4    binder, Mr. Hansen.  Are you there?

5    **A.**  Yes.

6    **Q.**  All right.  And you referenced in response to some

7    questions from Mr. Hughes that there were several projects

8    contained within this exhibit.  Do you recall that testimony?

9    **A.**  I do.

10   **Q.**  So let's focus on slides 32 through 34 of Plaintiff's

11   Exhibit 12, please.  These are the -- I'll wait until you're

12   there.

13   **A.**  Sorry.

14   **Q.**  No.  Take your time.

15   **A.**  Okay.

16   **Q.**  This is the modeling exercise you were discussing with

17   Mr. Hughes, right?

18   **A.**  Yes.

19   **Q.**  And you created these models, right?

20   **A.**  I believe so, yes.

21   **Q.**  Just so the record is clear, these are four separate

22   models, correct?

23   **A.**  Yes.

24   **Q.**  Did you consult with the Harvard admissions office in

25   creating these four separate models?

1    **A.** I did not.

2    **Q.** What was the goal of the four models that are shown on

3    slides 32 through 34 of Plaintiff's Exhibit 12?

4    **A.** It's laid out on slide 32. So using various ratings,

5    characteristics, how well can we simulate the demographic

6    composition of an admitted students pool, using different

7    combinations of those inputs.

8    **Q.** Let's take a look at slide 33, please, of Plaintiff's 12.

9    This describes the factors that were included in each of the

10   four models, right?

11   **A.** The inputs, yes.

12   **Q.** The inputs, thank you. And you discussed model 1 with

13   Mr. Hughes. Do you remember that?

14   **A.** I do, yes.

15   **Q.** What are the inputs to model 1?

16   **A.** In this instance, so the inputs would be academic index

17   and academic rating.

18   **Q.** Are those the only factors used in the Harvard admissions

19   process?

20   **A.** I don't believe so, no.

21   **Q.** Are those the only two academic considerations in the

22   Harvard admissions process?

23   **A.** I don't believe they are.

24   **Q.** And, again, did you confer with the admissions office

25   before selecting these two variables?

1    **A.**  I did not, no.

2    **Q.**  Can you please describe for the court the process that

3    you used to conduct the logistic regression using these two

4    factors in model 1?

5    **A.**  Sure.  So you take those two factors as inputs, and as an

6    output, you take an actual admissions outcome.  You'd fit a

7    series of -- or you'd fit a single logistics regression

8    model.  From that model you can get what are called fitted

9    probabilities.  That would be estimates at a given

10   applicant's probability of admission; and in this instance,

11   based on these two factors.

12            And then from there I took and rank-ordered the

13   data essentially by that fitted probability.  And for each

14   class year I took the 2100 students with the highest

15   probability of admission in this simulation and called that

16   my entering class.

17            So in total, these reflect probably about 21,000

18   kind of simulated admits.

19   **Q.**  And just to clear up something that Mr. Hughes asked, did

20   you run each model on a year-by-year basis?

21   **A.**  I fit a single model for everyone and then generated the

22   probabilities for everyone but then year by year selected the

23   top 2100 for each year.

24   **Q.**  So for each of the years of data you analyzed, you

25   selected the top 2100 for each of these years.  Do I have

Case: 19-2005   Document: 00117631840   Page: 528   Date Filed: 07/29/2020   Entry ID: 6356388
Case 1:14-cv-14176-ADB   Document 642   Filed 04/18/19   Page 57 of 245

57

1   that right?

2   **A.**   Yes.

3   **Q.**   The output that's shown on slide 34 combines them

4   altogether, correct?

5   **A.**   It would be the demographic composition of, essentially,

6   so model 1 -- actually, all four of them of ten kind of

7   simulated entering classes.  So about 21,000 people.

8   **Q.**   But the way that you constructed the models was on a

9   year-by-year basis?

10  **A.**   The model itself, so the fitting part would have been

11  against all the data.  But the actual selection, so the

12  slicing off the top 2100, would have been year by year.

13  **Q.**   Why did you choose 2100 to -- as the cutoff?

14  **A.**   It was an arbitrary sort of ballpark that was close to

15  the actual -- or I think the actual admitted class size.

16  **Q.**   Do you know what the actual admitted class size is for

17  any of those years in question?

18  **A.**   No, I don't.

19  **Q.**   So after you rank-ordered the 2100 for each year of the

20  model, what was the next step that you took?

21  **A.**   It would have been to look at the demographics of that

22  hypothetical admitted student class.

23  **Q.**   And so from model 1, that shows the demographics, that

24  is -- withdrawn.

25          On slide 34 you had the output for model 1 on the

Case: 19-2005    Document: 00117631840    Page: 529    Date Filed: 07/09/2020    Entry ID: 6356388
Case 1:14-cv-14176-ADB    Document 642    Filed 04/18/19    Page 58 of 245

58

1  far left of the slide, correct?

2      MS. ELLSWORTH:  God bless you, Your Honor.

3  **A.**  It would be the demographic composition of that

4  hypothetical admitted class.

5  **Q.**  Why is it a hypothetical admitted class, Mr. Hansen?

6  **A.**  These are essentially guesses at the individual level as

7  to whether someone got in or not.  The individuals that are

8  reflected in this left-most model may not have actually

9  gotten into Harvard College.

10  **Q.**  So let's go back, please, to slide 33, Mr. Lee, and look

11  at model 3.

12      How did the steps that you just described with

13  reference to model 1 compare to the steps that you took with

14  model 3?

15  **A.**  They would be the same, except they would add an

16  additional four factors:  so legacy, athlete, personal rating

17  and extracurricular rating.

18  **Q.**  And then after you used those additional four factors,

19  what were the next steps you took?

20  **A.**  So you'd get a single -- you'd fit a single model, you'd

21  generate fitted probabilities for every record in the

22  dataset, and then you'd go class by class or year by year

23  selecting the top 2100 or the top -- the 2100 applicants with

24  the highest probability of admission, and constructing an

25  essentially hypothetical admitted student pool from that.

Case: 19-2005   Document: 00117631840   Page: 530   Date Filed: 07/29/2020   Entry ID: 6356388
Case 1:14-cv-14176-ADB   Document 642   Filed 04/18/19   Page 59 of 245

59

1    **Q.**  And, again, the 2100 with the highest probability of

2    admission would be using just those six factors listed in

3    model 3?

4    **A.**  Yes.

5    **Q.**  Are there factors beyond those six factors listed in

6    model 3 that are used in the Harvard admission process?

7    **A.**  I believe so, yes.

8    **Q.**  And looking next at model 4 here on slide 33, what are

9    the steps that you took with model 4 as compared to the steps

10   you took with reference to the other models?

11   **A.**  I'm sorry.  Could you repeat the question?

12   **Q.**  Sure.  Let's step back one step.  What are the factors

13   that are included in model 4?

14   **A.**  It would be eight.  So academic index, academic rating,

15   legacy status, athlete, personal rating, extracurricular

16   rating, gender and ethnicity.

17   **Q.**  And how did the steps -- how did the steps that you just

18   described for models 1 and models 3 -- model 3 compare to the

19   steps you took to create model 4?

20   **A.**  They would be the same.  They just include those two

21   additional factors.

22   **Q.**  Mr. Lee, can we please pull up DD 7.2.

23          Mr. Hansen, do you see in front of you DD 7.2 on

24   the screen?

25   **A.**  Oh, sure.  I do, yes.

1   **Q.** And does DD 7.2 have the bar showing the racial breakdown

2   of the actual admitted student pool from slide 34 of

3   Plaintiff's Exhibit 12?

4   **A.** Yes, it does.

5   **Q.** Now, Mr. Lee, can we have DD 7.3, please.

6           All right. On the left of DD 7.3, Mr. Hansen, do

7   you see the list of inputs to model 4 from slide 33 of

8   Plaintiff's Exhibit 12?

9   **A.** I do, yes.

10  **Q.** Do you see the arrow at the bottom of DD 7.3?

11  **A.** I do, yes.

12  **Q.** What does that arrow at the bottom of the DD 7.3 show?

13  **A.** Essentially the circular nature of some of this in that

14  we're using the actual admissions outcomes and demographics

15  of an admitted student class to predict or to create a

16  hypothetical admitted student class.

17  **Q.** Mr. Lee, can we have DD 7.4, please?

18          So on DD 7.4, Mr. Hansen, do you see the bar

19  showing the results of model 4 from slide 34 of Plaintiff's

20  Exhibit 12?

21  **A.** I do, yes.

22  **Q.** Following up on some of the court's questions about the

23  difference between model 4 and the actual, why is there a

24  difference between these two bars as shown on DD 7.4?

25  **A.** So it could be a mix of my arbitrary choice of 2100

 1    admitted students when in reality there's probably some

 2    variation year to year in how many students are admitted.

 3    And there's also the possibility for noise in the model.

 4    **Q.**  Would the output of model 4 have been closer -- look more

 5    like the actual bar if you had used the exact number of

 6    admitted students from the years under analysis?

 7    **A.**  It seems likely, but I can't be sure.

 8    **Q.**  And can you just remind us again why model 4 so closely

 9    resembles the racial breakdown of the actual admitted

10    students pool?

11    **A.**  Because we're using the actual admitted students pool as

12    a predictor.

13    **Q.**  So are you using the inputs, the same inputs as you're

14    using as an output?

15    **A.**  Yes.

16            THE COURT:  That's not true of the first three

17    models, just of the fourth one, right?

18            THE WITNESS:  Yes, because race and ethnicity and

19    gender would not be a part of those first three.

20            THE COURT:  But those first three don't have that

21    same circular component, right?

22            THE WITNESS:  They would if you were to look at the

23    proportions of legacy.

24            So, for instance, for model 2, if you looked at the

25    proportions of -- if the bar graph did, you know, the percent

Case: 19-2005    Document: 00117631840    Page: 533    Date Filed: 07/30/2020    Entry ID: 6356388
Case 1:14-cv-14176-ADB  Document 642   Filed 04/18/19   Page 62 of 245

62

1    legacy, it should look close-ish to the actual proportion of

2    legacy students in the actual incoming -- or the actual

3    admitted class.

4         THE COURT:  So for each factor that you add in,

5    you're taking the percentage from the actual class?  Like,

6    what about academic rating?

7         THE WITNESS:  It's not quite a percentage because

8    this is happening at the individual level, but when you

9    aggregate it up, the percentages should be, I believe, pretty

10   close.

11   **Q.**  So just following up on the court's question, for each of

12   the models you had information about the actual students who

13   were admitted, correct?

14   **A.**  Yes.

15   **Q.**  So when you ran model 1, the factors included were

16   academic index, right?

17   **A.**  Yes.

18   **Q.**  Academic rating?

19   **A.**  Yes.

20   **Q.**  And then the actual admissions outcomes for the students

21   under -- for those years?

22   **A.**  Yes.

23   **Q.**  And that's the same for the other three models as well?

24   **A.**  So for the other three, the things listed would be the

25   inputs and the output that we'd be using would be the

Case: 19-2005    Document: 00117631840    Page: 534    Date Filed: 07/09/2020    Entry ID: 6356388
Case 1:14-cv-14176-ADB   Document 642   Filed 04/18/19   Page 63 of 245

63

1    actual -- or we'd be using as another portion of the actual

2    admissions decision.

3    **Q.**  Mr. Hansen, do you know whether the exercise in models 1

4    through 4 is the right way to attempt to model the admissions

5    process of Harvard College?

6          MR. HUGHES:  Your Honor, I'm going to object.  This

7    is -- we're getting into the territory of undisclosed expert

8    opinion right here.

9          THE COURT:  You can get that, but you need to

10   rephrase the question.

11         MS. ELLSWORTH:  Okay.

12   **Q.**  Was your goal in creating models 1 through 4 to attempt

13   to model the actual admissions process at Harvard College?

14   **A.**  No.

15   **Q.**  Did you speak with anyone in the office of admissions

16   about how one might attempt to model the actual admissions

17   process at Harvard College?

18   **A.**  No.

19   **Q.**  Do models 1 through 4 in Plaintiff's Exhibit 12 attempt

20   to model the actual admissions process at Harvard College?

21   **A.**  I'm sorry.  Could you repeat the question?

22   **Q.**  Sure.  Do models 1 through 4 in Plaintiff's Exhibit 12

23   attempt to model the actual admissions process at Harvard

24   College?

25   **A.**  No.

Case: 19-2005    Document: 00117631840    Page: 535    Date Filed: 07/29/2020    Entry ID: 6356388
Case 1:14-cv-14176-ADB   Document 642   Filed 04/18/19   Page 64 of 245

64

1    **Q.**  Does Plaintiff's Exhibit 12 evaluate whether there is

2    discrimination or bias in Harvard College admissions?

3    **A.**  They'd have no way of doing that.  That implies a causal

4    relationship between any of the inputs and an actual

5    admissions decision, which is not something, as far as I

6    know, any of these techniques can actually get at.

7         THE COURT:  Tell me again what these models do show

8    then.

9         THE WITNESS:  They'd essentially give you

10   hypothetical admitted student pools if you considered

11   different factors, if you had admissions regimes that use

12   different factors in making a decision.

13        THE COURT:  I hear you saying that it shows -- that

14   it shows hypothetical admitted students and that has some

15   meaning, but then I hear you say that because the input and

16   the output are the same that it doesn't have any meaning.

17   Can you parse that for me?

18        THE WITNESS:  Sorry, Your Honor.  I'm just thinking

19   through.

20        I think -- I'm not sure I'd argue it has no

21   meaning.  It's sort of when you're looking at -- so if you're

22   looking at race/ethnicity as predictors -- if you're looking

23   at the demographic composition of a pool using race/ethnicity

24   as predictors, that's a little less useful.  But if you're

25   looking at the demographic composition of a pool where race

 1   and ethnicity are not factors or legacy and athlete are not

 2   factors, or pick whichever one you'd like to remove, that is

 3   potentially useful.

 4            THE COURT:  Useful how?

 5            THE WITNESS:  You can get a sense of what an

 6   admitted class might look like if you're to use only a

 7   handful of factors.  I mean, subject to the fact that this is

 8   just a small number of potential inputs.

 9            MS. ELLSWORTH:  Can I proceed?

10   Q.  Mr. Hansen, you discussed with Mr. Hughes the fact that

11   you showed some of the work product to Dean Fitzsimmons that

12   we've discussed today.  Do you recall that?

13   A.  I do, yes.

14   Q.  And you recall showing the models in Plaintiff's Exhibit

15   12 to Dean Fitzsimmons; is that right?

16   A.  In some form, yes.

17   Q.  Did you tell Dean Fitzsimmons that models 1 through 4

18   showed bias or discrimination against Asian-American

19   applicants?

20   A.  No.  I wouldn't make that claim.

21   Q.  Did you tell anyone at OIR that models 1 through 4 showed

22   bias or discrimination against Asian-American applicants?

23   A.  No.

24   Q.  Did you tell anyone at all that models 1 through 4 showed

25   bias or discrimination against Asian-American applicants?

1    **A.**   No.

2    **Q.**   Why not?

3    **A.**   It's not a conclusion that this type of analysis could

4    support.

5    **Q.**   In 2013 when you were working on models 1 through 4, did

6    you ever conclude that any of your work at OIR showed

7    discrimination against Asian-American applicants?

8    **A.**   No.

9    **Q.**   Do you recall, Mr. Hansen, looking at Plaintiff's Exhibit

10   16 that you've got in front of you that Mr. Hughes showed

11   you?  It's the loose piece of paper on the desk there.

12   **A.**   Oh, yes.

13   **Q.**   And in that, in Plaintiff's Exhibit 16, you asked that

14   the word "bias" be changed.  Do you see that?

15   **A.**   I do.

16   **Q.**   Why did you suggest changing the word "bias" in the

17   presentation?

18   **A.**   Bias implies a causal relationship between really any of

19   the inputs and an admissions decision, and that's not

20   something that, as far as I know, these techniques can

21   establish.

22   **Q.**   And it's not something that you think the models 1

23   through 4 established, correct?

24   **A.**   That's correct.

25   **Q.**   Can you look back at Plaintiff's Exhibit 12, please.

Case: 19-2005     Document: 00117631840     Page: 538     Date Filed: 07/29/2020     Entry ID: 6356388
Case 1:14-cv-14176-ADB   Document 642   Filed 04/18/19   Page 67 of 245

67

 1    That should be Tab 4, I think.

 2    **A.**   Okay.

 3    **Q.**   And looking again at slide 34, does the bar showing the

 4    output of model 1 suggest what the demographics of the class

 5    would look like if only those factors were included in

 6    Harvard College admissions?

 7    **A.**   I'm sorry.  Could you repeat the question?

 8    **Q.**   Certainly.  The output of model 1, the left bar on the

 9    screen, does that suggest what the demographics of the

10    Harvard College class would look like if those were the only

11    two factors considered in admission?

12    **A.**   Yes.

13    **Q.**   And looking at models 2 and 3, do models 2 and 3 suggest

14    that as you add more factors to the process, the demographics

15    change?

16    **A.**   Yes.

17              MS. ELLSWORTH:  No further questions.

18              Thank you, Mr. Hansen.

19              Oh, before -- Your Honor, I'd move to admit P16

20    since we've talked about it.

21              MR. HUGHES:  No objection.

22              THE COURT:  It's admitted.

23              (Exhibit P16 admitted into evidence.)

24              MR. HUGHES:  Your Honor, I do have some follow up,

25    but I need to get set up.

```
 1                THE COURT:  You want to break or do you want to --
 2      either one is fine.  You can set it up or --
 3                MR. HUGHES:  A break will be great.
 4                THE COURT:  You want to break until 11:00?  That's
 5      fine.  You want to break until 11:00?
 6                MS. ELLSWORTH:  That's fine.
 7                THE COURT:  Okay.
 8                (Recess taken 10:50 a.m. - 11:01 a.m.)
 9      RE-EXAMINATION BY MR. HUGHES:
10                MR. HUGHES:  Your Honor, may I proceed?
11                THE COURT:  Yes.
12      Q.  All right.  Mr. Hansen, briefly, can you turn to, in my
13      binder there, Plaintiff's Exhibit 9?  Got that in front of
14      you?
15      A.  I do, yes.
16      Q.  Dean Fitzsimmons testified, sir, that he recognized this
17      document.  You don't have any reason to doubt that he saw it,
18      do you?
19                MS. ELLSWORTH:  Your Honor, I'd object on
20      foundation grounds and mischaracterization of prior
21      testimony.  We were all here.
22                MR. HUGHES:  I'll withdraw it.
23                THE COURT:  That's sustained.
24      Q.  Let's move on to Plaintiff's 46.  Now, Ms. Ellsworth
25      showed this to you briefly.
```

 1    **A.**  I'm sorry.  Which binder is this?

 2    **Q.**  I'm sorry.  This would be in your binder that Harvard's

 3    lawyers gave you behind Tab No. 2.

 4    **A.**  Okay.  Thank you.

 5    **Q.**  Got that in front of you, Mr. Hansen?

 6    **A.**  I do, yes.

 7    **Q.**  Okay.  And so in this you told Ms. Ellsworth that this is

 8    an email or a note that you wrote to Erica Bever, right?

 9    **A.**  I did so, yes.

10    **Q.**  She was your boss, right?

11    **A.**  Yes.

12    **Q.**  And you're accurate when your write -- in your

13    communications with your boss, correct?

14    **A.**  I believe so.

15    **Q.**  Okay.  And the first sentence of your note to Ms. Bever

16    is, "Here is the follow up to Fitz' question regarding a

17    low-income Asian interaction."  Do you see that?

18    **A.**  I do.

19    **Q.**  And Dean Fitzsimmons has been here.  He's commonly

20    referred to as Fitz, correct?

21    **A.**  Yes.

22    **Q.**  Okay.  And so what this is is you're writing your boss

23    following up on a question that Dean Fitzsimmons had about

24    interacting -- being Asian with being low income, correct?

25    **A.**  Yes.

1    **Q.**  And "interaction" is a term that's used in logistical

2    regression models.  You can interact different variables,

3    right?

4    **A.**  It would be the joint affect of essentially both at the

5    same time.

6    **Q.**  That's something you can do in logistic regression

7    models; you can interact variables, right?

8    **A.**  Yes.

9    **Q.**  We're not going to get into the nitty-gritty of that, but

10   apparently Dean Fitzsimmons has asked you to interact some

11   variables in a logistic regression model, correct?

12   **A.**  I don't know that their request would have been that

13   specific.

14   **Q.**  Okay.  So now let's look at page 2 of this.  And you see

15   you're talking in this note to your boss about "coefficients

16   for a logistic regression model."  Do you see that?

17   **A.**  In the text?

18   **Q.**  I'm on page 2.

19   **A.**  I see a table, yes.

20   **Q.**  You see a table that's entitled "Coefficients for

21   Logistic Regression Model," correct?

22   **A.**  Yes.

23   **Q.**  And the way that -- I'll represent to you that this is a

24   different model than P12, but the way these logistic

25   regression models work is that you identify variables that

1   you want to use in your model.  That's one thing you do,

2   right?

3   **A.**  As inputs, yes.

4   **Q.**  And then you calculate the relative importance of those

5   variables, correct?

6   **A.**  I'm not sure how to describe it.  You get -- coefficients

7   back out, different sizes.

8   **Q.**  But the coefficients reflect the relative importance of

9   the input variables to the model, correct?

10  **A.**  I'm not really sure.

11  **Q.**  Let's look at your chart here and see if we can clear it

12  up.

13           Here you've got athlete coefficient of 6.32 and so

14  forth, correct?

15  **A.**  That's the number there, yes.

16  **Q.**  Okay.  And then for personal 1 or 2, you've got a

17  coefficient of 2.4 and change, correct?

18  **A.**  That's correct.

19  **Q.**  So that means that a coefficient for athlete is

20  relatively higher than the coefficient for personal 1 or 2,

21  correct?

22  **A.**  Yes, it's larger.

23  **Q.**  And if these variables are going into a model that's

24  trying to predict whether or not you're admitted to Harvard,

25  being an athlete would be more positively associated with

1  admission than personal 1 or 2 in our example, correct?

2  **A.**  That sounds -- could you repeat that?  I'm sorry.

3  **Q.**  If this is a model that's trying to predict admission to

4  Harvard, being an athlete would be more positively associated

5  with admission to Harvard than a personal 1 or 2, right?

6  **A.**  I think so, but I'm not entirely sure.

7  **Q.**  Okay.  And then if we move down here, you've got

8  coefficients related to some racial or ethnic categories,

9  correct?

10  **A.**  I do, yes.

11  **Q.**  And I've got those highlighted on the screen, right?

12  **A.**  Thank you.

13  **Q.**  Do you see those?  Do you see what I've got highlighted?

14  **A.**  Yes.

15  **Q.**  And, again, what you're doing here is you're calculating,

16  you're determining a coefficient that's associated with these

17  four variables that I've got highlighted on the screen,

18  correct?

19  **A.**  You get coefficients for those four and then the other

20  ones in the model, yes.

21  **Q.**  You get coefficients to determine the relative importance

22  of the variables in your model, correct?

23  **A.**  I don't know if importance is the way I describe it.

24  Just the relative sizes.

25  **Q.**  The relative sizes of the variables in your model.  Would

1    you agree with that?

2    **A.**  Sure.

3    **Q.**  Okay.  And here we've got the relative size of the

4    variable for the coefficient for African-American is 2.3,

5    which is higher than the coefficient for Native American,

6    which is 1.7, which is higher than the variable for Hispanic,

7    which is 1.2, and Asian is negative 4.2.  Do you see that?

8    **A.**  Yes.

9    **Q.**  And just so you're -- I'll also point out to you that

10   because Dean Fitzsimmons was asking for the interaction of

11   the low income and Asian variable --

12           MS. ELLSWORTH:  Your Honor, I'm just going to

13   object on the characterization.  The witness was clear.

14           MR. HUGHES:  I'll start a new question.

15   **Q.**  There's another variable in here which has low income and

16   Asian, correct?

17   **A.**  Yes.

18   **Q.**  And you calculated the coefficient for that, right?

19   **A.**  Yes.

20   **Q.**  Okay.  Now, let's go to P12.  And you talked with

21   Ms. Ellsworth about the goals --

22   **A.**  Sorry.

23   **Q.**  -- and what I want to do here, I just want to reorient us

24   to the top of page 32.  Are you there?

25   **A.**  Sorry.  Yes.

1  **Q.**  And the goal of your analysis was "Using various

2  admissions ratings, how well can we approximate admit rates

3  by race ethnicity and the demographic composition of the

4  admitted students pool."  That was the goal of your analysis,

5  right?

6  **A.**  Of these in the following slides, yes.

7  **Q.**  And then here what we have on this page -- actually, go

8  back to strategy.

9       What you tell us on the second bullet is "These

10  models generate fitted probabilities of admissions given an

11  applicant's characteristics how likely are they to be

12  admitted," correct?

13  **A.**  Yes, the two bullets would sort of cover that.

14  **Q.**  And just like the coefficients for the variables that we

15  looked at in P46, what you did here is you generated a

16  coefficient for each of the variables that you used in the

17  models in P12, correct?

18  **A.**  Yes, there would be coefficients.

19  **Q.**  And the coefficients tell you the size or the importance

20  of the variable, right?

21  **A.**  Size, yes.

22  **Q.**  Okay.

23  **A.**  Or the effect size.

24  **Q.**  The effect size, right?

25  **A.**  Yes, I believe so.

1    **Q.** And then if we go to the topic that's been of much

2    discussion, you generate a coefficient for all of the

3    variables listed here on page 33, correct?

4    **A.** I'm not quite sure what you're asking.

5    **Q.** These are the variables in the model that's in P12,

6    correct?  In the models.

7    **A.** Can you -- sorry, can you -- I'm sorry.

8    **Q.** Let me try to ask it in bit-sized pieces.  I'm probably

9    asking another poor question.

10          If we look at model 1, we've got academic index and

11    academic rating, correct?

12    **A.** Yes.

13    **Q.** And you would have calculated coefficients for those

14    variables to show the effect size of those variables,

15    correct?

16    **A.** I would have calculated the coefficients, yeah.

17    **Q.** For both those variables, right?

18    **A.** Yes.

19    **Q.** And the same holds true for the additional variables that

20    you add for model 2, correct, legacy and athlete?  You would

21    have calculated the coefficients for those variables,

22    correct?

23    **A.** Yes, but that would be separate from model 1.  So the

24    coefficients for academic index and academic rating would

25    likely change with the addition of those other two.

1    **Q.**  Right, because you're recalculating the relative

2    importance of the coefficients, right?

3    **A.**  Just recalculating the coefficients.

4    **Q.**  And then for model 3, again, you recalculate -- you

5    calculate the coefficients for all the variables that we see

6    in model 3, correct?

7    **A.**  Yes.

8    **Q.**  And the same thing goes true for model 4; you calculate a

9    coefficient for every variable, correct?

10   **A.**  Yes.

11   **Q.**  And that includes the demographic variables in model 4.

12   To get to the actual results in model 4, you calculate a

13   coefficient of how important race is for an applicant's

14   chance of admission, correct?

15   **A.**  I'm not sure I, again, calculated a coefficient.

16   **Q.**  Well, you calculated a coefficient for every variable in

17   the model, right?

18   **A.**  Yes.

19   **Q.**  And the variables in the model are trying to predict

20   admission, right?

21   **A.**  Yes.

22   **Q.**  And so you calculated a coefficient of how important race

23   is for an applicant's chance for admission, correct?

24   **A.**  I don't know if the importance portion is correct or not.

25   **Q.**  Let me take that out.  You calculated a coefficient

1    related to an applicant's race, correct?

