No. 19-2005

## UNITED STATES COURT OF APPEALS
## FOR THE FIRST CIRCUIT

STUDENTS FOR FAIR ADMISSIONS, INC.,
*Plaintiff-Appellant,*

v.

PRESIDENT AND FELLOWS OF HARVARD COLLEGE,
*Defendant-Appellee.*

On Appeal from the United States District Court
for the District of Massachusetts

## JOINT APPENDIX
## VOLUME V

Adam K. Mortara
J. Scott McBride
Krista J. Perry
BARTLIT BECK LLP
54 W. Hubbard St., Ste. 300
Chicago, IL 60654
(312) 494-4469

John M. Hughes
Katherine L.I. Hacker
Meg E. Fasulo
BARTLIT BECK LLP
1801 Wewatta St., Ste. 1200
Denver, CO 80202
(303) 592-3140

William S. Consovoy
Thomas R. McCarthy
J. Michael Connolly
Cameron T. Norris
CONSOVOY MCCARTHY PLLC
1600 Wilson Blvd., Ste. 700
Arlington, VA 22209
(703) 243-9423
will@consovoymccarthy.com

Patrick Strawbridge
CONSOVOY MCCARTHY PLLC
10 Post Office Sq., 8th Fl., PMB #706
Boston, MA 02109
(617) 227-0548

*Counsel for Appellant Students for Fair Admissions, Inc.*

# TABLE OF CONTENTS

**Volume I**

Docket Sheet ..................................................................................................JA1

Notice of Appeal (Doc. 674) ....................................................................JA106

Complaint (Doc. 1) ...................................................................................JA108

Dispositive Motion Exhibits

    Motion to Dismiss for Lack of Subject-Matter Jurisdiction

        Declaration of William S. Consovoy

            Exhibit I (Doc. 205-9) ..................................................................JA228

    Cross-Motions for Summary Judgment

        Declaration of Felicia H. Ellsworth

            Exhibit 2 (Doc. 419-2) ................................................................JA230

            Exhibit 85 (Doc. 419-85) .............................................................JA244

            Exhibit 86 (Doc. 419-86) .............................................................JA251

            Exhibit 87 (excerpts) (Doc. 419-87) ...........................................JA254

            Exhibit 88 (excerpts) (Doc. 419-89) ...........................................JA285

            Exhibit 89 (Doc. 419-89) .............................................................JA330

            Exhibit 91 (Doc. 419-91) .............................................................JA347

            Exhibit 92 (Doc. 419-92) .............................................................JA370

        Declaration of Michael Connolly

            Exhibit 237 (Doc. 421-237)..........................................................JA399

            Exhibit 238 (Doc. 421-238)..........................................................JA418

            Exhibit 239 (Doc. 421-239)..........................................................JA425

            Exhibit 240 (Doc. 421-240)..........................................................JA427

            Exhibit 241 (Doc. 421-241)..........................................................JA431

            Exhibit 242 (Doc. 421-242)..........................................................JA434

            Exhibit 250 (Doc. 421-250)..........................................................JA436

            Exhibit 251 (Doc. 421-251)..........................................................JA440

Trial Transcripts

    Day 1 (Doc. 631) .................................................................................JA443

    Day 2 (Doc. 632) .................................................................................JA630

**Volume II**

Trial Transcripts (cont.)

    Day 3 (Doc. 633) .................................................................................JA722

    Day 4 (Doc. 635) .................................................................................JA952

    Day 5 (Doc. 636) ...............................................................................JA1198

**Volume III**

Trial Transcripts (cont.)

    Day 6 (Doc. 638) ...............................................................................JA1459

    Day 7 (Doc. 640) ...............................................................................JA1690

    Day 8 (Doc. 642) ...............................................................................JA1918

**Volume IV**

Trial Transcripts (cont.)

    Day 9 (Doc. 644) ...............................................................................JA2163

    Day 10 (Doc. 646) .............................................................................JA2413

    Day 11 (Doc. 648) .............................................................................JA2535

    Day 12 (Doc. 650) .............................................................................JA2752

**Volume V**

Trial Transcripts (cont.)

    Day 13 (Doc. 652) ........................................................................JA2937

    Day 14 (Doc. 654) ........................................................................JA3143

    Day 15 (Doc. 656) ........................................................................JA3404

    Closing Arguments (Doc. 666)........................................................JA3559

Trial Exhibits

    Plaintiff's Trial Exhibits

        Request for Judicial Notice (excerpts) (Doc. 577).......................................JA3688

        Notice of Deposition Designations Played in Court (Doc. 597-1)............JA3708

**Volume VI**

    Plaintiff's Trial Exhibits (cont.)

    PX1    ........................................................................................JA3723

    PX2    ........................................................................................JA3741

    PX9    ........................................................................................JA3742

    PX12   ........................................................................................JA3759

    PX13   ........................................................................................JA3802

    PX14   ........................................................................................JA3845

    PX15   ........................................................................................JA3848

    PX16   ........................................................................................JA3940

    PX17   ........................................................................................JA3941

    PX19   ........................................................................................JA3943

    PX21   ........................................................................................JA3944

    PX23   ........................................................................................JA3948

    PX24   ........................................................................................JA3951

    PX26   ........................................................................................JA3954

    PX28   ........................................................................................JA3963

PX29 ....................................................................................JA3971

PX35 ....................................................................................JA3972

PX36 ....................................................................................JA3979

PX41 (excerpts)....................................................................JA3980

PX50 ....................................................................................JA4002

PX57 ....................................................................................JA4008

PX68 ....................................................................................JA4011

PX71 ....................................................................................JA4012

PX72 ....................................................................................JA4028

PX75 ....................................................................................JA4075

PX81 ....................................................................................JA4079

PX88 (excerpts)....................................................................JA4080

PX95 ....................................................................................JA4084

PX96 ....................................................................................JA4090

PX99 ....................................................................................JA4097

PX106...................................................................................JA4109

PX111...................................................................................JA4110

PX147...................................................................................JA4112

PX148...................................................................................JA4113

PX149...................................................................................JA4115

PX150...................................................................................JA4116

PX152...................................................................................JA4124

PX153...................................................................................JA4128

PX154...................................................................................JA4130

PX155...................................................................................JA4131

PX156...................................................................................JA4132

PX157...................................................................................JA4133

PX163...................................................................................JA4134

PX164 ................................................................................................................JA4138

PX165 ................................................................................................................JA4142

PX167 ................................................................................................................JA4145

PX177 ................................................................................................................JA4147

PX182 ................................................................................................................JA4154

PX200 ................................................................................................................JA4156

PX218 ................................................................................................................JA4158

PX225 ................................................................................................................JA4196

PX227 ................................................................................................................JA4199

PX230 ................................................................................................................JA4200

PX236 ................................................................................................................JA4201

PX238 ................................................................................................................JA4203

PX265 ................................................................................................................JA4206

PX279 ................................................................................................................JA4209

PX287 ................................................................................................................JA4212

PX288 (excerpts) ..............................................................................................JA4214

PX299 ................................................................................................................JA4382

PX300 ................................................................................................................JA4389

PX302 ................................................................................................................JA4390

PX312 ................................................................................................................JA4412

PX316 ................................................................................................................JA4413

PX319 ................................................................................................................JA4432

PX324 ................................................................................................................JA4449

**Volume VII**

Plaintiff's Trial Exhibits (cont.)

PX340.................................................................................................................JA4451

PX461.................................................................................................................JA4454

PX465.................................................................................................................JA4460

PX467.................................................................................................................JA4461

PX509.................................................................................................................JA4464

PX555.................................................................................................................JA4475

PX604.................................................................................................................JA4521

PX618.................................................................................................................JA4523

PX619.................................................................................................................JA4524

PX620.................................................................................................................JA4525

PX621.................................................................................................................JA4527

PX622.................................................................................................................JA4528

PX623.................................................................................................................JA4530

PX624.................................................................................................................JA4531

PX625.................................................................................................................JA4532

PX626.................................................................................................................JA4533

PX628.................................................................................................................JA4534

PX629.................................................................................................................JA4535

PX630.................................................................................................................JA4536

PX631.................................................................................................................JA4537

PX633.................................................................................................................JA4538

PX634.................................................................................................................JA4558

PX656.................................................................................................................JA4559

PX657.................................................................................................................JA4561

PX659.................................................................................................................JA4562

PX696.................................................................................................................JA4563

PX705 ................................................................................................JA4564

PX720 ................................................................................................JA4565

PX721 ................................................................................................JA4566

PX722 ................................................................................................JA4585

PX723 ................................................................................................JA4586

PX741 ................................................................................................JA4606

PX749 ................................................................................................JA4607

PX755 ................................................................................................JA4625

PX767 ................................................................................................JA4627

Defendant's Trial Exhibits

DX2    ................................................................................................JA4628

DX3 (excerpts) ................................................................................JA4738

DX4    ................................................................................................JA4888

DX5    ................................................................................................JA4889

DX12 ................................................................................................JA4936

DX13 ................................................................................................JA4939

DX19 ................................................................................................JA4978

DX24 ................................................................................................JA5031

DX25 ................................................................................................JA5044

DX26 ................................................................................................JA5205

## Volume VIII

Defendant's Trial Exhibits (cont.)

DX27 .................................................................................................JA5244

DX36 .................................................................................................JA5272

DX39 .................................................................................................JA5346

DX40 .................................................................................................JA5376

DX41 .................................................................................................JA5462

DX42 .................................................................................................JA5463

DX44 .................................................................................................JA5479

DX47 .................................................................................................JA5484

DX53 .................................................................................................JA5508

DX55 .................................................................................................JA5546

DX56 .................................................................................................JA5596

DX60 .................................................................................................JA5597

DX76 .................................................................................................JA5598

DX79 .................................................................................................JA5599

DX80 .................................................................................................JA5600

DX81 .................................................................................................JA5601

DX82 .................................................................................................JA5602

DX83 .................................................................................................JA5603

DX84 .................................................................................................JA5611

DX100 ...............................................................................................JA5612

DX103 ...............................................................................................JA5615

DX106 ...............................................................................................JA5617

DX109 ...............................................................................................JA5620

DX119 ...............................................................................................JA5623

DX133 ...............................................................................................JA5633

DX139 ...............................................................................................JA5647

DX669 ........................................................................................................JA5684

DX670 ........................................................................................................JA5685

DX671 ........................................................................................................JA5686

DX672 ........................................................................................................JA5689

DX673 ........................................................................................................JA5690

DX674 ........................................................................................................JA5691

DX677 ........................................................................................................JA5692

DX678 ........................................................................................................JA5693

DX679 ........................................................................................................JA5694

DX680 ........................................................................................................JA5696

DX681 ........................................................................................................JA5697

DX683 ........................................................................................................JA5699

DX685 ........................................................................................................JA5701

DX686 ........................................................................................................JA5702

DX688 ........................................................................................................JA5706

DX692 ........................................................................................................JA5711

DX694 ........................................................................................................JA5720

DX695 ........................................................................................................JA5721

DX699 ........................................................................................................JA5722

DX702 ........................................................................................................JA5723

DX703 ........................................................................................................JA5725

DX704 ........................................................................................................JA5726

DX705 ........................................................................................................JA5728

DX706 ........................................................................................................JA5731

DX707 ........................................................................................................JA5732

DX708 ........................................................................................................JA5733

DX709 ........................................................................................................JA5734

DX711 ........................................................................................................JA5735

DX713 ..................................................................................... JA5743

DX715 ..................................................................................... JA5745

DX716 ..................................................................................... JA5746

DX718 ..................................................................................... JA5747

DX720 ..................................................................................... JA5748

DX721 ..................................................................................... JA5749

DX722 ..................................................................................... JA5754

DX723 ..................................................................................... JA5759

DX724 ..................................................................................... JA5764

DX725 ..................................................................................... JA5765

DX726 ..................................................................................... JA5767

DX727 ..................................................................................... JA5772

DX728 ..................................................................................... JA5776

DX729 ..................................................................................... JA5779

DX730 ..................................................................................... JA5791

DX740 ..................................................................................... JA5793

DX742 ..................................................................................... JA5875

DX743 ..................................................................................... JA5892

DX744 ..................................................................................... JA5908

DX746 ..................................................................................... JA5926

## Volume IX

Amici's Exhibits

AO4    ..................................................................................... JA5927

AO6    ..................................................................................... JA5978

AO17 ..................................................................................... JA5979

AO28 ..................................................................................... JA5980

AO31 ..................................................................................... JA5981

Trial Demonstratives

Plaintiff's Demonstratives

    PD20 ...............................................................................JA5982

    PD25 ...............................................................................JA5983

    PD27 ...............................................................................JA5984

    PD29 ...............................................................................JA5985

    PD31 ...............................................................................JA5986

    PD32 ...............................................................................JA5987

    PD33 ...............................................................................JA5988

    PD38 (excerpts) ............................................................JA5989

Defendant's Demonstratives

    DD1 (excerpts) .............................................................JA6030

    DD10 (excerpts) ...........................................................JA6032

    DD10A ...........................................................................JA6156

    DD10B ...........................................................................JA6157

    DD12 ..............................................................................JA6158



1              UNITED STATES DISTRICT COURT

2              DISTRICT OF MASSACHUSETTS

3    _____

4    STUDENTS FOR FAIR ADMISSIONS, INC.,

5              Plaintiff,          Civil Action
                                   No. 14-14176-ADB
6    v.
                                   October 31, 2018
7    PRESIDENT AND FELLOWS OF HARVARD
     COLLEGE, et al.,              Pages 1 to 206
8
              Defendants.
9    _____

10

11        TRANSCRIPT OF BENCH TRIAL - DAY 13
       BEFORE THE HONORABLE ALLISON D. BURROUGHS
12           UNITED STATES DISTRICT COURT
          JOHN J. MOAKLEY U.S. COURTHOUSE
13              ONE COURTHOUSE WAY
                BOSTON, MA  02210
14

15

16

17

18

19

20        JOAN M. DALY, RMR, CRR
        KELLY MORTELLITE, RMR, CRR
21         Official Court Reporter
        John J. Moakley U.S. Courthouse
22      One Courthouse Way, Room 5507
            Boston, MA  02210
23         joanmdaly62@gmail.com

24

25

**JA2937**

```
 1    APPEARANCES:

 2
      COUNSEL FOR THE PLAINTIFF:
 3

 4            ADAM K. MORTARA, ESQUIRE
              J. SCOTT McBRIDE, ESQUIRE
 5            KRISTA J. PERRY, ESQUIRE
              Bartlit Beck Herman Palenchar & Scott
 6            54 West Hubbard Street
              Suite 300
 7            Chicago, Illinois 60654
              312.494.4400
 8            adam.mortara@bartlit-beck.com
              scott.mcbride@bartlit-beck.com
 9            krista.perry@bartlit-beck.com

10            JOHN M. HUGHES, ESQUIRE
              KATHERINE L.I. HACKER, ESQUIRE
11            MEG E. FASULO, ESQUIRE
              Bartlit Beck Herman Palenchar & Scott
12            1801 Wewatta Street
              Suite 1200
13            Denver, Colorado 80202
              303.592.3100
14            john.hughes@bartlit-beck.com
              meg.fasulo@bartlit-beck.com
15            kat.hacker@bartlit-beck.com

16            JOHN MICHAEL CONNOLLY, ESQUIRE
              THOMAS R. McCARTHY, ESQUIRE
17            WILLIAM S. CONSOVOY, ESQUIRE
              Consovoy McCarthy Park PLLC
18            3033 Wilson Boulevard
              Suite 700
19            Arlington, Virginia 22201
              703.243.9423
20            mike@consovoymccarthy.com
              tom@consovoymccarthy.com
21            will@consovoymccarthy.com

22

23

24

25
```

**JA2938**

```
 1    APPEARANCES (cont.):

 2
             PATRICK STRAWBRIDGE, ESQUIRE
 3           Consovoy McCarthy Park PLLC
             Ten Post Office Square
 4           8th Floor, South, PMB #706
             Boston, Massachusetts 02109
 5           617.227.0548
             patrick@consovoymccarthy.com
 6
             MICHAEL H. PARK, ESQUIRE
 7           Consovoy McCarthy Park PLLC
             3 Columbus Circle
 8           15th Floor
             New York, New York 10024
 9           646.456.4432
             park@consovoymccarthy.com
10
             PAUL M. SANFORD ESQUIRE
11           BENJAMIN C. CALDWELL, ESQUIRE
             Burns & Levinson LLP
12           One Citizens Plaza
             Suite 110
13           Providence, Rhode Island 02903
             401.831.8330
14           psanford@burnslev.com
             bcaldwell@burnslev.com
15

16    COUNSEL FOR THE DEFENDANT:

17           WILLIAM F. LEE, ESQUIRE
             FELICIA H. ELLSWORTH, ESQUIRE
18           ANDREW S. DULBERG, ESQUIRE
             ELIZABETH C. MOONEY, ESQUIRE
19           SARAH R. FRAZIER, ESQUIRE
             Wilmer Cutler Pickering Hale and Dorr LLP
20           60 State Street
             Boston, Massachusetts 02109
21           617.526.6556
             william.lee@wilmerhale.com
22           felicia.ellsworth@wilmerhale.com
             andrew.dulberg@wilmerhale.com
23           elizabeth.mooney@wilmerhale.com
             sarah.frazier@wilmerhale.com
24

25
```

```
 1    APPEARANCES (cont.):

 2
             SETH P. WAXMAN, ESQUIRE
 3           DANIELLE CONLEY, ESQUIRE
             DANIEL WINIK, ESQUIRE
 4           BRITTANY AMADI, ESQUIRE
             PAUL R.Q. WOLFSON, ESQUIRE
 5           Wilmer Cutler Pickering Hale and Dorr LLP
             1875 Pennsylvania Ave, NW
 6           Washington, DC 20006
             202.663.6006
 7           seth.waxman@wilmerhale.com
             danielle.conley@wilmerhale.com
 8           daniel.winik@wilmerhale.com
             brittany.amadi@wilmerhale.com
 9           paul.wolfson@wilmerhale.com

10           DEBO P. ADEGBILE, ESQUIRE
             Wilmer Cutler Pickering Hale and Dorr LLP
11           7 World Trade Center
             250 Greenwich Street
12           New York, New York 10007
             212.295.6717
13           debo.adegbile@wilmerhale.com

14           ARA B. GERSHENGORN, ESQUIRE
             Harvard Office of the General Counsel
15           Smith Campus Center
             Suite 980
16           1350 Massachusetts Avenue
             Cambridge, Massachusetts 02138
17           617.495.8210
             ara_gershengorn@harvard.edu

18

19    COUNSEL FOR AMICI STUDENTS:

20           JON M. GREENBAUM, ESQUIRE
             BRENDA L. SHUM, ESQUIRE
21           GENEVIEVE BONADIES TORRES, ESQUIRE
             KRISTEN CLARKE, ESQUIRE
22           1500 K Street NW, Suite 900
             Washington, DC 20005
23           202.662.8315
             jgreenbaum@lawyerscommittee.org
24           bshum@lawyerscommittee.org
             gtorres@lawyerscommittee.org
25           kclarke@lawyerscommittee.org
```

```
 1    APPEARANCES (cont.):

 2
              LAWRENCE CULLEEN, ESQUIRE
 3            EMMA DINAN, ESQUIRE
              Arnold & Porter LLP
 4            555 Twelfth Street, NW
              Washington, DC 20004
 5            202.942.5477
              gina.dean@aporter.com
 6            emma.dinan@aporter.com

 7
      COUNSEL FOR AMICI ORGANIZATIONS:
 8
              JENNIFER A. HOLMES, ESQUIRE
 9            CARA McCLELLAN, ESQUIRE
              JIN HEE LEE, ESQUIRE
10            MICHAELE M. TURNAGE YOUNG, ESQUIRE
              RACHEL N. KLEINMAN, ESQUIRE
11            NAACP Legal Defense and Educational Fund, Inc.
              700 14th Street NW
12            Suite 600
              Washington, DC 20005
13            jholmes@naacpldf.org
              cmcclellan@naacpldf.org
14            jlee@naacpldf.org
              mturnageyoung@naacpldf.org
15            rkleinman@naacpldf.org

16            KENNETH N. THAYER, ESQUIRE
              KATE R. COOK, ESQUIRE
17            Sugarman Rogers
              101 Merrimac Street
18            Suite 900
              Boston, Massachusetts 02114
19            617.227.3030
              thayer@sugarmanrogers.com
20            cook@sugarmanrogers.com

21

22

23

24

25
```

**JA2941**

<u>P R O C E E D I N G S</u>

1

2          (The following proceedings were held in open

3    court before the Honorable Allison D. Burroughs, United

4    States District Judge, United States District Court, District

5    of Massachusetts, at the John J. Moakley United States

6    Courthouse, One Courthouse Way, Boston, Massachusetts, on

7    October 31, 2018.)

8          THE COURT:  Good morning, everyone.  Happy

9    Halloween.  Give me two seconds.

10          MR. MORTARA:  We have a very short issue Mr. Waxman

11    and I would like to raise.

12          THE COURT:  That is fine.

13          [Sidebar sealed and redacted.]

14          THE COURT:  When you're ready, Mr. Waxman.

15          MR. WAXMAN:  Thank you, Your Honor.

16          Just one housekeeping matter.  I am not clear -- we

17    had offered Defense Exhibit 685, which is at Tab 13, Volume

18    2.  My records don't indicate whether the Court admitted it

19    or not.

20          MR. MORTARA:  Your Honor, to the extent there needs

21    to be any record on this, no objection.

22          THE COURT:  All right.  My record shows it's been

23    admitted.  Karen's records.

24          MR. WAXMAN:  Thank you.

25    EXAMINATION BY MR. WAXMAN: (Continued)

1    **Q.**  Good morning, Professor Card.

2    **A.**  Good morning.

3    **Q.**  I believe that the last question I asked you was whether

4    or not you were concerned that your model was overfitted, and

5    that you said -- do you have any concern, and you said, I

6    don't, no.  Which was then clarified as, I don't, period, no.

7            THE COURT:  I like the whole Oxford comma debate.

8            MR. WAXMAN:  Yes.

9    **Q.**  Why do you have no concern that your model is overfitted?

10            MR. MORTARA:  Your Honor, I object.  We have to

11    return to the sidebar.

12            THE COURT:  Okay.

13            [Sidebar sealed and redacted.]

14    BY MR. WAXMAN:

15    **Q.**  Professor Card, do you recall my last question?

16    **A.**  Yes, I do, I think.

17    **Q.**  So why -- when you said you didn't have any concerns

18    about your model being overfitted, why do you have no

19    concerns?

20    **A.**  Well, the primary interest in my analysis is on the

21    average marginal effect of Asian-American ethnicity.  And

22    with regard to that marginal effect, I don't think that

23    there's any particular problem with, for example, including

24    many, many variables that represent academic strength, for

25    example, even though it might be hard to distinguish the

1    individual contributions of any one of them.

2              So you might say, for example, that if one was

3    focusing on the SAT, it might not be appropriate or might be

4    a concern to worry about them, that particular variable being

5    -- or that set of variables being potentially rather rich.

6              But for my purposes of estimating the effect on the

7    average marginal effect of Asian-Americans relative to

8    whites, which is the entire purpose of this exercise, I'm not

9    worried about that.

10   **Q.**  Let's turn to parental occupation.  And Mr. Lee, can you

11   take us to Demonstrative 10.47.

12             Can you walk us through this, please, Professor

13   Card?

14   **A.**  Yes.  So this is actually a summary of the four main

15   factors that are omitted from Professor Arcidiacono's model,

16   which, I believe, are, in fact, important variables in the

17   admissions process that help inform the way that admission

18   officers evaluate different candidates in terms of their

19   context and how they should be compared against other

20   students.

21             And in each case, the reason why the white sheet to

22   the left is shown, that's the summary sheet that goes along

23   with each application folder and shows kind of a summary of

24   some of the main information about the students, which my

25   understanding is that the admissions officers could easily

1    refer to quickly to find some of the most salient aspects of

2    a student.

3           And in each case, all four of these variables are,

4    in fact, included on this summary sheet.  So parental

5    occupation.  A student's intended career, whether or not they

6    had a staff interview, and, of course, the personal rating

7    are all included here.

8           So I'm trying to emphasize that not only are these

9    variables potentially salient for lots of different reasons,

10   but they're, in fact, directly on the summary sheet.

11   **Q.**  So let's turn to the next demonstrative, 10.48, and talk

12   about parental occupation.

13          Is parental occupation considered in the admissions

14   process?

15   **A.**  Yes.  My understanding from, for example, some of the

16   training materials that are distributed to the interviewers

17   and the case studies mention specifically parental

18   occupation, I actually, in a conversation call with the Dean,

19   actually directly asked him about this because it seemed like

20   it was important, and he strongly confirmed that.  And my

21   understanding is that it is, in fact, part of the process.

22   **Q.**  And did you also hear testimony in this courtroom by

23   admissions officers to that effect?

24   **A.**  Yes, I did.  Mm-hmm.

25   **Q.**  In the field of economics, is occupation considered a

1  useful variable to include in modeling?

2  **A.**  Yes, in both economics and sociology, parental occupation

3  is one of the most important variables for understanding,

4  especially, intergenerational issues; issues of how a

5  family's background might translate to some outcome for

6  children of the next generation.

7       I guess it's no accident that many -- in many

8  cultures last names are based on occupations.  My own last

9  name is actually an occupation.

10      And I think when an admissions officer -- so

11  there's a huge literature on that, in economics and

12  sociology.  And when an officer was thinking about looking at

13  a student, it would be almost inconceivable that they

14  wouldn't think about that as one of the most important

15  variables in putting the students' achievement in context.

16  **Q.**  In reviewing the data, did you determine that parental

17  occupation is one of the variables that varies by race?

18  **A.**  Yes, I did.

19  **Q.**  Please turn to Tab 11 in your binder, Volume 2, and tell

20  me when you've found Defense Exhibit 681.

21  **A.**  Yes.

22  **Q.**  What does this show?

23  **A.**  So it's two slides showing -- or two exhibits showing

24  mother's occupation and father's occupation by

25  race/ethnicity.

1          MR. WAXMAN:  Your Honor, we offer Defense Exhibit

2    681.

3          MR. MORTARA:  No objection.

4          THE COURT:  It's admitted.

5          (Defendant Exhibit 681 admitted into evidence.)

6    **Q.**  Mr. Lee, let's turn to Demonstrative 10.49.

7          And Professor Card, let me ask you what this is

8    showing.

9    **A.**  So this is an illustration -- this is a selected number

10   of mothers' occupations and fathers' occupations.  The way

11   that I've classified them, there's over 20 of each of these,

12   so these are three for mothers and two for fathers that are

13   notably different for white students and Asian-American

14   students.

15         So one place where they differ is in terms of the

16   fraction of the mothers who are elementary and secondary

17   school teachers.  So ten percent of all white applicants,

18   their mother is a -- is that kind of a teacher, or a

19   librarian, where, like, half as many Asian-Americans.

20         In terms of lawyers and judges, four percent of

21   white applicants are -- their mother is a lawyer or a judge

22   versus less than one percent of Asian-Americans.

23         Offsetting that you can see a stark difference in

24   terms of mothers who are in the computer and

25   mathematical-type occupations, which is much, much higher for

1    Asian-American kids.

2              On the father's side, business executive is much

3    more prominent among white applicants versus architecture and

4    engineering for fathers of Asian-Americans.

5    **Q.**  And Professor Card, given that you found that parental

6    occupations varied by race, does that -- does omitting that

7    variable give rise to any concern about omitted variable

8    bias?

9    **A.**  Yes, I think it would be a very important concern.

10             First, recall when we're talking about omitted

11   variable bias, there's really two things that are

12   particularly salient.  One is, does the omitted variable

13   potentially differ by race groups, in this case whites and

14   Asian-Americans, and the answer clearly is yes.

15             And the second is, is that variable itself

16   important in the process.  And the answer, again, is clearly

17   yes.

18             So this is exactly the situation where one would

19   be, I think, extremely concerned that excluding this variable

20   or the set of variables could give rise to omitted variable

21   bias, yeah.

22   **Q.**  Did you hear Dr. Arcidiacono testify that he excluded

23   this variable because of what he says are year-to-year

24   fluctuations?

25   **A.**  Yes.

1    **Q.**  Let's turn to -- I guess it's Plaintiff's Demonstrative

2    38, slide 42.

3          Can you remind us -- this is one of Dr.

4    Arcidiacono's demonstratives.  Can you remind us what this

5    shows?

6    **A.**  So this is showing five occupational categories that

7    Professor Arcidiacono has noted vary somewhat in terms of the

8    fraction of applicants that are classified with their mother

9    or father and in that occupation group from year to year.

10          I would emphasize that most of the other groups are

11    much more stable than this, so these are the ones that he has

12    sort of highlighted as being the problematic ones.

13    **Q.**  And are fluctuations like this common in economic data?

14    **A.**  Yes.  Actually, this kind of problem arises quite often,

15    and I've had to deal with it many times in my own research.

16          For instance, parental occupation is classified in

17    a different way in some of the older data sets that we use,

18    and then one has to try and make a concordance between the

19    way it's classified in one and in another.  And oftentimes

20    that concordance is somewhat incomplete, and there's --

21    that's just an inevitable consequence of the fact that on the

22    one hand, this is a somewhat complicated variable and

23    classification systems change over time.

24          And that's exactly what's -- part of the reason why

25    results that we see here are arising.

1    **Q.**   Let me ask you first.  When you say fluctuations like

2    this in the data that you have to analyze over years in which

3    the system for coding or inputting occupations varies, does

4    this mean that including this data in your model is that the

5    data itself are unreliable?

6    **A.**   No, not at all.  Actually, the same thing happened with

7    the docket.  So the docket changed, they introduced a new

8    docket in one year, and saw a bunch of states and parts of

9    states got moved, and so we have to deal with a change in the

10   classification system.

11          That's what -- you know, that's the kind of thing

12   that one has to do all the time in real research.

13   **Q.**   Mr. Lee, can we have the next demonstrative.

14          And here I'm highlighting a couple of numbers from

15   2014 that Professor Arcidiacono focused on.  Do you see those

16   changes in low-skilled and self-employed?

17   **A.**   I do, yes.

18   **Q.**   Do you know what explains the changes from the 2014 to

19   the 2015 cycle?

20   **A.**   Yes.  So occupations in the NEVO database are -- most of

21   them are coded in one of two types of systems.  It's sort of

22   like the way students' standardized tests are reported in the

23   SAT or the ACT.

24          And so what happens is that in 2014 -- after 2014,

25   one of these systems is used more widely.  And so the set of

1    parents who are coded in this one bucket of low skill goes

2    down.

3            Now, of course, that same kind of information is

4    actually being presented to the application officers or

5    admissions officers, so in some sense, they are dealing with

6    the same process when they're making their evaluation of each

7    student in context.

8    **Q.**  So let me just make sure the record is clear about what

9    you're talking about when you're saying that the applicants

10   in 2014 had one system, which I gather you mean one form of

11   application in which they were given one series of choices to

12   report occupations, and then in 2015, there were two

13   different systems available that -- for applicants to use in

14   order to indicate their parents' occupation.

15           Is that correct?

16   **A.**  There's a switch in the preponderance of the two systems,

17   yes.

18   **Q.**  Okay.  Let's turn to the next demonstrative.  And here

19   I've highlighted a couple of numbers from the classes of 2018

20   and 2019 that SFFA focused on.

21           Do you know what explains the changes from the 2017

22   cycle to those cycles?

23   **A.**  Yes, it's, again, a similar kind of problem.

24           So when one is asking someone their occupation,

25   sometimes the way that's done is one first asks if they have

1    a job; and if they do, they ask if you're unemployed --

2    excuse me, if you're unemployed, they don't ask any further

3    about your occupation, so the occupation then becomes

4    unemployed.

5           Another system that's actually used in most

6    government surveys is if one doesn't have a current job, one

7    is asked about the job they had most recently, and that's the

8    -- that's -- my understanding is that's exactly what's

9    happened here.

10          So, again, this is a kind of thing that would be

11   represented in the data that would be presented to the

12   admission officers themselves.  So they -- I think they would

13   understand or would notice that there's no longer anybody

14   unemployed.

15          Now, of course that doesn't mean that they suddenly

16   got rid of unemployment in the economy for that class.  What

17   it means is that those people -- the information that's being

18   captured in the system has changed a little bit.

19          Because I fit my model separately year by year,

20   this is of no particular consequence because the -- I'm

21   allowing presence of a student's mother or father to be in a

22   certain bucket to have a slightly different effect in

23   different years depending on what kind of classification,

24   who's moved around, exactly like I do with the docket.

25          So before the J docket was introduced, the other

1    dockets are kind of absorbing those students.  Once the J

2    docket is introduced, that set of students who are in that

3    docket are treated separately.  The fact we have different

4    docket coefficients in different years, those variables are

5    separate and it allows the model to capture that.

6    **Q.**  And is the effect of fitting your model year to year,

7    that the model is actually evaluating the parental occupation

8    choices, indicators that the admissions office itself is

9    looking at and considering?

10   **A.**  Yeah, largely, yes.

11   **Q.**  Did you do anything else to address the variation in

12   occupation coding systems year by year?

13   **A.**  Yes.  So in response to concerns that Professor

14   Arcidiacono raised, I did a very standard kind of check that

15   one would do in this kind of analysis.  So I took, first of

16   all, the low-skilled type occupations, so some of the

17   low-skilled occupations are amongst the ones that have a --

18   some fluctuations from year to year, and I made that into all

19   one group, a larger bucket across all the years.

20           And then I took the occupations that would include

21   unemployed, homemaker, other and put them in another bucket

22   that's constant across all the years.

23           And I evaluated what would happen to my model if

24   instead of using the slightly more granular information I was

25   to use those two classifications one at a time or together,

**JA2953**

1    and the results are extremely similar, virtually identical to

2    what I get with my main model.

3    **Q.**  Well, let's look now, if you can, at Tab 12 of -- by the

4    way, I believe all of these are in Volume 2.  So Tab 12 of

5    Volume 2.

6          And let me ask you this, when you've found Defense

7    Exhibit 683.

8    **A.**  Yes.

9    **Q.**  And is this showing the results of the sensitivity check

10   that you just described?

11   **A.**  Yes, there's two sets of sensitivity checks in these two

12   sets of exhibits.  Average marginal effect of Asian-American

13   ethnicity, after parental occupation variables are modified,

14   yes.

15          MR. WAXMAN:  Your Honor, we offer Defense Exhibit

16   683 into evidence.

17          MR. MORTARA:  No objection.

18          THE COURT:  Admitted.

19          (Defendant Exhibit 683 admitted into evidence.)

20   **Q.**  And so looking at Defense Exhibit 683, can you just show

21   what your conclusion was?

22   **A.**  Right.  So --

23   **Q.**  Mr. Lee?  Thank you.

24   **A.**  So recall for -- in my main specification, the one that

25   we've been focusing on, the average marginal effect across

```
 1    all the years was minus 0.05, not statistically significant,
 2    and this is minus 0.07, which is essentially a trivial change
 3    in the estimated marginal effect.  And the same is true year
 4    to year.
 5    Q.  Let me ask you to suppose that the occupation data were
 6    as unreliable as Dr. Arcidiacono has opined.  Would including
 7    that data in the regression ruin the results?
 8    A.  Well, as I -- no.  As I pointed out, I think when we were
 9    talking about my hypothetical case of retirement, if you were
10    to include in our regression model some variable that's truly
11    garbage, it's truly, you know, so poorly measured that it
12    just doesn't represent anything useful, that doesn't hurt a
13    regression model.  The regression model will just essentially
14    set that variable to have zero effects on everything and say,
15    well, you've given me garbage so I'm going to give you a zero
16    on that.  And that then does not lead to any change in
17    anything else in the model.  Especially with the kinds of
18    sample size I have here.
19    Q.  So to be clear, Professor Card, you included parental
20    occupation in your model, correct?
21    A.  I did, yes.
22    Q.  Let's talk about intended career and look at
23    Demonstrative 10.53.
24          Is the applicant's intended career considered in
25    the admissions process?
```

1    **A.**   Yes.  Again, it's a variable that's included directly on

2    the summary sheet as shown in this slide.  It's also a

3    variable that is -- comes up in discussions in the training

4    materials and case studies.  It's also a variable that I

5    understand from depositions is important in evaluating and

6    comparing different candidates.

7    **Q.**   And is intended career also a variable that varies by

8    race?

9    **A.**   Yes.

10   **Q.**   Would you please turn to Tab 7 in your binder.

11          Do you have it?

12   **A.**   I do, yes.

13   **Q.**   This is Defense Exhibit 677.  And what is this document?

14   **A.**   It's a summary of differences in intended career for

15   Asian-American and white applicants.

16          MR. WAXMAN:  Your Honor, we offer Defense Exhibit

17   677.

18          MR. MORTARA:  No objection, Your Honor.

19          THE COURT:  It's admitted.

20          (Defendant Exhibit 677 admitted into evidence.)

21   **Q.**   Turn, please, to Tab 8 in your binder, the next tab.

22          Do you find Defense Exhibit 678?

23   **A.**   I do, yes.

24   **Q.**   What is this?

25   **A.**   It's a summary of intended concentration for

 1    Asian-American and white applicants.

 2            MR. WAXMAN:  Your Honor, we offer Defense Exhibit

 3    678 into evidence.

 4            MR. MORTARA:  No objection, Your Honor.

 5            THE COURT:  Admitted.

 6            (Defendant Exhibit 678 admitted into evidence.)

 7    **Q.**  Please turn to Tab 10 in your binder.

 8    **A.**  Yes.

 9    **Q.**  What is this document -- well, this is on Defense Exhibit

10    680.

11            And what is it, please?

12    **A.**  This is a summary of primary extracurricular activities

13    by race.

14            MR. WAXMAN:  Your Honor, we offer Defense Exhibit

15    680 into evidence.

16            MR. MORTARA:  No objection.

17            THE COURT:  Admitted.

18            (Defendant Exhibit 680 admitted into evidence.)

19    **Q.**  Mr. Lee, please project Demonstrative 10.54 on the

20    screen.

21            And let me ask you, Professor Card, what does this

22    show?

23    **A.**  Well, this is showing in simple graphical form some of

24    the information contained in those documents that were just

25    admitted.  So it's showing the share of applicants, white and

1    Asian-American, on the average across the six years in my

2    sample who state that their intended careers are medicine or

3    health, science, undecided, government or law, arts,

4    communications, design or social science.  And this is a

5    selection of the possible careers they can list.

6         And you can see that there are some notable

7    differences.  For example, white students are quite a bit

8    more likely to say that they intend to pursue a career in

9    government or law.  They're also more likely to be undecided.

10   They're about equal in terms of their intention to pursue a

11   career in science.

12        And on the other hand, Asian-American students are

13   quite a bit more likely to say that they would intend to

14   pursue a career in medicine or health.

15   **Q.**  So why are these differences on average between the two

16   groups important?

17   **A.**  They're important because Harvard is thinking about

18   trying to get a set of students -- or my understanding, at

19   least, is Harvard is trying to get a set of students who will

20   have lots of diversity.  And I think, for instance, having a

21   large fraction of students who all intend to pursue, for

22   example, a career in medicine would be -- would not

23   accomplish that goal.  So, you know, they want to have

24   students who are, for instance, interested in pure science,

25   applied science, social science, humanities, political

1    science, government, things like that, and so having a too

2    unbalanced class would be a problem, I think.

3    **Q.**  Mr. Lee, can you please project Plaintiff's Demonstrative

4    38, slide 34.

5            And Professor Card, I'm showing you this from one

6    of the demonstratives that Dr. Arcidiacono projected and

7    discussed.

8            Can you remind us what this shows?

9    **A.**  Yes.  So this is a selection of some of the intended

10   careers and the numbers of applicants classified as stating

11   that intended career from year to year from Professor

12   Arcidiacono's testimony.

13   **Q.**  And Mr. Lee, can we have the next demonstrative.

14           I'm highlighting a couple of careers that I believe

15   Mr. Arcidiacono pointed out fluctuated significantly in one

16   or more years.

17           Do you see that?

18   **A.**  Yes.

19   **Q.**  And what does it show?

20   **A.**  Well, it's showing -- this is a -- kind of an interesting

21   example of the kind of thing that happens in any kind of

22   coding system like this.

23           So it seems clear that in 2018, for some reason,

24   medicine was essentially not available.  Now, I should remind

25   you that there are a very small number of students who are

1    filling in applications, pencil and paper and things like

2    that, so there's always, interestingly enough, a very small

3    number of students doing that even in this day.  So you can

4    get rise of a very small number, not a complete zero.

5         But virtually everybody, it seems, that previously

6    would have said they're intending a career in medicine seems

7    to have moved to health.  And you can see that in 2019 it

8    moves back.

9         Now, my understanding is that this is, in fact, the

10   kind of information that, again, the admissions officers

11   would themselves be seeing.  So, and, of course, they know

12   that many, many students are intending a career in medicine

13   so they know that didn't suddenly disappear.  So I think they

14   would fully understand the situation.

15        And so my understanding is that that's all that's

16   happened, is that one bucket has been relabeled.  And, again,

17   because my model is fit year to year with separate variables

18   representing each of these intended careers, the variable

19   that represents health in 2018 is more or less taking the

20   place of the variable that represents medicine in all the

21   other years.  So I think this is, again, not a concern.  This

22   is, again, the kind of thing that arises in lots of other

23   situations, and economists and other social scientists have

24   to deal with and regularly deal with.

25   **Q.**  So does this, the variation that we see here, give you

Case: 19-2005  Document: 00117621846  Page: 87  Date Filed: 07/29/2020  Entry ID: 6356391
Case 1:14-cv-14176-ADB  Document 652  Filed 04/18/19  Page 25 of 206

25

1    any greater degree of concern than the fluctuations we

2    discussed in parental occupation categories?

3    **A.**  No, not at all.

4    **Q.**  And to be clear, you included intended career in your

5    model, correct?

6    **A.**  Yes, I did.

7    **Q.**  Now let's talk, switch gears and talk about the staff

8    interview indicator.  And may we have Demonstrative 57,

9    please.

10            What is the -- what is a staff interview again?

11   **A.**  So students who are applying to Harvard can request, at

12   their kind of initiative, an interview with an admissions

13   staff member, an admissions officer.  And my understanding is

14   historically that was done at the campus and nowadays more

15   and more of it is done by Skype interview, but it's entirely

16   a process that's initiated by the student.

17            So the student -- there's information on how you

18   can request such a thing and the student would do that.

19   **Q.**  And why do you include this variable in your model?

20   **A.**  Well, again, there's, first of all, the fact that the

21   staff interview is indicated on the admissions file in the

22   summary sheet I think is important.  If a student has had a

23   staff interview, it means that one of these admissions

24   officers has actually talked to that student in person.

25            And just like when Professor Arcidiacono was

1    mentioning how Duke had moved to a process of trying to

2    interview students for their graduate program, I think that

3    kind of personal information and insight by someone who is

4    going to be present at the subcommittee and committee can

5    really fill in some holes about that student and help explain

6    or understand some issues, and that person could well turn

7    out to be an advocate for that person or potentially the

8    opposite.  And so I think that it makes a lot of sense that

9    this would be an important variable.

10           Moreover, you know, as an empirical matter, it is

11   an important variable in the admissions process.

12   **Q.**  Did you hear Dr. Arcidiacono explain that he excluded the

13   staff interview because ALDC applicants are

14   disproportionately likely to receive them?

15   **A.**  Yes.

16   **Q.**  Is that a reason to exclude the variable?

17   **A.**  No, not at all.  I mean, first of all, lots of other

18   non-ALDC students are interviewed.  There is something like

19   500 students a year are interviewed.  So when you think about

20   the burden on the admissions staff, quite a large amount of

21   interviews, and the ALDCs are in no way a majority of those

22   interviews.

23           And just because one group has a higher

24   representation I don't think is any reason -- in my model of

25   admissions, I'm going to actually have, of course, controls

1    for whether you're an A or an L or a D or a C.  So that's

2    going to be itself represented by those variables, and then

3    any importance of the staff variable is going to be a

4    separate variable in the regression model.

5            And so both for ALDCs and for non-ALDCs, I'm going

6    to be identifying any additional impact of having had the

7    staff interview on the admissions rate.  So it's a separate

8    variable in my model.

9    **Q.**  Let me ask you to turn to Tab 30 in your binder and tell

10   me when you've found Defense Exhibit 708.

11   **A.**  Yes.

12   **Q.**  What is this?

13   **A.**  This is a share of applicants who received staff

14   interviews who are ALDC categories.

15           MR. WAXMAN:  Your Honor, we offer Defense Exhibit

16   708.

17           MR. MORTARA:  No objection.

18           THE COURT:  Admitted.

19           (Defendant Exhibit 708 admitted into evidence.)

20   **Q.**  Did you hear Dr. Arcidiacono explain that Asian-American

21   applicants received staff interviews at a rate lower than

22   white applicants?

23   **A.**  Yes.

24   **Q.**  Is that a reason to include or exclude the variable?

25   **A.**  No, not at all.  First --

1    **Q.**  Not at all as to include or exclude or neither?

2    **A.**  My apologies.  It's not --

3    **Q.**  I just want to make sure I understand the answer.

4    **A.**  Not at all a reason to exclude it.

5            First of all, about 16 percent of Asian-Americans

6    receive a staff interview.  So it's not a trivial fraction --

7    excuse me, 16 percent of all people who get an interview are

8    Asians.  Excuse me.  So it's not completely out of line with

9    their share in the overall admission pool, which is in the

10   20s.

11           And lots of other variables differ substantially

12   between Asian-Americans and whites.  For example, the share

13   in California, a lot of these parental occupation variables

14   we noted are different.  The fraction of female applicants

15   amongst Asians, nearly half of the applicants are female, and

16   amongst whites it's only 45 percent.  So there's a fairly

17   large gap even in that variable.

18           So there's lots of gaps between the Asian and white

19   applicants and so I don't think that's at all a reason to

20   exclude it.  In fact, if we're concerned about omitted

21   variable bias, which I am, it's an important reason to

22   include it because it is a variable that differs, it is

23   important in the process, and so excluding it necessarily

24   leads to, in my view necessarily leads to omitted variable

25   bias.

1    **Q.**  Did you hear Dr. Arcidiacono explain also that applicants

2    who receive staff interviews are disproportionately likely to

3    be admitted?

4    **A.**  Yes.

5    **Q.**  More likely to be admitted than applicants who do not

6    request and receive a staff interview?

7    **A.**  Yes.

8    **Q.**  Is that a reason to exclude the variable?

9    **A.**  No, not at all.  I mean, we don't exclude somebody who

10   has an academic rating of 1, which have very high admission

11   rates.  So just because that's true is no basis for excluding

12   it.  It makes no sense to me.

13           It's going to be included in the regression model

14   along with other variables, a lot of these other positive

15   tips, for example, or benefits or preferences or factors that

16   help influence admission officers' decisions, so I think it's

17   important to include it.

18   **Q.**  Did you look at what would happen if you did exclude the

19   staff interview rating variable from your model?

20   **A.**  I did, yes.

21   **Q.**  Please turn to Tab 22 in your binder and tell me when

22   you've found Defense Exhibit 698.

23   **A.**  Yes.

24   **Q.**  What is it?

25   **A.**  It's an exhibit from one of my reports showing the

1   average marginal effect of Asian-American ethnicity when they

2   exclude the staff interview.

3   **Q.** So is this the analysis that you just described?  This

4   represents the results of the analysis you just described?

5   **A.** Yes.

6          MR. WAXMAN:  Your Honor, we offer Defense Exhibit

7   698 into evidence.

8          MR. MORTARA:  No objection.

9          THE COURT:  It's admitted.

10          (Defendant Exhibit 698 admitted into evidence.)

11   **Q.** And what is the result?

12   **A.** Well, as you would expect, I think, the effect of

13   Asian-American ethnicity becomes slightly more negative, but

14   year to year and, again, overall, it's not statistically

15   significant.

16          So if one, for some reason, really wanted to

17   exclude it or felt that it was useful to find out what would

18   happen if one excluded it, it does not make any of the

19   estimated marginal effects statistically significant, and the

20   overall effect remains relatively small and negative, but --

21   **Q.** And to be clear, you did include the staff interview

22   rating in your model, correct?

23   **A.** I did, yes.

24   **Q.** Let's turn to --

25          MR. MORTARA:  Can I object just a little bit?  I

**JA2966**

1    think you meant to say staff interview rating indicator, not

2    rating.

3             MR. WAXMAN:  Thank you, Counsel.

4    **Q.**  You included this variable in your model?

5    **A.**  Yes.  In fact, precisely as Mr. Mortara has said.  This

6    is an indicator for whether a student got a staff interview.

7    **Q.**  Let's turn now to the personal rating.  And may we see

8    the next demonstrative, which is 10.58.

9             Why did you include the personal rating in your

10   model?

11   **A.**  Well, the personal rating is one of the four ratings that

12   are conducted or made by admissions officers.  My

13   understanding is that it's one of the important variables

14   that are evaluated and considered in the admissions process.

15   Every student who is admitted -- or every student who is

16   evaluated, excuse me, every student who has got an

17   application, they're given a personal rating, and my

18   understanding is that it's an extremely important part of the

19   overall process.

20   **Q.**  What does the personal rating capture?

21   **A.**  Well, my understanding is the personal rating is meant to

22   capture a wide variety of factors that the admissions

23   officers characterize as personal qualities.  So they're

24   looking for evidence, I think, of issues like personal

25   integrity.  I think Harvard is very concerned about admitting

1    students who have a high level of personal integrity.

2    They're looking for evidence of leadership skills.  They're

3    extremely interested in leadership skills and trying to

4    educate leaders of the future.  They're looking for

5    evidence -- one of the personal qualities that I think is

6    definitely mentioned in the training materials, and the

7    testimony has emphasized, they're looking for evidence that

8    an individual is someone who can interact with a group and

9    try and create groups and create cohesion among students.

10   And with their emphasis on that in all of their applications,

11   I think that's an example of an important variable for them.

12   **Q.**  Does the personal rating reflect a range of information

13   in the application file and available to and considered by

14   the admissions officers that otherwise isn't quantified in

15   the -- in your model or Professor Arcidiacono's model?

16   **A.**  Yes, clearly.  Actually, I think all of the ratings

17   include information like that.

18          So, in fact, even the academic rating, which

19   there's a lot of quantified information, I've emphasized

20   before, I think yesterday, that even the academic rating has

21   a large component that isn't quantified.  And the same is

22   true with the other ratings, but particularly for the

23   personal rating, my understanding is a lot of that

24   information about the presence of personal qualities is

25   coming from the teacher letters and narratives of the -- what

1    the teacher says about a student, what the guidance counselor

2    says, coming from the letter that an alumni interviewer is

3    providing, coming in many cases from additional kinds of

4    letters of support from community leaders and religious

5    leaders and things like that.

6              So that's going to be not quantified directly in my

7    dataset.

8    **Q.**   And would the dataset otherwise quantify what the

9    admissions officer considers or gleans about the applicant

10   from the applicant's essays or personal statement?

11   **A.**   It does include some quantification of that, and we're

12   going to talk about that in a moment.

13   **Q.**   Okay.  In your opinion, can a model that excludes the

14   personal rating accurately model Harvard's admissions process

15   and decisions?

16   **A.**   No.  My opinion is that if one looks at, for example,

17   analysis of the probabilities of admission, one can see very

18   clearly that having like a 2 or better on a personal rating

19   is extremely important.  It's one of those four strengths I

20   was talking about when I talked about having one strength

21   versus two strengths versus three versus four.  And very,

22   very clearly, someone who is rated with a personal rating of

23   2 versus someone who is rated with a personal rating of 3 is

24   assessed differently by the committee.  And that's just a

25   very important feature that is helping them to distinguish

1    candidates.

2    **Q.**   In addition to Dr. Arcidiacono's main model, do you

3    understand that he also constructed regression models of the

4    academic, extracurricular and personal ratings?

5    **A.**   Yes.

6    **Q.**   Let's talk first about his model for the personal rating.

7    Does it support a conclusion that the personal rating is

8    affected by race?

9    **A.**   No, not in my opinion at all.

10   **Q.**   Let's turn, Mr. Lee, please, to the next demonstrative

11   and ask you, please, to walk through this demonstrative for

12   us.

13   **A.**   Well, this is a summary of four things that I'd like to

14   try and raise about Dr. Arcidiacono's personal rating

15   conclusions and my personal rating conclusions.

16   **Q.**   Excuse me, we'll go through these separately, but at the

17   outset, could you just explain at a high level the four

18   reasons -- your four conclusions?

19   **A.**   Yes.  So as I'm going to show next, Dr. Arcidiacono's

20   model explains very little of the variation in the personal

21   rating.

22        Secondly, I'm going to point out that Dr.

23   Arcidiacono's academic and extracurricular models, the models

24   he's developed for those ratings, actually show statistically

25   significant positive effects of Asian-American ethnicity.

1          I'm going to show -- third, I'm going to show that

2     Asian-American applicants are less strong on average than

3     white applicants on non-academic factors in the data.

4          And finally, I'm going to show, as a kind of

5     analysis, if one was concerned about bias in the ratings as a

6     whole, taking account of the fact that there's a positive and

7     statistically significant Asian-American gap in two of the

8     ratings and a negative gap in one of the ratings, if one was

9     concerned about bias as a whole, rather than throw out the

10    ratings, what one could do is adjust each of the ratings for

11    that racial component and then use the racially adjusted

12    ratings in the model.

13         And I'll show that when I do that, again, one gets

14    essentially the same results as I got in my main model.

15    **Q.**  All right.  Well, let's start with number one.

16         And let me ask you, what type of information cannot

17    be captured in Dr. Arcidiacono's personal rating model?

18         You mentioned a couple of things like the teacher

19    evaluations.  But can you speak more generally about the

20    kinds of information that is in the file and considered by

21    the admissions committee that is not captured in his personal

22    rating model?

23    **A.**  Yes.  So one -- obviously one set of variables is a close

24    reading of the teacher letters and the guidance counselor

25    letters, as I mentioned before.

1          A second very important component emphasized in the

2     admissions materials and in the testimony is the individual's

3     personal essay and personal statement.  And so a lot of

4     students spend a lot of time writing these personal essays

5     and trying to particularly emphasize things like obstacles

6     that they have overcome or special accomplishments that they

7     have made, and these -- my understanding is that those kind

8     of -- that kind of information would be very important in

9     evaluating some of these personal qualities.

10    **Q.**   So let me just ask you a question about the teacher

11    evaluations and the guidance counselor evaluations.  Each one

12    of these evaluations independently gets a rating by the first

13    reader, correct?

14    **A.**   Yes, and potentially by second readers.  It would be

15    updated if a second reader felt it should be updated.

16    **Q.**   And why doesn't that fully capture whatever is in those

17    recommendations about the personal qualities of the

18    applicant?

19    **A.**   So that's an extremely important question.

20          The rating is assigned to the teacher letter as a

21    whole.  The teacher letter, of course, is trying to get

22    across these multiple dimensions of the student.  So the

23    teacher is writing probably about the academic

24    accomplishments of the students.  That would be the natural

25    thing they would probably write in many cases first just to

1   reassure Harvard that this is a very strong academic

2   candidate because that's, of course, primary, first order

3   concern for Harvard.

4           Then they would be talking about potentially their

5   extracurricular or athletic accomplishments.

6           And then they would be talking about -- not

7   necessarily in this order, of course, but then they would be

8   talking about their personal qualities, things like, are they

9   a leader, have they had a leadership role in some kind of

10  activity on campus or even off campus in some personal

11  community.

12          And so the letter has -- the rating for the teacher

13  letter, for example, teacher letter -- teacher 1, has to kind

14  of summarize all four of those dimensions.  So just looking

15  at it by itself, it's got a combination of those four

16  features.

17  **Q.**  Now let's talk for a minute about the academic and

18  extracurricular ratings which Dr. Arcidiacono also modeled.

19          Do those two ratings, academic and extracurricular,

20  also reflect factors that are outside the data?

21  **A.**  Yes, very much so.  As I mentioned with reference to

22  academic, for instance, the kind of information that's used

23  to distinguish particularly an academic 1 or 2 would include

24  much more than just test scores and GPA because, of course,

25  there's many, many students, many more students applying to

1    Harvard that have virtually perfect, only one or two

2    questions wrong on the SAT or ACT, virtually perfect GPA than

3    there is gets an academic 1 or 2.

4         And that difference is driven by things like some

5    information about the student's context and information about

6    the high school that they're in, which the admissions

7    officers are normally -- especially for any high school that

8    has a significant number of students going to Harvard or

9    applying to Harvard over -- in the past, the admissions

10   officers normally specialize in individual schools and know a

11   lot about that context.  And they would be able to know if

12   this student has these kind of accomplishments from that

13   school is that, like, really an outstanding accomplishment.

14   If the student came from a disadvantaged high school and has

15   very good test scores, very good standardized test scores,

16   that's a really important accomplishment; whereas if they

17   came from an upper middle class high school in a place where

18   lots and lots of students have very high test scores, that's

19   a much different kind of accomplishment.

20        So that kind of understanding of the credentials --

21   the quantified credentials, I think, is just crucial in

22   translating quantified credentials into a rating.  And the

23   same thing, of course, is true with extracurricular.

24   Q.  Before we turn to extracurricular, let me just ask you,

25   did you hear testimony in this case, or did you see from your

1    review of the application files, indications in files that an

2    applicant had, you know, won the national math contest or had

3    written a publishable paper or had had her work evaluated by

4    a faculty member?

5    **A.**   Yes.

6    **Q.**   And would any of that information be part of the

7    quantifiable data that is captured in the -- in Professor

8    Arcidiacono's model of the academic rating?

9    **A.**   No.

10   **Q.**   Okay.  I interrupted you before you got to the

11   extracurricular rating.

12          Why is there information about the extracurricular

13   rating that's not captured in the data?

14   **A.**   Well, my understanding is that, again, it would be things

15   like, not just are you a participant in junior varsity sports

16   or something like that, but what level of accomplishment you

17   had, what role you played in a team, things like that.  And

18   that would be pretty important in assessing extracurricular

19   strengths.

20   **Q.**   Would you please turn to Tab 15 of your binder, and tell

21   me when you've found Defense Exhibit 688.

22   **A.**   I've got it, yeah.

23   **Q.**   What is this?

24   **A.**   This is a series of exhibits, average marginal effect of

25   Asian-American ethnicity on profile ratings, pseudo R-squared

1  for the profile ratings models, average marginal effect in

2  Professor Arcidiacono's regression models, and average

3  marginal effect on receiving a personal rating of 2 or

4  higher, modifying Professor Arcidiacono's model.

5  **Q.**  And are these all exhibits that you've prepared based on

6  data obtained and from evaluating Professor Arcidiacono's

7  models?

8  **A.**  Yes.

9          MR. WAXMAN:  Your Honor, we offer Defense Exhibit

10  687.

11          MR. MORTARA:  No objection.

12          THE COURT:  It's admitted.

13          (Defendant Exhibit 687 admitted into evidence.)

14  **Q.**  Mr. Lee, can we have, please, Demonstrative 61.

15          And we may have to take a little bit of a deep

16  breath here because I'm noticing a concept that I may have

17  forgotten to ask you about in the retirement hypothetical.

18          But let me just ask you at a general level, what is

19  this showing?

20  **A.**  Yes.  So this is showing the concept of each of these

21  different models that's somewhat important in understanding

22  the model.  And that is on the vertical axis, there's a scale

23  between zero and 100 percent, and the -- that representation

24  of what's called -- and I apologize for the jargon, it's

25  called an R-squared or even a pseudo R-squared.  And it's a

```
 1   summary representation between zero and 100 percent of the
 2   fraction of the variation from student to student in the
 3   particular thing we're looking at.
 4          So, for example, in the first column we're looking
 5   at the academic rating.  And so this is a summary of the
 6   variation from student to student and whether they're
 7   assigned a 1, or a 2, or a 3, or a 4 academically that can be
 8   explained by the factors included in Professor Arcidiacono's
 9   model.  So that would be the yellow components.  So in the
10   case of academic rating it's 57 percent.
11          And then, of course, the other balance of the 100
12   percent, or 43 percent in this case, is attributed to factors
13   outside the model.  So that would be the components like
14   national competitions, like the evaluation in context, like
15   variables that Professor Arcidiacono has not included in his
16   models, parental occupation or something like that that could
17   potentially be informing the determination of the rating but
18   are not in the data as he used it.
19          THE COURT:  This is just the qualitative versus the
20   quantitative?
21          THE WITNESS:  Yes, that's one way to think about
22   it.  It's the part of the qualitative that's not quantifiable
23   in the data, yes.
24          THE COURT:  And how do you come up with that
25   percentage?
```

Case: 19-2005   Document: 00117631846   Page: 54   Date Filed: 07/29/2020   Entry ID: 6356391
Case 1:14-cv-14176-ADB   Document 652   Filed 04/18/19   Page 42 of 206

42

1           THE WITNESS:  So the result of the estimation, it's

2    one of the things that comes out when you run -- estimate one

3    of these models.  It actually tells you this number.  Or it's

4    possible to calculate it very straightforwardly.

5           So loosely speaking, it's taking the predictions

6    from the model and comparing them to who actually got what

7    actual score, actual rating, trying to make an assessment of

8    how often it got -- how closely it was able to reproduce the

9    right answer.

10   **Q.**  Let me ask a question just to make sure I'm fully

11   understanding this.

12          So with respect to the academic rating regression,

13   is this R-squared statistic, tell me if I'm wrong, the

14   R-squared statistic shows that of the data that is captured

15   in Dr. Arcidiacono's model, it will explain 57 percent of the

16   actual rating that an applicant receives by the reader?

17   **A.**  I would state it slightly differently.  I think it would

18   be helpful to get this straight.

19   **Q.**  Fine.

20   **A.**  So think of -- there's lots of different students.

21   There's 150,000 students here in this -- he's pooling the six

22   years.  And so there's an enormous range of variation as we

23   emphasized in the individual variation in the ratings.  And

24   this is saying, okay, think of a way to summarize -- think of

25   a quantitative summary statistic that you could develop of

1   how much variation there is from student to student on this 1

2   to 4 scale.  And now what fraction of that student-to-student

3   variation is explainable by the factors in the model.

4   **Q.**   And what do we see with respect to the personal rating

5   regression and the extracurricular rating regression?

6   **A.**   Well, one can see a very important difference.

7         The quantifiable factors in the model are strongest

8   or most richest with respect to academic variables.  When we

9   get to the personal rating regression, the factors in

10  Professor Arcidiacono's model can only explain about 29

11  percent of the overall student-to-student variation.  And

12  when we get to the extracurricular, it only explains 13

13  percent.

14        So there's a much wider range of these unobserved

15  factors -- unquantifiable qualitative factors that Your Honor

16  was talking about.  And so that's 71 percent of the personal

17  rating and 87 percent of the extracurricular rating.

18  **Q.**   Would it be fair to say, maybe not, that what the

19  R-squared calculation is -- is measuring is the explanatory

20  power of the model, how much of the observed outcome the

21  model can explain?

22  **A.**   That would be absolutely, precisely correct.  And

23  oftentimes when someone says, you know -- an economist says

24  to another economist, what's the explanatory power of your

25  model, I would respond what the R-squared was.

Case: 19-2005    Document: 00117621846    Page: 56    Date Filed: 07/29/2020    Entry ID: 6356391
Case 1:14-cv-14176-ADB   Document 652   Filed 04/18/19   Page 44 of 206

44

1    **Q.** Why is it important to think about the magnitude of the

2    unexplained variance?

3    **A.** Yes. So this is getting back to a question that Your

4    Honor asked yesterday.

5         When the unexplained component is larger, it means

6    that more of the variation from student to student is being

7    determined by unobserved factors, as far as my model is

8    concerned. It doesn't mean that the application officers --

9    admissions officers don't see them. They see this amazing

10   range of material that I don't see.

11        So it means that more and more the variation is

12   being determined by factors outside of my particular data, or

13   our particular data. Professor Arcidiacono and I have access

14   to the same data. But, and that opens up more and more of a

15   possibility that those unobserved factors are leading to

16   inadvertent omitted variable biases in the model. Because

17   now with 71 percent of the variation unexplained, there's

18   just a lot more possibilities for things that we're not

19   measuring driving any difference that we're seeing attributed

20   to variables inside the model; for example, the difference

21   between Asian-American and white students.

22   **Q.** Mr. Lee, can we have Demonstrative 62, please.

23        Let's now focus, Professor Card, on the second of

24   four reasons that you mentioned. Did Dr. Arcidiacono

25   conclude that there is an effect of Asian-American ethnicity

Case: 19-2005  Document: 00117621846  Page: 57  Date Filed: 07/29/2020  Entry ID: 6356391
Case 1:14-cv-14176-ADB  Document 652  Filed 04/18/19  Page 45 of 206

45

1    for the other ratings he modeled?

2    **A.**  Yes, his models show statistically significant effects of

3    Asian-American ethnicity on all three ratings.  Positive

4    effects for academic and extracurricular ratings.

5    **Q.**  Can we have Demonstrative 63, please.

6          Can you explain using this demonstrative what he

7    found?

8    **A.**  Yes.  So in the upper right panel, I'm showing a kind of

9    illustration of the -- of the Asian-American average marginal

10   effect in academic rating, the extracurricular rating, and

11   the personal rating.

12         So the average marginal effect, or the magnitude of

13   the effect associated with being Asian-American relative to

14   white in the academic rating, all three of these are

15   statistically significant, is positive.  The magnitude for

16   the extracurricular rating is also positive but bigger, quite

17   a bit bigger.  And the personal rating is comparable to the

18   extracurricular rating but negative.

19         And what I'm showing down below there is the

20   ratings themselves.  And the way that I think about this is

21   the following:  What's going on is an admissions officer is

22   looking at a file, and they've got the quantitative

23   information that I have and they've got the qualitative

24   information that they in addition see.  And when it comes to

25   on average, again, on average, comparing Asian-American

1   students and white students, they're able to see and they
2   successfully report that qualitative information, which is on
3   average leading them to give a higher score to -- higher
4   rating to Asians than whites on the academic dimension.
5         So they're digging into the file and finding
6   information that is assuring that -- or giving them the
7   impression, leading them to conclude that this student is
8   better than the quantitative information indicates.
9         And on average that's what they're finding for
10  Asian-Americans, they're finding that they're better than the
11  quantitative information than whites.
12        And when we come to the extracurricular, they're
13  doing the same thing.  So they're looking through the file
14  material.  They're seeing information on the qualitative
15  side, which is giving them information so that they reach a
16  conclusion that the Asian-American students are better than
17  the white students conditional on the quantitative
18  information that I have.
19        And then what will Professor -- and Professor
20  Arcidiacono is arguing, and I agree with that, that that's
21  the right interpretation of those two variables.
22  **Q.**  Which is what interpretation?
23  **A.**  The interpretation that there's unobserved factors that
24  they're seeing in the qualitative information.
25        But then when it comes to the personal rating, what

1    he's asserting is that the same officers are digging into the

2    file, they've previously found positive information on the

3    academic dimension, positive information on the

4    extracurricular dimension relative to the quantitative

5    information, but then they're, in some sense, suppressing or

6    even putting a negative spin on things so that they --

7    they're actually exerting a bias against Asian-American

8    students in assigning the personal rating.

9          So that's how he is interpreting this exercise,

10    which I find very, very hard to understand or believe.

11    **Q.**   Okay.  Can you explain why?

12    **A.**   Well, for the reasons I've just said.  I don't think --

13    it just doesn't seem plausible to me that an officer who is

14    going through the file and looking at the individual by

15    individual, looking at students and on the average finding

16    very positive unobserved features about extracurricular

17    dimensions and academic dimensions and reporting that so that

18    on average the Asian students appear to be, or are coded as

19    more strong than can be justified on the basis of the

20    quantitative information.

21          And yet, that same officer is going and somehow

22    exerting bias against Asian-Americans when it comes to

23    assigning the personal rating.  So it's like there's some

24    kind of schizophrenia going on.  They're somehow on the one

25    hand positively giving boosts to Asian-Americans, but then on

Case: 19-2005    Document: 00117621846    Page: 60    Date Filed: 07/29/2020    Entry ID: 6356391
Case 1:14-cv-14176-ADB  Document 652  Filed 04/18/19  Page 48 of 206

48

1    the other hand giving them this negative animus, basically,

2    in assigning the personal rating.

3            And I just don't find -- I just do not find that

4    understandable or consistent.

5    **Q.**  Did you hear Dr. Arcidiacono testify that he reached the

6    conclusion that because Asian-Americans are stronger on

7    factors that are captured in the data that affect the -- I'm

8    sorry.  Withdraw the question.

9            Did you hear Dr. Arcidiacono testify that he

10   reached the conclusion that because Asian-Americans are

11   stronger on factors captured in the data that affect the

12   personal rating?

13           Did you hear that conclusion?  His conclusion that

14   the personal rating average marginal effect -- that one

15   reason why he reached the conclusion that the average

16   marginal effect for the personal rating was lower is that he

17   found that Asian-Americans are stronger on factors, those

18   factors that are quantifiable that affect the personal

19   rating?

20   **A.**  Yes.  He asserts that they are stronger on those.

21   **Q.**  Do you agree with that?

22   **A.**  No.

23   **Q.**  Why not?

24   **A.**  Well, I'm going to look, in the next series of slides,

25   I'm going to look carefully at the kinds of information, this

**JA2984**

1    qualitative information and information that's summarized in

2    the teacher evaluations and the alumni interviewer

3    evaluations, and I'm going to show that that's not correct.

4    **Q.**  Did you see Dr. Arcidiacono present various statistics

5    showing personal ratings of applicants of different races

6    within academic index deciles?

7    **A.**  Yes.

8    **Q.**  Are those analysis illuminating?

9    **A.**  Not in my opinion, no.  And the reason why is that it's

10   true that those academic index variables, which is GPA and

11   SAT, inform, you know, and are very highly related to

12   academic index, but when it comes to the personal -- academic

13   rating.  When it comes to the personal rating, those

14   variables are almost uninformative.  And so making that

15   comparison is not very informative at all.

16   **Q.**  Mr. Lee, can we please show Plaintiff's Demonstrative

17   38.11 and 38.117 next to each other.

18          I'm showing you two of Dr. Arcidiacono's

19   demonstratives.

20          What does this show?

21   **A.**  Well, the left panel shows the percentage of applicants

22   receiving a 1 or a 2 by academic decile, on the academic

23   rating, and if you focus on the top six deciles, which are

24   the top half of the class, and, of course, there's such a

25   large group of students applying to Harvard that that's kind

1    of the relevant group, you can see that when you go from --

2    Mr. Lee -- yeah, there.

3              When you go from the sixth to the tenth decile, in

4    fact, the fraction of students who are classified as having

5    an academic 1 or 2 virtually doubles.  So there's a very

6    strong relationship between the academic index and the

7    academic rating.  Not perfect, but it's correlated.

8    **Q.**  And what about the next demonstrative of Professor

9    Arcidiacono?

10   **A.**  So this demonstrative -- let me point out one important

11   thing about this demonstrative.  The scale of this

12   demonstrative is no longer zero to 100 percent.  The scale of

13   this demonstrative is only zero to 30 percent.  So it's, in

14   my view, a slightly -- one has to interpret this extremely

15   carefully.

16   **Q.**  Can we see the two side by side again?

17   **A.**  So if you look at the one on the left, it's zero to 100.

18   You look at the one on the right, it's zero to 30.

19   **Q.**  Okay.

20   **A.**  So then focusing on the one on the right with the

21   personal rating, again, focusing on the top six deciles of

22   the academic index, you notice that when you go from the

23   sixth decile to the tenth decile, where the fraction of

24   students who get classified as a 1 or 2 academically has gone

25   up substantially.  The fraction of students who get

Case: 19-2005    Document: 00117681846    Page: 63    Date Filed: 07/29/2020    Entry ID: 6356391
Case 1:14-cv-14176-ADB   Document 652   Filed 04/18/19   Page 51 of 206

51

1    classified with a higher personal rating has only gone up by

2    a very small amount.

3              So illustrating this very extremely important point

4    that that academic decile or academic variables alone are not

5    particularly informative about the personal rating.  It's a

6    different dimension of students.  And I think it's not very

7    helpful to focus on the relationship between the academic

8    decile and the personal rating because they're different

9    things.

10   **Q.**  Mr. Lee, can we have Demonstrative 65, please.

11             What is this showing?

12   **A.**  So this is putting them now on the same scale.  So this

13   is showing the academic deciles from 6 to 10, now in the 100

14   percent scale, and it's comparing what happens to the

15   fraction of students within academic rating of 1 or 2, which

16   is rising as we've just shown, from around 50 percent to 98

17   percent.  Whereas the personal rating, the fraction of

18   students with the personal rating of 1 or 2, has gone from 22

19   to 25 percent.

20             So there's very, very different content from

21   academic variables like SAT and GPA in the academic dimension

22   represented by the academic rating versus the personal

23   dimension represented by the personal rating.

24             THE COURT:  Wait, sorry.  You just lost me.

25             So you're saying that the personal ratings --

1    you're basically just saying they're pretty flat across the

2    academic rating so there's no correlation between the two.

3            Is that what you said?

4            THE WITNESS:  Yes, Your Honor.  Thank you.

5            They're not -- there's a slight correlation.

6    You've gone from 22 to 25.5, but it's not anything like the

7    correlation with academic.  And this difference is pretty

8    small, the 21.7 to 25.5.  So there's a small component, but

9    it's just not the first order of things that's going on.

10   **Q.**  Let's turn, please, to the next demonstrative, 66.  And

11   we're going to focus on the third conclusion that you drew

12   with respect to Professor Arcidiacono's model.

13           Professor Arcidiacono, I think you said you heard

14   him testify that he had some confidence in his bias

15   conclusion that when you look at Asian-Americans, generally,

16   they are stronger than whites on those non-academic factors

17   that are in the data.

18           And I want to ask you again whether you agree or

19   disagree with that conclusion.

20   **A.**  I disagree with that.

21   **Q.**  And why is this important?

22   **A.**  Well, it's important because my understanding is it's the

23   basis of Professor Arcidiacono's conclusion that there's

24   animus against Asians in assigning the personal rating, and

25   so this is really a fundamental fact in his conclusion.

Case: 19-2005   Document: 00117621846   Page: 65   Date Filed: 07/29/2020   Entry ID: 6356391
Case 1:14-cv-14176-ADB   Document 652   Filed 04/18/19   Page 53 of 206

53

1   **Q.**   Can we -- can you please turn to Tab 16 in your binder.

2          Do you see Defense Exhibit 692?

3   **A.**   I do, yes.

4   **Q.**   What is that document?

5   **A.**   It's a series of exhibits showing share of applicants in

6   top decile of non-academic admissions indexes by race;

7   percentage of Asian-American and white applicants with

8   profile ratings of 1 or 2; percentage of Asian-American and

9   white applicants with school support and alumni rating of 2

10  or better by academic rating; share of applicants who

11  collectively receive strong school support, alumni interview,

12  and non-academic profile ratings; share of Asian-American and

13  white applicants with strong non-academic ratings;

14  distribution of some with school support scores; distribution

15  of some with school support and alumni interview scores.

16  **Q.**   Are these all exhibits that you prepared in order to

17  evaluate Dr. Arcidiacono's claim that the non-academic

18  factor -- that Asian-American applicants are stronger than

19  white applicants on the observed non-academic factors in the

20  model?

21  **A.**   Yes.

22  **Q.**   And so does this summary fairly reflect the strength of

23  Asian-American applicants across the various non-academic

24  factors?

25  **A.**   Across the observable components, yes.

**JA2989**

1          MR. WAXMAN:  Your Honor, we offer Defense

2     Exhibit 692.

3          MR. MORTARA:  No objection, Your Honor.

4          THE COURT:  Admitted.

5          (Defendant Exhibit 692 admitted into evidence.)

6     **Q.**  May we have the Demonstrative 67, please.

7          What does this show?

8     **A.**  So now I'm going to focus on three very important

9     variables that we've discussed in some aspects before in my

10    testimony and also other people have talked about.  Excuse

11    me.  And that is the teacher 1 recommendation, the teacher 2

12    recommendation rating, and the guidance counselor

13    recommendation.

14          So these are the three ratings which together

15    Harvard calls the school support ratings.  So each applicant

16    gets a letter of recommendation from two teachers and from a

17    guidance counselor, and so this is the summary of the ratings

18    that are assigned to those three letters.

19    **Q.**  And do those ratings inform the personal rating?

20    **A.**  Yes, I think that's very clear they do, yes.

21    **Q.**  Let's look at the next Defense Demonstrative, 68.

22          What does this show?

23    **A.**  Excuse me.

24          So this shows the -- for each groups of students

25    classified by their academic rating of having a 1, so that's

1    the two columns on the left, or having an academic rating of

2    2, that's the two columns in the middle, or groups of

3    students that have academic rating of 3, on the right, I'm

4    showing within each of those groups the fraction of white

5    students and Asian-American students for whom the sum of

6    these three school support ratings -- excuse me.

7    **Q.**   Take your time.

8    **A.**   Excuse me.  I'm not used to talking this long.

9    **Q.**   Your lectures may be shorter than my oral arguments.

10   **A.**   Yes.

11          So this is showing the sum of those school support

12   ratings.  So to remind you, each of the ratings is from 1 to

13   4.  And 1 is good -- 1 is outstanding, 2 is quite good, 3 is

14   kind of, pretty good, and 4 is not so good.

15          And so a student that got, for example, on the

16   three ratings, got three 2s would get a 6, and that would be

17   a quite a strong rating.  A student who got, of course, three

18   1s would be a 3.  That would be almost unheard of.  But a

19   student who got, say, two 2s and a 3, they would get 7.

20          So I'm going to classify as having two 2s and a 3

21   or better.  And that's what this shows.  So the fraction --

22   amongst students who get an academic rating of 2, the

23   fraction of white students in that bucket who have the sum of

24   the school support ratings, these three ratings that's less

25   than 7, is around 43 percent, and the fraction of Asian

Case: 19-2005    Document: 00117621846    Page: 68    Date Filed: 07/29/2020    Entry ID: 6356391
Case 1:14-cv-14176-ADB   Document 652   Filed 04/18/19   Page 56 of 206

56

1    students in that category is -- who have that sum of ratings

2    less than 7 is around 37 percent.

3    **Q.**  And does that relationship, the relative percentage of

4    the white applicants versus Asian-American applicants also

5    hold for those applicants who got an academic rating of 1 and

6    an academic rating of 3?

7    **A.**  Yes, you can see that in the graph quite clearly.

8    **Q.**  And what do you conclude from those results?

9    **A.**  Well, it's important to classify the students by academic

10   rating.

11   **Q.**  And why is that?

12   **A.**  Well, the reason why is because, remember, as we talked

13   about a moment ago, the teacher -- the rating that's assigned

14   to the teacher letter is a single rating, but the teacher

15   letter is containing information about academic and

16   non-academic factors.

17          So what I'm trying to do by classifying conditional

18   academic rating of 2, for example, focusing on the middle

19   panel, I'm saying, well, imagine that the teacher has --

20   excuse me -- the admissions officer has pulled out of that

21   teacher letter the academic information in that letter and

22   putting that together with other information has decided that

23   this student is an academic 2, then the other components of

24   what's left after we hold constant to that is informing these

25   non-academic qualities.

1        So the non-academic qualities for students who are

2   assigned an academic 2 are obviously higher for white

3   students than for Asian students.

4   **Q.**  Now, I see in your next demonstrative that we have a

5   little shading around academic rating 2.  Can you tell us why

6   or what you're going to do with that?

7   **A.**  I can, yes.

8   **Q.**  Why, and what are you going to do with it?

9   **A.**  Well, one might be concerned that I've somehow fixed --

10  chosen the 7 number strategically.  And so what I'm going to

11  do is I'm going to take the students that are assigned an

12  academic rating of 2, and I'm going to show the full

13  distribution of the sum of the school support scores.

14  **Q.**  All right.  May we have the next demonstrative, please,

15  68 -- or 69.

16       So what is this showing?

17  **A.**  So recall, the school support, the 3 ratings could be 3

18  for unbelievably outstanding student.  They could be 4 if you

19  got two 1s and a 2 all the way up to 7, as I mentioned

20  before, which would be two 2s and a 3.

21       And we can see in each of these sort of better

22  ratings buckets white students are overrepresented relative

23  to Asian students who are more likely to be in that set of

24  categories amongst the students who have an academic rating

25  of 2.

**JA2993**

1    **Q.**  And what does the next demonstrative show?

2    **A.**  So it shows that that preponderance of white students in

3    the better side of the distribution is offset or balanced out

4    by a preponderance of Asian students on the lower side.

5         So Asian students are, in particular, much more

6    represented in the 9 category, which would be three 3s, which

7    would still be quite a good category but not nearly as good

8    as the others.

9    **Q.**  Did you conduct the same analysis for students with an

10   academic rating of 1 and an academic rating of 3?

11   **A.**  Yes.

12   **Q.**  And what did you find?

13   **A.**  I found that the pictures look very, very similar.

14   **Q.**  And are those results reflected in Defense Exhibit 692 in

15   evidence?

16   **A.**  Yes, they are.

17   **Q.**  Did you hear Dr. Arcidiacono testify that white and

18   Asian-American applicants actually have similar school

19   support ratings?

20   **A.**  Yes.

21   **Q.**  How did he reach that conclusion?

22   **A.**  Well, one very important thing he did was he focused

23   entirely on the non-ALDC group.  And so that's an important

24   group which I believe should be included, and when we're --

25   we know that's almost 30 percent of all the admitted

1    students, and so this is a very large group in terms of high

2    performers in the admissions pool.

3              And so by excluding them, it gives, in my view, a

4    biased picture of the difference between whites and Asians.

5    **Q.**  And did he -- did his analysis look, as you did, within

6    different academic ratings or different academic index

7    deciles?

8    **A.**  Not that I recall, no.

9    **Q.**  So even though virtually all of his other analyses are

10   keyed to the academic index or the academic ratings, in this

11   respect he did not do that control, correct?

12   **A.**  Yes, that's absolutely correct, yes.

13   **Q.**  Did you consider how Asian-American applicants fare on

14   other factors that inform the personal rating?

15   **A.**  Yes.  So I went and looked at the two ratings variables

16   that are provided by the alumni interviewer.

17   **Q.**  And do those also inform the personal rating?

18   **A.**  Yes.  My understanding is one of those ratings is, in

19   fact, the alumni interviewer's ratings of personal qualities

20   of the student and the other is an overall rating of the

21   student.

22   **Q.**  Let's look at Demonstrative 71, please, Mr. Lee.

23              What is this showing?

24   **A.**  So this shows from the summary sheet for each student the

25   location of the alumni interviewer information.  So the

Case: 19-2005    Document: 00117631846    Page: 72    Date Filed: 07/29/2020    Entry ID: 6356391
Case 1:14-cv-14176-ADB    Document 652    Filed 04/18/19    Page 60 of 206

60

1    alumni interviewer scores the students on the same scale, and

2    that one of the reasons for that document, that interviewer

3    guide, is really for purposes of alumni interviewers to

4    understand the Harvard process.

5    **Q.**   And the next demonstrative, please.

6    **A.**   So what I'm going to do now is I'm going to sum the three

7    ratings for the school support variables, so teacher 1,

8    teacher 2, guidance counselor, and I'm going to add to those

9    three the alumni interviewer rating and the alumni

10   interviewer overall rating and the alumni personal rating.

11   So now there's going to be five scores that can be -- again,

12   I mean, it's technically possible to have five 1s.  So it's

13   possible that somebody actually has a 5.  A very good score

14   would be something like four 2s and a 3, which would be

15   around 11.  So I'm going to --

16   **Q.**   Can we look at the next demonstrative.  I think this may

17   help in your explanation.

18          So what is this showing?

19   **A.**   So now I'm going to focus, as I did before, but now

20   adding in two more ratings, so now there's five ratings.  And

21   I'm going to look at the fraction of students who have the

22   five ratings summing to 11 or lower, so equivalent to four 2s

23   and a 3 or better.  So quite a strong rating.  But I'm going

24   to do that, again, for the same reasons as before, because I

25   want to try and isolate the component of the school support

1    and alumni evaluation that's apart from their academic

2    evaluation.  And I'm going to compare -- within each of the

3    1s, the 2s and the 3s, I'm going to compare the fraction of

4    Asian-American and white students that have 11 or lower of

5    scores.

6         And you can see across the three buckets that white

7    students are more likely to get the better sum of scores.

8    Q.   And did you review how Asian-American -- strike that.

9         Can we have the -- well, there we go.

10        THE COURT:  Hold on one second.

11        (Discussion off the record.)

12   Q.   So you've now highlighted, again, the comparison among

13   applicants who have an academic rating of 2.  And, again, why

14   have you done that, and what are we going to see next?

15   A.   Well, we're going to look at the full histogram, the full

16   representation of sums of scores again.

17   Q.   Okay.  May we have the next demonstrative, Mr. Lee.

18        So on Demonstrative 74, what are we seeing?

19   A.   So here we're seeing is the sum of school support; again,

20   focusing on Asian and white students who receive an academic

21   rating of 2, and I'm showing the fractions of students who

22   get 5.  There are, you know, some students with a 5, 6, 7, 8,

23   9, 10, 11, 12.  So that would be the better ratings.  And you

24   can see on the -- kind of the better half of the

25   distribution, white students are uniformly more represented

1    there.  So more likely to get a 9 than Asian students, more

2    likely to get a 10 and so on.

3              And if we go to the right side of the graph --

4    **Q.**  Can we have Demonstrative 75, please?

5              Yes, thank you.

6    **A.**  -- we can see that the opposite pattern is there.

7              So, again, the white students are represented more

8    in the higher end of the ratings with better ratings and the

9    Asian students are represented in the lower end.

10   **Q.**  And did you conduct a similar analysis with respect to

11   applicants who received an academic rating of 1 and an

12   academic rating of 3?

13   **A.**  Yes, I did.

14   **Q.**  And is that analysis reflected in Defense Exhibit 692?

15   **A.**  Yes.

16   **Q.**  And what did you conclude?

17   **A.**  I concluded that the same pattern is present in both --

18   in those other groups as well.

19   **Q.**  Did you analyze whether the data that show the school

20   support ratings and the alumni ratings inform the personal

21   ratings?

22   **A.**  I did, yes.

23   **Q.**  And can we have Defense Demonstrative 76, please.

24              What is this showing?

25   **A.**  Yes, so this is a way to show how different variables in

1    the context of Professor Arcidiacono's model of the personal

2    rating contribute to the overall explanatory power of that

3    model.

4            So just to remind you, that's the extent to which

5    the model can successfully explain the student-to-student

6    variability in the personal rating.

7            So he presents a series of five models.  And,

8    again, the -- the height of each bar is representing the

9    explanatory power of the model.

10           So if we start with just demographics, so just

11   focusing only on differences across the race groups, that

12   explains 6.8 percent of the variation.  If we add in academic

13   information, all those different academic variables that

14   Professor Arcidiacono uses, it rises a little bit to 9.5

15   percent.

16           And this illustrates the point we were making

17   before that academic variables, despite their richness and

18   availability in the dataset, explain a relatively modest

19   fraction of the overall variation in the personal rating.

20           If we add in the interaction variables that

21   Professor Arcidiacono often uses in his specifications, you

22   can see it really doesn't make that much difference to that

23   specification.

24           If we add in the context variables, so these are

25   the variables representing information from the college board

1    and schools and neighborhoods, that adds some more to the

2    data.

3            Finally, though, the big jump is when we add in

4    these ratings variables.  And I'd like to try and explain a

5    little bit more clearly how that works.  And I think it would

6    be helpful to go back to my hypothetical of retirement.

7            So imagine that I have the model that I call the

8    sparse model over here, with just age and salary, and then I

9    think about adding in health as a new variable.  The

10   explanatory power that health will add to the model is the

11   part of health that can't already be explained by age.  So

12   when you add a new variable to a regression model with other

13   variables in the model, the additional contribution to the

14   explanatory power represents the contribution of the part of

15   that new set of variables that are added that couldn't be

16   explained by the variables that were already in the model.

17   So it would be the component of health that if I adjusted

18   health for age, it's that component of health.  Not the part

19   that is correlated perfectly with age but the other part.

20           And so exactly what's going on here is when we add

21   in the information from the ratings variables, the part of

22   that that's not explained by academics and context and so on,

23   that's when we get this big jump in explanatory power.

24           So one can see that more than twice as much of the

25   personal rating, explanatory powers -- or twice as much of

1    the explanatory power is coming from those variables as, for

2    example, than demographics and academics alone.

3              So much more of the personal rating is driven by

4    this academics-adjusted addition of the ratings variables.

5              MR. WAXMAN:  Thank you.

6              Your Honor, this is a good stopping point.

7              THE COURT:  Wait.  Hold on a second.

8              It's driven by the academics adjusted addition?

9              THE WITNESS:  Yeah, so -- Your Honor, as I was

10   trying to make the case with the hypothetical, so if I took

11   my sparse model and added health --

12             THE COURT:  Yeah.

13             MR. WAXMAN:  I think you mean the richer model.

14             THE WITNESS:  Excuse me, the richer model.

15             -- and I added health, then the R-squared would go

16   up by the amount of information contained; age-adjusted

17   health.  Because age was already in the model and it was

18   trying to do the best it could with just age.

19             I add in health, the part of that that's adding to

20   the explanatory power is the part of health that can't be

21   explained by age.

22             And so in this context with the personal rating,

23   it's the part of these ratings variables that I've added to

24   the model that couldn't be explained by the academics.

25             THE COURT:  So you're saying that the difference in

**JA3001**

 1    the personal ratings between Asian applicants and white

 2    applicants is being driven by the school support and alumni

 3    rating?

 4            Is that what we're talking about?

 5            THE WITNESS:  This is the overall explanatory power

 6    only.

 7            THE COURT:  You just lost me where you're

 8    explaining it's the part not explained by anything else but

 9    the part of what?

10            THE WITNESS:  The part of the variable you added

11    in, the new variable you've added in.

12            THE COURT:  Well, adding to what?

13            THE WITNESS:  Oh, to the model.

14            THE COURT:  But which factor are -- are we talking

15    about the personal rating here, just the personal rating?

16            THE WITNESS:  Yes.  Excuse me.  So these are

17    different versions of Professor Arcidiacono's model of the

18    personal rating.  I apologize for not making that clear.

19            THE COURT:  So you're saying that the difference

20    between white applicants and Asian applicants is being

21    largely driven by the ratings variables.

22            THE WITNESS:  I'm not saying that in this graph

23    here.  This graph here is just about the overall explanatory

24    power of the model.

25            So we were talking about, like, how much can the

1    model explain, and I was pointing out that it had relatively

2    low explanatory power and so on.

3              THE COURT:  Yeah.

4              THE WITNESS:  I'm trying to sort of separate just

5    assessing the explanatory power of the model in this stage.

6    I'm going to come back, you know, after the break and talk

7    about how that's related to the gaps, but for now I'm just

8    trying to assess the explanatory power.  And I'm saying if

9    you take a model that only has --

10             THE COURT:  Of his model, right?

11             THE WITNESS:  Yes, these are all his models, yes.

12             THE COURT:  Okay.  I think I have it.

13             MR. WAXMAN:  Your Honor, after the break, we're

14   going to be looking at a line graph representation of this

15   that I think, I hope, will make clear to both of us the

16   difference between average marginal effect and explanatory

17   power in this context.

18             THE COURT:  All right.  Thank you.

19             (Recess, 11:11 a.m.)

20             THE COURT:  So I feel like the most important

21   decision I make every day is about what time we're having

22   lunch.  It's certainly what everyone is most interested in.

23             So is everyone all right with a half-hour lunch

24   break today to just try and make up some of the time we're

25   losing at the other end?  Will that give everybody enough

1    time?

2                How about you?  Can you manage with a half an hour

3    break?

4                THE WITNESS:  Yeah, sure.

5                THE COURT:  We'll recess a little early this

6    afternoon.  It's a national holiday.

7                THE WITNESS:  Yes.  That would be fine.

8                THE COURT:  So let's go till 12:30 and we'll recess

9    from 12:30 to 1:00.

10               MR. WAXMAN:  Very good, Your Honor.

11   BY MR. WAXMAN:

12   **Q.**  So Professor Card, this issue that Her Honor was asking

13   about I think I will come back to somewhat later.  But let me

14   just ask you a couple of questions that perhaps will clarify

15   what this means and doesn't mean.

16               To be clear, in addressing the court's question,

17   are you saying that the difference in the ratings that are

18   quantified in the data explains the average differences

19   across race in the personal rating?

20   **A.**  No.

21   **Q.**  Do you believe that the effect of Asian-American

22   ethnicity on the personal rating that's estimated by Dr.

23   Arcidiacono's model reflects a genuine effect of race or

24   rather the effects of factors outside of the data?

25   **A.**  I believe it reflects factors outside of the data.

1    **Q.**  And so what do you learn from the factors in the data

2    like ratings about those factors outside the data?

3    **A.**  So what we're trying to do is follow this logic of a

4    pattern which is often true; that the observable factors

5    inside the data that most inform the personal rating, which

6    are as shown in this slide here, those school support and

7    alumni interview ratings, those factors are stronger for

8    white students than for Asian students when we hold constant

9    academic factors.

10   **Q.**  Did you also compare Asian-American and white applicants

11   on other factors besides the five that we've already talked

12   about, on other factors that inform the personal rating?

13   **A.**  Yes, I did.  I actually took Professor Arcidiacono's

14   model 5 and added some additional contextual-type variables,

15   parental occupation and so on, and showed that those

16   variables also lead to an increase in explanatory power.

17   **Q.**  Did you conduct an analysis that looks at all of the

18   non-academic measures in the data?

19   **A.**  Oh, yes, I did.

20   **Q.**  And why is it relevant to look at non-academic factors in

21   general?

22   **A.**  Well, as we've been talking about, I think, extensively,

23   there's obviously differences across candidates on average.

24   So Asian-American students are stronger in academic factors,

25   white students are stronger on non-academic factors, and so

Case: 19-2005    Document: 00117621846    Page: 82    Date Filed: 07/29/2020    Entry ID: 6356391
Case 1:14-cv-14176-ADB   Document 652   Filed 04/18/19   Page 70 of 206

70

1    trying to understand differences, particularly as they inform

2    the personal rating.  What I've shown here is that personal

3    rating is representing mostly non-academic factors, and so

4    what I did was I took my overall admissions model and I

5    isolated all the factors in that model that are non-academic

6    components.  And I used just those components to rank the

7    students by their strength.  So this would be some

8    combination of all the factors in my model except the

9    academic variables.

10   **Q.**  And then if we may have Defense Demonstrative 10.77,

11   please.

12            What is this showing?

13   **A.**  So this shows when I look at this total combination of

14   all non-academic factors that white students are

15   substantially more highly represented in the top three

16   deciles.

17   **Q.**  And to be clear, these are the top three deciles of the

18   non-academic index?

19   **A.**  Yes.  So these -- as I said, the personal rating is

20   largely informed by these non-academic factors.  So in

21   understanding how the observable features differ between

22   whites and Asians, I use this construct of the total summary

23   of their non-academic strengths.  And one can see very

24   clearly that the white students are stronger on these

25   non-academic dimensions.

Case: 19-2005    Document: 00117631846    Page: 83    Date Filed: 07/29/2020    Entry ID: 6356391
Case 1:14-cv-14176-ADB    Document 652    Filed 04/18/19    Page 71 of 206

71

1    **Q.**  Now, does your analysis -- in creating the non-academic

2    index, did you also include the personal factor as a

3    non-academic factor?

4    **A.**  The personal rating, yes.

5    **Q.**  Yes.

6           And did you also include the ALDC attributes as

7    non-academic factors?

8    **A.**  I did, yes.

9    **Q.**  What happens if you remove the ALDC attributes and the

10   personal rating as factors?

11   **A.**  So I did that exercise as shown on the next slide.

12   **Q.**  Can we have Demonstrative 78, please.

13          And what is this showing?

14   **A.**  It shows the same pattern still persists.  So even when

15   you take all these non-academic factors but turn off any

16   preference given to the As or Ls or Ds or Cs, so that that's

17   no longer part of any difference, and completely throw out

18   the personal rating, which I believe is an overly extreme

19   assumption, but do that, it's still the case, and on the

20   remaining non-academic dimensions white students are more

21   highly represented in the top deciles than Asian students.

22   **Q.**  Does Dr. Arcidiacono analyze the non-academic index as

23   well?

24   **A.**  I believe he does, yes.

25   **Q.**  And does he agree with you that white applicants are

1    stronger than Asian applicants on the non-academic index?

2    **A.**  Well, again, the analysis that he presents focuses on a

3    subset of white students and Asian students, the non-ALDC

4    students.  And, of course, what I showed before was ALDC

5    students on many, many non-ALDC components are much stronger.

6    And so throwing away that group gives rise to, in my view, a

7    biased perception of the non-academic strengths of white

8    students versus Asian students.

9           THE COURT:  Okay.  Stop for a second.

10          So non-academic, you've taken out the academic

11   rating, you've taken out the personal rating.  What's left in

12   here is just extracurriculars and --

13          THE WITNESS:  No, Your Honor.  There's a whole

14   range of variables, all of the school support and variables

15   like that and all of the contextual variables, parental

16   occupation, things like that.

17          THE COURT:  So you've left everything in except the

18   ALDC effects and the personal rating?

19          THE WITNESS:  And the academic variables per se,

20   SAT and GPA and so on.  Yes.

21   BY MR. WAXMAN:

22   **Q.**  I had a question based on your last answer, but I can't

23   remember what the answer is, so let me just ask you.

24          Among the group -- I think you've testified that

25   among the ALDC applicants, independent of any tip that they

**JA3008**

1    receive, I believe we saw a chart showing that on every

2    measure, every rating they get substantially higher ratings

3    than non-ALDCs; is that correct?

4    **A.**  Yes.  And they're also -- when you combine ratings, one

5    also sees that, remember, that they are more multidimensional

6    and so they are a much stronger group, yes.

7    **Q.**  And what percentage, approximately, of the ALDCs are

8    white applicants?

9         This isn't a memory game.  If you don't remember,

10   you can just give an adjective.

11   **A.**  A relatively high fraction.  I actually have a document

12   we've prepared, but I don't quite remember off the top of my

13   head.

14   **Q.**  Do you recall what share of the ALDC applicants are

15   Asian-American?

16   **A.**  I know that only two percent of all -- two or three

17   percent of all Asian-Americans are ALDCs, which is a slightly

18   different question.

19   **Q.**  Yeah.

20        So what is -- what is the effect in terms of being

21   able to compare really strong white applicants with really

22   strong Asian applicants if you exclude all ALDCs?

23   **A.**  Well, in my view, that gives an inappropriate assessment

24   of the white applicant pool because, of course, amongst the

25   strongest people in the white applicant pool are the ALDC

1    groups.

2             So when I do this non-academic comparison -- again,

3    let me emphasize, in that second set of charts I was turning

4    off any particular tip given for A or L or D or C.  So I was

5    just trying to isolate these other components of strength as

6    represented here.

7    **Q.**  And so to sum up, Professor Card, what is your view about

8    the relative strength of white and Asian-American applicants

9    on factors in the data that inform the personal rating?

10   **A.**  My assessment is that they are stronger.  The white

11   students are stronger than Asian-American students on the

12   factors that are most relevant for informing the personal

13   rating, the observable factors.

14   **Q.**  And why is that important?

15   **A.**  Well, as I said, economists often argue that if the

16   observed factors inside the data that inform a particular

17   variable are in one direction, then the unobserved factors

18   may well be in that same direction.

19   **Q.**  And is that, in fact, the reasoning that Dr. Arcidiacono

20   uses in his interpretation of the positive average marginal

21   effect for Asian-American ethnicity that he observed in

22   modeling the academic rating and the extracurricular rating?

23   **A.**  Yes, precisely.

24   **Q.**  Did you do any other analysis to examine that conclusion?

25   **A.**  Yes, I did.

1    **Q.**  Can we have Defense Demonstrative 10.79.

2         And let me ask you what this shows.

3    **A.**  Well, I think this is going to more directly address Her

4    Honor's question about the average marginal effect between

5    Asian-Americans and whites in these different models that

6    Professor Arcidiacono developed for explaining the personal

7    rating.

8         So what I've done here is I've taken each of his

9    models from 2, 3, 4, 5, so model 2 starts with just

10   demographic variables and academic variables and goes on.

11   And what I've shown is the average marginal effect for

12   Asian-American ethnicity relative to whites and the

13   probability of receiving a personal rating of 2 or better.

14        And so according to his model 2, for example, this

15   very sparse model that only has demographics and academic

16   variables, there's a seven percentage point gap in the

17   probability of receiving a 2 or better between

18   Asian-Americans and whites.

19   **Q.**  This is a 2 or better on the personal rating?

20   **A.**  2 or better on the personal rating, yes.

21   **Q.**  What are you indicating by the R-squared value for model

22   2?

23   **A.**  Well, we saw that before the break.  The slide that we

24   were talking about shows the R-squared of that model is quite

25   low.  In fact, when I showed that slide, I showed that that's

1    mostly the demographic factors.  The academic variables

2    themselves don't add much at all to the personal rating, and

3    that's the point we've tried to emphasize earlier in my

4    testimony as well.

5            So the academic variables per se don't really

6    inform the personal rating very much.

7            So that's the starting point.

8            If you go to model 3, this is the model that he

9    shows that adds some of the interaction variables that he

10   uses in many of his models.  Of course that doesn't change

11   the average marginal effect for Asians versus whites much.

12           When we add the contextual variables, so these are

13   the variables representing high school and neighborhood

14   variables, we can see an important change.  Now instead of

15   seven percent it goes down to six percent, so it's 15

16   percent, 16 percent smaller effect.  And so those variables

17   are -- they're also adding some explanatory power to the

18   model, but importantly, those variables are different and are

19   helping to explain the gap.

20           But then when we go to model 5 where we add in the

21   personal variables, so now we're adding the variables, the

22   observed variables that are most relevant for determining the

23   personal rating, we can see not only does the R-squared go

24   up, which is -- the previous slide showed, but importantly,

25   now the unexplained gap between Asian-Americans and whites is

**JA3012**

1    only half as big as it started before.

2           So this is the kind of analysis that economists

3    often do.  They take a model and add more and more of the

4    observable variables that they have and they say, well, this

5    is a situation where as I add more variables, and

6    particularly when I add these variables that are most

7    informative to the personal rating, I see that I have removed

8    a very large component of the average marginal effect of

9    Asians and whites.

10          And I would be concerned because there are so many

11   unobserved factors left out, I would be concerned that if I

12   had access to more and more of that information, this trend

13   would continue and one could easily, in my view, logically

14   conclude that it may well be that it's a zero if you could

15   account for all of those factors.

16          So the observed variables are moving in this

17   direction.  There's a very large unobserved component.  If,

18   following Professor Arcidiacono's logic, the unobserved

19   variables move in the same direction as the observed

20   variables, then this would tend -- this trend would continue

21   and could reach the ceiling.

22   **Q.**  Can you summarize your conclusion regarding factors

23   outside the data and the personal rating?

24   **A.**  So my view is that just as factors outside the data

25   account for the unobserved positive average marginal effect

1   for Asian-Americans in the academic rating, and account for

2   the large positive unobserved gap between Asian-Americans and

3   whites, the average marginal effect in the extracurricular

4   rating, so there's unobserved factors that the admissions

5   officers are finding on top of the -- any kind of

6   quantitative factors, my interpretation is that exact same

7   explanation is the most logical and sensible for the negative

8   personal rating.

9   **Q.** Let's turn to Defense Demonstrative DD 10.80.  And let's

10  focus on the last personal rating conclusion.

11          And let me ask you to assume now, contrary to the

12  conclusion that you've expressed, that race really does

13  influence the ratings in ways estimated by Dr. Arcidiacono's

14  models.

15          And let me ask you first, would that justify

16  throwing the ratings out?

17  **A.** No.  I don't think that would be the right thing to do at

18  all.

19  **Q.** What would -- why wouldn't you throw the ratings out?

20  **A.** Well, because the ratings include all of this information

21  and they capture some of the information that I can't

22  quantify.  And so if one was concerned about that, it

23  wouldn't make sense to throw them out entirely.

24  **Q.** And so what did you do?

25  **A.** So instead of throwing them out entirely, what I did was

1    I took Professor Arcidiacono's models for these three ratings

2    variables, and they all have a component -- an Asian-American

3    effect, and I turned off that effect.

4    **Q.**  So let's see the next demonstrative, if we could.

5              And what is this -- is this -- this is showing the

6    effects, the estimated average marginal effect of

7    Asian-American ethnicity on the three ratings that

8    Dr. Arcidiacono modeled?

9    **A.**  Right.  So just to remind you, for instance, the

10    extracurricular effect here is representing the fact that

11    controlling for all of the observed variables in the model

12    that Professor Arcidiacono, his model 5, his most complete

13    model, richest model for the extracurricular rating, there is

14    still a large, or relatively large unexplained Asian-American

15    effect.  So they're getting higher extracurricular ratings

16    than can be explained by factors in the data.  Similar for

17    the academic rating and similar for the personal rating.

18    **Q.**  What does the next slide show?

19    **A.**  The next slide visually illustrates that I turned them

20    off.  So I take those three components, but only the race

21    components of the three variables, the three ratings

22    variables, and I turn off that, but leave in all the other

23    components in his prediction models.

24    **Q.**  Would you please turn to Tab 18 in your volume?

25    **A.**  Yes.

1    **Q.**   And what is -- this is document Defense Exhibit 694.

2         What is it?

3    **A.**   So it's average marginal effect of Asian-American

4    ethnicity in my models with profile ratings adjusted to

5    remove what Professor Arcidiacono claims to be racial

6    effects.

7    **Q.**   Does this reflect the analysis you just described?

8    **A.**   Yes.

9         MR. WAXMAN:  Your Honor, we'd offer Defense Exhibit

10   694.

11        MR. MORTARA:  No objection.

12        THE COURT:  It's admitted.

13        (Defendant Exhibit 694 admitted into evidence.)

14   **Q.**   Mr. Lee, if we can have Demonstrative 83, please.

15        So what is this showing?

16   **A.**   So this shows if I take Professor Arcidiacono's models,

17   turn off these race components for the ratings, the three

18   ratings variables, and then predict each person's ratings

19   from his models with what's left after taking out these

20   potential effects of race, then include those variables as

21   the ratings in the model, so these would be ratings that are

22   in some sense purged of any unexplained racial differences.

23        When I do that analysis, I get average marginal

24   effects from year to year that look quite similar to the

25   estimates I had before.  None of them are individually

1    significant.  Some are positive, some are negative.  The

2    average marginal effect across all the years is minus .011.

3    So eleven one-hundredths of a percentage point.  Not

4    statistically significantly different from zero.

5              So my conclusion is from that that if one believed

6    that the right thing to do was to turn off the race component

7    on the ratings, to imagine that there's some kind of racial

8    bias that's generating these phenomena, then I would get --

9    in fact, after taking off the race component of the three

10   ratings, I would get more or less the same results as I get

11   from my main specifications.

12   **Q.**   Which is in every -- if I'm correct, in every instance

13   results that are not statistically significant than zero?

14   **A.**   Not statistically significantly different from zero, and

15   especially, for example, the overall rating is quite small in

16   magnitude and could have easily occurred by chance.  Would be

17   quite consistent with there, in fact, being no difference at

18   all.

19   **Q.**   Did you hear Mr. Mortara speak during his opening

20   statement about a different analysis that you conducted in

21   your opening report in which you did entirely throw the

22   personal rating out of the model?

23   **A.**   I did, yes.

24   **Q.**   Why did you do that analysis?

25   **A.**   Well, it's like the kind of analysis I did in the chart

1    where we walk from my model, which I believe is the correct

2    model and includes all the variables that should be included,

3    and make the series of changes that Professor Arcidiacono

4    makes.

5          So one way to start that analysis and to understand

6    the differences between his model and my model would be to

7    exclude the personal rating altogether.  So it's a way to

8    understand how important is the personal rating to my

9    conclusions and what are the differences when I have that

10   model -- it's not that I'm endorsing that model; it's that

11   I'm trying to understand how one gets from my model to

12   Professor Arcidiacono's model.

13   **Q.**  So how would you compare that analysis to the one that we

14   just discussed and is in your rebuttal report in which you

15   use the adjusted ratings?

16   **A.**  Well, I don't think they're really the same thing.  I

17   think that what we've just discussed, if one believed that

18   the ratings variables were affected by race, then I think

19   what we've just discussed is by far the appropriate thing.

20         The analysis where I throw out the personal rating

21   is not really that type of exercise.  It's an exercise to

22   understand the extreme bound of throwing out the personal

23   rating altogether.

24   **Q.**  Now, Dr. Card, your model doesn't consider the

25   preliminary overall rating; is that right?

**JA3018**

1    **A.**   That's right, yes.

2    **Q.**   And why did you not include the overall -- the

3    preliminary overall rating but did include the personal

4    rating?

5    **A.**   Well, my understanding from a variety of testimony in the

6    case is that the personal -- excuse me, the preliminary

7    overall rating, the POR, is assigned by the first reader, or

8    the second reader, but is assigned as kind of an estimate by

9    that reader of the likelihood of admission given what

10   materials they have at that time, which may, of course, not

11   be the complete set of materials, and is meant to incorporate

12   sort of their overall assessment and may well include

13   information about the race and ethnicity.

14         So, for instance, if a student was a URM, an

15   underrepresented minority, and was highly competitive in

16   other dimensions, the preliminary overall rating could easily

17   include the potential that that would be another one of their

18   many strengths for that kind of student.  So it would be, in

19   some sense, affected directly by race per se for that set of

20   candidates.

21         And so I didn't want to include a variable like

22   that that's affected by race per se.

23   **Q.**   Let me ask you just a few final questions on the personal

24   rating.

25         Mr. Lee, may we have Plaintiff's Demonstrative 38,

**JA3019**

Case: 19-2005    Document: 00117621846    Page: 96    Date Filed: 07/29/2020    Entry ID: 6356391
Case 1:14-cv-14176-ADB    Document 652    Filed 04/18/19    Page 84 of 206

84

1    slide 19.

2            Do you recall when Dr. Arcidiacono showed this

3    slide?

4    **A.**  Yes, I did.

5    **Q.**  And do you recall his testimony that the slide showed

6    that the personal rating was affected by race?

7    **A.**  Yes.

8    **Q.**  Was he correct?

9    **A.**  I don't think so at all.  I think what -- remember, these

10   are -- each of these panels is an academic decile, 7, 8, 9,

11   the top four deciles now, and as I've pointed out with regard

12   to the personal rating, once you're comparing decile 7,

13   decile 8, decile 9, decile 10, there's virtually no

14   difference because going across these deciles doesn't really

15   inform the personal rating.

16           So it's not very surprising that the gaps across

17   the different race groups look the same as we go from decile

18   10 to decile 9 to decile 8 because, as I've shown, the

19   personal rating really doesn't depend on the academic index.

20           So I find this completely uninformative about any

21   issue with the personal rating.

22   **Q.**  Mr. Lee, can we project the trial transcript from October

23   25 at page 205, line 14 through page 206, line 6.

24           Were you here when Mr. -- when Dr. Arcidiacono gave

25   the following testimony:

 1                  "Question:  You don't claim that Harvard

 2     discriminated against Asian-American applicants who are

 3     recruited athletes, correct?

 4                  "Correct.

 5                  "You don't claim that Harvard discriminates against

 6     Asian-American applicants who are legacies, correct?

 7                  "Correct.

 8                  "You do not claim that Harvard discriminates

 9     against Asian-American applicants on the dean's or director's

10     list, correct?

11                  "Correct.

12                  "You do not claim that Harvard discriminates

13     against Asian-American applicants who are the children of

14     faculty, correct?

15                  "Correct.

16                  "You do not claim that Harvard discriminates

17     against Asian-Americans who are the children of staff,

18     correct?

19                  "Correct."

20                  You heard that testimony, correct?

21     **A.**   I did, yes.

22     **Q.**   So Dr. Arcidiacono claims that Harvard discriminates

23     against some Asian-American applicants but not Asian-American

24     ALDC applicants.

25                  Is that what you understand?

1    **A.**   That's my understanding, yes.

2    **Q.**   And do you recall Her Honor asking Dr. Arcidiacono about

3    the personal ratings of ALDC applicants?

4    **A.**   I do, yes.

5    **Q.**   How do the personal ratings of Asian-American ALDC

6    applicants compare to the personal ratings of white ALDC

7    applicants?

8    **A.**   Well, in fact, they, on average, have a lower personal

9    rating than white ALDCs.  And the gap between Asian-American

10   ALDCs and white ALDCs and the fraction with a personal rating

11   of 1 or 2 is slightly bigger than the gap between

12   Asian-American and whites who are non-ALDC.

13   **Q.**   So what does that tell you?

14   **A.**   I find that extremely hard or impossible to reconcile

15   with Professor Arcidiacono's claim that the personal rating

16   is the mechanism by which discrimination against Asians is

17   operating, and that there's no discrimination against ALDCs.

18   Because on the one hand if there's no discrimination against

19   ALDCs, then the personal rating should be fine.  On the other

20   hand if there's -- if there's -- it just doesn't make any

21   sense.

22   **Q.**   So just to put a fine point on it, if Dr. Arcidiacono is

23   right, that there's no discrimination against Asian-American

24   ALDC applicants, what would that tell us about the personal

25   rating?

**JA3022**

1    **A.**   Well, as far as I can understand what that would mean is

2    their personal rating is not tainted by bias.

3    **Q.**   In light of everything that you've seen and everything

4    that you've done in this case, is the personal rating an

5    instrument of discrimination against Asian-American

6    applicants?

7    **A.**   Well, as this exercise with the comparison between the

8    ALDCs and non-ALDCs show, I just don't think that makes any

9    sense.  So I don't believe that that's the correct

10   interpretation of the data at all.

11   **Q.**   Let's turn briefly to the issue of interactions.

12           Did you hear Dr. Arcidiacono testify that you

13   should have included an interaction term between race and

14   disadvantaged status?

15   **A.**   Yes.

16   **Q.**   And, again what is an interaction term?

17   **A.**   So an interaction term is a term that allows the effect

18   of one variable to depend on another variable in the model.

19   **Q.**   And did you run your model including Dr. Arcidiacono's

20   interaction terms, including the one between race and

21   disadvantaged status?

22   **A.**   Yes, I did.

23   **Q.**   Please turn to Tab 23 in your binder and tell me when

24   you've found Exhibit 699.

25   **A.**   Tab -- excuse me.

1  **Q.**  23.

2  **A.**  23.  Oh, excuse me.  Okay.

3        Yes.

4  **Q.**  Is this showing the results of the model that you just

5  described?

6  **A.**  This is showing the results of a model where I don't

7  include all the interactions that Professor Arcidiacono has

8  in his model but just the interactions with race.

9            MR. WAXMAN:  We offer Defense Exhibit 699.

10           MR. MORTARA:  No objection.

11           THE COURT:  It's admitted.

12           (Defendant Exhibit 699 admitted into evidence.)

13  **Q.**  And what does this show?

14  **A.**  This shows that the average marginal effect of

15  Asian-American ethnicity in a model that includes that set of

16  interactions, not his full set but that set of his

17  interactions, is minus 0.14.  Not statistically significant

18  across all the years, so very comparable to my overall model.

19  And, again, none of the individual estimates from year to

20  year are different.

21  **Q.**  So let's look in sum at Defense Demonstrative 10.84.

22        And will you remind us again what this shows?

23  **A.**  Yes.  So this is kind of a summary of the set of

24  exclusions that Professor Arcidiacono has made from my model,

25  in my view the right model of the overall admissions process,

**JA3024**

1    to get to his model.

2          So we start with the -- it's showing or summarizing

3    the average marginal effect, the estimated marginal effect

4    for Asian-Americans relative to whites in each case.

5          So I start with my model, which I believe is the

6    best representation of the overall admissions process, so

7    I've included all the groups, and I've included the variables

8    that are relevant, and I have a minus 0.05 average marginal

9    effect.  Not statistically significant across all the years.

10   I've estimated the models separately over the years as well.

11         If I include the interaction variables that

12   Professor Arcidiacono includes in his specifications, so this

13   would be disadvantaged status times race, but in addition

14   disadvantaged -- or excuse me, gender times race and so on,

15   if I include that set of variables, the average marginal

16   effect across all years is minus 0.08, which in my view is

17   not fundamentally or even incrementally different than my

18   overall model.

19         So that, I don't think that's a substantively

20   important issue in comparison of his model and my model

21   looking at that full set of interactions.

22         If I include -- or if I now then, starting from

23   that base, for example, if I was to make the exclusions he

24   makes, so excluding the intended career and staff interview,

25   and excluding parental occupation, which I don't believe is

 1    the right thing to do and I think is inconsistent with the

 2    way the application admissions procedure works, inconsistent

 3    with the use of those variables, what I'm exhibiting here is

 4    that one could get to a minus 0.38 by that set of exclusions,

 5    which, in my view, represents an effect of omitted variable

 6    bias.

 7            If in addition one was to exclude the personal

 8    rating, which I don't think makes sense, which I don't think

 9    is legitimate for the model, but if one was to do that, then

10    one would get to an average marginal effect of minus 0.79,

11    which includes an -- which shows an additional omitted

12    variable bias.

13            If one was to take that model and estimate the

14    model in a pooled framework, which Professor Arcidiacono

15    does, essentially it doesn't make any difference, so one is

16    still there.

17            But if one was to make one final exclusion, which

18    is to exclude the ALDCs, which, again, I think doesn't make

19    any sense, given the admissions process, given that they're

20    part of the overall process, that they're almost 30 percent

21    of all admitted students, that they're particularly strong in

22    these combinations of skills and so on, but if one was to do

23    that, one could get to minus 1.02, which is his preferred

24    model.

25            THE COURT:  You're basically saying that the

1    difference between -- what accounts for the fact that you

2    conclude one thing and he concludes another thing is the

3    inclusion of the personal rating and the ALDCs.

4            THE WITNESS:  Inclusion of the personal rating,

5    yes, Your Honor.  Inclusion of the -- actually, inclusion of

6    the other variables:  The parental occupation and staff

7    interview, intended career variables.

8            THE COURT:  But that doesn't have much of an

9    effect, right?

10           THE WITNESS:  Well, that gets him to minus 0.38.

11   What is statistically significant --

12           THE COURT:  But the things that really are driving

13   your different conclusions are the personal rating and the

14   ALDCs?  Or no?

15           THE WITNESS:  Well, it's a combination of the three

16   things, actually, Your Honor.

17           THE COURT:  Parental occupation, personal rating,

18   ALDCs.

19           THE WITNESS:  Yeah, parental occupation and the

20   intended career and staff interview, together, the three.

21           My recollection is if I just exclude the ALDCs,

22   that the average marginal effect is not statistically

23   significant, but I may be incorrect on that.

24   **Q.**  Just to clarify, when Her Honor was asking you the

25   question yesterday whether the order matters and whether you

1    can sort of estimate what the model will show about average

2    marginal effect irrespective of what order they're in, do you

3    recall that in his testimony Dr. Arcidiacono used to explain

4    his view of this point a table that is from your report?

5    **A.**   Yes.

6    **Q.**   So focusing on the disputed modeling choices here, did

7    Dr. Arcidiacono make any modeling choice that makes his

8    estimate of Asian-American effect less negative?

9    **A.**   No.

10   **Q.**   And what does that tell you about his model?

11   **A.**   Well, it suggests that these exclusions are very

12   one-sided.

13   **Q.**   Can we have Defense Demonstrative 85, please.

14          And just very briefly summarize the differences

15   between your model and Dr. Arcidiacono's modeling choices

16   with respect to the actual process that Harvard uses.

17   **A.**   Right.  So in my view, the actual admissions process

18   includes all the applicants in the process, so that includes

19   the ALDCs.  It's a separate process across years for a

20   variety of reasons that I mentioned before.  And these sets

21   of factors, including the personal rating and then the other

22   set of factors, parental occupation, intended career, and

23   staff interview, are all important ingredients of the

24   admissions process.

25          So in my view, that's the actual process, and

1    that's what I've tried to do in my model.

2              Professor Arcidiacono, on the other hand, has

3    excluded the ALDCs, fit a model -- single model and excluded

4    these factors.

5    **Q.**  Did you examine which model, that is, yours or his,

6    better explains the actual admissions decisions?

7    **A.**  Yes, I did.

8    **Q.**  Please turn to Tab 24 in your binder and tell me when

9    you've found Defense Exhibit 702.

10   **A.**  Yes.

11   **Q.**  What is this document?

12   **A.**  The first document shows the standard error of his model

13   and my model in different years for his model, and then

14   pooled and then my model pooled, talking about this issue of

15   power that we talked about yesterday.

16             And the second shows the R-squared for his model

17   and my model.

18             MR. WAXMAN:  Your Honor, we'd offer Defense Exhibit

19   702 in evidence.

20             MR. MORTARA:  No objection, Your Honor.

21             THE COURT:  It's admitted.

22             (Defendant Exhibit 702 admitted into evidence.)

23   **Q.**  Mr. Lee, may we have slide 86, please.

24             What does this demonstrative show?

25   **A.**  So this is showing the difference in explanatory power of

1    my preferred model and Professor Arcidiacono's preferred

2    model in terms of how they're explaining the variation.

3            So my model has about 64 percent of the overall

4    variation from student to student and whether they're

5    admitted or not, explained by the factors in the model.  So

6    importantly still 36 percent is omitted, and that is a higher

7    fraction, a notably higher fraction than Professor

8    Arcidiacono's model, which is only 56 percent.

9    **Q.**  So in your view, is this a significantly different -- is

10   this a significant difference in the explanatory power of

11   your model versus Dr. Arcidiacono's model?

12   **A.**  In my view, this is a very important difference.  And

13   quite notable.

14   **Q.**  Let me now turn to one other topic before we leave the

15   personal rating.

16           Did you hear Dr. Arcidiacono testify about the

17   phrase "standard strong" as applied to certain applicants?

18   **A.**  I did, yes.

19   **Q.**  And Mr. Lee, may we please have Plaintiff's Demonstrative

20   38.41.

21           Do you recall Dr. Arcidiacono showing this chart to

22   suggest that Asian-Americans with comments indicating

23   standard strong are stronger than white applicants who

24   receive that evaluation?

25   **A.**  I do, yes.

1    **Q.**  Is it true?

2    **A.**  Not in my view, no.  The problem is that Professor

3    Arcidiacono is looking, most importantly, here, in terms of

4    math, SAT math, SAT verbal, academic index, academic rating

5    of 2 or better.  So he's, again, kind of focusing on the

6    academic dimension.

7            And as I've tried to emphasize, it's a

8    multidimensional admissions process.  And what's really

9    important in understanding different students is that overall

10   strength on these multiple dimensions.  So this chart doesn't

11   even show the fraction rated athletic 2 or better, which I've

12   shown is a very important additional component.

13   **Q.**  Please turn to Tab 31 of your binder and tell me when you

14   find Defense Exhibit 709.

15   **A.**  I found it, yes.

16   **Q.**  What is this document?

17   **A.**  It's the average sum of profile ratings for

18   Asian-American and white students who are described as

19   standard strong.

20   **Q.**  So does this include all four of the profile ratings as

21   opposed to Dr. Arcidiacono's demonstrative?

22   **A.**  Yes.

23   **Q.**  And what does it show?

24   **A.**  Well, evaluating students in terms of their combinations

25   of these four strengths, it shows that amongst the students

 1    who are labeled as standard strong, the sum of the ratings

 2    for Asian-American and white students is essentially the

 3    same.  It's very, very far from statistically significant

 4    difference and very, very small in magnitude.

 5            So my understanding of this, my interpretation of

 6    this is that effectively on -- in terms of their overall

 7    evaluation on the multiple dimensions that Harvard values,

 8    they're identical.

 9            MR. WAXMAN:  Your Honor, we offer Defense Exhibit

10    709 in evidence.

11            MR. MORTARA:  No objection.

12            (Defendant Exhibit 709 admitted into evidence.)

13    **Q.**  Mr. Lee, can you please project Defense Demonstrative 89?

14            THE COURT:  Can I ask one more question?

15            MR. WAXMAN:  Oh, I'm sorry.

16            THE COURT:  Did you look at the admissions data for

17    the standard strongs?

18            THE WITNESS:  Thank you, Your Honor.

19            No, I couldn't really do that because there was

20    just a set of files that had standard strong.  There was a

21    relatively small number of such files, but I don't believe

22    that we had a measure of whether, like, any, you know, in the

23    overall 150,000, we didn't have a variable that indicated

24    whether standard strong appeared.  Just like we didn't have

25    any of the other marginal comments or anything like that.

 1    **Q.**  Do you recall whether the Office of Civil Rights, when it

 2    did its two-year study, did do something like that?

 3    **A.**  They mention that in their report, yes.

 4    **Q.**  So looking at -- can we have Defense Demonstrative 89,

 5    please.

 6              And what does this show?

 7    **A.**  Well, this shows what we just reviewed.

 8              So this is a simplified summary of the previous --

 9    the exhibit.  And it shows the sum of the four ratings among

10    students who are labeled standard strong and the set of files

11    that were pulled out that had standard strong mentioned.

12    **Q.**  And what do you conclude from this with respect to

13    Dr. Arcidiacono's demonstrative?

14    **A.**  Well, I think it's an incomplete representation of the

15    actual relative strengths of Asians and whites who are

16    labeled standard strong.

17              If you look closely at their overall combination of

18    strengths, they're virtually identical.

19    **Q.**  Bottom line, does Harvard admissions office treat Asian

20    applicants any different than white applicants?

21    **A.**  In my view, no.  In my view, the statistical evidence

22    strongly supports the conclusion that there's no difference

23    between them.  There's no statistically significant

24    difference.  The magnitude of the average marginal effect in

25    the admissions model taken as a whole across all the years is

1    very small in size, very far from statistically significant.

2    None of the individual years is statistically significant.

3    They bounce around, some positive, some negative.  So it's

4    exactly the kind of pattern of findings that one would expect

5    if there was truly a zero difference between the two.  And

6    that's what I conclude.

7    **Q.**  Have you seen any evidence to suggest that Harvard

8    discriminates against Asian-American applicants?

9    **A.**  I don't believe any statistical evidence support that

10   claim, and I'm not aware of any evidence from testimony or

11   evidence of actual process of discrimination.

12   **Q.**  Let's turn to Defense Demonstrative 10.92.

13          It's been a while since we've had this up.  We have

14   to retrieve it from archives, I think.

15          And let's focus on the second question that you

16   were asked to address in this case.  How did you go about

17   analyzing the extent to which race plays a role in Harvard's

18   admissions process?

19   **A.**  Well, the main things I did were two.  First, I looked at

20   the individual effect or the specific effect of race

21   variables alone in the admissions procedure and compared that

22   to the effects of other single sets of variables, for

23   example, variables like parental occupation or variables like

24   the ratings of teachers and the alumni interviewers.

25          And then I used my model, my admissions model, to

1    look at the magnitude of the tip that is offered to different

2    race groups across different groups of students.

3    **Q.**  Well, let's start with the first analysis.  How did you

4    analyze the extent to which race alone can predict admission

5    outcomes?

6    **A.**  What I did was along the same lines of some of the

7    exercises we've seen before.  I looked at the overall

8    explanatory power of race alone in explaining

9    student-to-student admissions decisions relative to the

10   overall explanatory power of other types of factors in

11   explaining student-to-student admissions outcomes.

12   **Q.**  And would you turn to your -- in your binder to Tab 34.

13   **A.**  Yes.

14   **Q.**  What is Defense Exhibit 715?

15   **A.**  It's pseudo R-squared values of various admissions

16   models -- of admission models containing various controls.

17           MR. WAXMAN:  We offer Defense Exhibit 715 into

18   evidence.

19           MR. MORTARA:  No objection.

20           THE COURT:  Admitted.

21           (Defendant Exhibit 715 admitted into evidence.)

22   **Q.**  Please turn, Professor Card, to Tab 35.

23   **A.**  Yes.

24   **Q.**  Do you find Defense Exhibit 716?

25   **A.**  I do, yes.

1    **Q.**   And what is that?

2    **A.**   It's changes in explanatory power of my model of

3    admissions when the effects of different variables are

4    removed.

5         MR. WAXMAN:   Your Honor, we offer Defense Exhibit

6    716 into evidence.

7         MR. MORTARA:   No objection.

8         THE COURT:   Admitted.

9         (Defendant Exhibit 716 admitted into evidence.)

10   **Q.**   Mr. Lee, let's please display 10.93 on the screen.

11        And Professor Card, what does this show?

12   **A.**   So this is the graphical illustration of this first

13   exercise I did to assess the magnitude or importance of race

14   in the admissions decision.

15        So each of these is the R-squared -- each of these

16   bars represents the R-squared or the fraction of explained

17   variability from student to student in the yes-no decision of

18   whether a student is admitted.

19        So starting on the left, I show what fraction of

20   that would be explained if one only used the four profile

21   ratings, nothing else.   So none of the other contextual

22   variables, no race information, nothing else.   And one can

23   see that those four variables alone would explain about 38

24   percent of the overall differences from student to student in

25   probability of admission.

1        The next bar shows the teacher and guidance

2    counselor ratings alone.  So these are just the three school

3    support ratings variables, and those variables alone, you can

4    see, have a fairly high explanatory power.  So those three

5    variables alone explain about 19 percent of the outcome.

6        The alumni interviewer ratings, the next bar,

7    explain about 13 percent.

8        The next bar shows explanatory power of a set of

9    contextual factors from the college board data on

10    characteristics of high schools and neighborhoods.  Those

11    variables explain about 6 percent.

12        And this is individually, I emphasize.  So in each

13    case I'm using these variables alone in my model, nothing

14    else.

15        So when I get -- docket explains about 2 percent,

16    so there's these domestic dockets we've talked about.

17        Intended career one of the variables we talked

18    about explains about 1 percent, that in itself.  Intended

19    major explains about 1 percent.  And by comparison, race by

20    itself explains 0.2 percent.  So relative to all these other

21    factors, race per se is a very, very small component of

22    explanatory power.

23    **Q.**  So does that mean that race has no effect on admissions?

24    **A.**  No, not at all.

25    **Q.**  How so?

1    **A.**  Well, this is an example of the fact that any individual

2    factor in the admissions process can be important but only

3    for students who are highly competitive, exactly the kind of

4    point I was making in my hypothetical example where I looked

5    at the S-curve relationship for retirement and pointed out,

6    for example, that presence of a spouse at home, for instance,

7    would not necessarily have much effect on retirement except

8    for people who are in kind of the bubble range.  And for that

9    group of people, there can be an effect, even though on

10    average the effect across everyone is relatively small, or

11    that variable doesn't explain very much of the outcome.

12    **Q.**  And the bubble range for purposes of this case is what?

13    **A.**  For purposes of this case, the bubble range is going to

14    be for students who have at least, I would argue, one

15    strength and possibly two strengths, are in the upper group

16    of the entire admissions pool in terms of their combination

17    of strengths.

18    **Q.**  So when we talk about the upper range, are we talking

19    about applicants who are highly competitive on many

20    dimensions?

21    **A.**  We are, yes.

22    **Q.**  So turning to the second analysis that you mentioned,

23    comparing race to other factors for competitive applicants,

24    how did you determine which applicants were the most

25    competitive?

1    **A.**   So I used my admissions model and I constructed -- or I

2    thought about it in terms of exactly the same kind of

3    framework as we're thinking about in this hypothetical with

4    retirement.

5         So I used my admissions model, and I looked at the

6    overall strength of an applicant, taking account of all of

7    their different features.  So there's the school support,

8    their profile ratings, the contextual factors and all of that

9    additional information, and then I tried to -- but in the

10    case of race, what I would do is I would ignore or turn off

11    any impact of race in that evaluation.  So I'd rank all the

12    students by that characteristic and then proceed.

13   **Q.**   Okay.  Can you turn to Tab 2 of Volume 2?

14   **A.**   Yes.

15   **Q.**   Do you find Defense Exhibit 670?

16   **A.**   Yes.

17   **Q.**   What is this?

18   **A.**   So this is four -- this is the cumulative distribution of

19    applicants' predicted probability of admission.

20        MR. WAXMAN:  Your Honor, we offer Defense Exhibit

21    670 into evidence.

22        MR. MORTARA:  No objection.

23        THE COURT:  It's admitted.

24        (Defendant Exhibit 670 admitted into evidence.)

25   **Q.**   Turning now, Mr. Lee, to Defense Demonstrative 94.

1          What is this showing?

2     **A.**   So this is showing, based on the -- exactly the previous

3     document that just went into evidence, this is showing the

4     predicted probability of admission for students when I use

5     the procedure I was describing of ranking students by their

6     strength.

7          And one can see that it's got the same kind of

8     S-curve relationship or logistical curve relationship as we

9     saw in my simple hypothetical.

10         So for something like the bottom two-thirds of the

11    admissions pool, their predicted probability of admissions is

12    essentially zero.  So that group of students is out of the

13    money.  There's no combination -- there's no single variable

14    that can have any effect on their admissions probability.  So

15    that's the first group.

16         The next group of students -- we can see that

17    contrary to my retirement example, there really aren't any

18    students who have extraordinarily high probabilities.

19    There's like a couple of students who are in the 90s.

20    **Q.**   We're now talking about the right hand?

21    **A.**   The right hand, yes.  So we can say there's a group of

22    students who I would say are on the bubble, and that's

23    starting around the 75th percentile of academic strength.  So

24    when I take all the applicants and order them by their

25    strength, I get to the 75th percentile.

1          And the point that's important to take away from

2     this graph is, while it's the case that for students with low

3     probabilities of admission, some feature like one more

4     strength or going to a single type of strength or being from

5     sparse country or being of a particular racial group, for

6     those students with low probabilities of admission, we have

7     essentially a negligible effect.

8          But when we get to the bubble range, now when I

9     take a student, for example, at around, say, the 90th

10    percentile -- remember, only seven percent of all students

11    are going to get in.  So the 90 percentile group on average

12    is not too good.  They're only the tenth percent -- they're

13    out of the money.

14         But for that group students at the 90th percentile,

15    if I could give them one more factor that would push them up

16    from the 90th percentile to the 93rd or 94th percentile, one

17    can see that could have a very large effect on the

18    probability of admission.

19         And so this is an extremely important point:  That

20    once a student has some combination of strengths, then one

21    more can really make a big marginal difference.  So that one

22    additional strength can have a very large effect relative to

23    the set of previous strengths that they had.

24         Now, importantly, which of those strengths -- so

25    suppose a student has -- I talked about this before.  But

1     suppose a student has three strengths and I move them to

2     four.  Which of the ones is the one that caused them to have

3     the high probability is entirely unclear because it's one of

4     many.

5           So this kind of illustrates this concept of when

6     students are highly competitive and in the bubble range, it's

7     really due to a combination of strengths, and it's -- the

8     isolating effect of any one of many has to be put in that

9     context.

10     **Q.**  Would you please turn to Tab 36 in your binder.

11     **A.**  Yes.

12     **Q.**  What is Defense Exhibit 718?

13     **A.**  So it's average marginal effects of various factors by

14     admissions index decile.

15     **Q.**  Is this a summary of the analysis you just described?

16     **A.**  In part.

17           MR. WAXMAN:  Your Honor, we offer Defense Exhibit

18     718 into evidence.

19           MR. MORTARA:  No objection.

20           THE COURT:  It's admitted.

21           (Defendant Exhibit 718 admitted into evidence.)

22     **Q.**  Turn, please, Mr. Lee, to Demonstrative 97.

23           What is this showing?

24     **A.**  So now what I'm going to do is I'm going to focus on the

25     marginal effect of African-American or Hispanic or other

Case: 19-2005    Document: 00117638846    Page: 449    Date Filed: 07/29/2020    Entry ID: 6356391
Case 1:14-cv-14176-ADB    Document 652    Filed 04/18/19    Page 107 of 206

107

 1   ethnicity.  And I apologize, I'm going to say Hispanic
 2   sometimes when I mean Hispanic or other.  So in my analysis
 3   and Professor Arcidiacono's analysis, the Hispanic group
 4   includes some other people of other ethnicities, Hawaiian,
 5   Alaskan-American and stuff like that.  So that's the group
 6   we're talking about.
 7           And so what I've done on the axis, as before, I've
 8   ranked all the students in the application pool, all the
 9   students, not just African-American students, but all the
10   students in the application pool, including the
11   African-American students, by their strength of admission and
12   from 1 to 10 deciles but not using any tip for race.
13           So when we get to the sixth or seventh decile,
14   we're into a range wherein students are getting to be having
15   some combination of strengths already.  And one can see when
16   one gets -- first of all, when one is in the bottom half of
17   the distribution, when a student is in the bottom half of the
18   distribution, there really is no effect of race on the
19   additional probability of admission.
20           But when one gets to, say, like the eighth decile,
21   now one is well into the bubble range, independent of any tip
22   associated with race.  So now a student would probably have,
23   say, two or even three strengths.
24           And now one of those in that case, having that base
25   of strength, being in addition an African-American applicant

1    would increase the probability of admission by an additional

2    25 percent.  Being a Hispanic would increase their

3    probability of admission by 8 or 9 percent.

4            And similarly, if one goes now to the ninth decile,

5    now one is into the very steep part of the S-curve.

6    **Q.**  Just to be clear, the ninth decile is from -- is the 80th

7    to the 89th percent highest group of applicants?

8    **A.**  Yes.  89.999 percent, yes.

9    **Q.**  Sorry.  We lawyers are not good with decimal points, but

10   I take your point.

11   **A.**  Yes.  But it goes all the way up but does not touch.

12   **Q.**  So the tenth decile is the decile between 90 and 100?

13   **A.**  Yes, yes.

14   **Q.**  Okay.

15   **A.**  So if we focus on students -- now we're ranking all the

16   students -- I want to emphasize very clearly that I'm ranking

17   all the students by all of their strengths except race.  So

18   there's some 200 factors in this model.  So all 200 are in

19   there except any effect of race.

20           I'm putting these into these different groups.  And

21   now in the ninth decile, this is the group of students who

22   are at the very steepest part of the S-curve.  For that group

23   of students, if at that point I turn on the effect of being

24   African-American, then I'm going to increase their

25   probability of admission by about 50 percentage points.  And

1    if I take an Hispanic student, for those students in the

2    ninth decile with these very strong combination of skills,

3    then I'm going to increase their probability of admission by

4    around 21 or 22 percentage points.

5    **Q.**  And is this result that we're seeing here consistent with

6    what you would expect?

7    **A.**  Yes, it's driven by this important feature of the S-curve

8    that I talked about yesterday in regard to the retirement

9    hypothetical.

10            So it's driven by the fact that, first of all,

11   very, very many students are out of the money.  And when one

12   gets to the upper deciles, in particular the upper two or

13   three deciles, those are the students that have a combination

14   of strengths.  And then with that base of, say, good

15   academics and a good extracurricular, then one additional

16   factor could make a substantial difference.

17            And that's exactly I believe how the admissions

18   process works.

19   **Q.**  And these -- what we're showing here are marginal

20   effects, correct, not coefficients?

21   **A.**  Yes.  Again, these are average marginal effects across

22   all the students in that decile.

23   **Q.**  And can you just remind us again of the difference

24   between the two?

25   **A.**  Yes.  So I want to emphasize that the average effect does

1    not mean that this is an effect for any given individual.

2    So, for example, in the ninth decile or eighth decile,

3    there's going to be students who get in and students who

4    don't get in.  So the individual is always much different

5    than the average.

6    **Q.**  What's termed --

7         THE COURT:  I'm sorry, Mr. Waxman.  Did you do this

8    analysis for Asians?

9         THE WITNESS:  No, Your Honor, because there's no

10   tip for Asians in my model.  It's minus .05, yeah.

11        THE COURT:  Okay.

12   BY MR. WAXMAN:

13   **Q.**  Mr. Lee, can we please have Demonstrative 98.

14        What is this showing?

15   **A.**  This is a set of graphs very similar in setup meant to

16   contextualize or help interpret the bumps or boosts that we

17   see for African-American and Hispanic students in different

18   deciles compared to other important attributes of students.

19        So, for example, focusing on the lineage case in

20   the middle upper panel, what I've done is taken all the

21   students in the admissions pool from my admissions model and

22   I've turned off lineage.  I said, I'm going to ignore lineage

23   and rank them by all other strengths.

24        Then for students in the eighth or ninth decile, by

25   that overall measure of combination of strengths, I'm going

1    to look at what would be the increase in admissions

2    probability if, say, starting in the ninth decile in this

3    very sharp S-curve part of the relationship, what would be

4    the effect of being a lineage student and, similarly, what

5    would be the effect of different ratings combinations.

6          Now, in the case of the ratings combinations, what

7    I've done is I've taken a student, for example, with an

8    academic rating of 1.  I've taken all of those students and

9    I've turned them down to a 3, which is kind of the base group

10   for academics.  Similarly for extracurricular or similarly

11   for personal.

12         So taking all the students but turning down the

13   academic 1s to an academic 3, re-rank them into the groups,

14   and now turn on their academic 1.  And so this is the result

15   showing the average marginal effect, for instance, if a

16   student with -- who would otherwise be an academic 1, but

17   I've put them into, say, the eighth decile by turning off

18   their academic 1, and then I turn on their academic 1, it's

19   going to increase their probability of admission if they're

20   in the eighth decile with all these other strengths up to

21   around 65 percent or so.

22   Q.  And, again, why do any of these factors have such a large

23   marginal effect for competitive applicants when the process

24   considers so many, many different factors?

25   A.  Well, as I tried to emphasize, once one gets into the

Case: 19-2005    Document: 00117638846    Page: 124    Date Filed: 07/29/2020    Entry ID: 6356391
Case 1:14-cv-14176-ADB   Document 652   Filed 04/18/19   Page 112 of 206

112

1    bubble range, those are going to be students that have a

2    combination of strengths.  So they're going to have two,

3    three, four strengths.

4              So when you're in that range, first of all, there's

5    a base of strength -- thank you -- and so you're starting,

6    let's say, around the 90th percentile.  So one more factor

7    that pushes you up a relatively small amount in terms of

8    going, say, from the 90th to the 93rd percentile can have

9    quite a large effect on your probability of admission.  So

10   that's a characteristic.

11             It's a combination of the fact that it's a multiple

12   dimensional admissions procedure.  So there's multiple

13   factors, any one of which, if it was considered the marginal

14   one, could have a big positive effect.

15   **Q.**  Can we go back to the previous demonstrative, 98, and

16   let's focus, and use, for example, the lineage applicants.

17   Let's consider a lineage applicant in decile 9.  This would

18   be the applicants in the decile between 80 percent

19   probability of admission and 89 if I have you right, .999

20   percent?

21   **A.**  Yes.

22   **Q.**  What is roughly the average marginal effect of lineage

23   status for that applicant?

24   **A.**  Reading off the graph, it's around 31 or 32 percentage

25   points.

1    **Q.**  Does that mean that the applicant is likely to be

2    admitted?

3    **A.**  It means that I don't, off the top of my head, know the

4    average -- the underlying average probability of admission.

5    It would mean that the probability of admission is far below

6    1.  So any given individual, even in that group and even with

7    the lineage turned on, would not be assured admission.

8    **Q.**  And so is lineage -- would this mean, this increase in

9    their probability of admission mean that lineage status is

10   decisive for that applicant?

11   **A.**  No, not at all because you recall to get to the ninth

12   decile they would have to have a combination of these other

13   strengths.  So if I took a student who, say, is an academic

14   2, an extracurricular 2 and an athletic 2, got them into the

15   ninth decile and then turned on their lineage, then I would

16   see an effect like a 30 percent point.

17          But if I gave them the lineage and the academic 2

18   and the extracurricular 2 and turn on the athletic 2, I would

19   see a similar boost.  So any one of those four factors would

20   have this large marginal effect because I'm starting with a

21   base of three other factors that are strong.

22   **Q.**  Consider an African-American applicant in decile 9.  What

23   is, roughly, the average marginal effect of race for that

24   applicant?

25   **A.**  It's just over 50 percentage points.

1    **Q.**  And does that mean that race is decisive for that

2    applicant?

3    **A.**  No, not at all.  Because there are other factors that are

4    contributing to getting them to the ninth decile and at that

5    point, on average, it's true that there's an increase in

6    probability, big increase in the probability of admission for

7    that group, but that's on top of this other base.

8            And even accounting for that increase in

9    probability, there is still uncertainty as to whether they're

10   going to get in or not.

11   **Q.**  Is it possible to think of these graphs as showing the

12   magnitude of the various, quote, tips for highly competitive

13   applicants?

14   **A.**  Yes.  This is showing that the magnitude of any specific

15   tip taken individually, one at a time, can appear to be quite

16   large in a process which values many dimensions of strength

17   when one gets into the bubble range.

18           THE COURT:  Why are the tips in the ninth

19   percentile worth more than in the tenth percentile?

20           THE WITNESS:  Good question, Your Honor.

21           The reason why is by reference to the S-curve.

22   When you're up to the high end, if you're really high, like,

23   let's say, someone who gets an academic rating of one 1 --

24   thank you Mr. Lee -- if you're at an academic -- if you're in

25   the tenth decile without your academic 1, an academic 1 is

```
 1    going to put you to 100 percent.  So the marginal boost --
 2    they're so strong already that it doesn't have far to go.
 3              THE COURT:  Sorry.  Flagging.
 4              MR. WAXMAN:  Did that answer Your Honor's question?
 5              THE COURT:  Yes.  Doesn't make any difference for
 6    them because they're already getting in, basically.
 7              THE WITNESS:  They're at the upper part of the
 8    S-curve, so the gap that they can possibly go up is smaller,
 9    yes.
10    BY MR. WAXMAN:
11    Q.  If somebody doesn't have one of these tips, say the
12    legacy tip, does that person suffer a penalty?
13    A.  Well, again, that's not my interpretation of the process.
14    My interpretation is that there's kind of a baseline group,
15    and then from that base, anybody who has a valuable attribute
16    like an extracurricular rating of 1 gets a tip.  Or, you
17    know, more specifically thinking of somebody who has a very
18    specific skill like a very high level of academic
19    achievement, those individuals can get a tip.
20              But that doesn't mean that the other people are
21    being disadvantaged by the presence of those highly talented
22    people, in my view.
23    Q.  Do these graphs show, for example, that Harvard
24    discriminates against non-legacy applicants?
25    A.  That would not be my interpretation, no.
```

**JA3051**

1    **Q.**  Did you hear Dr. Arcidiacono concede that under his

2    analysis there is a white penalty?

3    **A.**  I heard him say that, yes.

4    **Q.**  Do you agree that there is a white penalty?

5    **A.**  That would -- no.  No, that's not the way I would pose

6    it, no.

7    **Q.**  Can you please summarize your conclusions regarding the

8    effect of race in the admissions process?

9    **A.**  Yes.  So I have two rather straightforward summary

10   points.

11           The first is that if one looks just at race per se

12   as a variable, it has a very, very small, almost negligible

13   effect on the overall probability of admission.

14           So race in isolation has almost no contribution to

15   the overall explanatory power, is very, very small, and much

16   below many, many other factors, including variables like

17   contextual factors and certainly including variables like the

18   profile ratings.  So that's the first conclusion.

19           The second conclusion is that when you get to

20   highly competitive applicants in the upper ranges of skill of

21   the applicant pool who have characteristics that already put

22   them in the bubble and already put them in a range where

23   they're competitive, then the presence of being an

24   African-American or being an Hispanic can be one more factor

25   that increases their probability of admission in some cases

1    by a notable amount.

2    **Q.**   Thank you.

3         Before we turn to the racial balancing claim that

4    is Count 3 of the complaint, I just want to return you back

5    to the personal rating because my even older partner,

6    Mr. Lee, thinks that I have not asked questions that

7    clarified something sufficiently.

8         So that he's clarified, let me just beg your

9    indulgence on a couple of questions.

10        Professor Arcidiacono claims that the way Harvard

11   discriminates against Asian-Americans is by the personal

12   rating.  Do you understand that?

13   **A.**   Yes, I believe he has asserted that that's one of the

14   primary or the primary mechanism by which they do it, yes.

15   **Q.**   Now, let me focus you on the gap between whites and

16   Asian-Americans on the personal rating.  Do you have that in

17   mind?

18   **A.**   Yes.

19   **Q.**   For both the ALDC and the non-ALDC applicants, the

20   Asian-American personal ratings were lower than for whites.

21   Correct?

22   **A.**   Yes, that's correct.

23   **Q.**   Was the difference greater for the ALDCs or the

24   non-ALDCs?

25   **A.**   Well, the difference is actually greater.  In other

1    words, the Asian-American ALDCs are further behind the white

2    ALDCs than is the case for the non-ALDCs, yes.

3    **Q.**  But you understand that Professor Arcidiacono has

4    conceded that there is no discrimination against

5    Asian-American applicants who are in the ALDC group?

6    **A.**  Yes, that's my understanding, yes, clearly.

7    **Q.**  And the gap is smaller between Asian-Americans and whites

8    for the non-ALDC group; is that correct?

9    **A.**  The gap in the personal rating is smaller for the

10   non-ALDC group, yes.

11   **Q.**  But in that instance, his contention is there is

12   discrimination against Asian-Americans, correct?

13   **A.**  Yes.

14          MR. WAXMAN:  Is that quite clear to you, Mr. Lee?

15          MR. LEE:  It is now.  It happens with age.

16   **Q.**  Let's turn now to the racial balancing claim, Count 3 of

17   the complaint.  And can we have Demonstrative 99 and the

18   third question you examined:  Whether statistics support

19   SFFA's claim of racial balancing.

20          Did you hear or review testimony earlier in this

21   trial on the use of one-pagers?

22   **A.**  I did, yes.

23   **Q.**  And you heard -- did you hear Mr. Mortara argue in his

24   opening statement that Harvard uses the one-pagers, what are

25   referred to as the one-pagers to, quote, match up the racial

1    composition of the class to the prior year?

2            Did you hear that?

3    **A.**  I recall that, yes.

4    **Q.**  Did you do any statistical analysis that sheds light on

5    whether Harvard actually acted in that way?

6    **A.**  I did, yes.

7    **Q.**  And what did you find?

8    **A.**  Well, what I found is that, in my view, there's no

9    evidence that that's going on.

10   **Q.**  Can you please turn to Tab 32 in your binder and tell me

11   when you've found Defense Exhibit 711.

12   **A.**  Yes.

13   **Q.**  And what is this document?

14   **A.**  So this is the annual percentage change in various race

15   groups in the proportion of admitted students and annual

16   percentage change in various race groups in the proportion of

17   matriculating students.

18           MR. WAXMAN:  Your Honor, we offer Defense Exhibit

19   711 into evidence.

20           MR. MORTARA:  No objection.

21           THE COURT:  Admitted.

22           (Defendant Exhibit 711 admitted into evidence.)

23   **Q.**  Mr. Lee, let's display demonstrative 100.

24           And what is this showing?

25   **A.**  So this is meant to directly address the question of

Case: 19-2005   Document: 00117638846   Page: 452   Date Filed: 07/29/2020   Entry ID: 6356391
Case 1:14-cv-14176-ADB   Document 652   Filed 04/18/19   Page 120 of 206

120

1    whether there's somehow year-to-year balancing in the

2    composition of the admitted pool of students, racial

3    composition of the admitted pool of students at Harvard.

4         So what I've done for each of these four racial

5    groups is I've -- and I'm using here data that is not -- it's

6    a combination of other data because I'm able to go back all

7    the way to 2001 for using some aggregated data that Harvard

8    has made available.

9         So I'm showing, for example, the percentage change

10   in the share of one of these racial groups from the previous

11   year to the current year.

12   **Q.**  So can you illustrate that by showing us a few -- pick

13   out a few years?

14   **A.**  Yes.  So let's start with the African-American admitted

15   students 2001, minus 4 percent.  It would say that relative

16   to the previous year, the share of African-American students

17   in the admitted pool of students, all the students who are

18   admitted, their share fell by 4 percent.

19        In 2002, between -- that's relative to 2001.

20        From 2001 to 2002 it then rose by 14 percent.  If

21   one looks, for example, at the Asian-American graph, one can

22   see from 2000 to 2001, their share, the Asian-American share

23   in the admitted pool, rose by 5 percent between 2000 and

24   2001.  It rose by another 5 percent between 2001 and 2002.

25   Then it fell by 8 percent between 2002 and 2003.

**JA3056**

1          And one can see if one looks at this graph a

2     pattern of often fairly large changes in the year-to-year

3     shares of each race group in the admitted pool.

4     **Q.**  And if Harvard were trying to match the racial

5     composition of the prior class, what do these charts suggest?

6     **A.**  Well, they're not doing a very good job, I guess, would

7     be one way of putting it.  Another way to say it would be it

8     doesn't seem like that that could possibly be going on

9     because these changes -- these are big percentage changes in

10    year to year.

11    **Q.**  So in addition to analyzing the year-to-year changes in

12    the pool of students who get acceptance letters, did you also

13    analyze the change in the share of the matriculating class,

14    that is, the students who actually attend?

15    **A.**  I did, yes.

16    **Q.**  And please display 101.

17          And what is this showing?

18    **A.**  So this is an exactly parallel analysis now focusing on

19    the shares of matriculating students.  So the students who

20    are offered admission and decide to take it up and come to

21    Harvard, agree to come, from year to year for each of the

22    four racial groups.

23          So, for example, focusing on the Asian-American in

24    the upper left from 2000 to 2001, the Asian-American share of

25    the matriculating students rose by 5 percent; 2002, rose by

1    7; '3, fell by 7 and so on.

2    **Q.**  So what do you conclude based on the data that we've just

3    discussed?

4    **A.**  Well, again, it seems there's not any evidence of trying

5    to stabilize the year-to-year racial shares of the

6    matriculating class.

7    **Q.**  Did you look at any other data on these issues?

8    **A.**  Yes, I looked at a broader perspective on the actual

9    levels of the shares of each of the race groups over time.

10   **Q.**  Can you please turn to Tab 33 in your book and tell me

11   when you've found Defense Exhibit 713.

12   **A.**  Yes.

13   **Q.**  What does that show?

14   **A.**  It's two exhibits, the Asian-American, African-American

15   and Hispanic shares of applicants to the class of 2018 [sic]

16   to 2019, and the shares admitted to the class of 2018 [sic]

17   to 2019.

18   **Q.**  When you said it's two exhibits, I think what you meant

19   to say is it's two pages to the exhibit.

20   **A.**  Two pages, sorry.

21            MR. WAXMAN:  Your Honor, we offer Defense 713

22   into evidence.

23            MR. MORTARA:  No objection.

24            THE COURT:  Admitted.

25            (Defendant Exhibit 713 admitted into evidence.)

**JA3058**

1    **Q.**  Let's turn to slide 102, please, Mr. Lee.  What is this

2    showing?

3    **A.**  Okay.  So this is showing the share -- the applicant

4    pool.  So this is the share of all the students who apply to

5    Harvard who are in different racial groups between 1970 and

6    2019.  And this is the share overall, including in the

7    denominator, international students.  So slightly different

8    than some of the shares that we've talked about before or

9    things we've talked about before.

10   **Q.**  Let's turn now to Defense Demonstrative 10.103.

11            And what is this showing?

12   **A.**  This is showing the share of admitted -- the share -- the

13   different race groups in the admitted class from 1980 to

14   2019.

15   **Q.**  Now, Mr. Lee, if you can display slide 104.  I think

16   we'll see the two graphs together on one page.

17            Looking particularly at the years in question in

18   this case, which chart shows more year-to-year variation?

19   **A.**  To me it seems clear that, for instance, looking at

20   Hispanic and African-American, you can see wide swings from

21   year to year, particularly in the Hispanic share, but also

22   the African-American share of admitted students, whereas the

23   shares of applicants are a little bit more stable.  So this

24   is the opposite pattern than one would expect to see if

25   Harvard was trying to stabilize the admitted students

```
 1   relative to the students who apply.

 2              So if they were really trying to stabilize the

 3   shares of admitted students, then they would take kind of a

 4   noisy share of applicants and create a smooth or constant

 5   share of admitted students.  And the pattern is actually

 6   completely contrary to that.

 7   Q.  Let's turn to Demonstrative 105, please.

 8              And let's look now at the last question you

 9   addressed in this case.

10              MR. WAXMAN:  Your Honor, it's 12:30 and we are at

11   great stopping point.

12              THE COURT:  We will recess until 1:00.  Thank you,

13   all.

14              (Recess taken 12:33 p.m.)

15

16

17

18

19

20

21

22

23

24

25
```

Case: 19-2005    Document 00117631846    Page: 137    Date Filed: 07/29/2020    Entry ID: 6356391
Case 1:14-cv-14176-ADB   Document 652   Filed 04/18/19   Page 125 of 206

125

```
 1                  **** AFTERNOON SESSION ****

 2              THE CLERK:  All rise.  Court is in session.  Please

 3      be seated.

 4              THE COURT:  Did you get lunch?

 5              MR. WAXMAN:  I did, thank you.

 6              THE COURT:  Did you get lunch, Dr. Card?

 7              THE WITNESS:  Yes, I did.

 8              THE COURT:  All right.  Excellent.  When you're

 9      ready.

10              MR. WAXMAN:  Thank you.

11      BY MR. WAXMAN:

12      Q.  Looking at demonstrative 105 and the last question you

13      were asked to address in this case, the effect that

14      eliminating race on the admissions process would have on the

15      composition of Harvard's class.

16              Before we discuss your analysis, Professor Card,

17      are you expressing any view on what characteristics Harvard

18      should value in an admitted class?

19      A.  No.

20      Q.  Did you review the report produced by the committee to

21      study race-neutral alternatives in Harvard College admission?

22      A.  Yes, I did.

23      Q.  And what was your understanding of the division of labor

24      between you and the committee?

25      A.  My understanding was that I was to try and do essentially
```

1    the calculations involved in evaluating alternative

2    race-neutral alternatives, first to find some of them, to

3    look at the ones that Mr. Kahlenberg had done, and then

4    provide the numbers that the committee could then use.

5    **Q.**   Was it your job or the committee's job to decide whether

6    classes with those characteristics would or would not satisfy

7    Harvard's educational objectives?

8    **A.**   That was entirely the committee's job.

9    **Q.**   Let's look at demonstrative 106, please.  Can you please

10   walk us through the steps of your analysis.

11   **A.**   Yes.  So there's three basic steps.  The first step is to

12   consider the composition of the class if Harvard were to

13   remove consideration of race entirely in the admissions

14   process.

15            The second step would be to evaluate how the

16   composition of the class would change if it employed various

17   race-neutral alternatives.

18            And the third step was to evaluate how the

19   composition of the class would change if it used the approach

20   preferred by Mr. Kahlenberg.

21   **Q.**   So let's start with the effect of eliminating race.

22            Did you hear Dean Fitzsimmons and others testify

23   about Harvard's existing race-neutral efforts to promote

24   diversity?

25   **A.**   I did, yes.

1    **Q.**  If Harvard were to continue with all of those efforts but

2    then eliminate all consideration of race, would the racial

3    composition of its class change?

4    **A.**  Yes, I think so.

5    **Q.**  How did you calculate that?

6    **A.**  So what I did was I -- for today's purposes, I'm going to

7    focus on the class of 2019, which is the last of the six

8    years in the data set that we've analyzed.

9    **Q.**  May I interrupt you?  Is that also the class that

10   Mr. Kahlenberg identified and focused on?

11   **A.**  Yes.

12   **Q.**  Okay.

13   **A.**  So what I did is I took my model for that class, and I

14   used the exact model that I developed earlier and we've

15   talked about extensively, and I took that model and

16   effectively turned off all of the preference or whatever

17   effects associated with race and then, using that analysis,

18   recalculated the probabilities of admission for each student

19   without any race tips or whatever.  And then considered

20   through simulation methods the characteristics of the class

21   that would result in that case.

22   **Q.**  All right.  If we could have Slide 107, please.

23         What is this showing?

24   **A.**  So this is showing two charts.  The left chart is the

25   racial composition of the actual admitted class for the class

Case: 19-2005    Document: 00117631846    Page: 149    Date Filed: 07/29/2020    Entry ID: 6356391
Case 1:14-cv-14176-ADB   Document 652   Filed 04/18/19   Page 128 of 206

128

1    of 2019.  And I'm showing the five racial categories that

2    we've been using throughout the analysis and is employed in

3    all of my statistical models and so on.  So that class was

4    40 percent white, 24 percent Asian-American, 14 Hispanic or

5    other, 14 percent African-American, and 8 percent of those

6    students had race missing.

7              And the second bar --

8    **Q.**  Thank you.

9    **A.**  -- is my estimate.  I should say this is an estimate

10   under the assumptions that the set of students who actually

11   apply to Harvard stayed the same in 2019, but the procedures

12   and admissions were changed to remove consideration of race.

13   So that class would be 48 percent white, 27 percent Asian,

14   9 percent Hispanic, 6 percent African-American, and

15   10 percent missing race.

16   **Q.**  Now, what data did you use for this analysis?  This is

17   again the class of 2019.

18   **A.**  Yes.  I'm using the NEVO database for the actual

19   characteristics of the students who applied to the class,

20   merged with the College Board data on information on the

21   characteristics of schools and neighborhoods.

22   **Q.**  Did you do a similar analysis for the class years in this

23   case other than 2019?

24   **A.**  Yes, I did.  I did an analysis for all of the other

25   years.

```
 1    Q.  And were the results similar?

 2    A.  Yes.  Broadly similar, yes.

 3    Q.  Let's turn to Slide 108 and look at the second step.  Can

 4    you remind us what the second step of your analysis was?

 5    A.  Right.  So the second step of my analysis is to try and

 6    evaluate how the composition of the class would change if

 7    Harvard employed various race-neutral alternatives.

 8    Q.  And how did you decide which alternatives to examine?

 9    A.  Well, some of them were the kind of race-neutral

10    alternatives that have been proposed or discussed in the

11    existing literature.

12          There is an existing literature in this area.  Most

13    often the existing literature is evaluating proposals that

14    have been implemented or have been considered being

15    implemented in different settings, typically not a

16    Harvard-type setting.

17          And then I also used -- looked at the kind of

18    proposals that were in Mr. Kahlenberg's report.

19    Q.  Were there proposals that you considered from the

20    literature that were not in Mr. Kahlenberg's report?

21    A.  Yes.  In fact, I do consider one of those.

22    Q.  Which is that?

23    A.  I considered the possibility of eliminating the use of

24    the SAT in evaluating students, which is -- a number of even

25    fairly elite schools are doing that or have considered doing
```

**JA3065**

1    that and a number of other schools as well.

2    **Q.**   Mr. Kahlenberg and SFFA have not proposed that; is that

3    correct?

4    **A.**   That's correct, yes.

5    **Q.**   Now, let's look at demonstrative 109, please.  And could

6    you identify the first -- can you identify the categories of

7    race-neutral alternatives that you explored?

8    **A.**   Right.  First I'm going to show what happens if in

9    addition to eliminating the effect of race in the admissions

10   process Harvard were also to eliminate policies that -- in

11   particular that Mr. Kahlenberg has alleged to benefit white

12   applicants.

13          Then I'm going to evaluate what would happen if

14   Harvard tried to change the admissions process and put more

15   weight on candidates with lower levels of socioeconomic

16   status as measured by the variables that are available in the

17   NEVO database.

18          Then I'm going to look at a couple of policies that

19   Mr. Kahlenberg points to that may -- that he argues could

20   promote diversity.

21          And then I'm going to look -- at the end, the

22   fourth thing I'm going to do is look at place-based-type

23   admissions policies.

24   **Q.**   Let's look at the first.  Can you identify the category

25   of practices that you analyzed under policies that allegedly

1    benefit white applicants?

2    **A.**  Well, the main thing I'm doing here is I'm turning off

3    any tip associated with ALDC groups.  So I'm taking --

4    eliminating ALDC.  I'm going to look at the effect of ending

5    early action, which Harvard did and then restored, and I'm

6    going to consider eliminating consideration of standardized

7    test scores.

8    **Q.**  So looking at demonstrative 112, please.  Let's start

9    with eliminating ALDC consideration.  First of all, can you

10   please turn to Tab 37 of your binder --

11   **A.**  Yes.

12   **Q.**  -- and tell me when you've found Defense Exhibit 720.

13   **A.**  720 is the simulated racial composition of the admitted

14   class after removing consideration of race, lineage, athletic

15   recruit status, whether an applicant's parents are Harvard

16   faculty and staff, or on the dean's or director's interest

17   list.

18          MR. WAXMAN:  Your Honor, we offer Defense

19   Exhibit 720.

20          MR. MORTARA:  No objection.

21          THE COURT:  Admitted.

22          (Defendant Exhibit No. 720 admitted.)

23          MR. WAXMAN:  Mr. Lee, may we have Slide 112 again?

24   BY MR. WAXMAN:

25   **Q.**  What is this showing?  First of all let me just ask you,

1    are the left-hand bar and the middle bar the same as the two

2    bars that we had previously; that is, the actual admitted

3    class and then what happens if you remove consideration of

4    race, what the model would predict would happen to the ethnic

5    and racial composition of the class if you remove

6    consideration of race?  Is that right?

7    **A.**  Yes.

8    **Q.**  And is that right for all of these slides we're going to

9    be seeing for the next few minutes?

10   **A.**  Yes.  So as a benchmark, all of the slides will always

11   have the actual admitted -- the racial composition of the

12   actual admitted class and then the racial composition if one

13   was to remove consideration of race.  And then from there,

14   I'm going to proceed.

15   **Q.**  Okay.  So what does the third column here add.

16   **A.**  That shows the racial composition if, in addition to

17   removing consideration of race, one were to turn off the tips

18   associated with ALDC.

19          And one can see a couple of important features.

20   First in terms of the race-missing group, no large effect.

21   African-American fraction would fall slightly from 6 percent

22   to 5 percent.  Hispanic and other fraction would be about

23   constant.  Asian fraction would rise by about 4 percentage

24   points and the white fraction would fall about 4 percentage

25   points.

1    **Q.**  Are you aware of the claim in this case that the children

2    of donors or potential donors may be on the dean's or

3    director's interest list?

4    **A.**  Yes.

5    **Q.**  And to be clear, when you simulated eliminating the

6    consideration of the ALDC attributes, one of the things you

7    included was eliminating consideration of the interest list.

8    Am I right?

9    **A.**  Yes.  Because that's included in the D of the ALDC group.

10   **Q.**  Do you recall that Mr. Kahlenberg also suggested that

11   Harvard eliminate what it calls the Z list or the offer of

12   deferred admission for certain applicants?

13   **A.**  Yes.

14   **Q.**  Did you simulate that?

15   **A.**  Well, actually, yes.  It's simulated here directly, in

16   the sense that I'm simulating the actual set of people who

17   were admitted in 2019, including anybody who was admitted for

18   deferred admission.  So I'm essentially assuming there's one

19   admissions decision.

20   **Q.**  Let's turn to early action.  How did you assess the

21   effect of eliminating early action?

22   **A.**  Well, as I think has been clear from some of the earlier

23   testimony, in the case of early action, there's direct and

24   empirical evidence available from the record because Harvard

25   had early action for quite a long time and then eliminated it

1    for a number of years and then restored it.  So one can use

2    comparisons of characteristics of the class when early action

3    is in place and when it's been eliminated.

4    **Q.**  And did you look at whether the racial composition of the

5    applicant and admit pools changed when early action was

6    eliminated?

7    **A.**  Excuse me for a second.  Yes, I did.

8    **Q.**  And what did you find?

9    **A.**  I found that there doesn't seem to be any discernible

10   shift in either of those.

11   **Q.**  Did anything change?

12   **A.**  Yes.

13   **Q.**  What was that?

14   **A.**  What changed very consistently -- and this was, in fact,

15   noted by an evaluation done by Harvard itself -- was that the

16   matriculation rate of certain students fell.

17   **Q.**  Would you please turn to Tab 45 of your binder.

18   **A.**  Yes.

19   **Q.**  What is Defense Exhibit 728?

20   **A.**  728 is share of applicants by race before and after

21   changes to early admission and share of admitted students by

22   race before and after changes to early admission.

23          MR. WAXMAN:  Your Honor, we offer Defense

24   Exhibit 728 in evidence.

25          MR. MORTARA:  No objection, Your Honor.

1          THE COURT:  Admitted.

2          (Defendant Exhibit No. 728 admitted.)

3    BY MR. WAXMAN:

4    **Q.**  Mr. Lee, turning to demonstrative 113, what does this

5    show?

6    **A.**  So this is a before, during, and after comparison of the

7    period when Harvard had early action available, 2000 to 2011,

8    during the period when it had abolished that and then during

9    the period when it restored it.

10          I'm focusing on the matriculation rate, which is

11   the fraction of students who were offered admission who come

12   to Harvard.  And so I'm showing it for these four groups:

13   whites, Asian-Americans, African-American, Hispanic or other,

14   and unknown.

15   **Q.**  And what do you find?

16   **A.**  One can see that there's potentially no change in, for

17   example, the Asian-American matriculation rate.  But there's

18   a pretty large and discernible drop in the fraction of

19   African-American and Hispanics or other students who

20   matriculate.  They're already the lowest of the groups.  So

21   their matriculation rate compared to the earlier period and

22   compared to the later period falls by 5 to 6 percentage

23   points, which is something like nearly a 10 percent drop in

24   the matriculation rate.

25   **Q.**  Did you review documents in this case about why Harvard

1    actually decided to reinstate early action?

2    **A.**  Yes.

3    **Q.**  And did you hear or review testimony on that issue

4    earlier in this trial?

5    **A.**  Yes, I did.

6    **Q.**  Is your analysis of the data consistent with those

7    historical documents and the testimony in this court?

8    **A.**  Yes.  I think all of us find that all of that analysis is

9    totally consistent with this analysis and suggests that

10   elimination of early action would -- if it had any effect,

11   the main effect it would be would be to reduce the fraction

12   of African-American and Hispanic students who are in the

13   Harvard class.

14   **Q.**  So did you draw any conclusion from these data about the

15   likely effect if Harvard were to eliminate early action

16   again, as Mr. Kahlenberg thinks it should?

17   **A.**  My conclusion is that that would work contrary to the

18   goal of trying to increase the representation of these

19   underrepresented groups.  So my conclusion is it works in the

20   wrong direction.

21          MR. WAXMAN:  Mr. Lee, can we have demonstrative

22   115, please.

23   **Q.**  Let's turn now to your analysis of increasing

24   socioeconomic preferences.  How did you conduct that

25   analysis?

1    **A.**  Well, this is a highly -- at least somewhat artificial

2    exercise.  It's comparable to exercises that have been done

3    in the literature.  I'm going to take information that's

4    available in the database about a number of indicators of low

5    socioeconomic status.  I'm going to, for short, call it "SES"

6    because I am going to stumble over socioeconomic.

7              So I'm going to look at a set of factors that are

8    associated with low-SES status.  And I'm going to imagine

9    simulations where I change the Harvard admissions procedure

10   and consider what would happen if in addition to what they're

11   currently doing for evaluating low-SES students, which as far

12   as I can tell already in my model that they're already giving

13   them some boost, I'm going to increase the boost that this

14   group of students gets.

15             MR. WAXMAN:  Mr. Lee, may we see Slide 116?

16   **Q.**  Can you walk us through this slide?

17   **A.**  Yes.  What I'm going to do is I'm going to consider four

18   factors.  Each of these is a simple yes/no about individuals.

19             Are you identified as disadvantaged?  In other

20   words, was that a flag in the admissions file which we've

21   been using in my admissions model?

22             Are you a first-generation college student?  So did

23   neither of your parents go to college.

24             Did you apply for a fee waiver, which is an

25   indicator of relatively low-SES status.

 1          And finally from the College Board data, are you

 2     coming from a neighborhood where family income is 65,000 or

 3     below, which is the -- in 2019 was -- for the class of 2019

 4     was the reference point.  Anybody whose family income was

 5     $65,000 or below essentially got to go to Harvard for free

 6     with no parental contribution.

 7          And I'm going to combine these four and I'm going

 8     to sum.  A student that has all four of these, I will

 9     consider them to have a 1X, one times boost.  A student who

10     has two of these will get a .5X.  The student who has just

11     one will be a quarter of an X.

12          And then what I'm going to do is I'm going to

13     gradually go from 1X to 2X to 3X and multiply up this

14     combined set of factors.

15          MR. WAXMAN:  May we have Slide 117, please.

16     **Q.**   What is this showing?

17     **A.**   This is helping to understand what does it mean to impose

18     a 1X boost.  So with my actual model but on average across

19     all domestic students, the average application rate --

20     average acceptance rate is 7 percent.

21          And for a student that had a 1X boost -- in other

22     words, all four of these components were turned on, and I was

23     in a 1X simulation -- their probability of admission would

24     rise to 36 percent.  So as we've been talking about before,

25     the average marginal effect of a 1X boost for someone who has

 1    all four categories of low-SES status would be 29 percentage

 2    points.

 3              I'm going to show some simulations that also

 4    increase that boost up to ranges of 4 and far beyond that.

 5    So at a 4X boost, in other words, four times the boost that

 6    I'm calling a standard boost.

 7    **Q.**   That is the boost that Harvard is currently giving it?

 8    **A.**   Harvard is currently giving a 0X boost.

 9              THE COURT:  I'm sorry.  Where does the 29 come

10    from?

11              THE WITNESS:  The difference between 7 and 36, Your

12    Honor.

13              THE COURT:  I see it.  Thank you.

14              THE WITNESS:  I'm speaking a little too quickly in

15    anticipation of --

16    BY MR. WAXMAN:

17    **Q.**   -- of finishing.  Sorry.  Finishing with me.  He's so

18    eagerly anticipating his dialog with you, Mr. Mortara, as are

19    we all.

20    **A.**   On the right panel, I'm showing when I increased the

21    boost for this combined set of factors to a 4 times or 4X

22    level, so again as a benchmark, the average probability of

23    admissions is 7 percent for domestic students.

24              And in my current model there's no boost.  Now,

25    that doesn't mean that disadvantaged students aren't getting

1    some benefit, but this means there's no extra boost.  So this

2    is the extra boost.

3            With 7X -- excuse me -- with 4X boost, somebody who

4    would be kind of at a 7 percent probability of admission

5    would rise to 100 percent.  At a 4X boost, these four factors

6    essentially allow to you get in with certainty.

7    **Q.**  So in other words, an applicant who had simply an average

8    probability of admission of all applicants, 7 percent, now

9    slightly less, if the applicant were given what you're

10   calling a 4X boost over the current boost that Harvard gives

11   would be admitted, period?

12   **A.**  Yes.

13   **Q.**  Just by virtue of that?

14   **A.**  Yes.

15   **Q.**  Did you analyze -- when you were analyzing the low-SES

16   boost, were you analyzing it in isolation or combined with

17   other race-neutral alternatives?

18   **A.**  No.  So I'm going to start by turning off all of the race

19   tips and then eliminating the preference for ALDC groups.

20   **Q.**  Please turn to Tab 38 of your volume, please, and tell me

21   when you've found Defense Exhibit 721.

22   **A.**  Yes.

23   **Q.**  Does this show the results of the various simulations you

24   just described?

25   **A.**  Yes, it does.

1          MR. WAXMAN:  Your Honor, we offer Defense

2    Exhibit 721 into evidence.

3          MR. MORTARA:  No objection.

4          THE COURT:  Admitted.

5          (Defendant Exhibit No. 721 admitted.)

6          MR. WAXMAN:  Mr. Lee, would you please display --

7    yes, thank you -- Slide 118.

8    BY MR. WAXMAN:

9    Q.  There's a lot of columns here.  What does Slide 118 show?

10   A.  Yes.  As before, the first two columns are ones we've

11   seen before, so actual composition of the class, just

12   removing of the effect of race.

13          And then as we go across from there, I'm

14   simultaneously removing ALDC consideration and offering a 1X,

15   2X, 3X, and so on boost for low-SES students.  I'm seeing

16   what that kind of simulated admission model, what the racial

17   composition of the class would be under that simulation, each

18   of those simulations.

19   Q.  And so what SES boost would you calculate would be

20   required after eliminating consideration of race, removing

21   any ALDC consideration in order to have a class with a

22   combined level of African-American and Hispanic

23   representation comparable to the class of 2019?

24   A.  Yes.  So the class of 2019 is about 28 percent combined

25   African-American, Hispanic, or other.  And so looking across

1    the columns, one can see if I get to something like a 4X

2    boost, it's about 27 percent, the combined fraction.

3               So I'll use that as an illustrative benchmark in

4    the next slide.

5    **Q.**   And if I recall your testimony, that is the boost that

6    essentially automatically puts in any applicant among the

7    entire applicant pool with an average probability of

8    admission?

9    **A.**   Yes.

10   **Q.**   And what boost would be required, according to your

11   model, what your model predicts, to simulate a class that

12   would have a share of the admitted class represent the share

13   of the African-American share of the 2019 class?

14   **A.**   Yes.  So the 2019 class is about 14 percent

15   African-American.  And according to these simulations, one

16   would have to go out to something like a 10X boost to get

17   that share.

18   **Q.**   Now, under these simulations, would other characteristics

19   of the class change if you applied a large low-SES boost?

20   **A.**   Yes.

21              MR. WAXMAN:  Please turn, Mr. Lee, to Slide 118.

22   I'm sorry, 119.  Yes.

23   **Q.**   What does Defense Demonstrative 10.119 show?

24   **A.**   So this is summarizing characteristics of the class in

25   terms of these four key profile ratings.

1          If compared to the current class, so the actual

2     classes fractions of the four types of strengths is shown in

3     blue.  So for instance, 75 percent or so of the actual

4     admitted class had an academic 1 or 2.  And this would show

5     what would happen to those fractions of 1 or 2 rating on

6     academic, extracurricular, personal, and athletic under that

7     simulated admissions system with a 4X boost for low-SES

8     students.

9     **Q.**   So if I'm understanding this correct with respect to, for

10    example, the academic rating, the predicted class with a 4X

11    boost, that is the boost that you estimated would be required

12    in order to achieve a share of the admitted class comprising

13    African-Americans, Hispanics, and other that are represented

14    in the class of 2019, would produce -- is predicted to

15    produce a class with 13 percent fewer academic 1s and 2s,

16    correct?

17    **A.**   Yes.  9 percent fewer extracurricular 1 or 2s, 11 percent

18    fewer with the personal rating at 1 or 2, and 33 percent

19    lower with the athletic rating 1 or 2.

20    **Q.**   Do you know what would happen with a 10X boost?

21    **A.**   It would be in the same direction but bigger drops in

22    these components.

23    **Q.**   Let's turn to the alternative of eliminating

24    consideration of standardized test scores.  That is a

25    simulation, if I understand your testimony, that

 1    Mr. Kahlenberg didn't propose but has been proposed and done

 2    in some institutions, correct?

 3    **A.**   Yes.  My understanding is a number of schools have

 4    already done it and are talking about it, yes.

 5    **Q.**   And did you simulate eliminating test score --

 6    standardized test score consideration?

 7    **A.**   Yes, I did.

 8    **Q.**   And did you do so on its own or combined with alternative

 9    practices?

10    **A.**   So I did it building on the previous simulations.  So I

11    did all of the things I'd done in the previous simulations

12    and now in addition remove any consideration of SAT.

13    **Q.**   Would you please turn to Tab 39.

14    **A.**   Yes.

15    **Q.**   Does this show the results of the simulations you just

16    described?

17    **A.**   Yes.

18               MR. WAXMAN:  You were, we offer Defense

19    Exhibit 722.

20               MR. MORTARA:  No objection.

21               THE COURT:  You've broken Mr. Mortara's spirit.

22               MR. MORTARA:  For the record, Your Honor, I think

23    you'll see he hasn't.

24               MR. WAXMAN:  It's not even a goal of mine.  May it

25    be admitted, Your Honor?

1          THE COURT:  Yes, it may.

2          (Defendant Exhibit No. 722 admitted.)

3     BY MR. WAXMAN:

4     Q.  Please turn to demonstrative 120 and tell us what this

5     shows.

6     A.  So this is a set of simulations very similar to the

7     previous one.  So the first is the actual class, the second

8     is just removing the consideration of race, and then from

9     then on I'm eliminating any ALDC preferences.  I'm

10    eliminating the use of standardized test components in the

11    admissions model, and I'm imposing a 1X to 10X low-SES boost

12    as before.

13    Q.  What level of boost would be required in order to

14    simulate a class that had a share -- an admitted class that

15    had a share of African-American, Hispanic, or other students

16    comparable to the actual admitted class of 2019?

17    A.  Again, the admitted class was about 28 percent, those

18    combined groups.  And so looking across the columns here, one

19    would need to go to something like a 3X boost to get to

20    around that level.

21    Q.  And what boost does the model predict would be required

22    in order to produce an African-American share of the admitted

23    class similar to the class of 2019?

24    A.  That would be like a 5 or 6 X SES boost.

25    Q.  And would other characteristics of the class change if

1  you did that?

2  **A.**  Yes.  As before.

3  **Q.**  Let's look at Slide 120, please.  And what is this

4  showing?

5  **A.**  This shows that relative to the actual class in terms of

6  their fractions with an academic 1, 2, or extracurricular 1,

7  2, and so on, the simulated class, if I was to do this

8  combination of policies, the fraction with an academic rating

9  of 1 or 2 would fall by 17 percent; extracurricular rating

10  would fall by 7 percent; personal rating would fall by

11  7 percent; athletic rating by 27 percent.

12        MR. WAXMAN:  Mr. Lee, please put up 122.

13  **Q.**  Now, let's turn back to category C.  You said earlier

14  that you also assessed policies that Mr. Kahlenberg has

15  suggested might promote diversity.  Correct?

16  **A.**  Yes.

17  **Q.**  What policies did you assess?

18  **A.**  They're the three shown below there.

19        I looked at the possible, potential impact of

20  increasing the number of transfer students who are admitted

21  to Harvard, of trying to increase recruiting of disadvantaged

22  students, and increasing financial aid.

23  **Q.**  Let's turn to -- well, how did you assess the effect of

24  increasing transfer admissions?

25  **A.**  So here we've got some empirical evidence because we have

**JA3082**

1    a number of students who applied over the sample period who

2    were actually applying from other colleges and universities.

3    And so I take a look at their characteristics relative to the

4    existing class.

5    **Q.**   In order to show what?

6    **A.**   In order to show first how they compare in terms of race

7    and ethnicity differences; and second, how they compare in

8    terms of characteristics like academic 1, 2, and so on.

9    **Q.**   Please turn to Tab 47 in your binder.

10   **A.**   Yes.

11   **Q.**   What does Defense Exhibit 730 show?

12   **A.**   It shows academic and demographic characteristics of

13   transfer applicants and other applicants.

14           MR. WAXMAN:  Your Honor, we offer Defense

15   Exhibit 730.

16           MR. MORTARA:  No objection.

17           THE COURT:  Admitted.

18           (Defendant Exhibit No. 730 admitted.)

19           MR. WAXMAN:  Mr. Lee, please display demonstrative

20   124.

21   BY MR. WAXMAN:

22   **Q.**   Professor Card, what is this showing?

23   **A.**   This is a side-by-side comparison of the racial

24   composition of students who in the sample had applied as

25   transfer applicants, in yellow, and the actual composition of

**JA3083**

 1    other students who are non-transfers.  So they would be -- I

 2    guess you would call them first-time freshmen, prospective

 3    first-time freshmen.

 4              When looking across these categories, one can see

 5    in terms of the white share it's about the same.  In terms of

 6    other groups, African-American and Hispanic or others, it's

 7    about the same.  The one difference is more of the transfers

 8    have race missing and fewer are Asian-American.

 9    Q.  When you say fewer are Asian-American, in other words,

10    fewer applicants in the transfer pool are Asian-Americans

11    than applicants in the regular pool?

12    A.  Correct, yes.

13    Q.  Turning to demonstrative 125, what is this showing?

14    A.  So this is a side-by-side comparison of the fractions of

15    transfer and non-transfer applicants with academic rating of

16    1 or 2, personal rating 1 or 2, extracurricular rating 1 or

17    2, athletic rating 1 or 2.

18    Q.  And what do you conclude from those data?

19    A.  That shows that the transfer students are relatively

20    weaker on all four of these dimensions.  So they would be

21    substantially less strong than the existing class in terms of

22    those dimensions if more of them were admitted, yes.

23    Q.  Now let's turn to recruiting.

24    A.  Could I just say one thing?

25    Q.  Of course.

 1    **A.**   Because on the one hand these students are weaker, on the

 2    other hand they have about the same fraction of

 3    African-American and Hispanic students.  Increasing the

 4    number of transfers would have very little effect on the

 5    racial diversity of the campus in terms of the

 6    underrepresented racial groups, but it would lower the

 7    quality of the student pool.

 8              So again, I think that would be kind of in the

 9    wrong direction for the kind of thing that Mr. Kahlenberg

10    would like to promote.

11    **Q.**  Thank you.

12              THE COURT:  This assumes that the caliber of your

13    transfer applicants will be the same as the caliber of the

14    applicants in your regular pool, right?

15              THE WITNESS:  Thanks for clarifying, Your Honor.

16              It assumes that the caliber of the transfer

17    applicants will be the same as they have been in the past.

18    There have been transfer applicants in the past, and so this

19    is their average characteristics.  This is not a simulation.

20    This is historical data.

21              THE COURT:  Okay.  Thanks.

22    BY MR. WAXMAN:

23    **Q.**  Just to be clear, on demonstrative 125, if you look at

24    the academic ratings of non-transfer applicants, am I

25    understanding that 39.4 percent of non-transfer applicants

 1    have an academic rating of 1 or 2?  Correct?

 2    **A.**  Yes.  We've talked a lot about that, that there's a large

 3    abundance of highly qualified students in the overall

 4    application pool.

 5    **Q.**  And if you look at the profile, the academic profile

 6    rating of non-transfer applicants, only 18.2 percent have an

 7    academic rating of 1 or 2?

 8    **A.**  Yes.  You have slightly misspoke.  This is the transfer

 9    applicants.

10    **Q.**  I'm sorry.

11    **A.**  They are half as likely to be an academic 1 or 2, yes.

12    **Q.**  Now let's turn to recruiting.

13              First, did you develop an understanding of

14    Harvard's current recruiting efforts?

15    **A.**  I developed some understanding of it, yes.

16    **Q.**  And how did you do that?

17    **A.**  Well, some of it is actually well known.  They're

18    constantly stealing good students from California.

19              But some of it is known from other information that

20    was provided in terms of evidence of what they actually do.

21    And then there's testimony of the dean and director of

22    admissions.

23    **Q.**  Did Mr. Kahlenberg adopt a particular approach to

24    simulating the effects of increased recruitment?

25    **A.**  Yes, he did.

Case: 19-2005    Document 00117631846    Page: 163    Date Filed: 07/29/2020    Entry ID: 6356391
Case 1:14-cv-14176-ADB    Document 652    Filed 04/18/19    Page 151 of 206

151

1    **Q.**  What did he do?

2    **A.**  So what he did was he assumed that by some form of

3    outreach, without specifying specifically what that was, but

4    by some form of expanded effort and outreach, Harvard could

5    double the number of students in its application pool who

6    would be disadvantaged while maintaining exactly the same

7    characteristics of those disadvantaged students.

8            And so the way that's done in the simulation is I

9    take every single person in the existing application pool for

10   the class of 2019 who is disadvantaged, and I clone them or I

11   create a double of them.

12           And then I imagine the admission pool has now this

13   extra boost of people who are all disadvantaged that look

14   exactly like the other disadvantaged people that were already

15   there.

16   **Q.**  Do you think it's reasonable to think that Harvard could

17   double the number of disadvantaged students without loss of

18   applicant quality?

19   **A.**  I think that's an extreme bound.  I think that would be

20   like the most optimistic bound that one could have.  Normally

21   I think most economists and others would think if you reached

22   further, especially given in light of -- for example, all the

23   mailing and contact that Harvard does with highly qualified

24   students, you would reach down the pool and their

25   characteristics would decline.  But this provides kind of an

1    upper bound on the effect.

2    **Q.**  And I think, if I understand your testimony, that you did

3    nonetheless simulate Mr. Kahlenberg's proposal that by some

4    mechanism Harvard could double the number of equally

5    qualified disadvantaged students?

6    **A.**  Yes.

7    **Q.**  And did you do that alone or in combination with other

8    race-neutral alternatives?

9    **A.**  So again I basically built on the previous simulation.

10   So I took all of the things that were in the previous

11   simulation.  So turning off ALDCs, eliminating consideration

12   of race, not using standardized test scores, and now on top

13   of that I'm going to add in this extra group of disadvantaged

14   students.

15   **Q.**  Please turn to Tab 40 in your book and tell me when

16   you've found Defense Exhibit 723.

17   **A.**  Yes.

18   **Q.**  I'm not going to ask you to read the title.  Does this

19   show the results of the various simulations that you just

20   described?

21   **A.**  Yes.

22   **Q.**  We offer 723, Your Honor.

23          MR. MORTARA:  No objection, Your Honor.

24          THE COURT:  Admitted.

25          (Defendant Exhibit No. 723 admitted.)

Case: 19-2005     Document 00117631846     Page: 165     Date Filed: 07/29/2020     Entry ID: 6356391
Case 1:14-cv-14176-ADB   Document 652   Filed 04/18/19   Page 153 of 206

153

1        MR. WAXMAN:  Mr. Lee, may we have demonstrative

2    126.

3    BY MR. WAXMAN:

4    **Q.**  What is this showing?

5    **A.**  So again, exactly as all the previous charts of this

6    type, we begin with the actual admitted class's racial

7    composition.  We then show what would happen if there was

8    elimination of consideration of race.  And then from then on,

9    I show what would happen if they, in addition to eliminating

10   ALDC, eliminated the use of tips, eliminated the use of

11   standardized testing, doubled the number of disadvantaged

12   students effectively by cloning each one that's in the

13   existing data set, and imposing various low-SES boosts.

14   **Q.**  And what does this show about the level of boosts that

15   would be required to get a combined level of African-American

16   and Hispanic other representation comparable to the class of

17   2019?

18   **A.**  Well, again, in the overall, in the class of 2019, about

19   28 percent were Hispanic or African-American.  So looking

20   across the columns, one would get to something like a 2X

21   boost to get back the 28 percent as a benchmark.

22   **Q.**  And what boost would be required to get to a comparable

23   level of African-American representation?

24   **A.**  Looking across the columns to get to 14 percent, one

25   would have to get to something around the range of a 5X

1   boost.

2   **Q.**  And would that change other characteristics of the class?

3   **A.**  Yes.

4        MR. WAXMAN:  Please turn, Mr. Lee, to Defense

5   Demonstrative 127.

6   **Q.**  And what is this showing?

7   **A.**  Well, this is showing that with that combined set of

8   features in the simulation -- so eliminating ALDC,

9   eliminating standardized test scores, doubling the

10  disadvantaged applicants, and applying a 2X low-SES boost --

11  the fraction of students with an academic rating of 1 or 2

12  would fall about 17 percent relative to the existing class.

13  The fraction with an extracurricular rating of 1 or 2 would

14  fall just a little bit, about 1 percent.  The fraction with a

15  personal rating of 1 or 2 would rise a little bit, by about

16  3 percent.  The fraction with an athletic rating of 1 or 2

17  would fall by 27 percent.

18  **Q.**  Do you know what would happen if you did the same -- if

19  you showed the same slide for the 5X boost that would be

20  required to replicate the African-American share of the 2019

21  class?

22  **A.**  Yes.  The most important thing that could happen is the

23  fraction with the academic rating with 1 or 2 would fall

24  further.

25  **Q.**  Let's move to the effect of increasing financial aid.

Case: 19-2005    Document: 00117631846    Page: 167    Date Filed: 07/29/2020    Entry ID: 6356391
Case 1:14-cv-14176-ADB    Document 652    Filed 04/18/19    Page 155 of 206

155

1    How did you assess that effect?

2    **A.**  Well, in a way similar to what I was able to do

3    considering the effect of early action.  Because Harvard has

4    changed its financial aid program in the past, I was able to

5    analyze how those previous changes in the past had

6    empirically affected characteristics of the students and use

7    that to try and consider what additional effort would do.

8    **Q.**  What past expansions in financial aid are you referring

9    to?

10        MR. WAXMAN:  And perhaps, Mr. Lee, we could have

11    Slide 128 to help Professor Card.

12    **A.**  Yes.  The first major change in this is an effort that

13    was started for the class of 2008.  At that point, Harvard --

14    I believe this was a very, very important thing in American

15    higher education -- introduced the HFAI program.

16        So students with family income less than $40,000

17    didn't pay anything at Harvard.  And for students with up to

18    $60,000 in family income would pay, at most, 10 percent of

19    their family income.

20    **Q.**  And what is the next change that you looked at?

21    **A.**  For the class of 2010, the $40,000 was raised to $60,000,

22    and the $60,000 was raised to $80,000.  So this was

23    increasing the range of students who would receive these

24    benefits.

25    **Q.**  What's the third change?

1    **A.**   The third change is another major change in the program.

2    They introduce what they call the affordability initiative.

3            They didn't change the zero family contribution

4    limit.  That stayed constant at $60,000, but they expanded

5    substantially the range of family incomes who were eligible

6    for very low parental contribution.

7            So now into the new program if families had income

8    under 180,000, so between 60 and 180,000, they would pay no

9    more than 10 percent of their average income or their income

10   as tuition.

11   **Q.**   What is the last change that you examined?

12   **A.**   Excuse me.  And I meant to mention they also eliminated

13   loans for those groups, which is an important consideration

14   these days.

15   **Q.**   It was an important consideration in my day, but it

16   didn't exist.  Sorry.

17           What is the last change?

18   **A.**   Finally, there was another change for the class of 2016.

19           They raised the lower limit and somewhat lowered

20   the 10 percent or lower family contribution limit.  So the

21   zero 0 PC limit went from 60 to 65 importantly.

22   **Q.**   Now let's turn to -- did you look at the effects of those

23   changes on the applicant pool?

24   **A.**   Yes.  What I tried to do was look at historical data on

25   the racial composition of the applicant pool, along the lines

1    of data we've looked at before, and how that may or may not

2    have changed as these various initiatives were introduced.

3    **Q.**  Can you turn to Tab 44 in your binder, please.

4    **A.**  Yes.

5    **Q.**  Do you find Defense Exhibit 727?

6    **A.**  I do, yes.

7    **Q.**  And what is this?

8    **A.**  It's a series of charts with information on shares of

9    race before and after various financial policies and shares

10   of admitted students and so on.

11          MR. WAXMAN:  Your Honor, we offer Defense

12   Exhibit 727.

13          MR. MORTARA:  No objection.

14          THE COURT:  Admitted.

15          (Defendant Exhibit No. 727 admitted.)

16          MR. WAXMAN:  Mr. Lee, would you please display

17   slide 132.

18   BY MR. WAXMAN:

19   **Q.**  Professor Card, what is this showing?

20   **A.**  This is showing the timeline up to 2012.  So this is

21   incorporating the first of the three changes in the financial

22   aid program that were introduced by Harvard.

23   **Q.**  The first or the first two?

24   **A.**  Sorry.  It's only showing the first two.  Sorry.  Thank

25   you.

**JA3093**

1   **Q.**   Yeah.

2   **A.**   And I'm showing how those changes to the 2008 and then

3   the 2010 changes are related to the fraction of students in

4   the applicant pool who are Asian-American, which is

5   unfortunately mislabeled on this graph.  Asian-Americans is

6   the red one at the top.

7   **Q.**   Okay.  We'll substitute the right one.

8   **A.**   The green one is the share of African-American,

9   Hispanic -- no, that's not right.  My mistake.  I'm getting

10   confused.

11       So the green one is the share of Asian-American,

12   Hispanic or other, the blue one is the share of

13   Asian-Americans, and the red one is the share of whites.

14       Sorry.  My apologies.

15   **Q.**   What is this showing?

16   **A.**   This is showing first when Harvard introduced its first

17   HFAI program with the zero for parental contribution limit,

18   we can see just prior to that the fraction of, for example,

19   African-American and Hispanic students was around

20   19-20 percent.  And thereafter it starts to rise.  And when

21   they additionally raise the zero parental contribution limit

22   from 40,000 to 60,000, it looks like that rise continued for

23   the fraction of African-American or Hispanic students.

24       So it looks like there was a notable increase in

25   the share of those two groups applying to Harvard, from

1    around a base of 19 or 20 percent to something like

2    27 percent as a result of these two changes in the policy.

3            For Asian-Americans, it doesn't look like there was

4    that kind of an effect.

5    **Q.**  Can we turn to the next slide, which is defense 133.

6            What are we now seeing?

7    **A.**  So now we're seeing -- now we're looking at the

8    affordability initiative, which was in some sense a middle

9    class or upper middle class program, looking at the effect of

10   that and looking at the effect of the most recent adjustment

11   to the HFAI parameters to raise the zero parental

12   contribution limit to $65,000.

13           One can see just before that a set of changes, the

14   fraction of the applicant pool that was African-American or

15   Hispanic was around 27 percent, and that more or less stays

16   constant through these two subsequent changes.

17           So my conclusion from that is that the first two

18   initiatives had some effect; in fact, a notable effect on the

19   fraction of African-American and Hispanic students in the

20   application pool.  But subsequent adjustments, including the

21   affordability initiative, did not have that kind of effect at

22   all.

23   **Q.**  Do you draw any conclusion from those data about how

24   further expansions of financial aid would be likely to affect

25   the diversity of the applicant pool?

1    **A.**   Yes.  My conclusion would be, for example, if one was to

2    further raise the zero parental contribution limit another

3    $5,000 or so that it probably would have the kind of effect

4    it had in 2016.  In other words, no effect on the fraction of

5    underrepresented minorities who apply.

6    **Q.**   So currently no parental contribution is required for

7    applicants with families $65,000 or below, correct?

8    **A.**   Yes.

9    **Q.**   Would raising that threshold to $75,000 be likely to

10   increase the number of African-American and Hispanic

11   applicants?

12   **A.**   No.  As I said, no for two reasons, in my view, or

13   unlikely at least.

14          And one is that the previous increase of that zero

15   parental contribution from 60 to 65 didn't seem to do much.

16   And also I went and looked at the family income distribution

17   data using information from the American Community Survey,

18   which is a U.S. government survey that's used to estimate

19   these things.  And there's a relatively modest fraction of

20   underrepresented minority families in the range between 65

21   and 75,000.  So the set of people who could be affected by

22   that change is quite small.

23   **Q.**   Did you also look at how past expansions of financial aid

24   have affected matriculation rates?

25   **A.**   I did, yes.

**JA3096**

1    **Q.**  And what did you find?

2    **A.**  I did not find any systematic pattern there.

3    **Q.**  Let's turn now to Slide 134 and ask about the final

4    race-neutral alternative, the final category of race-neutral

5    alternatives employing place-based admissions.

6          First of all, what is a place-based policy?

7    **A.**  So a place-based admissions policy is a policy that

8    offers preferences to students in the admissions process

9    based on where they live or where their school is.  And such

10   policies have been adopted by a couple of states.  California

11   and Texas both have such programs, or California has had such

12   a program.

13         And so that's an example of how they work.

14   **Q.**  And which place-based policies did you assess?

15   **A.**  I looked at policies that could be directed at a

16   student's high school, individual high school, at the ZIP

17   Code that they live in, and then finally I looked at based on

18   which particular of the College Board neighborhood clusters

19   that their school was situated in.

20   **Q.**  And was each of those three place-based policies a

21   suggestion of Mr. Kahlenberg?

22   **A.**  Yes.

23   **Q.**  Did you hear Mr. Kahlenberg acknowledge that admitting

24   the top student from each ZIP Code or the top student from

25   each high school would not be feasible at Harvard?

Case: 19-2005    Document: 00117638846    Page: 174    Date Filed: 07/29/2020    Entry ID: 6356391
Case 1:14-cv-14176-ADB    Document 652    Filed 04/18/19    Page 162 of 206

162

1    **A.**   Yes.

2    **Q.**   Please turn to Tab 41 in your book.

3              What does Defense Exhibit 724 show?

4    **A.**   It shows the number of high schools and the number of ZIP

5    codes relative to the number of actual admitted students at

6    Harvard.

7              MR. WAXMAN:  We offer 724 into evidence.

8              MR. MORTARA:  No objection.

9              THE COURT:  Admitted.

10             (Defendant Exhibit No. 724 admitted.)

11             MR. WAXMAN:  Mr. Lee, may we have Slide 135.

12   BY MR. WAXMAN:

13   **Q.**   What does this show, Professor Card?

14   **A.**   This shows -- by way of benchmark, the yellow line at the

15   bottom is the total number of admitted domestic students for

16   the class of 2019.

17   **Q.**   And that's 1,719?

18   **A.**   Yes.  And then by comparison, there's around 4,100 or so

19   public and private high schools in the United Sates.

20   **Q.**   I think you meant to say 41,000?

21   **A.**   41,000.  Excuse me.

22             And there's around 3,300 ZIP Codes in the United

23   States.

24   **Q.**   Again, 33,000?

25   **A.**   33,000 ZIP Codes in the United States.

**JA3098**

1          And even if one looks inside the Harvard database

2    at high schools that had at least one student apply at some

3    time over the six years in my sample, there's about 7,561 of

4    those high schools.  All three of those numbers swamp the

5    number of available slots at Harvard.

6    **Q.**  So obviously it's infeasible for a college that is

7    admitting 1,700 students a year to take the "top" student

8    either from all high schools or even the high schools that

9    currently send one or more applicants to Harvard.

10         But can you imagine a policy in which Harvard would

11   say, well, we will look at how many top students we get, one

12   from each high school, and just have some sort of lottery

13   that would pick 1,719 of them?  Do you have that hypothetical

14   in mind?  Mr. Kahlenberg hasn't suggested it, but I'd like

15   you to consider it.

16   **A.**  Yes.  I have considered that, yes.

17   **Q.**  And thinking of that, did you try to identify the

18   characteristics of the top student from each of the schools

19   that applied to the class of 2019?

20   **A.**  I did, yes.

21   **Q.**  And how did you do that?

22   **A.**  I used some of their profile ratings.

23   **Q.**  Please turn to Tab 42 of Volume 2.

24         What does Defense Exhibit 725 show?

25   **A.**  So this shows the racial composition of top students from

1    each high school and then characteristics of academic and

2    other characteristics of that group.

3    **Q.**  Thank you.

4            MR. WAXMAN:  We offer Defense Exhibit 725.

5            MR. MORTARA:  No objection.

6            THE COURT:  Admitted.

7            (Defendant Exhibit No. 725 admitted.)

8    BY MR. WAXMAN:

9    **Q.**  Did you look at what would happen to the characteristics

10   of the admitted class if you admitted from among the top

11   student in each high school?

12   **A.**  Yes.

13   **Q.**  Can we have Slide 136, please.

14           And what does this show?

15   **A.**  So this is a comparison.  Taking this kind of

16   probabilistic or lottery-based admissions system, so we

17   somehow got the top student ranked from each high school

18   based on some of their profile ratings and then

19   probabilistically admitted that group.

20           It would show what would happen to the fraction of

21   the admitted class that had academic 1 or 2, extracurricular

22   1 or 2, personal 1 or 2, and athletic 1 or 2 ratings.

23   **Q.**  What does it show?

24   **A.**  It shows on all four dimensions there would be a notable

25   decline in the fractions with these higher profile ratings.

Case: 19-2005    Document: 00117631846    Page: 177    Date Filed: 07/29/2020    Entry ID: 6356391
Case 1:14-cv-14176-ADB   Document 652   Filed 04/18/19   Page 165 of 206

165

1    **Q.** And if Harvard were taking the top student from a

2    representative sample of high schools, why would that occur?

3    Why would you see such a pronounced decline in the quality of

4    applicants on all four profile measures?

5    **A.** Yes.  It's a very unfortunate feature of our American

6    education system that many, many high schools have relatively

7    disadvantaged and not very highly performing students.

8          And so this is just a set of high schools that

9    actually had an applicant that came to Harvard, an applicant

10   who applied to Harvard.  And even in that group of schools,

11   the top student from those schools is typically not really

12   competitive at Harvard in many cases.

13   **Q.** So under this policy, do you understand that Harvard

14   would be precluded from accepting the second-top or third-top

15   or fourth-top high school students from any school regardless

16   how well the school was preparing students for college or

17   regardless how qualified the applicants from that school

18   would be?

19   **A.** If Harvard were to -- yes.  If Harvard were to base their

20   admissions decision entirely on this type of method, then

21   that would preclude that, yes.

22   **Q.** And you said you also assessed a policy also suggested by

23   Mr. Kahlenberg under which Harvard would admit students in

24   equal shares from the neighborhood clusters maintained by the

25   College Board; is that correct?

1   **A.**   Yes.

2   **Q.**   What are these clusters?

3   **A.**   So clusters -- what the College Board does is it actually

4   does an analysis of data of students who are applying for

5   college and other characteristics of students based on other

6   data.  And it classifies those neighborhoods along various

7   dimensions, including income and race most importantly.

8          And so a cluster would be defined by some degree of

9   similarity in the income and race of students from that

10  cluster, and it would include neighborhoods from all around

11  the country that were sort of similar on those key clustering

12  dimensions.

13  **Q.**   And did you simulate what the model would predict the

14  admitted class would be if Harvard had a plan to accept from

15  each of the 33 neighborhood clusters the same number of

16  students, which I think would be something like 53 or 54

17  students from each cluster?

18  **A.**   Yes.

19  **Q.**   Did you do that in isolation or in combination with the

20  other practices we've discussed?

21  **A.**   No.  What I did was I did it in combination with all the

22  other practices, kind of consistent with what I've been doing

23  so far.

24  **Q.**   Please turn to Tab 43 of your binder.

25  **A.**   Yes.

1   **Q.**  Does this show the results of the simulations that you

2   just described?

3   **A.**  Yes.

4           MR. WAXMAN:  Your Honor, we offer Defense

5   Exhibit 726.

6           MR. MORTARA:  No objection.

7           THE COURT:  Admitted.

8           (Defendant Exhibit No. 726 admitted.)

9           MR. WAXMAN:  Mr. Lee, please put up Slide 137.

10  BY MR. WAXMAN:

11  **Q.**  What does this show, Professor Card?

12  **A.**  So this is again -- and I believe this is the last of the

13  slides that I'll be showing -- what the actual racial

14  composition of the class of 2019 as a benchmark, the class

15  removing any consideration of race, and then the simulated or

16  predicted composition at various levels of the low-SES boost

17  after eliminating standardized test scores, eliminating

18  consideration of ALDCs, doubling the number of disadvantaged

19  applicants basically from each cluster, then changing the

20  low-SES preference and admitting something like 51 or 52

21  students per cluster.

22  **Q.**  And what does this show?  What kind of a boost above the

23  boost that Harvard already gives if it implemented this

24  mother of all race-neutral alternatives would be required in

25  order to replicate the African-American, Hispanic, and other

**JA3103**

Case: 19-2005     Document 00147631846     Page: 169     Date Filed: 07/29/2020     Entry ID: 6356391
Case 1:14-cv-14176-ADB   Document 652   Filed 04/18/19   Page 168 of 206

168

```
 1   share of the admitted class?
 2   A.   So in this case, one can see that a 1X boost gets to --
 3   fairly close to the existing class.
 4   Q.   And if you pursued that set of practices, would the
 5   composition of the admitted class change in other ways?
 6   A.   Yes.
 7   Q.   May we have the next demonstrative, 138, please.
 8        What is this showing?
 9   A.   So this shows if Harvard were to somehow adopt this
10   admissions procedure, my simulation suggests that the
11   fraction of students who would have an academic 1 or 2 would
12   fall about 17 percent.  The fraction with extracurricular
13   rating of 1 or 2 would fall about 3 percent.  The fraction
14   with the personal rating 1 or 2 would rise by about
15   3 percent.  The fraction of students with an athletic rating
16   1 or 2 would fall about 25 percent.
17             MR. WAXMAN:  Mr. Lee, can we please have
18   demonstrative 139.
19   BY MR. WAXMAN:
20   Q.   What is the third analysis that you conducted?
21   A.   So the third analysis is I did a very similar analysis
22   but looking at the approach that Mr. Kahlenberg says is his
23   preferred approach.
24   Q.   And can you turn in your exhibit binder to Tab 46,
25   please.
```

1    **A.**   Yes.

2    **Q.**   What is Defense Exhibit 729 showing?

3    **A.**   It's a series of tables showing an analysis of

4    Mr. Kahlenberg's Simulations 1 through 7.

5            MR. WAXMAN:  Your Honor, we offer Defense

6    Exhibit 729.

7            MR. MORTARA:  No objection.

8            THE COURT:  Admitted.

9            (Defendant Exhibit No. 729 admitted.)

10           MR. WAXMAN:  Mr. Lee, can we have Slide 140,

11   please.

12   BY MR. WAXMAN:

13   **Q.**   What's displayed here?

14   **A.**   This is a summary of the racial composition arising in

15   the class, first as usual, the first two bars, the actual

16   admitted class and with removing consideration of race.  And

17   then under Mr. Kahlenberg's Simulation 6.

18   **Q.**   And why did you choose Simulation 6?

19   **A.**   Well, my understanding is that that is one of his

20   preferred simulations.

21   **Q.**   And what do we see?

22   **A.**   We can see that under that simulation the fraction of

23   African-American students is about 10 percent.  The fraction

24   of Hispanic and other students is around 20 percent.

25   **Q.**   And did you also look at how preferred Simulation 6 would

 1   be expected to change the class in other ways?

 2   **A.**   I did, yes.

 3         MR. WAXMAN:   Can we have slide 141, Mr. Lee.

 4   **Q.**   And what is this showing?

 5   **A.**   This is showing under that simulation the fraction of

 6   students with an academic 1 or 2 would fall about 19 percent,

 7   the fraction with an extracurricular rating would fall about

 8   13 percent, the fraction with a personal 1 or 2 rating would

 9   fall about 13 percent, and the fraction with an athletic

10   rating 1 or 2 would fall by about 26 percent.

11   **Q.**   So would Simulation 6, Mr. Kahlenberg's preferred

12   simulation, achieve either comparable diversity or comparable

13   quality of the admitted class?

14   **A.**   Well, it certainly does not achieve comparable quality to

15   the admitted class.

16         It achieves a level of combined African-American

17   and Hispanic diversity that's comparable to the existing

18   class.  It does not achieve the same level in terms of the

19   fraction of African-American students.

20   **Q.**   So based on the analyses that we've discussed today, how

21   would eliminating the consideration of race in admissions

22   affect Harvard's class?

23   **A.**   So in my opinion, all of the simulations show the same

24   thing, which is one can achieve some level of racial

25   diversity comparable to the existing class by imposing or

1    using these various race-neutral alternatives.  But

2    inevitably that involves some decline in particular in the

3    academic quality of the class and in many cases in other

4    dimensions as well.

5    **Q.**  And is that conclusion consistent with all of the

6    literature that you've reviewed on this issue?

7    **A.**  Yes.  My understanding of the existing literature is that

8    for elite colleges, colleges that are focusing on highly

9    qualified students, that's been the empirical conclusion in

10   the past.  And there's also theoretical literature which

11   suggests this would also be true.

12           MR. WAXMAN:  Mr. Lee, can we please have

13   demonstrative 10.2.

14   **Q.**  I'll end where we began and ask again, are these the

15   questions that you addressed in this case?

16   **A.**  Yes.

17   **Q.**  And at a high level, will you summarize your opinions on

18   these questions for the Court?

19   **A.**  Yes.  First, I was asked if statistical evidence supports

20   the plaintiff's claim that Harvard discriminated against

21   Asian-American applicants.  And my opinion is that the

22   evidence does not support that claim.

23           Second, I was asked to what extent does race affect

24   admissions decisions at Harvard.  In my view, the evidence

25   shows that race does have an effect on admissions decisions

Case: 19-2005    Document: 00117631846    Page: 484    Date Filed: 07/29/2020    Entry ID: 6356391
Case 1:14-cv-14176-ADB    Document 652    Filed 04/18/19    Page 172 of 206

172

1    at Harvard.  For students who are highly qualified on other

2    dimensions, race can be one of the many factors that are

3    associated with a higher probability of admission, comparable

4    in size to other favorable tips that Harvard awards in the

5    admissions process.

6           For the third question, is there statistical

7    evidence that Harvard has engaged in racial balancing, my

8    opinion is that there's no statistical evidence of that.

9           And finally, for the fourth question, how would the

10   admitted class change if Harvard eliminated consideration of

11   race and pursued race-neutral alternatives.  My opinion is

12   that if Harvard were to do so, it would potentially be

13   possible to achieve some level of diversity comparable to the

14   level of diversity in the current class, but that would

15   necessarily entail a trade-off and a reduction in several

16   dimensions, several important dimensions in the quality of

17   the class.

18   **Q.**  And can we have demonstrative 10.30.

19          Would you tell Her Honor why you don't think

20   Harvard admissions process discriminates against

21   Asian-American applicants?

22   **A.**  Yes.  So to reiterate an argument, a point I've made

23   before, when I take my admissions model, which I believe is

24   the best representation of the actual admissions process that

25   Harvard uses, taking account of the weight it puts on

1    multidimensionality, taking account of the way it uses

2    information and so on, using all of the data, so including

3    the ALDCs, my model shows that year by year there's no

4    statistically significant difference in the admission rate

5    between Asian-Americans and whites.

6              On average across the six years, three of the

7    estimates are positive, three of them are negative.  And then

8    if one looks averaging across the years, the average of these

9    effects is minus 0.05, this average marginal effect, which

10   means that the difference between the admission rates of

11   Asian-Americans and whites, controlling for all the

12   observable factors in my model, is about 5/100 of a

13   percentage point, not statistically significant.

14             So I believe the evidence strongly supports the

15   view that there's no statistical evidence of discrimination.

16             MR. WAXMAN:  Thank you, Dr. Card.  Pass the

17   witness.

18             THE WITNESS:  Could I take a break?

19             MR. MORTARA:  No problem for me, Your Honor.  We

20   can get set up.  Ten minutes?

21             THE COURT:  Ten minutes.

22             (Court recessed at 2:11 p.m.)

23             [Sidebar sealed and redacted.]

24             MR. MORTARA:  Whenever you're ready, I think I'm

25   ready, Your Honor.

174

```
1          THE COURT:  I am ready when you are.
2                         EXAMINATION
3     BY MR. MORTARA:
4     Q.  Good afternoon, Professor Card.  My name is Adam Mortara.
5     It's really nice to meet you.  I'm hoping that we'll spend a
6     few hours together getting to know each other.
7               I got to get a few questions out of the way I was
8     genuinely surprised Mr. Waxman didn't ask you.
9               You've been in court on and off a lot for the last
10    couple of weeks, right?
11    A.  Yes, I have.
12    Q.  And you know about the Bakke decision, don't you?  You
13    actually mentioned it in one of your articles?
14    A.  I know a little bit about it.  I am in no way an expert
15    on the law.
16    Q.  Did you know that the Bakke decision, actually just the
17    opinion of one member of the Court, described the Harvard
18    admissions system as an illuminating example in 1978?  Did
19    you know that?
20    A.  I think I've heard someone use that phrase.
21    Q.  More than once, huh?
22    A.  Yes.
23    Q.  Did you take that into account when preparing your
24    opinions in this case?
25    A.  No.
```

**JA3110**

1    **Q.** All right.  Let's hit a few things out of the gate before

2    delving more deeply into your opinions.

3           You testified on direct that race was a small

4    factor in admissions, and you used this slide that I'm

5    showing on the screen, which is DD 10.93, right?

6    **A.** No.  I said that -- no.

7    **Q.** You didn't say race was a small factor in admissions?

8    **A.** No.  I believe I said that alone and by itself, race was

9    a small factor in admissions.

10   **Q.** Great.  Thanks for that clarification.

11          And you also gave a nice discussion in your direct

12   about the importance of average marginal effect.  Do you

13   recall talking about that quite a bit?

14   **A.** Yes.

15   **Q.** But you discussed your computation of the average

16   marginal effect of Asian-American ethnicity across your whole

17   admissions model.  That was one of the last things you went

18   through with Mr. Waxman, right?

19   **A.** Yes.

20   **Q.** You didn't actually discuss your computation of the

21   average marginal effect of African-American race or Hispanic

22   ethnicity, did you?

23   **A.** I didn't directly present it, no.

24   **Q.** It's in your report.  Your reports are right next to you,

25   sir, for your review.  This is in your opening report.  I'm

**JA3111**

1    going to go to it.  It's on page 81 of your opening report,

2    Figure 26.

3              You can look at it on the screen or you can look at

4    it in your report.  Your choice.  Do you see that?

5    **A.**  Yes.

6    **Q.**  The average marginal effects are at the bottom.  Plus

7    6 percent for African-Americans, plus 3.73 percent for

8    Hispanics.  Do you see that?

9    **A.**  Yes.

10   **Q.**  You know that this represents an over 300 percent

11   increase in the chances of admission on average for an

12   African-American, correct?

13   **A.**  No.  I don't think that calculation sounds rights to me.

14   **Q.**  You don't think that's right.  What percentage do you

15   think it is, sir?  What do you think the base is?  The base

16   is about 3 percent, isn't it?

17   **A.**  The overall fraction of admission -- it's possible that's

18   right, yes.

19   **Q.**  And you know it represents an over 200 percent increase

20   in the chances of admission for a Hispanic applicant,

21   correct?

22   **A.**  I don't know that for a fact, but I'll trust you on it.

23   **Q.**  You can come back and let me know tomorrow if it was

24   incorrect.  You can think about that if you want or we'll go

25   through it some more in a little bit.

1         I want to talk about some, I'm not going to say

2    mistakes, but some inaccuracies on your slides.  We'll go

3    back to this one.

4         This is the one I showed you where we talked about

5    race, if it was the only thing not being a big factor.  Do

6    you remember that?  It was just three minutes ago.

7    **A.**  Yes.

8    **Q.**  You got this thing over here, R-squared.  Do you see

9    that?

10   **A.**  Yes.

11   **Q.**  That's a mistake, isn't it?

12   **A.**  Well, yes, technically.  But as I think I explained early

13   on to the Court, I would be using R-squared and pseudo

14   R-squared interchangeably.

15   **Q.**  Okay.  Well, I'm glad we cleared that up, but there is

16   actually a difference between them, right?

17   **A.**  Yes.  They're calculated differently, yes.

18   **Q.**  And let's just quickly go through all the slides where

19   you said R-squared but you meant pseudo R-squared.  So here

20   we are at DD 10.93.  You said R-squared, but you meant pseudo

21   R-squared, right?

22   **A.**  Yes.

23   **Q.**  You did that again on -- you substituted 76 today.  But

24   DD 10.76, you did it again.  I don't have it in my computer.

25   We'll get to that tomorrow.  You did it again on this graph.

Case: 19-2005   Document 00147631846   Page: 190   Date Filed: 07/29/2022   Entry ID: 6356391
Case 1:14-cv-14176-ADB   Document 652   Filed 04/18/19   Page 178 of 206

178

1    You showed 79.  You've got R-squareds here in a couple of

2    places.  Those are actually pseudo R-squareds, right?

3    **A.**  Yes.  As I said, I think to save space and not jargon up

4    my presentation, I tried to explain that that's what I was

5    going to be doing.

6    **Q.**  That's great.  We're going to talk about the difference

7    in a second.

8              And you did it over here on DD 10.86.  Do you see

9    that?

10   **A.**  Yes.

11   **Q.**  That's a pseudo R-squared, right?

12   **A.**  Yes.

13   **Q.**  And you did it again on 93.  We already did that one.  So

14   you did it in a few places, right?

15   **A.**  Yes.

16   **Q.**  Now, you know for a discrete choice model you don't use

17   R-squared, you use pseudo R-squared.  Don't you know that?

18   **A.**  I do know that, yes.

19   **Q.**  And you're well aware of the difference between the two,

20   right?

21   **A.**  Yes, I believe I am, yes.

22   **Q.**  Who is Daniel McFadden?

23   **A.**  Daniel McFadden is an emeritus professor at Berkeley,

24   formerly my colleague.  He was a very well-known figure in

25   the field in various aspects of economics.

1    **Q.**  He was your colleague.  He won a Nobel Prize?

2    **A.**  He did, yes.

3    **Q.**  All right.  So in your binder at C121 is an article by

4    your former colleague, Professor McFadden?

5              THE COURT:  Do I have a copy of this?

6              MR. MORTARA:  No, Your Honor.  I'm always terrible

7    with binders for you.  There you are.

8              THE COURT:  I don't have enough.

9              MR. MORTARA:  It's got 90 percent of everything I'm

10   going to use except the awesome stuff that I like to hand up.

11   BY MR. MORTARA:

12   **Q.**  If you could, turn to C121, please, Professor.

13   **A.**  Yes.

14   **Q.**  This is a paper by McFadden.  You've seen it before,

15   right?

16   **A.**  Yes.

17   **Q.**  If you turn to page 34 in the McFadden paper, there's a

18   footnote double star at the bottom.  Just tell me when you're

19   there, sir.

20   **A.**  Yes.

21   **Q.**  And it carries over to the next page, and I've got it on

22   the screen.

23              It says, "While the R-squared is a more familiar

24   concept to planners who are experienced in ordinary

25   regression analysis, it is not as well-behaved a statistic as

**JA3115**

1    the" --

2              And that means pseudo R-squared.  That's a Greek

3    rho, isn't it?

4    A.  I'll have to read the whole thing to know what he's

5    referring to precisely.  If you give me a second.

6    Q.  You know that pseudo R-squared is sometimes written as

7    rho squared, right?

8    A.  No.  To tell you the truth, in my profession rho usually

9    refers to the correlation.  And so it would be -- and in

10   fact, R-squared is the same as the squared correlation.  So

11   I'm finding it a bit confusing.

12   Q.  Sir, this came up in your expert report, remember?  You

13   criticized Professor Arcidiacono's models for having a low

14   pseudo R-squared and he cited the McFadden paper and he said

15   exactly what's going to be said right here, which is that --

16   for example, values of .2 to .4 represent an excellent fit.

17             Do you remember you talked about that in your

18   expert report, right?

19   A.  I did say that.  I do remember that, yes.

20   Q.  And what you remember is that there was a debate between

21   you and Professor Arcidiacono about whether .2 to .4

22   represents an excellent fit.

23             Do you remember that from the McFadden paper?

24   A.  Yes.  I remember words to that effect.

25   Q.  So Professor McFadden here, saying, as you remember from

**JA3116**

1    your expert reports, .2 to .4 is an excellent fit on the

2    pseudo R-squared, correct?

3    **A.**   That's what it -- yes, that's what it says here.  In my

4    view -- I mean, this paper was written in 1977, before the

5    era of modern computer.

6    **Q.**   Mr. Waxman can ask you questions when I'm done.  My

7    question was correct.

8              THE COURT:  You sit down.  You let him finish his

9    answer.

10             You finish your answer.

11             THE WITNESS:  Well, I was going to say this paper

12   was written in 1977, possibly even before that, back in the

13   day before modern computing methods.

14             And at that time, it was very difficult to estimate

15   especially discrete choice for multinomial logit models or

16   logit models with more than several dozen variables on large

17   data sets.  And so I think at that time that might have been

18   what he was thinking of in his experience.

19             I don't know whether I would say that that would

20   qualify today with modern data sets and modern methods.

21   BY MR. MORTARA:

22   **Q.**   All right.  So here's a question for you.

23             How many articles have you written that use

24   discrete choice models and report a pseudo R-squared.  Only a

25   handful, right?

Case: 19-2005    Document: 00117631846    Page: 494    Date Filed: 07/29/2020    Entry ID: 6356391
Case 1:14-cv-14176-ADB   Document 652   Filed 04/18/19   Page 182 of 206

182

1    **A.**   I'm not entirely sure, actually.

2    **Q.**   Glad you asked.  So let's go into my folder here for

3    David Card articles.  I've got a lot.  Let's just search

4    "pseudo" and see what comes back.

5           Do you see those articles there on the screen, what

6    to editors maximize, the effect of firm level contracts.  Do

7    you see that?

8           MR. WAXMAN:  Your Honor, I'm not exactly sure what

9    we're doing here.  If this is meant to be a demonstrative,

10   it's not disclosed.

11          MR. MORTARA:  It's not meant to be a demonstrative.

12          MR. WAXMAN:  He's using it as a demonstrative.

13   Maybe it's not meant to be, but it's being used as a

14   demonstrative.

15          MR. MORTARA:  I haven't even asked a question yet.

16          THE COURT:  You have it up on the screen.  That

17   means you are demonstrating it, which makes it a

18   demonstrative.

19   BY MR. MORTARA:

20   **Q.**   Do you see that?

21          MR. MORTARA:  It's also being done live, which I

22   don't need to disclose.  Under the pretrial memorandum, live

23   demonstratives don't need to be disclosed.  This is a live

24   demonstrative.

25          MR. WAXMAN:  I don't understand how this live

**JA3118**

 1   demonstrative is any different than the demonstratives that

 2   we provided them in advance that he objected to and

 3   successfully excluded yesterday.

 4        THE COURT:  Let me hear what his question is, but I

 5   take your point.  What is your question?

 6   BY MR. MORTARA:

 7   **Q.**  There's a handful of titles of articles on the screen.

 8   Do you see that?

 9   **A.**  I do see a handful of articles, yes.  I don't really

10   understand how this was constructed, what exactly you did to

11   get this list of articles.

12   **Q.**  Don't worry.  If you think of more than five or six

13   articles that you have a pseudo R-squared, you can come back

14   tomorrow and tell me, and I'll ask you first thing.

15        The question I have is, what's this article you

16   wrote from 2018 on editor gender bias, "Are Referees and

17   Editors in Economics Gender Neutral?"

18        Do you see that?

19   **A.**  I'm confused because you've got something here called

20   "Editor Gender Bias."

21   **Q.**  I'll clarify your confusion.

22        THE COURT:  If you have a copy of the article, why

23   don't you put it in front of him.

24        MR. MORTARA:  I intend to.  May I approach, Your

25   Honor?

```
 1                THE COURT:  Yes, of course.

 2                MR. MORTARA:  There's one for you, too.

 3     BY MR. MORTARA:

 4     Q.  Does this refresh your recollection that last week you

 5     published an article called "Are Referees and Editors in

 6     Economics Gender Neutral?"

 7     A.  I distributed such an article to a number of my friends

 8     and colleagues, yes.  I didn't publish it.

 9                MR. WAXMAN:  May I just inquire whether this was

10     disclosed to us?

11                MR. MORTARA:  It's not, Your Honor.  It's

12     impeachment of the opinion I just got on pseudo R-squared.

13                THE COURT:  He doesn't have to disclose things that

14     he's using to impeach.

15                MR. WAXMAN:  It's not impeachment.

16                MR. MORTARA:  I was just told that the standards

17     for pseudo R-squareds have changed since the 1970s.  I'm

18     about to inquire.

19                THE COURT:  I thought he said the precision had

20     changed since the '70s.  But go ahead.

21     BY MR. MORTARA:

22     Q.  Sure.  So this is a paper where you found, among other

23     things, possible evidence of discrimination against female

24     economists in the refereeing of articles for journals; is

25     that right?
```

 1   **A.**  Could you give me a second to review exactly the wording

 2   we used?

 3   **Q.**  Let me see if I can help you.  Turn to page 26.  And at

 4   the top you'll see.  Just want to get a sense of what the

 5   article is about.

 6        Do you see that at the top what I've got

 7   highlighted?  "Our findings are consistent with the presence

 8   of some discrimination towards female economists"?

 9   **A.**  Yes.  But if you read the context it says, "What accounts

10   for these patterns?  While we do not have direct evidence, we

11   envision three main explanations.  First, our findings are

12   consistent with the presence of some discrimination towards

13   female economists," and so on.

14        "Second, it could be that female economists submit

15   papers with somewhat different characteristics than those of

16   male authors," and so on.

17        And "A third possibility is that female economists

18   wait longer for submission," and so on.

19   **Q.**  Sure.  One of the possibilities of your findings in this

20   paper that you published last week is that there's some

21   discrimination towards female economists in reviewing.  One

22   of the possibilities.  Is that fair?

23   **A.**  Well, first I don't claim to have published this paper

24   last week.  This paper was distributed to some friends.  This

25   is still -- this has not been submitted.  This paper is still

1    in active editing stage, to tell the honest truth.

2    **Q.** Great. Well, let's take a look at what's on page 46,

3    Table 7.

4    **A.** Yes.

5    **Q.** You've got a bunch of models, and I just want to focus

6    you on the pseudo R-squareds of the models here. Do you see

7    those?

8    **A.** Yes.

9    **Q.** And every one of them is between .2 and .4, correct?

10   **A.** Well, to tell you the truth, this is a combination of

11   R-squared and pseudo R-squared. So some of these models are

12   actually linear regression models. In fact -- in fact, it's

13   possible that all of these are linear regression models, in

14   fact, reflecting the fact that this is a work in progress.

15         I believe, if I remember correctly, that all of

16   these are actually linear regressions, according to the top

17   heading. So it isn't -- actually, it's a misstatement on me

18   and my coauthors here.

19   **Q.** Let me go back to McFadden.

20         He said, the goodness of fit range for pseudo

21   R-squared was lower than regular R-squared, right? That's

22   the standard in your industry; isn't that right? So if these

23   are R-squareds, they're between .2 and .4, too, aren't they?

24   **A.** No. What he said was he said those unfamiliar with the

25   rho squared index should be forewarned that its values tend

1    to be considerably lower than an R-squared index.

2    **Q.**  What's the standard for regular R-squared for goodness of

3    fit, as far as you're concerned?

4    **A.**  Well, actually there is no real standard for goodness of

5    fit.  For example, one could have a model based on data from

6    year to year for the national economy, and it could have a

7    very high R-squared because those kind of variables tend to

8    correlate together very highly.  And yet many, many, many,

9    hundreds and thousands of those kinds of models are estimated

10   all the time and most people kind of think of them as junk or

11   very uninformative.

12          On the other hand, one could have data from an

13   experimental design, for example, where one had randomly

14   assigned some covariate of interest.

15          Like I could assign, for example, some kind of a

16   blinded resume that I send in for jobs.  And some of them

17   could be African-American candidates or names and some of

18   them could have non African-American names.  And there you

19   could have potentially quite a low R-squared and yet the

20   model could be extremely informative because of the design,

21   because of the randomized design.

22          So there isn't really a connection between

23   R-squared and whether a model is good or bad necessarily.

24   **Q.**  I'm just a little confused.  You were talking about the

25   explanatory power of several of Professor Arcidiacono's

1    models and you had a chart on the screen showing R-squareds.

2    Do you remember that?  You weren't testifying that the lower

3    R-squareds meant they had lower explanatory power?

4    **A.**   I was saying that lower pseudo R-squareds meant lower

5    explanatory power, yes.

6    **Q.**   So the junk models, you're talking about the national

7    economy where they have super high R-squareds, they have real

8    good explanatory power, but they're still junk, right?

9    **A.**   I wouldn't necessarily say that they're always junk, but

10    some models with high explanatory power could be very

11    informative; some models with low could be not very

12    informative.

13    **Q.**   And some models with low explanatory power could be very

14    informative; isn't that right?

15    **A.**   Yes, I would certainly agree to that.

16    **Q.**   All right.

17            You spent a lot of time in your direct testimony

18    trying to explain the difference between white and Asian

19    applicants to Harvard in the personal rating.  Do you

20    remember that?

21    **A.**   I do, yes.

22    **Q.**   I want to be clear about a few things.  As of the time

23    you were deposed, you had not constructed your own model of

24    the personal rating, did you?

25    **A.**   I believe that's correct, yes.

Case: 19-2005   Document: 00117630846   Page: 201   Date Filed: 07/29/2020   Entry ID: 6356391
Case 1:14-cv-14176-ADB   Document 652   Filed 04/18/19   Page 189 of 206

189

1   **Q.**  And you didn't disclose any model of the personal rating

2   in your expert reports, correct?

3   **A.**  I'm not entirely sure because I believe that I had done

4   some extensions of Professor Arcidiacono's model.

5   **Q.**  We're going to talk about those in just a little bit.

6          You used Professor Arcidiacono's models and you did

7   some extensions where you added some variables, right?

8   **A.**  I did, I believe, report some of those models.  Whether

9   those are my models or his models I guess is a matter of some

10  art.

11  **Q.**  You referred to, in your report, in "unexplained gap"

12  between whites and Asians in the personal rating," right?

13  Your rebuttal report.

14  **A.**  Yes.

15  **Q.**  And I've got it on the screen, just 35 and 36, your

16  rebuttal report.  It says "unexplained gap" four times.  If

17  you just want to see it on the screen, I'm just going to

18  stop.  I'm not going to use any more of it.

19  **A.**  Just a second while I look at the rebuttal report.  What

20  page are we on?

21  **Q.**  Paragraph 35 and 36.  It's on page 19, sir.  The question

22  is, have I highlighted and underlined "unexplained gap" four

23  times?

24  **A.**  Yes.  I used those words there, correct.

25  **Q.**  But you can't actually rule out racial bias as the

1    explanation for that gap, can you?

2    **A.**  No, not on the basis purely of statistical evidence, no.

3    **Q.**  Now, you did a lot of summing of the scores with

4    Mr. Waxman to try to show that whites were better than Asians

5    on the personal rating.

6            Do you remember all those sums you did, some less

7    than 7, some less than 11?  Do you remember those?

8    **A.**  I remember those scores, yes.

9    **Q.**  You did some charts with sort of bar charts, histograms

10   of who got 7 or less.  Do you remember those?

11   **A.**  Yep.

12   **Q.**  You've been here for a while.  You've listened to a lot

13   of Harvard witnesses.

14           Have you ever heard one single sentence of

15   testimony in this trial or before in discovery that anyone at

16   Harvard ever sums up profile ratings ever?

17   **A.**  I've never heard that.  But I've never heard they fit

18   logistic regression models either, the people on the

19   admissions committee for sure.

20   **Q.**  To be clear, you weren't fitting a logistic regression

21   model when you showed those histograms of who got a sum less

22   than 7 or 11.  You weren't doing a logistic regression model,

23   were you?

24   **A.**  No.  They're just sums.

25   **Q.**  Right.  And everybody can add?

**JA3126**

1    **A.**  Yes.  It's surprising how often mistakes can come in, but

2    yes, almost everybody can add, I think.

3    **Q.**  And you've seen no evidence in the dozen or so

4    depositions you've read with hundreds of hours of testimony

5    maybe and all the time you've been here listening to Harvard

6    witnesses that anyone ever once summed a profile rating,

7    correct?

8    **A.**  No.  I didn't hear that or I don't remember hearing it,

9    but I am not sure I was looking for it.

10   **Q.**  If you are remember, you can let me know tomorrow.

11           And the effect of the summing that you did is to

12   treat each rating equally and each point on those ratings

13   equally.  So having a 1 and a 2 and a 3 on school support is

14   the same as 2, 2, 2, even though 1s are far more rare.  Is

15   that right?

16   **A.**  It does just add them up, that's true, yes.

17   **Q.**  I'm trying to find one of those histograms for you, sir,

18   just so that we can -- this is one of them.  I've just got

19   one on the screen so we all know what we're talking about.

20           So it treats 1, 2, 3 the same as a 2, 2, 2, right?

21   **A.**  Yes.

22   **Q.**  And you didn't construct any model in your reports that

23   would tell you if, in fact, the ratings should all be treated

24   equally and each point in the ratings should be treated

25   equally, did you?

**JA3127**

```
 1    A.   No, I didn't.  But I didn't believe that that was
 2    necessary for illustrating the points here.
 3    Q.   You just did a bunch of arithmetic and then you showed
 4    these descriptive statistics; is that right?
 5    A.   Well, this is descriptive statistics, and it does involve
 6    adding these scores.  That's correct, yes.
 7    Q.   I want to show you Defendant's 692, which you also used
 8    today, and you were talking about this non-academic
 9    admissions index.  Do you remember that?
10    A.   Can I take a look at the whole thing?
11    Q.   Sure.  You have a big binder in front of you, sir.
12    Defendant's 692 is in there.
13    A.   So that's D 692?
14    Q.   Correct.
15            THE COURT:  I don't think I have 692.
16            MR. MORTARA:  You don't, Your Honor?  You should.
17            THE WITNESS:  I don't think I do either.
18    BY MR. MORTARA:
19    Q.   So that's okay.  Why don't we use your slide.  This is
20    it.  Do you remember this one?
21    A.   Yes, I do.  Yes.
22    Q.   Do you see down at the bottom it says Defendant's 692.
23    Do you see that.
24    A.   Yes.
25    Q.   And that's where it comes from, right?
```

1    **A.**   Yes.

2    **Q.**   And you constructed this non-academic index decile thing,

3    and it shows these higher percentages for whites and lower

4    percentages for Asians.

5           Do you see that?

6    **A.**   In each of the deciles, yes.

7    **Q.**   And it's your opinion that this explains, in part, or

8    maybe in whole, the unexplained gap in the personal rating

9    between whites and Asians?

10   **A.**   No.

11   **Q.**   Does it explain any of it?

12   **A.**   No.  That's not what I was saying that this explained.

13   **Q.**   What do you think this explains?

14   **A.**   Well, as I tried to explain, a central hypothesis that

15   Professor Arcidiacono is putting forth is that Asian students

16   are stronger than white students on the observed factors that

17   contribute toward the personal rating and then using that to

18   make some argument about the unobserved factors, which are,

19   of course, the things that are represented in the unexplained

20   gap or what's measured by the average marginal effect.

21          So what I'm trying to do in this slide is take a

22   look at the combination of all the non-academic observed

23   factors, weighting them by the way that they enter into the

24   admissions model, and look at how they differ for students in

25   the top several deciles between whites and Asians in terms of

1    the fractions, for example, in the ninth decile here.

2    **Q.**  And your basic point is that what we're looking at on the

3    screen, which now has the personal rating and ALDC effects

4    removed, it's DD 10.78, your basic point is that because

5    whites are doing better than Asians on these observable

6    characteristics, the gap between whites and Asians in the

7    personal rating may be explained by that.

8             Is that your basic point?

9    **A.**  Yes.  So the basic -- following on exactly the same kind

10   of logic that Professor Arcidiacono is using to explain, say,

11   the significant positive Asian-American average marginal

12   effect in the academic rating with a significant positive

13   Asian-American effect in the extracurricular rating.

14            He's asserting that that's due to unobserved

15   characteristics of the Asian-Americans and arguing that

16   that's consistent or -- consistent with this idea that the

17   observed characteristics of Asian-Americans that contribute

18   to each of those two variables are somewhat higher than the

19   observed characteristics for white students.

20            So I'm trying to evaluate that same kind of

21   argument when we look at the personal rating.  And so when we

22   look at the personal rating, what's really relevant because I

23   showed that personal rating is hardly at all affected by

24   academic factors, was to look at these non-academic factors.

25            So that's what I'm trying to do here and take a

Case: 19-2005    Document: 00117631846    Page: 207    Date Filed: 07/29/2020    Entry ID: 6356391
Case 1:14-cv-14176-ADB    Document 652    Filed 04/18/19    Page 195 of 206

195

 1    look at whether the non-academic factors when they're

 2    weighted by the way that they enter into the admissions

 3    process are higher for whites than Asians.  And I believe

 4    that's what it shows.

 5    **Q.**  Thank you.  Are you done?

 6              MR. WAXMAN:  Your Honor, it's one thing for counsel

 7    to be asking questions.  It's another thing for counsel to be

 8    making snide remarks like this.  Now, I suggest it reflects

 9    more on the questioner than the witness, but I object.

10              THE COURT:  All right.  The speech isn't required.

11    Ask the question.  Skip the narrative.

12              MR. MORTARA:  Your Honor, I will happily do so.

13    But next time we get three paragraphs after a "yes," I'm

14    going to move to strike and ask you to intervene.  That's

15    what I'm trying to move it along.

16              THE COURT:  My experience in this trial is that

17    experts often answer questions with three paragraphs instead

18    of one.  Yours did the same thing.  Okay?

19              MR. MORTARA:  Your Honor, respectfully, he didn't.

20    And that's the problem.  But we'll come back.  I'll keep

21    going.  Thank you, Your Honor.

22              MR. WAXMAN:  Just for the record, the question that

23    he asked was something like, well, what is this showing or

24    isn't this what you mean?  It was a question that required an

25    explanation, and an explanation was provided.

**JA3131**

```
 1              MR. MORTARA:  Moving on.
 2              THE COURT:  Yes.
 3    BY MR. MORTARA:
 4    Q.  You showed this graph in your direct testimony with
 5    Mr. Waxman, didn't you?
 6    A.  Yes.
 7    Q.  And in fact, I think you and I were just talking about it
 8    with respect to you said you added some additional variables
 9    onto Professor Arcidiacono's models, and you discovered
10    that -- I think you said something like we could almost hit
11    the ceiling eventually, the ceiling would be zero, which is
12    no difference between Asians and whites, right?
13    A.  No.  I didn't say that at all.
14    Q.  You didn't say we might almost hit the ceiling?
15    A.  I didn't say with the addition of the variables that I
16    added to his model that we almost hit the ceiling.  No, I
17    didn't say that.
18    Q.  I understand.  I'm not trying to quibble with you.
19              What you said was, if we kept adding variables, we
20    would almost hit the ceiling, right?
21    A.  I said something like that, yes.
22    Q.  I think you have this in your binder.  You have
23    Defendant's Exhibit 688.  Take a look to make sure you got
24    it.  I'm told that you do.
25    A.  I found it.  Here it is.
```

1   **Q.**  You found it.  Great.  Something is working.

2          Defendant's 688 has that analysis.  It actually has

3   a version of this graph in it, right?  Just confirm that for

4   you, sir.

5   **A.**  It has the information that is used to construct this

6   graph, yes.

7   **Q.**  It's also got the information about the additional

8   variables you added, right?  Keep flipping pages.  I think

9   it's on a subsequent page.  It's got your graph in there, the

10  one I've got on the screen, and it's got the additional

11  numbers, right?

12  **A.**  Yes.

13  **Q.**  Staying with the graph that's on the screen, just looking

14  at Professor Arcidiacono's Model 5, you spent a lot of time

15  with the histograms about the school support rating, right,

16  looking at the differences between whites and Asians,

17  correct?

18  **A.**  I did spend some time going through them.  They're not --

19  I don't quite understand what that has to do with Model 5.

20  **Q.**  Those involve the school support ratings, correct?

21  **A.**  Yes, that's correct.  Sorry.

22  **Q.**  Some of them involved the alumni ratings, correct?

23  **A.**  Yes.

24  **Q.**  And the school support and the alumni ratings are all

25  included in Professor Arcidiacono's Model 5?

1    **A.**  Right.  My understanding is other rating variables are

2    also included in that model, yes.

3    **Q.**  But the ones that you talked about with Mr. Waxman in the

4    histogram, school support, alumni ratings, they're included

5    in Arcidiacono's Model 5, correct?

6    **A.**  Yes.

7    **Q.**  Now, if you look at the fourth page of Defendant's 688,

8    it has those numbers we've been talking about when you added

9    variables, and the average marginal effect went down, right?

10   **A.**  Yes.  It becomes smaller in magnitude.  It actually goes

11   up because it's becoming more positive.  It becomes smaller

12   in magnitude.

13   **Q.**  Smaller magnitude.  Thanks for the correction.

14          And the first set of variables you added where you

15   ran it year by year, which is your preferred way of doing the

16   model, right?

17   **A.**  It's my preferred way of doing the admissions model, yes.

18   **Q.**  And you added additional card model variables.  Do you

19   see that?  Do you see that, sir?

20   **A.**  Yes.

21   **Q.**  And those variables are -- I'm highlighting on the

22   screen -- intended career, indicator for a staff rating,

23   parental occupations, measures of participation in

24   extracurricular activities and indicators for being born in

25   the United States and having lived outside of the United

1    States.

2              Those were the variables you added in the first

3    round, right?

4    **A.**   Yes.

5    **Q.**   And then you added still more variables.  That was the

6    additional extracurricular variables, right?

7    **A.**   Yes.

8    **Q.**   And so you got these two numbers there, right?

9              Now, just a quick question.  Are those

10   statistically significant still?

11   **A.**   Which numbers are you referring to?  There's three

12   numbers there.  Which numbers?

13   **Q.**   All of them.  Any of them.

14   **A.**   Yes, I believe they are.

15   **Q.**   They all are.  But that's not here on your

16   Defendant's 688.  Okay.  Now let's go back to your

17   demonstrative.  You could have graphed those two additional

18   points that you have on your demonstrative, couldn't you?

19   **A.**   Yes.

20   **Q.**   Let's do that.  See I've got the version of your graph

21   right here on the screen, sir?

22   **A.**   Yes.

23   **Q.**   All right.  I'm going to call the number 2 one you did

24   card 2, and that was minus 3.23, right?

25   **A.**   Yes.

 1  **Q.**  And the other one is going to be called card 3.  That was

 2  minus 3.01; right?  Do you see that I've entered that on the

 3  Excel spreadsheet on my computer?

 4  **A.**  Yes.

 5  **Q.**  Let's see what that looks like now.  Do you see that I've

 6  added your two additional layering on of variables, and we

 7  look at what the graph looks like now?  Do you see that?

 8  **A.**  Yes.

 9  **Q.**  And you see that I've created an axis of zero.  That's

10  where the ceiling is, right?  That's no effect, correct?

11  **A.**  Yes.

12  **Q.**  And when you added on as many variables as you had,

13  basically every variable you had available to you, what

14  happened here is that the average marginal effect of the

15  difference between Asians and whites on the personal rating,

16  it didn't head to the ceiling, did it?

17  **A.**  No.  Well, first of all, I would say two things about

18  this graph.

19            First of all, if one were to include all of those

20  variables and go directly from Model 5 to card 3, the graph

21  would look different, first of all.

22            Secondly, I wasn't actually asserting that adding

23  additional observed variables would make it go to the

24  ceiling.

25            MR. MORTARA:  Your Honor, we're going to mark this

1    as Plaintiff's Demonstrative 40.  We'll submit it and offer

2    it into evidence.

3          MR. WAXMAN:  Well, I'm going to -- he's obviously

4    made it as a demonstrative.  We object to it being in

5    evidence because the witness just said if he were calculating

6    his -- I can't remember what it's being called here, card

7    Model 3, the graph would not look like that.  So I don't

8    think there's a foundation for offering it into evidence.

9          MR. MORTARA:  Your Honor, the foundation is I just

10   made it, and we just agreed that demonstratives go back into

11   evidence.  I thought we had a rule about demonstratives now.

12         MR. WAXMAN:  We had a rule about disclosed

13   demonstratives.  This is a demonstrative again created on the

14   fly, and there's no agreement.

15         THE COURT:  This is what I'm going to do.  We'll

16   sort this out tomorrow morning.  I'm tired.  I'm sure

17   Dr. Card is tired.  It's 3:00.  It's been a long day.

18         We will resume tomorrow.  What time would you all

19   like to start?  Karen, do we have anything before this?

20         What time would you guys like to start tomorrow?

21         MR. MORTARA:  As early as the Court could

22   accommodate us.

23         MR. LEE:  9:30, if you could, Your Honor.

24         THE COURT:  Let's start at 9:30.  All right.  And

25   we will take this up.  I think there is an agreement about

Case: 19-2005    Document: 00117631846    Page: 214    Date Filed: 07/29/2020    Entry ID: 6356391
Case 1:14-cv-14176-ADB   Document 652   Filed 04/18/19   Page 202 of 206

202

1    demonstratives, but he's called into question the accuracy of

2    this demonstrative.  The witness hasn't adopted it.  We can

3    sort out some way to deal with that, but it's not going to

4    come in as a demonstrative that's been accepted as having

5    accuracy.

6              MR. MORTARA:  Sure.

7              THE COURT:  So we'll figure out some other way like

8    demonstrative marked for identification rather than --

9              MR. MORTARA:  That's fine.

10             THE COURT:  We'll get back to all those angels on

11   the head of a pin.  We'll see everyone tomorrow.  Okay?

12             MR. MORTARA:  Thank you, Your Honor.

13             MR. LEE:  Thank you, Your Honor.

14             (Court recessed at 3:04 p.m.)

15

16

17

18

19

20

21

22

23

24

25

- - - - - - - - - - -

CERTIFICATION


        I certify that the foregoing is a correct

transcript of the record of proceedings in the above-entitled

matter to the best of my skill and ability.




/s/ Joan M. Daly                    October 31, 2018

_____              _____

Joan M. Daly, RMR, CRR              Date
Official Court Reporter

```
 1                         INDEX OF WITNESSES

 2    WITNESS                                            PAGE

 3    DAVID CARD

 4
         Examination By Mr. Waxman ........................   6
 5       Examination By Mr. Mortara....................... 174

 6

 7

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

```
1                     E X H I B I T S

2

   Defendant Exhibit                                    Received
3
        670      ....................................      103
4
        677      ....................................       20
5
        678      ....................................       21
6
        680      ....................................       21
7
        681      ....................................       11
8
        683      ....................................       18
9
        687      ....................................       40
10
        692      ....................................       54
11
        694      ....................................       80
12
        698      ....................................       30
13
        702      ....................................       93
14
        708      ....................................       27
15
        709      ....................................       96
16
        713      ....................................      122
17
        715      ....................................       99
18
        716      ....................................      100
19
        718      ....................................      106
20
        720      ....................................      131
21
        721      ....................................      141
22
        722      ....................................      145
23
        723      ....................................      152
24
        724      ....................................      162
25
        725      ....................................      164
```

**JA3141**

726 .................................... 167

727 .................................... 157

728 .................................... 135

729 .................................... 169

730 .................................... 147

699 ....................................  88

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Case: 19-2005    Document: 00117620846    Page: 219    Date Filed: 07/29/2020    Entry ID: 6356391
Case 1:14-cv-14176-ADB   Document 654   Filed 04/18/19   Page 1 of 261

1

```
 1                    UNITED STATES DISTRICT COURT

 2                    DISTRICT OF MASSACHUSETTS

 3   _____

 4   STUDENTS FOR FAIR ADMISSIONS, INC.,

 5                    Plaintiff,          Civil Action
                                          No. 14-14176-ADB
 6   v.
                                          November 1, 2018
 7   PRESIDENT AND FELLOWS OF HARVARD
     COLLEGE, et al.,                     Pages 1 to 261
 8
                     Defendants.
 9   _____

10

11

12              TRANSCRIPT OF BENCH TRIAL - DAY 14
            BEFORE THE HONORABLE ALLISON D. BURROUGHS
13              UNITED STATES DISTRICT COURT
               JOHN J. MOAKLEY U.S. COURTHOUSE
14                   ONE COURTHOUSE WAY
                     BOSTON, MA  02210
15

16

17

18

19

20

21              JOAN M. DALY, RMR, CRR
              KELLY MORTELLITE, RMR, CRR
22               Official Court Reporter
             John J. Moakley U.S. Courthouse
23           One Courthouse Way, Room 5507
                   Boston, MA  02210
24              joanmdaly62@gmail.com

25
```

Case: 19-2005    Document 00117629846    Page: 220    Date Filed: 07/29/2020    Entry ID: 6356391
Case 1:14-cv-14176-ADB  Document 654  Filed 04/18/19  Page 2 of 261

2

```
 1   APPEARANCES:

 2
     COUNSEL FOR THE PLAINTIFF:
 3

 4           ADAM K. MORTARA, ESQUIRE
             J. SCOTT McBRIDE, ESQUIRE
 5           KRISTA J. PERRY, ESQUIRE
             Bartlit Beck Herman Palenchar & Scott
 6           54 West Hubbard Street
             Suite 300
 7           Chicago, Illinois 60654
             312.494.4400
 8           adam.mortara@bartlit-beck.com
             scott.mcbride@bartlit-beck.com
 9           krista.perry@bartlit-beck.com

10           JOHN M. HUGHES, ESQUIRE
             MEG E. FASULO, ESQUIRE
11           KATHERINE L.I. HACKER, ESQUIRE
             Bartlit Beck Herman Palenchar & Scott
12           1801 Wewatta Street
             Suite 1200
13           Denver, Colorado 80202
             303.592.3100
14           john.hughes@bartlit-beck.com
             meg.fasulo@bartlit-beck.com
15           kat.hacker@bartlit-beck.com

16           JOHN MICHAEL CONNOLLY, ESQUIRE
             THOMAS R. McCARTHY, ESQUIRE
17           WILLIAM S. CONSOVOY, ESQUIRE
             Consovoy McCarthy Park PLLC
18           3033 Wilson Boulevard
             Suite 700
19           Arlington, Virginia 22201
             703.243.9423
20           mike@consovoymccarthy.com
             tom@consovoymccarthy.com
21           will@consovoymccarthy.com

22

23

24

25
```

**JA3144**

Case: 19-2005    Document: 00117620846    Page: 221    Date Filed: 07/29/2020    Entry ID: 6356391
Case 1:14-cv-14176-ADB  Document 654  Filed 04/18/19  Page 3 of 261

3

```
 1    APPEARANCES (cont.):

 2
              PATRICK STRAWBRIDGE, ESQUIRE
 3            Consovoy McCarthy Park PLLC
              Ten Post Office Square
 4            8th Floor, South, PMB #706
              Boston, Massachusetts 02109
 5            617.227.0548
              patrick@consovoymccarthy.com
 6
              MICHAEL H. PARK, ESQUIRE
 7            Consovoy McCarthy Park PLLC
              3 Columbus Circle
 8            15th Floor
              New York, New York 10024
 9            646.456.4432
              park@consovoymccarthy.com
10
              PAUL M. SANFORD ESQUIRE
11            BENJAMIN C. CALDWELL, ESQUIRE
              Burns & Levinson LLP
12            One Citizens Plaza
              Suite 110
13            Providence, Rhode Island 02903
              401.831.8330
14            psanford@burnslev.com
              bcaldwell@burnslev.com
15

16    COUNSEL FOR THE DEFENDANT:

17            WILLIAM F. LEE, ESQUIRE
              FELICIA H. ELLSWORTH, ESQUIRE
18            ANDREW S. DULBERG, ESQUIRE
              ELIZABETH C. MOONEY, ESQUIRE
19            SARAH R. FRAZIER, ESQUIRE
              Wilmer Cutler Pickering Hale and Dorr LLP
20            60 State Street
              Boston, Massachusetts 02109
21            617.526.6556
              william.lee@wilmerhale.com
22            felicia.ellsworth@wilmerhale.com
              andrew.dulberg@wilmerhale.com
23            elizabeth.mooney@wilmerhale.com
              sarah.frazier@wilmerhale.com
24

25
```

**JA3145**

```
 1     APPEARANCES (cont.):

 2
               SETH P. WAXMAN, ESQUIRE
 3             DANIELLE CONLEY, ESQUIRE
               DANIEL WINIK, ESQUIRE
 4             BRITTANY AMADI, ESQUIRE
               PAUL R.Q. WOLFSON, ESQUIRE
 5             Wilmer Cutler Pickering Hale and Dorr LLP
               1875 Pennsylvania Ave, NW
 6             Washington, DC 20006
               202.663.6006
 7             seth.waxman@wilmerhale.com
               danielle.conley@wilmerhale.com
 8             daniel.winik@wilmerhale.com
               brittany.amadi@wilmerhale.com
 9             paul.wolfson@wilmerhale.com

10             DEBO P. ADEGBILE, ESQUIRE
               Wilmer Cutler Pickering Hale and Dorr LLP
11             7 World Trade Center
               250 Greenwich Street
12             New York, New York 10007
               212.295.6717
13             debo.adegbile@wilmerhale.com

14             ARA B. GERSHENGORN, ESQUIRE
               Harvard Office of the General Counsel
15             Smith Campus Center
               Suite 980
16             1350 Massachusetts Avenue
               Cambridge, Massachusetts 02138
17             617.495.8210
               ara_gershengorn@harvard.edu

18

19     COUNSEL FOR AMICI STUDENTS:

20             JON M. GREENBAUM, ESQUIRE
               BRENDA L. SHUM, ESQUIRE
21             GENEVIEVE BONADIES TORRES, ESQUIRE
               KRISTEN CLARKE, ESQUIRE
22             1500 K Street NW, Suite 900
               Washington, DC 20005
23             202.662.8315
               jgreenbaum@lawyerscommittee.org
24             bshum@lawyerscommittee.org
               gtorres@lawyerscommittee.org
25             kclarke@lawyerscommittee.org
```

Case: 19-2005     Document: 00117620846     Page: 223     Date Filed: 07/29/2020     Entry ID: 6356391
Case 1:14-cv-14176-ADB  Document 654  Filed 04/18/19  Page 5 of 261

5

```
 1    APPEARANCES (cont.):

 2
              LAWRENCE CULLEEN, ESQUIRE
 3            EMMA DINAN, ESQUIRE
              Arnold & Porter LLP
 4            555 Twelfth Street, NW
              Washington, DC 20004
 5            202.942.5477
              gina.dean@aporter.com
 6            emma.dinan@aporter.com

 7
      COUNSEL FOR AMICI ORGANIZATIONS:
 8
              JENNIFER A. HOLMES, ESQUIRE
 9            CARA McCLELLAN, ESQUIRE
              JIN HEE LEE, ESQUIRE
10            MICHAELE M. TURNAGE YOUNG, ESQUIRE
              RACHEL N. KLEINMAN, ESQUIRE
11            NAACP Legal Defense and Educational Fund, Inc.
              700 14th Street NW
12            Suite 600
              Washington, DC 20005
13            jholmes@naacpldf.org
              cmcclellan@naacpldf.org
14            jlee@naacpldf.org
              mturnageyoung@naacpldf.org
15            rkleinman@naacpldf.org

16            KENNETH N. THAYER, ESQUIRE
              KATE R. COOK, ESQUIRE
17            Sugarman Rogers
              101 Merrimac Street
18            Suite 900
              Boston, Massachusetts 02114
19            617.227.3030
              thayer@sugarmanrogers.com
20            cook@sugarmanrogers.com

21

22

23

24

25
```

**JA3147**

P R O C E E D I N G S

1

2              (The following proceedings were held in open

3      court before the Honorable Allison D. Burroughs, United

4      States District Judge, United States District Court, District

5      of Massachusetts, at the John J. Moakley United States

6      Courthouse, One Courthouse Way, Boston, Massachusetts, on

7      November 1, 2018.)

8              THE COURT:  Good morning, everyone.  Give me one

9      second here.

10             All right.  Mr. Mortara, when you're ready.

11             MR. MORTARA:  Thank you, Your Honor.

12     EXAMINATION BY MR. MORTARA:   (Continued.)

13     **Q.**  Good morning, Professor Card.

14     **A.**  Good morning.

15     **Q.**  Do you remember we talked yesterday about this article,

16     "Our Referees and Editors in Economics Gender-Neutral"?  Do

17     you remember that?

18     **A.**  Yes.

19     **Q.**  Who is Stefano Della Vigna?

20     **A.**  He's my colleague.

21     **Q.**  Did you know that Stefano Della Vigna put this article on

22     his personal web page at U.C. Berkeley?

23     **A.**  I didn't know that until yesterday, yes.

24     **Q.**  You know it now?

25     **A.**  I do.

1    **Q.**  You used this slide in your direct examination.  It's DD

2    10.35, right?

3    **A.**  Yes.

4    **Q.**  Do you remember the conversation you had, actually two

5    separate conversations with the court, and the court was

6    asking about both the order and the magnitude of the effects

7    on this slide.  Do you remember that?

8    **A.**  Yes.

9    **Q.**  And do you remember at one point I stood up and I said I

10   really wanted to know about what would happen if you just

11   took your model and removed the personal rating.  Do you

12   remember I said that?

13   **A.**  Yes.

14   **Q.**  And Mr. Waxman said you were going to get to that.

15   Remember?

16   **A.**  Yes.

17   **Q.**  You actually mentioned it yesterday in your direct

18   testimony?

19   **A.**  Yes.

20   **Q.**  You did that calculation in your opening report, correct?

21   **A.**  Yes.

22   **Q.**  And you didn't show it, though, did you?

23   **A.**  Not that I recall.

24   **Q.**  If you would turn in your opening report, please, to page

25   72.  Are you there, sir?

1          And I have it on the screen.  This is a calculation
2     of your logit model of admissions removing the personal
3     rating, correct?
4     **A.**  Yes.
5     **Q.**  And it concludes --
6               THE COURT:  What page of his report?
7               MR. MORTARA:  Sorry, Your Honor.  It is 72 of the
8     opening report.  May I proceed, Your Honor?
9     **A.**  Yes.
10    **Q.**  And you see that the overall marginal effect you
11    calculated was minus .34 percent and it was statistically
12    significant, correct?
13    **A.**  Yes.
14    **Q.**  And for the record, for the year 2014, the effect was
15    minus .76, correct?
16    **A.**  Yes.
17    **Q.**  And the effect for 2015 was minus .37, correct?
18    **A.**  Yes, not statistically significant.
19    **Q.**  And the effect for 2016 is minus .45, correct?
20    **A.**  Yes, again, not statistically significant.
21    **Q.**  And the effect for 2017 is positive 0.05, correct?
22    **A.**  Yes.
23    **Q.**  And the effect for 2018 is minus .68, and that is
24    statistically significant on its own, correct?
25    **A.**  Yes, that's the only individual year that is, yes.

1   **Q.**  At the effect for 2019 is positive .14, correct?

2   **A.**  Yes.

3   **Q.**  Now, this is your model with all the ALDCs in it,

4   correct?

5   **A.**  Yes.  The model is slightly different in my rebuttal

6   report, but yes, this is my model.

7   **Q.**  We'll get to that in just a second.  But this is your

8   model with all the ALDCs in it, correct?

9   **A.**  Yes.

10  **Q.**  This is your model with intended career and staff

11  interview indicator, correct?

12  **A.**  Yes.

13  **Q.**  This is your model with parental occupation, correct?

14  **A.**  Yes.

15  **Q.**  This is a yearly model, not a pooled model, correct?

16  **A.**  Yes.

17  **Q.**  So if you do all of the things that you talked about,

18  your differences with Professor Arcidiacono, and you just

19  remove the personal rating, your preferred model shows a

20  statistically significant Asian penalty just like it does

21  right here in Exhibit 21 from your opening report, right?

22  **A.**  Yes, on average, although only one year is statistically

23  significant, yes.

24  **Q.**  You said you had a slightly updated model, correct?

25  **A.**  Yes.

1    **Q.**  But that's true of the slightly updated model, too, isn't

2    it?

3    **A.**  I believe so, yes.

4    **Q.**  I want to talk about your research for a little while.

5    The focus in your research is labor economics, correct?

6    **A.**  Yes.

7    **Q.**  And you frequently run regression models in your

8    research, correct?

9    **A.**  Yes.

10   **Q.**  And the type of model that you created for Harvard's

11   admissions model -- I think we've gone over this -- is called

12   a discrete choice model; is that right?

13   **A.**  Yes.

14   **Q.**  And you talked a few times about the number of variables

15   that you used in your yearly models, right?

16   **A.**  Yes.

17   **Q.**  And it's over 200 variables, isn't that correct?

18   **A.**  Yes.

19   **Q.**  How many papers have you published that involve discrete

20   choice models with over 200 variables?

21   **A.**  Off the top of my head, I don't know the answer to that.

22   **Q.**  Can you name one?

23   **A.**  Can I look at my CV for a second?

24   **Q.**  Sure.

25   **A.**  So none are coming to mind other than some current work

1    I'm working on, but yeah.

2    **Q.**   Okay.  I'm going to go through some of your papers, a

3    couple of the discrete model choice papers that you've done.

4    If those are ones that you think have over 200 variables,

5    please let me know, okay?

6    **A.**   Sure.

7    **Q.**   Now I want to go over an article that you wrote with

8    Professor Giuliano about peer effects.  It's in your binder

9    at C82.

10   **A.**   Yes.

11   **Q.**   And this is an article called "Peer Effects and Multiple

12   Equilibria in the Risky Behavior of Friends."  It's by David

13   Card and Laura Giuliano.  Who is Laura Giuliano?

14   **A.**   She's one of my former Ph.D. students who is now a

15   professor at the University of California Santa Cruz.

16   **Q.**   And what were you studying in this article with Laura

17   Giuliano?

18   **A.**   We're studying, looking at young people who are followed

19   over time in a dataset known as ed health.  We're studying

20   behavior of best friend pairs in the initiation of various

21   kinds of risky behaviors.

22   **Q.**   And did you run regression models in this article?

23   **A.**   A variety of different kinds of models, mostly what are

24   called probits and logits.

25   **Q.**   And logit models are the type you ran in this case,

1    right?

2    **A.**   Actually, nearly all the models in this paper are

3    probits.  There is a logit as a specification test.

4    **Q.**   And probit is another type of regression model, correct?

5    **A.**   Yes.

6    **Q.**   And I'm showing you Table 3 from page 1137, and that

7    includes some of the coefficients from the co-variants you

8    used in some of your regressions, correct?

9    **A.**   Yeah.  Excuse me.  My screen is so fuzzy.  I prefer to

10   look here.

11   **Q.**   It's no problem, Professor Card.  I think everyone

12   prefers to use paper.

13   **A.**   Yes.

14            THE COURT:  The old people do.  Right, Mr. Waxman?

15            MR. WAXMAN:  Even the no-so-old.

16            MR. MORTARA:  I have no quip.  I have no come back

17   to that.  There's nothing.

18            MR. WAXMAN:  I think Your Honor should be looking

19   at Mr. Lee.

20            MR. LEE:  That's okay.  I'll accept.

21            THE COURT:  He hasn't disparaged my age yet.

22   **Q.**   So while we're on this page, I want to ask you something.

23   You were here for Mr. Lee's cross of Professor Arcidiacono,

24   right?

25   **A.**   Yes.

1   **Q.** And you heard him talk about a number of Professor

2   Arcidiacono's papers on affirmative action and other issues

3   that touch on race, correct?

4   **A.** Yes.

5   **Q.** And actually, in this paper, if you go back to the front,

6   you actually thanked Professor Arcidiacono in this paper,

7   didn't you?

8   **A.** Yes, I did.

9   **Q.** Now, if you go back to the page we were on, 1137, I just

10  want to ask you one quick question about something you

11  concluded at the lower right column at the bottom four and

12  five lines up. Are you there?

13  **A.** Yes.

14  **Q.** It says, "Other factors that increase the likelihood of

15  initiating sexual activity include age, black race," it goes

16  on, "physical development and self-reported attitude toward

17  risk." Do you see that?

18  **A.** Yes.

19  **Q.** That was a finding from the data that you made, correct?

20  **A.** Yes.

21  **Q.** You were in no way attempting to make any kind of

22  statement about causality between black race and the

23  likelihood to initiate sexual activity, were you?

24  **A.** No.

25  **Q.** Let's go back to the data. If you just go to 1148, I

 1    just have a very quick question here.

 2    **A.**   Same paper?

 3    **Q.**   Yes, same paper.  Sorry, Professor Card.  Are you there?

 4    **A.**   Yes.

 5    **Q.**   And you provide here in the back in the appendices all of

 6    the coefficients from your models for this paper, correct?

 7            You see in Table A3 you actually have the

 8    coefficients for black race.  We just talked about that,

 9    right?

10    **A.**   I believe so, but let me check the footnotes because

11    sometimes we don't report all the coefficients.

12    **Q.**   Well, I'll revise the question so we can move on.  You

13    report many, many of the coefficients here, don't you?

14    **A.**   Yes.

15    **Q.**   All right.  Let's look at another paper, if you would

16    turn to Tab C89.  And it's "What Works?  A Meta Analysis of

17    Recent Active Labor Market Program Evaluations."

18    **A.**   Yes.

19    **Q.**   Just a thumbnail, what's this paper about?

20    **A.**   Well, a meta analysis is a statistical analysis of

21    research papers.  So it tries to develop a model of the set

22    of results reported in different research papers, and these

23    research papers all concern active labor market programs

24    which are programs to try and help disadvantaged workers or

25    unemployed workers.

 1   **Q.**  And if you go to page 914, you report some results of

 2   some regression models, correct, in Table 5?

 3   **A.**  Yes.

 4   **Q.**  You report coefficients on the variables in your

 5   regression models there, correct?

 6   **A.**  Yes.

 7   **Q.**  And then down in the notes, I've got it highlighted on

 8   the screen, it says, "Models are linear regressions with the

 9   effect size as a dependent variable.  Coefficients of

10   additional control variables are reported in Table 7."  Do

11   you see that?

12   **A.**  Yes.

13   **Q.**  And if you go to Table 7, which appears at page 917, you

14   report many, many more coefficients, correct?

15   **A.**  Yes.

16   **Q.**  I'd like to turn now to C101, Professor Card.

17   **A.**  Yes.

18   **Q.**  And that is an article called, "Does gifted education

19   work?  For which students?"  Again, by you and Professor

20   Giuliano, correct?

21   **A.**  Yes.

22   **Q.**  And this is an article that actually has a logistic

23   regression of a discrete choice model, right?

24   **A.**  Let me check.

25   **Q.**  I can guide you to Appendix Table 1 towards the back.

**JA3157**

1    Please take your time.

2    **A.**   Appendix Table 1, yes.

3    **Q.**   Sadly, the a appendices tables are not page-numbered, so

4    you have to go through all the graphs, after page 36, all the

5    graphs and then you get to --

6    **A.**   Yes, I found it.

7    **Q.**   Now, my question is --

8          THE COURT:  Wait a second.  I haven't.

9          MR. MORTARA:  Sorry, Your Honor.

10          THE COURT:  Appendix Table 1.  Is that after

11    Figures 1 and 2?

12          MR. MORTARA:  Yes, it's after all the graphs.

13          THE COURT:  Appendix --

14          MR. MORTARA:  So Tables 1 through 7 and then

15    Appendix Table 1.  That was a lot of effort for not much.

16    This is an article that you have that actually uses a

17    logistic regression and discrete choice model, right?

18    **A.**   In this table it's using a conditional logit model, yes.

19    **Q.**   And you provided the coefficients, didn't you?

20    **A.**   Yes.

21    **Q.**   It's pretty standard in reporting on econometric models

22    in the literature to provide coefficients for your regression

23    models, correct?

24    **A.**   Yes.

25    **Q.**   And you said two days ago when you started your direct

```
 1    testimony that you approached your work in this case, quote,
 2    following basically the same procedure as you would in any
 3    kind of research enterprise.  Do you remember that?
 4    A.   I believe so, yes.
 5    Q.   But in your research when you report on your regression
 6    models you always report the coefficients of your model when
 7    you publish them, isn't that right?
 8    A.   So I'm not sure -- I would normally do so, but I wouldn't
 9    necessarily always do that.
10    Q.   Well, we talked -- you talked about the award you got
11    from Econometrica in your direct testimony, right?
12    A.   Yes.
13    Q.   Can you name any paper you've ever published in
14    Econometrica when you did a regression model of your own work
15    and did not publish your coefficients?
16    A.   Most of the coefficients, yes.
17    Q.   And can you name any paper on your CV -- take your
18    time -- where you did a regression model in your own work and
19    didn't publish your coefficients?
20    A.   Not -- I can't think of any.
21    Q.   And one reason that economists, econometricians provide
22    the coefficients on their regressions in their published
23    articles and the reason the community insists they be
24    provided is so that others can critique the models, correct?
25    A.   Yes, I would agree with that.
```

1    Q.  And that's so others can look at it, look at the models

2    to see if there's odd findings or other issues that might

3    provide for new research or even criticisms of the models

4    that have been published, right?

5    A.  Right, although in the case of -- yes, but in the case of

6    choice models, discrete choice models, oftentimes people

7    will -- because the coefficients are difficult to interpret,

8    they'll oftentimes have additional analysis or even additions

9    to the table which show how those coefficients translate into

10   differences across groups.

11   Q.  And that's what you've done, right?

12   A.  I've certainly done that in some cases, yes.

13   Q.  Now, you know that your expert reports in this case have

14   been made public through briefing that happened over the

15   summer, right?

16   A.  Yes, I do.

17   Q.  But neither of your expert reports in this case provide

18   any coefficients from your models, correct?

19   A.  Well, they're available in the workpapers, yes.

20   Q.  You provided them to Students For Fair Admissions in the

21   form of program files that you could run in Stata to generate

22   your coefficients; is that right?

23   A.  Yes.

24   Q.  Would you recognize your coefficients if I showed them to

25   you?

1    **A.**  Well, yes.  They're all digits between zero and nine; but

2    other than that, I can't say for sure.

3    **Q.**  We'll get there in just a second.  In your direct

4    testimony you did not discuss or provide any information on

5    the coefficients from your admissions models, correct?

6    **A.**  No.

7    **Q.**  And just to be clear, you frequently analyze the

8    coefficients of your regression models in your own research;

9    when you're talking about your models, you talk about both

10   the average marginal effect or the effects on the

11   coefficients, right?

12   **A.**  Yes, sometimes.

13   **Q.**  Well, turn to C100.  We'll just quickly do an example.

14   **A.**  C100.

15   **Q.**  Sure.

16   **A.**  Okay.

17   **Q.**  This is a paper on the elimination of mandatory

18   retirement.  "Did the Elimination of Mandatory Retirement

19   Affect Faculty Retirement," with Orley Ashenfelter and David

20   Card, correct?

21   **A.**  Yes.

22   **Q.**  And Orale Ashenfelter was your Ph.D. advisor?

23   **A.**  Yes.

24   **Q.**  And just very briefly, what's this article about?

25   **A.**  I think that it's exactly about what the title says it's

1    about, studying the effect of eliminating mandatory

2    retirement.

3    **Q.**  And in this paper you used a logistic regression model

4    for the discrete choice of retirement -- funny that -- he

5    used the example of retirement in your own testimony.  If you

6    turn to 971, you can see some results of that.  Do you see

7    that?

8    **A.**  Yes.

9    **Q.**  And you showed all sorts of coefficients here in Table 4

10   on page 971, correct?

11   **A.**  Yes.  And I also show at the bottom of the table what

12   amount to the average marginal effects for reaching age 70

13   and 71, yes.

14   **Q.**  So in this published research article with Orley

15   Ashenfelter you disclosed your coefficients and the average

16   marginal effect, right?

17   **A.**  Yes.

18   **Q.**  And on the previous page, 970, I want to direct your

19   attention to the first full paragraph on the page that

20   begins, "The coefficients."  Do you see that?

21   **A.**  Yes.

22   **Q.**  And you make a remark, "The coefficients of the key

23   covariates show some interesting patterns."  Do you see that?

24   **A.**  Excuse me.

25   **Q.**  First full paragraph on the left side.  The coefficients

1    of the key covariates" --

2    **A.**   Yeah.

3    **Q.**   Then you go on to make several observations about the

4    coefficients showing some interesting patterns.  Do you see

5    that?

6    **A.**   Yes.

7    **Q.**   And in the next paragraph, you turn to the coefficients

8    of the individual faculty characteristics, and you make

9    several observations about those, correct?

10   **A.**   Yes.

11   **Q.**   But in your reports in this case you did not provide

12   coefficients anywhere or remark about any interesting

13   patterns, correct?

14   **A.**   Well, as I said, the coefficients were certainly

15   available in the workpapers.  And of course something like

16   the statistical significance of the average marginal effect

17   is exactly related to the statistical significance of the

18   coefficient.  So in terms of the issue of statistical

19   significance, it's really the same thing.

20   **Q.**   Can sometimes values for coefficients give you warning

21   signs that there's something wrong with your model; say if

22   it's statistically significant when you think it shouldn't

23   matter, like some of the hat size things you were talking

24   about?

25   **A.**   Well, that can happen.  Yes, that can happen; sometimes

1  it can happen by accident.  So for instance, one -- if five

2  times out of 100, if you estimate something that should be

3  zero, you'll get a significant result at the 5 percent level.

4  **Q.**  Can another warning sign in your coefficients when you

5  run a model be something that you would expect to be

6  associated with a strongly negative effect showing it being

7  associated with a strongly positive effect?

8  **A.**  Yes.  Actually, there's an example of that in actually

9  like some of Professor Arcidiacono's models where, because

10  there's academic index and SAT and so on, sometimes when you

11  look at the individual coefficients, SAT will seem to have a

12  negative effect, but that's because there's so many variables

13  representing different aspects of academic quality that one

14  has to interpret the whole batch of them carefully.

15  **Q.**  Yeah.  I think you actually mentioned this yesterday,

16  didn't you?  I think I caught this concept yesterday, similar

17  concept.

18        A lot of collinear variables means that you're

19  going to get a lot of noise in the coefficients but the

20  average marginal effect will still be fine?

21  **A.**  Well, what I said --

22  **Q.**  If I mischaracterized what you said, please tell me.

23  **A.**  Yeah, but that was in regards -- that's what I said, but

24  that was in regard to the average marginal effect for Asians,

25  not the average marginal effect, for instance, of SAT in that

1    model.

2    **Q.**  Yes.  And let's be clear.  The only average marginal

3    effects you calculated and showed in your direct testimony

4    was the average marginal effect of being Asian both in your

5    overall model and then in some modified models and subgroups,

6    correct?

7    **A.**  Correct.  But I mean, for instance in his appendix,

8    Professor Arcidiacono does not report all of his coefficients

9    either, so --

10   **Q.**  We'll get there.

11   **A.**  Okay.

12   **Q.**  Also we talked yesterday about the average marginal

13   effect of being African-American or Hispanic, right?

14   **A.**  Yes.

15   **Q.**  Now, I can put it on the screen if you need it or you can

16   look -- you have Professor Arcidiacono's reports right there.

17   Professor Arcidiacono reports hundreds and hundreds of

18   coefficients in the back of his expert reports, doesn't he?

19   **A.**  Let me just refresh my memory of what we're talking about

20   here.

21   **Q.**  You can look at the rebuttal report because it's got all

22   the latest models if you want and just turn to the back.

23         There's tables starting in the B.6.2R range and

24   going on for pages and pages with coefficients, right?

25   **A.**  Yes.  But, for example, as I recall, some of the

1    variables that are included in the model, the coefficients

2    are not reported here.

3    **Q.**  You didn't report any, correct?

4    **A.**  Not in my report, no.

5    **Q.**  And Professor Arcidiacono reported many; is that fair?

6    **A.**  Yes.

7    **Q.**  Now I want to talk to you about your use of parental

8    occupation in your model.  I think you listed the variables

9    in your model.  I just want to put on the screen a list.

10             Will you take me down for one second.

11             COURTROOM CLERK:  Sure.

12             MR. MORTARA:  Thank you.  I just want to -- I

13   probably ruined the screen now by taking myself down for a

14   second.  Okay.  You can put it back up.

15   **Q.**  Do you see the list of parental occupation variables on

16   the screen, other, homemaker, unemployed, skilled trades.  Do

17   you see that?

18   **A.**  I do.  I'm not sure what I'm looking at, though.

19   **Q.**  Well, just, do you remember the list of parental

20   occupations you used?

21   **A.**  It's a long list and -- could I check?

22   **Q.**  You can look at your reports, too, if you need to.  I

23   just want to know if this is the list.

24             MR. WAXMAN:  Your Honor, the witness has already

25   said he doesn't know what he's looking at.  So perhaps my

**JA3166**

1    friend could either show him the paper or show him on the

2    screen what this is.

3              MR. MORTARA:  Your Honor, I'm happy to give it to

4    him.  It's a huge printout.  I'm just looking at the list of

5    variables.

6              THE COURT:  That's fine.  He is attempting to

7    refresh his recollection the way he's doing it.  If it does,

8    it does; and if it doesn't, you can show him something else.

9    **Q.**  I just want to know --

10   **A.**  So this is something that I -- it comes from my

11   workpapers?

12             MR. MORTARA:  Sure.  Your Honor, may I approach?

13             THE COURT:  Yes.

14   **Q.**  Professor Card, you remember me asking you if you

15   recognize the coefficients as you saw them, right?

16             What I've handed to you is a log file from Stata.

17   It's tabbed.  If you look at the tabs, the tabs have year

18   numbers on.  I really just do not want to spend that much

19   time on this, but I will put Defendant 685 up on the screen,

20   which has your average marginal effect and your 95 percent

21   confidence intervals.

22             And if you go through the years in the document I

23   handed you, and each tab tells you a year.  Blue tabs tell

24   you I think the year and the red tabs tell you the average

25   marginal effect.  You could maybe help yourself confirm that

1    what you're looking at is the log from your model.  But all I

2    want to ask you is the list of parental occupations.

3    **A.**   The thing is this is a very complicated thing to analyze.

4    I can't actually tell just in a few minutes whether this is

5    actually -- what data it's accessing, the sample sizes and

6    things like that.  I'm reluctant to make any conclusions

7    from --

8    **Q.**   My only --

9    **A.**   I have no idea where it came from.

10   **Q.**   My only question is what were the parental occupations in

11   your model.

12   **A.**   Oh, I can answer that.

13   **Q.**   Great.

14   **A.**   If we go to my direct report, my first report.

15   **Q.**   Take your time.  Tell me what page it's on.

16   **A.**   So a list would be in Appendix C of my main report, and I

17   would have --

18   **Q.**   Do you have the page number for me, sir?  I can put it up

19   on the screen for everybody.

20   **A.**   Yes.  Page 178 would be mothers' occupations.

21   **Q.**   No, sir.  These aren't the variables, are they?  Did you

22   have 24 variables?

23   **A.**   I believe that these are the set of occupations that I

24   use in my model, yes.

25   **Q.**   So you had 24 separate occupation variables?

1    **A.**   Well, there's variables for the mother and there's

2    variables for the father.

3    **Q.**   I understand.  So for each parent you had 24 separate

4    occupation variables.  Is that what you're saying?

5    **A.**   Well, of course there would be one omitted, but to the

6    best of my knowledge, that's correct, yes.

7    **Q.**   Okay.  If it turns out that that's not right, you can

8    come back and Mr. Waxman will lead you through it.

9           But putting aside the number of parental occupation

10   variables, these categories that you've got here, assuming

11   they are your variables, that's not what Harvard sees

12   necessarily on applications, is it?

13   **A.**   Well, so, of course students are applying through a

14   variety of mechanisms to Harvard, including the universal

15   application, the common application, and I think I mentioned

16   there's even some paper versions, and I believe there might

17   even be a Harvard application specifically.  So there's a

18   variety of mechanisms, and that information is then

19   translated into some kind of computerized database.

20   **Q.**   And then you pulled that information from the

21   computerized database, and you didn't use it directly.  You

22   converted it to a bunch of categories from a Bureau of Labor

23   Statistics database, right?

24   **A.**   I'm using a part of a BLS dataset, yes, that's correct,

25   yes.

1    **Q.** I want to put on the screen some of your testimony with

2    Mr. Waxman. And this is when you're talking about the

3    mothers' and fathers' occupations. And you started to say,

4    "Variables representing the mothers' and fathers'

5    occupations," but then you said "Categorizations." And what

6    you meant there was you didn't take the variables directly

7    out of Harvard's database and use them; you made your own

8    categories of these variables using the Bureau of Labor

9    Statistics categories and converted them yourself, like you

10   said you've done in other research from time to time, right?

11   **A.** Yes, and almost inevitably when you use occupation data

12   you have to do this because of course there's many, many

13   codes. Depending on the dataset there could be hundreds or

14   even thousands of occupation codes, yes.

15   **Q.** And that's what you said yesterday?

16   **A.** Yes.

17   **Q.** And if you would turn to your rebuttal report now.

18   **A.** Sure.

19   **Q.** Because I think you showed a table of your conversions on

20   page 110 of your rebuttal report.

21   **A.** Yes.

22   **Q.** And this is a Table Exhibit 28. It goes on to the next

23   page and it talks about how you took the codes that are on

24   the right and converted them to what's called a Card

25   category, right?

1   **A.**   Yes.  So exactly, yes.

2   **Q.**   And to be clear, these Card categories, those are named

3   after you, right?

4   **A.**   Yes.

5   **Q.**   And just to lighten the mood, you mentioned yesterday

6   that your name is also the name of a profession.  And I had

7   to look it up.  Do you want to tell everybody what it was?

8   Because I was a little surprised.

9   **A.**   It's something to do with wool.

10  **Q.**   Carding wool, huh?

11  **A.**   Yes.

12  **Q.**   I thought that was interesting.

13           Okay.  Back to the news.  Here we have your Card

14  categories -- nothing to do with wool -- and the categories

15  you created do not come directly from the Harvard database,

16  do they?

17  **A.**   No.  That's right.

18  **Q.**   And what you made is a virtual map.  You took the codes

19  you had from the database and you virtually mapped them to

20  create your Card category codes, right?

21  **A.**   Yes.  I largely followed the BLS hierarchy.  The Bureau

22  of Labor Statistics of course has developed many hierarchies

23  of occupations, so I followed that as closely as possible.

24  **Q.**   And BLS statistics are used by the Bureau of Labor

25  Statistics.  There's no evidence in this case that Harvard

1   uses BLS statistics for admissions, right; or have you seen

2   any?

3   **A.**   No, no.

4   **Q.**   So I want to just talk about --

5   **A.**   Excuse me.  I meant to say they're using the BLS

6   occupation -- the database has some categories and BLS

7   occupation codes.

8   **Q.**   They didn't do the Card, virtual thing with the Card

9   categories, did they?

10  **A.**   No, they didn't do that.

11  **Q.**   So let's talk about that.  On the right side of the

12  bottom of Number 5, you code everyone who is a business owner

13  or proprietor as self-employed, correct?

14  **A.**   Yes.

15  **Q.**   That means you code the owner of a small convenience

16  store the same way you would code one of the Koch brothers,

17  correct?

18  **A.**   Yes.

19  **Q.**   And do you think Harvard admissions officers would treat

20  those the same way?

21  **A.**   Well, they would have additional information about the --

22  so remember that the occupation -- I don't think they would.

23  The reason why is because, just like in my model, there's a

24  lot of other information.  There would be the education of

25  the parents, both parents.  There would be their occupation.

 1    And so there would be what neighborhood they live in and so

 2    on.  So there would be a way to contextualize that.

 3    **Q.**  There would be a lot of differences that Harvard

 4    admissions officers could use to draw the distinction I just

 5    did, right?

 6    **A.**  Yes, and my model would do some of that, yes.

 7    **Q.**  Some of it?

 8    **A.**  Yes.

 9    **Q.**  But your Card categories don't draw that distinction,

10    right?

11    **A.**  No, not in this case.

12    **Q.**  Let's just do one more with your Card categories.  Go to

13    number 6 on the next page.  You code --

14    **A.**  Yes.

15    **Q.**  -- everybody who is a policy-maker in government as a

16    business executive/management/administrator.  Do you see

17    that?

18    **A.**  This is category 7?

19    **Q.**  6.

20    **A.**  6.  Excuse me.

21    **Q.**  Do you see that?

22    **A.**  Yes.

23    **Q.**  And so if your father is the Secretary of Energy, and you

24    live in the suburbs of D.C., that's going to get you the same

25    code as someone whose dad is a regional sales manager for

1  Dunder Mifflin living down the street?

2  **A.** Yes. Exactly the way the BLS would make them in their

3  hierarchy, yes.

4  **Q.** Do you think Harvard admissions officers would treat the

5  son of the Secretary of Energy the same way they would treat

6  the son of a regional sales manager for Dunder Mifflin when

7  they're looking at parental occupation and deciding how that

8  affects admissions prospects?

9  **A.** No. But of course they would have other contextual

10  variables, some of which are included in my model as well.

11  **Q.** Now, yesterday -- and maybe the day before -- I can't

12  remember. You talked very confidently about overfitting, and

13  you said that you had no concerns that your model was

14  overfit. Do you remember that?

15  **A.** Yes.

16  **Q.** But overfitting and the concept of overfitting is not

17  discussed anywhere in your expert reports, is it?

18  **A.** I don't believe so, but I believe it came up in Professor

19  Arcidiacono's testimony.

20  **Q.** But it's not in your reports. That's my only question.

21  **A.** I don't believe so, no.

22  **Q.** Overfitting is the production of an analysis that

23  corresponds too close or exactly to a particular set of data

24  and may therefore fail to fit additional data or predict

25  future observations reliably, correct?

33

1   **A.**   That sounds like one textbook definition.

2   **Q.**   An overfitted model is a statistical model that contains

3   more variables than can be justified by the number of events.

4   Would you agree with that?

5   **A.**   In part.

6   **Q.**   Well, we've just exhausted my knowledge of overfitting,

7   which comes from Wikipedia.  So I think we can move on a

8   little bit.  But I've got one test on the hat-size thing.

9         We talked a little bit yesterday about explanatory

10  power, and I don't know if you used the word junk or I used

11  the word junk to describe some models of the economy that can

12  have really high R-squareds but they're not really good

13  models.  Do you remember that discussion you and I -- that

14  sort of exchange we had when it was late in the day; both of

15  us were tired?

16  **A.**   I certainly do.

17  **Q.**   Okay.  I want to talk about maybe a related concept as it

18  pertains to the admissions model.  You have about 2,000

19  admits in one of your yearly models, 2,000 yes decisions; 1s

20  versus 0s?

21  **A.**   Around that, including nondomestic admits.  But for the

22  datasets we're looking at, it's more like 1750.

23  **Q.**   Great.  Let's do 1750.  And you talked a couple of times

24  about hat size and junk variables.  I want to give you a junk

25  variable and ask you if it would perfectly predict Harvard's

 1    admissions process.

 2              Social security number.  If you had the nine-digit

 3    Social Security number for every student that got in and

 4    coded that as a variable, yes or no, do you have this

 5    nine-digit Social Security?  So you had 1750 admits and you

 6    had 1750 variables.  And the variables were just -- you just

 7    happened to know the Social Security numbers of the people

 8    who got in.  Are you following me?  And it was, Do you have

 9    this social security number?  That model, using only social

10    security numbers, would perfectly predict the Harvard

11    admissions process?

12    **A.**  I don't understand your hypothetical completely.

13    **Q.**  I'm going to work on it.

14    **A.**  Okay.

15    **Q.**  I'm not an economist, and I'm a worse teacher than -- I

16    teach law, and I don't think my students -- we could ask

17    Ms. Perry, but I don't think I'm the greatest teacher when I

18    teach law.

19              MR. WAXMAN:  Neither do I.

20              MR. MORTARA:  We could have a student-off between

21    me and Mr. Waxman and Professor Card.  And I'm not sure who

22    is going to win.  But if it's economics, I think Professor

23    Card would win.  Then we can bring Professor Arcidiacono's

24    students in and this can be like a brawl from Anchorman with

25    the news teams.

Case: 19-2005   Document: 00117631846   Page: 253   Date Filed: 07/29/2020   Entry ID: 6356391
Case 1:14-cv-14176-ADB   Document 654   Filed 04/18/19   Page 35 of 261

35

1          But back to serious stuff, Your Honor -- I know, I

2    get carried away.  Can we reduce the number of admits so we

3    can make the hypothetical a little less onerous.  So it's 100

4    admits.

5    A.   So if I could explain a little bit.  I'm having a problem

6    with like what -- if one is trying to model admissions, one

7    needs variables for both the people who are admitted and the

8    people who are not admitted.

9    Q.   This is kind of my point.  And I'm not trying to create a

10   good model.  I'm trying to create a really bad one that

11   perfectly predicts the process.  1750 people get in.

12   A.   Yes.

13   Q.   You run a regression model that happens to use 1750

14   variables that are, Do you have this social security number

15   for 1750 times, and each of the Social Security numbers

16   happens to be the social security number of the people that

17   got in.  You don't know anything else.  That model perfectly

18   predicts Harvard's admission process, right?

19   A.   Yes.  Yes, I understand.

20   Q.   It would also be completely junk, right?

21   A.   Well, it would be an example of in some sense a totally

22   circular model, yes.

23   Q.   In fact, it would be overfit.  It would be the definition

24   of overfit.  You have one observation for each variable?

25   A.   I can't -- I hesitate to say that -- there are some

1    circumstances where models would use -- there would be a set
2    of perfect predicts that would be perfectly okay.
3    Q.  I'm just talking about the hypothetical I've constructed
4    for you where we know -- we can all agree on one thing about
5    the Harvard admissions office.  They don't rely on Social
6    Security numbers.  And I constructed the model in order to
7    actually -- I used post hoc reasoning to construct the model.
8    That's an overfit model, isn't it?
9    A.  I think it could be described that way for some
10   circumstances but maybe not for others.  It would depend on
11   the setting.
12   Q.  And one indicator, one indicator that you should be
13   worried about an overfit model is when your number of
14   observations compared to your number of variables is pretty
15   small, right?  The hypothetical I've got is one to one.
16   That's a danger zone, right?
17   A.  No.  You've got 1756 variables but 25,000 people in the
18   admissions pool.
19   Q.  Okay.  You're saying that the number of observations
20   includes the number of rejects?
21   A.  Yes.  The model is fit on both the people who are
22   accepted and the people who are rejected.  So there's
23   really -- driving a model in any given year, for instance in
24   the Harvard admissions process, there could be 25,000
25   observation units.

1    **Q.**  And I want to be just completely clear.  You're saying

2    that -- withdrawn.

3              I said when you have a number of observations

4    that's low relative to or -- number of observations low

5    relative to number of variables, that's a danger sign for

6    overfit.  That's what I said, right?

7    **A.**  Yes.

8    **Q.**  And then you said, yeah, but in my admissions model, I've

9    got 25,000 observations, rejects and admits, and I think you

10   were essentially implying I've got 225 variables, so I'm not

11   worried about it, right?  I mean, I wasn't really asking you

12   about your model, but that's what you were trying to say.

13   **A.**  Yes.  I mean, in a pure accounting sense, whether one

14   would be worried or not would depend very much on the

15   context.

16   **Q.**  Sure.  But in terms of the sort of danger zone of

17   overfitness, in a logistic regression model, sort of a

18   discrete choice situation, it's your testimony that when

19   you're trying to compare the number of observations to the

20   number of variables, you look at all the observations, not

21   just the less frequent of the two events.  That's what you're

22   telling me?

23   **A.**  Not precisely, no.

24   **Q.**  In fact, when you're looking for the danger zone of an

25   overfitness in a logistic regression model where you've got

1    discrete choices, zero or one, the number of observations

2    that you look at to see if your model might be overfit is the

3    lower frequency event.

4          So for example, say you're doing a paper on the

5    likelihood of death after cesarean delivery and you have

6    500,000 observations but only 500 deaths.  You get worried

7    about overfittedness because you only have 500 deaths when

8    you have models trying to predict death versus life, right?

9    **A.**  Certainly.

10   **Q.**  In fact, you have a paper like that, don't you?

11   **A.**  I do, yes.

12   **Q.**  We're going to get to it in a little bit.  So you look at

13   the lower frequency event when you're talking about number of

14   observations versus variables, when you're thinking about

15   being concerned about overfitness.  That's what you did in

16   your paper on cesarean deliver, right?

17   **A.**  That's what I did in that context.  I'm hesitating to

18   draw a generalization.

19   **Q.**  Sure.  Let's just go through.  You have a few papers

20   where you discuss overfitting, right?

21   **A.**  I believe so, yes.

22   **Q.**  Well, we're just going to go through three of them.

23   **A.**  Okay.

24   **Q.**  If you go to C89, we're back to "What Works?"  Are you

25   there?

1    **A.**   Yes.

2    **Q.**   And I'm going to refer you to page 925.  At the very

3    bottom of the page, you'll see a sentence beginning, "A

4    concern."

5    **A.**   Yes.

6    **Q.**   And you say, "A concern with the specification in column

7    3 is that the average number of program estimates per country

8    is small.  Many countries only have two or three estimates,

9    leading to potential overfitting."  Do you see that?

10   **A.**   Yes.

11   **Q.**   That's referring to the number of observations you have

12   compared to the number of variables, and you're talking about

13   how for some of the countries you only have two or three

14   observations, right?

15   **A.**   Yes.  In this context we're including a variable that's

16   country-specific, GDP growth, and there's only two or three

17   observations per country, yes.

18   **Q.**   And your solution to that was to take the countries with

19   only a couple of estimates out of the model and re-estimate

20   the model with what you had left, increasing the ratio of

21   observations to variables -- if you just read on, goes to the

22   next page.  Right?

23   **A.**   Yes.

24   **Q.**   That was your solution, and then you compared that model

25   you did on a subgroup with the countries you had more data on

1    to the first model you measured, and you saw they were about

2    the same, resolving your concerns, right?

3    **A.**    Yes.

4    **Q.**    And that is a diagnostic technique for overfitting called

5    cross-validation, correct?

6    **A.**    No.

7    **Q.**    What's it called?

8    **A.**    I'm not sure this particular procedure has a name.  This

9    is a pretty standard thing where we look at a subgroup and

10    see if the model estimates are similar and if -- our main

11    concern is the coefficients on the top of this table.  And

12    we're trying to see if those coefficients are affected by how

13    we treat the other variables.  And so it would be kind of

14    similar in my report to, when I look at California and

15    applicants from California, female applicants, and say is the

16    average marginal effect for Asian ethnicity different for

17    those subgroups.  It's more like that, actually.

18    **Q.**    Except in this paper you compare coefficients and you

19    didn't do any comparison or any discussion of coefficients in

20    your expert reports, right?

21    **A.**    Well, in this paper, this is not a logit model, so these

22    are regression models, and these coefficients directly

23    translate into a effect of higher GNP growth on

24    effectiveness.

25    **Q.**    Let's get to a logit model then.  If you turn to Tab 88,

```
 1   you'll find your cesarean delivery paper.
 2   A.  Sure.  Okay.
 3   Q.  This is the health effects of cesarean delivery for
 4   low-risk first births by you and others.  I have I think
 5   page-numbered this on the bottom right because it's like many
 6   of the papers I got from you.  If you see at the bottom
 7   right, there's page numbers, 1 of 86.  Do you see that?
 8   A.  Yes.
 9   Q.  This will help us get through here.  You had a concern
10   that one of your models in here was overfit as well, didn't
11   you?
12   A.  I don't remember the specific wording.
13   Q.  Turn to page 32.
14   A.  Okay.  Yes.
15   Q.  Excuse me.  Wrong document.  77.  Here we go.  Sorry,
16   sir.  Table 9.
17           MR. WAXMAN:  What page are we on?
18           MR. MORTARA:  77.
19           MR. WAXMAN:  The same document?
20           MR. MORTARA:  Yes.
21           THE WITNESS:  Page 77?
22           MR. MORTARA:  Correct.  It's Table 9.
23   Q.  While you're looking, in this paper you have a model of
24   the effects of hospital practices on neonatal and
25   post-neonatal mortality, right?
```

```
 1    A.   In this table, that's true, but I don't see the
 2    overfitting reference.
 3    Q.   Just give me a second.
 4    A.   Okay.
 5    Q.   And in this table, Table 9, you present the coefficients
 6    from your model in standard errors, correct?
 7    A.   Yes.
 8    Q.   And then down at the bottom you have a note.  Do you see
 9    that?
10    A.   Yes.
11    Q.   And this is the discussion we were just having.  500,000
12    observations.  But I think in this model you only have about
13    600 deaths, right, something --
14    A.   Yes, around that, yes.
15    Q.   Very rare event, right?
16    A.   Yes, yes.
17    Q.   And so like admission to Harvard is pretty rare, but even
18    rarer, right?
19    A.   Yes.  But the predictions that are done and the risk of
20    overfitting has to do with how I classify these two groups.
21    I could explain in more detail if you'd like.
22    Q.   I only have a real simple question.
23    A.   Okay.
24    Q.   You had a huge number of observations, small number of
25    deaths, right?
```

1    **A.**   Yes.  But I just want to make clear the overfitting

2    doesn't have to do with like the coefficients in this model.

3    It has to do with how we choose the groups with low risk and

4    high risk of death.

5    **Q.**   Sure.

6    **A.**   Okay.

7    **Q.**   But the one thing you did to try to make sure you didn't

8    have a problem with overfitting was use 10-fold

9    cross-validation, correct?

10    **A.**   Well, we use -- yes, I used 10-fold cross-validation but

11    not for focusing on the coefficients but rather -- I'm going

12    to have to explain this in some detail.

13          So we wanted to focus on high-risk and low-risk

14    babies, and there's a well-known concern when one uses -- we

15    don't have a natural indicator of risk, so we fit a logit

16    model for risk.  But if you use the same logit model to then

17    classify who is high risk and low risk and then fit a model

18    inside of each of those two populations, there's a problem

19    there.  A little bit like a circularity problem.

20          And so what one does is use nine-tenths of the data

21    to predict risk and then, using that, classify each

22    individual.  It's rather complicated, and I don't want to

23    take too much of Your Honor's time.

24    **Q.**   That's okay.  Yesterday I got in trouble for asking

25    again.  I'm waiting.  I'm not going to ask.  But is that

1   sufficient?  Because I would like to move on.

2   **A.**  Yes, I just want to emphasize --

3   **Q.**  Go ahead.

4   **A.**  This is not anything to do with the kind of overfitting

5   issue in, say, what you were talking about before.

6   **Q.**  Yesterday you said -- I think it might have been two days

7   ago.  Hold on.  Trial Day 12.  I think it was two days ago.

8   I'm losing track of my days.  You said on the transcript at

9   158 that, "One of the problems with Professor Arcidiacono's

10  model is that he wasn't looking at the actual applicant

11  pool."  You said that, right?

12  **A.**  Right.

13  **Q.**  That's one of your criticisms?

14  **A.**  I can't remember the context.  Could I see the whole --

15  **Q.**  I'll take it off.  Is one of your criticisms of Professor

16  Arcidiacono that he didn't use the, quote, actual applicant

17  pool?

18  **A.**  Yes.  That's certainly a very important one of my

19  criticisms, that he's excluding the ALDC.

20  **Q.**  But you excluded a very large group of applicants from

21  your analysis, didn't you?

22  **A.**  Which group are you talking about?

23  **Q.**  You don't remember excluding a large group of applicants?

24  **A.**  Do you mean the foreign applicants?

25  **Q.**  Yes.  International citizens.  You excluded that group of

1    applicants from your model, correct?

2    **A.**  Yes, as did Professor Arcidiacono.

3    **Q.**  I'm just talking -- you tried to build the best model of

4    Harvard admissions as you can, right?

5    **A.**  Yes.

6    **Q.**  So let's just talk about your model.  You excluded

7    international citizens, non-U.S. citizens from your model,

8    correct?

9    **A.**  Roughly speaking, yes.

10   **Q.**  Even though many of those non-U.S. citizens actually go

11   to U.S. high schools and participate on the domestic dockets

12   and are discussed in subcommittee and full committee and get

13   profile ratings, right?

14   **A.**  My understanding is that they're on international

15   dockets.

16   **Q.**  Well, maybe I can refresh your memory.  There's

17   international dockets for people who live outside of the

18   United States?

19   **A.**  Yes.

20   **Q.**  Then there's foreign nationals who live in America who go

21   to U.S. high schools who are on the domestic dockets.  Does

22   that sound right?

23              If you don't know, you don't know, sir.  That's

24   fine.

25              MR. WAXMAN:  Your Honor, I want to object at this

1    point.  Both sides agreed at the outset, and it's reflected

2    in Professor Arcidiacono's original report, that the

3    comparisons would be -- because the allegation of

4    discrimination is against domestic applicants who are

5    Asian-American, that the models would look at domestic

6    applicants and not at foreign applicants.

7            THE COURT:  Well, okay.  Just now clarify this for

8    me.  So you're saying that they are excluding the

9    international docket, or they agreed to also exclude

10   foreign-born on the domestic docket?

11           MR. MORTARA:  It's both, Your Honor, but that's not

12   the -- not even the point of this at all.

13           THE COURT:  Now I want to understand it.

14           MR. MORTARA:  I can explain for our side.

15           THE COURT:  Okay.

16           MR. MORTARA:  Professor Arcidiacono did not use

17   people living in other countries, international citizens --

18   foreign nationals who live in other countries, and did not

19   use foreign nationals that go to U.S. high schools who

20   participate on the domestic dockets.  That's true.

21           Professor Card has offered a criticism that you

22   can't take information out of the model.  As you can I think

23   apprehend, I'm not talking about Professor Arcidiacono.  I'm

24   talking about what's good and bad to do.  And he also took a

25   bunch of information out of the model, and that's the point

1    of this cross, which I'm sure you already got.  This has

2    nothing to do with who did what and when and agreements.  It

3    has to do with crossing the witness about the approach.

4           THE COURT:  The cross-examination is perfectly

5    appropriate.  On a separate point, I now want to understand

6    whether we have excluded foreign-born -- if foreign-born

7    students who go to U.S. --

8           MR. MORTARA:  They're not U.S. citizens.

9           THE COURT:  So it has to -- the international

10   docket is defined by citizenship?

11          MR. MORTARA:  No.  So as far as I understand it,

12   and Mr. Waxman can correct me, there are international

13   dockets that are devoted to people who live outside of the

14   United States.  They were excluded.

15          THE COURT:  Yes.

16          MR. MORTARA:  There are also domestic dockets where

17   foreign nationals, i.e., a citizen of, say, El Salvador can

18   go to a U.S. high school and apply from his U.S. high school

19   with all the same information that you've seen a zillion

20   times, and they participate on the domestic docket, so for

21   instance if they're in Los Angeles, they're on the C docket

22   and they're discussed in subcommittee and full committee in

23   exactly the same way.  Neither expert used them.

24          THE COURT:  How are those people even extracted?

25          MR. MORTARA:  There's a citizenship code in the

1    database.

2            THE COURT:  Are we agreed that -- what did you say,

3    it was citizenship?

4            MR. MORTARA:  Yeah, it's based on citizenship.

5            MR. WAXMAN:  The parties agreed that we'd be

6    looking at the sets of applicants as to whom there's alleged

7    discrimination.  Dr. Arcidiacono ran his model in the way

8    that I believe Mr. Mortara has accurately represented, and

9    Dr. Card did the same thing.  So when the argument is that he

10   excluded people from the model, the model was the model of

11   the universe of applicants as to whom there is an allegation

12   of discrimination.

13           THE COURT:  Okay.  So he's not responsible, as it

14   turns out, for what is included in the model, but you are

15   free to cross-examine him on what the decision to leave those

16   people out did to the model.

17           MR. MORTARA:  Sure.  Thank you.  That's perfect.

18           THE COURT:  So then I'm perfect?  Can someone note

19   the date and time?

20           MR. MORTARA:  Your Honor, if you're going to

21   provide an opportunity for me to praise you on the record,

22   then I could go on.  I have a prepared speech that will last

23   15 and a half minutes.

24           MR. LEE:  If he does that, then we're definitely

25   not closing Monday.

1          MR. WAXMAN:  Your Honor, of course all of Your
2    Honor's rulings --
3          THE COURT:  I know --
4          MR. WAXMAN:  -- ruling on them are, quote, perfect
5    as Mr. Mortara says.  We can provide the court, in fact I can
6    provide the court now the citations to Professor Card's
7    report where he explains this.
8          MR. MORTARA:  Can he do that on redirect?
9          THE COURT:  I just want to understand.  I wanted to
10   make sure we were working off the same dataset, and I wanted
11   to know who was excluded.  But this area for
12   cross-examination is appropriate.  If he wants to look at
13   what the effect that agreement might have had on the
14   analysis, that's fine.
15         MR. MORTARA:  Sure.  I'm ready to keep going now.
16         THE COURT:  I'm sure you are.  Go ahead.
17   Q.  All right.  Now that we've got that out of the way,
18   Professor Card, we were talking about non-U.S. citizens who
19   apply to Harvard.  And the funny thing is you made this
20   comment on day one about how if you were applying to Harvard,
21   you wouldn't have gotten an academic 2 or something that
22   like.  Do you remember what you said about that?  Do you
23   remember that, this reference you made to yourself?  I
24   remember it.  Do you remember that?
25   A.  I said I wasn't sure I would get a 2 on anything, yes.

 1   **Q.**  Yeah, and I thought to myself, I think, if Professor Card

 2   had applied to Harvard, he wouldn't even be in the model,

 3   would you?  And the reason is -- and I'm delighted to report

 4   that you've rectified the situation, but I think when you

 5   applied to college, were you only a citizen of Canada?

 6   **A.**  Yes.

 7   **Q.**  And now you're a dual citizen, right?

 8   **A.**  Yes.

 9   **Q.**  So you wouldn't have even been in the database because

10   you were a foreign national.  Great.

11          Now, do you know the percentage of applicants that

12   were excluded from your model that are foreign nationals; do

13   you know the percentage of overall applicants?  Is it bigger

14   or smaller than the ALDCs?

15   **A.**  The number of applicants excluded -- I'm just looking at

16   my report.  Could you give me a few seconds?

17   **Q.**  Sure.

18   **A.**  So for example, it's going to be something like 10,000

19   students per year in the more recent years, I think, around

20   that order of magnitude.

21   **Q.**  If you could turn in your binder to Tab P319, I've got

22   the numbers up there for you.

23          THE COURT:  What was the exhibit?

24          MR. MORTARA:  P319.  Then I'm going to move on,

25   Your Honor.

1   **Q.**  Do you see it's about 5,000 applications, 16.4 percent of

2   applications.  Do you see that?

3   **A.**  Yes.  I also see -- I think this is an extremely

4   important point, that's only 194 admits.  So it's a

5   relatively small number of admits, whereas the ALDCs of

6   course are almost 30 percent of the admits.

7   **Q.**  It's the same number of admits as Hispanic?

8   **A.**  Hispanic-American students -- Hispanic or other American

9   students.

10  **Q.**  Yeah, 195.  Do you see it on the thing right there?

11  **A.**  Yes.

12  **Q.**  Okay.  Let's now focus on ALDCs and talk about the

13  process that they participated in.  Staff interviews,

14  Professor Card.  Do you think staff interviews are given out

15  in the same process to ALDCs and non-ALDCs?

16  **A.**  Well, my understanding of staff interviews is that they

17  can be requested by a student; and if there's someone

18  available to do it, then it's a student-driven thing.

19  **Q.**  You think it's the same process, there's no special

20  treatment for ALDCs?

21  **A.**  I'm not sure what you mean by "special treatment."

22  **Q.**  Were you here for my cross-examination of Director

23  McGrath, sir?

24  **A.**  I was not, no.

25  **Q.**  So you don't know that Director McGrath testified that

**JA3193**

1    there's a set-asides for interviews for the children of

2    donors, legacies and athletes?  You didn't know that?

3             MR. WAXMAN:  Objection.  That's mischaracterizing

4    the testimony.  Perhaps we could see what Director McGrath

5    said.

6             THE COURT:  You can either show him what Director

7    McGrath said, or you can rephrase the question.

8    Q.  Starting at the bottom of the screen, line 25, I'll just

9    read it, Professor Card.

10            "And some of the other ways you can get interviews

11   is if you're the child or relative of a donor, is that

12   right?"

13            "That may happen.

14            "It does happen.  And some of the other ways you

15   could get interviews are, for instance, you set aside a quota

16   of interviews for recruited athletes for each team."

17            Answer:  "We do interview a number of athletes for

18   each team, and we do have a target number for that."

19            Question:  "You have a set-aside number for

20   interview slots for recruited athletes?"

21            Answer:  "Yes.  We have a number, we agree, of not

22   doing more than, yes."

23            Do you see that?

24   A.  Yes.

25   Q.  Do you see all of that?  I read it to you.  That's what

```
 1    Director McGrath said.  Then it goes on, "And you can even
 2    get an interview outside of the September to November
 3    timeframe that you tell the world on the website you can get
 4    one in if you're in one of these special categories?"
 5              Answer:  "Yes."
 6              Do you see that?
 7    A.  I see what you're saying.  I would really like to read
 8    the whole thing to understand it better.
 9    Q.  Great.  But here is now my question.
10    A.  Okay.
11    Q.  If ALDCs have special access to interviews, quotas for
12    athletes outside of the normal timeframe, that's not the same
13    process, is it?
14    A.  My understanding is that, first of all, the number of
15    students on the dean's list is quite small.  They're omitted.
16    So my understanding is that there could be a process that
17    gives interviews for recruited athletes.  That's a very small
18    number of students.  So I don't think that's necessarily
19    meaning that other students can't ask for an interview.  And
20    my understanding is if you ask for an interview and it's
21    possible to schedule one, they'll do one even by Skype.
22    Q.  First come/first served, but there are special privileges
23    for ALDCs, set-aside quotas and outside of the normal
24    timeframe?
25              MR. WAXMAN:  Objection.  That completely
```

 1    mischaracterizes even the testimony that Mr. Mortara has --
 2    there's nothing here about set-asides for ALDCs.
 3            THE COURT:  Okay.  That's true.  Rephrase the
 4    question.  And what's the exhibit number on the staff
 5    interviews?
 6            MR. MORTARA:  This is PD 38.3.  It's one of
 7    Professor Arcidiacono's demonstratives.  Your Honor, it also
 8    comes from admitted Plaintiff's Exhibit 619.  I'm about to
 9    get into this, as I think you're anticipating, Your Honor.  I
10    will move on.
11    **Q.**  20 percent of ALDCs get staff interviews.  You saw that
12    Professor Arcidiacono presented that information, right?
13    **A.**  Yes.
14    **Q.**  You don't have any dispute with that, do you?
15    **A.**  I don't, but as I said, I think, in discussing these, I
16    have -- in my admissions models, I have separate controls for
17    ALDC as well as for staff interview, so they're kind of
18    separate factors in the model.
19    **Q.**  Feel free to explain as much as you need to.  That's not
20    really where I'm going, but we'll get there.  20 percent of
21    ALDCs get staff interviews, correct?
22    **A.**  That's what this says, yes.
23    **Q.**  And only 1.3 percent of non-ALDCs get the privilege of a
24    staff interview, correct?
25    **A.**  Well, I would hesitate to use "the privilege."  My

 1  understanding is it's a student-driven process.

 2  **Q.**  Well, the admission rate for people that get staff

 3  interviews is pretty good, right?

 4  **A.**  Well, of course, as you show here, for instance, many of

 5  them are ALDCs, so they have high interview -- admission

 6  rates.  And they may have other characteristics.  For

 7  instance, my guess would be many of them are from

 8  Massachusetts.  Many of them might be from nearby prep

 9  schools.

10  **Q.**  Sure.  So the only point I'm trying to make is about 45

11  percent of the people who get interviews are ALDCs.  Do you

12  agree with that?  Just looking at the numbers.  Do you want

13  me to do it, 1366 divided by 3043, 44.9 percent.

14  **A.**  I'm actually not seeing where you get the 3043.

15  **Q.**  It's at the bottom.  I'll move my little window for you.

16  Do you see that, total applicants interviewed?

17  **A.**  Okay.  Thank you.  Yeah.

18  **Q.**  45 percent of the people who get interviews are ALDCs;

19  that's right, isn't it?

20  **A.**  Yes, so less than half.

21  **Q.**  And you think that happens because it's a student-driven

22  process, not because of any special treatment ALDCs are

23  getting; that's your testimony?

24  **A.**  Well, my understanding is other students are free to

25  apply and they try to accommodate them, yeah.

**JA3197**

1    **Q.**  Do you understand that non-ALDCs can get interviews

2    outside of the September to November timeframe that's

3    advertised on Harvard's website?

4    **A.**  I'm not aware of the complete details of that, no.

5    **Q.**  So 45 percent of the interviews go to ALDCs.  And they're

6    only 5 percent of the applicant pool, right?

7    **A.**  Roughly, correct, yes.

8    **Q.**  Now, you mentioned yesterday a view of yours, that Asian

9    ALDCs receive lower personal scores than white ALDCs.  Do you

10   remember that?

11   **A.**  I wouldn't characterize it as a view.  It's an empirical

12   fact.

13   **Q.**  You didn't use a slide or exhibit or anything like that,

14   did you?

15   **A.**  No.

16   **Q.**  And those numbers aren't in your reports or in any

17   exhibit that you used, are they?

18   **A.**  No.

19   **Q.**  You did not show the court any analysis supporting your

20   view that you expressed to Mr. Waxman, did you?

21   **A.**  No.

22   **Q.**  Because there is no such analysis in your report, is

23   there?

24   **A.**  No.  We were responding -- I was trying to respond to a

25   question from the court, as I recall.  I believe she asked --

1    Your Honor asked that question more or less directly.

2    **Q.**  Fair enough.  Fair enough, Professor Card.

3            Now, did you happen to notice -- I'm going to put

4    up Plaintiff 619.  It's been previously admitted.  It's in

5    your binder, sir, if you want to look at it.

6            Did you happen to notice when you were reviewing

7    the data --

8    **A.**  Yeah, since this is so fuzzy I prefer to look at it.  So

9    where is it?

10   **Q.**  Sure.  It's in your binder.  It should be at P619.

11           THE COURT:  I don't actually have that one.

12           MR. WAXMAN:  I don't have it either.

13           MR. MORTARA:  I think he's got it.  I've got

14   copies.

15           THE WITNESS:  I don't believe I have it either.

16           MR. MORTARA:  I've got copies for everyone.  May I

17   approach everyone?

18           THE COURT:  Of course.

19   **Q.**  Plaintiff 619 is some more information about who gets

20   interviewed.  And you see that the rate of interviews for

21   Asian ALDCs is a little lower than whites.  That's the top

22   row.  Do you see all of that?

23   **A.**  Yes.

24   **Q.**  And you see the admission rates for ALDCs that get

25   interviewed is a whopping 80 percent, sometimes more than 80

Case: 19-2005    Document: 00117631846    Page: 276    Date Filed: 07/29/2020    Entry ID: 6356391
Case 1:14-cv-14176-ADB   Document 654   Filed 04/18/19   Page 58 of 261

58

1    percent across the board.  Do you see that?

2    **A.**  Yes.  Although I expect this is partially driven by the

3    preponderance of those students who might be athletes.

4    **Q.**  And athletes have a super-high admission rate, don't

5    they?

6    **A.**  Yes.  Of course, that's one of the reasons why I did that

7    analysis in my report of taking out the athletes, but yes.

8    **Q.**  And this is my question.  You talked with Mr. Waxman

9    yesterday about some review of the data in response to some

10   of the court's questions that wasn't in your report.  And you

11   didn't show any numbers, you didn't show any exhibits.

12          Did you happen to notice when you were reviewing

13   the data and coming to conclusions that are nowhere in your

14   reports or any slide or exhibit you used --

15          MR. WAXMAN:  Your Honor, hold on one second.  If

16   counsel wants to ask a question, of course, if it's proper,

17   we don't object.  This running commentary about his

18   impressions of what it is that is in his mind are

19   inappropriate as questions on cross-examination.

20          THE COURT:  I'm going to take that to be an

21   objection, and I'm going to sustain it.

22          MR. WAXMAN:  Yes.  I'm sorry.

23          THE COURT:  Skip the narrative.

24   **Q.**  Did you happen to notice in any analysis you did whether

25   Asians who got staff interviews got higher personal scores

 1  than Asians who did not get staff interviews?

 2  **A.**  No, I didn't look at that, I don't believe.

 3  **Q.**  There is a staff interview personal rating, isn't there,

 4  that's separate from the profile rating, correct?

 5  **A.**  Yes.  I don't use that information, but I believe there

 6  is such a variable.

 7  **Q.**  You didn't use the staff interview profile -- you didn't

 8  use the staff interview personal rating in your model, did

 9  you?

10  **A.**  No, I didn't.

11  **Q.**  I didn't hear you do any analysis of how whites and

12  Asians are treated on those staff interview personal ratings,

13  did you?

14  **A.**  I don't -- no, correct.

15  **Q.**  Would you agree that applicants who get a staff interview

16  and a face-to-face meeting with an admissions officer are

17  less likely to face the risk of implicit bias and

18  stereotyping because they've had that opportunity for a

19  face-to-face meeting?

20  **A.**  I hesitate to say exactly because I'm not really an

21  expert on all the mechanisms of stereotyping biases.

22  **Q.**  I'm just asking you as a sort of fellow citizen, do you

23  think that bias goes down, including racial bias, when you

24  get a chance to meet somebody?

25  **A.**  You know, unfortunately that's not necessarily my

1    experience.

2    **Q.**   Do you agree that one racial stereotype about

3    Asian-Americans is that many of them are immigrants?

4    **A.**   Again, I don't really know.

5    **Q.**   Well, you study immigration, right?

6    **A.**   I do, yes.

7    **Q.**   And you know that Asians are the fastest-growing

8    immigrant group, don't you?

9    **A.**   In the United States, yes.

10   **Q.**   So would you agree that one stereotype that might be held

11   about Asian-Americans is that they're immigrants?

12   **A.**   Yes, you know, they also -- a large fraction live in

13   California, so that's another stereotype, I guess, if that's

14   what a stereotype is.

15   **Q.**   Do you think that the stereotype I'm asking about, the

16   stereotype of being an immigrant, would apply equally to

17   Asian-American legacy applicants to Harvard?

18   **A.**   I don't know.

19   **Q.**   Well, you probably agree the majority of Asian-American

20   legacy applicants to Harvard will not be immigrants, right?

21   Their parents are in the Harvard Club.

22   **A.**   I don't -- I can't agree with that necessarily because I

23   know more about Princeton where I used to teach, and there

24   were many -- and at Berkeley where I teach now, and there's

25   many alums who live in Asia and send their children -- for

**JA3202**

Case: 19-2005    Document: 00117631846    Page: 279    Date Filed: 07/29/2020    Entry ID: 6356391
Case 1:14-cv-14176-ADB    Document 654    Filed 04/18/19    Page 61 of 261

61

1    instance, some of our major donors are from Hong Kong, and a

2    really important booster for our campus is that group.  So I

3    don't know whether you could really characterize it that way.

4    **Q.**  You think that the majority of Princeton alumni are not

5    United States citizens?

6    **A.**  No.

7    **Q.**  The vast majority of Princeton alumni are United States

8    citizens, right?

9    **A.**  I would assume so, yes.

10   **Q.**  Same with Harvard, right?

11   **A.**  I would assume so, yes.

12   **Q.**  And even the vast majority of Asian alumni of Harvard are

13   United States citizens.  You'd agree with that too, right?

14   **A.**  You know, I don't know about that.  I might be surprised.

15   **Q.**  I'll move on.

16         Two days ago -- I want to talk to you a little bit

17   more about stereotypes.  Two days ago you actually testified

18   that white applicants to Harvard were more multidimensional

19   than Asian-American applicants, didn't you?

20   **A.**  Yes.

21   **Q.**  You do realize that accusations of being one-dimensional

22   are an archaic racial stereotype about Asian-Americans, don't

23   you?

24   **A.**  No, I didn't know that.

25   **Q.**  Well, can you turn to Plaintiff's 555 in your binder.

**JA3203**

1    It's the OCR statement of findings.

2    **A.**  Yes.

3    **Q.**  And if you turn to page 39, you briefly touched on this

4    with Mr. Waxman yesterday, this document anyway.

5             THE COURT:  I'm sorry.  Where are you?

6             MR. MORTARA:  Page 39 of the OCR.

7             THE COURT:  555.

8             MR. MORTARA:  Plaintiff 555.

9    **A.**  Yes.

10   **Q.**  And you see that here in 1990, the Department of

11   Education Office of Civil Rights is talking about stereotypes

12   of Asian-Americans and including that they are

13   one-dimensional.  Do you see that?

14   **A.**  Yes.  So the sentence says stereotypically

15   one-dimensional math/science type applicants.  So this could

16   be one of those -- I believe this is when Your Honor was

17   speaking about the Oxford comma.  So I'm not entirely sure

18   whether they're one-dimensional math/science types or whether

19   it's one-dimensional more generally.

20   **Q.**  Understood, sir.  You can actually see on this page, one

21   of the things that's being discussed is how a lot of

22   Asian-Americans are CJ-ers, which means they're interested in

23   medicine as their career goal.  Do you see that?

24   **A.**  Yes.

25   **Q.**  We'll talk about that in a second.

 1           Now, you were not deploying that stereotype.
 2   You're just telling us that that's just what you see in the
 3   data, that Asians are less multidimensional than whites in
 4   the Harvard applicant pool?
 5   **A.**   Yes.  I was trying to define it precisely in terms of
 6   these ratings in that analysis.
 7   **Q.**   And you used this slide DD 10.9 to illustrate that point.
 8   You talk about number of strengths.  Do you remember that?
 9   You showed whites are better than Asians; they're more
10   multidimensional.  That's in the data; that's what you said,
11   right?
12   **A.**   Yes.
13   **Q.**   And I want to just look at what you said.  By the way,
14   this demonstrative that you created, DD 10.9, that includes
15   the personal rating, doesn't it?
16   **A.**   Yes.
17   **Q.**   I want to just take a look at what you said.  At the
18   top -- I've got your testimony.  I'm going to read it and
19   just make sure these are your views.
20           "And so when you put these three, four pieces
21   together, the multidimensional advantage coming for the white
22   students is coming because there's a higher academic strength
23   than the Asian students, there's a higher personal and higher
24   athletic strength in the white students, and that adds to a
25   multidimensional strength."  Right?

1    **A.**  Yes.  And the sentence continues on, "More balanced."

2    **Q.**  "The more balanced set of students," right?

3    **A.**  Yes.  By that I meant -- so what's important for

4    multidimensionality is not just the individual strengths but

5    also whether they're present together in a given student.

6    **Q.**  Let's go back to DD 10.9.  Who assigns the ratings you

7    were using to come to this conclusion about

8    multidimensionality?

9    **A.**  The admissions officers.

10   **Q.**  I want to make sure I get this right.  You have adopted a

11   conclusion that Asian-American applicants to Harvard are more

12   one-dimensional than whites, less multidimensional, right?

13   That's your conclusion?

14   **A.**  My conclusion is that based on these -- yes, my

15   conclusion is based on the presence of these four profile

16   ratings, which I believe are very, very important inputs to

17   the Harvard admissions process.

18   **Q.**  Will you acknowledge that one-dimensionality is an

19   archaic stereotype about Asian-Americans, that you just

20   happened to find data here supporting that it's true in this

21   instance?

22   **A.**  Well, it's your claim that that's an archaic stereotype.

23   I would hesitate to say that.

24   **Q.**  Fair enough.  It's my claim it's an archaic stereotype.

25   And this data confirms what I'm claiming is an archaic

**JA3206**

1   stereotype about Asian-Americans?

2   **A.**   I disagree with that.

3   **Q.**   What does it confirm then?

4   **A.**   It confirms that -- if I look at these four dimensions of

5   ratings that are all very important in the Harvard process,

6   as I mentioned before, the academic dimension is the most

7   common, just distinguishing by that basis, it would be

8   impossible to choose a class, and moreover that's not what

9   Harvard wants to do.  So looking at these four dimensions,

10  Asian students have a slightly lower rate of having three or

11  more of those profile ratings above 2.

12  **Q.**   And the phrase you used in your testimony with Mr. Waxman

13  was that whites are more multidimensional, right?

14  **A.**   Yes, but I think the understanding was I was talking

15  about these profile ratings.

16  **Q.**   And the profile ratings are assigned by Harvard

17  admissions officers, correct?

18  **A.**   Yes.

19  **Q.**   So it's Harvard admissions officers determining that

20  whites are more multidimensional in the way that you're

21  showing here on the slide, right?

22  **A.**   In this way, yes.

23  **Q.**   Do you think it's possible that Harvard admissions

24  officers are deploying racial stereotyping when they create

25  the dataset that you conclude shows that Asians are more

1   one-dimensional than whites?  Is that possible?

2   **A.**  Well, based purely on statistical analysis, I can never

3   say that something is impossible.  And that's what I've done

4   in the case.  But I don't think it's that likely, no.

5   **Q.**  So that's a yes, it is possible?

6   **A.**  It is possible, yes.

7   **Q.**  I want to engage you with another hypothetical and ask if

8   your model was built to detect the use of other stereotypes.

9   Going back to P555, that page we were looking at, the part

10  that I didn't highlight, it was about how Asian-Americans

11  were CJ-ers.  Do you remember that?

12  **A.**  Yes.

13  **Q.**  And that's a stereotype about Asians that they want to be

14  doctors.  Are you familiar with that stereotype?

15  **A.**  To tell you the truth, I wasn't.  On our campus, that

16  doesn't -- I've never really heard that.

17  **Q.**  Never heard that one?  Huh.  Then if you go back to page

18  24 of that document.

19  **A.**  Yes.

20  **Q.**  There's another comment pulled from a Harvard admissions

21  officer of that era.  "He's quiet and, of course, wants to be

22  a doctor."  Do you see that on the screen?  This is from the

23  OCR findings.

24  **A.**  Yes.

25  **Q.**  So would you accept that at least the Department of

 1   Education believed that there was a stereotype about Asians
 2   that they wanted to be doctors?
 3   **A.**   Yes.  But my understanding from reading their report was
 4   that they ultimately concluded that that stereotyping bias
 5   wasn't affecting the admissions of Asians and whites.
 6   **Q.**   That was from two weeks ago.  Great.  I'm just asking if
 7   it is a stereotype.
 8          MR. WAXMAN:  I'm sorry.  Again, the commentary.
 9   What was from two weeks ago?  And what does that have to do
10   with the question that this witness is being asked?
11          MR. MORTARA:  Your Honor, if I may?
12          THE COURT:  Hold on.  Let me reread it.  All right.
13   A marginal violation.
14          MR. MORTARA:  It's a yes or no question.
15          THE COURT:  "That was from two weeks ago, great."
16   Then you went back and asked the question, "I'm just asking
17   if that is a stereotype."  So the question is, is that a
18   stereotype.
19   **Q.**   Is it a stereotype of Asians that they want to be
20   doctors?
21          MR. WAXMAN:  Asked and answered, Your Honor.
22   **A.**   Yes.
23          THE COURT:  He can have the question.
24   **Q.**   That was a yes?
25   **A.**   As I said, I don't actually know the answer to that.

1    **Q.** Well, you put up a slide yesterday, or the day before, DD

2    10.54, and you wanted to show the court something, and it

3    included that Asians are significantly more interested in a

4    medicine- or health-intended career than whites. Do you see

5    that?

6    **A.** Yes.

7    **Q.** Could you engage me with a hypothetical, sir. Imagine

8    that Harvard through racial stereotyping imposes a penalty on

9    Asians who want to do medicine by valuing their applications

10   less, so they impose a penalty on Asians who want to do

11   medicine, but they don't impose that that penalty on whites.

12   Do you have that hypothetical?

13   **A.** Yes.

14   **Q.** The way you would determine that in your statistical

15   model would be to interact medicine with race, right?

16   **A.** I guess one might be able to do that. I'm not aware that

17   the -- this is an empirical fact, not a stereotype that

18   Asian-American -- Asian applicants to Harvard are more likely

19   to say they want to take medicine or health as an intended

20   career.

21   **Q.** And my hypothetical was Harvard punishes Asian students

22   through implicit or unconscious bias for conforming to a

23   racial stereotype, and that would show up; if you interacted

24   the variables of medicine and race, you would see a lower

25   coefficient or average marginal effect for Asians, a negative

Case 1:14-cv-14176-ADB   Document 654   Filed 04/18/19   Page 69 of 261

1    one, and zeroes for other races?  If my hypothetical were

2    true.  I'm not saying you did that.

3    **A.**  I would have to see the entire specification to agree

4    that's a valid test of that, but I could see that that would

5    be a test.

6    **Q.**  And you didn't do it, did you?

7    **A.**  I didn't, no.

8    **Q.**  Just one more on this one issue.  Withdrawn.

9            One more on this issue.  You also showed something

10   about parental occupations varying by race.  Do you see that?

11   **A.**  Yes.

12   **Q.**  This is slide 49.  And you pointed out that

13   Asian-Americans have a larger percentage of moms that are in

14   the computer and mathematical fields.  Do you see that?

15   **A.**  Yes.

16   **Q.**  And it's the same issue with the intended career in

17   medicine.  If Harvard was imposing a penalty on Asians who

18   conformed to a stereotype, say having a mom or even dad that

19   was involved in the computer and mathematical profession, but

20   not on whites, the way you'd figure that out is by

21   interacting parental occupation with race.  And you did not

22   do that, correct?

23   **A.**  Well, I did not do that, correct.  But I would not

24   necessarily agree that such a specification would be

25   dispositive on that issue.

1    **Q.**  You know that there's been a great deal of debate about

2    where and how Harvard has been using race in its admissions

3    process, correct?

4    **A.**  Yes.

5    **Q.**  I want to focus first on the overall rating.  You've

6    heard during this trial that the overall rating is quite

7    important in the reading of Harvard applications, haven't

8    you?

9    **A.**  No, that would not be what I understood from them.

10   **Q.**  You don't believe that the overall rating is important?

11   **A.**  Well, my understanding was that it's a preliminary

12   assessment made by the first reader and that when a file gets

13   to later stages at the docket or subcommittee level and then

14   later to the committee level, just like the other ratings

15   variables, the ratings themselves don't necessarily have much

16   effect.  It's more the actual materials in the file.

17   **Q.**  So it's at least equally as important to, say, the

18   athletic rating or personal rating or extracurricular rating.

19   Would you at least agree with that?

20   **A.**  No, I don't agree with that.

21   **Q.**  Why not?

22   **A.**  Because I don't -- my understanding of the process is

23   that it's an assessment.  It's like -- for example, in my

24   hypothetical of retirement, it would be like asking someone's

25   supervisor if they think someone is likely to retire.

Case: 19-2005   Document: 00117631846   Page: 289   Date Filed: 07/09/2020   Entry ID: 6356391
Case 1:14-cv-14176-ADB   Document 654   Filed 04/18/19   Page 71 of 261

71

1    **Q.**  And what you mean by that is shown here on the screen

2    from Trial Day 5 from Ms. Bever's testimony.

3             Question:  "Can you please describe the preliminary

4    overall rating?"

5             Answer:  "I use the preliminary overall rating to

6    give my assessment of how strong I think that particular

7    applicant is" --

8    **A.**  I --

9    **Q.**  -- "in a whole, if one can, in a rating."  Do you see

10   that?  That's what you're trying to say, right?  That's

11   agreeing with you, isn't it?

12   **A.**  I guess so, yes.

13   **Q.**  The overall rating includes an analysis of every single

14   thing, as far as you know, in Harvard's holistic admissions

15   process, right?  You heard that testimony, too.  That's what

16   we just showed.  It's the whole, right?

17   **A.**  No.

18   **Q.**  It's intended to capture the whole?

19   **A.**  Yes, but it's made -- the overall rating is made by the

20   readers at a time when they may not have all the information

21   that ultimately will be available.

22   **Q.**  Let's ask a few questions.  The overall rating takes into

23   account the teacher recommendations, right?

24   **A.**  I believe so.

25   **Q.**  The overall rating takes into account the guidance

Case: 19-2005    Document: 00117621846    Page: 290    Date Filed: 07/30/2020    Entry ID: 6356391
Case 1:14-cv-14176-ADB   Document 654   Filed 04/18/19   Page 72 of 261

72

1    counselor recommendations, correct?

2    **A.**  It could.

3    **Q.**  The overall rating takes into account the essays that are

4    written, correct?

5    **A.**  I believe it would, yes.

6    **Q.**  The overall rating, if the alumni interview has taken

7    place, the overall rating will take into account the alumni

8    interview ratings, correct?

9    **A.**  Yes, I believe it -- it would try to take account of all

10   those factors --

11   **Q.**  The overall -- sorry.

12   **A.**  -- when the person is trying to make their assessment of

13   this candidate's overall strength.

14   **Q.**  The overall rating will take into account

15   extracurriculars, right?

16   **A.**  Yes, to the extent they have all the letters at the time

17   they do it.

18   **Q.**  The overall rating would take into account athletics,

19   correct?

20   **A.**  Yes, again, same caveat.

21   **Q.**  Subject to your caveat, it will take into account

22   academics, correct?

23   **A.**  Yes.

24   **Q.**  That includes SAT, GPA, those kind of things, correct?

25   **A.**  Right.  But remember, this is just one of the reader's

1    early assessments.

2    **Q.** And it also takes into account all the observables we

3    talked about, say, for academics, like national awards and

4    how many AP classes you took or AP scores; it takes all of

5    that into account, right?

6    **A.** Yes. To the extent it's available at that time. And

7    again, subject to the fact that this is just one reviewer and

8    in the ultimate admissions decision, there's 40 votes.

9    **Q.** Yeah, but the personal rating is also the view of one

10   reviewer, right?

11   **A.** Or the second, yes, agreed.

12   **Q.** Same thing with the overall rating?

13   **A.** Agreed.

14   **Q.** Nothing different from the personal rating so far?

15   **A.** Yes.

16   **Q.** Great. It could also take into account geography?

17   **A.** Yes, I believe so.

18   **Q.** And the quality of the high school?

19   **A.** Yes, I believe so.

20   **Q.** And socioeconomic status?

21   **A.** Yes, I think so.

22   **Q.** And so far we've gone through a big list of things that

23   the overall rating includes, and the personal rating takes

24   into account potentially all those, too, although I will

25   acknowledge your testimony that you think academics are less

1    important, right?

2              MR. WAXMAN:  Objection.  That mischaracterizes the

3    testimony.

4    **Q.**  Please answer whatever way you see fit.  The personal

5    rating takes into account all of these things as well,

6    correct?

7    **A.**  I think the personal rating would -- I'm having a hard

8    time remembering the full list of questions you've asked me.

9    **Q.**  I'll give you a big list.  And then --

10   **A.**  I think it would take into account all these guidance

11   counselor letters and so on, yes.

12   **Q.**  And extracurriculars, athletics, geography, quality of

13   the high school, socioeconomic status and even a little bit

14   of academics, right?

15   **A.**  I'm not entirely sure about athletics.

16   **Q.**  Okay.  With that caveat?

17   **A.**  For example, for example -- I'm just giving an example --

18   I'm not entirely sure I agree with that.

19   **Q.**  The overall rating also includes consideration of

20   Harvard's confessed use of race, correct?

21             MR. WAXMAN:  Objection.  Again, can we have

22   questions instead of freighted conclusions like "confessions

23   of the use of race."  Harvard proclaims that it takes race

24   into account in its admissions process and that that factor

25   is included in the preliminary overall rating and not the

1   other -- not the four profile ratings.

2            MR. MORTARA:  Your Honor --

3            THE COURT:  Overruled.

4            MR. MORTARA:  Thank you.  And I would ask that the

5   coaching stop, but here we go.

6            MR. WAXMAN:  This is not coaching.  This is

7   embedding in a question a freighted conclusion that Harvard

8   has, quote, confessed to something.  The rest of the question

9   is not objectionable.

10            MR. MORTARA:  I'll rephrase the question to resolve

11   the objection.

12            THE COURT:  The question -- if you want to give me

13   a big explanation about why the question is objectionable,

14   let's do it at sidebar.  If you just want to object, all you

15   have to do is stand up and object and give me either the rule

16   or two sentences -- two words on mischaracterizes, for

17   example.

18   **Q.**  All right.  The preliminary overall rating also includes

19   Harvard's admitted use of race.  You've heard a bunch of

20   Harvard witnesses testify and admit they use race in the

21   overall rating, correct?

22   **A.**  Yes.  My understanding is, of course, that race is not a

23   factor in many students' cases, but it could be -- for highly

24   competitive cases, it could be a factor, yes.

25   **Q.**  I want to talk about your work on the overall rating in

```
 1    your reports.  Are you ready?

 2    A.   Yes.

 3    Q.   There isn't any work on the overall rating in your

 4    reports, is there?

 5    A.   There is no models of the overall rating, no.

 6    Q.   You did no work on the overall rating in your reports,

 7    did you?

 8    A.   I believe the word would be mentioned in my reports.

 9    Q.   But you did no analysis or work related to the overall

10    rating in your expert reports, correct?

11    A.   I did not report any analysis in my reports.

12    Q.   I'm only asking about things you've reported.

13    A.   Yes, yes.

14    Q.   And that's because you decided very early on that the

15    evidence suggested that the overall rating already included

16    some potential race-based tips so you did almost no careful

17    analysis of it, correct?

18    A.   Yes, that was true at the time of my deposition.  Since

19    then --

20         MR. MORTARA:  Your Honor, I'm going to ask him to

21    stop.  I only want disclosed opinions.  My question is very

22    clear.

23         THE COURT:  Well, you asked him -- you said you did

24    almost no careful analysis of it, correct, with no timeframe

25    on it, and he said, yes, that was true at the time of his
```

JA3218

1    deposition.

2           MR. MORTARA:  That's the answer.  I didn't ask for

3    undisclosed expert opinion, Your Honor.

4           THE COURT:  Well, I don't think he was giving you

5    an undisclosed expert opinion.  I think he was trying to take

6    your question which did not have a timeframe and say this was

7    then and that was at a different time.  Either you can ask a

8    follow-up question or they can ask it when it's their turn.

9    Q.  Go ahead, sir.

10   A.  I'll stay with that answer if you want.

11   Q.  Tell me whatever it is that you wanted to tell me.

12   A.  I was going to say I've looked at the issue in much

13   greater detail since then.

14          MR. MORTARA:  Your Honor, could I have a sidebar?

15          THE COURT:  Yes.  Do you guys want a morning break,

16   or do you want to keep going until noon?  How about a

17   15-minute break so we can talk for five minutes and then you

18   can have a ten-minute break, so we'll be back at 11:25.

19          [Sidebar sealed and redacted.]

20          (Recess taken.)

21   BY MR. MORTARA:

22   Q.  Professor Card, you did not include the overall rating in

23   any of the admissions models in your expert reports, correct?

24   A.  Correct, yes.

25   Q.  And that's since your analysis seeks to isolate the

1    incremental effect of race on admissions decisions, it is

2    inappropriate to include any variables that themselves can be

3    affected by race, correct?

4    **A.**  Yes.

5    **Q.**  You agree that if one of Harvard's ratings, such as the

6    overall rating, may be influenced by an applicant's race,

7    then it should not be included in any model that is

8    attempting to estimate the effect of race, correct?

9    **A.**  Not precisely, no.

10   **Q.**  Could you turn to your first expert report.  At page 63,

11   sir.

12           (Pause.)

13   **Q.**  Are you there?

14   **A.**  Yes.

15   **Q.**  And over to the top of 64 in paragraph 132, it says, The

16   second row also relies on Professor Arcidiacono's model six

17   but removes the overall rating.  Do you see that?

18   **A.**  Yes.

19   **Q.**  Professor Arcidiacono's model six had included the

20   overall rating, correct?

21   **A.**  Yes.

22   **Q.**  And you say, comma, which should not be included in any

23   model that is attempting to estimate the effect of race

24   because, as discussed above, the overall rating may be

25   influenced by an applicant's race.  That's in your expert

```
 1   report, right?
 2   A.   It is, yes.  But the "as discussed above" is trying to
 3   make the point that it's about, like, race per se has an
 4   effect on the rating rather than race may be a contextual
 5   factor.
 6   Q.   "Per se," that's not a phrase that appears anywhere in
 7   your expert reports in connection with this issue, is it?
 8   A.   I don't actually know.
 9   Q.   You think a rating cannot be used in your model even if
10   the influence of race in that rating may be just a positive
11   one, in other words, only a tip being given to
12   African-Americans, Hispanics, and other groups, right?
13   A.   Yes.  If it was a pure tip based on the race alone, yes,
14   I would say it should be excluded.  Yes, I agree.
15   Q.   And because you decided very early on that the evidence
16   suggested that the overall rating already included some
17   potential race-based tips, at the time of your deposition you
18   had done almost no careful analysis of it, correct?
19   A.   Yes.
20   Q.   So we've got may be influenced by race, can be affected
21   by race, and potential race-based tips in the overall rating,
22   correct?
23   A.   I don't quite understand the question.
24   Q.   The overall rating may be influenced by race, correct?
25   A.   Yes.
```

**JA3221**

1    **Q.**  The overall rating can be affected by race, correct?

2    **A.**  Yes.

3    **Q.**  The overall rating contains some potential race-based

4    tips, correct?

5    **A.**  Yes.

6    **Q.**  And that corresponds -- I know you were here for Dean

7    Fitzsimmons' testimony -- to what Dean Fitzsimmons said on

8    page 50 of day 4, putting it on the screen at line 7.

9           "Q.  How could race be considered in the

10   preliminary overall rating?

11          "A.  If as the -- you're doing your preliminary

12   overall rating if you think that this might be an additional

13   little element that might be helpful in terms of making a

14   case that this person, as I say, might be an unusual educator

15   of others, the person might decide to factor that into the

16   preliminary overall rating."

17          Did you hear Dean Fitzsimmons give that testimony?

18   **A.**  I believe I did, yes.

19   **Q.**  In preparing your reports in this case, you relied on

20   Dean Fitzsimmons and a personal phone call you had with him

21   for your view that race was not influencing the personal

22   rating, correct?

23   **A.**  Among other materials, yes.

24   **Q.**  And as of your deposition, you did nothing to verify what

25   Dean Fitzsimmons told you, correct?

1    **A.**  Correct, yes.

2    **Q.**  Now, we showed earlier the results of your model from

3    Exhibit 21 of your opening report, if you remove the personal

4    rating.  And what you told me was, the overall average

5    marginal effect is statistically significant and negative.

6    Correct?

7    **A.**  Yes.

8    **Q.**  If the personal rating may be influenced by race, per se,

9    whatever way that you think it applies to the overall rating,

10   then removing it from your model results in the finding of a

11   statistically significant Asian penalty, correct?

12   **A.**  Yes, excluding it entirely, which I don't think it would

13   be the right thing to do, but, yes.

14   **Q.**  Now I want to talk about the modified ratings model you

15   showed yesterday.  This is your slide DD 10.83.  No

16   significant effect of Asian-American ethnicity using modified

17   ratings.  Do you see that?

18   **A.**  Yes.

19   **Q.**  And this is where you used Professor Arcidiacono's

20   ratings models for the personal extracurricular and academic

21   ratings to try to remove any effect of race from them, and

22   then you substituted those recalculated ratings for the real

23   ones in the database and ran your model again.  Do I have

24   that right?

25   **A.**  Yes.

1   **Q.**  And to be clear, you were no longer using the actual

2   ratings that Harvard reviewers assigned, you were using these

3   mapped or virtual ratings that you had computed using the

4   ratings models, right?

5   **A.**  Yes, that's what I've done here.  I have done it the

6   other way as well.

7   **Q.**  The regular way, which is your preferred model, right?

8   **A.**  No, I have done it the other way where I actually take

9   the actual rating and subtract off the effect of race.

10  **Q.**  Is that what this is?

11  **A.**  No.

12  **Q.**  What is this?

13  **A.**  This is using the predicted ratings, as you said,

14  precisely as you said.

15  **Q.**  I want to make sure I understand here.  You removed the

16  Asian effect from the ratings when you did this modified

17  ratings model, right?

18  **A.**  I removed the effects of race from all three of the

19  ratings, yes.

20  **Q.**  Okay.  Just want to make sure we have that.

21          I'm sorry, Professor Card, now I lost my train of

22  thought.  I'll get it back in just ten seconds.

23          You didn't use the ratings from Harvard's database,

24  you substituted modified ratings, correct?  In what's showing

25  on DD 10.83?

1    **A.**  Yes.  That would be a way to summarize it, yes.

2    **Q.**  All right.  Now you removed the effect of race that you

3    were talking about yesterday with Mr. Waxman on the three

4    profile ratings -- academic, extracurricular, and personal --

5    when you made these modified ratings, right?

6    **A.**  Yes.

7    **Q.**  And what that really means is so on academic, there was a

8    positive Asian coefficient, right, and you associated that

9    with unobservables like national awards and other things,

10   right?

11   **A.**  My belief is that's the correct interpretation of that.

12   Just as my interpretation of all the racial gaps is like

13   that.  But in this exercise I'm not making a stand on what

14   the source of this difference is.  I'm just subtracting it

15   off.

16   **Q.**  You were playing even-Stevens with all the three ratings,

17   right?  You just took out race in all of them.

18   **A.**  Yes.

19   **Q.**  And what that means is that because there was a positive

20   effect of being Asian on the academic rating which you

21   associated with unobservables, you would end up moving some

22   Asians from a 1 to 2 and some from a 2 to 3.  That's what

23   it means to pull out a positive effect, right?

24   **A.**  Yes.

25   **Q.**  And same thing with extracurricular, although the effect

1   was smaller, some would go from a 1 to a 2 and some would go

2   from a 2 to a 3, right, for Asians?

3   **A.**   No, that's not correct.  The effect is bigger for

4   extracurricular.

5   **Q.**   Oh, okay.  There are still some that go from 1 to 2 and 2

6   to 3, right?

7   **A.**   Yes.

8   **Q.**   And then for personal, it kind of runs the other way.

9   Same Asians would go from 3 to 2s and some would go from 2 to

10  1s, right?

11  **A.**   Yes.

12  **Q.**   So you've reduced the Asian ratings on two of the ratings

13  and raised them on one, and then you recalculate -- you've

14  done it for everybody else, too, for whatever race effects

15  there are, whites, blacks, Hispanic and other, right?

16  **A.**   Yes.

17  **Q.**   Then you recalculated it, and these are were the results

18  that you got, right?

19  **A.**   Yes.

20  **Q.**   And I think you already said this, but in this instance,

21  you were assuming that the race effects seen in the academic

22  and extracurricular ratings were actually because of race,

23  because Professor Arcidiacono has concluded that the race

24  effects in the personal rating are because of race, right?

25  **A.**   I don't remember my precise wording.

**JA3226**

1    **Q.**  Use your own words.

2    **A.**  Okay.  So what I was trying to do was if one was

3    concerned about the effect of race influencing each of these

4    three ratings for some reason other than unobservable

5    characteristics, so animus against Asians, for example, or

6    some kind of stereotyping bias, whatever that means, then I

7    tried to adjust all three on an equal basis from the model

8    that he had developed his model 5 in each case.

9    **Q.**  And just to be clear for the record, you don't actually

10   believe that the academic and extracurricular models have an

11   Asian boost that comes from race, just like you don't believe

12   that the personal rating has an Asian penalty, right?

13   **A.**  That's right.  I think that -- that's right, yes.

14   **Q.**  Now, you used Professor Arcidiacono's ratings models to

15   do this, right?

16   **A.**  Yes.

17   **Q.**  But you criticized Professor Arcidiacono's ratings models

18   for their low explanatory power, right?  That's what's shown

19   here on DD 10.61, particularly the personal rating and

20   extracurricular rating.  You spent some time yesterday

21   criticizing the low explanatory power of Professor

22   Arcidiacono's rating models, right?

23   **A.**  I pointed out that they have low explanatory power.  As I

24   said I think yesterday very clearly, simply having a low R

25   squared or pseudo R squared isn't necessarily the damaging

**JA3227**

1    criticism.  What is important to realize, though, is when

2    there's a low R squared or pseudo R squared, there's an

3    enormous influence of unobserved factors, and that opens up

4    the door for potential omitted variable bias.

5    **Q.**  Okay.  So now we have your virtual rating on modified

6    rating analysis, it's a rating where Asians get lower

7    academic ratings than they should have because you took out

8    the unobservable effects, right?

9    **A.**  On the average across all the Asians there would be some

10   reduction in their academic scores, yes.

11   **Q.**  And that means that this modified model will potentially

12   explain some Asian rejections based on this modified lowering

13   of the academic rating, correct?

14   **A.**  Well, all three are done at once.

15   **Q.**  I'm going to go through all three.

16   **A.**  All right.

17   **Q.**  But that's correct, right, about the academic rating?

18   **A.**  So it's going to lower their ratings, and then the model

19   is going to be re-estimated to see how different candidates

20   compare against each other, yes.

21   **Q.**  And with the lower academic rating, it will explain Asian

22   rejections on the basis of that modified rating -- I'm going

23   to do all the ratings, all three of them.

24          THE COURT:  What's the slide number on this?  I

25   know it's ten --

1          MR. MORTARA:  This one, Your Honor, is DD 10.61.

2          Let me go back to the modified ratings analysis at

3    some point.

4    Q.  All right, so I'll ask my question again.  What it means

5    is your virtual ratings analysis model will potentially

6    explain Asian rejections based on an artificially lowered

7    academic rating, correct?

8    A.  No.

9    Q.  Well, what's wrong with what I said?

10   A.  Well, it's not artificially lower.  It's subtracting off

11   the component of that rating, precisely the component of that

12   rating, each of the ratings, that Professor Arcidiacono's

13   model explains as being unobservably different between

14   Asian-Americans and whites controlling for all the other

15   factors in his model.

16   Q.  And just to be clear, you don't think race is influencing

17   the academic or extracurricular ratings, right?

18   A.  I think the most likely -- correct.  My mostly likely

19   explanation is unobserved characteristics, yes.

20   Q.  But you substituted lower academic and extracurricular

21   ratings for Asians because of the unobservable

22   characteristics effect Professor Arcidiacono found, right?

23   In your modified reason analysis, that's what you did.

24   A.  Right.  So as I said -- correct.  His models find that,

25   for whatever reason, the raters, the readers of the file are

Case: 19-2005  Document: 00117631846  Page: 306  Date Filed: 07/29/2020  Entry ID: 6356391
Case 1:14-cv-14176-ADB  Document 654  Filed 04/18/19  Page 88 of 261

88

1    assigning a higher academic and extracurricular rating than

2    can be predicted by the observables, just as they find a

3    lower personal rating than can be explained by the

4    observables.  So I took all three at once, yes.

5    **Q.**  Thank you, Professor Card.  Sorry it took so long.

6           Professor Card, you did not address anywhere in

7    your expert reports or your deposition Professor

8    Arcidiacono's model of the teacher and guidance counselor

9    ratings, did you?

10   **A.**  I don't believe I have any written commentary on that,

11   but I certainly thought about them.

12   **Q.**  I'm only asking about what you've disclosed to us, okay.

13          But you were here when Professor Arcidiacono talked

14   about his findings that race influenced those ratings,

15   weren't you?

16   **A.**  I was here when he said something about that, yes.

17   **Q.**  Your modified rating analysis did not deploy the teacher

18   ratings, did it?  It didn't change them.  It used them as

19   they were in the database, did not remove any race effects

20   from the teacher ratings, correct?

21   **A.**  Correct.

22   **Q.**  And one other thing about your virtual rating analysis,

23   the overall rating, you did not use the overall rating in the

24   modified rating analysis, did you?

25   **A.**  No.

1  **Q.**  Now, you understand that Professor Arcidiacono has a

2  ratings model of the overall rating, correct?

3  **A.**  Yes.

4  **Q.**  You could have used Professor Arcidiacono's ratings model

5  of the overall rating to also modify it in your modified

6  rating model, correct?

7  **A.**  Yes, I could have.  And of course, we weren't using --

8  neither of us was using the overall rating in the model, so

9  that didn't seem to be a first order of concern.

10  **Q.**  I just want to get something straight.  The purpose of

11  the modified ratings analysis is to try to get out the

12  effects of race from Harvard's admissions process and see

13  what it looks like working from, in the first instance,

14  Professor Arcidiacono's models, right?  That's the purpose of

15  it.

16  **A.**  Working on the three profile ratings, yes.

17  **Q.**  But there's an effect of race in Harvard's admissions

18  process in the overall rating, correct?

19  **A.**  In his models there is, yes.

20  **Q.**  I mean, Harvard admits it uses race in the overall

21  rating, right?

22  **A.**  Yes.

23  **Q.**  And you did not take out the effect of race from the

24  overall rating and then use it in your modified ratings

25  analysis even though you could have, right?

1    **A.**  I didn't report that, but, actually, I did that exercise.

2    **Q.**  You didn't disclose it to us, did you?

3    **A.**  Well, I didn't because it's actually more favorable -- it

4    makes the Asian-American ethnicity effect even smaller,

5    closer to zero.

6              MR. MORTARA:  Your Honor, I move to strike the last

7    answer.

8              MR. WAXMAN:  It's totally responsive.

9              MR. MORTARA:  It's a yes or no question.

10             THE COURT:  No, it's not responsive.  The answer is

11   struck.

12             The question was:  You didn't disclose it to us,

13   did you?

14   **Q.**  Now, Professor Card, the admissions models you made are

15   discrete choice models as we've discussed, right?

16   **A.**  Yes.

17   **Q.**  And you teach discrete choice modeling at Berkeley,

18   right?

19   **A.**  Yes.

20   **Q.**  You teach discrete choice modeling in your labor

21   economics course, correct?

22   **A.**  Sometimes, yes.

23   **Q.**  And when you teach discrete choice modeling in your labor

24   economics course, you assign your students as recommended

25   reading works by Professor Michael Keane, correct?

 1   **A.**   I don't actually remember but, perhaps, yes.

 2   **Q.**   Let me see if I can refresh your memory.

 3           MR. MORTARA:  May I approach, Your Honor?

 4           THE COURT:  Sure.

 5   **Q.**   What I've handed you, Professor Card, is a partial course

 6   outline and reading list for Economics 250A.  This is the

 7   course outline and reading list for your labor economics

 8   course.

 9   **A.**   Well, I haven't taught this particular course for several

10   years, but, yes.

11   **Q.**   And if you turn to the third page, you'll see there's a

12   lecture on structural modeling?

13   **A.**   Yes.

14   **Q.**   And there's two articles, including one that's

15   double-starred by Michael Keane, double-star indicating that

16   you recommend reading that, correct?

17   **A.**   Yes.

18   **Q.**   And Professor Keane is a recognized leader in the field

19   of discrete choice modeling, isn't he?

20   **A.**   I think that's fair to say, yes.

21   **Q.**   And in fact, in your handbook of labor economics that you

22   edit, the discrete choice modeling chapter is by Michael

23   Keane, correct?

24   **A.**   Yes, with a co-author, I believe.

25   **Q.**   It's co-authored by Michael Keane, correct?

1    **A.**  Yes.

2    **Q.**  And you heard Mr. Lee talk with Professor Arcidiacono

3    about a group of economists who wrote a brief to this Court

4    agreeing with you.  Do you remember that?

5    **A.**  Yes.

6    **Q.**  It was actually an exchange between Professor Arcidiacono

7    and Mr. Lee, and Mr. Lee said something like Janet Yellen --

8    Dr. Card agrees with Janet Yellen, and I think Professor

9    Arcidiacono said, I'd actually say it's more like she agrees

10   with Professor Card.  Do you remember that?

11   **A.**  I remember some exchange.  I don't remember the precise

12   words.

13   **Q.**  And Mr. Lee mentioned Janet Yellen, and you referred to

14   two Nobel Prize winners, who are George Akerlof and Robert

15   Solow, right?

16   **A.**  Yes.

17   **Q.**  Did you share the results of your model, including all

18   the coefficients, with Janet Yellen?

19   **A.**  No.

20   **Q.**  Do you assign articles about discrete choice modeling

21   written by Janet Yellen to your students?

22   **A.**  No, they're not on my -- no.

23   **Q.**  I didn't think so.

24          So now let's look at C70.  I'm going to hand that

25   to you right now.  It's your binder.  You've got it in your

1    binder.  They've got it in their binder.  No one needs it to

2    be handed to them.

3            And this is a brief filed by economists, including

4    Michael Keane -- and that's the same Michael Keane whose

5    readings you assign when you teach discrete choice modeling

6    at Berkeley, correct?

7    **A.**   Yeah, one of his papers, yes.

8    **Q.**   And there's another gentleman here, named Fang Hanming,

9    Hanming Fang as he's also called, is a professor of economics

10   at the University of Pennsylvania, correct?

11   **A.**   I don't quite see where are we.

12   **Q.**   Second name on the screen, C 70 in your binder.

13   **A.**   I'm sorry, give me a second.

14   **Q.**   Sorry, take your time, sir.

15   **A.**   Okay.  I'm sorry.

16   **Q.**   Do you have it?  Just the front page.

17           I'm asking you about Fang Hanming, or Hanming Fang,

18   professor at University of Pennsylvania.  You know him, too,

19   right?

20   **A.**   I know of him.  I know of him a little bit.  I don't

21   think I've ever met him personally.

22   **Q.**   And he works on discrete choice modeling, too?

23   **A.**   He may have.  I think of him more as a theorist.

24   **Q.**   Well, let's stick with Professor Keane then.  Let's see

25   what these economists said about your work.  Just turn to

Case: 19-2005    Document: 00117631846    Page: 312    Date Filed: 07/29/2020    Entry ID: 6356391
Case 1:14-cv-14176-ADB    Document 654    Filed 04/18/19    Page 94 of 261

94

1    page 3.

2            Beginning is, Harvard's personal rating scores are

3    significantly biased against Asian-Americans.

4            Then it says, Dr. Arcidiacono persuasively shows

5    that Harvard's personal rating scores are biased against

6    Asian-Americans.

7            This is the brief by Michael Keane, who, when you

8    teach discrete choice modeling to your labor economics

9    course, you assign his articles.  That's what it says, right?

10   **A.**  He certainly signed the brief, and he certainly -- I've

11   used his papers in my class, apparently, yes.

12   **Q.**  And then, if you turn to the next page in the middle

13   paragraph, I'll read you another section.  "This issue is

14   critical.  The inclusion or exclusion of the personal rating

15   has the largest effect of any modeling decision on the

16   estimated degree of discrimination against Asian-American

17   applicants.  If the personal rating is biased, then all the

18   sensitivity analyses performed by Dr. Card to confirm there

19   is no evidence of discrimination are invalid, for they all

20   include the personal rating."

21           That's what Michael Keane -- that's what his brief

22   that he signed says, right?

23   **A.**  Yes.  I don't know how they would know that this has the

24   largest effect, because, like I showed in that analysis where

25   I go from my model to Professor Arcidiacono's model, there's

**JA3236**

```
 1   effects of excluding parental occupation and so on.  Those
 2   set of variables that's -- I don't exactly know whether it
 3   would be larger or smaller than the effect of removing the
 4   personal rating.
 5   Q.   Could you please turn to page 8?
 6   A.   Yes.
 7   Q.   And at the bottom, before the subheading 1, Professor
 8   Keane's brief says, "Here it is unreasonable to infer that
 9   missing data could be causing the racial disparities in
10   personal rating scores.  No plausible, nondiscriminatory
11   reason explains why Harvard rates Asian-American applicants
12   as less personally appealing than applicants in other racial
13   groups."  Do you see that?
14   A.   I do, yes.
15   Q.   Professor Keane, whose work you assign when you teach
16   discrete choice modeling in your labor economics class,
17   signed a brief that says that, correct?
18   A.   He did, but I certainly very strongly disagree with his
19   opinion.
20   Q.   Turn to page 12, over to 13.  There's a paragraph
21   bridging those two paragraphs that I want to talk about.
22        This is where Professor Keane and his colleagues
23   are talking about your comparison of Professor Arcidiacono's
24   findings on the academic and extracurricular ratings and his
25   findings on the personal rating.
```

 1              It says at the top, "Dr. Card's claim of selective

 2     reasoning is mistaken."

 3              Do you see that?

 4     **A.**   Excuse me.  I can't read the screen.

 5     **Q.**   It's on page 16.  Go on the hard copy.

 6     **A.**   16, I'm sorry.

 7              MR. MORTARA:  I believe it's 16.

 8              MR. WAXMAN:  I believe it's 12.

 9              MR. MORTARA:  12, I'm sorry.

10              THE COURT:  16 of 24 at the top or 12 on the

11     bottom.

12              MR. MORTARA:  Thank you, Your Honor.

13     **Q.**   Do you see, "Dr. Card's claim of selective reasoning is

14     mistaken."  Have you found that?

15     **A.**   I see that statement, yes.

16     **Q.**   And then the paragraph that bridges the two pages is,

17     "This argument is premised on a false dichotomy.  It makes

18     sense to infer that missing data may explain the gap favoring

19     Asian-Americans in the academic and extracurricular rating

20     scores relative to their test scores because Asian-Americans

21     objectively outperform all other applicants in academic and

22     extracurricular measures.  It does not make sense to infer

23     that missing data explains away the much starker racial

24     disparity disfavoring Asian-Americans in the subjective

25     personal rating scores because no observable data justifies

1    that inference."

2         And I understand you disagree.  My question is, is

3    this what Professor Keane said?

4    **A.**  That's what he signed.  I believe it's a completely false

5    statement, but it's what he signed, yeah.

6    **Q.**  Have you talked to him about it?

7    **A.**  No.

8    **Q.**  Over here on page 15, Michael Keane also agrees with

9    Professor Arcidiacono and disagrees with you in the question

10   of interaction with disadvantaged status, right?

11   **A.**  That's what this heading says, yes.

12   **Q.**  And over on page 17, you can see a discussion of the ALDC

13   issue, right?  And it summarizes your arguments and concludes

14   that on the ALDC issue, Dr. Arcidiacono has the better

15   argument, right?  That's what professor Keane concluded.

16   **A.**  That's -- he writes that sentence, precisely, yes.

17   **Q.**  And then on the next page, I want to talk about one of

18   the results in that conclusion.

19        He talks about the staff interview issue you and I

20   had discussed earlier.  And he says, "The personalized

21   treatment afforded special category applicants provides a

22   logical reason to think that Asian-Americans in that group,

23   ALDCs, are less likely to suffer from stereotyping and

24   implicit bias than are other Asian-American applicants, and

25   provides a sound justification for excluding special category

1    applicants from the sample."

2            That's what Professor Keane said, right?

3    A.   That's what he said.  Of course, I -- as before, I

4    disagree strongly with this interpretation.

5    Q.   And you assign his articles in your labor economics

6    course when you're teaching discrete choice modeling,

7    correct?

8    A.   When I did, yes.

9    Q.   And the Harvard admissions models that you and Professor

10   Arcidiacono created are discrete choice models, correct?

11   A.   They are, yes.

12           MR. MORTARA:  I have no further questions, Your

13   Honor.

14           MR. WAXMAN:  My turn?

15           THE COURT:  Your turn.

16   RE-EXAMINATION BY MR. WAXMAN:

17   Q.   Good afternoon, Professor Card.

18   A.   Yes, thank you.

19   Q.   Was there a brief filed in this case supporting your

20   conclusions?

21   A.   There was, yes.

22   Q.   And how many economists signed that brief?

23   A.   I don't remember.

24   Q.   Does the number 16 sound about right?

25   A.   Yes.

1   **Q.**  And as we've heard from Mr. Mortara, that brief, the

2   signatures included Janet Yellen, correct?

3   **A.**  Yes.

4   **Q.**  Is she a respected economist in this country and in the

5   world?

6   **A.**  Yes.

7   **Q.**  And it is also signed by two Nobel Prize winners in

8   economics; is that correct?

9   **A.**  Yes.  George Akerlof and Bob Solow, both of whom have

10  made very important contributions in the areas of labor

11  economics.

12  **Q.**  I want to ask you a couple of questions following up on

13  Mr. Mortara's examination about the treatment of

14  international students, and I want to ask Mr. Lee to please

15  pull up page 21 of Dr. Arcidiacono's report.

16          And would you highlight the sentence that begins,

17  "I limited the focus."

18          Can you please read that sentence from Professor

19  Arcidiacono's report?

20  **A.**  Right.  "To start, I limited the focus to domestic,

21  non-transfer applications."  Do you want me to keep going?

22  **Q.**  Yes, please, the next sentence.

23  **A.**  "Harvard's internal tracking of applicant race treats

24  international applicants as their own category, so I likewise

25  excluded them from my analysis."

**JA3241**

1    **Q.**  And now let me ask Mr. Lee to pull up page 13, footnote

2    eight of your report.

3          Would you please read the first sentence of that

4    footnote in your report?

5    **A.**  Yes.  "I follow Professor Arcidiacono by defining

6    domestic applicants as those who are U.S. citizens or

7    permanent residents and am limiting my analysis to domestic

8    applicants."

9          Could I just emphasize permanent residents is quite

10   important.

11   **Q.**  Okay.  Let me now ask you some questions about the

12   personal rating.  Mr. Mortara asked you about an analysis

13   that you -- that you, sorry, conducted in your opening report

14   in which you entirely threw out the personal rating, correct?

15   **A.**  Yes.

16   **Q.**  Now, you talked about this in your direct, but would you

17   remind Her Honor if the personal rating reflects some effect

18   of race, is throwing that rating out of the model the right

19   thing to do?

20   **A.**  No, not at all because, of course, there's lots of -- the

21   amount of variability in the personal rating that is driven

22   by race is quite small compared to the variability driven by

23   all the other factors.  And so, in my view, it would make

24   sense if one was concerned about these issues of racial

25   biases in the ratings to correct for the small components due

**JA3242**

1    to race in each case, and then -- but try and retain as much
2    as possible the other information.
3    **Q.**   Mr. Lee, would you please pull up Professor Card's
4    opening report on page 71, paragraph 152.
5           And apologies for -- I believe you have your
6    reports there if you can't read this.
7           But am I right that you describe the analysis that
8    Mr. Mortara discussed with you as, quote, very conservative?
9    **A.**   Yes.
10   **Q.**   And why was it very conservative?
11   **A.**   Well, I think, as we just discussed, it's -- in my view,
12   this is a much too extreme idea of throwing out the entire
13   rating but -- so in that sense it's conservative, yes.
14   **Q.**   Now, Mr. Mortara asked you if you relied on a
15   conversation with Dean Fitzsimmons in determining that the
16   applicant's race is not directly considered in the personal
17   rating.  Do you remember that?
18   **A.**   Yes.
19   **Q.**   And you said, if my notes are correct, that you relied on
20   it among other materials, correct?
21   **A.**   Yes.
22   **Q.**   What else did you do to arrive at your conclusion that
23   the personal rating doesn't reflect the applicant's race?
24   **A.**   Well, I was able to review the testimony of -- and
25   depositions, excuse me, of quite a few other admissions

1    officers, including his own deposition, and there were some

2    additional materials, obviously, from Harvard.

3    **Q.** Mr. Mortara also asked you some questions about your

4    modified ratings analysis, right?

5    **A.** Yes.

6    **Q.** And let's just be clear. Do you think that race is

7    driving the correlations that Dr. Arcidiacono found for any

8    of the three profile ratings he modeled: academic,

9    extracurricular or personal?

10    **A.** No. I don't think -- I think the most likely

11    interpretation is not that at all, no.

12    **Q.** So in your modified ratings analysis, are you making an

13    assumption contrary to that actual conclusion? In other

14    words, now you're assuming, contrary to your conclusion, that

15    race actually does affect those ratings, whether by

16    stereotypical views about Asian-Americans and whites or

17    otherwise?

18    **A.** Right. So if you think that -- if -- contrary to my

19    view, if you think that race is driving these for some

20    stereotypical or animus basis of bias, then I think the right

21    thing to do is exactly what I did, which is to subtract off

22    that component from all three ratings, yes.

23    **Q.** And remind us, again, what did you find when you used

24    those adjusted ratings in your model?

25    **A.** What I found is that I get an estimated effects year by

Case: 19-2005    Document: 00117631846    Page: 321    Date Filed: 07/29/2020    Entry ID: 6356391
Case 1:14-cv-14176-ADB   Document 654   Filed 04/18/19   Page 103 of 261

103

 1   year that are very similar to the estimates I got in my main

 2   model, and the average marginal effect across all the years

 3   is similar; and also, none of these are statistically

 4   significant, so the substantive conclusions are not affected

 5   by that.

 6   **Q.**   Now, Mr. Mortara also showed you some numbers that showed

 7   that ALDCs are more likely to receive staff interviews,

 8   correct?

 9   **A.**   Yes.

10   **Q.**   And I'm going to ask Mr. Lee to bring up the chart that

11   he showed, which I believe is Plaintiff Demonstrative 38,

12   slide 3.

13            Do you recognize this?

14   **A.**   Yes.

15   **Q.**   And let's look at the raw numbers.  Would you tell us how

16   many non-ALDC applicants received interviews?

17   **A.**   1,711.

18   **Q.**   1,711?

19   **A.**   Yes.

20   **Q.**   And how many ALDC applicants received interviews?

21   **A.**   1,366.

22   **Q.**   So I don't want to trust my ability to do math on the

23   fly, or even not on the fly.  Am I right that that means that

24   well over half the people who receive staff interviews are

25   not ALDCs?

1    **A.**   Yes.

2    **Q.**   Now, ALDCs are likelier to receive staff interviews than

3    non-ALDCs, right?

4    **A.**   Yes.

5    **Q.**   Is that a reason to throw out the staff indicator

6    variable?

7    **A.**   No, not in my view at all.  Because, again, the model

8    includes -- the model -- my admissions model includes

9    separate tips for each of the A and L and D and C, and then,

10   in addition, an indicator for whether one has an interview or

11   not.  So the variable for one having a staff interview or not

12   is an independent factor in the model and is -- because more

13   than half the people who get a staff interview are non-ALDCs,

14   is identifying differences across both ALDC and non-ALDC

15   students who get an interview.

16   **Q.**   So switching to a new topic, you testified that average

17   marginal effects or AMEs are more useful to refer to in this

18   case than coefficients, correct?

19   **A.**   I did, yes.

20   **Q.**   And would you remind us why?

21   **A.**   Yes.  Well, it has to do this with this S curve that

22   luckily is still sitting here.  I didn't realize it would be

23   so useful.  So it has to do with the fact that if one has --

24   as one has in the admissions setting such differences in the

25   underlying characteristics of students that two-thirds of

Case: 19-2005    Document: 00117631846    Page: 323    Date Filed: 07/29/2020    Entry ID: 6356391
Case 1:14-cv-14176-ADB    Document 654    Filed 04/18/19    Page 105 of 261

105

1    students are effectively out of the money completely, then

2    it's extremely important to think about the effects of

3    variables in a model which is a logistic type model as being

4    different for people who are in the bubble range.  And for

5    those people in the bubble range, as I tried to show in my

6    hypothetical and again mentioned in discussion of this issue,

7    for those people, any tip or benefit, like having a high

8    rating in some dimension or being from some sparse country or

9    having a particular other characteristic that's valued by the

10    admissions committee, that effect will be magnified in the

11    bubble range.  And so understanding the magnitudes of these

12    effects is quite important, and it particularly interacts

13    with multidimensionality issues.

14            So as I showed very simply, I think, or tried to

15    show very simply in one of my earliest slides, if one has a

16    student with only one strength, the value of that -- the

17    admission rate for students with one strength is only 2

18    percent.  So somebody who has got an academic 2 but nothing

19    else has only got a 2 or 3 percentage point probability of

20    admission.

21            Somebody who has two strengths goes up by to like a

22    14 percent probability.  So that second strength has a much

23    larger effect, independent of which one it is, when the first

24    one is already in play.  And again, when one goes to the

25    third, the same thing happens.  So if one has two strengths

1    and gets a third, then the probability goes up even more, and

2    that's exactly the kind of pattern that comes from these

3    models, and it's important in interpreting just about

4    everything in this case.

5         For example if one looks at so called tips for

6    African-Americans as a whole, African-Americans as a whole

7    have a tip that would be -- they're starting, in the absence

8    of that tip, at a base rate of admission of around 3 or so

9    percentage points, which is comparable to a student that has

10   one strength.

11        And just like in the case when I give a second

12   strength, the admission probability for the students with two

13   strengths goes up to 14 percent, just exactly like that.

14   When a student has one degree of strength and gets, say, a

15   tip for being African-American, it's as if we've given them a

16   second strength and their probability of admission rises

17   quite substantially.  It doesn't rise quite as much, it

18   doesn't rise all the way to 14 percent as these other

19   strengths but it rises.

20        So it's just fundamental to understanding the

21   admissions process and the way the characteristics interact

22   that one understands these average marginal effects.

23   Q.  If all that you knew or used was the coefficient, would

24   you be able to determine any of what you just explained?

25   A.  It's possible if somebody was an incredible expert in

1    understanding logit models and had great intuition, but in my

2    experience, no.

3    **Q.**   Now Mr. Mortara suggested that you were being misleading

4    by not reporting all of your coefficients.  Do you recall

5    that?

6    **A.**   He seemed to be suggesting that, I think.

7    **Q.**   Did you disclose to SFFA your dataset and code?

8    **A.**   Yes.

9    **Q.**   And that included every coefficient that arose from your

10   model, correct?

11   **A.**   They could construct every model that I estimated, yes.

12   **Q.**   Did you provide everything you would have provided to

13   your professional colleagues to assess your work?

14   **A.**   Yes.  In fact, what we do these days is we post an

15   appendix with all of the data and all of the programs, that's

16   standard protocol.

17   **Q.**   And SFFA could see all your coefficients by running that

18   code, correct?

19   **A.**   Yes.

20   **Q.**   Did you ever hear that SFFA was having difficulty in

21   doing so?

22   **A.**   No.

23   **Q.**   And now let me ask you, Mr. Mortara pointed out that Dr.

24   Arcidiacono reported a number of his coefficients in his

25   appendices, right?

1    **A.**  Yes.

2    **Q.**  Did he report all of them?

3    **A.**  No, not at all.

4    **Q.**  Do you recall any that he left off?

5    **A.**  Yes.  I specifically remember from his admissions models

6    that he leaves off the SAT variables, and some of those other

7    variables.  And some of those, as I mentioned before, have

8    this pattern that one might be a little surprised by it.

9    **Q.**  And in what respect?

10   **A.**  Well, certain of those models, the SAT variable itself

11   will have a negative effect.  It has a negative coefficient.

12   Excuse me.  Just looking at it in isolation.

13   **Q.**  Did it strike you as curious that Dr. Arcidiacono left

14   only those coefficients off the list?

15   **A.**  I wondered why, but --

16   **Q.**  Let me switch to another topic.

17          Mr. Mortara suggested that your coding of the

18   occupations was misleading or incorrect.  Do you recall that?

19   **A.**  Yes.

20   **Q.**  And I think you said your specialty was labor economics,

21   right?

22   **A.**  Yes.

23   **Q.**  Is this sort of thing, coding occupations, something that

24   you have expertise in?

25   **A.**  I have done it many, many times in many, many papers,

1    yes.

2    **Q.**  And did you do it in this case the same way that you

3    would do it in your academic work?

4    **A.**  Yes.  Normally I would try and follow as closely as

5    possible the BLS hierarchy so that's what we did, I did.

6    **Q.**  Another topic.  Do you recall Mr. Mortara's questioning

7    you about your decision to compare the sums of various

8    ratings for white and Asian-American applicants?

9    **A.**  Yes, I do.

10    **Q.**  Do you have Dr. Arcidiacono's rebuttal report there?  If

11    not, I'm sure we have --

12    **A.**  I do, yes.

13    **Q.**  Okay.  I want to ask Mr. Lee to pull up and for you to

14    look at Table 5.5R from Dr. Arcidiacono's rebuttal report.

15    And you can either see it on the screen or you can see it in

16    the report, but do you recognize this?

17    **A.**  Yes.

18    **Q.**  And does this show the proportion of applicants of

19    different races receiving teacher 1, teacher 2, and guidance

20    counselor ratings of 2 or better by academic index decile?

21    **A.**  Yes.

22    **Q.**  And, Mr. Lee, would you highlight the white and

23    Asian-American columns?  What does this show?

24    **A.**  Well, if one compares different levels of the academic

25    index, which is one of the ways -- seems to be largely

 1    Professor Arcidiacono's preferred way of looking at academic

 2    strength, you can see, for instance, among students in the

 3    top decile, the academic index, so that would be the top 10

 4    percent of applicants, that the whites in that category have

 5    a higher probability of receiving a 2 on school support from

 6    teacher 1 than Asian-Americans, so 50.17 versus 46.64.  For

 7    teacher 2, same pattern, so 47.11 versus 43.10.  Same for the

 8    guidance counselor rating, so 44.63 versus 38.34.  And the

 9    same pattern one can see across each of the deciles I think,

10    or almost all of the deciles.

11    Q.   I would say -- is it true that white applicants on

12    average are stronger than Asian applicants on each individual

13    rating in all but a handful of the lowest deciles?

14    A.   Yes, I believe that's a fair characterization, yes.

15    Q.   All right.  Now stick with the same report.

16         Mr. Lee, can you pull up Dr. Arcidiacono's Table

17    5.6R from his report -- his rebuttal report.

18         And would you please highlight the alumni personal

19    rating?

20         Do you recognize this, Professor Card?

21    A.   Yes.  It's a very similar kind of exercise.

22    Q.   And again, I'm going to ask Mr. Lee to highlight the

23    white and Asian-American columns.

24         What does this show?

25    A.   So it's -- again, each row represents a different row of

1    the academic index decile, and so the bottom row is the top

2    decile.  And it shows in each in most of these rows, at least

3    just looking at it quickly and trying to remember what I knew

4    about this, one can see that whites have a higher probability

5    of getting an alumni personal rating of 2 or better in each

6    of the academic deciles.

7    **Q.**  In fact, it's true in every decile, except the lowest

8    decile, correct?

9    **A.**  Yes.  And of course, the lowest decile students are

10   largely out of the money.

11   **Q.**  Largely out of the money?

12   **A.**  I believe so, yes.

13   **Q.**  Very largely out of the money.

14          Mr. Lee, would you now display Dr. Arcidiacono's

15   rebuttal Table 5.7R, and would you highlight the alumni

16   overall rating table.

17          Do you recognize this?

18   **A.**  Yes.

19   **Q.**  And again, Mr. Lee, would you highlight the white and

20   Asian-American columns.

21          And what does this show?

22   **A.**  Well, it shows the same kind of pattern in most cases.

23   For example, at the top decile there's a small difference,

24   but when we go to the second decile, there's a bigger

25   difference, the third decile.  And so decile by decile, as

Case: 19-2005    Document: 00117632846    Page: 330    Date Filed: 07/29/2020    Entry ID: 6356391
Case 1:14-cv-14176-ADB   Document 654   Filed 04/18/19   Page 112 of 261

112

1    far as I can see, with the exception of the bottom decile,

2    whites are more likely to get a higher overall rating than

3    Asians, conditional on their academic index decile.

4    **Q.**   And just to be clear, were these all for Dr.

5    Arcidiacono's baseline dataset?

6    **A.**   I believe they are, yes.

7    **Q.**   So, in fact, this is showing -- this is even for the

8    dataset that excludes ALDCs, correct?

9    **A.**   Yes.

10   **Q.**   So were your results dependent in any way on the decision

11   to calculate the sums of the various ratings?

12   **A.**   No, not at all.

13   **Q.**   Now, do you recall Mr. Mortara asking you to agree that

14   your analysis can't completely rule out the possibility of

15   racial bias?

16   **A.**   Yes.

17   **Q.**   Can any statistical analysis of real world data as

18   opposed to a randomized experiment actually show or disprove

19   bias?

20   **A.**   No, never.

21   **Q.**   Have you seen anything in your entire analysis that

22   suggests racial bias against Asian-American applicants?

23   **A.**   No.

24            MR. WAXMAN:  No further questions.

25            MR. MORTARA:  Your Honor, I have about five to ten

1    minutes of recross if that's okay.

2              THE COURT:  Mr. Mortara, do you want those red

3    marks off the screen?

4              MR. MORTARA:  Is that the court technology?

5              THE COURT:  Do you want those gone.  You can go and

6    show him, Karen.

7              THE WITNESS:  My apologies.

8              If I touch this screen, it will --

9              THE COURT:  Yeah, you're trying to highlight

10   something on the screen, that's how you can do it.  I just

11   didn't want him to have to live with his highlighting marks.

12   I'm not criticizing you at all for putting them on there.

13             THE WITNESS:  Thank you, Your Honor.

14             THE COURT:  Just giving you a clean slate to start

15   over again.

16             MR. MORTARA:  It's no problem.  Whenever you're

17   ready.

18             THE COURT:  Go ahead.

19   RE-EXAMINATION BY MR. MORTARA:

20   Q.  We meet again, Professor Card, very briefly for our last

21   time.

22             You talked with Mr. Waxman about how you relied on

23   depositions and other materials in addition to your phone

24   call with Dean Fitzsimmons for your conclusion that Harvard

25   didn't use race in the personal rating.  That just happened a

 1    few minutes ago, you remember that, right?

 2    **A.**   Yes.

 3    **Q.**   One of the things you reviewed was the sworn testimony of

 4    someone called Christopher Looby, or Chris Looby.  Do you

 5    remember reading that deposition?

 6    **A.**   Yes, I do.

 7    **Q.**   And do you remember what Mr. Looby said about his use of

 8    race in the personal rating?

 9    **A.**   I do, but perhaps it would be useful to bring it up.

10    **Q.**   You do remember?

11    **A.**   I'm quite old, my memory isn't as good as it used to be.

12    **Q.**   I'm going to refrain.

13             MR. MORTARA:  Your Honor, may I approach?

14             THE COURT:  Yes.

15    **Q.**   I've got excerpts of the Looby deposition, and I'd like

16    you to turn to what is marked page 51.

17             This is a deposition you read when you were

18    preparing your expert reports, correct?

19    **A.**   Yes.

20    **Q.**   Question, line 12:  "Would you take a student's race into

21    account when assessing his or her personal qualities?

22             "A.  Just like with the academic rating, it's one

23    factor of many I consider."

24             That's what Mr. Looby said under oath in his

25    deposition, correct?

1    **A.**  Yes.

2    **Q.**  And you reviewed that when you prepared your expert

3    reports, correct?

4    **A.**  Yes.

5    **Q.**  But you did not, in fact, mention that Mr. Looby had said

6    that anywhere in your expert reports, did you?

7    **A.**  I don't recall, but my interpretation is -- I certainly

8    was aware of it.

9    **Q.**  Okay.  Let's look at P 555 again.  That's the OCR

10   findings.  And on page 15 over to 16, is a highlighted

11   version on the screen that we've seen many times, and what it

12   says is that the Office of Civil Rights in the Department of

13   Education found in 1990 that Harvard's admissions officers,

14   some of them, were using race in the profile ratings,

15   correct?

16   **A.**  It could be reflected in the four ratings areas, yes.

17   **Q.**  And that's the profile ratings, correct?

18   **A.**  Yes.

19   **Q.**  You did not cite the Office of Civil Rights' findings in

20   your expert reports when you said race wasn't involved in the

21   personal rating based in part on the phone call, right?

22   **A.**  I didn't.  I had never seen that at the time I did my

23   reports.

24   **Q.**  You saw it here in court when Dean Fitzsimmons was

25   crossed for the first time, right?

1    **A.**  Sometime around then, yes.

2    **Q.**  And then the last document is P 509, also in your binder.

3    **A.**  P 509?

4    **Q.**  Yeah.  Take your time, sir.

5    **A.**  Okay, I found it.  I may have found it, yes.

6    **Q.**  It's a letter from Harvard's Office of the General

7    Counsel to the Office of Civil Rights.  And just at page 2,

8    there's a paragraph in the middle of the page, and I've got

9    some information highlighted that also came up during Dean

10   Fitzsimmons' cross.  This is a 2012 letter where Harvard

11   said, "The information that OCR gathered during the course of

12   that compliance review, and in subsequent cases, regarding

13   Harvard College's criteria for admission, its use of race as

14   a factor in admissions decisions, and its general policies

15   and procedures for selecting students for admission in its

16   undergraduate program is still accurate today."

17           You saw that during Dean Fitzsimmons' testimony,

18   correct?

19   **A.**  Yes.  I also saw the sentence above, "Nor did we find

20   that Asian-Americans were treated differently than white

21   applicants in the implementation of these processes."

22   **Q.**  You did not cite this letter with the OCR finding that

23   Harvard admissions officers used race in the profile ratings

24   in your expert reports, did you?

25   **A.**  No, I didn't.

**JA3258**

```
 1              MR. MORTARA:  No more questions.

 2              MR. WAXMAN:  Just a few more before lunch.

 3              THE COURT:  We really only allow two rounds each,

 4     right?  We haven't had any re-redirect.

 5              I will give you a very brief re-redirect, but he

 6     will have his re-recross.

 7              MR. MORTARA:  I will not take a re-recross, I'm

 8     sure.

 9              THE COURT:  I won't hold you to that.

10              MR. WAXMAN:  There won't be any material covered

11     other than a small subset of what my friend Mr. Mortara just

12     raised on cross-examination.

13     RE-EXAMINATION BY MR. WAXMAN:

14     Q.  With respect to the testimony of Christopher Looby, were

15     you here for Mr. Looby's testimony or did you review

16     Mr. Looby's testimony in this case?

17     A.  I did review it.  I wasn't here for it.

18     Q.  And do you recall him testifying about the way that he

19     used race in all of the profile ratings?

20     A.  Yes, I did.

21     Q.  And was that testimony here consistent with your

22     understanding of what he meant in his deposition, which you

23     reviewed prior to issuing your report, about how he uses race

24     in the evaluation of the various profile ratings?

25     A.  Yes.  My understanding is that exactly as he clarified in
```

**JA3259**

1   his testimony, that he used race as a contextual factor to
2   evaluate, for example, opportunities for students and
3   segregation and other features that would be important
4   background factors, but not using race per se as a separate
5   factor.
6   Q.  And just referring briefly to the portion of the 1990 OCR
7   report that Mr. Mortara just directed you to, there was a
8   sentence in that report in which the OCR reflected that a
9   couple of the admissions officers indicated that they
10  considered race in all four of the profile ratings.  Did you
11  recall that sentence that Mr. Mortara reviewed with you?
12  A.  Yes.
13  Q.  And indeed, in that report, OCR observed through its
14  regression analysis that Asian-Americans were scoring lower,
15  I believe 20 percent lower, than white applicants on the
16  personal rating, correct?
17  A.  Yes.  It was a gap about like that, yes.
18  Q.  Did OCR infer racial bias from that difference?
19  A.  No.
20  Q.  Did they in fact conduct a full audit study in which they
21  read the admissions files, about 200 admissions files or
22  maybe it was 400, and 2,000 summary sheets in order to
23  actually investigate whether racial bias was infecting the
24  personal rating?
25          MR. MORTARA:  Your Honor, I object, leading.

1            MR. WAXMAN:  I'll rephrase.

2            THE COURT:  It's not leading; it's overruled.

3   **A.**  Yes, I'm -- I was aware that they had done a -- both a

4   careful side-by-side audit study of an equal number of white

5   and Asian application folders, equally split by whether they

6   were admitted or not, and tried to compare, and that was I

7   think the primary thing that they were using to conclude that

8   the two groups of students were treated -- evaluated fairly

9   or equally on the basis of, for instance, finding personal

10  qualities and not -- and also this extended sample that they

11  looked, yes.

12  **Q.**  And have you seen anything in your preparation for this

13  case or in the trial of this case indicating or suggesting in

14  any way the result either whether SFFA or Professor

15  Arcidiacono did such an audit analysis or the results of that

16  analysis?

17  **A.**  No.

18            MR. WAXMAN:  No further questions.

19            MR. MORTARA:  As promised, Your Honor.

20            THE COURT:  All right.  We will break for lunch.

21  Why don't we go back to the 45-minute lunch just to give

22  everyone a little break.  So 1:15.  You are excused.

23            THE WITNESS:  Thank you, Your Honor.

24            THE COURT:  I know you're sad to be leaving us.

25            (Recess taken 12:29 p.m.)

**JA3261**

```
 1                    **** AFTERNOON SESSION ****
 2              THE CLERK:  Court is in session.  Please be seated.
 3              MR. McBRIDE:  Your Honor, before we get started
 4     with the next witness.  We have some summary exhibits that we
 5     want to put in evidence.  May I approach?
 6              THE COURT:  Sure.
 7              MR. McBRIDE:  This is summary exhibit, Plaintiff's
 8     Exhibit 634, that we offer into evidence.
 9              MR. LEE:  No objection, Your Honor.
10              THE COURT:  It's admitted.
11              (Plaintiff Exhibit No. 634 admitted.)
12              MR. LEE:  This is a summary exhibit.  It's designed
13     to answer some of the questions you asked President Simmons
14     two days ago.
15              MR. McBRIDE:  No objection.
16              (Defendant Exhibit No. 746 admitted.)
17              MR. MORTARA:  May I proceed, Your Honor?
18              THE COURT:  Of course.
19              MR. MORTARA:  Your Honor, the plaintiffs call
20     Marlyn McGrath.
21              THE COURT:  Director McGrath, we are going to
22     reswear you in.  I'm not sure if it's actually necessary,
23     but --
24              THE CLERK:  Can you raise your right hand, please.
25              (MARLYN McGRATH duly sworn by the Deputy Clerk.)
```

**JA3262**

```
 1              THE CLERK:  Thank you.  You may be seated.

 2              THE COURT:  I'm sure you're delighted to be back.

 3              THE WITNESS:  I am delighted to be back.

 4              MR. MORTARA:  I handed up -- for once, Your Honor,

 5     you have the binder in advance.

 6              THE COURT:  Thank you, Mr. Mortara.  Give me one

 7     second.  I neglected to -- I need a little room.  Okay.  Go

 8     ahead.  I'm ready.

 9                            EXAMINATION

10     BY MR. MORTARA:

11     Q.  Nice to see you again, Director McGrath.

12     A.  Good to see you.

13     Q.  How are you today?

14     A.  Fine, thank you.

15     Q.  I'm putting on the screen and in your binder in front of

16     you on your left is Plaintiff's Exhibit 1, the reading

17     procedures for the class of 2018.

18              You're responsible for the content of the reading

19     procedures and a group of you develop and change it every

20     year, correct?

21     A.  Yes, that is correct.

22     Q.  Please go to the section on personal rating that is on

23     page 5.

24     A.  I just want to be certain I'm looking at the right thing.

25     This is P1 is the tab?
```

1    **Q.**  P1.

2    **A.**  This is not paginated, but I can count.

3    **Q.**  Just go until personal appears at the bottom.

4    **A.**  Yes.

5    **Q.**  It does not say anywhere in this document that race

6    should not be used in the personal rating, correct?

7    **A.**  I think that's correct.

8    **Q.**  I've got a broader question.

9         Does it say anywhere in the admissions office in

10   any written form, training material, memo, email, or any kind

11   of writing down to a Post-it on the coffee maker that race

12   should not be used in the personal rating?  Is it written

13   anywhere?

14   **A.**  For this document?

15   **Q.**  I'll read the question again.

16   **A.**  Yes.  Thank you.

17   **Q.**  It's a broader question.

18        Does it say anywhere in the admissions office in

19   any written form, training material, memo, email, or any kind

20   of writing, down to a Post-it on the coffee maker, that race

21   should not be used in the personal rating?  Is it written

22   anywhere?

23   **A.**  It has been written in more recent reading instructions.

24   **Q.**  Could you please turn to the binder on your right.  And

25   your trial testimony is there.  It's open to Tab 5 already.

 1   And if you turn to page 231.

 2   **A.**  Yes.

 3   **Q.**  And this is when you and I were talking about things just

 4   a couple of weeks ago on Friday, October 18, correct?

 5   **A.**  Yes.

 6   **Q.**  And I asked you, at line 15, 231:  "Now I've got a

 7   broader question.  Does it say anywhere in the admissions

 8   office in any written form, training material, memo, email,

 9   or any kind of writing, down to a Post-it on the coffee

10   maker, that race should not be used in the personal rating?

11   Is it written anywhere?"

12          And you answered:  "In written form, no.  It is the

13   subject of a great deal of discussion and attention in our

14   training process."

15          Was that your sworn testimony?

16   **A.**  That was my sworn testimony.  And I had --

17   **Q.**  Go ahead.

18   **A.**  Sorry.  Go ahead.

19   **Q.**  I'm going to run through some basic facts and then I'm

20   going to give you an opportunity to fully explain in as much

21   detail as you like the discrepancy that we've just gone

22   through.

23          At least as of September 12, 2018, you have had

24   brand-new draft reading procedures that included an

25   instruction not to use race in the personal rating that you

1  had seen, correct?

2  **A.**  Yes.  We had in the 2018 September version, yes.

3  **Q.**  And at least as of September 19, 2018, your office issued

4  new reading procedures for the class of 2023 to all

5  admissions officers that included an instruction not to use

6  race in the personal rating, correct?

7  **A.**  Yes.

8  **Q.**  Then revised new reading procedures again issued on

9  October 5, 2018, that still included an instruction not to

10  use race in the personal rating, correct?

11  **A.**  Yes.

12  **Q.**  And on October 18, nearly two weeks after those last

13  procedures formally issued and nearly a month after the first

14  draft of the class of 2023 reading procedures, you told me

15  there was no written document at the admissions office that

16  said race should not be used in the personal rating.  That's

17  what you said, right?

18  **A.**  I said that because I had in mind the preparation

19  materials and what I had understood to be the focus of this

20  trial for the classes of 2014 to 2019.  I was not, in my

21  answer to you, referring to anything more current than that.

22  **Q.**  Is there anything else you'd like to tell us to explain

23  the discrepancy in the testimony that we've just gone

24  through?

25          MR. LEE:  Your Honor, I object to the form.

1    "Discrepancy" is his word, not hers.  It's argument.

2            THE COURT:  That's fair.  Why don't you just change

3    "discrepancy" to "difference."

4    BY MR. MORTARA:

5    **Q.**  Is there anything else you'd like to tell the Court to

6    explain the difference between your trial testimony on

7    October 18 and the way you answered the same question today?

8    **A.**  The reason I gave a different answer when we were here

9    before was that I had in mind those earlier reading

10   instructions, which I had understood -- which had been the

11   subject of my review and preparation for my testimony.

12   **Q.**  As far as you know, was Dean Fitzsimmons aware of the new

13   reading procedures when this trial began?

14   **A.**  As far as I know, he was aware that we were developing

15   new reading procedures.

16   **Q.**  Do you know if he was aware of the content of those new

17   reading procedures?

18   **A.**  I do not know.

19   **Q.**  Is the reason that you interpreted my question as being

20   limited in time in some way that Harvard's lawyers instructed

21   you to avoid bringing up the class of 2023 reading procedures

22   when you were here under oath the last time?

23   **A.**  No, I did not.

24           MR. LEE:  I'm going to let her answer the question,

25   but I don't want it to be a waiver of the attorney-client

1   privilege.

2            THE COURT:  All right.  So --

3            MR. MORTARA:  I think if she does answer, it is a

4   waiver, which is why --

5            MR. LEE:  Well, then I object.

6            THE COURT:  I think you've embedded the waiver in

7   your question.  So why don't you ask whether she got any such

8   instructions from the lawyers, any instructions --

9            MR. MORTARA:  Your Honor, I was going for the

10  objection and instruction not to answer.  If that's what I

11  get, that's what I want.

12           MR. LEE:  She answered the question.

13           THE COURT:  She did answer the question.

14           MR. MORTARA:  We can strike the answer.

15           THE COURT:  I'm not going to strike the answer.

16  She's answered the question and it doesn't implicate the

17  attorney-client privilege.  So forge forward.

18  BY MR. MORTARA:

19  Q.  Did you have any discussions with Harvard's lawyers about

20  the class of 2023 reading procedures when you were preparing

21  for this trial?

22  A.  No, not about those for this trial.

23  Q.  Did you have any discussions about the drafts when

24  preparing for this trial?

25  A.  Preparing for the trial?  Not previous to my prior

1    testimony.

2    Q.   I want to be clear now, the oath you've taken is to tell

3    the whole truth and nothing but the truth in response to my

4    questions.  Do you understand that?

5    A.   I do.

6    Q.   You cannot modify my questions in your head and answer

7    questions other than the one I'm asking.  Do you understand?

8              MR. LEE:  I object.  Your Honor, those were

9    instructions for you to give, not for him to give.

10             MR. MORTARA:  If they're wrong, Your Honor, then

11   I'm happy to be corrected.

12             THE COURT:  Well, you need to rephrase the

13   question.

14   BY MR. MORTARA:

15   Q.   Do you understand the nature of the oath that you took?

16   A.   Yes.

17   Q.   Now let's get into the substance.

18             You have in front of you a binder including

19   Defendant's Exhibit 744.  Would you please turn to it, D744.

20   Are you there?

21   A.   No.

22   Q.   You don't have the D744?  Can I assist maybe?  There's Ps

23   and Ds, director.

24   A.   This goes from 741 to 749.

25             THE COURT:  It's today's binder, second tab.

```
 1              MR. MORTARA:  We have an extra, just in case.

 2              THE COURT:  Just make sure she has the right binder

 3      in front of her.

 4              THE WITNESS:  Yes, I do.  I see it toward the

 5      beginning.  They're not in order.  Yes.  Thank you.

 6      BY MR. MORTARA:

 7      Q.   These are the reading procedures for the class of 2022,

 8      correct?

 9      A.   Correct.

10      Q.   This class was selected in the spring of 2018, correct?

11      A.   Yes.

12      Q.   I want to start with this as the baseline.

13              MR. MORTARA:  I'm going to offer Defendant's 744 at

14      this time.

15              MR. LEE:  No objection.

16              THE COURT:  It's admitted.

17              (Defendant Exhibit No. 744 admitted.)

18      BY MR. MORTARA:

19      Q.   If you would, turn to the third page.  This one actually

20      has page numbers.  I'm going to refer you to the discussion

21      of the overall rating.

22              Do you see that?

23      A.   Yes.

24      Q.   There's no instruction about the use of race here, is

25      there?
```

1    **A.**  That's correct.

2    **Q.**  Please turn to the next page and take a look at the

3    personal rating.

4    **A.**  Yes.

5    **Q.**  The text is slightly different from the 2018 version we

6    were looking at, Plaintiff's Exhibit 1, correct?

7    **A.**  Yes.

8    **Q.**  There's no instruction about the use of race in the 2022

9    reading procedures, Defendant's Exhibit 744, is there?

10   **A.**  That's correct.

11   **Q.**  And just very briefly, Director McGrath, above we have

12   the athletic rating.

13   **A.**  Yes.

14   **Q.**  Remember you and I had that discussion about my daughter,

15   the figure skater?

16   **A.**  We did.

17   **Q.**  And you talked about some potential changes to the

18   athletic rating that were being discussed?

19   **A.**  Yes.

20   **Q.**  And you see Number 1 here that there's no change there.

21   It's still about Harvard sports and varsity athletics, right?

22   **A.**  Yes.

23   **Q.**  I want to go through now with you the process of revision

24   that led to the written changes to the reading procedures in

25   the class of 2023 version.

```
 1              In the first week of June of this year, there was a
 2    retreat of some kind where the admissions office got together
 3    to discuss, amongst other things, suggestions for changing
 4    the reading guidance; is that right?
 5    A.   That's correct.
 6    Q.   Amongst the things that were discussed actually was an
 7    update about this case, right?
 8    A.   I was not at that retreat.
 9    Q.   Turn to Plaintiff's 696, please, in your binder.
10    A.   Yes.
11    Q.   This is an email dated June 12, 2018, from Christy
12    Mascolo to Jessica Bryan, subject line, "All staff retreat
13    followup."
14              Do you see that?
15    A.   Yes.
16              MR. MORTARA:  Your Honor, we offer Plaintiff's 696.
17              MR. LEE:  No objection, Your Honor.
18              THE COURT:  Admitted.
19              (Plaintiff Exhibit No. 696 admitted.)
20    BY MR. MORTARA:
21    Q.   Who is Jessica Bryan?
22    A.   She is my colleague who is a financial aid officer and
23    admissions officer.
24    Q.   And who is Tim?
25    A.   Tim I believe is Tim Smith, who was an admissions
```

**JA3272**

1    officer.

2    **Q.**  And is it your understanding that they led the discussion

3    about the personal rating at the retreat?

4    **A.**  That is my understanding.

5    **Q.**  I want to focus in on the middle paragraph there.

6    There's a sentence, "I would suggest sending a draft to your

7    whole group so they can weigh in before producing a final

8    recommendation by July 9.  Then these will go to WRF, MEM,

9    and others, including OGC."

10            Do you see that?

11   **A.**  I do.

12   **Q.**  And Jessica and Tim led the discussion about the personal

13   qualities rating at the retreat, correct?

14   **A.**  Yes.

15   **Q.**  And then there's a discussion here indicating that draft

16   edits will go to WRF.  That's Dean Fitzsimmons, correct?

17   **A.**  Yes.

18   **Q.**  MEM, that is you, correct?

19   **A.**  Yes.

20   **Q.**  And others, including OGC, that's the office of general

21   counsel at Harvard, correct?

22   **A.**  Yes.

23   **Q.**  Do you remember hearing anything about the discussions

24   around the personal rating at this retreat?

25   **A.**  I do not remember hearing anything about it at the time.

   1    **Q.** All right. Let's move forward in time. Please turn to

   2    Plaintiff's 705 in your binder.

   3    **A.** Yes.

   4    **Q.** This is an email from Christine Mascolo to Dean

   5    Fitzsimmons and you, copy I believe your assistants. The

   6    subject line is "Potential changes to reading instructions."

   7    It's dated July 23, 2018.

   8           Do you see that?

   9    **A.** Yes.

  10           MR. MORTARA: We offer Plaintiff's 705.

  11           MR. LEE: No objection.

  12           THE COURT: Admitted.

  13           (Plaintiff Exhibit No. 705 admitted.)

  14    BY MR. MORTARA:

  15    **Q.** Director McGrath, you'll notice the attachments to the

  16    email are in the tab right behind it. They are 706, 707, and

  17    708.

  18           MR. MORTARA: We will also offer those.

  19           MR. LEE: No objection.

  20           THE COURT: Those are admitted also.

  21           (Plaintiff Exhibit Nos. 706, 707, and 708

  22    admitted.)

  23    BY MR. MORTARA:

  24    **Q.** The email says, "Hi, Fitz and Marlyn. Attached you will

  25    find suggested revisions to the reading instructions born out

**JA3274**

1    of our retreat in early June.  These include the academic,

2    EC, and athletics section only.  There will be no suggested

3    changes for PQs and support at this time."

4            Do you see that?

5    A.   Yes.

6    Q.   Christine Mascolo was communicating to you that as of

7    July 23, 2018, there wasn't any plan to change the personal

8    rating or personal qualities section of the reading guidance?

9    A.   Yes, that's what this says.

10   Q.   And then the next sentence says, "My plan is to share

11   with both of you for any edits/thoughts you may have and then

12   to share with Ara, of course, as I do every year."

13           Do you see that?

14   A.   Yes.

15   Q.   Who is Ara?

16   A.   Ara is Ara Gershengorn, one of my attorneys.

17   Q.   Ara Gershengorn, she's in the office of general counsel,

18   correct?

19   A.   Yes.

20   Q.   Let's take a look at the drafts.  You see here there's a

21   markup of the academic rating, Plaintiff's 706?

22   A.   Yes.

23   Q.   And there's several changes here, including some

24   additional recommendations from the group discussion?

25   A.   Yes.

1   **Q.**  And on Plaintiff's 707, there's some changes to the EC

2   rating, relatively less comprehensive?

3   **A.**  Yup.

4   **Q.**  And then on 708 there's a few changes to the olympic

5   rating -- sorry -- the athletic rating.

6   **A.**  Yes.

7   **Q.**  And you see here, there is a change here sort of

8   responsive to the discussion you and I had about the figure

9   skating.  "Now you can get an athletic 1 if you have

10   recognition for individual athletic achievements,

11   championships at the national, world, or olympic level."

12   **A.**  Yes.

13   **Q.**  You didn't raise with me the fact that this change has

14   already been instituted last time, did you?

15   **A.**  I said it was a discussion, consideration of discussion.

16   How it's applied will remain to be seen.

17   **Q.**  I want to move forward now to August 13 and

18   Plaintiff's 755.

19   **A.**  Yes.

20   **Q.**  Plaintiff's 755 is an August 13, 2018, email from you to

21   Christine Mascolo, copy Dean Fitzsimmons.

22          Do you see that?

23   **A.**  Yes.

24          MR. MORTARA:  We'd offer Plaintiff's 755.

25          MR. LEE:  No objection, Your Honor.

```
 1              THE COURT:  It's admitted.

 2              (Plaintiff Exhibit No. 755 admitted.)

 3   BY MR. MORTARA:

 4   Q.  Here if you look in the middle of the page, there's a

 5   part of an email from August 13, 2018, at 10:53 a.m.  And

 6   Christine Mascolo had emailed your and said, "Just FYI, there

 7   may be more updates to the reading instructions."  Then we

 8   have a redaction.  "I will work with the group that

 9   considered PQS during the retreat and make some

10   recommendations I will share with you both."

11              Do you see that?

12   A.  Yes.

13   Q.  On August 13, Christine Mascolo informed you that there

14   were going to be some proposed revisions to the personal

15   rating section of the reading guidance, correct?

16   A.  Yes.

17   Q.  And you responded, "Sounds just right to me.  Thank you.

18   And thanks for checking with" -- help me.

19   A.  Ara.

20   Q.  Ara.  Thank you.

21              And this email chain you can see is heavily

22   redacted.  Do you see that?

23   A.  I do.

24   Q.  It starts out with an exchange between Ms. Mascolo and

25   Ms. Gershengorn, correct?
```

 1    **A.**  Yes.

 2    **Q.**  Let's move forward in time to August 20, Plaintiff's 657.

 3    **A.**  Yes.

 4    **Q.**  Plaintiff's 657 is an email from Ms. Mascolo to Dean

 5    Fitzsimmons and you.  It is dated August 20.

 6         Do you see that?

 7    **A.**  Yes.

 8         MR. MORTARA:  We offer Plaintiff's 657.

 9         MR. LEE:  I object.  This wasn't part of the

10    disclosure.  In fact, it was withdrawn.

11         MR. MORTARA:  I'm being told it is part of the

12    disclosure.

13         MR. LEE:  I don't think so.

14         THE COURT:  Hold on.

15         MR. LEE:  Your Honor, I'm pretty sure we have it

16    right that it was withdrawn.  But if what he wants to do is

17    offer it, in the interest of time, let's just go ahead.  No

18    objection.

19         THE COURT:  Just looking at it, it seems unlikely

20    he would have withdrew it, given the exercise here.

21         MR. MORTARA:  I'll offer it with its attachment,

22    Plaintiff's 658.

23         MR. LEE:  No objection.

24         (Plaintiff Exhibit Nos. 657 and 658 admitted.)

25    BY MR. MORTARA:

1    **Q.**  It's an email from Ms. Mascolo to you and Dean

2    Fitzsimmons.  It says, "Hi Fitz and Marlyn.  Attached you

3    will find updates to the reading instructions.  Thanks to Tim

4    and Jessica."

5            Do you see that?

6    **A.**  I do.

7    **Q.**  Tim and Jessica were the ones who worked on the personal

8    rating at the retreat, correct?

9    **A.**  Yes.

10   **Q.**  And the attachment, 658, is a draft for the personal

11   qualities.  Do you see that?

12   **A.**  Yes.

13   **Q.**  And there's some -- how would you characterize the number

14   of changes here?  Significant?  Moderate?

15   **A.**  Moderate.

16   **Q.**  So there's some moderate changes here, correct?

17   **A.**  Yes.

18   **Q.**  There's still no instructions on the use of race one way

19   or the other here in this draft, correct?

20   **A.**  Yes, that's correct.

21   **Q.**  Would you please turn to Plaintiff's Exhibit 767.

22   **A.**  Yes.

23   **Q.**  Plaintiff's Exhibit 767 is a September 7 email from you

24   to Ms. Mascolo and Dean Fitzsimmons.

25           Do you see that?

 1    **A.**   I do.

 2    **Q.**   The subject is "Privileged and confidential reading

 3    instructions."

 4              MR. MORTARA:  We offer Plaintiff's 767.

 5              MR. LEE:  No objection.

 6              THE COURT:  Objection?

 7              MR. LEE:  No objection.  I'm sorry.

 8              THE COURT:  It's admitted.

 9              (Plaintiff Exhibit No. 767 admitted.)

10    BY MR. MORTARA:

11    **Q.**   Your response in here says, "Good to have."  Correct?

12    **A.**   Yes.

13    **Q.**   Please turn -- this is September 7.  Please turn to

14    Plaintiff's Exhibit 749.

15    **A.**   Yes.

16    **Q.**   And Plaintiff's Exhibit 749 appears to be a hard-copy

17    document.  There are the initials CJM and the date

18    September 11 in the upper right-hand corner.

19              Who is CJ -- CGM?

20    **A.**   That's Christine Mascolo.

21              MR. MORTARA:  We offer Plaintiff's 749.

22              MR. LEE:  No objection.

23              THE COURT:  Admitted.

24              (Plaintiff Exhibit No. 749 admitted.)

25    BY MR. MORTARA:

1    **Q.**  There are some handwritten edits in several areas of this

2    document.  I want to focus on why we're here.  If you go to

3    page 3, there's some highlighted language I'd like you to

4    take a look at surrounding the overall rating.  Let me know

5    when you're ready.

6    **A.**  Yes.  I'm ready.

7    **Q.**  In the first highlighting we see some changes in the

8    discussion of race, and it says, "However, readers should

9    have not be taking an applicant's race or ethnicity into

10   account in making any of the ratings other than the overall

11   rating, as discussed further below."

12           Do you see that?

13   **A.**  Yes.

14   **Q.**  That's a change, isn't it, an explicit written

15   instruction?

16   **A.**  Yes.

17   **Q.**  And the next highlighting says, "The consideration of

18   race or ethnicity may be considered only as one factor among

19   many."

20           Do you see that?

21   **A.**  Yes.

22   **Q.**  And it goes on and it says, "In addition, the

23   consideration of race or ethnicity should be in connection

24   with the application's discussion of the effect an

25   applicant's race or ethnicity has had on the applicant, not

1    simply the fact alone that an applicant has identified as a

2    member of a particular race or ethnicity."

3            Did I read that correctly?

4    **A.**  You did.  I see that here in this draft.

5    **Q.**  I want to now revisit a discussion we had the last time

6    you were here.

7            Remember we had a discussion about Harvard's use or

8    not use of religion in evaluating applicants?  Do you

9    remember that?

10   **A.**  I do.

11   **Q.**  And you said that while there's a box on the form on the

12   common application where someone can say "I am Roman

13   Catholic," Harvard doesn't look at that answer.

14           Do you remember that?

15   **A.**  I do.

16   **Q.**  But you did say Harvard would take into account religion

17   if an applicant mentioned that in their writing about

18   themselves in their essays, for example?

19   **A.**  That we might, yes.

20   **Q.**  And then you said that it wasn't a disadvantage to

21   Harvard to not be able to consider someone's self-proclaimed

22   religious identity unless they've written about it in one of

23   their essays, right?

24   **A.**  Would you mind repeating that?

25   **Q.**  You said you didn't consider it to be a disadvantage that

Case: 19-2005    Document: 00117631846    Page: 359    Date Filed: 07/29/2020    Entry ID: 6356391
Case 1:14-cv-14176-ADB    Document 654    Filed 04/18/19    Page 141 of 261

141

1    Harvard didn't get the information from the box on the common

2    application and they didn't consider -- you didn't consider

3    religion unless an applicant had written about it himself,

4    right?

5    **A.**   Yes.

6    **Q.**   That's exactly the instruction that's being given here in

7    the draft guidance we just read out.  "Consider race only if

8    the applicant discussed the effect of race or ethnicity on

9    the applicant and not when they just checked the box,"

10   correct?

11   **A.**   This is a draft.  That was an incorrect instruction.  It

12   does not reflect our practice.

13   **Q.**   This is what the instruction said, correct?

14   **A.**   That is what the instruction says in this draft, yes,

15   you're correct.

16   **Q.**   And please go to the personal rating.

17   **A.**   Yes.

18   **Q.**   And comparing this to the previous year's version, class

19   of 2022, would you characterize this as moderate or

20   significant changes?

21   **A.**   I would say moderate.

22   **Q.**   And there's including things like, "Think about what kind

23   of contribution would the person make to the dining hall

24   conversation."

25            That's new, isn't it?

142

1    **A.**   As a recommendation, it's new, yes.

2    **Q.**   And the last sentence says, "As noted above, though, an

3    applicant's race or ethnicity should not be considered in

4    assigning the personal rating."

5         Do you see that?

6    **A.**   Yes.

7    **Q.**   Now, this is the first time in any draft that you've seen

8    in chronological order that we have an express statement not

9    to use race in the personal rating; is that right?

10   **A.**   I think that's correct, yes.

11   **Q.**   And this would be the first time you've seen that written

12   down in your 30 years in the Harvard's admissions office,

13   correct?

14   **A.**   I can't say that I've never seen that sentence before

15   somewhere.

16   **Q.**   But as far as you can remember, this is the first time

17   you've seen an express written instruction not to use race in

18   the personal rating, correct?

19   **A.**   This is the first time I remember seeing it explicitly

20   written that way in the reading instructions.  Yes, that's

21   correct.

22   **Q.**   In any document?

23   **A.**   I can't say that honestly.

24   **Q.**   Do you remember any specific document saying it?

25   **A.**   No.

 1    **Q.**  And this document is dated September 11, just about a

 2    month before this trial, right?

 3    **A.**  Yes.

 4    **Q.**  Let's go forward to September 12, Plaintiff's 659.  Are

 5    you there?

 6    **A.**  Yes.

 7    **Q.**  Plaintiff's 659 is an email from Ms. Mascolo to you, Dean

 8    Fitzsimmons, and Ms. Gershengorn.  Subject line is "Reading

 9    instructions."

10          And then it says, "Hi, everyone.  Input from all

11    previous drafts is captured in this document.  The only new

12    line everyone should look at is on page 5 in red."

13          And its attachment is Plaintiff's 660.  We would

14    offer them both.

15          MR. LEE:  No objection, Your Honor.

16          THE COURT:  They're admitted.

17          MR. MORTARA:  Thank you, Your Honor.  Sorry.

18          (Plaintiff Exhibit Nos. 659 and 660 admitted.)

19    BY MR. MORTARA:

20    **Q.**  You received this draft on September 12, 2018, correct?

21    **A.**  Yes.

22    **Q.**  Did you review it?

23    **A.**  I think I did not.

24    **Q.**  You did not review the draft?

25    **A.**  I may not have.  I was delegating until we had something

1    final.  I don't remember whether I did.  I think I may not

2    have.

3    **Q.**  Let's go look at the change that Ms. Mascolo was talking

4    about, over on page 5.  First let's go to page 3.  Sorry.

5          Let's just confirm the language we talked about

6    from the September 11 draft is still there.  "Don't take race

7    into account in any of the ratings other than the overall

8    rating, and only consider race when someone mentions it on

9    their application, not just because they self-identify."

10          Those two instructions we saw in the September 11

11    draft are still in there?

12   **A.**  In this draft they are still here, yes.

13   **Q.**  Now going to the red text Ms. Mascolo asked everyone to

14   read.

15          It says, and it's added to the previous version,

16   "It is important to keep in mind that characteristics not

17   always synonymous with extroversion are similarly valued.

18   Applicants who seem to be particularly reflective,

19   insightful, and/or dedicated should receive higher personal

20   ratings as well."

21          Do you see that?

22   **A.**  I do.

23   **Q.**  What's your definition of "extroverted"?

24   **A.**  I don't think I have a ready definition.  I think it's a

25   person who is -- there are lots of adjectives that you could

1   use in connection:  vivacious, outgoing.  Different people

2   would -- you asked me for mine.  Those are two.

3   **Q.**  Do you agree with me that some racial stereotypes that

4   are deployed against Asian-Americans is that they're quiet,

5   withdrawn, or one-dimensional?

6   **A.**  I think that's true, yes.

7   **Q.**  Do you think extroverted and quiet are the same thing or

8   perhaps more on opposite sides?

9   **A.**  I don't think they're the same thing, they're not exactly

10  opposites, but they're very different.

11  **Q.**  You're also using the word "reflective" here in

12  contradistinction to "extroverted."

13         Do you think "reflective" has a meaning closer to

14  "quiet" or "introverted"?

15  **A.**  I would not find it in contrast to extroversion.  It can

16  accompany an outgoing personality.  I think it's a different

17  aspect of personality, myself, my opinion.

18  **Q.**  Director McGrath, could a reasonable person looking at

19  this come to the view that this language was designed to make

20  sure that your admissions officers did not fall prey to

21  implicit bias or racial stereotyping about Asians?

22  **A.**  It's the kind of thing we always try to remind our staff

23  about when they're considering applications or people.  I

24  guess the most important thing I see about it is that it

25  captures a longstanding practice that was not included in

1    these terms in the reading instructions before this.

2    **Q.**  And it's in red here, the language Ms. Mascolo asked you

3    to look at, right?

4    **A.**  Yes.  Because it was an addition.

5    **Q.**  And my question, and I'll ask it again:  Could a

6    reasonable person looking at this believe that this

7    instruction was designed to help ensure that your admissions

8    officers did not fall prey to implicit bias or racial

9    stereotyping against Asians?

10           MR. LEE:  Objection, Your Honor.

11   **A.**  That would be a reasonable --

12           THE COURT:  Sustained.

13   BY MR. MORTARA:

14           MR. MORTARA:  I'll ask again in a different way.

15   BY MR. MORTARA:

16   **Q.**  Director McGrath, is it your view that this instruction

17   is designed to make sure that your admissions officers do not

18   fall prey to implicit bias or racial stereotyping about

19   Asians, in part?

20   **A.**  It would have that effect, and that would be desirable.

21   I don't think it's a new idea.  As I say, it memorializes a

22   long tradition of our office to work very hard to get beyond

23   stereotypes.

24   **Q.**  But this is the first time this kind of instruction has

25   ever appeared in writing anywhere, correct?

Case: 19-2005    Document: 00117603846    Page: 365    Date Filed: 07/29/2020    Entry ID: 6356391
Case 1:14-cv-14176-ADB   Document 654   Filed 04/18/19   Page 147 of 261

147

 1   **A.**  I can't say ever anywhere, but it's the first time in

 2   those words it appeared, to my knowledge, in the reading

 3   instructions.

 4   **Q.**  Just to be clear, to your knowledge, this is the first

 5   time there's ever been any written guidance that's in red

 6   here in the admissions office.  You can't remember any other

 7   time?

 8          MR. LEE:  I object.  Asked and answered.

 9          THE COURT:  He can have the question.  It has been

10   asked and answered, but --

11   **A.**  I would add that you may have seen in previous exhibits

12   part of what we call the packet for new members of the staff,

13   the training packet.

14          One text that we use for discussion is an essay

15   written by a Professor Helen Vendler on the subject of

16   student's interests and the range of personalities that may

17   do well at Harvard.  It includes a number of these ideas and

18   is not unfamiliar to our committee.  I can't tell you --

19   because I don't think they she used exactly these words, but

20   it's not a new idea.

21   BY MR. MORTARA:

22   **Q.**  You subsequently thanked Ms. Mascolo for this draft,

23   correct?

24   **A.**  I did.

25   **Q.**  And that's Plaintiff's Exhibit 741, an email, September

```
 1    2, from you to Ms. Mascolo, Dean Fitzsimmons, and

 2    Ms. Gershengorn.

 3              MR. MORTARA:  We'd offer Plaintiff's 741.

 4              MR. LEE:  No objection.

 5              THE COURT:  Admitted.

 6              (Plaintiff Exhibit No. 741 admitted.)

 7    BY MR. MORTARA:

 8    Q.  You sent this from your iPhone, correct?  You said "Thank

 9    you"?

10    A.  Yes.

11    Q.  But you're not sure you reviewed the draft she sent or

12    the language in red; is that right?

13    A.  That's right.

14    Q.  Let's move forward to Plaintiff's 720 and 721.

15    A.  Yes.

16    Q.  Plaintiff's 720 is an email from Ms. Mascolo to an email

17    list, admfao_officers-list@lists.fas.harvard.edu.  Subject,

18    "Reading instructions."

19              Do you see that?

20    A.  I do.

21    Q.  Sent on September 19.  Who is on that email list?

22    A.  Admissions and financial aid officers.

23    Q.  Does it include you?

24    A.  It does.

25    Q.  Does it include Dean Fitzsimmons?
```

**JA3290**

 1   **A.**   It does.

 2   **Q.**   Does it include Ms. Gershengorn?

 3   **A.**   I don't think so.  That list does not.

 4          MR. MORTARA:  We offer Plaintiff's Exhibit 720 and

 5   its attachment, 721.

 6          MR. LEE:  No objection.

 7          THE COURT:  Admitted.

 8          (Plaintiff Exhibit Nos. 720 and 721 admitted.)

 9   BY MR. MORTARA:

10   **Q.**   The email says, "Hi, everyone.  Attached please find the

11   updated reading instructions for the year.  The middle of the

12   document is taken directly from the Ivy League annual memo

13   which will not come out for another week or so, so you can

14   skip pages 8 to 14."

15          After the parenthetical it says, "That said, please

16   make sure you read the rest of the document thoroughly as

17   there are several updates/additions.  Many thanks to all of

18   you who helped in the editing process."

19          Do you see that?

20   **A.**   Yes.

21   **Q.**   And Ms. Mascolo has bolded thoroughly, correct?

22   **A.**   Yes.

23   **Q.**   Did you read the document when it was sent on

24   September 19?

25   **A.**   I think I did not.

Case: 19-2005    Document: 00117631846    Page: 368    Date Filed: 07/29/2026    Entry ID: 6356391
Case 1:14-cv-14176-ADB    Document 654    Filed 04/18/19    Page 150 of 261

150

1    **Q.**  Let's take a look at the attachment.  Again starting with

2    the overall rating section that we've been through before, I

3    just want to point out to you on page 3 it has the same

4    language we've been through before.

5           Don't use race in the ratings other than the

6    overall rating and don't use race unless the applicant brings

7    it up on his application in discussing it.  Don't use race

8    just when the applicant self-identifies as a member of a

9    particular race or ethnicity.

10          Those are the instructions before and they're still

11   here in the September 19 version, correct?

12   **A.**  Yes.  In this draft, they are still here.

13   **Q.**  Just to be clear, Charlene Kim would have gotten this

14   email?

15   **A.**  Yes.

16   **Q.**  Erica Bever would have gotten this email?

17   **A.**  Yes.

18   **Q.**  Chris Looby would have gotten this email?

19   **A.**  Yes.

20   **Q.**  Roger Banks would have gotten this email?

21   **A.**  Yes.

22   **Q.**  Moving forward to the personal rating, this version also

23   has the language that was in red on the draft, correct?

24   **A.**  Yes.

25   **Q.**  The red language which in the previous draft said, "It is

**JA3292**

151

1    important to keep in mind the characteristics not always

2    synonymous with extroversion are similarly valued.

3    Applicants who seem to be particularly reflective,

4    insightful, and/or dedicated should receive higher personal

5    ratings as well."

6    **A.**   Yes.

7    **Q.**   After the guidance was distributed on September 19, they

8    were released again on October 5 with a change, correct?

9    **A.**   Yes.

10   **Q.**   That's Plaintiff's 722.

11   **A.**   Yes.

12   **Q.**   Again an email from Ms. Mascolo to this list.  Same list

13   as before, correct?

14   **A.**   Yes.  Same list.

15   **Q.**   Dated October 5, 2018, 7:00 p.m.?

16          MR. MORTARA:  We offer Plaintiff's 722 and its

17   attachment, Plaintiff's 723.

18          MR. LEE:  No objection.

19          THE COURT:  Admitted.

20          (Plaintiff Exhibit Nos. 722 and 723 admitted.)

21   BY MR. MORTARA:

22   **Q.**   The text from Ms. Mascolo says, "Attached.  Please use

23   this version and disregard all previous versions," right?

24   **A.**   Yes.

25   **Q.**   This version was operative when you testified, talked to

**JA3293**

Case: 19-2005    Document: 00117631846    Page: 370    Date Filed: 07/29/2026    Entry ID: 6356391
Case 1:14-cv-14176-ADB    Document 654    Filed 04/18/19    Page 152 of 261

152

1  me and we asked those questions that we went over at the

2  beginning, correct?

3  **A.**  It was operative for our current work, yes, that's

4  correct.

5  **Q.**  Let's talk about the big change that was made or a change

6  that was made, again in the overall section.

7       It says still "Readers should not take an

8  applicant's race or ethnicity into account in making any of

9  the ratings other than the overall rating."

10       But down below the instruction to only consider

11  race when an applicant brings it up as opposed to

12  self-identifying has disappeared, correct?

13  **A.**  That's correct.

14  **Q.**  And I've now got the earlier version on the top of the

15  screen with the restriction that we talked about.

16       Do you see that?

17  **A.**  I do.

18  **Q.**  And that restriction is a restriction to only consider

19  race when an applicant brings it up and talks about it and

20  not just when the applicant checks the box, correct?

21  **A.**  That was incorrect advice, and that's correct.

22  **Q.**  It's correct that the restriction was there on

23  September 19, September 12, and September 11, correct?

24  **A.**  Yes.

25  **Q.**  And the restriction is gone from the reading guidance

 1   issued on October 5, correct?

 2   **A.**   Yes.

 3   **Q.**   Where did the idea come from to eliminate the restriction

 4   we saw earlier?  Who suggested it?

 5   **A.**   I don't know where the idea came from in the first place,

 6   that proposal, which is now gone.

 7          I have always regarded it as improper advice, not

 8   reflecting our practice.  And I don't know at what point in

 9   the process, we know the dates that it was between, it was

10   caught and eliminated.

11   **Q.**   Who suggested its elimination?

12   **A.**   I don't know.

13   **Q.**   Is it possible that the person who suggested its

14   elimination was a lawyer?

15          MR. LEE:  Your Honor, I object.  It's possible I'll

16   believe 7 foot 2 tomorrow, and it's not relevant.

17          THE COURT:  It is?

18          MR. LEE:  I won't be.

19          THE COURT:  The objection is sustained.  You can

20   withdraw the question.  In any event, she's not going to

21   answer it.

22   BY MR. MORTARA:

23   **Q.**   How did you find out that this language had been removed?

24   Who told you?

25   **A.**   I think I found out when I took up the looking at this

**JA3295**

1    text and I noticed that it was gone, which is what was

2    appropriate.  I don't remember exactly.

3    **Q.**  So, Director McGrath, you just testified that you looked

4    at the text and noticed the restriction was gone.  That means

5    at some point you had noticed the restriction, correct?

6    **A.**  Yes.  I noticed the restriction at some point, but it may

7    not been very long before October because I actually don't

8    remember when.

9    **Q.**  Did you write anybody an email saying the restriction was

10   wrong?

11   **A.**  I don't think so.

12   **Q.**  Did you tell anybody the restriction was wrong?

13   **A.**  I don't remember because I don't remember what group

14   conversations I was in.

15   **Q.**  At some point you did read the restriction.  And as far

16   as you can remember, you didn't write anybody or tell anybody

17   you thought it was wrong, correct?

18   **A.**  I don't remember whether I did.  I think I may not have.

19   We had a system for reviewing this, and when it reached the

20   final stage, which I did see, I saw that it seemed to be

21   correct.

22   **Q.**  And then let's go back to P723.  Sorry.  If you go to

23   page 5 under the personal rating, it still has the red text,

24   correct, the October 5 version, It is important to keep in

25   mind that characteristics that are not always synonymous with

1    extroversion are similarly valid and so forth.  The red text
2    that's there in the October 5 version, correct?
3    **A.**  Let me just check where I am.  Yes.
4    **Q.**  I'm showing you now at the top of the screen the
5    October 5 version, and then on the bottom of the screen the
6    September 12 draft with the red text, just to confirm that.
7    **A.**  Yes.
8    **Q.**  Do you remember our discussion of the Office of Civil
9    Rights review from a few weeks ago?
10   **A.**  Yes.
11   **Q.**  You told me that after OCR came out with its findings --
12   withdrawn.
13          Do you remember our discussion of OCR's findings
14   that some of your readers were using race in assigning of the
15   profile ratings?  Do you remember that?
16   **A.**  Yes.
17   **Q.**  And do you remember that OCR said that your readers were
18   using race in different ways, including some using race in
19   the profile ratings?
20          Do you remember that?
21   **A.**  Yes.
22   **Q.**  And you said to me at the time you did not support
23   written guidance on this subject.  Do you remember that?
24   **A.**  That's right, yes.  I did say that.
25   **Q.**  In fact, you told me that you did not think even on

156

1    October 19, 2018, that the right remedy for inconsistent use

2    of race was more written guidance.  That's what you told me?

3    **A.**  Yes.

4    **Q.**  I want to just make this clear.

5            The OCR report came out in 1990, correct?

6    **A.**  Yes.

7    **Q.**  We looked at the reading guidance for the class of 2022,

8    which is 32 years later -- no, 28 years later because 2022

9    was selected this year, right?

10   **A.**  Right.

11   **Q.**  So 28 years later and there still wasn't any instruction

12   on how to use race.  OCR found there wasn't any written

13   instruction on how to use race, right?

14   **A.**  Right.

15   **Q.**  And here we are 28 years later and there still isn't any

16   written instruction in 2022 on how to use race, correct?

17   **A.**  Correct.

18   **Q.**  So we have 28 years in the admissions office having no

19   writing anywhere on how to use race in the reading guidance,

20   and then a few weeks ago it gets added for the first time,

21   correct?

22   **A.**  Yes.  We make changes every year, some large, some small

23   in our reading instructions.

24   **Q.**  My question is do you think it's a pretty big change to

25   depart from 28 years of no written guidance on a subject and

 1    then all of a sudden do it?

 2    **A.**  It memorializes our normal practice which has been pretty

 3    much the same all of these years.  And to add it seemed to

 4    members of my staff helpful.

 5    **Q.**  Let's return to the discussion of the red text from the

 6    draft from September 11 -- September 12.  Excuse me.  I want

 7    to refer you to Plaintiff's Exhibit 656.  Going a little bit

 8    back in time.

 9    **A.**  Yes.  I'm there.

10    **Q.**  And Plaintiff's Exhibit 656 is an email from you to

11    Ms. Mascolo and Dean Fitzsimmons, dated August 13.

12            Do you see that?

13    **A.**  Yes.

14            MR. MORTARA:  We offer Plaintiff's 656.

15            MR. LEE:  No objection.

16            THE COURT:  Admitted.

17            (Plaintiff Exhibit No. 656 admitted.)

18    BY MR. MORTARA:

19    **Q.**  And down below is another email from you to Ms. Mascolo

20    and Dean Fitzsimmons.  And then further below there's a lot

21    of redactions.  So let's start with the August 13, 2018,

22    email from Ms. Mascolo.  That's the one we saw before.

23            "Just FYI, there may be more updates to the reading

24    instructions", right?  Do you remember that one?

25    **A.**  Yes.

1    **Q.**  Then you respond, "P.S. to my previous.  There may be

2    some helpful text in the handbooks for IVers/chairs.  Back

3    when Kevin Bolan did a thorough re-do, we tried to provide a

4    broad context for the PQ stuff.  Let me know if I can help.

5    Thanks, M."

6              Do you see that?

7    **A.**  Yes.

8    **Q.**  Did Ms. Mascolo ask for your help?

9    **A.**  Yes.

10   **Q.**  And she responds, "This is great.  We'll take a look."

11             And you just said, "I'm just hoping it's helpful,"

12   right?

13   **A.**  Yes.

14   **Q.**  And that refers to the alumni interviewer handbook.  I

15   think you looked at that with Mr. Lee the last time you were

16   here, right?

17   **A.**  Yes.

18   **Q.**  And you're suggesting that Ms. Mascolo look at the

19   interviewer handbook for guidance on what personal qualities

20   Harvard is looking for in applicants, correct?

21   **A.**  Yes.

22   **Q.**  Please turn to Defendant's Exhibit 5.

23   **A.**  Yes.

24   **Q.**  When you were here before, you explained that you used

25   the interviewer handbook in the training material for your

1    regular new staff when they arrived, correct?

2    **A.**  Yes.

3    **Q.**  And you told us that this includes factors that might be

4    used as tips in the admissions process, correct?

5    **A.**  Yes.

6    **Q.**  If you turn to the document page 10, there's some of

7    those categories here, students that might receive tips.

8          Do you see that?

9    **A.**  Yes.

10   **Q.**  And one of them is "unusually appealing personal

11   qualities."  Do you see that?

12   **A.**  Yes.

13   **Q.**  You discussed this section with Mr. Lee, remember?

14   **A.**  Yes.

15   **Q.**  And you see the mention here of "effervescence."  That's

16   a character trait usually considered to be synonymous with

17   "extroversion," isn't it?

18   **A.**  Yes.

19   **Q.**  There's no mention of reflective or insightful or

20   introversion, is there?

21   **A.**  Not in here at this place, no.

22   **Q.**  Dr. McGrath, we've looked at changes implemented in the

23   reading guidance over the summer with the particular focus on

24   the overall and personal ratings.

25          Do you agree that the idea to make changes to the

Case: 19-2005    Document: 00117631846    Page: 378    Date Filed: 07/29/2020    Entry ID: 6356391
Case 1:14-cv-14176-ADB    Document 654    Filed 04/18/19    Page 160 of 261

160

1    personal rating wasn't in the first draft distributed but

2    came sometime between mid July and mid August?

3    **A.**  Yes, that's when it was produced, this recommendation.

4    **Q.**  To the best of your knowledge, what was the most

5    important news event going on over the summer for the Harvard

6    admissions office?

7    **A.**  With respect to the preparation of this document, I would

8    say that it has to do with the retreat where everybody wanted

9    to have a go at giving people better training and advice.  I

10   think that was the event that kicked this off.

11   **Q.**  I think you might have misheard me or I misspoke.

12            For people working in the Harvard admissions

13   office, what was the most important national news going on

14   about how they did their jobs over the summer?

15            MR. LEE:  I object.  I don't know -- for 40 people?

16            THE COURT:  Right.  You can rephrase the question.

17   BY MR. MORTARA:

18   **Q.**  For you, what was the most important thing going on in

19   the national media as it pertained to your job as director of

20   admissions at Harvard?

21   **A.**  At what point?

22   **Q.**  Over the summer.

23   **A.**  I was in Montana.  The newspapers are terrible.

24   **Q.**  Mr. Hughes is from Montana.

25   **A.**  I learned that the other day and I wanted to take that up

Case: 19-2005    Document: 00117631846    Page: 379    Date Filed: 07/29/2020    Entry ID: 6356391
Case 1:14-cv-14176-ADB    Document 654    Filed 04/18/19    Page 161 of 261

161

1    with him.

2    Q.  Did you read the newspapers over the summer?

3    A.  I look at newspapers over the summer, but I wasn't really

4    following.

5    Q.  Did you read the news reports about this case over the

6    summer?

7    A.  Not much over the summer.  I don't remember reading any

8    over the summer.  There may have been some, but I don't think

9    I read them.

10    Q.  Are you aware that a lot of information about Harvard's

11    admissions process became public with filings over the

12    summer?

13    A.  I am.

14          MR. LEE:  Your Honor, I object.  This is a limited

15    recall to go to these events on the reading procedures.  Now

16    we're well beyond that.

17          THE COURT:  I know the question sounds broad, but I

18    think he's trying to figure out, and I think it's legitimate

19    to ask her whether these changes were a reaction to this

20    case.

21    BY MR. MORTARA:

22    Q.  I'm just asking if you were aware that there was a lot of

23    national media coverage about details of Harvard's admissions

24    process that became public because of this case.

25    A.  Yes, I'm aware of that.

Case: 19-2005    Document: 00117638846    Page: 380    Date Filed: 07/29/2020    Entry ID: 6356391
Case 1:14-cv-14176-ADB    Document 654    Filed 04/18/19    Page 162 of 261

162

1    **Q.**  Did you know that the expert reports from this case

2    became public over the summer?

3    **A.**  I wouldn't remember when they became public.

4    **Q.**  Did you learn over the summer that both experts had found

5    a gap between Asians and whites on the personal rating at --

6            MR. LEE:  Your Honor, I object.

7            THE COURT:  Sustained.

8    BY MR. MORTARA:

9    **Q.**  Director McGrath, I only have a few more questions.

10            Has the admissions office or anyone in the

11   admissions office conducted or received bias training?

12            MR. LEE:  Your Honor, I object.  This is a limited

13   recall.  There was a discovery period that went through

14   August of 2014.  This is well beyond the scope of the recall.

15            MR. MORTARA:  If I may respond?  Or if it's going

16   to be overruled, then I don't need to respond.

17            THE COURT:  You can ask if there's been any other

18   changes between 2014 and now on this topic.

19            MR. MORTARA:  That's kind of what I'm getting at.

20   We had a problem last time where my questions were being

21   interpreted in a timeframe that --

22            MR. LEE:  Your Honor --

23            MR. MORTARA:  Your Honor, this is exactly what

24   happened last time.  I want to find out what's happened.

25            THE COURT:  Do you guys want to discuss this at

Case: 19-2005    Document: 00117631846    Page: 384    Date Filed: 07/29/2020    Entry ID: 6356391
Case 1:14-cv-14176-ADB   Document 654   Filed 04/18/19   Page 163 of 261

163

```
 1   sidebar?

 2           MR. LEE:  I just don't want to say anything in

 3   front of the witness.  I'm happy to have him ask another

 4   question.

 5           MR. MORTARA:  I want to ask the question I asked.

 6           MR. LEE:  I'll object.

 7           MR. MORTARA:  I can ask it from 2014 forward.

 8           THE COURT:  Let me see the exact wording of the

 9   question.  Hold on.

10           MR. MORTARA:  Maybe we should sidebar this, if you

11   don't mind.

12           THE COURT:  Let me just look at the last question.

13   If you rephrase the question with the time period, that will

14   be fine.

15   BY MR. MORTARA:

16   Q.  Okay.  Director McGrath, has the admissions office or

17   anyone in the admissions office conducted or taken bias

18   training in the last year?

19           MR. LEE:  I object.

20           MR. MORTARA:  Could we have a sidebar, Your Honor?

21           THE COURT:  Are you objecting because it's beyond

22   the scope of her knowledge?

23           MR. LEE:  No.

24           THE COURT:  Then come to sidebar.

25           [Sidebar sealed and redacted.]
```

Case: 19-2005    Document: 00117632846    Page: 352    Date Filed: 07/29/2020    Entry ID: 6356391
Case 1:14-cv-14176-ADB    Document 654    Filed 04/18/19    Page 164 of 261

164

```
 1                  MR. MORTARA:  Your Honor, may I proceed?
 2                  THE COURT:  You may.
 3       BY MR. MORTARA:
 4       Q.   Director McGrath, has there been official admissions
 5       office implicit bias training?
 6       A.   Not formally.
 7       Q.   Has there been informal admissions office implicit bias
 8       training?
 9       A.   Yes.
10       Q.   When did that happen for the first time?
11       A.   I can't tell you for the first time.  When I took this
12       job 30-something years ago, there was already much discussion
13       about the importance of not stereotyping candidates.  I think
14       we didn't have the language "implicit bias" in those days.
15       We certainly had the language for bias.  That's been, in my
16       whole experience, a subject of training and a subject of
17       staff discussion.
18                  In addition, we have more recently, though we
19       haven't had formal instruction or seminars, we have sent
20       around as part of our continuing education program to staff
21       an article or two on this subject.  Professor Banaji in our
22       own faculty has written a good deal.  We have sent at least a
23       news article around about that.
24       Q.   About implicit bias?
25       A.   She works on that, yes.
```

**JA3306**

Case: 19-2005    Document: 00117631846    Page: 383    Date Filed: 07/29/2020    Entry ID: 6356391
Case 1:14-cv-14176-ADB    Document 654    Filed 04/18/19    Page 165 of 261

165

 1    **Q.**  And when were these documents and articles sent around to

 2    the admissions office on implicit bias?

 3    **A.**  Sometime within the past ten years.  Not very recently, I

 4    think.

 5            MR. MORTARA:  Thank you, Your Honor.  I have no

 6    more questions.

 7            MR. LEE:  Your Honor, could we have the flip chart?

 8            THE COURT:  Yes.  That's fine.

 9            MR. LEE:  Your Honor, may I proceed?

10            THE COURT:  You may.

11                            EXAMINATION

12    BY MR. LEE:

13    **Q.**  Director McGrath, good afternoon.

14    **A.**  Good afternoon.

15    **Q.**  Let me ask you a few questions and see if we can fill in

16    the blanks on some things that Mr. Mortara did not ask you

17    about.

18            Was there a specific period of time for which

19    Harvard had to produce documents in this case?

20    **A.**  Yes.

21    **Q.**  What was that period of time, as far as you know?

22    **A.**  Well, 2012 to 2014.  But for the classes of 2014 to 2019

23    were the --

24    **Q.**  Let's take both parts.

25            So the documents that were produced in this case

**JA3307**

1    went from the period 2012 to the period 2014; is that right?

2    **A.**  Yes.

3    **Q.**  And the classes were the classes of what?

4    **A.**  2014 to 2019.

5    **Q.**  And for the class of 2019, when would the information

6    have been generated that would apply to that class?

7    **A.**  In the summer or the fall of 2015.

8    **Q.**  So the parties agreed that the relevant body of

9    information was six classes, 2014 to 2019, correct?

10   **A.**  Yes.

11   **Q.**  And the parties agreed that the relevant documents were

12   for the period 2012 to 2014, correct?

13   **A.**  Yes.

14   **Q.**  Now, Mr. Mortara has spent the afternoon asking you about

15   documents from 2018, correct?

16   **A.**  Yes.

17   **Q.**  Four years later, correct?

18   **A.**  Yes.

19   **Q.**  Now, during your direct testimony a couple of weeks

20   ago --

21          Do you remember that?

22   **A.**  I do.

23   **Q.**  -- 29 exhibits were admitted during your testimony.  Do

24   you recall that?

25   **A.**  Yes.

1    **Q.**  It's true, is it not, that every single one of those

2    exhibits was dated in the period 2012 to 2014, correct?

3    **A.**  Yes, I think so.

4    **Q.**  Now, as you told us, the discovery or the information

5    provided by the parties to each other ended with the class of

6    2019, correct?

7            MR. MORTARA:  Your Honor, this has been leading

8    from the start.

9            THE COURT:  I think he's just orienting her to the

10   next question.  Then you can watch the leading for me,

11   please.

12           MR. LEE:  Sure.

13   BY MR. LEE:

14   **Q.**  Is that right?

15   **A.**  Yes.

16   **Q.**  Did the Harvard admissions office go out of business

17   after the class of 2019?

18   **A.**  No.

19   **Q.**  How many classes have you admitted since that period of

20   time?

21   **A.**  Three.  Three classes.

22   **Q.**  And the class of 2023 would be the fourth, correct?

23   **A.**  That be would the fourth.

24   **Q.**  So let's talk about the reading procedures that

25   Mr. Mortara asked you about.  Would you remind us what are

Case: 19-2005    Document: 00117631846    Page: 386    Date Filed: 07/29/2020    Entry ID: 6356391
Case 1:14-cv-14176-ADB    Document 654    Filed 04/18/19    Page 168 of 261

168

1    the reading procedures?

2    **A.**   They are a guide to the coding used in the database and

3    on the materials in the folders, and they offer some

4    suggestions about reading and evaluating folders.

5    **Q.**   Do the admissions office officers receive guidance in

6    addition to the reading procedures?

7    **A.**   Yes.

8    **Q.**   And we discussed that the last time you were here,

9    correct?

10   **A.**   Yes, we did.

11   **Q.**   Now, how often does the admissions office update the

12   reading procedures?

13   **A.**   Annually.

14   **Q.**   Every year?

15   **A.**   Every year.

16   **Q.**   So Mr. Mortara asked you about one for the class of 2019

17   and then skipped ahead to the class of 2022.  Do you recall

18   that?

19   **A.**   Yes.

20   **Q.**   Were there revisions to the reading procedures in the

21   intervening period?

22   **A.**   Yes.  In each year.

23   **Q.**   In every year?

24   **A.**   Yes.

25   **Q.**   So let's take a look at some of those revisions after the

1    period of discovery in this case.  Turn, if you would, to

2    Tab 5 in your notebook.

3    **A.**  I have that.

4    **Q.**  Do you see DX743?

5    **A.**  Yes.

6    **Q.**  What are these?

7    **A.**  This is the reading procedures for the class of 2020.

8            MR. LEE:  Your Honor, we offer DX743.

9            MR. MORTARA:  No objection.

10           THE COURT:  Admitted.

11           (Defendant Exhibit No. DX743 admitted.)

12   BY MR. LEE:

13   **Q.**  Now, Mr. Mortara didn't show you these reading

14   procedures, did he?

15   **A.**  No.

16   **Q.**  Let's turn, if you would, to Tab 4 in your notebook.

17   **A.**  I that.

18   **Q.**  Do you see DX742?

19   **A.**  Yes.

20   **Q.**  What are they?

21   **A.**  Reading procedures for the class of 2021.

22           MR. LEE:  Your Honor, we offer DX742.

23           MR. MORTARA:  No objection.

24           THE COURT:  Admitted.

25           (Defendant Exhibit No. DX742 admitted.)

**JA3311**

1    BY MR. LEE:

2    Q.    Now again, Mr. Mortara didn't show you the reading

3    procedures for the class of 2021, correct?

4    A.    Correct.

5    Q.    To be clear, they're after the discovery period in this

6    case, correct?

7    A.    Yes.

8    Q.    Now, did the admissions office make changes to the

9    reading procedures between the class of 2020 and the class of

10    2021?

11    A.    Yes.

12    Q.    Have you helped us prepare a redline that would

13    demonstrate the changes that were made from the class of 2020

14    to the class of 2021?

15    A.    I'm sorry.  What was the beginning of that question?

16    Q.    Have you helped us prepare a demonstrative redline to

17    show the changes between those two sets of reading

18    procedures?

19    A.    Yes.

20    Q.    Turn, if you would, to Tab 7 in your notebook.

21    A.    Yes.

22    Q.    Do you find DD 12?

23    A.    Yes.

24    Q.    What is it?

25    A.    This is reading procedures for the class of 2021 based

1    on -- original text is the reading procedures for the class

2    of 2020, and this includes the proposed changes for the next

3    set, the class of 2021.  You can see both versions here, two

4    colors.

5    **Q.**  There are a host of changes, but I want to explore a few

6    so we can fill in the period of time that was not addressed

7    by Mr. Mortara.

8            Turn, if you would to page 3.

9    **A.**  Yes.

10   **Q.**  And I'll put it on the screen.  It's DD 12.3 in the

11   bottom right-hand corner.  Do you see that?

12   **A.**  Yes.

13   **Q.**  Do you see the section "Coding Guidelines For Summary

14   Sheets"?

15   **A.**  Yes.

16   **Q.**  Were changes made in the coding guidelines for the

17   summary sheets between these two classes?

18   **A.**  Yes.

19   **Q.**  Turn to page 4, 12.4 in the bottom right-hand corner.

20   **A.**  Yes.

21   **Q.**  Do you see the section "Academic"?

22   **A.**  Yes.

23   **Q.**  And do you see the redlines or track changes indicating

24   changes?

25   **A.**  Yes.

1    **Q.**  Were changes made to the procedures for coding the

2    academic rating between class of 2020 and class of 2021?

3    **A.**  Yes.

4    **Q.**  Were changes also made to the coding of the

5    extracurricular rating, if I just move a little bit further

6    down the page?

7    **A.**  Yes.

8    **Q.**  If I turn you to the next page, were changes made to the

9    procedures for coding the athletic rating between the classes

10   of 2020 and 2021?

11   **A.**  Yes.

12   **Q.**  And if I take you done a little further, were changes

13   made to the procedures for ending coding for personal rating

14   between the classes of 2020 and 2021?

15   **A.**  Yes.

16   **Q.**  Now, were there other changes made to the reading

17   procedures as well between the class of 2020 and 2021?

18   **A.**  Yes.

19   **Q.**  You told us that changes are made on an annual basis?

20   **A.**  Yes.

21   **Q.**  If we just look at these changes that are indicated here,

22   for each of the different ratings and for other subjects, was

23   the magnitude of these changes unusual in your year-to-year

24   revisions?

25   **A.**  No.  We make a lot of changes every year.

**JA3314**

1    **Q.** Turn, if you would, to Tab 6.

2    **A.** Yes.

3    **Q.** Mr. Mortara discussed Tab 6 with you?

4    **A.** Yes.

5    **Q.** And what are these?

6    **A.** Reading procedures for the class of 2022.

7    **Q.** Now, so we're clear on the timing, when will the

8    admissions office begin reading files for the class of 2023?

9    **A.** We have begun already.

10   **Q.** And it's this fall?

11   **A.** Yes.

12   **Q.** Who was responsible for updating the reading procedures

13   for the class of 2023?

14   **A.** My colleague Christine Mascolo.

15   **Q.** Who is Ms. Mascolo?

16   **A.** She is associate director of admissions, and she

17   oversees, among other things, the training program for new

18   staff.

19   **Q.** Now, you mentioned a retreat in June.  Do you recall

20   that?

21   **A.** I do.

22   **Q.** Would you tell Her Honor what the retreat was about?

23   **A.** The retreat had a number of topics.  It was about all

24   kinds of different things.  Procedures about interviewing,

25   alumni relations, how to think about academic assessments.

1    And in the back of many people's minds was translating some

2    of the discussion in various categories in a more explicit

3    way into the reading instructions.

4    **Q.**  Was the retreat caused by or the result of the fact that

5    SFFA sued us, sued Harvard?

6    **A.**  No.  We do retreats every year, have for a number of

7    years.

8    **Q.**  Right.  Was SFFA's lawsuit or any publicity about it the

9    reason there was a retreat?

10   **A.**  No.

11   **Q.**  Was anyone other than Ms. Mascolo involved in updating

12   the reading procedures for the class of 2023?

13   **A.**  She was the manager of the document, but a number of our

14   staff helped her with some of the proposed language.  We've

15   had some discussion about that today.

16   **Q.**  Now, turn, if you would, to Tab 1.  Do you have it before

17   you?

18   **A.**  I do.

19          MR. LEE:  And actually before we get to Tab 1, let

20   me ask Mr. Lee to bring up P720.

21   **Q.**  Do you recall Mr. Mortara discussing this with you?

22   **A.**  Yes.

23   **Q.**  And it has a date of September 19, 2018?

24   **A.**  Yes.

25   **Q.**  Do you see under "Attachments" it says, Reading

**JA3316**

```
1    procedures 2018.19 draft, and then it goes on, correct?

2    A.  Yes.

3    Q.  Now, were these the final -- was this the final version

4    of the reading procedures for the class of 2023?

5    A.  No.

6    Q.  Now let's turn to Tab 1.  Do you find P633?

7    A.  Yes.

8    Q.  What is P633?

9    A.  I believe this is the final official text.

10   Q.  The final version of the reading procedures for the class

11   of 2023?

12   A.  I think so, yes.

13   Q.  When were they distributed to the admissions office?

14   A.  I think they were distributed to everybody on October 5.

15   Q.  About a week before this trial started?

16   A.  Yes.

17   Q.  Now turn, if you would, to the page that says

18   HARV 0097938.

19          Do you see the section that says "Overall"?

20   A.  Yes.

21   Q.  Let me draw your attention to the last paragraph of that

22   section.  Could you read those two sentences to us, please.

23   A.  "In assigning the overall rating, readers may consider

24   whether a student's background, including his or her race or

25   ethnicity, may contribute to the educational benefits of
```

**JA3317**

 1   diversity at Harvard College.  The consideration of race or

 2   ethnicity may be considered only as one factor among many."

 3   **Q.**  Is that paragraph consistent with how the Harvard

 4   admissions office has considered race in the admissions

 5   process?

 6   **A.**  Yes.

 7   **Q.**  For how long a period of time?

 8   **A.**  For many years, certainly throughout my tenure.

 9   **Q.**  And is it consistent with the description you provided to

10   Her Honor when you have testified a couple of weeks ago?

11   **A.**  Yes.

12   **Q.**  Turn, if you would, to page HARV 0097940.

13          Do you see the section titled "Personal"?

14   **A.**  Yes.

15   **Q.**  Were there updates to this section of the reading

16   procedures for the class of 2023?

17   **A.**  Yes.

18   **Q.**  Were there updates to other sections for the other

19   profile ratings also?

20   **A.**  Yes.

21   **Q.**  Let me direct your attention to the sentence at the end

22   of the first paragraph under personal.  It begins, "It is

23   important."

24          Do you see it?

25   **A.**  Yes.

1   **Q.** Mr. Mortara asked you about this. I want to go through

2   it a little bit more slowly. Would you read the two

3   sentences to us, please.

4   **A.** "It is important to keep in mind that characteristics not

5   always synonymous with extroversion are similarly valued.

6   Applicants who seem to be particularly reflective,

7   insightful, and/or dedicated should receive higher personal

8   ratings as well."

9   **Q.** Does what you just read represent a change in Harvard's

10  admissions policy?

11  **A.** Not -- no, it does not.

12  **Q.** How long has it been Harvard's admissions policy?

13  **A.** That has been our approach throughout my tenure also.

14  **Q.** And is it consistent with your description of the policy

15  that you provided to Her Honor two weeks ago?

16  **A.** Yes, it is.

17  **Q.** Would you read the next sentence which begins "As noted

18  above."

19  **A.** "As noted above, though, an applicant's race or ethnicity

20  should not be considered in assigning the personal rating."

21  **Q.** And how does that compare to what you told Her Honor two

22  weeks ago about how race is considered in the admissions

23  office?

24  **A.** That is the same message.

25  **Q.** Now, Mr. Mortara asked you about the reading procedures

**JA3319**

 1   for the years 2013 to 2014.  It was DX5 in his notebook.  So

 2   if I could ask you to switch notebooks for a second, go back

 3   to his notebook and get DX5.  Do you have it?

 4   **A.**  Yes, I do.

 5   **Q.**  If we could have the cover, this is the interviewer

 6   handbook for 2013 to 2014, correct?

 7   **A.**  Yes.

 8   **Q.**  Now, to be clear, this is one of the documents in the

 9   period of time for discovery in this case, correct?

10   **A.**  Yes.

11   **Q.**  And when Mr. Mortara examined you a couple of weeks

12   allege, this is a document that he put in front of you,

13   correct?

14   **A.**  Yes.

15   **Q.**  He just asked you some questions about what this document

16   said about extroverts and introverts.  Do you remember?

17   **A.**  Yes.

18   **Q.**  Let's look at a portion that he didn't address.  If you

19   turn to the second page, do you see a section called "Valuing

20   the Creative and the Reflective"?

21   **A.**  Yes.

22   **Q.**  And this is a letter written -- or this is a piece

23   written by a woman named Helen Vendler?

24   **A.**  Yes.

25   **Q.**  Who was Helen Vendler?

```
 1    A.   This is the piece I referred to earlier.  She is a
 2    university professor, professor of English literature.  She
 3    was a member of our admissions committee.  I think her tenure
 4    on our committee ended in the year 2000, and I believe that's
 5    when she wrote this essay at my request.
 6    Q.   And this essay is the introduction to the interviewer
 7    handbook for 2013 to 2014?
 8    A.   Yes.
 9    Q.   Turn, if you would, to the page that's page 3.
10    A.   Yes.
11    Q.   Now, you had mentioned to Mr. Mortara that the issue of
12    introverts and extroverts actually had been addressed in
13    written materials in admissions office previously, correct?
14    A.   Yes.
15    Q.   So let's look at a couple of the things that were said a
16    decade or so ago.  Go to the third paragraph on page 3.
17    A.   Yes.
18    Q.   Would you read the sentence that begins "The truth" and
19    continues down to "do we have room for."
20    A.   "The truth is that many future poets, novelists, and
21    screenwriters are not likely to be straight A students either
22    in high school or in college.  The arts through which they
23    will discover themselves prize creativity, originality, and
24    intensity above academic performance; they value
25    introspection above extroversion, insight above rote
```

1   learning.  Yet such unusual students may be in the long run

2   the graduates of whom we will be most proud."

3   **Q.**  And would you then read for me the very next sentence.

4   **A.**  "Do we have room for the reflective introvert as well as

5   for the future leader? "

6   **Q.**  When you told Mr. Mortara that Harvard had addressed the

7   question of introverts and extroverts years ago, was this one

8   of the things you had in mind?

9   **A.**  Yes, it is.

10  **Q.**  Let's see what else was said in this letter -- this

11  article.  Could you go down to the last paragraph on this

12  page.

13  **A.**  Yes.

14  **Q.**  Do you see the sentence that says, "Do we ask an

15  introverted student"?

16  **A.**  Yes.

17  **Q.**  Would you read that sentence for us.

18  **A.**  "Do we ask an introverted student which issues most

19  occupy his mind or suggest something, justice and injustice

20  in her high school, for her to discuss?"

21         Shall I continue?

22  **Q.**  No.  That's good.  Thank you.  Is this one of the

23  portions that you had in mind when you were answering

24  Mr. Mortara's questions?

25  **A.**  Yes.

1    **Q.**  Has Professor Vendler's article remained in the

2    interviewer handbook?

3    **A.**  Yes.

4    **Q.**  Right through today?

5    **A.**  Yes.

6    **Q.**  And would you remind us how many people get the

7    interviewer handbook with Professor Vendler's essay?

8    **A.**  Over 10,000 of our alumni.

9    **Q.**  Every year?

10   **A.**  Yes.  It's updated every year.

11   **Q.**  Now, Mr. Mortara asked you whether you had seen the class

12   of 2023 reading procedures before you testified a couple of

13   weeks ago.

14   **A.**  Yes.

15   **Q.**  And he showed you your testimony where you said that you

16   had not seen -- in answer to his specific question, you had

17   not seen them in written form, correct?

18   **A.**  Right.  Yes.

19   **Q.**  We've now seen the class of 2023 reading procedures.

20   Would you explain to us why you answered his question in the

21   manner that you did?

22   **A.**  When I testified before, I was referring to what I

23   thought was the period of time that was the principal focus

24   of this file and of the materials which I had reviewed in

25   preparation for my testimony.

1    **Q.**  And when you were pointing over to my hand scratchings on

2    the chart, you were referring to the period through 2014?

3    **A.**  Yes.

4    **Q.**  And the classes through 2019?

5    **A.**  Yes.

6    **Q.**  If you knew that his question was intended to come right

7    up through October the 15th or whatever day you were here,

8    would you have answered it differently?

9    **A.**  Yes.

10   **Q.**  Thank you.

11          MR. LEE:  Nothing further, Your Honor.

12          THE COURT:  Go.

13                     FURTHER EXAMINATION

14   BY MR. MORTARA:

15   **Q.**  You just looked at some pages from the alumni interviewer

16   handbook and an essay, correct?

17   **A.**  Yes.

18   **Q.**  And part of the essay had a question.  Do we ask the

19   introverted student about injustice in their high school, or

20   something to that effect, correct?

21   **A.**  Yes.

22   **Q.**  And that's talking about interviewing people, isn't it?

23   Did we ask questions?

24   **A.**  It's talking about interviewing people, and it's

25   talking -- yes.

**JA3324**

1    **Q.**  Can you ask an introverted student who submits a paper

2    application and is not interviewed by anyone in your office

3    how they feel about injustice?

4    **A.**  Not necessarily.  But the interviewers who read this

5    essay in preparation for their interviewing of -- official

6    interviewing of our candidates that might be able to think

7    more deeply about the interview.

8    **Q.**  That's your alumni interviewers, correct?

9    **A.**  Correct.

10   **Q.**  Not your admissions officers who assign personal ratings

11   without interviewing many, many, many applicants, correct?

12   **A.**  Correct.

13   **Q.**  Thank you.

14                     FURTHER EXAMINATION

15   BY MR. LEE:

16   **Q.**  Director McGrath, do you consider yourself an introvert

17   or an extrovert?

18   **A.**  Good heavens.  You will have a better view than I will.

19            Probably an introvert.

20   **Q.**  Thank you.

21            MR. MORTARA:  Your Honor, could we have a

22   ten-minute break to confer?

23            THE COURT:  Yes.  Ten minute break.  We'll be back

24   at five of.

25            MR. LEE:  Your Honor, can the witness be excused?

**JA3325**

```
 1              THE COURT:  I'm sorry.  You're excused, Director
 2     McGrath.
 3              (Court recessed at 2:44 p.m.)
 4              THE COURT:  Next witness, please.  Mr. Hughes,
 5     you're standing up.
 6              MR. HUGHES:  Your Honor, can we have a brief
 7     sidebar.
 8              THE COURT:  Yes.
 9              [Sidebar sealed and redacted.]
10              THE COURT:  Joan was just reminding me that the
11     sidebars have been sealed throughout as a matter of course
12     except for the parties.
13              Just so it is clear to everybody, I can't recollect
14     the number of the motion, but the agreed upon motion that
15     concerned judicial notice of historical documents is granted.
16              And Exhibits -- what's been marked for
17     identification as Exhibits 221, 512, and 513 are not
18     admitted.
19              MR. HUGHES:  Thank you, Your Honor.  Those are
20     P221, P512, and P513.
21              THE COURT:  Yes.  P221, P512, and P513.  And I have
22     under advisement the last two exhibits, and I'll give you the
23     ruling on that in the morning because I know you both have
24     submitted writings on that, and I haven't had a chance to
25     read them.
```

**JA3326**

```
 1              MR. HUGHES:  Thank you, Your Honor.  The plaintiffs
 2      rest, and I'll turn it over to Mr. Lee.
 3              MR. LEE:  Your Honor, Harvard calls Drew Faust.
 4              THE CLERK:  Can you please raise your right hand.
 5              (DREW FAUST duly sworn by the Deputy Clerk.)
 6              THE CLERK:  Thank you.  You may be seated.
 7              Can you please state your name and spell your last
 8      name for the record.
 9              THE WITNESS:  My name is Drew Faust, F-A-U-S-T.
10              THE COURT:  I see you leaning forward.  That whole
11      microphone can pull towards you if it's easier.
12              THE WITNESS:  Thank you.
13                              EXAMINATION
14      BY MR. LEE:
15      Q.  Good afternoon, President Faust.
16      A.  Good afternoon.
17      Q.  Would you introduce yourself to Her Honor?
18      A.  Your Honor, I am Drew Faust.
19              THE COURT:  Nice to meet you.
20              THE WITNESS:  Nice to meet you, too.
21      BY MR. LEE:
22      Q.  President Faust, by whom are you currently employed?
23      A.  I'm employed by Harvard University.
24      Q.  Were you the president of Harvard?
25      A.  Yes, I was.
```

**JA3327**

1    **Q.**  Would you very briefly describe your educational

2    background for the Court.

3    **A.**  I grew up and attended elementary school in Virginia and

4    then graduated from Concord Academy here in Massachusetts

5    then got a bachelors degree from Bryn Mawr College then an MA

6    and Ph.D. from the University of Pennsylvania.

7    **Q.**  In what year did you receive your Ph.D.?

8    **A.**  1975.

9    **Q.**  What was the subject of your dissertation?

10   **A.**  Of my dissertation?

11   **Q.**  Yes.

12   **A.**  I was in a program in American civilization, and I wrote

13   a dissertation on the defense of slavery in the pre Civil War

14   South.

15   **Q.**  What did you do after earning your Ph.D.?

16   **A.**  I joined the Pennsylvania faculty.

17   **Q.**  And how long were you a member of the faculty at Penn?

18   **A.**  I was on the faculty there for 25 years.

19   **Q.**  What is the field in which your academic work has

20   concentrated?

21   **A.**  My academic work has been concentrated in the study of

22   the pre Civil War South and the Civil War.

23   **Q.**  Has your academic work educated your view of race in

24   America?

25   **A.**  It has.  Those are central issues to the work I have

187

1    undertaken.

2    **Q.**  Now I'm going to ask you to be immodest for a moment on

3    your own behalf.

4        Have you received any formal recognition for your

5    academic work in this field?

6    **A.**  I have.

7    **Q.**  Would you just give us a couple of examples?

8    **A.**  I recently was awarded the Kluge Prize in the study of

9    humanity by the Library of Congress.  My most recent book was

10   a finalist for the Pulitzer Prize and the National Book Award

11   and was named by The New York Times as one of the ten best

12   books of 2008.

13   **Q.**  What was the title of that book?

14   **A.**  That book was entitled "This Republic of Suffering: Death

15   and the American Civil War."

16   **Q.**  At some point did you leave the University of

17   Pennsylvania?

18   **A.**  I did.

19   **Q.**  Where did you go?

20   **A.**  I went to Harvard University.

21   **Q.**  In what capacity?

22   **A.**  I became the dean of the Radcliffe Institute For Advanced

23   Study.

24   **Q.**  And what is the Radcliffe Institute?

25   **A.**  The Radcliffe Institute is the unit of Harvard that was

**JA3329**

Case: 19-2005    Document: 00117631846    Page: 406    Date Filed: 07/29/2020    Entry ID: 6356391
Case 1:14-cv-14176-ADB    Document 654    Filed 04/18/19    Page 138 of 261

188

1    created when Harvard and Radcliffe merged in 1999.  And what

2    had been Radcliffe College, a college for women, was

3    incorporated into the Harvard entity.  It was transformed at

4    that point into an institute for advanced study, and I was

5    the founding dean.

6    **Q.**  When did you begin serving as the president of Harvard

7    University?

8    **A.**  I began in that role in 2007, on July 1, 2007.

9    **Q.**  When did you complete your service as president?

10    **A.**  I completed my service as president on June 30 of this

11    year.

12    **Q.**  What is your current position at Harvard?

13    **A.**  I am the Lincoln professor of history.

14    **Q.**  What were your duties and responsibilities as president

15    of Harvard?

16    **A.**  I was responsible for everything at the university.

17    **Q.**  Were you involved in all the day-to-day decisions and

18    activities of the university?

19    **A.**  Yes.  I was ultimately responsibile.  But the day-to-day

20    decisions were not ones I engaged in universally across the

21    university.

22    **Q.**  Let me ask you some questions about the structure and

23    mission of Harvard University.

24          As president of Harvard University, were you

25    ultimately responsible for the oversight of Harvard College?

1   **A.**  Yes, ultimately I was.

2   **Q.**  Was Harvard College the only academic institution you

3   oversaw as president?

4   **A.**  No, it was not.

5   **Q.**  Turn, if you would, in the notebook that we've put before

6   you to Tab 14.

7   **A.**  Yes.

8   **Q.**  Do you see DD 11.2?

9   **A.**  I do.

10  **Q.**  It's also on the screen in front of you, if that makes it

11  easier.  Can you tell us what this slide describes?

12  **A.**  This slide lists the various academic units that make up

13  Harvard University.

14  **Q.**  Would you just tell us what they are?

15  **A.**  They are Harvard College, Harvard Graduate School of Arts

16  and Sciences, Harvard John A. Paulson School of Engineering

17  and Applied Sciences, the Radcliffe Institute for Advanced

18  Study, Harvard Business School, Harvard Divinity School,

19  Harvard School of Dental Medicine, Harvard Graduate School of

20  Design, Harvard Graduate School of Education, Harvard Kennedy

21  School, Harvard Law School, Harvard Medical School, and

22  Harvard T.H. Chan School of Public Health.

23  **Q.**  On a day-to-day basis, who is responsible for overseeing

24  each of these schools?

25  **A.**  Each of these schools has a dean.

1    **Q.**   Excluding the schools within the faculty of arts and

2    sciences and the dental school, to whom did the deans report?

3    **A.**   The deans reported to me.

4    **Q.**   Who is responsible for the day-to-day operations of

5    Harvard College?

6    **A.**   The dean of Harvard College is Rakesh Khurana, and he has

7    that responsibility.

8    **Q.**   And during your time as president, to whom did Dean

9    Khurana report?

10   **A.**   Dean Khurana reported to the dean of the faculty of arts

11   and sciences, Mike Smith.

12   **Q.**   And to whom did Dean Smith report?

13   **A.**   Dean Smith reported to me.

14   **Q.**   And who was responsible for undergraduate admissions

15   during their tenure?

16   **A.**   Dean Fitzsimmons.

17   **Q.**   And to whom did he report?

18   **A.**   He reported to Mike Smith, the dean of the faculty of

19   arts and sciences.

20   **Q.**   Were you involved in the day-to-day work of the

21   admissions office of Harvard College?

22   **A.**   No, I was not.

23   **Q.**   Were you involved in the day-to-day work of the

24   admissions offices of any of the other units of Harvard

25   University?

Case: 19-2005    Document: 00117631846    Page: 409    Date Filed: 07/29/2020    Entry ID: 6356391
Case 1:14-cv-14176-ADB   Document 654   Filed 04/18/19   Page 191 of 261

191

1    **A.**   No, I was not.

2    **Q.**   Let's turn back to Harvard College.  Does Harvard College

3    have a mission statement?

4    **A.**   It does.

5    **Q.**   Turn, if you would, to Tab 1 in your binder.  Do you find

6    DX109?

7    **A.**   I do.

8    **Q.**   What is it?

9    **A.**   It's the mission, vision, and history of Harvard College.

10   **Q.**   And under the mission, would you read for us the first

11   two sentences of the mission of Harvard College?

12   **A.**   "The mission of Harvard College is to educate the

13   citizens and citizen-leaders for our society.  We do this

14   through our commitment to the transformative power of a

15   liberal arts and sciences education."

16   **Q.**   Was that the mission of Harvard College during your

17   tenure as president?

18   **A.**   It was.

19   **Q.**   Turn, if you would, to the second sentence of the next

20   paragraph.  And I'll ask Mr. Lee to highlight it.  Could you

21   read that sentence for us?

22   **A.**   "Through a diverse living environment, where students

23   live with people who are studying different topics, who come

24   from different walks of life and have evolving identities,

25   intellectual transformation is deepened and conditions for

1    social transformation are created."

2    **Q.**  Do you agree with that statement?

3    **A.**  I do.

4    **Q.**  While you were president, was diversity important to

5    fulfilling Harvard's mission?

6    **A.**  Diversity was a central element of fulfilling Harvard's

7    mission.

8    **Q.**  Why was it a central element of fulfilling Harvard's

9    mission?

10   **A.**  We are a residential college, at Harvard College, and

11   that means that we bring people together from a wide range of

12   places and backgrounds to educate one another as well as to

13   benefit from the formal education that they may receive from

14   our faculty and staff.  And so having people who are able to

15   educate one another about differences, bring different

16   elements to that community, is an essential part of the

17   experience of Harvard College.

18   **Q.**  What types of diversity are important to fulfilling

19   Harvard College's mission?

20   **A.**  There are a wide range of types of diversity that matter

21   to us.  We look for geographic diversity, diversity of

22   ethnicity, of race, of religion, of intellectual focus.  We

23   want students who will pursue different fields and have --

24   engaged with different questions intellectually before they

25   come.  We look for people with a variety of talents across a

1  spectrum of areas.

2  **Q.** And racial diversity is one of the types of diversity

3  that you seek?

4  **A.** Yes, it is.

5  **Q.** Why is racial diversity important to achieving the

6  college's mission?

7  **A.** Racial diversity is important because race is an element

8  in our society of importance, and it also can be a defining

9  element in how our students understand themselves and how

10 they understand the experiences of their lives and what they

11 bring to the Harvard College community.

12 **Q.** During your 11 years as president, did the diversity of

13 the Harvard College class change?

14 **A.** It did.

15 **Q.** In what ways?

16 **A.** It became more diverse in a variety of dimensions.

17 Socioeconomic diversity was a very important one because of

18 our expansions of financial aid, and that, in part, enabled a

19 more diverse class overall.

20 **Q.** And did it change in terms of racial diversity?

21 **A.** It did.

22 **Q.** Geographic diversity?

23 **A.** Yes, it did.

24 **Q.** And in other ways?

25 **A.** Yes, it did.

**JA3335**

Case: 19-2005   Document: 00117631846   Page: 412   Date Filed: 07/29/2020   Entry ID: 6356391
Case 1:14-cv-14176-ADB   Document 654   Filed 04/18/19   Page 194 of 261

194

1    **Q.**  And as someone who was the president and who walked

2    across the campus on a daily basis for 11 years, did that

3    changed diversity change the campus and the community?

4    **A.**  It did.  It was a campus in which we saw students

5    bringing different elements of their own experiences to share

6    with their fellow students.

7              We saw, for example, in the arts, which was a real

8    interest and focus of mine, the kinds of diversity that

9    different ethnic and racial backgrounds enabled students to

10   represent through their artistic performances.  South Asian

11   dance or festival and so forth was just a symbol of the kind

12   of cultural differences that flourished on the campus as we

13   had more representation from more different groups,

14   geographic groups and ethnic groups and racial groups.

15   **Q.**  Is it your experience as an educator that students learn

16   from each other as well as from the faculty?

17   **A.**  Absolutely.  That's a fundamental assumption of our

18   educational model.

19   **Q.**  Is the diversity of the student body important to that

20   portion of the learning model?

21   **A.**  It absolutely is.

22   **Q.**  Now, has Harvard College ever evaluated the importance of

23   student body diversity?

24   **A.**  Yes, it has.

25   **Q.**  Has it made public its views on the importance of

**JA3336**

1    diversity?

2    **A.**  Yes, it has.

3    **Q.**  And, in fact, has it shared its views on the importance

4    of diversity with the Supreme Court?

5    **A.**  Yes, it has.

6    **Q.**  When has it done so?

7    **A.**  It did so in 1977 in an amicus brief in the *Bakke* case.

8    It did so again in 2002 in an amicus brief submitted in the

9    *Grutter* case.  It did so again in the *Fisher* case.  There

10   have been a number of times that it has done this.  *Fisher*

11   one and two.

12   **Q.**  In addition to filing amicus briefs with the Supreme

13   Court, has Harvard made other formal statements on the

14   importance of diversity?

15   **A.**  It has.

16   **Q.**  Turn, if you would, to Tab 2 in your notebook.  Do you

17   find DX40?

18   **A.**  I do.

19   **Q.**  Tell us what it is.

20   **A.**  This is a president's report from President Neil

21   Rudenstine that is focused on the issue of the importance of

22   diversity to learning and education.

23            MR. LEE:  Your Honor, we offer DX40.

24            MR. HUGHES:  No objection.

25            THE COURT:  Admitted.

```
 1              (Defendant Exhibit No. DX40 admitted.)
 2   BY MR. LEE:
 3   Q.  Who is Neil Rudenstine?
 4   A.  Neil Rudenstine is one of my predecessors as president of
 5   Harvard.  He served from 1991 to 2001.
 6   Q.  Was he the president at the time this report was issued?
 7   A.  Yes, he was.
 8   Q.  Turn, if you would, to the page that says DX040.004 at
 9   the bottom.  And I'm going to focus you on the first full
10   paragraph of this page.
11              Do you see it?
12   A.  I do.
13   Q.  Would you read to us the first sentence of that page.
14   A.  Beginning "In the pages?
15   Q.  Yes, please.
16   A.  "In the pages that follow, I discuss the emergence of
17   student diversity as an important idea in American higher
18   education, especially as it relates to learning that takes
19   place beyond the classroom and the formal curriculum."
20   Q.  Would you go to the last sentence of that paragraph and
21   read it for us, please.
22   A.  "Finally, I indicate why the goal of diversity remains so
23   important to the actual quality and breadth of education for
24   all our students, and why our existing policies continue to
25   offer the most effective and promising pathway to the
```

```
 1   future."
 2   Q.   Do these statements fairly summarize president
 3   Rudenstine's report?
 4   A.   They do.
 5   Q.   Turn, if you would, to Tab 3 in your binder.  Do you find
 6   DX14?
 7   A.   I do.
 8   Q.   What is DX14?
 9   A.   This is a report that was issued by a committee in the
10   faculty of arts and sciences, chaired by Rakesh Khurana, to
11   study the importance of student body diversity.  It was
12   submitted to the faculty of arts and sciences for discussion
13   and consideration.
14   Q.   What is the date of the report?
15   A.   It's 2015.
16   Q.   Was the report provided to you?
17   A.   It was.
18   Q.   And who participated in addition to Dean Khurana in the
19   creation of the report?
20   A.   There was a committee of FAS faculty listed at the end of
21   the report.
22   Q.   When you say "FAS," do you mean --
23   A.   Faculty of arts and sciences, yes.
24   Q.   Now, did the committee reach any conclusions?
25   A.   The committee did.
```

1  **Q.**  Let me draw your attention to page 22.  Do you have that?

2  **A.**  I do.

3  **Q.**  Do you see the concluding paragraph?

4  **A.**  I do.

5  **Q.**  Would you read that to us, please.

6  **A.**  "We emphatically embrace and reaffirm the university's

7  long-held view that student body diversity, including racial

8  diversity, is essential to our pedagogical objectives and

9  institutional mission.  It enhances the education of all of

10  our students.  It prepares them to assume leadership roles in

11  the increasingly pluralistic society into which they will

12  graduate.  And it is fundamental to the effective education

13  of the men and women of Harvard College."

14  **Q.**  Do you agree with that statement?

15  **A.**  I do.

16  **Q.**  And did you agree with that statement as president of

17  Harvard University?

18  **A.**  I did.

19  **Q.**  Now, what was done with the report?

20  **A.**  The report was submitted by the committee to the faculty

21  as a whole and was discussed in two faculty meetings and then

22  voted on.

23  **Q.**  And was it approved?

24  **A.**  It was approved unanimously.

25  **Q.**  Now, we've discussed President Rudenstine's report in

Case: 19-2005    Document: 00117631846    Page: 447    Date Filed: 07/29/2020    Entry ID: 6356391
Case 1:14-cv-14176-ADB   Document 654   Filed 04/18/19   Page 199 of 261

199

 1   1996 and Dean Khurana's report in 2015.  Are these the only

 2   statements Harvard has made about the importance of

 3   diversity?

 4   **A.**   Harvard has made, many, many statements about the

 5   importance of diversity in presidential speeches, decanal

 6   speeches.  And other predecessors, President Derek Bok

 7   published a book called "The Shape of the River," which is

 8   a -- together with Bill Bowen; they were coauthors.  And

 9   that's a major statement and analysis about the importance of

10   diversity.  So there are many places in which these

11   statements have been made.

12   **Q.**   And have you yourself made statements publicly about the

13   importance of diversity?

14   **A.**   I have.

15   **Q.**   And generally in what context?

16   **A.**   The context perhaps would be a talk at commencement which

17   I gave every year, I think.  Many of these were focused on

18   diversity.  I always gave a talk on the first day of classes

19   in morning prayers, and a number of those were focused on

20   diversity.  There were occasions in the course of the year

21   when I would emphasize diversity in either a formal or

22   informal talk, but it was a constant theme.

23   **Q.**   While you were the president, did Harvard College take

24   steps to ensure that it had a diverse student body?

25   **A.**   It did.

1    **Q.**   And what mechanism did it use to ensure it had a diverse

2    student body?

3    **A.**   Well, there were many mechanisms in the admissions

4    process, the kind of outreach, recruitment, identification of

5    talented students.  That was a very important dimension of

6    the admissions process.

7            But we also changed our financial aid policy as a

8    way of making Harvard more affordable and accessible to a

9    diverse number of students, a diverse population of

10   prospective students.

11   **Q.**   I'd like to ask you a little bit more about the

12   developments in the financial aid program.

13           Before you became the president, did Harvard take

14   any steps to expand financial aid?

15   **A.**   This has been a theme at Harvard for quite some time,

16   actually.  Right after World War II, the then president James

17   Conant created a national scholar system because he

18   recognized that it was important that Harvard reach out

19   beyond its usual population and bring in a more economically

20   diverse body of students.

21           But in more recent times -- and we've had over the

22   years a need-blind admissions policy of financial aid.

23           But in 2004, we made significant advances before my

24   presidency with the introduction of a Harvard financial aid

25   program that we now call HFAI for the lowest income group and

1    then expanded on that in 2007 when I became president.

2    Q.   When the program was expanded when you became president

3    in 2007, what were the elements of the program?

4    A.   The elements of the program were, first of all, we had no

5    loans.  There were to be no loans for families that made

6    below a certain income.  And we've tweaked it a little bit

7    since then.  I'll describe it as it currently is formulated.

8            Families below $65,000 a year in income paid no

9    parental contribution.  For families up to about $150,000,

10   the rubric was that the family would pay no more than

11   10 percent of income for tuition and room and board.

12           And then we have financial aid going up further in

13   the income level, dependent on family need and family

14   resources.  So students well into the middle class could have

15   assistance from Harvard financial aid to make education

16   affordable.

17   Q.   So to give us just an idea of the magnitude of the

18   financial aid program, let me ask you this:  Before your

19   presidency, how much was Harvard spending annually, each

20   year, on financial aid for the college?

21   A.   At the beginning of my presidency it was about

22   $90 million a year in the college.

23   Q.   At the end of your presidency this June, how much was

24   Harvard spending on financial aid at the college?

25   A.   It's close to 200 million.

1    **Q.**  Why did you expand financial aid so substantially during

2    your presidency?

3    **A.**  It seemed to me and to others in leadership roles and

4    throughout the university that this was an absolutely

5    essential act in order to be able to commit ourselves to our

6    fundamental purposes, those being attracting people of talent

7    regardless of their financial circumstances, attracting

8    people across a wide range of origins and identities and

9    ethnicities and races, making sure that people understood

10    they should not see financial impediments to being able to be

11    part of this community and to bring their extraordinary

12    talents to it.

13    **Q.**  Now, your decision to expand the financial aid program

14    came about close to the time of the recession, correct?

15    **A.**  It did.

16    **Q.**  Did the financial crisis have any impact on the Harvard

17    College financial aid program?

18    **A.**  The program was announced in December 2007, and then of

19    course the following fall, by September of 2008, we faced

20    really serious financial headwinds and began looking at

21    budgets and cutting expenditures in a variety of areas.

22           But we determined we were not going to do that in

23    the financial aid program.  In fact, we increased our

24    financial aid commitments because there were so many families

25    that found themselves more needy because of the circumstances

1    of the recession.

2    **Q.**  Was pressure brought to bear on you to actually reduce

3    the financial aid program because of that recession?

4    **A.**  Yes, there was.

5    **Q.**  What did you decide?

6    **A.**  I decided that we should not do that.  We should maintain

7    our commitment to the financial aid program.

8    **Q.**  And under Harvard's current financial aid program, what

9    percentage of undergraduates have zero parental contribution

10   and zero loans?

11   **A.**  It's about 20 percent.

12   **Q.**  Approximately what percentage of the class receives

13   financial aid?

14   **A.**  It varies a bit from year to year, but between 55 and

15   60 percent receive financial aid.

16   **Q.**  For those undergraduates receiving financial aid of some

17   kind, what is the average cost of attending Harvard on an

18   annual basis?

19   **A.**  It's about $12,000.  That's tuition and room and board, I

20   think is important to explain.

21   **Q.**  So it's tuition, room, and board and on average $12,000?

22   **A.**  Total cost.

23   **Q.**  What percentage of the incoming class are

24   first-generation college graduates?

25   **A.**  That's about 17 percent now.

1    **Q.**  Now, we've talked about the changes in the expansion of

2    the financial aid program, correct?

3    **A.**  We have.

4    **Q.**  In addition to yourself, was there a person or persons at

5    Harvard who were the real drivers of the expansion of the

6    financial aid program?

7    **A.**  The longtime champion of this commitment and the person

8    who really devised the various methods and worked with

9    administration in Mass. Hall, the president's office, to

10   advance this was Dean Fitzsimmons.

11   **Q.**  Over many years?

12   **A.**  Over many, many years.  This has been a passion for him,

13   the openness and access question.

14   **Q.**  Has Harvard made progress achieving all of its

15   diversity-related goals?

16   **A.**  We've made progress, but there is still work to be done.

17   **Q.**  Let's talk about some of the progress that's been made.

18            Today, what is the approximate gender composition

19   of the Harvard class?

20   **A.**  It's close to 50-50.

21   **Q.**  What is the approximate racial composition of Harvard's

22   class?

23   **A.**  That again is close to 50-50, 50-50 white and nonwhite.

24   **Q.**  Has the Asian-American share of the admitted class

25   changed over time?

1    **A.**   It has.

2    **Q.**   How has it changed?

3    **A.**   Well, if we go back to 1980, I believe that the

4    percentage of the class was around 3 percent.  In 2010 it was

5    around 18 percent.  It's currently in 2008 about 23 percent.

6    So we can see significant change both in the shorter term and

7    in the longer term.

8    **Q.**   Now, we just focused on students, correct?

9    **A.**   Yep.

10   **Q.**   Let me turn to faculty.

11            Has the diversity of the Harvard faculty changed

12   over time?

13   **A.**   It has.

14   **Q.**   Has the racial diversity of the Harvard faculty changed

15   over time?

16   **A.**   It has.

17   **Q.**   And specifically has the number of Asian-American faculty

18   on the faculty of arts and sciences changed over time?

19   **A.**   It has.

20   **Q.**   How much approximately?

21   **A.**   I believe that the tenured faculty, Asian-American

22   faculty, has increased by about 50 percent over the past

23   decade.

24   **Q.**   And do you know how much the faculty at large has

25   increased?

1    **A.**   That number is not right on the tip of my tongue.

2    **Q.**   The tenured faculty has about a 50 percent increase?

3    **A.**   Yes, it has.

4    **Q.**   We've heard during the course of the trial about the

5    concept of diversity and inclusion.  You're familiar with

6    both terms?

7    **A.**   I am.

8    **Q.**   What is the difference between the two?

9    **A.**   Diversity is about presence, who's present, what is the

10   demographic makeup of a group of a campus, of a community.

11          Inclusion is about the experience of those

12   individuals within that community.

13   **Q.**   Can Harvard achieve the benefits of diversity without

14   inclusion?

15   **A.**   Inclusion is a critical element of fully benefiting from

16   diversity, yes.

17   **Q.**   During your tenure as president, did students express

18   concerns to you about the inclusiveness of the Harvard

19   community?

20   **A.**   Yes, they did.

21   **Q.**   And did you respond to those concerns?

22   **A.**   I did.

23   **Q.**   Did you meet with them?

24   **A.**   I did.

25   **Q.**   Now, has Harvard taken systematic or more formal actions

1    to promote inclusion?

2    **A.**  Yes, it has.

3    **Q.**  Turn, if you would, to Tab 14 in your notebook, and I'm

4    going to put on the screen DD 11.3.  Do you see that?

5    **A.**  I do.

6    **Q.**  And you see we've listed a number of the different

7    committees and working groups during your tenure as president

8    of the university, correct?

9    **A.**  Yes.

10   **Q.**  Let's start with the first one, the college working group

11   on diversity and inclusion.  Who convened that working group?

12   **A.**  That group was convened in the college and chaired by

13   Professor Jonathan Walton.

14   **Q.**  Who is Professor Jonathan Walton?

15   **A.**  Professor Jonathan Walton is the Pusey Minister in

16   Memorial Church and the Plummer Professor of Christian

17   Morals.

18   **Q.**  What did his working group do?

19   **A.**  That working group looked at a number of quite specific

20   concerns of undergraduates that had been some of them under

21   discussion, some of them talked about for some time, but they

22   looked at them comprehensively and made some direct

23   recommendations for direct interventions.

24   **Q.**  Turn, if you would, to Tab 4 in your notebook.  Do you

25   have DX13?

**JA3349**

208

 1   **A.**  I do.

 2   **Q.**  What is it?

 3   **A.**  That is the report of the working group.

 4          MR. LEE:  Your Honor, I think it may already be in

 5   evidence.  It is in evidence.

 6   BY MR. LEE:

 7   **Q.**  President Faust, what recommendations did this report

 8   contain?

 9   **A.**  This report contained a number of recommendations in

10   different areas.  It recommended, for example, that we

11   provide spring break meals for students who were unable to

12   travel home and that we keep the dining halls open during

13   spring break.  It also recommended that we pay more attention

14   to mental health services for students.

15          Other recommendations about the curriculum, noting

16   that for students who came from less advantaged backgrounds,

17   perhaps they'd come from someplace that had no lab science,

18   and we needed to take action to make sure that laboratory

19   sciences, the way concentrations, majors were structured at

20   Harvard, they would be open to students who had not had that

21   kind of experience in high school.

22          It also had some administrative recommendations

23   about training of staff and faculty and asked that we look at

24   some of the different groups of individuals who were assigned

25   roles relating to diversity and what those roles entail.

1          And then it also asked that this college work be

2    supplemented by a look at the university more broadly and the

3    context within which the college sat on these issues.

4    **Q.**  Turn, if you would, to Tab 5 in your notebook.  Do you

5    have DX100?

6    **A.**  I do.

7    **Q.**  What is it?

8    **A.**  This is a charge that I issued to a subsequent task force

9    on inclusion and belonging that was at the universitywide

10   level.

11          MR. LEE:  Your Honor, we offer DX100.

12          MR. HUGHES:  No objection.

13          THE COURT:  Admitted.

14          (Defendant Exhibit No. DX100 admitted.)

15   BY MR. LEE:

16   **Q.**  How did this task force differ from Professor Walton's

17   working group.

18   **A.**  This group was meant to look at the questions on

19   universitywide basis, so the members of this group came from

20   all over the university.  It also was asked to look at

21   questions relating to staff and faculty and students so that

22   all of those groups were participating as representatives or

23   as examples of the experience of their groups.

24          It also asked that we address some of the questions

25   of universitywide structures, policies, and administrative

1   realities and ask how those could be more supportive of the

2   mission of inclusion and belonging.

3   **Q.**  What was the result of the task force work?

4   **A.**  The task force issued a report in the spring of this

5   year.

6   **Q.**  Turn, if you would, to Tab 6 in your notebook.  Do you

7   find DX740?

8   **A.**  I do.

9   **Q.**  What is it?

10  **A.**  This is the report that was issued by that task force.

11          MR. LEE:  Your Honor, we offer DX740.

12          MR. HUGHES:  No objection.

13          THE COURT:  Admitted.

14          (Defendant Exhibit No. DX740 admitted.)

15  BY MR. LEE:

16  **Q.**  Did you receive this report?

17  **A.**  I did.

18  **Q.**  Did you respond to the report?

19  **A.**  I did.

20  **Q.**  Turn, if you would, to Tab 7 in your binder.

21  **A.**  Yes.

22  **Q.**  Do you find DX83?

23  **A.**  I do.

24  **Q.**  What is DX83?

25  **A.**  This is my response to the community and to the task

1    force recommendations.

2                MR. LEE:  Your Honor, we offer DX83.

3                MR. HUGHES:  No objection.

4                THE COURT:  Admitted.

5                (Defendant Exhibit No. DX83 admitted.)

6    BY MR. LEE:

7    **Q.**  Can you summarize your response to the task force

8    recommendations?

9    **A.**  This response came in March of this year, and I had only

10   a few months left in my presidency at that point.  So I

11   wanted to respond in a way that would make some -- take some

12   initial actions in response to things that could be acted

13   upon right away but also set up some momentum for moving

14   forward in a general sense on the more long-range issues.

15                I did that, of course, in close consultation with

16   my successor.  I didn't want to do anything that would be at

17   cross-purposes with his intentions.  But we agreed that if we

18   could get some momentum going, then he would be able to pick

19   up this issue as he settled into his new role.

20                So one of the things this did was to bring someone

21   into the president's office, John Wilson, who is here today,

22   to be kind of the point person for the pursuing of the

23   recommendations that I was unable to meet right away.

24                But right away we instituted some changes in

25   symbols and the alma mater.  I committed presidential

Case: 19-2005    Document: 00117638846    Page: 450    Date Filed: 07/29/2020    Entry ID: 6356391
Case 1:14-cv-14176-ADB   Document 654   Filed 04/18/19   Page 212 of 261

212

1    resources to create faculty recruitment.  We also committed
2    resources to support innovative ideas in bringing teaching
3    and learning across the campus into a place where it could
4    take account of the findings of the task force.
5                And the task force had also recommended to faculty
6    committees to inquire into academic dimensions of inclusion
7    and belonging, and I appointed the chairs of those committees
8    to get them underway.
9    **Q.**  So he doesn't feel left out, who is your successor as the
10   president?
11   **A.**  My successor is Lawrence Bacow.
12   **Q.**  You mentioned John Wilson as the person that you put in
13   place to spearhead or lead some of these efforts.  Who is
14   Dr. Wilson?
15   **A.**  Dr. Wilson is a graduate of our school of education.  He
16   served as a member of the board of overseers, one of the
17   governing boards.  He's taking a leave of that at this time
18   to serve in the president's office.  He's the former
19   president of Morehouse College, and he's also someone who has
20   worked on diversity issues throughout his career, including
21   early in his career at MIT with Lawrence Bacow.
22   **Q.**  What did you ask Dr. Wilson to do other than to come to
23   court today?  What did you ask him to do?
24   **A.**  That was his idea coming to court.
25                I asked him to take up the agenda that the task

Case: 19-2005    Document: 00117631846    Page: 451    Date Filed: 07/29/2020    Entry ID: 6356391
Case 1:14-cv-14176-ADB  Document 654   Filed 04/18/19   Page 213 of 261

213

```
 1   force report had put forth and pursue how to implement the
 2   parts of it that seemed worthy of implementation immediately,
 3   to figure out -- some of the things that the task force
 4   recommended were things like strategic planning and setting
 5   up structures to enable the schools to look in a longer view
 6   at their goals for inclusion and belonging.  So this required
 7   organizational skill and organizational interventions that
 8   Dr. Wilson has committed himself to.
 9           Another issue was that I felt as president -- and
10   the task force believed this, too -- there needed to be a
11   function in the central administration, a point person in the
12   central administration looking at these issues on a permanent
13   basis.
14           But how to structure that role, what that job
15   should be, that's something that Dr. Wilson is also thinking
16   about during his time in the interim role in this position.
17   Q.  Has Harvard finished implementing the recommendations of
18   the task force?
19   A.  I would not expect it has.  I'm not president anymore,
20   but I would think a lot of these are very long term in their
21   demands.
22   Q.  Let me turn to a different topic.
23           Have you heard of the concept of race-neutral
24   alternatives?
25   A.  I have.
```

1    **Q.**  Has Harvard ever considered race-neutral alternatives

2    through a committee?

3    **A.**  Yes, it has.

4    **Q.**  When did Harvard first consider race-neutral alternatives

5    through a committee?

6    **A.**  That would be the Ryan committee, I believe, that was

7    formed in the spring of 2014.

8    **Q.**  And I'm going to bring up DD 11.3 again just so we can

9    orient ourselves.  This is the committee labeled the Ryan

10   committee.

11   **A.**  Mm-hmm.

12   **Q.**  Before we come back to the Ryan committee, let me ask you

13   this:  Before the formation of the Ryan committee, had

14   Harvard shared its views on race-neutral alternatives with

15   the United States Supreme Court?

16   **A.**  Yes, it had.

17   **Q.**  Turn, if you would, in your notebook to Tab 8.

18   **A.**  Tab 8?

19   **Q.**  Tab 8.  Do you have that before you?

20   **A.**  I do.

21   **Q.**  Do you find DX55?

22   **A.**  I do.

23   **Q.**  What is it?

24   **A.**  This is an amicus brief of Harvard University and other

25   universities in the case of California versus Allan *Bakke*.

Case: 19-2005      Document 00117631846      Page: 453      Date Filed: 07/29/2020      Entry ID: 6356391
Case 1:14-cv-14176-ADB   Document 654   Filed 04/18/19   Page 215 of 261

215

1   **Q.** Turn if you would to the page at the bottom which says
2   DX055.020.
3   **A.** Mm-hmm.
4   **Q.** Do you see the last paragraph?
5   **A.** I do.
6   **Q.** Would you read the first sentence to us.
7   **A.** "The educational goals discussed above cannot be realized
8   by any racially neutral procedure known to us."
9   **Q.** This is a statement made by Harvard and other
10  universities in 1977 or so, correct?
11  **A.** It is.
12  **Q.** Turn, if you would, to Tab 9 in your binder.  Do you find
13  DX53?
14  **A.** I do.
15  **Q.** What is it?
16  **A.** It's an amicus brief of Harvard University and other
17  universities in the case of *Grutter v. Bollinger*.
18          MR. LEE:  Your Honor, we offer DX53.
19          MR. HUGHES:  No objection.
20          THE COURT:  Admitted.
21          (Defendant Exhibit No. DX53 admitted.)
22  BY MR. LEE:
23  **Q.** Turn, if you would, to the page at the bottom that says
24  .0029.  And I'm going to draw your attention to the first
25  paragraph.  Do you have that before you?

1    **A.**   I do.

2    **Q.**   And could you read for us the third and fourth sentences

3    of that first paragraph.

4    **A.**   Beginning with "But the decisive fact"?

5    **Q.**   Yes.

6    **A.**   "But the decisive fact is that all of the suggested

7    race-neutral factors and many more besides already enter into

8    admissions decisions."

9    **Q.**   And the next sentence.

10   **A.**   "Consideration of those factors alone does not achieve

11   the distinctly racial diversity that amici seek in their

12   student bodies."

13   **Q.**   Had Harvard considered race-neutral alternatives before

14   the filing of this brief?

15   **A.**   Yes, it had.

16   **Q.**   What had it concluded about the viability of race-neutral

17   alternatives?

18   **A.**   It concluded that it could not, using only those

19   race-neutral alternatives, accomplish the diversity, racial

20   diversity in its student body that it saw as essential to its

21   educational mission.

22   **Q.**   Turn, if you would, to Tab 10 in your binder.  Do you

23   find DX26?

24   **A.**   I do.

25   **Q.**   What is this?

```
 1    A.   This is an amicus brief of Harvard and other universities

 2    in the case of Fisher versus the University of Texas.

 3              MR. LEE:   Your Honor, we offer DX26.

 4              MR. HUGHES:   No objection.

 5              THE COURT:   Admitted.

 6              (Defendant Exhibit No. DX26 admitted.)

 7    BY MR. LEE:

 8    Q.   Now turn, if you would, to the page at the bottom .0023.

 9    A.   Mm-hmm.

10    Q.   In the last paragraph, do you see the sentence which

11    begins "Amici also engage"?

12    A.   I do.

13    Q.   I'm not going to have you read the sentence because it's

14    now in evidence, but let me just ask you this:   Do those

15    sentences accurately describe Harvard's experience with

16    race-neutral alternatives at the time this brief was filed?

17    A.   They do.

18    Q.   And do each of the amicus briefs we've just looked at

19    accurately characterize or summarize Harvard's experience

20    with race-neutral alternatives at the time?

21    A.   They do.

22    Q.   Now, you mentioned the Ryan committee earlier.

23              Who chaired that committee?

24    A.   That committee was chaired by Jim Ryan, who was then the

25    dean of the school of education at Harvard.
```

```
 1    Q.  And he is today --
 2    A.  -- the president of the University of Virginia.
 3    Q.  Did you play any role in convening Dean Ryan's committee?
 4    A.  I did.
 5    Q.  What was your role?
 6    A.  I invited the various individuals to serve on that
 7    committee.
 8    Q.  Did you consult with anybody in convening the committee?
 9    A.  I did.
10    Q.  Who?
11    A.  I consulted with a wide range of individuals about who
12    would be appropriate and a good member of the committee.
13    Q.  And did you consult with Dean Ryan himself?
14    A.  I did.
15    Q.  Turn, if you would, to Tab 11 in your binder.  Do you
16    find DX12?
17    A.  I do.
18    Q.  What is it?
19    A.  This is a letter to one of the members, prospective
20    members of that committee from me, inviting that individual
21    to serve.
22    Q.  Does it include your charge to the committee?
23    A.  It does.
24            MR. LEE:  Your Honor, we offer DX12.
25            MR. HUGHES:  No objection.
```

**JA3360**

```
 1              THE COURT:  Admitted.
 2              (Defendant Exhibit No. DX12 admitted.)
 3    BY MR. LEE:
 4    Q.  What did you ask the committee to do?
 5    A.  I asked the committee to focus on two issues.  One is the
 6    value of diversity, to assess the value of diversity as part
 7    of the educational experience.
 8              And the second charge was to explore the viability
 9    of race-neutral alternatives in achieving that diversity.
10    Q.  Did the Ryan committee complete its work?
11    A.  No, it did not.
12    Q.  Why not?
13    A.  We ended the Ryan committee when the SFFA lawsuit was
14    begun.
15    Q.  Why?
16    A.  We felt that in the course of accumulating information
17    and evidence and analysis for this lawsuit there would be a
18    number of very helpful elements that would enable us to study
19    race-neutral alternatives very effectively.  And so we wanted
20    to postpone our consideration of that question until that
21    data was on hand.
22    Q.  Now, you told us that the Ryan committee was asked to
23    address two questions, correct?
24    A.  Yes.
25    Q.  Has Harvard College now addressed both of those
```

1    questions?

2    **A.**   Yes.  The first question, the question of the value of

3    diversity, is the one that was addressed by the Khurana

4    committee that we discussed a few minutes ago.

5              And the second question, the race-neutral

6    alternatives question, was taken up once again when the data

7    for this case became available.  And it was taken up in the

8    spring of 2017 by another committee.

9    **Q.**   Did you play any role in convening that committee?

10   **A.**   I did.

11   **Q.**   What was your role?

12   **A.**   I discussed with Dean Michael Smith of the faculty of

13   arts and sciences the creation of that committee.

14   **Q.**   Did you ask him to chair the committee?

15   **A.**   I did.

16   **Q.**   Did you discuss with Dean Smith the other members of the

17   committee?

18   **A.**   We discussed how to structure the committee, yes.

19   **Q.**   Why did you ask Dean Smith to chair the committee?

20   **A.**   Well, a couple of things.  One is that the lawsuit

21   focused on the college rather than the university as a whole.

22   So the Ryan committee had a wide representation from the

23   whole university, but it was clear that we needed to look at

24   this question very explicitly within the structure of the

25   college.

Case: 19-2005    Case 1:14-cv-14176-ADB    Document 654    Filed 04/18/19    Page 221 of 261    Date Filed: 07/29/2020    Entry ID: 6356391

221

1           And so Dean Smith, as the long-serving dean and

2    academic leader of the faculty of arts and sciences, seemed a

3    very good choice to undertake the task at hand.  He had been

4    responsible as the dean of FAS for the admissions office

5    which operates beneath him for ten years at that point, was

6    very experienced in these matters.

7    **Q.**  Who else was on the committee?

8    **A.**  The other two members of the committee were the dean of

9    the college, Rakesh Khurana, and the dean of admissions,

10   William Fitzsimmons.

11   **Q.**  In your view, were they the right people for the task?

12   **A.**  They were.  Dean Khurana deals with issues in the college

13   every day.  He's also a Ph.D. in sociology who has very

14   sophisticated abilities in statistical analysis, social

15   science data.  So we knew that the accumulation of all the

16   data that had occurred as a result of work on the case would

17   be something that he would be very adept at dealing with.

18           And Dean Fitzsimmons has been involved in these

19   questions for 40 years as dean of admissions at Harvard.  And

20   so it seemed there could be few people imaginable who would

21   be better suited to look at admissions questions.

22           I also thought, and Dean Smith agreed, that one of

23   the big issues was how do you implement policies, how do you

24   operationalize them.  And these were all people who were very

25   familiar with questions like how does the financial aid

1    policy work, or how would you undertake some of the measures
2    that have been advanced as possible race-neutral
3    alternatives.  They would understand how they would operate
4    within the system.
5            And so it seems that they were really well suited
6    to assess that because of their administrative experience as
7    well as their scholarly experience.
8    **Q.**   Now, SFFA has suggested that the committee for some
9    reason had too few members.  Do you agree?
10   **A.**   I think a committee should have the number of members it
11   needs to do the work that it's assigned to do, and I felt
12   that this committee was well suited to undertake that work.
13   **Q.**   Did Dean Smith's committee generate a report?
14   **A.**   It did.
15   **Q.**   Was it submitted to you?
16   **A.**   It was.
17   **Q.**   Did you review it?
18   **A.**   I did.
19   **Q.**   What conclusions did the committee reach?
20   **A.**   The committee looked very carefully at the variety of
21   suggested race-neutral alternatives and analyzed why they
22   would not be effective in establishing the kind of student
23   body diversity that we believed essential to our educational
24   mission without sacrificing some of the other essential parts
25   of our educational commitments.

1    **Q.**  Did the committee make any recommendation for future

2    work?

3    **A.**  It did.  It said we should look at these questions again

4    in five years.

5    **Q.**  Did you agree?

6    **A.**  I will certainly agree, yes.

7    **Q.**  Now, President Faust, I want to ask you a few questions

8    about issues that have come up during the course of the

9    litigation.

10          At the pretrial conference, there was a suggestion

11   that you denied the fact that Harvard discriminated against

12   Jewish applicants in the 1920's.  Is that true?

13   **A.**  No.

14   **Q.**  Have you ever denied that?

15   **A.**  I have never denied that.

16   **Q.**  Was it a proud chapter in Harvard's history?

17   **A.**  It was not a proud chapter in Harvard's history.

18   **Q.**  And have you taken steps during your tenure to ensure it

19   would not happen again?

20   **A.**  I feel that my tenure has been committed in considerable

21   part to expanding openness, access to Harvard, to making sure

22   that every individual who can thrive in our community has the

23   opportunity to apply and be included, welcomed, and to

24   flourish in our community.  There's no place for

25   discrimination of any kind at Harvard.

1    **Q.**  Now, President Faust, how long have you known Dean

2    Fitzsimmons?

3    **A.**  I'm not sure exactly when I met him, but it was soon

4    after I arrived at Radcliffe as the dean because our

5    geographic location -- the Radcliffe Institute was very

6    closely located to the admissions office.

7    **Q.**  And how long have you known Director McGrath?

8    **A.**  I met her soon after that, I think, as well.  So the very

9    early aughts, 2003, 2004, something like that.

10   **Q.**  So for each of them, you've known them for more than

11   15 years?

12   **A.**  Yes.

13   **Q.**  I'll represent to you that SFFA has suggested that both

14   or either has been less than truthful in this case.

15          Do you have an opinion on their truthfulness and

16   honesty?

17          MR. HUGHES:  Your Honor, I object.  I don't think

18   her opinion on this is relevant to what's happened here at

19   trial.  It's vouching character testimony.  It's completely

20   improper.

21          MR. LEE:  It's actually admissible under Rule 608.

22          THE COURT:  Give me a minute.

23          Admissible.  Evidence of truthful character

24   admissible once a witness' character for truthfulness has

25   been attacked.

```
 1              So that certainly gets us to Director McGrath.  I'm
 2    not sure it covers Dean Fitzsimmons at this point.
 3              MR. HUGHES:  That's just what I was about to say.
 4              MR. LEE:  If that's, in fact, the representation,
 5    I'll limit myself to Director McGrath.
 6              MR. HUGHES:  I'm not going to limit what I'm going
 7    to say in closing by any means.  I want to make sure that the
 8    question isn't connected to what's happened here at trial,
 9    which she can't possibly know about.
10              MR. LEE:  I'm not going to ask anything about what
11    occurred during the trial.  I have represented to her,
12    because she was sequestered, that this has occurred.  I am
13    now asking her for opinion independent of that under 608.
14              THE COURT:  If you're not going to limit your
15    closing, then I'll let him have the question for Dean
16    Fitzsimmons as well.
17              MR. HUGHES:  I'm definitely not limiting my
18    closing.  So we should let him have the question.
19              THE COURT:  Okay.
20    BY MR. LEE:
21    Q.  So, President Faust, let me start again.
22              I'll represent to you that SFFA has attacked Dean
23    Fitzsimmons and Director McGrath and their honesty.  Do you
24    have that in mind?
25    A.  I do.
```

1    **Q.**  I know you haven't been here.  Do you have an opinion

2    about the honesty and the credibility of these two folks who

3    you've known for 15 years?

4    **A.**  I regard both of them as people with the very highest

5    integrity.

6    **Q.**  And honesty?

7    **A.**  And honesty, yes.

8    **Q.**  During the 15 years that you've known them, have you ever

9    heard anyone challenge their honesty and integrity other than

10   SFFA?

11   **A.**  No, I have not.

12   **Q.**  And what is your reaction to SFFA's suggestion during

13   this trial that these folks lack integrity and honesty?

14   **A.**  I find it not credible.  They are people who believe in

15   values above all.

16   **Q.**  And is that what you've seen during your 15 years?

17   **A.**  It is.

18   **Q.**  Now, you also are aware of the allegations that were made

19   against Harvard in this case?

20   **A.**  Yes, I am.

21   **Q.**  And you know that SFFA claims that Harvard intentionally

22   discriminates against Asian-Americans?

23   **A.**  I know that.

24   **Q.**  As the president, what is your reaction to those

25   assertions?

```
 1    A.   Those assertions seem to me completely at odds with the

 2    history of Harvard over recent decades as it has opened up

 3    its doors more widely, has searched avidly to include people

 4    from every background and every group, and has committed

 5    itself to the notion of a community that is strengthened and

 6    indeed dependent on its openness to people of all races and

 7    backgrounds.

 8              That has been a driving force in the identity of

 9    Harvard College and Harvard University, and we would not

10    undermine that by discriminating.  It's totally at odds with

11    who we are, what we believe, and what we think makes us

12    strong.

13              MR. LEE:  Thank you, President Faust.

14              Nothing further, Your Honor.

15              MR. HUGHES:  Your Honor, may I approach the

16    witness?

17              THE COURT:  Yes.

18                           EXAMINATION

19    BY MR. HUGHES:

20    Q.   Good afternoon, President Faust.

21    A.   Good afternoon.

22    Q.   You've won the prize for being the last witness in the

23    case.

24              My name is John Hughes.  I'm a lawyer for SFFA.

25    I'm just going to ask you a few questions.
```

**JA3369**

1          The first is I'd like to ask you if you agree with

2     the following statement:  Do you agree that race is a factor

3     that has an impact on the formation of a personality of a

4     human being, could have an influence on a set of perspectives

5     that an individual may have?  It is one of many

6     characteristics of an individual that contribute to the

7     person who is presented to us in an admissions folder at

8     Harvard.

9          Do you agree with that?

10    **A.**   I do.

11    **Q.**   Now, you talked with Mr. Lee about some historical events

12    in Harvard's past and Harvard's treatment of Jewish

13    applicants to Harvard in the 1920's, right?

14    **A.**   Yes.

15    **Q.**   And you recall that you were asked some questions about

16    that when we took your deposition in this case?

17    **A.**   Yes.

18    **Q.**   And do you recall your deposition was on March 10, 2017?

19    **A.**   I recall it was in 2017.

20    **Q.**   It's sitting right there.  I'll just refresh your memory

21    it was in March of 2017.

22    **A.**   Okay.

23    **Q.**   So as of the date of your deposition, did you know

24    whether Harvard had ever acknowledged that its holistic

25    admissions process was used to discriminate against Jewish

1    applicants in the early 20th century?

2    **A.**   I recall that I was asked that question, and I wasn't

3    sure what was meant by "acknowledge."  I wasn't sure whether

4    you meant a formal public statement, so I wasn't sure how

5    exactly to answer.  I certainly knew that Harvard had

6    discriminated against Jews.

7    **Q.**   You recall your answer to that question at the deposition

8    was that you didn't know?

9    **A.**   I can't remember exactly the words.  I said I didn't

10   recall, perhaps.  I'm not sure what I said.  And it was in

11   response to the question had I -- had Harvard acknowledged.

12   **Q.**   Let me ask you a different question.

13            As of the date of your deposition, were you

14   generally aware that the holistic admissions process was used

15   for a time in the 20th century to discriminate against Jewish

16   applicants?

17   **A.**   I was aware that there were procedures in effect during

18   the presidency of President Lowell, but I'm not sure that we

19   could call those the holistic admissions process as we

20   currently understand it.

21   **Q.**   Let me direct you -- you've got your deposition there --

22   **A.**   I do.

23   **Q.**   -- on the table in front of you.  Let me direct you to

24   page 30 of your deposition.  I'm going to put it up on the

25   screen.  Do you see line 15, President Faust?

**JA3371**

1    **A.**  I do.

2    **Q.**  "QUESTION:  Are you -- are you generally aware that the

3    holistic admissions process was used for a time in the 20th

4    century to discriminate against Jewish applicants?"

5             And there was an exchange between counsel, then:

6             "QUESTION:  Do you know whether that's true?"

7    **A.**  I see that.

8    **Q.**  And then on the next page:

9             "ANSWER:  I'm a historian.  I would not rely on the

10   interpretation of a single historian unchallenged.  I have

11   not done that historical work myself, and therefore I would

12   not presume to make judgment about its accuracy."

13            Was that your sworn testimony?

14            MR. LEE:  Your Honor, in fairness, he needs to read

15   the question at line 13 and 14, the question and answer that

16   precedes it, actually beginning at line 10.  Because

17   otherwise you don't know who the single historian is on the

18   next page.

19            MR. HUGHES:  I'm happy to do that since it

20   clarifies.  Where did you want me to go, Mr. Lee?

21            MR. LEE:  I think if you started, Mr. Hughes, at

22   page 30, line 10, "Are you familiar with."

23   BY MR. HUGHES:

24   **Q.**  So we asked you:  "Are you familiar with the work of

25   Jerome Karabel?"

1          And you answered "Yes."

2          And then we asked:  "Are you familiar with his book

3     "The Chosen"?

4          You said:  "I am.  I have not read it.  I know of

5     it."

6          And then we asked you:  "Are you -- are you

7     generally aware that the holistic admissions process was used

8     for a time in the 20th century rich to discriminate against

9     Jewish applicants?  Do you know whether that's true?"

10         And then you answered, "I'm a historian.  I would

11    not rely on the interpretation of a single historian

12    unchallenged.  I have not done that historical work myself,

13    and therefore I would not presume to make judgment about its

14    accuracy."

15         That was your sworn testimony, correct?

16    **A.**  Yes, it was.

17    **Q.**  And do you know -- or at the time of your deposition, did

18    you know whether prior Harvard presidents had acknowledged

19    that the use of a holistic admissions process was

20    inappropriate with respect to Jewish applicants during the

21    20th century?

22    **A.**  I'm sorry.  Your question is?

23    **Q.**  At the time of your deposition, did you know whether

24    prior Harvard presidents had acknowledged that the use of a

25    holistic admissions process was inappropriate with respect to

 1    Jewish applicants during the 20th century?

 2    **A.**  I knew and my predecessors as presidents knew.  And Neil

 3    Rudenstine in that very document that we were talking about a

 4    moment ago talked about discrimination against Jews.

 5          What I was trying to say here is I did not know the

 6    nature of the admissions process as you described it as

 7    holistic.

 8          It was a characterization that you have given it.

 9    I don't know exactly how that admissions process worked.  Was

10    it the holistic admissions process that you equate with the

11    one today?  I was very uncomfortable with the way you -- not

12    you -- but your predecessors were asking me to describe this

13    process.  And I felt it was not adequately complicated in its

14    approach to historical materials.

15    **Q.**  Are you aware that Harvard adopted its holistic

16    admissions policy in the 1920s, in part, to limit the number

17    of Jewish students on its campus?  Are you aware of that?

18          MR. LEE:  We are way beyond the couple of questions

19    and way beyond the judicial notice.

20          MR. HUGHES:  It's the last question.  And we asked

21    Dean Khurana this exact question.

22          THE COURT:  That's fine.  He can have it.

23    BY MR. HUGHES:

24    **Q.**  I'll ask it again because of all the interruptions.

25    **A.**  I lost track.

**JA3374**

1    **Q.**  Are you aware that Harvard adopted its holistic

2    admissions process in the 1920s in part to limit the number

3    of Jewish students at Harvard?

4    **A.**  Harvard adopted an admissions process in the 1920s to

5    limit the number of Jewish students.  How to characterize

6    that precisely and to make an equation between that process

7    and the one that has been in effect in recent years is not

8    something that I am comfortable assenting to.

9          I would never doubt -- I would not ever want to

10   express a doubt that there had been discrimination against

11   Jews in the 1920s.  That is clear.  But the particulars of

12   how that admissions process worked are not known to me, and I

13   don't think I could say that they are equivalent to what we

14   today call the holistic admissions process.

15   **Q.**  All right.  Let's shift gears to a new topic.

16         Would you agree that implicit bias is a concept

17   that has been studied extensively by individuals on Harvard's

18   campus and other campuses and it's an important consideration

19   to take into account when one makes judgments?

20   **A.**  Yes.

21   **Q.**  Would you agree that the research on implicit bias shows

22   that everybody has some implicit bias?

23   **A.**  Yes.

24   **Q.**  And do you believe that the institution of Harvard has a

25   responsibility to ensure that bias is not leaking into its

1    admissions decision-making process in any form?

2    **A.**  I believe that Harvard should do its utmost to address

3    questions of bias, yes.

4    **Q.**  Last topic.

5         At a certain point during your presidency, Harvard

6    decided to bring back the early-action program to its

7    admissions process, right?

8    **A.**  That's correct.

9    **Q.**  And that happened in 2011, correct?

10   **A.**  That's correct.

11   **Q.**  And the decision to bring back early action in admissions

12   was a sufficiently important decision that the board had to

13   weigh in, right?

14   **A.**  That's correct.

15   **Q.**  Can you describe just a little bit the relationship of

16   the board to the college at a very high level?

17   **A.**  Harvard actually has two governing boards, the board of

18   overseers and the Harvard Corporation, and they jointly

19   oversee the university.  It's generally seen that the group

20   with the more direct fiduciary engagement is the corporation,

21   and they have the final say on anything in which they would

22   choose to be engaged.

23         But in most instances there's quite a respectful

24   division between management and governance.  And so a lot

25   takes place through consultation and advice and consent

1    rather than direct exertion of control by that governing

2    board.

3          Is that what you wanted to know?

4    **Q.**  It does.  I'm just trying to get to the point that the

5    corporation board had to approve -- did approve the return --

6    bringing back early action.  Is that right?

7    **A.**  It did.  It's unclear whether they would have had to, but

8    I felt it was important that they be on board because this

9    was a significant decision.  And so I wanted their

10   concurrence in it.

11   **Q.**  And you sought their concurrence on important issues, not

12   everyday issues?

13   **A.**  Yes.  Exactly.

14   **Q.**  So now I want to show you a document that's Plaintiff's

15   Exhibit P62.  It should be in that binder right there.  I'm

16   going to put it up on the screen.  And you see this is a

17   memorandum to the members of the corporation from you and

18   Mike Smith, correct?

19   **A.**  Yes.

20   **Q.**  And it concerns the proposed changes in admissions

21   policy, right?

22   **A.**  It does.

23   **Q.**  And it's from February 2, 2011, correct?

24   **A.**  Mm-hmm.

25   **Q.**  You're familiar with this document, right?

```
 1    A.   I am.
 2              MR. HUGHES:   I move the admission, if we haven't
 3    already, of P62.
 4              MR. LEE:   No objection.
 5              THE COURT:   It's admitted.
 6              (Plaintiff Exhibit No. P62 admitted.)
 7    BY MR. HUGHES:
 8    Q.   You actually presented this memo to the board during a
 9    meeting with them, right?
10    A.   Yes.
11    Q.   And you would have reviewed P62 before you did that
12    presentation, correct?
13    A.   Yes, I would have.
14    Q.   And the idea of the memo is it basically captures the
15    reasons why you and Dean Smith were recommending that Harvard
16    reinstate early action, correct?
17    A.   That's correct.
18    Q.   And you know, you're familiar with the Harvard Office of
19    Institutional Research, correct?
20    A.   I am.
21    Q.   Sometimes referred to as OIR, right?
22    A.   Yes.
23    Q.   Okay.  And OIR is an office within the provost's office
24    that does data analytics on whatever dimension of Harvard
25    that Harvard needs data analytics on, right?
```

 1    **A.**   That's correct.

 2    **Q.**   Did you work with OIR a fair amount when you were

 3    president?

 4    **A.**   I did.

 5    **Q.**   And you came to rely on their work?

 6    **A.**   I did.

 7    **Q.**   And that was a serious office with serious people that

 8    did reliable work?

 9    **A.**   Yes, it was.

10    **Q.**   Okay.  And some of the pages that are in P62 are pages

11    that were prepared by OIR; is that right?

12    **A.**   Yes, it is.

13    **Q.**   I'd like to just turn and show a few of those to you.

14    I'm going to go to page 10 on the screen.  You're welcome to

15    follow along with me on paper.

16              This would be one of the pages prepared by OIR,

17    correct?

18    **A.**   The screen is sort of blurry, so I'm going to --

19    **Q.**   Look at the papers.  You're not the first witness to make

20    that comment.

21    **A.**   I was thinking it was my eyes.

22    **Q.**   It's not your glasses.

23    **A.**   Good.

24    **Q.**   What you've got there on the paper, page 10 is one of the

25    pages or slides prepared by OIR, correct?

Case: 19-2005    Document: 00117631846    Page: 456    Date Filed: 07/29/2020    Entry ID: 6356391
Case 1:14-cv-14176-ADB   Document 654   Filed 04/18/19   Page 238 of 261

238

1    **A.**   Yes.

2    **Q.**   And you see up at the right-hand corner it says

3    "Preliminary Draft"?

4    **A.**   Yes.

5    **Q.**   And then on the next page the same thing, page 11 we've

6    got another OIR slide, correct?

7    **A.**   Yes.

8    **Q.**   It says "Preliminary Draft"?

9    **A.**   Mm-hmm.

10   **Q.**   Is that right?

11   **A.**   It does.

12   **Q.**   Then if we turn to page 15 of this presentation to the

13   board to bring back early action, again we have some analysis

14   from OIR, correct?

15   **A.**   Wait a minute.  Yes.

16   **Q.**   Again it says "Preliminary Draft," correct?

17   **A.**   It does.

18   **Q.**   And if we go to page 20, again we've got another OIR

19   slide, correct?

20   **A.**   I've got all kinds of things in the middle here.  Yes.

21   **Q.**   It says "Preliminary Draft"?

22   **A.**   Mm-hmm.

23   **Q.**   Is that a yes?

24   **A.**   Yes.

25   **Q.**   Same thing with page 21, correct?

1    **A.**   Yes.

2    **Q.**   Same thing with page 22, analysis from OIR with the

3    "Preliminary Draft" in the upper right, correct?

4    **A.**   Yes.

5    **Q.**   Same thing with the next page, more analysis from OIR,

6    also says "Preliminary Draft," correct?

7    **A.**   Yes.

8    **Q.**   And same thing again with the next page, more analysis

9    from OIR.  Also says "Preliminary Draft," correct?

10   **A.**   Yes.

11   **Q.**   And when you sent these slides from OIR to the board with

12   the designation of "Preliminary Draft," you weren't sending

13   unreliable or incomplete analysis to Harvard's board, were

14   you?

15   **A.**   Were these sent to the board in this form?

16   **Q.**   This is your memo, ma'am.  P62, this is your document.

17   This is the memorandum that I believe you told us you sent to

18   the board.

19   **A.**   It would surprise me that we were sending preliminary

20   drafts to the board.  Often materials were circulated within

21   the administrative units beforehand, and they were usually

22   formalized before they went to the board.  So I'm a little

23   puzzled why we would have sent preliminary material to the

24   board.

25   **Q.**   Let me direct you -- I'm going to direct you to part of

1    your deposition, just to see if we can refresh your

2    recollection.  If you can, look to page 148 of your

3    deposition.  Actually if you start at page 147, and you see

4    here we're talking about Exhibit 4 in your deposition?

5    **A.**  Yes.

6    **Q.**  And you see on the screen Exhibit 4 to your deposition is

7    the same document I'm showing you, Plaintiff's Exhibit 62.

8    **A.**  Okay.

9    **Q.**  Do you see that?

10   **A.**  Mm-hmm.

11   **Q.**  And then if you look at page, at the bottom of page 148,

12   line 22.  Kind of read from the bottom of page 148 over to

13   149, line 1 actually, the top of 149, line 1.  And I'll ask

14   you a question.

15   **A.**  Yes.

16   **Q.**  So now that you've looked at your testimony, do you agree

17   you presented the information contained in P62 to the board?

18   **A.**  I don't know if I did or not.  In my deposition we didn't

19   focus on the preliminary -- whatever it says, preliminary

20   report part of it, which puzzles me.

21        So I would expect that we presented some version of

22   this to the board, but we're not usually in the habit of

23   presenting preliminary drafts to the board.  During the

24   deposition we didn't talk about that.  And perhaps I didn't

25   notice that it said "Preliminary Draft."

Case: 19-2005     Document 00117631846     Page: 459     Date Filed: 07/29/2020     Entry ID: 6356391
Case 1:14-cv-14176-ADB   Document 654   Filed 04/18/19   Page 241 of 261

241

```
 1              You've made such an emphasis on it here that now
 2     I'm thinking did we give this to the board in preliminary
 3     form.
 4     Q.  Maybe I went too far.  But you agreed in your deposition
 5     that you did provide the information contained in P62 to the
 6     board, correct?
 7     A.  We gave information about statistics related to early
 8     action to the board, yes.
 9     Q.  Is there anything that you can see just from the face of
10     this document that would lead you to believe it wasn't the
11     final document?
12     A.  Well, that it says "Preliminary Draft."
13              MR. HUGHES:  Thank you, President Faust.
14              No further questions.
15              MR. LEE:  Nothing further, Your Honor.
16              THE COURT:  You're excused.  Thank you.
17              THE WITNESS:  Thank you.
18              THE COURT:  We have left the deposition testimony?
19              MR. LEE:  That's it.
20              THE COURT:  I'm game for forging through today and
21     we can get to closings tomorrow.
22              MR. LEE:  It's very short.  Ms. Ellsworth is going
23     to be the examiner.  I'm going to be the witness.
24              MS. ELLSWORTH:  Harvard calls the former associate
25     director of admissions Grace Cheng.  And her name and address
```

1    is actually in the record.

2           (GRACE CHENG, deposition read in court)

3                         EXAMINATION

4    BY MS. ELLSWORTH:

5    **Q.**  Ms. Cheng, how does an applicant's GPA play a role in

6    Harvard's admissions process?

7    **A.**  It is just one piece of data that is available.

8    **Q.**  Okay.  Now, let me ask the question replacing GPA with

9    race.  What's your answer on that?

10   **A.**  I would give the same answer.

11   **Q.**  Did you use the numbers of minorities from prior years

12   classes as targets from an admissions cycle?

13   **A.**  No.

14   **Q.**  Within the Z docket, we talked earlier about targets, how

15   you received a number of applicants to recommend which you

16   were to bring to the full committee meeting; is that right?

17   **A.**  Yes.  A recommended preliminary target.

18   **Q.**  And did you account for diversity by ethnicity or gender

19   or otherwise in arrival at that target number?

20   **A.**  No.

21   **Q.**  So your subcommittee was not focused on the number of men

22   and women, African-Americans, Asian-Americans, and others by

23   number in reaching the target in your subcommittee?

24   **A.**  Correct.

25   **Q.**  Okay.  So then let's go forward to the full committee.  I

1    guess each subcommittee then brings a recommended number of

2    applications.  How then is the class shaped by gender,

3    ethnicity, and otherwise?

4    **A.**  So once the committee enters full committee, as I

5    mentioned before, the targets become irrelevant and area

6    people advocate for individual cases to be admitted in the

7    full committee process without keeping track of specific

8    categories like you mentioned.

9             At the end of the full committee process, we then

10   are told the total number of still preliminary admitted

11   students.  We are told whether we need to pull out a certain

12   number according to the procedures we talked about earlier.

13   **Q.**  Okay.  So then at what point did Dean Fitzsimmons

14   communicate to the full committee that numbers by groups

15   needed to be adjusted?

16   **A.**  So approximately three days before the end of the full

17   committee process, the full committee would be notified how

18   many students needed to come out of the class.  They would

19   come out of each docket.

20   **Q.**  So the first time the full committee saw numbers by

21   subgroups such as ethnicity and gender was three days before

22   the end of the process?

23   **A.**  No.  To clarify, we never saw numbers by those

24   categories.  We only saw numbers by docket.

25   **Q.**  Okay.  At that point, is the full committee aware of the

1    subcategories of numbers?

2    **A.**   No.

3    **Q.**   So what guidance are the subcommittees given in terms of

4    how to narrow their pool?

5    **A.**   They are just given number of applicants that they need

6    to identify to pull out of the class.

7    **Q.**   And this is the lop process?

8    **A.**   Correct.

9    **Q.**   Were you ever given guidance in terms of a group being

10   too underrepresented?

11   **A.**   Not that I remember.

12   **Q.**   Did you know the numbers by race of the preliminarily

13   admitted class before the lopping process began?

14   **A.**   No.

15   **Q.**   Do you know if that information was tracked during the

16   admissions process?

17   **A.**   I don't know.

18   **Q.**   After that process, what was the committee's information

19   about groups by race of the prospectively admitted class at

20   that point?

21   **A.**   From what I remember, we were never told the breakdown.

22   **Q.**   So when did you learn the breakdown of an admitted class

23   by race?

24   **A.**   Usually in the press release to the public once the class

25   was admitted.

 1   **Q.**  So is it your testimony that from the beginning of the
 2   process until the press release, the full committee did not
 3   have in front of it the numbers of the prospectively admitted
 4   class by race?
 5   **A.**  From what I recall, yes.
 6   **Q.**  Okay.  The lopping process, just to finish that subject,
 7   who made the final decisions about who was lopped?  Was that
 8   also a full committee vote for each prospectively or
 9   preliminarily admitted applicant or was the process different
10   for the lopping?
11   **A.**  The process was not different.  It came down to the full
12   committee vote.
13   **Q.**  So for each person on the lop list, there was a full
14   committee vote?
15   **A.**  Yes.
16            (End of GRACE CHENG deposition reading.)
17            MS. ELLSWORTH:  Harvard calls former admissions
18   officer Caroline Weaver.
19            (CAROLINE WEAVER, deposition read in court)
20                      EXAMINATION
21   BY MS. ELLSWORTH:
22   **Q.**  And you worked at the admissions office at Harvard from
23   approximately August of 2013 to August 2015; is that
24   accurate?
25   **A.**  I believe so, yes.

**JA3387**

```
 1    Q.   So you worked there during two admission cycles, correct?

 2    A.   Correct.

 3    Q.   And that would be for the class of 2018 and the class of

 4    2019, correct?

 5    A.   Correct.

 6    Q.   Were there guidelines circulated to you as to what -- as

 7    to how to score within these four subcategories that we just

 8    mentioned?

 9    A.   Admissions officers receive training on how to read and

10    review an application file.

11    Q.   Which included how to properly score each subcategory

12    that we just mentioned?

13    A.   The scoring was included in the training, yes.

14    Q.   And you had that training at the beginning of your time

15    at the Harvard admissions office?

16    A.   There was a -- an official training that we went through.

17    However, we were constantly receiving feedback.

18    Q.   Going back to the personal score, what goes into that

19    score?

20    A.   Personal qualities would be decided based on many

21    different things that were covered in the application.

22    Q.   Such as what?

23    A.   A student teacher's recommendations could play a role.

24    Q.   Would you agree that an applicant's race can sometimes

25    factor into the personal score?
```

1    **A.**  No.

2    **Q.**  Why not?

3    **A.**  An individual's personal qualities are separate from the

4    race.

5    **Q.**  Have you seen -- have you seen applicants with legacy

6    status get in who, in your opinion, would not have been

7    admitted if not for their legacy status?

8    **A.**  Legacy status would not be a reason why a student was

9    either admitted or not admitted.

10   **Q.**  And you have no personal knowledge what, if any,

11   different treatment the list of applicants on the list for

12   Dean Fitzsimmons, which you just mentioned, had compared to

13   the other applicants.  You don't know one way or the other,

14   correct?

15   **A.**  My experience in the admissions office was that all

16   candidates were reviewed in the same form.

17   **Q.**  If an applicant has a familial or personal connection to

18   a Harvard employee, is that fact considered as part of the

19   admissions process?

20   **A.**  There is a place on the student's application where they

21   can check whether or not they're related to a faculty or

22   staff member at Harvard.

23   **Q.**  How is -- how significant is that factor considered?

24   **A.**  It is one small factor among a list of many that are

25   considered for the student's candidacy.

1    **Q.**  Do you recall an instance of where an applicant who has a

2    familial or personal connection to a Harvard employee,

3    whether that fact increased his or her chances of getting

4    into Harvard based on that?

5    **A.**  Again, it's one very small component, and it would depend

6    entirely on the individual applicant.  But that -- a

7    connection to staff or faculty alone would not be reason

8    enough to grant a student admission.

9    **Q.**  You mentioned that if an applicant noted his or her race

10   in an application, that would be noted on the applicant's

11   folder, correct?

12   **A.**  The student could elect to share their race or ethnicity

13   with the admissions department by checking a box on their

14   application.

15   **Q.**  Right.  When you receive the folder as a first reader,

16   where is that noted on within the application folder?

17   **A.**  It would be one of many pieces of information captured on

18   the summary sheet.

19   **Q.**  What does the term "standard strong" mean within the

20   admissions office?

21   **A.**  "Standard strong" would be a term used to describe an

22   applicant who is very well qualified academically and likely

23   has a good deal of extracurricular involvement as well but

24   isn't distinguished in Harvard's incredibly, incredibly

25   competitive applicant pool.

1   **Q.**  Based on your experience has an admissions officer over

2   two years, was it your impression that the term "standard

3   strong" or "SS" was used disproportionately to Asian

4   applicants, to describe Asian applicants?

5   **A.**  I don't have that impression.

6   **Q.**  In comparing applicants at the subcommittee meeting

7   stage, how was race used to justify full committee

8   consideration for one candidate over another?

9   **A.**  Race wouldn't have been a reason to justify full

10  committee consideration.

11  **Q.**  Was it used as a reason to influence full committee

12  consideration?

13  **A.**  Race was just one factor of many factors that were

14  considered in an applicant's folder.  It was very individual

15  and depended completely on the applicant.

16  **Q.**  During the subcommittee review process, to what extent

17  are the admissions officers aware of the racial diversity in

18  percentages of the prior year's class?

19  **A.**  I can't speak for other admissions officers.  In my

20  experience, no one told me the breakdown of the previous

21  class.  That information was public.  I could look it up if I

22  had wanted to.  It's published every year at the end of the

23  process.

24  **Q.**  In your experience, do the subcommittees that you were a

25  part of, did they try to ensure that the racial diversity of

1    the present year's class that was up for consideration was

2    reflective of the racial diversity in the prior year's class?

3    **A.**   When I was there, diversity was something that was

4    important to the university.  However, there was no effort

5    made to make sure that one particular year's diversity

6    reflected that of a previous year's.

7    **Q.**   For an applicant to be considered by the full committee,

8    does the subcommittee need to have a majority vote on that

9    applicant?

10   **A.**   A majority of subcommittee members would have to vote

11   that they would like to admit that individual student for the

12   student to then progress to full committee.  That's usually

13   the process when I was there.

14   **Q.**   After making decisions at the subcommittee level, did any

15   of the subcommittees you participated in ever go back and

16   reevaluate cases?

17   **A.**   Yes.

18   **Q.**   How often is that process triggered by a certain racial

19   group being underrepresented?

20   **A.**   That wouldn't have been the reason we would have reviewed

21   cases.

22   **Q.**   In your experience?

23   **A.**   In my experience, we did not go back and review an

24   application in subcommittee again because of your proposed

25   racial imbalance.  Yes.

Case: 19-2005    Document: 00117632846    Page: 469    Date Filed: 07/29/2020    Entry ID: 6356391
Case 1:14-cv-14176-ADB    Document 654    Filed 04/18/19    Page 251 of 261

251

1    **Q.**  In the full committee setting, how often is there

2    discussion about a particular racial group being

3    underrepresented compared to last year's class?

4    **A.**  I don't remember that being a focus of the full committee

5    process at all.

6    **Q.**  Based on your experiences as an admissions officer, how

7    could the admissions process be manipulated if someone wanted

8    to achieve a certain percentage of Asian admittees in a given

9    year?

10   **A.**  Based on my experience, I can't think of a way in which

11   the process could be manipulated.

12   **Q.**  What about through the lop list that we discussed

13   earlier?

14   **A.**  A lop list is not intended nor can I think of a way in

15   which it would be designed to manipulate the admissions

16   process.

17   **Q.**  Well, if students were listed by their ethnicity on a lop

18   list, couldn't that be used as a way potentially to lop

19   students off of a certain ethnicity?

20   **A.**  You're proposing that it's possible.  I'm telling you

21   that in my experience in the two years that I was working,

22   that's not how the lop list was used.

23   **Q.**  Understood.  But it's possible that it would be could be

24   used that way, correct?

25   **A.**  I don't think it's possible because individuals who were

1    submitted on a lop list were not necessarily lopped.  And the

2    entire full committee then reviewed the individual

3    application before a student was voted to stay in the class

4    or remove from the class.

5    **Q.**   But the individuals on the lop list, their ethnicity is

6    tracked on that list, correct?

7    **A.**   You showed me a document that was collected from Harvard.

8    That was not a document that I was familiar with.

9    **Q.**   You'd agree that those documents, you're referring to the

10   lop list exhibits that were previously marked, correct?

11   **A.**   Yes.

12   **Q.**   You'd agree that both those documents had the

13   abbreviation ETH on them, correct?

14   **A.**   They had that as a column header.

15   **Q.**   Do you agree that the bar is set higher for Asian

16   students as opposed to students from other races at Harvard?

17   **A.**   I personally do not agree with that.

18   **Q.**   Why do you think Asian-Americans are admitted at a lower

19   rate than other applicants at Harvard College?

20   **A.**   I don't know that they are admitted at a lower rate.

21   **Q.**   Do you agree that during your time at Harvard admissions,

22   the admission rate for Asian-Americans and whites were lower

23   than the admission rates for Hispanic and African-American

24   students?

25   **A.**   I don't know the numbers.

1  **Q.**  Do you think the way race is used in Harvard's admissions

2  process is inappropriate?

3  **A.**  No, I do not think it's inappropriate.  It's a small

4  factor that's considered for some applicants depending on the

5  student's individual application.

6          (End of CAROLINE WEAVER deposition reading.)

7          MS. ELLSWORTH:  Harvard calls former admissions

8  officer Brock Walsh.

9          THE COURT:  Hold on.  Let me just get caught up

10  here.

11          MS. ELLSWORTH:  Brock Walsh.

12          (BROCK WALSH, deposition read in court)

13                      EXAMINATION

14  BY MS. ELLSWORTH:

15  **Q.**  Could you please state your name and business address?

16  **A.**  Brock Walsh.  And my business address is 740 21st Street,

17  Santa Monica, California.

18  **Q.**  And what were you ultimately trying to decide when

19  assigning a personal rating?

20  **A.**  Whether the student would contribute to the class,

21  classroom, roommate group, to the class as a whole.  Their

22  human qualities.

23  **Q.**  When making that determination, would you take the

24  student's race into account?

25  **A.**  No.

Case: 19-2005   Document: 00117631846   Page: 452   Date Filed: 07/29/2020   Entry ID: 6356391
Case 1:14-cv-14176-ADB   Document 654   Filed 04/18/19   Page 254 of 261

254

1    **Q.** Would you ever take a student's race into account when

2    deciding whether the student should be lopped?

3    **A.** No.

4    **Q.** Why not?

5    **A.** The deliberations of the lop discussion were no different

6    from any other discussion. We discussed the whole candidate

7    no matter -- no one matter is more important than the other.

8    We tell their story. You advocate for them as best you can

9    as their area admissions person, and then you put it to a

10   vote.

11   **Q.** Why was knowing a student's race helpful for you in

12   deciding whether he or she should be admitted to Harvard?

13   **A.** It's one part of their story that they choose to share.

14   I honor their application and all the care they put into it.

15   And anything they decide to include I honor by taking all

16   that information in and doing my best to understand them as

17   fully as possible and render my best decision.

18                  (End of BROCK WALSH deposition reading.)

19                  MR. LEE:  Your Honor, Harvard rests.

20                  THE COURT:  So we have concluded the evidentiary

21   portion of the case. We'll go to closing arguments tomorrow.

22                  Does 9:30 make sense for everybody?

23                  MR. LEE:  That would be great.

24                  THE COURT:  Any representatives from the amici

25   here?

 1              AMICI REPRESENTATIVE:  Yes, Your Honor.

 2              THE COURT:  You all can close orally if you want.

 3    We will go SFFA, Harvard.

 4              I think you're going to reserve some rebuttal time?

 5              MR. HUGHES:  We've agreed we'll get 90 minutes.

 6    We'll split ours up.  I'm going to talk for about a minute --

 7    no.  It will it be 60 or 70 minutes, and then we'll have the

 8    remainder as rebuttal.

 9              THE COURT:  So close, close, rebuttal, and then the

10    two Amici groups can have their 15 minutes to close as well.

11    Okay?

12              AMICI REPRESENTATIVE:  Thank you, Your Honor.

13              MS. ELLSWORTH:  Your Honor, I've discussed with

14    counsel for SFFA coming up with a schedule for the posttrial

15    briefing and an argument date.  We've conferred with

16    Ms. Folan, and we'll ask for some dates potentially in

17    February for argument and back out the schedule from there.

18              So we'll submit it in writing after the closings,

19    if that's all right with you.

20              THE COURT:  Yes.  How are you planning on doing the

21    findings of fact and conclusions of law?  One and then the

22    other or both at the same time?

23              MS. ELLSWORTH:  What we had been discussing was

24    simultaneous submissions.  Two rounds, but simultaneous for

25    each of them.

```
 1              MR. HUGHES:  This isn't my area.  I'm going to
 2      trust that Ms. Ellsworth --
 3              THE COURT:  You're thinking about February for
 4      closing arguments?
 5              MS. ELLSWORTH:  That was the thinking based on some
 6      scheduling constraints on both ends.
 7              MR. WAXMAN:  Including your end.
 8              THE COURT:  All right.  Let me think about that.
 9      We have a trial that's scheduled for 14 weeks beginning at
10      the end of January.  And we will either take a day off from
11      that, depending on how it's going, or sit for a half day on
12      that and then have you do the closings in the afternoon.
13              I would like to take a separate day for this, but I
14      need to see where they are because I am very tightly
15      controlling their time.
16              MR. WAXMAN:  14 weeks?  How tight is that?
17              THE COURT:  14 weeks, not including jury selection,
18      which they claim to need all of.  I'm concerned about a jury.
19      If we take two weeks off in there, I'm trying to have it be
20      the two school vacation weeks in hopes that that increases
21      the jury pool.
22              I'm not sure -- we'll pick a day and then we'll
23      pick the time of day as we get closer to and I can figure out
24      what's going on in that case.  14 weeks does seem adequate
25      for almost anything.  So that's fine.  So we'll do that.
```

```
 1              Will you all just be mindful tomorrow, I've had
 2      some concerns expressed -- I guess it can be hard for the
 3      audience to hear what you all are saying, particularly when
 4      you're facing me.  So if those closing could be mindful of
 5      their volume in getting the microphone closer to their mouth,
 6      I think the viewing audience would appreciate that.
 7                    All right.  Anything else for today?
 8                    MR. HUGHES:  Thank you, Your Honor.
 9                    MR. LEE:  Thank you, Your Honor.
10                    THE COURT:  We'll see you tomorrow.
11                    (Court recessed at 4:30 p.m.)
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

Case: 19-2005    Document: 00117631846    Page: 476    Date Filed: 07/29/2020    Entry ID: 6356391
Case 1:14-cv-14176-ADB   Document 654   Filed 04/18/19   Page 258 of 261

258

```
 1                  - - - - - - - - - - -

 2                        CERTIFICATION

 3

 4         I certify that the foregoing is a correct

 5    transcript of the record of proceedings in the above-entitled

 6    matter to the best of my skill and ability.

 7

 8

 9

10    /s/ Joan M. Daly              November 1, 2018

11    _____          _____

12    Joan M. Daly, RMR, CRR        Date
      Official Court Reporter
13

14

15

16

17

18

19

20

21

22

23

24

25
```

Case: 19-2005    Document: 00117631846    Page: 477    Date Filed: 07/29/2020    Entry ID: 6356391
Case 1:14-cv-14176-ADB   Document 654   Filed 04/18/19   Page 259 of 261

259

INDEX OF WITNESSES

WITNESS                                                        PAGE

DAVID CARD (continued)

    Examination By Mr. Mortara ........................   6
    Re-Examination By Mr. Waxman .......................  98
    Re-Examination By Mr. Mortara ..................... 113
    Re-Examination By Mr. Waxman ...................... 117


MARLYN MCGRATH

    Examination By Mr. Mortara........................ 121
    Examination By Mr. Lee............................ 165
    Further Examination By Mr. Mortara................ 182
    Further Examination By Mr. Lee.................... 183


DREW FAUST

    Examination By Mr. Lee............................ 185
    Examination By Mr. Hughes......................... 227


GRACE CHENG, DEPOSITION READ IN COURT

    Examination ...................................... 242


CAROLINE WEAVER, DEPOSITION READ IN COURT

    Examination ...................................... 245


BROCK WALSH, DEPOSITION READ IN COURT

    Examination ...................................... 253

**JA3401**

Case: 19-2005    Document: 00117631846    Page: 478    Date Filed: 07/29/2020    Entry ID: 6356391
Case 1:14-cv-14176-ADB   Document 654   Filed 04/18/19   Page 260 of 261

260

```
 1                        E X H I B I T S

 2
     Defendant Exhibit                               Received
 3
         DX12      ...................................    219
 4
         DX26      ...................................    217
 5
         DX40      ...................................    196
 6
         DX53      ...................................    215
 7
         DX83      ...................................    211
 8
         DX100     ...................................    209
 9
         634       ...................................    120
10
         DX740     ...................................    210
11
         DX742     ...................................    169
12
         DX743     ...................................    169
13
         744       ...................................    128
14

15

16

17   Plaintiff Exhibit                               Received

18       P62       ...................................    236

19       634       ...................................    120

20       656       ...................................    157

21       657       ...................................    136

22       658       ...................................    136

23       659       ...................................    143

24       660       ...................................    143

25       696       ...................................    130
                   ...................................    132
```

**JA3402**

| | | | |
|---|---|---|---|
| 1 | 705 | ..................................... | |
| 2 | 706 | ..................................... | 132 |
| 3 | 707 | ..................................... | 132 |
| 4 | 708 | ..................................... | 132 |
| 5 | 720 | ..................................... | 149 |
| 6 | 721 | ..................................... | 149 |
| 7 | 722 | ..................................... | 151 |
| 8 | 723 | ..................................... | 151 |
| 9 | 741 | ..................................... | 148 |
| 10 | 749 | ..................................... | 138 |
| 11 | 755 | ..................................... | 135 |
| 12 | 767 | ..................................... | 138 |

**JA3403**

Case: 19-2005    Document: 00117620846    Page: 466    Date Filed: 07/29/2020    Entry ID: 6356391
Case 1:14-cv-14176-ADB   Document 656   Filed 04/18/19   Page 1 of 155

1

<pre>
 1                    UNITED STATES DISTRICT COURT

 2                     DISTRICT OF MASSACHUSETTS

 3   _____

 4   STUDENTS FOR FAIR ADMISSIONS, INC.,

 5                  Plaintiff,          Civil Action
                                        No. 14-14176-ADB
 6   v.
                                        November 2, 2018
 7   PRESIDENT AND FELLOWS OF HARVARD
     COLLEGE, et al.,                   Pages 1 to 155
 8
                  Defendants.
 9   _____

10

11

12
                  TRANSCRIPT OF BENCH TRIAL - DAY 15
13                        CLOSING ARGUMENTS
           BEFORE THE HONORABLE ALLISON D. BURROUGHS
14              UNITED STATES DISTRICT COURT
               JOHN J. MOAKLEY U.S. COURTHOUSE
15                  ONE COURTHOUSE WAY
                    BOSTON, MA  02210
16

17

18

19

20

21               JOAN M. DALY, RMR, CRR
               KELLY MORTELLITE, RMR, CRR
22                Official Court Reporters
              John J. Moakley U.S. Courthouse
23            One Courthouse Way, Room 5507
                    Boston, MA  02210
24                joanmdaly62@gmail.com

25
</pre>

**JA3404**

2

```
1    APPEARANCES:

2
     COUNSEL FOR THE PLAINTIFF:
3

4            ADAM K. MORTARA, ESQUIRE
             J. SCOTT McBRIDE, ESQUIRE
5            KRISTA J. PERRY, ESQUIRE
             Bartlit Beck Herman Palenchar & Scott
6            54 West Hubbard Street
             Suite 300
7            Chicago, Illinois 60654
             312.494.4400
8            adam.mortara@bartlit-beck.com
             scott.mcbride@bartlit-beck.com
9            krista.perry@bartlit-beck.com

10           JOHN M. HUGHES, ESQUIRE
             KATHERINE L.I. HACKER, ESQUIRE
11           MEG E. FASULO, ESQUIRE
             Bartlit Beck Herman Palenchar & Scott
12           1801 Wewatta Street
             Suite 1200
13           Denver, Colorado 80202
             303.592.3100
14           john.hughes@bartlit-beck.com
             meg.fasulo@bartlit-beck.com
15           kat.hacker@bartlit-beck.com

16           JOHN MICHAEL CONNOLLY, ESQUIRE
             THOMAS R. McCARTHY, ESQUIRE
17           WILLIAM S. CONSOVOY, ESQUIRE
             Consovoy McCarthy Park PLLC
18           3033 Wilson Boulevard
             Suite 700
19           Arlington, Virginia 22201
             703.243.9423
20           mike@consovoymccarthy.com
             tom@consovoymccarthy.com
21           will@consovoymccarthy.com

22

23

24

25
```

**JA3405**

```
 1     APPEARANCES (cont.):

 2
              PATRICK STRAWBRIDGE, ESQUIRE
 3            Consovoy McCarthy Park PLLC
              Ten Post Office Square
 4            8th Floor, South, PMB #706
              Boston, Massachusetts 02109
 5            617.227.0548
              patrick@consovoymccarthy.com
 6
              MICHAEL H. PARK, ESQUIRE
 7            Consovoy McCarthy Park PLLC
              3 Columbus Circle
 8            15th Floor
              New York, New York 10024
 9            646.456.4432
              park@consovoymccarthy.com
10
              PAUL M. SANFORD ESQUIRE
11            BENJAMIN C. CALDWELL, ESQUIRE
              Burns & Levinson LLP
12            One Citizens Plaza
              Suite 110
13            Providence, Rhode Island 02903
              401.831.8330
14            psanford@burnslev.com
              bcaldwell@burnslev.com
15

16     COUNSEL FOR THE DEFENDANT:

17            WILLIAM F. LEE, ESQUIRE
              FELICIA H. ELLSWORTH, ESQUIRE
18            ANDREW S. DULBERG, ESQUIRE
              ELIZABETH C. MOONEY, ESQUIRE
19            SARAH R. FRAZIER, ESQUIRE
              Wilmer Cutler Pickering Hale and Dorr LLP
20            60 State Street
              Boston, Massachusetts 02109
21            617.526.6556
              william.lee@wilmerhale.com
22            felicia.ellsworth@wilmerhale.com
              andrew.dulberg@wilmerhale.com
23            elizabeth.mooney@wilmerhale.com
              sarah.frazier@wilmerhale.com
24

25
```

**JA3406**

```
 1    APPEARANCES (cont.):

 2
              SETH P. WAXMAN, ESQUIRE
 3            DANIELLE CONLEY, ESQUIRE
              DANIEL WINIK, ESQUIRE
 4            BRITTANY AMADI, ESQUIRE
              PAUL R.Q. WOLFSON, ESQUIRE
 5            Wilmer Cutler Pickering Hale and Dorr LLP
              1875 Pennsylvania Ave, NW
 6            Washington, DC 20006
              202.663.6006
 7            seth.waxman@wilmerhale.com
              danielle.conley@wilmerhale.com
 8            daniel.winik@wilmerhale.com
              brittany.amadi@wilmerhale.com
 9            paul.wolfson@wilmerhale.com

10            DEBO P. ADEGBILE, ESQUIRE
              Wilmer Cutler Pickering Hale and Dorr LLP
11            7 World Trade Center
              250 Greenwich Street
12            New York, New York 10007
              212.295.6717
13            debo.adegbile@wilmerhale.com

14            ARA B. GERSHENGORN, ESQUIRE
              Harvard Office of the General Counsel
15            Smith Campus Center
              Suite 980
16            1350 Massachusetts Avenue
              Cambridge, Massachusetts 02138
17            617.495.8210
              ara_gershengorn@harvard.edu
18

19    COUNSEL FOR AMICI STUDENTS:

20            JON M. GREENBAUM, ESQUIRE
              BRENDA L. SHUM, ESQUIRE
21            GENEVIEVE BONADIES TORRES, ESQUIRE
              KRISTEN CLARKE, ESQUIRE
22            1500 K Street NW, Suite 900
              Washington, DC 20005
23            202.662.8315
              jgreenbaum@lawyerscommittee.org
24            bshum@lawyerscommittee.org
              gtorres@lawyerscommittee.org
25            kclarke@lawyerscommittee.org
```

```
1   APPEARANCES (cont.):

2

3           LAWRENCE CULLEEN, ESQUIRE
            EMMA DINAN, ESQUIRE
4           Arnold & Porter LLP
            555 Twelfth Street, NW
5           Washington, DC 20004
            202.942.5477
6           gina.dean@aporter.com
            emma.dinan@aporter.com

7

8   COUNSEL FOR AMICI ORGANIZATIONS:

9           JENNIFER A. HOLMES, ESQUIRE
            CARA McCLELLAN, ESQUIRE
10          JIN HEE LEE, ESQUIRE
            MICHAELE M. TURNAGE YOUNG, ESQUIRE
11          RACHEL N. KLEINMAN, ESQUIRE
            NAACP Legal Defense and Educational Fund, Inc.
12          700 14th Street NW
            Suite 600
13          Washington, DC 20005
            jholmes@naacpldf.org
14          cmcclellan@naacpldf.org
            jlee@naacpldf.org
15          mturnageyoung@naacpldf.org
            rkleinman@naacpldf.org

16          KENNETH N. THAYER, ESQUIRE
            KATE R. COOK, ESQUIRE
17          Sugarman Rogers
            101 Merrimac Street
18          Suite 900
            Boston, Massachusetts 02114
19          617.227.3030
            thayer@sugarmanrogers.com
20          cook@sugarmanrogers.com

21

22

23

24

25
```

**JA3408**

```
 1                  P R O C E E D I N G S
 2                  (The following proceedings were held in open
 3     court before the Honorable Allison D. Burroughs, United
 4     States District Judge, United States District Court, District
 5     of Massachusetts, at the John J. Moakley United States
 6     Courthouse, One Courthouse Way, Boston, Massachusetts, on
 7     November 2, 2018.)
 8                  THE COURT:  Good morning, everyone.  Can I see the
 9     parties at sidebar for one second.
10                  [Sidebar sealed and redacted.]
11                  THE COURT:  All right.  So for the audience, we
12     were just discussing scheduling up at sidebar.  Mr. Hughes is
13     going to close first.  He's going to reserve some time, so we
14     will take a break after his opening closing, and then we will
15     hear from Harvard.  That should take us right to the lunch
16     break.  We'll break for lunch, and then we'll come back for
17     SFFA's rebuttal and the two Amici closings.
18                  Mr. Hughes, I know we discussed this yesterday, but
19     try and keep your voice up because you have a cast of
20     thousands wanting to hear what you say this morning.
21                  MR. HUGHES:  I'll try to be very loud, Your Honor.
22                  THE COURT:  Excellent.
23                  MR. HUGHES:  Thank you, Your Honor.
24                  **PLAINTIFF CLOSING ARGUMENT**
25                  MR. HUGHES:  John Hughes for SFFA.
```

Case: 19-2005    Document: 00117620846    Page: 466    Date Filed: 07/29/2020    Entry ID: 6356391
Case 1:14-cv-14176-ADB    Document 656    Filed 04/18/19    Page 7 of 155

7

1          Your Honor, all of the claims here in this case are

2     important, but we're going to spend most, if not all, of our

3     time today in closing on Claim 1, the question of intentional

4     discrimination against Asian-Americans, and we'll give more

5     fulsome treatment to the other claims in our post-trial

6     briefing.

7          I want to start with what everyone knew going into

8     this case.  Asian-Americans continue to face racial bias and

9     are often falsely stereotyped as shy and reserved, book smart

10    and one-dimensional, perpetual foreigners or model

11    minorities.  How did that play out here at Harvard?

12         Harvard has a personal rating that is important to

13    admissions that is designed to measure how outgoing or

14    personable its applicants are, measuring subjective character

15    traits such as likability or effervescence.  And what the

16    undisputed evidence shows is that Harvard's system for the

17    years at issue in this case, the Harvard classes of 2014 to

18    2019, the Harvard admissions office awarded Asian-American

19    applicants statistically significantly lower personal scores

20    than it did for white applicants.

21         Harvard does not and cannot dispute this.  Lower

22    personal scores, statistically significant, critical to

23    admissions.

24         There are two possible explanations here.  There's

25    SFFA's explanation, that bias and stereotyping explain the

1    disparity, not a racist conspiracy, but bias and stereotypes

2    that even well-meaning people are susceptible to deploying.

3    And the law is clear, in a subjective process with proof of

4    statistical discrimination, evidence of bias and stereotyping

5    can suffice to show intentional discrimination.

6            This is particularly true in a system like

7    Harvard's that is not race-neutral.  And here, even though

8    Harvard has a race-conscious admission system where it claims

9    to consider the race of every applicant who provides it, it

10    did not provide bias training.  It did nothing to address or

11    debunk commonly held stereotypical beliefs about

12    Asian-Americans or other racial or ethnic groups.

13            And this remained true even after Harvard received

14    repeated warnings from the Harvard Office of Institutional

15    Research that its admissions system might be imposing an

16    Asian penalty.

17            And even if we give Harvard the benefit of the

18    doubt on the Office of Institutional Research, maybe this was

19    just a preliminary warning, its response is not what you

20    would expect from an institution committed to preventing

21    discrimination against Asian applicants.

22            Dean Fitzsimmons, despite receiving repeated

23    analysis from OIR showing an Asian penalty, told no one else

24    in the admissions, not Director McGrath, no one.  Didn't tell

25    his boss.  Didn't tell anybody.  Didn't follow up.  Just

Case: 19-2005    Document: 00117628846    Page: 488    Date Filed: 07/29/2020    Entry ID: 6356391
Case 1:14-cv-14176-ADB   Document 656   Filed 04/18/19   Page 9 of 155

9

1    plowed on ahead.  SFFA's explanation that intentional

2    discrimination is the reason for the undisputed disparity in

3    the personal score is the likely one.

4         Then we have Harvard's explanation.  Harvard's

5    explanation buys into these stereotypes that the Asian

6    penalty is the result of Asian-American applicants not being

7    sufficiently multidimensional:  the words of Dr. Card,

8    Harvard's expert.  Harvard suggests that Asian-American

9    applicants are a group of one-dimensional academic

10   superstars, many of whom Harvard has decided don't have the

11   right personal qualities for Harvard.  Book smart, not

12   personable.  That's Harvard's explanation based on the

13   ratings that Harvard's admissions officers determine.

14        Two possible explanations but only one persuasively

15   lines up with the evidence.  And what hopefully we all know

16   in our hearts, Asian-Americans do not have worse personal

17   qualities than any other group.  Harvard's explanations must

18   and should be rejected.

19        Now I want to turn to the evidence.  And it brings

20   us to the most important issue in the case in terms of both

21   the modeling and the statistical fight and the evidence

22   beyond that of intentional discrimination, and that is the

23   personal score.

24        It is important for two independent reasons, and I

25   want to make sure this is crystal clear.  First, if race

Case: 19-2005   Document: 00117621846   Page: 489   Date Filed: 07/29/2020   Entry ID: 6356391
Case 1:14-cv-14176-ADB   Document 656   Filed 04/18/19   Page 10 of 155

10

1    influenced the personal score in any meaningful way, even if

2    only as an avenue for Harvard to award preferences to

3    African-American and Hispanic applicants, it must come out of

4    Dr. Card's model.  Because at that point it is not

5    distinguishable from the overall rating.  I'll say more about

6    that in a minute.

7          And the reason why this is so important to the case

8    is that Dr. Card admits that if you take the personal rating

9    out of either the model that he reported in his original

10   report or the model that he or reported in his rebuttal

11   report, there is a statistically significant Asian-American

12   penalty.  So if you resolve that factual question in our

13   favor, it ends the statistical case.

14         And now I want to talk about how we need to compare

15   the treatment of the overall score, how Dr. Card and

16   Dr. Arcidiacono treated that, and then line that up with the

17   evidence about the personal score.  And what I'm hoping to do

18   is to connect the dots and show you that the way race is used

19   in the overall score, a score that's supposed to consider all

20   the information in the application and race is only a small

21   part of that; and even so, both experts agree it has to come

22   out.

23         The evidence is just as strong that race plays at

24   least a similarly powerful role in awarding the personal

25   score.  And once we connect those dots and win that factual

Case: 19-2005    Document: 00117631846    Page: 490    Date Filed: 07/29/2020    Entry ID: 6356391
Case 1:14-cv-14176-ADB    Document 656    Filed 04/18/19    Page 11 of 155

11

1    dispute, the statistical case is over.

2           So let's look in particular, before we get to the

3    evidence of the personal score, about what Dr. Card admitted

4    yesterday to Mr. Mortara about the overall score.

5           First of all, we just had some basic questions

6    about the overall score that Dr. Card admitted.  The overall

7    rating may be influenced by race; he agreed.  Can be affected

8    by race; he agreed.  Contain some potential race-based tips;

9    he agreed.

10           Then we followed up.  We asked him, "Since your

11    analysis seeks to isolate the incremental effect of race on

12    admissions decisions, it is inappropriate to include any

13    variable that themselves can be affected by race, correct?"

14    And he agreed, and that any variable admission applies

15    equally to the overall score as it does to the personal score

16    if we demonstrate that race is influencing the personal

17    score.

18           And the last piece I want to make sure that we

19    focus on is that Dr. Card agrees that if race is influencing

20    a score only where Harvard is administering its preferences

21    for African-American and Hispanic candidates, if it's doing

22    that, it has to come out, and Harvard is going to have no

23    answer that that is happening in both the overall and

24    personal scores and that is the testimony that I've got on

25    the screen that's at slide 4 in your binder where Dr. Card

1    agrees that if race is being used to administer preferences

2    in a particular rating, it's got to come out of the model.

3    That's what he agreed in his sworn testimony.

4           So now I want to focus on the evidence about

5    whether or not race is influencing the personal score, the

6    dispute relevant to the big modeling choice in this case.  I

7    want to start with Plaintiff's Trial Exhibit 631, which is

8    slide 5 in your binder, Your Honor.  This is a slide that

9    shows comparably qualified academic candidates to Harvard

10   stratified by academic decile.  We've talked about that a

11   number of times during the trial.  At the top of my chart are

12   the most competitive candidates by GPA and SAT score, and it

13   goes down from there.

14          And the first thing I want to draw Your Honor's

15   attention to is the total column over here on the right-hand

16   side, and we see that it is reasonable to look at the award

17   of high personal scores stratified by academic qualification

18   because there's a correlation between getting a high personal

19   score and academic qualification.  You can see it starts at

20   26.  2 percent for the top academically qualified candidates

21   and then marches down from there.  So that's the reason this

22   is a good way to look at evidence about the personal score.

23          And then we turn to the racial distribution of the

24   personal score and we see something very interesting.  We see

25   that for comparably qualified academic candidates to Harvard

Case: 19-2005   Document: 00117631846   Page: 492   Date Filed: 07/29/2020   Entry ID: 6356391
Case 1:14-cv-14176-ADB   Document 656   Filed 04/18/19   Page 13 of 155

13

1     at every single decile all along the way African-Americans

2     get the most personal scores of 2 or higher by a significant

3     percentage.  First place, every time.

4          Then if we look at the column for Hispanic

5     applicants to Harvard, they get on average -- they're in

6     second place in terms of getting a personal score of 2 or

7     higher every single time.  Then we turn to the white

8     applicants, third place every time.  And the Asian-American

9     applicants, dead last every single time.  We think this is

10    strong evidence that race is being used in the personal score

11    for all of these different ethnicities, and it's evidence of

12    an Asian penalty.  But I want to draw your attention to the

13    point that I've already made; that this is clearly a place

14    where Harvard is administering its racial preferences, the

15    tips that it gives to African-Americans and Hispanic.  And

16    remember, Harvard has admitted -- they agree in this case --

17    that African-American applicants to Harvard get more of a tip

18    than Hispanic applicants, and we can see that relationship

19    right here in the personal score data.

20          So now I want to turn to the comparison between the

21    overall rating and the personal score in terms of this

22    descriptive data that comes right of out of Harvard's open

23    database.  This is Plaintiff's Exhibit 38.  It's page 19 of

24    your deck, Your Honor.  What I've got at the top, I've

25    limited this to the top four academic deciles, the top 40

1   percent of the academically competitive candidates to

2   Harvard.  And I'm comparing the overall rating distribution

3   by race of a personal score of 2 or higher to the same thing

4   with the personal score.  And what we see is that there's a

5   very important lining-up of the distribution of these

6   personal scores.

7          So in the overall rating, where Harvard admits that

8   it uses race to give tips and preferences to African-American

9   and Hispanic candidates, we see that just like on the last

10  slide that we looked at in the overall rating,

11  African-Americans are leading the way.  They're getting the

12  highest overall ratings compared to similarly academically

13  qualified candidates.  Hispanics in second place.  Whites in

14  third.  Asians last every single time.  And we see that that

15  lines up with the personal rating in terms of the pattern of

16  that distribution, which is strong evidence that just like

17  race is used in the overall score to award preferences, it's

18  also used in the personal rating, and just like in the

19  overall score, Asian-American applicants are getting awarded

20  lower scores than similarly academically qualified applicants

21  from other groups, the same thing is turning up in the

22  personal score.

23         And the last thing I'll say on this slide is that

24  when Your Honor asked Professor Arcidiacono whether these

25  differences were statistically significant he explained that

1    they were, which is yet further evidence that we've got race

2    both in the overall score where they admit that it's used and

3    in the personal rating.

4            So now I want to turn to the last piece of data or

5    statistical evidence that supports our view that race is

6    influencing the personal score.  That is the model that Dr.

7    Arcidiacono ran to analyze this very issue.  And I want to

8    make sure Your Honor is clear.  Now I'm on slide 31, Your

9    Honor, Plaintiff's Demonstrative 38.  I want to be clear.

10   Dr. Arcidiacono ran a number of different models.  The one we

11   talked the most about was his preferred model, sometimes

12   referred to model 5, which looked at the ultimate admissions

13   outcome penalty on Asian-Americans.  What I'm talking about

14   here is a different model where he tried to determine whether

15   or not race was the thing that was driving the differences

16   that we just saw in the last two slides in the personal score

17   among the four different groups that the experts analyzed in

18   this case.

19           And so what Dr. Arcidiacono did is he ran a

20   logistic regression model that controlled for everything that

21   Harvard says explains the difference between Asian-Americans

22   and white applicants:  school rating support, teacher rating,

23   interview ratings and so forth, controlled for all of that

24   and yet found a statistically significant difference in the

25   awarding of personal scores based on race.

```
 1          And he had a discussion about the explanatory
 2   power.  That was the whole pseudo R-squared discussion that I
 3   think Mr. Mortara resolved in his cross-examination.  His
 4   model at a minimum has strong explanatory power for the
 5   difference in the distribution of personal scores based on
 6   race.
 7          And what he found was that Asian-Americans in the
 8   personal score have a penalty based on race based on his
 9   model, and that just like Harvard admits that there are
10   preferences, there's a boost for African-American applicants
11   and there's a boost for Hispanic applicants, and that
12   relative boost, African-Americans doing better than
13   Hispanics, which Harvard admits, we see right here in the
14   evidence.
15          And Dr. Card, other lobbing criticisms about pseudo
16   R-squared, he doesn't have a model on the other side of this.
17   He didn't try to model and isolate whether or not race was
18   influencing the personal score.  Only SFFA's expert did that.
19   They basically got nothing on the other side.
20          Now I want to turn to the evidence from the
21   admissions office about whether or not race was influencing
22   the personal score.  But before I do that, I want to make two
23   last points.  Neither Dr. Card nor any Harvard witness gave
24   any testimony explaining, disproving or even attempting to
25   explain the differences that we see in terms of the racial
```

Case: 19-2005   Document: 00117631846   Page: 496   Date Filed: 07/29/2020   Entry ID: 6356391
Case 1:14-cv-14176-ADB   Document 656   Filed 04/18/19   Page 17 of 155

17

1   distribution of the overall score and the personal score in

2   terms of Hispanic and African-Americans doing significantly

3   better than the white applicants and Asian applicants, which

4   is alone sufficient to prove that race is infecting the

5   personal score.

6           Dr. Card has zero opinions on that.  No testimony

7   on that.  And no Harvard witness came in to explain that.

8   All the evidence has gone to trying to explain the difference

9   between Asian applicants and white applicants.  And we'll

10  have more on that later.  But the fact dispute of whether

11  race influences the personal score, they've got nothing on

12  that point.

13          So now let's turn to the Harvard witness testimony

14  about whether or not race is influencing the personal score

15  and has to come out of Dr. Card's model.  Mr. Lee said in

16  opening that nothing has changed, nothing meaningful has

17  changed about Harvard's admissions process since the Supreme

18  Court blessed it in the <u>Bakke</u> decision back in the '70s and

19  certainly nothing changed since OCR did a two-year

20  investigation of Harvard's admissions office looking at the

21  issue of Asian-American discrimination in 1990 and issued a

22  50-some-odd- page report.

23          And then we had carefully studied OCR's finding and

24  wanted to make sure we understood Harvard's position on that.

25  So when Dean Fitzsimmons came to testify, I asked him, "Do

**JA3420**

 1    you think the description of how Harvard uses race in the

 2    1990 OCR report is still accurate?"  And he said, "Certainly

 3    the general description in the outlining, yes."  And then we

 4    went one step further.  And I asked an improper question

 5    about whether they'd ever stopped.  Then I rephrased and I

 6    asked him, I said, "Since you've been dean, have Harvard

 7    admissions officers ever used race in awarding personal

 8    scores?"  And he answered, "Not to my knowledge."  We're

 9    looking now, Your Honor, at the testimony on slide 9.

10                And the reason that was important, Dean Fitzsimmons

11    was dean way before the OCR investigation, and he's saying

12    not to my knowledge, no one's ever used race in awarding a

13    personal score, and his testimony is unequivocal.  But it

14    turns out that that's not what his own admissions officers

15    told the OCR investigators in the late 1980s and in 1990.

16    And we've looked at this portion of Plaintiff's Exhibit P555

17    many times.  What it says is that some readers would award --

18    consider race in the overall score in the committee process

19    while other readers indicated that ethnicity was a factor

20    considered throughout the entire admissions process.  They

21    stated that it could be reflected in the four reiterating

22    areas, which Your Honor knows includes the personal score.

23    And then the other set of folks that talked to OCR said they

24    would only ever consider race or ethnicity if the candidate

25    indicated it was important somehow in their application.  So

1    people doing it different ways, but certainly people

2    admitting that they were using it in the personal score.

3              And Harvard's reaction to this is important.  They

4    didn't institute any new guidelines after this or make any

5    changes after this.  What they did is actually, years later,

6    doubled down on it in 2012 when the Harvard Office of General

7    Counsel went back to OCR in 2012 responding to a claim of

8    Asian-American discrimination and told OCR that the

9    description OCR had put in that statement of findings that we

10   looked at about how race is used in the Harvard admissions

11   process was still accurate as of 2012.

12             And I want to try to pause and see if we can make a

13   little sense of this incongruity about what Harvard says

14   today and about what Harvard told OCR in the past.  Harvard

15   wants to suggest today that it's had an iron-clad prohibition

16   on the consideration of race in the personal score from time

17   in memorial.  The OCR evidence just fundamentally disproves

18   that, as does Harvard's reaction to the OCR evidence.

19             And the reason this can make sense is that it would

20   not be, Your Honor, automatically unlawful for Harvard to use

21   race in the personal score if they did it in a defined and

22   narrowly tailored way.  If that's how they decided they

23   wanted to award their preferences for the candidates that

24   they have determined need tips, if they did it within the

25   confines of the law, they could do it that way.  And it turns

**JA3422**

1    out the evidence shows that's what they've been doing.  We

2    see the substantial preferences for African-Americans and

3    Hispanic applicants in the personal score.

4         The reason that this has turned into such a big

5    deal in this case is because once the experts were hired and

6    everybody starting to crunch the numbers, people realized

7    that if Harvard admitted that it was using race both in the

8    overall score where it has admitted that it has done so

9    forever, and in the personal score, then they had a real

10   problem with the statistical analysis in this case.  So now

11   Harvard is trying to build this defense that race isn't used

12   in the personal score, but it's not consistent with the

13   things that it said in the past.  And I think that gives a

14   little explanatory power to what we've seen in term of the

15   evidence of OCR.

16        Now I want to turn to the evidence about what

17   Harvard's admissions officers said about the use of race in

18   the personal score.  And now I'm on slide 12, Your Honor.

19   And I've got some clips of testimony from some of the

20   witnesses that came to testify here at trial on this issue.

21   And I think we all remember Mr. Mortara's cross-examination

22   of Mr. Looby, who came in here and changed his testimony on

23   things from his deposition many times.  And I want to get

24   into the specifics of what he said on the personal score in a

25   minute, but I want to frame the credibility of what happened

1    with Mr. Looby, who went to a deposition, and all he had to

2    do was tell the truth about how he does his job, the thing he

3    does every day.  Not that hard to do.

4        And he was asked questions about how he considered

5    race, which is what this case is about, and other things

6    about how he did his job.  And he gave honest answers because

7    it's not hard to give honest answers about how you do your

8    job.  But some of the things he said were a real problem for

9    Harvard, like what we've got on the screen right here, where

10   we're impeaching him with his deposition at trial, and his

11   deposition testimony was, "You were asked whether you would

12   take a student's race into account when assessing his or her

13   personal qualities," and his answer was, "Just like with the

14   academic rating, it's one factor of many I consider."  And he

15   said it in other places, too, and Mr. Mortara had to impeach

16   him over and over again.

17       And what we learned is that even though he had an

18   errata and a chance to correct that testimony, that never

19   happened.  Instead he spent ten days with Wilmer lawyers for

20   three plus hours a day to come in and give the testimony that

21   he gave, and you can judge the credibility of what happened

22   there.

23       But then we get to the next witness, which is

24   Charlene Kim, and I thought she gave some pretty important

25   and interesting testimony on this issue which illustrates how

**JA3424**

1    race is used in the personal score.  Mr. Strawbridge asked

2    her, "When considering the personal score, you also think

3    about how the applicant will add to the community, correct?"

4    She says, "Yes," and gave an explanation.  The very next

5    question we asked her, "You would agree, right, that a

6    student's race or ethnicity is part of how they can help add

7    to the community?"  And she says, "Yes."  So she's connecting

8    those dots between the things that she's considering in terms

9    of personal score, how will they add to the community, which

10   is consonant with all the subjective characterizations that

11   we've heard of what the personal score is trying to measure.

12       And one of those things that admissions officers at

13   Harvard have in mind is that the reason they use race in the

14   admission system is to add to their community in terms of

15   making a diverse campus.  And so it's hard, I think, to

16   disentangle the consideration of race and the considerations

17   that go into awarding the personal score.  And that's exactly

18   what we see from Charlene Kim's testimony.

19       And the last example that I've got here on the

20   slide is the testimony of Erica Bever.  And we asked her,

21   Mr. McBride asked her, "Does race ever factor into an

22   applicant's personal rating?"  And the answer we got was one

23   that you heard over and over again.  We, in our war room,

24   called it Harvard's slogan, was "No, not per se."  We heard

25   that from Dean Fitzsimmons, and even Dr. Card picked up on

1    it.  But what she explained was, she said, "I may not -- the

2    fact that they're a particular race but certainly students

3    might write about their background and things like that that

4    would inform my personal rating and what I give in the

5    personal rating."

6              And the reason this is important is remember back

7    to Dr. Card's admissions on the overall score, what we need

8    to demonstrate is that there's an influence of race on the

9    personal score one of the many things people are considering

10   in awarding that score, just like in the overall score.  And

11   if we connect those dots, it should come out of the model

12   because Dr. Card agrees any variable that's influenced has to

13   come out.

14             And the reason Ms. Bever's testimony is important

15   and other witnesses that gave testimony like it, is that we

16   know that many applicants to Harvard are writing about their

17   experiences facing discrimination, their identity in terms of

18   ethnicity or race, and we heard a lot of that testimony on

19   the day that we had the students testify, which is evidence

20   that that is in front of these admissions officers in many

21   instances and is necessarily, based on the kind of testimony

22   that we saw from witnesses like Ms. Bever, going to lead to

23   the consideration of race in the personal score.

24             And any doubt about all of this is resolved I think

25   by the testimony that Dean Fitzsimmons gave on both these

1    issues, on the overall score on the one hand and the personal

2    rating on the other hand.  And I've got that testimony on the

3    screen, and it's slide 13.  And he was asked about the

4    overall rating.  "How can race be considered in the

5    preliminary overall rating?"  And he answered, "If as the --

6    you're doing your preliminary overall rating, if you think

7    that this might be an additional little element that might be

8    helpful in terms of making a case that this person, as I say,

9    might be an unusual educator of others, the person might

10   decide to factor that into the preliminary overall rating."

11   So a very hedged view of how race might affect the

12   preliminary overall rating.  But that kind of relationship

13   between race and the preliminary overall rating was

14   sufficient for both experts to determine that variable was

15   influenced by race and it had to come out.

16          And we see the same kind of thing when he's asked

17   on the personal rating, "Can circumstances related to

18   someone's race or ethnicity result in facts, circumstances or

19   events that are useful in assigning the personal rating," he

20   answered, "Sure," and then goes on to give an answer similar

21   to Ms. Bever about people writing about overcoming

22   discrimination and other life experiences.

23          So there's really no way to differentiate the role

24   that race is playing in these two scores, which is why the

25   personal rating has to come out of Dr. Card's model, and the

1    statistical case is over once you resolve that factual

2    dispute in our favor.

3           And the last point that I'll make here is that

4    Harvard's new reading procedures that we talked about with

5    Director McGrath yesterday, we view, are remedial measures

6    prohibiting the use of race in the personal score, and that

7    evidence is probative of Harvard's use of race in the

8    personal score in the past.  I'll have more to say on the new

9    reading procedures in a bit.

10           So that brings us to Dr. Arcidiacono's model.  And

11    I've got the results of his admissions outcome model on the

12    screen.  And this is the model that he ran.  It was called

13    his preferred model, sometimes referred to as model 5, with

14    all of his variables to determine whether Asian-American

15    students were facing an admissions penalty, outcome penalty,

16    in applying to Harvard.  And he ran it on both the baseline

17    dataset which excluded the athletes, the legacies, the

18    children of faculty and staff and dean's list, ALDCs, and he

19    ran it on the expanded dataset which included everybody but

20    the 1300 athletes that were included in the dataset.  And in

21    both of those analyses he showed a statistically significant

22    outcome penalty on Asian-American students for admission to

23    Harvard.  And as Your Honor knows, this model leaves in the

24    preferences for African-American and Hispanics.  It's just

25    measuring the Asian penalty.

1          So then we get to Dr. Card's criticisms of this

2     model.  And I'm going to talk about how Dr. Arcidiacono

3     addressed those criticisms.  Dr. Card criticized Dr.

4     Arcidiacono for removing the personal rating for failure to

5     include parental occupation and intended career variables.

6     And, Your Honor, I'm on slide 15 right now, looking at

7     Plaintiff's Demonstrative 38.  And he had some other

8     criticisms.  And what Dr. Arcidiacono did is he did a

9     robustness check on his model and addressed most of the

10    criticisms that Dr. Card made, and he still found the

11    statistically significant Asian penalty.

12          And this now brings us to the issue of the ALDCs,

13    because this robustness check, the evidence that you have in

14    front of you, was only run on the baseline set.  It's where

15    the ALDCs were removed.  And so in terms of the statistical

16    case and the modeling choices, Your Honor, the ALDC issue is

17    really only relevant at this point, from our perspective, to

18    two things.  One is the reliability of the robustness check

19    because it's run without those in the group; and two, if you

20    decide that it's appropriate or at least a reasonable choice

21    to exclude the ALDCs from the pool, it increases the size of

22    the Asian penalty, but it's not required to get us there

23    under Dr. Card's model or under Dr. Arcidiacono's model

24    either.

25          So let me say, let me now try to address the ALDC

**JA3429**

1   issue, which has been the subject of testimony and questions

2   from the court on a number of different instances.  And first

3   I've just got Plaintiff's Exhibit 634 up on the screen, which

4   just kind of sets the stage with some basic data about this

5   group, which is that, on average, the admission rates you can

6   see across the bottom, whites are admitted 43 percent of the

7   time, Asians 44, African-Americans 46 and so forth, the admit

8   rate amongst the groups is very similar, and the group is

9   overwhelmingly white.  5,000 white applicants.  Only 840

10  Asian applicants in the group.  So that's what we're seeing

11  in the group.

12          But there's been maybe some confusion or at least

13  some confusion on my part as I listened to the evidence on

14  this issue and how it relates to the issues in the case that

15  Your Honor needs to decide.  So let me see if I can clear up

16  what the experts had to say here.  First, the experts agreed

17  that the evidence in the case shows that Asian ALDCs are

18  awarded lower personal scores than white ALDCs; the bias and

19  stereotyping runs pool-wide.  Second, the experts agree,

20  including Dr. Arcidiacono, that there is not a statistically

21  significant admissions outcome difference for Asian ALDCs.

22  In other words, even though there's a penalty on the personal

23  score for Asians in this group, the models don't show that

24  the applicants from this group are facing a statistically

25  significant outcome penalty.  In other words, they're getting

1    admitted to Harvard.  And the way discrimination works in
2    this case is if you're not admitted to Harvard on the basis
3    of your race, which is why we're not claiming that there's
4    discrimination in that pool for this very small amount of
5    Asian-American applicants because we can't see a
6    statistically significant outcome penalty notwithstanding the
7    difference that we see in the personal score.
8              And let me try to put a little meat on the bone for
9    why that might be true.  We'll return to Dr. Card's "on the
10   bubble" demonstrative that's on slide 17 in your binder.  And
11   what he explained is that when you're up on the right-hand
12   side, up on the top of the bubble, that's when you've got a
13   really good chance of getting in, and that's when some of
14   these preferences can really help you.
15             And we've heard evidence about how very qualified a
16   lot of these ALDC applicants are, they're very strong.  And
17   what we see is they're going to be at the high end of that
18   bubble, many of them.  And we see on Dr. Card's next slide,
19   which is on page 18 of your binder, there's a very
20   significant bump-up for lineage for ALDCs, particularly at
21   the top of the bubble.  That's what we're seeing in the
22   eight, nine and ten columns in his bar graph.  And I think it
23   turns out that the boost of all the applicants in the ALDC
24   group, including the Asian-Americans, is overwhelming of
25   relatively smaller personal score penalty that we're seeing

1    for Asian-Americans in that group.  And there may be other

2    things going on as well.  As you can see from the

3    demographics slide, there's not that many Asian-Americans in

4    the ALDC group.  There may be other things about them.  But

5    for whatever reason, we're not seeing a statistically

6    significant outcome penalty in terms of admissions to

7    Harvard, which is why we're not claiming a discrimination for

8    that part of the applicant pool.

9            Now, turning to the modeling question, which is a

10   different question, whether it's appropriate to remove ALDCs

11   from the group and analyze the rest of the pool.  And the

12   reason we say that it is is that these applicants are

13   categorically different than the rest of the applicants to

14   Harvard.  They get in at about, on average, 45 percent admit

15   rate versus about a four and a half to five percent admit

16   rate to the rest of the pool.  Many of them have ties to the

17   college.  Many of them get a staff interview.  They're just

18   engaged.  They're a different group than everyone else.  And

19   what that means is by including them in the group in terms of

20   the modeling effect, Dr. Arcidiacono explained this, it

21   dilutes the power of Harvard's ratings because Harvard's

22   ratings turn out not to matter as much for this group that's

23   getting in at a wildly higher rate than the rest of the pool,

24   and removing them helps us to give an apples-to-apples

25   comparison for the vast majority of Asian applicants are not

1    in that part of the pool, and we want to compare them to

2    similarly situated applicants, not to the ALDCs, which are

3    kind of categorically different.

4         And the last thing I'll have to say on the modeling

5    choice is that Harvard's suggestion that this is somehow a

6    methodologically flawed approach is a bit in tension with how

7    it's treated the OCR report from 1990.  It's held that up as

8    exonerating them and is good evidence for them.  And what

9    happened there is that Harvard told OCR to look at and

10   analyze the question of Asian-American discrimination by

11   removing ALDCs from the group.  And this happened a long time

12   ago in the trial, but I want to remind Your Honor, looking at

13   slide 19, that what OCR did with its logistic regression

14   model is it ran one on the whole group and then another one

15   by removing ALDCs from the pool that it ran its logistic

16   regression model and conclusions from that, and Harvard has

17   touted those conclusions and even basically encouraged OCR to

18   take this approach, so the suggestion that there's some fatal

19   methodological flaw for doing that doesn't really hold up.

20   And as I've explained, at the end of the day, it turns out to

21   be not all that important for the modeling in this case.

22        So now I want to turn to our additional evidence of

23   intentional discrimination beyond the statistical evidence.

24   And here I want to start with the evidence from the Office of

25   Institutional Research.  I want to begin by putting that

**JA3433**

1    evidence in context.  The evidence is important for two

2    reasons, Your Honor.  First and foremost, Harvard's lack of

3    response to evidence of potential discrimination against

4    Asian-American applicants is evidence of intentional

5    discrimination.

6          And we're not going to focus on the law much, at

7    least I'm not today, but I've got a case up on the screen,

8    Columbus Board of Education, that gets at that basic point.

9    "Actions having foreseeable and anticipated disparate impact

10   are relevant evidence to prove the ultimate fact, forbidden

11   purpose."  And the point is here that the OIR evidence is

12   evidence of intent, even if you concluded that it does not

13   definitively establish an Asian penalty in fact, even if it

14   doesn't ultimately answer the statistical evidence, because

15   it's evidence of a potential problem that Harvard knew about

16   in its admission systems.  And as we'll walk through in a

17   minute, the response of Dean Fitzsimmons and Harvard to that,

18   forging ahead, is evidence of intentional discrimination.

19         And the second reason it's relevant, we do think it

20   puts a thumb on the scale for the ultimate fact question on

21   whether there is an Asian penalty because they found one, as

22   we'll talk about in a moment, and that was done before any

23   lawsuits were filed or anybody with a point of view hired an

24   expert.  So it's something that was done before litigation

25   that happens to line up on our side with Dr. Arcidiacono,

1    done by a group that everybody, including President Faust,

2    admitted yesterday did solid, reliable work that's relied on

3    all the time by people at Harvard.

4            So now let's turn to the evidence about OIR.  We've

5    fought long and hard to get P9 into evidence, Your Honor.

6    Harvard says Dean Fitzsimmons didn't see it and that it was

7    an early draft.  We don't think that's particularly credible.

8    We think he did see it and that it does show an Asian

9    penalty, including in the personal score.  But we don't need

10    P9 to prove our case, so I'm not going to focus on it today.

11            I'm going to start with P12 in terms of what we're

12    going to focus on, and there's no dispute -- and now I'm on

13    slide 22, Your Honor -- that Dean Fitzsimmons saw this at the

14    February 25, 2013 meeting with the people from OIR, Erin

15    Driver-Linn, Erica Bever and Mark Hansen.  And I want to put

16    the timing of this meeting in context because, as Your Honor

17    knows, in late 2012 there was the Unz article and the David

18    Brooks article on Christmas Eve in the New York Times raising

19    the issue of whether or not Harvard is discriminating against

20    Asian-American applicants.  And that set off a firestorm

21    within Harvard, emails going to the provost, to the

22    president, to all the top deans, to Dean Fitzsimmons, to

23    people within OIR, emails flying back and forth all over the

24    holiday break and into the new year.

25            And we saw additional evidence that alumni and

1    donors were getting in touch with Dean Fitzsimmons, looking

2    for a response, asking what they were doing.  So the context

3    of the February 25 meeting has to be viewed in light of the

4    fact that there was significant focus amongst not only people

5    within Harvard administration but also from the alumni and

6    donor network focused on precisely this issue of whether or

7    not Harvard was discriminating against Asian-American

8    applicants to Harvard.

9             So I want to walk through P12.  But before we get

10   into what it says and go through it one last time together, I

11   want to show Your Honor how Harvard described this document

12   in its summary judgment papers and then what Dean Fitzsimmons

13   had to say about it when he came to testify here under oath

14   at trial.

15            In the summary judgment papers, Harvard said the

16   documents originated within OIR were not in response to a

17   request from the admissions office; that the analysis in

18   question was not directed to whether there is bias against

19   Asians in college admissions at Harvard; no person outside of

20   OIR asked OIR to conduct the analysis; the work done by OIR

21   employees was not intended to address whether Asian-American

22   applicants were experiencing discrimination, and did not

23   answer the question.

24            Then when I asked Dean Fitzsimmons about this

25   evidence at trial, he agreed that it was part of the work

Case: 19-2005   Document: 00117621846   Page: 513   Date Filed: 07/29/2020   Entry ID: 6356391
Case 1:14-cv-14176-ADB   Document 656   Filed 04/18/19   Page 34 of 155

34

1    that his office, the admissions office, was coordinating on

2    with Harvard's Office of Institutional Research at least in

3    part related to the concerns about, that came around the Unz

4    article and discrimination against Asian-Americans.  He said

5    that would certainly be part of it, and that OIR ran logistic

6    regressions model for the admissions office.  I'll leave you

7    to judge the credibility of the incongruity of these two

8    descriptions.  But we think it goes to the spin that Harvard

9    is trying to put on the OIR story, both back at the summary

10   judgment stage and here at trial.

11           So the question of whether or not this was a study

12   into whether Asians were being disadvantaged in Harvard's

13   admissions process is actually answered on the third page of

14   Plaintiff's Exhibit 12, which is slide 24 in your binder.

15   And one of the things that it analyzed in this document is

16   does the admissions process disadvantage Asians.  And the

17   interesting thing about this language is it was put into this

18   PowerPoint presentation by Mark Hansen, who came here to

19   testify.  And when I asked him questions on the stand here

20   about whether he was doing analysis about whether the process

21   disadvantaged Asians, he wouldn't give me answers that were

22   straight with his testimony.  I had to impeach him two times

23   with his deposition on language that came right out of the

24   document that he edited, which is just more evidence about

25   Harvard's credibility or lack thereof on this issue.

Case: 19-2005    Document: 00117623846    Page: 514    Date Filed: 07/29/2020    Entry ID: 6356391
Case 1:14-cv-14176-ADB   Document 656   Filed 04/18/19   Page 35 of 155

35

```
 1          So what did P12 actually show?  Well, turn to page
 2     34 of P12, and we've looked at this a lot.  And what it shows
 3     is that Asians are disadvantaged by the personal score and
 4     demographics.  That's because if you look at model 3, when
 5     extracurricular and personal score are put into the model,
 6     the Asian percentage of the class goes substantially down.
 7     And when this evidence was provided to Dean Fitzsimmons, he
 8     admitted on the stand that he knew that as a group
 9     Asian-American applicants were doing better on the
10     extracurricular scores, so what was doing the work here was
11     the personal score operating as an Asian penalty.  And we see
12     that the Asian percent of the class goes down once ethnicity
13     and race is included in model 4.
14          So Dean Fitzsimmons understood what was happening
15     here.  He understood that OIR did serious reliable work.  And
16     if there were any doubt about what the results of this study
17     raised in terms of the possibility of whether Harvard's
18     process was biased against Asian-Americans, that doubt is
19     entirely put to rest by page 38 of P12, which questions
20     raised about admissions, is there bias against Asian in
21     college admissions.  That's the question that OIR is raising
22     here.
23          And Harvard's response to this document is not in
24     my mind credible.  First Harvard says the study was
25     preliminary.  It does say that with bold and underlined on a
```

Case: 19-2005    Document: 00117621846    Page: 515    Date Filed: 07/29/2020    Entry ID: 6356391
Case 1:14-cv-14176-ADB   Document 656   Filed 04/18/19   Page 36 of 155

36

1  page that we've seen many times.  And evidently, to Harvard,

2  that's a word that captures all sorts of unstated criticisms

3  to the model, even though no one wrote any of those

4  criticisms down at the time or can even remember anyone

5  verbalizing them today.  And of course we saw yesterday that

6  the word "preliminary" appears on lots of OIR work, including

7  work that potentially went to the board.

8       And Dean Fitzsimmons' response was not one you

9  would expect of an institution concerned with whether there

10 was an Asian penalty, especially in light of all the

11 attention this issue was getting -- this issue was getting at

12 Harvard at the time.  The response to a preliminary warning

13 would be at least to tell Director McGrath who he'd worked

14 with 30 years to try to see if there was a problem, but he

15 didn't do that or tell anyone else.  The only response is the

16 study merely confirmed what he already knew, but that's not

17 much of an answer at all because the study showed

18 Asian-Americans were being penalized in the admissions

19 process and raised the possibility of bias right here on the

20 screen.

21      So the suggestion that this lined up with

22 expectations is at best evidence of willful blindness to a

23 serious discrimination problem or worst evidence that Harvard

24 knew about the problem all along.  But even if you give Dean

25 Fitzsimmons and Harvard full credit, 100 percent credit for

Case: 19-2005    Document: 00117631846    Page: 516    Date Filed: 07/29/2020    Entry ID: 6356391
Case 1:14-cv-14176-ADB    Document 656    Filed 04/18/19    Page 37 of 155

37

1    their explanation to P12 and what was going on February 25

2    when this was delivered to Dean Fitzsimmons, and even if you

3    forgive the description of this document at summary judgment,

4    there is no way Harvard can get past the rest of the OIR

5    evidence that shows an Asian penalty.

6         And I want to go to a timeline here that I've made

7    starting on page 28.  And what we've got here is that on

8    April 15 -- April 15, 2013, Dean Fitzsimmons is asking OIR to

9    analyze whether low-income applicants to Harvard are getting

10   a tip or a boost in admissions to Harvard, and that was kind

11   of similar to the Asian-American discrimination issue.  At

12   the same time there were articles in the press criticizing

13   elite institutions like Harvard for failing to do enough to

14   get low-income students admitted to their campuses.  So Dean

15   Fitzsimmons asked the same researchers at OIR that prepared

16   P12 to take a look and see whether low-income students were

17   getting a tip to Harvard.

18        And he got his answer on Plaintiff's Exhibit 21 on

19   April 22.  And he was supplied some slides, three slides in

20   that exhibit, Your Honor, including one that showed the

21   output of the logistic regression model.  And when I asked

22   him what this showed, and the testimony is here on the

23   screen, is that what these slides showed to him from the

24   logistic regression model, it's very similar to the model

25   that was in P12, is that it was in fact empirical proof of a

1   tip for low-income applicants.  No qualifications, no

2   hedging, empirical proof that there's a tip, which is just

3   the opposite of a penalty, and we'll get into that in a

4   minute.

5           And he was gratified.  He was happy to receive

6   these results because Harvard laudably does want to give a

7   tip to low-income students, and he wanted to share that

8   information more broadly, a fact that he shared with Erin

9   Driver-Linn.  But Dr. Driver-Linn, the director of OIR, had

10  some concerns about sharing that information more broadly, so

11  she got in touch with the top PR person, Christine Heenan, at

12  Harvard, one of the top PR people, on April 28.  And she said

13  that Dean Fitzsimmons is excited to share this information,

14  but there may be some concerns.  And she explains to

15  Christine Heenan that Fitz asked us to do some analysis of

16  thumb on the scale for low income.  It could be a positive

17  message but has implications for need-blind policy as well as

18  opening the door for Unz-like requests for information about

19  other thumbs on the scale.

20          So why was Ms. Driver-Linn concerned that the

21  information that Dean Fitzsimmons was providing on April

22  26 -- April 22, why was she concerned that would open up the

23  door to the Unz-like Asian-American discrimination requests?

24  We see that in the draft of the memo that was ultimately

25  provided to Harvard on May 1.  And I've got it here on the

1    screen, Your Honor, it's on slide 31 in your deck,

2    Plaintiff's Demonstrative 41.  And this is the draft that OIR

3    is writing.  And they say "On the flip side, we see a

4    negative effect for Asian applicants."  This is in the same

5    study about low income.  "These realities have also received

6    intense scrutiny from critics like Bowen or more recently Unz

7    as we have discussed at length.  To draw attention to the

8    positive benefit that low-income students receive may also

9    draw attention to the more controversial findings around

10   Asians or the expected results around legacies and athletes."

11   This is the draft memo by OIR addressed to Dean Fitzsimmons.

12        And when Dr. Driver-Linn came here to testify at

13   trial, she admitted the realities that were discussed at

14   length concerning the negative effect on Asian-American

15   applicants.  That discussion occurred at the February 25,

16   2013 meeting.  That's her testimony, and this is her

17   contemporaneous memorialization of what happened at the time,

18   which is considerably more credible than the explanations

19   we're getting now, is that no one saw the Asian penalty in

20   these documents.

21        Which brings us to the final memo that was

22   delivered to Dean Fitzsimmons on May 1, which is Plaintiff's

23   Exhibit 26.  And again it has -- this is the edits to that

24   narrative that we just looked at, but it still makes clear

25   that there are demographic groups that have negative effects,

40

```
 1    and the only demographic group in P26, as we'll see in a

 2    minute, that has a negative effect are Asian-Americans.

 3           So what happened when we discussed this evidence at

 4    trial?  I reminded Dean Fitzsimmons that he had agreed that

 5    the logistic regression model here provided empirical

 6    evidence of a low-income tip, and in asking him about Exhibit

 7    26, I said, "It provides more empirical evidence about how

 8    the Harvard admissions process works," and then he agreed

 9    with that.  And then we went to look at that additional

10    empirical evidence, and this is the table in P26 that appears

11    just above the narrative about negative effects on certain

12    demographic groups, and Dean Fitzsimmons was ready to admit

13    he understood that the estimate coefficient that we have here

14    for the low income of .98 was positive associated with

15    admission to Harvard, unqualified yes testimony.

16           And then when I asked him whether the coefficient

17    for Asian, which has a negative sign in front of it, was a

18    sign that there was a negative relationship between being

19    Asian and admission to Harvard, he suggested that he couldn't

20    interpret that because he wasn't an expert in statistics.  I

21    don't think it requires that much expertise to interpret

22    that.  But we learned the next day after I went back and

23    reviewed his deposition is that he was reasonably

24    well-informed with modern statistical techniques.  He had

25    previously taught a course in statistics, admittedly a long
```

1    time ago, and that he had been part of studies at Harvard

2    using logistic regression in the past.  He was very familiar

3    with the term "logistic regression."  And we read some

4    testimony in from Dr. Driver-Linn's deposition that's part of

5    the record in this case, and she volunteered in her

6    deposition that they felt comfortable showing preliminary

7    work to Dean Fitzsimmons because he loved to talk about

8    statistics and he presumably still does.

9         So the idea that that Asian penalty that's reported

10   right there in P26 wasn't understood by Dean Fitzsimmons is

11   not credible.  It's from the same regression model that they

12   admit provides evidence of a tip for low income.  The same

13   regression model shows a penalty, a negative association with

14   being Asian to admission to Harvard.  And if there is any

15   debate about what that negative coefficient means, it's fully

16   resolved in the two paragraphs below the table which say it

17   shows a negative effect on certain demographic groups.  The

18   only demographic group that is there are Asians that are

19   treated negatively.

20        And what Harvard says about this document is, well,

21   it wasn't meant to study whether there was a negative effect

22   of being Asian in the Harvard admissions process.  The

23   assignment was to go out and study whether or not there was a

24   tip for low income.  So we can I guess then just ignore the

25   evidence about an Asian-American penalty.  But that excuse

1    doesn't add up.

2            If you tell OIR to do an assignment, and it finds

3    like what you like on the one hand with a tip for low income

4    and what you don't want to focus on that you don't like on

5    the other hand, you don't just get to ignore racial

6    discrimination because the original assignment had to do with

7    something else.

8            So here we have OIR communicating about the Asian

9    penalty.  And what happened next?  What happens next is that

10   Dean Fitzsimmons asked for a follow-up to see whether or not

11   there was a tip for low-income Asian-American applicants.

12   And that gets into P28.  And I think, Your Honor, something

13   in my mind pretty incredible that happened here at trial is

14   that Mr. Lee, in opening and then again when he was examining

15   Dean Fitzsimmons, they both represented to this court that

16   P28 shows a boost, a benefit, a tip for low-income Asian

17   applicants to Harvard.  And there are some ways to read that

18   document which suggests that that could be true.

19           But what the document also definitively

20   unquestionably shows from the same regression analysis

21   performed by OIR is that for 82 percent of the Asian

22   applicants to Harvard who are not low income -- and I've got

23   the demographic data right from that exhibit -- for those 82

24   percent in the same document where they say low-income Asian

25   applicants get a tip, it shows that the 82 percent that apply

1    get hammered with a penalty.

2            And there's no way they can have it both ways.  So

3    they knew there was a penalty.  They did nothing about it,

4    and that is alone sufficient for us to carry our burden and

5    have proof of intentional discrimination, especially in the

6    face of the reaction where no one in the admissions office

7    was told, not Director McGrath, not anybody, no further steps

8    were taken to look into this and dig into it deeper.  After

9    this, it was just business as usual.

10           So the OIR evidence shows there's a real

11   possibility of bias in the system, a statistically

12   significant penalty for Asian-Americans.  Harvard ignores it.

13           Now I'd like to review the evidence of bias in

14   Harvard's admissions process.  And I want to start with just

15   a brief touch-and-go on the law.  Now I'm on slide 32, the

16   Thomas Weisman Kodak case, which is that we don't have to

17   prove racist cabal.  I don't think the evidence would support

18   that.  What we have here is the ultimate question of whether

19   the employee has been treated disparately because of race.

20           This is regardless of whether the employer

21   consciously intended to base the evaluations on race or

22   simply did so because of unthinking stereotypes or bias.  And

23   that's what we think the evidence lines up with in this case.

24   So what I want to focus on now is the evidence of bias, both

25   implicit evidence of bias and explicit evidence of bias.  And

```
1    I want to start with explicit evidence of intentional

2    discrimination against Asian-American applicants that happens

3    in the recruiting process at the very front end.  And this

4    brings us back to where we started the trial:  to sparse

5    country.  And what happens here is that Harvard spends out

6    invitations to people to apply to Harvard as part of its

7    important recruitment techniques.  And Harvard admits that

8    these recruiting efforts are part of how Harvard consciously

9    shapes its class.

10           And here what Harvard does is that it invites white

11   applicants to apply to Harvard in sparse country with scores

12   as low as 1310, but Asian men and Asian women from those same

13   states, from those same schools, have to have a 1370 if

14   you're a man, 1350 if you're a woman to get applied.  And

15   there is no reason to do this, other than race.  It's the

16   only difference, and that is intentional race discrimination

17   plain and simple.  No other explanation.

18           And the interesting thing, when I confronted Dean

19   Fitzsimmons with this testimony, I actually thought he might

20   say, Gee, I didn't know about this.  We should take a look at

21   it.  There's not that many people in sparse country, although

22   there are significant Asian communities in Phoenix and Las

23   Vegas and New Orleans and other places, but instead he gave

24   an innocence answer that I thought was very interesting.  He

25   explained, when I confronted him with this evidence, that
```

 1    there were some people in sparse country who have only lived
 2    in a sparse country state for a year or two.  Let's say that
 3    can happen.  Then on the other hand there are people who have
 4    lived there for their entire lives.  And this is precisely
 5    the kind of stereotyping and bias this case is about.
 6    Because the new arrivals in this answer are the Asian
 7    students, stereotyped as perpetually foreign, while the folks
 8    who have lived in sparse country forever are the white kids
 9    that Harvard is expressly preferring in this situation.
10              Now that brings us to the part of the process that
11    starts once applications are being reviewed.  Where do we see
12    the evidence of bias or stereotyping?  We come back to the
13    personal score.  We've talked about how it's important to the
14    statistical analysis, but it's also independently important
15    of evidence of discrimination within Harvard's admissions
16    process because it's at least in part based on subjective
17    determinations by the admissions office about personality.
18              And Mr. Mortara made a couple of demonstratives
19    with the witnesses on this subject during the testimony.
20    I've got the one that he made with Mr. Looby on the screen,
21    which I believe is slide 45 in your notebook, Your Honor.
22    And they went through that the personal rating gets at who
23    the person is, what the person brings to the community, which
24    I'll remind you connects right back to why Harvard uses race
25    in its admissions process, whether they work well with

1    others, meaningful relationships, likability, positive

2    personality, all subjective characteristics.  And then he

3    made a similar demonstrative with Director McGrath, same

4    kinds of things, likability, good person, integrity,

5    helpfulness, courage, kindness.

6          We've seen all of this, very subjective

7    determinations, that Your Honor knows by and large the

8    admissions officers in the Harvard admissions office are

9    awarding this personal score on a cold record, on paper,

10   without having met anybody.  And that's precisely where bias

11   can creep into a system where race is considered for every

12   applicant who provides it and throughout the process.  And we

13   actually heard testimony about this bias issue from several

14   of Harvard's witnesses.  We heard about it yesterday from

15   President Faust, and she agreed that research on implicit

16   bias shows that everybody has some implicit bias.  And she

17   even agreed that Harvard has a responsibility to ensure that

18   bias is not leaking into its admissions decisionmaking

19   process in any form.  She said Harvard should do its utmost

20   to address questions of bias.

21         And we also heard from Dr. Simmons, when she was

22   asked about some research that she and others had done on how

23   women were treated in higher education.  And we confronted

24   her with decades of cognitive psychology research reveals

25   that most of us carry prejudice of which we are unaware and

1    nonetheless plays a large role in our evaluation of people,

2    and that in every study that's been examined there's a

3    significant effect of bias based on the gender or race of the

4    person being evaluated.

5            So this is all true in our world.  And we know that

6    there are the stereotypes that we talked about at the

7    beginning.  And when you have a subjective process and we

8    know that bias is possible, bias around race, bias around

9    gender, the fact that Asian-American applicants face a

10   statistically significant penalty on the subjective personal

11   rating year after year is pretty strong evidence that bias

12   has crept into, leaked into the system.  And it's particular

13   true when you analyze that in the context of some of the

14   admissions officers that we asked about this issue.

15           We actually asked, Mr. Strawbridge asked Charlene

16   Kim when she came to testify.  She's been there eight or nine

17   years.  And he asked her, "You would have no explanation if

18   Asian-Americans were to receive year after year lower

19   personal scores than white applicants, for example, correct?"

20           "That's not what I see as a member of the

21   committee."

22           "That's not been your experience during your nine

23   years on the admissions committee, has it?"

24           "It has not."

25           And the reason that's important is we know there's

**JA3450**

1    a statistically significant difference in that score.  Her

2    expectation is that she wouldn't see that.  She's not

3    pointing to personal scores or teacher supports or some kind

4    of difference that she observes kind of categorically about a

5    group by the data.  She says we wouldn't expect to see that.

6    And that's evidence that bias has crept into the system, even

7    if it's implicit or unconscious bias.  That's what we see

8    here.  And we've got similar testimony from Director McGrath

9    along the same lines that it wouldn't be her experience,

10   again, evidence of bias.  So when the empirical disparity is

11   incongruous with the expectations of long-time admissions

12   officers, that's when you know you might have a problem.

13           So what is the bias that is creeping into the

14   process?  We actually heard some interesting testimony on

15   this from Dr. Chin, who is an Asian-American studies

16   professor who is an alumni interviewer who came here to

17   testify on Monday.  And she actually wrote an article that

18   you may remember in 1983 looking at this issue of how bias

19   could affect personal ratings in admissions to Harvard.

20           And, she in that article, and we talked about it

21   with her on the stand, helpfully categorized some of those

22   stereotypes or biases that have been deployed over the years

23   against Asian-Americans.  And one of them was this concept of

24   over-representation, the idea that Asian-Americans are only 5

25   or 6 percent of the population as a whole but have a

1    significantly greater percentage of the admitted class at

2    elite institutions like Harvard.  That's one of the things

3    that she identified as a stereotype.

4            And it was interesting to us that Dr. Arcidiacono

5    was questioned on this very issue for reasons that were

6    unclear to us.  But again, this is the kind of thing that Dr.

7    Chin identified.  And then the other types of bias that we've

8    seen in this case, one is the idea that there is a

9    career-focus bias.  And we've seen that in this idea that

10   Asian-Americans are stereotyped as being overly interested in

11   math or science or doctors.  That's a bias that can creep

12   into the system and one that's potentially crept into Dr.

13   Card's analysis in his intended-career variable where he says

14   that explains the discrimination against Asian-Americans, and

15   yet we see that variable shows that a lot of Asian-American

16   applicants to Harvard do want to be scientists or doctors.

17           And then we've got the next stereotype that's been

18   identified both by Dr. Chin in her article and in the OCR,

19   this idea of passive personalities, shy and so forth, yet

20   another stereotype that's been identified.  And finally we've

21   got this idea of the model minority, which again was

22   identified both by Dr. Chin and in the OCR report.  And to

23   round it out, we connected the dots with Dr. Chin and we

24   asked her, you know, "Vestiges of this history remain.  Today

25   Asian-Americans continue to face racial bias and are often

1    falsely stereotyped as timid, exotic perpetual foreigners or

2    model minorities."  And we asked her what this means is that

3    Asian-American still face some of the same kinds of

4    stereotyping that you wrote about in your 1993 article, and

5    she said, "Some of them, yes."

6          So that's the kind of bias that can leak into the

7    system here.  And that brings us back to the new reading

8    procedures, which is an important piece of the evidence for

9    Your Honor to consider.  Of course we know now, Your Honor,

10   that there were some problems with the testimony of Dean

11   Fitzsimmons and Director McGrath on the existence of written

12   guidance around the use of race in the admissions office when

13   they came to testify the first time.

14         Your Honor is familiar with that testimony.  And

15   whether you ascribe a sinister motive or not to what happened

16   here, the fact of the matter is that the new guidance is

17   powerful evidence for our case for a couple of reasons.

18         I'll talk about why.  As we discussed, Charlene

19   Kim, Director McGrath, we just looked at the testimony, they

20   did not expect to see a personal score disparity, but it's in

21   the data nonetheless.  It's statistically significant.  So

22   what we had happen here is Harvard took corrective action.

23   It changed its reading procedures to ban the consideration of

24   race in the personal score and more importantly to the

25   stereotyping issue that we've been talking about, exhorting

1    readers not to overvalue extraversion.

2          And I've got here now on slide 57 at your deck,

3    reading procedures for the class of 2023 that Mr. Mortara and

4    Director McGrath talked about yesterday.  And again, it says,

5    "It is important to keep in mind that characteristics not

6    always synonymous with extraversion are similarly valued.

7    Applicants who seem to be particularly reflective, insightful

8    and/or dedicated should receive higher personal ratings as

9    well."  A corrective step to combat some of the bias and

10   stereotypes that leaked into the Harvard admissions office.

11   We know they leaked in because of the statistically

12   significant disparity in the personal score.

13         And Director McGrath, to her credit, admitted that

14   this instruction is designed to make sure that your

15   admissions officers do not fall prey to implicit bias or

16   racial stereotyping about Asians in part.  She said it would

17   have that effect and then went on to say that it's not a new

18   idea, it's been memorialized in the past.

19         But what I think we can see from a fair reading of

20   the evidence is that this bias did creep in.  We have the

21   statistically significant disparity.  There's no other good

22   explanation other than stereotyping and bias.  And to

23   Harvard's credit, they actually finally did something about

24   it in 2023.  It's a step in the right direction, and this I

25   think is an admission as much.  And this was a necessary step

1    because we did see some concrete instances of Harvard

2    admissions officers deploying the kind of stereotyping that

3    we talked about.

4            And I won't belabor the anecdotal evidence because

5    we don't think it's particularly important in a statistical

6    case with a bunch of data.  But we've got P116 on the screen.

7    I think you'll remember a discussion of this from Dr.

8    Arcidiacono's testimony that the person got a personal score

9    of 3, notwithstanding being a professional figure skater,

10   amazing life story, a lot of hardship, overwhelming teacher

11   support and alumni interviewer report, Asian applicant to

12   Harvard, given a personal score of 3, labeled a standard

13   strong, no evidence that the application was ever considered

14   again.

15           And then again we saw some evidence in the record

16   that Asian-American applicants to Harvard were labeled as

17   quiet or shy.  It's not that there's something inherently

18   wrong about labeling somebody as quiet or shy, but that's a

19   stereotype that's deployed against Asian-Americans that

20   doesn't really apply to other groups.  That's why it's a

21   stereotype.  And it's evidence that bias has leaked into the

22   system.

23           So Harvard took a small step in the right direction

24   with the new reading procedures to address this, but it

25   didn't even go as far as some of its supporters have

**JA3455**

1    suggested in this case.  And we're back to the testimony of

2    Dr. Chin, the professor of Asian-American studies.  And she

3    says she exhorted Harvard to increase training on cultural

4    bias and to be educated on the stereotypes that work against

5    Asian-American applicants.  And the evidence that Harvard did

6    that in this case is minimal, no more, evidently, than

7    sending around an article on implicit bias years ago.

8        And the final piece of the puzzle in the new

9    reading procedures is something that came up many times

10   during the trial.  Before the new reading procedures, Harvard

11   had no written instructions on how or where to use race.  And

12   we go back here to a document that we visited many times.

13   I'm on slide 62 now.  This is Plaintiff's Exhibit 555, the

14   OCR report.  And we've got this sentence.  "There are no

15   formulas or specific criteria for measuring or assessing

16   ethnicity."  That's fine.  Next half of the sentence is

17   important.  "Nor are there instructions for determining how

18   much weight is given to ethnicity or where the weight is to

19   be applied in the admissions process."  This goes all the way

20   back to 1990.  And we saw in the same document admissions

21   officers were using race in different parts of the process,

22   assigning it different relative importance.  We saw that all

23   the way back in 1990, and that persisted all the way to

24   today.

25       And to the extent that Harvard -- well, didn't have

**JA3456**

Case: 19-2005    Document: 00117631846    Page: 533    Date Filed: 07/29/2020    Entry ID: 6356391
Case 1:14-cv-14176-ADB  Document 656  Filed 04/18/19  Page 54 of 155

54

 1    written instructions before September.  To the extent they

 2    had oral instructions, the evidence in this case is that they

 3    weren't that memorable, at least for the people who testified

 4    at their deposition when they were testifying honestly about

 5    how they do their job.  And we've got the admission here on

 6    the screen from Chris Looby that he didn't recall anyone ever

 7    teaching him how to use race.  We've got the testimony from

 8    Lucerita Ortiz where she doesn't recall the specific

 9    substance of any training.  And you can see the other

10    admissions that we've got here on the slide.

11          So to the extent that Harvard had oral training, it

12    wasn't memorable, and it certainly didn't provide the kind of

13    guidance that the new reading procedures had.  So Harvard had

14    a problem, and they tried to fix it with the new reading

15    procedures, which again, we think is evidence of a

16    recognition that there was bias and stereotypes and a problem

17    with the way Harvard used race in its admissions process.

18          Now, the last thing I want to do is address

19    Harvard's explanation for the new reading procedures, because

20    I think it just confirms our point.

21          What Harvard says happened here with the new

22    reading procedures is that a group of admissions officers got

23    together over this past summer in 2018 and made changes,

24    including to the directions of the personal score.  And the

25    people who did this work were led by Christine Mascolo, who

1    is the associate director of the admissions office, who has

2    been there for 17 years.  And she worked with others who have

3    been there for a while as well.

4            And they assembled reading procedures, and they

5    sent them out to everybody in the admissions office on

6    September 19, 2018, and they said, "Attached please find the

7    updated reading instructions for the year."  And they told

8    everybody to read the document thoroughly, and they thanked

9    everybody who had helped in the editing process, and they

10   didn't suggest there was any problem with the document they

11   circulated or that it was in any way incomplete.  And what

12   Harvard wants us to believe is that these experienced people

13   who had been there in some instances as long as 17 years,

14   they just went out to memorialize what everybody knew all

15   along about how Harvard used race in its admissions process

16   and in the personal score.

17           And what Harvard wrote, what these people wrote in

18   this draft was that in the directions on considering race in

19   the overall to score was to only consider it if an applicant

20   writes about it, makes an issue of it in its application,

21   just like they consider religion.  That's what the people who

22   were seeking to memorialize how to use race said in this

23   document.

24           Of course Harvard can't admit that that's true for

25   a number of reasons, and issued an updated guidance on

Case: 19-2005   Document: 00117631846   Page: 535   Date Filed: 07/29/2020   Entry ID: 6356391
Case 1:14-cv-14176-ADB   Document 656   Filed 04/18/19   Page 56 of 155

56

1    October 5 striking that language.  And Director McGrath

2    testified yesterday that the language that was included in

3    P720 and its attachment was dead-bang wrong.  But the reason

4    that's important for our case is because it shows that even

5    experienced people in the Harvard admissions office have no

6    idea how race had been used, how it's supposed to be used,

7    and when you have lack of controls in a system that's using

8    race, considering it with every applicant, and you have

9    evidence of statistical disparity for Asian-Americans in the

10   subjective personal score, those lack of controls are

11   evidence of yet further bias.

12         I'm going to wrap up now, Your Honor, and save some

13   time for Mr. Mortara to come back later.  Before I do, I'd

14   just like to thank you for all the effort and attention that

15   you've put into this case and everybody else here.  Thank you

16   very much.

17         THE COURT:  All right.  Finished right on time,

18   Mr. Hughes.  Why don't we take a 15-minute break and we'll

19   come back at 11:00.

20         (Recess taken, 10:45 a.m.)

21         MR. LEE:  Thank you, Your Honor.  May I proceed,

22   Your Honor?

23         THE COURT:  You may.

24                 **DEFENDANT CLOSING ARGUMENT**

25         MR. LEE:  On behalf of the faculty, students,

1    administration and staff and the many members of the Harvard

2    community, I begin by thanking the Court and all of the court

3    staff for the opportunity to address the very serious

4    accusations by SFFA.  We thank you for your close attention

5    to what has been at times very detailed evidence, and we

6    thank you for your patience.

7         SFFA began its opening statement by contending

8    that, and I'm quoting, the wolf of racial bias is at

9    Harvard's door.

10        On this, we agree.  The wolf of racial bias is at

11   Harvard's door and at the door of this courthouse.  That wolf

12   is not intentional discrimination by anybody in the Harvard

13   admissions office.  That wolf comes in the form of SFFA and

14   its experts.  It is those who would turn back the clock.  It

15   is those who would eviscerate the progress we have made by

16   pursuing not just sanctioned but lauded, race-conscious

17   admissions policies.  It is those who would reduce

18   dramatically the number of African-American students and

19   Hispanic students on our college and university campuses

20   today.

21        Now, to be sure, Your Honor, the vehicle SFFA has

22   manufactured to pursue its goal is a claim that Harvard

23   intentionally discriminates against Asian-American

24   applicants.  As we said at the outset of our opening, Harvard

25   does not discriminate against Asian-American applicants.

1    Harvard has not discriminated against Asian-American

2    applicants.

3            What the evidence has demonstrated is that Harvard

4    has worked over the years tirelessly to create a vibrant

5    educational environment that includes students from all walks

6    of life.  We do not admit simply GPAs and board scores.

7            We admit people.  We admit people from a variety of

8    backgrounds who bring to the campus a range of experiences,

9    talents, and perspectives.  This effort to create a community

10   that is diverse, including, to be sure, racially diverse, is

11   very much deliberate.  It is very much intentional and, as

12   Your Honor has heard, it is critical to Harvard's mission of

13   preparing students to contribute to our increasingly diverse

14   society.

15           Now, Your Honor has heard directly from the people

16   that SFFA has accused of discrimination.  And as I'll come to

17   later, the precise claim of discrimination has been a moving

18   target over a long period of time.

19           But you heard from President Faust, Dean

20   Fitzsimmons, Dean Khurana, Dean Smith, Director McGrath, and

21   current and former admissions officers Roger Banks, Erica

22   Bever, Chris Looby, Charlene Kim, Tia Ray, and Elizabeth

23   Yong.

24           These folks came to court.  They sat in that

25   witness chair.  They subjected themselves to the crucible of

1    cross-examination and explained just why SFFA's accusations

2    are not only wrong but unfounded and very unfair.

3            You heard those admissions officers explain how

4    they carefully and thoroughly evaluate each and every

5    applicant and how they take into account a multitude of

6    factors when making admissions decisions.  You heard that

7    race can make a highly competitive applicant's application

8    even more compelling, continuing that applicant into the

9    admitted pool, just as being from Sparse Country or being an

10   extraordinary musician or being an extraordinary intellect

11   could tip you into the applicant pool.

12           And, Your Honor, you heard from some of the

13   remarkable students and alumni who were admitted as a result

14   of this holistic and comprehensive process.  You heard how

15   diversity inside and outside the classroom at Harvard has had

16   a profound impact on their educational experience.

17           In contrast to all of this, what did you hear from

18   SFFA?  The next slide are the fact witnesses representing the

19   plaintiff.  It's blank.  Not a single member of SFFA took the

20   stand.

21           In fact, Your Honor, no one who testified, no one

22   who took the oath had ever met with or spoken with any one of

23   the SFFA members who claim to have been denied admission at

24   Harvard.  Not one of their application files was introduced

25   into evidence.  Dr. Arcidiacono had them all, and not a

1    single file was introduced into evidence for any of their

2    standing members.

3            If there was an application file after all of this

4    that showed discrimination, wouldn't we have seen it?  The

5    fact that none was introduced actually leads to the contrary

6    conclusion there is none.

7            So where does that leave SFFA?  It leaves it, Your

8    Honor, candidly, with an illogical, contradictory, meritless

9    discrimination claim.

10           The evidence has made clear just what you would

11    have to believe from SFFA to credit their claim of

12    discrimination.  You would have to conclude that Harvard

13    actively recruits Asian-American students only to

14    discriminate against them once they apply.  You would have to

15    conclude that the process that involves multiple readers of

16    applications, multiple subcommittee reviews, multiple full

17    committee reviews, and decisions made openly by a group of 40

18    people is somehow being manipulated to discriminate against

19    Asian-Americans.

20           You would have to conclude that Harvard's

21    admissions office is favoring Asian-Americans who happen to

22    be athletes, legacies, faculty children, staff children, on

23    the dean's list or the director's list.  But then for some

24    inexplicable reason, the same admissions officers are

25    discriminating against Asian-American applicants who are not

1    in these categories.

2         You would have to conclude that Harvard is not

3    discriminating against Asian-American women or

4    Asian-Americans in California but are discriminating against

5    other Asian-Americans.

6         And you would have to conclude that to carry out

7    this bizarre scheme of discriminating against some but not

8    all Asian-Americans, the admissions officers assigning the

9    academic and extracurricular ratings which are on the screen

10   now, ratings, Your Honor, that everyone agrees reflect

11   subjective judgment, are giving Asian-American applicants

12   better scores on those ratings than the objective or the mere

13   quantifiable data would justify.

14        To be clear, it is not that Asian-Americans are

15   being scored higher on these ratings just because they have

16   better board scores or better GPAs or because they have more

17   extracurricular activities.  The admissions officers who are

18   reading these files are scoring Asian-Americans higher in

19   these categories on the nonobservable, nonquantifiable

20   factors.

21        But to believe SFFA, that same admissions officer

22   then moves two boxes down on the same form, as we've shown on

23   the next slide.  And then for some reason -- and according to

24   SFFA, it is to discriminate against that applicant -- it

25   gives that person a lower personal rating.  That would be a

1     peculiar form of intentional discrimination.

2              And you would have to conclude, Your Honor, that

3     the admissions officer managed to implement this complicated

4     scheme, a scheme with inconsistencies and illogical

5     consequences without leaving behind a single indication, a

6     single email, a single memo, a single presentation that would

7     tell the 40 admissions officers just how to navigate these

8     contradictions and these illogical inconsistencies.

9              But the problems with the plaintiff's

10    discrimination claim don't end there.  There are a host of

11    other inconsistencies.

12             For instance, as the trial progressed we moved from

13    intentional discrimination and at the end we're coming to

14    something that seems to be focusing on implicit bias.  And

15    I'll come back to implicit bias because there's been

16    virtually no evidence of that.

17             But the fact that SFFA now resorts to implicit bias

18    demonstrates yet another inconsistency.  It's entirely

19    inconsistent with the proposition that Harvard is

20    discriminating against some Asian-Americans but favoring

21    others.  How do you implicitly discriminate for someone and

22    then implicitly discriminate against someone?  Another

23    logical inconsistency.

24             And then to focus on SFFA's primary focus on the

25    personal rating, the personal rating which they say is a

Case: 19-2005    Document: 00117631846    Page: 542    Date Filed: 07/29/2020    Entry ID: 6356391
Case 1:14-cv-14176-ADB    Document 656    Filed 04/18/19    Page 63 of 155

63

1    vehicle to carry out the intentional discrimination.  The

2    very same differences in the personal rating, on average --

3    now, we're just talking about averages here because there are

4    some Asian-Americans with spectacularly good personal

5    ratings.

6            But the very same difference they're focusing on on

7    average is the difference that the ALDC Asian-American

8    applicants also have.  Their personal ratings are also on

9    average lower, yet they concede there's no discrimination.

10   Again just another logical inconsistency.

11           Why would they sponsor such a claim?  It's a claim

12   predicated on data mining.  It's a claim omitting variables.

13   It is a claim just ripe with self-defeating inconsistencies.

14           But now the answer is clear, and I would suggest

15   much clearer than it was at the outset.

16           The answer is that the goal of SFFA is to eliminate

17   all consideration of race in admissions.  The founder of SFFA

18   pursued that goal in *Fisher* 1.  He was unsuccessful.  He

19   pursued that goal on behalf of white plaintiffs in *Fisher* 2.

20   He was unsuccessful.

21           So what did he do?  Mr. Kahlenberg told us.  He

22   advertised for Asian-American plaintiffs, but the goal

23   remained the same, and that became manifest during the

24   evidence.

25           Your Honor, the plaintiff's own slides, one that

**JA3466**

1    Mr. Hughes didn't show you, tell the entire story.  Here is

2    Plaintiff's Demonstrative 38, Slide 40.

3            You may recall that we cross-examined

4    Dr. Arcidiacono on this slide.  This tells the entire story.

5    If we were to accept SFFA's proposition that race be

6    eliminated from consideration, the number of

7    African-Americans would decrease by 150 a class or 600 over

8    four-year classes.  If we were to accept their analysis, the

9    number of Hispanics would decrease by 125 per class or about

10   500.  To accept their analysis, the number of

11   African-American and Hispanic students of color would be

12   reduced by 1,000 on Harvard's campus.

13           How does SFFA address this?  What it says is in

14   their analysis, and I'm now quoting from Dr. Arcidiacono, the

15   winners are the Asian-Americans and whites, and the losers

16   are the African-Americans and Hispanics.

17           Your Honor, he could not be more wrong.

18           If that is the circumstance, we all lose, every

19   single one of us loses.

20           Now, before we turn to each of SFFA's claims, let

21   me address why diversity, including racial diversity, is so

22   critical to the educational experience at Harvard and other

23   colleges and universities.

24           The plaintiff suggested in its opening that

25   diversity and its benefits is not on trial here.  But as that

1    chart I just showed you indicates it is.  If you accept their

2    proposition, it couldn't be more on trial.

3              In fact, Dr. Arcidiacono spent as much of his time

4    attacking the tips for African-American and Hispanic students

5    as he did trying to move the Asian-American penalty.

6              To the plaintiffs, Your Honor, these things are two

7    sides of the same coin.  As their expert said, a tip for

8    African-Americans and Hispanics is a penalty for

9    Asian-Americans.  That's his use of the word "penalty."

10             But he went one step further.  He said a tip, a tip

11   for whites, for African-Americans, and Hispanics is a white

12   penalty.  That's how they're using these terms.

13             Now, as an initial matter to suggest that one

14   student is being penalized because another student is

15   receiving a tip based on her or Hispanic racial background

16   assumes that the student who received the tip was not

17   qualified.

18             Nothing could be further from the truth.  As the

19   evidence established, every single student admitted to

20   Harvard is quite qualified.  And as the evidence showed, the

21   applicant's race may provide a boost only to those very

22   highly qualified competitive candidates in the pool.

23             That is like many other boosts like geography, like

24   socioeconomic status, like a music talent.  None of these

25   boosts is imposing a penalty on someone else.  And the racial

**JA3468**

Case: 19-2005    Document: 00117631846    Page: 545    Date Filed: 07/29/2020    Entry ID: 6356391
Case 1:14-cv-14176-ADB    Document 656    Filed 04/18/19    Page 66 of 155

66

1    boost benefits everyone on the Harvard campus.

2          Harvard, as you've heard, has long recognized that

3    the quality, and I'm now quoting from Dean Fitzsimmons'

4    testimony in *Bakke*.  Harvard has long recognized that the

5    quality of the educational experience of all the students at

6    Harvard College depends in part on the differences in

7    background and outlook that the students bring with them to

8    campus.

9          That was true in 1977 at the time of *Bakke* and is

10   true today.  That is why in 2016, Your Honor, Harvard's

11   faculty of arts and sciences unanimously endorsed the

12   conclusion of a committee chaired by Dean Khurana that

13   reaffirmed, and I quote, "The university's long-held view

14   that student body diversity, including racial diversity, is

15   essential to our pedagogical objectives and institutional

16   mission."

17         This commitment to diversity is shared at the

18   highest level of the university.  But more importantly, Your

19   Honor, it is lived by the Harvard students.  You heard

20   firsthand from those Harvard students who have experienced

21   firsthand both the benefits and some of the burdens of a

22   diverse student body.

23         Their testimony on Monday was powerful.  They were

24   people who volunteered to take the stand and be examined and

25   cross-examined.  They told us why the diversity of Harvard

Case: 19-2005    Document: 00117631846    Page: 546    Date Filed: 07/29/2020    Entry ID: 6356391
Case 1:14-cv-14176-ADB   Document 656   Filed 04/18/19   Page 67 of 155

67

1    was important to their decision to apply to and attend

2    Harvard and to their learning while on campus.

3              And most importantly, Your Honor, if we go to the

4    next slide, Slide 13, they shared how devastating it would be

5    if the reduction in the diversity, racial diversity, that

6    would result from plaintiff's so-called alternatives would

7    come to pass.

8              These students are living proof that Harvard has a

9    compelling interest in student body diversity.  These

10   students are living proof that taking a thousand

11   African-American, Hispanic students off the campus in the

12   guise of an illogical discrimination claim is not the right

13   result.

14             And as you know, Your Honor, Harvard does not stand

15   alone on this issue in American higher education

16   institutions.  You heard from President Ruth Simmons, whose

17   life's story and life's work embodies the meaning, the

18   importance, the benefits, and the triumph of racial

19   diversity.

20             As she put it, and I quote, "Diversity provides an

21   opportunity to deepen that learning, to give students

22   firsthand experience with difference.  Which allows students

23   to test themselves, to test their background, to test their

24   ideas, and to challenge assumptions."

25             So with that in mind, let me turn to SFFA's claims.

1    And I'll turn first to the intentional discrimination claim.

2           The law on what's required is clear.  And this was

3    not among Mr. Hughes' slides.  The burden is on SFFA to prove

4    first that Harvard discriminated on the basis of race, to

5    prove second that the discrimination was intentional, and to

6    prove third that the discrimination was a substantial and

7    motivating factor for Harvard's actions.

8           SFFA must prove racial animus, prove it as a

9    necessary component of the claim.  In other words, the

10   plaintiffs must show that a committee comprised of roughly 40

11   people at any given time is intentionally trying to

12   discriminate against some but not all Asian-Americans because

13   some of those folks are Asian-Americans.

14          Now, SFFA suggests in its opening because Harvard

15   considers one factor in its admissions process, once the --

16   and I'm quoting now -- statistically significant Asian

17   penalty has been shown, the burden is on Harvard to explain

18   these differences.

19          Quite honestly, Your Honor, that's not the law.

20   It's confusing the burden of production with the burden of

21   persuasion.  The law is perfectly clear that the ultimate

22   burden of persuasion remains with SFFA.

23          Now, on the intentional discrimination claim, there

24   are fundamentally two questions.  The first is -- and I'm

25   going to take them in the order that Mr. Hughes took them --

```
 1    has plaintiff proven discrimination.  Because if it's not,
 2    the rest becomes irrelevant.
 3              And the second is, has the plaintiff proven the
 4    discriminatory animus required by the law.
 5              The answer to both is no.
 6              Mr. Waxman will address the evidence that
 7    demonstrates the plaintiff has failed to prove
 8    discrimination, and then I'll return to address the second
 9    question in the remaining claims.
10              I'm going to hand the mic off now.
11              [Microphone technical issues.]
12              MR. WAXMAN:  I could see Joan's face.
13              MR. LEE:  I realize that folding my arms was a bad
14    idea.
15              THE COURT:  I'll even give you permission to take
16    your jacket off, if that would help you, if you could talk
17    without a jacket.
18              MR. WAXMAN:  I don't know if I can talk in a court
19    without a jacket.
20              [Microphone technical issues.]
21              MR. WAXMAN:  May I proceed?
22              THE COURT:  You may.
23              MS. HACKER:  As Your Honor is aware, the plaintiff
24    relies on statistics to prove its claim of discrimination.
25    Mr. McBride, in the passage here, even said that there's no
```

**JA3472**

1    question that the central issue in this case is being

2    determined on the basis of statistical analysis.  That's

3    plaintiff's claim because it has nothing else.

4            Of course it is not true that statistics can decide

5    the question of either discrimination or intentional

6    discrimination because, as Professor Card explained and

7    Dr. Arcidiacono did not disagree, the most that statistics

8    and statistical modeling can prove is a correlation.  It can

9    never prove causation in the real world.

10           But even the bloodless statistics don't support

11   SFFA's claim.

12           Now, the experts agree that any statistical

13   analysis can only go so far in modeling Harvard's admissions

14   process.  There are many, many factors that admissions

15   officers and the admissions committee consider in the process

16   that simply can't be reduced to numbers and thus can't be

17   accounted for in any statistical analysis.

18           But as you heard from Professor Card, he tried to

19   get as close as possible.  He included all domestic

20   applicants in his model, and he included all the relevant

21   data that he had.  And when he did that, he found that

22   Asian-American ethnicity had no statistically significant

23   effect in the Harvard admissions process.  It had no effect

24   in any of the six years he looked at or even when he averaged

25   the six years.

1      Professor Card also found that for applicants who

2  are female or applicants from California, there was actually

3  a positive effect associated with being Asian-American.  Now

4  again, these results aren't statistically significant, but

5  they would surely be a bizarre outcome for an admissions

6  office trying to discriminate against Asian-Americans.

7      Now, Dr. Arcidiacono reached a different

8  conclusion.  He testified that for some, but not all,

9  Asian-American applicants he found a penalty.  There is a

10  simple explanation for why two economists using the same type

11  of model and the same data reached different conclusions, and

12  it is this:  For one methodological issue after another,

13  Professor Card made the choice that allowed his model of the

14  admissions process to resemble the actual admissions process

15  as closely as possible.

16      Dr. Arcidiacono, on the other hand, made choices

17  that took him further and further away from Harvard's actual

18  process.  He made the choices that instead allowed him to

19  find the result the plaintiff was looking for.

20  Dr. Arcidiacono, a proclaimed proponent of the mismatch

21  theory, who believes, in his own words, in a "more efficient

22  sorting of minority students" manipulated the data to support

23  his desired result.

24      Now, let me start with the issue of which

25  applicants are included in the model.  Professor Card

**JA3474**

1    included all domestic applicants, which is the group that
2    both sides agree is relevant here.
3            Dr. Arcidiacono threw out of his model a group that
4    accounts for almost 30 percent of admitted students:  the
5    recruited athletes, the legacy applicants, the applicants who
6    are on the dean or director's list, and the children of
7    Harvard faculty and staff, the so-called ALDC applicants.
8            Now, there are two important questions to ask about
9    why Dr. Arcidiacono made that choice.  The first, why did he
10   claim to do it.  The answer you heard him give is that the
11   ALDC applicants received tips in the admissions process.  But
12   of course so many other groups receive tips, and yet he
13   didn't exclude any of those applicants from his model.
14           Dr. Arcidiacono also said that he excluded ALDC
15   applicants because they have high admission rates.  He told
16   Your Honor that he needed to exclude the ALDCs so he could
17   compare "apples to apples."
18           That is nonsense.  One might as well say that
19   people with low SAT scores can't be compared as apples to
20   apples with people with high SAT scores.
21           The whole point of a regression is to allow
22   apples-to-apples comparisons among people with different
23   characteristics by controlling for those characteristics.
24           Now, the second question is why did Dr. Arcidiacono
25   actually choose to exclude ALDC applicants.  And I think here

Case: 19-2005    Document: 00117631846    Page: 552    Date Filed: 07/29/2020    Entry ID: 6356391
Case 1:14-cv-14176-ADB   Document 656   Filed 04/18/19   Page 73 of 155

73

1    the answer is pretty clear.  He did it because doing so

2    produced the result he wanted.  He did it because among ALDC

3    applicants he agrees that Asian-American applicants are

4    admitted at a higher rate than white applicants.

5            That is why the first sentence of the plaintiff's

6    opening statement in this case is what you see on the screen.

7    The evidence in this trial will show that Harvard College

8    discriminates against Asian-American applicants, specifically

9    those applicants ineligible for Harvard's sizeable

10   professions for recruited athletes, the children of its

11   alumni, major donors, and its faculty.

12           As Your Honor recognized, Asian-Americans are not

13   only not being discriminated against in these categories,

14   they're actually being favored.

15           As Professor Card testified, for legacy applicants,

16   the largest component of the ALDC group by far, that

17   advantage is a statistically significant one.

18           That is a fact that Mr. Hughes tried deftly to

19   obscure in his statements this morning.  Were there any doubt

20   about Dr. Arcidiacono's motives for removing the ALDC

21   applicants from his file, that issue was put to rest when

22   Mr. Lee asked him about the early action applicants.

23           You may recall that Dr. Arcidiacono said that the

24   reason he removed ALDC applicants was their high admission

25   rates.

1          Now, early action applicants also have high

2     admission rates, between six and seven times higher than

3     regular applicants.  And in fact, Dr. Arcidiacono initially

4     excluded those applicants from his model for that very stated

5     reason.  But then he put those early action applicants back

6     into his model after he realized that Asian-Americans were

7     not being admitted at higher rates within that group.

8          He quite simply went looking across the data.  He

9     saw some groups where Asian-Americans did better than white

10    applicants.  He saw some groups where they did worse.

11         And rather than analyzing all of those groups

12    together, as Professor Card did, he decided to throw out the

13    groups where the Asian-American applicants did better.

14         That is unabashed data mining, and the result is

15    that because Dr. Arcidiacono excluded ALDCs from his

16    analysis, SFFA has no statistical evidence of discrimination

17    against Asian-Americans in the applicant pool as a whole.

18    Absolutely none.

19         The sole theory of discrimination that SFFA has

20    advanced is that Harvard discriminates against only those

21    Asian-Americans who are not athletes, not legacies, not on

22    the dean's or director's list, and not children of Harvard

23    faculty or staff.

24         As Your Honor's questions to Dr. Arcidiacono

25    recognized, that theory makes no sense.  If Harvard really

**JA3477**

Case: 19-2005   Document: 00117632846   Page: 554   Date Filed: 07/29/2020   Entry ID: 6356391
Case 1:14-cv-14176-ADB   Document 656   Filed 04/18/19   Page 76 of 155

75

1   bore discriminatory animus or even implicit bias towards

2   Asian-American applicants, a premise on which SFFA's theory

3   depends, why would it discriminate against only

4   Asian-Americans who are not ALDCs?  That is a fatal weakness

5   in SFFA's case.

6          And indeed, if as it now appears from Mr. Hughes'

7   statement this morning, the plaintiff is relying only on a

8   theory of implicit bias in admissions, its concession that

9   admissions officers do not discriminate against ALDC

10  applicants renders that theory incoherent.

11         Now, before I move on, I want to address something

12  else we've heard from the plaintiff, which is the suggestion

13  that ALDCs are not as strong as other applicants or that

14  academic or other success matters less for their admissions

15  chances.

16         That is simply not true.  ALDCs as a group are

17  rated higher, much higher on every dimension in the data.

18         Now let me turn briefly to the issue of pooling;

19  that is, the question of whether it's proper to run a single

20  model for all six years of data or to model each year

21  separately.

22         Professor Card, as Your Honor will recall, ran his

23  model separately for each admissions cycle because that's how

24  the process works.  The applicants in each year compete

25  against other applicants in that year.  They don't compete

1    against applicants in other years.  And running a model

2    year-by year, Dr. Card explained, also allows him to examine

3    the effect of early action because for some years Harvard did

4    have early action.  For others it did not.  And with respect

5    to changes in the coding of parental occupation categories,

6    it also allows his model to see exactly what the admissions

7    officers saw in each year as opposed to a pool model which

8    does not.

9           Now, the only reason that Dr. Arcidiacono gives for

10   his approach is he says it gave his model more statistical

11   power or made it more precise.

12          But as you heard Professor Card explain, that's

13   just not true.  Professor Card doesn't just use his

14   year-by-year models, he also averages the results from those

15   models across all six years.  And when he does that, his

16   estimates are actually more precise and his model actually

17   has more statistical power than Dr. Arcidiacono's.

18          Let me turn next to the issue of omitted variables,

19   and I'll ask by -- I'll start by asking Your Honor to think

20   back to the hypothetical that Professor Card described on the

21   whiteboard about the likelihood that somebody will retire in

22   the next year.

23          The point that example was trying to illustrate is

24   that if a regression does not include every variable that

25   would affect the outcome, then you can't infer from any

Case 1:14-cv-14176-ADB   Document 656   Filed 04/18/19   Page 77 of 155

77

1    regression estimate that the factor in question actually

2    caused the estimated change.  That is why it is so important

3    that Professor Card includes in his model so many of the

4    factors for which data exists.

5            By contrast, Dr. Arcidiacono did not.  He omitted

6    four factors:  intended career, parental occupation, whether

7    the applicant received a staff interview, and the personal

8    rating.  Those four factors have one thing in common.  They

9    turn out to make a big difference in the results.

10           Let me talk first about the parental occupation and

11   intended career.  Dr. Arcidiacono admits that parental

12   occupation and intended career are factors that are

13   considered by the admissions office.  They're on the summary

14   sheet.  And so here, too, by choosing to omit those variables

15   he was taking his model farther away from the actual process.

16           His supposed reason for excluding those factors was

17   the fact that some of the data vary from year to year.  But

18   other categories also vary from year to year, but

19   Dr. Arcidiacono did not exclude them.  He excluded those

20   other ones.

21           And as you heard Professor Card explain,

22   year-to-year variation is a commonplace feature of data like

23   this.  It is no reason to exclude these factors which the

24   evidence shows are important factors in the admissions

25   decision.

1              Now, Dr. Arcidiacono also excluded the fact of

2      whether an applicant had a staff interview.  His reason for

3      doing that was that ALDC applicants are more likely to

4      receive staff interviews than non-ALDC applicants.

5              But that's not a reason to exclude the factor any

6      more than it's a reason to exclude any other factor that is

7      correlated with ALDC status, because it is a reason to

8      include that factor so that the ALDC effect can be controlled

9      and because the fact of a staff interview does affect

10     admissions decisions.

11             The effect of pulling each of these variables out

12     of his model was that it allowed Dr. Arcidiacono to find an

13     increasingly negative effect of Asian-American ethnicity.

14             And now let me turn to the personal rating, which

15     it now appears is all of the plaintiff's case here.

16             Mr. Hughes has suggested that the differences

17     between average ratings of applicants by race indicates bias.

18     But as our demonstrative 10.10, which is on the screen,

19     shows, there are differences in all four ratings, and that

20     does not mean there is bias.

21             By removing the personal rating, Dr. Arcidiacono

22     was able to make the negative effect even greater.

23             Now, the personal rating has obviously been a focus

24     for both parties from the start, and the reason is that it is

25     important.  As you've heard from all of the admissions

1    officers, one of the things that they are trying to assess is

2    what type of classmate or roommate an applicant might make.

3    What qualities does she or he bring to the campus.

4         The admissions officers pour over essays,

5    recommendation letters, alumni interview reports, and other

6    materials in an effort to learn more about who the applicants

7    are.  The personal qualities expressed in those materials and

8    reflected in the personal rating and nowhere else are

9    critically important to deciding who will be admitted.  And

10   because the information reflected in the personal rating is

11   so important to the process, it makes a big difference to the

12   result of the model whether or not that rating is included.

13        Removing the personal rating means depriving the

14   model of a plethora of information about what admissions

15   officers actually consider.

16        But by removing the personal rating from his model,

17   Dr. Arcidiacono was able to find the Asian penalty he was

18   looking for.  There is no justification for removing it.

19        Both experts agree that if race is directly taken

20   into account in determining a variable, that variable should

21   be excluded in a model that is trying to assess the effect of

22   one's race.  That is why both experts excluded the

23   preliminary overall rating in constructing their models

24   because admissions officers have clearly stated that race

25   itself may be considered in that factor.

1          That is emphatically not true of the personal

2     rating.  Every single admissions officer testified that an

3     applicant's race itself is not considered when assigning the

4     personal rating.  That testimony was consistent and

5     undisputed.

6          The personal rating does not reflect the fact that

7     an applicant has self-identified as belonging to a particular

8     race.

9          The fact that admissions officers may consider

10    whether an applicant has overcome discrimination or other

11    things when assigning the personal rating is not considering

12    the applicant's race when assigning that rating.  It's

13    considering qualities such as the applicant's determination,

14    perseverance, grit, and many other personal qualities that

15    are revealed in that instance.

16         Now, Dr. Arcidiacono says he removed the personal

17    rating because he inferred that the rating itself reflected

18    bias against Asian-Americans.  To be clear, what he found was

19    that Asian-American ethnicity was associated with slightly

20    lower personal ratings on average.  He found on average a

21    negative correlation.

22         That is decidedly not the same thing as finding

23    that the correlation he observed could properly be attributed

24    to bias, as OCR's own report which noticed the same negative

25    correlation and nonetheless concluded that there was no

1    evidence of bias in the admissions process against

2    Asian-Americans.

3        Importantly, Dr. Arcidiacono also found that

4    Asian-American ethnicity was associated with better academic

5    and extracurricular ratings, controlling for the factors in

6    his model.  That means that his rating models show that

7    Asian-Americans are getting higher academic ratings, higher

8    extracurricular ratings than equally situated white

9    applicants, but slightly lower personal ratings.

10        The question is whether the correlations

11   Dr. Arcidiacono found in these ratings are attributable to

12   racial bias or just reflect factors that aren't controlled

13   for in the model.

14        So let's think for a moment about what it would

15   mean if the correlations really did reflect the consideration

16   of race.

17        As Mr. Lee showed you earlier and Dr. Arcidiacono

18   agreed, this means that admissions officers are giving

19   Asian-American applicants better ratings in the first two

20   boxes than can be explained by any data in the model.

21   Remember, it's the same admissions officer filling out all

22   four boxes.

23        Dr. Arcidiacono would have you believe that the

24   same admissions officer is deliberately -- or exercising some

25   stereotypical bias, deliberately giving Asian-American

1    applicants a better academic rating, a better extracurricular

2    rating only to move two boxes over and give them a worse

3    personal rating than the data can explain.

4            16 leading economists, including two Nobel Prize

5    winners and Janet Yellen, the former chair of the federal

6    reserve, agreed that that conclusion is nonsense.  They

7    explained in a brief to this Court, and I'm quoting,

8    "Dr. Arcidiacono's finding are implausible because they would

9    indicate that Harvard discriminates against Asian-American

10   applicants on one subscore only to turn around and

11   discriminate in their favor on two others.

12           "The better and more plausible explanation of these

13   findings," they conclude, "is that Dr. Arcidiacono's

14   regression models are simply not reliable enough to measure

15   most of the applicant qualities that drive Harvard's

16   assignment of these ratings."

17           And that indeed is the very interpretation that

18   Dr. Arcidiacono himself gave for the positive correlations he

19   found in his models of the academic and extracurricular

20   ratings.  He didn't attribute the better academic and

21   extracurricular ratings that admissions officers give to

22   Asian-American applicants as an Asian preference.  He said

23   simply that those better scores reflect factors that aren't

24   captured in the data.

25           And the reason he said that is because that

1    Asian-American applicants are stronger than white applicants

2    on measures of academic and extracurricular excellence in the

3    data like SAT scores.  As he explained, economists generally

4    operate under the assumption that observable characteristics

5    operate in a similar manner to unobservable characteristics.

6            So because he found that Asian-American applicants

7    were stronger on measures of academic and extracurricular

8    strength in the data, he assumed they must also be strong on

9    measures of strength in those areas outside the data which

10   would account for the positive correlations he found.

11           He was right about that.  Professor Card doesn't

12   disagree.  And Dr. Arcidiacono should have interpreted the

13   personal rating regression in the same way.

14           But instead, Dr. Arcidiacono interpreted the

15   negative effect of Asian-American ethnicity that he found in

16   his personal rating regression to be the result of bias.

17           Now, what reasons did he give for those

18   inconsistent interpretations?  He said that for the personal

19   rating, like the academic and extracurricular ratings,

20   Asian-American applicants are stronger on the factors in the

21   data that affect the rating.  So they're presumably also

22   stronger on the many factors admissions considers that are

23   outside the data.

24           That is just not true.  Asian-American applicants,

25   as Dr. Card painstakingly demonstrated, are not stronger on

1    the non-academic factors in the data that affect the personal

2    rating.  Professor Card showed you slide after slide

3    explaining how the data disproved Dr. Arcidiacono on this

4    point.  He showed you that Asian-American applicants have

5    weaker school support ratings, the teacher and guidance

6    counselor ratings, than white applicants of equal academic

7    strengths.

8             Those teacher and guidance counselor ratings inform

9    the personal rating.  The same holds true if you add alumni

10   ratings to the school support ratings.  Asian-American

11   applicants do slightly less well than white applicants.  And

12   he showed you that if you look across all of the observable

13   non-academic factors in the model, Asian-American applicants

14   are less strong than white applicants of equal academic

15   strength.

16            Now let me reiterate.  Dr. Arcidiacono's

17   explanation for why he concluded the personal rating was

18   bias, why he threw it entirely out of his model, was his

19   conclusion that Asian-American applicants are stronger on the

20   factors in the data that inform the personal rating.

21            And he therefore inferred that only bias, not

22   factors outside the data, could explain the negative

23   association between Asian-American ethnicity and the personal

24   rating.

25            But Asian-American applicants are not stronger on

1    the factors in the data that inform the personal rating.

2    Applying the same generally accepted economic principle that

3    he applied to the academic and extracurricular ratings, the

4    conclusion that Dr. Arcidiacono should have drawn, the one

5    that Professor Card properly drew, is that the explanation

6    for why Asian-Americans do less well on the personal rating

7    is not bias.  It is the many, many factors considered by

8    admissions that the model cannot control for.

9         But finally, as Dr. Card explained, let's just

10   suppose he is wrong about this and suppose that the

11   correlations that Dr. Arcidiacono found for the three ratings

12   actually are attributable to race, racial bias, or racial

13   stereotyping and not simply factors outside the data.  Would

14   the ratings have to be thrown out of the model?  The answer

15   is no.

16        You repeatedly heard Mr. Hughes tell you this

17   morning that the answer is yes.  That is just not correct.

18        As Professor Card explained, throwing out the

19   ratings would discard a great deal of helpful information

20   about the applicant that both experts agree is important to

21   the process.  Is the applicant a leader?  Does she offer

22   assistance to her peers?  Does he have a determined spirit?

23        Rather than throwing out that information, the

24   right approach is to simply remove the effect of race found

25   in Dr. Arcidiacono's models from the ratings, keeping the

1    remainder of the ratings intact.

2         When Professor Card did that and used the adjusted

3    ratings in his admissions model, the results were entirely

4    consistent with those of his main model.  He still found no

5    evidence of bias.

6         Now, let me emphasize two -- before I turn the

7    podium over to Mr. Lee, emphasize two additional points

8    regarding the personal rating.

9         Number one, Mr. Hughes and Dr. Arcidiacono hinged

10   their claim of personal rating bias on the charts that showed

11   that Mr. -- that Mr. Hughes showed again this morning,

12   comparing the personal ratings to the academic index.

13        But as Dr. Card explained conclusively, the

14   personal rating has almost no correlation at all to the

15   academic index or to academics at all.  And that is revealed

16   on, I believe, our demonstrative 65.

17        One additional point -- yes, here it is.  The

18   correlation that his misleading charts purported to show

19   between the academic index decile and the personal rating, in

20   fact, when revealed on the proper same scale shows almost no

21   correlation whatsoever between the personal rating and the

22   academic index or academics more generally.

23        Now, one additional point that Dr. Card raised

24   regarding the personal rating, and that is the fact that for

25   both the ALDC and the non-ALDC applicants, Asian-American

applicants have lower personal ratings than white applicants. Mr. Lee touched on this, and let me just expand a little bit.

The difference in the gap on personal ratings between Asian-American applicants and white applicants is -- not only exists in the ALDC group, it is greater for the ALDC group. In other words, the Asian-American ALDCs are farther behind the white ALDCs in terms of the personal rating than is true for the non-ALDC applicants.

That again drains any coherence from SFFA's claim that the personal rating is the vehicle being used to discriminate against Asian-American applicants. It's simply inconceivable to think that the personal rating is being used as an engine for discrimination. When Asian-Americans who are ALDCs, a group that SFFA concedes Harvard does not discriminate against -- that was Mr. Mortara's very first sentence in this trial -- they are also getting even lower personal ratings than their white counterparts.

Now, I acknowledge, and I'm sure both parties regret the fact that a lot of data has been thrown at Her Honor in this case. But all you really need to take away is that one expert was trying to model the process and the other was not.

Professor Card is the expert who tried to model the process. The result was a durable finding that there was no evidence of discrimination.

1          Dr. Arcidiacono, on the other hand, made choice
2     after choice after choice after choice designed to move
3     further away from the actual admissions process in order to
4     find evidence of discrimination.  His findings would not be
5     sufficient to support a finding of intentional discrimination
6     or discrimination even if they were reliable.
7          But they are not reliable.  They are manipulated.
8     Dr. Arcidiacono selectively, purposefully eliminated
9     legitimate factors in the admissions process in order to
10    suggest an illegitimate outcome.
11         MR. LEE:  I promise not to fold my arms.
12         Your Honor, now that Mr. Waxman has explained that
13    the evidence is not sufficient for SFFA to carry its burden
14    to show that Harvard is discriminating, let me turn to the
15    question of discriminatory intent.
16         Now, to state the obvious, if there was
17    discriminatory animus, why would it be directed only to
18    certain categories of Asian-American applicants?  Why would
19    athletes, legacies, dean's list, director's list, faculty
20    children, children of staff, Asian-American women,
21    Asian-Americans from California, why would they not be
22    discriminated against but others are?
23         Probably more importantly, where is the evidence
24    that shows that this bizarre scheme was implemented in any
25    intentional or even unintentional way.  We would suggest that

**JA3491**

1    having seen the witnesses you've seen, you've seen the

2    opposite of intentional discrimination.

3            The officer, the admissions officers took the

4    stand.  They have testified unequivocally that they have

5    never witnessed any discrimination or bias in the admissions

6    process.  These admissions officers, everyone from Ms. Bever

7    who's been in the office for four years to, say, Mr. Banks

8    who's been there for closer to 40, described an open,

9    collaborative, iterative process designed to ensure that each

10   applicant gets a full and fair review.

11           Every one of the 40,000 applicants can be put back

12   into play at any point in the process.  Any admissions

13   officer can at any point in the process request that any

14   application be discussed.  And when they are, they're

15   discussed in subcommittee and committee openly with all of

16   the information, quantitative and qualitative, available to

17   everyone.

18           In fact, you heard Ms. Bever describe just what

19   happened with Ms. Sally Chen's application.  In the interests

20   of time I'm not going to go through the details, but it was a

21   wonderful example of the consideration of an application by a

22   group of people who ultimately came to the correct decision

23   and admitted Ms. Chen.  But it was only the result of an

24   iterative and open process.

25           This is not a process where discrimination and

1    racial animus could go unnoticed.  It is a process replete

2    with checks and balances.  It is a process that relies upon

3    transparency and open discussion.  It is a process that

4    relies upon 40 votes of individuals, many of whom Your Honor

5    saw and got to see testify.

6         Now, as part of this process, the admissions office

7    considers all the information available.  If the applicant

8    chooses to provide information about his or her race, that

9    fact is considered alongside all the other pieces of

10   information in the file.  Race is considered as one of many

11   factors.

12        For some competitive applicants, the tip of race

13   may make a difference.  The admissions officers were

14   consistent.  But race is never used to deny admission to

15   anyone.  Race is never a negative factor.  The admissions

16   officers don't think in Dr. Arcidiacono's terms of winners

17   and losers.

18        This very process was praised in *Bakke* by the

19   Supreme Court as an illuminating example.  Now, I understand

20   that SFFA thinks that this is somehow humorous or a joke, but

21   it's not.  It's law of the land.  They might want it to be

22   different, but it is our law.  This process is the same

23   process that was examined by the Department of Education's

24   Office For Civil Rights in 1990.

25        Now, SFFA has yanked from context a sentence here,

1    a sentence there, and tried to tie it to deposition testimony

2    and suggest something other than what the document says.

3            Your Honor has it.

4            What the document is, is this:  OCR reviewed 400

5    application files, they reviewed 2,000 application summary

6    sheets, they interviewed 10 admissions officers, and they had

7    data on 110,000 applicants and even did their own regression

8    analysis.

9            After all that, at the end of the document which

10    had the statements that Mr. Hughes relied upon, what did it

11    find?  Harvard did not discriminate against Asian-Americans.

12            Now, to be clear, OCR's analysis found, just as the

13    experts have found in this case, that there was on average a

14    slight difference in the personal ratings for Asian-American

15    and white applicants.  On average, Asian-Americans received a

16    slightly lower personal ratings, the difference between 25

17    and 20 percent.

18            But then, Your Honor, OCR did what SFFA didn't

19    bother to do.  OCR didn't just notice a negative coefficient

20    of Asian-American ethnicity and then say we assume bias.  It

21    conducted an audit of hundreds of admissions files, hundreds

22    of summary sheets, looking for actual evidence of bias.  It

23    found none.

24            They compared the ratings assigned to the

25    application materials they reviewed, and here's their

1    finding:  "Our comparison of the personal qualities ratings

2    to the supporting material in the applicant files revealed no

3    apparent inconsistencies between the ratings and the

4    underlying documentation."

5            That is the way to investigate a claim of bias, not

6    to simply jump to the conclusion that bias is the answer.

7            When OCR did the real work, it concluded, just as

8    Dr. Card did, that there is no evidence that this discrepancy

9    was the result of any discrimination.

10           To reiterate, Your Honor, they had the files that

11   Your Honor ordered produced.  They had the files for their

12   standing members.  If they wanted to do this audit to support

13   their claim, they could have done it.

14           Dr. Arcidiacono could have put those files into

15   evidence.  They did not.  And there's only one inference that

16   can be drawn from that is that those files would not support

17   the convoluted claim they're offering you today.

18           Now, Harvard's current admissions process is, in

19   general, the same process that's described as we said

20   repeatedly.  It's the same process that was examined again in

21   2001 when there was another complaint.  It's the same process

22   that was mentioned favorably in *Grutter*.  And it is largely

23   the same process today.

24           Now, confronted with this unbroken line endorsement

25   of Harvard's process over 50 years, where does that leave

Case: 19-2005    Document: 00117631846    Page: 572    Date Filed: 07/29/2020    Entry ID: 6356391
Case 1:14-cv-14176-ADB   Document 656   Filed 04/18/19   Page 93 of 155

93

1    SFFA?  It's left with the suggestion that Harvard's process

2    is not formulaic enough.  It's not specific enough.  They're

3    not stringent written directives.

4          I would suggest that if they had stringent written

5    directives, they would be making the other claim, which is

6    they're too mechanical and not flexible enough.

7          For two weeks, the plaintiffs asked admissions

8    officer after admissions officer about the fact that there

9    were no specific guidelines to take into consideration as

10   part of Harvard's whole-person review.

11         For the discovery period, Your Honor, which

12   extended though August 2014 and the class of 2019, everybody

13   testified consistently and it's consistent with the record.

14   There was nothing addressed in this specific issue.  At the

15   very end, the reading procedures for the class of 2023 became

16   an issue.

17         It is true that after SFFA sued, the admissions

18   office did not go out of business.  It is true that they

19   continued to review applications.  It is true, as Your Honor

20   learned yesterday, that every year the reading procedures

21   were revised.

22         And it's true that on October 5 of this year a new

23   set of reading procedures were issued that said that race can

24   be considered in the preliminary overall rating as one factor

25   among many but that it cannot be considered in the personal

Case 1:14-cv-14176-ADB   Document 656   Filed 04/18/19   Page 94 of 155

```
 1    rating.

 2              It is nothing more than a codification of what Your

 3    Honor heard the admissions officers testify had been the

 4    practice before.

 5              Now, I just want to say one additional thing about

 6    the reading procedures.  For the first time today in this

 7    case, there was argument that somehow the reading procedures

 8    are relevant to liability.

 9              Your Honor allowed the recall of witnesses to the

10    extent it might demonstrate some indication of a witness'

11    credibility.

12              Rule 407 precludes the very argument they made

13    today.  They cannot make that argument.  It's an argument

14    that is precluded by the rules of evidence that govern this

15    case.

16              But the reading procedures at the end are only a

17    small part of the admissions officer's training.  You've

18    learned a lot about it.  You've learned that the new

19    admissions officers receive training at the outset, that

20    their first 50 to 100 files are reviewed by another reader.

21    You learned about the casebook and the casebook guidance.

22              And we walked you through an example in the

23    casebook, two examples, one of a student named Grace, who is

24    on Slide 54, and one who is a student named Peter, on

25    Slide 55.
```

```
 1            I'm not going to walk through them today because we
 2     did it during the course of the evidence.  But the suggestion
 3     that these casebook examples and the casebook guidance don't
 4     provide the instruction on how to employ the multifactor test
 5     is simply incorrect.
 6            In fact, for all of us as lawyers, we largely learn
 7     by case studies.  We learn from looking at specific case
 8     studies and drawing conclusions from them.  That is precisely
 9     what happens at the Harvard admissions office.  These are
10     real cases drawn from real applicants with their names
11     changed.  And then the casebook allows the admissions
12     officers to determine just how the multifactor test should be
13     applied.
14            The admissions officers also receive the
15     interviewer handbook which have the tips that they are to be
16     looking for.  And each year the entire office receives
17     training from the Harvard office of the general counsel
18     concerning the legal limitations on how race can properly be
19     considered in the admissions process.
20            And in addition, Your Honor, periodically the
21     office gives trainings like those discussed by Ms. Ray in her
22     testimony that provide information to admissions officers
23     giving the experience of students of color in the United
24     States so they have the benefit of their context of the
25     discussions.
```

**JA3498**

Case: 19-2005    Document: 00117631846    Page: 575    Date Filed: 07/29/2020    Entry ID: 6356391
Case 1:14-cv-14176-ADB    Document 656    Filed 04/18/19    Page 96 of 155

96

1          It is through all of these materials and all of

2     this training and all of this collaborative work that the 40

3     individuals would do the admissions process come together to

4     vote and admit each of the incoming Harvard classes.

5          Now, the one thing that SFFA points to as evidence

6     of discrimination are the search lists.

7          It's a really -- respectfully, and I respect

8     Mr. Hughes a great deal.  It's a disingenuous argument.

9          The exhibit that they gave you has a top and a

10    bottom.  The bottom has the ACT cutoff levels.

11         As Dean Fitzsimmons testified, for people in Sparse

12    Country, particularly in rural portions of Sparse Country,

13    the ACT is the more common test.  On the very same document

14    that they claim is discriminatory, the ACT cutoff is the same

15    at 30.

16         And in the document that Dean Fitzsimmons talked

17    about that followed, we saw another year where the cutoff

18    actually for Asian-Americans was lower than whites in Sparse

19    Country.  This is no evidence of discriminatory intent.

20         So let me now turn to a big focus of what SFFA has

21    focused on, and that's OIR.  Now, to be clear, Your Honor,

22    this has been a moving target.  And I think the fact that

23    it's been a moving target speaks volumes.

24         In opening statements, SFFA showed you these pages

25    from Exhibit 9.  They pointed you to these two slides in

1    opening.  These are the same pages that SFFA cross-examined

2    Mr. Hansen about.

3            And in opening, this is what SFFA said about these

4    pages.  "Harvard's own researchers told Dean Fitzsimmons

5    there was a statistically significant penalty on

6    Asian-Americans applying to Harvard," referring to these

7    specific pages.

8            We now know that's simply not true.  Dean

9    Fitzsimmons never saw these pages.  That is undisputed.

10           Mr. Hughes's conjecture about other evidence that

11   might have indicated that he did is simply that.  The

12   information on the very slides that was the core of their

13   opening never got to the dean.  Period.

14           Now, there are models that were, in fact, shown to

15   Dean Fitzsimmons, and Your Honor has seen them and we've

16   talked about them repeatedly.  The work that OIR did was work

17   regarding the demographics of Harvard's admitted class, and

18   it was to be sure, in part, prompted by the Unz article.

19           That article, as Your Honor now knows, was very

20   controversial.  It criticized people of all ethnic,

21   religious, and racial backgrounds equally.

22           As Dean Fitzsimmons explained, he heard from many

23   alumni who were particularly upset and concerned about the

24   deeply anti-Semitic comments in the article.  Many of the

25   privilege log entries are dealing not with just

Case: 19-2005    Document: 00117621846    Page: 577    Date Filed: 07/29/2020    Entry ID: 6356391
Case 1:14-cv-14176-ADB   Document 656   Filed 04/18/19   Page 98 of 135

98

1    Asian-American penalties on their face, but the Unz article,

2    and the Unz article had broader implications.

3            Now, OIR did do some work.  And what it found, as

4    Your Honor now knows, is that Model 1 demonstrated if

5    admissions decisions were based only on academic factors, the

6    admitted class would have a higher percentage of

7    Asian-American students than it does.  No one has ever

8    disagreed with that or disputed that.

9            Models 2 and 3 show that the more factors that are

10    added, the representation -- the more factors that are added

11    results in the representation of Asian-Americans decreasing.

12    No one has ever disputed that as well.

13            Now, Model 4 got a lot of attention, but I think at

14    the end of the day we realize that that model itself is a

15    little circular.  Its input is demographics, its output is

16    demographics, and that's the reason, as was explained to Your

17    Honor, that the results are so close to the actual class.

18            But as Dean Fitzsimmons said, when he saw this, it

19    was not inconsistent with what he understood before, which is

20    if it were just grade point averages and board scores, there

21    would be more Asian-Americans.  He's never disagreed with

22    that, and he said it on the stand.

23            But he also said that the more factors you add

24    in -- and this is only a handful of factors -- the closer you

25    get to the class that Harvard has.

       1            Against the backdrop of *Bakke*, the OCR
       2     investigation, the second OCR investigation, and everything
       3     else that had occurred, this didn't tell Dean Fitzsimmons
       4     something that he didn't know before.  And as he's testified
       5     and as even Mr. Kahlenberg, their expert, has acknowledged,
       6     Dean Fitzsimmons has a reputation for having been a pioneer
       7     in opening up the admissions office of educational
       8     institutions to people of different ethnicities and different
       9     socioeconomic backgrounds.
      10            The idea that he would take this and have an alarm
      11     bell go off and do nothing is simply implausible.
      12            In fact, what he did do is in late 2013 he asked
      13     OIR to do an analysis to confirm that the admissions office
      14     was giving a tip to low-income applicants.  He got that.
      15            But then he went another step.  After receiving
      16     that analysis, he specifically asked for follow-up regarding
      17     whether the tip for low-income applicants was being applied
      18     consistently across all racial and ethnic groups.  The answer
      19     was it was.
      20            In fact, the results showed that Asian-Americans
      21     were getting as large a tip for being low income as almost
      22     any group.  As Slide 64 demonstrates, the admit rates for
      23     low-income Asian-Americans was 10 percent as compared to
      24     7 percent for non-low-income Asian-Americans, a 3 percent
      25     increase.

Case: 19-2005    Document: 00117633846    Page: 579    Date Filed: 07/29/2020    Entry ID: 6356391
Case 1:14-cv-14176-ADB   Document 656   Filed 04/18/19   Page 100 of 155

100

1          Now, we can quarrel about who got the larger

2     increase and who didn't, but this is just another place that

3     demonstrates the illogic in SFFA's claims.  If Harvard were

4     trying to discriminate against Asian-Americans, why would it

5     give the largest percentage tip to low-income

6     Asian-Americans?

7          Now, SFFA has suggested Dean Fitzsimmons should

8     have done more, that he should have commissioned or requested

9     the full analysis that Dr. Card has now done.

10          There are three responses to this.  Dean

11     Fitzsimmons testified that he has been vigilant about

12     ensuring that his process is not infected by bias and

13     discrimination.

14          When he got this information, he knew that what he

15     needed to do was to continue what he had done before, and he

16     told you that he did.  No one suggested to him that these

17     results showed discrimination.  No one suggested that these

18     results proved discrimination.  No one involved in the

19     process sounded the alarm bell that SFFA seems to think

20     should have gone off.

21          The second thing is that to the extent SFFA wants a

22     more thorough analysis, it's been done now.  It was done by

23     Dr. Card.  And Dr. Card concluded that there is no evidence

24     of discrimination against Asian-Americans.

25          But the third is this:  This effort to cobble

Case: 19-2005    Document: 00117628846    Page: 580    Date Filed: 07/29/2020    Entry ID: 6356391
Case 1:14-cv-14176-ADB    Document 656    Filed 04/18/19    Page 101 of 155

101

1    together a line from a deposition here, a line from a

2    document here over a period of 10 or 15 years and suggests

3    that, ah-ha, this is evidence of intentional discrimination

4    just doesn't work.

5        This is Monday morning quarterbacking looking back

6    at a series of events that occurred before and saying I can

7    ignore the context, I can ignore what the dean knew.

8        I can pull out a sentence or two here and say he

9    should have done more.  Or he should have done more, even if

10    they're right, isn't intentional discrimination.

11        Let me briefly address two issues that the

12    plaintiff has raised late in the trial.  The first is

13    implicit bias.  Mr. Waxman and I both touched on this.  Let

14    me say three things:

15        First, there was no evidence to suggest that anyone

16    in Harvard's admissions office harbored any implicit bias

17    against Asian-Americans.  There are experts in implicit bias.

18    We didn't hear one.  The only person to basically bring

19    together the implicit bias case was Mr. Hughes.  But that's

20    insufficient to carry their burden of showing implicit bias.

21        Second, the claim makes no sense.  How do you

22    implicitly bias yourself against some Asian-Americans but

23    implicitly or explicitly bias yourself in favor of other

24    Asian-Americans?  If it sounds like it doesn't make sense,

25    it's because it doesn't.

```
 1              Now, third, the law that they've showed you
 2     actually is incorrect.
 3              Mr. Hughes put on the screen a citation from the
 4     Columbus Board of Education v Penick.  He argued that actions
 5     having a foreseeable despaired impact are relevant to proving
 6     an unconstitutional purpose.
 7              What you didn't hear, Your Honor, is on the very
 8     same page of that case, at 443 U.S. 464, the Supreme Court
 9     reemphasized that disparate impact in foreseeable
10     consequences without more do not establish a violation.
11              And the court, the Supreme Court, made the very
12     same in the same year in Massachusetts v Feeney.  There
13     aren't slides because we didn't quite know this was coming
14     up, but it's 442 U.S. 254 where the Supreme Court stressed
15     that intentional discrimination occurs only when the
16     decision-maker acts -- and I now quote -- "because of, not
17     merely in spite of, adverse effects on an identifiable
18     group."
19              In other words, it's not enough for SFFA to show
20     Harvard might have been aware of differential outcomes or
21     even that someone has suggested that they could be
22     differential outcomes.  SFFA needs to prove that Harvard
23     acted for the deliberate purpose of obtaining that result,
24     and they cannot do that.
25              The last point, Your Honor, on intentional
```

```
 1    discrimination is this:  I want to turn to the attack on the

 2    credibility that we've heard this morning of the Harvard

 3    leadership, of the Harvard admissions officers, and near as I

 4    can tell, Harvard's lawyers.

 5            There's an old saying among trial lawyers, which

 6    Her Honor as heard before, if the facts are on your side,

 7    argue the facts.  If the law is on your side, argue the law.

 8    If you have neither the facts or the law, attack, attack,

 9    attack.

10            And that's what we've had today and for three

11    weeks.  It's what the plaintiff has done at every turn.  It

12    is easy to attack when you yourself are never going to get on

13    the stand and be cross-examined.  It has attacked Harvard, it

14    has attacked Harvard's witnesses, and apparently now counsel.

15            But, Your Honor, again, if you trace the history,

16    the attacks speak volumes themselves.  In its summary

17    judgment filings, the plaintiff accused Dean Khurana of

18    killing the work done by OIR, and I quote, "burying the

19    reports."  But as Your Honor now knows, it turns out not to

20    be true.

21            At the pretrial conference, the plaintiff claimed

22    that President Faust's credibility was in doubt and could not

23    be trusted because of a statement she made about Jewish

24    discrimination in the 1920s.  That too was a meritless attack

25    on the reputation of a dedicated academic leader.
```

 1              It alleged that Dean Smith led a sham committee, to

 2      quote them.  I think the evidence demonstrates that's false

 3      as well.

 4              And then yesterday it was the suggestion that

 5      Marlyn McGrath didn't bring out facts about the October 5

 6      email and reading procedures, reading procedures that are

 7      good for Harvard, that demonstrate in this case which

 8      requests only prospective relief that Harvard is acting just

 9      as it said it has acted.

10              And you've heard the plaintiff attack Dean

11      Fitzsimmons, whom SFFA has accused of intentionally

12      discriminating against Asian-Americans.

13              Now, before SFFA was formed, before *Fisher* 2 was

14      law, Mr. Kahlenberg actually had something to say about Dean

15      Fitzsimmons.  And what did he say?  He said, "This is a

16      leader in higher education who has," and I quote, "worked

17      doggedly to open the doors of higher education to individuals

18      from a broader range of racial and ethnic background."

19              This is the person they're now attacking.  As

20      President Faust said yesterday, no one in the 15 years that

21      she's been working with Dean Fitzsimmons has ever questioned

22      his honesty, has ever questioned his integrity, has ever

23      questioned his truthfulness.  No one until SFFA decided to

24      make its claims.

25              Your Honor saw the witnesses.  The credibility of a

Case: 19-2005   Document: 00117638846   Page: 584   Date Filed: 07/29/2020   Entry ID: 6356391
Case 1:14-cv-14176-ADB   Document 656   Filed 04/18/19   Page 105 of 155

105

1    witness is not determined by how many times I can impeach a

2    witness with a deposition.  Certainly two times doesn't make

3    a lack of credibility.  It depends upon their overall

4    testimony and the manner in which they communicated to you.

5             Your Honor saw it.  We trust Your Honor's

6    assessment of the credibility of these folks.  They were

7    honest.  They were straightforward.  They admitted when

8    things weren't good for us.  They were clear when things were

9    good for us.

10            The attack on the credibility is just an effort to

11   cobble together and support an illogical claim.

12            Now I am going to briefly address the other claims

13   that Mr. Hughes didn't.  Let me say this on racial balancing.

14   Slide 66 has the legal framework, and I'm not going to go

15   into it.

16            This claim in some ways is easier to resolve for

17   this reason.  If we just look at the experts on racial

18   balancing, Dr. Arcidiacono conceded that he had an opinion in

19   his report on racial balancing.  He conceded that he was not

20   giving that testimony in this case, and he didn't.

21            So as a consequence, the only expert to testify on

22   this issue of racial balancing was Professor Card, who showed

23   you what is now Slide 67, DD 10.100, which showed that there

24   had been significant variations year to year in the racial

25   composition of Harvard's admitted students.

Case: 19-2005  Document: 00117638846  Page: 585  Date Filed: 07/29/2020  Entry ID: 6356391
Case 1:14-cv-14176-ADB  Document 656  Filed 04/18/19  Page 106 of 155

106

1           As Professor Card put it, if Harvard is trying to

2   racially balance year to year, it's not doing a very good

3   job.  There are significant variations year to year.  And,

4   Your Honor, this is precisely what you would expect from the

5   process that I've described to you and that you've heard

6   about repeatedly.

7           When you look at the side by side -- when you look

8   side by side at the composition of the applicant pool on the

9   left-hand side of Slide 69 and the admitted class pool on the

10  right-hand side, the composition of the admitted class has

11  fluctuated more than the composition of the applicant pool.

12  That's exactly the opposite of what you would expect.

13          Now, I think the argument that should be made here

14  on rebuttal is about the one-pagers.  I'm just going to say

15  this:  During the course of the examination of Elizabeth

16  Yong, there was a demonstrative instruction that had a series

17  of one-pagers, and the suggestion seems to be that's too many

18  one-pagers.  That doesn't make a racial balancing claim.

19          The one-pagers, as Your Honor now knows, if we go

20  to Slide 70, contain more information than just race.  They

21  have information about gender and geography, intended major

22  and race.  The one-pagers are not used, if I move to

23  Slide 72, to set quotas or floors on any group, racial or

24  otherwise.

25          On this point, Harvard's evidence is

**JA3509**

1    uncontroverted.  Each and every one of the officers who came

2    to court, as shown in Slides 73 and 74, testified that there

3    are no targets, there are no floors.

4         Instead what the undisputed evidence demonstrated

5    was that these one-pagers are distributed to three people --

6    Dean Fitzsimmons, Director McGrath, and at the time Sally

7    Donahue -- during the course of the process so that they can

8    evaluate the likely yield of the class.  To the extent the

9    information is useful, it's communicated orally to the

10   admissions officers during the full committee process.

11        But as Your Honor now knows, at the tend of the

12   process in every admissions cycle, in every year, if I go to

13   Slide 76, the committee goes through the lop process.

14        And they've been directed explicitly by Dean

15   Fitzsimmons in a memo written to guide them.  I doubt he ever

16   thought it would see the light of day in a federal

17   courthouse.  What he says is at the end of the day, at the

18   end of the day the quality of the case is what counts.

19        Now, I'm just going to very quickly address race is

20   more than a plus factor.  I don't think there's any dispute

21   about what *Grutter* and *Bakke* says.  Race can be used.  It can

22   be used as a plus factor.  It can be used as a tip.

23        Now, this is interesting particularly given that

24   the fundamental predicate of Dr. Arcidiacono's opinion is

25   that a tip for someone is a penalty for someone else.

**JA3510**

 1          Harvard's process, Harvard's admissions process

 2    meet the standards set forth on Slide 77.  In that process,

 3    race may be a factor to a particular candidate's admission.

 4    It is never the factor.  Tips for race come into play only

 5    for candidates that are otherwise highly competitive.

 6    Candidates who are qualified and not just academically, but

 7    across a wide series of dimensions.

 8          Once again, the testimony to Your Honor was

 9    consistent.  Race can make a difference, but it's just one of

10    many tips in the process that can make a difference.

11          And, Your Honor, if I would bring you to Slide 80,

12    the data confirmed that.  First the experts agreed that race

13    does not make a difference in the admissions decision for a

14    majority of applicants.  A large number of applicants to

15    Harvard would be rejected without ever having their race

16    considered.  And there is a group that are so qualified

17    they'll be admitted without the race being considered.

18          Second, if I move to Slide 81, Your Honor, when

19    race does come into play, it's only for applicants who are

20    highly qualified and highly competitive.  This is the chart,

21    and it demonstrates that race matters but only to candidates

22    who have a high probability of admission to begin with.

23          Now, Your Honor, to be sure, there are some

24    African-American applicants for whom the tip of race can make

25    a difference.  And I want to pause here for a minute to

1    emphasize something that at least to me personally is very

2    important.

3             Contrary to Dr. Arcidiacono's charts and

4    implications, all the students that are admitted to Harvard

5    are qualified.  All the African-American students admitted to

6    Harvard are eminently qualified, all the Hispanic students

7    are eminently qualified, and so too are the Asian-Americans

8    and whites.

9             The suggestion that African-American and Hispanic

10   students at Harvard are somehow less qualified or were

11   admitted only because they got a tip of race is not true.

12   It's actually offensive.  For highly competitive candidates

13   race can make a difference, but only if you have many other

14   factors that get you there first.  Dr. Card explained that

15   yesterday.

16            Every dimension of the candidate matters.  Multiple

17   dimensions matter.

18            The fact is that Harvard's pool is, fortunately for

19   Harvard, highly competitive on many dimensions.  In this

20   competitive pool, the presence of any additional factor,

21   including race for some candidates, can make a difference.

22            Lastly, race-neutral alternatives, which Mr. Hughes

23   didn't address.  So let me try to summarize our position so

24   Your Honor has it.  And we'll brief it more fully.

25            First, the process.  While there was some

 1    discussion of the Ryan committee, my bet is you've heard more
 2    about the Ryan committee than you might want to hear.  So
 3    let's talk about the committee that did do the work.
 4         I would say this on the Ryan committee:  The idea
 5    that you have a committee and then you get sued and someone
 6    is making precisely the claim that the committee is going to
 7    consider, suspending the work of the committee is not a
 8    illogical thing to do.
 9         But the committee was -- for the college was
10    reconvened later, and it had three people:  Dean Smith, Dean
11    Khurana, Dean Fitzsimmons.  They were the right people for
12    the job because they were the people responsible for
13    precisely the alternatives that might be considered.
14         Dean Smith described to you the work of the
15    committee.  They met seven times.  They worked outside of the
16    committee room.  They reviewed literature.  They reviewed
17    expert reports from this case.  They considered and evaluated
18    every race-neutral alternative Mr. Kahlenberg proposed and
19    more.  They considered, for instance, elimination of the
20    consideration of SATs.
21         And at the end, it was the judgment of these three
22    senior leaders of Harvard, after looking at all of this
23    material, after looking at simulations from both expert
24    witnesses, that at this time race-neutral alternatives could
25    substitute no -- no race-neutral alternative could substitute

1    for the consideration of race as one consideration among

2    many.

3          They looked.  They reached this conclusion by

4    looking at what would happen in those simulations.  Not just

5    to racial diversity, Your Honor, but to all kinds of

6    diversity on the Harvard campus and what it would do from an

7    intellectual and excellence point of view.

8          And they found that the plaintiff's suggested

9    alternatives resulted in decreases in the student body

10   excellence, decreases in diversity, decreases that were

11   simply not acceptable to Harvard.

12         Now, as Your Honor now knows, Harvard has had a lot

13   of experience with race-neutral alternatives.  It addressed

14   the issues with the Supreme Court back as far as *Bakke*.  Dean

15   Fitzsimmons is one of the people who has been working on

16   race-neutral alternatives for socioeconomically disadvantaged

17   folks.

18         Here is what I referred to earlier on Slide 88 that

19   Mr. Kahlenberg said in 2010, four years before the complaint

20   was filed, about what Dean Fitzsimmons has done.

21         You've also heard about the Harvard financial aid

22   initiative.  You've also heard about the extensive

23   recruitment effort, including the efforts to recruit

24   Asian-American students.  You've heard about the increase in

25   tenured faculty on the campus, Asian-American tenured faculty

Case: 19-2005    Document: 00117631846    Page: 591    Date Filed: 07/29/2020    Entry ID: 6356391
Case 1:14-cv-14176-ADB    Document 656    Filed 04/18/19    Page 112 of 155

112

1   by 50 percent.

2       Now, Mr. Kahlenberg was the one witness who came in

3   to address this issue.  He's never worked in a college

4   administration.  He's never implemented a minority

5   recruitment program.  He never implemented a financial aid

6   program.  He never worked in a college admissions office.

7   He's never been retained by a college or university anywhere

8   to consult on any of these things.  But he said, I've got

9   some alternatives for you to consider.

10      But Harvard has considered financial aid in its

11   expansion.  Harvard has considered eliminating early action.

12   Harvard has increased its effort to recruit socioeconomically

13   disadvantaged students.  Harvard has increased its efforts to

14   recruit students of color.

15      With all this backdrop, Dean Smith's committee

16   determined that the impact of the simulations which would

17   have resulted in a decrease in African-Americans on campus by

18   close to 40 percent was unacceptable.

19      Now, I want to say just another word or two about

20   Mr. Kahlenberg.  Mr. Kahlenberg was paid to consult on the

21   complaint in this case.  He was paid to work on a complaint

22   that alleged that Harvard should be using race-neutral

23   alternatives instead of race.

24      As Your Honor now knows, the day after the

25   complaint was filed, before Harvard had even been served,

```
 1    he's giving an interview and he's pronouncing judgment that
 2    Harvard should lose.  This is not the work of an independent
 3    expert.  It's not the work of someone who's gone through a
 4    deliberative process.  It's the work of an advocate.
 5            He had a result in mind when the complaint was
 6    filed.  He had a result in mind the next day when he gave his
 7    interview.  And by coincidence, his opinion four years later
 8    happened to be the same one he gave to Fox News.
 9            Now, what do we know about his opinion?  We now
10    know that, to Mr. Kahlenberg, considerable racial and ethnic
11    diversity means a decrease of African-American representation
12    on the Harvard campus by at least 30 percent.
13            And, Your Honor, as you go back to this, we would
14    ask you not to be fooled by his charts.  What he did is he
15    grouped African-Americans and Hispanics in an effort to show
16    that the decrease was less than might worry folks.  Only if
17    you separate out the two do you see the true implications for
18    what he is suggesting.
19            To be clear, a drop of 14 percent to 10 percent
20    would mean 340 fewer African-American undergraduates on the
21    Harvard campus.  Now, Dean Smith told you that he could not
22    overestimate the harm that change would have to the student
23    experience.
24            But, Your Honor, you don't need to take Dean
25    Smith's word for it, and I wouldn't take his word alone.
```

**JA3516**

1          Because we heard from the students themselves.  We

2     heard from the students who are living diversity every day.

3     We heard them tell us the importance of the current levels of

4     diversity.  And even with those levels of diversity that have

5     increased in the last decade or two, there are still feelings

6     of isolation, discomfort, and the lack of inclusion.

7          The impact that the plaintiff's alternatives, as

8     they call them, would have on these students, if they even

9     got to remain on campus and be part of the student body,

10    would be, to quote one of the students, devastating.

11         Let me conclude our closing, Your Honor, as I did

12    our opening.  Then I reflected on how much had changed since

13    I walked into this District Court for the first time 42 years

14    ago.  That change was manifest in the courtroom that day.

15    That change was manifest when the students came to testify.

16    That change is manifest in the crowd behind me today.

17         The demographics of those here with us today as

18    this trial ends reflect the enormous progress we have made in

19    becoming a more diverse and inclusive society and community.

20         The plaintiff wants to turn back that clock.  The

21    plaintiff thinks, as they told us under oath, in terms of the

22    efficient allocation of minority students and winners and

23    losers.  Those are not my words, Your Honor.  Those are the

24    words of Dr. Arcidiacono, winners and losers.

25         But the institutions and people who have

Case: 19-2005      Document: 00117638846      Page: 594      Date Filed: 07/29/2020      Entry ID: 6356391
Case 1:14-cv-14176-ADB   Document 656   Filed 04/18/19   Page 115 of 155

115

1    contributed to the enormous progress and the positive changes

2    that we witnessed in this courtroom and that we see on the

3    university campuses today don't think in terms of winners and

4    losers.

5           They are thinking, as President Faust told you

6    yesterday, about taking steps to ensure that everybody is a

7    winner; that our communities win; that societies win; that

8    it's not a situation like Dr. Arcidiacono would like to have

9    where whites and Asian-Americans are winners and

10   African-Americans and Hispanics are, to use his term, losers.

11          Dr. Simmons put it the best, and I would just quote

12   her.  "How can we imagine a world in which we are not

13   creating leaders and citizens who have the capacity to

14   mediate differences?  I cannot imagine it.  And so it's with

15   great conviction that I say that we must continue to offer

16   diverse undergraduate education to our young people to save

17   our nation."

18          The wolf of racial bias is indeed at our door.  We

19   ask the Court to turn the wolf out.  As we said, much

20   progress has been made.  There remains much to be done.

21          Thank you, Your Honor.

22          THE COURT:  All right.  Thank you all.  We will

23   break for lunch.  How long a break would you all like?

24          MR. MORTARA:  However long works for Your Honor.

25   30 minutes works.

**JA3518**

```
 1              THE COURT:  Why don't we come back how about at
 2       like -- let's just make it 1:30.  We probably only have about
 3       an hour left, right?
 4              MR. MORTARA:  We only have 20 minutes.
 5              THE COURT:  We have two more after you.
 6              MR. MORTARA:  Plus the 30 from amici.
 7              THE COURT:  About an hour.  Let's come back at
 8       1:30.  That will give everyone a break.
 9              (Court recessed at 12:38 p.m.)
10              THE CLERK:  Court is in session.  Please be seated.
11              MR. MORTARA:  Your Honor, I have a couple of
12       additional slides for you here.  Your Honor, you'll know when
13       you get to those.  There's only two.
14              THE COURT:  You're going back to the first
15       notebook?
16              MR. MORTARA:  Yes, sure.  I might use some of
17       Harvard's, but we'll muddle through.
18              THE COURT:  Do you have that microphone on,
19       Mr. Mortara?
20              MR. MORTARA:  I believe it is.
21              THE COURT:  When you're ready.
22                       **PLAINTIFF REBUTTAL CLOSING ARGUMENT**
23              MR. MORTARA:  Thank you, Your Honor.  It's been
24       three weeks since I was here in front of you the last time,
25       and it's been an experience, to say the least.
```

Case: 19-2005    Document: 00117638846    Page: 596    Date Filed: 07/29/2020    Entry ID: 6356391
Case 1:14-cv-14176-ADB    Document 656    Filed 04/18/19    Page 117 of 155

117

1          I want to just briefly begin with the class of 2023

2     reading procedures and Mr. Lee's late assertion of Rule 407.

3     That was waived when they relied on it.  We will brief it.

4     Rule 407 has been waived here.

5          The law is absolutely clear that application of

6     racial stereotypes is intentional discrimination, and that is

7     our claim.  And we heard that sort of bias over the weeks,

8     suggestions that Asians are one-dimensional or just book

9     smart or are recent arrivals, as Mr. Hughes pointed out.

10         I want to address first the supposed

11    inconsistencies as to racial stereotyping with respect to the

12    ALDCs.  Yes, the evidence is the ALDC Asians received

13    somewhat lower personal ratings than white ALDCs.  That is

14    absolutely consistent with the idea that racial stereotypes

15    are at work.

16         But we don't see discriminations in admissions

17    outcomes.  That's what discrimination means.  You were denied

18    admission.  Lower personal scores, but they weren't denied

19    admission, at least not in a statistically significant sense

20    in the small population of Asians that are ALDCs.

21         Why is that?  No one has ever said that Harvard

22    wants zero Asian-Americans on campus.  That's not their goal.

23    They just don't want overrepresentation, too many.

24         If you're going to let in some Asian-American

25    students, where do you pick first?  You go to your donor

**JA3520**

1    base, the children of your alumni, the children of your major

2    donors.  So it makes sense that being a legacy overcomes the

3    personal rating hit that the Asian-Americans ALDCs take

4    because of racial stereotyping.

5          I'm going to put up on the screen a slide that the

6    defendants used.  Here you see very high marginal effect for

7    the lineage applicants.  You see 30 percent boost, over

8    30 percent boost when they're in the higher chances of

9    getting in.  Very high effects that swamp out the minor

10   effect or the more minor effect, if you will, of the personal

11   rating hilt.

12         And there's been some suggestion that you can't

13   make a claim of discrimination as to a subgroup, as if

14   there's something wrong with that.  I think Your Honor may be

15   familiar with or we will make you familiar with, through the

16   briefing, the so-called sex-plus case law where subsets of

17   women are discriminated against because they have children or

18   because they behave in a gender nonconforming way.  That's

19   the PriceWaterhouseCoopers case.  We will get to all that in

20   briefing.

21         But it absolutely is possible to discriminate on

22   the basis of race against a subset just like it's possible to

23   discriminate on the basis of sex against a subgroup.

24         I want to get back to what matters, which is the

25   personal rating.  Dr. Card admitted that if you take the

1    personal rating out of his model, both his model from his

2    opening report and his model from his rebuttal report -- we

3    walked through these numbers in the transcript; that's the

4    extra slide I just gave you, Your Honor -- he admitted that

5    you find a statistically significant Asian penalty.

6            He admits that if race is involved, you've got to

7    take it out.  We've proven race is involved in the personal

8    rating.  Take it out.  Statistically significant penalty.

9            But let's deal with his proposed alternative first

10   that Mr. Waxman talked about, the virtual ratings analysis.

11           This is where he tried to remove race from the

12   academic and extracurricular and personal ratings.  But

13   Dr. Card admitted that race isn't what causes the observed

14   difference in academic and extracurricular ratings.  He did

15   that under oath when I was talking to him.

16           And just to be clear, you don't think race is

17   influencing the academic or extracurricular ratings, right?

18           ANSWER:  I think the most likely -- correct, my

19   most likely explanation is unobserved characteristics.

20           This is day 14 at 87.

21           And then Professor Card admitted he didn't even

22   finish the job on his virtual ratings analysis because

23   Professor Arcidiacono had pointed out that race affects the

24   overall rating and that race affects the teacher ratings as

25   well.

1          And yet when I asked him, on the very next page,

2     page 88, Professor Card said -- I said:  You were here when

3     Professor Arcidiacono talked about his findings that race

4     influenced those ratings, weren't you?

5          He said he was here.

6          Your modified rating analysis did not deploy the

7     teacher ratings, didn't change them.

8          Correct?

9          And one other thing about your virtual rating

10    analysis, the overall rating, you didn't use that either?

11         No.

12         So you either have to have it one way or the other.

13    You do it the way he said it in his first report, which is

14    that race influences the personal rating.  You yank it out

15    just, like you did with the overall rating, or you do a

16    complete virtual ratings analysis where you remove the effect

17    of race from all the ratings.  He did not do that.  He didn't

18    even try.  He did half a loaf.  And just like the SAT, your

19    first answer is best.  Pull the rating out if race influences

20    it.

21         And I want to get a little bit to this idea that

22    there's something funny about Professor Arcidiacono's

23    analysis because the same reader is giving Asians a boost on

24    academic and extracurricular and then punishing them through

25    racial stereotyping on the personal score.

Case: 19-2005    Document: 00117631846    Page: 600    Date Filed: 07/29/2020    Entry ID: 6356391
Case 1:14-cv-14176-ADB    Document 656    Filed 04/18/19    Page 121 of 155

121

1          That's not true, and Professor Arcidiacono

2     explained as much.  He pointed out that unobservables track

3     the observables.  So what you see on the right with the

4     academic and EC ratings is what Professor Card admitted to.

5          All the bumps and arrows, the observable goes in

6     one direction, the race influence goes in the same direction.

7     You see it on the right.

8          On the left you see the opposite effect in the

9     overall rating and the personal rating.  You see the

10    observables go one way for Asian-Americans in the overall

11    rating, but they go -- but the coefficient goes the other

12    way.  That's what's proving the Asian penalty.

13         And simultaneously you see it for African-Americans

14    and Hispanics, proving the existence.

15         Tips, the tips that are admitted in the overall

16    rating.  And Harvard has still -- despite the fact Mr. Hughes

17    was talking for a while about it, Harvard has still said

18    nothing about the tips that are blatantly apparent in the

19    personal rating.

20         I want to go there now and talk about Harvard's

21    denials that race is used in the personal rating.

22         Mr. Hughes went over OCR and Mr. Looby and the

23    comparison between that evidence and what Harvard's witnesses

24    said in court.

25         I want to also point out what Director McGrath said

Case: 19-2005    Document: 00117632846    Page: 664    Date Filed: 07/29/2020    Entry ID: 6356391
Case 1:14-cv-14176-ADB    Document 656    Filed 04/18/19    Page 122 of 155

122

1    to me the first time she was here.  I talked to her about a

2    bunch of people that worked in the admissions office, and I

3    said, Do you know whether this person had used race in the

4    personal rating?

5              She said she didn't.  One of the reasons she didn't

6    is that they didn't have any written guidance.  No one could

7    be sure what anyone was doing.  I rattled off 29 people or

8    something from the spring of 2011 in our dataset, in our

9    dataset those people, 29 of those people are gone.  And

10    Director McGrath had no idea whether they used race in the

11    personal rating.  One reason she had no idea is because no

12    one had written anything down about how to do it.

13              We've shown you the data where African-Americans

14    and Hispanics trounce whites and Asians in the personal

15    rating.  Harvard has yet to explain how it is that racial

16    preferences are not being applied in the personal rating.

17    And Mr. Hughes showed you those stunning differences in his

18    slide and showed you the same pattern as the personal rating.

19    That was Slide 19 or 6.  I can't tell.  I think 6.

20              All Harvard and Professor Card want to talk about

21    is admitted variable bias and how it might explain the

22    differences between whites and Asians.  You've heard

23    absolutely nothing about African-Americans and Hispanics with

24    respect to the personal rating.

25              And that's important both because if you pull the

Case: 19-2005    Document: 00117638846    Page: 602    Date Filed: 07/29/2020    Entry ID: 6356391
Case 1:14-cv-14176-ADB    Document 656    Filed 04/18/19    Page 123 of 155

123

1    rating out, we win, but also because Harvard's failure to

2    dispute the African-Americans and Hispanics get tips proves

3    that Harvard isn't telling the whole truth about the use of

4    race in the personal rating.

5        If Harvard dissembles and says race is not used at

6    all and we can see that it is, how can we trust them when

7    they say that stereotyping is not lowering the personal

8    ratings of Asians?

9        And I want to just briefly go through Dr. Card's

10    histograms.  I'm showing you DD 10.69.  I'm trying to show

11    you DD 10.69.  These histograms were used.  And I don't know

12    if you notice, this is the school support.  This is

13    Dr. Card's cherry-picked set of observables.  Not all of

14    them.

15        Mr. Waxman said all.  It's not.  I don't know if

16    you noticed, he never put African-Americans or Hispanics on

17    these charts, never once.  Because if he did, he would see

18    that his cherry-picked observables do not explain that

19    African-Americans and Hispanics do significantly better than

20    whites on the personal rating.  He never once did it.

21        And Harvard only has one document, the backup

22    document to Dr. Card's slides, Defendant's 692.  This is the

23    only document anywhere where they compared anything that

24    might be related to the personal rating for African-Americans

25    and Hispanics.

1          And when you take a look at it, Your Honor, you can

2     see that in any of these quadrants there is absolutely no

3     explanation when you look at these percentages for why

4     African-Americans and Hispanics do better than whites.  They

5     do about the same or sometimes a little bit worse than

6     Asians.  They never do better than whites.  These data do not

7     explain the racial distribution in the personal rating.  And

8     that's because they don't use all the observables.

9          Professor Arcidiacono created a model that used

10    more of the data.  You see this here in Plaintiff's

11    Demonstrative 40, which I used with Professor Card.  Model 5

12    has all the ratings in it, has the teacher ratings, has the

13    school support, has the alumni interview ratings.

14         And then Professor Card went out and he added every

15    single variable he could possibly find, and he still couldn't

16    make this go away.  He couldn't make the gap disappear.  He

17    told me it was statistically significant.

18         So when you combine on one hand evidence from OCR

19    through the 2012 Harvard letter to OCR saying some readers

20    use race in the personal rating with Mr. Looby telling the

21    truth at his deposition before he spent ten days getting

22    prepped to testify here, and then with Director McGrath's

23    testimony that she had no idea how these 29 people who had

24    left the admissions office who were applying the ratings that

25    are in our dataset used race or not in the personal rating.

**JA3527**

Case: 19-2005   Document: 00117633846   Page: 604   Date Filed: 07/29/2020   Entry ID: 6356391
Case 1:14-cv-14176-ADB   Document 656   Filed 04/18/19   Page 125 of 155

125

1          And then the sudden need for written prohibitions

2     on using race in the personal rating after 28 years of

3     refusing to write anything down.  You combine all that with

4     the powerful statistical evidence Professor Arcidiacono

5     assembled, the evidence is inescapable that race is used in

6     the personal rating.

7          And if race is used in the personal rating, the

8     statistical battle, Your Honor, is over.  There is a

9     statistically significant Asian penalty.

10          This is a model Professor Card did.  It has all the

11     ALDCs.  It has parental occupation, intended career.  It has

12     every single variable Professor Card wanted to throw in here.

13     It has every interaction he wanted to do, excludes every

14     interaction he didn't want to do.  It's a model in every

15     respect the way that Professor Card wants it except one:

16     pull the personal rating out because the evidence is

17     overwhelming that race is influencing it.

18          Harvard didn't even answer us on how the racial

19     tips be are being applied in the personal rating.  Didn't

20     even respond.

21          I want to touch briefly on Harvard's anecdotal

22     evidence.  The war of summary sheets and applications is not

23     helpful to the Court because it doesn't represent an

24     even-handed sampling or cross-section of what looking at all

25     the applications would give us.

1          Your Honor will recall that each side got to pick

2     applications that were produced.  And of course you know we

3     picked based on just the database and the numbers you can see

4     in the database.

5          Harvard got to look at the applications before they

6     picked them.  Got to fully vet and pick out everything it

7     wanted to put in front of you.  And then Harvard also got to

8     work with its admissions personnel in the same respect that

9     they worked with Mr. Looby so they worked with them to

10    remember every single detail of these applications that were

11    just a couple of the thousands these admissions officers had

12    reviewed over the past six years.

13         Anecdotes are not persuasive evidence when Harvard

14    has had the opportunity to cherry-pick and set up testimony

15    on rails about what they got to select for you to see.  And

16    even to the extent that anecdotes are relevant, you know, I

17    want to remind you of the professional figure skater in

18    Plaintiff's 116.  This is an Asian student that was so

19    cursorily and shabbily treated by Harvard's admissions

20    officers, she was awarded a standard strong and a personal

21    rating of 3, almost as if her application wasn't even read.

22         I'm going to wrap up pretty soon, Your Honor.  And

23    I want to take this opportunity to thank the Court, Joan,

24    Kelly, Karen, the law clerks, Mr. Dereau and the IT staff,

25    and I want to even thank the CSOs and the people down in the

1    cafeteria.  We have never been treated better in any

2    courthouse in America trying a case than we have here.  I

3    don't know that I'll ever be treated better again.  The

4    experience has been absolutely tremendous.

5            My partners and co-counsel have given me the

6    privilege of talking last, for which I also thank them.

7            And I want to talk a little bit about why I am

8    here.  I've alluded to it a few times in my more

9    conversational moments.  Count I in this case speaks to me

10   because of my personal experience.  I'm here because of my

11   three best friends in college:  Mike Gomez, Kalpesh Patel,

12   and Saleem Zafar.

13           They have all have kids my daughter's age.  I'm

14   here because of my daughter Juliet's godmothers, Sharon and

15   Diya.  They have children my daughter's age, Asian children.

16   Asian children who deserve the same chance to go to Harvard

17   that my white daughter has.

18           I'm here because of an incredible young

19   Chinese-American, my friend Rebecca Kuang who was in our

20   dataset but did not get to attend Harvard.  To meet her is to

21   know that her personal qualities deserved a 1.  And that's

22   before you learn that she wrote her first novel at 19,

23   recently published.

24           I am here because I spent a significant chunk of my

25   formative years in China and studying Mandrin back in the

1    early 1990s when few suburban boys from Milwaukee did such

2    things.

3         And I'm here on behalf of 20,000 members of

4    Students For Fair Admissions and our standing members who

5    brought this suit.

6         And even with all that, in another part of my life

7    I have personal experience reviewing paper applications and

8    assessing people based on a written record.  People every bit

9    as astounding as those who are on the bubble in applying to

10   Harvard.  I look at grades, test scores, recommendations, and

11   I know how hard it is to judge someone's personality from the

12   written record.  You have to be vigilant about implicit bias

13   and stereotyping well beyond e-mailing an article around once

14   every few years.

15        Harvard has not been vigilant and Asian-American

16   applicants paid the price.

17        Your Honor, I don't envy the job in front of you.

18   I have no idea how I'd respond to the historic task you have.

19   But what I do know is that in our judicial system this Court

20   may have the first and last word as a factual matter on what

21   happened here at Harvard, and that's because no one knows

22   what changes in the law are ahead of us as the case moves on.

23        Your Honor may remember I mentioned in my first

24   cross-examination of Director McGrath the perception that

25   racially charged language, stereotypes, or even

1    discrimination may be perceived in our country as less

2    important or less harmful when they're directed at

3    Asian-Americans than when directed at other minorities.  At

4    some level, this is because of the model minority stereotype

5    and the overrepresentation canard we saw deployed during

6    Professor Arcidiacono's examination.

7           The question is whether Asian-Americans will be

8    told some time next year that, yes, this did happen here,

9    that racial stereotyping and bias led to a penalty at

10   Harvard, or whether they get the news that even though

11   Harvard's own researchers found an Asian penalty before there

12   ever was a lawsuit, Harvard can pay for enough variables to

13   make it all go away as long as you pretend the personal

14   rating has nothing to do with race that is.

15          Some day this will be written about in the history

16   books, and those books will say there was Asian

17   discrimination at Harvard.  Of that, I'm confident.  Those

18   books might say that Harvard let the wolf of racial bias in

19   through the front door, as I put it a few weeks ago and

20   Mr. Lee paraphrased.  They might point out that this summer

21   Harvard took a small step to start to close that door.

22          We hope those books will say this Court slammed the

23   door shut.  Thank you, Your Honor.

24          THE COURT:  Thank you, Mr. Mortara.

25          The Amici closings.

Case: 19-2005    Document: 00117631846    Page: 609    Date Filed: 07/29/2020    Entry ID: 6356391
Case 1:14-cv-14176-ADB  Document 656   Filed 04/18/19   Page 130 of 155

130

|    |                                                              |
|----|--------------------------------------------------------------|
| 1  | **AMICI STUDENT CLOSING ARGUMENT**                           |
| 2  | MS. TORRES:  Hi.  Genevieve Bonadies Torres, and I           |
| 3  | represent the --                                             |
| 4  | THE COURT:  Voice way up.  I can barely hear you             |
| 5  | and you're facing me.                                        |
| 6  | MS. TORRES:  I represent the student Amici in this           |
| 7  | case.  This case may involve Harvard's admissions policy, but |
| 8  | the impacts are felt most directly by students.  The outcome |
| 9  | impacts what students can express and have considered by     |
| 10 | Harvard and elite colleges across the country.  It impacts   |
| 11 | whether students' experiences will be valid, and it impacts  |
| 12 | the educational environment students will encounter.         |
| 13 | Students are at the heart of the issues in this              |
| 14 | case, and their testimony is telling both for what the       |
| 15 | students say and for where they are silent.                  |
| 16 | The Court did not hear from any of SFFA's students           |
| 17 | nor review any of their files.  The only testimony came from |
| 18 | student amici and student organization amici on Monday.  And |
| 19 | this student testimony and their application files speak to  |
| 20 | both sets of claims before this Court.                       |
| 21 | As this Court knows, the first set of claims                 |
| 22 | challenges Harvard's appreciation of race and ethnicity to   |
| 23 | promote diversity.  Here, the students' testimony and        |
| 24 | application files provide proof that Harvard's use of race is |
| 25 | both constitutionally acceptable and wise.                   |

1          With regard to plaintiff's claim of intentional

2     discrimination, the students' application files illustrate

3     that Harvard's admissions officers view Asian-American

4     ethnicity in a positive light, not a negative one.

5          I'm going to focus nearly entirely on plaintiff's

6     challenge to race-conscious admissions.

7          Three weeks ago the plaintiff's counsel stood

8     before you and stated diversity and its benefits are not on

9     trial here.  But make no mistake, diversity is what is at

10    stake in this case.  That's because SFFA is seeking a remedy

11    where race would be erased in the application process.

12         This type of erasure threatens to ignore diverse

13    experiences that applicants offer, and it also threatens to

14    suppress diversity on campus.  The students spoke to these

15    troubling consequences, and their application files show why

16    such an outcome is not constitutionally required.

17         Specifically they affirmed that Harvard more than

18    satisfies two aspects of the narrow tailoring standard.

19         First, individualized review.  Our four students'

20    files arguably are the best illustration of what Harvard's

21    admissions officers have said again and again.  One, our

22    students and all admitted students to Harvard are

23    exceptional; two, to the extent race is considered, it is one

24    of many factors, and it is only viewed as a positive,

25    including for Asian-American students; three, it is flexibly

1    applied and not formulaic.

2         All four of our student amici -- Itzel Libertad

3    Vasquez-Rodriguez, Sarah Cole, Thang Diep, and Sally Chen --

4    discuss why their racial and ethnic background throughout the

5    application process was important to them.  Why?  Because

6    it's inextricably intertwined with their experiences and

7    can't be extricated.  It's critical to appreciate their

8    achievements and contributions.

9         Take Thang.  He has a strong GPA and commitment to

10   social justice.  But in his words "I don't think they can be

11   necessarily understood without taking into account the fact

12   that I moved here when I was eight, I didn't speak English,

13   and I excelled despite the racial prejudice I encountered."

14        All four of the application files show that race

15   was only considered alongside a multitude of other factors

16   and never provided any preset advantage or disadvantage.

17        Take Itzel's application.  The extensive comments

18   in her file make it clear that her admission was based upon

19   having multiple strengths.  Her file was marked up with notes

20   about how she has a strong set of AP scores, how she was

21   demonstrably a hard worker with a nearly perfect GPA, how she

22   was editor of her newspaper, how she had athletic success as

23   a runner, and how her guidance counselor highlighted her

24   "electric personality."

25        While there is reference to her ethnicity, she is,

1    quote, connected with her heritage after a period of

2    disconnect.  This appears alongside the variety of other

3    strengths Itzel offers.

4         Importantly, our students' files show that this

5    limited, positive consideration of race is equally applied to

6    students of Asian-American heritage.  Like Itzel, Sally and

7    Thang also received positive comments by Harvard's reviewers

8    associated with their racial and ethnic backgrounds.

9         For Thang, the same reviewer who noted his

10   Vietnamese identity and use of pencils to improve his English

11   also positively noted his commitment to pushing himself

12   academically and socially.

13        For Sally, the interviewer noted how her upbringing

14   in a culturally Chinese home where she served as a translator

15   reflected positively on her responsibility to take care of

16   others.

17        The students' files and testimony also show that

18   having a relatively lower academic score does not make an

19   applicant academically unqualified or undeserving in

20   admission.

21        Three of our four students received an academic

22   rating of a 3 or a 3+ despite stellar accomplishments.  Sarah

23   received straight As and A-pluses at a premiere prep school.

24   Itzel took 10 AP tests and scored the top score on 7.  And

25   Thang was valedictorian at an intensive magnet program.

1    Proof that they were academically qualified, they thrived at

2    Harvard and beyond, becoming, in Harvard's words, citizen

3    leaders.

4            Sarah graduated with a 3.6 GPA and has committed

5    herself to serving our public school system.  Itzel graduated

6    cum laude with a 3.7 and now serves as a California assembly

7    fellow.  Indeed, our students are a reminder that merit

8    cannot be measured by academic ratings.  Their contribution

9    to Harvard's campus were extensive, and some of those

10   contributions did flow from their perspectives as ethnoracial

11   minorities.

12           For example, Sarah led the Black Students

13   Association during a time when Harvard, like our country, was

14   grieving the slew of police shootings of black people.  In

15   this role, she worked with Harvard's administrators and white

16   student groups, Latino student groups, and others to help

17   them, quote, think through just what was black lives matter

18   and how they could be better allies.

19           She responded to calls from Dean Khurana to draft

20   emails for the entire student body to guide them and console

21   them in the aftermath of yet another shooting.  Her actions

22   took time and represent tangible contributions.  Indeed, she

23   recounted how countless classmates and professors thanked her

24   for sharing her perspective shaped by her race.

25           There is nothing wrong with an admissions system

1  valuing this along with the myriad of other contributions

2  Sarah offered.

3       Our students' files put on full display that

4  Harvard is genuinely engaged in an individualized review that

5  values all ethnoracial backgrounds, whether Chinese or

6  Chicana, and that it does so in a limited, flexible way to

7  develop a class that is diverse across a range of dimensions.

8       Moving on to the second aspect of narrow tailoring

9  that students affirm, there is no workable race-neutral

10  alternative available because such alternatives reduce the

11  depth of diversity on Harvard's campus.  This is clear from

12  what's undisputed at trial.

13       Harvard's counsel talked about this briefly, but

14  I'll just restate because it's important to the students that

15  there is no dispute that if you ended the consideration of

16  race, the number of black, Latinx, and other minority

17  students would plummet by about 50 percent in terms of sheer

18  numbers.

19       Plaintiffs have tried to soften the blow with their

20  proposed race-neutral alternatives, but even their preferred

21  alternative would cause the number of admitted

22  African-American students to drop by about 30 percent in

23  terms of numbers.

24       More than this, the students have offered

25  undisputed testimony that these projections likely

1    underestimate the actual decline.  The students testified

2    that if Harvard stopped considering race, it's likely that,

3    one, fewer students of color would apply.

4         You heard Itzel forthrightly state, "Honestly I

5    probably would not have applied to Harvard if they didn't

6    take race into account."  And Sarah Cole affirmed that this

7    type of likelihood by saying that it would signal to students

8    that they weren't welcome and reduce applications from

9    students of color.

10        Two, testimony also suggested that fewer students

11   of color would accept.  Sarah testified that her choice to

12   accept Harvard's offer was substantially influenced by

13   encountering a strong presence of other black students on

14   Harvard's campus.  If that presence declined, there's a

15   substantial risk that the acceptance rate would decline, too.

16        The plaintiff's expert on race-neutral

17   alternatives, Richard Kahlenberg, tried to downplay this

18   decline in two ways:  First, he emphasized how his

19   alternative would yield greater socioeconomic diversity.  But

20   all four student amici testified that the educational

21   benefits that flow from socioeconomic diversity cannot be

22   equated with those flowing from racial diversity.

23        As Itzel expressed, ethnoracial diversity is

24   something that's more visibly salient.  "When I walked

25   through campus, I didn't feel judged or discriminated against

1   because of my socioeconomic status.  I felt discriminated

2   against because of my ethnoracial identity."

3          Itzel shared that it was only in spaces with Latinx

4   and Native American students that she felt that she could,

5   quote finally breathe.  Socioeconomic diversity does not on

6   its own provide that space.

7          Second, Kahlenberg downplayed this decline by

8   emphasizing how the overall numbers of black, Latinx, and

9   other minority students stayed relatively steady, but this

10  ignores other dimensions of diversity.

11         Overall representation is important, but so is the

12  representation of each particular racial group.  A decline in

13  any one group can be problematic, and this is particularly

14  true when that group is already marginalized and relatively

15  low in numbers.

16         Take Sarah Cole's experience.  When Harvard's

17  newspaper published an article saying that, quote, admitting

18  black students to Harvard is like teaching a blind person to

19  be a pilot.  At that moment and the many others when Sarah

20  encountered racial prejudice specifically targeted at the

21  black community, it was the strong presence of other black

22  students on Harvard's campus that mattered to Sarah.  There

23  needed to be enough in terms of numbers for her to, quote,

24  lean on and form a true community.

25         And it was this support system that allowed Sarah

1    and other black students to, quote, remain steadfast in our

2    confidence and thrive, despite bigoted comments that they and

3    an entire race of people did not deserve to be at Harvard.

4            Interracial diversity represents another concern.

5    As the amici organization member Madison Trice reflected, she

6    and other students have benefited from having, quote, every

7    nearby of black identity celebrated, and so it has a space on

8    campus.  It's this diversity within the black students that

9    makes it, quote, harder to have stereotypes because you can

10   learn about the different shapes that blackness can take.

11           A 30 percent reduction in the number of black

12   students would likely reduce such interracial diversity, as

13   would Kahlenberg's mechanical race-neutral preferences across

14   all racial groups.

15           And the harms would flow to all students, including

16   white and nonwhite students.  Such a reduction would, even if

17   limited to the black community, be, in the words of Itzel,

18   fairly catastrophic.

19           As a Vietnamese student, Thang similarly shared a

20   30 percent decline in the black student population would,

21   quote, hurt his education dramatically, as the efforts led by

22   black students have allowed him to better, quote, understand

23   issues affecting a different community and better understand

24   his own.

25           Turning very briefly to plaintiff's claim that

**JA3541**

1   Harvard intentionally discriminates against Asian-Americans,

2   the student amici observed that Sally and Thang's admissions

3   files strongly indicate Harvard is only considering race in a

4   positive light.

5        Both Sally and Thang openly and extensively

6   discussed their ties to their Asian heritage.  Both files

7   contain comments indicating their ethnic identities were seen

8   as a strength, and both received personal scores of 2 or a

9   2-, relatively high scores.

10        Sally and Thang's files show that Harvard's policy

11   of appreciating race in admissions is not discriminating

12   against Asian-Americans.  In fact, it oftentimes helps such

13   applicants and can cultivate diversity within the admitted

14   group of Asian-American students by appreciating distinctions

15   in their immigration and cultural histories.

16        Sally's testimony serves as a reminder that a

17   policy that appreciates race is one of many factors is just

18   as important for applicants from culturally Chinese homes.

19   As Sally stated, quote, I decided to write about being

20   Chinese-American and being from a working-class immigrant

21   family precisely because I felt like stories like mine were

22   fading under this model minority myth.

23        She continued, "I think that there was no way in

24   which flat numbers and a resume could have gotten across how

25   much of a whole person that I am.  And I that that it's truly

1    incredible to have been seen and have been heard for who I am

2    and valued for it."

3            On behalf of all of our students, I thank this

4    Court for letting them share their stories about how this

5    policy has positively impacted them and better prepared them

6    to positively impact others.  Thank you.

7            THE COURT:  Thank you, Ms. Torres.

8            MS. McCLELLAN:  May I proceed, Your Honor?

9            THE COURT:  Yes.  Get that microphone right up to

10   your mouth.

11                  **ORGANIZATION AMICI CLOSING ARGUMENT**

12           MS. McCLELLAN:  Good afternoon, Your Honor,

13   counsel.  My name is Cara McClellan, and I represent 25

14   Harvard student and alumni organizations as amici curiae in

15   support of Harvard's ability to consider race as one of many

16   factors in its holistic admissions process.

17           In the words of Dean Fitzsimmons, race is one part

18   of a person's life that may lead that person to be a great

19   educator of others, about how to be a good citizen and

20   citizen leader, not just at Harvard, but later.

21           During this divisive time for our country, the need

22   for citizen leaders, educated in diverse settings, remains as

23   urgent as ever.  My clients include thousands of Harvard

24   students and alumni who are black, white, Latinx, Native

25   American, and Asian-American.  Some grew up in public housing

Case 1:14-cv-14176-ADB    Document 656    Filed 04/18/19    Page 141 of 155

141

1    and were the first in their families to attend college.

2    Others come from families that have achieved financial

3    success and impressive educational credentials yet still

4    experience the effects of persistent racial discrimination in

5    our country.

6            You have heard from:  Professor Margaret Chin, a

7    Chinese-American alumna, a founding board member of the

8    Coalition For a Diverse Harvard, and a member of the Harvard

9    Asian-American Alliance.

10           Catherine Ho, a Vietnamese-American sophomore and

11   copresident of the Harvard-Radcliffe Asian-American woman's

12   association.

13           Madison Trice, a black sophomore, political action

14   chair of the Association of Black Harvard Women, and a member

15   of the Harvard-Radcliffe Black Students Association.

16           And Cecilia Nunez, a black and Mexican-American

17   junior, vice president of Fuerza Latina, and a board member

18   of the Phillips Brooks House Association.

19           You have also heard from four additional Harvard

20   students and alumni:  Itzel Libertad Vasquez-Rodriguez, Sarah

21   Cole, Thang Diep, and Sally Chen.

22           In contrast, no students have come forward to

23   testify in support of ending race-conscious admissions.

24           SFFA has not met its burden of proving that Harvard

25   can fulfill its educational admission which requires that it

1    put together an exceptional, racially diverse class without

2    considering race.

3                Instead the stories that you heard this past Monday

4    from Harvard students and alumni first demonstrate that race

5    is an indelible part of their lives, their educational

6    experiences, and their long-term professional goals.

7                Second, each witness described how black, Latinx,

8    and Asian-American students and alumni and the organizations

9    they form are indispensable to Harvard's ability to reap the

10    educational benefits of diversity.

11                And third, their testimony also made clear that the

12    dramatic reduction of black and Latinx students on campus

13    from the loss of race conscious admission estimated at

14    50 percent would be devastating for all Harvard students.

15                As one of my clients, Catherine Ho, put it,

16    diversity allows for more opportunities to organically learn

17    from other people, listening to their stories and listening

18    to their perspectives.

19                But if their perspectives and stories aren't

20    present on campus, who are we supposed to be learning from?

21                First, the evidence unequivocally shows that

22    race-conscious admissions must be preserved to completely and

23    holistically evaluate individual student applicants.

24                For many students of color, early experiences

25    related to race are a formative part of their identity, and

1    they include this in their application.

2            For some, memories of discrimination or observed

3    inequality are at the root of what motivates them to work

4    hard and to advocate for change.  This is evident in the

5    amici witnesses testimony about their educational experiences

6    in college application essays.

7            Catherine Ho testified that her ethnoracial

8    identity is a core part of who she is and became the focus of

9    all three personal essays she submitted to Harvard.  In one

10   essay, the Vietnamese language, a language that has no past

11   tense, provided a metaphor for how she understands her

12   parents don't-look-back attitude.  As refugees from Vietnam,

13   her parents overcame many barriers.  Their strength is what

14   drives her to push forward despite obstacles.

15           When Catherine viewed her application file and

16   learned that her Vietnamese heritage was an aspect of her

17   identity that Harvard valued, she rushed to tell her father.

18   Although her father's refugee story is not always

19   appreciated, she believes she carries important lessons

20   because of this history, a contribution the Harvard

21   admissions committee recognized she would bring before she

22   even arrived.

23           In addition to impacting the development of

24   applicants' individual identity, race systematically impacts

25   the opportunities and resources that applicants can access

1    before they apply to college.  Too often the resources

2    available in a school correlate with the racial makeup of the

3    school.

4         Sarah Cole described how her predominantly white

5    college prep school included standardized test prep in its

6    curriculum, while her friends at the majority black local

7    public high school were offered no such opportunities.

8         As Tia Marie Ray, director of the undergraduate

9    minority recruitment program, explained, Harvard recognizes

10   that resources impact students' performance on SATs.  Even in

11   wealthy, high-performing schools, students of color face bias

12   that can limit academic opportunities.

13        Madison Trice testified about facing the bigotry of

14   low expectations.  Her elementary school teacher discouraged

15   her from entering her school's gifted program, despite her

16   excellent grades, until her parents intervened to challenge

17   an arbitrary entrance examination and requirement that only

18   seemed to apply to her, the so-called 10 perfect score rule.

19        Once enrolled in more advanced courses, Madison

20   spent most of her academic life as one of the only black

21   students in her class, facing bullying and social isolation

22   because she was different.

23        As Dean Fitzsimmons' testimony made clear,

24   Madison's experience is not uncommon.  Many students of color

25   who apply to Harvard come from academic environments where

Case: 19-2005    Document: 00117631846    Page: 624    Date Filed: 07/29/2020    Entry ID: 6356391
Case 1:14-cv-14176-ADB   Document 656   Filed 04/18/19   Page 145 of 155

145

1    they feel isolated as minorities and write about this

2    experience to help the admissions office contextualize the,

3    quote, persistence, courage, and self-confidence that went

4    into their remarkable achievements.

5            Indeed, Madison wrote in her personal essay that

6    the different treatment she endured led to her aspirations to

7    pursue a career in foreign service and work on behalf of

8    marginal communities experiencing oppression abroad.

9            Preventing her from speaking about her race would

10   inhibit her ability to fully describe what motivates her

11   intellectual and professional ambitions.

12           SFFA would prohibit universities from considering

13   race as part of a holistic review while allowing colleges to

14   consider other aspects of an applicant's identity such as

15   socioeconomic status, gender, sexual orientation, or their

16   disability.  However, pretending to be race blind when

17   reviewing applications will only disadvantage applicants of

18   color, including Asian-American students whose full stories

19   would be ignored.

20           Second, amici witnesses' testimony provides real

21   life validation for why the Supreme Court has repeatedly

22   affirmed that the pursuit of the educational benefits of

23   diversity is a compelling interest that colleges and

24   universities may seek.  As the Supreme Court recognized in

25   *Fisher*, a diverse student body promotes cross-racial

1   understanding and the lessening of racial isolation and

2   stereotypes.

3          At Harvard, student affinity groups help facilitate

4   these benefits by advocating for inclusivity and creating

5   opportunities for students of all backgrounds to engage in

6   cross-cultural exchange.  Affinity of groups provide critical

7   support that allow students of color to feel comfortable

8   being their authentic selves.  This happens when a student

9   who was once bullied for being different opens the

10  Association of Black Harvard Women survival guide and reads

11  that black hair is beautiful and versatile.

12         Cultural organizations also challenge the broader

13  Harvard community to become more culturally literate and

14  respectful of difference.  Like when La Fuerza successfully

15  advocated for more culturally competent mental health

16  providers on campus or when the Asian-American Women's

17  Association hosted a workshop to address anti-black bias.

18         Diversity within the vibrant affinity groups on

19  campus matters.  It relieves students of color from feeling

20  like representatives of their entire race and allows

21  flexibility to explore different aspects of their identity

22  and culture.  It combats stereotypes as students see multiple

23  representation of what it means to be a particular race.

24         Importantly, diversity within groups requires a

25  holistic approach that considers the multifaceted identities

**JA3549**

1   of applicants beyond just checking a box.  By serving Harvard

2   for decades in this way, affinity groups and the individual

3   students who form them improve the community's critical

4   thinking skills, communication skills, and civic engagement,

5   among other things.

6          Unfortunately, without race-conscious admissions, a

7   substantial reduction in black and Latinx students would

8   threaten the continued existence of cultural organizations

9   and the benefits they provide.  Some organizations would have

10  to reduce the size of their leadership boards or the

11  programming they offer.

12         Other organizations and their subgroups would

13  suffer such a stark reduction in their membership that they

14  would cease to exist or no longer have the capacity to be

15  effective.

16         Because collaboration across organizations is

17  essential, even organizations whose membership ranks are not

18  significantly reduced would no longer be able to provide the

19  same experiences for their members and for the larger Harvard

20  community.

21         As Cecilia Nunez testified, the idea that there

22  would be a much smaller pool of Latinx students on campus is

23  concerning as it calls into question whether Fuerza Latina as

24  an organization can exist.  In addition, she continued, it

25  would impact the well-being of our constituents.  That could

1    mean even more students feeling that much more alone on

2    campus.

3            As student amici pointed out, the witnesses we

4    heard from explained that racial diversity was a crucial

5    factor in why they applied to and ultimately decided to

6    attend Harvard.

7            For Professor Margaret Chin, Harvard was not even

8    on her radar until she attended a college fair in Chinatown

9    and heard from Asian-American Harvard students that she

10   should apply.

11           Roger Banks, who served as director of the

12   undergraduate minority recruitment program for 20 years,

13   explained that, quote, typically the leaders of various

14   minority groups and communities on campus became recruitment

15   coordinators and host students during Visitas, a prospective

16   student weekend.  This allows students to, quote, really see

17   what its like as a student of color at Harvard.

18           Cecilia Nunez considered it very important to be in

19   a school that had a diverse student body.  Visiting Harvard

20   during Visitas weekend affirmed that Harvard would be a good

21   fit.

22           While the undergraduate minority recruitment

23   program is a key tool, what ultimately attracts many students

24   of color to Harvard is the diversity itself.  Without this

25   diversity, admissions officers and student ambassadors could

1    not be as persuasive and successful in their recruitment

2    efforts.

3            As Cecilia explained, "If Harvard hadn't felt like

4    it was a space that would be welcoming to people of color and

5    if it hadn't felt like a very diverse space, it probably

6    would have affected my decision to go."

7            The diversity attained through race-conscious

8    admissions must be preserved in order to attract future

9    classes of diverse students.

10           Finally, our witnesses' testimony makes clear that

11   Dr. Kahlenberg is wrong.  Race-neutral alternatives cannot

12   provide meaningful full diversity, and the educational

13   benefits currently conveyed would be lost under an admissions

14   program that does not actually consider race.

15           In all of Kahlenberg's simulations of race-neutral

16   alternatives, the racial group that bore the greatest burden

17   was black students.  The percentage of black students

18   declined dramatically in each simulation.  And in some, the

19   result was a 40 percent reduction of the number of black

20   students on campus.

21           Dr. Kahlenberg did not talk to a single Harvard

22   student or faculty member about how a reduction of black

23   students would affect the quality of a Harvard education.

24           But Your Honor has had the benefit of hearing from

25   eight amici witnesses, each of whom testified that a loss of

1    black students of this magnitude would fundamentally alter

2    the educational experience for all students.

3         In addition, each amici witness testified that

4    while socioeconomic status is important, it is not a

5    substitute for understanding and addressing race.

6         Race remains a visible marker that cannot be

7    ignored.  Cecilia Nunez described how she faced bias growing

8    up that was based on race and entirely unrelated to her

9    socioeconomic status.  She grew up in an upper middle class

10   family, her parents are both doctors, yet people often

11   assumed that her family wasn't educated or -- and I'm

12   quoting -- that they were in some way less than other

13   families in their city.

14        In elementary and middle school, classmates were

15   not allowed to come over to play at her house because their

16   parents made false assumptions that her family would be a bad

17   influence.  Assumptions like these are wrong regardless of a

18   family's socioeconomic status, but Cecelia's experience show

19   how these assumptions persist for families of color, even

20   when they've achieved financial comfort.

21        Importantly, Dr. Kahlenberg parts ways with SFFA.

22   It acknowledges that racial discrimination faced by

23   applicants of color should be considered as part of the

24   admissions process, and he further concedes that employing

25   race is, by definition, the most efficient method of

Case: 19-2005    Document: 00117638846    Page: 630    Date Filed: 07/29/2020    Entry ID: 6356391
Case 1:14-cv-14176-ADB  Document 656  Filed 04/18/19  Page 151 of 155

151

1    promoting racial diversity.  On this point, we agree.

2           Behind the dueling statistical models in this case

3    are real people directly impacted by Harvard's race-conscious

4    admissions policy.  Students and alumni for whom diversity

5    and inclusion that it fosters remain a pressing concern that

6    cannot be taken for granted.

7           We heard painful stories that show the harsh ways

8    race continues to impact the experiences of Harvard students.

9    A Chinese-American student assumed to be a tourist and asked

10   to leave the common room.  A black student labeled

11   threatening and treated violently by Cambridge police.  A

12   group of Latinx students called wetbacks while walking around

13   campus with friends.

14          The stereotypes and prejudice experienced by these

15   students varied, but the hostile and alienating message was

16   always clear.  Students and alumni who have been committed to

17   diversity and inclusion for decades, like Professor Chin,

18   advocate for race conscious solutions.

19          Plaintiffs mention Dr. Chin's article from 35 years

20   ago but failed to mention its conclusion that race-conscious

21   solutions are necessary to address any bias against

22   Asian-American applicants.

23          Your Honor has also heard stories of the

24   transformation that happens when some of our country's

25   brightest young people have the opportunity to engage with

        1   classmates who are different from them, sometimes for the
        2   first time in their lives.
        3        The benefits of diversity can be found in the
        4   late-night conversations between two roommates.  One black
        5   whose family is from Ghana, one Asian-American whose family
        6   is from Vietnam, assigned to live together in a dorm room
        7   where they fall asleep talking to each other at night.
        8        For Catherine Ho, the experience of living with her
        9   roommate opened her eyes to how police brutality impacts
       10   black students, making her personally connected to a social
       11   problem from which she previously had the privilege of being
       12   relatively removed.
       13        Harvard has embraced its educational mission of
       14   preparing the future citizen leaders of our country to
       15   address the enduring schisms and problems that plague our
       16   society.  How, Dr. Ruth Simmons asked, can we expect our
       17   future leaders to remediate these schisms if we don't prepare
       18   them to do so?
       19        Similarly, as a leader in the Phillips Brooks House
       20   Association, Cecilia Nunez explained that, quote, it's very
       21   important that we have people who understand our
       22   constituents' diverse experience.  Her comments referred to
       23   her volunteer activities, but the same principles apply to
       24   the future work of citizen leaders after college.
       25        Harvard's diversity puts students in an environment

 1    where people of different backgrounds stop being faceless

 2    others and become classmates, teammates, lab partners, and

 3    friends.  In this process, stereotypes are undermined,

 4    cross-cultural relationships grow, and deeper understandings

 5    of complex social problems are formed.

 6              The testimony you have heard makes clear, racial

 7    diversity is one of the most meaningful aspects of the

 8    preparation that Harvard students receive.  Harvard must be

 9    permitted to pursue the benefits of diversity if it is to

10    fulfill its educational mission.  Thank you.

11              THE COURT:  All right.  Thank you all.

12              I think what remains is a schedule for findings of

13    fact and conclusions of law.  Do you want to submit that in

14    the next few days?  Does that make the most sense?

15              MS. ELLSWORTH:  Yes, Your Honor.  We can confer

16    with SFFA and submit something in writing if that works for

17    you.

18              THE COURT:  Welcome back, Mr. Consovoy.  Your voice

19    has been missing.

20              So we have finished.  I know I said this at the

21    midpoint, but I really want to thank you all.  To echo

22    something that Mr. Mortara said, I really feel privileged to

23    have participated in a trial where the lawyering by

24    everybody, the lawyer for both parties and the amici, has

25    been so exceptional.

Case: 19-2005    Document: 20-7    Page: 633    Date Filed: 07/29/2020    Entry ID: 6356391
Case 1:14-cv-14176-ADB   Document 656   Filed 04/18/19   Page 154 of 155

154

1           I don't know if I will have another case in my

2    career where I can say that the presentation has been as

3    exceptional and professional and thoughtful as it has been in

4    this case.  So I want to thank you for all of that.

5           Obviously the issues raised by this case are

6    incredibly important both for the parties to the case but

7    also sort of for the world, or at least for students in the

8    United States.  And I take the charge seriously and will wait

9    for your findings of fact and conclusions of law.

10          And we'll have another closing session.  I suspect

11   that most of you know in this courtroom how difficult it is

12   to try the hours we've been trying and keep the rest of the

13   docket afloat.  So my thanks also to Joan and Karen and the

14   law clerks who have all been exceptional throughout this.

15          But again, I really can't compliment you enough for

16   the job that's been done throughout this trial.  It's really

17   been a privilege.  And I hope that our final work product on

18   it is worthy of the effort that you all have put into it.  So

19   thank you very much.

20          We will reconvene, but in the meantime the case is

21   recessed.

22          (The Court adjourned at 2:25 p.m.)

23

24

25

Case: 19-2005    Document: 00117631846    Page: 634    Date Filed: 07/29/2020    Entry ID: 6356391
Case 1:14-cv-14176-ADB   Document 656   Filed 04/18/19   Page 155 of 155

155

```
 1                 - - - - - - - - - - -

 2                     CERTIFICATION

 3

 4          I certify that the foregoing is a correct

 5    transcript of the record of proceedings in the above-entitled

 6    matter to the best of my skill and ability.

 7

 8

 9

10    /s/ Joan M. Daly              November 2, 2018

11    _____       _____

12    Joan M. Daly, RMR, CRR        Date
      Official Court Reporter
13

14

15

16

17

18

19

20

21

22

23

24

25
```

**JA3558**

1          UNITED STATES DISTRICT COURT

2          DISTRICT OF MASSACHUSETTS

3    _____

4    STUDENTS FOR FAIR ADMISSIONS, INC.,

5                    Plaintiff,          Civil Action
                                         No. 14-14176-ADB
6    v.
                                         February 13, 2019
7    PRESIDENT AND FELLOWS OF HARVARD
     COLLEGE, et al.,                    Pages 1 to 129
8
                    Defendants.
9    _____

10

11

12            TRANSCRIPT OF CLOSING ARGUMENTS
        BEFORE THE HONORABLE ALLISON D. BURROUGHS
13            UNITED STATES DISTRICT COURT
           JOHN J. MOAKLEY U.S. COURTHOUSE
14               ONE COURTHOUSE WAY
                 BOSTON, MA  02210
15

16

17

18

19

20

21

22
              JOAN M. DALY, RMR, CRR
23             Official Court Reporter
          John J. Moakley U.S. Courthouse
24         One Courthouse Way, Room 5507
               Boston, MA  02210
25            joanmdaly62@gmail.com

Case: 19-2005    Case 1:14-cv-14176-ADB    Document 001172610846    Document 666    Page: 666    Date Filed: 07/01/19    07/29/2020    Page 2 of 129    Entry ID: 6356391

2

```
1     APPEARANCES:

2
      COUNSEL FOR THE PLAINTIFF:
3

4             ADAM K. MORTARA, ESQUIRE
              J. SCOTT McBRIDE, ESQUIRE
5             KRISTA J. PERRY, ESQUIRE
              Bartlit Beck Herman Palenchar & Scott
6             54 West Hubbard Street
              Suite 300
7             Chicago, Illinois 60654
              312.494.4400
8             adam.mortara@bartlit-beck.com
              scott.mcbride@bartlit-beck.com
9             krista.perry@bartlit-beck.com

10            JOHN M. HUGHES, ESQUIRE
              MEG E. FASULO, ESQUIRE
11            Bartlit Beck Herman Palenchar & Scott
              1801 Wewatta Street
12            Suite 1200
              Denver, Colorado 80202
13            303.592.3100
              john.hughes@bartlit-beck.com
14            meg.fasulo@bartlit-beck.com

15            JOHN MICHAEL CONNOLLY, ESQUIRE
              THOMAS R. McCARTHY, ESQUIRE
16            WILLIAM S. CONSOVOY, ESQUIRE
              CAMERON T. NORRIS, ESQUIRE
17            Consovoy McCarthy Park PLLC
              3033 Wilson Boulevard
18            Suite 700
              Arlington, Virginia 22201
19            703.243.9423
              mike@consovoymccarthy.com
20            tom@consovoymccarthy.com
              will@consovoymccarthy.com
21

22

23

24

25
```

Case: 19-2005    Document-001176218846    Page: 667    Date Filed: 07/29/2020    Entry ID: 6356391
Case 1:14-cv-14176-ADB   Document 666   Filed 07/01/19   Page 3 of 129

3

```
 1    APPEARANCES (cont.):

 2
              PATRICK STRAWBRIDGE, ESQUIRE
 3            Consovoy McCarthy Park PLLC
              Ten Post Office Square
 4            8th Floor, South, PMB #706
              Boston, Massachusetts 02109
 5            617.227.0548
              patrick@consovoymccarthy.com
 6

 7    COUNSEL FOR THE DEFENDANT:

 8            WILLIAM F. LEE, ESQUIRE
              FELICIA H. ELLSWORTH, ESQUIRE
 9            ANDREW S. DULBERG, ESQUIRE
              ELIZABETH C. MOONEY, ESQUIRE
10            SARAH R. FRAZIER, ESQUIRE
              Wilmer Cutler Pickering Hale and Dorr LLP
11            60 State Street
              Boston, Massachusetts 02109
12            617.526.6556
              william.lee@wilmerhale.com
13            felicia.ellsworth@wilmerhale.com
              andrew.dulberg@wilmerhale.com
14            elizabeth.mooney@wilmerhale.com
              sarah.frazier@wilmerhale.com
15
              SETH P. WAXMAN, ESQUIRE
16            DANIELLE CONLEY, ESQUIRE
              DANIEL WINIK, ESQUIRE
17            Wilmer Cutler Pickering Hale and Dorr LLP
              1875 Pennsylvania Ave, NW
18            Washington, DC 20006
              202.663.6006
19            seth.waxman@wilmerhale.com
              danielle.conley@wilmerhale.com
20            daniel.winik@wilmerhale.com

21            DEBO P. ADEGBILE, ESQUIRE
              Wilmer Cutler Pickering Hale and Dorr LLP
22            7 World Trade Center
              250 Greenwich Street
23            New York, New York 10007
              212.295.6717
24            debo.adegbile@wilmerhale.com

25
```

```
 1    APPEARANCES (cont.):

 2
              ARA B. GERSHENGORN, ESQUIRE
 3            ROBERT IULIANO, ESQUIRE
              Harvard Office of the General Counsel
 4            Smith Campus Center, Suite 980
              1350 Massachusetts Avenue
 5            Cambridge, Massachusetts 02138
              617.495.8210
 6            ara_gershengorn@harvard.edu
              Robert_iuliano@harvard.edu
 7

 8    COUNSEL FOR AMICI STUDENTS:

 9            JON M. GREENBAUM, ESQUIRE
              BRENDA L. SHUM, ESQUIRE
10            GENEVIEVE BONADIES TORRES, ESQUIRE
              1500 K Street NW, Suite 900
11            Washington, DC 20005
              202.662.8315
12            jgreenbaum@lawyerscommittee.org
              bshum@lawyerscommittee.org
13            gtorres@lawyerscommittee.org

14            EMMA DINAN, ESQUIRE
              Arnold & Porter LLP
15            555 Twelfth Street, NW
              Washington, DC 20004
16            202.942.5477
              emma.dinan@aporter.com
17

18    COUNSEL FOR AMICI ORGANIZATIONS:

19            JENNIFER A. HOLMES, ESQUIRE
              CARA McCLELLAN, ESQUIRE
20            MICHAELE M. TURNAGE YOUNG, ESQUIRE
              RACHEL N. KLEINMAN, ESQUIRE
21            CATHERINE BULLOCK, ESQUIRE
              NAACP Legal Defense and Educational Fund, Inc.
22            700 14th Street NW, Suite 600
              Washington, DC 20005
23            jholmes@naacpldf.org
              cmcclellan@naacpldf.org
24            mturnageyoung@naacpldf.org
              rkleinman@naacpldf.org
25
```

**APPEARANCES (cont.):**

**KATE R. COOK, ESQUIRE**
**Sugarman Rogers**
**101 Merrimac Street**
**Suite 900**
**Boston, Massachusetts 02114**
**617.227.3030**
**cook@sugarmanrogers.com**

```
 1                    P R O C E E D I N G S

 2                (The following proceedings were held in open court

 3      before the Honorable Allison D. Burroughs, United States

 4      District Judge, United States District Court, District of

 5      Massachusetts, at the John J. Moakley United States

 6      Courthouse, One Courthouse Way, Boston, Massachusetts, on

 7      February 13, 2019.)

 8                THE CLERK:  All rise.  Court is in session.  Please

 9      be seated.  This is Civil Action 14-14176, Students for Fair

10      Admissions.

11                Will counsel identify yourselves for the record.

12                MR. MORTARA:  Your Honor, Adam Mortara for Students

13      for Fair Admissions.  With me are my colleagues Will

14      Consovoy, John Hughes, Meg Fasulo, Michael Connolly, Cameron

15      Norris, Patrick Strawbridge, Thomas McCarthy, Krista Perry,

16      and Scott McBride.  Excused absences for Ms. Hacker, who is

17      full-term now and cannot travel, and Mr. Michael Park who had

18      the great honor of appearing in front of the Senate Judiciary

19      Committee this morning in connection with his nomination to

20      the United States Court of Appeals for The Second Circuit.

21                MR. LEE:  Good afternoon, Your Honor.  Bill Lee

22      from Wilmer Hale for Harvard.  With me are my partners Seth

23      Waxman, Danielle Conley, Felicia Ellsworth, Debo Adegbile and

24      Daniel Winik.  And from Harvard, Bob Iuliano and Ara

25      Gershengorn.
```

Case: 19-2005    Document-001176218846    Page: 646    Date Filed: 07/29/2020    Entry ID: 6356391
Case 1:14-cv-14176-ADB   Document 666   Filed 07/01/19   Page 7 of 129

7

1          MS. TORRES:  Good afternoon, Your Honor.  Genevieve

2    Bonadies --

3          THE COURT:  I knew you were here someplace.

4          MS. TORRES:  Genevieve Bonadies Torres representing

5    the student Amici in this case.  From the Lawyers Committee,

6    I'm joined by Brenda Shum and Jon Greenbaum.  And I am joined

7    by my colleagues at Asian Americans Advancing Justice, Nicole

8    Gon Ochi and Arnold & Porter -- somebody.  Thank you.

9          MS. HOLMES:  Good afternoon, Your Honor.  Jennifer

10   Holmes from the NAACP Legal Defense Fund here on behalf of

11   the Amici organizations.  I'm joined by our local counsel,

12   Kate Cook, and also my colleagues Michelle Turnage Young,

13   Rachel Kleinman, Cara McClellan, and Catherine Bullock.

14         THE COURT:  Excellent.  So each party has an hour.

15   The two Amici have 15 minutes.  I'm happy to do this however

16   you would like.

17         MR. MORTARA:  Your Honor, I'll be presenting in our

18   opening piece for Students for Fair Admissions.  We have one

19   small request changing up from the last closing.

20         We would like, with Your Honor's permission, to

21   have the plaintiff's traditional opportunity to have the last

22   word.  So if you wouldn't mind, we'd like our rebuttal piece

23   to go after the amicus parties.

24         THE COURT:  I'm fine with that.  Any objection from

25   Harvard?

Case: 19-2005   Document: 00117620846   Page: 642   Date Filed: 07/29/2020   Entry ID: 6356391
Case 1:14-cv-14176-ADB   Document 666   Filed 07/01/19   Page 9 of 129

8

```
1              MR. LEE:  Not from Harvard, Your Honor.
2              THE COURT:  How much time are you reserving,
3     Mr. Mortara?
4              MR. MORTARA:  15 minutes.
5              THE COURT:  Karen, you got that?  45 minutes for
6     him and then he can have his last 15.
7              Wasn't sure you were going to make it back,
8     Mr. Mortara.
9              MR. MORTARA:  Your Honor, I just couldn't quit this
10    case.
11             THE COURT:  The people that are standing in back,
12    you're welcome to stand.  But you have to have a wall because
13    you're blocking all those people that you're standing in
14    front of.  Or a floor, you can have a floor, too.
15             When you're ready.
16             MR. MORTARA:  You should have a binder, Your Honor,
17    that has all of my demonstratives that I'm going to show.  I
18    know you like to follow along in paper.
19             THE COURT:  Yes.  I appreciate that.  Thank you.
20             MR. MORTARA:  I'll try to tell you the tabs that
21    are numbered.  They're not all consecutive because they
22    correspond to some things I'm showing on the screen or in my
23    outline, but I'll direct you to the tabs as needed as we roll
24    through.  There's also some duplicates, but that's because
25    I'm rolling through.  So please don't be alarmed by
```

Case: 19-2005   Document: 00117620846   Page: 643   Date Filed: 07/29/2020   Entry ID: 6356391
Case 1:14-cv-14176-ADB   Document 666   Filed 07/01/19   Page 9 of 129

9

```
 1    duplicates.  Luckily nothing fell out this time.

 2             With your permission, Your Honor, I'll begin.

 3             THE COURT:  Go.

 4             MR. MORTARA:  Your Honor, in preparing your opinion

 5    in this case, the Court will have the opportunity to explain

 6    the undisputed facts, decide the disputed facts, and of

 7    course apply the law to both.

 8             Perhaps the most important undisputed fact is that

 9    Asian-Americans received dramatically statistically

10    significantly lower personal ratings from Harvard, lower than

11    whites, lower than African-Americans, and lower than Hispanic

12    applicants.

13             And perhaps the most important question in the case

14    is, why is that happening?

15             It's no exaggeration to say that entire communities

16    of Americans, millions of them, await this Court's important

17    answer to that question.  And the case also turns on the

18    answer, as the Court knows.

19             If the Court finds that Harvard imposed a racial

20    penalty in the personal rating against Asian-Americans,

21    Harvard loses this case on Count I.

22             And Your Honor, as we did in the previous closing,

23    we're happy to rest on our papers on the other counts.

24    Should Your Honor have questions on those other counts,

25    Mr. Hughes is here to answer them, and we'll take up our time
```

**JA3567**

```
 1    to do so should we need to.

 2              There's only two possible answers to that important

 3    question, Your Honor.  Either Asian-Americans actually

 4    deserve those lower personal ratings because, in fact, they

 5    have less integrity, kindness, grit, and likability and all

 6    the things that Harvard says it's looking for; they actually

 7    have inferior personal qualities.  Or Harvard admissions

 8    officers have fallen prey to human frailty and racial

 9    stereotyping.

10              The Court can side with Harvard and write into law

11    that Asian-Americans are actually just one dimensional and

12    book smart.  Those are Harvard's terms.

13              Or the Court can find that through some mechanism,

14    whether it was inadequate supervision, inadequate training,

15    or inadequate written guidance, racial stereotyping crept

16    into Harvard's process.

17              As Mr. Hughes said the last time we were here, the

18    statistical battle in this case boils down to whether or not

19    you find race influences the personal rating.

20              If it does, even as just a tip, Professor Card

21    admitted it should be removed from the admissions model.

22    Your Honor knows the testimony.

23              Please excuse me while I relaunch my computer.

24              Your Honor knows the testimony.  He said it.  It's

25    behind Tab 1 in your binder.  It's inappropriate to include
```

 1    any variables that can themselves be affected by race.

 2              And behind Tab 2, he said it again.  Even if the

 3    rating is influenced by race only in the form of a tip.

 4              Those are clear admissions.

 5              THE COURT:  Can I interrupt you for a second?

 6    Don't I have to find it was intentional for Count I?

 7              MR. MORTARA:  Absolutely not, Your Honor.  Unless

 8    by "intentional" you mean animus.

 9              THE COURT:  That or intentionality.  Or are you

10    relying on *Teamsters*?

11              MR. MORTARA:  We are relying on pattern or

12    practice, absolutely.  Obviously it's an intentional

13    discrimination case.  You have to find intentional

14    discrimination.

15              The First Circuit has been very clear that

16    intentional discrimination doesn't mean animus.  The Supreme

17    Court has been very clear about that in all of the equal

18    protection cases going back to the '90s that you do not need

19    to find animus to find intentional discrimination.

20    Intentional discrimination can come from racial stereotypes

21    or unthinking bias.  That's what the First Circuit said in

22    *Thomas* against Eastman Kodak.

23              THE COURT:  Go ahead.

24              MR. MORTARA:  In Professor Card's own model, when

25    the personal rating was removed, again as Your Honor knows,

1    he himself found in Harvard's admissions model a

2    statistically significant Asian penalty.

3              And you would expect then, since Professor Card

4    testified that if race influences the personal rating and if

5    it comes out of his model, it should come out of his model.

6    And if it does come out of his model, he himself found an

7    Asian penalty, that he would have told you, given you an

8    opinion, that race was not affecting the personal rating at

9    all.

10             But he did not.  He did not give you an expert

11   opinion as an economist crunching any numbers or present any

12   analysis that showed race wasn't influencing the personal

13   rating.  He instead chose to take Harvard's word for it.

14             Dean Fitzsimmons had a telephone call with him and

15   said we have never used race in the personal ratings, and

16   Professor Card accepted that representation.

17             The only model of the personal rating came from

18   Professor Arcidiacono, which showed significant effects of

19   race.  Negative on Asians, positive for African-Americans and

20   Hispanics.  That's behind Tab 4 in your binder.  You'll

21   remember this slide from Professor Arcidiacono, and in the

22   lower left pane of that slide you'll see the personal rating

23   model.  Negative penalty for Asians.  Large tips for

24   African-Americans and Hispanics.

25             Professor Card and Harvard, now through hundreds of

1    pages of posttrial briefing, have made no effort whatsoever

2    to explain the massive boost for African-Americans and

3    Hispanics found here and shown in the raw data.

4            Card never once talked about it, even though if

5    those tips are present, the personal rating will be just like

6    the overall rating and should be removed from the admissions

7    model, by his own testimony.

8            Harvard hasn't even tried to offer a rationale for

9    why African-Americans and Hispanics just have better personal

10   qualities than Asians or whites, why they would be more

11   likeable or have greater kindness, integrity, or grit.

12   Because they don't.  Because your skin color doesn't

13   determine your personal qualities.

14           In answering Professor Arcidiacono's model, Harvard

15   focused exclusively on the first third, the Asian penalty

16   that Professor Arcidiacono found.  But all the analysis

17   Professor Card did could not make it go away.

18           You'll remember, Your Honor, this demonstrative I

19   have created with Professor Card during the

20   cross-examination.  This is behind Tab 5 in your binder.  He

21   had shown the first four dots in his direct exam Professor

22   Arcidiacono's models of the personal rating, including model

23   5 which includes all the variables, the ratings variables,

24   context variables, interactions, demographics, academics.

25           And then he said, and I added some more variables

**JA3571**

Case: 19-2005    Document: 00117621846    Page: 648    Date Filed: 07/09/2020    Entry ID: 6356391
Case 1:14-cv-14176-ADB    Document 666    Filed 07/01/19    Page 14 of 129

14

1    and I made the Asian penalty smaller.  And if I kept adding

2    variables, it might just go to the ceiling.

3            When I got to talk to him, we put in his results

4    and showed that even throwing in all the variables he could

5    at the personal rating model, he could not make the Asian

6    penalty go away.  Far from going to the ceiling, it's

7    plateauing at a statistically significant level.  He said his

8    own analysis showed a statistically significant Asian

9    penalty.  He didn't make it go away.

10           Harvard has some answers to this.  First, Harvard

11   repeats like a mantra the idea that because Asians outperform

12   white and other applicants on the extracurricular and

13   academic ratings, that must mean that Professor Arcidiacono

14   found a positive racial bias in those ratings.

15           And behind Tab 6 you have again Professor

16   Arcidiacono's models of the ratings, and I'll just blow up on

17   the screen the academic rating.  The point Harvard is making

18   here is because of this modest positive coefficient on

19   Asian-Americans, that must be mean that Professor Arcidiacono

20   should have been saying there's a positive bias in the

21   academic rating, as we have explained many many times.

22           There are observables in the data like SAT scores,

23   for example, important for the academic rating.  There's also

24   data about the applicant that Harvard has that don't go into

25   the model either because we don't have enough of it or

**JA3572**

```
 1    because it's hard to program into the model.
 2               One example of the former is the number of AP exams
 3    a student may have taken.  There's also evidence in the
 4    record that Asian applicants take more AP exams than white
 5    applicants to Harvard.
 6               An example of the latter would be the type and
 7    quality of academic awards that an applicant got.  That's
 8    hard to code into the data.
 9               The directionality you see here is consistent with
10    the idea that Asian-Americans are superior to white
11    applicants on the observable data like SATs, GPAs, the like.
12    And they're also superior on the unobservables like number of
13    AP scores, number of AP tests, and academic awards.
14               It's when these arrows move in starkly opposite
15    directions that you know there's a problem like you see in
16    the lower left with the personal rating, arrows and the bars
17    moving in opposite directions.
18               Now, Harvard likes to use jargon like
19    omitted-variable bias or other unobservables as some sort of
20    mystical explanation for why Asians are getting penalized on
21    the personal score that isn't itself race.
22               I just gave you the example of the number of AP
23    scores and the academic awards.  What are Harvard's omitted
24    variables that will tell us Asian applicants really have less
25    integrity, grit, kindness or likability?  To even ask the
```

1   question proves that Harvard's invocation of terms like

2   omitted-variable bias and other unobservables just repackages

3   racial stereotypes and cloaks them in scientific sounding

4   phrases.

5            And to the surprise of no one, other than Harvard,

6   perhaps, the law is defendants cannot win discrimination

7   cases by saying it must be some other variable, without

8   telling us what that variable is, and providing evidence that

9   would support a race-neutral reason.

10           Harvard didn't do that.  A case that says that,

11  Your Honor, is the *Palmer* case from the D.C. Circuit cited in

12  our briefs.

13           Where is the evidence that white applicants to

14  Harvard write essays that just make them seem more likeable

15  than Asian applicants?  Harvard cannot even start to answer

16  that question without invoking still more casual racist

17  stereotypes, adding to the list of loaded terms like

18  "one-dimensional" and "book smart" that we heard during the

19  trial.

20           The law and common sense tells us that skin color

21  has nothing to do with your personal qualities or likability.

22           Harvard's second answer to this is that, even

23  though Professor Arcidiacono's model 5, shown here on the

24  screen, includes all the ratings variables, Harvard now says

25  that because whites do slightly better on school support

**JA3574**

1    ratings, that answers everything.

2              But it answers absolutely nothing, Your Honor.

3    Harvard's admissions officers themselves assigned the school

4    support ratings.  And there was unrebutted and undisputed

5    testimony from Professor Arcidiacono that he also found an

6    Asian penalty in those ratings.

7              Moreover, there was testimony, including from Dean

8    Fitzsimmons, that the personal rating is not only based on

9    school support or alumni interview ratings.  Harvard admits

10   extracurriculars and how a student performs in them weigh

11   into the personal rating.  And we know Asians massively

12   outperform white applicants on the extracurricular rating.

13             All Harvard did was cherry-pick one sliver of the

14   data, one spot where whites do slightly better, and then

15   tried to drive that through the entire explanation of the

16   observed Asian penalty.  But without an actual statistical

17   model, it proves nothing.  And the only regression analysis

18   we have is the one on the screen and the iterations Professor

19   Card did afterwards, all of which show a statistically

20   significant Asian penalty.

21             And as Professor Arcidiacono testified, and the

22   amicus brief at page 7 says, the relatively small white Asian

23   school support gap cannot explain the observed raw data

24   personal score gap that we see both in the raw data and in

25   the regression model.

1           And what about African-Americans and Hispanics?

2      Two-thirds of the pane you're looking at with these massive

3      boosts going in the opposite direction of the observables,

4      they do so much better on the personal rating than whites and

5      Asians.

6           Did Professor Card and Harvard show you how school

7      support or alumni interview ratings explained that?  No, they

8      didn't because they're not explaining the racial distribution

9      of the personal rating at all.  They're not giving you

10     evidence that race doesn't influence the personal rating.

11          Harvard wants you to believe that it's just a

12     coincidence that the racial pattern on the personal rating

13     looks just like the racial pattern on the overall rating,

14     which you'll see behind Tab 7.

15          Harvard wants you to think they admit using race in

16     the overall rating, admit giving a preference to

17     African-Americans and Hispanics in the overall rating.

18          There's undisputed testimony, unrebutted by

19     Harvard, unrebutted by Card, in this case that there's an

20     Asian penalty in the overall rating.  And they want you to

21     look at the same distribution in the personal rating and

22     believe them that race has never been used and race does not

23     influence the personal rating.

24          One thing Harvard is very good at is something that

25     some people call, colloquially, don't believe your lying

eyes, but we can also learn about in George Orwell's 1984.
Two plus two equals five.  Don't believe what you're seeing.
Don't believe what you're looking at, the same pattern
between overall and personal.  Believe us, trust us.  Race
has never been used in the personal rating.

        And, Your Honor, that's before we get to all the
nonstatistical evidence on the personal rating where we see
more of this type of argument.

        Some examples.  Christopher Luby.  We're supposed
to believe that Mr. Luby testified credibly at trial that he
never used race in the personal rating.  That's Harvard's
word from their posttrial brief, "credibly," even though he
said the opposite under oath at his deposition in the first
hour.  Then he sat there for hours answering additional
questions from my friend Mr. Connolly, didn't change his
testimony.

        Then a month later he got the written transcript
and spent hours looking at that, reading what had been asked
and what he had answered, changing dozens of things,
substantive things about his testimony.  Didn't change it
then.

        But then we're supposed to believe, you and I, that
after 40 hours spent with Harvard's counsel, he suddenly
discovered the truth about how he'd been doing his job all
along and that he'd never used race in the personal rating

1    ever.

2            Two plus two equals five, Your Honor.  Trust us.

3            We're supposed to believe that even though the

4    Department of Education's Office of Civil Rights found in a

5    report in 1990 that Harvard's admissions offices, at least

6    some of them, had been using race in the personal ratings, a

7    finding that has never once been disputed by Harvard in

8    hundreds of pages of posttrial briefings.  They've never once

9    even answered it or addressed it.

10           And then everyone from Mr. Lee to Director McGrath

11   to Dean Fitzsimmons came to court and told us nothing had

12   changed about Harvard's use of race since that finding.

13           And as you know, and behind Tab 8 you will find

14   Plaintiff's Exhibit 509, Harvard's own lawyers are writing

15   letters to the Department of Education, telling them those

16   earlier findings are still accurate today as late as 2012.

17           And no one remembers ever training or admonishing

18   anyone about not using race in the personal rating, even

19   after DOE made those findings.  Yet we are now supposed to

20   believe Harvard's made-for-litigation excuse that no one has

21   ever used race in the personal rating, despite the fact that

22   the United States Government found that they did.  And then

23   they told that same government nothing had changed as late as

24   2012.

25           Two plus two equals five, Your Honor.  Trust us.

 1    It's never happened.

 2            And what about what happened last summer?  We're

 3    supposed to believe that Director McGrath was in Montana and

 4    she didn't read the deluge of national press about this case

 5    created by the summary judgment filings and the revelations

 6    about the personal rating that were all over the press.

 7            Mr. Hughes is from Montana.  His parents in

 8    Whitefish had no trouble following the case.

 9            We're supposed to believe that even though before

10    that summary judgment briefing the admissions office had

11    gotten together at a retreat and they decided to make no

12    changes to the personal rating guidance.

13            But somehow Harvard would have us believe that sua

14    sponte in August, after all that press, the admissions office

15    embarked on a process that ultimately added 872 percent more

16    words to the instructions on the personal rating than had

17    existed before.

18            That's depicted behind Tab 9, Your Honor.  You see

19    the class of 2022 reading procedures, Defendant's 744,

20    compared to the class of 2023, Plaintiff's 633.  This thing

21    had not changed in such a material way in decades.

22            Behind the next tab, Your Honor, 10, you'll see the

23    reading procedures guidance from the 1980s contained in the

24    OCR report compared to 2022 compared to what they did in

25    August.  And of course that had nothing to do with this case,

1    nothing to do with the revelations in the press, nothing to

2    do with this upcoming trial.  Nothing at all.  That's what

3    Harvard wants you to believe.  That's what they've said.

4         Now, we're told these massive revisions actually

5    changed nothing at all, and this is just a codification of

6    uniform historical practice that no one has ever deviated

7    from.  Right.  Because you don't change something for nearly

8    40 years in any appreciable way, and the system is working

9    perfectly, and no one uses race in the personal rating even

10   though the Department of Education found they did, but you

11   need to add 872.5 percent more words to make sure everything

12   stays the same.  And you have to add the first ever

13   injunction against using race in the personal rating

14   appearing in writing ever.

15        And of course the key language added that we all

16   know is designed to fight caricature and stereotypes of

17   Asians.

18        Appearing behind Tab 11, of course, at the top,

19   you'll see the reading procedures and the language that

20   you'll well remember was in red in one of the drafts, Your

21   Honor, compared to the OCR report which found, amongst other

22   things, that Harvard admissions officers had used

23   stereotypical language about Asian applicants.

24        We need to talk a little bit about how this came to

25   light, Your Honor.  First Director McGrath and Dean

1    Fitzsimmons testify inaccurately about whether there's

2    written guidance on the personal rating on race in this

3    court.  That's what happened.  The questions could not have

4    been clearer, and they got the answers dead wrong.

5              Remember my question.  Down to a sticky note on the

6    coffee pot, I asked Director McGrath, is it written anywhere

7    at the admissions office not to use race in the personal

8    operating?

9              She said, no, it's not.

10             We found out later when Director McGrath came back

11   that she had imposed an unverbalized qualification on my

12   question to be limited to the discovery period.

13             But putting aside Director McGrath's confusion

14   about my question, after that, Harvard knew, Harvard's

15   lawyers knew inside and outside, Your Honor, they knew those

16   answers were inaccurate.

17             And they did nothing to correct that false factual

18   testimony even though every rule in the book says that when

19   your witness in your case says something that is not true and

20   you know it's not true, whether or not the witness made a

21   mistake, you have a duty to tell the Court and to tell the

22   other side, but they didn't.

23             Then when the last admissions officer was on the

24   stand in a throwaway rehabilitation attempt of Tia Ray, we

25   find out about the new reading procedures.

```
 1          Caught now with the McGrath and Fitzsimmons'
 2   inaccurate testimony and the Court's immediate order to
 3   produce the reading procedures, Harvard first assures me and
 4   assures you that these new reading procedures actually help
 5   Harvard's case.
 6          Two plus two equals five, Your Honor.  Trust us.
 7          These reading procedures, once we get them, end up
 8   helping Harvard so much that by the time of closing Harvard
 9   is telling the Court they're not admissible to support a
10   liability finding under Federal Rule of Evidence 407,
11   Subsequent Remedial Measures.
12          Just like I told you at my closing, Your Honor,
13   that argument has disappeared from the posttrial briefing
14   because it was waived when Harvard allowed the reading
15   procedures into evidence without objection.
16          I know you know this, Your Honor, but Rule 407 does
17   not exist because subsequent remedial measures are not
18   probative of liability.  They're extremely probative of
19   liability.  Rule 407 exists because of the public policy
20   matter.  We want cities to fill potholes after there are
21   accidents without fear that the filling of them will be used
22   in a very effective way to acknowledge they should have been
23   filled in the first place.
24          We want universities to fix broken admissions that
25   are broken down because of racial stereotyping and add new
```

1    instructions to people that read those applications without

2    fear that those new reading procedures won't be marched into

3    court to prove, because they do, that they knew there was a

4    problem.

5           But because of our hands were trapped in the cookie

6    jar over the earlier erroneous testimony, Harvard waived

7    Rule 407, and now we can see just about the most powerful

8    evidence you can imagine of a recognition of a problem by at

9    least some of Harvard's own rank and file admissions

10   personnel after everything came out in public over the

11   summer.  And a fundamental rewrite of the reading procedures

12   on the personal rating ensued.

13          But this is no big deal, Your Honor.  872 percent

14   more words, first ever injunction about race in the personal

15   rating, had hardly changed for decades, but we were supposed

16   to believe it just codifies uniform existing practice, Your

17   Honor.

18          Trust us.  Two plus two equals five.

19          There's also a little bit of legal two plus two

20   equals five going on, Your Honor, and you alluded to it

21   earlier in your question.  Harvard wants to tell you that we

22   have to prove evil racist intent in the hearts and minds of

23   admissions personnel in order to make out a case of

24   intentional discrimination.

25          I want to dispel that right here and right now with

1    binding First Circuit precedent behind Tab 12.  It's the

2    *Thomas vs Eastman Kodak* case from Judge Lynch.  The ultimate

3    question is whether the employee has been treated disparately

4    because of race.

5          This is so regardless of whether the employer

6    consciously intended to base the evaluations on race or

7    simply did so because of unthinking stereotypes or bias.  And

8    it goes on.

9          And what does this mean?  It means when Harvard's

10    admissions personnel come in here and tell you from the heart

11    that they're not discriminating while at the same time none

12    of them can explain why Asians are getting dramatically lower

13    personal ratings than whites, they may quite well have fallen

14    prey to racial stereotyping.  And it doesn't make them evil.

15    It makes them human.

16          What else does it mean, Your Honor?  It means if

17    you find in our favor on Count I, you do not need to find,

18    behind Tab 13, that the admissions officers came here and

19    lied and perjured themselves.  That is a straw man.  You

20    don't need to do that.  We don't have to look into the hearts

21    of these admissions officers to see exactly why they

22    systematically gave Asians lower personal ratings,

23    undisputedly penalized Asians on the overall rating, no

24    rebuttal from Card.  And undisputedly penalized Asians on the

25    school support ratings.  Again, no rebuttal.

1          The models produced by both experts tell us it's

2     happening, and that's sufficient to make out our prima facie

3     case of intentional discrimination by itself under the

4     pattern or practice method.

5          Behind Tab 14 is again Professor Card's own model

6     with the personal rating out and the statistically

7     significant Asian penalty.  Recall this model includes all

8     the things Harvard wants included except the personal rating.

9     ALDCs, intended careers, parental occupations, everything

10    that Professor Card wanted except that racially influenced

11    personal rating.

12          Under the pattern or practice method, we need to

13    show no more than this, this gross disparity to make out our

14    case.

15          Now, Your Honor, Harvard does like to make a little

16    bit of this gross disparity language that appears throughout

17    the cases, but the cases also make clear that it's synonymous

18    with the little asterisk at the bottom of the screen, a

19    statistical significance.  *Hazelwood* at Footnote 14 talks

20    about the difference being two or three standard deviations.

21    Two standard deviations means a p-value of less than 0.05,

22    which is what we call a statistical significance, and it is

23    right there in the asterisk.

24          The First Circuit said as much in *Jones against*

25    *City of Boston*, at Footnote 9.  That's a disparate impact

1    case.  The D.C. Circuit has said it multiple times, including

2    in *Segar* and *Palmer against Schultz*, cited in our briefs.

3             We, of course, had our own statistical analyses.

4    It wasn't just Harvard's that showed an Asian penalty.

5    Professor Arcidiacono's analysis showed an Asian penalty.

6    And you recall the robustness checks that he had on that

7    analysis.  And this one little change to Professor Card's,

8    removal, as he testified you should, of a rating that is

9    influenced by race gives what all the courts call prima facie

10   evidence of intentional discrimination, statistically

11   significant penalty.

12            Going to the law, Harvard now has two options.

13   They can dispute the analysis or provide a race-neutral

14   explanation.  But it's hard for Harvard to dispute the

15   analysis and model of their own expert coupled with the

16   single finding that race influenced the personal rating.

17   They can only try to convince you, no, no, no, ignore what's

18   going on with the African-Americans and Hispanics, look only

19   at the school support ratings, or whatever other excuse they

20   have.  Race isn't influencing the personal rating.  Put aside

21   what the United States Government said in the OCR report.

22            And Harvard has yet to come up with any

23   race-neutral explanation for the Asian penalty in the

24   personal rating.  I'll ask again for Harvard to be explicit.

25   Tell the whole world that Asian applicants to Harvard

```
 1    actually deserved statistically significantly lower ratings
 2    than whites, African-Americans, and Hispanics.  Say they
 3    deserved it.
 4            But you know what, Your Honor, that will just be
 5    lawyer argument, even if they're willing to say it, because
 6    no Harvard admissions officer was willing to come in here and
 7    testify as to why this is happening.
 8            In fact, the idea that Asians deserve lower
 9    personal ratings will be news to every Harvard admissions
10    officer that testified, from Director McGrath to Charlene
11    Kim.  They universally said they wouldn't expect Asians to
12    have worse personal qualities.
13            Your Honor, there is some discussion about the
14    pattern or practice method and some discussion of waiver,
15    some confusion about this.  And Harvard seemed surprised to
16    see reference to this method of proof in our brief.
17            But behind Tab 15 you will find Harvard's summary
18    judgment brief, docket 418.  And over on page 36, which is
19    also behind that tab, Your Honor, at the top you'll see
20    Harvard knew exactly what was going on here.
21            Harvard told you that lacking direct support for an
22    intentional discrimination claim -- of course almost all
23    discrimination claims are circumstantial.  Rarely do you find
24    the smoking gun letter saying what we're really trying to do
25    is limit the number of non-ALDC Asians on campus.
```

JA3587

1          SFFA can make a prima facie case based on

2     statistics only if it can show gross disparities of the kind

3     and degree sufficient to give rise to an inference that the

4     nonuniform individualized analyses reflects a pattern or

5     practice of discrimination.

6          Citing what?  A Third Circuit Title VII case on

7     pattern or practice.  Citing what else?  The *Hazelwood* case.

8     What's that?  A Title VII case on pattern and practice.

9          This is Harvard's summary judgment brief.  This is

10    no surprise to them.  We had told you, Your Honor, and them

11    in discovery motions way before that, including back in April

12    of 2017.  Behind Tab 18 you'll find one of our briefs, a

13    reply brief on a discovery dispute, where we said SFFA

14    alleges that Harvard engaged in a pattern or practice of

15    discrimination under Title VI.  Citing what?  The *Teamsters*

16    case, first case where the Supreme Court held private

17    plaintiffs could bring a pattern or practice method of proof

18    claim.

19          And then also *Indiana Harbor Belt Railroad*, which

20    is the Northern District of Indiana case, that holds that an

21    association like SFFA, like a union, can bring pattern or

22    practice method of proof to bear.

23          We did, Your Honor, refer to the *Arlington Heights*

24    framework and move on that basis an alternative legal theory

25    in our summary judgment motions.  It's true.  But one does

**JA3588**

1    not have to move on all the bases for relief in a summary

2    judgment motion.

3          And moreover, we did not have the cross-examination

4    of Professor Card wherein he admitted that in all of his

5    admissions models, including the very last one he did, if you

6    pulled out the personal rating you got a statistically

7    significant Asian penalty.

8          We didn't waive pattern or practice method.

9          But Harvard has still more arguments.  They're now

10   telling you the pattern or practice method of proof is either

11   not available in associational standing cases like this one

12   or not available under Title VI.  The problem with both those

13   arguments is there is actually zero authority for either of

14   them.

15         We cited the only case to address the question of

16   associational standing cases, *Indiana Harbor Belt Railroad*;

17   that's the Northern District of Indiana case.  No case holds

18   to the contrary.

19         And there's not a lot of case law on this, for

20   obvious reasons, Your Honor.  The very premise of an

21   associational standing case, as you've observed several times

22   in orders in this case, is that we are not bringing claims

23   one by one on behalf of individuals.  We're not deploying the

24   individual method of proof or the *McDonnell Douglas*

25   framework.  We're not doing that.  We're alleging systematic

```
 1    discrimination.

 2             The courts have held that individual plaintiffs

 3    bringing a McDonnell Douglas-type claim cannot also resort to

 4    the pattern or practice method.  That is true.  Those were

 5    not the types of claims we were bringing.

 6             And Harvard tried to tell you, in its opposition

 7    brief at page 9, that the Second Circuit had held that

 8    associations could not use pattern or practice proof in the

 9    Chin case, which is behind Tab 20.

10             And it takes only a few minutes to look at the Chin

11    case to realize that that is a mischaracterization.  Over at

12    the very first paragraph, which is also in your binder, Your

13    Honor -- I'll just put it on the screen -- you will see, and

14    then in the pages that follow, the only claims that were

15    tried in that case were claims by 11 Asian-American

16    individuals.

17             There had been an association as part of the case

18    earlier, Your Honor.  They got the right to sue letter from

19    the EEOC.  But no associational standing claims were tried in

20    that case, none at all.  It was all individual evidence, Your

21    Honor.

22             Of course the Second held, as all circuits had,

23    that individual plaintiffs cannot bring pattern or practice

24    method cases.  That's not what we're doing.  This is an

25    associational standing case.
```

1          Your Honor, Harvard also says that you can't bring
2     pattern or practice under Title VI.  Precisely zero authority
3     supports that.

4          And behind Tab 22 -- this only came up in Harvard's
5     reply brief, Your Honor, you'll find some supplemental
6     authority, which is the Title VI legal manual from the United
7     States Department of Justice, which on the very first page
8     tells you in the table of contents that, yes, you can use the
9     pattern or practice method in a Title VI case.

10          And it goes on on pages 22 and 23, which you can
11     also find in there, to discuss the legal bases for that,
12     citing all sorts of Title VII cases.

13          And on page 23, Your Honor, you will find
14     supplemental authority, the *Melendres* versus the infamous
15     Sheriff Joe Arpaio case from the Ninth Circuit, which is a
16     Title VI case deploying the pattern or practice method of
17     proof.

18          And, Your Honor, lest you think this is newly
19     minted Justice Department guidance on Title VI, we actually
20     made some effort to try to track back how long the Justice
21     Department has been telling everyone that they think you can
22     bring pattern or practice claims and prove intentional
23     discrimination under Title VI.  It goes back at least as far,
24     potentially began at the time when Mr. Waxman was Solicitor
25     General of the United States in the Justice Department in the

1    Clinton administration.

2           We can bring a pattern or practice method.  And

3    that means statistics alone, contrary to what Harvard says,

4    can prove our case.  A regression analysis is what every

5    pattern or practice method says is sufficient to show

6    intentional discrimination, to get that statistical

7    significance mark.

8           But even if that weren't true, Your Honor, even if

9    we're under *Arlington Heights*, there's a mountain of

10   circumstantial evidence.  I've already touched on the Office

11   of Civil Rights findings that Harvard used stereotypes and

12   was using race in the personal rating.  The ultimate finding

13   there wasn't discrimination, but it didn't take long for it

14   to mature into a statistically significant Asian penalty.

15          I touched on Mr. Luby's frankly not at all credible

16   trial testimony and I talked about the new reading

17   procedures, such dynamite evidence of liability that

18   Rule 407, had Harvard been timely about it, would have kept

19   it out.

20          And, of course, there's the issue of Sparse

21   Country, Your Honor, and Dean Fitzsimmons's revealing and

22   frankly saddening testimony justifying why Asian students

23   living in New Orleans and Salt Lake City needed to get higher

24   PSAT scores to get a letter inviting them to Harvard.

25          Harvard points out in their brief it's not illegal

1    to discriminate on the basis of race in terms of who you

2    invite to apply.  We agree, that is not illegal.  What it is

3    probative of is Harvard didn't want any more Asians to apply.

4              What is more important is the direct evidence

5    behind Tab 25 that was right here in court when Dean

6    Fitzsimmons, in struggling to explain why this was going on,

7    over 20 pages of transcript finally says, well, there's some

8    people who might have only recently arrived in Sparse Country

9    and other people have been there forever.

10             We all know what was meant by that.  It's what

11   Dr. Chin called the stereotype of Asians as the perpetual

12   foreigner.  Mr. Hughes talked about it in his closing.

13             And what about what Dean Fitzsimmons did not do in

14   response to the findings of the Office of Institutional

15   Research?  Here we have perhaps the worst instances of two

16   plus two equals five in the case.

17             Harvard, its witnesses, and its lawyers have stood

18   here and told you the following incoherent concepts.  On the

19   one hand, everyone in admissions, including all the recent

20   college graduates they have, Miss Tia Ray, and Chris Luby,

21   they're perfectly trained on how to use race, even though

22   many of them couldn't remember that they'd ever been trained

23   on it.  Essentially, they don't get any written guidance,

24   they never make mistakes ever or succumb to racial

25   stereotyping in assigning the personal rating.  And, Your

```
 1        Honor, to quote The Lego Movie, the first one, everything is
 2        awesome.
 3               But to use another literary reference, over at the
 4        Office of Institutional Research, the Ph.D.'s who crunch
 5        numbers for Harvard to submit to the United States
 6        Government, they are the gang that couldn't shoot straight
 7        because their work is so poor no one should believe it.
 8               But in order to know they're the gang that couldn't
 9        shoot straight, you have to first understand what they're
10        telling you.  And there we're treated to potentially the most
11        extreme two plus two equals five moment of the case, and
12        that's Plaintiff's Exhibit 26, Your Honor, behind Tab 26 in
13        your binder, the May 1 memo from OIR.  Not just Mark Hansen,
14        the junior staffer off on a lark --
15               THE COURT:  I don't have Tab 26.
16               MR. MORTARA:  It might be Tab 27, Your Honor.
17               THE COURT:  No.  27 is something different.
18               MR. MORTARA:  It might be Tab 28.  It might not be
19        there.
20               THE COURT:  It's not there.
21               MR. MORTARA:  As is usual, Your Honor.  Technical
22        details.
23               You know the document very well, Your Honor.  And
24        as you see, a memo from all of OIR, not just Mark Hansen, but
25        Dr. Driver-Linn herself at the head, and you know what it
```

**JA3594**

```
 1    told Dean Fitzsimmons:  They did a regression model, and he
 2    looked at it.
 3              Dean Fitzsimmons used to teach statistics.  He
 4    loved talking about statistics, and he's conversant in modern
 5    statistical methods like regression analyses.
 6              And here's the table.  What did do we see in the
 7    table?  What did it tell Dean Fitzsimmons?  If you have an
 8    athletic rating of 1, you're a recruited athlete.  Harvard
 9    wants you there.  You get a big tip.  I know that.  We intend
10    to recruit athletes.  We intend to given legacies a big tip.
11    It's a big part of this case.  We've heard a lot about it.
12    We intend to give African-Americans a big tip.  We intend to
13    give Hispanics a big tip.  We intend to give low-income
14    applicants a tip.
15              And this is empirical proof of that, said Dean
16    Fitzsimmons.  And then he got to the Asian penalty, minus
17    .37, p-value zero.  He says, I don't know what that means.
18              That's what we're being told, that he got to the
19    bottom, intent to help athletes, intent to help legacies,
20    intent to help African-Americans, intent to help Hispanics,
21    intent to help low-income folks, proves empirical proof.
22    What's that?  I don't know what that means.  Even though OIR
23    told him what it meant.  There are demographic groups that
24    have negative effects.
25              Your Honor, he understood what this meant.  There's
```

1    some dispute about the law here about cases like *Personal*

2    *Administrator Against Phoebe*, the idea that you can proceed

3    in the face of a known disparate impact and that doesn't mean

4    you're discriminating on the basis of race.

5              Your Honor will recall that involved a preference

6    for veterans, which obviously falls unequally, at least at

7    the time, less so now, between men and women.  We could still

8    have that preference.  That's not discriminatory intent.

9    Absolutely true, Your Honor.

10             But that's not what this memo shows.  A regression

11   analysis of this type in every single pattern or practice

12   method case is considered proof not of a disparate impact but

13   of intentional discrimination.

14             And that's what Professor Fitzsimmons, former

15   teacher of statistics, got in a memo.  Not a memo saying

16   we've got disparate outcomes.  A memo saying we have an Asian

17   penalty, intentional discrimination, the same as if an owner

18   of a business got a memo from a manager, saying I think we're

19   invidiously discriminating against African-Americans, boss,

20   what do you think?

21             What did Dean Fitzsimmons think?  Not enough to

22   tell anybody about it or do anything else.

23             Your Honor, Harvard has its own accusations, to be

24   fair, of inconsistency on our part.  Even though Professor

25   Card found that Asian penalty in the personal rating once he

1    removed -- Asian penalty in the admission outcome once he

2    removed the personal rating, Harvard points out that Students

3    for Fair Admissions went one step further and proved that

4    that Asian admissions penalty is only affecting the

5    98 percent of Asian applicants that aren't ALDCs.  Your Honor

6    will recall that Professor Card's model includes all the

7    ALDCs, so that's kind of not an issue.

8             But we went a step further and said, no, this is

9    really falling heavily on the 98 percent of applicants that

10   are not in those preferred groups.  Harvard calls it

11   incoherent that the 2 percent of Asian applicants who are

12   ALDCs are not treated on admissions outcomes statistically

13   significantly different from whites.

14            That should be behind Tab 28, Your Honor.  And you

15   can see the admissions rates, they're slightly higher for

16   Asian-Americans.  And Dr. Card actually said if you add back

17   in the athletes and peel apart the ALDCs, Professor

18   Arcidiacono's model shows there may even be a tip for Asian

19   legacies over white legacies.

20            But the absence of an Asian penalty for ALDCs or

21   even a preference for them is not inconsistent with a penalty

22   in the 98 percent of Asian applicants who don't fall into

23   those special categories.

24            It's not incoherent.  It's, in fact, so coherent

25   legally there's an entire body of case law, typically in sex

1    discrimination, directed to this concept, saying plaintiffs

2    can prove illegal discrimination against a subgroup.

3         And it's not so coherent factually.  Your Honor,

4    it's happened before.  The law of the so-called sex-plus or

5    race-plus cases is absolutely clear.  You can't defend a

6    discrimination charge by pointing to another subgroup of the

7    protected class you didn't discriminate against.

8         Imagine a scenario where 98 percent of the women

9    who apply to a job have children and 2 percent don't.  The

10   employer discriminates against the 98 percent of the women

11   with children, for whatever reason, and does not discriminate

12   against the 2 percent that do not have children or maybe even

13   gives them a preference.

14        Why would they do that?  There could be many

15   different and equally awful reasons.  Maybe they think women

16   without children are more likely to participate in company

17   social activities, they'll fit in better, be more patriotic

18   towards the company.  Maybe they prefer having women in the

19   workplace who they perceive don't always talk about their

20   children.

21        Maybe they even prefer the 2 percent childless

22   women and hire as many as they can so that they can justify

23   to the EEOC or someone else who comes along and makes charges

24   of sex discrimination based on the raw numbers.  They want to

25   be able to say we don't discriminate; look at all these women

1    we hire.  Maybe when they get sued, they will say your sex

2    discrimination theory is incoherent.  We hired all these

3    childless women; we even gave them a preference.

4           Too bad for them and for Harvard.  The law is

5    crystal clear that this is unlawful discrimination, and

6    incoherency is not an excuse.  That's exactly what happened

7    here.  Just like an employee in my hypothetical, Harvard

8    imposes no admission penalty on Asian ALDCs but does impose

9    the penalty on those it deems less desirable, the non-ALDC

10   Asians.

11          This makes perfect sense.  This would be an easy

12   case if Harvard hadn't ever let in any Asian-American

13   applicant.  We would have won this on a Rule 12 summary

14   judgment.  It would be an easy case if they let in zero of

15   that 98 percent of Asian non-ALDCs.

16          Harvard is always going to admit some

17   Asian-American applicants.  We all know that.  And the fact

18   that in their virtual draft they prioritize the wealthy and

19   connected may be somewhat embarrassing to Harvard, but after

20   the evidence at trial, it's hardly surprising.  It makes

21   perfect sense.

22          Asian ALDCs are certainly less likely to be the

23   perpetual foreigner that Dean Fitzsimmons was alluding to.

24   They're the children of Harvard alumni, after all.  They have

25   something more, the Harvard DNA that Harvard likes so much.

1       It makes perfect sense.  Asian alumni of Harvard are

2    Harvard's donor and support base.  Why risk angering them and

3    losing those donations and support?

4              Makes perfect sense, Your Honor.  It's happened

5    before.  And I know you've expressed reticence, to put it

6    mildly, to invoke history here.  But I can point out that

7    several institutions of higher education in the last century

8    had the very same unlawful discriminatory policy that Harvard

9    today calls incoherent.  They had discriminated against Jews

10   who were not legacies while treating legacy Jewish applicants

11   more fairly.  They even enlisted the support of prominent

12   Jewish alumni to justify their schemes to keep the numbers of

13   undesirable Jewish students down.

14             And why did they do this?  Because of stereotypes

15   about those Jewish students, as among other things recent

16   emigrants or perpetual foreigners.  It's right in Jerome

17   Karabel's book at page 98.

18             You're right, Your Honor.  It's not terribly

19   relevant in the identity sense which institutions ran this

20   perfectly coherent if morally repugnant, sick system of

21   discrimination.  It's not terribly relevant that they

22   included Williams, Dartmouth, and Harvard.

23             But the history does tell us it's perfectly

24   coherent to prefer a subgroup of the unpreferred group to

25   cover one's tracks by allowing more of the desirable Asian or

1    Jewish applicant and less of the undesirables and to provide

2    a fig leaf of a justification to enroll the support of alumni

3    members of that unpreferred group.

4           It happened before, and it's happening again.  It's

5    about as far, sadly, from incoherent as one could imagine.

6           But Harvard tells you it's incoherent to accuse

7    someone that it and others have done before.  What scofflaw

8    employers of in violation of Title VII have done typically in

9    the sex discrimination context and which sadly and perversely

10   makes sense.

11          Two plus two equals five again.

12          Your Honor, I've reached the end of my initial time

13   with you.  I'm going to come back again and tell you that

14   Asian applicants didn't deserve lower personal ratings.  Will

15   Harvard explain to all of us why they did, or will they hide

16   behind omitted-variable bias and unidentified unobservables

17   without telling us on what omitted unobservable variable

18   Asians do so much worse than not just white applicants but

19   African-American and Hispanic applicants, too?

20          The school support ratings, they're in the model.

21   All the ratings are in the model.  Every variable Card could

22   find could not make the racial penalty on Asians go away.

23   Harvard never once has tried to explain what's going on in

24   the personal rating with African-Americans and Hispanics.  We

25   know what's going on.  It's a preference just like there's a

 1    penalty for Asians.

 2              The Court, however, does not have the luxury of

 3    silence.  For it to rule in favor of Harvard on Count I, it

 4    must explain why Asians deserved lower personal ratings.

 5              It's now Harvard's turn, finally, here at the end

 6    of all things, to tell us why.

 7              THE COURT:  I have three questions for you.  I want

 8    you to answer all three of them in less than two minutes.

 9              MR. MORTARA:  I can do it.

10              THE COURT:  I'm going to give you all three of them

11    so you can allocate your time.

12              To find for you, which is largely a statistical

13    argument you're making, must I find Harvard's witnesses not

14    credible?

15              MR. MORTARA:  No.

16              THE COURT:  That's number one.

17              Number two, what am I to do with the fact that you

18    haven't shown me any students that you think should have

19    gotten in instead of the non-Asian students that did get in?

20              And number three, what are we doing with *Goodman*

21    and its requirement --

22              MR. MORTARA:  I am ready.  I have *Goodman* to put up

23    on the screen.  I'll take the last one first, Your Honor.

24              The language you talked about from *Goodman* is up on

25    the screen now, Your Honor.  It is very clear from the

**JA3602**

1    context that racial animus is here being used just as

2    interchangeably with intentional discrimination.

3              But I don't even need to get there.  The Supreme

4    Court held in *Gratz*, they found a Title VI violation in *Gratz*

5    by the University of Michigan when there was absolutely no

6    animus whatsoever.  That's a Supreme Court decision.

7              Decisions both before and after *Goodman*, including

8    *Croson* and *Adarand* say in the equal protection context, your

9    motives don't matter.  You don't have to have animus to make

10   out an equal protection violation.

11             As you know, the Supreme Court's incorporated those

12   equal protection concepts into Title VI, and that includes

13   cases that postdate *Goodman*, like *Cooper*, cited in our brief.

14   No court has ever said that Title VI bizarrely sits out in

15   the family of Section 1981, 1983, Title VII, Title IX, and

16   the equal protection as the one anti-discrimination law we

17   have in this country where you have to prove evil racist

18   intent.

19             *Goodman* certainly does not say that.  If it did say

20   that, Your Honor, it's been overruled by subsequent Supreme

21   Court precedent.  *Gratz*, no one said -- no one said the

22   University of Michigan had invidious intent.  And there was a

23   Title VI violation found in that case.

24             Your Honor's first question was do you need to find

25   Harvard's witnesses were not credible or lied?

```
 1              Absolutely not, Your Honor.  Obviously we believe
 2    Mr. Luby wasn't credible on the use of race in the personal
 3    rating.  But I understood your question to be more general.
 4    Absolutely not.  *Thomas* against Eastman Kodak said that.
 5              There was a premise in your first question saying
 6    our evidence was largely statistical.  I have to quibble a
 7    little bit with you there.  I really like those new reading
 8    procedures, OIR, and I know there's pieces of evidence I
 9    didn't talk about that Your Honor has indicated are not
10    terribly persuasive to you.  But we are not running away from
11    them.  There are some emails and some jokes, including some
12    jokes you didn't let us put into evidence, that I think
13    support our case.
14              The second question is escaping me.
15              THE COURT:  You haven't showed me any students --
16              MR. MORTARA:  Sorry, Your Honor.  Because you told
17    us we didn't have to.  The answer to that one is you told us
18    that we didn't need to bring individual students in here and
19    prove their claims.
20              The *Segar* case from the D.C. Circuit is really
21    great on this.  It's true that circumstantial evidence can
22    give life and meaning, to breathe life into the statistics.
23    That's true.  But there is absolutely no requirement to bring
24    it.
25              We also gave you some anecdotal evidence.  We
```

1    showed you that ice skater.  Remember the ice skater with the
2    low personal rating and everything else was out of sight
3    about that Asian applicant, yet that person did not get in.
4         We don't need to do it.  *Segar* says we don't need
5    to do it.  The very premise of associational standing cases
6    is we don't need to do it.
7         Thank you, Your Honor.
8         MR. LEE:  May I proceed, Your Honor?
9         THE COURT:  You may.
10        MR. LEE:  Good afternoon.  As we did in our closing
11   argument after trial, Mr. Waxman and I are going to split the
12   closing for the next hour.  After I offer an introduction,
13   Mr. Waxman will address the intentional discrimination claim
14   and the claim that Harvard does not use race as more than a
15   plus factor.
16        I will then address the claim of racial balancing
17   and the race-neutral alternatives.  Although SFFA hasn't
18   addressed those claims, they are important claims and they
19   were tried and litigated and we think they should be
20   addressed.
21        Let me begin again by thanking the Court and the
22   courtroom staff for the time and careful attention you've
23   given to this case.  As the Court noted at the very end of
24   the trial, the issues raised in this case are incredibly
25   important, not only for the parties but also for the future

```
 1    of higher education.  And of course those issues are

 2    critically important to Harvard's health.

 3              And here with us in the courtroom today are the new

 4    president of Harvard, Larry Bacow, Dean Fitzsimmons who you

 5    know, and Director McGrath who you know.

 6              We have trials for a reason, Your Honor, as you

 7    know.  And it's not a coincidence that Harvard asked for a

 8    trial in this case.  We have trials because cases should be

 9    decided on the facts and evidence elicited under oath, not by

10    unsupported accusation and vitriol directed at lawyers or

11    individuals.  We have trials because of facts and the truth

12    matter.

13              Thirteen current and former Harvard employees and

14    administrators appeared in this courtroom and subjected

15    themselves to the crucible of cross-examination.  At the end,

16    we submit they left a singular and indelible impression.

17    They are good and dedicated people faced with the

18    exceptionally difficult task of selecting from an

19    extraordinary group of applicants in admitting a class of

20    students who are individually excellent and who collectively

21    form a diverse and robust community.

22              They make those decisions, as Your Honor knows, as

23    a result of a long process involving many checks and

24    balances, and ultimately as a group of 40 after reviewing the

25    entire applicant's file and understanding the applicant
```

```
 1    entirely.

 2              The record of the trial that I was at is thousands

 3    of pages and hundreds of exhibits.  But that collective

 4    record demonstrates, we submit, that Harvard does not

 5    discriminate against Asian-Americans or any other racial or

 6    ethnic group; that Harvard does not consider race as more

 7    than one among many factors in evaluating an applicant; that

 8    Harvard does not and has not engaged in racial balancing; and

 9    that it could not achieve its educational mission without

10    considering race as one of many factors in admissions

11    process.

12              Now, before we go into the claims in detail, I

13    would like to take a moment to discuss what is missing from

14    the record and answer Your Honor's third question to SFFA.

15              It is really remarkable.  The cases we have talked

16    to Your Honor about Bakke, Grutter, Grace, Fisher, Fisher 1,

17    Fisher 2.  They have those names because there was a

18    plaintiff.  There was an individual.  There was someone who

19    claimed to be discriminated against.

20              What you have is really remarkable.  No member of

21    SFFA testified.  Not a single one of its standing members

22    testified.  Not a single Asian-American applicant to Harvard

23    who was denied admission testified.  Not a single application

24    of any one of their standing members went into evidence.

25              And with the truly unexceptional -- truly
```

1      insignificant exception, and I'll explain why in a second, of

2      one file that its expert discussed, the plaintiff presented

3      nothing.  And when their expert presented that one file that

4      SFFA just referred Your Honor to, the expert conceded on

5      cross-examine that it did not prove discrimination.

6             Even after Your Honor in the middle of trial raised

7      the issue and invited the plaintiff to reconsider the absence

8      of any individuals who have been discriminated against, it

9      offered nothing.  In a case alleging widespread intentional

10     discrimination across multiple years, 160,000 applicants, the

11     plaintiff's failure to produce a single individual claiming

12     to have suffered as a result of that discrimination or a

13     single file reflecting a discriminatory outcome is truly

14     remarkable.

15            Now, there were fact witnesses who did testify, and

16     they showed just how and why Harvard's admissions system

17     works and why it complies with the law.  Just like the

18     testimony of the trial witnesses in *Grutter* described in the

19     *Grutter* opinion, those witnesses confirmed that Harvard

20     considers an applicant's race along with all other factors;

21     that Harvard does not seek to admit any particular number or

22     percentage of underrepresented minorities; and that the

23     extent to which race is considered in admissions, to quote

24     from the case, varies from one applicant to another.

25            Now, as a result of the absence of this proof, the

1    absence of any real-world proof that would bring to life

2    their allegations and accusations, their claim has become a

3    constantly moving target, which is why SFFA at the end of

4    their closing just now spent so much time trying to justify

5    their change in positions.

6         Let me give you two examples.  In opening

7    statement, the plaintiff claimed at the outset that Harvard,

8    Harvard's admissions office, bore intentional discriminatory

9    animus against some Asian-American applicants.

10        By closing, having failed to address any evidence

11   of animus, it retreated to the claim of, and I quote,

12   implicit or unconscious bias, and suggested it had crept into

13   the system.

14        Now, in the posttrial briefing and in the closing

15   today, recognizing that there was no proof of unconscious

16   bias from an expert or otherwise, the plaintiff argues that

17   because people in the United States stereotype

18   Asian-Americans, Harvard has a burden to show that it has

19   uniquely escaped the infiltration of that bias.

20        That's not the law, and Mr. Waxman will address it

21   specifically.

22        THE COURT:  Can I interrupt you?  You can put this

23   off to Mr. Waxman, if you want, later.

24        MR. WAXMAN:  Thank you, Your Honor.

25        MR. LEE:  It depends how difficult it is, Your

**JA3609**

Case: 19-2005   Document: 00117631846   Page: 686   Date Filed: 07/29/2020   Entry ID: 6356391
Case 1:14-cv-14176-ADB   Document 606   Filed 07/01/19   Page 52 of 129

52

1    Honor.

2           THE COURT:  If one were to believe that there was

3    implicit bias or unconscious bias of some sort or another, is

4    there no remedy for that?

5           MR. LEE:  Your Honor, I don't think -- I have two

6    parts to that, and I think Mr. Waxman will address it

7    specifically.  Let me give you my answer and maybe his will

8    be better.

9           The first thing is on this record there's just no

10   proof.  And the concept of -- and I think Your Honor got this

11   even as it started to creep into the trial, precisely what

12   implicit or unconscious bias is.

13          It's not some easily defined concept.  The question

14   of whether things that might fall within someone's rubric of

15   unconscious or implicit bias might, might satisfy the intent

16   requirement is something that I don't think Your Honor needs

17   to decide.  It's something that can't be decided on this

18   record.  And the whole concept doesn't have sufficient

19   specificity to decide it in the abstract.

20          I think the important part here is to go to Your

21   Honor's first question to Mr. Mortara.  They do have to

22   proffer intentional discrimination.  That's the claim.  The

23   fact that the claim has evolved to where it is today says a

24   lot about the evidence at trial.

25          And it's not just, Your Honor, the claim that's

Case: 19-2005    Document: 00117631846    Page: 687    Date Filed: 07/29/2020    Entry ID: 6356391
Case 1:14-cv-14176-ADB    Document 666    Filed 07/01/19    Page 53 of 129

53

```
 1      evolved.  It's the specifics of the claim.  Your Honor will
 2      recall in opening, if I go to Slide 4 of our presentation,
 3      the very first thing that SFFA said to the Court, to the
 4      public, was that it was not alleging that Harvard
 5      discriminates against Asian-American ALDC applicants.  Those
 6      literally were the first words of the trial.
 7              Why?  Because as we found out on cross-examination
 8      of their expert, he was not claiming that Harvard
 9      discriminates against Asian-Americans.  And I took him
10      through each category specifically.  It's on Slide 5.  He
11      agreed that Asian-Americans in those categories, if I move to
12      Slide 6, were actually admitted at higher rates than those --
13      than identical white applicants.  For legacy applicants, he
14      conceded on cross-examination the difference was
15      statistically significant.
16              It is very difficult to square that testimony or
17      that accusation of discrimination against some but not all
18      with an intentional discrimination case.
19              It's even harder, to go to Your Honor's question,
20      to square that with an unconscious bias or an implicit bias
21      case.  How does that work?  The plaintiff knows that, which
22      is why you heard what you heard in this closing.  What they
23      did is they have changed their theory 180 degrees.  They now
24      have claimed in their final filings that, oh, wait, actually
25      Harvard does discriminate against ALDCs, but they have a
```

Case: 19-2005    Document: 00117631846    Page: 688    Date Filed: 07/29/2020    Entry ID: 6356391
Case 1:14-cv-14176-ADB    Document 666    Filed 07/01/19    Page 54 of 129

54

1    problem.

2              First, it's just a 180-degree change in position.

3    The second is, if I take you to Slide 8, Professor

4    Arcidiacono testified that even taking into account any tip

5    given for being an ALDC applicant, Asian-Americans in these

6    categories are admitted at higher rates than white

7    applicants.  It is a concession that is inconsistent with the

8    intentional discrimination claim.

9              So, Your Honor, if I could, just on Slide 9s, let's

10   just compare what SFFA said when the trial started and what

11   it said last week.  When the trial started, Harvard did not

12   discriminate, according to them, against ALDCs.  They had to

13   say that because their expert actually conceded that ALDCs

14   were favored.  Asian-American ALDCs were favored.

15             Now, recognizing that that is a fatal flaw in their

16   argument, what do they say at the bottom?  Factually Harvard

17   does discriminate against ALDCs.

18             A 180-degree turn.  Recognizing that they have to

19   make these turns, change in theory, change in law, change in

20   facts, what did they do?  The same thing they did and I

21   mentioned to you at the closing three months ago, they

22   attacked the witnesses.  They attacked the lawyers.  They

23   attacked them in ways for which there's no justification.

24             So as we move into the specific claims, Your Honor,

25   let me start with important proof in the case that

1    Mr. Mortara didn't address, and that is Harvard's compelling

2    interest in achieving educational diversity and the benefits

3    of that diversity.  That's important because it is the

4    predicate for what Harvard's done.  It is a predicate for

5    what the Supreme Court has said.

6            So if I turn to Slide 10, the Supreme Court has

7    told us in *Fisher* 2 that once a university gives a reasoned,

8    principled explanation for its decision to pursue those

9    benefits, that decision on the compelling interest of

10   diversity gets some deference.

11           On this record, we submit that Harvard has supplied

12   a reasoned and principled explanation for its decision to

13   pursue the educational and community benefits of diversity.

14           Harvard's commitment to the benefits of diversity

15   and its articulation of those benefits, on Slide 11, can be

16   found in the mission of Harvard College.  It can be found on

17   Slide 12 in the report from President Rudenstine.  And most

18   recently, it can be found on Slide 13 in the report of Dean

19   Khurana's committee, adopted unanimously by the full faculty

20   of arts and sciences, concluding that that student-body

21   diversity, including racial diversity, is essential to

22   Harvard's pedagogical mission, pedagogical objectives, and

23   institutional mission.

24           Perhaps more importantly, Your Honor, this interest

25   in a diverse student body was reflected by the day devoted to

**JA3613**

Case: 19-2005    Document: 00117621846    Page: 690    Date Filed: 07/29/2020    Entry ID: 6356391
Case 1:14-cv-14176-ADB    Document 666    Filed 07/01/19    Page 56 of 129

56

```
 1   the testimony of the Harvard students themselves.  Your Honor
 2   heard from several of those students.  You heard their own
 3   stories and how they and their classmates have benefited from
 4   living and learning from each other in a diverse community.
 5           These students, these eight students who came to
 6   testify and took the stand, are living proof that Harvard has
 7   a compelling interest and we all have a compelling interest
 8   in communities that are diverse and inclusive.
 9           Let me now turn the podium over to Mr. Waxman to
10   turn to the intentional discrimination count.
11           MR. WAXMAN:  Good afternoon, Your Honor.  I'll
12   start first with the claim of intentional discrimination and
13   then cover the race is more than a plus factor count of the
14   complaint, which is not addressed in the closing argument but
15   is something that Your Honor needs to rule on.
16           THE COURT:  And I have some questions on that.  So
17   I would appreciate it.
18           MR. WAXMAN:  So the legal standard on intentional
19   discrimination, as Your Honor already adverted to, is pretty
20   straightforward.  It's the one that Your Honor stated in
21   denying summary judgment.  It's from Goodman, and it says
22   that to state a claim for intentional discrimination under
23   Title VI, the plaintiff, quote, must demonstrate that the
24   defendant discriminated on the basis of race, the
25   discrimination was intentional, and the discrimination was a
```

```
 1     substantial or motivating factor for the defendant's actions.
 2              There wasn't any dispute about that until SFFA
 3     filed its first posttrial brief.  Before then, SFFA agreed
 4     with the Court and with Harvard on two fundamental points:
 5     number one, the plaintiff bears the burden to prove
 6     intentional discrimination; and number two, the Arlington
 7     Heights standard governs the inquiry.
 8              Now, SFFA has now tried to change course on both
 9     points.  Those new arguments are obviously inconsistent with
10     the Court's prior ruling, and they are incorrect.  But they
11     are also largely irrelevant, given the evidence adduced at
12     trial.
13              First, as to the burden.  SFFA's basic argument in
14     its posttrial briefs is that because Harvard considers race
15     in its admissions process, Harvard bears the burden to show
16     that its practices survive strict scrutiny.
17              But that argument doesn't distinguish between the
18     consideration of race in pursuit of diversity, which Harvard
19     does engage in, and the allegation in Count I that Harvard
20     discriminates intentionally against Asian-American applicants
21     relative to white applicants, which we vociferously dispute
22     and which would, in any event, have nothing to do with the
23     pursuit of diversity.
24              SFFA's claim in Count I depends on that second
25     disputed proposition, and SFFA bears the burden to prove it.
```

Case: 19-2005    Document: 00117621846    Page: 692    Date Filed: 07/29/2020    Entry ID: 6356391
Case 1:14-cv-14176-ADB    Document 666    Filed 07/01/19    Page 58 of 129

58

1     It can't evade its burden to prove intentional discrimination

2     against Asian-American applicants relative to white

3     applicants simply because it's undisputed that the admissions

4     process considers race as a plus factor in other ways.

5           This level of confusion in their part -- and maybe

6     it's just confusion -- was reiterated just now when my friend

7     cited the Supreme Court's decision in *Gratz* as evidence that

8     intentional discrimination doesn't require intentionality.

9           Let's be very clear.  *Gratz* was not a case about

10    intentional discrimination.  *Gratz* was a case in which the

11    University of Michigan undergraduate program was concededly

12    using race pursuant to a diversity rationale, and the Supreme

13    Court held that it failed strict scrutiny.  It had nothing to

14    do with any burden to prove intentional discrimination.

15          Now, second, as to *Teamsters*.  There are several

16    reasons why it's essentially irrelevant whether *Teamsters* or

17    *Arlington Heights* applies.  One is that no one disputes that

18    SFFA can seek to rely on aggregate statistical evidence as

19    part of its claim.  So the only serious question is whether

20    the Court should apply the *Teamsters* burden shifting

21    framework in evaluating that statistical evidence.

22          Even if that framework did apply, and even if

23    Dr. Arcidiacono's analysis were reliable and stark enough to

24    establish a prima facie case of intentional discrimination,

25    which as I'll explain it certainly is not, even in that

1    event, Harvard's only burden in response would be one of

2    production, to put in evidence a competing analysis that

3    calls Dr. Arcidiacono's into question.  We've obviously done

4    that.

5            So at the end of the day under *Teamsters* or

6    *Arlington Heights*, the Court still has to resolve the

7    question whether Harvard intended to discriminate, and it

8    still has to do that by considering all the evidence,

9    nonstatistical and statistical.  And under either standard,

10   statistical evidence isn't enough unless it is far, far more

11   stark than anything here.

12           The Supreme Court cases that -- the Supreme Court

13   subsequent later cases and circuit court cases have talked

14   about without exception are *Yick Wo* and *Gomillion*, which are

15   cases in which the disparity was so incredible, they rezoned

16   the City of Tuskegee to exclude all black people and include

17   all white people, that the Court said in that rare instance

18   the proof of a statistical disparity can in and of itself be

19   evidence of intentional discrimination.

20           THE COURT:  What am I to do with the statistical

21   analysis that shows a penalty on the personal rating?  Or if

22   you're going to get to that, keep going.

23           MR. WAXMAN:  It would be a criminal default for me

24   not to get to it, given the emphasis.  I'm happy to answer

25   any questions.

 1           THE COURT:  You can go in your orderly way.  They

 2   have the no-victim problem, but you guys have the personal

 3   rating.

 4           MR. WAXMAN:  Absolutely.  What I want to say here

 5   is that even if the Court were to credit Dr. Arcidiacono's

 6   methodology and accept his model, that would not carry SFFA's

 7   burden under Count I.

 8           Now, let me start -- I'll talk about the

 9   nonstatistical evidence and then I'll talk about the

10   statistical evidence.

11           SFFA has told this Court in its posttrial

12   briefings, and it said as much during the trial, that it

13   views its nonstatistical evidence of intentional

14   discrimination as "not particularly important."

15           That is an incredible concession.  SFFA received

16   more than 100,000 pages of documents.  It took dozens of

17   depositions of witnesses of its choice.  By its own

18   admission, it has little, if anything, to show for that.

19           What the evidence showed is that Harvard engages in

20   a dedicated effort to recruit students from all states,

21   across all socioeconomic strata, and of all races.  It showed

22   that Asian-Americans are one of the five demographic groups

23   targeted by the undergraduate minority recruitment program.

24   It showed an admissions process that is driven by open

25   discussion among 40 people, a process in which every

```
 1    admissions officer has complete access to every application

 2    file, a process in which the ratings that the initial readers

 3    assign are not used to decide who gets in and who does not

 4    but rather as an initial shorthand reflection of some of the

 5    information that admissions officers consider in making their

 6    decisions.

 7              You heard live testimony from eight members of the

 8    admissions office.  SFFA says that those witnesses can't be

 9    believed, that there is no reason for Your Honor to believe

10    them.

11              Each described the same process.  They consistently

12    explained that they based their decisions on the full range

13    of information that is available to them.  They consistently

14    explained that everything in the application file matters,

15    with race as one of many factors that is considered.  And

16    they consistently explained that they have never seen any

17    evidence of bias or discrimination in the process.  That is

18    the nonstatistical record in this case, which is why SFFA

19    wishes that it were "not particularly important."

20              Now, SFFA keeps telling us that the law doesn't

21    require it to produce smoking-gun evidence.  That is true,

22    But it is equally true that the absence of any direct

23    evidence of discrimination is a powerful indication of the

24    absence of discrimination especially in a process that has so

25    many participants as Harvard's does.
```

1          It's not just that SFFA has failed to supply a

2     smoking gun.  They failed to provide evidence of a single

3     victim of discrimination.  They have failed to find a single

4     current or former employee who has witnessed even one

5     instance of discrimination.  In a case in which SFFA says

6     that scores of Asian-American applicants are denied admission

7     each year because of intentional discrimination, where is the

8     evidence?

9          Well, SFFA's expert, who said that he read 480

10    files and many more summary sheets, discussed, as we heard

11    again today, the figure skater, a single application that in

12    his view might suggest discrimination because a qualified

13    Asian-American candidate was denied admission.

14         As Your Honor knows, literally thousands of

15    students with perfect scores and/or perfect GPAs are denied

16    admission every year.  Applicants of all races with

17    compelling stories and competitive credentials are not

18    admitted.  Tellingly, SFFA asked no Harvard witness, not a

19    single one of them, about that rejected applicant or any

20    other.

21         So what does SFFA point to?  Pardon me.  I'm on

22    what I hope is the back end of the flu.

23              THE COURT:  Is it your Marco Rubio moment?

24              MR. WAXMAN:  Excuse me?

25              THE COURT:  Is it your Marco Rubio moment?

1          MR. WAXMAN:  So first of all, SFFA says that

2    Harvard discriminates in its recruiting practices against

3    Asian-Americans who live in what the admissions office calls

4    Sparse Country.

5          Here are the relevant facts.  For the classes of

6    2014 to 2016, Harvard sent recruiting letters to

7    Asian-American students across the country who scored lower

8    on the PSAT than the white students who received those

9    letters.  For the classes of 2017 through 2019, in most

10   states Harvard sent recruiting letters to Asian-American and

11   white students at identical thresholds.

12         In those three years, in the Sparse Country states,

13   Harvard sent recruiting letters to white students who

14   received lower PSAT scores than Asian-Americans, but at the

15   same time Harvard applied an identical cutoff on the ACT for

16   sending recruiting letters to Asian-American and white

17   students in Sparse Country.  And as Your Honor heard, the ACT

18   is by far the dominant test in those states.

19         That is their grand recruiting conspiracy.  There

20   was no evidence that the difference in the PSAT cutoff for

21   those three years was intentional, there was no evidence that

22   it was a result of unconscious bias, and there was no

23   evidence that it mattered.  Harvard does not provide an

24   admission tip to applicants who receive recruiting letters.

25         Now, next let me address the work of Harvard's

1    Office of Institutional Research.  SFFA says that OIR's work

2    provides key support for its intentional discrimination claim

3    and that Dean Fitzsimmons's reaction to OIR's work

4    establishes deliberate indifference to discrimination.  Those

5    assertions bear no relation to reality.

6         You'll recall that initially SFFA focused much of

7    its attention on a document prepared by Mark Hansen, who you

8    heard.  This is Plaintiff's Exhibit 9.  But at trial,

9    Mr. Hansen explained that the document comprised his working

10   notes, that he doubted he ever shared it with anyone,

11   including his boss, Ms. Driver-Linn, and certainly not Dean

12   Fitzsimmons, which is unsurprising because it's full of

13   errors.  The subtitle is "Subtitle."  The date is wrong by a

14   year.  Entire pages of these working notes, including notably

15   the conclusion page, are blank.

16        For her part, Ms. Driver-Linn testified she'd never

17   even seen Exhibit 9 before this litigation and certainly

18   didn't show it to Dean Fitzsimmons.

19        And yet, unconstrained by the record, in its

20   posttrial briefings SFFA continues to insist that Dean

21   Fitzsimmons saw this document.  In its finding of fact 118,

22   SFFA says, "OIR gave this report to Fitzsimmons."

23        In its response, SFFA doubles down, claiming in

24   Paragraphs 175 through 177 that "Fitzsimmons was shown

25   Exhibit 9 before this litigation, as were Driver-Linn and

```
 1        Bever, and that it "provided Fitzsimmons with extensive
 2        statistical evidence that Harvard penalizes Asian-Americans."
 3                 Not only does SFFA have no evidence to support
 4        those assertions, the evidence at trial flatly contradicts
 5        them.   Now, OIR did show Dean Fitzsimmons the four models
 6        that so preoccupied us all at trial to simulate what the
 7        admitted class would look like under certain oversimplified
 8        admissions practices.
 9                 As Mr. Hansen explained those models, which were
10        his very first effort ever at using statistical regression,
11        were not meant to show the effect of any given factor in the
12        admissions process.   They omitted far too many factors to do
13        so.
14                 And as Your Honor heard, the fact that the racial
15        composition of the simulated class so closely matches that of
16        the actual class signified nothing.   It's simply a function
17        of the circularity of the model that Mr. Hansen used which
18        used the racial composition of the actual class in order to
19        predict the racial composition of the hypothetical class.
20                 For his part, since this is all about Dean
21        Fitzsimmons, Dean Fitzsimmons testified that his takeaway
22        from this was simple.   The more factors you add to a model of
23        the admissions process, the more closely you resemble
24        reality.   He certainly did not view OIR's work as evidence of
25        discrimination.
```

1        SFFA then invokes the memorandum that OIR sent Dean

2   Fitzsimmons about low-income applicants, claiming that the

3   dean did nothing in response.

4        Once again, that's not true.  In response to that

5   memorandum, the dean asked OIR to look into whether

6   low-income Asian-American applicants received a tip.  The

7   answer was, yes, a low-income tip as large or larger than the

8   one given to applicants of any other race.  The dean

9   explained to you under oath why he was reassured.

10        Your Honor, this is an intentional discrimination

11   case.  Why on God's green earth, in a system that intended to

12   discriminate against Asian-American applicants, would the

13   dean ask for, receive, and then be reassured by data that

14   showed him and he was told that Asian-American applicants

15   receive perhaps the most significant low-income tip of any

16   group?

17        In other words, the reason Dean Fitzsimmons didn't

18   sound the alarm in response to the documents, as SFFA says he

19   should have, is that he didn't understand the documents even

20   to show smoke, let alone a fire.

21        Now, in its posttrial brief the plaintiff has

22   offered an explanation for how to interpret the chart of

23   coefficients that are attached to the low-income memo.  On

24   their face, P28 offers no such explanation.  There is no

25   evidence from which the Court can infer that Dean Fitzsimmons

1    should have understood those charts as SFFA claims they were

2    meant to be understood.  Even Ms. Bever, who was the deputy

3    director of OIR and was involved in the creation of this

4    document, disagreed that SFFA's interpretation -- that is,

5    Dr. Arcidiacono's interpretation -- was the correct one.

6    That is on pages 234 to 236 of the transcript of October 18.

7            Even if SFFA were correct that Dean Fitzsimmons

8    should have done more in response to OIR's work, that would

9    get SFFA no closer to proving intentional discrimination.

10   Even if this Court were to import the deliberate indifferent

11   standard from Section 1983 cases into the Title VI context,

12   SFFA would still have to show that the dean actually knew

13   that the admissions office was actually discriminating but

14   chose to do nothing.

15           Now, we've seen on the chart the coefficient that

16   Mr. Mortara showed you with a negative 0.37 attached to

17   Asian.  He says that showed Dean Fitzsimmons, who apparently

18   taught introductory statistics in the 1960s, that this was

19   discrimination.  But Dean Fitzsimmons wouldn't have learned

20   much about statistics if he thought that that showed

21   discrimination.  It doesn't.  It shows a weak correlation

22   with between Asian-American ethnicity and outcomes in a very,

23   very incomplete model.  Just as, Your Honor, OCR found a

24   disparity between Asian-Americans and white applicants, and

25   yet doing the work of -- doing the heavy work of auditing the

**JA3625**

1    files found no evidence of discrimination.

2            SFFA did not argue, nor could it, that the dean

3    actually knew that the admissions office was actually

4    discriminating.  Its theory, at most, is that OIR's work put

5    Dean Fitzsimmons on notice of the possibility of

6    discrimination.  Under the case law, a failure to investigate

7    a possibility of discrimination, even if proven, which it was

8    not, does not establish intentional discrimination.

9            So now let me turn to another focus of what has

10   morphed into SFFA's case about intentional discrimination,

11   which is stereotypes.

12           SFFA says that Harvard, through no fault of the

13   good people in the admissions office, are engaging in anti

14   Asian-American stereotypes.  As Mr. Lee observed earlier,

15   this is the latest in SFFA's progression of theories of

16   discrimination in search of facts.  But here again, there is

17   just no evidence of stereotyping.  None apparently that SFFA

18   could find in the hundreds of application files and summary

19   sheets that were produced.

20           That's why SFFA spent so much time in its posttrial

21   findings about a handful of comments that the Office of Civil

22   Rights found in files that it reviewed in the late 1980s.

23   It's why its posttrial briefs cite a government report in

24   multiple law review articles for the proposition that

25   stereotyping occurs in the world.  That's why SFFA quotes at

1      length in its posttrial filings, and in the present tense,

2      from an article that Margaret Chin prepared 36 years ago,

3      without bothering to acknowledge Ms. Chin's testimony in this

4      very court about the immense strides that have been made

5      since then, not just generally but at Harvard in particular.

6              SFFA did all that because it has no actual evidence

7      of stereotyping in Harvard's admissions process.  It points

8      to a handful of comments in a single docket binder that

9      itself contains handwritten notes with respect to between

10     four and 5,000 applicants.  It deemed two of those notes

11     important enough to feature at trial.

12             In one comment, the applicant is noted as "very

13     quiet."  And in another comment, "quiet and strong."  Those

14     two applicants cherry-picked out of this binder happened to

15     be Asian-American.

16             What SFFA did not do was to ask Dean Fitzsimmons,

17     or for that matter, any of the other seven witnesses from the

18     admissions office, about other comments in the same docket

19     binder that describe white, African-American, and Hispanic

20     applicants as "shy," "understated," "quiet."  There is no

21     reason to believe that any of these notations are anything

22     other than accurate characterizations of the applicants.

23             I guess I'd better get going.

24             When OCR did its review, it noted that certain

25     comments that might be characterized as stereotypical had,

quote, actually originated from the interviews, teacher or
counselor recommendations, or self-descriptions given by the
applicant.  But when it went on to examine the files, it
found no evidence of discrimination by stereotype.  Here SFFA
hasn't even tried to tie any supposed stereotypical language
to any adverse outcomes.

The charge that Harvard is engaged in racial
stereotyping, a practice that Dean Fitzsimmons characterized
as aberrant and deeply offensive, is utterly unsupported by
the record.

Let me now turn to the statistical evidence.  And
for the sake of relative simplicity, I'll focus on two
issues, the descriptive statistics and the personal rating.

SFFA has given up lots of descriptive statistics
showing differences in rating or admission outcomes by race,
generally focusing on the academic index deciles, which just
compare applicants with similar high school grades and SAT
scores.

Those statistics don't try to analyze the effect of
a given factor controlling for others.  That's what a
regression does.

Because SFFA's statistics don't control for the
many noneconomic factors that matter so much in the process,
or even for the academic factors beyond high school scores,
they tell you very little.  To a very significant degree, the

Case: 19-2005    Document: 00117631846    Page: 705    Date Filed: 07/09/2020    Entry ID: 6356391
Case 1:14-cv-14176-ADB    Document 666    Filed 07/01/19    Page 71 of 129

71

1    descriptive statistics just reflect Harvard's persistent and

2    wrong-headed view that the admissions process is all about

3    high school grades and test scores.

4            Let's turn now to the regression analysis.  The

5    main dispute having to do with the regression analysis, the

6    only one we really heard today, has to do with the personal

7    ratings.  You have heard sworn testimony in which admissions

8    officers sat in that witness chair and testified over and

9    over again that they do not consider race in assigning the

10   personal rating.

11           Here are just a few of the key pieces of testimony.

12   Their testimony was consistent and credible, and nothing in

13   the class of 2023 reading procedures is to the contrary.

14           Those procedures, as Director McGrath testified,

15   simply codify Harvard's consistent practice.  So the real

16   question in this case as to the personal rating, Your Honor,

17   is whether there is enough statistical evidence that race

18   is -- race per se is considered in the personal rating for

19   Your Honor to conclude that those admissions officers are all

20   either lying or mistaken.  The answer to that question is no,

21   and it is not close.

22           First, recall that OCR found a very similar

23   difference between the average personal rating of

24   Asian-American and white applicants.  OCR did not find,

25   nonetheless, on a further review of the files that race was

1    an element of the personal rating.  It told you -- it stated

2    in its report that it went and did the actual file review to

3    determine whether racial differences observed in the rating

4    factors could reflect racial bias.  It did the work that SFFA

5    either didn't do or didn't tell us about, and it issued a

6    report concluding that the answer was no.

7           SFFA is relying on Dr. Arcidiacono's regression

8    model of the personal rating.  But as Dr. Card explained,

9    there is a difference between correlation and causation.

10   Regression estimates can't measure causal effects unless the

11   model controls for all factors that are correlated with a

12   variable of interest and that affect the outcome.

13          A regression just spits out a number.  And if the

14   regression is missing information that could help explain the

15   outcome, then the number that the regression spits out simply

16   doesn't tell you whether that factor is actually causing the

17   estimated effect.  That's what Dr. Card showed you with his

18   whiteboard example about how age and salary affected a

19   worker's likelihood of retirement.

20          Now, SFFA, in its posttrial briefings, makes what

21   is really an astonishing assertion, which is the assertion

22   that if the effect that is estimated by a regression is

23   statistically significant, then it must be a genuine causal

24   effect.

25          I can't even begin to tell you how wrong that is.

1    If a regression is missing relevant factors, it may estimate

2    statistically significant effects that are not genuine causal

3    effects.  Nobody versed in statistics could possibly agree.

4    I am certain that if Dr. Arcidiacono were on that stand

5    today, he'd tell you how wrong it is.

6            So now back to the personal rating.  Everyone

7    agrees that there are many, many factors that are not

8    included in the model that affect the personal rating.

9    Indeed, the factors in Dr. Arcidiacono's model explain only

10   29 percent of the variation in the personal rating.

11   71 percent of the information that goes into determining what

12   the personal rating would be is unobserved.  It is not

13   available in the data.

14           The question for Your Honor with respect to this

15   point is whether the negative effect that is estimated by

16   Dr. Arcidiacono's model can be attributed to those factors,

17   the 71 percent that is outside the record.

18           SFFA says no.  And the reason it gives is that

19   Asian-American applicants are supposedly stronger than white

20   applicants on the factors that are in the data that affect

21   the personal rating.  If that's true, SFFA says, it's fair to

22   assume that they are also stronger on factors outside the

23   data.  And if that's true, then the negative estimate that

24   Dr. Arcidiacono's model produced may not be attributable to

25   the 71 percent of factors that are outside the data.

1              The problem with this entire hypothesis of

2      Dr. Arcidiacono is that SFFA is wrong about the premise.  The

3      applications submitted by Asian-American applicants are not

4      stronger than those of white applicants on the factors in the

5      data that affect the personal rating.  As Dr. Card showed,

6      precisely the opposite is true.  White applicants on average

7      scored higher than Asian-American applicants on the school

8      support ratings.  The same was true for the alumni ratings.

9              And Dr. Card showed the very same thing for the

10     combination of all non-academic factors in the model.  And he

11     did it twice, both with a slide with the personal rating and

12     the ALDC characteristics included, and then with a slide with

13     those two things excluded.

14             The reason that Dr. Arcidiacono obtained a contrary

15     result was because he removed the ALDC applicants who are

16     mostly white and indeed are many of the very strongest white

17     applicants.  And by larding into his model academic data,

18     even though the personal rating reflects non-academic

19     factors, not academic factors, the Court -- in answer to

20     Mr. Mortara's rhetorical challenge here, the Court doesn't

21     have to find the reason, as if there is the reason, that

22     these Asian-American applicants in the database received

23     marginally lower personal ratings on average.  It just has to

24     find that SFFA has failed to prove that the cause of this

25     disparity was racial bias.  When one after another admissions

**JA3632**

1   officer testified that they don't consider race, and when, as

2   Dr. Card explained, Dr. Arcidiacono's model of the personal

3   rating didn't come close to proving a causal effect of race.

4          Now, one last point on the personal rating.  SFFA

5   keeps saying, as if repetition will make it true, that if the

6   personal rating is somehow affected by race, that it has to

7   be removed completely from the model.

8          Dr. Card explained in detail why that isn't right.

9   Even if the personal rating were affected to some degree by

10  race, it nonetheless captures a tremendous amount of

11  information that isn't affected by race and that is otherwise

12  unobservable, like applicant essays, for example, or

13  recommendation letters other than the two teacher letters and

14  the guidance counselor letters.

15         So even if a hypothetical situation in which a

16  portion of the personal rating could be fairly attributed to

17  racial bias, that is the marginal effect that Dr. Arcidiacono

18  found, the right thing wouldn't be to throw out the personal

19  rating entirely, it would be just to take out the part that

20  is supposedly affected by race.

21         And as you saw when Dr. Card adjusted the profile

22  ratings from that way, he found again no evidence of bias

23  against Asian-American applicants.  That is the analysis that

24  SFFA really doesn't want you to think about, which is why

25  they keep saying incorrectly that the only option is to take

**JA3633**

1    the rating out.

2           Their exclusion of the personal rating is just

3    emblematic of the consistent difference between their

4    analysis and ours.  Harvard's analysis tries to model the

5    actual admissions process, and they don't.  Their preferred

6    model excludes the ALDCs, fully 30 percent of the admitted

7    students.  It ignores factors that demonstratively matter to

8    the admissions outcomes, like the staff interview, parental

9    occupation, intended career, and of course the vast

10   information that is reflected in the personal rating.

11          By contrast, Harvard's analysis includes the data

12   that SFFA wishes to ignore, although the admissions committee

13   considers.  It includes the applicants that SFFA wishes to

14   ignore, and its faithfulness to the process leads to a more

15   reliable measure of the effective race.  That analysis shows

16   that race has no effect on the admission of Asian-American

17   applicants relative to white applicants.

18          That was true, as Your Honor saw in Dr. Card's main

19   model, which I've just described.  It is true when you allow

20   the effects of the ALDC characteristics to vary by race and

21   vice versa, which SFFA insisted should be done.  Same

22   results.  It's true when you exclude recruited athletes,

23   which are -- SFFA said somehow their inclusion biases the

24   result because for athletes things like academics don't

25   matter that much.  He excluded the recruited athletes, same

**JA3634**

1    result.

2              And it's true when you modify the profile ratings

3    to remove the supposed effects of race, that is the marginal

4    effects that Dr. Arcidiacono found when modeling the factors.

5              So to sum up, even if in theory an intentional

6    discrimination case could be based only on statistics, a

7    circumstance that is reserved under governing case law not

8    for any case in which some expert can come up with a

9    statistically significant effect, but for exceptionally stark

10   cases like *Yick Wo* and *Gomillion*, the statistical evidence in

11   this case doesn't even establish a correlation between

12   Asian-American ethnicity and admissions outcomes, much less

13   that Harvard intentionally discriminates against

14   Asian-American applicants.

15             So in my remaining three to four minutes, I'll

16   address the more than a plus factor count.  Again let me

17   start by summarizing the law, which is largely undisputed, at

18   least in its broad outlines.  I've displayed the key points

19   on the slides here.

20             The Supreme Court has held that a university may

21   consider race only as a plus in a particular applicant's file

22   without insulating the individual from comparison with all

23   other candidates for available seats.  It's held that when

24   using race as a plus factor, a university's admissions

25   program must remain flexible enough to ensure that each

**JA3635**

1    applicant is evaluated as an individual, not in a way that

2    makes the applicant's race or ethnicity the defining feature.

3              And the Court has forbidden, quote, mechanical

4    predetermined diversity bonuses based on race or ethnicity,

5    but conversely, it's made clear that race can make a

6    difference as to whether an application is accepted or

7    rejected.

8              The evidence in this case showed that Harvard's

9    consideration of race satisfies those requirements in every

10   respect.  Admissions officers took the stand one after

11   another, and they testified that they consider race as only

12   one among many other factors.  They don't award any fixed or

13   formulaic preferences, and they consider race in an

14   individualized way in the context of each applicant's life

15   story.

16             SFFA tries to support its contrary argument by

17   relying on statistical evidence.  But let's look at the full

18   story on those statistics, which are essentially undisputed.

19             First, the statistics show that knowing an

20   applicant's race tells you almost nothing about whether he or

21   she will be admitted.  I'm sure Your Honor -- well, I'm not

22   sure.  In light of Your Honor's recent labors, maybe you

23   don't remember the slide.

24             But then that takeaway is if you know the

25   applicant's race and nothing more, you can explain 2/10 of

**JA3636**

1    1 percent of the probability that that person will be

2    admitted.  That is an incredible number, and it proves that

3    race is anything but the defining feature of the admissions

4    process.

5         Secondly, the statistics show that for highly

6    competitive applicants who would be on the bubble for

7    admission, no matter what their race, any number of factors,

8    including but by no means limited to race, have a meaningful

9    effect.

10        To understand why, recall again Dr. Card's

11    retirement example.  If you're 40, growing a year older isn't

12    going to significantly affect your likelihood of retirement.

13    If you are 78, the same is true, you're probably going to

14    retire anyway.  If you are 67 or 68 and right on the bubble

15    of retirement, then the additional year may mean a lot.  And

16    the same is true for admission to Harvard.

17        Here is the graph that Dr. Card used, showing that

18    there are basically no applicants who are assured of

19    admission to Harvard.  There are lots of applicants who

20    effectively have no chance.  There are about 25 percent who

21    are, as he called it, on the bubble.  That is, given the

22    constellation of the strengths in their application,

23    competitive enough that any one additional factor can push

24    them over the top, it's for those people that race can and

25    does have a meaningful effect and so can many other factors.

**JA3637**

 1          That's shown by the graphs on the next slide.  For

 2    most applicants, race has no effect whatsoever on their

 3    likelihood of admission.  It has a meaningful effect only for

 4    candidates who would be competitive for admission no matter

 5    what their race.  And for those candidates, the effect of

 6    race isn't disproportionate to the effect of other factors

 7    like academic excellence, extracurricular excellence, or

 8    excellent personal qualities.

 9          Every additional factor has a large effect for

10    highly competitive candidates.

11          Now, SFFA likes to emphasize that in the aggregate

12    the consideration of race significantly increases the number

13    of African-American and Hispanic students at Harvard.  That

14    is true.  That is a feature of the system, not a bug.  It's

15    not only permitted by the Supreme Court's jurisprudence, it's

16    expressly envisioned by it.

17          The Supreme Court recognized in *Fisher* 2 that race

18    can "make a difference to whether an application is accepted

19    or rejected."  It raised that the whole point of considering

20    race is to increase the admission of minority students who

21    otherwise "might not be represented in meaningful numbers."

22          Indeed, the Court in *Fisher* pointed favorably to

23    the fact that the consideration of race in that case caused a

24    54 percent increase in Hispanic candidates and 94 percent

25    increase in African-American candidates enrolled through the

 1    University of Texas's holistic review program, an effect the

 2    Court called "meaningful if still limited."

 3            And in *Parents Involved*, a case that SFFA loves to

 4    invoke, the Court pointed favorably to the fact that in

 5    *Grutter*, consideration of race was necessary to achieve

 6    diversity because doing so tripled minority enrollment.

 7            I'm ready to turn the podium over to the marvelous

 8    Mr. Lee.

 9            MR. LEE:  Your Honor, let me turn to the claim that

10    Harvard engages in racial balancing.

11            Again, as Mr. Waxman did in each of the claims, let

12    us set out what the law is.  In Slide 48, we have what the

13    Supreme Court explained that a university is not permitted to

14    define diversity as some specified percentage of a particular

15    group merely because of the race or ethnic origin of the

16    group.  But the Court also explained that some attention to

17    numbers without more does not transform a flexible admissions

18    system into a rigid quota.  The evidence shows that Harvard

19    complies with just this longstanding precedent.

20            At Slide 49, each and every admissions officer who

21    testified consistently that there are no targets, there are

22    no quotas, on Slide 50.  There are no floors on Slide 51.

23    And Dean Fitzsimmons confirmed that for the entirety of the

24    time he's been there.

25            That testimony is also supported by the statistical

Case: 19-2005   Document: 00117621846   Page: 716   Date Filed: 07/29/2020   Entry ID: 6356391
Case 1:14-cv-14176-ADB   Document 666   Filed 07/01/19   Page 82 of 129

82

1    evidence, largely uncontested, which shows meaningful

2    year-to-year differences in the racial composition of

3    Harvard's admitted and matriculating classes.

4             The plaintiff, Your Honor, disputed none of this,

5    not today in closing, not in the first closing, and not

6    during the course of the trial.  To remind Your Honor, their

7    expert had an opinion on racial balancing in his report.  He

8    did not offer it.  He did not offer it at all, or any other

9    opinion.

10            So having no expert opinion, what does SFFA rely

11   upon?  It relies upon the recruitment letters for Sparse

12   Country, which Mr. Waxman has already addressed, and I'm not

13   going to reiterate the chronology of those letters.

14            And the one-pagers.  So let me talk really quickly

15   about the one-pagers.  At Slide 56, Your Honor, we have the

16   different categories that the one-pagers include.

17            There is, as Your Honor knows, much more

18   information than just race.  They include information on

19   gender, geography, intended major, legacy status, residency,

20   and financial aid.  They're used to keep a rough tab or rough

21   finger on how the composition of the tentatively admitted

22   class compares to that of prior classes across all of these

23   different dimensions.

24            Now, the plaintiff suggests that the fact that

25   these one-pagers were created as key milestones in the

1    admissions cycle is evidence that too much attention is being

2    paid to the numbers.  It is not.  It is not surprising that

3    the dean and director of admissions want to be aware if there

4    is a dramatic drop-off in the diversity of the class in any

5    dimension.

6           That's exactly the kind of attention to numbers the

7    Supreme Court expressly held does not transform a flexible

8    admissions system into a rigid quota.  And if Your Honor

9    considers the *Grutter* decision, you will see that the dean of

10   admissions was receiving daily one-pager reports during the

11   height of the admissions season in exactly the same way that

12   Harvard does.

13          As Your Honor has heard, the primary purpose of the

14   one-pagers is to ensure that Harvard, a residential college

15   with a fixed number of beds, does not admit more students

16   than it has room for.  The yield rate, the percentage of

17   admitted students who then decide to come to Harvard, varies

18   by categories, and the category is listed on the one-pagers.

19          If the tentatively admitted class has more students

20   than the prior year in a category with historically lower

21   yield rates, the dean knows there is room to admit a few more

22   students.

23          Conversely, if a tentatively admitted class has

24   more students in groups with historically higher yield rates,

25   the dean knows that fewer overall students can be admitted.

**JA3641**

1            This has simply nothing to do with racial

2    balancing.  That's why the plaintiff's expert offered no

3    opinion on racial balancing.  That's why he didn't contest

4    Dr. Card's presentation on racial balancing.  The proportion

5    of African-American students, Hispanic-American students, and

6    Asian-American students, as you can see from Slide 57, has

7    steadily risen over several decades.  And those percentages

8    have varied significantly from year to year.  That is

9    anything other than racial balancing.

10            Now, the final claim concerns race-neutral

11    alternatives.  Again the law.  The Court has been clear that

12    universities need not, and I quote, "exhaust every

13    conceivable race-neutral alternative to a race-conscious

14    admissions process."

15            The burden on us in this circumstance is to show

16    that the race-neutral alternatives that are both available

17    and workable would not suffice to achieve the diversity and

18    the educational objectives of Harvard.

19            Critically, the Supreme Court has said, and we

20    quote it on Slide 59, that the university does not need,

21    cannot be forced to choose between maintaining its reputation

22    for academic excellence and fulfilling its equally important

23    commitment to provide educational opportunities for members

24    of all racial groups.

25            The evidence shows no combination of race-neutral

```
 1    practices would allow Harvard to achieve a comparably diverse
 2    class without compromising the academic excellence of the
 3    class.
 4            That is precisely what the Smith committee
 5    examined.  They looked at the proposed alternatives more than
 6    Mr. Kahlenberg suggested.  They looked at what happened when
 7    these proposed alternatives were implemented.  They looked at
 8    the history of alternatives like dispensing with early action
 9    or increased financial aid and what happened.  They looked at
10    the literature and they evaluated the effect of those
11    alternatives:  an intellectual excellence at Harvard, the
12    broader excellence at Harvard in many dimensions, and the
13    diversity of the class.
14            What did the plaintiff offer in response?  Just
15    Mr. Kahlenberg.  Mr. Kahlenberg testified that the committee
16    considered the right race-neutral alternatives.  He testified
17    that the committee considered them according to the right
18    criteria.  In the end, he just disagrees with the judgment of
19    the committee.
20            Now, although he didn't do it, the plaintiff
21    attacks the process.  And I quote this because I think it's
22    unfair.  They describe the committee's work or composition as
23    almost comical.
24            You heard Dean Smith, Dean Khurana, Dean
25    Fitzsimmons, collectively a group of people with nearly five
```

JA3643

1   decades of experience in university administration and

2   admissions.  We think that it's clear that they didn't

3   deserve the vitriolic attack that their work is almost

4   comical.

5           Compare that to Mr. Kahlenberg, who had never been

6   in university admissions, who had never implemented a

7   minority recruitment program, who had never implemented

8   financial aid program, who had never been retained by a

9   college or a university to consult on a race-neutral

10  alternative.

11          Mr. Kahlenberg, who was paid to consult on the

12  drafting of the complaint.  Mr. Kahlenberg, who the day after

13  the complaint was filed before there had been a single

14  document produced, a single deposition, a single expert

15  report, went on Fox News and pronounced judgment on Harvard,

16  a judgment that he stuck to.  And his judgment was that there

17  are race-neutral alternatives that wouldn't compromise the

18  academic integrity of Harvard and the diversity of Harvard.

19          Mr. Kahlenberg, as you now know, has vastly

20  different conceptions of what the academic excellence is that

21  is the core of Harvard's mission, and he has a radically

22  different view of what diversity is and should be at a

23  university.

24          On academic excellence, he had a very narrow set of

25  simulations based only upon test scores and GPAs.  And as

 1    Your Honor knows, those are not the drivers for the

 2    composition of the Harvard class.  The Harvard admissions

 3    officers consider much more.

 4         Dr. Card showed that if you took Mr. Kahlenberg's

 5    alternatives and other alternatives, you would significantly

 6    reduce the number of students on campus with academic ratings

 7    of 1 or 2.  You would significantly reduce the academic

 8    excellence of the class.

 9         Mr. Kahlenberg's definition of what is racially

10    diverse and what is acceptable as racial diversity was

11    equally off the mark.  Every one of his complicated

12    alternatives and some of his alternatives, as Your Honor

13    knows, are based upon assumptions that are just not --

14    they're just not based in reality -- show a drop in the

15    proportion of African-American students on campus from 14 to

16    10 percent.

17         Now, that's not a drop of 4 percent, as they

18    suggest to you in their filings.  That's a drop of

19    30 percent.  The plaintiff is confusing a drop, a percentage

20    drop with absolute percentage points.  A drop from 14 percent

21    to 10 percent of the African-Americans on campus would reduce

22    the number of African-Americans by 320.

23         How does Mr. Kahlenberg and SFFA address that?

24         MR. MORTARA:  Your Honor, we're five minutes over.

25    As long as I get them, I'm fine.

1          THE COURT:  You are over.

2          MR. LEE:  I'm close.  Can I have three minutes?

3          MR. MORTARA:  Can I have eight, Your Honor?

4          THE COURT:  Do you really need all eight?

5          MR. MORTARA:  I probably won't, Your Honor, but

6   this also happened in opening.  The Harvard rules for Harvard

7   and SFFA rules for SFFA gets a little tiresome.

8          THE COURT:  You can have eight.  I'm going to let

9   the Amici go before you go, though.

10          MR. LEE:  I'm not even going to dignify the

11   suggestion there have been different rules for Harvard and

12   for SFFA with a response.  It's not entitled to one.

13          How did they respond?  They say that a 30 percent

14   decrease in number of African-Americans is a slight decrease.

15   That's their response to you.  But the Smith committee told

16   you it's not slight.  More importantly, the students you saw

17   have told you that it's not slight.

18          So as we finish what we began in October, let me

19   suggest it would be useful to step back from all of the

20   detail, the statistical detail, the nonstatistical detail,

21   and look more broadly.  What do we see?

22          At Slide 62 on the screen, we can see what has

23   happened to the number of Asian-Americans at Harvard College

24   over time, from 3 percent in 1980 to the 20-some percent

25   where it is today.  These numbers have increased

Case 1:14-cv-14176-ADB   Document 666   Filed 07/01/19   Page 89 of 129

89

```
 1    substantially.  But at the same time, the number of

 2    African-Americans and Hispanic students have increased as

 3    well.

 4              The plaintiffs nevertheless claim that

 5    discrimination has affected hundreds of Asian-American

 6    students over six years and 160,000 applications.  They

 7    suggest to you that there have been hundreds of

 8    Asian-American applicants that have been discriminated

 9    against and disadvantaged.

10              And as Mr. Waxman and I have both pointed out

11    repeatedly, they have not identified one.  They have failed

12    to produce a single rejected applicant who claims

13    discrimination.  They have failed to produce a single file.

14              Now, Your Honor, Harvard, like many other

15    institutions of higher education, has recognized, as I said,

16    the compelling interest in creating communities through

17    diverse in many respects.  Those institutions -- not us

18    alone, but many other institutions of higher education have

19    invested enormous time, effort, and energy over many years in

20    recruiting and enrolling students from a wide variety of

21    racial, ethnic, socioeconomic, geographic, and other

22    backgrounds.

23              As President Simmons testified, and I quote on

24    Slide 65, how can we imagine a world in which we are not

25    creating leaders and citizens who have the capacity to
```

**JA3647**

```
 1   mediate differences?  I cannot imagine it.

 2            And as President Faust testified, on Slide 66,

 3   we've made progress, but there much to be done.

 4            That is why the plaintiff's expert conceded, as

 5   shown on Slide 67 that SFFA's analysis and his analysis is

 6   one where there are winners -- whites and Asian-Americans --

 7   and one where there are losers -- African-Americans and

 8   Hispanics.

 9            Buried in two footnotes in SFFA's briefing is the

10   evidence of SFFA's real ambition, to ask the Supreme Court to

11   change the law and forbid the consideration of race by

12   Harvard and other universities like it.

13            As the plaintiff's own slide show -- and I'm

14   putting now up on Slide 69 one of the slides from their own

15   expert's testimony -- at Harvard College, without any of the

16   ineffective race-neutral alternatives Mr. Kahlenberg

17   proposes, the elimination of race would result in a drastic

18   reduction of the number of African-American and Hispanic

19   students on campus.  That result would be wrong bigly; it

20   would be wrong morally.

21            Your Honor, the course the plaintiff urges you to

22   take is one that would undercut the considered judgment of

23   educators at Harvard and elsewhere that diversity enhances

24   the community and the learning that takes place in

25   classrooms, around the dining tables, and on playing fields.
```

1    It would leave generations of young Americans less equipped

2    to thrive in and to confront the challenges in an

3    increasingly complex world.  And it would send the message

4    and it would create the reality that American universities

5    are no longer the cradles of opportunity and its beacons of

6    social mobility.

7            Congress cannot have possibly intended that

8    Title VI, a statute enacted to expand opportunity, would be

9    used to contract the opportunity that's been made available

10   to so many people who have not historically had that

11   opportunity.

12           Thank you.

13           THE COURT:  Thank you.

14           Mr. Mortara, how many extra minutes do you get?

15           MR. MORTARA:  According to Mr. Hughes, it will be

16   ten.  I am certain I will not use it, but I won't be rushed.

17           THE COURT:  I'm going to give you some time to

18   figure out how to use your extra ten minutes and let the

19   Amici go next.

20           MR. MORTARA:  That's great.

21           MS. TORRES:  Your Honor, we have prepared slide

22   deck copies, if you would like one, as well as for the

23   parties.

24           And if I can quickly correct myself, I am joined by

25   Emma Dinan from Arnold & Porter and from MJ Rosner, one of

1    our co-counsel in the case.

2             Race-blind admissions is an act of erasure.  To try

3    to not see my race is to try to not see me.

4             It was on the witness stand right there that Sarah

5    Cole shared this sentiment, and Sarah was not alone.  Eight

6    Harvard students and alum testified at trial for student

7    Amici:  Thang, Sally, Itzel, and Sarah, along with

8    organizational Amici.

9             All eight shared their ethnicity with Harvard when

10   applying because all eight felt it was an integral aspect.

11   All eight testified that Harvard's racial diversity, a

12   product of its admissions process, positively shaped their

13   educational experience.  They engaged in cross-racial

14   conversations that were mind opening, met other students of

15   color who were their saving grace and learned lessons that

16   made them better physicians, teachers, policy makers, and

17   citizens.

18            SFFA did not challenge these facts.  And at points,

19   it outright agreed that race and racial diversity remains

20   vitally important in today's society.

21            Instead, the plaintiffs have engaged in their own

22   act of erasure.  They did not call a single student to

23   testify, and its experts did not consult a single student to

24   form their opinions.  The plaintiffs have tried to erase

25   countless student stories by placing undue emphasis on its

1       flawed statistical analysis and by ignoring the wealth of

2       evidence in the students' application files.  That evidence

3       is persuasive proof that Harvard's appreciation of race is

4       lawful and critical for cultivating citizen leaders.

5               As this Court knows, the plaintiffs tried to

6       achieve its singular goal of banning the consideration of

7       race by advancing two distinct legal theories, starting with

8       the claims against Harvard's policy promoting diversity.

9               The legal standard is straightforward.  Harvard

10      must show that it is both necessary and individualized.

11              Necessity is established by three undisputed facts.

12      The first, race provides critical context for accurately

13      assessing many applicants' strengths and contributions.  This

14      was true for Itzel, whose personal essay, entitled

15      "Different," told Harvard about how she initially felt like

16      an ethnic outsider because of her Latina heritage.  When she

17      used advanced vocabulary, she was made fun of for talking

18      white.  But she returned to her roots.  She ultimately

19      embraced her heritage because it made her stronger, more

20      empathetic, a more critical thinker.

21              She told Harvard that she discovered her life's

22      ambition to represent her heritage and that she would carry

23      that pride with her to college if admitted.

24              And the evidence shows that Harvard took note, not

25      of a single fact about Itzel but of a complex picture, of a

1    complex young woman who Harvard decided would be a good fit.

2              The plaintiffs don't say that that these strengths

3    should not be valued, but their requested remedy would compel

4    universities to blind themselves to any reference to race.

5    This would systematically undervalue the contributions like

6    Itzel.

7              The harm would cut just as deep for American

8    students like Thang.  Thang told Harvard that when he was

9    growing up, his Vietnamese identity felt lost in translation.

10   He told Harvard about his transformative growth, placing

11   pencils between his teeth to improve his pronunciation.  And

12   he told Harvard that he reconnected with his Vietnamese

13   identity because it showed he had a strong sense of self.

14   Erasing Thang's ethnicity from his application file would

15   undercount his strengths as well.

16             The plaintiff's own expert agreed.  Mr. Kahlenberg

17   conceded that admissions offices should be able to consider

18   whether an applicant has overcome racial discrimination.

19             Furthermore, the students show that even the

20   demographic check box can offer meaningful information.

21             Sarah wrote her essay on combatting gun violence in

22   Kansas City.  She committed herself to this cause after a

23   close acquaintance was killed.  And she presented the mayor

24   with six recommendations to end youth violence.  Sarah never

25   mentioned her race in her essay, but she did mark the box

1    that she was African-American.  This provides additional

2    context for Sarah's advocacy, and at trial Sarah agreed.

3           The second undisputed fact is that racial diversity

4    enriches the educational environment for all students.  Every

5    single student testified to this fact.  Thang explained that

6    his interactions with racially diverse students gave him a

7    tool set to think about cultural sensitivity which will make

8    him a better doctor.  And this diversity benefits nonminority

9    students, too.

10           Sarah told this court that she was repeatedly

11   thanked by classmates for her contributions, including when

12   she specifically framed them as a black woman.  Racial

13   diversity also matters for combatting racial hostility.

14           While Harvard has taken steps to better support

15   students of color, Itzel still felt stereotyped by classmates

16   who constantly questioned her:  Were you born here?  Are you

17   a citizen?

18           A staff member kicked Sally out of a student

19   lounge, presuming she was a trespassing tourist, making Sally

20   feel like a perpetual foreigner.

21           Cecelia Nunez shared about how a classmate called

22   her and her friends a bunch of wetbacks.  The number of

23   minority students matters in these moments.  Cecelia shared

24   that they could laugh off the racial slur because they were a

25   large group of students, but she acknowledged that they had

**JA3653**

1    likely felt threatened had their numbers been lower.

2          The plaintiffs have suggested that these benefits

3    could be achieved without considering race, but they are

4    wrong because of the third undisputed fact.

5          Eliminating the consideration of race would sharply

6    reduce the number of black, Hispanic, and other minority

7    students on campus.  Harvard's expert estimated that their

8    numbers would be cut in half, and the plaintiff's expert said

9    that their numbers would be cut by roughly 1,000 students on

10   campus.

11         All students would lose out from this decline.  As

12   Sarah shared, there would be less learning because black and

13   Latinx students offer perspectives that make classes so much

14   richer.  And Itzel explained that students of color are

15   driving many of the positive changes on Harvard's campus.

16         SFFA's expert, Mr. Kahlenberg, tries to erase these

17   harms by saying Harvard could achieve comparable benefits by

18   using race-neutral alternatives.  But his alternatives do not

19   make up for the losses.

20         All of them reduce the share of black students.

21   This reduction would undoubtedly harm Harvard's

22   African-American students.  Sarah needed a sufficient number

23   of same-race peers to lean on when Harvard's newspaper

24   published a racially bigoted article suggesting that

25   admitting black students to Harvard was like teaching a blind

**JA3654**

1    person to be a pilot.  This is a group that is already highly

2    marginalized on Harvard's campus.  But this decline also

3    hurts every student.

4           Thang testified that the decline in black students

5    would hurt his education dramatically because it's their

6    advocacy that taught him how to build coalitions and how to

7    better address the health needs of people of color, including

8    his own Vietnamese community.

9           Another shortcoming, socioeconomic status cannot

10   serve as a proxy for race.  As Itzel testified, ethnoracial

11   diversity is more visibly salient.  When she entered a

12   classroom, she took note mentally of the number of nonwhite

13   students, and she intentionally sought out spaces with more

14   students of color because there she could finally breathe.

15          Kahlenberg himself admits that the most efficient

16   method for cultivating racial diversity is considering race,

17   not socioeconomic status.

18          Another major pitfall.  It threatens to reduce the

19   diversity within each racial group.  Asian-Americans vary

20   widely in their immigration histories, educational

21   opportunities, and countless other characteristics.  As Thang

22   testified, Southeast Asian representation is lacking at

23   Harvard with fewer underrepresented Vietnamese students.

24   This often makes him feel erased.  Thang explained

25   race-conscious admissions allows Harvard to take his

1    Vietnamese immigration history into account.

2            As a final problem, it's likely that the decline

3    would be even greater than estimated.  Several students said

4    that if Harvard stopped considering race, minority students

5    would be less likely to apply and less likely to accept.

6            Taken together, these facts demonstrate racial

7    considerations are necessary.  The remaining question is

8    whether Harvard's manner of considering it is individualized.

9            This question should also be resolved in their

10   favor based on three facts:  Admitted black and Hispanic

11   students are eminently qualified regardless of race; Harvard

12   considers all pertinent elements of diversity; and Harvard

13   flexibly applies its positive appreciation of race across

14   students of all backgrounds.  It does not award predetermined

15   points, and it is never a negative factor.

16           The plaintiffs say that race is the predominant

17   factor in admitting black and Hispanic students.  The claim

18   is false, and Sarah's file shows why.

19           Harvard's readers made no comment about Sarah's

20   race.  They do comment extensively on Sarah's extraordinary

21   achievements.  And I've just pulled out a few highlights.

22   They praised Sarah's stellar academics and wide-ranging

23   extracurriculars.  She earned straight As and A pluses in

24   high school while holding down a part-time job.  The comment

25   about her character attributes are all backed up by glowing

1    recommendations.

2           And notably for this case, Harvard's readers

3    underlined that she exhibited leadership of a subtler,

4    quieter type, proof that "quiet" can be a positive term.  The

5    comments also show Harvard's valuing a full range of

6    diversity attributes, noting Sarah's socioeconomic status,

7    her geographic ties, and even her parents' occupations, a

8    sign that Harvard does consider this information.  And

9    Dr. Card's model is stronger for considering it, too.

10          Izel's application reflects a similar pattern.  It

11   is full of detailed commentary about the full spectrum of her

12   strengths.  For Itzel, Harvard's readers did make two

13   references to her ethnicity, noting that she was connected to

14   her heritage after a period of disconnect, see PE.

15   Presumably PE is her personal essay entitled "Different."

16   This shows when Harvard's considering ethnicity, they're

17   viewing it in context.

18          To be clear, race may have played a limited role in

19   Itzel and Sarah's admission, but the plaintiff's argument

20   that race is the predominant factor is not only incorrect, it

21   unfairly erases the great weight of their accomplishments.

22          Just as importantly, there is nothing wrong with

23   considering race in a limited, reasonable way.  Harvard is

24   admitting minority students who are making concrete

25   contributions to its educational goals based in part on their

Case: 19-2005    Document: 00117638846    Page: 734    Date Filed: 07/29/2020    Entry ID: 6356391
Case 1:14-cv-14176-ADB   Document 666   Filed 07/01/19   Page 100 of 125

100

1     race.  Itzel vowed in her application to carry her Latina

2     pride to college, and she made good on this promise.  She led

3     a coalition of students who established an ethnic studies

4     track at Harvard.

5           The recommendation letter from Sarah's school

6     counselor, including her response in a prior survey saying

7     that her greatest contribution in high school was loosening

8     the strong hold of stereotypes by providing her classmates

9     with an example of a working-class black woman who strives

10    for academic excellence.

11          Sarah continued to challenge stereotypes at

12    Harvard.  She co-authored a diversity report.  She served as

13    president of the Black Students Association.  And when the

14    campus was shaken by the deaths of Michael Brown, Eric

15    Garner, and the slew of police shootings that followed, Sarah

16    led the rest of the campus in finding a path for her to mourn

17    and make meaning of the fact that black lives matter and how

18    to be better allies.

19          It's clear on this record that Harvard's process is

20    both necessary and highly individualized.

21          Turning briefly to the plaintiff's second legal

22    theory of intentional discrimination, the students offer

23    three observations.

24          First, the plaintiffs cannot evade the burden of

25    proving intent, and strict scrutiny does not apply.

1    Harvard's counsel covered this.  So I'm going to move on to

2    the second observation.

3            The application files of the Asian-American student

4    Amici corroborate the testimony of Harvard's witnesses.  If

5    Asian-American ethnicity is taken into account, it's always

6    seen in a positive light.

7            The reviewer who noted Thang's Vietnamese identity

8    and use of pencils used to improve his English also favorably

9    praised him for pushing himself academically and personally.

10           For Sally, the only reference to her Chinese

11   heritage were positive, and they were always tied to context.

12           The plaintiffs cannot erase entirely the

13   significance of these examples.

14           A third observation:  The plaintiff's method of

15   proof overlooks the importance of non-academic factors.  The

16   plaintiff's arguments about the personal score are not

17   persuasive because they overemphasize academic metrics.

18   Their expert throws out the personal score based on two

19   flawed analyses.

20           First, he points to differences in the personal

21   score when students are arranged by academic index, a score

22   based entirely on standardized test scores and grades.  While

23   there may be racial variants, this does not show racial bias.

24   It simply demonstrates that the academic index is not

25   strongly related to the personal score.  And those applicants

1    with midrange scores are more than academically qualified.

2            Take our students.  Among the four, Thang had the

3    lowest academic index at 220, probably because of his

4    lower-end SAT score.  According to the plaintiff's table,

5    this places him in the 5th decile.  The plaintiffs have

6    derisively referred to this as a middle-of-the-pack score.

7            But Thang was more than academically qualified.  He

8    had straight As in high school, graduated first in his

9    prestigious magnet program, and was a national AP scholar

10   with distinction.  That's what qualifies as underqualified in

11   the SFFA model.

12           His academic index also says nothing about the

13   attributes relevant to the personal score, such as reaction

14   to setbacks and concern for others.  Here, Thang excelled.

15   He overcame language barriers, and his school recommendations

16   stressed that he was an unusually caring individual with an

17   infectiously happy personality.

18           There's also nothing suspicious about variation by

19   race.  The academic index is highly driven by standardized

20   test scores which track privilege more than talent.  Test

21   scores are racially skewed in large part because of racial

22   variation in wealth, which impacts who has access to

23   expensive test-prep programs.

24           Grades and coursework can also be racially skewed.

25   Several student Amici testified that teachers were less

1    likely to identify black and Latino students for gifted

2    coursework.

3          Dr. Arcidiacono also justifies throwing out his

4    personal score based on his regression analysis.  But his

5    method selectively ignores some racial associations but not

6    others.  All three of the rating regressions showed

7    associations with race.  All three had no explanatory power.

8    They should be treated consistently.

9          Dr. Card did this.  He adjusted his model for the

10   racial associations across all three of the ratings, and he

11   found no sign of discrimination.

12         Harvard's admissions system is not perfect.  To be

13   clear, Asian-Americans overcome setbacks, display courage,

14   and make great leaders.  But because of biases in the K-12

15   system, such attributes may show up in students' application

16   files at varying rates.

17         Teachers and counselors may offer effusive praise

18   of Asian-American students, but that praise may focus more on

19   their academic strengths and less on their reaction to

20   setbacks.

21         Think of Sally Chen.  Her college counselor told

22   her not to write about her family's Asian immigrant story

23   because it was overdone.  Fortunately, Sally did not heed

24   this advice.  She wrote about it, received a high personal

25   score, and got in.  But imagine if the counselor had

Case: 19-2005    Document: 00117638846    Page: 738    Date Filed: 07/29/2020    Entry ID: 6356391
Case 1:14-cv-14176-ADB    Document 666    Filed 07/01/19    Page 104 of 125

104

```
 1    convinced Sally.  And these are the very same counselors who
 2    are writing recommendation letters for students.
 3              Instead of perpetuating inequalities,
 4    race-conscious admissions is one of the most important tools
 5    for counterbalancing such biases.  Harvard should continue to
 6    refine its system to promote greater equity.  It should
 7    continue to train its staff to be more sensitive to the
 8    challenges of all minority students.  And it should and
 9    legally may use race-conscious admissions as one of these
10    tools.
11              In sum, the plaintiffs cannot erase student stories
12    from the record, and it should not be permitted to erase the
13    appreciation of race in admissions.
14              The students trust that this Court's holistic
15    review of the evidence, much like Harvard's holistic
16    race-conscious process will honor their stories and preserve
17    diversity on Harvard's campus to cultivate the citizen
18    leaders that we need to lead in this stunningly diverse
19    world.
20              Thank you.
21              MS. HOLMES:  Good afternoon, Your Honor, counsel.
22    I represent 25 Harvard student and alumni organizations as
23    Amici.  These organizations represent thousands of
24    Asian-Americans, black, white, Latinx, and native students
25    and alumni who support Harvard's ongoing consideration of
```

Case: 19-2005    Document: 00117633846    Page: 769    Date Filed: 07/29/2020    Entry ID: 6356391
Case 1:14-cv-14176-ADB    Document 666    Filed 07/01/19    Page 105 of 125

105

1    race as one of many factors in its holistic admissions

2    system.

3            Your Honor heard from a few of these members who

4    testified during trial, as well as from witnesses from the

5    student Amici.

6            By contrast, as has been pointed out, no student

7    testified in support of SFFA's claims.  The Court has our

8    proposed findings of fact and conclusions of law, but I would

9    like to highlight three crucial points in a case that has

10   become largely dominated by the battles of statistics.

11           First is to give a concrete picture of what is

12   meant by the educational benefits of diversity.  In other

13   words, what would be lost should Harvard no longer be able to

14   cultivate this diversity.

15           The second is to expose the fallacy of race-neutral

16   alternatives.  They have been studied, attempted, and

17   simulated.  And the evidence in the record shows that there

18   are no workable alternatives through which Harvard can

19   generate sufficient educational benefits of diversity

20   compared to the limited consideration of race in admissions.

21           And finally, SFFA's push for a race-blind

22   admissions system disproportionately harms applicants and

23   students of color, including Asian-Americans.

24           One goal of the organizations I represent is to

25   make concrete what a diverse student body looks like.  And

Case: 19-2005    Document: 00117631846    Page: 740    Date Filed: 07/29/2020    Entry ID: 6356391
Case 1:14-cv-14176-ADB    Document 666    Filed 07/01/19    Page 106 of 125

106

1    I'm focusing here on racial and ethnic diversity, although it

2    is true that other types of diversity are also important and

3    Harvard does consider those other types of diversity.

4         Our witnesses demonstrated how learning in a

5    racially diverse student environment shaped their educational

6    experiences.  Their firsthand experience offers real-world

7    examples of the concepts described by Dr. Ruth Simmons, an

8    educator with decades of experience in college pedagogy and

9    administration, that, in her words, encountering difference

10   deepens student's learning, influences their academic and

11   career paths, and breaks down stereotypes to prepare them for

12   a future in a pluralistic and diverse society.

13        To highlight a few examples from the record, a

14   racially diverse student body enhances academic study.  You

15   heard this from Thang Diep, who recalled hearing from a black

16   student in his public health class which helped open his eyes

17   to how medical studies can be racially biased and forming his

18   plans to be a pediatrician.

19        Or take Cecelia Nunez, whose experience before

20   Harvard was primarily with her own Mexican-American community

21   but came to Harvard and discovered other Latinx students from

22   a range of ethnic backgrounds and was inspired to focus on

23   Latin-American studies to explore the full breadth of this

24   diaspora.

25        Harvard as an institution also depends on a diverse

1    student body to become a school that is more responsive to

2    the needs of its students.  For example, Harvard

3    administrators reached out to Sarah Cole, the president of

4    the Black Students Association, during a period of police

5    shootings of unarmed black men for help in communicating with

6    the student body about this sensitive issue.

7         Diversity on campus also fosters feelings of

8    representation, recognition, and solidarity.  Madison Trice

9    spent years being the only black student in her high school

10   honors courses but was elated to arrive at Harvard and be

11   welcomed into an organization that celebrates black women and

12   all their multidimensional identities.

13        Diversity allows for coalition building and coming

14   together to tackle difficult topics.  A group of

15   Asian-American students at Harvard started a coalition of

16   multiple student groups of color to push the Harvard

17   admiration to establish an ethnic studies track and an ethnic

18   studies program, efforts that continue today.

19        And diversity promotes moments of interpersonal

20   revelation.  Through late-night conversations with her black

21   roommate after an incident of police brutality against a

22   black student took place just steps from campus, Catherine Ho

23   learned about the emotional total that the episode had taken

24   on the black student community.

25        This is precisely what the Supreme Court meant when

1    it says, in *Bakke*, "The atmosphere of speculation,

2    experiment, and creation so essential to the quality of

3    higher education is widely believed to be promoted by a

4    diverse student body."  Justice Powell continued, "It is not

5    too much to say that the nation's future depends upon leaders

6    trained through wide exposure to the ideas and mores of

7    students as diverse as this nation of many peoples."

8            Without a diverse student body, the conversations,

9    educational epiphanies, moments of solidarity, challenges to

10   prior assumptions, or feelings of finally belonging cannot

11   happen.  These educational experiences cannot be taught in

12   the classroom.  Indeed, much of the work of translating

13   diversity into these benefits is shouldered by our client

14   organizations which bring people together across racial lines

15   for socializing, educational events, dialogue, and activism.

16           Even though they can't be quantified, the evidence

17   showed that these benefits are more than abstract concepts

18   and have real, lasting effects on students' educational

19   experiences and future potential.  And we should tread very

20   carefully when we consider dismantling an admissions system

21   that has made them possible.

22           Turning to race-neutral alternatives, I will start

23   by pointing out that on the stand Mr. Kahlenberg agreed to

24   the eminently simple concept that the best and most efficient

25   method of promoting racial diversity in a student body is to

1    consider race in admissions.  The evidence in the record

2    takes this further, demonstrating that it is a fallacy that

3    race-neutral alternatives are enough to produce a

4    sufficiently diverse class to foster the educational benefits

5    of diversity.

6           First, Harvard already employs numerous

7    race-neutral alternatives, such as an immense and targeted

8    recruitment apparatus, one of the most generous financial aid

9    programs in the country, strong consideration of low-income

10   and disadvantaged status in admissions, and extensive

11   resources put towards convincing admitted students to

12   matriculate.

13          Even if these practices remained in place,

14   according to Dr. Arcidiacono, if Harvard eliminated the

15   consideration of race in admissions, the number of black and

16   Latinx admitted students would fall by nearly 1,100 across

17   all four years.  That is roughly half.

18          Mr. Kahlenberg agreed that this is unacceptable,

19   but his own proposals of race-neutral alternatives do not

20   fare much better.  In each of his four main simulations, the

21   share of admitted black students would drop by nearly

22   one-third.  And we must remember that this is the percentage

23   of admitted students, so the actual share of black student

24   enrollment would be even lower, in the single-digit

25   percentages, especially given that black students yield at a

1    lower rate.

2           As Mr. Lee mentioned, SFFA repeatedly characterizes

3    this reduction as slight.  And shockingly, SFFA touts this

4    marginalization of Harvard's black student community as an

5    increase in diversity, claiming that there will be increases

6    to the Latinx or Asian-Americans share of admits.  Our

7    clients would support this increase but not at the cost of

8    losing one-third of their black classmates.

9           In SFFA's view, apparently, diversity means that

10   people of color are fungible.  You don't need a robust mix of

11   people from different backgrounds.  You don't care about

12   diversity within each racial group, and you can squeeze out

13   one-third of the black community and pat yourself on the back

14   for increasing diversity.

15          Thankfully, under *Fisher*, Harvard and not SFFA has

16   a First Amendment right to define its educational mission and

17   pursue the type of robust diversity that supports that

18   vision.

19          But SFFA's ultimate failure here is that it does

20   not go past the numbers to consider the effect on actual

21   students.  SFFA and Mr. Kahlenberg offer no evidence about

22   how the loss of one-third of admitted black students would

23   affect the educational benefits of diversity at Harvard.

24          Mr. Kahlenberg did not speak to any students,

25   faculty, or educational experts about this.  And SFFA

1    presented no evidence on this issue.  In its brief, SFFA

2    simply scoffed at the idea that there could be a negative

3    effect, calling it "not credible."

4         But the unrebutted evidence at trial shows

5    otherwise.  Amici witnesses described their participation in

6    or their engagement with the black student community and the

7    detrimental effects a significant reduction in this community

8    would have on their Harvard experience.

9         These effects include fewer opportunities for

10   meaningful interactions that break down stereotypes, more

11   isolation of black students, and feelings of tokenism in the

12   classroom, a potential increase in racial hostility, less

13   diversity within the black student community because a

14   smaller community will likely not reflect the full range of

15   black experiences, fewer black students to help recruit and

16   welcome prospective students, and less capacity of cultural

17   organizations to promote dialogue and education that helps

18   expose students to people of different backgrounds and issues

19   faced by different communities.

20        On this last point, many black student

21   organizations such as our clients, the Black Students

22   Association and the Kuumba singers, for example, are some of

23   the more established organizations on campus with decades of

24   leadership at Harvard.  They have served as models and paved

25   the way for a proliferation of cultural organizations.  For

1    these organizations to lose membership and capacity would

2    have effects that reach beyond the black community, but it

3    would affect this entire network and also affect Harvard's

4    relationship with its students of color.

5          Harvard still has progress to make to become a more

6    inclusive place.  There are still classes and spaces that

7    feel overwhelmingly white.  Harvard still lacks an ethnic

8    studies program.  There are still incidents of racial

9    hostility, and many complained about the school's inadequate

10   response to an incident of police brutality.

11         A significant reduction in the black student

12   community is antithetical to making progress on these issues.

13         And thus, Your Honor should reject SFFA's claims

14   that it has identified a race-neutral solution that works

15   about as well as the consideration of race in admissions

16   because there is no evidence that these alternatives can

17   foster diversity sufficient to reach -- sufficient to reap

18   its educational benefits.

19         Finally, at every step of this case, SFFA has

20   pursued its claims in ways that disadvantage students of

21   color.  First, SFFA's intentional discrimination claim relies

22   heavily on comparing applicants on academic measures of

23   grades and test scores.  But Harvard has never claimed that

24   these are the most important metrics in its admissions

25   determinations, especially when distinguishing between highly

1      competitive applicants.

2              One reason is because Harvard recognizes the

3      realities of our K-12 educational system in which black and

4      Latinx students disproportionately face barriers to

5      educational opportunity that may limit the degree to which

6      grades and test scores reflect their full academic potential.

7              And yet, SFFA overemphasizes grades and test scores

8      in its analysis, constantly comparing applicants by academic

9      index, even though Harvard does not even consider the

10     academic index in its admissions.

11             You've heard from student witnesses of many races,

12     and they are all highly qualified with stellar academic and

13     non-academic credentials.  Hearing their pre-Harvard

14     accomplishments, scores, and resumes, it is clear that to the

15     extent that race was considered this their admission, it was

16     simply a plus factor that helped add context to their

17     stories, the cherry on top of a great application.

18             But SFFA's focus on academic measures devalues the

19     non-academic strengths of those applications, which are can

20     sometimes be the credentials that allow black and Latinx

21     applicants to show their full potential.

22             Second, race-conscious admissions allow Harvard to

23     consider the full lived experiences of applicants of color,

24     whose experiences may often be illuminated by their racial or

25     ethnic identity.  If Harvard no longer considered race in

1    admissions, it could signal to these applicants that the

2    school doesn't value these experiences or might not even

3    consider compelling stories of adversity or identity or

4    immigrant background that are inextricably tied to race.

5            This would hurt Asian-American applicants just as

6    much as other applicants of color.

7            Finally, under all the expert analysis in this

8    case, Dr. Card, Dr. Arcidiacono, and Mr. Kahlenberg, if you

9    remove the consideration of race, almost any way you slice

10   the data, the groups that suffer in the admissions process

11   are primarily black and Latinx applicants.

12           SFFA's claim is premised on alleged discrimination

13   against Asian-American applicants compared to white

14   applicants.  And yet white applicants do not bear the brunt

15   of the burdens of their proposed alternatives or remedies.

16   Indeed, in some of the analyses, white applicants are the

17   primary beneficiaries.

18           It is hard to believe that SFFA has pursued this

19   case in order to turn away the wolf of racial bias when

20   SFFA's claims, analyses, and remedies seem so slanted against

21   students and applicants of color.

22           On a final note, since its inception, my

23   organization, the NAACP legal defense fund, as well as the 25

24   organizations we represent, has been committed to racial

25   equality.  We unequivocally denounce discrimination against

1    any group.  We are also well aware of the burden that civil

2    rights plaintiffs shoulder in bringing intentional

3    discrimination cases under Title VI.

4            SFFA bears that burden in this case, but it has

5    attempted to evade its obligation by twisting the law to

6    argue that the burden should shift onto Harvard to disprove

7    discrimination simply because Harvard has a race-conscious

8    admissions policy, even though that policy has been approved

9    by Supreme Court precedent.

10            SFFA's legal gymnastics are revealing because this

11    case is not really about intentional discrimination.  It is

12    an attack on Harvard's ability to provide a racially

13    inclusive and diverse educational environment from which all

14    students benefit.  The subtext of SFFA's argument is that any

15    race-conscious admissions policy is tantamount to

16    discrimination.  But that premise is not borne out by the

17    evidence in this case and conflicts with Supreme Court

18    precedent.

19            And it is deeply ironic that under the guise of

20    Title VI of the Civil Rights Act of 1964, SFFA would attempt

21    to ban a civil rights policy that is intended to advance

22    equity in higher education, without which Harvard would be a

23    of whiter, more closed institution.

24            Thank you.

25            MR. MORTARA:  Your Honor, subject to the computer,

Case: 19-2005    Document: 00117683846    Page: 750    Date Filed: 07/29/2020    Entry ID: 6356391
Case 1:14-cv-14176-ADB   Document 666   Filed 07/01/19   Page 116 of 129

116

1    I'm ready to go.

2              Ms. Daly, are you?

3              Your Honor, while the screen is adjusting, I think

4    you've learned a little bit about me personally in the course

5    of this case.  I hadn't told you yet that my wife, Mary

6    Swietnicki, and I have ten nieces and nephews.  Four of them

7    are Chinese-Americans.  My daughter has four Chinese-American

8    cousins.  Mary's brother married a Chinese-American woman.

9              And I'm here to tell you I'm part of the community

10   of Americans waiting to hear why it is that Asian-Americans

11   got not marginally lower personal ratings, statistically

12   significantly lower personal ratings than white applicants.

13   It is undisputed in this case, and we still haven't been told

14   why.

15             I get it, Your Honor, from listening to Mr. Waxman

16   in particular, I have failed my own family because we are the

17   gang that can't shoot straight.  We allegedly have told you

18   all sorts of inconsistent things.

19             But if you remember Tab 12 of your binder and the

20   *Thomas* case, it is not inconsistent to talk about intentional

21   discrimination.  I will say it again.  Harvard intentionally

22   discriminated in this case.  It's not inconsistent to follow

23   that up with statements that it could have happened because

24   of implicit bias, and it could have happened because of

25   racial stereotyping.

1          None of those things are inconsistent with one

2    another.  The *Thomas* versus Eastman Kodak case says they are

3    all the same.  And I'll say it all again.  Harvard

4    intentionally discriminated in this case against

5    Asian-American applicants.

6          And right behind that, Your Honor, you know you

7    don't have to find that Harvard's witnesses were liars and

8    perjurers, even when they said they never used race in the

9    personal rating.

10          That's what *Thomas* is all about.  Cognitive biases

11   that cause people to do things that they come in here and

12   they can't even explain.

13          None of them could explain why Asians were getting

14   lower personal ratings, but they are.  How is it happening?

15   Why is it happening?  We still haven't heard.

16          What we have heard is a lot of confusion and more

17   two plus two equals five about the law.  I heard Mr. Waxman

18   say that *Gratz* is not an intentional discrimination case.

19          Let's check.  Here's the Supreme Court decision in

20   *Gratz*, and I just am going to go to the very beginning of

21   Chief Justice Rehnquist's majority opinion.  This is a case

22   about alleged violations of the equal protection clause and

23   what Title VI of the Civil Rights Act of 1964.

24          And what's the conclusion?  The program in the

25   University of Michigan *Gratz* case violated these

 1    constitutional and statutory provisions.

 2              The last I checked, Title VI only bans intentional

 3    discrimination.  *Gratz* absolutely is an intentional

 4    discrimination case.  All we heard just now was another

 5    episode of two plus two equals five.  And Harvard is even

 6    move confused about other areas of discrimination law.

 7              If you took seriously everything they were saying,

 8    they'd be overturning about 40 years of discrimination case

 9    law or trying to make Title VI different from Title VII in

10    some way nobody could possibly explain.  They're right next

11    to each other, in the same act and are modeled after one

12    another.

13              First, we somehow need to show you direct evidence

14    of discrimination?  Not according to the Third Circuit in

15    *Aman v Cort Furniture*.  Let's take a look at that.  This is

16    *Aman v Cort Furniture Rental* from the Third Circuit.  And

17    what did they say on the subject where we were criticized for

18    no direct evidence.

19              Here's what they said:  "As one court has

20    recognized, defendants of even minimal sophistication will

21    neither admit discriminatory animus or leave a paper trail

22    demonstrating it."

23              I think we can all agree Harvard and its admission

24    personnel are more than minimal sophistication.  We need to

25    have anecdotal evidence?  Really?  What did the D.C. Circuit

Case: 19-2005    Document: 00117638846    Page: 753    Date Filed: 07/29/2020    Entry ID: 6356391
Case 1:14-cv-14176-ADB    Document 666    Filed 07/01/19    Page 119 of 125

119

1    say about that in the *Segar* case.  This is the *Segar* case
2    from the D.C. Circuit.
3            And over in that case, around about Headnote 36,
4    statistics of course are not irrefutable, citing *Teamsters*,
5    but when a plaintiff's statistical methodology focus on the
6    right things, the appropriate labor pool, and generates
7    evidence of discrimination at a statistically significant
8    level, no sound policy reason exists for subjecting the
9    plaintiff to the additional requirement of either providing
10   anecdotal evidence or showing further gross disparities.
11   Such a rule would reflect little more than a superstitious
12   hostility to statistical proof, a preference for the
13   intuitionistic and individualistic over the scientific and
14   systematic.
15           We are rolling back the decades in employment
16   discrimination law every time Harvard stands up, or we're
17   just deciding that Title VI is somehow different.  Courts
18   cite Title VII cases and Title VI cases interchangeably every
19   single week in this country.
20           Now, Your Honor, I did say something -- I did say
21   we didn't think much of the anecdotes because Harvard's
22   cherry-picked set of applications that they gave us --
23   remember, we picked applications from behind the veil of
24   ignorance as to what they said.  They had all the
25   applications when they picked them.

**JA3677**

 1          The anecdotes don't mean of because we didn't get a
 2   statistically relevant sample of applications.  And I did say
 3   that.  We don't think much of the anecdotal evidence, and
 4   that includes the ice skater, Your Honor, to be candid.  I
 5   never once said, we never once said our nonstatistical
 6   evidence doesn't amount to much.
 7          Your Honor, maybe we've got disagreements between
 8   the Court and SFFA.  We certainly have them with our friends
 9   from Harvard.  But we produced a mountain of nonstatistical
10   evidence.  OIR, the new reading procedures, the emails, Utah,
11   etc., the stereotypical notes on the dockets.  It's different
12   to call an Asian-American applicant quiet than to call a
13   Hispanic applicant quiet.  One is a racial stereotype, one
14   isn't.  What OCR found.
15          Your Honor, we are constantly being told that we
16   should have dragged Students for Fair Admissions standing
17   members in here and put them on the stand.  I know no one
18   from Harvard or its legal team would have done the kinds of
19   things that Ms. Fisher experienced for her being a plaintiff
20   in a case like this.
21          But I think you can understand -- I think everyone
22   here can understand what people online -- what the online
23   community has done and the way things have gotten in our
24   country and what would have happened to these young people.
25          We all know -- none of us in here would have done

```
 1    it, but somebody would have done something horrible to one of
 2    our students if they'd stood there and done that.  And we
 3    didn't have to, and we didn't.  Nothing in the law says we
 4    had to bring our kids in here to suffer the slings and arrows
 5    rather than the adulation that is poured on others who
 6    support Harvard.
 7              And we're very proud of the students who testified
 8    as well.
 9              There's room for disagreement about these deep,
10    deep questions.  But I think we can put aside the idea that
11    legally or for any other reason we needed to have our members
12    testify.
13              I want to move on to the Office of Institutional
14    Research because I just heard that Plaintiff's Exhibit 28,
15    the so-called follow-up analysis, put Dean Fitzsimmons at
16    ease.
17              Let's take a look at that.  Here's the follow-up
18    analysis.  We did not see the coefficients on the screen,
19    Your Honor.  Follow-up analysis tells you basically the same
20    story, intent to help athletes, intent to help
21    African-Americans.  I won't do the whole staccato
22    presentation again.
23              There's the thing allegedly put Dean Fitzsimmons at
24    ease.  Oh, we gave a plus to low-income Asians.
25              Right down below is a massive minus for
```

1    non-low-income Asians.  82 percent of the Asian applicants to

2    Harvard are not low income.  And this is not a statistically

3    significant finding of a correlation, not at all.

4    Statistical significance in a regression model equals intent.

5    Wrong again, Harvard.

6              Let's take a look at *Fudge v Providence Fire* from

7    the First Circuit.  "When statistical tests sufficiently

8    diminish chance as a likely explanation, it can then be

9    presumed that an apparently substantial difference in pass

10   rates here is attributable to discriminatory bias."

11             Regressions show intent.  Not just disparate

12   impact.  Dean Fitzsimmons knew that.  He saw those

13   coefficients.  He wasn't put at ease by a plus for low-income

14   Asians.  Standing right next to it is an even bigger, even

15   bigger minus for non-low-income Asians.  Instead of being

16   minus .037 now, it's minus .46789, even bigger.

17             Your Honor, I'm going to wrap up, not even taking

18   close to my time, but I am going to talk a little bit about

19   the personal rating.

20             I cannot make Harvard answer our questions.  But

21   you have not heard any answer to the racial pattern in the

22   personal rating.  Will someone please tell us why

23   African-Americans and Hispanics get these huge boosts in the

24   personal rating?  It's undisputed they do better than

25   everyone else, whites and Asians.  No one has ever adequately

1    explained that to you.  You weren't shown school support

2    ratings or non-academic ratings or anything else explaining

3    the racial pattern in the personal rating.  You were given,

4    at best, a partial explanation for the differences between

5    Asians and whites.  But it's incomplete, for the reasons I

6    gave.

7            Professor Arcidiacono's model showed you all the

8    ratings variables going into his model of the personal

9    rating.  And it's true, Your Honor, a little bit, that the

10   academic ratings don't matter as much for the personal

11   rating.  That's all taken into account in the model.  Let me

12   take you back there.

13           You see the model that just includes academic

14   variables, model 2?  It's not very good.  R-squared value, a

15   pseudo R-squared value of .2, it's considered the gold

16   standard.  That's the McFadden paper I discussed with

17   Professor Card.

18           Once you get above .2, that's a good fit.  The

19   first model with just the academic variables isn't a great

20   fit.  The model takes into account the relatively weak

21   correlation, if there still is one, the relatively weak

22   correlation between academics and the personal rating.  And

23   it rolls it all in.

24           So by the time you get to model 5, you've got

25   whatever contribution academics makes, small though it may

1    be, and all the contributions of school support, alumni

2    interview, and everything else that Mr. Waxman called

3    non-academic, none of which explained the rank hierarchy

4    we've shown you time and time again.

5         They have never bothered to tell you why it is

6    African-Americans do better than Hispanics, do better than

7    whites, do better than Asians.  Not once.  There is no

8    explanation other than what Mr. Luby said the first time when

9    he told the truth, Harvard uses race in the personal rating.

10        And if so, I don't know what else we need to do

11   other than keep putting up Professor Card's own testimony

12   about how he treated the overall rating.

13        And now we're given the story that the personal

14   rating has all this good, extra data in it, and why would we

15   get it out of the model.  The overall rating has all sorts of

16   good, extra data in it.  It's the admissions officers

17   assessment of the ultimate likelihood that the candidate will

18   be admitted taken into account every single thing in the

19   application.

20        Nevertheless, because Harvard told Professor Card

21   that they were using preferences in the overall rating as

22   opposed to what they hid from him about the personal rating,

23   Card pulled it out of his model.  There's no rationale for

24   not doing the same thing to the personal rating that he did

25   to the overall rating.  I've shown it dozens of times.

 1          So now what do we get?  We get the virtual rating

 2    model.  This is a model no one believes is accurate.  You

 3    have to give Asians artificially low academic ratings and

 4    artificially low extracurricular ratings while boosting the

 5    ratings of other groups like African-Americans and Hispanics,

 6    giving everybody false ratings.

 7          At the same time, you don't bother to racially

 8    correct the overall rating where there's an undisputed Asian

 9    penalty, and you don't bother to racially correct the school

10    support ratings where there's an undisputed racial penalty.

11          The virtual rating model is junk.  Dr. Card had it

12    right when he talked the first time about the overall rating

13    and why he took it out.  And by implication, if you find race

14    influences the personal rating, it's got to come out.

15          I want to close on what we heard from Harvard.

16    Instead of omitted-variable bias, it's now missing relevant

17    factors.

18          Your Honor, the law in discrimination cases is that

19    a defendant cannot look at a statistical analysis like

20    Dr. Card's own analysis without the personal rating or like

21    Professor Arcidiacono's models of the personal rating, and

22    say that doesn't prove anything, it must be some other

23    variable.

24          And don't just take my word for it, like Mr. Waxman

25    standing up here and telling you *Gratz* is not an intentional

 1    discrimination case.  Let's look at the *Palmer* case from the
 2    D.C. Circuit.  We'll go there together.
 3           This is *Palmer v Schultz* from the D.C. Circuit.  As
 4    I said, decades of discrimination law.  It's discussing the
 5    *Bazemore* case from the Supreme Court, a pattern or practice
 6    case involving race discrimination.
 7           *Bazemore* instructs lower courts to be cautious
 8    about dismissing plaintiff's statistical studies as not
 9    probative simply because Harvard offers some
10    nondiscriminatory explanation for the disparity shown.
11           Implicit in the *Bazemore* holding is the principle
12    that a mere conjecture or assertion on Harvard's part that
13    some missing factor would explain the existing disparities
14    between Asians and white applicants generally cannot defeat
15    the inference of discrimination created by plaintiff
16    statistics.
17           To be sure, as the Supreme Court acknowledged in
18    *Bazemore*, there may be a few instances in which the relevance
19    of a factor to the selection process is so obvious that the
20    defendants merely pointing to its omission can defeat the
21    inference of discrimination created by plaintiff statistics.
22           The logic of *Bazemore*, however, dictates that in
23    most cases what a defendant cannot rebut statistical evidence
24    by mere conjectures or assertions without introducing
25    evidence to support the contentions that the missing factor

Case: 19-2005    Document: 00117631846    Page: 761    Date Filed: 07/29/2020    Entry ID: 6356391
Case 1:14-cv-14176-ADB   Document 666   Filed 07/01/19   Page 127 of 129

127

can explain the disparities as a product of a legitimate,
nondiscriminatory selection criterion without introducing
evidence that Asian essays are worse than whites, without
introducing evidence that something in these recommendation
letters tells Harvard that Asian applicants are less
likeable, kind, have less integrity, less grit, or just have
inferior personal qualities.

I asked a question.  We are asking a question.  Why
did Harvard give Asian applicants lower personal ratings?  We
have not yet received an answer other than answers that
decades of discrimination case law say are not good enough.

Your Honor, I have to address the ALDC point.
We're all big fans of PowerPoint in here, but one thing you
can do with PowerPoint is you can cut off statements and
conceal the full context, and that's exactly what happened
with the ALDC issue from our findings of fact.

As Your Honor knows, we don't allege that the ALDC
Asians suffer a discriminatory admissions outcome penalty.
Everyone agrees they suffered some kind of personal rating
penalty, which we say just proves our point about stereotypes
being applied.

And then later on when they get into full committee
or subcommittee, wherever it is, somebody says let's pull
that candidate up, he's one of us, he's one of ours, he's or
she's got that Harvard DNA.

**JA3685**

```
 1              Mr. Lee put on the screen -- I can't remember if it

 2     was Mr. Lee or Mr. Waxman -- Harvard does discriminate

 3     against Asian ALDCs, pulled completely out of context from

 4     Paragraph 274 of our brief where we acknowledge that there is

 5     no admissions penalty outcome on Asian ALDCs, but there is a

 6     penalty on the personal rating.

 7              It's right here.  If you take a look, Harvard does

 8     not appear to impose an admissions penalty on Asian-American

 9     ALDCs.

10              We are not the gang that cannot shoot straight.  We

11     have not been inconsistent.  And I hope we have not failed

12     and I have not failed my nieces and nephews.

13              Thank you, Your Honor.

14              THE COURT:  All right.  Thank you all again.  As

15     usual, the arguments were of the highest caliber and

16     edifying.  Thank you.  We'll get to work on this.  Thanks,

17     everyone.

18              (Court recessed at 4:32 p.m.)

19

20

21

22

23

24

25
```

Case: 19-2005    Document: 00117631846    Page: 763    Date Filed: 07/29/2020    Entry ID: 6356391
Case 1:14-cv-14176-ADB   Document 666   Filed 07/01/19   Page 129 of 129

129

1                   - - - - - - - - - - -

2                       CERTIFICATION

3

4           I certify that the foregoing is a correct

5       transcript of the record of proceedings in the above-entitled

6       matter to the best of my skill and ability.

7

8

9

10      /s/ Joan M. Daly                February 14, 2019

11      _____     _____

12      Joan M. Daly, RMR, CRR          Date
        Official Court Reporter

13

14

15

16

17

18

19

20

21

22

23

24

25

**JA3687**

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MASSACHUSETTS
### BOSTON DIVISION

| | |
|---|---|
| STUDENTS FOR FAIR ADMISSIONS, INC., <br>          Plaintiff, <br>      v. <br> PRESIDENT AND FELLOWS OF HARVARD COLLEGE, <br>          Defendant. | Civil Action No. 1:14-cv-14176-ADB |

## REQUEST FOR JUDICIAL NOTICE

Plaintiff Students for Fair Admissions, Inc. files this request for judicial notice as the Court invited in its Memorandum and Order on Cross-Motions for Summary Judgment (D.I. 566 at 29 n.18) and during the pretrial conference.[1] Pursuant to Federal Rule of Civil Procedure 201(b), SFFA asks the Court to take judicial notice of the following:

The Report of the College Working Group on Diversity and Inclusion at Harvard, issued in November 2015, stated that "[u]nder the presidency of Abbott Lawrence Lowell (1909-1933), the Harvard administration restricted the numbers of Jewish students." (DX-13.)

The Harvard President's Report: 1993-1995 stated that "President A. Lawrence Lowell . . . called for quotas on the number of Jewish students admitted to Harvard." (DX-40.)

In 1926, the Board of Overseers of Harvard College adopted a recommendation that "the rules for the admission of candidates be amended to lay greater emphasis on selection based on character and fitness, and the promise of the greatest usefulness in the future as a result of a Harvard education." (P500.)

---

[1] Harvard does not oppose this motion, without prejudice to Harvard's continuing objection to the relevance of these judicially noticeable facts to SFFA's claims.

Dated: October 8, 2018                    Respectfully submitted,

                                          /s/ Adam K. Mortara
                                          Adam K. Mortara
                                          J. Scott McBride
                                          Krista J. Perry
                                          Bartlit Beck Herman Palenchar & Scott LLP
                                          54 West Hubbard Street, Suite 300
                                          Chicago, IL 60654
                                          312.494.4400
                                          adam.mortara@bartlit-beck.com
                                          scott.mcbride@bartlit-beck.com
                                          krista.perry@bartlit-beck.com

                                          John M. Hughes
                                          Katherine L.I. Hacker
                                          Meg E. Fasulo
                                          Bartlit Beck Herman Palenchar & Scott LLP
                                          1801 Wewatta Street, Suite 1200
                                          Denver, CO 80202
                                          303.592.3100
                                          john.hughes@bartlit-beck.com
                                          kat.hacker@bartlit-beck.com
                                          meg.fasulo@bartlit-beck.com

                                          William S. Consovoy
                                          Thomas R. McCarthy
                                          Michael H. Park
                                          J. Michael Connolly
                                          CONSOVOY MCCARTHY PARK PLLC
                                          3033 Wilson Boulevard, Suite 700
                                          Arlington, Virginia 22201
                                          703.243.9423
                                          will@consovoymccarthy.com
                                          tom@consovoymccarthy.com
                                          park@consovoymccarthy.com
                                          mike@consovoymccarthy.com

                                          Patrick Strawbridge BBO #678274
                                          CONSOVOY MCCARTHY PARK PLLC
                                          Ten Post Office Square
                                          8th Floor South PMB #706
                                          Boston, MA 02109
                                          617.227.0548
                                          patrick@consovoymccarthy.com

**JA3689**

AT A MEETING OF THE

# BOARD OF OVERSEERS OF HARVARD COLLEGE



**TRIAL EXHIBIT**

**P500**

SFFA v. Harvard

IN Cambridge,  January 11,    192 6.

Mr. James presented the report of the Special Committee on the Limitation of the Size of the Freshman Class, and after debate thereon, the Board voted to accept said report, and to adopt the following recommendations:

1. That, during the next three years, 1926-27 to 1928-29, the limit of 1,000 Freshmen shall include dropped Freshmen as well as those newly admitted to the College and Engineering School, but not thereafter, save with the approval of the Governing Boards.

2. That the application of the rule concerning candidates from the first seventh of their school be discretionary, both as to schools and candidates, with the Committee on Admission.

3. That the rules for the admission of candidates be amended to lay greater emphasis on selection based on character and fitness, and the promise of the greatest usefulness in the future as a result of a Harvard education.

and further that said report and recommendations appear to the Board to be wise, but that they be referred to the Faculties of Arts and Sciences, and of Engineering, for advice.

The Board also voted that the Committee be discharged with the thanks of the Board for its excellent and comprehensive report.

A true copy of record,

Attest:  *Winthrop H. Wade, Sec'y.*

*Dec. 1925*

*Sn Faculty Jan. 19/1926*
*Records*

*Strictly Confidential until all Boards*
*and Faculties concerned have acted*

*Page 17.*

# REPORT OF THE SPECIAL COMMITTEE APPOINTED
## TO CONSIDER THE LIMITATION OF NUMBERS

To the Board of Overseers of Harvard College: —

The purpose of this report is to present facts bearing upon different aspects of the question of numbers in the College and to offer certain conclusions for the consideration of the Overseers.

It will be recalled that a provisional limitation was sanctioned by the Overseers, by the following action on February 25, 1924:

> *Voted* — That the Board give its consent to the vote of the President and Fellows which defines a limit of size for the Freshman Class "for the present," with the understanding that this limitation is temporary in its nature and will be reconsidered at the earliest possible time.

At the same time the Board created this Special Committee to report —

> . . . on numbers in relation to equipment, personnel, standards, and the scope and function of the College.

Thus the vote establishing a limit of 1,000 "for the present" was precautionary. During the few years following the War and preceding the vote, numbers had been increasing with unparalleled rapidity. They had already begun to cause difficulties. Therefore, although Freshman enrollments had not yet reached the limit that was chosen, it was feared that they might soon pass it and that the College would not be able to stand the strain. Being conceived as precautionary the limitation was considered by all to be expedient, and it was adopted without long discussion. But it was understood that the subject would be canvassed more fully.

### I

Since the limit of 1,000 was established, two Freshman classes have come to Cambridge. The limit set "for the present" has about been reached.

The general rate of growth which has, but for the war-time, prevailed for Harvard College during more than 50 years, and which is shown in Tables 1 and 5, is so nearly constant that it

Case: 19-2005   Case: 19-2005   Document: 00117408194   Document 547-3   Date Filed: 10/08/1829   Page 3 of 19   Entry ID: 6356391

the entry of a new class at the close of each lecture stops the question-and-conference episode which normally follows each lecture and may last for from 15 minutes to as much as an hour, if the lecturer can remain in the room with the students who gather about his desk to question him. The economical remedy might be to provide small conference rooms next to lecture rooms. At present, however, there are almost none such, except in Sever Hall, where a few are conveniently placed. These few are regularly used for conferences. If there is no available place in or close to the lecture room for a student to remain and confer with the professor after a class meeting, he must seek the professor later in the Widener Library or at his house — which means, in most cases, that he does not consult him. We believe that the after-lecture conference is a most important item in the curriculum, and that it ought to be provided for. Moreover, the need of rooms for tutorial conferences is a serious one which requires to be met.

The foregoing facts and figures suggest the following conclusions:

Space and physical equipment, if they were the only bar to the admission of numbers, could perhaps be provided if money could be found; but the last 20 years' experience indicates that it is not easy to obtain money for laboratories and lecture rooms promptly. Although it is true that in many ways, and on the whole, Harvard's physical and financial equipment is better adapted to the education of the present student body than its equipment of 20 years ago was to the tasks of that day, we believe that, before more students can be accommodated, more lecture rooms, laboratories, and dormitories must be provided. The housing situation in Cambridge requires the last, and we conceive that more biological laboratories especially are essential. Additional lecture rooms, tutorial and conference rooms will also be required.

It appears at first sight that a good deal of lecture space is perforce vacant in the afternoon. The reason is that experience has seemed to show that the afternoon is best fitted for laboratory work, which requires continuous meetings of two hours or more. Only a few advanced courses meet in the evening. Whether a reorganization of the tabular view would relieve the situation has not been made evident. The question has been studied by the Faculty, which — to date — has not thought reorganization wise or practicable; but further attention to the problem appears desirable to this Committee.

---

looks like a normal which it would be unreasonable not to consider in making estimates or forecasts. The recent noticeable augmentation of college enrollment throughout the country is even greater and looks as if our own normal would be borne upward rather than depressed by the tendencies in the country at large. (See Table 2.) The curves would lead one to expect that the number of qualified applicants for admission to the College may considerably exceed 1,000 in a few years unless some limitation is enforced.

Hitherto Harvard has always taken care of as many qualified students as the community wanted to send here. Now, however, we are asking the question whether we are not subjecting ourselves to a strain which will impair the quality of our work, whether we can go on, and if not, then what rate of growth we can permit ourselves, or at what point we must assign a stopping place. It is obvious that we are considering a very important question of policy.

## II

Equipment, physical and financial, has been pointed to as a limiting factor. Data in Table 3 bear on this, and indicate the situation 20 years ago as compared with that in 1924-25. The situation with respect to lecture rooms is further elucidated by the analysis of the state of things at the opening of the current year, 1925-26, which will be found in Table 4.

To illustrate some of the limitations now imposed by conditions which are beyond the Faculty's control by reason of the shortage of rooms for class meetings and the difficulty of lecturing effectively to very large classes, it will be sufficient to cite the following instances of forced limitation:

English 41, History of English Literature; limited to 300.
Biology 1, Life and its Environment; limited to 300.
Geology 4, Introduction to Geology; limited to 300.
Meteorology 1, Elementary Meteorology; limited to 100.
Psychology 1, Introduction to Experimental Psychology; limited to 80.

All these are courses fundamental to their subjects; and naturally they are desired by students concentrating in other fields. Practically all Freshmen have been excluded from Biology 1 this year.

From the educational point of view an uninterrupted use of lecture rooms is not economical. Large lecture halls cannot empty and refill immediately without curtailing the lecture periods; and

JA3692

Case: 19-2005 Case 1:14-cv-14176-ADB Document 577-3 Filed 10/08/18 Page 4 of 8 Entry ID: 6356391

4

## III

Teaching-personnel, standards, and function can hardly be discussed separately.

Educational methods and college policies are always changing. In the last 20 years the emphasis at Harvard has shifted from the course as the unit of instruction to the individual as the unit, and the technique for dealing with an unlimited number of student-units has not yet been found.

The conception used to be that if a large and liberal menu of opportunities in the way of courses was spread before the student, the main thing had been done for him. The old policy respecting physical training and exercise was typical of the then new theory of the College; a gymnasium was provided, and also playing fields, but after that about everything was left to the option of the student, who took as much advantage of these facilities as he liked, or none at all. In his studies he had to get through a certain number of courses if he wanted to keep in standing and graduate, but otherwise his education was nearly as much an affair of his own adventure as was his physical development. Lectures being the chief means of instruction, organization and methods were about as compatible with large as with small numbers of students.

During the last two decades, however, the College has increasingly undertaken to guide and stimulate the undergraduate's choices and ambitions, in the belief that all parts of the College which touch the undergraduate's life, whether physical, moral, or intellectual, should work in sympathetic accord. Obviously this imposes a much heavier task upon instructors and deans; and, the individual being the ultimate unit of education, success cannot help being more and more difficult as numbers grow.

The function of the College as thus conceived is exemplified by numerous changes or reforms which have been devised and successfully put into effect; but about these so much has been said elsewhere that it is needless to do more than enumerate them here. The concentration requirement; the general examination; the tutorial system, and along with it the diminished reliance upon lectures as the chief means of instruction; also the numerous measures intended to carry the Freshman through his transition from school to college — among them the Freshman dormitories, and a considerable development of services of information and guidance connected with the Dean's office; compulsory physical exercise; increased provision for dormitory accommodation; and various

5

improved facilities of a more or less social order, such as the Harvard Union, the reading-rooms in the Library, and others. The most striking evidence that these changes are combining toward one good effect is the way in which the number of students who graduate with distinction has been rising. In the period between 1915-16, the year when General Final Examinations were first given, and 1919-20, the percentage of men who won distinction by the examinations was 17.4; in 1924-25 the percentage had risen to 21.4. To this we should add the men who gained distinction in those departments in which no General Final Examination is given, and those who won distinction in general studies. When this is done we find that 29.8 per cent of those who graduated in last year's class had secured distinction in their studies.

It hardly needs saying that the present conception of Harvard as a residential college rather than just a University department implies a belief that there must be a greater degree of intimacy between teacher and student and between student and environment than there used to be. Crowds do not favor intimacy. Although the figure at which, for Harvard's purposes, overcrowding begins cannot be defined by any process of reasoning, we are persuaded that the Faculty — by whose sense of the situation the Governing Boards must be largely guided in such matters — already feels that there are now as many undergraduates as its present number of teachers and rooms allows it to cope with adequately. Many, indeed, feel that the limit of 1,000 is too high.

Is it feasible to remove one difficulty simply by enlarging the teaching force and multiplying assistant deans? The following comparisons between 20 years ago and today show how largely the teaching force has already been augmented, and yet by how small a margin it has gained on the students with whom it is trying to deal more personally. There are several Divisions which may still adopt the tutorial system — the Division of Mathematics will do so in 1926-27 — and their budgets for salaries will then have to be enlarged. In the departments of Natural Science there are, as yet, neither General Final Examinations nor tutors. Moreover, assistants in laboratories are normally paid less than tutors with the rank of instructor. It is possible that laboratory instruction might be distinctly improved by a more liberal policy. However, laboratory assistants can hardly be expected to have acquired the breadth of view which a tutor must possess, for assistants are selected for their ability to assist students in a very limited field. Nevertheless a larger expenditure of money for assistants appears

JA3693

Case: 19-2005 Case 1:14-cv-14176-ADB Document 770-3 Filed 10/08/18 Page 5 of 11 Entry ID: 6356391

desirable, and the budgets of the scientific departments should be enlarged accordingly. As a matter of fact, they are now being increased for this very purpose as rapidly as the funds allow.

| | 1904-05 | 1924-25 |
|---|---|---|
| Number of teachers of professorial rank in the Faculty of Arts and Sciences ... | 112[1] | 172 |
| Increase ...................... | | 53.5+% |
| Number of teachers of non-professorial rank in the Faculty of Arts and Sciences ... | 184[1] | 233 |
| Increase ...................... | | 26.6% |
| Number of students under the Faculty of Arts and Sciences (College and Graduate School of Arts and Sciences) ... | 2905 | 3804 |
| Increase ...................... | | 30.9+% |
| Average number of students to each teacher of professorial rank in the Faculty of Arts and Sciences ... | 25.9:1 | 22+:1 |
| Average number of students to all teachers in the Faculty of Arts and Sciences ... | 9.8:1 | 9.4:1 |

From these figures it is clear that no substantial gain has been made in reducing the ratio of students to the whole number of teachers in the Faculty of Arts and Sciences, although the proportion of teachers of higher rank has increased. The individual student is, however, receiving more personal attention than is evident from the figures, because there has been no material increase in the number of courses offered, but a large increase in the number of men who give much of their time as tutors, instructors, and assistants to individuals or small groups.

It is obvious that, without any expansion in the number of subjects taught, an increase in the number of teachers is greatly to be desired. But before the teaching body is expanded to teach larger numbers, it will be necessary to finance larger budgets for the departments which have not yet adopted the general Final Examination and to increase salaries of professors and instructors all along the line, if Harvard is to hold her eminent position among the universities and colleges of America. Indeed, this will have to be done whether we expand or not. It is said that Chicago is now establishing a number of $10,000-a-year professorships. Harvard's maximum in the Faculty of Arts and Sciences is still $8,000. Justice and fairness, as well as competition in Cambridge and expediency, require a better salary scale. Conditions in Cambridge are becoming more and more difficult for men who are de-

---

[1] The Faculty of Arts and Sciences included the Lawrence Scientific School at this date.

pendent on the present salaries. In the long run it is the quality of its Faculties which mainly determines the position of a university. If that is not attended to, buildings, endowments, organization, and even traditions will prove to be of little avail.

Therefore, considerations of personnel, finance, and equipment all point to the necessity of maintaining a limitation of numbers in Harvard College for the present.

These are all what might be called internal considerations. It will be well to look at the situation of the College from the outside, too.

### IV

The size of the College relative to the University and its other departments has not been constant, and may alter materially when the College stops growing. For many years the University as a whole has been increasing faster than the College anyway, though not so much faster as the creation of entirely new graduate schools might have led one to expect. The Graduate School of Arts and Sciences, which is in many respects an advanced department of the College, has been swelling in size more rapidly than the College itself, and faster than the University as a whole (see Table 11). The signs of the times indicate that this will probably continue (see Tables 5, 6, 7, and Figs. 2, 3, 4, 5); and this is desirable, for the Graduate School is the source from which most of the young teachers are drawn.

Table 8 shows which departments of the University are now restricting their size, and also those which have no present purpose of limiting it.

Even if the College should contain a smaller proportion of the total University enrollment than now, that in itself need not be deplored, for there is no necessarily right proportion. The influence of the departments under the Faculty of Arts and Sciences — namely, the College and the Graduate School — will always depend on the eminence of the teachers and the quality of the students' work. Since the College, through its graduates, does much to set the scholastic standard in all the graduate departments of the University, its influence is likely to remain predominant.

It may be feared by some that the College will receive less from the Treasury of the University as the students in the several graduate schools increase in number. But it must be remembered that, barring the Endowment Fund raised by the graduates since the War, the free funds at the disposal of the Corporation are small

JA3694

Case: 19-2005    Case: 19-2005  Document: 141767A1B4  Page: 771    Dated: 10/08/18  Document: 141767A1B4  Page 6 of 8  Entry ID: 6356391

8

in proportion to those that are restricted; and the history of the financial management by the Corporation gives every reason to believe that the College will not be overlooked in the future. It is true that if the College stands still in size while the other departments become bigger and more expensive, it will be more and more necessary to uncover new fountains of financial aid, and the graduates of the professional schools will have to assume more responsibility than in the past.

With reference to the Graduate School of Arts and Sciences, the Committee believes that from the point of view of the College the School can be a great deal bigger and still give more in the way of stimulation to both Faculty and students than it takes away by its drafts upon equipment and personnel; for this School is concerned not so much with what is particular and empirical as with what is fundamental and general. Philosophy, the so-called moral and social sciences; the fine arts and the humanities in their deepest and broadest senses; physics, chemistry, and mathematics, which underlie all our modern scientific progress, are there cultivated most eagerly and advanced most successfully. In short, although most of the students in the School are preparing for a particular profession, that of teaching, they are all engaged in liberal studies. What goes on in the Graduate School fertilizes the life of the whole institution — the College included — and draws together all its scholars into a true university. If it is in any way difficult for that School and the College to be closely associated — and it must be admitted that there are difficulties — the remedy is not to be sought in a jealous restriction of the School. The extent to which the College prepared students for work in the graduate schools and professional schools is indicated by Table 12.

V

It was remarked at the beginning that Harvard College has, until now, allowed itself to grow with the community. It is a striking fact that there has recently been a great increase in the proportion of the population seeking college education. Nothing yet indicates that the desire for college education will soon decline again, or even stop spreading. Forty years ago a high-school training was coveted by people of small means. Today the same large class has generally adopted a college as its goal. Furthermore, in the northeastern states many other colleges have limited numbers. Table 9 presents a situation which warrants serious

9

discussion, if not public anxiety. If all the endowed colleges in this part of the country decide to stand pat, or if most of them stick close to the existing size standards, to what institutions will this community which wants more opportunities for higher education, and waxes continually, send its boys?

We have all heard lately from within our own circle that our entrance requirements are "too high." If we are to turn away a greater and greater number of potentially qualified applicants who come from schools and communities which have hitherto supposed they could count on Harvard, we must be prepared to meet more and more such complaints.

If and when complaints are thrust at us, it seems to this Committee that the answer will be twofold. First, it is not for us but for the country to meet a general shortage of facilities by means of junior colleges and other diversifications in the field of higher education, or otherwise. Second, Harvard participates actively, not passively, in the general welfare of college education in the United States.

We must not forget that Harvard College is still, as it always has been, an explorer and pathfinder. It has lately again developed a new type of instruction, is thereby giving its undergraduates a distinctly better education than they have ever received before, and in this it is being imitated by other colleges. This furnishes a very potent reason for limiting our students to a number with which this system can be efficiently carried on until it has been perfected, rather than allowing that number to increase to a point that will interfere seriously with what we are trying to do.

VI

It will be well, however, to ask the question, how the applicants for admission to the Freshman Class are selected from a considerably larger number. The Committee is not prepared to make a full report now concerning this difficult matter or to propose anything new. But as this report is primarily informative and intended to supply data for later discussion it will be appropriate to make certain explanations and comments.

First, it is probably wise to release certain changes in the methods of admission which have recently been introduced, and to summarize the results to date.

Some of these changes have raised the minimum of admission in the past twenty years; more have simplified and lightened the

10

burden for all but the very lazy or incompetent. The chief items under the first are the requirements that (1) a candidate under the old plan must pass ⅔ of the examinations required; (2) that he must pass ⅔ of the total with satisfactory grades (70 per cent or higher); and (3) that he must write satisfactory English. Among the simplifying changes, some of which actually make admission easier, must be named:

(1) The New Plan, established in 1911–12, whereby candidates are admitted on a combination of school record and four examinations. Each case is considered individually, and the personality of the candidate may be given greater weight than under the Old Plan.

(2) All candidates, whether by the Old or New Plan, are now admitted without admission conditions, provided they satisfy the minimum requirements.

(3) Candidates who stand, at graduation, among the highest seventh of the boys in the graduating class of a regularly organized school, and who have the strong recommendation of the head master, are admitted without examination, provided they have satisfactory school records corresponding to the requirements of the New Plan.

(4) The examinations of the College Entrance Examination Board are now used exclusively for all candidates who present themselves in June under the Old or New Plan.

The following shows the admissions by the different plans for 1924 and 1925:

|  | 1924 | 1925 |
|---|---|---|
| Under Old Plan | 371 | 469 |
| Under New Plan | 196 | 191 |
| Under Honor Plan (1/7) | 309 | 314 |
| Total | 876 | 974 |

It will be seen that nearly one third of the Freshman Class is now entering on the so-called Honor Plan. When this plan was adopted, its primary purpose was to open admission to brilliant boys in schools that do not ordinarily prepare for Harvard; but the Admission Committee has felt that the vote was mandatory rather than permissive, and has believed that it had no discretion in the administration of it. The Committee which is making this report thinks, however, that it may be better *not* to extend this privilege of recommending boys under the honor system to large Eastern schools and similar institutions that regularly prepare boys

11

for entrance examinations, and it believes that the application of the rule should be left to the discretion of the Committee on Admission. This will not diminish the value of the school record of the candidates or of the personal estimates of their fitness on the part of the school masters. Table 14 shows how "Honor" Freshmen have been distributed geographically.

Few graduates realize that admission to Harvard College to-day is based not only on the records made in entrance examinations, when they are taken, but also on the school records and the judgment of school officials who have known the boys for some time. The value of the two latter is especially emphasized in the application of the honor system.

The vote which established a provisional limit went on to prescribe that —

From the remaining candidates[1] the Committee on Admission shall fill up the quota, so far as it may be advantageously filled, by selecting those who, having satisfied the minimum requirements for admission, in the judgment of the Committee have best proved their competence.

Thus far there has been no opportunity to try the process of selection here contemplated, for the quota set has not been exceeded or even reached, and therefore there has been no chance to test the machinery for weeding out the excess of lower-grade men by inspection. When this clause goes into full operation it may affect about one-third of the candidates for admission.

Although the Committee is not prepared to make suggestions as to the methods of admission except on the single point mentioned above, it wishes to state —

(1) That it believes that it is neither feasible nor desirable to raise the standards of the College so high that none but brilliant scholars can enter and remain in regular standing. The standards ought never to be too high for serious and ambitious students of average intelligence.

(2) That it believes that standards, whether of admission or of work in the College, have not in fact been raised beyond this point, nor to such a point that there is any present prospect of their being made too difficult for such men. This is stated with confidence, in spite of certain complaints which have recently been heard.

(3) That, on the other hand, it sees no reason whatsoever for thinking that it would be a reproach to Harvard if it became

[1] Those whose admission records do not place them on an equality with Harvard undergraduates in the first four groups of the Rank List.

Case: 19-2005 Case 1:19-cv-10170-RDB Document 577-3 Filed 10/08/18 Page 8 of 8 Entry ID: 6356391

somewhat harder for a student to enter here than to enter elsewhere — always providing that standards are not above the level just indicated.

## VII

To conclude — it will have been made clear that the three chief difficulties in the way of dealing with large numbers are: (1) the lack of a sufficient number of teachers; (2) the lack of rooms to hold classes; (3) the difficulty of lecturing effectively to very large classes. The first two difficulties could probably be remedied in a few years by an adequate expenditure of money. But for the moment they are so insurmountable that this Committee is convinced that the restriction on numbers is truly necessary for the present. The Committee will go further, however. The difficulties just spoken of and the importance of working out to their logical conclusions the very promising experiments which the College is making in new methods of instruction, lead the Committee to advise that, in reckoning the Freshmen who are to be included in the thousand, "dropped" Freshmen should be reckoned as well as others. This was recommended by the Faculty in 1923. Dropped Freshmen are students who are taking a large part of their work in Freshman courses, and have always been registered as Freshmen.

The Committee presents the following recommendations which, if adopted by the Board of Overseers, are to be referred to the Faculty of Arts and Sciences for consideration and action:

(1) That, during the next three years, 1926–27 to 1928–29, the limit of 1,000 Freshmen shall include dropped Freshmen as well as those newly admitted to the College and Engineering School, but not thereafter, save with the approval of the Governing Boards on the recommendation of the Faculties concerned.

(2) That the application of the rule concerning candidates from the first seventh of their school be discretionary with the Committee on Admission.

COMFORT A. ADAMS,
JAMES BYRNE,
CHESTER N. GREENOUGH,
HENRY JAMES, *Chairman,*
A. LAWRENCE LOWELL,
CLIFFORD H. MOORE,
WILLIAM S. THAYER,
*Committee.*

## APPENDIX

In the writer's mind there is *one outstanding reason* for the limitation of numbers in Harvard College, and although this reason is implied at one point in the main report (where reference is made to the pioneer work of Harvard and to an improved type of instruction), the importance of the *real objective* seems to the writer to be of such dominant importance as to warrant a brief explanation, which has received the approval of the other members of the Committee.

The enormous strides made in our knowledge of the material universe during the past generation or two have introduced problems of coöperation between larger and larger groups, not only within the nation but of world-wide extent, the solution of which makes absolutely necessary a new kind of education — in fact, something more nearly corresponding to the original meaning of the word education.

Man is largely guided by his habits of thought: traditions, customs, hatreds, desires, prejudices, etc.; for the most part he does not know what it means to think for himself. He has the habit of accepting facts and arguments, however incomplete, superficial, or misleading they may be. He allows pictures to be painted in his mind by the promoter or the propagandist without demanding sound evidence of the so-called facts or making sure that the facts presented are reasonably comprehensive for the purpose in hand. Hence the enormous annual loss in crooked or unwise investments; hence the large predominance of failures of corporations and other business enterprises; hence the frightful and wasteful confusion of international relations.

The solution of these problems demands a kind of thinking or analysis which is new to the vast majority of even our educated class, a habit of mind which refuses to accept a biased presentation of facts; which withholds judgment until all the returns are in, and even then allows something for the probable incompleteness of the returns; which refuses to entertain prejudices and hatreds; which keeps its perspective free from anything but logic, justice, and truth.

No course of reasoning can yield more than is covered by the premises; it can only transform the facts or assumptions of the premises into a more useful form. Therefore, to reach a sound conclusion involves sound premises and sound reasoning, whether

JA3697

Case: 19-2005   Case 1:19-cv-10171-ADB   Document 577-3   Filed 10/08/18   Page 9 of 19   Entry ID: 6356391

15

this be through the medium of words or of mathematics, which is merely quantitative logic.

It is not claimed that these ideals are new or original, but, unfortunately, they are not applied to any appreciable extent in our educational institutions. For the most part, our students listen, accept, and try to remember; rarely do they know what it means to demand sound evidence of the facts underlying their problem, to understand thoroughly the principles involved, and then to think carefully and surefootedly without the twist of bias or prejudice; they are mostly occupied with the endeavor to meet certain tests which are unfortunately too often tests of memory rather than of mental power; they rarely know the joy of making a subject their own, of thinking for themselves and of seeing the worth-while results of their own work.

Such a habit of mind is absolutely essential to the solution of the great problems confronting civilization today.

It is to the development of this habit in our students that Harvard College has set itself; but the task is a difficult one and takes time for its development. Teachers with this ideal are rare and must be developed; we cannot go out into the open market and hire them. We need time to imbue the present staff with the spirit of the movement and to develop the best technique and organization, without being so pressed for increase of staff and equipment as to fail in our major purpose, which is quality rather than quantity.

As the difficulty of forming new habits of mind increases with the age of the students, the undergraduate departments are the centre of attack, but even there the task is a difficult one, and demands a closer contact between student and instructor and much more work on the part of the instructing staff.

However, the objective is worthy of every possible effort and sacrifice. A thousand graduates with this habit of mind are worth more than ten thousand without it, no matter how well stocked with useful information or conventional knowledge the minds of the latter may be.

COMFORT A. ADAMS.

TABLE 1. CONSISTS OF THE FIGURES UPON WHICH FIGURE 1 IS BASED

(see page 28)

TABLE 2

POPULATION OF THE UNITED STATES EXCLUSIVE OF OUTLYING POSSESSIONS

| | | | |
|---|---|---|---|
| 1870...... | 38,558,371 | 1900...... | 75,994,575 |
| 1880...... | 50,155,783 | 1910...... | 91,972,266 |
| 1890...... | 62,947,714 | 1920...... | 105,710,620 |

ENROLLMENT OF MEN AND WOMEN IN COLLEGES, UNIVERSITIES, AND PROFESSIONAL SCHOOLS IN THE UNITED STATES

| | | |
|---|---|---|
| 1870...... | 60,798 | From Rept. of Commissioner of Education |
| 1880...... | 84,991 | " |
| 1880...... | 109,664 | " |
| 1900...... | 176,435 | " |
| 1910...... | 338,018 | " |
| 1920...... | 521,754 | From World Almanac, 1924 |

TABLE 3. NUMBERS, BUILDINGS, AND INCOME

| | 1904-05 Number | Percentage | 1924-25 Number | Percentage |
|---|---|---|---|---|
| University enrollment, total ............... | 4136 | ... | 7075 | ... |
| College enrollment .................... | 2539 | ... | 3041 | ... |
| **Dormitories** | | | | |
| Undergraduates housed in dormitories owned by the College ............. | 623 | 24.5+ | 1570 | 51.6+ |
| Dormitories in process in 1924-25 or planned and financed, not including Medical School and Business School buildings, are expected to provide for an additional........................ | ... | ... | 358 | ... |

*Libraries*

Widener Library opened in 1914

*Laboratories* (additions)

Coolidge (Chemistry) 1913
Gibbs (Chemistry) 1913
Cruft (Physics) 1914
Research laboratory in connection with Farlow Botanical Library and Herbarium

Additions now financed and in process —
Fogg Art Museum   $1,000,000
Chemical Lab.   $2,000,000
(NOTE: Biological laboratories are especially needed)

Case: 19-2005 Document: 00117676484 Page: 10 Date Filed: 08/29/2019 Entry ID: 6356391

## 16

### TABLE 3 (continued)

*Lecture Rooms or Class Rooms*

*Music Building, 1914*

| Income | 1904-05 | 1924-25 |
|---|---|---|
| Income bearing funds for University | $18,036,025 | $66,024,462 |
| Total Expenditure for Faculty of Arts and Sciences | 563,048 | 1,486,194 |
| Expenditure for salaries in Faculty of Arts and Sciences | 408,887 | 1,077,402 |
| Expenditure for salaries per student under Faculty of Arts and Sciences | 140.75 | 283.28 |

1 This includes the Lawrence Scientific School which in 1904-05 was under the Faculty of Arts and Sciences.

### TABLE 4. COMPARISON OF ACTUAL AND POSSIBLE USE OF ROOMS, 1925-26

*A. Number of Hours during which Rooms are in Use*

| Available Rooms Capacity | No. | Total 1-hr periods possible per week | 8-9 | 9-10 | 10-11 | 11-12 | 12-1 | 1-2 | 2-3 | 3-4 | 4-5 | 5-6 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 12-30 | 2 | 12 | 0 | 4 | 7 | 5 | 1 | 2 | 1 | 1 | 3 | 1 |
| 31-50 | 16 | 96 | 0 | 80 | 87 | 89 | 67 | 10 | 29 | 14 | 4 | 0 |
| 51-75 | 10 | 60 | 4 | 58 | 59 | 55 | 45 | 14 | 26 | 8 | 2 | 4 |
| 76-100 | 5 | 30 | 0 | 29 | 29 | 29 | 20 | 6 | 12 | 6 | 4 | 2 |
| 101-125 | 3 | 18 | 0 | 18 | 15 | 17 | 12 | 0 | 10 | 3 | 1 | 0 |
| 126-150 | 1 | 6 | 3 | 6 | 6 | 6 | 6 | 0 | 6 | 0 | 0 | 0 |
| 151-200 | 2 | 12 | 0 | 11 | 12 | 9 | 8 | 2 | 4 | 5 | 0 | 0 |
| 201-300 | 2 | 12 | 0 | 12 | 12 | 12 | 6 | 0 | 5 | 0 | 0 | 0 |
| 301-400 | 1 | 6 | 0 | 6 | 5 | 6 | 6 | 0 | 0 | 1 | 0 | 0 |
| 900 | 1 | 6 | 0 | 6 | 3 | 6 | 6 | 0 | 2 | 1 | 0 | 0 |
| Total | 43 | 258 [2] | 7 | 230 | 235 | 233 | 175 | 32 | 95 | 42 | 12 | 5 |
| Per cent of 258 | | | .02 | .89 | .91 | .90 | .67 | .12 | .36 | .16 | .04 | .01 |

1 This report covers the class rooms in the following buildings only: Emerson (not including 28 and 27, Psych. Lab.), New Lecture Hall, Sever (not including 25 [Class. Arch. Mus.] or lower rooms), Harvard Hall.
Two hundred and three meetings were held outside above buildings 1925-26; 137 in 1923-24.
2 Multiplying this by 5 x/7 to get a weekly total for the hours from 9 to 1 and 2 to 5 on 5 week-days and the hours from 9 to 1 on Saturdays gives 1438.
The total of "periods in use" for these hours, when added together, gives 1022, which is 71% of 1438.

## 17

### TABLE 4. COMPARISON OF ACTUAL AND POSSIBLE USE OF ROOMS, 1925-26 (continued)

*B. Percentage of Available Rooms Utilized*

| Available Rooms Capacity | No. | Total periods possible per week | 8-9 | 9-10 | 10-11 | 11-12 | 12-1 | 1-2 | 2-3 | 3-4 | 4-5 | 5-6 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 12-30 | 2 | 12 | 0.0 | 33.3 | 58.3 | 41.7 | 8.3 | 0.0 | 16.7 | 16.7 | 25.0 | 8.3 |
| 31-50 | 16 | 96 | 0.0 | 83.4 | 90.6 | 92.8 | 69.8 | 10.4 | 30.2 | 14.6 | 3.3 | 0.0 |
| 51-75 | 10 | 60 | 6.7 | 96.7 | 98.3 | 91.6 | 75.0 | 23.3 | 43.4 | 13.3 | 3.3 | 6.7 |
| 76-100 | 5 | 30 | 0.0 | 96.7 | 96.7 | 96.7 | 66.6 | 20.0 | 40.0 | 20.0 | 5.5 | 0.0 |
| 101-125 | 3 | 18 | 0.0 | 100.0 | 83.4 | 94.4 | 66.6 | 0.0 | 55.6 | 16.7 | 0.0 | 0.0 |
| 126-150 | 1 | 6 | 50.0 | 100.0 | 100.0 | 100.0 | 83.4 | 0.0 | 83.4 | 0.0 | 0.0 | 0.0 |
| 151-200 | 2 | 12 | 0.0 | 91.6 | 100.0 | 75.0 | 66.6 | 16.7 | 33.3 | 0.0 | 0.0 | 0.0 |
| 201-300 | 2 | 12 | 0.0 | 100.0 | 100.0 | 100.0 | 0.0 | 0.0 | 41.7 | 41.7 | 0.0 | 0.0 |
| 301-400 | 1 | 6 | 0.0 | 100.0 | 83.4 | 100.0 | 100.0 | 0.0 | 0.0 | 16.7 | 0.0 | 0.0 |
| 900 | 1 | 6 | 0.0 | 100.0 | 50.0 | 100.0 | 100.0 | 0.0 | 33.3 | 16.7 | 0.0 | 0.0 |

In the last two years there has been an increase of 400 students under the Faculty of Arts and Sciences. In this period there has been an increase of 72 in the number of class meetings per week. This increase does not include additional meetings arranged by departments in their own departmental buildings, for example, additional Chemistry courses in Boylston Hall, etc. Twenty-two of these 72 additional class meetings have gone into the four main class-room buildings at the crowded hours 9 to 1; 26 have gone into these four buildings at other hours (that is, 7.45 to 8.45 A.M., or after-noons). The other 14 additional class meetings have been taken care of by the use of class rooms in buildings assigned for departmental uses (for example, Semitic Museum, Geological Lecture Room, etc.). All but two of these fourteen take place in the morning in the 9 to 1 hours.

It does not appear likely that the increase in the next two years will be smaller than in the last two. We are now using in the morning hours, from 9 to 1, 84.6 per cent of the capacity of the four main class-room buildings. Even if questions of health and safety were not involved it is unlikely, because of the impossibility of forecasting demands, that we could make 100 per cent utilization of our capacity. It does not seem feasible to crowd in more courses in the morning hours. Assuming that the Business School moves all of its class meetings across the river in the next few years, very small relief will be given since there are only fourteen meetings of Business School courses in our four main class-room buildings in the 9 to 1 hours.

JA3699

Case: 19-2005    Case 1:14-cv-14176-ADB    Document 576-3    Filed 11/09/18    Page 11 of 19    Entry ID: 6356391

## 18

### TABLE 4 (continued)

#### C. Enrollment in Largest Courses, 1924-25 and 1925-26

| NAME OF COURSE | UNDER 400 1924-25 | UNDER 400 1925-26 | OVER 400 1924-25 | OVER 400 1925-26 |
|---|---|---|---|---|
| English A | | | 815 | 893 |
| "      28 | 223 | 240 | | |
| "      41 | 269 | 281 | | |
| "       2 | 193 | 190 | | |
| German A | | | 649 | 580 |
| French 2 | | | 453 | 543 |
| Mathematics A | 192 | 287 | | |
| Mathematics C | 206 | 233 | | |
| Physics C | 229 | 280 | | |
| Biology 1 | 243 | 264 | | |
| History 1 | | | 649 | 750 |
| Government 1 | | | 417 | 525 |
| Economics A | | | 405 | 485 |
| Philosophy A | 347 | | | 407 |

### TABLE 5. ATTENDANCE, 1870-1925 — HARVARD COLLEGE AND UNIVERSITY

| Year | Col. | Univ. | Year | Col. | Univ. |
|---|---|---|---|---|---|
| 1870-71 | 608 | 1316 | 1898-99 | 1551 | 3901 |
| 1871-72 | 620 | 1214 | 1899-1900 | 1902 | 4091 |
| 1872-73 | 635 | 1039 | 1900-01 | 1992 | 4288 |
| 1873-74 | 706 | 1167 | 1901-02 | 1983 | 4142 |
| 1874-75 | 716 | 1199 | 1902-03 | 2109 | 4261 |
| 1875-76 | 776 | 1290 | 1903-04 | 2073 | 4328 |
| 1876-77 | 821 | 1370 | 1904-05 | 2009 | 4136 |
| 1877-78 | 813 | 1344 | 1905-06 | 1899 | 3945 |
| 1878-79 | 819 | 1350 | 1906-07 | 2247 | 4026 |
| 1879-80 | 813 | 1356 | 1907-08 | 2277 | 4012 |
| 1880-81 | 828 | 1365 | 1908-09 | 2238 | 3918 |
| 1881-82 | 823 | 1382 | 1909-10 | 2265 | 4046 |
| 1882-83 | 928 | 1450 | 1910-11 | 2217 | 4123 |
| 1883-84 | 972 | 1526 | 1911-12 | 2262 | 4203 |
| 1884-85 | 1006 | 1594 | 1912-13 | 2308 | 4279 |
| 1885-86 | 1068 | 1669 | 1913-14 | 2359 | 4366 |
| 1886-87 | 1077 | 1688 | 1914-15 | 2473 | 4604 |
| 1887-88 | 1138 | 1812 | 1915-16 | 2519 | 5226 |
| 1888-89 | 1180 | 1899 | 1916-17 | 2642 | 5656 |
| 1889-90 | 1271 | 2079 | 1917-18 | 1720 | 3684 |
| 1890-91 | 1339 | 2271 | 1918-19 | 2221 | 3894 |
| 1891-92 | 1456 | 2658 | 1919-20 | 2602 | 5273 |
| 1892-93 | 1598 | 2969 | 1920-21 | 2609 | 5667 |
| 1893-94 | 1656 | 3156 | 1921-22 | 2745 | 6073 |
| 1894-95 | 1667 | 3290 | 1922-23 | 2787 | 6357 |
| 1895-96 | 1771 | 3600 | 1923-24 | 2980 | 6733 |
| 1896-97 | 1754 | 3674 | 1924-25 | 3041 | 7075 |
| 1897-98 | 1819 | 3859 | | | |

## 19

### TABLE 5 (continued)

| Percent Increase: | 1870-71 to 1924-25 | 1900-01 to 1924-25 |
|---|---|---|
| University | 437.61 | 64.99 |
| College | 400.16 | 52.66 |

### TABLE 6. POPULATION AND COLLEGE ENROLLMENT IN THE NORTHEASTERN STATES

Population Northeastern States (New England, New York and New Jersey)

| | |
|---|---|
| 1870 | 8,776,779 |
| 1880 | 10,224,516 |
| 1890 | 12,143,531 |
| 1900 | 14,744,580 |
| 1910 | 18,203,462 |
| 1920 | 20,942,036 |
| 1925 | 22,495,502 [1] |

Registration — Colleges and Universities

| | Harvard | Yale | Columbia | Princeton | Brown | Amherst |
|---|---|---|---|---|---|---|
| 1870 | 1,316 | 755 | 776 | 364 | 220 | 261 |
| 1880 | 1,365 | 1,087 | 1,532 | 488 | 247 | 339 |
| 1890 | 2,271 | 1,645 | 1,671 | 850 | 352 | 352 |
| 1900 | 4,288 | 2,542 | 3,176 | 1,277 | 1,026 | 400 |
| 1910 | 4,123 | 3,282 | 5,117 | 1,450 | 935 | 502 |
| 1920 | 5,667 | 3,820 | 9,117 | 1,967 | 1,867 | 503 |
| 1925 | 7,075 | 5,143 | 13,230 | 2,412 | 2,032 | 615 |

| | Dartmouth | Williams | Bowdoin | Tufts | Cornell | Total |
|---|---|---|---|---|---|---|
| 1870 | 436 | 141 | 121 | 74 | 609 | 5,073 |
| 1880 | 429 | 227 | 157 | 84 | 399 | 6,304 |
| 1890 | 462 | 311 | 185 | 145 | 1,390 | 9,634 |
| 1900 | 741 | 375 | 252 | 802 | 2,521 | 17,400 |
| 1910 | 1,229 | 543 | 338 | 1,142 | 4,412 | 23,073 |
| 1920 | 1,888 | 579 | 403 | 2,128 | 5,668 | 33,107 |
| 1925 | 2,138 | 750 | 500 | 2,021 | 5,697 | 41,613 |

Freshman Class — Harvard College

| Year | Total Registration | No. from Northeastern States |
|---|---|---|
| 1870 | 189 | 159 |
| 1880 | 243 | 191 |
| 1890 | 366 | 301 |
| 1900 | 537 | 421 |
| 1910 | 671 | 538 |
| 1920 | 621 | 494 |
| 1924 | 944 | 735 |

[1] Estimated, World Almanac, 1924.

20

21

TABLE 7.  ENROLLMENT IN THE UNIVERSITY AND PARTS OF THE UNIVERSITY, 1900-25

|  | 1900-01 | 1901-02 | 1902-03 | 1903-04 | 1904-05 | 1905-06 |
|---|---|---|---|---|---|---|
| College¹ | 1992 | 1983 | 2109 | 2073 | 2009 | 1899 |
| Grad. School of Arts and Sciences | 341 | 312 | 316 | 402 | 366 | 394 |
| All Depts. except College | 2296 | 2159 | 2152 | 2255 | 2037 | 2046 |
| Whole University² | 4288 | 4142 | 4261 | 4328 | 4136 | 3945 |

|  | 1906-07 | 1907-08 | 1908-09 | 1909-10 | 1910-11 | 1911-12 |
|---|---|---|---|---|---|---|
| College¹ | 2247 | 2277 | 2238 | 2265 | 2217 | 2262 |
| Grad. School of Arts and Sciences | 387 | 400 | 403 | 425 | 463 | 454 |
| All Depts. except College | 1779 | 1735 | 1680 | 1781 | 1906 | 1941 |
| Whole University² | 4026 | 4012 | 3918 | 4046 | 4123 | 4203 |

|  | 1912-13 | 1913-14 | 1914-15 | 1915-16 | 1916-17 | 1917-18 |
|---|---|---|---|---|---|---|
| College¹ | 2308 | 2359 | 2473 | 2519 | 2642 | 1720 |
| Grad. School of Arts and Sciences | 463 | 497 | 532 | 598 | 605 | 296 |
| All Depts. except College | 1971 | 2007 | 2131 | 2707 | 3014 | 1964 |
| Whole University² | 4279 | 4366 | 4604 | 5226 | 5656 | 3684 |

|  | 1918-19 | 1919-20 | 1920-21 | 1921-22 | 1922-23 | 1923-24 | 1924-25 |
|---|---|---|---|---|---|---|---|
| College¹ | 2221 | 2602 | 2609 | 2745 | 2787 | 2980 | 3041 |
| Grad. School of Arts and Sciences | 359 | 531 | 532 | 582 | 648 | 670 | 763 |
| All Depts. except College | 1673 | 2671 | 3058 | 3328 | 3570 | 3753 | 4034 |
| Whole University² | 3894 | 5273 | 5667 | 6073 | 6357 | 6733 | 7075 |

Percent Increase:

| | |
|---|---|
| College | 52.66 |
| Graduate School of Arts and Sciences | 123.75 |
| All Departments except College | 75.69 |
| Whole University | 64.99 |

¹ Lawrence Scientific School not included, but, beginning 1906-07, special students formerly registered with Lawrence Scientific School now registered in Harvard College, on account of a change in the administration of the S.B. degree.
² University Extension and Summer School students not included.

TABLE 8.  ENROLLMENT — HARVARD UNIVERSITY, 1924-25

The College (total enrollment, 1924-25, 3041). A limit of 1,000 in each Freshman Class has been fixed.

The Graduate School of Arts and Sciences (total enrollment, 1924-25, 763). No limit desired.

The Law School (total enrollment, 1924-25, 1201). Increased facilities for expanding numbers being planned without intention of limitation.

The School of Education (total enrollment, 1924-25, 273). Coeducational; no limit proposed.

The Graduate School of Business Administration (total enrollment, 1924-25, 614). First-year class entering September, 1924, limited to 335 — that in February, 1925, to 150. This limitation will prevail until the new buildings are completed.

The Medical School (total enrollment, 1924-25, 506). Limited to 125 in each of the first two years, 135 in each of the second two years — total 520. Limit dictated by optimum use of existing laboratory space, clinical facilities and instructing staff. More students apply for admission than can be accepted, and the selection is made chiefly on the basis of an examination of the candidate's previous work — preference being given to men who have already prepared themselves in subjects which would more or less specially fit them for medical studies.

School of Public Health (total enrollment, 1924-25, 90). No limitation.

The Dental School (total enrollment, 1924-25, 204). No limitation.

Engineering School (total enrollment, 1924-25, 268). No limitation.

The Theological School (total enrollment, 1924-25, 74). No limitation.

School of Architecture and Landscape Architecture (total enrollment, 1924-25, 48 (Architecture) and 39 (Landscape Architecture)).

Case: 19-2005     Case 1:14-cv-14176-ADB     Document 577-3     Filed 06/18/21     Page 13 of 19     Entry ID: 6356391

22

### TABLE 9. LIMITATION OF NUMBERS IN ENDOWED COLLEGES OF NORTHEASTERN STATES

| College or University | Lee-way | Limitation | When Adopted | Number Admitted in fall of 1924 |
|---|---|---|---|---|
| Amherst | .. | No formal limitation. Will probably accept 230 in the fall of 1925 | .... | 210 |
| Bowdoin | 50 | Freshman Class limited to about 150. (500 for College) | .... | 136 |
| Brown | 0 | No rigid limitation. Try to limit Freshman Class to about 400 men (about 150 for Women's College) | .... | 422 Men [1] |
| Columbia | 0 | Total registration for College limited to about 2,000 | .... | 474 |
| Cornell | 0 | Limited to 500 (applies only to candidates for B.A. degree). College of Architecture limited to about 45. Other Schools not rigidly limited | Beginning with fall of 1925 | 490 (as candidates for B.A.) |
| Dartmouth | 0 | Trustee provision that total registration be limited to 2,000. The number admitted each year depends on size of upper classes | About 1918 | 673 |
| Princeton | 0 | Limited to 600 | .... | Slightly over 600 |
| Tufts | .. | ? | ? | 108 [1] |
| Williams | 50 | About 225 | 1924 | 254 |
| Yale | 50 | Limited to 850 | 1923 | 880 |

[1] Size of Freshman Class.

23

### TABLE 10. GROWTH OF ENROLLMENTS AND ENDOWMENTS IN ELEVEN UNIVERSITIES AND COLLEGES

#### A. Attendance

| | 1900-01 College | 1900-01 University | 1923-24 College | 1923-24 University |
|---|---|---|---|---|
| Amherst | 400 | ... | 561 | ... |
| Bowdoin | 254 | ... | 503 | ... |
| Brown [1] | 920 | 920 | 2,060 | 2,013 |
| Dartmouth | 741 | ... | 2,094 | ... |
| Tufts | 802 | ... | 694 | ... |
| Williams | 375 | ... | 2,005 | ... |
| Columbia | 476 | 3,419 | 2,980 | 13,230 |
| Harvard | 1,992 | 4,288 | 2,231 | 6,733 |
| Princeton | 1,168 | 1,277 | 2,005 | 2,448 |
| Yale | 1,190 | 2,542 | 2,005 | 4,447 |
| Cornell | ... | 2,521 | ... | 5,558 |
| | 8,318 | | 15,133 | |

[1] Women included.

#### B. Income-Bearing Funds

| | 1900 | 1924 |
|---|---|---|
| Amherst | $1,600,000.00 | $7,340,000.00 |
| Bowdoin | 660,416.86 | 3,541,164.77 |
| Brown | 1,297,227.56 | 8,209,057.83 |
| Dartmouth | 2,500,000.00 [1] | 6,000,000.00 |
| Tufts | 48,926.00 (Income)[1] | 167,304.00 (Income) |
| Williams | 1,050,850.00 | 4,543,972.00 |
| Columbia | 435,000.00 (Income) | 1,975,000.00 (Income) [2] |
| Harvard | 12,614,448.19 | 66,624,462.12 |
| Princeton | 2,455,400.00 | 14,322,147.08 |
| Yale | 4,942,166.04 | 35,764,883.97 [2] (Exclusive of Sterling Bequest) |
| Cornell | ? | ? |

[1] 1901     [2] 1923

JA3702

Case: 19-2005    Document 577.3    Filed 11/14/19    Page 14 of 19    Entry ID: 6356391

## TABLE 10 (continued)

### C. Percentage Increase in

| | Attendance in College 1900–24 | Attendance in whole University incl. College 1900–24 | Income-Bearing Funds, Whole University 1900–24 |
|---|---|---|---|
| Amherst | 40.25 | ... | 358.75 |
| Bowdoin | 93.03 | ... | 436.20 |
| Brown University | ... | 118.84[1] | 532.81 |
| Dartmouth | 178.00 | ... | 140.00[2] |
| Tufts | 161.09 | ... | 241.53[3](Income) |
| Williams | 85.06 | ... | 332.41 |
| Columbia | 321.21 | 286.95 | 354.02[3](Income) |
| Cornell | ... | 121.65 | ? |
| Harvard | 49.59 | 57.19 | 428.15 |
| Princeton | 91.01 | 91.69 | 408.33 |
| Yale | 65.48 | 74.94 | 623.66[3] |

[1] Placed in this column in deference to the name; but might fairly be in column 1.
[2] 1901–24.
[3] 1900–23.

## TABLE 11. ENROLLMENT IN DEPARTMENTS OF HARVARD UNIVERSITY, 1916–17 TO 1925–26

| | 1916 –17 | 1917 –18 | 1918 –19 | 1919 –20 | 1920 –21 | 1921 –22 | 1922 –23 | 1923 –24 | 1924 –25 | 1925 –26[1] |
|---|---|---|---|---|---|---|---|---|---|---|
| The College[2] | 2642 | 1720 | 2221 | 2602 | 2609 | 2745 | 2787 | 2980 | 3041 | 3279 |
| Grad. School of Arts and Sciences | 605 | 296 | 359 | 531 | 532 | 552 | 648 | 670 | 763 | 732 |
| Law School | 856 | 296 | 436 | 879 | 944 | 999 | 1019 | 1097 | 1201 | 1282 |
| School of Education | ... | ... | ... | 121 | 153 | 241 | 285 | 272 | 236 | |
| Grad. School of Bus. Administration | 222 | 93 | 159 | 394 | 442 | 466 | 468 | 539 | 614 | 675 |
| Medical School | 355 | 386 | 404 | 419 | 439 | 472 | 499 | 494 | 506 | 502 |
| School of Public Health | ... | ... | ... | ... | 30 | 16 | 29 | 30 | 30 | |
| Dental School | 240 | 211 | 154 | 189 | 232 | 205 | 219 | 191 | 204 | 186 |
| Engineering School | 577[3] | 591[3] | 59 | 126 | 214 | 261 | 257 | 253 | 258 | 283 |
| Mining School | 4 | | | | | | | | | |
| Bussey Institution | 16 | 6 | 7 | 10 | 15 | 20 | 16 | 16 | 25 | 16 |
| Theological School | 73 | 59 | 51 | 58 | 53 | 61 | 95 | 86 | 74 | 69 |
| School of Arch. and Landscape Arch. | 63 | 25 | 44 | 65 | 66 | 79 | 92 | 93 | 87 | 91 |
| Total | 5656 | 3684 | 3894 | 5273 | 5667 | 6073 | 6357 | 6733 | 7075 | 7381 |

[1] On October 1, 1925.
[2] Including Special Students.
[3] In combination with Massachusetts Institute of Technology.

## TABLE 12. HARVARD COLLEGE AS A FEEDER TO THE OTHER DEPARTMENTS

Degrees conferred in Harvard College, June 1923

*(From Rept. of President and Treasurer, 1923–24, p. 322)*

(1)
| | |
|---|---|
| A.B. | 400 |
| A.B. OcC. | 56 |
| A.B. for Honorable Service in the War | 9 |
| S.B. | 108 |
| S.B. OcC. | 17 |
| S.B. for Honorable Service in the War | 2 |
| Total | 592 |

(2) Total number continuing in post-graduate work in Harvard University ... 185

Total number that did not go on to post-graduate work in Harvard University ... 407

(3) Proportion continuing in post-graduate work in Harvard University ... 31.25%

## TABLE 13. HARVARD UNIVERSITY — ANALYSIS OF ENROLLMENT, 1924–25

### Geographical Distribution

| | College | | Graduate and Professional Schools | | Per cent of Total Population of U.S. area, (1920)[1] |
|---|---|---|---|---|---|
| | No. | Per cent | No. | Per cent | |
| **North Atlantic** | | | | | |
| New England | 1717 | 56.46 | 1518 | 37.63 | ... |
| N. Y., N. J., Pa., Del. | 697 | ... | 773 | ... | 28.3 |
| | 2414 | 79.38 | 2291 | 56.79 | ... |
| **South Atlantic** | | | | | |
| Va., W. Va., Ga., Fla., N. C., S. C., D. C., Md. | 76 | 2.50 | 240 | 5.95 | 13.0 |
| **Western** | | | | | |
| Colo., Calif., N. Mex., Ore., Mont., Wash., Ariz., Utah, Nev., Idaho, Wyo. | 87 | 2.86 | 304 | 7.54 | 8.4 |
| **North Central** | | | | | |
| S. D., N. D., Ill., Mich., Minn., Iowa, Mo., Wis., Ohio, Ind., Nebr., Kans. | 357 | 11.74 | 740 | 18.34 | 32.2 |
| **South Central** | | | | | |
| Ala., Tenn., Tex., Okla., Ark., Ky., La., Miss. | 55 | 1.81 | 198 | 4.91 | 18.1 |
| U.S. Territories and Foreign | 52 | 1.71 | 261 | 6.47 | ... |
| Total | 3041 | 100.00 | 4034 | 100.00 | 100.0 |

[1] In this column the Territories and Foreign Possessions do not enter into the 100 per cent; so there is a slight discrepancy in comparing it with percentages in columns 1 and 2.

Case: 19-2005    Case: 1:14-cv-14176-ADB   Document 577-3   Filed 11/08/18/24 Page 15 of 19   Entry ID: 6356391

TABLE 14.  TABLE SHOWING GEOGRAPHICAL DISTRIBUTION OF
CANDIDATES ADMITTED IN 1925

*Under the Old, New, and Honor Plans*

| | Honor | New Plan | Old Plan | Total | Honor Admissions % of Total |
|---|---|---|---|---|---|
| *North Atlantic* | | | | | |
| Maine | 6 | 1 | 2 | 9 | |
| New Hampshire | 5 | 2 | 3 | 10 | |
| Vermont | 1 | 1 | 1 | 3 | |
| Massachusetts | 154 | 77 | 307 | 538 | |
| Connecticut | 11 | 0 | 8 | 19 | |
| Rhode Island | 3 | 3 | 3 | 9 | |
| Total, New England States | 180 | 84 | 324 | 588 | 30.6% |
| New York | 38 | 55 | 62 | 155 | |
| New Jersey | 12 | 8 | 13 | 33 | |
| Pennsylvania | 13 | 9 | 17 | 39 | |
| | 243 | 156 | 416 | 815 | 29.77% |
| *South Atlantic* | | | | | |
| Florida | 0 | 1 | 0 | 1 | |
| Virginia | 2 | 1 | 0 | 3 | |
| Georgia | 3 | 1 | 0 | 4 | |
| District of Columbia | 3 | 0 | 2 | 5 | |
| West Virginia | 1 | 0 | 1 | 2 | |
| South Carolina | 1 | 0 | 0 | 1 | |
| | 10 | 3 | 3 | 16 | 62.5% |
| *Western* | | | | | |
| California | 2 | 10 | 4 | 16 | |
| Washington | 2 | 0 | 1 | 3 | |
| New Mexico | 0 | 1 | 0 | 1 | |
| Colorado | 1 | 0 | 1 | 2 | |
| Utah | 1 | 1 | 0 | 2 | |
| Idaho | 0 | 1 | 0 | 1 | |
| | 6 | 13 | 6 | 25 | 24% |
| *North Central* | | | | | |
| North Dakota | 1 | 0 | 0 | 1 | |
| South Dakota | 0 | 1 | 0 | 1 | |
| Illinois | 14 | 4 | 8 | 26 | |
| Michigan | 3 | 1 | 3 | 7 | |
| Minnesota | 2 | 1 | 3 | 6 | |
| Iowa | 0 | 1 | 2 | 3 | |
| Missouri | 2 | 0 | 10 | 12 | |
| Wisconsin | 3 | 2 | 1 | 6 | |
| Ohio | 15 | 8 | 6 | 29 | |
| Indiana | 3 | 0 | 0 | 3 | |
| Nebraska | 1 | 0 | 0 | 1 | |
| | 44 | 18 | 33 | 95 | 46.3% |

TABLE 14 (*Continued*)

| | Honor | New Plan | Old Plan | Total | Honor Admissions % of Total |
|---|---|---|---|---|---|
| *South Central* | | | | | |
| Alabama | 1 | 0 | 0 | 1 | |
| Tennessee | 4 | 0 | 1 | 5 | |
| Texas | 1 | 0 | 1 | 2 | |
| Oklahoma | 1 | 0 | 2 | 3 | |
| Kentucky | 4 | 0 | 0 | 4 | |
| | 11 | 0 | 4 | 15 | 73.3% |
| Total for North Atlantic States plus Illinois and Ohio (schools which make a specialty of fitting for colleges like Harvard being numerous in these states) | 272 | 168 | 430 | 870 | 31.26% |
| Total for remainder of Continental United States | 42 | 22 | 32 | 96 | 43.7% |
| Total, Continental United States | 314 | 190 | 462 | 966 | 32.5% |
| *Insular Territories* | | | | | |
| Hawaii | 0 | 0 | 1 | 1 | |
| Porto Rico | 0 | 0 | 1 | 1 | |
| | 0 | 0 | 2 | 2 | |
| *Foreign* | | | | | |
| Bermuda | 0 | 0 | 1 | 1 | |
| Canada | 0 | 0 | 2 | 2 | |
| Cuba | 0 | 0 | 1 | 1 | |
| Guatemala | 0 | 1 | 0 | 1 | |
| Jamaica | 0 | 0 | 1 | 1 | |
| Norway | 0 | 0 | 1 | 1 | |
| Peru | 0 | 0 | 1 | 1 | |
| | 0 | 1 | 7 | 8 | |
| Total, Insular Territories and Foreign Countries | 0 | 1 | 9 | 10 | |
| Grand total | 314 | 191 | 471 | 976 | 32.17% |

In the fall of 1925–26 no candidates were admitted from the following states: Delaware, Maryland, North Carolina, Louisiana, Mississippi, Arkansas, Kansas, Arizona, Wyoming, Oregon.

Case: 19-2005   Case 1:14-cv-01476-ADB   Document 597-3   Filed 10/08/18/29   Page 16 of 19   Entry ID: 6356391



Fig. 2. Population in the U.S. (Exclusive of Outlying Possessions) Compared with Enrollment (Men and Women) in Universities, Colleges, and Professional Schools

Added Below — Registration of Harvard Freshman Class in Hundreds



Fig. 1. College Attendance — 1870-71 to 1924-25

JA3705

Case: 19-2005  Document: 147  ABB4  Document 577.3  Filed 01/03/18/2018  Page 47 of Entry ID: 6356391

31.



Fig. 4. Certain Comparisons of the Rate of Growth of Population and College Enrollment

"Population in Millions" is that of the New England States plus New York and New Jersey. "Registration in Thousands" is the total for Harvard, Yale, Columbia, Princeton, Brown, Cornell, Amherst, Dartmouth, Williams, Bowdoin, Tufts.

"Registration in Hundreds" is (above) that of the Harvard Freshman Class, (below) that of students from above named states in the Harvard Freshman Class.

30





Fig. 3. The Rate of Growth of the College Compared with That of the University

Case: 19-2005 Case: 14-cv-14176-ADB Document 599-3 Filed: 07/28/2020 Document 517-3 Page 18 of Entry ID: 6356391




Fig. 5. Comparison of Rates of Growth of Harvard University and Certain Departments

Case 1:14-cv-14176-ADB   Document 597-1   Filed 10/27/18   Page 1 of 15

## Fitzsimmons W MERGED PA DC on 10-25 PLAYED on 10-26

| Designation | Source | Tx Duration | Remains | Barcode |
|---|---|---|---|---|
| **46:5 -46:17** | Fitzsimmons, William 2017-08-03 | 00:00:57 | 00:27:39 | V1.1 |

46:5    Q. Do you know what the annual budget is for
46:6        the admissions office?
46:7    A. We -- you know, we don't have a -- we
46:8        submit a budget every year.  I don't have an exact
46:9        amount to give you.  What we are told is that our
46:10       mission is clear that we need to get, you know, the
46:11       best, most interesting students who will be the
46:12       best educators of others during the four years and
46:13       beyond from all backgrounds.  We are not given a
46:14       rigid limit on the amount of financial aid that
46:15       we -- we would be -- we'd have to meet.
46:16   Q. Ballpark, not the exact number, do you
46:17       know what that annual budget is?

| | | | | |
|---|---|---|---|---|
| **46:20 -46:25** | Fitzsimmons, William 2017-08-03 | 00:00:18 | 00:26:42 | V1.2 |

46:20   A. I don't have an exact number.  The
46:21       financial aid budget these days for one year for
46:22       Harvard College is around $180 million.
46:23   Q. That's money to be distributed through
46:24       financial aid, or does it also include the
46:25       financial aid operations?

| | | | | |
|---|---|---|---|---|
| **47:3 -47:4** | Fitzsimmons, William 2017-08-03 | 00:00:06 | 00:26:24 | V1.3 |

47:3    A. That would be money going directly to
47:4        undergraduate for financial aid.

| | | | | |
|---|---|---|---|---|
| **48:21 -49:10** | Fitzsimmons, William 2017-08-03 | 00:00:45 | 00:26:18 | V1.4 |

48:21   Q. I'm sorry.  I meant -- I thought you
48:22       referred to recruitment groups as they reached out
48:23       to people who were prospective candidates for
48:24       admission who they thought would be eligible for
48:25       HFAI?
49:1                    FITZSIMMONS
49:2    A. Our own students who are part of HFAI, our
49:3        current undergraduates, they would reach out to
49:4        students in general we think might be eligible for
49:5        the largest financial grants, if that's what you
49:6        mean.
49:7    Q. Yes.  And so those students who are
49:8        identified as potentially eligible, do they receive
49:9        an admissions benefit by dint of their potential
49:10       eligibility?

| | | | | |
|---|---|---|---|---|
| **49:12 -49:18** | Fitzsimmons, William 2017-08-03 | 00:00:27 | 00:25:33 | V1.5 |

## JA3708

|  |  |  |  |  |  |
|---|---|---|---|---|---|
| | 49:12 | A. The fact that they would be eligible for | | | |
| | 49:13 | HFAI typically would be 80,000 or under.  And, | | | |
| | 49:14 | particularly, 65,000 or under would be one factor | | | |
| | 49:15 | among all the other factors that, you know, you | | | |
| | 49:16 | would find in any single application.  That would | | | |
| | 49:17 | certainly be one factor that would be taken into | | | |
| | 49:18 | account. | | | |

| **134:14 - 134:22** | Fitzsimmons, William 2017-08-03 | 00:00:12 | 00:25:06 | V1.6 |
|---|---|---|---|---|
| 134:14 | Q. Does Harvard intend to stop using race in |
| 134:15 | its admissions process? |
| 134:16 | A. No. |
| 134:17 | Q. No? |
| 134:18 | A. I'm sorry.  I didn't realize you didn't |
| 134:19 | finish your question.  I apologize. |
| 134:20 | Q. That's okay.  The answer is no? |
| 134:21 | A. No. |
| 134:22 | Q. At any point in time? |

| **134:24 - 135:3** | Fitzsimmons, William 2017-08-03 | 00:00:10 | 00:24:54 | V1.7 |
|---|---|---|---|---|
| 134:24 | A. There is no evidence for that. |
| 134:25 | Q. And what evidence would it take to |
| 135:1 | FITZSIMMONS |
| 135:2 | convince you that Harvard should no longer use race |
| 135:3 | in the admissions process? |

| **135:5 - 135:6** | Fitzsimmons, William 2017-08-03 | 00:00:06 | 00:24:44 | V1.8 |
|---|---|---|---|---|
| 135:5 | A. I haven't seen any evidence, and I don't |
| 135:6 | know what form such evidence might take. |

| **142:2 - 142:5** | Fitzsimmons, William 2017-08-03 | 00:00:10 | 00:24:38 | V1.9 |
|---|---|---|---|---|
| 142:2 | Q. If Harvard wanted to, could it ensure that |
| 142:3 | readers of files did not receive information about |
| 142:4 | the box that the applicant checked with respect to |
| 142:5 | racial identity? |

| **142:7 - 142:15** | Fitzsimmons, William 2017-08-03 | 00:00:21 | 00:24:28 | V1.10 |
|---|---|---|---|---|
| 142:7 | A. You mean mechanically? |
| 142:8 | Q. Yes. |
| 142:9 | A. I use the summary sheet, reader sheet, the |
| 142:10 | one we talked about before.  Could we not provide |
| 142:11 | it mechanically?  Yes. |
| 142:12 | Q. You could screen off that information from |
| 142:13 | being available to those reading the file, whether |
| 142:14 | they checked the box or not or what they identified |
| 142:15 | as? |

| **142:17 - 142:23** | Fitzsimmons, William 2017-08-03 | 00:00:11 | 00:24:07 | V1.11 |
|---|---|---|---|---|
| 142:17 | A. Mechanically, yes. |

**JA3709**

Case: 19-2005    Document: 00117621846    Page: 786    Date Filed: 07/29/2020    Entry ID: 6356391
Case 1:14-cv-14176-ADB    Document 597-1    Filed 10/27/18    Page 3 of 15

Fitzsimmons W MERGED PA DC on 10-25 PLAYED on 10-26

|  |  |  |  |  |
|---|---|---|---|---|
| | 142:18 | Q. So in some cases it might still come | | |
| | 142:19 | through from the essay or the personal statement or | | |
| | 142:20 | some recommendation, right? | | |
| | 142:21 | A. In any number of different ways. | | |
| | 142:22 | Q. All right.  Do you think that's always | | |
| | 142:23 | true? | | |

| **142:25 -143:6** | Fitzsimmons, William 2017-08-03 | 00:00:06 | 00:23:56 | V1.12 |
|---|---|---|---|---|
| | 142:25 | A. In every case? | | |
| | 143:1 | FITZSIMMONS | | |
| | 143:2 | Q. Yes. | | |
| | 143:3 | A. No. | | |
| | 143:4 | Q. Do you know how many applications, on | | |
| | 143:5 | average, contain that information in those | | |
| | 143:6 | statements? | | |

| **143:8 -143:8** | Fitzsimmons, William 2017-08-03 | 00:00:03 | 00:23:50 | V1.13 |
|---|---|---|---|---|
| | 143:8 | A. There's no way to estimate that. | | |

| **153:10 -153:21** | Fitzsimmons, William 2017-08-03 | 00:00:24 | 00:23:47 | V1.14 |
|---|---|---|---|---|
| | 153:10 | Q. Is Harvard attempting to obtain critical | | |
| | 153:11 | mass of any particular ethnic group at the college? | | |
| | 153:12 | A. I'm not sure what you would mean by | | |
| | 153:13 | critical mass. | | |
| | 153:14 | Q. Have you heard that term before? | | |
| | 153:15 | A. I've heard it in physics.  I've heard it | | |
| | 153:16 | in, you know, in -- you know, I've heard the term | | |
| | 153:17 | before. | | |
| | 153:18 | Q. Have you heard it used with respect to the | | |
| | 153:19 | use of race in college admissions? | | |
| | 153:20 | A. Occasionally. | | |
| | 153:21 | Q. Is it ever used at Harvard? | | |

| **153:23 -154:5** | Fitzsimmons, William 2017-08-03 | 00:00:13 | 00:23:23 | V1.15 |
|---|---|---|---|---|
| | 153:23 | A. I have never used it. | | |
| | 153:24 | Q. Have you ever used it to describe what | | |
| | 153:25 | Harvard's attempting to achieve? | | |
| | 154:1 | FITZSIMMONS | | |
| | 154:2 | A. No. | | |
| | 154:3 | Q. I take it, then, that Harvard does not | | |
| | 154:4 | have its own definition of what constitutes | | |
| | 154:5 | critical mass? | | |

| **154:7 -154:11** | Fitzsimmons, William 2017-08-03 | 00:00:15 | 00:23:10 | V1.16 |
|---|---|---|---|---|
| | 154:7 | A. I certainly don't. | | |
| | 154:8 | Q. And if I understand your testimony | | |
| | 154:9 | previously, you can't provide any range or | | |
| | 154:10 | quantification of what level of racial diversity is | | |
| | 154:11 | sufficient to achieve Harvard's educational goals? | | |

**JA3710**

**Fitzsimmons W MERGED PA DC on 10-25 PLAYED on 10-26**

| | | | | |
|---|---|---|---|---|
| **154:13 -154:13** | Fitzsimmons, William 2017-08-03 | 00:00:01 | 00:22:55 | V1.17 |
| | 154:13    A. That would be correct. | | | |
| **180:10 -180:13** | Fitzsimmons, William 2017-08-03 | 00:00:09 | 00:22:54 | V1.18 |
| | 180:10   Q. Are you aware of any formal analysis on | | | |
| | 180:11     paper that purports to analyze how these could be | | | |
| | 180:12     used and what the result of them would be instead | | | |
| | 180:13     of using race? | | | |
| **180:15 -180:18** | Fitzsimmons, William 2017-08-03 | 00:00:11 | 00:22:45 | V1.19 |
| | 180:15   A. Formal analysis? | | | |
| | 180:16   Q. Something in writing. | | | |
| | 180:17   A. Something that doesn't -- nothing as | | | |
| | 180:18     specific as what you're describing comes to mind. | | | |
| **180:21 -180:22** | Fitzsimmons, William 2017-08-03 | 00:00:03 | 00:22:34 | V1.20 |
| | 180:21        Since this lawsuit, are you aware of any | | | |
| | 180:22     such formal analysis? | | | |
| **181:5 -181:9** | Fitzsimmons, William 2017-08-03 | 00:00:17 | 00:22:31 | V1.21 |
| | 181:5    A. I think the answer to that question would | | | |
| | 181:6     be in the interrogatory regarding -- I believe, if | | | |
| | 181:7     I understand your question, the Ryan committee and | | | |
| | 181:8     then the committee that Dean Khurana and Dean Smith | | | |
| | 181:9     and I are on. | | | |
| **204:13 -204:18** | Fitzsimmons, William 2017-08-03 | 00:00:08 | 00:22:14 | V1.22 |
| | 204:13   Q. Do you know -- do you think that Harvard | | | |
| | 204:14     is doing all it can to achieve socioeconomic | | | |
| | 204:15     diversity? | | | |
| | 204:16   A. Yes. | | | |
| | 204:17   Q. Do you think there's anything else it can | | | |
| | 204:18     do? | | | |
| **204:20 -204:21** | Fitzsimmons, William 2017-08-03 | 00:00:03 | 00:22:06 | V1.23 |
| | 204:20   A. Not at the moment, but we stay open to | | | |
| | 204:21     possibilities. | | | |
| **213:5 -213:9** | Fitzsimmons, William 2017-08-03 | 00:00:12 | 00:22:03 | V1.24 |
| | 213:5    Q. When was the Ryan committee formed? | | | |
| | 213:6    A. I'm not sure precisely, but I would guess | | | |
| | 213:7     2014. | | | |
| | 213:8    Q. Okay.  Do you know why the Ryan committee | | | |
| | 213:9     was formed? | | | |
| **213:14 -213:22** | Fitzsimmons, William 2017-08-03 | 00:00:25 | 00:21:51 | V1.25 |
| | 213:14   A. Just from looking at the charge of the | | | |
| | 213:15     committee, that's how I would know. | | | |
| | 213:16   Q. What was your role in the Ryan committee? | | | |
| | 213:17   A. One of, you know, any number of members. | | | |

**JA3711**

Fitzsimmons W MERGED PA DC on 10-25 PLAYED on 10-26

|  |  |  |  |  |  |
|---|---|---|---|---|---|
|  | 213:18 | Q. And what was the charge of the Ryan |  |  |  |
|  | 213:19 | committee? |  |  |  |
|  | 213:20 | A. It had to do with race-neutral admissions. |  |  |  |
|  | 213:21 | Q. And, in particular, what did it have to do |  |  |  |
|  | 213:22 | with race-neutral admissions? |  |  |  |
| **213:24 - 214:3** | Fitzsimmons, William 2017-08-03 | 00:00:11 | 00:21:26 | V1.26 |
|  | 213:24 | A. I can't recall specifically, you know, |  |  |  |
|  | 213:25 | other than the general -- the general topic. |  |  |  |
|  | 214:1 | FITZSIMMONS |  |  |  |
|  | 214:2 | Q. And do you know why the Ryan committee was |  |  |  |
|  | 214:3 | asked to look at race-neutral admissions? |  |  |  |
| **214:7 - 214:14** | Fitzsimmons, William 2017-08-03 | 00:00:33 | 00:21:15 | V1.27 |
|  | 214:7 | A. I don't really know, based -- I don't know |  |  |  |
|  | 214:8 | what discussions, you know, Dean Ryan had with |  |  |  |
|  | 214:9 | others, so I simply don't know. |  |  |  |
|  | 214:10 | Q. How often did the Ryan committee meet? |  |  |  |
|  | 214:11 | A. I believe it met perhaps three times. |  |  |  |
|  | 214:12 | Q. Before the Ryan committee, are you aware |  |  |  |
|  | 214:13 | of any other committee at Harvard that was tasked |  |  |  |
|  | 214:14 | with analyzing race-neutral admissions? |  |  |  |
| **214:16 - 214:20** | Fitzsimmons, William 2017-08-03 | 00:00:16 | 00:20:42 | V1.28 |
|  | 214:16 | A. No committee with that specific charge. |  |  |  |
|  | 214:17 | Q. Are you aware of any committee that |  |  |  |
|  | 214:18 | specifically discussed race-neutral admissions to |  |  |  |
|  | 214:19 | replace the use of race in Harvard's admissions |  |  |  |
|  | 214:20 | process? |  |  |  |
| **214:22 - 214:25** | Fitzsimmons, William 2017-08-03 | 00:00:07 | 00:20:26 | V1.29 |
|  | 214:22 | A. I don't. |  |  |  |
|  | 214:23 | Q. Do you expect that you would be aware of |  |  |  |
|  | 214:24 | any such committee, given your role as dean of |  |  |  |
|  | 214:25 | admissions? |  |  |  |
| **215:3 - 215:3** | Fitzsimmons, William 2017-08-03 | 00:00:01 | 00:20:19 | V1.30 |
|  | 215:3 | A. Yes. |  |  |  |
| **260:16 - 261:19** | Fitzsimmons, William 2017-08-03 | 00:01:43 | 00:20:18 | V1.31 |
|  | 260:16 | Q. Are you familiar with the phrase "standard |  |  |  |
|  | 260:17 | strong" as it's used in the reading process? |  |  |  |
|  | 260:18 | A. I am familiar with the phrase. |  |  |  |
|  | 260:19 | Q. What does standard strong mean? |  |  |  |
|  | 260:20 | A. I would say pretty much what the words |  |  |  |
|  | 260:21 | mean in standard usage.  We have, as I indicated |  |  |  |
|  | 260:22 | before, many, many strong candidates and many |  |  |  |
|  | 260:23 | people who present extremely strong standardized |  |  |  |
|  | 260:24 | tests and grades, so that would certainly be a -- |  |  |  |

**JA3712**

**Fitzsimmons W MERGED PA DC on 10-25 PLAYED on 10-26**

| | | |
|---|---|---|
| 260:25 | someone who might be described as standard strong. |
| 261:1 | FITZSIMMONS |
| 261:2 | It's not a term that I use myself, particularly, |
| 261:3 | but it certainly indicates, you know, some real |
| 261:4 | strength to be in that pool, to be standard strong. |
| 261:5 | Q. What makes it standard? |
| 261:6 | A. There may not yet be something that might |
| 261:7 | make that person quite as strong an educator of |
| 261:8 | others or quite as strong as an applicant overall |
| 261:9 | as some others because it is, you know, it is a |
| 261:10 | competition where there's lots of strength.  But |
| 261:11 | that would probably be the best description I could |
| 261:12 | give. |
| 261:13 | Q. Is that something else, that other thing, |
| 261:14 | sometimes referred to in the admissions office as a |
| 261:15 | "distinguishing excellence"? |
| 261:16 | A. It could be. |
| 261:17 | Q. Or DE? |
| 261:18 | A. It could be. |
| 261:19 | Q. What's a distinguishing excellence? |

| **261:21 - 262:2** | Fitzsimmons, William 2017-08-03 | 00:00:26 | 00:18:35 | V1.32 |
|---|---|---|---|---|
| 261:21 | A. It would be -- it could be an excellence |
| 261:22 | of any kind one could imagine, but it would be an |
| 261:23 | additional factor that might help the admissions |
| 261:24 | committee understand better what kind of a |
| 261:25 | contribution this particular applicant might make |
| 262:1 | FITZSIMMONS |
| 262:2 | to the -- to fellow classmates. |

| **263:15 - 264:13** | Fitzsimmons, William 2017-08-03 | 00:01:16 | 00:18:09 | V1.33 |
|---|---|---|---|---|
| 263:15 | Q. What's a CJer? |
| 263:16 | A. A CJer used to be a person who was |
| 263:17 | interested in biological sciences which, I recall, |
| 263:18 | was the C.  And the J, I believe, was medicine. |
| 263:19 | So that would be a person who was interested in, |
| 263:20 | perhaps, something medical and who might be |
| 263:21 | interested in one of the various biological |
| 263:22 | sciences as a possible concentration. |
| 263:23 | Q. To borrow your phrase earlier, this |
| 263:24 | strikes me as it must be some form of |
| 263:25 | Harvard-speak.  Why would C and J be associated |
| 264:1 | FITZSIMMONS |
| 264:2 | with biological sciences and medical? |
| 264:3 | A. Simply because the coding used to use |
| 264:4 | alphabetic -- you know, use the alphabet to |
| 264:5 | indicate certain concentrations.  I'm not sure |

**JA3713**

Case 1:14-cv-14176-ADB    Document 597-1    Filed 10/27/18    Page 7 of 15

**Fitzsimmons W MERGED PA DC on 10-25 PLAYED on 10-26**

| | | | | |
|---|---|---|---|---|
| | 264:6 | those are the same letters that are used today, but | | |
| | 264:7 | certainly there are people around who would use | | |
| | 264:8 | that.  I think, B, I think, was humanities for | | |
| | 264:9 | example.  I may be wrong on that. | | |
| | 264:10 | Q. But that's an artifact, essentially, of | | |
| | 264:11 | the former database system? | | |
| | 264:12 | A. Yes, it probably is an artifact at this | | |
| | 264:13 | point. | | |

| **279:17 -279:19** | Fitzsimmons, William 2017-08-03 | 00:00:07 | 00:16:53 | V1.34 |
|---|---|---|---|---|
| | 279:17  Q. Before the subcommittee process begins, | | | |
| | 279:18    does each docket receive a target number? | | | |
| | 279:19  A. Yes. | | | |

| **279:21 -281:3** | Fitzsimmons, William 2017-08-03 | 00:02:14 | 00:16:46 | V1.35 |
|---|---|---|---|---|
| | 279:21  Q. And how is that target number calculated? | | | |
| | 279:22  A. It's the roughest of rough estimates based | | | |
| | 279:23    on the quality of the applicants the previous year | | | |
| | 279:24    from that area with the information about number of | | | |
| | 279:25    applicants, the number of people admitted from that | | | |
| | 280:1            FITZSIMMONS | | | |
| | 280:2    particular area, which would be a measure of the | | | |
| | 280:3    quality. | | | |
| | 280:4        And then you would have the information | | | |
| | 280:5    this year of any variations in the application | | | |
| | 280:6    numbers.  And then, depending on where you are in | | | |
| | 280:7    the process, you would have the admits so far, | | | |
| | 280:8    which would be, again, a rough measure of -- this | | | |
| | 280:9    is on, say, a one-pager as we had talked about | | | |
| | 280:10    before. | | | |
| | 280:11        So it's a very, very, very rough way to | | | |
| | 280:12    start, just to -- but because our recruiting is so | | | |
| | 280:13    comprehensive and because every year we are | | | |
| | 280:14    writing, as you know, and communicating with | | | |
| | 280:15    thousands and thousands of applicants in very much | | | |
| | 280:16    the same way from year to year, we will tend to | | | |
| | 280:17    have -- from one year to the next, you tend to have | | | |
| | 280:18    the roughly the same number and then roughly the | | | |
| | 280:19    same quality from an area. | | | |
| | 280:20        Although, and the reason I use the word | | | |
| | 280:21    rough, very rough to describe the targets is that | | | |
| | 280:22    until you actually read the applications, you -- | | | |
| | 280:23    and go through committee, you don't really know | | | |
| | 280:24    what the quality is this year. | | | |
| | 280:25        So the targets are just a starting point | | | |
| | 281:1            FITZSIMMONS | | | |
| | 281:2    that we all know may end up not at all representing | | | |

**JA3714**

Fitzsimmons W MERGED PA DC on 10-25 PLAYED on 10-26

|  |  |  |  |  |
|---|---|---|---|---|
|  | 281:3 | the quality this year versus last year. |  |  |
| **285:11 - 285:17** | Fitzsimmons, William 2017-08-03 | 00:00:15 | 00:14:32 | V1.36 |
|  | 285:11 | Q. So the targets that get generated through |  |  |
|  | 285:12 | this series of assumptions and calculations you |  |  |
|  | 285:13 | just described, those are distributed to each |  |  |
|  | 285:14 | docket chair? |  |  |
|  | 285:15 | A. Yes. |  |  |
|  | 285:16 | Q. And are those docket chairs, do they |  |  |
|  | 285:17 | consider those to be hard or soft targets? |  |  |
| **285:19 - 285:19** | Fitzsimmons, William 2017-08-03 | 00:00:02 | 00:14:17 | V1.37 |
|  | 285:19 | A. I would say generally hard. |  |  |
| **285:20 - 287:8** | Fitzsimmons, William 2017-08-03 | 00:02:39 | 00:14:15 | V1.38 |
|  | 285:20 | Q. They're expected to come to the full |  |  |
|  | 285:21 | committee meeting -- |  |  |
|  | 285:22 | A. Oh, I see what you're saying. I'm sorry. |  |  |
|  | 285:23 | When I said hard, I thought you meant difficult to |  |  |
|  | 285:24 | meet. Sorry. |  |  |
|  | 285:25 | We look -- the way I would look at them is |  |  |
|  | 286:1 | FITZSIMMONS |  |  |
|  | 286:2 | that they are -- we know that the targets are the |  |  |
|  | 286:3 | roughest of estimates, and so we tell our -- and we |  |  |
|  | 286:4 | know that every docket has far more attractive |  |  |
|  | 286:5 | students on the docket to admit than they have room |  |  |
|  | 286:6 | to admit, given the targets. |  |  |
|  | 286:7 | So we tell the dockets that here is the |  |  |
|  | 286:8 | target, this is a number, but we also would like to |  |  |
|  | 286:9 | know who are the strongest students who didn't make |  |  |
|  | 286:10 | it at this time; who are the weakest students who |  |  |
|  | 286:11 | did make it; who are the students who look |  |  |
|  | 286:12 | promising, but perhaps we need additional |  |  |
|  | 286:13 | information. |  |  |
|  | 286:14 | And, occasionally, we'll even say to them |  |  |
|  | 286:15 | in addition to that, we'll say to a subcommittee or |  |  |
|  | 286:16 | a docket that -- we'll say, look, we know we'll be |  |  |
|  | 286:17 | reviewing you in full committee. It'll be better |  |  |
|  | 286:18 | for everyone if we just give you some more spaces |  |  |
|  | 286:19 | now because we know -- I might, for example, read |  |  |
|  | 286:20 | some of these cases, and I know how strong, based |  |  |
|  | 286:21 | on my overview of the situation. |  |  |
|  | 286:22 | There are also dockets that will sometimes |  |  |
|  | 286:23 | come under target, so that they will keep lists of |  |  |
|  | 286:24 | the strongest ones in, the weakest ones out. They |  |  |
|  | 286:25 | may have people for whom they need additional |  |  |
|  | 287:1 | FITZSIMMONS |  |  |

**JA3715**

Case 1:14-cv-14176-ADB    Document 597-1    Filed 10/27/18    Page 9 of 15

**Fitzsimmons W MERGED PA DC on 10-25 PLAYED on 10-26**

| | 287:2 | information, so they would say at this time we will | | | |
| | 287:3 | prefer to come in under target, and we'll get the | | | |
| | 287:4 | late information and see where all this goes. | | | |
| | 287:5 | Q. In the full committee process, can some | | | |
| | 287:6 | spots shift between dockets, so one docket ends up | | | |
| | 287:7 | with more than what their initial target was and | | | |
| | 287:8 | one docket ends up with less? | | | |

| **287:10 - 287:11** | Fitzsimmons, William 2017-08-03 | 00:00:02 | 00:11:36 | V1.39 |
| | 287:10 | A. Yes. | | | |
| | 287:11 | Q. Does that happen a lot? | | | |

| **287:13 - 287:13** | Fitzsimmons, William 2017-08-03 | 00:00:01 | 00:11:34 | V1.40 |
| | 287:13 | A. Yes. | | | |

| **291:19 - 292:5** | Fitzsimmons, William 2017-08-03 | 00:00:26 | 00:11:33 | V1.41 |
| | 291:19 | MR. STRAWBRIDGE: Hand you a document | | | |
| Link > P177.1 | 291:20 | marked as Exhibit 5. | | | |
| | 291:21 | Q. Do you recognize this document? | | | |
| | 291:22 | A. Yes. | | | |
| Link > P177.1.1 | 291:23 | Q. Is this the copy of the target report that | | | |
| | 291:24 | would be prepared for the regular action cycle for | | | |
| | 291:25 | the class of 2018? | | | |
| | 292:1 | FITZSIMMONS | | | |
| | 292:2 | MS. ELLSWORTH: Why don't you look at the | | | |
| | 292:3 | whole document. | | | |
| | 292:4 | A. Can I look at the whole document first? | | | |
| | 292:5 | Q. If you need to. | | | |

| **292:6 - 292:12** | Fitzsimmons, William 2017-08-03 | 00:00:17 | 00:11:07 | V1.42 |
| | 292:6 | A. Yes. | | | |
| | 292:7 | Q. Yes, this is the target for the class of | | | |
| | 292:8 | 2018? | | | |
| | 292:9 | A. Yes. | | | |
| | 292:10 | Q. Okay. And is this typical of the reports | | | |
| | 292:11 | that you receive during the process of setting the | | | |
| | 292:12 | targets? | | | |

| **292:14 - 292:17** | Fitzsimmons, William 2017-08-03 | 00:00:07 | 00:10:50 | V1.43 |
| | 292:14 | A. It's certainly what we received this | | | |
| | 292:15 | particular year. | | | |
| | 292:16 | Q. I mean, does this look different than what | | | |
| | 292:17 | you're used to getting? | | | |

| **292:19 - 293:3** | Fitzsimmons, William 2017-08-03 | 00:00:25 | 00:10:43 | V1.44 |
| | 292:19 | A. It looks, you know, I don't have another | | | |
| | 292:20 | one to look at, but it looks, certainly, relatively | | | |
| | 292:21 | similar. | | | |
| | 292:22 | Q. On the page of this document that begins | | | |

**JA3716**

Fitzsimmons W MERGED PA DC on 10-25 PLAYED on 10-26

| | | | | |
|---|---|---|---|---|
| Link > P177.4 | 292:23 | in the lower right-hand corner with the suffix | | |
| Link > P177.4.1 | 292:24 | 4101, there is information broken up by ethnicity? | | |
| | 292:25 | A. Yes. | | |
| | 293:1 | FITZSIMMONS | | |
| | 293:2 | Q. So would you review this when the target | | |
| | 293:3 | information comes along? | | |

| | | | | |
|---|---|---|---|---|
| **293:5 - 294:6** | Fitzsimmons, William 2017-08-03 | 00:01:45 | 00:10:18 | V1.45 |

|  | |
|---|---|
| 293:5 | A. It would be something I would look at |
| 293:6 | along with all the other information, and -- but |
| 293:7 | this is the information that I referred to |
| 293:8 | previously.  This information that, you know, |
| 293:9 | historically has been prepared is, you know, is |
| 293:10 | interesting information, giving you variations, |
| 293:11 | you know, from one year to the next.  But, |
| 293:12 | realistically, what, you know, would really be |
| 293:13 | important is where you ended up with last year. |
| 293:14 | And as you can see, for example, with docket A, |
| 293:15 | you know, it's -- you know, that's the kind of |
| 293:16 | information that -- it essentially helps you to |
| 293:17 | understand in summary fashion what happened, |
| 293:18 | considering all the factors way beyond, you know, |
| 293:19 | the things on the -- on this set of documents, you |
| 293:20 | know, which would include ethnic information, |
| 293:21 | information about lineage, athletes, information |
| 293:22 | about economic background, you know, other |
| 293:23 | information, that all of that is in a sense |
| 293:24 | summarized by looking at where things ended up the |
| 293:25 | previous year. |
| 294:1 | FITZSIMMONS |
| 294:2 | Q. Those aren't the only factors that Harvard |
| 294:3 | considers in its admissions process? |
| 294:4 | A. All factors are considered. |
| 294:5 | Q. Right.  These are just the ones that are |
| 294:6 | put on this report? |

| | | | | |
|---|---|---|---|---|
| **294:8 - 294:8** | Fitzsimmons, William 2017-08-03 | 00:00:03 | 00:08:33 | V1.46 |
| | 294:8 | A. Yes, in this, yes. | | |

| | | | | |
|---|---|---|---|---|
| **296:11 - 296:12** | Fitzsimmons, William 2017-08-03 | 00:00:03 | 00:08:30 | V1.47 |
| | 296:11 | Q. Do you have conversations about the racial | | |
| | 296:12 | changes by docket? | | |

| | | | | |
|---|---|---|---|---|
| **296:14 - 296:16** | Fitzsimmons, William 2017-08-03 | 00:00:06 | 00:08:27 | V1.48 |
| | 296:14 | A. Occasionally.  On any of the variables, | | |
| | 296:15 | you know, there can be variations from year to | | |
| Link > Hide | 296:16 | year. | | |

| | | | | |
|---|---|---|---|---|
| **323:25 - 323:25** | Fitzsimmons, William 2017-08-03 | 00:00:03 | 00:08:21 | V1.49 |

**JA3717**

Fitzsimmons W MERGED PA DC on 10-25 PLAYED on 10-26

| | | | | |
|---|---|---|---|---|
| | 323:25 | Q. Do ethnicities yield at different rates? | | |
| **324:3 - 324:5** | Fitzsimmons, William 2017-08-03 | 00:00:04 | 00:08:18 | V1.50 |
| | 324:3 | A. Generally, yes. | | |
| | 324:4 | Q. Does Harvard track yield rate by | | |
| | 324:5 | ethnicity? | | |
| **324:7 - 324:9** | Fitzsimmons, William 2017-08-03 | 00:00:07 | 00:08:14 | V1.51 |
| | 324:7 | A. We're aware of it. | | |
| | 324:8 | Q. Does it actually keep tabs and make | | |
| | 324:9 | projections based on yield rate by ethnicity? | | |
| **324:11 - 324:13** | Fitzsimmons, William 2017-08-03 | 00:00:18 | 00:08:07 | V1.52 |
| | 324:11 | A. Be one of many factors that we would look | | |
| | 324:12 | at in trying to come in with a class that would | | |
| | 324:13 | meet the 1,662 ultimate goal. | | |
| **325:6 - 325:7** | Fitzsimmons, William 2017-08-03 | 00:00:03 | 00:07:49 | V1.53 |
| | 325:6 | Q. Is this information that's unusual | | (Edited) |
| | 325:7 | for you to receive at Harvard? | | |
| **325:9 - 325:10** | Fitzsimmons, William 2017-08-03 | 00:00:04 | 00:07:46 | V1.54 |
| | 325:9 | A. I have not seen it, I don't think, in this | | |
| | 325:10 | form. | | |
| **325:20 - 325:21** | Fitzsimmons, William 2017-08-03 | 00:00:03 | 00:07:42 | V1.55 |
| | 325:20 | Q. You don't know why this particular report | | |
| | 325:21 | was prepared? | | |
| **325:23 - 325:23** | Fitzsimmons, William 2017-08-03 | 00:00:01 | 00:07:39 | V1.56 |
| | 325:23 | A. No. | | |
| **326:14 - 327:15** | Fitzsimmons, William 2017-08-03 | 00:00:59 | 00:07:38 | V1.57 |
| Link > P324.1.1 | 326:14 | Q. The bottom sort of third of this chart, | | |
| | 326:15 | does that display yield rates by ethnicity for the | | |
| | 326:16 | classes of 2014 through 2017? | | |
| | 326:17 | MS. ELLSWORTH: Which page are you on? | | |
| | 326:18 | THE WITNESS: Page one? | | |
| | 326:19 | MR. STRAWBRIDGE: The first page. | | |
| | 326:20 | MS. ELLSWORTH: 1859? | | |
| | 326:21 | MR. LEE: Yes. | | |
| | 326:22 | MS. ELLSWORTH: Okay. | | |
| | 326:23 | Q. Do you see that? | | |
| | 326:24 | A. Yes. | | |
| | 326:25 | Q. All right. And so, for example, let's | | |
| | 327:1 | FITZSIMMONS | | |
| | 327:2 | just look at the most recent class on this chart, | | |
| Link > P324.1.2 | 327:3 | the class of 2017. That indicated that Asian | | |
| | 327:4 | Americans had an 83.8 percent yield that year? | | |
| | 327:5 | A. Yes. | | |

**JA3718**

**Fitzsimmons W MERGED PA DC on 10-25 PLAYED on 10-26**

| Link > P324.1.3 | 327:6 | Q. And the prior year it was 87.5 percent for |
| | 327:7 | Asian Americans? |
| | 327:8 | A. Yes. |
| Link > P324.1.4 | 327:9 | Q. And it was over 80 percent for both the |
| | 327:10 | classes of '14 and '15, was it not? |
| | 327:11 | A. Yes. |
| Link > P324.1.5 | 327:12 | Q. And African American yield in 2017 was 67 |
| | 327:13 | percent, correct? |
| | 327:14 | A. Yes. |
| | 327:15 | Q. 16 points lower? |

| **331:5 - 331:6** | Fitzsimmons, William 2017-08-03 | 00:00:03 | 00:06:39 | V1.58 |
| | 331:5 | Q. Well, isn't that what this is doing?  I |
| | 331:6 | mean, you track yield rate, correct? |

| **331:8 - 331:14** | Fitzsimmons, William 2017-08-03 | 00:00:14 | 00:06:36 | V1.59 |
| | 331:8 | A. Yes. |
| | 331:9 | Q. And you predict yield rate to set the |
| | 331:10 | targets at the beginning of the process? |
| | 331:11 | A. Yes. |
| | 331:12 | Q. And if -- the prediction is based on the |
| | 331:13 | prior year's statistics, right? |
| | 331:14 | A. Yes. |

| **331:15 - 331:22** | Fitzsimmons, William 2017-08-03 | 00:00:25 | 00:06:22 | V1.60 |
| Link > Hide | 331:15 | Q. And those predictions, in turn, those |
| | 331:16 | statistics reflect significant differences by |
| | 331:17 | ethnicity in yield rates, then does it stand to |
| | 331:18 | reason if the final 1,660 some-odd people selected |
| | 331:19 | by the full committee is significantly more Asian |
| | 331:20 | American than last year, you're going to have more |
| | 331:21 | people accept their offers of admission than you |
| | 331:22 | were planning? |

| **331:24 - 332:10** | Fitzsimmons, William 2017-08-03 | 00:00:54 | 00:05:57 | V1.61 |
| | 331:24 | A. It's possible.  But, again, one of the |
| | 331:25 | things we do in our recruiting process is look for |
| | 332:1 | FITZSIMMONS |
| | 332:2 | people from a wide range of backgrounds, including |
| | 332:3 | ethnicity, so that it's unlikely, if you continue |
| | 332:4 | to do the kind of strong recruitment that we have |
| | 332:5 | done, that you would end up in exactly the |
| | 332:6 | situation we've been in. |
| | 332:7 | Q. So your expectation based on the |
| | 332:8 | recruiting that you do is that you're going to end |
| | 332:9 | up with a pool and a final class that's similar to |
| | 332:10 | what you've had before? |

| **332:12 - 332:20** | Fitzsimmons, William 2017-08-03 | 00:00:45 | 00:05:03 | V1.62 |

**JA3719**

Fitzsimmons W MERGED PA DC on 10-25 PLAYED on 10-26

| | |
|---|---|
| 332:12 | A. Given the strength of the recruitment |
| 332:13 | efforts across the board which we have described in |
| 332:14 | various ways today and in the interrogative, we |
| 332:15 | would expect to get an extremely strong and diverse |
| 332:16 | applicant pool. And given the vital importance of |
| 332:17 | having a class that is diverse ethnically and in |
| 332:18 | every other way for the educational value of our |
| 332:19 | undergraduates, it is very unlikely that the |
| 332:20 | hypothetical that you raise would ever occur. |

| **336:16 - 336:16** | Fitzsimmons, William 2017-08-03     00:00:03     00:04:18 | V1.63 |
|---|---|---|
| 336:16 | Q. Why do you track yield rates by ethnicity? | |

| **336:18 - 337:7** | Fitzsimmons, William 2017-08-03     00:00:55     00:04:15 | V1.64 |
|---|---|---|
| 336:18 | A. It's simply important for us to understand | |
| 336:19 | not just what might happen if a class turns out to | |
| 336:20 | be a particular -- have a particular composition | |
| 336:21 | ethnically, but we would look at other factors, | |
| 336:22 | geography, for example, as well. | |
| 336:23 | So it wouldn't simply be the only factor. | |
| 336:24 | But we, again -- once the meetings, you know, are, | |
| 336:25 | you know, completed, we, you know, we want to make, | |
| 337:1 | FITZSIMMONS | |
| 337:2 | you know, as we go through the process, we want to | |
| 337:3 | be certain that we have given everybody a careful | |
| 337:4 | review and that in the end, based on what we can | |
| 337:5 | see, have a reasonable expectation that we would be | |
| 337:6 | close to our target number of residents once the | |
| 337:7 | yield is completed. | |

| **337:14 - 338:6** | Fitzsimmons, William 2017-08-03     00:01:07     00:03:20 | V1.65 |
|---|---|---|
| 337:14 | Q. As I understood your question is -- the | |
| 337:15 | question was why do you track ethnicity yield rates | |
| 337:16 | by ethnicity. And I understood your answer to be | |
| 337:17 | that as you go through the process and you give | |
| 337:18 | everyone consideration, you want to make sure at | |
| 337:19 | the end you have an idea as to how many people are | |
| 337:20 | going to come. | |
| 337:21 | A. So if -- I think the -- certainly, we are | |
| 337:22 | under an obligation to make certain that we're at | |
| 337:23 | or close to our resident target. But, you know -- | |
| 337:24 | and if at the end of the process one of the things | |
| 337:25 | that you would -- if you found yourself, for | |
| 338:1 | FITZSIMMONS | |
| 338:2 | example, as an example, people from the South tend | |
| 338:3 | to yield at a lower rate. If you had more people | |
| 338:4 | from the South, you could then say you might feel | |

**JA3720**

**Fitzsimmons W MERGED PA DC on 10-25 PLAYED on 10-26**

| | | | | |
|---|---|---|---|---|
| | 338:5 | free to admit more people right at the end of the | | |
| | 338:6 | process, if that answers the question. | | |

| **451:23 - 452:5** | Fitzsimmons, William 2017-08-03 | 00:00:17 | 00:02:13 | V1.66 |
|---|---|---|---|---|
| | 451:23 | Q. Do you know what ABAFAOILSS is? | | |
| | 451:24 | A. Yes. | | |
| | 451:25 | Q. Does Harvard send a representative to | | |
| | 452:1 | FITZSIMMONS | | |
| | 452:2 | ABAFAOILSS meetings? | | |
| | 452:3 | A. Usually. | | |
| | 452:4 | Q. And does that representative participate | | |
| | 452:5 | in the round-robin exchange at those meetings? | | |

| **452:7 - 452:16** | Fitzsimmons, William 2017-08-03 | 00:00:32 | 00:01:56 | V1.67 |
|---|---|---|---|---|
| | 452:7 | A. I'm not sure specifically whether every | | |
| | 452:8 | year our representative has participated in the | | |
| | 452:9 | round-robin. | | |
| | 452:10 | Q. In the past has data from the round-robin | | |
| | 452:11 | been given to you following the ABAFAOILSS | | |
| | 452:12 | meetings? | | |
| | 452:13 | A. I can recall some years getting some data. | | |
| | 452:14 | Q. What did you do with that data? | | |
| | 452:15 | A. Simply noted it. | | |
| | 452:16 | Q. And why did you note it? | | |

| **452:18 - 452:23** | Fitzsimmons, William 2017-08-03 | 00:00:26 | 00:01:24 | V1.68 |
|---|---|---|---|---|
| | 452:18 | A. As information that it would be useful in | | |
| | 452:19 | getting to know what happens beyond Harvard and our | | |
| | 452:20 | profession. | | |
| | 452:21 | Q. Is it useful for you to understand the | | |
| | 452:22 | context of what other Ivy League schools are doing | | |
| | 452:23 | with respect to their admissions? | | |

| **452:25 - 453:4** | Fitzsimmons, William 2017-08-03 | 00:00:09 | 00:00:58 | V1.69 |
|---|---|---|---|---|
| | 452:25 | A. It could be useful. | | |
| | 453:1 | FITZSIMMONS | | |
| | 453:2 | Q. Does that include it's useful to have | | |
| | 453:3 | information about the ethnic composition of their | | |
| | 453:4 | admitted classes? | | |

| **453:6 - 453:8** | Fitzsimmons, William 2017-08-03 | 00:00:06 | 00:00:49 | V1.70 |
|---|---|---|---|---|
| | 453:6 | A. It could be useful. | | |
| | 453:7 | Q. And to what use do you recall putting that | | |
| | 453:8 | data from ABAFAOILSS? | | |

| **453:10 - 453:12** | Fitzsimmons, William 2017-08-03 | 00:00:15 | 00:00:43 | V1.71 |
|---|---|---|---|---|
| | 453:10 | A. Simply to have this information. And, of | | |
| | 453:11 | course, this information would almost always be | | |
| | 453:12 | publicly available. | | |

**JA3721**

**Fitzsimmons W MERGED PA DC on 10-25 PLAYED on 10-26**

| **453:13** - **453:15** | Fitzsimmons, William 2017-08-03 | 00:00:11 | 00:00:28 | **V1.72** |
|---|---|---|---|---|
| 453:13 | Q. Does the ABAFAOILSS information include | | | |
| 453:14 | information about the applications that were filed | | | |
| 453:15 | by various ethnic applicants? | | | |

| **453:17** - **453:21** | Fitzsimmons, William 2017-08-03 | 00:00:19 | 00:00:19 | **V1.73** |
|---|---|---|---|---|
| 453:17 | A. I don't recall specifically whether | | | |
| 453:18 | institutions would provide that data per se. | | | |
| 453:19 | Q. Do you know whether admission rate | | | |
| 453:20 | information is provided? | | | |
| 453:21 | A. I do not. | | | |

|  | Play Time for this Script: | **00:27:39** |
|---|---|---|

|  | Total time for all Scripts in this report: | **00:27:39** |
|---|---|---|

**JA3722**

**CERTIFICATE OF SERVICE**

I mailed copies of this appendix to the Court and to the following counsel:

William F. Lee
Felicia H. Ellsworth
Andrew S. Dulberg
Elizabeth Connell Mooney
Joseph H. Mueller
WILMER CUTLER PICKERING
HALE AND DORR LLP
60 State Street
Boston, MA 02109
Tel: (617) 526-6687
Fax: (617) 526-5000
william.lee@wilmerhale.com
felicia.ellsworth@wilmerhale.com
andrew.dulberg@wilmerhale.com
elizabeth.mooney@wilmerhale.com
sarah.frazier@wilmerhale.com
joseph.mueller@wilmerhale.com


Dated: February 18, 2020                  *s/ William S. Consovoy*