No. 19-2005

## UNITED STATES COURT OF APPEALS
## FOR THE FIRST CIRCUIT

STUDENTS FOR FAIR ADMISSIONS, INC.,
*Plaintiff-Appellant,*

v.

PRESIDENT AND FELLOWS OF HARVARD COLLEGE,
*Defendant-Appellee.*

On Appeal from the United States District Court
for the District of Massachusetts

## JOINT APPENDIX
## VOLUME I

Adam K. Mortara
J. Scott McBride
Krista J. Perry
BARTLIT BECK LLP
54 W. Hubbard St., Ste. 300
Chicago, IL 60654
(312) 494-4469

John M. Hughes
Katherine L.I. Hacker
Meg E. Fasulo
BARTLIT BECK LLP
1801 Wewatta St., Ste. 1200
Denver, CO 80202
(303) 592-3140

William S. Consovoy
Thomas R. McCarthy
J. Michael Connolly
Cameron T. Norris
CONSOVOY MCCARTHY PLLC
1600 Wilson Blvd., Ste. 700
Arlington, VA 22209
(703) 243-9423
will@consovoymccarthy.com

Patrick Strawbridge
CONSOVOY MCCARTHY PLLC
10 Post Office Sq., 8th Fl., PMB #706
Boston, MA 02109
(617) 227-0548

*Counsel for Appellant Students for Fair Admissions, Inc.*

# TABLE OF CONTENTS

**Volume I**

Docket Sheet ........................................................................................................JA1

Notice of Appeal (Doc. 674) .......................................................................JA106

Complaint (Doc. 1) ......................................................................................JA108

Dispositive Motion Exhibits

    Motion to Dismiss for Lack of Subject-Matter Jurisdiction

        Declaration of William S. Consovoy

            Exhibit I (Doc. 205-9).......................................................................JA228

    Cross-Motions for Summary Judgment

        Declaration of Felicia H. Ellsworth

            Exhibit 2 (Doc. 419-2) ......................................................................JA230

            Exhibit 85 (Doc. 419-85)...................................................................JA244

            Exhibit 86 (Doc. 419-86)...................................................................JA251

            Exhibit 87 (excerpts) (Doc. 419-87) .................................................JA254

            Exhibit 88 (excerpts) (Doc. 419-89) .................................................JA285

            Exhibit 89 (Doc. 419-89)...................................................................JA330

            Exhibit 91 (Doc. 419-91)...................................................................JA347

            Exhibit 92 (Doc. 419-92)...................................................................JA370

        Declaration of Michael Connolly

            Exhibit 237 (Doc. 421-237)...............................................................JA399

            Exhibit 238 (Doc. 421-238)...............................................................JA418

            Exhibit 239 (Doc. 421-239)...............................................................JA425

            Exhibit 240 (Doc. 421-240)...............................................................JA427

            Exhibit 241 (Doc. 421-241)...............................................................JA431

            Exhibit 242 (Doc. 421-242)...............................................................JA434

            Exhibit 250 (Doc. 421-250)...............................................................JA436

            Exhibit 251 (Doc. 421-251)...............................................................JA440

Trial Transcripts

    Day 1 (Doc. 631) ...................................................................................JA443

    Day 2 (Doc. 632) ...................................................................................JA630

## Volume II

Trial Transcripts (cont.)

    Day 3 (Doc. 633) ...................................................................................JA722

    Day 4 (Doc. 635) ...................................................................................JA952

    Day 5 (Doc. 636) .................................................................................JA1198

## Volume III

Trial Transcripts (cont.)

    Day 6 (Doc. 638) .................................................................................JA1459

    Day 7 (Doc. 640) .................................................................................JA1690

    Day 8 (Doc. 642) .................................................................................JA1918

## Volume IV

Trial Transcripts (cont.)

    Day 9 (Doc. 644) .................................................................................JA2163

    Day 10 (Doc. 646) ...............................................................................JA2413

    Day 11 (Doc. 648) ...............................................................................JA2535

    Day 12 (Doc. 650) ...............................................................................JA2752

## Volume V

Trial Transcripts (cont.)

    Day 13 (Doc. 652) ...................................................................................JA2937

    Day 14 (Doc. 654) ...................................................................................JA3143

    Day 15 (Doc. 656) ...................................................................................JA3404

    Closing Arguments (Doc. 666)...............................................................JA3559

Trial Exhibits

    Plaintiff's Trial Exhibits

        Request for Judicial Notice (excerpts) (Doc. 577).......................................JA3688

        Notice of Deposition Designations Played in Court (Doc. 597-1).............JA3708

## Volume VI

    Plaintiff's Trial Exhibits (cont.)

    PX1   .........................................................................................JA3723

    PX2   .........................................................................................JA3741

    PX9   .........................................................................................JA3742

    PX12   .........................................................................................JA3759

    PX13   .........................................................................................JA3802

    PX14   .........................................................................................JA3845

    PX15   .........................................................................................JA3848

    PX16   .........................................................................................JA3940

    PX17   .........................................................................................JA3941

    PX19   .........................................................................................JA3943

    PX21   .........................................................................................JA3944

    PX23   .........................................................................................JA3948

    PX24   .........................................................................................JA3951

    PX26   .........................................................................................JA3954

    PX28   .........................................................................................JA3963

PX29 ..................................................................................................JA3971

PX35 ..................................................................................................JA3972

PX36 ..................................................................................................JA3979

PX41 (excerpts) ................................................................................JA3980

PX50 ..................................................................................................JA4002

PX57 ..................................................................................................JA4008

PX68 ..................................................................................................JA4011

PX71 ..................................................................................................JA4012

PX72 ..................................................................................................JA4028

PX75 ..................................................................................................JA4075

PX81 ..................................................................................................JA4079

PX88 (excerpts) ................................................................................JA4080

PX95 ..................................................................................................JA4084

PX96 ..................................................................................................JA4090

PX99 ..................................................................................................JA4097

PX106 ................................................................................................JA4109

PX111 ................................................................................................JA4110

PX147 ................................................................................................JA4112

PX148 ................................................................................................JA4113

PX149 ................................................................................................JA4115

PX150 ................................................................................................JA4116

PX152 ................................................................................................JA4124

PX153 ................................................................................................JA4128

PX154 ................................................................................................JA4130

PX155 ................................................................................................JA4131

PX156 ................................................................................................JA4132

PX157 ................................................................................................JA4133

PX163 ................................................................................................JA4134

PX164................................................................................JA4138

PX165................................................................................JA4142

PX167................................................................................JA4145

PX177................................................................................JA4147

PX182................................................................................JA4154

PX200................................................................................JA4156

PX218................................................................................JA4158

PX225................................................................................JA4196

PX227................................................................................JA4199

PX230................................................................................JA4200

PX236................................................................................JA4201

PX238................................................................................JA4203

PX265................................................................................JA4206

PX279................................................................................JA4209

PX287................................................................................JA4212

PX288 (excerpts) ................................................................JA4214

PX299................................................................................JA4382

PX300................................................................................JA4389

PX302................................................................................JA4390

PX312................................................................................JA4412

PX316................................................................................JA4413

PX319................................................................................JA4432

PX324................................................................................JA4449

## Volume VII

Plaintiff's Trial Exhibits (cont.)

PX340 ................................................................................................JA4451

PX461 ................................................................................................JA4454

PX465 ................................................................................................JA4460

PX467 ................................................................................................JA4461

PX509 ................................................................................................JA4464

PX555 ................................................................................................JA4475

PX604 ................................................................................................JA4521

PX618 ................................................................................................JA4523

PX619 ................................................................................................JA4524

PX620 ................................................................................................JA4525

PX621 ................................................................................................JA4527

PX622 ................................................................................................JA4528

PX623 ................................................................................................JA4530

PX624 ................................................................................................JA4531

PX625 ................................................................................................JA4532

PX626 ................................................................................................JA4533

PX628 ................................................................................................JA4534

PX629 ................................................................................................JA4535

PX630 ................................................................................................JA4536

PX631 ................................................................................................JA4537

PX633 ................................................................................................JA4538

PX634 ................................................................................................JA4558

PX656 ................................................................................................JA4559

PX657 ................................................................................................JA4561

PX659 ................................................................................................JA4562

PX696 ................................................................................................JA4563

PX705 ................................................................................. JA4564

PX720 ................................................................................. JA4565

PX721 ................................................................................. JA4566

PX722 ................................................................................. JA4585

PX723 ................................................................................. JA4586

PX741 ................................................................................. JA4606

PX749 ................................................................................. JA4607

PX755 ................................................................................. JA4625

PX767 ................................................................................. JA4627

Defendant's Trial Exhibits

DX2   ................................................................................. JA4628

DX3 (excerpts) ................................................................. JA4738

DX4   ................................................................................. JA4888

DX5   ................................................................................. JA4889

DX12 ................................................................................. JA4936

DX13 ................................................................................. JA4939

DX19 ................................................................................. JA4978

DX24 ................................................................................. JA5031

DX25 ................................................................................. JA5044

DX26 ................................................................................. JA5205

**Volume VIII**

Defendant's Trial Exhibits (cont.)

DX27 ...................................................................................................JA5244

DX36 ...................................................................................................JA5272

DX39 ...................................................................................................JA5346

DX40 ...................................................................................................JA5376

DX41 ...................................................................................................JA5462

DX42 ...................................................................................................JA5463

DX44 ...................................................................................................JA5479

DX47 ...................................................................................................JA5484

DX53 ...................................................................................................JA5508

DX55 ...................................................................................................JA5546

DX56 ...................................................................................................JA5596

DX60 ...................................................................................................JA5597

DX76 ...................................................................................................JA5598

DX79 ...................................................................................................JA5599

DX80 ...................................................................................................JA5600

DX81 ...................................................................................................JA5601

DX82 ...................................................................................................JA5602

DX83 ...................................................................................................JA5603

DX84 ...................................................................................................JA5611

DX100 ..................................................................................................JA5612

DX103 ..................................................................................................JA5615

DX106 ..................................................................................................JA5617

DX109 ..................................................................................................JA5620

DX119 ..................................................................................................JA5623

DX133 ..................................................................................................JA5633

DX139 ..................................................................................................JA5647

DX669 ...................................................................................................JA5684

DX670 ...................................................................................................JA5685

DX671 ...................................................................................................JA5686

DX672 ...................................................................................................JA5689

DX673 ...................................................................................................JA5690

DX674 ...................................................................................................JA5691

DX677 ...................................................................................................JA5692

DX678 ...................................................................................................JA5693

DX679 ...................................................................................................JA5694

DX680 ...................................................................................................JA5696

DX681 ...................................................................................................JA5697

DX683 ...................................................................................................JA5699

DX685 ...................................................................................................JA5701

DX686 ...................................................................................................JA5702

DX688 ...................................................................................................JA5706

DX692 ...................................................................................................JA5711

DX694 ...................................................................................................JA5720

DX695 ...................................................................................................JA5721

DX699 ...................................................................................................JA5722

DX702 ...................................................................................................JA5723

DX703 ...................................................................................................JA5725

DX704 ...................................................................................................JA5726

DX705 ...................................................................................................JA5728

DX706 ...................................................................................................JA5731

DX707 ...................................................................................................JA5732

DX708 ...................................................................................................JA5733

DX709 ...................................................................................................JA5734

DX711 ...................................................................................................JA5735

DX713 .................................................................................JA5743

DX715 .................................................................................JA5745

DX716 .................................................................................JA5746

DX718 .................................................................................JA5747

DX720 .................................................................................JA5748

DX721 .................................................................................JA5749

DX722 .................................................................................JA5754

DX723 .................................................................................JA5759

DX724 .................................................................................JA5764

DX725 .................................................................................JA5765

DX726 .................................................................................JA5767

DX727 .................................................................................JA5772

DX728 .................................................................................JA5776

DX729 .................................................................................JA5779

DX730 .................................................................................JA5791

DX740 .................................................................................JA5793

DX742 .................................................................................JA5875

DX743 .................................................................................JA5892

DX744 .................................................................................JA5908

DX746 .................................................................................JA5926

## Volume IX

Amici's Exhibits

AO4    .................................................................................JA5927

AO6    .................................................................................JA5978

AO17   .................................................................................JA5979

AO28   .................................................................................JA5980

AO31   .................................................................................JA5981

Trial Demonstratives

Plaintiff's Demonstratives

PD20 ...................................................................................JA5982

PD25 ...................................................................................JA5983

PD27 ...................................................................................JA5984

PD29 ...................................................................................JA5985

PD31 ...................................................................................JA5986

PD32 ...................................................................................JA5987

PD33 ...................................................................................JA5988

PD38 (excerpts) ................................................................JA5989

Defendant's Demonstratives

DD1 (excerpts) ..................................................................JA6030

DD10 (excerpts) ................................................................JA6032

DD10A ...............................................................................JA6156

DD10B ...............................................................................JA6157

DD12 ..................................................................................JA6158

APPEAL

# United States District Court
## District of Massachusetts (Boston)
## CIVIL DOCKET FOR CASE #: 1:14–cv–14176–ADB

Students for Fair Admissions, Inc. v. President and Fellows of
Harvard College et al
Assigned to: Judge Allison D. Burroughs
Case in other court:   USCA – First Circuit, 15–01823
                       USCA – First Circuit, 19–02005
Cause: 28:1331 Federal Question: Other Civil Rights

Date Filed: 11/17/2014
Date Terminated: 09/30/2019
Jury Demand: Plaintiff
Nature of Suit: 440 Civil Rights: Other
Jurisdiction: Federal Question

**Plaintiff**

**Students for Fair Admissions, Inc.**                     represented by   **Adam K Mortara**
Barlit Beck LLP
54 West Hubbard Street, Suite 300
Chicago, IL 60654
312–494–4400
Fax: 312–494–4440
Email: adam.mortara@bartlit–beck.com
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**J Scott McBride**
Bartlit Beck LLP
54 W Hubbard Street
Third Floor
Chicago, IL 60654
312–494–4400
Email: scott.mcbride@bartlit–beck.com
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**John Michael Connolly**
Consovoy McCarthy Park PLLC
3033 Wilson Boulevard
Suite 700
Arlington, VA 22201
(703) 243–9423
Email: mike@consovoymccarthy.com
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**John M Hughes**
Bartlit Beck LLP
1801 Wewatta Street
Suite 1200
Denver, CO 80202
303–592–3100
Fax: 303–592–3140
Email: john.hughes@bartlit–beck.com
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Katherine L.I. Hacker**
Bartlit Beck LLP
1801 Wewatta Street
Suite 1200
Denver, CO 80202

**JA1**

(303) 592–3100
Email: kat.hacker@bartlit−beck.com
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Krista J. Perry**
Bartlit Beck LLP
54 West Hubbard Street, Suite 300
Chicago, IL 60654
312.494.4400
Fax: 312.494.4440
Email: krista.perry@bartlit−beck.com
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Meg E. Fasulo**
Bartlit Beck LLP
1801 Wewatta Street, Suite 1200
Denver, CO 80202
303−592−3100
Fax: 303−592−3140
Email: meg.fasulo@bartlit−beck.com
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Michael H. Park**
Consovoy McCarthy Park PLLC
3 Columbus Circle, 15th Floor
New York, NY 10024
(646) 456–4432
*TERMINATED: 05/16/2019*
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Paul M Sanford**
Burns & Levinson LLP
One Citizens Plaza
Suite 1100
Providence, RI 02903
401−831−8330
Fax: 401−831−8359
Email: psanford@burnslev.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Thomas R. McCarthy**
Consovoy McCarthy PLLC
3033 Wilson Boulevard
Suite 700
Arlington, VA 22201
703−243−9423
Email: tom@consovoymccarthy.com
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**William S. Consovoy**
Consovoy McCarthy PLLC
1600 Wilson Boulevard
Suite 700
Arlington, VA 22209

**JA2**

703–243–4923
Email: will@consovoymccarthy.com
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Benjamin C. Caldwell**
Burns & Levinson LLP
One Citizens Plaza
Suite 1100
Providence, RI 02903
401–831–8330
Email: bcaldwell@burnslev.com
*TERMINATED: 04/10/2018*
*ATTORNEY TO BE NOTICED*

**Patrick Strawbridge**
Consovoy McCarthy PLLC
8th Floor, South, PMB #706
Ten Post Office Square
Boston, MA 002109
617–227–0548
Email: patrick@consovoymccarthy.com
*ATTORNEY TO BE NOTICED*

V.

**Defendant**

**President and Fellows of Harvard College**                    represented by    **Brittany Amadi**
Wilmer Cutler Pickering Hale and Dorr LLP
1875 Pennsylvania Ave. NW
Washington, DC 20006
202–663–6022
Fax: 202–663–6363
Email: brittany.amadi@wilmerhale.com
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Daniel Winik**
Wilmer Cutler Pickering Hale and Dorr LLP
1875 Pennsylvania Avenue NW
Washington, DC 20006
202–663–6922
Fax: 202–663–6363
Email: daniel.winik@wilmerhale.com
*TERMINATED: 07/02/2019*
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Danielle Conley**
Wilmer Cutler Pickering Hale and Dorr LLP
1875 Pennsylvania Ave. NW
Washington, DC 20006
202–663–6006
Fax: 202–663–6363
Email: danielle.conley@wilmerhale.com
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**JA3**

**Debo P. Adegbile**
Wilmer Cutler Pickering Hale and Dorr
LLP
7 World Trade Center
250 Greenwich St.
New York, NY 10007
212–295–6717
Email: Debo.Adegbile@wilmerhale.com
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Paul R.Q. Wolfson**
Wilmer, Cutler, Pickering, Hale and Dorr
LLP
1875 Pennsylvania Avenue, NW
Washington, DC 20006
202–663–6000
Fax: 202–663–6363
Email: paul.wolfson@wilmerhale.com
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Seth P. Waxman**
Wilmer Cutler Pickering Hale and Dorr
LLP
1875 Pennsylvania Avenue, NW
Washington, DC 20006
202–663–6800
Email: seth.waxman@wilmerhale.com
*(Inactive)*
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**William F. Lee**
Wilmer Cutler Pickering Hale and Dorr
LLP (Bos)
60 State Street
Boston, MA 02109
617–526–6556
Fax: 617–526–5000
Email: william.lee@wilmerhale.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Andrew S. Dulberg**
Wilmer Cutler Pickering Hale and Dorr
LLP (Bos)
60 State Street
Boston, MA 02109
617–526–6352
Fax: 617–526–5000
Email: andrew.dulberg@wilmerhale.com
*ATTORNEY TO BE NOTICED*

**Ara B. Gershengorn**
Harvard Office of the General Counsel
Smith Campus Center, Suite 980
1350 Massachusetts Avenue
Cambridge, MA 02138
617–495–8210
Fax: 617–495–5079

**JA4**

Email: ara_gershengorn@harvard.edu
*ATTORNEY TO BE NOTICED*

**Elizabeth C. Mooney**
Drummond Woodsum
Suite 600
84 Marginal Way
Portland, ME 04101
207–772–1941
Email: EMooney@dwmlaw.com
*ATTORNEY TO BE NOTICED*

**Felicia H. Ellsworth**
Wilmer Cutler Pickering Hale and Dorr
LLP (Bos)
60 State Street
Boston, MA 02109
617–526–6000
Fax: 617–526–5000
Email: felicia.ellsworth@wilmerhale.com
*ATTORNEY TO BE NOTICED*

**Joseph J. Mueller**
Wilmer Hale LLP
60 State Street
Boston, MA 02109
617–526–6396
Fax: 617–526–5000
Email: joseph.mueller@wilmerhale.com
*ATTORNEY TO BE NOTICED*

**Sarah R. Frazier**
Wilmer Cutler Pickering Hale and Dorr
LLP (Bos)
60 State Street
Boston, MA 02109
617–526–6022
Email: sarah.frazier@wilmerhale.com
*ATTORNEY TO BE NOTICED*

**Defendant**

**The Honorable and Reverend The
Board of Overseers**
*TERMINATED: 01/12/2015*

**Intervenor Defendant**

**Sarah Cole**                    represented by   **Brenda Shum**
Lawyers Committee For Civil Rights
Under Law
1500 K Street NW, Suite 9
Washington, DC 20005
202–662–8332
Email: bshum@lawyerscommittee.org
*TERMINATED: 05/17/2019*
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Christopher Lapinig**
Asian Americans Advancing Justice
1145 Wilshire Boulevard
Los Angeles, CA 90017
213–977–7500
Email: clapinig@advancingjustice–la.org

**JA5**

*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Emma Katherine Dinan**
Arnold & Porter Kaye Scholer LLP
601 Massachusettes Avenue, NW
Washington, DC 20005
202–942–5485
Email: Emma.Dinan@arnoldporter.com
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Genevieve Bonadies Torres**
Lawyers Committee for Civil Rights Under
Law
1401 New York Ave., NW, Suite 400
Washington, DC 20005
202–662–8326
Email: gbonadies@lawyerscommittee.org
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Laboni Hoq**
Asian Americans Advancing Justice
1145 Wilshire Boulevard
Los Angeles, CA 90017
213–241–0257
Email: labonihoq@hotmail.com
*TERMINATED: 12/09/2019*
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Lawrence Culleen**
Arnold & Porter LLP
555 Twelfth Street, NW
Washington, DC 20004
202–942–5477
Email: gina.dean@aporter.com
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Nancy L. Perkins**
Arnold & Porter LLP
555 Twelfth Street, NW
Washington, DC 20004
202–942–5065
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Nicole K. Ochi**
Asian Americans Advancing Justice
Impacts Litigation Unit
1145 Wilshire Boulevards
Los Angeles, CA 90017
213–241–0211
Email: nochi@advancingjustice–la.org
*TERMINATED: 06/05/2019*
*LEAD ATTORNEY*
*PRO HAC VICE*

**JA6**

*ATTORNEY TO BE NOTICED*

**Rahsaan D. Hall**
Lawyers' Committee for Civil Rights
Under Law
294 Washington Street
Suite 443
Boston, MA 02108
617–988–0608
Fax: 617–482–4392
Email: rhall@aclum.org
*LEAD ATTORNEY*

**Steven L. Mayer**
Arnold & Porter LLP
Three Embarcadero Center
10th Floor
San Francisco, CA 94111–4024
415–471–3163
Email: steven.mayer@aporter.com
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Matthew M. Cregor**
Lawyers' Committee for Civil Rights
Under Law
294 Washington Street
Suite 443
Boston, MA 02108
617–988–0609
Email: mcregor@lawyerscom.org
*ATTORNEY TO BE NOTICED*

**Oren M. Sellstrom**
Lawyers' Committee for Civil Rights and
Economic Justic
Fifth Floor
61 Batterymarch Street
Boston, MA 02110
617–988–0608
Email: osellstrom@lawyerscom.org
*ATTORNEY TO BE NOTICED*

**Priya A. Lane**
Lawyers' Committee for Civil Rights
Under Law
294 Washington Street, Suite 443
Boston, MA 02108
617–988–0610
Email: plane@lawyerscom.org
*ATTORNEY TO BE NOTICED*

**Intervenor Defendant**

**Fadhal Moore**                    represented by    **Brenda Shum**
(See above for address)
*TERMINATED: 05/17/2019*
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Christopher Lapinig**
(See above for address)
*LEAD ATTORNEY*

**JA7**

*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Emma Katherine Dinan**
(See above for address)
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Genevieve Bonadies Torres**
(See above for address)
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Jon M. Greenbaum**
Lawyers' Committee for Civil Rights
Under Law
1401 New York Avenue, NW
Suite 400
Washington, DC 20005
(202) 662–8315
Email: jgreenbaum@lawyerscommittee.org
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Laboni Hoq**
(See above for address)
*TERMINATED: 12/09/2019*
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Lawrence Culleen**
(See above for address)
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Nancy L. Perkins**
(See above for address)
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Rahsaan D. Hall**
(See above for address)
*LEAD ATTORNEY*

**Steven L. Mayer**
(See above for address)
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Matthew M. Cregor**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Oren M. Sellstrom**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Priya A. Lane**

**JA8**

(See above for address)
*ATTORNEY TO BE NOTICED*

**Intervenor Defendant**

**Arjini Kumari Nawal**                    represented by    **Brenda Shum**
(See above for address)
*TERMINATED: 05/17/2019*
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Christopher Lapinig**
(See above for address)
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Emma Katherine Dinan**
(See above for address)
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Genevieve Bonadies Torres**
(See above for address)
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Jon M. Greenbaum**
(See above for address)
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Laboni Hoq**
(See above for address)
*TERMINATED: 12/09/2019*
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Lawrence Culleen**
(See above for address)
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Nancy L. Perkins**
(See above for address)
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Rahsaan D. Hall**
(See above for address)
*LEAD ATTORNEY*

**Steven L. Mayer**
(See above for address)
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**JA9**

**Matthew M. Cregor**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Oren M. Sellstrom**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Priya A. Lane**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Intervenor Defendant**

**Itzel Vasquez–Rodriguez**                    represented by   **Brenda Shum**
(See above for address)
*TERMINATED: 05/17/2019*
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Christopher Lapinig**
(See above for address)
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Emma Katherine Dinan**
(See above for address)
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Genevieve Bonadies Torres**
(See above for address)
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Jon M. Greenbaum**
(See above for address)
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Laboni Hoq**
(See above for address)
*TERMINATED: 12/09/2019*
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Lawrence Culleen**
(See above for address)
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Nancy L. Perkins**
(See above for address)
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Rahsaan D. Hall**

**JA10**

(See above for address)
*LEAD ATTORNEY*

**Steven L. Mayer**
(See above for address)
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Matthew M. Cregor**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Oren M. Sellstrom**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Priya A. Lane**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Intervenor Defendant**

**Keyanna Wigglesworth**                 represented by  **Brenda Shum**
(See above for address)
*TERMINATED: 05/17/2019*
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Christopher Lapinig**
(See above for address)
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Emma Katherine Dinan**
(See above for address)
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Genevieve Bonadies Torres**
(See above for address)
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Jon M. Greenbaum**
(See above for address)
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Laboni Hoq**
(See above for address)
*TERMINATED: 12/09/2019*
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Lawrence Culleen**
(See above for address)
*LEAD ATTORNEY*
*PRO HAC VICE*

**JA11**

*ATTORNEY TO BE NOTICED*

**Nancy L. Perkins**
(See above for address)
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Rahsaan D. Hall**
(See above for address)
*LEAD ATTORNEY*

**Steven L. Mayer**
(See above for address)
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Matthew M. Cregor**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Oren M. Sellstrom**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Priya A. Lane**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Intervenor Defendant**

**M. B.**                                    represented by   **Brenda Shum**
(See above for address)
*TERMINATED: 05/17/2019*
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Christopher Lapinig**
(See above for address)
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Emma Katherine Dinan**
(See above for address)
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Genevieve Bonadies Torres**
(See above for address)
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Jon M. Greenbaum**
(See above for address)
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Laboni Hoq**
(See above for address)

**JA12**

*TERMINATED: 12/09/2019*
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Lawrence Culleen**
(See above for address)
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Nancy L. Perkins**
(See above for address)
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Nicole K. Ochi**
(See above for address)
*TERMINATED: 06/05/2019*
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Rahsaan D. Hall**
(See above for address)
*LEAD ATTORNEY*

**Steven L. Mayer**
(See above for address)
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Matthew M. Cregor**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Oren M. Sellstrom**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Priya A. Lane**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Intervenor Defendant**

**K. C.**                                    represented by  **Brenda Shum**
(See above for address)
*TERMINATED: 05/17/2019*
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Christopher Lapinig**
(See above for address)
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Emma Katherine Dinan**
(See above for address)
*LEAD ATTORNEY*
*PRO HAC VICE*

**JA13**

*ATTORNEY TO BE NOTICED*

**Genevieve Bonadies Torres**
(See above for address)
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Jon M. Greenbaum**
(See above for address)
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Laboni Hoq**
(See above for address)
*TERMINATED: 12/09/2019*
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Lawrence Culleen**
(See above for address)
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Nancy L. Perkins**
(See above for address)
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Nicole K. Ochi**
(See above for address)
*TERMINATED: 06/05/2019*
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Rahsaan D. Hall**
(See above for address)
*LEAD ATTORNEY*

**Steven L. Mayer**
(See above for address)
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Matthew M. Cregor**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Oren M. Sellstrom**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Priya A. Lane**
(See above for address)
*ATTORNEY TO BE NOTICED*

**<u>Intervenor Defendant</u>**

**Y. D.**                                    represented by

# JA14

**Brenda Shum**
(See above for address)
*TERMINATED: 05/17/2019*
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Christopher Lapinig**
(See above for address)
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Emma Katherine Dinan**
(See above for address)
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Genevieve Bonadies Torres**
(See above for address)
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Jon M. Greenbaum**
(See above for address)
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Laboni Hoq**
(See above for address)
*TERMINATED: 12/09/2019*
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Lawrence Culleen**
(See above for address)
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Nancy L. Perkins**
(See above for address)
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Nicole K. Ochi**
(See above for address)
*TERMINATED: 06/05/2019*
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Rahsaan D. Hall**
(See above for address)
*LEAD ATTORNEY*

**Steven L. Mayer**
(See above for address)
*LEAD ATTORNEY*
*PRO HAC VICE*

**JA15**

*ATTORNEY TO BE NOTICED*

**Matthew M. Cregor**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Oren M. Sellstrom**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Priya A. Lane**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Intervenor Defendant**

**G. E.**                                    represented by    **Brenda Shum**
                                                              (See above for address)
                                                              *TERMINATED: 05/17/2019*
                                                              *LEAD ATTORNEY*
                                                              *PRO HAC VICE*
                                                              *ATTORNEY TO BE NOTICED*

                                                              **Christopher Lapinig**
                                                              (See above for address)
                                                              *LEAD ATTORNEY*
                                                              *PRO HAC VICE*
                                                              *ATTORNEY TO BE NOTICED*

                                                              **Emma Katherine Dinan**
                                                              (See above for address)
                                                              *LEAD ATTORNEY*
                                                              *PRO HAC VICE*
                                                              *ATTORNEY TO BE NOTICED*

                                                              **Genevieve Bonadies Torres**
                                                              (See above for address)
                                                              *LEAD ATTORNEY*
                                                              *PRO HAC VICE*
                                                              *ATTORNEY TO BE NOTICED*

                                                              **Jon M. Greenbaum**
                                                              (See above for address)
                                                              *LEAD ATTORNEY*
                                                              *PRO HAC VICE*
                                                              *ATTORNEY TO BE NOTICED*

                                                              **Laboni Hoq**
                                                              (See above for address)
                                                              *TERMINATED: 12/09/2019*
                                                              *LEAD ATTORNEY*
                                                              *PRO HAC VICE*
                                                              *ATTORNEY TO BE NOTICED*

                                                              **Lawrence Culleen**
                                                              (See above for address)
                                                              *LEAD ATTORNEY*
                                                              *PRO HAC VICE*
                                                              *ATTORNEY TO BE NOTICED*

                                                              **Nancy L. Perkins**
                                                              (See above for address)
                                                              *LEAD ATTORNEY*
                                                              *PRO HAC VICE*
                                                              *ATTORNEY TO BE NOTICED*

**JA16**

**Nicole K. Ochi**
(See above for address)
*TERMINATED: 06/05/2019*
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Rahsaan D. Hall**
(See above for address)
*LEAD ATTORNEY*

**Steven L. Mayer**
(See above for address)
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Matthew M. Cregor**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Oren M. Sellstrom**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Priya A. Lane**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Intervenor Defendant**

**A. G.**                                     represented by    **Brenda Shum**
(See above for address)
*TERMINATED: 05/17/2019*
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Christopher Lapinig**
(See above for address)
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Emma Katherine Dinan**
(See above for address)
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Genevieve Bonadies Torres**
(See above for address)
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Jon M. Greenbaum**
(See above for address)
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Laboni Hoq**
(See above for address)

**JA17**

*TERMINATED: 12/09/2019*
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Lawrence Culleen**
(See above for address)
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Nancy L. Perkins**
(See above for address)
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Nicole K. Ochi**
(See above for address)
*TERMINATED: 06/05/2019*
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Rahsaan D. Hall**
(See above for address)
*LEAD ATTORNEY*

**Steven L. Mayer**
(See above for address)
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Matthew M. Cregor**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Oren M. Sellstrom**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Priya A. Lane**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Intervenor Defendant**

**I. G.**                                    represented by    **Brenda Shum**
(See above for address)
*TERMINATED: 05/17/2019*
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Christopher Lapinig**
(See above for address)
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Emma Katherine Dinan**
(See above for address)
*LEAD ATTORNEY*
*PRO HAC VICE*

**JA18**

*ATTORNEY TO BE NOTICED*

**Genevieve Bonadies Torres**
(See above for address)
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Jon M. Greenbaum**
(See above for address)
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Laboni Hoq**
(See above for address)
*TERMINATED: 12/09/2019*
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Lawrence Culleen**
(See above for address)
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Nancy L. Perkins**
(See above for address)
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Nicole K. Ochi**
(See above for address)
*TERMINATED: 06/05/2019*
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Rahsaan D. Hall**
(See above for address)
*LEAD ATTORNEY*

**Steven L. Mayer**
(See above for address)
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Matthew M. Cregor**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Oren M. Sellstrom**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Priya A. Lane**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Intervenor Defendant**
**R. H.**                                    represented by

**JA19**

**Brenda Shum**
(See above for address)
*TERMINATED: 05/17/2019*
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Christopher Lapinig**
(See above for address)
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Emma Katherine Dinan**
(See above for address)
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Genevieve Bonadies Torres**
(See above for address)
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Jon M. Greenbaum**
(See above for address)
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Laboni Hoq**
(See above for address)
*TERMINATED: 12/09/2019*
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Lawrence Culleen**
(See above for address)
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Nancy L. Perkins**
(See above for address)
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Nicole K. Ochi**
(See above for address)
*TERMINATED: 06/05/2019*
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Rahsaan D. Hall**
(See above for address)
*LEAD ATTORNEY*

**Steven L. Mayer**
(See above for address)
*LEAD ATTORNEY*
*PRO HAC VICE*

**JA20**

*ATTORNEY TO BE NOTICED*

**Matthew M. Cregor**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Oren M. Sellstrom**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Priya A. Lane**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Intervenor Defendant**

**J. L.**                                   represented by   **Brenda Shum**
                                                             (See above for address)
                                                             *TERMINATED: 05/17/2019*
                                                             *LEAD ATTORNEY*
                                                             *PRO HAC VICE*
                                                             *ATTORNEY TO BE NOTICED*

                                                             **Christopher Lapinig**
                                                             (See above for address)
                                                             *LEAD ATTORNEY*
                                                             *PRO HAC VICE*
                                                             *ATTORNEY TO BE NOTICED*

                                                             **Emma Katherine Dinan**
                                                             (See above for address)
                                                             *LEAD ATTORNEY*
                                                             *PRO HAC VICE*
                                                             *ATTORNEY TO BE NOTICED*

                                                             **Genevieve Bonadies Torres**
                                                             (See above for address)
                                                             *LEAD ATTORNEY*
                                                             *PRO HAC VICE*
                                                             *ATTORNEY TO BE NOTICED*

                                                             **Jon M. Greenbaum**
                                                             (See above for address)
                                                             *LEAD ATTORNEY*
                                                             *PRO HAC VICE*
                                                             *ATTORNEY TO BE NOTICED*

                                                             **Laboni Hoq**
                                                             (See above for address)
                                                             *TERMINATED: 12/09/2019*
                                                             *LEAD ATTORNEY*
                                                             *PRO HAC VICE*
                                                             *ATTORNEY TO BE NOTICED*

                                                             **Lawrence Culleen**
                                                             (See above for address)
                                                             *LEAD ATTORNEY*
                                                             *PRO HAC VICE*
                                                             *ATTORNEY TO BE NOTICED*

                                                             **Nancy L. Perkins**
                                                             (See above for address)
                                                             *LEAD ATTORNEY*
                                                             *PRO HAC VICE*
                                                             *ATTORNEY TO BE NOTICED*

**JA21**

Nicole K. Ochi
(See above for address)
*TERMINATED: 06/05/2019*
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Rahsaan D. Hall**
(See above for address)
*LEAD ATTORNEY*

**Steven L. Mayer**
(See above for address)
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Matthew M. Cregor**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Oren M. Sellstrom**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Priya A. Lane**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Intervenor Defendant**

**R. S.**                                    represented by    **Brenda Shum**
(See above for address)
*TERMINATED: 05/17/2019*
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Christopher Lapinig**
(See above for address)
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Emma Katherine Dinan**
(See above for address)
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Genevieve Bonadies Torres**
(See above for address)
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Jon M. Greenbaum**
(See above for address)
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Laboni Hoq**
(See above for address)

**JA22**

*TERMINATED: 12/09/2019*
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Lawrence Culleen**
(See above for address)
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Nancy L. Perkins**
(See above for address)
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Rahsaan D. Hall**
(See above for address)
*LEAD ATTORNEY*

**Steven L. Mayer**
(See above for address)
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Matthew M. Cregor**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Oren M. Sellstrom**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Priya A. Lane**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Witness**

| | | |
|---|---|---|
| **Boston Public Schools** | represented by | **Jennifer N. Seich**<br>City of Boston<br>2300 Washington Street<br>Roxbury, MA 02119<br>617–635–9320<br>*LEAD ATTORNEY*<br>*ATTORNEY TO BE NOTICED* |

**Amicus**

| | | |
|---|---|---|
| **New England First Amendment Coalition; Reporters Committee for Freedom of the Press; Massachusetts Newspaper Publishers Association; GateHouse Media, LLC** | represented by | **Sigmund David Schutz**<br>Preti Flaherty LLP<br>One City Center<br>PO Box 9546<br>Portland, ME 04112<br>207–791–3000<br>Email: sschutz@preti.com<br>*LEAD ATTORNEY*<br>*ATTORNEY TO BE NOTICED* |
| | | **Eric G. Penley**<br>Preti Flaherty Beliveau & Pachios LLP<br>60 State Street, Suite 1100<br>Boston, MA 02109<br>(617) 226–3854 |

**JA23**

Email: epenley@preti.com
*ATTORNEY TO BE NOTICED*

**Amicus**

**National Association of Scholars**         represented by   **Dwight G. Duncan**
National Association of Scholars                              University of Massachusetts School of Law
12 East 46th Street, 6th floor                               333 Faunce Corner Rd.
New York, NY 10017−2418                                      North Dartmouth, MA 02747−1252
917.551.6770                                                 508−985−1124
                                                             Fax: 508−985−1115
                                                             Email: dduncan@umassd.edu
                                                             *LEAD ATTORNEY*
                                                             *ATTORNEY TO BE NOTICED*

**Amicus**

**American Council on Education**            represented by   **Natashia Tidwell**
                                                             Hogan Lovells US LLP
                                                             100 High Street
                                                             20th Flr.
                                                             Boston, MA 02110
                                                             (617) 371−1000
                                                             Email: natashia.tidwell@hoganlovells.com
                                                             *ATTORNEY TO BE NOTICED*

**Amicus**

**Brown University**                         represented by   **Matthew S. Hellman**
                                                             Jenner & Block LLP
                                                             1099 New York Avenue, N.W.
                                                             Washington, DC 20001
                                                             (202) 639−6861
                                                             Email: MHellman@jenner.com
                                                             *LEAD ATTORNEY*
                                                             *PRO HAC VICE*
                                                             *ATTORNEY TO BE NOTICED*

                                                             **Seth B. Orkand**
                                                             Miner Orkand Siddall LLP
                                                             470 Atlantic Avenue, 4th Floor
                                                             Boston, MA 02210
                                                             617−273−8287
                                                             Fax: 617−273−8004
                                                             Email: sorkand@mosllp.com
                                                             *ATTORNEY TO BE NOTICED*

**Amicus**

**Case Western Reserve University**          represented by   **Seth B. Orkand**
                                                             (See above for address)
                                                             *ATTORNEY TO BE NOTICED*

**Amicus**

**Columbia University**                      represented by   **Seth B. Orkand**
                                                             (See above for address)
                                                             *ATTORNEY TO BE NOTICED*

**Amicus**

**Cornell University**                       represented by   **Seth B. Orkand**
                                                             (See above for address)
                                                             *ATTORNEY TO BE NOTICED*

**Amicus**

**Dartmouth College**                        represented by

**JA24**

**Seth B. Orkand**
(See above for address)
*ATTORNEY TO BE NOTICED*

<u>**Amicus**</u>

**Duke University**                    represented by    **Seth B. Orkand**
(See above for address)
*ATTORNEY TO BE NOTICED*

<u>**Amicus**</u>

**Emory University**                   represented by    **Seth B. Orkand**
(See above for address)
*ATTORNEY TO BE NOTICED*

<u>**Amicus**</u>

**George Washington University**       represented by    **Seth B. Orkand**
(See above for address)
*ATTORNEY TO BE NOTICED*

<u>**Amicus**</u>

**John Hopkins University**            represented by    **Seth B. Orkand**
(See above for address)
*ATTORNEY TO BE NOTICED*

<u>**Amicus**</u>

**Massachusetts Institute of Technology**    represented by    **Seth B. Orkand**
(See above for address)
*ATTORNEY TO BE NOTICED*

<u>**Amicus**</u>

**Princeton University**               represented by    **Seth B. Orkand**
(See above for address)
*ATTORNEY TO BE NOTICED*

<u>**Amicus**</u>

**Stanford University**                represented by    **Seth B. Orkand**
(See above for address)
*ATTORNEY TO BE NOTICED*

<u>**Amicus**</u>

**University of Pennsylvania**         represented by    **Seth B. Orkand**
(See above for address)
*ATTORNEY TO BE NOTICED*

<u>**Amicus**</u>

**Vanderbilt University**              represented by    **Seth B. Orkand**
(See above for address)
*ATTORNEY TO BE NOTICED*

<u>**Amicus**</u>

**Washington University in St. Louis**    represented by    **Seth B. Orkand**
(See above for address)
*ATTORNEY TO BE NOTICED*

<u>**Amicus**</u>

**Yale University**                    represented by    **Seth B. Orkand**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Amicus**

**Walter Dellinger**

**Amicus**

**Amici Curiae Economists Michael**
**Keane et al., in Support of Students for**
**Fair Admissions**
*Amici Curiae Economists Michael Keane*
*et al., in Support of Students for Fair*
*Admissions*

represented by **Adam R.F. Gustafson**
Boyden Gray & Associates PLLC
801 17th Street NW, Suite 350
Washington, DC 20006
202−955−0620
Fax: 202−955−0621
Email: gustafson@boydengrayassociates.com
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Andrew R. Varcoe**
Boyden Gray & Associates
801 17th Street NW
Suite 350
Washington, DC 20006
(202) 706−5488
Email: avarcoe@boydengrayassociates.com
*TERMINATED: 08/19/2019*
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Clayland Boyden Gray**
Boyden Gray & Associates PLLC
801 17th Street NW, Suite 350
Washington, DC 20006
202−955−0620
Fax: 202−955−0621
Email: bethany@boydengrayassociates.com
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**James R. Conde**
Boyden Gray & Associates PLLC
801 17th Street NW, Suite 350
Washington, DC 20006
202−955−0622
Fax: 202−955−0621
Email: conde@boydengrayassociates.com
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Randall B. Clark**
Randall B. Clark, Attorney at Law
80A Rust Hollis Road
Hollis, NH 03049
603−801−3039
Email: rbc@randallbclark.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Amicus**

**Harvard−Radcliffe Black Students**
**Association**

represented by **Cara McClellan**
NAACP LEGAL DEFENSE AND
EDUCATIONAL FUND, INC.

**JA26**

40 Rector St., 5th Floor
New York, NY 10006
212–965–2200
Fax: 212–226–7592
Email: cmcclellan@naacpldf.org
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Earl A. Kirkland , III**
NAACP Legal Defense and Educational
Fund, INC.
40 Rector Street, 5th Floor
New York, NY 10006
212–965–2200
Fax: 212–226–7592
Email: ekirkland@naacpldf.org
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Janai S. Nelson**
NAACP LEGAL DEFENSE AND
EDUCATIONAL FUND, INC.
40 Rector St., 5th Floor
New YorK, NY 10006
212–965–2200
Fax: 212–226–7592
Email: jnelson@naacpldf.org
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Jennifer A. Holmes**
NAACP LEGAL DEFENSE AND
EDUCATIONAL FUND, INC.
700 14th St, NW 8th Floor
Washington, DC 20005
202–683–1300
Fax: 202–682–1312
Email: jholmes@naacpldf.org
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Jin Hee Lee**
NAACP LEGAL DEFENSE AND
EDUCATIONAL FUND, INC.
40 Rector St., 5th Floor
New York, NY 10006
212–965–2200
Fax: 212–226–7592
Email: jlee@naacpldf.org
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Michaele N. Turnage Young**
NAACP LEGAL DEFENSE AND
EDUCATIONAL FUND, INC.
700 14th St NW, Suite 600
Washington, DC 20005
212–683–1300
Fax: 202–682–1312
Email: mturnageyoung@naacpldf.org

*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Rachel M. Kleinman**
NAACP LEGAL DEFENSE AND
EDUCATIONAL FUND, INC.
40 Rector St., 5th Floor
New York, NY 10006
212–965–2200
Fax: 212–226–7592
Email: rkleinman@naacpldf.org
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Samuel Spital**
NAACP Legal Defense and Educational
Fund, Inc.
40 Rector Street, 5th Floor
New York, NY 10006
212–965–2200
Fax: 212–226–7592
Email: sspital@naacpldf.org
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Sherrilyn A. Ifill**
NAACP Legal Defense and Educational
Fund, Inc.
40 Rector Street, 5th Floor
New York, NY 10006
212–965–2200
Fax: 212–226–7592
Email: sifill@naacpldf.org
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Kathryn Rebecca Cook**
Sugarman, Rogers, Barshak & Cohen, P.C.
101 Merrimac Street
9th Floor
Boston, MA 02114
617–6227–3030
Email: cook@srbc.com
*ATTORNEY TO BE NOTICED*

**Kenneth N. Thayer**
Sugarman, Rogers, Barshak & Cohen, P.C.
101 Merrimac Street
9th Floor
Boston, MA 02114
617–227–3030
Email: thayer@srbc.com
*ATTORNEY TO BE NOTICED*

**Amicus**

**Kuumba Singers of Harvard College**          represented by **Cara McClellan**
(See above for address)
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**JA28**

**Earl A. Kirkland , III**
(See above for address)
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Janai S. Nelson**
(See above for address)
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Jennifer A. Holmes**
(See above for address)
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Jin Hee Lee**
(See above for address)
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Michaele N. Turnage Young**
(See above for address)
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Rachel M. Kleinman**
(See above for address)
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Samuel Spital**
(See above for address)
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Sherrilyn A. Ifill**
(See above for address)
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Kathryn Rebecca Cook**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Kenneth N. Thayer**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Amicus**

**Fuerza Latina of Harvard**　　　　represented by **Cara McClellan**
(See above for address)
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**JA29**

**Earl A. Kirkland , III**
(See above for address)
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Janai S. Nelson**
(See above for address)
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Jennifer A. Holmes**
(See above for address)
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Jin Hee Lee**
(See above for address)
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Michaele N. Turnage Young**
(See above for address)
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Rachel M. Kleinman**
(See above for address)
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Samuel Spital**
(See above for address)
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Sherrilyn A. Ifill**
(See above for address)
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Kathryn Rebecca Cook**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Kenneth N. Thayer**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Amicus**

**Native Americans At Harvard College**          represented by   **Cara McClellan**
(See above for address)
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Earl A. Kirkland , III**

**JA30**

(See above for address)
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Janai S. Nelson**
(See above for address)
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Jennifer A. Holmes**
(See above for address)
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Jin Hee Lee**
(See above for address)
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Michaele N. Turnage Young**
(See above for address)
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Rachel M. Kleinman**
(See above for address)
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Samuel Spital**
(See above for address)
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Sherrilyn A. Ifill**
(See above for address)
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Kathryn Rebecca Cook**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Kenneth N. Thayer**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Amicus**

**Harvard–Radcliffe Asian American Association**　　represented by　**Cara McClellan**
(See above for address)
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Earl A. Kirkland , III**
(See above for address)

**JA31**

*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Janai S. Nelson**
(See above for address)
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Jennifer A. Holmes**
(See above for address)
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Jin Hee Lee**
(See above for address)
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Michaele N. Turnage Young**
(See above for address)
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Rachel M. Kleinman**
(See above for address)
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Samuel Spital**
(See above for address)
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Sherrilyn A. Ifill**
(See above for address)
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Kathryn Rebecca Cook**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Kenneth N. Thayer**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Amicus**

**Harvard–Radcliffe Asian American**               represented by   **Cara McClellan**
**Women's Association**                                             (See above for address)
                                                                   *LEAD ATTORNEY*
                                                                   *PRO HAC VICE*
                                                                   *ATTORNEY TO BE NOTICED*

                                                                   **Earl A. Kirkland , III**
                                                                   (See above for address)
                                                                   *LEAD ATTORNEY*

**JA32**

*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Janai S. Nelson**
(See above for address)
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Jennifer A. Holmes**
(See above for address)
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Jin Hee Lee**
(See above for address)
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Michaele N. Turnage Young**
(See above for address)
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Rachel M. Kleinman**
(See above for address)
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Samuel Spital**
(See above for address)
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Sherrilyn A. Ifill**
(See above for address)
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Kathryn Rebecca Cook**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Kenneth N. Thayer**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Amicus**

**Harvard Asian American Brotherhood**    represented by  **Cara McClellan**
(See above for address)
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Earl A. Kirkland , III**
(See above for address)
*LEAD ATTORNEY*
*PRO HAC VICE*

**JA33**

*ATTORNEY TO BE NOTICED*

**Janai S. Nelson**
(See above for address)
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Jennifer A. Holmes**
(See above for address)
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Jin Hee Lee**
(See above for address)
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Michaele N. Turnage Young**
(See above for address)
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Rachel M. Kleinman**
(See above for address)
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Samuel Spital**
(See above for address)
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Sherrilyn A. Ifill**
(See above for address)
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Kathryn Rebecca Cook**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Kenneth N. Thayer**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Amicus**

| **Harvard Vietnamese Association** | represented by | **Cara McClellan** |

(See above for address)
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Earl A. Kirkland , III**
(See above for address)
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**JA34**

**Janai S. Nelson**
(See above for address)
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Jennifer A. Holmes**
(See above for address)
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Jin Hee Lee**
(See above for address)
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Michaele N. Turnage Young**
(See above for address)
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Rachel M. Kleinman**
(See above for address)
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Samuel Spital**
(See above for address)
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Sherrilyn A. Ifill**
(See above for address)
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Kathryn Rebecca Cook**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Kenneth N. Thayer**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Amicus**

**Harvard–Radcliffe Chinese Students Association**

represented by **Cara McClellan**
(See above for address)
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Earl A. Kirkland , III**
(See above for address)
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**JA35**

**Janai S. Nelson**
(See above for address)
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Jennifer A. Holmes**
(See above for address)
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Jin Hee Lee**
(See above for address)
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Michaele N. Turnage Young**
(See above for address)
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Rachel M. Kleinman**
(See above for address)
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Samuel Spital**
(See above for address)
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Sherrilyn A. Ifill**
(See above for address)
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Kathryn Rebecca Cook**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Kenneth N. Thayer**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Amicus**

**Harvard Korean Association**                    represented by **Cara McClellan**
(See above for address)
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Earl A. Kirkland , III**
(See above for address)
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Janai S. Nelson**

**JA36**

(See above for address)
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Jennifer A. Holmes**
(See above for address)
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Jin Hee Lee**
(See above for address)
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Michaele N. Turnage Young**
(See above for address)
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Rachel M. Kleinman**
(See above for address)
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Samuel Spital**
(See above for address)
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Sherrilyn A. Ifill**
(See above for address)
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Kathryn Rebecca Cook**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Kenneth N. Thayer**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Amicus**

**Harvard Japan Society**                    represented by  **Cara McClellan**
(See above for address)
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Earl A. Kirkland , III**
(See above for address)
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Janai S. Nelson**
(See above for address)

**JA37**

*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Jennifer A. Holmes**
(See above for address)
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Jin Hee Lee**
(See above for address)
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Michaele N. Turnage Young**
(See above for address)
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Rachel M. Kleinman**
(See above for address)
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Samuel Spital**
(See above for address)
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Sherrilyn A. Ifill**
(See above for address)
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Kathryn Rebecca Cook**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Kenneth N. Thayer**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Amicus**

| | | |
|---|---|---|
| **Harvard South Asian Association** | represented by | **Cara McClellan** |

(See above for address)
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Earl A. Kirkland , III**
(See above for address)
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Janai S. Nelson**
(See above for address)
*LEAD ATTORNEY*

**JA38**

*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Jennifer A. Holmes**
(See above for address)
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Jin Hee Lee**
(See above for address)
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Michaele N. Turnage Young**
(See above for address)
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Rachel M. Kleinman**
(See above for address)
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Samuel Spital**
(See above for address)
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Sherrilyn A. Ifill**
(See above for address)
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Kathryn Rebecca Cook**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Kenneth N. Thayer**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Amicus**

**Harvard Islamic Society**                represented by  **Cara McClellan**
(See above for address)
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Earl A. Kirkland , III**
(See above for address)
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Janai S. Nelson**
(See above for address)
*LEAD ATTORNEY*
*PRO HAC VICE*

**JA39**

*ATTORNEY TO BE NOTICED*

**Jennifer A. Holmes**
(See above for address)
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Jin Hee Lee**
(See above for address)
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Michaele N. Turnage Young**
(See above for address)
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Rachel M. Kleinman**
(See above for address)
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Samuel Spital**
(See above for address)
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Sherrilyn A. Ifill**
(See above for address)
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Kathryn Rebecca Cook**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Kenneth N. Thayer**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Amicus**

**Task Force on Asian and Pacific**          represented by   **Cara McClellan**
**American Studies at Harvard College**                      (See above for address)
                                                            *LEAD ATTORNEY*
                                                            *PRO HAC VICE*
                                                            *ATTORNEY TO BE NOTICED*

**Earl A. Kirkland , III**
(See above for address)
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Janai S. Nelson**
(See above for address)
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**JA40**

**Jennifer A. Holmes**
(See above for address)
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Jin Hee Lee**
(See above for address)
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Michaele N. Turnage Young**
(See above for address)
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Rachel M. Kleinman**
(See above for address)
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Samuel Spital**
(See above for address)
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Sherrilyn A. Ifill**
(See above for address)
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Kathryn Rebecca Cook**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Kenneth N. Thayer**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Amicus**

**Harvard Phillips Brooks House**          represented by  **Cara McClellan**
**Association**                                            (See above for address)
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Earl A. Kirkland , III**
(See above for address)
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Janai S. Nelson**
(See above for address)
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**JA41**

**Jennifer A. Holmes**
(See above for address)
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Jin Hee Lee**
(See above for address)
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Michaele N. Turnage Young**
(See above for address)
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Rachel M. Kleinman**
(See above for address)
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Samuel Spital**
(See above for address)
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Sherrilyn A. Ifill**
(See above for address)
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Kathryn Rebecca Cook**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Kenneth N. Thayer**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Amicus**

**Harvard Minority Association of**            represented by   **Cara McClellan**
**Pre–Medical Students**                                        (See above for address)
                                                                *LEAD ATTORNEY*
                                                                *PRO HAC VICE*
                                                                *ATTORNEY TO BE NOTICED*

**Earl A. Kirkland , III**
(See above for address)
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Janai S. Nelson**
(See above for address)
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Jennifer A. Holmes**

**JA42**

(See above for address)
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Jin Hee Lee**
(See above for address)
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Michaele N. Turnage Young**
(See above for address)
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Rachel M. Kleinman**
(See above for address)
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Samuel Spital**
(See above for address)
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Sherrilyn A. Ifill**
(See above for address)
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Kathryn Rebecca Cook**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Kenneth N. Thayer**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Amicus**

**Coalition for a Diverse Harvard**　　　　represented by　**Cara McClellan**
(See above for address)
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Earl A. Kirkland , III**
(See above for address)
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Janai S. Nelson**
(See above for address)
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Jennifer A. Holmes**
(See above for address)

**JA43**

*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Jin Hee Lee**
(See above for address)
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Michaele N. Turnage Young**
(See above for address)
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Rachel M. Kleinman**
(See above for address)
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Samuel Spital**
(See above for address)
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Sherrilyn A. Ifill**
(See above for address)
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Kathryn Rebecca Cook**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Kenneth N. Thayer**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Amicus**

**First Generation Harvard Alumni**    represented by **Cara McClellan**
(See above for address)
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Earl A. Kirkland , III**
(See above for address)
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Janai S. Nelson**
(See above for address)
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Jennifer A. Holmes**
(See above for address)
*LEAD ATTORNEY*

**JA44**

*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Jin Hee Lee**
(See above for address)
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Michaele N. Turnage Young**
(See above for address)
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Rachel M. Kleinman**
(See above for address)
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Samuel Spital**
(See above for address)
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Sherrilyn A. Ifill**
(See above for address)
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Kathryn Rebecca Cook**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Kenneth N. Thayer**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Amicus**

**Native American Alumni of Harvard University**    represented by   **Cara McClellan**
(See above for address)
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Earl A. Kirkland , III**
(See above for address)
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Janai S. Nelson**
(See above for address)
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Jennifer A. Holmes**
(See above for address)
*LEAD ATTORNEY*
*PRO HAC VICE*

**JA45**

*ATTORNEY TO BE NOTICED*

**Jin Hee Lee**
(See above for address)
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Michaele N. Turnage Young**
(See above for address)
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Rachel M. Kleinman**
(See above for address)
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Samuel Spital**
(See above for address)
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Sherrilyn A. Ifill**
(See above for address)
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Kathryn Rebecca Cook**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Kenneth N. Thayer**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Amicus**

**Harvard University Muslim Alumni**        represented by  **Cara McClellan**
(See above for address)
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Earl A. Kirkland , III**
(See above for address)
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Janai S. Nelson**
(See above for address)
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Jennifer A. Holmes**
(See above for address)
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**JA46**

**Jin Hee Lee**
(See above for address)
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Michaele N. Turnage Young**
(See above for address)
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Rachel M. Kleinman**
(See above for address)
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Samuel Spital**
(See above for address)
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Sherrilyn A. Ifill**
(See above for address)
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Kathryn Rebecca Cook**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Kenneth N. Thayer**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Amicus**

**Harvard Latino Alumni Alliance**            represented by   **Cara McClellan**
(See above for address)
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Earl A. Kirkland , III**
(See above for address)
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Janai S. Nelson**
(See above for address)
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Jennifer A. Holmes**
(See above for address)
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**JA47**

**Jin Hee Lee**
(See above for address)
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Michaele N. Turnage Young**
(See above for address)
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Rachel M. Kleinman**
(See above for address)
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Samuel Spital**
(See above for address)
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Sherrilyn A. Ifill**
(See above for address)
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Kathryn Rebecca Cook**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Kenneth N. Thayer**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Amicus**

**Asian American Legal Foundation**          represented by **Gordon M. Fauth , Jr.**
Litigation Law Group
1801 Clement Ave, Ste. 101
Alameda, CA 94501
510–238–9610
Fax: 510–473–0603
Email: gmf@classlitigation.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Lee Cheng**
Asian American Legal Foundation
c/o Maschoff Brennan
100 Spectrum Center Drive
Irvine, CA 92618
(949) 202–1900
Email: lcheng@mabr.com
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Marc J. Randazza**
Randazza Legal Group, PLLC
2764 Lake Sahara Drive, Suite 109
Las Vegas, NV 89117

702–420–2001
Email: mjr@randazza.com
*ATTORNEY TO BE NOTICED*

**Amicus**

**Asian American Coalition for
Education**

represented by **Gordon M. Fauth , Jr.**
(See above for address)
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Marc J. Randazza**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Amicus**

**Social Scientists and Scholars**

represented by **Sarah E. Harrington**
Goldstein & Russell, P.C.
7475 Wisconsin Ave., Suite 850
Bethesda, MD 20814
202–362–0636
Email: sharrington@goldsteinrussell.com
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Richard J. Rosensweig**
Goulston & Storrs, PC
400 Atlantic Avenue
Boston, MA 02110
617–574–3588
Fax: 617–574–7505
Email: rrosensweig@goulstonstorrs.com
*ATTORNEY TO BE NOTICED*

**Amicus**

**Amici Curiae Professors of Economics
Susan Dynarski, et al., in Support of
Defendant**
*Amici Curiae Professors of Economics
Susan Dynarski, et al., in Support of
Defendant*

represented by **Derek Tam Ho**
Kellogg, Huber, Hansen, Todd Evans &
Figel, PLLC
Sumner Square
1615 M Street, N.W.
Suite 400
Washington, DC 20036
202–326–7900
Fax: 202–326–7999
Email: dho@khhte.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Amicus**

**Amici Curiae the Asian American
Legal Defense and Education Fund, et
al.**

represented by **Kenneth Kimerling**
Asian American Legal Defense and
Education Fund
99 Hudson Street
New York, NY 10014
212–966–5932
Fax: 212–966–4303
Email: kkimerling@aaldef.org
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

Madeleine K. Rodriguez
Foley Hoag LLP
155 Seaport Boulevard
Seaport World Trade Center West
Boston, MA 02210
617–832–1720
Email: mrodriguez@foleyhoag.com
*ATTORNEY TO BE NOTICED*

**Amicus**

| | | |
|---|---|---|
| **Harvard Black Alumni Society** | represented by | **Cara McClellan**<br>(See above for address)<br>*ATTORNEY TO BE NOTICED* |
| | | **Earl A. Kirkland , III**<br>(See above for address)<br>*ATTORNEY TO BE NOTICED* |
| | | **Janai S. Nelson**<br>(See above for address)<br>*ATTORNEY TO BE NOTICED* |
| | | **Jennifer A. Holmes**<br>(See above for address)<br>*ATTORNEY TO BE NOTICED* |
| | | **Jin Hee Lee**<br>(See above for address)<br>*ATTORNEY TO BE NOTICED* |
| | | **Kenneth N. Thayer**<br>(See above for address)<br>*ATTORNEY TO BE NOTICED* |
| | | **Michaele N. Turnage Young**<br>(See above for address)<br>*ATTORNEY TO BE NOTICED* |
| | | **Rachel M. Kleinman**<br>(See above for address)<br>*ATTORNEY TO BE NOTICED* |
| | | **Samuel Spital**<br>(See above for address)<br>*ATTORNEY TO BE NOTICED* |
| | | **Sherrilyn A. Ifill**<br>(See above for address)<br>*ATTORNEY TO BE NOTICED* |

**Amicus**

| | | |
|---|---|---|
| **Harvard Asian American Alumni Alliance** | represented by | **Cara McClellan**<br>(See above for address)<br>*ATTORNEY TO BE NOTICED* |
| | | **Earl A. Kirkland , III**<br>(See above for address)<br>*ATTORNEY TO BE NOTICED* |
| | | **Janai S. Nelson**<br>(See above for address)<br>*ATTORNEY TO BE NOTICED* |
| | | **Jennifer A. Holmes** |

(See above for address)
*ATTORNEY TO BE NOTICED*

**Jin Hee Lee**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Kenneth N. Thayer**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Michaele N. Turnage Young**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Rachel M. Kleinman**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Samuel Spital**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Sherrilyn A. Ifill**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Amicus**

**Association of Black Harvard Women**          represented by   **Cara McClellan**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Earl A. Kirkland , III**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Janai S. Nelson**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Jennifer A. Holmes**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Jin Hee Lee**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Kenneth N. Thayer**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Michaele N. Turnage Young**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Rachel M. Kleinman**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Samuel Spital**
(See above for address)
*ATTORNEY TO BE NOTICED*

**JA51**

**Sherrilyn A. Ifill**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Amicus**

**21 Colorful Crimson**                 represented by   **Cara McClellan**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Earl A. Kirkland , III**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Janai S. Nelson**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Jennifer A. Holmes**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Jin Hee Lee**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Kenneth N. Thayer**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Michaele N. Turnage Young**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Rachel M. Kleinman**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Samuel Spital**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Sherrilyn A. Ifill**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Amicus**

**American Civil Liberties Union**       represented by   **Sarah Hinger**
125 Broad Street                                         American Civil Liberties Union
18th Fl.                                                 Foundation
New York, NY 10004                                       125 Broad St.
212–519–7882                                             18th floor
                                                         New York, NY 10004
                                                         (212) 549–2500
                                                         Fax: (212) 549–2654
                                                         Email: shinger@aclu.org
                                                         *LEAD ATTORNEY*
                                                         *PRO HAC VICE*
                                                         *ATTORNEY TO BE NOTICED*

**Amicus**

**American Civil Liberties Union**       represented by   **Sarah Hinger**
**Foundation of Massachusetts, Inc.**                    (See above for address)
211 Congress Street                                      *LEAD ATTORNEY*

**JA52**

3rd Fl.
Boston, MA 02110
617–482–3170

*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Matthew Segal**
American Civil Liberties Union
211 Congress Street
Boston, MA 02110
617–482–3170
Fax: 617–451–0009
Email: msegal@aclum.org
*ATTORNEY TO BE NOTICED*

<u>**Amicus**</u>

**Southeastern Legal Foundation**          represented by    **Douglass C. Lawrence**
Curran Antonelli, LLP
22 Boston Wharf Road
7th Floor
Boston, MA 02210
617–207–8670
Fax: (857) 263–5215
Email: dlawrence@curranantonelli.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**John J. Park , Jr.**
Strickland Brockington Lewis LLP
Midtown Proscenium Suite 2200
1170 Peachtree Stree NE
Atlanta, GA 30309
678–347–2208
Fax: 678–347–2210
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

<u>**Amicus**</u>

**Center for Equal Opportunity**          represented by    **Douglass C. Lawrence**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**John J. Park , Jr.**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

<u>**Amicus**</u>

**Reason Foundation**          represented by    **Douglass C. Lawrence**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**John J. Park , Jr.**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

<u>**Amicus**</u>

**Lawrence Crawford**
*also known as*
JahJah Tishbite
*also known as*
Jonah Gabriel

**JA53**

*also known as*
JahJah Al Mahdi

**Interested Party**

| | |
|---|---|
| **United States** | represented by **Matthew J. Donnelly** |
| | United States Department of Justice |
| | 950 Pennsylvania Avenue |
| | Washington, DC 20530 |
| | 202−617−2788 |
| | Email: matthew.donnelly@usdoj.gov |
| | *LEAD ATTORNEY* |
| | *ATTORNEY TO BE NOTICED* |

| Date Filed | # | Docket Text |
|---|---|---|
| 11/17/2014 | 1 | COMPLAINT against All Defendants Filing fee: $ 400, receipt number 0101−5281571 (Fee Status: Filing Fee paid), filed by Students for Fair Admissions, Inc.. (Attachments: # 1 Exhibit A, # 2 Civil Cover Sheet, # 3 Category Form)(Sanford, Paul) (Entered: 11/17/2014) |
| 11/17/2014 | 2 | NOTICE of Appearance by Paul M Sanford on behalf of Students for Fair Admissions, Inc. (Sanford, Paul) (Entered: 11/17/2014) |
| 11/17/2014 | 3 | NOTICE of Appearance by Benjamin C. Caldwell on behalf of Students for Fair Admissions, Inc. (Caldwell, Benjamin) (Entered: 11/17/2014) |
| 11/17/2014 | 4 | CORPORATE DISCLOSURE STATEMENT by Students for Fair Admissions, Inc.. (Sanford, Paul) (Entered: 11/17/2014) |
| 11/17/2014 | 5 | MOTION for Leave to Appear Pro Hac Vice for admission of William S. Consovoy, Thomas R. McCarthy and J. Michael Connolly Filing fee: $ 300, receipt number 0101−5281670 by Students for Fair Admissions, Inc.. (Attachments: # 1 Cert. of Attorney Consovoy, # 2 Cert. of Attorney McCarthy, # 3 Cert. of Attorney Connolly, # 4 Text of Proposed Order)(Sanford, Paul) (Entered: 11/17/2014) |
| 11/17/2014 | 6 | ELECTRONIC NOTICE of Case Assignment. Judge Denise J. Casper assigned to case. If the trial Judge issues an Order of Reference of any matter in this case to a Magistrate Judge, the matter will be transmitted to Magistrate Judge Judith G. Dein. (Abaid, Kimberly) (Entered: 11/17/2014) |
| 11/17/2014 | 7 | Summons Issued as to All Defendants. **Counsel receiving this notice electronically should download this summons, complete one for each defendant and serve it in accordance with Fed.R.Civ.P. 4 and LR 4.1. Summons will be mailed to plaintiff(s) not receiving notice electronically for completion of service.** (Abaid, Kimberly) (Entered: 11/17/2014) |
| 11/18/2014 | 8 | Judge Denise J. Casper: ELECTRONIC ORDER entered granting 5 Motion for Leave to Appear Pro Hac Vice Added William S. Consovoy, Thomas R. McCarthy and John Michael Connolly. **Attorneys admitted Pro Hac Vice must register for electronic filing if the attorney does not already have an ECF account in this district. To register go to the Court website at www.mad.uscourts.gov. Select Case Information, then Electronic Filing (CM/ECF) and go to the CM/ECF Registration Form.** (Maynard, Timothy) (Entered: 11/18/2014) |
| 12/04/2014 | 9 | WAIVER OF SERVICE Returned Executed by Students for Fair Admissions, Inc.. President and Fellows of Harvard College waiver sent on 11/20/2014, answer due 1/19/2015. (Sanford, Paul) (Entered: 12/04/2014) |
| 12/19/2014 | 10 | NOTICE of Appearance by Felicia H. Ellsworth on behalf of President and Fellows of Harvard College (Ellsworth, Felicia) (Entered: 12/19/2014) |
| 12/19/2014 | 11 | CORPORATE DISCLOSURE STATEMENT by President and Fellows of Harvard College. (Ellsworth, Felicia) (Entered: 12/19/2014) |
| 12/19/2014 | 12 | Assented to MOTION for Extension of Time to February 18, 2015 to Respond to the Complaint by President and Fellows of Harvard College.(Ellsworth, Felicia) (Entered: |

**JA54**

| | | |
|---|---|---|
| | | 12/19/2014) |
| 12/19/2014 | 13 | Assented to MOTION for Leave to Appear Pro Hac Vice for admission of Seth P. Waxman, Paul R.Q. Wolfson, and Debo P. Adegbile Filing fee: $ 300, receipt number 0101−5332406 by President and Fellows of Harvard College. (Attachments: # 1 Certification of Seth P. Waxman, # 2 Certification of Paul R.Q. Wolfson, # 3 Certification of Debo P. Adegbile)(Ellsworth, Felicia) (Entered: 12/19/2014) |
| 12/22/2014 | 14 | Judge Denise J. Casper: ELECTRONIC ORDER entered granting 12 Motion for Extension of Time to Answer to 2/18/15 by President and Fellows of Harvard College (Hourihan, Lisa) (Entered: 12/22/2014) |
| 12/23/2014 | 15 | Judge Denise J. Casper: ELECTRONIC ORDER entered granting 13 Motion for Leave to Appear Pro Hac Vice Added Debo P. Adegbile. **Attorneys admitted Pro Hac Vice must register for electronic filing if the attorney does not already have an ECF account in this district. To register go to the Court website at www.mad.uscourts.gov. Select Case Information, then Electronic Filing (CM/ECF) and go to the CM/ECF Registration Form.** (Maynard, Timothy) (Entered: 12/23/2014) |
| 01/09/2015 | 16 | STIPULATION *of Dismissal as to Defendant The Board of Overseers of Harvard College Only* by Students for Fair Admissions, Inc.. (Sanford, Paul) (Entered: 01/09/2015) |
| 02/18/2015 | 17 | ANSWER to 1 Complaint, by President and Fellows of Harvard College.(Waxman, Seth) (Entered: 02/18/2015) |
| 02/19/2015 | 18 | NOTICE of Scheduling Conference Scheduling Conference set for 3/23/2015 02:30 PM in Courtroom 11 before Judge Denise J. Casper. (Hourihan, Lisa) (Entered: 02/19/2015) |
| 02/19/2015 | 19 | Judge Denise J. Casper: ORDER entered. Standing Order Re: Courtroom Opportunities for Relatively Inexperienced Attorneys(Hourihan, Lisa) (Entered: 02/19/2015) |
| 03/02/2015 | 20 | MOTION to Continue Rule 16 Initial Scheduling Conference *(UNOPPOSED)* by Students for Fair Admissions, Inc..(Caldwell, Benjamin) (Entered: 03/02/2015) |
| 03/03/2015 | 21 | Judge Denise J. Casper: ELECTRONIC ORDER entered granting 20 Motion to Continue Scheduling Conference set for 4/13/2015 02:00 PM in Courtroom 11 before Judge Denise J. Casper. (Hourihan, Lisa) (Entered: 03/03/2015) |
| 03/12/2015 | 22 | ELECTRONIC NOTICE of Reassignment. Judge Allison D. Burroughs added. Judge Denise J. Casper no longer assigned to case. (Abaid, Kimberly) (Entered: 03/12/2015) |
| 03/13/2015 | 23 | ELECTRONIC NOTICE OF RESCHEDULING Scheduling Conference RESET for 4/23/2015 10:30 AM in Courtroom 17 before Judge Allison D. Burroughs. (Folan, Karen) (Entered: 03/13/2015) |
| 03/16/2015 | 24 | Assented to MOTION to Continue Intial Scheduling Conference to 04/30/2015 by President and Fellows of Harvard College.(Ellsworth, Felicia) (Entered: 03/16/2015) |
| 03/18/2015 | 25 | Judge Allison D. Burroughs: ELECTRONIC ORDER entered granting 24 Motion to Continue. Scheduling Conference reset for 4/30/2015 02:00 PM in Courtroom 17 before Judge Allison D. Burroughs. (Folan, Karen) (Entered: 03/18/2015) |
| 04/23/2015 | 26 | JOINT STATEMENT of counsel *pursuant to Federal Rule 26(f) and Local Rule 16.1(d)*. (Sanford, Paul) (Entered: 04/23/2015) |
| 04/23/2015 | 27 | CERTIFICATION pursuant to Local Rule 16.1 *(d)(3)*. (Ellsworth, Felicia) (Entered: 04/23/2015) |
| 04/23/2015 | 28 | CERTIFICATION pursuant to Local Rule 16.1 . (Sanford, Paul) (Entered: 04/23/2015) |
| 04/29/2015 | 29 | ELECTRONIC NOTICE OF RESCHEDULING Scheduling Conference reset for 4/30/2015 02:00 PM in Courtroom 4 before Judge Allison D. Burroughs. NOTICE IS FOR COURTROOM LOCATION CHANGE ONLY.(Folan, Karen) (Entered: 04/29/2015) |

**JA55**

| 04/29/2015 | 30 | MOTION to Intervene *In Defense of Harvard's Admission Policy* by Sarah Cole, Fadhal Moore, Arjini Kumari Nawal, Itzel Vasquez–Rodriguez, Keyanna Wigglesworth, M. B., K. C., Y. D., G. E., A. G., I. G., R. H., J. L., R. S..(Hall, Rahsaan) (Entered: 04/29/2015) |
|---|---|---|
| 04/29/2015 | 31 | MEMORANDUM in Support re 30 MOTION to Intervene *In Defense of Harvard's Admission Policy* filed by M. B., K. C., Sarah Cole, Y. D., G. E., A. G., I. G., R. H., J. L., Fadhal Moore, Arjini Kumari Nawal, R. S., Itzel Vasquez–Rodriguez, Keyanna Wigglesworth. (Attachments: # 1 Exhibit Declarations of Proposed Defendant–Intervenors, # 2 Exhibit Proposed Answer)(Hall, Rahsaan) (Entered: 04/29/2015) |
| 04/29/2015 | 32 | MOTION for Leave to Appear Pro Hac Vice for admission of Jon M. Greenbaum Filing fee: $ 100, receipt number 0101–5535156 by M. B., K. C., Sarah Cole, Y. D., G. E., A. G., I. G., R. H., J. L., Fadhal Moore, Arjini Kumari Nawal, R. S., Itzel Vasquez–Rodriguez, Keyanna Wigglesworth. (Attachments: # 1 Exhibit A – Certificate of Good Standing, # 2 Exhibit B – Affidavit)(Hall, Rahsaan) (Entered: 04/29/2015) |
| 04/29/2015 | 33 | NOTICE of Appearance by Rahsaan D. Hall on behalf of M. B., K. C., Sarah Cole, Y. D., G. E., A. G., I. G., R. H., J. L., Fadhal Moore, Arjini Kumari Nawal, R. S., Itzel Vasquez–Rodriguez, Keyanna Wigglesworth (Hall, Rahsaan) (Entered: 04/29/2015) |
| 04/30/2015 | 34 | ELECTRONIC Clerk's Notes for proceedings held before Judge Allison D. Burroughs: Scheduling Conference held on 4/30/2015. Colloquy re: motion to intervene. Responses will be filed within 2 weeks. Colloquy re: applications. Colloquy re: discovery schedule. Scheduling order to issue. (Court Reporter: James Gibbons at jmsgibbons@yahoo.com.)(Attorneys present: Sanford, Consovoy, Caldwell, Waxman, Ellsworth) (Folan, Karen) (Entered: 04/30/2015) |
| 05/04/2015 | 35 | Judge Allison D. Burroughs: ORDER entered. SCHEDULING ORDER: Status Conference set for 7/9/2015 02:00 PM in Courtroom 17 before Judge Allison D. Burroughs. Amended Pleadings due by 9/25/2015. Discovery to be completed by 4/1/2016 Motions due by 10/13/2016(Folan, Karen) (Entered: 05/04/2015) |
| 05/13/2015 | 36 | NOTICE of Appearance by Patrick Strawbridge on behalf of Students for Fair Admissions, Inc. (Strawbridge, Patrick) (Entered: 05/13/2015) |
| 05/13/2015 | 37 | MEMORANDUM in Opposition re 30 MOTION to Intervene *In Defense of Harvard's Admission Policy* filed by Students for Fair Admissions, Inc.. (Consovoy, William) (Entered: 05/13/2015) |
| 05/13/2015 | 38 | RESPONSE to Motion re 30 MOTION to Intervene *In Defense of Harvard's Admission Policy* filed by President and Fellows of Harvard College. (Waxman, Seth) (Entered: 05/13/2015) |
| 05/15/2015 | 39 | MOTION for Leave to File *REPLY MEMORANDUM IN SUPPORT OF THE MOTION TO INTERVENE* by M. B., K. C., Sarah Cole, Y. D., G. E., A. G., I. G., R. H., J. L., Fadhal Moore, Arjini Kumari Nawal, R. S., Itzel Vasquez–Rodriguez, Keyanna Wigglesworth. (Attachments: # 1 Exhibit Proposed Reply)(Hall, Rahsaan) (Entered: 05/15/2015) |
| 05/15/2015 | 40 | Judge Allison D. Burroughs: ELECTRONIC ORDER entered granting 39 Motion for Leave to File Document ; Counsel using the Electronic Case Filing System should now file the document for which leave to file has been granted in accordance with the CM/ECF Administrative Procedures. Counsel must include – Leave to file granted on (date of order)– in the caption of the document. (Folan, Karen) (Entered: 05/15/2015) |
| 05/18/2015 | 41 | CERTIFICATE OF SERVICE pursuant to LR 5.2 by Students for Fair Admissions, Inc. re 36 Notice of Appearance *of Patrick Strawbridge*. (Strawbridge, Patrick) (Entered: 05/18/2015) |
| 05/18/2015 | 42 | REPLY to Response to 39 MOTION for Leave to File *REPLY MEMORANDUM IN SUPPORT OF THE MOTION TO INTERVENE* filed by M. B., K. C., Sarah Cole, Y. D., G. E., A. G., I. G., R. H., J. L., Fadhal Moore, Arjini Kumari Nawal, R. S., Itzel Vasquez–Rodriguez, Keyanna Wigglesworth. (Hall, Rahsaan) (Entered: 05/18/2015) |

**JA56**

| 05/19/2015 | 43 | Transcript of Status Conference held on April 30, 2015, before Judge Allison D. Burroughs. The Transcript may be purchased through the Court Reporter, viewed at the public terminal, or viewed through PACER after it is released. Court Reporter Name and Contact Information: James Gibbons at jmsgibbons@yahoo.com Redaction Request due 6/9/2015. Redacted Transcript Deadline set for 6/19/2015. Release of Transcript Restriction set for 8/17/2015. (Scalfani, Deborah) (Entered: 05/19/2015) |
| --- | --- | --- |
| 05/19/2015 | 44 | NOTICE is hereby given that an official transcript of a proceeding has been filed by the court reporter in the above–captioned matter. Counsel are referred to the Court's Transcript Redaction Policy, available on the court website at http://www.mad.uscourts.gov/attorneys/general–info.htm (Scalfani, Deborah) (Entered: 05/19/2015) |
| 05/26/2015 | 45 | Judge Allison D. Burroughs: ELECTRONIC ORDER entered granting 32 Motion for Leave to Appear Pro Hac Vice Added Jon M. Greenbaum. **Attorneys admitted Pro Hac Vice must register for electronic filing if the attorney does not already have an ECF account in this district. To register go to the Court website at www.mad.uscourts.gov. Select Case Information, then Electronic Filing (CM/ECF) and go to the CM/ECF Registration Form.** Pursuant to Local Rule 83.5.3, local counsel shall also file an appearance in this matter. Further, local counsel shall review all filings and shall personally appear in Court for any hearings or conferences, unless expressly excused by the Court for good cause. (Folan, Karen) (Entered: 05/26/2015) |
| 05/26/2015 | 46 | MOTION for Leave to Appear Pro Hac Vice for admission of Lawrence Culleen Filing fee: $ 100, receipt number 0101–5572007 by M. B., K. C., Sarah Cole, Y. D., G. E., A. G., I. G., R. H., J. L., Fadhal Moore, Arjini Kumari Nawal, R. S., Itzel Vasquez–Rodriguez, Keyanna Wigglesworth. (Attachments: # 1 Exhibit Certificate of Good Standing, # 2 Exhibit Affidavit)(Hall, Rahsaan) (Entered: 05/26/2015) |
| 05/26/2015 | 47 | MOTION for Leave to Appear Pro Hac Vice for admission of Nancy L. Perkins Filing fee: $ 100, receipt number 0101–5572061 by M. B., K. C., Sarah Cole, Y. D., G. E., A. G., I. G., R. H., J. L., Fadhal Moore, Arjini Kumari Nawal, R. S., Itzel Vasquez–Rodriguez, Keyanna Wigglesworth. (Attachments: # 1 Exhibit Certificate of Good Standing, # 2 Exhibit Af)(Hall, Rahsaan) (Entered: 05/26/2015) |
| 05/26/2015 | 48 | MOTION for Leave to Appear Pro Hac Vice for admission of Steven L. Mayer Filing fee: $ 100, receipt number 0101–5572070 by M. B., K. C., Sarah Cole, Y. D., G. E., A. G., I. G., R. H., J. L., Fadhal Moore, Arjini Kumari Nawal, R. S., Itzel Vasquez–Rodriguez, Keyanna Wigglesworth. (Attachments: # 1 Exhibit Certificate of Good Standing, # 2 Exhibit Affidavit)(Hall, Rahsaan) (Entered: 05/26/2015) |
| 05/27/2015 | 49 | Judge Allison D. Burroughs: ELECTRONIC ORDER entered granting 46 Motion for Leave to Appear Pro Hac Vice Added Lawrence Culleen. **Attorneys admitted Pro Hac Vice must register for electronic filing if the attorney does not already have an ECF account in this district. To register go to the Court website at www.mad.uscourts.gov. Select Case Information, then Electronic Filing (CM/ECF) and go to the CM/ECF Registration Form.** Pursuant to Local Rule 83.5.3, local counsel shall also file an appearance in this matter. Further, local counsel shall review all filings and shall personally appear in Court for any hearings or conferences, unless expressly excused by the Court for good cause. (Folan, Karen) (Entered: 05/27/2015) |
| 05/27/2015 | 50 | Judge Allison D. Burroughs: ELECTRONIC ORDER entered granting 47 Motion for Leave to Appear Pro Hac Vice Added Nancy L. Perkins. **Attorneys admitted Pro Hac Vice must register for electronic filing if the attorney does not already have an ECF account in this district. To register go to the Court website at www.mad.uscourts.gov. Select Case Information, then Electronic Filing (CM/ECF) and go to the CM/ECF Registration Form.** Pursuant to Local Rule 83.5.3, local counsel shall also file an appearance in this matter. Further, local counsel shall review all filings and shall personally appear in Court for any hearings or conferences, unless expressly excused by the Court for good cause. (Folan, Karen) (Entered: 05/28/2015) |
| 05/27/2015 | 51 | Judge Allison D. Burroughs: ELECTRONIC ORDER entered granting 48 Motion for Leave to Appear Pro Hac Vice Added Steven L. Mayer. **Attorneys admitted Pro Hac Vice must register for electronic filing if the attorney does not already have an** |

|  |  | **ECF account in this district. To register go to the Court website at www.mad.uscourts.gov. Select Case Information, then Electronic Filing (CM/ECF) and go to the CM/ECF Registration Form.** Pursuant to Local Rule 83.5.3, local counsel shall also file an appearance in this matter. Further, local counsel shall review all filings and shall personally appear in Court for any hearings or conferences, unless expressly excused by the Court for good cause. (Folan, Karen) (Entered: 05/28/2015) |
|---|---|---|
| 06/15/2015 | 52 | Judge Allison D. Burroughs: ORDER enteredMEMORANDUM AND ORDER ON PROPOSED DEFENDANT–INTERVENORS' MOTION TO INTERVENE the Proposed Intervenors Motion to Intervene 30 is DENIED; however, the Proposed Intervenors are granted leave to participate in this action as amici curiae. (Montes, Mariliz) (Entered: 06/15/2015) |
| 06/25/2015 | 53 | Joint MOTION for Protective Order *(Stipulated)* by President and Fellows of Harvard College.(Waxman, Seth) (Entered: 06/25/2015) |
| 06/25/2015 | 54 | Judge Allison D. Burroughs: ELECTRONIC ORDER entered The parties' Joint Motion for Protective Order 53 is hereby ALLOWED, and the parties' Stipulated Protective Order is approved. However, given the lack of specificity in Paragraphs 10 and 13 regarding the use of protected documents during public proceedings, the Court reserves the right to allow, after notice to the parties, the disclosure of any document or information covered by the Protective Order or to modify the Protective Order at any time in the interests of justice and to ensure that any proceeding before this Court is fair, efficient, and consistent with the public interest. (Montes, Mariliz) (Entered: 06/25/2015) |
| 06/25/2015 | 55 | Judge Allison D. Burroughs: ORDER entered. STIPULATION PROTECTIVE ORDER REGARDING DISCLOSURE AND USE OF DISCOVERY MATERIALS(Montes, Mariliz) (Entered: 06/25/2015) |
| 06/30/2015 | 56 | MOTION to Continue Status Conference *(UNOPPOSED)* by Students for Fair Admissions, Inc..(Caldwell, Benjamin) (Entered: 06/30/2015) |
| 07/01/2015 | 57 | Judge Allison D. Burroughs: ELECTRONIC ORDER entered granting 56 Motion to Continue. Status Conference reset for 7/21/2015 02:00 PM in Courtroom 17 before Judge Allison D. Burroughs. (Folan, Karen) (Entered: 07/01/2015) |
| 07/06/2015 | 58 | MOTION to Stay by President and Fellows of Harvard College.(Waxman, Seth) (Entered: 07/06/2015) |
| 07/06/2015 | 59 | MEMORANDUM in Support re 58 MOTION to Stay filed by President and Fellows of Harvard College. (Attachments: # 1 Exhibit A)(Waxman, Seth) (Entered: 07/06/2015) |
| 07/13/2015 | 60 | NOTICE OF APPEAL as to 52 Order on Motion to Intervene, by M. B., K. C., Sarah Cole, Y. D., G. E., A. G., I. G., R. H., J. L., Fadhal Moore, Arjini Kumari Nawal, R. S., Itzel Vasquez–Rodriguez, Keyanna Wigglesworth Filing fee: $ 505, receipt number 0101–5656193 Fee Status: Not Exempt. NOTICE TO COUNSEL: A Transcript Report/Order Form, which can be downloaded from the First Circuit Court of Appeals web site at http://www.ca1.uscourts.gov MUST be completed and submitted to the Court of Appeals. **Counsel shall register for a First Circuit CM/ECF Appellate Filer Account at http://pacer.psc.uscourts.gov/cmecf. Counsel shall also review the First Circuit requirements for electronic filing by visiting the CM/ECF Information section at http://www.ca1.uscourts.gov/cmecf.** US District Court Clerk to deliver official record to Court of Appeals by 8/3/2015. (Hall, Rahsaan) (Entered: 07/13/2015) |
| 07/14/2015 | 61 | Certified and Transmitted Abbreviated Electronic Record on Appeal to US Court of Appeals re 60 Notice of Appeal. (Paine, Matthew) (Entered: 07/14/2015) |
| 07/14/2015 | 62 | USCA Case Number 15–1823 for 60 Notice of Appeal filed by G. E., K. C., R. S., Keyanna Wigglesworth, Sarah Cole, Itzel Vasquez–Rodriguez, Fadhal Moore, M. B., Y. D., Arjini Kumari Nawal, I. G., R. H., A. G., J. L.. (Paine, Matthew) (Entered: 07/14/2015) |
| 07/15/2015 | 63 | NOTICE TO COUNSEL: The clerk's office has received a request to video record this hearing as part of the "Cameras in the Courtroom" project. Counsel are directed to the |

**JA58**

| | | district court web site at http://www.mad.uscourts.gov/general/cameras.html to determine if they wish to consent to video recording. Responses are due July 20, 2015. A RESPONSE FROM EACH PARTY IS REQUIRED. (Hurley, Virginia) (Entered: 07/15/2015) |
|---|---|---|
| 07/16/2015 | 64 | MOTION to Compel *Production* by Students for Fair Admissions, Inc..(Caldwell, Benjamin) (Entered: 07/16/2015) |
| 07/16/2015 | 65 | MEMORANDUM in Support re 64 MOTION to Compel *Production* filed by Students for Fair Admissions, Inc.. (Caldwell, Benjamin) (Main Document 65 replaced on 2/9/2016) (Montes, Mariliz). (Entered: 07/16/2015) |
| 07/16/2015 | 66 | DECLARATION re 65 Memorandum in Support of Motion *to Compel Production* by Students for Fair Admissions, Inc.. (Attachments: # 1 Exhibit A, # 2 Exhibit B, # 3 Exhibit C, # 4 Exhibit D, # 5 Exhibit E)(Caldwell, Benjamin) (Entered: 07/16/2015) |
| 07/17/2015 | 67 | MOTION to Seal *Exhibit and Unredacted Memorandum of Law Associated with Motion to Compel* by Students for Fair Admissions, Inc..(Caldwell, Benjamin) (Entered: 07/17/2015) |
| 07/17/2015 | 70 | Judge Allison D. Burroughs: ELECTRONIC ORDER entered granting 67 Motion to Seal (Montes, Mariliz) (Entered: 07/17/2015) |
| 07/20/2015 | 71 | Opposition re 58 MOTION to Stay filed by Students for Fair Admissions, Inc.. (Strawbridge, Patrick) (Entered: 07/20/2015) |
| 07/21/2015 | 72 | MOTION to Seal by President and Fellows of Harvard College.(Ellsworth, Felicia) (Entered: 07/21/2015) |
| 07/21/2015 | 73 | MOTION for Leave to File *Reply Memorandum In Support Of Motion To Stay* by President and Fellows of Harvard College. (Attachments: # 1 Exhibit A, # 2 Exhibit B)(Ellsworth, Felicia) (Entered: 07/21/2015) |
| 07/21/2015 | 74 | ELECTRONIC NOTICE OF RESCHEDULING Status Conference set for 7/21/2015 02:00 PM in Courtroom 16 before Judge Allison D. Burroughs. NOTICE IS FOR COURTROOM LOCATION CHANGE ONLY.(Folan, Karen) (Entered: 07/21/2015) |
| 07/21/2015 | 75 | NOTICE of Withdrawal of Appearance by Rahsaan D. Hall (Hall, Rahsaan) (Entered: 07/21/2015) |
| 07/21/2015 | 76 | NOTICE of Appearance by Priya A. Lane on behalf of M. B., K. C., Sarah Cole, Y. D., G. E., A. G., I. G., R. H., J. L., Fadhal Moore, Arjini Kumari Nawal, R. S., Itzel Vasquez–Rodriguez, Keyanna Wigglesworth (Lane, Priya) (Entered: 07/21/2015) |
| 07/21/2015 | 77 | ELECTRONIC Clerk's Notes for proceedings held before Judge Allison D. Burroughs: granting 72 Motion to Seal; granting 73 Motion for Leave to File Document ; Status Conference held on 7/21/2015; (Court Reporter: Carol Scott at carollynnscott@cs.com.)(Attorneys present: Sanford, Consovoy, Strawbridge, Waxman, Ellsworth, Gershengorn) (Folan, Karen) (Entered: 07/23/2015) |
| 07/23/2015 | 78 | REPLY to Response to 58 MOTION to Stay filed by President and Fellows of Harvard College. (Ellsworth, Felicia) (Entered: 07/23/2015) |
| 07/23/2015 | 79 | DECLARATION re 78 Reply to Response to Motion *to Stay* by President and Fellows of Harvard College. (Attachments: # 1 Exhibit A, # 2 Exhibit B)(Ellsworth, Felicia) (Entered: 07/23/2015) |
| 07/28/2015 | 82 | NOTICE by President and Fellows of Harvard College re 58 MOTION to Stay – *Supplemental Submission* (Ellsworth, Felicia) (Entered: 07/28/2015) |
| 07/28/2015 | 83 | Supplemental Opposition re 58 MOTION to Stay filed by Students for Fair Admissions, Inc.. (Strawbridge, Patrick) (Entered: 07/28/2015) |
| 07/30/2015 | 84 | Transcript of Status Conference held on July 21, 2015, before Judge Allison D. Burroughs. COA Case No. 15–1823. The Transcript may be purchased through the Court Reporter, viewed at the public terminal, or viewed through PACER after it is released. Court Reporter Name and Contact Information: Carol Scott at carollynnscott@cs.com Redaction Request due 8/20/2015. Redacted Transcript Deadline set for 8/31/2015. Release of Transcript Restriction set for 10/28/2015. |

**JA59**

| | | (Scalfani, Deborah) (Entered: 07/30/2015) |
|---|---|---|
| 07/30/2015 | 85 | NOTICE is hereby given that an official transcript of a proceeding has been filed by the court reporter in the above–captioned matter. Counsel are referred to the Court's Transcript Redaction Policy, available on the court website at http://www.mad.uscourts.gov/attorneys/general–info.htm (Scalfani, Deborah) (Entered: 07/30/2015) |
| 07/30/2015 | 86 | MEMORANDUM in Opposition re 64 MOTION to Compel *Production* filed by President and Fellows of Harvard College. (Ellsworth, Felicia) (Entered: 07/30/2015) |
| 07/30/2015 | 87 | DECLARATION re 86 Memorandum in Opposition to Motion *to Compel (McCrary)* by President and Fellows of Harvard College. (Ellsworth, Felicia) (Main Document 87 replaced on 7/31/2015) (Montes, Mariliz). (Additional attachment(s) added on 7/31/2015: # 1 Addendum) (Montes, Mariliz). (Entered: 07/30/2015) |
| 07/30/2015 | 88 | DECLARATION re 86 Memorandum in Opposition to Motion *to Compel (McGrath)* by President and Fellows of Harvard College. (Ellsworth, Felicia) (Entered: 07/30/2015) |
| 07/31/2015 | 89 | Notice of correction to docket made by Court staff. Correction: Docket 87 corrected by detaching Addendum from Declaration and re–filing it as an attachment. (Montes, Mariliz) (Entered: 07/31/2015) |
| 08/05/2015 | 90 | MOTION to Stay *Proceedings Pending Appeal* by M. B., K. C., Sarah Cole, Y. D., G. E., A. G., I. G., R. H., J. L., Fadhal Moore, Arjini Kumari Nawal, R. S., Itzel Vasquez–Rodriguez, Keyanna Wigglesworth.(Lane, Priya) (Entered: 08/05/2015) |
| 08/05/2015 | 91 | MEMORANDUM in Support re 90 MOTION to Stay *Proceedings Pending Appeal* filed by M. B., K. C., Sarah Cole, Y. D., G. E., A. G., I. G., R. H., J. L., Fadhal Moore, Arjini Kumari Nawal, R. S., Itzel Vasquez–Rodriguez, Keyanna Wigglesworth. (Lane, Priya) (Entered: 08/05/2015) |
| 08/06/2015 | 92 | MOTION for Leave to File *Reply Memorandum in Support of Motion to Compel* by Students for Fair Admissions, Inc.. (Attachments: # 1 Proposed Reply Memo, # 2 Declaration of Patrick Strawbridge)(Caldwell, Benjamin) (Entered: 08/06/2015) |
| 08/07/2015 | 93 | Judge Allison D. Burroughs: ELECTRONIC ORDER entered granting 92 Motion for Leave to File Document ; Counsel using the Electronic Case Filing System should now file the document for which leave to file has been granted in accordance with the CM/ECF Administrative Procedures. Counsel must include – Leave to file granted on (date of order)– in the caption of the document. (Montes, Mariliz) (Entered: 08/07/2015) |
| 08/07/2015 | 94 | REPLY to Response to 64 MOTION to Compel *Production* filed by Students for Fair Admissions, Inc.. (Caldwell, Benjamin) (Entered: 08/07/2015) |
| 08/07/2015 | 95 | DECLARATION re 94 Reply to Response to Motion *to Compel* by Students for Fair Admissions, Inc.. (Attachments: # 1 Exhibit A, # 2 Exhibit B)(Caldwell, Benjamin) (Entered: 08/07/2015) |
| 08/07/2015 | 96 | CERTIFICATE OF SERVICE pursuant to LR 5.2 by Students for Fair Admissions, Inc. re 95 Declaration re 94 *Reply to Response to Motion to Compel by Students for Fair Admissions, Inc...* (Caldwell, Benjamin) (Entered: 08/07/2015) |
| 08/14/2015 | 97 | MOTION for Leave to File *A Sur–Reply Memorandum In Opposition to SFFA's Motion to Compel* by President and Fellows of Harvard College. (Attachments: # 1 Exhibit A)(Ellsworth, Felicia) (Entered: 08/14/2015) |
| 08/14/2015 | 98 | Opposition re 90 MOTION to Stay *Proceedings Pending Appeal* filed by Students for Fair Admissions, Inc.. (Strawbridge, Patrick) (Entered: 08/14/2015) |
| 08/17/2015 | 99 | RESPONSE to Motion re 90 MOTION to Stay *Proceedings Pending Appeal* filed by President and Fellows of Harvard College. (Ellsworth, Felicia) (Entered: 08/17/2015) |
| 08/18/2015 | 100 | Judge Allison D. Burroughs: ELECTRONIC ORDER entered granting 97 Motion for Leave to File Document ; Counsel using the Electronic Case Filing System should now file the document for which leave to file has been granted in accordance with the CM/ECF Administrative Procedures. Counsel must include – Leave to file granted on |

| | | (date of order)– in the caption of the document. (Folan, Karen) (Entered: 08/18/2015) |
|---|---|---|
| 08/18/2015 | 101 | SUR–REPLY to Motion re 64 MOTION to Compel *Production* filed by President and Fellows of Harvard College. (Ellsworth, Felicia) (Entered: 08/18/2015) |
| 09/01/2015 | 102 | Letter/request (non–motion) from SFFA Requesting Telephonic Conference . (Strawbridge, Patrick) (Entered: 09/01/2015) |
| 09/28/2015 | 103 | MOTION for Leave to Appear Pro Hac Vice Filing fee: $ 100, receipt number 0101–5765135 by Students for Fair Admissions, Inc.. (Attachments: # 1 Exhibit Certification of Michael H. Park, # 2 Exhibit Proposed Order)(Sanford, Paul) (Entered: 09/28/2015) |
| 09/30/2015 | 104 | Emergency MOTION for Protective Order by President and Fellows of Harvard College. (Attachments: # 1 Declaration in Support of Motion, # 2 Exhibit Exhibit 1 to Ellsworth Declaration, # 3 Exhibit Exhibit 2 to Ellsworth Declaration, # 4 Exhibit Exhibit 3 to Ellsworth Declaration)(Ellsworth, Felicia) Modified on 10/1/2015 (Montes, Mariliz). (Entered: 09/30/2015) |
| 09/30/2015 | 107 | MEMORANDUM in Support re 104 Emergency MOTION for Protective Order filed by President and Fellows of Harvard College. (Montes, Mariliz) (Entered: 10/01/2015) |
| 10/01/2015 | 105 | Opposition re 104 Emergency MOTION for Protective Order filed by Students for Fair Admissions, Inc.. (Strawbridge, Patrick) (Entered: 10/01/2015) |
| 10/01/2015 | 106 | DECLARATION re 105 Opposition to Motion *for Protective Order* by Students for Fair Admissions, Inc.. (Attachments: # 1 Exhibit 1, # 2 Exhibit 2, # 3 Exhibit 3, # 4 Exhibit 4)(Strawbridge, Patrick) (Entered: 10/01/2015) |
| 10/01/2015 | 108 | Notice of correction to docket made by Court staff. Correction: Docket 104 corrected by detaching Memorandum and re–filing it as a separate docket entry. (Montes, Mariliz) (Entered: 10/01/2015) |
| 10/07/2015 | 109 | Judge Allison D. Burroughs: ELECTRONIC ORDER entered granting 103 Motion for Leave to Appear Pro Hac Vice Added Michael H. Park. **Attorneys admitted Pro Hac Vice must register for electronic filing if the attorney does not already have an ECF account in this district. To register go to the Court website at www.mad.uscourts.gov. Select Case Information, then Electronic Filing (CM/ECF) and go to the CM/ECF Registration Form.** Pursuant to Local Rule 83.5.3, local counsel shall also file an appearance in this matter. Further, local counsel shall review all filings and shall personally appear in Court for any hearings or conferences, unless expressly excused by the Court for good cause. (Folan, Karen) (Entered: 10/07/2015) |
| 10/09/2015 | 110 | Judge Allison D. Burroughs: ORDER entered The Proposed Defendant–Intervenors Motion to Stay [ECF No. 90] is ALLOWED IN PART and DENIED IN PART, and Harvards Motion to Stay [ECF No. 58] is also ALLOWED IN PART and DENIED IN PART, as set forth in the accompanying Order. And in light of the Court's ruling, Harvards Emergency Motion for a Protective Order and a Temporary Stay of Depositions [ECF No. 104] is DENIED AS MOOT. (Montes, Mariliz) (Entered: 10/09/2015) |
| 10/23/2015 | 111 | RESPONSE TO COURT ORDER by President and Fellows of Harvard College *Regarding The Proposed Scope Of Discovery During A Stay Pending Resolution Of Fisher II*. (Ellsworth, Felicia) (Entered: 10/23/2015) |
| 10/23/2015 | 112 | RESPONSE TO COURT ORDER by Students for Fair Admissions, Inc. re 110 Order on Motion to Stay,, Order on Motion for Protective Order,,, . (Strawbridge, Patrick) (Entered: 10/23/2015) |
| 10/30/2015 | 113 | Judge Allison D. Burroughs: ELECTRONIC ORDER entered Plaintiff's Motion to Compel Production (ECF No. 64) is DENIED as MOOT with leave to renew. The issue of whether a sample of alumni interviewers should be identified and/or deposed will be addressed at a status conference to be held shortly following the First Circuit's decision regarding intervention. (Montes, Mariliz) (Entered: 10/30/2015) |
| 12/09/2015 | 114 | OPINION of USCA as to 60 Notice of Appeal filed by G. E., K. C., R. S., Keyanna Wigglesworth, Sarah Cole, Itzel Vasquez–Rodriguez, Fadhal Moore, M. B., Y. D., |

**JA61**

| | | Arjini Kumari Nawal, I. G., R. H., A. G., J. L.. (Paine, Matthew) (Entered: 12/10/2015) |
|---|---|---|
| 12/09/2015 | 115 | USCA Judgment as to 60 Notice of Appeal filed by G. E., K. C., R. S., Keyanna Wigglesworth, Sarah Cole, Itzel Vasquez–Rodriguez, Fadhal Moore, M. B., Y. D., Arjini Kumari Nawal, I. G., R. H., A. G., J. L. AFFIRMED. (Paine, Matthew) (Entered: 12/10/2015) |
| 12/31/2015 | 116 | MANDATE of USCA as to 60 Notice of Appeal filed by G. E., K. C., R. S., Keyanna Wigglesworth, Sarah Cole, Itzel Vasquez–Rodriguez, Fadhal Moore, M. B., Y. D., Arjini Kumari Nawal, I. G., R. H., A. G., J. L.. Appeal 60 Terminated (Paine, Matthew) (Entered: 01/04/2016) |
| 01/07/2016 | 117 | ELECTRONIC NOTICE of Hearing. Status Conference set for 1/28/2016 10:00 AM in Courtroom 17 before Judge Allison D. Burroughs. (Folan, Karen) (Entered: 01/07/2016) |
| 01/27/2016 | 118 | Letter/request (non–motion) from SFFA to Judge Burroughs . (Caldwell, Benjamin) (Main Document 118 replaced on 2/9/2016) (Montes, Mariliz). (Entered: 01/27/2016) |
| 01/27/2016 | 119 | MOTION to Seal Document *(SFFA's Letter to Judge Burroughs)* by Students for Fair Admissions, Inc..(Caldwell, Benjamin) (Entered: 01/27/2016) |
| 01/27/2016 | 120 | Judge Allison D. Burroughs: ELECTRONIC ORDER entered granting 119 Motion to Seal Document. (Folan, Karen) (Entered: 01/27/2016) |
| 01/27/2016 | 121 | Letter/request (non–motion) from Harvard In Response to Letter/request (non–motion) from SFFA . (Ellsworth, Felicia) (Entered: 01/27/2016) |
| 01/28/2016 | 123 | Electronic Clerk's Notes for proceedings held before Judge Allison D. Burroughs: Status Conference held on 1/28/2016. Colloquy re: discovery. ( Further Status Conference set for 2/25/2016 11:00 AM in Courtroom 17 before Judge Allison D. Burroughs.) (Court Reporter: Carol Scott at carollynnscott@cs.com.)(Attorneys present: Park, Caldwell, Strawbridge, Waxman, Ellsworth) (Folan, Karen) (Entered: 01/28/2016) |
| 02/01/2016 | 124 | Letter/request (non–motion) from SFFA to Judge Burroughs . (Caldwell, Benjamin) (Main Document 124 replaced on 2/9/2016) (Montes, Mariliz). (Entered: 02/01/2016) |
| 02/01/2016 | 125 | MOTION to Seal Document *(SFFA's letter to Judge Burroughs dated 2.1.16)* by Students for Fair Admissions, Inc..(Caldwell, Benjamin) (Entered: 02/01/2016) |
| 02/02/2016 | 126 | Judge Allison D. Burroughs: ELECTRONIC ORDER entered granting 125 Plaintiff's Motion to Seal Document (Montes, Mariliz) (Entered: 02/02/2016) |
| 02/03/2016 | 128 | Transcript of Status Conference held on January 28, 2016, before Judge Allison D. Burroughs. The Transcript may be purchased through the Court Reporter, viewed at the public terminal, or viewed through PACER after it is released. Court Reporter Name and Contact Information: Carol Scott at carollynnscott@cs.com Redaction Request due 2/24/2016. Redacted Transcript Deadline set for 3/7/2016. Release of Transcript Restriction set for 5/3/2016. (Scalfani, Deborah) (Entered: 02/03/2016) |
| 02/03/2016 | 129 | NOTICE is hereby given that an official transcript of a proceeding has been filed by the court reporter in the above–captioned matter. Counsel are referred to the Court's Transcript Redaction Policy, available on the court website at http://www.mad.uscourts.gov/attorneys/general–info.htm (Scalfani, Deborah) (Entered: 02/03/2016) |
| 02/05/2016 | 130 | MOTION to Seal *Response to SFFA's Jan. 27, 2016 Letter* by President and Fellows of Harvard College.(Ellsworth, Felicia) (Entered: 02/05/2016) |
| 02/08/2016 | 131 | Judge Allison D. Burroughs: ELECTRONIC ORDER entered granting 130 Motion to Seal (Folan, Karen) (Entered: 02/08/2016) |
| 02/09/2016 | 132 | Notice of correction to docket made by Court staff. Correction: Dockets 65 , 118 and 124 corrected: documents were replaced by counsel with identical documents, as he noticed the redacted material (from the original documents), was compromised as a result of hidden metadata. (Montes, Mariliz) (Entered: 02/09/2016) |

| 02/10/2016 | 134 | MOTION to Seal Document *(SFFA's Reply to Harvard's February 5, 2016 Letter)* by Students for Fair Admissions, Inc..(Caldwell, Benjamin) (Additional attachment(s) added on 2/10/2016: # 1 Exhibit. (Folan, Karen). (Entered: 02/10/2016) |
| 02/10/2016 | 135 | Judge Allison D. Burroughs: ELECTRONIC ORDER entered granting 134 Motion to Seal Document. (Folan, Karen) (Entered: 02/10/2016) |
| 02/22/2016 | 136 | Letter/request (non–motion) from Harvard regarding SFFA's February 1, 2016 Letter . (Ellsworth, Felicia) (Entered: 02/22/2016) |
| 02/25/2016 | 137 | Electronic Clerk's Notes for proceedings held before Judge Allison D. Burroughs: Status Conference held on 2/25/2016. Colloquy re: production of documents, protective order. (Further Status Conference set for 3/30/2016 10:00 AM in Courtroom 17 before Judge Allison D. Burroughs.) (Court Reporter: Carol Scott at carollynnscott@cs.com.)(Attorneys present: Park, Caldwell, Strawbridge, Ellsworth, Fox) (Folan, Karen) (Entered: 02/25/2016) |
| 02/29/2016 | 138 | MOTION to Seal Document *Feb. 29, 2016 Letter to Court regarding Database Fields* by President and Fellows of Harvard College.(Ellsworth, Felicia) (Entered: 02/29/2016) |
| 03/01/2016 | 139 | Judge Allison D. Burroughs: ELECTRONIC ORDER entered granting 138 Defendant's Motion to File Under Seal Harvard's February 29, 2016 letter (Montes, Mariliz) (Entered: 03/01/2016) |
| 03/02/2016 | 141 | MOTION to Seal Document *(SFFA's Reply to Harvard's February 29, 2016 Letter)* by Students for Fair Admissions, Inc..(Caldwell, Benjamin) (Entered: 03/02/2016) |
| 03/03/2016 | 142 | Judge Allison D. Burroughs: ELECTRONIC ORDER entered granting 141 Motion to Seal Document (Folan, Karen) (Entered: 03/03/2016) |
| 03/04/2016 | 143 | Transcript of Status Conference held on February 25, 2016, before Judge Allison D. Burroughs. The Transcript may be purchased through the Court Reporter, viewed at the public terminal, or viewed through PACER after it is released. Court Reporter Name and Contact Information: Carol Scott at carollynnscott@cs.com Redaction Request due 3/25/2016. Redacted Transcript Deadline set for 4/4/2016. Release of Transcript Restriction set for 6/2/2016. (Scalfani, Deborah) (Entered: 03/04/2016) |
| 03/04/2016 | 144 | NOTICE is hereby given that an official transcript of a proceeding has been filed by the court reporter in the above–captioned matter. Counsel are referred to the Court's Transcript Redaction Policy, available on the court website at http://www.mad.uscourts.gov/attorneys/general–info.htm (Scalfani, Deborah) (Entered: 03/04/2016) |
| 03/11/2016 | 146 | Judge Allison D. Burroughs: STAY ORDER entered. ( Status Conference set for 4/25/2016 02:00 PM in Courtroom 17 before Judge Allison D. Burroughs.)(Folan, Karen) (Entered: 03/11/2016) |
| 04/15/2016 | 147 | Letter/request (non–motion) from Harvard Regarding Discovery of SFFA . (Attachments: # 1 Exhibit 1, # 2 Exhibit 2, # 3 Exhibit 3, # 4 Exhibit 4, # 5 Exhibit 5)(Ellsworth, Felicia) (Entered: 04/15/2016) |
| 04/21/2016 | 148 | MOTION to Continue Status Conference of April 25, 2016 to April 29, 2016 *(UNOPPOSED)* by Students for Fair Admissions, Inc..(Caldwell, Benjamin) (Entered: 04/21/2016) |
| 04/22/2016 | 149 | Judge Allison D. Burroughs: ELECTRONIC ORDER entered granting 148 Motion to Continue Status Conference set for 4/29/2016 02:30 PM in Courtroom 17 before Judge Allison D. Burroughs. (Folan, Karen) (Entered: 04/22/2016) |
| 04/29/2016 | 150 | Letter/request (non–motion) from Students for Fair Admissions . (Attachments: # 1 Affidavit Ex A, # 2 Exhibit Ex B, # 3 Affidavit Ex C, # 4 Affidavit Ex D, # 5 Affidavit Ex E)(Consovoy, William) (Entered: 04/29/2016) |
| 04/29/2016 | 151 | Electronic Clerk's Notes for proceedings held before Judge Allison D. Burroughs: Status Conference held on 4/29/2016. Parties will have two weeks after Fisher to file a letter to the court. Colloquy re: discovery dispute. (Court Reporter: Cheryl Dahlstrom at cheryldahlstrom@comcast.net.)(Attorneys present: various) (Folan, Karen) (Entered: 05/03/2016) |

| 05/10/2016 | 152 | Transcript of Status Conference held on April 29, 2016, before Judge Allison D. Burroughs. The Transcript may be purchased through the Court Reporter, viewed at the public terminal, or viewed through PACER after it is released. Court Reporter Name and Contact Information: Cheryl Dahlstrom at cheryldahlstrom@comcast.net Redaction Request due 5/31/2016. Redacted Transcript Deadline set for 6/10/2016. Release of Transcript Restriction set for 8/8/2016. (Scalfani, Deborah) (Entered: 05/10/2016) |
|---|---|---|
| 05/10/2016 | 153 | NOTICE is hereby given that an official transcript of a proceeding has been filed by the court reporter in the above–captioned matter. Counsel are referred to the Court's Transcript Redaction Policy, available on the court website at http://www.mad.uscourts.gov/attorneys/general–info.htm (Scalfani, Deborah) (Entered: 05/10/2016) |
| 05/18/2016 | 154 | Letter/request (non–motion) from Harvard *Regarding Discovery of SFFA*. (Attachments: # 1 Exhibit Yoga Source v. Choudhury, # 2 Exhibit SFFA Articles of Incorporation and Bylaws)(Ellsworth, Felicia) (Entered: 05/18/2016) |
| 06/17/2016 | 155 | NOTICE of Appearance by William F. Lee on behalf of President and Fellows of Harvard College (Lee, William) (Entered: 06/17/2016) |
| 06/27/2016 | 156 | ELECTRONIC NOTICE of Hearing. Status Conference set for 7/20/2016 03:15 PM in Courtroom 17 before Judge Allison D. Burroughs. (Folan, Karen) (Entered: 06/27/2016) |
| 07/08/2016 | 157 | MOTION to Seal *Letter* by President and Fellows of Harvard College.(Ellsworth, Felicia) (Entered: 07/08/2016) |
| 07/08/2016 | 158 | Judge Allison D. Burroughs: ELECTRONIC ORDER entered granting 157 Defendant's Motion to File Under Seal Defendant's Unredacted Letter Regarding Implication of Fisher II for this Litigation. (Montes, Mariliz) (Entered: 07/08/2016) |
| 07/08/2016 | 159 | MOTION to Seal Document *(SFFA's letter to Judge Burroughs dated 7.8.16)* by Students for Fair Admissions, Inc..(Caldwell, Benjamin) (Entered: 07/08/2016) |
| 07/08/2016 | 160 | Judge Allison D. Burroughs: ELECTRONIC ORDER entered granting 159 Motion to Seal Document. (Folan, Karen) (Entered: 07/08/2016) |
| 07/11/2016 | 161 | NOTICE of Appearance by Matthew M. Cregor on behalf of M. B., K. C., Sarah Cole, Y. D., G. E., A. G., I. G., R. H., J. L., Fadhal Moore, Arjini Kumari Nawal, R. S., Itzel Vasquez–Rodriguez, Keyanna Wigglesworth (Cregor, Matthew) (Entered: 07/11/2016) |
| 07/19/2016 | 164 | Assented to MOTION to Seal *Unredacted Letter* by President and Fellows of Harvard College.(Ellsworth, Felicia) (Entered: 07/19/2016) |
| 07/19/2016 | 165 | Judge Allison D. Burroughs: ELECTRONIC ORDER entered granting 164 Motion to Seal. (Folan, Karen) (Entered: 07/19/2016) |
| 07/20/2016 | 166 | MOTION to Seal *SFFA's Unredacted Letter to J. Burroughs* by Students for Fair Admissions, Inc..(Caldwell, Benjamin) (Entered: 07/20/2016) |
| 07/20/2016 | 167 | Judge Allison D. Burroughs: ELECTRONIC ORDER entered granting 166 Motion to Seal SFFA's Unredacted Letter to J. Burroughs by Students for Fair Admissions, Inc. (Montes, Mariliz) (Entered: 07/20/2016) |
| 07/20/2016 | 170 | Electronic Clerk's Notes for proceedings held before Judge Allison D. Burroughs: Status Conference held on 7/20/2016. Colloquy re: discovery. (Court Reporter: Carol Scott at carollynnscott@cs.com.)(Attorneys present: Consovoy, Ellsworth, Waxman, Strawbridge, Cregor) (Folan, Karen) (Entered: 07/21/2016) |
| 07/27/2016 | 171 | Letter/request (non–motion) from Harvard *regarding Scope of Discovery*. (Ellsworth, Felicia) (Entered: 07/27/2016) |
| 07/28/2016 | 172 | Letter/request (non–motion) from SFFA to Judge Burroughs responding to Harvard's 7.27.16 Letter . (Strawbridge, Patrick) (Entered: 07/28/2016) |
| 08/04/2016 | 173 | Transcript of Status Conference held on July 20, 2016, before Judge Allison D. Burroughs. The Transcript may be purchased through the Court Reporter, viewed at the public terminal, or viewed through PACER after it is released. Court Reporter |

| | | Name and Contact Information: Carol Scott at carollynnscott@cs.com Redaction Request due 8/25/2016. Redacted Transcript Deadline set for 9/5/2016. Release of Transcript Restriction set for 11/2/2016. (Scalfani, Deborah) (Entered: 08/04/2016) |
|---|---|---|
| 08/04/2016 | 174 | NOTICE is hereby given that an official transcript of a proceeding has been filed by the court reporter in the above–captioned matter. Counsel are referred to the Court's Transcript Redaction Policy, available on the court website at http://www.mad.uscourts.gov/attorneys/general–info.htm (Scalfani, Deborah) (Entered: 08/04/2016) |
| 08/11/2016 | 175 | Letter/request (non–motion) from Students for Fair Admissions, Inc. . (Strawbridge, Patrick) (Entered: 08/11/2016) |
| 08/29/2016 | 176 | ELECTRONIC NOTICE of Hearing. Status Conference set for 9/6/2016 09:30 AM in Courtroom 17 before Judge Allison D. Burroughs. Status Conference to address disputed issues with respect to Harvard's production of various databases.(Folan, Karen) (Entered: 08/29/2016) |
| 08/30/2016 | 177 | Assented to MOTION for Leave to Appear Pro Hac Vice for admission of Daniel Winik Filing fee: $ 100, receipt number 0101–6270154 by President and Fellows of Harvard College.(Ellsworth, Felicia) (Entered: 08/30/2016) |
| 08/31/2016 | 178 | Judge Allison D. Burroughs: ELECTRONIC ORDER entered granting 177 Motion for Leave to Appear Pro Hac Vice Added Daniel Winik. **Attorneys admitted Pro Hac Vice must register for electronic filing if the attorney does not already have an ECF account in this district. To register go to the Court website at www.mad.uscourts.gov. Select Case Information, then Electronic Filing (CM/ECF) and go to the CM/ECF Registration Form.** Pursuant to Local Rule 83.5.3, local counsel shall also file an appearance in this matter. Further, local counsel shall review all filings and shall personally appear in Court for any hearings or conferences, unless expressly excused by the Court for good cause. (Montes, Mariliz) (Entered: 08/31/2016) |
| 09/01/2016 | 179 | NOTICE of Appearance by Oren M. Sellstrom on behalf of M. B., K. C., Sarah Cole, Y. D., G. E., A. G., I. G., R. H., J. L., Fadhal Moore, Arjini Kumari Nawal, R. S., Itzel Vasquez–Rodriguez, Keyanna Wigglesworth (Sellstrom, Oren) (Entered: 09/01/2016) |
| 09/01/2016 | 180 | Judge Allison D. Burroughs: ORDER entered. AMENDED SCHEDULING ORDER: Amended Pleadings due by 9/15/16; Fact Discovery to be completed by 6/20/2017 Dispositive Motions due by 3/2/2018. (Montes, Mariliz) (Entered: 09/02/2016) |
| 09/06/2016 | 182 | Electronic Clerk's Notes for proceedings held before Judge Allison D. Burroughs: Status Conference held on 9/6/2016. Colloquy re: pending motion, discovery issues, depositions, confidentiality designations. (Court Reporter: Carol Scott at carollynnscott@cs.com.)(Attorneys present: various) (Folan, Karen) (Entered: 09/09/2016) |
| 09/07/2016 | 181 | Judge Allison D. Burroughs: ORDER on Various Discovery Disputes entered. (Montes, Mariliz) (Entered: 09/07/2016) |
| 09/22/2016 | 183 | Assented to MOTION to Seal *Memorandum and Supporting Materials in Support of Defendant's Motion to Dismiss* by President and Fellows of Harvard College.(Ellsworth, Felicia) (Entered: 09/22/2016) |
| 09/23/2016 | 184 | Judge Allison D. Burroughs: ELECTRONIC ORDER entered granting 183 Motion to Seal (Folan, Karen) (Entered: 09/23/2016) |
| 09/23/2016 | 185 | MOTION for Judgment on the Pleadings *on Counts IV and VI* by President and Fellows of Harvard College.(Waxman, Seth) (Entered: 09/23/2016) |
| 09/23/2016 | 186 | MEMORANDUM in Support re 185 MOTION for Judgment on the Pleadings *on Counts IV and VI* filed by President and Fellows of Harvard College. (Waxman, Seth) (Entered: 09/23/2016) |
| 09/23/2016 | 187 | MOTION to Dismiss for Lack of Jurisdiction by President and Fellows of Harvard College.(Waxman, Seth) (Entered: 09/23/2016) |

**JA65**

| 09/23/2016 | 188 | DECLARATION re 187 MOTION to Dismiss for Lack of Jurisdiction by President and Fellows of Harvard College. (Attachments: # 1 Exhibit A, # 2 Exhibit B, # 3 Exhibit C, # 4 Exhibit D, # 5 Exhibit E, # 6 Exhibit F, # 7 Exhibit G, # 8 Exhibit H, # 9 Exhibit I)(Ellsworth, Felicia) (Additional attachment(s) added on 9/27/2016: # 10 Exhibit A (unredacted), # 11 Exhibit B (unredacted), # 12 Exhibit C (unredacted), # 13 Exhibit E (unredcted), # 14 Exhibit F (unredacted), # 15 Exhibit G (unredacted)) (Montes, Mariliz). (Entered: 09/23/2016) |
| 09/26/2016 | 189 | Letter/request (non–motion) from SFFA *in response to motions filed by Harvard*. (Strawbridge, Patrick) (Entered: 09/26/2016) |
| 09/26/2016 | 190 | MEMORANDUM in Support re 187 MOTION to Dismiss for Lack of Jurisdiction *(Redacted)* filed by President and Fellows of Harvard College. (Waxman, Seth) (Additional attachment(s) added on 9/27/2016: # 1 (Unredacted) Memorandum in Supp.) (Montes, Mariliz). (Entered: 09/26/2016) |
| 09/29/2016 | 191 | Letter/request (non–motion) from Harvard *in response to SFFA's letter/request (Dkt. 189).* (Waxman, Seth) (Entered: 09/29/2016) |
| 09/30/2016 | 192 | Letter/request (non–motion) from SFFA *in Response to Harvard's Letter of September 29, 2016.* (Strawbridge, Patrick) (Entered: 09/30/2016) |
| 10/03/2016 | 193 | Transcript of Status Conference held on September 6, 2016, before Judge Allison D. Burroughs. The Transcript may be purchased through the Court Reporter, viewed at the public terminal, or viewed through PACER after it is released. Court Reporter Name and Contact Information: Carol Scott at carollynnscott@cs.com Redaction Request due 10/24/2016. Redacted Transcript Deadline set for 11/3/2016. Release of Transcript Restriction set for 1/2/2017. (Scalfani, Deborah) (Entered: 10/03/2016) |
| 10/03/2016 | 194 | NOTICE is hereby given that an official transcript of a proceeding has been filed by the court reporter in the above–captioned matter. Counsel are referred to the Court's Transcript Redaction Policy, available on the court website at http://www.mad.uscourts.gov/attorneys/general–info.htm (Scalfani, Deborah) (Entered: 10/03/2016) |
| 10/05/2016 | 196 | STIPULATION re 187 MOTION to Dismiss for Lack of Jurisdiction , 185 MOTION for Judgment on the Pleadings *on Counts IV and VI (Stipulation to Enlarge Time to File an Opposition)* by Students for Fair Admissions, Inc.. (Caldwell, Benjamin) (Entered: 10/05/2016) |
| 10/06/2016 | 197 | ELECTRONIC ENDORSEMENT APPROVING 196 Stipulation to Enlarge Time to File an Opposition, filed by Students for Fair Admissions, Inc. (Folan, Karen) (Entered: 10/06/2016) |
| 10/19/2016 | 199 | MEMORANDUM in Support re 185 MOTION for Judgment on the Pleadings *on Counts IV and VI* filed by M. B., K. C., Sarah Cole, Y. D., G. E., A. G., I. G., R. H., J. L., Fadhal Moore, Arjini Kumari Nawal, R. S., Itzel Vasquez–Rodriguez, Keyanna Wigglesworth. (Culleen, Lawrence) (Entered: 10/19/2016) |
| 10/20/2016 | 200 | Letter/request (non–motion) from Harvard *regarding document production*. (Ellsworth, Felicia) (Entered: 10/20/2016) |
| 10/20/2016 | 201 | Assented to MOTION to Seal Document *(Opposition Memorandums and Supporting Materials)* by Students for Fair Admissions, Inc..(Caldwell, Benjamin) (Entered: 10/20/2016) |
| 10/21/2016 | 202 | MEMORANDUM in Opposition re 185 MOTION for Judgment on the Pleadings *on Counts IV and VI (Redacted)* filed by Students for Fair Admissions, Inc.. (Consovoy, William) (Additional attachment(s) added on 10/27/2016: # 1 Sealed– Memorandum in Opposition for Judgment on the Pleadings) (Montes, Mariliz). (Entered: 10/21/2016) |
| 10/21/2016 | 203 | DECLARATION re 202 Memorandum in Opposition to Motion by Students for Fair Admissions, Inc.. (Attachments: # 1 Exhibit A (Redacted))(Consovoy, William) (Additional attachment(s) added on 10/27/2016: # 2 Exhibit Sealed Exhibit to the Declaration of William S. Consovoy) (Montes, Mariliz). (Entered: 10/21/2016) |

| 10/21/2016 | 204 | MEMORANDUM in Opposition re 187 MOTION to Dismiss for Lack of Jurisdiction *(Redacted)* filed by Students for Fair Admissions, Inc.. (Consovoy, William) (Additional attachment(s) added on 10/27/2016: # 1 Sealed MEMORANDUM in Opposition 187 MOTION to Dismiss) (Montes, Mariliz). (Entered: 10/21/2016) |
|---|---|---|
| 10/21/2016 | 205 | DECLARATION re 204 Memorandum in Opposition to Motion *(Redacted)* by Students for Fair Admissions, Inc.. (Attachments: # 1 Exhibit A (Redacted), # 2 Exhibit B (Redacted), # 3 Exhibit C (Redacted), # 4 Exhibit D (Redacted), # 5 Exhibit E (Redacated), # 6 Exhibit F, # 7 Exhibit G (Redacted), # 8 Exhibit H, # 9 Exhibit I, # 10 Exhibit J (Redacted), # 11 Exhibit K (Redacted), # 12 Exhibit L (Redacted), # 13 Exhibit M (Redacted), # 14 Exhibit N (Redacted), # 15 Exhibit O (Redacted), # 16 Exhibit P (Redacted), # 17 Exhibit Q (Redacted), # 18 Exhibit R (Redacted), # 19 Exhibit S (Redacted), # 20 Exhibit T (Redacted), # 21 Exhibit U)(Consovoy, William) (Additional attachment(s) added on 10/27/2016: # 22 Sealed Version: Plaintiff's Opposition to Defendant's Motion to Dismiss, # 23 Exhibit Sealed Exhibit A to Declaraiton of W. S. Convoy, # 24 Exhibit Sealed Exhibit B to Declaraiton of W. S. Convoy, # 25 Exhibit Sealed Exhibit C to Declaraiton of W. S. Convoy, # 26 Exhibit Sealed Exhibit D to Declaraiton of W. S. Convoy, # 27 Exhibit Sealed Exhibit E to Declaraiton of W. S. Convoy, # 28 Exhibit Sealed Exhibit F to Declaraiton of W. S. Convoy, # 29 Exhibit Sealed Exhibit G to Declaraiton of W. S. Convoy, # 30 Exhibit Sealed Exhibit H to Declaraiton of W. S. Convoy, # 31 Sealed Exhibit I to Declaration of W. S. Convoy, # 32 Exhibit Sealed Exhibit J to Declaration of W. S. Convoy, # 33 Exhibit Sealed Exhibit K to Declaration of W. S. Convoy, # 34 Exhibit Sealed Exhibit L to Declaration of W. S. Convoy, # 35 Exhibit Sealed Exhibit M to Declaration of W. S. Convoy, # 36 Exhibit Sealed Exhibit N to Declaration of W. S. Convoy, # 37 Exhibit Sealed Exhibit O to Declaration of W. S. Convoy, # 38 Exhibit Sealed Exhibit P to Declaration of W. S. Convoy, # 39 Exhibit Sealed Exhibit Q to Declaration of W. S. Convoy, # 40 Exhibit Sealed Exhibit R to Declaration of W. S. Convoy, # 41 Exhibit Sealed Exhibit S to Declaration of W. S. Convoy, # 42 Exhibit Sealed Exhibit T to Declaration of W. S. Convoy, # 43 Exhibit Sealed Exhibit U to Declaration of W. S. Convoy) (Montes, Mariliz). (Entered: 10/21/2016) |
| 10/24/2016 | 206 | Judge Allison D. Burroughs: ELECTRONIC ORDER entered granting 201 Motion to Seal Document (Folan, Karen) (Entered: 10/24/2016) |
| 11/01/2016 | 209 | Assented to MOTION to Seal *SFFA's Unredacted Letter to J. Burroughs and accompanying documents* by Students for Fair Admissions, Inc..(Caldwell, Benjamin) (Entered: 11/01/2016) |
| 11/01/2016 | 210 | Judge Allison D. Burroughs: ELECTRONIC ORDER entered granting 209 Motion to Seal (Folan, Karen) (Entered: 11/01/2016) |
| 11/03/2016 | 211 | MOTION for Leave to File *Reply Memorandum in Support of Motion for Judgment on the Pleadings* by President and Fellows of Harvard College.(Waxman, Seth) (Entered: 11/03/2016) |
| 11/03/2016 | 212 | MOTION for Leave to File *Reply Memorandum in Support of Motion to Dismiss* by President and Fellows of Harvard College.(Waxman, Seth) (Entered: 11/03/2016) |
| 11/03/2016 | 213 | MOTION to Seal Document *Reply Memorandum and Exhibit in Support of Motion to Dismiss* by President and Fellows of Harvard College.(Ellsworth, Felicia) (Entered: 11/03/2016) |
| 11/03/2016 | 215 | Judge Allison D. Burroughs: ELECTRONIC ORDER entered granting 211 Motion for Leave to File Document ; Counsel using the Electronic Case Filing System should now file the document for which leave to file has been granted in accordance with the CM/ECF Administrative Procedures. Counsel must include – Leave to file granted on (date of order)– in the caption of the document. (Folan, Karen) (Entered: 11/03/2016) |
| 11/03/2016 | 216 | Judge Allison D. Burroughs: ELECTRONIC ORDER entered granting 212 Motion for Leave to File Document ; Counsel using the Electronic Case Filing System should now file the document for which leave to file has been granted in accordance with the CM/ECF Administrative Procedures. Counsel must include – Leave to file granted on (date of order)– in the caption of the document. (Folan, Karen) (Entered: 11/03/2016) |
| 11/03/2016 | 217 | Judge Allison D. Burroughs: ELECTRONIC ORDER entered granting 213 Motion to Seal Document (Folan, Karen) (Entered: 11/03/2016) |

| 11/04/2016 | 218 | REPLY to Response to 185 MOTION for Judgment on the Pleadings *on Counts IV and VI* filed by President and Fellows of Harvard College. (Waxman, Seth) (Entered: 11/04/2016) |
|---|---|---|
| 11/04/2016 | 219 | DECLARATION *re Reply Memorandum in Support of Motion to Dismiss* by President and Fellows of Harvard College. (Attachments: # 1 Exhibit A, # 2 Exhibit B, # 3 Exhibit C, # 4 Exhibit D, # 5 Exhibit E)(Ellsworth, Felicia) (Additional attachment(s) added on 11/8/2016: # 6 Exhibit A (sealed)) (Montes, Mariliz). (Entered: 11/04/2016) |
| 11/08/2016 | 220 | REPLY to Response to 187 MOTION to Dismiss for Lack of Jurisdiction *(Redacted)* filed by President and Fellows of Harvard College. (Waxman, Seth) (Additional attachment(s) added on 11/8/2016: # 1 Sealed Reply Memorandum in Support of Defendant's Motion to Dismiss) (Montes, Mariliz). (Entered: 11/08/2016) |
| 12/01/2016 | 222 | Assented to MOTION to Seal *SFFA's Motions to Compel* by Students for Fair Admissions, Inc..(Caldwell, Benjamin) (Entered: 12/01/2016) |
| 12/05/2016 | 223 | Judge Allison D. Burroughs: ELECTRONIC ORDER entered granting 222 Motion to Seal (Folan, Karen) (Entered: 12/05/2016) |
| 12/12/2016 | 228 | MOTION for Leave to Appear Pro Hac Vice for admission of Nicole Gon Ochi Filing fee: $ 100, receipt number 0101–6410623 by M. B., K. C., Sarah Cole, Y. D., G. E., A. G., I. G., R. H., J. L., Fadhal Moore, Arjini Kumari Nawal, R. S., Itzel Vasquez–Rodriguez, Keyanna Wigglesworth. (Attachments: # 1 Exhibit Certificate of Good Standing, # 2 Exhibit Declaration)(Cregor, Matthew) (Entered: 12/12/2016) |
| 12/12/2016 | 229 | Judge Allison D. Burroughs: ELECTRONIC ORDER entered granting 228 Motion for Leave to Appear Pro Hac Vice admitted Nicole K. Ochi. **Attorneys admitted Pro Hac Vice must register for electronic filing if the attorney does not already have an ECF account in this district. To register go to the Court website at www.mad.uscourts.gov. Select Case Information, then Electronic Filing (CM/ECF) and go to the CM/ECF Registration Form.** Pursuant to Local Rule 83.5.3, local counsel shall also file an appearance in this matter. Further, local counsel shall review all filings and shall personally appear in Court for any hearings or conferences, unless expressly excused by the Court for good cause. (Montes, Mariliz) (Entered: 12/12/2016) |
| 12/12/2016 | 230 | MOTION for Leave to File *to Participate as Amici Curiae* by M. B., K. C., Sarah Cole, Y. D., G. E., A. G., I. G., R. H., J. L., Fadhal Moore, Arjini Kumari Nawal, R. S., Itzel Vasquez–Rodriguez, Keyanna Wigglesworth. (Attachments: # 1 Exhibit, # 2 Exhibit)(Culleen, Lawrence) (Entered: 12/12/2016) |
| 12/19/2016 | 231 | MOTION to Seal *Oppositions to SFFA's Motions to Compel* by President and Fellows of Harvard College.(Ellsworth, Felicia) (Entered: 12/19/2016) |
| 12/19/2016 | 232 | Judge Allison D. Burroughs: ELECTRONIC ORDER entered granting 231 Motion to Seal (Folan, Karen) (Entered: 12/19/2016) |
| 12/22/2016 | 236 | Assented to MOTION for Leave to File *Reply Memoranda in Support of SFFA's Two Pending Motions to Compel* by Students for Fair Admissions, Inc..(Caldwell, Benjamin) (Entered: 12/22/2016) |
| 12/22/2016 | 237 | Judge Allison D. Burroughs: ELECTRONIC ORDER entered granting 236 Motion for Leave to File Document ; Counsel using the Electronic Case Filing System should now file the document for which leave to file has been granted in accordance with the CM/ECF Administrative Procedures. Counsel must include – Leave to file granted on (date of order)– in the caption of the document. (Folan, Karen) (Entered: 12/22/2016) |
| 01/03/2017 | 238 | Assented to MOTION to Seal *Reply Memoranda in Support of SFFA's Two Pending Motions to Compel* by Students for Fair Admissions, Inc..(Caldwell, Benjamin) (Entered: 01/03/2017) |
| 01/03/2017 | 239 | Judge Allison D. Burroughs: ELECTRONIC ORDER entered granting 238 Motion to Seal (Folan, Karen) (Entered: 01/03/2017) |
| 01/05/2017 | 240 | Letter/request (non–motion) from SFFA *regarding discovery matters.* (Strawbridge, Patrick) (Entered: 01/05/2017) |

| 01/18/2017 | 244 | Judge Allison D. Burroughs: ELECTRONIC ORDER entered 230 Motion for Leave to Participate As Amici Curiae is GRANTED. The students J.F. and M.A. are allowed to participate in this matter as amici curiae alongside the current amici curiae and under the same terms and conditions. [ECF No. 52]. (Montes, Mariliz) (Entered: 01/18/2017) |
| 02/02/2017 | 245 | Joint MOTION to Seal *Letters Regarding Production Of Reviewer Comments* by President and Fellows of Harvard College.(Ellsworth, Felicia) (Entered: 02/02/2017) |
| 02/03/2017 | 246 | Judge Allison D. Burroughs: ELECTRONIC ORDER entered granting 245 Motion to Seal (Folan, Karen) (Entered: 02/03/2017) |
| 02/08/2017 | 249 | NOTICE of Appearance by Andrew S. Dulberg on behalf of President and Fellows of Harvard College (Dulberg, Andrew) (Entered: 02/08/2017) |
| 02/08/2017 | 250 | NOTICE of Appearance by Elizabeth C. Mooney on behalf of President and Fellows of Harvard College (Mooney, Elizabeth) (Entered: 02/08/2017) |
| 03/13/2017 | 251 | Assented to MOTION for Order to Produce Applicant Files by President and Fellows of Harvard College. (Attachments: # 1 Text of Proposed Order Proposed Order for Application Files)(Ellsworth, Felicia) (Entered: 03/13/2017) |
| 03/13/2017 | 252 | Judge Allison D. Burroughs: ORDER entered granting 251 Motion for Order. (Folan, Karen) (Entered: 03/13/2017) |
| 03/13/2017 | 253 | Assented to MOTION to Seal *Motion to Quash Subpoenas and Deposition Notices or for a Protective Order* by Students for Fair Admissions, Inc..(Caldwell, Benjamin) (Entered: 03/13/2017) |
| 03/15/2017 | 254 | Judge Allison D. Burroughs: ELECTRONIC ORDER entered granting 253 Motion to Seal (Folan, Karen) (Entered: 03/15/2017) |
| 03/21/2017 | 258 | Assented to MOTION to Seal *Motion for a Protective Order and to Quash Deposition Notices* by Students for Fair Admissions, Inc..(Caldwell, Benjamin) (Entered: 03/21/2017) |
| 03/21/2017 | 259 | Judge Allison D. Burroughs: ELECTRONIC ORDER entered granting 258 Motion to Seal (Folan, Karen) (Entered: 03/21/2017) |
| 03/28/2017 | 263 | Assented to MOTION to Seal Document *Opposition to SFFA's Motion to Quash Subpoenas and Deposition Notices or For a Protective Order* by President and Fellows of Harvard College.(Ellsworth, Felicia) (Entered: 03/28/2017) |
| 03/29/2017 | 264 | Judge Allison D. Burroughs: ELECTRONIC ORDER entered granting 263 Motion to Seal Document (Folan, Karen) (Entered: 03/29/2017) |
| 03/31/2017 | 265 | Assented to MOTION for Leave to File *Reply Memorandum in Support of SFFA's Motion to Quash Subpoenas and Deposition Notices or for a Protective Order* by Students for Fair Admissions, Inc..(Caldwell, Benjamin) (Entered: 03/31/2017) |
| 04/03/2017 | 267 | Judge Allison D. Burroughs: ELECTRONIC ORDER entered granting 265 Motion for Leave to File Document ; Counsel using the Electronic Case Filing System should now file the document for which leave to file has been granted in accordance with the CM/ECF Administrative Procedures. Counsel must include – Leave to file granted on (date of order)– in the caption of the document. (Folan, Karen) (Entered: 04/03/2017) |
| 04/03/2017 | 268 | Assented to MOTION to Seal Document *Harvard's Opposition to SFFA's Motion for a Protective Order and to Quash Deposition Notices* by President and Fellows of Harvard College.(Ellsworth, Felicia) (Entered: 04/03/2017) |
| 04/03/2017 | 269 | Judge Allison D. Burroughs: ELECTRONIC ORDER entered granting 268 Motion to Seal Document (Folan, Karen) (Entered: 04/03/2017) |
| 04/03/2017 | 270 | Assented to MOTION to Seal Document *SFFA's Reply in Support of its Motion to Quash Subpoenas and Deposition Notices or for a Protective Order* by Students for Fair Admissions, Inc..(Caldwell, Benjamin) (Entered: 04/03/2017) |
| 04/03/2017 | 271 | Judge Allison D. Burroughs: ELECTRONIC ORDER entered granting 270 Motion to Seal Document (Folan, Karen) (Entered: 04/03/2017) |

**JA69**

| 04/06/2017 | 272 | First MOTION to Quash *Plaintiff's Subpoena to BLS* by Boston Public Schools.(Seich, Jennifer) (Main Document 272 replaced on 4/10/2017) (Montes, Mariliz). (Entered: 04/06/2017) |
|---|---|---|
| 04/06/2017 | 276 | MEMORANDUM in Support of 272 First MOTION to Quash *Plaintiff's Subpoena to BLS* filed by Boston Public Schools. (Attachments: # 1 Exhibit 1)(Montes, Mariliz) (Entered: 04/10/2017) |
| 04/07/2017 | 275 | Assented to MOTION to Seal *SFFA's Motions to Compel* by Students for Fair Admissions, Inc..(Caldwell, Benjamin) (Entered: 04/07/2017) |
| 04/10/2017 | 277 | Notice of correction to docket made by Court staff. Correction: Docket 272 corrected by detaching memorandum and it's exhibit and re–docketing as a separate docket entry. (Montes, Mariliz) (Entered: 04/10/2017) |
| 04/10/2017 | 278 | Assented to MOTION for Leave to File *Reply Memorandum in Support of SFFA's Motion for a Protective Order and to Quash Deposition Notices* by Students for Fair Admissions, Inc..(Caldwell, Benjamin) (Entered: 04/10/2017) |
| 04/10/2017 | 279 | Judge Allison D. Burroughs: ELECTRONIC ORDER entered granting 275 Assented–To Motion to Under Seal Two Motions to Compel; granting 278 Plaintiff's Assented–To Motion for Leave to File a Reply Memorandum in Support of Its Motion for a Protective Order and to Quash Deposition Notices ; Counsel using the Electronic Case Filing System should now file the document for which leave to file has been granted in accordance with the CM/ECF Administrative Procedures. Counsel must include – Leave to file granted on (date of order)– in the caption of the document. (Montes, Mariliz) (Entered: 04/10/2017) |
| 04/10/2017 | 280 | Assented to MOTION to Seal *Reply Memorandum in Support of SFFA's Motion for a Protective Order and to Quash Deposition Notices* by Students for Fair Admissions, Inc..(Caldwell, Benjamin) (Entered: 04/10/2017) |
| 04/10/2017 | 281 | Judge Allison D. Burroughs: ELECTRONIC ORDER entered granting 280 Plaintiff's Assented–to Motion to File Under Seal Reply Memorandum in Support of Motion for a Protective Order and to Quash Deposition Notices (Montes, Mariliz) (Entered: 04/10/2017) |
| 04/11/2017 | 282 | Assented to MOTION to Seal *SFFA's Letter Motion Regarding Depositions and Custodians* by Students for Fair Admissions, Inc..(Caldwell, Benjamin) (Entered: 04/11/2017) |
| 04/11/2017 | 283 | Judge Allison D. Burroughs: ELECTRONIC ORDER entered granting 282 Plaintiff's Assented–To Motion to File Under Seal Plaintiff's Letter Motion Regarding Depositions and Custodians. (Montes, Mariliz) (Entered: 04/11/2017) |
| 04/12/2017 | 288 | Letter/request (non–motion) from SFFA *to Judge Burroughs Requesting Conference.* (Strawbridge, Patrick) (Entered: 04/12/2017) |
| 04/14/2017 | 291 | Letter/request (non–motion) from Harvard *in Response to Letter from SFFA (Dkt. 288).* (Ellsworth, Felicia) (Entered: 04/14/2017) |
| 04/18/2017 | 292 | Assented to MOTION to Seal Document *Harvard's Oppositions to SFFA's Motions to Compel Production of Unredacted Documents and Application Files* by President and Fellows of Harvard College.(Ellsworth, Felicia) (Entered: 04/18/2017) |
| 04/19/2017 | 293 | Judge Allison D. Burroughs: ELECTRONIC ORDER entered granting 292 Harvard's Assented– Motion to File Under Seal Harvard's Oppositions to SFFA's Motions to Compel (Montes, Mariliz) (Entered: 04/19/2017) |
| 04/20/2017 | 294 | Opposition re 272 First MOTION to Quash *Plaintiff's Subpoena to BLS* filed by Students for Fair Admissions, Inc.. (Attachments: # 1 Notice of Subpoena to Boston Latin School, # 2 Notice of Subpoena to Thomas Jefferson High School for Science and Technology, # 3 Notice of Subpoena to Stuyvesant High School, # 4 Notice of Subpoena to Monta Vista High School)(Strawbridge, Patrick) (Entered: 04/20/2017) |
| 04/26/2017 | 295 | Assented to MOTION for Leave to File *Reply Memoranda in Support of SFFA's Two Pending Motions to Compel* by Students for Fair Admissions, Inc..(Caldwell, Benjamin) (Entered: 04/26/2017) |

| 04/27/2017 | 298 | Judge Allison D. Burroughs: ELECTRONIC ORDER entered granting 295 Motion for Leave to File Document ; Counsel using the Electronic Case Filing System should now file the document for which leave to file has been granted in accordance with the CM/ECF Administrative Procedures. Counsel must include – Leave to file granted on (date of order)– in the caption of the document. (Folan, Karen) (Entered: 04/27/2017) |
|---|---|---|
| 04/27/2017 | 299 | Assented to MOTION to Seal *Reply Memoranda in Support of SFFA's Two Pending Motions to Compel* by Students for Fair Admissions, Inc..(Caldwell, Benjamin) (Entered: 04/27/2017) |
| 04/28/2017 | 300 | Assented to MOTION to Seal Document *Harvard's Response Letter to SFFA's April 12, 2017 Letter Motion re Depositions and Custodians* by President and Fellows of Harvard College.(Ellsworth, Felicia) (Entered: 04/28/2017) |
| 04/28/2017 | 301 | Judge Allison D. Burroughs: ELECTRONIC ORDER entered granting 299 Motion to Seal (Folan, Karen) (Entered: 04/28/2017) |
| 05/01/2017 | 302 | Judge Allison D. Burroughs: ELECTRONIC ORDER entered granting 300 Motion to Seal Document (Folan, Karen) (Entered: 05/01/2017) |
| 05/02/2017 | 303 | Letter/request (non–motion) from SFFA to Judge Burroughs Requesting Status Conference This Week to Address Urgent Discovery Matters . (Strawbridge, Patrick) (Entered: 05/02/2017) |
| 05/05/2017 | 304 | Assented to MOTION to Seal *SFFA's Emergency Application* by Students for Fair Admissions, Inc..(Caldwell, Benjamin) (Entered: 05/05/2017) |
| 05/05/2017 | 305 | Judge Allison D. Burroughs: ELECTRONIC ORDER entered. SFFAs motions to quash certain subpoenas [ECF Nos. 255, 260] are DENIED. SFFA failed to meet its burden under Fed. R. Civ. P. 45(d)(3). Because of the broad understanding of what constitutes relevant discovery, it is very unusual for a court to prohibit the taking of a deposition altogether. Green v. Cosby, 152 F. Supp. 3d 31, 35 (D. Mass. 2015), modified on reconsideration on other grounds, 160 F. Supp. 3d 431 (D. Mass. 2016) (quoting E.E.O.C. v. FreudenbergNOK Gen. P'ship, No. 07 Civ. 406, 2009 WL 909571, at *3 (D.N.H. Apr. 3, 2009)). Moreover, at this stage, the Court will not unduly fetter the parties ability to develop a complete factual record. (Folan, Karen) (Entered: 05/05/2017) |
| 05/05/2017 | 306 | Judge Allison D. Burroughs: ELECTRONIC ORDER entered denying as moot 304 Motion to Seal. (Folan, Karen) (Entered: 05/05/2017) |
| 05/09/2017 | 307 | Judge Allison D. Burroughs: ELECTRONIC ORDER entered Boston Latin's motion to quash SFFA's subpoena to BLS [ECF No. 272] is GRANTED IN PART and DENIED IN PART. BLS will not be required to produce documents or information that were prepared by or shared with Harvard. However, BLS is hereby ordered to produce the following: (1) documents from the Relevant Period prepared by BLS concerning the racial composition of applicants, admitted persons, or enrollees to Harvard, excluding documents that merely aggregate statistical information; (2) all internal communications from the Relevant Period by or among BLS employees or agents regarding Harvard's use of race in the admissions process; (3) any documents from the Relevant Period that describe any alleged discrimination by Harvard against persons of Asian descent in the college admissions process; and (4) all non–privileged communications during the Relevant Period concerning SFFA or this litigation. Furthermore, SFFA may depose a BLS representative. The motion to quash is otherwise granted. This is meant to minimize the burden on non–party BLS, while also ensuring the availability of information and the integrity of the discovery process. (Montes, Mariliz) Modified on 5/9/2017 *NEF Regenerated.*(Montes, Mariliz). (Entered: 05/09/2017) |
| 05/10/2017 | 311 | Assented to MOTION to Seal *SFFA's Reply in Support of its Letter Motion Regarding Depositions and Custodians* by Students for Fair Admissions, Inc..(Caldwell, Benjamin) (Entered: 05/10/2017) |
| 05/11/2017 | 312 | Judge Allison D. Burroughs: ELECTRONIC ORDER entered granting 311 Motion to Seal (Folan, Karen) (Entered: 05/11/2017) |
| 05/19/2017 | 314 | Assented to MOTION to Seal *SFFA'S Letter Motion Requesting Production of Performance Reports* by Students for Fair Admissions, Inc..(Caldwell, Benjamin) |

**JA71**

| | | (Entered: 05/19/2017) |
|---|---|---|
| 05/19/2017 | 315 | Letter/request (non–motion) from SFFA *requesting stay of discovery deadlines*. (Strawbridge, Patrick) (Entered: 05/19/2017) |
| 05/22/2017 | 316 | Judge Allison D. Burroughs: ELECTRONIC ORDER entered granting 314 Motion to Seal (Folan, Karen) (Entered: 05/22/2017) |
| 05/23/2017 | 318 | Letter/request (non–motion) from Harvard *in Response to the May 19, 2017 Letter 315 from SFFA*. (Ellsworth, Felicia) (Entered: 05/23/2017) |
| 05/24/2017 | 319 | Letter/request (non–motion) from SFFA *in response to Harvard's letter of May 23 regarding stay of discovery deadlines*. (Strawbridge, Patrick) (Entered: 05/24/2017) |
| 05/26/2017 | 320 | STIPULATION re 307 Order on Motion to Quash,,,,, *(Joint Stipulation between SFFA and Boston Latin School re: SFFA's Subpoena for Documents and Testimony)* by Boston Public Schools, Students for Fair Admissions, Inc.. (Attachments: # 1 Text of Proposed Order)(Caldwell, Benjamin) (Entered: 05/26/2017) |
| 05/30/2017 | 321 | Judge Allison D. Burroughs: ORDER entered re 320 Stipulation, filed by Boston Public Schools, Students for Fair Admissions, Inc. (Folan, Karen) (Entered: 05/30/2017) |
| 05/31/2017 | 322 | Assented to MOTION to Seal Document *Harvard's Response Letter to SFFA's Letter Motion regarding Performance Reports* by President and Fellows of Harvard College.(Ellsworth, Felicia) (Entered: 05/31/2017) |
| 05/31/2017 | 323 | Judge Allison D. Burroughs: ELECTRONIC ORDER entered granting 322 Motion to Seal Document (Folan, Karen) (Entered: 05/31/2017) |
| 06/02/2017 | 324 | Judge Allison D. Burroughs: ORDER entered. MEMORANDUM AND ORDER. "...Accordingly, Harvards motion to dismiss for lack of subject matter jurisdiction [ECF No. 187] is DENIED. SO ORDERED."(Folan, Karen) (Entered: 06/02/2017) |
| 06/02/2017 | 325 | Judge Allison D. Burroughs: ORDER entered. MEMORANDUM AND ORDER. "...Accordingly, Harvards motion for partial judgment on the pleadings as to Count IV and VI [ECF No. 185] is GRANTED. SO ORDERED."(Folan, Karen) (Entered: 06/02/2017) |
| 06/16/2017 | 327 | Assented to MOTION to Seal *SFFA's Reply Letter in support of its Letter Motion regarding Performance Reports* by Students for Fair Admissions, Inc..(Caldwell, Benjamin) (Entered: 06/16/2017) |
| 06/16/2017 | 329 | Judge Allison D. Burroughs: ELECTRONIC ORDER entered granting 327 Motion to Seal (Folan, Karen) (Entered: 06/16/2017) |
| 06/21/2017 | 331 | Assented to MOTION to Seal Document *Harvard's Letter to the Court regarding June 6, 2017 Discovery Order* by President and Fellows of Harvard College.(Ellsworth, Felicia) (Entered: 06/21/2017) |
| 06/21/2017 | 332 | Judge Allison D. Burroughs: ELECTRONIC ORDER entered granting 331 Motion to Seal Document (Folan, Karen) (Entered: 06/21/2017) |
| 06/27/2017 | 334 | Joint MOTION to Amend *September 1, 2016 Amended Scheduling Order* by President and Fellows of Harvard College.(Ellsworth, Felicia) (Entered: 06/27/2017) |
| 06/27/2017 | 335 | Judge Allison D. Burroughs: ELECTRONIC ORDER entered granting 334 Motion to Amend. In light of the Court's extension of the fact discovery deadline until August 4, 2017 [ECF No. 326], the September 1, 2016 Scheduling Order [ECF No. 180] is amended as follows. Plaintiffs experts shall be designated and the information required by Fed. R. Civ. P. 26(a)(2) shall be disclosed by October 3, 2017. Defendants experts shall be designated and the information required by Fed. R. Civ. P. 26(a)(2) shall be disclosed by December 2, 2017. Plaintiffs rebuttal expert reports shall be disclosed by January 16, 2018. Defendants rebuttal expert reports shall be disclosed by February 26, 2018. All expert discovery, including expert depositions, shall be completed by May 1, 2018. All dispositive motions under Fed. R. Civ. P. 56 shall be filed by June 15, 2018. Opposition briefs shall be filed by July 30, 2018. Reply briefs shall be filed by August 30, 2018. (Folan, Karen) (Entered: 06/27/2017) |

| 06/28/2017 | 336 | Reset Scheduling Order Deadlines: Fact Discovery to be completed by 8/4/2017, Dispositive Motions due by 6/15/2018, Oppositions due by 7/30/2018, Replies due by 8/30/2018. (Montes, Mariliz) (Entered: 06/28/2017) |
| 07/07/2017 | 338 | Letter/request (non–motion) from SFFA to Judge Burroughs (Emergency Request for Judicial Intervention and Relief re: scheduling dispute) . (Strawbridge, Patrick) (Entered: 07/07/2017) |
| 07/11/2017 | 339 | Judge Allison D. Burroughs: ELECTRONIC ORDER entered. On July 7, 2017, SFFA requested that the Court order certain witness depositions to be taken on a weekend or, alternatively, that those depositions be quashed. [ECF No. 338]. Although the Court strongly urges the parties to work to accommodate witness schedules, the Court will not require that depositions be taken on a weekend over the objection of either party. Further, an unwillingness to take depositions over a weekend does not justify quashing the depositions in their entirety.(Folan, Karen) (Entered: 07/11/2017) |
| 08/01/2017 | 340 | Assented to MOTION to Seal *SFFA's Request for Judicial Intervention and Relief* by Students for Fair Admissions, Inc..(Caldwell, Benjamin) (Entered: 08/01/2017) |
| 08/02/2017 | 341 | Judge Allison D. Burroughs: ELECTRONIC ORDER entered granting 340 Motion to Seal (Folan, Karen) (Entered: 08/02/2017) |
| 08/02/2017 | 342 | Assented to MOTION to Seal Document *Harvard's Response to SFFA's August 1, 2017 Letter* by President and Fellows of Harvard College.(Ellsworth, Felicia) (Entered: 08/02/2017) |
| 08/02/2017 | 343 | Judge Allison D. Burroughs: ELECTRONIC ORDER entered granting 342 Motion to Seal Document (Folan, Karen) (Entered: 08/02/2017) |
| 08/03/2017 | 345 | Assented to MOTION to Seal *SFFA's Reply in Support of its August 1, 2017 Request for Judicial Intervention and Relief* by Students for Fair Admissions, Inc..(Caldwell, Benjamin) (Entered: 08/03/2017) |
| 08/03/2017 | 346 | Judge Allison D. Burroughs: ELECTRONIC ORDER entered granting 345 Motion to Seal (Folan, Karen) (Entered: 08/03/2017) |
| 08/07/2017 | 349 | Assented to MOTION to Seal *SFFA's Letter Motion Regarding Summary Sheets* by Students for Fair Admissions, Inc..(Caldwell, Benjamin) (Entered: 08/07/2017) |
| 08/07/2017 | 350 | Judge Allison D. Burroughs: ELECTRONIC ORDER entered granting 349 Plaintiff's Assented–To Motion to File Under Seal Plaintiff's Letter Motion Regarding Summary Sheets (Montes, Mariliz) (Entered: 08/07/2017) |
| 08/07/2017 | 351 | Judge Allison D. Burroughs: ELECTRONIC ORDER entered.

The Court is very reluctant to allow SFFA the additional deposition that it now seeks. [ECF No. 344]. The discovery period has ended. Further, the potential deponent clearly qualifies as a party, and SFFA has used all of its allotted party depositions. The testimony sought seems largely duplicative of information already obtained and of marginal utility. The Court would be well within its bounds to decline the request for the above reasons as well as other reasons set forth by Harvard in its opposition [ECF No. 347]. That being said, the Court is equally reluctant to force this case to go forward without a fully developed factual record, particularly where there is only one additional deposition sought and where Harvard arguably should have disclosed the name of the deponent earlier. Out of an abundance of caution and trying to fairly balance the interests of the parties, the Court will allow the deposition to go forward under the following conditions: the deposition will be limited to two (2) hours and will take place at a location and time convenient for the deponent and Harvard, with SFFA to bear all the costs of the deposition, including reasonable attorneys fees and costs incurred by Harvard. See San Francisco Health Plan v. McKesson Corp., 264 F.R.D. 20, 21 (D. Mass. 2010) (ordering party seeking additional depositions to pay associated costs because a balance must be struck between upholding the limitations of the rule and the reasons for those limitations on the one hand and counsel's judgment as to the needs of his or her case on the other). Alternatively, the parties can agree on a different format, including allowing the deponent to respond to written questions. (Montes, Mariliz) (Entered: 08/07/2017) |

**JA73**

| 08/11/2017 | 353 | MOTION to Seal Document *Harvard's Response to SFFA's Letter Motion regarding Summary Sheets* by President and Fellows of Harvard College.(Ellsworth, Felicia) (Entered: 08/11/2017) |
|---|---|---|
| 08/11/2017 | 354 | Judge Allison D. Burroughs: ELECTRONIC ORDER entered granting 353 Motion to Seal Document (Folan, Karen) (Entered: 08/11/2017) |
| 08/23/2017 | 355 | Letter/request (non−motion) from SFFA . (Strawbridge, Patrick) (Entered: 08/23/2017) |
| 08/25/2017 | 357 | Assented to MOTION to Seal *SFFA's Reply in Support of its Letter Motion Regarding Summary Sheets* by Students for Fair Admissions, Inc..(Caldwell, Benjamin) (Entered: 08/25/2017) |
| 08/28/2017 | 358 | Judge Allison D. Burroughs: ELECTRONIC ORDER entered granting 357 Motion to Seal (Folan, Karen) (Entered: 08/28/2017) |
| 08/31/2017 | 359 | Letter/request (non−motion) from Harvard in Response to Aug. 23, 2017 Letter from SFFA . (Ellsworth, Felicia) (Entered: 08/31/2017) |
| 08/31/2017 | 360 | Judge Allison D. Burroughs: ELECTRONIC ORDER entered.<br><br>The Court is in receipt of letters from both parties. [ECF Nos. 355, 359]. Despite the fact that discovery had closed and SFFA had used all of its allotted party depositions, the Court allowed one additional deposition to go forward with the understanding that SFFA would bear all of the reasonable associated expenses, including Harvard's attorneys' fees. [ECF No. 351]. SFFA has not presented compelling grounds to reconsider that decision. The estimate provided by Harvard is not unreasonable on its face. SFFA may challenge the reasonableness of the fees and costs after they have accrued or forego the deposition, which again appears to seek information that is marginal, duplicative, and disproportionate.(Montes, Mariliz) (Entered: 08/31/2017) |
| 09/20/2017 | 363 | Joint MOTION to Amend 335 Order on Motion to Amend,,, *Scheduling Order* by Students for Fair Admissions, Inc..(Strawbridge, Patrick) (Entered: 09/20/2017) |
| 09/22/2017 | 364 | Judge Allison D. Burroughs: ELECTRONIC ORDER entered granting 363 Motion to Amend scheduling order (Folan, Karen) (Entered: 09/22/2017) |
| 12/21/2017 | 365 | Assented to MOTION to Seal *SFFA's Motion to Compel Regarding Harvard's Privilege Log* by Students for Fair Admissions, Inc..(Caldwell, Benjamin) (Entered: 12/21/2017) |
| 12/22/2017 | 366 | Judge Allison D. Burroughs: ELECTRONIC ORDER entered granting 365 Motion to Seal (Folan, Karen) (Entered: 12/22/2017) |
| 12/27/2017 | 369 | STIPULATION *to Enlarge Time to file an Opposition to Plaintiff's Motion to Compel* by President and Fellows of Harvard College. (Ellsworth, Felicia) (Entered: 12/27/2017) |
| 12/28/2017 | 370 | ELECTRONIC ENDORSEMENT APPROVING 369 Stipulation to extend time to file opposition to motion to compel filed by President and Fellows of Harvard College (Folan, Karen) (Entered: 12/28/2017) |
| 01/17/2018 | 371 | Assented to MOTION to Seal Document *Harvard's Opposition to SFFA's Motion to Compel Production of Documents Withheld or Redacted* by President and Fellows of Harvard College.(Ellsworth, Felicia) (Entered: 01/17/2018) |
| 01/17/2018 | 372 | Judge Allison D. Burroughs: ELECTRONIC ORDER entered granting 371 Motion to Seal Document (Folan, Karen) (Entered: 01/17/2018) |
| 01/23/2018 | 375 | Assented to MOTION for Leave to File *Reply Memorandum in Support of SFFA's Motion to Compel* by Students for Fair Admissions, Inc..(Caldwell, Benjamin) (Entered: 01/23/2018) |
| 01/23/2018 | 376 | Judge Allison D. Burroughs: ELECTRONIC ORDER entered granting 375 Motion for Leave to File Document ; Counsel using the Electronic Case Filing System should now file the document for which leave to file has been granted in accordance with the CM/ECF Administrative Procedures. Counsel must include – Leave to file granted on (date of order)– in the caption of the document. (Folan, Karen) (Entered: 01/23/2018) |

**JA74**

| 01/24/2018 | 377 | ELECTRONIC NOTICE of Hearing.Motion Hearing on Motion to compel set for 2/7/2018 02:30 PM in Courtroom 17 before Judge Allison D. Burroughs. Defendant to provide the court with unredacted copies of all documents at issue noting the proposed redactions 7 days prior to hearing.(Folan, Karen) (Entered: 01/24/2018) |
|---|---|---|
| 01/25/2018 | 378 | Assented to MOTION to Seal *Reply Memorandum in Support of SFFA's Motion to Compel* by Students for Fair Admissions, Inc..(Caldwell, Benjamin) (Entered: 01/25/2018) |
| 01/25/2018 | 379 | Judge Allison D. Burroughs: ELECTRONIC ORDER entered granting 378 Motion to Seal (Folan, Karen) (Entered: 01/25/2018) |
| 01/29/2018 | 380 | Receipt of Defendant's unredacted documents for in camera review, pursuant to 377 Order. (Montes, Mariliz) (Entered: 01/30/2018) |
| 02/07/2018 | 382 | Electronic Clerk's Notes for proceedings held before Judge Allison D. Burroughs: Hearing held on 2/7/2018. Order to issue. (Court Reporter: Joan Daly at joanmdaly62@gmail.com.) (Folan, Karen) (Entered: 02/12/2018) |
| 02/21/2018 | 384 | Transcript of Hearing held on February 7, 2018, before Judge Allison D. Burroughs. The Transcript may be purchased through the Court Reporter, viewed at the public terminal, or viewed through PACER after it is released. Court Reporter Name and Contact Information: Joan Daly at joanmdaly62@gmail.com Redaction Request due 3/14/2018. Redacted Transcript Deadline set for 3/26/2018. Release of Transcript Restriction set for 5/22/2018. (Scalfani, Deborah) (Entered: 02/21/2018) |
| 02/21/2018 | 385 | NOTICE is hereby given that an official transcript of a proceeding has been filed by the court reporter in the above–captioned matter. Counsel are referred to the Court's Transcript Redaction Policy, available on the court website at http://www.mad.uscourts.gov/attorneys/general–info.htm (Scalfani, Deborah) (Entered: 02/21/2018) |
| 03/09/2018 | 386 | STATUS REPORT *(Joint Status Report on behalf of all parties)* by Students for Fair Admissions, Inc.. (Consovoy, William) (Entered: 03/09/2018) |
| 03/14/2018 | 387 | Judge Allison D. Burroughs: ELECTRONIC ORDER entered.<br><br>Upon review of the parties' joint status report filed on March 9, 2018 ECF No. 386 , the Court orders the following:<br><br>1. Dispositive motions shall be filed and briefed in accordance with the operative scheduling order ECF No. 363 .<br><br>2. Amicus briefs in support of a dispositive motion shall be filed by July 13, 2018. Amicus briefs in opposition to a dispositive motion shall be filed by August 17, 2018.<br><br>3. The parties shall meet and confer regarding the treatment of confidential materials to narrow the areas of dispute. The parties shall file letter briefs on the outstanding issues by March 30, 2018, and a hearing is scheduled for April 10, 2018 at 9:00 AM in Courtroom 17 before Judge Allison D. Burroughs.<br><br>4. By the agreement of the parties, the Court will bifurcate the issues of liability and remedies. Remedies will be addressed after the disposition of dispositive motions and/or trial on liability.<br><br>5. The Court is considering scheduling trial for four weeks beginning the week of January 2, 2019. The parties may address the trial schedule at the hearing on April 10, 2018.<br><br>(McDonagh, Christina) (Entered: 03/14/2018) |
| 03/30/2018 | 388 | Letter/request (non–motion) from SFFA re: Treatment of Materials Marked Confidential . (Consovoy, William) (Entered: 03/30/2018) |
| 03/30/2018 | 389 | Letter/request (non–motion) from Harvard *Regarding Confidential Materials*. (Ellsworth, Felicia) (Entered: 03/30/2018) |

**JA75**

| 04/06/2018 | 390 | Amicus Curiae APPEARANCE entered by Sigmund David Schutz on behalf of New England First Amendment Coalition; Reporters Committee for Freedom of the Press; Massachusetts Newspaper Publishers Association; GateHouse Media, LLC. (Schutz, Sigmund) (Entered: 04/06/2018) |
|---|---|---|
| 04/06/2018 | 391 | MOTION for Leave to File *as Amicus Curiae* by New England First Amendment Coalition; Reporters Committee for Freedom of the Press; Massachusetts Newspaper Publishers Association; GateHouse Media, LLC. (Attachments: # 1 Exhibit A – Letter Brief)(Schutz, Sigmund) (Entered: 04/06/2018) |
| 04/06/2018 | 392 | NOTICE of Appearance by Eric G. Penley on behalf of New England First Amendment Coalition; Reporters Committee for Freedom of the Press; Massachusetts Newspaper Publishers Association; GateHouse Media, LLC (Penley, Eric) (Entered: 04/06/2018) |
| 04/06/2018 | 393 | Judge Allison D. Burroughs: ELECTRONIC ORDER entered granting 391 Motion for Leave to File Document ; Counsel using the Electronic Case Filing System should now file the document for which leave to file has been granted in accordance with the CM/ECF Administrative Procedures. Counsel must include – Leave to file granted on (date of order)– in the caption of the document. (Folan, Karen) (Entered: 04/06/2018) |
| 04/06/2018 | 394 | *Leave to file granted on April 6, 2018* Letter/request (non–motion) from Amici Curiae . (Schutz, Sigmund) (Entered: 04/06/2018) |
| 04/06/2018 | 395 | NOTICE by United States *of Interest in Public Access to Summary Judgment Briefing and Materials* (Donnelly, Matthew) (Entered: 04/06/2018) |
| 04/06/2018 | 396 | Response by Students for Fair Admissions, Inc. to 389 Letter/request (non–motion) . (Consovoy, William) (Entered: 04/06/2018) |
| 04/09/2018 | 397 | Letter/request (non–motion) from Harvard *Regarding Confidential Materials*. (Lee, William) (Entered: 04/09/2018) |
| 04/09/2018 | 398 | Letter/request (non–motion) from Students, Amici Curiae *Regarding Confidential Materials*. (Greenbaum, Jon) (Entered: 04/09/2018) |
| 04/10/2018 | 399 | NOTICE of Withdrawal of Appearance by Benjamin C. Caldwell (Caldwell, Benjamin) (Entered: 04/10/2018) |
| 04/11/2018 | 400 | MOTION for Leave to Appear Pro Hac Vice for admission of Adam K. Mortara and John M. Hughes Filing fee: $ 200, receipt number 0101–7090675 by Students for Fair Admissions, Inc.. (Attachments: # 1 Cert. of Attorney Mortara, # 2 Cert. of Attorney Hughes, # 3 Text of Proposed Order)(Strawbridge, Patrick) (Entered: 04/11/2018) |
| 04/12/2018 | 401 | Judge Allison D. Burroughs: ELECTRONIC ORDER entered granting 400 Motion for Leave to Appear Pro Hac Vice Added Adam K. Mortara & John M. Hughes. **Pursuant to Local Rule 83.5.3, local counsel shall also file an appearance in this matter. Further, local counsel shall review all filings and shall personally appear in Court for any hearings or conferences, unless expressly excused by the Court for good cause. Attorneys admitted Pro Hac Vice must register for electronic filing if the attorney does not already have an ECF account in this district. To register go to the Court website at www.mad.uscourts.gov. Select Case Information, then Electronic Filing (CM/ECF) and go to the CM/ECF Registration Form.** (McDonagh, Christina) (Entered: 04/12/2018) |
| 04/12/2018 | 402 | Transcript of Status Conference held on April 10, 2018, before Judge Allison D. Burroughs. The Transcript may be purchased through the Court Reporter, viewed at the public terminal, or viewed through PACER after it is released. Court Reporter Name and Contact Information: Richard Romanow at bulldog@richromanow.com Redaction Request due 5/3/2018. Redacted Transcript Deadline set for 5/14/2018. Release of Transcript Restriction set for 7/11/2018. (Scalfani, Deborah) (Entered: 04/12/2018) |
| 04/12/2018 | 403 | NOTICE is hereby given that an official transcript of a proceeding has been filed by the court reporter in the above–captioned matter. Counsel are referred to the Court's Transcript Redaction Policy, available on the court website at http://www.mad.uscourts.gov/attorneys/general–info.htm (Scalfani, Deborah) (Entered: 04/12/2018) |

**JA76**

| 05/23/2018 | 404 | Judge Allison D. Burroughs: ELECTRONIC ORDER entered.<br><br>As discussed at the hearing held on April 10, 2018 ECF No. 402 , the Court orders the following:<br><br>1. The deadlines for amicus briefing on dispositive motions ECF No. 387 are amended as follows. Amicus briefs in support of a dispositive motion shall be filed by July 30, 2018. Amicus briefs in opposition to a dispositive motion shall be filed by August 30, 2018.<br><br>2. Prior to June 15, 2018, the parties shall meet and confer and propose a procedure for the Court to determine whether any dispositive motion briefing and/or exhibits filed under seal should remain sealed.<br><br>(McDonagh, Christina) (Entered: 05/23/2018) |
| 05/23/2018 | 405 | Judge Allison D. Burroughs: ORDER entered. PROCEDURAL ORDER re pretrial/trial Final Pretrial Conference set for 10/3/2018 10:00 AM in Courtroom 17 before Judge Allison D. Burroughs. Bench Trial set for 10/15/2018 10:00 AM in Courtroom 17 before Judge Allison D. Burroughs.(McDonagh, Christina) (Entered: 05/23/2018) |
| 06/08/2018 | 406 | Joint MOTION for Leave to File Excess Pages by Students for Fair Admissions, Inc..(Strawbridge, Patrick) (Entered: 06/08/2018) |
| 06/11/2018 | 407 | Judge Allison D. Burroughs: ELECTRONIC ORDER entered granting 406 Motion for Leave to File Excess Pages. Parties are nonetheless encouraged to adhere to the limits set forth in Local Rule 7.1(b)(4) to the extent possible and to limit repetition between the various briefs. Further, given the potential volume of the submissions and the impending trial date, the court further orders as follows: a summary judgment motion shall include a separately filed Statement of Undisputed Facts which details, in numbered paragraphs, the material facts that the moving party contends are undisputed and entitle the movant to judgment as a matter of law. Only those facts which bear on dispositive material issues shall be included in this statement. Oppositions shall include a separate filing of a statement of material facts, responding to each numbered paragraph in the movants Statement of Undisputed Facts, which the respondent contends present genuine issues for trial. The responding party shall also set forth, in separate numbered paragraphs, any additional facts which the respondent contends preclude the entry of summary judgment. Statements of material facts in support of or in opposition to a motion for summary judgment shall include specific references to the parts of the record that support each stated fact. Each stated fact shall cite the source relied upon, including the page of any document or line and page number of any deposition to which reference is made. If both parties are moving for summary judgment, the parties may also submit one joint Statement of Undisputed Facts or include a separate joint submission of facts that are truly undisputed to the extent that that may make sense. In light of the number of pages that are likely to be submitted and the scheduled trial date, the parties are encouraged to work together to find ways in which the information, particularly undisputed facts, can be presented to the court as efficiently as possible. (Folan, Karen) (Entered: 06/11/2018) |
| 06/12/2018 | 408 | JOINT STATEMENT re scheduling conference . (Ellsworth, Felicia) (Entered: 06/12/2018) |
| 06/12/2018 | 409 | Judge Allison D. Burroughs: ELECTRONIC ORDER entered granting 408 JOINT scheduling motion. (Folan, Karen) (Entered: 06/12/2018) |
| 06/13/2018 | 410 | Joint MOTION to Seal *Certain Information Filed in Connection with the Parties' Summary Judgment Motions* by President and Fellows of Harvard College.(Ellsworth, Felicia) (Entered: 06/13/2018) |
| 06/14/2018 | 411 | Judge Allison D. Burroughs: ELECTRONIC ORDER entered granting 410 Motion to Seal (Folan, Karen) (Entered: 06/14/2018) |
| 06/15/2018 | 412 | MOTION for Summary Judgment by Students for Fair Admissions, Inc..(Consovoy, William) (Entered: 06/15/2018) |

| 06/15/2018 | 413 | MEMORANDUM in Support re 412 MOTION for Summary Judgment filed by Students for Fair Admissions, Inc.. (Consovoy, William) (Additional attachment(s) added on 6/18/2018: # 1 **Unredacted version** of Memorandum in Support) (Montes, Mariliz). (Additional attachment(s) added on 7/13/2018: # 2 Updated Redacted Version of Memorandum of Reasons in Support of Motion for Summary Judgment) (McDonagh, Christina). (Entered: 06/15/2018) |
| 06/15/2018 | 414 | Statement of Material Facts L.R. 56.1 re 412 MOTION for Summary Judgment filed by Students for Fair Admissions, Inc.. (Consovoy, William) (Additional attachment(s) added on 6/18/2018: # 1 **Unredacted version** of Statement of Material Facts) (Montes, Mariliz). (Additional attachment(s) added on 7/13/2018: # 2 Updated Redacted Version of Plaintiff's Statement of Undisputed Material Facts) (McDonagh, Christina). (Additional attachment(s) added on 10/3/2018: # 3 Updated(10/3/2018) Revised Redacted Statement) (McDonagh, Christina). (Entered: 06/15/2018) |
| 06/15/2018 | 415 | DECLARATION re 412 MOTION for Summary Judgment by Students for Fair Admissions, Inc.. (Attachments: # 1 Exhibit Expert Report, # 2 Exhibit Rebuttal Expert Report, # 3 Errata Errata)(Consovoy, William) (Additional attachment(s) added on 6/18/2018: # 4 **Unredacted version** of Declaration of P. Arcidiacono, # 5 Exhibit A– **unredacted version**, # 6 Exhibit B–**unredacted version**) (Montes, Mariliz). (Additional attachment(s) added on 7/13/2018: # 7 Updated Redacted Version of Declaration of Peter Arcidiacono, # 8 Updated Redacted Version of Exhibit 1, # 9 Updated Redacted Version of Exhibit 2) (McDonagh, Christina). (Entered: 06/15/2018) |
| 06/15/2018 | 416 | DECLARATION re 412 MOTION for Summary Judgment by Students for Fair Admissions, Inc.. (Attachments: # 1 Exhibit Expert Report, # 2 Exhibit Rebuttal Expert Report, # 3 Exhibit Supplemental Report)(Consovoy, William) (Additional attachment(s) added on 6/18/2018: # 5 Exhibit A– **unredacted version**) (Montes, Mariliz). (Entered: 06/15/2018) |
| 06/15/2018 | 417 | MOTION for Summary Judgment by President and Fellows of Harvard College.(Waxman, Seth) (Entered: 06/15/2018) |
| 06/15/2018 | 418 | MEMORANDUM in Support re 417 MOTION for Summary Judgment filed by President and Fellows of Harvard College. (Waxman, Seth) (Additional attachment(s) added on 7/2/2018: # 1 **Unredacted version** of Memorandum in Support) (Montes, Mariliz). (Additional attachment(s) added on 7/10/2018: # 2 Updated Redacted Version) (McDonagh, Christina). (Entered: 06/15/2018) |
| 06/15/2018 | 419 | DECLARATION re 417 MOTION for Summary Judgment by President and Fellows of Harvard College. (Attachments: # 1 Exhibit 1, # 2 Exhibit 2, # 3 Exhibit 3, # 4 Exhibit 4, # 5 Exhibit 5, # 6 Exhibit 6, # 7 Exhibit 7, # 8 Exhibit 8, # 9 Exhibit 9, # 10 Exhibit 10, # 11 Exhibit 11, # 12 Exhibit 12, # 13 Exhibit 13, # 14 Exhibit 14, # 15 Exhibit 15, # 16 Exhibit 16, # 17 Exhibit 17, # 18 Exhibit 18, # 19 Exhibit 19, # 20 Exhibit 20, # 21 Exhibit 21, # 22 Exhibit 22, # 23 Exhibit 23, # 24 Exhibit 24, # 25 Exhibit 25, # 26 Exhibit 26, # 27 Exhibit 27, # 28 Exhibit 28, # 29 Exhibit 29, # 30 Exhibit 30, # 31 Exhibit 31, # 32 Exhibit 32, # 33 Exhibit 33, # 34 Exhibit 34, # 35 Exhibit 35, # 36 Exhibit 36, # 37 Exhibit 37, # 38 Exhibit 38, # 39 Exhibit 39, # 40 Exhibit 40, # 41 Exhibit 41, # 42 Exhibit 42, # 43 Exhibit 43, # 44 Exhibit 44, # 45 Exhibit 45, # 46 Exhibit 46, # 47 Exhibit 47, # 48 Exhibit 48, # 49 Exhibit 49, # 50 Exhibit 50, # 51 Exhibit 51, # 52 Exhibit 52, # 53 Exhibit 53, # 54 Exhibit 54, # 55 Exhibit 55, # 56 Exhibit 56, # 57 Exhibit 57, # 58 Exhibit 58, # 59 Exhibit 59, # 60 Exhibit 60, # 61 Exhibit 61, # 62 Exhibit 62, # 63 Exhibit 63, # 64 Exhibit 64, # 65 Exhibit 65, # 66 Exhibit 66, # 67 Exhibit 67, # 68 Exhibit 68, # 69 Exhibit 69, # 70 Exhibit 70, # 71 Exhibit 71, # 72 Exhibit 72, # 73 Exhibit 73, # 74 Exhibit 74, # 75 Exhibit 75, # 76 Exhibit 76, # 77 Exhibit 77, # 78 Exhibit 78, # 79 Exhibit 79, # 80 Exhibit 80, # 81 Exhibit 81, # 82 Exhibit 82, # 83 Exhibit 83, # 84 Exhibit 84, # 85 Exhibit 85, # 86 Exhibit 86, # 87 Exhibit 87, # 88 Exhibit 88, # 89 Exhibit 89, # 90 Exhibit 90, # 91 Exhibit 91, # 92 Exhibit 92, # 93 Exhibit 93, # 94 Exhibit 94, # 95 Exhibit 95, # 96 Exhibit 96, # 97 Exhibit 97)(Ellsworth, Felicia) (Additional attachment(s) added on 7/2/2018: # 98 **Unredacted version** of Declaration) (Montes, Mariliz). (Additional attachment(s) added on 7/2/2018: # 99 Exhibit 1 (filed under seal), # 100 Exhibit 3 (filed under seal), # 101 Exhibit 4 (filed under seal), # 102 Exhibit 5 (filed under seal), # 103 Exhibit 6 (filed under seal), # 104 Exhibit 7 (filed under seal), # 105 Exhibit 8 (filed under seal), # 106 Exhibit 9 (filed under seal), # 107 |

| | | |
|---|---|---|
| | | Exhibit 10 (filed under seal), # <u>108</u> Exhibit 11 (filed under seal), # <u>109</u> Exhibit 12 (filed under seal), # <u>110</u> Exhibit 13 (filed under seal), # <u>111</u> Exhibit 14 (filed under seal), # <u>112</u> Exhibit 15 (filed under seal), # <u>113</u> Exhibit 16 (filed under seal), # <u>114</u> Exhibit 17 (filed under seal), # <u>115</u> Exhibit 18 (filed under seal), # <u>116</u> Exhibit 19 (filed under seal), # <u>117</u> Exhibit 20 (filed under seal), # <u>118</u> Exhibit 21 (filed under seal), # <u>119</u> Exhibit 22 (filed under seal), # <u>120</u> Exhibit 23 (filed under seal), # <u>121</u> Exhibit 24 (filed under seal), # <u>122</u> Exhibit 25 (filed under seal), # <u>123</u> Exhibit 26 (filed under seal), # <u>124</u> Exhibit 27 (filed under seal), # <u>125</u> Exhibit 29 (filed under seal), # <u>126</u> Exhibit 30 (filed under seal), # <u>127</u> Exhibit 40 (filed under seal), # <u>128</u> Exhibit 43 (filed under seal), # <u>129</u> Exhibit 52 (filed under seal), # <u>130</u> Exhibit 53(filed under seal), # <u>131</u> Exhibit 54 (filed under seal), # <u>132</u> Exhibit 55 (filed under seal), # <u>133</u> Exhibit 56 (filed under seal), # <u>134</u> Exhibit 57 (filed under seal), # <u>135</u> Exhibit 61 (filed under seal), # <u>136</u> Exhibit 62 (filed under seal), # <u>137</u> Exhibit 63 (filed under seal), # <u>138</u> Exhibit 65 (filed under seal), # <u>139</u> Exhibit 93 (filed under seal)) (Montes, Mariliz). (Attachment 1 replaced on 7/10/2018) (McDonagh, Christina). (Attachment 9 replaced on 7/10/2018) (McDonagh, Christina). (Additional attachment(s) added on 7/10/2018: # <u>140</u> Updated Redacted Version of Exhibit 31, # <u>141</u> Updated Redacted Version of Exhibit 33, # <u>142</u> Updated Redacted Version of Exhibit 35, # <u>143</u> Updated Redacted Version of Exhibit 37) (McDonagh, Christina). (Entered: 06/15/2018) |
| 06/15/2018 | <u>420</u> | Statement of Material Facts L.R. 56.1 re <u>417</u> MOTION for Summary Judgment filed by President and Fellows of Harvard College. (Waxman, Seth) (Additional attachment(s) added on 7/2/2018: # <u>1</u> **Unredacted version** of Statement of Undisputed Material Facts) (Montes, Mariliz). (Entered: 06/15/2018) |
| 06/15/2018 | <u>421</u> | DECLARATION re <u>412</u> MOTION for Summary Judgment by Students for Fair Admissions, Inc.. (Attachments: # <u>1</u> Exhibit 1, # <u>2</u> Exhibit 2, # <u>3</u> Exhibit 3, # <u>4</u> Exhibit 4, # <u>5</u> Exhibit 5, # <u>6</u> Exhibit 6, # <u>7</u> Exhibit 7, # <u>8</u> Exhibit 8, # <u>9</u> Exhibit 9, # <u>10</u> Exhibit 10, # <u>11</u> Exhibit 11, # <u>12</u> Exhibit 12, # <u>13</u> Exhibit 13, # <u>14</u> Exhibit 14, # <u>15</u> Exhibit 15, # <u>16</u> Exhibit 16, # <u>17</u> Exhibit 17, # <u>18</u> Exhibit 18, # <u>19</u> Exhibit 19, # <u>20</u> Exhibit 20, # <u>21</u> Exhibit 21, # <u>22</u> Exhibit 22, # <u>23</u> Exhibit 23, # <u>24</u> Exhibit 24, # <u>25</u> Exhibit 25, # <u>26</u> Exhibit 26, # <u>27</u> Exhibit 27, # <u>28</u> Exhibit 28, # <u>29</u> Exhibit 29, # <u>30</u> Exhibit 30, # <u>31</u> Exhibit 31, # <u>32</u> Exhibit 32, # <u>33</u> Exhibit 33, # <u>34</u> Exhibit 34, # <u>35</u> Exhibit 35, # <u>36</u> Exhibit 36, # <u>37</u> Exhibit 37, # <u>38</u> Exhibit 38, # <u>39</u> Exhibit 39, # <u>40</u> Exhibit 40, # <u>41</u> Exhibit 41, # <u>42</u> Exhibit 42, # <u>43</u> Exhibit 43, # <u>44</u> Exhibit 44, # <u>45</u> Exhibit 45, # <u>46</u> Exhibit 46, # <u>47</u> Exhibit 47, # <u>48</u> Exhibit 48, # <u>49</u> Exhibit 49, # <u>50</u> Exhibit 50, # <u>51</u> Exhibit 51, # <u>52</u> Exhibit 52, # <u>53</u> Exhibit 53, # <u>54</u> Exhibit 54, # <u>55</u> Exhibit 55, # <u>56</u> Exhibit 56, # <u>57</u> Exhibit 57, # <u>58</u> Exhibit 58, # <u>59</u> Exhibit 59, # <u>60</u> Exhibit 60, # <u>61</u> Exhibit 61, # <u>62</u> Exhibit 62, # <u>63</u> Exhibit 63, # <u>64</u> Exhibit 64, # <u>65</u> Exhibit 65, # <u>66</u> Exhibit 66, # <u>67</u> Exhibit 67, # <u>68</u> Exhibit 68, # <u>69</u> Exhibit 69, # <u>70</u> Exhibit 70, # <u>71</u> Exhibit 71, # <u>72</u> Exhibit 72, # <u>73</u> Exhibit 73, # <u>74</u> Exhibit 74, # <u>75</u> Exhibit 75, # <u>76</u> Exhibit 76, # <u>77</u> Exhibit 77, # <u>78</u> Exhibit 78, # <u>79</u> Exhibit 79, # <u>80</u> Exhibit 80, # <u>81</u> Exhibit 81, # <u>82</u> Exhibit 82, # <u>83</u> Exhibit 83, # <u>84</u> Exhibit 84, # <u>85</u> Exhibit 85, # <u>86</u> Exhibit 86, # <u>87</u> Exhibit 87, # <u>88</u> Exhibit 88, # <u>89</u> Exhibit 89, # <u>90</u> Exhibit 90, # <u>91</u> Exhibit 91, # <u>92</u> Exhibit 92, # <u>93</u> Exhibit 93, # <u>94</u> Exhibit 94, # <u>95</u> Exhibit 95, # <u>96</u> Exhibit 96, # <u>97</u> Exhibit 97, # <u>98</u> Exhibit 98, # <u>99</u> Exhibit 99, # <u>100</u> Exhibit 100, # <u>101</u> Exhibit 101, # <u>102</u> Exhibit 102, # <u>103</u> Exhibit 103, # <u>104</u> Exhibit 104, # <u>105</u> Exhibit 105, # <u>106</u> Exhibit 106, # <u>107</u> Exhibit 107, # <u>108</u> Exhibit 108, # <u>109</u> Exhibit 109, # <u>110</u> Exhibit 110, # <u>111</u> Exhibit 111, # <u>112</u> Exhibit 112, # <u>113</u> Exhibit 113, # <u>114</u> Exhibit 114, # <u>115</u> Exhibit 115, # <u>116</u> Exhibit 116, # <u>117</u> Exhibit 117, # <u>118</u> Exhibit 118, # <u>119</u> Exhibit 119, # <u>120</u> Exhibit 120, # <u>121</u> Exhibit 121, # <u>122</u> Exhibit 122, # <u>123</u> Exhibit 123, # <u>124</u> Exhibit 124, # <u>125</u> Exhibit 125, # <u>126</u> Exhibit 126, # <u>127</u> Exhibit 127, # <u>128</u> Exhibit 128, # <u>129</u> Exhibit 129, # <u>130</u> Exhibit 130, # <u>131</u> Exhibit 131, # <u>132</u> Exhibit 132, # <u>133</u> Exhibit 133, # <u>134</u> Exhibit 134, # <u>135</u> Exhibit 135, # <u>136</u> Exhibit 136, # <u>137</u> Exhibit 137, # <u>138</u> Exhibit 138, # <u>139</u> Exhibit 139, # <u>140</u> Exhibit 140, # <u>141</u> Exhibit 141, # <u>142</u> Exhibit 142, # <u>143</u> Exhibit 143, # <u>144</u> Exhibit 144, # <u>145</u> Exhibit 145, # <u>146</u> Exhibit 146, # <u>147</u> Exhibit 147, # <u>148</u> Exhibit 148, # <u>149</u> Exhibit 149, # <u>150</u> Exhibit 150, # <u>151</u> Exhibit 151, # <u>152</u> Exhibit 152, # <u>153</u> Exhibit 153, # <u>154</u> Exhibit 154, # <u>155</u> Exhibit 155, # <u>156</u> Exhibit 156, # <u>157</u> Exhibit 157, # <u>158</u> Exhibit 158, # <u>159</u> Exhibit 159, # <u>160</u> Exhibit 160, # <u>161</u> Exhibit 161, # <u>162</u> Exhibit 162, # <u>163</u> Exhibit 163, # <u>164</u> Exhibit 164, # <u>165</u> Exhibit 165, # <u>166</u> Exhibit 166, # <u>167</u> Exhibit 167, # <u>168</u> Exhibit 168, # <u>169</u> Exhibit 169, # <u>170</u> Exhibit 170, # <u>171</u> Exhibit 171, # <u>172</u> Exhibit 172, # <u>173</u> Exhibit 173, # <u>174</u> Exhibit 174, # <u>175</u> Exhibit 175, # <u>176</u> Exhibit 176, # <u>177</u> Exhibit 177, # <u>178</u> Exhibit 178, # <u>179</u> Exhibit 179, # <u>180</u> Exhibit 180, # <u>181</u> Exhibit 181, # <u>182</u> Exhibit 182, # <u>183</u> Exhibit |

**JA79**

183, # 184 Exhibit 184, # 185 Exhibit 185, # 186 Exhibit 186, # 187 Exhibit 187, # 188 Exhibit 188, # 189 Exhibit 189, # 190 Exhibit 190, # 191 Exhibit 191, # 192 Exhibit 192, # 193 Exhibit 193, # 194 Exhibit 194, # 195 Exhibit 195, # 196 Exhibit 196, # 197 Exhibit 197, # 198 Exhibit 198, # 199 Exhibit 199, # 200 Exhibit 200, # 201 Exhibit 201, # 202 Exhibit 202, # 203 Exhibit 203, # 204 Exhibit 204, # 205 Exhibit 205, # 206 Exhibit 206, # 207 Exhibit 207, # 208 Exhibit 208, # 209 Exhibit 209, # 210 Exhibit 210, # 211 Exhibit 211, # 212 Exhibit 212, # 213 Exhibit 213, # 214 Exhibit 214, # 215 Exhibit 215, # 216 Exhibit 216, # 217 Exhibit 217, # 218 Exhibit 218, # 219 Exhibit 219, # 220 Exhibit 220, # 221 Exhibit 221, # 222 Exhibit 222, # 223 Exhibit 223, # 224 Exhibit 224, # 225 Exhibit 225, # 226 Exhibit 226, # 227 Exhibit 227, # 228 Exhibit 228, # 229 Exhibit 229, # 230 Exhibit 230, # 231 Exhibit 231, # 232 Exhibit 232, # 233 Exhibit 233, # 234 Exhibit 234, # 235 Exhibit 235, # 236 Exhibit 236, # 237 Exhibit 237, # 238 Exhibit 238, # 239 Exhibit 239, # 240 Exhibit 240, # 241 Exhibit 241, # 242 Exhibit 242, # 243 Exhibit 243, # 244 Exhibit 244, # 245 Exhibit 245, # 246 Exhibit 246, # 247 Exhibit 247, # 248 Exhibit 248, # 249 Exhibit 249, # 250 Exhibit 250, # 251 Exhibit 251, # 252 Exhibit 252, # 253 Exhibit 253, # 254 Exhibit 254, # 255 Exhibit 255, # 256 Exhibit 256, # 257 Exhibit 257, # 258 Exhibit 258, # 259 Exhibit 259, # 260 Exhibit 260, # 261 Exhibit 261)(Consovoy, William) (Additional attachment(s) added on 6/18/2018: # 262 **Unredacted version** of Declaration, # 263 Exhibit 1 (filed under seal), # 264 Exhibit 2 (filed under seal), # 265 Exhibit 5 (filed under seal), # 266 Exhibit 6 (filed under seal), # 267 Exhibit 7 (filed under seal), # 268 Exhibit 8 (filed under seal), # 269 Exhibit 9 (filed under seal), # 270 Exhibit 10 (filed under seal)) (Montes, Mariliz). (Additional attachment(s) added on 6/18/2018: # 271 Exhibit 11 (filed under seal), # 272 Exhibit 12(filed under seal), # 273 Exhibit 13 (filed under seal), # 274 Exhibit 14 (filed under seal), # 275 Exhibit 16 (filed under seal), # 276 Exhibit 17(filed under seal), # 277 Exhibit 18(filed under seal), # 278 Exhibit 19 (filed under seal), # 279 Exhibit 20 (filed under seal), # 280 Exhibit 22 (filed under seal), # 281 Exhibit 23 (filed under seal), # 282 Exhibit 24 (filed under seal), # 283 Exhibit 25(filed under seal), # 284 Exhibit 26 (filed under seal), # 285 Exhibit 28 (filed under seal), # 286 Exhibit 29 (filed under seal), # 287 Exhibit 31 (filed under seal), # 288 Exhibit 32 (filed under seal), # 289 Exhibit 33 (filed under seal), # 290 Exhibit 35 (filed under seal), # 291 Exhibit 36 (filed under seal), # 292 Exhibit 37 (filed under seal), # 293 Exhibit 38(filed under seal), # 294 Exhibit 39 (filed under seal), # 295 Exhibit 40 (filed under seal), # 296 Exhibit 41, # 297 Exhibit 42 (filed under seal), # 298 Exhibit 43 (filed under seal), # 299 Exhibit 44(filed under seal), # 300 Exhibit 45 (filed under seal), # 301 Exhibit 46 (filed under seal), # 302 Exhibit 47 (filed under seal), # 303 Exhibit 48 (filed under seal), # 304 Exhibit 51 (filed under seal)) (Montes, Mariliz). (Additional attachment(s) added on 7/2/2018: # 305 Exhibit 52 (filed under seal), # 306 Exhibit 53 (filed under seal), # 307 Exhibit 54 (filed under seal), # 308 Exhibit 55 (filed under seal), # 309 Exhibit 56 (filed under seal), # 310 Exhibit 57 (filed under seal), # 311 Exhibit 58 (filed under seal), # 312 Exhibit 59 (filed under seal), # 313 Exhibit 60 (filed under seal), # 314 Exhibit 61 (filed under seal), # 315 Exhibit 62 (filed under seal), # 316 Exhibit 63 (filed under seal), # 317 Exhibit 64 (filed under seal), # 318 Exhibit 65 (filed under seal), # 319 Exhibit 66 (filed under seal), # 320 Exhibit 67 (filed under seal), # 321 Exhibit 68 (filed under seal), # 322 Exhibit 69 (filed under seal), # 323 Exhibit 70 (filed under seal), # 324 Exhibit 71 (filed under seal), # 325 Exhibit 72 (filed under seal), # 326 Exhibit 73 (filed under seal), # 327 Exhibit 74 (filed under seal), # 328 Exhibit 75 (filed under seal), # 329 Exhibit 76(filed under seal), # 330 Exhibit 77 (filed under seal), # 331 Exhibit 78 (filed under seal), # 332 Exhibit 79 (filed under seal), # 333 Exhibit 80 (filed under seal), # 334 Exhibit 81 (filed under seal), # 335 Exhibit 82 (filed under seal), # 336 Exhibit 83 (filed under seal), # 337 Exhibit 84 (filed under seal), # 338 Exhibit 85 (filed under seal), # 339 Exhibit 86 (filed under seal), # 340 Exhibit 87 (filed under seal), # 341 Exhibit 88 (filed under seal), # 342 Exhibit 89 (filed under seal), # 343 Exhibit 90 (filed under seal), # 344 Exhibit 91 (filed under seal)) (Montes, Mariliz). (Additional attachment(s) added on 7/2/2018: # 345 Exhibit 92 (filed under seal), # 346 Exhibit 93 (filed under seal), # 347 Exhibit 95 (filed under seal), # 348 Exhibit 96 (filed under seal), # 349 Exhibit 97 (filed under seal), # 350 Exhibit 99 (filed under seal), # 351 Exhibit 100 (filed under seal), # 352 Exhibit 101 (filed under seal), # 353 Exhibit 103 (filed under seal), # 354 Exhibit 104 (filed under seal), # 356 Exhibit 108 (filed under seal), # 357 Exhibit 109 (filed under seal), # 358 Exhibit 110 (filed under seal), # 359 Exhibit 111 (filed under seal), # 360 Exhibit 113 (filed under seal), # 361 Exhibit 114 (filed under seal), # 362 Exhibit 117 (filed under seal), # 363 Exhibit 118 (filed under seal), # 364 Exhibit 119

**JA80**

| | | |
|---|---|---|
| | | (filed under seal), # [365](#) Exhibit 120 (filed under seal)) (Montes, Mariliz). (Additional attachment(s) added on 7/2/2018: # [366](#) Exhibit 121 (filed under seal), # [367](#) Exhibit 122 (filed under seal), # [368](#) Exhibit 124 (filed under seal), # [369](#) Exhibit 125 (filed under seal), # [370](#) Exhibit 126 (filed under seal), # [371](#) Exhibit 127 (filed under seal), # [372](#) Exhibit 128 (filed under seal), # [373](#) Exhibit 129 (filed under seal), # [374](#) Exhibit 130 (filed under seal), # [375](#) Exhibit 131 (filed under seal), # [376](#) Exhibit 132 (filed under seal), # [377](#) Exhibit 134 (filed under seal), # [378](#) Exhibit 135 (filed under seal), # [379](#) Exhibit 136 (filed under seal), # [380](#) Exhibit 137 (filed under seal), # [381](#) Exhibit 138 (filed under seal), # [382](#) Exhibit 139 (filed under seal), # [383](#) Exhibit 140 (filed under seal), # [384](#) Exhibit 141 (filed under seal), # [385](#) Exhibit 142 (filed under seal), # [386](#) Exhibit 144 (filed under seal), # [387](#) Exhibit 146 (filed under seal), # [388](#) Exhibit 147 (filed under seal), # [389](#) Exhibit 151 (filed under seal), # [390](#) Exhibit 152 (filed under seal), # [391](#) Exhibit 153 (filed under seal), # [392](#) Exhibit 158 (filed under seal), # [393](#) Exhibit 159 (filed under seal), # [394](#) Exhibit 160 (filed under seal), # [395](#) Exhibit 161 (filed under seal), # [396](#) Exhibit 162 (filed under seal), # [397](#) Exhibit 163 (filed under seal), # [398](#) Exhibit 169 (filed under seal), # [399](#) Exhibit 170 (filed under seal), # [400](#) Exhibit 171 (filed under seal), # [401](#) Exhibit 172 (filed under seal), # [402](#) Exhibit 173 (filed under seal), # [403](#) Exhibit 174 (filed under seal), # [404](#) Exhibit 175 (filed under seal)) (Montes, Mariliz). (Additional attachment(s) added on 7/2/2018: # [405](#) Exhibit 176 (filed under seal), # [406](#) Exhibit 177 (filed under seal), # [407](#) Exhibit 178 (filed under seal), # [408](#) Exhibit 179 (filed under seal), # [409](#) Exhibit 180 (filed under seal), # [410](#) Exhibit 181 (filed under seal), # [411](#) Exhibit 182 (filed under seal), # [412](#) Exhibit 183, # [413](#) Exhibit 184 (filed under seal), # [414](#) Exhibit 187 (filed under seal), # [415](#) Exhibit 188 (filed under seal), # [416](#) Exhibit 189 (filed under seal), # [417](#) Exhibit 192 (filed under seal), # [418](#) Exhibit 194 (filed under seal), # [419](#) Exhibit 195 (filed under seal), # [420](#) Exhibit 196 (filed under seal), # [421](#) Exhibit 197 (filed under seal), # [422](#) Exhibit 198 (filed under seal), # [423](#) Exhibit 199 (filed under seal), # [424](#) Exhibit 200 (filed under seal)) (Montes, Mariliz). (Additional attachment(s) added on 7/2/2018: # [425](#) Exhibit 202 (filed under seal), # [426](#) Exhibit 205 (filed under seal), # [427](#) Exhibit 206 (filed under seal), # [428](#) Exhibit 207 (filed under seal), # [429](#) Exhibit 220 (filed under seal), # [430](#) Exhibit 223 (filed under seal), # [431](#) Exhibit 224 (filed under seal), # [432](#) Exhibit 225 (filed under seal), # [433](#) Exhibit 226 (filed under seal), # [434](#) Exhibit 227 (filed under seal), # [435](#) Exhibit 228 (filed under seal), # [436](#) Exhibit 229 (filed under seal), # [437](#) Exhibit 230 (filed under seal), # [438](#) Exhibit 231 (filed under seal), # [439](#) Exhibit 233 (filed under seal), # [440](#) Exhibit 234 (filed under seal)) (Montes, Mariliz). (Additional attachment(s) added on 7/2/2018: # [441](#) Exhibit 236 (filed under seal), # [442](#) Exhibit 252 (filed under seal), # [443](#) Exhibit 253, # [444](#) Exhibit 254 (filed under seal), # [445](#) Exhibit 255 (filed under seal), # [446](#) Exhibit 256 (filed under seal), # [447](#) Exhibit 258 (filed under seal), # [448](#) Exhibit 259 (filed under seal), # [449](#) Exhibit 260 (filed under seal), # [450](#) Exhibit 261 (filed under seal)) (Montes, Mariliz). Modified to fix docket text on 7/30/2018 (McDonagh, Christina). (Entered: 06/15/2018) |
| 06/22/2018 | [422](#) | MEMORANDUM in Support re [410](#) Joint MOTION to Seal *Certain Information Filed in Connection with the Parties' Summary Judgment Motions* filed by President and Fellows of Harvard College. (Attachments: # [1](#) Declaration of Robin Worth)(Ellsworth, Felicia) (Entered: 06/22/2018) |
| 06/27/2018 | [423](#) | Letter/request (non–motion) from Sean D. Reyes Utah Attorney General. (McDonagh, Christina) (Entered: 06/27/2018) |
| 06/27/2018 | [424](#) | Assented to MOTION to Seal *Portions of SFFA's Opposition to Harvard's Motion to Seal* by Students for Fair Admissions, Inc..(Strawbridge, Patrick) (Entered: 06/27/2018) |
| 06/28/2018 | [425](#) | MOTION to Unseal Document by President and Fellows of Harvard College.(Ellsworth, Felicia) (Entered: 06/28/2018) |
| 06/29/2018 | 426 | Judge Allison D. Burroughs: ELECTRONIC ORDER entered granting [424](#) Motion to Seal (Folan, Karen) (Entered: 06/29/2018) |
| 06/29/2018 | [427](#) | Opposition re [410](#) Joint MOTION to Seal *Certain Information Filed in Connection with the Parties' Summary Judgment Motions* filed by Students for Fair Admissions, Inc.. (Consovoy, William) (Additional attachment(s) added on 7/2/2018: # [1](#) SEALED Memorandum of Law (unredacted)) (McDonagh, Christina). (Entered: 06/29/2018) |

| 07/02/2018 | 428 | Judge Allison D. Burroughs: ELECTRONIC ORDER entered granting 425 Motion to Unseal Document (Folan, Karen) (Entered: 07/02/2018) |
|---|---|---|
| 07/24/2018 | 429 | JOINT STATEMENT of counsel *Regarding the Submission of Amicus Briefs*. (Strawbridge, Patrick) (Entered: 07/24/2018) |
| 07/24/2018 | 430 | MOTION to Seal *Certain Information Filed in Connection with Harvard's Opposition to Plaintiff's Motion for Summary Judgment* by President and Fellows of Harvard College.(Ellsworth, Felicia) (Entered: 07/24/2018) |
| 07/24/2018 | 431 | Judge Allison D. Burroughs: ELECTRONIC ORDER entered granting 430 Motion to Seal (Folan, Karen) (Entered: 07/24/2018) |
| 07/24/2018 | 432 | Judge Allison D. Burroughs: ELECTRONIC ORDER entered. In response to the parties' joint statement regarding the submission of amicus briefs [ECF No. 429], the Court hereby grants leave for any interested party to file an amicus brief on the pending dispositive motions, in accordance with the deadlines set forth in the Court's order dated May 23, 2018 [ECF No. 404]. (Folan, Karen) (Entered: 07/24/2018) |
| 07/26/2018 | 433 | Assented to MOTION to Seal by Students for Fair Admissions, Inc..(Strawbridge, Patrick) (Entered: 07/26/2018) |
| 07/26/2018 | 434 | Judge Allison D. Burroughs: ELECTRONIC ORDER entered granting 433 Motion to Seal (Folan, Karen) (Entered: 07/26/2018) |
| 07/27/2018 | 435 | MEMORANDUM in Opposition re 412 MOTION for Summary Judgment filed by President and Fellows of Harvard College. (Waxman, Seth) (Additional attachment(s) added on 7/30/2018: # 1 SEALED Opposition to Motion for Summary Judgment) (McDonagh, Christina). (Entered: 07/27/2018) |
| 07/27/2018 | 436 | Amicus Curiae APPEARANCE entered by Dwight G. Duncan on behalf of National Association of Scholars. (Duncan, Dwight) (Entered: 07/27/2018) |
| 07/27/2018 | 437 | Counter Statement of Material Facts L.R. 56.1 re 412 MOTION for Summary Judgment filed by President and Fellows of Harvard College. (Waxman, Seth) (Additional attachment(s) added on 7/30/2018: # 1 SEALED Response to Statement of Material Facts) (McDonagh, Christina). (Entered: 07/27/2018) |
| 07/27/2018 | 438 | DECLARATION *Declaration of Felicia H. Ellsworth ISO Defendant's Opposition to Plaintiff's Motion for Summary Judgment* by President and Fellows of Harvard College. (Attachments: # 1 Exhibit 98, # 2 Exhibit 99, # 3 Exhibit 100, # 4 Exhibit 101, # 5 Exhibit 102, # 6 Exhibit 103, # 7 Exhibit 104, # 8 Exhibit 105, # 9 Exhibit 106, # 10 Exhibit 107, # 11 Exhibit 108, # 12 Exhibit 109, # 13 Exhibit 110, # 14 Exhibit 111, # 15 Exhibit 112, # 16 Exhibit 113, # 17 Exhibit 114, # 18 Exhibit 115, # 19 Exhibit 116, # 20 Exhibit 117, # 21 Exhibit 118, # 22 Exhibit 119, # 23 Exhibit 120, # 24 Exhibit 121, # 25 Exhibit 122, # 26 Exhibit 123, # 27 Exhibit 124, # 28 Exhibit 125, # 29 Exhibit 126, # 30 Exhibit 127, # 31 Exhibit 128, # 32 Exhibit 129, # 33 Exhibit 130, # 34 Exhibit 131, # 35 Exhibit 132, # 36 Exhibit 133, # 37 Exhibit 134, # 38 Exhibit 135, # 39 Exhibit 136, # 40 Exhibit 137, # 41 Exhibit 138, # 42 Exhibit 139, # 43 Exhibit 140, # 44 Exhibit 141, # 45 Exhibit 142, # 46 Exhibit 143, # 47 Exhibit 144, # 48 Exhibit 145, # 49 Exhibit 146, # 50 Exhibit 147, # 51 Exhibit 148, # 52 Exhibit 149, # 53 Exhibit 150, # 54 Exhibit 151, # 55 Exhibit 152, # 56 Exhibit 153, # 57 Exhibit 154, # 58 Exhibit 155, # 59 Exhibit 156, # 60 Exhibit 157, # 61 Exhibit 158)(Ellsworth, Felicia) (Additional attachment(s) added on 7/30/2018: # 62 SEALED Declaration of Felicia H. Ellsworth in Support of Defendant's Opposition to Plaintiff's Motion for Summary Judgment, # 63 Exhibit 98 Unredacted Version, # 64 Exhibit 101 Unredacted Version, # 65 Exhibit 102 Unredacted Version) (McDonagh, Christina). (Additional attachment(s) added on 7/30/2018: # 66 Exhibit 105 Unredacted Version, # 67 Exhibit 119 Unredacted Version, # 68 Exhibit 128 Unredacted Version, # 69 Exhibit 151 Unredacted Version, # 70 Exhibit 158 Unredacted Version) (McDonagh, Christina). (Entered: 07/27/2018) |
| 07/30/2018 | 439 | AMICUS BRIEF filed by National Association of Scholars . (Duncan, Dwight) (Entered: 07/30/2018) |
| 07/30/2018 | 440 | MEMORANDUM in Support re 417 MOTION for Summary Judgment filed by M. B., K. C., Sarah Cole, Y. D., G. E., A. G., I. G., R. H., J. L., Fadhal Moore, Arjini Kumari Nawal, R. S., Itzel Vasquez–Rodriguez, Keyanna Wigglesworth. (Attachments: # 1 |

| | | |
|---|---|---|
| | | Exhibit Student Declarations)(Culleen, Lawrence) (Entered: 07/30/2018) |
| 07/30/2018 | 441 | Amicus Curiae APPEARANCE entered by Natashia Tidwell on behalf of American Council on Education. (Tidwell, Natashia) (Entered: 07/30/2018) |
| 07/30/2018 | 442 | AMICUS BRIEF filed by American Council on Education *and 36 Other Higher Education Organizations in Opposition to Plaintiff's Motion for Summary Judgment and in Support of Defendant's Motion for Summary Judgment*. (Tidwell, Natashia) (Entered: 07/30/2018) |
| 07/30/2018 | 443 | Amicus Curiae APPEARANCE entered by Seth B. Orkand on behalf of Brown University, Case Western Reserve University, Columbia University, Cornell University, Dartmouth College, Duke University, Emory University, George Washington University, John Hopkins University, Massachusetts Institute of Technology, Princeton University, Stanford University, University of Pennsylvania, Vanderbilt University, Washington University in St. Louis, Yale University. (Orkand, Seth) (Entered: 07/30/2018) |
| 07/30/2018 | 444 | MOTION for Leave to Appear Pro Hac Vice for admission to Matthew S. Hellman Filing fee: $ 100, receipt number 0101−7251217 by Brown University, Case Western Reserve University, Columbia University, Cornell University, Dartmouth College, Duke University, Emory University, George Washington University, John Hopkins University, Massachusetts Institute of Technology, Princeton University, Stanford University, University of Pennsylvania, Vanderbilt University, Washington University in St. Louis, Yale University. (Attachments: # 1 Affidavit of Matthew S. Hellman)(Orkand, Seth) (Entered: 07/30/2018) |
| 07/30/2018 | 445 | AMICUS BRIEF filed by Brown University, Case Western Reserve University, Columbia University, Cornell University, Dartmouth College, Duke University, Emory University, George Washington University, John Hopkins University, Massachusetts Institute of Technology, Princeton University, Stanford University, University of Pennsylvania, Vanderbilt University, Washington University in St. Louis, Yale University *in Support of Defendants*. (Orkand, Seth) (Entered: 07/30/2018) |
| 07/30/2018 | 446 | Judge Allison D. Burroughs: ELECTRONIC ORDER entered granting 444 Motion for Leave to Appear Pro Hac Vice Added Matthew S. Hellman. **Pursuant to Local Rule 83.5.3, local counsel shall also file an appearance in this matter. Further, local counsel shall review all filings and shall personally appear in Court for any hearings or conferences, unless expressly excused by the Court for good cause. Attorneys admitted Pro Hac Vice must register for electronic filing if the attorney does not already have an ECF account in this district. To register go to the Court website at www.mad.uscourts.gov. Select Case Information, then Electronic Filing (CM/ECF) and go to the CM/ECF Registration Form.** (McDonagh, Christina) (Entered: 07/30/2018) |
| 07/30/2018 | 447 | BRIEF by Walter Dellinger *(Brief For Walter Dellinger As Amicus Curiae In Support Of Defendant On The Issue Of Standing)*. (Wisner, Joanne) (Entered: 07/30/2018) |
| 07/30/2018 | 448 | Amicus Curiae APPEARANCE entered by Randall B. Clark on behalf of Amici Curiae Economists Michael Keane et al., in Support of Students for Fair Admissions. (Clark, Randall) Modified to correct docket text on 7/30/2018 (McDonagh, Christina). (Entered: 07/30/2018) |
| 07/30/2018 | 449 | MEMORANDUM in Opposition re 417 MOTION for Summary Judgment filed by Students for Fair Admissions, Inc.. (Consovoy, William) (Additional attachment(s) added on 7/31/2018: # 1 Memorandum of Reasons in Opposition to Harvard's Motion For Summary Judgment (Unredacted and Sealed)) (McDonagh, Christina). (Entered: 07/30/2018) |
| 07/30/2018 | 450 | AMICUS BRIEF filed by Amici Curiae Economists Michael Keane et al., in Support of Students for Fair Admissions . (Attachments: # 1 Exhibit)(Clark, Randall) (Entered: 07/30/2018) |
| 07/30/2018 | 451 | MOTION for Leave to Appear Pro Hac Vice for admission of C. Boyden Gray, Andrew R. Varcoe, Adam R.F. Gustafson, James R. Conde Filing fee: $ 400, receipt number 0101−7251970 by Amici Curiae Economists Michael Keane et al., in Support |

| | | |
|---|---|---|
| | | of Students for Fair Admissions.(Clark, Randall) (Entered: 07/30/2018) |
| 07/30/2018 | 452 | Counter Statement of Material Facts L.R. 56.1 re 417 MOTION for Summary Judgment filed by Students for Fair Admissions, Inc.. (Consovoy, William) (Additional attachment(s) added on 7/31/2018: # 1 Unredacted Version of Plaintiff's Response to Defendant's Statement of Undisputed Material Facts (Filed under Seal)) (McDonagh, Christina). (Additional attachment(s) added on 10/3/2018: # 2 Updated (10/3/2018) Redacted Response) (McDonagh, Christina). (Entered: 07/30/2018) |
| 07/30/2018 | 453 | Judge Allison D. Burroughs: ELECTRONIC ORDER entered granting 451 Motion for Leave to Appear Pro Hac Vice Added James R. Conde, Adam R.F. Gustafson, C. Boyden Gray, Andrew R. Varcoe. **Pursuant to Local Rule 83.5.3, local counsel shall also file an appearance in this matter. Further, local counsel shall review all filings and shall personally appear in Court for any hearings or conferences, unless expressly excused by the Court for good cause. Attorneys admitted Pro Hac Vice must register for electronic filing if the attorney does not already have an ECF account in this district. To register go to the Court website at www.mad.uscourts.gov. Select Case Information, then Electronic Filing (CM/ECF) and go to the CM/ECF Registration Form.** (McDonagh, Christina) (Entered: 07/30/2018) |
| 07/30/2018 | 454 | DECLARATION *of Michael Connolly in Support of SFFA's Opposition to Harvard's Motion for Summary Judgment* by Students for Fair Admissions, Inc.. (Attachments: # 1 Exhibit 262, # 2 Exhibit 263, # 3 Exhibit 264, # 4 Exhibit 265, # 5 Exhibit 266, # 6 Exhibit 267, # 7 Exhibit 268, # 8 Exhibit 269, # 9 Exhibit 270, # 10 Exhibit 271, # 11 Exhibit 272, # 12 Exhibit 273, # 13 Exhibit 274, # 14 Exhibit 275, # 15 Exhibit 276, # 16 Exhibit 277, # 17 Exhibit 278, # 18 Exhibit 279, # 19 Exhibit 280, # 20 Exhibit 281, # 21 Exhibit 282, # 22 Exhibit 283, # 23 Exhibit 284, # 24 Exhibit 285)(Consovoy, William) (Additional attachment(s) added on 7/31/2018: # 25 Unredacted DECLARATION of Michael Connolly in Support of SFFA's Opposition to Harvard's Motion for Summary Judgment (Filed Under Seal), # 26 Exhibit 262 (Filed Under Seal), # 27 Exhibit 263 (Filed Under Seal), # 28 Exhibit 264 (Filed Under Seal), # 29 Exhibit 265 (Filed Under Seal), # 30 Exhibit 266 (Filed Under Seal), # 31 Exhibit 267 (Filed Under Seal), # 32 Exhibit 268 (Filed Under Seal), # 33 Exhibit 269 (Filed Under Seal), # 34 Exhibit 270 (Filed Under Seal), # 35 Exhibit 271 (Filed Under Seal), # 36 Exhibit 272 (Filed Under Seal), # 37 Exhibit 273 (Filed Under Seal), # 38 Exhibit 274 (Filed Under Seal), # 39 Exhibit 275 (Filed Under Seal), # 40 Exhibit 276 (Filed Under Seal), # 41 Exhibit 277 (Filed Under Seal), # 42 Exhibit 278 (Filed Under Seal), # 43 Exhibit 279 (Filed Under Seal), # 44 Exhibit 280 (Filed Under Seal), # 45 Exhibit 281 (Filed Under Seal), # 46 Exhibit 282 (Filed Under Seal), # 47 Exhibit 283 (Filed Under Seal), # 48 Exhibit 284 (Filed Under Seal), # 49 Exhibit 285 (Filed Under Seal)) (McDonagh, Christina). (Entered: 07/30/2018) |
| 07/30/2018 | 455 | MOTION for Leave to File *to Participate as Amici Curiae* by Harvard–Radcliffe Black Students Association, Kuumba Singers of Harvard College, Fuerza Latina of Harvard, Native Americans At Harvard College, Harvard–Radcliffe Asian American Association, Harvard–Radcliffe Asian American Women's Association, Harvard Asian American Brotherhood, Harvard Vietnamese Association, Harvard–Radcliffe Chinese Students Association, Harvard Korean Association, Harvard Japan Society, Harvard South Asian Association, Harvard Islamic Society, Task Force on Asian and Pacific American Studies at Harvard College, Harvard Phillips Brooks House Association, Harvard Minority Association of Pre–Medical Students, Coalition for a Diverse Harvard, First Generation Harvard Alumni, Native American Alumni of Harvard University, Harvard University Muslim Alumni, Harvard Latino Alumni Alliance. (Attachments: # 1 Exhibit Amicus Brief by Harvard Student and Alumni Organizations in Support of Defendants' Motion for Summary Judgment, # 2 Exhibit Declaration, # 3 Exhibit Declaration, # 4 Exhibit Declaration, # 5 Exhibit Declaration, # 6 Exhibit Declaration, # 7 Exhibit Declaration, # 8 Exhibit Declaration, # 9 Exhibit Declaration, # 10 Exhibit Declaration, # 11 Exhibit Declaration, # 12 Exhibit Declaration, # 13 Exhibit Declaration, # 14 Exhibit Declaration, # 15 Exhibit Declaration, # 16 Exhibit Declaration, # 17 Exhibit Declaration)(Thayer, Kenneth) (Entered: 07/30/2018) |
| 07/30/2018 | 456 | NOTICE of Appearance by Kenneth N. Thayer on behalf of Coalition for a Diverse Harvard, First Generation Harvard Alumni, Fuerza Latina of Harvard, Harvard Asian American Brotherhood, Harvard Islamic Society, Harvard Japan Society, Harvard |

| | | |
|---|---|---|
| | | Korean Association, Harvard Latino Alumni Alliance, Harvard Minority Association of Pre–Medical Students, Harvard Phillips Brooks House Association, Harvard South Asian Association, Harvard University Muslim Alumni, Harvard Vietnamese Association, Harvard–Radcliffe Asian American Association, Harvard–Radcliffe Asian American Women's Association, Harvard–Radcliffe Black Students Association, Harvard–Radcliffe Chinese Students Association, Kuumba Singers of Harvard College, Native American Alumni of Harvard University, Native Americans At Harvard College, Task Force on Asian and Pacific American Studies at Harvard College (Thayer, Kenneth) (Entered: 07/30/2018) |
| 07/30/2018 | 457 | MOTION for Leave to Appear Pro Hac Vice for admission of Sherrilyn A. Ifill, Janai S. Nelson, Samuel Spital, Jin Hee Lee, Rachel M. Kleinman, Michaele N. Turnage Young, Jennifer A. Holmes, and Cara McClellan by Coalition for a Diverse Harvard, First Generation Harvard Alumni, Fuerza Latina of Harvard, Harvard Asian American Brotherhood, Harvard Islamic Society, Harvard Japan Society, Harvard Korean Association, Harvard Latino Alumni Alliance, Harvard Minority Association of Pre–Medical Students, Harvard Phillips Brooks House Association, Harvard South Asian Association, Harvard University Muslim Alumni, Harvard Vietnamese Association, Harvard–Radcliffe Asian American Association, Harvard–Radcliffe Asian American Women's Association, Harvard–Radcliffe Black Students Association, Harvard–Radcliffe Chinese Students Association, Kuumba Singers of Harvard College, Native American Alumni of Harvard University, Native Americans At Harvard College, Task Force on Asian and Pacific American Studies at Harvard College. (Attachments: # 1 Certification of Attorney Ifill, # 2 Certification of Attorney Nelson, # 3 Certification of Attorney Spital, # 4 Certification of Attorney Lee, # 5 Certification of Attorney Kleinman, # 6 Certification of Attorney Turnage Young, # 7 Certification of Attorney Holmes, # 8 Certification of Attorney McClellan)(Thayer, Kenneth) (Entered: 07/30/2018) |
| 07/30/2018 | 458 | NOTICE of Appearance by Kathryn Rebecca Cook on behalf of Coalition for a Diverse Harvard, First Generation Harvard Alumni, Fuerza Latina of Harvard, Harvard Asian American Brotherhood, Harvard Islamic Society, Harvard Japan Society, Harvard Korean Association, Harvard Latino Alumni Alliance, Harvard Minority Association of Pre–Medical Students, Harvard Phillips Brooks House Association, Harvard South Asian Association, Harvard University Muslim Alumni, Harvard Vietnamese Association, Harvard–Radcliffe Asian American Association, Harvard–Radcliffe Asian American Women's Association, Harvard–Radcliffe Black Students Association, Harvard–Radcliffe Chinese Students Association, Kuumba Singers of Harvard College, Native American Alumni of Harvard University, Native Americans At Harvard College, Task Force on Asian and Pacific American Studies at Harvard College (Cook, Kathryn) (Entered: 07/30/2018) |
| 07/30/2018 | 459 | MOTION for Leave to Appear Pro Hac Vice for admission of Gordon M. Fauth, Jr. and Lee Cheng Filing fee: $ 200, receipt number 0101–7252337 by Asian American Legal Foundation, Asian American Coalition for Education. (Attachments: # 1 Exhibit Cheng Certification, # 2 Exhibit Fauth Certification, # 3 Text of Proposed Order)(Randazza, Marc) (Entered: 07/30/2018) |
| 07/30/2018 | 460 | AMICUS BRIEF filed by Asian American Coalition for Education, Asian American Legal Foundation . (Randazza, Marc) (Entered: 07/30/2018) |
| 07/30/2018 | 461 | MOTION for Leave to File *Brief of Amici Curiae 460 Out of Time* by Asian American Coalition for Education, Asian American Legal Foundation. (Attachments: # 1 Text of Proposed Order)(Randazza, Marc) (Entered: 07/30/2018) |
| 07/31/2018 | 462 | Judge Allison D. Burroughs: ELECTRONIC ORDER entered granting 459 Motion for Leave to Appear Pro Hac Vice Added Gordon M. Fauth Jr. and Lee Cheng. **Pursuant to Local Rule 83.5.3, local counsel shall also file an appearance in this matter. Further, local counsel shall review all filings and shall personally appear in Court for any hearings or conferences, unless expressly excused by the Court for good cause. Attorneys admitted Pro Hac Vice must register for electronic filing if the attorney does not already have an ECF account in this district. To register go to the Court website at www.mad.uscourts.gov. Select Case Information, then Electronic Filing (CM/ECF) and go to the CM/ECF Registration Form.** (McDonagh, Christina) (Entered: 07/31/2018) |

**JA85**

| 07/31/2018 | 463 | NOTICE OF ATTORNEY PAYMENT OF FEES as to 457 MOTION for Leave to Appear Pro Hac Vice for admission of Sherrilyn A. Ifill, Janai S. Nelson, Samuel Spital, Jin Hee Lee, Rachel K. Kleinman, Michaele N. Turnage Young, Jennifer A. Holmes, and Cara McClellan by Amicus Parties Coalition for a Diverse Harvard, First Generation Harvard Alumni, Fuerza Latina of Harvard, Harvard Asian American Brotherhood, Harvard Islamic Society, Harvard Japan Society, Harvard Korean Association, Harvard Latino Alumni Alliance, Harvard Minority Association of Pre–Medical Students, Harvard Phillips Brooks House Association, Harvard South Asian Association, Harvard University Muslim Alumni, Harvard Vietnamese Association, Harvard–Radcliffe Asian American Association, Harvard–Radcliffe Asian American Women's Association, Harvard–Radcliffe Black Students Association, Harvard–Radcliffe Chinese Students Association, Kuumba Singers of Harvard College, Native American Alumni of Harvard University, Native Americans At Harvard College, Task Force on Asian and Pacific American Studies at Harvard College. Filing fee $ 400, receipt number 0101–7253250. Payment Type : PRO HAC VICE. (Thayer, Kenneth) (Entered: 07/31/2018) |
| 07/31/2018 | 464 | NOTICE OF ATTORNEY PAYMENT OF FEES by Amicus Parties Coalition for a Diverse Harvard, First Generation Harvard Alumni, Fuerza Latina of Harvard, Harvard Asian American Brotherhood, Harvard Islamic Society, Harvard Japan Society, Harvard Korean Association, Harvard Latino Alumni Alliance, Harvard Minority Association of Pre–Medical Students, Harvard Phillips Brooks House Association, Harvard South Asian Association, Harvard University Muslim Alumni, Harvard Vietnamese Association, Harvard–Radcliffe Asian American Association, Harvard–Radcliffe Asian American Women's Association, Harvard–Radcliffe Black Students Association, Harvard–Radcliffe Chinese Students Association, Kuumba Singers of Harvard College, Native American Alumni of Harvard University, Native Americans At Harvard College, Task Force on Asian and Pacific American Studies at Harvard College. Filing fee $ 400, receipt number 0101–7253315. Payment Type : PRO HAC VICE. (Thayer, Kenneth) (Entered: 07/31/2018) |
| 07/31/2018 | 465 | Judge Allison D. Burroughs: ELECTRONIC ORDER entered granting 455 Motion for Leave to File Document ; Counsel using the Electronic Case Filing System should now file the document for which leave to file has been granted in accordance with the CM/ECF Administrative Procedures. Counsel must include – Leave to file granted on (date of order)– in the caption of the document. (Folan, Karen) (Entered: 07/31/2018) |
| 07/31/2018 | 466 | Judge Allison D. Burroughs: ELECTRONIC ORDER entered granting 461 Motion for Leave to File Document ; Counsel using the Electronic Case Filing System should now file the document for which leave to file has been granted in accordance with the CM/ECF Administrative Procedures. Counsel must include – Leave to file granted on (date of order)– in the caption of the document. (Folan, Karen) (Entered: 07/31/2018) |
| 07/31/2018 | 467 | AMICUS BRIEF filed by Asian American Coalition for Education, Asian American Legal Foundation . (Randazza, Marc) (Entered: 07/31/2018) |
| 07/31/2018 | 468 | Judge Allison D. Burroughs: ELECTRONIC ORDER entered granting 457 Motion for Leave to Appear Pro Hac Vice Added Sherrilyn A. Ifill, Janai S. Nelson, Samuel Spital, Jin Hee Lee, Rachel K. Kleinman, Michaele N. Turnage Young, Jennifer A. Holmes, and Cara McClellan. **Pursuant to Local Rule 83.5.3, local counsel shall also file an appearance in this matter. Further, local counsel shall review all filings and shall personally appear in Court for any hearings or conferences, unless expressly excused by the Court for good cause. Attorneys admitted Pro Hac Vice must register for electronic filing if the attorney does not already have an ECF account in this district. To register go to the Court website at www.mad.uscourts.gov. Select Case Information, then Electronic Filing (CM/ECF) and go to the CM/ECF Registration Form.** (McDonagh, Christina) (Entered: 07/31/2018) |
| 08/01/2018 | 469 | NOTICE by Asian American Legal Foundation *NOTICE OF APPEARANCE OF LEE C. CHENG AS COUNSEL FOR AMICUS CURIAE THE ASIAN AMERICAN LEGAL FOUNDATION* (Fauth, Gordon) (Entered: 08/01/2018) |
| 08/01/2018 | 470 | NOTICE of Appearance by Gordon M. Fauth, Jr on behalf of Asian American Coalition for Education, Asian American Legal Foundation (Fauth, Gordon) (Entered: 08/01/2018) |

| 08/03/2018 | 471 | AMICUS BRIEF filed by Coalition for a Diverse Harvard, First Generation Harvard Alumni, Fuerza Latina of Harvard, Harvard Asian American Brotherhood, Harvard Islamic Society, Harvard Japan Society, Harvard Korean Association, Harvard Latino Alumni Alliance, Harvard Minority Association of Pre–Medical Students, Harvard Phillips Brooks House Association, Harvard South Asian Association, Harvard University Muslim Alumni, Harvard Vietnamese Association, Harvard–Radcliffe Asian American Association, Harvard–Radcliffe Asian American Women's Association, Harvard–Radcliffe Black Students Association, Harvard–Radcliffe Chinese Students Association, Kuumba Singers of Harvard College, Native American Alumni of Harvard University, Native Americans At Harvard College, Task Force on Asian and Pacific American Studies at Harvard College *in Support of Defendants' Motion for Summary Judgment*. (Attachments: # 1 Exhibit 2 Declaration, # 2 Exhibit 3 Declaration, # 3 Exhibit 4 Declaration, # 4 Exhibit 5 Declaration, # 5 Exhibit 6 Declaration, # 6 Exhibit 7 Declaration, # 7 Exhibit 8 Declaration, # 8 Exhibit 9 Declaration, # 9 Exhibit 10 Declaration, # 10 Exhibit 11 Declaration, # 11 Exhibit 12 Declaration, # 12 Exhibit 13 Declaration, # 13 Exhibit 14 Declaration, # 14 Exhibit 15 Declaration, # 15 Exhibit 16 Declaration, # 16 Exhibit 17 Declaration)(Thayer, Kenneth) (Entered: 08/03/2018) |
| 08/06/2018 | 472 | MOTION for Leave to Appear Pro Hac Vice for admission of Brenda Shum Filing fee: $ 100, receipt number 0101–7261415 by M. B., K. C., Sarah Cole, Y. D., G. E., A. G., I. G., R. H., J. L., Fadhal Moore, Arjini Kumari Nawal, R. S., Itzel Vasquez–Rodriguez, Keyanna Wigglesworth. (Attachments: # 1 Shum Declaration, # 2 Text of Proposed Order Text of Proposed Order)(Cregor, Matthew) (Entered: 08/06/2018) |
| 08/06/2018 | 473 | MOTION for Leave to Appear Pro Hac Vice for admission of Genevieve Bonadies Torres Filing fee: $ 100, receipt number 0101–7261863 by M. B., K. C., Sarah Cole, Y. D., G. E., A. G., I. G., R. H., J. L., Fadhal Moore, Arjini Kumari Nawal, R. S., Itzel Vasquez–Rodriguez, Keyanna Wigglesworth. (Attachments: # 1 Certificate of Good Standing, # 2 Declaration, # 3 Text of Proposed Order Text of Proposed Order)(Cregor, Matthew) (Entered: 08/06/2018) |
| 08/06/2018 | 474 | MOTION for Leave to Appear Pro Hac Vice for admission of Emma Dinan Filing fee: $ 100, receipt number 0101–7261880 by M. B., K. C., Sarah Cole, Y. D., G. E., A. G., I. G., J. L., Fadhal Moore, Arjini Kumari Nawal, R. S., Itzel Vasquez–Rodriguez, Keyanna Wigglesworth. (Attachments: # 1 Declaration, # 2 Text of Proposed Order Text of Proposed Order)(Cregor, Matthew) (Entered: 08/06/2018) |
| 08/06/2018 | 475 | Judge Allison D. Burroughs: ELECTRONIC ORDER entered granting 472 Motion for Leave to Appear Pro Hac Vice Added Brenda Shum. **Pursuant to Local Rule 83.5.3, local counsel shall also file an appearance in this matter. Further, local counsel shall review all filings and shall personally appear in Court for all hearings or conferences, unless expressly excused by the Court for good cause. Attorneys admitted Pro Hac Vice must register for electronic filing if the attorney does not already have an ECF account in this district. To register go to the Court website at www.mad.uscourts.gov. Select Case Information, then Electronic Filing (CM/ECF) and go to the CM/ECF Registration Form.** (McDonagh, Christina) (Entered: 08/06/2018) |
| 08/06/2018 | 476 | Judge Allison D. Burroughs: ELECTRONIC ORDER entered granting 473 Motion for Leave to Appear Pro Hac Vice Added Genevieve Bonadies Torres. **Pursuant to Local Rule 83.5.3, local counsel shall also file an appearance in this matter. Further, local counsel shall review all filings and shall personally appear in Court for all hearings or conferences, unless expressly excused by the Court for good cause. Attorneys admitted Pro Hac Vice must register for electronic filing if the attorney does not already have an ECF account in this district. To register go to the Court website at www.mad.uscourts.gov. Select Case Information, then Electronic Filing (CM/ECF) and go to the CM/ECF Registration Form.** (McDonagh, Christina) (Entered: 08/06/2018) |
| 08/06/2018 | 477 | Judge Allison D. Burroughs: ELECTRONIC ORDER entered granting 474 Motion for Leave to Appear Pro Hac Vice Added Emma Katherine Dinan. **Pursuant to Local Rule 83.5.3, local counsel shall also file an appearance in this matter. Further, local counsel shall review all filings and shall personally appear in Court for all hearings or conferences, unless expressly excused by the Court for good cause.** |

**JA87**

| | | Attorneys admitted Pro Hac Vice must register for electronic filing if the attorney does not already have an ECF account in this district. To register go to the Court website at www.mad.uscourts.gov. Select Case Information, then Electronic Filing (CM/ECF) and go to the CM/ECF Registration Form. (McDonagh, Christina) (Entered: 08/06/2018) |
|---|---|---|
| 08/13/2018 | 478 | JOINT STATEMENT of counsel *Regarding the Submission of Trial Briefs*. (Mortara, Adam) (Entered: 08/13/2018) |
| 08/13/2018 | 479 | MEMORANDUM in Opposition re 455 MOTION for Leave to File *to Participate as Amici Curiae* filed by Students for Fair Admissions, Inc.. (Attachments: # 1 Exhibit 1)(Hughes, John) (Entered: 08/13/2018) |
| 08/16/2018 | 480 | MOTION for Leave to File *Reply* by Coalition for a Diverse Harvard, First Generation Harvard Alumni, Fuerza Latina of Harvard, Harvard Asian American Brotherhood, Harvard Islamic Society, Harvard Japan Society, Harvard Korean Association, Harvard Latino Alumni Alliance, Harvard Minority Association of Pre–Medical Students, Harvard Phillips Brooks House Association, Harvard South Asian Association, Harvard University Muslim Alumni, Harvard Vietnamese Association, Harvard–Radcliffe Asian American Association, Harvard–Radcliffe Asian American Women's Association, Harvard–Radcliffe Black Students Association, Harvard–Radcliffe Chinese Students Association, Kuumba Singers of Harvard College, Native American Alumni of Harvard University, Native Americans At Harvard College, Task Force on Asian and Pacific American Studies at Harvard College. (Attachments: # 1 Exhibit 1 – Proposed Reply to Students for Fair Admissions, Inc.'s Memorandum in Opposition to Amici Organizations' Motion to Participate as Amici Curiae)(Kleinman, Rachel) (Entered: 08/16/2018) |
| 08/16/2018 | 481 | Judge Allison D. Burroughs: ELECTRONIC ORDER entered granting 480 Motion for Leave to File Document ; Counsel using the Electronic Case Filing System should now file the document for which leave to file has been granted in accordance with the CM/ECF Administrative Procedures. Counsel must include – Leave to file granted on (date of order)– in the caption of the document. (Folan, Karen) (Entered: 08/16/2018) |
| 08/16/2018 | 482 | REPLY to Response to 455 MOTION for Leave to File *to Participate as Amici Curiae* filed by Coalition for a Diverse Harvard, First Generation Harvard Alumni, Fuerza Latina of Harvard, Harvard Asian American Brotherhood, Harvard Islamic Society, Harvard Japan Society, Harvard Korean Association, Harvard Latino Alumni Alliance, Harvard Minority Association of Pre–Medical Students, Harvard Phillips Brooks House Association, Harvard South Asian Association, Harvard University Muslim Alumni, Harvard Vietnamese Association, Harvard–Radcliffe Asian American Association, Harvard–Radcliffe Asian American Women's Association, Harvard–Radcliffe Black Students Association, Harvard–Radcliffe Chinese Students Association, Kuumba Singers of Harvard College, Native American Alumni of Harvard University, Native Americans At Harvard College, Task Force on Asian and Pacific American Studies at Harvard College. (Kleinman, Rachel) (Entered: 08/16/2018) |
| 08/27/2018 | 483 | MOTION to Seal *Certain Information Filed in Connection with Harvard's Reply in Support of its Motion for Summary Judgment* by President and Fellows of Harvard College.(Ellsworth, Felicia) (Entered: 08/27/2018) |
| 08/27/2018 | 484 | REPLY to Response to 417 MOTION for Summary Judgment filed by President and Fellows of Harvard College. (Waxman, Seth) (Entered: 08/27/2018) |
| 08/28/2018 | 485 | Assented to MOTION to Seal by Students for Fair Admissions, Inc..(Strawbridge, Patrick) (Entered: 08/28/2018) |
| 08/28/2018 | 486 | Judge Allison D. Burroughs: ELECTRONIC ORDER entered granting 483 Motion to Seal (Folan, Karen) (Entered: 08/28/2018) |
| 08/28/2018 | 487 | DECLARATION of Felicia H. Ellsworth ISO Defendant's Reply ISO Its Motion for *Summary Judgment* by President and Fellows of Harvard College. (Attachments: # 1 Exhibit 159, # 2 Exhibit 160, # 3 Exhibit 161, # 4 Exhibit 162, # 5 Exhibit 163, # 6 Exhibit 164, # 7 Exhibit 165, # 8 Exhibit 166)(Ellsworth, Felicia) (Additional attachment(s) added on 8/28/2018: # 9 Unredacted Memorandum, # 10 Exhibit 160 Unredacted Version (FILED UNDER SEAL), # 11 Exhibit 161 Unredacted Version |

**JA88**

| | | (FILED UNDER SEAL), # 12 Exhibit 162 Unredacted Version (FILED UNDER SEAL), # 13 Exhibit 163 Unredacted Version (FILED UNDER SEAL), # 14 Exhibit 164 Unredacted Version (FILED UNDER SEAL), # 15 Exhibit 165 Unredacted Version (FILED UNDER SEAL)) (McDonagh, Christina). (Entered: 08/28/2018) |
|---|---|---|
| 08/29/2018 | 488 | NOTICE of Appearance filed in error. Please see docket entry ECF 489 (Entered: 08/29/2018) |
| 08/29/2018 | 489 | NOTICE of Appearance by Richard J. Rosensweig on behalf of Social Scientists and Scholars (Attachments: # 1 Exhibit)(Rosensweig, Richard) (Entered: 08/29/2018) |
| 08/29/2018 | 490 | Assented to MOTION for Leave to Appear Pro Hac Vice for admission of Sarah E. Harrington Filing fee: $ 100, receipt number 0101−7295782 by Social Scientists and Scholars. (Attachments: # 1 Exhibit Certificate in Support of Pro Hac Vice Admission, # 2 Exhibit List of Amici Curiae)(Rosensweig, Richard) (Entered: 08/29/2018) |
| 08/29/2018 | 491 | Judge Allison D. Burroughs: ELECTRONIC ORDER entered granting 490 Motion for Leave to Appear Pro Hac Vice Added Sarah E. Harrington. **Attorneys admitted Pro Hac Vice must register for electronic filing if the attorney does not already have an ECF account in this district. To register go to the Court website at www.mad.uscourts.gov. Select Case Information, then Electronic Filing (CM/ECF) and go to the CM/ECF Registration Form. Pursuant to Local Rule 83.5.3, local counsel shall also file an appearance in this matter. Further, local counsel shall review all filings and shall personally appear in Court for any hearings or conferences, unless expressly excused by the Court for good cause.** (McDonagh, Christina) (Entered: 08/29/2018) |
| 08/29/2018 | 492 | Judge Allison D. Burroughs: ELECTRONIC ORDER entered granting 485 Motion to Seal (Folan, Karen) (Entered: 08/29/2018) |
| 08/29/2018 | 493 | MOTION for Leave to Appear Pro Hac Vice for admission of Earl A. Kirkland III Filing fee: $ 100, receipt number 0101−7296869 by Coalition for a Diverse Harvard, First Generation Harvard Alumni, Fuerza Latina of Harvard, Harvard Asian American Brotherhood, Harvard Islamic Society, Harvard Japan Society, Harvard Korean Association, Harvard Latino Alumni Alliance, Harvard Minority Association of Pre−Medical Students, Harvard Phillips Brooks House Association, Harvard South Asian Association, Harvard University Muslim Alumni, Harvard Vietnamese Association, Harvard−Radcliffe Asian American Association, Harvard−Radcliffe Asian American Women's Association, Harvard−Radcliffe Black Students Association, Harvard−Radcliffe Chinese Students Association, Kuumba Singers of Harvard College, Native American Alumni of Harvard University, Native Americans At Harvard College, Task Force on Asian and Pacific American Studies at Harvard College. (Attachments: # 1 Exhibit Certification of Attorney Kirkland)(Thayer, Kenneth) (Entered: 08/29/2018) |
| 08/30/2018 | 494 | AMICUS BRIEF filed by Social Scientists and Scholars *in Support of Defendant*. (Attachments: # 1 Appendix List of Amici)(Rosensweig, Richard) (Entered: 08/30/2018) |
| 08/30/2018 | 495 | Judge Allison D. Burroughs: ELECTRONIC ORDER entered granting 493 Motion for Leave to Appear Pro Hac Vice Added Earl A. Kirkland III. **Attorneys admitted Pro Hac Vice must register for electronic filing if the attorney does not already have an ECF account in this district. To register go to the Court website at www.mad.uscourts.gov. Select Case Information, then Electronic Filing (CM/ECF) and go to the CM/ECF Registration Form. Pursuant to Local Rule 83.5.3, local counsel shall also file an appearance in this matter. Further, local counsel shall review all filings and shall personally appear in Court for any hearings or conferences, unless expressly excused by the Court for good cause.** (McDonagh, Christina) (Entered: 08/30/2018) |
| 08/30/2018 | 496 | Assented to MOTION to Seal *Statement of Interest* by United States.(Donnelly, Matthew) (Entered: 08/30/2018) |
| 08/30/2018 | 497 | AMICUS BRIEF filed by United States *in Opposition to Defendant's Motion for Summary Judgment 417* . (Attachments: # 1 Exhibit Fitzsimmons Dep., # 2 Exhibit Ortiz Dep., # 3 Exhibit Smith (2nd) Dep.)(Donnelly, Matthew) (Additional attachment(s) added on 8/31/2018: # 4 Unredacted Version of United States' Statement |

**JA89**

| | | of Interest Opposition to Defendant's Motion for Summary Judgment) (McDonagh, Christina). (Entered: 08/30/2018) |
|---|---|---|
| 08/30/2018 | 498 | NOTICE of Appearance by Derek Tam Ho on behalf of Amici Curiae Professors of Economics Susan Dynarski, et al., in Support of Defendant (Ho, Derek) (Entered: 08/30/2018) |
| 08/30/2018 | 499 | AMICUS BRIEF filed by Amici Curiae Professors of Economics Susan Dynarski, et al., in Support of Defendant . (Ho, Derek) (Entered: 08/30/2018) |
| 08/30/2018 | 500 | NOTICE of Appearance by Madeleine K. Rodriguez on behalf of Amici Curiae the Asian American Legal Defense and Education Fund, et al. (Rodriguez, Madeleine) (Entered: 08/30/2018) |
| 08/30/2018 | 501 | MOTION for Leave to Appear Pro Hac Vice for admission of Kenneth Kimerling Filing fee: $ 100, receipt number 0101−7297870 by Amici Curiae the Asian American Legal Defense and Education Fund, et al.. (Attachments: # 1 Affidavit of Kenneth Kimerling)(Rodriguez, Madeleine) (Entered: 08/30/2018) |
| 08/30/2018 | 502 | AMICUS BRIEF filed by Amici Curiae the Asian American Legal Defense and Education Fund, et al. *in Opposition to Plaintiff's Motion for Summary Judgment*. (Rodriguez, Madeleine) (Entered: 08/30/2018) |
| 08/30/2018 | 503 | MOTION for Leave to File *to Participate as Amici Curiae* by Harvard Black Alumni Society, Harvard Asian American Alumni Alliance, Association of Black Harvard Women, 21 Colorful Crimson. (Attachments: # 1 Exhibit Declaration, # 2 Exhibit Declaration, # 3 Exhibit Declaration, # 4 Exhibit Declaration)(Thayer, Kenneth) (Entered: 08/30/2018) |
| 08/30/2018 | 504 | AMICUS BRIEF filed by 21 Colorful Crimson, Association of Black Harvard Women, Coalition for a Diverse Harvard, First Generation Harvard Alumni, Fuerza Latina of Harvard, Harvard Asian American Alumni Alliance, Harvard Asian American Brotherhood, Harvard Black Alumni Society, Harvard Islamic Society, Harvard Japan Society, Harvard Korean Association, Harvard Latino Alumni Alliance, Harvard Minority Association of Pre−Medical Students, Harvard Phillips Brooks House Association, Harvard South Asian Association, Harvard University Muslim Alumni, Harvard Vietnamese Association, Harvard−Radcliffe Asian American Association, Harvard−Radcliffe Asian American Women's Association, Harvard−Radcliffe Black Students Association, Harvard−Radcliffe Chinese Students Association, Kuumba Singers of Harvard College, Native American Alumni of Harvard University, Native Americans At Harvard College, Task Force on Asian and Pacific American Studies at Harvard College *in Opposition to Plaintiff's Motion for Summary Judgment*. (Thayer, Kenneth) (Entered: 08/30/2018) |
| 08/30/2018 | 505 | Judge Allison D. Burroughs: ELECTRONIC ORDER entered granting 496 Motion to Seal (Folan, Karen) (Entered: 08/30/2018) |
| 08/30/2018 | 506 | Judge Allison D. Burroughs: ELECTRONIC ORDER entered granting 501 Motion for Leave to Appear Pro Hac Vice Added Kenneth Kimerling. **Attorneys admitted Pro Hac Vice must register for electronic filing if the attorney does not already have an ECF account in this district. To register go to the Court website at www.mad.uscourts.gov. Select Case Information, then Electronic Filing (CM/ECF) and go to the CM/ECF Registration Form. Pursuant to Local Rule 83.5.3, local counsel shall also file an appearance in this matter. Further, local counsel shall review all filings and shall personally appear in Court for any hearings or conferences, unless expressly excused by the Court for good cause.** (McDonagh, Christina) (Entered: 08/30/2018) |
| 08/30/2018 | 507 | MOTION for Leave to Appear Pro Hac Vice for admission of Sarah Hinger Filing fee: $ 100, receipt number 0101−7298403 by American Civil Liberties Union, American Civil Liberties Union Foundation of Massachusetts, Inc.. (Attachments: # 1 Affidavit Affidavit of Sarah Hinger in Support of Motion to Appear Pro Hac Vice)(Segal, Matthew) (Entered: 08/30/2018) |
| 08/30/2018 | 508 | BRIEF by American Civil Liberties Union, American Civil Liberties Union Foundation of Massachusetts, Inc. *in Opposition to Plaintiffs Motion For Summary Judgment*. (Segal, Matthew) (Entered: 08/30/2018) |

**JA90**

| 08/30/2018 | 509 | MEMORANDUM in Opposition re 412 MOTION for Summary Judgment filed by M. B., K. C., Sarah Cole, Y. D., G. E., A. G., I. G., R. H., J. L., Fadhal Moore, Arjini Kumari Nawal, R. S., Itzel Vasquez–Rodriguez, Keyanna Wigglesworth. (Attachments: # 1 Exhibit Student Record)(Culleen, Lawrence) (Entered: 08/30/2018) |
|---|---|---|
| 08/30/2018 | 510 | REPLY to Response to 412 MOTION for Summary Judgment filed by Students for Fair Admissions, Inc.. (Consovoy, William) (Additional attachment(s) added on 8/31/2018: # 1 Unredacted Memorandum) (McDonagh, Christina). (Entered: 08/30/2018) |
| 08/30/2018 | 511 | Counter Statement of Material Facts L.R. 56.1 re 412 MOTION for Summary Judgment filed by Students for Fair Admissions, Inc.. (Consovoy, William) (Additional attachment(s) added on 8/31/2018: # 1 Unredacted Response to Statement of Material Facts) (McDonagh, Christina). (Entered: 08/30/2018) |
| 08/30/2018 | 512 | DECLARATION re 510 Reply to Response to Motion *for Summary Judgment* by Students for Fair Admissions, Inc.. (Attachments: # 1 Exhibit 286, # 2 Exhibit 287)(Consovoy, William) (Additional attachment(s) added on 8/31/2018: # 3 Exhibit 286 (Unredacted Version FILED UNDER SEAL), # 4 Exhibit 287 (UNREDACTED VERSION FILED UNDER SEAL)) (McDonagh, Christina). (Additional attachment(s) added on 8/31/2018: # 5 Unredacted Declaration of Michael Connolly) (McDonagh, Christina). (Entered: 08/30/2018) |
| 08/30/2018 | 513 | NOTICE of Appearance by Douglass C. Lawrence on behalf of Southeastern Legal Foundation, Center for Equal Opportunity, Reason Foundation (Lawrence, Douglass) (Entered: 08/30/2018) |
| 08/30/2018 | 514 | AMICUS BRIEF filed by Center for Equal Opportunity, Reason Foundation, Southeastern Legal Foundation *in Opposition to Defendants Motion for Summary Judgment*. (Lawrence, Douglass) (Entered: 08/30/2018) |
| 08/31/2018 | 515 | Judge Allison D. Burroughs: ELECTRONIC ORDER entered granting 507 Motion for Leave to Appear Pro Hac Vice Added Sarah Hinger. **Attorneys admitted Pro Hac Vice must register for electronic filing if the attorney does not already have an ECF account in this district. To register go to the Court website at www.mad.uscourts.gov. Select Case Information, then Electronic Filing (CM/ECF) and go to the CM/ECF Registration Form. Pursuant to Local Rule 83.5.3, local counsel shall also file an appearance in this matter. Further, local counsel shall review all filings and shall personally appear in Court for any hearings or conferences, unless expressly excused by the Court for good cause.** (McDonagh, Christina) (Entered: 08/31/2018) |
| 08/31/2018 | 516 | Judge Allison D. Burroughs: ELECTRONIC ORDER entered granting 503 Motion for Leave to File Document ; Counsel using the Electronic Case Filing System should now file the document for which leave to file has been granted in accordance with the CM/ECF Administrative Procedures. Counsel must include – Leave to file granted on (date of order)– in the caption of the document. (Folan, Karen) (Entered: 08/31/2018) |
| 08/31/2018 | 517 | AMICUS BRIEF filed by 21 Colorful Crimson, Association of Black Harvard Women, Coalition for a Diverse Harvard, First Generation Harvard Alumni, Fuerza Latina of Harvard, Harvard Asian American Alumni Alliance, Harvard Asian American Brotherhood, Harvard Black Alumni Society, Harvard Islamic Society, Harvard Japan Society, Harvard Korean Association, Harvard Latino Alumni Alliance, Harvard Minority Association of Pre–Medical Students, Harvard Phillips Brooks House Association, Harvard South Asian Association, Harvard University Muslim Alumni, Harvard Vietnamese Association, Harvard–Radcliffe Asian American Association, Harvard–Radcliffe Asian American Women's Association, Harvard–Radcliffe Black Students Association, Harvard–Radcliffe Chinese Students Association, Kuumba Singers of Harvard College, Native American Alumni of Harvard University, Native Americans At Harvard College, Task Force on Asian and Pacific American Studies at Harvard College *in Opposition to Plaintiff's Motion for Summary Judgment*. (Attachments: # 1 Exhibit Declaration, # 2 Exhibit Declaration, # 3 Exhibit Declaration, # 4 Exhibit Declaration)(Thayer, Kenneth) (Entered: 08/31/2018) |
| 08/31/2018 | 518 | MOTION Participate in Trial Proceedings by M. B., K. C., Sarah Cole, Y. D., G. E., A. G., I. G., R. H., J. L., Fadhal Moore, Arjini Kumari Nawal, R. S., Itzel |

| | | Vasquez–Rodriguez, Keyanna Wigglesworth.(Culleen, Lawrence) (Entered: 08/31/2018) |
|---|---|---|
| 09/04/2018 | 519 | Amicus Curiae APPEARANCE entered by Sarah E. Harrington on behalf of Social Scientists and Scholars. (Attachments: # 1 Exhibit Exhibit A: List of Amici)(Harrington, Sarah) (Entered: 09/04/2018) |
| 09/04/2018 | 520 | NOTICE of Appearance by Sherrilyn A. Ifill on behalf of 21 Colorful Crimson, Association of Black Harvard Women, Coalition for a Diverse Harvard, First Generation Harvard Alumni, Fuerza Latina of Harvard, Harvard Asian American Alumni Alliance, Harvard Asian American Brotherhood, Harvard Black Alumni Society, Harvard Islamic Society, Harvard Japan Society, Harvard Korean Association, Harvard Latino Alumni Alliance, Harvard Minority Association of Pre–Medical Students, Harvard Phillips Brooks House Association, Harvard South Asian Association, Harvard University Muslim Alumni, Harvard Vietnamese Association, Harvard–Radcliffe Asian American Association, Harvard–Radcliffe Asian American Women's Association, Harvard–Radcliffe Black Students Association, Harvard–Radcliffe Chinese Students Association, Kuumba Singers of Harvard College, Native American Alumni of Harvard University, Native Americans At Harvard College, Task Force on Asian and Pacific American Studies at Harvard College (Ifill, Sherrilyn) (Entered: 09/04/2018) |
| 09/04/2018 | 521 | NOTICE of Appearance by Samuel Spital on behalf of 21 Colorful Crimson, Association of Black Harvard Women, Coalition for a Diverse Harvard, First Generation Harvard Alumni, Fuerza Latina of Harvard, Harvard Asian American Alumni Alliance, Harvard Asian American Brotherhood, Harvard Black Alumni Society, Harvard Islamic Society, Harvard Japan Society, Harvard Korean Association, Harvard Latino Alumni Alliance, Harvard Minority Association of Pre–Medical Students, Harvard Phillips Brooks House Association, Harvard South Asian Association, Harvard University Muslim Alumni, Harvard Vietnamese Association, Harvard–Radcliffe Asian American Association, Harvard–Radcliffe Asian American Women's Association, Harvard–Radcliffe Black Students Association, Harvard–Radcliffe Chinese Students Association, Kuumba Singers of Harvard College, Native American Alumni of Harvard University, Native Americans At Harvard College, Task Force on Asian and Pacific American Studies at Harvard College (Spital, Samuel) (Entered: 09/04/2018) |
| 09/04/2018 | 522 | NOTICE of Appearance by Jin Hee Lee on behalf of 21 Colorful Crimson, Association of Black Harvard Women, Coalition for a Diverse Harvard, First Generation Harvard Alumni, Fuerza Latina of Harvard, Harvard Asian American Alumni Alliance, Harvard Asian American Brotherhood, Harvard Black Alumni Society, Harvard Islamic Society, Harvard Japan Society, Harvard Korean Association, Harvard Latino Alumni Alliance, Harvard Minority Association of Pre–Medical Students, Harvard Phillips Brooks House Association, Harvard South Asian Association, Harvard University Muslim Alumni, Harvard Vietnamese Association, Harvard–Radcliffe Asian American Association, Harvard–Radcliffe Asian American Women's Association, Harvard–Radcliffe Black Students Association, Harvard–Radcliffe Chinese Students Association, Kuumba Singers of Harvard College, Native American Alumni of Harvard University, Native Americans At Harvard College, Task Force on Asian and Pacific American Studies at Harvard College (Lee, Jin) (Entered: 09/04/2018) |
| 09/04/2018 | 523 | NOTICE of Appearance by Rachel M. Kleinman on behalf of 21 Colorful Crimson, Association of Black Harvard Women, Coalition for a Diverse Harvard, First Generation Harvard Alumni, Fuerza Latina of Harvard, Harvard Asian American Alumni Alliance, Harvard Asian American Brotherhood, Harvard Black Alumni Society, Harvard Islamic Society, Harvard Japan Society, Harvard Korean Association, Harvard Latino Alumni Alliance, Harvard Minority Association of Pre–Medical Students, Harvard Phillips Brooks House Association, Harvard South Asian Association, Harvard University Muslim Alumni, Harvard Vietnamese Association, Harvard–Radcliffe Asian American Association, Harvard–Radcliffe Asian American Women's Association, Harvard–Radcliffe Black Students Association, Harvard–Radcliffe Chinese Students Association, Kuumba Singers of Harvard College, Native American Alumni of Harvard University, Native Americans At Harvard College, Task Force on Asian and Pacific American Studies at Harvard College (Kleinman, Rachel) (Entered: 09/04/2018) |

| 09/04/2018 | 524 | NOTICE of Appearance by Michaele N. Turnage Young on behalf of 21 Colorful Crimson, Association of Black Harvard Women, Coalition for a Diverse Harvard, First Generation Harvard Alumni, Fuerza Latina of Harvard, Harvard Asian American Alumni Alliance, Harvard Asian American Brotherhood, Harvard Black Alumni Society, Harvard Islamic Society, Harvard Japan Society, Harvard Korean Association, Harvard Latino Alumni Alliance, Harvard Minority Association of Pre–Medical Students, Harvard Phillips Brooks House Association, Harvard South Asian Association, Harvard University Muslim Alumni, Harvard Vietnamese Association, Harvard–Radcliffe Asian American Association, Harvard–Radcliffe Asian American Women's Association, Harvard–Radcliffe Black Students Association, Harvard–Radcliffe Chinese Students Association, Kuumba Singers of Harvard College, Native American Alumni of Harvard University, Native Americans At Harvard College, Task Force on Asian and Pacific American Studies at Harvard College (Turnage Young, Michaele) (Entered: 09/04/2018) |
|---|---|---|
| 09/04/2018 | 525 | NOTICE of Appearance by Jennifer A. Holmes on behalf of 21 Colorful Crimson, Association of Black Harvard Women, Coalition for a Diverse Harvard, First Generation Harvard Alumni, Fuerza Latina of Harvard, Harvard Asian American Alumni Alliance, Harvard Asian American Brotherhood, Harvard Black Alumni Society, Harvard Islamic Society, Harvard Japan Society, Harvard Korean Association, Harvard Latino Alumni Alliance, Harvard Minority Association of Pre–Medical Students, Harvard Phillips Brooks House Association, Harvard South Asian Association, Harvard University Muslim Alumni, Harvard Vietnamese Association, Harvard–Radcliffe Asian American Association, Harvard–Radcliffe Asian American Women's Association, Harvard–Radcliffe Black Students Association, Harvard–Radcliffe Chinese Students Association, Kuumba Singers of Harvard College, Native American Alumni of Harvard University, Native Americans At Harvard College, Task Force on Asian and Pacific American Studies at Harvard College (Holmes, Jennifer) (Entered: 09/04/2018) |
| 09/04/2018 | 526 | NOTICE of Appearance by Cara McClellan on behalf of 21 Colorful Crimson, Association of Black Harvard Women, Coalition for a Diverse Harvard, First Generation Harvard Alumni, Fuerza Latina of Harvard, Harvard Asian American Alumni Alliance, Harvard Asian American Brotherhood, Harvard Black Alumni Society, Harvard Islamic Society, Harvard Japan Society, Harvard Korean Association, Harvard Latino Alumni Alliance, Harvard Minority Association of Pre–Medical Students, Harvard Phillips Brooks House Association, Harvard South Asian Association, Harvard University Muslim Alumni, Harvard Vietnamese Association, Harvard–Radcliffe Asian American Association, Harvard–Radcliffe Asian American Women's Association, Harvard–Radcliffe Black Students Association, Harvard–Radcliffe Chinese Students Association, Kuumba Singers of Harvard College, Native American Alumni of Harvard University, Native Americans At Harvard College, Task Force on Asian and Pacific American Studies at Harvard College (McClellan, Cara) (Entered: 09/04/2018) |
| 09/05/2018 | 527 | MOTION for Leave to File *Amended Amicus Brief* by Amici Curiae Professors of Economics Susan Dynarski, et al., in Support of Defendant. (Attachments: # 1 Exhibit A – Proposed Amended Brief)(Ho, Derek) (Entered: 09/05/2018) |
| 09/05/2018 | 528 | MOTION for Leave to Appear Pro Hac Vice for admission of Meg E. Fasulo, Katherine L.I. Hacker, J. Scott McBride, and Krista J. Perry Filing fee: $ 400, receipt number 0101–7305513 by Students for Fair Admissions, Inc.. (Attachments: # 1 Fasulo Certification, # 2 Hacker Certificaton, # 3 McBride Certification, # 4 Perry Certification, # 5 Text of Proposed Order)(Strawbridge, Patrick) (Entered: 09/05/2018) |
| 09/06/2018 | 529 | Judge Allison D. Burroughs: ELECTRONIC ORDER entered granting 528 Motion for Leave to Appear Pro Hac Vice Added J. Scott McBride, Katherine L.I. Hacker, Meg E. Fasulo, and Krista J. Perry. **Attorneys admitted Pro Hac Vice must register for electronic filing if the attorney does not already have an ECF account in this district. To register go to the Court website at www.mad.uscourts.gov. Select Case Information, then Electronic Filing (CM/ECF) and go to the CM/ECF Registration Form.** Pursuant to Local Rule 83.5.3, local counsel shall also file an appearance in this matter. Further, local counsel shall review all filings and shall personally appear in Court for any hearings or conferences, unless expressly excused by the Court for good cause. (McDonagh, Christina) (Entered: 09/06/2018) |

| 09/06/2018 | 530 | Judge Allison D. Burroughs: ELECTRONIC ORDER entered granting 527 Motion for Leave to File Document ; Counsel using the Electronic Case Filing System should now file the document for which leave to file has been granted in accordance with the CM/ECF Administrative Procedures. Counsel must include – Leave to file granted on (date of order)– in the caption of the document. (Folan, Karen) (Entered: 09/06/2018) |
|---|---|---|
| 09/06/2018 | 531 | AMENDED DOCUMENT by Amici Curiae Professors of Economics Susan Dynarski, et al., in Support of Defendant. Amendment to 499 Amicus brief filed *Amended Brief of Professors of Economics As Amici Curiae In Support of Defendant*. (Ho, Derek) (Entered: 09/06/2018) |
| 09/07/2018 | 532 | MOTION To Participate In Trial by 21 Colorful Crimson, Association of Black Harvard Women, Coalition for a Diverse Harvard, First Generation Harvard Alumni, Fuerza Latina of Harvard, Harvard Asian American Alumni Alliance, Harvard Asian American Brotherhood, Harvard Black Alumni Society, Harvard Islamic Society, Harvard Japan Society, Harvard Korean Association, Harvard Latino Alumni Alliance, Harvard Minority Association of Pre–Medical Students, Harvard Phillips Brooks House Association, Harvard South Asian Association, Harvard University Muslim Alumni, Harvard Vietnamese Association, Harvard–Radcliffe Asian American Association, Harvard–Radcliffe Asian American Women's Association, Harvard–Radcliffe Black Students Association, Harvard–Radcliffe Chinese Students Association, Kuumba Singers of Harvard College, Native American Alumni of Harvard University, Native Americans At Harvard College, Task Force on Asian and Pacific American Studies at Harvard College.(Turnage Young, Michaele) (Entered: 09/07/2018) |
| 09/10/2018 | 533 | NOTICE of Appearance by Janai S. Nelson on behalf of 21 Colorful Crimson, Association of Black Harvard Women, Coalition for a Diverse Harvard, First Generation Harvard Alumni, Fuerza Latina of Harvard, Harvard Asian American Alumni Alliance, Harvard Asian American Brotherhood, Harvard Black Alumni Society, Harvard Islamic Society, Harvard Japan Society, Harvard Korean Association, Harvard Latino Alumni Alliance, Harvard Minority Association of Pre–Medical Students, Harvard Phillips Brooks House Association, Harvard South Asian Association, Harvard University Muslim Alumni, Harvard Vietnamese Association, Harvard–Radcliffe Asian American Association, Harvard–Radcliffe Asian American Women's Association, Harvard–Radcliffe Black Students Association, Harvard–Radcliffe Chinese Students Association, Kuumba Singers of Harvard College, Native American Alumni of Harvard University, Native Americans At Harvard College, Task Force on Asian and Pacific American Studies at Harvard College (Nelson, Janai) (Entered: 09/10/2018) |
| 09/10/2018 | 534 | NOTICE of Appearance by Earl A. Kirkland, III on behalf of 21 Colorful Crimson, Association of Black Harvard Women, Coalition for a Diverse Harvard, First Generation Harvard Alumni, Fuerza Latina of Harvard, Harvard Asian American Alumni Alliance, Harvard Asian American Brotherhood, Harvard Black Alumni Society, Harvard Islamic Society, Harvard Japan Society, Harvard Korean Association, Harvard Latino Alumni Alliance, Harvard Minority Association of Pre–Medical Students, Harvard Phillips Brooks House Association, Harvard South Asian Association, Harvard University Muslim Alumni, Harvard Vietnamese Association, Harvard–Radcliffe Asian American Association, Harvard–Radcliffe Asian American Women's Association, Harvard–Radcliffe Black Students Association, Harvard–Radcliffe Chinese Students Association, Kuumba Singers of Harvard College, Native American Alumni of Harvard University, Native Americans At Harvard College, Task Force on Asian and Pacific American Studies at Harvard College (Kirkland, Earl) (Entered: 09/10/2018) |
| 09/10/2018 | 535 | NOTICE of Appearance by Sarah R. Frazier on behalf of President and Fellows of Harvard College (Frazier, Sarah) (Entered: 09/10/2018) |
| 09/10/2018 | 536 | MOTION for Leave to Appear Pro Hac Vice for admission of Danielle Conley and Brittany Amadi Filing fee: $ 200, receipt number 0101–7312062 by President and Fellows of Harvard College. (Attachments: # 1 Conley Certification in Support of Motion, # 2 Amadi Certification in Support of Motion)(Ellsworth, Felicia) Modified on 9/11/2018 (McDonagh, Christina). (Entered: 09/10/2018) |

| 09/11/2018 | 537 | Judge Allison D. Burroughs: ELECTRONIC ORDER entered granting 536 Motion for Leave to Appear Pro Hac Vice Added Danielle Conley and Brittany Amadi. **Attorneys admitted Pro Hac Vice must register for electronic filing if the attorney does not already have an ECF account in this district. To register go to the Court website at www.mad.uscourts.gov. Select Case Information, then Electronic Filing (CM/ECF) and go to the CM/ECF Registration Form. Pursuant to Local Rule 83.5.3, local counsel shall also file an appearance in this matter. Further, local counsel shall review all filings and shall personally appear in Court for any hearings or conferences, unless expressly excused by the Court for good cause.** (McDonagh, Christina) (Entered: 09/11/2018) |
| 09/12/2018 | 538 | NOTICE of Appearance by Ara B. Gershengorn on behalf of President and Fellows of Harvard College (Gershengorn, Ara) (Entered: 09/12/2018) |
| 09/13/2018 | 539 | Assented to MOTION for Leave to Appear Pro Hac Vice for admission of John J. Park, Jr. Filing fee: $ 100, receipt number 0101−7318306 by Center for Equal Opportunity, Reason Foundation, Southeastern Legal Foundation. (Attachments: # 1 Affidavit of John J. Park, Jr.)(Lawrence, Douglass) (Entered: 09/13/2018) |
| 09/14/2018 | 540 | Assented to MOTION to Seal *Portions of Pre−Trial Motions* by Students for Fair Admissions, Inc..(Strawbridge, Patrick) (Entered: 09/14/2018) |
| 09/14/2018 | 541 | RESPONSE to Motion re 518 MOTION Participate in Trial Proceedings , 532 MOTION To Participate In Trial filed by President and Fellows of Harvard College. (Waxman, Seth) (Entered: 09/14/2018) |
| 09/14/2018 | 542 | Judge Allison D. Burroughs: ELECTRONIC ORDER entered granting 540 Motion to Seal (Folan, Karen) (Entered: 09/14/2018) |
| 09/14/2018 | 543 | Opposition re 518 MOTION Participate in Trial Proceedings filed by Students for Fair Admissions, Inc.. (Hughes, John) (Entered: 09/14/2018) |
| 09/14/2018 | 544 | Letter/request (non−motion) from Jahjah T. Jishbite. (McDonagh, Christina) (Entered: 09/17/2018) |
| 09/17/2018 | 545 | Judge Allison D. Burroughs: ELECTRONIC ORDER entered granting 539 Motion for Leave to Appear Pro Hac Vice Added John J. Park Jr.. **Attorneys admitted Pro Hac Vice must register for electronic filing if the attorney does not already have an ECF account in this district. To register go to the Court website at www.mad.uscourts.gov. Select Case Information, then Electronic Filing (CM/ECF) and go to the CM/ECF Registration Form. Pursuant to Local Rule 83.5.3, local counsel shall also file an appearance in this matter. Further, local counsel shall review all filings and shall personally appear in Court for any hearings or conferences, unless expressly excused by the Court for good cause.** (McDonagh, Christina) (Entered: 09/17/2018) |
| 09/17/2018 | 546 | MOTION in Limine by Students for Fair Admissions, Inc.. (Attachments: # 1 Exhibit 1, # 2 Exhibit 2, # 3 Exhibit 3, # 4 Exhibit 4, # 5 Exhibit 5)(Hughes, John) (Entered: 09/17/2018) |
| 09/17/2018 | 547 | MOTION in Limine by President and Fellows of Harvard College.(Waxman, Seth) (Entered: 09/17/2018) |
| 09/21/2018 | 550 | Opposition re 532 MOTION To Participate In Trial filed by Students for Fair Admissions, Inc.. (Hughes, John) (Entered: 09/21/2018) |
| 09/21/2018 | 551 | Unopposed Motion for leave to File a Reply in regards to 518 MOTION Participate in Trial Proceedings filed by M. B., K. C., Sarah Cole, Y. D., G. E., A. G., I. G., R. H., J. L., Fadhal Moore, Arjini Kumari Nawal, R. S., Itzel Vasquez−Rodriguez, Keyanna Wigglesworth. (Attachments: # 1 Exhibit)(Culleen, Lawrence) Modified on 9/25/2018 (McDonagh, Christina). (Entered: 09/21/2018) |
| 09/26/2018 | 555 | Judge Allison D. Burroughs: ELECTRONIC ORDER entered granting 551 Motion for Leave to File Document ; Counsel using the Electronic Case Filing System should now file the document for which leave to file has been granted in accordance with the CM/ECF Administrative Procedures. Counsel must include − Leave to file granted on (date of order)− in the caption of the document. (Folan, Karen) (Entered: 09/26/2018) |

**JA95**

| 09/26/2018 | 558 | REPLY to Response to 518 MOTION Participate in Trial Proceedings filed by M. B., K. C., Sarah Cole, Y. D., G. E., A. G., I. G., R. H., J. L., Fadhal Moore, Arjini Kumari Nawal, R. S., Itzel Vasquez–Rodriguez, Keyanna Wigglesworth. (Culleen, Lawrence) (Entered: 09/26/2018) |
| 09/26/2018 | 559 | MOTION for Leave to File *Response to the United States' Statement of Interest* by President and Fellows of Harvard College. (Attachments: # 1 Proposed Response)(Waxman, Seth) (Entered: 09/26/2018) |
| 09/27/2018 | 560 | Judge Allison D. Burroughs: ELECTRONIC ORDER entered granting 559 Motion for Leave to File Document ; Counsel using the Electronic Case Filing System should now file the document for which leave to file has been granted in accordance with the CM/ECF Administrative Procedures. Counsel must include – Leave to file granted on (date of order)– in the caption of the document. (Folan, Karen) (Entered: 09/27/2018) |
| 09/27/2018 | 561 | Response by President and Fellows of Harvard College to 497 Amicus brief filed, *by the United States*. (Waxman, Seth) (Entered: 09/27/2018) |
| 09/27/2018 | 562 | Assented to MOTION for Leave to File *Reply* by 21 Colorful Crimson, Association of Black Harvard Women, Coalition for a Diverse Harvard, First Generation Harvard Alumni, Fuerza Latina of Harvard, Harvard Asian American Alumni Alliance, Harvard Asian American Brotherhood, Harvard Black Alumni Society, Harvard Islamic Society, Harvard Japan Society, Harvard Korean Association, Harvard Latino Alumni Alliance, Harvard Minority Association of Pre–Medical Students, Harvard Phillips Brooks House Association, Harvard South Asian Association, Harvard University Muslim Alumni, Harvard Vietnamese Association, Harvard–Radcliffe Asian American Association, Harvard–Radcliffe Asian American Women's Association, Harvard–Radcliffe Black Students Association, Harvard–Radcliffe Chinese Students Association, Kuumba Singers of Harvard College, Native American Alumni of Harvard University, Native Americans At Harvard College, Task Force on Asian and Pacific American Studies at Harvard College. (Attachments: # 1 Exhibit Proposed Reply)(Holmes, Jennifer) (Entered: 09/27/2018) |
| 09/27/2018 | 563 | Judge Allison D. Burroughs: ELECTRONIC ORDER entered granting 562 Motion for Leave to File Document ; Counsel using the Electronic Case Filing System should now file the document for which leave to file has been granted in accordance with the CM/ECF Administrative Procedures. Counsel must include – Leave to file granted on (date of order)– in the caption of the document. (Folan, Karen) (Entered: 09/27/2018) |
| 09/27/2018 | 564 | REPLY to Response to 532 MOTION To Participate In Trial filed by 21 Colorful Crimson, Association of Black Harvard Women, Coalition for a Diverse Harvard, First Generation Harvard Alumni, Fuerza Latina of Harvard, Harvard Asian American Alumni Alliance, Harvard Asian American Brotherhood, Harvard Black Alumni Society, Harvard Islamic Society, Harvard Japan Society, Harvard Korean Association, Harvard Latino Alumni Alliance, Harvard Minority Association of Pre–Medical Students, Harvard Phillips Brooks House Association, Harvard South Asian Association, Harvard University Muslim Alumni, Harvard Vietnamese Association, Harvard–Radcliffe Asian American Association, Harvard–Radcliffe Asian American Women's Association, Harvard–Radcliffe Black Students Association, Harvard–Radcliffe Chinese Students Association, Kuumba Singers of Harvard College, Native American Alumni of Harvard University, Native Americans At Harvard College, Task Force on Asian and Pacific American Studies at Harvard College. (Holmes, Jennifer) (Entered: 09/27/2018) |
| 09/28/2018 | 565 | Consent MOTION to Seal by Students for Fair Admissions, Inc..(Strawbridge, Patrick) (Entered: 09/28/2018) |
| 09/28/2018 | 566 | Judge Allison D. Burroughs: MEMORANDUM AND ORDER entered. Accordingly, the cross–motions for summary judgment [ECF Nos. 412 , 417 ] are denied without prejudice. Consistent with this order, the parties may renew their arguments at trial. **SO ORDERED**. (McDonagh, Christina) (Entered: 09/28/2018) |
| 09/28/2018 | 567 | Judge Allison D. Burroughs: ELECTRONIC ORDER entered. The Courts Summary Judgment Memorandum and Order ("Opinion") cites to several paragraphs in the parties submissions that were filed with redactions. The Court has concluded that two of these paragraphs must be filed without redactions. SFFA shall |

**JA96**

| | | email the Court's docket clerk an updated version of its Statement of Material Fact [ECF No. 414 −2] with the redaction in 130 removed, and an updated version of its Counter Statement of Material Facts [ECF No. 452 ] with the redaction in its response to 73 removed. |
| | | The Court finds "good cause" to maintain under seal the remaining redacted statements cited by the Opinion, which consist primarily of individuals' names and other personally identifiable information. Bradford & Bigelow, Inc. v. Richardson, 109 F. Supp. 3d 445, 447 (D. Mass. 2015). The parties disagree about whether there is sufficient cause to maintain partial or complete sealing of approximately 100 exhibits and numerous statements in the parties' submissions. See [ECF No. 422 at 21−24]. Given that the court has not relied on these materials in its Opinion and some of this information may become public during trial, the Court will defer deciding the issues raised by the parties' memoranda on sealing [ECF Nos. 422 , 427 ] until the conclusion of trial. |
| | | (McDonagh, Christina) (Entered: 09/28/2018) |
| 09/28/2018 | 568 | Judge Allison D. Burroughs: ELECTRONIC ORDER entered granting 565 Motion to Seal (Folan, Karen) (Entered: 09/28/2018) |
| 10/01/2018 | 569 | Opposition re 547 MOTION in Limine filed by Students for Fair Admissions, Inc.. (Attachments: # 1 Exhibit 1, # 2 Exhibit 2, # 3 Exhibit 3, # 4 Exhibit 4, # 5 Exhibit 5, # 6 Exhibit 6, # 7 Exhibit 7, # 8 Exhibit 8, # 9 Exhibit 9, # 10 Exhibit 10, # 11 Exhibit 11, # 12 Exhibit 12, # 13 Exhibit 13, # 14 Exhibit 14, # 15 Exhibit 15, # 16 Exhibit 16)(Mortara, Adam) (Attachment 6 replaced on 10/1/2018) (McDonagh, Christina). (Additional attachment(s) added on 10/2/2018: # 17 Unredacted Memorandum in Opposition (FILED UNDER SEAL), # 18 Exhibit 4 (Filed Under Seal)) (McDonagh, Christina). (Entered: 10/01/2018) |
| 10/01/2018 | 570 | PRETRIAL MEMORANDUM by Students for Fair Admissions, Inc.. (Attachments: # 1 Exhibit A1, # 2 Exhibit A2, # 3 Exhibit B, # 4 Exhibit C, # 5 Exhibit D, # 6 Exhibit E, # 7 Exhibit F)(Mortara, Adam) (Additional attachment(s) added on 10/2/2018: # 8 Exhibit A1 (Filed Under Seal)) (McDonagh, Christina). (Entered: 10/01/2018) |
| 10/01/2018 | 571 | Opposition re 546 MOTION in Limine filed by President and Fellows of Harvard College. (Attachments: # 1 Exhibit 1, # 2 Exhibit 2, # 3 Exhibit 3, # 4 Exhibit 4, # 5 Exhibit 5, # 6 Exhibit 6, # 7 Exhibit 7, # 8 Exhibit 8, # 9 Exhibit 9, # 10 Exhibit 10)(Waxman, Seth) (Entered: 10/01/2018) |
| 10/02/2018 | 572 | ELECTRONIC NOTICE OF RESCHEDULING Final Pretrial Conference reset for 10/3/2018 09:00 AM in Courtroom 17 before Judge Allison D. Burroughs. NOTICE IS FOR TIME CHANGE ONLY.(Folan, Karen) (Entered: 10/02/2018) |
| 10/03/2018 | 573 | Electronic Clerk's Notes for proceedings held before Judge Allison D. Burroughs: Final Pretrial Conference held on 10/3/2018. Colloquy re: pending motions, trial schedule and logistics. (Court Reporter: Joan Daly at joanmdaly62@gmail.com.)(Attorneys present: various) (Folan, Karen) (Entered: 10/03/2018) |
| 10/03/2018 | 574 | Judge Allison D. Burroughs: ELECTRONIC ORDER entered. |
| | | As was more fully set forth during the October 3, 2018 pretrial conference, the parties motions in limine (MIL), see [ECF Nos. 546 , 547 ], are resolved as follows: |
| | | SFFAs MIL No. 1 which sought to preclude Harvard from calling Edward Blum as a witness is denied as moot, see [ECF No. 571 ]. |
| | | SFFAs MIL No. 2 which sought to preclude evidence or argument regarding portions of application files relevant to personal ratings is denied with leave to renew or object at trial. |
| | | SFFAs MIL No. 3 concerning the expected testimony of Dean Khurana is resolved as follows: Dean Khurana was not noticed as an expert and, therefore, may not be called as an expert witness. He may, however, testify as a percipient witness and based on his personal knowledge. |

|  |  | Harvards MIL No.1 to exclude evidence concerning its early twentieth−century discrimination against Jewish applicants is granted in part and denied in part. In the interests of developing a complete factual record, but also recognizing the somewhat attenuated relevance, the Court will allow a very limited presentation of this topic including through exhibits, stipulations and direct and cross examination.

Harvards MIL No. 2 to preclude evidence regarding Harvards invocation of the attorney−client privilege is denied with leave to renew or object at trial in recognition of the fact that there are proper and improper uses for the documents at issue.

(McDonagh, Christina) (Entered: 10/03/2018) |
|---|---|---|
| 10/03/2018 | 575 | Judge Allison D. Burroughs: ORDER entered. MEMORANDUM AND ORDER(McDonagh, Christina) (Entered: 10/03/2018) |
| 10/03/2018 | 576 | EXHIBIT 1 by Lawrence Crawford. (Attachments: # 1 Exhibit 2, # 2 Exhibit 3, # 3 Exhibit 4, # 4 Exhibit 5, # 5 Exhibit 6) **Note that the envelop of this filing states that it is being made as 2 of 2 but Clerk's Office never received envelop 1 of 2 so there is no motion to link this to on the docket**(McDonagh, Christina) (Entered: 10/05/2018) |
| 10/05/2018 | 578 | AFFIDAVIT of Lawrence Crawford re 576 Exhibit, by Lawrence Crawford. (Attachments: # 1 Affidavit, # 2 Exhibit 1, # 3 Exhibit 2, # 4 Exhibit 3, # 5 Exhibit 4) **Note this is envelop 1 of 2.**(McDonagh, Christina) (Entered: 10/09/2018) |
| 10/08/2018 | 577 | Request for Judicial Notice by Students for Fair Admissions, Inc.. (Attachments: # 1 Exhibit DX−13, # 2 Exhibit DX−40, # 3 Exhibit P500)(Mortara, Adam) (Entered: 10/08/2018) |
| 10/10/2018 | 579 | NOTICE by 21 Colorful Crimson, Association of Black Harvard Women, Coalition for a Diverse Harvard, First Generation Harvard Alumni, Fuerza Latina of Harvard, Harvard Asian American Alumni Alliance, Harvard Asian American Brotherhood, Harvard Black Alumni Society, Harvard Islamic Society, Harvard Japan Society, Harvard Korean Association, Harvard Latino Alumni Alliance, Harvard Minority Association of Pre−Medical Students, Harvard Phillips Brooks House Association, Harvard South Asian Association, Harvard University Muslim Alumni, Harvard Vietnamese Association, Harvard−Radcliffe Asian American Association, Harvard−Radcliffe Asian American Women's Association, Harvard−Radcliffe Black Students Association, Harvard−Radcliffe Chinese Students Association, Kuumba Singers of Harvard College, Native American Alumni of Harvard University, Native Americans At Harvard College, Task Force on Asian and Pacific American Studies at Harvard College re 575 Memorandum & ORDER *Regarding Witnesses and Opening Statement* (Thayer, Kenneth) (Entered: 10/10/2018) |
| 10/11/2018 | 580 | NOTICE of Appearance by Joseph J. Mueller on behalf of President and Fellows of Harvard College (Mueller, Joseph) (Entered: 10/11/2018) |
| 10/12/2018 | 581 | NOTICE by M. B., K. C., Sarah Cole, Y. D., G. E., A. G., I. G., R. H., J. L., Fadhal Moore, Arjini Kumari Nawal, R. S., Itzel Vasquez−Rodriguez, Keyanna Wigglesworth re 575 Memorandum & ORDER *REGARDING TRIAL WITNESSES, REQUEST FOR DATE CERTAIN FOR STUDENT TESTIMONY, AND NOTICE OF INTENT TO PRESENT ORAL OPENING STATEMENT* (Culleen, Lawrence) (Entered: 10/12/2018) |
| 10/15/2018 | 585 | Electronic Clerk's Notes for proceedings held before Judge Allison D. Burroughs: Bench Trial Day 1 held on 10/15/2018. Opening statements by the parties. Dean William Fitzsimmons sworn and testifies. (Court Reporter: Joan Daly at joanmdaly62@gmail.com.) (Folan, Karen) (Entered: 10/18/2018) |
| 10/16/2018 | 582 | Transcript of Bench Trial − Day One held on October 15, 2018, before Judge Allison D. Burroughs. The Transcript may be purchased through the Court Reporter, viewed at the public terminal, or viewed through PACER after it is released. Court Reporter Name and Contact Information: Joan Daly at joanmdaly62@gmail.com Redaction Request due 11/6/2018. Redacted Transcript Deadline set for 11/16/2018. Release of Transcript Restriction set for 1/14/2019. (Scalfani, Deborah) (Entered: 10/16/2018) |
| 10/16/2018 | 583 | Transcript of Bench Trial − Day Two held on October 16, 2018, before Judge Allison D. Burroughs. The Transcript may be purchased through the Court Reporter, viewed at |

| | | the public terminal, or viewed through PACER after it is released. Court Reporter Name and Contact Information: Joan Daly at joanmdaly62@gmail.com Redaction Request due 11/6/2018. Redacted Transcript Deadline set for 11/16/2018. Release of Transcript Restriction set for 1/14/2019. (Scalfani, Deborah) (Entered: 10/16/2018) |
|---|---|---|
| 10/16/2018 | 584 | NOTICE is hereby given that an official transcript of a proceeding has been filed by the court reporter in the above–captioned matter. Counsel are referred to the Court's Transcript Redaction Policy, available on the court website at http://www.mad.uscourts.gov/attorneys/general–info.htm (Scalfani, Deborah) (Entered: 10/16/2018) |
| 10/16/2018 | 586 | Electronic Clerk's Notes for proceedings held before Judge Allison D. Burroughs: Bench Trial Day 2 held on 10/16/2018. Testimony of William Fitzsimmons resumes. (Court Reporter: Joan Daly at joanmdaly62@gmail.com.) (Folan, Karen) (Entered: 10/18/2018) |
| 10/17/2018 | 587 | Electronic Clerk's Notes for proceedings held before Judge Allison D. Burroughs: Bench Trial Day 3 held on 10/17/2018. Testimony of William Fitzsimmons resumes. (Court Reporter: Joan Daly at joanmdaly62@gmail.com.) (Folan, Karen) (Entered: 10/18/2018) |
| 10/18/2018 | 589 | Electronic Clerk's Notes for proceedings held before Judge Allison D. Burroughs: Bench Trial Day 4 held on 10/18/2018. Dean Fitzsimmons testimony continues. Christopher Looby and Erica Bever sworn and testify. (Court Reporter: Joan Daly at joanmdaly62@gmail.com.) (Folan, Karen) (Entered: 10/22/2018) |
| 10/19/2018 | 590 | Electronic Clerk's Notes for proceedings held before Judge Allison D. Burroughs: Bench Trial Day 5 held on 10/19/2018. Erica Bever testimony continues. Erin Driver–Linn and Marlyn McGrath sworn and testify. (Court Reporter: Joan Daly at joanmdaly62@gmail.com.) (Folan, Karen) (Entered: 10/22/2018) |
| 10/21/2018 | 588 | MOTION Admit Exhibit P9 by Students for Fair Admissions, Inc.. (Attachments: # 1 Exhibit 1, # 2 Exhibit 2, # 3 Exhibit 3, # 4 Exhibit 4)(Mortara, Adam) (Entered: 10/21/2018) |
| 10/22/2018 | 591 | Letter/request (non–motion) from Jahjah Al Mahdi. (McDonagh, Christina) (Entered: 10/22/2018) |
| 10/22/2018 | 592 | Electronic Clerk's Notes for proceedings held before Judge Allison D. Burroughs: Bench Trial Day 6 held on 10/22/2018. Richard Kahlenberg sworn and testifies. Marlyn McGrath testimony resumes. Rakesh Khurana sworn and testifies. (Court Reporter: Joan Daly at joanmdaly62@gmail.com.) (Folan, Karen) (Entered: 10/23/2018) |
| 10/23/2018 | 594 | Electronic Clerk's Notes for proceedings held before Judge Allison D. Burroughs: Bench Trial Day 7 held on 10/23/2018. Rakesh Khurana, Michael Smith, and Elizabeth Yong sworn and testify. (Court Reporter: Joan Daly at joanmdaly62@gmail.com.) (Folan, Karen) (Entered: 10/24/2018) |
| 10/24/2018 | 593 | Judge Allison D. Burroughs: ELECTRONIC ORDER entered finding as moot 588 Motion to Admit Exhibit P9 (Folan, Karen) (Entered: 10/24/2018) |
| 10/24/2018 | 599 | Electronic Clerk's Notes for proceedings held before Judge Allison D. Burroughs: Bench Trial Day 8 held on 10/24/2018. Mark Hansen, Roger Banks, Charlene Kim, and Tia Ray sworn and testify. (Court Reporter: Joan Daly at joanmdaly62@gmail.com.) (Folan, Karen) (Entered: 10/29/2018) |
| 10/25/2018 | 595 | AFFIDAVIT of Lawrence Crawford re 591 Letter/request (non–motion) by Lawrence Crawford. (McDonagh, Christina) (Entered: 10/26/2018) |
| 10/25/2018 | 600 | Electronic Clerk's Notes for proceedings held before Judge Allison D. Burroughs: Bench Trial Day 9 held on 10/25/2018. Peter Arcidiacono sworn and testifies. (Court Reporter: Joan Daly at joanmdaly62@gmail.com.) (Folan, Karen) (Entered: 10/29/2018) |
| 10/26/2018 | 601 | Electronic Clerk's Notes for proceedings held before Judge Allison D. Burroughs: Bench Trial Day 10 held on 10/26/2018. Testimony of Peter Arcidiacono resumes. Deposition testimony read into the record. (Court Reporter: Joan Daly at |

**JA99**

| | | joanmdaly62@gmail.com.) (Folan, Karen) (Entered: 10/29/2018) |
|---|---|---|
| 10/26/2018 | 609 | Opposition to SFFA's Oral Motion to Admit P438 and P588 by President and Fellows of Harvard College. (Folan, Karen) (Entered: 11/02/2018) |
| 10/27/2018 | 596 | Assented to MOTION to Seal by Students for Fair Admissions, Inc..(Hacker, Katherine) (Entered: 10/27/2018) |
| 10/27/2018 | 597 | NOTICE by Students for Fair Admissions, Inc. *of Deposition Designations Played in Court* (Attachments: # 1 Script report)(Hacker, Katherine) (Entered: 10/27/2018) |
| 10/29/2018 | 598 | Judge Allison D. Burroughs: ELECTRONIC ORDER entered granting 596 Motion to Seal (Folan, Karen) (Entered: 10/29/2018) |
| 10/29/2018 | 606 | Electronic Clerk's Notes for proceedings held before Judge Allison D. Burroughs: Bench Trial Day 11 held on 10/29/2018. Margaret Chin, Sarah Cole, Catherine Ho, Cecelia Nunez, Thang Diep, Madison Trice, and Sally Chen all sworn and testify. (Court Reporter: Kelly Mortellite and Joan Daly at joanmdaly62@gmail.com.) (Folan, Karen) (Entered: 10/31/2018) |
| 10/30/2018 | 602 | NOTICE by Students for Fair Admissions, Inc. *Bench Brief Regarding Exhibits D669 Through D730* (Mortara, Adam) (Entered: 10/30/2018) |
| 10/30/2018 | 603 | NOTICE by Students for Fair Admissions, Inc. *Offer of Proof of Deposition Designations* (Mortara, Adam) (Additional attachment(s) added on 10/30/2018: # 1 Exhibit 1 (Filed under Seal), # 2 Exhibit 2 (Filed Under Seal), # 3 Exhibit 3 (Filed Under Seal)) (McDonagh, Christina). (Entered: 10/30/2018) |
| 10/30/2018 | 604 | Letter/request (non–motion) from Harvard *in Response to Dkt. 602*. (Waxman, Seth) (Entered: 10/30/2018) |
| 10/30/2018 | 605 | Reply in Support of Admission of P438 and P588 by Students for Fair Admissions, Inc. (Mortara, Adam) Modified on 11/1/2018 (McDonagh, Christina). (Entered: 10/30/2018) |
| 10/30/2018 | 607 | Electronic Clerk's Notes for proceedings held before Judge Allison D. Burroughs: Bench Trial Day 12 held on 10/30/2018. Ruth Simmons and David Card sworn and testify. (Court Reporter: Joan Daly at joanmdaly62@gmail.com.) (Folan, Karen) (Entered: 10/31/2018) |
| 10/31/2018 | 608 | Electronic Clerk's Notes for proceedings held before Judge Allison D. Burroughs: Bench Trial Day 13 held on 10/31/2018. Testimony of David Card resumes. (Court Reporter: Joan Daly at joanmdaly62@gmail.com.) (Folan, Karen) (Entered: 11/01/2018) |
| 11/01/2018 | 613 | Electronic Clerk's Notes for proceedings held before Judge Allison D. Burroughs: Bench Trial Day 14 held on 11/1/2018. Testimony of David Card resumes. Marlyn McGrath sworn and testifies. Plaintiff rests. Drew Faust sworn and testifies. Deposition testimony read into the record. Defense rests. (Court Reporter: Joan Daly at joanmdaly62@gmail.com.) (Folan, Karen) (Entered: 11/13/2018) |
| 11/02/2018 | 614 | Electronic Clerk's Notes for proceedings held before Judge Allison D. Burroughs: Bench Trial Day 15 completed on 11/2/2018. Closing arguments by the parties. (Court Reporter: Joan Daly at joanmdaly62@gmail.com.) (Folan, Karen) (Entered: 11/13/2018) |
| 11/05/2018 | 610 | NOTICE of Change of Address or Firm Name by Adam K Mortara (Mortara, Adam) (Entered: 11/05/2018) |
| 11/05/2018 | 611 | NOTICE by Students for Fair Admissions, Inc. *Admitted Exhibit List* (Mortara, Adam) (Entered: 11/05/2018) |
| 11/06/2018 | 612 | ELECTRONIC NOTICE of Hearing.Hearing on Arguments in support of proposed findings set for 2/13/2019 02:00 PM in Courtroom 17 before Judge Allison D. Burroughs. (Folan, Karen) (Entered: 11/06/2018) |
| 11/13/2018 | 615 | Joint MOTION Entry of Scheduling Order by Students for Fair Admissions, Inc..(Consovoy, William) (Entered: 11/13/2018) |

| 11/14/2018 | 616 | Judge Allison D. Burroughs: ELECTRONIC ORDER entered granting 615 Motion for Entry of Scheduling Order (Folan, Karen) (Entered: 11/14/2018) |
| 11/14/2018 | 617 | NOTICE by President and Fellows of Harvard College *Corrected Admitted Exhibit List* (Attachments: # 1 Exhibit 01)(Ellsworth, Felicia) (Entered: 11/14/2018) |
| 12/18/2018 | 618 | Consent MOTION to Seal by Students for Fair Admissions, Inc..(Consovoy, William) (Entered: 12/19/2018) |
| 12/19/2018 | 619 | Proposed Findings of Fact by President and Fellows of Harvard College. (Attachments: # 1 Appendix Selected Exhibits)(Waxman, Seth) (Entered: 12/19/2018) |
| 12/19/2018 | 620 | Proposed Findings of Fact by Students for Fair Admissions, Inc.. (Attachments: # 1 Appendix)(Consovoy, William) (Additional attachment(s) added on 12/20/2018: # 2 Unredacted Version, # 3 Appendix Unredacted Version) (McDonagh, Christina). (Entered: 12/19/2018) |
| 12/20/2018 | 621 | Judge Allison D. Burroughs: ELECTRONIC ORDER entered granting 618 Motion to Seal (Folan, Karen) (Entered: 12/20/2018) |
| 01/08/2019 | 622 | AMICUS BRIEF filed by Asian American Coalition for Education *AMICI CURIAE BRIEF OF THE ASIAN AMERICAN COALITION FOR EDUCATION AND THE ASIAN AMERICAN LEGAL FOUNDATION, IN SUPPORT OF PLAINTIFF STUDENTS FOR FAIR ADMISSIONS, INC.*. (Fauth, Gordon) (Entered: 01/08/2019) |
| 01/09/2019 | 623 | Proposed Findings of Fact by 21 Colorful Crimson, Association of Black Harvard Women, Coalition for a Diverse Harvard, First Generation Harvard Alumni, Fuerza Latina of Harvard, Harvard Asian American Alumni Alliance, Harvard Asian American Brotherhood, Harvard Black Alumni Society, Harvard Islamic Society, Harvard Japan Society, Harvard Korean Association, Harvard Latino Alumni Alliance, Harvard Minority Association of Pre–Medical Students, Harvard Phillips Brooks House Association, Harvard South Asian Association, Harvard University Muslim Alumni, Harvard Vietnamese Association, Harvard–Radcliffe Asian American Association, Harvard–Radcliffe Asian American Women's Association, Harvard–Radcliffe Black Students Association, Harvard–Radcliffe Chinese Students Association, Kuumba Singers of Harvard College, Native American Alumni of Harvard University, Native Americans At Harvard College, Task Force on Asian and Pacific American Studies at Harvard College. (Lee, Jin) (Entered: 01/09/2019) |
| 01/09/2019 | 624 | AMICUS BRIEF filed by Amici Curiae Economists Michael Keane et al., in Support of Students for Fair Admissions . (Attachments: # 1 Exhibit A)(Clark, Randall) (Entered: 01/09/2019) |
| 01/09/2019 | 625 | AMICUS BRIEF filed by Amici Curiae the Asian American Legal Defense and Education Fund, et al. *in Support of Defendant*. (Rodriguez, Madeleine) (Entered: 01/09/2019) |
| 01/09/2019 | 626 | Proposed Findings of Fact by M. B., K. C., Sarah Cole, Y. D., G. E., A. G., I. G., R. H., J. L., Fadhal Moore, Arjini Kumari Nawal, R. S., Itzel Vasquez–Rodriguez, Keyanna Wigglesworth. (Culleen, Lawrence) (Entered: 01/09/2019) |
| 01/23/2019 | 627 | Proposed Findings of Fact by Students for Fair Admissions, Inc.. (Consovoy, William) (Entered: 01/23/2019) |
| 01/23/2019 | 628 | Response by President and Fellows of Harvard College to 620 Proposed Findings of Fact . (Waxman, Seth) (Entered: 01/23/2019) |
| 01/31/2019 | 629 | Hearing of arguments in support of proposed findings of fact and conclusions of law is rescheduled for February 13, 2019 at 1:30 PM in Courtroom 17. **This is a TIME change only**. SFFA and Harvard may each have up to 60 minutes for argument. Amici groups "Students" and "Organizations" will each be allowed up to 15 minutes. See ECF No. 575 .(McDonagh, Christina) (Entered: 01/31/2019) |
| 02/13/2019 | 630 | Electronic Clerk's Notes for proceedings held before Judge Allison D. Burroughs: Hearing re on arguments in support of proposed findings of fact and conclusions of law held on 2/13/2019. (Court Reporter: Joan Daly at joanmdaly62@gmail.com.) (Folan, Karen) (Entered: 02/13/2019) |

**JA101**

| 04/18/2019 | [631](#) | Transcript of Bench Trial – Day One held on October 15, 2018, before Judge Allison D. Burroughs. The Transcript may be purchased through the Court Reporter, viewed at the public terminal, or viewed through PACER after it is released. Court Reporter Name and Contact Information: Joan Daly at joanmdaly62@gmail.com Redaction Request due 5/9/2019. Redacted Transcript Deadline set for 5/20/2019. Release of Transcript Restriction set for 7/17/2019. (Scalfani, Deborah) (Entered: 04/18/2019) |
|---|---|---|
| 04/18/2019 | [632](#) | Transcript of Bench Trial – Day Two held on October 16, 2018, before Judge Allison D. Burroughs. The Transcript may be purchased through the Court Reporter, viewed at the public terminal, or viewed through PACER after it is released. Court Reporter Name and Contact Information: Joan Daly at joanmdaly62@gmail.com Redaction Request due 5/9/2019. Redacted Transcript Deadline set for 5/20/2019. Release of Transcript Restriction set for 7/17/2019. (Scalfani, Deborah) (Entered: 04/18/2019) |
| 04/18/2019 | [633](#) | Transcript of Bench Trial – Day Three held on October 17, 2018, before Judge Allison D. Burroughs. The Transcript may be purchased through the Court Reporter, viewed at the public terminal, or viewed through PACER after it is released. Court Reporter Name and Contact Information: Joan Daly at joanmdaly62@gmail.com Redaction Request due 5/9/2019. Redacted Transcript Deadline set for 5/20/2019. Release of Transcript Restriction set for 7/17/2019.(Scalfani, Deborah) (Entered: 04/18/2019) |
| 04/18/2019 | [634](#) | SEALED Transcript of Bench Trial – Day Three held on October 17, 2018, before Judge Allison D. Burroughs. Court Reporter Name and Contact Information: Joan Daly at joanmdaly62@gmail.com (Scalfani, Deborah) (Entered: 04/18/2019) |
| 04/18/2019 | [635](#) | Transcript of Bench Trial – Day Four held on October 18, 2018, before Judge Allison D. Burroughs. The Transcript may be purchased through the Court Reporter, viewed at the public terminal, or viewed through PACER after it is released. Court Reporter Name and Contact Information: Joan Daly at joanmdaly62@gmail.com Redaction Request due 5/9/2019. Redacted Transcript Deadline set for 5/20/2019. Release of Transcript Restriction set for 7/17/2019. (Scalfani, Deborah) (Entered: 04/18/2019) |
| 04/18/2019 | [636](#) | Transcript of Bench Trial – Day Five held on October 19, 2018, before Judge Allison D. Burroughs. The Transcript may be purchased through the Court Reporter, viewed at the public terminal, or viewed through PACER after it is released. Court Reporter Name and Contact Information: Kelly Mortellite and Joan Daly at joanmdaly62@gmail.com Redaction Request due 5/9/2019. Redacted Transcript Deadline set for 5/20/2019. Release of Transcript Restriction set for 7/17/2019. (Scalfani, Deborah) Modified on 4/18/2019 (Scalfani, Deborah). (Entered: 04/18/2019) |
| 04/18/2019 | [637](#) | SEALED Transcript of Bench Trial – Day Five held on October 19, 2018, before Judge Allison D. Burroughs. Court Reporter Name and Contact Information: Kelly Mortellite and Joan Daly at joanmdaly62@gmail.com (Scalfani, Deborah) (Entered: 04/18/2019) |
| 04/18/2019 | [638](#) | Transcript of Bench Trial – Day Six held on October 22, 2018, before Judge Allison D. Burroughs. The Transcript may be purchased through the Court Reporter, viewed at the public terminal, or viewed through PACER after it is released. Court Reporter Name and Contact Information: Joan Daly at joanmdaly62@gmail.com Redaction Request due 5/9/2019. Redacted Transcript Deadline set for 5/20/2019. Release of Transcript Restriction set for 7/17/2019. (Scalfani, Deborah) (Entered: 04/18/2019) |
| 04/18/2019 | [639](#) | SEALED Transcript of Bench Trial – Day Six held on October 22, 2018, before Judge Allison D. Burroughs. Court Reporter Name and Contact Information: Joan Daly at joanmdaly62@gmail.com (Scalfani, Deborah) (Entered: 04/18/2019) |
| 04/18/2019 | [640](#) | Transcript of Bench Trial – Day Seven held on October 23, 2018, before Judge Allison D. Burroughs. The Transcript may be purchased through the Court Reporter, viewed at the public terminal, or viewed through PACER after it is released. Court Reporter Name and Contact Information: Joan Daly at joanmdaly62@gmail.com Redaction Request due 5/9/2019. Redacted Transcript Deadline set for 5/20/2019. Release of Transcript Restriction set for 7/17/2019. (Scalfani, Deborah) (Entered: 04/18/2019) |
| 04/18/2019 | [641](#) | SEALED Transcript of Bench Trial – Day Seven held on October 23, 2018, before Judge Allison D. Burroughs. Court Reporter Name and Contact Information: Joan Daly at joanmdaly62@gmail.com (Scalfani, Deborah) (Entered: 04/18/2019) |

**JA102**

| 04/18/2019 | 642 | Transcript of Bench Trial – Day Eight held on October 24, 2018, before Judge Allison D. Burroughs. The Transcript may be purchased through the Court Reporter, viewed at the public terminal, or viewed through PACER after it is released. Court Reporter Name and Contact Information: Kelly Mortellite and Joan Daly at joanmdaly62@gmail.com Redaction Request due 5/9/2019. Redacted Transcript Deadline set for 5/20/2019. Release of Transcript Restriction set for 7/17/2019. (Scalfani, Deborah) (Entered: 04/18/2019) |
|---|---|---|
| 04/18/2019 | 643 | SEALED Transcript of Bench Trial – Day Eight held on October 24, 2018, before Judge Allison D. Burroughs. Court Reporter Name and Contact Information: Kelly Mortellite and Joan Daly at joanmdaly62@gmail.com (Scalfani, Deborah) (Entered: 04/18/2019) |
| 04/18/2019 | 644 | Transcript of Bench Trial – Day Nine held on October 25, 2018, before Judge Allison D. Burroughs. The Transcript may be purchased through the Court Reporter, viewed at the public terminal, or viewed through PACER after it is released. Court Reporter Name and Contact Information: Joan Daly at joanmdaly62@gmail.com Redaction Request due 5/9/2019. Redacted Transcript Deadline set for 5/20/2019. Release of Transcript Restriction set for 7/17/2019. (Scalfani, Deborah) (Entered: 04/18/2019) |
| 04/18/2019 | 645 | SEALED Transcript of Bench Trial – Day Nine held on October 25, 2018, before First. Court Reporter Name and Contact Information: Joan Daly at joanmdaly62@gmail.com (Scalfani, Deborah) (Entered: 04/18/2019) |
| 04/18/2019 | 646 | Transcript of Bench Trial – Day Ten held on October 26, 2018, before Judge Allison D. Burroughs. The Transcript may be purchased through the Court Reporter, viewed at the public terminal, or viewed through PACER after it is released. Court Reporter Name and Contact Information: Kelly Mortellite and Joan Daly at joanmdaly62@gmail.com Redaction Request due 5/9/2019. Redacted Transcript Deadline set for 5/20/2019. Release of Transcript Restriction set for 7/17/2019. (Scalfani, Deborah) (Entered: 04/18/2019) |
| 04/18/2019 | 647 | SEALED Transcript of Bench Trial – Day Ten held on October 26, 2018, before Judge Allison D. Burroughs. Court Reporter Name and Contact Information: Kelly Mortellite and Joan Daly at joanmdaly62@gmail.com (Scalfani, Deborah) (Entered: 04/18/2019) |
| 04/18/2019 | 648 | Transcript of Bench Trial – Day Eleven held on October 29, 2018, before Judge Allison D. Burroughs. The Transcript may be purchased through the Court Reporter, viewed at the public terminal, or viewed through PACER after it is released. Court Reporter Name and Contact Information: Kelly Mortellite and Joan Daly at joanmdaly62@gmail.com Redaction Request due 5/9/2019. Redacted Transcript Deadline set for 5/20/2019. Release of Transcript Restriction set for 7/17/2019. (Scalfani, Deborah) (Entered: 04/18/2019) |
| 04/18/2019 | 649 | SEALED Transcript of Bench Trial – Day Eleven held on October 29, 2018, before Judge Allison D. Burroughs. Court Reporter Name and Contact Information: Kelly Mortellite and Joan Daly at joanmdaly62@gmail.com (Scalfani, Deborah) (Entered: 04/18/2019) |
| 04/18/2019 | 650 | Transcript of Bench Trial – Day Twelve held on October 30, 2018, before Judge Allison D. Burroughs. The Transcript may be purchased through the Court Reporter, viewed at the public terminal, or viewed through PACER after it is released. Court Reporter Name and Contact Information: Kelly Mortellite and Joan Daly at joanmdaly62@gmail.com Redaction Request due 5/9/2019. Redacted Transcript Deadline set for 5/20/2019. Release of Transcript Restriction set for 7/17/2019. (Scalfani, Deborah) (Entered: 04/18/2019) |
| 04/18/2019 | 651 | SEALED Transcript of Jury Trial – Day Twelve held on October 30, 2018, before Judge Allison D. Burroughs. Court Reporter Name and Contact Information: Kelly Mortellite and Joan Daly at joanmdaly62@gmail.com (Scalfani, Deborah) (Entered: 04/18/2019) |
| 04/18/2019 | 652 | Transcript of Bench Trial – Day Thirteen held on October 31, 2018, before Judge Allison D. Burroughs. The Transcript may be purchased through the Court Reporter, viewed at the public terminal, or viewed through PACER after it is released. Court Reporter Name and Contact Information: Kelly Mortellite and Joan Daly at joanmdaly62@gmail.com Redacted Transcript Deadline set for 5/20/2019. Release of Transcript Restriction set for 7/17/2019. (Scalfani, Deborah) (Entered: 04/18/2019) |

| 04/18/2019 | 653 | SEALED Transcript of Bench Trial – Day Thirteen held on October 31, 2018, before Judge Allison D. Burroughs. Court Reporter Name and Contact Information: Kelly Mortellite and Joan Daly at joanmdaly62@gmail.com (Scalfani, Deborah) (Entered: 04/18/2019) |
| --- | --- | --- |
| 04/18/2019 | 654 | Transcript of Bench Trial – Day Fourteen held on November 1, 2018, before Judge Allison D. Burroughs. The Transcript may be purchased through the Court Reporter, viewed at the public terminal, or viewed through PACER after it is released. Court Reporter Name and Contact Information: Kelly Mortellite and Joan Daly at joanmdaly62@gmail.com Redaction Request due 5/9/2019. Redacted Transcript Deadline set for 5/20/2019. Release of Transcript Restriction set for 7/17/2019. (Scalfani, Deborah) (Entered: 04/18/2019) |
| 04/18/2019 | 655 | SEALED Transcript of Bench Trial – Day Fourteen held on November 1, 2018, before Judge Allison D. Burroughs. Court Reporter Name and Contact Information: Kelly Mortellite and Joan Daly at joanmdaly62@gmail.com (Scalfani, Deborah) (Entered: 04/18/2019) |
| 04/18/2019 | 656 | Transcript of Bench Trial Day Fifteen (Closing Arguments) held on November 2, 2018, before Judge Allison D. Burroughs. The Transcript may be purchased through the Court Reporter, viewed at the public terminal, or viewed through PACER after it is released. Court Reporter Name and Contact Information:Kelly Mortellite and Joan Daly at joanmdaly62@gmail.com Redaction Request due 5/9/2019. Redacted Transcript Deadline set for 5/20/2019. Release of Transcript Restriction set for 7/17/2019. (Scalfani, Deborah) (Entered: 04/18/2019) |
| 04/18/2019 | 657 | SEALED Transcript of Bench Trial – Day Fifteen held on November 2, 2018, before Judge Allison D. Burroughs. Court Reporter Name and Contact Information:Kelly Mortellite and Joan Daly at joanmdaly62@gmail.com (Scalfani, Deborah) (Entered: 04/18/2019) |
| 04/18/2019 | 658 | NOTICE is hereby given that an official transcript of a proceeding has been filed by the court reporter in the above–captioned matter. Counsel are referred to the Court's Transcript Redaction Policy, available on the court website at http://www.mad.uscourts.gov/attorneys/general–info.htm (Scalfani, Deborah) (Entered: 04/18/2019) |
| 05/14/2019 | 659 | NOTICE of Withdrawal of Appearance by Michael H. Park (Park, Michael) (Entered: 05/14/2019) |
| 05/16/2019 | 660 | NOTICE of Withdrawal of Appearance by Lawrence Culleen *on behalf of Brenda Shum* (Culleen, Lawrence) (Entered: 05/16/2019) |
| 06/04/2019 | 661 | NOTICE of Withdrawal of Appearance by Lawrence Culleen *on behalf of Nicole K. Ochi* (Culleen, Lawrence) (Entered: 06/04/2019) |
| 06/07/2019 | 662 | MOTION for Leave to Appear Pro Hac Vice for admission of Laboni Hoq Filing fee: $ 100, receipt number 0101–7721447 by M. B., K. C., Sarah Cole, Y. D., G. E., A. G., I. G., R. H., J. L., Fadhal Moore, Arjini Kumari Nawal, R. S., Itzel Vasquez–Rodriguez, Keyanna Wigglesworth.(Sellstrom, Oren) (Entered: 06/07/2019) |
| 06/07/2019 | 663 | MOTION for Leave to Appear Pro Hac Vice for admission of Christopher Lapinig Filing fee: $ 100, receipt number 0101–7721517 by M. B., K. C., Sarah Cole, Y. D., G. E., A. G., I. G., R. H., J. L., Fadhal Moore, Arjini Kumari Nawal, R. S., Itzel Vasquez–Rodriguez, Keyanna Wigglesworth.(Sellstrom, Oren) (Entered: 06/07/2019) |
| 06/10/2019 | 664 | Judge Allison D. Burroughs: ELECTRONIC ORDER entered granting 662 Motion for Leave to Appear Pro Hac Vice Added Laboni Hoq. **Attorneys admitted Pro Hac Vice must register for electronic filing if the attorney does not already have an ECF account in this district. To register go to the Court website at www.mad.uscourts.gov. Select Case Information, then Electronic Filing (CM/ECF) and go to the CM/ECF Registration Form. Pursuant to Local Rule 83.5.3, local counsel shall also file an appearance in this matter. Further, local counsel shall review all filings and shall personally appear in Court for any hearings or conferences, unless expressly excused by the Court for good cause.** (McDonagh, Christina) (Entered: 06/10/2019) |

**JA104**

| 06/10/2019 | 665 | Judge Allison D. Burroughs: ELECTRONIC ORDER entered granting <u>663</u> Motion for Leave to Appear Pro Hac Vice Added Christopher Lapinig. **Attorneys admitted Pro Hac Vice must register for electronic filing if the attorney does not already have an ECF account in this district. To register go to the Court website at www.mad.uscourts.gov. Select Case Information, then Electronic Filing (CM/ECF) and go to the CM/ECF Registration Form. Pursuant to Local Rule 83.5.3, local counsel shall also file an appearance in this matter. Further, local counsel shall review all filings and shall personally appear in Court for any hearings or conferences, unless expressly excused by the Court for good cause.** (McDonagh, Christina) (Entered: 06/10/2019) |
|---|---|---|
| 07/01/2019 | <u>666</u> | Transcript of Closing Arguments held on February 13, 2019, before Judge Allison D. Burroughs. The Transcript may be purchased through the Court Reporter, viewed at the public terminal, or viewed through PACER after it is released. Court Reporter Name and Contact Information: Joan Daly at joanmdaly62@gmail.com Redaction Request due 7/22/2019. Redacted Transcript Deadline set for 8/1/2019. Release of Transcript Restriction set for 9/30/2019. (Scalfani, Deborah) (Entered: 07/01/2019) |
| 07/01/2019 | 667 | NOTICE is hereby given that an official transcript of a proceeding has been filed by the court reporter in the above–captioned matter. Counsel are referred to the Court's Transcript Redaction Policy, available on the court website at http://www.mad.uscourts.gov/attorneys/general–info.htm (Scalfani, Deborah) (Entered: 07/01/2019) |
| 07/02/2019 | <u>668</u> | NOTICE of Withdrawal of Appearance by Daniel Winik (Winik, Daniel) (Entered: 07/02/2019) |
| 08/16/2019 | <u>669</u> | NOTICE of Withdrawal of Appearance by Andrew R. Varcoe (Varcoe, Andrew) (Entered: 08/16/2019) |
| 08/22/2019 | <u>671</u> | Letter. (McDonagh, Christina) (Entered: 09/04/2019) |
| 08/27/2019 | <u>670</u> | USCA Judgment In Re: Lawrence L. Crawford. Appeal No. 18–8022. The petition is <u>DISMISSED</u> for want of jurisdiction. All pending motions are <u>DENIED</u>. (Pacho, Arnold) (Entered: 08/28/2019) |
| 09/30/2019 | <u>672</u> | Judge Allison D. Burroughs: ORDER entered. FINDINGS OF FACT AND CONCLUSIONS OF LAW (McDonagh, Christina) (Entered: 10/01/2019) |
| 09/30/2019 | <u>673</u> | Judge Allison D. Burroughs: ORDER entered. Judgment for the Defendant President and Fellows of Harvard College (Harvard Corporation).(McDonagh, Christina) (Entered: 10/01/2019) |
| 10/04/2019 | <u>674</u> | NOTICE OF APPEAL <u>672</u> FINDINGS OF FACT AND CONCLUSIONS OF LAW <u>673</u> JUDGMENT by Students for Fair Admissions, Inc. Filing fee: $ 505, receipt number 0101–7910565 Fee Status: Not Exempt. NOTICE TO COUNSEL: A Transcript Report/Order Form, which can be downloaded from the First Circuit Court of Appeals web site at http://www.ca1.uscourts.gov MUST be completed and submitted to the Court of Appeals. **Counsel shall register for a First Circuit CM/ECF Appellate Filer Account at http://pacer.psc.uscourts.gov/cmecf. Counsel shall also review the First Circuit requirements for electronic filing by visiting the CM/ECF Information section at http://www.ca1.uscourts.gov/cmecf.** US District Court Clerk to deliver official record to Court of Appeals by 10/24/2019. (Consovoy, William) (Modified on 10/4/2019 to Correct Docket Text and CM/ECF Document Link – Appealed Orders) (Paine, Matthew). (Entered: 10/04/2019) |
| 10/07/2019 | <u>675</u> | Certified and Transmitted Abbreviated Electronic Record on Appeal to US Court of Appeals re <u>674</u> Notice of Appeal. (Paine, Matthew) (Entered: 10/07/2019) |
| 10/08/2019 | 676 | USCA Case Number 19–2005 for <u>674</u> Notice of Appeal filed by Students for Fair Admissions, Inc.. (Paine, Matthew) (Entered: 10/08/2019) |
| 12/09/2019 | <u>677</u> | NOTICE of Withdrawal of Appearance by Lawrence Culleen *on behalf of Laboni A. Hoq* (Culleen, Lawrence) (Entered: 12/09/2019) |

**JA105**

# UNITED STATES DISTRICT COURT FOR
## THE DISTRICT OF MASSACHUSETTS
### BOSTON DIVISION

| | |
|---|---|
| STUDENTS FOR FAIR ADMISSIONS, INC., | |
| Plaintiff, | |
| v. | Civil Action No. 1:14-cv-14176-ADB |
| PRESIDENT AND FELLOWS OF HARVARD COLLEGE, | |
| Defendant. | |

## NOTICE OF APPEAL

Plaintiff, Students for Fair Admissions, Inc., now appeals to the United States Court of Appeals for the First Circuit this Court's final judgment entered on October 1, 2019.

Dated: October 4, 2019

Respectfully submitted,

_/s/ William S. Consovoy_

Adam K. Mortara
J. Scott McBride
Krista J. Perry
BARTLIT BECK LLP
54 West Hubbard Street, Suite 300
Chicago, IL 60654
312.494.4400
adam.mortara@bartlitbeck.com
scott.mcbride@bartlitbeck.com
krista.perry@bartlitbeck.com

John M. Hughes
Katherine L.I. Hacker
Meg E. Fasulo
BARTLIT BECK LLP
1801 Wewatta Street, Suite 1200
Denver, CO 80202
303.592.3100
john.hughes@bartlitbeck.com
kat.hacker@bartlitbeck.com
meg.fasulo@bartlitbeck.com

William S. Consovoy
Thomas R. McCarthy
J. Michael Connolly
Cameron T. Norris
CONSOVOY MCCARTHY PLLC
1600 Wilson Boulevard, Suite 700
Arlington, Virginia 22209
703.243.9423
will@consovoymccarthy.com
tom@consovoymccarthy.com
mike@consovoymccarthy.com
cam@consovoymccarthy.com

Patrick Strawbridge BBO #678274
CONSOVOY MCCARTHY PLLC
Ten Post Office Square
8th Floor South PMB #706
Boston, MA 02109
617.227.0548
patrick@consovoymccarthy.com

1

Paul M. Sanford BBO #566318
Burns & Levinson LLP
One Citizens Plaza, Suite 1100
Providence, RI 02903
617.345.3000
psanford@burnslev.com

## CERTIFICATE OF SERVICE

I certify that this document was filed via the CM/ECF system, which will notify all counsel of

record.

_/s/ William S. Consovoy_
Counsel for Plaintiff

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MASSACHUSETTS
### BOSTON DIVISION

| | |
|---|---|
| STUDENTS FOR FAIR ADMISSIONS, INC., <br><br> Plaintiff, <br><br> v. <br><br> PRESIDENT AND FELLOWS OF HARVARD COLLEGE (HARVARD CORPORATION); and THE HONORABLE AND REVEREND THE BOARD OF OVERSEERS, <br><br> Defendants. | Civil Action No. _____ <br><br> **COMPLAINT** <br><br> **JURY TRIAL DEMANDED** |

Plaintiff Students for Fair Admissions, Inc. brings this action to obtain, among other relief, a declaratory judgment under the Declaratory Judgment Act, 28 U.S.C. § 2201, that Defendant President and Fellows of Harvard College ("Harvard Corporation") and The Honorable and Reverend the Board of Overseers ("Board of Overseers" and together with Harvard Corporation, "Defendants" or "Harvard") have employed and are employing racially and ethnically discriminatory policies and procedures in administering the undergraduate admissions program at Harvard College in violation of Title VI of the Civil Rights Act of 1964, 42 U.S.C. § 2000d *et seq.* ("Title VI"). Harvard's undergraduate admissions policies and procedures have injured and continue to injure Plaintiff's members by intentionally and improperly discriminating against them on the basis of their race and ethnicity in violation of Title VI.

## I.    **INTRODUCTION**

1.    This is an action brought under Title VI of the Civil Rights Act of 1964 to prohibit Harvard from engaging in intentional discrimination on the basis of race and ethnicity. "Classifications of citizens solely on the basis of race are by their very nature

odious to a free people whose institutions are founded upon the doctrine of equality. They threaten to stigmatize individuals by reason of their membership in a racial group and to incite racial hostility." *Shaw v. Reno*, 509 U.S. 630, 643 (1993) (citations and quotations omitted). As a consequence, racial classifications are highly disfavored and have been permitted only when there is a compelling government interest that cannot be met through race-neutral means. In the educational setting, "diversity"is the only interest the Supreme Court has found compelling. Even then, the Supreme Court has mandated strict judicial scrutiny to ensure that an academic institution is actually pursuing that interest and that it is absolutely necessary to employ racial preferences in order to achieve a diverse student body.

2.    Yet the Supreme Court has always had misgivings about its decision to permit *any* use of racial preferences in university admissions. *See City of Richmond v. J.A. Croson Co.*, 488 U.S. 469, 518 (1989) (Kennedy, J., concurring in part and concurring in the judgment). The Supreme Court was nevertheless convinced to permit racial preferences in pursuit of diversity for two reasons. First, based mainly on an *amicus* brief that Harvard submitted, the Supreme Court was led to believe that schools only would "take account of race as one, nonpredominant factor in a system designed to consider each applicant as an individual." *Grutter v. Bollinger*, 539 U.S. 306, 387 (2003) (Kennedy, J., dissenting) (citing *Regents of Univ. of Cal. v. Bakke*, 438 U.S. 265, 289-91 (1978)). Second, the Supreme Court believed that the "strict scrutiny standard [would] operate in a manner generally consistent with the imperative of race neutrality, because it forbids the use even of narrowly drawn racial classifications except as a last resort."

*Croson*, 488 U.S. at 519 (Kennedy, J., concurring in part and concurring in the judgment).

3.      The Supreme Court was misled. The admissions plan Harvard advocated for in *Bakke* (the "Harvard Plan") that promised to treat each applicant as an individual has always been an elaborate mechanism for hiding Harvard's systematic campaign of racial and ethnic discrimination against certain disfavored classes of applicants. Indeed, the Harvard Plan was created for the specific purpose of discriminating against Jewish applicants. Put simply, *Bakke* "legitimated an admissions process that is *inherently capable* of gross abuse and that … *has in fact been deliberately* manipulated for the specific purpose of perpetuating religious and ethnic discrimination in college admissions." Alan Dershowitz and Laura Hanft, *Affirmative Action and the Harvard College Diversity-Discretion Model: Paradigm or Pretext*, 1 Cardozo L. Rev. 379, 385 (1979). Today it is used to hide intentional discrimination against Asian Americans. Harvard is using the same "holistic" code words to discriminate for the same invidious reasons and it is relying on the same pretextual excuses to justify its disparate treatment of another high-achieving racial and ethnic minority group.

4.      In any event, even if the Harvard Plan at some point outgrew its discriminatory roots, Harvard has long since abandoned an admissions policy that purported to merely use race contextually to fill the last few seats in the entering freshman class. Harvard now labels every applicant by race on the claim that it is pursuing the so-called "critical mass" diversity objective. That creates two problems for Harvard. First, as it has abandoned the very "plan" that led the Supreme Court to permit the use of racial admissions preferences, Harvard has deprived the Court of any

continuing "authority to approve the use of race in pursuit of student diversity." *Grutter*, 539 U.S. at 394 (Kennedy, J., dissenting). Second, Harvard's new diversity interest— critical mass—should never have been endorsed and should be outlawed once and for all. "[T]he concept of critical mass is a delusion used … to mask [an] attempt to make race an automatic factor in most instances and to achieve numerical goals indistinguishable from quotas." *Id.* at 389.

5. Worse still, Harvard is not even pursuing its claimed "critical mass" interest. Rather, even under governing Supreme Court precedent, Harvard is violating Title VI for at least four reasons. First, Harvard is using racial classifications to engage in the same brand of invidious discrimination against Asian Americans that it formerly used to limit the number of Jewish students in its student body. Statistical evidence reveals that Harvard uses "holistic" admissions to disguise the fact that it holds Asian Americans to a far higher standard than other students and essentially forces them to compete against each other for admission. There is nothing high-minded about this campaign of invidious discrimination. It is "illegitimate racial prejudice or stereotype." *Croson*, 488 U.S. at 493.

6. Second, Harvard is engaging in racial balancing. Over an extended period, Harvard's admission and enrollment figures for each racial category have shown almost no change. Each year, Harvard admits and enrolls essentially the same percentage of African Americans, Hispanics, whites, and Asian Americans even though the application rates and qualifications for each racial group have undergone significant changes over time. This is not the coincidental byproduct of an admissions system that treats each applicant as an individual; indeed, the statistical evidence shows that Harvard

4

**JA111**

modulates its racial admissions preference whenever there is an unanticipated change in the yield rate of a particular racial group in the prior year.  Harvard's remarkably stable admissions and enrollment figures over time are the deliberate result of systemwide intentional racial discrimination designed to achieve a predetermined racial balance of its student body.

7.    Third, Harvard is failing to use race merely as a "plus factor"in admissions decisions.  Rather, Harvard's racial preference for each student (which equates to a penalty imposed upon Asian-American applicants) is so large that race becomes the "defining feature of his or her application." *Grutter*, 539 U.S. at 337.  Only using race or ethnicity as a dominant factor in admissions decisions could, for example, account for the remarkably low admission rate for high-achieving Asian-American applicants.  Harvard's admissions decisions simply are not explainable on grounds other than race.  High-achieving Asian-American applicants are as broadly diverse and eclectic in their abilities and interests as any other group seeking admission to Harvard.  They compete in interscholastic sports, are members of the school band, work part-time jobs after school, travel, and engage in volunteer work just like everyone else.  It is not a lack of non-academic achievement that is keeping them from securing admission.  It is Harvard's dominant use of racial preferences to their detriment.

8.    Fourth, and last, Harvard is using race in admissions decisions when race-neutral alternatives can achieve diversity.  As other elite universities have shown, increased utilization of non-race-based criteria, such as socioeconomic preferences, can promote diversity about as well as racial preferences.  This approach is particularly effective when combined with increased use of financial aid, scholarships, and

recruitment to attract and enroll minority applicants and the elimination of admissions policies and practices, such as legacy preferences and early admission, which operate to the disadvantage of minority applicants.  Further, eliminating racial preferences at Harvard will alleviate the substantial harm these discriminatory policies cause to those minority applicants who receive such admissions preferences, the Harvard community, and society as a whole.  Racial preferences are a dangerous tool and may only be used as a last resort.  There is now overwhelming evidence that race-neutral alternatives render reliance on racial preferences unnecessary.  It is incumbent on Harvard to take full advantage of these preferred alternatives.

9.     Accordingly, there is no doubt that Harvard is in violation of Title VI. The only question is the proper judicial response.  Given what is occurring at Harvard and at other schools, the proper response is the outright prohibition of racial preferences in university admissions—  period.  Allowing this issue to be litigated in case after case will only "perpetuate the hostilities that proper consideration of race is designed to avoid." *Grutter*, 539 U.S. at 394 (Kennedy, J., dissenting).  Harvard and other academic institutions cannot and should not be trusted with the awesome and historically dangerous tool of racial classification.  As in the past, they will use any leeway the Supreme Court grants them to use racial preferences in college admissions—  under whatever rubric—  to engage in racial stereotyping, discrimination against disfavored minorities, and quota-setting to advance their social-engineering agenda.  Strict scrutiny has proven to be no match for concerted discrimination hidden behind the veil of "holistic"admissions. There may be times when social problems can be solved democratically.  But massive resistance to racial equality is not one of them.  *See Brown v. Bd. of Educ. of Topeka,*

6

**JA113**

*Kan.*, 349 U.S. 294 (1955).  "The moral imperative of racial neutrality is the driving force of the Equal Protection Clause ….  Structural protections may be necessities if moral imperatives are to be obeyed."  *Croson*, 488 U.S. at 518 (Kennedy, J., concurring in part and concurring in the judgment).

## II.      JURISDICTION AND VENUE

10.      This action arises under 42 U.S.C. § 2000d *et seq*.  This Court has subject matter jurisdiction under 28 U.S.C. §§ 1331 and 1343.

11.      Venue is proper in the District of Massachusetts under 28 U.S.C. § 1391 because the events giving rise to the claims detailed herein occurred in the District of Massachusetts.

## III.     THE PARTIES

### A.      <u>Plaintiff</u>

12.      Plaintiff, Students for Fair Admissions, Inc. ("SFFA") is an Internal Revenue Code Section 501(c)(3) organization formed for the purpose of defending human and civil rights secured by law, including the right of individuals to equal protection under the law, through litigation and any other lawful means.  More specifically, SFFA seeks to promote and protect the right of the public to be free from discrimination on the basis of race in higher education admissions.

13.      SFFA is a coalition of prospective applicants and applicants to higher education institutions who were denied admission to higher education institutions, their parents, and other individuals who support the organization's purpose and mission of eliminating racial discrimination in higher education admissions.  SFFA has members throughout the country.

Case 1:14-cv-14176    Document 1    Filed 11/17/14    Page 8 of 120

14.    Edward Blum is the President of SFFA.  *See **Exhibit A***, Declaration of Edward Blum ("Blum Dec.")  ¶ 2.

15.    SFFA has at least one member ("Applicant") who applied for and was denied admission to Harvard's 2014 entering class.  Blum Dec. ¶ 4.

16.    Applicant is Asian American.  Blum Dec. ¶ 5.

17.    Applicant's parents are first-generation immigrants to the United States from China.  Blum Dec. ¶ 6.

18.    Applicant graduated from high school ranked 1 out of 460 students by weighted and un-weighted grade point average. Blum Dec. ¶ 7.

19.    U.S. News and World Report ranks Applicant's high school in the top 5 percent of all high schools in the United States.  Blum Dec. ¶ 8.

20.    Applicant achieved a perfect score of 36 on the ACT.  Applicant achieved a perfect score of 800 for SAT II History and a perfect score of 800 for SAT II Math.  Among other academic achievements, Applicant was named an AP Scholar with distinction, a National Scholar, and a National Merit Scholarship semifinalist.  Blum Dec. ¶¶ 9-10.

21.    While in high school, Applicant participated in numerous extracurricular and volunteer activities.  Among other things, Applicant was captain of the varsity tennis team, volunteered at a community tennis camp, volunteered for the high school's student peer tutoring program, was a volunteer fundraiser for National Public Radio, and traveled to China as part of a program organized by the United States Consulate General and Chinese American Students Education and Exchange to assist students in learning English writing and presentation skills.  Blum Dec. ¶ 11.

22.    Applicant was denied the opportunity to compete for admission to Harvard on equal footing with other applicants on the basis of race or ethnicity due to Harvard's discriminatory admissions policies.  Blum Dec. ¶ 12.

23.    Applicant was accepted to and has enrolled at a university that is ranked in the Top 20 in the nation by U.S. News and World Report.  That university does not grant an admissions preference on the basis of race or ethnicity.  Blum Dec. ¶ 13.

24.    Applicant is ready, able, and intends to seek to transfer to Harvard when it ceases the use of race or ethnicity as an admissions preference and ceases its intentional discrimination against Asian Americans.  Blum Dec. ¶ 14.

25.    SFFA has members who are currently in high school and intend to apply for admission to Harvard ("Future Applicants").  Some of these Future Applicants are Asian American.  Blum Dec. ¶ 15.

26.    Future Applicants will be denied the opportunity to compete for admission to Harvard on equal footing with other applicants on the basis of race or ethnicity due to Harvard's discriminatory admissions policies.  As a result, Future Applicants may be denied admission to Harvard because of these discriminatory policies.  Blum Dec. ¶ 16.

27.    SFFA has members whose children intend to apply for admission to Harvard ("Parents").  Some of these Parents are Asian Americans.  Blum Dec. ¶ 17.

28.    Parents' children will be denied the opportunity to compete for admission to Harvard on equal footing with other applicants on the basis of race or ethnicity due to Harvard's discriminatory admissions policies.  As a result, Parents' children may be denied admission to Harvard because of these discriminatory policies.  Blum Dec. ¶ 18.

**B.**     **Defendants**

29.     Defendants, the Harvard Corporation and Harvard Board of Overseers govern Harvard University.

30.     Harvard University is a private educational institution based in Cambridge, Massachusetts.

31.     Harvard College is a component of Harvard University that offers undergraduate, graduate, professional, and research programs in the fields of arts, science, medicine, business, design, and public health.

32.     Despite having an endowment of approximately $36.4 billion, Harvard accepts substantial direct financial assistance from the Federal government through, among other things, grants and loans.  In 2010, Harvard accepted more than $6.6 million in federal funds.  In 2011, Harvard accepted more than $11.9 million in federal funds.  In 2012, Harvard accepted more than $20.9 million in federal funds.  In 2013, Harvard accepted more than $13.4 million in federal funds.  Harvard also has received and will further receive substantial direct financial assistance from the Federal government in 2014.

33.     Harvard also accepts substantial indirect Federal financial assistance by, among other things, enrolling students who pay, in part, with Federal financial aid directly distributed to those students.

34.     As a recipient of Federal financial assistance, Harvard University, and all of its programs and activities, which includes Harvard College, are subject to Title VI of the Civil Rights Act of 1964, 42 U.S.C. § 2000d *et. seq.*

IV.  **HARVARD HAS A LONG HISTORY OF INTENTIONAL DISCRIMINATION ON THE BASIS OF RACE OR ETHNICITY AGAINST DISFAVORED MINORITY APPLICANTS.**

35.    Discrimination on the basis of race or ethnicity is longstanding at Harvard. The "Harvard Plan" itself— and the concept of an admissions system based on a "holistic" review of applicants instead of admission based on academic qualifications— was formulated for the specific purpose of discriminating against disfavored minority groups. "Indeed, the historical evidence points inexorably to the conclusion that the current Harvard College admissions system was *born* out of one of the most shameful episodes in the history of American higher education in general, and of Harvard college in particular." Alan Dershowitz and Laura Hanft, *Affirmative Action and the Harvard College Diversity-Discretion Model: Paradigm or Pretext*, 1 Cardozo L. Rev. 379, 385 (1979).

A.    **1900s to 1920s: Before "Selective Admissions"**

36.    Until the early 1920s, Harvard, like all other Ivy League schools, selected its students by admitting applicants who passed a required examination.

37.    Because Harvard's entrance examination was not especially demanding, an applicant for undergraduate admission with average intelligence from a prominent school could usually pass with ease.

38.    Though the performance of some students placed them in a gray zone from which they could be admitted "with conditions," most applicants were admitted based solely on objective academic criteria.

39.    Under this system, the number of students entering Harvard fluctuated, sometimes quite widely, from year to year.

40.     Harvard's student body during this time period was fairly homogenous in terms of class, race, religion, and ethnicity.  Students during this time period were overwhelmingly from affluent backgrounds, almost exclusively white, and composed largely of graduates of elite private secondary schools.

41.     Harvard was considered somewhat open to African Americans, immigrants, and foreigners, though the numerical presence of each of these groups of students on campus was relatively small.

**B.     1920s to 1930s: Harvard's "Jewish Problem"**

42.     Ivy League schools began to reevaluate their admissions systems when students deemed socially "undesirable"— most prominently, Jewish applicants— started to pass the examinations and enroll in greatly increasing numbers.

43.     In or around the late 1910s, the number of Jewish students enrolling at Harvard began to increase, and Harvard administrator determined that the college had a "Jewish problem" that it needed to address.

44.     By 1918, Harvard's freshman class was 20 percent Jewish, three times the percentage at Yale and six times that at Princeton.

45.     The President of Harvard, A. Lawrence Lowell, was deeply troubled by this rising Jewish population.

46.     President Lowell feared that the enrollment of too many Jewish students would cause students from Protestant upper and upper-middle class families to choose other elite colleges over Harvard.

47.     In 1920, in a letter to William Hocking, a Harvard philosophy professor, President Lowell wrote that the increasing number of Jewish students enrolling at Harvard would ultimately "ruin the college."

48.     To combat this "Jewish problem," President Lowell sought to institute a cap on Jewish enrollment in each entering class.

49.     In his letter to Hocking, President Lowell stated that the best approach would be "to state frankly that we thought we could do the most good by not admitting more than a certain proportion of men in a group that did not intermingle with the rest, and give our reasons for it to the public." According to Lowell, "[e]xperience seems to place that proportion at about 15%."

50.     Yet President Lowell knew that such overt discrimination would meet resistance. He believed that the faculty, and probably the governing boards, would prefer to make a rule whose motive was less obvious on its face, such as giving to the Committee on Admission authority to refuse admittance to persons who possessed particular qualities believed to be characteristic of Jewish applicants.

51.     If such a system was instituted, however, President Lowell wished to ensure that the faculty knew "perfectly well what they are doing, and that any vote passed with the intent of limiting the number of Jews should not be supposed by anyone to be passed as a measurement of character really applicable to Jews and Gentiles alike."

52.     By the spring of 1922, the proportion of Jewish students had reached 21.5 percent. President Lowell warned that unless immediate measures were taken "the danger would seem to be imminent."

53.    President Lowell made clear that absent the rise in Jewish enrollment, no change in Harvard's admissions policies would be needed. The problem was not with the academic method of selection *per se*, but with its results: it was now yielding too many Jewish students at Harvard.

54.    In a 1922 letter President Lowell wrote: "We can reduce the number of Jews by talking about other qualifications than those of admission examinations.  If the object is simply to diminish the Jews, this is merely an indirect method of avoiding a problem in American life which is really important.  This is the feeling of the most thoughtful people here, both gentile and Jew.  On the other hand, we are in no present danger of having more students in college than we can well take care of; nor, apart from the Jews, is there any real problem of selection, the present method of examination giving us, for the Gentile, a satisfactory result."

55.    In May 1922, Professor Ropes proposed that the Committee on Admission "take into account the proportionate size of racial and national groups in the membership of Harvard College," declaring that "it is not desirable that the number of students in any group which is not easily assimilated into the common life of the College should exceed 15 percent of the whole college."

56.    As one Harvard alumnus noted, "I am fully prepared to accept the judgment of the Harvard authorities that a concentration of Jews in excess of fifteen percent will produce a segregation of culture rather than a fusion."

57.    President Lowell's plans received pushback.  One petition, signed by 31 faculty members, described the "action of the Faculty relating to controlling the percentage of the Jews in Harvard College" as "a radical departure from the spirit and

practice of the College" and declared "that racial consideration should not influence the Committee on Admission before a careful and deliberate study of the whole question of the Jews shall be made by the Faculty."

58.    At the same time, Harvard was beginning to gather the information that would permit it to identify which applicants were Jewish.

59.    Starting in the fall of 1922, applicants were required to answer questions on "Race and Color," "Religious Preference," "Maiden Name of Mother," and "Birthplace of Father," as well as the question, "What change, if any, has been made since birth in your own name or that of your father? (Explain fully.)"

60.    In addition, Harvard asked high school principals and private school headmasters to fill out a form indicating "by a check [the applicant's] religious preference so far as known . . . Protestant . . . Roman Catholic . . . Hebrew . . . Unknown."

61.    Harvard also created a committee tasked with counting the number of Jewish students at Harvard.

62.    After analyzing all the student information it could obtain, the committee began classifying each Harvard student into one of four categories: "J1," "J2," "J3," and "other." A "J1" was assigned "when the evidence pointed conclusively to the fact that the student was Jewish;" a "J2" was assigned when a "preponderance of evidence" suggested the student was Jewish; and a "J3" was assigned when "the evidence suggested the possibility that the student might be Jewish."

63.    During this time period, Harvard also adopted a "one-seventh plan," which purported to target "a new group of men from the West and South" who were in the top

seventh of their graduating class.  In reality, however, it was a "thinly disguised attempt to lower the Jewish proportion of the student body by bringing in boys—  some of them academically ill equipped for Harvard—  from regions of the country where there were few Jews."

64.     After President Lowell's intentions of imposing a Jewish cap became known to the public, opponents began mobilizing opposition.

65.     In 1923, Harvard's Committee on Methods of Sifting Candidates for Admission defeated President Lowell's requests for a cap on Jewish enrollment.  In doing so, the committee issued a statement indicating its opposition to "an arbitrary limitation of the number of students to be admitted" and specifying that "if the size of our Freshman class is to be reduced, the reduction can best be accomplished by raising the standard for admission."

66.     Despite this defeat, President Lowell pressed forward.  In June 1923, he commissioned a study to determine "whether it might be wise to limit the number of students admitted to the Freshman class to one thousand."

67.     President Lowell realized that a ceiling on the size of the class was the necessary precondition for addressing the "Jewish problem," for as long as Harvard had an absolute standard of admission, discretionary selection policy using nonacademic as well as academic criteria would not be possible.

68.     Lowell's proposal "signaled the beginning of a new, more subtle campaign to restrict Jewish enrollment."

69.     By the end of 1923, President Lowell's committee issued a report recommending a limit of 1,000 on the size of the freshman class and additional changes

in the criteria for admission. Instead of making decisions based on academic achievement, the committee proposed using letters from teachers and personal interviews to shed light on the candidates' "aptitude and character." However, no changes were made in 1923.

70.    By 1924, Harvard's Jewish enrollment had risen to 25 percent.

71.    According to President Lowell, Harvard's "reputation of having so many Jews" was hurting its ability to "attract applicants from western cities and the great preparatory schools."

72.    By 1925, the dean's office reported that the proportion of known Jewish freshmen (the J1s and J2s) had risen to 27.6 percent, with an additional 3.6 percent in the J3 category.

73.    As President Lowell was contemplating these figures, he was receiving letters from alumni castigating the school for being overrun by Jewish students. Among these letters was one from W.F. Williams '01, who had attended a recent Harvard-Yale football game. Williams recommended using the school's admissions program to discretely limit the number of Jewish students enrolling at Harvard: "Naturally, after twenty-five years, one expects to find many changes but to find that one's University had become so Hebrewized was a fearful shock. There were Jews to the right of me, Jews to the left of me, in fact they were so obviously everywhere that instead of leaving the Yard with pleasant memories of the past I left with a feeling of utter disgust of the present and grave doubts about the future of my Alma Mater . . . . The Jew is undoubtedly of high mental order, desires the best education he can get CHEAPEST, and is more persistent than other races in his endeavors to get what he wants. It is self evident, therefore, that

by raising the standard of marks he can't be eliminated from Harvard, whereas by the same process of raising the standard 'White' boys ARE eliminated.  And is this to go on? Why the Psychology Test if not to bar those not wanted?  Are the Overseers so lacking in genius that they can't devise a way to bring Harvard back to the position it always held as a 'white man's' college?"

74.    President Lowell agreed with Williams' assessment, responding that he "had foreseen the peril of having too large of a number of an alien race and had tried to prevent it," but that "not one of the alumni ventured to defend the policy publicly." President Lowell was "glad to see from your letter, as I have from many other signs, that the alumni are beginning to appreciate that I was not wholly wrong three years ago in trying to limit the proportion of Jews."

75.    Despite increasing alumni approval, President Lowell still faced significant obstacles to his plan.  He needed Harvard's "Special Committee on the Limitation of the Size of the Freshman Class" to approve his new admissions plan.

76.    In a letter to the chairman of the committee, President Lowell wrote that "questions of race," though "delicate and disagreeable," were not solved by ignoring them.  The solution was a new admissions system giving the school wide discretion to limit the admission of Jewish applicants: "To prevent a dangerous increase in the proportion of Jews, I know at present only one way which is at the same time straightforward and effective, and that is a selection by a personal estimate of character on the part of the Admissions authorities, based upon the probable value to the candidate, to the college and to the community of his admission.  Now a selection of this kind can be carried out only in case the numbers are limited.  If there is no limit, it is impossible to

reject a candidate who passes the admissions examinations without proof of defective character, which practically cannot be obtained. The only way to make a selection is to limit the numbers, accepting those who appear to be the best."

77.    Anticipating pushback, President Lowell insisted that he was not proposing to discriminate against Jewish applicants. Instead, he sought "discrimination among individuals in accordance with the probable value of a college education to themselves, to the University, and the community," carefully adding that "a very large proportion of the less desirable, upon this basis, are at the present time the Jews."

78.    The committee's chairman was initially opposed, stating that "[e]verything in my education and bringing up makes me shrink from a proposal to begin a racial discrimination at Harvard—   there's no use my pretending this isn't the case."

79.    In the end, however, the chairman agreed with President Lowell's notion of "a sound and discerning 'discrimination' among individuals" and expressed confidence that "such a discrimination would inevitably eliminate most of the Jewish element which is making trouble."

80.    Nevertheless, the chairman refused to endorse "a candid regulation excluding all but so many or such a proportion of 'Jews.'" Instead, he advised President Lowell that more subtle measures to exclude Jewish applicants would be a wiser approach.

81.    In its report, the Committee made multiple recommendations along these lines. First, the committee recommended that Harvard limit its incoming class to just 1,000 students. Second, it recommended that "the application of the rule concerning candidates from the first seventh of their school be discretionary with the Committee on

Case 1:14-cv-14176     Document 1     Filed 11/17/14     Page 20 of 120

Admission." This modification would allow the committee to eliminate from the program high schools that sent too many Jewish students to Harvard.

82.     Finally, and most important, the committee rejected an admissions policy that would select the 1,000 students on the basis of scholarship alone.  According to the committee, it was "neither feasible nor desirable to raise the standards of the College so high that none but brilliant scholars can enter" and "the standards ought never to be too high for serious and ambitious students of average intelligence."

83.     Not only did the faculty adopt these proposals, but it also approved measures making the admissions process even more subjective.

84.     In particular, the faculty called on the admissions committee to interview as many applicants as possible to gather additional information on "character and fitness and the promise of the greatest usefulness in the future as a result of a Harvard education."

85.     In addition, Harvard began requiring a passport-sized photo "as an essential part of the application for admissions."

86.     Harvard also began using "legacy" preferences for the children of alumni as a strategy for reducing the admission of Jewish students.

87.     President Lowell was elated by these changes, realizing that they "provided a tremendous opportunity to impose, at long last, the policy of restriction he had favored since 1922."

88.     The reduction in Jewish enrollment at Harvard was immediate.  The Jewish portion of Harvard's entering class dropped from over 27 percent in 1925 to 15 percent the following year.

89.    For the next 20 years, this percentage (15 percent) remained virtually unchanged.

90.    Harvard's new system of selection was far more complicated than the exam-based system that had preceded it, and implementing it required a new bureaucratic apparatus of information gathering and assessment.

91.    In addition to expanding its administrative staffing apparatus, the new Office of Admissions needed to collect vast quantities of data formerly unnecessary.

92.    The development of a procedure for identifying Jewish applicants was only the first step.  For the first time, candidates were asked to fill out lengthy applications that included demographic information, a personal essay, and a detailed description of extracurricular activities that might demonstrate "leadership" and reveal something about their "character."

93.    The centerpiece of the new system was the personal letter of recommendation, especially those from trusted sources such as alumni and headmasters or teachers from the leading feeder schools.

94.    Finally, to ensure that "undesirables" were identified and to assess important but subtle indicators of background and breeding such as speech, dress, deportment, and physical appearance, a personal interview was required, a final screening device usually conducted by the Director of Admissions or a trusted alumnus.

95.    The new policy permitted the rejection of scholastically brilliant students considered "undesirable," and it granted the director of admissions broad latitude to admit those of good background with weaker academic records.

96.     The key code word used was "character"– a quality thought to be frequently lacking among Jewish applicants, but present congenitally among affluent Protestants.

97.     By emphasizing the inherently subjective character of admissions decisions, Harvard's new system of selection left it free to adapt to changing circumstances by admitting—  and rejecting—  whomever it wished.

98.     These tools gave admissions officials the power to discriminate, ostensibly on the basis of "objective" evidence.  Any number of reasons could be invoked to deny an applicant. "Selective admissions deflected much criticism precisely because it singled out no single status as 'key.'"

99.     As a consequence, university leaders could deny the existence of any racial or religious quotas, while still managing to reduce Jewish enrollment to a much lower level, and thereafter hold it essentially constant during the decades that followed.

**C.     1930s to 1960s: A Continuation of Policies**

100.     In the 1930s, Harvard continued the discriminatory admissions policies instituted during the previous decade.

101.     Instrumental during this time period was Richard Gummere, who served as Harvard's Chairman of the Committee on Admission from 1934 to 1952.

102.     Gummere continued to use Harvard's opaque admissions system to limit the number of Jewish students enrolling at Harvard.

103.     The key was secrecy.  In 1922, when he was headmaster of William Penn Charter School in Philadelphia, Gummere had recommend that Harvard follow the approach he had employed at his own school: "I feel that Doctor Edsall [a Harvard

faculty member] has stated the case very correctly and intelligently, as far as the experiences of the Penn Charter School in the Jew problem are concerned. Such action was taken very definitely, and a very limited number of Jews is admitted; in fact, it is at present almost infinitesimal. We are particularly careful not to make any issue of the matter, and when people of that persuasion wish to be admitted, and we either have enough in the school, or do not feel that the applicant is satisfactory, we employ the same methods of keeping them out of the school as we would any unsatisfactory candidate of any denomination. As a matter of fact, I admitted only one Jew last fall, and plan to admit none this coming fall."

104.    Gummere continued the policies of the prior decade laid down by President Lowell, including the establishment of a fixed number of places in the freshman class and a clear statement to both applicants and the public that candidates would not be accepted on academic ability alone.

105.    Instead, a multiplicity of nonacademic criteria— alumni connections, athletic talent, geographical diversity, and vague qualities such as "character"and "leadership"—  played a pivotal role in determining admission.

106.    Similarly, Gummere reported that "increased emphasis is being put on the preliminary interviews." Rather than subjecting undesirable applicants, many of them Jewish, to a formal rejection, the committee preferred to discourage them—  politely but firmly—  from submitting a final application.

107.    For example, in 1936, Irving B. Rosenstein, a Jewish alumnus who had graduated first in his class at Harvard, contacted Dean Hanford about two young Jewish men who were applying for admission. Hanford took notes during his conversation but

did not pass on an endorsement.  Instead, he wrote directly to Gummere, stating that "I do not know either Goldberg or Rabinowitz, and I realize that we have quite enough applicants of this type." Nevertheless, Hanford continued, "I felt it my duty to pass along the information that Rosenstein had given me regarding the two boys."

108.    In another case, Jerome Greene, secretary to the Harvard Corporation, explained why a young Jewish man named S. A. Goldstein, who reportedly had high marks on his College Board exams, had been turned down.  Mr. Goldstein "came just under the 'weighted average,' which takes all pertinent factors into account." Harvard, he declared, had "no reason to suppose that he is not a creditable representative of his race, many members of which are admitted to Harvard each year." He closed his letter by assuring that "no personal discrimination against him was involved."

109.    During this time period, Harvard continued to accept mainly wealthy, Protestant applicants who could pay the tuition and meet minimal standards.  Harvard filled approximately 75 to 80 percent of the seats with individuals who could afford to pay the full tuition, and fewer than 13 percent of legacy applicants were rejected.

110.    In the late 1940s and early 1950s, following World War II, American public sentiment turned against anti-Semitism, and Harvard began to gradually reduce its discrimination against Jewish applicants.

111.    Harvard, however, retained the admissions policies that it had used to successfully cap Jewish enrollments in the past.

112.    In a 1952 report from the Harvard Committee on Admissions, the Dean of Admissions wrote that Harvard was "one of the few colleges with 'snob' appeal." Accordingly, it attracted the children of the "upper-upper" class throughout the country

who were "almost entirely paying guests." It was possible, he acknowledged, that "a third or half of this group, strictly on their merits in terms of SAT scores, character and personality, was not particularly desirable."But if Harvard rejected them, it "would lose most of the rest of the group, including a lot of able and desirable students."

113.    Similarly, allegations that Harvard was "dominated by Jews"could cause "students from upper-income, business backgrounds"to abandon Harvard for "colleges like Yale, Princeton, Dartmouth, Williams, etc."

114.    By the 1960s, Harvard was using a complex "docket system"of classifications to process each candidate.

115.    The docket system created 22 groups, ranging from the huge (Docket B, which covered eight Rocky Mountain states) to the very small (Docket P, limited to Boston Latin, and Docket Q, which covered the rest of metropolitan Boston).

116.    The docket system generated "targets"for each docket that proved strikingly close to the actual number of students admitted each year. Each docket was admitted at a different rate.

117.    For example, Docket D (covering the upper Midwest) had about a 25 percent acceptance rate.  By contrast, Docket M ("Select New England private schools)" and Docket L ("Exeter and Andover)" were admitted at a rate of 44 and 46 percent respectively, compared to just 20 percent for all applicants.

118.    The structure of this system ensured that competition would be almost entirely within rather than between dockets.

119.    The generous targets for some dockets were designed to insulate applicants from competition with other dockets while the restrained targets for others

were intended to guarantee that the number of students admitted would not upset Harvard's delicate "balance."

120.    At this time Harvard also used a second system of classification to rate each applicant individually along four dimensions: personal, academic, extracurricular, and athletic.

121.    The "personal" rating was critical.  According to Harvard's own statistical studies, the personal rating was a stronger predictor of which candidates would ultimately be admitted than the more objective academic rating.   A "4" rating ("generally acceptable") was all but fatal, with a rejection rate of 98 percent; a "1" was a virtual guarantee of admission, with a rejection rate of just 2.5 percent.

122.    Finally, at this time Harvard used a third major scheme to divide applicants into 12 categories.  This "typology," as Harvard called it, was an integral part of each student's file. Each candidate was assigned a code letter that was shorthand for the social type he was thought to embody.

123.    Under this typology, every candidate was placed in one of the following categories:

| 1 | S | First-rate scholar in Harvard departmental terms. |
|---|---|---|
| 2 | D | Candidate's primary strength is his academic strength, but it doesn't look strong enough to qualify as an S (above). |
| 3 | A | All-American – healthy, uncomplicated athletic strengths and style, perhaps some extracurricular participation, but not combined with top academic credentials. |
| 4 | W | Mr. School – significant extracurricular and perhaps (but not necessarily) athletic participation plus excellent academic record. |
| 5 | X | Cross-country style – steady man who plugs and plugs and plugs, won't quit when most others would.  Gets results largely through stamina and consistent effort. |
| 6 | P | PBH [Phillips Brooks House] style: in activities and personal concerns. |
| 7 | C | Creative in music, art, writing. |
| 8 | B | Boondocker – unsophisticated rural background. |
| 9 | T | Taconic – culturally depressed background, low income. |
| 10 | K | Krunch – main strength is athletic, prospective varsity athlete. |
| 11 | L | Lineage – candidate probably couldn't be admitted without the extra plus of being a Harvard son, a faculty son, or a local boy with ties to the university community. |
| 12 | O | Other – use when none of the above are applicable. |

124.   With only minor modifications, Harvard used this typology through at least 1988, which includes the period when Harvard submitted its description of the "Harvard Plan" to the Supreme Court in its *Bakke amicus* brief.

## V.    HARVARD HAS USED AND CONTINUES TO USE AN APPLICANT'S RACE AND ETHNCITY AS A FACTOR IN ADMISSION DECISIONS.

125.    Harvard has long expressly considered the race and ethnicity of applicants in making admissions decisions in ways that go far beyond its systematic discrimination against Jewish applicants.

126.    In 1926, Harvard's Chairman of Admissions, Henry Pennypacker, described how race would be considered under Harvard's new subjective admissions policies: "Race is a part of the record.  It is by no means the whole record and no man will be kept out on grounds of race; but those racial characteristics which make for race isolation will, if they are borne by the individual, be taken into consideration as a part of that individual's characteristics under the test of character, personality and promise.  That if there should result in fact any substantial change in the proportion of groups in the College following application of the test, this will be due, not to race discrimination or any quota system, but to the failure of particular individuals to possess as individuals those evidences of character, personality and promise which weighed with other evidences render them more fit than other individuals to receive all that Harvard has to offer.  Of course there will be criticisms.  It will be said that Harvard is discriminating on grounds of race. That will not be true."

127.    In the early 1960's, Harvard began actively seeking to increase the number of African-American students on its campus.  Notwithstanding this concerted effort, African-American enrollment stagnated until 1968.

128.    In 1968, Harvard altered its admissions policies and practices to admit more African Americans by taking into greater account the limitations of background and schooling that shaped the qualification of many African-American applicants.

129.    Under this new policy, an applicant who had "survived the hazards of poverty" and showed that he or she "is clearly intellectually thirsty" and "still has room for more growth" was given an admissions preference.

130.    In 1969, one year after this policy change, Harvard's African-American enrollment increased 76 percent over the prior year to 7 percent of the enrolled freshman class.  Although Harvard denied that it had instituted a quota, the enrollment rate consistently averaged 7 percent over the next several years.

131.    In 1969, a majority of the African-American applicants admitted to Harvard came from socioeconomically challenged backgrounds.  By 1973, however, this number had decreased dramatically, with 75 to 80 percent of the African Americans admitted to Harvard coming from backgrounds that did not include "the hazards of poverty."

132.    According to Dean Peterson, Harvard diminished its focus on applicants with disadvantaged backgrounds because African Americans from relatively privileged backgrounds allegedly made the transition to Harvard more easily than those from working class and poor backgrounds: "We have learned" that "we cannot accept the victims of social disaster, however deserving of promise they once might have been, or however romantically or emotionally an advocate (or a society) might plead for him."

133.    In 1978, Harvard submitted an *amicus* brief to the Supreme Court in *Regents of the University of California v. Bakke* that included a copy of the "Harvard College Admissions Program" as an Appendix.

134.    The "Harvard College Admissions Program" submitted to the Supreme Court in *Bakke* stated that "for the past 30 years the Committee on Admissions" has

"adopted … [t]he belief … that if scholarly excellence were the sole or even predominant criterion, Harvard College would lose a great deal of its vitality and intellectual excellence and that the quality of the educational experience offered to all students would suffer."

135.    The "Harvard College Admissions Program" submitted to the Supreme Court in *Bakke* further stated: "The belief that diversity adds an essential ingredient to the educational process has long been a tenet of Harvard College admissions.  Fifteen or twenty years ago, however, diversity meant students from California, New York, and Massachusetts; city dwellers and farm boys; violinists, painters and football players; biologists, historians and classicists; potential stockbrokers, academics and politicians. The result was that very few ethnic or racial minorities attended Harvard College.  In recent years Harvard College has expanded the concept of diversity to include students from disadvantaged economic, racial and ethnic groups.  Harvard College now recruits not only Californians or Louisianans but also blacks and Chicanos and other minority students.  Contemporary conditions in the United States mean that if Harvard College is to continue to offer a first-rate education to its students, minority representation in the undergraduate body cannot be ignored by the Committee on Admissions."

136.    The "Harvard College Admissions Program" submitted to the Supreme Court in *Bakke* further stated: "In practice, this new definition of diversity has meant that race has been a factor in some admission decisions.  When the Committee on Admissions reviews the large middle group of applicants who are 'admissible' and deemed capable of doing good work in their courses, the race of an applicant may tip the balance in his favor just as geographic origin or a life spent on a farm may tip the balance in other candidates'

cases. A farm boy from Idaho can bring something to Harvard College that a Bostonian cannot offer. Similarly, a black student can usually bring something that a white person cannot offer. The quality of the educational experience of all the students in Harvard College depends in part on these differences in the background and outlook that students bring with them."

137. The "Harvard College Admissions Program" submitted to the Supreme Court in *Bakke* further stated: "In Harvard College admissions the Committee has not set target-quotas for the number of blacks, or of musicians, football players, physicists or Californians to be admitted in a given year. At the same time the Committee is aware that if Harvard College is to provide a truly heterogeneous environment that reflects the rich diversity of the United States, it cannot be provided without some attention to numbers. It would not make sense, for example, to have 10 or 20 students out of 1,100 whose homes are west of the Mississippi. Comparably, 10 or 20 black students could not begin to bring to their classmates and to each other the variety of points of view, backgrounds and experiences of blacks in the United States. Their small numbers might also create a sense of isolation among the black students themselves and thus make it more difficult for them to develop and achieve their potential. Consequently, when making its decisions, the Committee on Admissions is aware that there is some relationship between numbers and achieving the benefits to be derived from a diverse student body, and between numbers and providing a reasonable environment for those students admitted. But that awareness does not mean that the Committee sets a minimum number of blacks or of people from west of the Mississippi who are to be admitted. It means only that in choosing among thousands of applicants who are not only

'admissible' academically but have other strong qualities, the Committee, with a number of criteria in mind, pays some attention to distribution among many types and categories of students."

138.    The "Harvard College Admissions Program"submitted to the Supreme Court in *Bakke* further stated: "The further refinements sometimes required help to illustrate the kind of significance attached to race.  The Admissions Committee, with only a few places left to fill, might find itself forced to choose between A, the child of a successful black physician in an academic community with promise of superior academic performance, and B, a black who grew up in an inner-city ghetto of semi-literate parents whose academic achievement was lower, but who had demonstrated energy and leadership, as well as an apparently abiding interest in black power.  If a good number of black students much like A, but few like B, had already been admitted, the Committee might prefer B, and vice versa.  If C, a white student with extraordinary artistic talent, were also seeking one of the remaining places, his unique quality might give him an edge over both A and B.  Thus, the critical criteria are often individual qualities or experience not dependent upon race but sometimes associated with it."

139.    In 2003, Harvard submitted an *amicus* brief to the Supreme Court in *Grutter v. Bollinger*.

140.    The *Grutter amicus* brief stated that Harvard "considers an academically qualified student's race or ethnicity as one among many factors in a carefully designed, competitive admissions process that views each applicant as an individual and weighs the capacity of each to contribute to the class as a whole."

141.    The *Grutter amicus* brief further stated that Harvard seeks "racial and ethnic diversity as a natural part of a long and expanding policy of inclusion" and that it "has been pursuing the idea of student diversity for a period that dates back to the nineteenth century." That includes the period when Harvard was discriminating against Jewish and other disfavored minority groups.

142.    The *Grutter amicus* brief further stated that a racial or ethnic admissions "quota" is "impermissible as an affront to the equal dignity of the excluded" and it defined a "quota" as a "policy that "exclude[s] someone altogether from a given position or opportunity on account of the individual's race."

143.    In 2012, Harvard submitted an *amicus* brief to the Supreme Court in *Fisher v. University of Texas at Austin*.

144.    The *Fisher amicus* brief stated that Harvard has "long used admissions policies similar to the Harvard Plan that Justice Powell approved in [*Bakke*] and the University of Michigan Law School plan upheld in *Grutter*."

145.    The *Fisher amicus* brief further stated that Harvard "consider[s] all aspects of an applicant's background and experience, including in some circumstances the applicant's racial or ethnic background."

146.    The *Fisher amicus* brief further stated that Harvard believes that "racial and ethnic diversity are a distinct kind of difference in background, and reliance on … race-neutral measures alone cannot substitute for individualized, holistic review that takes account of race and ethnicity."

147.     In other words, it is now Harvard's position that race or ethnicity itself—not other factors that may be associated with race or ethnicity— is a distinguishing characteristic that warrants consideration in the admissions process.

## VI.   HARVARD HAS A LONG HISTORY OF INTENTIONALLY DISCRIMINATING SPECIFICALLY AGAINST ASIAN AMERICANS.

148.     Harvard started considering Asian-American students a discrete subset of its undergraduate applicant pool in the early 1970s.

149.     At that juncture, Harvard took the position that Asian Americans students were not "under represented"on its campus and therefore were not in need of "affirmative action."Harvard nevertheless included Asian Americans in its affirmative-action compliance reports to the Federal government.

150.     Like Jewish applicants, Asian-American applicants tended to have superior academic records, and were well represented among the most successful students.

151.     Harvard came to the conclusion that Asian Americans were "over-represented"in its student body.

152.     According to Henry Rosovsky, Harvard's Dean of the Faculty of Arts and Sciences (and later Acting President), Asian-American students were "no doubt the most over-represented group in the university."

153.   In 1974, a group calling itself the Coalition of Asian Americans ("CAA") formed at Harvard.  For at least two years, Harvard refused to recognize the CAA as a minority student organization.

154.   In 1976, Harvard continued to refuse to recognize Asian Americans as a minority and barred those Asian Americans that had accepted admission to the college from participating in its Freshman Minority Orientation.

155.   By 1977, the CAA had become the Asian-American Association ("AAA"). The AAA demanded, among other things, that Harvard expand Asian-American recruitment and include Asian Americans within the college's "affirmative action" program.

156.   Between 1976 and 1978, the proportion of Asian Americans increased from 3.6 percent to 6.5 percent of the freshman class— a result of the successful mobilization of Asian-American students at Harvard. These events coincided with a massive increase in Asian Americans applying to Harvard for undergraduate admission.

157.   Despite these increases, Harvard held Asian Americans to a higher standard than other applicants.

158.   In 1983, Margaret Chin, a Harvard undergraduate who had worked in the college's admissions office, co-authored a report entitled "Admissions Impossible." Surveying data from 25 universities, the report found that while Asian-American applications to Harvard and other universities were soaring, enrollments were barely increasing.

159.   Although Harvard claimed that the lower admission rate for Asian-American applicants was attributable to weaker academic qualifications, the "Admissions Impossible" report found that, on average, Asian Americans were *more* qualified than other applicants and that Harvard had set an informal ceiling on Asian-American enrollment.

160.   In the wake of this report, Harvard abandoned the argument that Asian-American applicants had weaker qualifications.  Former Dean of Admissions Fred Jewett instead claimed, on behalf of Harvard, that "arguments over numbers ignore a whole range of personal qualities," and that Harvard's official policy favored "choosing people who bring talents underrepresented in the applicant pool."

161.   In 1987, a study found that Asian-American students admitted to Harvard had an average SAT score of 1467, whereas white students admitted to Harvard had an average SAT score of 1355—  a 112-point difference.

162.   In a 1987 *New York Times* article, Berkeley professor Ling-Chi Wang compared the way Asian Americans are considered in college admissions to the earlier treatment of Jews: "I think all of the elite universities in America suddenly realized they had what used to be called a 'Jewish problem' before World War II, and they began to look for ways of slowing down the admissions of Asians." Robert Lindsey,   *Colleges Accused of Bias to Stem Asians' Gains*, New York Times (Jan. 19, 1987).

163.   In 1988, Harvard rejected Ling-Chi Wang's claim of discrimination against Asian-American applicants just as it had rejected the "Admissions Impossible" study's findings of discrimination.  Dean of Admissions William Fitzsimmons—  who remains Dean of Admissions today—  acknowledged that "Asian Americans are slightly stronger than whites on academic criteria," but blamed the disparity in admissions on Asian Americans, as a group, being "slightly less strong on extracurricular criteria."

164.   In July 1988, the Office of Civil Rights ("OCR") of the U.S. Department of Education began investigating the treatment of Asian-American applicants at Harvard to determine whether Harvard was engaging in discrimination in violation of Title VI of the

Civil Rights Act. However, the investigation was strictly limited to the treatment of Asian-American applicants as compared to white applicants.

165.   The OCR investigation lasted more than two years. Under the pressure of the investigation, Harvard began to increase its enrollment of Asian Americans. By the end of the investigation, the percentage of Asian Americans admitted to Harvard increased from 10.8 percent in 1988 to 16.1 percent in 1991.

166.   OCR announced its findings in October 1990. Focusing on ten groups admitted from 1979 through 1988, it found that Asian Americans had been admitted at a significantly lower rate for each of the past seven years, even though they were "similarly qualified" to white applicants. OCR nevertheless blamed the differential on legacy preferences and found that the differential admission rates were not the product of racial or ethnic discrimination.

167.   The OCR report was roundly criticized. According to Harvard Law Professor Alan Dershowitz, for example, Harvard's rationale was just pretext for intentional discrimination: "Asian Americans clearly get a big whack—  not a tip—  in the direction against them. Harvard wants a student body that possesses a certain racial balance… . I think the report was sloppy. I have absolutely no faith in the Harvard system of admissions."

## VII.   HARVARD'S CURRENT DISCRIMINATORY ADMISSIONS PLAN

### A.   <u>Harvard's Stated Admissions Goals.</u>

168.   On its website, Harvard states as follows: "In our admissions process, we give careful, individual attention to each applicant. We seek to identify students who will

be the best educators of one another and their professors— individuals who will inspire those around them during their College years and beyond."

169.    The Harvard website further states that Harvard "asks [itself] many questions' about an applicant for admission, which generally fall under four categories: an applicant's "growth and potential," "interests and activities," "character and personality,' and "contribution to the Harvard community."

170.    The Harvard website further states that, in assessing an applicant's "growth and potential, the committee asks questions such as "Have you reached your maximum academic and personal potential' and "Do you have initiative?' and "What sort of human being are you now?"

171.    The Harvard website further states that, in assessing an applicant's "interests and activities,' the committee asks questions such as "Do you care deeply about anything— intellectual? Extracurricular? Personal?' and "What have you learned from your interests?' and "In terms of extracurricular, athletic, community, or family commitments, have you taken full advantage of opportunities?"

172.    The Harvard website further states that, in assessing "character and personality,' the committee asks questions such as "What choices have you made for yourself?' and "Are you a late bloomer?' and "What about your maturity, character, leadership, self-confidence, warmth of personality, sense of humor, energy, concern for others, and grace under pressure?"

173.    The Harvard website further states, in assessing an applicant's "contribution to the Harvard community,' the committee asks questions such as "Will you be able to stand up to the pressures and freedoms of College life?' and "Will you

contribute something to Harvard and to your classmates?"and "Would other students want to room with you, share a meal, be in a seminar together, be teammates, or collaborate in a closely knit extracurricular group?"

174.    The Harvard website further states that its admissions process "strives to be deliberate, meticulous and fair"while acknowledging that the process "permits extraordinary flexibility and the possibility of changing decisions virtually until the day the Admissions Committee mails them."

**B.    Harvard's Admissions Process.**

1.    The Application.

175.    During an admissions cycle, the Harvard Admissions Committee reviews each student's admissions materials.  Those materials include: (1) the Common Application or Universal College Application, including an essay, and the required parts of the Harvard Supplement; (2) the high school transcript, school report, and mid-year school report— all submitted by a student's guidance counselor; (3) standardized test scores— submitted by the College Board; (4) teacher and guidance counselor recommendations; (5) optional on-campus and/or off-campus interviewer evaluation; (6) optional personal statements (found on the Harvard Supplement) in addition to the required essays; and (7) optional music tapes, artwork slides, or samples of academic work.

176.    Harvard gathers information about the race and ethnicity of its applicants through numerous ways.

177.    An applicant filling out a Common Application has the option of disclosing his or her racial identity.

178.   The Common Application asks two questions to identify an applicant's race and ethnicity: (1) "Are you Hispanic/Latino?"and (2) "Regardless of your answer to the prior question, please indicate how you identify yourself. (Check one or more and describe your background.)  American Indian or Alaska Native (including all Original Peoples of the Americas); Asian (including Indian subcontinent and Philippines); Black or African American (including Africa and Caribbean); Native Hawaiian or Other Pacific Islander (Original People); or White (including Middle Eastern)."

179.   The Common Application requires applicants to identify their parents' first and last name, the parents' former last names, and their country of birth.

180.   Similarly, the Universal College Application gives the applicant the option of disclosing his or her racial identity.

181.   The Universal College Application asks two questions to identify an applicant's race and ethnicity: "Are you Hispanic or Latino?"and "How would you describe your racial background? (select one or more of the following categories): Asian ([if so, identify] country of family origin); Black or African American; American Indian or Alaska Native ([if so, identify where] enrolled [and] Tribal affiliation; Native Hawaiian or Other Pacific Islander; or White."

182.   The Universal College Application requires applicants to identify their parents' first and last names.

183.   The Universal College Application also requires applicants to identify, if it is not English, the "language spoken in your home."

184.   Harvard also encourages students to emphasize their race and ethnicity through their essays.  According to Monica Del Toro, a Harvard Admissions Officer, the

essay "is the most important part of the application." The biggest rule, she says, "is to stand out," and a good way "to truly stand out from the rest of the pack is to discuss your culture."

185.    Harvard accepts transfer students who have completed at least one continuous academic year in a full-time degree program at one college.

186.    Harvard evaluates applicants for transfer in the same purportedly "holistic" manner it evaluates all other applicants.  Harvard uses race or ethnicity as a factor in evaluating transfer applicants.

>    2.    <u>The Review Process.</u>

187.    Students are admitted through one of four lists: (1) early admissions; (2) regular admissions; (3) the waitlist; or (4) the "Z-list." A student accepted through the early admission process must accept Harvard's offer of admission.

188.    As the admissions materials are received at the admissions office, they are stamped, dated, sorted, and organized in a folder, called the "file," along with a scorecard, called the "reading sheet," which is used to evaluate the applicant's eligibility for admission.

189.    Admissions officers start by assessing each applicant in four areas (academics, extracurriculars, personal qualities, and athletics) on a scale of one (best) to six (worst).

190.    Those who pass this initial threshold move forward to a second and sometimes third reader for further appraisal; the rest form the first batch of rejections, their folders marked with notes such as "below the edge" or "case falls flat."

191.   Small teams of admissions officers, each responsible for one of the 25 or so geographic regions or "dockets" into which Harvard divides its applicants, then scrutinize the remaining applicants for as long as five days.

192.   After the docket reader has looked through and graded the file on the reading sheet, the folder is passed on to two more readers, who examine and evaluate all materials on separate reading sheets.  The information from the three reading sheets is compiled onto a final reading sheet.  Once this sheet has been prepared for all applicants in the docket, the admissions committee convenes to discuss the eligibility of all applicants from that docket.

193.   Between 5,000 and 7,000 applicants proceed to the last and most contentious stage, the full committee meeting, in which all 35 admissions officers debate and vote on who will make the final cut.  The committee's decisions are ultimately rendered by simple majority ballot.

194.   Typically, more students are voted in than space will permit.  So the final portion of the process is spent in "reruns," in which candidates who had won approval have their initial acceptances rescinded.

195.   After reruns, a final decision is made either to accept, reject, wait-list, or "Z-list" the applicant.

196.   Harvard considers race and/or ethnicity as a factor in whether to accept, reject, wait-list, or "Z-list" an applicant.

197.   Applicants who are waitlisted are reviewed again by Harvard admissions officials in May after the admissions office has received students' updated class grades, test scores, and achievements.

198.    Those select students placed on the "Z-list'àre admitted on the condition that they take a mandatory year off before enrolling in Harvard.  Harvard uses the Z-list to admit legacies and children of affluent families and elite schools who cannot gain admission through the ordinary course.

199.    Harvard does not reveal publicly any aspect of its deliberative or decisional admissions process other than the end result.

## VIII.    HARVARD CURRENTLY ENGAGES IN INTENTIONAL DISCRIMINATION AGAINST ASIAN-AMERICAN APPLICANTS.

200.    Harvard intentionally discriminates against Asian-American applicants. This discrimination is shown through both direct and circumstantial evidence, including statistical studies of Harvard's admissions decisions.  These studies confirm what Asian-American applicants and their parents already know: Harvard intentionally and artificially limits the number of Asian Americans to whom it will offer admission.

### A.    There Is Decisive Statistical Evidence That Harvard Discriminates Against Asian-American Applicants.

201.    Each year, Harvard publishes a significant amount of data concerning its application process.  Among other things, Harvard releases admitted student data and enrolled student data broken down by racial category.

202.    Harvard used to allow the public to examine admission rates by race as well.  More recently, however, Harvard began keeping these figures secret.  Harvard has never offered an explanation for this decision.

203.    By contrast, the prestigious University of California system routinely releases information about its applicant pool broken down by racial category, which allows the public to examine admission rates by race.

204.     Nonetheless, significant data regarding Harvard's applicant pool has been made publicly available.

205.     This statistical evidence establishes that Harvard is intentionally discriminating against Asian Americans by making it far more difficult for Asian Americans than for any other racial and ethnic group of students to gain admission to Harvard.

206.     Princeton professor Thomas J. Espenshade and his coauthor, Alexandra Radford, conducted an authoritative study of the role of race in elite American undergraduate admissions for their book *No Longer Separate, Not Yet Equal*, which was published in 2009.  Espenshade and Radford gathered exhaustive application data on a group of three elite public and four elite private colleges.

207.     Controlling for a wide variety of academic, demographic, and personal characteristics, Espenshade and Radford found that Asian-American students were dramatically less likely to be admitted than otherwise similar students who identified themselves as white or Caucasian.  In fact, Espenshade and Radford's analysis showed that the negative odds-ratio affecting Asian Americans relative to Whites was larger than the positive odds-ratio affecting African Americans relative to Whites.

208.     The Espenshade-Radford study also expressed the admissions penalty facing Asian Americans in terms of SAT-point equivalents.  The authors reported that Asian Americans needed SAT scores that were about 140 points higher than white students, all other quantifiable variables being equal, to get into elite schools.  Thus, if a white student needed a 1320 SAT score to be admitted to one of these schools, an Asian American needed a 1460 SAT score to be admitted.  That is a massive penalty given that

marginal differences in SAT scores are magnified among those students competing for admission to the most elite universities, as there is less room at the very top of the SAT scale to differentiate between applicants.

209.    Recent statistical evidence reveals that discrimination against Asian Americans at Harvard is even more severe than the Espenshade-Radford study found.

210.    In recent years, *The Harvard Crimson* has been surveying incoming freshmen.  In 2013, nearly 80% of the incoming class of 2017 responded to its survey. According to the survey, the average SAT of respondents was 2237 (on a 2400-scale), while the average SAT of individual ethnic groups varied widely: 2299 for East Asians and Indians, 2107 for African-Americans, and 2142 for Native Americans).  Given this reporting, the average SAT for non-Hispanic Whites is at or somewhat below the overall median.

211.    This class average (2237) corresponds to roughly the 99.5 percentile of the SAT, meaning that Harvard draws half of its class from students scoring in the top 1/2 of 1 percent of the SAT I distribution.  The "East Asian and Indian" average of 2299 corresponds to the 99.9 percentile of the SAT, meaning that Harvard draws about half of this ethnic group from the top 1/10 of 1 percent of the SAT I distribution.  That is a dramatically higher standard of academic performance.  Harvard requires much more of its Asian-American applicants than it requires of other races and ethnicities.

212.    Dr. Richard Sander, a professor of law at UCLA, and Medha Uppala, a graduate student in statistics at UCLA, recently co-authored a working paper titled *The Evolution of SES Diversity in the Applicant Pool of Highly Selective Universities, 1994-2012*.  In this working paper, Dr. Sander and Ms. Uppala examine data on several Ivy

League colleges that shed valuable light on the admissions practices at these schools. The paper examines the degree to which elite colleges, including Harvard, have expanded their access in recent years to students with low socioeconomic status. The primary data source is a widely used database from the College Board, which biannually compiles anonymized data on 100,000 SAT-takers nationwide. The paper reveals startling application patterns from the aggregated data that it reports, which, in conjunction with other data sources, make manifest Harvard's massive intentional discrimination against Asian Americans.

213. As an initial matter, the paper finds that Asian Americans are being admitted to these schools at a far lower rate than the rate at which they apply. The paper notes that for "three of the most selective Ivy League colleges," the average racial makeup of all domestic score senders between 2008 and 2012 is 27.3 percent Asian American, 11.3 percent African American, 12.5 percent Hispanic, 40.4 percent non-Hispanic White, and 8.5 percent other race or non-identified. Over this same time period, however, Asian Americans represented only 17-20 percent of the admitted students. No other racial or ethnic group at these schools is as underrepresented relative to its application numbers as are Asian Americans. Indeed, no other racial or ethnic group comes even remotely close to this level of underrepresentation.

214. Thus, if Harvard admitted randomly from its applicant pool, the number of Asian Americans in its entering freshman class would be far higher than it actually is.

215. These data alone provide strong evidence that Harvard is engaging in intentional discrimination against Asian-American applicants absent some factor that makes this gross disparity explainable on non-discriminatory grounds.

216.    Moreover, the paper's data shows that Asian-American applicants have, on average, stronger qualifications for admission than any other racial or ethnic group applying to top Ivy League schools.

217.    Ironically, then, the most *underrepresented* group of admitted students relative to the applicant pool is the most *overrepresented* racial or ethnic group among top academic performers.

218.    Among "three of the most selective Ivy League colleges," the paper's data shows that, during the 2008, 2010, and 2012 admissions cycles, Asian Americans, on average, constituted nearly 39 percent of all domestic SAT-takers who (a) had scores of 2100 or higher and (b) sent their scores to these schools.

219.    *The Harvard Crimson* survey, as does every other available public source, confirms that the vast majority of Harvard's students come from this pool of applicants (with SAT scores of 2100 or higher).

220.    Remarkably, students with higher test scores were even more likely to be Asian Americans.  In 2008, Asian Americans made up 46 percent of domestic Harvard score-senders with SAT scores above 2200 (a range from which Harvard draws more than half of its students).   In addition, Asian Americans made up an even higher percentage of the very top students; they accounted for 55 percent of domestic Harvard score-senders with SAT scores above 2300.  These patterns are very similar across all of the top Ivy League schools.  In 2008-12, for the three Ivy League schools analyzed by Dr. Sander and Ms. Uppala, Asian Americans made up 38.9 percent of all domestic score-senders with SAT scores above 2100; 45 percent of domestic score-senders with SAT scores above 2200; and over 51 percent of domestic score-senders with SAT scores

above 2300.  These data, in combination with other publicly available data, demonstrate that Asian Americans admitted to Harvard are vastly underrepresented—  by a factor of half or even two-thirds—  relative to the number of applications from Asian Americans that Harvard receives.

221.    There is no reason to doubt that Harvard is one of the three Ivy League colleges in Dr. Sander's and Ms. Uppala's analysis.  Harvard is among the most selective colleges in the Ivy League (if not the most selective).  But even if Harvard is not one of the colleges they examined, its patterns of Asian-American enrollment and selectivity closely match those of the "three of the most selective Ivy League colleges"in Dr. Sander's and Ms. Uppala's analysis such that there is no reason to believe their conclusions would not apply to Harvard.

222.    In all events, Harvard's data is highly consistent with *all* other Ivy League schools, which as Table A shows, inexplicably enroll Asian Americans in remarkably similar numbers year after year after year.

| Table A Ivy League Enrollment (Asian Americans) | | | | | | | |
|---|---|---|---|---|---|---|---|
| School | 2007 | 2008 | 2009 | 2010 | 2011 | 2012 | 2013 |
| Brown | 15% | 16% | 15% | 15% | 14% | 12% | 14% |
| Columbia | 17% | 17% | 16% | 16% | 16% | 16% | 18% |
| Cornell | 16% | 17% | 17% | 16% | 16% | 16% | 16% |
| Dartmouth | 14% | 14% | 15% | 15% | 14% | 14% | 14% |
| Harvard | 15% | 17% | 17% | 16% | 17% | 18% | 18% |
| Penn | 17% | 17% | 18% | 18% | 18% | 18% | 18% |
| Princeton | 14% | 15% | 16% | 17% | 18% | 19% | 17% |
| Yale | 14% | 14% | 15% | 15% | 15% | 16% | 16% |

223.    Various additional studies confirm that Harvard is intentionally discriminating against Asian-American applicants and that it is doing so in much the same manner as it discriminated against Jewish applicants decades ago.

224.    In 2012, Ron Unz, who holds an undergraduate physics degree from Harvard and studied theoretical physics at Stanford, conducted an extensive study of Ivy League admissions.  *See* Ron Unz, *The Myth of American Meritocracy*, American Spectator (Dec. 2012).  Mr. Unz found rampant discrimination against Asian Americans by Ivy League universities generally and Harvard specifically.

225.    Using data from the National Center for Educational Statistics, as well as other sources, Mr. Unz found that the "ethnic composition of Harvard's undergraduates … follows a highly intriguing pattern."In particular, he found that after seeing a steady increase in Asian-American admissions through the 1980s and into the 1990s, in 1993 "Asian numbers went into reverse, generally stagnating in the two decades that followed, with the official 2011 figure being 17.2 percent."

226.    Unz found "[e]ven more surprising … the sheer constancy of these percentages, with almost every year from 1995-2011 showing an Asian enrollment within a single point of the 16.5 percent average, despite high fluctuations in the numbers of applications and the inevitable uncertainty surrounding which students will accept admission." Unz highlighted that "this exactly replicates the historical pattern … in which Jewish enrollment rose very rapidly, leading to the imposition of an informal quota system, after which the numbers fell substantially, and thereafter remained roughly constant for decades."

227.    A report by the Consortium on Financing Higher Education, in the Harvard Class of 1995, also showed that Asian Americans are held to a higher standard than any other group of applicants. *See* Melissa Lee, *Report Discloses SATs, Admit Rate*, The Harvard Crimson (May 7, 1993).  Responding to this study, Dean Fitzsimmons stated that race is "only one factor in deciding whether a candidate is admitted," but that certain minority groups, particularly African Americans, are "highly sought after" and that, "[s]tatistically, one could make the argument that it's easier for certain minorities [to be admitted]."

228.    Dean Fitzsimmons added: "It's true that admission rates for Asian Americans and whites are lower than the admission rates for Hispanics and African American students and Native American students as well.  But it's more complicated than that. . . . The question we look at is how much more likely will white and Asian American students have access to the kind of preparation that will make one an outstanding college candidate here."

229.   No non-discriminatory factor justifies the gross disparity in Asian American admissions relative to their presence in Harvard's applicant pool.

230.   One non-discriminatory factor that theoretically could justify this gross disparity would be if a disproportionally high percentage of Asian-American students were clustered at the low end of the applicant pool with regard to academic qualifications as compared to other racial groups.  But as Dr. Sander's and Ms. Uppala's paper and other data show, the opposite is in fact true.  A disproportionally high percentage of Asian-American students are clustered at the high end of the applicant pool with regard to academic qualifications.

231.   Another non-discriminatory factor that theoretically could justify this gross disparity would be if a disproportionally high percentage of Asian-American students were lacking with regard to non-academic criteria as compared to other racial groups.

232.   But there is no data to support that theory.  *See, e.g.*, Esteban M. Aucejo, Hanming Fang, and Ken Spenner, "Does Affirmative Action Lead to Mismatch? A New Test and Evidence," 2 Quantitative Economics 303 (2011).  This study found no racial advantage for underrepresented minority applicants in levels of personal achievement.

233.   Studies also have shown that high-achieving Asian-American students are equally, if not more, qualified than other racial groups with regard to non-academic criteria.  At the University of California, Los Angeles (UCLA), over several years, undergraduate admissions readers assigned each applicant three types of scores: "academic achievement" (principally high school grades, AP courses, and standardized test scores); "life challenges" (mainly socioeconomic background); and "personal

achievement"(such as leadership, musical ability, and community service).  These three scores jointly determined virtually all admissions decisions.  *See* Peter Arcidiacono, Thomas Espenshade, Stacy Hawkins, and Richard Sander, *A Conversation on the Nature, Effects, and Future of Affirmative Action in Higher Education Admissions*, Pennsylvania Journal of Constitutional Law (Fall 2014).

234.    The data cover over 100,000 undergraduate applicants to UCLA over three years and show absolutely no correlation between race and "personal achievement." Rather, the data show that the only strong predictor of personal-achievement scores is academic achievement; applicants with high test scores and grades tended to have personal achievement scores that were about one standard deviation higher than applicants with low test scores and grades.

235.    There is no evidence that Asian Americans applying to UCLA have personal achievement credentials that Asian Americans applying to Harvard uniformly lack.  Rather, all available evidence points in the opposite direction.

236.    Moreover, notwithstanding Harvard's public relations emphasis on non-academic factors in reviewing applications, academic performance is the principal criteria for admission— except when it comes to minority groups that are either preferred or discriminated against based on their race and ethnicity.

237.    Academic analyses of dozens of application processes at colleges and law schools around the country demonstrate that selective schools give far more weight to academic achievement and preparation than to other types of accomplishment and activity.  *See* Richard Sander, *Why Strict Scrutiny Requires Transparency: The Practical*

*Effects of Bakke, Gratz, and Grutter* (2011). In general, academic factors alone explain about 80 percent of admissions decisions at selective schools.

238. The gross disparity between the percentage of Asian-American students in the applicant pool and those in the admitted pool therefore are not explainable on any grounds other than intentional discrimination on the basis of race.

**B.    Elite Schools That Use Race-Neutral Admissions Have Far Higher Asian-American Enrollment.**

239. Other elite colleges and universities do not consider race in their admissions process, and therefore serve as controls against which to measure Harvard's admission and enrollment figures. Those universities uniformly admit and enroll far higher percentages of Asian American students than Harvard.

240. For example, the California Institute of Technology (Caltech) is a private school that selects its students by strict academic standards and chooses not to consider race. Almost 40 percent of its undergraduates are Asian American.

241. Table B sets forth the Asian-American percentage of the total undergraduate enrollment at Caltech and Harvard:

| Table B<br>Asian-American Enrollment | | |
|---|---|---|
| | **Harvard** | **Caltech** |
| **1992** | 19.1% | 25.2% |
| **1993** | 20.6% | 26.9% |
| **1994** | 18.3% | 29.8% |
| **1995** | 18.4% | 29.1% |
| **1996** | 17.5% | 27.6% |
| **1997** | 17.4% | 27.4% |
| **1998** | 17.0% | 24.1% |
| **1999** | 17.2% | 24.3% |
| **2000** | 17.1% | 24.9% |
| **2001** | 16.4% | 24.5% |
| **2002** | 16.3% | 27.2% |
| **2003** | 16.2% | 31.1% |
| **2004** | 17.1% | 31.1% |
| **2005** | 17.6% | 33.0% |
| **2006** | 14.3% | 37.4% |
| **2007** | 15.4% | 38.1% |
| **2008** | 16.7% | 39.8% |
| **2009** | 17.0% | 39.9% |
| **2010** | 15.6% | 39.4% |
| **2011** | 17.2% | 38.8% |
| **2012** | 17.7% | 39.6% |
| **2013** | 18.0% | 42.5% |

242. The following graph represents the Asian-American enrollment trends between the two schools:



243.    The University of California system also does not use racial preferences, as they were banned via popular referendum in 1996.  Asian Americans currently make up 34.8 percent of UCLA's student body and 32.4 percent of the University of California at Berkley's student body.

244.    A similar phenomenon exists at elite high schools.  Those high schools that do not employ racial preferences have extraordinarily high percentages of Asian Americans.  For example, Hunter College High School in New York chooses students without giving preference to legacies, athletes, or underrepresented minorities.  This admissions system produced a student body that was 49 percent Asian American in 2013.

245.    Similarly, Thomas Jefferson High School for Science and Technology, a magnet school in Virginia that is consistently ranked one of the best high schools in the country, does not employ racial preferences.  Its 2014 entering fall class is 66 percent Asian American.

**C.    Statements By Admissions Staff At Harvard And Other Schools Provide Further Evidence That Harvard Discriminates Against Asian-American Applicants.**

246.    Harvard evaluators consistently rank Asian-American candidates below White candidates in "personal qualities." In comments written in applicants' files, Harvard admissions staff repeatedly have described Asian Americans as "being quiet/shy, science/math oriented, and hard workers."

247.    One Harvard official summed up the profile of a purportedly typical Asian applicant this way: "He's quiet and, of course, wants to be a doctor."

248.    Another Harvard official wrote that an applicant's "scores and application seem so typical of other Asian applications I've read: extraordinarily gifted in math with the opposite extreme in English."

249.    According to Hunter College High School's director of college counseling, admissions officers at elite universities often complain that Asian American applicants all look the same on paper.  "When Harvard calls us back and gives us a brief synopsis of why certain [Asian] kids didn't make it, they'll say, 'There were so many kids in the pool that looked just like this kid.'"

250.    Admissions officers at other top schools have expressed similar sentiments. For example, asked why Vanderbilt poured resources into recruiting Jewish students instead of Asian Americans, a former administrator said, "Asians are very good students, but they don't provide the kind of intellectual environment that Jewish students provide."

251.    Rod Bugarin, a former admissions officer at Wesleyan, Brown, and Columbia, stated: "The bar is different for every group.  Anyone who works in the

industry knows that." Without affirmative action, "our elite campuses will look like UCLA and Berkeley," and "[t]hat wouldn't be good for Asians or for anyone else."

### D.    College Counselors Acknowledge Discrimination Against Asian Americans At Elite Universities.

252.   College counselors and advisors recognize that discrimination against Asian Americans occurs at elite universities such as Harvard and thus tell Asian Americans to hide their identity, to emphasize personal characteristics that avoid Asian stereotypes, and, in many cases, to lower their expectations and apply elsewhere.

253.   For example, the Princeton Review, the leading guide to college admissions, gives specific recommendations for Asian-American students applying to elite schools such as Harvard on how to overcome these schools' anti-Asian-American bias.  Its recommendations are both honest and discouraging.

254.   According to the Princeton Review: "Asian Americans comprise an increasing proportion of college students nationwide.  Many Asian Americans have been extraordinarily successful academically, to the point where some colleges now worry that there are 'too many' Asian Americans on their campuses.  Being an Asian American can now actually be a distinct disadvantage in the admissions processes at some of the most selective schools in the country.  Increasingly, the standard for affirmative action isn't minority status, but under-represented minority status.   Since Asian American populations at many colleges exceed the proportion of Asian Americans to the population of the state or country as a whole, Asian Americans are a minority, but not an under-represented minority, at those colleges… . If you are an Asian American—  or even if you simply have an Asian or Asian-sounding surname—  you need to be careful about what you do and don't say in your application."

255.   According to the Princeton Review: "You need to avoid being an Asian Joe Bloggs.  Asian Joe Bloggs is an Asian American applicant with a very high math SAT score, a low or mediocre verbal SAT score, high math- or science-related SAT II scores, high math and science grades, few credits in the humanities, few extracurricular activities, an intended major in math or the sciences, and an ambition to be a doctor, an engineer, or a research scientist.  The more you sound like this person, the more likely admissions officers will be to treat you as part of the 'Asian invasion' and reject your application, or at the very least make you compete against other Asian applicants with similar characteristics, rather than against the applicant pool as a whole."

256.   Princeton Review further explains: "If you share traits with Asian Joe Bloggs you should probably pay careful attention to the following guidelines:

- If you're given an option, don't attach a photograph to your application and don't answer the optional question about your ethnic background.  This is especially important if you don't have an Asian-sounding surname.  (By the same token, if you do have an Asian-sounding surname but aren't Asian, do attach a photograph.)

- Work on your verbal SAT score, take some literature and history courses, and get involved in activities other than math club, chess club, and computer club.

- Do not write your application essay about the importance of your family or the positive/negative aspects of living in two cultures.  These are Asian Joe Bloggs topics, and they are incredibly popular.  Instead, write about something entirely unrelated to your ethnic background.

- Don't say you want to be a doctor, and don't say you want to major in math or the sciences.  You don't have to lie.  If you have lousy SAT verbal scores, saying you want to be an English major isn't going to help you, either. Just say you're undecided.  The point is to distance yourself as much as possible from the stereotype.

- These guidelines are less important if you are chiefly interested in less selective schools or if you are applying to schools where all the students take only math and science courses and dream of medical or

> research careers.  In fact, Asian Joe Bloggs's high math and science
> scores can be an advantage in applying to schools below the Ivy league
> level. Even there, though, the less you sound like the stereotype, the
> better your chances will be."

257.   Whole new industries have sprung up to help Asian Americans overcome discrimination and secure admission to elite universities, including Harvard.

258.   One organization called "Asian Advantage College Consulting" promises to help an "Asian-American student applying to elite colleges beat the Asian Quotas." Its strategy is, first, recognizing that "Asian students need to approach the admissions process in a completely different manner than the white or non-Asian applicant" and, second, developing a strategy to stand out from the many "Asian-American applicants with high grades and SAT/ACT scores, along with a seemingly impressive list of awards and achievements in science fairs, musical competitions and school-based activities like debate and the robotics club."

259.   Similarly, the Ivy League Coach, a college counseling practice, provides specific recommendations for Asian Americans: "The fact is, highly selective colleges seek a diverse incoming class and a diverse incoming class does not mean an all Asian class.  So Asian students do indeed compete against each other.  Does that mean that an Asian American student shouldn't check off 'Asian American' on their college application?  Not necessarily.  A student should check off the ethnicity that they're most comfortable with, the ethnicity or ethnicities that they most closely identify with.  But what the article on Asians and college admissions …  doesn't say is that college admissions counselors are going to suspect that Henry Chang is Asian whether or not Henry Chang checks the box.  But that doesn't mean Henry can't do something about differentiating himself from other Asian American applicants… .  Don't just be the math

Case 1:14-cv-14176   Document 1   Filed 11/17/14   Page 60 of 120

kid with perfect scores who competes in Mathletes.  Don't just play the violin.  Do
something that many of the Asian American kids in your class aren't doing… .  Whether
or not the following is [politically correct], it's also true: What you want to do is
distinguish yourself from any perceived stereotypes."

260.   The bias against Asian-American applicants discussed by these college
counselors exists at Harvard.  Many high school guidance counselors caution students
applying to Harvard not to list their race as Asian.

261.   According to one high school guidance counselor, Asian Americans face
difficulty because they cannot distinguish themselves within their community: "[e]very
single child has had music lessons.  Every single child succeeds well in math.  Every
single child has done community service in a hospital. Every child has done Chinese or
Korean studies on Saturday and is fluent in that language."

### E.   Asian-American Applicants And Their Families Know That They Are Being Discriminated Against By Elite Universities.

262.   Asian Americans are not blind to the discrimination employed by Harvard
and other elite colleges and universities.

263.   According to Princeton economist Uwe Reinhardt, "within the Asian
community, of which I'm a part, there's this feeling that, for you to get into Harvard or
Princeton, you've got to be better than everybody else."

264.   According to Kara Miller, a former Ivy League admissions officer, "Asian
kids know that when you look at the average SAT for the school, they need to add 50 or
100 to it.  If you're Asian, that's what you'll need to get in."

265.   For example, Iris Wang, a senior at Hunter College High School, one of the
best public high schools in America, scored a 1520 SAT score and had top grades.  Her

father is a chemist and her mother a postal worker.  She was rejected by Harvard, as well as numerous other schools.  According to Wang, "All the schools basically say, 'we don't discriminate.'  But I went to the Columbia session and they said they value a multicultural community.  If they want to be multicultural, there's only so many of one culture they can take."

266.   Daniel Golden, the Pulitzer Prize-winning reporter then of *The Wall Street Journal*, described Jamie Lee, who applied to Harvard, as well as six other elite private schools:  According to Mr. Golden, "Jamie Lee was a superb student.  Born in Hong Kong to an English father and Chinese mother, he grew up in London, where teachers marveled at his ability and his IQ was measured at 162, widely considered genius level.  When his family emigrated to Greenwich, Connecticut, in 2003, he quickly established himself as a top student at Greenwich High, a premier public school.  On his first tries, without a test-prep course, he scored the maximum on the PSAT, the SAT, and two of his three SAT II subject tests; on the third SAT II, writing, he missed by only 20 points, scoring 780 out of 800.  Nor was he merely a standardized-test machine; his problem solving displayed impressive originality. In 2005, Jamie won the Greenwich High award given to the senior who 'demonstrates creative ability and inventiveness in math, who may take the unusual approach to a problem and come up with an unexpected answer.'  His creativity also emerged in music (the high school string ensemble performed his composition 'Three Dances,' with Jamie on cello) and mechanical design (he built an ingenious wooden cabinet with doors that automatically opened and closed a mobile rack for storing compact discs).  'He likes to be opposition and play the devil's advocate,' said his junior-year Latin teacher, Camille Fusco.  'He's very independent in his thinking.  On

an essay question, he'd deliberately take the point of view I didn't want to hear. But he got away with it because he can take any view brilliantly.'"

267.   Despite this academic record, Harvard— as well as Princeton, Yale, Stanford, Columbia, Dartmouth, and MIT— denied Jamie Lee admission. Fusco said he "'was really shocked [Jamie] didn't get in'because he "'thought of him as a Harvard person.'"

268.   Jamie's English literature teacher, Brigid Barry, said she too was "'very, very surprised. There's no doubt he's an outstanding student,"'and that in eight years of teaching AP English, she had seen the Ivy League schools admit many weaker candidates.

269.   Marlyn McGrath Lewis, Harvard's director of admissions, told Jamie's father that Jamie "'was an excellent student but that a number of better musicians had applied.'"When asked later if Jamie was held to a higher standard because he was half Asian, Ms. Lewis declined to comment.

270.   One strategy that Asian-American students applying to Harvard use is to avoid identifying their race. Many Asian-American students are unwilling to state their race at all on college applications.

271.   For example, Lanya Olmstead was born in Florida to a mother who immigrated from Taiwan and an American father of Norwegian ancestry. Ethnically, she considers herself half Taiwanese and half Norwegian. But when applying to Harvard, Olmstead checked only one box for her race: white. According to Olmstead: "I didn't want to put 'Asian' down … because my mom told me there's discrimination against

Asians in the application process… . Not to really generalize, but a lot of Asians, they have perfect SATs, perfect GPAs, … so it's hard to let them all in."

272.   Said another student: "As someone who was applying with relatively strong scores, I didn't want to be grouped into that stereotype … I didn't want to be written off as one of the 1.4 billion Asians that were applying."

273.   Applicants who are part Asian American regularly attempt to conceal their Asian ancestry when applying to Harvard out of concern it would greatly reduce their chances of admission.

274.   For example, Harvard student Heather Pickerell, born in Hong Kong to a Taiwanese mother and American father, refused to check any race box on her application because "I figured it might help my chances of getting in."

275.   According to Lee Cheng, founder of the Asian American Legal Foundation, "Many Chinese-American children have internalized their anger and pain, confused about why they are treated differently from their non-Chinese friends.  Often they become ashamed of their ethnic heritage after concluding that their unfair denial is a form of punishment for doing something wrong."

276.   Another example is Henry Park.  According to Daniel Golden's reporting: "Henry Park ranked 14th out of 79 members of the class of 1998 at Groton School, a super competitive prep school in Groton, Massachusetts.  He got a perfect 800 on the math SAT for a combined score of 1560 out of 1600, placing him in the top one-quarter of 1 percent of college-bound students.  On the SAT II subject test, he scored another perfect 800 on the harder of the two math exams offered, along with 760 out of 800 in Latin and 740 in physics.  He played violin and competed on the cross-country team, and

a respected math journal published a paper he coauthored with two classmates. And as the son of hardworking, middle-class Korean immigrants who dreamed of a better life for their children and scrimped to pay Groton's tuition, Henry seemed to embody the up-by-his bootstraps American saga that is supposed to appeal to college admissions officers."

277.   Henry's guidance counselor at Groton nevertheless discouraged him from applying to the Ivy League, telling him "it was a long shot at best, and advised him to lower his expectations to second- and third-tier schools."

278.   Harvard denied Henry admission, as did Yale, Brown, and Columbia. At the same time, Ivy League universities admitted 34 of Henry's Groton classmates. According to Henry: "When the decisions came out, and all these people started getting in, I was a little upset. I feel I have to hold myself to a higher standard." Added his mother, Suki Park, "I was naïve. I thought college admissions had something to do with academics."

279.   Henry Park's mother described the harm caused to Henry and his family: "I have thought many, many times why Henry failed. It was just devastating. He just failed like a falling leaf…. Korean Americans have to do a lot better than Caucasians to get admitted, and it's probably the same for other Asians. It's very, very tough. Presently, yes, there is discrimination."

280.   When MIT's dean of admissions Marillee Jones was asked about Henry Park, who was rejected by Harvard, she said that "it's possible that Henry Park looked like a thousand other Korean kids with the exact same profile of grades and activities and temperament. My guess is that he just wasn't involved or interesting enough to surface to

the top." To Ms. Jones, it made sense for universities to admit other students over "yet another textureless math grind."

281.   The "model minority" stereotype of high-achieving Asian Americans does an even greater disservice to socioeconomically disadvantaged individuals by making it virtually impossible for disadvantaged Asian Americans to compete with disadvantaged students from other races who are held to a lower standard.

282.   For example, Kai Chan, a Princeton doctoral student in economics and the son of Chinese immigrants, describes the struggles he has endured: "Is it fair in the name of (skin-deep) diversity to hold back qualified students from admission to the Ivies because of their race?   After all, it is a fact that Asians need higher academic achievements than their peers to get admitted to the same school… .  The misguided approach of programs like affirmative action can be seen through my experience.  I am the son of poor, non-English speaking parents, neither of whom attended high school. They never read to me as a child.  They never attended my graduations.  I went to some terrible high schools.  (Altogether, I attended five high schools, one of which was known locally as 'last chance high.')  I worked practically full-time while attending high school and college. But I've never gotten the benefit of the doubt anytime in my life.   If anything, I've had to be better than my peers."

283.   Application statistics confirm that Asian Americans are aware of (and have responded to) the discrimination they suffer at Harvard.   As the Asian-American population of the United States has grown, so has its share of academically high-achieving students.  As Dr. Sander's paper shows, Asian Americans made up roughly 21 percent of all domestic SAT takers with scores above 1400 in the 1994, 1996, and 1998

admissions cycles.  In the 2008, 2010, and 2012 admissions cycles, Asian Americans made up roughly 33 percent of all domestic SAT takers with scores above 2100— an increase roughly proportionate to the growth of the Asian-American proportion of all SAT takers.

284.  Yet during this same period, as many elite colleges, including Harvard, increasingly discriminated against Asian Americans, the proportion of high-scoring Asian Americans sending their scores to these schools declined sharply.  As Dr. Sander and Ms. Uppala report, the proportion of Asian Americans with top SAT scores (i.e., above 1400 in 1994-98 and 2100 in 2008-12) who sent their scores to the most selective Ivy League schools fell from 39.7 percent in the mid-1990s to only 27.4 percent during the 2008, 2010, and 2012 cycles.  No comparable drop occurred for any other racial group.

285.  Asian Americans understand that they are not competing for admission to Harvard against the entire applicant pool.  In light of Harvard's discriminatory admissions policies, they are competing only against each other, and all other racial and ethnic groups are insulated from competing against high-achieving Asian Americans.

286.  Because Asian Americans congregate at the high end of Harvard's applicant pool, the competition is fierce.  This has deterred and continues to deter many qualified Asian Americans from applying to Harvard.  Harvard's discriminatory reach thus extends far beyond those highly qualified Asian Americans who decide to apply and whose applications are treated unfairly in the admissions process.

287.  This discrimination has reached and continues to reach every Asian American student who has shied away or will shy away from applying to Harvard out of

Case 1:14-cv-14176    Document 1    Filed 11/17/14    Page 67 of 120

the well-founded fear that he or she will not successfully make it out of the highly competitive Asian American admissions pool and gain admission to Harvard.

## IX.  HARVARD CURRENTLY ENGAGES IN RACIAL BALANCING.

288.    Not only does Harvard discriminate against Asian Americans, it racially balances its entering freshman class to ensure proportional representation of the various racial and ethnic groups present in Harvard's student body.

289.    Harvard's system of racial balancing is shown through both direct and circumstantial evidence, including statistical studies of Harvard's admissions decisions. This evidence confirms that Harvard is not using racial preference to pursue "critical mass" or any other diversity goal the Supreme Court has ever found permissible.

290.    As shown in Table C, the racial demographics of Harvard's admitted class have remained stable across all racial groups at least over the last 9 years.

| Table C  Harvard Admissions (Percentage of Admitted Students by Race/Ethnicity) | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| | 2014 | 2013 | 2012 | 2011 | 2010 | 2009 | 2008 | 2007 | 2006 |
| African American | 11.9% | 11.5% | 10.2% | 11.8% | 11.3% | 10.8% | 11.0% | 10.7% | 10.5% |
| Hispanic | 13.0% | 11.5% | 11.2% | 12.1% | 10.3% | 10.9% | 9.7% | 10.1% | 9.8% |
| Asian American | 19.7% | 19.9% | 20.7% | 17.8% | 18.2% | 17.6% | 18.5% | 19.6% | 17.7% |
| Native American | 1.9% | 2.2% | 1.7% | 1.9% | 2.7% | 1.3% | 1.3% | 1.5% | 1.4% |
| White and Other | 53.5% | 54.9% | 56.2% | 56.4% | 57.5% | 59.4% | 59.5% | 58.1% | 60.6% |

291.    As shown in Table D, the racial demographics of Harvard's enrolled first-year classes also have remained stable across all racial groups throughout the past decade.

| Table D Harvard Enrollment (Percentage of First Years by Race/Ethnicity) | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | **2013** | **2012** | **2011** | **2010** | **2009** | **2008** | **2007** | **2006** | **2005** | **2004** | **2003** |
| **Nonresident alien** | 11% | 11% | 12% | 10% | 10% | 10% | 10% | 9% | 9% | 9% | 8% |
| **Hispanic/Latino** | 10% | 9% | 10% | 9% | 9% | 7% | 8% | 8% | 7% | 9% | 8% |
| **American Indian or Alaska Native** | 0% | 0% | 0% | 0% | 1% | 1% | 1% | 1% | 1% | 1% | 1% |
| **Asian Americans** | 19% | 20% | 17% | 15% | 17% | 19% | 18% | 15% | 19% | 20% | 17% |
| **Black or African American** | 7% | 6% | 7% | 6% | 9% | 8% | 8% | 8% | 9% | 9% | 9% |
| **Native Hawaiian or Other Pacific Islander** | 0% | 0% | 0% | 0% | 0% | 0% | 0% | 0% | 0% | 0% | 0% |
| **White** | 43% | 45% | 45% | 44% | 40% | 41% | 42% | 44% | 47% | 47% | 50% |
| **Two or more races** | 7% | 6% | 6% | 6% | 0% | 0% | 0% | 0% | 0% | 0% | 0% |
| **Race and ethnicity unknown** | 3% | 3% | 3% | 11% | 14% | 15% | 13% | 15% | 8% | 5% | 7% |

292.    As shown in Table E, the racial demographics of Harvard's overall student body likewise have remained remarkably stable across all racial groups throughout the past decade.

| Table E<br>Harvard Enrollment (Percentage of Student Body) | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | 2013 | 2012 | 2011 | 2010 | 2009 | 2008 | 2007 | 2006 | 2005 | 2004 | 2003 |
| **Nonresident alien** | 11% | 11% | 11% | 10% | 10% | 10% | 9% | 10% | 8% | 8% | 7% |
| **Hispanic/Latino** | 9% | 9% | 9% | 8% | 8% | 7% | 7% | 7% | 7% | 8% | 7% |
| **American Indian or Alaska Native** | 0% | 0% | 0% | 0% | 1% | 1% | 1% | 1% | 1% | 1% | 1% |
| **Asian Americans** | 18% | 18% | 17% | 16% | 17% | 17% | 15% | 17% | 18% | 17% | 16% |
| **Black or African American** | 6% | 6% | 7% | 7% | 8% | 8% | 8% | 8% | 8% | 8% | 7% |
| **Native Hawaiian or Other Pacific Islander** | 0% | 0% | 0% | 0% | 0% | 0% | 0% | 0% | 0% | 0% | 0% |
| **White** | 45% | 45% | 45% | 44% | 42% | 45% | 46% | 45% | 49% | 49% | 49% |
| **Two or more races** | 6% | 5% | 5% | 3% | 0% | 0% | 0% | 0% | 0% | 0% | 0% |
| **Race and ethnicity unknown** | 4% | 5% | 6% | 12% | 14% | 14% | 14% | 14% | 8% | 9% | 12% |

293.    Table C, Table D, and Table E, both individually and collectively, demonstrate that Harvard is engaging in racial balancing as there can be no non-discriminatory reason justifying such remarkable stability in its overall student body across all racial groups over this multi-year period.

294.    Indeed, Harvard's admissions and enrollment data tends to demonstrate that Harvard is engaging in racial balancing to a statistically significant degree.

295.    The year-to-year changes in the racial composition of Harvard's admitted and enrolled freshman class also reflect racial balancing as shown by, among other things, how Harvard has managed its balance between African Americans and Hispanics, and how it has managed its balance between Asians and Non-Hispanic whites.

296.    Over the period between 1994 and 2008, African American enrollment has remained extraordinarily stable at Harvard, averaging 7.8 percent with a standard deviation (calculated by year over the 14-year period) of 0.3 percent.    Hispanic enrollment also remained quite stable, averaging 7.4 percent with a standard deviation of 0.4 percent.  This occurred despite the fact that throughout this period, the applicant pool of academically strong Hispanic students at Harvard and other elite Ivy League schools was substantially larger than the similar pool for African Americans, and the gap became larger over time.

297.    Yet Harvard and its peer Ivy League colleges have consistently admitted as many African Americans as Hispanics (if not more), even though this meant using substantially larger preferences for African Americans than for Hispanics.  In other words, Harvard has manipulated the size of racial preferences to ensure it maintained racial balance.

298.    Over the period between 2003 and 2012, the percentage of Asian Americans at Harvard wavered only slightly above and below approximately 17 percent.  As noted earlier, this is despite the fact that, by 2008, Asian Americans made up over 27 percent of Harvard's applicant pool, and approximately 46 percent of applicants with academic credentials in the range from which Harvard admits the overwhelming majority of students.  But during this same period, Harvard's "non-Hispanic white" representation is only slightly declining.

299.    Given Harvard's other racial balancing goals, it is obvious that if Harvard evaluated Asian Americans and non-Hispanic whites equally, non-Hispanic white admissions would drop significantly, possibly to the point where Asian-American

enrollment and non-Hispanic white enrollment would be roughly comparable. Although this would cause Harvard's overall level of racial diversity to increase, not decrease, Harvard nevertheless continues to use racial balancing to keep white enrollment more than twice as high as Asian-American enrollment.

300.    The minor year-to-year deviations in admissions and enrollment numbers demonstrate Harvard's commitment to maintaining racial stability over any four-year enrollment period. In other words, when enrollment of a particular racial or ethnic group exceeds or falls short of Harvard's intended goal, in the next one or two admissions cycles, Harvard admits fewer or more applicants of that racial or ethnic group in order to balance out the overall student body.

301.    For example, in 2005, 18 percent of Harvard's student body was Asian American, which was a 16-year high. In response, Harvard admitted an unusually low number of Asian Americans in the following admissions cycle (17.7 percent). That predictably resulted in an unusually low yield of Asian Americans enrolling at Harvard (15.0 percent). Indeed, both the 2006 admissions and enrollment figures for Asian Americans were at or near 10-year lows.

302.    Similarly, in 2012, 6 percent of Harvard's overall student body was African American, which was a 24-year low. In response, Harvard admitted an unusually high number of African Americans in the next two admissions cycle (11.5 percent and 11.9 percent, respectively), which were both record highs. That predictably resulted in an usually high yield of African Americans enrolling at Harvard in 2013, which maintained an overall enrollment figure in line with the 20-year average, and would be expected to result in a similar enrollment level of African Americans in 2014.

303.    No factor or criteria for admission— other than racial balancing— could explain these admissions patterns and the overall consistency of Harvard's admissions, enrollment, and overall student body figures across all racial groups.

304.    As the Unz study found, "ethnic enrolment levels which widely diverge from academic performance data or applications rates and which remain remarkably static over time provide obvious circumstantial evidence for at least a *de facto* quota system."

## X.   HARVARD HAS AVAILABLE RACE-NEUTRAL ALTERNATIVES THAT CAN ACHIEVE STUDENT-BODY DIVERSITY.

305.    Harvard has a host of race-neutral alternatives that can achieve student body diversity without the use of racial classifications, including but not limited to: (a) increased utilization of non-race-based preferences; (b) increased use of financial aid, scholarships, and recruitment to attract and enroll minority applicants; and (c) elimination of admissions policies and practices that operate to the disadvantage of minority applicants. Furthermore, eliminating racial preferences at Harvard will alleviate the substantial harm these discriminatory policies cause to those minority applicants who receive such admissions preference, the Harvard community, and society as a whole.

### A.   Harvard Can Achieve Student Body Diversity Without Using Race As A Factor In Admissions Decisions By Making Greater Use Of Non-Racial Preferences.

306.    Colleges and universities that have eliminated race-based admissions have maintained or increased their student body diversity by placing greater emphasis on socioeconomic factors, which often strongly correlate with an applicant's race but are not exclusively reserved for applicants of a particular race or ethnicity. Using socioeconomic

preferences thus increases racial diversity *and* achieves the broader diversity that Harvard claims to seek by opening the door of opportunity for poor students of all races.

307.    In a recent study of ten leading public universities that ended race-based preferences, researchers found that seven of these schools maintained or increased their enrollment of African-American and Hispanic students by adopting strategies that target socioeconomic inequality.  *See* Halley Potter, *Transitioning to Race-Neutral Admissions: An Overview of Experiences in States Where Affirmative Action Has Been Banned*, The Future of Affirmative Action (2014).

308.    For example, the University of Colorado has devised an admissions formula that gives a significant preference to students from socioeconomically disadvantaged backgrounds.  This refined formula takes into consideration numerous socioeconomic factors, including single-parent status, parents' education level, family income, native language, the number of dependents in the family, whether the applicant attended a rural high school, the percentage of students from the applicant's high school eligible for free or reduced-price lunch, the school-wide student-to-teacher ratio, and the size of the twelfth-grade class.

309.    Under this admissions program, the University of Colorado found not only that the socioeconomic diversity of its incoming class increased substantially, but that racial and ethnic diversity increased as well.  African-American and Hispanic acceptance rates to the University of Colorado increased from 56 percent under race-based admissions to 65 percent under class-based admissions.  *See* Matthew N. Gaertner, *Advancing College Access with Class-Based Affirmative Action*, The Future of Affirmative Action (2014).

310.    Recently, a national simulation was conducted to determine whether the use of socioeconomic preferences could achieve student body diversity without the use of racial preferences at elite universities. *See* Anthony P. Carnevale, Stephen J. Rose, Jeff Strohl, *Achieving Racial and Economic Diversity with Race-Blind Admissions Policy*, The Future of Affirmative Action (2014). The study simulated various admissions models at the top-rated 193 colleges and universities "because the dialogue about affirmative action often implies that it is access to these schools and the opportunities they provide in business, social and career advancement that truly matters." The study examined, among other things, the effect of substituting socioeconomic preference for race-based preferences at America's elite college and universities using test scores and high-school grades as measures of merit.

311.    The national simulation ultimately found that "it is possible to achieve both racial and economic diversity in selective colleges without using race per se as an admissions criterion" and, importantly, that it could be achieved consistent with the understanding "that affirmative action models ought to promote racial diversity as an educational benefit instead of promoting racial diversity for its own sake."

312.    Another study found that increased focus on parental education and wealth— as opposed to income— as a measure of socioeconomic status also can help achieve student body diversity without the use of racial preferences. *See* Dalton Conley, *The Why, What, and How of Class-Based Admissions Policy*, The Future of Affirmative Action (2014). The study found that "the most important factor in predicting individual academic success is the education of a parent" and the "economic factor" that mattered most was "parental net worth (that is, wealth) and not income." Indeed, "wealth

Case 1:14-cv-14176    Document 1    Filed 11/17/14    Page 75 of 120

conceptually captures the legacy of historical inequalities of opportunity better than aspects of class that cannot be literally transferred directly from one generation to the next by signing a check (or a deed or a will)." While African Americans make on the order of 60 to 70 percent of what whites make in income, the median African-American family wealth is just 10 percent of white family wealth.

313.    Affording a community-based preference is another means of achieving student body diversity by admitting more socioeconomically disadvantaged students.  *See* Sheryll Cashin, *Place not Race: A New Vision of Opportunity in America* (2014). African Americans and Hispanics are much more likely to live in neighborhoods with concentrated poverty than whites.  *See* John R. Logan, *Separate and Unequal: The Neighborhood Gap for Blacks, Hispanics, and Asians in Metropolitan America* (2011), Table 2.

314.    Universities have used this community-based homogeneity to promote racial and ethnic diversity through race-neutral means.  For example, Texas, California, and Florida have adopted "percent plans" that guarantee admission to state universities for top graduates (based on grades) from each high school in the state.  These percentage plans have been successful in promoting community, socioeconomic, and racial diversity.

315.    In addition to statewide percentage plans, a university can achieve student body diversity by granting a preference within their existing admissions framework utilizing other community-based metrics, such as an applicant's zip code.  *See* Danielle Allen, *Talent is Everywhere: Using Zip Codes and Merit to Enhance Diversity*, The Future of Affirmative Action (2014).

316.    Studies show that students admitted based on socioeconomic as opposed to racial criteria regularly outperform all other admitted students.  These students drop out at lower rates, graduate in shorter time periods, and receive better grades.

317.    The Espenshade-Radford study found that selective private institutions use racial preferences that are two to three times as large as their socioeconomic preferences.

318.    This failure to give weight to socioeconomic preferences is exemplified by Harvard, particularly given the lack of socioeconomic diversity in the student body as compared to racial diversity.

319.    Measured in terms of those students receiving federal Pell Grants, which are awarded to students coming from low-income families, Harvard lags far behind other schools. The percentage of students at Harvard who receive Pell Grants has ranged in recent years from 11 percent to 19 percent.  In comparison, universities that employ race-neutral admissions had far greater numbers of Pell Grant recipients, including UCLA (35 percent), UC Berkeley (33 percent), and the University of Florida (30 percent). *2014 National Universities Rankings – Social Mobility*, Washington Monthly (2014).

320.    According to a survey of the 2014 freshman class that *The Harvard Crimson* conducted, 14 percent reported annual family income above $500,000 and another 15 percent came from families making more than $250,000 per year.  In contrast, only 20 percent reported incomes less than $65,000.  Taking these statistics at face value, they show that a high school student from the top "1 percent" of the income distribution is approximately 35 times more likely to attend Harvard than one from the bottom 50 percent.

321.    According to former Harvard president Lawrence Summers, only ten percent of students at selective colleges and universities, including Harvard, come from the bottom half of the income scale.  *See* Harvard University President Lawrence H. Summers Commencement Address (2004).

322.    By contrast, Harvard places far greater weight on an applicant's race—regardless of his or her socioeconomic status or the community of origin.

323.    By increasing the weight given to an applicant's socioeconomic status and/or community of origin, Harvard could achieve student body diversity without resorting to the disfavored tool of racial preferences.

**B.**    **Harvard Can Achieve Student Body Diversity Without Using Race As A Factor In Admissions Decisions By Making Greater Use Of Financial Aid And Scholarships To Attract Minority Candidates.**

324.    Relying on socioeconomic instead of racial preferences at the admissions stage is the first step.  But Harvard needs to ensure that those underprivileged minorities that benefit from socioeconomic preferences are in a position to accept the offer of admission and enroll at Harvard.  To that end, Harvard can achieve student body diversity by increasing its use of financial aid and scholarships.

325.    Colleges and universities that have eliminated racial preferences have maintained or increased student body diversity by offering more financial aid to socioeconomically disadvantaged students.  For example, the University of California system, which does not use race-based preferences, covers system-wide tuition for students from families with incomes below $80,000.  The University of California devotes one-third of tuition revenue to financial aid.

326.    Harvard, in contrast, only covers the tuition of students from families with incomes below $65,000.  This is a trivial use of Harvard's vast economic resources.

Harvard's $36.4 billion endowment is the largest in the nation; it exceeds the gross domestic product of over 100 nations. Yet it costs students $43,938 per year in tuition alone, and $58,607 overall per year, to attend Harvard.

327.    Harvard has the economic resources to increase the coverage of full tuition far beyond the current $65,000 threshold. Doing so would make it possible for underprivileged minorities, especially those in the lower middle class and those who may have slightly higher income levels but less wealth, admitted to Harvard through the increased use of socioeconomic preferences (as opposed to affluent minorities currently admitted due to racial preferences) to be in a position to accept an offer of admission and enroll at Harvard.

   **C.     Harvard Can Achieve Student Body Diversity Without Using Race As A Factor In Admissions Decisions Through Increased Recruitment And Other Steps Designed To Encourage More Qualified Minority Students To Apply For Admission.**

328.    Harvard can achieve student body diversity by bringing more highly qualified, socioeconomically disadvantaged minorities into its applicant pool.

329.    Across the country, there are tens of thousands of high-achieving, socioeconomically disadvantaged minorities who fail to apply to selective schools, including Harvard, at which they would likely be admitted and at which they would enroll if offered sufficient financial aid.

330.    One study found that between 25,000 and 35,000 socioeconomically disadvantaged high school seniors obtain an SAT or ACT in the 90th percentile or higher and have a GPA of A- or better. Nearly 6 percent of this group is African American and nearly 8 percent is Hispanic. A great many of these socioeconomically disadvantaged students "undermatch" by applying to and enrolling at colleges and universities less

selective than the ones to which they could have been admitted.  *See* Caroline Hoxby,

Christopher Avery, *The Missing "One-Offs": The Hidden Supply of High-Achieving,*

*Low-Income Students*, Brookings Papers on Economic Activity (Spring 2013).

331.    The "undermatch" problem is a serious issue in the Ivy League.  Among

the highly selective Ivy League schools studied by Dr. Sander and Ms. Uppala, the

applicant pools of these schools included, on average, less than 20 percent of the

socioeconomically disadvantaged students in the country with SAT scores above 2100.

The rate is even lower for high-scoring, socioeconomically disadvantaged Asian

Americans, in which less than 18 percent of such students are, on average, in the

applicant pools of the highly selective Ivy League schools.

332.    Universities with race-neutral admissions have increased their student

body diversity by improving recruitment of these socioeconomically disadvantaged, high-

achieving minority students.  For example, after race-based admissions were eliminated

in Texas, the University of Texas at Austin increased its student body diversity by

implementing numerous programs designed to recruit students from underrepresented

regions and high schools, including "Longhorn Game Weekends," which focus on

specific geographic regions, and "Longhorn for a Day," which reaches out to students in

underrepresented high schools.

333.    Furthermore, a study found that simply mailing a well-designed, targeted

brochure to high-achieving, socioeconomically disadvantaged students could be

instrumental in causing them to apply to selective colleges and universities.  *See* Sheryll

Cashin, *Place not Race: A New Vision of Opportunity in America* 49 (2014).

334.     Universities also have achieved student body diversity by aggressively recruiting high-achieving community college students, who are more likely to be African American or Hispanic.  For example, in 1997, after California banned racial preferences, the University of California substantially increased its recruitment and enrollment of community college students.  As a result of the University of California's efforts, by 2012, about 29 percent of new students enrolling in the University of California system were transfers from community colleges.  *See Preparing California for Its Future: Enhancing Community College Student Transfer to the University of California* (2014).

335.     Harvard does little to recruit high-achieving, socioeconomically disadvantaged minority students or high-achieving community college students.

336.     Harvard focuses its recruitment in parts of the country with small numbers of socioeconomically disadvantaged achievers and neglects regions with a significant number of such students.  For example, Harvard recruits heavily in New England, which has only 3.5 percent of low-income high achievers nationwide, yet neglects Midwest and Rocky Mountain states, which produce 21.2 percent of these students.

337.     This failure to recruit socioeconomically disadvantaged students is reflected in Harvard's applicant pool.  Although there are more than 10,000 high schools in the country that have students with the credentials to be admitted to Harvard, only a small fraction of these schools have students who ultimately apply to Harvard.

338.     In addition, community college transfer students are a miniscule percentage of Harvard's student body.  Each year, Harvard accepts fewer than three students from community colleges across the country.

339.    Harvard officials have flatly conceded that they make little effort to recruit students from community colleges and other nontraditional educational backgrounds. *See* Arianna Markel, *Harvard Lags in Community College Recruitment*, The Harvard Crimson (Dec. 12, 2007).

340.    Harvard could achieve its student body diversity without the use of racial preferences by improving its recruitment of socioeconomically disadvantaged, high-achieving minorities, and community college students.

D.    **Harvard Can Achieve Student Body Diversity Without Using Race As A Factor In Admissions Decisions Through The Elimination Of Admissions Policies And Practices That Harm Minority Applicants.**

341.    Harvard employs a series of admissions practices and policies that make it more difficult for socioeconomically disadvantaged minorities to gain admission. Eliminating these practices and policies would allow Harvard to achieve student body diversity without using racial preferences.

342.    Harvard grants an admissions preference to "legacy" applicants.

343.    The acceptance rate for legacy applicants to Harvard is about 30 percent, which is roughly five times the rate at which all other applicants are admitted to Harvard.

344.    At most universities throughout the country, including Harvard, alumni children are less likely to be socioeconomically disadvantaged or racial minorities than the rest of the student body.  Thus, colleges and universities, like Harvard, that grant admissions preferences to legacies give a competitive advantage to mainly white, wealthy applicants, while undermining the chances for admission of socioeconomically disadvantaged and minority applicants.  *See* John Brittain and Eric L. Bloom, *Admitting the Truth: The Effect of Affirmative Action, Legacy Preferences, and the Meritocratic*

*Ideal on Students of Color in College Admissions*, Affirmative Action for the Rich (2010).

345.    As a consequence, eliminating legacy preferences in conjunction with other race-neutral admissions policies can achieve student body diversity.    Several universities, including Texas A&M University, the University of Georgia, and the University of California, have increased their student body diversity by ending their practice of favoring legacies in the admissions process in conjunction with the elimination of racial preferences.

346.    Furthermore, one study found that eliminating legacy preferences in combination with other race-neutral admissions criteria could more than double African-American and Hispanic enrollment and more than triple the enrollment of socioeconomically disadvantaged students.    *See* Anthony P. Carnevale, Stephen J. Rose, Jeff Strohl, *Achieving Racial and Economic Diversity with Race-Blind Admissions Policy*, The Future of Affirmative Action (2014).

347.    Harvard can achieve student body diversity without using racial preferences by eliminating legacy admissions preferences in conjunction with other race-neutral measures.

348.    Eliminating legacy preferences is a workable race-neutral strategy. Research finds that the existence of legacy preferences does not increase alumni donations to an institution.    *See* Chad Coffman, Tara O'Neil, and Brian Starr, *An Empirical Analysis of Legacy Preferences on Alumni Giving at Top Universities*, Affirmative Action for the Rich (2010).

349.    Harvard also grants admissions preferences to non-legacy students whose parents make significant donations to Harvard, notwithstanding its $36.4 billion endowment.

350.    For example, a wealthy New Jersey real estate developer who did not attend Harvard pledged $2.5 million to Harvard in 1998.  That same year, his son applied to Harvard, even though he did not take demanding classes in high school and his test scores were below Ivy League standards.  His son's high school advisors were "surprised when he applied to Harvard—  and dismayed when he was admitted."

351.    As one of his advisors explained, "[t]here was no way anybody in the administrative office of the school thought he would on the merits get into Harvard.  His GPA did not warrant it, his SAT scores did not warrant it.  We thought for sure, there was no way this was going to happen.  Then, lo and behold, [he] was accepted.  It was a little bit disappointing because there were at the time other kids we thought should really get in on the merits, and they did not."

352.    Minority students are far less likely to be children of wealthy donors.  Thus, colleges and universities, like Harvard, that grant admissions preferences to children of wealthy donors give a competitive advantage to mainly white applicants while undermining the chances for admission of minority applicants.

353.    Harvard's preferences for legacies and children of wealthy donors often operate in tandem to the detriment of minority applicants.  For example, one applicant, who was a fifth-generation Harvard legacy, scored 1440 on her SATs, which is below Harvard's average, and ranked in the second quartile her high school class.  Before she applied to Harvard, her father donated $1 million to the university and pledged an

additional $5 million in future years.  Shortly after her junior year, the applicant's father arranged for her to meet the Dean of Admissions, William Fitzsimmons.  She was admitted to Harvard the following year.

354.    When asked whether it was fair that she was admitted, she stated that legacy preferences are a "valid thing for a college to do.  Any college has to be careful about the students it lets in from a social perspective.  If you let in too many of any one group, it can affect social cohesiveness.  At one time, Harvard had too many Asian American students… .  It's important to Harvard to have people who know what it means to work hard, make good friends, and go out at night.  A lot more alumni children are well-rounded kids, probably because they come from more stable families."

355.    Harvard can achieve student body diversity without using racial preferences by eliminating admissions preferences for children of wealthy donors, both legacies and non-legacies, in conjunction with other race-neutral measures.

356.    Harvard also operates a unique form of admissions known as the "Z-list."  The Z-list is an admissions process under which Harvard admits a select group of students on the condition that they take a year off before enrolling in Harvard.

357.    Harvard admits between 20 and 50 students through the Z-list every year.

358.    Harvard principally uses the Z-list to admit legacies and children of affluent families who cannot gain admission through the ordinary course and who can afford to take a year off before enrolling in college.

359.    In 2010, *The Harvard Crimson* interviewed 28 students admitted under the Z-list.  Of these students, 18 were children of Harvard alumni and all but four received no financial aid from Harvard.

360.    Students admitted through the Z-list are overwhelmingly wealthy and white, and have a worse academic record than the rest of the student body.

361.    For example, in 2006, Harvard used the Z-list to admit the granddaughter of a Harvard alumnus who had endowed a professorship in computer science, even though she had inferior admissions credentials.  By contrast, one of her high school classmates, Jennifer Soo Hoo, who is of Chinese descent, had comparatively outstanding credentials: she was a Cum Laude Society member, an Advance Placement Scholar, a National Merit Scholar, an all-conference center back on the soccer team, and scored a 34 out of 36 on the ACT.  Jennifer was rejected by every Ivy League school to which she applied.

362.    Harvard can achieve student body diversity without using racial preferences by eliminating Z-list admissions in conjunction with other race-neutral measures.

363.    Finally, Harvard admits applicants through an early admission program. Early admissions is a practice in which schools allow students to submit their application in the early Fall if they apply to only one school or promise to attend the school if admitted.

364.    Early admission programs, like Harvard's program, usually benefit wealthier and better-informed students because these students have the resources to submit their application early and do not need to hold out for the prospect of financial aid.  *See* Justin Pope, *Harvard Drops Early Admissions, Saying They Favor Wealthier Students Over Minorities, Poor*, Associated Press (Sept. 12, 2006).

365.    By contrast, socioeconomically disadvantaged students and minorities face a disadvantage under early admission programs because they often receive inadequate information and counseling and lack the economic resources to commit to a school so early in the process.

366.    Because early admissions undermine the chances of socioeconomically disadvantaged and minority applicants, in 2006, Harvard terminated this program. According to Harvard's then-President Derek Bok, "We think this will produce a fairer process because the existing process has been shown to advantage those who are already advantaged."

367.    Similarly, Dean of Admissions William Fitzsimmons supported ending early admissions because "[t]here are lots of very talented students out there from poor and moderate-income backgrounds who have been discouraged by this whole hocus-pocus of early admissions."

368.    Harvard reinstated early admissions in 2011.  The reintroduction of early admissions has again hurt the ability of socioeconomically disadvantaged and minority students to apply and be admitted to Harvard.

369.    Harvard can achieve student body diversity without using racial preferences by eliminating its early admission program in conjunction with other race-neutral measures.

**E.    Achieving Student Body Diversity Through Race-Neutral Means Eliminates The Heavy Cost Imposed By The Use Of Racial Preferences.**

370.    Any assessment of the feasibility of race-neutral alternatives must also take into account the heavy costs of *not* employing them.  The costs of continuing to use

racial preferences, when workable race-neutral alternatives exist, are high from both a legal and a practical perspective.

371.    As a legal matter, "[d]istinctions between citizens solely because of their ancestry are by their very nature odious to a free people, and therefore are contrary to our traditions and hence constitutionally suspect." *Fisher v. University of Texas at Austin*, 133 S. Ct. 2411, 2418 (2013) (citations and quotations omitted).

372.    As a result, the Fourteenth Amendment, and therefore Title VI, "forbids the use even of narrowly drawn racial classifications except as a last resort." *Croson*, 488 U.S. at 519 (Kennedy, J., concurring in part and concurring in the judgment).

373.    Harvard's practice of labeling all applicants according to broad racial categories illustrates why such classifications are pernicious and always create the "danger that a racial classification is merely the product of unthinking stereotypes or a form of racial politics." *Croson*, 488 U.S. at 493.

374.    These racial categories lump together students in categories such as "African American" or "Hispanic" or "Asian American," even though they come from vastly different cultures, experiences, and backgrounds.

375.    For example, Harvard's category of "Asian Americans" comprises roughly 60 percent of the world's population, including individuals of Chinese, Japanese, Korean, Vietnamese, Cambodian, Hmong, and Indian descent.

376.    While many Asian Americans have been in the United States for generations, others are recent immigrants or children of immigrants. Some Asian Americans came to the United States to escape communism, authoritarianism, war, and

poverty, while others simply sought out greater opportunities. Some Asian Americans come from highly educated families, but many others do not.

377. Asian Americans also have a wide range of religious beliefs, including Christianity, Islam, Buddhism, Judaism, Hinduism and many others. Some come from cultures that aggressively promote education, while many others come from cultures that take a less demanding approach.

378. Thus, for example, Indian-American students are different from Japanese-American students; Vietnamese-American students are different from Chinese-American students; and students from Mainland China, Hong Kong, and Taiwan all have unique perspectives and cultural experiences.

379. Given this diversity, it is lamentable for Harvard to lump all Asian Americans together in the admissions process. Yet this categorization is the inevitable byproduct of using group-based racial classifications instead of employing race-neutral alternatives that are able to account for the vast differences among applicants.

380. Racial classifications also have a stigmatizing effect on the supposed beneficiaries of these policies. Irrespective of whether an individual African-American or Hispanic applicant is admitted to Harvard because of a racial preference, so long as racial preferences exist, it will often be assumed that race is the reason for the applicant's admission to the school. This stigma can have a devastating effect on the psyche of impressionable students.

381. For example, according to one African American who attended an elite liberal arts college, upon arriving at school, "I was immediately stereotyped and put into a box because I was African-American. And that made it harder to perform. . . . There

was a general feeling that all blacks on campus were there either because they were athletes or they came through a minority-recruitment program and might not really belong there." Shaken by the experience, the student dropped out after his freshman year.

382.    Harvard can eliminate the harmful effects these unfair stereotypes cause by using race-neutral alternatives.

383.    Finally, the "mismatch effect" of racial preferences far too frequently put the supposed beneficiaries of race-based admissions policies in a position where they cannot succeed academically in order to fulfill the university's social-engineering vision.

384.    This "mismatch" effect happens when a school employs such a large admissions preference that the student is academically damaged in a variety of ways by being placed in an academic environment where most of the student's peers have substantially stronger levels of academic preparation.

385.    For example, a student who would flourish at a less elite school instead finds himself or herself at Harvard, where the professors are not teaching at a pace designed for him or her.   Instead, they are teaching to the "middle" of the class, introducing terms and concepts at a speed that is unnerving even to the best-prepared student.

386.    The student who is underprepared relative to others in that class falls behind from the start and becomes increasingly lost as the professor and classmates race ahead.   The student's grades on his or her first exams or papers put him or her at the bottom of the class.   Worse, the experience may well induce panic and self-doubt,

making learning even more difficult, thus creating a vicious cycle that only exacerbates the problem.

387.    The "mismatch effect" has been documented in dozens of studies.    *See, e.g.*, Peter Arcidiacono, Esteban M. Aucejo, and Ken Spenner, *What Happens After Enrollment? An Analysis of the Time Path of Racial Differences in GPA and Major Choice* (2011); U.S. Commission on Civil Rights, *Encouraging Minority Students to Pursue Science, Technology, Engineering and Math Careers, Briefing Report* (October 2010); Richard Sander and Roger Bolus, *Do Credential Gaps in College Reduce the Number of Minority Science Graduates?* (2009); Richard Sander, *A Systemic Analysis of Affirmative Action in American Law Schools*, 57 Stan. L. Rev. 367 (2004); Stephen Cole and Elinor Barber, *Increasing Faculty Diversity* (2003); Rogers Elliott, A. Christopher Strenta, Russell Adair, Michael Matier and Jannah Scott, *The Role of Ethnicity in Choosing and Leaving Science in Highly Selective Institutions,* 37 Research in Higher Education 681 (1996).

388.    As this research demonstrates, African-American college freshmen are more likely to aspire to science or engineering careers than are white freshmen, but mismatch causes African Americans to abandon these fields at twice the rate of whites.

389.    As a consequence, African Americans who start college interested in pursuing a doctorate and an academic career are twice as likely to be derailed from this path if they attend a school where they are mismatched.

390.    Furthermore, about half of African-American college students rank in the bottom 20 percent of their classes.

391.    Mismatch also creates social problems on campus.  The academic research shows that interracial friendships are more likely to form among students with relatively similar levels of academic preparation; thus, African Americans and Hispanics are more socially integrated on campuses where they are less academically mismatched.

392.    Harvard has and is continuing to experience the problems associated with the "mismatch" effect as documented in major, unrebutted empirical studies that either included Harvard or included studies of close peer institutions.

393.    "Academic mismatch" has been documented at Harvard by sociologists Stephen Cole and Elinor Barber.  *See* Stephen Cole and Elinor Barber, *Increasing Faculty Diversity* (2003).  Cole and Barber undertook their research in large part at the urging of Harvard President Neil Rudenstein, and the Council of Ivy League Presidents financially supported their work.  The purpose of the study was to understand why there were so few underrepresented minorities— particularly African Americans— in the academic pipeline leading to university faculty positions.

394.    Cole and Barber found that a prime cause of the constrained pipeline was academic mismatch.  Promising African American and Hispanic students who were interested in academic careers sought to go to selective colleges.  Through the operation of racial preferences, these students often found themselves being admitted and courted by super-elite colleges, and often unwittingly found themselves at schools where their level of academic preparation was far below the median.  In these environments, the students survived but did not flourish.  Their grades tended to be well below the median, and in large numbers they soured on the prospect of pursuing a career in academia.  The study found that otherwise similar students who went to less elite schools— such as

flagship state universities— performed better and retained their interest in academic careers at much higher rates.

395.     Harvard also has a documented "mismatch" problem in the sciences.  In 2004, two psychologists at the University of Virginia published a peer-reviewed study of minority attrition in the sciences.  *See* Frederick L. Smyth and John J. McArdle, *Ethnic and Gender Differences in Science Graduation at Selective Colleges With Implications For Admission Policy and College Choice*, Research In Higher Education, Vol. 45, No. 4 (June 2003).  These scholars gained permission to use the College and Beyond dataset assembled by the Mellon Foundation.  This dataset, which included comprehensive data from several Ivy League colleges (Columbia, Princeton, and Yale) as well as approximately twenty less selective schools, served as the basis for the well-known study of affirmative action, The Shape of the River (1998).

396.     Smyth and McArdle examined what factors affected the success of students in science, technology, engineering, and math ("STEM") fields of study.  They found that a critical factor was a student's academic preparation relative to her peers.  Moreover, they found that this effect was essentially identical for white, African American, and Hispanic students.  In all cases, students who attended a school where their level of academic preparation was substantially lower than those of their peers were far more likely to drop out of STEM fields as compared to identical students who attended schools where their relative peer position was higher.  The effect was so large that Smyth and McArdle advised high school counselors to take potential mismatch into account in helping students understand the pros and cons of attending "reach" schools.

397.    In 1996, a group of researchers at Dartmouth University, led by Dartmouth psychologist Rogers Elliott, published a peer-reviewed study that examined rates of STEM attrition at four Ivy League colleges. *See* Rogers Elliott, A. Christopher Strenta, Russell Adair, Michael Matier and Jannah Scott, *The Role of Ethnicity in Choosing and Leaving Science in Highly Selective Institutions*, 37 Research in Higher Education 681 (1996).  They found that although African-American freshmen aspired to STEM majors at roughly the same rate as other students, only about 10 percent of African-American aspirants actually achieved bachelor degrees in STEM fields.  Many of these students switched to majors in the humanities and social sciences; some failed to graduate at all.  The study found that a principal reason for the high attrition rate of African Americans was their relative position among a group of peers who generally had much higher levels of academic preparation, and could thus compete effectively in the demanding, sequential, rigorously graded STEM curricula.

398.    Harvard has disregarded the "mismatch effect" that is harming the many African American and Hispanic students who are admitted to and enroll at Harvard because of its large admissions preference.

399.    Harvard can eliminate this harmful mismatch and allow students to excel at schools for which they are most prepared by eliminating the use of racial preferences and employing race-neutral alternatives that bring high-performing, socioeconomically disadvantaged minorities into the applicant pool.

## XI.    GOVERNING LAW

400.    Title VI of the Civil Rights Act of 1964 provides: "No person in the United States shall, on the ground of race, color, or national origin, be excluded from

participation in, be denied the benefits of, or be subjected to discrimination under any

program or activity receiving Federal financial assistance." 42 U.S.C. § 2000d.

401.    Under Title VI, "the term 'program or activity' and the term 'program'

mean all of the operations …   of a college, university, or other postsecondary institution,

or a public system of higher education …   any part of which is extended Federal financial

assistance." 42 U.S.C. § 2000d-4a.

402.    An institution that accepts federal funds violates Title VI when it engages

in racial or ethnic discrimination that violates the Equal Protection Clause of the

Fourteenth Amendment of the United States Constitution. *See Gratz v. Bollinger*, 539

U.S. 244, 257 n.23 (2003) ("We have explained that discrimination that violates the

Equal Protection Clause of the Fourteenth Amendment committed by an institution that

accepts federal funds also constitutes a violation of Title VI.)' (citing  *Alexander v.

Sandoval,* 532 U.S. 275, 281 (2001)).

403.    The Fourteenth Amendment provides, in relevant part, that no person shall

be denied "the equal protection of the laws." The "central mandate" of equal protection

is "racial neutrality" by the government or institution subject to the Fourteenth

Amendment. *Miller v. Johnson*, 515 U.S. 900, 904 (1995). "Whenever the government

treats any person unequally because of his or her race, that person has suffered an injury

that falls squarely within the language and spirit of the Constitution's guarantee of equal

protection." *Adarand Constructors, Inc. v. Pena*  , 515 U.S. 200, 229-30 (2000).

404.    "Distinctions between citizens solely because of their ancestry are by their

very nature odious to a free people, and therefore are contrary to our traditions and hence

constitutionally suspect."  *Fisher*, 133 S. Ct. at 2419 (citations and quotations omitted).

Thus, "any official action that treats a person differently on account of race or ethnic origin is inherently suspect." *Id.* (citation and quotations omitted). In other words, "because racial classifications so seldom provide a relevant basis for disparate treatment, the Equal Protection Clause demands that racial classifications be subjected to the most rigid scrutiny." *Id.* (citations and quotations omitted).

405. "[A]ll racial classifications … must be analyzed by a reviewing court under strict scrutiny." *Adarand*, 515 U.S. at 227. "Strict scrutiny is a searching examination, and it is the government [or institution subject to the Fourteenth Amendment through Title VI] that bears the burden to prove that the reasons for any racial classification are clearly identified and unquestionably legitimate." *Fisher*, 133 S. Ct. at 2419 (citations and quotations omitted). Strict scrutiny thus requires a "detailed judicial inquiry to ensure that the personal right to equal protection of the laws has not been infringed."*Adarand*, 515 U.S. at 227.

406. In particular, strict scrutiny requires a "detailed examination, both as to ends and to means." *Adarand*, 515 U.S. at 236. When those governmental or other institutions subject to the Fourteenth Amendment directly or through Title VI implement policies and practices that "touch upon an individual's race or ethnic background, he is entitled to a judicial determination that the burden he is asked to bear on that basis is precisely tailored to serve a compelling governmental interest." *Fisher*, 133 S. Ct. at 2417 (citations and quotations omitted).

407. Racial "classifications are constitutional only if they are narrowly tailored to further compelling governmental interests."*Grutter*, 539 U.S. at 326.

408.    "Strict scrutiny requires the university to demonstrate with clarity that its purpose or interest is both constitutionally permissible and substantial, and that its use of the classification is necessary to accomplish that purpose." *Fisher*, 133 S. Ct. at 2418.

409.    To meet strict scrutiny, the end must be "compelling"— not merely legitimate or important.  To be narrowly tailored, "the means chosen" must "fit" the unmet compelling interest "so closely that there is little or no possibility that the motive for the classification was illegitimate racial prejudice or stereotype." *Croson*, 488 U.S. at 493 (citations and quotations omitted).  In other words, "racial classifications, however, compelling their goals, are potentially so dangerous that they may be employed no more broadly than the interest demands." *Grutter*, 539 U.S. at 342.

410.    "To survive strict scrutiny," moreover, the institution "must do more than assert a compelling state interest—  it must demonstrate that its law is necessary to serve the asserted interest." *Burson v. Freeman*, 504 U.S. 191, 199 (1992).  The institution must establish the necessity of using race by a "strong basis in evidence" because "the mere recitation" of a compelling interest is "not an automatic shield which protects against any inquiry" into the justification for race-based action."  *Croson*, 488 U.S. at 495, 500.

411.    Strict scrutiny "forbids the use even of narrowly drawn racial classifications except as a last resort."  *Id*. at 519 (Kennedy, J., concurring in part and concurring in the judgment).

412.    An institution's use of race or ethnicity that is in any way motivated by "prejudice or stereotype" against a particular group violates the Fourteenth Amendment and therefore violates Title VI.  *Croson*, 488 U.S. at 493.  "[T]he Equal Protection Clause

Case 1:14-cv-14176   Document 1   Filed 11/17/14   Page 97 of 120

prohibits a State [or institution subject to the Fourteenth Amendment through Title VI] from taking any action based on crude, inaccurate racial stereotypes." *Batson v. Kentucky,* 476 U.S. 79, 104 (1986); *see also Thomas v. Eastman Kodak Co.*, 183 F.3d 38, 42 (1st Cir. 1999) ("Title VII's prohibition against 'disparate treatment because of race' extends both to employer acts based on conscious racial animus and to employer decisions that are based on stereotyped thinking or other forms of less conscious bias.").

413.    In addition to direct evidence of discrimination, racial "prejudice or stereotype" may be proven through circumstantial evidence.    *See Village of Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252, 266 (1977) ("Determining whether invidious discriminatory purpose was a motivating factor demands a sensitive inquiry into such circumstantial and direct evidence of intent as may be available.").    The Supreme Court has identified five, non-exhaustive "subjects of proper inquiry in determining whether racially discriminatory intent existed" based on circumstantial evidence. *Id.* at 268.

414.    First, the Court looks to whether the policy, notwithstanding its purportedly neutral rationale, "bears more heavily on one race than another. . . . Sometimes a clear pattern, unexplainable on grounds other than race, emerges from the effect of the state action even when the governing legislation appears neutral on its face." *Id.* at 266.

415.    Second, the Court looks to "the historical background" of the policy, "particularly if it reveals a series of official actions taken for invidious purposes." *Id.* at 267.

416.    Third, "[t]he specific sequence of events leading up the challenged decision also may shed some light on the decisionmaker's purposes."  *Id*.

417.    Fourth, "[d]epartures from the normal procedural sequence also might afford evidence that improper purposes are playing a role.  Substantive departures too may be relevant, particularly if the factors usually considered important by the decisionmaker strongly favor a decision contrary to the one reached."*Id*  .

418.    Fifth, and last, "[t]he legislative or administrative history may be highly relevant, especially where there are contemporary statements by members of the decisionmaking body, minutes of its meetings, or reports."*Id*  . at 268.

419.    Even if not motivated by prejudice or stereotype, a racial classification violates the Fourteenth Amendment and therefore violates Title VI if it is a quota.  In the educational setting, then, "universities cannot establish quotas for members of certain racial groups or put members of those groups on separate admissions tracks.  Nor can universities insulate applicants who belong to certain racial or ethnic groups from the competition for admission."*Grutter*  , 539 U.S. at 334 (citation omitted).

420.    Moreover, a university's policy violates the Fourteenth Amendment and therefore violates Title VI if it amounts to "racial balancing, which is patently unconstitutional."  *Id*. at 329.  Racial balancing is a program designed "to assure within [the school's] student body some specified percentage of a particular group merely because of its race or ethnic origin."  *Id*. (citations and quotation omitted).  "[P]roportional representation"is never a constitutional "rationale for programs of preferential treatment."*Id*  . at 343.

421.    The only interest in using racial preferences in higher education that the Supreme Court has accepted as "compelling"is the interest "in obtaining the educational benefits that flow from a diverse student body." *Grutter*, 539 U.S. at 343.  Redressing past discrimination does "not serve as a compelling interest, because a university's broad mission of education is incompatible with making the judicial, legislative, or administrative findings of constitutional or statutory violations necessary to justify remedial racial classification." *Fisher*, 133 S. Ct. at 2417 (citations and quotations omitted).

422.    The interest in student body diversity the Supreme Court has found compelling "is not an interest in simply ethnic diversity, in which a specified percentage of the student body is in effect guaranteed to be members of selected ethnic groups, with the remaining percentage an undifferentiated aggregation of students." *Fisher*, 133 S. Ct. at 2418 (citation and quotations omitted).  "[C]ritical mass is defined by reference to the educational benefits that diversity is designed to produce." *Grutter*, 539 U.S. at 330.

423.    Even in the pursuit of critical mass, the Supreme Court has permitted race to be used only as a "plus"factor in admissions decisions.  *Id*. at 333.  "[I]t remains at all times the University's obligation to demonstrate, and the Judiciary's obligations to determine, that admissions processes 'ensure that each applicant is evaluated as an individual and not in a way that makes an applicant's race or ethnicity the defining feature of his or her application.'" *Fisher*, 133 S. Ct. at 2418 (quoting *Grutter*, 539 U.S. at 337).  Thus, even if "the University has established that its goal of diversity is consistent with strict scrutiny, …  there must still be a further judicial determination that the admissions process meets strict scrutiny in its implementation.  The University must

prove that the means chosen by the University to attain diversity are narrowly tailored to that goal." *Id* . at 2419-20.

424.    "Narrow tailoring also requires that the reviewing court verify that it is 'necessary' for a university to use race to achieve the educational benefits of diversity. This involves a careful judicial inquiry into whether a university could achieve sufficient diversity without using racial classifications."  *Id*. at 2420 (internal citation omitted). Accordingly, strict scrutiny uniformly "require[s] a court to examine with care, and not defer to, a university's 'serious, good faith consideration of workable race-neutral alternatives.'"*Id.* (quoting *Grutter*  , 539 U.S. at 339- 340).

425.    "Consideration by the university is of course necessary, but it is not sufficient to satisfy strict scrutiny: The reviewing court must ultimately be satisfied that no workable race-neutral alternatives would produce the educational benefits of diversity. If a nonracial approach …  could promote the substantial interest about as well and at tolerable administrative expense, then the university may not consider race."  *Id*. (citations and quotations omitted).

426.    As a consequence, "strict scrutiny imposes on the university the ultimate burden of demonstrating, *before turning to racial classifications*, that available, workable race-neutral alternatives do not suffice."  *Id*. (emphasis added).

## XII.    CLAIM FOR RELIEF

427.    Harvard's use of racial preferences in undergraduate admissions violates Title VI of the Civil Rights Act of 1964.  Plaintiff should be granted relief on that claim for a host of reasons.  First, Harvard is intentionally discriminating against Asian-American applicants.  Second, Harvard is engaging in racial balancing.  Third, Harvard's

use of racial preference is not narrowly tailored because Harvard is not pursuing the critical-mass interest found permissible in *Grutter*.    Fourth, Harvard's use of racial preferences is not narrowly tailored because Harvard is not using this disfavored tool merely to fill the "few places'left in its incoming class contrary to the "Harvard College Admissions Program"submitted to the Supreme Court in *Bakke*.    Fifth, Harvard is not fully utilizing a number of race-neutral alternatives that can achieve student body diversity.    Finally, whether or not Harvard is found to be acting permissibly under Supreme Court precedent, the Supreme Court should overrule any decision holding that the Fourteenth Amendment and therefore Title VI ever permits the use of racial preferences to achieve "diversity."

## COUNT I

### Violation of 42 U.S.C. § 2000d *et seq.*
### (Intentional Discrimination Against Asian Americans)

428.    Plaintiff incorporates the allegations and averments contained in paragraphs 1-427 as if fully set forth herein.

429.    Harvard, a recipient of federal funds, intentionally discriminated against certain of Plaintiff's members on the basis of their race, color, or ethnicity in violation of Title VI of the Civil Rights Act of 1964, 42 U.S.C. § 2000d *et seq*., by employing an undergraduate admissions policy that intentionally discriminates against Asian-American applicants on the basis of race or ethnicity.

430.    Harvard has conceded that, because it uses a racial criterion in its admissions process and receives federal funds, it is subject to potential liability for violations of Title VI if it is found to have discriminated on the basis of race in its admissions process.    *See* Harvard *Grutter* Amicus Brief at 2 ("Because Title VI of the

Civil Rights Act of 1964 forbids institutions that receive federal funds from engaging in racial 'discrimination,' the ability of private colleges and universities to exercise their institutional competence could well be dramatically compromised by any new limits . . . on state university admissions criteria or procedures."); Harvard *Fisher* Amicus Brief 3 (stating that "Title VI of the Civil Rights Act of 1964 forbids institutions that receive federal funds from engaging in racial 'discrimination,' and so Harvard's "efforts to attain diverse student bodies could be compromised" if limits were placed on the university's admissions procedures).

431.    Title VI is privately enforceable.

432.    Discrimination that violates the Equal Protection Clause of the Fourteenth Amendment of the United States Constitution constitutes a violation of Title VI when committed by an institution that accepts federal funds.

433.     An institution's use of race or ethnicity that is in any way motivated by prejudice or stereotype against a particular group violates the Fourteenth Amendment and therefore violates Title VI.

434.    Harvard has intentionally discriminated against Asian-American applicants for admission on the basis of race or ethnicity based on prejudicial and stereotypical assumptions about their qualifications.

435.    Harvard officials have made prejudicial and stereotypical statements about Asian-American applicants for admission.  Among other things, Harvard officials have made racially stereotypical statements assuming that, as a group, Asian Americans all have same academic interests, experiences, and personal attributes and that Asian Americans, as a group, lack certain qualities that Harvard values.

436.    Harvard's admissions system has a disproportionately negative effect on Asian-American applicants for admission that is not explainable on grounds other than intentional discrimination on the basis of race or ethnicity.  As the statistical evidence demonstrates, Asian Americans are underrepresented at Harvard in relation to their share of the applicant pool and are massively underrepresented in relation to the share of the highly qualified portion of Harvard's applicant pool.  Asian Americans represent roughly 46 percent of the highly qualified portion of Harvard's applicant pool, yet they represent only about 17 percent of those admitted and/or enrolled at Harvard over a multi-year period.

437.    Harvard has a long and unfortunate history of intentional discrimination on the basis of race or ethnicity, including a history of intentional discrimination against Asian Americans.  The Harvard Plan itself is a product of admissions policies created to advance an invidious purpose.  Harvard has a history of using the rubric of "holistic" admissions in general, and the Harvard Plan in particular, to limit the admission of Jewish applicants and other minority groups.  Indeed, Harvard is using the same pretextual excuses to justify its disparate treatment of Asian Americans that it used to deny that it was discriminating against Jewish applicants in the past.  In short, Harvard's intentional discrimination against Asian-American applicants exhibits the same pattern as its previous discrimination against Jewish applicants.

438.    Harvard's departure from its normal procedures, including its abrupt decision to no longer make public the application figures grouped by racial category, demonstrates that steps were taken for the improper purpose of engaging in intentional discrimination on the basis of race or ethnicity.

439.    Harvard's substantive decision to abandon or place considerably less reliance, when it comes to Asian Americans, on the academic factors it usually considers important for purposes of granting or denying admission demonstrates that Harvard is engaging in intentional discrimination on the basis of race or ethnicity.

440.    Plaintiff's members have been and will continue to be injured because Harvard has and will continue to deny them the opportunity to compete for admission to Harvard on equal footing with other applicants on the basis of race or ethnicity due to its intentionally discriminatory admissions policies and procedures.

441.    Plaintiff is entitled to a declaratory judgment, pursuant to 28 U.S.C. § 2201, and a permanent injunction because there is no plain, adequate, or speedy remedy at law to prevent Harvard from continuing to use admissions policies and procedures that discriminate on the basis of race or ethnicity in violation of Title VI of the Civil Rights Act of 1964 and because the harm Plaintiff's members will otherwise continue to suffer is irreparable.

442.    Plaintiff is entitled to attorneys' fees and costs pursuant to 42 U.S.C. § 1988.

## COUNT II

### Violation of 42 U.S.C. § 2000d *et seq.*
### (Racial Balancing)

443.    Plaintiff incorporates the allegations and averments contained in paragraphs 1-442 as if fully set forth herein.

444.    Harvard, a recipient of federal funds, intentionally discriminated against certain of Plaintiff's members on the basis of their race, color, or ethnicity in violation of Title VI of the Civil Rights Act of 1964, 42 U.S.C. § 2000d *et seq.*, by employing an

undergraduate admissions policy that balances the class according to its racial or ethnic composition.

445.    Harvard has conceded that, because it uses a racial criterion in its admissions process and receives federal funds, it is subject to potential liability for violations of Title VI if it is found to have discriminated on the basis of race in its admissions process.  *See* Harvard *Grutter* Amicus Brief at 2 ("Because Title VI of the Civil Rights Act of 1964 forbids institutions that receive federal funds from engaging in racial 'discrimination,' the ability of private colleges and universities to exercise their institutional competence could well be dramatically compromised by any new limits . . . on state university admissions criteria or procedures."); Harvard  *Fisher* Amicus Brief 3 (stating that "Title VI of the Civil Rights Act of 1964 forbids institutions that receive federal funds from engaging in racial 'discrimination,' and so Harvard's "efforts to attain diverse student bodies could be compromised" if limits were placed on the university's admissions procedures).

446.    Title VI is privately enforceable.

447.    Discrimination that violates the Equal Protection Clause of the Fourteenth Amendment of the United States Constitution constitutes a violation of Title VI when committed by an institution that accepts federal funds.

448.    A university that uses its admissions system to pursue quotas or proportional representation of racial or ethnic groups either in the entering class or in the overall student body violates the Fourteenth Amendment and therefore violates Title VI.

449.    The remarkable stability of Harvard's admissions figures across racial and ethnic groups— especially in the overall student body— demonstrates that Harvard is seeking proportional representation and therefore is engaged in racial balancing.

450.    There is no non-discriminatory reason that could justify admissions figures this stable across all racial groups over a period of several years given the unique characteristics of each applicant for admission.  If Harvard were truly treating each applicant for admission as an individual, as it professes to do, "[o]ne would expect the percentage of specified minority enrollees produced by such a such a system to vacillate widely from year to year, reflecting changes in each year's applicant pool." Alan Dershowitz and Laura Hanft, *Affirmative Action and the Harvard College Diversity-Discretion Model: Paradigm or Pretext*, 1 Cardozo L. Rev. 379, 382 n.13 (1979).  That is not happening.

451.    The pursuit of "critical mass" could never justify admissions figures this stable given the balancing that occurs between African-American and Hispanic applicants.  But even if the pursuit of "critical mass" led to stable admissions figures for African Americans and Hispanics, which it did not, that would not provide a non-discriminatory explanation for why the white and Asian-American admissions and enrollment figures have been this stable over a multi-year period.

452.    The stability of Harvard's admission and enrollment figures across all racial groups notwithstanding the massive changes in the racial and ethnic makeup of Harvard's admissions pool over time— especially the significant increase in highly qualified Asian-American applicants— confirms that Harvard is engaged in racial balancing.

453.    Plaintiff's members have been and will continue to be injured because Harvard has and will continue to deny them the opportunity to compete for admission to Harvard on equal footing with other applicants on the basis of race or ethnicity due to its intentionally discriminatory admissions policies and procedures.

454.    Plaintiff is entitled to a declaratory judgment, pursuant to 28 U.S.C. § 2201, and a permanent injunction because there is no plain, adequate, or speedy remedy at law to prevent Harvard from continuing to use admissions policies and procedures that discriminate on the basis of race or ethnicity in violation of Title VI of the Civil Rights Act of 1964 and because the harm Plaintiff's members will otherwise continue to suffer is irreparable.

455.    Plaintiff is entitled to attorneys' fees and costs pursuant to 42 U.S.C. § 1988.

## COUNT III

**Violation of 42 U.S.C. § 2000d *et seq.***
**(Failure To Use Race Merely As A "Plus" Factor In Admissions Decisions)**

456.    Plaintiff incorporates the allegations and averments contained in paragraphs 1-455 as if fully set forth herein.

457.    Harvard, a recipient of federal funds, intentionally discriminated against certain of Plaintiff's members on the basis of their race, color, or ethnicity in violation of Title VI of the Civil Rights Act of 1964, 42 U.S.C. § 2000d *et seq.*, by employing an undergraduate admissions policy that is not narrowly tailored because it does not use race merely as a "plus" factor in order to achieve student body diversity.

458.    Harvard has conceded that, because it uses a racial criterion in its admissions process and receives federal funds, it is subject to potential liability for

violations of Title VI if it is found to have discriminated on the basis of race in its admissions process. *See* Harvard *Grutter* Amicus Brief at 2 ("Because Title VI of the Civil Rights Act of 1964 forbids institutions that receive federal funds from engaging in racial 'discrimination,' the ability of private colleges and universities to exercise their institutional competence could well be dramatically compromised by any new limits . . . on state university admissions criteria or procedures."); Harvard *Fisher* Amicus Brief 3 (stating that "Title VI of the Civil Rights Act of 1964 forbids institutions that receive federal funds from engaging in racial 'discrimination,' and so Harvard's "efforts to attain diverse student bodies could be compromised" if limits were placed on the university's admissions procedures).

459.    Title VI is privately enforceable.

460.    Discrimination that violates the Equal Protection Clause of the Fourteenth Amendment of the United States Constitution constitutes a violation of Title VI when committed by an institution that accepts federal funds.

461.    Harvard is not complying with the requirement of narrow tailoring because it is not using race merely as a "plus" factor in admissions decisions in order to achieve student body diversity.

462.    The statistical evidence shows that each applicant for admission is not evaluated as an individual. Instead, race or ethnicity is the defining feature of the application. That is especially true for Asian-American applicants. Only using race or ethnicity as a dominant factor in admissions decisions could account for the remarkably low admission rate for high-achieving Asian-American applicants.

463.    Plaintiff's members have been and will continue to be injured because Harvard has and will continue to deny them the opportunity to compete for admission to Harvard on equal footing with other applicants on the basis of race or ethnicity due to its intentionally discriminatory admissions policies and procedures.

464.    Plaintiff is entitled to a declaratory judgment, pursuant to 28 U.S.C. § 2201, and a permanent injunction because there is no plain, adequate, or speedy remedy at law to prevent Harvard from continuing to use admissions policies and procedures that discriminate on the basis of race or ethnicity in violation of Title VI of the Civil Rights Act of 1964 and because the harm Plaintiff's members will otherwise continue to suffer is irreparable.

465.    Plaintiff is entitled to attorneys' fees and costs pursuant to 42 U.S.C. § 1988.

## COUNT IV

### Violation of 42 U.S.C. § 2000d *et seq*.
### (Failure To Use Race To Merely Fill The Last
### "Few Places" In The Incoming Freshman Class)

466.    Plaintiff incorporates the allegations and averments contained in paragraphs 1-465 as if fully set forth herein.

467.    Harvard, a recipient of federal funds, intentionally discriminated against certain of Plaintiff's members on the basis of their race, color, or ethnicity in violation of Title VI of the Civil Rights Act of 1964, 42 U.S.C. § 2000d *et seq*., by employing an undergraduate admissions policy that is not narrowly tailored because it does not merely use race as a factor in filling the last "few places" in the entering freshman class.

468.    Harvard has conceded that, because it uses a racial criterion in its admissions process and receives federal funds, it is subject to potential liability for

violations of Title VI if it is found to have discriminated on the basis of race in its admissions process. *See* Harvard *Grutter* Amicus Brief at 2 ("Because Title VI of the Civil Rights Act of 1964 forbids institutions that receive federal funds from engaging in racial 'discrimination,' the ability of private colleges and universities to exercise their institutional competence could well be dramatically compromised by any new limits . . . on state university admissions criteria or procedures."); Harvard *Fisher* Amicus Brief 3 (stating that "Title VI of the Civil Rights Act of 1964 forbids institutions that receive federal funds from engaging in racial 'discrimination,' and so Harvard's "efforts to attain diverse student bodies could be compromised" if limits were placed on the university's admissions procedures).

469.    Title VI is privately enforceable.

470.    Discrimination that violates the Equal Protection Clause of the Fourteenth Amendment of the United States Constitution constitutes a violation of Title VI when committed by an institution that accepts federal funds.

471.    In its *Bakke amicus* brief, Harvard informed the Supreme Court that it was using race as a factor in admissions decisions only when it had "a few places left to fill" in the entering freshman class. But to the extent that Harvard ever used race in this way, given that the Harvard Plan itself was the product of racial and ethnic discrimination, it clearly is no longer using race in this fashion.

472.    In its *Fisher amicus* brief, Harvard stated that it uses admissions "policies similar to the Harvard Plan that Justice Powell approved in [*Bakke*] and the University of Michigan Law School plan upheld in *Grutter*." But an admissions policy similar in any fashion to the plan employed by the University of Michigan Law School by definition

uses race beyond filling the remaining few places.  In such a plan, race is— to one degree or another— a factor for every applicant as it is ostensibly being used to pursue a "critical mass" of underrepresented minorities in the overall student body.

473.    Moreover, the statistical evidence demonstrates that Harvard is not using race merely to fill the last few places in the entering freshman class.  Rather, especially for Asian Americans, race or ethnicity is a factor in admissions decision far beyond those competing for the last few places.  Only using race or ethnicity as a dominant factor in admissions decisions could account for the remarkably low admission rate for high-achieving Asian-American applicants.

474.    Plaintiff's members have been and will continue to be injured because Harvard has and will continue to deny them the opportunity to compete for admission to Harvard on equal footing with other applicants on the basis of race or ethnicity due to its intentionally discriminatory admissions policies and procedures.

475.    Plaintiff is entitled to a declaratory judgment, pursuant to 28 U.S.C. § 2201, and a permanent injunction because there is no plain, adequate, or speedy remedy at law to prevent Harvard from continuing to use admissions policies and procedures that discriminate on the basis of race or ethnicity in violation of Title VI of the Civil Rights Act of 1964 and because the harm Plaintiff's members will otherwise continue to suffer is irreparable.

476.    Plaintiff is entitled to attorneys' fees and costs pursuant to 42 U.S.C. § 1988.

## COUNT V

### Violation of 42 U.S.C. § 2000d *et seq.*
### (Race-Neutral Alternatives)

477.    Plaintiff incorporates the allegations and averments contained in paragraphs 1-476 as if fully set forth herein.

478.    Harvard, a recipient of federal funds, intentionally discriminated against certain of Plaintiff's members on the basis of their race, color, or ethnicity in violation of Title VI of the Civil Rights Act of 1964, 42 U.S.C. § 2000d *et seq.*, by employing racial preferences in undergraduate admissions when there are available race-neutral alternatives capable of achieving student body diversity.

479.    Harvard has conceded that, because it uses a racial criterion in its admissions process and receives federal funds, it is subject to potential liability for violations of Title VI if it is found to have discriminated on the basis of race in its admissions process.  *See* Harvard *Grutter* Amicus Brief at 2 ("Because Title VI of the Civil Rights Act of 1964 forbids institutions that receive federal funds from engaging in racial 'discrimination,' the ability of private colleges and universities to exercise their institutional competence could well be dramatically compromised by any new limits . . . on state university admissions criteria or procedures."); Harvard   *Fisher* Amicus Brief 3 (stating that "Title VI of the Civil Rights Act of 1964 forbids institutions that receive federal funds from engaging in racial 'discrimination,' and so Harvard's "efforts to attain diverse student bodies could be compromised" if limits were placed on the university's admissions procedures).

480.    Title VI is privately enforceable.

481.    Discrimination that violates the Equal Protection Clause of the Fourteenth Amendment of the United States Constitution constitutes a violation of Title VI when committed by an institution that accepts federal funds.

482.    Harvard's use of racial preferences is narrowly tailored only if using them is necessary to achieve student body diversity.  If Harvard can achieve student body diversity without resorting to racial preferences, it is required to do so as a matter of law. Moreover, Harvard must have a strong basis in evidence that a non-racial approach will not work about as well as a race-based approach *before* turning to the use of racial preferences.

483.    There is no evidence that Harvard studied all of the available race-neutral alternatives and had a strong basis in evidence that none would work about as well as a race-based approach *before* turning to racial preferences.  Indeed, Harvard claims that it has been using racial preferences—  to one degree or another—  continuously for nearly a century.

484.    Whether Harvard considered them all or not, there are a host of race-neutral alternatives that if implemented can achieve student body diversity without resorting to racial preferences.   Among these alternatives, both individually and collectively, are (a) increased use of non-racial preferences, (b) increased financial aid, scholarships, and recruitment efforts, and (c) elimination of admissions policies and practices that negatively affect minority applicants.

485.    The use of race-neutral alternatives instead of racial preferences would not only achieve student body diversity, it would eliminate the heavy costs that using race as

a factor in admissions decisions imposes on minority applicants who receive such admissions preference, the Harvard community, and society as a whole.

486.     Plaintiff's members have been and will continue to be injured because Harvard has and will continue to deny them the opportunity to compete for admission to Harvard on equal footing with other applicants on the basis of race or ethnicity due to its intentionally discriminatory admissions policies and procedures.

487.     Plaintiff is entitled to a declaratory judgment, pursuant to 28 U.S.C. § 2201, and a permanent injunction because there is no plain, adequate, or speedy remedy at law to prevent Harvard from continuing to use admissions policies and procedures that discriminate on the basis of race or ethnicity in violation of Title VI of the Civil Rights Act of 1964 and because the harm Plaintiff's members will otherwise continue to suffer is irreparable.

488.     Plaintiff is entitled to attorneys' fees and costs pursuant to 42 U.S.C. § 1988.

## COUNT VI

### Violation of 42 U.S.C § 2000d *et seq.*
### (Any Use of Race As A Factor In Admissions)

489.     Plaintiff incorporates the allegations and averments contained in paragraphs 1-488 as if fully set forth herein.

490.     Harvard, a recipient of federal funds, intentionally discriminated against certain of Plaintiff's members on the basis of their race, color, or ethnicity in violation of Title VI of the Civil Rights Act of 1964, 42 U.S.C. § 2000d *et seq.*, by employing an undergraduate admissions policy that uses race as a factor in admissions.

491.    Harvard has conceded that, because it uses a racial criterion in its admissions process and receives federal funds, it is subject to potential liability for violations of Title VI if it is found to have discriminated on the basis of race in its admissions process.  *See* Harvard *Grutter* Amicus Brief at 2 ("Because Title VI of the Civil Rights Act of 1964 forbids institutions that receive federal funds from engaging in racial 'discrimination,' the ability of private colleges and universities to exercise their institutional competence could well be dramatically compromised by any new limits . . . on state university admissions criteria or procedures."); Harvard *Fisher* Amicus Brief 3 (stating that "Title VI of the Civil Rights Act of 1964 forbids institutions that receive federal funds from engaging in racial 'discrimination,' and so Harvard's "efforts to attain diverse student bodies could be compromised" if limits were placed on the university's admissions procedures).

492.    Title VI is privately enforceable.

493.    Discrimination that violates the Equal Protection Clause of the Fourteenth Amendment of the United States Constitution constitutes a violation of Title VI when committed by an institution that accepts federal funds.

494.    The Supreme Court's decisions holding that there is a compelling government interest in using race as a factor in admissions decisions in pursuit of "diversity" should be overruled.  Those decisions were wrongly decided at the time they were issued and they remain wrong today.  "Diversity" is not an interest that could ever justify the use of racial preferences under the Fourteenth Amendment and Title VI.

495.    Even if there were a compelling government interest in "diversity" in the abstract, however, the use of racial preferences in the educational setting nevertheless should be forbidden for several important reasons.

496.    The Supreme Court's jurisprudence in this area has been built on mistakes of fact and law.  The Supreme Court first accepted the use of racial preferences in admissions on the assumption that they would be used consistent with the Harvard Plan, which purported to use race merely as a contextual factor in filling the final few places in the entering class.  But the Harvard Plan itself was created in order to hide racial and ethnic discrimination.  Thus, it is far from certain that Harvard has *ever* used race in the way the Supreme Court envisioned.

497.    "The raison d'être for race-specific affirmative action programs has simply never been diversity for the sake of education."  Alan Dershowitz and Laura Hanft, *Affirmative Action and the Harvard College Diversity-Discretion Model: Paradigm or Pretext*, 1 Cardozo L. Rev. 379, 407 (1979).  It is instead "a clever post facto justification for increasing the number of minority group students in the student body." *Id*.

498.    In any event, neither Harvard nor any other college or university uses race in this manner now.  Instead, colleges and universities, including Harvard, claim to use race in order to pursue a "critical mass" of underrepresented minorities in the student body.  But Harvard, and many others, are not pursuing this interest.  Even when this interest is actually being pursued, moreover, it is nothing more than racial balancing in that it necessarily seeks to ensure a proportional number of students of certain races or ethnicities in the entering class.  Critical mass is a formula for ensuring "a specified

percentage of the student body is in effect guaranteed to be members of selected ethnic groups, with the remaining percentage an undifferentiated aggregation of students." *Bakke*, 438 U.S. at 315 (Powell, J.).

499.    Ultimately, there is overwhelming evidence that colleges and universities will take advantage of any leeway given by the Supreme Court to use the dangerous tool of racial preferences in inappropriate ways.  The experience with Harvard confirms that, if given the chance, colleges and universities will use racial preferences "for the ostensible purpose of enhancing education diversity of the student body"with the true "goal of simply increasing the number of minority persons in the universities and in the professions that these universities feed."  Alan Dershowitz and Laura Hanft, *Affirmative Action and the Harvard College Diversity-Discretion Model: Paradigm or Pretext*, 1 Cardozo L. Rev. 379, 385 (1979).

500.    There simply is no practical way to ensure that colleges and universities will use race in their admissions processes in any way that would meet the narrow tailoring requirement.  The strong medicine of strict scrutiny has proven insufficient to ensure that the Fourteenth Amendment and Title VI operate in conformity of racial neutrality except in those rare circumstances that justify the use of this disfavored remedy.  Time after time, district courts and the courts of appeals have been either unwilling or unable to force these colleges and universities to provide a strong evidentiary basis for their conclusion that use of racial preferences is *necessary* to achieve diversity.  Nor have they been willing to engage in the close review of admissions programs to ensure that schools are treating each applicant as an individual.

501.    There also have been important factual developments since this question was last considered by the Supreme Court.  There is now much evidence that race-neutral alternatives can achieve the benefits of diversity.  This is crucially important in light of the equally compelling evidence that racial preferences impose significant costs on the university community, society in general, and the very minority students these programs are purported to benefit.

502.    In the end, the costs of allowing the use of racial preferences in admissions decisions— even in a limited way— far exceed any rapidly diminishing benefits.  No principle of *stare decisis* counsels in favor of retaining decisions allowing their use.  Those decisions were not well reasoned, were predicated on mistakes of fact, have been undermined by more recent developments, and have proven to be unworkable.  Any decision allowing the use of racial preferences in the educational setting should be overruled.

503.    Plaintiff's members have been and will continue to be injured because Harvard has and will continue to deny them the opportunity to compete for admission to Harvard on equal footing with other applicants on the basis of race or ethnicity due to its intentionally discriminatory admissions policies and procedures.

504.    Plaintiff is entitled to a declaratory judgment, pursuant to 28 U.S.C. § 2201, and a permanent injunction because there is no plain, adequate, or speedy remedy at law to prevent Harvard from continuing to use admissions policies and procedures that discriminate on the basis of race or ethnicity in violation of Title VI of the Civil Rights Act of 1964 and because the harm Plaintiff's members will otherwise continue to suffer is irreparable.

505.    Plaintiff is entitled to attorneys' fees and costs pursuant to 42 U.S.C. § 1988.

**WHEREFORE**, Plaintiff, Students for Fair Admissions, Inc., prays for the following relief as to all counts:

(a)    A declaratory judgment, pursuant to the Declaratory Judgment Act, 28 U.S.C. § 2201, from the Court that Harvard's admissions policies and procedures violate Title VI of the Civil Rights Act of 1964, 42 U.S.C. § 2000d *et seq.*;

(b)    A declaratory judgment, pursuant to the Declaratory Judgment Act, 28 U.S.C. § 2201, from the Court that any use of race or ethnicity in the educational setting violates the Fourteenth Amendment and Title VI of the Civil Rights Act of 1964, 42 U.S.C. § 2000d *et seq.*;

(c)    A permanent injunction prohibiting Harvard from using race as a factor in future undergraduate admissions decisions;

(d)    A permanent injunction requiring Harvard to conduct all admissions in a manner that does not permit those engaged in the decisional process to be aware of or learn the race or ethnicity of any applicant for admission;

(e)    Attorneys' fees and costs pursuant to 42 U.S.C. § 1988 and any other applicable legal authority; and

(f)    All other relief this Court finds appropriate and just.

### DEMAND FOR JURY TRIAL

Pursuant to Rule 38 of the Federal Rules of Civil Procedure, Plaintiff demands a trial by jury in this action of all triable issues.

Respectfully submitted,

By: _W S Con_____

Paul M. Sanford BBO #566318
Benjamin C. Caldwell BBO #67506
BURNS & LEVINSON LLP
One Citizens Plaza, Suite 1100
Providence, RI 02903
Tel: 617-345-3000
Fax: 617-345-3299
psanford@burnslev.com
bcaldwell@burnslev.com

William S. Consovoy
Thomas R. McCarthy
J. Michael Connolly
CONSOVOY MCCARTHY PLLC
3033 Wilson Boulevard
Suite 700
Arlington, Virginia 22201
Tel: 703.243.4923
Fax: 703.243.4923
will@consovoymccarthy.com
tom@consovoymccarthy.com
mike@consovoymccarthy.com

*Counsel for Plaintiff Students for Fair
Admissions, Inc.*

Dated: November 17, 2014

# Exhibit I

INTERNAL REVENUE SERVICE                          DEPARTMENT OF THE TREASURY
P. O. BOX 2508
CINCINNATI, OH  45201


Date:      JAN 3 0 2015                Employer Identification Number:
                                         47-1689810
                                       DLN:
                                         17053287307014
STUDENTS FOR FAIR ADMISSIONS INC       Contact Person:
3571 FAR WEST BLVD 17                     LOUIS F JOHNSON              ID# 95135
AUSTIN, TX  78731                      Contact Telephone Number:
                                         (877) 829-5500
                                       Accounting Period Ending:
                                         December 31
                                       Public Charity Status:
                                         170(b)(1)(A)(vi)
                                       Form 990 Required:
                                         YES
                                       Effective Date of Exemption:
                                         July 30, 2014
                                       Contribution Deductibility:
                                         YES
                                       Addendum Applies:
                                         NO


Dear Applicant:

We are pleased to inform you that upon review of your application for tax
exempt status we have determined that you are exempt from Federal income tax
under section 501(c)(3) of the Internal Revenue Code.  Contributions to you are
deductible under section 170 of the Code.  You are also qualified to receive
tax deductible bequests, devises, transfers or gifts under section 2055, 2106
or 2522 of the Code.  Because this letter could help resolve any questions
regarding your exempt status, you should keep it in your permanent records.

Organizations exempt under section 501(c)(3) of the Code are further classified
as either public charities or private foundations.  We determined that you are
a public charity under the Code section(s) listed in the heading of this
letter.

For important information about your responsibilities as a tax-exempt
organization, go to www.irs.gov/charities. Enter "4221-PC" in the search bar
to view Publication 4221-PC, Compliance Guide for 501(c)(3) Public Charities,
which describes your recordkeeping, reporting, and disclosure requirements.

                              Sincerely,

                              Tamera Ripperda

                              Director, Exempt Organizations


                                                    Letter  947

**JA229**

SFFA-Harvard 0000001

# EXHIBIT 02

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 1

1           UNITED STATES DISTRICT COURT

2          FOR THE DISTRICT OF MASSACHUSETTS

3                 BOSTON DIVISION

4    * * * * * * * * * * * * * * * * *

5    STUDENTS FOR FAIR ADMISSIONS,      *

6    INC.,                              *

7            Plaintiff,                 *

8    v.                                 *   Civil Action

9    PRESIDENT AND FELLOWS OF HARVARD   *  No. 14-cv-14176

10   COLLEGE (HARVARD CORPORATION),     *      (ADB)

11           Defendant.                 *

12   * * * * * * * * * * * * * * * * *

13

14       HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

15       Rule 30(b)(6) Notice to Students for Fair

16                 Admissions, Inc.

17      Videotaped Deposition of EDWARD J. BLUM

18             Tuesday, July 12, 2016

19                   9:05 a.m.

20      Wilmer Cutler Pickering Hale and Dorr LLP

21           60 State Street - 26th Floor

22            Boston, Massachusetts 02109

23

24   ----------- J. Edward Varallo, RMR, CRR  ----------

25         Registered Professional Reporter

Page 73

1  email exchange and phone calls with friends and

2  allies.

3       A.    Yes.  The other -- Did I include

4  designing, helping to design a website?

5       Q.    Nope.  Tell me about that.

6       A.    Okay.  I helped Engage design a website.

7       Q.    So you together with EngageDC helped

8  design the website?

9       A.    Correct.

10      Q.    What was your role in that?  What did you

11 do?

12      A.    Described what the website should do, what

13 we wanted to accomplish, and reviewed the various

14 designs that were submitted to us.

15      Q.    And when you say the website, which

16 website are you referring to?

17      A.    Students for Fair Admissions.

18      Q.    And what about the Harvard Not Fair

19 website?

20      A.    That as well.

21      Q.    So part of the launch of SFFA was to

22 design the Harvard Not Fair website?

23      A.    Not exactly.  The Harvard Not Fair, UNC

24 Not Fair and UW Not Fair really preceded sort of the

25 launch of Students for Fair Admissions.

Page 88

1        A.      I guess that would be me.

2        Q.      And what about in the 2013 time frame, who

3    was primarily responsible for membership

4    recruitment?

5        A.      Primarily probably me.

6        Q.      And in 2014 who was primarily responsible

7    for membership recruitment?

8        A.      Primarily me.

9        Q.      The interrogatory response also talks

10   about day-to-day operations of SFFA on page 4 and

11   indicates that you are responsible for those

12   operations.  Do you see that?

13       A.      Yes.

14       Q.      And that was in July 2015, this particular

15   interrogatory.

16       A.      Okay.

17       Q.      Are you still primarily -- Are you still

18   responsible for the day-to-day operations of SFFA?

19       A.      Yes.

20       Q.      And what do those operations entail?

21       A.      Communicating with members, communicating

22   with the board, and communicating with counsel.

23       Q.      And prior to July of 2015, were you also

24   responsible for the day-to-day operations of SFFA?

25       A.      Yes.

Page 89

1      Q.    Is there anybody else at SFFA who is

2  responsible for the day-to-day operations?

3      A.    No.

4      Q.    Is Mr. Fisher responsible for any day-to-

5  day operations?

6      A.    No.

7      Q.    Is Ms. Fisher responsible for any day-to-

8  day operations?

9      A.    No.

10     Q.    Are counsel responsible for any day-to-day

11 operations?

12     A.    Oh, yes.

13     Q.    Without disclosing any consultation with

14 counsel, can you describe to me any actions that

15 counsel are responsible for in connection with the

16 day-to-day operations of SFFA?

17          MR. STRAWBRIDGE:  And I'll object on

18 grounds of privilege and instruct the client that he

19 may answer this question only to the extent that he

20 does not reveal the actions or advice of counsel.

21     A.    Every question of substance is discussed

22 with counsel.

23     Q.    Can you provide without disclosing advice

24 of counsel, can you provide detail on what you mean

25 by a question of substance?  I just don't

Page 102

1        A.    All right.

2        Q.    Sorry, through 73, really, with the

3   signature pages.  Have you seen this document

4   before?

5        A.    Yes.

6        Q.    And what do you understand this document

7   to be?

8        A.    This is our, sort of our founding document

9   to organize our organization.

10       Q.    And it is signed by the three members of

11   the board of directors on that date in 2014.  Is

12   that right?

13       A.    That's right.

14       Q.    Who are Richard Fisher, Abigail Fisher,

15   and yourself?

16       A.    Correct.

17       Q.    The document on Bates 68 -- the Bates

18   number is the number in the bottom right of the

19   page, in case you're not familiar -- is a unanimous

20   written consent in lieu of an organizational

21   meeting.  Do you see that?

22       A.    Yes.

23       Q.    And what do you understand that to mean,

24   that title?

25              MR. STRAWBRIDGE:  Objection, calls for a

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 104

```
 1    of SFFA?

 2         A.    Yes.

 3         Q.    And was there discussion between you and

 4    Abigail Fisher about her becoming the secretary of

 5    SFFA?

 6         A.    Yes.

 7         Q.    And did she agree to become the secretary?

 8         A.    She did.

 9         Q.    Who appointed -- Who appointed yourself as

10    president of SFFA?

11         A.    It was a collaborative understanding

12    between the three of us and it was kind of a

13    direction that we took informally leading up to this

14    establishment.

15         Q.    When you say the direction that you took,

16    do you mean you were serving, playing the role of a

17    president-type role before this was officially

18    enacted?  Or maybe I'll just ask you to explain what

19    you meant by that last answer.

20         A.    I was the leader, if you will, of the

21    organization of this group.

22         Q.    And I asked who appointed you as president

23    of SFFA.  It was yourself and Mr. Fisher and

24    Ms. Fisher?

25         A.    We all agreed that I would be president.
```

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

1    Q.    Was anybody else involved in that
2    decision?
3    A.    No.
4    Q.    And who appointed Abigail Fisher as
5    secretary?
6    A.    She agreed to serve in that capacity after
7    consultation with myself and Richard Fisher.
8    Q.    Was anybody else involved in that
9    decision?
10   A.    No.
11   Q.    And who appointed Richard Fisher as
12   treasurer?
13   A.    He agreed to serve in that capacity after
14   consultation with myself.
15   Q.    And with Ms. Fisher as well?
16   A.    And with Abby.
17   Q.    And was anybody else involved in that
18   decision?
19   A.    No.
20   Q.    Did you consult with anybody, any members
21   or nonmembers of SFFA, before this August 6th
22   organizational action was taken?
23        MR. STRAWBRIDGE:  That is a yes or no
24   question.  You may answer that question yes or no.
25   A.    So the question is, did I consult with

Page 108

1    Q.    So who are the affiliate -- Without giving
2  me any names, are there members of SFFA that are not
3  affiliate members?
4           MR. STRAWBRIDGE:  Object to the form of
5  the question.  You may answer.
6    A.    So all members of SFFA at the time of the
7  adoption of these bylaws were affiliate members.
8    Q.    Thank you.  That was my question.  There
9  were no other type of members at that time?
10   A.    No other type of members.
11   Q.    And so affiliate members did not have any
12  voting rights at the time of the adoption of the
13  bylaws.  Correct?
14   A.    They did not have voting rights at the
15  time of the adoption.
16   Q.    And they did not have voting rights at the
17  time the complaint was filed in this litigation.
18  Correct?
19   A.    That's correct.
20   Q.    Did the affiliate members have any role in
21  electing any of the officers of SFFA?
22   A.    No.
23   Q.    Did the affiliate members when these
24  bylaws were in effect have any role in appointing
25  any of the directors of SFFA?

Page 109

1       A.      No.

2       Q.      Did the affiliate members at the time

3   these bylaws were in place have the right to vote on

4   anything involving the purpose or the mission of

5   SFFA?

6               MR. STRAWBRIDGE:  I'll object to the form

7   of the question.

8       A.      No.

9       Q.      Did they have the right to vote to modify

10  SFFA's purpose?

11      A.      No.

12      Q.      Did they have the right to ratify any

13  action that SFFA took?

14              MR. STRAWBRIDGE:  I will object to the

15  form of the question.

16      A.      No.

17      Q.      What was the purpose of SFFA at the time

18  that these bylaws were in effect?

19      A.      To further our mission, which was to end

20  the use of race in the admissions process through

21  litigation and through advocacy.

22      Q.      And members, affiliate members of SFFA at

23  the time these bylaws were in effect, were they

24  required to agree with that mission to become a

25  member?

Case: 19-2005   Document: 00117623236   Page: 258   Date Filed: 07/30/2020   Entry ID: 6356615
Case 1:14-cv-14176-ADB   Document 419-2   Filed 06/15/18   Page 11 of 14

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

 1      Q.    Okay.  So we'll go ahead and play the
 2   first clip, please.  And let us know if you can't
 3   see or hear.
 4            THE WITNESS:  I can see it.
 5            MR. STRAWBRIDGE:  Counsel, for the record,
 6   can we just, are these all clips taken from the
 7   video that's represented in this exhibit?
 8            MS. ELLSWORTH:  They are all clips from
 9   the video represented in this exhibit which is on
10   YouTube.
11            MR. STRAWBRIDGE:  Okay, thank you.
12            (Video clip played as follows:
13            "So I needed plaintiffs; I needed Asian
14   plaintiffs.  And finding plaintiffs to challenge the
15   Ivy League admissions policies, Harvard in
16   particular, is not an easy thing to do, so
17   I started -- I designed three websites,
18   HarvardNotFair.org, UNC, University of
19   NorthCarolinaNotFair.org, and UWNotFair.org."
20            (End of video clip.)
21            THE WITNESS:  So painful to watch.
22   BY MS. ELLSWORTH:
23      Q.    Mr. Blum, that was you speaking that we
24   just presented.  Is that correct?
25      A.    Yes, it was.

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 325

1    now.

2        Q.    Okay.

3        A.    There were considerably more than 16,000,

4    but we used 16,000 as sort of a safe harbor because

5    we wanted to verify that perhaps, you know, all of

6    them were accurate and correct and could be

7    legitimate members of SFFA.

8        Q.    So when the interrogatory response was

9    given on July 2nd of 2015, was that before

10   Mr. Connolly had completed his task of reviewing

11   that big influx of numbers?

12       A.    I don't know.

13       Q.    What was the reason for providing this

14   safe harbor that you just testified to?

15       A.    Concern about providing information that

16   was inaccurate.

17       Q.    And was that concern driven by this

18   technological situation that had arisen with the

19   influx of new members in June 2015?

20       A.    Yes.

21       Q.    Do you know now what a more accurate

22   number would have been in July of 2015?

23       A.    I have an estimate of that.

24       Q.    What is that estimate?

25       A.    Slightly over 20,000.

Page 326

1      Q.    So the overwhelming of EngageDC's system

2   was by about 20,000 new members?

3      A.    That's correct.

4      Q.    In a how-many-week period or how-many-day

5   period?

6      A.    I'm unsure exactly how many, but it was a

7   relatively short number of days.

8      Q.    Was it less than a week?

9      A.    About a week, I would think.

10      Q.    And then once the payment process was put

11   in place on July 30th, is it fair to say that the

12   membership growth slowed substantially?

13      A.    It did.

14      Q.    Do you see the new members

15   contemporaneously now?

16      A.    I do.

17      Q.    About how frequently do new members flow

18   in?

19      A.    So there are two things that flow to me

20   contemporaneously:  people who contact us through

21   SFFA without joining and then people who contact us

22   through SFFA and join.  So there are a lot of people

23   that contact us through SFFA without joining, but

24   I see both of those categories contemporaneously.

25      Q.    What is the email address that they use to

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 349

1              COURT REPORTER'S CERTIFICATE

2              I, J. Edward Varallo, RMR, CRR, Registered

3    Professional Reporter and Notary Public in the

4    Commonwealth of Massachusetts (my commission expires

5    12/09/2022), hereby certify that the deposition of

6    Edward J. Blum taken on July 12, 2016, in the matter

7    of Students for Fair Admissions v. President and

8    Fellows of Harvard College (Harvard Corporation);

9    and The Honorable and Reverend the Board of

10   Overseers, was recorded by me stenographically and

11   transcribed; that before being sworn by me, the

12   deponent provided satisfactory evidence of

13   identification as required by Executive Order 455

14   (03-13) of the Governor.

15             I certify that the deposition transcript

16   produced by me is true and accurate to the best of

17   my ability.

18             I certify further that I am not counsel,

19   attorney, or relative of any party litigant, and

20   have no interest, financial or otherwise, in the

21   outcome of this suit.

22

23

24   _____

25   DATED:  7/15/2016           J. Edward Varallo

# EXHIBIT 85

# ARTICLES OF INCORPORATION
### *of*
## STUDENTS FOR FAIR ADMISSIONS, INC.

The undersigned, pursuant to the Virginia Nonstock Corporation Act (the "Act"), hereby states as follows:

1.      The name of the corporation is Students for Fair Admissions, Inc. (the "Corporation").

2.      The Corporation shall have no members.

3.      The initial directors of the Board of Directors of the Corporation shall be appointed by the sole incorporator. All other directors shall be elected by an affirmative vote of a majority of the directors then in office, and each shall continue in office for the term specified in the Bylaws of the Corporation and until such director's successor is elected and qualified, or until such director's earlier death, resignation, or removal.

4.      The name of the initial registered agent of the Corporation is National Corporate Research, Ltd. The registered agent is a domestic or foreign stock or nonstock corporation, limited liability company, or registered limited liability partnership authorized to transact business in Virginia.

5.      The Corporation's initial registered office address, which is identical to the business office of the initial registered agent, is: 250 Browns Hill Court, Midlothian, Virginia, 23114. The registered office is located in the county of Chesterfield.

6.      The Corporation is organized and shall be operated exclusively for charitable, religious, scientific, literary, educational and other purposes within the meaning of Section 501(c)(3) of the Internal Revenue Code of 1986, as now in effect or as hereafter may be amended (the "Code"). The purposes for which the Corporation is formed are to defend human and civil rights secured by law, including the right of individuals to equal protection under the law, through litigation and any other lawful means, and to engage in any lawful act or activity for which corporations may be organized under the Act. In furtherance thereof, the Corporation shall have all the general powers enumerated in Sections 13.1-826 and 13.1-827 of the Act. Except as otherwise provided by law, or in any Bylaw of the Corporation, the business of the Corporation shall be managed and all of the powers of the Corporation shall be exercised by the Board of Directors of the Corporation.

7.      The duration of the existence of the Corporation is perpetual.

8.      Provisions for the regulation of the internal affairs of the Corporation, including provisions for distribution of assets on dissolution or final liquidation, are as follows:

    A.      The Corporation shall not only be organized but also operated exclusively for charitable purposes within the meaning of section 501(c)(3) of the Code; provided, however, that the corporation may engage in any lawful act or activity for which

**SFFA-Harvard 0000002**

corporations may be organized under the Act, provided such acts or activities would not prevent the Corporation from obtaining and retaining exemption from federal income taxation as a corporation described in Section 501(c)(3) of the Code.

   B.      No part of the net earnings of the Corporation shall inure to the benefit of, or be distributable to, its members, officers, directors, or other private individuals, except that the Corporation shall be authorized and empowered to pay reasonable compensation for services rendered to or for the Corporation and to make payments and distributions in furtherance of the purposes set forth in Article 6 hereof;

   C.      No substantial part of the activities of the Corporation shall be the carrying on of propaganda, or otherwise attempting to influence legislation, and the Corporation shall not participate or intervene in (including the publication or distribution of statements concerning) any political campaign on behalf of, or in opposition to, any candidate for public office. Notwithstanding any other provision of these Articles of Incorporation, the Corporation shall not, except to an insubstantial degree, engage in any activities or exercise any powers that are not in furtherance of the purposes of the Corporation; and

   D.      In the event of dissolution or final liquidation of the Corporation, the remaining assets of the Corporation shall be distributed for one or more exempt purposes within the meaning of section 501(c)(3) of the Code or shall be distributed to the federal government, or to a state or local government, for a public purpose. Any such assets not so disposed of shall be disposed of by a court of competent jurisdiction of the county in which the principal office of the Corporation is then located, exclusively for such purposes or to such organization or organizations, as the court shall determine, that are organized and operated exclusively for such purposes.

   9.      To the fullest extent permitted by the Act, no officer or director of the Corporation shall be personally liable for damages in any proceeding brought by or in the right of the Corporation, or in connection with any claim, action, suit, or proceeding to which he or she may be or is made a party by reason of being or having been an officer or director of the Corporation.

   10.     The Corporation reserves the right to amend or repeal any provision contained in these Articles of Incorporation, in the manner now or hereafter prescribed by statute, and all rights conferred upon directors herein are granted subject to this reservation.

Dated:  July 29, 2014

[SIGNATURE PAGE FOLLOWS]

13751680 4

- 2 -

**SIGNATURE PAGE TO**
**ARTICLES OF INCORPORATION**
*of*
**STUDENTS FOR FAIR ADMISSIONS, INC.**

IN WITNESS WHEREOF, the undersigned has executed these Articles of Incorporation as of the date set forth above.

Robert D. Benton
Sole Incorporator

- 3 -

**JA247**

SFFA-Harvard 0000004

# Commonwealth of Virginia



## State Corporation Commission

*I Certify the Following from the Records of the Commission:*

The foregoing is a true copy of all documents constituting the charter of Students for Fair Admissions, Inc. on file in the Clerk's Office of the Commission.

Nothing more is hereby certified.



*Signed and Sealed at Richmond on this Date:*
*July 31, 2014*

*Joel H. Peck*

—————————————————————
*Joel H. Peck, Clerk of the Commission*

CIS0505

SFFA-Harvard 0000005



# S T A T E  C O R P O R A T I O N  C O M M I S S I O N

*Richmond, July 30, 2014*

*This is to certify that the certificate of incorporation of*

**Students for Fair Admissions, Inc.**

*was this day issued and admitted to record in this office and that the said corporation is authorized to transact its business subject to all Virginia laws applicable to the corporation and its business. Effective date: July 30, 2014*



*State Corporation Commission*
*Attest:*

Clerk of the Commission

CIS0372

SFFA-Harvard 0000006



**COMMONWEALTH OF VIRGINIA
STATE CORPORATION COMMISSION**

**Office of the Clerk**

July 30, 2014

BETH EPSTEIN
UCC RETRIEVALS INC
7288 HANOVER GREEN DR
*** HOLD FOR PICK UP ***
MECHANICSVILLE, VA 23111

**RECEIPT**

RE: Students for Fair Admissions, Inc.

ID: 0780781 - 1

DCN: 14-07-29-1206

Dear Customer:

This is your receipt for $75.00, to cover the fees for filing articles of incorporation with this office.

This is also your receipt for $100.00 to cover the fee(s) for expedited service(s).

The effective date of the certificate of incorporation is July 30, 2014.

If you have any questions, please call (804) 371-9733 or toll-free in Virginia, 1-866-722-2551.

Sincerely,

*Joel H. Peck*

Joel H. Peck
Clerk of the Commission

CORPRCPT
NEWCD
CIS0372

P.O. Box 1197, Richmond, VA 23218-1197
Tyler Building, First Floor, 1300 East Main Street, Richmond, VA 23219-3630
Clerk's Office (804) 371-9733 or (866) 722-2551 (toll-free in Virginia) www.scc.virginia.gov/clk
Telecommunications Device for the Deaf-TDD/Voice: (804) 371-9206

SFFA-Harvard 0000007

# EXHIBIT 86

ORGANIZATIONAL ACTION TAKEN BY
THE SOLE INCORPORATOR
*of*
STUDENTS FOR FAIR ADMISSIONS, INC.

Pursuant to the provisions of Section 13.1-822 of the Virginia Nonstock Corporation Act (the "Act"), the undersigned, being and constituting the sole incorporator of Students for Fair Admissions, Inc. (the "Corporation"), a Virginia nonstock corporation, does hereby take the following action:

WHEREAS, the Articles of Incorporation have been duly filed with the office of the Virginia State Corporation Commission of the Commonwealth of Virginia as of July 30, 2014, and

WHEREAS, the incorporator has the authority under Section 13.1-822 of the Act to elect the initial Board of Directors of the Corporation, it hereby is:

RESOLVED, that the initial Board of Directors consists of three (3) directors and that the following persons are hereby elected to serve as a director of the Corporation until their successors are elected and qualified or until their prior resignation or removal:

> Edward Blum
> Abigail Fisher
> Richard Fisher

FURTHER RESOLVED, that the undersigned, having taken his sole action as incorporator, hereby resigns as incorporator effective immediately after the election of the directors as provided herein.

Dated: July 31, 2014

[SIGNATURE PAGE FOLLOWS]

13753193.1

**CONFIDENTIAL**                    **JA252**                    **SFFA-Harvard 0000105**

SIGNATURE PAGE TO
ORGANIZATIONAL ACTION TAKEN BY
THE SOLE INCORPORATOR
*of*
STUDENTS FOR FAIR ADMISSIONS, INC.

IN WITNESS WHEREOF, the undersigned has executed this Organizational Action Taken by the Sole Incorporator as of the date set forth above.

Robert Benton
Sole Incorporator

– 2 –

CONFIDENTIAL     JA253     SFFA-Harvard 0000106

# EXHIBIT 87

UNANIMOUS WRITTEN CONSENT
IN LIEU OF AN ORGANIZATIONAL MEETING
*of*
THE BOARD OF DIRECTORS
*of*
STUDENTS FOR FAIR ADMISSIONS, INC.

The undersigned, being and constituting all of the initial members of the Board of Directors of Students for Fair Admissions, Inc. (the "Corporation"), a Virginia nonstock corporation, for purposes of taking action in lieu of an organizational meeting of the Board of Directors of the Corporation, pursuant to Sections 13.1-865 and 13.1-867 of the Virginia Nonstock Corporation Act, hereby adopt the following resolutions and waive all requirements of notice:

### Adoption of Bylaws

WHEREAS, the Articles of Incorporation have been duly filed with the office of the Virginia State Corporation Commission of the Commonwealth of Virginia as of July 30, 2014; and

WHEREAS, the Bylaws of the Corporation (Exhibit A) have been presented to the Board of Directors of the Corporation, it is hereby:

RESOLVED, that said Bylaws of the Corporation are adopted in their entirety and ordered to be a permanent part of the records of the Corporation.

### Election of Officers

WHEREAS, the election of officers of the Corporation is to be undertaken as specified in the Bylaws, it is hereby:

RESOLVED, that the following persons hereby are elected to the offices set forth opposite their names, to serve until their respective successors are elected, or until their prior resignation or removal:

| *Name of Officer* | *Corporate Office* |
|---|---|
| Edward Blum | President |
| Abigail Fisher | Secretary |
| Richard Fisher | Treasurer |

### Other Organizational Actions

WHEREAS, the following organizational actions of the Corporation have been reviewed by the Board, and the Board deems it is advisable and in the best interests of the Corporation to take the following actions, it is hereby:

RESOLVED, that the officers of the Corporation shall make such filings and take such actions as may be necessary to cause the Corporation to receive from the Internal Revenue Service a determination letter recognizing the tax exemption of the Corporation under Section 501(c)(3) of the Internal Revenue Code; and it is

FURTHER RESOLVED, that the accounting and tax year of the Corporation shall be January 1st through December 31st, unless otherwise determined by resolution of the Board at a later date pursuant to the provisions of the Bylaws; and it is

FURTHER RESOLVED, that the officers of the Corporation are hereby authorized to pay all fees and expenses incident to and necessary for the organization of the Corporation; and it is

FURTHER RESOLVED, that the officers of the Corporation are hereby authorized to open such bank accounts in the name of the Corporation in such bank or banks as they shall determine necessary for the deposit of funds belonging to the Corporation, such funds to be withdrawn only by check of the Corporation and other orders for the payment of money drawn in the name of the Corporation when signed by an officer of the Corporation; and it is

FURTHER RESOLVED, that the President and Treasurer are hereby authorized to sign checks, drafts, or other orders for payment of money on behalf of the Corporation; sign acceptances, notes, or other evidences of indebtedness on behalf of the Corporation; enter into contracts on behalf of the Corporation; execute and deliver other documents and instruments on behalf of the Corporation; and it is

FURTHER RESOLVED, that the officers of the Corporation are hereby authorized to exercise all such powers of the Corporation and take all such lawful acts that they deem necessary to implement the foregoing resolutions of the Corporation that are not by law, by the Articles of Incorporation, or by the Bylaws of the Corporation reserved or required to be exercised or done by the Board of Directors; and it is

FURTHER RESOLVED, that all activities and actions taken and documents executed heretofore by any incorporator, director, or officer of the Corporation in connection with the organization and operation of the Corporation are hereby ratified, confirmed, and approved in all respects.

<u>Adoption of Governance Policies</u>

WHEREAS, the Conflict of Interest Policy (Exhibit B), Compensation Review Policy (Exhibit C), Document Retention Policy (Exhibit D), and Whistleblower Policy (Exhibit E) of the Corporation have been presented to the Board of Directors;

WHEREAS, the Board of Directors has reviewed these governance policies and deems it is advisable and in the best interests of the Corporation to adopt these governance policies, it is hereby:

CONFIDENTIAL                    **JA256**                    SFFA-Harvard 0000069

RESOLVED, that the Conflict of Interest Policy, Compensation Review Policy, Document Retention Policy, and Whistleblower Policy are hereby approved and adopted in their entireties, and ordered to be inserted in the minute book of the Corporation.

\*   \*   \*

This action by unanimous written consent may be signed in any number of counterparts, all of which when taken together will constitute one and the same document.

Dated:  August 6, 2014

[SIGNATURE PAGE FOLLOWS]

**CONFIDENTIAL**                    **JA257**                    **SFFA-Harvard 0000070**

SIGNATURE PAGE TO
UNANIMOUS WRITTEN CONSENT
IN LIEU OF AN ORGANIZATIONAL MEETING
*of*
THE BOARD OF DIRECTORS
*of*
STUDENTS FOR FAIR ADMISSIONS, INC.

IN WITNESS WHEREOF, the undersigned have executed this Written Consent as of the date set forth above.

_____
Edward Blum
Director

_____
Abigail Fisher
Director

_____
Richard Fisher
Director

– 4 –

SIGNATURE PAGE TO
UNANIMOUS WRITTEN CONSENT
IN LIEU OF AN ORGANIZATIONAL MEETING
*of*
THE BOARD OF DIRECTORS
*of*
STUDENTS FOR FAIR ADMISSIONS, INC.

      IN WITNESS WHEREOF, the undersigned have executed this Written Consent as of the date set forth above.

                    Edward Blum
                    Director

                    Abigail Fisher
                    Director

                    Richard Fisher
                    Director

- 3 -

**JA259** SFFA-Harvard 0000072

SIGNATURE PAGE TO
UNANIMOUS WRITTEN CONSENT
IN LIEU OF AN ORGANIZATIONAL MEETING
*of*
THE BOARD OF DIRECTORS
*of*
STUDENTS FOR FAIR ADMISSIONS, INC.

IN WITNESS WHEREOF, the undersigned have executed this Written Consent as of the date set forth above.

_____
Edward Blum
Director


_____
Abigail Fisher
Director


_____
Richard Fisher
Director

- 4 -

CONFIDENTIAL       SFFA-Harvard 0000073

# EXHIBIT A

Bylaws
(see attached)

BYLAWS

*of*

STUDENTS FOR FAIR ADMISSIONS, INC.

(Formed under the Virginia Nonstock Corporation Act)

(Adopted August 6, 2014)

## ARTICLE I
*Name and Location*

Section 1.01   Name.  The name of the corporation is Students for Fair Admissions, Inc. (the "Corporation").

Section 1.02   Location.  The principal office of the Corporation shall be located at 109 North Henry Street, Alexandria, Virginia 22314, or at any other place approved by the Board of Directors.

Section 1.03   Registered Office and Agent.   The Corporation shall continuously maintain a registered office and agent within the Commonwealth of Virginia at such place as may be designated by the Board of Directors.  The Corporation's initial registered office and agent are set forth in the Articles of Incorporation.

## ARTICLE II
*Purposes*

The Corporation is organized and shall be operated exclusively for charitable, religious, scientific, literary, educational and other purposes within the meaning of Section 501(c)(3) of the Internal Revenue Code of 1986, as now in effect or as hereafter may be amended (the "Code"). The purposes for which the Corporation is formed are to defend human and civil rights secured by law, including the right of individuals to equal protection under the law, through litigation and any other lawful means, and to engage in any lawful act or activity for which corporations may be organized under the Virginia Nonstock Corporation Act (the "Act").  In furtherance thereof, the Corporation shall have all the general powers enumerated in Sections 13.1-826 and 13.1-827 of the Act.

## ARTICLE III
*Membership*

Section 3.01   Members.  The Corporation shall have no members within the meaning of the Act.

Section 3.02   Affiliate Members.   The Corporation shall have one class of affiliate members with rights, privileges, and obligations established by the Board of Directors.  Affiliate members have no voting rights and are not members within the meaning of the Act.  Any

individual who seeks to support the purposes and mission of the Corporation shall be eligible to be an affiliate member, subject to any additional standards that may be set from time to time by the Board of Directors. The Board of Directors shall have authority to recognize any individual as an affiliate member.

## ARTICLE IV
### Board of Directors

Section 4.01    Power of Board of Directors.   The business and affairs of the Corporation shall be managed by the Board of Directors.

Section 4.02    Number of Directors.   The number of directors of the Corporation is no fewer than three (3), but no more than five (5), and may be increased or decreased from time to time by action of the Board of Directors.

Section 4.03    Election and Term of Directors.   The initial Board of Directors shall consist of those directors named in the Action of the Sole Incorporator dated July 30, 2014 and shall serve until their successors are elected and qualified. Thereafter, directors shall be elected at an annual meeting of the Board of Directors by an affirmative vote of a majority of the directors then in office, and each shall continue in office until his or her successor is elected or qualified (unless the Board of Directors, at the annual meeting, determines that there is to be no such immediate successor), or until his or her death, resignation, or removal.   The tenure of incumbent members of the Board of Directors shall not be affected by an increase or decrease in the number of directors.

Section 4.04    Vacancies and Newly-Created Directorships.   Vacancies and newly-created directorships, resulting from any increase in the authorized number of directors, may be filled by a majority vote of the directors then in office although less than a quorum, or by a sole remaining director.   A director elected to fill a vacancy or newly-created directorship shall hold office until the next annual meeting of the Board of Directors and until his or her successor is elected and qualified.

Section 4.05    Removal.   Any director may be removed with or without cause at any time by action of the Board.   A director may be removed only at a meeting called for that purpose (together with other purposes, if any).

Section 4.06    Resignations.   Any director may resign at any time upon written notice to the Corporation.   Unless otherwise specified in the written notice, the resignation shall be effective upon delivery to the Corporation.

Section 4.07    Quorum of the Board of Directors and Action of the Board of Directors. Unless a greater proportion is required by law or by these Bylaws for adoption of a particular action, a majority of the directors shall constitute a quorum for the transaction of business and, except as otherwise provided by law or by the Articles of Incorporation or these Bylaws, the vote of a majority of the directors present at the meeting at which a quorum is present shall be the act of the Board of Directors.

CONFIDENTIAL     SFFA-Harvard 0000076

Section 4.08     Meetings of the Board of Directors.     An annual meeting of the Board of Directors shall be held each year at such time and place as shall be fixed by the Board of Directors, for the election of officers and directors and for the transaction of such other business as may properly come before the meeting.     Regular meetings of the Board of Directors shall be held at such times as may be fixed by the Board of Directors.     Special meetings of the Board of Directors may be held at any time whenever called by a majority of the directors then in office. Notice of all special meetings shall be delivered in writing to all directors and shall specify the matters to be addressed at such meeting.     Meetings of the Board of Directors may be held at such places within or without the Commonwealth of Virginia as may be fixed by the Board of Directors for annual and regular meetings and in the notice of meeting for special meetings.

Section 4.09     Informal Action by the Board of Directors.     Unless otherwise restricted by the Articles of Incorporation or these Bylaws, any action required or permitted to be taken by the Board of Directors may be taken without a meeting if all directors consent in writing to the adoption of a resolution authorizing the action.     The resolution and the written consents thereto by the directors shall be filed with the minutes of proceedings of the Board of Directors.     A written consent and the signing thereof may be accomplished by one or more electronic transmissions, including a signed email message from the applicable director.

Section 4.10     Meetings by Conference Telephone.     Any one or more members of the Board of Directors may participate in a meeting of such Board of Directors by means of conference telephone or similar communications equipment by means of which all persons participating in the meeting can communicate with one another.     Participation in a meeting by such means shall constitute presence in person at the meeting.

Section 4.11     Compensation of Directors.     The Corporation may not pay any compensation to directors for services rendered, except that directors may be reimbursed for expenses incurred in the performance of their duties to the Corporation, in reasonable amounts as approved by a majority of the entire Board of Directors.

## ARTICLE V
### Committees

Section 5.01     General Provisions.     A majority of the Board of Directors may create one or more committees and appoint members of the Board of Directors to serve on them.     To the extent specified by the Board of Directors, each committee may exercise the authority of the Board of Directors, except that a committee may not exercise authority prohibited by law.

Section 5.02     Committee Rules.     Requirements for the Board of Directors set forth herein or, if applicable, in Sections 13.1-864 through 13.1-868 of the Act as now in effect or as may hereafter be amended, or any other statutory provision, governing meetings, action without meetings, notice and waiver of notice, and quorum and voting requirements shall apply to committees and their members as well.

- 3 -

## ARTICLE VI
### *Officers, Agents, and Employees*

Section 6.01   Officers.   The Board of Directors shall elect or appoint a President, Secretary, and Treasurer, and it may, if it so determines, elect or appoint one or more Vice Presidents, Assistant Secretaries, Assistant Treasurers, and other officers and may give any of them such further designation or alternate titles as it considers desirable. The same individual may simultaneously hold more than one office in the Corporation.

Section 6.02   Term of Office, Vacancies and Removal.   Each officer shall hold office for the term for which he or she is elected or appointed and until his or her successor is elected or appointed and qualified, or until his or her earlier death, resignation or removal. All officers shall be elected or appointed at the annual meeting of the Board of Directors, except in the case of initial officers and vacancies resulting from any resignation or removal, which may be filled by the Board of Directors as needed. An officer appointed or elected to fill a vacancy shall hold office for the unexpired term of his or her predecessor in office, and until his or her successor is elected and qualified. Any officer may be removed by the Board of Directors with or without cause at any time.

Section 6.03   Resignation.   Any officer may resign at any time by giving written notice to the Corporation. Unless otherwise specified in the written notice, the resignation shall be effective upon delivery to the Corporation.

Section 6.04   Powers and Duties of Officers.   Subject to the control of the Board of Directors, all officers as between themselves and the Corporation shall have such authority and perform such duties in the management of the Corporation as may be provided by the Board of Directors and, to the extent not so provided, as generally pertain to their respective offices.

*President.* The President shall serve as the chief executive officer of the Corporation and preside at all meetings of the Board of Directors. The President shall supervise and control all of the affairs of the Corporation and oversee the management of the Corporation in accordance with policies and directives approved by the Board of Directors, including appointing assistants and hiring employees as necessary to ensure orderly operations.

*Secretary.* The Secretary shall be responsible for the keeping of an accurate record of the proceedings of all meetings of the Board of Directors, shall give or cause to be given all notices in accordance with these Bylaws or as required by law, and shall perform all duties customary to the office of Secretary.

*Treasurer.* The Treasurer shall have the custody of, and be responsible for, all funds and securities of the Corporation. He or she shall keep or cause to be kept complete and accurate accounts of receipts and disbursements of the Corporation, and shall deposit all monies and other valuable property of the Corporation in the name and to the credit of the Corporation in such banks or depositories as the Board of Directors may designate. Whenever required by the Board of Directors, the Treasurer shall render a statement of accounts. He or she shall at all reasonable times exhibit the books and accounts to any

~ 4 ~

officer or director of the Corporation, and shall perform all duties incident to the office of Treasurer, subject to the supervision of the Board of Directors, and such other duties as shall from time to time be assigned by the Board of Directors.

Section 6.05    Agents and Employees.    The Board of Directors may appoint agents and employees who shall have such authority and perform such duties as may be prescribed by the Board of Directors.  The Board of Directors may remove any agent or employee at any time with or without cause.  Removal without cause shall be without prejudice to such person's contract rights, if any, and the appointment of such person shall not itself create contract rights.

Section 6.06    Compensation of Officers, Agents and Employees.    The Corporation may pay compensation to officers for services rendered to the Corporation in their capacity as officers, and officers may be reimbursed for expenses incurred in the performance of their duties to the Corporation, in reasonable amounts as approved by a majority of the entire Board of Directors.    The Corporation may pay compensation in reasonable amounts to agents and employees for services rendered, such amounts to be fixed by the Board of Directors or, if the Board of Directors delegates power to any officer or officers, then by such officer or officers. The Board of Directors may require officers, agents or employees to give security for the faithful performance of their duties.

## ARTICLE VII
### *Miscellaneous*

Section 7.01    Fiscal Year.    The fiscal year of the Corporation shall be the calendar year or such other period as may be fixed by the Board of Directors.

Section 7.02    Corporate Seal.    The corporate seal, if any, shall be circular in form, shall have the name of the Corporation inscribed thereon and shall contain the words "Corporate Seal" and "Virginia" and the year the Corporation was formed in the center, or shall be in such form as may be approved from time to time by the Board of Directors.

Section 7.03    Checks, Notes, Contracts.    The Board of Directors shall determine who shall be authorized from time to time on the Corporation's behalf to: (A) sign checks, drafts, or other orders for payment of money; (B) to sign acceptances, notes, or other evidences of indebtedness; (C) to enter into contracts; and (D) to execute and deliver other documents and instruments.

Section 7.04    Books and Records.    The Corporation shall keep correct and complete books and records of account, the activities and transactions of the Corporation, minutes of the proceedings of the Board of Directors and any committee of the Corporation, a current list of the directors and officers of the Corporation, their business addresses and the Corporation's most recent annual report.  Any of the books, minutes, and records of the Corporation may be in written form or in any other form capable of being converted into written form within a reasonable time.

Section 7.05    Amendment of Articles of Incorporation and Bylaws.    The Articles of Incorporation or Bylaws of the Corporation may be amended in whole or in part by a majority

- 5 -

vote of the directors then in office and upon the taking of any other actions required under the Act.

Section 7.06  Indemnification and Insurance.  The Corporation shall indemnify any director, any former director, any person who while a director of the Corporation may have served at its request as a director, officer, partner, trustee, employee, or agent of another foreign or domestic corporation, partnership, joint venture, trust, employee benefit plan or other enterprise, and may, by resolution of the Board of Directors, indemnify any officer, employee, or agent against any and all expenses and liabilities actually and necessarily incurred by him or her or imposed on him or her in connection with any claim, action, suit, or proceeding (whether actual or threatened, civil, criminal, administrative, or investigative, including appeals) to which he or she may be or is made a party by reason of being or having been such director, officer, employee or agent; subject to the limitation, however, that there shall be no indemnification in relation to matters unless such person: (1) conducted himself or herself in good faith; (2) believed in the case of conduct in his or her official capacity with the Corporation that his or her conduct was in the best interest of the Corporation; and in all other cases that his or her conduct was at least not opposed to the best interests of the Corporation; or (3) in the case of any criminal proceeding, he or she had no reasonable cause to believe that his or her conduct was unlawful.  Further, there shall be no indemnification in connection with a proceeding (A) by or in the right of the Corporation in which the director, officer, employee or agent was judged liable to the Corporation, or (B) in which improper personal benefit is charged.

The Corporation shall upon order of a court of competent jurisdiction indemnify a director who entirely prevails in the defense of any proceeding to which he or she was a party because he or she is or was a director of the Corporation, for reasonable expenses incurred by him or her in connection with the proceeding.

Amounts paid in indemnification of expenses and liabilities may include, but shall not be limited to, counsel fees and other fees; costs and disbursements; judgments, fines, and penalties against, and amounts paid in settlement by, such director, officer, employee or agent.  The Corporation may pay for or reimburse the reasonable expenses in advance of final disposition of the proceeding provided that the provisions of Section 13.1-878 of the Act are met.

The provisions of this Article shall be applicable to claims, actions, suits, or proceedings made or commenced after the adoption hereof, whether arising from acts or omissions to act occurring before or after adoption hereof.

The indemnification provided by this Article shall not be deemed exclusive of any other rights to which such director, officer, or employee may be entitled under any statute, bylaw, agreement, vote of the Board of Directors, or otherwise and shall not restrict the power of the Corporation to make any indemnification permitted by law.

The Board of Directors may authorize the purchase of and maintain insurance on behalf of any director, officer, employee or agent of the Corporation against any liability asserted against or incurred by him or her which arises out of such person's status in such capacity or who is or was serving at the request of the Corporation as a director, officer, employee or agent of another foreign or domestic corporation, partnership, joint venture, trust, employee benefit plan

- 6 -

or otherwise, or out of acts taken in such capacity, whether or not the Corporation would have the power to indemnify the person against that liability under law.

If any part of this Section shall be found in any action, suit or proceeding to be invalid or ineffective, the validity and the effectiveness of the remaining parts shall not be affected.

Section 7.07    Dissolution.    The Corporation may be dissolved at any time by majority vote of the directors then in office and upon the taking of any other actions required under the Act.  In the event of dissolution or final liquidation of the Corporation, all of the remaining assets of the Corporation shall, after paying or making provision for the payment of all of the liabilities and obligations of the Corporation and for necessary expenses thereof, be distributed as determined by the Board of Directors in accordance with the Articles of Incorporation and applicable law.

- 7 -

## EXHIBIT B

Conflict of Interest Policy
(see attached)

**CONFIDENTIAL**

**JA269**

**SFFA-Harvard 0000082**

*Adopted August 6, 2014*

## STUDENTS FOR FAIR ADMISSIONS, INC.

### Conflict of Interest Policy

### I.   Purpose

The purpose of this Conflict of Interest Policy is to protect the interests of Students for Fair Admissions, Inc. (the "Corporation") as a tax-exempt, charitable and educational organization when it is contemplating entering into a transaction or arrangement that might benefit the private interest of an officer or director of the Corporation or might possibly result in an excess benefit transaction. This Policy is intended to supplement but not replace any applicable state and federal laws governing conflicts of interest applicable to nonprofit entities.

### II.   Definitions

A.   **Interested Person** – Any director, principal officer, or member of a committee with Board of Directors-delegated powers, who has a direct or indirect financial interest, as defined below, is an interested person.

B.   **Financial Interest** – A person has a financial interest if the person has, directly or indirectly, through business, investment, or family:

1.   An ownership or investment interest in any entity with which the Corporation has a transaction or arrangement;

2.   A compensation arrangement with the Corporation or with any entity or individual with which the Corporation has a transaction or arrangement; or

3.   A potential ownership or investment interest in, or compensation arrangement with, any entity or individual with which the Corporation is negotiating a transaction or arrangement.

Compensation includes direct and indirect remuneration as well as gifts or favors that are not insubstantial. A financial interest is not necessarily a conflict of interest. Under Section III.B, a person who has a financial interest may have a conflict of interest only if the Board of Directors or committee with Board of Directors-delegated powers decides that a conflict of interest exists.

### III.   Procedures

A.   **Duty to Disclose** – In connection with any actual or possible conflict of interest, an interested person must disclose on an ongoing basis the existence of the financial interest and be given the opportunity to disclose all material facts to the directors and members of committees with Board of Directors delegated powers considering the proposed transaction or arrangement.

B.    **Determining Whether a Conflict of Interest Exists** – After disclosure of the financial interest and all material facts, and after any discussion with the interested person, he/she shall leave the Board of Directors or committee with Board of Directors-delegated powers meeting while the determination of a conflict of interest is discussed and voted upon.    The remaining board or committee members shall decide if a conflict of interest exists.

C.    **Procedures for Addressing the Conflict of Interest**

1.    An interested person may make a presentation at the Board of Directors or committee with Board of Directors-delegated powers meeting, but after the presentation, he/she shall leave the meeting during the discussion of, and the vote on, the transaction or arrangement involving the possible conflict of interest.

2.    The President of the Corporation or chairperson of the committee with Board of Directors-delegated powers shall, if appropriate, appoint a disinterested person or committee to investigate alternatives to the proposed transaction or arrangement.

3.    After exercising due diligence, the Board of Directors or committee with Board of Directors-delegated powers shall determine whether the Corporation can obtain with reasonable efforts a more advantageous transaction or arrangement from a person or entity that would not give rise to a conflict of interest.

4.    If a more advantageous transaction or arrangement is not reasonably possible under circumstances not producing a conflict of interest, the Board of Directors or committee with Board of Directors-delegated powers shall determine by a majority vote of the disinterested members whether the transaction or arrangement is in the Corporation's best interest, for its own benefit, and whether it is fair and reasonable.    In conformity with the above determination it shall make its decision as to whether to enter into the transaction or arrangement.

D.    **Violations of the Conflict of Interest Policy**

1.    If the Board of Directors or committee with Board of Directors-delegated powers has reasonable cause to believe a member has failed to disclose an actual or possible conflict of interest, it shall inform the member of the basis for such belief and afford the member an opportunity to explain the alleged failure to disclose.

2.    If, after hearing the member's response and after making further investigation as warranted by the circumstances, the Board of Directors or committee with Board of Directors-delegated powers determines the member has failed to disclose an actual or possible conflict of interest, it shall take appropriate disciplinary and corrective action.

2

**CONFIDENTIAL**                    **JA271**                    **SFFA-Harvard 0000084**

*Adopted August 6, 2014*

IV.   Records of Proceedings

The minutes of the Board of Directors and all committees with Board of Directors-delegated powers shall contain:

A.   The names of the persons who disclosed or otherwise were found to have a financial interest in connection with an actual or possible conflict of interest, the nature of the financial interest, any action taken to determine whether a conflict of interest was present, and the decision of the Board of Directors or committee with Board of Directors-delegated powers as to whether a conflict of interest in fact existed; and

B.   The names of the persons who were present for discussions and votes relating to the transaction or arrangement, the content of the discussion (including any alternatives to the proposed transaction or arrangement), and a record of any votes taken in connection with the proceedings.

V.   Compensation

A.   A director who receives compensation, directly or indirectly, from the Corporation for services is precluded from voting on matters pertaining to that director's compensation.

B.   A voting member of any committee with Board of Directors-delegated powers whose jurisdiction includes compensation matters and who receives compensation, directly or indirectly, from the Corporation for services is precluded from voting on matters pertaining to that member's compensation.

C.   No director or voting member of any committee with Board of Directors-delegated powers whose jurisdiction includes compensation matters and who receives compensation, directly or indirectly, from the Corporation, either individually or collectively, is prohibited from providing information to any such committee regarding compensation.

VI.   Annual Statements

Each director, principal officer and member of a committee with Board of Directors-delegated powers shall annually sign a statement which affirms such person:

A.   Has received a copy of the Conflict of Interest Policy;

B.   Has read and understands the Policy;

C.   Has agreed to comply with the Policy; and

D.   Understands the Corporation is a nonprofit, charitable and educational organization and in order to maintain its federal tax exemption it must engage primarily in activities which accomplish one or more of its tax-exempt purposes.

3

*Adopted August 6, 2014*

### VII.  Periodic Reviews

To ensure the Corporation operates in a manner consistent with its charitable and educational purposes and does not engage in activities that could jeopardize its tax-exempt status, periodic reviews shall be conducted.  The periodic reviews shall, at a minimum, include the following subjects:

i.    Whether compensation arrangements and benefits are reasonable, based on competent survey information, and the result of arm's length bargaining; and

ii.   Whether partnerships, joint ventures, and arrangements with management entities conform to the Corporation's written policies, are properly recorded, reflect reasonable investment or payments for goods and services, further the charitable and educational purposes of the Corporation and do not result in inurement, impermissible private benefit or in an excess benefit transaction.

### VIII.  Use of Outside Experts

When conducting the periodic reviews pursuant to Section VII, the Corporation may, but need not, use outside advisors.  If outside experts are used, their use shall not relieve the Board of Directors of its responsibility for ensuring periodic reviews are conducted.

CONFIDENTIAL

SFFA-Harvard 0000086

STUDENTS FOR FAIR ADMISSIONS, INC.

### Annual Conflict of Interest Disclosure Statement

I hereby acknowledge that I have received a copy of Students for Fair Admissions, Inc.'s Conflict of Interest Policy ("Policy") and that I have read and understand its terms. I understand that Students for Fairness, Inc. is a nonprofit, charitable and educational organization and in order to maintain its federal tax exemption it must engage primarily in activities which accomplish one or more of its tax-exempt purposes. To the best of my knowledge, except as disclosed below, I do not have a Conflict of Interest, as defined in the Policy, requiring disclosure under the Policy.

☑ Without exception

☐ Except as described below

Disclosure of Financial Interest that may give rise to a Conflict of Interest (a written statement may be attached if additional space is needed):

_____

_____

_____

_____

_____

_____

_____

_____

_____

If any situation should arise in the future which I believe may or does pose a Conflict of Interest, I will promptly disclose the applicable Financial Interest in writing to the President.

By signing below I indicate my agreement to comply with the terms of the Policy and of this Disclosure Statement.

Signature: _____          Date: 8-12-14

Print Name: Edward Blum

STUDENTS FOR FAIR ADMISSIONS, INC.

Annual Conflict of Interest Disclosure Statement

I hereby acknowledge that I have received a copy of Students for Fair Admissions, Inc.'s Conflict of Interest Policy ("Policy") and that I have read and understand its terms. I understand that Students for Fairness, Inc. is a nonprofit, charitable and educational organization and in order to maintain its federal tax exemption it must engage primarily in activities which accomplish one or more of its tax-exempt purposes. To the best of my knowledge, except as disclosed below, I do not have a Conflict of Interest, as defined in the Policy, requiring disclosure under the Policy.

☒ Without exception

☐ Except as described below

Disclosure of Financial Interest that may give rise to a Conflict of Interest (a written statement may be attached if additional space is needed):

If any situation should arise in the future which I believe may or does pose a Conflict of Interest, I will promptly disclose the applicable Financial Interest in writing to the President.

By signing below I indicate my agreement to comply with the terms of the Policy and of this Disclosure Statement.

Signature: _Richard Fisher_     Date: August 1, 2014

Print Name: Richard Fisher

## STUDENTS FOR FAIR ADMISSIONS, INC.

### Annual Conflict of Interest Disclosure Statement

I hereby acknowledge that I have received a copy of Students for Fair Admissions, Inc.'s Conflict of Interest Policy ("Policy") and that I have read and understand its terms. I understand that Students for Fairness, Inc. is a nonprofit, charitable and educational organization and in order to maintain its federal tax exemption it must engage primarily in activities which accomplish one or more of its tax-exempt purposes. To the best of my knowledge, except as disclosed below, I do not have a Conflict of Interest, as defined in the Policy, requiring disclosure under the Policy.

☒ Without exception

☐ Except as described below

Disclosure of Financial Interest that may give rise to a Conflict of Interest (a written statement may be attached if additional space is needed):

_____

_____

_____

_____

_____

_____

_____

_____

_____

If any situation should arise in the future which I believe may or does pose a Conflict of Interest, I will promptly disclose the applicable Financial Interest in writing to the President.

By signing below I indicate my agreement to comply with the terms of the Policy and of this Disclosure Statement.

Signature: _Abigail Fisher_____     Date: _8-11-14_____

Print Name: _Abigail Fisher_____

## EXHIBIT C

Compensation Review Policy
(see attached)

*Adopted on August 6, 2014*

## STUDENTS FOR FAIR ADMISSIONS, INC.

### Compensation Review Policy

This Compensation Review Policy applies to Students for Fair Admission, Inc.'s (the "Corporation") Chief Employed Executive, Officers, Key Employees, and Disqualified Persons. The purpose of this policy is to ensure the Corporation does not engage in any "excess benefit transaction" as defined in Section 4958 of the Internal Revenue Code ("I.R.C.") and regulations promulgated thereunder.[1]

1. **Definitions**

   a. **Chief Employed Executive** – The chief executive officer, executive director, or top management official (i.e., the employee who has ultimate responsibility for implementing the decisions of the Corporation's governing body or for supervising the management, administration, or operations of the Corporation).

   b. **Officer** – A person elected or appointed to manage the Corporation's daily operations, such as a president, vice president, secretary, or treasurer. The officers of the Corporation are determined by reference to its organizing document, bylaws, or resolutions of its governing body, or as otherwise designated consistent with state law, but at a minimum include those officers required by applicable law. The Corporation's top management official and top financial official (the person who has ultimate responsibility for managing the Corporation's finances) are included as officers.

   c. **Key Employee** – An employee of the Corporation who meets all three of the following tests: (a) *$100,000 Test* – receives reportable compensation from the Corporation and all related entities in excess of $100,000 for the year; (b) *Responsibility Test* – the employee (i) has responsibility, powers, or influence over the Corporation as a whole that is similar to those of officers, directors, or trustees, (ii) manages a discrete segment or activity of the Corporation that represents 10% or more of its activities, assets, income, or expenses of the Corporation, as compared to the Corporation as a whole, or (iii) has or shares authority to control or determine 10% or more of the Corporation's capital expenditures, operating budget, or compensation for employees; and (c) *Top 20 Test* – is one of the 20 employees (that satisfy the $100,000 Test and Responsibility Test) with the highest reportable compensation from the Corporation and related entities for the year.

   d. **Disqualified Person** – Any person (including any management company or entity acting as a consultant or independent contractor) in a position to exercise substantial influence over the affairs of the Corporation. To be a disqualified

---

[1] See *An Introduction to I.R.C. 4958 (Intermediate Sanctions)* by Lawrence M. Brauer, Toussaint T. Tyson, Leonard J. Henzke and Debra J. Kawecki, (2002 EO CPE Text, page 259) (the "Introduction to I.R.C. 4958").

1

CONFIDENTIAL

JA278

SFFA-Harvard 0000091

*Adopted on August 6, 2014*

person, it is not necessary that the person *actually* exercise substantial influence, only that the person *be in a position to* exercise substantial influence. (*See* Treas Reg. § 53.4958-3T).

2.  Compensation Review Process

   a.  **Review and Approval.** The compensation of the Chief Employed Executive and each Officer, Key Employee or Disqualified Person shall be reviewed and approved by the Board of Directors or compensation committee of the Corporation, provided that directors or other persons with conflicts of interest with respect to the compensation arrangement at issue shall not be involved in this review and approval.

   b.  **Use of Comparable Compensation Data.** The compensation of the Chief Employed Executive and each Officer, Key Employee or Disqualified Person shall be reviewed and approved using data as to comparable compensation for similarly qualified persons in functionally comparable positions at similarly situated entities.

   c.  **Contemporaneous Documentation and Recordkeeping.** There shall be contemporaneous documentation and recordkeeping with respect to the deliberations and decisions regarding the compensation arrangement. The board of directors or compensation committee evaluating such compensation arrangement may, but shall not be required, to use the "Rebuttable Presumption Checklist" or other tools set forth in the Introduction to I.R.C. 4958.

**CONFIDENTIAL**

**SFFA-Harvard 0000092**

EXHIBIT D

Document Retention Policy
(see attached)

Case: 19-2005   Case 1:14-cv-14176-ADB   Document 419-87   Filed 06/15/18   Page 28 of 31 Date Filed: 07/30/2020   Entry ID: 6356615

Document 00147658236   Page: 293

*Adopted August 6, 2014*

## STUDENTS FOR FAIR ADMISSIONS, INC.

### Document Retention and Destruction Policy

This Document Retention and Destruction Policy identifies the record retention responsibilities of directors, officers, employees, volunteers, and outside agents and vendors of Students for Fair Admissions, Inc. (the "Corporation") for maintaining and documenting the storage and destruction of the Corporation's paper and electronic documents and records.

1.  **Rules.** The Corporation's directors, officers, employees, consultants, vendors, and volunteers are required to honor the following rules:

    a.  All documents or records containing information concerning the Corporation should be closely guarded and considered as containing confidential information not to be disseminated or distributed outside of the Corporation.

    b.  No paper or electronic documents will be destroyed or deleted if pertinent to any ongoing or anticipated government investigation or proceeding or any civil or criminal judicial proceeding.

    c.  Paper or electronic documents listed for retention below will be transferred and maintained by the President or his designee.

    d.  All other paper documents that do not fall under the retention schedule below will be destroyed after three years.

    e.  All other electronic documents that are not currently being used and do not fall under the retention schedule below will be deleted from all individual computers, databases, networks, and back-up storage after one year.

2.  **Retain Permanently**

    a.  **Governance records** – Articles of Incorporation and Bylaws, and any amendments thereto, other organizational documents, policies, governing board and committee written consents and minutes.

    b.  **Tax records** – Filed federal and state tax returns/reports and supporting records, application for tax exemption, tax exemption determination letter and related correspondence, and any files related to tax audits.

    c.  **Intellectual property records** – Copyright and trademark registrations and samples of protected works.

    d.  **Financial records** – Audited financial statements, attorney contingent liability letters.

1

**CONFIDENTIAL**   **JA281**   **SFFA-Harvard 0000094**

*Adopted August 6, 2014*

3. **Retain for 10 Years**

    a.    **Pension and benefit records** – Pension (ERISA) plan participant/beneficiary records, actuarial reports, related correspondence with government agencies, and supporting records.

    b.    **Government relations records** – Federal and state lobbying reports and supporting records.

4. **Retain for 3 Years**

    a.    **Employee/employment records** – Employee names, addresses, social security numbers, dates of birth, INS Form I-9, resume/application materials, job descriptions, dates of hire and termination/separation, evaluations, compensation information, promotions, transfers, disciplinary matters, time/payroll records, leave/comp time/FMLA, engagement and discharge correspondence, documentation of basis for independent contractor status (retain for all current employees and independent contractors and for three years after the departure of each individual).

    b.    **Lease, Insurance, and Contract/License Records** – Software license agreements, vendor, hotel, and service agreements, independent contractor agreements, employment agreements, consultant agreements, and all other agreements (retain during the term of the agreement and for three years after the termination, expiration, or non-renewal of each agreement).

5. **Retain for 1 Year**

    All other pertinent electronic records, documents, and files, such as correspondence files, publications, survey information.

6. **Exceptions**

    Any exceptions to these rules and the terms for retention may be granted only by the Corporation's President or Board of Directors in writing.

**CONFIDENTIAL**

**SFFA-Harvard 0000095**

## EXHIBIT E

Whistleblower Policy
(see attached)

*Adopted on August 6, 2014*

## STUDENTS FOR FAIR ADMISSIONS, INC.

### Whistleblower Policy

This Whistleblower Policy (1) encourages Students for Fair Admissions, Inc. (the "Corporation") employees and volunteers to come forward with information on possible illegal practices or serious violations of adopted policies of the Corporation, (2) specifies that the Corporation will protect any such person from retaliation, and (3) identifies where and how such information can be reported.

1. **Encouragement of Reporting.** The Corporation encourages complaints, reports, or inquiries about possible illegal practices or serious violations of the Corporation's policies, including illegal or improper conduct by the Corporation itself, by its leadership, or by others on its behalf. Appropriate subjects to report under this policy include financial improprieties, accounting or audit matters, ethical violations, or other similar illegal or improper practices.

2. **Protection from Retaliation.** The Corporation prohibits retaliation by or on behalf of the Corporation against employees or volunteers who make good-faith complaints, reports, or inquiries under this Policy or who participate in a review or investigation under this Policy. This protection extends to those whose allegations are made in good faith but prove to be mistaken. The Corporation reserves the right to discipline persons who make bad faith, knowingly false, or vexatious complaints, reports, or inquiries or who otherwise abuse this Policy.

3. **Where to Report.** Complaints, reports, or inquiries may be made under this Policy on a confidential or anonymous basis. Complaints should describe in detail the specific facts demonstrating the bases for the complaints, reports, or inquiries. Complaints may be directed to the Corporation's President; if this person is implicated in the complaint, report, or inquiry, then it should be directed to any other member of the Corporation's Board of Directors. The Corporation will conduct a prompt, discreet, and objective review or investigation. Employees or volunteers must recognize that the Corporation may be unable to fully evaluate a vague or general complaint, report, or inquiry that is made anonymously.

# EXHIBIT 88



1776 K STREET NW
WASHINGTON, DC 20006
PHONE  202.719.7000
FAX  202.719.7049

7925 JONES BRANCH DRIVE
McLEAN, VA 22102
PHONE  703.905.2800
FAX  703.905.2820

www.wileyrein.com

October 8, 2014

Robert D. Benton
202.719.7142
rbenton@wileyrein.com

**VIA EXPRESS MAIL**

Internal Revenue Service
201 West Rivercenter Blvd.
Attn: Extracting Stop 312
Covington, KY 41012-0192

Re:    Form 1023 (Application for Recognition of Exemption) on behalf of
       Students for Fair Admissions, Inc. (EIN: 47-1689810)

Dear Sir or Madam:

On behalf of Students for Fair Admissions, Inc., please find enclosed Form 1023
(Application for Recognition of Exemption) and its supporting materials.

The following documents are enclosed as part of Students for Fair Admissions'
application:

1.    Form 1023 Checklist

2.    $850 Check Payable to the U.S. Treasury

3.    Form 2848 (Power of Attorney and Declaration of Representative)

4.    Form 1023 (Application for Recognition of Exemption)

5.    Exhibit A – Articles of Incorporation

6.    Exhibit B – Bylaws

7.    Exhibit C – Narrative Description of Activities

8.    Exhibit D – Other Application Attachments

9.    Exhibit E – Conflict of Interest Policy

Please do not hesitate to call me at 202-719-7142 if you have any questions or
comments concerning the enclosed application.

                    SFFA-Harvard 0000008



Internal Revenue Service
October 8, 2014
Page 2

Sincerely,

Robert D. Benton

Enclosures

SFFA-Harvard 0000009

# Form 1023 Checklist
## (Revised December 2013)

Application for Recognition of Exemption under Section 501(c)(3) of the
Internal Revenue Code

*Note. Retain a copy of the completed Form 1023 in your permanent records. Refer to the General Instructions regarding Public Inspection of approved applications.*

**Check each box to finish your application (Form 1023). Send this completed Checklist with your filled-in application. If you have not answered all the items below, your application may be returned to you as incomplete.**

- ☑ Assemble the application and materials in this order:
  - ● Form 1023 Checklist
  - ● Form 2848, *Power of Attorney and Declaration of Representative* (if filing)
  - ● Form 8821, *Tax Information Authorization* (if filing)
  - ● Expedite request (if requesting)
  - ● Application (Form 1023 and Schedules A through H, as required)
  - ● Articles of organization
  - ● Amendments to articles of organization in chronological order
  - ● Bylaws or other rules of operation and amendments
  - ● Documentation of nondiscriminatory policy for schools, as required by Schedule B
  - ● Form 5768, Election/Revocation of Election by an Eligible Section 501(c)(3) Organization To Make Expenditures To Influence Legislation (if filing)
  - ● All other attachments, including explanations, financial data, and printed materials or publications. Label each page with name and EIN.

- ☑ User fee payment placed in envelope on top of checklist. DO NOT STAPLE or otherwise attach your check or money order to your application. Instead, just place it in the envelope.

- ☑ Employer Identification Number (EIN)

- ☑ Completed Parts I through XI of the application, including any requested information and any required Schedules A through H.
  - ● You must provide specific details about your past, present, and planned activities.
  - ● Generalizations or failure to answer questions in the Form 1023 application will prevent us from recognizing you as tax exempt.
  - ● Describe your purposes and proposed activities in specific easily understood terms.
  - ● Financial information should correspond with proposed activities.

- ☑ Schedules. Submit only those schedules that apply to you and check either "Yes" or "No" below.

| | | | |
|---|---|---|---|
| Schedule A   Yes _____  No ✓ | | Schedule E   Yes _____  No ✓ | |
| Schedule B   Yes _____  No ✓ | | Schedule F   Yes _____  No ✓ | |
| Schedule C   Yes _____  No ✓ | | Schedule G   Yes _____  No ✓ | |
| Schedule D   Yes _____  No ✓ | | Schedule H   Yes _____  No ✓ | |

**SFFA-Harvard 0000010**

☑ An exact copy of your complete articles of organization (creating document). Absence of the proper purpose and dissolution clauses is the number one reason for delays in the issuance of determination letters.

   ❋ Location of Purpose Clause from Part III, line 1 (Page, Article and Paragraph Number)   Page 1, Article 6

   ❋ Location of Dissolution Clause from Part III, line 2b or 2c (Page, Article and Paragraph Number) or by operation of state law   Pages 1-2, Article 8

☑ Signature of an officer, director, trustee, or other official who is authorized to sign the application.

   ❋ Signature at Part XI of Form 1023.

☑ Your name on the application must be the same as your legal name as it appears in your articles of organization.

Send completed Form 1023, user fee payment, and all other required information, to:

Internal Revenue Service
P.O. Box 192
Covington, KY 41012-0192

If you are using express mail or a delivery service, send Form 1023, user fee payment, and attachments to:

Internal Revenue Service
201 West Rivercenter Blvd.
Attn: Extracting Stop 312
Covington, KY 41011

**SFFA-Harvard 0000011**

**WILEY REIN LLP**
1776 K Street, N.W.
Washington, DC
**Operating Account**

291795

| Date | Amount |
|------|--------|
| 10/09/2014 | **********850.00 |

*Pay*   Eight Hundred Fifty and 00/100 Dollars ONLY

*To the
Order of*   UNITED STATES TREASURY
1500 PENNSYLVANIA AVE, NW
WASHINGTON, DC 20220

*Barry S. Strauss*

Bank of America, N.A.
Washington, DC

(Two Signatures Required For Amounts Over $1,000.00)

⑅⑅291795⑅⑅ ⑇054001204⑇ ⑅⑅000003702987⑅

---

Attached is our check in full settlement of items shown hereon. If not
correct, please return with explanation or call us at (202) 719-4266.

**No.   291795**

| UNITED STATES TREASURY | | | | | Check Date | 10/09/2014 |
|---|---|---|---|---|---|---|

| Description | Date | Invoice No. | Amount of Invoice | Discount | Net |
|---|---|---|---|---|---|
| FORM 1023 APP FEE | 10/08/2014 | 10082014 | 850.00 | .00 | 850.00 |
| | | | | Total | 850.00 |

Remittance Advice

Detach before depositing

**WILEY REIN LLP**
Operating Account

**SFFA-Harvard 0000012**

Form **2848**

(Rev. July 2014)
Department of the Treasury
Internal Revenue Service

## Power of Attorney
## and Declaration of Representative

▶ Information about Form 2848 and its instructions is at www.irs.gov/form2848.

OMB No. 1545-0150

For IRS Use Only
Received by:
Name ............................
Telephone ......................
Function ........................
Date ........ / ...... /

**Part I**  Power of Attorney

**Caution:** A separate Form 2848 must be completed for each taxpayer. Form 2848 will not be honored for any purpose other than representation before the IRS.

**1    Taxpayer information.** Taxpayer must sign and date this form on page 2, line 7.

| Taxpayer name and address | Taxpayer identification number(s) |
|---|---|
| Students for Fair Admissions, Inc.<br>3571 Far West Blvd #17<br>Austin, TX 78731 | 47-1889810 |
| | Daytime telephone number | Plan number (if applicable) |

hereby appoints the following representative(s) as attorney(s)-in-fact:

**2    Representative(s)** must sign and date this form on page 2, Part II.

| Name and address | |
|---|---|
| Robert D. Benton<br>Wiley Rein LLP<br>1776 K Street NW, Washington, DC 20006 | CAF No. ......... 0309-27699R<br>PTIN ....................................<br>Telephone No. ....... 202-719-7142<br>Fax No. ........... 202-719-7049 |
| Check if to be sent copies of notices and communications ☑ | Check if new: Address ☐  Telephone No. ☐  Fax No. ☐ |

| Name and address | |
|---|---|
| Brandis L. Zehr<br>Wiley Rein LLP<br>1776 K Street NW, Washington, DC 20006 | CAF No. ......... 0309-27701R<br>PTIN ....................................<br>Telephone No. ....... 202-719-7210<br>Fax No. ........... 202-719-7049 |
| Check if to be sent copies of notices and communications ☑ | Check if new: Address ☐  Telephone No. ☐  Fax No. ☐ |

| Name and address | |
|---|---|
| | CAF No. ....................................<br>PTIN ....................................<br>Telephone No. ................................<br>Fax No. ................................ |
| (Note. IRS sends notices and communications to only two representatives.) | Check if new: Address ☐  Telephone No. ☐  Fax No. ☐ |

| Name and address | |
|---|---|
| | CAF No. ....................................<br>PTIN ....................................<br>Telephone No. ................................<br>Fax No. ................................ |
| (Note. IRS sends notices and communications to only two representatives.) | Check if new: Address ☐  Telephone No. ☐  Fax No. ☐ |

to represent the taxpayer before the Internal Revenue Service and perform the following acts:

**3    Acts authorized (you are required to complete this line 3).** With the exception of the acts described in line 5b, I authorize my representative(s) to receive and inspect my confidential tax information and to perform acts that I can perform with respect to the tax matters described below. For example, my representative(s) shall have the authority to sign any agreements, consents, or similar documents (see instructions for line 5a for authorizing a representative to sign a return).

| Description of Matter (Income, Employment, Payroll, Excise, Estate, Gift, Whistleblower, Practitioner Discipline, PLR, FOIA, Civil Penalty, Sec. 5000A Shared Responsibility Payment, Sec. 4980H Shared Responsibility Payment, etc.) (see instructions) | Tax Form Number (1040, 941, 720, etc.) (if applicable) | Year(s) or Period(s) (if applicable) (see instructions) |
|---|---|---|
| Application for Recognition of Exemption Under Section 501(c)(3) | Form 1023 | |
| | | |
| | | |

**4    Specific use not recorded on Centralized Authorization File (CAF).** If the power of attorney is for a specific use not recorded on CAF, check this box. See the instructions for Line 4. Specific Use Not Recorded on CAF ........................................................... ▶ ☐

**5a    Additional acts authorized.** In addition to the acts listed on line 3 above, I authorize my representative(s) to perform the following acts (see instructions for line 5a for more information):

☐ Authorize disclosure to third parties;    ☐ Substitute or add representative(s);    ☐ Sign a return;

☐ Other acts authorized: ....................................................................................................................

For Privacy Act and Paperwork Reduction Act Notice, see the instructions.        Cat. No. 11980J        Form **2848** (Rev. 7-2014)

SFFA-Harvard 0000013

Form 2848 (Rev. 7-2014)                                                                                                      Page 2

b    Specific acts not authorized. My representative(s) is (are) not authorized to endorse or otherwise negotiate any check (including directing or
     accepting payment by any means, electronic or otherwise, into an account owned or controlled by the representative(s) or any firm or other
     entity with whom the representative(s) is (are) associated) issued by the government in respect of a federal tax liability.
     List any specific deletions to the acts otherwise authorized in this power of attorney (see instructions for line 5b):

6    Retention/revocation of prior power(s) of attorney. The filing of this power of attorney automatically revokes all earlier power(s) of
     attorney on file with the Internal Revenue Service for the same matters and years or periods covered by this document. If you do not want
     to revoke a prior power of attorney, check here . . . . . . . . . . . . . . . . . . . . . . . . . . . . . ▶ ☐
     YOU MUST ATTACH A COPY OF ANY POWER OF ATTORNEY YOU WANT TO REMAIN IN EFFECT.

7    Signature of taxpayer. If a tax matter concerns a year in which a joint return was filed, each spouse must file a separate power of attorney
     even if they are appointing the same representative(s). If signed by a corporate officer, partner, guardian, tax matters partner, executor,
     receiver, administrator, or trustee on behalf of the taxpayer, I certify that I have the authority to execute this form on behalf of the taxpayer.
     ▶ IF NOT COMPLETED, SIGNED, AND DATED, THE IRS WILL RETURN THIS POWER OF ATTORNEY TO THE TAXPAYER.

| Signature | 9-12-14 Date | President Title (if applicable) |
|---|---|---|
| Edward Blum Print Name | | Students for Fair Admissions, Inc. Print name of taxpayer from line 1 if other than individual |

## Part II    Declaration of Representative

Under penalties of perjury, by my signature below I declare that:

* I am not currently suspended or disbarred from practice before the Internal Revenue Service;
* I am subject to regulations contained in Circular 230 (31 CFR, Subtitle A, Part 10), as amended, governing practice before the Internal Revenue Service;
* I am authorized to represent the taxpayer identified in Part I for the matter(s) specified there; and
* I am one of the following:

a    Attorney—a member in good standing of the bar of the highest court of the jurisdiction shown below.
b    Certified Public Accountant—duly qualified to practice as a certified public accountant in the jurisdiction shown below.
c    Enrolled Agent—enrolled as an agent by the Internal Revenue Service per the requirements of Circular 230.
d    Officer—a bona fide officer of the taxpayer organization.
e    Full-Time Employee—a full-time employee of the taxpayer.
f    Family Member—a member of the taxpayer's immediate family (for example, spouse, parent, child, grandparent, grandchild, step-parent, step-child, brother, or sister).
g    Enrolled Actuary—enrolled as an actuary by the Joint Board for the Enrollment of Actuaries under 29 U.S.C. 1242 (the authority to practice before the Internal Revenue Service is limited by section 10.3(d) of Circular 230).
h    Unenrolled Return Preparer—Your authority to practice before the Internal Revenue Service is limited. You must have been eligible to sign the return under examination and have prepared and signed the return. See Notice 2011-6 and Special rules for registered tax return preparers and unenrolled return preparers in the instructions (PTIN required for designation h).
i    Registered Tax Return Preparer—registered as a tax return preparer under the requirements of section 10.4 of Circular 230. Your authority to practice before the Internal Revenue Service is limited. You must have been eligible to sign the return under examination and have prepared and signed the return. See Notice 2011-6 and Special rules for registered tax return preparers and unenrolled return preparers in the instructions (PTIN required for designation i).
k    Student Attorney or CPA—receives permission to represent taxpayers before the IRS by virtue of his/her status as a law, business, or accounting student working in an LITC or STCP. See instructions for Part II for additional information and requirements.
r    Enrolled Retirement Plan Agent—enrolled as a retirement plan agent under the requirements of Circular 230 (the authority to practice before the Internal Revenue Service is limited by section 10.3(e)).

     ▶ IF THIS DECLARATION OF REPRESENTATIVE IS NOT COMPLETED, SIGNED, AND DATED, THE IRS WILL RETURN THE
     POWER OF ATTORNEY. REPRESENTATIVES MUST SIGN IN THE ORDER LISTED IN PART I, LINE 2. See the instructions for
     Part II.

Note: For designations d-f, enter your title, position, or relationship to the taxpayer in the "Licensing jurisdiction" column. See the instructions for Part II for more information.

| Designation— Insert above letter (a–r) | Licensing jurisdiction (state) or other licensing authority (if applicable) | Bar, license, certification, registration, or enrollment number (if applicable). See instructions for Part II for more information. | Signature | Date |
|---|---|---|---|---|
| a | DC, NY, TX | 490503, 3065423, 24035510 | | 10/8/2014 |
| a | DC, VA | 490203, 78238 | Grandis L. Zinn | 10/8/2014 |
| | | | | |
| | | | | |

Form 2848 (Rev. 7-2014)

**JA292**                                                                  **SFFA-Harvard 0000014**

**Form 1023**
(Rev. December 2013)
Department of the Treasury
Internal Revenue Service

# Application for Recognition of Exemption
## Under Section 501(c)(3) of the Internal Revenue Code

(00)

▶ (Use with the June 2006 revision of the Instructions for Form 1023 and the current Notice 1382.)

OMB No. 1545-0056

Note: *If exempt status is approved, this application will be open for public inspection.*

Use the instructions to complete this application and for a definition of all **bold** items. For additional help, call IRS Exempt Organizations Customer Account Services toll-free at 1-877-829-5500. Visit our website at www.irs.gov for forms and publications. If the required information and documents are not submitted with payment of the appropriate user fee, the application may be returned to you.

Attach additional sheets to this application if you need more space to answer fully. Put your name and EIN on each sheet and identify each answer by Part and line number. Complete Parts I - XI of Form 1023 and submit only those Schedules (A through H) that apply to you.

### Part I    Identification of Applicant

| | |
|---|---|
| 1    Full name of organization (exactly as it appears in your **organizing document**)<br><br>Students for Fair Admissions, Inc. | 2    c/o Name (if applicable) |

| | | |
|---|---|---|
| 3    Mailing address (Number and street) (see instructions)<br><br>3571 Far West Blvd #17 | Room/Suite | 4    Employer Identification Number (EIN)<br><br>47-1689810 |
| City or town, state or country, and ZIP + 4<br><br>Austin, TX 78731 | | 5    Month the annual accounting period ends (01 – 12)<br><br>12 |

| | |
|---|---|
| 6    Primary contact (officer, director, trustee, or **authorized representative**)<br><br>a Name: Robert D. Benton | b Phone:    202-719-7142<br><br>c Fax: (optional)    202-719-7049 |

7    Are you represented by an authorized representative, such as an attorney or accountant? If "Yes," provide the authorized representative's name, and the name and address of the authorized representative's firm. Include a completed Form 2848, *Power of Attorney and Declaration of Representative*, with your application if you would like us to communicate with your representative.      ☑ Yes    ☐ No

8    Was a person who is not one of your officers, directors, trustees, employees, or an authorized representative listed in line 7, paid, or promised payment, to help plan, manage, or advise you about the structure or activities of your organization, or about your financial or tax matters? If "Yes," provide the person's name, the name and address of the person's firm, the amounts paid or promised to be paid, and describe that person's role.      ☐ Yes    ☑ No

9a    Organization's website: N/A

  b    Organization's email: (optional)

10    Certain organizations are not required to file an information return (Form 990 or Form 990-EZ). If you are granted tax-exemption, are you claiming to be excused from filing Form 990 or Form 990-EZ? If "Yes," explain. See the instructions for a description of organizations not required to file Form 990 or Form 990-EZ.      ☐ Yes    ☑ No

11    Date incorporated if a corporation, or formed, if other than a corporation.    (MM/DD/YYYY)    07 / 30 / 2014

12    Were you formed under the laws of a foreign country?      ☐ Yes    ☑ No
If "Yes," state the country.

For Paperwork Reduction Act Notice, see page 24 of the instructions.          Cat. No. 17133K          Form **1023** (Rev. 12-2013)

Form 1023 (Rev. 12-2013)    (00) Name: Students for Fair Admissions, Inc.    EIN: 47 - 1689310    Page 2

## Part II    Organizational Structure

You must be a corporation (including a limited liability company), an unincorporated association, or a trust to be tax exempt. (See instructions.) DO NOT file this form unless you can check "Yes" on lines 1, 2, 3, or 4.

| | | | |
|---|---|---|---|
| 1 | Are you a **corporation**? If "Yes," attach a copy of your articles of incorporation showing certification of filing with the appropriate state agency. Include copies of any amendments to your articles and be sure they also show state filing certification. | ☑ Yes | ☐ No |
| 2 | Are you a **limited liability company** (LLC)? If "Yes," attach a copy of your articles of organization showing certification of filing with the appropriate state agency. Also, if you adopted an operating agreement, attach a copy. Include copies of any amendments to your articles and be sure they show state filing certification. Refer to the instructions for circumstances when an LLC should not file its own exemption application. | ☐ Yes | ☑ No |
| 3 | Are you an **unincorporated association**? If "Yes," attach a copy of your articles of association, constitution, or other similar organizing document that is dated and includes at least two signatures. Include signed and dated copies of any amendments. | ☐ Yes | ☑ No |
| 4a | Are you a **trust**? If "Yes," attach a signed and dated copy of your trust agreement. Include signed and dated copies of any amendments. | ☐ Yes | ☑ No |
| b | Have you been funded? If "No," explain how you are formed without anything of value placed in trust. | ☐ Yes | ☐ No |
| 5 | Have you adopted **bylaws**? If "Yes," attach a current copy showing date of adoption. If "No," explain how your officers, directors, or trustees are selected. | ☑ Yes | ☐ No |

## Part III    Required Provisions in Your Organizing Document

The following questions are designed to ensure that when you file this application, your organizing document contains the required provisions to meet the organizational test under section 501(c)(3). Unless you can check the boxes in both lines 1 and 2, your organizing document does not meet the organizational test. DO NOT file this application until you have amended your organizing document. Submit your original and amended organizing documents (showing state filing certification if you are a corporation or an LLC) with your application.

| | | |
|---|---|---|
| 1 | Section 501(c)(3) requires that your organizing document state your exempt purpose(s), such as charitable, religious, educational, and/or scientific purposes. Check the box to confirm that your organizing document meets this requirement. Describe specifically where your organizing document meets this requirement, such as a reference to a particular article or section in your organizing document. Refer to the instructions for exempt purpose language. Location of Purpose Clause (Page, Article, and Paragraph):  **Page 1, Article 6** | ☑ |
| 2a | Section 501(c)(3) requires that upon dissolution of your organization, your remaining assets must be used exclusively for exempt purposes, such as charitable, religious, educational, and/or scientific purposes. Check the box on line 2a to confirm that your organizing document meets this requirement by express provision for the distribution of assets upon dissolution. If you rely on state law for your dissolution provision, do not check the box on line 2a and go to line 2c. | ☑ |
| 2b | If you checked the box on line 2a, specify the location of your dissolution clause (Page, Article, and Paragraph). Do not complete line 2c if you checked box 2a.  **Pages 1-2, Article 8** | |
| 2c | See the instructions for information about the operation of state law in your particular state. Check this box if you rely on operation of state law for your dissolution provision and indicate the state: | ☐ |

## Part IV    Narrative Description of Your Activities

Using an attachment, describe your *past*, *present*, and *planned* activities in a narrative. If you believe that you have already provided some of this information in response to other parts of this application, you may summarize that information here and refer to the specific parts of the application for supporting details. You may also attach representative copies of newsletters, brochures, or similar documents for supporting details to this narrative. Remember that if this application is approved, it will be open for public inspection. Therefore, your narrative description of activities should be thorough and accurate. Refer to the instructions for information that must be included in your description.

## Part V    Compensation and Other Financial Arrangements With Your Officers, Directors, Trustees, Employees, and Independent Contractors

1a  List the names, titles, and mailing addresses of all of your officers, directors, and trustees. For each person listed, state their total annual compensation, or proposed compensation, for all services to the organization, whether as an officer, employee, or other position. Use actual figures, if available. Enter "none" if no compensation is or will be paid. If additional space is needed, attach a separate sheet. Refer to the instructions for information on what to include as compensation.

| Name | Title | Mailing address | Compensation amount (annual actual or estimated) |
|---|---|---|---|
| Edward Blum | President, Director | 13571 Far West Blvd #17 Austin, TX 78731 | None |
| Abigail Fisher | Secretary, Director | 13571 Far West Blvd #17 Austin, TX 78731 | None |
| Richard Fisher | Treasurer, Director | 13571 Far West Blvd #17 Austin, TX 78731 | None |
| | | | |
| | | | |
| | | | |

Form **1023** (Rev. 12-2013)

**JA294**

SFFA-Harvard 0000016

Form 1023 (Rev. 12-2013)    (00) Name: Students for Fair Admissions, Inc.    EIN: 47 – 1889810    Page 3

**Part V** Compensation and Other Financial Arrangements With Your Officers, Directors, Trustees, Employees, and Independent Contractors *(Continued)*

b List the names, titles, and mailing addresses of each of your five highest compensated employees who receive or will receive compensation of more than $50,000 per year. Use the actual figure, if available. Refer to the instructions for information on what to include as compensation. Do not include officers, directors, or trustees listed in line 1a.

| Name | Title | Mailing address | Compensation amount (annual actual or estimated) |
|---|---|---|---|
| None | | | |
| | | | |
| | | | |
| | | | |
| | | | |

c List the names, names of businesses, and mailing addresses of your five highest compensated independent contractors that receive or will receive compensation of more than $50,000 per year. Use the actual figure, if available. Refer to the instructions for information on what to include as compensation.

| Name | Title | Mailing address | Compensation amount (annual actual or estimated) |
|---|---|---|---|
| None | | | |
| | | | |
| | | | |
| | | | |
| | | | |

The following "Yes" or "No" questions relate to *past, present, or planned* relationships, transactions, or agreements with your officers, directors, trustees, highest compensated employees, and highest compensated independent contractors listed in lines 1a, 1b, and 1c.

2a Are any of your officers, directors, or trustees related to each other through family or business relationships? If "Yes," identify the individuals and explain the relationship.    ☑ Yes    ☐ No

b Do you have a business relationship with any of your officers, directors, or trustees other than through their position as an officer, director, or trustee? If "Yes," identify the individuals and describe the business relationship with each of your officers, directors, or trustees.    ☐ Yes    ☑ No

c Are any of your officers, directors, or trustees related to your highest compensated employees or highest compensated independent contractors listed on lines 1b or 1c through family or business relationships? If "Yes," identify the individuals and explain the relationship.    ☐ Yes    ☑ No

3a For each of your officers, directors, trustees, highest compensated employees, and highest compensated independent contractors listed on lines 1a, 1b, or 1c, attach a list showing their name, qualifications, average hours worked, and duties.

b Do any of your officers, directors, trustees, highest compensated employees, and highest compensated independent contractors listed on lines 1a, 1b, or 1c receive compensation from any other organizations, whether tax exempt or taxable, that are related to you through common control? If "Yes," identify the individuals, explain the relationship between you and the other organization, and describe the compensation arrangement.    ☐ Yes    ☑ No

4 In establishing the compensation for your officers, directors, trustees, highest compensated employees, and highest compensated independent contractors listed on lines 1a, 1b, and 1c, the following practices are recommended, although they are not required to obtain exemption. Answer "Yes" to all the practices you use.

a Do you or will the individuals that approve compensation arrangements follow a conflict of interest policy?    ☑ Yes    ☐ No
b Do you or will you approve compensation arrangements in advance of paying compensation?    ☑ Yes    ☐ No
c Do you or will you document in writing the date and terms of approved compensation arrangements?    ☑ Yes    ☐ No

Form 1023 (Rev. 12-2013)

SFFA-Harvard 0000017

Form 1023 (Rev. 12-2013)    (00) Name: Students for Fair Admissions, Inc.    EIN: 47 - 1009010    Page 4

**Part V**  Compensation and Other Financial Arrangements With Your Officers, Directors, Trustees, Employees, and Independent Contractors *(Continued)*

| | | | |
|---|---|---|---|
| d | Do you or will you record in writing the decision made by each individual who decided or voted on compensation arrangements? | ☑ Yes | ☐ No |
| e | Do you or will you approve compensation arrangements based on information about compensation paid by similarly situated taxable or tax-exempt organizations for similar services, current compensation surveys compiled by independent firms, or actual written offers from similarly situated organizations? Refer to the instructions for Part V, lines 1a, 1b, and 1c, for information on what to include as compensation. | ☑ Yes | ☐ No |
| f | Do you or will you record in writing both the information on which you relied to base your decision and its source? | ☑ Yes | ☐ No |
| g | If you answered "No" to any item on lines 4a through 4f, describe how you set compensation that is reasonable for your officers, directors, trustees, highest compensated employees, and highest compensated independent contractors listed in Part V, lines 1a, 1b, and 1c. | | |
| 5a | Have you adopted a **conflict of interest policy** consistent with the sample conflict of interest policy in Appendix A to the instructions? If "Yes," provide a copy of the policy and explain how the policy has been adopted, such as by resolution of your governing board. If "No," answer lines 5b and 5c. | ☑ Yes | ☐ No |
| b | What procedures will you follow to assure that persons who have a conflict of interest will not have influence over you for setting their own compensation? | | |
| c | What procedures will you follow to assure that persons who have a conflict of interest will not have influence over you regarding business deals with themselves? | | |
| | **Note:** A conflict of interest policy is recommended though it is not required to obtain exemption. Hospitals, see Schedule C, Section I, line 14. | | |
| 6a | Do you or will you compensate any of your officers, directors, trustees, highest compensated employees, and highest compensated independent contractors listed in lines 1a, 1b, or 1c through **non-fixed payments**, such as discretionary bonuses or revenue-based payments? If "Yes," describe all non-fixed compensation arrangements, including how the amounts are determined, who is eligible for such arrangements, whether you place a limitation on total compensation, and how you determine or will determine that you pay no more than reasonable compensation for services. Refer to the instructions for Part V, lines 1a, 1b, and 1c, for information on what to include as compensation. | ☐ Yes | ☑ No |
| b | Do you or will you compensate any of your employees, other than your officers, directors, trustees, or your five highest compensated employees who receive or will receive compensation of more than $50,000 per year, through non-fixed payments, such as discretionary bonuses or revenue-based payments? If "Yes," describe all non-fixed compensation arrangements, including how the amounts are or will be determined, who is or will be eligible for such arrangements, whether you place or will place a limitation on total compensation, and how you determine or will determine that you pay no more than reasonable compensation for services. Refer to the instructions for Part V, lines 1a, 1b, and 1c, for information on what to include as compensation. | ☐ Yes | ☑ No |
| 7a | Do you or will you purchase any goods, services, or assets from any of your officers, directors, trustees, highest compensated employees, or highest compensated independent contractors listed in lines 1a, 1b, or 1c? If "Yes," describe any such purchase that you made or intend to make, from whom you make or will make such purchases, how the terms are or will be negotiated at **arm's length**, and explain how you determine or will determine that you pay no more than **fair market value**. Attach copies of any written contracts or other agreements relating to such purchases. | ☐ Yes | ☑ No |
| b | Do you or will you sell any goods, services, or assets to any of your officers, directors, trustees, highest compensated employees, or highest compensated independent contractors listed in lines 1a, 1b, or 1c? If "Yes," describe any such sales that you made or intend to make, to whom you make or will make such sales, how the terms are or will be negotiated at arm's length, and explain how you determine or will determine you are or will be paid at least fair market value. Attach copies of any written contracts or other agreements relating to such sales. | ☐ Yes | ☑ No |
| 8a | Do you or will you have any leases, contracts, loans, or other agreements with your officers, directors, trustees, highest compensated employees, or highest compensated independent contractors listed in lines 1a, 1b, or 1c? If "Yes," provide the information requested in lines 8b through 8f. | ☐ Yes | ☑ No |
| b | Describe any written or oral arrangements that you made or intend to make. | | |
| c | Identify with whom you have or will have such arrangements. | | |
| d | Explain how the terms are or will be negotiated at arm's length. | | |
| e | Explain how you determine you pay no more than fair market value or you are paid at least fair market value. | | |
| f | Attach copies of any signed leases, contracts, loans, or other agreements relating to such arrangements. | | |
| 9a | Do you or will you have any leases, contracts, loans, or other agreements with any organization in which any of your officers, directors, or trustees are also officers, directors, or trustees, or in which any individual officer, director, or trustee owns more than a 35% interest? If "Yes," provide the information requested in lines 9b through 9f. | ☐ Yes | ☑ No |

Form 1023 (Rev. 12-2013)

**JA296**    SFFA-Harvard 0000018

Form 1023 (Rev. 12-2013)   (00) Name: Students for Fair Admissions, Inc.   EIN: 47 - 1689810   Page 8

**Part V**   Compensation and Other Financial Arrangements With Your Officers, Directors, Trustees, Employees, and Independent Contractors *(Continued)*

b  Describe any written or oral arrangements you made or intend to make.

c  Identify with whom you have or will have such arrangements.

d  Explain how the terms are or will be negotiated at arm's length.

e  Explain how you determine or will determine you pay no more than fair market value or that you are paid at least fair market value.

f  Attach a copy of any signed leases, contracts, loans, or other agreements relating to such arrangements.

**Part VI**   Your Members and Other Individuals and Organizations That Receive Benefits From You

The following "Yes" or "No" questions relate to goods, services, and funds you provide to individuals and organizations as part of your activities. Your answers should pertain to *past, present,* and *planned* activities. (See instructions.)

| | | | |
|---|---|---|---|
| 1a | In carrying out your exempt purposes, do you provide goods, services, or funds to individuals? If "Yes," describe each program that provides goods, services, or funds to individuals. | ☐ Yes | ☑ No |
| b | In carrying out your exempt purposes, do you provide goods, services, or funds to organizations? If "Yes," describe each program that provides goods, services, or funds to organizations. | ☐ Yes | ☑ No |
| 2 | Do any of your programs limit the provision of goods, services, or funds to a specific individual or group of specific individuals? For example, answer "Yes," if goods, services, or funds are provided only for a particular individual, your members, individuals who work for a particular employer, or graduates of a particular school. If "Yes," explain the limitation and how recipients are selected for each program. | ☐ Yes | ☑ No |
| 3 | Do any individuals who receive goods, services, or funds through your programs have a family or business relationship with any officer, director, trustee, or with any of your highest compensated employees or highest compensated independent contractors listed in Part V, lines 1a, 1b, and 1c? If "Yes," explain how these related individuals are eligible for goods, services, or funds. | ☐ Yes | ☑ No |

**Part VII**   Your History

The following "Yes" or "No" questions relate to your history. (See instructions.)

| | | | |
|---|---|---|---|
| 1 | Are you a **successor** to another organization? Answer "Yes," if you have taken or will take over the activities of another organization; you took over 25% or more of the fair market value of the net assets of another organization; or you were established upon the conversion of an organization from for-profit to non-profit status. If "Yes," complete Schedule G. | ☐ Yes | ☑ No |
| 2 | Are you submitting this application more than 27 months after the end of the month in which you were legally formed? If "Yes," complete Schedule E. | ☐ Yes | ☑ No |

**Part VIII**   Your Specific Activities

The following "Yes" or "No" questions relate to specific activities that you may conduct. Check the appropriate box. Your answers should pertain to *past, present,* and *planned* activities. (See instructions.)

| | | | |
|---|---|---|---|
| 1 | Do you support or oppose candidates in **political campaigns** in any way? If "Yes," explain. | ☐ Yes | ☑ No |
| 2a | Do you attempt to **influence legislation?** If "Yes," explain how you attempt to influence legislation and complete line 2b. If "No," go to line 3a. | ☐ Yes | ☑ No |
| b | Have you made or are you making an **election** to have your legislative activities measured by expenditures by filing Form 5768? If "Yes," attach a copy of the Form 5768 that was already filed or attach a completed Form 5768 that you are filing with this application. If "No," describe whether your attempts to influence legislation are a substantial part of your activities. Include the time and money spent on your attempts to influence legislation as compared to your total activities. | ☐ Yes | ☐ No |
| 3a | Do you or will you operate bingo or **gaming activities?** If "Yes," describe who conducts them, and list all revenue received or expected to be received and expenses paid or expected to be paid in operating these activities. Revenue and expenses should be provided for the time periods specified in Part IX, Financial Data. | ☐ Yes | ☑ No |
| b | Do you or will you enter into contracts or other agreements with individuals or organizations to conduct bingo or gaming for you? If "Yes," describe any written or oral arrangements that you made or intend to make, identify with whom you have or will have such arrangements, explain how the terms are or will be negotiated at arm's length, and explain how you determine or will determine you pay no more than fair market value or you will be paid at least fair market value. Attach copies or any written contracts or other agreements relating to such arrangements. | ☐ Yes | ☑ No |
| c | List the states and local jurisdictions, including Indian Reservations, in which you conduct or will conduct gaming or bingo. | | |

Form **1023** (Rev. 12-2013)

**JA297**

SFFA-Harvard 0000019

Form 1023 (Rev. 12-2013)    (00) Name: Students for Fair Admissions, Inc.    EIN: 47 – 1689810    Page 6

**Part VIII   Your Specific Activities (Continued)**

4a  Do you or will you undertake fundraising? If "Yes," check all the fundraising programs you do or will conduct. (See instructions.)    ☒ Yes    ☐ No

☐ mail solicitations
☐ email solicitations
☒ personal solicitations
☐ vehicle, boat, plane, or similar donations
☐ foundation grant solicitations

☐ phone solicitations
☐ accept donations on your website
☐ receive donations from another organization's website
☐ government grant solicitations
☐ Other

Attach a description of each fundraising program.

b  Do you or will you have written or oral contracts with any individuals or organizations to raise funds for you? If "Yes," describe these activities. Include all revenue and expenses from these activities and state who conducts them. Revenue and expenses should be provided for the time periods specified in Part IX, Financial Data. Also, attach a copy of any contracts or agreements    ☐ Yes    ☒ No

c  Do you or will you engage in fundraising activities for other organizations? If "Yes," describe these arrangements. Include a description of the organizations for which you raise funds and attach copies of all contracts or agreements.    ☐ Yes    ☒ No

d  List all states and local jurisdictions in which you conduct fundraising. For each state or local jurisdiction listed, specify whether you fundraise for your own organization, you fundraise for another organization, or another organization fundraises for you.

e  Do you or will you maintain separate accounts for any contributor under which the contributor has the right to advise on the use or distribution of funds? Answer "Yes" if the donor may provide advice on the types of investments, distributions from the types of investments, or the distribution from the donor's contribution account. If "Yes," describe this program, including the type of advice that may be provided and submit copies of any written materials provided to donors.    ☐ Yes    ☒ No

5  Are you affiliated with a governmental unit? If "Yes," explain.    ☐ Yes    ☒ No

6a  Do you or will you engage in economic development? If "Yes," describe your program.    ☐ Yes    ☒ No
b  Describe in full who benefits from your economic development activities and how the activities promote exempt purposes.

7a  Do or will persons other than your employees or volunteers develop your facilities? If "Yes," describe each facility, the role of the developer, and any business or family relationship(s) between the developer and your officers, directors, or trustees.    ☐ Yes    ☒ No

b  Do or will persons other than your employees or volunteers manage your activities or facilities? If "Yes," describe each activity and facility, the role of the manager, and any business or family relationship(s) between the manager and your officers, directors, or trustees.    ☐ Yes    ☒ No

c  If there is a business or family relationship between any manager or developer and your officers, directors, or trustees, identify the individuals, explain the relationship, describe how contracts are negotiated at arm's length so that you pay no more than fair market value, and submit a copy of any contracts or other agreements.

8  Do you or will you enter into joint ventures, including partnerships or limited liability companies treated as partnerships, in which you share profits and losses with partners other than section 501(c)(3) organizations? If "Yes," describe the activities of these joint ventures in which you participate.    ☐ Yes    ☒ No

9a  Are you applying for exemption as a childcare organization under section 501(k)? If "Yes," answer lines 9b through 9d. If "No," go to line 10.    ☐ Yes    ☒ No

b  Do you provide child care so that parents or caretakers of children you care for can be gainfully employed (see instructions)? If "No," explain how you qualify as a childcare organization described in section 501(k).    ☐ Yes    ☐ No

c  Of the children for whom you provide child care, are 85% or more of them cared for by you to enable their parents or caretakers to be gainfully employed (see instructions)? If "No," explain how you qualify as a childcare organization described in section 501(k).    ☐ Yes    ☐ No

d  Are your services available to the general public? If "No," describe the specific group of people for whom your activities are available. Also, see the instructions and explain how you qualify as a childcare organization described in section 501(k).    ☐ Yes    ☐ No

10  Do you or will you publish, own, or have rights in music, literature, tapes, artworks, choreography, scientific discoveries, or other intellectual property? If "Yes," explain. Describe who owns or will own any copyrights, patents, or trademarks, whether fees are or will be charged, how the fees are determined, and how any items are or will be produced, distributed, and marketed.    ☐ Yes    ☒ No

Form 1023 (Rev. 12-2013)

SFFA-Harvard 0000020

## Part VIII   Your Specific Activities (Continued)

11   Do you or will you accept contributions of: real property; conservation easements; closely held securities; intellectual property such as patents, trademarks, and copyrights; works of music or art; licenses; royalties; automobiles, boats, planes, or other vehicles; or collectibles of any type? If "Yes," describe each type of contribution, any conditions imposed by the donor on the contribution, and any agreements with the donor regarding the contribution.   ☐ Yes   ☒ No

12a   Do you or will you operate in a foreign country or countries? If "Yes," answer lines 12b through 12d. If "No," go to line 13a.   ☐ Yes   ☒ No

  b   Name the foreign countries and regions within the countries in which you operate.

  c   Describe your operations in each country and region in which you operate.

  d   Describe how your operations in each country and region further your exempt purposes.

13a   Do you or will you make grants, loans, or other distributions to organization(s)? If "Yes," answer lines 13b through 13g. If "No," go to line 14a.   ☐ Yes   ☒ No

  b   Describe how your grants, loans, or other distributions to organizations further your exempt purposes.

  c   Do you have written contracts with each of these organizations? If "Yes," attach a copy of each contract.   ☐ Yes   ☐ No

  d   Identify each recipient organization and any relationship between you and the recipient organization.

  e   Describe the records you keep with respect to the grants, loans, or other distributions you make.

  f   Describe your selection process, including whether you do any of the following:

    (i)   Do you require an application form? If "Yes," attach a copy of the form.   ☐ Yes   ☐ No

    (ii)   Do you require a grant proposal? If "Yes," describe whether the grant proposal specifies your responsibilities and those of the grantee, obligates the grantee to use the grant funds only for the purposes for which the grant was made, provides for periodic written reports concerning the use of grant funds, requires a final written report and an accounting of how grant funds were used, and acknowledges your authority to withhold and/or recover grant funds in case such funds are, or appear to be, misused.   ☐ Yes   ☐ No

  g   Describe your procedures for oversight of distributions that assure you the resources are used to further your exempt purposes, including whether you require periodic and final reports on the use of resources.

14a   Do you or will you make grants, loans, or other distributions to foreign organizations? If "Yes," answer lines 14b through 14f. If "No," go to line 15.   ☐ Yes   ☒ No

  b   Provide the name of each foreign organization, the country and regions within a country in which each foreign organization operates, and describe any relationship you have with each foreign organization.

  c   Does any foreign organization listed in line 14b accept contributions earmarked for a specific country or specific organization? If "Yes," list all earmarked organizations or countries.   ☐ Yes   ☐ No

  d   Do your contributors know that you have ultimate authority to use contributions made to you at your discretion for purposes consistent with your exempt purposes? If "Yes," describe how you relay this information to contributors.   ☐ Yes   ☐ No

  e   Do you or will you make pre-grant inquiries about the recipient organization? If "Yes," describe these inquiries, including whether you inquire about the recipient's financial status, its tax-exempt status under the Internal Revenue Code, its ability to accomplish the purpose for which the resources are provided, and other relevant information.   ☐ Yes   ☐ No

  f   Do you or will you use any additional procedures to ensure that your distributions to foreign organizations are used in furtherance of your exempt purposes? If "Yes," describe these procedures, including site visits by your employees or compliance checks by impartial experts, to verify that grant funds are being used appropriately.   ☐ Yes   ☐ No

Form 1023 (Rev. 12-2013)

SFFA-Harvard 0000021

Form 1023 (Rev. 12-2013)    (00) Name: Students for Fair Admissions, Inc.                              EIN: 47 - 1689819                Page 8

**Part VIII   Your Specific Activities** *(Continued)*

| | | | |
|---|---|---|---|
| 15 | Do you have a close connection with any organizations? If "Yes," explain. | ☑ Yes | ☐ No |
| 16 | Are you applying for exemption as a cooperative hospital service organization under section 501(e)? If "Yes," explain. | ☐ Yes | ☑ No |
| 17 | Are you applying for exemption as a cooperative service organization of operating educational organizations under section 501(f)? If "Yes," explain. | ☐ Yes | ☑ No |
| 18 | Are you applying for exemption as a charitable risk pool under section 501(n)? If "Yes," explain. | ☐ Yes | ☑ No |
| 19 | Do you or will you operate a school? If "Yes," complete Schedule B. Answer "Yes," whether you operate a school as your main function or as a secondary activity. | ☐ Yes | ☑ No |
| 20 | Is your main function to provide hospital or medical care? If "Yes," complete Schedule C. | ☐ Yes | ☑ No |
| 21 | Do you or will you provide low-income housing or housing for the elderly or handicapped? If "Yes," complete Schedule F. | ☐ Yes | ☑ No |
| 22 | Do you or will you provide scholarships, fellowships, educational loans, or other educational grants to individuals, including grants for travel, study, or other similar purposes? If "Yes," complete Schedule H. | ☐ Yes | ☑ No |

**Note:** Private foundations may use Schedule H to request advance approval of individual grant procedures.

Form **1023** (Rev. 12-2013)

**JA300**

SFFA-Harvard 0000022

Form 1023 (Rev. 12-2013)    (00) Name: Students for Fair Admissions, Inc.    EIN: 47 – 1689810    Page 9

**PART IX    Financial Data**

For purposes of this schedule, years in existence refer to completed tax years. If in existence 4 or more years, complete the schedule for the most recent 4 tax years. If in existence more than 1 year but less than 4 years, complete the statements for each year in existence and provide projections of your likely revenues and expenses based on a reasonable and good faith estimate of your future finances for a total of 3 years of financial information. If in existence less than 1 year, provide projections of your likely revenues and expenses for the current year and the 2 following years, based on a reasonable and good faith estimate of your future finances for a total of 3 years of financial information. (See instructions.)

### A. Statement of Revenues and Expenses

| | Type of revenue or expense | Current tax year | 3 prior tax years or 2 succeeding tax years | | | (e) Provide Total for (a) through (d) |
|---|---|---|---|---|---|---|
| | | (a) From 7/30/14 To 12/31/14 | (b) From 1/1/15 To 12/31/15 | (c) From 1/1/16 To 12/31/16 | (d) From ......... To ......... | |
| Revenues | 1 Gifts, grants, and contributions received (do not include unusual grants) | 500,000 | 750,000 | 750,000 | | 2,000,000 |
| | 2 Membership fees received | 0 | 0 | 0 | | 0 |
| | 3 Gross investment income | 0 | 0 | 0 | | 0 |
| | 4 Net unrelated business income | 0 | 0 | 0 | | 0 |
| | 5 Taxes levied for your benefit | 0 | 0 | 0 | | 0 |
| | 6 Value of services or facilities furnished by a governmental unit without charge (not including the value of services generally furnished to the public without charge) | 0 | 0 | 0 | | 0 |
| | 7 Any revenue not otherwise listed above or in lines 9–12 below (attach an itemized list) | 0 | 0 | 0 | | 0 |
| | 8 Total of lines 1 through 7 | 500,000 | 750,000 | 750,000 | | 2,000,000 |
| | 9 Gross receipts from admissions, merchandise sold or services performed, or furnishing of facilities in any activity that is related to your exempt purposes (attach itemized list) | 0 | 0 | 0 | | 0 |
| | 10 Total of lines 8 and 9 | 500,000 | 750,000 | 750,000 | | 2,000,000 |
| | 11 Net gain or loss on sale of capital assets (attach schedule and see instructions) | 0 | 0 | 0 | | 0 |
| | 12 Unusual grants | 0 | 0 | 0 | | 0 |
| | 13 Total Revenue Add lines 10 through 12 | 500,000 | 750,000 | 750,000 | | 2,000,000 |
| Expenses | 14 Fundraising expenses | 0 | 0 | 0 | | |
| | 15 Contributions, gifts, grants, and similar amounts paid out (attach an itemized list) | 0 | 0 | 0 | | |
| | 16 Disbursements to or for the benefit of members (attach an itemized list) | 0 | 0 | 0 | | |
| | 17 Compensation of officers, directors, and trustees | 0 | 0 | 0 | | |
| | 18 Other salaries and wages | 0 | 0 | 0 | | |
| | 19 Interest expense | 0 | 0 | 0 | | |
| | 20 Occupancy (rent, utilities, etc.) | | | | | |
| | 21 Depreciation and depletion | 0 | 0 | 0 | | |
| | 22 Professional fees | 475,000 | 725,000 | 725,000 | | |
| | 23 Any expense not otherwise classified, such as program services (attach itemized list) | 25,000 | 25,000 | 25,000 | | |
| | 24 Total Expenses Add lines 14 through 23 | 500,000 | 750,000 | 750,000 | | |

Form 1023 (Rev. 12-2013)

SFFA-Harvard 0000023

Form 1023 (Rev. 12-2013)    (00) Name: Students for Fair Admissions, Inc.    EIN: 47 – 1689819    Page 10

## Part IX — Financial Data (Continued)

### B. Balance Sheet (for your most recently completed tax year)    Year End: 9/30/14

|  | Assets |  | (Whole dollars) |
|---|---|---|---|
| 1 | Cash | 1 | 0 |
| 2 | Accounts receivable, net | 2 | 0 |
| 3 | Inventories | 3 | 0 |
| 4 | Bonds and notes receivable (attach an itemized list) | 4 | 0 |
| 5 | Corporate stocks (attach an itemized list) | 5 | 0 |
| 6 | Loans receivable (attach an itemized list) | 6 | 0 |
| 7 | Other investments (attach an itemized list) | 7 | 0 |
| 8 | Depreciable and depletable assets (attach an itemized list) | 8 | 0 |
| 9 | Land | 9 | 0 |
| 10 | Other assets (attach an itemized list) | 10 | 0 |
| 11 | Total Assets (add lines 1 through 10) | 11 | 0 |
|  | Liabilities |  |  |
| 12 | Accounts payable | 12 | 0 |
| 13 | Contributions, gifts, grants, etc. payable | 13 | 0 |
| 14 | Mortgages and notes payable (attach an itemized list) | 14 | 0 |
| 15 | Other liabilities (attach an itemized list) | 15 | 0 |
| 16 | Total Liabilities (add lines 12 through 15) | 16 | 0 |
|  | Fund Balances or Net Assets |  |  |
| 17 | Total fund balances or net assets | 17 | 0 |
| 18 | Total Liabilities and Fund Balances or Net Assets (add lines 16 and 17) | 18 | 0 |
| 19 | Have there been any substantial changes in your assets or liabilities since the end of the period shown above? If "Yes," explain. | ☐ Yes | ☒ No |

## Part X — Public Charity Status

Part X is designed to classify you as an organization that is either a **private foundation** or a **public charity**. Public charity status is a more favorable tax status than private foundation status. If you are a private foundation, Part X is designed to further determine whether you are a **private operating foundation**. (See instructions.)

1a Are you a private foundation? If "Yes," go to line 1b. If "No," go to line 5 and proceed as instructed. If you are unsure, see the instructions.    ☐ Yes    ☒ No

b As a private foundation, section 508(e) requires special provisions in your organizing document in addition to those that apply to all organizations described in section 501(c)(3). Check the box to confirm that your organizing document meets this requirement, whether by express provision or by reliance on operation of state law. Attach a statement that describes specifically where your organizing document meets this requirement, such as a reference to a particular article or section in your organizing document or by operation of state law. See the instructions, including Appendix B, for information about the special provisions that need to be contained in your organizing document. Go to line 2.    ☐

2 Are you a private operating foundation? To be a private operating foundation you must engage directly in the active conduct of charitable, religious, educational, and similar activities, as opposed to indirectly carrying out these activities by providing grants to individuals or other organizations. If "Yes," go to line 3. If "No," go to the signature section of Part XI.    ☐ Yes    ☐ No

3 Have you existed for one or more years? If "Yes," attach financial information showing that you are a private operating foundation; go to the signature section of Part XI. If "No," continue to line 4.    ☐ Yes    ☐ No

4 Have you attached either (1) an affidavit or opinion of counsel, (including a written affidavit or opinion from a certified public accountant or accounting firm with expertise regarding this tax law matter), that sets forth facts concerning your operations and support to demonstrate that you are likely to satisfy the requirements to be classified as a private operating foundation; or (2) a statement describing your proposed operations as a private operating foundation?    ☐ Yes    ☐ No

5 If you answered "No" to line 1a, indicate the type of public charity status you are requesting by checking one of the choices below. You may check only one box.

The organization is not a private foundation because it is:

a 509(a)(1) and 170(b)(1)(A)(i)—a church or a convention or association of churches. Complete and attach Schedule A.    ☐

b 509(a)(1) and 170(b)(1)(A)(ii)—a school. Complete and attach Schedule B.    ☐

c 509(a)(1) and 170(b)(1)(A)(iii)—a hospital, a cooperative hospital service organization, or a medical research organization operated in conjunction with a hospital. Complete and attach Schedule C.    ☐

d 509(a)(3)—an organization supporting either one or more organizations described in line 5a through c, f, g, or h or a publicly supported section 501(c)(4), (5), or (6) organization. Complete and attach Schedule D.    ☐

Form 1023 (Rev. 12-2013)

SFFA-Harvard 0000024

Form 1023 (Rev. 12-2013)    (00) Name: Students for Fair Admissions, Inc.                EIN: 47 ... 1689810              Page 11

**Part X**    **Public Charity Status** *(Continued)*

| | | |
|---|---|---|
| e | 509(a)(4)—an organization organized and operated exclusively for testing for public safety. | ☐ |
| f | 509(a)(1) and 170(b)(1)(A)(iv)—an organization operated for the benefit of a college or university that is owned or operated by a governmental unit. | ☐ |
| g | 509(a)(1) and 170(b)(1)(A)(vi)—an organization that receives a substantial part of its financial support in the form of contributions from publicly supported organizations, from a governmental unit, or from the general public. | ☑ |
| h | 509(a)(2)—an organization that normally receives not more than one-third of its financial support from gross investment income and receives more than one-third of its financial support from contributions, membership fees, and gross receipts from activities related to its exempt functions (subject to certain exceptions). | ☐ |
| i | A publicly supported organization, but unsure if it is described in 5g or 5h. The organization would like the IRS to decide the correct status. | ☐ |

6    If you checked box g, h, or i in question 5 above, you must request either an **advance** or a **definitive ruling** by selecting one of the boxes below. Refer to the instructions to determine which type of ruling you are eligible to receive.

a    **Request for Advance Ruling:** By checking this box and signing the consent, pursuant to section 6501(c)(4) of the Code you request an advance ruling and agree to extend the statute of limitations on the assessment of excise tax under section 4940 of the Code. The tax will apply only if you do not establish public support status at the end of the 5-year advance ruling period. The assessment period will be extended for the 5 advance ruling years to 8 years, 4 months, and 15 days beyond the end of the first year. You have the right to refuse or limit the extension to a mutually agreed-upon period of time or issue(s). Publication 1035, *Extending the Tax Assessment Period*, provides a more detailed explanation of your rights and the consequences of the choices you make. You may obtain Publication 1035 free of charge from the IRS web site at *www.irs.gov* or by calling toll-free 1-800-829-3676. Signing this consent will not deprive you of any appeal rights to which you would otherwise be entitled. If you decide not to extend the statute of limitations, you are not eligible for an advance ruling.

---

Consent Fixing Period of Limitations Upon Assessment of Tax Under Section 4940 of the Internal Revenue Code

For Organization

......................................................    ......................................................    ......................
(Signature of Officer, Director, Trustee, or other    (Type or print name of signer)                    (Date)
authorized official)

......................................................
(Type or print title or authority of signer)

For IRS Use Only

......................................................    ......................
IRS Director, Exempt Organizations                      (Date)

---

b    **Request for Definitive Ruling:** Check this box if you have completed one tax year of at least 8 full months and you are requesting a definitive ruling. To confirm your public support status, answer line 6b(i) if you checked box g in line 5 above. Answer line 6b(ii) if you checked box h in line 5 above. If you checked box i in line 5 above, answer both lines 6b(i) and (ii).    ☐

(i)  (a) Enter 2% of line 8, column (e) on Part IX-A. Statement of Revenues and Expenses.    _____

(b) Attach a list showing the name and amount contributed by each person, company, or organization whose gifts totaled more than the 2% amount. If the answer is "None," check this box.    ☐

(ii) (a) For each year amounts are included on lines 1, 2, and 9 of Part IX-A. Statement of Revenues and Expenses, attach a list showing the name of and amount received from each disqualified person. If the answer is "None," check this box.    ☐

(b) For each year amounts are included on line 9 of Part IX-A. Statement of Revenues and Expenses, attach a list showing the name of and amount received from each payer, other than a disqualified person, whose payments were more than the larger of (1) 1% of line 10, Part IX-A. Statement of Revenues and Expenses, or (2) $5,000. If the answer is "None," check this box.    ☐

7    Did you receive any unusual grants during any of the years shown on Part IX-A. Statement of Revenues and Expenses? If "Yes," attach a list including the name of the contributor, the date and amount of the grant, a brief description of the grant, and explain why it is unusual.    ☐ Yes   ☐ No

---

    SFFA-Harvard 0000025

Form 1023 (Rev. 12-2013)    (90) Name Students for Fair Admissions, Inc.    EIN 47 - 1609810    Page 12

**Part XI    User Fee Information**

You must include a user fee payment with this application. It will not be processed without your paid user fee. If your average annual gross receipts have exceeded or will exceed $10,000 annually over a 4-year period, you must submit payment of $850. If your gross receipts have not exceeded or will not exceed $10,000 annually over a 4-year period, the required user fee payment is $400. See instructions for Part XI for a definition of gross receipts over a 4-year period. Your check or money order must be made payable to the United States Treasury. User fees are subject to change. Check our website at www.irs.gov and type "User Fee" in the keyword box, or call Customer Account Services at 1-877-829-5500 for current information.

| | | | |
|---|---|---|---|
| 1 | Have your annual gross receipts averaged or are they expected to average not more than $10,000? | ☐ Yes | ☑ No |
| | If "Yes," check the box on line 2 and enclose a user fee payment of $400 (Subject to change—see above). | | |
| | If "No," check the box on line 3 and enclose a user fee payment of $850 (Subject to change—see above). | | |
| 2 | Check the box if you have enclosed the reduced user fee payment of $400 (Subject to change). | | ☐ |
| 3 | Check the box if you have enclosed the user fee payment of $850 (Subject to change). | | ☑ |

I declare under the penalties of perjury that I am authorized to sign this application on behalf of the above organization and that I have examined this application, including the accompanying schedules and attachments, and to the best of my knowledge it is true, correct, and complete.

| Please Sign Here ▶ | _(signature)_ | Edward Blum | 9-12-14 |
|---|---|---|---|
| | (Signature of Officer, Director, Trustee, or other authorized official) | (Type or print name of signer) | (Date) |
| | | President | |
| | | (Type or print title or authority of signer) | |

**Reminder:** Send the completed Form 1023 Checklist with your filled-in application.    Form **1023** (Rev. 12-2013)

IRS Form 1023 – Exhibit A
Students for Fair Admissions, Inc.
EIN: 47-1689810

Part II, Line 1

ARTICLES OF INCORPORATION

(attached)

SFFA-Harvard 0000027

ARTICLES OF INCORPORATION
*of*
STUDENTS FOR FAIR ADMISSIONS, INC.

The undersigned, pursuant to the Virginia Nonstock Corporation Act (the "Act"), hereby states as follows:

1.      The name of the corporation is Students for Fair Admissions, Inc. (the "Corporation").

2.      The Corporation shall have no members.

3.      The initial directors of the Board of Directors of the Corporation shall be appointed by the sole incorporator. All other directors shall be elected by an affirmative vote of a majority of the directors then in office, and each shall continue in office for the term specified in the Bylaws of the Corporation and until such director's successor is elected and qualified, or until such director's earlier death, resignation, or removal.

4.      The name of the initial registered agent of the Corporation is National Corporate Research, Ltd. The registered agent is a domestic or foreign stock or nonstock corporation, limited liability company, or registered limited liability partnership authorized to transact business in Virginia.

5.      The Corporation's initial registered office address, which is identical to the business office of the initial registered agent, is: 250 Browns Hill Court, Midlothian, Virginia, 23114. The registered office is located in the county of Chesterfield.

6.      The Corporation is organized and shall be operated exclusively for charitable, religious, scientific, literary, educational and other purposes within the meaning of Section 501(c)(3) of the Internal Revenue Code of 1986, as now in effect or as hereafter may be amended (the "Code"). The purposes for which the Corporation is formed are to defend human and civil rights secured by law, including the right of individuals to equal protection under the law, through litigation and any other lawful means, and to engage in any lawful act or activity for which corporations may be organized under the Act. In furtherance thereof, the Corporation shall have all the general powers enumerated in Sections 13.1-826 and 13.1-827 of the Act. Except as otherwise provided by law, or in any Bylaw of the Corporation, the business of the Corporation shall be managed and all of the powers of the Corporation shall be exercised by the Board of Directors of the Corporation.

7.      The duration of the existence of the Corporation is perpetual.

8.      Provisions for the regulation of the internal affairs of the Corporation, including provisions for distribution of assets on dissolution or final liquidation, are as follows:

        A.      The Corporation shall not only be organized but also operated exclusively for charitable purposes within the meaning of section 501(c)(3) of the Code; provided, however, that the corporation may engage in any lawful act or activity for which

SFFA-Harvard 0000028

corporations may be organized under the Act, provided such acts or activities would not prevent the Corporation from obtaining and retaining exemption from federal income taxation as a corporation described in Section 501(c)(3) of the Code.

B. No part of the net earnings of the Corporation shall inure to the benefit of, or be distributable to, its members, officers, directors, or other private individuals, except that the Corporation shall be authorized and empowered to pay reasonable compensation for services rendered to or for the Corporation and to make payments and distributions in furtherance of the purposes set forth in Article 6 hereof;

C. No substantial part of the activities of the Corporation shall be the carrying on of propaganda, or otherwise attempting to influence legislation, and the Corporation shall not participate or intervene in (including the publication or distribution of statements concerning) any political campaign on behalf of, or in opposition to, any candidate for public office. Notwithstanding any other provision of these Articles of Incorporation, the Corporation shall not, except to an insubstantial degree, engage in any activities or exercise any powers that are not in furtherance of the purposes of the Corporation; and

D. In the event of dissolution or final liquidation of the Corporation, the remaining assets of the Corporation shall be distributed for one or more exempt purposes within the meaning of section 501(c)(3) of the Code or shall be distributed to the federal government, or to a state or local government, for a public purpose. Any such assets not so disposed of shall be disposed of by a court of competent jurisdiction of the county in which the principal office of the Corporation is then located, exclusively for such purposes or to such organization or organizations, as the court shall determine, that are organized and operated exclusively for such purposes.

9. To the fullest extent permitted by the Act, no officer or director of the Corporation shall be personally liable for damages in any proceeding brought by or in the right of the Corporation, or in connection with any claim, action, suit, or proceeding to which he or she may be or is made a party by reason of being or having been an officer or director of the Corporation.

10. The Corporation reserves the right to amend or repeal any provision contained in these Articles of Incorporation, in the manner now or hereafter prescribed by statute, and all rights conferred upon directors herein are granted subject to this reservation.

Dated: July 29, 2014

[SIGNATURE PAGE FOLLOWS]

11751680 4

- 2 -

SIGNATURE PAGE TO
ARTICLES OF INCORPORATION
*of*
STUDENTS FOR FAIR ADMISSIONS, INC.

IN WITNESS WHEREOF, the undersigned has executed these Articles of Incorporation as of the date set forth above.

Robert D. Benton
Sole Incorporator

- 3 -

SFFA-Harvard 0000030

# Commonwealth of Virginia



## State Corporation Commission

*I Certify the Following from the Records of the Commission:*

The foregoing is a true copy of all documents constituting the charter of Students for Fair Admissions, Inc. on file in the Clerk's Office of the Commission.

Nothing more is hereby certified.



*Signed and Sealed at Richmond on this Date:*
*July 31, 2014*

*Joel H. Peck, Clerk of the Commission*

CIS0505

SFFA-Harvard 0000031



## Commonwealth of Virginia

### STATE CORPORATION COMMISSION

*Richmond, July 30, 2014*

*This is to certify that the certificate of incorporation of*

Students for Fair Admissions, Inc.

*was this day issued and admitted to record in this office and that
the said corporation is authorized to transact its business subject
to all Virginia laws applicable to the corporation and its business.
Effective date: July 30, 2014*



*State Corporation Commission*
*Attest:*

*Joel H. Peck*
*Clerk of the Commission*

CIS0372

**SFFA-Harvard 0000032**

IRS Form 1023 – Exhibit B
Students for Fair Admissions, Inc.
EIN: 47-1689810

## Part II, Line 5

### BYLAWS

(attached)

SFFA-Harvard 0000033

BYLAWS

*of*

STUDENTS FOR FAIR ADMISSIONS, INC.

(Formed under the Virginia Nonstock Corporation Act)

(Adopted August 6, 2014)

## ARTICLE I
*Name and Location*

Section 1.01    Name.  The name of the corporation is Students for Fair Admissions, Inc. (the "Corporation").

Section 1.02    Location.  The principal office of the Corporation shall be located at 109 North Henry Street, Alexandria, Virginia 22314, or at any other place approved by the Board of Directors.

Section 1.03    Registered Office and Agent.    The Corporation shall continuously maintain a registered office and agent within the Commonwealth of Virginia at such place as may be designated by the Board of Directors.  The Corporation's initial registered office and agent are set forth in the Articles of Incorporation.

## ARTICLE II
*Purposes*

The Corporation is organized and shall be operated exclusively for charitable, religious, scientific, literary, educational and other purposes within the meaning of Section 501(c)(3) of the Internal Revenue Code of 1986, as now in effect or as hereafter may be amended (the "Code"). The purposes for which the Corporation is formed are to defend human and civil rights secured by law, including the right of individuals to equal protection under the law, through litigation and any other lawful means, and to engage in any lawful act or activity for which corporations may be organized under the Virginia Nonstock Corporation Act (the "Act").  In furtherance thereof, the Corporation shall have all the general powers enumerated in Sections 13.1-826 and 13.1-827 of the Act.

## ARTICLE III
*Membership*

Section 3.01    Members.  The Corporation shall have no members within the meaning of the Act.

Section 3.02    Affiliate Members.    The Corporation shall have one class of affiliate members with rights, privileges, and obligations established by the Board of Directors.  Affiliate members have no voting rights and are not members within the meaning of the Act.  Any

**SFFA-Harvard 0000034**

individual who seeks to support the purposes and mission of the Corporation shall be eligible to be an affiliate member, subject to any additional standards that may be set from time to time by the Board of Directors. The Board of Directors shall have authority to recognize any individual as an affiliate member.

### ARTICLE IV
*Board of Directors*

Section 4.01    Power of Board of Directors. The business and affairs of the Corporation shall be managed by the Board of Directors.

Section 4.02    Number of Directors. The number of directors of the Corporation is no fewer than three (3), but no more than five (5), and may be increased or decreased from time to time by action of the Board of Directors.

Section 4.03    Election and Term of Directors. The initial Board of Directors shall consist of those directors named in the Action of the Sole Incorporator dated July 30, 2014 and shall serve until their successors are elected and qualified. Thereafter, directors shall be elected at an annual meeting of the Board of Directors by an affirmative vote of a majority of the directors then in office, and each shall continue in office until his or her successor is elected or qualified (unless the Board of Directors, at the annual meeting, determines that there is to be no such immediate successor), or until his or her death, resignation, or removal. The tenure of incumbent members of the Board of Directors shall not be affected by an increase or decrease in the number of directors.

Section 4.04    Vacancies and Newly-Created Directorships. Vacancies and newly-created directorships, resulting from any increase in the authorized number of directors, may be filled by a majority vote of the directors then in office although less than a quorum, or by a sole remaining director. A director elected to fill a vacancy or newly-created directorship shall hold office until the next annual meeting of the Board of Directors and until his or her successor is elected and qualified.

Section 4.05    Removal. Any director may be removed with or without cause at any time by action of the Board. A director may be removed only at a meeting called for that purpose (together with other purposes, if any).

Section 4.06    Resignations. Any director may resign at any time upon written notice to the Corporation. Unless otherwise specified in the written notice, the resignation shall be effective upon delivery to the Corporation.

Section 4.07    Quorum of the Board of Directors and Action of the Board of Directors. Unless a greater proportion is required by law or by these Bylaws for adoption of a particular action, a majority of the directors shall constitute a quorum for the transaction of business and, except as otherwise provided by law or by the Articles of Incorporation or these Bylaws, the vote of a majority of the directors present at the meeting at which a quorum is present shall be the act of the Board of Directors.

- 2 -

**SFFA-Harvard 0000035**

Section 4.08   Meetings of the Board of Directors.   An annual meeting of the Board of Directors shall be held each year at such time and place as shall be fixed by the Board of Directors, for the election of officers and directors and for the transaction of such other business as may properly come before the meeting.   Regular meetings of the Board of Directors shall be held at such times as may be fixed by the Board of Directors.   Special meetings of the Board of Directors may be held at any time whenever called by a majority of the directors then in office. Notice of all special meetings shall be delivered in writing to all directors and shall specify the matters to be addressed at such meeting.   Meetings of the Board of Directors may be held at such places within or without the Commonwealth of Virginia as may be fixed by the Board of Directors for annual and regular meetings and in the notice of meeting for special meetings.

Section 4.09   Informal Action by the Board of Directors.   Unless otherwise restricted by the Articles of Incorporation or these Bylaws, any action required or permitted to be taken by the Board of Directors may be taken without a meeting if all directors consent in writing to the adoption of a resolution authorizing the action.   The resolution and the written consents thereto by the directors shall be filed with the minutes of proceedings of the Board of Directors.   A written consent and the signing thereof may be accomplished by one or more electronic transmissions, including a signed email message from the applicable director.

Section 4.10   Meetings by Conference Telephone.   Any one or more members of the Board of Directors may participate in a meeting of such Board of Directors by means of conference telephone or similar communications equipment by means of which all persons participating in the meeting can communicate with one another.   Participation in a meeting by such means shall constitute presence in person at the meeting.

Section 4.11   Compensation of Directors.   The Corporation may not pay any compensation to directors for services rendered, except that directors may be reimbursed for expenses incurred in the performance of their duties to the Corporation, in reasonable amounts as approved by a majority of the entire Board of Directors.

## ARTICLE V
### Committees

Section 5.01   General Provisions.   A majority of the Board of Directors may create one or more committees and appoint members of the Board of Directors to serve on them.   To the extent specified by the Board of Directors, each committee may exercise the authority of the Board of Directors, except that a committee may not exercise authority prohibited by law.

Section 5.02   Committee Rules.   Requirements for the Board of Directors set forth herein or, if applicable, in Sections 13.1-864 through 13.1-868 of the Act as now in effect or as may hereafter be amended, or any other statutory provision, governing meetings, action without meetings, notice and waiver of notice, and quorum and voting requirements shall apply to committees and their members as well.

SFFA-Harvard 0000036

## ARTICLE VI
### *Officers, Agents, and Employees*

Section 6.01    Officers.    The Board of Directors shall elect or appoint a President, Secretary, and Treasurer, and it may, if it so determines, elect or appoint one or more Vice Presidents, Assistant Secretaries, Assistant Treasurers, and other officers and may give any of them such further designation or alternate titles as it considers desirable.    The same individual may simultaneously hold more than one office in the Corporation.

Section 6.02    Term of Office, Vacancies and Removal.    Each officer shall hold office for the term for which he or she is elected or appointed and until his or her successor is elected or appointed and qualified, or until his or her earlier death, resignation or removal.    All officers shall be elected or appointed at the annual meeting of the Board of Directors, except in the case of initial officers and vacancies resulting from any resignation or removal, which may be filled by the Board of Directors as needed.    An officer appointed or elected to fill a vacancy shall hold office for the unexpired term of his or her predecessor in office, and until his or her successor is elected and qualified.    Any officer may be removed by the Board of Directors with or without cause at any time.

Section 6.03    Resignation.    Any officer may resign at any time by giving written notice to the Corporation. Unless otherwise specified in the written notice, the resignation shall be effective upon delivery to the Corporation.

Section 6.04    Powers and Duties of Officers.    Subject to the control of the Board of Directors, all officers as between themselves and the Corporation shall have such authority and perform such duties in the management of the Corporation as may be provided by the Board of Directors and, to the extent not so provided, as generally pertain to their respective offices.

*President.*    The President shall serve as the chief executive officer of the Corporation and preside at all meetings of the Board of Directors.    The President shall supervise and control all of the affairs of the Corporation and oversee the management of the Corporation in accordance with policies and directives approved by the Board of Directors, including appointing assistants and hiring employees as necessary to ensure orderly operations.

*Secretary.*    The Secretary shall be responsible for the keeping of an accurate record of the proceedings of all meetings of the Board of Directors, shall give or cause to be given all notices in accordance with these Bylaws or as required by law, and shall perform all duties customary to the office of Secretary.

*Treasurer.*    The Treasurer shall have the custody of, and be responsible for, all funds and securities of the Corporation.    He or she shall keep or cause to be kept complete and accurate accounts of receipts and disbursements of the Corporation, and shall deposit all monies and other valuable property of the Corporation in the name and to the credit of the Corporation in such banks or depositories as the Board of Directors may designate.    Whenever required by the Board of Directors, the Treasurer shall render a statement of accounts.    He or she shall at all reasonable times exhibit the books and accounts to any

**JA315**                                    **SFFA-Harvard 0000037**

officer or director of the Corporation, and shall perform all duties incident to the office of Treasurer, subject to the supervision of the Board of Directors, and such other duties as shall from time to time be assigned by the Board of Directors.

Section 6.05   Agents and Employees.  The Board of Directors may appoint agents and employees who shall have such authority and perform such duties as may be prescribed by the Board of Directors.  The Board of Directors may remove any agent or employee at any time with or without cause.  Removal without cause shall be without prejudice to such person's contract rights, if any, and the appointment of such person shall not itself create contract rights.

Section 6.06   Compensation of Officers, Agents and Employees.  The Corporation may pay compensation to officers for services rendered to the Corporation in their capacity as officers, and officers may be reimbursed for expenses incurred in the performance of their duties to the Corporation, in reasonable amounts as approved by a majority of the entire Board of Directors.  The Corporation may pay compensation in reasonable amounts to agents and employees for services rendered, such amounts to be fixed by the Board of Directors or, if the Board of Directors delegates power to any officer or officers, then by such officer or officers. The Board of Directors may require officers, agents or employees to give security for the faithful performance of their duties.

### ARTICLE VII
*Miscellaneous*

Section 7.01   Fiscal Year.  The fiscal year of the Corporation shall be the calendar year or such other period as may be fixed by the Board of Directors.

Section 7.02   Corporate Seal.  The corporate seal, if any, shall be circular in form, shall have the name of the Corporation inscribed thereon and shall contain the words "Corporate Seal" and "Virginia" and the year the Corporation was formed in the center, or shall be in such form as may be approved from time to time by the Board of Directors.

Section 7.03   Checks, Notes, Contracts.  The Board of Directors shall determine who shall be authorized from time to time on the Corporation's behalf to: (A) sign checks, drafts, or other orders for payment of money; (B) to sign acceptances, notes, or other evidences of indebtedness; (C) to enter into contracts; and (D) to execute and deliver other documents and instruments.

Section 7.04   Books and Records.  The Corporation shall keep correct and complete books and records of account, the activities and transactions of the Corporation, minutes of the proceedings of the Board of Directors and any committee of the Corporation, a current list of the directors and officers of the Corporation, their business addresses and the Corporation's most recent annual report.  Any of the books, minutes, and records of the Corporation may be in written form or in any other form capable of being converted into written form within a reasonable time.

Section 7.05   Amendment of Articles of Incorporation and Bylaws.  The Articles of Incorporation or Bylaws of the Corporation may be amended in whole or in part by a majority

**JA316**                                                      **SFFA-Harvard 0000038**

vote of the directors then in office and upon the taking of any other actions required under the Act.

Section 7.06   Indemnification and Insurance.   The Corporation shall indemnify any director, any former director, any person who while a director of the Corporation may have served at its request as a director, officer, partner, trustee, employee, or agent of another foreign or domestic corporation, partnership, joint venture, trust, employee benefit plan or other enterprise, and may, by resolution of the Board of Directors, indemnify any officer, employee, or agent against any and all expenses and liabilities actually and necessarily incurred by him or her or imposed on him or her in connection with any claim, action, suit, or proceeding (whether actual or threatened, civil, criminal, administrative, or investigative, including appeals) to which he or she may be or is made a party by reason of being or having been such director, officer, employee or agent; subject to the limitation, however, that there shall be no indemnification in relation to matters unless such person: (1) conducted himself or herself in good faith; (2) believed in the case of conduct in his or her official capacity with the Corporation that his or her conduct was in the best interest of the Corporation; and in all other cases that his or her conduct was at least not opposed to the best interests of the Corporation; or (3) in the case of any criminal proceeding, he or she had no reasonable cause to believe that his or her conduct was unlawful. Further, there shall be no indemnification in connection with a proceeding (A) by or in the right of the Corporation in which the director, officer, employee or agent was judged liable to the Corporation, or (B) in which improper personal benefit is charged.

The Corporation shall upon order of a court of competent jurisdiction indemnify a director who entirely prevails in the defense of any proceeding to which he or she was a party because he or she is or was a director of the Corporation, for reasonable expenses incurred by him or her in connection with the proceeding.

Amounts paid in indemnification of expenses and liabilities may include, but shall not be limited to, counsel fees and other fees; costs and disbursements; judgments, fines, and penalties against, and amounts paid in settlement by, such director, officer, employee or agent.   The Corporation may pay for or reimburse the reasonable expenses in advance of final disposition of the proceeding provided that the provisions of Section 13.1-878 of the Act are met.

The provisions of this Article shall be applicable to claims, actions, suits, or proceedings made or commenced after the adoption hereof, whether arising from acts or omissions to act occurring before or after adoption hereof.

The indemnification provided by this Article shall not be deemed exclusive of any other rights to which such director, officer, or employee may be entitled under any statute, bylaw, agreement, vote of the Board of Directors, or otherwise and shall not restrict the power of the Corporation to make any indemnification permitted by law.

The Board of Directors may authorize the purchase of and maintain insurance on behalf of any director, officer, employee or agent of the Corporation against any liability asserted against or incurred by him or her which arises out of such person's status in such capacity or who is or was serving at the request of the Corporation as a director, officer, employee or agent of another foreign or domestic corporation, partnership, joint venture, trust, employee benefit plan

- 6 -

SFFA-Harvard 0000039

or otherwise, or out of acts taken in such capacity, whether or not the Corporation would have the power to indemnify the person against that liability under law.

If any part of this Section shall be found in any action, suit or proceeding to be invalid or ineffective, the validity and the effectiveness of the remaining parts shall not be affected.

Section 7.07   Dissolution.   The Corporation may be dissolved at any time by majority vote of the directors then in office and upon the taking of any other actions required under the Act. In the event of dissolution or final liquidation of the Corporation, all of the remaining assets of the Corporation shall, after paying or making provision for the payment of all of the liabilities and obligations of the Corporation and for necessary expenses thereof, be distributed as determined by the Board of Directors in accordance with the Articles of Incorporation and applicable law.

SFFA-Harvard 0000040

IRS Form 1023 – Exhibit C
Students for Fair Admissions, Inc.
EIN: 47-1689810

<u>Part IV</u>

NARRATIVE DESCRIPTION OF ORGANIZATION'S ACTIVITIES

I.    **Introduction**

    Students for Fair Admissions, Inc. is a non-profit public charity organized and operated exclusively for charitable purposes within the meaning of Section 501(c)(3) of the Internal Revenue Code ("IRC"). Formed for the purpose of defending human and civil rights secured by law through the institution of litigation, Students for Fair Admissions seeks to promote and protect the right of the public to be free from discrimination on the basis of race in higher education admissions. *See* Rev. Rul. 80-278, 1980-2 C.B. 175.

    Students for Fair Admissions is a coalition of prospective applicants and applicants to higher education institutions who were denied admission to higher education institutions, their family members, and other individuals who support the organization's purpose and mission of eliminating racial discrimination in higher education admissions. An independent and experienced board of directors governs Students for Fair Admissions. The organization's members do not have any voting rights in governance matters.

    Students for Fair Admissions does not have its own staff of attorneys and does not provide legal representation to its members or others. Instead, the organization will employ private attorneys to represent it in bringing and maintaining civil rights litigation. As described below, the type of litigation that Students for Fair Admissions intends to initiate benefits the public and does not benefit any private party or interest. Students for Fair Admissions' volunteer board of directors will oversee its litigation, which will include selecting qualified private attorneys to represent the organization and making decisions about litigation strategy.

    In addition, Students for Fair Admissions does not have dedicated office space. Its volunteer directors and officers perform their work from home. The board of directors has the sole discretion to determine how and where the organization's funds are expended. Please see Part VIII, Line 15 for additional information about how Students for Fair Admissions is funded.

II.    **Overview of Students for Fair Admissions' Party-Plaintiff Litigation**

    Students for Fair Admissions intends to file lawsuits against universities located in the United States alleging that the universities employed racially discriminatory policies and procedures in administering their admissions programs in violation of the Equal Protection Clause of the U.S. Constitution's Fourteenth Amendment and/or Title VI of the Civil Rights Act of 1964. At this time, Students for Fair Admissions anticipates simultaneously filing 2-3 separate lawsuits against 2-3 different universities. The lawsuits will seek declaratory judgments that the universities' admissions programs are racially discriminatory and violate the Equal Protection Clause and Title VI.

    The IRS has set forth a three-part test for determining whether an organization that institutes and maintains litigation as a party plaintiff is operated exclusively for charitable

**SFFA-Harvard 0000041**

IRS Form 1023 – Exhibit C
Students for Fair Admissions, Inc.
EIN: 47-1689810

purposes. *See* Rev. Rul. 80-278, 1980-2 C.B. 175. Under this three-part test, an organization's activities will be considered permissible under Section 501(c)(3) if:

> (1)    the purpose of the organization is charitable;
>
> (2)    the activities are not illegal, contrary to a clearly defined and established public policy, or in conflict with express statutory restrictions; and
>
> (3)    the activities are in furtherance of the organization's exempt purpose and are reasonably related to the accomplishment of that purpose.

*Id.* As explained below, Students for Fair Admissions satisfies this three-part test.

### A.    Students for Fair Admissions' Purpose is Charitable.

Treasury Regulation 1.501(c)(3)-1(d)(2) provides that "defend[ing] human and civil rights secured by law" is a charitable purpose. "[H]uman and civil rights secured by law" include rights provided not only by the Constitution of the United States, but also by federal statute. *See Nat'l Right to Work Legal Defense & Educ. Foundation*, 487 F. Supp. 801 (E.D. N.C. 1979). Students for Fair Admissions' party-plaintiff litigation, which will focus on defending the rights of all individuals to be free from racial discrimination in higher education admissions under the Equal Protection Clause of the U.S. Constitution's Fourteenth Amendment and/or Title VI of the Civil Rights Act of 1964, falls into this category of charitable activities.

The Equal Protection Clause forbids states from "deny[ing] to any person within its jurisdiction the equal protection of the laws." U.S. Const. amend XIV, § 1. The Supreme Court has held that the Equal Protection Clause applies to higher education admissions policies and procedures. *See, e.g., Grutter v. Bollinger*, 539 U.S. 306 (2003) ("A core purpose of the Fourteenth Amendment was to do away with all governmentally imposed discrimination based on race" and "whenever the government treats any person unequally because of his or her race, that person has suffered an injury that falls squarely within the language and spirit of the Constitution's guarantee of equal protection."). It is well-established that instituting litigation to defend rights guaranteed by the U.S. Constitution constitutes "defend[ing] human and civil rights secured by law" and is a charitable activity. *See, e.g.,* Rev. Rul. 73-285, 1973-2 C.B. 174.

Title VI prohibits discrimination on the basis of race, color, and national origin in programs and activities receiving federal financial assistance, such as universities. *See* 42 U.S.C. § 2000d et seq. The Supreme Court also has recognized that Title VI applies to high education admissions policies and procedures. *See, e.g., Regents of Univ. of California v. Bakke*, 438 U.S. 265 (1978) ("Examination of the voluminous legislative history of Title VI reveals a congressional intent to halt federal funding of entities that violate a prohibition of racial discrimination similar to that of the Constitution."). The IRS has frequently recognized that instituting litigation to defend rights provided for under civil rights statutes constitutes "defend[ing] human and civil rights secured by law" and is a charitable activity. *See, e.g.,*

**SFFA-Harvard 0000042**

IRS Form 1023 – Exhibit C
Students for Fair Admissions, Inc.
EIN: 47-1689810

G.C.M. 38468 (Aug. 12, 1980) (citing *Nat'l Right to Work Legal Defense & Educ. Foundation*, 487 F. Supp. 801 (E.D. N.C. 1979)).

      **B.    Students for Fair Admissions' Activities are Not Illegal, Contrary to a Clearly Defined and Established Public Policy, or in Conflict with Express Statutory Restrictions.**

Private litigation activities are not illegal nor contrary to public policy or any IRC 501(c)(3) restrictions. *See* Rev. Ruls. 80-278, 73-285.

      **C.    Students for Fair Admissions' Activities Further Its Exempt Purpose and Reasonably Relate to the Accomplishment of that Purpose.**

Students for Fair Admissions' primary activity, the institution of litigation as a party plaintiff, is an effective method to further its exempt purpose of promoting and protecting the public's right to be free from discrimination on the basis of race in higher education admissions. Congress has provided for private litigation as a means to enforce the Equal Protection Clause. *See* 42 U.S.C. § 1983 (creating a private right of action to enforce rights guaranteed by the U.S. Constitution. And the U.S. Supreme Court has found an implied private right of action under Title VI. *See Alexander v. Sandoval*, 532 U.S. 275 (2001). "These provisions indicate Congressional approval of private litigation as desirable and appropriate means of enforcing" the Equal Protection Clause and federal civil rights statutes. Rev. Rul. 80-278.

## III.    Students for Fair Admissions' Party-Plaintiff Litigation Serves a Public Interest

Students for Fair Admissions' party-plaintiff litigation serves a public rather than private interest. Regardless of the outcome, the organization's litigation will serve as "test cases" and define the rights of the public generally to be free from discrimination on the basis of race in higher education admissions. As noted above, Students for Fair Admissions' litigation will seek declaratory judgments that the defendant universities' admissions programs are racially discriminatory and violate the Equal Protection Clause and Title VI. Such declaratory judgments would cause not only the defendant universities, but also higher education institutions throughout the country to examine their admissions programs and alter any policies and procedures that could be discriminatory.

In addition to declaratory judgments, Students for Fair Admissions will also seek attorneys' fees in their party-plaintiff litigation. Should Students for Fair Admissions be awarded attorneys' fees, the organization would ensure that the fees are paid directly to the organization to be used for the purpose of defraying its normal operating and program expenses. No monetary recovery of any kind would be distributed to Students for Fair Admissions' members.

**SFFA-Harvard 0000043**

IRS Form 1023 -- Exhibit D
Students for Fair Admissions, Inc.
EIN: 47-1689810

## Part I, Line 7

### AUTHORIZED REPRESENTATIVES

| | |
|---|---|
| Attorney Names: | Robert D. Benton |
| | Brandis L. Zehr |
| | |
| Law Firm: | Wiley Rein LLP |
| | 1776 K Street NW |
| | Washington, DC 20006 |

## Part V, Line 2(a)

### FAMILY RELATIONSHIPS OF OFFICERS AND DIRECTORS

Abigail Fisher, a director and Secretary, and Richard Fisher, a director and Treasurer, are related to each other through a family relationship. Mr. Fisher is the father of Ms. Fisher.

## Part V, Line 3(a)

### QUALIFICATIONS, AVERAGE HOURS WORKED, AND DUTIES OF OFFICERS AND DIRECTORS

**Edward Blum, President**

Edward Blum serves as a volunteer director and President of Students for Fair Admissions. As President, Mr. Blum functions as the chief executive officer, supervising the day-to-day affairs of the organization. Students for Fair Admissions estimates that Mr. Blum will spend an average of 10 hours per week fulfilling his duties.

Mr. Blum is a leading scholar of civil rights policy issues, such as voting rights, affirmative action, and multiculturalism. He is currently a visiting fellow at the American Enterprise Institute and also the Executive Director of the Project on Fair Representation. (Please see Part VIII, Line 15 for more information of Students for Fair Admissions' relationship with the Project on Fair Representation.) Prior to joining AEI and founding the Project on Fair Representation, Mr. Blum was a Senior Fellow at the Center for Equal Opportunity and the Director of Legal Affairs at the Center for Equal Opportunity. He holds a bachelor's degree from the University of Texas.

**Abigail Fisher, Secretary**

Abigail Fisher serves as a volunteer director and Secretary of Students for Fair Admissions. As Secretary, Ms. Fisher is responsible for keeping an accurate record of the proceedings of all meetings of the Board of Directors. Students for Fair Admissions estimates that Ms. Fisher will spend an average of one hour per week fulfilling her duties.

**SFFA-Harvard 0000044**

IRS Form 1023 – Exhibit D
Students for Fair Admissions, Inc.
EIN: 47-1689810

Ms. Fisher has firsthand experience about the type of litigation that Students for Fair Admissions intends to initiate. After being denied admission to the University of Texas, Ms. Fisher challenged the university's race-conscious admissions program. *Fisher v. University of Texas* has generated precedential decisions in the Supreme Court and Fifth Circuit Court of Appeals.

Ms. Fisher is a financial analysis for a Fortune 100 company. She holds a bachelor's degree in finance from Louisiana State University.

**Richard Fisher, Treasurer**

Richard Fisher serves as a volunteer director and Treasurer of Students for Fair Admissions. As Treasurer, Mr. Fisher is responsible for the financial management of the organization. Students for Fair Admissions estimates that Mr. Fisher will spend less than five hours per week fulfilling his duties.

Mr. Fisher is a Certified Public Accountant. He holds a bachelor's degree in business administration from the University of Texas.

<u>Part V, Line 5(a)</u>

### CONFLICT OF INTEREST POLICY

Students for Fair Admissions' board of directors adopted its conflict of interest policy on August 6, 2014 through a unanimous written consent in lieu of an organizational meeting. A copy of the organization's conflict of interest policy is attached as Exhibit E.

<u>Part VIII, Line 4(a)</u>

### FUNDRAISING PROGRAMS

Students for Fair Admissions anticipates that it will primarily raise funds through personal solicitations of other 501(c)(3) public charities. The organization also may raise funds through personal solicitations of individuals and businesses.

<u>Part VIII, Line 4(d)</u>

### JURISDICTIONS IN WHICH THE ORGANIZATION CONDUCTS FUNDRAISING

Students for Fair Admissions anticipates that its fundraising activities will be primarily conducted in Texas and it will only engage in fundraising activities on its own behalf.

**SFFA-Harvard 0000045**

IRS Form 1023 – Exhibit D
Students for Fair Admissions, Inc.
EIN: 47-1689810

## Part VIII, Line 15

### CLOSE CONNECTION WITH ANOTHER ORGANIZATION

Students for Fair Admissions has a "close connection" with the Project on Fair Representation ("POFR"). POFR is a legal defense fund that supports civil and voting rights litigation brought under the U.S. Constitution and federal statutes. POFR is currently in the process of transitioning from being a program of Project Liberty, Inc., a Section 509(a)(3) supporting organization, to being a legally-distinct public charity under Section 501(c)(3). Edward Blum, who serves as a volunteer director and the President of Students for Fair Admissions, also serves as a director and the Executive Director of POFR. Students for Fair Admissions' initial funding is from POFR, and the organization anticipates that POFR will continue to be the primary funder of the organization.

## Part IX, Line 23

### ANY EXPENSE NOT OTHERWISE CLASSIFIED

|  | Current Tax Year | Two Succeeding Tax Years | |
|---|---|---|---|
|  | (a) From    7/30/14<br>To    12/31/14 | (b) From    1/1/15<br>To    12/31/15 | (c) From    1/1/16<br>To    12/31/16 |
| Office Supplies | $5,000 | $5,000 | $5,000 |
| Travel Expenses | $20,000 | $20,000 | $20,000 |
| Line 23 Total | $25,000 | $25,000 | $25,000 |

SFFA-Harvard 0000046

IRS Form 1023 – Exhibit E
Students for Fair Admissions, Inc.
EIN: 47-1689810

Part V, Line 5(a)

CONFLICT OF INTEREST POLICY

(attached)

SFFA-Harvard 0000047

*Adopted August 6, 2014*

## STUDENTS FOR FAIR ADMISSIONS, INC.

### Conflict of Interest Policy

### I.  Purpose

The purpose of this Conflict of Interest Policy is to protect the interests of Students for Fair Admissions, Inc. (the "Corporation") as a tax-exempt, charitable and educational organization when it is contemplating entering into a transaction or arrangement that might benefit the private interest of an officer or director of the Corporation or might possibly result in an excess benefit transaction.  This Policy is intended to supplement but not replace any applicable state and federal laws governing conflicts of interest applicable to nonprofit entities.

### II.  Definitions

A.  **Interested Person** – Any director, principal officer, or member of a committee with Board of Directors-delegated powers, who has a direct or indirect financial interest, as defined below, is an interested person.

B.  **Financial Interest** – A person has a financial interest if the person has, directly or indirectly, through business, investment, or family:

1.  An ownership or investment interest in any entity with which the Corporation has a transaction or arrangement;

2.  A compensation arrangement with the Corporation or with any entity or individual with which the Corporation has a transaction or arrangement; or

3.  A potential ownership or investment interest in, or compensation arrangement with, any entity or individual with which the Corporation is negotiating a transaction or arrangement.

Compensation includes direct and indirect remuneration as well as gifts or favors that are not insubstantial.  A financial interest is not necessarily a conflict of interest.  Under Section III.B, a person who has a financial interest may have a conflict of interest only if the Board of Directors or committee with Board of Directors-delegated powers decides that a conflict of interest exists.

### III.  Procedures

A.  **Duty to Disclose** – In connection with any actual or possible conflict of interest, an interested person must disclose on an ongoing basis the existence of the financial interest and be given the opportunity to disclose all material facts to the directors and members of committees with Board of Directors delegated powers considering the proposed transaction or arrangement.

1

**SFFA-Harvard 0000048**

*Adopted August 6, 2014*

B.  **Determining Whether a Conflict of Interest Exists** — After disclosure of the financial interest and all material facts, and after any discussion with the interested person, he/she shall leave the Board of Directors or committee with Board of Directors-delegated powers meeting while the determination of a conflict of interest is discussed and voted upon.  The remaining board or committee members shall decide if a conflict of interest exists.

C.  **Procedures for Addressing the Conflict of Interest**

1.  An interested person may make a presentation at the Board of Directors or committee with Board of Directors-delegated powers meeting, but after the presentation, he/she shall leave the meeting during the discussion of, and the vote on, the transaction or arrangement involving the possible conflict of interest.

2.  The President of the Corporation or chairperson of the committee with Board of Directors-delegated powers shall, if appropriate, appoint a disinterested person or committee to investigate alternatives to the proposed transaction or arrangement.

3.  After exercising due diligence, the Board of Directors or committee with Board of Directors-delegated powers shall determine whether the Corporation can obtain with reasonable efforts a more advantageous transaction or arrangement from a person or entity that would not give rise to a conflict of interest.

4.  If a more advantageous transaction or arrangement is not reasonably possible under circumstances not producing a conflict of interest, the Board of Directors or committee with Board of Directors-delegated powers shall determine by a majority vote of the disinterested directors whether the transaction or arrangement is in the Corporation's best interest, for its own benefit, and whether it is fair and reasonable.  In conformity with the above determination it shall make its decision as to whether to enter into the transaction or arrangement.

D.  **Violations of the Conflict of Interest Policy**

1.  If the Board of Directors or committee with Board of Directors-delegated powers has reasonable cause to believe a member has failed to disclose an actual or possible conflict of interest, it shall inform the member of the basis for such belief and afford the member an opportunity to explain the alleged failure to disclose.

2.  If, after hearing the member's response and after making further investigation as warranted by the circumstances, the Board of Directors or committee with Board of Directors-delegated powers determines the member has failed to disclose an actual or possible conflict of interest, it shall take appropriate disciplinary and corrective action.

                    SFFA-Harvard 0000049

*Adopted August 6, 2014*

IV.    Records of Proceedings

The minutes of the Board of Directors and all committees with Board of Directors-delegated powers shall contain:

A.    The names of the persons who disclosed or otherwise were found to have a financial interest in connection with an actual or possible conflict of interest, the nature of the financial interest, any action taken to determine whether a conflict of interest was present, and the decision of the Board of Directors or committee with Board of Directors-delegated powers as to whether a conflict of interest in fact existed; and

B.    The names of the persons who were present for discussions and votes relating to the transaction or arrangement, the content of the discussion (including any alternatives to the proposed transaction or arrangement), and a record of any votes taken in connection with the proceedings.

V.    Compensation

A.    A director who receives compensation, directly or indirectly, from the Corporation for services is precluded from voting on matters pertaining to that director's compensation.

B.    A voting member of any committee with Board of Directors-delegated powers whose jurisdiction includes compensation matters and who receives compensation, directly or indirectly, from the Corporation for services is precluded from voting on matters pertaining to that member's compensation.

C.    No director or voting member of any committee with Board of Directors-delegated powers whose jurisdiction includes compensation matters and who receives compensation, directly or indirectly, from the Corporation, either individually or collectively, is prohibited from providing information to any such committee regarding compensation.

VI.    Annual Statements

Each director, principal officer and member of a committee with Board of Directors-delegated powers shall annually sign a statement which affirms such person:

A.    Has received a copy of the Conflict of Interest Policy;

B.    Has read and understands the Policy;

C.    Has agreed to comply with the Policy; and

D.    Understands the Corporation is a nonprofit, charitable and educational organization and in order to maintain its federal tax exemption it must engage primarily in activities which accomplish one or more of its tax-exempt purposes.

3

**JA328**

SFFA-Harvard 0000050

VII.    Periodic Reviews

To ensure the Corporation operates in a manner consistent with its charitable and educational purposes and does not engage in activities that could jeopardize its tax-exempt status, periodic reviews shall be conducted. The periodic reviews shall, at a minimum, include the following subjects:

i.    Whether compensation arrangements and benefits are reasonable, based on competent survey information, and the result of arm's length bargaining; and

ii.    Whether partnerships, joint ventures, and arrangements with management entities conform to the Corporation's written policies, are properly recorded, reflect reasonable investment or payments for goods and services, further the charitable and educational purposes of the Corporation and do not result in inurement, impermissible private benefit or in an excess benefit transaction.

VIII.    Use of Outside Experts

When conducting the periodic reviews pursuant to Section VII, the Corporation may, but need not, use outside advisors. If outside experts are used, their use shall not relieve the Board of Directors of its responsibility for ensuring periodic reviews are conducted.

4

**SFFA-Harvard 0000051**

# EXHIBIT 89

## UNANIMOUS WRITTEN CONSENT
## IN LIEU OF A MEETING
*of*
## THE BOARD OF DIRECTORS
*of*
## STUDENTS FOR FAIR ADMISSIONS, INC.

The undersigned, being and constituting all of the members of the Board of Directors of Students for Fair Admissions, Inc. (the "Corporation"), a Virginia nonstock corporation, for purposes of taking action in lieu of an organizational meeting of the Board of Directors of the Corporation, pursuant to Section 13.1-841 of the Virginia Nonstock Corporation Act, hereby adopt the following resolutions and waive all requirements of notice:

### Amendment of Bylaws

WHEREAS, Section 7.05 of the Corporation's Bylaws provides that the Board of Directors may amend the Bylaws in whole or in part by a majority vote of the directors then in office;

WHEREAS, Article III of the Corporation's Bylaws provides that the Corporation shall have "Members" with rights, privileges, and obligations established by the Board of Directors, but shall not have voting rights and shall not be considered "members" within the meaning of the Act;

WHEREAS, the Corporation's Members presently number more than 20,000, and the Members have expressed a desire to participate directly in the leadership of the Corporation;

WHEREAS, the Board of Directors believes that Members should have a direct voice in the Corporation's decision-making, including the management and direction of ongoing litigation;

WHEREAS, the Board of Directors believes it is in the best interests of the Corporation to amend the Bylaws to permit Members to directly elect a member of the Board of Directors;

WHEREAS, the Board of Directors has waived membership dues for Members since the Corporation's inception because it believed that doing so would encourage participation, aid membership recruitment, and ensure the success of the Corporation in its early stages;

WHEREAS, the Board of Directors believes it is in the best interests of the Corporation to amend the Bylaws to clarify the dues requirements of Members;

WHEREAS, the Board of Directors has reviewed and considered the Amended Bylaws (Exhibit A) to effect such changes;

BE IT RESOLVED, that said Amended Bylaws are adopted in their entirety and a copy is ordered placed in the minute book of the Corporation.

**Establishment of Dues Policy for General Members**

WHEREAS, Section 3.02 of the Corporation's Bylaws provided that Members shall have the "rights, privileges, and obligations established by the Board of Directors;"

WHEREAS, Section 3.02 of the Amended Bylaws clarifies that General Members shall pay membership dues as may be prescribed by the Board of Directors;

WHEREAS, the Board of Directors has waived membership dues for General Members since the Corporation's inception because it believed that doing so would encourage participation, aid membership recruitment, and ensure the success of the Corporation in its early stages;

WHEREAS, the Corporation has been in existence for nearly one year and has experienced extraordinary membership growth;

WHEREAS, the Board of Directors believes it is in the best interests of the Corporation to begin assessing membership dues upon the one-year anniversary of the Corporation's formation;

BE IT RESOLVED, that the Corporation shall continue to waive membership dues for individuals who become General Members prior to July 30, 2015; and

FURTHER RESOLVED, that the Corporation shall require individuals who become General Members on or after July 30, 2015 to pay a one-time assessment of $10 as membership dues.

**Adoption of Member-Elected Director Election Procedures**

WHEREAS, Article IV of the Amended Bylaws created a new directorship to be elected by the Corporation's General Members (the "Member-Elected Director");

WHEREAS, Section 4.04(b) of the Amended Bylaws provides that the Member-Elected Director shall be elected in conjunction with the annual meeting of the Board of Directors by an affirmative vote of a majority of the General Members;

WHEREAS, Section 4.04(b) of the Amended Bylaws further provides that the Board of Directors shall determine the time, method, manner, and eligibility of voting for the Member-Elected Director;

WHEREAS, the Board of Directors has determined that it is in the best interests of the Corporation to hold an election for the Member-Elected Director in conjunction with the Board of Directors' upcoming 2015 annual meeting;

WHEREAS, the Board of Directors has further determined that it is in the best interests of the Corporation to conduct the election in accordance with the attached "Procedures for Electing Member-Elected Directors" (Exhibit B);

- 2 -

BE IT RESOLVED, that the "Procedures for Electing Member-Elected Directors" are adopted in their entirety, and the first election for the Member-Elected Director shall be held in accordance with these procedures.

### Authorization and Ratification

BE IT RESOLVED, that the officers of the Corporation are hereby authorized to do all things, take all actions, and to execute, deliver, and file all documents, in the name and on behalf of the Corporation, as may be determined by the officers to be necessary or appropriate to give effect to the foregoing resolutions and the matters contemplated thereby (the appropriateness of which shall be conclusively determined by the taking of such action); and

FURTHER RESOLVED, that any and all actions taken and documents executed by the officers of the Corporation in furtherance of the foregoing resolutions or the matters contemplated thereby are hereby ratified, confirmed, and approved in all respects.

\*    \*    \*

This action by unanimous written consent may be signed in any number of counterparts, all of which when taken together will constitute one and the same document.

Dated: June 19, 2015

[SIGNATURE PAGE FOLLOWS]

- 3 -

SIGNATURE PAGE TO
UNANIMOUS WRITTEN CONSENT
IN LIEU OF A MEETING
of
THE BOARD OF DIRECTORS
of
STUDENTS FOR FAIR ADMISSIONS, INC.

IN WITNESS WHEREOF, the undersigned have executed this Written Consent as of the
date set forth above.

_____
Edward Blum
Director

_____
Abigail Fisher
Director

_____
Richard Fisher
Director

JA334

SIGNATURE PAGE TO
UNANIMOUS WRITTEN CONSENT
IN LIEU OF A MEETING
*of*
THE BOARD OF DIRECTORS
*of*
STUDENTS FOR FAIR ADMISSIONS, INC.

IN WITNESS WHEREOF, the undersigned have executed this Written Consent as of the
date set forth above.

_____
Edward Blum
Director


_____
Abigail Fisher
Director


_____
Richard Fisher
Director

## SIGNATURE PAGE TO
## UNANIMOUS WRITTEN CONSENT
## IN LIEU OF A MEETING
*of*
## THE BOARD OF DIRECTORS
*of*
## STUDENTS FOR FAIR ADMISSIONS, INC.

IN WITNESS WHEREOF, the undersigned have executed this Written Consent as of the date set forth above.

_____
Edward Blum
Director

_____
Abigail Fisher
Director

_____
Richard Fisher
Director

**EXHIBIT A**

Amended Bylaws
(see attached)

SFFA-Harvard 0000058

# BYLAWS

*of*

# STUDENTS FOR FAIR ADMISSIONS, INC.

(Formed under the Virginia Nonstock Corporation Act)

(Adopted August 6, 2014; Amended June 19, 2015)

## ARTICLE I
*Name and Location*

Section 1.01   Name.  The name of the corporation is Students for Fair Admissions, Inc. (the "Corporation").

Section 1.02   Location.  The principal office of the Corporation shall be located at 2200 Wilson Blvd., Suite 102-13, Arlington, VA 22201, or at any other place approved by the Board of Directors.

Section 1.03   Registered Office and Agent.   The Corporation shall continuously maintain a registered office and agent within the Commonwealth of Virginia at such place as may be designated by the Board of Directors.  The Corporation's initial registered office and agent are set forth in the Articles of Incorporation.

## ARTICLE II
*Purposes*

The Corporation is organized and shall be operated exclusively for charitable, religious, scientific, literary, educational and other purposes within the meaning of Section 501(c)(3) of the Internal Revenue Code of 1986, as now in effect or as hereafter may be amended (the "Code"). The purposes for which the Corporation is formed are to defend human and civil rights secured by law, including the right of individuals to equal protection under the law, through litigation and any other lawful means, and to engage in any lawful act or activity for which corporations may be organized under the Virginia Nonstock Corporation Act (the "Act").  In furtherance thereof, the Corporation shall have all the general powers enumerated in Sections 13.1-826 and 13.1-827 of the Act.

## ARTICLE III
*Membership*

Section 3.01   Members.  The Corporation shall have one class of members, referred to as General Members, which shall not be "members" within the meaning of the Act and shall have only the rights specifically set forth in these Bylaws.

Section 3.02   General Members.  Any individual who seeks to support the purposes and mission of the Corporation, pays membership dues as may be prescribed by the Board of

Directors, and meets any additional standards and procedures that may be prescribed from time to time by the Board of Directors shall be eligible to become a General Member. General Members shall have the right to vote for one (1) Member-Elected Director pursuant to Section 4.04.

Section 3.03   Revocation; Resignation.   The Board of Directors may revoke the membership of any General Member on the grounds that the General Member has engaged or is engaging in activities which are, in the sole discretion of the Board of Directors, contrary to the purposes of the Corporation. A General Member may resign at any time upon written notice to the Corporation.

## ARTICLE IV
### *Board of Directors*

Section 4.01   Power of Board of Directors.   The business and affairs of the Corporation shall be managed by the Board of Directors.

Section 4.02   Number of Directors.   The number of directors of the Corporation shall be five (5) and shall consist of four (4) Board-Elected Directors and one (1) Member-Elected Director.

Section 4.03   Qualifications.   All directors must be General Members of the Corporation.

Section 4.04   Election and Term of Directors.

(a)   Board-Elected Directors.   There shall be four (4) Board-Elected Directors. Board-Elected Directors shall be elected at the applicable annual meeting of the Board of Directors by an affirmative vote of a majority of the directors then in office, to serve for terms of two (2) years from the date of their election, and each shall continue in office until his or her successor is elected or qualified, or until his or her prior death, resignation, or removal.

(b)   Member-Elected Director.   There shall be one (1) Member-Elected Director.   The Member-Elected Director shall be elected in conjunction with the applicable annual meeting of the Board of Directors by an affirmative vote of a majority of the General Members, to serve for a term of two (2) years from the date of such director's election, and such director shall continue in office until his or her successor is elected or qualified, or until his or her prior death, resignation, or removal. The time, method, manner, and eligibility of voting for the Member-Elected Director shall be determined by the Board of Directors. Neither cumulative nor proxy voting shall be allowed in such elections. The candidate receiving the highest number of votes shall be elected.

Section 4.05   Vacancies.   A vacancy of a Board-Elected Directorship may be filled by a majority vote of the directors then in office although less than a quorum, or by a sole remaining director. A vacancy of a Member-Elected Directorship shall be filled by an affirmative majority vote of the General Members. Such election shall be held within sixty (60) days of the Member-Elected Directorship becoming vacant; provided that an election to fill a vacancy resulting from

- 2 -

the creation of a new Member-Elected Directorship shall be held within ninety (90) days of such creation.  A director elected to fill a vacancy shall be elected for the unexpired term of his or predecessor in office and until his or her successor is elected and qualified.

Section 4.06   Removal.  Any director may be removed with or without cause at any time by action of the Board.  A director may be removed only at a meeting called for that purpose (together with other purposes, if any).

Section 4.07   Resignations.  Any director may resign at any time upon written notice to the Corporation.  Unless otherwise specified in the written notice, the resignation shall be effective upon delivery to the Corporation.

Section 4.08   Quorum of the Board of Directors and Action of the Board of Directors.  Unless a greater proportion is required by law or by these Bylaws for adoption of a particular action, a majority of the directors shall constitute a quorum for the transaction of business and, except as otherwise provided by law or by the Articles of Incorporation or these Bylaws, the vote of a majority of the directors present at the meeting at which a quorum is present shall be the act of the Board of Directors.

Section 4.09   Meetings of the Board of Directors.  An annual meeting of the Board of Directors shall be held each year at such time and place as shall be fixed by the Board of Directors, for the election of officers and directors and for the transaction of such other business as may properly come before the meeting.  Regular meetings of the Board of Directors shall be held at such times as may be fixed by the Board of Directors.  Special meetings of the Board of Directors may be held at any time whenever called by a majority of the directors then in office.  Notice of all special meetings shall be delivered in writing to all directors and shall specify the matters to be addressed at such meeting.  Meetings of the Board of Directors may be held at such places within or without the Commonwealth of Virginia as may be fixed by the Board of Directors for annual and regular meetings and in the notice of meeting for special meetings.

Section 4.10   Informal Action by the Board of Directors.  Unless otherwise restricted by the Articles of Incorporation or these Bylaws, any action required or permitted to be taken by the Board of Directors may be taken without a meeting if all directors consent in writing to the adoption of a resolution authorizing the action.  The resolution and the written consents thereto by the directors shall be filed with the minutes of proceedings of the Board of Directors.  A written consent and the signing thereof may be accomplished by one or more electronic transmissions, including a signed email message from the applicable director.

Section 4.11   Meetings by Conference Telephone.  Any one or more members of the Board of Directors may participate in a meeting of such Board of Directors by means of conference telephone or similar communications equipment by means of which all persons participating in the meeting can communicate with one another.  Participation in a meeting by such means shall constitute presence in person at the meeting.

Section 4.12   Compensation of Directors.   The Corporation may not pay any compensation to directors for services rendered, except that directors may be reimbursed for

- 3 -

expenses incurred in the performance of their duties to the Corporation, in reasonable amounts as approved by a majority of the entire Board of Directors.

## ARTICLE V
### Committees

Section 5.01    General Provisions.  A majority of the Board of Directors may create one or more committees and appoint members of the Board of Directors to serve on them.  To the extent specified by the Board of Directors, each committee may exercise the authority of the Board of Directors, except that a committee may not exercise authority prohibited by law.

Section 5.02    Committee Rules.  Requirements for the Board of Directors set forth herein or, if applicable, in Sections 13.1-864 through 13.1-868 of the Act as now in effect or as may hereafter be amended, or any other statutory provision, governing meetings, action without meetings, notice and waiver of notice, and quorum and voting requirements shall apply to committees and their members as well.

## ARTICLE VI
### Officers, Agents, and Employees

Section 6.01    Officers.  The Board of Directors shall elect or appoint a President, Secretary, and Treasurer, and it may, if it so determines, elect or appoint one or more Vice Presidents, Assistant Secretaries, Assistant Treasurers, and other officers and may give any of them such further designation or alternate titles as it considers desirable.  The same individual may simultaneously hold more than one office in the Corporation.

Section 6.02    Term of Office, Vacancies and Removal.  Each officer shall hold office for the term for which he or she is elected or appointed and until his or her successor is elected or appointed and qualified, or until his or her earlier death, resignation or removal.  All officers shall be elected or appointed at the annual meeting of the Board of Directors, except in the case of initial officers and vacancies resulting from any resignation or removal, which may be filled by the Board of Directors as needed.  An officer appointed or elected to fill a vacancy shall hold office for the unexpired term of his or her predecessor in office, and until his or her successor is elected and qualified.  Any officer may be removed by the Board of Directors with or without cause at any time.

Section 6.03    Resignation.  Any officer may resign at any time by giving written notice to the Corporation. Unless otherwise specified in the written notice, the resignation shall be effective upon delivery to the Corporation.

Section 6.04    Powers and Duties of Officers.  Subject to the control of the Board of Directors, all officers as between themselves and the Corporation shall have such authority and perform such duties in the management of the Corporation as may be provided by the Board of Directors and, to the extent not so provided, as generally pertain to their respective offices.

*President.*  The President shall serve as the chief executive officer of the Corporation and preside at all meetings of the Board of Directors.  The President shall supervise and

- 4 -

control all of the affairs of the Corporation and oversee the management of the Corporation in accordance with policies and directives approved by the Board of Directors, including appointing assistants and hiring employees as necessary to ensure orderly operations.

*Secretary.*  The Secretary shall be responsible for the keeping of an accurate record of the proceedings of all meetings of the Board of Directors, shall give or cause to be given all notices in accordance with these Bylaws or as required by law, and shall perform all duties customary to the office of Secretary.

*Treasurer.*  The Treasurer shall have the custody of, and be responsible for, all funds and securities of the Corporation.  He or she shall keep or cause to be kept complete and accurate accounts of receipts and disbursements of the Corporation, and shall deposit all monies and other valuable property of the Corporation in the name and to the credit of the Corporation in such banks or depositories as the Board of Directors may designate.  Whenever required by the Board of Directors, the Treasurer shall render a statement of accounts.  He or she shall at all reasonable times exhibit the books and accounts to any officer or director of the Corporation, and shall perform all duties incident to the office of Treasurer, subject to the supervision of the Board of Directors, and such other duties as shall from time to time be assigned by the Board of Directors.

Section 6.05    Agents and Employees.  The Board of Directors may appoint agents and employees who shall have such authority and perform such duties as may be prescribed by the Board of Directors.  The Board of Directors may remove any agent or employee at any time with or without cause.  Removal without cause shall be without prejudice to such person's contract rights, if any, and the appointment of such person shall not itself create contract rights.

Section 6.06    Compensation of Officers, Agents and Employees.  The Corporation may pay compensation to officers for services rendered to the Corporation in their capacity as officers, and officers may be reimbursed for expenses incurred in the performance of their duties to the Corporation, in reasonable amounts as approved by a majority of the entire Board of Directors.  The Corporation may pay compensation in reasonable amounts to agents and employees for services rendered, such amounts to be fixed by the Board of Directors or, if the Board of Directors delegates power to any officer or officers, then by such officer or officers.  The Board of Directors may require officers, agents or employees to give security for the faithful performance of their duties.

## ARTICLE VII
### *Miscellaneous*

Section 7.01    Fiscal Year.  The fiscal year of the Corporation shall be the calendar year or such other period as may be fixed by the Board of Directors.

Section 7.02    Corporate Seal.  The corporate seal, if any, shall be circular in form, shall have the name of the Corporation inscribed thereon and shall contain the words "Corporate Seal" and "Virginia" and the year the Corporation was formed in the center, or shall be in such form as may be approved from time to time by the Board of Directors.

- 5 -

Section 7.03   <u>Checks, Notes, Contracts.</u>   The Board of Directors shall determine who shall be authorized from time to time on the Corporation's behalf to: (A) sign checks, drafts, or other orders for payment of money; (B) to sign acceptances, notes, or other evidences of indebtedness; (C) to enter into contracts; and (D) to execute and deliver other documents and instruments.

Section 7.04   <u>Books and Records.</u>   The Corporation shall keep correct and complete books and records of account, the activities and transactions of the Corporation, minutes of the proceedings of the Board of Directors and any committee of the Corporation, a current list of the directors and officers of the Corporation, their business addresses and the Corporation's most recent annual report.   Any of the books, minutes, and records of the Corporation may be in written form or in any other form capable of being converted into written form within a reasonable time.

Section 7.05   <u>Amendment of Articles of Incorporation and Bylaws.</u>   The Articles of Incorporation or Bylaws of the Corporation may be amended in whole or in part by a majority vote of the directors then in office and upon the taking of any other actions required under the Act.

Section 7.06   <u>Indemnification and Insurance.</u>   The Corporation shall indemnify any director, any former director, any person who while a director of the Corporation may have served at its request as a director, officer, partner, trustee, employee, or agent of another foreign or domestic corporation, partnership, joint venture, trust, employee benefit plan or other enterprise, and may, by resolution of the Board of Directors, indemnify any officer, employee, or agent against any and all expenses and liabilities actually and necessarily incurred by him or her or imposed on him or her in connection with any claim, action, suit, or proceeding (whether actual or threatened, civil, criminal, administrative, or investigative, including appeals) to which he or she may be or is made a party by reason of being or having been such director, officer, employee or agent; subject to the limitation, however, that there shall be no indemnification in relation to matters unless such person: (1) conducted himself or herself in good faith; (2) believed in the case of conduct in his or her official capacity with the Corporation that his or her conduct was in the best interest of the Corporation; and in all other cases that his or her conduct was at least not opposed to the best interests of the Corporation; or (3) in the case of any criminal proceeding, he or she had no reasonable cause to believe that his or her conduct was unlawful.   Further, there shall be no indemnification in connection with a proceeding (A) by or in the right of the Corporation in which the director, officer, employee or agent was judged liable to the Corporation, or (B) in which improper personal benefit is charged.

The Corporation shall upon order of a court of competent jurisdiction indemnify a director who entirely prevails in the defense of any proceeding to which he or she was a party because he or she is or was a director of the Corporation, for reasonable expenses incurred by him or her in connection with the proceeding.

Amounts paid in indemnification of expenses and liabilities may include, but shall not be limited to, counsel fees and other fees; costs and disbursements; judgments, fines, and penalties against, and amounts paid in settlement by, such director, officer, employee or agent.   The

- 6 -

Corporation may pay for or reimburse the reasonable expenses in advance of final disposition of the proceeding provided that the provisions of Section 13.1-878 of the Act are met.

The provisions of this Article shall be applicable to claims, actions, suits, or proceedings made or commenced after the adoption hereof, whether arising from acts or omissions to act occurring before or after adoption hereof.

The indemnification provided by this Article shall not be deemed exclusive of any other rights to which such director, officer, or employee may be entitled under any statute, bylaw, agreement, vote of the Board of Directors, or otherwise and shall not restrict the power of the Corporation to make any indemnification permitted by law.

The Board of Directors may authorize the purchase of and maintain insurance on behalf of any director, officer, employee or agent of the Corporation against any liability asserted against or incurred by him or her which arises out of such person's status in such capacity or who is or was serving at the request of the Corporation as a director, officer, employee or agent of another foreign or domestic corporation, partnership, joint venture, trust, employee benefit plan or otherwise, or out of acts taken in such capacity, whether or not the Corporation would have the power to indemnify the person against that liability under law.

If any part of this Section shall be found in any action, suit or proceeding to be invalid or ineffective, the validity and the effectiveness of the remaining parts shall not be affected.

Section 7.07    Dissolution.  The Corporation may be dissolved at any time by majority vote of the directors then in office and upon the taking of any other actions required under the Act.  In the event of dissolution or final liquidation of the Corporation, all of the remaining assets of the Corporation shall, after paying or making provision for the payment of all of the liabilities and obligations of the Corporation and for necessary expenses thereof, be distributed as determined by the Board of Directors in accordance with the Articles of Incorporation and applicable law.

CONFIDENTIAL                    **JA344**                    SFFA-Harvard 0000065

## EXHIBIT B

### Procedures for Electing Member-Elected Directors

Students for Fair Admissions, Inc.'s ("SFFA") General Members are entitled to elect one (1) individual to serve on SFFA's Board of Directors (the "Member-Elected Director"). SFFA's Bylaws provide that the Board of Directors is responsible for determining the time, method, manner, and eligibility of voting for such elections. The following election procedures shall be followed when an election for a Member-Elected Director is required by the Bylaws.

1.   Announcement of Election. The Board of Directors shall send an email to its General Members announcing that there will be an election for the Member-Elected Director. The date on which the announcement email is sent shall be the "Record Date," which shall be used to set the deadlines below and to determine eligibility to participate in the election. The announcement email shall call for self-nominations, clearly identify all deadlines, and include a copy of these election procedures.

2.   Candidate Qualifications. A candidate for Member-Elected Director must be a General Member of SFFA as of the Record Date.

3.   Nomination Process. Any individual who would like to be a candidate for Member-Elected Director must submit a self-nomination no later than fourteen (14) days after the Record Date at 11:59 P.M. E.D.T. The self-nomination must include the candidate's name, address, telephone number, email address, and a personal statement of 500 words or less describing the candidate's qualifications and explaining why the candidate would like to serve on SFFA's Board of Directors. The self-nomination must be submitted via email to the email address specified in the announcement email.

4.   Selection of Nominees; Appearance on Ballot. No more than five (5) candidates shall appear on the ballot. In the event that more than five (5) individuals submit self-nominations, the Board of Directors shall select five (5) nominees to appear as candidates on the ballots.

5.   Eligibility to Vote. Any individual who is an General Member of SFFA as of the Record Date is eligible to vote in the election for Member-Elected Director. Each eligible voter is entitled to cast one ballot in the election. Cumulative and proxy voting are prohibited.

6.   Distribution of Personal Statements and Ballots. No later than twenty-one (21) days after the Record Date, the Board of Directors shall send an email to the General Members eligible to vote setting forth the name, city/state, and personal statement of each candidate as well as a link to the online ballot.

7.   Voting Period. The time period for voting shall begin as soon as the ballots are distributed and shall end twenty-eight (28) days after the Record Date at 11:59 P.M. E.D.T.

8.   Winner. The candidate receiving the highest number of votes shall be elected. In the event of a tie between candidates, the Board of Directors shall determine the tie by a coin

toss.  The Board of Directors has the sole authority and discretion to resolve any disputes concerning the election.

9.    <u>Declaration of Winner</u>.  No later than thirty-one (31) days after the Record Date, the Board of Directors shall email the General Members declaring the winner of the election. The winner shall take office immediately upon this declaration.

10.    <u>Amendment of Procedures</u>.  The Board of Directors may amend these procedures at any time without notice, provided that such amendments do not take effect during the time period between the Record Date and the declaration of the winner.

CONFIDENTIAL       SFFA-Harvard 0000067

# EXHIBIT 91

Form **990**

Department of the Treasury
Internal Revenue Service

## Return of Organization Exempt From Income Tax

Under section 501(c), 527, or 4947(a)(1) of the Internal Revenue Code (except private foundations)

▶ Do not enter social security numbers on this form as it may be made public.
▶ Information about Form 990 and its instructions is at *www.irs.gov/form990.*

OMB No. 1545-0047

**2015**

Open to Public
Inspection

**A** For the 2015 calendar year, or tax year beginning _____ , 2015, and ending _____ ,

| B Check if applicable: | C Name of organization | Students For Fair Admissions, Inc. | | D Employer identification number |
|---|---|---|---|---|
| ☐ Address change | Doing business as | | | 47-1689810 |
| ☐ Name change | Number and street (or P.O. box if mail is not delivered to street address) | Room/suite | E Telephone number |
| ☐ Initial return | 2200 Wilson Blvd. | 102-13 | (713) 626-7560 |
| ☐ Final return/terminated | City or town, state or province, country, and ZIP or foreign postal code | | |
| ☐ Amended return | Arlington | VA 22201 | G Gross receipts $ 826,664. |
| ☐ Application pending | F Name and address of principal officer: | | |
| | Edward Blum 2200 Wilson Blvd.#102-13 Arlington VA 22201 | | |

**H(a)** Is this a group return for subordinates? ☐ Yes ☒ No
**H(b)** Are all subordinates included? ☐ Yes ☐ No
If 'No,' attach a list. (see instructions)

**I** Tax-exempt status: ☒ 501(c)(3)   ☐ 501(c) ( ) ◀ (insert no.)   ☐ 4947(a)(1) or   ☐ 527

**J** Website: ▶ N/A

**H(c)** Group exemption number ▶

**K** Form of organization: ☒ Corporation   ☐ Trust   ☐ Association   ☐ Other ▶   **L** Year of formation: 2014   **M** State of legal domicile: VA

## Part I | Summary

| | | | |
|---|---|---|---|
| **Activities & Governance** | **1** Briefly describe the organization's mission or most significant activities: The purposes of the organization are to defend human and civil rights secured by law, including the right of individuals to equal protection under the law, through litigation and any other lawful means. | | |
| | **2** Check this box ▶ ☐ if the organization discontinued its operations or disposed of more than 25% of its net assets. | | |
| | **3** Number of voting members of the governing body (Part VI, line 1a) . . . . . . . . . | **3** | 5 |
| | **4** Number of independent voting members of the governing body (Part VI, line 1b) . . . . . | **4** | 5 |
| | **5** Total number of individuals employed in calendar year 2015 (Part V, line 2a) . . . . . . | **5** | 0 |
| | **6** Total number of volunteers (estimate if necessary) . . . . . . . . . . . . . . . | **6** | 0 |
| | **7a** Total unrelated business revenue from Part VIII, column (C), line 12 . . . . . . . . . | **7a** | 0. |
| | **b** Net unrelated business taxable income from Form 990-T, line 34 . . . . . . . . . . | **7b** | 0. |

| | | Prior Year | Current Year |
|---|---|---|---|
| **Revenue** | **8** Contributions and grants (Part VIII, line 1h) . . . . . . . . . | 0. | 826,664. |
| | **9** Program service revenue (Part VIII, line 2g) . . . . . . . . . | | |
| | **10** Investment income (Part VIII, column (A), lines 3, 4, and 7d) . . . | | 0. |
| | **11** Other revenue (Part VIII, column (A), lines 5, 6d, 8c, 9c, 10c, and 11e) . . | | |
| | **12** Total revenue – add lines 8 through 11 (must equal Part VIII, column (A), line 12) . . . | 0. | 826,664. |
| **Expenses** | **13** Grants and similar amounts paid (Part IX, column (A), lines 1-3) . . . . | | |
| | **14** Benefits paid to or for members (Part IX, column (A), line 4) . . . . | | |
| | **15** Salaries, other compensation, employee benefits (Part IX, column (A), lines 5-10) . . | | 0. |
| | **16a** Professional fundraising fees (Part IX, column (A), line 11e) . . . . | | |
| | **b** Total fundraising expenses (Part IX, column (D), line 25) ▶ 14,412. | | |
| | **17** Other expenses (Part IX, column (A), lines 11a-11d, 11f-24e) . . . . | | 545,576. |
| | **18** Total expenses. Add lines 13-17 (must equal Part IX, column (A), line 25) . . . | | 545,576. |
| | **19** Revenue less expenses. Subtract line 18 from line 12 . . . . . . | 0. | 281,088. |

| | | Beginning of Current Year | End of Year |
|---|---|---|---|
| **Net Assets or Fund Balances** | **20** Total assets (Part X, line 16) . . . . . . . . . . . . | 0. | 281,088. |
| | **21** Total liabilities (Part X, line 26) . . . . . . . . . . . | | |
| | **22** Net assets or fund balances. Subtract line 21 from line 20 . . . . . | 0. | 281,088. |

## Part II | Signature Block

Under penalties of perjury, I declare that I have examined this return, including accompanying schedules and statements, and to the best of my knowledge and belief, it is true, correct, and complete. Declaration of preparer (other than officer) is based on all information of which preparer has any knowledge.

| Sign Here | ▶ | Signature of officer | | 11/03/16 Date |
|---|---|---|---|---|
| | ▶ | Richard Fisher | Treasurer | |
| | | Type or print name and title. | | |

| Paid Preparer Use Only | Print/Type preparer's name | Preparer's signature | Date | Check ☐ if self-employed | PTIN |
|---|---|---|---|---|---|
| | Firm's name ▶ RICHARD FISHER | | | | |
| | Firm's address ▶ 4550 POST OAK PLACE STE 224 | | | Firm's EIN ▶ | |
| | HOUSTON TX 77027 | | | Phone no. | |

May the IRS discuss this return with the preparer shown above? (see instructions) . . . . . . . . . . . . ☒ Yes   ☐ No

**BAA For Paperwork Reduction Act Notice, see the separate instructions.**       TEEA0101 10/12/15       Form **990** (2015)

JA348

SFFA-Harvard 0001965

Case: 19-2005    Document: 00117623236    Page: 361    Date Filed: 07/30/2020    Entry ID: 6356615
Case 1:14-cv-14176-ADB   Document 419-91   Filed 06/15/18   Page 3 of 23

| Form 990 (2015) | Students For Fair Admissions, Inc. | 47-1689810 | Page 2 |

## Part III   Statement of Program Service Accomplishments

Check if Schedule O contains a response or note to any line in this Part III . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  ☒

**1**  Briefly describe the organization's mission:

The purposes of the organization are to defend human and civil rights secured by law, including the right of individuals to equal protection under the law, through litigation and any other lawful means.

**2**  Did the organization undertake any significant program services during the year which were not listed on the prior Form 990 or 990-EZ? . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  ☒ **Yes**  ☐ **No**
   If 'Yes,' describe these new services on Schedule O.

**3**  Did the organization cease conducting, or make significant changes in how it conducts, any program services? . . . . .  ☐ **Yes**  ☒ **No**
   If 'Yes,' describe these changes on Schedule O.

**4**  Describe the organization's program service accomplishments for each of its three largest program services, as measured by expenses. Section 501(c)(3) and 501(c)(4) organizations are required to report the amount of grants and allocations to others, the total expenses, and revenue, if any, for each program service reported.

**4a**  (Code: _____ ) (Expenses $   530,926. including grants of  $   0. ) (Revenue $   530,926. )

Corporation litigated two lawsuits in federal district court against Harvard University and the University of North Carolina at Chapel Hill, alleging that these universities are violating the Fourteenth Amendment and Title VI of the Civil Rights Act of 1964 by engaging in racial discrimination in their admissions processes.

**4b**  (Code: _____ ) (Expenses $   0. including grants of  $   0. ) (Revenue $   0. )

All corporation litigation operations are included above in line 4,a.

**4c**  (Code: _____ ) (Expenses $_____ including grants of  $_____ ) (Revenue $_____ )

**4d**  Other program services. (Describe in Schedule O.)
   (Expenses  $_____ including grants of  $_____ ) (Revenue  $_____ )

**4e**  Total program service expenses  ▶   530,926.

| BAA | | TEEA0102   10/12/15 | Form **990** (2015) |

SFFA-Harvard 0001966

| Form 990 (2015) | Students For Fair Admissions, Inc. | 47-1689810 | Page 3 |

**Part IV | Checklist of Required Schedules**

| | | | Yes | No |
|---|---|---|---|---|
| 1 | Is the organization described in section 501(c)(3) or 4947(a)(1) (other than a private foundation)? *If 'Yes,' complete Schedule A.* . . . . . . . . . . . . . . . . . . . . . | **1** | X | |
| 2 | Is the organization required to complete *Schedule B, Schedule of Contributors* (see instructions)? . . . . . . . . . . . . . . | **2** | X | |
| 3 | Did the organization engage in direct or indirect political campaign activities on behalf of or in opposition to candidates for public office? *If 'Yes,' complete Schedule C, Part I* . . . | **3** | | X |
| 4 | **Section 501(c)(3) organizations.** Did the organization engage in lobbying activities, or have a section 501(h) election in effect during the tax year? *If 'Yes,' complete Schedule C, Part II* . . . . . . . . . . . . . . | **4** | | X |
| 5 | Is the organization a section 501(c)(4), 501(c)(5), or 501(c)(6) organization that receives membership dues, assessments, or similar amounts as defined in Revenue Procedure 98-19? *If 'Yes,' complete Schedule C, Part III* . . . . . . | **5** | | X |
| 6 | Did the organization maintain any donor advised funds or any similar funds or accounts for which donors have the right to provide advice on the distribution or investment of amounts in such funds or accounts? *If 'Yes,' complete Schedule D, Part I* . . . | **6** | | X |
| 7 | Did the organization receive or hold a conservation easement, including easements to preserve open space, the environment, historic land areas, or historic structures? *If 'Yes,' complete Schedule D, Part II* . . . . . . . . . | **7** | | X |
| 8 | Did the organization maintain collections of works of art, historical treasures, or other similar assets? *If 'Yes,' complete Schedule D, Part III.* . . . . . . . . . . . . . . | **8** | | X |
| 9 | Did the organization report an amount in Part X, line 21, for escrow or custodial account liability; serve as a custodian for amounts not listed in Part X; or provide credit counseling, debt management, credit repair, or debt negotiation services? *If 'Yes,' complete Schedule D, Part IV* . . . | **9** | | X |
| 10 | Did the organization, directly or through a related organization, hold assets in temporarily restricted endowments, permanent endowments, or quasi-endowments? *If 'Yes,' complete Schedule D, Part V* . . . . | **10** | | X |
| 11 | If the organization's answer to any of the following questions is 'Yes', then complete Schedule D, Parts VI, VII, VIII, IX, or X as applicable. | | | |
| **a** | Did the organization report an amount for land, buildings and equipment in Part X, line 10? *If 'Yes,' complete Schedule D, Part VI.* . . . . . . . . . . . . . . | **11a** | | X |
| **b** | Did the organization report an amount for investments — other securities in Part X, line 12 that is 5% or more of its total assets reported in Part X, line 16? *If 'Yes,' complete Schedule D, Part VII.* . . . | **11b** | | X |
| **c** | Did the organization report an amount for investments — program related in Part X, line 13 that is 5% or more of its total assets reported in Part X, line 16? *If 'Yes,' complete Schedule D, Part VIII* . . . | **11c** | | X |
| **d** | Did the organization report an amount for other assets in Part X, line 15 that is 5% or more of its total assets reported in Part X, line 16? *If 'Yes,' complete Schedule D, Part IX* . . . . . | **11d** | | X |
| **e** | Did the organization report an amount for other liabilities in Part X, line 25? *If 'Yes,' complete Schedule D, Part X* . . . . . | **11e** | | X |
| **f** | Did the organization's separate or consolidated financial statements for the tax year include a footnote that addresses the organization's liability for uncertain tax positions under FIN 48 (ASC 740)? *If 'Yes,' complete Schedule D, Part X* . . . . . | **11f** | | X |
| 12a | Did the organization obtain separate, independent audited financial statements for the tax year? *If 'Yes,' complete Schedule D, Parts XI, and XII.* . . . . . . . . . . . . . . | **12a** | | X |
| **b** | Was the organization included in consolidated, independent audited financial statements for the tax year? *If 'Yes,' and if the organization answered 'No' to line 12a, then completing Schedule D, Parts XI and XII is optional* . . . . . . . . . | **12b** | | X |
| 13 | Is the organization a school described in section 170(b)(1)(A)(ii)? *If 'Yes,' complete Schedule E.* . . . . | **13** | | X |
| 14a | Did the organization maintain an office, employees, or agents outside of the United States?. . . . . . . . . . | **14a** | | X |
| **b** | Did the organization have aggregate revenues or expenses of more than $10,000 from grantmaking, fundraising, business, investment, and program service activities outside the United States, or aggregate foreign investments valued at $100,000 or more? *If 'Yes,' complete Schedule F, Parts I and IV* . . . | **14b** | | X |
| 15 | Did the organization report on Part IX, column (A), line 3, more than $5,000 of grants or other assistance to or for any foreign organization? *If 'Yes,' complete Schedule F, Parts II and IV* . . . | **15** | | X |
| 16 | Did the organization report on Part IX, column (A), line 3, more than $5,000 of aggregate grants or other assistance to or for foreign individuals? *If 'Yes,' complete Schedule F, Parts III and IV* . . . | **16** | | X |
| 17 | Did the organization report a total of more than $15,000 of expenses for professional fundraising services on Part IX, column (A), lines 6 and 11e? *If 'Yes,' complete Schedule G, Part I* (see instructions) . . . . | **17** | | X |
| 18 | Did the organization report more than $15,000 total of fundraising event gross income and contributions on Part VIII, lines 1c and 8a? *If 'Yes,' complete Schedule G, Part II* . . . | **18** | | X |
| 19 | Did the organization report more than $15,000 of gross income from gaming activities on Part VIII, line 9a? *If 'Yes,' complete Schedule G, Part III.* . . . . . . . . . . . . . . | **19** | | X |

| BAA | | TEEA0103   10/12/15 | | Form **990** (2015) |

SFFA-Harvard 0001967

| Form 990 (2015) | Students For Fair Admissions, Inc. | 47-1689810 | Page 4 |
|---|---|---|---|

**Part IV** | **Checklist of Required Schedules** *(continued)*

|  |  |  | Yes | No |
|---|---|---|---|---|
| **20a** | Did the organization operate one or more hospital facilities? *If 'Yes', complete Schedule H* . . . . . . . . . . . . . . . . . . . | **20a** |  | X |
| **b** | If 'Yes' to line 20a, did the organization attach a copy of its audited financial statements to this return? . . . . . . . . . . . . | **20b** |  |  |
| **21** | Did the organization report more than $5,000 of grants or other assistance to any domestic organization or domestic government on Part IX, column (A), line 1? *If 'Yes', complete Schedule I, Parts I and II* . . . . . . . . . . . . . | **21** |  | X |
| **22** | Did the organization report more than $5,000 of grants or other assistance to or for domestic individuals on Part IX, column (A), line 2? *If 'Yes', complete Schedule I, Parts I and III* . . . . . . . . . . . . . . . . . . . . . . . . . | **22** |  | X |
| **23** | Did the organization answer 'Yes' to Part VII, Section A, line 3, 4, or 5 about compensation of the organization's current and former officers, directors, trustees, key employees, and highest compensated employees? *If 'Yes,' complete Schedule J* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | **23** |  | X |
| **24a** | Did the organization have a tax-exempt bond issue with an outstanding principal amount of more than $100,000 as of the last day of the year, that was issued after December 31, 2002? *If 'Yes,' answer lines 24b through 24d and complete Schedule K. If 'No,' go to line 25a* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | **24a** |  | X |
| **b** | Did the organization invest any proceeds of tax-exempt bonds beyond a temporary period exception? . . . . . . . . . . . | **24b** |  |  |
| **c** | Did the organization maintain an escrow account other than a refunding escrow at any time during the year to defease any tax-exempt bonds? . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | **24c** |  |  |
| **d** | Did the organization act as an 'on behalf of' issuer for bonds outstanding at any time during the year? . . . . . . . . . . | **24d** |  |  |
| **25a** | **Section 501(c)(3), 501(c)(4), and 501(c)(29) organizations.** Did the organization engage in an excess benefit transaction with a disqualified person during the year? *If 'Yes,' complete Schedule L, Part I* . . . . . . . . . . . . . . . | **25a** |  | X |
| **b** | Is the organization aware that it engaged in an excess benefit transaction with a disqualified person in a prior year, and that the transaction has not been reported on any of the organization's prior Forms 990 or 990-EZ? *If 'Yes,' complete Schedule L, Part I* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | **25b** |  | X |
| **26** | Did the organization report any amount on Part X, line 5, 6, or 22 for receivables from or payables to any current or former officers, directors, trustees, key employees, highest compensated employees, or disqualified persons? *If 'Yes', complete Schedule L, Part II* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | **26** |  | X |
| **27** | Did the organization provide a grant or other assistance to an officer, director, trustee, key employee, substantial contributor or employee thereof, a grant selection committee member, or to a 35% controlled entity or family member of any of these persons? *If 'Yes,' complete Schedule L, Part III* . . . . . . . . . . . . . . . . . . . . . . . . . . . | **27** |  | X |
| **28** | Was the organization a party to a business transaction with one of the following parties (see Schedule L, Part IV instructions for applicable filing thresholds, conditions, and exceptions): |  |  |  |
| **a** | A current or former officer, director, trustee, or key employee? *If 'Yes,' complete Schedule L, Part IV* . . . . . . . . . . . . | **28a** |  | X |
| **b** | A family member of a current or former officer, director, trustee, or key employee? *If 'Yes,' complete Schedule L, Part IV* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | **28b** |  | X |
| **c** | An entity of which a current or former officer, director, trustee, or key employee (or a family member thereof) was an officer, director, trustee, or direct or indirect owner? *If 'Yes,' complete Schedule L, Part IV* . . . . . . . . . . . . . . | **28c** |  | X |
| **29** | Did the organization receive more than $25,000 in non-cash contributions? *If 'Yes,' complete Schedule M* . . . . . . . . | **29** |  | X |
| **30** | Did the organization receive contributions of art, historical treasures, or other similar assets, or qualified conservation contributions? *If 'Yes,' complete Schedule M* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | **30** |  | X |
| **31** | Did the organization liquidate, terminate, or dissolve and cease operations? *If 'Yes,' complete Schedule N, Part I* . . . . . . | **31** |  | X |
| **32** | Did the organization sell, exchange, dispose of, or transfer more than 25% of its net assets? *If 'Yes,' complete Schedule N, Part II* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | **32** |  | X |
| **33** | Did the organization own 100% of an entity disregarded as separate from the organization under Regulations sections 301.7701-2 and 301.7701-3? *If 'Yes,' complete Schedule R, Part I* . . . . . . . . . . . . . . . . . . . . . . . . . . . | **33** |  | X |
| **34** | Was the organization related to any tax-exempt or taxable entity? *If 'Yes,' complete Schedule R, Part II, III, or IV, and Part V, line 1* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | **34** |  | X |
| **35a** | Did the organization have a controlled entity within the meaning of section 512(b)(13)? . . . . . . . . . . . . . . . . . | **35a** |  | X |
| **b** | If 'Yes' to line 35a, did the organization receive any payment from or engage in any transaction with a controlled entity within the meaning of section 512(b)(13)? *If 'Yes,' complete Schedule R, Part V, line 2* . . . . . . . . . . . . . . | **35b** |  |  |
| **36** | **Section 501(c)(3) organizations.** Did the organization make any transfers to an exempt non-charitable related organization? *If 'Yes,' complete Schedule R, Part V, line 2* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | **36** |  | X |
| **37** | Did the organization conduct more than 5% of its activities through an entity that is not a related organization and that is treated as a partnership for federal income tax purposes? *If 'Yes,' complete Schedule R, Part VI* . . . . . . . . . . . | **37** |  | X |
| **38** | Did the organization complete Schedule O and provide explanations in Schedule O for Part VI, lines 11b and 19? **Note.** All Form 990 filers are required to complete Schedule O . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | **38** | X |  |

| BAA |  | Form **990** (2015) |
|---|---|---|

TEEA0104   10/12/15

SFFA-Harvard 0001968

Form **990** (2015)    Students For Fair Admissions, Inc.                          47-1689810          Page **5**

| Part V | Statements Regarding Other IRS Filings and Tax Compliance |
|---|---|

Check if Schedule O contains a response or note to any line in this Part V . . . . . . . . . . . . . . . . . . . . . . . □

|  |  |  | Yes | No |
|---|---|---|---|---|
| **1a** Enter the number reported in Box 3 of Form 1096. Enter -0- if not applicable . . . . . . . . . | **1a** | 0 | | |
| **b** Enter the number of Forms W-2G included in line 1a. Enter -0- if not applicable . . . . . . . . | **1b** | 0 | | |
| **c** Did the organization comply with backup withholding rules for reportable payments to vendors and reportable gaming (gambling) winnings to prize winners? . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | | | **1c** | | |
| **2a** Enter the number of employees reported on Form W-3, Transmittal of Wage and Tax State- ments, filed for the calendar year ending with or within the year covered by this return . . . . . | **2a** | 0 | | |
| **b** If at least one is reported on line 2a, did the organization file all required federal employment tax returns? . . . . . . . . . | | | **2b** | | |
| **Note.** If the sum of lines 1a and 2a is greater than 250, you may be required to *e-file* (see instructions) | | | | | |
| **3a** Did the organization have unrelated business gross income of $1,000 or more during the year? . . . . . . . . . . . . . . . | | | **3a** | | X |
| **b** If 'Yes' has it filed a Form 990-T for this year? *If 'No' to line 3b, provide an explanation in Schedule O* . . . . . . . . . . . . . . . | | | **3b** | | |
| **4a** At any time during the calendar year, did the organization have an interest in, or a signature or other authority over, a financial account in a foreign country (such as a bank account, securities account, or other financial account)? . . . . . . . | | | **4a** | | X |
| **b** If 'Yes,' enter the name of the foreign country: ► | | | | | |
| See instructions for filing requirements for FinCEN Form 114, Report of Foreign Bank and Financial Accounts. (FBAR) | | | | | |
| **5a** Was the organization a party to a prohibited tax shelter transaction at any time during the tax year? . . . . . . . . . . . . . | | | **5a** | | X |
| **b** Did any taxable party notify the organization that it was or is a party to a prohibited tax shelter transaction? . . . . . . . . . . | | | **5b** | | X |
| **c** If 'Yes,' to line 5a or 5b, did the organization file Form 8886-T? . . . . . . . . . . . . . . . . . . . . . . . . . . . . | | | **5c** | | |
| **6a** Does the organization have annual gross receipts that are normally greater than $100,000, and did the organization solicit any contributions that were not tax deductible as charitable contributions? . . . . . . . . . . . . . . . . . . . . . . | | | **6a** | | X |
| **b** If 'Yes,' did the organization include with every solicitation an express statement that such contributions or gifts were not tax deductible? . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | | | **6b** | | |
| **7** **Organizations that may receive deductible contributions under section 170(c).** | | | | | |
| **a** Did the organization receive a payment in excess of $75 made partly as a contribution and partly for goods and services provided to the payor? . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | | | **7a** | | X |
| **b** If 'Yes,' did the organization notify the donor of the value of the goods or services provided? . . . . . . . . . . . . . . . . | | | **7b** | | |
| **c** Did the organization sell, exchange, or otherwise dispose of tangible personal property for which it was required to file Form 8282? . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | | | **7c** | | X |
| **d** If 'Yes,' indicate the number of Forms 8282 filed during the year . . . . . . . | **7d** | | | | |
| **e** Did the organization receive any funds, directly or indirectly, to pay premiums on a personal benefit contract? . . . . . . . . | | | **7e** | | X |
| **f** Did the organization, during the year, pay premiums, directly or indirectly, on a personal benefit contract? . . . . . . . . . . | | | **7f** | | X |
| **g** If the organization received a contribution of qualified intellectual property, did the organization file Form 8899 as required? . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | | | **7g** | | |
| **h** If the organization received a contribution of cars, boats, airplanes, or other vehicles, did the organization file a Form 1098-C? . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | | | **7h** | | |
| **8** **Sponsoring organizations maintaining donor advised funds.** Did a donor advised fund maintained by the sponsoring organization have excess business holdings at any time during the year? . . . . . . . . . . . . . . . . . . . . . . . . | | | **8** | | |
| **9** **Sponsoring organizations maintaining donor advised funds.** | | | | | |
| **a** Did the sponsoring organization make any taxable distributions under section 4966? . . . . . . . . . . . . . . . . . . | | | **9a** | | |
| **b** Did the sponsoring organization make a distribution to a donor, donor advisor, or related person? . . . . . . . . . . . . . | | | **9b** | | |
| **10** **Section 501(c)(7) organizations.** Enter: | | | | | |
| **a** Initiation fees and capital contributions included on Part VIII, line 12. . . . . . . . . . . . . . | **10a** | | | | |
| **b** Gross receipts, included on Form 990, Part VIII, line 12, for public use of club facilities . . . . . | **10b** | | | | |
| **11** **Section 501(c)(12) organizations.** Enter: | | | | | |
| **a** Gross income from members or shareholders. . . . . . . . . . . . . . . . . . . . . . . | **11a** | | | | |
| **b** Gross income from other sources (Do not net amounts due or paid to other sources against amounts due or received from them.) . . . . . . . . . . . . . . . . . . . . . . | **11b** | | | | |
| **12a** **Section 4947(a)(1) non-exempt charitable trusts.** Is the organization filing Form 990 in lieu of Form 1041? . . . . . . . . . | | | **12a** | | |
| **b** If 'Yes,' enter the amount of tax-exempt interest received or accrued during the year . . . . . . | **12b** | | | | |
| **13** **Section 501(c)(29) qualified nonprofit health insurance issuers.** | | | | | |
| **a** Is the organization licensed to issue qualified health plans in more than one state? . . . . . . . . . . . . . . . . . . . | | | **13a** | | |
| **Note.** See the instructions for additional information the organization must report on Schedule O. | | | | | |
| **b** Enter the amount of reserves the organization is required to maintain by the states in which the organization is licensed to issue qualified health plans . . . . . . . . . . . . . | **13b** | | | | |
| **c** Enter the amount of reserves on hand . . . . . . . . . . . . . . . . . . . . . . . | **13c** | | | | |
| **14a** Did the organization receive any payments for indoor tanning services during the tax year? . . . . . . . . . . . . . . . . | | | **14a** | | X |
| **b** If 'Yes,' has it filed a Form 720 to report these payments? *If 'No,' provide an explanation in Schedule O* . . . . . . . . . . . . . | | | **14b** | | |

BAA                                      TEEA0105   10/12/15                                      Form **990** (2015)

## JA352

SFFA-Harvard 0001969

Form 990 (2015)   Students For Fair Admissions, Inc.                     47-1689810          Page 6

| Part VI | Governance, Management, and Disclosure *For each 'Yes' response to lines 2 through 7b below, and for a 'No' response to line 8a, 8b, or 10b below, describe the circumstances, processes, or changes in Schedule O. See instructions.* |
|---|---|

Check if Schedule O contains a response or note to any line in this Part VI. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . [X]

## Section A. Governing Body and Management

|  |  |  | Yes | No |
|---|---|---|---|---|
| **1 a** Enter the number of voting members of the governing body at the end of the tax year . . . . . . | **1 a** | 5 | | |
| If there are material differences in voting rights among members of the governing body, or if the governing body delegated broad authority to an executive committee or similar committee, explain in Schedule O. | | | | |
| **b** Enter the number of voting members included in line 1a, above, who are independent . . . . . | **1 b** | 5 | | |
| **2** Did any officer, director, trustee, or key employee have a family relationship or a business relationship with any other officer, director, trustee, or key employee? . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | | **2** | X | |
| **3** Did the organization delegate control over management duties customarily performed by or under the direct supervision of officers, directors, or trustees, or key employees to a management company or other person? . . . . . . . . . . . . . . . . | | **3** | | X |
| **4** Did the organization make any significant changes to its governing documents since the prior Form 990 was filed? . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | | **4** | X | |
| **5** Did the organization become aware during the year of a significant diversion of the organization's assets? . . . . . . . . . . | | **5** | | X |
| **6** Did the organization have members or stockholders? . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | | **6** | X | |
| **7 a** Did the organization have members, stockholders, or other persons who had the power to elect or appoint one or more members of the governing body? . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | | **7 a** | X | |
| **b** Are any governance decisions of the organization reserved to (or subject to approval by) members, stockholders, or persons other than the governing body? . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | | **7 b** | | X |
| **8** Did the organization contemporaneously document the meetings held or written actions undertaken during the year by the following: | | | | |
| **a** The governing body? . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | | **8 a** | X | |
| **b** Each committee with authority to act on behalf of the governing body? . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | | **8 b** | X | |
| **9** Is there any officer, director, trustee, or key employee listed in Part VII, Section A, who cannot be reached at the organization's mailing address? *If 'Yes,' provide the names and addresses on Schedule O* . . . . . . . . . . . . . . . . . | | **9** | | X |

## Section B. Policies *(This Section B requests information about policies not required by the Internal Revenue Code.)*

|  |  | Yes | No |
|---|---|---|---|
| **10a** Did the organization have local chapters, branches, or affiliates? . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | **10a** | | X |
| **b** If 'Yes,' did the organization have written policies and procedures governing the activities of such chapters, affiliates, and branches to ensure their operations are consistent with the organization's exempt purposes?. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | **10b** | | |
| **11 a** Has the organization provided a complete copy of this Form 990 to all members of its governing body before filing the form? . . . . . . . . . . . . | **11 a** | X | |
| **b** Describe in Schedule O the process, if any, used by the organization to review this Form 990. | | | |
| **12a** Did the organization have a written conflict of interest policy? *If 'No,' go to line 13* . . . . . . . . . . . . . . . . . . . . . | **12a** | X | |
| **b** Were officers, directors, or trustees, and key employees required to disclose annually interests that could give rise to conflicts? . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | **12b** | X | |
| **c** Did the organization regularly and consistently monitor and enforce compliance with the policy? *If 'Yes,' describe in Schedule O how this was done* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | **12c** | X | |
| **13** Did the organization have a written whistleblower policy? . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | **13** | X | |
| **14** Did the organization have a written document retention and destruction policy? . . . . . . . . . . . . . . . . . . . . . . . | **14** | X | |
| **15** Did the process for determining compensation of the following persons include a review and approval by independent persons, comparability data, and contemporaneous substantiation of the deliberation and decision? | | | |
| **a** The organization's CEO, Executive Director, or top management official . . . . . . . . . . . . . . . . . . . . . . . . . . . | **15a** | X | |
| **b** Other officers or key employees of the organization . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | **15b** | X | |
| If 'Yes' to line 15a or 15b, describe the process in Schedule O (see instructions). | | | |
| **16a** Did the organization invest in, contribute assets to, or participate in a joint venture or similar arrangement with a taxable entity during the year? . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | **16a** | | X |
| **b** If 'Yes,' did the organization follow a written policy or procedure requiring the organization to evaluate its participation in joint venture arrangements under applicable federal tax law, and take steps to safeguard the organization's exempt status with respect to such arrangements?. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | **16b** | | |

## Section C. Disclosure

**17** List the states with which a copy of this Form 990 is required to be filed ► Virginia _____

**18** Section 6104 requires an organization to make its Forms 1023 (or 1024 if applicable), 990, and 990-T (Section 501(c)(3)s only) available for public inspection. Indicate how you made these available. Check all that apply.

[ ] Own website    [ ] Another's website    [X] Upon request    [ ] Other (explain in Schedule O)

**19** Describe in Schedule O whether (and if so, how) the organization made its governing documents, conflict of interest policy, and financial statements available to the public during the tax year.

**20** State the name, address, and telephone number of the person who possesses the organization's books and records: ►

Richard Fisher    922 Bent Creek    Richmond    TX    77406    (281) 342-1932

BAA                              TEEA0106  10/12/15                              Form **990** (2015)

SFFA-Harvard 0001970

Form 990 (2015)    Students For Fair Admissions, Inc.    47-1689810    Page **7**

| **Part VII** | **Compensation of Officers, Directors, Trustees, Key Employees, Highest Compensated Employees, and Independent Contractors** |

Check if Schedule O contains a response or note to any line in this Part VII . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . ☐

| **Section A. Officers, Directors, Trustees, Key Employees, and Highest Compensated Employees** |

**1 a** Complete this table for all persons required to be listed. Report compensation for the calendar year ending with or within the organization's tax year.

● List all of the organization's **current** officers, directors, trustees (whether individuals or organizations), regardless of amount of compensation. Enter -0- in columns (D), (E), and (F) if no compensation was paid.

● List all of the organization's **current** key employees, if any. See instructions for definition of 'key employee.'

● List the organization's five **current** highest compensated employees (other than an officer, director, trustee, or key employee) who received reportable compensation (Box 5 of Form W-2 and/or Box 7 of Form 1099-MISC) of more than $100,000 from the organization and any related organizations.

● List all of the organization's **former** officers, key employees, and highest compensated employees who received more than $100,000 of reportable compensation from the organization and any related organizations.

● List all of the organization's **former directors or trustees** that received, in the capacity as a former director or trustee of the organization, more than $10,000 of reportable compensation from the organization and any related organizations.

List persons in the following order: individual trustees or directors; institutional trustees; officers; key employees; highest compensated employees; and former such persons.

☒ Check this box if neither the organization nor any related organization compensated any current officer, director, or trustee.

| (A)<br>Name and Title | (B)<br>Average hours per week (list any hours for related organizations below dotted line) | (C)<br>Position (do not check more than one box, unless person is both an officer and a director/trustee) | | | | | | (D)<br>Reportable compensation from the organization (W-2/1099-MISC) | (E)<br>Reportable compensation from related organizations (W-2/1099-MISC) | (F)<br>Estimated amount of other compensation from the organization and related organizations |
|---|---|---|---|---|---|---|---|---|---|---|
| | | Individual trustee or director | Institutional trustee | Officer | Key employee | Highest compensated employee | Former | | | |
| (1) Edward J Blum<br>President | 15.00 | | | X | | | | 0. | 0. | 0. |
| (2) Richard Fisher<br>Treasurer | 1.00 | | | X | | | | 0. | 0. | 0. |
| (3) Abigail Fisher<br>Secretary | 1.00 | X | | | | | | 0. | 0. | 0. |
| (4) Ed Chen<br>Director | 1.00 | X | | | | | | 0. | 0. | 0. |
| (5) Joe Zhou<br>Director | 1.00 | X | | | | | | 0. | 0. | 0. |
| (6) | | | | | | | | | | |
| (7) | | | | | | | | | | |
| (8) | | | | | | | | | | |
| (9) | | | | | | | | | | |
| (10) | | | | | | | | | | |
| (11) | | | | | | | | | | |
| (12) | | | | | | | | | | |
| (13) | | | | | | | | | | |
| (14) | | | | | | | | | | |

BAA    TEEA0107   10/12/15    Form **990** (2015)

**JA354**

SFFA-Harvard 0001971

Form **990** (2015)  Students For Fair Admissions, Inc.                    47-1689810                    Page **8**

| Part VII | Section A. Officers, Directors, Trustees, Key Employees, and Highest Compensated Employees *(continued)* |

| (A)<br>Name and title | (B)<br>Average hours per week (list any hours for related organiza-tions below dotted line) | (C)<br>Position<br>(do not check more than one box, unless person is both an officer and a director/trustee) | | | | | | (D)<br>Reportable compensation from the organization (W-2/1099-MISC) | (E)<br>Reportable compensation from related organizations (W-2/1099-MISC) | (F)<br>Estimated amount of other compensation from the organization and related organizations |
|---|---|---|---|---|---|---|---|---|---|---|
| | | Individual trustee or director | Institutional trustee | Officer | Key employee | Highest compensated employee | Former | | | |
| (15) _____ | | | | | | | | | | |
| (16) _____ | | | | | | | | | | |
| (17) _____ | | | | | | | | | | |
| (18) _____ | | | | | | | | | | |
| (19) _____ | | | | | | | | | | |
| (20) _____ | | | | | | | | | | |
| (21) _____ | | | | | | | | | | |
| (22) _____ | | | | | | | | | | |
| (23) _____ | | | | | | | | | | |
| (24) _____ | | | | | | | | | | |
| (25) _____ | | | | | | | | | | |
| **1 b** Sub-total . . . . . . . . . . . . . . . . . ▶ | | | | | | | | 0. | 0. | 0. |
| **c** Total from continuation sheets to Part VII, Section A  . . . . . . . . . . ▶ | | | | | | | | | | |
| **d** Total (add lines 1b and 1c) . . . . . . . . . . . ▶ | | | | | | | | 0. | 0. | 0. |

**2** Total number of individuals (including but not limited to those listed above) who received more than $100,000 of reportable compensation from the organization ▶   0

| | | Yes | No |
|---|---|---|---|
| **3** Did the organization list any **former** officer, director, or trustee, key employee, or highest compensated employee on line 1a? *If 'Yes,' complete Schedule J for such individual*  . . . . . . . . . . . . . . . . . . . . . . . . . | **3** | | X |
| **4** For any individual listed on line 1a, is the sum of reportable compensation and other compensation from the organization and related organizations greater than $150,000? *If 'Yes' complete Schedule J for such individual* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | **4** | | X |
| **5** Did any person listed on line 1a receive or accrue compensation from any unrelated organization or individual for services rendered to the organization? *If 'Yes,' complete Schedule J for such person* . . . . . . . . . . . . . . . . . | **5** | | X |

**Section B. Independent Contractors**

**1** Complete this table for your five highest compensated independent contractors that received more than $100,000 of compensation from the organization. Report compensation for the calendar year ending with or within the organization's tax year.

| (A)<br>Name and business address | (B)<br>Description of services | (C)<br>Compensation |
|---|---|---|
| Consovoy McCarthy PLLC 3033 Wilson Blvd. Suite 700 Arlington    VA  22201 | Legal and etc | 418,933. |
| | | |
| | | |
| | | |
| | | |

**2** Total number of independent contractors (including but not limited to those listed above) who received more than $100,000 of compensation from the organization  ▶    1

**BAA**                    TEEA0108  10/12/15                    Form **990** (2015)

## JA355

SFFA-Harvard 0001972

Form 990 (2015)   Students For Fair Admissions, Inc.                                          47-1689810                        Page 9

| Part VIII | Statement of Revenue |

Check if Schedule O contains a response or note to any line in this Part VIII . . . . . . . . . . . . . . . . . . . . . . □

| | | | | (A)<br>Total revenue | (B)<br>Related or<br>exempt<br>function<br>revenue | (C)<br>Unrelated<br>business<br>revenue | (D)<br>Revenue<br>excluded from tax<br>under sections<br>512-514 |
|---|---|---|---|---|---|---|---|
| Contributions, Gifts, Grants and Other Similar Amounts | **1 a** Federated campaigns . . . . . | **1 a** | | | | | |
| | **b** Membership dues . . . . . . . | **1 b** | 430. | | | | |
| | **c** Fundraising events . . . . . . . . | **1 c** | | | | | |
| | **d** Related organizations . . . . . | **1 d** | | | | | |
| | **e** Government grants (contributions) . . | **1 e** | | | | | |
| | **f** All other contributions, gifts, grants, and<br>similar amounts not included above . . | **1 f** | 826,234. | | | | |
| | **g** Noncash contributions included in lines 1a-1f: $ | | | | | | |
| | **h Total.** Add lines 1a-1f . . . . . . . . . . . . . . . . . . ▶ | | 826,664. | | | | |
| Program Service Revenue | **2 a** _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ | Business Code | | | | | |
| | **b** _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ | | | | | | |
| | **c** _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ | | | | | | |
| | **d** _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ | | | | | | |
| | **e** _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ | | | | | | |
| | **f** All other program service revenue . . . | | | | | | |
| | **g Total.** Add lines 2a-2f . . . . . . . . . . . . . . . . ▶ | | | | | | |
| Other Revenue | **3** Investment income (including dividends, interest and<br>other similar amounts) . . . . . . . . . . . . . . . . ▶ | | 0. | 0. | 0. | 0. |
| | **4** Income from investment of tax-exempt bond proceeds . . ▶ | | | | | |
| | **5** Royalties . . . . . . . . . . . . . . . . . . . . . . ▶ | | | | | |
| | | (i) Real | (ii) Personal | | | | |
| | **6 a** Gross rents . . . . . | | | | | | |
| | **b** Less: rental expenses | | | | | | |
| | **c** Rental income or (loss) . . | | | | | | |
| | **d** Net rental income or (loss) . . . . . . . . . . . . . . ▶ | | | | | |
| | | (i) Securities | (ii) Other | | | | |
| | **7 a** Gross amount from sales of<br>assets other than inventory | | | | | | |
| | **b** Less: cost or other basis<br>and sales expenses . . . | | | | | | |
| | **c** Gain or (loss) . . . . | | | | | | |
| | **d** Net gain or (loss) . . . . . . . . . . . . . . . . . . ▶ | | | | | |
| | **8 a** Gross income from fundraising events<br>(not including . . $ _ _ _ _ _ _ _ _ _ _ _ _<br>of contributions reported on line 1c).<br>See Part IV, line 18. . . . . . . . . **a** | | | | | | |
| | **b** Less: direct expenses . . . . . . . **b** | | | | | | |
| | **c** Net income or (loss) from fundraising events . . . . . . . ▶ | | | | | |
| | **9 a** Gross income from gaming activities.<br>See Part IV, line 19. . . . . . . . . **a** | | | | | | |
| | **b** Less: direct expenses . . . . . . . **b** | | | | | | |
| | **c** Net income or (loss) from gaming activities . . . . . . . ▶ | | | | | |
| | **10 a** Gross sales of inventory, less returns<br>and allowances . . . . . . . . . **a** | | | | | | |
| | **b** Less: cost of goods sold . . . . . . **b** | | | | | | |
| | **c** Net income or (loss) from sales of inventory . . . . . . ▶ | | | | | |
| | Miscellaneous Revenue | Business Code | | | | | |
| | **11 a** _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ | | | | | | |
| | **b** _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ | | | | | | |
| | **c** _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ | | | | | | |
| | **d** All other revenue . . . . . . . . . . | | | | | | |
| | **e Total.** Add lines 11a-11d . . . . . . . . . . . . . . ▶ | | | | | |
| | **12 Total revenue.** See instructions . . . . . . . . . . . . ▶ | | 826,664. | 0. | 0. | 0. |

BAA                                  TEEA0109   10/12/15                                  Form **990** (2015)

SFFA-Harvard 0001973

Case 1:14-cv-14176-ADB   Document 419-91   Filed 06/15/18   Page 11 of 23

| Form 990 (2015) | Students For Fair Admissions, Inc. | | 47-1689810 | | Page **10** |
|---|---|---|---|---|---|

**Part IX** | **Statement of Functional Expenses**

*Section 501(c)(3) and 501(c)(4) organizations must complete all columns. All other organizations must complete column (A).*

Check if Schedule O contains a response or note to any line in this Part IX . . . . . . . . . . . . . . . . . . . . . . . . . . . □

| *Do not include amounts reported on lines 6b, 7b, 8b, 9b, and 10b of Part VIII.* | **(A)** Total expenses | **(B)** Program service expenses | **(C)** Management and general expenses | **(D)** Fundraising expenses |
|---|---|---|---|---|
| **1** Grants and other assistance to domestic organizations and domestic governments. See Part IV, line 21 . . . . . . . . . . . . . . | | | | |
| **2** Grants and other assistance to domestic individuals. See Part IV, line 22 . . . . . | | | | |
| **3** Grants and other assistance to foreign organizations, foreign governments, and for- eign individuals. See Part IV, lines 15 and 16 . | | | | |
| **4** Benefits paid to or for members . . . . . . . . | | | | |
| **5** Compensation of current officers, directors, trustees, and key employees . . . . . . . . . | 0. | 0. | 0. | 0. |
| **6** Compensation not included above, to disqualified persons (as defined under section 4958(f)(1)) and persons described in section 4958(c)(3)(B). . . . . . . . . . . | | | | |
| **7** Other salaries and wages . . . . . . . . . . . | | | | |
| **8** Pension plan accruals and contributions (include section 401(k) and 403(b) employer contributions) . . . . . . . . . . . | | | | |
| **9** Other employee benefits . . . . . . . . . . . | | | | |
| **10** Payroll taxes . . . . . . . . . . . . . . . . . | | | | |
| **11** Fees for services (non-employees): | | | | |
| **a** Management . . . . . . . . . . . . . . . . . | | | | |
| **b** Legal . . . . . . . . . . . . . . . . | 530,926. | 530,926. | 0. | 0. |
| **c** Accounting . . . . . . . . . . . . . . . . . | | | | |
| **d** Lobbying . . . . . . . . . . . . . . . . . . | | | | |
| **e** Professional fundraising services. See Part IV, line 17 . | | | | |
| **f** Investment management fees . . . . . . . . . | | | | |
| **g** Other. (If line 11g amount exceeds 10% of line 25, column (A) amount, list line 11g expenses on Schedule O.) . . | | | | |
| **12** Advertising and promotion . . . . . . . . . . | | | | |
| **13** Office expenses . . . . . . . . . . . . . . . | 1,016. | 0. | 238. | 778. |
| **14** Information technology . . . . . . . . . . . . | 5,010. | 0. | 0. | 5,010. |
| **15** Royalties . . . . . . . . . . . . . . . . . . | | | | |
| **16** Occupancy . . . . . . . . . . . . . . . . . | | | | |
| **17** Travel . . . . . . . . . . . . . . . . . . . | 4,312. | 0. | 0. | 4,312. |
| **18** Payments of travel or entertainment expenses for any federal, state, or local public officials . . . . . . . . . . . . . . | | | | |
| **19** Conferences, conventions, and meetings . . . | 4,312. | 0. | 0. | 4,312. |
| **20** Interest . . . . . . . . . . . . . . . . . . . | | | | |
| **21** Payments to affiliates . . . . . . . . . . . . | | | | |
| **22** Depreciation, depletion, and amortization . . . | 0. | 0. | 0. | 0. |
| **23** Insurance . . . . . . . . . . . . . . . . . . | | | | |
| **24** Other expenses. Itemize expenses not covered above (List miscellaneous expenses in line 24e. If line 24e amount exceeds 10% of line 25, column (A) amount, list line 24e expenses on Schedule O.) . . . . . . . . . | | | | |
| **a** _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ | | | | |
| **b** _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ | | | | |
| **c** _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ | | | | |
| **d** _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ | | | | |
| **e** All other expenses . . . . . . . . . . . . . | | | | |
| **25** Total functional expenses. Add lines 1 through 24e . . | 545,576. | 530,926. | 238. | 14,412. |
| **26** Joint costs. Complete this line only if the organization reported in column (B) joint costs from a combined educational campaign and fundraising solicitation. Check here ► □ if following SOP 98-2 (ASC 958-720). . . . . . . . . . | | | | |

| BAA | | TEEA0110  10/12/15 | Form **990** (2015) |
|---|---|---|---|

**JA357**

SFFA-Harvard 0001974

| Form 990 (2015) | Students For Fair Admissions, Inc. | 47-1689810 | Page **11** |
|---|---|---|---|

| **Part X** | **Balance Sheet** |
|---|---|

Check if Schedule O contains a response or note to any line in this Part X . . . . . . . . . . . . . . . . . . . . . . . □

|  |  |  | **(A)** Beginning of year |  | **(B)** End of year |
|---|---|---|---|---|---|
| **Assets** | **1** | Cash — non-interest-bearing . . . . . . . . . . . . . . . . | 0. | **1** | 281,088. |
| | **2** | Savings and temporary cash investments . . . . . . . . . . . | | **2** | |
| | **3** | Pledges and grants receivable, net . . . . . . . . . . . . . | | **3** | |
| | **4** | Accounts receivable, net . . . . . . . . . . . . . . . . . | | **4** | |
| | **5** | Loans and other receivables from current and former officers, directors, trustees, key employees, and highest compensated employees. Complete Part II of Schedule L . . . . . . . . . . . . . . . . . . . | | **5** | |
| | **6** | Loans and other receivables from other disqualified persons (as defined under section 4958(f)(1)), persons described in section 4958(c)(3)(B), and contributing employers and sponsoring organizations of section 501(c)(9) voluntary employees' beneficiary organizations (see instructions). Complete Part II of Schedule L . . . . . | | **6** | |
| | **7** | Notes and loans receivable, net . . . . . . . . . . . . . . | | **7** | |
| | **8** | Inventories for sale or use . . . . . . . . . . . . . . . . | | **8** | |
| | **9** | Prepaid expenses and deferred charges . . . . . . . . . . . | | **9** | |
| | **10 a** | Land, buildings, and equipment: cost or other basis. Complete Part VI of Schedule D . . . . . . . . |**10a**| | | | |
| | **b** | Less: accumulated depreciation . . . . . . . . . . . |**10b**| | | **10c** | |
| | **11** | Investments — publicly traded securities . . . . . . . . . . | | **11** | |
| | **12** | Investments — other securities. See Part IV, line 11 . . . . . | | **12** | |
| | **13** | Investments — program-related. See Part IV, line 11 . . . . . | | **13** | |
| | **14** | Intangible assets . . . . . . . . . . . . . . . . . . . . | | **14** | |
| | **15** | Other assets. See Part IV, line 11 . . . . . . . . . . . . . | | **15** | |
| | **16** | **Total assets.** Add lines 1 through 15 (must equal line 34) . . . . . . . | 0. | **16** | 281,088. |
| **Liabilities** | **17** | Accounts payable and accrued expenses . . . . . . . . . . . | | **17** | |
| | **18** | Grants payable . . . . . . . . . . . . . . . . . . . . . | | **18** | |
| | **19** | Deferred revenue . . . . . . . . . . . . . . . . . . . . | | **19** | |
| | **20** | Tax-exempt bond liabilities . . . . . . . . . . . . . . . . | | **20** | |
| | **21** | Escrow or custodial account liability. Complete Part IV of Schedule D . . . . . . . . | | **21** | |
| | **22** | Loans and other payables to current and former officers, directors, trustees, key employees, highest compensated employees, and disqualified persons. Complete Part II of Schedule L . . . . . . . . . . . . . . . . . . . | | **22** | |
| | **23** | Secured mortgages and notes payable to unrelated third parties . . . . . . | | **23** | |
| | **24** | Unsecured notes and loans payable to unrelated third parties . . . . . . | | **24** | |
| | **25** | Other liabilities (including federal income tax, payables to related third parties, and other liabilities not included on lines 17-24). Complete Part X of Schedule D . . . | | **25** | |
| | **26** | **Total liabilities.** Add lines 17 through 25 . . . . . . . . . . . . . . | 0. | **26** | 0. |
| **Net Assets or Fund Balances** | | **Organizations that follow SFAS 117 (ASC 958), check here ► [X] and complete lines 27 through 29, and lines 33 and 34.** | | | |
| | **27** | Unrestricted net assets . . . . . . . . . . . . . . . . . | | **27** | 281,088. |
| | **28** | Temporarily restricted net assets . . . . . . . . . . . . . | | **28** | |
| | **29** | Permanently restricted net assets . . . . . . . . . . . . . | | **29** | |
| | | **Organizations that do not follow SFAS 117 (ASC 958), check here ► □ and complete lines 30 through 34.** | | | |
| | **30** | Capital stock or trust principal, or current funds . . . . . . . . . . | | **30** | |
| | **31** | Paid-in or capital surplus, or land, building, or equipment fund . . . . . . | | **31** | |
| | **32** | Retained earnings, endowment, accumulated income, or other funds . . . . . | | **32** | |
| | **33** | Total net assets or fund balances . . . . . . . . . . . . . | 0. | **33** | 281,088. |
| | **34** | Total liabilities and net assets/fund balances . . . . . . . . . . . . | 0. | **34** | 281,088. |

| **BAA** | | Form **990** (2015) |
|---|---|---|

TEEA0111   10/12/15

**JA358**

SFFA-Harvard 0001975

Form **990** (2015)    Students For Fair Admissions, Inc.                                    47-1689810              Page **12**

| Part XI | Reconciliation of Net Assets |
|---|---|

Check if Schedule O contains a response or note to any line in this Part XI . . . . . . . . . . . . . . . . . . . . . . . . . ☐

| | | | |
|---|---|---|---:|
| 1 | Total revenue (must equal Part VIII, column (A), line 12) . . . . . . . . . . . . . . . . . . . . . . . . . | **1** | 826,664. |
| 2 | Total expenses (must equal Part IX, column (A), line 25) . . . . . . . . . . . . . . . . . . . . . . . . . | **2** | 545,576. |
| 3 | Revenue less expenses. Subtract line 2 from line 1 . . . . . . . . . . . . . . . . . . . . . . . . . | **3** | 281,088. |
| 4 | Net assets or fund balances at beginning of year (must equal Part X, line 33, column (A)) . . . . . . . . . . . | **4** | |
| 5 | Net unrealized gains (losses) on investments . . . . . . . . . . . . . . . . . . . . . . . . . . . . | **5** | |
| 6 | Donated services and use of facilities . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | **6** | |
| 7 | Investment expenses . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | **7** | |
| 8 | Prior period adjustments . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | **8** | |
| 9 | Other changes in net assets or fund balances (explain in Schedule O) . . . . . . . . . . . . . . . . . | **9** | |
| 10 | Net assets or fund balances at end of year. Combine lines 3 through 9 (must equal Part X, line 33, column (B)) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | **10** | 281,088. |

| Part XII | Financial Statements and Reporting |
|---|---|

Check if Schedule O contains a response or note to any line in this Part XII . . . . . . . . . . . . . . . . . . . . . . . . . ☐

| | | Yes | No |
|---|---|---|---|
| 1 | Accounting method used to prepare the Form 990: ☐ Cash ☒ Accrual ☐ Other _____ | | |
| | If the organization changed its method of accounting from a prior year or checked 'Other,' explain in Schedule O. | | |
| 2 a | Were the organization's financial statements compiled or reviewed by an independent accountant? . . . . . . . . . . . . . | **2 a** | | X |
| | If 'Yes,' check a box below to indicate whether the financial statements for the year were compiled or reviewed on a separate basis, consolidated basis, or both: <br> ☐ Separate basis  ☐ Consolidated basis  ☐ Both consolidated and separate basis | | | |
| b | Were the organization's financial statements audited by an independent accountant? . . . . . . . . . . . . . . . . . | **2 b** | | X |
| | If 'Yes,' check a box below to indicate whether the financial statements for the year were audited on a separate basis, consolidated basis, or both: <br> ☐ Separate basis  ☐ Consolidated basis  ☐ Both consolidated and separate basis | | | |
| c | If 'Yes' to line 2a or 2b, does the organization have a committee that assumes responsibility for oversight of the audit, review, or compilation of its financial statements and selection of an independent accountant? . . . . . . . . . . . . . | **2 c** | | |
| | If the organization changed either its oversight process or selection process during the tax year, explain in Schedule O. | | | |
| 3 a | As a result of a federal award, was the organization required to undergo an audit or audits as set forth in the Single Audit Act and OMB Circular A-133? . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | **3 a** | | X |
| b | If 'Yes,' did the organization undergo the required audit or audits? If the organization did not undergo the required audit or audits, explain why in Schedule O and describe any steps taken to undergo such audits . . . . . . . . . . . . . . . . . | **3 b** | | |

**BAA**                                                                                                             Form **990** (2015)

TEEA0112   10/20/15

SFFA-Harvard 0001976

| SCHEDULE A | Public Charity Status and Public Support | OMB No. 1545-0047 |
|---|---|---|
| (Form 990 or 990-EZ) | Complete if the organization is a section 501(c)(3) organization or a section 4947(a)(1) nonexempt charitable trust. | **2015** |
| Department of the Treasury Internal Revenue Service | ► Attach to Form 990 or Form 990-EZ.<br>► Information about Schedule A (Form 990 or 990-EZ) and its instructions is at www.irs.gov/form990. | **Open to Public Inspection** |

| Name of the organization | Employer identification number |
|---|---|
| Students For Fair Admissions, Inc. | 47-1689810 |

**Part I** | **Reason for Public Charity Status** (All organizations must complete this part.) See instructions.

The organization is not a private foundation because it is: (For lines 1 through 11, check only one box.)

1 ☐ A church, convention of churches, or association of churches described in **section 170(b)(1)(A)(i).**

2 ☐ A school described in **section 170(b)(1)(A)(ii).** (Attach Schedule E (Form 990 or 990-EZ).)

3 ☐ A hospital or a cooperative hospital service organization described in **section 170(b)(1)(A)(iii).**

4 ☐ A medical research organization operated in conjunction with a hospital described in **section 170(b)(1)(A)(iii).** Enter the hospital's name, city, and state:

5 ☐ An organization operated for the benefit of a college or university owned or operated by a governmental unit described in **section 170(b)(1)(A)(iv).** (Complete Part II.)

6 ☐ A federal, state, or local government or governmental unit described in **section 170(b)(1)(A)(v).**

7 ☐ An organization that normally receives a substantial part of its support from a governmental unit or from the general public described in **section 170(b)(1)(A)(vi).** (Complete Part II.)

8 ☐ A community trust described in **section 170(b)(1)(A)(vi).** (Complete Part II.)

9 ☒ An organization that normally receives: (1) more than 33-1/3% of its support from contributions, membership fees, and gross receipts from activities related to its exempt functions — subject to certain exceptions, and (2) no more than 33-1/3% of its support from gross investment income and unrelated business taxable income (less section 511 tax) from businesses acquired by the organization after June 30, 1975. See **section 509(a)(2).** (Complete Part III.)

10 ☐ An organization organized and operated exclusively to test for public safety. See **section 509(a)(4).**

11 ☐ An organization organized and operated exclusively for the benefit of, to perform the functions of, or to carry out the purposes of one or more publicly supported organizations described in **section 509(a)(1)** or **section 509(a)(2).** See **section 509(a)(3).** Check the box in lines 11a through 11d that describes the type of supporting organization and complete lines 11e, 11f, and 11g.

a ☐ **Type I.** A supporting organization operated, supervised, or controlled by its supported organization(s), typically by giving the supported organization(s) the power to regularly appoint or elect a majority of the directors or trustees of the supporting organization. **You must complete Part IV, Sections A and B.**

b ☐ **Type II.** A supporting organization supervised or controlled in connection with its supported organization(s), by having control or management of the supporting organization vested in the same persons that control or manage the supported organization(s). **You must complete Part IV, Sections A and C.**

c ☐ **Type III functionally integrated.** A supporting organization operated in connection with, and functionally integrated with, its supported organization(s) (see instructions). **You must complete Part IV, Sections A, D, and E.**

d ☐ **Type III non-functionally integrated.** A supporting organization operated in connection with its supported organization(s) that is not functionally integrated. The organization generally must satisfy a distribution requirement and an attentiveness requirement (see instructions). **You must complete Part IV, Sections A and D, and Part V.**

e ☐ Check this box if the organization received a written determination from the IRS that it is a Type I, Type II, Type III functionally integrated, or Type III non-functionally integrated supporting organization.

f Enter the number of supported organizations . . . . . . . . . . . . . . . . . . . . . . . . . . . . ☐

g Provide the following information about the supported organization(s).

| (i) Name of supported organization | (ii) EIN | (iii) Type of organization (described on lines 1-9 above (see instructions)) | (iv) Is the organization listed in your governing document? | | (v) Amount of monetary support (see instructions) | (vi) Amount of other support (see instructions) |
|---|---|---|---|---|---|---|
| | | | Yes | No | | |
| **(A)** | | | | | | |
| **(B)** | | | | | | |
| **(C)** | | | | | | |
| **(D)** | | | | | | |
| **(E)** | | | | | | |
| **Total** | | | | | | |

BAA  For Paperwork Reduction Act Notice, see the Instructions for Form 990 or 990-EZ.       Schedule A (Form 990 or 990-EZ) 2015

TEEA0401   10/12/15

# JA360

SFFA-Harvard 0001977

| Schedule **A** (Form 990 or 990-EZ) 2015 | Students For Fair Admissions, Inc. | 47-1689810 | Page **2** |

**Part II** | **Support Schedule for Organizations Described in Sections 170(b)(1)(A)(iv) and 170(b)(1)(A)(vi)**

(Complete only if you checked the box on line 5, 7, or 8 of Part I or if the organization failed to qualify under Part III. If the organization fails to qualify under the tests listed below, please complete Part III.)

## Section A. Public Support

| Calendar year (or fiscal year beginning in) ► | (a) 2011 | (b) 2012 | (c) 2013 | (d) 2014 | (e) 2015 | (f) Total |
|---|---|---|---|---|---|---|
| **1** Gifts, grants, contributions, and membership fees received. (Do not include any 'unusual grants.') . . . . | | | | | | |
| **2** Tax revenues levied for the organization's benefit and either paid to or expended on its behalf . . . . . . . . . . | | | | | | |
| **3** The value of services or facilities furnished by a governmental unit to the organization without charge. . . | | | | | | |
| **4** **Total.** Add lines 1 through 3 . . | | | | | | |
| **5** The portion of total contributions by each person (other than a governmental unit or publicly supported organization) included on line 1 that exceeds 2% of the amount shown on line 11, column (f) . . . . | | | | | | |
| **6** **Public support.** Subtract line 5 from line 4 . . . . . . . . | | | | | | |

## Section B. Total Support

| Calendar year (or fiscal year beginning in) ► | (a) 2011 | (b) 2012 | (c) 2013 | (d) 2014 | (e) 2015 | (f) Total |
|---|---|---|---|---|---|---|
| **7** Amounts from line 4 . . . . . . | | | | | | |
| **8** Gross income from interest, dividends, payments received on securities loans, rents, royalties and income from similar sources . . . . . . . . | | | | | | |
| **9** Net income from unrelated business activities, whether or not the business is regularly carried on . . . . . . . . . . | | | | | | |
| **10** Other income. Do not include gain or loss from the sale of capital assets (Explain in Part VI.) . . . . . . . . . . | | | | | | |
| **11** **Total support.** Add lines 7 through 10 . . . . . . . . | | | | | | |

| **12** Gross receipts from related activities, etc. (see instructions) . . . . . . . . . . . . . . . . . . . . . . . | **12** | |

**13** **First five years.** If the Form 990 is for the organization's first, second, third, fourth, or fifth tax year as a section 501(c)(3) organization, check this box and **stop here** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . ► ☐

## Section C. Computation of Public Support Percentage

| **14** Public support percentage for 2015 (line 6, column (f) divided by line 11, column (f)) . . . . . . . . . . . . . . . | **14** | % |
| **15** Public support percentage from 2014 Schedule A, Part II, line 14 . . . . . . . . . . . . . . . . . . . . . . . | **15** | % |

**16a** **33-1/3% support test — 2015.** If the organization did not check the box on line 13, and line 14 is 33-1/3% or more, check this box and **stop here.** The organization qualifies as a publicly supported organization . . . . . . . . . . . . . . . . . . . . . . . ► ☐

**b** **33-1/3% support test — 2014.** If the organization did not check a box on line 13 or 16a, and line 15 is 33-1/3% or more, check this box and **stop here.** The organization qualifies as a publicly supported organization . . . . . . . . . . . . . . . . . . . . . . . ► ☐

**17a** **10%-facts-and-circumstances test — 2015.** If the organization did not check a box on line 13, 16a, or 16b, and line 14 is 10% or more, and if the organization meets the 'facts-and-circumstances' test, check this box and **stop here.** Explain in Part VI how the organization meets the 'facts-and-circumstances' test. The organization qualifies as a publicly supported organization . . . . . . . . . ► ☐

**b** **10%-facts-and-circumstances test — 2014.** If the organization did not check a box on line 13, 16a, 16b, or 17a, and line 15 is 10% or more, and if the organization meets the 'facts-and-circumstances' test, check this box and **stop here.** Explain in Part VI how the organization meets the 'facts-and-circumstances' test. The organization qualifies as a publicly supported organization . . . . . . . . . . . . ► ☐

**18** **Private foundation.** If the organization did not check a box on line 13, 16a, 16b, 17a, or 17b, check this box and see instructions . . . . . ► ☐

| **BAA** | | Schedule **A** (Form 990 or 990-EZ) 2015 |

TEEA0402   10/12/15

# JA361

SFFA-Harvard 0001978

Case 1:14-cv-14176-ADB   Document 419-91   Filed 06/15/18   Page 16 of 23

| Schedule A (Form 990 or 990-EZ) 2015 | Students For Fair Admissions, Inc. | 47-1689810 | Page 3 |
|---|---|---|---|

**Part III** Support Schedule for Organizations Described in Section 509(a)(2)

(Complete only if you checked the box on line 9 of Part I or if the organization failed to qualify under Part II. If the organization fails to qualify under the tests listed below, please complete Part II.)

### Section A. Public Support

| Calendar year (or fiscal year beginning in) ▶ | (a) 2011 | (b) 2012 | (c) 2013 | (d) 2014 | (e) 2015 | (f) Total |
|---|---|---|---|---|---|---|
| 1 Gifts, grants, contributions and membership fees received. (Do not include any 'unusual grants.') . . . . . | 0. | 0. | 0. | 0. | 826,234. | 826,234. |
| 2 Gross receipts from admissions, merchandise sold or services performed, or facilities furnished in any activity that is related to the organization's tax-exempt purpose . . . . . | | | | | | |
| 3 Gross receipts from activities that are not an unrelated trade or business under section 513 . | | | | | | |
| 4 Tax revenues levied for the organization's benefit and either paid to or expended on its behalf . . . . . . . . . | | | | | | |
| 5 The value of services or facilities furnished by a governmental unit to the organization without charge. . . . . | | | | | | |
| 6 **Total.** Add lines 1 through 5 . . | 0. | 0. | 0. | 0. | 826,234. | 826,234. |
| 7 a Amounts included on lines 1, 2, and 3 received from disqualified persons . | | | | | | |
| b Amounts included on lines 2 and 3 received from other than disqualified persons that exceed the greater of $5,000 or 1% of the amount on line 13 for the year . . . . . . . . . | | | | | | |
| c Add lines 7a and 7b . . . . . . | | | | | | |
| 8 **Public support.** (Subtract line 7c from line 6.) . . . . . . . | | | | | | 826,234. |

### Section B. Total Support

| Calendar year (or fiscal year beginning in) ▶ | (a) 2011 | (b) 2012 | (c) 2013 | (d) 2014 | (e) 2015 | (f) Total |
|---|---|---|---|---|---|---|
| 9 Amounts from line 6 . . . . . . | 0. | 0. | 0. | 0. | 826,234. | 826,234. |
| 10 a Gross income from interest, dividends, payments received on securities loans, rents, royalties and income from similar sources . . . . . . . . . | | | | | 0. | 0. |
| b Unrelated business taxable income (less section 511 taxes) from businesses acquired after June 30, 1975 . . | | | | | | |
| c Add lines 10a and 10b . . . . . | | | | | 0. | 0. |
| 11 Net income from unrelated business activities not included in line 10b, whether or not the business is regularly carried on . . . . . . . | | | | | | |
| 12 Other income. Do not include gain or loss from the sale of capital assets (Explain in Part VI.) . . . . . . . . . . . | | | | | | |
| 13 **Total support.** (Add lines 9, 10c, 11, and 12.) . . . . . . . | 0. | 0. | 0. | 0. | 826,234. | 826,234. |
| 14 **First five years.** If the Form 990 is for the organization's first, second, third, fourth, or fifth tax year as a section 501(c)(3) organization, check this box and **stop here.** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . ▶ [X] |

### Section C. Computation of Public Support Percentage

| | | |
|---|---|---|
| 15 Public support percentage for 2015 (line 8, column (f) divided by line 13, column (f)) . . . . . . . . . . . . . . . . | **15** | % |
| 16 Public support percentage from 2014 Schedule A, Part III, line 15. . . . . . . . . . . . . . . . . . . . . . | **16** | % |

### Section D. Computation of Investment Income Percentage

| | | |
|---|---|---|
| 17 Investment income percentage for **2015** (line 10c, column (f) divided by line 13, column (f)) . . . . . . . . . . . | **17** | % |
| 18 Investment income percentage from **2014** Schedule A, Part III, line 17 . . . . . . . . . . . . . . . . . . . | **18** | % |

19 a **33-1/3% support tests — 2015.** If the organization did not check the box on line 14, and line 15 is more than 33-1/3%, and line 17 is not more than 33-1/3%, check this box and **stop here.** The organization qualifies as a publicly supported organization . . . . . . . . . . ▶ ☐

b **33-1/3% support tests — 2014.** If the organization did not check a box on line 14 or line 19a, and line 16 is more than 33-1/3%, and line 18 is not more than 33-1/3%, check this box and **stop here.** The organization qualifies as a publicly supported organization . . . . . . . ▶ ☐

20 **Private foundation.** If the organization did not check a box on line 14, 19a, or 19b, check this box and see instructions. . . . . . . . . . . ▶ ☐

| BAA | TEEA0403   10/12/15 | Schedule A (Form 990 or 990-EZ) 2015 |
|---|---|---|

SFFA-Harvard 0001979

Schedule **A** (Form 990 or 990-EZ) 2015    Students For Fair Admissions, Inc.    47-1689810    Page 4

| **Part IV** | **Supporting Organizations** |
|---|---|

(Complete only if you checked a box in line 11 on Part I. If you checked 11a of Part I, complete Sections A and B. If you checked 11b of Part I, complete Sections A and C. If you checked 11c of Part I, complete Sections A, D, and E. If you checked 11d of Part I, complete Sections A and D, and complete Part V.)

### Section A. All Supporting Organizations

| | | | Yes | No |
|---|---|:---:|:---:|:---:|
| **1** | Are all of the organization's supported organizations listed by name in the organization's governing documents? *If 'No,' describe in Part VI how the supported organizations are designated. If designated by class or purpose, describe the designation. If historic and continuing relationship, explain* . . . . . . . . . . . . . . . | **1** | | |
| **2** | Did the organization have any supported organization that does not have an IRS determination of status under section 509(a)(1) or (2)? *If 'Yes,' explain in Part VI how the organization determined that the supported organization was described in section 509(a)(1) or (2)* . . . . . . . . . . . . . . . | **2** | | |
| **3 a** | Did the organization have a supported organization described in section 501(c)(4), (5), or (6)? *If 'Yes,' answer (b) and (c) below* . . . . . . . . . . . . . . . | **3a** | | |
| **b** | Did the organization confirm that each supported organization qualified under section 501(c)(4), (5), or (6) and satisfied the public support tests under section 509(a)(2)? *If 'Yes,' describe in Part VI when and how the organization made the determination* . . . . . . . . . . . . . . . | **3b** | | |
| **c** | Did the organization ensure that all support to such organizations was used exclusively for section 170(c)(2)(B) purposes? *If 'Yes,' explain in Part VI what controls the organization put in place to ensure such use* . . . . . . . . . . . . . . . | **3c** | | |
| **4 a** | Was any supported organization not organized in the United States ('foreign supported organization')? *If 'Yes' and if you checked 11a or 11b in Part I, answer (b) and (c) below* . . . . . . . . . . . . . . . | **4a** | | |
| **b** | Did the organization have ultimate control and discretion in deciding whether to make grants to the foreign supported organization? *If 'Yes,' describe in Part VI how the organization had such control and discretion despite being controlled or supervised by or in connection with its supported organizations* . . . . . . . . . . . . . . . | **4b** | | |
| **c** | Did the organization support any foreign supported organization that does not have an IRS determination under sections 501(c)(3) and 509(a)(1) or (2)? *If 'Yes,' explain in Part VI what controls the organization used to ensure that all support to the foreign supported organization was used exclusively for section 170(c)(2)(B) purposes* . . . . . . . . . . | **4c** | | |
| **5 a** | Did the organization add, substitute, or remove any supported organizations during the tax year? *If 'Yes,' answer (b) and (c) below (if applicable). Also, provide detail in Part VI, including (i) the names and EIN numbers of the supported organizations added, substituted, or removed; (ii) the reasons for each such action; (iii) the authority under the organization's organizing document authorizing such action; and (iv) how the action was accomplished (such as by amendment to the organizing document)* . . . . . . . . . . . . . . . | **5a** | | |
| **b** | **Type I or Type II only.** Was any added or substituted supported organization part of a class already designated in the organization's organizing document? . . . . . . . . . . . . . . . | **5b** | | |
| **c** | **Substitutions only.** Was the substitution the result of an event beyond the organization's control? . . . . . . . . . . . . . | **5c** | | |
| **6** | Did the organization provide support (whether in the form of grants or the provision of services or facilities) to anyone other than (i) its supported organizations, (ii) individuals that are part of the charitable class benefited by one or more of its supported organizations, or (iii) other supporting organizations that also support or benefit one or more of the filing organization's supported organizations? *If 'Yes,' provide detail in Part VI* . . . . . . . . . . | **6** | | |
| **7** | Did the organization provide a grant, loan, compensation, or other similar payment to a substantial contributor (defined in section 4958(c)(3)(C)), a family member of a substantial contributor, or a 35% controlled entity with regard to a substantial contributor? *If 'Yes,' complete Part I of Schedule L (Form 990 or 990-EZ)* . . . . . . | **7** | | |
| **8** | Did the organization make a loan to a disqualified person (as defined in section 4958) not described in line 7? *If 'Yes,' complete Part I of Schedule L (Form 990 or 990-EZ)* . . . . . . . . . . . . . . . | **8** | | |
| **9 a** | Was the organization controlled directly or indirectly at any time during the tax year by one or more disqualified persons as defined in section 4946 (other than foundation managers and organizations described in section 509(a)(1) or (2))? *If 'Yes,' provide detail in Part VI* . . . . . . . . . . . . . . . | **9a** | | |
| **b** | Did one or more disqualified persons (as defined in line 9a) hold a controlling interest in any entity in which the supporting organization had an interest? *If 'Yes,' provide detail in Part VI* . . . . . . . . . . . . | **9b** | | |
| **c** | Did a disqualified person (as defined in line 9a) have an ownership interest in, or derive any personal benefit from, assets in which the supporting organization also had an interest? *If 'Yes,' provide detail in Part VI* . . . . . . . . | **9c** | | |
| **10a** | Was the organization subject to the excess business holdings rules of section 4943 because of section 4943(f) (regarding certain Type II supporting organizations, and all Type III non-functionally integrated supporting organizations)? *If 'Yes,' answer 10b below* . . . . . . . . . . . . . . . | **10a** | | |
| **b** | Did the organization have any excess business holdings in the tax year? *(Use Schedule C, Form 4720, to determine whether the organization had excess business holdings.)* . . . . . . . . . . . . . . . | **10b** | | |

**BAA**    TEEA0404  10/12/15    Schedule **A** (Form 990 or 990-EZ) 2015

SFFA-Harvard 0001980

Schedule A (Form 990 or 990-EZ) 2015    Students For Fair Admissions, Inc.    47-1689810    Page 5

| **Part IV** | **Supporting Organizations** *(continued)* | | | |
|---|---|---|---|---|

| | | | Yes | No |
|---|---|---|---|---|
| 11 | Has the organization accepted a gift or contribution from any of the following persons? | | | |
| **a** | A person who directly or indirectly controls, either alone or together with persons described in (b) and (c) below, the governing body of a supported organization? . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | **11a** | | |
| **b** | A family member of a person described in (a) above? . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | **11b** | | |
| **c** | A 35% controlled entity of a person described in (a) or (b) above? *If 'Yes' to a, b, or c, provide detail in* **Part VI** . . . . . . . . | **11c** | | |

### Section B. Type I Supporting Organizations

| | | | Yes | No |
|---|---|---|---|---|
| 1 | Did the directors, trustees, or membership of one or more supported organizations have the power to regularly appoint or elect at least a majority of the organization's directors or trustees at all times during the tax year? *If 'No,' describe in* **Part VI** *how the supported organization(s) effectively operated, supervised, or controlled the organization's activities. If the organization had more than one supported organization, describe how the powers to appoint and/or remove directors or trustees were allocated among the supported organizations and what conditions or restrictions, if any, applied to such powers during the tax year* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | **1** | | |
| 2 | Did the organization operate for the benefit of any supported organization other than the supported organization(s) that operated, supervised, or controlled the supporting organization? *If 'Yes,' explain in* **Part VI** *how providing such benefit carried out the purposes of the supported organization(s) that operated, supervised, or controlled the supporting organization* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | **2** | | |

### Section C. Type II Supporting Organizations

| | | | Yes | No |
|---|---|---|---|---|
| 1 | Were a majority of the organization's directors or trustees during the tax year also a majority of the directors or trustees of each of the organization's supported organization(s)? *If 'No,' describe in* **Part VI** *how control or management of the supporting organization was vested in the same persons that controlled or managed the supported organization(s)* . . . . . . | **1** | | |

### Section D. All Type III Supporting Organizations

| | | | Yes | No |
|---|---|---|---|---|
| 1 | Did the organization provide to each of its supported organizations, by the last day of the fifth month of the organization's tax year, (i) a written notice describing the type and amount of support provided during the prior tax year, (ii) a copy of the Form 990 that was most recently filed as of the date of notification, and (iii) copies of the organization's governing documents in effect on the date of notification, to the extent not previously provided? . . . . . . . . | **1** | | |
| 2 | Were any of the organization's officers, directors, or trustees either (i) appointed or elected by the supported organization(s) or (ii) serving on the governing body of a supported organization? *If 'No,' explain in* **Part VI** *how the organization maintained a close and continuous working relationship with the supported organization(s)*. . . . . . . . . . | **2** | | |
| 3 | By reason of the relationship described in (2), did the organization's supported organizations have a significant voice in the organization's investment policies and in directing the use of the organization's income or assets at all times during the tax year? *If 'Yes,' describe in* **Part VI** *the role the organization's supported organizations played in this regard* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | **3** | | |

### Section E. Type III Functionally-Integrated Supporting Organizations

1    *Check the box next to the method that the organization used to satisfy the Integral Part Test during the year* **(see instructions):**

a ☐ The organization satisfied the Activities Test. *Complete line 2 below.*

b ☐ The organization is the parent of each of its supported organizations. *Complete line 3 below.*

c ☐ The organization supported a governmental entity. *Describe in Part VI how you supported a government entity (see instructions).*

| | | | Yes | No |
|---|---|---|---|---|
| 2 | Activities Test. **Answer (a) and (b) below.** | | | |
| **a** | Did substantially all of the organization's activities during the tax year directly further the exempt purposes of the supported organization(s) to which the organization was responsive? *If 'Yes,' then in* **Part VI** **identify those supported organizations and explain** *how these activities directly furthered their exempt purposes, how the organization was responsive to those supported organizations, and how the organization determined that these activities constituted substantially all of its activities* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | **2a** | | |
| **b** | Did the activities described in (a) constitute activities that, but for the organization's involvement, one or more of the organization's supported organization(s) would have been engaged in? *If 'Yes,' explain in* **Part VI** *the reasons for the organization's position that its supported organization(s) would have engaged in these activities but for the organization's involvement* | **2b** | | |
| 3 | Parent of Supported Organizations. **Answer (a) and (b) below.** | | | |
| **a** | Did the organization have the power to regularly appoint or elect a majority of the officers, directors, or trustees of each of the supported organizations? *Provide details in* **Part VI** . . . . . . . . . . . . . . . . . . . . . | **3a** | | |
| **b** | Did the organization exercise a substantial degree of direction over the policies, programs, and activities of each of its supported organizations? *If 'Yes,' describe in* **Part VI** *the role played by the organization in this regard* . . . . . . . . . . . . . | **3b** | | |

SFFA-Harvard 0001981

Schedule **A** (Form 990 or 990-EZ) 2015    Students For Fair Admissions, Inc.    47-1689810    Page **6**

| **Part V** | **Type III Non-Functionally Integrated 509(a)(3) Supporting Organizations** |
|---|---|

**1** ☐ Check here if the organization satisfied the Integral Part Test as a qualifying trust on November 20, 1970. **See instructions.** All other Type III non-functionally integrated supporting organizations must complete Sections A through E.

### Section A — Adjusted Net Income

|  |  |  | (A) Prior Year | (B) Current Year (optional) |
|---|---|---|---|---|
| **1** | Net short-term capital gain . . . . . . . . . . . . . . . . . . . . . . . . . . . | **1** | | |
| **2** | Recoveries of prior-year distributions . . . . . . . . . . . . . . . . . . . . . . | **2** | | |
| **3** | Other gross income (see instructions). . . . . . . . . . . . . . . . . . . . . . | **3** | | |
| **4** | Add lines 1 through 3 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | **4** | | |
| **5** | Depreciation and depletion . . . . . . . . . . . . . . . . . . . . . . . . . . | **5** | | |
| **6** | Portion of operating expenses paid or incurred for production or collection of gross income or for management, conservation, or maintenance of property held for production of income (see instructions) . . . . . . . . . . . . . . . . . . . . | **6** | | |
| **7** | Other expenses (see instructions) . . . . . . . . . . . . . . . . . . . . . . . | **7** | | |
| **8** | **Adjusted Net Income** (subtract lines 5, 6 and 7 from line 4) . . . . . . . . . . . . . | **8** | | |

### Section B — Minimum Asset Amount

|  |  |  | (A) Prior Year | (B) Current Year (optional) |
|---|---|---|---|---|
| **1** | Aggregate fair market value of all non-exempt-use assets (see instructions for short tax year or assets held for part of year): | | | |
| **a** | Average monthly value of securities . . . . . . . . . . . . . . . . . . . . . | **1 a** | | |
| **b** | Average monthly cash balances . . . . . . . . . . . . . . . . . . . . . . . | **1 b** | | |
| **c** | Fair market value of other non-exempt-use assets . . . . . . . . . . . . . . . | **1 c** | | |
| **d** | **Total** (add lines 1a, 1b, and 1c). . . . . . . . . . . . . . . . . . . . . . . | **1 d** | | |
| **e** | **Discount** claimed for blockage or other factors (explain in detail in **Part VI**): | | | |
| **2** | Acquisition indebtedness applicable to non-exempt-use assets . . . . . . . . . . . . | **2** | | |
| **3** | Subtract line 2 from line 1d . . . . . . . . . . . . . . . . . . . . . . . . . | **3** | | |
| **4** | Cash deemed held for exempt use. Enter 1-1/2% of line 3 (for greater amount, see instructions) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | **4** | | |
| **5** | Net value of non-exempt-use assets (subtract line 4 from line 3) . . . . . . . . . . | **5** | | |
| **6** | Multiply line 5 by .035. . . . . . . . . . . . . . . . . . . . . . . . . . . | **6** | | |
| **7** | Recoveries of prior-year distributions . . . . . . . . . . . . . . . . . . . . . | **7** | | |
| **8** | **Minimum Asset Amount** (add line 7 to line 6) . . . . . . . . . . . . . . . . | **8** | | |

### Section C — Distributable Amount

|  |  |  | Current Year |
|---|---|---|---|
| **1** | Adjusted net income for prior year (from Section A, line 8, Column A) . . . . . . . . | **1** | |
| **2** | Enter 85% of line 1 . . . . . . . . . . . . . . . . . . . . . . . . . . . . | **2** | |
| **3** | Minimum asset amount for prior year (from Section B, line 8, Column A) . . . . . . . | **3** | |
| **4** | Enter greater of line 2 or line 3 . . . . . . . . . . . . . . . . . . . . . . . | **4** | |
| **5** | Income tax imposed in prior year . . . . . . . . . . . . . . . . . . . . . . . | **5** | |
| **6** | **Distributable Amount.** Subtract line 5 from line 4, unless subject to emergency temporary reduction (see instructions) . . . . . . . . . . . . . . . . . . . . | **6** | |

**7** ☐ Check here if the current year is the organization's first as a non-functionally-integrated Type III supporting organization (see instructions).

**BAA**    Schedule **A** (Form 990 or 990-EZ) 2015

TEEA0406    10/12/15

## JA365

SFFA-Harvard 0001982

Schedule **A** (Form 990 or 990-EZ) 2015    Students For Fair Admissions, Inc.    47-1689810    Page **7**

| **Part V** | Type III Non-Functionally Integrated 509(a)(3) Supporting Organizations *(continued)* | |
|---|---|---|

| **Section D — Distributions** | | **Current Year** |
|---|---|---|
| 1 | Amounts paid to supported organizations to accomplish exempt purposes . . . . . . . . . . . . . . . . . . . . . | |
| 2 | Amounts paid to perform activity that directly furthers exempt purposes of supported organizations, in excess of income from activity . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | |
| 3 | Administrative expenses paid to accomplish exempt purposes of supported organizations . . . . . . . . . . . . | |
| 4 | Amounts paid to acquire exempt-use assets . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | |
| 5 | Qualified set-aside amounts (prior IRS approval required). . . . . . . . . . . . . . . . . . . . . . . . | |
| 6 | Other distributions (describe in **Part VI**). See instructions . . . . . . . . . . . . . . . . . . . . . . | |
| 7 | **Total annual distributions.** Add lines 1 through 6 . . . . . . . . . . . . . . . . . . . . . . . . . . | |
| 8 | Distributions to attentive supported organizations to which the organization is responsive (provide details in **Part VI**). See instructions. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | |
| 9 | Distributable amount for 2015 from Section C, line 6 . . . . . . . . . . . . . . . . . . . . . . . . . | |
| 10 | Line 8 amount divided by Line 9 amount . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | |

| **Section E — Distribution Allocations (see instructions)** | **(i)** Excess Distributions | **(ii)** Underdistributions Pre-2015 | **(iii)** Distributable Amount for 2015 |
|---|---|---|---|
| 1 | Distributable amount for 2015 from Section C, line 6 . . . . . . . . | | | |
| 2 | Underdistributions, if any, for years prior to 2015 (reasonable cause required — see instructions) . . . . . . . . . . . . . . . . | | | |
| 3 | Excess distributions carryover, if any, to 2015: | | | |
| a | | | | |
| b | | | | |
| c | | | | |
| d | From 2013 . . . . . . . . . . | | | |
| e | From 2014 . . . . . . . . . . | | | |
| f | **Total** of lines 3a through e . . . . . . . . . . . . . . . . | | | |
| g | Applied to underdistributions of prior years . . . . . . . . . . | | | |
| h | Applied to 2015 distributable amount . . . . . . . . . . . . . | | | |
| i | Carryover from 2010 not applied (see instructions) . . . . . . . . | | | |
| j | Remainder. Subtract lines 3g, 3h, and 3i from 3f . . . . . . . . | | | |
| 4 | Distributions for 2015 from Section D, line 7:    $ | | | |
| a | Applied to underdistributions of prior years . . . . . . . . . . | | | |
| b | Applied to 2015 distributable amount . . . . . . . . . . . . . | | | |
| c | Remainder. Subtract lines 4a and 4b from 4 . . . . . . . . . . | | | |
| 5 | Remaining underdistributions for years prior to 2015, if any. Subtract lines 3g and 4a from line 2 (if amount greater than zero, see instructions) . . . . . . . . . . . . . . . . . . . | | | |
| 6 | Remaining underdistributions for 2015. Subtract lines 3h and 4b from line 1 (if amount greater than zero, see instructions) . . . . . . | | | |
| 7 | **Excess distributions carryover to 2016.** Add lines 3j and 4c . . . . | | | |
| 8 | Breakdown of line 7: | | | |
| a | | | | |
| b | | | | |
| c | Excess from 2013 . . . . . . . . . . | | | |
| d | Excess from 2014 . . . . . . . . . . | | | |
| e | Excess from 2015 . . . . . . . . . . | | | |

**BAA**    Schedule **A** (Form 990 or 990-EZ) 2015

TEEA0407    10/12/15

## JA366

SFFA-Harvard 0001983

Schedule **A** (Form 990 or 990-EZ) 2015    Students For Fair Admissions, Inc.    47-1689810    Page **8**

| **Part VI** | **Supplemental Information.** Provide the explanations required by Part II, line 10; Part II, line 17a or 17b; Part III, line 12; Part IV, Section A, lines 1, 2, 3b, 3c, 4b, 4c, 5a, 6, 9a, 9b, 9c, 11a, 11b, and 11c; Part IV, Section B, lines 1 and 2; Part IV, Section C, line 1; Part IV, Section D, lines 2 and 3; Part IV, Section E, lines 1c, 2a, 2b, 3a and 3b; Part V, line 1; Part V, Section B, line 1e; Part V, Section D, lines 5, 6, and 8; and Part V, Section E, lines 2, 5, and 6. Also complete this part for any additional information. (See instructions.) |

**SFFA-Harvard 0001984**

| SCHEDULE O | Supplemental Information to Form 990 or 990-EZ | OMB No. 1545-0047 |
|---|---|---|
| (Form 990 or 990-EZ) | Complete to provide information for responses to specific questions on Form 990 or 990-EZ or to provide any additional information. ► Attach to Form 990 or 990-EZ. | **2015** |
| Department of the Treasury Internal Revenue Service | ► Information about Schedule O (Form 990 or 990-EZ) and its instructions is at *www.irs.gov/form990*. | Open to Public Inspection |

| Name of the organization | Employer identification number |
|---|---|
| Students For Fair Admissions, Inc. | 47-1689810 |

| | |
|---|---|
| Pt VI, Line 11b | Form 990 has been distributed to all directors/ officers. |
| Pt VI, Line 2 | Officer Richard Fisher is the father of officer, Abigail Fisher. |
| Pt VI, Line 12c | Legal council requires written executed annual conflict of interest responses. |
| Pt III, Line 2 | Organization initiated litigation defending individuals against civil rights' challenges. |
| Pt VI, Line 6 | Organization has 5 officers and 19,000+ members. |
| Pt VI, Line 15a | Organization paid no compensation to any official in 2015, but does require review and approval if any were to be paid. |
| Pt VI, Line 15b | Organization paid no compensation to any official. |
| Pt VI, Line 4 | Organization amended Bylaws to allow members to elect a director,begin assessing membership dues, & various other items. |
| Pt VI, Line 7a | Members can elect Member-Elected Directors. |

**BAA  For Paperwork Reduction Act Notice, see the Instructions for Form 990 or 990-EZ.**    TEEA4901    10/12/15    Schedule O (Form 990 or 990-EZ) (2015)

SFFA-Harvard 0001985

Form **8879-EO**

Department of the Treasury
Internal Revenue Service

**IRS e-file Signature Authorization**
**for an Exempt Organization**

For calendar year 2015, or fiscal year beginning _ _ _ _ _ _ , 2015, and ending _ _ _ _ _ _ , 20 _ _ _ _

▶ **Do not send to the IRS. Keep for your records.**
▶ **Information about Form 8879-EO and its instructions is at** *www.irs.gov/form8879eo.*

OMB No. 1545-1878

**2015**

| Name of exempt organization | Employer identification number |
|---|---|
| Students For Fair Admissions, Inc. | 47-1689810 |

Name and title of officer

Richard Fisher                                    Treasurer

## Part I  Type of Return and Return Information (Whole Dollars Only)

Check the box for the return for which you are using this Form 8879-EO and enter the applicable amount, if any, from the return. If you check the box on line **1a, 2a, 3a, 4a,** or **5a,** below, and the amount on that line for the return being filed with this form was blank, then leave line **1b, 2b, 3b, 4b,** or **5b,** whichever is applicable, blank (do not enter -0-). But, if you entered -0- on the return, then enter -0- on the applicable line below. **Do not** complete more than 1 line in Part I.

| | | |
|---|---|---|
| **1 a** Form 990 check here ▶ ☒ | **b Total revenue,** if any (Form 990, Part VIII, column (A), line 12) . . . . . . . | **1 b**   826,664. |
| **2 a** Form 990-EZ check here ▶ ☐ | **b Total revenue,** if any (Form 990-EZ, line 9) . . . . . . . . . . . . . . | **2 b** |
| **3 a** Form 1120-POL check here ▶ ☐ | **b Total tax** (Form 1120-POL, line 22) . . . . . . . . . . . . . . . . | **3 b** |
| **4 a** Form 990-PF check here ▶ ☐ | **b Tax based on investment income** (Form 990-PF, Part VI, line 5). . . . | **4 b** |
| **5 a** Form 8868 check here ▶ ☐ | **b Balance Due** (Form 8868, Part I, line 3c or Part II, line 8c) . . . . . . . . . | **5 b** |

## Part II  Declaration and Signature Authorization of Officer

Under penalties of perjury, I declare that I am an officer of the above organization and that I have examined a copy of the organization's 2015 electronic return and accompanying schedules and statements and to the best of my knowledge and belief, they are true, correct, and complete. I further declare that the amount in Part I above is the amount shown on the copy of the organization's electronic return. I consent to allow my intermediate service provider, transmitter, or electronic return originator (ERO) to send the organization's return to the IRS and to receive from the IRS **(a)** an acknowledgement of receipt or reason for rejection of the transmission, **(b)** the reason for any delay in processing the return or refund, and **(c)** the date of any refund. If applicable, I authorize the U.S. Treasury and its designated Financial Agent to initiate an electronic funds withdrawal (direct debit) entry to the financial institution account indicated in the tax preparation software for payment of the organization's federal taxes owed on this return, and the financial institution to debit the entry to this account. To revoke a payment, I must contact the U.S. Treasury Financial Agent at 1-888-353-4537 no later than 2 business days prior to the payment (settlement) date. I also authorize the financial institutions involved in the processing of the electronic payment of taxes to receive confidential information necessary to answer inquiries and resolve issues related to the payment. I have selected a personal identification number (PIN) as my signature for the organization's electronic return and, if applicable, the organization's consent to electronic funds withdrawal.

**Officer's PIN: check one box only**

☐ I authorize _____ to enter my PIN _____ as my signature
                          ERO firm name                                              Enter five numbers, but
                                                                                      do not enter all zeros

on the organization's tax year 2015 electronically filed return. If I have indicated within this return that a copy of the return is being filed with a state agency(ies) regulating charities as part of the IRS Fed/State program, I also authorize the aforementioned ERO to enter my PIN on the return's disclosure consent screen.

☒ As an officer of the organization, I will enter my PIN as my signature on the organization's tax year 2015 electronically filed return. If I have indicated within this return that a copy of the return is being filed with a state agency(ies) regulating charities as part of the IRS Fed/State program, I will enter my PIN on the return's disclosure consent screen.

Officer's signature ▶ _____ Date ▶ 11/03/2016

## Part III  Certification and Authentication

**ERO's EFIN/PIN.** Enter your six-digit electronic filing identification
number (EFIN) followed by your five-digit self-selected PIN . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 123456 |
                                                                                                                          do not enter all zeros

I certify that the above numeric entry is my PIN, which is my signature on the 2015 electronically filed return for the organization indicated above. I confirm that I am submitting this return in accordance with the requirements of Pub. 4163, Modernized e-File (MeF) Information for Authorized IRS *e-file* Providers for Business Returns.

ERO's signature ▶ _____ Date ▶ _____

**ERO Must Retain This Form — See Instructions**
**Do Not Submit This Form To the IRS Unless Requested To Do So**

**BAA  For Paperwork Reduction Act Notice, see instructions.**                          Form **8879-EO** (2015)

TEEA7401  10/22/15

## JA369

SFFA-Harvard 0001986

# EXHIBIT 92

Case: 19-2005    Document 141764236   Page: 439.92   Date Filed: 05/18/2020   2 of 29   1545-0047

| Form **990** | **Return of Organization Exempt From Income Tax** | | **2016** |
|---|---|---|---|
| | Under section 501(c), 527, or 4947(a)(1) of the Internal Revenue Code (except private foundations) | | |
| Department of the Treasury Internal Revenue Service | ▶ Do not enter social security numbers on this form as it may be made public ▶ Information about Form 990 and its instructions is at *www IRS gov/form990* | | **Open to Public Inspection** |

**A** For the 2016 calendar year, or tax year beginning 01-01-2016 , and ending 12-31-2016

| **B** Check if applicable | **C** Name of organization Students For Fair Admissions Inc | **D** Employer identification number |
|---|---|---|
| ☐ Address change | | 47-1689810 |
| ☐ Name change | Doing business as | |
| ☐ Initial return | | |
| ☐ Final return/terminated | Number and street (or P O box if mail is not delivered to street address)    Room/suite 2200 Wilson Blvd | **E** Telephone number (713) 626-7560 |
| ☐ Amended return | City or town, state or province, country, and ZIP or foreign postal code Arlington, VA 22201 | |
| ☐ Application pending | | **G** Gross receipts $ 1,107,022 |

| **F** Name and address of principal officer EDWARD BLUM 2200 Wilson Blvd102-13 Arlington, VA 22201 | **H(a)** Is this a group return for subordinates?    ☐ Yes ☑ No |
|---|---|
| | **H(b)** Are all subordinates included?    ☐ Yes ☐ No |
| **I** Tax-exempt status ☑ 501(c)(3)   ☐ 501(c) ( ) ◀ (insert no )   ☐ 4947(a)(1) or ☐ 527 | If "No," attach a list (see instructions) |
| **J** Website: ▶ N/A | **H(c)** Group exemption number ▶ |
| **K** Form of organization ☑ Corporation ☐ Trust ☐ Association ☐ Other ▶ | **L** Year of formation 2014   **M** State of legal domicile VA |

**Part I**   **Summary**

**1** Briefly describe the organization's mission or most significant activities
The purposes of the organization are to defend human and civil rights secured by law, including the right of individuals to equal protection under the law, through litigation and any other lawful means

**2** Check this box ▶ ☐ if the organization discontinued its operations or disposed of more than 25% of its net assets

| | | | |
|---|---|---|---|
| **3** Number of voting members of the governing body (Part VI, line 1a) . . . . . . . . | **3** | 5 |
| **4** Number of independent voting members of the governing body (Part VI, line 1b) . . . . . | **4** | 4 |
| **5** Total number of individuals employed in calendar year 2016 (Part V, line 2a) . . . | **5** | 0 |
| **6** Total number of volunteers (estimate if necessary) . . . . . . . . . | **6** | 0 |
| **7a** Total unrelated business revenue from Part VIII, column (C), line 12 . . . . . | **7a** | 0 |
| **b** Net unrelated business taxable income from Form 990-T, line 34 . . . . . | **7b** | |

| | **Prior Year** | **Current Year** |
|---|---|---|
| **8** Contributions and grants (Part VIII, line 1h) . . . . . . . | 826,664 | 1,107,022 |
| **9** Program service revenue (Part VIII, line 2g) . . . . . . | | 0 |
| **10** Investment income (Part VIII, column (A), lines 3, 4, and 7d ) . . . | | 0 |
| **11** Other revenue (Part VIII, column (A), lines 5, 6d, 8c, 9c, 10c, and 11e) | | 0 |
| **12** Total revenue—add lines 8 through 11 (must equal Part VIII, column (A), line 12) | 826,664 | 1,107,022 |
| **13** Grants and similar amounts paid (Part IX, column (A), lines 1–3 ) . . . | | 0 |
| **14** Benefits paid to or for members (Part IX, column (A), line 4) . . . | | 0 |
| **15** Salaries, other compensation, employee benefits (Part IX, column (A), lines 5–10) | | 48,000 |
| **16a** Professional fundraising fees (Part IX, column (A), line 11e) . . . | | 0 |
| **b** Total fundraising expenses (Part IX, column (D), line 25) ▶48,535 | | |
| **17** Other expenses (Part IX, column (A), lines 11a–11d, 11f–24e) . . . . | 545,576 | 1,214,178 |
| **18** Total expenses Add lines 13–17 (must equal Part IX, column (A), line 25) | 545,576 | 1,262,178 |
| **19** Revenue less expenses Subtract line 18 from line 12 . . . . . . . | 281,088 | -155,156 |

| | **Beginning of Current Year** | **End of Year** |
|---|---|---|
| **20** Total assets (Part X, line 16) . . . . . . . . | 281,088 | 125,932 |
| **21** Total liabilities (Part X, line 26) . . . . . . . . | | 0 |
| **22** Net assets or fund balances Subtract line 21 from line 20 . . . . . | 281,088 | 125,932 |

**Part II**   **Signature Block**

Under penalties of perjury, I declare that I have examined this return, includ knowledge and belief, it is true, correct, and complete Declaration of prepa any knowledge

| **Sign Here** | ✱✱✱✱✱✱ Signature of officer | |
|---|---|---|
| | RICHARD FISHER TREASURER Type or print name and title | |

| **Paid Preparer Use Only** | Print/Type preparer's name RICHARD FISHER | Preparer's signature RICHARD FISHER |
|---|---|---|
| | Firm's name ▶ MOORE TAX SERVICES INC | |
| | Firm's address ▶ 10106 KLECKLEY DR | |
| | HOUSTON, TX 770753417 | JA3 |

May the IRS discuss this return with the preparer shown above? (see instru

**For Paperwork Reduction Act Notice, see the separate instructions.**

Case 8:21-cv-01412-WFJ-AEP Document 226-92 Filed 06/15/18 Page 3 of 29  Entry ID: 63566

**Part III  Statement of Program Service Accomplishments**

Check if Schedule O contains a response or note to any line in this Part III  .  .  .  .  .  .  .  .  .  .  .  ☐

**1**  Briefly describe the organization's mission

The purposes of the organization are to defend human and civil rights secured by law,

**2**  Did the organization undertake any significant program services during the year which were not listed on

the prior Form 990 or 990-EZ?  .  .  .  .  .  .  .  .  .  .  .  .  .  .  .  .  .  ☐ **Yes** ☑ **No**

If "Yes," describe these new services on Schedule O

**3**  Did the organization cease conducting, or make significant changes in how it conducts, any program

services?  .  .  .  .  .  .  .  .  .  .  .  .  .  .  .  .  .  .  .  .  ☐ **Yes** ☑ **No**

If "Yes," describe these changes on Schedule O

**4**  Describe the organization's program service accomplishments for each of its three largest program services, as measured by expenses.
Section 501(c)(3) and 501(c)(4) organizations are required to report the amount of grants and allocations to others, the total
expenses, and revenue, if any, for each program service reported

**4a**  (Code                    ) (Expenses $          1,188,086    including grants of $                  ) (Revenue $                  )
See Additional Data

**4b**  (Code                    ) (Expenses $                   including grants of $                  ) (Revenue $                  )
**JA372**

**4c**  (Code                    ) (Expenses $                   including grants of $                  ) (Revenue $                  )

**4d**  Other program services (Describe in Schedule O )
(Expenses $                   including grants of $                  ) (Revenue $                  )

**4e  Total program service expenses** ▶          1,188,086

Case 1:14-cv-14176-ADB Document 415-92 Filed 06/15/18 Page 4 of 29

## Part IV   Checklist of Required Schedules

| | | Yes | No |
|---|---|---|---|
| 1 | Is the organization described in section 501(c)(3) or 4947(a)(1) (other than a private foundation)? *If "Yes," complete Schedule A* . . . | **1** | Yes | |
| 2 | Is the organization required to complete *Schedule B, Schedule of Contributors* (see instructions)? . . . | **2** | Yes | |
| 3 | Did the organization engage in direct or indirect political campaign activities on behalf of or in opposition to candidates for public office? *If "Yes," complete Schedule C, Part I* . . . . . . . . . . . | **3** | | No |
| 4 | **Section 501(c)(3) organizations.** Did the organization engage in lobbying activities, or have a section 501(h) election in effect during the tax year? *If "Yes," complete Schedule C, Part II* . . . . . . . . . . . . . . . . | **4** | | No |
| 5 | Is the organization a section 501(c)(4), 501(c)(5), or 501(c)(6) organization that receives membership dues, assessments, or similar amounts as defined in Revenue Procedure 98-19? *If "Yes," complete Schedule C, Part III* . . . . . . . . . . . . . . . . | **5** | | No |
| 6 | Did the organization maintain any donor advised funds or any similar funds or accounts for which donors have the right to provide advice on the distribution or investment of amounts in such funds or accounts? *If "Yes," complete Schedule D, Part I* . . . . . . . . . . . . . . . | **6** | | No |
| 7 | Did the organization receive or hold a conservation easement, including easements to preserve open space, the environment, historic land areas, or historic structures? *If "Yes," complete Schedule D, Part II* . . . | **7** | | No |
| 8 | Did the organization maintain collections of works of art, historical treasures, or other similar assets? *If "Yes," complete Schedule D, Part III* . . . . . . . . . . . . . . . . | **8** | | No |
| 9 | Did the organization report an amount in Part X, line 21 for escrow or custodial account liability, serve as a custodian for amounts not listed in Part X, or provide credit counseling, debt management, credit repair, or debt negotiation services? *If "Yes," complete Schedule D, Part IV* . . . . . . . . . . . . | **9** | | No |
| 10 | Did the organization, directly or through a related organization, hold assets in temporarily restricted endowments, permanent endowments, or quasi-endowments? *If "Yes," complete Schedule D, Part V* . . . . . | **10** | | No |
| 11 | If the organization's answer to any of the following questions is "Yes," then complete Schedule D, Parts VI, VII, VIII, IX, or X as applicable | | | |
| a | Did the organization report an amount for land, buildings, and equipment in Part X, line 10? *If "Yes," complete Schedule D, Part VI* . . . . . . . . . . . . . . . . | **11a** | | No |
| b | Did the organization report an amount for investments—other securities in Part X, line 12 that is 5% or more of its total assets reported in Part X, line 16? *If "Yes," complete Schedule D, Part VII* . . . . . . . | **11b** | | No |
| c | Did the organization report an amount for investments—program related in Part X, line 13 that is 5% or more of its total assets reported in Part X, line 16? *If "Yes," complete Schedule D, Part VIII* . . . . . . . | **11c** | | No |
| d | Did the organization report an amount for other assets in Part X, line 15 that is 5% or more of its total assets reported in Part X, line 16? *If "Yes," complete Schedule D, Part IX* . . . . . . . . . | **11d** | | No |
| e | Did the organization report an amount for other liabilities in Part X, line 25? *If "Yes," complete Schedule D, Part X* | **11e** | | No |
| f | Did the organization's separate or consolidated financial statements for the tax year include a footnote that addresses the organization's liability for uncertain tax positions under FIN 48 (ASC 740)? *If "Yes," complete Schedule D, Part X* | **11f** | | No |
| 12a | Did the organization obtain separate, independent audited financial statements for the tax year? *If "Yes," complete Schedule D, Parts XI and XII* . . . . . . . . . . . . . | **12a** | | No |
| b | Was the organization included in consolidated, independent audited financial statements for the tax year? *If "Yes," and if the organization answered "No" to line 12a, then completing Schedule D, Parts XI and XII is optional* | **12b** | | No |
| 13 | Is the organization a school described in section 170(b)(1)(A)(ii)? *If "Yes," complete Schedule E* | **13** | | No |
| 14a | Did the organization maintain an office, employees, or agents outside of the United States? . . . . | **14a** | | No |
| b | Did the organization have aggregate revenues or expenses of more than $10,000 from grantmaking, fundraising, business, investment, and program service activities outside the United States, or aggregate foreign investments valued at $100,000 or more? *If "Yes," complete Schedule F, Parts I and IV* . . . . . . . | **14b** | | No |
| 15 | Did the organization report on Part IX, column (A), line 3, more than $5,000 of grants or other assistance to or for any foreign organization? *If "Yes," complete Schedule F, Parts II and IV* . . . . . . . | **15** | | No |
| 16 | Did the organization report on Part IX, column (A), line 3, more than $5,000 of aggregate grants or other assistance to or for foreign individuals? *If "Yes," complete Schedule F, Parts III and IV* . . . . | **16** | | No |
| 17 | Did the organization report a total of more than $15,000 of expenses for professional fundraising services on Part IX, column (A), lines 6 and 11e? *If "Yes," complete Schedule G, Part I* (see instructions) . . . . . | **17** | | No |
| 18 | Did the organization report more than $15,000 total of fundraising event gross income and contributions on Part VIII, lines 1c and 8a? *If "Yes," complete Schedule G, Part II* . . . . . . . . . . . | **18** | | No |
| 19 | Did the organization report more than $15,000 of gross income from gaming activities on Part VIII, line 9a? *If "Yes," complete Schedule G, Part III* . . . . . . . . . . . . . . . . | **19** | | No |

**JA373**

Case 1:19-cv-14760-ASB Document 489-92 Filed 06/15/18 Page 5 of 29 Entry ID: 63566

**Part IV** Checklist of Required Schedules *(continued)*

| | | | Yes | No |
|---|---|---|---|---|
| **20a** | Did the organization operate one or more hospital facilities? *If "Yes," complete Schedule H* . . . . | **20a** | | No |
| **b** | If "Yes" to line 20a, did the organization attach a copy of its audited financial statements to this return? | **20b** | | |
| **21** | Did the organization report more than $5,000 of grants or other assistance to any domestic organization or domestic government on Part IX, column (A), line 1? *If "Yes," complete Schedule I, Parts I and II* . . . . . . | **21** | | No |
| **22** | Did the organization report more than $5,000 of grants or other assistance to or for domestic individuals on Part IX, column (A), line 2? *If "Yes," complete Schedule I, Parts I and III* . . . . . . . . . . | **22** | | No |
| **23** | Did the organization answer "Yes" to Part VII, Section A, line 3, 4, or 5 about compensation of the organization's current and former officers, directors, trustees, key employees, and highest compensated employees? *If "Yes," complete Schedule J* . . . . . . . . . . . . . . . . . . . . . . | **23** | | No |
| **24a** | Did the organization have a tax-exempt bond issue with an outstanding principal amount of more than $100,000 as of the last day of the year, that was issued after December 31, 2002? *If "Yes," answer lines 24b through 24d and complete Schedule K If "No," go to line 25a* . . . . . . . . . . . . . . . | **24a** | | No |
| **b** | Did the organization invest any proceeds of tax-exempt bonds beyond a temporary period exception? . . . | **24b** | | |
| **c** | Did the organization maintain an escrow account other than a refunding escrow at any time during the year to defease any tax-exempt bonds? . . . . . . . . . . . . . . . . . . . | **24c** | | |
| **d** | Did the organization act as an "on behalf of" issuer for bonds outstanding at any time during the year? . . . | **24d** | | |
| **25a** | **Section 501(c)(3), 501(c)(4), and 501(c)(29) organizations.** Did the organization engage in an excess benefit transaction with a disqualified person during the year? *If "Yes," complete Schedule L, Part I* . . . . . . . . . . . . . . . . . | **25a** | | No |
| **b** | Is the organization aware that it engaged in an excess benefit transaction with a disqualified person in a prior year, and that the transaction has not been reported on any of the organization's prior Forms 990 or 990-EZ? *If "Yes," complete Schedule L, Part I* . . . . . . . . . . . . . . . . . | **25b** | | No |
| **26** | Did the organization report any amount on Part X, line 5, 6, or 22 for receivables from or payables to any current or former officers, directors, trustees, key employees, highest compensated employees, or disqualified persons? *If "Yes," complete Schedule L, Part II* . . . . . . . . . . . . . . . . | **26** | | No |
| **27** | Did the organization provide a grant or other assistance to an officer, director, trustee, key employee, substantial contributor or employee thereof, a grant selection committee member, or to a 35% controlled entity or family member of any of these persons? *If "Yes," complete Schedule L, Part III* . . . . . . . . . | **27** | | No |
| **28** | Was the organization a party to a business transaction with one of the following parties (see Schedule L, Part IV instructions for applicable filing thresholds, conditions, and exceptions) | | | |
| **a** | A current or former officer, director, trustee, or key employee? *If "Yes," complete Schedule L, Part IV* . . . . . . . . . . . . . . . . . . . . . . . | **28a** | | No |
| **b** | A family member of a current or former officer, director, trustee, or key employee? *If "Yes," complete Schedule L, Part IV* . . . . . . . . . . . . . . . . . . . . . . . | **28b** | | No |
| **c** | An entity of which a current or former officer, director, trustee, or key employee (or a family member thereof) was an officer, director, trustee, or direct or indirect owner? *If "Yes," complete Schedule L, Part IV* . . . . | **28c** | | No |
| **29** | Did the organization receive more than $25,000 in non-cash contributions? *If "Yes," complete Schedule M* . . | **29** | | No |
| **30** | Did the organization receive contributions of art, historical treasures, or other similar assets, or qualified conservation contributions? *If "Yes," complete Schedule M* . . . . . . . . . . . . . . | **30** | | No |
| **31** | Did the organization liquidate, terminate, or dissolve and cease operations? *If "Yes," complete Schedule N, Part I* . | **31** | | No |
| **32** | Did the organization sell, exchange, dispose of, or transfer more than 25% of its net assets? *If "Yes," complete Schedule N, Part II* . . . . . . . . . . . . . . . . | **32** | | No |
| **33** | Did the organization own 100% of an entity disregarded as separate from the organization under Regulations sections 301 7701-2 and 301 7701-3? *If "Yes," complete Schedule R, Part I* . . . . . . . . . | **33** | | No |
| **34** | Was the organization related to any tax-exempt or taxable entity? *If "Yes," complete Schedule R, Part II, III, or IV, and Part V, line 1* . . . . . . . . . . . . . . . . . . . . . . . | **34** | | No |
| **35a** | Did the organization have a controlled entity within the meaning of section 512(b)(13)? | **35a** | | No |
| **b** | If 'Yes' to line 35a, did the organization receive any payment from or engage in any transaction with a controlled entity within the meaning of section 512(b)(13)? *If "Yes," complete Schedule R, Part V, line 2* . . . . | **35b** | | No |
| **36** | **Section 501(c)(3) organizations.** Did the organization make any transfers to an exempt non-charitable related organization? *If "Yes," complete Schedule R, Part V, line 2* . . . . . . . . . . . . | **36** | | |
| **37** | Did the organization conduct more than 5% of its activities through an entity that is not a related organization and that is treated as a partnership for federal income tax purposes? *If "Yes," complete Schedule R, Part VI* | **37** | | No |
| **38** | Did the organization complete Schedule O and provide explanations in Schedule O for Part VI, lines 11b and 19? **Note.** All Form 990 filers are required to complete Schedule O . . . . . . . . . . . . | **38** | Yes | |

JA374

Case 2:20-cv-00176-ABJ   Document 41-12   Filed 06/15/18   Page 6 of 29

**Part V** Statements Regarding Other IRS Filings and Tax Compliance

Check if Schedule O contains a response or note to any line in this Part V . . . . . . . . . . ☐

| | | | | Yes | No |
|---|---|---|---|---|---|
| **1a** | Enter the number reported in Box 3 of Form 1096 Enter -0- if not applicable . . | **1a** | 0 | | |
| **b** | Enter the number of Forms W-2G included in line 1a *Enter -0-* if not applicable | **1b** | 0 | | |
| **c** | Did the organization comply with backup withholding rules for reportable payments to vendors and reportable gaming (gambling) winnings to prize winners? . . . . . . . . . . . | | | **1c** | | |
| **2a** | Enter the number of employees reported on Form W-3, Transmittal of Wage and Tax Statements, filed for the calendar year ending with or within the year covered by this return . . . . . . . . . . . . . . | **2a** | 0 | | | |
| **b** | If at least one is reported on line 2a, did the organization file all required federal employment tax returns? **Note.**If the sum of lines 1a and 2a is greater than 250, you may be required to e-file (see instructions) | | | **2b** | | |
| **3a** | Did the organization have unrelated business gross income of $1,000 or more during the year? . . . | | | **3a** | | No |
| **b** | If "Yes," has it filed a Form 990-T for this year?*If "No" to line 3b, provide an explanation in Schedule O* . . . | | | **3b** | | |
| **4a** | At any time during the calendar year, did the organization have an interest in, or a signature or other authority over, a financial account in a foreign country (such as a bank account, securities account, or other financial account)? . . . | | | **4a** | | No |
| **b** | If "Yes," enter the name of the foreign country ▶ See instructions for filing requirements for FinCEN Form 114, Report of Foreign Bank and Financial Accounts (FBAR) | | | | | |
| **5a** | Was the organization a party to a prohibited tax shelter transaction at any time during the tax year? . . | | | **5a** | | No |
| **b** | Did any taxable party notify the organization that it was or is a party to a prohibited tax shelter transaction? | | | **5b** | | No |
| **c** | If "Yes," to line 5a or 5b, did the organization file Form 8886-T? . . . . . . . . . . . | | | **5c** | | |
| **6a** | Does the organization have annual gross receipts that are normally greater than $100,000, and did the organization solicit any contributions that were not tax deductible as charitable contributions? . . . . | | | **6a** | | No |
| **b** | If "Yes," did the organization include with every solicitation an express statement that such contributions or gifts were not tax deductible? . . . . . . . . . . . . . . . . . | | | **6b** | | |
| **7** | **Organizations that may receive deductible contributions under section 170(c).** | | | | | |
| **a** | Did the organization receive a payment in excess of $75 made partly as a contribution and partly for goods and services provided to the payor? . . . . . . . . . . . . . . . . . | | | **7a** | | No |
| **b** | If "Yes," did the organization notify the donor of the value of the goods or services provided? . . . . . | | | **7b** | | |
| **c** | Did the organization sell, exchange, or otherwise dispose of tangible personal property for which it was required to file Form 8282? . . . . . . . . . . . . . . . . . . . | | | **7c** | | No |
| **d** | If "Yes," indicate the number of Forms 8282 filed during the year . . . . | **7d** | | | | |
| **e** | Did the organization receive any funds, directly or indirectly, to pay premiums on a personal benefit contract? | | | **7e** | | No |
| **f** | Did the organization, during the year, pay premiums, directly or indirectly, on a personal benefit contract? . . | | | **7f** | | No |
| **g** | If the organization received a contribution of qualified intellectual property, did the organization file Form 8899 as required? . . . . . . . . . . . . . . . . . . . . | | | **7g** | | |
| **h** | If the organization received a contribution of cars, boats, airplanes, or other vehicles, did the organization file a Form 1098-C? . . . . . . . . . . . . . . . . . . . . | | | **7h** | | |
| **8** | **Sponsoring organizations maintaining donor advised funds.** Did a donor advised fund maintained by the sponsoring organization have excess business holdings at any time during the year? . . . . . . . . . . . . . . . . . . . . | | | **8** | | No |
| **9a** | Did the sponsoring organization make any taxable distributions under section 4966? . . . . | | | **9a** | | |
| **b** | Did the sponsoring organization make a distribution to a donor, donor advisor, or related person? . . . | | | **9b** | | |
| **10** | **Section 501(c)(7) organizations.** Enter | | | | | |
| **a** | Initiation fees and capital contributions included on Part VIII, line 12 . . . | **10a** | | | | |
| **b** | Gross receipts, included on Form 990, Part VIII, line 12, for public use of club facilities | **10b** | | | | |
| **11** | **Section 501(c)(12) organizations.** Enter | | | | | |
| **a** | Gross income from members or shareholders . . . . . . . . | **11a** | | | | |
| **b** | Gross income from other sources (Do not net amounts due or paid to other sources against amounts due or received from them ) . . . . . . . . | **11b** | | | | |
| **12a** | **Section 4947(a)(1) non-exempt charitable trusts.** Is the organization filing Form 990 in lieu of Form 1041? | | | **12a** | | |
| **b** | If "Yes," enter the amount of tax-exempt interest received or accrued during the year | **12b** | | | | |
| **13** | **Section 501(c)(29) qualified nonprofit health insurance issuers.** | | | | | |
| **a** | Is the organization licensed to issue qualified health plans in more than one state?**Note.** See the instructions for additional information the organization must report on Schedule O | | | **13a** | | |
| **b** | Enter the amount of reserves the organization is required to maintain by the states in which the organization is licensed to issue qualified health plans . . . . . | **13b** | | | | |
| **c** | Enter the amount of reserves on hand . . . . . . . . . | **13c** | | | | |
| **14a** | Did the organization receive any payments for indoor tanning services during the tax year? . . . . . | | | **14a** | | No |
| **b** | If "Yes," has it filed a Form 720 to report these payments?*If "No," provide an explanation in Schedule O* . . | | | **14b** | | |

Form 990 (2016)

Case 4:20-cv-01143-O Document 1-1 Filed 10/15/18 Page 7 of 29

**Part VI** Governance, Management, and Disclosure *For each "Yes" response to lines 2 through 7b below, and for a "No" response to lines 8a, 8b, or 10b below, describe the circumstances, processes, or changes in Schedule O See instructions*

Check if Schedule O contains a response or note to any line in this Part VI . . . . . . . . . . . ☑

## Section A. Governing Body and Management

| | | | Yes | No |
|---|---|---|---|---|
| **1a** Enter the number of voting members of the governing body at the end of the tax year | **1a** | 5 | | |
| If there are material differences in voting rights among members of the governing body, or if the governing body delegated broad authority to an executive committee or similar committee, explain in Schedule O | | | | |
| **b** Enter the number of voting members included in line 1a, above, who are independent | **1b** | 4 | | |
| **2** Did any officer, director, trustee, or key employee have a family relationship or a business relationship with any other officer, director, trustee, or key employee? . . . . . . . . . . . | **2** | | Yes | |
| **3** Did the organization delegate control over management duties customarily performed by or under the direct supervision of officers, directors or trustees, or key employees to a management company or other person? . | **3** | | | No |
| **4** Did the organization make any significant changes to its governing documents since the prior Form 990 was filed? . . . . . . . . . . . . . . . . . . . . . . . . . . | **4** | | | No |
| **5** Did the organization become aware during the year of a significant diversion of the organization's assets? . | **5** | | | No |
| **6** Did the organization have members or stockholders? . . . . . . . . . . . . | **6** | | Yes | |
| **7a** Did the organization have members, stockholders, or other persons who had the power to elect or appoint one or more members of the governing body? . . . . . . . . . . . . . . . . . | **7a** | | Yes | |
| **b** Are any governance decisions of the organization reserved to (or subject to approval by) members, stockholders, or persons other than the governing body? . . . . . . . . . . . . . . . . | **7b** | | | No |
| **8** Did the organization contemporaneously document the meetings held or written actions undertaken during the year by the following | | | | |
| **a** The governing body? . . . . . . . . . . . . . . . . . . . . . | **8a** | | Yes | |
| **b** Each committee with authority to act on behalf of the governing body? . . . . . . . . . | **8b** | | Yes | |
| **9** Is there any officer, director, trustee, or key employee listed in Part VII, Section A, who cannot be reached at the organization's mailing address? *If "Yes," provide the names and addresses in Schedule O* . . . . . . | **9** | | | No |

## Section B. Policies (*This Section B requests information about policies not required by the Internal Revenue Code.*)

| | | Yes | No |
|---|---|---|---|
| **10a** Did the organization have local chapters, branches, or affiliates? . . . . . . . . . . . | **10a** | | No |
| **b** If "Yes," did the organization have written policies and procedures governing the activities of such chapters, affiliates, and branches to ensure their operations are consistent with the organization's exempt purposes? | **10b** | | |
| **11a** Has the organization provided a complete copy of this Form 990 to all members of its governing body before filing the form? . . . . . . . . . . . . . . . . . . . . . . . . . . | **11a** | Yes | |
| **b** Describe in Schedule O the process, if any, used by the organization to review this Form 990 . . . . . | | | |
| **12a** Did the organization have a written conflict of interest policy? *If "No," go to line 13* . . . . . . . | **12a** | Yes | |
| **b** Were officers, directors, or trustees, and key employees required to disclose annually interests that could give rise to conflicts? . . . . . . . . . . . . . . . . . . . . . . . . . . | **12b** | Yes | |
| **c** Did the organization regularly and consistently monitor and enforce compliance with the policy? *If "Yes," describe in Schedule O how this was done* . . . . . . . . . . . . . . . . . . . | **12c** | Yes | |
| **13** Did the organization have a written whistleblower policy? . . . . . . . . . . . . . | **13** | Yes | |
| **14** Did the organization have a written document retention and destruction policy? . . . . . . . . | **14** | Yes | |
| **15** Did the process for determining compensation of the following persons include a review and approval by independent persons, comparability data, and contemporaneous substantiation of the deliberation and decision? | | | |
| **a** The organization's CEO, Executive Director, or top management official . . . . . . . . . . | **15a** | Yes | |
| **b** Other officers or key employees of the organization . . . . . . . . . . . . . . | **15b** | | No |
| If "Yes" to line 15a or 15b, describe the process in Schedule O (see instructions) | | | |
| **16a** Did the organization invest in, contribute assets to, or participate in a joint venture or similar arrangement with a taxable entity during the year? . . . . . . . . . . . . . . . . . . . . | **16a** | | No |
| **b** If "Yes," did the organization follow a written policy or procedure requiring the organization to evaluate its participation in joint venture arrangements under applicable federal tax law, and take steps to safeguard the organization's exempt status with respect to such arrangements? . . . . . . . . . . . . . . . . | **16b** | | |

## Section C. Disclosure

**17** List the States with which a copy of this Form 990 is required to be filed▶

VA

**18** Section 6104 requires an organization to make its Form 1023 (or 1024 if applicable), 990, and 990-T (501(c)(3)s only) available for public inspection Indicate how you made these available Check all that apply

☐ Own website ☐ Another's website ☑ Upon request ☐ Other (explain in Schedule O)

**19** Describe in Schedule O whether (and if so, how) the organization made its governing documents, conflict of interest policy, and financial statements available to the public during the tax year

**20** State the name, address, and telephone number of the person who possesses the organization's books and records
▶RICHARD FISHER  922 Bent Creek  Richmond, TX 77406 (281) 342-1932

Form **990** (2016)

Case 1:20-cv-04160-JGK-OTW Document 415-92 Filed 08/13/18 Page 8 of 29. ID: 63566

**Part VII** **Compensation of Officers, Directors, Trustees, Key Employees, Highest Compensated Employees, and Independent Contractors**

Check if Schedule O contains a response or note to any line in this Part VII . . . . . . . . . . . . . . ☐

## Section A. Officers, Directors, Trustees, Key Employees, and Highest Compensated Employees

**1a** Complete this table for all persons required to be listed Report compensation for the calendar year ending with or within the organization's tax year

 ● List all of the organization's **current** officers, directors, trustees (whether individuals or organizations), regardless of amount of compensation Enter -0- in columns (D), (E), and (F) if no compensation was paid

 ● List all of the organization's **current** key employees, if any See instructions for definition of "key employee "

 ● List the organization's five **current** highest compensated employees (other than an officer, director, trustee or key employee) who received reportable compensation (Box 5 of Form W-2 and/or Box 7 of Form 1099-MISC) of more than $100,000 from the organization and any related organizations

 ● List all of the organization's **former** officers, key employees, or highest compensated employees who received more than $100,000 of reportable compensation from the organization and any related organizations

 ● List all of the organization's **former directors or trustees** that received, in the capacity as a former director or trustee of the organization, more than $10,000 of reportable compensation from the organization and any related organizations

List persons in the following order  individual trustees or directors, institutional trustees, officers, key employees, highest compensated employees, and former such persons

☐ Check this box if neither the organization nor any related organization compensated any current officer, director, or trustee

| (A)<br>Name and Title | (B)<br>Average hours per week (list any hours for related organizations below dotted line) | (C)<br>Position (do not check more than one box, unless person is both an officer and a director/trustee) | | | | | | (D)<br>Reportable compensation from the organization (W- 2/1099-MISC) | (E)<br>Reportable compensation from related organizations (W- 2/1099-MISC) | (F)<br>Estimated amount of other compensation from the organization and related organizations |
|---|---|---|---|---|---|---|---|---|---|---|
| | | Individual trustee or director | Institutional Trustee | Officer | Key employee | Highest compensated employee | Former | | | |
| (1) EDWARD J BLUM<br>................<br>President | 15 00 | X | | X | | X | | 48,000 | 0 | 0 |
| (2) RICHARD FISHER<br>................<br>Treasurer | 1 00 | X | | X | | | | 0 | 0 | 0 |
| (3) ABIGAIL FISHER<br>................<br>Secretary | 1 00 | X | | X | | | | 0 | 0 | 0 |
| (4) ED CHEN<br>................<br>Director | 1 00 | X | | | | | | 0 | 0 | 0 |
| (5) JOE ZHOU<br>................<br>Director | 1 00 | X | | | | | | 0 | 0 | 0 |
| | | | | | | | | | | |
| | | | | | | | | | | |
| | | | | | | | | | | |
| | | | | | | | | | | |
| | | | | | | | | | | |
| | | | | | | | | | | |
| | | | | | | | | | | |
| | | | | | | | | | | |

JA377

Case 1:14-cv-14176-ADB Document 419-92 Filed 06/15/18 Page 9 of 29

**Part VII** Section A. Officers, Directors, Trustees, Key Employees, and Highest Compensated Employees (continued)

| (A)<br>Name and Title | (B)<br>Average<br>hours per<br>week (list<br>any hours<br>for related<br>organizations<br>below dotted<br>line) | (C)<br>Position (do not check more<br>than one box, unless person<br>is both an officer and a<br>director/trustee) | | | | | | (D)<br>Reportable<br>compensation<br>from the<br>organization (W-<br>2/1099-MISC) | (E)<br>Reportable<br>compensation<br>from related<br>organizations (W-<br>2/1099-MISC) | (F)<br>Estimated<br>amount of other<br>compensation<br>from the<br>organization and<br>related<br>organizations |
|---|---|---|---|---|---|---|---|---|---|---|
| | | Individual trustee or director | Institutional Trustee | Officer | Key employee | Highest compensated employee | Former | | | |
| | | | | | | | | | | |
| | | | | | | | | | | |
| | | | | | | | | | | |
| | | | | | | | | | | |
| | | | | | | | | | | |
| | | | | | | | | | | |
| | | | | | | | | | | |
| | | | | | | | | | | |
| | | | | | | | | | | |
| | | | | | | | | | | |
| **1b Sub-Total** . . . . . . . . . . . ▶ | | | | | | | | | | |
| **c** Total from continuation sheets to Part VII, Section A . . . . ▶ | | | | | | | | | | |
| **d** Total (add lines 1b and 1c) . . . . . . . . . . ▶ | | | | | | | | 48,000 | | |

**2** Total number of individuals (including but not limited to those listed above) who received more than $100,000 of reportable compensation from the organization ▶ 0

| | | | Yes | No |
|---|---|---|---|---|
| **3** | Did the organization list any *former* officer, director or trustee, key employee, or highest compensated employee on line 1a? *If "Yes," complete Schedule J for such individual* . . . . . . . . . . . . . . . | **3** | | No |
| **4** | For any individual listed on line 1a, is the sum of reportable compensation and other compensation from the organization and related organizations greater than $150,000? *If "Yes," complete Schedule J for such individual* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | **4** | | No |
| **5** | Did any person listed on line 1a receive or accrue compensation from any unrelated organization or individual for services rendered to the organization? *If "Yes," complete Schedule J for such person* . . . . . . . . | **5** | | No |

### Section B. Independent Contractors

**1** Complete this table for your five highest compensated independent contractors that received more than $100,000 of compensation from the organization Report compensation for the calendar year ending with or within the organization's tax year

| (A)<br>Name and business address | (B)<br>Description of services | (C)<br>Compensation |
|---|---|---|
| Consovoy McCarthy PLLC<br><br>3033 Wilson Blvd Suite 700<br>Arlington, VA 22201 | Legal and etc | 1,028,738 |
| Burns & Levinson<br><br>125 Summer St<br>Boston, MA 02110 | Legal and etc | 103,860 |
| | | |
| | | |
| | | |

**JA378**

**2** Total number of independent contractors (including but not limited to those listed above) who received more than $100,000 of compensation from the organization ▶ 2

Form **990** (2016)

Case 1:14-cv-14176-ADB   Document 419-92   Filed 06/15/18   Page 10 of 29

**Part VIII**   Statement of Revenue

Check if Schedule O contains a response or note to any line in this Part VIII . . . . . . . . . . . . . □

| | | | **(A)** Total revenue | **(B)** Related or exempt function revenue | **(C)** Unrelated business revenue | **(D)** Revenue excluded from tax under sections 512-514 |
|---|---|---|---|---|---|---|
| **Contributions, Gifts, Grants and Other Similar Amounts** | **1a** Federated campaigns . . | **1a** | | | | |
| | **b** Membership dues . . | **1b** | 300 | | | |
| | **c** Fundraising events . . | **1c** | | | | |
| | **d** Related organizations | **1d** | | | | |
| | **e** Government grants (contributions) | **1e** | | | | |
| | **f** All other contributions, gifts, grants, and similar amounts not included above | **1f** | 1,106,722 | | | |
| | **g** Noncash contributions included in lines 1a-1f $ _____ | | | | | |
| | **h Total.** Add lines 1a-1f . . . . . . . ▶ | | 1,107,022 | | | |

| | | | Business Code | | | | |
|---|---|---|---|---|---|---|---|
| **Program Service Revenue** | **2a** _____ | | | | | | |
| | **b** _____ | | | | | | |
| | **c** _____ | | | | | | |
| | **d** _____ | | | | | | |
| | **e** _____ | | | | | | |
| | **f** All other program service revenue | | | | | | |
| | **g Total.** Add lines 2a-2f . . . . ▶ | | | | | | |

| | | | | | |
|---|---|---|---|---|---|
| **Other Revenue** | **3** Investment income (including dividends, interest, and other similar amounts) . . . . . . ▶ | | | | |
| | **4** Income from investment of tax-exempt bond proceeds ▶ | | | | |
| | **5** Royalties . . . . . . . . ▶ | | | | |

| | | **(i)** Real | **(ii)** Personal | | | | |
|---|---|---|---|---|---|---|---|
| | **6a** Gross rents | | | | | | |
| | **b** Less rental expenses | | | | | | |
| | **c** Rental income or (loss) | | | | | | |
| | **d** Net rental income or (loss) . . . . . . . ▶ | | | | | | |

| | | **(i)** Securities | **(ii)** Other | | | | |
|---|---|---|---|---|---|---|---|
| | **7a** Gross amount from sales of assets other than inventory | | | | | | |
| | **b** Less cost or other basis and sales expenses | | | | | | |
| | **c** Gain or (loss) | | | | | | |
| | **d** Net gain or (loss) . . . . . . ▶ | | | | | | |

| | | | | | |
|---|---|---|---|---|---|
| | **8a** Gross income from fundraising events (not including $ _____ of contributions reported on line 1c) See Part IV, line 18 . . . . . a | | | | |
| | **b** Less direct expenses . . . b | | | | |
| | **c** Net income or (loss) from fundraising events . . ▶ | | | | |
| | **9a** Gross income from gaming activities See Part IV, line 19 . . . . a | | | | |
| | **b** Less direct expenses . . . b | | | | |
| | **c** Net income or (loss) from gaming activities . . ▶ | | | | |
| | **10a** Gross sales of inventory, less returns and allowances . . a | | | | |
| | **b** Less cost of goods sold . . b | | | | |
| | **c** Net income or (loss) from sales of inventory . . ▶ | | | | |

| Miscellaneous Revenue | | Business Code | | | | |
|---|---|---|---|---|---|---|
| **11a** _____ | | | | | | |
| **b** _____ | | | | | | |
| **c** _____ | | | | | | |
| **d** All other revenue . . . . . | | | | | | |
| **e Total.** Add lines 11a–11d . . . . . ▶ | | | | | | |
| **12 Total revenue.** See instructions . . . . . ▶ | | | 1,107,022 | | | |

**JA379**

Case 2:15-cv-02440-JAD-VCF Document 410-92 Filed 06/30/2020 Page 11 of 29 Entry ID: 63566

**Part IX** Statement of Functional Expenses

Section 501(c)(3) and 501(c)(4) organizations must complete all columns All other organizations must complete column (A).

Check if Schedule O contains a response or note to any line in this Part IX . . . . . . . . . . . . . . ☐

| Do not include amounts reported on lines 6b, 7b, 8b, 9b, and 10b of Part VIII. | **(A)** Total expenses | **(B)** Program service expenses | **(C)** Management and general expenses | **(D)** Fundraising expenses |
|---|---|---|---|---|
| **1** Grants and other assistance to domestic organizations and domestic governments See Part IV, line 21 | | | | |
| **2** Grants and other assistance to domestic individuals See Part IV, line 22 | | | | |
| **3** Grants and other assistance to foreign organizations, foreign governments, and foreign individuals See Part IV, line 15 and 16 | | | | |
| **4** Benefits paid to or for members | | | | |
| **5** Compensation of current officers, directors, trustees, and key employees . . . . | 48,000 | 0 | 24,000 | 24,000 |
| **6** Compensation not included above, to disqualified persons (as defined under section 4958(f)(1)) and persons described in section 4958(c)(3)(B) . . . . | | | | |
| **7** Other salaries and wages | | | | |
| **8** Pension plan accruals and contributions (include section 401(k) and 403(b) employer contributions) . . . . | | | | |
| **9** Other employee benefits . . . . . . . | | | | |
| **10** Payroll taxes . . . . . . . . | | | | |
| **11** Fees for services (non-employees) | | | | |
| **a** Management . . . . . . . | | | | |
| **b** Legal . . . . . . . . | 1,171,512 | 1,171,512 | 0 | 0 |
| **c** Accounting . . . . . . . | | | | |
| **d** Lobbying . . . . . . . . . . | | | | |
| **e** Professional fundraising services See Part IV, line 17 | | | | |
| **f** Investment management fees . . . . | | | | |
| **g** Other (If line 11g amount exceeds 10% of line 25, column (A) amount, list line 11g expenses on Schedule O) | | | | |
| **12** Advertising and promotion . . . . | | | | |
| **13** Office expenses . . . . . . . | 1,557 | 0 | 1,557 | 0 |
| **14** Information technology . . . . . . | 16,574 | 16,574 | 0 | 0 |
| **15** Royalties . . | | | | |
| **16** Occupancy . . . . . . | | | | |
| **17** Travel . . . . . . . . | 12,267 | 0 | 0 | 12,267 |
| **18** Payments of travel or entertainment expenses for any federal, state, or local public officials . | | | | |
| **19** Conferences, conventions, and meetings . . . . | 12,268 | 0 | 0 | 12,268 |
| **20** Interest . . . . . . . . | | | | |
| **21** Payments to affiliates . . . . . . | | | | |
| **22** Depreciation, depletion, and amortization . . | | | | |
| **23** Insurance . . . . | | | | |
| **24** Other expenses Itemize expenses not covered above (List miscellaneous expenses in line 24e If line 24e amount exceeds 10% of line 25, column (A) amount, list line 24e expenses on Schedule O ) | | | | |
| **a** | | | | |
| **b** | | | | |
| **c** | | | | |
| **d** | | | | |
| **e** All other expenses | | | | |
| **25** **Total functional expenses.** Add lines 1 through 24e | 1,262,178 | 1,188,086 | 25,557 | 48,535 |
| **26** **Joint costs.** Complete this line only if the organization reported in column (B) joint costs from a combined educational campaign and fundraising solicitation Check here ▶ ☐ if following SOP 98-2 (ASC 958-720) | **JA380** | | | |

Case 1:14-cv-14176-ADB Document 419-92 Filed 06/15/18 Page 12 of 29

**Part X** Balance Sheet

Check if Schedule O contains a response or note to any line in this Part IX . . . . . . . . . . . □

| | | | | (A) Beginning of year | | (B) End of year |
|---|---|---|---|---|---|---|
| **Assets** | 1 | Cash—non-interest-bearing . . . . . . . . | 281,088 | **1** | | 125,932 |
| | 2 | Savings and temporary cash investments . . . . . . . . . | | **2** | | |
| | 3 | Pledges and grants receivable, net . . . . . . . | | **3** | | |
| | 4 | Accounts receivable, net . . . . . . . . | | **4** | | |
| | 5 | Loans and other receivables from current and former officers, directors, trustees, key employees, and highest compensated employees Complete Part II of Schedule L | | **5** | | |
| | 6 | Loans and other receivables from other disqualified persons (as defined under section 4958(f)(1)), persons described in section 4958(c)(3)(B), and contributing employers and sponsoring organizations of section 501(c)(9) voluntary employees' beneficiary organizations (see instructions) Complete Part II of Schedule L | | **6** | | |
| | 7 | Notes and loans receivable, net . . . . . | | **7** | | |
| | 8 | Inventories for sale or use . . . . . . | | **8** | | |
| | 9 | Prepaid expenses and deferred charges . . . . . . . | | **9** | | |
| | 10a | Land, buildings, and equipment cost or other basis Complete Part VI of Schedule D **10a** | | | | |
| | b | Less accumulated depreciation **10b** | | **10c** | | |
| | 11 | Investments—publicly traded securities . | | **11** | | |
| | 12 | Investments—other securities See Part IV, line 11 . . . . . | | **12** | | |
| | 13 | Investments—program-related See Part IV, line 11 . . | | **13** | | |
| | 14 | Intangible assets . . . . . . . . . | | **14** | | |
| | 15 | Other assets See Part IV, line 11 . . . . . . . . | | **15** | | |
| | 16 | **Total assets.** Add lines 1 through 15 (must equal line 34) . . . | 281,088 | **16** | | 125,932 |
| **Liabilities** | 17 | Accounts payable and accrued expenses . . . . . . | | **17** | | |
| | 18 | Grants payable . . . . . | | **18** | | |
| | 19 | Deferred revenue . . . . . . . | | **19** | | |
| | 20 | Tax-exempt bond liabilities . . . . . . . | | **20** | | |
| | 21 | Escrow or custodial account liability Complete Part IV of Schedule D | | **21** | | |
| | 22 | Loans and other payables to current and former officers, directors, trustees, key employees, highest compensated employees, and disqualified persons Complete Part II of Schedule L . . . | | **22** | | |
| | 23 | Secured mortgages and notes payable to unrelated third parties . . | | **23** | | |
| | 24 | Unsecured notes and loans payable to unrelated third parties . . | | **24** | | |
| | 25 | Other liabilities (including federal income tax, payables to related third parties, and other liabilities not included on lines 17-24) Complete Part X of Schedule D | | **25** | | |
| | 26 | **Total liabilities.** Add lines 17 through 25 . . . | 0 | **26** | | 0 |
| **Net Assets or Fund Balances** | | **Organizations that follow SFAS 117 (ASC 958), check here ▶ ☑ and complete lines 27 through 29, and lines 33 and 34.** | | | | |
| | 27 | Unrestricted net assets | 281,088 | **27** | | 125,932 |
| | 28 | Temporarily restricted net assets . . . . . . . . | | **28** | | |
| | 29 | Permanently restricted net assets . . . . . . . | | **29** | | |
| | | **Organizations that do not follow SFAS 117 (ASC 958), check here ▶ □ and complete lines 30 through 34.** | | | | |
| | 30 | Capital stock or trust principal, or current funds . . . . . | | **30** | | |
| | 31 | Paid-in or capital surplus, or land, building or equipment fund . . . | | **31** | | |
| | 32 | Retained earnings, endowment, accumulated income, or other funds | | **32** | | |
| | 33 | Total net assets or fund balances . . . . . . . | 281,088 | **33** | | 125,932 |
| | 34 | Total liabilities and net assets/fund balances . . . . . | 281,088 | **34** | | 125,932 |

JA381

**Part XI** Reconciliation of Net Assets

Check if Schedule O contains a response or note to any line in this Part XI . . . . . . . . . . □

| | | |
|---|---|---|
| 1 | Total revenue (must equal Part VIII, column (A), line 12) . . . . . . . . . . **1** | 1,107,022 |
| 2 | Total expenses (must equal Part IX, column (A), line 25) . . . . . . . . . . **2** | 1,262,178 |
| 3 | Revenue less expenses  Subtract line 2 from line 1 . . . . . . . . . . **3** | -155,156 |
| 4 | Net assets or fund balances at beginning of year (must equal Part X, line 33, column (A)) . **4** | 281,088 |
| 5 | Net unrealized gains (losses) on investments . . . . . . . . . . . **5** | |
| 6 | Donated services and use of facilities . . . . . . . . . . . **6** | |
| 7 | Investment expenses . . . . . . . . . . . . . **7** | |
| 8 | Prior period adjustments . . . . . . . . . . . . **8** | |
| 9 | Other changes in net assets or fund balances (explain in Schedule O) . . . . **9** | |
| 10 | Net assets or fund balances at end of year  Combine lines 3 through 9 (must equal Part X, line 33, column (B)) **10** | 125,932 |

**Part XII** Financial Statements and Reporting

Check if Schedule O contains a response or note to any line in this Part XII . . . . . . . . . . □

| | | Yes | No |
|---|---|---|---|
| 1 | Accounting method used to prepare the Form 990 □ Cash ☑ Accrual □ Other _____ If the organization changed its method of accounting from a prior year or checked "Other," explain in Schedule O | | |
| 2a | Were the organization's financial statements compiled or reviewed by an independent accountant? | **2a** | No |
| | If "Yes," check a box below to indicate whether the financial statements for the year were compiled or reviewed on a separate basis, consolidated basis, or both | | |
| | □ Separate basis  □ Consolidated basis  □ Both consolidated and separate basis | | |
| b | Were the organization's financial statements audited by an independent accountant? | **2b** | No |
| | If "Yes," check a box below to indicate whether the financial statements for the year were audited on a separate basis, consolidated basis, or both | | |
| | □ Separate basis  □ Consolidated basis  □ Both consolidated and separate basis | | |
| c | If "Yes," to line 2a or 2b, does the organization have a committee that assumes responsibility for oversight of the audit, review, or compilation of its financial statements and selection of an independent accountant? | **2c** | |
| | If the organization changed either its oversight process or selection process during the tax year, explain in Schedule O | | |
| 3a | As a result of a federal award, was the organization required to undergo an audit or audits as set forth in the Single Audit Act and OMB Circular A-133? | **3a** | No |
| b | If "Yes," did the organization undergo the required audit or audits? If the organization did not undergo the required audit or audits, explain why in Schedule O and describe any steps taken to undergo such audits | **3b** | |

JA382

**Additional Data**

Case: 19-2005 Document: 114-7 Page: 395 Date Filed: 06/18/2021 Entry ID: 63566

**Software ID:** 16000371

**Software Version:**

**EIN:** 47-1689810

**Name:** Students For Fair Admissions Inc

**JA383**

## Form 990, Part III, Line 4a:

CORPORATION LITIGATED TWO LAWSUITS IN FEDERAL DISTRICT COURT AGAINST HARVARD UNIVERSITY AND THE UNIVERSITY OF NORTH CAROLINA AT CHAPEL HILL, ALLEGING THAT THESE UNIVERSITIES ARE VIOLATING THE FOURTEENTH AMENDMENT AND TITLE VI OF THE CIVIL RIGHTS ACT OF 1964 BY ENGAGING IN RACIAL DISCRIMINATION IN THEIR ADMISSIONS PROCESSES

| **SCHEDULE A** | **Public Charity Status and Public Support** | **2016** |
|---|---|---|
| (Form 990 or 990EZ) | Complete if the organization is a section 501(c)(3) organization or a section 4947(a)(1) nonexempt charitable trust. | |

▶ **Attach to Form 990 or Form 990-EZ.**
▶ **Information about Schedule A (Form 990 or 990-EZ) and its instructions is at**
*www.irs.gov/form990.*

Department of the Treasury
Internal Revenue Service

**Open to Public Inspection**

| **Name of the organization** | **Employer identification number** |
|---|---|
| Students For Fair Admissions Inc | 47-1689810 |

| **Part I** | **Reason for Public Charity Status** (All organizations must complete this part.) See instructions. |
|---|---|

The organization is not a private foundation because it is (For lines 1 through 12, check only one box )

1 ☐ A church, convention of churches, or association of churches described in **section 170(b)(1)(A)(i).**

2 ☐ A school described in **section 170(b)(1)(A)(ii).** (Attach Schedule E (Form 990 or 990-EZ))

3 ☐ A hospital or a cooperative hospital service organization described in **section 170(b)(1)(A)(iii).**

4 ☐ A medical research organization operated in conjunction with a hospital described in **section 170(b)(1)(A)(iii).** Enter the hospital's name, city, and state

5 ☐ An organization operated for the benefit of a college or university owned or operated by a governmental unit described in **section 170 (b)(1)(A)(iv).** (Complete Part II )

6 ☐ A federal, state, or local government or governmental unit described in **section 170(b)(1)(A)(v).**

7 ☐ An organization that normally receives a substantial part of its support from a governmental unit or from the general public described in **section 170(b)(1)(A)(vi).** (Complete Part II )

8 ☐ A community trust described in **section 170(b)(1)(A)(vi)** (Complete Part II )

9 ☐ An agricultural research organization described in **170(b)(1)(A)(ix)** operated in conjunction with a land-grant college or university or a non-land grant college of agriculture See instructions Enter the name, city, and state of the college or university

10 ☑ An organization that normally receives (1) more than 33⅓% of its support from contributions, membership fees, and gross receipts from activities related to its exempt functions—subject to certain exceptions, and (2) no more than 33⅓% of its support from gross investment income and unrelated business taxable income (less section 511 tax) from businesses acquired by the organization after June 30, 1975 See **section 509(a)(2).** (Complete Part III )

11 ☐ An organization organized and operated exclusively to test for public safety See **section 509(a)(4).**

12 ☐ An organization organized and operated exclusively for the benefit of, to perform the functions of, or to carry out the purposes of one or more publicly supported organizations described in **section 509(a)(1)** or **section 509(a)(2).** See **section 509(a)(3).** Check the box in lines 12a through 12d that describes the type of supporting organization and complete lines 12e, 12f, and 12g

a ☐ **Type I.** A supporting organization operated, supervised, or controlled by its supported organization(s), typically by giving the supported organization(s) the power to regularly appoint or elect a majority of the directors or trustees of the supporting organization **You must complete Part IV, Sections A and B.**

b ☐ **Type II.** A supporting organization supervised or controlled in connection with its supported organization(s), by having control or management of the supporting organization vested in the same persons that control or manage the supported organization(s) **You must complete Part IV, Sections A and C.**

c ☐ **Type III functionally integrated.** A supporting organization operated in connection with, and functionally integrated with, its supported organization(s) (see instructions) **You must complete Part IV, Sections A, D, and E.**

d ☐ **Type III non-functionally integrated.** A supporting organization operated in connection with its supported organization(s) that is not functionally integrated The organization generally must satisfy a distribution requirement and an attentiveness requirement (see instructions) **You must complete Part IV, Sections A and D, and Part V.**

e ☐ Check this box if the organization received a written determination from the IRS that it is a Type I, Type II, Type III functionally integrated, or Type III non-functionally integrated supporting organization

f Enter the number of supported organizations

g Provide the following information about the supported organization(s)

| (i)Name of supported organization | (ii)EIN | (iii) Type of organization (described on lines 1- 10 above (see instructions)) | (iv) Is the organization listed in your governing document? | | (v) Amount of monetary support (see instructions) | (vi) Amount of other support (see instructions) |
|---|---|---|---|---|---|---|
| | | | **Yes** | **No** | | |
| | | | | | | |
| **Total** | | | | | | |

**JA384**

| For Paperwork Reduction Act Notice, see the Instructions for Form 990 or 990-EZ. | Cat No 11285F | Schedule A (Form 990 or 990-EZ) 2016 |
|---|---|---|

Case 1:14-cv-14176-ADB Document 415-92 Filed 06/15/18 Page 19 of 29

**Part II** Support Schedule for Organizations Described in Sections 170(b)(1)(A)(iv) and 170(b)(1)(A)(vi)
(Complete only if you checked the box on line 5, 7, 8, or 9 of Part I or if the organization failed to qualify under Part III. If the organization fails to qualify under the tests listed below, please complete Part III.)

## Section A. Public Support

| Calendar year<br>(or fiscal year beginning in) ▶ | **(a)**2012 | **(b)**2013 | **(c)**2014 | **(d)**2015 | **(e)**2016 | **(f)**Total |
|---|---|---|---|---|---|---|
| **1** Gifts, grants, contributions, and membership fees received (Do not include any "unusual grant ") | | | | | | |
| **2** Tax revenues levied for the organization's benefit and either paid to or expended on its behalf | | | | | | |
| **3** The value of services or facilities furnished by a governmental unit to the organization without charge | | | | | | |
| **4** **Total.** Add lines 1 through 3 | | | | | | |
| **5** The portion of total contributions by each person (other than a governmental unit or publicly supported organization) included on line 1 that exceeds 2% of the amount shown on line 11, column (f) | | | | | | |
| **6** **Public support.** Subtract line 5 from line 4 | | | | | | 0 |

## Section B. Total Support

| Calendar year<br>(or fiscal year beginning in) ▶ | **(a)**2012 | **(b)**2013 | **(c)**2014 | **(d)**2015 | **(e)**2016 | **(f)**Total |
|---|---|---|---|---|---|---|
| **7** Amounts from line 4 | | | | | | |
| **8** Gross income from interest, dividends, payments received on securities loans, rents, royalties and income from similar sources | | | | | | 0 |
| **9** Net income from unrelated business activities, whether or not the business is regularly carried on | | | | | | |
| **10** Other income Do not include gain or loss from the sale of capital assets (Explain in Part VI ) | | | | | | |
| **11** **Total support.** Add lines 7 through 10 | | | | | | |

| | | |
|---|---|---|
| **12** Gross receipts from related activities, etc (see instructions) | **12** | |

**13** **First five years.** If the Form 990 is for the organization's first, second, third, fourth, or fifth tax year as a section 501(c)(3) organization, check this box and **stop here** . . . . . . . . . . . . . . . . . . . . . . . . . . . . ▶ ☐

## Section C. Computation of Public Support Percentage

| | | |
|---|---|---|
| **14** Public support percentage for 2016 (line 6, column (f) divided by line 11, column (f)) | **14** | 0 % |
| **15** Public support percentage for 2015 Schedule A, Part II, line 14 | **15** | |

**16a** **33 1/3% support test—2016.** If the organization did not check the box on line 13, and line 14 is 33 1/3% or more, check this box and **stop here.** The organization qualifies as a publicly supported organization ▶ ☐

  **b** **33 1/3% support test—2015.** If the organization did not check a box on line 13 or 16a, and line 15 is 33 1/3% or more, check this box and **stop here.** The organization qualifies as a publicly supported organization ▶ ☐

**17a** **10%-facts-and-circumstances test—2016.** If the organization did not check a box on line 13, 16a, or 16b, and line 14 is 10% or more, and if the organization meets the "facts-and-circumstances" test, check this box and **stop here.** Explain in Part VI how the organization meets the "facts-and-circumstances" test The organization qualifies as a publicly supported organization ▶ ☐

  **b** **10%-facts-and-circumstances test—2015.** If the organization did not check a box on line 13, 16a, 16b, or 17a, and line 15 is 10% or more, and if the organization meets the "facts-and-circumstances" test, check this box and **stop here.** Explain in Part VI how the organization meets the "facts-and-circumstances" test The organization qualifies as a publicly supported organization ▶ ☐

**18** **Private foundation.** If the organization did not check a box on line 13, 16a, 16b, 17a, or 17b, check this box and see instructions ▶ ☐

**JA385**

aser 1 2015 Deschedule 0071 7657210 - Paregul05 2 - date fuled 06/15/18 30 Page 17 of 20 ID: 635661

**Part III**   **Support Schedule for Organizations Described in Section 509(a)(2)**
(Complete only if you checked the box on line 10 of Part I or if the organization failed to qualify under Part II. If the organization fails to qualify under the tests listed below, please complete Part II.)

## Section A. Public Support

| Calendar year<br>(or fiscal year beginning in) ▶ | (a)2012 | (b)2013 | (c)2014 | (d)2015 | (e)2016 | (f)Total |
|---|---|---|---|---|---|---|
| **1** Gifts, grants, contributions, and membership fees received (Do not include any "unusual grants ") | | | | 826,234 | 1,107,022 | 1,933,256 |
| **2** Gross receipts from admissions, merchandise sold or services performed, or facilities furnished in any activity that is related to the organization's tax-exempt purpose | | | | | | |
| **3** Gross receipts from activities that are not an unrelated trade or business under section 513 | | | | | | |
| **4** Tax revenues levied for the organization's benefit and either paid to or expended on its behalf | | | | | | |
| **5** The value of services or facilities furnished by a governmental unit to the organization without charge | | | | | | |
| **6** **Total.** Add lines 1 through 5 | | | | 826,234 | 1,107,022 | 1,933,256 |
| **7a** Amounts included on lines 1, 2, and 3 received from disqualified persons | | | | | | |
| **b** Amounts included on lines 2 and 3 received from other than disqualified persons that exceed the greater of $5,000 or 1% of the amount on line 13 for the year | | | | | | |
| **c** Add lines 7a and 7b | | | | | | |
| **8** **Public support.** (Subtract line 7c from line 6 ) | | | | | | 1,933,256 |

## Section B. Total Support

| Calendar year<br>(or fiscal year beginning in) ▶ | (a)2012 | (b)2013 | (c)2014 | (d)2015 | (e)2016 | (f)Total |
|---|---|---|---|---|---|---|
| **9** Amounts from line 6 | | | | 826,234 | 1,107,022 | 1,933,256 |
| **10a** Gross income from interest, dividends, payments received on securities loans, rents, royalties and income from similar sources | | | | | | |
| **b** Unrelated business taxable income (less section 511 taxes) from businesses acquired after June 30, 1975 | | | | | | |
| **c** Add lines 10a and 10b | | | | | | |
| **11** Net income from unrelated business activities not included in line 10b, whether or not the business is regularly carried on | | | | | | |
| **12** Other income Do not include gain or loss from the sale of capital assets (Explain in Part VI ) | | | | | | |
| **13** **Total support.** (Add lines 9, 10c, 11, and 12 ) | | | | | | 1,933,256 |

**14**   **First five years.** If the Form 990 is for the organization's first, second, third, fourth, or fifth tax year as a section 501(c)(3) organization,
check this box and **stop here**         ▶ ☑

## Section C. Computation of Public Support Percentage

| | | | |
|---|---|---|---|
| **15** Public support percentage for 2016 (line 8, column (f) divided by line 13, column (f)) | **15** | 0 % |
| **16** Public support percentage from 2015 Schedule A, Part III, line 15 | **16** | |

## Section D. Computation of Investment Income Percentage

| | | | |
|---|---|---|---|
| **17** Investment income percentage for **2016** (line 10c, column (f) divided by line 13, column (f)) | **17** | 0 % |
| **18** Investment income percentage from **2015** Schedule A, Part III, line 17 | **18** | |

**19a** **331/3% support tests—2016.** If the organization did not check the box on line 14, and line 15 is more than 33 1/3%, and line 17 is not
more than 33 1/3%, check this box and **stop here.** The organization qualifies as a publicly supported organization     ▶ ☐

**b** **33 1/3% support tests—2015.** If the organization did not check a box on line 14 or line 19a, and line 16 is more than 33 1/3% and line 18 is
not more than 33 1/3%, check this box and **stop here.** The organization qualifies as a publicly supported organization     ▶ ☐

**20**   **Private foundation.** If the organization did not check a box on line 14, 19a, or 19b, check this box and see instructions     ▶ ☐

JA386

Case 1:14-cv-14176-ADB   Document 419-92   Filed 06/15/18   Page 18 of 29

**Part IV** Supporting Organizations *(continued)*

(Complete only if you checked a box on line 12 of Part I  If you checked 12a of Part I, complete Sections A and B  If you checked 12b of Part I, complete Sections A and C  If you checked 12c of Part I, complete Sections A, D, and E  If you checked 12d of Part I, complete Sections A and D, and complete Part V )

### Section A. All Supporting Organizations

| | | | Yes | No |
|---|---|---|---|---|
| **1** | Are all of the organization's supported organizations listed by name in the organization's governing documents? *If "No," describe in **Part VI** how the supported organizations are designated  If designated by class or purpose, describe the designation  If historic and continuing relationship, explain* | **1** | | |
| **2** | Did the organization have any supported organization that does not have an IRS determination of status under section 509 (a)(1) or (2)? *If "Yes," explain in **Part VI** how the organization determined that the supported organization was described in section 509(a)(1) or (2)* | **2** | | |
| **3a** | Did the organization have a supported organization described in section 501(c)(4), (5), or (6)? *If "Yes," answer (b) and (c) below* | **3a** | | |
| **b** | Did the organization confirm that each supported organization qualified under section 501(c)(4), (5), or (6) and satisfied the public support tests under section 509(a)(2)? *If "Yes," describe in **Part VI** when and how the organization made the determination* | **3b** | | |
| **c** | Did the organization ensure that all support to such organizations was used exclusively for section 170(c)(2)(B) purposes? *If "Yes," explain in **Part VI** what controls the organization put in place to ensure such use* | **3c** | | |
| **4a** | Was any supported organization not organized in the United States ("foreign supported organization")? *If "Yes" and if you checked 12a or 12b in Part I, answer (b) and (c) below* | **4a** | | |
| **b** | Did the organization have ultimate control and discretion in deciding whether to make grants to the foreign supported organization? *If "Yes," describe in **Part VI** how the organization had such control and discretion despite being controlled or supervised by or in connection with its supported organizations* | **4b** | | |
| **c** | Did the organization support any foreign supported organization that does not have an IRS determination under sections 501(c)(3) and 509(a)(1) or (2)? *If "Yes," explain in **Part VI** what controls the organization used to ensure that all support to the foreign supported organization was used exclusively for section 170(c)(2)(B) purposes* | **4c** | | |
| **5a** | Did the organization add, substitute, or remove any supported organizations during the tax year? *If "Yes," answer (b) and (c) below (if applicable)  Also, provide detail in **Part VI**, including (i) the names and EIN numbers of the supported organizations added, substituted, or removed, (ii) the reasons for each such action, (iii) the authority under the organization's organizing document authorizing such action, and (iv) how the action was accomplished (such as by amendment to the organizing document)* | **5a** | | |
| **b** | **Type I or Type II only.** Was any added or substituted supported organization part of a class already designated in the organization's organizing document? | **5b** | | |
| **c** | **Substitutions only.** Was the substitution the result of an event beyond the organization's control? | **5c** | | |
| **6** | Did the organization provide support (whether in the form of grants or the provision of services or facilities) to anyone other than (i) its supported organizations, (ii) individuals that are part of the charitable class benefited by one or more of its supported organizations, or (iii) other supporting organizations that also support or benefit one or more of the filing organization's supported organizations? *If "Yes," provide detail in **Part VI.*** | **6** | | |
| **7** | Did the organization provide a grant, loan, compensation, or other similar payment to a substantial contributor (defined in section 4958(c)(3)(C)), a family member of a substantial contributor, or a 35% controlled entity with regard to a substantial contributor? *If "Yes," complete Part I of Schedule L (Form 990 or 990-EZ)* | **7** | | |
| **8** | Did the organization make a loan to a disqualified person (as defined in section 4958) not described in line 7? *If "Yes," complete Part I of Schedule L (Form 990 or 990-EZ)* | **8** | | |
| **9a** | Was the organization controlled directly or indirectly at any time during the tax year by one or more disqualified persons as defined in section 4946 (other than foundation managers and organizations described in section 509(a)(1) or (2))? *If "Yes," provide detail in **Part VI.*** | **9a** | | |
| **b** | Did one or more disqualified persons (as defined in line 9a) hold a controlling interest in any entity in which the supporting organization had an interest? *If "Yes," provide detail in **Part VI.*** | **9b** | | |
| **c** | Did a disqualified person (as defined in line 9a) have an ownership interest in, or derive any personal benefit from, assets in which the supporting organization also had an interest? *If "Yes," provide detail in **Part VI.*** | **9c** | | |
| **10a** | Was the organization subject to the excess business holdings rules of section 4943 because of section 4943(f) (regarding certain Type II supporting organizations, and all Type III non-functionally integrated supporting organizations)? *If "Yes," answer line 10b below* | **10a** | | |
| **b** | Did the organization have any excess business holdings in the tax year? *(Use Schedule C, Form 4720, to determine whether the organization had excess business holdings)* | **10b** | | |

JA387

**Part IV** Supporting Organizations *(continued)*

|  |  | Yes | No |
|---|---|---|---|
| **11** | Has the organization accepted a gift or contribution from any of the following persons? | | |
| **a** | A person who directly or indirectly controls, either alone or together with persons described in (b) and (c) below, the governing body of a supported organization? | | |
|  | **11a** | | |
| **b** | A family member of a person described in (a) above? | | |
|  | **11b** | | |
| **c** | A 35% controlled entity of a person described in (a) or (b) above? *If "Yes" to a, b, or c, provide detail in Part VI* | | |
|  | **11c** | | |

## Section B. Type I Supporting Organizations

|  |  | | Yes | No |
|---|---|---|---|---|
| **1** | Did the directors, trustees, or membership of one or more supported organizations have the power to regularly appoint or elect at least a majority of the organization's directors or trustees at all times during the tax year? *If "No," describe in Part VI how the supported organization(s) effectively operated, supervised, or controlled the organization's activities  If the organization had more than one supported organization, describe how the powers to appoint and/or remove directors or trustees were allocated among the supported organizations and what conditions or restrictions, if any, applied to such powers during the tax year* | | | |
|  |  | **1** | | |
| **2** | Did the organization operate for the benefit of any supported organization other than the supported organization(s) that operated, supervised, or controlled the supporting organization? *If "Yes," explain in Part VI how providing such benefit carried out the purposes of the supported organization(s) that operated, supervised or controlled the supporting organization* | | | |
|  |  | **2** | | |

## Section C. Type II Supporting Organizations

|  |  | | Yes | No |
|---|---|---|---|---|
| **1** | Were a majority of the organization's directors or trustees during the tax year also a majority of the directors or trustees of each of the organization's supported organization(s)? *If "No," describe in Part VI how control or management of the supporting organization was vested in the same persons that controlled or managed the supported organization(s)* | | | |
|  |  | **1** | | |

## Section D. All Type III Supporting Organizations

|  |  | | Yes | No |
|---|---|---|---|---|
| **1** | Did the organization provide to each of its supported organizations, by the last day of the fifth month of the organization's tax year, (i) a written notice describing the type and amount of support provided during the prior tax year, (ii) a copy of the Form 990 that was most recently filed as of the date of notification, and (iii) copies of the organization's governing documents in effect on the date of notification, to the extent not previously provided? | | | |
|  |  | **1** | | |
| **2** | Were any of the organization's officers, directors, or trustees either (i) appointed or elected by the supported organization (s) or (ii) serving on the governing body of a supported organization? *If "No," explain in Part VI how the organization maintained a close and continuous working relationship with the supported organization(s)* | | | |
|  |  | **2** | | |
| **3** | By reason of the relationship described in (2), did the organization's supported organizations have a significant voice in the organization's investment policies and in directing the use of the organization's income or assets at all times during the tax year? *If "Yes," describe in Part VI the role the organization's supported organizations played in this regard* | | | |
|  |  | **3** | | |

## Section E. Type III Functionally-Integrated Supporting Organizations

| **1** | Check the box next to the method that the organization used to satisfy the Integral Part Test during the year **(see instructions)** |
|---|---|
| **a** | ☐ The organization satisfied the Activities Test  Complete **line 2** below |
| **b** | ☐ The organization is the parent of each of its supported organizations  Complete **line 3** below |
| **c** | ☐ The organization supported a governmental entity  Describe in **Part VI** how you supported a government entity (see instructions) |

|  |  | | Yes | No |
|---|---|---|---|---|
| **2** | Activities Test **Answer (a) and (b) below.** | | | |
| **a** | Did substantially all of the organization's activities during the tax year directly further the exempt purposes of the supported organization(s) to which the organization was responsive? *If "Yes," then in Part VI identify those supported organizations and explain how these activities directly furthered their exempt purposes, how the organization was responsive to those supported organizations, and how the organization determined that these activities constituted substantially all of its activities* | | | |
|  |  | **2a** | | |
| **b** | Did the activities described in (a) constitute activities that, but for the organization's involvement, one or more of the organization's supported organization(s) would have been engaged in? *If "Yes," explain in Part VI the reasons for the organization's position that its supported organization(s) would have engaged in these activities but for the organization's involvement* | | | |
|  |  | **2b** | | |
| **3** | Parent of Supported Organizations **Answer (a) and (b) below.** | | | |
| **a** | Did the organization have the power to regularly appoint or elect a majority of the officers, directors, or trustees of each of the supported organizations? *Provide details in Part VI.* | | | |
|  |  | **3a** | | |
| **b** | Did the organization exercise a substantial degree of direction over the policies, programs and activities of each of its supported organizations? *If "Yes," describe in Part VI. the role played by the organization in this regard* | | | |
|  |  | **3b** | | |

**JA388**

Case 1:14-cv-14176-ADB   Document 419-92   Filed 06/15/18   Page 20 of 29

**Part V** Type III Non-Functionally Integrated 509(a)(3) Supporting Organizations *(continued)*

**1** ☐ Check here if the organization satisfied the Integral Part Test as a qualifying trust on Nov 20, 1970 **See instructions.** All other Type III non-functionally integrated supporting organizations must complete Sections A through E

| Section A - Adjusted Net Income | | (A) Prior Year | (B) Current Year (optional) |
|---|---|---|---|
| **1** Net short-term capital gain | **1** | | |
| **2** Recoveries of prior-year distributions | **2** | | |
| **3** Other gross income (see instructions) | **3** | | |
| **4** Add lines 1 through 3 | **4** | | |
| **5** Depreciation and depletion | **5** | | |
| **6** Portion of operating expenses paid or incurred for production or collection of gross income or for management, conservation, or maintenance of property held for production of income (see instructions) | **6** | | |
| **7** Other expenses (see instructions) | **7** | | |
| **8** **Adjusted Net Income** (subtract lines 5, 6 and 7 from line 4) | **8** | | |

| Section B - Minimum Asset Amount | | (A) Prior Year | (B) Current Year (optional) |
|---|---|---|---|
| **1** Aggregate fair market value of all non-exempt-use assets (see instructions for short tax year or assets held for part of year) | **1** | | |
| **a** Average monthly value of securities | **1a** | | |
| **b** Average monthly cash balances | **1b** | | |
| **c** Fair market value of other non-exempt-use assets | **1c** | | |
| **d** **Total** (add lines 1a, 1b, and 1c) | **1d** | | |
| **e** **Discount** claimed for blockage or other factors (explain in detail in Part VI) | | | |
| **2** Acquisition indebtedness applicable to non-exempt use assets | **2** | | |
| **3** Subtract line 2 from line 1d | **3** | | |
| **4** Cash deemed held for exempt use Enter 1-1/2% of line 3 (for greater amount, see instructions) | **4** | | |
| **5** Net value of non-exempt-use assets (subtract line 4 from line 3) | **5** | | |
| **6** Multiply line 5 by 035 | **6** | | |
| **7** Recoveries of prior-year distributions | **7** | | |
| **8** **Minimum Asset Amount** (add line 7 to line 6) | **8** | | |

| Section C - Distributable Amount | | Current Year |
|---|---|---|
| **1** Adjusted net income for prior year (from Section A, line 8, Column A) | **1** | |
| **2** Enter 85% of line 1 | **2** | |
| **3** Minimum asset amount for prior year (from Section B, line 8, Column A) | **3** | |
| **4** Enter greater of line 2 or line 3 | **4** | |
| **5** Income tax imposed in prior year | **5** | |
| **6** **Distributable Amount.** Subtract line 5 from line 4, unless subject to emergency temporary reduction (see instructions) | **6** | |

**JA389**

**7** ☐ Check here if the current year is the organization's first as a non-functionally-integrated Type III supporting organization (see instructions)

Case 1:14-cv-14176-ADB   Document 419-92   Filed 06/15/18   Page 21 of 29

**Part V** Type III Non-Functionally Integrated 509(a)(3) Supporting Organizations (continued)

| **Section D - Distributions** | Current Year |
|---|---|
| **1** Amounts paid to supported organizations to accomplish exempt purposes | |
| **2** Amounts paid to perform activity that directly furthers exempt purposes of supported organizations, in excess of income from activity | |
| **3** Administrative expenses paid to accomplish exempt purposes of supported organizations | |
| **4** Amounts paid to acquire exempt-use assets | |
| **5** Qualified set-aside amounts (prior IRS approval required) | |
| **6** Other distributions (describe in Part VI) See instructions | |
| **7** **Total annual distributions.** Add lines 1 through 6 | |
| **8** Distributions to attentive supported organizations to which the organization is responsive (provide details in Part VI) See instructions | |
| **9** Distributable amount for 2016 from Section C, line 6 | |
| **10** Line 8 amount divided by Line 9 amount | |

| **Section E - Distribution Allocations (see instructions)** | (i) **Excess Distributions** | (ii) **Underdistributions Pre-2016** | (iii) **Distributable Amount for 2016** |
|---|---|---|---|
| **1** Distributable amount for 2016 from Section C, line 6 | | | |
| **2** Underdistributions, if any, for years prior to 2016 (reasonable cause required--see instructions) | | | |
| **3** Excess distributions carryover, if any, to 2016 | | | |
| **a** | | | |
| **b** | | | |
| **c** From 2013. . . . . . . . | | | |
| **d** From 2014. . . . . . . . | | | |
| **e** From 2015. . . . . . . . | | | |
| **f** **Total** of lines 3a through e | | | |
| **g** Applied to underdistributions of prior years | | | |
| **h** Applied to 2016 distributable amount | | | |
| **i** Carryover from 2011 not applied (see instructions) | | | |
| **j** Remainder Subtract lines 3g, 3h, and 3i from 3f | | | |
| **4** Distributions for 2016 from Section D, line 7 $ | | | |
| **a** Applied to underdistributions of prior years | | | |
| **b** Applied to 2016 distributable amount | | | |
| **c** Remainder Subtract lines 4a and 4b from 4 | | | |
| **5** Remaining underdistributions for years prior to 2016, if any Subtract lines 3g and 4a from line 2 (if amount greater than zero, see instructions) | | | |
| **6** Remaining underdistributions for 2016 Subtract lines 3h and 4b from line 1 (if amount greater than zero, see instructions) | | | |
| **7** **Excess distributions carryover to 2017.** Add lines 3j and 4c | | | |
| **8** Breakdown of line 7 | | | |
| **a** | | | |
| **b** Excess from 2013. . . . . . . . | | | |
| **c** Excess from 2014. . . . . | | | |
| **d** Excess from 2015. . . . . . . | | | |
| **e** Excess from 2016. . . . . . . | | | |

**JA390**

**Part VI** Supplemental Information. Provide the explanations required by Part II, line 10; Part II, line 17a or 17b; Part III, line 12; Part IV, Section A, lines 1, 2, 3b, 3c, 4b, 4c, 5a, 6, 9a, 9b, 9c, 11a, 11b, and 11c; Part IV, Section B, lines 1 and 2; Part IV, Section C, line 1; Part IV, Section D, lines 2 and 3; Part IV, Section E, lines 1c, 2a, 2b, 3a and 3b; Part V, line 1; Part V, Section B, line 1e; Part V Section D, lines 5, 6, and 8; and Part V, Section E, lines 2, 5, and 6. Also complete this part for any additional information. (See instructions).

**Facts And Circumstances Test**

JA391

efile GRAPHIC print - DO NOT PROCESS | As Filed Data - | DLN: 93493318129457

Case: 19-2005 Document: 00117630200 Page: 404 Date Filed: 05/04/2023 Entry ID: 6456061

# SCHEDULE O
## (Form 990 or 990-EZ)

Department of the Treasury
Internal Revenue Service

## Supplemental Information to Form 990 or 990-EZ

Complete to provide information for responses to specific questions on
Form 990 or 990-EZ or to provide any additional information.
▶ Attach to Form 990 or 990-EZ.
▶ Information about Schedule O (Form 990 or 990-EZ) and its instructions is at
www.irs.gov/form990.

**2016**

Open to Public
Inspection

Name of the organization
Students For Fair Admissions Inc

Employer identification number

47-1689810

## 990 Schedule O, Supplemental Information

| Return Reference | Explanation |
|---|---|
| Pt VI, Line 11b | Form 990 was distributed to all directors and officers and to legal counsel for review |



**A393**

| Return Reference | Explanation |
|---|---|
| Pt V, line 2 | Officer Richard Fisher is the father of officer, Abigail Fisher |

**JA394**

| Return Reference | Explanation |
|---|---|
| Pt VI Line 12c | Legal council requires written executed annual conflict of interest responses |

Case: 19-2005 Document: 40-16 Document: 40-16 Page: 407-92 Date Filed: 05/30/2026 Date Filed: 05/30/2026 Entry ID: 63566

**A395**

| Return Reference | Explanation |
|---|---|
| Pt VII line 7a | Members can elect Member-Elected Director |

**JA396**

| Return Reference | Explanation |
|---|---|
| Pt V Line 6 | Organization has 5 officers and 20,000+ members |

| Return Reference | Explanation |
|---|---|
| Pt VI Line 15a | Organization paid compensation to only one official in 2016  The compensation was approved by the disinterested directors after review of the compensation package and information o n comparables for similar organizations |

Case: 19-2005   Document: 40-1   Page: 410   Date Filed: 07/30/2020   Entry ID: 6356669

**JA398**

| Return Reference | Explanation |
|---|---|
| Pt V, line 15b | Organization paid compensation to only one official |

# EXHIBIT 237



AT A MEETING OF THE

# BOARD OF OVERSEERS OF HARVARD COLLEGE

IN CAMBRIDGE, January 11,    1926.

Mr. James presented the report of the Special Committee on the Limitation of the Size of the Freshman Class, and after debate thereon, the Board voted to accept said report, and to adopt the following recommendations:

1. That, during the next three years, 1926-27 to 1928-29, the limit of 1,000 Freshmen shall include dropped Freshmen as well as those newly admitted to the College and Engineering School, but not thereafter, save with the approval of the Governing Boards.

2. That the application of the rule concerning candidates from the first seventh of their school be discretionary, both as to schools and candidates, with the Committee on Admission.

3. That the rules for the admission of candidates be amended to lay greater emphasis on selection based on character and fitness, and the promise of the greatest usefulness in the future as a result of a Harvard education.

and further that said report and recommendations appear to the Board to be wise, but that they be referred to the Faculties of Arts and Sciences, and of Engineering, for advice.

The Board also voted that the Committee be discharged with the thanks of the Board for its excellent and comprehensive report.

A true copy of record,

Attest: *Winthrop H. Wade, Secy.*

*Dec. 1925*

*Su Faculty Jan. 19 1926*
*Reports*

*Page 17.*

*Strictly Confidential until all Boards*
*and Faculties concerned have acted*

# REPORT OF THE SPECIAL COMMITTEE APPOINTED
## TO CONSIDER THE LIMITATION OF NUMBERS

To the Board of Overseers of Harvard College: —

The purpose of this report is to present facts bearing upon different aspects of the question of numbers in the College and to offer certain conclusions for the consideration of the Overseers.

It will be recalled that a provisional limitation was sanctioned by the Overseers, by the following action on February 25, 1924:

> *Voted* — That the Board give its consent to the vote of the President and Fellows which defines a limit of size for the Freshman Class "for the present," with the understanding that this limitation is temporary in its nature and will be reconsidered at the earliest possible time.

At the same time the Board created this Special Committee to report —

> . . . on numbers in relation to equipment, personnel, standards, and the scope and function of the College.

Thus the vote establishing a limit of 1,000 "for the present" was precautionary. During the few years following the War and preceding the vote, numbers had been increasing with unparalleled rapidity. They had already begun to cause difficulties. Therefore, although Freshman enrollments had not yet reached the limit that was chosen, it was feared that they might soon pass it and that the College would not be able to stand the strain. Being conceived as precautionary the limitation was considered by all to be expedient, and it was adopted without long discussion. But it was understood that the subject would be canvassed more fully.

### I

Since the limit of 1,000 was established, two Freshman classes have come to Cambridge. The limit set "for the present" has about been reached.

The general rate of growth which has, but for the war-time, prevailed for Harvard College during more than 50 years, and which is shown in Tables 1 and 5, is so nearly constant that it

the entry of a new class at the close of each lecture stops the question-and-conference episode which normally follows each lecture and may last for from 15 minutes to as much as an hour, if the lecturer can remain in the room with the students who gather about his desk to question him. The economical remedy might be to provide small conference rooms next to lecture rooms. At present, however, there are almost none such, except in Sever Hall, where a few are conveniently placed. These few are regularly used for conferences. If there is no available place in or close to the lecture room for a student to remain and confer with the professor after a class meeting, he must seek the professor later in the Widener Library or at his house — which means, in most cases, that he does not consult him. We believe that the after-lecture conference is a most important item in the curriculum, and that it ought to be provided for. Moreover, the need of rooms for tutorial conferences is a serious one which requires to be met.

The foregoing facts and figures suggest the following conclusions:

Space and physical equipment, if they were the only bar to the admission of numbers, could perhaps be provided if money could be found; but the last 20 years' experience indicates that it is not easy to obtain money for laboratories and lecture rooms promptly. Although it is true that in many ways, and on the whole, Harvard's physical and financial equipment is better adapted to the education of the present student body than its equipment of 20 years ago was to the tasks of that day, we believe that, before more students can be accommodated, more lecture rooms, laboratories, and dormitories must be provided. The housing situation in Cambridge requires the last, and we conceive that more biological laboratories especially are essential. Additional lecture rooms, tutorial and conference rooms will also be required.

It appears at first sight that a good deal of lecture space is perforce vacant in the afternoon. The reason is that experience has seemed to show that the afternoon is best fitted for laboratory work, which requires continuous meetings of two hours or more. Only a few advanced courses meet in the evening. Whether a reorganization of the tabular view would relieve the situation has not been made evident. The question has been studied by the Faculty, which — to date — has not thought reorganization wise or practicable; but further attention to the problem appears desirable to this Committee.

looks like a normal which it would be unreasonable not to consider in making estimates or forecasts. The recent noticeable augmentation of college enrollment throughout the country is even greater and looks as if our own normal would be borne upward rather than depressed by the tendencies in the country at large. (See Table 2.) The curves would lead one to expect that the number of qualified applicants for admission to the College may considerably exceed 1,000 in a few years unless some limitation is enforced.

Hitherto Harvard has always taken care of as many qualified students as the community wanted to send here. Now, however, we are asking the question whether we are not subjecting ourselves to a strain which will impair the quality of our work, whether we can go on, and if not, then what rate of growth we can permit ourselves, or at what point we must assign a stopping place. It is obvious that we are considering a very important question of policy.

## II

Equipment, physical and financial, has been pointed to as a limiting factor. Data in Table 3 bear on this, and indicate the situation 20 years ago as compared with that in 1924-25.

The situation with respect to lecture rooms is further elucidated by the analysis of the state of things at the opening of the current year, 1925-26, which will be found in Table 4.

To illustrate some of the limitations now imposed by conditions which are beyond the Faculty's control by reason of the shortage of rooms for class meetings and the difficulty of lecturing effectively to very large classes, it will be sufficient to cite the following instances of forced limitation:

English 41, History of English Literature; limited to 300.
Biology 1, Life and its Environment; limited to 300.
Geology 4, Introduction to Geology; limited to 300.
Meteorology 1, Elementary Meteorology; limited to 100.
Psychology 1, Introduction to Experimental Psychology; limited to 80.

All these are courses fundamental to their subjects; and naturally they are desired by students concentrating in other fields. Practically all Freshmen have been excluded from Biology 1 this year. From the educational point of view an uninterrupted use of lecture rooms is not economical. Large lecture halls cannot empty and refill immediately without curtailing the lecture periods, and

JA402

Case: 19-2005 Document: 00116780382 Document: 415237 Date Filed: 06/18/18 Page 5 of 119 ID: 6356615

## III

Teaching-personnel, standards, and function can hardly be discussed separately.

Educational methods and college policies are always changing. In the last 20 years the emphasis at Harvard has shifted from the course as the unit of instruction to the individual as the unit, and the technique for dealing with an unlimited number of student-units has not yet been found.

The conception used to be that if a large and liberal menu of opportunities in the way of courses was spread before the student, the main thing had been done for him. The old policy respecting physical training and exercise was typical of the then new theory of the College; a gymnasium was provided, and also playing fields, but after that about everything was left to the option of the student, who took as much advantage of these facilities as he liked, or none at all. In his studies he had to get through a certain number of courses if he wanted to keep in standing and graduate, but otherwise his education was nearly as much an affair of his own adventure as was his physical development. Lectures being the chief means of instruction, organization and methods were about as compatible with large as with small numbers of students.

During the last two decades, however, the College has increasingly undertaken to guide and stimulate the undergraduate's choices and ambitions, in the belief that all parts of the College which touch the undergraduate's life, whether physical, moral, or intellectual, should work in sympathetic accord. Obviously this imposes a much heavier task upon instructors and deans; and, the individual being the ultimate unit of education, success cannot help being more and more difficult as numbers grow.

The function of the College as thus conceived is exemplified by numerous changes or reforms which have been devised and successfully put into effect; but about these so much has been said elsewhere that it is needless to do more than enumerate them here. The concentration requirement; the general examination; the tutorial system, and along with it the diminished reliance upon lectures as the chief means of instruction; also the numerous measures intended to carry the Freshman through his transition from school to college — among them the Freshman dormitories, and a considerable development of services of information and guidance connected with the Dean's office; compulsory physical exercise; increased provision for dormitory accommodation; and various

improved facilities of a more or less social order, such as the Harvard Union, the reading-rooms in the Library, and others. The most striking evidence that these changes are combining toward one good effect is the way in which the number of students who graduate with distinction has been rising. In the period between 1915–16, the year when General Final Examinations were first given, and 1919–20, the percentage of men who won distinction by the examinations was 17.4; in 1924–25 the percentage had risen to 21.4. To this we should add the men who gained distinction in those departments in which no General Final Examination is given, and those who won distinction in general studies. When this is done we find that 29.8 per cent of those who graduated in last year's class had secured distinction in their studies.

It hardly needs saying that the present conception of Harvard as a residential college rather than just a University department implies a belief that there must be a greater degree of intimacy between teacher and student and between student and environment than there used to be. Crowds do not favor intimacy. Although the figure at which, for Harvard's purposes, overcrowding begins cannot be defined by any process of reasoning, we are persuaded that the Faculty — by whose sense of the situation the Governing Boards must be largely guided in such matters — already feels that there are now as many undergraduates as its present number of teachers and rooms allows it to cope with adequately. Many, indeed, feel that the limit of 1,000 is too high.

Is it feasible to remove one difficulty simply by enlarging the teaching force and multiplying assistant deans? The following comparisons between 20 years ago and today show how largely the teaching force has already been augmented, and yet by how small a margin it has gained on the students with whom it is trying to deal more personally. There are several Divisions which may still adopt the tutorial system — the Division of Mathematics will do so in 1926–27 — and their budgets for salaries will then have to be enlarged. In the departments of Natural Science there are, as yet, neither General Final Examinations nor tutors. Moreover, assistants in laboratories are normally paid less than tutors with the rank of instructor. It is possible that laboratory instruction might be distinctly improved by a more liberal policy. However, laboratory assistants can hardly be expected to have acquired the breadth of view which a tutor must possess, for assistants are selected for their ability to assist students in a very limited field. Nevertheless a larger expenditure of money for assistants appears

7

pendent on the present salaries. In the long run it is the quality of its Faculties which mainly determines the position of a university. If that is not attended to, buildings, endowments, organization, and even traditions will prove to be of little avail.

Therefore, considerations of personnel, finance, and equipment all point to the necessity of maintaining a limitation of numbers in Harvard College for the present.

These are all what might be called internal considerations. It will be well to look at the situation of the College from the outside, too.

## IV

The size of the College relative to the University and its other departments has not been constant, and may alter materially when the College stops growing. For many years the University as a whole has been increasing faster than the College anyway, though not so much faster as the creation of entirely new graduate schools might have led one to expect. The Graduate School of Arts and Sciences, which is in many respects an advanced department of the College, has been swelling in size more rapidly than the College itself, and faster than the University as a whole (see Table 11). The signs of the times indicate that this will probably continue (see Tables 5, 6, 7, and Figs. 2, 3, 4, 5); and this is desirable, for the Graduate School is the source from which most of the young teachers are drawn.

Table 8 shows which departments of the University are now restricting their size, and also those which have no present purpose of limiting it.

Even if the College should contain a smaller proportion of the total University enrollment than now, that in itself need not be deplored, for there is no necessarily right proportion. The influence of the departments under the Faculty of Arts and Sciences — namely, the College and the Graduate School — will always depend on the eminence of the teachers and the quality of the students' work. Since the College, through its graduates, does much to set the scholastic standard in all the graduate departments of the University, its influence is likely to remain predominant.

It may be feared by some that the College will receive less from the Treasury of the University as the students in the several graduate schools increase in number. But it must be remembered that, barring the Endowment Fund raised by the graduates since the War, the free funds at the disposal of the Corporation are small

---

6

desirable, and the budgets of the scientific departments should be enlarged accordingly. As a matter of fact, they are now being increased for this very purpose as rapidly as the funds allow.

| | 1904-05 | 1924-25 |
|---|---|---|
| Number of teachers of professorial rank in the Faculty of Arts and Sciences ... | 112[1] | 172 |
| Increase ... | | 53.5+% |
| Number of teachers of non-professorial rank in the Faculty of Arts and Sciences ... | 184[1] | 233 |
| Increase ... | | 26.6% |
| Number of students under the Faculty of Arts and Sciences (College and Graduate School of Arts and Sciences) ... | 2905 | 3804 |
| Increase ... | | 30.9+% |
| Average number of students to each teacher of professorial rank in the Faculty of Arts and Sciences ... | 25.9:1 | 22+:1 |
| Average number of students to all teachers in the Faculty of Arts and Sciences ... | 9.8:1 | 9.4:1 |

From these figures it is clear that no substantial gain has been made in reducing the ratio of students to the whole number of teachers in the Faculty of Arts and Sciences, although the proportion of teachers of higher rank has increased. The individual student is, however, receiving more personal attention than is evident from the figures, because there has been no material increase in the number of courses offered, but a large increase in the number of men who give much of their time as tutors, instructors, and assistants to individuals or small groups.

It is obvious that, without any expansion in the number of subjects taught, an increase in the number of teachers is greatly to be desired. But before the teaching body is expanded to teach larger numbers, it will be necessary to finance larger budgets for the departments which have not yet adopted the general Final Examination and to increase salaries of professors and instructors all along the line, if Harvard is to hold her eminent position among the universities and colleges of America. Indeed, this will have to be done whether we expand or not. It is said that Chicago is now establishing a number of $10,000-a-year professorships. Harvard's maximum in the Faculty of Arts and Sciences is still $8,000. Justice and fairness, as well as competition in Cambridge and expediency, require a better salary scale. Conditions in Cambridge are becoming more and more difficult for men who are de-

[1] The Faculty of Arts and Sciences included the Lawrence Scientific School at this date.

8

in proportion to those that are restricted; and the history of the financial management by the Corporation gives every reason to believe that the College will not be overlooked in the future. It is true that if the College stands still in size while the other departments become bigger and more expensive, it will be more and more necessary to uncover new fountains of financial aid, and the graduates of the professional schools will have to assume more responsibility than in the past.

With reference to the Graduate School of Arts and Sciences, the Committee believes that from the point of view of the College the School can be a great deal bigger and still give more in the way of stimulation to both Faculty and students than it takes away by its drafts upon equipment and personnel; for this School is concerned not so much with what is particular and empirical as with what is fundamental and general. Philosophy, the so-called moral and social sciences; the fine arts and the humanities in their deepest and broadest senses; physics, chemistry, and mathematics, which underlie all our modern scientific progress, are there cultivated most eagerly and advanced most successfully. In short, although most of the students in the School are preparing for a particular profession, that of teaching, they are all engaged in liberal studies. What goes on in the Graduate School fertilizes the life of the whole institution — the College included — and draws together all its scholars into a true university. If it is in any way difficult for that School and the College to be closely associated — and it must be admitted that there are difficulties — the remedy is not to be sought in a jealous restriction of the School.

The extent to which the College prepared students for work in the graduate schools and professional schools is indicated by Table 12.

## V

It was remarked at the beginning that Harvard College has, until now, allowed itself to grow with the community. It is a striking fact that there has recently been a great increase in the proportion of the population seeking college education. Nothing yet indicates that the desire for college education will soon decline again, or even stop spreading. Forty years ago a high-school training was coveted by people of small means. Today the same large class has generally adopted a college as its goal. Furthermore, in the northeastern states many other colleges have limited numbers. Table 9 presents a situation which warrants serious

9

discussion, if not public anxiety. If all the endowed colleges in this part of the country decide to stand pat, or if most of them stick close to the existing size standards, to what institutions will this community which wants more opportunities for higher education, and waxes continually, send its boys?

We have all heard lately from within our own circle that our entrance requirements are "too high." If we are to turn away a greater and greater number of potentially qualified applicants who come from schools and communities which have hitherto supposed they could count on Harvard, we must be prepared to meet more and more such complaints.

If and when complaints are thrust at us, it seems to this Committee that the answer will be twofold. First, it is not for us but for the country to meet a general shortage of facilities by means of junior colleges and other diversifications in the field of higher education, or otherwise. Second, Harvard participates actively, not passively, in the general welfare of college education in the United States.

We must not forget that Harvard College is still, as it always has been, an explorer and pathfinder. It has lately again developed a new type of instruction, is thereby giving its undergraduates a distinctly better education than they have ever received before, and in this it is being imitated by other colleges. This furnishes a very potent reason for limiting our students to a number with which this system can be efficiently carried on until it has been perfected, rather than allowing that number to increase to a point that will interfere seriously with what we are trying to do.

## VI

It will be well, however, to ask the question, how the applicants for admission to the Freshman Class are selected from a considerably larger number. The Committee is not prepared to make a full report now concerning this difficult matter or to propose anything new. But as this report is primarily informative and intended to supply data for later discussion it will be appropriate to make certain explanations and comments.

First, it is probably wise to rehearse certain changes in the methods of admission which have recently been introduced, and to summarize the results to date.

Some of these changes have lately raised the minimum of admission in the past twenty years; more have simplified and lightened the

burden for all but the very lazy or incompetent. The chief items under the first are the requirements that (1) a candidate under the old plan must pass ⅔ of the examinations required; (2) that he must pass ⅔ of the total with satisfactory grades (70 per cent or higher); and (3) that he must write satisfactory English. Among the simplifying changes, some of which actually make admission easier, must be named:

(1) The New Plan, established in 1911–12, whereby candidates are admitted on a combination of school record and four examinations. Each case is considered individually, and the personality of the candidate may be given greater weight than under the Old Plan.

(2) All candidates, whether by the Old or New Plan, are now admitted without admission conditions, provided they satisfy the minimum requirements.

(3) Candidates who stand, at graduation, among the highest seventh of the boys in the graduating class of a regularly organized school, and who have the strong recommendation of the head master, are admitted without examination, provided they have satisfactory school records corresponding to the requirements of the New Plan.

(4) The examinations of the College Entrance Examination Board are now used exclusively for all candidates who present themselves in June under the Old or New Plan.

The following shows the admissions by the different plans for 1924 and 1925:

|                        | 1924 | 1925 |
| ---------------------- | ---- | ---- |
| Under Old Plan         | 371  | 469  |
| Under New Plan         | 196  | 191  |
| Under Honor Plan (1/7) | 309  | 314  |
| Total                  | 876  | 974  |

It will be seen that nearly one third of the Freshman Class is now entering on the so-called Honor Plan. When this plan was adopted, its primary purpose was to open admission to brilliant boys in schools that do not ordinarily prepare for Harvard; but the Admission Committee has felt that the vote was mandatory rather than permissive, and has believed that it had no discretion in the administration of it. The Committee which is making this report thinks, however, that it may be better not to extend this privilege of recommending boys under the honor system to large Eastern schools and similar institutions that regularly prepare boys

for entrance examinations, and it believes that the application of the rule should be left to the discretion of the Committee on Admission. This will not diminish the value of the school record of the candidates or of the personal estimates of their fitness on the part of the school masters. Table 14 shows how "Honor" Freshmen have been distributed geographically.

Few graduates realize that admission to Harvard College to-day is based not only on the records made in entrance examinations, when they are taken, but also on the school records and the judgment of school officials who have known the boys for some time. The value of the two latter is especially emphasized in the application of the honor system.

The vote which established a provisional limit went on to prescribe that—

From the remaining candidates[1] the Committee on Admission shall fill up the quota, so far as it may be advantageously filled, by selecting those who, having satisfied the minimum requirements for admission, in the judgment of the Committee have best proved their competence.

Thus far there has been no opportunity to try the process of selection here contemplated, for the quota set has not been exceeded or even reached, and therefore there has been no chance to test the machinery for weeding out the excess of lower-grade men by inspection. When this clause goes into full operation it may affect about one-third of the candidates for admission.

Although the Committee is not prepared to make suggestions as to the methods of admission except on the single point mentioned above, it wishes to state—

(1) That it believes that it is neither feasible nor desirable to raise the standards of the College so high that none but brilliant scholars can enter and remain in regular standing. The standards ought never to be too high for serious and ambitious students of average intelligence.

(2) That it believes that standards, whether of admission or of work in the College, have not in fact been raised beyond this point, nor to such a point that there is any present prospect of their being made too difficult for such men. This is stated with confidence, in spite of certain complaints which have recently been heard.

(3) That, on the other hand, it sees no reason whatsoever for thinking that it would be a reproach to Harvard if it became

[1] Those whose admission records do not place them on an equality with Harvard undergraduates in the first four groups of the Rank List.

Case: 19-2005 Case 1:14-cv-14176-ADB Document 419-237 Filed 06/15/18 Page 9 of 19 ID: 6356615

# APPENDIX

In the writer's mind there is *one outstanding reason* for the limitation of numbers in Harvard College, and although this reason is implied at one point in the main report (where reference is made to the pioneer work of Harvard and to an improved type of instruction), the importance of the *real objective* seems to the writer to be of such dominant importance as to warrant a brief explanation, which has received the approval of the other members of the Committee.

The enormous strides made in our knowledge of the material universe during the past generation or two have introduced problems of coöperation between larger and larger groups, not only within the nation but of world-wide extent, the solution of which makes absolutely necessary a new kind of education — in fact, something more nearly corresponding to the original meaning of the word education.

Man is largely guided by his habits of thought: traditions, customs, hatreds, desires, prejudices, etc.; for the most part he does not know what it means to think for himself. He has the habit of accepting facts and arguments, however incomplete, superficial, or misleading they may be. He allows pictures to be painted in his mind by the promoter or the propagandist without demanding sound evidence of the so-called facts or making sure that the facts presented are reasonably comprehensive for the purpose in hand. Hence the enormous annual loss in crooked or unwise investments; hence the large predominance of failures of corporations and other business enterprises; hence the frightful and wasteful confusion of international relations.

The solution of these problems demands a kind of thinking or analysis which is new to the vast majority of even our educated class, a habit of mind which refuses to accept a biased presentation of facts; which withholds judgment until all the returns are in, and even then allows something for the probable incompleteness of the returns; which refuses to entertain prejudices and hatreds; which keeps its perspective free from anything but logic, justice, and truth.

No course of reasoning can yield more than is covered by the premises; it can only transform the facts or assumptions of the premises into a more useful form. Therefore, to reach a sound conclusion involves sound premises and sound reasoning, whether

somewhat harder for a student to enter here than to enter elsewhere — always providing that standards are not above the level just indicated.

## VII

To conclude — it will have been made clear that the three chief difficulties in the way of dealing with large numbers are: (1) the lack of a sufficient number of teachers; (2) the lack of rooms to hold classes; (3) the difficulty of lecturing effectively to very large classes. The first two difficulties could probably be remedied in a few years by an adequate expenditure of money. But for the moment they are so insurmountable that this Committee is convinced that the restriction on numbers is truly necessary for the present. The Committee will go further, however. The difficulties just spoken of and the importance of working out to their logical conclusions the very promising experiments which the College is making in new methods of instruction, lead the Committee to advise that, in reckoning the Freshmen who are to be included in the thousand, "dropped" Freshmen should be reckoned as well as others. This was recommended by the Faculty in 1923. Dropped Freshmen are students who are taking a large part of their work in Freshman courses, and have always been registered as Freshmen.

The Committee presents the following recommendations which, if adopted by the Board of Overseers, are to be referred to the Faculty of Arts and Sciences for consideration and action:

(1) That, during the next three years, 1926–27 to 1928–29, the limit of 1,000 Freshmen shall include dropped Freshmen as well as those newly admitted to the College and Engineering School, but not thereafter, save with the approval of the Governing Boards on the recommendation of the Faculties concerned.

(2) That the application of the rule concerning candidates from the first seventh of their school be discretionary with the Committee on Admission.

COMFORT A. ADAMS,
JAMES BYRNE,
CHESTER N. GREENOUGH,
HENRY JAMES, *Chairman,*
A. LAWRENCE LOWELL,
CLIFFORD H. MOORE,
WILLIAM S. THAYER,
*Committee.*

Case: 19-2005 Document 41761-2 Page 420 of 734 Date Filed: 06/15/180 Page 10 of 19 ID: 6356615

14

this be through the medium of words or of mathematics, which is merely quantitative logic.

It is not claimed that these ideals are new or original, but, unfortunately, they are not applied to any appreciable extent in our educational institutions. For the most part, our students listen, accept, and try to remember; rarely do they know what it means to demand sound evidence of the facts underlying their problem, to understand thoroughly the principles involved, and then to think carefully and surefootedly without the twist of bias or prejudice; they are mostly occupied with the endeavor to meet certain tests which are unfortunately too often tests of memory rather than of mental power; they rarely know the joy of making a subject their own, of thinking for themselves and of seeing the worth-while results of their own work.

Such a habit of mind is absolutely essential to the solution of the great problems confronting civilization today.

It is to the development of this habit in our students that Harvard College has set itself; but the task is a difficult one and takes time for its development. Teachers with this ideal are rare and must be developed; we cannot go out into the open market and hire them. We need time to imbue the present staff with the spirit of the movement and to develop the best technique and organization, without being so pressed for increase of staff and equipment as to fail in our major purpose, which is quality rather than quantity.

As the difficulty of forming new habits of mind increases with the age of the students, the undergraduate departments are the centre of attack, but even there the task is a difficult one, and demands a closer contact between student and instructor and much more work on the part of the instructing staff.

However, the objective is worthy of every possible effort and sacrifice. A thousand graduates with this habit of mind are worth more than ten thousand without it, no matter how well stocked with useful information or conventional knowledge the minds of the latter may be.

COMFORT A. ADAMS.

---

15

TABLE 1. CONSISTS OF THE FIGURES UPON WHICH FIGURE 1 IS BASED
(see page 28)

TABLE 2

POPULATION OF THE UNITED STATES EXCLUSIVE OF OUTLYING POSSESSIONS

| 1870...... | 38,558,371 | 1900...... | 75,994,575 |
| 1880...... | 50,155,783 | 1910...... | 91,972,266 |
| 1890...... | 62,947,714 | 1920...... | 105,710,620 |

ENROLLMENT OF MEN AND WOMEN IN COLLEGES, UNIVERSITIES, AND PROFESSIONAL SCHOOLS IN THE UNITED STATES

| 1870...... | 60,798 | From Rept. of Commissioner of Education |
| 1880...... | 84,991 | " |
| 1890...... | 109,664 | " |
| 1900...... | 176,435 | " |
| 1910...... | 338,018 | " |
| 1920...... | 521,754 | From World Almanac, 1924 |

TABLE 3. NUMBERS, BUILDINGS, AND INCOME

| | 1904–05 | | 1924–25 | |
| --- | --- | --- | --- | --- |
| | Number | Percentage | Number | Percentage |
| University enrollment, total ............... | 4136 | ... | 7075 | ... |
| College enrollment ..................... | 2539 | ... | 3041 | ... |

Dormitories

| | | | | |
| --- | --- | --- | --- | --- |
| Undergraduates housed in dormitories owned by the College ............ | 623 | 24.5+ | 1570 | 51.6+ |
| Dormitories in process in 1924–25 or planned and financed, not including Medical School and Business School buildings, are expected to provide for an additional................. | ... | ... | 358 | ... |

Libraries

Widener Library opened in 1914

Laboratories (additions)
Coolidge (Chemistry) 1913
Gibbs (Chemistry) 1913
Cruft (Physics) 1914
Research laboratory in connection with Farlow Botanical Library and Herbarium
Additions now financed and in process —
Fogg Art Museum $1,000,000
Chemical Lab. $2,000,000
(NOTE: Biological laboratories are especially needed)

JA408

Case: 19-2006  Document: 00117612237  Page: 421  Date Filed: 06/15/2020  Entry ID: 6356615

Table 3 (continued)

Lecture Rooms or Class Rooms

Music Building, 1914

| Income | 1904-05 | 1924-25 |
|---|---|---|
| Income bearing funds for University ...... | $18,036,025 | $60,024,462 |
| Total Expenditure for Faculty of Arts and Sciences ...... | 563,048 | 1,486,194 |
| Expenditure for salaries in Faculty of Arts and Sciences ...... | 408,887 | 1,077,402 |
| Expenditure for salaries per student under Faculty of Arts and Sciences ...... | 140.75 | 283.23 |

[1] This includes the Lawrence Scientific School which in 1904-05 was under the Faculty of Arts and Sciences.

Table 4.  Comparison of Actual and Possible Use of Rooms,[1] 1925-26

A. Number of Hours during which Rooms are in Use

| Available Rooms | | Total 1-hr. periods possible per week | Number of periods in use from | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Capacity | No. | | 8-9 | 9-10 | 10-11 | 11-12 | 12-1 | 1-2 | 2-3 | 3-4 | 4-5 | 5-6 |
| 12-30 | 2 | 12 | 0 | 4 | 7 | 5 | 1 | 0 | 0 | 3 | 3 | 1 |
| 31-50 | 16 | 96 | 0 | 80 | 87 | 89 | 67 | 10 | 29 | 14 | 2 | 0 |
| 51-75 | 10 | 60 | 4 | 58 | 59 | 55 | 45 | 14 | 26 | 8 | 2 | 4 |
| 76-100 | 5 | 30 | 0 | 29 | 29 | 29 | 20 | 6 | 12 | 9 | 4 | 0 |
| 101-125 | 3 | 18 | 0 | 18 | 15 | 17 | 12 | 0 | 10 | 3 | 1 | 0 |
| 126-150 | 1 | 6 | 3 | 6 | 6 | 5 | 6 | 0 | 0 | 6 | 0 | 0 |
| 151-200 | 2 | 12 | 0 | 11 | 12 | 9 | 8 | 2 | 4 | 5 | 0 | 0 |
| 201-300 | 2 | 12 | 0 | 12 | 12 | 12 | 10 | 0 | 5 | 0 | 0 | 0 |
| 301-400 | 1 | 6 | 0 | 6 | 5 | 6 | 6 | 0 | 0 | 1 | 0 | 0 |
| 900 | 1 | 6 | 0 | 6 | 3 | 6 | 6 | 0 | 2 | 0 | 0 | 0 |
| Total .. | 43 | 258[2] | 7 | 230 | 235 | 233 | 175 | 32 | 95 | 42 | 12 | 5 |
| Per cent of 258 | | | .02 | .89 | .91 | .90 | .67 | .12 | .36 | .16 | .04 | .01 |

[1] This report covers the class rooms in the following buildings only: Emerson (not including 23 and 27, Psych. Lab.); New Lecture Hall; Sever (not including 25 [Class. Arch. Mus.] or lower rooms); Harvard Hall.
Two hundred and fifty-eight meetings were held outside above buildings 1925-26; 137 in 1923-24.
[2] Multiplying this by 5 4/7 to get a weekly total for the hours from 9 to 1 and 2 to 5 on 5 week-days and the hours from 9 to 1 on Saturdays gives 1438.
The totals of "periods in use" for these hours, when added together, gives 1022, which is 71% of 1438.

Table 4.  Comparison of Actual and Possible Use of Rooms, 1925-26 (continued)

B. Percentage of Available Rooms Utilized

| Available Rooms | | Total 1-hr periods possible per week | Percentage of actual use of rooms available | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Capacity | No. | | 8-9 | 9-10 | 10-11 | 11-12 | 12-1 | 1-2 | 2-3 | 3-4 | 4-5 | 5-6 |
| 12-30 | 2 | 12 | 0.0 | 33.3 | 58.3 | 41.7 | 8.3 | 0.0 | 16.7 | 16.7 | 25.0 | 8.3 |
| 31-50 | 16 | 96 | 0.0 | 83.4 | 90.6 | 92.8 | 69.8 | 10.4 | 30.2 | 14.6 | 3.3 | 0.0 |
| 51-75 | 10 | 60 | 6.7 | 96.7 | 98.3 | 91.6 | 75.0 | 23.3 | 43.4 | 13.3 | 3.3 | 6.7 |
| 76-100 | 5 | 30 | 0.0 | 96.7 | 96.7 | 96.7 | 66.6 | 20.0 | 40.0 | 30.0 | 5.5 | 0.0 |
| 101-125 | 3 | 18 | 0.0 | 100.0 | 83.4 | 94.4 | 66.6 | 0.0 | 55.6 | 16.7 | 0.0 | 0.0 |
| 126-150 | 1 | 6 | 50.0 | 100.0 | 100.0 | 83.4 | 100.0 | 0.0 | 83.4 | 0.0 | 0.0 | 0.0 |
| 151-200 | 2 | 12 | 0.0 | 91.6 | 100.0 | 75.0 | 66.6 | 16.7 | 33.3 | 0.0 | 0.0 | 0.0 |
| 201-300 | 2 | 12 | 0.0 | 100.0 | 100.0 | 100.0 | 83.4 | 0.0 | 41.7 | 41.7 | 0.0 | 0.0 |
| 301-400 | 1 | 6 | 0.0 | 100.0 | 83.4 | 100.0 | 0.0 | 0.0 | 0.0 | 16.7 | 0.0 | 0.0 |
| 900 | 1 | 6 | 0.0 | 100.0 | 50.0 | 100.0 | 100.0 | 0.0 | 33.3 | 0.0 | 0.0 | 0.0 |

In the last two years there has been an increase of 400 students under the Faculty of Arts and Sciences. In this period there has been an increase of 72 in the number of class meetings per week. This increase does not include additional meetings arranged by departments in their own departmental buildings, for example, additional Chemistry courses in Boylston Hall, etc. Twenty-two of these 72 additional class meetings have gone into the four main class-room buildings at the crowded hours 9 to 1; 26 have gone into these four buildings at other hours (that is, 7.45 to 8.45 A.M., or afternoons). The other 14 additional class meetings have been taken care of by the use of class rooms in buildings assigned for departmental uses (for example, Semitic Museum, Geological Lecture Room, etc.). All but two of these fourteen take place in the morning in the 9 to 1 hours.

It does not appear likely that the increase in the next two years will be smaller than in the last two. We are now using in the morning hours, from 9 to 1, 84.6 per cent of the capacity of the four main class-room buildings. Even if questions of health and safety were not involved it is unlikely, because of the impossibility of forecasting demands, that we could make 100 per cent utilization of our capacity. It does not seem feasible to crowd in more courses in the morning hours. Assuming that the Business School moves all of its class meetings across the river in the next few years, very small relief will be given since there are only fourteen meetings of Business School courses in our four main class-room buildings in the 9 to 1 hours.

JA409

Case: 19-2005   Case: Document: 141-1  Document: 42-2  Page: 422  Filed: 08/15/18  Page 12 of 19   ID: 6356615

## TABLE 4 (continued)

### C. Enrollment in Largest Courses, 1924–25 and 1925–26

| Name or Course | Under 400 1924-25 | 1925-26 | Over 400 1924-25 | 1925-26 |
|---|---|---|---|---|
| English A | 223 | 240 | 815 | 893 |
| " 28 | 269 | 281 | | |
| " 41 | | | 649 | 580 |
| " 2 | 193 | 190 | | |
| German A | | | 453 | 543 |
| French 2 | 287 | | | |
| Mathematics A | 192 | 287 | | |
| Mathematics C | 206 | 233 | | |
| Physics C | 229 | 280 | | |
| Biology 1 | 243 | 264 | | |
| History 1 | | | 649 | 750 |
| Government 1 | | 417 | | 525 |
| Economics A | | 405 | | 485 |
| Philosophy A | | 347 | | 407 |

## TABLE 5 — ATTENDANCE, 1870–1925 — HARVARD COLLEGE AND UNIVERSITY

| Year | Col. | Univ. | Year | Col. | Univ. |
|---|---|---|---|---|---|
| 1870-71 | 608 | 1316 | 1898-99 | 1551 | 3901 |
| 1871-72 | 620 | 1214 | 1899-1900 | 1902 | 4091 |
| 1872-73 | 635 | 1089 | 1900-01 | 1992 | 4288 |
| 1873-74 | 706 | 1167 | 1901-02 | 1983 | 4142 |
| 1874-75 | 716 | 1199 | 1902-03 | 2109 | 4261 |
| 1875-76 | 776 | 1290 | 1903-04 | 2073 | 4328 |
| 1876-77 | 821 | 1370 | 1904-05 | 2009 | 4136 |
| 1877-78 | 813 | 1344 | 1905-06 | 1899 | 3945 |
| 1878-79 | 819 | 1350 | 1906-07 | 2247 | 4026 |
| 1879-80 | 813 | 1356 | 1907-08 | 2277 | 4012 |
| 1880-81 | 828 | 1365 | 1908-09 | 2238 | 3918 |
| 1881-82 | 833 | 1382 | 1909-10 | 2265 | 4046 |
| 1882-83 | 928 | 1450 | 1910-11 | 2217 | 4123 |
| 1883-84 | 972 | 1526 | 1911-12 | 2262 | 4203 |
| 1884-85 | 1006 | 1594 | 1912-13 | 2308 | 4279 |
| 1885-86 | 1068 | 1669 | 1913-14 | 2359 | 4366 |
| 1886-87 | 1077 | 1688 | 1914-15 | 2473 | 4604 |
| 1887-88 | 1138 | 1812 | 1915-16 | 2519 | 5226 |
| 1888-89 | 1180 | 1899 | 1916-17 | 2642 | 5656 |
| 1889-90 | 1271 | 2079 | 1917-18 | 1720 | 3684 |
| 1890-91 | 1339 | 2271 | 1918-19 | 2221 | 3894 |
| 1891-92 | 1456 | 2658 | 1919-20 | 2602 | 5273 |
| 1892-93 | 1598 | 2969 | 1920-21 | 2609 | 5667 |
| 1893-94 | 1656 | 3156 | 1921-22 | 2745 | 6073 |
| 1894-95 | 1667 | 3290 | 1922-23 | 2787 | 6357 |
| 1895-96 | 1771 | 3600 | 1923-24 | 2980 | 6733 |
| 1896-97 | 1754 | 3674 | 1924-25 | 3041 | 7075 |
| 1897-98 | 1819 | 3859 | | | |

## TABLE 5 (continued)

| Percent Increase: | 1870-71 to 1924-25 | 1900-01 to 1924-25 |
|---|---|---|
| University | 437.61 | 64.99 |
| College | 400.16 | 52.66 |

## TABLE 6. POPULATION AND COLLEGE ENROLLMENT IN THE NORTHEASTERN STATES

### Population Northeastern States (New England, New York and New Jersey)

| Year | Population |
|---|---|
| 1870 | 8,776,779 |
| 1880 | 10,224,516 |
| 1890 | 12,143,531 |
| 1900 | 14,744,580 |
| 1910 | 18,203,462 |
| 1920 | 20,942,036 |
| 1925 | 22,495,502 [1] |

### Registration — Colleges and Universities

| Year | Harvard | Yale | Columbia | Princeton | Brown | Amherst |
|---|---|---|---|---|---|---|
| 1870 | 1,316 | 755 | 776 | 364 | 220 | 261 |
| 1880 | 1,365 | 1,087 | 1,532 | 488 | 247 | 339 |
| 1890 | 2,271 | 1,645 | 1,671 | 850 | 352 | 352 |
| 1900 | 4,288 | 2,542 | 3,176 | 1,277 | 1,026 | 400 |
| 1910 | 4,123 | 3,282 | 5,117 | 1,450 | 935 | 502 |
| 1920 | 5,667 | 3,820 | 9,117 | 1,967 | 1,867 | 503 |
| 1925 | 7,075 | 5,143 | 13,230 | 2,412 | 2,032 | 615 |

| Year | Dartmouth | Williams | Bowdoin | Tufts | Cornell | Total |
|---|---|---|---|---|---|---|
| 1870 | 436 | 141 | 121 | 74 | 609 | 5,073 |
| 1880 | 429 | 227 | 157 | 84 | 399 | 6,304 |
| 1890 | 462 | 311 | 185 | 145 | 1,390 | 9,634 |
| 1900 | 741 | 375 | 252 | 802 | 2,521 | 17,400 |
| 1910 | 1,229 | 543 | 338 | 1,142 | 4,412 | 23,073 |
| 1920 | 1,888 | 579 | 403 | 2,128 | 5,668 | 33,107 |
| 1925 | 2,138 | 750 | 500 | 2,021 | 5,697 | 41,613 |

### Freshman Class — Harvard College

| Year | Total Registration | No. from Northeastern States |
|---|---|---|
| 1870 | 189 | 159 |
| 1880 | 243 | 191 |
| 1890 | 366 | 301 |
| 1900 | 537 | 421 |
| 1910 | 671 | 538 |
| 1920 | 621 | 494 |
| 1924 | 944 | 735 |

[1] Estimated, World Almanac, 1924.

Case: 19-2006 Document: 00117486229 Page: 423 Date Filed: 06/18/2019 Entry ID: 6356615

TABLE 7.  ENROLLMENT IN THE UNIVERSITY AND PARTS OF THE UNIVERSITY, 1900-25

| | 1900-01 | 1901-02 | 1902-03 | 1903-04 | 1904-05 | 1905-06 |
|---|---|---|---|---|---|---|
| College[1] | 1992 | 1983 | 2109 | 2073 | 2009 | 1899 |
| Grad. School of Arts and Sciences | 341 | 312 | 316 | 402 | 366 | 394 |
| All Depts. except College | 2296 | 2159 | 2152 | 2255 | 2037 | 2046 |
| Whole University[2] | 4288 | 4142 | 4261 | 4328 | 4136 | 3945 |

| | 1906-07 | 1907-08 | 1908-09 | 1909-10 | 1910-11 | 1911-12 |
|---|---|---|---|---|---|---|
| College[1] | 2247 | 2277 | 2238 | 2265 | 2217 | 2262 |
| Grad. School of Arts and Sciences | 387 | 400 | 403 | 425 | 463 | 454 |
| All Depts. except College | 1779 | 1735 | 1680 | 1781 | 1906 | 1941 |
| Whole University[2] | 4026 | 4012 | 3918 | 4046 | 4123 | 4203 |

| | 1912-13 | 1913-14 | 1914-15 | 1915-16 | 1916-17 | 1917-18 |
|---|---|---|---|---|---|---|
| College[1] | 2308 | 2359 | 2473 | 2519 | 2642 | 1720 |
| Grad. School of Arts and Sciences | 463 | 497 | 532 | 598 | 605 | 296 |
| All Depts. except College | 1971 | 2007 | 2131 | 2707 | 3014 | 1964 |
| Whole University[2] | 4279 | 4366 | 4604 | 5226 | 5656 | 3684 |

| | 1918-19 | 1919-20 | 1920-21 | 1921-22 | 1922-23 | 1923-24 | 1924-25 |
|---|---|---|---|---|---|---|---|
| College[1] | 2221 | 2602 | 2609 | 2745 | 2787 | 2980 | 3041 |
| Grad. School of Arts and Sciences | 359 | 531 | 532 | 582 | 648 | 670 | 763 |
| All Depts. except College | 1673 | 2671 | 3058 | 3328 | 3570 | 3753 | 4034 |
| Whole University[2] | 3894 | 5273 | 5667 | 6073 | 6357 | 6733 | 7075 |

Percent Increase:

| | |
|---|---|
| College | 52.66 |
| Graduate School of Arts and Sciences | 123.75 |
| All Departments except College | 75.69 |
| Whole University | 64.99 |

[1] Lawrence Scientific School not included, but, beginning 1906-07, special students formerly registered with Lawrence Scientific School now registered in Harvard College, on account of a change in the administration of the S.B. degree.
[2] University Extension and Summer School students not included.

TABLE 8.  ENROLLMENT — HARVARD UNIVERSITY, 1924-25

The College (total enrollment, 1924-25, *3041*).  A limit of 1,000 in each Freshman Class has been fixed.

The Graduate School of Arts and Sciences (total enrollment, 1924-25, *763*).  No limit desired.

The Law School (total enrollment, 1924-25, *1801*).  Increased facilities for expanding numbers being planned without intention of limitation.

The School of Education (total enrollment, 1924-25, *272*).  Coeducational; no limit proposed.

The Graduate School of Business Administration (total enrollment, 1924-25, *614*).  First-year class entering September, 1924, limited to 335 — that in February, 1925, to 150.  This limitation will prevail until the new buildings are completed.

The Medical School (total enrollment, 1924-25, *506*).  Limited to 125 in each of the first two years, 135 in each of the second two years — total 520.  Limit dictated by optimum use of existing laboratory space, clinical facilities and instructing staff.  More students apply for admission than can be accepted, and the selection is made chiefly on the basis of an examination of the candidate's previous work — preference being given to men who have already prepared themselves in subjects which would more or less specially fit them for medical studies.

School of Public Health (total enrollment, 1924-25, *30*).  No limitation.

The Dental School (total enrollment, 1924-25, *204*).  No limitation.

Engineering School (total enrollment, 1924-25, *288*).  No limitation.

The Theological School (total enrollment, 1924-25, *74*).  No limitation.

School of Architecture and Landscape Architecture (total enrollment, 1924-25, *48* (Architecture) and *39* (Landscape Architecture)).

JA411

Case: 19-2006 Case 1:14-cv-14176-ADB Document 421-237 Filed 06/15/18 Page 14 of 149   ID: 6356615

22

### Table 9. Limitation of Numbers in Endowed Colleges of Northeastern States

| College or University | Lee-way | Limitation | When Adopted | Number Admitted in fall of 1924 |
|---|---|---|---|---|
| Amherst | .. | No formal limitation. Will probably accept 230 in the fall of 1925 | .... | 210 |
| Bowdoin | 50 | Freshman Class limited to about 150. (500 for College) | .... | 136 |
| Brown | 0 | No rigid limitation. Try to limit Freshman Class to about 400 men (about 150 for Women's College) | .... | 422 Men [1] |
| Columbia | 0 | Total registration for College limited to about 2,000 | .... | 474 |
| Cornell | 0 | Limited to 500 (applies only to candidates for B.A. degree). College of Architecture limited to about 45. Other Schools not rigidly limited | Beginning with fall of 1925 | 490 (as candidates for B.A.) |
| Dartmouth | 0 | Trustee provision that total registration be limited to 2,000. The number admitted each year depends on size of upper classes | About 1918 | 673 |
| Princeton | 0 | Limited to 600 | .... | Slightly over 600 |
| Tufts | .. | ? | ? | 108 [1] |
| Williams | 50 | About 225 | 1924 | 254 |
| Yale | 50 | Limited to 850 | 1923 | 880 |

[1] Size of Freshman Class.

23

### Table 10. Growth of Enrollments and Endowments in Eleven Universities and Colleges

#### A. Attendance

| | 1900-01 | | 1923-24 | |
|---|---|---|---|---|
| | College | University | College | University |
| Amherst | 400 | ... | 561 | ... |
| Bowdoin | 254 | ... | 503 | ... |
| Brown [1] | 920 | 920 | 2,060 | 2,013 |
| Dartmouth | 741 | ... | 694 | ... |
| Tufts | 802 | ... | 2,094 | ... |
| Williams | 375 | ... | 2,005 | ... |
| Columbia | 476 | 3,419 | ... | 13,230 |
| Harvard | 1,992 | 4,288 | 2,980 | 6,733 |
| Princeton | 1,168 | 1,277 | 2,231 | 2,448 |
| Yale | 1,190 | 2,542 | 2,005 | 4,447 |
| Cornell | ... | 2,521 | ... | 5,558 |
| | 8,318 | | 15,133 | |

[1] Women included.

#### B. Income-Bearing Funds

| | 1900 | 1924 |
|---|---|---|
| Amherst | $1,600,000.00 | $7,340,000.00 |
| Bowdoin | 660,416.86 | 3,541,164.77 |
| Brown | 1,297,227.56 | 8,209,057.83 |
| Dartmouth | 2,500,000.00 [1] | 6,000,000.00 |
| Tufts | 48,926.00 (Income) [1] | 167,304.00 (Income) |
| Williams | 1,050,850.00 (Income) | 4,543,972.00 |
| Columbia | 435,000.00 (Income) | 1,975,000.00 (Income) [2] |
| Harvard | 12,614,448.19 | 66,624,462.12 |
| Princeton | 2,455,400.00 | 14,322,147.08 |
| Yale | 4,942,166.04 | 35,764,883.97 [2] (Exclusive of Sterling Bequest) |
| Cornell | ? | ? |

[1] 1901        [2] 1923

JA412

Case: 19-2005  Document: ... Page: 15 ... ID: 6356615

### Table 10 (continued)

#### C. Percentage Increase in

| | Attendance in College 1900–24 | Attendance in whole University incl. College 1900–24 | Income-Bearing Funds, Whole University 1900–24 |
|---|---|---|---|
| Amherst | 40.25 | … | 358.75 |
| Bowdoin | 93.03 | … | 436.20 |
| Brown University | … | 118.84[1] | 532.81 |
| Dartmouth | 178.00 | … | 140.00[2] (Income) |
| Tufts | 161.09 | … | 241.53[2] (Income) |
| Williams | 85.06 | … | 332.41 |
| Columbia | 321.21 | 286.95 | 354.02[2] (Income) |
| Cornell | … | 121.65 | ? |
| Harvard | 49.59 | 57.19 | 428.15 |
| Princeton | 91.01 | 91.69 | 408.33 |
| Yale | 68.48 | 74.94 | 623.66[3] |

[1] Placed in this column in deference to the name; but might fairly be in column 1.
[2] 1901–24.
[3] 1900–23.

### Table 11. Enrollment in Departments of Harvard University, 1916–17 to 1925–26

| | 1916–17 | 1917–18 | 1918–19 | 1919–20 | 1920–21 | 1921–22 | 1922–23 | 1923–24 | 1924–25 | 1925–26 |
|---|---|---|---|---|---|---|---|---|---|---|
| The College[2] | 2642 | 1720 | 2221 | 2602 | 2609 | 2745 | 2787 | 2980 | 3041 | 3279 |
| Grad. School of Arts and Sciences | 605 | 296 | 359 | 531 | 532 | 582 | 648 | 670 | 763 | 732 |
| Law School | 856 | 296 | 436 | 879 | 944 | 990 | 1019 | 1097 | 1201 | 1282 |
| School of Education | | | | | 121 | 153 | 241 | 285 | 272 | 236 |
| Grad. School of Bus. Administration | 222 | 93 | 159 | 394 | 442 | 466 | 468 | 539 | 614 | 675 |
| Medical School | 355 | 386 | 404 | 419 | 439 | 472 | 499 | 494 | 506 | 502 |
| School of Public Health | | | | | | 30 | 16 | 29 | 30 | 30 |
| Dental School | 240 | 211 | 154 | 189 | 232 | 205 | 219 | 191 | 204 | 186 |
| Engineering School | 577[3] | 591[3] | 59 | 126 | 214 | 261 | 257 | 253 | 258 | 283 |
| Mining School | 4 | | | 7 | 10 | 15 | 20 | 16 | 25 | 16 |
| Bussey Institution | 16 | 6 | 7 | 10 | 15 | 20 | 16 | 16 | 25 | 16 |
| Theological School | 73 | 59 | 51 | 58 | 53 | 61 | 95 | 86 | 74 | 69 |
| School of Arch. and Landscape Arch. | 63 | 25 | 44 | 65 | 66 | 79 | 92 | 93 | 87 | 91 |
| Total | 5656 | 3684 | 3894 | 5273 | 5667 | 6073 | 6357 | 6733 | 7075 | 7381 |

[2] On October 1, 1925.
[3] Including Special Students.
[4] In combination with Massachusetts Institute of Technology.

### Table 12. Harvard College as a Feeder to the Other Departments

Degrees conferred in Harvard College, June 1923

*(From Rept. of President and Treasurer, 1923–24, p. 322)*

| | |
|---|---|
| (1) A.B. | 400 |
| A.B. O.C. | 56 |
| A.B. for Honorable Service in the War | 9 |
| S.B. | 108 |
| S.B. O.C. | 17 |
| S.B. for Honorable Service in the War | 2 |
| Total | 592 |
| (2) Total number continuing in post-graduate work in Harvard University | 185 |
| Total number that did not go on to post-graduate work in Harvard University | 407 |
| (3) Proportion continuing in post-graduate work in Harvard University | 31.25% |

### Table 13. Harvard University — Analysis of Enrollment, 1924–25

#### Geographical Distribution

| | College | | Graduate and Professional Schools | | Per cent of Total Population of U.S. area, (1920) |
|---|---|---|---|---|---|
| | No. | Per cent | No. | Per cent | |
| *North Atlantic* | | | | | |
| New England | 1717 | 56.46 | 1518 | 37.63 | … |
| N. Y., N. J., Pa., Del. | 697 | … | 773 | … | 28.3 |
| | 2414 | 79.38 | 2291 | 56.79 | |
| *South Atlantic* | | | | | |
| Va., W. Va., Ga., Fla., N. C., S. C., D. C., Md. | 76 | 2.50 | 240 | 5.95 | 13.0 |
| *Western* | | | | | |
| Colo., Calif., N. Mex., Ore., Mont., Wash., Ariz., Utah, Nev., Idaho, Wyo. | 87 | 2.86 | 304 | 7.54 | 8.4 |
| *North Central* | | | | | |
| S. D., N. D., Ill., Mich., Minn., Iowa, Mo., Wis., Ohio, Ind.; Nebr., Kans. | 357 | 11.74 | 740 | 18.34 | 32.2 |
| *South Central* | | | | | |
| Ala., Tenn., Tex., Okla., Ark., Ky., La., Miss. | 55 | 1.81 | 198 | 4.91 | 18.1 |
| U.S. Territories and Foreign | 52 | 1.71 | 261 | 6.47 | … |
| Total | 3041 | 100.00 | 4034 | 100.00 | 100.0 |

[1] In this column the Territories and Foreign Possessions do not enter into the 100 per cent; so there is a slight discrepancy in comparing it with percentages in columns 1 and 2.

Case: 19-2005  Document: 141761  Page: 426  Filed: 05/15/2019

TABLE 14. TABLE SHOWING GEOGRAPHICAL DISTRIBUTION OF CANDIDATES ADMITTED IN 1925

*Under the Old, New, and Honor Plans*

| | Honor | New Plan | Old Plan | Total | Honor Admissions % of Total |
|---|---|---|---|---|---|
| *North Atlantic* | | | | | |
| Maine | 6 | 2 | 1 | 9 | |
| New Hampshire | 5 | 1 | 2 | 10 | |
| Vermont | 1 | 1 | 1 | 3 | |
| Massachusetts | 154 | 77 | 307 | 538 | |
| Connecticut | 11 | 0 | 8 | 19 | |
| Rhode Island | 3 | 3 | 3 | 9 | |
| Total, New England States | 180 | 84 | 324 | 588 | 30.6% |
| New York | 38 | 55 | 62 | 155 | |
| New Jersey | 12 | 8 | 13 | 33 | |
| Pennsylvania | 13 | 9 | 17 | 39 | |
| | 243 | 156 | 416 | 815 | 29.77% |
| *South Atlantic* | | | | | |
| Florida | 0 | 1 | 0 | 1 | |
| Virginia | 2 | 1 | 0 | 3 | |
| Georgia | 3 | 1 | 0 | 4 | |
| District of Columbia | 3 | 0 | 2 | 5 | |
| West Virginia | 1 | 0 | 1 | 2 | |
| South Carolina | 1 | 0 | 0 | 1 | |
| | 10 | 3 | 3 | 16 | 62.5% |
| *Western* | | | | | |
| California | 2 | 10 | 4 | 16 | |
| Washington | 2 | 1 | 0 | 3 | |
| New Mexico | 0 | 1 | 0 | 1 | |
| Colorado | 1 | 0 | 1 | 2 | |
| Utah | 1 | 1 | 0 | 2 | |
| Idaho | 0 | 0 | 1 | 1 | |
| | 6 | 13 | 6 | 25 | 24% |
| *North Central* | | | | | |
| North Dakota | 1 | 0 | 0 | 1 | |
| South Dakota | 0 | 0 | 1 | 1 | |
| Illinois | 14 | 4 | 8 | 26 | |
| Michigan | 3 | 1 | 3 | 7 | |
| Minnesota | 2 | 1 | 3 | 6 | |
| Iowa | 0 | 1 | 2 | 3 | |
| Missouri | 2 | 0 | 10 | 12 | |
| Wisconsin | 3 | 2 | 1 | 6 | |
| Ohio | 15 | 8 | 6 | 29 | |
| Indiana | 3 | 0 | 0 | 3 | |
| Nebraska | 1 | 1 | 0 | 1 | |
| | 44 | 18 | 33 | 95 | 46.3% |

TABLE 14 (*Continued*)

| | Honor | New Plan | Old Plan | Total | Honor Admissions % of Total |
|---|---|---|---|---|---|
| *South Central* | | | | | |
| Alabama | 1 | 0 | 0 | 1 | |
| Tennessee | 4 | 0 | 1 | 5 | |
| Texas | 1 | 0 | 1 | 2 | |
| Oklahoma | 1 | 0 | 2 | 3 | |
| Kentucky | 4 | 0 | 0 | 4 | |
| | 11 | 0 | 4 | 15 | 73.3% |
| Total for North Atlantic States plus Illinois and Ohio (schools which make a specialty of fitting for colleges like Harvard being numerous in these states) | 272 | 168 | 430 | 870 | 31.26% |
| Total for remainder of Continental United States | 42 | 22 | 32 | 96 | 43.7% |
| Total, Continental United States | 314 | 190 | 462 | 966 | 32.5% |
| *Insular Territories* | | | | | |
| Hawaii | 0 | 0 | 1 | 1 | |
| Porto Rico | 0 | 0 | 1 | 1 | |
| | 0 | 0 | 2 | 2 | |
| *Foreign* | | | | | |
| Bermuda | 0 | 0 | 1 | 1 | |
| Canada | 0 | 0 | 2 | 2 | |
| Cuba | 0 | 0 | 1 | 1 | |
| Guatemala | 0 | 0 | 1 | 1 | |
| Jamaica | 0 | 1 | 0 | 1 | |
| Norway | 0 | 0 | 1 | 1 | |
| Peru | 0 | 0 | 1 | 1 | |
| Total, Insular Territories and Foreign Countries | 0 | 1 | 9 | 10 | |
| Grand total | 314 | 191 | 471 | 976 | 32.17% |

In the fall of 1925–26 no candidates were admitted from the following states: Delaware, Maryland, North Carolina, Louisiana, Mississippi, Arkansas, Kansas, Arizona, Wyoming, Oregon.

JA414

Case: 19-2005 Case: 19-1404 Document: 14-1 Document: 22 Page: 427 Filed: 06/15/18 Filed: 06/15/18 Page: 17 of 19 ID: 6356615



Fig. 2. Population in the U. S. (Exclusive of Outlying Possessions) Compared with Enrollment (Men and Women) in Universities, Colleges, and Professional Schools

—Added Below — Registration of Harvard Freshman Class in Hundreds



Fig. 1. College Attendance — 1870-71 to 1924-25

Case: 19-2005 Case 1:14-cv-01074-ADB Document 421-237 Filed 06/15/18 Page 18 of 19 ID: 6356615

31



FIG. 4. CERTAIN COMPARISONS OF THE RATE OF GROWTH OF POPULATION AND COLLEGE ENROLLMENT

"Population in Millions" is that of the New England States plus New York and New Jersey.
"Registration in Thousands" is the total for Harvard, Yale, Columbia, Princeton, Brown, Cornell, Amherst, Dartmouth, Williams, Bowdoin, Tufts.
"Registration in Hundreds" is (above) that of the Harvard Freshman Class, (below) that of students from above named states in the Harvard Freshman Class.

30



FIG. 3. THE RATE OF GROWTH OF THE COLLEGE COMPARED WITH THAT OF THE UNIVERSITY

**JA416**

Case: 19-2005   Document: 14-1   Page: 429   Date Filed: 06/15/180   Entry ID: 6356615




Fig. 5.  Comparison of Rates of Growth of Harvard University and
Certain Departments

# EXHIBIT 238

Case: 19-2005   Document: 0011762236   Page: 431   Date Filed: 07/30/2020   Entry ID: 6356615

CONFIDENTIAL--FOR USE OF SCHOOLS AND
SCHOLARSHIP COMMITTEES

HARVARD COLLEGE ADMISSION POLICY

The following statement of the criteria used in selecting students for admission to Harvard College has been drawn up in response to a request made at a recent meeting in Cambridge by the representatives of the Harvard Club Committees on Scholarships and Schools. It describes as comprehensively and specifically as is possible in brief compass the policies that have been followed for many years by the Harvard College Committee on Admission. We hope it will be useful to the alumni who interview our applicants.

The Committee selects candidates for admission on the basis of certain broad criteria: (1) academic promise; (2) personal qualities of character, all-round effectiveness, stability, and purpose; (3) health and participation in athletic activities; (4) geographical distribution; and (5) Harvard parentage. In the paragraphs that follow we shall try to make clear how these criteria are defined, how they are related to one another, and how much importance is attached to each.

Admission to Harvard College is not so much admission versus rejection as it is selection of those best qualified from a large group of applicants. The process of selection necessarily rests on the informed judgment of the Committee, and involves a weighing of all the factors to be considered.

(1) Academic Promise. The matter of primary concern is whether the candidate will be able to do Harvard work and how well he will do it. An estimate of the student's academic promise is made by examining his secondary school record and his College Board test scores. These factors are summarized, for the use of the Committee, in a single index--the Probable Rank List (PRL),

2-

a statistical device based on the actual records in the freshman year of students who came to Harvard in previous years. Categories are established according to class standing in school combined with the results of College Board tests. Each entering student is assigned a PRL in accordance with the most typical standing of students with similar admission records in the past. Obviously this device gives only a rough approximation, and the Committee's estimate of an individual's academic promise is frequently modified by other evidence supplied by interviewers, school authorities, and others familiar with the applicant's intellectual qualities.

Ordinarily, a candidate of high academic promise has a better chance of admission than a candidate of lower promise, and the higher it is, the more important it is likely to become in the decision to admit. When the candidate's PRL is in the middle or lower ranges, other criteria assume increasing importance. No one is admitted, however impressive he may be in other respects, unless in the Committee's judgment, he has a reasonable chance of achieving at Harvard a satisfactory record ( 3 C's and a D) without damage to his personality because of excessive pressure of work and worry. Only in exceptional cases will a candidate be accepted whose PRL is below 6.0 ( i.e. Group 6).

(2) Personal Qualities. The difficult criterion of personal qualities is of major importance. It includes such intangibles as strength of character, emotional stability, personal and social adjustment, capacity for leadership, and motivation. Clearly it is not possible to appraise these qualities with a high degree of precision. Concrete indications of outstanding leadership, moral courage, high integrity, strong idealism and a sense of responsibility to the community carry great weight. Similarly, evidence of an unusually attractive

JA420

and well-adjusted personality counts heavily in favor of the candidate. A candidate of moderate academic promise may prove acceptable for admission if he has one or more outstanding personal qualities to his credit. The candidate who is definitely lacking in these qualities is not necessarily accepted, in spite of high academic standing.

In appraising the candidate's personal qualities, the Committee is careful not to confuse mere social immaturity resulting from a limited background with fundamental personality defects.

It is in the evaluation of these intangible personal qualities that alumni representatives can be most helpful to the College. Reports from the schools vary in the completeness of their information. For every candidate we need as much unbiased information as can be obtained—and this is likely to come best from our own alumni representatives who have an intimate knowledge of what Harvard wants and an interest in having the most desirable students at Harvard. It is important, particularly when there is strong evidence either way, that the interviewer's report shall contain positive statements with a citing of specific evidence to support them, if possible.

(3) Health and Athletic Activities. Health and physical vigour are factors in selection, but of less importance than those already mentioned. The presence of any significant health problem should be reported to the Committee. It will not necessarily lead to rejection. In fact, the Committee has gone out of its way to admit applicants with certain kinds of physical handicaps when, in the judgment of our doctors and the Committee, they could meet our requirements despite these handicaps. For the protection of the applicant and the College, however, the facts should be reported.

4 -

Outstanding athletic ability is a strong point in favor of a candidate. Regardless of how promising an athlete a candidate may be, however, he will not be admitted unless he is of sound character and has the required academic promise and the will to profit from a Harvard education. In fairness to the candidate it is particularly important that one who has athletic promise but limited means should not be encouraged to come to Harvard unless his budget plans enable him to meet college expenses without excessive strain.

(4) <u>Geographic Distribution</u>. The Admission Committee has set up no geographic quotas. Special preference, however, is given to residents of Cambridge and to areas from which we draw comparatively few students such as rural regions and small towns throughout the country. The purpose of this policy is to maintain, and extend Harvard's character as a national college, which contributes to the educational value of undergraduate experience at Harvard and to the service which the College renders to the country. Unless weight were given to geographic distribution in the selection of applicants, Harvard would have fewer students from the more distant parts of the country where our drawing power is naturally smaller. The geographic factor is of course only one of the several considerations which the Committee takes into account.

(5) <u>Harvard parentage</u>. Although no candidate is admitted solely because his father is a graduate of Harvard, nevertheless it is customary to admit sons of alumni provided they qualify academically and appear to have good character, a stable personality, and a sincere desire to obtain a liberal education at Harvard. If they are academically marginal, the fact of Harvard parentage carries less weight with the Committee.

Case: 19-2005   Document: 00117622236   Page: 434   Date Filed: 07/30/2020   Entry ID: 6356615

5.

The same policy is followed for sons of the Harvard faculty and non-academic staff.

The existence of a Harvard brother or a Harvard ancestor other than a father has a somewhat smaller effect on the Committee's decisions, but it is taken into account.

December 12, 1949

JA423

6

## FAIR EDUCATIONAL PRACTICES LAW

The Massachusetts legislature enacted in 1949 a Fair Educational Practices Act which forbids discrimination because of race, religion, creed, color or national origin in the selection of applicants for admission to an educational institution. The law also forbids schools and colleges to make or cause to be made any written or oral inquiry concerning the race, religion, color or national origin of a person seeking admission.

Harvard is in full agreement with the purpose of this act and intends to obey it both in letter and in spirit. The policy embodied in the law is one which Harvard has tried to follow in admissions, in awarding scholarships, and in the treatment of students. The law specifically states that it is not intended "to limit or prevent an educational institution from using any criteria other than race, religion, color or national origin in the admission of students." We intend, therefore, to continue to select in accordance with the policies explained above which we have followed for many years.

It is important that all who assist in any way in the work of the Scholarship and Admission Committees be aware of the provisions of the law and take pains to comply with its requirements. Not only should they be careful, as they have been, not to be influenced by the considerations mentioned above, but they must not make any inquiries about any of these matters or give any information to the College about them.

Case: 19-2005   Document: 00117622236   Page: 436   Date Filed: 07/30/2020   Entry ID: 6356615

# EXHIBIT 239

CONFIDENTIAL

Discussed at dinner mtg of Committee
Oct. 1, 1952

## I.   ADMISSION POLICY

There has never been a comprehensive formal statement of
Harvard College admission policy.  In fact, until relatively recent
years there was no real need for such a statement.  Admission was a
comparatively simple matter when students came to Harvard from a small
number of schools in which a common pattern of preparation for college
had been followed.  The job of the Admission Committee was simply to
select from among those who applied for admission those who appeared
to have the ability to do acceptable work in the College.  The size
of the Freshman Class was determined until 1921 by the number of quali-
fied applicants.  The only problem was the technical one of setting
and administering admission examinations to weed out the clearly in-
competent.  There was no thought of recruiting students.  It was as-
sumed that Harvard would naturally attract enough of the right kind
of applicants.

Gradually this situation has changed, however.  Quotas have
been set limiting the size of the entering class and the number of
applicants has increased so that we have a serious problem of select-
ing a certain number to be admitted from among a much larger number
of applicants who are able to do satisfactory academic work at Harvard.
Principles of selection, therefore, have to be established, which
means that there must be some reasonably clear conception of the kind
of student body we want.

Furthermore, we are no longer content to sit back and let
students seek out Harvard.  One looks back nostalgically at an earlier
and simpler day when, if any one had thought about it, it would have
seemed beneath Harvard's dignity to recruit students.  It would be

# EXHIBIT 240

Document 421-240   Filed 06/15/18   Page 2 of 4

*Jews*

May 19, 1922

Dear Mr Hocking:

You are quite right that the Hebrew question is a knotty one,
and a source of much anxiety.  The main problem caused by the increase
in the number of Jews comes, I take it, not from the fact that they are
individually undesirable, but from the fact that they form a distinct
body, and cling, or are driven, together, apart from the great mass of
the undergraduates.  If other men of the same/character flowed undis-
tinguished in the stream of college youth, there would be no difficulty.
The summer hotel that is ruined by admitting Jews meets its fate, not
because the Jews it admits are of bad character, but because they drive
away the Gentiles, and then, after the Gentiles have left, they leave
also.  This happened to a friend of mine with a school in New York, who
thought, on principle, that he ought to admit Jews, but who discovered in
a few years that he had no school at all.  A similar thing has happened in
the case of Columbia College; and in all these cases it is not because Jews
of bad character have come; but the result follows from the coming in large
numbers of Jews of any kind, save those few who mingle readily with the
rest of the undergraduate body.  Therefore any tests of character in the
ordinary sense of the word afford no remedy.  The number of men who could
be rejected by any such process is very small, and would not, I think,
touch the real problem.  The summer hotel guards itself by refusing to
admit any Jews.  That, I believe, is very unfortunate; and in the case of
a college would be wholly wrong.  We must take as many as we can benefit,
but if we take more, we shall not benefit them and shall ruin the college.

There may be different ways of limiting the number of Jews; either by directly excluding all beyond a certain percentage, a rule that could on the same ground be applied to any group of men who did not mingle indistinguishably with the general stream, - let us say Orientals, colored men, and perhaps I can imagine French Canadians, if they did not speak English and kept themselves apart; or we might limit them by making the fact that men do not so mingle one of the causes for rejection above a certain percentage. This would apply to almost all, but not all, Jews; possibly, but not probably, to other people. Applied in that way to all candidates for admission who do not clearly pass our entrance examinations, or who seek to transfer from other colleges, it would probably be effective for the moment; and meanwhile a committee could be studying the matter and report next year.

Personally, I think I should prefer to state frankly that we thought we could do the most good by not admitting more than a certain proportion of men in a group that did not intermingle with the rest, and give our reasons for it to the public. This would cause at once some protest, but would be recognised by reasonable people as the wise and generous thing. I suspect, however, that the Faculty, and probably the Governing Boards, would prefer to make a rule whose motive was less obvious on its face, by giving to the Committee on Admission authority to refuse admittance to persons who possess qualities described with more or less distinctness and believed to be characteristic of the Jews. This is what Professor Holcombe's motion was intended to do. Its object was to diminish the number of Jews in the college. He merely did not want it to be supposed that the Jews were excluded simply because they were Jews, but because they possessed the qualities common to Jews, although not absolutely universal.

What seems to me of greatest importance is that the Faculty should understand perfectly well what they are doing, and that any vote passed with the intent of limiting the number of Jews should not be supposed by anyone to be passed as a measurement of character really applicable to Jew and Gentile alike.

> Very truly yours,
>
> A. LAWRENCE LOWELL

Professor William E. Hocking
    16 Quincy Street
        Cambridge, Mass.

# EXHIBIT 241

*Jews*

May 20, 1922

Dear Mr Tucker:

The whole question of the Jewish students is a very disagreeable one, and one that we have never been obliged to face. The fact is that the theories on which we have been proceeding - that all men are born free and equal, etc. - are not absolutely true, but true within certain limits. In the world of European politics we have found our ideas of democracy rudely shaken by race aspirations, which the men of Rousseau's school of thought never contemplated, but which are facts, - facts which cannot be ignored and which have caused the slaughter of hundreds of thousands of men, which are now keeping Europe in a turmoil. I suspect the only way to solve the difficulty that we have is to look it straight in the fact and see the facts as they are. Now the facts are that where Jews become numerous they drive off other people, and then leave themselves. It is not a question of moral character or individual qualities. It is the fact of segregation by groups which repel other groups. The summer hotel that is ruined by admitting Jews is not ruined because the Jews are bad in character, but simply because other people stay away, and then the Jews themselves cease to come. A similar thing has happened at Columbia College, where the number of Jews has driven off other people, and the college remains small, their attempts to reduce the number of Jews being too late. With us the danger would seem to be imminent. Unlike the summer hotel, we ought not to, and will not, exclude Jews for fear of the consequences to the College. We will take as many of them as we can take for their profit and without injuring the College. I guess this at 15% or 16%,

JA432

because it was when the proportion exceeded that amount that complaints began to be loud.  In travelling through Western cities I now hear that one reason why the Harvard Clubs have difficulty in getting students is because Harvard has the reputation of having so many Jews.  I am told the same talk is heard in the great preparatory schools.

The question is not one of moral character, of religion, or of race, but of social segregation.  It boots nothing to inquire whose is the fault of that segregation, for the matter with which we are concerned is a fact.  It is a case of incompatibility of groups, what I suppose would now be studied under the familiar name of group psychology; and there lies the problem.  Hitherto we have assumed a general homogeneity, and hence could consider only the qualities of the individual.  We are now faced by an actual group segregation, in which the important factor is not the quality of the individual, but of the group.  I suppose that as scholars and men of science we must study and accept the facts as they are, and not ignore them for the sake of a preconceived theory, which was near enough the truth to be applicable under past conditions.  The important thing in the resolution that you suggest seems to me, therefore, the words "social qualities".

Very truly yours,

A. LAWRENCE LOWELL

Rufus S. Tucker, Esq.

8 Plympton Street

Cambridge

# EXHIBIT 242

June 10, 1922

Dear Mr Marvin:

The situation about the Jews is not really very differint in Harvard
from what it is in the rest of the country. There is a race problem, and
a very difficult one; and there is no use in shutting our eyes to it. During
Reconstruction, the North shut its eyes to the race problem of the negro in
the South and tried to act on the principle that there was no such thing as
a race distinction. It made a mistake from which the country has not wholly
recovered yet. There is no use, it seems to me, in shutting our eyes to a
great problem of this kind. The assimilation of races in this country will be
difficult, and ought to be carefully considered. When in any place - as in a
college or school - the Jews become very numerous, it is a fact that the
Gentiles tend to leave and the institution tends to change its character. To
a limited number of Jews we can do a vast deal of good in making them American;
but if the numbers increase largely, they cling together and are affected
comparatively little. This is a real problem. Now, it is possible to meet it
directly or indirectly. We can reduce the number of Jews by talking about other
qualifications than those of admission examinations. If the object is simply
to diminish the Jews, this is merely an indirect method of avoiding a problem
in American life which is really important. This is the feeling of the most
thoughtful people here, both Gentile and Jew. On the other hand, we are in no
present danger of having more students in college than we can well take care of;
nor, apart from the Jews, is there any real problem of selection, the present
method of examination giving us, for the Gentile, a satisfactory result. It seems
to me that where we have a real question we had better face it, and try to solve
it as it is.

Very truly yours,

**JA435**

P. Marvin, Esq.

# EXHIBIT 250

Read selected article ▶

**FINAL EDITION**

# Chicago Daily Tribune

THE WORLD'S GREATEST NEWSPAPER

VOLUME LXXXV—NO. 111 C    SATURDAY, MAY 8, 1926—34 PAGES    ★ ★ ★ PRICE TWO CENTS

Daily · · · 741,831
Sunday · · 1,072,297

# BRITISH ARMY FACES RIOTERS

## GIVE COMMAND TO HELP CIVIL AUTHORITIES

## Mobbing in Hull and Glasgow.

*Expose Illinois Pardon Ring in New Letters*

### Court Enjoins Pastor from Lovemaking

PULLING HIM DOWN, BUT HE WON'T LET GO

HELP! HELP! HELP! BANKRUPTCY DANGERS

### MYSTERY NOTES IN PRISON QUIZ PROMISE THRILL

Nathan Leopold Is Escape Witness.

### SHOW STEVENS HAD PUT FEAR INTO OFFICIALS

### Became Wild Over Delayed Parole.

NEWS SUMMARY

BULLETIN

**JA437**

**Chicago Tribune** — May 8, 1926

## Harvard Scans Racial Traits of Applicants

Cambridge, Mass., May 7.—[P]—The Harvard Liberal club will say tomorrow in its publication, the Gadfly, that Prof. Henry Pennypacker, chairman of the committee on admissions at Harvard, has stated that racial characteristics are considered in passing upon applicants and that "race is part of the record."

The alleged statement adds that race is one of the grounds on which a man will be kept out on grounds of "race." The editors of the student organ state that Mr. Pennypacker certified he had made the statement attributed to him. Mr. Pennypacker could not be reached to-night.

### Extreme Racial Characteristics.

The whole record does include evidence of the candidate's character, his personality and promise," the quoted statement reads, "his fitness to give the man to Harvard and to derive the most from what Harvard has to offer. Traits of character may tend to give a boy from becoming a part of our great fellowship of Harvard will be weighed.

"Among these traits may be extreme racial characteristics. Race is a part of the record. It is by no means the whole record, and no man will be kept out on grounds of race; but those racial characteristics which make for race isolation will, if they are too strong in an individual, be taken into consideration as part of that total of character, personality, and promise.

### Denies Race Discrimination.

"It there should result, in fact, any ...

---

## WHITING TAKES HIS STEP-COUSIN AS THIRD WIFE

Bradford Hill Whiting, whose two previous marriages resulted in divorces ... was revealed in letters discovered ... yesterday ... Miss Florence Warrington ...

Mr. Whiting, the son of J. Hill Whiting, wealthy steel manufacturer, married Miss Warrington, daughter of the late Judge John Warrington of Cincinnati, at her brother George's home there about three weeks ago. It was learned, the couple spending part of their wedding trip here with Brad-ford's parents at the Lake Shore Drive hotel.    Miss   Warrington,   whose parents are dead, was a stepdaughter to a sister of her husband's mother. The couple will make their home in Cincinnati.

Mr. Whiting was first married to Miss Adele Martin, who divorced him Nov. 17, 1922, charging habitual drunkenness. She was awarded the custody of their four children by Judge George F. Rush. Rosa Picard Daniels, a divorcee, on July 6, 1923, who divorced him March 2, this year, on similar charges. Thus, his third marriage tends to offer his late mother's family.

---

## 22 Drowned in Russian Floods; Damage Is Great

Moscow, May 7.—[P]—Twenty-two persons have been drowned in floods of the Volga river. Much damage has been caused to the agricultural districts of Nizhni-Novgorod, where the water rose in one area twenty miles wide.

---

## THE WEATHER

SATURDAY, MAY 8, 1926.

---

## BOMB PERILS FAMILY OF FOUR; NEW TERRORISM

A black powder bomb was exploded late last night on a rear porch at 5991 Rogers avenue, endangering the lives of C. C. Lynch, his wife and two children, who were sleeping in adjoining ...

The first floor of the building is occupied by the Material Service company. The home of the Lynch family is on the second floor. Lynch is employed by the company.

According to Sergts. Frank Sweeney and Charles Thomas of the Albany Park station, Lynch had been appointed by an organizer striving to form a union of team owners and had not agreed at once to join it. The bomb, which was placed at the second floor level, caused damage of $200.

---

## DELAY DURKIN TRIAL AGAIN AS ATTORNEY QUITS

Martin Durkin, stolk bandit who is under indictment as the slayer of two men, found himself without a lawyer yesterday in Judge Harry B. Miller's criminal court. Attorney John P. Tyrell, who heretofore has represented the bandit, told Judge Miller yesterday that he had withdrawn and asked that Durkin be given time to obtain new counsel.

Judge Miller granted a continuance until May 24 and notified Durkin's other relatives that they are either extraneous to her, or that he would appoint lawyers to defend him. Last evening Mrs. Durkin announced that she was hopeful of raising enough money.

### Strike or No Strike, British Must Get Tea; Ration It

---

## Dry Agent in Murder Case Freed by Court's Order

Aberdeen, S. D., May 7.—[P]—Edward C. Wood, federal prohibition agent charged with first degree murder in connection with the shooting of Frank ... in 1925, was freed las today.  Federal Judge Elliott ordered the jury to return a verdict of not guilty.

---

ing.

Tells of Alleged Wooing.

"But he kept coming to the house. He began to insist on trips to fly. That was last fall. I didn't know what to do. You see, he was our pastor.  I reposed him; I told him not to come near the house any more or I would inform my husband. But he kept on. He would push his car in the neighborhood and drop in by the back door. He tried to kiss me. He forced me to kiss him. I told my husband."

"I warned Mr. Curtiss to stay away from our home," Bryan said. "I didn't want to take extreme measures with him."

"When I insisted he stop his foolishness," Mrs. Bryan continued, "he told me that he had had 13 years' experience in such things and that it would take a sly person to catch him.

### Tells Chief of Police.

The husband said that about six months ago he told the chief of police that Mr. Curtiss was annoying Mrs. Bryan.

The petition in the case charges it became necessary for Mrs. Bryan to keep the revolver loaded constantly to prevent the minister from entering, announced. She also claimed she was afraid he would do her bodily harm.

Rev. Mr. Curtiss said, "Yes, I took Mrs. Bryan home from church several times. She lives five or six blocks from home, too. About making love to her, I may have been friendly for a little, and I'm sorry I did. It was simply a matter I would like to go away with her."



http://archives.chicagotribune.com/1926/05/08/page/1/article/harvard-scans-racial-traits-of-applicants

# EXHIBIT 251

# Race Determining Factor in Regard to Harvard Applicants, He Admits

DOWNLOAD PDF FOR THIS DATE

May 11, 1926

Boston (May. 10)

(Jewish Daily Bulletin)

Race and place of residence are to be part of the qualifications of candidates for admission to Harvard College under the new rule of "character, personality and promise," according to Henry S. Pennypacker, Chairman of the Committee on Admissions which administers this rule.

Mr. Pennypacker's statement was contained in the Gadfly, publication of the Harvard Student Liberal Club, on Saturday.

A committee of six undergraduate and graduate students, all members of the Liberal Club, inteviewed Mr. Pennypacker recently and asked him the following questions:

How far are the new regulations designed to preserve a balance between racial groups? Between social groups?"

Mr. Pennypacker stated that the traditional policy of freedom from discrimination on the grounds of race or religion is still of binding force and effect. He then declared:

"Race is a part of the record. It is by no means the whole record and no man will be kept out on grounds of race. But those racial characteristics which make for race isolation will, if they are borne by the individual, be taken into consideration as a part of that individual's characteristics under the test of character, personality and promise."

The new rule which the Committee on Admissions will interpret and which it is alleged will result in discrimination particularly against unfavored races reads:

"Candidates should bear in mind that in all admissions to the university regard is given to character, personality and promise as well as to scholarly attainments."

The committee asked him what factors would be taken into consideration.

"All available factors concerning the boys will be taken into consideration We wish to look at the boy's fitness for his job in much the same way an employer wants to looke at his employee."

Under the new rule all candidates must include a photograph with the application blank. Mr. Pennypacker was asked the purpose of the photograph.

"For purposes of identification," he said, "as evidence of character, personality, and promise, only very vague in the case of candidates not seen."

ADVERTISEMENT: Get up to $1000 off your first summer at over 150 Jewish overnight camps! Visit OneHappyCamper.org.

FEATURED STORIES

 Boston mourns Jewish girl and best friend killed by motorist

 Is Olympic skier Mikaela Shiffrin Jewish?

 For Jews in the Netherlands, Catholic Carnival feels like 'hardcore Purim'

 Son of Holocaust survivor named president of Harvard

## Founding Funders

The digitization of the JTA Archive would not have been possible without the generous support of the following donors:

- The Gottesman
- Elisa Spungen Bildner and Robert Bildner, in honor of Norma Spungen



JA441

Case 1:14-cv-14176-ADB    Document 421-251    Filed 06/15/18    Page 3 of 3

Righteous Persons
Foundation
- Charles H. Revson
  Foundation

- George S. Blumenthal
- Grace and Scott Offen Charitable Fund

**JA442**

1                UNITED STATES DISTRICT COURT

2                DISTRICT OF MASSACHUSETTS

3     _____

4     STUDENTS FOR FAIR ADMISSIONS, INC.,

5                    Plaintiff,          Civil Action
                                         No. 14-14176-ADB
6     v.
                                         October 15, 2018
7     PRESIDENT AND FELLOWS OF HARVARD
      COLLEGE, et al.,                   Pages 1 to 187

8                    Defendants.

9     _____

10

11

12           TRANSCRIPT OF BENCH TRIAL -- DAY 1
       BEFORE THE HONORABLE ALLISON D. BURROUGHS
13            UNITED STATES DISTRICT COURT
           JOHN J. MOAKLEY U.S. COURTHOUSE
14                ONE COURTHOUSE WAY
                 BOSTON, MA  02210

15

16

17

18

19

20

21

22              JOAN M. DALY, RMR, CRR
23                Official Court Reporter
           John J. Moakley U.S. Courthouse
24         One Courthouse Way, Room 5507
                Boston, MA  02210
25             joanmdaly62@gmail.com

```
 1    APPEARANCES:

 2
      COUNSEL FOR THE PLAINTIFF:
 3

 4            ADAM K. MORTARA, ESQUIRE
              J. SCOTT McBRIDE, ESQUIRE
 5            KRISTA J. PERRY, ESQUIRE
              Bartlit Beck Herman Palenchar & Scott
 6            54 West Hubbard Street
              Suite 300
 7            Chicago, Illinois 60654
              312.494.4400
 8            adam.mortara@bartlit-beck.com
              scott.mcbride@bartlit-beck.com
 9            krista.perry@bartlit-beck.com

10            JOHN M. HUGHES, ESQUIRE
              MEG E. FASULO, ESQUIRE
11            Bartlit Beck Herman Palenchar & Scott
              1801 Wewatta Street
12            Suite 1200
              Denver, Colorado 80202
13            303.592.3100
              john.hughes@bartlit-beck.com
14            meg.fasulo@bartlit-beck.com

15            KATHERINE L.I. HACKER, ESQUIRE
              Bartlit Beck Herman Palenchar & Scott
16            1899 Wynkoop Street
              Suite 800
17            Denver, Colorado 80202
              303.592.3100
18            kat.hacker@bartlit-beck.com

19            JOHN MICHAEL CONNOLLY, ESQUIRE
              THOMAS R. McCARTHY, ESQUIRE
20            WILLIAM S. CONSOVOY, ESQUIRE
              Consovoy McCarthy Park PLLC
21            3033 Wilson Boulevard
              Suite 700
22            Arlington, Virginia 22201
              703.243.9423
23            mike@consovoymccarthy.com
              tom@consovoymccarthy.com
24            will@consovoymccarthy.com

25
```

**JA444**

Case: 19-2005   Document: 00117628336   Page: 457   Date Filed: 07/30/2020   Entry ID: 6356615
Case 1:14-cv-14176-ADB   Document 631   Filed 04/18/19   Page 3 of 187

3

```
 1    APPEARANCES (cont.):

 2
            PATRICK STRAWBRIDGE, ESQUIRE
 3          Consovoy McCarthy Park PLLC
            Ten Post Office Square
 4          8th Floor, South, PMB #706
            Boston, Massachusetts 02109
 5          617.227.0548
            patrick@consovoymccarthy.com
 6
            MICHAEL H. PARK, ESQUIRE
 7          Consovoy McCarthy Park PLLC
            3 Columbus Circle
 8          15th Floor
            New York, New York 10024
 9          646.456.4432
            park@consovoymccarthy.com
10
            PAUL M. SANFORD ESQUIRE
11          BENJAMIN C. CALDWELL, ESQUIRE
            Burns & Levinson LLP
12          One Citizens Plaza
            Suite 110
13          Providence, Rhode Island 02903
            401.831.8330
14          psanford@burnslev.com
            bcaldwell@burnslev.com
15

16    COUNSEL FOR THE DEFENDANT:

17          WILLIAM F. LEE, ESQUIRE
            FELICIA H. ELLSWORTH, ESQUIRE
18          ANDREW S. DULBERG, ESQUIRE
            ELIZABETH C. MOONEY, ESQUIRE
19          SARAH R. FRAZIER, ESQUIRE
            Wilmer Cutler Pickering Hale and Dorr LLP
20          60 State Street
            Boston, Massachusetts 02109
21          617.526.6556
            william.lee@wilmerhale.com
22          felicia.ellsworth@wilmerhale.com
            andrew.dulberg@wilmerhale.com
23          elizabeth.mooney@wilmerhale.com
            sarah.frazier@wilmerhale.com
24

25
```

Case: 19-2005    Document: 00117628336    Page: 458    Date Filed: 07/30/2020    Entry ID: 6356615
Case 1:14-cv-14176-ADB   Document 631   Filed 04/18/19   Page 4 of 187

4

```
 1    APPEARANCES (cont.):

 2
            SETH P. WAXMAN, ESQUIRE
 3          DANIELLE CONLEY, ESQUIRE
            DANIEL WINIK, ESQUIRE
 4          BRITTANY AMADI, ESQUIRE
            PAUL R.Q. WOLFSON, ESQUIRE
 5          Wilmer Cutler Pickering Hale and Dorr LLP
            1875 Pennsylvania Ave, NW
 6          Washington, DC 20006
            202.663.6006
 7          seth.waxman@wilmerhale.com
            danielle.conley@wilmerhale.com
 8          daniel.winik@wilmerhale.com
            brittany.amadi@wilmerhale.com
 9          paul.wolfson@wilmerhale.com

10          DEBO P. ADEGBILE, ESQUIRE
            Wilmer Cutler Pickering Hale and Dorr LLP
11          7 World Trade Center
            250 Greenwich Street
12          New York, New York 10007
            212.295.6717
13          debo.adegbile@wilmerhale.com

14          ARA B. GERSHENGORN, ESQUIRE
            Harvard Office of the General Counsel
15          Smith Campus Center
            Suite 980
16          1350 Massachusetts Avenue
            Cambridge, Massachusetts 02138
17          617.495.8210
            ara_gershengorn@harvard.edu

18

19    COUNSEL FOR AMICI STUDENTS:

20          JON M. GREENBAUM, ESQUIRE
            BRENDA L. SHUM, ESQUIRE
21          GENEVIEVE BONADIES TORRES, ESQUIRE
            KRISTEN CLARKE, ESQUIRE
22          1500 K Street NW, Suite 900
            Washington, DC 20005
23          202.662.8315
            jgreenbaum@lawyerscommittee.org
24          bshum@lawyerscommittee.org
            gtorres@lawyerscommittee.org
25          kclarke@lawyerscommittee.org
```

```
 1    APPEARANCES (cont.):

 2
              LAWRENCE CULLEEN, ESQUIRE
 3            EMMA DINAN, ESQUIRE
              Arnold & Porter LLP
 4            555 Twelfth Street, NW
              Washington, DC 20004
 5            202.942.5477
              gina.dean@aporter.com
 6            emma.dinan@aporter.com

 7
       COUNSEL FOR AMICI ORGANIZATIONS:
 8
              JENNIFER A. HOLMES, ESQUIRE
 9            CARA McCLELLAN, ESQUIRE
              JIN HEE LEE, ESQUIRE
10            MICHAELE M. TURNAGE YOUNG, ESQUIRE
              RACHEL N. KLEINMAN, ESQUIRE
11            NAACP Legal Defense and Educational Fund, Inc.
              700 14th Street NW
12            Suite 600
              Washington, DC 20005
13            jholmes@naacpldf.org
              cmcclellan@naacpldf.org
14            jlee@naacpldf.org
              myoung@naacpldf.org
15            rkleinman@naacpldf.org

16            KENNETH N. THAYER, ESQUIRE
              KATE R. COOK, ESQUIRE
17            Sugarman Rogers
              101 Merrimac Street
18            Suite 900
              Boston, Massachusetts 02114
19            617.227.3030
              thayer@sugarmanrogers.com
20            cook@sugarmanrogers.com

21

22

23

24

25
```

**JA447**

```
 1              P R O C E E D I N G S
 2              (The following proceedings were held in open
 3   court before the Honorable Allison D. Burroughs, United
 4   States District Judge, United States District Court, District
 5   of Massachusetts, at the John J. Moakley United States
 6   Courthouse, One Courthouse Way, Boston, Massachusetts, on
 7   October 15, 2018.)
 8              THE CLERK:  All rise.  Court is in session.  Please
 9   be seated.  This is Civil Action 14-14176, Students for Fair
10   Admissions versus President and Fellows of Harvard College.
11              Will counsel identify yourselves for the record.
12              MR. MORTARA:  Your Honor, Adam Mortara for the
13   Students for Fair Admissions.  With me today are Kat Hacker,
14   John Hughes, and Scott McBride.  In the back row, Patrick
15   Strawbridge, Meg Fasulo, Krista Perry.  Behind them, Mike
16   Connolly, Will Consovoy, and Paul Sanford.  And behind them,
17   Tom McCarthy and Mike Park.
18              THE COURT:  I'm not going to remember that.  That's
19   a lot.  Mr. Consovoy, Mr. Strawbridge, I can't get used to
20   seeing you back there.
21              Good morning, Mr. Lee.
22              MR. LEE:  Good morning, Your Honor.  On behalf of
23   Harvard, you will hear from during the course of the trial
24   Felicia Ellsworth, Danielle Conley, Seth Waxman, and Ara
25   Gershengorn and me.  Thank you.
```

1          THE COURT:  I think we're ready to get right to

2     openings.  I have a couple of housekeeping matters.  The

3     first is, as you've no doubt noticed, we're being besieged by

4     media requests, and one of the things they want are copies of

5     the exhibits.  We're wondering if we can leave it to the

6     parties to take responsibility for distributing exhibits to

7     the media in some way.

8          MR. MORTARA:  That's no problem from our

9     perspective, Your Honor.

10          MR. LEE:  We're fine with that, Your Honor.

11          THE COURT:  We don't have the resources to do that.

12     The two amicus parties have proposed a schedule.  It seems

13     like Harvard was amenable to it as they didn't want their

14     case interrupted.  Is that right?

15          MS. HACKER:  That's correct, Your Honor.  We're

16     willing to be flexible with the amici and keep them up to

17     date about when we expect our case will close before

18     Harvard's case begins.

19          Right now we told amici that we anticipate that

20     being potentially next Thursday or Friday.  Of course as this

21     week goes along, we can update them.  But it's just difficult

22     to provide a date certain when that will happen.  I think

23     both sides here agree that it will make sense for the amici

24     to go between SFFA's case and Harvard's case.

25          THE COURT:  I agree that that makes sense.  And I

**JA449**

Case: 19-2005    Document: 00117628336    Page: 462    Date Filed: 07/30/2020    Entry ID: 6356615
Case 1:14-cv-14176-ADB   Document 631   Filed 04/18/19   Page 9 of 187

8

```
 1    don't want to interrupt the presentation of your case, but I
 2    understand they had one person that was only available on one
 3    day.  So let's just let that go for a bit and we'll see where
 4    we end up as we get closer to that one day.  Is it the 29th?
 5              I have a request for judicial notice on some of the
 6    historical stuff.  Are you going to respond to that, Mr. Lee?
 7              MR. LEE:  No, Your Honor.  The motion that was
 8    filed is something that we negotiated with SFFA.
 9              THE COURT:  Okay.  The last thing is the schedule.
10    I'm just going to go a couple of days ahead.  I have a bunch
11    of other things scheduled at 3:00, so at close to 3:00 today
12    when we have a reasonable stopping point, we'll stop there.
13    I usually allow only half an hour and 45 minutes for a lunch.
14    I'm just thinking the cafeteria is going to be crazed today.
15    So I'm thinking of starting with an hour today.  If that
16    turns out to be too much, we can shorten it.  I don't want
17    anybody to not have time to eat.
18              Tomorrow, as you know, I can only sit until around
19    1:00.  And I think I had told you there was another day next
20    week.  I forget which day it was, Tuesday or Wednesday.  That
21    meeting has been changed to a week after.  So I'm planning on
22    going, depending on the rest of my schedule, somewhere
23    between 10:00 to -- somewhere between 3:00 and 4:00 this week
24    with the exception of tomorrow.  All right?  I'll give you
25    more specifics on that.
```

 1          MR. LEE:  Your Honor, what time would you like to

 2   start tomorrow?

 3          THE COURT:  It's hard for me to start before 9:30.

 4   If you want the extra half hour, we can do it.  Otherwise,

 5   the regular start time.

 6          MR. LEE:  10:00 is fine with us.

 7          THE COURT:  I think 10:00 in terms of -- if we

 8   start to need extra time, we can begin starting earlier.

 9   Give me one second here.

10          MR. MORTARA:  Your Honor, may I proceed?

11          THE COURT:  Yes, you may.

12       OPENING STATEMENT OF STUDENTS FOR FAIR ADMISSIONS

13          MR. MORTARA:  Thank you, Your Honor.

14          The evidence in this trial will show that Harvard

15   College discriminates against Asian-American applicants,

16   specifically those applicants ineligible for Harvard's

17   sizeable preferences for recruited athletes, the children of

18   its alumni, major donors, and its faculty.

19          The evidence will show that senior officials at

20   Harvard, including Dean William Fitzsimmons, have been aware

21   of this discrimination since at least 2013.  And in short,

22   Harvard will deny both what its own internal research told it

23   in February 2013 and what common sense should tell us all,

24   that subjectively determining someone's personal qualities

25   from a stack of paper without any guidance, without any

1    warnings about using race, invites racial bias, explicit

2    bias, implicit bias, racial stereotyping, and that here has

3    added up to intentional discrimination in violation of

4    Title VI.

5          This is particularly true in the case of Harvard's

6    admissions process where the very first page of the very

7    first document an admissions officer reads about how to read

8    applications enjoins the admissions officer to focus on race.

9          Most of the evidence we will present in this trial

10    goes to Count I, our claims of anti Asian-American

11    discrimination because on this claim we have the least

12    disagreement with Harvard about the law.  Harvard agrees it

13    is against Title VI.  It violates Title VI for Harvard to

14    impose an Asian penalty in its admission process.  We

15    disagree about the facts.

16          As to the other counts, Your Honor, it's a bit of

17    the converse.  The facts are less in dispute.  Harvard uses

18    race in its admission process and says its purpose is

19    diversity.

20          By Harvard's own admission, race is determinative

21    in the admission of over half the African-Americans and about

22    the third of the Hispanics on Harvard's campus in the

23    college.  That's not our report.  That's Harvard's own report

24    on race-neutral alternatives, Plaintiff's Exhibit 316.

25          And as Director McGrath testified and will testify,

Case: 19-2005   Document: 00117629236   Page: 465   Date Filed: 07/30/2020   Entry ID: 6356615
Case 1:14-cv-14176-ADB   Document 631   Filed 04/18/19   Page 11 of 187

11

1   Harvard runs its preliminary admissions process and then

2   checks the racial numbers from the previous year.  If it sees

3   a group that's far behind or significantly behind, an

4   under-represented minority group, it explicitly goes back and

5   re-reviews those applications, balances it out.

6           And of course, as Your Honor observed in the

7   summary judgment ruling, Harvard did not convene or finish a

8   committee or seriously consider race-neutral alternatives

9   until nearly 15 years after the Supreme Court told Harvard it

10  needed to in the *Grutter* decision.

11          Your Honor, the future of affirmative action in

12  college admissions is not on trial here this next couple of

13  weeks.  The Supreme Court has held that race can be used in a

14  narrowly tailored way in college admissions.  Diversity and

15  its benefits are not on trial here.  Students for Fair

16  Admissions supports diversity on campus, and the Supreme

17  Court has held that race can be used in a narrowly tailored

18  way in a college admissions process to unlock the education

19  at benefits of diversity.

20          This trial is about what Harvard has done and is

21  doing to Asian-American applicants and how far Harvard has

22  gone in its zeal to use race in its admissions process.

23          Your Honor, I think you're already very familiar

24  with Harvard's admissions process from the summary judgment

25  briefing.  I want to focus on some elements of that process

1    and how important certain features of that process are to

2    admission to Harvard.

3            And the guidance, the written guidance to Harvard's

4    admissions officers about how to review that big stack of

5    paper that they get in the application, is contained in

6    documents like Plaintiff's Exhibit 1.  Plaintiff's Exhibit 1

7    is the reading procedures for the class of 2018.  They're

8    here on your screen right now, and all the reading procedures

9    will be introduced into evidence, Your Honor.

10            You can see what I told you at the outset.  The

11    very first thing that a reader of a Harvard application is

12    enjoined to do is check the race of the applicant and make

13    sure it's been properly transferred from the common

14    application.

15            Now, I know Your Honor knows, you ordered the

16    production of a significant quantity of data about how

17    Harvard applies the written guidance in documents like

18    Plaintiff's Exhibit 1, six years of admissions data from the

19    class years 2014 to 2019.  We have about 150,000 applicants.

20    We have about 10,000 offers of admission.  You can look at

21    that data and summarize it, and we've done that in Rule 1006

22    summaries of the voluminous evidence Harvard produced from

23    its own admissions decisions.

24            I want to show you one of those summaries now.

25    This is Plaintiff's Exhibit 620.  This is a lot of

1    information, Your Honor.  I'm not going to talk about all of

2    it today.  I want to orient you.  This is talking about

3    showing how Harvard uses its ratings.  I'm going to talk

4    about some of those ratings.

5         The first thing I want to focus the Court's

6    attention on is this notation down in the corner, so-called

7    baseline data set.  As Your Honor knows, we have significant

8    discussions about how to treat the athletes; legacies; dean's

9    list -- that's the list of people that take the attraction of

10   Dean Fitzsimmons, perhaps because he knows the person or

11   because Harvard's development office has asked for that

12   attention; and the children of faculty or staff.  They're not

13   included on the data you're seeing on the screen.  This is

14   the regular folk, the people with no connection to Harvard,

15   the non-ALDC applicants.

16        You see up here I'm going to focus on the ratings

17   Harvard applies, the first four here.  There you see.

18        Now, these ratings are important.  They are ratings

19   assigned by Harvard's admissions officers in their subjective

20   judgment, guided by the guidance you saw or are going to see,

21   Plaintiff's Exhibit 1.

22        The overall rating is quite important, but you're

23   not going to hear that much about it.  The overall rating is

24   the admissions officer's assessment of the likelihood that

25   the candidate will ultimately be admitted.  You won't hear as

1    much about it because Harvard admits that race directly

2    influences the overall rating itself.

3           And once Harvard made that admission, both sides'

4    experts agreed the overall rating could not be used as a

5    variable in an admissions model trying to measure the effect

6    of race.  That makes sense.

7           So I'm going to talk first about the academic

8    rating and how important it is to admissions.  To do that,

9    I'm going to blow up a portion of Plaintiff's Exhibit 620 so

10   we can all look at it more closely.

11          Here you see the academic rating here, and you're

12   going to start to see some patterns as I go through this.  1s

13   are the best rating and they're the rarest.  There's only 600

14   in the six years of data that we have, again for the regular

15   applicants, not the ALDC folks.  The admissions rate is very

16   high.  66.18 percent of those candidates were admitted.

17          Then you'll see the lion's share of the admissions

18   are at academic rating 2, 6,000.  The admissions rate is

19   lower, about 10 percent.

20          And then you'll an interesting phenomenon.  Lions'

21   share here, 2.  Then you'll see the steep drop off between 2

22   and 3 and then down to 4.  You see, 4 has a lower chance of

23   getting in if you get an academic 3, 2.4 percent admissions

24   rate, and then essentially no chance of getting in if you get

25   a higher rating; that is, a worse rating.

1          This is important.  It tells us that the academic

2    rating in getting a 2 or a 1 is very important to admission

3    to Harvard.  Since this is such an important rating, we can

4    take a look at the guidance to tell us exactly how admissions

5    officers are directed to assign the academic rating.

6          You can see this here.  This is from Plaintiff's

7    Exhibit 1.  It's from page 5 over to page 6.  This is the

8    guidance for the academic rating.  Guideposts, even for

9    academic 1.  Evidence of unusual creativity or original

10   scholarship.  You see it there.  And then down below in 2, 3,

11   and 4, you see score targets for the SAT and the ACT,

12   objective guidance for the assignment of this important

13   rating.

14         Now that we've seen the academics and the academic

15   rating are important to admission to Harvard, we can talk a

16   little bit about how it is that we came to be here today.

17         Well, members of the general public did not have

18   access to Harvard's database that Your Honor ordered

19   produced.  What the general public did know was that across

20   America, Asian-American high school students were

21   out-performing their white counterparts on the SAT, on the

22   ACT, on national awards, national merit scholar, all sorts of

23   these types of things.

24         But that wasn't necessarily borne out on Harvard's

25   campus.  There were more whites than Asians.  But now we have

1   Harvard's database and we can see maybe if the applicant pool

2   explains that.

3           To do that, I want to use an index Harvard uses

4   called the Harvard academic index.  That's a score between 60

5   and 240.  It's generated for every Harvard applicant for whom

6   Harvard can get the information.  It's composed of two-thirds

7   from the SAT or ACT and one-third from the GPA or class rank.

8   We can look at Harvard's own database to summarize the

9   information therein to look at characteristics of the

10  applicant pool.

11          I'm now going to show you Plaintiff's Exhibit 624.

12  This is another Rule 1006 summary of the database.  This is

13  not a calculation.  This is the data from the database

14  summarized here.

15          What's organized on the left, you see academic

16  index ranges.  And on the right, you can see that each one of

17  these ranges, each one of those rows, comprises approximately

18  10 percent of the applicants.  They're deciles.  And so now

19  we can compare white applicants and Asian-American applicants

20  by reference to these academic deciles.

21          The very first thing you see is that Asian-American

22  applicants are disproportionately present in the top

23  10 percent of Harvard applicants academically.  You see that

24  17.92 percent there.

25          You also see that they numerically outnumber white

1   applicants by quite a substantial number in that first decile

2   and again in the second decile.

3           In the third decile, you see that the situation

4   starts to reverse and now there's more white applicants than

5   Asian applicants and the same in the fourth decile.

6           I'll stop there and I'll tell you why.  This top

7   40 percent, by academics, of white and Asian applicants to

8   Harvard, again in the regular applicant pool, not ALDC, make

9   up 83 percent of the whites and Asians in the regular

10  applicant pool admitted to Harvard.  This is a very important

11  group.  It's the most, the lion's share, of the admittees.

12  But on Harvard's campus what we see is something quite a bit

13  different.

14          This is from Plaintiff's Exhibit 319.  It's

15  internal Harvard data, but it ends up with things that

16  everybody knew.  And what you see here are first the

17  admission rates, Asians being admitted at about half the rate

18  of whites.  You see that right there.  The percentage of

19  admits.  20 percent of the admits were Asians, 40 percent

20  whites, year in and year out, including years that overlap

21  with the data Your Honor ordered produced.

22          That's of course reflected in the faces on campus,

23  one Asian face for every two whites.  That's the result.  The

24  public knew that too, which is why the public started to ask

25  questions.

**JA459**

1          And Harvard has answers to those questions.  The

2    first answer Harvard gives is admission to Harvard is not all

3    about academics.  That is absolutely true, and Students for

4    Fair Admissions is not here to say that Harvard needs to

5    switch to an admissions model that focuses exclusively on

6    academics.

7          The problem with that first answer is

8    Asian-Americans do as well or better than white applicants to

9    Harvard on every single rating that matters to admission to

10   Harvard, including extracurriculars, with the exception of

11   the subjective personal rating I'm going to talk about in a

12   little bit.

13         Asians do better on extracurriculars.  That's what

14   the evidence will show.  I'll show you that in a little bit,

15   a few minutes.

16         First let's look at how important the

17   extracurricular rating is to Harvard admissions.  We'll go

18   back to the blowup of Plaintiff's Exhibit 620, here now

19   showing the extracurricular rating.  You see again the same

20   pattern.

21         1s are rare, and the admission rate is quite high,

22   45 percent.  All the action is with the 2s.  5,000 admittees

23   here, an admission rate of 15 percent.  Then you see again

24   very steep drop off from 2 to 3.  And comparing 2 to 4,

25   2.28 percent, 7 times lower chance of getting in if you get

Case: 19-2005    Document: 00117620236    Page: 473    Date Filed: 07/30/2020    Entry ID: 6356615
Case 1:14-cv-14176-ADB    Document 631    Filed 04/18/19    Page 19 of 187

19

1    an EC rating of 3.  This is a very important rating for

2    admission to Harvard.

3            Well, we can check again in Plaintiff's Exhibit 1

4    and see what kind of guidance is given Harvard admissions

5    officers on this important rating.  This is again from

6    Plaintiff's Exhibit 1.  This is over at page 6,

7    extracurricular.

8            You see some guidance.  In extracurricular 1, you

9    see possible national-level achievement or professional

10    experience.  In 2, you see examples:  class president,

11    newspaper editor, local or regional recognition, and so on.

12    5 and 6, as I think Your Honor probably knows, are special

13    cases for the EC rating:  5 is significant family obligations

14    that prevent participation, and 6 may be something like a

15    physical condition, as you can see on the screen.

16            So the extracurricular rating, also very important

17    to Harvard, also significant objective guideposts and

18    guidance given to its admissions officers on how to apply

19    that important and relevant rating.

20            The athletic rating is a little bit different, Your

21    Honor.  We'll blow up Plaintiff's 620 for the athletic rating

22    now, and the very first thing the Court will notice is that

23    there are no 1s.  That's because, as I've been telling you,

24    the ALDCs which include the recruited athletes are not

25    included here, and they are the only ones that receive an

1    athletic rating of 1.

2           An athletic rating of 1 is not actually a rating.

3    It's a message that comes from the coach to Harvard

4    admission, saying we would like this person admitted.  What

5    the evidence will show is it's not so much a message as it is

6    essentially a command.  Recruited athletes are admitted

7    86.6 percent of the time, the evidence will show.

8           I want to talk about the athletic rating for

9    everyone else.  They do get athletic ratings.  The difference

10   is it's quite unlike what you saw before with academic and

11   extracurricular.  See, athletic 2, it's not where the lion's

12   share of that admits are.  It's not where the action is, and

13   the admission rate is lower, a little bit lower than academic

14   2, substantially lower than extracurricular 2.

15          But that's not what's important here.  What's

16   important is no steep drop off, 3 and 4, and no difference at

17   all between 3 and 4.  In fact, the admit rate for 3 and 4 is

18   slightly higher.

19          When you turn to the admissions guidance, the

20   reading procedures, what you'll see is the difference between

21   4 and 3 is someone with an athletic 4 doesn't participate in

22   sports at all, and someone with athletic 3 is on the team.

23          You can take a look at the guidance.  You can see

24   it here on the screen, again from Plaintiff's Exhibit 1.  You

25   can see is that 4 is little or no interest in athletics, and

**JA462**

1    3 is active participation.  The athletic rating is just not

2    very important to admission to Harvard.

3            I want to pause here and talk about why did I

4    mention this.  Both experts have included the athletic rating

5    in their models.  So for whatever importance it has, it's

6    taken into account by both sides' experts.  I've included

7    this because I think Harvard might during the trial focus a

8    little bit and talk a little bit more about how important the

9    athletic rating is in defiance of what its database is

10   telling us.

11           The reason they're going to do that is we've

12   discovered that, for whatever reason, white applicants

13   receive higher athletic ratings than Asian applicants.  We're

14   not going to focus too much on that during the trial because

15   the athletic rating isn't very important to admissions.  I

16   only note it here in case Harvard makes a big deal out of

17   athletic participation.  You just saw the admissions rate for

18   4 and 3 is exactly the same.

19           The personal rating is a different story.  The

20   personal rating is crucial to admission to Harvard.  And what

21   do I mean by that?  Here is Plaintiff's Exhibit 620, enhanced

22   for the personal rating.  You see again 1s are the rarest for

23   the personal rating, only 39 for non-ALDC applicants in the

24   six years of data we have.

25           The admission rate is gigantic, 66.67 percent.  All

1    the action is with the 2s again, 6,000 of our under 8,000

2    admittees in this group come from the 2s, and they have a

3    21.71 percent chance of getting in, the highest of the

4    ratings you've seen.  Look at the drop off from 2 to 3, a

5    14 times lower chance, in Harvard's own database, of getting

6    into Harvard if you get a personal 3 compared to a

7    personal 2.  You see it right here.  A 1.51 percent chance of

8    getting in if you get a personal 3.

9              And we found zero Harvard admittees from the

10   regular applicant group that got a personal 4 or higher.

11   Given that this is the most important rating that I've shown

12   you, we can all look at now what does Harvard tell its

13   admissions officers about how to assign the personal rating.

14             It's here on page 6, Plaintiff's Exhibit 1.  There

15   it is.  That's it.  That's all.  No objective guidance.  No

16   instruction or admonition about how to or how not to use race

17   in the assignment of the personal rating.  No enjoinment or

18   injunction against applying racial stereotypes or anything of

19   the kind when applying the personal rating.  That's it.

20             Harvard's witnesses in this trial will be nearly as

21   vague in their descriptions of what goes into the personal

22   rating as what you're seeing on the screen.  Is this person

23   likeable?  Are they sensitive?  Would they be a good roommate

24   or fit in at Harvard or contribute to the community or do

25   they have grit and integrity?

```
 1              The personal score is dramatically important to
 2      admissions to Harvard College.  It's a subjective assessment
 3      with essentially no guidance about the applicant's
 4      likability.
 5              The undisputed evidence, Your Honor, will be that
 6      Asian-American applicants to Harvard receive substantially
 7      lower personal ratings than white applicants.  Harvard's own
 8      expert, Professor David Card of Berkeley will sit to my left
 9      next week or the week after and he will testify that he
10      cannot rule out racial bias as the explanation for why
11      Asian-American students receive substantially lower personal
12      ratings.  He'll say that when I talk to him.  He will call
13      this gap unexplained.
14              We have an explanation.  It's that when no one in
15      the admissions office ever even talks about how to properly
16      use race in admissions and there's definitely no written
17      guidance about how to do so and no one gets any guidance or
18      training about how to use race -- there is not -- and there's
19      no written guidance about how to assign the personal ratings,
20      you have let the wolf of racial bias in through the front
21      door.
22              Our evidence on the personal rating will include
23      the only statistical analysis of Harvard's personal rating
24      from its database performed by either expert.  Only Students
25      for Fair Admissions' expert, Professor Peter Arcidiacono,
```

1    actually modeled the personal rating and showed that race was

2    influencing it.  Harvard's expert, Professor Card, did not

3    construct his own model.

4         You can also see the influence of race on the

5    personal rating in Harvard's database, just looking at the

6    data.  You can see it with your own eyes.

7         I'm going to show you another 1006 summary of the

8    voluminous evidence, not an expert model, not a statistical

9    calculation, just Harvard's own decisions reflected in the

10   data that this Court ordered produced in this case.  This is

11   Plaintiff's Exhibit 629.  I'm going to mention it a lot.

12        It's again of the regular applicants, the

13   non-ALDCs, Your Honor, but the pattern repeats in another

14   exhibit we have when you include the legacies, dean's list,

15   and children of faculty or staff.

16        You see the academic index ranges on the left.

17   These are the same academic deciles I showed you before.

18   Then you see way on the right, it's that's the first thing I

19   want to talk to you about.

20        What's shown here in each of these cells is the

21   percentage in each academic decile that receives that

22   all-important 2 or 1 on the personal rating.  Remember you

23   need that 2 or 1 to be in that big, massive group of 6,000

24   from our just close to 8,000 numbers in the admit database.

25   And this shows you the percentage in each academic decile

1    that got that rating.

2            In the highest academic index, the highest decile

3    is 25.46 percent.  I'm pointing that out because it goes

4    steadily down, smoothly down as you go down the academic

5    index ranges.  And that's critically important because it

6    shows there's at lease an association between performing very

7    well in high school and on your SATs and ACTs and receiving a

8    high personal rating, for whatever reason.  That bears out in

9    all the subgroups you're going to see, too.

10           And then I'm sure Your Honor was looking at already

11   the quite remarkable difference between Asian-Americans and

12   whites on the personal rating.  In the top academic decile,

13   whites, nearly 30 percent of them get a 1 or a 2 on the

14   personal rating, the all-important personal rating.  This is

15   the regular applicants.  We're not talking about the ALDCs

16   yet.  Asians are down at 22 percent, and that persists.

17           Remember I talked about the top four academic

18   deciles, whites beating Asians in the second by nearly

19   8 percent, in the third by nearly 8 percent, in the fourth.

20   You see it right there all the way down the line.

21           And you can see also some relationships that are

22   interesting.  Asian-Americans in the top academic decile,

23   22 percent of them get that all important 1 or 2.  You've got

24   to go all the way down to the fifth academic decile to get

25   the same proportion of white applicants to Harvard.

1          That's a pretty stunning difference, and I'm going

2     to hazard a guess that Your Honor noticed another difference.

3     Asian-Americans don't just do more poorly than

4     African-Americans; they do dramatically and shockingly more

5     poorly than African-Americans, sometimes half the proportion

6     of Asians getting personal scores of 1 or 2 compared to the

7     percentage of African-Americans.

8          And I really do not think that Harvard is going to

9     come in here and say that the reason for this is that

10    African-American applicants to Harvard just seem on paper to

11    be more likeable, have greater integrity or sensitivity, or

12    have more grit.  I don't think they're going to say that.  I

13    don't know what they're going to say.  We'll ask.

14         You've also noticed Hispanics do more poorly than

15    African-Americans but wildly better than Asians as well, and

16    they do better than whites.

17         And now perhaps a more plausible explanation for

18    what you're seeing on the screen from Harvard's own database

19    emerges.  Harvard admits that it has an affirmative action

20    program in place for under-represented minorities, including

21    African-Americans and Hispanics.  Harvard will admit in this

22    trial that the tip, as Harvard calls it, for

23    African-Americans is significantly larger than the tip that

24    Hispanics receive, but they still do receive a tip over

25    whites.

 1          And now you see the ordering here, the same
 2    ordering in Harvard's admitted affirmative action program,
 3    African-Americans receiving a very large boost on the
 4    personal rating, Hispanics receiving a boost over whites but
 5    not as large as African-Americans.
 6          And then you see what's going on on the left side,
 7    Your Honor, and that's the discrimination.  That's the use of
 8    race Harvard will not admit to, which is Harvard pushing down
 9    Asian-Americans on this all-important, subjective,
10    no-guidance personal rating.  You see it right here from
11    Harvard's own database.
12          But Harvard has repeatedly tried to tell this Court
13    in briefs, and they will do it again in this trial, that race
14    doesn't influence the personal rating.  They will tell you to
15    deny what you're looking at on the screen.  They will say
16    race is not involved here.
17          Harvard's trial witnesses, nearly to a man and
18    woman, will try to testify that they don't use race in the
19    personal ratings.  Some will do that with more conviction
20    than others, and of course it's the Court's job to judge the
21    credibility of that.
22          One senior admissions officer Christopher Looby,
23    our second trial witness, he'll tell the truth that he's been
24    using race in the personal rating for ten years.  And we know
25    from what we're seeing on the screen from the database that

1    Christopher Looby can't be alone.

2           Some group, a sizeable group of Harvard's 40 or so

3    readers of applications, has been using race as a factor in

4    the personal rating.  There's no other possible explanation

5    for what you're seeing on the screen in Plaintiff's 629.

6           As to whether Harvard's witnesses are credible on

7    the subject, we'll ask them questions.  They'll say there's

8    no correlation between race and the personal rating, in

9    defiance of what you're seeing.  They'll say Asian-American

10   applicants are no worse in their personal qualities than

11   others, including whites.  And they will be unable to explain

12   what you're seeing on the screen.

13          The truth is, Harvard has known for quite some time

14   that they have a problem with the personal rating and how

15   it's being applied to Asian-American applicants.

16          In December of 2012 when David Brooks of the New

17   York Times gave wide publicity to Ron Unz's critique of

18   Harvard on this subject, the evidence will show a near panic

19   set in at the Harvard admissions office, emails exchanged in

20   the wee hours of the mornings over the holidays.

21          Some of those emails went to the staff of Harvard

22   office of institutional research, including Dr. Erin

23   Driver-Linn, the head of OIR.  What is OIR?  We can see from

24   Plaintiff's Exhibit 465 what they say they are.  Their

25   objective is to offer accurate, timely, and digestible

1    research to, among others, senior university officials like

2    Dean William Fitzsimmons, dean of admissions, that are

3    responsible for mandatory reporting requirements to including

4    the federal government.  This is a serious office with a

5    serious mission staffed by serious people.

6              The testimony from Dr. Driver-Linn will be that she

7    would never ever offer senior university officials research

8    that she thought was shoddy or wrong.

9              So what did Dr. Driver-Linn and her colleagues

10   offer Dean Fitzsimmons in February of 2013?  Your Honor

11   knows.  A statistical analysis of ten years of admissions

12   data that showed what?  That Asian-American applicants were

13   better than or equal to white applicants to Harvard on every

14   ranking except the personal score, and that there was a

15   statistically significant Asian penalty in the Harvard

16   admissions office.

17             And here's that report, Plaintiff's Exhibit 9.  And

18   as Your Honor knows from before, it's got a mistype on the

19   date.  It says February 2012; it's actually February 2013.

20             And on the fifth slide you can see the first thing

21   I discussed.  The difference is in average test scores for

22   ratings for white and Asian applicants.

23             First I want to orient you to something on the

24   bottom.  This analysis excludes legacies and athletes.

25   There's going to be a lot of discussion of this, Your Honor.

1    I've reserved my time on it.  Towards the end, you asked

2    about it at the pretrial hearing.  I want to save some to

3    talk about it.

4            But here is Harvard's own internal researchers

5    removing legacies and athletes from the database.  As I told

6    you before, Harvard has had an excuse about the

7    disproportionate or underrepresentation of Asians on its

8    campus, that the legacy and athlete preferences explain it,

9    which is why many researches have removed them from the data

10   set.  It's why Students for Fair Admissions expert did it.

11           Let's look at what the data shows on the screen.

12   Blow this up, you see in the middle is the zero line.  That's

13   where Asian-American and white applicants to Harvard are the

14   same.  And you see starting from the top what the public knew

15   that I mentioned, Asian-Americans vastly out performing

16   whites on the SAT 2, over .3 standard deviations.  Same on

17   the SAT, both math and verbal.

18           Then you see this alumni rating also outperforming

19   whites.  The next four are the same.

20           Then you see the personal rating on which Harvard

21   never gives anybody any training, there's no guidance, no

22   injunction against using race.  You saw the written

23   procedures.  There's almost nothing written in it.  It's

24   about how likeable you are.  And somehow, some way, white

25   applicants are deemed to be more likeable.

1          I told you Asian-Americans do better on

2    extracurricular.  There it is right there.  You can see it.

3          Because they do better on the SATs and they do

4    better in high school, Asian-Americans applicants are doing

5    better on the academic rating.  This is the accurate, timely,

6    and digestible research OIR gave Dean Fitzsimmons.

7          What they did next is they created a statistical

8    model.  It's called a logistic regression model.  And what

9    you do here is you gather variables plausibly related to the

10   admissions process and you use the data that you have.  Here

11   OIR was pooling ten years of application data and you try to

12   measure how important those variables are.

13         I have a demonstrative that sort of shows you what

14   you're talking about.  You have the admissions data.  You

15   know the outcomes.  You have the variables, the ratings and

16   such, and now you attempt to use a computer to tell you

17   whether these things are important or not.

18         On the next slide, I have a little picture of what

19   the equation that gets produced results in.  You see the

20   ratings there -- academic, extracurricular, and so on -- and

21   you compute these coefficients, the little colored letters.

22   And if they're high and positive, that tells you they're very

23   important to admissions.  Negative tells you it's a penalty,

24   it's a minus, penalty.  Statistical significance Your Honor

25   is familiar with, and that's what your model spits out.

1    If you're trying to measure race, the impact of
2    race, you can do that, too.
3    So did Dr. Driver-Linn and her colleagues tell Dean
4    Fitzsimmons something about this and what their model had
5    determined?  Yes.
6    That's slide 8 of Plaintiff's Exhibit 9.  We can
7    blow this up.  They expressed their findings in something
8    called odds ratios.  Odds ratios are how much more likely are
9    you to get into Harvard if you have this characteristic.
10    And you see the very most important thing in this
11    first model created by Harvard's own researchers, before
12    there was litigation, before there was a website called
13    Harvard Not Fair, before Harvard knew anything about this
14    case or any witness was retained or any expert retained to do
15    an analysis for either side's set of lawyers, Harvard's own
16    internal researchers told Harvard, told Dean Fitzsimmons,
17    that having a high personal rating was the most important
18    thing, a 9x higher chance ever getting in.
19    Also told them there's a big tip for
20    African-Americans.  You see it right there, also the legacy
21    tip about the same size.
22    Remember, we looked at the ordering, the hierarchy,
23    if you will, in Harvard's assignment of the personal rating
24    where you can see that African-Americans do better than
25    Hispanics, do better than whites, do better than Asians.  I

**JA474**

Case: 19-2005    Document: 00117629236    Page: 497    Date Filed: 07/30/2020    Entry ID: 6356615
Case 1:14-cv-14176-ADB   Document 631   Filed 04/18/19   Page 33 of 187

33

 1    told you Harvard admits to using race in admissions.  You see

 2    here the same hierarchy, the African-American tip bigger than

 3    the Hispanic tip.  Right here.

 4           Then Harvard's own researchers told Dean

 5    Fitzsimmons something else, that there was a statistically

 6    significant penalty on Asian-Americans applying to Harvard in

 7    February 2013.  It's about a 20 percent hit on your

 8    admissions chances.  That's what they showed him.  That's

 9    what he knew about.

10           And this was not the only time this information was

11    conveyed to Dean Fitzsimmons.  The same analysis was given

12    again and again and again, including with updated and

13    improved models and including in a formal memorandum given to

14    Dean Fitzsimmons in May of 2013.

15           That's Plaintiff's Exhibit 26.

16           This is an email from Erica Bever.  She works at

17    OIR, and she is sending this memo to Dean Fitzsimmons,

18    including some others at OIR on the email.  Subject is

19    admissions memo.  It says, low income admission memo final.

20    You see that?  It's the attachment.

21           Now, Your Honor knows, but others may be wondering,

22    why am I talking about a memo describing a recent analysis of

23    low-income admissions in a case about discrimination against

24    Asians?  I'll explain.

25           Dean Fitzsimmons did not respond to Plaintiff's

1    Exhibit 9, the February 2013 PowerPoint, by saying our

2    process isn't reducible to a statistical model, I don't like

3    these models, they don't represent what we're doing, they're

4    incomplete or flawed, please never do them again.

5              No.  He asked Harvard's own researchers, before

6    there ever was a case here, to do more analysis, more

7    modeling to show that Harvard was giving a tip or a boost to

8    students from underprivileged backgrounds, and he asked for a

9    memo on that.

10             He also asked them to review literature to see if

11   their approach was consistent with what others have done.

12   And Ms. Bever is reporting here that it was.

13             Now there's a curious second paragraph.  Harvard's

14   own researchers want to get some other people involved,

15   including Jeff Neal and Christine Heenan.

16             Who are they?  They work for Harvard's public

17   relations department.  So why is it that Harvard's internal

18   researchers want to tell public relations about this?

19             Well, we can find out in the memo.  Here's the memo

20   to Bill Fitzsimmons from Bever, Driver-Linn, and Mark Hansen,

21   all working at OIR.  And if you look at the second page of

22   the memo, you see this model.  It's a table, logistic

23   regression.

24             The variables are what I told you, SAT or academic

25   rating or whatnot.  The coefficients are the numbers, the

 1    little colored letters.  Positive is a boost and negative is

 2    a minus.  Your Honor is familiar with what a P value is.

 3            The next page we can find out what happened.  Here

 4    in this model, OIR include the recruited athletes, and they

 5    have this enormous positive coefficient.  Because as I said,

 6    it's less of a rating than it is an instruction.  6.33, that

 7    is gigantic.  They get in 86 percent of the time.

 8            You see for the rest of us, the personal rating is

 9    really important, the most important.  2.4.  Legacy the same,

10    2.4.  Remember that was translating to between a 7 and 10

11    times higher chance of getting in than the previous model.

12            Then you see the same hierarchy.  African-Americans

13    getting a big boost.  Hispanics less of a boost but still a

14    positive coefficient.  The same ordering you saw on

15    Plaintiff's 629 with the personal rating where Harvard denies

16    using race in assigning the personal rating.

17            Then you see what OIR was reporting to Dean

18    Fitzsimmons in an updated improved model.  He didn't say I

19    don't want any more models.  He got another one.  Here it is.

20            A statistically significant Asian penalty, P value

21    of zero.  It's right here.  Unless there be any doubt as to

22    why OIR was concerned enough to alert public relations or

23    wished to do so, it's right here at the bottom of the memo:

24    "We imagine that sharing any analysis of admission weights

25    will draw attention."

1          And in the lower highlighted section you see what

2     they're worried about attention being drawn to:  "Our

3     descriptive analysis and regression models also shows that

4     the tip for legacies and athletes is larger."

5          Harvard's always been somewhat sheepish about the

6     size of these preferences -- and we'll see why in a little

7     bit -- and "that there are demographic groups that have

8     negative effects."  I'm sure it wasn't lost on Your Honor,

9     even though it was on the screen only briefly, that the only

10    demographic group that has a negative effect in the table is

11    Asians.

12         And this wasn't the last time that Dr. Driver-Linn

13    and her colleagues presented this information.  They did it

14    again in October 2013.  They did it again in May and July

15    of 2014.

16         Now, Your Honor, you will never see any document,

17    any email, or any contemporaneous objective evidence

18    whatsoever that there was anything shoddy, flawed, or wrong

19    with these OIR analyses all warning Harvard they had a

20    problem, a red warning flag that they at least had a

21    potential problem with discrimination against Asians.

22         What you will see is that Dr. Driver-Linn and her

23    colleagues recognized in their own internal draft of this

24    memo that these findings were "realities."

25         They are realities, and Harvard and Dean

 1    Fitzsimmons did nothing you would expect a reasonable

 2    employer or university or institution to do, which would be

 3    to investigate, deal with the problem, if the analyses were

 4    incomplete, to complete them, to acknowledge fault, and

 5    commit to doing better.  You see it right here.

 6           And you'll see nothing from Harvard's documents

 7    with all the criticism of this work that you're going to

 8    hear.  You're going to hear a lot of vague memories that the

 9    studies were incomplete or flawed, from Harvard's witnesses.

10           Part of the Court's job is to judge the credibility

11    of that against the objective contemporaneous written record

12    and against the accurate timely and digestible reports OIR

13    generated.

14           You're also going to hear from Harvard that these

15    OIR analyses were so terrible that no one bothered to discuss

16    it further or do any research.

17           Dean Fitzsimmons, for his part, told no one in the

18    chain of command about it.  He did not tell his immediate

19    superior, Dean Smith, the dean of the faculty of arts and

20    sciences, about these warning flags.  He did not tell

21    President Drew Faust, the president of Harvard, about these

22    warning flags about the treatment of Asians.  And he did not

23    tell Marlyn McGrath, the director of admissions that he'd

24    been working with for nearly 30 years, three decades.  He

25    didn't tell her.

Case: 19-2005    Document: 00117629236    Page: 492    Date Filed: 07/30/2020    Entry ID: 6356615
Case 1:14-cv-14176-ADB   Document 631   Filed 04/18/19   Page 38 of 187

38

 1          The question we should all ask is what would this

 2     have had to have said for Dean Fitzsimmons and Harvard to do

 3     anything about it, to take one single further step, to talk

 4     to admissions officers about how they're using the personal

 5     rating, or how they might be engaging in racial stereotyping,

 6     to give them training or written guidance, implicit bias

 7     training, anything.

 8          Instead, Dean Fitzsimmons and Harvard decided that

 9     the system was working as they intended and perhaps had

10     always intended it to work.  And that adds up to intentional

11     discrimination in violation of Title VI.

12          The next expert to come along and model Harvard's

13     admissions process is Professor Peter Arcidiacono, Duke's

14     fair admissions expert from Duke University.

15          He took the six years of data that Your Honor

16     ordered produced and that we've been looking at and he did a

17     logistic regression analysis, creating an admissions model

18     similar in kind to the models that had been created before

19     there was ever any litigation by Harvard's own researchers.

20          And just like those prelitigation models created by

21     Harvard itself, Professor Arcidiacono found a substantial

22     penalty on Asian applicants to Harvard not in the ALDC group.

23     He found the Asian penalty results in a 20 percent reduction

24     in the admissions chances of an Asian-American applicant,

25     again about the same size of what you saw in OIR's very first

 1    model.

 2              And that translates into real numbers, Your Honor.

 3    Professor Arcidiacono will tell you that compared to his

 4    model without the Asian penalty, there would be at least

 5    hundreds more Asian faces on campus in a four-year cohort.

 6              And he'll also tell you his model is conservative.

 7    If anything, it underestimates the size of the Asian-American

 8    penalty.

 9              What you will be able to see when experts testify,

10    Your Honor, and you look at particularly Professor Card's

11    yearly models, which he likes, you'll see some patterns in

12    the yearly data.  I wanted to point just two of them out for

13    you.

14              One is, and I think in one of Mr. Lee's slides you

15    see this if he uses it, is that the effect of Asian-American

16    ethnicity on admissions, even in Professor Card's model, goes

17    down -- the coefficient goes up a little bit -- in 2017.

18              And what's special about 2017?  Class year 2017,

19    most of those students were admitted in the spring of 2013

20    after the Unz article, after David Brooks.

21              After Unz and Brooks shined a flashlight on Harvard

22    admissions, Asian penalty or the effect goes down a little

23    bit.

24              Then you'll see something very interesting, which

25    is that in 2019, when Students for Fair Admissions had sued

1    Harvard in 2014, late 2014, and the admin cycle for the class

2    of 2019 had occurred right after that and this court was

3    going to turn a spotlight on Harvard, the Asian penalty goes

4    down substantially.  The effective Asian -- marginal effect

5    of Asians on admissions, the numbers go up, the coefficient

6    gets higher, gets more positive.

7         Why is that?  That's because when Harvard knew that

8    somebody was going to be looking into what was going on, they

9    exerted control.  They dialed down the Asian penalty.

10        This is powerful evidence, circumstantial evidence

11   of intentional discrimination.  They have the control, and

12   they react to this lawsuit by exercising that control.  And

13   just like an employer who for ten years does not promote

14   African-Americans on the shop floor and then is sued for

15   civil rights violation and magically promotes three after

16   that, that's not evidence that the employer wasn't

17   discriminating.  That's evidence the employer was.  So too

18   here, and you'll see it in some of the charts that the

19   experts will show you.

20        In fairness to Harvard, their expert, Professor

21   Card from Berkeley, he has his own model.  And the Court's

22   detailed summary judgment ruling outlined some of the many

23   disagreements that Professor Card and Professor Arcidiacono

24   have.

25        But how best to model Harvard admissions?  Should

```
 1    we have the ALDCs?  Should we do a pooled model versus a

 2    yearly model?  Oh, I already did pooled; Professor

 3    Arcidiacono did pooled.  Professor Card prefers a yearly

 4    model.

 5            Should we include parental occupation?  Professor

 6    Card really wants to.  Professor Arcidiacono says the data

 7    quality is not good enough.

 8            Should we do certain types of interactions?  The

 9    list goes on.  There are many disagreements.  You'll hear

10    about them during the trial.

11            But, Your Honor, you can choose to assume the truth

12    of every single word that Professor Card, Harvard's expert,

13    utters.  And as long as you rule in our favor and decide one

14    thing our way:  Harvard's own model shows a statistically

15    significant Asian penalty, the model that they went to great

16    lengths to produce, hundreds of pages of expert reports.

17    Their own model shows a statistically significant Asian

18    penalty.

19            If you agree with us on one thing, what is it?  You

20    have to agree with us that what you're seeing here on

21    Plaintiff's Exhibit 629 reflects the influence of race on the

22    personal rating.  If you believe what every single person

23    listening to me can see right here on this screen that race

24    is influencing the personal rating, the acknowledged use of

25    race and the tip for African-Americans and Hispanics is right
```

1    there.

2           All you have to believe is that Harvard is using

3    race in a way that it acknowledges it is using race in the

4    ultimate outcomes but denies that they're doing it here with

5    the personal rating.  If you believe that, that race has an

6    effect here, then Harvard's own expert will agree that just

7    like the overall ratings got to be pulled out, the personal

8    ratings got to be pulled as because it's influenced by race.

9           What happens to his model if you do that?  This is

10   not from Students for Fair Admissions expert report.  This is

11   from Harvard's own expert report.  A statistically

12   significant Asian penalty if you simply take out the

13   subjective personal rating where no one gets any guidance.

14          And the evidence is going to show Harvard has to be

15   using race.  Race has to be influencing it.  If you do that,

16   Harvard admits there's an Asian-American penalty and it's

17   statistically significant.

18          And a third of a percent doesn't seem like much,

19   Your Honor, until you realize that the chances of getting

20   into Harvard are about 5 percent.  That's actually quite

21   sizeable.

22          Now we can turn to a big disagreement that Your

23   Honor asked about, which is the exclusion of ALDCs from the

24   data analysis.  You asked about this at the pretrial hearing.

25   And I didn't understand Your Honor to be asking how did it

**JA484**

1    come to pass that SFFA removed them from the data side.

2            In their analysis, you can see why that's true.

3    OIR did it, others have done it.  I thought you were really

4    asking why is it important.  I want to try to get into that

5    and show you how it changes the model.

6            To do that, I need to show you some facts about

7    Harvard's admissions of legacies, children of faculty or

8    staff, and those on the dean's list, children of donors, for

9    example, and athletes and the non-ALDC group.

10            And here you see admission rates stratified by

11    academic ratings similar to the blowups of 620 I showed you

12    before.  In the left column you see the same numbers I showed

13    you before, for non-ALDC 66, 10 percent, and 2.4 percent.

14    Remember the lion's share of the action is at academic 2.

15            Then you start to see how much better the legacy

16    list does here.  They do about 50 percent better.  Virtually

17    all of them get in at academic 1.  Of course the one athlete

18    in the six years of data we have got in.

19            Then you see something interesting here in

20    academic 2.  10 percent admission chance for the regular folk

21    with no connection to Harvard.  A 50 percent admissions

22    chance at academic 2 for the legacy, dean's list, and

23    children of faculty or staff.  It's a 5x difference.  Again

24    the athletes almost always get in.  I told you that; I'll

25    stop saying it.

Case: 19-2005    Document: 00117629236    Page: 499    Date Filed: 07/30/2020    Entry ID: 6356615
Case 1:14-cv-14176-ADB   Document 631   Filed 04/18/19   Page 44 of 187

44

1        At academic 3, 2.4 percent, really pretty low

2    chances for the regular folk.  But if your mom or dad went to

3    Harvard or your grandparent or uncle gave a lot of money to

4    Harvard, then your chances of getting in are seven and a half

5    times higher, 18 percent.

6        Down below at academic 4, almost nobody gets

7    admitted in the regular group.  But here we have the legacy,

8    dean's list, and children of faculty or staff, still

9    3.5 percent of them got in.

10        You can also see these relationships.  3.5 percent

11    at academic 4 for the legacy group.  That's 2.4 percent at

12    academic 3 for the regular group.  A whole academic

13    difference.  And the legacy group is a whole academic rating

14    better off.  Higher admissions chances.  Their admissions

15    chances at academic 3 are almost double what the regular

16    applicants are at academic 2.

17        But that's not what tells you how the model is

18    going to get distorted when you include the ALDCs.

19        Here's how to look at that.  You need to look down

20    the columns.  I told you have that the academic rating was

21    very important to admissions.  You see that here reflected in

22    this drop off and admissions chances as you go from 1 to 2 to

23    3 to 4.  There's large numbers, 6, 4, 120.

24        For the legacy, dean's list, and children of

25    faculty or staff, those numbers are quite a bit lower.  What

Case: 19-2005    Document: 00117629236    Page: 499    Date Filed: 07/30/2020    Entry ID: 6356615
Case 1:14-cv-14176-ADB   Document 631   Filed 04/18/19   Page 45 of 187

45

1    that reflects is the academic rating is simply not as

2    important to admissions for this group.  It's not as

3    relevant.  It's not totally unimportant, but it's not as

4    important.

5         And this effect is most profoundly seen with the

6    athletes, where the numbers and the multipliers get close

7    to 1, reflecting the fact that the academic rating really

8    doesn't matter much at all for the admissions of athletes.

9    As I said, they almost universally get in.

10        So now how does that affect the model?  You can see

11   this from the chart I have in front of you, but actually one

12   of Mr. Lee's slides shows it best.  The legacy, dean's list,

13   children of faculty or staff, the ALDC group, they are only

14   5 percent of the applicants, Your Honor, but they are a

15   whopping -- I'll use Mr. Lee's slide for this.  They are a

16   whopping 29 percent of the admitted students.  5 percent of

17   the applicant pool, 30 percent of the admitted students.

18        So when you include this group for who academics

19   don't matter as much, what your model gets is distorted.  It

20   gets a distorted average effect where Harvard is saying

21   academics just aren't that important.  It's weighing down the

22   regular applicants.

23        Why are the regular applicants so important to us,

24   Your Honor?  I've kind of saved this towards the end.  I've

25   shown you have a lot of the baseline data set.

1           98 percent of the Asian applicants to Harvard are

2      in the non-ALDC group.  When Harvard chose, its expert chose

3      to include the ALDCs in the dataset, it had the effect of

4      weakening the importance of academics in a distortive way.

5           Academics are very important for the non-ALDC group

6      where most Asians are applying.  But if you include the

7      ALDCs, your model spits out kind of an average, a lower

8      number.

9           What does that do?  Well, that means that the

10     things that Asian-Americans are much, much better at,

11     academics, are less valued by the model.  When an Asian

12     applicant doesn't get in, your model explains it with

13     academics just aren't that important to Harvard in a

14     distortive way, instead of concluding that there's an Asian

15     penalty.

16          You can see that in an analysis of Professor Card's

17     model as well.  Because when you remove the personal rating,

18     you get that statistically significant effect, that's Card's

19     yearly model right there.  It's in his own report.  If you

20     remove the ALDCs, it gets bigger.

21          Here you see that.  Take out the personal rating,

22     get the statistically significant effect, and we win.  Just

23     believe that race influences the personal rating.

24          Take out the ALDCs, and the effect gets quite a bit

25     larger.  That's the point, and that's the answer to Your

1    Honor's question.

2          Now, Your Honor, Harvard has many, many times

3    positioned this case as if we have to prove more than a

4    statistically significant Asian penalty.  Harvard has sort of

5    suggested that we need to prove the existence of a 40-person

6    racist conspiracy.

7          We do not.  That's not the law.  That's not the law

8    in employment discrimination, and it's not the law here.  We

9    have shown a statistically significant Asian penalty, and

10   Harvard acknowledges that it uses race in its admissions

11   process.  The burden is on Harvard to explain these

12   differences and it will be unable to do so.

13         There's also significant circumstantial evidence,

14   as I've alluded to.  The nonresponse.  Frankly, the quietude

15   about OIR from Dean Fitzsimmons.  That's circumstantial

16   evidence.  The 2019 dialing down of the Asian penalty that

17   you'll see, circumstantial evidence.

18         It's not hard to see how Harvard got here, when you

19   look at its laser beam focus on race in its admissions

20   process.  And that gets to the rest of the case.  I'll spend

21   a very little time this morning talking about it.

22         As you know Harvard, said it has a holistic

23   admissions process harkening back to *Grutter* and *Bakke* and

24   the statements in those cases.  Harvard's own brief in the

25   *Bakke* case.

1          The evidence will show and allow the Court to test
2     the proposition whether Harvard is really treating everyone
3     as a whole person instead of as, first and foremost, the
4     member of a racial group.  And some of that evidence will be
5     the stunning regularity in the racial balance in Harvard's
6     class.  And you've seen this before, Your Honor.  It's ten
7     years of admissions data.  You see the sort of stability in
8     the numbers.

9          And Harvard doesn't like this.  They don't like the
10    rounding.  They want to point out the fact that the numbers
11    change plus 10 to 15 percent or minus 10 to 15 percent year
12    to year.

13         Our point is not that Harvard has a quota system
14    down to the last jot and tittle.  The point is that Harvard
15    achieves a rough racial balance.

16         And the second point is if Harvard was really
17    treating everyone as a whole person, wouldn't you expect this
18    to move around a little bit more?  It's just a commonsense
19    point.  I can also see, and the evidence will show, that
20    Harvard is very focused on this racial balance in its class
21    throughout its admissions process.

22         This is Plaintiff 146.  It's what's called a
23    one-pager.  These are generated routinely throughout the
24    admissions process, largely for Director McGrath and Dean
25    Fitzsimmons.  What you'll notice about these one-pagers --

1    I'll point out a couple of things.

2         Number one, race is always on them.  It's not that

3    race is the only thing on all of them or it's the only thing

4    on this one, but race is always present.  Last year is always

5    being compared to this year.  What possible reason is there

6    to do this unless you're trying to match up to last year and

7    not deviate too much from last year, which is the very

8    definition of racial balancing, which the Court has said is

9    per se illegal.

10        Then you'll notice, of course, something that

11   you've seen before is that Harvard likes to separate out the

12   non-legacy, non-athlete students just like Students for Fair

13   Admissions did and OIR did.  That's right there on the

14   one-pager.

15        Now, Your Honor, I mentioned earlier that

16   affirmative action in higher education is not on trial here,

17   and diversity is not on trial here.  Students for Fair

18   Admissions supports diversity on campus.  And our expert,

19   Mr. Rick Kahlenberg, is one the country's foremost supporters

20   of diversity on campus.

21        The problem for Harvard is that race dominates its

22   process.  By its own admission, race is determinative in

23   admissions for half the African-Americans and a third of the

24   Hispanics.  That's not our report.  That's Harvard's report

25   on race-neutral alternatives, Plaintiff's 316.  And that's

1   still with the personal rating included.

2          And so we took them at their word.  We have said we

3   won't change anything about your admissions system other than

4   what you admit to be the use of race, and we'll generate some

5   alternatives for you.  We'll take away what you admit to be

6   doing on race, and we'll generate some alternatives.  That's

7   what Mr. Rick Kahlenberg did.

8          Those alternatives required Harvard to do one thing

9   and stop doing another.  They had to increase socioeconomic

10  preferences.  They had to stop with the legacy and donor

11  children preferences.

12         Harvard steadfastly refuses to even contemplate

13  giving up those preferences, which themselves operate to

14  preserve Harvard as a bastion of privilege.  Putting aside

15  the moral valence of those preferences, which I think the

16  amici, some of them will get into.  If the choice is between

17  putting young Americans on racial registers or preserving

18  those preferences that almost universally benefit whites,

19  that is no choice at all.  Title VI does not contain a

20  Harvard Club exemption.

21         THE COURT:  Hold on a second.

22         (Off-record conversation)

23         MR. MORTARA:  It says right here, big finish.

24  Right after I said there's no Harvard Club exception for

25  legacy preferences.  And I thought you were going to stop me

**JA492**

Case: 19-2005     Document: 00117629236     Page: 505     Date Filed: 07/30/2020     Entry ID: 6356615
Case 1:14-cv-14176-ADB   Document 631   Filed 04/18/19   Page 51 of 187

51

1  and say really?

2       No big finish.  Here we go.  In all seriousness,

3  Your Honor, this is a serious matter.  I'm sorry to make

4  jokes.

5       Looking back at Plaintiff's 146, you're going to

6  see that Harvard uses these one-pagers.  And Harvard's

7  witnesses and its expert will admit Harvard doesn't need to

8  use race as a factor in admissions to enroll a significant

9  number of Asians, and everybody knows they don't need it to

10 enroll a significant number of whites.  It's simply not

11 necessary for them to achieve a diverse group of

12 Asian-Americans on campus.  They don't need any more whites.

13      The Court might reasonably ask why Harvard needs to

14 distinguish Asian-Americans from whites at all in its

15 process.  You see right here, Harvard is not -- is perfectly

16 happy to group together Filipinos and Japanese and Chinese

17 and Indonesians and Vietnamese and Cambodians and Pakistanis

18 and all these groups.

19      Why not just group them in with whites?  Why didn't

20 Harvard blind themselves to the difference between whites and

21 Asians after its own researchers pointed out these issues

22 with the personal rating and the existing of the Asian

23 penalty in admissions?  Why didn't Harvard do that?  Why is

24 Harvard so afraid of such a remedy, which is one that this

25 Court might conceivably and obviously order if there's a

Case: 19-2005    Document: 00117629236    Page: 506    Date Filed: 07/30/2020    Entry ID: 6356615
Case 1:14-cv-14176-ADB   Document 631   Filed 04/18/19   Page 52 of 187

52

1    finding of liability on our Count I.  Just treat Asians and

2    whites the same.

3            The evidence in this trial will provide the answer.

4    Harvard is engaged in and wishes to continue to engage in

5    intentional discrimination against Asian-Americans.

6            Thank you, Your Honor.

7            MR. LEE:  May I proceed, Your Honor?

8            THE COURT:  Yes.

9     OPENING STATEMENT OF PRESIDENT AND FELLOWS OF HARVARD COLLEGE

10           MR. LEE:  May it please the Court.  My name is Bill

11   Lee.  And together with my colleagues Seth Waxman, Felicia

12   Ellsworth, Danielle Conley, and Ara Gershengorn, and me.  I

13   represent Harvard.  With us today are Drew Faust, until

14   recently the president of Harvard University; Mike Smith,

15   until recently the dean of Harvard's faculty of arts and

16   sciences; Rakesh Khurana, the dean of Harvard College; Erin

17   Driver-Linn, the dean of education at the Chan School of

18   Public Health; Marlyn McGrath, the Harvard College director

19   of the admissions; and Bill Fitzsimmons, the Harvard College

20   dean of admissions.

21           These are the people, Your Honor, along with many

22   other admissions officers, that you'll hear from that SFFA,

23   the plaintiff, has spent the last hour and the last four

24   years of accusing of intentional discrimination.

25           To be clear, they do not discriminate and did not

1    discriminate against Asian-Americans.  Harvard does not

2    discriminate and has not discriminated against

3    Asian-Americans.

4         Now, as Your Honor knows, at the outset of this

5    case, the plaintiff's stated goal, publicly stated and its

6    purpose of the case, was to change the law and eliminate all

7    considerations of race in college admissions.  It brought

8    that very claim in this case.  Your Honor rejected that claim

9    in this case.  As the Court's order recognized, the claim is

10   precluded by an unbroken line of Supreme Court precedent,

11   most recently the second *Fisher* decision.

12        So what is the plaintiff left with?  The plaintiff

13   is left instead to claim that an admissions process that was

14   lauded by the Supreme Court in *Bakke* as an illuminating

15   example of a college admissions process and again years later

16   in *Grutter* that is expressly described in a manner in which

17   it's applied today in the appendix to *Bakke* that Justice

18   Powell appended.  And it was approved after a more than

19   two-year review by the Department of Education's office of

20   civil rights has somehow been manipulated in some clandestine

21   way by these folks to intentionally discriminate against

22   Asian-American applicants.

23        But, Your Honor, after four years of litigation,

24   the production of tens of thousands of documents, scores of

25   deposition pages, and the production of data of more than

Case: 19-2005    Document: 00117625236    Page: 509    Date Filed: 07/30/2020    Entry ID: 6356615
Case 1:14-cv-14176-ADB   Document 631   Filed 04/18/19   Page 54 of 187

54

1   200,000 applicants to Harvard over a six-year period, the

2   plaintiff cannot prove that Harvard discriminates against

3   Asian-American applicants.

4           Instead what the evidence will confirm is that, as

5   identified by the Supreme Court as an illuminating example,

6   race is considered as one factor among many in Harvard's

7   admissions process, that when it is considered it is

8   considered flexibly and not mechanically, and it is always

9   used as a plus factor.  To be clear, Your Honor, an

10  applicant's race never counts against an applicant in the

11  admissions process.

12          You will not hear differently from SFFA.  In fact,

13  you will not hear from a single fact witness from SFFA.  The

14  plaintiff concedes that its founder, Mr. Blum, who is in the

15  courtroom today, has nothing relevant to offer to the issues

16  that are before Your Honor now.  We couldn't agree more.  Not

17  a single one, as Your Honor knows, of the plaintiff's members

18  who were denied admission will appear and testify in that

19  witness box.

20          Instead the plaintiff has resorted into summary

21  judgment briefing and even this morning to invective,

22  accusation, and innuendo based upon -- I think I'll be able

23  to demonstrate to you even this morning misstatements of the

24  record and supposed facts that had been wrenched from

25  context.  The plaintiff attacks Harvard and other

Case: 19-2005    Document: 00117629236    Page: 509    Date Filed: 07/30/2020    Entry ID: 6356615
Case 1:14-cv-14176-ADB   Document 631   Filed 04/18/19   Page 55 of 187

55

1  institutions of higher education that are dedicated to

2  assembling diverse, inclusive, and vibrant communities and

3  educating those who will help an increasingly diverse

4  society.

5         The plaintiff, as you heard, attacks the

6  reputations and motives of Harvard's president, its deans,

7  and dozens of admissions officers and other employees who

8  have dedicated themselves to assembling just that kind of

9  diverse and inclusive class.

10        And the plaintiff has tried to silence the voices

11 of the students who have benefited from these efforts and who

12 can best explain to the Court the benefits of these

13 environments.

14        Now, the vast majority, by my computation, of the

15 opening from the plaintiff today was about statistics and

16 numbers.  I think it was almost 80 percent of it.  And the

17 plaintiff, for sure, offers an analysis of an economist who

18 has so manipulated the data that it led 16 leading

19 economists, including Janet Yellen, the former chair of the

20 federal reserve, and two noble prize winners to conclude --

21 and I quote here, Your Honor -- his models are, quote, simply

22 not reliable and his findings are, quote, implausible, closed

23 quote.

24        Your Honor will see they are.  They are living

25 proof that if you torture the data long enough, it will

Case: 19-2005    Document: 00117629236    Page: 519    Date Filed: 07/30/2020    Entry ID: 6356615
Case 1:14-cv-14176-ADB    Document 631    Filed 04/18/19    Page 56 of 187

56

1    confess to anything.

2         We are fortunate to have a system that adjudicates

3    controversies based upon real evidence and fact-based inquiry

4    on complete pictures rather than facts taken from context.

5    We're fortunate to have a system that decides cases on a set

6    of principles and the rule of law.

7         Those principles, that evidence, the facts, the

8    truth, Your Honor, will demonstrate unequivocally to Your

9    Honor that there has been no discrimination against

10   Asian-American applicants in the Harvard admissions process.

11   The Harvard admissions process is, as the Supreme Court said,

12   an illuminating example of how far to balance a variety of

13   competing interests.

14        So let me turn to the remaining claims in the case

15   and first address the legal principles which SFFA really

16   didn't address in its opening.  I will then turn to the facts

17   and describe what Harvard does, why Harvard does it, and what

18   Harvard does not do.

19        Now, the plaintiff's allegations of intentional

20   discrimination are serious.  They are certainly not something

21   humorous.  The bar to prove them is high, and the courts have

22   been clear about what the bar is.  The plaintiff must prove

23   that Harvard discriminated on the basis of race, that the

24   discrimination was intentional, and the discrimination was a

25   substantial and motivating factor for Harvard's actions.

1          In other words, the plaintiff must have show that a

2     committee comprised of roughly 40 people at any given time is

3     intentionally trying to discriminate against Asian-American

4     applicants because they are Asian-American.

5          Harvard's evidence and the lack of evidence that

6     the plaintiff has been able to muster will show this is

7     simply not true.

8          The plaintiff also claims that Harvard has engaged

9     in racial balancing.  To prove this, the plaintiffs must show

10     that Harvard has imposed a quota or otherwise taken steps,

11     and I quote, to assure within its student body some specified

12     percentage of a particular group merely because of race or

13     ethnic origin.

14          It is not enough, Your Honor, to simply show that

15     Harvard pays some attention to the racial and ethnic

16     diversity of its applicants during the admissions process.

17          In fact, the Supreme Court has specifically

18     endorsed the principle that paying some attention to the

19     numbers is permissible.  This is from *Grutter* at 336.  Were

20     it otherwise, Your Honor, there would be no way for the

21     admissions office and Harvard to know that it was, in fact,

22     assembling a diverse class.

23          Now, the plaintiff next claims that Harvard gives

24     undue weight to race.  But again, the Supreme Court has held,

25     and I quote, universities can consider race or ethnicity

1    flexibly as a plus factor in the context of individualized

2    consideration of each and every applicant, again from

3    *Grutter*.

4              In so ruling, Your Honor, the Supreme Court

5    specifically endorsed Harvard's flexible use of race as

6    described in the *Bakke* opinion as a model for how

7    universities can choose to consider race in admissions.  As

8    you will hear from Dean Fitzsimmons and several other

9    admissions officers that will testify, that process described

10   in the very appendix to *Bakke* is fundamentally the same

11   process that's used today.

12             It is a system that involves highly individualized

13   holistic review of an applicant's file, gives serious

14   consideration to all the ways an applicant might contribute

15   to a diverse educational environment, and it is a system full

16   of checks and balances, many of which were ignored by SFFA in

17   their opening today, and a system in which no single factor

18   is determinative.  It is exactly what the Supreme Court has

19   endorsed.

20             Finally, Your Honor, as you know, the plaintiff

21   alleges that Harvard could achieve its goals without

22   considering race.

23             For many years now, going back decades, Harvard has

24   used and will continue to use multiple initiatives to

25   increase the diversity of its applicant pool and admitted

**JA500**

 1    class.  You will hear about them.  But at this time, Harvard

 2    cannot achieve its educational goals without considering

 3    race.  Either its classes would be radically less diverse or

 4    they would suffer in other fundamental ways, including

 5    academic excellence.  The Supreme Court again has made it

 6    clear that universities cannot be forced to choose between

 7    diversity and other educational objectives.

 8              So let me turn, Your Honor, to what we do because

 9    it's important.  Each year the Harvard admissions office

10    engages in a comprehensive iterative process with three goals

11    in mind:

12              The first is to admit a class of truly exceptional

13    students.  Harvard looks for students who excel in many, many

14    different ways and who will contribute to and benefit from

15    the community and all it has to offer.  As you will hear,

16    this does not mean only students who have the highest SAT

17    scores or the highest grade point averages.

18              The second goal, Your Honor, is to admit a class

19    that is diverse in many ways, including racially diverse, so

20    that students live and learn from a range of ideas,

21    perspectives, life experiences, and ways of thinking.

22              The final goal, Your Honor, is to admit a number of

23    students that Harvard has room for.  Harvard is a residential

24    college.  More than 98 percent of the students live on campus

25    in campus housing.  For the class of 2019, there were exactly

Case: 19-2005    Document: 00117629236    Page: 514    Date Filed: 07/30/2020    Entry ID: 6356615
Case 1:14-cv-14176-ADB   Document 631   Filed 04/18/19   Page 60 of 187

60

1    1,664 or so beds.  The admissions office manages the number

2    of offers it extends so that the number of students who

3    actually arrive does not exceed those for whom we have room.

4         To accomplish those goals, the admissions work

5    starts long before any applications are received.  Through a

6    variety of initiatives, the office recruits essentially to

7    ensure that as many qualified applicants as possible consider

8    Harvard as an option.  For example, since 1971 -- so we're

9    going back now 50 years -- Harvard's had an undergraduate

10   minority recruitment program.  You will hear it referred to

11   UMRP.  It has sought to identify and encourage high school

12   students of different racial and ethnic backgrounds to apply.

13   This includes Asian-American students and has included

14   Asian-American students.

15        The precise group that the plaintiff claims Harvard

16   is intentionally discriminating against is a group that we

17   are actively recruiting on a daily basis.

18        You will also hear from admissions officers about

19   numerous other recruiting efforts.  These officers regularly

20   travel to all 50 states and visit approximately 150 cities.

21   Their purpose is to spread the message that Harvard's doors,

22   like many of its peer colleges and universities, are open to

23   students of all backgrounds and means, and Harvard wants

24   students of all backgrounds and means.

25        These efforts have produced an increasingly large

Case: 19-2005    Document: 00117629236    Page: 515    Date Filed: 07/30/2020    Entry ID: 6356615
Case 1:14-cv-14176-ADB    Document 631    Filed 04/18/19    Page 61 of 187

61

1   and diverse pool of highly qualified candidates.  Harvard

2   currently receives approximately 40,000 applications each

3   year, and it's an incredibly accomplished group of students.

4         For the class of 2019, there were more than 2,700

5   applicants with perfect scores on the verbal section of the

6   SAT, more than 3,400 with perfect scores on the math section,

7   and more than 8,000 applicants with perfect GPAs.

8         But, Your Honor, Harvard has never admitted

9   students on the basis of grades or SAT scores alone and has

10   never defined academic, personal, extracurricular, or any

11   other excellence in that manner.  There are simply more

12   academically qualified applicants than there are spots.  The

13   ability to succeed academically is necessary to be admitted,

14   but it's not sufficient.

15         Once applications begin arriving, the admissions

16   office begins the difficult task of identifying the

17   approximately 2,000 applications who are offered admission.

18   The suggestion that everything is being done off of that one

19   page that the plaintiff showed you in its opening is at least

20   incorrect.

21         To do its work, the admissions office considers an

22   enormous amount of information provided by the applicants.

23   The material Harvard receives often runs for an application

24   to more than 50 pages, and we will walk you through a couple

25   of the applications so you can see them.  You will hear about

 1    the parts of the applications in more detail, but they

 2    include much more than transcripts and test scores.

 3          It includes information about extracurriculars.  It

 4    includes information about the applicant's high school and

 5    the rigor of the program.  It includes information about the

 6    applicant's parents, their education, their occupation.  It

 7    includes the applicant's intended major and career

 8    aspirations.  It includes personal statements and essays.

 9    Critically, it includes a guidance counselor recommendation,

10    two teacher recommendations, and an alumni report.

11          And applicants may and often do submit supplemental

12    materials they would like the admissions officer to consider.

13    This includes academic papers, artwork, videos of theatre

14    performances.  The admissions officers consider all of these

15    materials in an effort to understand who the applicants are.

16          You will hear it referred to as the whole-person

17    approach, which has been sanctioned by the Supreme Court.

18    Admissions officers pore over the essays, the recommendation

19    letters, interview reports, and other materials to learn what

20    motivates an applicant, what makes an applicant unique, and

21    what the applicant would bring and take away from the Harvard

22    community.

23          Now, because of the wide range of information that

24    applicants submit and that may be submitted on their behalf,

25    it's impossible to list every factor that could contribute to

1    the decision to admit a candidate.  But there are several

2    factors that Harvard consistently values.  Admissions

3    officers and alumni interviews are expressly told in writing

4    what these factors are and that they should be considered in

5    evaluating a candidate.

6            On the screen now is DX 5 which will be in

7    evidence.  These factors are sometimes referred to as tips or

8    pluses.  They are listed in a handbook that's provided to all

9    admissions officers and all alumni interviewers.

10           The tips, the pluses, the things that Harvard is

11   looking for are outstanding and unusual intellectual

12   abilities, unusually appealing personal qualities,

13   outstanding capacity for leadership, creative ability,

14   athletic ability, Harvard and Radcliffe parentage, and

15   geographic, ethnic, and economic factors.

16           As you will hear, Your Honor, none of these tips on

17   their own will earn an applicant admission.  The purpose of

18   the whole review process is to ensure that no one aspect of

19   any applicant in isolation can alone tip him or her into the

20   admitted pool.  Nor, Your Honor, is this an exhaustive list

21   of all the things that may weigh in favor of a particular

22   candidate.  But these are some of the factors that Harvard

23   values that are considered by the admissions office and that

24   are set forth in black and white in detail, as Your Honor

25   will see.

Case: 19-2005    Document: 00117629236    Page: 519    Date Filed: 07/30/2020    Entry ID: 6356615
Case 1:14-cv-14176-ADB   Document 631   Filed 04/18/19   Page 64 of 137

64

 1          Now, Your Honor is going to hear about the process

 2     in detail because understanding the process puts the lie to

 3     much of what SFFA contends.  For now, let me outline the

 4     process because I think it's important and describes some of

 5     the basic contours of a process that involves lots of people

 6     considering lots of information over a long period of time.

 7          When the application is received, as Your Honor

 8     noted in your summary judgment ruling, they are grouped by

 9     geographical areas known as the dockets.  Within each docket,

10     admissions officers are assigned to specific areas.  You will

11     learn that admissions officers are instructed to be advocates

12     for the applicants from their dockets.  Their job is to

13     identify and seek out information so they can make the best

14     case on behalf of competitive applicants throughout the

15     process.

16          Now, Your Honor heard a lot about the personal, the

17     four ratings.  Let me tell you where in the process they

18     occur and what they actually are.

19          Admissions officers conduct the initial review or

20     the first read of the applications from the high schools.

21     Based upon the initial review of the file before any

22     committee discussion, before my subcommittee discussion,

23     before the file is even complete, often, admissions officers

24     make preliminary assessments of applicants and assign ratings

25     in a number of different categories.

1          There are four ratings referred to as the profile

2    ratings:  academic, extracurricular, athletic, and personal.

3          The admissions officers also assign scores based

4    upon teacher and guidance counselor recommendations,

5    information that's coming to the admissions office from

6    outside of Harvard, from the teachers and guidance

7    counselors.

8          There are scores from any interviews for the

9    applicant.

10          And finally, the admissions officers assign each

11    applicant a preliminary overall rating.  Some applications

12    are assigned ratings by a second reader.  Some a third reader

13    who provide his or her own preliminary assessment and

14    ratings.  Applications may also be read, Your Honor, by a

15    member of the faculty.

16          Now, let me pause and say this.  The suggestion

17    that the only document at Harvard that discusses these

18    ratings is that one page that SFFA showed you in the opening

19    is simply not true.  There is a handbook for interviewers and

20    admissions officers.  There are case books with different

21    descriptions of different cases.  There are periodic updates

22    that go out from the admissions office.  And when a new

23    admissions officer comes in, they are trained, they go over

24    cases, and for their first 50 to 100 files they are read in

25    parallel with a senior admissions officer who can ensure that

1    the person is addressing all issues, including the ratings,

2    in the correct way.

3           Now, contrary to what SFFA has suggested, not a

4    single one of these ratings, not a single one is formulaic.

5    Every single one requires judgment by the admissions office,

6    and every single one involves quantitative and qualitative

7    information to some varying degrees.

8           So let me take the academic rating.  Some might

9    assume that the academic rating is a formula based on test

10   scores and GPAs.  Your Honor, the academic index that SFFA

11   refers you to is a formulaic determination.  It is an index.

12   It's not used in the admissions process.  It's not the

13   academic rating.  I'm not sure why it was even suggested to

14   you that it is.

15          Instead, the academic rating that's assigned by the

16   reader of a file is something that does take into account

17   grades.  It does take into account board scores, but it takes

18   into account whether the applicant has won any awards.  It

19   takes into account the strength of the school, the strength

20   of the academic program.  It will take into account

21   statements and the recommendations about the student's

22   academic curiosity or capability.  And when a Harvard faculty

23   member reads a file, it will include judgments on that basis

24   as well.  Nothing in the academic rating is formulaic.

25          The same is true of the extracurricular rating, and

1    the same is true of the personal rating.  The personal rating

2    captures a wide variety of things, including characteristics

3    such as leadership, determination, and compassion, the very

4    tips that are expressly described in the handbook.  They

5    capture the applicant's potential to contribute not just to

6    their college community but more broadly to society after

7    graduation.

8            Like the other ratings, Your Honor, the personal

9    rating is based in substantial part on information in

10   individual's outside the admissions office giving information

11   to the admissions office.  It is teachers; it is guidance

12   counselors; it is recommenders; it is alumni interviewers.

13           Critically, and something not mentioned by SFFA,

14   these ratings are all assigned very early in the process and

15   are very preliminary.  And I'm going to come back to this,

16   but Your Honor can see on the screen how the four profile

17   ratings are side by side by side by side.

18           I'd ask Your Honor to keep that in mind, and I'll

19   come back to it.

20           The ratings are intended to help the officers

21   triage among the hundreds and thousands of applications they

22   review, and they serve as rough reminders of the applicant's

23   strength.

24           But, Your Honor, the ratings are assigned before

25   any applicant is discussed by the committee, before any

1    subcommittee meeting occurs.  They are assigned before

2    there's been any determination of whether an applicant

3    advances.

4           So what happens next?  What actually happens in the

5    process is after these ratings have been assigned, after the

6    individual officers have given it a first read, they actually

7    meet with a group of folks who have read files from the same

8    docket.  These meetings take place over several days.  They

9    are open.  There's an open discussion.  There's no one hiding

10   any information from anybody.

11          The application files, all of this information is

12   projected on a screen and available to every member of the

13   committee electronically.  Every single member can and does

14   assess for him or herself the strength of an applicant's

15   essay or the strength of the recommendation submitted by a

16   teacher or the strength of a recommendation submitted by a

17   guidance counselor.

18          Then there's a discussion, an open discussion.  And

19   after that discussion, a preliminary recommendation as to

20   whether an applicant should be admitted is made.  The

21   decisions are tentative.  They are recommendations, but

22   they're made collectively.  And critically, Your Honor, they

23   can and do change.

24          Your Honor will learn that the ratings assigned

25   that are the focus of SFFA's case do not determine whether an

Case: 19-2005    Document: 00117629236    Page: 523    Date Filed: 07/30/2020    Entry ID: 6356615
Case 1:14-cv-14176-ADB    Document 631    Filed 04/18/19    Page 69 of 187

69

1    applicant will be tentatively admitted or not.  An applicant

2    with lower ratings in all categories can be recommended for

3    admission while an applicant with better ratings, higher

4    ratings might not.  It is the collective review and

5    discussion of what the substance of the application is that

6    makes the determination.

7           After the subcommittee meetings are complete, Your

8    Honor, there's another step.  The full committee meetings

9    begin.

10          These meetings are attended by 40 members of the

11   admissions committee and span multiple weeks.  During these

12   meetings again, the full committee considers all of the

13   applicants who will be recommended for admission and who

14   might not be.  To do so, the committee collectively reviews

15   thousands of applications as they work together to put

16   together a class that is diverse in many different respects.

17          Again in the full committee meetings, the

18   applications are projected on a screen.  Again in the full

19   committee meetings, every admissions officer has electronic

20   access to the full file.

21          They also have a full list of all the applicants.

22   The admissions can and often do say, well, I know you're not

23   recommending this person, but I'd like us to look at their

24   file.  That occurs frequently.

25          At the end of this process, there's a full

1    discussion.  There's a full discussion of every single person

2    who will be recommended for admission.  The decision is then

3    made in the open meeting among 40 people, each with one

4    vote -- one vote, one person -- and either by consensus or

5    majority vote, the decision is made.

6            It is this decision that results from the process

7    I've just described and the 40-person vote or consensus and

8    not the numerical ratings that determine admission.

9            At every stage of the process, Your Honor, you'll

10   learn that applicants are evaluated as the multidimensional

11   people they are.  Harvard doesn't believe that any individual

12   is defined by their grade point average or their SATs.  All

13   of the information about an applicant is considered.

14           And for those applicants who have disclosed it,

15   that includes race.  To be clear, for Harvard and its

16   students to attain the educational benefits of a diverse

17   student body, Harvard believes that students of certain races

18   or ethnic backgrounds should receive a tip.  To be clear, for

19   most applicants, race makes absolutely no difference to the

20   admission decision.

21           There are some applicants who will be denied

22   admission no matter what the race.  And for many applicants,

23   they will be admitted no matter what the race.  Therefore,

24   however, highly qualified applicants on many, many

25   different -- in many, many different respects who without the

1    tip for race may otherwise not have been admitted.

2          But you will learn there are highly qualified

3    applicants who will not have been admitted, highly qualified

4    in many ways without the tip from being from a certain part

5    of the country, without the tip for being from a modest

6    socioeconomic background, without the tip for being

7    exceptionally creative in an artistic way.

8          A tip in isolation is never what makes the

9    difference.  And the files themselves will show that to Your

10   Honor.  Race alone is never the reason that a student is

11   granted admission.  And most importantly for the issues

12   remaining with Your Honor, race is never the reason that a

13   student is denied admission.

14          In fact, race by itself does not factor into the

15   four profile ratings.  And this is the place where,

16   respectfully, SFFA has engaged in a war of words.  The

17   self-identification of race by student is not factored into

18   the four ratings per se or in isolation.

19          But the readers are not blind.  If a student is an

20   African-American who grew up in a place or location where he

21   or she suffered substantial discrimination and had to

22   overcome that and took steps to help their community overcome

23   that, that's going to educate the personal rating.  That's

24   not race being considered.  That is the person and the

25   person's life story which does, in part, depend upon the race

Case: 19-2005   Document: 00117629236   Page: 526   Date Filed: 07/30/2020   Entry ID: 6356615
Case 1:14-cv-14176-ADB   Document 631   Filed 04/18/19   Page 72 of 187

72

 1   being considered.

 2          So the mere fact of race self-identified in

 3   isolation does not make it into the four ratings.  The

 4   person's life story, which may or may not relate to the race

 5   in the same way that it may or may not relate to gender, it

 6   may or he may not relate to modest socioeconomic background

 7   are considered in the ratings.

 8          Now, a student's race may be considered by the

 9   individual admissions officers at any point during the

10   discussion.  It's considered one factor among many, and

11   within the context of each individual application.

12          This is what each of the admissions officers, the

13   folks who are really willing to come to take the stand, will

14   tell you.  It's exactly what *Grutter* says at page 337.

15          In keeping with the courts's holding in *Grutter*,

16   Harvard has no policy, either de jure or de facto, of

17   automatic acceptance or rejection based upon any single soft

18   variable.  Every student admitted to Harvard is qualified on

19   multiple dimensions and different dimensions, Your Honor,

20   including having the intellectual and academic ability to

21   thrive in the community.

22          This was true of the Harvard system at the time of

23   *Bakke*.  This was true of the Harvard system at the time of

24   *Grutter*.  It is true today.  Race is considered.  It can tip

25   an applicant who is qualified in multiple different ways into

1    the pool.  But the same is true of a variety of other

2    factors, as we say in black and white.

3            Now, as permitted by *Bakke*, Harvard's program

4    treats each applicant as an individual in the admissions

5    process, and an applicant will not be foreclosed from all

6    consideration of a seat simply because of race.

7            At the risk of being redundant, let me just restate

8    this because it's important to the claims that remain before

9    Your Honor.

10           Harvard never considers an applicant's race to be a

11   negative.  If it considers race, it's always considered in a

12   positive light.  The fact that one applicant is given a plus

13   or a tip doesn't mean that another who is not given that tip

14   is being discriminated against.  And if there's one thing

15   that's clear from the Supreme Court cases and the excerpts

16   that I've tried to show you during the opening, it is this:

17   The Harvard process for the last 50 years has been viewed as

18   lawful.  That is why the Supreme Court twice pointed to it as

19   illuminating.

20           We are actually not here because Harvard has failed

21   to comply with that unbroken line of Supreme Court precedent.

22   We're here because SFFA would like to change what the law is.

23           So having talked about what we do, let me talk

24   briefly about why we do it.  The suggestion this morning that

25   the issue of why we do it is not an issue was at least

1    surprising to me.  Why does Harvard -- why do so many

2    colleges and so many universities in the United States

3    consider race as one factor among many in the admissions

4    process?

5            Harvard itself determined long ago that diversity

6    of all kinds was in the best interest of the college and its

7    students.  And without considering, as I said, race as one

8    factor, Harvard did not believe it could fully realize the

9    educational benefits of a diverse student body.

10            Harvard's core mission statement, which is on a

11   slide now and will come into evidence, is to educate citizens

12   and citizen leaders to serve society in a variety of ways.

13            You will hear directly from President Faust, Dean

14   Khurana, and the other senior Harvard leaders that Harvard

15   has long regarded diversity in every dimension as essential

16   to its mission.

17            Harvard believes that its students learn as much

18   from each other as they do from their professors.  Because

19   they learn -- they live and learn surrounded by classmates

20   who have different backgrounds, different interests,

21   different factions, and who bring different perspectives to

22   the discussions occurring around them every day, our students

23   are able to challenge stereotypes and confront their own

24   assumptions.  They are better able to assess their own

25   values.  They are in a better position to succeed in our

1    increasingly diverse world.

2            Your Honor, these benefits flow to all students,

3    not just students of color.  You will hear directly from some

4    of those students who actually have asked themselves to

5    testify.  They are living proof that Harvard has a compelling

6    interest and a diverse student body.

7            I want to be clear on one thing.  This commitment

8    to diversity is not a mantra made for this litigation.

9    Justice Powell's opinion in *Bakke* includes an appendix, as I

10   said, specifically describing Harvard's process.

11           On the screen now is a statement from the appendix.

12   The appendix says, "If scholarly excellence were the sole or

13   even predominant criteria for admission, Harvard would lose a

14   great dealing of its vitality and intellectual excellence,

15   and the quality of the educational experience offered to all

16   students would suffer."

17           That was true before *Bakke*; that was true at the

18   time of *Bakke*; it was true at the time of *Grutter*; it is true

19   today.  And Harvard has said it in multiple reports that will

20   come into evidence.

21           On the screen now, Your Honor, is an excerpt from

22   the 1996 report by then President Neil Rudenstine, a lengthy

23   report that noted expressly that little, if anything, can

24   substitute for the experience of continued association with

25   others who are different from ourselves and who challenge us

Case: 19-2005    Document: 00117629236    Page: 530    Date Filed: 07/30/2020    Entry ID: 6356615
Case 1:14-cv-14176-ADB   Document 631   Filed 04/18/19   Page 76 of 187

76

1    even as we challenge them.

2         And in February of 2016, under Dean Khurana's

3    leadership, the faculty of arts and sciences at Harvard

4    unanimously adopted a report issued by a committee to study

5    the importance of student body veracity, a committee that

6    Dean Khurana chaired.  The committee embraced and reaffirmed,

7    as the slide suggests, "the university's long-held view that

8    student body diversity, including racial diversity, is

9    essential to our pedagogical objectives and institutional

10   mission."

11        Now, Harvard is not alone in this judgment and for

12   sure Harvard is not alone in making progress.  You will hear

13   from Dr. Ruth Simmons.  She is the current president of

14   Prairie View A&M University and the former president of Brown

15   and Smith.  She has spent her career learning what works and

16   what does not work in higher education.  And she will explain

17   diversity, including racial diversity, vastly enhances

18   educational opportunities and better prepares students for

19   the world after graduation.

20        Nothing, she will explain, can substitute from

21   learning that happens from direct personal interactions with

22   people who are different from us.

23        Now that I've discussed what we do and why we do

24   it, let me talk for a few minutes about what we don't do.

25        Before I address the plaintiff's allegations from

1    this century, let me briefly address the subject of Your

2    Honor's judicial notice of inquiry before we started today.

3    These are events from the 1920's.

4         As I said in open court last week, the fact that

5    Harvard restricted the number of Jewish students was not a

6    proud moment in Harvard's history.  Not a single Harvard

7    witness will tell you that it was.  Instead, they will tell

8    you that they've devoted their careers to making sure that

9    nothing like that ever happens again.

10         As I said in the pretrial conference, that policy

11    occurred 50 years before the *Bakke* decision, 50 years before

12    the Supreme Court said that the Harvard system was an

13    illuminating example.

14         So let's talk about this century and what SFFA has

15    from this century.  Each of the Harvard admissions officers

16    who will take the stand will tell you that they take

17    seriously the commitment to evaluate each student fully and

18    fairly, without bias, without prejudice.  They don't try to

19    keep personnel out.  They try to get people in.

20         Now, as I said, by my calculation, roughly

21    80 percent of the opening was about statistics.  To be sure

22    the plaintiff relies upon a complicated statistical analysis

23    of Harvard admissions data in an attempt to prove its claim.

24    But if we take a step back, the fact is that the percent of

25    Asian-American students in a Harvard's admitted class has

1    grown considerably over time.

2         By way of example, from the class of 2006 to the

3    class of 2019, the percentage of Asian-Americans in the

4    admitted class increased from 16.5 percent to almost

5    21 percent, an increase of 25 percent.  This representation

6    has continued to increase.  Last year, the class of 2022,

7    Asian-Americans were almost 23 percent of the admitted class.

8         Now, there are a variety of factors that contribute

9    to this increase.  But I would say respectfully the idea that

10    we got sued by SFFA is the reason that the numbers have gone

11    up simply isn't true.  It's an argument only a lawyer could

12    love.

13         These numbers simply do not support the plaintiff's

14    allegations.  And when you look at the right set of

15    comprehensive statistics, they don't support the allegations

16    either.

17         Professor David Card, who is also here with us in

18    the gallery today, is a world-renowned economist and

19    recipient of the John Bates Clark Medal, one of the field's

20    most prestigious awards.  He will tell you that any model of

21    the Harvard admissions process is imperfect.  And it is.

22         The admissions office makes a series of highly

23    individualized decisions each based on the quantitative and

24    qualitative information in the file.  And most of that cannot

25    be captured in quantifiable data.

**JA520**

1          Professor Card built a model that approximates

2     Harvard's admissions process as closely as possible.

3          As Your Honor is aware, there are differences in

4     how the experts model the data, but they actually all reduce

5     to one simple question:  Which model most accurately reflects

6     what actually happens in the Harvard admissions process?

7     Which one models the real world as opposed to a world that is

8     not consistent with what Harvard does?

9          Professor Card included all applicants in his

10    model.  He included athletes, legacies, children of faculty

11    and staff, applicants who have been brought to the attention

12    of the dean or director.  He included them, Your Honor,

13    because they are all competing in the same pool to gain

14    admission.

15          He also ran a separate model for each admissions

16    cycle because that's how the process works.  When the

17    admissions office makes its decision as to who to admit in

18    any given cycle, it is doing so in the context of who can

19    help make the best class from among that year's applicants.

20    It does not compare those students to students who applied

21    four years ago or those who might apply three or four years

22    from now.

23          Professor Card also included in his analysis all

24    the information that is quantifiable that the admissions

25    office considers.  This encompasses a wide variety of data,

1    but it includes the applicant's intended career, his or her

2    parent's occupation, and all the ratings assigned by the

3    admissions officer when the applications are read, not just

4    some of them.

5         When Professor Card modeled Harvard's admissions

6    process considering all the applicants, considering all the

7    quantifiable information that the admissions office itself

8    considers, and considering the information year by year the

9    way that the admissions office does, he found no statistical

10   evidence of discrimination.

11        Critically, Professor Card found that

12   Asian-American ethnicity is never statistically significant

13   in the admissions process.  In other words, Your Honor, at

14   the end in a model that considers all the data and all the

15   applicants in the manner in which admissions office does, it

16   is -- the result is not distinguishable from zero.

17        What his model found instead was that over the six

18   years of data that Your Honor had the parties focus upon,

19   Asian-American ethnicity had a positive effect, not

20   statistically significant but a modest positive effect in

21   three years and a modest but statistically significant

22   negative effect in three other years.  This would surely be

23   an odd result if we had this massive clandestine scheme to

24   discriminate against Asian-Americans.

25        But Professor Card also found more.  He found that

1    there was actually a slightly positive effect in the

2    admissions process for Asian-American women.  He found that

3    there was a slightly positive effect for Asian-American

4    applicants from California.  Now, these results, too, he will

5    tell you were not statistically significant.  But if you're

6    trying to intentionally discriminate against Asian-American

7    applicants, why would it only be males, and why would it only

8    be males from outside of California?

9         Now, the plaintiff's expert did not come to this

10   case without a point of view.  He has published papers

11   endorsing the mismatch theory, with which Your Honor may be

12   familiar.  But it posits that affirmative action harms

13   minority students by admitting them to schools in which they

14   are unable to succeed.  His own published work suggested

15   African-American students for some reason gravitate to easy

16   majors.  He came to this case as an opponent of affirmative

17   action, and he then developed a model that would allow him to

18   justify that result.

19        So how did he do that?  The way that he did it was

20   not to include all the applicants, not to include all the

21   information, not to do it cycle by cycle.

22        Instead, he kept taking out information.  He kept

23   taking out factors and got further and further away from the

24   admissions process.  It is the reason the amici describe his

25   results as simply implausible.

1           So what did he do?  First he excluded from his

2    analysis whole categories of applicants, including athletes,

3    legacies, children of staff, and students on the dean's and

4    director's list.  The plaintiffs have suggested that this is

5    no big deal because these applicants are a small portion of

6    the applicant pool.  But as SFFA said in their opening, they

7    are a significant portion of the admitted class.

8           Now, I heard the suggestion today that the academic

9    profile of the legacies is somehow less than the applicant

10   pool itself.  That's 100 percent wrong.  It's actually

11   better.  And the suggestion that somehow giving legacies a

12   tip is an indication that Harvard has dispensed with

13   academics is simply wrong.

14          And the suggestion that the coaches order the

15   admissions office to accept people is simply wrong.  Before

16   the recruited athletes can be granted admission, they are all

17   reviewed by the admissions process for their academic,

18   extracurricular, athletic, and personal profiles.

19          Why does SFFA's expert exclude this information?

20   Your Honor, he does so because if you look at each of these

21   categories, the Asian-American applicants in these categories

22   are accepted at higher rates than white applicants.  So he

23   takes out a portion of the pool where Asian-Americans, while

24   a very small portion of that pool but an increasing portion

25   as every day passes, are actually admitted at higher rates.

Case: 19-2005    Document: 00117629236    Page: 537    Date Filed: 07/30/2020    Entry ID: 6356615
Case 1:14-cv-14176-ADB    Document 631    Filed 04/18/19    Page 83 of 137

83

1          Why would you do that?  Now, he removed them

2     because having those numbers in doesn't get you to the result

3     he want you to have.  He also pooled six years of data rather

4     than going year by year.  But the class -- applicants for the

5     class of 2014 do not complete with applicants for the class

6     of 2019.

7          He also excluded from his model parental

8     occupation, intended career, and whether the applicant had an

9     interview with a staff member on campus.

10          Now, that may sound like a random list to Your

11     Honor.  It is not.  As you will learn, the reason he removed

12     the specific variables is because only by removing them could

13     he reach the results he wanted.

14          And then finally, he came to the personal rating,

15     and he excluded the personal rating from his model.  Now, he

16     admits that the personal rating reflects information that is

17     important to the admissions office in evaluating candidates.

18     He admits that it reflects information that comes from

19     teacher recommendations, guidance counselor recommendations,

20     other recommendations, personal statements, and interview

21     reports.  He admits that he's unaware of any of the 200,000

22     applicants that he reviewed who was admitted without a

23     personal rating.  But he takes them from the model.  And he

24     takes them out of his model.

25          Now, the plaintiff has suggested to you that he had

Case: 19-2005   Document: 00117629236   Page: 539   Date Filed: 07/30/2020   Entry ID: 6356615
Case 1:14-cv-14176-ADB   Document 631   Filed 04/18/19   Page 84 of 187

84

1   to remove them from his model because there was a negative

2   effect for Asian-American ethnicity on the personal rating.

3   But that same model, Your Honor, shows a positive effect for

4   Asian-American ethnicity on the non completely quantitative

5   academic rating, on the non completely quantitative

6   extracurricular rating.  A positive effect.

7          So do you remember, Your Honor, when I showed you

8   the summary sheet and I said I would come back to the fact

9   that the four ratings are side by side by side by side?

10          You have a first reader sifting down with a sheet

11   in front of them.  They're reviewing the file.  To believe

12   SFFA, to credit their allegations, you would have to conclude

13   that a single reader sitting down with a file with that sheet

14   in front of them goes to box one, to the academic rating

15   which is not quantitative, but quantitative and qualitative,

16   and actually gives Asian-Americans a bump up.

17          You then come to the seconds box, which is

18   extracurriculars, which has a substantial portion of the

19   evaluation, not quantifiable, and gives Asians a bump up.

20          And yet the same reader filling out the same form

21   gets to the fourth box and says now I'm going to

22   discriminate, and I'm going to downgrade the same person I

23   just gave the bump up to twice to ensure they're not

24   admitted.

25          Does that make sense?  We would suggest it does

1    not.

2         Now, what that leaves SFFA with is a handful of

3    emails and letters among the tens of thousands of documents

4    that Harvard has produced.  I am not going to address them

5    now.  We will address them during the course of the evidence.

6         Most of them fall in the category like the letter

7    from the 90-year old alum which was racist, inappropriate.

8    There was a response that was polite.  Has nothing to do with

9    Harvard's admissions process.

10        Now, this allegation that Harvard's process

11   discriminates against Asian-Americans has been made before,

12   it has been investigated before, and it has been found to be

13   meritless before.

14        In 1988, Your Honor, the Department of Education's

15   Office For Civil Rights responded to the concern that there

16   was possible discrimination against Asian-Americans to

17   selective colleges.  Specifically the concern was described,

18   and I quote it here because it is so close to what you're

19   seeing today, "Despite superior academic credentials in terms

20   of high school performance and standardized test results,

21   Asian-Americans have been admitted to selective schools at a

22   lower rate."

23        Both Dean Fitzsimmons and Marlyn McGrath, director

24   of admissions, were there at the time.  They will explain

25   that while there have been, for sure, some changes to the

Case: 19-2005   Document: 00117629236   Page: 540   Date Filed: 07/30/2020   Entry ID: 6356615
Case 1:14-cv-14176-ADB   Document 631   Filed 04/18/19   Page 86 of 137

86

1    admissions process over the last 30 years, the basic

2    system -- the first readers, the docket system, the

3    subcommittees, the full committees, the vote of the 40

4    folks -- is fundamentally the same.

5         The office of civil rights investigated for two

6    years.  It reviewed 400 full applications and 2,000

7    application summary sheets.  It interviewed ten admissions

8    officers, and it reviewed admissions offices policies.  In

9    fact, it set itself up physically in the admissions office.

10   OCR even conducted its own statistical regression analysis on

11   a sample of 110,000 students from Harvard's data.

12        In the end, OCR found that there were some

13   differences in the aggregate statistics between white and

14   Asian-American applicants.  When you do averages, you're

15   growing to see some differences.  But it recognized that

16   those differences did not reflect discrimination.  The

17   conclusion, on the screen now, was that Harvard did not

18   discriminate against Asian-American applicants.

19        Significantly, Your Honor, OCR reached this

20   decision even though its own statistical model found that

21   white applicants on average had higher personal ratings than

22   Asian-American applicants.  The very finding or the very

23   proposition that the plaintiff here claims is the linchpin of

24   its case, OCR said we find there to be a difference.  There

25   is a difference.  Based upon our analysis, it's not evidence

1    of discrimination of any kind.

2         A decade later, an Asian-American individual filed

3    a complaint alleging much the same, that he or she had been

4    discriminated against by Harvard on the basis of their

5    Asian-American ethnicity.  OCR investigated again and again

6    confirmed there was no evidence of discrimination.

7         These allegations that SFFA makes today against

8    Harvard have been made before.  They've been investigated

9    before.  Even though they have been found to be meritless

10   before, Harvard takes those allegations seriously, as you

11   expect we would.

12        So let me give you an example.  In the report, OCR

13   recognized in 1990 that Harvard provides admissions tips for

14   athletes and legacies.  OCR concluded that those tips

15   explained, in its view, the disparity between whites -- the

16   admission rates between whites and Asian-Americans.  OCR also

17   said that those tips were completely proper, that the ability

18   to field competitive athletic teams and the ability to

19   develop a community with Harvard students, faculty, staff,

20   and alumni contributed to a sense of community in ways that

21   are important to the institution, Your Honor, just as it does

22   to other colleges and universities.  OCR found that those

23   tips, tips that we use today, were not used to discriminate

24   against Asian-Americans.

25        But nevertheless, following the issuance of the

Case: 19-2005   Document: 00117629236   Page: 542   Date Filed: 07/30/2020   Entry ID: 6356615
Case 1:14-cv-14176-ADB   Document 631   Filed 04/18/19   Page 88 of 187

88

1      findings, Dean Fitzsimmons periodically reviewed admission

2      rates for non-athletes, non-legacy applicants to confirm that

3      there were not significant differences between white and

4      Asian-American applicants.

5             The suggestion that he just put his head in the

6      sand and assumed an ostrich-like posture as information came

7      his way simply is not true.  He asked for this information as

8      the check or balance to ensure that the process that OCR said

9      didn't discriminate against Asian-Americans would not in the

10     future discriminate against Asian-Americans.

11            And as the bar chart on Slide 35 will show you, the

12     data report to him showed that there were no significant

13     differences.  Indeed, across the six years of data the

14     experts have studied in this case, not taking all the data

15     that Dean Fitzsimmons has received, but this case, the

16     admission rates for Asian-American applicants who were not

17     legacies or recruited athletes was 5.15 percent.

18            The admission rate for white applicants who were

19     not legacies or recruited athletes was 4.91 percent, a

20     quarter of a point lower.

21            Do I give you the numbers because I think there are

22     some dispositive determination by numbers?  No.  We give it

23     to Your Honor because it belies the suggestion that Harvard

24     just buried their head in the stand.  They could have just

25     said OCR said we don't discriminate, let's move on.  Instead

```
 1    they took steps to ensure that for the non-legacy and

 2    non-athlete populations they were being treated fairly and

 3    squarely.

 4           Now, Your Honor, I want to address what I think is

 5    the heart of the 20th century information or 21st century

 6    information that the plaintiff relies upon.  And it's these

 7    OIR reports.

 8           The plaintiff suggests that there was some internal

 9    investigation that found discrimination, and that the dean

10    buried it.  There was no finding of discrimination I can show

11    you.  I, in fact, can show you that the documents they showed

12    you today and suggested the dean reviewed, he didn't review

13    and there was nothing to bury.

14           Now, this is entirely based upon work from the

15    office of institutional research.  It is a universitywide

16    office.  It is populated by good folks who are highly

17    qualified.  Ms. Driver-Linn then was a director of OIR.  You

18    will hear from her and others that the story behind these

19    documents, particularly if you look at all the documents, is

20    not what you heard earlier this morning.

21           You will learn instead that there's been some

22    cherry-picking, and what I'd like to do very quickly is give

23    you a fuller picture of the story.

24           So how does the story develop?  In late 2012, Ron

25    Unz, a Harvard alumnus, published an article about what he
```

1    called corrupt Ivy League admissions, in which he cast

2    aspersions on Harvard and other institutions and alleged

3    admissions policies were discriminating against

4    Asian-Americans.

5        Now, SFFA said this morning that it created a lot

6    of concern.  When Your Honor reads the article, it will cause

7    you a lot of concern.

8        Mr. Unz is an equal opportunity critic of racial

9    groups.  He criticizes Jews and their intellectual capacity.

10   He criticizes East Asians and their intellectual capacity.

11   He criticized Japanese-Americans and their work ethic.  And

12   he is most critical of blacks.

13       The article would get attention from anyone who is

14   in college admissions.  It would get attention because it had

15   a provocative thesis:  It was disparaging of multiple ethnic

16   groups, and it was based upon a highly suspect analysis.

17       Now, around the same time, Your Honor, at the end

18   of 2012 and 2013, there was another paper published by

19   researchers Caroline Hoxby and Chris Avery.

20       It, too, made a splash in higher education but for

21   a better and different reason.  Their thesis was that

22   universities like Harvard and others were not making

23   education accessible to a wide enough range of low-income

24   applicants.

25       It is against this background that OIR began

**JA532**

1    looking at a variety of issues in 2013.  Some of this work,

2    to be sure, was in response to Mr. Unz's provocative article.

3    Some addressed low-income students in response to the

4    Hoxby-Avery article and others.  And some addressed other

5    topics like early admissions, which Harvard had just

6    reinstituted, and gender balance at our engineering school,

7    which was relatively new.

8            Now, SFFA focused you on P9 -- and I'm going to put

9    it on the screen -- and suggested that this was presented to

10   the dean and he sat on the information.

11           Let me take you through what actually happened.

12   The dean has said he saw some of the information in P9 but

13   never all of it.  And let's look at what P9 is.

14           You can see that there's a cover page with no title

15   filled in.  You can see that the date is February 14, 2012.

16   It's wrong by a year.  When you get to the second and third

17   pages, you'll see that the data is actually flipped.  The

18   data for Asian-Americans is under the category of whites, and

19   the data for whites is under the category of Asian-Americans.

20           And when you get to the conclusion page, this is

21   what you will see.  When some Harvard witnesses testified

22   that this was preliminary and incomplete, they were not being

23   critical of Ms. Driver-Linn or any of the people working for

24   them.  They were just looking at what you're looking at and

25   could see with their four eyes, wrong date, no title, data

1    flipped, no conclusion.

2            Now, let me take you to the next slide into P12.

3    P12 is a presentation that was presented to the dean.  It was

4    presented on February 25, 2013.  It has, as he said, some at

5    the end, you'll see, data that is the same as P9 but not all

6    of the data.  As you can see, this presentation has the

7    correct date.  As you will see, it does not have blank pages.

8    As you will see, it does not have data in the wrong columns.

9    And at the end, it does contain some but not all the slides

10   from P9.

11           The first roughly 30 pages of this presentation

12   address issues regarding the return of early action, which

13   Harvard had recently reinstituted.  It also examines, as I

14   said, issues of gender balance at the engineering school

15   because Harvard had just recently launched an engineering

16   school.

17           Starting at page 31 of P12, there is a section

18   entitled "Evaluating Factors That Play a Role in Harvard

19   College Admissions."

20           Now, as you will see, OIR itself specifically said

21   at the bottom of the page that the following analysis is

22   preliminary and for discussion.

23           Now, Ms. Driver-Linn will be here herself to

24   explain to you that the models were exploratory, preliminary,

25   and incomplete in the data they modeled.  That's why they're

Case: 19-2005    Document: 00117629236    Page: 547    Date Filed: 07/30/2020    Entry ID: 6356615
Case 1:14-cv-14176-ADB   Document 631   Filed 04/18/19   Page 93 of 187

93

1    described as preliminary.

2            To give you an idea, Your Honor, on Slide 44 is a

3    listing of all the variables that Dr. Card modeled.  He

4    admits that these aren't all the variables considered in the

5    process, but he modeled all these variables.

6            On the next slide, Slide 45, here are the variables

7    that were modeled in the OIR analysis.  So let me return to

8    the OIR analysis and to P12 and to the pages that Dean

9    Fitzsimmons, in fact, did see.

10            In model 1, which is on the screen right now, OIR

11    considered what would happen to the class if it was admitted

12    only on the basis of academic criteria and found that the

13    class would have more Asian-American students than it does.

14    Now, this model actually used the academic index even though

15    the academic index isn't used in admissions.

16            Models 2, 3, and 4, as Your Honor moves from left

17    to right, adds additional factors at each step.

18            THE COURT:  Can you blow up that a little bit?  I

19    can't see it.

20            MR. LEE:  Is that better, Your Honor?

21            THE COURT:  Yes.  Much better.  Thank you.

22            MR. LEE:  If you move from left to right, you'll

23    see that as you add in additional factors, legacies,

24    athletes, personal qualities, and demographics, the makeup

25    you have of the class changes, and you actually get very

 1    close to what the class looks like.

 2           When the dean and others saw this analysis at a

 3    high level, even in a preliminary analysis it told them what

 4    they knew already, which is if Harvard admitted just on

 5    quantitative academic indications, the class would be more

 6    Asian-American.  It would.  But if you added more and more

 7    factors in, you get closer and closer to the actual class.

 8           Now, I think I heard SFFA saying that Dean

 9    Fitzsimmons should have sounded an alarm in response to

10    something that basically confirmed what he knew already.

11           There was no reason for alarm for several reasons.

12    First, he's been in the trenches.  He's been at these

13    meetings.  He's been there when the 40 people have voted.  He

14    knows what the models show.  If they just went by test scores

15    and grades, the composition of the class would be different.

16    But that's not the class that they want.

17           And the dean, he will tell you, continued to do

18    what he had done before this, after this, to ensure that

19    there was no prejudice or bias working against anybody in the

20    process.

21           Now, he also asked, after this, OIR to do some

22    additional research regarding the tip for students from

23    low-income families.  He wanted to know whether they were

24    getting a plus in response to the Hoxby-Avery letter.  On the

25    screen now is PX29.  He specifically asked for this

1     information and he specifically asked for that information

2     for Asian-Americans.  And he got a response:  Low income

3     Asian-Americans, like other ethnicities, were getting a tip.

4            And, in fact, Your Honor will see that the tip

5     received by Asian-Americans was as high as or equal to the

6     highest tips that were being given.  If the dean was involved

7     in that nefarious plan to bury OIR and discriminate against

8     Asian-Americans, why would he be concerned in ensuring and

9     confirming that low-income Asian-Americans were getting a tip

10    and a benefit in the process?

11           Before I briefly return to the other claims -- and

12    it will be briefly -- let me say this:  To believe there is

13    intentional discrimination, SFFA would have you conclude that

14    a process involves multiple readers, multiple subcommittee

15    meetings, multiple committee meetings, and a decision by

16    40 folks year after year after year has been somehow used to

17    intentionally discriminate against a group of folks,

18    Asian-Americans, on the basis of their race.

19           You would have to conclude that to carry out this

20    scheme the readers assigned to the academic and

21    extracurricular ratings -- ratings that I said are

22    quantitative and qualitative -- are giving Asian-Americans

23    better scores but then moving to the last box and saying now

24    I'm going to discriminate and I'm going to lower the score in

25    the last box.

1          You would have to conclude that the admissions

2     office did not discriminate against Asian-Americans who are

3     legacies, athletes, children of faculty, children of staff,

4     on the dean's list or Asian-American women or Asian-Americans

5     from California but that Harvard is somehow intentionally

6     discriminating against all the Asian-Americans, all other

7     Asian-Americans.

8          And you would have to conclude that the admissions

9     office managed to execute this, what I would say is a

10    nonsensical scheme, without leaving behind an email, a

11    document, a single presentation that would indicate that this

12    is what they're trying to do.

13         Now, briefly on the other claims, one of the claims

14    is that Harvard uses race as more than a plus factor with

15    greater weight than is permissible.

16         As Dr. Card will tell you looking across the full

17    applicant pool, there are many factors that explain

18    admissions decisions better than the applicant's race.

19         There on the screen now in Slide 48 it includes

20    everything, and it's commonsensical.  The teacher

21    recommendations, the guidance counselor recommendations, the

22    information about the student's high school and its program,

23    even the applicant's intended career, actually tells you more

24    about whether a student will get admitted than race.

25         Now, SFFA says, and it is true, Your Honor, that

1       for certain African-American and Hispanic applicants, those

2       whose files demonstrate real strength in multiple dimensions,

3       the tip for race can mean a great deal.

4              But in this pool of applicants who are otherwise on

5       the bubble, as you'll hear, the presence of any one factor

6       could tip the balance in.  For some it's race, and that's

7       permissible.

8              Now, SFFA also suggested that Harvard engages in

9       racial balancing.  You will hear there are no quotas; I think

10      they conceded that this morning.  You will hear that there

11      are no formulas; I think they conceded that this morning.  In

12      fact, you'll see, I think, I hope, that the process is as

13      I've described and results in substantial variation in the

14      composition of the admitted class.

15             So on the screen now is Slide 49, which has

16      Asian-American, African-American, and Hispanic admission

17      rates over years.  You can see an increase for all three but

18      wide variations year by year by year.

19             Now, the plaintiffs suggests this is somehow racial

20      balancing.  I think the chart speaks for itself.

21             And the one-pagers that SFFA described to you are

22      somehow what's being used to racially balance.  As Your Honor

23      said in your summary judgment ruling, the one-pagers, if I go

24      to the next slide, have a host of information:  gender,

25      geography, legacy status, financial aid, disadvantaged

1    status, intended concentration, and yes, race.

2         They are not provided to all the admissions

3    officers, just to the dean and the director of admissions.

4    It is used for two reasons:  to help manage the yield, to

5    ensure that the number of kids who are admitted are folks for

6    whom we have beds.  And it is to see how the class is shaping

7    up in terms of diversity across all of these different

8    dimensions.

9         And that is precisely what *Bakke* in the appendix

10   blessed.  Some attention to the numbers so that you could

11   understand whether you're achieving the benefits of a diverse

12   class.

13        Race-neutral alternatives.  Harvard has taken

14   seriously its obligation to evaluate in good faith whether

15   there are other ways to achieve meaningful racial diversity.

16   Long before *Grutter* says or made the phrase "racial neutral

17   alternatives" as popular it's it's it might be today, Harvard

18   actually, you will learn, was aggressively pursuing many of

19   these things.  I talked about the minority recruitment

20   program.  You'll learn about Harvard's effort to have early

21   action and the decision that it had been not the right

22   decision.

23        You will also learn about one of the most ambitious

24   financial aid programs to help increase diversity.  Today

25   over half the students at Harvard are on financial aid.

1    20 percent of the class has no parental contribution.  And

2    for that portion of the class receiving some financial aid,

3    the average cost of attending Harvard all in -- tuition,

4    room, and board -- each year is $12,000.  That is our effort

5    at a race-neutral alternative to increase diversity.  And

6    16 percent of the incoming class is first generation in their

7    family to go to college.

8            Harvard will continue to pursue these alternatives,

9    but it also has evaluated the question of whether race needed

10   to be considered at this time.  It took up the charge in

11   2017.  Dean Smith, Dean Khurana, and Dean Fitzsimmons, each

12   of who will testify, will tell you that they met on multiple

13   occasions.  They will tell you that they reviewed literature.

14   They will tell you that they reviewed the expert reports of

15   the plaintiff's expert and Dr. Card's.  And they came to the

16   conclusion that at this moment in time Harvard still needed

17   to consider race.

18           Now, SFFA claims that somehow the fact that lawyers

19   were involved in this process makes the process a sham or in

20   less than good faith.

21           Your Honor, this concept of pursuing race-neutral

22   alternatives comes from a Supreme Court decision.  It comes

23   from a legal decision.  How you comply with that is something

24   that lawyers are going to be involved in, unless it's done

25   poorly.

1          Let me end, Your Honor.  42 years ago I walked into

2     a courtroom at Post Office Square, my first time in the

3     United States District Court for the District of

4     Massachusetts.  I remember it as if it were yesterday.  With

5     the exception of the courtroom deputy, every single person in

6     the room was male.  With the exception of me, every person in

7     the room was a white male.  Even the gallery, which like

8     today had interest from the press, looked the same.

9          I'd ask Your Honor just to look around the

10    courtroom today.  It could not look more different.  The

11    demographics of those sitting in the courtroom today and

12    enormous progress we have made in becoming a diverse and more

13    inclusive legal system in society are manifest.

14         Many institutions, many people have contributed and

15    worked tirelessly to make this happen.  Among them are our

16    colleges and universities.  Those colleges and universities,

17    including Harvard but not Harvard on its own or not Harvard

18    in a way that is different from so many other colleges and

19    universities, have realized the benefits, the very real

20    benefits to our students, to our communities, and ultimately

21    to society that come from a diverse community.

22         Those colleges and universities recognize that

23    fostering diversity and broad inclusion in higher education

24    through tested and constitutionally approved measures like

25    the Harvard system have been an engine, not the only engine,

**JA542**

1   but an engine for democracy itself.  The result is what you

2   see in the courtroom behind me and in front of me.

3           This progress was a result of concerted efforts by

4   lots of folks to do the right thing.  For Harvard, it meant

5   implementing and adhering to the very admissions program the

6   Supreme Court has twice blessed.  For Harvard, it meant an

7   admissions process that considers not just what students have

8   done, for admission to any college is not a reward for what

9   you have done but, more importantly, what they'll bring to

10  their peers and their communities and the world beyond.

11          This progress, Your Honor, is not the result of

12  intentional discrimination.  This progress is not the result

13  of racial balancing.  It is not the result of using race as

14  more than a tip.

15          The progress we have made in considering race as

16  one of many factors is what has led us to the more diverse,

17  more inclusive, and more robust society that we have today.

18  We have made much progress, but there remains, as the

19  students will tell you, much left to be done.

20          This, of all times -- this of all times is not the

21  time to go backwards.  This is the time to build upon the

22  progress we have made and carry ourselves further.

23          Thank you, Your Honor.

24          THE COURT:  If it's all right with everyone, I

25  would like to go on to the two remaining openings before we

```
 1    break for lunch?  Can everyone manage or do we need a break?

 2              MR. LEE:  It's fine for us, Your Honor.

 3              MR. MORTARA:  It's great, Your Honor.

 4              THE COURT:  I'm Mostly concerned with my court

 5    reporter, and she says she's good to go, so I'd like to go

 6    forward.

 7              Are both amici groups going to open orally?

 8              MS. TORRES:  Yes.

 9              THE COURT:  When you're ready.

10              MS. TORRES:  I have some slides, and I do have a

11    copy.

12               OPENING STATEMENT FOR AMICI STUDENTS

13              MS. TORRES:  May it please the Court.  My name is

14    Genevieve Bonadies Torres, and I represent the student amici

15    in this case who are a diverse group of current and

16    prospective Harvard students and recent graduates who stand

17    together to defend Harvard's right to appreciate race and

18    racial diversity in admissions.  Our students appreciate the

19    opportunity to share how this policy has intimately impacted

20    their lives.

21              As this Court is well aware, plaintiffs bring two

22    separate claims.  Students are here to defend one and show

23    the other is disconnected.

24              The first challenges Harvard's race-conscious

25    admissions policy, which values racial and ethnic diversity.
```

**JA544**

1    The second claims that Harvard intentionally discriminates

2    against Asian-Americans by giving white applicants an

3    admissions advantage.  The plaintiff's evidence may blend

4    these claims together, but they must be distinguished.

5              The first involves race-conscious holistic review,

6    which the Supreme Court has repeatedly upheld because the

7    benefits of diversity are both constitutional and profound.

8              The second involves a white admissions advantage

9    which, if found, does not justify a blanket ban on valuing

10   race in admissions.

11             I will mainly focus on the first claim, which asks

12   whether Harvard when engaging in whole-person review may

13   appreciate an applicant's race.  The answer is yes.  Our

14   students humanize the reasons why, and there are three.

15             First, race and racial diversity matter in

16   present-day America, on Harvard's campus, and in admissions.

17   Ethnoracial identity also matters for many Asian-American

18   applicants who vary widely in their cultural backgrounds.

19             Take Thang.  2060 out of 2400, that was Thang's

20   total SAT score, a high score that is surely impressive at

21   most schools but not at Harvard.

22             Indeed, Thane's admission file notes that his SAT

23   scores were at the lower end of the Harvard average.  But the

24   file will also show that Harvard did not reduce Thang to a

25   number.  There is not just a raw academic score but comments

1    about his intellectual curiosity.  Not just a raw score for

2    extracurriculars, but comments about his genuine commitment

3    to social impact and the arts.  Not just a raw personal score

4    but comments about his infectiously happy personality.

5            And on top of all this, there will be information

6    about Thane's socioeconomic status, his parents' occupation,

7    his intended concentration, and much more.  And in this

8    multitude of contextual information is Thane's ethnicity.

9    It's listed once, but it shines through in his essay, his

10   interview, and his recommendation.

11           Notes from one of the readers states, Immigrant,

12   Vietnamese identity, pencils as tools.

13           This comment is a reference to Thang's essay where

14   he shared about how his family emigrated from Vietnam in

15   2006, how he struggled with English, how he was ridiculed,

16   how he was called racial slurs.  For a year he put a pencil

17   between his teeth and read hundreds of books out loud to

18   improve his pronunciation.

19           And he shared all of this with Harvard, and Harvard

20   listened.  This note, though short, Vietnamese identity and

21   pencils as tools, reflects how Harvard's whole-person review

22   process appreciates how ethnicity can shape our prior

23   achievements and future potential.  Indeed, Thang's 2060 SAT

24   score takes on a different hue after realizing that he faced

25   racial slurs and struggled with English.

Case: 19-2005    Document: 00117632236    Page: 559    Date Filed: 07/30/2020    Entry ID: 6356615
Case 1:14-cv-14176-ADB   Document 631   Filed 04/18/19   Page 105 of 187

105

1           His contribution to discussions on Harvard's campus

2      takes on new light once you know that he can weigh in on

3      race-based hurdles faced by many immigrant communities.

4           Thang is not alone in having his ethnoracial

5      identity play some role in his experiences and contributions.

6           You'll also hear from Itzel Vasquez-Rodriguez,

7      class of 2017.  Itzel will share that her application

8      highlighted her strength as a Latina growing up in California

9      and how her extracurriculars included Spanish club, Latino

10     club, and volunteer work on behalf of native and Latino

11     youth.

12          The Supreme Court itself has observed that race

13     remains relevant in evaluating applicants since it remains

14     relevant in our society.  As the Court observed in *Grutter*,

15     which involves Michigan law school, by virtue of our nation's

16     struggle with racial inequality, underrepresented minority

17     students are both likely to have experiences of particular

18     importance to the law school's mission and less likely to be

19     admitted in meaningful numbers on criteria that ignore those

20     experiences.

21          Harvard's race-conscious policy recognizes these

22     experiences, and its flexible policy applies to all racial

23     groups, including many Asian-Americans.

24          As you'll hear from our student Sally Chen, she was

25     pleased -- Sally Chen.  She was pleased that when she

Case: 19-2005    Document: 00117628236    Page: 560    Date Filed: 07/30/2020    Entry ID: 6356615
Case 1:14-cv-14176-ADB   Document 631   Filed 04/18/19   Page 106 of 187

106

1    reviewed her admissions file she saw praise for her academic

2    interests which drew from her Chinese heritage.

3         Now, just as race continues to matter, so does

4    racial diversity.  As you'll hear from Itzel, racial

5    diversity on campus eased her sense of isolation.  And as

6    you'll hear from Sarah Cole, other students of color were her

7    saving grace when correcting biases felt exhausting and gave

8    her the support to share her voice and perspective.

9         You will hear from all of our students how the

10   racial diversity on campus resulted in better discussions and

11   learning.  And two aspects of this diversity make it

12   particularly rewarding:  First, by seeking diversity across

13   all dimensions, Harvard cultivates diversity within each

14   racial group, interracial diversity.  And this breaks down

15   stereotypes.

16        Second, the benefits students derive from

17   ethnoracial diversity is distinct from that of socioeconomic

18   diversity.

19        As you will hear from Itzel, she felt isolated in

20   classrooms because of the color of her skin, her name, and

21   her features.  Race is visually salient and culturally

22   distinct.  The lawfulness of Harvard's race-conscious

23   admissions policy will be based on these sound facts.

24        And plaintiff's evidence cannot disturb these

25   justifications.  Plaintiff's attack primarily relies on their

1   expert, Dr. Arcidiacono.  Their expert concludes that black

2   and Hispanic applicants receive an unfair advantage in the

3   admissions process.

4        There are many problems with their expert's

5   analysis, but one stands out.  He fixates on academic scores

6   which are primarily determined by grades and test scores.

7        This brings us to the second problem with

8   plaintiff's evidence.  Merit is more than a number.  First,

9   equating merit with academics overlooks every other strength

10  of an applicant.

11       But second, it ignores that those receiving an

12  average academic score, what plaintiff's counsel called a 3,

13  rather than a 1 or 2, are still academically exceptional.

14  This is because Harvard's applicants pool is a highly

15  competitive one, full of high academic credentials.

16  Admitting students with more average academic scores is not

17  unfair when the evidence will show that such students are

18  more than academically qualified and their other strengths

19  make them stand out.

20       Take Sarah Kohl.  Sarah earned a scholarship to one

21  of the best college prep schools in Kansas City, where she

22  earned straight A's with several A pluses.  Her school letter

23  said that academically Sarah stood out and was virtually

24  unparalleled.  With all of those stellar credentials, Sarah

25  earned a 3 plus for her academic score, what plaintiffs would

1    call a not cutting edge score, not a 1 or a 2.

2           A narrow focus on academics also overlooks Sarah's

3    other strengths, such as the fact that she worked part-time

4    while maintaining her grades or the fact that she served on

5    Kansas City's Engage KC Leadership Board.  Kansas City, which

6    had the second highest homicide rate in the nation where she

7    focused her efforts on combatting gun violence because a

8    close acquaintance was murdered, where she presented six

9    recommendations to the Kansas City mayor on how to combat gun

10   violence, and she shared about these things in her

11   application.

12          Now, this is a compelling application on its own.

13   But knowing that Sarah is an African-American woman adds

14   texture.  She was combatting violence in a city notorious for

15   its own violence against the African-American community.

16          This brings me to the third problem with

17   plaintiff's evidence, the impacts of eliminating race in

18   admissions.  Harvard expert calculated this impact on the

19   admitted class, and it's captured through this graph.

20          Three things jump out.  First, white students will

21   benefit the most from removing the consideration of race, not

22   Asian-Americans.

23          Second, eliminating the consideration of race will

24   have a drastic negative impact on the number of

25   African-American, Hispanic, and other minority students

1    admitted to Harvard's campus.  In terms of their numbers,

2    they will be cut by 50 percent about.

3            Third, the proportion of Asian-Americans changes

4    slightly from 24 to 27 percent.  But importantly, this has a

5    minimal impact on the likelihood of admission for

6    Asian-American applicants.  And it's shown in the data.

7    While the number admitted does rise slightly, the number of

8    Asian-Americans applying is still over 7,800.  As such, the

9    actual admissions rate hardly changes at all, only moving

10   1 percentage point from 5.1 to 5.8 percent, less than

11   1 percentage point.

12           And recall there's a substantial impact on the

13   number of black, Hispanic, and other ethnoracial minorities

14   on Harvard's campus.  This is a reduction among the students

15   who already feel a heightened sense of isolation, who also

16   lead many of the efforts which improve the campus racial

17   climate for all students of color.

18           Plaintiffs will claim that race-neutral

19   alternatives can achieve the same levels of diversity.

20   Students' testimony will focus on two reasons that this has

21   problems.  And it's not on the slide.

22           But the first reason is that our student Itzel will

23   testify that it was important to her that Harvard valued race

24   and racial diversity on campus.  And she may not have applied

25   if that were not the case.  The admissions pool may actually

1    change if Harvard no longer considered race.

2            Second, the parties' experts have put forth several

3    race-neutral alternatives.  There are primarily three in

4    play.  But under all three, there is a reduction of

5    approximately 30 percent of the number of African-American

6    students on campus.  Again, a group that already feels

7    racially isolated.

8            Now, I'll turn very briefly to plaintiff's second

9    claim of a white admissions advantage.  Again, students are

10   here to show that it's disconnected from a policy that

11   appreciates ethnoracial identity and promotes diversity.

12   This disconnect is shown by the fact that banning

13   race-conscious admissions predominantly benefits white

14   students.

15           But this disconnect is also shown by the data which

16   suggests that any white admissions advantage is due to

17   Harvard's preferences for ALDC applicants, athletes, legacy

18   applicants, those on the dean or director's list, and

19   children of faculty or staff.  These preferences, as we saw,

20   are substantial.  And two pieces of evidence suggest it is

21   these preferences, not race-conscious admissions which

22   explain the white admissions advantage.

23           Now, first, I don't have a slide for this, but it's

24   in the reports that we've heard about several times.

25   Harvard's own internal report notes athletes and legacies

1    explain the difference in raw admit rates for Asian-American

2    and white applicants.  You'll see that come out during the

3    trial.

4          And then second, the raw numbers.  A table in

5    plaintiff's expert report provides the following breakdown of

6    admitted students over six years.  It shows the total admits

7    broken down by race.  It also shows the total admits

8    receiving special ALDC preferences by race.

9          It's immediately apparent that the number of white

10   students receiving these preferences dwarfs those of all

11   other racial groups.

12         Adding them up makes it even clearer.  A totaling

13   of 2,678 white admittees are associated with ALDC

14   preferences.  To put this in perspective, that's roughly

15   equal to all the Asian-American applicants admitted and

16   roughly equal to all the Hispanic and black students admitted

17   combined.

18         Numerically any disadvantage Harvard faces is more

19   likely attributable to these ALDC preferences and

20   race-conscious admissions.  As such, any remedy that

21   addresses a white admissions advantage would not involve

22   banning race-conscious admissions but addressing the actual

23   underlying issue.

24         Now, we all know that this case has national

25   significance, but it also has personal significance to our

 1   students and the countless other prospective, current, and

 2   other former students of Harvard and beyond.  Race

 3   consciousness is critical for campus diversity, and it's

 4   critical for viewing the whole person.

 5           Our student Sarah Kohl will perhaps state it best.

 6   To not see my race is to not see me at all.

 7           Thank you.

 8           Good morning, Your Honor.  I have the unenviable

 9   position of standing between everyone and lunch, so I will

10   try to be brief.

11           THE COURT:  I'm not that hungry.

12            OPENING STATEMENT OF AMICI ORGANIZATIONS

13           MS. HOLMES:  My name is Jennifer Holmes from the

14   NAACP Legal Defense and Educational Fund.  We represent 2,500

15   Harvard student and alumni organizations that joined this

16   lawsuit as amici in support of Harvard's ability to consider

17   race as one of many factors in its holistic admissions

18   process.

19           Collectively, these organizations represent

20   thousands of Harvard students and alumni.  They are black,

21   white, Latino, Native American, and Asian-American.  In fact,

22   ten of the organizations that we represent are Asian or

23   Asian-American affinity groups.  Our clients are the children

24   of immigrants, those who can trace their lineage back to

25   antebellum slavery and before, and those whose ancestors were

Case: 19-2005   Document: 00117638236   Page: 567   Date Filed: 07/30/2020   Entry ID: 6356615
Case 1:14-cv-14176-ADB   Document 631   Filed 04/18/19   Page 113 of 187

113

1    indigenous to this country.  Many of them were the first in

2    their families to attend Harvard, and some of them were the

3    first in their family to attend any college at all.

4            They are doctors, public servants, professors,

5    entrepreneurs, and many are students still figuring out what

6    the future holds for them and just trying to make it through

7    this semester of organic chemistry.

8            The 25 organizations that we represent are

9    emblematic of Harvard's diversity and play a crucial role in

10   helping Harvard realize the benefits of that diversity.  They

11   join this case because their racial identities matter both to

12   who they are and how they shape Harvard.

13           SFFA ignores this reality.  As Harvard's counsel

14   mentioned, SFFA's stated goal in this case was to change the

15   law and make race-conscious admissions illegal.  That claim

16   was dismissed.

17           But in its summary judgment papers, SFFA continued

18   to argue that Harvard should no longer be permitted to

19   consider race.  So when Your Honor hears that affirmative

20   action is not on trial and that diversity is not on trial,

21   the Court need only review the record in this case and SFFA's

22   ultimate goal in this lawsuit.

23           SFFA wants Harvard to create an admissions system

24   where we can't acknowledge racial identity, where race gets

25   redacted, erased, and ignored, applicants can't talk about it

1    or reveal it, and Harvard can't consider it.

2           But allowing universities to consider race in

3    admissions as one of many factors is a necessary part of

4    achieving the constitutional goal of pursuing the educational

5    benefits of diversity.

6           As the Supreme Court recognized in *Fisher*, a

7    diverse student body promotes enhanced classroom dialogue and

8    the lessening of racial isolation and stereotypes.  Diverse

9    learning environments improve critical thinking skills and

10   prepare students for careers in an increasingly global work

11   force.

12          We also can't forget that race affects the

13   opportunities that students receive even before they apply to

14   college with bias and structural barriers imbedded in school

15   discipline, standardized tests, and whether a student is

16   selected for advanced courses or even the cheerleading team.

17          An admissions process that considers race, along

18   with academics, extracurriculars, civic engagement, career

19   goals, socioeconomic economic status, parental occupation,

20   geography, and many other factors allows for a truly

21   individualized and equitable assessment of students that

22   examines the whole person.

23          You will hear testimony from three Harvard students

24   and one alumni whose life experiences offer real-world

25   examples of the concepts I just described.  They are

1    Catherine Ho, a Vietnamese-American student; Madison Trice, a

2    black student; Cecelia Nunez, a Latina and African-American

3    student; and Margaret Chen, a Chinese-American alumna.

4         If you take nothing else from their testimony, know

5    that these witnesses are the ones who have firsthand

6    experience with student life at Harvard.  They have spent

7    many days learning at Harvard and contributing their talents

8    to its campus.  They're the ones collaborating in the

9    library, at the laboratory, at the late-night study sessions,

10   or sometimes feeling excluded from those spaces because even

11   at Harvard real inclusion is still a work in progress.

12        Our witnesses' voices and perspectives and stories

13   cannot be accounted for in statistical modeling.  And unlike

14   any of the witnesses that SFFA or Harvard will put on, these

15   witnesses will offer a window into the student experience,

16   including going through the application process and learning

17   in the diverse environment that Harvard strives to cultivate.

18        You will hear a few common themes from our

19   witnesses.  They will share personal stories about how their

20   racial and ethnic identities figured prominently into their

21   experiences growing up and continue to shape their experience

22   at Harvard.  Race is just not something they can separate

23   from who they are.  And being unable to share that with a

24   college admissions officer would place students like them at

25   a significant disadvantage.

Case: 19-2005    Document: 00117632236    Page: 570    Date Filed: 07/30/2020    Entry ID: 6356615
Case 1:14-cv-14176-ADB    Document 631    Filed 04/18/19    Page 116 of 187

116

1         Second, cultural organizations played a meaningful

2    role in enhancing their college and alumni experiences.  The

3    educational benefits of a school like Harvard are not just

4    found in the classroom.  These organizations serve as support

5    systems, hubs of civic and intellectual engagement, inclusive

6    social spaces, and voices that challenge the Harvard

7    administration when it needs to do better.

8         They rely on a diverse student body for their

9    membership.  And if the number of students of color on campus

10   declined, some of these organizations would cease to exist or

11   would operate at a diminished capacity.

12        Catherine Ho will testify about how her identity as

13   a Vietnamese-American was front and center in her admissions

14   application.  Ms. Ho's parents were refugees who were

15   resettled in the U.S. during the Vietnam War.  In her

16   personal essay, Ms. Ho wrote about the idea that the

17   Vietnamese language has no past tense, so everything is

18   expressed in the present tense.  She explored the concept

19   that this structural aspect of the language helped her

20   parents not to dwell on hardships of the past but to focus on

21   pursuing a better life in the present, which for Ms. Ho

22   included extensive volunteer work at the same refugee

23   organization that helped her mother years before she was

24   born.

25        SFFA claims that Asian-American applicants are

1    primarily a collection of strong SAT scores and academic

2    credentials.  Although Ms. Ho's scores were impressive, SFFA

3    couldn't be more wrong that those scores represented the sum

4    total of her life by the end of high school.  If SFFA

5    prevails in this case, students like Ms. Ho will be forced to

6    erase the formative experiences that shaped their lives when

7    they apply to college.  Applicants of color, in particular,

8    will be at a disadvantage because they will not be able to

9    share compelling stories of adversity or identity that relate

10    to race.

11            And Harvard, whose mission is to educate the

12    citizen leaders of tomorrow, will be forced to adopt a

13    definition of "merit" that is blind to the people behind the

14    numbers.

15            Although Harvard now strives to create a class of

16    high achieving students of diverse racial, geographic, and

17    socioeconomic backgrounds, that was not always the case.

18    Until the late 1970s, Harvard was a bastion of the white,

19    privileged, and male.

20            This has changed, to a large degree.  But as

21    Harvard's expert will testify, the remedies sought by SFFA

22    threatens to slash the number of students of color on campus

23    and turn back the clock to a time when the halls of Harvard

24    were predominantly white and difference was not welcome or

25    celebrated.

**JA559**

1          Our witness Madison Trice will testify about her

2     experience in an educational environment -- in a similar

3     educational environment as one of the few black students at a

4     predominantly white high school.  Despite excellent grades,

5     she faced classmates who doubted her abilities and her

6     intellect and teachers who steered her away from gifted and

7     talented courses until her parents intervened.

8          She felt isolated in the classroom, treated as an

9     other, an anomaly, and a curiosity because of her skin tone

10    and her hair.  Seeing new black students enter the high

11    school in lower grades each year was a bittersweet experience

12    for Ms. Trice.  She was happy to see more representation but

13    feared that their experience, like her own, would be painful,

14    marked by isolation and tokenism, and carrying the burden of

15    being a symbol and a spokesperson of their race.

16          Ms. Trice will testify that when she came to

17    Harvard in 2017, discovering a school more significant than

18    her high school was a revelation.  Through her involvement in

19    the Association of Black Harvard Women and the Black Students

20    Association, Ms. Trice found a rich, supportive network of

21    black students.  She now helps organize events that encourage

22    campus engagement with issues that affect communities of

23    color and provide a social and intellectual hub for students

24    from all backgrounds.

25          For example, the black students union -- Black

**JA560**

1    Students Association hosted a panel on police brutality after

2    a black student was assaulted by the police.

3            Ms. Trice, like other Harvard students, can also

4    take advantage of a range of events put on by other

5    organizations such as "walk tails" or a women of color

6    cocktail and discussion night hosted by the Asian-American

7    women's association.  Or the Harvard Pow Wow, hosted annually

8    by the Native Americans of Harvard College.  Or Brown Sugar,

9    a massive dance party hosted Fuerza Latina and other cultural

10   groups and one of the few parties where you will hear Spanish

11   music on campus.

12           Ms. Trice will testify that when new black faces

13   arrive at Harvard each year on move-in day, she no longer

14   feels bittersweet but instead is joyful about the diverse,

15   vibrant community that awaits them.

16           SFFA's goal of eliminating race-conscious

17   admissions threatens this community and the organizations

18   that help it thrive.

19           So far I've painted a rosy picture of Harvard, but

20   you will hear testimony that Harvard is not perfect.  The

21   organizations we represent often challenge the Harvard

22   administration to support and include students of color.

23   Margaret Chen has spent decades advocating for

24   Asian-Americans at Harvard, first as a student and minority

25   recruiter, then as an alumni interviewer, and now as an

1    active member of various alumni organizations.

2            Experiencing firsthand the transformative impact of

3    Harvard's diverse environment on her own life and career,

4    Ms. Chen has pushed the administration to hire more

5    Asian-American professors and admissions officers, to offer

6    an ethnic studies program, and to increase training on

7    cultural bias and stereotypes.

8            She knows from personal experience that advocating

9    for Asian-Americans does not mean wiping away race altogether

10   or, as SFFA suggests, lumping Asian-Americans in with white

11   students, as if their unique life experiences have no value.

12           You will hear that even as diversity has grown on

13   campus, some students still face racial isolation or episodes

14   of racial insensitivity.

15           The organizations we represent play an important

16   role in supporting students who face these challenges,

17   especially when Harvard's own support system falls short.

18           Cecelia Nunez will testify about how she has been

19   called racial slurs on campus when just trying to enjoy a

20   night out with friends.  Her organization, Fuerza Latina,

21   conducts mental health check-ins with its members and

22   successfully lobbied the administration to hire more mental

23   health counselors with experience on issues of race and in

24   particular Latino identity to better serve students on

25   campus.

1          Harvard has made great strides over the years, but

2     there's still a pressing need for more diversity and

3     inclusion.  Being able to consider race as part of a holistic

4     admissions process is necessary for Harvard to continue to

5     pursue these goals.  Eliminating race altogether would make

6     the existing challenges faced by Harvard students of color

7     far worse.

8          SFFA wants you to believe that none of these

9     experiences matter and there's no value in Harvard's

10    consideration of race.  They want you to believe that Harvard

11    should ignore race and that applicants should erase their

12    racial identity when they present themselves for admission.

13    But a colorblind approach to college admissions means that

14    you close your eyes to the realities of racial inequities.  A

15    colorblind approach means that you close your eyes to the

16    full, lived experience of each applicant.  A colorblind

17    approach means that you close your eyes to the value of a

18    campus where students of different backgrounds learn

19    alongside each other, challenge each other, overcome

20    stereotypes, and shape the campus into a place that is

21    increasingly inclusive and intellectually stimulating.

22         The diversity on Harvard's campus is a foundational

23    part of the student experience, and the organizations we

24    represent are the engines that bring that diversity to life.

25         Creating supportive networks is fostering outreach

```
1    and exchange and holding Harvard accountable on issues that

2    affect communities of color.  The law recognizes Harvard's

3    right to foster that kind of campus, and our witnesses will

4    make clear why it is imperative that Harvard continue to do

5    so.

6              Thank you.

7              THE COURT:  All right.  Thanks very much, everyone.

8    We'll recess for lunch and be back at ten of 2:00.

9              THE CLERK:  Court is adjourned.

10             (Court recessed at 12:50 p.m.)

11                  ***  AFTERNOON SESSION  ***

12             THE COURT:  Do you want to call your witness?

13             MR. MORTARA:  SFFA calls Dean William Fitzsimmons.

14             THE CLERK:  Can you please raise your right hand.

15             (WILLIAM FITZSIMMONS duly sworn by the Deputy

16   Clerk.)

17             MR. HUGHES:  Your Honor, before I get started with

18   the witness, I've got a binder of the exhibits that we may

19   get to with him during his examination.  Would you like a

20   copy of that binder or would you prefer just to follow along

21   on the screen?

22             THE COURT:  I'll take a binder.  I'm going to

23   confess to still using a paper calendar too.  I like paper.

24                       DIRECT EXAMINATION

25   BY MR. HUGHES:
```

1    **Q.**  Good afternoon, Dean Fitzsimmons?

2    **A.**  Good afternoon.

3    **Q.**  We haven't met yet.  My name is John Hughes.  I'll be

4    examining you today.  Nice to meet you.

5    **A.**  Good to meet you.

6    **Q.**  I'd like to start with some background about your

7    experience in the Harvard admissions office.  You began

8    working in the Harvard admissions and financial office in

9    1972, correct?

10   **A.**  That's correct.

11   **Q.**  What were your job title?  What were your

12   responsibilities at that time?

13   **A.**  It was a long time ago, but I think it was assistant

14   director of admissions.

15   **Q.**  I understand you did that job for two or three years, and

16   then you shifted to some different responsibilities within

17   Harvard, with the Harvard fund for about a year and a half;

18   is that right?

19   **A.**  That's not quite the sequence, no.  I then became

20   director of admissions.  That other position you mentioned

21   didn't occur until about the mid '80s.

22   **Q.**  You were with the Harvard fund for about a year and a

23   half, correct?

24   **A.**  Yes.

25   **Q.**  What did you do when you were working for the Harvard

```
 1   fund?

 2   A.   It was a job that was mostly designed to raise gifts for

 3   financial aid.  It's annual gifts, small gifts, to try to

 4   inspire classmates mostly through reunions to make gifts that

 5   we thought were critically important to us.

 6   Q.   And after you finished working for the Harvard fund, what

 7   was your next position with Harvard?

 8   A.   It was dean of admission and financial aid.

 9   Q.   And that's a position that you've held ever since,

10   correct?

11   A.   That's correct.

12   Q.   And you got that position, to be clear, in 1986, right?

13   A.   That's right.

14   Q.   So for the last 32 years, you've been the person in

15   charge of Harvard's admissions office, correct?

16   A.   That's correct.

17   Q.   And you have a number of folks that report and work with

18   you in the admissions office, right?

19   A.   That's correct.

20   Q.   One of those is Director McGrath, right?

21   A.   Yes.

22   Q.   How long has Director McGrath worked with you in the

23   admissions office?

24   A.   She came on board very shortly after I became dean.  I

25   would say maybe within the year perhaps.
```

1  **Q.**  So you've been working with her at least approximately

2  30 years?

3  **A.**  Yes.

4  **Q.**  And how many people do you have in the admissions office

5  that are reading applications to Harvard?

6  **A.**  About 40 people.

7  **Q.**  Does that include you?

8  **A.**  Yes.

9  **Q.**  So all of you read applications and participate in the

10  admissions process that we've heard described this morning,

11  correct?

12  **A.**  Yes.

13  **Q.**  You were here this morning for the opening statements,

14  right?

15  **A.**  I was.

16  **Q.**  And would you agree that you are ultimately responsible

17  for the way the Harvard admissions process is administered?

18  **A.**  I'm not sure I would say that.  It really is a team

19  effort.  I have one of the 40 votes, but it's really the

20  responsibility of everyone.

21  **Q.**  You agree that you lead the admissions office, correct?

22  **A.**  Yes.

23  **Q.**  Do you agree that you have a responsibility to make sure

24  that the admissions process is fair?

25  **A.**  Yes.  I'm one of, as I said, really 40 people and more.

Case: 19-2005    Document: 00117682236    Page: 580    Date Filed: 07/30/2020    Entry ID: 6356615
Case 1:14-cv-14176-ADB   Document 631   Filed 04/18/19   Page 126 of 187

126

 1   **Q.**  Do you agree that you have a responsibility to make sure

 2   that each applicant that is applying to Harvard is treated

 3   fairly?

 4   **A.**  That is certainly one of my responsibilities but also the

 5   responsibility of everyone on the committee.

 6   **Q.**  Something that you would expect everybody in the

 7   admissions office to do as the leader of the office, correct?

 8   **A.**  That's correct.

 9   **Q.**  Now I'd like to shift gears a little bit and talk about

10   the Harvard admissions process, about the part that we only

11   heard a little bit about this morning.  And that's the

12   beginning of the cycle, recruitment.  You heard Mr. Lee talk

13   about recruitment, right?

14   **A.**  I did.

15   **Q.**  And recruiting prospective students is a very important

16   part of the work done by you and your colleagues in the

17   admissions office, correct?

18   **A.**  That's correct.

19   **Q.**  I'd like to look at some things that the admissions

20   office has said about recruiting.  I'm going to show you on

21   the screen Plaintiff's Exhibit 83.

22           Before I do that, Dean Fitzsimmons, I'm going to

23   let you know I put a binder in front of you that has numbered

24   tabs which each of the exhibits that we may discuss in our

25   time together over the course of the next couple of days -- I

```
 1   can't promise we'll get to all of those, but if you ever want

 2   to see a paper copy, see more context, please do so.  It will

 3   be right in front of you.

 4   A.   But it's going to be on the screen.

 5   Q.   It will be on the screen.  Hopefully we can follow along

 6   on the screen.  I'm going to show you Plaintiff's Exhibit 88.

 7          MR. LEE:  Can I have a hard copy?

 8   BY MR. HUGHES:

 9   Q.   I've got on the screen, Dean Fitzsimmons, the third page

10   of Plaintiff's Exhibit 88.  Do you recognize this as a

11   document from your admissions office?

12   A.   I do.

13   Q.   What this document is, it's the interviewer handbook,

14   correct?

15   A.   That's correct.

16   Q.   And the interviewer handbook is something that you supply

17   to your alumni interviewers, correct?

18   A.   Among other things, correct.

19   Q.   Is it also supplied to the folks working in the

20   admissions office?

21   A.   That's correct.

22   Q.   And the information that's contained in here is an

23   accurate description of how the admissions process at Harvard

24   works, correct?

25   A.   Yes.  It's kind of a thumbnail sketch, as it were, but
```

1    it's an overview.

2    **Q.**  Alumni interviewers are important to the process because

3    virtually every applicant to Harvard interviews with an

4    alumni of Harvard who lives in their geographic area,

5    correct?

6    **A.**  The majority do.

7    **Q.**  So now I want to see what the alumni interview handbook,

8    Plaintiff's Exhibit 88, has to say about recruitment.  So I'm

9    going to turn to page 15.

10            MR. LEE:  Your Honor, I have no objection.  But I

11    think before we start asking witnesses about exhibits, we

12    ought to offer them.

13            THE COURT:  Do you have exhibits that are agreed

14    upon or are you going to admit each one as we go?

15            MR. LEE:  We're admitting them as we go.

16            MR. MORTARA:  That's fine.  I thought we might wait

17    for a break and do a bunch at the same time.

18            But Your Honor, I offer Plaintiff's Exhibit 88.

19            MR. LEE:  No objection, Your Honor.

20            THE COURT:  Admitted.

21            (Plaintiff Exhibit No. 88 admitted.)

22    BY MR. HUGHES:

23    **Q.**  Dean Fitzsimmons, I'm going to blow up a part that I want

24    to take a look at with you together.  These screens are a

25    little small.  I want to make sure you can see what's on the

 1   screen in front of you.

 2   **A.**   I can.

 3   **Q.**   This is the part of the alumni interviewer handbook that

 4   has to do with recruiting prospective students, correct?

 5   **A.**   That's correct.

 6   **Q.**   And it starts by saying, "Many people often ask why,

 7   given the thousands of applications Harvard receives every

 8   year, we must invest such time, effort, and resources to

 9   recruit talented students.  Vigorous recruitment, however,

10   has been instrumental to our success."

11          Do you see that?

12   **A.**   I do.

13   **Q.**   Do you agree with that statement?

14   **A.**   I do.

15   **Q.**   And then down below you see I've got some additional

16   language highlighted that says, "Active recruitment helps

17   sustain the critical opportunity to 'consciously shape the

18   makeup of our student body' as colleges compete intensely for

19   the best students."

20          Do you see that?

21   **A.**   I do.

22   **Q.**   Do you agree with that statement?

23   **A.**   I do.

24   **Q.**   So recruiting is part of how Harvard consciously shapes

25   the makeup of Harvard's student body, right?

1    **A.**  It's certainly one of the most important beginnings.

2    **Q.**  Now I've just highlighted the next paragraph down below

3    what we've just looked at.  I want to read this into the

4    record and ask you a few questions about it.

5            "Direct mail.  Virtually all college-bound students

6    take the PSAT by their junior year.  High school juniors and

7    seniors also take SATs and the ACT which survey students

8    about their academic experiences and interests.  With

9    students' permission, the College Board and the American

10    College Testing company sell colleges this information.

11    Harvard has identified accomplished students with these

12    searches for many years.  We send letters and view books to

13    searched students, and we share student lists with schools

14    committee chairs to craft recruitment plans and to identify

15    students to invite to local presentations.  Our research

16    shows that students who qualify for this search are about

17    twice as likely to be admitted as other applicants."

18            Do you see that?

19    **A.**  I do.

20    **Q.**  Does that accurately describe how Harvard uses the

21    information that it purchases from the College Board?

22    **A.**  It's a partial explanation.

23    **Q.**  To make sure we unpack what's happening here, Harvard

24    gets information from the College Board, which administers

25    the PSAT, about certain students, correct?

1    **A.**  Yes.

2    **Q.**  Based on things like SAT scores, ACT scores, PSAT scores,

3    geography, and race or ethnicity, correct?

4    **A.**  Yes.

5    **Q.**  And then what Harvard does with that information is it

6    generates a list of students to invite to apply to Harvard,

7    correct?

8    **A.**  Yes.  It's one of the ways we recruit.

9    **Q.**  It not only uses those names to create the mailing list,

10   so to speak, those searched student lists are provided to

11   underrepresented minority recruitment programs, correct?

12   **A.**  That's true.

13   **Q.**  And they're used when you go out on the road.  You go all

14   over the country every fall meeting prospective students,

15   right?

16   **A.**  Yes.

17   **Q.**  One of the ways the list is used to identify people to

18   invite to come to meet with you and your staff when you go

19   out on the road, correct?

20   **A.**  Yes.  It's what we call a good start.

21   **Q.**  And you also supply the list to the schools committee,

22   correct?

23   **A.**  We do.

24   **Q.**  Tell us what that is.

25   **A.**  The schools committee.  There are about 10,000 alumnae

1    and alumni around the country and around the world who help

2    us recruit, first of all, which is what we're talking about

3    here.  But then they will interview all of the local

4    candidates in their local areas.  Then afterwards they have

5    another job.  When the students are admitted, we also ask

6    them to do everything they can to encourage the students to

7    come to Harvard.

8    **Q.**   So getting back to our -- thank you for that.

9         But getting back to our search list, the last

10   sentence I have highlighted here says, "Our research shows

11   that students who qualify for this search are about twice as

12   likely to be admitted as other applicants."

13        That's a true statement, right?

14   **A.**   I believe it was at the time, yes.

15   **Q.**   And whether or not a student is searched is actually

16   something the admissions office keeps track of during the

17   admissions cycle, correct?

18   **A.**   We do.

19   **Q.**   Getting on the list is a good thing if you're a high

20   school student who wants to go to Harvard, correct?

21   **A.**   The fact that you are on the searched list would not make

22   a difference in terms of the decision the committee might

23   make, but it's a good thing for us to know in terms of

24   whether or not our outreach through the search program is

25   helpful.

1    **Q.**  Now I'd like to look at an example of the letter that you

2    send to searched students, and that's going to be Plaintiff's

3    Exhibit 55.

4            MR. HUGHES:  Before I get started, Your Honor, I'd

5    like to offer Plaintiff's Exhibit 55.

6            MR. LEE:  No objection, Your Honor.

7            THE COURT:  Admitted.

8            (Plaintiff Exhibit No. 55 admitted.)

9    BY MR. HUGHES:

10   **Q.**  So, Dean Fitzsimmons, I've got again blown up on the

11   screen.  Will you just let me know if at any time you can't

12   see what's on the screen in front of you?  Otherwise I'll

13   just assume that you can.

14   **A.**  I will.

15   **Q.**  So I've got on the screen the first page of Plaintiff's

16   Exhibit 55.  You're one of the people this email is addressed

17   to, correct?

18   **A.**  Yes.

19   **Q.**  It's for fall 2013.  You can see that down below in

20   attachments, correct?

21   **A.**  Yes.

22   **Q.**  And one of the attachments is the search letter, correct?

23   **A.**  That's correct.

24   **Q.**  And the search letter is the way the admissions office

25   refers to this letter that goes out to the names that you get

 1    from the College Board and the ACT, correct?

 2    **A.**   Yes.  It's the first communication of many.

 3    **Q.**   Based on your mailing list, you communicate more than one

 4    time with these potential applicants?

 5    **A.**   That's true.

 6    **Q.**   Now I'd like to show you -- I'm on page 2 now of

 7    Exhibit 55.  I'll blow up -- part of what you tell students

 8    in the letter is that "Your strong grades and standardized

 9    test scores indicate to us, to Harvard, that Harvard and

10    other selective institutions may be possibilities for you."

11         That's part of what you communicate in the letter,

12    correct?

13    **A.**   That's right.

14    **Q.**   And whether a high school student receives this letter

15    depends on whether they're on your list, right?

16    **A.**   That's right.

17    **Q.**   Now, Dean Fitzsimmons, I'd like to show you Plaintiff's

18    Exhibit 2.

19         MR. HUGHES:  Before we proceed, I'd like to offer

20    Plaintiff's Exhibit 2 into evidence.

21         MR. LEE:  Can we at least have the foundation as to

22    whether he's seen it?  Otherwise no objection.

23    BY MR. HUGHES:

24    **Q.**   Dean Fitzsimmons, you've seen this document before.  We

25    showed it to you in your deposition, right?

1    **A.**  Yes.  I think I recall it.

2         MR. LEE:  No objection, Your Honor.

3         THE COURT:  Admitted.

4         (Plaintiff Exhibit No. 2 admitted.)

5    BY MR. HUGHES:

6    **Q.**  What I'd like to focus on -- and I'll blow this up at the

7    top here.  PSAT is the basis for -- let me back up.

8         What this document, this Plaintiff's Exhibit 2,

9    shows searches that are done in 2013 for the class of 2018,

10   correct?

11   **A.**  That's correct.

12   **Q.**  It has data that about searches that occur in 2018, and

13   it also has information about the preceding class year, 2017,

14   correct?

15   **A.**  Where would that be?  I'm sorry.  Oh, I see.  Yes.  Yes.

16   **Q.**  Agreed?

17   **A.**  Agreed.

18   **Q.**  The PSAT is the source of, in 2017, 92,510 letters,

19   correct?

20   **A.**  That's correct.

21   **Q.**  And in 2018, 95,119, correct?

22   **A.**  That's correct.

23   **Q.**  Let me show you the rest of the document.  That is the

24   majority of the total of the letters sent.  I've got the

25   totals here at the bottom, correct?

1    **A.**   They sound right.

2    **Q.**   The PSAT is the primary source of names for the list,

3    correct?

4    **A.**   Yes.

5    **Q.**   Okay.  So now I want to go back up and look at what we

6    have for the PSAT.

7            So in the left-hand column we have, it says PSAT

8    and we've got some different categories of people in that

9    column, correct?

10   **A.**   That's correct.

11   **Q.**   I want to start with the first two, "High Scores Men" and

12   "High Scores Women."  Do you see that?

13   **A.**   I do.

14   **Q.**   And up at the top of the -- in the second column we've

15   got an SAT score range.  Do you see that?

16   **A.**   I do.

17   **Q.**   For men, that's 1380 to 1600, correct?

18   **A.**   Correct.

19   **Q.**   And for women, that's 1350 to 1600, direct?

20   **A.**   Correct.

21   **Q.**   These are some of the people that will be getting the

22   search letter we just looked at, right?

23   **A.**   That's correct.

24   **Q.**   And the next column, that column is entitled

25   "ETH/States."  Do you see that?

1    **A.**   I do.

2    **Q.**   ETH stands for ethnicity, correct?

3    **A.**   That's correct.

4    **Q.**   And "States" stands for geographic states, correct?

5    **A.**   Correct.

6    **Q.**   And the ethnicity for high scores, men and women, is KOW.

7    Do you see those codes there?

8    **A.**   Yes.

9    **Q.**   W stands for white, correct?

10   **A.**   That's correct.

11   **Q.**   O stands for other, correct?

12   **A.**   Probably.  Because these things change.  Probably.

13   **Q.**   And K stands for unknown when you don't fill it out?

14   **A.**   I think it's essentially everyone, when all is said and

15   done.

16   **Q.**   I'm sorry?

17   **A.**   I think it would be everyone, it sounds like.  In other

18   words -- I'm not 100 percent sure, but just looking at this,

19   it would be all high scores no matter, of all states and all

20   ethnicities.

21   **Q.**   Let's look down the test data.  Let me ask you this.

22        Who is Elizabeth Young?

23   **A.**   She used to be our data person and computer interface

24   person and research person.

25   **Q.**   She'd be very familiar with this date, correct?

**JA579**

1    **A.**  Yes.

2    **Q.**  And she testified that K is unknown.  It's when somebody

3    doesn't fill it out on the common app.  You'd have no reason

4    to dispute that, right?

5    **A.**  I would take her word for it.

6    **Q.**  If she testified that O means "other" on the common app,

7    you'd take her word for it, too, correct?

8    **A.**  I would.

9    **Q.**  Just to kind of clear things up, you said it might be

10   referring to everyone.  Here we have down here -- we'll come

11   back to sparse country in a minute, but we've got these

12   categories down here which are high scores Asian men, high

13   scores Asian women, females, right?

14   **A.**  Yes.

15   **Q.**  And those are additional people who are getting letters,

16   correct?

17   **A.**  That's correct.

18   **Q.**  They're not included in that KOW category, correct?

19   **A.**  It's the same range, but that would be technically

20   correct.

21   **Q.**  They're different people, right?

22   **A.**  Yeah.

23   **Q.**  It's the same SAT range, correct?

24   **A.**  Yes.

25   **Q.**  And if we go down here to BCHNP.  That's -- BCHNP stands

```
 1    for black, Chicano, Hispanic, Native American, and Puerto
 2    Rican, correct?
 3    A.   That's correct.
 4    Q.   All of the states, United States and Puerto Rico, those
 5    applicants are invited to apply if they have an SAT score of
 6    1100 up to 1600, correct?
 7    A.   That's correct.
 8    Q.   So in Harvard's view, a student in this BCHNP category
 9    with the PSAT of 1100 could be admitted and succeed at
10    Harvard, correct?
11    A.   Just simply -- that isn't technically correct.  It would
12    simply be these are people who we hope would consider
13    Harvard, in looking at that range.
14    Q.   And you tell them in the letter that you send them that
15    their SAT scores indicate that they could be a good candidate
16    to apply to Harvard, right?
17    A.   That's right.  That they could be.
18    Q.   And Harvard does not invite white or Asian students to
19    apply unless they have a 1350 for women or a 1380 for men,
20    correct?
21    A.   That's correct.
22    Q.   Even though you agree that an Asian student with an 1100,
23    depending on the individual case, could be successful at
24    Harvard, correct?
25    A.   It's possible that any student could be.
```

1    **Q.**  And of course you must admit that Asian-American

2    applicants are treated very differently than all other

3    minority applicants in terms of receiving an invitation to

4    apply to Harvard based on information provided by the College

5    Board, correct?

6    **A.**  Again, it is really exactly the same parameters as was

7    the case for white students.

8    **Q.**  My question is the Asian-American applicants were treated

9    very differently in terms of getting the letter based on the

10   information from the College Board than other minority

11   potential applicants, correct?

12   **A.**  Again, there's a slightly lower range for the other

13   minorities.

14   **Q.**  So you would describe an 1100 on the PSAT as slightly

15   lower than 1350?

16   **A.**  Yes.

17   **Q.**  And slightly lower than 1380?

18   **A.**  Yes.

19   **Q.**  And the last time we asked you questions under oath, you

20   had no explanation for why Asian applicants who score 1100

21   and above are not being reached out to through this

22   particular recruiting method, correct?

23   **A.**  It's simply with all of the outreach that we do for all

24   these categories, what we're trying to do, for example, with

25   the minority students who are not Asian is to get a sense of

1    to what extent economic background might make a difference in

2    their ability to score at higher levels on the SAT or the

3    PSAT.  So it really comes down to the rather stark economic

4    differences and opportunities that are available for the

5    BCHNP.

6    **Q.**  Dean Fitzsimmons, I'd like you to pick up your transcript

7    of your deposition that's in the coil-bound binder to your

8    right, on the far right of the desk.  If you could open that

9    to page 73, please.  If you could look at page 73, line 13.

10   Do you see that?

11   **A.**  Yes, page 73.

12   **Q.**  Line 13.  Are you there?

13   **A.**  Yes.

14   **Q.**  "QUESTION:  So my question is, why aren't Asian males who

15   score 1100 to 1370 being reached out to through this

16   particular search method?

17          "ANSWER:  I don't have a precise answer.

18          "QUESTION:  Do you have any answer?

19          "ANSWER:  No."

20          Were you asked those questions?  Did you give that

21   testimony?

22   **A.**  If this says I did, I did.  But again, I think it would

23   come down, at least in my mind, to having a precise answer.

24   **Q.**  So when you're sending letters out to the people that are

25   on the list that you generate from the College Board, you

1    have three pieces of information:  the score, geography,

2    race/ethnicity, correct?

3    **A.**   There are some additional.

4    **Q.**   Those are the ways the data is getting sorted here,

5    correct?

6    **A.**   There's also self-reported grades.

7    **Q.**   So you've got grades, SAT score, geography,

8    race/ethnicity, correct?

9    **A.**   Yes.

10   **Q.**   You don't have the information you need to do a

11   whole-person review, correct?

12   **A.**   I'm sorry.  Could you repeat that question?

13   **Q.**   When you're sending these letters out, you don't have the

14   information that you need to do the kind of holistic review

15   that you say you do once these people apply, correct?

16   **A.**   Certainly not.  Just one of the most basic set of

17   components.

18   **Q.**   Is the reason Harvard makes substantial racial

19   categorical distinctions in terms of who's getting invited to

20   apply based on this list, is that part of how Harvard

21   consciously shapes its student body?

22   **A.**   No.  It's simply trying to reach out to people from all

23   backgrounds, and especially those who have experienced

24   disproportionate effects of economic disadvantage.

25   **Q.**   Do you remember the interview or handbook and the

 1   language that we read that you agreed was accurate that said

 2   recruitment is part of how Harvard consciously shapes its

 3   student body?  You remember that, right?

 4   **A.**  Yes.

 5   **Q.**  And are you saying that this is somehow an exception to

 6   that, that the way you've sliced and diced the data here for

 7   in terms of who gets an invitation to apply to Harvard is

 8   somehow not part of how Harvard is consciously shaping its

 9   student body?

10   **A.**  No.  It's certainly one of the things we do to recruit.

11   **Q.**  And one of the things that you do to recruit to

12   consciously shape your student body is to differentiate who

13   you invite based on race or ethnicity, correct?

14   **A.**  You're technically correct.

15   **Q.**  Now I want to focus on the last category here, Sparse

16   Country, near and dear to my heart because that's where I'm

17   from.

18   **A.**  Which state?

19   **Q.**  Montana, a great state.

20        Dean Fitzsimmons, we look at Sparse Country.  In

21   Sparse Country you get invited to apply if you get a score

22   between a 1310 and a 1370, correct?

23   **A.**  That's correct.

24   **Q.**  And the people who are invited to apply from Sparse

25   Country are the unknown, other, and white, correct?

**JA585**

1    **A.**   Yes.

2    **Q.**   Asians are not included in that list, correct?

3    **A.**   Not in that particular list.

4    **Q.**   Okay.  And the score, again, is 1310 to 1370, correct?

5    **A.**   That's right.

6    **Q.**   Now, I want to see if you would help me build a map of

7    Sparse Country.  You'll probably need to turn to the actual

8    paper Exhibit 2 because I'm going to switch it off of the

9    screen.  Let me know when you're there.

10   **A.**   It's P2?

11   **Q.**   Yes.

12   **A.**   Okay.  I have it.

13   **Q.**   I'm going to show you a map that your lawyers I think

14   plan to use with you in your examination.  I want to see if

15   we can use it in mine.  I've got that up on the screen.  It's

16   a map of the United States divided up by docket, correct?

17   **A.**   That is correct.

18   **Q.**   The we'll take a little detour here.

19          Dockets are the way you kind of break down the

20   applicant pool in terms of your process in the admissions

21   office, correct?

22   **A.**   It's a beginning of the committee process.

23   **Q.**   And the geographic breakdown, right?

24   **A.**   More or less.

25   **Q.**   So now if you've got P2 in front of you, I want to walk

1    through the states and we'll mark them here on your map.

2    Okay?

3              So the first one is AL.  That's Alabama, right?

4    **A.**  That is correct.

5    **Q.**  And I've got an X on Alabama on the screen, correct?

6    **A.**  Very good.  Yes.

7    **Q.**  The second one is Alaska, correct?

8    **A.**  Yes.

9    **Q.**  And now we've got an X on Alaska, correct?

10   **A.**  That's correct.

11   **Q.**  And we've got Arizona, and I've got that correct on the

12   screen, right?

13   **A.**  Yes.

14   **Q.**  Arkansas?

15   **A.**  Yes.

16   **Q.**  Idaho?

17   **A.**  Yes.

18   **Q.**  Louisiana?

19   **A.**  Yes.

20   **Q.**  Maine?

21   **A.**  Yes.

22   **Q.**  Mississippi?

23   **A.**  Yes.

24   **Q.**  Montana?

25   **A.**  Yes.

```
 1    Q.   Nebraska?

 2    A.   Yes.

 3    Q.   Nevada?

 4    A.   Yes.

 5    Q.   New Hampshire?

 6    A.   Yes.

 7    Q.   New Mexico?

 8    A.   Yes.

 9    Q.   North Dakota?

10    A.   Yes.

11    Q.   Oklahoma?

12    A.   Yes.

13    Q.   South Dakota?

14    A.   Yes.

15    Q.   Utah?

16    A.   Correct.

17    Q.   Did I get that right?

18    A.   Yes.

19    Q.   Vermont?

20    A.   Yes.

21    Q.   Kind of crowded up there.

22         West Virginia?

23    A.   Yes.

24    Q.   And Wyoming, right?

25    A.   Yes.
```

1    **Q.**  Okay.  20 states, right?

2    **A.**  Correct.

3    **Q.**  And there's some pretty big population centers in some of

4    these states, like Las Vegas and Phoenix, New Orleans,

5    Oklahoma City, all metropolitan areas with significant

6    populations, correct?

7    **A.**  There are certainly some large metropolitan areas within

8    those states.

9    **Q.**  And turning back to Exhibit 2, which I'll put back on the

10   screen so everybody can see it, you invite -- so all of the

11   BCHNP candidates are invited to apply in Sparse Country.

12   Because every single state, anybody in that category that

13   gets 1100 or above gets invited to apply out of the black,

14   Chicano, Hispanic, Native American or Puerto Rican category,

15   they get invited to apply in those states, correct?

16   **A.**  That would be correct.

17   **Q.**  The only distinctions you have for Sparse Country are

18   white, other, and unknown.  No Asians.  We've already agreed

19   on that, correct?

20   **A.**  Yes.  Obviously they're included in the other searches.

21   **Q.**  My question to you is, what is Harvard's explanation for

22   why in Sparse Country in 20 states, states that some of them

23   have big population centers, a white applicant with a 1310 is

24   invited to apply to Harvard, but an Asian male who lives in

25   any of those states with a 1370 is not?  What are all the

**JA589**

1   reasons Harvard does that?

2   **A.**   Again, we're looking for candidates from all different

3   kinds of backgrounds.  In the Sparse Country states, there

4   are -- certainly there are some cities, but there are lots of

5   very rural areas.  Again, we're trying to apply the same

6   standards for the different kinds of searches that we have.

7   **Q.**   You're not suggesting that there aren't significant

8   Asian-American populations in Sparse Country, are you?

9   **A.**   There are certainly some Asian-American populations in

10  Sparse Country.

11  **Q.**   And what you're doing is -- you could have kids in Las

12  Vegas where there's a significant Asian-American population

13  at the same school, white kid, 1310, gets a letter that says

14  his scores qualify him to apply to Harvard.  Asian kid

15  sitting next to him in class gets a 1370, they're comparing

16  notes.  The Asian boy does not get invited to apply.  The

17  white student does.

18            What is the possible explanation for that?

19  **A.**   Well, again, we're looking for a diverse student

20  population, for all the reasons that was discussed in the

21  opening statement this morning.  And we simply want to make

22  sure in those schools that we send encouraging messages to

23  people along our normal search parameters.

24  **Q.**   Is part of how you achieve the diversity that Mr. Lee

25  discussed this morning is to put a thumb on the scale for

1    white students who you invite to apply from Sparse Country?

2    **A.**   The fact that a person applied from Sparse Country might

3    be one of, again, many, many factors that could possibly go

4    into a decision.  But there are people who, let's say, for

5    example, have only lived in the Sparse Country state for a

6    year or two.  Let's say that can happen.  And then on the

7    other hand there are people who have lived there for their

8    entire lives under very different settings.

9            So what we're trying to make sure we do, in an

10   even-handed way, is to reach out to what lots of people would

11   say is the heartland of America.  And many of these states

12   that you have on your map are states where Harvard is not on

13   anyone's radar scope at all.

14           And one of the things we love to do is to get

15   students from any background, really, from those states who

16   could bring something special to Harvard that would help

17   educate fellow classmates.

18           One of my roommates was from Mitchell, South

19   Dakota, home of, you probably know, the Corn Palace, which

20   you may not know.  But he was an amazing person.  And the

21   thing that he brought to me and to everybody in our dorm was

22   a tremendous appreciation for what was happening in a state

23   where we get very few people.  So he was a great ambassador.

24           We also of course will visit all of these states

25   every year.  So we do everything we can to reach out to a

1    much broader range of people than certainly was the case at

2    Harvard when I was an undergraduate.

3    Q.   I want to just try to focus on what we've got before us.

4    And that is in Sparse Country if you're an Asian male, you've

5    got to score 1380 to get an invitation from Harvard, correct?

6    A.   Yes.  And we would hope that that student would apply.

7    Q.   In Sparse Country if you're white, either gender, you are

8    get invited to apply at 1310, correct?

9    A.   That's correct.

10   Q.   And all the stuff you just told me about some people have

11   lived there longer and some people just arrived one or two

12   years ago, you have no idea who that applies to at the time

13   that you're sending out these letters, correct?

14   A.   That's correct.

15   Q.   You don't know whether the recipient of the letter is

16   going to be like your roommate from South Dakota.  You have

17   none of that kind of information when you send out the

18   letter, correct?

19   A.   That's true.  But people talk among themselves.  So there

20   are times when a search letter will go out to someone, say,

21   with a lower search parameter.  People start talking.  People

22   start considering whether or not they might consider Harvard.

23   And that's one of the ways Harvard has changed, why it's

24   changed so dramatically in terms of its geographic

25   distribution over the past 35 or 40 years.

Case: 19-2005    Document: 00117633236    Page: 605    Date Filed: 07/30/2020    Entry ID: 6356615
Case 1:14-cv-14176-ADB   Document 631   Filed 04/18/19   Page 151 of 187

151

1    **Q.**  So I get it.  So when you have send a letter out to

2    somebody to recruit them, part of what you're doing is

3    sending a message, you said, with a lower search parameter.

4    They might start talking and get other people interested in

5    Harvard.  Is that the gist of what you just said?

6    **A.**  Yes.  And that's exactly what has happened over the

7    years.

8    **Q.**  And is the flip side of that message to the Asian student

9    from Sparse Country with a 1370 whose white pals tell him

10   they got invited to apply at 1310 and he didn't, what's the

11   message that student is supposed to receive?

12   **A.**  I guess the general message would be, say within a high

13   school class and sometimes -- you're from Montana, and I know

14   there are large high schools in Montana, and there are some

15   very, very small high schools in Montana.

16          But the idea is to try to break the cycle, to try

17   to get people from a much broader array of states and

18   backgrounds to think about Harvard.  So the idea at least is

19   to get Harvard on the map, just given the fact, remember,

20   that most students will end up going to college within about

21   one hour's drive of their home.

22   **Q.**  Between the Asian student in Sparse Country with 1370 who

23   doesn't get the letter and the white student with the 1310

24   who does, the only difference between those two students, the

25   only different information that you have when you decide

1   whether or not to send that letter is race.  Correct?

2   **A.**   In terms of that letter, yes.

3   **Q.**   And that's race discrimination, plain and simple, isn't

4   it, Dean Fitzsimmons?

5   **A.**   It's reaching out to people who might be good applicants

6   for Harvard and hoping that these applicants will again talk

7   to their friends and think about whether or not Harvard could

8   be an option.

9   **Q.**   Respectfully, sir, you're not answering my question.

10          The only different information you have between the

11   white applicant who you invite to apply with the 1370 and the

12   Asian --

13          MR. HUGHES:  May I finish my question before you

14   object?  I'll try again.

15   BY MR. HUGHES:

16   **Q.**   My question is, the only reason that Harvard doesn't

17   invite the Asian student with the 1310 from Sparse Country

18   and does invite the white student with the 1310 is race?

19          MR. LEE:  Asked and answered twice before.

20   Identically.

21          THE COURT:  I'll let him answer it this time.  It

22   has been asked and answered.  You might want to move it

23   along.

24          THE WITNESS:  On the search parameter, that very

25   small number of points is the difference.

**JA594**

1    BY MR. HUGHES:

2    **Q.**   And that's race discrimination, plain and simple, isn't

3    it, Dean Fitzsimmons?

4    **A.**   It is not.

5    **Q.**   And is the decision to invite white students with lower

6    scores than Asian students from Sparse Country part of how

7    Harvard consciously shapes the makeup of its class?

8    **A.**   We're simply trying to reach out to people from all over

9    the nation.

10   **Q.**   I'm going to change topics now, talk about how athletes

11   and legacies are treated in the admissions process, okay?

12   **A.**   Sure.

13   **Q.**   To establish some common ground, I think you will agree

14   that, as a whole, the legacy applicant pool is on average

15   less ethnically diverse than the non-legacy applicant pool,

16   correct?

17   **A.**   At the moment it is, but it's fast changing.

18   **Q.**   But at the moment that holds true, right?

19   **A.**   That's correct.

20   **Q.**   Okay.  And Harvard is very competitive.  Most of your

21   applicants are turned away, correct?

22   **A.**   Unfortunately, yes.

23   **Q.**   And I'd like to talk to you about the admission rates,

24   the likelihood of admission to Harvard.  That's something

25   that you and your colleagues in the Harvard admissions office

 1    keep track of, correct?

 2    **A.**    That's correct.

 3    **Q.**    And I'd like to take a look at Plaintiff's Exhibit 163.

 4    **A.**    Will it be up on the screen, too?

 5    **Q.**    It should be.

 6    **A.**    I have 163.

 7          MR. MORTARA:  Before we get started, I'd like to

 8    offer P163.

 9          MR. LEE:  No objection, Your Honor.

10          THE COURT:  Admitted.

11          (Plaintiff Exhibit No. 163 admitted.)

12    BY MR. HUGHES:

13    **Q.**    Do you see that, Dean Fitzsimmons?

14    **A.**    This is the Sunday, March 2?

15    **Q.**    Yes, sir.

16    **A.**    Yes, I do.

17    **Q.**    And you're getting at the bottom here an email from

18    Elizabeth Young, attaching certain statistics for a meeting I

19    guess on March 3, correct?

20    **A.**    It sounds that way, yes.

21    **Q.**    And at what point in the admissions process is early

22    March?

23    **A.**    This is probably just as we were going into full

24    committees, and that's when the actual decisions are made.

25    **Q.**    And so let's look at the fifth page of this document, the

1    fourth page of the document.  I've got it blown up on the

2    screen, Dean Fitzsimmons.  Do you see that in front of you?

3    **A.**  I do.

4    **Q.**  What we've got here, harkening back to the first page of

5    the email, we're in 2013.  We're selecting the class of 2018,

6    correct?

7    **A.**  Yes.

8    **Q.**  And what we've got on the right-hand side of the screen

9    is information related to the class of 2018, correct?

10   **A.**  That's correct.

11   **Q.**  And on the left-hand side of the screen we've got

12   information related to 2017, correct?

13   **A.**  That's correct.

14   **Q.**  And you've got information that relates in both years

15   both to the overall applicant pool, correct?

16   **A.**  Yes.

17   **Q.**  And you've also got information that relates to the NLNA

18   portion of the applicant pool, correct?

19   **A.**  That's correct.

20   **Q.**  NLNA is non-legacy, non-athlete, correct?

21   **A.**  That's correct.

22   **Q.**  Why does Harvard, Harvard admissions office, separate out

23   the applicant pool by NLNA?

24   **A.**  It's really a safeguard, in a sense, to make sure we're

25   going along the way Susie Chow and I stated before the OCR

1    investigation where we said that the difference between the

2    admission rate of whites and Asian-Americans had to do with

3    essentially lineage and athletics.

4           And then it actually relates back to the OCR report

5    itself, which found that we did not discriminate against

6    Asian-Americans.  But it is a -- it's a thing that we have

7    done ever since then to provide another safeguard, another

8    check and balance on this, another way of trying to make sure

9    that we're being even-handed with Asian-Americans and white

10   students.

11   **Q.**  So that the safeguard or check that the Harvard

12   admissions office does to ensure that there is not

13   discrimination against Asian-American applicants is to take

14   the athletes and the legacies out of the pool and look at the

15   portion of the pool that remains?

16   **A.**  No.  It's not the safeguard.  There are many, many

17   safeguards.  It's one of the things that we did even prior,

18   just to sort of let the public know prior to the OCR

19   investigation.

20          But then after the finding, we just wanted to make

21   sure we continued to take a look at this as one way of many

22   where we would make sure that we're treating every applicant

23   in a fair and even-handed way.

24   **Q.**  And do you still do that today?

25   **A.**  Yes.

1    **Q.**  So a safeguard, one of many, you say, that Harvard

2    admissions office employs to check to make sure there's not

3    discrimination against Asian-American applicants is to take

4    the legacies and the athletes out of the applicant pool and

5    then analyze the remaining applicant pool, correct?

6    **A.**  Yes.  It's a very quick and simple thing to look at, but

7    it's one -- remember there are -- Professor Card identified

8    200 variables of factors in admission.  Certainly grades and

9    scores are factors, as we know from this morning.  And also,

10   though, it's also true that alumnae/alumni sons and daughters

11   and athletics are also factors, one of many factors in the

12   admissions process.

13   **Q.**  So let's look at some admissions rates together.  I've

14   got them highlighted at the top.

15         So the admission rate if you're not a legacy or not

16   an applicant in these class years is about 4 1/2 percent,

17   correct?

18   **A.**  That would be correct.  In a very rough kind of way.

19   **Q.**  That sounds right to you, right?

20   **A.**  Yes.

21   **Q.**  And then if you add the legacies and applicants back into

22   the pool because they're admitted at such a higher rate, the

23   overall admit rate jumps up to 5.7 in 2018 and 5.8 in 2017,

24   correct?

25   **A.**  Overall, yes.

**JA599**

1    **Q.**  And I'd like to look at one other thing on here.  This is

2    something you referred to in the admissions office as a

3    one-pager, correct?

4    **A.**  That's part of it, yes.

5    **Q.**  Although sometimes the one-pagers are more than one page,

6    correct?

7    **A.**  Occasionally.  They're usually one page.

8    **Q.**  So this one that we're looking at has information all the

9    way up and down.  The information that's being compared

10   between the class of 2017 and the class of 2018 is the racial

11   or ethnic makeup of the class, correct?

12   **A.**  That would be correct.

13   **Q.**  And sometimes, to be fair, Dean Fitzsimmons, there are

14   one-pagers with other information like geography and so

15   forth, correct?

16   **A.**  Yes.  It could be occasionally.

17   **Q.**  I'll show you that in a minute.  Focusing on this page 4

18   of Plaintiff's Exhibit 63, why does the admissions office

19   compare the racial or ethnic makeup of the current year's

20   class to the racial or ethnic makeup of the preceding year's

21   class?

22           MR. LEE:  Your Honor, if I could.  This is just to

23   make the record clear.  The second page of this exhibit is

24   the actual one-pager.

25           MR. HUGHES:  We're going to look at that in a

**JA600**

1    moment.

2         MR. LEE:  Which is part of the confusion.  The

3    fourth page is something different.  I think if we're going

4    to refer to the one-pager, we'll should refer to the

5    one-pager.

6         MR. HUGHES:  Mr. Lee, I asked him if it was the

7    one-pager.  He told me it was.

8         THE WITNESS:  I'm sorry.  I did not.  I said that's

9    part of the one-pager.  The one-pager is usually is one page.

10   And usually at the bottom it has the thing that you had

11   selected out for page 4.  What you just showed with all the

12   information, that's the one-pager.

13   BY MR. HUGHES:

14   Q.  There's no doubt that the Harvard admissions office

15   created page 4, correct?

16   A.  As part of the one-pager.

17   Q.  And now let's look at the other part of the one-pager.

18   I'll ask my question again.

19        Here at the bottom, like you were just telling us,

20   Dean Fitzsimmons, there is information at the bottom of the

21   one-pager comparing the racial or ethnic makeup of the

22   current class that you're working to admit to the prior

23   year's admitted class, correct?

24   A.  That's correct.

25   Q.  And the question is why does the Harvard admissions

1  office, when it's trying to decide who to admit to Harvard,

2  compare the racial makeup of the prospective admitted class

3  to the admitted class of the prior year?

4  **A.**   There are a couple of reasons.  One is, remember, I think

5  you said it was March 3 or something like that.  We've

6  already started the recruiting for the next year.  And we'll

7  be going out on the road.  We actually visit about 60-70

8  cities in the spring or locations in the spring and then 60

9  or 70 more in the fall.

10         But one thing you can do is just simply to give you

11  have a rough idea perhaps of how far effective your

12  recruiting has been this year versus last year.  Keeping in

13  mind that in America usually there isn't a huge change from

14  one year to the next in of the talent pool, as it were, in

15  America.  So one year will be more like the next one but can

16  often be very different, say, from five years ago or five

17  years into the future.

18         But the other thing, the other reason you do this

19  is that we have to be really, really careful that we do not

20  come in with too many students.  We try to shoot for about

21  1,660 every year.

22         And we are -- as Mr. Lee said this morning, we're

23  at 98 percent residential.  All the first-year students

24  actually have to live in the dorms, so we cannot be

25  overcrowded.

          1          So this information is actually very useful to --

          2     for us to try to prevent being overcrowded.  Because, for

          3     example, if you went through the whole one-pager, there are

          4     expected differential yields by -- on the part of really a

          5     lot of different kinds of people.

          6          For example, your Sparse Country often has a

          7     relatively lower yield than some other parts.  So in other

          8     words, what we're trying to do is to -- at that point, we

          9     probably have until about March 20 to try to make some final

         10     decisions before we let people know around April 1 what's

         11     going to happen.

         12          But if you found yourself, for example, with lots

         13     of engineers admitted, that -- we know that historically

         14     engineers will yield a considerably lower rate than most

         15     other students.  So that would give us -- in other words,

         16     they're less likely to choose Harvard if admitted.  So that

         17     would give us at least a little bit more room, knowing that a

         18     whole bunch of them probably won't come to, once we're trying

         19     to figure out that last number around March 20, that we would

         20     be able to perhaps admit a few more people generally.

         21     **Q.**  Are yield rates something that can factor into admission

         22     to Harvard?

         23     **A.**  Just in terms of the number of admissions that we send

         24     out on April 1.  If we miscalculate, which we did one year

         25     since the '70s, it can create a really big set of problems.

 1   **Q.**  Are there differences in yield rates amongst different
 2   races or ethnicities?
 3   **A.**  Yes.
 4   **Q.**  Do you keep track of that?
 5   **A.**  Generally speaking.  Quite a bit of variation from year
 6   to year.  It's kind of unpredictable, but in general terms,
 7   yes.
 8   **Q.**  And is that something you take into account when making
 9   certain admissions decisions to Harvard?
10   **A.**  Not any particular decisions, but it's just in terms of
11   the number you would feel confident about sending out so that
12   you would not be overcrowded.  The best thing for us is --
13   obviously we cannot be overcrowded.  There's no place to put
14   people.  So the other thing we typically would then be able
15   to take perhaps 50 or 100 people off the waiting list.
16   **Q.**  All right.  Let's get back to our admission rate
17   discussion.  I'm going to try to blow up part of this page.
18   Can you see that, Dean Fitzsimmons?
19   **A.**  I do.
20   **Q.**  We're still on page 2.  Here we have the overall admit
21   rate at the top of page 2, Dean Fitzsimmons?
22   **A.**  Yes.
23   **Q.**  5.8 and 5.7.  Do you see that?
24   **A.**  I do.
25   **Q.**  Down below, the Harvard admission office keeps track of

1    the admit rates for a category called "Lineage."  Do you see

2    that?

3    **A.**   I do.

4    **Q.**   What does that category refer to?

5    **A.**   That refers to applicants where either the mother or

6    father or both went to Harvard College.

7    **Q.**   And the admission rate for legacy candidates in 2017 was

8    35.4 and in 2018 was 33.3, correct?

9    **A.**   Yes.  Except I think, again, 2018 I believe was still a

10   work in progress.

11   **Q.**   2018 was --

12   **A.**   Right.

13   **Q.**   We looked before on page 4 that the non-legacy,

14   non-athlete admission rate was about 4 1/2 percent, correct?

15   **A.**   Yes.

16   **Q.**   So a legacy candidate is many, many, many times more

17   likely to get into Harvard than a non-legacy, non-athlete,

18   correct?

19   **A.**   That would be true for many reasons.

20   **Q.**   If we look down at athletes, 1 athletes, those are

21   athletes that receive an athletic rating of 1, correct?

22   **A.**   That's correct.

23   **Q.**   And again, that is a result of a request from a coach who

24   is trying to recruit an athlete to come to Harvard

25   communicates that request to the admissions office, correct?

**JA605**

1    **A.**   That would be a person the coach has rated as an athlete

2    desired for his or her team.

3    **Q.**   And the admission rate for 1 athletes is even higher than

4    legacies, 76.6 for the class of 2017, correct?

5    **A.**   That's correct.

6    **Q.**   The number is close for 2018 as well?

7    **A.**   That's correct.

8    **Q.**   So what that means is that athletes are many, many, many

9    times more likely to get in than the non-legacy, non-athletes

10   who are admitted at 4.5 percent, correct?

11   **A.**   That would be correct.

12   **Q.**   Now, you talked to me a minute ago and said that Harvard

13   started carving out the non-legacy, non-athlete rating as a

14   result of -- or in connection with OCR's investigation of

15   claims of Asian-American discrimination in the late 1980s?

16   **A.**   Well, it was really prior to that because there had been

17   much speculation in the press and from our students, is it,

18   you know, why the admission rate was different.  So that's

19   why Susie and I just sat down and did, again, a very simple

20   calculation.  But I think it was somewhat illuminating

21   because it certainly was something that was noted by OCR as

22   it conducted its investigation and in doing so found that we

23   had not discriminated against Asian-Americans.

24   **Q.**   I'd like to talk with you a little bit more about that

25   OCR investigation.  Dean Fitzsimmons, you were the dean when

1    that investigation occurred in the late '80s, correct?

2    **A.**   That's correct.

3    **Q.**   It ultimately culminated in a statement of findings in

4    1990, right?

5    **A.**   That's correct.

6    **Q.**   And before OCR issued that statement of findings, it

7    conducted a comprehensive investigation.  We heard Mr. Lee

8    tell us this morning they actually set up shop in your

9    office, right?

10   **A.**   Among other things.  They did quite a few things.  They

11   interviewed ten of us.  They did their own regressions with

12   lots of data.  They looked at 400 applications.  They looked

13   at 2000 summary sheets or reader sheets.  So it was a very,

14   very comprehensive investigation.

15   **Q.**   And I know that -- and Mr. Habeno was the gentleman at

16   OCR who was in charge of that investigation, correct?

17   **A.**   That's correct.

18   **Q.**   You ultimately became friends with Mr. Habeno, correct?

19   **A.**   We have over the years.

20   **Q.**   Eaten at Ruth's Chris together, right?

21   **A.**   Yes.  Once, as I recall.

22   **Q.**   Exchanging jokes over email, correct?

23   **A.**   That, I wouldn't say at all.

24   **Q.**   Okay.  We'll get to that tomorrow.

25   **A.**   We'll get to that, I'm sure.

1    **Q.**  I assumed that even through you developed a friendly

2    relationship with Mr. Habeno that you and everyone in the

3    admissions office was professional and forthright with

4    Mr. Habeno during the OCR investigation.

5    **A.**  Yes.  And with all his colleagues, both here in Boston

6    and in Washington.

7    **Q.**  And I think you already told me you thought that

8    investigation was comprehensive and thorough, correct?

9    **A.**  I do.

10   **Q.**  And your admissions officers and you all told the truth

11   when you talked to the OCR folks, correct?

12   **A.**  Yes.

13   **Q.**  And you believe OCR used a reliable approach and

14   methodology to investigate the claims that Harvard was

15   discriminating against Asian-Americans, correct?

16   **A.**  It certainly was comprehensive.

17   **Q.**  And reliable.  Mr. Lee relied on it this morning, right?

18   **A.**  Yes.  And we've relied on its base, especially given its

19   correlation to the *Bakke* decision and then ultimately to

20   *Grutter* and others.

21   **Q.**  And you don't have any criticisms of OCR's approach.

22   You're comfortable with the statement of findings, correct?

23   **A.**  Yes.

24   **Q.**  So now I'd like to look at some portions of the statement

25   of findings with you, which is Plaintiff's Exhibit 555.

1          MR. HUGHES:  Before I do, I'd like to offer that

2    into evidence.

3          MR. LEE:  No objection.

4          THE COURT:  Admitted.

5          (Plaintiff Exhibit No. 555 admitted.)

6    BY MR. HUGHES:

7    **Q.**  I've got it on the screen here, Dean Fitzsimmons.

8    **A.**  Are you going to highlight?

9    **Q.**  I will do my best.  You're familiar with this document

10   and you've reviewed it before, right?

11   **A.**  I have.

12   **Q.**  I'd like to turn to page 2.  And here we've got -- I'll

13   just read it.

14          In January of 1988, Harvard, through the dean of

15   admissions and financial aid, issued a statement on

16   Asian-American admissions at Harvard-Radcliffe which in part

17   responded to concerns raised about underrepresentation of

18   Asian-Americans at Harvard and rumors of quotas.

19          Do you see that?

20   **A.**  Yes.  Susie and I put that together.

21   **Q.**  You remember issuing that statement, correct?

22   **A.**  I do.

23   **Q.**  You've got the statement block quoted below, correct?

24   **A.**  It looks like it, yes.

25   **Q.**  I'll read what the OCR said in the block quote.

```
 1              "The difference in admission rates for Asians and

 2     whites, about 3.7 percent, 13.3 versus 17.0 over a 10-year

 3     period including the classes of 1982 through 1991, was

 4     explained as follows."

 5              And then we've got the block quote.  The block

 6     quote says, "While Asian-Americans are slightly stronger than

 7     white candidates on academic criteria, they're slightly less

 8     strong on extracurricular criteria.  In addition, there are

 9     very few Asian-Americans in our applicant pool who are alumni

10     children or prospective varsity athletes.  When all these

11     factors are taken into account, the difference in admission

12     rates for the two groups disappears."

13              Do you see that?

14     A.   I do.

15     Q.   And that's what you told OCR back in the late 1980s,

16     correct?

17     A.   That's certainly what our data told us.

18     Q.   In fact, we can look at this tomorrow.  It's no longer

19     true that Asian-Americans are slightly less strong on

20     extracurriculars, correct?

21     A.   Yes.  In fact, our readers rate them stronger than whites

22     on extracurriculars.

23     Q.   Just to make sure the record is clear --

24     A.   Yes.  Based on the evidence that we see in the

25     applications.
```

Case: 19-2005    Document: 00117632236    Page: 623    Date Filed: 07/30/2020    Entry ID: 6356615
Case 1:14-cv-14176-ADB   Document 631   Filed 04/18/19   Page 169 of 187

169

1   **Q.**  Currently the Asian-Americans have scored better on

2   extracurricular criteria than white applicants to Harvard,

3   correct?

4   **A.**  Yes.  That's certainly what our staff believes when it

5   goes through all the applications one at a time and then

6   assigns a strong extracurricular rating, slightly stronger

7   for Asian-Americans and whites.

8   **Q.**  I think you've already told me that OCR performed a

9   statistical analysis as part of its work here, correct?

10  **A.**  Yes.

11  **Q.**  I'd like to look at some of that with you.  I'm going to

12  turn to page 33.

13        THE COURT:  Mr. Hughes, I see you looking at your

14  watch.  I pushed everything later.  We can go until 3:30, if

15  that's all right with you.  I don't want to surprise you.  We

16  can go until 3:30.

17        MR. HUGHES:  I think I'm going to hit a logical

18  breaking point between 3:15 and 3:30.

19        THE COURT:  That's fine.

20        MR. HUGHES:  Thank you very much, Your Honor.

21  BY MR. HUGHES:

22  **Q.**  Dean Fitzsimmons, I've got on the page here the narrative

23  that OCR put together relating to some of its statistical

24  analysis.  Do you see that?

25  **A.**  I do.  You've highlighted a number of things.

1  **Q.**  OCR says, "Our first task was to determine whether the

2  Asian-American and white applicant pools were similarly

3  qualified.  If the white applicants were, on average,

4  superior to Asian-American applicants, then it is reasonable

5  to expect that whites would be admitted at a higher rate."

6          Do you see that?

7  **A.**  I do.

8  **Q.**  Then we've got a table and the OCR says, "As shown in

9  Table 5 below, while the two groups were found to be

10  significantly different on many of the variables, they appear

11  overall to be comparably qualified when viewing their means."

12          Do you see that?

13  **A.**  I do.

14  **Q.**  And then we've got some comparisons between Asian and

15  white applicants in Table 5.  Do you see that?

16  **A.**  I do.

17  **Q.**  So one of them is academic rating.  Do you see that?

18  **A.**  I do.

19  **Q.**  For that variable, Asian-Americans scored higher,

20  correct?

21  **A.**  That's correct.

22  **Q.**  The athletic rating, white higher, correct?

23  **A.**  Yes.

24  **Q.**  And personal rating, which was the discussion discussed

25  at length this morning, at least at this time whites were

1    getting higher personal scores than Asian applicants,

2    correct?

3    **A.**   Yeah.  Again, it's pretty slight.  Yes.  The one before

4    it was not significant statistically.

5    **Q.**   That was on extracurricular?

6    **A.**   Right.

7    **Q.**   The white applicants were being awarded higher personal

8    scores than Asian-American applicants at this time, correct?

9    **A.**   Yes.  By a very small margin.

10   **Q.**   And the other area where white applicants were performing

11   better was on the SAT verbal, correct?

12   **A.**   That's correct.

13   **Q.**   And that was true maybe back in 1990, but that's not true

14   today, correct?

15   **A.**   I would have to look at it, but I believe that could be

16   correct.

17   **Q.**   And it's also the case that Asian-American applicants to

18   Harvard score better on the SAT writing test than white

19   applicants, at least today, correct?

20   **A.**   We actually no longer use the writing, actually.

21   **Q.**   For the time period that you did, in recent times the

22   Asian-American applicants were doing better?

23   **A.**   That, I did not know that.  But we found the test to be

24   quite unreliable, so we actually dropped it this past year.

25   **Q.**   Now, you wouldn't have any reason to dispute your own

 1   internal admissions data that showed what I just said to be

 2   true.  It just doesn't come to mind, correct?

 3   **A.**   Excuse me.  Table 5's data?

 4   **Q.**   Your own recent data from the Harvard admissions office

 5   showing Asian-Americans applicants scored better on the SAT

 6   writing.  You don't have any reason to --

 7   **A.**   I don't have any data at all on it.

 8   **Q.**   So now, I think you also mentioned that OCR ran a

 9   statistical or regression analysis.  You're familiar with

10   that, correct?

11   **A.**   I am.

12   **Q.**   Let's look at what they had to say about that.  It's on

13   page 34.

14            OCR says, "We then employed logistic regression to

15   try to identify which of the ten admissions variables could

16   account for the admit rate disparity.  Through this

17   technique, we identified six variables which appeared to

18   negatively impact Asian-Americans; that is, those variables

19   on which Asian-Americans received less benefit in the

20   admit/reject decision than white applicants with similar

21   scores.  These were three of the reader ratings:  academic,

22   extracurricular, and personal, along with the counselor and

23   alumni ratings and SAT math.

24            "Since Harvard asserted that the preference given

25   to legacy and recruited athlete applicants explained the

1    admit rate disparity, we next reran the logistic regressions

2    without these two groups.  When recruited athletes and

3    legacies were removed from the analysis, all of these race

4    effects disappeared with the exception that one variable, the

5    reader academic rating, continued to have a small adverse

6    effect on Asian-Americans."

7         Do you see that?

8    A.   I see that.

9    Q.   Back in 1990, Harvard was asserting that legacy and

10   athlete preferences explained the difference in admit rates

11   between White and Asian applicants.  And based on that

12   explanation, OCR removed the legacy and athlete applicants

13   from their regression analysis, correct?

14   A.   I see that.

15   Q.   And again, you don't have any criticism with what OCR did

16   here, correct?

17   A.   That's correct.  The only thing I would just say -- and

18   maybe I'm misunderstanding your question.  I think when Susie

19   and I did our little NLNA, I'm not sure which data we

20   actually used.  It might have been one year.  It might have

21   been five years.  I don't know.  Their data was -- I think it

22   was ten years, I think.  So they're not directly comparable,

23   I would say.

24   Q.   Right.  But what OCR did, which Harvard has relied on, is

25   when OCR was analyzing claims of discrimination against

1    Asian-Americans and running a logistic regression model, it

2    decided to take out the legacies and the athletes from its

3    logistic regression model data set, correct?

4    **A.**   It did.  That's what they say, yes.

5    **Q.**   You understand both the experts in this case have run

6    logistic regression models, correct?

7    **A.**   Yes.  As I understand it.

8    **Q.**   I want to look at a more recent document between Harvard

9    and OCR.  Before I do, let's just ask you a few questions.

10           You work with, from time to time, Harvard's office

11   of general counsel, correct?

12   **A.**   Yes.

13   **Q.**   And when you communicate with Harvard's office of general

14   counsel about what's going on in the admissions office,

15   you're careful to be truthful and accurate, correct?

16   **A.**   Yes.

17   **Q.**   And you expect, I'm sure, that when Harvard's office of

18   general counsel communicates with your regulators like the

19   Department of Education Office of Civil Rights, that it

20   provides accurate information, correct?

21   **A.**   That sounds fair.

22   **Q.**   So now I want to jump forward in time to see what Harvard

23   has to say in more recent times about whether athletes and

24   legacies should be removed from the data set when analyzing

25   claims of discrimination against Asian-Americans.

**JA616**

```
 1              I'm going to show Plaintiff's Exhibit 509.
 2    A.  Will you be putting this on the screen?
 3    Q.  Yes, sir.  I was just providing a copy to Mr. Lee.
 4              MR. LEE:  Thank you.
 5              MR. HUGHES:  So what we have here -- before I do,
 6    I'd like to offer this into evidence, Plaintiff's
 7    Exhibit 509.
 8              MR. LEE:  No objection, Your Honor.
 9              THE COURT:  Admitted.
10              (Plaintiff Exhibit No. 509 admitted.)
11    BY MR. HUGHES:
12    Q.  Mr. Lee, this is a February 2, 2012, letter, correct?
13              MR. LEE:  I think you mean Mr. Fitzsimmons, not
14    Mr. Lee.  I can't testify.
15              MR. HUGHES:  You and I both.
16    BY MR. HUGHES:
17    Q.  Dean Fitzsimmons, this is a February 2, 2012, letter from
18    the Harvard office of the general counsel, correct?
19    A.  It appears to be.
20    Q.  And it's to Ms. Nicole Merhill at the Office of Civil
21    Rights for the Department of Education, correct?
22    A.  Yes.
23    Q.  Turning to page 11, the last page of the document, you
24    were copied at least on this document, correct?
25    A.  Yes.
```

```
 1   Q.  If we go back to the first page, I think that this -- I
 2   think Mr. Lee talked about this this morning, this letter
 3   related to an individual claim of discrimination against
 4   Asian-American students, correct?
 5   A.  Yes, I believe so.
 6   Q.  So now I want to see what Harvard told OCR in 2012,
 7   turning to page 7.
 8           So Harvard tells OCR, "Enclosed as attachment 8 is
 9   a chart labeled "Class of 2015-NLNA Overall."  Again limited
10   as described above to data for self-identified
11   Asian-Americans and white Americans, this chart shows the
12   applicant numbers and admissions rates for non-legacy and
13   non-athlete candidates, in other words; for those applicants
14   who would not be eligible for a tip either because one of
15   their parents went to Harvard or Radcliffe or because of
16   their exceptional athletic ability.  These data show that,
17   consistent with OCR's previous findings about Harvard's
18   admissions practices, once applicant data is limited to
19   non-legacy/non-athlete candidates, the admit rates between
20   Asian-Americans and white Americans are far closer."
21           Do you see that?
22   A.  I do.
23   Q.  So what we have here is the Harvard office of general
24   counsel in 2012, concerning a claim of Asian-American
25   discrimination, telling the government to remove the
```

Case: 19-2005 Document: 00117632236 Page: 631 Date Filed: 07/30/2020 Entry ID: 6356615
Case 1:14-cv-14176-ADB Document 631 Filed 04/18/19 Page 177 of 187

177

 1    legacy/athletes from the data, correct?

 2    **A.**   That's what it says.

 3    **Q.**   So now I want to make sure we're on the same page about

 4    this athlete and legacy issue.

 5           1990, OCR, at Harvard's invitation, removes the

 6    athletes and legacies from their logistic regression model.

 7    We just looked at that, right?

 8    **A.**   As one of many things they did in the very comprehensive

 9    investigation.

10    **Q.**   And then in 2012, much more recent times, we have the

11    Harvard office of general counsel telling the government that

12    when they're analyzing claims of discrimination against

13    Asian-Americans, the way to do that is by removing athletes

14    and legacies from the data set, correct?

15    **A.**   I don't think I would read it that way.

16           I guess what I would need to know is the context of

17    who this applicant was and what this person was like relative

18    to other applicants.

19           Certainly in our real admissions process, certainly

20    legacy and athletic expertise, certainly some of the many

21    tips that could perhaps get somebody admitted.  But I'd have

22    to see exactly how they were applying this to this particular

23    case.  I would need to see literally what this complainant's

24    application was all about before I would try to figure out

25    exactly how this description was applied.

1    **Q.**  We can get into those details, if you'd like to, in a

2    minute.

3            But what I'm just focusing on here is, here we have

4    the office of general counsel enclosing attachment 8, which

5    is a chart like the charts we've looked at, 2015-NLNA

6    Overall, and then telling the government that the data shows

7    that consistent with OCR's previous findings about Harvard's

8    admissions practices, once applicant data is limited to

9    non-legacy/non-athlete candidates, the admit rates between

10   Asian-Americans and white Americans are far closer.

11           Harvard is still taking the same position it took

12   in 1990 here in this letter, correct?

13   **A.**  Yes.  And I think if I understand it correctly, following

14   OCR's guidelines.

15   **Q.**  OCR took the athletes and legacies out in 1990.  Harvard

16   is still encouraging OCR to take them out in 2012.  That's

17   what this document says, correct?

18   **A.**  I'm not quite sure it says that.  I just think that -- it

19   was certainly one thing that OCR looked at is one way of all

20   the different things they did, reading all those

21   applications, reading all the reader sheets, all the other

22   things they did.

23           And another thing they did, I suppose, was take a

24   look at what Susie and I had postulated, just a very simple

25   way to look at it.  And this is another one way to try to get

1    to the truth.  But I'd have to see what this person looked

2    like.

3    Q.  And Harvard is still taking the position that one way to

4    look at potential discrimination against Asian-American

5    athletes is to take out the athletes and legacies from the

6    data set.  That's what it says right here on the screen.  One

7    way?

8    A.  It's one way to look at, depending on the issue that

9    you're dealing with.

10   Q.  I want to fast-forward to even more recent times.

11                   You're aware that Harvard has sent out emails to

12   its alumni updating them on this very case, correct?

13   A.  There have been emails sent out, I know, by Harvard.

14   Q.  In fact, you sent one out over the weekend, right?

15   A.  Our office did.

16   Q.  Under your name?

17   A.  I believe that's right.  To our interviewers.

18   Q.  And that encouraged the people receiving that email to

19   look at the portion of Harvard's website that provides

20   Harvard's -- information by Harvard about this case, correct?

21   A.  Yes.  We have referred people who are interested in the

22   case to our website.

23   Q.  And I'd like to take a look at that.  This is Plaintiff's

24   Exhibit 467.

25                   MR. HUGHES:  I'd like to offer that.

 1            MR. LEE:  I can't read it.  Sorry.  Old eyes won't

 2    do it.  No objection, Your Honor.

 3            THE COURT:  Admitted.

 4            (Plaintiff Exhibit No. 467 admitted.)

 5    BY MR. HUGHES:

 6    **Q.**  You can see up at the top here, Dean Fitzsimmons, this is

 7    part of Harvard's website that relates to the Harvard

 8    admissions lawsuit, correct?

 9    **A.**  That's correct.

10    **Q.**  And I'm going to turn to page 3 of that.

11    **A.**  I guess the date is 8/21, I think, as I see it.

12    **Q.**  This is likely the date that we printed it out to make it

13    an exhibit.

14    **A.**  Okay.

15    **Q.**  I'll represent to you it's still the same.  I'd like to

16    look at page 3 of Plaintiff's Exhibit 467.  Do you see that?

17    **A.**  I do.

18    **Q.**  And what Harvard says today on its website, it's entitled

19    "A Faulty Statistical Model."

20            "Mr. Blum's case hinges on a statistical model that

21    deliberately ignores essential factors such as personal essay

22    or teacher recommendations, and omits entire swaths of the

23    applicant pool (such as recruited athletes or applicants

24    whose parents attended Harvard) to achieve a deliberate and

25    pre-assumed outcome."

**JA622**

1           Do you see that?

2    **A.**  I see that.

3    **Q.**  You understand that our expert, like your expert, ran a

4    logistic regression model, correct?

5    **A.**  That's correct.

6    **Q.**  And in 1990, Harvard and OCR's position was that the

7    right way to run a logistic regression model was to remove

8    athletes and legacies from the data set, correct?

9    **A.**  I am not sure that's correct.  I think we certainly were

10   in no position to tell OCR how to conduct its own

11   investigation in any way.  Because both the Boston office and

12   the Washington office did look at all kinds of different

13   factors.  So we certainly had no leverage at all to tell them

14   how to conduct their own logistical statistical procedures.

15   They happened to do the NLNA, but that's one of many, many

16   things they did.

17   **Q.**  I've got the portion of Plaintiff's Exhibit 555, the

18   statement of findings from OCR, page 34, back on the screen.

19           Do you see that?

20   **A.**  Yes, I do.

21   **Q.**  This is the paragraph we looked at a moment ago, talking

22   about the logistic regression model run by OCR.  Correct?

23   **A.**  Yes.

24   **Q.**  And it says -- do you see where I've got it

25   underlined? -- "Since Harvard asserted that the preference

**JA623**

 1    given to legacy and recruited athlete applicants explained

 2    the admit rate disparity, we next reran the logistic

 3    regressions without these two groups."

 4            You see that, correct?

 5    **A.**  I do.  They obviously made their own decision on that,

 6    but they certainly decided to do it.

 7    **Q.**  You've already told me you guys had no problem with OCR's

 8    methodology and are relying on it in court today.  Mr. Lee's

 9    opening, correct?

10    **A.**  Yes.  But you have to understand I am no statistical

11    expert.  So I would certainly refer to Professor Card for any

12    statistical expertise.

13    **Q.**  And we saw that in 2012 the Harvard OGC office is still

14    talking about removing athletes and legacies from the data,

15    correct?

16    **A.**  It certainly was there, yes.

17    **Q.**  What you told all your alumni on the website is when our

18    expert did the same thing that OCR did, which was to remove

19    athletes and legacies in a logistic model regression set,

20    that that was fatally flawed.

21            That's what it says on your website.

22            MR. LEE:  I object.  Particularly with this on the

23    screen.  This actually says the analysis was run twice, and

24    once with legacies in and once without.  The foundation for

25    all these questions is just inconsistent with the document,

1    Your Honor.

2            MR. HUGHES:  I think he can answer the question.

3            MR. LEE:  That's up to Her Honor, I think.

4            THE COURT:  I actually get to decide that.

5            He makes a good point about the foundation.  So why

6    don't you rephrase the question and try it again.

7    BY MR. HUGHES:

8    Q.  You understand that OCR ran a logistic regression model,

9    correct?

10   A.  Yes.

11   Q.  You understand they ran it two times.  They ran it once

12   with the legacies and athletes and once without them,

13   correct?

14   A.  Yes.  But I know they also did quite a few other things.

15   Again I don't know, since I obviously wasn't on their team,

16   exactly what they did over that two and a half period of

17   time.  They may have done many, many different things with

18   the data.

19   Q.  One thing we know for sure that they did was run their

20   logistic regression model without the legacies and athletes.

21   That's what we can see right here, correct?

22   A.  Yes, we can see that.

23   Q.  We also know for sure that in 2012 the Harvard office of

24   general counsel told OCR again that one way to look at claims

25   of Asian-American discrimination is to take the legacies and

 1    athletes out of the data set.  That's what we looked at in

 2    P509, correct?

 3    **A.**   It's one way.  But you really have to look at it

 4    comprehensively, I think in the way Professor Card did.

 5    **Q.**   What you're saying, what Harvard is saying on its website

 6    today -- I'll put it back up on the screen -- is that

 7    omitting recruited athletes and legacies is not the way to

 8    go.  That's what Harvard says today, correct?

 9    **A.**   Yes.  And I would agree with that.

10          MR. HUGHES:  Your Honor, I think I'm actually at a

11    really good transition point, if that's okay with you.

12          THE COURT:  It's fine.  I usually like to go right

13    up to the end of the day.  But I did mislead you today and

14    tell you that we'd be done by 3:00 and then I baked in a

15    little bit of extra time.

16          We can recess for the day today.  We'll start again

17    at 10:00 tomorrow.  I have another meeting at about 1:30, so

18    maybe we can go to like 1:15 or so.  We'll take a 15-minute

19    break in the morning, if that helps you for planning

20    purposes.  But other than that, we'll go straight through.

21          Thanks, everyone.  Case is recessed.

22          (Court recessed at 3:16 p.m.)

23

24

25

Case: 19-2005    Document: 00117623236    Page: 639    Date Filed: 07/30/2020    Entry ID: 6356615
Case 1:14-cv-14176-ADB   Document 631   Filed 04/18/19   Page 185 of 187

185

```
1                    - - - - - - - - - - -

2                        CERTIFICATION

3

4          I certify that the foregoing is a correct

5    transcript of the record of proceedings in the above-entitled

6    matter to the best of my skill and ability.

7

8

9

10   /s/ Joan M. Daly                October 15, 2018

11   _____         _____

12   Joan M. Daly, RMR, CRR          Date
     Official Court Reporter
13

14

15

16

17

18

19

20

21

22

23

24

25
```

INDEX OF WITNESSES

WITNESS                                                    PAGE

WILLIAM FITZSIMMONS

    Direct Examination By Mr. Hughes.................... 122

E X H I B I T S

Plaintiff Exhibit                                              Admitted

2            ....................................        135

55           ....................................        133

88           ....................................        128

163          ....................................        154

467          ....................................        180

509          ....................................        175

555          ....................................        167

1                    UNITED STATES DISTRICT COURT

2                      DISTRICT OF MASSACHUSETTS

3     _____

4     STUDENTS FOR FAIR ADMISSIONS, INC.,

5                         Plaintiff,          Civil Action
                                              No. 14-14176-ADB
6     v.
                                              October 16, 2018
7     PRESIDENT AND FELLOWS OF HARVARD
      COLLEGE, et al.,                        Pages 1 to 92

8                         Defendants.

9     _____

10

11

12              TRANSCRIPT OF BENCH TRIAL - DAY 2
           BEFORE THE HONORABLE ALLISON D. BURROUGHS
13              UNITED STATES DISTRICT COURT
              JOHN J. MOAKLEY U.S. COURTHOUSE
14                  ONE COURTHOUSE WAY
                   BOSTON, MA   02210

15

16

17

18

19

20

21

22

23              JOAN M. DALY, RMR, CRR
                 Official Court Reporter
24          John J. Moakley U.S. Courthouse
            One Courthouse Way, Room 5507
25               Boston, MA   02210
                 joanmdaly62@gmail.com

```
 1    APPEARANCES:

 2
      COUNSEL FOR THE PLAINTIFF:
 3

 4            ADAM K. MORTARA, ESQUIRE
              J. SCOTT McBRIDE, ESQUIRE
 5            KRISTA J. PERRY, ESQUIRE
              Bartlit Beck Herman Palenchar & Scott
 6            54 West Hubbard Street
              Suite 300
 7            Chicago, Illinois 60654
              312.494.4400
 8            adam.mortara@bartlit-beck.com
              scott.mcbride@bartlit-beck.com
 9            krista.perry@bartlit-beck.com

10            JOHN M. HUGHES, ESQUIRE
              KATHERINE L.I. HACKER, ESQUIRE
11            MEG E. FASULO, ESQUIRE
              Bartlit Beck Herman Palenchar & Scott
12            1801 Wewatta Street
              Suite 1200
13            Denver, Colorado 80202
              303.592.3100
14            john.hughes@bartlit-beck.com
              meg.fasulo@bartlit-beck.com
15            kat.hacker@bartlit-beck.com

16            JOHN MICHAEL CONNOLLY, ESQUIRE
              THOMAS R. McCARTHY, ESQUIRE
17            WILLIAM S. CONSOVOY, ESQUIRE
              Consovoy McCarthy Park PLLC
18            3033 Wilson Boulevard
              Suite 700
19            Arlington, Virginia 22201
              703.243.9423
20            mike@consovoymccarthy.com
              tom@consovoymccarthy.com
21            will@consovoymccarthy.com

22            PATRICK STRAWBRIDGE, ESQUIRE
              Consovoy McCarthy Park PLLC
23            Ten Post Office Square
              8th Floor, South, PMB #706
24            Boston, Massachusetts 02109
              617.227.0548
25            patrick@consovoymccarthy.com
```

```
 1    APPEARANCES (cont.):

 2
            MICHAEL H. PARK, ESQUIRE
 3          Consovoy McCarthy Park PLLC
            3 Columbus Circle
 4          15th Floor
            New York, New York 10024
 5          646.456.4432
            park@consovoymccarthy.com
 6
            PAUL M. SANFORD ESQUIRE
 7          BENJAMIN C. CALDWELL, ESQUIRE
            Burns & Levinson LLP
 8          One Citizens Plaza
            Suite 110
 9          Providence, Rhode Island 02903
            401.831.8330
10          psanford@burnslev.com
            bcaldwell@burnslev.com
11

12    COUNSEL FOR THE DEFENDANT:

13          WILLIAM F. LEE, ESQUIRE
            FELICIA H. ELLSWORTH, ESQUIRE
14          ANDREW S. DULBERG, ESQUIRE
            ELIZABETH C. MOONEY, ESQUIRE
15          SARAH R. FRAZIER, ESQUIRE
            Wilmer Cutler Pickering Hale and Dorr LLP
16          60 State Street
            Boston, Massachusetts 02109
17          617.526.6556
            william.lee@wilmerhale.com
18          felicia.ellsworth@wilmerhale.com
            andrew.dulberg@wilmerhale.com
19          elizabeth.mooney@wilmerhale.com
            sarah.frazier@wilmerhale.com
20

21

22

23

24

25
```

```
 1    APPEARANCES (cont.):

 2
              SETH P. WAXMAN, ESQUIRE
 3            DANIELLE CONLEY, ESQUIRE
              DANIEL WINIK, ESQUIRE
 4            BRITTANY AMADI, ESQUIRE
              PAUL R.Q. WOLFSON, ESQUIRE
 5            Wilmer Cutler Pickering Hale and Dorr LLP
              1875 Pennsylvania Ave, NW
 6            Washington, DC 20006
              202.663.6006
 7            seth.waxman@wilmerhale.com
              danielle.conley@wilmerhale.com
 8            daniel.winik@wilmerhale.com
              brittany.amadi@wilmerhale.com
 9            paul.wolfson@wilmerhale.com

10            DEBO P. ADEGBILE, ESQUIRE
              Wilmer Cutler Pickering Hale and Dorr LLP
11            7 World Trade Center
              250 Greenwich Street
12            New York, New York 10007
              212.295.6717
13            debo.adegbile@wilmerhale.com

14            ARA B. GERSHENGORN, ESQUIRE
              Harvard Office of the General Counsel
15            Smith Campus Center
              Suite 980
16            1350 Massachusetts Avenue
              Cambridge, Massachusetts 02138
17            617.495.8210
              ara_gershengorn@harvard.edu

18
19    COUNSEL FOR AMICI STUDENTS:

20            JON M. GREENBAUM, ESQUIRE
              BRENDA L. SHUM, ESQUIRE
21            GENEVIEVE BONADIES TORRES, ESQUIRE
              KRISTEN CLARKE, ESQUIRE
22            1500 K Street NW, Suite 900
              Washington, DC 20005
23            202.662.8315
              jgreenbaum@lawyerscommittee.org
24            bshum@lawyerscommittee.org
              gtorres@lawyerscommittee.org
25            kclarke@lawyerscommittee.org
```

**JA633**

```
 1     APPEARANCES (cont.):

 2
               LAWRENCE CULLEEN, ESQUIRE
 3             EMMA DINAN, ESQUIRE
               Arnold & Porter LLP
 4             555 Twelfth Street, NW
               Washington, DC 20004
 5             202.942.5477
               gina.dean@aporter.com
 6             emma.dinan@aporter.com

 7
       COUNSEL FOR AMICI ORGANIZATIONS:
 8
               JENNIFER A. HOLMES, ESQUIRE
 9             CARA McCLELLAN, ESQUIRE
               JIN HEE LEE, ESQUIRE
10             MICHAELE M. TURNAGE YOUNG, ESQUIRE
               RACHEL N. KLEINMAN, ESQUIRE
11             NAACP Legal Defense and Educational Fund, Inc.
               700 14th Street NW
12             Suite 600
               Washington, DC 20005
13             jholmes@naacpldf.org
               cmcclellan@naacpldf.org
14             jlee@naacpldf.org
               myoung@naacpldf.org
15             rkleinman@naacpldf.org

16             KENNETH N. THAYER, ESQUIRE
               KATE R. COOK, ESQUIRE
17             Sugarman Rogers
               101 Merrimac Street
18             Suite 900
               Boston, Massachusetts 02114
19             617.227.3030
               thayer@sugarmanrogers.com
20             cook@sugarmanrogers.com

21

22

23

24

25
```

**JA634**

```
1                    P R O C E E D I N G S
2                 (The following proceedings were held in open
3       court before the Honorable Allison D. Burroughs, United
4       States District Judge, United States District Court, District
5       of Massachusetts, at the John J. Moakley United States
6       Courthouse, One Courthouse Way, Boston, Massachusetts, on
7       October 16, 2018.)
8                 THE CLERK:  All rise.  Court is in session.  Please
9       be seated.
10                THE COURT:  Good morning, everyone.
11                MR. MORTARA:  Good morning, Your Honor.
12                THE COURT:  Is Dean Fitzsimmons here?
13                MR. MORTARA:  Your Honor, before we get started
14      this morning, there is one housekeeping matter.
15                THE COURT:  Yes.
16                MS. HACKER:  We have the transcripts, Your Honor,
17      for the majority of the witnesses that SFFA intends to call
18      by deposition.  We have a binder of the eight witnesses.  If
19      I could hand it up to Your Honor, there are a few remaining
20      objections to testimony in these transcripts.  We anticipate
21      we may read some of these depositions tomorrow, so we wanted
22      to hand it up to Your Honor today in case you wanted to rule
23      on those.
24                THE COURT:  Okay.
25                MS. ELLSWORTH:  Your Honor, just so we're aware,
```

```
 1    there are objections to at least three of the transcripts in
 2    full on relevance grounds.  The other objections we can work
 3    out whenever counsel tries to read it in.
 4              THE COURT:  Three whole witnesses?
 5              MS. ELLSWORTH:  The entire testimony of three
 6    non-parties that was taken by subpoena.
 7              THE COURT:  And when to you want to do that?
 8              MS. ELLSWORTH:  Whenever they want to read them in,
 9    I suppose.
10              MS. HACKER:  We can take those up as we get to
11    those witnesses in the order.  So that we can just start with
12    Dean Fitzsimmons this morning.
13              THE COURT:  That's fine.  You can pass that up.
14              You're still under oath.  Just a reminder.
15              THE WITNESS:  I'm sorry?
16              THE COURT:  Just a reminder that you're still under
17    oath.
18              THE WITNESS:  Okay.  Thank you.  Good.
19              MR. HUGHES:  Good morning, Your Honor.
20              THE COURT:  When you're ready, Mr. Hughes.
21              (WILLIAM FITZSIMMONS previously sworn by the Deputy
22    Clerk.)
23                       DIRECT EXAMINATION (resumed)
24    BY MR. HUGHES:
25    Q.  Good morning, Dean Fitzsimmons.
```

Case: 19-2005    Document: 00117623336    Page: 649    Date Filed: 03/30/2020    Entry ID: 6356615
Case: 1:14-cv-14176-ADB    Document 632    Filed 04/18/19    Page 8 of 92

8

1    **A.**   Good morning.

2    **Q.**   I'd like to start by talking about what happens when

3    somebody applies to Harvard.   I understand that the

4    application comes in to the admissions office and is assigned

5    to a docket based on geography; is that correct?

6    **A.**   That's correct.

7    **Q.**   We talked about this a little yesterday.   Each docket has

8    a docket chair and then several other readers who are reading

9    applications on that docket, correct?

10   **A.**   Yes.   Correct.   Those other readers are advocates for

11   particular parts of the docket.

12   **Q.**   And a given reader might read applications on more than

13   one docket, correct?

14   **A.**   That's correct.

15   **Q.**   That includes even the docket chairs, right?

16   **A.**   That's correct.

17   **Q.**   And the dockets have -- do they have roughly the same

18   number of applicants from docket to docket, or does that

19   vary?

20   **A.**   It varies slightly, but that's true on the main.

21   **Q.**   Each application is read in full by at least one

22   admissions officer, correct?

23   **A.**   That's correct.

24   **Q.**   And the first admissions officer to read an application

25   is referred to, at least sometimes, as the first reader,

1   correct?

2   **A.**   Yes.  That first reader would be the advocate.

3   **Q.**   The first reader reads through the application, and part

4   of what that first reader does is assign some scores in

5   different categories, correct?

6   **A.**   Say that again.

7   **Q.**   The first reader gets the application and reads through

8   it, and part of the reader's first responsibility is to

9   assign an academic score, an extracurricular score, the

10  athletic score, a personal score, and a preliminary overall

11  rating, correct?

12  **A.**   Yes.  That would be one of the things that the reader

13  would do based on the evidence in the application.

14  **Q.**   And the reader also might write some comments in a couple

15  of comment fields on the summary sheet.  That's another thing

16  the reader could do, correct?

17  **A.**   That's correct.

18  **Q.**   And sometimes in the admissions office an application is

19  read in full again by another admissions officer, correct?

20  **A.**   That's correct.

21  **Q.**   Not all applications get that additional read, correct?

22  **A.**   That's correct.

23  **Q.**   Because some applications the first reader can see really

24  the applicant isn't going to make the cut, so those

25  applications don't frequently get that additional read,

1  correct?

2  **A.**  Not entirely.  Everyone is still in play.  In other

3  words, the first reader may make a decision not at that time

4  to pass the application on to a second or perhaps to a

5  faculty reader.  But all the applications are still very much

6  in play because there are lots of new pieces of information

7  coming in at all times.

8  **Q.**  Okay.  Focusing back on those categories where a numeric

9  score is awarded -- the academic, extracurricular, personal,

10  athletic, and preliminary overall score -- the readers score

11  those on a numeric scale from 1 being the best to 5 or 6

12  being the worst, correct?

13  **A.**  That's correct.

14          THE COURT:  Mr. Hughes, can you bend that

15  microphone a little closer to your mouth for me.

16          MR. HUGHES:  That better?

17          THE COURT:  Yes.

18  BY MR. HUGHES:

19  **Q.**  So 1 is the best score you can get, correct?

20  **A.**  That's correct.

21  **Q.**  5 or 6 is the worst?

22  **A.**  Usually 4.  A 5 might have another kind of indication;

23  for example, that a person has so many home responsibilities

24  and so many employment responsibilities that he or she is not

25  able to take part fully or at all in conventional

1    extracurricular activities, for example.

2    **Q.**   Thank you for that.

3            And generally speaking, a score of 1 in any of

4    these categories is relatively rare to the other scores,

5    correct?

6    **A.**   That's correct.

7    **Q.**   And a score of 2 is a pretty good score that in any of

8    these categories indicates that a candidate is at least

9    somewhat competitive for admission to Harvard, correct?

10   **A.**   Certainly competitive.

11   **Q.**   Sometimes there are gradations in the scores.  You can

12   see a 2 plus which is better than a 2, right?

13   **A.**   That's correct.

14   **Q.**   A 2 minus is worse than a 2, correct?

15   **A.**   That's correct.

16   **Q.**   You can see that up and down the scale, right?

17   **A.**   Yes.

18   **Q.**   So Harvard's applicant pool is very strong academically.

19   Do you agree with that?

20   **A.**   Yes.

21   **Q.**   So these non-academic factors -- the extracurricular, the

22   personal score -- those can be important to admission to

23   Harvard, correct?

24   **A.**   That's correct.

25   **Q.**   I'd like to look at Plaintiff's Exhibit 1.  I'll pull

Case: 19-2005    Document-00117628336    Page: 653    Date Filed: 07/30/2020    Entry ID: 6356615
Case 1:14-cv-14176-ADB    Document 632    Filed 04/18/19    Page 12 of 92

12

 1   that up on the screen.  And this is the reading procedures

 2   for the class of 2018.

 3            MR. HUGHES:  And before I ask questions about the

 4   document, I'd like to offer it into evidence.

 5            MR. LEE:  No objection, Your Honor.

 6            THE COURT:  Admitted.

 7            (Plaintiff Exhibit No. 1 admitted.)

 8            MR. HUGHES:  Thank you, Your Honor.

 9   BY MR. HUGHES:

10   Q.   Dean Fitzsimmons, there's been a lot of discussion about

11   the personal score in this case, so I'd like to look at the

12   part of P1 that relates to that which I believe appears on

13   page 6.  I'll pull that up.

14            Actually I'm going to go back to page 5.  Can you

15   see that?

16   A.   Yes.

17   Q.   I've blown up the top of it.  This part of Plaintiff's

18   Exhibit 1, the reading guidance gives coding guidelines for

19   the summary sheets, correct?

20   A.   That's correct.

21   Q.   Plaintiff's Exhibit 1 is the reading guidance that is

22   supplied each year to Harvard admissions officers who are

23   reading and scoring applications, correct?

24   A.   Yes.

25   Q.   Admissions office document instructing the readers on how

1   to read and score, correct?

2   **A.**   That's correct.

3   **Q.**   And here we've got this part of the document that we're

4   looking at on page 5 is part of the document that relates to

5   the coding guidelines for the summary sheets, correct?

6   **A.**   That's correct.

7   **Q.**   And the summary sheet is the document where the scoring

8   that we talked about appears.  That's what the admissions

9   officer -- that's where the admissions officer records his or

10  her scores, correct?

11  **A.**   Yes.

12  **Q.**   So here is where Harvard is telling the admissions

13  officers how to score the various categories, correct?

14  **A.**   Yes.  In addition to, of course, the lengthy training

15  that takes place prior to looking at the document.

16  **Q.**   Lengthy training you're talking about is when somebody

17  first joins the admissions office, the first 50 or 100 files

18  that they read, somebody else is reading those over their

19  shoulder, so to speak?

20  **A.**   That's correct.

21  **Q.**   Let's talk about academic.  We've got at the bottom of

22  the page some instructions on how to score academics.  And

23  right there we see an academic -- what it takes to get an

24  academic 1, correct?

25  **A.**   Yes.  In a very general way.

1    **Q.**  Academic 1's are pretty rare, right?

2    **A.**  They are.

3    **Q.**  But here it's a determination by the admissions officer

4    that the person would likely -- would have a good chance to

5    graduate very near the top of the class at Harvard, summa,

6    right?

7    **A.**  That's correct.

8    **Q.**  If we go over to page 6 of Plaintiff's Exhibit 1, we've

9    got some more guidance on how to award these academic index

10   scores, correct?

11   **A.**  That's correct.

12   **Q.**  And for example, to get a 2, which is important to

13   admissions, there are specific guidance about the kind of SAT

14   or ACT score that the admissions officer should be looking

15   for in an applicant, correct?

16   **A.**  That's correct.  But it's a bit of an oversimplification

17   just to look at that.  Because what we're asking people to do

18   in addition to looking at these kinds of -- such as grades

19   and standardized tests, we're actually asking our readers to

20   go through everything on that application and to try also to

21   think about growth and the future potential.  Because in lots

22   of respects, we really are in the futures business.  We're

23   looking at people not simply by a rigid, formulaic kind of

24   thing such as a test score.

25   **Q.**  None of that is here in the guidance, correct?

1    **A.**   That's correct.  It would be part of the training and all

2    the extensive discussion we have in committee.

3    **Q.**   What we definitely have here in the guidance between a 2

4    and a 3 is an instruction to the reader to differentiate

5    between applicants based on grades and standardized test

6    scores, correct?

7    **A.**   Yes.  It would be a correlation but, again, not a

8    formula.

9    **Q.**   And the grades and the standardized test scores are

10   objective measures.  Right?

11   **A.**   We would not at all look at them as objective measures.

12   Just to give you an idea, so let's say we had one student who

13   had grown up in a very advantaged household and gone to

14   wonderful schools and had five or six years of very, very

15   expensive test prep and had enormous educational advantages.

16            And then let's take, on the other hand, someone who

17   grew up in an underresourced community in an underresourced

18   family, had not been able to attend rigorous schools that

19   would prepare a person for standardized tests, and did not

20   have the money to take advantage of any kind of lengthy and

21   expensive test prep.

22            So in those two circumstances, you -- again,

23   thinking creatively and thinking about people's actual

24   potential, you would take that kind of a thing and put it in

25   the back of your mind as you're trying to figure out what the

1    real future of that person is like.  Not one standardized

2    test score is certainly not equivalent to another

3    standardized test score taken over a very different lifetime

4    of experiences.

5    **Q.**  So is it the position of the Harvard admissions office

6    that you would discount the importance of a standardized test

7    score if you had evidence that a particular applicant had the

8    resources to go to significant test preparation courses?

9    **A.**  Not at all.  We're simply looking at the evidence sitting

10   in front of us.  And there are certainly people who have had

11   many advantages who are spectacular students and would do

12   great things with their lives.  So it's always trying to look

13   positively in every case and not ever look negatively.  And

14   that's the way the advocate system works.

15   **Q.**  I thought you just told me, Dean Fitzsimmons, that you

16   would look at test scores differently based on someone's

17   access to resources to take standardized test preparation

18   courses.  Is that your testimony?

19   **A.**  It would be certainly one of the factors that we would

20   look at, given the enormous amount of research out there that

21   indicates the effect of background and opportunity on

22   standardized testing.

23   **Q.**  And none of that guidance appears here in P1, correct?

24   **A.**  Not directly.

25   **Q.**  Now, let's move on to the personal score.  In P1, the

1    reader guide that your admissions officers get each year,

2    this is the sum total of the instructions in this document

3    that you give to your admissions officers about how to score

4    the personal score, correct?

5    **A.**   Yes.  In this document.

6    **Q.**   Are there any other documents where you instruct your

7    readers in the admissions office about how to award the

8    personal score?

9    **A.**   Of course the interviewer handbook, which you mentioned

10   yesterday.

11           But really what happens is through the lengthy

12   training process, and there would be many, many discussions,

13   working with actual case studies over a period of time,

14   talking with other -- say if you're a new admission officer,

15   talking with other more experienced admission officers about

16   what to look for.  So it's a very, very lengthy, you know --

17   and then continuing monitoring of exactly what happens when

18   you're looking at a personal rating.

19   **Q.**   Dean Fitzsimmons, I'd like to point out the interviewer

20   handbook which you mentioned in your answer.  This is

21   Plaintiff's Exhibit 88 that was admitted yesterday.  It's

22   page 10 of the interviewer handbook, page 12 of the exhibit.

23           Is this section that I have up here on the screen,

24   I think Mr. Lee might have shown it yesterday in opening, is

25   this the portion of the interviewer handbook that you had in

1  mind?

2  **A.**  Yes.  That's certainly part of it.

3  **Q.**  And this language in the interviewer handbook and what we

4  looked at in P1 is the sum and substance of the written

5  instructions to admissions officers relating to the personal

6  score, correct?

7  **A.**  Yes.

8  **Q.**  Now I want to talk about race in the admissions process.

9  Back to Plaintiff's Exhibit 1.

10        And on the first page of Plaintiff's Exhibit 1,

11  there are instructions to admissions officers reading Harvard

12  applications about basically confirming the race or ethnicity

13  of applicants who have provided that information, correct?

14  **A.**  That's correct.

15  **Q.**  But there's nothing in Plaintiff's Exhibit 1 that

16  instructs admissions officers about how they are supposed to

17  use race in considering an application to Harvard, correct?

18  **A.**  Let me just -- can I look just for a second?

19  **Q.**  You absolutely may.  If you want to flip through the

20  document, it's P1, the very first one in the binder there in

21  front of you.

22  **A.**  Could you repeat the question again?

23  **Q.**  The question is, we've got instructions here on the first

24  page of confirming the race or ethnicity of a given

25  applicant, but there's nothing in P1 that instructs an

1    admissions officer how they are supposed to consider race in

2    considering an application to Harvard.

3    **A.**   That would be technically true, as I look at this.  Let

4    me just take another quick look here because we do change

5    these on occasion.  That looks correct to me.

6    **Q.**   And the same is true for the alumni interviewer handbook

7    that we just looked at, Plaintiff's Exhibit 88.  There's

8    nothing in there that instructs -- that provides instructions

9    about how race is supposed to be used in the review of an

10   applicant to Harvard, correct?

11   **A.**   That's correct.

12   **Q.**   As far as you know, there is no written guidance provided

13   to admissions officers that instructs admissions officers

14   about how they are supposed to take race into account in the

15   admissions process, correct?

16   **A.**   That's correct.  But of course there is an enormous

17   amount of other information that's provided.

18   **Q.**   And there's certainly no guidance, written guidance, on

19   whether race can be considered one way or the other in the

20   personal score, correct?

21   **A.**   In these two documents, that's correct.

22   **Q.**   And anywhere else in the Harvard admissions office there

23   is no written guidance on whether or not race can be used in

24   the personal score, correct?

25   **A.**   Right.  The guidance is really given in a wide variety of

Case: 19-2005    Document: 00117628336    Page: 661    Date Filed: 07/30/2020    Entry ID: 6356615
Case 1:14-cv-14176-ADB   Document 632   Filed 04/18/19   Page 20 of 92

20

1   other ways.

2   **Q.**  And in fact, you don't recall giving any particular

3   yearly instructions to the admissions office about how race

4   should be used, correct?

5   **A.**  No.  That isn't really the way it works.  So one of

6   the -- I've already talked about the process for training new

7   admission officers, and that is a process that takes place

8   over many weeks and really, you could argue, right through

9   the first year.

10        But one of the things that also happens is that in

11  our orientation every year, we will have presentations by

12  counsel, for example, and we'll have discussions about the

13  current situation regarding race.

14        And then in the reading process and certainly in

15  all the committee meetings that take place, both the

16  subcommittee and the full committee, there is certainly lots

17  of information back and forth from one admission officer to

18  another, from new admission officers to senior admission

19  officers and vice versa.

20  **Q.**  Dean Fitzsimmons, I'm going to put up page 236 of your

21  deposition on the screen.  Starting at line 22.  We asked

22  you, "Do you give any particular instruction every year to

23  the admissions office about how race should be used? "

24        Turn to page 237, you answered, "Not that I

25  recall."

```
 1              Were you asked that question?  Did you give that
 2    answer?
 3    A.  Yes.  And I must have been thinking about the written
 4    part, but I'm not sure what was in my mind at that point.
 5              MR. LEE:  Can we in the interest of completeness
 6    just have the next question and answer, which I think is
 7    perfectly consistent with what he just testified?
 8              MR. HUGHES:  I'm happy to read the whole page.
 9              MR. LEE:  That's great.
10              MR. HUGHES:  Is there a specific -- I'll blow it
11    up.
12              MR. LEE:  I think the next question and answer.
13              MR. HUGHES:  I think the whole page is instructive.
14    BY MR. HUGHES:
15    Q.  "QUESTION:  Is there a specific training session that
16    everyone is required to attend on a regular basis that
17    reviews what is legally permissible with respect to the use
18    of race in the admissions process?
19              "ANSWER:  That really would be part of the
20    comprehensive training program.
21              "QUESTION:  Are you aware that it's specifically
22    included every year on the training program?
23              "ANSWER:  The intention of the training program is
24    to give a comprehensive overview of how to evaluate an
25    application.
```

```
 1              "QUESTION:  Is it your understanding that that
 2     includes specific training on how to race should be used?
 3              "ANSWER:  If it isn't in writing, it could well
 4     also be done in discussion.
 5              "QUESTION:  Are you sure that it is?
 6              "ANSWER:  I don't know for sure."
 7          Were you asked those questions?  Did you give those
 8     answers?
 9     A.  I did.  I think what -- there in my mind, I think, was
10     there one huge specific session.
11              The fact is that this is built into our -- as I
12     said here really in the deposition, it's built into the
13     normal training program.  It really is part and parcel of
14     what we do, and it's a part of really every time we look at
15     an application.  For example, in a subcommittee or in a full
16     committee, there are always examples of how race might
17     factor, say, in that particular situation.
18     Q.  How does race factor into Harvard's admissions process?
19     A.  For highly competitive applicants, it could be one factor
20     among many that might lead our 40-person admissions committee
21     to vote yes.
22              But race would never be seen in isolation, say
23     relative to the rest of the application.  It would be part of
24     it.  In some cases a person -- in many cases, in fact, would
25     have been admitted anyway without any consideration of race.
```

1          But it is again one part of a person's life, and

2     it's one part of a person's life that might lead that person

3     to be a great educator of others about how to be a good

4     citizen and citizen leader, not just at Harvard but later.

5     **Q.**   Is race part of your holistic admissions process or your

6     whole-person review?

7     **A.**   It is certainly one part of the whole-person review.

8     **Q.**   And you actually think it's impossible to abuse a

9     holistic admissions process like Harvard's, correct?

10    **A.**   To abuse?

11    **Q.**   Yes, sir.

12    **A.**   Could you repeat the question?

13    **Q.**   You actually think it's impossible to abuse a holistic

14    process like Harvard's, correct?

15    **A.**   I do.

16    **Q.**   In fact, you are not aware that the holistic admissions

17    process at Harvard was instituted, in part, because of

18    concerns about the number of Jewish students on Harvard's

19    campus, correct?

20    **A.**   That's certainly a part of history that I wasn't present

21    for.   I've certainly heard the charges.

22    **Q.**   I'm going to pull up page 408 of your deposition on the

23    screen, line 17.

24          "QUESTION:  Are you aware of the fact that the

25    holistic admissions process at Harvard was instituted in part

**JA652**

1    to concerns about the number of Jewish students on campus?

2            "ANSWER:  I'm not sure exactly what kind of

3    admissions process was being run at Harvard a hundred years

4    ago."

5            MR. LEE:  Your Honor, immediately preceding

6    questions and answers actually tell you what he was saying.

7            "Are you aware as to the origin of Harvard's

8    holistic admissions process?

9            "ANSWER:  I am aware of the holistic admissions

10   process of which I have been a part."

11           This is not proper impeachment.

12           MR. HUGHES:  It is exactly the question I asked him

13   on the stand.

14           THE COURT:  I'm not sure it's proper impeachment,

15   but I will sort out what is relevant and not relevant.  It's

16   more efficient to let him ask and answer the question than it

17   is to think about the objection.  So go ahead.

18           MR. HUGHES:  We're going to move on from this

19   issue.

20           THE COURT:  Perfect.

21           MR. HUGHES:  I understand Your Honor's views on

22   this subject.

23   BY MR. HUGHES:

24   Q.  Dean Fitzsimmons, let's get back to Harvard's use of race

25   in admissions today, okay?

Case: 19-2005    Document: 00117628336    Page: 666    Date Filed: 07/30/2020    Entry ID: 6356615
Case 1:14-cv-14176-ADB   Document 632   Filed 04/18/19   Page 25 of 92

25

1    **A.**   Sure.

2    **Q.**   Since you have been dean, the way Harvard uses race in

3    admissions has not changed, correct?

4    **A.**   That's correct.

5    **Q.**   In fact, you say the way Harvard uses race has not

6    changed since the filing of this lawsuit, correct?

7    **A.**   That's correct.

8    **Q.**   And in fact, you don't recall any specific discussion

9    about a staff member using race inappropriately, correct?

10   **A.**   That's correct.

11   **Q.**   And you don't recall any discussions with any staff

12   members about concerns that race was not being used

13   consistently with Harvard's guidelines, correct?

14   **A.**   That's correct.

15   **Q.**   And Harvard considers the race of an applicant even in

16   instances where the applicant does not indicate in their

17   application materials that race provided a particular

18   experience or influenced some part of their background,

19   correct?

20   **A.**   I'm not sure how that applies to a particular case.

21   Could you just repeat the question?  Maybe I don't quite

22   understand it.

23   **Q.**   Sure.  Harvard considers the race of an applicant even in

24   instances where the applicant does not indicate in their

25   application materials that race provided a particular

1    experience or influenced some part of their background?

2    **A.**   I'm still having trouble a little bit understanding the

3    thrust of the question.

4         But we certainly -- we are aware -- if people

5    choose to let us know through the common application, we

6    would know they are from a minority background.  Beyond that,

7    it really depends.  Each case really depends on how that

8    person's life has been lived.

9         But I think we're always -- because the nub of what

10   we do is literally 40 people looking at one person at a time

11   and looking to see all the different factors which would

12   include race in that person's life.  I hope I'm answering

13   your question.  I'm not sure I still understand it.

14   **Q.**   This was discussed last time you were under oath.  So if

15   an applicant provides their race or ethnicity in the common

16   application, Harvard will have that information, correct?

17   **A.**   That's correct.

18   **Q.**   Okay.  And then that applicant could choose to write

19   about in an essay or a teacher could write about in a

20   recommendation some experience in that applicant's life that

21   relates to or has to do with their race or ethnicity,

22   correct?

23   **A.**   That's true.  They could choose to do that.  The teachers

24   could choose to write about it.

25   **Q.**   But even in circumstances where you have the applicant's

1    racial or ethnic information but they don't write about

2    whether that's important to them and the teachers don't say

3    anything about them, you still consider the race of the

4    applicant in those situations as part of your whole-person

5    review process, correct?

6    **A.**   Yes.  We would still know about it, and it would still be

7    there.  Whether or not the race of the applicant would lead

8    someone to vote for that person really depends on all the

9    other factors.  Again, looking at people who are fully

10   competitive.

11   **Q.**   Let me just ask you, is Harvard's use of race as a factor

12   in the admissions process limited only to those applicants

13   who say in their application materials that race provided a

14   particular experience or influenced some part of their

15   background as they were growing up?

16   **A.**   If I understand your question, there's no requirement

17   that students would have to write about their background.

18   That still might mean that even if they didn't write about

19   their racial or cultural or ethnic background, that would

20   still be in the application.

21   **Q.**   And Harvard would still use race as a factor in the

22   admissions process for those applicants, correct?

23   **A.**   Again, race is never going to be used in isolation.  So

24   I'm not quite sure what the -- maybe I'm misunderstanding

25   where you're going with it.  We would know about it, but I am

**JA656**

1    not sure exactly what you want me to answer, I guess.

2    **Q.**  I'm just trying to see if we can get on the same page we

3    were on in your deposition.  I've got page 86, line 6 through

4    13 pulled up on the screen.

5            "QUESTION:  Is Harvard's use of race as a factor in

6    the admissions process limited only to those applicants who

7    say in their application materials that race provided a

8    particular experience or influenced some part of their

9    background as they were growing up?

10           "ANSWER:  No."

11           That was your testimony at your deposition,

12    correct?

13    **A.**  Yes.  And I'm still having a little trouble trying to

14    think about it in juxtaposition of a single case.  We would

15    always know what the person's race was if the person wanted

16    to tell us about it.

17    **Q.**  You're not disagreeing with your testimony from your

18    deposition, correct?

19    **A.**  Could you just repeat again exactly what you're -- is

20    this the question --

21    **Q.**  I've already asked the question word for word, and you

22    can read it there.

23    **A.**  Right.

24    **Q.**  I'm just trying to see if we're on the same page that as

25    a general matter in the admissions process to Harvard you

1  consider the race of an applicant -- your consideration of

2  race of an applicant is not limited to applicants who write

3  about their race or ethnicity?

4  **A.**   Yes.  I think I answered that question.

5  **Q.**   That's exactly consistent with what we've got on the

6  screen, correct?

7  **A.**   Yes.

8  **Q.**   Now, why does Harvard consider race in its admissions

9  process?

10  **A.**   The major thing really is one of the best things about

11  going to any college, including Harvard -- and as you know,

12  Harvard is almost entirely residential -- is the opportunity

13  to learn from fellow classmates.  Mr. Lee talked in his

14  opening remarks about how critical that kind of piece of

15  education can be.

16        One of the things that was certainly a huge part of

17  my education was learning from roommates, learning from

18  people in dining halls, learning from people in

19  extracurricular activities, in smaller classes, literally

20  24 hours a day, about who they were, what their backgrounds

21  were.

22        I certainly think that in a country that is so

23  divided along racial and ethnic lines as ours is and with

24  demographics for the future that suggest an even more

25  critical role for race and ethnicity in the United States

1   that the opportunity for our undergraduates to learn from

2   people from every possible background, including racial and

3   ethnic backgrounds, is a critical part.  Not just of making a

4   difference to their own classmates during college, affecting

5   perhaps even how they would use the college experience.

6           Maybe they -- as a result of getting to know people

7   from different ethnic and racial backgrounds, they might

8   decide to take different courses from the ones they might

9   ordinarily have.  Or they might also go to lectures or take

10  part in activities of various kinds so that they would learn

11  a great deal more about what the country is really like.

12          That, in our view would make people much better

13  citizens and citizen leaders, again not just during Harvard

14  but we hope throughout the rest of their lives in a world

15  that race and ethnicity certainly seems to be, perhaps will

16  be even more important in the decades ahead as our students

17  live out their lives.

18  **Q.**  Thank you for that answer, Dean Fitzsimmons.

19          Just trying to get some shorthand, which I think

20  many people have used both in the context of this case and

21  outside the context much this case, one of the reasons

22  Harvard is considering race in its admissions process is to

23  achieve a racially diverse class, which you say results in

24  all of the benefits that you just testified to, correct?

25  **A.**  We do believe that diversity of all kinds is very

1    important in terms of what our students learn over the four

2    years and how they'll live their lives, we hope for the

3    public good.

4    **Q.**   Is there a way you can measure a particular level or

5    quantity of racially diversity that Harvard thinks is needed

6    to obtain all the benefits that you just described for us?

7    **A.**   No.  It's just like the admissions process.  There are no

8    formulas.  There are no sort of numerical guidelines that

9    would do justice to anything like that.  It just isn't that

10   simple.

11   **Q.**   If the racial diversity of Harvard's classes from year to

12   year bounced around significantly, you could still achieve

13   potentially the benefits of diversity that you just described

14   for us?

15   **A.**   Well, I think it depends a little bit on the degree.  If

16   you attended the Harvard I attended where there were

17   virtually no students of color -- and for that matter 4 to 1

18   male-female ratio -- it was a very, very different world.

19   And I know learned much, much less about what was going on in

20   the world than our undergraduates do today.

21          I just know from the fact because we do financial

22   aid and student employment as well as admissions, we have

23   lots of student recruiters, as you know.  So we know our

24   undergraduates well.  I would simply say my own life has been

25   enormously enriched by the opportunity to get to know our

**JA660**

Case: 19-2005    Document: 00117628336    Page: 673    Date Filed: 07/30/2020    Entry ID: 6356615
Case 1:14-cv-14176-ADB  Document 632  Filed 04/18/19  Page 32 of 92

32

1    students over the past four decades, including I noticed even

2    Jeannie Park, who is here with us today, was one of our key

3    student recruiters when she was an undergraduate.

4    Q.   I'd like to shift gears a little bit, Dean Fitzsimmons,

5    and talk about the importance of race in the admissions

6    process; in other words, how important race is to whether or

7    not a given applicant gets into Harvard.

8            And my question is, would you agree that race is a

9    determinative factor for about half of the African-Americans

10   admitted to Harvard and about a third of Hispanics in recent

11   admissions cycles?

12   A.   I'm not sure that I would use the word "determinative,"

13   again because it implies that race would be used in isolation

14   and separate from all the other factors that go into choosing

15   among very competitive applicants.

16           But certainly race was a help in terms of some

17   portion of the people, again when all other factors were

18   substantially equal.

19   Q.   I'd like to explore that with you now.  I'm going to put

20   on the screen Plaintiff's Exhibit 316.  I'm going to blow up

21   the top so you can see it before I ask questions.

22           MR. HUGHES:  I'd like to offer P316 into evidence.

23           MR. LEE:  No objection, Your Honor.

24           THE COURT:  It's admitted.

25           (Plaintiff Exhibit No. 316 admitted.)

1    BY MR. HUGHES:

2    **Q.**   Dean Fitzsimmons, you're familiar with Plaintiff's

3    Exhibit 316, correct?

4    **A.**   I am.

5    **Q.**   Plaintiff's Exhibit 316 is a report of a committee to

6    study race-neutral alternatives at Harvard, correct?

7    **A.**   That's correct.

8    **Q.**   And the committee consisted of you, Dean Smith --

9         Who is your boss, right?

10   **A.**   Yes.

11   **Q.**   -- and Dean Khurana, right?

12   **A.**   Yes.

13   **Q.**   Dean Khurana isn't part of the admissions process at

14   Harvard.  He does something else, right?

15   **A.**   He is a member of our committee, of our faculty committee

16   actually.

17   **Q.**   So that means he might read materials from a particular

18   applicant from time to time?

19   **A.**   That could happen.

20   **Q.**   Anything else?

21   **A.**   He could certainly attend meetings.

22   **Q.**   Committee meetings?

23   **A.**   No.  He's been very busy with his new duties, relatively

24   new duties and lots of things.

25   **Q.**   He's not significantly involved in the admissions

1    process?

2    **A.**  Not on a day-to-day basis.

3    **Q.**  Now, to be clear, this is Harvard's report, nothing to do

4    with Students For Fair Admission, correct?

5    **A.**  That's correct.

6    **Q.**  I want to turn to page 3.  Part of what you did, your

7    committee did here is you looked at some of the work that was

8    performed by some of the experts in this case, correct?

9    **A.**  That's correct.

10   **Q.**  Okay.  And one of the expert's work that you looked at

11   was Harvard's expert Dr. Card, correct?

12   **A.**  That's correct.

13   **Q.**  And the other expert that you looks at was SFFA's expert

14   Mr. Kahlenberg, correct?

15   **A.**  That's correct.

16   **Q.**  And you knew who Mr. Kahlenberg was before this committee

17   was formed, right?

18   **A.**  That's correct.

19   **Q.**  In fact, you're familiar with a book that he edited,

20   called "Rewarding Strivers."  You put a blurb on the back of

21   that book, right?

22   **A.**  Yes.

23   **Q.**  I'd like to read that, what you said.

24          MR. LEE:  Your Honor, I'm not sure what we're

25   doing.  It's not a disclosed exhibit and surely not

**JA663**

1    impeachment.

2         MR. HUGHES:  I'm just going to ask him if he

3    agrees.  I'm not offering it into evidence.

4         MR. LEE:  There's a reason for the disclosures of

5    the exhibits.  But Your Honor can consider it.

6         THE COURT:  Do you want to take a minute to look at

7    it?

8         MR. HUGHES:  Do you want to look at it?

9         MR. LEE:  No.

10        THE COURT:  Why wasn't it disclosed?

11        MR. HUGHES:  The disclosure agreement relates to

12   exhibits that we're planning to offer into evidence.  I'm not

13   planning to offer it into evidence.  That's our agreement

14   with them.

15        MR. LEE:  Your Honor, I don't want to slow us down.

16   The agreement is you disclose anything other than that which

17   you're using for impeachment, so demonstratives are

18   disclosed, exhibits are disclosed.  There's nothing to

19   impeach here.

20        THE WITNESS:  I would --

21        THE COURT:  Hold on for a second.

22        You can read it to him and ask him if he agrees.

23   You're parsing a mighty fine line between what is shared and

24   was not.  So if there's things that you intend on using in

25   the days to come, why don't you show them to him before we

1    get going.

2          MR. HUGHES:  We will certainly abide by Your

3    Honor's instruction.  Thank you, Your Honor.

4    BY MR. HUGHES:

5    **Q.**  Dean Fitzsimmons, could you agree that The Century

6    Foundation continues its trailblazing mission to prevent the

7    tragic waste of human talent that threatens America's future.

8    "Rewarding Strivers" presents provocative research and

9    analysis that provides a blueprint for the way forward?

10   **A.**  Again, I would -- it would certainly have been better for

11   me to have seen the full context for me to look once again at

12   the book.  I'm not sure what the publication date was.  And

13   again, the context for that blurb that I wrote.  And also,

14   frankly, for me to see how well that report perhaps as how

15   good it looks today in terms of what we know about

16   admissions.

17   **Q.**  Thanks, Dean Fitzsimmons.  We can move on to page 8 of

18   your report by the race-neutral alternatives committee.  I've

19   got that blown up on the screen.  This is the section of the

20   report that talks about -- we've got it at the top here --

21   "What would happen if Harvard stopped considering race?"

22   Correct?

23   **A.**  That's correct.

24   **Q.**  And Harvard's report says, "The committee considered as

25   an initial matter the likely effect on Harvard's student body

```
 1    if it were to stop considering race in its admissions process
 2    while continuing to engage in the other practices in pursuit
 3    of diversity described above.  As the expert report submitted
 4    by one of Harvard's experts in the SFFA litigation, Professor
 5    David Card, explains, the number of African-American and
 6    Hispanic students on campus would decline dramatically,
 7    notwithstanding all the other efforts that Harvard takes to
 8    recruit a broadly diverse class.
 9              "Specifically, Professor Card estimates that the
10    elimination of race in its race-conscious admissions program
11    would reduce the population of students who self-identify as
12    African-American, Hispanic, or other racial or ethnic
13    background by nearly 50 percent.  Relative to the admitted
14    class of 2019, for example, the proportion of
15    African-American students would be expected to drop from 14
16    to 6 percent and the proportion of Hispanic or other students
17    would be expected to drop from 14 to 9 percent.  This
18    decrease would produce a corresponding increase in students
19    of other races, primarily white students."
20              Do you see that?
21    A.   I do.
22    Q.   And what I just read is Harvard's position on what would
23    happen if Harvard stopped using race in its admissions
24    process, correct?
25    A.   That's correct.
```

Case: 19-2005    Document: 00117628836    Page: 679    Date Filed: 07/30/2020    Entry ID: 6356615
Case 1:14-cv-14176-ADB   Document 632   Filed 04/18/19   Page 38 of 92

38

1    **Q.**  Okay.  And I want to talk a little bit about -- we talked

2    before about whether or not race is determine -- a

3    determinative factor.

4         Do you remember we had that discussion?

5    **A.**  Yes.  A factor.

6    **Q.**  A factor.  But according to Harvard's own report here,

7    without race a large number of students would not be admitted

8    to Harvard, correct?

9    **A.**  That's correct.

10   **Q.**  And for those students, at least, race is a determinative

11   factor, correct?

12   **A.**  It certainly made a difference in whether or not they

13   were admitted, again all other things equal relative to lots

14   of other highly qualified candidates.

15   **Q.**  On average, Harvard admits about 2,000 students a year;

16   is that right?

17   **A.**  That's right, yep.

18   **Q.**  So if we're looking at Dr. Card's -- your report of

19   Dr. Card's analysis of 2019 in the actual admitted class,

20   that class had about 14 percent African-American admits,

21   correct?

22   **A.**  I think that's true, yes.

23   **Q.**  That would be about 280 students, correct?

24   **A.**  I'll trust your math.

25   **Q.**  And if that drops to 6 percent, that 280 drops to about

1    120, correct?

2    **A.**  Again, you were probably a math major.

3    **Q.**  No, sir.  We could do the same math for the drop for the

4    Hispanic students as well, correct?

5    **A.**  Correct.

6    **Q.**  The report here says that the decrease would produce a

7    corresponding increase of students from other races,

8    primarily white students, but other races would benefit as

9    well, correct?

10   **A.**  That would be true.

11   **Q.**  And what other race would benefit if Harvard stopped

12   considering the use of race in its admissions process?

13   **A.**  It doesn't say here, but I presume it would be

14   Asian-American and people from backgrounds who did not

15   declare, which is a reasonably large number, at least in

16   terms of the counting process.

17   **Q.**  Let's look at the part of Dr. Card's report that presents

18   the information about this 2019 deal, put that on the screen.

19            MR. LEE:  Does he have a copy of the report?

20            MR. HUGHES:  No, I don't think he does.  Bill, if

21   he has an issue, we can come back to it after a break.

22            MR. LEE:  Can he get a chance to get his report?

23            MR. HUGHES:  Sure.

24            MR. LEE:  Which report?

25            MR. HUGHES:  It's his first report.  It is page --

1          MR. LEE:  -- 108.

2          THE COURT:  Do you have it?

3          MR. LEE:  I don't have it.  Mr. Hughes has

4    represented that he has two questions.

5          My real concern is this was not disclosed for use

6    with this witness, again.  This is a document -- it's a

7    report by another expert.  It was not disclosed for use with

8    this witness.  That's the trouble.  That's really why we

9    don't have it here.

10         MR. HUGHES:  It was shown yesterday in opening

11   statements.

12         THE COURT:  Is the arrangement that you're going to

13   share all the exhibits that are to be used with a particular

14   witness before that witness takes the stand?

15         MR. HUGHES:  We have an arrangement to share

16   exhibits we intend to -- not admitted exhibits that we intend

17   to offer through a witness, which we've done, and

18   demonstrative.  All this is, this is not demonstrative, this

19   is their expert's report.  This is the table that provides

20   the precise data that we just looking at on page 8 of the

21   race-neutral alternatives report.

22         And all I want to do is he said he assumed that

23   Asian-Americans would benefit from getting rid of race.  I

24   just want to show him that's what Dr. Card said, and then

25   I'll move on.

```
 1              MR. LEE:  Your Honor, I have it.  If that's all he
 2     wants to do, in the interests of time.
 3              THE COURT:  We've already had a discussion that
 4     you'll be more careful about identifying what you're going to
 5     use with the witness.  Unless we run into some kind of
 6     roadblock on this, ask the questions you're going to ask.
 7     And if there's a problem, we'll circle back to it.
 8              MR. HUGHES:  Thank you, Your Honor.
 9     BY MR. HUGHES:
10     Q.  Dean Fitzsimmons, you see over here on the far left
11     hand --
12              [Alarm system goes off in Federal Courthouse.]
13              THE COURT:  They'll give us a voice in a minute
14     that will tell us what we're doing.  All right.  Karen is
15     telling us if the voice is not telling us to stay, we have to
16     go.  Murphy's law.
17              (Off the record.)
18              THE COURT:  Sorry about that, everyone.  It's
19     Murphy's law, right?  If it can go wrong, it will.  So we
20     will forego our usual morning break and we'll go straight
21     through until like 1:15 or 1:20 when you find a stopping
22     spot.  Okay?
23              MR. HUGHES:  Thank you, Your Honor.
24     BY MR. HUGHES:
25     Q.  Welcome back, Dean Fitzsimmons.
```

Case: 19-2005    Document: 00117628336    Page: 683    Date Filed: 07/30/2020    Entry ID: 6356615
Case 1:14-cv-14176-ADB   Document 632   Filed 04/18/19   Page 42 of 92

42

1    **A.**   Thank you very much.  And to you.

2    **Q.**   Just to reorient where we were, I'm going to go back few

3    questions just to remind you where we were.  We had been

4    looking at Plaintiff's Exhibit 316, which is Harvard's report

5    on the race neutral alternatives.

6              Do you recall our conversation about that exhibit?

7    **A.**   I do.

8    **Q.**   I want to orient up to the bottom where I've got

9    highlighted here.  In your report, you reference the work of

10   Dr. Card, correct?

11   **A.**   That's correct.

12   **Q.**   And he does a model about what the class of 2019 would

13   look like if Harvard stopped considering race, correct?

14   **A.**   That's correct.

15   **Q.**   And I now just want you to focus on these figures because

16   I'm going to show you Dr. Card's bar graph that relates to

17   these in a minute.

18             And according to his model, the number of

19   African-American students would have dropped from 14 percent

20   to 6 percent, Hispanics from 14 to 9 percent, correct?

21   **A.**   That's correct.

22   **Q.**   Okay.  So now we'll go to what I had on the screen when

23   the alarm went off.  Hopefully it won't cause it to go off

24   again.

25             And this is page 109 of Dr. Card's report.  And if

1    you see on the left-hand side, we've got a column that says

2    "Actual Admitted Class."

3              Do you see that?

4              MR. LEE:  I think that's page 108.

5              MR. HUGHES:  You're right, Mr. Lee.

6    BY MR. HUGHES:

7    Q.  Do you see on the left-hand column it's got the actual

8    admitted class?

9    A.  I see that.

10   Q.  And it's got the percentages of different ethnic or

11   racial groups, correct?

12   A.  That's correct.

13   Q.  And we've got the color blue for African-American.  That

14   goes from 14 to 6, just like in your report, correct?

15   A.  That's correct.

16   Q.  And for Hispanics, which Dr. Card used yellow, it goes

17   from 14 to 9, just like in your report, correct?

18   A.  Correct.

19   Q.  For red -- for Asian-Americans, if Harvard were to stop

20   considering race, the Asian admissions would actually go up

21   from 24 to 27 percent, correct?

22   A.  That's correct.

23   Q.  So I just want to make sure we can agree on a few basic

24   things.

25              THE COURT:  Can you put that back up for me?  Just

**JA672**

 1   leave it up there for a second.  Keep going.

 2            MR. HUGHES:  Absolutely.

 3   BY MR. HUGHES:

 4   Q.   Just a few basic things that are illustrated by both P316

 5   and Dr. Card's bar graph here.

 6            Asian-Americans, Dean Fitzsimmons, as a group do

 7   not benefit from Harvard's use of race in terms of how many

 8   Asian-Americans are admitted in a given class, correct?

 9   A.   Just looking across, could you just go through the line

10   of reasoning?  So the 24 versus all the other reds across?

11   Q.   All the other reds have to do with models about

12   socioeconomic boosts that have nothing to do with my question

13   or what you're talking about in P316.

14   A.   Okay.

15   Q.   I'm just focused on the first two columns, which is

16   Column 1 is "Actual Admitted Class," Column 2 is removing

17   consideration of race.

18            You've already agreed that the numbers I've shown

19   you here for African-Americans and Hispanic applicants line

20   up with that paragraph I've showed you from your report,

21   correct?

22   A.   That's correct.

23   Q.   And we see that the Asian admissions go from 24 in the

24   actual class up to 27 when you remove race, correct?

25   A.   That's correct.

Case: 19-2005    Document: 00117628336    Page: 685    Date Filed: 07/30/2020    Entry ID: 6356615
Case 1:14-cv-14176-ADB    Document 632    Filed 04/18/19    Page 45 of 92

45

1    **Q.**   So my question is Asian-Americans, as a group, do not

2    benefit from Harvard's use of race in terms of how many

3    Asian-Americans are admitted in a given class, correct?

4    **A.**   Not in the number except that I think that the education

5    that the Asian-American students get as a result of being at

6    Harvard and being at a place that has great racial and ethnic

7    diversity is quite substantial.

8    **Q.**   I understand your testimony on that benefit, Dean

9    Fitzsimmons, but I'm focused on the number.  And on the

10   number, the number of Asian-Americans that are admitted to

11   Harvard, Asian-Americans do not benefit in terms of getting

12   into Harvard because of Harvard's consideration of race,

13   correct?

14   **A.**   Yes.  Except certainly there are certainly some

15   Asian-Americans who end up at Harvard themselves because

16   their background was a factor in their admissions in a

17   positive way.

18   **Q.**   But as a group, according to Dr. Card, actually more

19   Asian-Americans would be admitted if race weren't considered,

20   correct?

21   **A.**   That would be correct.

22   **Q.**   The other thing I wanted to focus on -- and this we can

23   go right back to your document -- the preference, the racial

24   tip that African-Americans receive is relatively stronger

25   than, more than the tip that Hispanic applicants receive.

1    Would you agree with that?

2    **A.**   I think I would just simply say again looking at

3    individual cases you can add these numbers up afterwards, but

4    again, the racial and ethnic background would be a factor in

5    those cases.

6    **Q.**   I'm trying to look at the math that you adopted in your

7    report, and I'll ask you the question.  According to the

8    numbers in your report, the falloff for African-Americans, 14

9    to 6, is greater than the falloff for Hispanics, 14 to 9, if

10   Harvard were to stop considering race, correct?

11   **A.**   I understand the numbers, yes.

12   **Q.**   The reverse is therefore true that as a group

13   African-Americans receive more of a benefit based on race in

14   the Harvard admissions process than Hispanics, correct?

15   **A.**   Yes.  There are more individuals who had benefited in

16   this individual review.

17   **Q.**   Now I want to shift gears a little bit, Dean Fitzsimmons,

18   and talk to you some more about the personal score.  Okay?

19   **A.**   Yes.

20   **Q.**   We can take this down.  Would you agree that Harvard

21   admissions officers do not take race into account when

22   assigning the personal rating?

23   **A.**   Yes, I do.

24   **Q.**   And what that means is that race is not involved in the

25   personal rating, correct?

1   **A.**  Not per se, correct.

2   **Q.**  And we've talked about guidance, written guidance.  Can

3   you think of anywhere where Harvard provides written guidance

4   telling its admissions officers not to use race or ethnicity

5   in awarding the personal score?

6   **A.**  I have not seen any written guidance, but it's certainly

7   well known on the staff and part of the training.

8   **Q.**  So I understand you say Harvard does not use race now

9   when awarding the personal score.

10         My question is, when did Harvard admissions

11  officers stop using race or ethnicity in awarding personal

12  scores?

13         MR. LEE:  I object to the predicate.  There's been

14  no demonstration of the predicate.

15         THE COURT:  That's sustained.

16         MR. HUGHES:  I'll rephrase.

17  BY MR. HUGHES:

18  **Q.**  Since you've been dean, have Harvard admissions officers

19  ever used race in awarding personal scores?

20  **A.**  Not to my knowledge.

21  **Q.**  Yesterday, you and I had a reasonably lengthy

22  conversation about the OCR statement of findings.

23         Do you recall that?

24  **A.**  Yes, I do.

25  **Q.**  We had a back-and-forth.  I just want to kind of refresh

1    everybody's memory where you described that process.

2         It was a lengthy investigation.  They set up shop

3    in your office.  They interviewed you and Director McGrath

4    and a number of other admissions officers in the course of

5    their investigation, correct?

6    **A.**   That's correct.

7    **Q.**   So -- and part of what the OCR did when it was conducting

8    this investigation was it got an understanding of how your

9    admissions process works, correct?

10   **A.**   I think it did.

11   **Q.**   And it did that in part based on the conversations with

12   you and other people in the admissions office, correct?

13   **A.**   In part, yes.  Correct.

14   **Q.**   I just want to look at parts of Plaintiff's Exhibit 555,

15   which has already been admitted into evidence, which is the

16   statement of findings from OCR.  Okay?

17   **A.**   Yes.

18   **Q.**   So I'm looking, Dean Fitzsimmons, at page 6 of

19   Plaintiff's Exhibit 555, the statement of findings.  And I'll

20   blow up this part of OCR's report.  Here OCR is reporting

21   what you and I have already discussed at length that there

22   are four major criteria on which all candidates are assessed:

23   academic achievement, extracurricular activities, athletics,

24   and personal qualities.

25         That's part of what OCR learned when it was

1    conducting this investigation, correct?

2    **A.**   That's correct.

3    **Q.**   OCR also as part of this investigation, since it had to

4    do with claims of racial discrimination, they investigated

5    how race was being used by the Harvard's admissions office in

6    the application process, correct?  That's part of what they

7    looked at?

8    **A.**   That's correct.

9    **Q.**   Now I want to show you the part of the OCR's statement of

10   findings that addresses that.  Okay?

11   **A.**   Sure.

12   **Q.**   Now what I've got on the screen is the bottom of page 15

13   and the top of page 16 of the report, which is P555.  And let

14   me read that into the record, dean Fitzsimmons, and I'll ask

15   you some questions.

16          This is OCR:  "We found that the readers had

17   several different views as to where and whether

18   Asian-American ethnicity was given positive weight or a tip

19   in the admissions process.  Some readers explained that when

20   ethnicity was deemed to be a significant factor in an

21   application, it was reflected in the POR" --

22          And I'll pause right there.

23          POR is preliminary overall rating, correct?

24   **A.**   Correct.

25   **Q.**   -- "it was reflected in the POR and during discussions at

1    subcommittee and committee meetings.

2           "Other readers indicated that ethnicity was a

3    factor considered throughout the entire admissions process.

4    They stated that it could be reflected in the four reader

5    rating areas, as well as in the POR and during the

6    subcommittee and committee meeting discussions.

7           "Still other readers stated that ethnicity was not

8    a factor at all unless the effect of that ethnicity on the

9    applicant was evident from the applicant's file.  They

10   indicated that ethnicity was only considered a plus when the

11   applicant wrote about or indicated the significance of his or

12   her heritage, or when there was some other indicia in the

13   file of the applicant's involvement with ethnic community

14   organizations or groups."

15          That's what OCR found, correct?

16   **A.**   That's one of their findings, yes.

17   **Q.**   And you told me yesterday that you and Director McGrath

18   and the other admissions officers that talked to OCR and

19   Mr. Hibino were honest and accurate when they described how

20   the process worked, correct?

21   **A.**   I certainly believe that they were honest and accurate in

22   terms of the information they received.

23   **Q.**   And so the date of this is 1990, correct?

24   **A.**   That's correct.

25   **Q.**   So at least in 1990, there was a group of Harvard

1    admissions officers that stated that race or ethnicity could

2    be reflected in the four reader rating areas, correct?

3    **A.**   Yes.  That's what it said.

4           But I think, again, let's give you an example.  So

5    let's say someone who was from, let's say, an

6    African-American background had experienced discrimination of

7    one sort or a set of hurdles for a variety of reasons due to

8    ethnicity in their home, in their high school, in their

9    community.  The fact that had overcome and surmounted those

10   kinds of obstacles could, in fact, have illuminated the

11   strength of the personal rating.

12          Now, that could happen to someone from any ethnic

13   background.  It depends, I think, on how you read that

14   question.  In other words, wasn't anyone from any ethnic

15   background or, say, gender or religion could be, let's say,

16   discriminated against.  And then due to their background --

17   and so that is -- and that might illuminate the strength of

18   their personal qualities.  So it really depends a little bit

19   on how you want to read that.

20   **Q.**   Let's break this down, Dean Fitzsimmons.  The four reader

21   rating areas that I've got highlighted here, one of those is

22   personal quality, correct?

23   **A.**   That's correct.

24   **Q.**   What you just testified to is that sometimes Harvard

25   admissions officers might consider the fact that somebody's

Case: 19-2005    Document-00117628336    Page: 693    Date Filed: 07/30/2020    Entry ID: 6356615
Case 1:14-cv-14176-ADB Document 632 Filed 04/18/19 Page 52 of 92

52

1    overcome discrimination as part of awarding their score,

2    correct?

3    **A.**   That's correct.  And it could be someone from any kind of

4    a background.  It doesn't have to be connected to race or

5    ethnicity.

6    **Q.**   We're talking about race.  And you're trying to interpret

7    the sentences I have highlighted here and suggest that what

8    that could really mean is that if the applicant provided

9    Harvard information about overcoming racial discrimination,

10   then that could play a role in the scores, correct?

11   **A.**   Yes.  Except what I'm trying to say, it depends on how

12   the phrase be reflected, could be read any number of ways.

13           But the rubric is that it per se would not affect

14   the personal rating.  It depends on the circumstance of the

15   individual.

16   **Q.**   What OCR found was that a group of readers indicated that

17   ethnicity was a factor considered throughout the entire

18   admissions process and could be reflected in the personal

19   score.  That's what they found, correct?

20   **A.**   Yes.  Just even on the first part of the sentence,

21   though, is that again the readings take place, the

22   subcommittee takes place, the full committee takes place.  So

23   race certainly could be discussed all the way along the line

24   and be a factor, let's say, in the final vote.

25           Even if you take the first part of that sentence,

1    you can see that the ethnicity can be a factor in individual
2    cases all the way down to the final committee vote.
3    **Q.**   And these readers told OCR that race could be reflected
4    in the four reader areas, which includes the personal score,
5    correct?
6    **A.**   Again, I've tried, I think, to explain how the
7    individual's background -- it could be religion, could be
8    gender, could be anything, could -- and overcoming obstacles
9    or prejudice or whatever it might be, that could illuminate
10   in that individual case the personal qualities rating.
11   **Q.**   The Harvard admissions office would only know the
12   information you just talked about if it was in the
13   applicant's file, correct?
14   **A.**   That would be correct, for individual circumstances.
15   **Q.**   Do you agree that OCR drew a distinction between readers
16   who consider ethnicity throughout the process and use it in
17   awarding the reader ratings; and other readers, still other
18   readers, stated that ethnicity was not a factor at all unless
19   the effect of that ethnicity on the applicant was evident
20   from the applicant's file?  Do you agree OCR is drawing the
21   distinction between those two types of readers?
22   **A.**   Again, I wasn't part of the conversations that the
23   readers at that time -- it was almost 30 years ago -- had
24   with the OCR people.  But I think, you know, depending on how
25   the discussion took place with those readers, I think you --

Case: 19-2005    Document: 00117628336    Page: 695    Date Filed: 07/30/2020    Entry ID: 6356615
Case 1:14-cv-14176-ADB    Document 632    Filed 04/18/19    Page 54 of 92

54

1   and depending on the context of the particular case, I could

2   see how you could interpret these things in a number of

3   different ways.

4   **Q.**  One way we can interpret what OCR found is that there

5   were a group of readers in Harvard's admissions office in

6   1990 who were using race and awarding personal scores.

7   That's one fair interpretation of this document, correct?

8   **A.**  It's possible.

9   **Q.**  And you agree it's possible that that's actually what was

10  happening in 1990, correct?

11  **A.**  Again depending on how you want to read that sentence.

12  **Q.**  I want to walk through a couple other parts of this that

13  relate to this issue.

14          Are you aware that in this document that OCR found

15  that Harvard did not provide its admissions officers

16  instructions on how much weight to give race or where to use

17  it in the process?

18  **A.**  Again, I think you're referring to written instructions.

19  And I certainly would argue, based on the extensive training

20  and the fact that this is monitored all the time, not just

21  for the first year of a staff member's time, but in a sense

22  one of the great checks and balances is we're all watching

23  each other, all 40 people.  When we look at those individuals

24  and all the information in the cases, everyone is always

25  vigilant to be certain that race and ethnicity is used in the

 1   proper way.

 2   **Q.**   OCR became familiar not only with your written

 3   instructions but also -- let's take this down until I'm

 4   ready.

 5           OCR became familiar not only with your written

 6   instructions but also with the process that you've had since

 7   you've been dean where there's this training where somebody

 8   is reading over your shoulder, so to speak, when you first

 9   start in the admissions office, right?

10   **A.**   Yes.  In a sense, we're always reading over everyone

11   else's shoulders.  Because every time you put, as we do, all

12   that information up on the screen during the subcommittee and

13   the full committee, everyone is watching everybody else to be

14   sure that each applicant is being dealt with fairly.

15   **Q.**   And OCR knew all about that when it issued this report,

16   correct?

17   **A.**   You know, I don't know exactly what was in their minds,

18   but they certainly talked to ten admission officers, as you

19   know, and we talked about the 400 cases that they looked at,

20   and they had other information.

21   **Q.**   So now I want to look at what the OCR found about

22   training.  I'm focused here on the bottom.

23           "There are no formulas or specific criteria for

24   measuring or assessing ethnicity, nor are there instructions

25   for determining how much weight is given to ethnicity or

1    where the weight is to be applied in the admissions process."

2    That's what OCR found in 1990, correct?

3    **A.**   Yes.   And I think the fact that there was no formula, no

4    mechanical process that would in some rigid way do this, I

5    think is one of the strengths of the process.   Because each

6    individual is unique in the world, and how one's background

7    may affect one's life or one's life chances or life

8    experiences is unique to that individual.   So I think it is

9    important to have no formula or some mechanistic thing that

10   would do that.

11   **Q.**   Let's set aside formulas and mechanistic things.

12   Do you think it's important to have instructions

13   for determining how much weight to give to ethnicity or where

14   the weight should be applied in the admissions process?   Is

15   it important to have instructions on that?

16   **A.**   I agree not only instructions but, again, to have an

17   ongoing process that provides checks and balances not just

18   for new people but for everyone.

19   **Q.**   And right here we have OCR finding, based on their

20   lengthy investigation that we heard about yesterday, that

21   there aren't such instructions or at least there weren't in

22   1990, correct?

23   **A.**   If you mean a rigid set of formulaic instructions, that

24   would be correct.

25   **Q.**   Is that how you read the second part of this sentence, to

1    be referring to a rigid set of formulaic instructions?  Is

2    that how you're reading it, sir?

3    **A.**   I guess when I see formulas connected to instructions, it

4    leads me at least to think that there could be something

5    mechanistic or rigid or formulaic, which is not what we do.

6    **Q.**   Now, are you aware that at the time of this report that

7    OCR found that Asian-Americans were receiving lower personal

8    scores than white applicants?

9    **A.**   Again in general, I think there was a slight difference

10    between the personal ratings for Asian-Americans compared to

11    white students.

12    **Q.**   I've got page 21 of the OCR report up on the screen.  OCR

13    found, "With respect to the personal qualities ratings, most

14    applicants in our sample, both Asian-American and white, were

15    given between a three minus and a two plus.  Overall, in the

16    classes of 1991 and 1992, from which our file samples were

17    drawn, over 98 percent of the applications received some form

18    of a 2 or 3.  However, between the two groups, 20 percent of

19    Asian-American applicants and 25.5 percent of white

20    applicants received a 2 rating in the personal category."

21          Do you see that?

22    **A.**   I can see that.

23    **Q.**   And you were aware of that in 1990, correct?

24    **A.**   That's correct.

25    **Q.**   Did that give you any concern that there was such a stark

1    difference in personal quality ratings between Asian-American

2    applicants and white applicants in 1990?

3    **A.**   I think obviously any time you see anything about our

4    applicant pool, you want to make sure that everyone is being

5    treated fairly and evenly.  I think one of the things that

6    this shows is that there was an incredible range.  Obviously

7    there were many Asian-American applicants receiving very

8    strong personal ratings then and now.

9          Remembering of course that the ratings themselves

10   are just a beginning, you then have to go through the

11   process.  And that the ratings themselves are simply again

12   not for a group, but it's looking at each individual at a

13   time.

14         And when each time, say, a reader is going through

15   an application, it's a little bit like a legal process

16   certainly.  Or let's say if you're a baseball umpire or

17   something of that sort, what you're trying to do is look at

18   the evidence in front of you, evidence from outside sources,

19   you know, for example, from the teachers, from the counselor,

20   from all of the outside recommendations and all the other

21   outside information along with all the information provided

22   by the applicant.

23         And looking at that information on a case-by-case

24   basis, coming to some sort of a conclusion, again preliminary

25   conclusion, because a rating is only a preliminary step,

Case: 19-2005   Document: 00117628336   Page: 700   Date Filed: 07/30/2020   Entry ID: 6356615
Case 1:14-cv-14176-ADB   Document 632   Filed 04/18/19   Page 59 of 92

59

1    that's where you end up with these aggregate numbers.

2    **Q.**  Do you think the difference between the 20 percent of

3    Asian-Americans that were receiving a 2 and the 25.5 of white

4    applicants who were receiving a 2, do you think that's a

5    significant difference?

6    **A.**  It's a relatively small difference in the greater scheme

7    of things, keeping in mind that the personal rating is only

8    one of many, many factors that go into things, and that you

9    can certainly, if you took any other group, maybe let's say

10   Sparse Country people or students from my background,

11   first-generation students, you could find any number of

12   differences perhaps along any number of dimensions.

13          But as long as you get back to just keeping in mind

14   that any of these dimensions would only be one factor among

15   many as the committee looks at its applicants and then makes

16   its decisions.

17   **Q.**  You told me before that you never had to sit down with a

18   Harvard admissions officer and tell them they were using race

19   inappropriately in the Harvard admissions process.  You agree

20   with that, right?

21   **A.**  I cannot think of any instance where that's occurred.

22   **Q.**  And nothing in this report caused you to do that, right?

23   **A.**  No.  Simply looking, again, looking at the evidence in

24   front of us.

25   **Q.**  And the 25 to 20 percent, that wasn't a concern to you.

1  You thought that was okay that Asian-Americans were receiving

2  that level of difference in the personal score back in 1990,

3  correct?

4  **A.**  I think the big point was to ensure that we had a process

5  that looked at each individual; and took all the factors in

6  each individual's case into account; and have a process where

7  we ensured that it was really the evidence given by the

8  applicant him or herself as well as all the outside

9  information, which I won't detail just to save time.  We

10  wanted to make sure that process was well in place.

11  **Q.**  I want to look at a few additional things that OCR found,

12  Dean Fitzsimmons.  I've got page 24 in front of you.  Let me

13  read it and then I'll ask you some questions.

14      OCR says, "In addition to examining the ethnic

15  reader's comments, OCR's concerns for the potential

16  stereotyping of Asian-American applicants prompted a review

17  of reader comments for negative characterizations which could

18  have an impact on the admissions decision and ratings.

19      "On its face, reader comments revealed several

20  recurring characterizations attributed to Asian-American

21  applicants.  Quite often Asian-American applicants were

22  described as being quiet, shy, science/math oriented, and

23  hard workers.  For example, one reader's comment embraced all

24  of these in describing an Asian-American applicant when she

25  wrote:  'Applicant seems like a reserved, hard-working,

 1    aspiring woman scientist/doctor.'

 2            "While such descriptions may not seem damaging, OCR

 3    was conscious that problems of model minority stereotypes

 4    could negatively impact Asian-Americans applicants as a

 5    whole.  This concern was also raised when OCR's file review

 6    came upon comments such as, 'He's quiet and of course wants

 7    to be a doctor'" --

 8            Let me go to the next page.

 9            -- "suggesting that most or all Asian-American

10    applicants want to be a doctor.  Or more pointedly,

11    applicant's scores and application seem so typical of other

12    Asian applications I've read:  Extraordinarily gifted in math

13    with the opposite extreme in English."

14            These were all findings by OCR, correct?

15    **A.**   That's correct.

16    **Q.**   Do any of the statements that your admissions officers

17    made that I've just read to you, do any of those concern you?

18    **A.**   Yes.  And I think one of the things we have made a point

19    of doing, certainly since receiving this report, is making

20    certain that staff members just simply do what we want them

21    to do.  And that is, go through the evidence contained in the

22    teacher reports, the counselor reports, and the outside

23    recommendations on which to base their ratings.

24            And I think one of the things to remember is that

25    the teacher recommendations and the counselor

1    recommendations, as you know, are certainly an important part

2    of the application.  And to the extent to which information

3    might be conveyed from those reports and the others, that

4    could affect how an individual reader may do the write-up.

5    **Q.**  But to be clear, you didn't sit down with any of your

6    admissions officers after this report came out and say stop

7    doing this, stop using race this way, stop making these

8    stereotypical comments.  You didn't do that, right?

9    **A.**  That's not right.  We took the report very, very

10   seriously, and we shared the report obviously with our staff

11   members and discussed the report in detail.  It was obviously

12   a very important report for the admissions committee members

13   and really for the general public to be aware of.

14            And it continues to be -- the OCR report continues

15   to be an important benchmark for us to make certain that we

16   do exactly what we said -- what the *Bakke* decision and what

17   was outlined here, and then what was outlined certainly in

18   any of the studies done.

19   **Q.**  I just want to make sure you're not changing what you've

20   told me before.

21            You never sat down with an admissions officer and

22   told them they were using race in the wrong way in your

23   process, correct?

24   **A.**  I'm not sure the image of, say, me or anyone else on the

25   staff sitting down with an individual admission officer --

1    for one thing, I'm not even sure who might have said these

2    kinds of things.

3            The point is that the entire staff, not just an

4    individual admission officer, the entire staff certainly

5    studied this report very, very carefully to make certain that

6    it did not engage in any racial stereotyping but rather

7    looked carefully at the evidence in each application.

8            But it's not simply talking with individuals.  It

9    was really talking with the entire admissions committee and

10   future admissions committees.

11   **Q.**  Dean Fitzsimmons, do you think that the stereotypical

12   comments which OCR quoted here are consistent with using race

13   with Harvard's guidelines?

14   **A.**  This is not -- I'm not quite sure what you mean by

15   consistent with guidelines.

16   **Q.**  Are these stereotypical comments that OCR found your

17   admissions officers made, are those comments consistent with

18   the way Harvard wants race used in its admissions process?

19   **A.**  We do not endorse, we abhor stereotypical comments.  This

20   is not part of our process.  This is not who I am, and it's

21   not who our admissions committee members are.

22   **Q.**  Dean Fitzsimmons, now I want to fast-forward to 2012.

23   We've looked at a number of things from 1990 that relate to

24   Harvard's use of race in its admissions process in this OCR

25   report, correct?

**A.**  That's correct.

**Q.**  We looked at the four categories of ratings; we looked at
these comments; we looked at the issue of instructions;
correct?

**A.**  That's correct.

**Q.**  And do you believe that OCR's 1990 description of how
Harvard uses race in its admissions process is still accurate
in more recent times, say like 2012?

**A.**  Again, I'm not exactly sure which aspect of the policy.
But in general terms, certainly the OCR report has been
important to us.

**Q.**  Do you think that a description of how Harvard uses race
in the -- do you think the description of how Harvard uses
race in the 1990 OCR report is still accurate?

**A.**  The general -- certainly the general description and the
outlining, yes.

**Q.**  Yesterday we looked at Plaintiff's Exhibit 509.  It's
already admitted.  I'll put it back on the screen.  Just to
remind you, I've got it on the screen, but Dean Fitzsimmons,
you're certainly welcome to look at it in the binder.

Again, this is the 2012 letter from Harvard office
of general counsel to OCR.  You recall talking about that
document with me yesterday?

**A.**  I do.

**Q.**  You were copied on it, and it's dated February of 2012,

Case: 19-2005   Document: 00117628336   Page: 706   Date Filed: 07/30/2020   Entry ID: 6356615
Case 1:14-cv-14176-ADB   Document 632   Filed 04/18/19   Page 65 of 92

65

1   correct?

2   **A.**   That's correct.

3   **Q.**   Turn to the second page of the document.  This is

4   Harvard's office of general counsel, and I'll just read this

5   and ask you some questions.

6            "In no way did Harvard subject" -- and then there's

7   a redacted name -- "to different treatment in the admissions

8   process on the basis of national origin as the complaint

9   alleges.  As you know, OCR has in the past conducted an

10  extensive compliance review of Harvard College admissions

11  process particularly with respect to Asian-American

12  applicants."

13           And then it references the compliance review that

14  we just looked at, correct?

15  **A.**   That's correct.

16  **Q.**   It goes on to say, "As OCR reported to Harvard at the end

17  of that review, we found no evidence of the existence or use

18  of quotas, nor did we find that Asian-Americans were treated

19  differently than white applicants in the implementation of

20  the admissions process."

21           That was the ultimate finding in the letter from

22  Mr. Hibino, correct?

23  **A.**   That's correct.

24  **Q.**   And then Harvard office of general counsel goes on to

25  say, "The information that OCR gathered during the course of

1  that compliance review and in subsequent cases regarding

2  Harvard College's criteria for admission, its use of race as

3  a factor in admissions decisions, and its general policies

4  and procedures for selecting students for admission to its

5  undergraduate program is still accurate today."

6          Do you see that?

7  **A.**  I do.

8  **Q.**  So do you agree that the way Harvard runs its admissions

9  process in terms of how Harvard uses race as a factor in

10  admissions is the same as it was in 1990 today?

11  **A.**  I do.

12  **Q.**  So does that -- would you then admit that based on what

13  OCR found in 1990 that it's at least possible that a group of

14  your admissions officers are using race in awarding the

15  personal score along the lines that OCR found in 1990?  Is

16  that possible today?

17  **A.**  I don't know.  I think -- I doubt it.  But what I would

18  say, though, is again the OCR report is certainly something

19  that our office is well aware of, continues to be well aware

20  of, as this sentence indicates.

21  **Q.**  All right.  I'm going to move on from OCR for now, Dean

22  Fitzsimmons.

23          Before this case, before this lawsuit, had the

24  admissions office ever conducted any empirical research into

25  whether Harvard admissions officers used race or ethnicity in

 1    awarding personal scores?

 2    **A.**  I'm not aware of any research that looked at that

 3    specifically.  It's possible that there was some other sets

 4    of things.  You'd have to show me.

 5    **Q.**  Nothing comes to mind?

 6    **A.**  No.

 7    **Q.**  So you do recognize that as a result of this case the

 8    experts have conducted some empirical research based on data

 9    that was produced from your admissions office, correct?

10    **A.**  That's correct.

11    **Q.**  You understand the admissions office produced data for

12    six admission cycles, correct?

13    **A.**  That's correct.

14    **Q.**  And that data included data about students that were

15    admitted and students that were not admitted, correct?

16    **A.**  That's correct.

17    **Q.**  It had information like GPA and SAT scores and all of the

18    different ratings that we've talked about, correct?

19    **A.**  That's correct.

20    **Q.**  And it had information, to the extent it was provided, by

21    the applicants about race or ethnicity, correct?

22    **A.**  That's correct.

23    **Q.**  And in fact, I want to put Plaintiff's Exhibit 316 back

24    on the screen.  It's the race-neutral alternative report

25    that's already been admitted into evidence.  We'll put page 2

1   up on the screen.  Let me just read that to you, Dean

2   Fitzsimmons.  You're welcome to follow along on paper on the

3   screen.  It's page 2.

4           Harvard's report says, "In 2014, Harvard convened a

5   universitywide committee chaired by James Ryan, dean of the

6   graduate school of education.  That committee was charged

7   with examining the importance of student-body diversity at

8   the university and with evaluating whether the university

9   could achieve the educational benefits of a diverse student

10  body without considering the race or ethnicity of its

11  applicants.

12          "That committee paused its work when Students for

13  Fair Admissions, Inc., SFFA, filed a lawsuit against Harvard

14  challenging Harvard College's consideration of race in

15  undergraduate admissions.  Recognizing that the litigation

16  would include an extensive discovery process in which experts

17  would conduct in-depth empirical analyses of the college

18  admissions process and proposed changes to it, Harvard

19  decided to evaluate whether it could achieve the educational

20  benefits of diversity without considering race in admissions

21  in the college in a way that would be informed by the

22  race-neutral alternatives proposed in the SFFA complaint and

23  the analysis of those and other alternatives anticipated to

24  be prepared by the parties' expert witnesses."

25          That's what your reports says, correct?

 1  **A.**  That's correct.

 2  **Q.**  I want to march through and unpack that a little bit.

 3          What was the Ryan committee?

 4  **A.**  The Ryan committee was chaired by Jim Ryan, who was the

 5  dean of the graduate school of education at that time.  He is

 6  now the president of the University of Virginia.  And he

 7  convened this committee, as the statement indicates.

 8  **Q.**  And it was convened in 2014?

 9  **A.**  Right, that's correct.

10  **Q.**  How many people were on the Ryan committee?

11  **A.**  I'm not sure exactly.  I'm just trying to recollect.

12  Perhaps ten people, maybe more.  It was very brief.

13  **Q.**  You were one of the people?

14  **A.**  I was one of the people.  And obviously -- and a lot of

15  people on the committee, like me, have lots of other

16  conflicting meetings and so on.

17  **Q.**  So the record is clear, you were one of the people on the

18  Ryan committee, correct?

19  **A.**  I was, yes.

20  **Q.**  And what happened was after that committee kind of first

21  got started, but this lawsuit was filed in the fall of 2014,

22  so the work on the committee was stopped at that time,

23  correct?

24  **A.**  That's correct.

25  **Q.**  Was that your decision to stop that work?

1    **A.**  It was not my decision.

2    **Q.**  So the Ryan committee at that point was effectively

3    disbanded while Harvard waited for the empirical analysis to

4    be conducted by the parties' respective experts in this case,

5    correct?

6    **A.**  That's my understanding.

7    **Q.**  And then a new committee to study race-neutral

8    alternatives was formed after that, correct?

9    **A.**  That's correct.

10   **Q.**  The purpose, just so it's clear, the purpose of the Ryan

11   committee was to study race-neutral alternatives.  It really

12   didn't get off the ground.  We had the lawsuit, the work of

13   the experts, and then a new committee was formed that

14   included yourself, Dean Smith, and Dean Khurana, correct?

15   **A.**  That's correct.

16   **Q.**  So only three members on the new committee, correct?

17   **A.**  That's correct.

18   **Q.**  Did you make the decision about who to staff on the

19   committee that you participated in?

20   **A.**  I did not.

21   **Q.**  But what you definitely were anticipating was to look at

22   some of the empirical evidence that would be generated as a

23   result of the analysis done in this case about the admissions

24   data that you provided, correct?

25   **A.**  That would certainly be one of the things we would want

**JA699**

1    to look at.

2    **Q.**  Now I'd like to show you a page of Dr. Card's expert

3    report, his first report, which I think Mr. Lee has a copy

4    of.  I'll show you page 37.

5              MR. LEE:  I think the witness is looking for it in

6    the binder.

7              THE WITNESS:  What page?

8    BY MR. HUGHES:

9    **Q.**  It is not in your binder, Dean Fitzsimmons, but I

10   actually do have a paper copy which I'm happy to walk up to

11   you or we can look at it on the screen.  I defer to you, sir.

12   **A.**  The screen is fine for me.  I don't want to anticipate

13   another fire drill or something.

14   **Q.**  I've got it here if you want it.  Just let me know.

15   **A.**  Should I ask counsel --

16             MR. LEE:  Yeah.  If he could have a hard copy.

17   **A.**  -- maybe to see the whole context.  They would know

18   better than I.

19   BY MR. HUGHES:

20   **Q.**  Here you go, sir.  The only thing I'm going to ask you

21   about is what I have on the screen.  So what I've got on the

22   screen is page 36 of Dr. Card's report.  And we've got

23   Exhibit 8 to the report, and it's entitled, "White and

24   Asian-American Applicants Excel At Different Dimensions:

25   Percentage of Applicants With Ratings of 2 Or Better."

1          Do you see that on the screen in front of you, Dean

2   Fitzsimmons?

3   **A.**  I do.

4   **Q.**  So the only two ethnicities we've got on here are

5   Asian-American and white, correct?

6   **A.**  That would be correct.

7   **Q.**  And if we look at academic ratings, we see -- let me ask

8   you a new question just to orient you.

9          The red bars relate to Asian-American applicants,

10  correct?

11  **A.**  That's correct.

12  **Q.**  And the blue bars relate to white applicants, correct?

13  **A.**  That's correct.

14  **Q.**  And you reviewed Dr. Card's report as part of your duties

15  on the race-neutral alternative committee, right?

16  **A.**  Yes, that's correct.

17  **Q.**  And we've got -- along the left-hand side, we've got the

18  percentage of the applicant pool that gets these scores of 2

19  or better.  You see that over here, correct?

20  **A.**  I do.

21  **Q.**  Okay.  And then Dr. Card has helpfully provided the

22  aggregate number of students on each of the bars, correct?

23  **A.**  Yes.

24  **Q.**  And so what we've got for -- and again, this is Harvard's

25  expert, right?

Case: 19-2005   Document: 00117628336   Page: 714   Date Filed: 07/30/2020   Entry ID: 6356615
Case 1:14-cv-14176-ADB   Document 632   Filed 04/18/19   Page 73 of 92

73

1   **A.**   That's correct.

2   **Q.**   And so just we'll go through here.  On the academic

3   rating, it looks like almost 60 percent --

4           MR. LEE:  Your Honor, I am going to object now.

5   The tie to this is his review of the report for race-neutral

6   alternatives.  I don't think this has anything to do with

7   race-neutral alternatives.  And cross-examining this witness

8   on Dr. Card's report when Dr. Card is going to be here

9   doesn't seem to be either appropriate or a good use of our

10  time.

11          MR. HUGHES:  With respect, Your Honor, this is --

12  what I just showed him from his race-neutral alternative

13  report talked about anticipating empirical analysis of his

14  admissions process.  This is that empirical analysis.

15          He has been the dean of the admissions process for

16  32 years, and I think it's perfectly appropriate to confront

17  him and ask him questions with the basic pretty simple to

18  understand output of those empirical analysis to see if he

19  has helpful testimony or information to provide on those

20  subjects.

21          MR. LEE:  Your Honor, when he cross-examined on the

22  other chart, it dealt with the impact of the race-neutral

23  alternatives on different ethnicities.  I didn't object

24  because that was related to the report.

25          But Dr. Card's report runs hundreds of pages, much

1    of which has nothing to do with the RNAs, including this.  I

2    just think cross-examining a fact witness on the expert

3    report of an expert witness who's going to be here to

4    testify --

5         THE COURT:  I'm not sure where he's going with it.

6    If what he wants to ask is were you aware of these things and

7    did you take steps in response to it, that's fair game.

8    Right?  But to cross-examine on how he got to these numbers

9    and what they mean is not fair game.

10        MR. HUGHES:  I have absolutely no intention of

11   doing that, Your Honor.  I am going to ask him whether what

12   Dr. Card is showing here is consistent with what he knows,

13   given his long experience in the admissions process.  And I'm

14   going to ask him if he has explanations, for example, for the

15   difference in the personal score rating that Dr. Card is

16   showing here on his chart, based on his experience as the

17   dean of admissions office for 32 years.

18        I'm not going to ask him how he got to these

19   numbers or whether the numbers are right or whether

20   Dr. Card's opinions are valid.  I have no plan to get into

21   any of that.

22        I would actually be happy to skip this and move to

23   a different piece of empirical evidence that I'll put up

24   right now, which is Plaintiff's Exhibit 629.  And this is not

25   from an expert report.

```
 1          MR. LEE:  I object.  There's no foundation for this
 2     at all.  This witness has not seen this document before.
 3     It's not been before him before.
 4          Your Honor, if I could very briefly?
 5          THE COURT:  Yes.
 6          MR. LEE:  There are two things here.  The witness
 7     has reviewed the Card reports for the purpose of the RNA
 8     committee.  That doesn't mean that everything that's in those
 9     reports that deal with a whole host of other issues would be
10     fair game for cross.
11          THE COURT:  That first question about whether the
12     report is consistent with what he knows based on his
13     experience, that is fair game, in my opinion.  However wrong
14     you think I have it, I think that question is a fair
15     question.  We'll see what his answer is.
16          I don't know how much further beyond that you go.
17     You can ask him what his familiarity is, but if there's no
18     foundation for asking him questions on 629 --
19          MR. HUGHES:  If I may be heard on this one.
20          THE COURT:  Yes.
21          MR. HUGHES:  629 is not part of the expert analysis
22     in the case.  What 629 is, is a summary-of-evidence exhibit
23     that summarizes the evidence produced by Dean Fitzsimmons'
24     admissions office, and it's an un-objected to exhibit in
25     terms of its admissibility.  It was used in opening
```

**JA704**

1    yesterday.

2              I plan to try to walk through with the witness the

3    basic structure of it.  But I think given the importance of

4    whether race is used in the personal score, given that Dean

5    Fitzsimmons has been the dean for 32 years and given that

6    this is an unobjected-to summary-of-evidence exhibit, based

7    on the data that they've produced, I'd like to see, and I

8    think it would be helpful to the Court, whether Dean

9    Fitzsimmons has any explanation for what we're seeing in

10   P629, which to me plainly shows --

11             MR. LEE:  Wait a minute.  Let's not talk in front

12   of the witness, which plainly shows to you --

13             THE COURT:  You make an excellent witness,

14   Mr. Hughes, but that's not your job here.

15             MR. LEE:  First, could we have this taken down?

16             THE COURT:  Take this down.  You can go back to the

17   other exhibit, and you can ask him if the information in that

18   exhibit is consistent with what he has observed, if you still

19   want to ask that question.  And then we'll see where he goes

20   and what the next question is.

21             MR. LEE:  And, Your Honor, this summary chart is

22   from -- this is from their expert, Dr. Arcidiacono.  His

23   report was not reviewed in connection with the RNA.

24             THE COURT:  When we get to that, he can ask him

25   about that exhibit.  And if he hasn't seen it and doesn't

1    have any basis for understanding the accuracy of it, then

2    he's not going to be asked questions about that.

3                MR. HUGHES:  On 629.

4                THE COURT:  On 629.

5                MR. HUGHES:  Understood, Your Honor.

6                THE WITNESS:  I'm sorry.  What's the question?

7    BY MR. HUGHES:

8    **Q.**  At least the fire alarm didn't go off.

9    **A.**  I'm ready.

10   **Q.**  So now I've got page 36 of Dr. Card's report.  And we had

11   kind of been walking through the basic structure of the bar

12   graph.  You recall our conversation there, sir?

13   **A.**  I do.  He's using Arcidiacono's data.  Is that the idea?

14   **Q.**  Yes.  Everybody but the athletes, but yes.

15   **A.**  Which, again, I think would be important.  In our world,

16   we look at everybody simultaneously together year by year.

17   But I'll leave that aside.

18               THE COURT:  Can I interrupt for one second?

19               What is this last category, three or more profile

20   ratings?  What is that category?

21               MR. HUGHES:  I have no intention of asking Dean

22   Fitzsimmons about that category because that has to do with

23   some analysis and calculation done by Dr. Card, which he can

24   probably explain better than I can.

25               THE COURT:  Okay.

```
 1              THE WITNESS:  And better than I can.
 2    BY MR. HUGHES:
 3    Q.   We're on the same team on that one, Dean Fitzsimmons.
 4              If we focus on the academic rating, we see that
 5    Asian-Americans as a group, about 60 percent of the
 6    Asian-Americans that apply to Harvard receive a 2 or higher
 7    on the academic score, correct?
 8    A.   That's correct.
 9    Q.   And for a total number of almost 25,000, correct?
10    A.   That's correct.
11    Q.   And would you agree with me that on average in a given
12    admissions cycle, about twice the number of white applicants
13    apply to Harvard as Asian-American applicants?
14    A.   I would have to see the figures.  That sounds reasonable,
15    but I don't want to guess because I don't have the figures in
16    front of me.
17    Q.   And coming back to the chart here, the percentage of
18    white applicants that get a 2 or higher is less than
19    50 percent, correct?
20    A.   That's correct.
21    Q.   And about 3,700, 3,800 more white applicants than Asians,
22    correct?
23    A.   That sounds right.
24    Q.   And is the relative strength of the Asian-American
25    applicant pool in terms of academics consistent with -- does
```

**JA707**

1    that look right to you, based on your experience as the dean

2    of the Harvard admissions office?

3    **A.**   Yes.  And just to remind you, so these are ratings that

4    the admission officers themselves created based on the

5    evidence in the file.  And just reminding you that even in

6    the academic realm, we would argue that it's not objective in

7    any literal sense, that there's lots of things.

8         And so the judgment made by individual admission

9    officers looking at individual cases, that it was their

10   judgment that produced this kind of difference.  It looks

11   like a reasonable difference though.

12   **Q.**   And some of the things that go into the academic score,

13   one of the things is standardized test scores, correct?

14   **A.**   That would be part of it certainly.

15   **Q.**   And based on your experience in the admissions office,

16   would you agree that Asian-Americans as a group outperform

17   white applicants to Harvard on standardized test scores?

18   **A.**   Standardized tests are higher for Asian-Americans.

19   **Q.**   Grade point average, that's another component, one

20   component of the academic score, correct?

21   **A.**   That's correct.

22   **Q.**   Would you agree that Asian-Americans as a group tend to

23   get higher grade point averages than white applicants?

24   **A.**   Yes.

25   **Q.**   So there's a number of things that go into the academic

1   score, I think is what you're trying to tell me, correct?

2   **A.** I am.  Including things such as faculty readings and all

3   kinds of things.

4   **Q.** Are the teacher and guidance counselor ratings another

5   thing that your admissions officers consider when determining

6   the academic score?

7   **A.** Very much so.

8   **Q.** And so would you agree that based on the data that we

9   have here in front of you that Asian-Americans as a group get

10  better support from their teacher recommendations and

11  guidance counselors?

12  **A.** Again, that's one of the factors that go to the rating.

13  As the admission officers compile the ratings for an

14  individual, they're taking all those factors into account,

15  including the teacher recommendations.

16  **Q.** Yeah.  I'm just trying to go through each of the factors

17  with you, sir.

18  **A.** Right.

19  **Q.** So the question is, would you agree that based on what we

20  see here in Dr. Card's analysis that Asian-Americans as a

21  group are getting better teacher recommendations, more

22  support from guidance counselors?

23          MR. LEE:  I object.

24          THE COURT:  Sustained.

25  BY MR. HUGHES:

1   **Q.**  Do you think that Asian-Americans as a group are more

2   competitive in terms of the high school curriculum they take,

3   based on your experience in the Harvard admissions office?

4   **A.**  I don't have data on that, and it doesn't demonstrate

5   here.  Could be.

6   **Q.**  Do you think that Asian-Americans as a group, based on

7   your experience in the Harvard admissions office, take more

8   advanced placement exams than white applicants?

9   **A.**  I don't have data on that.  It could be.

10   **Q.**  Let's move on to the extracurricular bar graphs here.  We

11   see that the Asian-American applicants are slightly stronger

12   in terms of the percentage of the applicant pool that gets a

13   2 or better than white applicants, correct?

14   **A.**  Yes.  Again, that are rendered by the admission officers.

15   **Q.**  And that's based on the information that the applicants

16   are provided about their participation in various

17   extracurricular activities.  That's one data point for your

18   admissions officers, correct?

19   **A.**  Yes.

20   **Q.**  And also get information probably from teachers and

21   guidance counselors and so forth, correct?

22   **A.**  Yes.  As you know, everything in the application would be

23   looked at to help compile the extracurricular rating.

24   **Q.**  And your admissions officers aren't using race when

25   they're awarding extracurricular or academic scores, right?

1    **A.**   That's correct.

2    **Q.**   Now, when we move on -- they're just looking at the data,

3    the information that's provided in the application, correct?

4    **A.**   Just looking at the evidence.

5    **Q.**   And then if we move on to personal rating, there we see

6    that this relationship shifts where the white applicants to

7    Harvard are more likely to receive a personal rating of 2 or

8    greater than Asian-American applicants, correct?

9    **A.**   That's correct.

10   **Q.**   And based on your experience as the dean of Harvard

11   admissions office, you don't think that Asian-Americans have

12   fewer attractive personal qualities than whites or any other

13   group, right?

14   **A.**   I would certainly agree with that.

15   **Q.**   And so based on your experience as the dean of the

16   Harvard admissions office, do you have any explanation for

17   why whites are more likely, according to Dr. Card, to get a

18   personal score rating of 2 or greater than Asian-American

19   applicants?

20   **A.**   Well, as I said in my deposition, there's no way when

21   you're looking at the whole person to know for certain, you

22   know, to come up with a definitive answer.

23           But you know, the one thing we do know, for

24   example -- and again speculation, but it's a fact that the

25   strength of the teacher recommendations and the counselor

1    recommendations for whites is somewhat stronger than those

2    for Asian-Americans.  That could be one factor.  But again

3    when an admission officer is going through an application,

4    they're looking at everything.

5    **Q.**  How do you know that the strength of teacher

6    recommendations is somewhat stronger for Asian-American

7    applicants than white applicants?

8    **A.**  We simply know that because it's our office and we're in

9    the business and there's evidence of it.

10   **Q.**  We're done with that.

11          MR. LEE:  For clarity of the record, could I have

12   the question back?

13          MR. HUGHES:  I had it flipped.

14          MR. LEE:  You had it flipped.  You had it stronger

15   for Asian-Americans than for whites as opposed to the

16   reverse.

17          MR. HUGHES:  I don't even remember what the

18   question was.  I'm prepared to move on unless you want me to

19   try to reconstruct my question.

20          MR. LEE:  I said it on the record.  I think that's

21   what was intended, and the answer is clear.

22          THE COURT:  He did.  He got it backwards, but I

23   actually got it right in my notes.

24          THE WITNESS:  The strength of the recommendation

25   for whites are stronger than for Asian-Americans.

**JA712**

1    BY MR. HUGHES:

2    **Q.**  Harvard computes for each of its applicants, at least for

3    as many as it can, an academic index score, correct?

4    **A.**  That's correct.

5    **Q.**  And is part of the reason that Harvard computes that

6    academic index score is it gets reported out to the Ivy

7    League, right?

8    **A.**  Yes, to the Ivy League.

9    **Q.**  I don't think we need to get into the precise contours of

10   the equation, but the academic index, the score, is based on

11   a combination of standardized test scores and grade point

12   average; is that right?

13   **A.**  That's correct.

14   **Q.**  And the highest score you can get on an academic index is

15   a 240, correct?

16   **A.**  That's correct.

17   **Q.**  Perfect score?

18   **A.**  Perfect everything.

19   **Q.**  So that would mean 800 on your SATs, both of them, and

20   really good grades?

21   **A.**  That's correct.

22   **Q.**  And I think the lowest you can get is 60, right?

23   **A.**  Never seen one, but I'll take your word for it.

24   **Q.**  And do you have any reason -- can you give us any reason

25   why applicants to Harvard with comparable academic index

Case: 19-2005    Document: 00117628336    Page: 726    Date Filed: 07/30/2020    Entry ID: 6356615
Case 1:14-cv-14176-ADB  Document 632   Filed 04/18/19   Page 85 of 92

85

1    ratings --

2              You understand that concept?

3    **A.**  Yes.

4    **Q.**  Let's say you had 10,000 applicants to Harvard, and they

5    all had comparable academic index rating.

6    **A.**  Okay.

7    **Q.**  Do you have that you in mind?  And let's say we divvy

8    them up by race, ethnicity, so we've got white,

9    Asian-American, African-American, Hispanic.

10             Do you have that in mind?

11   **A.**  I do.  Do you have an exhibit?

12   **Q.**  I do have an exhibit that shows that, that I would very

13   much like to show you, which is P629, which I'll put on the

14   screen and we'll see how we do.

15             MR. HUGHES:  But this is the subject of our prior

16   conversation with Your Honor.

17             MR. LEE:  If he wants to put it on the screen and

18   ask the witness if he's ever seen it before.

19             THE COURT:  That's fine.

20   BY MR. HUGHES:

21   **Q.**  So, Dean Fitzsimmons, I've got on the screen P629.  Do

22   you have that in front of you on the screen?

23   **A.**  I have.  But I haven't seen it before.

24   **Q.**  Just let me ask you.  You were here during Mr. Mortara's

25   opening statement, right?

**JA714**

1    **A.**  I was.

2    **Q.**  Do you remember seeing this during Mr. Mortara's opening

3    statement?

4    **A.**  Ever so briefly, and I was in the very back.

5          MR. HUGHES:  Ruling?

6          THE COURT:  You can't ask him to interpret this

7    exhibit.  But if these numbers mean something to him and they

8    happen to be displayed to him on this exhibit, that's fine.

9    But if the numbers don't mean anything to him, I'm not going

10   to ask him to sit up there and try to do an analysis.

11         MR. HUGHES:  Let me try to baby step it.

12         THE COURT:  Okay.

13   BY MR. HUGHES:

14   **Q.**  You see at the very top, I'll just highlight this row,

15   Dean Fitzsimmons, we've got academic index range between 236

16   and 240.

17         Do you see that?

18   **A.**  I do.  Again, I have never worked with this data in such

19   a way before, so it's a bit unfamiliar.

20         THE COURT:  Let me just ask you, have you ever

21   broken down the academic index range by ethnicity?

22         THE WITNESS:  Have I?

23         THE COURT:  Or have you looked at data that breaks

24   down the academic index range by ethnicity, either yourself

25   or compiled by someone else?

```
 1              THE WITNESS:  I have not.
 2              THE COURT:  That closes that avenue for you.
 3    BY MR. HUGHES:
 4    Q.  Do you have any explanation, Dean Fitzsimmons, for why
 5    applicants with comparable academic index scores receive
 6    significantly different personal scores based on ethnicity?
 7    Do you have any explanation for why that is a result from the
 8    process in your admissions office?
 9    A.  I don't want to be repetitive, but I would simply just go
10    back to the idea that we do look at everything, when
11    everybody individual has a personal rating compiled and
12    recorded.
13              The one thing that, you know, I can say is that the
14    strength of the support from the teachers and the counselors
15    is less strong for Asian-Americans than for whites.  Just
16    again looking at those reports, which are important.  Beyond
17    that, we're simply looking at everything else as well.
18    Q.  The strength of the teacher-supported recommendations for
19    Asian-American applicants is stronger than it is for Hispanic
20    and African-American applicants, correct?
21    A.  I am not sure of that.
22    Q.  You don't know the answer to that one way or the other?
23    A.  I don't.
24              MR. HUGHES:  Your Honor, I'm at a perfect breaking
25    point, and it's almost 1:15.
```

**JA716**

```
 1              THE COURT:  That's fine.  It's exactly 1:15.  We
 2     will resume tomorrow at 10:00 unless anyone feels they want
 3     to make up some of the time we lost today, in which case I'm
 4     happy to start at 9:30.
 5              MR. HUGHES:  Mr. Lee, I defer to you and Dean
 6     Fitzsimmons.
 7              THE COURT:  Tomorrow I can sit until 3:30.  So
 8     10:00 to 3:30 seems like a perfectly reasonable day to me,
 9     but if you -- if people feel like we're getting behind, I'm
10     happy to start at 9:30.
11              When we're thinking about that, we had an hour for
12     lunch yesterday.  Do you all want to keep going with an hour?
13     Do you want do shorten it up?
14              MR. LEE:  I think two things.  Our view, I think it
15     would be great if we could start at 9:30 tomorrow so we can
16     get the dean on and off and get to some other witnesses.  I
17     think for us, if it's all right to the Court and everybody
18     else, 45 minutes for lunch probably does it.
19              MR. HUGHES:  I'm perfectly happy to start at 9:30,
20     and as short of a lunch break as we can take for our team is
21     fine.  45 minutes seems reasonable.
22              THE COURT:  We'll start at 9:30 tomorrow, and we'll
23     take a 45-minute break, and that will at least get us part
24     way made up for the time we lost today.
25              I think you all know you have three weeks, and I
```

 1   start another trial after that.  So we'll use these three

 2   weeks any way you want.  However long you want to sit,

 3   however long you want lunches to be, just let me know.  To

 4   the extent that I can be here, I'll be here.  We're trying to

 5   move some of these late-afternoon things to even later so we

 6   can make up some of that time at the end of the day, too.

 7        MR. HUGHES:  I can tell you in terms of the

 8   duration of the presentation of evidence from our side's

 9   perspective, once we finish with Dean Fitzsimmons, the pace

10   will pick up considerably in terms of how long we're spending

11   with Harvard's witnesses.  Of course the experts will be a

12   little bit of a different story.

13        THE COURT:  I'm not trying to rush you at all.  I

14   just want to make sure we get everything done in the time

15   that we need to get it done.  I notice everybody always

16   stands up and says I'm going to be brief.  I'm really not

17   trying to rush anybody.  But I to want to make sure that we

18   get as much time in as we need in the next three weeks,

19   because that's really kind of what we have.

20        I'll see you at 9:30 tomorrow morning.  We'll take

21   a 45-minute lunch break.

22        MR. LEE:  Thank you, Your Honor.

23        (Court recessed at 1:18 p.m.)

24

25

```
 1                    - - - - - - - - - - -

 2                         CERTIFICATION


 4           I certify that the foregoing is a correct

 5   transcript of the record of proceedings in the above-entitled

 6   matter to the best of my skill and ability.




10   /s/ Joan M. Daly                    October 16, 2018

11   _____            _____

12   Joan M. Daly, RMR, CRR             Date
     Official Court Reporter
13
```



1                    INDEX OF WITNESSES

2    WITNESS                                              PAGE

3

4    WILLIAM FITZSIMMONS

        Direct Examination (Resumed) by Mr. Hughes.........   7
5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                    E X H I B I T S

2


3

   Plaintiff Exhibit                                    Received

4
    1            ....................................    12

5
    316          ....................................    32

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

## CERTIFICATE OF SERVICE

I mailed copies of this appendix to the Court and to the following counsel:

William F. Lee
Felicia H. Ellsworth
Andrew S. Dulberg
Elizabeth Connell Mooney
Joseph H. Mueller
WILMER CUTLER PICKERING
HALE AND DORR LLP
60 State Street
Boston, MA 02109
Tel: (617) 526-6687
Fax: (617) 526-5000
william.lee@wilmerhale.com
felicia.ellsworth@wilmerhale.com
andrew.dulberg@wilmerhale.com
elizabeth.mooney@wilmerhale.com
sarah.frazier@wilmerhale.com
joseph.mueller@wilmerhale.com


Dated: February 18, 2020                    *s/ William S. Consovoy*