2    **A.**  Yes.

3    **Q.**  You didn't just take the percentage of the admitted class

4    and put the percentage of the admitted class in your model;

5    you calculated a coefficient, right?

6    **A.**  Yes.

7    **Q.**  Okay.  Now -- and what we see here on model 4 is that as

8    you keep calculating your coefficients and calibrating your

9    model and adding in variables, by the time you get to model 4

10   and you calculate your coefficients in model 4, you get

11   pretty close to the actual admitted class, correct?

12   **A.**  Subject to what we talked about in terms of the circular

13   element.

14   **Q.**  And on page 36, when you're telling -- OIR is reporting

15   to Dean Fitzsimmons what have we learned, you tell him, "Once

16   we account for ratings and demographic factors, we can

17   closely predict what the admitted class will look like,"

18   correct?

19   **A.**  On the attributes included in those models.

20   **Q.**  Right.  And you didn't say it was circular or unreliable

21   or inaccurate, right?

22   **A.**  I would have covered that in that first preface slide

23   with the preliminary, bold and underlined.

24   **Q.**  And, again, the question that OIR posed to Dean

25   Fitzsimmons after showing him this analysis was, "Is there

 1    bias against Asians in college admissions," correct?

 2    **A.**   That's what it says there.

 3    **Q.**   Okay.  And the next step that OIR raised relating to this

 4    is to further address the question of bias.  "Is there more

 5    data to elaborate our understanding of the role of the

 6    personal essay and other factors?"

 7            That was a question OIR posed, correct?

 8    **A.**   That's what it says on the slide.

 9            MR. HUGHES:  No further questions.

10            MS. ELLSWORTH:  Nothing further.  Thank you.

11            THE COURT:  You're excused.

12            THE WITNESS:  Thank you, Your Honor.

13            MR. CONNOLLY:  Your Honor, SFFA calls Roger Banks.

14            (ROGER BANKS duly sworn by the Deputy Clerk.)

15            THE CLERK:  Thank you.  You may be seated.

16            And can you please state your name and spell your

17    last name for the record.

18            THE WITNESS:  Roger Banks, B-a-n-k-s.

19    EXAMINATION BY MR. CONNOLLY:

20    **Q.**   Good morning.

21    **A.**   Good morning.

22    **Q.**   My name is Michael Connolly.  Thank you for being here.

23    You work at the Harvard admissions office, correct?

24    **A.**   That is correct.

25    **Q.**   And you are currently the senior associate director of

 1  admissions; is that correct?

 2  **A.**  That is correct.

 3  **Q.**  And you've been employed in the Harvard admissions office

 4  since 1983; is that right?

 5  **A.**  That is correct, too.

 6  **Q.**  And you've been a senior admissions officer since 1989,

 7  right?

 8  **A.**  That is right.

 9  **Q.**  So you were around in 1990 when the Office For Civil

10  Rights investigated Harvard's treatment of Asian-Americans;

11  is that correct?

12  **A.**  That is correct.

13  **Q.**  Have you ever read OCR's statement of findings?

14  **A.**  I have.

15  **Q.**  Do you remember that OCR made a finding that readers used

16  race differently in the admissions process?

17  **A.**  I don't recall that specifically, no.

18          MR. CONNOLLY:  Your Honor, may I approach the

19  witness?

20          THE COURT:  Yes.

21  **Q.**  Can you please turn to page 15.  I've handed you OCR's

22  statement of findings.  It is labeled P555.

23          THE COURT:  Do I have this one, or do you want me

24  to work off the screen?  I'm happy to work off the screen.

25          MR. CONNOLLY:  I have a copy.

```
 1              THE COURT:  Okay.
 2    BY MR. CONNOLLY:
 3    Q.  Are you there?
 4    A.  I'm here.
 5    Q.  Do you see the bottom paragraph of -- or do you see the
 6    last paragraph of page 15?  It starts "We found."  Do you see
 7    that paragraph?
 8    A.  I do.
 9    Q.  Okay.  I'm going to read the paragraph to you.  It says,
10    "We found that the readers had several different views as to
11    where and whether Asian-American ethnicity was given positive
12    weight or a tip in the admissions process.  Some readers
13    explain that when ethnicity was deemed to be a significant
14    factor in an application, it was reflected in the POR and
15    during discussions at subcommittee and committee meetings.
16    Other readers indicated that ethnicity was a factor
17    considered throughout the entire admissions process.
18              They stated that it could be reflected in the four
19    reader rating areas as well as in the POR and during the
20    subcommittee and committee meeting discussions.  Still other
21    readers stated that ethnicity was not a factor at all, unless
22    the effect of that ethnicity on the applicant was evident
23    from the applicant's file.  They indicated that ethnicity was
24    only considered a plus when the applicant wrote about or
25    indicated the significance of his or her heritage, or when
```

Case: 19-2005    Document: 00117631840    Page: 552    Date Filed: 07/09/2020    Entry ID: 6356388
Case 1:14-cv-14176-ADB   Document 642   Filed 04/18/19   Page 81 of 245

81

1    there was some other indicia in the file of the applicant's

2    involvement with ethnic community organizations or groups?"

3             And my question is, since OCR laid out several

4    different views as to how Harvard used race in 1990, my

5    question is which type of reader sort of reflects how you

6    used race in 1990?

7    **A.**  I always took the application as a whole.  My use of

8    ethnicity probably was reflected in the overall rating,

9    frankly, more than any other aspect of the case.

10   **Q.**  So would it be this first reader that OCR talks about

11   where it says, "Some readers explain that when ethnicity was

12   deemed to be a significant factor in an application, it was

13   reflected in the POR and during discussions at subcommittee

14   and commit meetings"?

15   **A.**  Yes.

16   **Q.**  And you have not changed how you used race in the

17   admissions process since then?

18   **A.**  I have not.

19   **Q.**  I'd like to discuss full committee meetings.

20            You serve on the A, R and T dockets; is that

21   correct?

22   **A.**  Well, in all honesty there is no more R docket.  It's

23   been subsumed by other dockets, but I did serve on those

24   dockets.

25   **Q.**  Is there reason --

1    **A.**   Just administrative economy.

2    **Q.**   And during subcommittee meetings -- so you are on the A

3    and the T docket right now?

4    **A.**   Currently, yes.

5    **Q.**   Is that still California and Texas?

6    **A.**   No.  Actually, it's California and New York.

7    **Q.**   California and New York?

8    **A.**   New York City, yes.

9    **Q.**   And during subcommittee meetings, you make tentative

10   decisions on the applications that are in your dockets; is

11   that right?

12   **A.**   Yes.

13   **Q.**   And other admissions officers are doing the same thing in

14   their dockets, I assume?

15   **A.**   Yes.

16   **Q.**   So by the time full committee meetings start, all the

17   applicants will have a tentative designation, correct?

18   **A.**   Yes.

19   **Q.**   And the full committee meeting is the meeting where you

20   have 40 admissions officers and Dean Fitzsimmons is running

21   the meeting, correct?

22   **A.**   He chairs that meeting, yes.

23   **Q.**   And the purpose of the full committee meetings is to make

24   final decisions on these applicants, correct?

25   **A.**   As final as we can get them before mailing deadlines,

```
 1    yes.
 2    Q.  And during the full committee meeting, Dean Fitzsimmons
 3    typically will give the full committee a sense of how far you
 4    had over-admitted the class and, therefore, how many students
 5    need to be taken out of the class; is that correct?
 6    A.  That is correct.
 7    Q.  And at the full committee meetings, what do you recall
 8    Dean Fitzsimmons saying about race?
 9    A.  Well, typically what he would do is give us a sense of
10    where we were along a variety of planes, academic,
11    extracurricular, geographic, in addition to race, ethnicity,
12    gender breakdowns, sort of a scattergram of the class as it
13    was admitted at that point in time.
14    Q.  Sure.  And to be clear, typically he would give you a
15    breakdown of admitted students by race and ethnicity?
16    A.  In addition to other indicia, yes.
17    Q.  I'd like to ask you about your role in an organization
18    called the Association of Black Admissions and Financial Aid
19    Officers of the Ivy League and Sister Schools.
20              Do you recognize that organization?
21    A.  I do.
22    Q.  Is it also called ABAFAOILSS?
23    A.  It is.
24    Q.  That's very long, right?
25    A.  Longest acronym I know of.
```

**JA2000**

1   **Q.**  And for ABAFAOILSS, all of the Ivy League schools are

2   members, correct?

3   **A.**  Yes, that is correct.  In addition to others, yes.

4   **Q.**  Right.  And the sister schools are members, right?

5   **A.**  The sister schools and Stanford actually.

6   **Q.**  And is MIT a member?

7   **A.**  Also in addition to MIT, correct.

8   **Q.**  So I have 16 schools.  Does that sound about right?

9   **A.**  It's about right.

10  **Q.**  And ABAFAOILSS holds two conferences a year, right?

11  **A.**  Yes.

12  **Q.**  One is in January and one is in May?

13  **A.**  Typically, yes.

14  **Q.**  And you regularly attend these conferences, correct?

15  **A.**  I do.

16  **Q.**  And at each conference there is a meeting called a round

17  robin meeting, correct?

18  **A.**  That is correct.

19  **Q.**  And typically one representative from each school attends

20  the round robin meeting, right?

21  **A.**  Typically, yes.

22  **Q.**  And at the round robin meeting, a representative from

23  each school will go around the table providing numbers of

24  applicants, acceptances and enrollments by race, correct?

25  **A.**  That is correct.

1    **Q.**  And as the numbers are read aloud, everyone at the round

2    robin meeting will write the numbers down on a chart,

3    correct?

4    **A.**  That also is correct.

5    **Q.**  And the one exception is that if a college does not

6    report its numbers, their representative will be asked to

7    leave the room as the institutional numbers are reported; is

8    that correct?

9    **A.**  That is policy, yes.

10   **Q.**  Okay.  And part of the reason that you all exchange data

11   in this fashion is because the schools are trying to preserve

12   confidentiality given the sensitivity of this data; is that

13   right?

14   **A.**  That's one of the reasons we do, yes.

15           The other reason, quite frankly, goes back to the

16   essential goal of the organization, which is to learn about

17   other schools better, best practices, et cetera.

18   **Q.**  Now, in the past, after round robin meetings, you have

19   met with Dean Fitzsimmons to discuss what happened at these,

20   correct?

21   **A.**  Yes, I would meet occasionally.  I've been a member of

22   the organization for 40 years, and all of those years at

23   Harvard -- some of those years I was actually an associate

24   member, but when I was a full member, I would show those data

25   to the Dean very briefly, yes.

1    **Q.**  And that was my next question.

2            So the chart that you were filling out at the round

3    robin meetings --

4    **A.**  Yes.

5    **Q.**  -- which contains -- it contains the confidential data of

6    the schools who are members of ABAFAOLSS, correct?

7    **A.**  That is correct, yes.

8    **Q.**  And you have in the past taken that chart that you filled

9    out and brought it back to Dean Fitzsimmons, correct?

10   **A.**  Yes, that is correct.

11   **Q.**  And you have seen him look at this chart in the past,

12   correct?

13   **A.**  I have, yes.

14   **Q.**  And although you take this chart back to Dean

15   Fitzsimmons, you don't know what, in particular, the Dean was

16   interested in about these numbers; is that correct?

17   **A.**  That is safe to say.

18   **Q.**  Now, when ABAFAOLSS meetings are occurring, the deadline

19   for submitting applications to Harvard is over, correct?

20   **A.**  Yes.

21   **Q.**  So, for example, at the January ABAFAOLSS meetings, there

22   is nothing Harvard can do at that point to increase the

23   number of applications it receives from minorities for that

24   cycle, correct?

25   **A.**  For anyone for that cycle, right, exactly.

1   **Q.**  But Harvard can, at this point, still make admissions

2   decisions on the applications of those who applied during

3   early action but have been deferred to regular action,

4   correct?

5   **A.**  Of course.  That would be true.

6   **Q.**  And Harvard can also still make admissions decisions on

7   the applications it has received for the regular action

8   cycle, correct?

9   **A.**  Yes, that would be correct.

10              MR. CONNOLLY:  Pass the witness.

11              MS. ELLSWORTH:  Your Honor, may I proceed?

12              THE COURT:  Yes.

13   EXAMINATION BY MS. ELLSWORTH:

14   **Q.**  Good morning, Mr. Banks.

15   **A.**  Good morning.

16   **Q.**  Before I talk about your role on the admissions office, I

17   just want to follow up on a few of those final questions from

18   Mr. Connolly.

19              Does ABAFAOLSS have any role in the admission of

20   any applicant to Harvard College?

21   **A.**  No, none whatsoever.

22   **Q.**  Have you ever used the numbers obtained during an

23   ABAFAOLSS meeting to set any targets for Harvard admissions

24   process?

25   **A.**  No, never.

1    **Q.**  Do you use the numbers obtained at ABAFAOLSS meetings for

2    any purpose at all?

3    **A.**  No.

4    **Q.**  Is ABAFAOLSS -- well, withdrawn.

5         What is the purpose or the mission of ABAFAOLSS?

6    **A.**  Well, the central purpose of the organization is to -- is

7    professional development, to become more expert in this area,

8    which is a very complicated part of administration in higher

9    ed.  I think that case law proves that.

10        From a little bit of context, if possible, the

11   organization was formed in 1970, which really would have

12   represented, for a lot of colleges and universities, kind of

13   the dawning of the age of modern recruitment of anyone,

14   minorities and otherwise.  There was no blueprint.  There was

15   no owner's manual about how to do this.

16        So the original founders of the organization

17   determined that it might be useful to pool, as it were, their

18   growing -- ever-growing knowledge and experience with this

19   kind of activity.

20        I would also wish to add, if I may, that there was

21   a lot of public interest in this area.  The schools have

22   mandated that this work be done, and it was -- I think

23   forming such an organization, I think, was a very prudent

24   thing to do.

25   **Q.**  What racial and ethnic backgrounds are the focus of

Case: 19-2005   Document: 00117631840   Page: 560   Date Filed: 07/29/2020   Entry ID: 6356388
Case 1:14-cv-14176-ADB   Document 642   Filed 04/18/19   Page 89 of 245

89

 1   ABAFAOLSS today?

 2   **A.**   We are committed to recruiting Asian-American students,

 3   African-American students, Latino students and Native

 4   American students.

 5   **Q.**   And you described ABAFAOLSS as something like a

 6   professional development association, right?

 7   **A.**   Yes.

 8   **Q.**   Mr. Connolly asked you some questions about one part of

 9   ABAFAOLSS meetings, so I wanted to talk about a few other

10   things that happen at those meetings.

11          What are the general topics covered at an ABAFAOLSS

12   meeting?

13   **A.**   Oh, we talk about recruitment strategies, what seems to

14   be effective, what seems to be working, what seems to be

15   working less effectively.  We talk about yield, matriculation

16   strategies, what seems to be working, what seems not to be

17   working so well, and everything in between.

18          We talk about financial aid policies, which is a

19   major, obvious, component for not only recruitment but

20   matriculation and varies a lot among and between colleges and

21   universities.

22          There was often discussion of campus climate with

23   respect to minority students.

24          Again, a good deal of variation among and between

25   schools, depending on the time of year and the place where

1   the school is located and what was happening on campus

2   politically and otherwise.

3           So it was a wide range of issues, retention.  You

4   know, things that were really salient to minority student

5   life on these campuses where minority students had not spent

6   much time before 1968 and 1969.

7   **Q.**  Have you ever learned new or different recruitment

8   practices through your attendance at an ABAFAOLSS meeting?

9   **A.**  Yes.  You know, one of the problems with doing admissions

10  is that it's a very isolating profession, actually.  And one

11  of the advantages of having conferences like this was the

12  opportunity to learn what other schools were doing and how

13  they were doing it; again, in a critical area of

14  administrative activity.

15          So I learned much over the course of my time with

16  the organization.

17          Would you like examples?

18  **Q.**  I'd love an example.

19  **A.**  Well, for example, there are lots of ways of going at

20  this, depending on finances and -- institutional finances and

21  resources and human resources and the will to do it and the

22  political climate in which these things are being done, or

23  wish to be done.

24          And there are schools, for example, that have

25  preview weekends in the fall before candidates even apply.

**JA2007**

 1    There are fly-in programs for students before they even

 2    apply.  There are fly-in programs for students after they're

 3    admitted.  There are -- there's one school, one of our peer

 4    institutions that used to have -- I'm not sure whether or not

 5    it's still conducting things this way -- a four-pronged

 6    preview weekend in the fall for different minority groups.

 7    These things were done for different academic reasons in

 8    addition to racial and ethnic background.

 9          There's a lot of -- really, a surprising amount of

10    variation.  And if you were sitting in my office in

11    Cambridge, I would never have known things like that, and I

12    think it's valuable and important to know.

13    **Q.**  How have you taken into account some of the strategies

14    that you've learned at ABAFAOILSS meetings in your work at

15    Harvard College admissions?

16    **A.**  Well, during my time as, you know, UMRP director, I think

17    it was probably midway into my 20 years with the program,

18    there was a fair amount of discussion about Native American

19    recruitment; Dartmouth's fly-in program, for example, which

20    has been extraordinarily successful, and that, of course, you

21    know, would prompt a me-too discussion, how about us, maybe

22    we could do something like that, too.

23          And I took the idea back to our office and our

24    dean, and he suggested talking to our students, Native

25    American students, and to try to, you know, sort of get the

**JA2008**

Case: 19-2005   Document: 00117621840   Page: 563   Date Filed: 07/29/2020   Entry ID: 6356388
Case 1:14-cv-14176-ADB   Document 642   Filed 04/18/19   Page 92 of 245

92

1    sense of their interest in something like this.

2            Some of those students, in fact, had attended

3    Dartmouth's fly-in program.  They chose Harvard anyway.  They

4    don't get a 100 percent bounce on the program, but it's a

5    very big bounce on the program.

6            And the consensus, actually, coming back from the

7    students was that they really actually preferred not to have

8    a fly-in program.  And we revisit that issue from time to

9    time.

10           But, again, from the standpoint of trying to

11   develop professional expertise on a complicated subject, such

12   as minority enrollment and admissions, et cetera, one could

13   do worse than by listening to what other schools are doing

14   and how they're doing it.

15   Q.   Mr. Banks, just two more questions about ABAFAOILSS.

16   Mr. Connolly asked you some questions about discussions with

17   Dean Fitzsimmons that you may have had after ABAFAOILSS

18   meetings.  Do you recall that?

19   A.   Yes.

20   Q.   How often did you share information about other schools'

21   admission numbers with Dean Fitzsimmons?

22   A.   If I were to hazard a guess, over the 20 years that I ran

23   the program with the UMRP, of which I've been a member of

24   ABAFAOILSS, three times maybe, four -- I'm not even sure four

25   times.  I would say three that I can directly, clearly

1  recall.

2  **Q.**  Over a 20-year period?

3  **A.**  Yes.

4  **Q.**  All right.  So let's move on to the topic of this case,

5  which is Harvard College admissions.  You've been working --

6          THE COURT:  Can I ask one question?

7          MS. ELLSWORTH:  Yes.

8          THE COURT:  During the course of this case, I've

9  seen Asians referred to as Asians, which seems like a big

10  group of different things.  Right?  And then I see things

11  like Native Americans and Hawaiian Islanders, which seem like

12  tiny groups of things.

13          So how is it sorted out?  Maybe in your experience

14  with ABAFAOILSS, like, how is that kind of -- how are those

15  categories determined as things to be looking at?

16          THE WITNESS:  Well, Your Honor, these are typically

17  self-descriptors, and the discussion has evolved greatly over

18  the past -- over my time in the office.

19          When I arrived in the office in 1980, I would guess

20  that the Asian-American population, for example, was far less

21  diverse than it is today.  There are 19 different student

22  groups on campus that represent different demographics within

23  the Asian-American population alone, and all of these groups

24  are a segment.  I think there are at least a dozen cultural

25  groups on campus today that represent Hispanic students.

Case: 19-2005   Document: 00117631840   Page: 565   Date Filed: 07/29/2020   Entry ID: 6356388
Case 1:14-cv-14176-ADB   Document 642   Filed 04/18/19   Page 94 of 245

94

1          So that's an area where we all, within the

2    organization, just sort of watched -- it's still an ongoing

3    discussion.  And, you know, from the standpoint of, you know,

4    recruitment, you know, generally speaking, you know, we don't

5    have the kinds of resources to recruit people based on

6    particular subgroups per se.

7          We tried, for example, because we recognize that

8    Cambodian students, for example, very small segment of the

9    Asian-American population, underrepresented at our school at

10   least, and we have tried to target that group, for example,

11   in terms of outreach and recruitment.

12          But, you know, the whole matter is kind of -- is

13   somewhat elusive.  And ultimately it comes back to the

14   individual and her or his experience, you know, sort of no

15   matter what their ethnic background and how individualized it

16   is.

17          I don't know whether or not that is responsive to

18   your question.  You don't have to answer that.

19          THE COURT:  Go ahead.

20   BY MS. ELLSWORTH:

21   **Q.**  Well, let me turn to the subject of recruitment,

22   Mr. Banks, and I'll ask Mr. Lee to pull up DD 4.2.

23          So you've held a variety of recruitment-related

24   positions in your time at Harvard College, right?

25   **A.**  I have, yes.

Case 1:14-cv-14176-ADB   Document 642   Filed 04/18/19   Page 96 of 245

95

1    **Q.**  So to avoid unnecessary memory tests --

2    **A.**  Yes.

3    **Q.**  -- we've put this together.

4          Are these five of the recruitment-related positions

5    that you've held at Harvard College admissions?

6    **A.**  Yes.

7    **Q.**  And, again, you joined the office in 1980, right?

8    **A.**  Yes.

9    **Q.**  And you became a full-time officer a few years later,

10   right?

11   **A.**  Correct.

12   **Q.**  So let's talk first about what is actually listed second

13   on this slide, which is the "Undergraduate Minority

14   Recruitment Program."

15         And first, can you please just explain what is the

16   Undergraduate Minority Recruitment Program, or we can also

17   call it the UMRP.

18   **A.**  The Undergraduate Minority Recruitment Program, the UMRP

19   was -- is an organization that was assembled in 1971, and its

20   purpose was to help the admissions office conduct recruitment

21   activities targeted at minority students around the country.

22   **Q.**  And how long did you serve as the director or codirector

23   of the UMRP?

24   **A.**  For roughly -- more than 20 years.

25   **Q.**  When you were the director, how and what are the steps

1    that the UMRP took or the efforts in which the UMRP engaged

2    to go about recruiting students to apply to Harvard?

3    **A.**  Well, there were several approaches that we tended to

4    use.  Keep in mind that these were -- my job was to assemble,

5    train and supervise a cohort of ten undergraduates whose

6    primary responsibility was to get good grades and send them

7    home to their parents and not necessarily to spend 15-plus

8    hours working a job like this, which had a lot of complexity

9    to it.

10            So we conducted direct mail campaigns,

11    letter-writing campaigns, telephone campaigns.  We sent as

12    many as 30 students back to their hometowns to recruit in

13    high schools, at least a dozen high schools, in addition to

14    at least two middle schools for a week, essentially

15    replicating the activity of a full-time admissions officer.

16            We held a lot of special information sessions.  We

17    did a lot of greeting families and individuals who came to

18    the campus and wanted to talk to a student who was living the

19    life of a minority student at Harvard.

20            That was a lot of our activity in the fall.  And

21    then we would get to the spring, and much of the focus at

22    that point was yield matriculation.  And a very strong

23    component of matriculation was hosting people for, what for

24    many years was a stand-alone minority recruitment weekend,

25    which was run pretty much by the students themselves.  And it

1   was festooned with various academic programming and

2   extracurricular programming and social programming, et

3   cetera, et cetera.

4           It became the kind of model for what eventually

5   turned out to be our nos broad-scale recruitment effort,

6   so-called Visitas program.

7           But a lot of the activity was focused on yield in

8   the spring, and then we rolled right into the summer working

9   on the next year's class; again, with direct mail and

10  telephoning and, you know, doing our best to reach people by

11  whatever means we could.

12  **Q.**   So the UMRP employs current Harvard students, right?

13  **A.**   That's right, yes.

14  **Q.**   Why does the UMRP use current Harvard students to conduct

15  its outreach activities?

16  **A.**   Well, based on my experience, I thought everyone in the

17  office really felt that current undergraduates were the best

18  ambassadors for their -- for the Harvard experience.

19  **Q.**   If you can look, Mr. Banks, please, at Tab 1 in your

20  binder, which is DX47.  It should be the one in your right

21  hand.

22  **A.**   Okay.

23  **Q.**   Or maybe the one in your left hand.  Do you have DX47?

24  **A.**   I do, thank you.

25  **Q.**   Good.  What is DX47, please, Mr. Banks?

 1    **A.**  DX47 is a training manual.  This is an owner's manual,

 2    actually, for the coordinators who worked with me in the

 3    Undergraduate Minority Recruitment Program.

 4    **Q.**  And did you use this manual to train those student

 5    coordinators?

 6    **A.**  Yes.

 7            MS. ELLSWORTH:  Your Honor, I'd move to admit DX47.

 8            MR. CONNOLLY:  No objection.

 9            THE COURT:  It's admitted.

10            (Exhibit DX47 admitted into evidence.)

11    BY MS. ELLSWORTH:

12    **Q.**  If you can focus just on the title of the exhibit,

13    please, Mr. Banks.

14    **A.**  Yes.

15    **Q.**  And in particular, underneath the coordinator manual it

16    says "Five Divisions, One Goal," right?

17    **A.**  Yes.

18    **Q.**  What does that mean?

19    **A.**  Well, there are essentially five different, again,

20    targets; that is to say, groups of students that we were

21    assigned to recruit:  Asian-Americans, African-Americans,

22    Mexican-Americans and other Latino students, and Native

23    American students.

24            The one goal was to apply as much faith and energy

25    as one could summon to each one of those groups, recognizing

 1    that, you know, some of those groups, quite frankly, were

 2    larger than others in terms of administrative demands and

 3    requirements, interface, time spent deployed in the

 4    recruitment process.

 5    **Q.**  Have those five groups that you just identified been the

 6    five groups that the UMRP recruits since you joined the

 7    office -- or since you became the director of the UMRP?

 8    Pardon me.

 9    **A.**  Yeah.  Certainly since I was -- when I became director of

10    the program in 1992, this is what I inherited, yes.

11    **Q.**  And that includes Asian-American students, correct?

12    **A.**  Oh, yes, very much so.

13    **Q.**  Are the student coordinators that the UMRP employs, are

14    they associated typically with any student groups on campus?

15    **A.**  Typically the leaders of various minority groups and

16    communities on campus became our coordinators.

17           When I became director of the program in 1992, for

18    example, for Asian-American students in particular, the two

19    co-heads of the Triple A the Asian-American Students

20    Association on campus, which was at that point the largest

21    Asian-American group on campus, they were expected to become

22    the two coordinators of the UMRP, and they always went hand

23    in hand.  And it was -- the same was true for most of the

24    other groups as well.

25    **Q.**  What are some of the characteristics, generally speaking,

1    of the student coordinators that worked with you over the

2    years when you were the director of the UMRP?

3    **A.**  Well, these were very highly resourceful, bright

4    individuals.  Again, the assignment essentially was to do

5    what adults do on a full-time basis, what we were trying to

6    do on a full-time basis they were trying to do on a part-time

7    basis.  And so they had -- their qualities were intellectual

8    and very personal as well.

9           They had to be quick on their feet.  They had to be

10   prepared to work longer hours than those for which they were

11   being paid.  They were on a salary.  They weren't being paid

12   by the hour.  They did extraordinary work, actually.

13   **Q.**  Were the UMRP student coordinators expected to be

14   ambassadors for Harvard in the recruitment process?

15   **A.**  Yes, yes, completely.

16   **Q.**  And are you proud of the work that the UMRP coordinators

17   did under your time as the director of the program?

18   **A.**  Oh, no -- yes.  And these again, I think Harvard

19   College's -- the students who were there during my term of

20   office who proceeded them and who are currently doing this

21   work, I think the college owes these people a great debt,

22   actually.

23   **Q.**  Mr. Banks, when you first began working at Harvard in

24   1980, about what percentage of the class was nonwhite?

25   **A.**  Less -- well less, well below 20 percent.

1    **Q.** And what percentage of the Harvard class is nonwhite

2    today?

3    **A.** I've seen figures ranging from 49 to 50 to 51 percent.

4    **Q.** In your opinion, has the UMRP played any role in that

5    increase?

6    **A.** I would hope that we have. I know that's in combination

7    with other factors.

8    **Q.** What is the role, in your view, that the UMRP has played

9    to increase the levels of diversity at Harvard?

10    **A.** Well, a lot of the evidence that's come to me has been

11    anecdotal in nature. In our office we kept a bulletin board,

12    actually, and there were many testimonials from individual

13    students, family members, parents who would write and express

14    their gratitude to our coordinators saying something along

15    the lines of, I actually never would have considered applying

16    to a place like Harvard, much less attending it had it not

17    been for your telephone call or had it not been for your

18    visit to my high school, things of that kind.

19    **Q.** How would you compare the recruiting efforts that Harvard

20    undertakes to Harvard's peer institutions?

21    **A.** Well, again, this is something, you know, I was able to

22    learn by attending ABAFAOILSS meetings, but I think -- I

23    think in compared to -- and not to knock any of my peer

24    institutions -- but I think we are -- we work very hard at

25    this. Again, we work year-round at this and very

1    aggressively.  Carefully but aggressively.  And I am not

2    aware, frankly, of a peer institution that pours as much

3    human and other capital into this endeavor.

4    **Q.**  Mr. Banks, I'd like to move to some of the other

5    recruitment programs you've been involved in.

6              Can I have DD 4.4, please, Mr. Lee?

7              You were also involved in recruitment efforts for

8    the Harvard Financial Aid Initiative, right?

9    **A.**  Yes.

10   **Q.**  What is the Harvard Financial Aid Initiative, or HFAI?

11   **A.**  The Harvard Financial Aid Initiative was created,

12   really -- the architects of the program were

13   President Summers and Dean Fitzsimmons.  And together they

14   recognized that we might do well to consider enlarging our

15   base of students who needed financial aid at the highest

16   level, the fullest level.

17             So that was the mission of the program really.  It

18   was to help low-end, middle-income students deal with

19   affordability, which in its own way is what I would call the

20   silent killer in college recruitment because, essentially,

21   there are plenty of families and individual students who look

22   at a price tag, and the other variables, the other things

23   that they see may be perfectly fine, but they will select

24   themselves out of applying simply because they imagine that

25   they couldn't afford it.  So that's what the Harvard

 1    Financial Aid Initiative was designed to address.

 2    **Q.**  And was the Harvard Financial Aid Initiative designed to

 3    dispel that sticker shock that you just identified, for

 4    purposes of Harvard College admissions at least?

 5    **A.**  Well, yes.  I mean, essentially for families who at that

 6    point -- and we began this program in 2004 and ramped it up a

 7    couple of years after that, but for families earning $40,000

 8    a year or less, we paid for everything.  And then we, you

 9    know, we sort of ramped it up.  And at this point for

10    families earning $65,000 or less, it's a fully-funded

11    education.

12          It is not free, which is sort of a distortion, a

13    media distortion.  Not least because people have to get into

14    the college through the admissions process to qualify for the

15    financial aid initiative, but I think it has allowed us to

16    dispel a lot of negative perceptions around affordability and

17    cost.

18          At this point, you know, we're able to compete with

19    most state universities in the country in terms of what

20    individuals might have to pay to attend.

21    **Q.**  Does HFAI have a recruiting component separate from the

22    financial aid aspect?

23    **A.**  Yes.  One of the reasons I was asked to get involved was

24    because of my experience with the UMRP, and so we used many

25    of the same kinds of tactics.  We had a group of student

1   coordinators.  We used direct mail and telephone outreach.

2   That was 2014.  So email outreach, lots of -- you know, sort

3   of lots of similar kinds of recruitment tools.

4   **Q.**  And you were the first director or co-director of the

5   recruiting component of HFAI, right?

6   **A.**  Yes.

7   **Q.**  You mentioned that the recruitment strategies used by

8   HFAI were influenced by the UMRP.  Do I have that right?

9   **A.**  You do.

10  **Q.**  Why is that?

11  **A.**  Well, we were trying to -- there are very few novel tools

12  in the cabinet when it comes to recruitment.  There are only

13  so many things that you can do and only so many approaches

14  one can use.

15        The tools that we used in the UMRP seemed

16  reasonably effective and safe, and we thought they might be

17  well deployed with the HFAI program.

18        And we also, frankly, enlisted the help of alumni

19  in rolling out the HFAI program, in addition to the media.

20  **Q.**  When you first became the co-director of the Harvard

21  Financial Aid Initiative, how would you describe the

22  socioeconomic diversity of Harvard's student body?

23  **A.**  I would -- I would guess that the percentage of students

24  at the college on full financial aid, need-based financial

25  aid, was probably something in the order of 10 to 11 percent.

Case: 19-2005    Document: 00117638846    Page: 576    Date Filed: 07/29/2020    Entry ID: 6356388
Case 1:14-cv-14176-ADB    Document 642    Filed 04/18/19    Page 105 of 245

105

1    **Q.**  And has the socioeconomic diversity at Harvard increased

2    since the financial aid initiative was launched in 2004?

3    **A.**  Substantially.  I would guess that the percentage of

4    students at the college on full financial aid at this point

5    is 18, 19 percent.

6    **Q.**  Has HFAI's recruitment program or the recruitment

7    component of the financial aid initiative played any role in

8    that increase in socioeconomic diversity at Harvard?

9    **A.**  Well, yes.  I would hope so.  I think, again, when

10   families who are struggling to make ends meet, you've got two

11   parents working, and a $65,000 tab is a substantial amount of

12   money.  To know that families won't have to worry about that

13   and the students can, you know, attend a place like Harvard

14   without having to worry about books and things like that I

15   think is fundamental.  I think it's a real game-changer.

16        I should also mention that we also took loans out

17   of our financial aid packaging for everybody who qualified

18   for financial aid as a result of this initiative, and that

19   also, I think, has very much changed the conversation that we

20   are able to have between parents and students who are

21   interested in the college.

22        MS. ELLSWORTH:  Your Honor, I'm not going to

23   finish before lunch.  Is now a time you'd like to take the

24   lunch break, or should I soldier on?

25        THE COURT:  That's fine.  I was hoping we'd finish

1    by lunch.  Everybody always looks so happy when I tell them

2    they're excused.  But we can come back.  I'd like to take an

3    hour today, so 1:00.

4              MS. ELLSWORTH:  That's great.  Thank you, Your

5    Honor.

6              (Recess taken 12:00 p.m.)

```
 1                    **** AFTERNOON SESSION ****

 2              THE CLERK:  All rise.  Court is in session.  Please

 3    be seated.

 4              THE COURT:  When you're ready, Ms. Ellsworth.

 5              MS. ELLSWORTH:  Thank you, Your Honor.

 6    BY MS. ELLSWORTH:

 7    Q.   Mr. Banks, moving on to another recruitment program, you

 8    also mentioned that you were a codirector of the Harvard

 9    College Connection; is that right?

10    A.   Yes.

11    Q.   When was the Harvard College Connection formed?

12    A.   In 2014.

13    Q.   What is the Harvard College Connection?

14    A.   It actually is kind of an extension of the Harvard

15    financial aid initiative.  The objective of the program was

16    to try to reach low- and middle-income students using social

17    media as a means of communication versus traditional emails,

18    direct mail, telephones, etc.

19              MS. ELLSWORTH:  And, Mr. Lee, could we have DD 4.5,

20    please.  Sorry, I gave you the wrong slide number.

21    BY MS. ELLSWORTH:

22    Q.   Is the Harvard College Connection still focused on

23    lower-income students?

24    A.   Yes.  But I think it's grabbed the attention of a lot of

25    other students who are very deep into social media and make
```

1   inquiries anyway.

2   **Q.**  And do current students participate in recruiting efforts

3   through the Harvard College Connection?

4   **A.**  Yes.  Again, the model is to have current undergraduate

5   staff these programs because they're the most effective

6   representatives of the college.

7   **Q.**  Mr. Banks, do you also have a role with the visitor

8   center and tour guide program at Harvard College?

9   **A.**  Yes.  I've been director of the Harvard Admissions

10  Visitor Center for 10, almost 11 years, and I was director of

11  the tour guide program for 8 years.

12  **Q.**  Approximately how many tours does the tour guide program

13  conduct each year?

14  **A.**  Oh, hundreds of tours.

15  **Q.**  Who conducts the tours?

16  **A.**  Again, current undergraduates.

17  **Q.**  Do you consider the tour guide program to be a part of

18  recruiting?

19  **A.**  Yes, very much so.  Actually in lots of survey results

20  over the past several years suggests that the campus tour is

21  most important variable that students use when trying to

22  decide where to apply to college.

23  **Q.**  So all of the recruitment programs that we've discussed

24  before lunch and just now have involved current students sort

25  of running the programs; is that right?

1    **A.**  Yes.  That would be correct.

2    **Q.**  Why does Harvard use its current students to recruit

3    potential future students?

4    **A.**  Well, again, I think the ultimate connection between

5    prospective students and current students is clear.  I think

6    people are looking for truth and integrity of information and

7    not for a sales pitch.  I think they're counting on current

8    undergraduates to be honest to a fault, and they tend to be.

9    And we trust our students to do that.

10   **Q.**  Mr. Banks, I wanted to turn to an example of an applicant

11   file that I'd like to show.

12           MS. ELLSWORTH:  But before I do that, Your Honor,

13   could we turn off the gallery monitors?

14           THE COURT:  Yes.

15           MS. ELLSWORTH:  And are the jury monitors, they can

16   be off as well?

17           THE CLERK:  Yes.

18           MS. ELLSWORTH:  Mr. Lee, could we have DX262 up,

19   please?

20   BY MS. ELLSWORTH:

21   **Q.**  It's Tab 2 in your binder, Mr. Banks.  You can look at

22   the version in your binder if you prefer.

23   **A.**  It's sort of fuzzy.  Thank you.

24   **Q.**  What is this document, Defendant's Exhibit 262?

25   **A.**  Well, this would be appear to be a full application

 1    completed by a candidate for admission to the class of 2018.

 2    **Q.**   Did you review this file?

 3    **A.**   I did.

 4    **Q.**   Are your initials on the summary sheet?

 5    **A.**   They are.

 6          MS. ELLSWORTH:  Your Honor, I move to admit

 7    defendant's 262.

 8          MR. CONNOLLY:  No objection.

 9          THE COURT:  It's admitted.

10          (Defendant Exhibit No. 262 admitted.)

11    BY MS. ELLSWORTH:

12    **Q.**   Mr. Banks, without disclosing any personal information,

13    do you recall this applicant?

14    **A.**   Yes, I do.

15    **Q.**   Was this applicant admitted to Harvard?

16    **A.**   Yes.

17    **Q.**   Without identifying or naming the applicant's high

18    school, could you please just describe what some of the

19    characteristics of the applicant's high school were?

20    **A.**   Yes.  This is a school I know well.  It's one of the

21    first schools I visited when I got into admissions 100 or so

22    years ago.  It's a large, sprawling urban high school,

23    public, one of the largest high schools in the country, known

24    for its rigor and academics and also the diversity of its

25    student body.

1  **Q.**  Do you review all application files that are submitted to

2  Harvard from this high school?

3  **A.**  Yes.

4  **Q.**  In a given cycle, you'll review every application filed

5  from this high school?

6  **A.**  In addition to many other high schools, yes.

7  **Q.**  And for how many years have you read -- been the first

8  reader on applications from this particular high school?

9  **A.**  Off and on probably for 15-plus years.

10  **Q.**  How has that impacted your assessment of letters that may

11  be written by guidance counselors or teachers at this high

12  school?

13  **A.**  Well, I think it's -- I used to be a high school teacher

14  myself in a much smaller high school.  It's hard to capture

15  attention of teachers and school officials in a school this

16  big.  When one rises to the top in the classroom and outside

17  of the classroom, it's something noteworthy.

18  **Q.**  Let's look, staying on this first page, page 1 of

19  Defendant's 262, did this applicant identify his or her race

20  or ethnicity?

21  **A.**  Yes.  Asian-American, Chinese.

22  **Q.**  And looking at page 2 of the file, are those handwritten

23  notes written by you?

24  **A.**  They are.

25  **Q.**  Could you help us decipher these a little bit?

1   **A.**   Decipher I think would be the correct -- yes.

2           "Lots to like.  HFAI, first gen, basketball captain

3   at 5 feet tall.  Sounds bright and lively.  Hope alums can

4   help to fortify.  Engineering may be a stretch, but let's

5   watch for further developments."

6   **Q.**  What stood out to you about this applicant after you had

7   reviewed the entire file?

8   **A.**   Well, I think our mission in the office is to try to find

9   people who will flourish in a residential -- fast-paced

10  competitive residential community.  And she seemed to me to

11  be a promising bet.

12          In admissions parlance, I would have tagged her as

13  a great all-rounder, someone who's very versatile and good at

14  lots of very different kinds of things, again, inside and

15  outside of the classroom, and seemed to be, in personal

16  terms, you know, a very strong individual.

17  **Q.**  Let's look back at the first page of the exhibit.

18  Looking at the first page, are there any indicators about

19  this applicant's socioeconomic status on the application

20  file?

21  **A.**   Yes.  I noticed several things quickly.  I noticed that

22  the application fee was waived.  I noticed that neither

23  parent had attended college, that in fact one parent is

24  unemployed.  Both parents are in skilled trades.  Those were

25  immediate indicators.

**Q.**  And how were this applicant's grades?

**A.**  She has a -- had a 98.02 average out of 100.

**Q.**  What academic rating did you assign to this applicant?

**A.**  A 3+.

**Q.**  How would you describe her academic rating in the context
of Harvard's overall applicant pool?

**A.**  I think taking into account her overall GPA, the quality
of the courses that she had taken -- which included, by the
way, a course in organic chemistry in high school, and other
advanced courses -- her various tests, ACT and AP test
scores, she was clearly capable of doing Harvard work and
doing it well.

**Q.**  Was there anything that stood out about this applicant's
athletic participation?

**A.**  Well, I was impressed by her captaincy of what I
assumed -- again, knowing something about the school and the
area in which it's located, this is not going to be a
recruited athlete for one of our Division 1 sports for
basketball.

But it did suggest to me something about her
leadership potential, which is important.  She writes about
her love of the game, and other people write about her love
of the game.  She actually plays basketball with guys a lot.
Truthfully, she sounds pretty good at the game.  She's the
lead-point guard on her team.  And I gather also in the file

1    that it was the only multiracial basketball team in the

2    athletic league.

3            Most students at Harvard -- a lot of students at

4    Harvard participate in athletics, actually.  We have very

5    strong intramural programs, etc.  So even though, again, she

6    wouldn't be a recruited athlete, my suspicion was that she

7    could, in fact, make a very strong contribution to athletics

8    at the school in the freshman dorms and in the upper-class

9    houses as well if she chose to.

10   **Q.**  And let's look just to the bottom of the same page at the

11   profile ratings.  What athletic rating did you assign to this

12   applicant?

13   **A.**  A 3+.

14   **Q.**  Would that athletic rating have been important to this

15   applicant's -- or to your consideration of this applicant's

16   file?

17   **A.**  Given the fact when you're trying to whittle down 43,000

18   applicants to 2,000 admits, everything becomes important.

19   Everything becomes important.

20           Again, I was looking for earmarks of distinction

21   and potential contribution to the life of the college.  And

22   it seemed to me that, in addition to the other things that

23   she was doing outside of the classroom, this was noteworthy,

24   yes.  So it was, in fact, a part of my consideration.

25   **Q.**  Looking at the next profile rating over, what personal

1   rating did you assign to this applicant?

2   **A.**   I gave her a straight 2.

3   **Q.**   So let's take a look on page 31 of the file, if we could.

4   Is this the guidance counselor recommendation for this

5   applicant?

6   **A.**   Yes.

7   **Q.**   And if you can look at the last paragraph on the page,

8   could you please read the first sentence, beginning "Born to

9   immigrant parents"?

10  **A.**   "Born to immigrant parents.  Serves as the family

11  translator as well as paying bills, reading mail, and

12  answering phones."

13  **Q.**   What stood out to you about this guidance counselor

14  recommendation for this particular applicant?

15  **A.**   Again, this is a very large high school.  And I think the

16  average high school, public high school student-counselor

17  ratio is about 600 to 1 now.  It used to be 500 to 1.  That

18  was the standard metric.  I think it's now six to maybe 700

19  to 1.

20           So it struck me as impressive that someone could

21  get this detailed a report from a guidance counselor at a

22  school this large.  It just seemed to me unusual, given what

23  I know about the school and the nature of the demands on

24  guidance counselors and what they are prepared to commit

25  themselves to writing on behalf of students.

Case: 19-2005    Document 00117631846    Page: 587    Date Filed: 07/29/2020    Entry ID: 6356388
Case 1:14-cv-14176-ADB    Document 642    Filed 04/18/19    Page 116 of 245

116

1    **Q.**  Did the information in this guidance counselor

2    recommendation inform your assignment of a personal rating to

3    this applicant?

4    **A.**  Yes.  Again, it kind of dovetails with my sense that this

5    was a well-rounded, well-grounded, mature individual who

6    would make the most of whatever opportunities she faced.

7    **Q.**  If you can turn, please, Mr. Banks, to page 42 of

8    Defendant's 262.  What does page 42 show?

9    **A.**  These are what are called check marks, which are

10   individual attributions characterized by teachers, and there

11   are designated categories of strength.  One of the top in my

12   career is the best you can be.  Those are the best checks you

13   can get.  And they go down the line from one of the top to

14   excellent to good, etc.

15          So I was impressed that up and down these various

16   attributional characteristics, she was described as one of

17   the best in this teacher's teaching career.

18   **Q.**  Do the check boxes filled out by teachers and guidance

19   counselors on a form like this, are they taken into account

20   in your assessment of an applicant to Harvard?

21   **A.**  Oh, yes, absolutely.  There are schools and teachers who

22   don't fill out these checks.  They don't have the time or the

23   patience to do it.  So when people actually do, it's worth

24   paying attention to.

25          MS. ELLSWORTH:  Mr. Lee, can we just zoom in

**JA2033**

1    underneath the ratings on the descriptions, academic

2    achievement on down to overall.

3    BY MS. ELLSWORTH:

4    **Q.**   Are some of the check boxes that teachers and guidance

5    counselors are asked to fill out integrity?

6    **A.**   Yes.

7    **Q.**   Reaction to setbacks?

8    **A.**   Yes.

9    **Q.**   Concern for others?

10   **A.**   Yes.

11   **Q.**   Self-confidence?

12   **A.**   Yes.

13   **Q.**   Leadership?

14   **A.**   Yes.

15   **Q.**   Maturity?

16   **A.**   Yes.

17   **Q.**   Are these all taken into account in the personal ratings

18   that you might assign to an applicant?

19   **A.**   Yes.   Those kinds of personal characteristics are

20   important on a residential -- on a diverse and residential

21   campus where people are living and learning among each other

22   from very different, you know, points of origin and very

23   different aspirational levels.   So yeah, they're very

24   important to us.

25   **Q.**   Let's take a look at the next page, page 43, which is the

 1    letter that accompanied those check boxes.

 2    **A.**  Yes.

 3    **Q.**  And can you please read the third paragraph with the

 4    sentence beginning "I have observed."  The very bottom of the

 5    third paragraph.

 6    **A.**  "I have observed her helping other students to understand

 7    some of the more detailed and difficult aspects of the course

 8    material, always with a smile on her face."

 9    **Q.**  What stood out to you from this particular teacher

10    recommendation submitted on behalf of this applicant?

11    **A.**  Well, Harvard College is a fast-paced, demanding academic

12    environment.  Pedagogically, we are trying to take a little

13    bit of the edge off of that by, wherever possible -- and

14    faculty members are, too -- urging students to work in groups

15    and urging people to work cooperatively.

16         So whenever I see a recommendation from a teacher

17    that suggests that a student actually is at ease extending

18    herself or himself to other students to assist them in

19    getting material and class work that other students don't get

20    as quickly, that would tend to grab my attention always.

21    **Q.**  Did the information provided in this teacher

22    recommendation letter inform your assignment of a personal

23    rating to this applicant?

24    **A.**  Yes.  Because in addition to that sentence there, there

25    are others.  The end of the first paragraph reads, "One of

1    the nicest and kindest students that I've ever taught."

2    **Q.**  And did that inform your rating of this applicant?

3    **A.**  Again, very much so.  I think that when teachers are

4    prepared to commit themselves with that degree of strength

5    and specificity in a recommendation that it deserves careful

6    consideration.

7    **Q.**  Let's take a look back, please, at the first page of the

8    application, Defendant's 262, and particularly focusing on

9    the rating box at the bottom of the page.

10       Did this applicant receive ratings from another

11   reader in the Harvard College admissions office?

12   **A.**  No.  Under normal circumstances it would be appropriate

13   to send an application from the first reader to the chair for

14   a second reading with a 2- overall designation.

15       I decided in this case not to do that because I

16   felt that I didn't have enough critical information.  I did

17   not have an alumni interview to confirm what I thought were

18   very promising personal qualities.  I did not have

19   information nailed down about her financial circumstances,

20   and I thought that was really necessary.

21       And I knew, given the nature of our process, that

22   once that material was in, I could bring this case to the

23   subcommittee for a full, open, and fair discussion and then

24   to the full committee for a full, fair, open discussion

25   without the need of a second reading.

1    **Q.**  And did you ultimately receive some of the information

2    that was missing when you first assigned ratings to this

3    file?

4    **A.**  Yes.  Yes.

5    **Q.**  Did you ultimately raise this applicant for discussion in

6    the subcommittee?

7    **A.**  Yes.  Once the interview was in and we had a better sense

8    of her financial circumstances, yes.

9    **Q.**  Can you identify any one particular factor that led to

10    this applicant's admission to Harvard College?

11    **A.**  No.  Actually there never is any single factor.

12        I understand and chafe somewhat when people

13    describe any admissions process this complicated involving

14    this many people and this many factors as just because a

15    student got in just because of X, Y, or Z.

16        What made this candidate strong is her

17    comprehensive strength, both academically, extracurricularly,

18    and personally, and the strength of her teacher

19    recommendations, and the strength of the interview, all of

20    which really in a parade of confirmation, virtual

21    confirmation led to an affirmative discussion of her

22    candidacy.

23    **Q.**  Just a few more questions, Mr. Banks.

24        Does Harvard give applicants a tip for their racial

25    or ethnic background in the admissions process?

**JA2037**

1    **A.**  Yes.

2    **Q.**  Is race the only factor that can serve as a tip in the

3    admissions process?

4    **A.**  Race is never the only factor that serves as a tip in the

5    application process.  It is only used in combination with

6    other factors and personal accomplishments and virtues as

7    they appear in the file.

8    **Q.**  When you are reading and considering an applicant for

9    admission, how do you take race into account as a tip in the

10   process?

11   **A.**  I tend to try to get a full sense of the strength of the

12   candidate based on academic, extracurricular, and other kinds

13   of considerations, teacher recommendations.  We usually often

14   do not have alumni interviews to help to confirm some of the

15   personal qualities.  So we have to distill the information as

16   it appears before us.

17           But once I get a sense of that, again, at that

18   point based on the strength of all those variables taken

19   together, then I would enter the tip into the calculus but

20   not before that.

21   **Q.**  And to the extent that an applicant's race serves as a

22   tip in the process for one individual applicant, in what

23   rating that you assign to the application file might that be

24   reflected?

25   **A.**  For me, based on my experience, I would put that -- I

1    would kind of insert that into the overall rating because

2    that suggests something about further discussion, the need

3    for further discussion and further consideration based on all

4    those factors together, not in isolation.

5    **Q.**  Do you consider race when assigning any of the four

6    profile ratings -- the academic, extracurricular, academic,

7    or personal -- to an application file?

8    **A.**  No.  Never.

9    **Q.**  Mr. Banks, you were discussing with Mr. Connolly this

10    morning when Dean Fitzsimmons occasionally provides some

11    information to the committee about where the class is.  Do

12    you recall that testimony?

13    **A.**  Yes.

14    **Q.**  Has Dean Fitzsimmons ever provided information like that

15    only along racial or ethnic lines?

16    **A.**  No.  No.  Again, it's a broad discussion of the admitted

17    class, including academic information, geographic

18    information, and other considerations, yeah.

19    **Q.**  And to the extent that information is shared with the

20    committee, have you ever been told to admit more students of

21    a particular racial or ethnic background?

22    **A.**  No, never.

23    **Q.**  Have you ever been told to admit fewer students of a

24    particular racial or ethnic background?

25    **A.**  Never.

1   **Q.**  Mr. Banks, how many subcommittee meetings do you think

2   you've participated in over the course of your time at

3   Harvard admissions?

4   **A.**  Many, with a capital M.

5   **Q.**  How about full committee meetings?  How many full

6   committee meetings do you think you've participated in?

7   **A.**  An even larger capital M.

8   **Q.**  You've been in the admissions office for over 30 years,

9   right?

10  **A.**  That's correct.

11  **Q.**  In those 30-plus years, how many times have you seen

12  another admissions officer demonstrate bias against an

13  applicant because of the applicant's race?

14  **A.**  Never.

15  **Q.**  In your 30-plus years in the admissions office, have you

16  ever been instructed to admit a target number of students of

17  any particular racial or ethnic background?

18  **A.**  Never.

19  **Q.**  When considering whether to admit an applicant, is an

20  applicant's race ever a negative factor?

21  **A.**  No.  Of course not.

22  **Q.**  In your view, is it important that Harvard have a diverse

23  student community?

24  **A.**  In my view, yes.

25  **Q.**  In your view, does racial diversity have educational

1    benefits?

2    **A.**   In my view, yes.  I've been hanging around places like

3    this for a lot of years, and I think my own view is that

4    diversity of all kinds and excellence of all kinds, including

5    race/ethnicity, but also along lines of excellence in

6    academics and extracurricular has made our campus stronger,

7    more interesting, more attractive, frankly.  I don't know

8    otherwise how to account for 43,000 applications to a school

9    that only can take 2,000 people.

10               MS. ELLSWORTH:  Thank you, Mr. Banks.

11               No further questions.

12               MR. CONNOLLY:  No further questions.

13               THE COURT:  You're excused, Mr. Banks.

14               THE WITNESS:  Thank you, Your Honor.

15               MR. LEE:  Your Honor, Ms. Gershengorn is going to

16    present the next witness for us.

17               THE COURT:  That's fine.

18               MR. STRAWBRIDGE:  We'll call Charlene Kim.  We'll

19    just need a minute here.

20               THE COURT:  Who did you just call, Mr. Strawbridge?

21               MR. STRAWBRIDGE:  Charlene Kim.

22               THE CLERK:  Can you please stand and raise your

23    right hand.

24               (CHARLENE KIM duly sworn by the Deputy Clerk.)

25               THE CLERK:  Thank you.  You may be seated.

 1          Can you please state your name and spell your last

 2    name for the record.

 3          THE WITNESS:  Sure.  It's Charlene Sun Jin Kim,

 4    K-I-M, as in Mary.

 5          MR. STRAWBRIDGE:  Ms. Kim, with the Court's

 6    permission, I'm going to provide you with some materials

 7    here.

 8                         EXAMINATION

 9    BY MR. STRAWBRIDGE:

10    **Q.**  Good afternoon, Ms. Kim.

11    **A.**  Hi.

12    **Q.**  My name is Patrick Strawbridge.  I'm an attorney for

13    Students for Fair Admissions.  We have not met before.  You

14    are a 2003 graduate of the University of California at

15    Berkeley; is that correct?

16    **A.**  Yes.

17    **Q.**  And then you earned a master's degree?

18    **A.**  Yes.

19    **Q.**  At New York University?

20    **A.**  That's correct.

21    **Q.**  And do you remember when you earned that?

22    **A.**  2008 or '09 was when I finished the thesis.

23    **Q.**  And then you began working in the Harvard office of

24    admissions and financial aid in around 2008, 2009?

25    **A.**  In 2008, yes.

1              THE COURT:  Ms. Kim, can I ask you to keep your

2    voice up?

3              THE WITNESS:  Yes.

4              THE COURT:  Thank you.

5    BY MR. STRAWBRIDGE:

6    **Q.**  You've worked in the admissions office then for nine

7    years?

8    **A.**  That's correct.

9    **Q.**  You've been reading applications for that whole time?

10   **A.**  Yes.

11   **Q.**  Last year you estimate you probably read more than a

12   thousand applications?

13   **A.**  Yes.  I believe last year I read about 1,100.

14   **Q.**  In a given year during your experience in the office,

15   you'd say you read somewhere between 700 and 1,100

16   applications a year.  Does that sound right?

17   **A.**  That does sound right.  My first year was closer to 7,

18   800.

19   **Q.**  So if we just sort of took the middle of that range, 900

20   applications over nine years, you would have read more than

21   8,000 applications in your time in the admissions office,

22   correct?

23   **A.**  I would say that's safe to say, yes.

24   **Q.**  You used to read on C docket; is that correct?

25   **A.**  That's right.

1  **Q.**  What states are on C docket? -- or areas, I should say.

2  **A.**  The Greater Los Angeles area.

3  **Q.**  Anything else, or is it just Los Angeles?

4  **A.**  So it's Los Angeles County, parts of the San Fernando

5  Valley, and then parts of San Bernardino County.

6  **Q.**  Dockets in general sometimes have some variances between

7  them in terms of the racial diversity of the populations they

8  cover.  Would you agree with that?

9  **A.**  I don't know for a fact, but I would imagine so, given

10  that the country has different makeups demographically.

11  **Q.**  The racial diversity in C docket may well be different

12  than the racial diversity in B docket, for example, correct?

13  **A.**  Sure.  I can see that.  I grew up in Los Angeles, so I

14  would imagine that -- my experience has been it's a very

15  diverse in many ways kind of place.  So I would say so.

16  **Q.**  You used to read on B docket, right?

17  **A.**  On B as in boy?

18  **Q.**  Yes.

19  **A.**  Yes.

20  **Q.**  That covers Colorado and some of the Western states; is

21  that correct?

22  **A.**  That's right, yes.

23  **Q.**  You understand, and I assume you agree, that Harvard does

24  consider race in the process of making its admissions

25  decisions, right?

1    **A.**  Yes.

2    **Q.**  And one of the reasons that Harvard considers race in its

3    admissions process is that it believes having a class that's

4    composed of different students from different racial

5    backgrounds adds to Harvard's community, correct?

6    **A.**  Yes.  I think we really want to have a wide variety of

7    lived experiences and backgrounds in the community.

8    **Q.**  And race is something that the admissions office

9    considers throughout the admissions process, correct?

10   **A.**  Yes.  We have discussions throughout the committee

11   process, and that would be one of the many things we discuss.

12   **Q.**  And I think -- well, in your familiarity, I'm sure

13   there's a place on the summary sheets that readers receive

14   that lists the race of the applicant.  Is that correct?

15   **A.**  If the applicant provided it, then the demographic

16   information would be on the summary sheet, yes.

17   **Q.**  And in the same way, if the applicant provides his or her

18   race, that's included in the information that appears on the

19   printed docket sheets that the subcommittees use?

20   **A.**  Yes.

21   **Q.**  And the applicant's race is known to admissions officers

22   during the subcommittee discussions?

23   **A.**  Yes, it is.

24   **Q.**  At subcommittee meetings?

25   **A.**  Yes.

1    **Q.**  And the race of the applicants would also be known to the

2    admissions officer during the discussions of the full

3    committee, correct?

4    **A.**  That is correct.  If it's on the application materials,

5    it would be available to all members of the admissions

6    committee.

7    **Q.**  And indeed, during the full committee meeting, Dean

8    Fitzsimmons will provide information that includes the racial

9    breakdown of the admitted class to that point in time; is

10   that correct?

11   **A.**  I'm sorry.  Can you repeat that?

12   **Q.**  Yes.  During the full committee meetings, in your

13   experience, Dean Fitzsimmons will sometimes provide

14   information that includes the racial breakdown of the

15   admitted class to date; is that correct?

16   **A.**  Yes.  So in -- during a few of the years that I've been

17   on the admissions committee -- I don't know if it's been all

18   of the years -- during a time before we go into kind of the

19   final committee meetings, Dean Fitzsimmons has kind of

20   verbally given us an overview of the class as it is looking

21   at the time.  So just general demographic information, the

22   gender breakdown, the racial and ethnic breakdown, the number

23   of students who would qualify for our highest amount of

24   financial aid, and also a kind of geographic breakdown of

25   Mid-Atlantic, West Coast, things like that.

Case: 19-2005    Document: 00147631840    Page: 601    Date Filed: 07/29/2020    Entry ID: 6356388
Case 1:14-cv-14176-ADB   Document 642   Filed 04/18/19   Page 130 of 245

130

 1   **Q.**  And you've been there for nine years.  That covers
 2   basically 18 full committee meeting processes?
 3   **A.**  Well, we didn't have early action for the three years
 4   that I was there.  And the committee meetings are multiple
 5   days and many weeks, but I've been through many cycles, yes.
 6   **Q.**  More than a dozen at least, correct?
 7   **A.**  Right.
 8   **Q.**  You said multiple times Dean Fitzsimmons during this full
 9   committee meeting process has conveyed this demographic
10   information, including the racial and ethnic breakdown of the
11   class, correct?
12   **A.**  Yes.  I do recall that that has happened a handful of
13   times.
14   **Q.**  But you don't know why he shares that information, do
15   you?
16   **A.**  No, I don't.
17   **Q.**  Race is also used at the end of the full committee
18   process?
19   **A.**  At the end of the process?
20   **Q.**  You're familiar with what's known as lopping?
21   **A.**  Yes.
22   **Q.**  Just as a reminder, lopping is the process where the
23   class frequently at the end of the full committee process
24   ends up with too many people in it for all the beds that
25   Harvard has, correct?

1    **A.**   Yes.  So the lop process happens at the end of full

2    committee and then -- well, also kind of at the end of the

3    subcommittee meetings as well, depending on the subcommittee.

4    Sometimes we have too many students at that point as well.

5    So I kind of think of what you're calling the lop happening

6    at least two different stages.

7    **Q.**   Okay.  And at both those stages, there needs to be a

8    decision made as to who's going to be removed from the class

9    as you get down to the last few spots?

10   **A.**   That's correct, yes.

11   **Q.**   And one of the information that is -- strike that.

12           There's a form that's filled out with respect to

13   each docket's lops or proposed lops?

14   **A.**   Yes.  There's a lop list for the full committee lop

15   process.

16   **Q.**   And the lop list includes some information about the

17   applicants who are being placed on the lop list?

18   **A.**   It does have information on the applicants, yes.

19   **Q.**   One of the pieces of information that goes on the lop

20   list is the race or ethnicity of the applicant, correct?

21   **A.**   That's correct.  I think there are four or five columns

22   on it, and that is one of the columns in addition to the HFAI

23   status, I think the athletic rating, the lineage status.

24   There might have been gender in actually some years.

25   **Q.**   By "lineage," you mean whether they're a legacy or not?

1    **A.**   Right.

2    **Q.**   Let's talk about the training in the admissions office.

3           When you first came to the office, were you are

4    trained by a senior admissions officer?

5    **A.**   I was, yes.

6    **Q.**   And that training included how to read the files?

7    **A.**   Yes, it did.

8    **Q.**   It's true, is it not, in your nine years in the

9    admissions office you have never received any written

10   instructions on how to evaluate race when considering

11   applicants?

12   **A.**   I don't think that explicit instructions are in the

13   reading procedures.

14   **Q.**   You never received any written instructions that are

15   specific to how to use race when considering applicants, have

16   you?

17   **A.**   I don't recall written instructions on how to do so.

18   **Q.**   As far as reading the files, admissions officers assign a

19   number of ratings to the files?

20   **A.**   That's right.

21   **Q.**   To the applicants, I should say.

22           And those ratings include the academic rating,

23   correct?

24   **A.**   Yes.

25   **Q.**   Extracurricular rating?

 1  **A.**  Yes.

 2  **Q.**  The personal rating?

 3  **A.**  Yes.

 4  **Q.**  And the athletic rating?

 5  **A.**  That's right, yep.

 6  **Q.**  And then there's an overall rating, correct?

 7  **A.**  Yes, that's right.

 8  **Q.**  You would agree there's nothing in the written procedures

 9  of the admissions office that talks about how race should

10  factor into any of those particular numeric ratings, correct?

11  **A.**  Right.  There's no written instructions on how race would

12  be a factor in any of those numerical ratings.

13  **Q.**  Now, it's true that there is an annual orientation in the

14  admissions office where sometimes the general counsel's

15  office comes and provides some basic information about the

16  higher education landscape?

17  **A.**  Well, we have -- we have an admissions orientation, and

18  we also have an admissions retreat.  I think the one that our

19  general counsel comes to is the orientation.

20  **Q.**  And in some of that discussion, without getting into it

21  in too great detail, might cover what the legal standard is

22  for the use of race in higher education, correct?

23  **A.**  Yes.  I would say he gives us kind of an overview of the

24  legal landscape in higher education and then, you know, kind

25  of talks about things that pertain to our work.

1    **Q.**  In your nine years in the Harvard admissions office, you

2    have not participated in any annual training where you were

3    instructed by Dean Fitzsimmons or Director McGrath or anyone

4    else about how you're supposed to consider race when

5    reviewing and evaluating an application at Harvard, have you?

6    **A.**  In our various -- in our orientations and in our

7    admissions retreat, my colleagues and I and various other

8    people across the university talk about all the various

9    aspects of our admissions committee.  And demographic

10   identities, information, experiences and how those translate

11   into the work that we do is something that we put a lot of

12   thoughtful discussion into.

13          So I don't know if I would characterize it in that

14   sort of black-and-white kind of way.  Our committee process

15   is such that it is something that we both do on the job, and

16   then in the retreat and in the orientation we step back and

17   think about things in a larger way.

18   **Q.**  I just want you to listen to my question again to make

19   sure you're hearing me correctly.

20          In your nine years at Harvard, is there any annual

21   training where you're instructed by Dean Fitzsimmons or

22   Director McGrath or anyone else about how you're supposed to

23   consider race when reviewing or evaluating an application to

24   Harvard?

25   **A.**  So I've been told that race is one of many factors that

**JA2051**

1  we can take into account when we are reviewing applications.

2  For example, I gave a presentation to our staff about

3  socioeconomic background and first-generation status.  My

4  colleagues have given presentations on various racial groups

5  and identities and things like that.  So it's hard for me to

6  think about it in that sort of way.

7  **Q.**  You remember giving a deposition in this case, I assume,

8  right?

9  **A.**  I do.

10  **Q.**  It was just a couple of week ago, right?

11  **A.**  That's right.

12  **Q.**  It was over at the offices of Wilmer Hale?

13  **A.**  That's right.

14  **Q.**  You have a copy of the transcript there in front of you.

15  Can you turn to page 22 of the deposition, please.

16  **A.**  Yep.

17  **Q.**  I'll direct you to the bottom of page 22, line 17.

18  **A.**  Line 17?

19  **Q.**  I'm sorry.  Line 23.  Do you see it?

20  **A.**  Yes.

21  **Q.**  "QUESTION:  And is there any annual training where you're

22  instructed by Dean Fitzsimmons or Director McGrath or anyone

23  else about how you're supposed to consider race when

24  reviewing and evaluating an application to Harvard?

25          "ANSWER:  I don't recall any sort of explicit

 1    directive on how to do so."

 2              Were you asked that question?

 3    **A.**  Yes.

 4    **Q.**  And did you give that answer?

 5    **A.**  Yes.

 6              MS. GERSHENGORN:  Your Honor, can we get additional

 7    verification with the next question and answer given that

 8    matches what the witness just testified to?

 9              THE COURT:  Yes.

10    BY MR. STRAWBRIDGE:

11    **Q.**  The next question was, "So in your nine years at Harvard,

12    no one else has ever talked with you about the appropriate

13    way to use race in evaluating an application to Harvard,

14    correct?

15              "ANSWER:  So each year we have an orientation where

16    our general counsel comes and kind of gives us an update on

17    this landscape of higher education and to know about various

18    considerations in the admissions process.  And so, you know,

19    in that the discussion has come up that, you know, race is

20    one of the many considerations that we use in evaluating all

21    these very complex and nuanced individuals."

22              Did you give that answer to that question?

23    **A.**  Yes.  With very many "you knows," but yes.

24    **Q.**  You have never received any training on how to prevent

25    implicit bias from affecting your review of applications to

Case: 19-2005    Document: 00117632840    Page: 608    Date Filed: 07/29/2020    Entry ID: 6356388
Case 1:14-cv-14176-ADB    Document 642    Filed 04/18/19    Page 137 of 245

137

1    Harvard, have you?

2    **A.**   I have not received direct implicit bias training, no.

3    **Q.**   You would agree it's possible for any person to exhibit

4    bias, right?

5    **A.**   I believe that's true.

6    **Q.**   In your view, discrimination can take all forms?

7    **A.**   Yes.

8    **Q.**   And it's possible, for example, for a woman to

9    discriminate against other women?

10   **A.**   Yes.

11   **Q.**   And it's possible for one member of a given racial group

12   to discriminate against other members of that racial group,

13   isn't it?

14   **A.**   Yes.  I think discrimination can indeed take all forms.

15   **Q.**   We talked about the fact that one of the reasons that

16   Harvard considers race in its admissions process is because

17   it believes that racial diversity adds to Harvard's

18   community, correct?

19   **A.**   Yes.

20   **Q.**   I want to talk a little bit about how you assign the

21   score for personal qualities.

22   **A.**   Okay.

23   **Q.**   You're familiar with that rating, one of the four profile

24   ratings, correct?

25   **A.**   I am familiar with it, yes.

1   **Q.**  And when considering the personal score, you also think

2   about how the applicant will add to the community, correct?

3   **A.**  Yes.  Because I think that their personal qualities are a

4   part of the way that they would add to the community, much

5   in -- you know, and in an academic way or extracurricular way

6   or any other way.

7   **Q.**  And you would agree, right, that a student's race or

8   ethnicity is part of how they can add to the community?

9   **A.**  Yes.  I think all of a student's experiences and

10  identities are ways that they can add to a community.

11  **Q.**  And in terms of the personal qualities that you are

12  looking for, you would agree that Asian-Americans as a group

13  do not have worse personal qualities, as Harvard views them,

14  than the other groups of applicants who apply to Harvard,

15  correct?

16  **A.**  No, they do not.

17  **Q.**  And so you would have no explanation if Asian-Americans

18  were to receive year after year lower personal scores than

19  white applicants, for example, correct?

20  **A.**  Yep.  That's not what I see as a member of the committee.

21  **Q.**  That has not been your experience during your nine years

22  on the admissions committee, has it?

23  **A.**  It has not.

24          MR. STRAWBRIDGE:  No further questions.

25                          EXAMINATION

**JA2055**

BY MS. GERSHENGORN:

**Q.**  Good afternoon, Ms. Kim.

**A.**  Hi.

**Q.**  So Mr. Strawbridge asked you a number of questions about your training in the office.  Do you recall his doing that?

**A.**  Yes.

**Q.**  Let me just ask you a few questions about that.  Did you receive training to be an admissions officer when you first joined the office?

**A.**  I did.

**Q.**  What did that consist of?

**A.**  So one of my colleagues, who's no longer with us, was a senior admissions officer, and she trained a lot of the newer people that had just joined staff.  So we actually read actual cases from previous years, a good number of them, and rated them and discussed them in a kind of mock committee process.  So that was the first part of my training.

And then after that, I think my first 50 or 100 files were read by other admissions officers who had been there for a longer time.  So they would stop into my office and we would go over things that they had seen in my writings or in my ratings, things like that.

So that's what I recall from the training.  It was nine years ago, ten years ago.

**Q.**  Based on your training and your experience, what is your

 1    understanding of how race or ethnicity may be used in the

 2    admissions process?

 3    **A.**   So it is one factor that we take into account among the

 4    multitude of things that we see in every single candidate's

 5    application.

 6    **Q.**   Is race a factor that you consider when you're assigning

 7    the academic rating?

 8    **A.**   No.

 9    **Q.**   Is it a factor that you consider when you're assigning an

10    extracurricular rating?

11    **A.**   No.

12    **Q.**   Is it a factor that you consider when you're assigning

13    the athletic rating?

14    **A.**   No.

15    **Q.**   Is race a factor that you consider when you're assigning

16    the personal rating?

17    **A.**   No.

18    **Q.**   What about the preliminary overall rating?  Is race a

19    factor that you may consider when you're assigning the

20    preliminary overall rating?

21    **A.**   So I would say that sometimes it is, along with other

22    things that I'm looking at, whether an applicant is from a

23    lower socioeconomic background or a rural applicant.  Things

24    like that are things that may be captured in the overall

25    rating.

Case: 19-2005    Document: 00117631840    Page: 642    Date Filed: 07/29/2020    Entry ID: 6356388
Case 1:14-cv-14176-ADB    Document 642    Filed 04/18/19    Page 141 of 245

141

1    Q.  Thank you.  So you've spoken a bit about your work at the

2    admissions office when Mr. Strawbridge was asking you

3    questions.  I just want to take a bit of a step back.

4         When did you first start working in the office?

5    A.  In 2008.

6    Q.  And what was your position when you first started?

7    A.  I was an admissions and financial aid officer.

8    Q.  And what was it about that position that drew you to it?

9    A.  So it was actually the financial aid portion of it, just

10   because I didn't know that such generous financial aid

11   existed.  And I know from my personal experience that cost of

12   college is something that a lot of people in this country are

13   considering when they're looking at schools.

14        And so, you know, I actually had another job offer

15   to work at a different part of Harvard, and I took this job

16   because I was interested in the financial aid piece.  And the

17   admissions piece was also part of it.

18   Q.  And has your position changed over your time in the

19   office?

20   A.  Yes.  I am currently the assistant director of financial

21   aid, a senior admissions officer, and the director of the

22   Harvard first-generation program.

23   Q.  How long have you held all those roles?

24   A.  So the director of the Harvard first-generation program

25   is a role that I've held for a little over a year and the

1    other two roles for a few years.

2    **Q.**  So let's break those down.  What are your

3    responsibilities as a senior admissions officer?

4    **A.**  So I read admissions files, and I am a member of the

5    admissions committee.  And this year I will be chair of a

6    subcommittee.

7    **Q.**  And Mr. Strawbridge asked you about the dockets that you

8    were assigned to previously.  What are the dockets that

9    you're currently assigned to?

10   **A.**  So I read files on J docket, and I'm chairing Z docket.

11   **Q.**  And what are the geographic territories that you are

12   responsible for on your dockets?

13   **A.**  On J docket, I read the states of West Virginia,

14   Kentucky, parts of Tennessee, parts of Kansas, and parts of

15   Indiana and other places where the metro area kind of spills

16   into a couple of different states.

17   **Q.**  And the Z docket that you'll be chairing?

18   **A.**  Z docket is California outside of C docket so the area

19   that I outlined earlier and the Bay Area.

20   **Q.**  And turning to your responsibilities as the assistant

21   director of the financial aid program, what are those

22   responsibilities?

23   **A.**  So as an assistant director of financial aid, I am a

24   financial aid officer to my caseload of current college

25   students.  And then I also help set policy and procedures for

 1    the financial aid office.

 2    **Q.**  And then finally with respect to your three hats, what

 3    does your role as director of the first-generation program

 4    entail?

 5    **A.**  So the Harvard first-generation program is an outreach --

 6    it has two kind of arms.  It's on the one hand an outreach

 7    and support program for first-generation -- prospective

 8    first-generation college students.  And then on the other

 9    side is support and community building for the

10    first-generation students that we have on campus.

11    **Q.**  I'd like to just ask you a few questions about the

12    financial aid and the first-generation program.  We heard

13    some about that this morning.  I just want to take you

14    through each of those one at a time.

15          What are the goals of the Harvard financial aid

16    program?

17    **A.**  I think the goals of the financial aid program are to

18    make sure that Harvard is affordable to anyone that is

19    admitted and wants to apply.  Yeah.  And also I think that it

20    helps to kind of be a beacon of accessibility and

21    affordability in higher education.

22    **Q.**  And are there different components to that program?

23    **A.**  To the financial aid program?

24    **Q.**  Yes.

25    **A.**  Can you clarify?

1  **Q.** Sure. Before the applicants apply to Harvard College, is

2  there a recruiting component to the HFAI program?

3  **A.** To the HFAI program, yes.

4         So the Harvard financial aid initiative, there

5  is -- much like the first-generation program, on the one hand

6  there's outreach to prospective students. Both of these

7  programs actually hire current Harvard College students who

8  identify with these identities.

9         And when the outreach portion, they send emails,

10  they write blog posts, they're on our social media, and also

11  host tours both in person and actually now increasingly more

12  on a virtual level to prospective students and to

13  community-based organizations across the country.

14  **Q.** And is there travel that's done as part of the financial

15  aid program as well on the recruiting side?

16  **A.** Yes. So HFAI hires -- they actually just completed

17  hiring last week students as a winter break job to go to

18  their hometowns and visit a number of high schools and middle

19  schools to talk about the affordability actually not just of

20  Harvard but a lot of need-blind schools with strong financial

21  aid programs, just to kind of get the message of

22  accessibility and affordability out there.

23  **Q.** You mentioned electronic outreach. Does Harvard have a

24  web page about its financial aid?

25  **A.** Yes.

```
 1    Q.  If you could turn, to Tab 1 in the binder in front of

 2    you.  Do you see a document there labeled DX106?

 3    A.  Yes.

 4    Q.  Do you recognize this document?

 5    A.  Yes.  This looks to be one of the pages on our financial

 6    aid website.

 7           MS. GERSHENGORN:  Your Honor, we'd move to admit

 8    DX106.

 9           MR. STRAWBRIDGE:  No objection, Your Honor.

10           THE COURT:  It's admitted.

11           (Defendant Exhibit No. DX106 admitted.)

12    BY MS. GERSHENGORN:

13    Q.  Why is this website maintained?

14    A.  I think it's so our financial aid policy is clear to all

15    family, students who may be interested, and to just get the

16    message of affordability out there.

17    Q.  And is there a tool on the website to help people figure

18    out the cost of attending Harvard?

19    A.  Yes, there is.  There's a net price calculator.  There's

20    actually a link, it looks like, on the second page.

21    Q.  And if you turn to the second tab in the binder, do you

22    see a document there labeled DX111?

23    A.  Yes.

24    Q.  What is DX111?

25    A.  That looks to be the net price calculator that's on our
```

1    website.

2            MS. GERSHENGORN:  Your Honor, we'd move to admit

3    DX111.

4            MR. STRAWBRIDGE:  No objection.

5            THE COURT:  It's admitted.

6            (Defendant Exhibit No. DX111 admitted.)

7    BY MS. GERSHENGORN:

8    Q.  Is there anything special about Harvard's net price

9    calculator?

10   A.  Well, it was introduced a few years ago when there was a

11   federal mandate for all schools actually to have net price

12   calculators just in the way of cost transparency.

13           But I think that ours is particularly -- very

14   simple and clear.  We always have ease of use in mind, that

15   we don't want it to be kind of prohibitive or a lot of tax

16   documents or something are needed for people to fill this

17   out.

18   Q.  In addition to maintaining the web pages, is there

19   actually a physical space on campus where they can go if they

20   have questions about financial aid?

21   A.  Yes.  Our financial aid office is located on campus in

22   Harvard Square.

23   Q.  And is that open to the public?

24   A.  Yes.

25   Q.  And do prospective applicants go to the office sometimes?

1    **A.**  Yes, they do.

2    **Q.**  And what kinds of information can people get there?

3    **A.**  So they can get our brochure.  We actually have current

4    graduate students there at the front to answer kind of

5    general questions about our financial aid, direct people to

6    the net price calculator, give an overview about financial

7    aid, and also often give directions on how to get to other

8    parts of campus.

9    **Q.**  So why does Harvard take all of these steps to recruit

10   and assist students who can't afford the tuition?

11   **A.**  I think it's because there is a commitment to

12   affordability, to make it affordable.  I think that in order

13   to truly make sure that we have the best and brightest

14   students from all backgrounds considering Harvard, it needs

15   to be as affordable as possible.  And I think that that's

16   something that the college is quite committed to.

17   **Q.**  And so actually talking about the financial aid itself,

18   how does Harvard determine the amount of financial aid that a

19   student receives?

20   **A.**  So I think of it as a lot like our admissions process

21   from that we ask for information so students and families

22   fill out the FAFSA, the Free Application For Federal Student

23   Aid, the CSS profile through the College Board.  We ask for

24   their tax returns.

25            And we gather all of that information and also it's

Case: 19-2005    Document: 00117631846    Page: 619    Date Filed: 07/29/2020    Entry ID: 6356388
Case 1:14-cv-14176-ADB   Document 642   Filed 04/18/19   Page 148 of 245

148

1    read by multiple financial aid officers.  We actually write a

2    good amount of prose in addition to doing the calculations of

3    income to kind of understand a student's family, you know,

4    what is the family size, are there any sorts of medical

5    expenses or unforeseen expenses that are happening, any

6    stressors, job insecurity, things like that that I think

7    don't come through with just the numbers on someone's tax

8    forms.

9              So this is all information that we take into

10   account and is read by multiple people so that we're being as

11   comprehensive and thoughtful as equitable as possible with

12   our financial aid.

13   **Q.**  Is a student's academic success in high school a factor

14   in awarding the financial aid?

15   **A.**  No.

16   **Q.**  Does Harvard provide athletic scholarships?

17   **A.**  No.  All financial aid is need based.

18   **Q.**  Has Harvard's financial aid budget changed during your

19   time in the office?

20   **A.**  Yes, it's changed.  It's changed quite a bit.  I think

21   it's increased to -- this year I believe it's about

22   $200 million is the budget for this year's undergraduate

23   financial aid.

24   **Q.**  When HFAI was launched, when was that?

25   **A.**  In 2004.

1    **Q.**  So back in 2004, what were the parameters in terms of the

2    amount of aid that a student could receive based on their

3    family income?

4    **A.**  So back then, it was families that had an annual income

5    of under $40,000 there would be no parent contribution.

6    **Q.**  And what are the parameters of HFAI today?

7    **A.**  So today, it's families that are making under $65,000

8    have no parent contribution.

9    **Q.**  And about families who make more than 65,000 dollars?  Is

10   there financial aid above that?

11   **A.**  From 65 to $150,000, it's up to 10 percent.  So if a

12   family is making $140,000 a year with typical assets, their

13   estimated cost for their child to attend Harvard would be

14   about $14,000 a year.  And then beyond that, families that

15   make over 150, over $200,000 still qualify for need-based

16   grant aid.

17   **Q.**  Are there any cutoffs beyond which a student who needs

18   aid can receive aid?

19   **A.**  No.  I think that there's no income cutoff.  It's just

20   because family situations are so unique and nuanced.

21   **Q.**  You mentioned the families with incomes below 65,000

22   where the family contribution is nothing for the students to

23   attend Harvard.

24           What percentage of students fall within that

25   zero-contribution threshold?

1    **A.**  About 20 percent of students, one in five of our

2    students.

3    **Q.**  And about what percent receive aid overall, what percent

4    of the students?

5    **A.**  So I think it's about 55 percent receive aid from our

6    office.

7    **Q.**  The Court heard this morning that Harvard doesn't expect

8    students to take out loans.  Why is that?

9    **A.**  I think it's for the same -- it's all under the same idea

10    of affordability and accessibility that loans are -- that

11    grant makes things more affordable than loans would.

12    **Q.**  Are these all details, is this information that's all on

13    Harvard's websites?

14    **A.**  Yes.

15    **Q.**  And then does HFAI have a role once students are on

16    campus and admitted and coming to the college?

17    **A.**  Yes.  So the current students, they kind of think about

18    it as a community building is where the focus is.

19          So there are dinners for HFAI students featuring

20    local restaurants, study break sessions.  There's the hosting

21    of different kinds of events.  For instance, this coming

22    week -- or I guess two weekends from now is first-year family

23    weekend where a lot of the first-year students' families will

24    come to visit.

25          But for low-income and first-generation students,

1    often their families would be unable to attend because it's

2    cost prohibitive.  And so there's programming that HFAI and

3    the first-gen program are doing to kind of make sure that

4    these students are included in the celebrations of this

5    weekend.

6    **Q.**  And you mentioned that you have some responsibilities

7    with respect to current students.  Are financial aid officers

8    paired up with students once they come to campus?

9    **A.**  Yes.  So once a student has said that they are going to

10   attend, over the summer each student is assigned a financial

11   aid officer.  So I'm the financial aid officer for a number

12   of students, and I would stay with them for the four years

13   that they are at the college.

14   **Q.**  If I could ask you to turn to Tab 3 in that binder in

15   front of you, do you see a document labeled DX27?

16   **A.**  Yes.

17   **Q.**  Do you recognize this document?

18   **A.**  Yes.

19   **Q.**  What is this?

20   **A.**  This is a presentation that I actually helped to put

21   together and give about HFAI and first-generation students.

22            MS. GERSHENGORN:  Your Honor, we'd move to admit

23   DX27.

24            MR. STRAWBRIDGE:  No objection.

25            THE COURT:  It's admitted.

```
 1              (Defendant Exhibit No. DX27 admitted.)

 2    BY MS. GERSHENGORN:

 3    Q.  Turning to Slide 10 of the presentation, could you just

 4    tell me generally what does this slide show?

 5    A.  The slide shows some of the financial and kind of other

 6    sorts of resources and support that's available for HFAI

 7    students.  And actually some of these are for any students

 8    that are on financial aid.

 9    Q.  We won't go through all of them, but just for a couple.

10              What is the winter coat fund?

11    A.  So the winter coat fund is for first-year students who

12    have a zero parent contribution.  So it's money that we

13    actually just deposit it into their bank account, about a

14    week and a half ago, for them to buy winter gear for the

15    coming New England winter.

16    Q.  And what about the midyear considerations?

17    A.  So the financial aid committee -- we actually have

18    reconsideration meetings throughout the year.  But during the

19    end of the calendar year, so in December and then in January,

20    we have specific meetings for families whose financial

21    situations have changed a lot, since again we're using the

22    federal tax returns which are -- often, you know, show a

23    snapshot that's not that recent.

24              So the midyear reconsideration process captures any

25    significant changes, usually a significant loss in income
```

Case: 19-2005    Document: 00117631840    Page: 624    Date Filed: 07/29/2020    Entry ID: 6356388
Case 1:14-cv-14176-ADB    Document 642    Filed 04/18/19    Page 153 of 245

153

1    that happened in that current calendar year, so that we can

2    adjust our financial aid.

3    **Q.**  Are there other programs to support admitted students

4    that are not on this list?

5    **A.**  Yes.  So I think two or three years ago we started a

6    start-up grant for first-year zero-parent-contribution

7    students.  So they receive a thousand dollars each semester.

8    So $2,000 total just to help with the transition into

9    college, because we heard from a lot of our students from the

10   most modest backgrounds how financially difficult that

11   transition to college could be.

12   **Q.**  So we talk now a lot about the HFAI program.  In your

13   view, does the HFAI program foster diversity?

14   **A.**  Yes, I believe it does.

15   **Q.**  How does it do that?

16   **A.**  I think on the outreach and recruitment side that it is

17   putting Harvard and other kind of highly selective,

18   need-blind schools on the radar of students from more modest

19   socioeconomic backgrounds.  And that, in turn, will hopefully

20   increase the socioeconomic diversity on campus.  And then,

21   once they're there, to build a sense of community I think is

22   such an important thing.

23   **Q.**  I want to talk very briefly about the first-generation

24   program.  When was that founded?

25   **A.**  In 2015, I believe.

1   **Q.**  And do you know why that program was created?

2   **A.**  It was created because across the country in higher ed

3   there was -- a lot of students were kind of embracing their

4   first-generation college identity.  We actually had a student

5   group form on campus, the First Generation Student Union, in

6   2014.  So we felt that it was important to have yet another

7   kind of touch point way to reach out to students and to build

8   a more diverse and inclusive community.

9   **Q.**  And is that program organized similar to the HFAI program

10  we were talking about?

11  **A.**  Yes, it is.

12  **Q.**  And if I could just ask you to turn to Tab 4, do you see

13  a document there marked DX103?

14  **A.**  I do.

15  **Q.**  Do you recognize that?

16  **A.**  Yes.  This is our landing page on the first-generation

17  students on our website.

18          MS. GERSHENGORN:  Your Honor, we'd move to admit

19  DX103.

20          MR. STRAWBRIDGE:  No objection.

21          THE COURT:  It's admitted.

22          (Defendant Exhibit No. DX103 admitted.)

23  BY MS. GERSHENGORN:

24  **Q.**  Who does Harvard view to be a first-generation student?

25  **A.**  It's the italicized section at the bottom there.  We

Case: 19-2005    Document 00117631846    Page: 626    Date Filed: 07/29/2020    Entry ID: 6356388
Case 1:14-cv-14176-ADB    Document 642    Filed 04/18/19    Page 155 of 245

155

1    consider a first-generation college student if they will be

2    in the first generation of their immediate family to graduate

3    from a four-year institution.  So the student's parents would

4    not have earned degrees from four-year institutions, but

5    older siblings may have.

6    Q.  And what percent approximately of Harvard's class is

7    first generation?

8    A.  I think it's about 15 to 16 percent.  The class that we

9    actually just admitted earlier this year was a little over

10   17 percent first gen, which was exciting.

11   Q.  And what are your observations of how the

12   first-generation program has impacted the Harvard community?

13   A.  I think that it adds diversity.  It adds the experiences

14   of students to the large chorus of all of the other kinds of

15   experiences and backgrounds and things that comprise of the

16   learning experience of college.

17        You know, I think that first-generation college

18   students bring so much with them.  And I don't want to say

19   that each student brings the same thing because they don't.

20   All of their experiences that have led to them being at the

21   school and embracing this identity is -- it adds to the

22   learning environment.

23   Q.  So I want to actually turn your attention to the rating

24   of a file and the profile ratings that we've been hearing a

25   lot about.

1          How do you think about the profile ratings and the

2    role that they play in the admissions process?

3    **A.**   So when I think of profile ratings, they're really just

4    handles for me for the application of how to go about

5    discussing the applicant in subcommittee and full committee,

6    things like that.

7    **Q.**   Does an applicant get admitted or rejected based solely

8    on the profile ratings?

9    **A.**   No.

10   **Q.**   And when you're having conversations in subcommittee

11   about applicants, what information about the applicant do you

12   have in front of you?

13   **A.**   What information do I have?

14   **Q.**   Yes.

15   **A.**   The entire application.  All of it.

16   **Q.**   Do you have the full application file in front of you in

17   addition to the ratings that your colleagues have assigned?

18   **A.**   Yes.  So all admissions officers have access to all of

19   the application materials of all applicants.

20   **Q.**   And so do you have an opportunity to see the ratings that

21   other admissions officers have assigned when you're in

22   subcommittee?

23   **A.**   Yes.

24   **Q.**   And you also, as you said, you see the full application

25   file at the same time?

1    **A.**   Yes.

2    **Q.**   And do you have an opportunity in the course of those

3    meetings to compare the materials in the file, the essays,

4    the teacher recommendations, to the ratings that your

5    colleagues have assigned and you've assigned?

6    **A.**   Yes.

7    **Q.**   And over your nine years in subcommittee meetings, have

8    you ever seen anything that suggests to you that other

9    admissions officers are treating Asian-Americans unfairly

10   when they're assigning the personal rating?

11   **A.**   I have not.

12   **Q.**   Is that something that you think you would have noticed?

13   **A.**   I absolutely think I would have noticed.

14   **Q.**   And I want to just talk a little more about the

15   application files that you reviewed.

16          Do you remember application files after you've read

17   them?

18   **A.**   I do.  Some more than others I'm sure, but I'm surprised

19   by how much things evoke applications that I've read.

20   **Q.**   Do you remember the ratings that you've applied to

21   specific applications?

22   **A.**   I don't.

23   **Q.**   What is it that you do remember from an application?

24   **A.**   I think that it depends on the application and the

25   applicant that, you know, sometimes it's an essay.  Sometimes

1    it's something that a teacher had said, an anecdote.

2    Sometimes it's something that might have come up in the

3    interview report.  It really varies by the student.

4    **Q.**  So I'd like to turn your attention to an application

5    file.

6           MS. GERSHENGORN:  Your Honor, with your permission,

7    we'll ask the gallery monitors to be turned off and the jury

8    monitors.

9           THE COURT:  Turn off the jury box, please, too,

10   Karen.

11   BY MS. GERSHENGORN:

12   **Q.**  And if we could turn to Tab 5.  And do you see there a

13   document marked DX527?

14   **A.**  Yes, I do.

15   **Q.**  And do you recognize this?

16   **A.**  Yes, I do.  It's an application.

17   **Q.**  So we've talked about before about how a couple of the

18   things, because of the auto filling on the computer system,

19   there are initials there that are not right and the year

20   that's not right.

21          But if we look at -- directing your attention to

22   page 38 of this document, were you the first reader on this

23   file?

24   **A.**  I was, yes.

25          MS. GERSHENGORN:  Your Honor, we'd move to admit

1    DX527.

2              MR. STRAWBRIDGE:  No objection.

3              THE COURT:  It's admitted.

4              MS. GERSHENGORN:  Thank you.

5              (Defendant Exhibit No. DX527 admitted.)

6    BY MS. GERSHENGORN:

7    **Q.**  I'd like you to take us through this application.  What's

8    the first thing you look at when you're reviewing an

9    application file?

10   **A.**  So I start with the common application.

11   **Q.**  Is that at page 4?

12   **A.**  That is page 4, yes.  And just kind of looking over the

13   demographic information that the student provides.

14   **Q.**  The demographic information, is that provided for this

15   applicant?

16   **A.**  Yes, it is.

17   **Q.**  And how did this applicant elect to self-identify in

18   terms of their racial identity?

19   **A.**  So she specifies that she's Asian and more specifically

20   other South Asian/Tibetan.

21   **Q.**  And what else would you look at on these pages?

22   **A.**  You know, I would look at kind of her address, where she

23   lives, the languages spoken at home.  What would stand out to

24   me is that she had requested a fee waiver, and that she's

25   eligible to receive an ACT or SAT testing waiver from the

1    College Board.

2    **Q.**  And what would that indicate to you?

3    **A.**  It would suggest to me that she might be a high school

4    student that would be from a lower income background and

5    therefore an HFAI student.

6    **Q.**  And on that next page where the information is provided

7    about the parents, is there information there that you would

8    find relevant in your consideration of the applicant?

9    **A.**  Yes.  So I see that she has two parents.  They're

10   married.  Her mother is an RN, a registered nurse.  She is

11   employed.  And it looks like she has some schooling, but she

12   never got a four-year degree.

13          And then I would see that her father is listed as a

14   homemaker and also has some schooling but does not have a

15   degree.  And I do see here that she has an older sibling that

16   attends college.

17          This would show me that she has an RN parent and a

18   homemaker parent, and that she's also a first-generation

19   college student.

20   **Q.**  So how would the parental occupations be relevant for you

21   when thinking about this applicant?

22   **A.**  For this particular applicant, it would be something I

23   would be thinking about when looking over the application.

24   Perhaps she chose an interest in medicine or something.

25   Perhaps she's been able to do some shadowing or an internship

Case: 19-2005    Document: 00117633840    Page: 632    Date Filed: 07/29/2020    Entry ID: 6356388
Case 1:14-cv-14176-ADB   Document 642   Filed 04/18/19   Page 161 of 245

161

1    at the hospital where her mother works maybe.

2           And there may be more information about dad being a

3    homemaker, was it a choice that the family had made, you

4    know, are there other sorts of situations or instances in the

5    family that would have resulted in the snapshot that I see

6    here.

7    Q.  Then turning to the next pages, are those the next things

8    that you would look at in reviewing this application file?

9    A.  Yes.  I would look at either her high school -- it seems

10   that she's affiliated with a community-based organization.  I

11   see her self-reported GPA and then also the current courses

12   she's taking for the, year which she's taking seven AP

13   courses for the senior year.  So she's clearly taking a very

14   rigorous curriculum.

15          And then she's listed some honors she's received.

16   National History Day, first-place county champion.  Seems to

17   be something she's very involved in.  The Hugh O'Brian Youth

18   Leadership she's participated in.  These are things that I

19   would notice.

20   Q.  And then her testing scores on the next page?

21   A.  She provides her SAT testing and then some AP subject

22   tests, which there are a good number of.  She's clearly taken

23   AP classes in her junior year as well.

24   Q.  And then would you go to the next page of her activities.

25   A.  Yes.  I would look at her activities and everything that

1    she has kind of told us about.  She was treasurer and vice

2    president of her key club, co-captain of tennis, and you

3    know, that she's involved in the art and architecture club.

4              And I think that -- and she's also, I see, involved

5    in Students For a Free Tibet, which she self-identifies as

6    Tibetan.  She speaks Tibetan at home.  Chose this tie to her

7    culture.

8              And actually the sense that I get from just looking

9    at her activities is that she's clearly very involved in

10   community service, that there's a clear thread here of what

11   she's passionate about, where she's spending her time, where

12   her mind is going.  Yeah.

13   **Q.**  And then what would you look at next?

14   **A.**  I would look at her essay.  And this is actually what I

15   remember about this student.

16   **Q.**  And that's the next page, page 10?

17   **A.**  Yes.

18   **Q.**  And what is it that stood out to you about this essay?

19   **A.**  So she describes going back to the Tibetan refugee

20   community in India where her relatives are and essentially

21   witnessing caste discrimination within this community, and

22   just how she kind of thoughtfully ties it to her own

23   experiences in America.  And just the larger sentiments and

24   themes that she's kind of putting together in this is just

25   really -- it's the kind of thing where you really have to

1    read it.  I'm not doing justice to what a beautiful essay it

2    is and the thought and the clarity of mind and the presence

3    of a person, that no one but she could have written this

4    essay.

5    **Q.**  Then what would you look at after that?

6    **A.**  I would look at the various information that she's

7    applying.  I would look at her various interests.  She's

8    interested in engineering, but it seems at the 4 level.

9         So 1 is most sure, 5 is likely to change.

10        And then I would see her activities, political

11   groups, environmental groups, community service.  These are

12   things that are not surprising to me, given what I've seen

13   her activities to be and what the sense of person that's

14   being conveyed so far.

15   **Q.**  And after that, would you look at a supplemental essay

16   that she wrote there?  Is it on 15?

17   **A.**  Yup, she did.  This is an essay that she's -- she's

18   talking about a painting that she studied in her AP art

19   history class, and she ties it to the self-immolators in

20   their struggle for a free Tibet.

21        On a variety of levels, the fact that she's kind of

22   tying this painting from hundreds of years ago to very

23   current events to things in her life, the way she's kind of

24   thinking about and connecting all of these things is very

25   convincing, very well done.

 1           And just in the same way that actually I think her

 2   personal essay before, and there's this kind of -- it turns

 3   to the reader and there's this kind of together, you know, we

 4   need to embark on this together.  We can do this.

 5           You can already see she's sort of conveying these

 6   sort of things, but there's this forward-looking sort of

 7   action, passion that's there.

 8   **Q.**  And after that, would you turn to the school report, 16

 9   and 17?

10   **A.**  Yes.  So afterwards I would look at the school report.  I

11   have would look at the profile.

12           And so it looks like this profile, the school

13   provides a profile.  So I would take into account things

14   about the school:  the graduating class size; the percentage

15   that's going on to four-year or two-year institutions; the

16   number of students that are on free and reduced lunch.  These

17   are all things that tell us a lot about a school.

18           And then I would also look at the descriptors that

19   the guidance counselor uses about the student.  So here she

20   says she's ambitious, diligent, dedicated, dependable,

21   goal-oriented, natural-born leader, and that the student is

22   recommended enthusiastically.

23   **Q.**  And then does that person provide a letter for you at 20?

24   **A.**  Yes.  So there's a letter on page 20.  This letter just

25   kind of goes more into who she is as a person and of course

Case: 19-2005    Document: 00117631840    Page: 636    Date Filed: 07/29/2020    Entry ID: 6356388
Case 1:14-cv-14176-ADB   Document 642   Filed 04/18/19   Page 165 of 245

165

1    talks about her extracurricular activities, her hard work,

2    her perseverance.  She calls her ambitious, diligent,

3    dedicate, dependable, goal-oriented.  She's extremely

4    conscientious, highly motivated, admired for her humility,

5    concern for others, as well as her intellectual ability and

6    clear-sightedness.

7          The moral fiber and intellectual curiosity she has

8    to offer will enable her to embrace the direct and plentiful

9    learning available at the college level.

10          And in the paragraph before that, just talking

11    about kind of her experiences traveling back to her home

12    country and her connections to her extended family and

13    culture.  "These experiences have not only opened her eyes up

14    to be appreciate to the opportunities and resources made

15    available to her education here in America, but also lit a

16    fire inside her to do everything she can to help the less

17    fortunate and those in need here in America through her

18    community service and club activities mentioned above."

19          It's the same person that's kind of coming through

20    in all of this.

21    **Q.**  And then after that, would you look at the teacher

22    recommendations?

23    **A.**  Yes.  I would look at her transcript.  She has very

24    strong curriculum, and she has all As.  And then her teacher

25    evaluation I would look at.  When we are reading in paper, I

1    would mark up the pages.  Now that we are reading online, we

2    have a highlighting tool, so I would be highlighting parts of

3    these letters that I would want to be reading out or calling

4    attention to in our discussions in committee.

5              In this essay, this teacher says she's a very

6    special young woman of great potential with her quiet skills,

7    determination to succeed, and high intelligence.  She will be

8    an asset to any organization.

9              And earlier this essay says she is especially

10   interested in following a science and academic career, though

11   she is also an-award winning poet, which is not anything that

12   comes through in any other parts of the file thus far.  So

13   again, it shows kind of a breadth of interest in a variety of

14   ways.

15   **Q.**  And then she has another teacher evaluation after that?

16   **A.**  Yes, she does.

17             So what I would notice here is this teacher, the

18   check marks are all the top few, top 1 percent.  The

19   descriptors, "intellectually gifted, exceptionally

20   thoughtful, enormous potential, kind and caring, determined,

21   committed to excellence, concerned about the world, lover

22   learning, fun to be with, friendly, accepting of others, a

23   person who will make a difference."

24             And just looking at the length of this letter at a

25   large kind of public school where teachers are under enormous

1    workloads, clearly the student has impressed this teacher

2    quite a bit.  That's such a range of descriptors and yet is

3    consistent with who is coming to life in this file.

4    **Q.**  And so after you reviewed the second teacher

5    recommendation, what would you do then?

6    **A.**  I would love to see if there are any other

7    recommendations, any other materials to look at.  And if not,

8    then I would sit and begin writing out prose and then go back

9    to the summary sheet and start putting in the profile rating

10    numbers.

11    **Q.**  In a case like this, would you be filling in the ratings

12    as you were going through the file?

13    **A.**  No.  Usually I read through it, make like a first pass

14    and read through everything.  And then, yeah.

15    **Q.**  You assign all of the ratings together at the end then?

16    **A.**  Yes.  Usually.  And sometimes I actually write the prose

17    first because that helps to -- that helps me to clarify my

18    thoughts.

19    **Q.**  Just looking at your ratings on page 38, we talked a lot

20    about who this applicant is as a person.

21    **A.**  Yes.

22    **Q.**  What's the personal rating that you assigned to this

23    applicant?

24    **A.**  I gave her a 2-.

25    **Q.**  And in your nine years of serving, this seems like more

1    like a 1 to me.

2            Have you ever given an applicant a personal rating

3    of 1?

4    **A.**  I have not.

5    **Q.**  What about 1-?

6    **A.**  I don't believe I have.

7    **Q.**  So what does a rating of 2- mean?

8    **A.**  It's a very, very strong rating.

9    **Q.**  And so did you advocate for this applicant in the

10   subcommittee and the committee?

11   **A.**  Yes, I did.

12   **Q.**  And what would you have said about this applicant there?

13   **A.**  I think my kind of summary there is where I would -- you

14   know, essentially what I would say, I like the sound of her.

15   Her voice really comes through in her personal essays.  She

16   seems to have a very solid sense of self and a highly

17   developed sense of empathy and open-mindedness.

18           T2, which is the second teacher report, is

19   extremely helpful and lengthy and helps to flesh out her

20   activities, while EC's, which are extracurriculars, may not

21   be as dazzling as some, she's clearly a natural for PBH,

22   which is our community service organization on campus and is

23   deeply tried to her culture.

24           With HFAI info, so her socioeconomic background,

25   and AIV, which is the alumni interview, maybe want to

```
 1    discuss.  "Slate context may not be too much of an issue but
 2    something to keep in mind."
 3    Q.   What is "slate context" referring to there?
 4    A.   That's all of the applications from her high school.
 5    Q.   Do you know if this applicant was admitted?
 6    A.   Yes, I believe she was.
 7    Q.   I'm just going to look at -- very, very quickly at two
 8    files, have you look at two files.
 9              MS. GERSHENGORN:  These are for students who are
10    going to testify later on in the case, Your Honor.
11    BY MS. GERSHENGORN:
12    Q.   If you could, just look behind Tab 6.
13    A.   Okay.
14    Q.   Do you see a document there marked SA4?
15    A.   Yes, I do.
16    Q.   And do you recognize this document?
17    A.   Yes, I do.
18    Q.   What is this?
19    A.   It's an application for Sarah Cole.
20    Q.   Were you a reader of this application?
21    A.   Yes.  I was the first reader.
22              MS. GERSHENGORN:  Move to admit SA4.
23              MR. STRAWBRIDGE:  No objection.
24              THE COURT:  It's admitted.
25              (Defendant Exhibit No. SA4 admitted.)
```

BY MS. GERSHENGORN:

Q.  And just one or two questions on this very quickly.

That first page, this is a different form than we were just looking at.  Those handwritten markings, where would those have come from?

A.  So the handwritten markings are mostly mine.  And then there are also some from the second reader.

Q.  And toward the top there where it says "A other" and "A other 2 and 3," what are those indicating?

A.  Those are the parents.  And it shows the parent college information and then it looks like the other reader also wrote in where the parents work.

Q.  And then if you could, turn to Tab 7.

THE COURT:  Is this your handwriting on the second page of SA4?

THE WITNESS:  So my handwriting is that top portion.  And then the two bottom lines are the handwriting of the second reader.

THE COURT:  What is C plus C?

THE WITNESS:  C plus C is coast to coast.  So that's -- I'm sorry.  My handwriting is a little hard to read.  It says I think she should look very strong coast to coast.  Meaning whether we get into the full committee context, she will probably look very strong across the board.

BY MS. GERSHENGORN:

1    **Q.**  And is "coast to coast" a phrase that you've used in

2    other applications?

3    **A.**  Yes.

4              THE COURT:  Possibly HFAI and definitely not --

5              THE WITNESS:  -- fancy.

6              THE COURT:  Can you --

7              THE WITNESS:  Would it be helpful for me to read

8    it?

9              THE COURT:  No.  I've got the rest of it.  I'm just

10   asking you to fill in the words I can't actually read.

11             Can you read the one below.  I know it's not your

12   writing.  Is that CSK --

13             THE WITNESS:  Sums up.  She writes CSK sums up.

14   CSK are my initials.  One to do with a great IV.  Hope we can

15   get her.

16             THE COURT:  One to do with a great --

17             THE WITNESS:  -- interview.  Yeah.  So if we had a

18   great interview.

19             THE COURT:  Okay.  Sorry.  I know she's going to

20   testify, but she may not be able to read it either.  I wanted

21   to get it while I had it.

22   BY MS. GERSHENGORN:

23   **Q.**  I just wanted to ask.  You were mentioning for Her Honor

24   coast to coast.  Is that something you use with applicants of

25   all backgrounds and races and ethnicities?

Case: 19-2005    Document 00117623840    Page: 643    Date Filed: 07/29/2020    Entry ID: 6356388
Case 1:14-cv-14176-ADB   Document 642   Filed 04/18/19   Page 172 of 245

172

1    **A.**   Yes.  So I think because of the areas that I cover, I see

2    a lot of HFAI students and a lot of rural students.  So those

3    are the ways that come to mind that I've -- that's what kind

4    of comes to mind.  But essentially it's when we're going into

5    the full committee process that they'll look pretty strong,

6    yeah.

7    **Q.**   If you would go to Tab 7.  Do you recognize this document

8    marked SA3?

9    **A.**   SA3.  This looks to be an application for the class of

10   2017.

11   **Q.**   And were you a reader on this application?

12   **A.**   I was not.

13   **Q.**   Was this in the C docket that you were discussing with

14   Mr. Strawbridge?

15   **A.**   Yes.

16   **Q.**   And were you on C docket at the time that this applicant

17   applied?

18   **A.**   Yes.  Class of 2017.

19   **Q.**   And as we indicated, this is a student who's going to be

20   testifying.  Would you have seen this file in connection with

21   your work on the C docket?

22   **A.**   Yes.

23              MS. GERSHENGORN:  We move to admit SA3.

24              MR. STRAWBRIDGE:  No objection.

25              THE COURT:  It's admitted.

**JA2089**

```
 1              (Defendant Exhibit No. SA3 admitted.)

 2    BY MS. GERSHENGORN:

 3    Q.   Ms. Kim, you've mentioned this a few times, but how long

 4    have you worked as a Harvard admissions officer in Harvard's

 5    admissions and financial aid office?

 6    A.   A little over nine years.

 7    Q.   I think you discussed with Mr. Strawbridge about how many

 8    files you read, and I think he had calculated to it maybe

 9    around 8,000 application files.  Does that sound about right?

10    A.   I guess so.  I haven't counted them, but that would sound

11    right.

12    Q.   And fair to say that you've discussed thousands of

13    applications in subcommittee or full committee?

14    A.   Yes, I would say so.

15    Q.   Have you ever seen another admissions officer demonstrate

16    bias against an applicant because of the applicant's race?

17    A.   I have not.

18    Q.   Have you ever seen another admissions officer demonstrate

19    bias against an Asian-American applicant?

20    A.   I have not.

21    Q.   Have you ever yourself acted in a biased way against an

22    applicant because of their race?

23    A.   No.

24    Q.   When you're considering whether to admit an applicant, is

25    their race ever a negative factor?
```

1    **A.**   It is not.

2    **Q.**   Have you ever admitted an applicant because of his or her

3    race?

4    **A.**   Solely because --

5    **Q.**   Solely.

6    **A.**   No.

7    **Q.**   Have you ever rejected an applicant because of his or her

8    race?

9    **A.**   No.

10    **Q.**   Have you ever been instructed to admit a target number of

11    African-American students?

12    **A.**   No.

13    **Q.**   Mr. Strawbridge was speaking with you earlier about the

14    numbers that Dean Fitzsimmons speaks with you about.  Were

15    you ever instructed to admit a target number of students of

16    any race or ethnicity?

17    **A.**   I have never been instructed to admit any target of any

18    demographic group or anything of the sort.

19    **Q.**   Based on your years working in the admissions office,

20    what is your opinion of the review process, the whole-person

21    review process that Harvard College uses?

22    **A.**   I mean, I -- so I didn't do admissions work before I

23    started at Harvard.  I worked in higher education.  I didn't

24    have any ties to Harvard or anything.

25              So I think that when I went into it, what really

Case: 19-2005    Document: 00117634840    Page: 646    Date Filed: 07/29/2020    Entry ID: 6356388
Case 1:14-cv-14176-ADB    Document 642    Filed 04/18/19    Page 175 of 245

175

 1    struck me was just how thoughtful and transparent the policy

 2    is.  I think in an imperfect world, I think we're kind of --

 3    I can't think of a better way to do this sort of work.

 4    **Q.**  Ms. Kim, are you familiar with the specific allegations

 5    in this case?

 6    **A.**  I am.  I am.

 7    **Q.**  And are you familiar with the fact that one of those

 8    allegations is that the Harvard College admissions office

 9    where you work is discriminating against Asian-Americans?

10    **A.**  I am aware of that.

11    **Q.**  What is your reaction to that allegation?

12    **A.**  So I think initially it was a surprise.  You know, I

13    think now just concern.  It's not what I know our office to

14    be.  It's not who I am.  And I'm -- you know, I would never

15    be part of a process that would discriminate against anybody,

16    let alone people that looked like me, like my family, like my

17    friends, like my daughter.

18            And so I'm actually really grateful to be able to

19    be here to share my little bit of my experience on the

20    admissions committee.  Because, you know -- yeah, I'm not

21    here to say that it's perfect, but I know that we don't

22    discriminate against anyone.  I know that we are thoughtful

23    people, and that we're doing the best that we can do.

24            MS. GERSHENGORN:  Thank you, Ms. Kim.

25            I have no further questions.

```
 1              MR. STRAWBRIDGE:  Nothing else for this witness,

 2    Your Honor.

 3              THE COURT:  Can I ask you one question before you

 4    go?

 5              THE WITNESS:  Sure.

 6              THE COURT:  When you talk about all kinds of

 7    diversity, I take it that also means geographic diversity?

 8              THE WITNESS:  Yes.

 9              THE COURT:  I know there's not targets numbers, but

10    when you go for geographic diversity, how do you -- if

11    there's not a target number, how are you making sure you have

12    that?

13              THE WITNESS:  I think -- so the entire -- the

14    committee is broken up into subcommittees.  So all

15    subcommittees admit students.  But we try to have as much

16    representation as possible, but it's not guaranteed.  There

17    are a number of years where we didn't have any students from

18    the state of Wyoming or where sometimes there are parts of

19    the world or parts of the United States that are

20    underrepresented.  So I think we do what we can in our

21    outreach efforts and hope that we see them in the applicant

22    pool.

23              But beyond that, there's no way for us to do that.

24    Sometimes all 50 states are not represented.  Sometimes not

25    all of the different kinds of groups as represented as
```

Case: 19-2005   Document 00117681846   Page: 648   Date Filed: 07/29/2020   Entry ID: 6356388
Case 1:14-cv-14176-ADB   Document 642   Filed 04/18/19   Page 177 of 245

177

 1   perhaps it would have been nice to have been the case.

 2          THE COURT:  Is it ever like we have to find someone

 3   from Wyoming?

 4          THE WITNESS:  No.  I can think of a couple years

 5   where -- because I also do financial aid applications and

 6   things like that, it was like, wait a minute, we don't have

 7   any students from Wyoming, was one state.  And I can't

 8   remember the other state where we just didn't have students.

 9   And that's the nature of our process.

10          Does that answer your question?

11          THE COURT:  I was just thinking you have kind of

12   like geographic quotas, and then you have a geographic area

13   that's, say, heavily Asian that you could get a quota on that

14   geographic area, you could be tamping down the Asian

15   applicants to get the geographic diversity.

16          THE WITNESS:  We don't have quotas by geographic

17   area, is my understanding, especially when we're kind of

18   entering the final weeks.  We're not kind of saying, oh,

19   there are too few students from the Mid-Atlantic, so we need

20   to keep some in.  That's not the way it is.

21          THE COURT:  Okay.  Now I've asked her some

22   questions.  I know you've all passed the witness, but I'll

23   give you a chance to follow up if you want to.

24          MR. STRAWBRIDGE:  No, Your Honor.  Thank you.

25          MS. GERSHENGORN:  No, Your Honor.

```
 1              THE COURT:  This time you really are excused.

 2              MS. HACKER:  Your Honor, we're ready for the next

 3   witness.  But given that we're going a little bit later

 4   today, do you want to take an afternoon break?

 5              THE COURT:  I'm happy to take a break if that's

 6   what you all want to do.

 7              We'll take a break until 3:00 and go until you want

 8   to go.

 9              (Court recessed at 2:44 p.m.)

10              MS. HACKER:  We're ready to proceed, Your Honor.

11              THE COURT:  Yes.  When you're ready, go ahead.

12              MS. HACKER:  SFFA calls Tia Ray.

13              (TIA RAY duly sworn by the Deputy Clerk.)

14              THE CLERK:  Thank you.  You may be seated.

15              Can you please state your name and spell your last

16   name for the record.

17              THE WITNESS:  My name is Tia Mari Ray, R-A-Y.

18                         EXAMINATION

19   BY MS. HACKER:

20   Q.  Good afternoon, Ms. Ray.

21   A.  Good afternoon.

22   Q.  My name is Kat Hacker.  We haven't had an opportunity to

23   meet before.  Thank you for being here today.  I'd like to

24   start with how you became involved at Harvard.

25              You actually graduated from Harvard, right?
```

 1    **A.**  Yes.

 2    **Q.**  That was in 2012?

 3    **A.**  Yes.

 4    **Q.**  After you got your undergraduate degree, you took a job

 5    working in the admissions office?

 6    **A.**  Correct.

 7    **Q.**  Your first job there was as an admissions officer?

 8    **A.**  Yes.

 9    **Q.**  And about three years later, you were promoted to senior

10    admissions officer?

11    **A.**  Yes.

12    **Q.**  Let's jump in today by talking about how Harvard uses

13    race in the admissions process because, after all, that's why

14    we're all here.

15           I think we can agree on one thing that Harvard does

16    use race as at least one factor in the admissions process,

17    right?

18    **A.**  Yes, it can be.  For competitive applicants, we may

19    provide a tip.

20    **Q.**  What's your understanding for why Harvard provides that

21    tip for race in the admissions office?

22    **A.**  It's one factor that we may consider as we're looking at

23    students as whole people who may contribute to our campus

24    community.

25    **Q.**  Do you consider that factor in the admissions process to

1    help make sure that Harvard builds a community that reflects

2    a diversity of cultures?

3    **A.**  We use it as one factor to ensure that we have a class

4    that's diverse in many different ways.

5    **Q.**  And to ensure that Harvard has a diverse community,

6    right?

7    **A.**  From my understanding, yes.

8    **Q.**  You don't know of any written document at Harvard that

9    describes how race should play into the admissions process,

10   right?

11   **A.**  Can you repeat your question?

12   **Q.**  Sure.  You don't know of any written document at Harvard

13   that describes how race should play into the admissions

14   process; is that right?

15   **A.**  That is incorrect.

16   **Q.**  Ms. Ray, do you remember giving a deposition in this

17   case?

18   **A.**  Yes.

19           MS. HACKER:  May I approach, Your Honor?

20           THE COURT:  Yes.

21   BY MS. HACKER:

22   **Q.**  Ms. Ray, you were under oath when you gave this

23   deposition, right?

24   **A.**  Yes.

25   **Q.**  I'd like to turn your attention to page 128 in your

**JA2097**

1    deposition, if you'll flip with me there.

2            And I'd like to focus your attention on lines 1

3    through 5.  You were asked, "Is there any written document at

4    Harvard that describes how racial identity should play into

5    the admissions process?

6            And you answered, "Not that I know of."

7            Were you asked that question and did you give that

8    answer at your deposition?

9    **A.**  Yes.

10   **Q.**  Now, it's not a written document, but you've actually

11   given presentations to admissions officers about diversity

12   before, right?

13   **A.**  Yes, about diversity, but not how to take that into

14   consideration in the admissions process.

15   **Q.**  And that was my next question actually.

16           Those presentations, they weren't designed to

17   instruct admissions officers on when to use race in the

18   admissions process, right?

19   **A.**  Correct.

20   **Q.**  One of the presentations you gave, actually the first

21   presentation you gave, was in the fall of 2013; is that

22   right?

23   **A.**  Yes.

24   **Q.**  Let's talk a little bit about that presentation, and I'm

25   going to pull up P99.  You have a copy of that in the binder

1  in front of you, if you'd like to look at a hard copy, though

2  I'll zoom in on the screen to try to make it easier to see.

3       Do you recognize P99 as the notes that you took in

4  preparing to give this presentation in the fall of 2013?

5  **A.**  Yes.

6  **Q.**  And the handwriting we see on this document is yours,

7  correct?

8  **A.**  Yes, that is correct.

9       MS. HACKER:  SFFA offers P99.

10      MS. CONLEY:  No objection, Your Honor.

11      THE COURT:  It's admitted.

12      (Plaintiff Exhibit No. P99 admitted.)

13  BY MS. HACKER:

14  **Q.**  Let's start at the top, Ms. Ray.  And here you say,

15  "Noticed that there are many questions around the way racial

16  identity should play into the admissions process."

17       Do you see that?

18  **A.**  Yes.

19  **Q.**  So you found that admissions officers had questions about

20  how they were supposed to use race in evaluating

21  applications?

22  **A.**  We noticed that there may be some questions, and this

23  presentation was designed to provide greater context for

24  admissions officers' work.

25  **Q.**  And that's what you go on to explain here, right, "We

1    wanted to see if we could provide some context to better

2    situate and understand the questions that we want to be

3    asking and not asking when evaluating applicants."

4           That's what it says here?

5    A.  Yes.

6    Q.  If we turn to the next page, we can see -- let me zoom in

7    on this so you can see it a little bit better on the screen.

8           We see that there's a section here called "Testing

9    Distributions."  Do you see that?

10   A.  Yes.

11   Q.  And under that subtitle you note, "Although around

12   1.5 million students took the SATs, we see some stark

13   realities about educational access and attainment when

14   looking at the actual score ranges of different demographic

15   groups."

16          Do you see that?

17   A.  Yes.

18   Q.  Then you continue to note a little further down the page,

19   "For example, if we're thinking of the number of black

20   students in the entire country scoring above 700, we're

21   looking at a little over 2,000.  And this is students in the

22   entire country, not necessarily students who are even

23   applying here."

24          And you have a big exclamation mark next to that.

25   Do you see that?

1    **A.**   Yes.

2    **Q.**   And then there's a similar explanation for native -- the

3    reference to native there is Native American students, right?

4    **A.**   Yes.

5    **Q.**   And there's a similar reference for Mexican-American

6    students, right?

7    **A.**   Yes.

8    **Q.**   Let's take a look at one more exhibit that talks about

9    the same thing.  I want to turn your attention to D19.

10              Ms. Ray, do you recognize this document as the

11   slides from the presentation you gave to new admissions

12   officers the next year in 2014?

13   **A.**   Yes.

14              MS. HACKER:  SFFA offers D19.

15              MS. CONLEY:  No objection.

16              THE COURT:  It's admitted.

17              (Defendant Exhibit No. DX19 admitted.)

18   BY MS. HACKER:

19   **Q.**   Ms. Ray, I'd like to turn to page 10 in this document.

20   I've got it up on the screen.

21              We see some approximate numbers here of students

22   scoring above 700 on the SATs, right?

23   **A.**   Yes.

24   **Q.**   And we see that just looking at the math scores, we see

25   roughly 2,000 black students who score above 700 on the SATs?

1    **A.**   Yes.

2    **Q.**   And that's compared to just under 50,000 Asian-American

3    students who score above 700 on the SATs, right?

4    **A.**   Yes.

5    **Q.**   And that AAPI is Asian-American Pacific Islander?

6    **A.**   Yes.

7    **Q.**   Given these numbers, it's more uncommon to see an

8    African-American applicant scoring over 700 on their SATs

9    than an Asian-American applicant, right?

10   **A.**   From my experience typically, yes.

11   **Q.**   And did you provide these numbers -- I think earlier you

12   said you gave this presentation to give admissions officers

13   greater context, right?

14   **A.**   Yes.

15   **Q.**   So you provided these numbers to give the admissions

16   officers some context on these testing distributions?

17   **A.**   Yes, in part.

18   **Q.**   So you were training your fellow admissions officers to

19   understand the relative rarity of these applicants; is that

20   right?

21   **A.**   No.  It was to allow admissions officers to better be

22   able to situate the potential access to things like SAT

23   testing that may be impacted by a variety of factors.

24   **Q.**   And you wanted your fellow admissions officers to

25   understand how that variety of factors can contribute to the

Case: 19-2005    Document: 00117638840    Page: 657    Date Filed: 07/29/2020    Entry ID: 6356388
Case 1:14-cv-14176-ADB    Document 642    Filed 04/18/19    Page 186 of 245

186

1    relative rarity of some of these different demographic groups

2    getting high scores on SATs, right?

3    **A.**  It was more so to provide information regarding the types

4    of things that may influence a student's ability to have

5    access to things like even taking an exam.

6    **Q.**  And what influences a student's ability to take an exam

7    can actually affect the numbers as we've seen, right?

8    **A.**  It may, alongside many other factors.

9    **Q.**  Let's take a look at P75.  Do you see that document,

10   Ms. Ray?

11   **A.**  Yes.

12   **Q.**  You recognize this as the personal interview report?  I

13   think it says that right up here in the corner that is used

14   for interviewers to fill out when they meet with applicants?

15   **A.**  For alumni interviewers, yes.

16              MS. HACKER:  SFFA offers P75.

17              MS. CONLEY:  No objection.

18              THE COURT:  It's admitted.

19              (Defendant Exhibit No. P75 admitted.)

20   BY MS. HACKER:

21   **Q.**  If you turn with me to the third page, Ms. Ray, there's a

22   section here on overall rating.  Do you see that?

23   **A.**  Yes.

24   **Q.**  And interviewers can check some boxes down here at the

25   bottom that they think pertain to certain applicants, right?

1    **A.**  Yes.

2    **Q.**  And we see a box that's called "Diamond in the Rough."

3    Do you see that?

4    **A.**  Yes.

5    **Q.**  Does that describe one of the things that admissions

6    officers and alumni interviewers should be on the lookout

7    for, as we've been talking about, this unique diamond in the

8    rough?

9    **A.**  Can you repeat your question?

10   **Q.**  Sure.  We see a box here called "Diamond in the Rough,"

11   right?

12   **A.**  Yes.

13   **Q.**  So obviously this is one thing that Harvard is looking

14   for in potential applicants, people who are the rare

15   diamond-in-the rough applicant, right?

16   **A.**  No.  I've taken that to mean that someone can be

17   described as a diamond in the rough.

18   **Q.**  And someone that would be described as a diamond in the

19   rough is someone that Harvard is looking for?

20   **A.**  Potentially, alongside many other things that may apply

21   to interviews.  As you can see, there's a variety of boxes

22   that can be checked both positively and less positively in

23   that section.

24   **Q.**  Do you think that diamond in the rough is taken in a

25   negative way?

1    **A.**   I think it would depend entirely on the description of

2    the interview.

3    **Q.**   But it's more likely, right, when somebody checks this

4    box, diamond in the rough, after meeting an applicant,

5    they're using that to convey that they like this applicant

6    and they think they would add to Harvard's class in some

7    positive way, right?

8    **A.**   Typically, yes.

9    **Q.**   Now, I'd like to turn back to your presentation to talk

10   about one more thing.  That was D19.  Let's turn to page 50.

11   What I'd like to focus on is the bottom bullet on this page.

12          It says, "Regardless of economic background, black

13   students' experiences are impacted by racial bias, both

14   explicit and implicit."

15          Do you see that?

16   **A.**   Yes.

17   **Q.**   You'd agree that it's not just black students, though,

18   who are impacted by explicit and implicit bias, right?

19   **A.**   Correct.

20   **Q.**   For example, Asian-American students are also impacted by

21   explicit bias?

22   **A.**   Yes.

23   **Q.**   And Asian-American students are also impacted by implicit

24   bias?

25   **A.**   Yes, as we're discussing broader sociological issues.

1  **Q.**  Now let's talk about what you actually do as an

2  admissions officer to decide who to admit to Harvard.

3          Admissions officers read over student application

4  files and provide a number of ratings, right?

5  **A.**  Yes.

6  **Q.**  Let's talk through those ratings, starting with academic.

7  In assigning a student an academic rating, you look at those

8  students' qualifications, right?

9  **A.**  Correct.

10  **Q.**  You don't take race into account when you assign an

11  academic rating?

12  **A.**  Correct.

13  **Q.**  You've never noticed that Asian-Americans on average have

14  worse academic qualifications than other races or

15  ethnicities?

16  **A.**  Correct.

17  **Q.**  In assigning an applicant an extracurricular score, you

18  look at things like involvement in activities at their high

19  school or in their community?

20  **A.**  Correct.

21  **Q.**  You don't take race into account when you assign an

22  applicant an extracurricular rating?

23  **A.**  That's also correct.

24  **Q.**  And you've never noticed that Asian-Americans on average

25  are less involved in activities at their high schools or in

1  their communities?

2  **A.**  Correct.

3  **Q.**  In assigning an applicant an athletic score, you look at

4  their involvement in athletic activities, right?

5  **A.**  Yes.

6  **Q.**  You don't take race into account when assigning someone

7  an athletic rating?

8  **A.**  We do not.

9  **Q.**  You haven't noticed that Asian-Americans are less

10  involved in athletic activities than other races or

11  ethnicities?

12  **A.**  Correct.

13  **Q.**  In giving an applicant a personal rating, you're looking

14  at their personal qualities and character, right?

15  **A.**  Yes.

16  **Q.**  You're generally looking for is this person a good

17  person?

18  **A.**  That's one type of question we may ask, yes.

19  **Q.**  Another type of question you may ask -- I think we've

20  heard this from some other people -- is what the applicant

21  could add to the community at Harvard?

22  **A.**  In terms of their personality, yes.

23  **Q.**  You're looking at all sorts of things that go into what

24  someone could add to the community at Harvard, right?

25  **A.**  Yes.

1    **Q.**  You don't take a student's race into account, though,

2    when determining an applicant's personal rating, right?

3    **A.**  Correct.

4    **Q.**  The last rating I'd like to talk through is the school

5    support ratings.  You calculate those by reading the

6    recommendation letters and assessing the strength of the

7    school report based on those, right?

8    **A.**  Yes.

9    **Q.**  You don't take a student's race into account when

10   determining their school support rating?

11   **A.**  Can you repeat your question?

12   **Q.**  Sure.  You don't take race into account when determining

13   those school support ratings, right?

14   **A.**  Correct.

15   **Q.**  Like all the other ratings we've talked about, you

16   haven't noticed that one group of students tend to have

17   different school support ratings based on race, right?

18   **A.**  Not from my experience.

19   **Q.**  So once the admissions officers read and rate the

20   application files, then the next step in the process are the

21   subcommittee and committee meetings; is that right?

22   **A.**  Yes.

23   **Q.**  In these meetings, you get together as a group in a

24   conference room, I imagine, and you put the application up on

25   a big projector, right?

1    **A.**   Yes.

2    **Q.**   One of the components that you project up onto a big

3    screen is the applicant's race?

4    **A.**   Yes.  Alongside other features of the application.

5    **Q.**   By the time you're in the regular action subcommittee

6    meetings, it's around January or February, right?

7    **A.**   Yes.

8    **Q.**   By that point, you've reviewed all the early action

9    candidates?

10   **A.**   Yes.

11   **Q.**   And you've been reviewing the regular action applicants

12   for weeks at that point, right?

13   **A.**   Yes.

14   **Q.**   So in the subcommittee meeting, you're deciding whether

15   to provisionally admit or reject an applicant; is that right?

16   **A.**   Yes.

17   **Q.**   And one of the factors you consider, among others, in

18   deciding whether to admit or reject an applicant is their

19   race?

20   **A.**   Yes, it may be.

21   **Q.**   When deciding whether an applicant should move from the

22   subcommittee to the full committee meeting, you take race

23   into account as at least one factor among others, right?

24   **A.**   It can be one factor among many that we're considering.

25   **Q.**   And then after the subcommittee meetings, you get to the

1    full committee meeting process?

2    **A.**  Yes.

3    **Q.**  At the beginning of the full committee meeting, someone

4    announces the racial composition of the class that has been

5    tentatively admitted, right?

6    **A.**  Sometimes, yes.

7    **Q.**  You have, in fact, learned the racial composition of the

8    students that Harvard has admitted to that date at the

9    beginning of the full committee process, right?

10    **A.**  Sometimes, yes.

11    **Q.**  And I assume when you learn the racial composition of the

12    students, it's Dean Fitzsimmons who tells the committee those

13    numbers?

14    **A.**  Sorry.  Could you repeat your question?

15    **Q.**  Is it Dean Fitzsimmons who tells those numbers to the

16    committee at the beginning of the full committee meetings?

17    **A.**  Yes.  He may share numbers about the broad demographics

18    of the class, including racial or ethnic identity, geography,

19    intended concentration, as some examples.

20    **Q.**  And Dean Fitzsimmons does that at the very beginning of

21    the full committee meeting?

22    **A.**  Yes.

23    **Q.**  Then in the full committee meeting you go through a

24    similar process of putting an applicant's file on a big

25    screen, right?

1    **A.**   Yes.

2    **Q.**   And the same information including an applicant's race

3    goes up on that big screen?

4    **A.**   Yes.

5    **Q.**   Then after you review a student and discuss them, a vote

6    might be taken; is that right?

7    **A.**   Correct.

8    **Q.**   But whether a vote happens depends on the strength of the

9    case and the feeling in the room?

10   **A.**   Yes.

11   **Q.**   Again when you're making those decisions to admit or

12   reject an applicant, one of the factors you consider is an

13   applicant's race?

14   **A.**   Sorry.  Can you repeat why you are question?

15   **Q.**   That's okay.  I'm happy to.

16        When you're making these decisions in the full

17   committee meetings to admit or reject an applicant, one of

18   the factors you consider is an applicant's race, right?

19   **A.**   One of the factors that we may consider as we're deciding

20   who to admit may be race.  But that would never be something

21   that would tip somebody out of the class or a reason for

22   denial.

23   **Q.**   And race is one factor, among others, you consider in

24   deciding whether to deny admission to an applicant, right?

25   **A.**   No.

1    **Q.** Race is one factor you consider in deciding among the

2    many other factors that you use to determine who you will

3    deny admission to, right?

4    **A.** No.

5    **Q.** Ms. Ray, if you could, turn to page 85 of your deposition

6    with me. I'm going to focus your attention on lines 9

7    through 13. Let me know when you get there.

8    **A.** I am there.

9    **Q.** "QUESTION: So when deciding who you will deny admission

10   to, race is a factor, is one factor among many that you use

11   to determine who you will deny admission to, correct?

12           "ANSWER: Yes."

13           MS. CONLEY: Your Honor, for completion, I'd ask

14   that the testimony at page 84, lines 4 through 12 be read.

15   BY MS. HACKER:

16   **Q.** Let's look at the previous page, too, Ms. Ray.

17           You were asked, "Sure. But it could be one factor

18   among -- a race could be one factor among many in deciding to

19   deny an applicant admission to Harvard, correct?

20           "ANSWER: No. Race is one factor that we are

21   considering as we evaluate a student's applicant file but it

22   is not a determining factor."

23           Were you asked those questions and did you give

24   those answers at your deposition?

25   **A.** Yes.

1    **Q.** Then just like at the beginning, when you get to the end

2    of the full committee meeting, someone announces the racial

3    composition of the admitted students; is that right?

4    **A.** Sometimes, yes.

5    **Q.** To be clear, you have learned the information about the

6    demographic and racial composition of the admitted students

7    at the end of the full committee process, right?

8    **A.** Yes.

9    **Q.** After the full committee process ends, then the next step

10    is the lopping process, right?

11    **A.** Yes.

12    **Q.** At that point, you have to decide which students to

13    remove from the tentatively admitted class?

14    **A.** Correct.

15    **Q.** Let's take a look together at a lop list so we can see

16    what actually goes into this practice.  Look at P200.

17            Ms. Ray, do you recognize this as an example of a

18    lop list?

19    **A.** Yes.

20    **Q.** And we see it's labeled "Docket Lop List" here at the

21    top?

22    **A.** Yes.

23    **Q.** You filled out forms like this when deciding who to lop,

24    correct?

25    **A.** Yes.

**JA2113**

Case: 19-2005   Document: 00117632840   Page: 668   Date Filed: 07/29/2020   Entry ID: 6356388
Case 1:14-cv-14176-ADB   Document 642   Filed 04/18/19   Page 197 of 245

197

1   **Q.**  And this is for docket K.  We see that noted here at the

2   top?

3   **A.**  Yes.

4   **Q.**  You were assigned docket K; is that right?

5   **A.**  At one point, yes.

6   **Q.**  Were you assigned docket K for the class of 2017?

7   **A.**  Yes.

8   **Q.**  And we can see that these initials TMR refer to you,

9   correct, because you were on the docket that year?

10  **A.**  Yes.

11  **Q.**  And do you recognize the handwriting as Sally Harty's

12  handwriting in this document?

13  **A.**  Yes.

14          MS. HACKER:  Your Honor, SFFA offered P200.

15          MS. CONLEY:  No objection, Your Honor.

16          THE COURT:  It's admitted.

17          (Plaintiff Exhibit No. P200 admitted.)

18  BY MS. HACKER:

19  **Q.**  What we're looking at, Ms. Ray, each line, and we can see

20  numbers 1, 2, 3, and we can see these lines continuing down

21  the page, these all represent an applicant who the docket is

22  considering moving from the provisional admit pile to the

23  rejected pile.  Is that right?

24  **A.**  Yes.

25  **Q.**  And for each applicant, we see four factors in these

Case: 19-2005    Document: 00117631840    Page: 669    Date Filed: 07/29/2020    Entry ID: 6356388
Case 1:14-cv-14176-ADB    Document 642    Filed 04/18/19    Page 198 of 245

198

 1   columns.  The first one is LIN.  Do you see that?

 2   **A.**  Yes.

 3   **Q.**  That stands for lineage?

 4   **A.**  Correct.

 5   **Q.**  The next one is ETH.  That stands for ethnicity, right?

 6   **A.**  Yes.

 7   **Q.**  And we also see on here ATH for athlete; is that right?

 8   **A.**  Yes.

 9   **Q.**  And then we see a reference to HFAI or financial aid,

10   right?

11   **A.**  Yes.

12   **Q.**  So these are the four factors that you're looking at when

13   deciding whether to lop a student; is that right?

14   **A.**  No.

15   **Q.**  Is it your testimony that you don't consider these four

16   factors when deciding whether to lop a student?

17   **A.**  It's my testimony that these are not the only factors

18   that we're considering when we're determining who to remove

19   from the tentatively admitted class.

20   **Q.**  But these are four factors that you take into account in

21   deciding whether to lop a student, right?

22   **A.**  These are several of the many we may take into

23   consideration.

24   **Q.**  And one of the many included in that consideration is

25   ethnicity?

1    **A.**   Yes.  As we're determining the candidates.

2    **Q.**   I'd like to take a look at the Xs down here in this

3    column.  Do you see these Xs?  I'll put a square around them.

4    Do you see that?

5    **A.**   Yes.

6    **Q.**   So we see a squiggly line through the middle of the page.

7    Above that line are the seven applicants who are getting

8    lopped, correct?  They're getting moved to the rejected pool?

9    **A.**   Potentially, yes.

10   **Q.**   Do you see that it says "seven out" up here at the top?

11   **A.**   Yes.

12   **Q.**   And then there's seven applicants who are getting taken

13   out of the provisional admit pool?

14   **A.**   Yes.  Those are seven potential candidates to be removed.

15   **Q.**   And then below the line we have four candidates that are

16   not getting removed from the provisional admit pool.  Do you

17   see that?

18   **A.**   I see those candidates.

19   **Q.**   And three of the four candidates below that line who are

20   not getting lopped out of the provisional admit pools have an

21   X in the ethnicity box; is that right?

22   **A.**   Well, I'd like to clarify that the candidates below that

23   line may also be removed from the tentatively admitted class.

24   **Q.**   But what we see on this document are four candidates that

25   at least as of this point are not getting removed from the

1    tentatively admitted class?

2    **A.**   It would depend entirely on the discussion with the full

3    committee.

4    **Q.**   On this piece of paper, Ms. Ray, do you see that there's

5    a dividing line between the candidates that are being

6    suggested above the line to be removed from the provisional

7    admit pool and those below, right?

8    **A.**   Yes, I see that line.

9    **Q.**   And of the four candidates below that line, three of them

10   have an X mark in the ethnicity box?

11   **A.**   I see that the candidates below the line have that X

12   mark.

13   **Q.**   You'd agree with me that the categories listed on this

14   document can be important when determining which students to

15   lop, right?

16   **A.**   They can be important, as can many other factors.

17   **Q.**   Let's move on to talking about your role as the director

18   of the undergraduate minority recruitment program.

19          You were given the job as assistant director of

20   that program in 2012 when you started working in the

21   admissions office, right?

22   **A.**   Yes.

23   **Q.**   That was immediately after you got your undergraduate

24   degree?

25   **A.**   Very shortly after, yes.

1    **Q.**  Then you were promoted to the position as director of the

2    undergraduate minority recruitment program within three

3    years, right?

4    **A.**  Yes.

5    **Q.**  Besides you, there's only one other full-time employee

6    with the undergrad minority recruitment program?

7    **A.**  Yes.

8    **Q.**  That's the assistant director?

9    **A.**  Correct.

10    **Q.**  Then there's the between two and roughly ten students who

11    work for the program, depending on the time of year?

12    **A.**  Correct.

13    **Q.**  So there's never more than a dozen people working for the

14    undergraduate minority recruitment program?

15    **A.**  That's incorrect.

16    **Q.**  Is there a time of year when there are more students who

17    work for the program?

18    **A.**  Yes.

19    **Q.**  How many students at a maximum work for the program?

20    **A.**  25 to 30.

21    **Q.**  And has that changed in the last year?

22    **A.**  No.

23    **Q.**  So you have 25 to 30 students who can be employed -- I

24    assume that's during the school year, not during the summer?

25    **A.**  Correct.

1    **Q.**  But then the two full-time employees also work both

2    school year and during the summer, right?

3    **A.**  The admissions office employees, yes.

4    **Q.**  Do you think it would be helpful to have more full-time

5    employees?

6    **A.**  Potentially, yes.

7    **Q.**  You could potentially get more accomplished the more

8    employees you had, right?  Pretty basic idea?

9    **A.**  Sometimes, yes.

10   **Q.**  Let's take a look at P55 together.

11        Ms. Ray, do you recognize this as an email that

12   Amy -- is it Amy Lavoie?

13   **A.**  Yes, that's correct.

14   **Q.**  This is an email that Amy Lavoie sent to you and a number

15   of other people in October of 2013, right?

16   **A.**  Correct.

17        MS. HACKER:  SFFA offers P55.

18        MS. CONLEY:  No objection.

19        THE COURT:  It's admitted.

20        (Plaintiff Exhibit No. P55 admitted.)

21   BY MS. HACKER:

22   **Q.**  Ms. Ray, I'd like to look at page 11 in this document

23   together.  I'll zoom in a little bit because the text is

24   pretty small.  This is an example of an email that gets sent

25   out through the undergraduate minority recruitment program to

 1   potential applicants, right?

 2   **A.**   Sorry.  Can you repeat your question?

 3   **Q.**   Sure.  What we're looking at is just an email that gets

 4   sent out through the undergraduate minority recruitment

 5   program to potential applicants to Harvard?

 6   **A.**   Correct.  This is an example from that year 2013.

 7   **Q.**   The purpose of these emails is to encourage minorities to

 8   apply to Harvard, right?

 9   **A.**   Correct.

10   **Q.**   You send emails like this.  You mentioned what year this

11   is, but these type of emails get sent out every year, right?

12   **A.**   Yes.  Emails like this but with similar but more specific

13   content.

14   **Q.**   But you don't know if these emails are effective in

15   increasing the number of minorities who apply to Harvard,

16   right?

17   **A.**   I don't know in terms of specific statistics, but from my

18   anecdotal knowledge, yes, I find them effective.

19   **Q.**   Ms. Ray, I'd like you to turn to page 112 of your

20   deposition.  I'd like to turn your attention to lines 4

21   through 8.

22          "QUESTION:  And you find that these types of emails

23   are effective in increasing the unable of minorities who

24   apply to Harvard?

25          "ANSWER:  I don't know."

**JA2120**

```
 1              Were you asked that question and did you give that
 2     answer?
 3              MS. CONLEY:  Your Honor, in interest of
 4     completeness, I'd like for the remaining four lines to be
 5     read.
 6              MS. HACKER:  Happy to read them.
 7              MS. CONLEY:  Thank you.
 8     BY MS. HACKER:
 9     Q.  The next question, "Why don't you know?
10              "ANSWER:  I don't know the complete statistics on
11     application rates of students who are on our search list."
12              Were you asked those questions and did you give
13     those answers, Ms. Ray?
14     A.  Yes.
15     Q.  So if these emails, since you don't know the full
16     statistics, if these emails aren't effective, would you want
17     to take other steps to try to encourage minorities to apply
18     to Harvard?
19     A.  Yes.  As I noted also, I may not know the full
20     statistics.  However, from anecdotal knowledge, I know that
21     the emails are effective, and the UMRP does take many other
22     steps to recruit students of color.
23     Q.  If the statistics showed you could be more effective,
24     would you want to do more to encourage minorities to apply to
25     Harvard?
```

1    **A.**  Yes.

2    **Q.**  And I'm assuming -- strike that.

3           Ms. Ray, I'd like to end today by talking about

4    something we started with, and that's why Harvard uses race

5    in admissions.  You already explained to us that Harvard uses

6    race in admissions to help assemble a diverse community.

7           Do you remember that?

8    **A.**  Yes.

9    **Q.**  And you already told us that when assigning an applicant

10   a personal rating, you consider, among lots of things, what

11   someone could add to the community, right?

12   **A.**  Sorry.  Can you repeat your question?

13   **Q.**  Sure.  What you told us earlier is when you're assigning

14   an applicant a personal rating, one thing, among many others

15   that you consider, is what that applicant could add to the

16   community; is that right?

17   **A.**  Correct.  In terms of personality and potential impact.

18   **Q.**  Are you sure that you never consider how an applicant's

19   race could add diversity to the community when you're

20   assigning a personal rating?

21   **A.**  I'm sure.

22           MS. HACKER:  Pass the witness.

23           MS. CONLEY:  Your Honor, if we could just have one

24   minute to set up.

25           THE COURT:  Of course.

1          MS. CONLEY:  Thank you.

2                          EXAMINATION

3     BY MS. CONLEY:

4     **Q.**  Good afternoon, Ms. Ray.

5     **A.**  Good afternoon.

6     **Q.**  I want to pick up on something that Ms. Hacker asked you

7     about with respect to written guidance in the office with

8     respect to how to use race in the admissions process.

9          Ms. Hacker asked you the question whether it was

10    your understanding that there was no written guidance as to

11    how to use race in admissions.  And you told her that was

12    incorrect.

13         Do you recall when she asked you that?

14    **A.**  Yes.

15    **Q.**  And then she showed you your deposition testimony in

16    which you said that there was no written guidance at the time

17    of your deposition?

18    **A.**  Correct.

19    **Q.**  Now, what were you referring to today when you told

20    Ms. Hacker that she was incorrect?

21    **A.**  I was referring to reading procedures for the class of

22    two thousand and -- recent reading procedures that reinforced

23    what we had already been doing in practice but were created

24    after the day of my deposition.

25    **Q.**  So were you referring to reading procedures that were

1    issued this year?

2    **A.**  Yes, I was.

3    **Q.**  And did those reading procedures that were issued this

4    year reflect any changes to the admissions policy?

5    **A.**  Absolutely not.  It was just a reinforcement of what we

6    had already been doing in practice.

7    **Q.**  So when you answered at your deposition that there were

8    no written procedures on the use of race, you were talking

9    about at that particular time, correct?

10   **A.**  Correct.

11   **Q.**  But sitting here today when you said that there were

12   reading procedures, you were talking about reading procedures

13   that had been issued after your deposition; is that right?

14   **A.**  That is correct.

15   **Q.**  Now, Ms. Hacker asked you a few questions about whether

16   and when applicants can get a tip for race.  Do you recall

17   those questions?

18   **A.**  Yes, I do.

19   **Q.**  Ms. Ray, can race provide a tip to an applicant in the

20   admissions process?

21   **A.**  Yes, it can.

22   **Q.**  And can an applicant's race make his or her case more

23   compelling for admission?

24   **A.**  Yes, it can.

25   **Q.**  In what circumstances can an applicant's race make his or

Case: 19-2005     Document: 00117628840     Page: 679     Date Filed: 07/29/2020     Entry ID: 6356388
Case 1:14-cv-14176-ADB   Document 642   Filed 04/18/19   Page 208 of 245

208

1    her application more compelling?

2    **A.**   For a competitive applicant, race may provide a tip in

3    our pool.

4    **Q.**   Is race the only factor that could provide a tip or make

5    an applicant's application more compelling?

6    **A.**   No.   In fact, there is a few other examples.   For

7    example, if someone was from a sparse area of the country,

8    they may receive a tip for that.   Or if someone has a

9    particular extracurricular talent, say they're a very

10   talented cellist, that may also be another example of a tip.

11   **Q.**   And is race ever a determinative factor in someone's

12   admission?

13   **A.**   Absolutely not.

14   **Q.**   Ms. Ray, is race ever a factor in deciding whether to

15   deny an applicant admission?

16   **A.**   It is not.

17   **Q.**   And is race ever used as a negative factor when making an

18   admissions decision on a particular applicant?

19   **A.**   It is never.

20   **Q.**   Now, Ms. Hacker asked you a few questions about what's

21   known as the lop list.   Do you recall those questions?

22   **A.**   Yes.

23   **Q.**   And when candidates are listed on a lop list, are they

24   automatically or definitely removed from the admitted class

25   at that point?

1    **A.**    No.

2    **Q.**    And so what happens to candidates that are listed on a

3    lop list?

4    **A.**    They'll be discussed with the full admissions committee.

5    **Q.**    And so even after the lop list is created, there could

6    still be an opportunity for those particular applicants to be

7    discussed?

8    **A.**    Certainly.  Every applicant that is on a lop list is

9    presented to the full committee for discussion as a potential

10   student to be removed from the class.

11   **Q.**    Ms. Hacker also asked you earlier about Dean Fitzsimmons

12   sharing statistics about the admitted class during the

13   admissions process.  Do you recall those questions?

14   **A.**    Yes.

15   **Q.**    Based on your experience, what kinds of statistics does

16   Dean Fitzsimmons share with the full committee process?

17   **A.**    He may share broad demographic information about the

18   class.  For example, the number of male and female students

19   in the class, intended concentration, where tentatively

20   admitted students are from geographically, as well as race,

21   ethnicity, if you're a first-generation student, as some

22   examples.

23   **Q.**    Ms. Ray, during your time in the admissions office, has

24   Dean Fitzsimmons shared only numbers about the race

25   demographics about the class?

**JA2126**

Case: 19-2005    Document: 00117631840    Page: 681    Date Filed: 07/29/2020    Entry ID: 6356388
Case 1:14-cv-14176-ADB   Document 642   Filed 04/18/19   Page 210 of 245

210

1    **A.**   No.

2    **Q.**   And during your time in the admissions office, have you

3    ever been instructed to admit a target number of students

4    from any particular racial or ethnic background?

5    **A.**   Absolutely not.

6    **Q.**   Are you aware of any effort to reached a target number of

7    admitted students from a particular racial or ethnic

8    background?

9    **A.**   No.  We have no targets of any kind.

10   **Q.**   Taking a step back for a moment and turning back to your

11   role in the office, is it correct to say you wear two hats?

12   You're both a senior admissions officer as well as the

13   director of UMRP?

14   **A.**   Yes.

15   **Q.**   How long have you been the detector of UMRP?

16   **A.**   About three years.

17   **Q.**   And what are your responsibilities in that role?

18   **A.**   I oversee, train, and hire our undergraduate coordinators

19   as part of our recruitment efforts for students of color.

20   **Q.**   And you went to Harvard for undergraduate school, right?

21   **A.**   Yes.

22   **Q.**   And when you went to Harvard, did you have a role with

23   respect to the UMRP?

24   **A.**   Yes.  I was a UMRP coordinator in the Native American

25   division.

1    **Q.**  Who does the UMRP recruit?

2    **A.**  We recruit students of color.  So students who

3    self-identify as Asian-American, African-American, Latinx,

4    Mexican-American, and Native American.

5    **Q.**  And how is it that the UMRP is organized?

6    **A.**  We're organized in divisions that do outreach to those

7    populations.

8    **Q.**  And what are the particular divisions?

9    **A.**  Great.  So we have African-American division,

10   Asian-American, Latinx, Mexican-American, and Native American

11   division.

12   **Q.**  Ms. Hacker asked you a bit about who works for UMRP, and

13   you referenced undergraduate students who are known as

14   student coordinators?

15   **A.**  Yes.

16   **Q.**  And how are student coordinators assigned to those five

17   divisions that you just mentioned?

18   **A.**  Typically they're assigned to the divisions that they

19   themselves also self-identify with.

20   **Q.**  Why does the UMRP staff the divisions with student

21   coordinators who share the same racial background as the

22   particular division?  Why do you staff it that way?

23   **A.**  Well, we found that it can be very powerful to have that

24   be one point of connection for undergraduate students with

25   prospective students.  It can sometimes allow the prospective

**JA2128**

Case: 19-2005    Document 00117638840    Page: 683    Date Filed: 07/29/2020    Entry ID: 6356388
Case 1:14-cv-14176-ADB   Document 642   Filed 04/18/19   Page 212 of 245

212

1    students to really envision themselves on Harvard's campus,

2    since they may have questions about what it's like to be a

3    student of color at an institution that is historically

4    predominantly white.

5    **Q.**   Ms. Ray, has UMRP made any efforts to recruit applicants

6    from different Asian-American ethnic backgrounds?

7    **A.**   Yes.  So for example, our UMRP coordinators are often

8    from a variety of Asian-American ethnic backgrounds.  They

9    may do things like post about, as a Filipino student, their

10   own experience through the college admissions process.  They

11   may post online on our blog about their involvement in a

12   Southeast Asian dance show on our campus every spring.  And

13   we also will go to various events at high schools or college

14   fairs that may particularly reach Asian-American populations.

15   **Q.**   When during the year does UMRP begin recruiting students

16   of color?

17   **A.**   Typically during the spring of their junior year.

18   **Q.**   Let's pull up DD63.

19        Ms. Ray, can you describe what year-round

20   activities that UMRP would undertake in order to recruit

21   students of color?

22   **A.**   So year-round, the UMRP coordinators are able to provide

23   information sessions and tours for visiting groups that serve

24   populations that are predominantly students of color.

25   Usually these groups are community-based organizations or

1    public school groups.  And our coordinators are able to speak

2    a little bit about life as a Harvard undergraduate and show

3    them around our campus.

4              And year-round our coordinators also post on social

5    media.  So they'll post on the admissions office blog.  They

6    will take over our Snapchat and show people around campus as

7    a sort of day in the life as a student at Harvard, and

8    recently they've also begun posting on Instagram on a weekly

9    basis.

10   **Q.**   For those of us born after 1985, can you talk about what

11   Snapchat and Instagram are and how they help with UMRP's

12   recruiting?

13   **A.**   Sure.  So with Snapchat, essentially it's a video feed

14   that you can add to throughout the course of the day.

15             So our student coordinators will take short videos

16   potentially showcasing them walking to class or at a

17   particular event.  And it allows prospective students to see

18   some short video clips that can provide a little bit more

19   insight and show a little bit more about the personality at

20   Harvard.  So it can be really useful for prospective students

21   to get a glimpse into that.

22   **Q.**   And when does UMRP typically first reach out to a

23   potential applicant on an individual basis?

24   **A.**   Typically during the spring of their junior year.

25   **Q.**   Pull up DD64.

Case: 19-2005    Document: 00117632840    Page: 685    Date Filed: 07/29/2020    Entry ID: 6356388
Case 1:14-cv-14176-ADB   Document 642   Filed 04/18/19   Page 214 of 245

214

 1          So, Ms. Ray, could you please walk the Court

 2   through the recruiting efforts that UMRP undertakes starting

 3   in the spring of a potential applicant's junior year in high

 4   school?

 5   **A.**   Sure.  So during the spring, we'll do our first round of

 6   email outreach to prospective applicants.  And we identify

 7   students for that UMRP list in a few different ways.  So

 8   we'll send to all self-identified students of color on

 9   Harvard's search list.  We also will send an email to

10   students who have opted in to receive communications about

11   the UMRP on the admissions office website.  And we'll add in

12   names that we get from students who have expressed interest

13   in Harvard through a partnership with a nationwide

14   community-based organization network.

15   **Q.**   And how does UMRP identify which high school students to

16   send emails to?

17   **A.**   Sure.  So it's all self-identified students of color on

18   that search list as well as a few other information streams

19   that we'll pull together.

20   **Q.**   What information do the UMRP outreach emails contain?

21   **A.**   In typical practice, they're addressed now from an

22   individual coordinator who will share information about what

23   it's like at Harvard.  So they may provide information about

24   their own application process and journey to Harvard,

25   information on cultural life and cultural communities at

1    Harvard, financial aid, and other types of things.

2           And there's also a lot of information on how to get

3    in touch with the UMRP in case any students have questions

4    about the admissions process or life at Harvard.

5    **Q.**  Approximately how many high school students per year

6    receive recruiting emails from the UMRP?

7    **A.**  Right.  So it will vary from year to year.  But as an

8    example, last year about 85,000 students were reached through

9    these emails.

10   **Q.**  And are students who don't receive outreach emails from

11   UMRP disadvantaged in the admissions process?

12   **A.**  Not at all.  All students who apply go through the same

13   application process and evaluation process.

14   **Q.**  Does UMRP continue its recruitment efforts into the

15   summer after a prospective applicant's junior year?

16   **A.**  Yes.

17   **Q.**  What kinds of recruiting activities does UMRP engage in

18   during the summer?

19   **A.**  During the summer, we send another round of emails to an

20   even more expanded list of students.  The list has typically

21   grown by that point.  And we also have a few summer-specific

22   travel opportunities that come up through the UMRP.

23          So an admissions officer will go, for example, to a

24   week-long college access program targeted towards native

25   students, called College Horizons, which has happened for the

 1    past 20 years.

 2              And we travel to a few other events typically on a

 3    yearly basis as well.  For example, to an information session

 4    at Leadership Enterprise For a Diverse America, a program

 5    through Princeton University that targets low-income,

 6    first-gen, and students of color.

 7              And we'll also try to attend events like college

 8    fairs and events with other community-based college access

 9    organizations that are in the nearby area, as our schedule

10    allows.

11    **Q.**  Does UMRP continue its recruiting activities through the

12    fall of a prospective applicant's senior year?

13    **A.**  Yes.

14    **Q.**  DD 6.6, please.

15              What recruiting efforts does UMRP take during the

16    fall?

17    **A.**  In the fall, we'll send our final email to the students

18    who have now become seniors in high school, again to an

19    ever-expanding list, and we begin the process of hiring and

20    training hometown recruiters.

21    **Q.**  What are hometown recruiters?

22    **A.**  Hometown recruiters are other Harvard undergraduate

23    students, a cohort of students who we hire to go back to

24    their hometowns to give presentations about life as an

25    undergraduate student at Harvard.

Case: 19-2005   Document 00117631846   Page: 688   Date Filed: 07/29/2020   Entry ID: 6356388
Case 1:14-cv-14176-ADB   Document 642   Filed 04/18/19   Page 217 of 245

217

1    **Q.**  And how does UMRP select who to hire as the hometown

2    recruiters?

3    **A.**  We try to hire students from a variety of backgrounds

4    from a variety of geographical areas.  And through this,

5    we're hoping -- it's always our hope that we can particularly

6    target schools or communities where we think that there are

7    students of color who might particularly benefit from hearing

8    messaging about the college application process and life at

9    Harvard.  We're hoping to get students to think about Harvard

10   but also higher education more generally.

11   **Q.**  Does the UMRP continue its recruitment efforts into the

12   winter?

13   **A.**  Yes.

14   **Q.**  DD 6.7.

15          And can you walk us through what the UMRP does

16   during the winter of a prospective applicant's senior year?

17   **A.**  Sure.  During the winter, our hometown recruiters will be

18   on the road conducting all of their hometown visits.

19   Typically this is a cohort of anywhere from 15 to 20

20   upperclassman students -- or Harvard undergraduate students

21   that are doing these presentations, and they go all over the

22   country.

23          So in January our recruiters are on the road in

24   places -- like last year, for example, Los Angeles, South

25   Carolina, Missouri, Alabama.  We try to hit as many places as

Case: 19-2005    Document: 00117638340    Page: 689    Date Filed: 07/29/2020    Entry ID: 6356388
Case 1:14-cv-14176-ADB    Document 642    Filed 04/18/19    Page 218 of 245

218

1    possible.  And through this in a typical year, we'll visit

2    about 200 to 250 high schools.

3    **Q.**  How does UMRP decide what high schools to visit?

4    **A.**  Working with the admissions officer who reads for a

5    particular area, they help us to craft an itinerary that may

6    allow us to visit high schools and middle schools that we

7    think might really have a place for messaging about higher

8    education and about Harvard to really resonate.  So we're

9    always looking to create pipelines of students.

10   **Q.**  Now, once a student is admitted, does UMRP continue its

11   recruitment efforts with respect to that particular student?

12   **A.**  Yes.

13   **Q.**  How so?

14        If we could pull up DD 6.8, please.

15   **A.**  So during the spring, we really focus on being in touch

16   with students who have recently been admitted to Harvard.

17        So we do this in a couple of different ways.  The

18   first way is by connecting with students through a

19   "call-a-thon."  In this call-a-thon, we call all

20   self-identified students of color who have been admitted to

21   Harvard.  So typically this is about 800 students.  Obviously

22   depending on how many students are admitted, that drives how

23   many students we call.

24        And we also have programming through Visitas, which

25   is our weekend for visiting our students.

**Q.**  Does UMRP contact every admitted Asian-American student?

**A.**  Yes.

**Q.**  And you mentioned Visitas.  What is Visitas?

**A.**  Visitas is our weekend for all admitted students when we welcome them to campus to showcase what it's really like for undergraduate students.  So they'll learn about living in our residence halls, about student life, and have opportunities to see campus and ask lots and lots of questions.

**Q.**  How does UMRP use Visitas to recruit admitted students of color?

**A.**  In a few different ways.  So during Visitas, we run a specific hosting program through the UMRP.  So we ask admitted students if they'd like to be hosted through the UMRP by an undergraduate student who is volunteering through our program.

And we also have a few items of programming during our visiting weekend.  So we have a reception for all admitted students of color, and we also have a panel discussion where our coordinators discuss life as a student of color at Harvard.

**Q.**  And for Visitas, how does UMRP match admitted students of color to a student host?

**A.**  So our undergraduate coordinators work very hard to make hand matches between our prospective students and our undergraduate volunteers.  So they take into consideration

Case: 19-2005    Document: 00117638840    Page: 691    Date Filed: 07/29/2020    Entry ID: 6356388
Case 1:14-cv-14176-ADB    Document 642    Filed 04/18/19    Page 220 of 245

220

1    things like the way each student may identify racially or

2    ethnically as one item.

3         But they also look for things like a shared

4    hometown, similar academic interest, or maybe overlap in

5    extracurricular activity interest as well.

6    **Q.**  And why is shared racial identity a consideration in

7    connecting prospective students with current Harvard College

8    students during Visitas?

9    **A.**  From my own experience and from what I've seen and heard,

10   that can be one point of connection that undergraduates and

11   prospective students can use to really see what its like as a

12   student of color at Harvard.

13        They may have similar questions about what it's

14   like to be a person of color on Harvard's campus, and that

15   can then be one point of connection that will lead them to

16   having discussions about other aspects of life at Harvard, in

17   the classroom, in our dorms, and in other activities as well.

18   **Q.**  Approximately how many students of color are hosted at

19   Visitas through the UMRP?

20   **A.**  It varies from year to year, but typically several

21   hundred.

22   **Q.**  We've talked a bit about the number of recruitment

23   activities that UMRP engages in throughout the year to

24   recruit students of color.  Why does UMRP undertake all these

25   recruiting efforts throughout the year?

 1    **A.**  We think recruitment is incredibly important, and it's

 2    vital to ensure that talented students across the entire

 3    country are really considering Harvard as an option.

 4           From my own experience in hearing the types of

 5    questions that students ask, I know that it can be really

 6    important to demystify what an institution like Harvard might

 7    be like for someone.  And through these recruitment efforts,

 8    we can hopefully inspire students to think about applying to

 9    Harvard and persuade them to attend once they're admitted.

10    **Q.**  And, Ms. Ray, do you believe that there's a continued

11    need for the recruiting efforts that UMRP undertakes?

12    **A.**  Absolutely.

13    **Q.**  Let's talk a little bit about your role as an admissions

14    officer.

15           THE COURT:  Let me ask about UMRP.

16           UMRP is -- I think it's the only place I've seen

17    that sort of separates out Mexican-Americans.

18           THE WITNESS:  Yes.

19           THE COURT:  Why is that and how did that happen?

20    I'm just wondering why you have sort of Mexican-Americans

21    singled out but we have this monolithic Asian group.

22           When you're ultimately tracking Mexican-American

23    statistics, is that done separately or is that lumped in with

24    like --

25           THE WITNESS:  From my understanding, that's an

1    inheritance that when the UMRP started there were lots of

2    Chicano students on campus who self-identified in that way.

3    And that's why that's been identified as a separate division.

4            However, when we're reporting out statistics, from

5    my understanding it's in terms of Hispanic and Latinx overall

6    and not separating out Mexican-American.

7    BY MS. CONLEY:

8    **Q.**   Ms. Ray, we talked a little bit about training.  Did you

9    receive training on how to evaluate applications when you

10   first started as an admissions officer?

11   **A.**   Yes.

12   **Q.**   Can you describe that training?

13   **A.**   In the admissions office when I first started, I had

14   several sources of training about how to read an application.

15           So the first kind of programming that was done, it

16   was led by an associate director of admissions at the time

17   and other admissions office staff, and we walked through,

18   with other new admissions officers, the components of an

19   application, the ratings, and how to evaluate applicants.

20           We also read files and participated in a mock

21   subcommittee process that taught us how committee worked and

22   how to be a good committee member.

23           And the final component of that was reading

24   application files once the process started and having my

25   committee chairs and other admissions office staff members

 1   read files after I did, about the first 100 or so files.  And

 2   they were able to provide some feedback on my evaluations.

 3   **Q.**  And did you receive that training when you first came on

 4   board in 2012?

 5   **A.**  Yes, I did.

 6   **Q.**  In the course of that training, did you receive guidance

 7   when evaluating an applicant's race when evaluating that

 8   applicant as a whole?

 9   **A.**  Yes, I did.

10   **Q.**  What did you learn when you received that training on how

11   to consider race when evaluating an applicant?

12   **A.**  I learned that race may be one factor that we consider as

13   we're evaluating applicants, and it may provide a tip for

14   competitive candidates depending on the individual cases.

15   **Q.**  And in that same training, did you learn about other

16   factors that could be considered when evaluating an applicant

17   as a whole?

18   **A.**  Yes.  Certainly.

19   **Q.**  And who lead those training meetings?

20   **A.**  Yeah.  Grace Cheng led many of those meetings, as well as

21   other senior admissions staff members and admissions officers

22   who had been in the office for a while.

23   **Q.**  And did anyone else in addition to you attend the

24   particular training in 2012 when you first began?

25   **A.**  Yes.  New admissions officers who also started at the

```
 1   same time attended them as well.
 2   Q.  Turn to Tab 2 in your binder, please.  Do you see
 3   Defendant's Exhibit 004?
 4   A.  Yes.
 5   Q.  What is this document?
 6   A.  This is an agenda for admissions staff orientation in the
 7   fall of 2013.
 8   Q.  Did you attend that orientation?
 9   A.  Yes, I did.
10           MS. CONLEY:  Your Honor, we offer Defendant's
11   Exhibit 4 into evidence.
12           MS. HACKER:  No objection, Your Honor.
13           THE COURT:  Admitted.
14           (Defendant Exhibit No. 4 admitted.)
15   BY MS. CONLEY:
16   Q.  Ms. Ray, do you see the third section titled
17   "Considerations in the Admissions Process:  Fisher Versus
18   Texas"?
19   A.  Yes.
20   Q.  Who was that led by?
21   A.  That was led by Bob Iuliano of the general counsel's
22   office.
23   Q.  At a high level, what did that session relate to?
24   A.  It related generally to race-conscious admissions and
25   Supreme Court decisions and how that relates to our work in
```

1    the admissions office.

2    **Q.**   Ms. Ray, since joining the admissions office and after

3    the training you received as a new admissions officer, do you

4    continue to receive feedback on how you evaluate applicants?

5    **A.**   Yes, certainly.  So as part of the committee process,

6    there are committee chairs who provide guidance and feedback

7    on my own evaluation of cases and ratings.  And during the

8    process of reading files, occasionally that will happen near

9    other admissions officers who may also be reading files, and

10   we're able to have discussions about the nuances of case work

11   together as well.

12   **Q.**   In your role as the UMRP director, have you given any

13   presentations about issues of diversity?

14   **A.**   Yes.  I have given two formal presentations and a handful

15   of others as well.

16   **Q.**   And who did you give those presentations to?

17   **A.**   I gave them to all admissions and financial aid office

18   staff that were at staff orientation meetings.

19   **Q.**   And did anyone else participate with you in giving those

20   particular presentations?

21   **A.**   Yes.  An admissions officer at the time, Lucerito Ortiz.

22   **Q.**   Can you turn to Tab 3 in your binder, which is

23   Defendant's Exhibit 36.

24   **A.**   Yes.

25   **Q.**   Do you recognize what's been marked as Defendant's

1    Exhibit 36?

2    **A.**  Yes.

3    **Q.**  What is this document?

4    **A.**  This document is the presentation that Ms. Ortiz and I

5    gave in the fall of 2013.

6           MS. CONLEY:  Your Honor, we move to admit

7    Defendant's Exhibit 36.

8           MS. HACKER:  No objection.

9           THE COURT:  It's admitted.

10          (Defendant Exhibit No. 36 admitted.)

11   BY MS. CONLEY:

12   **Q.**  And can you turn to page 2 of the document.

13   **A.**  Yes.

14   **Q.**  What topics were discussed at this first presentation

15   that you and Ms. Ortiz gave?

16   **A.**  We discussed broadly issues surrounding the demographics

17   in the United States, information on educational attainment,

18   testing as well as a specific focus on Native American and

19   Latinx populations.

20   **Q.**  And I believe Ms. Hacker showed you to what's now at

21   Tab 4 of your binder, Defendant's Exhibit 19.

22          THE COURT:  Which tab?

23          MS. CONLEY:  It's Tab 4 of your binder, Your Honor.

24          THE WITNESS:  Yes.

25   BY MS. CONLEY:

Case: 19-2005   Document: 00117633840   Page: 698   Date Filed: 07/29/2020   Entry ID: 6356388
Case 1:14-cv-14176-ADB   Document 642   Filed 04/18/19   Page 227 of 245

227

1    **Q.**  Now, was this the second presentation in the fall of 2014

2    that you and Ms. Ortiz gave that you were referring to?

3    **A.**  Yes, it is.

4    **Q.**  And what was this particular presentation about?

5    **A.**  This presentation also included information about

6    demographics at large and how to focus on Asian-American and

7    black populations in the United States.

8    **Q.**  And if you could, turn to Tab 5 in your binder.  These

9    are the notes that Ms. Hacker was discussing with you

10   earlier.  Do you recall those?

11   **A.**  Yes.

12   **Q.**  And let's look at the very first note that Ms. Hacker

13   also referenced during her examination of you.

14           Looking at that note, can you explain why you and

15   Ms. Ortiz decided to give these presentations to the

16   admissions office staff?

17   **A.**  From my understanding, these presentations were designed

18   to give context more generally about the experiences of

19   communities of color and students of color in the United

20   States at large.  And hopefully this could help admissions

21   officers understand the broad context that students in our

22   applicant pool or on our campus may be facing.

23   **Q.**  Can you talk a little bit more about how these particular

24   presentations provided context for admissions officers about

25   applicants of color to Harvard?

Case: 19-2005   Document 00117631840   Page: 699   Date Filed: 07/29/2020   Entry ID: 6356388
Case 1:14-cv-14176-ADB   Document 642   Filed 04/18/19   Page 228 of 245

228

1    **A.**   Sure.  So for example, in our first presentation we

2    discussed generally Native American populations.  And having

3    an admissions officer have a general understanding of the

4    demography of the United States at large could help an

5    admissions officer in understanding the particular context

6    that a student who may, say, be from a reservation in a rural

7    area may be coming from.

8              So if a student communicates something about those

9    experiences, having some background knowledge about it may be

10   useful for an admissions officer to situate a certain

11   experience.

12   **Q.**   Let's turn back to the 2014 presentation that we were

13   just looking at, which is at Tab 4.

14             THE COURT:  Did you move for the admission of this

15   one?

16             MS. CONLEY:  I believe that Ms. Hacker did.

17             THE COURT:  Sorry.

18             MS. CONLEY:  Thank you.

19   BY MS. CONLEY:

20   **Q.**   If you turn back to Tab 4 and take a look at page 18,

21   Ms. Ray, what does this slide show?

22   **A.**   This slide shows information about different

23   Asian-American ethnicities.

24   **Q.**   A little small for me to read from here, but what exactly

25   does it show?  Are these national statistics?

1    **A.**   Yes.   Sorry.   So these are national statistics that show

2    information about the numbers of Asian-Americans within given

3    ethnic populations.

4    **Q.**   And why was this particular slide included in this

5    presentation that you gave?

6    **A.**   We thought it was important to really highlight and

7    discuss the wide diversity that exists within Asian-America

8    or those who may identify as Asian-American.

9    **Q.**   Let's turn to the next slide on page 19.   And what was

10   the purpose of including this particular slide in the

11   presentation?

12   **A.**   This slide helped to provide further context for other

13   items that we would be discussing about the fact that, given

14   that students and populations of people who identify as

15   Asian-American are so diverse, we wanted to really highlight

16   the fact that there's a lot of diversity within that

17   population in terms of country of origin, cultural identity,

18   and other items as well.

19   **Q.**   And can you give an example of how this information can

20   provide more context for an admissions officer who was

21   evaluating an Asian-American applicant for admission?

22   **A.**   Mm-hmm.   Understanding the complexities of identity can

23   really help to situate an applicant more broadly.

24          So for example, if a Cambodian student who lives in

25   the South is writing about the experience of growing up in an

1    immigrant family while also writing about how much they value

2    growing up in Mississippi and love sweet tea, understanding

3    more broadly the complexities of identity can really help to

4    situate someone who's discussing any aspect of that, but

5    certainly the ways that different experiences may impact

6    their own perception of identity or just experiences more

7    generally.

8    Q.  And did you give this particular portion of the

9    presentation to the admissions staff?

10   A.  Yes, I did.

11   Q.  If we could take a look at -- turn to Tab 6 in your

12   binder.

13          MS. CONLEY:  Your Honor, if we could turn off the

14   monitors in the gallery?

15          THE COURT:  Yes.

16          MS. CONLEY:  Thank you very much.

17   BY MS. CONLEY:

18   Q.  Ms. Ray, can you tell me what defendant's Exhibit 195 is?

19   A.  This is an application file.

20   Q.  And have the profile ratings been completed on this

21   application by both a first reader and a second reader?

22   A.  Yes.

23   Q.  Ms. Ray, who was the first reader on this file?

24   A.  I was.

25          MS. CONLEY:  Your Honor, we move to admit

1    Defendant's Exhibit 195 into evidence.

2             MS. HACKER:  No objection, Your Honor.

3             THE COURT:  Admitted.

4             (Defendant Exhibit No. 195 admitted.)

5    BY MS. CONLEY:

6    **Q.**  If you turn to page 3 of the file.

7             MS. CONLEY:  Mr. Lee, if we could blow up the very

8    top paragraph.

9    BY MS. CONLEY:

10   **Q.**  What is TMR in the top left-hand corner?

11   **A.**  Those are my initials.

12   **Q.**  And what did you write under your initials?

13   **A.**  Redacted "is noted as exceptionally mature and thoughtful

14   in the TRs.  I hope AIV confirms.  Clearly very bright.  She

15   has made a niche here with music.  All-state band and some

16   volunteering.  SAT 2s and AIV would help in comparison."

17   **Q.**  And what is TRs or what are TRs?

18   **A.**  Teacher recommendations.

19   **Q.**  And AIV is alumni interview?

20   **A.**  Yes.

21   **Q.**  Now let's turn to pages 24 and 25 in this application.

22             What's reflected on these pages?

23   **A.**  This is the first letter of recommendation or teacher

24   recommendation as part of the file.

25   **Q.**  And focusing on page 25, is there information in this

1    first teacher recommendation that informed your evaluation of

2    the applicant's personal qualities?

3    **A.**   Yes.  So in the first paragraph it's noted that the

4    student is insightful and personable and that they're a class

5    act.  And in the next paragraph it's noted that the student

6    is thoughtful, reflective, and honest.  I underlined that

7    about midway down.

8             And at the bottom of that paragraph, I also

9    underlined that the student was mature, passionate, and

10   focused.

11   **Q.**   And did you take this teacher recommendation into account

12   when assigning a personal rating for this applicant?

13   **A.**   Yes, I did.

14   **Q.**   And let's turn to page 27 of this application.  What

15   appears at page 27, Ms. Ray?

16   **A.**   This is the second teacher recommendation as part of the

17   file.

18             MS. CONLEY:  Mr. Lee, if you could blow up the

19   first two paragraphs.

20   BY MS. CONLEY:

21   **Q.**   Did the information in this particular teacher

22   recommendation inform your evaluation of the applicant's

23   personal qualities?

24   **A.**   Yes.

25   **Q.**   And what information in those pages informed your

 1    evaluation of the applicant's personal qualities?

 2    **A.**    The applicant was noted to be exceptional.  The applicant

 3    also -- it says that she has an extraordinary work ethic, at

 4    the bottom of the next paragraph.  And at the very bottom

 5    that the student demonstrates a never-give-up attitude and

 6    responds well to feedback.

 7    **Q.**    And if we turn back to page 2 of this application, what

 8    personal rating did you ultimately assign to this applicant?

 9    **A.**    A 3++.

10    **Q.**    And what does a 3++ mean to you?

11    **A.**    That the applicant has strong personal qualities.

12    **Q.**    And do applicants with 3++ ratings get admitted to

13    Harvard College?

14    **A.**    Yeah.  Certainly.

15    **Q.**    Just stepping back and looking at the profile ratings for

16    a minute, do those ratings determine whether an applicant is

17    ultimately discussed in subcommittee or in full committee?

18    **A.**    No.  So these ratings are preliminary and based on the

19    information that we have available at the time that we're

20    assessing them.  And I think of them much more as a proxy

21    for, for example, commitment to extracurriculars.  But

22    whether we discuss a case, it's much more, and it's all about

23    the substance of the actual case.

24    **Q.**    And taking a look there at the academic rating, what

25    academic rating did you assign to this applicant?

1    **A.**  A 2-.

2    **Q.**  And what information did you consider when assigning the

3    academic rating?

4            MS. CONLEY:  If we maybe move up to the top of

5    page 2, Mr. Lee.

6    **A.**  At the top you can see that the applicant has a perfect

7    SAT verbal score of 800.  That's that first score there.  And

8    you can see below that the applicant has a 36 on the ACT.

9            I underlined the composite score at the very end,

10   which is perfect.  And the applicant also had four perfect AP

11   scores of 5.  That's the highest possible score and one of 4.

12   **Q.**  Let's turn to page 23 of the file.  Is this the

13   applicant's high school transcript?

14   **A.**  Yes, it is.

15   **Q.**  What grades did the applicant receive?

16   **A.**  All forms of A throughout high school.

17   **Q.**  What was the applicant's rank in their high school class?

18   **A.**  They were ranked ninth in a class of over 550 students.

19   **Q.**  And according to the transcript, what percentile was

20   that?

21   **A.**  They were in the top 2 percent of their high school

22   class.

23   **Q.**  And did you consider this transcript when evaluating the

24   applicant's academic qualities?

25   **A.**  Yes, I did.

Case: 19-2005   Document: 00117638846   Page: 706   Date Filed: 07/29/2020   Entry ID: 6356388
Case 1:14-cv-14176-ADB   Document 642   Filed 04/18/19   Page 235 of 245

235

```
 1    Q.  And let's take a look again at page 2, profile ratings.
 2    What extracurricular rating did you assign to this applicant?
 3    A.  3+.
 4    Q.  Ms. Ray, if you could turn to page 13 of the file, what
 5    is that document?
 6    A.  This is an activity grid that the applicant provided as
 7    part of their application.
 8    Q.  And did you take the information that's on that
 9    particular page into account when assigning the applicant's
10    extracurricular rating?
11    A.  Yes, I did.
12    Q.  And what specifically did you take into account?
13    A.  I took into account some of this information about
14    volunteering and other extracurriculars that the student was
15    involved in, and specifically took note of their deep
16    involvement in music.
17         So for example, the student is a clarinetist and
18    lettered in that instrument.  And in another instrument, they
19    won multiple junior festival trophies.  And they were also a
20    member of the all-state band, which is a statewide
21    recognition that requires students to audition to get into.
22    Q.  Flipping back to the summary sheet on page 2 of the
23    application, when you're looking at or evaluating an
24    applicant, do you take the applicant's parental occupation
25    into account, the applicant's parents' occupations into
```

1    account?

2    **A.**   Yes.

3    **Q.**   And why is that something you would consider when

4    evaluating an applicant?

5    **A.**   Yeah.  It's something we might consider because it might

6    be able to provide us a little bit more information about the

7    family context.  So for example, if both of an applicant's

8    parents work retail jobs, that might lead us to think that

9    they might benefit significantly from our financial aid

10   program or add to socioeconomic diversity on our campus.

11   **Q.**   And according to this page, what ethnicity did this

12   applicant self-identify as?

13   **A.**   As African-American and white.

14   **Q.**   Did you consider there applicant's race when evaluating

15   the application?

16   **A.**   I underlined it here, so I would say most likely,

17   probably.

18   **Q.**   And why would you consider the applicant's race on this

19   particular application?

20   **A.**   As a student with strong academics and robust

21   extracurricular involvement, a competitive applicant, race

22   may be one factor that we consider overall.

23   **Q.**   Let's turn back to your comments on the top of page 3 of

24   the file.  What was the last sentence that you wrote?

25   **A.**   "SAT 2s and AIV would help in comparison."

 1    **Q.**   What did you mean by that comment?

 2    **A.**   That having information on the student's SAT subject test

 3    and the alumni interview report would help the admissions

 4    committee as we're making decisions in our broader pool.

 5    **Q.**   So at the time that you did those comments in the

 6    original profile ratings, you hadn't yet received the alumni

 7    interview report?

 8    **A.**   Correct.

 9    **Q.**   Let's turn to page 7 of the file.  What is this?

10    **A.**   This is the alumni interview report.

11    **Q.**   And what in the alumni interview report did you consider

12    when evaluating this applicant?

13    **A.**   All right.  So I considered -- you can see some positive

14    information there in the academics section, that the student

15    is at the top of their class.  That's a positive piece of

16    information that was provided.

17           We would have considered that music is a large part

18    of the applicant's life, which the alumni interview report

19    notes in the extracurricular section, and that they're

20    involved somewhat otherwise.

21           And then in the personal quality section, it says

22    that while setting up the interview, in that first line

23    there, the applicant seemed exceptionally shy and formal, and

24    in person her mannerisms supported that impression.

25           And a little further down it also says that the

1    applicant seemed reluctant to discuss substantive topics in

2    depth.

3                And then in the overall section, it seems to note

4    that the applicant seemed a bit rehearsed or perhaps coached.

5    So there were some positive aspects, but overall the

6    interview seems a bit flat.

7    **Q.**   And, Ms. Ray, was this applicant ultimately admitted to

8    Harvard College?

9    **A.**   No, they were not.

10   **Q.**   And why not?

11   **A.**   In a pool that's as competitive as ours, we have a lot of

12   students who are really talented.  Even if you're

13   academically qualified, even if you have a lot of

14   extracurricular engagement, a flat alumni interview can make

15   you less compelling in our really deep and talented pool.

16   **Q.**   And is that true regardless of the race or ethnicity of

17   the applicant?

18   **A.**   Yes.

19   **Q.**   Ms. Ray, do you find it difficult to reject competitive

20   students who have the qualifications to succeed at Harvard?

21   **A.**   Absolutely.  I think that's the most difficult part of my

22   job.  I get to read about and learn about so many talented

23   students from all over the country.  And at the end of the

24   day, some of the students whose stories I remember the most

25   vividly and who had the most impact on me were ultimately not

1    admitted to Harvard.  And it's just the reality of our

2    talented pool.

3    **Q.**  Ms. Ray, in the six years that you've worked as an

4    admissions officer, about how many files have you read?

5    **A.**  Thousands.

6              THE COURT:  Can I get back to page 3 on this one,

7    the second reviewer.  "Extremely smart and one" something.

8              THE WITNESS:  Would you like me to read that?

9              THE COURT:  Please.  I need some translation here.

10   Extremely smart.  What's after that?

11             THE WITNESS:  So these aren't my notes, but I'll

12   also do the best job.

13             THE COURT:  If you can do them.

14             THE WITNESS:  And one we'll likely want to likely

15   do.

16             THE COURT:  "Want to likely do."

17             What does that mean, if you know?

18             THE WITNESS:  From my understanding, or how I would

19   interpret that is that it's a competitive applicant.

20             THE COURT:  I was less sure about PQs.  Is that

21   what that says?

22             THE WITNESS:  Yes.

23             THE COURT:  What's PQs?  Is that a word that you

24   use?

25             THE WITNESS:  It's an abbreviation for personal

1    qualities.

2            THE COURT:  "Given her own writing," but what was

3    warmer?  Oh, support was warmer, hoping that her interview

4    will clarify.  Okay.  Thank you.

5    BY MS. CONLEY:

6    Q.  Ms. Ray, just for clarification there, can you read the

7    last two sentences of those notes?

8    A.  Yes.  "Hoping, as TMR notes, that IV will clarify.

9    Frankly, if it does, we should/could ponder a likely."

10   Q.  What is "a likely"?

11   A.  "Likely" refers to a likely letter that our office may

12   send for competitive applicants.

13   Q.  Again after the alumni interview came in, this applicant

14   was ultimately rejected?

15   A.  Correct.

16   Q.  Now, Ms. Ray, in the six years that you've been an

17   admissions officer, how many subcommittee meetings have you

18   attended?

19   A.  Over six years, about 100.

20   Q.  And in those subcommittee meetings, about how many

21   applicants did you discuss?

22   A.  Thousands.

23   Q.  And in those six years, about how many full committee

24   meetings have you attended?

25   A.  About 50.

1   **Q.**  And in those full committee meetings, about how many

2   applications would you say you discussed?

3   **A.**  Over six years, thousands.

4   **Q.**  In your six years at the admissions office, how many

5   times have you seen an admissions officer show bias against

6   an applicant because of his or her race?

7   **A.**  Absolutely never.

8   **Q.**  And when you're determining whether to admit an

9   applicant, have you ever seen any of your colleagues consider

10  an applicant's race as a negative factor?

11  **A.**  I have never seen that.

12  **Q.**  Ms. Ray, have you ever rejected an applicant because of

13  his or her race?

14  **A.**  Certainly not.

15  **Q.**  And in your six years in the admissions office, have you

16  ever seen anything to substantiate accusations of bias

17  against Asian-Americans in the admissions process?

18  **A.**  Never.

19          MS. CONLEY:  Nothing further.

20          MS. HACKER:  Your Honor, can we have a sidebar?

21          THE COURT:  Sure.

22          [Sidebar sealed and redacted.]

23          THE COURT:  Have you had enough, Mr. Hughes?

24          MR. HUGHES:  Ms. Hacker asked me the question,

25  which is whether we want to keep on trucking with reading

Case: 19-2005    Document: 00117631846    Page: 713    Date Filed: 07/29/2020    Entry ID: 6356388
Case 1:14-cv-14176-ADB   Document 642   Filed 04/18/19   Page 242 of 245

242

1    depositions.  I gave her the affirmative nod, but Ms. Daly is

2    shaking her head.

3               MR. MORTARA:  I would suggest we break for the day.

4               THE COURT:  Joan will clearly agree with you.  For

5    tomorrow, I don't have anything tomorrow afternoon either.

6    For tomorrow, we can also go as long as you want, with the

7    caveat that I have a quick status conference scheduled for

8    2:30.  So we will take at least a 15-minute break at 2:30.

9    Other than that, we'll start at 9:30 and we'll go as long you

10   want.  Okay?

11              MR. MORTARA:  Thank you, Your Honor.

12              MR. LEE:  Thank you, Your Honor.

13              (Court recessed at 4:35 p.m.)

14

15

16

17

18

19

20

21

22

23

24

25

**JA2159**

```
 1                    - - - - - - - - - - -

 2                        CERTIFICATION

 3

 4            I certify that the foregoing is a correct

 5    transcript of the record of proceedings in the above-entitled

 6    matter to the best of my skill and ability.

 7

 8

 9

10    /s/ Joan M. Daly                October 24, 2018

11    _____            _____

12    Joan M. Daly, RMR, CRR          Date
      Official Court Reporter
13

14

15

16

17

18

19

20

21

22

23

24

25
```

**JA2160**

Case: 19-2005    Document: 00117636840    Page: 715    Date Filed: 07/29/2020    Entry ID: 6356388
Case 1:14-cv-14176-ADB    Document 642    Filed 04/18/19    Page 244 of 245

244

1                        INDEX OF WITNESSES

2    WITNESS                                              PAGE

3

     MARK HANSEN
4
         Examination By Mr. Hughes ........................   9
5        Examination By Ms. Ellsworth ....................  49
         Re-Examination By Mr. Hughes ....................  68
6

7    ROGER BANKS

8        Examination By Mr. Connolly .....................  78
         Examination By Ms. Ellsworth ....................  87
9

10   CHARLENE KIM

11       Examination By Mr. Strawbridge................... 125
         Examination By Ms. Gershengorn.................. 138
12

13   TIA RAY

14       Examination By Ms. Hacker........................ 178
         Examination By Ms. Conley........................ 206
15

16

17

18

19

20

21

22

23

24

25

**JA2161**

```
 1                    E X H I B I T S

 2
        Defendant Exhibit                           Received
 3
           SA3    ...................................   173
 4
           4      ...................................   224
 5
           SA4    ...................................   169
 6
           P9     ...................................    37
 7
           P16    ...................................    67
 8
           DX19   ...................................   184
 9
           26     ...................................   226
10
           DX27   ...................................   152
11
           P46    ...................................    53
12
           DX47   ...................................    98
13
           P75    ...................................   186
14
           DX103  ...................................   154
15
           DX106  ...................................   145
16
           DX111  ...................................   146
17
           195    ...................................   231
18
           262    ...................................   110
19
           DX527  ...................................   159
20

21

22      Plaintiff Exhibit                           Received

23         P55    ...................................   202

24         P99    ...................................   182

25         P200   ...................................   197
```

## CERTIFICATE OF SERVICE

I mailed copies of this appendix to the Court and to the following counsel:

William F. Lee
Felicia H. Ellsworth
Andrew S. Dulberg
Elizabeth Connell Mooney
Joseph H. Mueller
WILMER CUTLER PICKERING
HALE AND DORR LLP
60 State Street
Boston, MA 02109
Tel: (617) 526-6687
Fax: (617) 526-5000
william.lee@wilmerhale.com
felicia.ellsworth@wilmerhale.com
andrew.dulberg@wilmerhale.com
elizabeth.mooney@wilmerhale.com
sarah.frazier@wilmerhale.com
joseph.mueller@wilmerhale.com


Dated: February 18, 2020                    _s/ William S. Consovoy_____