No. 19-2005

## UNITED STATES COURT OF APPEALS
## FOR THE FIRST CIRCUIT

STUDENTS FOR FAIR ADMISSIONS, INC.,
*Plaintiff-Appellant,*

v.

PRESIDENT AND FELLOWS OF HARVARD COLLEGE,
*Defendant-Appellee.*

On Appeal from the United States District Court
for the District of Massachusetts

## JOINT APPENDIX
## VOLUME II

Adam K. Mortara
J. Scott McBride
Krista J. Perry
BARTLIT BECK LLP
54 W. Hubbard St., Ste. 300
Chicago, IL 60654
(312) 494-4469

John M. Hughes
Katherine L.I. Hacker
Meg E. Fasulo
BARTLIT BECK LLP
1801 Wewatta St., Ste. 1200
Denver, CO 80202
(303) 592-3140

William S. Consovoy
Thomas R. McCarthy
J. Michael Connolly
Cameron T. Norris
CONSOVOY MCCARTHY PLLC
1600 Wilson Blvd., Ste. 700
Arlington, VA 22209
(703) 243-9423
will@consovoymccarthy.com

Patrick Strawbridge
CONSOVOY MCCARTHY PLLC
10 Post Office Sq., 8th Fl., PMB #706
Boston, MA 02109
(617) 227-0548

*Counsel for Appellant Students for Fair Admissions, Inc.*

# TABLE OF CONTENTS

**Volume I**

Docket Sheet ..................................................................................................JA1

Notice of Appeal (Doc. 674) .......................................................................JA106

Complaint (Doc. 1) .....................................................................................JA108

Dispositive Motion Exhibits

    Motion to Dismiss for Lack of Subject-Matter Jurisdiction

        Declaration of William S. Consovoy

            Exhibit I (Doc. 205-9) ...............................................................JA228

    Cross-Motions for Summary Judgment

        Declaration of Felicia H. Ellsworth

            Exhibit 2 (Doc. 419-2) ...............................................................JA230

            Exhibit 85 (Doc. 419-85) ...........................................................JA244

            Exhibit 86 (Doc. 419-86) ...........................................................JA251

            Exhibit 87 (excerpts) (Doc. 419-87) ..........................................JA254

            Exhibit 88 (excerpts) (Doc. 419-89) ..........................................JA285

            Exhibit 89 (Doc. 419-89) ...........................................................JA330

            Exhibit 91 (Doc. 419-91) ...........................................................JA347

            Exhibit 92 (Doc. 419-92) ...........................................................JA370

        Declaration of Michael Connolly

            Exhibit 237 (Doc. 421-237) ........................................................JA399

            Exhibit 238 (Doc. 421-238) ........................................................JA418

            Exhibit 239 (Doc. 421-239) ........................................................JA425

            Exhibit 240 (Doc. 421-240) ........................................................JA427

            Exhibit 241 (Doc. 421-241) ........................................................JA431

            Exhibit 242 (Doc. 421-242) ........................................................JA434

            Exhibit 250 (Doc. 421-250) ........................................................JA436

            Exhibit 251 (Doc. 421-251) ........................................................JA440

Trial Transcripts

    Day 1 (Doc. 631) ...................................................................................JA443

    Day 2 (Doc. 632) ...................................................................................JA630

## Volume II

Trial Transcripts (cont.)

    Day 3 (Doc. 633) ...................................................................................JA722

    Day 4 (Doc. 635) ...................................................................................JA952

    Day 5 (Doc. 636) .................................................................................JA1198

## Volume III

Trial Transcripts (cont.)

    Day 6 (Doc. 638) .................................................................................JA1459

    Day 7 (Doc. 640) .................................................................................JA1690

    Day 8 (Doc. 642) .................................................................................JA1918

## Volume IV

Trial Transcripts (cont.)

    Day 9 (Doc. 644) .................................................................................JA2163

    Day 10 (Doc. 646) ...............................................................................JA2413

    Day 11 (Doc. 648) ...............................................................................JA2535

    Day 12 (Doc. 650) ...............................................................................JA2752

## Volume V

Trial Transcripts (cont.)

    Day 13 (Doc. 652) ..............................................................................JA2937

    Day 14 (Doc. 654) ..............................................................................JA3143

    Day 15 (Doc. 656) ..............................................................................JA3404

    Closing Arguments (Doc. 666)..........................................................JA3559

Trial Exhibits

    Plaintiff's Trial Exhibits

        Request for Judicial Notice (excerpts) (Doc. 577)........................JA3688

        Notice of Deposition Designations Played in Court (Doc. 597-1)............JA3708

## Volume VI

    Plaintiff's Trial Exhibits (cont.)

    PX1 ..............................................................................................JA3723

    PX2 ..............................................................................................JA3741

    PX9 ..............................................................................................JA3742

    PX12 ............................................................................................JA3759

    PX13 ............................................................................................JA3802

    PX14 ............................................................................................JA3845

    PX15 ............................................................................................JA3848

    PX16 ............................................................................................JA3940

    PX17 ............................................................................................JA3941

    PX19 ............................................................................................JA3943

    PX21 ............................................................................................JA3944

    PX23 ............................................................................................JA3948

    PX24 ............................................................................................JA3951

    PX26 ............................................................................................JA3954

    PX28 ............................................................................................JA3963

PX29 ............................................................................................JA3971

PX35 ............................................................................................JA3972

PX36 ............................................................................................JA3979

PX41 (excerpts) .........................................................................JA3980

PX50 ............................................................................................JA4002

PX57 ............................................................................................JA4008

PX68 ............................................................................................JA4011

PX71 ............................................................................................JA4012

PX72 ............................................................................................JA4028

PX75 ............................................................................................JA4075

PX81 ............................................................................................JA4079

PX88 (excerpts) .........................................................................JA4080

PX95 ............................................................................................JA4084

PX96 ............................................................................................JA4090

PX99 ............................................................................................JA4097

PX106 ..........................................................................................JA4109

PX111 ..........................................................................................JA4110

PX147 ..........................................................................................JA4112

PX148 ..........................................................................................JA4113

PX149 ..........................................................................................JA4115

PX150 ..........................................................................................JA4116

PX152 ..........................................................................................JA4124

PX153 ..........................................................................................JA4128

PX154 ..........................................................................................JA4130

PX155 ..........................................................................................JA4131

PX156 ..........................................................................................JA4132

PX157 ..........................................................................................JA4133

PX163 ..........................................................................................JA4134

PX164 ................................................................................................JA4138

PX165 ................................................................................................JA4142

PX167 ................................................................................................JA4145

PX177 ................................................................................................JA4147

PX182 ................................................................................................JA4154

PX200 ................................................................................................JA4156

PX218 ................................................................................................JA4158

PX225 ................................................................................................JA4196

PX227 ................................................................................................JA4199

PX230 ................................................................................................JA4200

PX236 ................................................................................................JA4201

PX238 ................................................................................................JA4203

PX265 ................................................................................................JA4206

PX279 ................................................................................................JA4209

PX287 ................................................................................................JA4212

PX288 (excerpts) ...............................................................................JA4214

PX299 ................................................................................................JA4382

PX300 ................................................................................................JA4389

PX302 ................................................................................................JA4390

PX312 ................................................................................................JA4412

PX316 ................................................................................................JA4413

PX319 ................................................................................................JA4432

PX324 ................................................................................................JA4449

**Volume VII**

Plaintiff's Trial Exhibits (cont.)

PX340 ................................................................................................................JA4451

PX461 ................................................................................................................JA4454

PX465 ................................................................................................................JA4460

PX467 ................................................................................................................JA4461

PX509 ................................................................................................................JA4464

PX555 ................................................................................................................JA4475

PX604 ................................................................................................................JA4521

PX618 ................................................................................................................JA4523

PX619 ................................................................................................................JA4524

PX620 ................................................................................................................JA4525

PX621 ................................................................................................................JA4527

PX622 ................................................................................................................JA4528

PX623 ................................................................................................................JA4530

PX624 ................................................................................................................JA4531

PX625 ................................................................................................................JA4532

PX626 ................................................................................................................JA4533

PX628 ................................................................................................................JA4534

PX629 ................................................................................................................JA4535

PX630 ................................................................................................................JA4536

PX631 ................................................................................................................JA4537

PX633 ................................................................................................................JA4538

PX634 ................................................................................................................JA4558

PX656 ................................................................................................................JA4559

PX657 ................................................................................................................JA4561

PX659 ................................................................................................................JA4562

PX696 ................................................................................................................JA4563

PX705 ................................................................................................JA4564

PX720 ................................................................................................JA4565

PX721 ................................................................................................JA4566

PX722 ................................................................................................JA4585

PX723 ................................................................................................JA4586

PX741 ................................................................................................JA4606

PX749 ................................................................................................JA4607

PX755 ................................................................................................JA4625

PX767 ................................................................................................JA4627

Defendant's Trial Exhibits

DX2 ..................................................................................................JA4628

DX3 (excerpts) ................................................................................JA4738

DX4 ..................................................................................................JA4888

DX5 ..................................................................................................JA4889

DX12 ................................................................................................JA4936

DX13 ................................................................................................JA4939

DX19 ................................................................................................JA4978

DX24 ................................................................................................JA5031

DX25 ................................................................................................JA5044

DX26 ................................................................................................JA5205

**Volume VIII**

Defendant's Trial Exhibits (cont.)

DX27 .................................................................................................................JA5244

DX36 .................................................................................................................JA5272

DX39 .................................................................................................................JA5346

DX40 .................................................................................................................JA5376

DX41 .................................................................................................................JA5462

DX42 .................................................................................................................JA5463

DX44 .................................................................................................................JA5479

DX47 .................................................................................................................JA5484

DX53 .................................................................................................................JA5508

DX55 .................................................................................................................JA5546

DX56 .................................................................................................................JA5596

DX60 .................................................................................................................JA5597

DX76 .................................................................................................................JA5598

DX79 .................................................................................................................JA5599

DX80 .................................................................................................................JA5600

DX81 .................................................................................................................JA5601

DX82 .................................................................................................................JA5602

DX83 .................................................................................................................JA5603

DX84 .................................................................................................................JA5611

DX100 ...............................................................................................................JA5612

DX103 ...............................................................................................................JA5615

DX106 ...............................................................................................................JA5617

DX109 ...............................................................................................................JA5620

DX119 ...............................................................................................................JA5623

DX133 ...............................................................................................................JA5633

DX139 ...............................................................................................................JA5647

DX669 ...................................................................................................JA5684

DX670 ...................................................................................................JA5685

DX671 ...................................................................................................JA5686

DX672 ...................................................................................................JA5689

DX673 ...................................................................................................JA5690

DX674 ...................................................................................................JA5691

DX677 ...................................................................................................JA5692

DX678 ...................................................................................................JA5693

DX679 ...................................................................................................JA5694

DX680 ...................................................................................................JA5696

DX681 ...................................................................................................JA5697

DX683 ...................................................................................................JA5699

DX685 ...................................................................................................JA5701

DX686 ...................................................................................................JA5702

DX688 ...................................................................................................JA5706

DX692 ...................................................................................................JA5711

DX694 ...................................................................................................JA5720

DX695 ...................................................................................................JA5721

DX699 ...................................................................................................JA5722

DX702 ...................................................................................................JA5723

DX703 ...................................................................................................JA5725

DX704 ...................................................................................................JA5726

DX705 ...................................................................................................JA5728

DX706 ...................................................................................................JA5731

DX707 ...................................................................................................JA5732

DX708 ...................................................................................................JA5733

DX709 ...................................................................................................JA5734

DX711 ...................................................................................................JA5735

DX713 ..................................................................................................JA5743

DX715 ..................................................................................................JA5745

DX716 ..................................................................................................JA5746

DX718 ..................................................................................................JA5747

DX720 ..................................................................................................JA5748

DX721 ..................................................................................................JA5749

DX722 ..................................................................................................JA5754

DX723 ..................................................................................................JA5759

DX724 ..................................................................................................JA5764

DX725 ..................................................................................................JA5765

DX726 ..................................................................................................JA5767

DX727 ..................................................................................................JA5772

DX728 ..................................................................................................JA5776

DX729 ..................................................................................................JA5779

DX730 ..................................................................................................JA5791

DX740 ..................................................................................................JA5793

DX742 ..................................................................................................JA5875

DX743 ..................................................................................................JA5892

DX744 ..................................................................................................JA5908

DX746 ..................................................................................................JA5926

## Volume IX

Amici's Exhibits

AO4   ..................................................................................................JA5927

AO6   ..................................................................................................JA5978

AO17 ..................................................................................................JA5979

AO28 ..................................................................................................JA5980

AO31 ..................................................................................................JA5981

Trial Demonstratives

Plaintiff's Demonstratives

    PD20 ................................................................................JA5982

    PD25 ................................................................................JA5983

    PD27 ................................................................................JA5984

    PD29 ................................................................................JA5985

    PD31 ................................................................................JA5986

    PD32 ................................................................................JA5987

    PD33 ................................................................................JA5988

    PD38 (excerpts) ...............................................................JA5989

Defendant's Demonstratives

    DD1 (excerpts) ................................................................JA6030

    DD10 (excerpts) ..............................................................JA6032

    DD10A ............................................................................JA6156

    DD10B ............................................................................JA6157

    DD12 ..............................................................................JA6158

1          UNITED STATES DISTRICT COURT

2          DISTRICT OF MASSACHUSETTS

3    _____

4    STUDENTS FOR FAIR ADMISSIONS, INC.,

5               Plaintiff,          Civil Action
                                    No. 14-14176-ADB
6    v.
                                    October 17, 2018
7    PRESIDENT AND FELLOWS OF HARVARD
     COLLEGE, et al.,               Pages 1 to 230
8
               Defendants.
9    _____

10

11

12          TRANSCRIPT OF BENCH TRIAL – DAY 3
         BEFORE THE HONORABLE ALLISON D. BURROUGHS
13            UNITED STATES DISTRICT COURT
            JOHN J. MOAKLEY U.S. COURTHOUSE
14               ONE COURTHOUSE WAY
                 BOSTON, MA  02210

15

16

17

18

19

20

21

22          JOAN M. DALY, RMR, CRR
            Official Court Reporter
23       John J. Moakley U.S. Courthouse
         One Courthouse Way, Room 5507
24            Boston, MA  02210
            joanmdaly62@gmail.com
25

**JA722**

```
 1    APPEARANCES:

 2
      COUNSEL FOR THE PLAINTIFF:
 3

 4            ADAM K. MORTARA, ESQUIRE
              J. SCOTT McBRIDE, ESQUIRE
 5            KRISTA J. PERRY, ESQUIRE
              Bartlit Beck Herman Palenchar & Scott
 6            54 West Hubbard Street
              Suite 300
 7            Chicago, Illinois 60654
              312.494.4400
 8            adam.mortara@bartlit-beck.com
              scott.mcbride@bartlit-beck.com
 9            krista.perry@bartlit-beck.com

10            JOHN M. HUGHES, ESQUIRE
              KATHERINE L.I. HACKER, ESQUIRE
11            MEG E. FASULO, ESQUIRE
              Bartlit Beck Herman Palenchar & Scott
12            1801 Wewatta Street
              Suite 1200
13            Denver, Colorado 80202
              303.592.3100
14            john.hughes@bartlit-beck.com
              meg.fasulo@bartlit-beck.com
15            kat.hacker@bartlit-beck.com

16            JOHN MICHAEL CONNOLLY, ESQUIRE
              THOMAS R. McCARTHY, ESQUIRE
17            WILLIAM S. CONSOVOY, ESQUIRE
              Consovoy McCarthy Park PLLC
18            3033 Wilson Boulevard
              Suite 700
19            Arlington, Virginia 22201
              703.243.9423
20            mike@consovoymccarthy.com
              tom@consovoymccarthy.com
21            will@consovoymccarthy.com

22

23

24

25
```

**JA723**

```
 1     APPEARANCES (cont.):

 2
               PATRICK STRAWBRIDGE, ESQUIRE
 3             Consovoy McCarthy Park PLLC
               Ten Post Office Square
 4             8th Floor, South, PMB #706
               Boston, Massachusetts 02109
 5             617.227.0548
               patrick@consovoymccarthy.com
 6
               MICHAEL H. PARK, ESQUIRE
 7             Consovoy McCarthy Park PLLC
               3 Columbus Circle
 8             15th Floor
               New York, New York 10024
 9             646.456.4432
               park@consovoymccarthy.com
10
               PAUL M. SANFORD ESQUIRE
11             BENJAMIN C. CALDWELL, ESQUIRE
               Burns & Levinson LLP
12             One Citizens Plaza
               Suite 110
13             Providence, Rhode Island 02903
               401.831.8330
14             psanford@burnslev.com
               bcaldwell@burnslev.com
15

16     COUNSEL FOR THE DEFENDANT:

17             WILLIAM F. LEE, ESQUIRE
               FELICIA H. ELLSWORTH, ESQUIRE
18             ANDREW S. DULBERG, ESQUIRE
               ELIZABETH C. MOONEY, ESQUIRE
19             SARAH R. FRAZIER, ESQUIRE
               Wilmer Cutler Pickering Hale and Dorr LLP
20             60 State Street
               Boston, Massachusetts 02109
21             617.526.6556
               william.lee@wilmerhale.com
22             felicia.ellsworth@wilmerhale.com
               andrew.dulberg@wilmerhale.com
23             elizabeth.mooney@wilmerhale.com
               sarah.frazier@wilmerhale.com
24

25
```

**JA724**

```
 1     APPEARANCES (cont.):

 2
              SETH P. WAXMAN, ESQUIRE
 3            DANIELLE CONLEY, ESQUIRE
              DANIEL WINIK, ESQUIRE
 4            BRITTANY AMADI, ESQUIRE
              PAUL R.Q. WOLFSON, ESQUIRE
 5            Wilmer Cutler Pickering Hale and Dorr LLP
              1875 Pennsylvania Ave, NW
 6            Washington, DC 20006
              202.663.6006
 7            seth.waxman@wilmerhale.com
              danielle.conley@wilmerhale.com
 8            daniel.winik@wilmerhale.com
              brittany.amadi@wilmerhale.com
 9            paul.wolfson@wilmerhale.com

10            DEBO P. ADEGBILE, ESQUIRE
              Wilmer Cutler Pickering Hale and Dorr LLP
11            7 World Trade Center
              250 Greenwich Street
12            New York, New York 10007
              212.295.6717
13            debo.adegbile@wilmerhale.com

14            ARA B. GERSHENGORN, ESQUIRE
              Harvard Office of the General Counsel
15            Smith Campus Center
              Suite 980
16            1350 Massachusetts Avenue
              Cambridge, Massachusetts 02138
17            617.495.8210
              ara_gershengorn@harvard.edu

18

19     COUNSEL FOR AMICI STUDENTS:

20            JON M. GREENBAUM, ESQUIRE
              BRENDA L. SHUM, ESQUIRE
21            GENEVIEVE BONADIES TORRES, ESQUIRE
              KRISTEN CLARKE, ESQUIRE
22            1500 K Street NW, Suite 900
              Washington, DC 20005
23            202.662.8315
              jgreenbaum@lawyerscommittee.org
24            bshum@lawyerscommittee.org
              gtorres@lawyerscommittee.org
25            kclarke@lawyerscommittee.org
```

**JA725**

1    APPEARANCES (cont.):

2

3           LAWRENCE CULLEEN, ESQUIRE
            EMMA DINAN, ESQUIRE
            Arnold & Porter LLP
4           555 Twelfth Street, NW
            Washington, DC 20004
5           202.942.5477
            gina.dean@aporter.com
6           emma.dinan@aporter.com

7
     COUNSEL FOR AMICI ORGANIZATIONS:
8
            JENNIFER A. HOLMES, ESQUIRE
9           CARA McCLELLAN, ESQUIRE
            JIN HEE LEE, ESQUIRE
10          MICHAELE M. TURNAGE YOUNG, ESQUIRE
            RACHEL N. KLEINMAN, ESQUIRE
11          NAACP Legal Defense and Educational Fund, Inc.
            700 14th Street NW
12          Suite 600
            Washington, DC 20005
13          jholmes@naacpldf.org
            cmcclellan@naacpldf.org
14          jlee@naacpldf.org
            myoung@naacpldf.org
15          rkleinman@naacpldf.org

16          KENNETH N. THAYER, ESQUIRE
            KATE R. COOK, ESQUIRE
17          Sugarman Rogers
            101 Merrimac Street
18          Suite 900
            Boston, Massachusetts 02114
19          617.227.3030
            thayer@sugarmanrogers.com
20          cook@sugarmanrogers.com

21

22

23

24

25

**JA726**

P R O C E E D I N G S

1

2          (The following proceedings were held in open

3   court before the Honorable Allison D. Burroughs, United

4   States District Judge, United States District Court, District

5   of Massachusetts, at the John J. Moakley United States

6   Courthouse, One Courthouse Way, Boston, Massachusetts, on

7   October 17, 2018.)

8          THE CLERK:  All rise.  Court is in session.  Please

9   be seated.

10          THE COURT:  All right.  I have to apologize because

11   I did not look at this binder until I got home last night,

12   and then I realized I actually had no idea what I was

13   supposed to be it doing with it.  There's a bunch of

14   witnesses in here, right?

15          MS. HACKER:  That's correct, Your Honor.  There's

16   eight witnesses.

17          THE COURT:  Which ones was I supposed to be looking

18   at for today?

19          MS. HACKER:  We can give you an order of what we

20   expect to get to first.  Just to orient Your Honor, the

21   objections that you need to rule on are highlighted in there

22   so that you can just flip through easily and just find the

23   highlighting.

24          THE COURT:  So that's what I tried to do last

25   night.  I decided I was just going to do all of them because

**JA727**

1    I didn't know which one you wanted.  So I started with Cheng.

2    Do I have the larger deposition transcript for context?  Or

3    is this what you've given me?

4         MS. HACKER:  We've given you just the clips that

5    the parties have designated.  We can certainly provide the

6    larger transcripts.  I will warn you it will be a much larger

7    binder.

8         THE COURT:  Let me give you a for-instance on why

9    I'm asking.  Just for an instance, if you look at page 8 of

10   22 of Cheng.  So it starts off with the witness saying, "I

11   don't know what this document is," and then there's a series

12   of questions, all of which I think the objection should be

13   sustained to because the witness says she doesn't know what

14   the document is.

15        But then I get to the middle of that page 8 where

16   it says page 9, lines 1 to 4, and it says, "Back to the

17   spreadsheet."  And I can't tell if we're going back to the

18   same document or there's been a new document introduced

19   between the highlighting on the top of the page and that

20   highlighting.  Because if it goes -- just as an example, if

21   it goes back to the same document that she says she can't

22   identify, I'm going to sustain those objections.  But if

23   we're talk willing about a different spreadsheet that she has

24   some foundation for, I would overrule that objection.

25        MS. HACKER:  Understood.  I think the confusion may

**JA728**

Case: 19-2005    Document: 00117629237    Page: 22    Date Filed: 03/30/2020    Entry ID: 6356615
Case 1:14-cv-14176-ADB    Document 633    Filed 04/18/19    Page 8 of 230

8

 1    be with the exhibits.  So we can provide Your Honor a binder

 2    with all the exhibits that are referenced in these.  We

 3    actually have those now, but we anticipated handing them out

 4    as we read through and offer the exhibits individually, as

 5    we've been doing with witnesses.  But that may help clear up

 6    the confusion with, at least with Ms. Cheng's deposition.

 7              THE COURT:  Right there, it wouldn't help me

 8    because there's no exhibit number.  When it's "back to this

 9    spreadsheet," is that the same exhibit that we've been

10    talking about or is it a different exhibit?

11              MS. ELLSWORTH:  It's the same spreadsheet, Your

12    Honor.

13              THE COURT:  The other one says it's a -- it looked

14    to me it was a survey monkey.

15              MS. ELLSWORTH:  From my memory from being in the

16    deposition, it was the same spreadsheet that was being

17    inquired about.

18              THE COURT:  When I started to confuse myself there,

19    I wondered if there was something else that I was supposed to

20    have to give myself some context on these.

21              Anyways, the long and short of it was I threw in

22    the towel on the whole project last night.  I will try and --

23    we can take a break if we need to.

24              Who is the next witness?  Is it Cheng?

25              MS. HACKER:  For priority order, I would say first

1    let's address Lucerito Ortiz and second Fabio Zuluaga.  I

2    believe those have less objections and less exhibits to deal

3    with, so hopefully those will go by quickly.  We don't

4    anticipate getting to those witnesses today.

5              THE COURT:  Ortiz.  Who is the other one?  Zuluaga?

6              MS. HACKER:  Exactly.

7              MS. ELLSWORTH:  Your Honor, we object in full to

8    Mr. Zuluaga.  He's the principal or the designee from the

9    Thomas Jefferson High School.  We have objected in full to

10   the relevance of the testimony which doesn't relate to

11   Harvard admissions at all.  It relates to the ethnic makeup

12   of that particular high school and some numbers that

13   Mr. Zuluaga had no foundation to testify to.  We've also put

14   individual objections into some of the snips, to the extent

15   that Your Honor overrules the general relevance objection.

16             THE COURT:  I'm happy to get to these either later

17   this afternoon or tonight and hope that I can get through the

18   whole binder.  But just as I started, it just occurred to me

19   that I might be missing something.

20             MS. ELLSWORTH:  Your Honor, the other two witnesses

21   to whom Harvard objects in full is Ms. Pedrick and Ms. Lopez.

22             THE COURT:  Okay.  And who is the next witness?  Is

23   it Ortiz?

24             MS. HACKER:  Ortiz would work for us, Your Honor.

25             THE COURT:  Who are you calling next?

```
 1          MR. MORTARA:  Your Honor, the next live witness --
 2    there will be no deposition testimony read today.  The next
 3    live witness is senior admissions officer Christopher Luby.
 4          THE COURT:  If I get through these tonight rather
 5    than during the lunch break, that will suffice for everyone?
 6          MR. MORTARA:  Yes.  And if we're not done at the
 7    end of the day with live witness testimony, we'll be prepared
 8    to start reading depositions at the end of live testimony
 9    tomorrow and fill in that, if there's gap time at the end of
10    every day, until we finish with those.
11          What we'll start doing is advising you about what
12    deposition designation reading might go on on any particular
13    day so you're not faced with a massive binder not knowing
14    which one is which.
15          THE COURT:  These didn't look -- at least the ones
16    I went through, they didn't look overwhelming.  So I'll try
17    and get through them today.  How do you want my to convey the
18    information back to you?
19          MS. HACKER:  Whatever is most convenient for Your
20    Honor.  If you'd like to just rule on the record, we can keep
21    track as you go through.  If you'd like to hand us back
22    copies, we can look through them with our colleagues on the
23    other side.  We don't have a preference.  Whatever is easiest
24    on Your Honor.
25          THE COURT:  Do you all have a preference?
```

**JA731**

Case: 19-2005   Document: 00117632237   Page: 23   Date Filed: 07/30/2020   Entry ID: 6356615
Case 1:14-cv-14176-ADB   Document 633   Filed 04/18/19   Page 11 of 230

11

1          MS. ELLSWORTH:  No.  Whatever you prefer.

2          THE COURT:  Let me take a look at them tonight and

3     see exactly what we're talking about, and I will do at least

4     a chunk of it tonight if not all of it.  All right?  Okay.

5          MS. ELLSWORTH:  Thank you, Your Honor.

6          THE COURT:  Sorry about that.  I should have looked

7     at it before I left and I didn't.  Okay.

8               Where is the dean?

9          THE WITNESS:  Your Honor, good morning.

10         THE COURT:  You can resume your position.

11         MR. HUGHES:  Good morning, Dean Fitzsimmons.

12              Before we get started and resume the examination of

13    the dean, there's an evidentiary matter that I anticipate is

14    going to come up right away that I'd like to handle before we

15    get going.  I'd prefer actually to do that either at sidebar

16    or somehow outside the presence of the witness.  I'm just

17    concerned the discussion of the objections could be better

18    had not in front of the witness.

19         MR. LEE:  Sidebar would be fine, Your Honor.

20         THE COURT:  I'll see you at sidebar.

21         (The following was held at sidebar.)

22         [Sidebar redacted.]

23         THE COURT:  Dean Fitzsimmons, you remain under

24    oath.

25         THE WITNESS:  Thank you, Your Honor.

```
 1              THE COURT:  Whenever you're ready, Mr. Hughes.
 2              MR. HUGHES:  Thank you, Your Honor.
 3              (WILLIAM FITZSIMMONS previously sworn by the Deputy
 4    Clerk.)
 5                   DIRECT EXAMINATION (resumed)
 6    BY MR. HUGHES:
 7    Q.  Good morning, Dean Fitzsimmons.  Hopefully we'll get
 8    through this morning without a fire alarm.
 9    A.  Let's hope.
10    Q.  Let's go to a new topic.  During each admission cycle,
11    the admissions office maintains something called the dean's
12    interest list, correct?
13    A.  That's correct.
14    Q.  The dean that's referred to on the dean's interest list
15    is you, right?
16    A.  It would be.
17    Q.  And that is a list that you use to make sure that you are
18    aware of what happens to particular applicants to Harvard,
19    correct?
20    A.  That's correct.
21    Q.  And so if there's going to be an action up or down on one
22    of the candidates on the dean's list, the people in your
23    office are supposed to keep you in the loop on that, right?
24    A.  Well, I'd be in the loop anyway.  But I would want to
25    know because I'm a member of the committee.
```

**JA733**

1    **Q.**   And one category of applicants that get on the admission

2    list or the dean's interest list are the children of donors,

3    correct?

4    **A.**   That's certainly some of the people on the list.

5    **Q.**   Not only just children of donors but relatives of donors,

6    other relatives of donors, correct?

7    **A.**   It could be.

8    **Q.**   And what is the Harvard development office?

9    **A.**   The Harvard development office is a part of Harvard that

10   tries to raise funds for the advancement of Harvard for all

11   the research purposes and all the other -- and our world's

12   scholarships, among other things.

13   **Q.**   And sometimes the development office communicates with

14   you about getting somebody on the dean's interest list,

15   correct?

16   **A.**   They'll communicate with me about individuals, and I will

17   sometimes put them on the list.

18   **Q.**   And sometimes you'll put them on the list if the

19   development office asks you to, regardless of whether they

20   are otherwise a strong candidate for admission, correct?

21   **A.**   Until we actually look at the applications, we certainly

22   don't know who will be a strong applicant, and they certainly

23   don't.

24   **Q.**   So does that mean you'll put candidates on the interest

25   list even if you don't know whether they're a strong

Case: 19-2005    Document: 00117632237    Page: 26    Date Filed: 07/30/2020    Entry ID: 6356615
Case 1:14-cv-14176-ADB   Document 633   Filed 04/18/19   Page 14 of 230

14

1  applicant?

2  **A.**  It could be well in advance of any of the application

3  deadlines.

4  **Q.**  Let's talk about your relationship with the donors at

5  Harvard.  Is part of what you do in your role as dean in the

6  admissions office, do you sometimes meet with Harvard donors?

7  **A.**  Yes, that's right.

8  **Q.**  Do you ever socialize with Harvard donors?

9  **A.**  Occasionally people I may know over the years.

10  **Q.**  Do Harvard donors ever take you out to dinner?

11  **A.**  No.

12  **Q.**  Do you have some kind of policy where you're not supposed

13  to have donors taking you out to dinner, taking you to Red

14  Sox games?

15  **A.**  That's --

16  **Q.**  Is that right?

17  **A.**  That's correct.

18  **Q.**  So is admitting the children and relatives of large

19  donors important to you and others at Harvard?

20  **A.**  It is important for the long-term strength of the

21  institution that we have the resources would we need to,

22  among other things, provide scholarships but also for all the

23  other purposes at the university.

24  **Q.**  Now, Dean Fitzsimmons, I'd like to walk through a few

25  exhibits with you.

Case: 19-2005   Document: 00117632237   Page: 27   Date Filed: 07/30/2020   Entry ID: 6356615
Case 1:14-cv-14176-ADB   Document 633   Filed 04/18/19   Page 15 of 230

15

1          MR. HUGHES:  Your Honor, some of these Harvard has

2     indicated -- P104, P106, and P111.

3          And these are all in the binder there, Mr. Lee, but

4     I believe they are exhibits that you've taken the position

5     should not be shown to the gallery.  We don't share that

6     position.  If you still maintain that, then I think we need

7     to take it up.

8          MR. LEE:  Yes, Your Honor.  Here would be my

9     suggestion, if Mr. Hughes is willing.  For each of these

10    where there's been some redaction, there's still enough

11    information in there if someone basically wanted to identify

12    who the person was, they could.  We can put the exhibit up.

13    We're not going to object to the admission of the exhibits.

14    We could put the exhibit on the screen for Your Honor,

15    witness, counsel, and he can be examined on it but without

16    eliciting for the public record the information that would

17    personally identify an applicant.

18         MR. HUGHES:  Your Honor, SFFA's position is that I

19    don't think there is personal identifying information in

20    these exhibits, and I don't believe that these should be kept

21    out of the public record.  They don't meet the high bar for

22    keeping evidence out of the public record.

23         We can, I suppose, however you'd like to handle it.

24    We can take them up one by one maybe at another sidebar.  But

25    our position is these should be part of the public record.

**JA736**

Case: 19-2005   Document: 00117628237   Page: 28   Date Filed: 07/30/2020   Entry ID: 6356615
Case 1:14-cv-14176-ADB   Document 633   Filed 04/18/19   Page 16 of 230

16

1          MR. LEE:  Your Honor, just by way of example, if

2     Your Honor considered P104.

3          THE COURT:  I have P104 in front of me.  We have

4     the ELMO here, so we're not restricted to the way you all --

5     maybe you can redact on the screen.  But we also have the

6     ELMO.  I'm wondering with 104 if we redact -- it says

7     "committed to a building."  If we redacted what came after

8     that in that sentence, if that sufficiently anonymizes it.

9          MR. LEE:  On that one, that would be fine, Your

10     Honor.  That's what would personally identify people.

11          MR. HUGHES:  I think I can do that on my trial

12     presentation software, but I guess we'd need to turn off the

13     gallery screen to give me 30 seconds to do that.

14          THE COURT:  That, we can easily do.  So you can fix

15     it on your screen.  You can also just black it out and use it

16     on the ELMO instead, whichever is easier for you.

17          MR. HUGHES:  I'm a little better at this than the

18     ELMO.

19          THE COURT:  Are you telling me my technology is

20     dated?

21          MR. HUGHES:  My first time in court with the ELMO

22     did not go well.  Is it off the gallery's screen?

23          THE COURT:  It's off everybody's screen including

24     mine.

25          Karen, is it off the gallery screen?

```
 1                THE CLERK:  I shut it off.

 2                MR. HUGHES:  It's off from the gallery.

 3                Mr. Lee, can you see what I've done?

 4                MR. LEE:  I will be able to in ten seconds.

 5                MR. HUGHES:  Your Honor, can you see?

 6                MR. LEE:  That would be fine, Your Honor.

 7                THE COURT:  Okay.

 8                MR. HUGHES:  I'll go ahead and offer P104 into

 9       evidence.

10                MR. LEE:  No objection.

11                THE COURT:  It's admitted.

12                (Plaintiff Exhibit No. 104 admitted.)

13                THE COURT:  On the screen for everybody.

14       BY MR. HUGHES:

15       Q.  Now we can get started, Dean Fitzsimmons.

16                Who is David Ellwood?

17       A.  David Ellwood was the dean of the Kennedy School.

18       Q.  And he is writing you an email here in June of 2013,

19       correct?

20       A.  That's correct.

21       Q.  And the title of the email is "My Hero," correct?

22       A.  It is.

23       Q.  He said, "Once again you have done wonders.  I am simply

24       thrilled about all the folks you were able to admit."

25                Then there are some redacted names.
```

**JA738**

1          He says, "Those are big wins, all big wins, and" --

2    a redacted name -- "has already committed to a building, and

3    building" -- and then we've got another redaction -- "and

4    other names have committed major money for fellowships before

5    the decision from you and all are likely to be prominent in

6    the future.  Most importantly, I think all of these people

7    will be superb additions to the class."

8          Do you see that?

9    **A.**   I do.

10   **Q.**   He's expressing his gratitude for children of significant

11   donors to Harvard getting admitted to Harvard, correct?

12   **A.**   That's correct.

13   **Q.**   Now I'd like to turn to P106, and I'll give Harvard a

14   moment.

15         MR. LEE:  Your Honor, if I could, I'll just give

16   Mr. Hughes a suggestion about what should be redacted.

17         THE COURT:  Yes.  I was just about to do the same,

18   but I would appreciate it if you would.

19         MR. HUGHES:  I can agree to everything that Mr. Lee

20   is suggesting except for he wants me to redact, and I won't

21   say it out loud, the number -- the dollar number.

22         MR. LEE:  That's fine.  No problem.

23         MR. HUGHES:  So now we'll need to go off that.

24   While I am doing this, I'll offer P106 into evidence.

25         Mr. Lee, can we confer momentarily?

```
 1              MR. LEE:  Is that all right with Your Honor, if we
 2    confer?
 3              MR. HUGHES:  If we confer about a redaction?
 4              THE COURT:  Yes, of course.
 5              MR. HUGHES:  I'd like to leave in that word, get
 6    rid of that word, put in that word.
 7              MR. LEE:  That's fine.
 8              MR. HUGHES:  Mr. Lee and Your Honor, I've got it
 9    redacted.  I don't know if you want to check it.
10              THE COURT:  Have Mr. Lee or whoever from that table
11    take a look at it.
12              MR. LEE:  Yes, that's right.
13              MR. HUGHES:  Thank you, Mr. Lee.  I think I've
14    already offered this, but I'm not sure it's been technically
15    admitted, Your Honor.  I offer P106.
16              MR. LEE:  No objection.
17              THE COURT:  I'm not sure it's been offered, but now
18    it has and there's no objection.  It's admitted.
19              (Plaintiff Exhibit No. 106 admitted.)
20    BY MR. HUGHES:
21    Q.  Dean Fitzsimmons, can you see on the screen P106?
22    A.  I can.
23    Q.  You see down below there's an email from -- it looks like
24    it's from -- it's to Roger Cheever from Alessandra Bouchard.
25              Do you see that?
```

1    **A.**   Yes.

2    **Q.**   Who are those people?

3    **A.**   Roger Cheever works in the development office, a

4    development officer, and Alessandra used to be his assistant.

5    **Q.**   What she's telling Roger, "One of the early non-lineage

6    cases we've been trying, the Virginia, is that of" -- and

7    then we've got a redacted name -- "is the grandson of who is

8    married to" -- redacted -- "to the late" -- redacted -- "gave

9    about $8.7 million to Harvard in his lifetime.  Dean

10   Fitzsimmons would like to receive your insight when you're

11   able to provide it of the relative standing of this case."

12          And then you get an email from Mr. Cheever on

13   November 15, 2013, there at the top, correct?

14   **A.**   Yes.

15   **Q.**   Okay.  And what Mr. Cheever tells you, he says, "Fitz" --

16   and there's a redacted name -- "was a devoted chair and a

17   generous donor.  His latter years were quite challenging

18   based on having" -- redacted.  Going forward, I don't see a

19   significant opportunity for further major gifts.  Had an art

20   collection which conceivably could come our way, more

21   probably will it will go to the," redacted, "museum.  I will

22   get Brad Voigt's perspective.  For the moment, I would call

23   it a 2.  I'll know more tomorrow.  Roger."

24          That's what Mr. Cheever said to you in that email,

25   correct?

1    **A.**   That's correct.

2    **Q.**   And when Mr. Cheever says "I would call it a 2," a 2 is a

3    number that would go on the dean's interest list, right?

4    **A.**   That's correct.

5    **Q.**   And what would that number reflect?

6    **A.**   It would be a reasonably serious donor.

7    **Q.**   So you keep track on the dean's interest list of whether

8    somebody is a reasonably serious donor, right?

9    **A.**   Yes.  And also again whether this person was an important

10   part of the Harvard community during his or her lifetime.

11   **Q.**   And it's the same kind of scoring system, at least

12   conceptually, as the 1 is a better score than a 2 is a better

13   score than a 3 and so forth, right?

14   **A.**   That's correct.

15            THE COURT:  Did I miss this?  Who is Mr. Cheever?

16   BY MR. HUGHES:

17   **Q.**   Dean Fitzsimmons?

18   **A.**   He's a development officer at Harvard.

19            MR. HUGHES:  I think we're now ready to move to

20   Plaintiff's Exhibit 111.

21            THE COURT:  These redaction problems get more

22   complicated as we go through the exhibits.

23            MR. LEE:  Yes.

24            MR. HUGHES:  This is all I have in my examination

25   for redactions.

```
 1              May I confer with Mr. Lee, Your Honor?
 2              THE COURT:  Of course.
 3              MR. HUGHES:  Your Honor, I'm going to need to
 4   redact.  Again, is the gallery screen off?
 5              THE CLERK:  Yes.
 6              MR. HUGHES:  If I may confer with Mr. Lee one more
 7   time, Your Honor?
 8              THE COURT:  You may.
 9              MR. HUGHES:  Your Honor, I'd like to offer P111
10   into evidence.
11              MR. LEE:  No objection, Your Honor.
12              THE COURT:  Admitted.
13              (Plaintiff Exhibit No. 111 admitted.)
14   BY MR. HUGHES:
15   Q.  I've got the redacted version that we worked out with
16   Harvard on the screen.
17              Dean Fitzsimmons, this is pretty small.  Would you
18   prefer a hard copy to follow along?
19   A.  I've got a hard copy here.
20   Q.  Who is David Fish.  This is an email from David Fish to
21   you on October 2, 2014.
22   A.  He is our former tennis coach.
23   Q.  He is writing you, and he says, "Hi, Bill.  Thanks so
24   much for meeting with" -- redacted -- "during his visit.  He
25   was unsurprisingly thrilled with the chance to meet you and
```

Case: 19-2005    Document: 00117632237    Page: 35    Date Filed: 07/30/2020    Entry ID: 6356615
Case 1:14-cv-14176-ADB    Document 633    Filed 04/18/19    Page 23 of 230

23

1    really enjoyed it despite the usual nerves.  I know that you

2    are aware that Joe Donovan and Mike Smith have been in close

3    contact with the family for some time" -- redacted -- "who

4    donated" -- and then there's a redaction -- "to Harvard and

5    two full professorships and who over the last four years have

6    given us about $1,100,000."

7              And then there's some more redactions, and I want

8    to go down to the next paragraph.

9              "It would mean a great deal to" -- redacted -- "and

10   to" -- redacted -- "to see" -- redacted -- "at Harvard.  Thus

11   we rolled out the red carpet and we're all delighted that he

12   had a great time."

13             Do you see all that?

14   **A.**  I do.

15   **Q.**  And your response to him at the top is, "Dear Dave,

16   thanks for your email.  I had a terrific meeting with" --

17   redacted -- "It would be perfectly appropriate for him to be

18   considered for a likely on October 21."

19             Do you see that?

20   **A.**  I do.

21   **Q.**  So this is the son or daughter or a relative of

22   significant donors to Harvard, correct?

23   **A.**  That's correct.

24   **Q.**  And you're telling the tennis coach that he can expect a

25   likely letter in October, correct?

**JA744**

1   **A.**   I'm simply saying that he could be considered by the

2   committee in October for the possibility of a likely letter.

3   I could also have said to him that it would not be a good

4   idea and he wasn't a good candidate, for example.

5   **Q.**   What is a likely letter?

6   **A.**   A likely letter is given when we have an applicant who is

7   being pressured by another institution to commit to that

8   institution, either through a likely letter at that

9   institution or possibly by having the student apply binding

10   early decision to that institution.

11   **Q.**   Let's change topics now.

12         MR. HUGHES:  Your Honor, I want to make sure that I

13   offered P111.

14         THE COURT:  You did, and it's been admitted.

15   BY MR. HUGHES:

16   **Q.**   I want to shift topics now, Dean Fitzsimmons.  I want to

17   focus on a series of events that started towards the end of

18   2012.

19         You're familiar with an article published by Ron

20   Unz in The American Conservative in December of 2012,

21   correct?

22   **A.**   I am.

23   **Q.**   And among other things, he advanced an argument that

24   Harvard was discriminating against Asian-American applicants,

25   correct?

1    **A.**  Correct.

2    **Q.**  And the Unz article caught the attention of David Brooks

3    at the New York Times.  In fact, Mr. Brooks wrote an article

4    published on Christmas Eve of 2012 recognizing the Unz

5    article as one of the best magazine essays of the year,

6    correct?

7    **A.**  That's correct.

8    **Q.**  And the article caught the attention of you and others at

9    Harvard, correct?

10   **A.**  That's correct.

11   **Q.**  Both the Unz article and the magnified publicity it

12   received after Mr. Brooks' article was published on Christmas

13   Eve in the New York Times, correct?

14   **A.**  That's correct.

15   **Q.**  And the article also caught the attention of some Harvard

16   donors, correct?

17   **A.**  That's correct.

18   **Q.**  I'd like to show you Plaintiff's Exhibit 227.

19         MR. HUGHES:  Before we get started, I'd like to

20   offer it into evidence.

21         MR. LEE:  No objection.  I'm sorry.

22         THE COURT:  Admitted.

23         (Plaintiff Exhibit No. 227 admitted.)

24   BY MR. HUGHES:

25   **Q.**  Dean Fitzsimmons, this -- let me back up.  Here we go.

1          Start at the bottom.  You're getting an email --

2     first of all, who is Olesia.  With can you pronounce that

3     last name for me?  I'm afraid I'll get it wrong.

4     **A.**  Olesia Pacholok, my staff assistant.

5     **Q.**  And sometimes emails that are intended for you come

6     through her first, correct?

7     **A.**  Yes.  She and I have the same email.

8     **Q.**  You get an email and the subject of it is Ron Unz,

9     correct?

10    **A.**  That's correct.

11    **Q.**  And the date of the email is December 27, 2012, correct?

12    **A.**  That's correct.

13    **Q.**  It says, "Bill.  See letter to editor in New York Times."

14         Do you see that?

15    **A.**  I do.

16    **Q.**  And then you respond.  You say, "Dear" -- and we've got

17    the names redacted.  "It was great to talk with you

18    yesterday.  We clearly share many of the same perspectives on

19    Harvard and its history.  Thanks for the follow up on the

20    letters.  They will be helpful as we go through the process

21    of creating an institutional response.  I made some progress

22    on that front last night and today.  Given the sensitivity of

23    the issues, it will probably take some time to complete the

24    deliberations, and I will keep you posted.  Have a wonderful

25    holiday."

 1              Do you see that?

 2     **A.**   I do.

 3     **Q.**   And what you're talking about there is preparation of an

 4     institutional response within Harvard to the Unz article and

 5     the accusations against Harvard contained in that article,

 6     correct?

 7     **A.**   That's correct.

 8     **Q.**   You mentioned that the article caught your attention.  It

 9     also caught the attention of the top leadership at Harvard,

10     correct?

11     **A.**   That's correct.

12     **Q.**   And do you recall receiving numerous emails over the

13     holidays concerning the Unz article?

14     **A.**   Yes.  I don't remember how many, but I get lots of emails

15     on lots of subjects.

16     **Q.**   I'd actually like to walk you through a number of emails

17     that you received and just create a timeline of when you

18     received them and who was on the email.

19              MR. HUGHES:  I think the easiest way to do that is

20     if I could use the privilege log that Harvard has provided to

21     refresh his memory on when he received certain emails, which

22     I think Your Honor ruled that we could do at the pretrial

23     conference.  We don't need necessarily to offer it into

24     evidence, but I think it would be useful to use with the

25     witness in that manner.

1          THE COURT:  You can use anything you want to

2    refresh recollection.

3          MR. HUGHES:  Thank you, Your Honor.  May I approach

4    the witness?

5          THE COURT:  Yes.

6    BY MR. HUGHES:

7    **Q.**  So, Dean Fitzsimmons, I've got the privilege log in front

8    of you, which is a document your lawyers provided us.  I

9    don't want to talk about the substance of what's contained in

10   any of these emails because it's privileged, but I just want

11   to walk through a number of emails that you were receiving on

12   this topic.

13         If you look starting with on December 27, do you

14   see I've got your name highlighted there?

15   **A.**  Yes.

16   **Q.**  So you received a couple of emails on December 27 from

17   Robert Iuliano, correct?

18   **A.**  It appears that I did.

19   **Q.**  And the subject was the Unz article, correct?

20   **A.**  Yes.

21   **Q.**  And who is Robert Iuliano?

22   **A.**  He is the general counsel of Harvard and is here today.

23   **Q.**  And if you go down, you actually received four emails it

24   looks like from him on the 27th, correct?

25   **A.**  Just adding them up.  It appears to be the case, yes.

1  **Q.** All of those relate to The American Conservative article

2  or the Unz article, correct?  That's in the subject line.

3  **A.** I'm not sure about Number 10, but I certainly -- yes.

4  **Q.** And then you received on the 27th three more emails from

5  President Faust, correct?

6  **A.** Yes.

7  **Q.** And again, those relate to the subject line, American

8  Conservative article, correct?

9  **A.** That's correct.

10 **Q.** And then, in fact, if you go to the next page there are

11 three more emails from Mr. Iuliano to you, again on the 27th,

12 concerning The American Conservative article, correct?

13 **A.** Yes.

14 **Q.** And then a couple more from President Faust to you on

15 that same day, correct?

16 **A.** Yes.

17 **Q.** And then we get to the first time you send an email on

18 this list, and that is on the 28th of December, correct?

19 **A.** That's correct.

20 **Q.** And you send an email to Erin Driver-Linn on the 28th of

21 December, subject, Forward American Conservative article,

22 correct?

23 **A.** That's correct.

24 **Q.** And if we switch to the next page, you send two

25 additional emails on the 28th to Ms. Driver-Linn with the

 1  same subject heading, correct?

 2  **A.**  That would be correct.

 3  **Q.**  And then she responds with emails back to you.  It looks

 4  like there are four in a row on the 29th, emailing back to

 5  you and others, correct?

 6  **A.**  That's correct.

 7  **Q.**  If you look at line 26, the first email that -- first of

 8  all, who is Ms. Driver-Linn?

 9  **A.**  She was the head of the office of institutional research.

10  She now works at the School of Public Health at Harvard in

11  the same sort of role.

12  **Q.**  So at this time when she's sending these emails, she's

13  the head of OIR, correct?

14  **A.**  That's correct.

15  **Q.**  On her first email, she copies Alan Garber.  Do you see

16  that?

17  **A.**  I do.

18  **Q.**  Who is Alan Garber?

19  **A.**  He's the provost of Harvard.

20  **Q.**  Who role does the provost have at Harvard?

21  **A.**  It's really sort of an administrative oversight of the

22  university, has a portfolio for all the different parts of

23  the university.

24  **Q.**  One of the top officials in the entire university,

25  correct?

1    **A.**  That's correct.

2    **Q.**  And then her next email includes someone named Erica

3    Bever, among others, correct?

4    **A.**  Yes.

5    **Q.**  Who is Erica Bever?

6    **A.**  She then, if I am looking at the date, worked with -- in

7    the office of institutional research.  She now works in our

8    office.

9    **Q.**  So these are all emails that we've been talking about, 1,

10   2, 3, 4 coming from Driver-Linn to you and others on the 29th

11   of December 2012, correct?

12   **A.**  Yes.

13   **Q.**  And then there's one email from Mr. Garber, Provost

14   Garber, to Ms. Driver-Linn to you after the ones we've just

15   discussed, also on the 29th of December, correct?

16   **A.**  Yes.

17   **Q.**  And then there are two more emails to Provost Garber and

18   you later on that day, on the 29th of December, again with

19   the title "American Conservative article," correct?

20   **A.**  That's correct.

21   **Q.**  And then there's yet another email from Provost Garber,

22   later on at 6:39 p.m. on the 29th of December, to

23   Ms. Driver-Linn, copying you again concerning The American

24   Conservative article, correct?

25   **A.**  I'm sorry.  Which document number is that?

1    **Q.**  We're looking at Number 29.

2    **A.**  29.

3    **Q.**  At the very bottom of page 3.  Do you see your name

4    highlighted there?

5    **A.**  It's not in the same order.  I'm trying to find it.

6    **Q.**  If you look at page 3, there's a --

7    **A.**  Page 3.  Okay.

8    **Q.**  On the very bottom.

9    **A.**  Okay.  Yes.

10   **Q.**  Do you see that?  There's an email from Provost Garber to

11   Ms. Driver-Linn and to you, correct?

12   **A.**  That's correct.

13   **Q.**  And then yet another email from the provost to

14   Ms. Driver-Linn and you on the 29th, at the top of the next

15   page, correct?

16   **A.**  Yes.

17   **Q.**  All right.  Now, I want to fast-forward to after the new

18   year.  If you turn to page 5 of the document that you've got

19   in front of you, starting kind of in the middle you can see

20   there's an email on the 2nd of January from Ms. Driver-Linn

21   at OIR to you and to the provost, again concerning The

22   American Conservative article?

23   **A.**  That's correct.

24   **Q.**  What I've done is I've counted up -- and you can look and

25   see.  If you start with Number 31, that's what we just talked

1    about, that's correspondence between you and Ms. Driver-Linn

2    on the 2nd of January.  You go down, you get to the second

3    piece of correspondence, again an email from Ms. Driver-Linn

4    to you also on the 2nd of January.  You drop down to what is

5    Document Number 91, there's an email from you to

6    Ms. Driver-Linn on the 3rd of January.  That's three

7    different pieces of correspondence, correct?

8    A.   Yes.

9    Q.   And then there are two emails from Provost Garber to you

10   and Ms. Driver-Linn.  And in fairness, those may be the same

11   thing; they've got the time stamp.  But at least that's

12   additional communication between the provost, you, and

13   Ms. Driver-Linn concerning The American Conservative article,

14   correct?

15   A.   That's correct.

16   Q.   And then we've got the bottom of page 4, two more emails

17   from Ms. Driver-Linn to you and Provost Garber, and also on

18   the 3rd of January at 1:56.

19   A.   I think you mean page 5, but I see them.

20   Q.   Two at the bottom there from Ms. Driver-Linn to you and

21   Provost Garber on the 3rd of January, correct?

22   A.   That's correct.

23   Q.   And then if we switch over -- we're almost finished with

24   this -- to page 6, you see there are several emails.

25   Starting with Number 33, there's three in a row there from

1    Elizabeth Yong to you and Ms. Driver-Linn, among others,

2    concerning demographic data, correct?

3    **A.**   That's correct.

4    **Q.**   Ms. Yong works in your office, correct?

5    **A.**   She was our institutional researcher for our office.

6    **Q.**   She doesn't work there still, but at that time she was

7    the institutional researcher, correct?

8    **A.**   That's correct.

9    **Q.**   And then down at the bottom of page 6 we've got another

10    from Ms. Yong to Ms. Driver-Linn -- or Dr. Driver-Linn,

11    excuse me, and you, Dean Fitzsimmons, again on the 3rd

12    of January, correct?

13    **A.**   Yes.

14    **Q.**   And two more emails from Dr. Driver-Linn, one to Ms. Yong

15    and to you and one to Mr. Iuliano and you, correct?

16    **A.**   That's correct.

17    **Q.**   All of this, these exchanges are happening kind of right

18    at the end of 2012 and right at the beginning of 2013, top

19    leadership at Harvard exchanging emails concerning The

20    American Conservative article, correct?

21    **A.**   That's correct.

22    **Q.**   I'd like to now show you Plaintiff's Exhibit 230.

23           MR. HUGHES:  And I'd like to offer it into

24    evidence.

25           MR. LEE:  No objection, Your Honor.

```
 1              THE COURT:  Admitted.
 2              MR. HUGHES:  Thank you, Your Honor.
 3              (Plaintiff Exhibit No. 230 admitted.)
 4    BY MR. HUGHES:
 5    Q.  And at the top, Dean Fitzsimmons, you can see this is an
 6    email chain from Kaitlin Howrigan.
 7              Do you see that?
 8    A.  I do.
 9    Q.  Who is she?
10    A.  She worked in our office at the time and helped with the
11    collection of data and research.
12    Q.  And the date of the email is January 8, 2013, correct?
13    A.  That's correct.
14    Q.  And you're copied on the email?
15    A.  Yes.
16    Q.  If we go to the bottom, you can see the part that I've
17    got highlighted.
18              Ms. Yong says, "Hi, Kaitlin.  We need access to the
19    RO data files for the last few years.  Is it all right with
20    you if I ask Eric to move that data into the ArchiveTwo
21    share.  We're in the middle of a study of Asian-Americans at
22    Harvard.  And rather than having to rerun all of the RO data,
23    it will be much faster just to use the ones you've already
24    created.  Also there's a meetings at Mass Hall tomorrow at
25    2:00 p.m. that I would like to at least have some preliminary
```

1    data for."

2           Do you see that?

3    **A.**  I do.

4    **Q.**  Do you agree that at this time, January 8, 2013, your

5    office was in the middle of a study of Asian-Americans at

6    Harvard?

7    **A.**  Yes.

8    **Q.**  And did you attend the meeting at Mass Hall that

9    occurred, it looks like, on January 9, 2013, at 2:00 p.m.?

10   **A.**  I don't remember exactly.

11   **Q.**  Is Mass Hall where the president and provost offices are?

12   **A.**  Yes.

13   **Q.**  Now I'd like to show you Plaintiff's Exhibit 236.

14          MR. HUGHES:  I'd like to offer it into evidence,

15   Your Honor.

16          MR. LEE:  No objection.

17          MR. HUGHES:  Thank you, Mr. Lee.

18          THE COURT:  Admitted.

19          (Plaintiff Exhibit No. 236 admitted.)

20          MR. HUGHES:  Thank you, Your Honor.

21   BY MR. HUGHES:

22   **Q.**  Dean Fitzsimmons, I've got Plaintiff's Exhibit 236 on the

23   screen.  This is another email from an alumni concerned with

24   Harvard's response to the Unz article.  So let me just read

25   the email.

1          On January 20, 2013, the alumni writes, "Dear Bill.

2    Have I missed a printed response from Harvard to the errors

3    and negative spin of these articles?  If not, what other

4    steps did Harvard take to correct the errors and seek

5    retractions?  E.g., was the public editor of the New York

6    Times ever advised?  Were the authors?  Uncorrected, the

7    impression is damaging to Harvard."

8          Do you see that?

9    A.   I do.

10   Q.   And the title of the email, the subject line that you can

11   see above is "Ron Unz and the David Brooks articles,"

12   correct?

13   A.   That's correct.

14   Q.   You write back do this donor, "Dear" redacted.  "There

15   have been a number of meetings already to consider how

16   Harvard should respond.  Both the researchers and the public

17   affairs staff are hard at work doing a variety of analysis.

18   Our office has been involved in the deliberations, and we

19   have provided data that will help to frame the decision.

20   Obviously we stand ready to help in any way we can.  Bill."

21         Do you see that?

22   A.   I do.

23   Q.   Was the information that you communicated in this email

24   on January 20, 2013, accurate?

25   A.   It appears accurate.

1    **Q.**  Okay.  So at this time you knew Harvard had already

2    deployed its researchers to look into the issues raised in

3    the Unz article, correct?

4    **A.**  Yes.

5    **Q.**  And those researchers would have been researchers at the

6    Harvard office of institutional research, correct?

7    **A.**  That's correct.

8    **Q.**  And your office was cooperating at this time, January 20,

9    2013, into the Harvard office of institutional research

10   analysis of the issues raised around the Unz article,

11   correct?

12   **A.**  That's correct.

13   **Q.**  And again, the issue raised by the Unz article was

14   potential discrimination by Harvard against Asian-Americans,

15   correct?

16   **A.**  Yes, among other things.

17   **Q.**  So now I'd like to show you Plaintiff's Exhibit 14 and

18   offer it into evidence.

19           MR. LEE:  No objection, Your Honor.

20           THE COURT:  Admitted.

21           (Plaintiff Exhibit No. 14 admitted.)

22           MR. HUGHES:  Thank you, Your Honor.

23           THE WITNESS:  I'm sorry.  Is this P14?

24   BY MR. HUGHES:

25   **Q.**  Yes, Dean Fitzsimmons, Plaintiff's Exhibit 14, P14.

1    **A.**   Thank you.

2    **Q.**   We're actually going to start on the second page.  I'll

3    blow it up to try to help us on the screen.  Can you see

4    that?

5    **A.**   Yes, I can.

6    **Q.**   So we just looked at an email exchange from January 20

7    with the donor.  Now we've moved ahead to February 18, 2013,

8    when you're getting an email from Dr. Driver-Linn on that

9    date, correct?

10   **A.**   That's correct.

11   **Q.**   She says, "Dear Fitz and Sally."  Who is Sally?

12   **A.**   Sally Donahue was our director of financial aid at the

13   time.  She now works part-time for us.

14   **Q.**   She starts -- Dr. Driver-Linn starts, "Dear Fitz and

15   Sally.  Hope all is going well.  I know this is a super busy

16   time of year for you, so advance apologies for the demands on

17   your time.  Just let me know if these are impossible because

18   we can probably come up with alternatives to meetings."

19          And then her first thing that she discusses in the

20   email is something called COFHE.  Do you see that?

21   **A.**   I do.

22   **Q.**   What does that stand for?

23   **A.**   That's the consortium on financing higher education.

24   **Q.**   I am interested in the second thing.  So Dr. Driver-Linn

25   says, "Second, the team has continued to work on a variety of

1    admissions and financial aid analyses, including follow-up on

2    some of those regressions and tracking down the discrepancy

3    in IPEDS numbers that came up around the Unz discussions."

4             Do you see that?

5    **A.**   I do.

6    **Q.**   And what Dr. Driver-Linn is talking about is she and her

7    colleagues at OIR, one of the things they've been working on

8    are regressions related to the concerns that have come up

9    around the Unz article, correct?

10   **A.**   That's correct.

11   **Q.**   And then at the bottom she's asking for a time for a

12   meeting.  "Just let me know what works for you.  Look forward

13   to seeing you sometime soon."

14             Do you see that?

15   **A.**   I do.

16   **Q.**   And then to fast-forward this, if you look at the top of

17   Plaintiff's Exhibit 14, you write Dr. Driver-Linn.  You say,

18   "Sally and I can make the 3:30 meeting on Monday at your

19   place."

20             Do you see that?

21   **A.**   I do.

22   **Q.**   She says, "Thanks, Fitz."

23             And you understand that that was a meeting that

24   occurred on February 25, 2013, correct?

25   **A.**   I think that's right.

```
 1   Q.  Just to make sure we're all on the same page, the meeting
 2   is proposed for February 25, and you say that you can make
 3   it, correct?
 4   A.  Yes.  I see.
 5           MR. HUGHES:  Your Honor, may I approach the
 6   witness?  I'd like to hand him a paper copy of Plaintiff's
 7   Exhibit 602.
 8           THE COURT:  Yes.
 9   BY MR. HUGHES:
10   Q.  Dean Fitzsimmons, do you have the paper copy of
11   Plaintiff's Exhibit 602 in front of you?
12   A.  I do.
13   Q.  And do you see that there's a sticker in the middle of it
14   that has the number 17 and below it your name, on the very
15   first page, correct?
16   A.  It is correct.
17   Q.  So what that is, this was Exhibit 17 to your deposition,
18   correct?
19   A.  I think that's true.
20   Q.  Okay.
21   A.  I'm not a lawyer.
22   Q.  And you carefully and slowly looked through this document
23   at length at your deposition and testified that you had a
24   recollection of this document, correct?
25           MR. LEE:  Your Honor, I object for two reasons.
```

```
1    The first thing is --
2              THE COURT:  Sustained.
3              MR. HUGHES:  Your Honor, may we approach?
4              THE COURT:  Yes.  He hasn't -- you can approach,
5    but he hasn't denied any familiarity with the document.
6              MR. HUGHES:  Okay.  Try it again.
7    BY MR. HUGHES:
8    Q.  Dean Fitzsimmons, are you familiar with this document?
9    A.  I've seen it before or some of the document.  I'm not
10   quite sure, you know, exactly what you're asking, I guess.
11   Q.  Do you recall carefully paging through the document at
12   your deposition for six minutes and telling us that you
13   recognize this document?
14   A.  Yes.  As it turns out, it's clear that I remember some of
15   the parts of the document.  But there are clearly problems
16   with the document.
17             MR. LEE:  Your Honor, that's precisely the reason I
18   objected.  The deposition states, "You remember seeing this
19   document?
20             "ANSWER:  Some of the information is familiar."
21             That's perfectly consistent with what he said.
22             THE COURT:  He's not impeaching him at the moment.
23             MR. HUGHES:  Your Honor, if I may, he was asked --
24   he was handed the document.  He looked at it for six minutes,
25   page by page by page.  Then he was asked, "Do you recognize
```

Case: 19-2005    Document: 00117622237    Page: 55    Date Filed: 07/30/2020    Entry ID: 6356615
Case 1:14-cv-14176-ADB   Document 633   Filed 04/18/19   Page 43 of 230

43

1    this document?"

2           And he testified, "I have a recollection of it."

3           THE COURT:  The question was, do you recall

4    carefully paging through the document at your deposition for

5    six minutes and telling us that you recognize this document?

6           So let's go back and answer that question.

7           THE WITNESS:  Yes.  I mean I don't remember paging

8    through it for six minutes.  I looked at the document.  It

9    was clear that I had seen some of the stuff in the document

10   before.

11          MR. HUGHES:  Your Honor, I'd like to play the video

12   of exactly what happened at the deposition because his

13   familiarity with this document is something that was called

14   into question by Mr. Lee in opening.  And I understand

15   that -- I think that viewing that video and watching a

16   witness page through and then be asked whether he has a

17   recollection of this document and having him say "I have a

18   recollection of it" is an impeachment of the testimony that

19   we just heard.

20          THE COURT:  You're going to have to be more

21   specific with me about where you think the impeachment was.

22   Give me a second here.

23          MR. LEE:  Your Honor, I have extra copies of the

24   deposition right at this particular point.

25          THE COURT:  Tell me where you think the impeachment

1    on what he just --

2              MR. HUGHES:  Hold on.  You just said the question

3    was, do you recall carefully paging through the document at

4    your deposition for six minutes and telling us that you

5    recognize this document?

6              So -- this is you, Your Honor -- so let's go back

7    and answer that question.

8              "ANSWER:  Yes.  I mean, I don't remember paging

9    through it for six minutes.  I looked at the document.  It

10   was clear that I had seen some of the stuff in the document

11   before."

12             And I think the impeachment is he says he doesn't

13   remember.  I guess we can refresh his recollection by

14   watching the video.

15             THE COURT:  Are you disputing that he reviewed it

16   for six minutes?

17             MR. LEE:  No.

18             If I could give Your Honor, here's the deposition.

19             THE COURT:  At the moment, the only thing he said

20   is he's not sure that he looked at it for six minutes, right?

21             MR. HUGHES:  I just want to make sure that it's

22   clear for the record and the witness agrees that he paged

23   through the document for six minutes at his deposition and

24   then he was asked, "Do you recognize this document?"

25             And he answered, page 391, "I have a recollection

**JA765**

1   of it."

2           MR. LEE:  That's exactly why there's no

3   impeachment.  We don't dispute that he looked at it for six

4   minutes.  We don't say that -- and then the precise question

5   that was asked, the portion that I gave you --

6           THE COURT:  You say, "Do you recognize this

7   document?"

8           He says, "I have a recollection of it."

9           I'm on 392 at line 7.

10          MR. LEE:  Right.

11          THE COURT:  Hold on a second.

12          MR. HUGHES:  That's exactly the exchange.

13          MR. LEE:  And then, Your Honor, if we go over to

14  393.

15          THE COURT:  Hold on.

16          MR. LEE:  Remember, Your Honor, with some of these

17  witnesses, in preparation for the deposition, the real

18  question is what happened to --

19          THE COURT:  Let me just read through it.

20          MR. LEE:  The question is --

21          THE COURT:  Hold on.  Let me read it.

22          MR. LEE:  Okay.

23          MR. HUGHES:  The impeachment/refreshing

24  recollection is that he just -- his testimony was that he

25  doesn't remember looking at it for six minutes.

**JA766**

 1          When the witness flips through the whole thing,

 2    looks at the pages page by page, and gives the testimony on

 3    392, line 6, "Do you recognize this document?" and gives an

 4    unqualified "I have a recollection of it," I think that is

 5    important.  And what he's disagreed with is how carefully he

 6    reviewed it before he gave that testimony.

 7          THE COURT:  They're willing to stipulate that he

 8    looked at it for six minutes.  I will accept for the record

 9    that he looked at it for six minutes.

10          The questions that follow about how familiar he is

11    with it, he's pretty clear that he is familiar with parts of

12    it, and he remembers things about it.  So that's not

13    inconsistent.  He says he remembers parts of it.

14          You ask him questions about what you want to ask

15    him.  If it's a part that he remembers, he'll testify about

16    it.  If you need to refresh his recollection on something in

17    here that he used to have a recollection of that part but no

18    longer does, you can do that.

19          But let's get into the document and see what he

20    remembers and what he doesn't.  I will accept for the record

21    that he looked at it for six minutes.

22          MR. HUGHES:  Thank you, Your Honor.  What I'd like

23    to do is I'd like to offer P602 into evidence.

24          MR. LEE:  I object.  There's no foundation.  There

25    will be another witness who actually prepared the document

1  who will be here to testify.  But there's no foundation for

2  this witness.

3          THE COURT:  I can hold off on the admitting of the

4  exhibit, but I'm going to let him ask him questions about it.

5          MR. LEE:  I understand.

6          MR. HUGHES:  Just so Your Honor is clear, he

7  testified in his deposition he had a recollection of it

8  independent of his deposition preparation.  We'll get into

9  all of that.  What I would prefer to do is actually show him

10  the color version of this, which is Plaintiff's Exhibit 9,

11  which I'd also like to offer into evidence, which I assume

12  Mr. Lee has the same objection to.

13          THE COURT:  I assume this exhibit is going to come

14  in.  I'm going to let you ask questions of him about it now

15  so that he doesn't have to be recalled once it's admitted.

16  My guess is Mr. Lee is also expecting the document to come

17  in.

18          MR. LEE:  Yes.  At some point, Your Honor.  I think

19  having the color version is fine, and having him be examined

20  on the same basis Your Honor talked about, the non-color

21  version, is fine.

22          THE COURT:  So now it's not going to be admitted at

23  the moment.  I am going to let him be questioned about it.

24          What's your view on whether it's put up for the

25  studio audience here?  It's a not-admitted exhibit.

1          MR. LEE:  It's fine, Your Honor.

2          THE COURT:  Okay.  Karen, go ahead -- it's not

3      admitted at the moment, but we will put it up on the screen

4      so everybody can follow along.

5          MR. HUGHES:  Thank you, Your Honor.

6      BY MR. HUGHES:

7      **Q.**  Do you see, Dean Fitzsimmons -- I've got Plaintiff's

8      Exhibit 9 on the screen.

9          Do you see that?

10     **A.**  I do.

11     **Q.**  And this is the color version of what I just showed you,

12     which is Plaintiff's Exhibit 602, correct?

13     **A.**  Do I have this --

14     **Q.**  You have P9 in your binder.  Yes, sir.

15     **A.**  Okay.  Yeah.  Okay.

16     **Q.**  This is the color version of the document that you

17     testified you have a recollection of, correct?

18          MR. LEE:  I object.

19          THE COURT:  He has some recollection of.

20     BY MR. HUGHES:

21     **Q.**  Let's look at page 5.  Do you see I've got a blowup of

22     page 5 of Plaintiff's Exhibit 9 in front of you, Dean

23     Fitzsimmons?

24     **A.**  Yes, I do.

25     **Q.**  You're familiar with the information that's on page 5 of

1    Plaintiff's Exhibit 9, correct?

2    **A.**  I'm sorry.  Page 5?

3    **Q.**  Yes, sir.  You're familiar with it.  You can see on the

4    screen, I've got the information in front of you, this is

5    information, Mr. Lee, that you're familiar with, correct,

6    Dean Fitzsimmons?

7              MR. LEE:  Your Honor, I think the question is

8    whether he saw this page before.

9              MR. HUGHES:  Hold on, then.  I'll ask that

10   question.

11   BY MR. HUGHES:

12   **Q.**  Dean Fitzsimmons, is this part of the document that you

13   have a recollection of?

14   **A.**  I'm not sure what you mean.  I don't know whether it was

15   in this document or not.

16   **Q.**  Why don't you get your deposition exhibit out and turn to

17   page 5 of Plaintiff's Exhibit 602.  There's a loose copy

18   right in front of it you, Dean Fitzsimmons.  Right in front

19   of you, right there.

20   **A.**  Here?

21   **Q.**  Yeah.  Turn to page 5.

22             THE COURT:  Mr. Hughes, can you just follow up with

23   him?  I think he was about to say he's familiar with the

24   page, but he's not sure if it's from this document.  That

25   might save you.

 1    BY MR. HUGHES:

 2    **Q.**  Are you familiar with this page that I've got up on the

 3    screen here with this kind of information in it?

 4    **A.**  Again, at the time I'm not sure I saw it in this

 5    document.

 6    **Q.**  You don't know one way or the other.  That's your

 7    testimony?

 8    **A.**  I could have.  I see lots of documents.

 9    **Q.**  This is something you could have seen?

10    **A.**  Pardon?

11    **Q.**  This is something that you could have seen in your role

12    as the dean of the Harvard admissions office, correct?

13    **A.**  Quite possible.

14    **Q.**  It was contained in a document that you've already told

15    us you reviewed for six minutes and you have a recollection

16    of the document.

17    **A.**  I have a recollection of a document.  I have a

18    recollection, though, that I'd seen some of it before.

19    **Q.**  I'd like to ask you questions about the information

20    that's on page 5 of Plaintiff's Exhibit 9.

21          MR. LEE:  I object.  There's not enough foundation

22    for this.  He actually was asked in his deposition whether he

23    had ever seen page 5 before, and he said, "I can't remember

24    seeing it five or six years ago."

25          THE COURT:  I'm going to let him ask the questions

1    about the data that's contained in this exhibit on this page.

2          MR. HUGHES:  Thank you, Your Honor.

3    BY MR. HUGHES:

4    **Q.**  So first of all, Dean Fitzsimmons, you see that the data

5    that OIR has put together here excludes legacies and

6    athletes.

7          Do you see that?

8    **A.**  I do.

9    **Q.**  And then I want to look at the chart that OIR has

10   prepared for -- the title of it is "Difference in Average

11   Test Scores and Ratings For White and Asian Applicants."

12         Do you see that?

13   **A.**  I do.

14   **Q.**  Do you see there's kind of a centerline here?  Do you see

15   that, the zero line?

16   **A.**  I do.

17   **Q.**  And if you go to the right of the zero line, that is

18   Asian higher, correct?

19   **A.**  That's correct.

20   **Q.**  And if you go to the left of the centerline, that is

21   white higher, correct?

22   **A.**  That's correct.

23   **Q.**  And the first two have to do with SAT II average and SAT

24   average, correct?

25   **A.**  That's correct.

Case: 19-2005   Document: 00117632237   Page: 64   Date Filed: 07/30/2020   Entry ID: 6356615
Case 1:14-cv-14176-ADB   Document 653   Filed 04/18/19   Page 52 of 230

52

1    **Q.**  And the bars on that are way out to the right.  Asians

2    are higher in those two categories, correct?

3            THE COURT:  What's the difference between SAT and

4    SAT II?

5            MR. HUGHES:  I think Dean Fitzsimmons can probably

6    answer that for us.

7            THE WITNESS:  The SAT II are now called the subject

8    test.  They are tests in particular subjects, chemistry,

9    European history, and so on.  So that would be the average of

10   whichever of the SAT II tests the students had taken.

11   BY MR. HUGHES:

12   **Q.**  And then the SAT is just the traditional verbal math SAT,

13   correct?

14   **A.**  That's correct.

15   **Q.**  In both those categories, the Asian students are doing --

16   the Asian applicants are doing better than the white

17   applicants, correct?

18   **A.**  That's correct.

19   **Q.**  And then we have alumni rating and alumni rating 2.  Is

20   alumni rating 2 the alumni personal rating?  Is that the

21   second box?

22   **A.**  I'm not sure how they lined that up, quite frankly.  I

23   presume -- I'm not entirely sure, to be honest -- one would

24   probably be the overall rating.  The other would be the

25   personal rating.

1   **Q.**  And one of these alumni -- there's only two alumni

2   ratings, correct?

3   **A.**  Yes, it would appear probably on our system.  But we ask

4   them to rate candidates in other respects as well.

5   **Q.**  Sure.  And here in OIR's chart we've got Asian applicants

6   doing better than white applicants in alumni rating 2, and

7   it's pretty close, slightly better for white applicants in

8   alumni rating 1, correct?

9   **A.**  That's correct.

10  **Q.**  And we talked actually yesterday about teacher

11  recommendations and guidance counselors.  Those are the next

12  three categories.  We've got a slight favoring white

13  applicants in some and a slight favor of Asians in the other,

14  they're pretty darn close to each other in this table,

15  correct?

16  **A.**  Well there, again, they are different obviously.

17  **Q.**  But there's not a significant difference here between the

18  white and the Asian applicants?

19  **A.**  I'm not sure what "significant" means.  And again, I'm

20  not entirely sure about this data, but it's consistent with

21  what we have talked about.

22  **Q.**  What you're seeing here is consistent with what you would

23  expect to see, given your experience as dean.  That's what

24  you just told me, correct?

25  **A.**  Certainly some of the things we discussed yesterday.

**JA774**

Case: 19-2005    Document: 00117632237    Page: 66    Date Filed: 07/30/2020    Entry ID: 6356615
Case 1:14-cv-14176-ADB    Document 653    Filed 04/18/19    Page 54 of 230

54

1    **Q.**   Those are consistent with what you're seeing in this

2    chart, correct?

3    **A.**   That's correct.

4              THE COURT:  What's Teacher 1 and Teacher 2?

5              THE WITNESS:  It would be the two teacher reports

6    that we require.  So we ask as part of the application each

7    student to submit a guidance counselor school report with a

8    transcript, and so on.  So that's what the guidance rating

9    is.

10             Then we ask for recommendations and information

11   from two teachers.  And I think it's just the way --

12   Teacher 1, Teacher 2 would just simply be I think how the

13   material had been ordered in the application.  But they're

14   just -- you could switch them.  There's no significance in

15   being, in other words, Teacher Number 1.

16   BY MR. HUGHES:

17   **Q.**   They don't get a prize?

18   **A.**   No, no prize.  And it's not our rating system.

19             THE COURT:  Tell me again, Alumni 1 and Alumni 2.

20             THE WITNESS:  I'm not sure.  One of them would be

21   the personal rating.  The other would be the overall rating.

22   But I'm not familiar enough with this data to know which

23   would be which.

24   BY MR. HUGHES:

25   **Q.**   And, Dean Fitzsimmons, just to be clear, the alumni

**JA775**

1    ratings --

2              MR. HUGHES:  I'm sorry, Your Honor.  Had you

3    finished?

4              THE COURT:  Yes.  Sorry.

5              MR. HUGHES:  I didn't mean to interrupt.

6    BY MR. HUGHES:

7    Q.  The alumni ratings, those are ratings that are awarded by

8    the interviewers who actually meet the applicants, correct?

9    A.  That's correct.

10   Q.  And for the most part, the admissions officers in your

11   admissions office when they give the personal score, the

12   extracurricular score, they haven't met the applicant in

13   person.  They're reading a paper file, correct?

14   A.  Mostly.  But remember we do interview a fair number of

15   people ourselves.  And we also meet people on the road

16   because we're out at 150 locations across the country every

17   year.  Occasionally I will meet some people I will put on my

18   dean's list, for example.

19   Q.  Some of the applicants are known to you, but most of them

20   are being judged on a paper file?

21   A.  Yes.  With all the information that is in the

22   application.

23   Q.  Then we get down to personal rating here, and here we see

24   that whites are doing better than Asians in the personal

25   rating, correct?

**A.**   Yes.  And again, this would be the staff person after

looking at all the information would make that rating.

**Q.**   That's a staff person in your admissions office, correct?

**A.**   Yes.  Whoever had read -- there might have been more than

one person.  Whoever read the application.

**Q.**   This shows -- and then we go on and we see that Asians

are getting better extracurricular ratings, better academic

rating, and the only rating that your staff members are

providing where the whites are doing better than the Asian

applicants is in the personal rating, correct?

**A.**   No.  That isn't actually the way it works.  Again, each

staff person goes through the application, as you know, in

great detail, looking at everything, trying to take all the

factors into account well beyond the numbers.  And the staff

person would -- based on that evidence, would assign an

extracurricular rating and in the same way would do the same

thing for the academic rating.

        So it's really, again, looking at all three of

those -- the personal, the extracurricular, and the

academic -- is all the results of a staff person reading

carefully everything in the application and then making a

judgment about what the rating should be based on the

evidence.

**Q.**   Just so we're on the same page.  On page 5 of P2, the

three ratings that are -- never mind.  Strike that.  I'm

1    going to move on.  Let's go to the next page.

2          Dean Fitzsimmons, is the information contained on

3    page 6 of Plaintiff's Exhibit 2, is this information that

4    looks familiar to you from this document?

5    **A.**  I am not sure I remember seeing it in the document.

6    **Q.**  Let me ask you about some information and just see if you

7    can agree whether it makes sense in light of your experience

8    in the office of admissions.

9          MR. LEE:  Your Honor, I am going to object, but I

10   understand Your Honor's prior ruling.  But for a document he

11   doesn't recognize, at some point there's a limit.

12         THE COURT:  I'm going to let you do your direct

13   examination the way you want to do it.

14         I'll tell you what I'm interested in from this

15   witness and this document is when he sees this sort of data,

16   what's his reaction to it.  Does he have any explanation to

17   it.  I don't think he's in a position to verify the data or

18   say that it's accurate.  But when he sees a chart like this,

19   his response to it if he saw it.  I think he did, but -- I'd

20   rather hear his view of the data and how data could be like

21   that than actually verify the actual data, which I don't

22   think he's in a position to do.

23         MR. HUGHES:  I don't think I have asked him to

24   verify it.

25         THE COURT:  It's your direct examination.  It's a

1    bench trial.  I'll disregard what I think is not

2    appropriately before me.  But this is the kind of data that

3    in his position he would be familiar with, whether he's

4    actually familiar with this particular document or not.

5              So I'm interested in his reaction to the data,

6    including whether he thinks it's wrong.  His answers are what

7    they're going to be.  I think his response to this kind of

8    data is fair game.

9              MR. HUGHES:  Thank you, Your Honor.

10   BY MR. HUGHES:

11   **Q.**  So looking at page 6, Dean Fitzsimmons, we've got a table

12   or a chart called "Admit Rates by Academic Index For White

13   and Asian Applicants, Classes of 2007-2016."

14             Do you see that?

15   **A.**  I do.

16   **Q.**  And then along the bottom it says, "Standardized academic

17   index (zero equals average academic index)."

18             Do you see that?

19   **A.**  I do.

20   **Q.**  So what we have here is a chart that shows admit rates

21   for white applicants and admit rates for Asian applicants as

22   you move up the academic index, collect?

23   **A.**  That's what it appears to be.  I haven't studied the

24   document.

25   **Q.**  So at least OIR uses academic index as a metric when it

1   is evaluating the admissions chances for white and Asian

2   applicants, correct?

3   **A.**   Apparently they do.  It's not something that we use in

4   our office.

5   **Q.**   And what you can see here on the dotted line are the

6   admit rates for the applicants under consideration here.  The

7   darker line is for the white admit rate.  And I can't really

8   tell what color that is, but the lighter line is the Asian

9   admit rate, correct?

10  **A.**   That is correct.

11  **Q.**   And at every step of the way from the weakest spot on the

12  academic index to the strongest spot on the academic index,

13  white applicants are admitted at a higher rate than Asian

14  applicants, according to this chart, correct?

15  **A.**   That's what it shows.

16  **Q.**   Is that consistent with what you see in the dean's office

17  as the dean of admissions?

18  **A.**   I'm sorry.  Could you say that again?

19  **Q.**   Is that consistent with what you see, that comparably

20  academically qualified white applicants are admitted at a

21  higher rate than Asian applicants?

22  **A.**   It's certainly something we've always been concerned

23  about the admit rate, and it's certainly something that Susie

24  Chao and I covered really back in 1988, and it was certainly

25  an issue that was studied in depth by OCR in its 1990 report.

1          So it's always something we look at.  Certainly

2     we've continued to do NLNA, that kind of thing again as a

3     check.  So yeah, I'm familiar with it.

4     **Q.**  NLNA really is a measure of kind of the overall admit

5     rate.  Not the overall class admit rate, but if you take

6     everybody in the NLNA group, you're looking at what's the

7     admit rate for Asian-American applicants in the NLNA group,

8     what's the admit rate for white applicants, and so forth in

9     the NLNA group, correct?

10    **A.**  Just a, yeah, quick overview, I guess is the best way to

11    look at it.

12    **Q.**  It doesn't take and compare similarly academically

13    qualified candidates and compare admission rates of similarly

14    academically qualified candidates, correct?

15    **A.**  Not with that particular piece.

16    **Q.**  But the information that you see here isn't surprising

17    because you know, going back to OCR, that Harvard admits

18    similarly academically qualified white candidates at a higher

19    rate than Asian applicants, correct?

20    **A.**  I'm not sure exactly which part of the report you're

21    referring to.  But there was a difference in the admission

22    rate, which is something that they looked at very carefully

23    and then found that we did not discriminate against

24    Asian-Americans despite that evidence on the scores.

25    **Q.**  Dean Fitzsimmons, I'd like to turn to page 8 of the

1    Plaintiff's Exhibit 2.  Do you see that on the screen in

2    front of you?

3    **A.**  Yes.  I have it here, too.  Yes.

4    **Q.**  You understand that OIR ran -- you've seen in other

5    documents, which we're going to look at later, you understand

6    that OIR ran a logistic regression model in connection with

7    the Asian-American issue, correct?

8    **A.**  They certainly ran some models for us, yes.

9    **Q.**  In fact, we can just look at real quickly, you see on the

10   screen I've got page 11 of Plaintiff's Exhibit 2.  You've

11   seen these bars, this kind of model before, correct?

12   **A.**  Yes.

13   **Q.**  You've seen that in other documents different than the

14   document we're looking at, correct?

15   **A.**  Yes.

16   **Q.**  So I'd like to look at some information back on page 8

17   related to that logistic model.  This actually may not be the

18   same model, but this is the model being discussed here in P2.

19   And I'd like to ask you about the information that you see on

20   the screen.

21          And this is the odds of admission based on the

22   different categories that we see on the left.  Do you see

23   that?

24   **A.**  I do see that.

25          MR. LEE:  Your Honor, I understand he's going to be

```
 1    allowed to ask, but can we at least have the foundation
 2    question so I can preserve my objection of whether he's seen
 3    this page before?
 4              THE COURT:  Yes.
 5    BY MR. HUGHES:
 6    Q.  Dean Fitzsimmons, is this part of the document that you
 7    testified you have had a recollection of?  Do you have a
 8    recollection of page 8 of this document?
 9    A.  I really don't.
10    Q.  So let's briefly move through it then.  Again, this is a
11    chart that shows the odds of getting into Harvard based on
12    the different categories on the left.  You see that, correct,
13    Dean Fitzsimmons?
14    A.  I again don't -- I'm reaching beyond the limits of my
15    statistical knowledge.  I'm surer Erin Driver-Linn could help
16    you or Dr. Card.
17    Q.  Would you agree that having, for example, a high personal
18    rating would increase the odds of an applicant getting into
19    Harvard?
20    A.  Again I don't know how this works, how they figured that
21    out from the logistic model.  It's not in my purview.
22              THE COURT:  I'm going to stop you there on this
23    line.  It sounds like he's going to be guessing, to me.
24              MR. HUGHES:  We're going to leave this momentarily.
25    BY MR. HUGHES:
```

1    **Q.**  So again, Dean Fitzsimmons, I'm showing you now page 11

2    of Plaintiff's Exhibit 2.  Is this part of the document that

3    you had a recollection of?

4    **A.**  I do recollect that -- --

5    **Q.**  Is page 11 of Plaintiff's Exhibit 2 -- page 11 of

6    Plaintiff's Exhibit 9 part of the document that you have a

7    recollection of seeing?

8    **A.**  It's -- page 11 is something that I remember, but I don't

9    know whether I remember it being in this document or not.

10   **Q.**  Is page 10 of Plaintiff's Exhibit 9 part of the

11   information you recall seeing in this document?

12   **A.**  I'm less sure of this one, quite honestly.

13          MR. HUGHES:  Let's move on to Plaintiff's

14   Exhibit 12.  And this is a document entitled "Admissions and

15   Final Aid At Harvard College," from the office of

16   institutional research, dated February 13.  I'd like to offer

17   this exhibit into evidence.

18          MR. LEE:  No objection.

19          THE COURT:  It's admitted.

20          (Plaintiff Exhibit No. 12 admitted.)

21   BY MR. HUGHES:

22   **Q.**  You were here on Monday for opening statements?

23   **A.**  I was.

24   **Q.**  And I think Mr. Lee said in his opening that this was a

25   presentation that was shown to you.  Is that -- did you, in

Case: 19-2005    Document: 00117632237    Page: 76    Date Filed: 07/30/2020    Entry ID: 6356615
Case 1:14-cv-14176-ADB   Document 633   Filed 04/18/19   Page 64 of 230

64

1  fact, see this presentation back in 2013?

2  **A.**  I did.

3  **Q.**  And was this presentation shown to you at that

4  February 25 meeting that you and Ms. Donahue agreed to attend

5  with Dr. Driver-Linn from OIR?

6  **A.**  I think so.  That's right.  Remember we're right in the

7  middle of regular action at that point and we have lots of

8  things going on, but I have a recollection of it.

9  **Q.**  We saw that email earlier about February 25th.

10  **A.**  Yeah.

11  **Q.**  Do you remember who else was at that meeting besides

12  Dr. Driver-Linn and Ms. Donahue?

13  **A.**  I'm not sure exactly.  I would speculate -- I can

14  speculate if you want.

15  **Q.**  I don't think we need speculation.  Let's go ahead and

16  look at page 3 of Plaintiff's Exhibit 12.  Again, this is a

17  document that was prepared by Harvard's office of

18  institutional research, correct?

19  **A.**  That's correct.

20  **Q.**  And is this part of the work that your office was

21  coordinating on with Harvard's office of institutional

22  research at least in part related to the concerns about --

23  that came around the Unz article and discrimination against

24  Asian-Americans?

25  **A.**  That would certainly be part of it, to the best of my

1   recollection.

2   **Q.**  There are obviously other subjects identified and

3   discussed in this document that don't relate to that,

4   correct?

5   **A.**  That's correct.

6   **Q.**  So we have at the top here of this OIR document, "Recent

7   admissions and financial aid questions raised."

8            Do you see that?

9   **A.**  I do.

10  **Q.**  And the first question is, "What is the effect on our

11  applicant pool and yield of reintroducing early action?"

12           That was something OIR was working on at the time

13  with your office?

14  **A.**  That's correct.

15  **Q.**  But that's one of the things that doesn't have anything

16  to do to do with Unz and claims of discrimination, correct?

17  **A.**  That's correct.

18  **Q.**  Okay.  And then the second thing is, "Is the shift and

19  gender balance at Harvard College due to increased interest

20  and recruitment for SEAS?"

21           Again, that's a topic that doesn't have to do with

22  the discrimination issue, correct?

23  **A.**  That would be correct.

24  **Q.**  Okay.  Then we have Number 3, "Does the admissions

25  process disadvantage Asians?"

Case: 19-2005    Document: 00117628237    Page: 78    Date Filed: 07/30/2020    Entry ID: 6356615
Case 1:14-cv-14176-ADB    Document 633    Filed 04/18/19    Page 66 of 230

66

1    That's the third topic, correct?

2    **A.**  That's correct.

3    **Q.**  And that's a topic your office was working on with the

4    office of institutional research at this time, correct?

5    **A.**  Certainly one of the things, correct.

6    **Q.**  Now, I want to look at the portion of this February 2013

7    presentation that relates to that question, the question of

8    whether the process disadvantages Asians.

9         So let's look at page 31 of Plaintiff's Exhibit 12.

10   I've got it up on the screen, Dean Fitzsimmons, but you're

11   welcome, of course, to follow along on paper or on the

12   screen.

13        Here on the screen, page 31 of P12, we've got

14   "Evaluating factors that play a role in Harvard College

15   admission."

16        Do you see that?

17   **A.**  I do.

18   **Q.**  Then if we turn to page 32, the next page, at the top of

19   the page it says, "Goal:  Using various admissions ratings,

20   how well can we approximate admit rates by race/ethnicity and

21   the demographic composition of the admitted students pool?"

22        Do you see that?

23   **A.**  I do.

24   **Q.**  That was a goal of the analysis that OIR was working on

25   in coordination with your office, correct?

1    **A.**   Yes.  That's the goal they were working with, and they

2    had a variety of inputs, I'm sure.

3    **Q.**   So then we've got strategy.  The strategy here is to fit

4    a series of basic logistic regression models using data from

5    classes of 2007 to 2016.

6         Do you see that?

7    **A.**   I do.

8    **Q.**   That's ten years of data, correct?

9    **A.**   Yes.

10   **Q.**   And then it says, "Generate fitted probabilities of

11   admission, given an applicant's characteristics, how likely

12   they are to be admitted?"

13        Do you see that?

14   **A.**   I do.

15   **Q.**   The basic goal is to try to build a model that predicts

16   whether or not you'll get in based on the different variables

17   in the model, correct?

18   **A.**   That's correct.

19   **Q.**   And then for each class, "Select the 2,100 applicants

20   with the highest probability of admissions as our simulated

21   admitted class."

22        Do you see that?

23   **A.**   I do.

24   **Q.**   And then you examine the resulting demographics and admit

25   rates by ethnicity.  That was the strategy here for this

1    analysis, correct?

2    **A.**    That's correct.

3    **Q.**    And then on the notes on the bottom, just to be complete,

4    students that didn't have an academic index weren't included,

5    correct?

6    **A.**    That's correct.

7    **Q.**    And this notes that the analysis was preliminary, bold

8    underlined, and for discussion.  Correct?

9    **A.**    That's correct.

10   **Q.**    Now, if we go to the next page, we've got -- you remember

11   we've already looked at that colorful bar graph, and there's

12   four different bar graphs, right?

13   **A.**    Maybe five.

14   **Q.**    Actually, you're right.  There's five.

15   **A.**    Yeah.

16   **Q.**    There's four different modeling choices, correct?

17   **A.**    That's correct.

18   **Q.**    And then the first one, academic only, the OIR starts

19   with the academic index and the academic rating, correct?

20   **A.**    Correct.

21   **Q.**    And then in the second model, OIR adds in the preferences

22   for legacies and athletes, correct?

23   **A.**    That's correct.

24   **Q.**    While keeping in academic index and academic rating,

25   correct?

1    **A.** Correct.

2    **Q.** And then in the third model keeps in academic index,

3    academic rating, legacy, athlete, and then adds in the

4    personal rating and the extracurricular rating, correct?

5    **A.** Correct.

6    **Q.** And then in the fourth model keeps everything that was in

7    the third model and adds gender and ethnicity, correct?

8    **A.** That's correct.

9    **Q.** And then if we look at page 34 of Plaintiff's Exhibit 12,

10   I just want to walk through kind of what happens in each of

11   those models.  Okay?

12   **A.** Yes.

13   **Q.** Just to orient everybody who maybe hasn't seen this

14   document, what we have on the screen, the first four bars

15   going from left to right, those are the first -- those are

16   the four models that you and I just discussed, correct?

17   **A.** That's correct.

18   **Q.** And then the fifth column is what the actual admitted

19   class would look like, correct?

20   **A.** That's correct.

21   **Q.** And the way the different colors in the bars here

22   represent different races or ethnicities, correct?

23   **A.** That's correct.

24   **Q.** And the bottom, which is I think the color black is for

25   white applicants, correct?

1    **A.**  That's correct.

2    **Q.**  And then the second color, which I guess is olive-green

3    or brown, whatever it is, that is for Asian applicants,

4    correct?

5    **A.**  Correct.

6    **Q.**  What would you call that color?

7    **A.**  I have no idea.

8    **Q.**  I'm not the only one.  Okay.

9           Then as we move up, we've got more of the maroon

10   color, and that is for African-American applicants, correct?

11   **A.**  You did unknown, right?

12   **Q.**  I'm sorry.  We've got unknown, which is a gray color,

13   correct?

14   **A.**  That's correct.

15   **Q.**  Right above Asian applicants?

16   **A.**  Yes.

17   **Q.**  And then we go up and the next color, maroon,

18   African-American applicants, correct?

19   **A.**  That's correct.

20   **Q.**  And then we've got going up, international, light gray;

21   Hispanic, pinkish; and then Native American, light pink.

22   Correct?

23   **A.**  That's correct.

24   **Q.**  Okay.  The first I want to focus on what happens to these

25   different demographic groups as we march through the models.

Case: 19-2005   Document: 00117632237   Page: 83   Date Filed: 07/30/2021   Entry ID: 6356615
Case 1:14-cv-14176-ADB   Document 633   Filed 04/18/19   Page 71 of 230

71

1          In the first model if Harvard -- according to OIR,

2    if Harvard only considered academics, the model predicts that

3    Harvard's admitted class would be over 43 percent

4    Asian-American, correct?

5    **A.**   That's correct.

6    **Q.**   And it predicts that the admitted class would be

7    38 percent white, correct?

8    **A.**   That's correct.

9    **Q.**   And .67 percent African-American, correct?

10   **A.**   Correct.

11   **Q.**   And 2.42 percent Hispanic, correct?

12   **A.**   Correct.

13   **Q.**   That's academics only.  That's not what Harvard does in

14   its admissions office, correct?

15   **A.**   That's right.  And as we said in the *Bakke* decision and

16   in OCR and lots of other times.

17   **Q.**   Then we move and we add in legacies and athletes.  That's

18   what's happening in Model 2, correct?

19   **A.**   That's correct.

20   **Q.**   And when we that happens, we see that the Asian-American

21   applicants go from 43 percent down to 31.4 percent, correct?

22   **A.**   That's correct.

23   **Q.**   Those preferences for legacies and athletes don't help

24   Asians as a group in terms of admission to Harvard, according

25   to this model, correct?

Case: 19-2005    Document: 00117633237    Page: 84    Date Filed: 07/30/2020    Entry ID: 6356615
Case 1:14-cv-14176-ADB    Document 633    Filed 04/18/19    Page 72 of 230

72

1    **A.**   According to the model, yes.

2    **Q.**   The fact that the Asian-American admission rate goes down

3    from Model 1 to Model 2 when we add in the legacies and

4    athletes is consistent with what Harvard has told OCR about

5    the effect of legacies and athletes on the relative admission

6    rates between white and Asian-American applicants, correct?

7    **A.**   Yes.  Those are two important institutional factors.

8    **Q.**   And then if we add in legacy and athlete preferences,

9    African-American admissions predicted to go up to 1.83, and

10   Hispanic stays basically the same, a little bump, to 2.62.

11              Do you see that?

12   **A.**   I do.

13   **Q.**   Those changes are consistent with what you know, based on

14   your experience as dean, that the legacy and athlete

15   preferences primarily -- at least at this time, and you've

16   told me yesterday that's changing -- at least at this time

17   primarily benefit white applicants, correct?

18   **A.**   That's right.  And you're right about "at this time."

19   **Q.**   Then we move to Model 3 where we add in the

20   extracurricular and personal ratings.

21              Do you see that?

22   **A.**   I do.

23   **Q.**   You've already told me yesterday that as a group

24   Asian-Americans are awarded on average higher personal

25   ratings -- I'm sorry -- higher extracurricular ratings than

1    white applicants.  That's correct, right?

2    **A.**  Yes.

3    **Q.**  So here we've got those two variables, extracurricular

4    and personal.  And so we see here when you add in those

5    variables that the predicted Asian admission to Harvard goes

6    from 31 percent to 26 percent, correct?

7    **A.**  That's correct.

8    **Q.**  And we know that Asian-Americans are doing better as a

9    group on the extracurricular score, so what is likely doing

10   the work here is lower personal ratings for Asian-Americans

11   as a group, correct?

12   **A.**  That sounds logical, yeah.

13   **Q.**  And then we see that when you add in extracurricular and

14   personal rating, African-Americans as a group, their

15   projected admission goes from 1.83 up to 2.36, correct?

16   **A.**  That's correct.

17   **Q.**  And Hispanic applicants as a group go up from 2.62 to

18   4.07, correct?

19   **A.**  That's correct.

20   **Q.**  And the white applicants go from 48 percent up to

21   50 percent, correct?

22   **A.**  That's correct.

23   **Q.**  So of the four groups that the experts have focused on --

24   white applicants, Asian-American applicants,

25   African-American, and Hispanic applicants -- only the

```
 1    Asian-American applicants go down once you add in the
 2    extracurricular and personal rating, correct?
 3    A.   That's what this says, yes.
 4    Q.   That's what was communicated to you when you received and
 5    reviewed this document in February 2013, correct?
 6    A.   That's correct.
 7    Q.   The chance of Asian admission was going down when you
 8    consider extracurricular and personal scores, correct?
 9    A.   That's correct.
10    Q.   Then we move to the last -- sorry, not the last, the
11    fourth column.  And we keep all the other variables in and
12    then we add in ethnicity and gender, correct?
13    A.   That's correct.
14    Q.   And what happens when we do that is that Asian-American
15    applicants, their chance of admission to Harvard comes down
16    yet again, correct?
17    A.   That's correct.
18    Q.   It comes down -- it's highest in Model 1 and then it just
19    comes down, down, down, correct?
20    A.   That's correct.
21    Q.   And in Model 4, once you add in demographic factors, the
22    chance of Asian-Americans getting admitted to Harvard drops
23    from 26 to 18 percent, correct?
24    A.   That's correct.
25    Q.   There's also a drop for white applicants from 51 to
```

1    44 percent, correct?

2    **A.**  Correct.

3    **Q.**  And there's a significant increase for African-American

4    applicants from 2.36 to 11.12, correct?

5    **A.**  That's correct.

6    **Q.**  I want to correct something, Dean Fitzsimmons, that I was

7    getting wrong here.

8            What we're looking at here is the share of each

9    class by ethnicity, correct?

10   **A.**  What was the other dimension you thought?

11   **Q.**  I think I might have said "chance of admission."

12           But what we're at -- on a couple of questions.  But

13   what we're looking at from bar graph to bar graph is the

14   first one, the share of Asian-Americans in the class would be

15   43 percent.  Second one comes down to 31.  Third one comes

16   down to 26, right?  That's what you understand this to show?

17   **A.**  That's correct, yes.

18   **Q.**  So if we look at, going back to the demographics, once

19   you add in gender and race, again the share of the projected

20   class for Asians comes from 26 to 18, correct?

21   **A.**  Yes.  And I knew that's what you meant before.

22   **Q.**  Yes.  Sometimes it's hard to keep all the language

23   straight.

24           And again, the share of the class for white

25   applicants goes from 51 to 44, correct?

1    **A.**   That's correct.

2          THE COURT:  What does gender mean in this?  I'm

3    going to leave it to you, Mr. Hughes to sort out, but what

4    does gender mean in this category?  I take it the ethnicity,

5    we're talking about a tip one way or the other; is that

6    right?  But how does gender factor in?

7          MR. HUGHES:  It's not reported in these bars.  The

8    way that we know that it was factored in is that if we look

9    at page 33 in the fourth model, the two variables that are

10   factored in are gender and ethnicity.

11         THE COURT:  I see that.  But can you see if he

12   knows what it means to factor in gender on this?

13         MR. HUGHES:  It's a variable in the model.

14         THE COURT:  That cuts which way?  On gender why

15   would the number go up or down?

16         MR. HUGHES:  I think that the experts will agree

17   that it doesn't have a significant effect on way or the

18   other.

19         MR. LEE:  Whoa, whoa, whoa.

20         MR. HUGHES:  But I'm not the master of that part of

21   the case.

22         THE COURT:  That's my bad.

23         If you can elicit it from this witness, I would

24   appreciate the clarification.  If you can't -- and I leave it

25   to you whether you want to ask the question now or not.  If

1    it can't be elicited through this witness and you want to

2    elicit it through someone later, but I am curious about

3    whether -- which way -- most of these I understand how they

4    cut.  Right?  You get a higher personal rating and it makes

5    your chance of getting in -- the percentage of the class goes

6    up.  But the gender thing, I'm not sure what it means.  If he

7    can do it, fine; if he can't, we'll wait.

8                    MR. HUGHES:  I have an idea.

9    BY MR. HUGHES:

10   **Q.**  Dean Fitzsimmons, does the Harvard admissions process

11   provide a tip for applicants based on gender?

12   **A.**  No.

13   **Q.**  So pretty much gender doesn't make a difference per se

14   one way or the other in terms of admission to Harvard?

15   **A.**  That would be correct.

16   **Q.**  And you can see that gender is a variable in this model.

17   Do you see that?

18   **A.**  It is.  It's a rough model.  For some reason they decided

19   not to give you more description of it.  But it is in the

20   model according to page 33, and then it doesn't show the

21   effect obviously on 34.

22   **Q.**  Given that your testimony is that gender per se doesn't

23   make a difference one way or the other, you wouldn't expect

24   that to change things in the model?

25   **A.**  Right.  It would simply -- I think you should ask the

 1    experts on this, though, just for the definitive piece.  But

 2    that's generally the case is that women and men get in at

 3    about the rate at which they apply.  As with anything else,

 4    there are certainly variations from year to year because the

 5    individuals vary from year to year.

 6    **Q.**  Okay.

 7              MR. HUGHES:  Your Honor, did that address the

 8    question?

 9              THE COURT:  Yes.  Thank you.

10    BY MR. HUGHES:

11    **Q.**  So, Dean Fitzsimmons, let's keep talking here about

12    page 34.  We see that the share of the class that is

13    Asian-Americans once we add in personal score and

14    extracurricular goes down, goes down again once we add in

15    demographics.  We've reviewed that together, correct?

16    **A.**  That's correct.

17    **Q.**  Then when we compare the final model, Model 4, to the

18    actual admitted class, we see that Model 4 comes pretty close

19    to predicting the share of each ethnicity in the actual

20    admitted class.

21              Do you see that?

22    **A.**  I do.  And it's very consistent with what we've talked

23    about before, you know.  It's not simply a matter of looking

24    at test scores and grades or academics alone.  The more

25    factors you add in to try to predict admission, the closer

1    you will come to the class.  As rough a model as this is, it

2    was perfectly -- ultimately quite consistent with what the

3    actual class was and what we have known over of the decades.

4    **Q.**  So did the fact that Model 4 lined up pretty closely with

5    the actual model and what you've known over the decades, did

6    that -- that suggested that the model was reliable, right?

7    **A.**  It certainly came up with a -- in a very rough way with a

8    very small number of variables; for example, Professor Card

9    looked at 200 variables.  Here you've got obviously a very

10   small number of variables.  They're important variables,

11   obviously, but again very consistent with what we've known in

12   the past and very consistent with the actual class at the

13   moment.

14   **Q.**  Mr. Lee said on Monday that this analysis basically

15   confirmed what you already knew and it wasn't a cause for

16   concern.

17          Is that true, this analysis when it was presented

18   to you and you saw the impact of personal score and

19   demographics on Asian-American applicants, that wasn't a

20   concern to you?

21   **A.**  It's always a concern any time, you know, we have to turn

22   anybody down.  But I think if you were to go back even to the

23   *Bakke* decision and also certainly to the OCR decision, that

24   isn't simply how we do things.  And the idea is that all of

25   these factors are important factors.

**JA800**

```
 1           Then of course there are many, many others
 2    identified by Professor Card.
 3           But our job is just to make sure that these factors
 4    are applied in an evenhanded way to everybody who applies
 5    regardless of background.  So that is quite consistent, when
 6    you get down to the end of this, obviously quite consistent
 7    with the actual Harvard class.
 8    Q.  At least as of the time that you got this analysis from
 9    OIR, you were aware that inclusion of the extracurricular and
10    personal score would drive down the share of a class that was
11    Asian-American and drive it up for white, African-American,
12    and Hispanic applicants, correct?
13    A.  Again just going back even to the Bakke decision, but
14    certainly to OCR, this is very, very consistent.  We've said
15    to people constantly over the years that our process does
16    include as factors legacy, athlete, extracurricular,
17    personal, and various demographic factors.
18           So you know, there will be changes as you go
19    through the models, but this is very consistent with what we
20    have said all along and been found to be certainly not any
21    indication of discrimination by OCR, among others.
22    Q.  With respect, sir, my question had nothing to do with
23    Bakke or OCR.  It had to do with what the model shows.
24           I want to focus on the difference between Model 2
25    and Model 3.  The things that are added in between those two
```

**JA801**

1    models, the things that drive all the change are

2    extracurricular and personal score, correct?

3    **A.**    They are certainly factors that made a difference, you're

4    correct, as you went from 2 to 3.

5    **Q.**    And what is being communicated to you here in February

6    of 2013, an analysis by OIR, is that when you factor in the

7    personal score and the extracurricular score, the share of

8    Asian-Americans in the projected class goes down, and the

9    other three groups that are being focused on here -- White

10    applicants, African-American applicants, Hispanic

11    applicants -- go up, correct?

12    **A.**    Right.    The numbers are what they are.    But again, those

13    are two very important factors in our process.

14    **Q.**    And you knew at the time that Asian-Americans were doing

15    better on the extracurricular rating.    You've told me that,

16    correct?

17    **A.**    That's correct.

18    **Q.**    And so did it concern you when you were provided this

19    information that your admissions process might be penalizing

20    Asian applicants because of the personal quality score?    Was

21    that a concern to you in February 2013?

22    **A.**    Well, it's always a concern.    But the personal quality

23    factor, you know, has been a factor we have talked about

24    consistently over time.    And it certainly is a part of what

25    we do.

1     **Q.**  Let's continue to look at this document.  Page 36 of

2     Plaintiff's Exhibit 12 is entitled "What Have We Learned?"

3     Correct?

4     **A.**  That's correct.

5     **Q.**  And what OIR says, "Once we account for ratings and

6     demographic factors, we can closely predict what the admitted

7     class will look like."  Correct?

8     **A.**  That's correct.

9     **Q.**  "With current data, we explain a significant amount of

10    the variation in admission, but further details (especially

11    around the personal rating) may provide further insight."

12              That's what OIR says, correct?

13    **A.**  That's correct.

14    **Q.**  And you didn't follow up with OIR to figure out further

15    details around the personal rating, correct?

16    **A.**  That's correct.  Because what we saw here was perfectly

17    consistent with what we've seen for decades, as I said

18    before.

19    **Q.**  And then it ends saying, "There are a variety of factors

20    that quantitative data is likely to miss or ratings do not

21    capture.  We'd like to understand exceptional talent, music,

22    art, writing, the role of context cases, the role of personal

23    statement/essay, measures of socioeconomic status," correct?

24    **A.**  That's correct.  Among other things.

25    **Q.**  You didn't follow up with OIR to figure out how those

Case: 19-2005    Document: 00117632237    Page: 85    Date Filed: 07/30/2020    Entry ID: 6356615
Case 1:14-cv-14176-ADB   Document 633   Filed 04/18/19   Page 83 of 230

83

1    things play a role after this, did you?

2    **A.**   We certainly were interested and followed up on

3    socioeconomic status, among other things.

4           But I think we've always had a very clear sense

5    that, again with exceptional talent or the other factors,

6    as -- I don't want to repeat myself.  But yesterday we talked

7    about how we really do look at everything when we go through.

8    So we've known that these have long been factors in our

9    process, and I think the world knows that.

10   **Q.**   The one thing that you followed up with OCR -- with OIR,

11   which we'll talk about in a minute, you did follow up and ask

12   for more research on socioeconomic -- low-income issues,

13   correct?

14   **A.**   Yes.  Not with OCR, but -- I'm just kidding.  OIR, yep.

15   **Q.**   Now, turning to page 37.  "Next steps.  Determining

16   priorities, timing, and audiences."

17          Do you see that?

18   **A.**   Yes.

19   **Q.**   It says, "Should this work be shared with additional

20   audiences (e.g., President Faust, Dean Smith, Dean Hammonds)?

21   What are your priorities?"

22          Do you see that?

23   **A.**   Yes, I do.

24   **Q.**   This a presentation that OIR is presenting to you on

25   February 25?

**JA804**

1    **A.**   Yes.  And obviously data that they have themselves now

2    knowledge of.

3    **Q.**   And you decided not to share the work with President

4    Faust, Dean Smith, and Dean Hammonds, correct?

5    **A.**   There's lots of information, as you indicated before, in

6    this very lengthy report.  But it was certainly good to have

7    the information about early admission, for example, and what

8    the effect was of bringing it back.  And it was obviously

9    good to have an understanding of what was going on with our

10   new and very, very rapidly growing School of Engineering and

11   Applied Sciences, especially as it relates to gender.

12          The third part of it, again, there was no

13   preliminary study.  It was very incomplete, as they said, and

14   it literally took us right to where the actual class was, and

15   again, very consistent with what we've always said over time.

16   So it was good to have this information.

17   **Q.**   It was good for you to have the information that we just

18   looked at, but you didn't share that information with

19   President Faust, Dean Smith --

20   **A.**   Not immediately at that point.  Of course, remember that

21   we were sitting in the middle of the busiest time of the year

22   in regular action looking at 40 -- no, at that time I guess

23   it was more like 35,000 applicants.

24   **Q.**   You didn't share it with your boss, Dean Smith, or the

25   president -- or President Faust, right?

1    **A.**   That's correct.

2    **Q.**   And now I want to talk about who else you didn't tell.

3          MR. LEE:  Your Honor, just for clarity purposes, is

4    he talking about the entire report?  You didn't tell them

5    anything about the entire report?

6          MR. HUGHES:  I'm talking about the pages that we

7    were with just talking about, starting at page 31.  I think

8    the record is crystal clear on that.

9          MR. LEE:  That was my concern.

10   BY MR. HUGHES:

11   **Q.**   So, Dean Fitzsimmons, remember earlier we had a somewhat

12   laborious walk through the privilege log.  I have one more

13   time that I'd like to look at that with you.  Do you have

14   that handy?

15   **A.**   Let me see.  I have it handy.

16   **Q.**   And I've got a red tab --

17          MR. HUGHES:  Your Honor, would you like a copy of

18   the privilege log?

19          THE COURT:  If you're just going to have him do

20   what you've done, I don't need it.

21          MR. HUGHES:  Okay.  Thank you, Your Honor.

22   BY MR. HUGHES:

23   **Q.**   I've got a red tab that should be on page 10 of the log.

24   Do you see that?

25   **A.**   I do.  I was wondering what that red tab was.

**JA806**

1    **Q.**  It's to help us both move things along.  So here, just to

2    remind you, the document that we were just looking at was

3    from -- that's still up on the screen, Plaintiff's

4    Exhibit 12, was from February of 2013, correct?

5    **A.**  That's correct.

6    **Q.**  Showing it at a meeting on February 25, correct?

7    **A.**  That's correct.

8    **Q.**  And then now we're looking at the privilege log, do you

9    recall that there was an OCR request to your office in April

10   of 2013?

11   **A.**  I don't recall precisely to, be honest, but --

12   **Q.**  You do see on the privilege --

13   **A.**  I see it.  So I assume something came in at that point.

14   **Q.**  So there's two entries here between Ms. Yong and you,

15   subject matter:  First pass, OCR request, date April 10,

16   2013.  Correct?

17   **A.**  That's correct.

18   **Q.**  Okay.  And now I'd like to show you Plaintiff's

19   Exhibit 515, which is correspondence from the same time

20   between you and Mr. Hibino.  And I'd like to offer that into

21   evidence.

22            MR. LEE:  No objection.

23            THE COURT:  Admitted.

24            (Plaintiff Exhibit No. 515 admitted.)

25   BY MR. HUGHES:

1    **Q.**  Thank you, Your Honor.  And I've got it here on the

2    screen, Dean Fitzsimmons.

3    **A.**  It's a little blurry, so I think I'll just go with the

4    paper.

5    **Q.**  I've blown it up for you.  There we see, we've got an

6    email exchange between Mr. Hibino and you with a date of

7    April 10, 2013.

8              Do you see that?

9    **A.**  Excuse me.  I do.

10   **Q.**  It's P516.

11   **A.**  I have it.  Yes, I do.

12   **Q.**  And that's the same date we saw in the privilege log for

13   the email exchange between you and Ms. Yong, correct?

14   **A.**  That's correct.

15   **Q.**  And then I want to blow up part of that email from

16   Mr. Hibino to you.  Mr. Hibino is writing to your

17   assistant -- you're copied on this email right here, correct,

18   Dean Fitzsimmons?

19   **A.**  This is the one you have on the screen?

20   **Q.**  On the screen.

21   **A.**  Yes.

22   **Q.**  Okay.  He's talking to your assistant, but you received

23   these emails, correct?

24   **A.**  Yes.

25   **Q.**  We've got this email dated April 10, 2013.  "In case he

1    is not reading his emails, I wanted to ask him one other

2    question from our call this morning.  Regarding the impact of

3    legacy on Asian-American applicants, what proportion of

4    Asian-American applicants are legacies and what proportion of

5    white applicants are legacies?"

6              Do you see that?

7    **A.**  I can, yes.

8    **Q.**  And do you recall at this time that OCR was looking at a

9    potential claim of discrimination, an individual claim

10   against Asian-American applicant?

11   **A.**  I do have a recollection.  I'm not quite sure of the

12   precise details.

13   **Q.**  But it relates to that general issue, correct?

14   **A.**  Yes.

15   **Q.**  And that's what these documents concern, correct?

16   **A.**  That's correct.

17   **Q.**  And Mr. Hibino is asking you about legacy issues

18   surrounding that, correct?

19   **A.**  That's right.  Again, it's the cross-tab between

20   Asian-American and legacies and whites.

21   **Q.**  I want to go back to Plaintiff's Exhibit 12, page 34.

22             When you were having this dialogue and

23   correspondence with Mr. Hibino in April, just a little more

24   than a month after you'd been presented this information by

25   Harvard's Office of Institutional Research, did you tell

1    Mr. Hibino that even after you factor in the legacy and

2    athlete preferences that doesn't explain away all the

3    differences between white and Asian-American admissions to

4    Harvard?  Did you communicate to him what you'd learned from

5    OIR?

6    **A.**   I think he was just simply asking me about the numbers of

7    legacies who are Asian-American and white.  I don't think he

8    was asking me the question you just posed.

9    **Q.**   You didn't hell him, you know, we used to say legacies

10   and athletes explained everything.  OIR's now run some models

11   that might call that into question.  You didn't volunteer

12   that to Mr. Hibino, correct?

13   **A.**   Well, again, he simply asked me for some fairly limited

14   information.  Again, these were again very unremarkable

15   results here, again consistent with what we had done and what

16   they had looked at actually, what, 20-something years ago.

17   **Q.**   Let's keep moving on through 2013.  Later on in April

18   of 2013 after this dialogue with Mr. Hibino --

19   **A.**   Where are you now?

20   **Q.**   I'm sorry.  I'll take this off the screen.  I'm going to

21   ask you a question unrelated to a document.

22   **A.**   Okay.

23   **Q.**   In April of 2013, you asked the Office of Institutional

24   Research to look into the question of whether low-income

25   students receive a tip in the admissions process, correct?

1   **A.**  I did.

2   **Q.**  And I want to just look at -- show you Plaintiff's

3   Exhibit 19 and offer it into evidence.

4   **A.**  This is P19?

5   **Q.**  I'm waiting to see if we get it into evidence.

6           MR. LEE:  No objection.

7           THE COURT:  Admitted.

8           (Plaintiff Exhibit No. 19 admitted.)

9   BY MR. HUGHES:

10  **Q.**  Here we have an email from Erica Bever.  Do you see that?

11  **A.**  I do.

12  **Q.**  The date of the email is April 15, 2013, correct?

13  **A.**  That's correct.

14  **Q.**  At that time, Ms. Bever worked in -- she was the

15  assistant director, as we can see from her signature, of the

16  Office of Institutional Research, correct?

17  **A.**  That's correct.

18  **Q.**  And, Dean Fitzsimmons, Ms. Bever actually works for you

19  now in the admissions office, correct?

20  **A.**  That's correct.

21  **Q.**  But at this time she was with OIR, and she's writing you.

22  Subject is "Follow up," and copying Dr. Driver-Linn, Mark

23  Hansen.

24          She says, "Hi, Fitz.  Mark and I will be putting

25  together materials for the two requests you discussed with

1    Erin on Friday.  One, Dean Smith's tuition versus income

2    growth question; two, low-income students in admissions.

3    We're aiming to get you materials to review no later than the

4    end of the week."

5         Do you see that?

6    **A.**  Yes, I do.

7    **Q.**  And you recall asking for this work to be performed,

8    correct?

9    **A.**  I did.

10   **Q.**  The people that were performing this work,

11   Dr. Driver-Linn, Ms. Bever, were some of the same people that

12   worked on the work we just looked at in Plaintiff's

13   Exhibit 12, correct?

14   **A.**  That's correct.

15   **Q.**  When you asked him to do this additional work on

16   low-income students and admissions, you didn't tell them not

17   to run a logistic regression model, correct?

18   **A.**  Well, they had done the work, so I'm not sure what you're

19   asking me.

20   **Q.**  You weren't saying it's not a good idea to keep analyzing

21   our admissions process with logistic regression models.  You

22   were fine with them continuing to do that, correct?

23   **A.**  They had submitted the data.  We had discussed it.  And

24   again, the five models -- again, the four models were again

25   very consistent with the past.  But I'm not quite sure what

1    you were expecting me to ask here.

2    **Q.**  Just a very simple question.  You were perfectly

3    comfortable with them continuing to analyze admissions data

4    using the logistic regression models that they employed,

5    correct?

6    **A.**  Really, whatever they wanted to do.  Whatever they

7    thought could be helpful to us.

8    **Q.**  And you had confidence, of course, that your colleagues

9    at OIR would provide you robust and reliable work, correct?

10   **A.**  Yes.

11   **Q.**  That's a serious office that does serious work on behalf

12   of Harvard, correct?

13   **A.**  That's correct.

14   **Q.**  And remember we saw back in Plaintiff's Exhibit 12 that

15   one of the things that OIR was using in its model was the

16   academic index.

17           Do you recall that?

18   **A.**  Yes.

19   **Q.**  And you didn't suggest to them, hey, it's not a good idea

20   to use the academic index.  You trusted them to pick reliable

21   variables, correct?

22   **A.**  We trusted them to do good research.

23   **Q.**  Now I want to show you Plaintiff's Exhibit 21 and offer

24   it into evidence.

25           MR. LEE:  No objection.

```
 1              THE COURT:  It's admitted.
 2              (Plaintiff Exhibit No. 21 admitted.)
 3              MR. HUGHES:  Thank you, Your Honor.
 4    BY MR. HUGHES:
 5    Q.  And here we've got an email from Ms. Bever, dated
 6    April 22, 2013, to you, copying others, correct?
 7    A.  That's correct.
 8    Q.  And this is about a week after the email that we just
 9    looked at, correct?
10    A.  That's correct.
11    Q.  And Ms. Bever says, "Dear Bill.  I'm attaching two sets
12    of slides for your review.  Number one, low-income exhibits.
13    This set of slides examines difference in admission rates for
14    low-income students and all other students."
15              Do you see that?
16    A.  Yes, I do.
17    Q.  Okay.  And then those low-income slides are attached to
18    this email, as she just said.  I've got the second page of
19    Plaintiff's Exhibit 21 on the screen.
20              Do you recall getting this information from OIR
21    concerning low income?
22    A.  I do.
23    Q.  Okay.  And what we've got here is we've got a chart that
24    shows income along the bottom, correct?
25    A.  That's correct.
```

**JA814**

 1  **Q.**  And we've got SAT scores as the other metric, correct?

 2  **A.**  That's correct.

 3  **Q.**  And the title, the note here in the bullet point is that

 4  income and SAT scores are positively related, correct?

 5  **A.**  That's correct.

 6  **Q.**  Okay.  Just the basic idea is the more resources you

 7  have, that would be at least correlated with a likelihood of

 8  getting a higher SAT score, correct?

 9  **A.**  Yes.

10  **Q.**  Okay.  Then we go to the next slide.  And what OIR does

11  is uses SAT as a proxy for admissions qualifications.  We see

12  at every score level lower-income students have higher admit

13  rates.

14          Do you see that?

15  **A.**  I do.

16  **Q.**  Again, this was data that you asked for and was presented

17  to you by OIR, correct?

18  **A.**  That's correct.

19  **Q.**  You remember getting this data, correct?

20  **A.**  I do.

21  **Q.**  And what we've got along the bottom here are SAT scores

22  it looks like ranging from 600 up to 800, perfect, correct?

23  **A.**  That's correct.

24  **Q.**  Okay.  And here what we have is we have a comparison of

25  the likelihood of admission for similarly qualified academic

1    candidates, correct?

2    **A.**  Yes.  That's the analysis.

3    **Q.**  This is good analysis in the sense it makes sense

4    sometimes to look at similarly qualified academic candidates

5    when analyzing the Harvard admissions process, correct?

6    **A.**  It's certainly one way to do it.

7    **Q.**  And a way that OIR, your colleagues at OIR did, correct?

8    **A.**  That's correct.

9    **Q.**  The work that you asked for, correct?

10   **A.**  That's correct.

11   **Q.**  Okay.  And so what we see here actually is that even

12   though getting a higher SAT score is at least correlated with

13   more money, more resources, it turns out in the Harvard

14   admissions process, if you have people with similarly

15   academic qualifications, low-income socioeconomic applicants

16   are more likely to get in to Harvard than a similarly

17   qualified non-disadvantaged applicant, correct?

18   **A.**  Yes.  It could serve in a sense as a tip factor.

19   **Q.**  You were actually -- based on some things that had been

20   reported in the literature, you were actually looking into

21   whether the Harvard admissions process could provide a tip

22   for -- did provide a tip, in fact, for low-income applicants,

23   correct?

24   **A.**  Yes.  We wanted empirical proof of it.

25   **Q.**  And you asked OIR to get that empirical proof, correct?

1    **A.**   That's correct.

2    **Q.**   And that's what this is.  This was empirical proof of

3    that tip, correct?

4    **A.**   Yes.

5    **Q.**   And then we go to the next slide.  And again, these are

6    predicted and actual admit rates by income band.

7              Do you see that?

8    **A.**   I do.

9    **Q.**   And this is page 3 of the slides.  It's actually page 4

10   of Plaintiff's Exhibit 21.  And I want to just walk through

11   what this is showing.  If we look at the bottom, we have the

12   maroon is the predicted admit rate.

13             Do you see that?

14   **A.**   I do.

15   **Q.**   And then the white with the maroon outline around it is

16   the difference between the predicted and actual admit rates,

17   correct?

18   **A.**   Correct.

19   **Q.**   And then the diamond, black diamond is the actual admit

20   rate, correct?

21   **A.**   That's correct.

22   **Q.**   And then what we do here, they kind of explain what

23   they've done.  OIR says, "Predicted admit rates by income are

24   based on logistic regression models that control for academic

25   index, academic rating, athlete, legacy, extracurricular

1    rating, personal rating, ethnicity, and gender."

2             Do you see that?

3    **A.**   I do.

4    **Q.**   And then it describes the conclusions that are shown in

5    the bar graph here, that "low-income students are admitted at

6    higher rates than predicted.  Higher income students are

7    admitted at a lower rate."

8             Correct?

9    **A.**   That's correct.

10   **Q.**   And then it describes the pseudo R-squared of the model,

11   correct?

12   **A.**   That's correct.

13   **Q.**   This was more of the empirical evidence that OIR provided

14   to you showing that, in fact, there is a tip for low-income

15   applicants to Harvard, correct?

16   **A.**   That's correct.

17   **Q.**   Now I'd like to show you Plaintiff's Exhibit 604.

18             MR. LEE:  Are you going to offer it?

19             MR. HUGHES:  I'm sorry, Mr. Lee.

20             I offer Plaintiff's Exhibit 604 into evidence.

21             MR. LEE:  I would object because this witness is

22   not on this email chain.

23             THE COURT:  Hold on.  Let me look at it.

24             MR. HUGHES:  If I may be heard, Your Honor?

25             THE COURT:  Let me read it first and then you can

1    definitely be heard.

2           I'm not going to admit -- you can be heard, but let

3    me tell you what my preliminary thought is.  I'm not going to

4    admit the exhibit through this witness.  He's not on it, and

5    I don't know that he's ever seen it before.  But to the

6    substance that, for example, he -- it reflects that he has

7    some information he wants to share, if you want to ask him

8    about that, you can.

9           MR. HUGHES:  He was shown it in preparation for his

10   30(b)(6) deposition, but we can get that out here.

11          THE COURT:  Okay.  Any objection to it being on the

12   screen, Mr. Lee?

13          MR. LEE:  Pardon, Your Honor?

14          THE COURT:  Any objection to it being on the

15   screen?

16          MR. LEE:  No.

17          THE COURT:  It can be shown, Karen.

18   BY MR. HUGHES:

19   **Q.**  Now, Dean Fitzsimmons, do you have the paper version of

20   this in front of you?

21   **A.**  Is this still 604?

22   **Q.**  Yes, sir.  This is Plaintiff's Exhibit 604.

23   **A.**  Okay.

24   **Q.**  Sir, you see there's a sticker on there that has your

25   name on it, "Fitz," with the number 19 in the lower

1    right-hand corner?

2    **A.**   Yes, I do.

3    **Q.**   And you recall being shown this document during your

4    deposition?

5    **A.**   I don't, to be honest, but it was ten hours videotaped.

6    **Q.**   I just want to refresh your recollection on this because

7    it's not a memory contest.  If you want to pull out your

8    deposition and turn to page 417.

9    **A.**   Let's see.  It's the binder.  Okay.  417?

10   **Q.**   417.  I'll remind you that this was Exhibit 19 to your

11   deposition.  I just want you to read to yourself starting at

12   417, line 22, stopping at 418, line 8.  And let me know when

13   you've finished reading --

14   **A.**   So 417 from -- excuse me?

15   **Q.**   417, 22, to 418, line 8.

16   **A.**   I'm sorry.  How far down do you want me to read?

17   **Q.**   Line 8.

18   **A.**   Can I just finish?  One second.

19   **Q.**   Sure.  Take your time.

20   **A.**   Okay.

21   **Q.**   Now that you've refreshed your recollection, do you agree

22   that you saw this during your deposition and it was shown to

23   you in preparation for your deposition?  That's what you

24   testified to.

25   **A.**   That sounds right.

 1   **Q.**  So now let's take a look at the document.  The second

 2   page, let's orient everybody to the date.  We've got an email

 3   from Dr. Driver-Linn to Christine Heenan, and the date is

 4   Sunday, April 28, 2013, correct?

 5   **A.**  That's correct.

 6   **Q.**  And remember we just looked at those slides that provided

 7   that empirical evidence that Harvard was giving a tip to

 8   low-income students?  Do you remember looking at Plaintiff's

 9   Exhibit 21 just a few minutes ago?

10   **A.**  I do.

11   **Q.**  And do you have in mind that the date of Plaintiff's

12   Exhibit 21 was just a few days before?  Plaintiff's

13   Exhibit 21 was April 22.  Do you have that in mind?

14   **A.**  I do.

15   **Q.**  Okay.  So this is an email exchange that you're not on,

16   but it concerns you, and it's occurring just a few days after

17   OIR has sent you its empirical data that establishes that

18   low-income students get a tip, correct?

19   **A.**  Yes.  That sounds right.

20   **Q.**  Okay.  And Dr. Driver-Linn works for OIR, correct?

21           MR. LEE:  No, Your Honor.  He's asked this question

22   20 times about Dr. Linn and OIR.  And I'm getting a little

23   worried about the time.

24           MR. HUGHES:  We all know who Dr. Driver-Linn is.

25   BY MR. HUGHES:

1    **Q.**  Who is Christine Heenan?

2              THE COURT:  The objection took longer than the

3    question would have.  Go ahead.

4    BY MR. HUGHES:

5    **Q.**  Who is Christine Heenan?

6    **A.**  Christine Heenan was our vice president for public and

7    community affairs, I think the title was at the time.  I

8    can't be exact.

9    **Q.**  She's no longer with Harvard.  But when she was, she was

10   one of the top PR people at Harvard, correct?

11   **A.**  That's correct.

12   **Q.**  Was she the very top PR person or just one of a handful

13   at the top?

14   **A.**  I think you could say that.  I'm not totally familiar

15   with the organizational structure of public and community

16   affairs, but she certainly -- you could make that case.

17   **Q.**  Dr. Driver-Linn is communicating with Ms. Heenan a few

18   days after you received the slides we just looked at.

19              And she says, "Hi, Christine.  Hope all is well.

20   Also would like to give you have a heads-up about some

21   analysis and correspondence we've been having with Fitz.

22   He's excited to share more broadly.  I believe he is going to

23   be in touch with Jeff Neal tomorrow, but I'd like to make

24   sure you've had a chance to think through implications, not

25   entirely straightforward."

1          Do you see that?

2    **A.**   I do.

3    **Q.**   And do you remember in the few days after you'd received

4    the information you'd asked for showing that there was

5    empirical evidence of a tip for low-income applicants being

6    excited to share that information?

7    **A.**   I'm not sure I would have used the word "excited," but

8    there's certainly been a great deal of discussion out in the

9    world about the issue.  And it was very good, frankly, for us

10   to see that it was confirmed.

11   **Q.**   There was some criticism that low-income applicants might

12   not be getting a tip.  OIR found they were, in fact, getting

13   a tip, empirical evidence, provided that to you.  Maybe you

14   wouldn't use the word "excited," but you thought that might

15   be something worth getting out there in the public, correct?

16   **A.**   Certainly to, at some point, have the public be aware

17   that contrary to some speculation or research that this is

18   something that we do.  Because I think we really wanted to

19   make sure we sent a message to people from poor and

20   modest-income backgrounds that Harvard was a real possibility

21   for them.  And we had put in place two rounds of a really

22   quite dramatic change in financial aid.  So it seems to me to

23   be something that we would -- if we were asked, for example,

24   we would want to let people know that poor people as well as

25   rich people should think about Harvard.

1   **Q.**  You wanted to send the message to low-income applicants

2   that Harvard would give them a favor shake, even a tip, based

3   on the OIR research, correct?

4   **A.**  Yes.  And again, it's following the process.

5   **Q.**  Now I want to look at the first page of P 604.

6          THE COURT:  How much longer do you think you have

7   with this witness?

8          MR. HUGHES:  Probably another 20 minutes or so.  If

9   it's a good time for a break, this is fine.

10          THE COURT:  I was thinking you would finish your

11   direct and we'd break and then start the cross at after

12   lunch.  It doesn't sound like we're going to get that far.

13          MR. HUGHES:  It just kind of depends on a couple of

14   things.  I'd really defer to Your Honor.

15          THE COURT:  Get to a good stopping place and we'll

16   take the lunch recess.

17          MR. HUGHES:  I think now is as good as any.

18          THE COURT:  Quarter of 1:00.  All right, everyone?

19          MR. LEE:  Your Honor, just if I could remind the

20   Court in the pretrial order we agreed to split the trial

21   time.  We know you've given us three weeks.  We've agreed to

22   split the trial time.  I'm a little worried because we're

23   five and a half hours for this witness, and they have 16

24   other witnesses to go.  And I haven't had a chance with him

25   yet.

```
 1          THE COURT:  He told me yesterday the pace is going

 2     to pick up dramatically after this witness.  And I will build

 3     in what extra time I can for you in the next three weeks, or

 4     you can make my next case settle and I'll give you the extra

 5     time on the other end.

 6          MR. LEE:  I don't think I can do the latter so

 7     we're going to have to try for the former.

 8          MR. MORTARA:  Your Honor, Adam Mortara for Students

 9     for Fair Admissions.  A lot of the information that Harvard

10     presumably will elicit from Dean Fitzsimmons has been

11     elicited, so we're going to be efficient.  And I can

12     guarantee you, my direct -- my adverse direct of Senior

13     Admissions Officer Christopher Luby will be less than 30

14     minutes.

15          THE COURT:  I am not trying to rush you, although I

16     will try to point out that they have the right to elicit the

17     information from their witness in their own way.  Although

18     I'm sure they're appreciative of the efforts you're making on

19     their behalf.

20          I'm not trying to rush you.  I'm trying to give you

21     what time you need.  If just you tell me two weeks, then you

22     tell me three, and I've adjusted my schedule to accommodate

23     the third.  I will do what I can to give you the extra time.

24     We'll just keep track of it.

25          Can I ask you one favor before we go?  The
```

**JA825**

```
 1    discussion that we had this morning, someone left me with a
 2    copy of half of it but not the other half.  Can someone get
 3    me a copy of the other half as well?  I have 513.
 4              Take 45 minutes, so it's a little after a quarter
 5    of.
 6              (Court recessed at 12:05 p.m.)
 7                   ***  AFTERNOON SESSION  ***
 8              MR. HUGHES:  Welcome back, Dean Fitzsimmons.
 9              THE COURT:  I'm sure he's happy to be here.
10    BY MR. HUGHES:
11    Q.  We're going to try to finish this up and then turn it
12    over to Mr. Lee.
13              Just to reorient where we were, we were marching
14    through April.  We looked at the April 22 slides that you got
15    from OIR that showed the tip for low income.  Then when we
16    took the break we were looking at an email exchange from
17    April 28 between Dr. Driver-Linn and Ms. Heenan, and we
18    talked about how at this time you thought it would be
19    worthwhile to share the empirical data that you had on low
20    income.
21              Do you recall that conversation?
22    A.  I do.
23    Q.  Okay.  And so then Ms. Heenan responds to
24    Dr. Driver-Linn's email.  She says, "Sounds good re Fitz."
25    She asks, "What's the issue?"
```

```
 1              And then briefly on page 1 of 604, we're got

 2    Dr. Driver-Linn's response to Christine Heenan.  This is now

 3    the next day on April 2, 2013.  Let me just read this part of

 4    Plaintiff's Exhibit 604 and I'll ask you a quick question and

 5    we'll move on.

 6              "Fitz asked us to do some analysis of the 'thumb on

 7    the scale' for low income.  Could be a positive message but

 8    has implications for need-blind policy as well as opening the

 9    door to Unz-like requests for information about other thumbs

10    on the scale.  Team is putting together a memo to send to

11    Fitz, copy to you and Jeff, to put this in context, but I

12    guess I am aware that part of the wonderful thing about Fitz

13    is that he has lots of friends and he likes to talk about his

14    work."

15              And I'm sure we can agree with the last part,

16    right?

17    A.   That would not be unfair.

18    Q.   Okay.  My question here, in all seriousness, Dean

19    Fitzsimmons, is at this time, after you received those

20    low-income slides, you were thinking about sharing them more

21    broadly, were you in conversations with Driver-Linn about

22    potential implications or concerns with sharing that

23    information because it might lead to concerns around the Unz

24    Asian-American discrimination issue?

25    A.   I guess.  I mean, I think that's as good a guess as I
```

1    could give.

2    Q.   That's something you recall discussing with her around

3    that time, correct?

4    A.   Yes.

5    Q.   And you do -- and we'll look at it in a moment.  You do

6    recall ultimately getting a memo dated May 1 from OIR on the

7    low-income issue, correct?

8    A.   That's correct, yes.

9    Q.   We're going to look at that in one minute, but I reminded

10   myself over the break we forgot to look at one page of

11   Plaintiff's Exhibit 12.  So we'll do that briefly.  We'll go

12   back to Plaintiff's Exhibit 12, page 34.

13           We spent a long time -- I've got it on the screen,

14   Dean Fitzsimmons.  We spent a long time talking about what

15   these models and these bar graphs show.  You recall that,

16   correct?

17   A.   That's correct.

18   Q.   We're not going to revisit that discussion.  The record

19   is clear.  What I wanted to show you was page 38.  We looked

20   at page 35 -- actually we skipped 35.  We looked at 36 and 37

21   together.  I meant to show you, I forgot, page 38.  So just a

22   few pages after the model.  Page 38, Plaintiff's Exhibit 12.

23   Next steps.

24   A.   This is P12?

25   Q.   Yes.  I've got it on the screen.  You're welcome to get

 1   it out from the binder.  Just let me know when you're ready.

 2   **A.**  You're on page 38.

 3   **Q.**  Right.  Of the slide.  What OIR is saying on page 38,

 4   "Next steps.  Addressing questions raised about admissions

 5   and financial aid."

 6            Do you see that?

 7   **A.**  I do.

 8   **Q.**  And then we'll blow up the top of this document, and you

 9   see one of the research questions, Question Number 3 is, "Is

10   there bias against Asians in college admissions?"

11            Do you see that?

12   **A.**  I do.

13   **Q.**  You said you were comfortable with what those bar graphs

14   showed that we talked about for so long.  But at least OIR is

15   asking the question, "Is there bias against Asians in college

16   admissions?"  That's the question they're asking here,

17   correct?

18   **A.**  The question they asked is part of the report, their

19   comprehensive report.

20   **Q.**  And then next steps they have on the right, they have,

21   "Who else should see this work?"

22            Do you see that?

23   **A.**  I do.

24   **Q.**  We've already agreed that this wasn't shared with others

25   in the admissions office or Dean Smith or President Faust,

1    correct, this part of the document, correct?

2    **A.**   That's correct.

3    **Q.**   Okay.  And then it says, "To further address the question

4    of bias, is there more data to elaborate our understanding of

5    the role of the personal essay and other factors?"

6              Do you see that?

7    **A.**   I do.

8    **Q.**   And there was no follow-up between OIR and the admissions

9    office on the personal essay issue, correct?

10   **A.**   That's correct.  Of course they are not admission

11   officers and we are, and we know that the personal essay

12   along with every other factor does play a role.  So that

13   might have been sort of interesting to them because perhaps

14   they didn't realize what we did with it.

15   **Q.**   So they were raising the question, "Is there bias against

16   Asians in college admissions?"  But you thought you knew the

17   answer at this time.  Is that what you're saying?

18   **A.**   Certainly their model and all the other things we looked

19   at suggested that there was no bias.

20   **Q.**   Let's go ahead and look at that May 1 memo, which is

21   Plaintiff's Exhibit 26.

22              MR. HUGHES:  And before I ask substantive

23   questions, I'd like to offer Plaintiff's Exhibit 26 into

24   evidence.

25              MR. LEE:  No objection.

**JA830**

110

```
 1              THE COURT:  Admitted.
 2              (Plaintiff Exhibit No. 26 admitted.)
 3    BY MR. HUGHES:
 4    Q.  Thank you, Your Honor.  So, Dean Fitzsimmons, I've got
 5    the first page of Plaintiff's Exhibit 26 blown up on the
 6    screen.
 7              Do you see that?
 8    A.  I do.
 9    Q.  And you recall receiving this email with the May 1 memo
10    attached to it, correct?
11    A.  I do.
12    Q.  The email is from Ms. Bever on May 1, addressed to you,
13    correct?
14    A.  That's correct.
15    Q.  Copying your assistant and Dr. Driver-Linn and Mark
16    Hansen, correct?
17    A.  That's correct.
18    Q.  Subject, "Admissions memo," and the title of the
19    attachment is "Low-Income Admissions Memo Final," date of
20    May 1, 2013, correct?
21    A.  That's correct.
22    Q.  This is the final memo from OIR on the low-income
23    admission issue that you asked them to look into, correct?
24    A.  It looks like their final draft.
25    Q.  And then Ms. Bever writes to you, "Dear Fitz.  Attached
```

**JA831**

1    is a memo describing our recent analysis of low-income

2    admissions.  In the memo we describe our approach and

3    results.  At your suggestion, we reviewed a small sample of

4    literature to put this in context and realized our approach

5    was consistent with what others have done.  We'd appreciate

6    any comments or suggestions you have."

7              I'll stop there.  And I'll ask you, do you agree

8    that you suggested to OIR to look into the literature to

9    effectively validate their approach?

10   **A.**   That's correct.

11   **Q.**   And you agree that OIR did, in fact, do that and they

12   described what they did in the memo, correct?

13   **A.**   That's correct.

14   **Q.**   And then the next paragraph goes on to say, "We thought

15   based on our conversation last week that it would also make

16   sense to share this with Jeff Neal, Christine Heenan, Nina

17   Collins, and Sally Donahue.  Does that make sense?"

18              Do you see that?

19   **A.**   I do.

20   **Q.**   Do you know whether you ultimately shared this memo with

21   Jeff Neal or Christine Heenan?

22   **A.**   I suspect that maybe they shared the memo, but we would

23   certainly be open to having them share that information.

24   **Q.**   Again, this is just a few days after the email exchange

25   between Driver-Linn and Heenan on the Unz issue.

1           Were the conversations that Ms. Bever was referring

2      to here conversations about the potential considerations in

3      sharing this low-income information more broadly?

4      **A.**  I think so.  I'm not quite sure whether she was referring

5      to a conversation she had with me or perhaps with others in

6      her group.

7      **Q.**  The email is addressed to you, right?

8      **A.**  Yes.  But I'm just talking -- I understand what you're

9      saying.

10     **Q.**  Okay.  So we can go ahead, Dean Fitzsimmons, and look at

11     the memo.  This is where the actual attachment, the memo,

12     starts, right?

13     **A.**  That's correct.

14     **Q.**  Let's walk through parts of it.  We're not going to read

15     the whole thing.  On the first page, OIR says -- the memo is

16     addressed to you and only to you, correct?

17     **A.**  That's correct.

18     **Q.**  And OIR says, "At your request, we undertook an analysis

19     to determine if the chance of admission is any different for

20     low-income students, holding all other admissions

21     characteristics constant.

22              "Below we briefly describe the data used for our

23     analysis and its limitations, our approach, and our findings.

24     At the conclusion we outline some issues we believe are

25     important to consider prior to public dissemination of this

1    analysis."

2            That's part of the memo, correct?

3    **A.**   That's correct.

4    **Q.**   Again done at your request, correct?

5    **A.**   That's correct.

6    **Q.**   And then if we go to the second page, they describe in

7    the memo the approach and the process that they took,

8    correct, Dean Fitzsimmons?

9    **A.**   That's correct.

10   **Q.**   And I've got the second page of the memo, which is the

11   third page of Plaintiff's Exhibit 26, up on the screen.  And

12   you can see I've highlighted a paragraph where OIR identifies

13   some of the limitations associated with the approach they've

14   taken, correct?

15   **A.**   That's correct.

16   **Q.**   Do you see that up on the screen?

17   **A.**   I do.

18   **Q.**   And then OIR goes on to say, "In spite of these

19   limitations, the logistic regression model results are

20   consistent with the descriptive analysis described above and

21   shown in Exhibits 1 and 2.  Exhibit 3 illustrates the

22   difference between the predicted admission rate and actual

23   admission rate for students at each income level."

24            Do you see that?

25   **A.**   I do.

1    **Q.**  They walk through the limitations and they say we

2    compared the output of our model to some descriptive

3    analysis.  They match up.  That's a measure of reliability.

4         Would you agree?

5    **A.**  That's correct.

6    **Q.**  So now I want to look at Exhibits 1, 2, and 3.  I think

7    they will look familiar.  So here is Exhibit 1 to the May 1

8    memo.  This was also an exhibit to Plaintiff's Exhibit 21,

9    the slides that you received on April 22 that we looked at

10   earlier.  It's the same slide, correct?

11   **A.**  Looks identical.

12   **Q.**  And Exhibit 2, again, is the same thing we looked at that

13   you got on April 22, correct?

14   **A.**  That's correct.

15   **Q.**  And Exhibit 3 is, again, the same thing that you got on

16   April 22 in Plaintiff's Exhibit 21, correct?

17   **A.**  That's correct.

18   **Q.**  And again, this Exhibit 3 actually shows some of the

19   results of the logistic regression model that was performed

20   by OIR, correct?

21   **A.**  That's correct.

22   **Q.**  You agreed that that logistic regression model provided

23   empirical evidence of that low-income students applying to

24   Harvard were receiving a tip, correct?

25   **A.**  That's correct.

1    **Q.**  Okay.  So now I want to go back to where we were on

2    page 2 of the memo.  The first paragraph describes Exhibits 1

3    and 2, agree?  That I've got highlighted, culled out?

4    **A.**  Yes.

5    **Q.**  And then I want to go to the paragraph before, which

6    says, "To get a sense of the size of the admissions advantage

7    conferred to low-income applicants relative to other groups

8    of applicants, the so-called 'thumb on the scale,' we include

9    low-income status in a second logistic regression model.  The

10   table below is sorted based on the effect size of each of the

11   variables included in the model.  The variables with the

12   largest effects on the probability of admission are athletic

13   rating, personal rating, and legacy status.  Compared to

14   athletes and legacies, the side of the advantage for

15   low-income students is relatively small."

16          Do you see that?

17   **A.**  I do.

18   **Q.**  And you know from looking at this document before that

19   the reports of that logistic regression model are reported --

20   the results of it are reported on the next page, correct?

21   **A.**  Yes, and with their -- yes.

22   **Q.**  But those results provide more empirical evidence about

23   how Harvard's admissions process works, correct?

24   **A.**  It gives you another way to look at it perhaps.

25   **Q.**  It builds on the first logistic regression model that was

1    in Slide 3 that we just looked at, right?

2    **A.**  Right.

3    **Q.**  And it provides more empirical evidence about how the

4    Harvard admissions process works, correct?

5    **A.**  Yes.  In the sample that they used, yes.

6    **Q.**  And then if we go to the third page, the next page, we've

7    got the output of that logistic regression model, correct?

8    **A.**  That's correct.

9          THE COURT:  What does "constant" mean?  Do you know

10   what "constant" means?

11         THE WITNESS:  I'm in over my head on this kind of

12   stuff.  These are always very hard to gauge, Your Honor.

13   It's probably better to look at the actual chart that they

14   created.  But it comes out of, I guess, weightings in the

15   equation.  But I'm not quite sure what the "constant" is, to

16   be honest.

17         MR. HUGHES:  We'd probably be better have some

18   other experts do that.

19         THE COURT:  We'll get it tomorrow.  Thank you.

20   BY MR. HUGHES:

21   **Q.**  In any event, what OIR has described to you in this memo

22   is that the higher the number here, the greater your chances

23   are of getting into Harvard, correct?

24   **A.**  Yes.  But it's very hard for a non-statistical expert to

25   figure out actually what these things mean.

1    **Q.**  I just want to make sure we read what OIR told you, and

2    I'll highlight it.  We just went over this, but again, OIR is

3    telling you that the variable with the largest effects on the

4    probability of admission, and then it describes what those

5    are and then it has the table, correct?

6    **A.**  Yes.

7    **Q.**  OIR is communicating to you what the basic meeting of

8    these variables and the numbers associated with them are,

9    right?

10   **A.**  That's what they're trying to do.

11   **Q.**  And then if we go to the next page and we see what OIR

12   told you about the variables that are included, we see the

13   athletic rating of 1, you've got a really good chance of

14   admission to Harvard, correct?  Highest number on the list?

15   **A.**  I'm not sure that's exactly how to read that.  It is a

16   factor that can be very helpful.  I think it's probably the

17   way you look at it.  Again, I'm not entirely sure what these

18   numbers actually mean, and I would certainly defer to the

19   statistical experts when the time comes.

20   **Q.**  So you understood what Table 3 in Plaintiff's Exhibit 21

21   meant which was based on a version of this logistic

22   regression model.

23         Are you saying that you don't understand that OIR

24   is telling you the higher the number here the more likely

25   chance of admission to Harvard?

1    **A.**  I think, again, it's what the -- effect the factor would

2    have.  But how you calibrate that with a real candidate is a

3    little bit unclear to me and I think to most people probably

4    in the room.

5            But I understand what you're saying.  And I think

6    there's no question, for example, that if you have an

7    athletic rating of 1, that would perhaps increase your

8    chances of getting in.

9    **Q.**  You would agree that having an athletic rating of 1

10   significantly increases your chances of getting into Harvard,

11   correct?

12   **A.**  Yes.

13   **Q.**  And you also agree that having a high personal rating

14   also increases your chances of getting into Harvard, correct?

15   **A.**  That's correct.

16   **Q.**  And you also agree that African-Americans receive a tip

17   in the admissions process.  We talked about that yesterday,

18   correct?

19   **A.**  That's correct.

20   **Q.**  And you also agree that Hispanic applicants, we see down

21   here, also get a tip in the admissions process at Harvard,

22   correct?

23   **A.**  That's true.

24   **Q.**  Remember we looked at your report, Plaintiff's

25   Exhibit 31, where you adopted Dr. Card's analysis, and it

1    showed as a group African-Americans get more of a tip than

2    Hispanic applicants to Harvard, correct?

3    **A.**   Yes.

4    **Q.**   And that relative relationship --

5    **A.**   At least in terms of the way that worked out in that

6    sample.

7    **Q.**   And that relative relationship holds true in this report

8    that you received from --

9             MR. LEE:  I'm objecting to this now, having him

10   draw conclusions on this chart.  He said repeatedly he's not

11   quite sure how it works.  I don't have any problem with him

12   going back to the charts that he testified about, but we're

13   now -- he said four or five times he's not quite sure how

14   these numbers work.

15            MR. HUGHES:  Your Honor, he received this memo --

16            THE COURT:  I don't understand the question even.

17            MR. HUGHES:  I will withdraw that question.

18            THE COURT:  All right.

19   BY MR. HUGHES:

20   **Q.**   If we look down at the low income here is that

21   self-reported income less than or equal to $60,000, correct?

22   **A.**   That's correct.

23   **Q.**   That was the definition of low income in both these

24   regression models, correct?

25   **A.**   Yes.

1    **Q.**  And that's positively associated with admission to

2    Harvard, correct?

3    **A.**  That's correct.

4    **Q.**  And what we see down the next --

5              THE COURT:  Hold on a second, Mr. Hughes.

6              MR. LEE:  Your Honor, I object.  The witness who

7    prepared this chart is going to testify.  She's on their

8    witness list.  She's going to come in.  He said a number of

9    times he's not the person to do it.

10             MR. HUGHES:  Your Honor, he asked for this

11   analysis.  This is just showing the size of the tip for low

12   income.

13             MR. LEE:  It's --

14             THE COURT:  Stop.  I'm going to let him -- he's

15   just going through the information in the chart.  So we get

16   down to the Asians so he can comment on that, I assume is the

17   purpose of the exercise.  It's not prejudicing you in any

18   way.  I'm going to overrule the objection.

19             MR. LEE:  Can I say one more thing, Your Honor?

20             THE COURT:  Yes.

21             MR. LEE:  I understand where Your Honor is going.

22   This doesn't say anything about the tip and how a tip

23   correlates to any of this, which is the last question.

24             THE COURT:  All right.  He's right about that.  So

25   why don't you rephrase it without the word "tip."

**JA841**

1    BY MR. HUGHES:

2    **Q.**  The variable self-reported income less than or equal to

3    $60,000 is positively associated with admission to Harvard,

4    correct?

5    **A.**  Again, it's not a cause and effect.  It would be one

6    factor among many, I think is the way to think about it with

7    anything.

8    **Q.**  You understand this is a refinement of the logistic

9    regression model that you've told me 20 times provided

10   empirical evidence that low-income applicants were getting a

11   tip.  You understand that, right?

12   **A.**  I do.

13   **Q.**  Now, the next variable I want to ask you about is Asian,

14   and under Asian the number is negative, correct?

15   **A.**  That's correct.

16   **Q.**  The variable Asian is negatively associated with your

17   chance of getting into Harvard.  That's what you were told on

18   May 1, 2013, correct?

19   **A.**  That's -- again, I'm not quite sure what these numbers

20   mean.  You have to ask an expert, but I understand the drift

21   of your question.

22   **Q.**  Now, we're just going to March down the same page of

23   Plaintiff's Exhibit 26, this memo that you requested and OIR

24   delivered.  I'll read it into the record.

25              "The relative sizes of the admissions advantage

1    conferred on different groups can be seen by looking at the

2    differences in actual admit rates as well.  In Exhibit 4, we

3    limit our analysis to students with high academic ratings, 1

4    or 2, and examine the differences between athletes and

5    non-athletes, legacy students and others, Asian students and

6    all other students, and low-income students and all other

7    students.

8            "An athlete that is also an academic 1 or 2 has an

9    admit rate of 83 percent compared against 16 percent for

10   non-athletes with an academic 1 or 2.  55 percent of legacies

11   who are academic 1s and 2s are admitted compared with

12   15 percent of all other academic 1s and 2s.  Asian applicants

13   with an academic 1 or 2 are admitted 12 percent of the time

14   compared against an admit rate of 18 percent for non-Asian

15   applicants.  By comparison, low-income applicants with an

16   academic 1 or 2 have an admit rate of 24 percent compared

17   against 15 percent for all other applicants."

18           That's what was reported to you in the May 1 memo,

19   correct?

20   **A.**   That's correct.

21   **Q.**   If we look at Slide 4, this is the bar graph that relates

22   to that paragraph that we just read, correct?

23   **A.**   That's correct.

24   **Q.**   And on the right-hand side, it shows that Asian-American

25   applicants with an academic 1 or 2 are less likely to get

1    into Harvard than everybody else who has an academic 1 or 2,

2    correct?

3    **A.**   Yes.

4    **Q.**   And it also shows a low-income tip, correct?

5    **A.**   That's correct.

6    **Q.**   Okay.  Low-income tip that -- I'll withdraw that

7    question.

8            Let's go back to the page we were just looking at.

9    This is the last paragraph of text in the memo that OIR

10   delivered to you on May 1.

11           "Issues to consider before sharing these results

12   publicly.  We imagine that sharing any analysis of admission

13   weights will draw attention to the variety of factors that

14   compete with one another in the admissions decision.  To

15   state the obvious, with only approximately 2,200 spaces for

16   admitted students per year, implicit trade-offs are made

17   between athletes and non-athletes, legacy admits and those

18   without affiliation, low income, and other students.

19           "We know that many are interested in the analysis

20   of the relative trade-offs.  While we find that low-income

21   students clearly receive a tip in the admissions process, our

22   descriptive analysis and regression models also shows the tip

23   for legacies and athletes is larger and there are demographic

24   groups that have negative effects."

25           That's what OIR told you, correct?

1   **A.**   That's correct.

2   **Q.**   And the only demographic group in the chart above that

3   has a negative effect are Asians, correct?

4   **A.**   Yeah.  I think that's right.  Well, slight difference for

5   unknown and other, but I see your --

6   **Q.**   Asians have a negative effect, correct?

7   **A.**   Then there's unknown and other that apparently have a

8   slight negative association.

9   **Q.**   But no question Asians are included in the demographic

10  groups that have negative effects, correct?

11  **A.**   Correct.

12  **Q.**   Do you recall once you got this memo discussing with

13  Dr. Driver-Linn, Ms. Bever, Christine Heenan, whether it

14  would be a -- the concerns about sharing the low-income

15  information that you had told me earlier you thought was

16  worth sharing, but the concern on the other hand that it

17  might release information about negative effects on certain

18  demographic groups like Asians?

19  **A.**   You know, that, I'm not sure again.  I wasn't in their

20  minds, you know, for what set of concerns they might have

21  had.

22           I was interested in something very straightforward,

23  and that was to find out whether or not we actually gave a

24  tip, because many didn't think we did, for people from low-

25  and modest-income backgrounds.  And so that's what I wanted.

```
 1   And I think that information was good for us to have in the
 2   event that the issue would come up either on the road or in
 3   other ways.
 4   Q.   So you asked OIR to look at the issue of whether
 5   low-income applicants get a tip.  They provided you analysis,
 6   including a regression model, that showed a tip, and you
 7   thought that was reliable empirical evidence of a tip for
 8   low-income applicants, correct?
 9   A.   It certainly -- yes.  Yup.
10   Q.   When OIR refined that regression model and showed a
11   negative effect on Asian-Americans, you didn't tell anyone in
12   the admissions office about that, did you?
13   A.   I'm not sure frankly exactly what we talked about as we
14   talked about the findings.  But again, the focus was a simple
15   one; and that is, whether or not we give a tip for people
16   from low- and moderate-income backgrounds.  So that as we
17   were actually out on the road already recruiting for next
18   year at that moment, because we do a lot of traveling, we
19   visit 150 locations across the United States.  Every year we
20   do a chunk of those in May.  So the idea that at least if
21   someone were to ask, they would have this new information
22   that we could corroborate.
23   Q.   I'm going to put up page 427 of your deposition, line 14.
24        "QUESTION:  Did you share the information about the
25   effect of being Asian in this study with anyone else in the
```

1   admissions office?

2            "ANSWER:  I don't recall sharing that specific

3   finding or other findings."

4            Were you asked that question?  Did you give that

5   answer?

6   **A.**   I'm sure I did because it's here in the record.  But

7   again, I'm not sure exactly, you know, the complexity of the

8   discussion that I eventually had with staff.  But the idea

9   was that we had this information about low- and

10  moderate-income students, which was of the whole point of the

11  exercise.  But I don't remember when I did that sharing the

12  complexity of apparently some concerns about other tips.

13  **Q.**   You did share with your staff the information about

14  low-income tips, correct?

15  **A.**   Yes.  To be honest, I'm not exactly sure, for example,

16  the date or anything of that sort because we have lots of

17  things going on.  But the staff certainly knows that there is

18  a tip.

19  **Q.**   But you didn't share the information from this memo about

20  the effect of being Asian with the admissions office,

21  correct?

22  **A.**   That would be correct, I think, but I don't honestly

23  remember the complexity of the discussion.

24  **Q.**   And you didn't ask -- you did not do anything to follow

25  up on the May 1 memo, correct?

 1   **A.**   That's not correct.

 2   **Q.**   Well, the very next question:

 3            "Did you do anything to follow up on it?

 4            "ANSWER:  No."

 5            Did you give that testimony in your deposition?

 6            MR. LEE:  Your Honor, if you go back to preceding

 7   questions, this is a very narrow focus.  Not the memo in its

 8   entirety.

 9            THE COURT:  I agree.  I agree.  That's sustained.

10   BY MR. HUGHES:

11   **Q.**   Dean Fitzsimmons, tell us what you did do to follow up on

12   the May 1 memo.

13   **A.**   One of the things that, again, the various concerns,

14   including the one your just raised and the Ron Unz article

15   and lots of concern in the world certainly over the past

16   30 years about Asian-American admissions, one of the things

17   that I was concerned about when we looked at the findings

18   that we just went through was that I wanted to make sure that

19   if we give a tip for low-income background that we do it as

20   we do everything else, in an evenhanded manner for students

21   from all ethnic backgrounds.

22   **Q.**   So, sir, are you telling me that after you got this May 1

23   memo, you asked OIR to dig into the issue of the effect of

24   being Asian?

25   **A.**   Yes.  Relative, again, to what we were interested in, and

 1    that is the -- at this particular point was low-income and

 2    moderate-income applicants.

 3    **Q.**  You'd seen the negative impact of being Asian in

 4    Plaintiff's Exhibit 26, and so you went and you asked OIR to

 5    take another look at it.  That's your testimony, correct?

 6    **A.**  That's what we ended up getting, yes.

 7    **Q.**  And you asked OIR to do that because you wanted them to

 8    dig deeper on the effect of being Asian in your process,

 9    correct?

10    **A.**  That would be the best of my recollection.  Again, we are

11    always busy at that time of year.  There's lots of things

12    going on, but that's the best of my recollection.

13    **Q.**  Same page back up on the screen, starting line 14.

14           "Did you share the information about the effect of

15    being Asian in this study with anyone else in the admissions

16    office?

17           "ANSWER:  I don't recall sharing that specific

18    finding or other findings.

19           "QUESTION:  Did you do anything to follow up on it?

20           "ANSWER:  No.

21           "QUESTION:  Did you ask to dig into it and ask OIR

22    to take another look at it?

23           "ANSWER:  Not that I recall."

24           Did you give that testimony?

25    **A.**  Yes.  And I would -- again for that particular thing, no.

1    I was concerned about if we have a tip for low- and

2    moderate-income students, I wanted to make sure that that tip

3    applied to all ethnic groups in the same evenhanded manner.

4    Q.  So, Dean Fitzsimmons, let's now talk about what you now

5    remember.  Let's look at Plaintiff's Exhibit 29.

6              MR. HUGHES:  I offer this into evidence.

7              MR. LEE:  What number are we?

8              MR. HUGHES:  Plaintiff's Exhibit 29.

9              MR. LEE:  No objection.

10              THE COURT:  Admitted.

11              (Plaintiff Exhibit No. 29 admitted.)

12   BY MR. HUGHES:

13   Q.  Dean Fitzsimmons, is Plaintiff's Exhibit 29 the result of

14   the follow-up that you say you asked for about whether

15   Asian-Americans receive a low-income tip?

16   A.  Again, to look at, make sure that it went across all

17   ethnic groups.

18   Q.  And do you remember -- we'll look at it together in a

19   moment.  I just want to test your memory.  Do you remember

20   what OIR found?

21   A.  Is this a memory test?

22   Q.  No.  If you want to look at the document, if you prefer

23   to do that, we'll do that.  Would you prefer that?

24   A.  Yeah.  It might be good for the Court.

25   Q.  So now we need to look at what I believe is the

 1   attachment or the link for this email which is Plaintiff's

 2   Exhibit 28.

 3            And I'll offer that into evidence.

 4            MR. LEE:  No objection, Your Honor.

 5            THE COURT:  Admitted.

 6            (Plaintiff Exhibit No. 28 admitted.)

 7   BY MR. HUGHES:

 8   **Q.**  Thank you, Your Honor.  Is this, Dean Fitzsimmons --

 9   looking at the first page here, is this the OIR information

10   that you got as a result of the follow-up that you asked for?

11   **A.**  It looks like the beginning of -- it's a draft, but it

12   looks like the beginning of it.  Sorry.  My Boston accent

13   again.  Sorry.

14   **Q.**  So now I want to look at page 8 of Plaintiff's

15   Exhibit 28.

16            Do you see that?  And I've got it on the screen, if

17   it's easier.

18   **A.**  Yeah.  It's a little bit easier to read here.

19   **Q.**  Here we have the coefficients for logistic regression

20   modeling predicting probability of admissions, classes

21   2009-2016, includes interaction terms for all race/ethnicity

22   and low income.  Correct?

23   **A.**  That's what it says, yes.

24   **Q.**  Actually I want to go back to Plaintiff's Exhibit 29 for

25   one minute and ask you a question.

1    **A.**  Should I hold this?

2    **Q.**  Just look at the screen Plaintiff's Exhibit 29.

3    **A.**  All right.  Thank you.

4    **Q.**  What precisely did you ask OIR to do?  Did you just give

5    them a general request to look at the low income, or did you

6    ask them to interact the variable low income with ethnicity?

7    **A.**  Again, I don't remember the conversation exactly.  But at

8    first it was just the general, let's see if we give a tip.

9         And I don't remember exactly how I phrased it.  It

10   was a long time ago, but I did want to make sure -- we've

11   talked yesterday and the day before about safeguards.  We're

12   always trying to be vigilant and always trying to make sure

13   we are treating everybody in an evenhanded way.  So I

14   probably phrased it let's just make sure that we're looking

15   at this across -- giving the same kind of tip across all

16   ethnic backgrounds.

17   **Q.**  So now we'll go back to where we were, Plaintiff's

18   Exhibit 28, page 8.  And we'd read everything down to the

19   parenthetical, "Includes interaction terms for all

20   race/ethnicity and low income."

21        Do you see that?

22   **A.**  I do.

23   **Q.**  Okay.  And we've got three things that are in bold here,

24   correct?

25   **A.**  That is correct.

Case: 19-2005   Document 00117683237   Page: 144   Date Filed: 07/30/2020   Entry ID: 6356615
Case 1:14-cv-14176-ADB   Document 633   Filed 04/18/19   Page 132 of 230

132

1   **Q.**  We've got low income, Asian and low income, and Asian.

2   Correct?

3   **A.**  That's correct.

4   **Q.**  Can you explain to us what OIR -- actually I withdraw

5   that question.

6                    Let's go to the very bottom, the lowest bolded

7   thing.  There we have Asian.  Do you see that?

8   **A.**  I do.  Right next to an even stronger thing for

9   African-American and low income.

10  **Q.**  I want to ask you about that in a moment.  But what we

11  see here for Asian -- so that's Asian and not low income --

12  negative .418 coefficient, a negative chance of getting into

13  Harvard by virtue of being Asian, correct?

14  **A.**  That's correct.

15  **Q.**  That's actually a lower coefficient, a worse chance of

16  getting into Harvard than we saw in Plaintiff's Exhibit 26

17  where the coefficient was a negative .37, correct?

18  **A.**  That's correct.  But again, it's very hard for me to do

19  this.  This is a very kind of strange statistic that I don't

20  fully understand.  But especially if you just look at the

21  African-American low income which has an even greater

22  negative loading, I'm not sure how to interpret that.  I

23  really would prefer to have the experts.

24  **Q.**  Okay.  When you looked at Asian and low income, what was

25  your reaction to that, or did you just not understand?

1    **A.**  I don't think I fully understood it because a lot of

2    non-statisticians don't quite know how this stuff works.  But

3    if you look at the chart in this, it gives you a pretty clear

4    sense.  Obviously -- I guess you're the one asking the

5    questions, but there's another chart here on page --

6    **Q.**  I tried to read your mind and put the clarity on the

7    screen.

8    **A.**  Oh, you did it.  There it is.  Thank you.

9    **Q.**  Here we've got low income in maroon and then not low

10   income in gray, and we see that everybody gets some kind of a

11   tip for being low income versus not, correct?

12   **A.**  That's correct, yup.  This is an easier way to understand

13   it.

14   **Q.**  I just want to show one last thing here.  Again low

15   income here is defined by an income of $60,000 or less,

16   correct?

17   **A.**  That's correct.

18   **Q.**  And this, page 4 of Plaintiff's Exhibit 28, has the

19   percentages of the applicant pool for the different

20   ethnicities that fall into that low-income category, correct?

21   **A.**  Yes.  Yeah, for that group of people they were studying.

22   **Q.**  And for Asians, that's 18 percent, correct?

23   **A.**  Yes.

24   **Q.**  And after this, you didn't do any further follow-up on

25   the Unz issue related to discrimination against

1   Asian-Americans, correct?

2   **A.**   We did not directly.  Harvard didn't directly do that.

3   **Q.**   Okay.  And when you got this, did this satisfy you that

4   Unz was wrong and that the negative penalty that we saw in

5   the May 1 memo wasn't a concern?  Did this put all your

6   concerns to bed about potential discrimination against

7   Asian-Americans when you got this?

8   **A.**   I think we felt reassured that we were treating

9   Asian-Americans in an evenhanded manner, giving of the same

10  kind of tip that we gave for low-income students from all

11  ethnic backgrounds.

12  **Q.**   All right.  So we've now looked at a number of documents

13  from OIR.  We looked at the admissions 2 document which you

14  were less familiar with.  We looked at the February 2013

15  presentation that was shown to you at the February 25

16  meeting.  We looked at the May 1, 2013, memo that was shown

17  to you.

18          All of those showed information that indicated at

19  least the possibility of disadvantage of being Asian in terms

20  of a chance of getting into Harvard, correct?

21  **A.**   Again, I'm not sure I would phrase it that way, but I

22  understand the thrust of your question.

23  **Q.**   And you agreed that there's data points in those -- the

24  25th or the February 20 presentation raises concerns of bias.

25  The admissions 2 shows a negative effect for being Asian.

1    The May 1 memo we just looked at shows a negative coefficient

2    for being Asian, gets even lower when we get to the P28,

3    doesn't it?

4              MR. LEE:  Your Honor, this is all compound.

5              THE COURT:  Sustained.

6    BY MR. HUGHES:

7    **Q.**  Did you ever share any of this information with Director

8    McGrath?

9    **A.**  I'm sorry.  Which information?

10   **Q.**  Any of the information OIR supplied to you concerning the

11   effect of being Asian in the admissions process.

12   **A.**  I am sure that she eventually learned, along with others

13   on the staff, about the fact that we in fact do give a tip

14   for people from poor and modest income backgrounds.  I don't

15   remember.  She and I see each other all the time.  Her office

16   is right across from mine, so we share lots of information.

17   It certainly wouldn't have been kept from her.  That's for

18   certain.

19   **Q.**  After you got this information from OIR in 2013, you

20   didn't change anything about your admissions process,

21   correct?

22   **A.**  Well, we certainly continued to be vigilant in all the

23   ways I've talked about before and continued -- especially

24   given the climate, legal issues and so on, continued to have

25   the office of the general counsel meet with our staff every

1    year.  We certainly continued our strong training program for

2    new people.  And we remained especially vigilant in our

3    committee process where the actual decisions were made.

4    **Q.**  In response to the May 1 memo, did you make changes to

5    your admissions process?

6    **A.**  Not to the fundamental admissions process that we again

7    have had in place for a very, very long time and has been

8    studied in lots of different ways.

9    **Q.**  And you didn't seek bias training for your admissions

10   staff, correct?

11   **A.**  Again, we certainly had lots of discussion in the staff

12   and the training periods about making sure that every single

13   person regardless of ethnic background was considered fairly

14   and thoroughly.

15   **Q.**  You didn't bring somebody in to give bias training, did

16   you?

17   **A.**  Not that I recall.  But again, remember we've been

18   dealing with this issue for three or four decades.

19   **Q.**  You didn't bring in Cornerstone or Dr. Card to analyze

20   your admissions process, correct?

21   **A.**  Again, we had OIR, which we thought was very, very good.

22   **Q.**  Okay.  And you think your reaction to these OIR reports

23   is consistent with your statement you gave me just now, that

24   you are vigilant concerning claims of discrimination,

25   correct?

1    **A.**   Yes.  I think your word "consistent" is just right

2    because what you saw when we looked at the five, four models

3    in the actual class, that was perfectly consistent with

4    everything we've always said about our admissions process and

5    everything that was said about our process in *Bakke* and

6    coming out of the OCR review.

7    **Q.**   And you think it was consistent with vigilance not to

8    send any of this information to anyone else in the admissions

9    office.  Do you agree with that?

10   **A.**   I'm not sure that's actually true.

11   **Q.**   You think that you ultimately sent some of this

12   information to people in the admissions office?

13   **A.**   We certainly shared the idea that there is a tip for low-

14   and modest-income-background students which was, I think, a

15   vitally important thing for us to be able to say to a country

16   that is in many ways less and less equal almost every year in

17   terms of economic background.

18   **Q.**   Do you think it was consistent with vigilance not to

19   share the information concerning the negative effect on

20   Asian-Americans with the admissions office?

21   **A.**   Again, I think the materials that were viewed I think

22   were vetted thoroughly.

23   **Q.**   And do you think that it was consistent with the exercise

24   of vigilance after you got this last report from OIR not to

25   ask OIR to do further work on these reports?

1    **A.**  Well, they did do some further work, obviously, and they
2    had access to all the information.
3    **Q.**  Sir, I'm asking you about the last document we looked at,
4    P28 and P29.  Do you think it was consistent with vigilance
5    for you --
6    **A.**  I'm sorry.  I need to look at that.  P28?
7    **Q.**  This one.  I've got it on the screen.  Do you think it
8    was consistent with the exercise of vigilance not to ask OIR
9    to do further work on these reports?
10   **A.**  I just want to make sure I've got the right one.  Okay,
11   this is the one on ethnicity.
12          I think again page 6 gave us the answer, I think,
13   that we and others who -- you know, who would need the
14   information would have, that we're giving a tip for low- and
15   moderate-income-background students and we're doing it
16   evenhandedly for everyone regardless of ethnicity.
17   **Q.**  I'm not focused on the low-income tip.
18          Let me ask you again.  Do you think it was
19   consistent with vigilance for any allegation of
20   discrimination against Asian-Americans not to ask the Office
21   of Institutional Research to do further work on these
22   reports?
23   **A.**  Yes.  I think we considered everything as carefully as we
24   could.
25          MR. HUGHES:  No further questions.

**JA859**

 1              MR. LEE:  Could we have a minute to set up, Your

 2      Honor?

 3              THE COURT:  Yes.  Five minutes, ten minutes.

 4              MR. LEE:  Five minutes and we're ready to go.

 5              THE COURT:  Fine.

 6              (Off the record.)

 7              THE COURT:  When you're ready, Mr. Lee.

 8                      CROSS EXAMINATION

 9      BY MR. LEE:

10      **Q.**  Good afternoon, Dean Fitzsimmons.

11      **A.**  Good afternoon.

12      **Q.**  You've told us a number of times that the Harvard

13      admissions process is a whole-person process where you

14      consider all the information about the person, correct?

15      **A.**  Correct.

16      **Q.**  To understand the Harvard admissions process, would it be

17      important to understand the entire process and not just parts

18      of it in the same way?

19      **A.**  Absolutely.  Beginning to end on each person.

20      **Q.**  And I'm going to take you through the process in detail,

21      but I want to complete the picture on some of the things that

22      Mr. Hughes asked you about for the last six hours or so.

23              There's a notebook before you, and if you would,

24      turn the notebook to Tab 27.  Tell me when you're there.

25      **A.**  I have it, I believe.

 1    **Q.**   Do you have Tab 27 before you?

 2    **A.**   Is it P88?

 3    **Q.**   It's P88.  It's the interviewer handbook from 2013 to

 4    2014.

 5    **A.**   Yes.

 6    **Q.**   Mr. Hughes asked you some questions about the guidance

 7    provided on the personal rating in the document.

 8              Do you recall that?

 9    **A.**   I do.

10    **Q.**   And he blew up on the screen one paragraph and asked if

11    this was all the information about how do you set a personal

12    rating in the guide book.

13              Do you recall that?

14    **A.**   I do.

15    **Q.**   So let's look at some of the pages that he did not show

16    you.  Turn, if you would, to page 38, and tell me when you're

17    there.

18    **A.**   I'm there.

19    **Q.**   Now, this is a portion of the same book that he put in

20    front of you, correct?

21    **A.**   That's correct.

22    **Q.**   And in this portion of the book, what do you find?

23    **A.**   These are our sample interview reports.  And many times

24    alums find these extremely helpful in understanding a bit

25    more of the nuance and the whole-person approach that we

1  have.

2  **Q.**  These interview guides go out to how many interviewers?

3  **A.**  There are about 10,000.

4  **Q.**  And how many admissions officers receive these?

5  **A.**  About 40.

6  **Q.**  And all 10,000 plus 40 people would receive the sample

7  interview reports in this exhibit, correct?

8  **A.**  That's correct.  And of course also the trainees as they

9  go through the process as new employees.

10  **Q.**  Now, when you were asked questions about how the personal

11  rating is set by Mr. Hughes, and I think I wrote it down

12  correctly, you said there is the other information and

13  training provided.

14        Do you recall that?

15  **A.**  I do.

16  **Q.**  Now, in this handbook itself, how many sample interview

17  reports are there?

18  **A.**  I haven't counted them up yet.

19  **Q.**  I can represent to you in the interest of time --

20  **A.**  There are quite a few.

21  **Q.**  -- there are approximately five.  Do you see those?

22  **A.**  Yes.

23  **Q.**  And for each one of the five, they actually have a

24  section called "Personal Qualities," correct?

25  **A.**  That's correct.

1    **Q.**  So by way of example if I pick the first interview report

2    on page 38.  Do you have that?

3    **A.**  I do.

4    **Q.**  Tell me when you're there.

5    **A.**  Or I will.  Let's see.  I do.

6    **Q.**  If I take you about halfway down the page in the sample

7    interview report, you see a "Personal Qualities" caption?

8    **A.**  Yes.

9    **Q.**  And a rating, correct?

10   **A.**  That's correct.

11   **Q.**  And then there are comments below in this sample

12   interview report, correct?

13   **A.**  That's correct.

14   **Q.**  Now, for each of these five samples, there's a section on

15   personal qualities, correct?

16   **A.**  That's correct.

17   **Q.**  For each of these five, there is a "Comments" section,

18   correct?

19   **A.**  That's correct.

20   **Q.**  What is the purpose of the "Comments" section?

21   **A.**  It's really to try to critique each one of the sample

22   interviews and to try to let our interviewers know that we

23   need more than a number.  In fact, the number is interesting,

24   but the more important thing than the number is the

25   description and the complexity of the description.

1    **Q.**  Turn, if you would, to page 46.  And let's just take a

2    look at one of the five examples in this same exhibit.  Do

3    you have that before you?

4    **A.**  I do, yep.

5    **Q.**  If you go to the top of the page, page 46, this is for a

6    hypothetical applicant named Wilbur, correct?

7    **A.**  That's correct.

8    **Q.**  Now, if we could scroll down, is there a section on

9    personal qualities?

10   **A.**  There is.

11   **Q.**  And just take a minute to read to yourself what is said

12   about the personal qualities.

13            Do you see that?

14   **A.**  I do.

15   **Q.**  And the ratings that was given is what in this sample?

16   **A.**  Is a 4.

17   **Q.**  Now, there are comments that indicate why this is the

18   appropriate rating, correct?

19   **A.**  That's correct.

20   **Q.**  Turn, if you would, to page 47.

21   **A.**  I have it.

22   **Q.**  And would you tell us in this training document, the

23   document that Mr. Hughes had in front of you, what do the

24   comments tell interviewers and admissions officers about the

25   manner in which you go about assessing personal qualities?

Case: 19-2005   Document: 00117632237   Page: 156   Date Filed: 07/30/2020   Entry ID: 6356615
Case 1:14-cv-14176-ADB   Document 633   Filed 04/18/19   Page 144 of 230

144

1   **A.**   I'll just read, if you wish, just a little bit.  But

2   we're trying to let people know what a helpful report is.

3   The fact that that person went through and had so much detail

4   was extremely helpful but also a little bit of a qualifier

5   because the interviewer felt perhaps he hadn't seen Wilbur

6   quite at his best.  But I think it did give a vivid picture.

7            And again, this is one factor that we could look at

8   and go back in to see what the rest of the application looked

9   like and see, in a sense, what kind of corroborating evidence

10  there might be for those comments.

11  **Q.**   In addition to materials like these materials which are

12  the second half of Mr. Hughes' exhibit, are there case books

13  with case studies at the admissions office?

14  **A.**   Yes.

15  **Q.**   Are those case books and case studies used to train your

16  admissions officer?

17  **A.**   Yes, they are.

18  **Q.**   And what kind of information, generally?  We're going to

19  have Ms. McGrath talk about them in some detail, but what

20  kind of information do they give about the personal qualities

21  you're looking for and how to use the personal rating?

22  **A.**   Well, to go through the cases -- and again it's a real

23  application, probably not everything, but close to

24  everything.  We allow the new people -- and we also of course

25  use these with alumnae and alumni.  We go out across the

1    country and across the world and do case books with them as

2    well.

3              And we have the leaders of what we call schools and

4    scholarship committees come to Cambridge three times a year,

5    and we will often do case books with them.  So it's looking

6    at real people and then the complexity of the real person and

7    then in a sense giving them a clearer sense of what might be

8    helpful to our committee.

9    **Q.**  So when Mr. Hughes asked you whether that one paragraph

10   was the only guidance you gave and you said there are other

11   things, did you have in mind the case books?

12   **A.**  Among other things, yes.

13   **Q.**  Did you have in mind the case studies?

14   **A.**  Yes.

15   **Q.**  Did you have in mind the training?

16   **A.**  Yep.

17   **Q.**  Did you have in mind these three-time-a-year visits when

18   people came to get trained?

19   **A.**  Yes.

20   **Q.**  Now let's go to another topic he talked to you about, and

21   let me see if I can fill in the picture.

22             Do you recall him asking you some questions about

23   search lists?

24   **A.**  Yes.

25   **Q.**  And to remind Her Honor, what is a search list and what

1    is your purpose in getting a search list?

2    **A.**   The search list are the names we buy from the ACT and the

3    College Board.  We buy maybe 100,000 -- depends on the

4    year -- names, and these are people who have done well in the

5    PSAT or various other standardized tests, and also people who

6    report high grades, usually an A or A minus.

7           And it's a pretty good start.  We send information

8    to these students.  And then in these days, we follow up with

9    as many as 40 or 50 electronic communications -- emails,

10   Snapchat, Instagram, you name it -- to try to make sure that

11   they consider Harvard as a place for them over the next four

12   years.

13   **Q.**   And approximately, using the search list, how many

14   applicants do you reach out to?

15   **A.**   With the search list it varies from year to year, but

16   well in excess of 100,000 usually.

17   **Q.**   Now, Mr. Hughes asked you whether for African-American

18   high school students you purchased information for a wider

19   range of scores.

20          Do you remember that?

21   **A.**   Yes.

22   **Q.**   And he asked you whether for Hispanic students you

23   purchased information for a wider range of scores.

24          Do you recall that?

25   **A.**   I do.

1   **Q.** Would you explain to Her Honor why for students for

2   African-American or Hispanics you purchase a wider range of

3   scores?

4   **A.** It really comes down to the economic disadvantage

5   associated, again in general, with both of those ethnic

6   groups. These are students who have less of an opportunity,

7   on average at least, to prepare well and to do well on

8   standardized testing because of the lack of opportunity often

9   in their schools and their communities.

10  **Q.** So you're trying a get a broader cross-section of

11  African-American students?

12  **A.** That's right.

13          MR. HUGHES: Your Honor, I'm going to object to the

14  leading. I'm trying to give some leeway to keep us going.

15          THE COURT: It is leading.

16          MR. LEE: I'm just trying to move us along.

17  BY MR. LEE:

18  **Q.** Let's go to Exhibit P2, which is at Tab 26. Do you

19  recall Mr. Hughes talking to you about this exhibit?

20  **A.** Yes, I do.

21  **Q.** And he asked you about the top half of the page, correct?

22  **A.** That's correct.

23  **Q.** Let me draw your attention to the bottom half of the same

24  page, and you'll see something that says "ACT Search"?

25  **A.** Correct.

1    **Q.**   Do you see that?

2    **A.**   I do.

3    **Q.**   What is the ACT?

4    **A.**   The ACT is a test very much like the SAT, and it's

5    available in all parts of the country, but particularly

6    historically certainly in the Midwest and the sort of heart

7    of the country, in some respects the Sparse Country.

8    **Q.**   In Sparse Country, as you discussed with Mr. Hughes, is

9    the SAT or the PSAT the test most likely to be taken?

10   **A.**   It would be usually more likely to be the ACT.

11   **Q.**   So let's look at what the ranges are for the ACT.  Can

12   you tell us what the range is for Asians in the search list

13   request?

14   **A.**   That would be 30 to 32.

15   **Q.**   And what is the range for Sparse Country in the same

16   document?

17   **A.**   30 to 32.

18   **Q.**   So how does the range for Sparse Country and Asians

19   compare on the exhibit that Mr. Hughes asked you about?

20   **A.**   They're obviously very similar, here obviously identical.

21   **Q.**   Now, for white students, what is the ACT range?

22   **A.**   It would be 33 plus.

23   **Q.**   Let's look at a couple of other documents that deal with

24   the search, with search lists.  Would you turn to Tab 25,

25   which is P50.

1    **A.**  Tab 25, okay.

2    **Q.**  Tab 25 in the notebook before you.

3    **A.**  I see.  Okay.  Sorry.

4           THE COURT:  On P2 for a minute, if you can just

5    help me out here.  High scorers men, 1380 to 1600, and then

6    high scorers Asian men 1380 to 1600.

7           THE WITNESS:  Yes.

8           THE COURT:  What's the difference?  Why are they

9    listed out separately?

10          THE WITNESS:  Simply to get more Asian and more

11   Sparse Country, lower it to 30 for Asians and for Sparse

12   Country because of where the ACT is located.

13          THE COURT:  Up on the PSAT.

14          THE WITNESS:  On the PSAT?  Okay.  I'm sorry, Your

15   Honor.  What's the question?

16          THE COURT:  Do you see on PSAT high scorers men?

17          THE WITNESS:  Yes.

18          THE COURT:  1380 to 1600?

19          THE WITNESS:  Yes.

20          THE COURT:  And then if you go down four lines,

21   high scorers Asian men is the exact same range?

22          THE WITNESS:  Yes.

23          THE COURT:  Why are Asians broken out separately?

24   Wouldn't they be subsumed in high scorers men?

25          THE WITNESS:  Yes.  I think it's the way you order

 1   them from the College Board.  And then you can also -- one of

 2   the things, remember we have the undergraduate minority

 3   recruitment coordinators.  These are students who help us

 4   with recruiting, including one of the UMRP groups is the

 5   Asian-American student group.  It's a very old group.  So

 6   they'll help us.  So it's probably just simply the way they

 7   ordered it from the College Board.

 8          But you're right; it's identical.

 9   BY MR. LEE:

10   Q.  So let's turn, if we could, to Tab 25.  Let me know when

11   you're there.

12   A.  I have it.

13   Q.  Do you have P50 in front of you?

14   A.  I do.

15   Q.  What is it?

16   A.  This just gives you a little sense of the early action

17   applicants for the class of 2017.

18   Q.  Now, let's --

19          MR. LEE:  Your Honor, we would offer P50.

20          MR. HUGHES:  No objection, Your Honor.

21          THE COURT:  Admitted.

22          (Plaintiff Exhibit No. 50 admitted.)

23   BY MR. LEE:

24   Q.  Now, if we turn to the last page of P50 --

25   A.  Yes.

**JA871**

1    **Q.**  -- do you have that before you?

2    **A.**  I do.

3    **Q.**  Can you tell us what it is?

4    **A.**  It's a memo to Marlyn and to me from Elizabeth Yong.  And

5    she's just describing -- again, it's always complex for

6    whoever is ordering the search because it's -- sometimes

7    there are uneven numbers who take various test

8    administrations.  But she's just giving us a sense of what's

9    happening with this year's PSAT search.

10   **Q.**  Now, there is a category of high scorers.  Do you see

11   that?

12   **A.**  Yes, I do.

13   **Q.**  What is the range for Sparse Country?

14   **A.**  Sparse Country appears to be 1310 to 1370.

15   **Q.**  Now, there are two Asian levels.  Do you see those?

16   **A.**  I do.

17   **Q.**  What is Asian level 1?

18   **A.**  1380 to 1600.

19   **Q.**  What is Asian level 2?

20   **A.**  1300 to 1370.

21   **Q.**  And as you move from left to right, is the number of

22   students in each of these categories for 2014 and 2015

23   listed?

24   **A.**  Yes.

25   **Q.**  For 2014 and 2015, was Harvard sending letters to

1    students in Asian level 1 and Asian level 2?

2    **A.**   Yes.

3    **Q.**   So how does Asian level 2 compare to the high scorers?

4    **A.**   You know, it is somewhat lower.

5    **Q.**   Now, do the cutoffs that the admissions office uses on a

6    year-to-year basis vary?

7    **A.**   I'm sorry?

8    **Q.**   I'm sorry.  I'll state it again.

9          Do the cutoffs that you use in your search list

10   vary from year to year?

11   **A.**   It can, but there's some continuity over time.  We don't

12   want to send out too many search letters simply because if

13   you send out too many search letters to people who have less

14   of a chance of getting in, it can actually have a negative

15   effect.  First of all, you don't want to turn more people

16   down.  And second of all, long term within that high school,

17   it may send a discouraging message in the future.  So I think

18   we try to be very realistic with these levels.

19   **Q.**   Now, the dates for the columns when there's an Asian

20   level 2, which is lower than high scorers are 2014 and 2015.

21          Do you see that?

22   **A.**   Yes, I do.

23   **Q.**   And approximately when were you implementing your

24   low-income initiatives across a variety of ethnicities?

25   **A.**   The low-income piece of it started in 2003, 2004, right

1    in that range.  It was originally 60,000.  We have raised the

2    low-income piece to 65, but that's when it started.

3    **Q.**  So let me go to a third issue that Mr. Hughes talked to

4    you about and see if I can fill in a blank.  Turn, if you

5    would, to Tab 12, which is the OCR findings.

6    **A.**  Yes.

7    **Q.**  Do you have that before you?

8    **A.**  I do.

9    **Q.**  And I want to turn you to page 26.

10           MR. HUGHES:  Mr. Lee, could we get an exhibit

11   number?

12           MR. LEE:  555.

13   BY MR. LEE:

14   **Q.**  Could you tell me when you're there?

15   **A.**  I'm there.

16   **Q.**  Turn, if you would, to page 26.

17   **A.**  26.

18   **Q.**  Do you see the second paragraph on page 26?

19   **A.**  I do.

20   **Q.**  Now, do you recall yesterday Mr. Hughes asking you some

21   questions about stereotyping?

22   **A.**  I do.

23   **Q.**  And reading to you a sentence or two from the report that

24   talked to you about stereotyping?

25   **A.**  Yes.

1   **Q.** And I think you referred to the findings of OCR.  Do you

2   remember that?

3   **A.** I did.

4   **Q.** Would you read to us what OCR found in the second

5   paragraph on page 26.

6   **A.** "OCR found that while some reader comments could be

7   construed to negatively affect the case of Asian-American

8   applicants, the ratings given to the applicant where these

9   comments did occur did not reflect a lower-than-expected

10  score.

11          "For example, in the aforementioned interviewer's

12  comment on 'hard worker' versus the 'outstanding potential

13  scholar,' the reader rated the applicant's academic area a 2,

14  consistent with his test scores and class standing.

15          "Similarly, applicants who were deemed to be

16  'quiet/shy' were often rated 3 or better in the preliminary

17  over all rating."

18  **Q.** And what did OCR conclude in the next paragraph, after

19  having considered these comments and the ratings that

20  resulted in?

21  **A.** "OCR concluded that while descriptions of Asian-American

22  applicants were found that could have implications for the

23  stereotyping of Asian-American students, they could not be

24  shown to have negatively impacted the ratings given to these

25  applicants."

Case: 19-2005    Document: 00117638235    Page: 167    Date Filed: 07/30/2020    Entry ID: 6356615
Case 1:14-cv-14176-ADB   Document 633   Filed 04/18/19   Page 155 of 230

155

1    **Q.**  Now, the fourth area I want to go into before I take you

2    through the admissions process is the whole question of the

3    Unz article and OIR, which Mr. Hughes talked to you about

4    today.

5          Do you have those in mind?

6    **A.**  I do.

7    **Q.**  Turn, if you would, to -- let's make sure I get the right

8    number tab -- 22.

9    **A.**  Okay.  I have it.

10   **Q.**  Do you have that before you?

11   **A.**  I do.

12   **Q.**  Did you find P14?

13   **A.**  I did.

14   **Q.**  First let me ask you this:  You were asked several

15   questions about OIR.  Is OIR involved in the admissions

16   process as it's implemented and executed at Harvard?

17   **A.**  No.

18   **Q.**  Does OIR participate in the admissions committee

19   decisions in any way?

20   **A.**  No.

21   **Q.**  So now if you're at Tab 22, P14, what is P14?

22          THE WITNESS:  Your Honor, P14 is a memo from Sally

23   Donahue, our director of financial aid, to me about getting

24   together.

25          MR. LEE:  And, Your Honor, we offer P14.  It's in.

```
 1        I'm sorry.  I think it went in already.
 2                Could I just have a second, Your Honor?
 3                THE COURT:  Yes.
 4     BY MR. LEE:
 5     Q.   So let me now talk to you a little bit about the Unz
 6     article that Mr. Hughes talked to you about.  Turn in your
 7     notebook to Tab 23.
 8     A.   23, yes.
 9     Q.   Do you have that before you?
10     A.   I do.
11     Q.   What is it?
12     A.   It's the article by Ron Unz, the "Myth of American
13     Meritocracy."
14     Q.   Now, Mr. Hughes described it as criticizing Harvard's
15     admissions process.
16                Do you recall that?
17     A.   I do.
18     Q.   Did he say something about more than just Harvard's
19     admissions process?
20     A.   Yes.  Certainly he was talking well beyond Harvard.
21     Q.   Let's see what he said about some other ethnic groups.
22                In PX218, would you turn to page 26?
23     A.   I have it.
24     Q.   Do you see the -- and I'll bring it up on the screen.
25                Do you see the section that's called "The Strange
```

1    Collapse of Jewish Academic Achievement"?

2    **A.**  I do.

3    **Q.**  Turn, if you would, to the next page, and I'm going to

4    ask you to go to the right hand column.

5            Do you see the sentence that begins "This pattern"?

6    **A.**  "This pattern"?  Yes, I do.

7    **Q.**  Would you read that sentence for us, please.

8    **A.**  "This pattern of third- or fourth-generation American

9    students lacking the academic drive or intensity of their

10   forefathers is hardly surprising, nor unique to Jews.

11   Consider the case of Japanese-Americans who mostly arrived in

12   America during roughly the same era.  America's Japanese" --

13   **Q.**  I'll stop you there because the exhibit is in.  Let's see

14   what he had to say about some of these ethnic groups.  Turn,

15   if you would, to the next page, page 28.

16   **A.**  Okay.

17   **Q.**  And look at the bottom of the left-hand column of

18   page 28.

19   **A.**  Yes.

20   **Q.**  Do you see the sentence that begins "We should"?

21   **A.**  How far down are you?

22   **Q.**  The bottom.

23   **A.**  Okay.  Yes.

24   **Q.**  "We should also remember that Jewish intellectual

25   performance tends to be quite skewed," and then it goes on?

1    **A.**   Yes.

2    **Q.**   Do you recall when you read the Unz article in 2012

3    considering the comments about ethnic groups other than

4    Asian-Americans?

5    **A.**   Yes.

6    **Q.**   Was there any controversy about Mr. Unz's comments about

7    groups other than Asian-Americans?

8    **A.**   I think many of us thought it was profoundly

9    anti-Semitic.

10   **Q.**   You were asked about this flurry of phone calls that you

11   received when the article came out.  Were some of them from

12   Jewish alumni at Harvard?

13   **A.**   That's correct.

14   **Q.**   Were they concerned about the anti-Semitic nature of the

15   article?

16   **A.**   Very much so.

17   **Q.**   Let's turn to the next page, bottoms of page 29.  Do you

18   see the last sentence that says "Meanwhile"?

19   **A.**   The last sentence on the left-hand column, yes.

20   **Q.**   Now, would you read the sentence that says "Meanwhile"?

21   It goes up until the top of the next column.

22   **A.**   "Meanwhile, blacks are substantially out numbered by

23   Hispanics, and they have much weaker academic performance, so

24   they would produce far fewer very high-scoring students.

25   Therefore, we can approximate the number of whites by merely

1    subtracting the number of Asian and Hispanic names as well as

2    an estimated black total based on the latter figure and then

3    determine the number of white gentiles by also subtracting

4    the Jewish total."

5    **Q.**   Now, Dean Fitzsimmons, in December of 2012 when this

6    article was published, what was your personal reaction to the

7    article?

8    **A.**   My personal reaction was that it was profoundly

9    anti-Semitic and inaccurate and stereotyping and had lots of

10   logical lapses.

11   **Q.**   At or about the same time, was there a publication by

12   Professors Hoxby and Avery?

13   **A.**   That's correct.

14   **Q.**   What was the thesis of the Hoxby-Avery publication?

15   **A.**   The thesis was that colleges needed to do more to reach

16   out to students from modest and poor economic backgrounds,

17   especially those who come from what they called one-off

18   schools, schools that rarely would send people out of state,

19   say, to a regional or a national institution.

20   **Q.**   So now let's go back to the OIR analysis in February

21   of 2014.

22            THE COURT:  Mr. Lee, P218 at Tab 23, the article

23   you've just been discussing, it's not admitted.  Did you

24   intend to admit it?

25            MR. LEE:  Actually I thought it was.  I apologize.

```
 1   We offer it.

 2           MR. HUGHES:  We don't object, Your Honor.

 3           THE COURT:  It's admitted.

 4           (Plaintiff Exhibit No. 218 admitted.)

 5   BY MR. LEE:

 6   Q.  Would you turn back to Tab 22 in your notebook, which is

 7   P14.

 8   A.  Yes.

 9   Q.  Just to anchor us, what is the date of the email chain

10   between you, Ms. Driver-Linn, and some others?

11   A.  February 20.

12   Q.  In the middle of the page, literally right in the middle,

13   and I'll ask Mr. Lee to highlight it, there's reference to a

14   meeting on the 25th of February at 2:00 p.m.

15           Do you see that?

16   A.  I do.

17   Q.  Did such a meeting occur?

18   A.  Yes, I believe.

19   Q.  Now, I want to ask you some questions about the

20   presentation that was made to you at that meeting.  First

21   turn, if you would, to Tab 17, which is P12.

22   A.  Yes.

23   Q.  Do you have that before you?

24   A.  Yes.

25   Q.  Is this the document that was presented to you in
```

161

1     February of 2013?

2     **A.**   Yes.

3     **Q.**   Now, I want to ask you a couple of questions about P9,

4     which is not yet in evidence, but Mr. Hughes asked you about

5     it. So turn back to Tab 16. Did you find P9?

6     **A.**   I do, P9, yes.

7     **Q.**   What is the date on this document?

8     **A.**   February 14, 2012.

9     **Q.**   What was the date of your meeting with OIR?

10     **A.**   It was February 25, I guess, 2013.

11     **Q.**   And the date of P12, I'm not going to have you flip back,

12     is February 2013, correct?

13     **A.**   Yes.

14     **Q.**   Okay. Now, you told Mr. Hughes that you recall seeing

15     some of the information that's in P12?

16     **A.**   Yes, I did.

17     **Q.**   I'm sorry. Withdrawn.

18          You saw some of the information that was in P9,

19     correct?

20     **A.**   Yes. Yes.

21     **Q.**   With P9 in front of you, can you tell Her Honor what

22     portion of P9 you recall seeing in some form in some

23     presentation? Do you have P9 before you?

24     **A.**   I do.

25     **Q.**   And you can flip through the pages, if it would help.

**JA882**

 1  **A.**  Yes.  Let me do that.  Let me pull this up.

 2  **Q.**  It's at Tab 15, Dean Fitzsimmons.

 3  **A.**  I have it.  You want me to flip through and --

 4  **Q.**  Just flip through and tell Her Honor which pages you

 5  recall seeing.

 6  **A.**  Well, the one I know I recall really was the one on

 7  page 11.

 8  **Q.**  Could we have page 11 from P9 on the screen.

 9          This is the four models plus actuals that you

10  discussed with Mr. Hughes, correct?

11  **A.**  That's correct.

12  **Q.**  All right.  Now, let's turn back to P12 at Tab 17.

13  **A.**  Okay.

14  **Q.**  Turn, if you would, to page 5.

15  **A.**  Page 5.

16  **Q.**  What are the subjects that are being considered in the

17  presentation that was actually made to you?

18  **A.**  This is the statement of findings.

19  **Q.**  I'm sorry.  I'm on page 5.  Do you see contents?

20  **A.**  I'm sorry.  Which one are we on?

21  **Q.**  Page 5 of P12 at Tab 17.

22  **A.**  P12.  What tab is that?

23  **Q.**  Tab 17.

24  **A.**  Tab 17, okay.

25  **Q.**  I've been having you jump back and forth.  We'll stay

1    now.

2    **A.**   Okay.  So my assignment is to go through and --

3    **Q.**   No, no.  No assignment quite yet.

4          Do you see the title of this page, which is

5    "Contents"?

6    **A.**   Yes.

7    **Q.**   What is the first question posed?

8    **A.**   "A first look at the return of early action."

9    **Q.**   And would you explain to Her Honor why you were looking

10   at the return of early action at this point in time?

11   **A.**   Well, we had given up early action for four classes.  And

12   we made the decision on our own, hoping that others would

13   join us.  We were only joined, as it turned out, in terms of

14   some of our colleagues, as it were, by Princeton and then

15   University of Virginia.  But we were hoping that more

16   institutions would think about giving up early action for a

17   whole variety of different reasons.

18   **Q.**   And what decision did you make, did Harvard make, on

19   early action?

20   **A.**   Well, we had -- we always -- we did not have binding

21   early decision.  It was not binding if you get into Harvard,

22   never has been.  It was if you got in, you were free to apply

23   elsewhere.

24          But we did make that decision.  We gave it up for

25   four years, but then we felt that we really needed -- had to

1    go back.

2    **Q.**  Now, the second question is a shift in gender balance.

3    Briefly, what was that issue at the time?

4    **A.**  It really had to do with the founding of the new School

5    of Engineering and Applied Science.  And that ended up

6    attracting lots of new applicants, which was terrific.  But

7    the downside was that a large percentage of them were men,

8    overwhelmingly really in some of the areas.

9              So we wanted to look at that to see what was

10   actually going on.

11   **Q.**  And the third category you discussed with Mr. Hughes, and

12   that portion of the presentation begins on page 31, correct?

13   **A.**  That's correct.

14   **Q.**  So let's turn back to page 31 to this portion of the

15   presentation.  "Evaluating factors that play a role in

16   Harvard College admission."

17   **A.**  That's great.  I'll go along with the screen here.

18   **Q.**  If you turn to page 32, Mr. Hughes asked you about the

19   goal of analysis.

20              Do you recall that?

21   **A.**  I do.

22   **Q.**  He asked you about the strategy.  Do you recall that?

23   **A.**  I do.

24   **Q.**  And he asked you about the notes, correct?

25   **A.**  That's correct.

1    **Q.**  I'm not going to repeat any of that, but I want to ask

2    you this:  There's a reference to the academic index, and

3    Mr. Hughes asked you about the academic index?

4    **A.**  Yes.

5    **Q.**  What use does the admissions committee make of the

6    academic index in its admissions decision making?

7    **A.**  The only use, really, is for reporting purposes to the

8    Ivy Athletic League literally.

9    **Q.**  Is the academic index the same thing as the academic

10   rating?

11   **A.**  No, not at all.

12   **Q.**  Turn, if you would, to page 33.  On page 33, you see the

13   list of the four models, correct?

14   **A.**  Yes.

15   **Q.**  And Mr. Hughes asked you about these in detail, so I'm

16   not going to ask you about them again except this:  The

17   academic model is based upon the academic index and the

18   academic rating, correct?

19   **A.**  That's correct.

20   **Q.**  Now turn, if you would, to Slide 34.  Do you have that

21   before you?

22   **A.**  I do.

23   **Q.**  And he asked you about that in some detail, correct?

24   **A.**  He did.

25   **Q.**  Now I'd like to ask about your reaction and your

1   understanding of these models when you first saw it in 2013.

2   Do you have that in mind?

3   **A.**   I do.

4   **Q.**   First, do you recall seeing these results in February

5   of 2013?

6   **A.**   I do.

7   **Q.**   Did you see the four models plus the actual?

8   **A.**   Yes.  I saw the four models.

9   **Q.**   And what was your reaction to the information provided in

10   the four models plus the actuals?

11   **A.**   Very much as I responded to Mr. Hughes.  And that is that

12   there are -- these are some of the factors certainly that go

13   into our admissions process.  It's never been test scores and

14   grades alone, you know, going all the way back to the *Bakke*

15   decision.

16          It's interesting, you know, with a small number of

17   factors to see at the end after Model 4 that it was very

18   close to the class size -- to what was actually true in the

19   class itself.  So it was certainly perfectly consistent,

20   nothing new, perfectly consistent with everything we'd known

21   before.

22   **Q.**   Now I just want to ask you a couple of questions, not to

23   go over ground that Mr. Hughes covered with you, but let me

24   focus you just for a second on Model 1.

25          Model 1 suggested if you just went on the academic

1    index and academic rating, you would have more

2    Asian-Americans in the class, correct?

3    **A.**   That's correct.

4    **Q.**   Have you ever doubted that?

5    **A.**   No.   That was certainly part of everything we've talked

6    about, Susie and I, and the OCR report.   And again just going

7    back even to the appendix in the *Bakke* decision, it was

8    always the case that Harvard was never simply about looking

9    at somebody's test scores and grades only.

10   **Q.**   And of the four models, which is the model that actually

11   takes into account the most factors?

12   **A.**   Well, Model 4.

13   **Q.**   If we flip back a page, how many factors does Model 4

14   take into account?

15   **A.**   It really takes into account eight.   Really seven, if you

16   think about it, because it has academic as 1.   But let's say

17   seven or eight factors.

18   **Q.**   Is this a comprehensive list of the factors used in

19   Harvard's admissions process?

20   **A.**   Not in the real world of actually doing admissions at

21   all.   Because in there, you're really looking at every single

22   human talent.

23   **Q.**   Go back to Slide 34.   When you saw these results, I think

24   you told Mr. Hughes they were consistent with what you had

25   understood before, correct?

1   **A.**   That's correct.

2   **Q.**   In what way were the results consistent?

3   **A.**   Well, in the sense that you ended up with -- they came

4   fairly close to the shares in the actual class itself.  So

5   that's a pretty good start.  But of course the reality is

6   it's much more complicated than this.

7         MR. LEE:  So if we could, Mr. Lee, could we blow up

8   the statistics on Model 4 and actual so we could all see a

9   little bit better?  If you could, just blow up the numbers at

10  the bottom.

11  BY MR. LEE:

12  **Q.**   When you said to Mr. Hughes that the numbers were pretty

13  close to the admitted class, were these numbers the numbers

14  you were referring to?

15  **A.**   Absolutely.

16  **Q.**   Turn, if you would, to Slide 36 in the same exhibit.

17  **A.**   I have it.

18  **Q.**   And the title of the slide is?

19  **A.**   "What Have We Learned?"

20  **Q.**   And what is the first bullet of what we have learned?

21  **A.**   "Once we account for ratings and demographic factors, we

22  can closely predict what the admitted class will look like."

23  **Q.**   Now, this is what OIR said, correct?

24  **A.**   That's correct.

25  **Q.**   Was this consistent or inconsistent with your reactions

1    to the models?

2    **A.**   Consistent.

3    **Q.**   Was this consistent or inconsistent with what you

4    understood to have been the result of the Harvard admissions

5    process over the years?

6    **A.**   Very consistent.

7    **Q.**   Was it consistent or inconsistent with your experience as

8    an admissions officer?

9    **A.**   Very consistent.

10   **Q.**   Let's look at the second bullet point on what we have

11   learned.  Would you read that to us.

12   **A.**   "With current data, we explain a significant amount of

13   the variation in admission, but further details especially

14   around the personal rating may provide further insight."

15   **Q.**   And the next bullet point, would you read that to us.

16   **A.**   Yes.  "There are a variety of factors that quantitative

17   data is likely to miss or ratings do not capture.  We'd like

18   to better understand exceptional talent; for example, in

19   unusual music, art, and writing, the role of context cases,

20   the role of the personal statement and essay, and then

21   measures of socioeconomic status, the HFAI" -- that's the

22   Harvard financial aid initiative active flag -- "and the

23   low-income flag."

24   **Q.**   Would you explain to Her Honor what the HFAI flag and the

25   low income flag are?

1    **A.**   The HFAI flag is when a reader is going through an

2    application, the reader would try to indicate whether or not

3    that person would be eligible for the lowest-income

4    scholarship.  So, for example, $60,000 and under or $65,000

5    and under now.

6              The low-income flag is very similar.  It's the

7    whole idea of trying to make sure that we are, at least as we

8    open up the application and do the preliminary stuff, that if

9    we think there's something going on with either HFAI or the

10   low-income flag, we want it to be noticed.

11             THE COURT:  Excuse me.  Context cases?

12             THE WITNESS:  Context cases are a little more

13   complicated.  Just to give you an example, suppose you found

14   a wonderful low-income student who had all kinds of great

15   things, you know, in the application beyond obviously just

16   simply the fact the person is low income.  Could be a very

17   attractive applicant of all kinds, of any kind, that might be

18   well down in the class.

19             Because sometimes, say, for example -- I'll speak

20   personally as a person from a low-income background who had,

21   shall we say, a very unsuccessful first ninth grade.  You can

22   tell how unsuccessful that was.

23             So sometimes you'll have somebody who has done not

24   quite as well perhaps for economic reasons or other reasons

25   early in high school who then picks up speed and does

1    extraordinarily well.  And we might just say this is great.

2    We really want to have this person.

3            There might, on the other hand, at the same school

4    be another very attractive applicant who may be very

5    different, but you might want to go in and consider --

6    remember we're trying to create relationships with schools.

7    You know the old Tip O'Neill, all politics is local, as they

8    say, and we're trying to create 100-year relationships with

9    them.

10           So when we go in and take somebody out of the --

11   lower in the class or down further in the class and we've got

12   some other very attractive people at the upper end of the

13   class, sometimes you can make an argument to take them both

14   because they're both terrific, they both look as though they

15   would be great at Harvard.  And it's also a very good message

16   to that school that you may be trying to develop that you're

17   looking for all kinds of different people.

18           But that's one example.  Does that suffice or more

19   confusing?

20           THE COURT:  I got it.

21   BY MR. LEE:

22   Q.   The factors that are listed by OIR that are not likely to

23   be included in its analysis, are these the only other factors

24   that the admissions process considers?

25   A.   No.  No, there are so many others.  Back in the real

1   world, you know, every time you open up an application, there
2   are all kinds of reasons why you might want to do it.  We
3   talk about Sparse Country, for example.  You might make an
4   argument, say if you're covering Montana, that this is a
5   great state, you would like to get somebody from there.
6           But we also -- not as well known is that we -- a
7   real geographic tip we give are for Cambridge and Boston
8   students and for Massachusetts generally because we want to
9   do what we can to educate future leaders from our home
10  community.  But there's so many other factors.
11  Q.  Now, at this February 25, 2013, meeting, did anyone at
12  OIR report to you that they had uncovered discrimination or
13  bias against Asian-Americans?
14  A.  Not at all.
15  Q.  Did anybody tell you that this presentation showed
16  discrimination or bias against Asian-Americans?
17  A.  Not at all.
18  Q.  If they had, would you have remembered?
19  A.  I think so.
20  Q.  And would you have done something about it?
21  A.  Yes.
22  Q.  Now, in the month or two that followed, you did ask OIR
23  to do another analysis for you, as you told Mr. Hughes,
24  correct?
25  A.  That's correct.

**JA893**

1    **Q.**  And that was on what issue?

2    **A.**  On low-income students.

3    **Q.**  Turn, if you would, to Tab 18.

4    **A.**  Tab?

5    **Q.**  Tab 18.  I apologize.

6    **A.**  18.  Okay.

7    **Q.**  Do you find P26?

8    **A.**  I do.

9    **Q.**  Can you tell us what this is?

10   **A.**  This is a memo from Erica Bever, who was working then at

11   OIR, to me regarding low-income issues.

12   **Q.**  And Mr. Hughes discussed this with you a little bit.

13   What was the bottom line on Ms. Bever's analysis in response

14   to your question, are we giving low-income applicants a tip?

15   **A.**  That we are, would be the bottom line.

16   **Q.**  And after you received this report, did you ask OIR to do

17   any additional analysis?

18   **A.**  I did.

19   **Q.**  On what subject?

20   **A.**  On the subject of the low-income tip across ethnic

21   groups.

22   **Q.**  Mr. Hughes asked you some questions about that, too.  So

23   I'm going to take you to Tab 20, which is P29.  Do you have

24   that?

25   **A.**  Tab 20, yes, I do, P29.

1    **Q.**  Do you recall receiving that?

2    **A.**  I do.

3    **Q.**  This was a follow-up to your conversation on low-income

4    applicants in admissions, correct?

5    **A.**  That's correct.

6    **Q.**  And if you would, turn to the third bullet.

7    **A.**  Yes.  "Across all race/ethnicity groups, low-income

8    students are admitted at a higher rate."

9    **Q.**  Was this a question you specifically asked of her?

10   **A.**  Yes.

11   **Q.**  Turn to Tab 21, which is P28.

12   **A.**  Yes.

13   **Q.**  Do you have those before you?

14   **A.**  I do.

15   **Q.**  Mr. Hughes discussed this with you.  Turn to page 6,

16   which is the chart.

17   **A.**  Okay, yes.

18   **Q.**  Did OIR specifically consider Asian-American applicants?

19   **A.**  Yes, they did.

20   **Q.**  What were the results of OIR's analysis on Asian --

21   low-income Asian-American applicants?

22   **A.**  That low-income Asian-Americans were admitted at a

23   10 percent rate while other above $60,000 income were

24   admitted at 7 percent rate.

25   **Q.**  How did the incremental tip, how did the higher admission

1    rate for Asians compare to the tip or the higher admission

2    rate given to any other ethnicity?

3    **A.**   It was certainly among the highest.  The Native American

4    difference was slightly greater.  That's a very, very small

5    number in terms of individuals, so that can fluctuate quite a

6    bit.

7    **Q.**   So among the different ethnicities, the tip or the

8    benefit given to Asian-Americans, low-income Asian-Americans,

9    was among the highest given, correct?

10   **A.**   That's correct.

11   **Q.**   Now, what was your reaction to this chart when you

12   received it?

13   **A.**   I think this is the information that I wanted.  Because

14   again, we want to make sure that any criterion, any factor at

15   that might affect admissions would be administered in an

16   evenhanded way across ethnic groups.

17   **Q.**   Now, Mr. Hughes asked you some questions about the

18   information you received based upon OIR's models, the models

19   you recall seeing.

20           Do you recall those?

21   **A.**   Yes.

22   **Q.**   He asked you whether you reported that information to

23   President Faust, to Dean Smith, or to Dean Khurana.

24           Do you recall that?

25   **A.**   I do.

1    **Q.**  Based upon those models, was there anything to report?

2    **A.**  There was absolutely nothing to report.

3    **Q.**  Why?

4    **A.**  Everything was absolutely consistent with everything else

5    we already knew.  And literally, even that very preliminary

6    incomplete model came up with, you know, by the time they get

7    through with the fourth model, it was really almost identical

8    with the actual class.  No news, nothing to report.

9    **Q.**  Let me take you back to the beginning here and walk

10   through the admissions process in a little bit of a

11   disciplined way than I have so far.

12           Dean Fitzsimmons, where did you go to high school?

13   **A.**  Archbishop Williams in Braintree, Massachusetts.

14   **Q.**  The what did your parents do for a living?

15   **A.**  We all ran a gas station and a mom-and-pop store in

16   Weymouth.

17   **Q.**  Did your parents attend college?

18   **A.**  They did not.

19   **Q.**  Were you the first in your family to attend college?

20   **A.**  All four of us were the first in our generation to attend

21   college.

22   **Q.**  Where did you attend college?

23   **A.**  Harvard College, fully accredited in Cambridge.

24   **Q.**  I hope so.  What year --

25   **A.**  1967.

1    **Q.**  What year did you graduate?

2    **A.**  1967.

3    **Q.**  How did you finance your education at Harvard?

4    **A.**  Two ways.  Almost entirely with Harvard's scholarship

5    funding because our family was expected to pay virtually

6    nothing.  And the other thing is that I worked term time and

7    summers as dorm crew, research, all kinds of different jobs.

8    And I -- like many low-income students, I actually paid my

9    parents' contribution because they couldn't afford it.

10   **Q.**  And how much was the parental contribution for you back

11   then?

12   **A.**  It's hard to remember exactly.  I would say maybe a

13   couple of hundred dollars.

14   **Q.**  Now, did your experience as a first-generation financial

15   aid student influence or educate your views on financial aid

16   as you became involved in the Harvard admissions process?

17   **A.**  Absolutely.  It totally transformed my life.  It opened

18   up possibilities I had no idea -- you know, growing up in

19   Weymouth, I had never even seen Harvard until my senior year

20   in high school.

21   **Q.**  Now, were you involved in activities while you were in

22   college?

23   **A.**  I was.

24   **Q.**  What activities were you involved in?

25   **A.**  With ice hockey, with the Catholic Students Association,

1    and with the thing called Phillips Brooks, which is sort of

2    an organization that does community service, social service.

3    **Q.**   What was the composition, the demographic composition of

4    the Harvard-Radcliffe classes when you were there?

5    **A.**   It was something out of generations ago.  It was 4 to 1

6    male to female.  And of course my high school had been

7    60 percent female, so I thought that was really strange,

8    quite frankly.  There were almost no students of color.

9    There were almost no international students.  There were

10   extremely few first-generation students.  Only about probably

11   a quarter of our class was on financial aid of any kind.  It

12   was a totally different world.

13   **Q.**   What did you do after you graduated?

14   **A.**   I went to the graduate school of education and got a

15   master's and a doctorate.

16   **Q.**   Now, what did you do after that?

17   **A.**   While in grad school, I was a freshman proctor in the

18   Harvard Yard, and I also taught at Holy Cross college in

19   Worcester part-time and then one year full-time right after I

20   got the doctorate and then came to work at Harvard admissions

21   in 1972.

22   **Q.**   How long have you worked at Harvard?

23   **A.**   Whatever that difference is, 48 years.

24   **Q.**   Since 1972?

25   **A.**   46 years, yeah.

1    **Q.**   What year did you become dean of admissions at Harvard?

2    **A.**   In 1986.

3    **Q.**   Have you held that position continuously since that time?

4    **A.**   I have.

5    **Q.**   I don't think you've been asked this yet, so I will.

6          Would you explain to Her Honor what are your duties

7    and responsibilities of dean of admissions?

8    **A.**   I'll make it quick.  So including number one, you've

9    heard all the various ways we recruit.

10          It is worth mentioning, though, that it is quite an

11    amazing outreach.  And we travel with Georgetown, Penn, Duke,

12    and Stanford to 120 locations in the United States every

13    year, doing evening meetings and then counselor breakfasts in

14    the morning.  And then travel to another 20 or so cities with

15    UVA and Princeton, who became our partners after they gave up

16    early admissions.  Then I asked Wellesley and Yale to come

17    with us in that group.  So there's another 20 cities there.

18    And then we do additional outreach with other colleges.

19    Probably brings it up -- and sometimes by ourselves to about

20    150 or 160 locations just in the U.S.  So a lot of

21    recruiting.

22    **Q.**   I'm going to come back to the recruiting just a little

23    bit.  We've talked about some of it.  The search lists are

24    part of recruiting.  Is that correct?

25    **A.**   That's correct.

1    **Q.**  The joint visits are part of recruiting?

2    **A.**  Students, everything.

3    **Q.**  Let me ask you first how many employees are in the

4    admissions office?

5    **A.**  Total of about 70, I would say.

6    **Q.**  How many admissions officers are there?

7    **A.**  About 40.

8    **Q.**  How many admissions officers are actually involved in

9    reviewing applications?

10    **A.**  About 40.

11    **Q.**  How many admissions officers vote or participate in every

12    admissions decision every admissions year?

13    **A.**  Every single one of the 40.

14         MR. LEE:  Your honor, if this is a good time to

15    take a brief break, we can take it.

16         THE COURT:  That's fine.  I'm good to go.  I'm also

17    happy to take a break.  We moved everything to quarter of

18    4:00.  We're good to go to quarter of 4:00.  If you want to

19    take a break, that's fine.  How long?  Ten minutes.

20         MR. LEE:  Ten minutes is great.

21         THE COURT:  Ten minute break.

22         (Court recessed at 2:40 p.m.)

23         THE COURT:  When you're ready.

24    BY MR. LEE:

25    **Q.**  Dean Fitzsimmons, I'd like to take you through the

1    admissions process in some detail so we can understand it.

2            MR. LEE:  Could I have on the screen DD 1.2,

3    Demonstrative 1.2?  Do you see the slide entitled "Objective

4    of" --

5            THE COURT:  Where is this?  Where do I find it?  Is

6    it a demonstrative?

7            MR. LEE:  It's just a demonstrative.  I think Your

8    Honor has them.  Tab 2, Your Honor.

9    BY MR. LEE:

10   **Q.**   Are you with us, Dean Fitzsimmons?

11   **A.**   I am.

12   **Q.**   Would you take us briefly through each of the three

13   objectives that are on DD 1.2?

14   **A.**   Well, ever so briefly.  So a little over 42,000

15   applicants, and we're going to admit about 2,000 people, so

16   truly exceptional students are -- who knows exactly how many.

17   But there might only be two or 300 admitted in every class

18   that would be truly unusual.

19           So these would be people who not only have terrific

20   test scores and grades and all those kinds of things --

21   because lots of people have them.  They'd be people who had

22   truly exceptional recommendations, let's say from not just

23   their teachers but perhaps from people they'd worked with in

24   the summer or say national or international competitions.

25           They also very often would have had a faculty

1    reading, expertise reading from one of our faculty members on

2    whatever it is.  That's a rough idea of who is truly

3    exceptional.

4    **Q.**  And are you also looking for students who are exceptional

5    in ways other than academically?

6    **A.**  Yes.  Really in every way that one could imagine,

7    actually.  And we're looking -- I think the whole idea of

8    having a great educational environment and having people who

9    truly will educate each other and inspire each other we

10    actually hope over the four years, that diversity really

11    matters.  And it's diversity in all its forms, not just

12    simply ethnic diversity or economic diversity.  Religious

13    diversity, you name it.  The more diverse the students are,

14    the richer the education.

15    **Q.**  You've gone to the second objective.

16    **A.**  Yes.

17    **Q.**  I think you've hit on some, but what are the types of

18    diversity that you're looking for in a Harvard College class?

19    **A.**  It really would go right down the line.  The easy ones

20    we've talked a lot about would be ethnic diversity and

21    economic diversity.  But we're also looking -- and to some

22    extent certainly geographic diversity, things -- very

23    standard things that people think about.

24          But it's much more than that.  It's diversity of

25    thinking.  It's diversity of academic interests.  I think one

1    of the things we hope with all of our new students who are

2    coming into the School of Engineering and Applied Science is

3    we want them to live with and learn from humanities students

4    and social science students and maybe take some of those

5    courses themselves.

6              So it's diversity in every possible way you can

7    think of it.

8    **Q.**   What is the third objective?

9    **A.**   Very simple.  No more students than beds.  We have

10   typically a 97, 98 percent graduation rate for all of our

11   students.  And all of our freshmen are required to live in

12   the dorms, and about 98 percent of all of our students live

13   in the dorms.  We simply cannot -- we don't have room for

14   more than 1,660 people roughly in each class.

15   **Q.**   Approximately how many applications does Harvard receive

16   in a year?

17   **A.**   A little over 40,000 in recent years.

18   **Q.**   Of that approximately 40,000, how many are academically

19   qualified to do the work at Harvard?

20   **A.**   A majority, I would say, perhaps a substantial majority

21   of the people who apply.  Because they're very self-selecting

22   in some ways, despite all of our recruiting.  A very large

23   percentage could do the work at Harvard.

24   **Q.**   To prepare yourself to testify, did you review some

25   information about the Harvard class of 2019?

1   **A.**   Yes.

2   **Q.**   Approximately how many applications did you receive for

3   the Harvard class of 2019?

4   **A.**   It was probably around 35,000.

5   **Q.**   Could I have on the Exhibit DD 1.3.

6           MR. LEE:  This is a demonstrative, Your Honor,

7   which I think is the next slide in Tab 2.

8   BY MR. LEE:

9   **Q.**   Do you have DD 1.3 before you?

10  **A.**   I do.

11  **Q.**   Is this a chart with some of the information you obtained

12  for your testimony?

13  **A.**   Yes.

14  **Q.**   For the class of 2019, how many domestic applicants had

15  perfect scores on the verbal section of the SAT?

16  **A.**   About 2,700.

17  **Q.**   How many had perfect scores on the math section of the

18  SAT?

19  **A.**   About 3,400.

20  **Q.**   Approximately how many had perfect grade point averages?

21  **A.**   A little over 8,000.

22  **Q.**   How many students did you admit to the Harvard class of

23  2019?

24  **A.**   Sent out about 2,000 admissions tickets.

25  **Q.**   Is the number 2,000 a typical number?

1    **A.**  It's typical.

2    **Q.**  Why is the number 2,000 a typical number?

3    **A.**  Simply because we have a pretty good sense, based on whom

4    we've admitted that year, how many of them are likely to show

5    up because there are so many great places out there beyond

6    Harvard.  Some of the students, you know, will look at it and

7    decide they want to go to the great state university nearby,

8    or they might decide to go to a beautiful small college.  All

9    kinds of different reasons why people would turn us down.

10            And typically almost 20 percent in recent years of

11    the students roughly will turn us down to go elsewhere.

12    **Q.**  Now, let's go from the numbers to the materials that you

13    considered.  And I think on a number of occasions you told

14    Mr. Hughes that the admissions office considers all the

15    information in the file.  Is that what you said?

16    **A.**  That's correct.

17    **Q.**  We're going to go through the information in some detail,

18    but let me ask you this:  Who submits the information that

19    ultimately ends up in the file?

20    **A.**  The student submits quite a bit of information, but then

21    there's a lot of other information coming in from outside

22    sources such as the teachers and the counselor.  People maybe

23    with whom the student had worked over the summer or

24    employers.  There's loads of information coming in from the

25    outside.

1    **Q.** What information is submitted by the student him or

2    herself?

3    **A.** It would really be the common application. We were

4    actually the first of our kind to get into the common

5    application in the mid '90s. And the idea was to --

6    especially for a busy, stressed-out student and especially

7    those who perhaps are facing economic obstacles at home, we

8    felt it would be good to go to the common application because

9    it's easy for them to fill that out and then apply to a whole

10   variety of other good places at the same time.

11   **Q.** Now, just in general terms, because we're going to look

12   at it specifically, what information is submitted by others

13   other than the student?

14   **A.** We require the two teacher reports, and of course we

15   require the guidance counselor report along with a

16   transcript. But you could just about get anything. Lots of

17   students will work term time or during the summer or they'll

18   do research or other kinds of things in the school year or

19   the summer. So that information comes in. Just about

20   everything you can imagine.

21   **Q.** Now, let's, before we get to the specifics of the files,

22   I want to ask you something about this concept of tips that

23   Her Honor and the rest of us have heard about. What is a

24   tip?

25   **A.** A tip would be a factor that might influence our readers

**JA907**

1     to vote yes in the end.  You'd look at something and say,

2     well, gee, that would make this particular person a

3     particularly interesting educator of others and classmate.

4     But it could be anything.

5     **Q.**   Is it also sometimes referred to as a plus factor?

6     **A.**   Yes.

7     **Q.**   Is a tip ever a negative factor?

8     **A.**   Never.

9     **Q.**   Now, turn, if you would, to Tab 3 in your notebook.  Do

10    you have that before you?

11    **A.**   Would this be the application review process?

12    **Q.**   No.

13    **A.**   Tab 3.  I'm sorry.

14    **Q.**   Tab 3 should be DX5.

15    **A.**   Yes.

16    **Q.**   This is the interviewer handbook.  Do you see that?

17    **A.**   I do.

18    **Q.**   We saw excerpts of the interviewer handbook for 2013-2014

19    when Mr. Hughes examined you.  I'll represent to you that

20    this is a complete version of the interviewer handbook.

21           Do you recognize it?

22    **A.**   I do.

23    **Q.**   What is it used for?

24    **A.**   We use it, of course, for our 10,000 interviewers.  We

25    also use it for our own staff, obviously for their training.

**JA908**

1    It's a very useful, quick kind of summary of what we do.

2              MR. LEE:  Your Honor, we offer DX5.

3              MR. HUGHES:  No objection, Your Honor.

4              THE COURT:  Admitted.

5              (Defendant Exhibit No. DX5 admitted.)

6    BY MR. LEE:

7    Q.  Turn, if you would, to the page at the bottom that says

8    DX005.0009.

9              Do you have that before you?

10   A.  I am one page away.  Yes.

11   Q.  Just remind us.  This is something that you send out to

12   the 10,000-plus people involved in the admissions process?

13   A.  That's correct.

14   Q.  Is it available to your 40 admissions officers each year?

15   A.  Yes.  And it's used obviously in the training as well.

16   Q.  Now, there's a category called "The Search For

17   Distinguishing Excellences."

18             Do you see that?

19   A.  I have it.

20   Q.  What is a distinguishing excellence in the Harvard

21   admissions process?

22   A.  Well, if I could read just a little bit of it.  We talk

23   about our goal is to attract the best students to the

24   college.

25   Q.  Dean Fitzsimmons, you are going to have to go slower if

1    you're going to read or the court reporter will kill both of

2    us.

3    **A.**   Sorry.  I'll make sure the Boston accent is correctly

4    applied.

5    **Q.**   You don't have to read it because it's in evidence.  But

6    just in general terms, what's a distinguishing excellence?

7    **A.**   It would really be excellences of all kinds.  It could be

8    academic.  It could be, for example, musical.  You know,

9    Yo-Yo Ma, the cellist, went to Harvard.  In recent years we

10   might get 2,200 music CD's and resumes sent in, and we'll

11   take a look at them, and then we'll pass the best ones on to

12   faculty.  And then they'll tell us again on a 1 through 4

13   scale who might be truly excellent musically.  So it could be

14   anything, really.

15   **Q.**   Now, turn, if you would, to the next page.  Do you see

16   the first sentence of the first full paragraph?

17   **A.**   Yes.

18           MR. LEE:  I'm going to ask Mr. Lee to highlight

19   that.

20   BY MR. LEE:

21   **Q.**   And I am this time going to ask you to read it to us.

22   **A.**   "The admissions committee values objective criteria but

23   holds a more expansive view of excellence."

24   **Q.**   Is that true?

25   **A.**   That's very true.

1    **Q.**  And is it an accurate description of the real process

2    that's used to admit students at Harvard?

3    **A.**  Absolutely.

4    **Q.**  All right.  Then there's a reference to test scores and

5    grades indicating academic aptitude and achievement.

6              Do you see that?

7    **A.**  Yes.

8    **Q.**  That's true, is it not?

9    **A.**  It is.

10   **Q.**  Then would you read to us the next sentence from the

11   handbook.

12   **A.**  "The committee also scrutinizes applications for

13   extracurricular distinction and personal qualities."

14             Keep reading?

15   **Q.**  Yes, please.

16   **A.**  "Students' intellectual imagination, strength of

17   character, and their ability to exercise good judgment.

18   These are other critical factors in the admissions process,

19   and they are revealed not by test scores but by students'

20   activity outside the classroom, the testimony of teachers and

21   guidance counselors, and by alumnae/alumni interview

22   reports."

23   **Q.**  Let's stop there.  Is that an accurate description of

24   what the admissions office is looking for, at a high level?

25   **A.**  Yes.

1    **Q.** Now, in the handbook you specifically identify some

2    things that you're positively looking for in applicants.

3    **A.** Yes.

4    **Q.** Now, turn, if you would, to page 10 of DX5. And I'm

5    going to draw your attention to the third paragraph of this

6    page. Do you have it before you?

7    **A.** Page 10, yes.

8    **Q.** There's a sentence that begins "Tips." Would you read

9    that sentence for us. Mr. Lee will highlight it for you.

10   **A.** Yes. "Tips come into play only at a high level of merit.

11   The committee never gives enough of a tip to admit an average

12   candidate at the expense of a first-rate one. These are

13   among the most common tips by which applicants presenting

14   distinguished academic and extracurricular records might

15   distinguish themselves for admission."

16   **Q.** I want to ask you about that first sentence, "Tips come

17   into play only at a high level of merit."

18                First, is that true?

19   **A.** Absolutely true.

20   **Q.** What does it mean?

21   **A.** It really means that you have to be highly competitive

22   really across the board before you really will be in

23   contention for a place in the class, at which point having a

24   tip of one kind of another might help you get in, all other

25   factors substantially equal.

**JA912**

1   **Q.**   There was a lot of reference to tips for race or ethnic

2   background during Mr. Hughes' examination you.

3          Do you remember that?

4   **A.**   I do.

5   **Q.**   Let's see what the list of tips is that's listed in the

6   notebook.  What is the first tip?

7   **A.**   "Outstanding and unusual intellectual ability."

8   **Q.**   Now, given the academic success of the applicant pool as

9   you've just described to us, what makes someone outstanding

10  and unusual enough to get this tip from that very, very

11  qualified applicant pool?

12  **A.**   It's really the ones at the very tip-top who will get,

13  for example, Harvard faculty reads that will say this is one

14  of the most promising poets in this generation or one of the

15  most promising mathematicians in this generation.

16         But it would be based on they perhaps would be

17  looking at, say, the person's poetry or the person's original

18  math.  Then they'd look at the entire application to see the

19  recommendations and to see what other -- perhaps in the math

20  world, for example, this person was on either the national or

21  the international Math Olympiad team.

22  **Q.**   What is the next tip that is expressly described in the

23  handbook?

24  **A.**   "Unusually appealing personal qualities."

25  **Q.**   And what are -- can you give us an example of an

1    unusually appealing personal quality?

2    **A.**   Well, I'd say in a general kind of way we're looking at

3    people who have really made everyone around them better, say,

4    in their high school, in their family perhaps, in their

5    community.  People who literally have in some cases really

6    made a difference, positive, big positive difference in other

7    people's lives so far, at least in terms of what the

8    application indicates from the reports.

9         And then we're also though -- we're in the futures

10   business.  So the idea, too, is, okay, maybe they'll be great

11   roommates and make a huge difference over the four years

12   based on what they've done so far.  But we're also trying to

13   do the impossible, I suppose, and trying to project them out

14   into the world later.

15   **Q.**   Now, under this paragraph it says, "In certain cases

16   teacher recommendations, the secondary school report,

17   personal statement, and the alumnae/alumni interview report

18   offer consistent testimony of an applicant's unusual

19   effervescence, charity, maturity, or strength of character in

20   addition to academic and extracurricular accomplishments.  A

21   residential community with strong emphasis on extracurricular

22   participation.

23        "As a residential community with strong emphasis on

24   extracurricular participation, Harvard prizes these

25   qualities."  Is that true?

**JA914**

 1   **A.**   Very much so.  Yes, it's true.

 2   **Q.**   And the next tip is what?

 3   **A.**   Outstanding capacity for leadership.

 4   **Q.**   The next tip is what?

 5   **A.**   Creative ability.

 6   **Q.**   And let's go to the next page.  What is the next tip?

 7   **A.**   Athletic ability.

 8   **Q.**   There's been a lot of discussion about athletes.  Why

 9   does Harvard give a tip for athletes?

10   **A.**   For a couple of reasons.  One is having people, having

11   all of our students gather together, you know, for athletic

12   contests builds a spirit of community that I think many

13   students expect and I think they deserve.  It really unifies

14   the institution in quite a specific and vital way,

15   remembering, of course, that Harvard has changed a lot since

16   my era.

17        So now our biggest state often is California.  Our

18   fourth biggest is Texas.  Our sixth biggest is Florida.  So

19   if you're a kid coming from some of these areas, you want to

20   go to a place that is collegiate in the way Americans often

21   think of colleges.  So having a vibrant athletic tradition

22   and ability to rally people around makes a big difference in

23   our ability to attract all kinds of students.

24        The other part of it is that people who have

25   achieved high levels of athletic expertise, if you want to

1    use that word, often have a commitment, a drive, and an

2    energy that often serves them well during college and then

3    well beyond.

4    Q.  I'm going to ask you some more about the athletes and the

5    athletic ratings when we get to that.

6          But I want to ask you one thing.  In SFFA's

7    opening, they suggested that the coaches or the athletic

8    department basically order you who to admit.  Is that true?

9    A.  Hardly.

10   Q.  Does every athlete that gets admitted to the class get

11   reviewed and voted on by the 40-person admissions committee?

12   A.  Absolutely.

13         THE COURT:  Can I ask a question?  This says about

14   tips that they come only into play at a high level.  The

15   committee never gives a tip to admit an average candidate at

16   the expense of a first-rate on.

17         But didn't we see a chart earlier that said that

18   there's a big chunk of athletes and of legacies that wouldn't

19   get in but for that tip?

20         THE WITNESS:  There are some who needed a tip to

21   get in.  That's true.

22         But if you look at it in any sort of a national

23   sense, they're all very, very competitive in a national

24   sense.  Our applicant pool, you saw the 8,000 people with

25   perfect grades and so on that you just saw.  It's quite a

1    rarified pool in the end.

2              But there's room in lots of different ways for

3    people with lots of different abilities and skills to be

4    successful.  And one of the things that is very important for

5    people who come from a variety of different backgrounds is

6    that they have -- in addition to their academic work, they

7    have extracurricular or maybe athletic niches where they can

8    meet other people and have a sense of identity.  And in some

9    ways that helps achieve our usually 97-98 percent graduation

10   rate.

11             So it's a little different.  You know, the athletic

12   academic credentials are somewhat lower.  But the lineage of

13   the alumnae/alumni sons and daughters, their academic

14   credentials look almost exactly like the rest of the class.

15   So it's two very different pools.

16   BY MR. LEE:

17   Q.  That was going to be my next question.

18             There's been a suggestion is that if you look at

19   the children of Harvard and Radcliffe alums, they're somehow

20   academically less qualified than either the rest of the pool

21   or the admitted pool.  Is that accurate?

22   A.  That's not accurate, actually.

23   Q.  How does the lineage pool compare to the overall pool and

24   to the admitted pool?

25   A.  Just simple kinds of things.  The pool itself, they are

197

 1   stronger than the average applicants certainly in the pool.

 2   So they are certainly on academic credentials.  When they're

 3   admitted, the test scores and grades and things like that

 4   literally are identical to the average for the Harvard class.

 5   So indistinguishable.

 6            THE COURT:  I'm sorry.  This is the perils of

 7   having me do the summary judgment motions and all the other

 8   motions as I sit on this trial.

 9            Didn't I read someplace that the legacies are the

10   lowest-performing demographic at Harvard?

11            THE WITNESS:  I don't think so.

12            MS. ELLSWORTH:  I don't believe you did, Your

13   Honor.

14            THE COURT:  I know you're like the collector of

15   facts over there.

16            MR. LEE:  The answer is?

17            MS. ELLSWORTH:  I'm not familiar with that as a

18   fact.

19            MR. LEE:  And I actually think it's not the fact.

20   BY MR. LEE:

21   Q.  Do you know, Dean Fitzsimmons?

22   A.  What we know is this, and you would expect it:  These are

23   a very self-selecting group because lots of them will not

24   apply if they're -- because for two reasons.

25            One, some of them don't want to go where their

1    parents went.  Another is that they are -- many of them go to

2    very good public and private schools.  They're very well

3    prepared.  And oftentimes their guidance counselors are very

4    good at telling them not to apply to Harvard even if they may

5    well be able to get in, especially if they may be a better

6    match for a different kind of school; for example, for a

7    smaller school, as often happens.  I think you yourself,

8    Mr. Lee, have seen that with two of your children.

9            And so it's a very -- by the time they get through

10   thinking about whether or not they're going to apply to

11   Harvard, they're a very, very strong group.  This is true at

12   similar institutions as well, not just at Harvard.

13   Q.  And from where you sit in the process, if you look at the

14   lineage applicants and compare them to the rest of the

15   applicants who are admitted, are they, as SFFA suggested,

16   academically weaker?

17   A.  No, no.  A very large percentage of them -- again,

18   because there is self-selection and good advice coming to

19   them, a very large percentage of them would have gotten in

20   without the tip.  And that's the way a lot of these so-called

21   tips work.  Many times you don't need the tip, actually.

22   Q.  Why does Harvard give a tip to children of alumni?

23   A.  I have think there are several reasons, and some of which

24   have been touched upon already.

25           One of them is, of course, just think of our 10,000

1    alumnae/alumni who help us with what we call schools and

2    scholarship work.  They interview a very, very large, well

3    over half the students who apply to Harvard each year.

4           They often will go to college nights for us.  In

5    recruitment they'll visit secondary schools for us.  They

6    hold parties for admitted students.  They do all kinds of

7    good things in that world.  So that's one piece of it.  So

8    when their sons and daughters apply, we're going to look very

9    carefully.

10           Another piece is that many of the alumnae/alumni,

11    again feeling a very special part of the Harvard community,

12    they will be part of Harvard Club activities that promote

13    Harvard across the country and across the world and put loads

14    of time into it.

15           The third part is people who give money and raise

16    money for Harvard.  I certainly would not have been able to

17    go to Harvard without the -- obviously the scholarship, the

18    need-based scholarship I had.  And this is a huge part of --

19    Harvard is trying very hard -- we've expanded our financial

20    aid program dramatically over the past 15 years.  We still --

21    we're always a work in progress.

22           So we would like to do even better.  You think that

23    after the capital campaign we'd be all set, and we're not.

24    We're only about two-thirds endowed for financial aid.

25           So there's lots of other things obviously our

Case: 19-2005    Document: 00117632235    Page: 212    Date Filed: 07/30/2020    Entry ID: 6356615
Case 1:14-cv-14176-ADB   Document 633   Filed 04/18/19   Page 200 of 230

200

1    alumnae/alumni are interested in helping us.  And our faculty

2    conduct cutting-edge research and create an academic

3    environment that will make the most of these talents of the

4    students who come to Harvard.  So that's certainly a part of

5    what we do.

6              And I think the moment you're admitted to Harvard,

7    and I would guess this is true at lots of different colleges,

8    you're part of our community forever.  And we hope you have a

9    special feeling about the place.  And many people because of

10   this special feeling will continue to help Harvard in various

11   ways throughout their lives.

12   **Q.**  Do the lineage applicants go through a different

13   admissions process?

14   **A.**  Not at all.

15   **Q.**  Are they reviewed by the same committee?

16   **A.**  Absolutely.

17   **Q.**  And I think you said this in partial answer to

18   Her Honor's question.  For many of the lineage candidates who

19   are admitted, do they need the tip?

20   **A.**  No.

21   **Q.**  Now, does Harvard also give a tip to children of Harvard

22   faculty and staff?

23   **A.**  We do.

24   **Q.**  Why?

25   **A.**  Because one of the most important things -- they always

1    say Henry Rosovsky, one of our former great deans, still

2    going strong, always said there are only two things you need

3    to do to have a great university.  One is to have great

4    students, and the other is to have great faculty.

5            And so this is -- the idea is that try to attract

6    faculty to Harvard, the best faculty in the world is

7    obviously critically important to our institutional goals.

8            So that when -- and again, it's not just that they

9    teach.  A lot of them help around our houses.  The faculty

10   deans of our houses, Doug Melton, who is one of the great

11   researchers in the world for stem cell research, runs one of

12   our houses in addition to doing world-class research.

13           I think one of the things -- they're a huge part of

14   our community.  And when their sons and daughters apply, we

15   feel it's important to look very carefully at them and, if we

16   can, try to act positively.  But if not, not admit them and

17   do it in a very sensitive way.

18   **Q.**  Now, do the children of faculty and staff go through a

19   separate admissions process from other applicants?

20   **A.**  Not at all.

21   **Q.**  The last tip listed here is geographic, ethnic, and

22   economic factors.  Do you have that in mind?

23   **A.**  I do.

24   **Q.**  Now, you've talked about geographic factors already, so

25   I'm not going to ask you about those.  Is the economic tip

1    the socioeconomic or low-income tip that you've described

2    before?

3    **A.**   Yes.  And I think it's one of the things in a country

4    that is so segregated economically, and in some ways with our

5    social classes even coming further apart, one from the other,

6    I think it's more important than ever to have people from

7    low- and modest-income backgrounds, from blue collar

8    backgrounds, from first-generation backgrounds, to be at

9    Harvard and to -- first of all, to have an opportunity to

10   make a difference in the world with the education.  But also,

11   frankly, to make sure that their classmates understand what

12   America is really like.  And it will make their classmates

13   better, and I think it will make them better for mixing with

14   people from all economic backgrounds.

15   **Q.**   Now, the last tip that I haven't discussed with you is

16   ethnic or race, correct?

17   **A.**   Yes.

18   **Q.**   And Mr. Hughes asked you why Harvard gave a tip for race,

19   and you answered that yesterday, so I'm not going to ask you

20   again.

21          Let me ask you this:  Is this list of tips a

22   complete list of tips?

23   **A.**   No, not really.

24   **Q.**   Does any one tip guarantee admission to a candidate?

25   **A.**   Not at all.

**JA923**

1    **Q.**  Go to Her Honor's question.  Can the presence of a tip

2    make a difference in admission?

3    **A.**  It can, again among fully qualified students, all other

4    factors substantially equal.

5    **Q.**  Is race or ethnicity ever a negative tip?

6    **A.**  Never.

7    **Q.**  Is anyone ever excluded from the class because of their

8    race?

9    **A.**  Never.

10   **Q.**  Turn, if you would, to DD 1.4, which is at Tab 2, which

11   is demonstrative Number 4.  Let's put a little more meat in

12   the bones around the actual process that results in this

13   class of 1,600 or so.

14          Do you see DD 1.4?

15   **A.**  I do.

16   **Q.**  What is it?

17   **A.**  It gives a quick overview of the phases of the admissions

18   process.

19   **Q.**  And every applicant -- athlete, legacy, children of

20   staff, children of faculty, dean's list, someone not on those

21   lists -- they're going to go through this process, right?

22   **A.**  Exactly the same process.

23   **Q.**  Now, what is the first step in the process?

24   **A.**  It's just a very simple one, and that's to try to get our

25   applicants into manageable subcommittees or dockets, as we

1    call them.

2    **Q.**  So if I go to demonstrative 1.5, let's see if we can take

3    us to -- actually demonstrative 1.6, in the interest of time.

4             What does that show us?

5    **A.**  This gives you a rough idea of what the docket's like.

6    **Q.**  Are admissions officers assigned to specific dockets?

7    **A.**  Yes, they are.

8    **Q.**  How many are assigned to each docket?

9    **A.**  Typically five to seven with a chair.

10   **Q.**  And when an application comes in, is it assigned to

11   someone in a docket?

12   **A.**  Yes.  And that someone has the job of being the advocate.

13   **Q.**  Does that someone read all the applications from the same

14   high school?

15   **A.**  That's correct.

16   **Q.**  And why are those applications assigned in that manner?

17   **A.**  Partly because we want to understand -- it's a little bit

18   like Her Honor's contacts case question, actually.

19             And that is it's important for us to always

20   understand the context of we have an applicant, but the

21   applicant from this kind of a family background goes to this

22   particular school in this kind of community.

23             We also are looking how others at the school have

24   done based on the profile in the secondary school report.

25   But we also can see the other applicants from the school and

**JA925**

1     get a sense of what kinds of people at least their school is

2     sending our way this year.

3          So it's important that the advocate and the other

4     people, including the chair of the docket, have a good sense

5     of that area and perhaps even that particular school.

6     **Q.**  Turn, if you would, to Slide 1.7, DD 1.7.

7          Once the applications are assigned, what's the next

8     step?

9     **A.**  The next step is for the advocate to do the first read.

10    I won't bring you through the whole process because I think

11    we're going to see -- I don't know whether we will.  I don't

12    want to take too long.

13         The idea is that as first reader you are supposed

14    to look at that application in its entirety and then do a

15    bunch of ratings and so forth and then a write-up at that

16    point.  One of the issues that first readers always face is

17    that there's often lots of information that comes in after

18    they do their profile, after they do their preliminary

19    overall rating, and so on.

20         For example, the interview might not be there.  The

21    second teacher report might not be there.  The outside

22    recommendations from the employer or the research and so

23    forth.  So it's a moving target.  The first time is a first

24    look with what's in the folder then, and it kind of sets it

25    up at least with what we see so far.

1    **Q.**  I'm going to go into the information in a little bit more

2    detail.  Can the application be reviewed by anyone in

3    addition to the first reader?

4    **A.**  Yes.  Very much so.  Often the chair will do what we call

5    a third reading.  But if you're a -- let's say you're new to

6    this area and you would like to get a second reading, we

7    would call it from a person who had covered that area before

8    who might know the school a little bit better.  You can do

9    that before it goes on to the third reader.

10            You could often have -- often will have a faculty

11   reading either in terms of having an expertise reading or

12   simply a faculty member who would be interested in reading,

13   let's say, I don't know, eastern Massachusetts applicants.

14   **Q.**  So now let's talk about what happens during the first

15   reading.  I think you told me at that moment in time the file

16   may not be complete.

17   **A.**  That's correct.

18   **Q.**  So let's turn to DD 1.9, and let's look at the ratings.

19            Mr. Hughes asked you about some of them but I don't

20   think about all of them.  So I'm going to take you through

21   them.  There are three different categories of ratings on the

22   summary sheet, correct?

23   **A.**  That's correct.

24   **Q.**  So what are the profile ratings?

25   **A.**  The profile ratings would be the academic,

1    extracurricular, athletic, and personal ratings.

2    **Q.**   What are the school support ratings?

3    **A.**   These would be the two teacher recommendations and the

4    counselor recommendation.

5    **Q.**   What are the other ratings?

6    **A.**   It would be the interview ratings, whether it was staff

7    and/or alumnae and alumni.  And then finally there would be

8    the preliminary overall rating.

9    **Q.**   And these are completed during this first read, if

10   possible, correct?

11   **A.**   That's right.  Each reader, no matter whether first,

12   second, third, fourth, whatever, should fill these out.

13   **Q.**   And remind us the scale is -- except for

14   extracurriculars, what is the scale for the profile ratings?

15   **A.**   It's 1 to 4.  Extracurricular you can have a 5 if work or

16   family obligations get in the way.

17   **Q.**   So the 5 rating for extracurriculars is to allow for the

18   circumstance where family or personal circumstance might not

19   allow you to participate in the extracurriculars that someone

20   might otherwise do?

21   **A.**   Or could be a disability of one sort.  It's actually a

22   very positive rating because it does imply something a little

23   bit out of the norm.

24   **Q.**   All right.  So let's talk about what goes into the

25   academic rating.

```
 1                MR. LEE:  Could I have slide DD-10, please.
 2    BY MR. LEE:
 3    Q.   Now, do you see that we've highlighted the box in red and
 4    then highlighted them in yellow?  Do you see that?
 5    A.   I have.
 6    Q.   On this summary sheet -- so Her Honor knows, how many
 7    readings have there been?
 8    A.   There have been two readers so far.
 9    Q.   One is EJB on November 6 and one is CGM on November 8,
10    correct?
11    A.   That's correct.
12    Q.   And the four profile ratings are the ones that begin with
13    the two plus box that's highlighted, correct?
14    A.   That's right.  That's the academic rating.
15    Q.   Now, what are the factors that can be considered in the
16    academic rating?
17    A.   There are many.  Obviously test scores and grades --
18                THE COURT:  What's that box to the left?
19                THE WITNESS:  That's the preliminary overall
20    rating.  So EJB gave a two plus and then the chair, CGM, gave
21    it a 1.  So this is a very outstanding application, according
22    to their profiles.
23                So anyways, you wanted the academic.
24    BY MR. LEE:
25    Q.   Yeah.  Just to level -- is it right if I start with two
```

**JA929**

1    plus that's highlighted, that's the academic rating, the next

2    1 is the extracurricular rating, the next 4 is the athletic

3    rating, and the 2 plus is the personal rating?

4    **A.**   That's correct.

5    **Q.**   And just to be clear, when someone is sitting down as the

6    first reader to fill out these boxes, it's the same person

7    that's filling out these four boxes, isn't it?

8    **A.**   That's correct.

9    **Q.**   It's not someone filling out the first two and someone

10   filling out the fourth, right?

11   **A.**   That's correct.

12   **Q.**   Okay.  Back to the academic rating, in general terms.  I

13   don't want to go too far into the details given the hour of

14   the day.

15   **A.**   Yes, I understand.

16   **Q.**   In general terms, what goes into the academic rating?

17   **A.**   It really is, the simple thing is the test scores and

18   grades at the beginning.  But then you read really carefully

19   about what teachers and counselors have to say about things

20   such as creativity, love of learning, things of that sort,

21   how unusual in the context that person might be.

22            Then you would look at any outside academic

23   evaluations, researchers and so on, and then perhaps faculty

24   evaluation.

25   **Q.**   Is the academic rating based upon a formula?

1    **A.**  No, not at all.

2    **Q.**  Are there factors that go into the academic rating that

3    are not quantitative?

4    **A.**  Many.

5    **Q.**  And are some of them the examples that you just gave us?

6    **A.**  Very much so.  And also just because you are also -- it's

7    not just looking at what the person has done so far.  You're

8    trying to project, I guess, future potential, growth.  And

9    that's a big piece of it.  Love of learning, a person who's

10   demonstrated an ability to grow and learn and make absolutely

11   the most of academic opportunities.  People who would love to

12   talk to you for hours about their love of physics, for

13   example.  It's that kind of a thing that probably is going to

14   produce that upward growth curve during college and beyond.

15            THE COURT:  Can you blow up the left-hand side of

16   the screen for me just so I can see it?  I can't see it on

17   the screen.  Further left.  Can you blow it up a little bit

18   more?

19            MR. LEE:  Your Honor, if it's all right with you --

20            THE COURT:  I can't see it on the paper or on my

21   book.

22            MR. LEE:  We can get a hard copy.

23            THE COURT:  Bigger than the hard copy that I

24   already have?

25            MR. LEE:  That, I don't know.

```
 1              MS. ATTORNEY:  It's at Tab 6 of her binder.

 2              THE COURT:  I just wanted to see what it is.  Thank

 3      you.  Go ahead.

 4              THE WITNESS:  I'm sorry, Your Honor.  Did you have

 5      questions on that?

 6              THE COURT:  No.  I just wanted to be able to see

 7      it.

 8              THE WITNESS:  It's a little bit of a test for my

 9      reading glasses.

10              MR. LEE:  I think Her Honor wanted to see what was

11      on the left.

12              THE COURT:  I have it.  They don't give you this

13      job until you're old enough for your eyesight to fail and you

14      can't see it.

15      BY MR. LEE:

16      Q.  Dean Fitzsimmons, does the fact that an applicant has

17      identified a certain race or ethnicity per se or in isolation

18      factor into the academic rating?

19      A.  No, not at all.

20      Q.  All right.  What is the next profile rating?  So if we

21      move from left to right, there are two 1's here.

22      A.  Yes, there are two 1's.

23      Q.  What rating is that for?

24      A.  That's the extracurricular rating.

25      Q.  And you told me the scale for that is 1 to 5, correct?
```

Case: 19-2005    Document: 00117682237    Page: 224    Date Filed: 07/30/2020    Entry ID: 6356615
Case 1:14-cv-14176-ADB   Document 633   Filed 04/18/19   Page 212 of 230

212

1    **A.**  That is correct.

2    **Q.**  Is there a formula for the extracurricular rating?

3    **A.**  No, not at all.

4    **Q.**  In general terms, what are the factors that are going

5    into the extracurricular rating?

6    **A.**  In conventional terms in this particular one, if your

7    eyesight is working well you can -- this is a very good

8    dancer, as an example.  And also somebody who had been really

9    a leader across the board.  She's just an absolute dynamo, it

10   appears.  Anybody with a 1 extracurricular is really

11   something special.

12        But it could be anything.  There are any number of

13   conventional extracurricular activities you could think of I

14   think in any high school, but there are also other kinds of

15   things.  Suppose you were active say in your local temple or

16   your local church or community organization or had been

17   active in some regional or national organization.

18        So extracurricular covers the -- I suppose you'd

19   say the energy, drive, and commitment this person puts into

20   nonacademic things.  But it could be anything.

21   **Q.**  Would it include commitment to community organizations,

22   for instance, outside of school?

23   **A.**  Absolutely.

24   **Q.**  Now, the factors that go into this rating, are they

25   qualitative as well as quantitative?

1    **A.**  Yes.

2    **Q.**  Does the race, self-identified race of an applicant in

3    isolation per se factor into the extracurricular rating?

4    **A.**  Not at all.

5    **Q.**  Now, the next rating is the athletic rating?

6    **A.**  Yes, it is.

7    **Q.**  And there's a 4 and a 5 here?

8    **A.**  Yes.

9    **Q.**  Setting aside the numbers here, what is the athletic

10    rating attempting to measure?

11    **A.**  It would be, I guess, again the energy, drive, and

12    commitment put into athletics.  We've already talked about

13    what a 1 is, I think.  So I won't go over that.

14    **Q.**  I actually wanted to ask you because I'm not sure it's

15    100 percent clear.  Who gets a 1 on the athletic rating?

16    **A.**  That would be someone who's identified by one of our

17    coaches as a potential varsity participant.

18    **Q.**  Now, the fourth rating which goes 2 plus 2 plus --

19    **A.**  Yes.

20    **Q.**  -- is what rating?

21    **A.**  Is the personal rating.

22    **Q.**  And Mr. Hughes asked you some questions about it, and

23    because it's been a focus, I want to ask you about it.  What

24    is the personal rating?

25    **A.**  Again, if you had read through this application and you

**JA934**

214

1    had sort of tried to figure out what kind of a positive

2    difference this person had made to others in her school,

3    outside her school, to her family, across the board, what

4    kind of a person is this as far as, I would say, maximizing

5    the experiences of everyone around her.

6              That's kind of what you're looking for.  There's no

7    formula to it.  It could be almost in any setting.  I'll give

8    you an example because I used to work dorm crew, so it's near

9    and dear to my heart.

10             Probably the best recommendation, one of the best

11   I've ever read was from the janitor at a high school because

12   this person had worked in the school's work program to help

13   pay tuition.  And what this person said about how the student

14   just lit up a room.  At the end of the day, everybody's tired

15   and they've got a lot of stuff to do to clean the school --

16   anyway, it was brief.  But you said to yourself on a dismal

17   day, this is the kind of person you want with you and the

18   kind of person you'd want with you, as they say, in any tough

19   situation.

20   **Q.**  Is the information that goes into the personal ratings

21   supplied in part by the student?

22   **A.**  You can get a sense sometimes, yes, from -- first of all

23   not just what the person says, for example, in the essay or

24   essays, because that can help obviously.  But also by what

25   the person does and what the person has actually

1    accomplished.

2           It's one thing to say what you're doing in an

3    essay.  It's another thing to look at what this person has

4    accomplished just in terms of action.  So it's a whole

5    variety of different things.

6    Q.  Is some of the information provided by school guidance

7    counselors and teachers?

8    A.  Very much so because they've usually spent a lot of time

9    with the student.  In some cases the teachers have taught the

10   student for two or three, sometimes four classes.  So they

11   get to know the student very well on a day-to-day basis.  And

12   some of the counselors really go out of their way to get to

13   know the students well.

14          And they also have, in a sense, a bit of a

15   comparative perspective sometimes because they can calibrate

16   again what kind of a difference -- how unusual this student

17   is in this particular high school.

18   Q.  And do you also consider information provided by other

19   recommenders and other sources?

20   A.  Very much so.  We're in the information business.  So

21   whatever comes in, we're going to look at it.  And that

22   information, for example, the one from the janitor, can be

23   really, really helpful.  And again, part of it is

24   corroborating all the pieces of the application.

25          So it's like anything else, no one thing is going

1    to do it.  But it's really in combination.

2    **Q.**  Now, does the fact that an applicant has self-identified

3    as a specific race or ethnicity factor in isolation or per se

4    to the personal rating?

5    **A.**  No, not at all.

6    **Q.**  Can circumstances related to someone's race or ethnicity

7    result in facts, circumstances, or events that are useful in

8    assigning the personal rating?

9    **A.**  Sure.

10   **Q.**  Can you give us an example?

11   **A.**  There are plenty of examples of students who have faced

12   enormous prejudice in all kinds of different ways in their

13   secondary school setting or in their communities.  And what

14   they have done as a result with this issue, what they've done

15   to overcome the challenges or the challenge or whatever it

16   might be, can illuminate what kind of a person this is in

17   terms of how that person would again perhaps face any kind of

18   an obstacle in college and later.

19   **Q.**  There's been a suggestion that the personal rating is a

20   personality rating.  Have you heard that?

21   **A.**  I have.

22   **Q.**  Is it right?

23   **A.**  It is not.

24   **Q.**  What's the difference?

25   **A.**  It's really -- I guess I'd go back to the doing as

1    opposed to self-promotion.  There are plenty of people who

2    can stand up and give a wonderful speech who might actually

3    not be very good people in the long term.  I'm just using a

4    stark example there.

5            Where it's really much more what a person has done

6    and evidence, say, from everything in that application that

7    would indicate that this person has made everyone around him

8    or her better and has the potential to do that throughout the

9    rest of his or her life.  So it really is -- it's really a

10   set of demonstrated achievements along with real testimony

11   across the board from people who know the student well.

12   **Q.**  Let's go to the next couple of ratings.  Turn, if you

13   would, to DD 1.14 in Tab 2.  Do you have those?

14   **A.**  Yes.

15   **Q.**  What do these ratings reflect?  And perhaps you can

16   explain to Her Honor why one of them has four ratings rather

17   than three.

18   **A.**  Yes.  So here we have -- again, I think Your Honor had a

19   question before about Teacher 1, Teacher 2.  It just simply

20   happens to be which one was read first by the reader.

21           The first teacher considered by EJB was an

22   off-the-charts 1, one of the best students I've ever had kind

23   of thing.  The second teacher, she rated as a 2 plus.  Again

24   very good, one of the best perhaps in five or ten years.

25           The secondary school counselor report is the third

1    one, and that's a -- it's usually from the guidance

2    counselor.  It can be from others at the school representing

3    the school.  And that's -- again, that's the one there.

4           And then the additional one was from an outside

5    recommendation.  So we've got space there at least to code a

6    couple of outside recommendations.

7    **Q.**  Now, are these teacher recommendations, counselor

8    recommendations, outside recommendations important to your

9    process?

10   **A.**  They're very important.

11   **Q.**  Are they important to setting the academic rating, the

12   extracurricular rating, as well as the personal rating?

13   **A.**  Absolutely.

14   **Q.**  And any of these pieces, any of these recommendations or

15   letters have information relevant to any of those ratings?

16   **A.**  They almost always have information about all three.

17   **Q.**  Now, do some applicants also interview with a Harvard

18   alum?

19   **A.**  They do.

20   **Q.**  And do the alumni interviewers assign ratings in the same

21   profile ratings we've just discussed?

22   **A.**  They do.

23   **Q.**  And do they also assign an overall rating?

24   **A.**  They do.

25   **Q.**  Now, when the alumni are doing the ratings and the

```
 1   interviews, do they have all of the information that your
 2   readers have?
 3   A.   They don't.
 4   Q.   What do they not have, in general?
 5   A.   Just about everything.  They get a chance to meet the
 6   student and talk for 45 minutes or an hour and then fill out
 7   the form.  They get trained, but they don't have teacher
 8   reports, counselor reports, transcripts, or anything like
 9   that.
10   Q.   And where on this form is the rating for the interview
11   rating?
12   A.   It would be over on the right.  It's the person the alum
13   had given her a 1 personal and a 1 overall.
14   Q.   Now, do some applicants also interview with a member of
15   the admissions staff?
16   A.   Yes.
17   Q.   Is any applicant able to request an interview with the
18   admissions staff?
19   A.   Yes.
20   Q.   Is anyone who asks for an interview ever denied an
21   admission?
22   A.   Once the spaces fill up, the answer is yes.  But the
23   spaces are open, and then we do our best.  Remember we're on
24   the road a lot in the fall.  Then we're right into early
25   action, which the deadline is coming up actually November 1.
```

1    **Q.**  Does the staff ever request an interview with an

2    applicant?

3    **A.**  Yes.

4    **Q.**  In what circumstances would you ask to see an applicant?

5    **A.**  I chair the local subcommittee, eastern Massachusetts.

6    If you're looking on your materials, that's P docket.  So we

7    will -- let's say we find somebody very interesting and a

8    real possibility, but sometimes it might be useful for one or

9    more of us to see the applicant in the office.  So we'll

10   invite the person in.

11            We'll sometimes travel, actually have a staff

12   person travel to other places to do this.

13   **Q.**  Now, the final rating is a preliminary overall rating,

14   correct?

15   **A.**  That's correct.

16   **Q.**  And that's on the far left-hand side; is that correct?

17   **A.**  That's correct.

18   **Q.**  Is the preliminary -- it's called the preliminary overall

19   rating, correct?

20   **A.**  That's correct.

21   **Q.**  Why is it called preliminary?

22   **A.**  Because it is incredibly preliminary because we haven't

23   even talked about this person yet in committee and even in

24   the subcommittee.  The real decision is going to be made by

25   the 40 people in the full committee.  And we also know there

 1    will probably be lots of additional information coming in, as

 2    there often is.

 3    **Q.**  Can the preliminary overall rating take into account the

 4    self-identified race of an applicant?

 5    **A.**  It can.

 6    **Q.**  If an application is passed on for additional reviews,

 7    does each additional reader rate the application according to

 8    these same categories?

 9    **A.**  Yeah, that's correct.

10    **Q.**  And as the application moves through the process, how are

11    these ratings used in general?

12    **A.**  They're used as kind of a starting point.  You know, in

13    Weymouth where I come from, we call it jacks are better to

14    open, in poker.

15         But the idea is that it's a place to start.  This

16    is what the reader saw when they first laid eyes on the

17    application.  But typically there's a lot that's going to

18    happen, a lot that's going to happen as the committee

19    meetings evolve.

20    **Q.**  Are the other ratings summed or basically put into some

21    formula that find their way into the preliminary overall

22    rating?

23    **A.**  Not at all.

24    **Q.**  Is any one of these eight ratings that we've looked at

25    given more weight than others?

**JA942**

1   **A.**   No.

2   **Q.**   Do the ratings themselves dictate admissions decisions?

3   **A.**   No.  And they kind of fade into the background.  Because

4   remember, when people are actually looking at making

5   decisions in subcommittee and full committee, every single

6   piece of the application, common application,

7   recommendations, everything go up on a screen for all -- say

8   in the subcommittee five to seven people, literally they're

9   all going to read the application.  Literally everybody reads

10  the application with any new information in it.  Then they'll

11  discuss.  Then they'll vote.  And then you kind of go from

12  there.

13          It's the same thing in the full committee.  All 40

14  people get a chance to read the application and then to make

15  a decision.

16          MR. LEE:  One final question and then, if it's all

17  right with Your Honor, it would be a good breaking point.

18  BY MR. LEE:

19  **Q.**   In your experience, has an applicant with lower, meaning

20  worse, preliminary ratings and profile ratings actually

21  gotten admitted to Harvard while an applicant with higher or

22  better profile ratings did not?

23  **A.**   It happens all the time.  Because again, unless the

24  committee -- the committee is really looking at the materials

25  when they're making a decision.  The preliminary stuff gets

 1    left in the background.  They can make up their own minds,

 2    for example, when they're looking at all the material whether

 3    or not that counselor report really was a 1 because they're

 4    going to see it.

 5            They know that the reader suggested it was a 1, but

 6    they're actually going to look at the stuff.

 7    Q.   Do admissions officers from time to time simply disagree?

 8    A.   Disagree?

 9    Q.   Disagree on what a particular recommendation is?

10    A.   Absolutely.

11            MR. LEE:  This would be a good stopping point.

12            THE COURT:  One more question.  If all 40 people

13    look at 40,000 applications, there must be some chunk at the

14    bottom that gets lopped off.

15            THE WITNESS:  That's correct.  But not lopped off.

16    So when we get to -- let's say in full committee we'll come

17    to, let's say, P docket, the docket I chair.  So everybody

18    will have the paper docket.  We call official number 1 and

19    official number 2 that recorded what we did, and it's up on

20    the screen.

21            So let's say we come to High School A, for example,

22    without getting -- and we'd say, okay, I'm the area person.

23    I'd say, okay, well, here's the slate for you to look at.

24    Here are the people that applied from High School A.  You can

25    see what their profiles look like.  Because we actually do

Case 1:14-cv-14176-ADB   Document 633   Filed 04/18/19   Page 224 of 230

 1    the profiles and a lot of information about each of the

 2    candidates in each of the schools we see.

 3            So of the 10 applicants, you can see here that four

 4    or five of them based on the information are not very strong.

 5            So what I'm going to do is I'm going to talk to you

 6    about two of them, and I need to get the late interviews for

 7    three of them.  But I'm now going to talk about the two of

 8    them.

 9            So then you would put -- for those two, you'd start

10    off by putting this reader sheet up on the screen, and then

11    you'd begin the discussion.  You'd go right through the

12    entire application.

13            And what you have to do as the advocate is to

14    convince the members of the subcommittee to vote for the

15    person.  Literally sometimes you will spend -- I know it

16    sounds not true, but sometimes you can spend an hour on a

17    single case in subcommittee before you can get to a tentative

18    decision.  But even that is not even close to the final

19    decision because you know you're going to have to defend it

20    in the full committee.

21            So you're right.  The way it works is you keep

22    winnowing down.  Let's say for one of the people, the five

23    you weren't even thinking of, it didn't look very good on the

24    profiles.  Suppose you get a whole new thing.  Let's say you

25    get a great interview.  Let's say you get now a terrific

```
 1    music rating from our faculty or some other additional
 2    information.  Because people change and grow a lot senior
 3    year in high school.
 4              So by the time you get even to the end of the
 5    subcommittee or certainly by the time you get into full
 6    committee, that's an entirely different case.  And the
 7    advocate and the subcommittees have the responsibility of
 8    making sure that everybody from their docket and from the
 9    schools they cover get the best possible case made.
10              But it's a moving target all the way up to the last
11    day because you're comparing the kid from School A on P
12    docket to the kid from Ulaanbaatar in Mongolia or the kid
13    from the school in London.  It's all a matter of comparing
14    and then voting on applicants, the ones you think are going
15    to be the best educators of others.
16              THE COURT:  Each first reader is reading something
17    like a thousand applications?
18              THE WITNESS:  It could be as many as 1,700.  It
19    could be that high.  Some of our staff members also do
20    financial aid.  Some of them do anywhere from maybe 500 to up
21    to 1,100 applications.  Full-time admission officer would
22    read usually in the neighborhood of 14 to 17 or 1,800,
23    depending on what other responsibilities they have.  So you
24    do a lot of reading, and so you get lots of experience.
25              And as much as we love each other, though, we all
```

1    know that it's our job to make the best case for all of the

2    people we're presenting.

3             And so it is a matter of -- and you may vote for a

4    case -- all hear the case and you might vote for the case for

5    a couple of different reasons.  You have vote for the case

6    for another different set of reasons.  You never quite know

7    because you've got 40 people in the room.  It is the most

8    thorough process that you could possibly devise.

9             We're also not just watching what each other did

10   with the ratings and whether or not somebody was too soft,

11   let's say, with a 1 rating.  You're also making sure that

12   people are -- making sure they're presenting the case in the

13   best possible way.

14            I don't know if that answers your question.

15            MR. LEE:  Can I ask one more question to follow up

16   on that?

17            THE COURT:  Yes.

18   BY MR. LEE:

19   Q.   To go to Her Honor's question.  If someone is basically

20   saying I'm going to discuss two cases from P docket, if one

21   of the 39 other admissions officers says, "But I actually

22   want to discuss this person you're not recommending," can you

23   do that?

24   A.   It happens all the time.  And that's what the chair's

25   responsibility is, but also the other people who sit on the

1    docket.  But even all 40 people, you can say, well, why

2    aren't we hearing this case, you know, that kind of thing.

3    So it's a very thorough -- and frankly, we're all checking

4    and balancing each other all the time.

5              MR. LEE:  Thank you, Your Honor.

6              THE COURT:  So the case is recessed for today.

7    We'll see you again tomorrow.  Would you like to start at

8    9:30 again tomorrow?

9              MR. LEE:  I think that would be great if we could.

10             THE COURT:  I have a dispositive motion hearing at

11   3:30.  I just can't push it any later and still have time to

12   do it.  We'll end at 3:30 tomorrow.  That's what we'll do.

13             MR. LEE:  Thank you, Your Honor.

14             (Court recessed at 3:55 p.m.)

15

16

17

18

19

20

21

22

23

24

25

```
 1                       - - - - - - - - - - -

 2                        CERTIFICATION

 3

 4          I certify that the foregoing is a correct

 5   transcript of the record of proceedings in the above-entitled

 6   matter to the best of my skill and ability.

 7

 8

 9

10   /s/ Joan M. Daly                October 17, 2018

11   _____            _____

12   Joan M. Daly, RMR, CRR          Date
     Official Court Reporter
13

14

15

16

17

18

19

20

21

22

23

24

25
```

**JA949**

1                          INDEX OF WITNESSES

2    WITNESS                                                    PAGE

3

     WILLIAM FITZSIMMONS
4
       Direct Examination (Resumed) by Mr. Hughes..........   12
5      Cross Examination by Mr. Lee.......................  139

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1                        E X H I B I T S

 2
                Defendant Exhibit              Received
 3
                  DX5      .....................    188
 4

 5

 6              Plaintiff Exhibit              Received

 7                12       .....................      63

 8                14       .....................      38

 9                19       .....................      90

10                21       .....................      93

11                26       .....................     110

12                28       .....................     130

13                29       .....................     129

14                50       .....................     150

15               104       .....................      17

16               106       .....................      19

17               111       .....................      22

18               218       .....................     160

19               227       .....................      25

20               230       .....................      35

21               236       .....................      36

22               515       .....................      86

23

24

25
```

Case: 19-2005    Document: 00117628337    Page: 243    Date Filed: 07/30/2020    Entry ID: 6356615
Case 1:14-cv-14176-ADB   Document 635   Filed 04/18/19   Page 1 of 246

1

1              UNITED STATES DISTRICT COURT

2               DISTRICT OF MASSACHUSETTS

3     _____

4     STUDENTS FOR FAIR ADMISSIONS, INC.,

5                    Plaintiff,          Civil Action
                                         No. 14-14176-ADB
6     v.
                                         October 18, 2018
7     PRESIDENT AND FELLOWS OF HARVARD
      COLLEGE, et al.,                   Pages 1 to 246
8
                     Defendants.
9     _____

10

11
                  TRANSCRIPT OF BENCH TRIAL - DAY 4
12        BEFORE THE HONORABLE ALLISON D. BURROUGHS
                  UNITED STATES DISTRICT COURT
13            JOHN J. MOAKLEY U.S. COURTHOUSE
                    ONE COURTHOUSE WAY
14                  BOSTON, MA  02210

15

16

17

18

19

20

21

22                 JOAN M. DALY, RMR, CRR
23                  Official Court Reporter
              John J. Moakley U.S. Courthouse
24            One Courthouse Way, Room 5507
                    Boston, MA  02210
25                joanmdaly62@gmail.com

```
 1    APPEARANCES:

 2
      COUNSEL FOR THE PLAINTIFF:
 3

 4            ADAM K. MORTARA, ESQUIRE
              J. SCOTT McBRIDE, ESQUIRE
 5            KRISTA J. PERRY, ESQUIRE
              Bartlit Beck Herman Palenchar & Scott
 6            54 West Hubbard Street
              Suite 300
 7            Chicago, Illinois 60654
              312.494.4400
 8            adam.mortara@bartlit-beck.com
              scott.mcbride@bartlit-beck.com
 9            krista.perry@bartlit-beck.com

10            JOHN M. HUGHES, ESQUIRE
              KATHERINE L.I. HACKER, ESQUIRE
11            MEG E. FASULO, ESQUIRE
              Bartlit Beck Herman Palenchar & Scott
12            1801 Wewatta Street
              Suite 1200
13            Denver, Colorado 80202
              303.592.3100
14            john.hughes@bartlit-beck.com
              kat.hacker@bartlit-beck.com
15            meg.fasulo@bartlit-beck.com

16            JOHN MICHAEL CONNOLLY, ESQUIRE
              THOMAS R. McCARTHY, ESQUIRE
17            WILLIAM S. CONSOVOY, ESQUIRE
              Consovoy McCarthy Park PLLC
18            3033 Wilson Boulevard
              Suite 700
19            Arlington, Virginia 22201
              703.243.9423
20            mike@consovoymccarthy.com
              tom@consovoymccarthy.com
21            will@consovoymccarthy.com

22

23

24

25
```

**JA953**

```
 1    APPEARANCES (cont.):

 2
              PATRICK STRAWBRIDGE, ESQUIRE
 3            Consovoy McCarthy Park PLLC
              Ten Post Office Square
 4            8th Floor, South, PMB #706
              Boston, Massachusetts 02109
 5            617.227.0548
              patrick@consovoymccarthy.com
 6
              MICHAEL H. PARK, ESQUIRE
 7            Consovoy McCarthy Park PLLC
              3 Columbus Circle
 8            15th Floor
              New York, New York 10024
 9            646.456.4432
              park@consovoymccarthy.com
10
              PAUL M. SANFORD ESQUIRE
11            BENJAMIN C. CALDWELL, ESQUIRE
              Burns & Levinson LLP
12            One Citizens Plaza
              Suite 110
13            Providence, Rhode Island 02903
              401.831.8330
14            psanford@burnslev.com
              bcaldwell@burnslev.com
15

16    COUNSEL FOR THE DEFENDANT:

17            WILLIAM F. LEE, ESQUIRE
              FELICIA H. ELLSWORTH, ESQUIRE
18            ANDREW S. DULBERG, ESQUIRE
              ELIZABETH C. MOONEY, ESQUIRE
19            SARAH R. FRAZIER, ESQUIRE
              DENISE W. TSAI, ESQUIRE
20            Wilmer Cutler Pickering Hale and Dorr LLP
              60 State Street
21            Boston, Massachusetts 02109
              617.526.6556
22            william.lee@wilmerhale.com
              felicia.ellsworth@wilmerhale.com
23            andrew.dulberg@wilmerhale.com
              elizabeth.mooney@wilmerhale.com
24            sarah.frazier@wilmerhale.com
              denise.tsai@wilmerhale.com
25
```

**JA954**

```
 1    APPEARANCES (cont.):

 2
              SETH P. WAXMAN, ESQUIRE
 3            DANIELLE CONLEY, ESQUIRE
              DANIEL WINIK, ESQUIRE
 4            BRITTANY AMADI, ESQUIRE
              PAUL R.Q. WOLFSON, ESQUIRE
 5            Wilmer Cutler Pickering Hale and Dorr LLP
              1875 Pennsylvania Ave, NW
 6            Washington, DC 20006
              202.663.6006
 7            seth.waxman@wilmerhale.com
              danielle.conley@wilmerhale.com
 8            daniel.winik@wilmerhale.com
              brittany.amadi@wilmerhale.com
 9            paul.wolfson@wilmerhale.com

10            DEBO P. ADEGBILE, ESQUIRE
              Wilmer Cutler Pickering Hale and Dorr LLP
11            7 World Trade Center
              250 Greenwich Street
12            New York, New York 10007
              212.295.6717
13            debo.adegbile@wilmerhale.com

14            ARA B. GERSHENGORN, ESQUIRE
              Harvard Office of the General Counsel
15            Smith Campus Center
              Suite 980
16            1350 Massachusetts Avenue
              Cambridge, Massachusetts 02138
17            617.495.8210
              ara_gershengorn@harvard.edu

18

19    COUNSEL FOR AMICI STUDENTS:

20            JON M. GREENBAUM, ESQUIRE
              BRENDA L. SHUM, ESQUIRE
21            GENEVIEVE BONADIES TORRES, ESQUIRE
              KRISTEN CLARKE, ESQUIRE
22            1500 K Street NW, Suite 900
              Washington, DC 20005
23            202.662.8315
              jgreenbaum@lawyerscommittee.org
24            bshum@lawyerscommittee.org
              gtorres@lawyerscommittee.org
25            kclarke@lawyerscommittee.org
```

```
 1    APPEARANCES (cont.):

 2
            LAWRENCE CULLEEN, ESQUIRE
 3          EMMA DINAN, ESQUIRE
            Arnold & Porter LLP
 4          555 Twelfth Street, NW
            Washington, DC 20004
 5          202.942.5477
            gina.dean@aporter.com
 6          emma.dinan@aporter.com

 7
      COUNSEL FOR AMICI ORGANIZATIONS:
 8
            JENNIFER A. HOLMES, ESQUIRE
 9          CARA McCLELLAN, ESQUIRE
            JIN HEE LEE, ESQUIRE
10          MICHAELE M. TURNAGE YOUNG, ESQUIRE
            RACHEL N. KLEINMAN, ESQUIRE
11          NAACP Legal Defense and Educational Fund, Inc.
            700 14th Street NW
12          Suite 600
            Washington, DC 20005
13          jholmes@naacpldf.org
            cmcclellan@naacpldf.org
14          jlee@naacpldf.org
            myoung@naacpldf.org
15          rkleinman@naacpldf.org

16          KENNETH N. THAYER, ESQUIRE
            KATE R. COOK, ESQUIRE
17          Sugarman Rogers
            101 Merrimac Street
18          Suite 900
            Boston, Massachusetts 02114
19          617.227.3030
            thayer@sugarmanrogers.com
20          cook@sugarmanrogers.com

21

22

23

24

25
```

```
 1                    P R O C E E D I N G S
 2              (The following proceedings were held in open
 3    court before the Honorable Allison D. Burroughs, United
 4    States District Judge, United States District Court, District
 5    of Massachusetts, at the John J. Moakley United States
 6    Courthouse, One Courthouse Way, Boston, Massachusetts, on
 7    October 18, 2018.)
 8              THE CLERK:  All rise.  Court is in session.  Please
 9    be seated.
10              THE COURT:  Couple things.  Ms. Hacker, thank you
11    for that, but I didn't get the email until this morning.
12    Some of it's done and some of it's not.  We'll have to pick
13    and choose as we go.
14              To make a long story short, I have a relative in
15    town just for the day.  I'd like to try to catch up with them
16    at lunch, so I'm hoping we can have our lunch break from
17    quarter of 1:00 to 1:30.  And then we'll go straight through
18    1:30 to 3:30.
19              So I don't know how long your cross is, but
20    whenever you want to take a break this morning, that's fine
21    because we'll take a later lunch and we won't have a break in
22    the afternoon, if that's all right with everyone.
23              You were standing up.  Did you have --
24              MS. HACKER:  We were just going to update you on
25    witness order, Your Honor.
```

Case: 19-2005   Document: 00117628337   Page: 249   Date Filed: 07/30/2020   Entry ID: 6356615
Case 1:14-cv-14176-ADB   Document 635   Filed 04/18/19   Page 7 of 246

7

```
 1          THE COURT:  Okay.

 2          MS. HACKER:  If it is helpful, we do have a thumb

 3   drive with the full transcripts for all those depositions, in

 4   case you want to see those for contexts.  It also has all of

 5   the exhibits referenced in those, if that would be helpful

 6   when you're ruling on this objection.

 7          THE COURT:  I'm happy to take it, but it's just as

 8   easy to work out of the notebook.  I just have a few

 9   questions along the way of things I can't sort out.

10          The first two that you said were Ortiz and Zuluaga.

11          MS. HACKER:  And Mr. Zuluaga.

12          THE COURT:  I have Ortiz done.  Do you want me to

13   go through those now?  Do you want me to wait?  What's your

14   preference?  I don't want to interrupt Mr. Lee.

15          MS. HACKER:  We're happy to start with Dean

16   Fitzsimmons this morning and then do the -- Miss Ortiz'

17   rulings right before we read her transcript.

18          THE COURT:  What is UMRP?

19          MS. HACKER:  Underrepresented minority group at

20   Harvard.

21          MS. ELLSWORTH:  Undergraduate minority recruitment

22   program.

23          THE COURT:  There's a couple others that I have

24   questions about.  It might be easier to do it when we get

25   there.  Most of those are done.  Then I -- I'm happy to hear
```

**JA958**

```
 1    you on it, but I am inclined to exclude Zuluaga.  I don't

 2    know what there is in there that is relevant and not opinion

 3    and not very subjective.

 4              MS. HACKER:  We would like to be heard about it,

 5    Your Honor, if I may just very briefly.

 6              THE COURT:  You want to do it now or after?

 7              MS. HACKER:  Your Honor's preference.  We can get

 8    started with Dean Fitzsimmons and do it this afternoon.

 9              THE COURT:  I don't want to end up in a situation

10    where poor Dean Fitzsimmons has to come back for 10 minutes

11    tomorrow.  I'd rather -- if we're going to finish him today,

12    I'd like to finish him.  I don't want to use up his time such

13    that he ends up having to come back another day unless he

14    wants to.

15              MR. LEE:  Going to need more shirts.

16              THE WITNESS:  I got a shirt.

17              THE COURT:  When you're ready.

18              MR. LEE:  Thank you, Your Honor.

19              THE COURT:  One more reminder.  I'm sure you know

20    this by now, but you're still under oath.

21              THE WITNESS:  Yes, Your Honor.

22              (WILLIAM FITZSIMMONS previously sworn by the Deputy

23    Clerk.)

24                    CROSS-EXAMINATION (resumed)

25    BY MR. LEE:
```

**JA959**

1    **Q.**  Dean Fitzsimmons, when we suspended yesterday, we were

2    discussing the process by which the admissions office reviews

3    files and makes decisions.  Do you remember that?

4    **A.**  I do.

5    **Q.**  I'm going to put on the screen now DD 1.17.  It's Tab 2

6    of the notebook.  It's a demonstrative.  You can look at it

7    on the screen or the notebook, whatever is best for you.  And

8    I want to move to the next stage of the process.

9            After the initial review of the applications which

10   we discussed yesterday, what is the next step in the review

11   process?

12   **A.**  I believe we were talking about the subcommittee

13   meetings.

14   **Q.**   What are the subcommittee meetings?

15   **A.**   This is what we would call the first pass.  And there are

16   about 20 or so subcommittees just dividing pretty much evenly

17   the number of applications geographically.  It's meetings

18   that take place, five to seven people, three to five days to

19   do the initial review.

20   **Q.**  And what happens at the subcommittee meetings?

21   **A.**   Literally what happens is we go through each school

22   individually throughout the whole docket.  As we start at

23   each school, we take a look at all the people who applied

24   from the school, and then the advocate makes a decision at

25   that point about which ones he or she will present and put up

1    all the information on the screen.

2    **Q.**  Now, are all the applicants from that docket discussed at

3    the meetings?

4    **A.**  Not all will be discussed at the meetings.  Some, based

5    on at least the initial readings, may not go through a

6    discussion.  It's really the ones who at least at that point

7    appear to be legitimate contenders.

8    **Q.**  Can other admissions officers in the subcommittee

9    meetings ask to discuss candidates who advocates are not

10   proposing?

11   **A.**  Absolutely.  That's really the job of the chair, but it's

12   also the job of everybody else on that committee to provide a

13   check and a balance, in a sense, on really the advocate's

14   judgment.

15   **Q.**  Now, are you familiar with the concept of a docket

16   binder?

17   **A.**  I am.

18   **Q.**  What is a docket binder and what is its purpose at the

19   subcommittee meetings?

20   **A.**  The docket binder is a paper -- there are two of them,

21   actually.  It's a paper copy of literally all of the schools

22   and all of the applicants by school.  It supplements the

23   electronic system that we have.

24   **Q.**  We're not going to offer it into evidence, but I have

25   this large notebook from one docket.

```
 1                MR. LEE:  May I approach the witness, Your Honor?

 2                THE COURT:  Yes.

 3      BY MR. LEE:

 4      Q.   We're not going to offer it into evidence because of its

 5      bulk.  Can you just tell Her Honor what is in the docket

 6      binder?

 7      A.   It really is as we go through this docket it gives you

 8      information literally about every single candidate on the

 9      docket.  For example, I can take a look at this particular

10      school and I can see the person's name.  I can see background

11      information.  I can see the profiles that we've talked about.

12      I can see the test scores and what the person intends to

13      major in.  All that sort of information.  It's about this

14      much of a page for that person.  And that's for every single

15      person from that docket.

16                So that's why it's very easy for the chair to say,

17      okay, well, there happen to be three people, as I'm looking

18      right here quickly at this docket, who applied from this

19      school.

20                But everyone is looking at those three cases, and

21      the area person may have chosen to present one of them.  But

22      as that presentation goes on, everyone else may be looking

23      also -- listening, of course, but also looking at the other

24      two to see whether or not perhaps they should have been

25      presented.
```

1  **Q.** Now, when an application is, in fact, discussed, is there

2  information available to the subcommittee members in addition

3  to the docket binder?

4  **A.** There's a great deal of information. We literally

5  have -- of course it's all electronic. We have every single

6  thing about the applicant available, at least what's come in

7  up to that point.

8  **Q.** And I think you told Mr. Hughes that the information is

9  projected on a screen, correct?

10  **A.** Yes. So all that information you would see literally

11  starting with the common application all the way through the

12  short story that was presented. There are some applications

13  that will have well over 100 pages.

14  **Q.** What is the end product of the subcommittee meetings?

15  **A.** The end product is to come up with what we call initial

16  recommendations. This is way oversimplified, but let's

17  say -- remember we have to go out with about 2,000 admits.

18  So let's say, oversimplification, we'd ask the

19  subcommittee to come in with 100 recommended admits. So

20  they'd come in with 100 recommended admits, we hope, after

21  the five days after going through this.

22  They would have gradations of admits, some that

23  looked stronger than others. They might circle some of those

24  actions, saying that we need this whatever-it-was additional

25  information.

**JA963**

 1              They might also have circles around the wait-list,

 2      the rejects.  We also have holds.  We also have a thing

 3      called financial aid holds so that we can get more

 4      information to determine whether or not this person is, in

 5      fact, let's say, very low income.

 6      **Q.**  Are the decisions final decisions?

 7      **A.**  Hardly.

 8      **Q.**  Now, are there applicants who are not recommended for

 9      tentative admission after the subcommittee meetings that, in

10      fact, are admitted at the end of the cycle?

11      **A.**  Oh, absolutely.  All the time.

12      **Q.**  Are there applicants who are actually recommended for

13      tentative admission who are ultimately not admitted to the

14      class?

15      **A.**  Also all the time.

16      **Q.**  Turn to DD 1.18 and let's talk about the next step in the

17      process.  Do you have DD 1.18 before you?

18      **A.**  Yes.  Is this the full committee meeting?

19      **Q.**  Yes.  Who from your office participates in the full

20      committee meetings?

21      **A.**  All 40 or so admission officers.

22      **Q.**  Does anyone from outside the office participate in the

23      full committee meetings?

24      **A.**  We invite our faculty committee to come in, and based on

25      their schedules, they sometimes are able to be with us as

1    well.

2    **Q.**  Have you heard of something called the faculty standing

3    committee?

4    **A.**  And that's the faculty standing committee I was referring

5    to.

6    **Q.**  The faculty standing committee is made up of tenured

7    members of the faculty?

8    **A.**  That's correct.

9    **Q.**  How long do these full committee meetings last?

10   **A.**  The full committee meetings for regular will go from

11   roughly, say, March 3 to maybe March 20.

12   **Q.**  Turn, if you would, to Tab 4 in your notebook.

13   **A.**  I have it.

14   **Q.**  Do you find DX41?

15   **A.**  I do.

16   **Q.**  What is it?

17   **A.**  It gives you a simplified view of our admissions

18   calendar.

19           MR. LEE:  Your Honor, we offer DX41.

20           THE COURT:  What tab is it at?

21           MR. LEE:  Tab 4, Your Honor.

22           MR. HUGHES:  No objection.

23           THE COURT:  It's admitted.

24           (Defendant Exhibit No. DX41 admitted.)

25   BY MR. LEE:

**Q.**  By way of example, for the year 2013 to 2014, when did
the full complete meetings take place?

**A.**  From the 3rd of March.  It looks like we had final review
on the 19th.

**Q.**  Had there been an early action admission cycle before the
full admission cycle?

**A.**  There had.

**Q.**  Is the review process for applications the same for early
applications as it is for the regular application cycle?

**A.**  Yes.

**Q.**  During 2013 to 2014, how many dockets were discussed at
each full committee meeting?

**A.**  In the full committee, it's typically about two in the
full committee, sometimes depending on whether you get ahead
of schedule or have a fire drill, for example, something of
that sort.  But pretty much stay on schedule.

**Q.**  Are all applicants recommended by the subcommittees or
the dockets discussed at the full committee meetings?

**A.**  Yes.  Almost always.

        But let's say you had someone recommended in
subcommittee and then subsequent information comes in
indicating that that person wasn't as strong a candidate as
we thought, maybe bad midyear grades, perhaps an interview
that was below expectations.

        So you don't necessarily -- we would talk about it,

1   but there would be an explanation for why this person who had

2   been tentatively recommended in subcommittee was not going to

3   be presented.  And then the committee could say, well,

4   usually what you'd do is they had a lot of promise.  You

5   might end up putting that person on the waiting list and

6   hoping things get better, let's say, with the grades.

7   **Q.**  Now, as is true at the subcommittee level, can applicants

8   not recommended by the dockets be discussed?

9   **A.**  Yes.

10   **Q.**  How long does the full committee, all 40 people plus

11   whoever is there from the faculty standing committee, how

12   long does that group of folks discuss any particular

13   candidate?

14   **A.**  It really varies a great deal.  If you had someone who

15   was unbelievably strong and you could see that from the

16   reader sheet and a quick perusal and the subcommittee members

17   as well as the chair and the advocate talk about it, now,

18   that could be a relatively short discussion.

19           There are others where you could have a

20   discussion -- I know the math doesn't quite work out, Your

21   Honor, for this, but it does -- you can have a discussion of

22   up to an hour.  There's no limit to go through the

23   complexities of the case.

24           And you could also -- perhaps if it took that long,

25   you might at the very end of the subcommittee process talk

1    about -- in the last three days be talking about that

2    candidate again maybe one or two more times.  Maybe not for

3    an hour.  But the idea is we want the full committee to get

4    to know all the cases in the world here that have a chance of

5    getting in.

6    Q.   Now, as is true at the subcommittee level, are the

7    applications themselves projected electronically on a screen?

8    A.   Yes.

9    Q.   Are the applications in full available electronically to

10   all the admissions committee members?

11   A.   Yes.

12   Q.   Does the full committee ever have information that the

13   first readers who we discussed yesterday did not?

14   A.   It happens all the time because so much late information

15   comes in because the senior year is a time for candidates

16   where lots of things are coming together.

17   Q.   And for some of these applications, they're filed in

18   November and the full committee's meeting five or six months

19   later?

20   A.   They can be totally different applications at that point.

21   Q.   Now, how does a full committee decide to admit, reject,

22   or wait-list an applicant?

23   A.   It really is a majority vote.  I've got a vote, as does

24   everyone else.

25   Q.   And you take those votes in the open meeting with 40

1   folks there?

2   **A.**   Yes.

3   **Q.**   Now, you mentioned earlier that you could only admit

4   about 2,000 applicants.  Do you recall that yesterday?

5   **A.**   I do.

6   **Q.**   When you get to the end of the full committee process,

7   are you often over 2,000 in number of tentative admits?

8   **A.**   Not often.  Always.

9   **Q.**   Do you have something called a lop process for when you

10   reach that point?

11   **A.**   We do.

12   **Q.**   What is the lop process?

13   **A.**   It's a process that sometimes takes us as long as three

14   days where we might have just, for example, 100 places left

15   in the class based on what we've done before.  And we might

16   have 300 people that we have been looking at actually over a

17   period of time.  And so it's getting to know, over a

18   three-day period, all of those people who have a real chance

19   of getting into the class and then voting and comparing each

20   one.

21   **Q.**   So when you said a little bit earlier that some

22   applicants could be discussed for a second or third time, is

23   this one of the occasions on which some applicants would be

24   discussed again?

25   **A.**   Yes.  And they could have been discussed two or three

1    times in subcommittee.  Yes, that's how it works.

2    **Q.**  I'm sorry.  Turn, if you would, to Tab 5.  Do you have

3    Tab 5 before you?

4    **A.**  I do.

5    **Q.**  What is Tab 5?

6    **A.**  This is a memo that I sent out on March 14, 2014, about

7    essentially the last three days, the so-called lop session

8    which you referred to.

9              MR. LEE:  Your Honor, we offer DX56.

10             MR. HUGHES:  No objection.

11             THE COURT:  Admitted.

12             (Defendant Exhibit No. DX56 admitted.)

13   BY MR. LEE:

14   **Q.**  Let me turn you in the document to the second to the last

15   paragraph.  Let me ask you first, are you the author of the

16   document?

17   **A.**  I am.

18   **Q.**  To whom did you send the document?

19   **A.**  To the whole staff.

20   **Q.**  And would you read for us the paragraph that begins,

21   "These are only guidelines."

22   **A.**  "These are only guidelines.  In the end it will be the

23   quality of the case that decides the issue, not whose case it

24   is or on which docket it resides.  There is a time and a

25   place for strong advocacy, but we must put this role aside

1    and think simply about getting the best class.  For the most

2    part, the class has been chosen and there is no reason to do

3    anything other than keep our perspective and sense of humor

4    as we make the final judgments."

5    **Q.**  Is that how you conduct this last stage of admissions

6    process?

7    **A.**  That's right.

8    **Q.**  Now, if we could go back to slide DD 1.19 in Tab 2.

9    What's the final step in the admissions process that we've

10   been discussing yesterday and today?

11   **A.**  Well, after we make -- get through that session, we make

12   our final decisions.  And then of course we then let the

13   financial aid office do what they do magically and come up

14   with financial aid awards and then send out the admission and

15   financial aid packet together.

16   **Q.**  And you then offer admission to approximately how many

17   people?

18   **A.**  About 2,000.

19   **Q.**  Now, to give some life to the process, I'm going to take

20   you through an actual application file so we can see how this

21   works.  Could you turn to Tab 6?

22              THE COURT:  Can I ask a question?  Of your

23   admissions, the 40 readers -- let's just take this year, if

24   you remember.  How many of those 40 were Asian?

25              THE WITNESS:  On the voting committee this year I

1    think around four or five, I would say.  On the staff, it's

2    more like eight or ten, I would say.

3            THE COURT:  Okay.

4            MR. LEE:  Your Honor, what we're going to do is I'm

5    going to offer DX293, which is at Tab 6.  It has personal

6    identifying information, obviously.  What I'm going to do is

7    take the dean through it and direct Your Honor's attention to

8    pages, ask him to describe what's there in general terms so

9    he's not revealing the information.  And we won't put the

10   information on the public screen, but it will be an

11   opportunity to walk through an actual file, if that's all

12   right with Your Honor.

13           THE COURT:  This appears to be the one that we

14   spent some time on yesterday.

15           MR. LEE:  Yes.  A little bit, yes.

16           THE COURT:  Does it make sense to put yesterday's

17   exhibit up on the screen so we can have some idea what we're

18   talking about?

19           MR. LEE:  That was just a demonstrative.  It had

20   the summary sheet on the left and the pullout on the right.

21           THE COURT:  Yes.

22           MR. LEE:  We can put it back up so people will know

23   what it is, and I'll offer the file.  Could someone remind me

24   what the demonstrative number is?  Here it is.  So this is a

25   file for DD 1.9, Your Honor.  On the left would be the

```
 1   summary sheet from the actual file.  DX293 is the actual
 2   file.
 3              THE COURT:  Yes.
 4              MR. LEE:  And we would offer DX293.
 5              MR. HUGHES:  No objection, Your Honor.
 6              THE COURT:  Admitted.
 7              (Defendant Exhibit No. DX293 admitted.)
 8   BY MR. LEE:
 9   Q.   Now, Dean Fitzsimmons, I want to take you through the
10   file, as I said, to give some life to the process, but I'd
11   like to do it in a way where we're not revealing information
12   about this person individually so we can protect their
13   privacy.  Are you with me?
14   A.   I'm with you.
15   Q.   If you look at DX293, just first, look at the first three
16   pages.  Do you have those before you?
17   A.   I do.
18   Q.   What are those first three pages?
19   A.   The first page gives you lots of demographic information
20   and test scores and background information.  And then the
21   second and third pages are for comments by the readers.
22   Q.   What follows these summary sheets?
23   A.   What follows the summary sheets, the first sheets, so on
24   page 2, this is after the first two readers put their
25   profiles in.  They then talk about what they think some of
```

1    the strengths and possible weaknesses of the application are

2    and what some of the issues are, maybe some of the

3    highlights.

4    **Q.**   Turn, if you would, then, to the fourth page of the

5    exhibit.   Do you have that before you?

6    **A.**   Yes.

7    **Q.**   What begins at the fourth page?

8    **A.**   This is the common application that I mentioned

9    yesterday.

10   **Q.**   Again I want to protect the privacy of the individual.

11   In the common application, in general, what is the

12   information that the applicant is providing on the fourth and

13   following pages?

14   **A.**   It's all kinds of information about the family, the

15   background, to some extent the financial status.   All kinds

16   of things to really help to give a little bit of a sense of

17   who the actual person is.

18   **Q.**   Turn, if you would, to page 5, which has the numbers .005

19   in the bottom centered.   Do you see that?

20   **A.**   Yes.

21   **Q.**   Is this still part of the common application?

22   **A.**   Yes, it is.

23   **Q.**   What information is being provided by the applicant on

24   page 5?

25   **A.**   This is all about the family.   Families obviously are

Case: 19-2005    Document: 00117629237    Page: 266    Date Filed: 07/30/2020    Entry ID: 6356615
Case 1:14-cv-14176-ADB    Document 635    Filed 04/18/19    Page 24 of 246

24

1    very important in all kinds of ways for students.  It gives

2    you a sense of the -- among other things, the educational

3    background of the family, the profession the family might

4    have, and also information about siblings, which can

5    sometimes be sort of an interesting piece of a person's life.

6    **Q.**  One of the pieces of information you mentioned was

7    parental occupation, correct?

8    **A.**  That's correct.

9    **Q.**  Do you consider parental occupation in the admission

10   among many of these factors?

11   **A.**  We do because it can often give you at least a high

12   correlation with the student's life chances.

13   **Q.**  Can you give us an example where the parental occupation

14   would illuminate or educate your admissions decision?

15   **A.**  It really illuminates almost every case.  Let's say you

16   had somebody -- for example, in California we have a fair

17   number of migrant worker families who have kids in the pool

18   and who end up sending their kids to Harvard.  So that kind

19   of a piece of information would be very helpful.

20   **Q.**  Now, in your experience, is there a benefit to Harvard

21   student body in considering the backgrounds and parental

22   occupations in the admissions decisions?

23   **A.**  I think there's a huge benefit.  Because I think, again,

24   you bring with you to Harvard your life experience.  And your

25   life experience has been shaped often quite profoundly by

1    your parents and your family situation.  So you bring, in a

2    sense, a slice of that life with you.

3            For example, let's say you were the son or daughter

4    of a migrant worker.  It's one thing to talk about migrant

5    workers and immigration in the abstract, for example.  It's

6    another thing to live with someone for four years who has

7    lived that experience.

8    Q.   Now, turn if you would, to page 6 and 7 of the exhibit.

9    They have the numbers .006 and .007.  Do you see those?

10   A.   Yes.  I have it.

11   Q.   Are these still part of the common application?

12   A.   Yes.

13   Q.   Again without specifics, what information is the

14   applicant now providing?

15   A.   It's information about the high school, or lack

16   thereof -- because we have people who are homeschooled -- a

17   little bit about honors, future plans, which we know can

18   often be tentative, and also a little bit of a sense of what

19   the current year courses are.

20   Q.   Now, if you turn to pages 8 and 9 of this application --

21   A.   Yes.

22   Q.   -- what is on pages 8 and 9?

23   A.   0O07 is really just about testing, whatever testing a

24   person wants to put in.

25   Q.   I put you on the wrong page.  Pages .008 and .009?

**JA976**

1    **A.**   008 and 9 are the opportunity for the student to tell us

2    about what he or she has done not just in school but out of

3    school.  And not just conventional extracurricular activities

4    but work experience:  babysitting, which I did myself because

5    I had too much younger siblings and had a neighborhood

6    babysitting system.  But whatever that person has done

7    outside of school is of interest to us in addition to what

8    that person might have done academically.

9    **Q.**   Did this applicant have actually a substantial number of

10   activities outside the classroom?

11   **A.**   Yes.

12   **Q.**   Now, turn to the final page of the common application.

13   Do you have that before you?

14   **A.**   0010.

15   **Q.**   Do you have that?

16   **A.**   I do.

17   **Q.**   What is that?

18   **A.**   This is the personal essay, and it also is an opportunity

19   for a person to give additional information.

20   **Q.**   And is the personal essay an important part of the file

21   when you're considering an admissions decision?

22   **A.**   It can be.  It's a real opportunity for the student to

23   help define who he or she is.

24   **Q.**   Turn to the page that at the bottom center says .12,

25   00.12.  Do you see that?

**JA977**

1    **A.**   On this page.

2    **Q.**   .0012 in the middle.

3    **A.**   0012 in the middle.  What am I missing here?  I'm sorry.

4    I'm talking about 0012.  Okay.  It's the Harvard College

5    member page.

6    **Q.**   What is the Harvard College member page?

7    **A.**   So under the common application, a college can ask

8    additional questions that we think might be helpful in

9    filling out the picture.

10   **Q.**   What does Harvard ask applicants to do to help fill out

11   the picture?

12   **A.**   We're actually really trying to get a little bit more of

13   a sense of how the person is thinking about college and what

14   we might look for in the application.

15          So for example, for many -- since as long as I've

16   really been in the office, we've encouraged people to send in

17   portfolios or any additional information they might want to

18   send.  This is a sign for us to look for it in the

19   electronics.

20          But we're also interested in what kind of thing

21   they want to do academically and also maybe how certain they

22   may be.  We're not looking for certainty necessarily because

23   one of the jokes in college admissions is the most popular

24   major is undecided.  But nevertheless, there are people who

25   might be, for example, among the best poets in the country or

1    the best mathematicians.  So we'd be interested in that.

2            And then we're trying to get a sense of how the

3    student is envisioning spending time in college.  So you can

4    look at the activities section.  Not surprisingly, just based

5    on the previous page, this woman wants to dance, is her

6    number one extracurricular.

7            But we're also concerned about, I guess, two things

8    under the context.  One is we're trying to check ourselves to

9    see whether or not sort of the way we try to reach out to

10   people is effective.  So we want to find out how this person

11   ended up in the Harvard applicant pool.

12           So you can see with her she was part of our email

13   and social media campaigns and our letter writing and mailing

14   campaign.  She also probably was contacted by one of our

15   student recruiters, it looked like, and maybe one of our

16   alums.  We're always glad to see -- we try to make sure we

17   understand, try to check ourselves to make sure that our

18   outreach is as good as can be.

19   **Q.**  One of the things you mentioned was intended

20   concentration or major.

21   **A.**  Yes.

22   **Q.**  Why do you ask for that information?

23   **A.**  Because it is important for us to see how well people are

24   thinking about their academic interests but also really to

25   take a look at the record they have compiled.

1          Let's say, for example, one of the things we're

2    always interested in doing is getting more humanists to come

3    to Harvard.  Unfortunately, if you look at the College Board

4    reports every year, there seems almost every year there are

5    fewer and fewer students who want to do anything like the

6    humanities in college.  And we think we've got a great

7    humanities program, and we teach over 80 languages.

8          So we really want to get these humanists to come

9    here.  If they have a track record of accomplishment in the

10   humanities, let's say they had taken Latin and Greek and they

11   were thinking of the classics, that's really a good thing

12   because we think it's really important for people with such

13   serious interests and track records they'll be great

14   educators, we hope.  Not just a fellow humanist but of our

15   engineers and our scientists so they'll have a human basis

16   for deciding how to use this powerful technology they're

17   studying.

18   Q.   Do you also consider information about the applicant's

19   intended career, tentative as it is?

20   A.   We do, tentative as it is.  But sometimes there are

21   people who make a very clear record of interest and

22   demonstrated accomplishment that would lead them to be very

23   successful in one kind of career or another.

24   Q.   Now, let's look at the additional information that's in

25   this file.  Turn, if you would, to the pages 00.17 to 00.20.

1    Do you have that?

2    **A.**   I have 17.

3    **Q.**   Yeah.  All I want you to do right now, I'm going to come

4    back to some of the specifics.

5            What is the document that begins at page 00.17?

6    **A.**   This is the secondary school report that usually is

7    filled out by the guidance counselor or the head of the

8    school or something of that sort.

9    **Q.**   Turn, if you would, to pages 25 -- 00.25 to 00.30.

10   **A.**   Okay.  I have it.

11   **Q.**   What do you find there?

12   **A.**   This is one of the teacher reports.  We require that

13   students send two recommendations from teachers.

14   **Q.**   Turn, if you would, to the pages .0031 to 32.  What do

15   you find?

16   **A.**   There we have the interview from the alumnus or alumnae.

17   **Q.**   Turn, if you would, back to the first page of this

18   applicant's file.

19   **A.**   Right to the reader sheet.

20   **Q.**   Right.  Now, did the first reader assign ratings that we

21   looked at briefly yesterday?

22   **A.**   Yes.

23   **Q.**   Was there a second reader?

24   **A.**   Yes, there was.  The chair of the docket.

25   **Q.**   Is there an academic rating?

1    **A.**   There is.

2    **Q.**   What was the academic rating assigned to this applicant

3    by the first reader?

4    **A.**   A 2+ academic.

5    **Q.**   What was the academic rating assigned by the docket

6    chair?

7    **A.**   A 2, which seems a little low to me.  But nevertheless,

8    there it is.

9    **Q.**   Now, you told me that page 6 provides information on the

10   applicant's educational background, correct?

11   **A.**   That's correct.

12   **Q.**   And page 7 provides information on the testing results?

13   **A.**   Yes.

14   **Q.**   Is that the only information that is considered in

15   setting the academic rating?

16   **A.**   Hardly, no.

17   **Q.**   Turn, if you would, to page 15 of the application file.

18   **A.**   I have it.

19   **Q.**   Do you have it before you?

20   **A.**   Yes.  15, right.

21   **Q.**   What is that?

22   **A.**   This is the writing supplement, again something we allow

23   people to do.

24   **Q.**   Now, looking at this writing supplement, is there

25   information in the writing supplement from the applicant that

1    would be considered in assigning the academic rating?

2    **A.**   Yes.

3    **Q.**   What?

4    **A.**   I think one the things that comes through, as I read

5    through here quickly, is a tremendous intellectual curiosity

6    and love of learning, which is a huge piece of being a really

7    great academician.  Without that, it doesn't work.

8    **Q.**   Was there a discussion in her written supplement about

9    her research in a laboratory?

10   **A.**   Yes.

11   **Q.**   Would that information be useful in setting the academic

12   rating?

13   **A.**   Yes, absolutely.  Very important.

14   **Q.**   Turn, if you would, to pages 17 to 20 of DX293.

15   **A.**   17 to 20?

16   **Q.**   Yes.

17   **A.**   Okay.

18   **Q.**   You told me that that's the school report?

19   **A.**   It is.

20   **Q.**   Is the school report used in assigning the academic

21   rating?

22   **A.**   Yes.

23   **Q.**   Why is it important?

24   **A.**   Really for some of the same reasons.  I think it's to try

25   to get a sense of, based on what was available at the school,

1    for example, academically, did this person take full

2    advantage of the academic opportunities at the school.

3            And the other part of it is -- I don't want to be

4    too simple-minded about it, but did this person do it

5    joyfully?  Did this person again have an excitement and a

6    love of learning and an intellectual curiosity?  Was this

7    person perhaps someone who might have inspired other students

8    to share that love of learning?

9    **Q.**  And what type of information did you get on those issues

10    from this file?

11    **A.**  Lots of things.  They talk about her being an

12    extraordinary young woman.  It talks all about the amazing

13    things she did to try to get into the ballet world at a

14    relatively older age.

15            It's really, in lots of respects, a love letter for

16    a person who has, to me, astonishing range of intellectual

17    and other interests and seems to be able to blend those

18    interests together, which is a really good sign, something

19    you'd want to look for.

20    **Q.**  Turn to the pages that have the Bates stamp number 0022

21    through 0023.  Do you have those?

22    **A.**  I do.

23    **Q.**  I forgot to ask you about these.  What are those?

24    **A.**  If it's 0022 and 23, it's the end of the secondary school

25    report.

1    **Q.**   Recommendation from the guidance counselor?

2    **A.**   From the guidance counselor, right.

3    **Q.**   Turn back to page 1.

4    **A.**   Yes.

5    **Q.**   What was the extracurricular rating for this applicant?

6    **A.**   It was a 1.

7    **Q.**   How unusual is it to have an extracurricular rating of 1?

8    **A.**   It's quite unusual.

9    **Q.**   Is the extracurricular rating of 1 or 2 or 3 or 4 done by

10   some formula?

11   **A.**   Not at all.

12   **Q.**   Is there information in this file that would tell you why

13   the readers gave her a extracurricular rating of 1?

14   **A.**   There is.

15   **Q.**   Turn, if you would, to page 8.  Do you have that?

16   **A.**   Page 8.

17   **Q.**   .0008?

18   **A.**   Yes, sir.

19   **Q.**   In general terms, what's listed on this page?

20   **A.**   In general terms, there's really a listing of the

21   activities.  And they're pretty impressive.  The listing

22   alone wouldn't -- that would suggest that you start to look

23   for the quality.

24   **Q.**   I'm going to ask you some specifics, but again trying to

25   protect the applicant's privacy.

| | |
|---|---|
| 1 | Did this applicant have a research internship? |
| 2 | **A.** Yes. |
| 3 | **Q.** Did this applicant perform with a ballet company? |
| 4 | **A.** Yes. |
| 5 | **Q.** Did she also participate in student government? |
| 6 | **A.** She did. |
| 7 | **Q.** And did she also have a paid job? |
| 8 | **A.** I'm sorry? |
| 9 | **Q.** Did she also have a paid job? |
| 10 | **A.** Yes. |
| 11 | **Q.** Is there information on these pages about how many hours |
| 12 | she devoted to each of these activities? |
| 13 | **A.** There is. |
| 14 | **Q.** Now, is this the only information that you consider when |
| 15 | you set the extracurricular rating? |
| 16 | **A.** No, not at all. |
| 17 | **Q.** Turn to page 42. |
| 18 | **A.** 42.  Yes, I have it. |
| 19 | **Q.** What is this? |
| 20 | **A.** This is a rating from our own dance person, Jill Johnson. |
| 21 | **Q.** She's a faculty member? |
| 22 | **A.** She is. |
| 23 | **Q.** And what is she rating? |
| 24 | **A.** She's rating the dance and choreography, and she's |
| 25 | giving -- beyond the rating, she's giving sort of a |

Case: 19-2005     Document: 00117629237     Page: 278     Date Filed: 07/30/2020     Entry ID: 6356615
Case 1:14-cv-14176-ADB   Document 635   Filed 04/18/19   Page 36 of 246

36

1    description of what it is perhaps we would expect this person

2    to do.

3              And that's a very good thing for us to understand

4    because it means in these activities which she could be

5    perhaps a star in, she'll meet others, she'll inspire others,

6    she'll educate others in these activities.

7    **Q.**  Turn back to the first page of the exhibit again to the

8    summary sheet.

9    **A.**  Yes.

10   **Q.**  Is there a personal rating?

11   **A.**  There is a personal rating.

12   **Q.**  Now, we looked at that briefly yesterday, correct?

13   **A.**  Yes.

14   **Q.**  What I'd like to do now is look at some of the

15   information that would have been used or was used in setting

16   the personal rating.  Are you with me?

17   **A.**  I'm with you.

18   **Q.**  Turn to page 10.

19   **A.**  Okay.  I have it.

20   **Q.**  What do you find at page 10?

21   **A.**  We have the essay and then we also have the additional

22   information.

23   **Q.**  And without disclosing details, what information is the

24   applicant providing to you that helps set the personal

25   rating?

1          MR. HUGHES:  Your Honor, I'm going to object to

2     this question.  He didn't actually award the personal ratings

3     on this application.  It's pure speculation on his part about

4     what the people who actually did consider in awarding those

5     awards.  He has no basis to testify what they considered when

6     awarding those awards.  He can talk about what's in the

7     application, but I don't see how he can possibly offer

8     reliable testimony on what went into the subjective

9     determination of awarding the personal scores on this

10    application.

11          THE COURT:  Well, I think he can say that -- he can

12    say whether or not the personal essays are considered in that

13    score.  And he can say generally what the two topics are that

14    she covers in these, right?

15          MR. HUGHES:  I think he can say what information is

16    contained in the application.  He can't get in the mind of

17    the people who awarded the personal score.  Certainly that

18    information was available to them, but he can't say that

19    whoever awarded these scores considered this essay or this

20    factor.

21          THE COURT:  No, but he can ask him whether or not

22    the essays are considered in the personal rating.  If he says

23    sometimes, he may not know whether it was in this case.  But

24    if he says it's the office policy that they always are, and

25    to discuss these two topics, that's fine.

**JA988**

1              So why don't you lay the foundation.

2              MR. LEE:  Sure.

3    BY MR. LEE:

4    **Q.**  First, Dean Fitzsimmons, was this student admitted to

5    Harvard?

6    **A.**  Yes.

7    **Q.**  Were you there when her file was reviewed and put on the

8    screen?

9    **A.**  I was.

10   **Q.**  Were you there when the summary sheet was put on the

11   screen?

12   **A.**  Yes.

13   **Q.**  Did you have access to every single piece of paper and

14   information we've just been discussing?

15   **A.**  Yes.

16   **Q.**  You had a chance to look at the personal rating that the

17   first reader had established, correct?

18   **A.**  I did.

19   **Q.**  Have you evaluated the personal rating -- withdrawn.

20             Turn to page 10.  Do you have that before you?

21   **A.**  I do.

22   **Q.**  Is there any information on page 10 that was relevant to

23   you when you were evaluating the personal qualities of this

24   applicant?

25   **A.**  Very much so.

**Q.**  In general terms, without revealing her personal details,
could you tell us the type of information that's on page 10
that is useful in evaluating the personal characteristics of
a person?

**A.**  I would say first in terms of extracurricular interest.
The way she went about it was very unusual and the way she
described her experience with dance was quite unusual.

        That was reflected in Jill Johnson's report.  Jill
Johnson is a very tough grader.  If you look carefully at
that piece, she actually rated her as a 2+ plus, which -- I'm
not sure I've ever seen Jill give a 1.

        It's the combination of her heart and her soul and
her intellect that goes into her extracurricular passion.
It's dance for its own sake.

        The other piece on the same page was really all
about her father's health challenges.  Without getting into
the details that could reveal -- that could broach
confidentiality, I found this to be incredibly moving.  And I
would have given her -- based on these two and all the rest
of the information in the application, I would have given her
a 1 personal.

**Q.**  Now, is the manner in which she responded to her father's
disability something you considered in evaluating her
personal qualities?

**A.**  Yes, very much so.

1    **Q.**  Is it something that you can reduce to a number?

2    **A.**  Not in a million years.

3    **Q.**  Turn, if you would, to pages 22 and 23, which we

4    discussed just a few minutes ago.

5    **A.**  Yes.

6    **Q.**  Does the secondary school report of this candidate

7    discuss her personal qualities?

8    **A.**  Yes.

9    **Q.**  And again without reviewing details, what does the school

10   say about the personal qualities of this young woman?

11   **A.**  Among other things, they talk about her as being an

12   extraordinary young woman and then give you loads of reasons

13   and examples of why they would make that claim.

14   **Q.**  Did they provide any information about how she interacts

15   with others in her community?

16   **A.**  Yes.  Very much so.

17   **Q.**  Would that be important to you in evaluating the personal

18   characteristics of a candidate?

19   **A.**  Absolutely.

20   **Q.**  I think you told us that she's described as an

21   extraordinary young woman, correct?

22   **A.**  That's correct.

23   **Q.**  Let me do this so that we're not revealing too much

24   information.  Is she also described as gracious, genuine, and

25   caring?

1    **A.**  Yes.

2    **Q.**  Is that information important to you in evaluating the

3    personal qualities of a candidate?

4    **A.**  Yes.

5    **Q.**  Now, if you turn to pages 26 and 27, do you have those

6    before you?

7    **A.**  I do.

8    **Q.**  I think you told me this is one of the teacher

9    recommendations?

10   **A.**  It is.

11   **Q.**  Turn, if you would, to page 27 to the paragraph that's at

12   the bottom of page 27 and carries over to the top of -- I'm

13   sorry.  At the bottom of page 26 and then carries over to the

14   top of 27.  Do you see that?

15   **A.**  I do.

16   **Q.**  And I think we can do this without revealing any

17   confidential information.  But if you look at the very last

18   sentence?

19   **A.**  Yes.

20   **Q.**  It begins, "As this illustrates the nature of all" --

21   redacted -- "activities."

22           Would you read the remainder of the sentence?

23   **A.**  Let's see.  You're starting where?

24   **Q.**  If you start at the top of page 27.

25   **A.**  Okay.  I'm sorry.

1    **Q.**  I want you to begin with "She is."

2    **A.**  "She is mature beyond her years.  She operates at an

3    exceptional level for a person of any age, and she does so in

4    a number of different fields all at the same time."

5    **Q.**  Was that information important to you in evaluating the

6    personal qualities of this candidate?

7    **A.**  Yes.

8    **Q.**  Staying on page 27, let's see what else her teacher says

9    about her.  Do you see the portion in the second page which

10   reads, "She is calm, kind, and quiet, thoughtful and focused,

11   never anxious but always working toward her goals."

12   **A.**  I see that.

13   **Q.**  Was that also important information to you?

14   **A.**  Very much so.

15   **Q.**  Turn to page 29 and 30.

16   **A.**  I have it.

17   **Q.**  Is this another teacher recommendation?

18   **A.**  It is.

19   **Q.**  We're not going to go through it, but it will be part of

20   the record for Her Honor.

21           But again, is there information on the personal

22   qualities of this individual that would have been relevant to

23   the personal rating but, more importantly, is relevant to

24   whether she's admitted or not?

25   **A.**  Absolutely.

**Q.**   Turn to pages 31 and 32.

**A.**   I have them.

**Q.**   I think you told me that's the alumni interview report?

**A.**   It is.

**Q.**   Now, was the alumni interview report available at the time that the preliminary ratings were set?

**A.**   You know, I'm not sure.  Quite possibly not so because -- because California, I think I mentioned yesterday, four out of the past seven years has been our biggest contributor of students to Harvard.  There are lots of people applying.  So our alumni interviewers often are -- they have a big backlog and they'll get to the ones we need to get to.  It's quite likely it wasn't there when --

**Q.**   If you turn to page 32 --

**A.**   Yes.

**Q.**   -- there is a portion of the interview form called "Personal Qualities."  Do you see that?

**A.**   I do.

**Q.**   Now, to help complete the picture, do you recall yesterday when I started your cross-examination we were looking at the interview handbook?

**A.**   Yes.

**Q.**   And there was a section that described how interviewers should evaluate personal qualities?

**A.**   Yes.

**Q.** If I'm looking at the top of page 22, what is set forth
in general terms --

**A.** You mean 32?

**Q.** 32, you're right. I'm sorry.

**A.** This gives you -- and I guess you could look under the
other topics as well. For example, under academic, if you go
to 31, you can see some of the things even before they get
into their write-up that we hope that they will engage in.

And then we try to give them a little sense on the
extracurriculars.

The personal qualities, among other things, we'd
like them to give us information or at least their opinions
on openness to new ideas and new people, contribution to
college life.

And a very, very fundamental question that we've
talked about before, and with Mr. Hughes as well, is the
whole idea of what kind of a roommate will this person be.
That's the beginning of the places where people can really
make a difference to educating their fellow classmates.

And then of course we just ask them to give an
overall. They can write as much as they want, by the way,
because the electronics now allow them to continue on, as
they say, for pages if they want to.

**Q.** Now, under the comments this begins, "There is a special
maturity about the applicant," correct?

1   **A.**  That's correct.

2   **Q.**  Is that the kind of information that is important to you

3   in evaluating the personal characteristics and qualities of a

4   candidate?

5   **A.**  Yes.

6   **Q.**  Is it important to you in deciding whether to admit a

7   candidate or not?

8   **A.**  Absolutely.

9   **Q.**  Is it capable of quantification?

10  **A.**  No.  I'm not sure how you do it, but if you use all the

11  different sources and you begin to see how they all meld

12  together, you can get, I think, a good picture of that.

13  **Q.**  Now, you mentioned yesterday, but we didn't talk about it

14  much, that the admissions office also assigns a rating to the

15  guidance counselor recommendation?

16  **A.**  That's correct.

17  **Q.**  And to the teacher recommendations?

18  **A.**  That's correct.

19  **Q.**  And if you go back to page 1 --

20  **A.**  I have it.

21  **Q.**  -- of this exhibit?

22  **A.**  Yes.

23  **Q.**  Do you have those?

24  **A.**  I do.

25  **Q.**  Now, those are the numbers or the ratings that were

1    assigned by the reader to the guidance counselor

2    recommendation and the teacher recommendations?

3    **A.**   That's correct.

4    **Q.**   Now, let's turn to page 2 of the application file.

5    **A.**   Okay.

6    **Q.**   Now, what is at page 2?

7    **A.**   This again is a chance for the readers to put any notes

8    down that they think is worth perhaps mentioning in the

9    subcommittee and the full committee.  And also we ask them to

10   give a brief overview of what they think is actually going on

11   in the total file.

12   **Q.**   What did the first reader say about this candidate?

13   **A.**   I am not sure how X has managed to accomplish so much.  A

14   product of the blank public schools, she spent her early

15   education in a Spanish immersion program, so she's bilingual.

16   She auditioned for dance but soon discovered a love for

17   ballet and enrolled in the City Ballet of X and fought to

18   continue academics through school.

19          With the city ballet, she had lead paid roles such

20   as Aurora in Sleeping Beauty.  She's got a talent for science

21   and research supported by teachers at a local university.

22   For courses that her school did not offer, such as AP

23   chemistry, bio, and environmental studies, she studied the

24   material on her own.

25          It says she studied the material and took the exams

1    on her own, paying for them out of her babysitting money and

2    in the process earned a top grade, which is a 5, in those

3    tests.

4              The principal investigator in the lab where she

5    volunteers wrote that she has "shown a devotion, maturity,

6    and strong assistant in researches uncommon among peers her

7    age."  She sounds like she would be a fabulous admission to

8    Harvard.

9    **Q.**  Now, when you were telling Mr. Hughes that the admissions

10   process is not just any one factor but a collection of

11   information, is this the type of decision you were talking

12   about?

13             MR. HUGHES:  Your Honor, I'm going to object to the

14   leading.

15             THE COURT:  Rephrase the question.

16             MR. LEE:  I'll rephrase it.

17   BY MR. LEE:

18   **Q.**  Do you remember Mr. Hughes asking you about different

19   factors in the admissions process?

20   **A.**  I do.

21   **Q.**  And you responded about the different factors that were

22   considered?

23   **A.**  Yes.

24   **Q.**  Taking a look at this file, have we discussed the

25   different factors you had in mind when you were answering

1    Mr. Hughes?

2    **A.**   Yes.  I mean, this is a good example of what we do.

3    **Q.**   And she was admitted, correct?

4    **A.**   She was admitted.

5    **Q.**   Now, I'm going to come to another file in a few minutes,

6    but let me ask you a few questions about the use of race in

7    admissions.  You told Mr. Hughes that race can be considered

8    in the admissions process, correct?

9    **A.**   That's correct.

10   **Q.**   Can race be a tip for some applicants?

11   **A.**   It can be.

12   **Q.**   And you told us yesterday that can be a plus factor?

13   **A.**   It can be.

14   **Q.**   What does it mean for race to be a tip or a plus factor

15   in the admissions process?

16   **A.**   It simply means for people who are highly qualified and

17   who are, again, in that group of people who really have a

18   chance of getting in, it could be one factor that would lead

19   committee members to vote for that person just in terms of

20   whether or not that person might be a great educator of

21   others over the four years.

22   **Q.**   Are applicants of any race or ethnicity subjected to a

23   different admissions process?

24   **A.**   No.

25   **Q.**   In any of the ratings that we discussed, does indicating,

1   self-identifying yourself as a certain race automatically

2   result in a better rating?

3   **A.**   No.

4   **Q.**   Are there applicants of all races who are rejected

5   because they're just not academically qualified?

6   **A.**   That's correct.

7   **Q.**   For those applicants, is race a factor in those

8   decisions?

9   **A.**   No.

10  **Q.**   At what point in the process could race factor into the

11  decision?

12  **A.**   I think when you're in the situation of -- when you're

13  talking about candidates who are very competitive in the

14  subcommittee and then ultimately in the full committee,

15  that's when that kind of thing could come into play.  It's

16  one factor among many for people choosing to vote or not.

17  **Q.**   Is the fact that an applicant has self-identified their

18  race considered in assigning any of the four profile ratings?

19  **A.**   No.

20  **Q.**   Is it considered or can it be considered in assigning the

21  preliminary overall rating?

22  **A.**   It can be.

23  **Q.**   Must it be?

24  **A.**   Not necessarily.  Lots of people would be -- don't need

25  anything like that, that extra little tip to get in.  Many

**JA1000**

1    people are -- again in the real world, you're talking about

2    people who are multidimensional across all these dimensions

3    that we've talked about.

4    **Q.**  Are there some applicants who will get in no matter what

5    their race or ethnicity is?

6    **A.**  Yes.  Quite a few.

7    **Q.**  How can race be considered in the preliminary overall

8    rating?

9    **A.**  If as the -- you're doing your preliminary overall

10    rating, if you think that this might be an additional little

11    element that might be helpful in terms of making a case that

12    this person, as I say, might be an unusual educator of

13    others, the person might decide to factor that into the

14    preliminary overall rating.

15    **Q.**  Is an applicant's race ever considered a negative factor?

16    **A.**  Never.

17    **Q.**  A negative tip?

18    **A.**  Never.

19    **Q.**  A negative, opposite of a plus, a negative?

20    **A.**  Never.

21    **Q.**  Turn, if you would, to Tab 7 in your notebook.

22    **A.**  Okay.

23    **Q.**  Do you find Exhibit 7 A-2 before you?

24    **A.**  I do.

25    **Q.**  Have you SA-2 before you?

| | |
|---|---|
| 1 | **A.**  I do. |
| 2 | **Q.**  Have you seen it before? |
| 3 | **A.**  Yes. |
| 4 | **Q.**  Have you reviewed this file before? |
| 5 | **A.**  Yes. |
| 6 | MR. LEE:  Your Honor, we offer SA-2 which is one of |
| 7 | the exhibits from the amicus students. |
| 8 | MR. HUGHES:  No objection. |
| 9 | THE COURT:  Admitted.  Can I ask a question?  Are |
| 10 | we going to see any of the applications from the SFFA |
| 11 | representatives? |
| 12 | MR. LEE:  I don't think so.  Not a thing. |
| 13 | THE COURT:  Okay. |
| 14 | MR. LEE:  I think the only application files you're |
| 15 | going to see are from us. |
| 16 | THE COURT:  And you're not putting on any of the -- |
| 17 | MR. LEE:  (Witness shakes head negatively.) |
| 18 | (Defendant Exhibit No. SA-2 admitted.) |
| 19 | BY MR. LEE: |
| 20 | **Q.**  Do you have SA-2 before you? |
| 21 | **A.**  I do. |
| 22 | **Q.**  Is this applicant a current student at Harvard? |
| 23 | **A.**  Yes. |
| 24 | **Q.**  Is this applicant one of the students who will testify at |
| 25 | this trial? |

1    **A.**   Yes.

2    **Q.**   Turn, if you would, to page 4, which has the Bates stamp

3    number .004.

4    **A.**   Yes, I have it.

5    **Q.**   Is this the first page of the common application we've

6    discussed?

7    **A.**   Yes.

8    **Q.**   Does this applicant self-identify his race?

9    **A.**   Yes.

10   **Q.**   What does he say?

11   **A.**   He says Asian and then Vietnam.

12   **Q.**   So he has both identified himself as Asian and also as

13   Vietnamese, correct?

14   **A.**   Yes.

15   **Q.**   Now, for the first four days of this trial we've been

16   referring to Asian-Americans as a category.  Do you have that

17   in mind?

18   **A.**   I do.

19   **Q.**   In the admissions process, are there different groups and

20   subgroups and sub-subgroups within the category of

21   Asian-Americans?

22   **A.**   Very much so.

23   **Q.**   Are they different?

24   **A.**   Very much so.

25   **Q.**   Do you consider their differences?

1    **A.**   Yes.

2    **Q.**   Can you give us just an example of how they're different?

3    **A.**   There's a vast difference just within any country in Asia

4    in terms of socioeconomic advantage, for example.  The life

5    experiences of someone from Xinjiang province lives in a

6    rural area is vastly different from the experience someone

7    would have in Shanghai, for example.

8              There's astonishing diversity that you can get from

9    even one single country.

10             And in Vietnam, where I've actually been to

11   recruit, there is again a vast difference between what the

12   opportunities in life would be for someone from the rural

13   areas and someone in the cities.

14   **Q.**   The applicant here in the admitted student is named

15   Mr. Diep, correct?

16   **A.**   Yes.

17   **Q.**   And Mr. Diep has publicly disclosed portions of his file,

18   correct?

19   **A.**   He has.

20   **Q.**   I'm going to ask you some specifics that we can do on the

21   public record, thanks to him.  Turn, if you would, to page 5.

22   It has a Bates stamp number .0005.

23   **A.**   I'm sorry.  Page 5?

24   **Q.**   Yes.

25   **A.**   Okay.  I have it.

1    **Q.**  What does this page tell you about Mr. Diep's parents'

2    education?

3    **A.**  It tells you that they did not have college education,

4    but they did graduate from high school and secondary school,

5    which I think is a very good achievement.  And it also tells

6    you a lot about what they're doing for work now.

7    **Q.**  Would Mr. Diep be considered a first-generation Harvard

8    student?

9    **A.**  Yes.  As I was.

10    **Q.**  Turn, if you would, to page 6.  What was Mr. Diep's class

11    rank?

12    **A.**  Page 6.  I'm sorry.  He was number one in the class.  I

13    don't recall whether there was another person who shared that

14    rank, but he was number one.

15    **Q.**  What was his grade point average?

16    **A.**  4.325 out of 4.

17    **Q.**  Go to page 7.

18    **A.**  Okay.

19    **Q.**  What was Mr. Diep's SAT 1 score?

20    **A.**  The SAT 1 was a 650.

21    **Q.**  650 for critical reading?

22    **A.**  Yes.  I'm sorry.  Critical reading, which is the old

23    verbal if you're thinking of the way it used to be described.

24    710 in math and 710 in writing, and he had sort of mid

25    600-ish subject tests.

Case 1:14-cv-14176-ADB Document 635   Filed 04/18/19   Page 55 of 246

55

```
 1   Q.   His total score on the SAT 1 was about 2090, correct?
 2   A.   Sounds about right.
 3   Q.   In the overall applicant pool at Harvard, where does a
 4   2090 SAT 1 score fall?
 5   A.   It would be kind of middling in the pool.  But I think
 6   the way we would look at him is that here's a person who
 7   until the fourth grade was in another country and English was
 8   not his first language.  And he describes in the essay about
 9   what he did to learn English.
10           Usually when a person has another language as a
11   first language or, as often is the case in many American
12   homes, usually over 20 percent of American homes have a
13   language other than English somewhere in the home.  You will
14   typically find a verbal or a critical reading score probably
15   is not going to reflect whatever his or her real verbal or
16   critical reading score would be.
17           If this person had had a different set of
18   opportunities to grow up with English and so forth, who
19   knows?  He may well have had an 800.
20   Q.   Was Mr. Diep academically qualified to be admitted to
21   Harvard?
22   A.   Perfectly qualified.
23   Q.   Turn, if you would, to page 10.
24   A.   Page 10.  Okay.
25   Q.   What did you find at page 10?
```

**JA1006**

1    **A.**   His personal essay.

2    **Q.**   And what is the topic of Mr. Diep's personal essay?

3    **A.**   It's really all about his adjustment to the United States

4    and especially his language challenges, which is a problem --

5    we have loads of kids who arrive from other countries in our

6    pool and end up at Harvard.  His story is a familiar one.

7    **Q.**   Does he discuss the challenge with his classmates of

8    being Asian or Vietnamese?

9    **A.**   Very much so.

10   **Q.**   Turn, if you would, to page 26.  Let me ask you this:

11   You reviewed his file as part of the application process,

12   correct?

13   **A.**   Yes.

14   **Q.**   You were in the room when he was voted to be admitted,

15   correct?

16   **A.**   Yes.

17   **Q.**   Is this information that we're looking at now important

18   to you in evaluating the personal qualities of this

19   individual?

20   **A.**   Yeah.  Certainly I think for me and I think anyone who

21   would read it.

22   **Q.**   Turn, if you would, to page 26.

23   **A.**   Yes.

24   **Q.**   Is this the teacher evaluation?

25   **A.**   It is.

1    **Q.**  Now, since you've been doing most of the talking for

2    three days, I'll read this paragraph.  Do you see the second

3    paragraph that begins "As an immigrant?

4    **A.**  I do.

5    **Q.**  "As an immigrant, Thang has had to overcome some major

6    obstacles.  First, his father is still in Vietnam so Thang

7    has had to deal with the challenge of distance and separation

8    from him.  Second, Thang had had to deal with languages.  Due

9    to experiences when he was younger, Thang has had to overcome

10   a fear of public speaking.  As a child he was made fun of due

11   to his accent.  Once he entered high school, Thang challenged

12   himself to overcome this fear, and he has been successful in

13   this struggle.  Thang has developed strong voice and he

14   participates consistently with thoughtful comments and

15   questions."

16          Have I read that correctly?

17   **A.**  You have.

18   **Q.**  Was that information important to you when you were

19   evaluating the personal qualities of this individual?

20   **A.**  Absolutely.  How could your heart not go out for this

21   person?

22   **Q.**  Turn, if, would, to page 29.

23   **A.**  Yes.

24   **Q.**  What is at page 29?

25   **A.**  This is the alumnae/alumni interview.

1    **Q.**  And without going into the details, does the interviewer

2    note some of the same challenges and some of the same

3    successes?

4    **A.**  Yes.

5    **Q.**  And then let me ask you to look at another portion of

6    what the interviewer said.  There is a section called

7    "Supporting Comments on Personal Qualities Ratings."

8         Do you see that on page 30?

9    **A.**  I do.

10   **Q.**  And about halfway down there's a sentence that begins

11   "What was most striking."  Do you see that?

12   **A.**  Begins where they met?

13   **Q.**  No.  If you go down seven lines.

14   **A.**  Okay.

15   **Q.**  In the middle you'll see a sentence that begins "What

16   was."

17   **A.**  Yes.

18   **Q.**  All right.  Would you read that sentence for us.

19   **A.**  "What was most striking about Thang was his fun, casual

20   nature but impressive understated maturity."

21   **Q.**  Now, go back to the first page and let's look at the

22   ratings that the first reader assigned to this applicant.  Do

23   you have the first page before you?

24   **A.**  I do.

25   **Q.**  What was the preliminary overall rating assigned by the

1  first reader?

2  **A.**  It was a 2-.

3  **Q.**  What was of the initial academic rating?

4  **A.**  3+.

5  **Q.**  What was the initial extracurricular rating?

6  **A.**  2-.

7  **Q.**  What was the initial athletic rating?

8  **A.**  4.

9  **Q.**  And what was the initial personal rating?

10  **A.**  2-.

11  **Q.**  Now, the first reader also made some notes, correct?

12  **A.**  Yes.

13  **Q.**  And if you turn to the notes, do you see the notes from

14  the first reader?  Could you read to us the first two

15  sentences.

16  **A.**  It says, "Essay, immigrant Vietnamese identity" --

17  **Q.**  I'm sorry.  Wrong one.  The readers comments.

18  **A.**  Oh, yes.

19        Thang is an incredibly hardworking student and very

20  committed to pushing himself academically and personally.  He

21  has done a good deal to push his own boundaries and explore

22  new experiences.  Support expresses admiration for his

23  intellect, work ethic, and leadership on campus.  A very

24  involved first-generation student from a modest background,

25  one to compare with HFAI info --

1          Which is that's the Harvard financial aid

2    initiative, as we call it, to get the precise ranking.  In

3    other words, to get the information that might clarify that

4    he might be $65,000 and under family income so that the

5    family wouldn't have to pay anything, he wouldn't have any

6    loans to pay.  It would be obviously a full scholarship.

7    **Q.**  Did Mr. Diep's Asian and Vietnamese heritage factor --

8    strike that.

9          Did Mr. Diep's Vietnamese and Asian heritage

10   standing alone factor into any of the four profile ratings?

11   **A.**  No.  Not alone, no.

12   **Q.**  Did his story that resulted from his Asian and Vietnamese

13   heritage factor into the ratings?

14   **A.**  Yeah.  I think certainly into the overall rating.  To me

15   just reading it now, it's a very compelling story.

16   **Q.**  Did his application demonstrate to you that he would

17   contribute to the Harvard community?

18   **A.**  Very much so.

19   **Q.**  You told me that the Asian-American pool or the

20   Asian-American category actually has a lot of subgroups.

21          Are there groups within the Asian-American

22   community that actually receive tips in the admissions

23   process?

24   **A.**  I certainly think there are individuals.  For example,

25   Hmong applicants, there's actually quite a few from

1   Minnesota, for example.  A lot of the more recent immigrants

2   from Southeast Asia have come out of extremely impoverished

3   rural backgrounds, just as an example.

4          There's so much complexity and so much going on

5   that every application is a story in and of itself because

6   it's a person from what is always a complex country, and then

7   coming from a particular part of that country.

8   **Q.**  You told us Mr. Diep was Asian-Vietnamese, he was from a

9   modest socioeconomic background, and he was first generation,

10  correct?

11  **A.**  That's correct.

12  **Q.**  Did any one of those factors guarantee him admission to

13  the Harvard class?

14  **A.**  No, not at all.

15  **Q.**  What was it that led him to be admitted to the Harvard

16  class?

17  **A.**  It really was the combination of things.  And I think one

18  of our Asian-American graduates is a woman named Angela

19  Duckworth, and she's done quite a bit of research.  She's a

20  person at Penn who -- she's known as the grit lady, I guess.

21  She talks a lot about grit and hard work and how essentially

22  something I think a lot of us believe that about 99 percent

23  of success in life comes through hard work.

24          And this is a person who has truly in every way, if

25  you go all the way through this application, has pushed the

1    boundaries to develop and really consolidate and coordinate

2    all the different opportunities that he's had to put together

3    I think an incredible application.

4    Q.  I don't think you know, but to keep the family happy, I

5    should tell you that Angela Duckworth is my first cousin.  I

6    don't think you knew that.

7    A.  I did not.

8    Q.  If I didn't say something, she'd never forgive me.

9         Let's go back to the overall Harvard admissions

10   process.  I think you described it as a whole-person process?

11   A.  Yes.

12   Q.  Has that process been in place since you joined the

13   office in 1972?

14   A.  It has, yes.

15   Q.  Turn, if you would, to Tab 8 in your notebook.

16   A.  Yes.

17   Q.  What do you find at Tab 8?

18   A.  This is the *Bakke* opinion.

19   Q.  Actually, Tab 8 is it the opinion or is it --

20   A.  I'm sorry.  Is it the friend of the Court brief?

21   Q.  Yes.

22   A.  Yes.

23   Q.  Have you seen it before?

24   A.  Yes.  Not for a while.

25   Q.  Turn, if you would, to page 47.

1    **A.** All right.  I have it.

2    **Q.** At page 47, do you see something called "Appendix" and

3    the title is "Harvard College Admissions Program"?

4    **A.** I see it.

5            MR. LEE:  Your Honor, we would offer DX55.

6            MR. HUGHES:  No objection, Your Honor.

7            THE COURT:  Admitted.

8            (Defendant Exhibit No. DX55 admitted.)

9    BY MR. LEE:

10   **Q.** I want to focus you on the appendix.  Do you see that?

11   **A.** I do.

12   **Q.** What does the appendix describe in general?

13   **A.** It really talks about how our admission process had

14   worked for at least 30 years or so.

15   **Q.** Dean Fitzsimmons, were you one of the people who helped

16   put the information together and draft this appendix?

17   **A.** I was.  I had been in the office about five or six years.

18   It was a team effort, obviously, but lots of us contributed

19   to the information that was sent in.

20   **Q.** And in fact, was this appendix attached to the *Bakke*

21   opinion itself?

22   **A.** Yes.

23   **Q.** Let's look a little bit about what the appendix to the

24   Supreme Court opinions said.  Turn, if you would, to the

25   middle of the first paragraph of the appendix.

1    **A.**   Uh-huh.

2    **Q.**   Do you see the sentence that begins "The belief"?

3    **A.**   Let's see.  The belief, yes.

4    **Q.**   Could you read that sentence for us, please.

5    **A.**   Yes.  "The belief has been that if scholarly excellence

6    were the sole or even predominant criterion, Harvard College

7    would lose a great deal of its vitality and intellectual

8    excellence and that the quality of the educational experience

9    offered to all students would suffer."

10   **Q.**   Was that true in 1977?

11   **A.**   Absolutely.

12   **Q.**   Is it still true today?

13   **A.**   It is.  Not just at Harvard but lots of places.

14   **Q.**   And has it been true consistently for the time that

15   you've been the dean?

16   **A.**   It has.

17   **Q.**   Turn, if you would, to page 48 of this appendix.

18   **A.**   Okay.

19   **Q.**   Do you see the sentence that begins "The belief"?

20   **A.**   I do.

21   **Q.**   Would you read that sentence for us?

22   **A.**   "The belief that diversity adds an essential ingredient

23   to the educational process has long been a tenet of Harvard

24   College admissions."

25   **Q.**   Was that true in 1977?

1    **A.**  Yes.

2    **Q.**  Is it true today?

3    **A.**  It is.

4    **Q.**  And has it been true consistently during your time as

5    dean?

6    **A.**  Yes.

7    **Q.**  Would you read the last sentence on that page?

8    **A.**  The last sentence begins, "The quality of the educational

9    experience of all the students in Harvard College depends in

10   part on these differences in the background and outlook that

11   students bring with them."

12   **Q.**  Was that true then?

13   **A.**  Yes.

14   **Q.**  Is it still true today?

15   **A.**  Yes.

16   **Q.**  And has it been true consistently?

17   **A.**  Yes.

18   **Q.**  How was race used in the Harvard admissions process at

19   the time that this appendix was submitted to the Supreme

20   Court?

21   **A.**  Very much the way we've described, as one factor among

22   many.

23   **Q.**  Did you tell the Supreme Court that in the appendix?

24   **A.**  We did.

25   **Q.**  Has the basic manner in which race is considered in the

1  Harvard admissions process changed?

2  **A.**  It has not.

3          MR. LEE:  Your Honor, I'm about to move to another

4  topic.  I can either go or break, whatever is best for you.

5          THE COURT:  As I say, I'm hoping to break for lunch

6  at about quarter of one.  I'm happy to take a morning break

7  any time that's a good stopping place for you.

8          MR. LEE:  This would be a good place, and then I

9  can finish up with the dean.

10         THE COURT:  15 minutes, does that work for

11  everyone?  Mr. Hughes, 15 minutes?

12         MR. HUGHES:  15 minutes is great, Your Honor.

13  Thank you.

14         THE COURT:  Five past, then.

15         MR. LEE:  Thank you, Your Honor.

16         (Court recessed at 10:48 a.m.)

17         THE COURT:  When you're ready.

18         MR. LEE:  Thank you, Your Honor.

19  BY MR. LEE:

20  **Q.**  Dean Fitzsimmons, I'd like to move to a different topic,

21  and that is recruiting.  Okay?

22  **A.**  Yes.

23  **Q.**  You discussed some of this with Mr. Hughes, so I'm just

24  going to try to fill in some spots.  Okay?

25  **A.**  Sure.

 1   **Q.**  You testified earlier that Harvard has many more

 2   applicants than it can admit, correct?

 3   **A.**  That's correct.

 4   **Q.**  If that's true, why do you so actively recruit?

 5   **A.**  Because the reality is most of the best students in the

 6   United States hardly have Harvard on their list.  Most of the

 7   very good students in the United States, in fact, 80 percent

 8   or so, will end up at a public college or university.

 9            In fact, about 80 percent of students will end up

10   going to college within about 200 miles of their homes.  If

11   we hope to get some share of the top students in the country,

12   we need to be out there.  We need to be talking with them, to

13   their guidance counselors, and to their families.

14   **Q.**  All right.  Turn if you would to DD 1.20 in Tab 2.  It's

15   demonstrative Number 20.

16   **A.**  Tab 2, okay.  Yes.

17   **Q.**  What is summarized on this page?

18   **A.**  These are some of the ways we recruit.

19   **Q.**  Again, we've touched on some of these so I'm not going to

20   cover them all.  We've talked about the search lists?

21   **A.**  We have.

22   **Q.**  Can you remind us what joint travel is?

23   **A.**  Joint travel is the program where we go to 120 locations

24   every year in the U.S. with Georgetown, Penn, Duke, and

25   Stanford.

1          We do big evening meetings.  Sometimes there's 800

2    or 1,000 people, parents, students, and family members, and

3    so on.

4          Then in the morning we do a counselor breakfast.

5    You can have as many as 100 counselors at the breakfast, and

6    essentially presenting our institutions at least as a set of

7    possibilities.

8          It's a very important part of what we do.  And we

9    do these presentations and the large presentations in a

10   school auditorium, whatever.

11         Afterwards we talk with individual families after

12   those presentations.  And one of the things that -- it is

13   really important, I think, to make contact directly with

14   people on this because -- especially in terms of the

15   financial aid access ability.

16         I remember being in Texas a number of years ago,

17   actually as we were trying to come up with our first

18   iteration for our new financial aid program.  And a person --

19   it was in Austin, actually, in Texas, sort of said, gee,

20   Mr. Fitzsimmons, Harvard sounds great, and so on.  So do

21   these other colleges tonight.  Why should I send my daughter

22   up to the cold north with a bunch of Yankees -- and he was

23   kidding, I think; a bunch of communists -- when I could send

24   my daughter right here to UT Austin in the honors program

25   with music on Sixth Street and Hill Country to the west --

1    and here was the kicker -- for one-third of the cost?

2            So that was the time that we knew we really needed

3    that face-to-face joint travel, that we needed to make a

4    change.

5            So we ended up with the new financial aid program,

6    which means about for really a huge proportion of the United

7    States it's about the same or less expensive for close to

8    90 percent of American families to have their sons or

9    daughters to come to Harvard, even versus the public

10   university in state.  So the joint travel is really important

11   for us to get out there.

12   **Q.**   Now, why do you meet with the guidance counselors?

13   **A.**   Guidance counselors are really the ones who oftentimes

14   will encourage people to apply or not to apply to places,

15   especially out of state.

16   **Q.**   Now, there are a number of others listed here.  I just

17   want to ask you a couple of questions about each of them.

18            What is alumni outreach?

19   **A.**   This is where we ask our 10,000 alumnae/alumni not just

20   to interview but to go to college nights, visit high schools,

21   have events for local students to try to encourage them not

22   just to apply but then after admitted to come to Harvard.

23   **Q.**   Now, there is something called the undergraduate minority

24   recruitment program, UMRP.  It was mentioned earlier this

25   morning before you took the stand.

1    What is the undergraduate minority recruitment

2  program?

3  **A.**  The UMRP is our oldest recruitment program.  It was

4  started in the early '70s, really just after I came onto the

5  staff.  There are organizations for each -- components for

6  each of the minority groups.  So there's an Asian-American

7  organization, there's one for African-Americans, for Latin X,

8  and for Native Americans.

9  **Q.**  I think you may have mentioned this.  Is there a

10  recruitment program for Asian-Americans?

11  **A.**  Yes.

12  **Q.**  Her Honor asked you a question yesterday about the search

13  list that you purchased for Asian-Americans.  Is that used in

14  the portion of the UMRP that relates to Asian-Americans?

15  **A.**  Yes.  So not only will these students hear from us

16  perhaps 40 or 50 times electronically and otherwise, but the

17  students themselves will -- in the UMRP will use those lists

18  as a way to sort of go after them electronically, sometimes

19  telephone, all the ways to sort of connect them sort of

20  person-to-person, student-to-student.

21  **Q.**  Are the students in UMRP who are helping to recruit

22  Asian-American applicants, do they include Asian-American

23  students?

24  **A.**  Yes.

25  **Q.**  Now, I want to ask you about the Harvard financial aid

 1    initiative which you've already mentioned.

 2            Dean Fitzsimmons, do you know how much of the

 3    incoming class at Harvard approximately receives financial

 4    aid?

 5    **A.**   About 55 percent right now.

 6    **Q.**   How much of the incoming class has no parental

 7    contribution to tuition --

 8    **A.**   About 20 percent.

 9    **Q.**   You need to let me finish.  She'll get mad at one of us.

10    **A.**   Sorry about that.

11    **Q.**   So the question is how much of the incoming class has no

12    parental contribution to tuition, room, or board?

13    **A.**   That's about 20 percent.

14            That's the group I mentioned, typically $65,000 and

15    under.  All of our financial aid students, including this

16    group, do not have to take out loans.  All they have to do is

17    work 10 or 12 hours a week.

18            And the other thing we do for that group under

19    65,000 is we give them for the first year what we call a

20    start-up grant.  So they're given a thousand dollars in

21    August, another thousand dollars in the end of January.  And

22    the idea there is they can use that to really purchase some

23    of the things that, frankly, most of the rest of their

24    classmates have been able to purchase through their families.

25    It's really in a sense to level the playing field right away.

**JA1022**

1    **Q.**  For the portion of the class that is receiving some

2    financial aid, what is the average cost of attending Harvard?

3    **A.**  $12,000.  And so that's for the 55 percent of the

4    students who are on undergraduate financial aid.  Remember

5    also they do not have to take out loans.  Pretty much when

6    you think about it, we call it the 0 to 10 percent plan.  So

7    from say, for example, a $150,000-a-year family income, you

8    pay only $15,000 to send your son or daughter to Harvard.

9    **Q.**  Has the Harvard financial aid program, as you've outlined

10   it, helped Harvard recruit a more diverse and different class

11   of students?

12   **A.**  Very much so.  It's been 15 years and it's been

13   transformative.

14   **Q.**  The last one I want to ask you about is the

15   first-generation program.  Do you have that in front of you?

16   **A.**  I do.

17   **Q.**  What is the first-generation program?

18   **A.**  This is a program designed to help recruit those who

19   neither of their parents graduated from a four-year college

20   or university.

21   **Q.**  For the incoming class at Harvard, how many students are

22   first generation?

23   **A.**  This year about 17 percent of the admits, 16 percent of

24   the matrics.

25   **Q.**  I want to go to a slightly different but related topic.

1    You were asked by Mr. Hughes yesterday about the dean's

2    interest list.

3    **A.**  Yes.

4    **Q.**  I think you mentioned, too, that the list includes people

5    that you meet on your travel, correct?

6    **A.**  That would be true.

7    **Q.**  Who else is included on the dean's interest list?

8    **A.**  For example, if I hear about somebody who -- it may be

9    from any kind of a source, someone who is supposed to be a

10   really good applicant, I'll keep track of that.

11          I'll also keep track of if I hear about people who

12   with have performed unusual service for Harvard, whether it's

13   schools and scholarship committee service or Harvard Club --

14   schools and scholarship are the ones who help us recruit and

15   interview and so on -- Harvard Club activities.  But also

16   those who have helped raise money or give money to Harvard.

17   **Q.**  So let me ask you a few questions about the list.  In any

18   given year, how many names are on the list?

19   **A.**  I'm not exactly sure, but I'd say a couple of hundred.

20   **Q.**  Does everybody on the list get in?

21   **A.**  Hardly.

22   **Q.**  Does everybody on the list go through the same process

23   that we've gone through this morning and yesterday afternoon?

24   **A.**  Yes.

25   **Q.**  Now, you were asked some questions yesterday about some

```
 1    exhibits that dealt with the children of donors.  Do you
 2    recall that?
 3    A.   I do.
 4    Q.   For any given cycle, how much of the dean's list is
 5    significant donors to Harvard?
 6    A.   Significant might be 15 or 20 people, something lake
 7    that.
 8    Q.   15 or 20 people in total?
 9    A.   Yeah.  You used the word "significant."  Yes.
10    Q.   Of those 15 to 20 people, do some people get in?
11    A.   Some get in.
12    Q.   Some not?
13    A.   Some not.  And again, one of the things I'll do, not just
14    with them but some of the others who'd been close to Harvard,
15    is I might try to give them some advance warning.  Or if I'm
16    really good and we hear that they might be applying, I
17    might -- if I find out enough about them, try to encourage
18    them not to apply, to be honest.
19    Q.   Do you recall the three exhibits that Mr. Hughes gave you
20    yesterday about applicants that were admitted?
21    A.   Yes.
22    Q.   One was a message from Dean Ellwood?
23    A.   Pardon?
24    Q.   One was a message from Dean Ellwood that mentioned --
25    A.   Yes, yes.
```

1    **Q.**   -- four candidates that he said were highly qualified?

2    **A.**   Yes.

3    **Q.**   Did they go through the same process as other candidates?

4    **A.**   Yes.

5    **Q.**   And just to be clear, for each one of the different

6    cycles we're talking about here, the significant donors might

7    be 15 to 20 people out of 40,000?

8    **A.**   Yes.

9    **Q.**   Has anybody ever suggested to you that considering donors

10   or whether folks have been donors has somehow disadvantaged

11   Asian-Americans?

12   **A.**   No.

13   **Q.**   Now, what is your purpose for keeping the dean's interest

14   list?

15   **A.**   I think like any of us, we're trying to, we hope, get the

16   best people from around the world that we can.  And we also

17   are really thinking about the long-term strength of Harvard,

18   both in terms of its ability to generate, for example,

19   cutting-edge research that might save lives or advance

20   knowledge in a variety of ways.

21        The other is really to make sure that the gates of

22   Harvard are open and remain open and we hope even wider for

23   people from modest economic backgrounds.  A huge part of my

24   life has been devoted to helping and to worry about making

25   sure there's enough financial aid for all the great students

1   who need it.

2   **Q.**  Let me go now to a different topic that Mr. Hughes I

3   think may have mentioned to you.  But if he didn't, I

4   apologize.

5        You're familiar with the concept of one-pagers?

6   **A.**  One?

7   **Q.**  One-pagers.

8   **A.**  Yes.

9   **Q.**  Turn, if you would, to Tab 10 in your notebook.

10  **A.**  Yes.

11  **Q.**  Do you find P163?

12  **A.**  Yes, I believe.  Yes.

13  **Q.**  Do you have that?

14  **A.**  Tab 10.  Yes, I do.

15  **Q.**  P163 is something you discussed with Mr. Hughes, and it

16  has several pages, correct?

17  **A.**  That's correct.

18  **Q.**  I want to be sure that the record is clear on what the

19  one-pager is.  Which page of this multipage exhibit is the

20  one-pager?

21  **A.**  It would be, I guess, in yours it would be 807, 16807.

22  **Q.**  00016807 is the one-pager, correct?

23  **A.**  That's the one-pager.

24  **Q.**  Now, I just want to ask you a couple questions.

25       Do you see the categories of information?  And

1    perhaps we could ask Mr. Lee to blow up as best he can the

2    categories on the left-hand side of the page.

3              Do you see those?

4    **A.**   I do.

5    **Q.**   On the one-pagers, what information are you receiving?

6    **A.**   This gives us a rough idea of what we've done so far in

7    the process.

8    **Q.**   It's broken down by category?

9    **A.**   It is.

10   **Q.**   And does that include gender?

11   **A.**   It does.

12   **Q.**   Geography?

13   **A.**   Yes.

14   **Q.**   Intended major career?

15   **A.**   It does.

16   **Q.**   If we can move a little further down, lineage?

17   **A.**   Yes.

18   **Q.**   Financial aid circumstances?

19   **A.**   Yes.

20   **Q.**   Athletes?

21   **A.**   Yes.

22   **Q.**   Disadvantaged staff fee waived?

23   **A.**   Correct.

24   **Q.**   Citizenship?

25   **A.**   Yes.

**JA1028**

1    **Q.**   Race has three methodologies, correct?

2    **A.**   That's correct.

3    **Q.**   Could you explain to Her Honor why there are three

4    different methodologies listed?

5    **A.**   The first one is really just more historical, and we

6    certainly probably don't need it at this point.  But I think

7    probably some of the older staff members probably find it

8    useful as some sort of comparison.

9            The two that really are more helpful are the new

10   methodology and then the IPEDS.

11   **Q.**   And what is IPEDS?

12   **A.**   This is the federal government Integrated Postsecondary

13   Educational Data System, as I understand it.

14   **Q.**   Now, do you receive the one-pagers?

15   **A.**   Yes.

16   **Q.**   And when do you receive them?

17   **A.**   At various points in the process.

18   **Q.**   What do you do with them?

19   **A.**   It gives me a good sense perhaps of -- the real point of

20   the exercise is to make certain we don't come in over 1,660

21   people because that's all the beds we have.  So it's a good

22   way for me to look at how the class is developing so that we

23   could know what total number we should probably be thinking

24   about this year.

25            There are lots of factors.  We're trying to think

1   about the yield.  We even think about current news events,

2   the current state of the economy, almost anything else you

3   can imagine.  But this information is pretty helpful because

4   it has patterns that pertain from year to year.

5   **Q.**  Would you remind us what's yield?

6   **A.**  Yield would be the percentage of the students who we

7   admit who then decide to come to Harvard.  We admit about

8   2,000 people, and then about 1,660 will show up.

9   **Q.**  And does the yield, in your experience, differ by

10  category for the categories listed on the left-hand side of

11  this one-pager?

12  **A.**  Oh, absolutely.

13  **Q.**  And why is it important for you to have that yield

14  information by category?

15  **A.**  So for example, if you were admitting a lot of engineers

16  this year for whatever set of reasons.  And over the past 10

17  years there has been a huge increase in the number of

18  applications and admits from engineers and computer

19  scientists.  You would know that they're going to yield at a

20  much lower rate than the rest of the students typically.

21  Again, the competition to so many other great places that do

22  engineering and computer science.

23          So that would give you a confidence that you could

24  admit more total people because you know that a whole bunch

25  of those engineers and computer scientists will end up

1    happily ever after at MIT or Caltech or wherever.

2    **Q.**  Now, who gets the one-pagers in addition to you?

3    **A.**  I get it and Marlyn McGrath Lewis, the director of

4    admissions; and Sally Donahue, the director of financial aid.

5    Now Jay Kaufman, who is the new director.

6    **Q.**  Do you from time to time share information from the

7    one-pagers with the full committee?

8    **A.**  I will.

9    **Q.**  Do you share the full one-pager with the committees?

10   **A.**  No.

11   **Q.**  Is there a reason you share information orally but not by

12   giving them the one-pager?

13   **A.**  The reason really just goes back to that memo that you

14   had on here about the people in the last few days just

15   focusing on the actual quality of the cases.  Nothing to do

16   with numbers, nothing to do with dockets.  The whole idea is

17   that you want this to be as far as possible from anything

18   mechanistic or formulaic.

19   **Q.**  Do the yield rates at Harvard differ by race?

20   **A.**  The yield rates, yes.

21   **Q.**  Can you give Her Honor an example or two of how the yield

22   rates differ by race?

23   **A.**  Yes.  Just as an example, Asian-Americans yield at a very

24   high rate, really the highest rate of any of the ethnic

25   groups.

```
 1              Latin X, or might say -- I'm not sure what they use
 2   on this particular one.  I guess they say Hispanic-American.
 3   That again for a whole bunch of different reasons, part of
 4   them geography, those students would tend to yield at a lower
 5   rate.
 6   Q.  Now, of the three different categories of race, new
 7   methodology, old methodology, IPEDS, which one do you
 8   consider the most reliable?
 9   A.  I would consider the new methodology the most reliable.
10   Q.  Because?
11   A.  Well, because it allows the student to -- when the
12   students fill out the common application, they can put down
13   the ethnicities with which they identify.  So it's really
14   from them and how they identify themselves.
15              It seems to us, too, just based on what we've seen
16   people do once they come to Harvard, for example, did they
17   end up being involved in ethnic organizations of various
18   kinds, of which there are many.  Oftentimes it will relate
19   back to what they said on their common app.
20   Q.  Now, does the one-pager include information about the
21   breakdown or the makeup of a past -- the past year's class?
22   A.  Yes.
23   Q.  And why is that information helpful to you in the
24   admissions process?
25   A.  It's really, I guess, just generally -- remember we've
```

1    already started the recruiting year for the next year, and

2    we'll be out on the road shortly doing joint travel.

3             One of the things we sort of say -- well, let's

4    say, for example, we were for whatever set of reasons, and it

5    happens, we're having a really bad year let's say in the

6    Mountain States, for example.  And there are some states --

7    remember we have no quotas of any kind.  Some years there are

8    some states where no one is admitted.

9             So it's good for the staff to have a sense of how

10   well or how badly we're doing as they go back out and to

11   think about whether or not there could be new recruiting

12   approaches.  It's a little bit of a report card to us, in a

13   sense of, maybe what's happened this year.

14            We don't have control over a lot of these things.

15   We know that there are different states, including New

16   England, where there are declines in the number of

17   18-year-olds very steadily.  There have been and there will

18   be going forward.

19   **Q.**  Do you use one-pagers to set a quota on the number of

20   minority applicants?

21   **A.**  No.

22   **Q.**  Do you use them to set a floor on the number of minority

23   applicants?

24   **A.**  No.

25   **Q.**  If a one-pager showed you that, to use your example, the

1    number of admitted engineers was significantly lower than a

2    prior year, would you make an effort to increase the number

3    of engineers admitted in that year?

4    **A.**  No, no.  It has nothing to do with that.  That will just

5    tell us we have a little more room or a little less room to

6    admit anybody the committee wants to do as they compare

7    people from around the world.

8    **Q.**  Would the same be true if you received a report that said

9    the number of African-Americans who were being admitted was

10   significantly lower than the prior year?

11   **A.**  Really the same thing would apply.

12   **Q.**  Do you make any effort to match the demographics of a

13   class for one year to the demographics of a class from

14   another year?

15   **A.**  Not at all.

16   **Q.**  Turn, if you would, to Tab 11 in your notebook.

17          THE COURT:  Can I just ask a question?  Is the

18   three methodologies on race and ethnicity, is the only

19   difference between those three where the information comes

20   from?

21          THE WITNESS:  No.  It's a little bit more

22   complicated.  The old methodology is was rather arcane.  Part

23   of it is the staff would take a look at what the student

24   maybe had said.  But also sometimes students even forget to

25   check it, but they may have, for example, when they took the

**JA1034**

1    ACT and the SAT, they may have indicated an ethnicity there.

2    So there are ethnicities coming in from a variety of

3    different places.

4            That didn't seem to me to be as effective, say, as

5    what the common app does.  Looking just simply at the common

6    app, again you put down exactly what it is.  There are a fair

7    number of students in America who have not just two different

8    ethnicities, they might have three or for, which is often you

9    see more often than you would think.

10           On the other hand with IPEDS it's very different.

11   I'll give you an example.  So if you check they call it

12   Hispanic on IPEDS, then that's it.  You may have checked

13   other boxes or other ethnicities.  They don't get recorded.

14   If you check -- if you're not Hispanic but you check two or

15   more ethnicities, then you will be called two or more.

16           So what that means is, for example, the most

17   extreme example would be Native Americans.  Usually about 80

18   or 90 percent of Native Americans have at least one other

19   ethnicity.  Sometimes they would be Hispanic and Native

20   American.  That would not get counted -- they would not get

21   counted as Native American.  And if they were checked two or

22   more of the others, that would -- they would not.  So

23   essentially under IPEDS, Native Americans almost disappear

24   off the radar scope.

25           And in the real world, we know plenty of people who

1    have checked Native American and other things, which is often

2    the case, and then end up being the head of our Native

3    American recruiting organization or the head of the Native

4    American cultural activities.

5           So the IPEDS would not give you a very good sense

6    at all about what your real diversity was.  So that's why we

7    like the new methodology.

8           THE COURT:  On the new methodology, how do you

9    account for people that leave that section of the common app

10   blank?

11          THE WITNESS:  Blank.

12          THE COURT:  So those people aren't accounted for in

13   that section.

14          THE WITNESS:  That's correct.  They're just blank.

15   It's voluntary.

16   BY MR. LEE:

17   **Q.**  I think during the course of your examination by

18   Mr. Hughes, you mentioned from time to time people who were

19   not self-identified.  Do you remember that?

20   **A.**  That's correct.

21   **Q.**  Are those the people that Her Honor is referring to?

22   **A.**  That's correct.

23   **Q.**  Okay.  Now, turn, if you would, to Tab 11.  Do you have

24   DX97?

25   **A.**  I do.

```
 1    Q.   What is it?
 2    A.   This is a Harvard Gazette article announcing our new
 3    class of current freshmen.
 4    Q.   For the class of 2022?
 5    A.   That's correct.
 6    Q.   Does it report the breakdown of the admitted class?
 7    A.   It does.
 8    Q.   Did admissions provide this information to the Gazette?
 9    A.   Yes.
10         MR. LEE:  Your Honor, we offer DX97.
11         MR. HUGHES:  No objection.
12         THE COURT:  Admitted.
13         (Defendant Exhibit No. DX97 admitted.)
14    BY MR. LEE:
15    Q.   Turn, if you would, to page 3.
16    A.   Okay.  I have it.
17    Q.   What was the percentage of the admitted class for the
18    class of 2022 that was African-American?
19    A.   African-American was 15.5 percent.
20    Q.   What was the percentage that was Asian-American?
21    A.   22.7.
22    Q.   What was the percentage that was Latino?
23    A.   12.2.
24    Q.   Do these numbers fluctuate from year to year?
25    A.   They do.
```

1    **Q.**  And have the numbers of Asian-Americans,

2    African-Americans, and Latinos fluctuated from year to year?

3    **A.**  They have.

4    **Q.**  But during the period of time that you've been the dean,

5    have the numbers and percentages for each of these three

6    categories increased?

7    **A.**  Increased, you say?

8    **Q.**  Yes.

9    **A.**  Generally, yes.  Not every year.

10   **Q.**  Over time, have they increased significantly?

11   **A.**  They have.  When I first started in admissions there were

12   almost no Asian-Americans.  We were only up to about

13   5 percent by the early '80s, and now it's 22.7 percent.

14   **Q.**  Now, let me go to a related but different question.

15        You discussed with Mr. Hughes, I think on the first

16   day of your examination, the importance of diversity and why

17   diversity was one of your goals.

18        Do you remember that?

19   **A.**  I do.

20   **Q.**  Now, you've been in admissions for 46 years, correct?

21   **A.**  Correct.

22   **Q.**  Have you been able to see the benefits of diversity in

23   the diverse classes you've admitted on the Harvard campus?

24   **A.**  It's a profoundly better place.  Just in terms of what

25   the students learn from each other, what the faculty and

1  those of us who work at Harvard learn from the astonishingly

2  diverse classes we have today.

3          Just think of examples, Paula Johnson, one of our

4  great African-American admits from not so long ago, became a

5  great doctor here in Boston, and she's now the president of

6  Wellesley College.  I've known her forever.

7          I think of Lisa Quiroz, who was one of our minority

8  recruiters as an undergraduate.  She died young,

9  unfortunately, last year in her 50's.  But she was the

10  Hispanic Woman of the Year not so long ago.

11          I think of Brenda Wallhood, who was one of our

12  great Native American recruiters, who has gone back and spent

13  her life in the Midwest working on Native American activities

14  and welfare.

15          I guess it's sort of like my daughter, but I was

16  the host family for a woman named Gia Chang, who was one of

17  the first three students admitted after the cultural

18  revolution from China.  She and her family spent -- her

19  father spent ten years out in the countryside at hard labor,

20  she spent three years in the countryside at hard labor, and

21  the rest of her family three to five years.

22          Getting to know these people and learning about who

23  they were and what they had experienced in their lives and

24  then being able to watch what they have done, it's changed my

25  life profoundly for the better.  And they've changed Harvard

1  and their classmates profoundly for the better.

2  **Q.**  Does diversity only benefit minority students?

3  **A.**  It benefits everybody.  I think I'm not a minority

4  student.  It certainly has changed my life.

5  **Q.**  Let me talk about race-neutral alternatives very briefly.

6  There are going to be some other witnesses who talk about it

7  in a little bit more detail.

8         But I want to ask you specifically, very quickly

9  yesterday you had mentioned early action and then the

10  decision to reinstitute early action.

11        Do you remember that?

12  **A.**  I do.

13  **Q.**  Could you explain to Her Honor why you eliminated early

14  action, what you were hoping to achieve, and why you had to

15  say it was an experiment that didn't work?

16  **A.**  Well, what we hoped -- one of the problems we see in

17  America right now is there's so much pressure on students.

18        We, in fact, have a paper on our website called

19  "Time Out Or Burn Out For the Next Generation" in which we

20  try to encourage people to think about, for example, taking

21  gap years before coming to college and to Harvard.

22        And that pressure is on all kinds of students.  I

23  think one of the dilemmas with early admission is it puts

24  pressure, as part of the general pressure of growing up,

25  pressure across the board.  It puts -- I think sometimes

1    people in positions where they begin to make preliminary, I

2    think, decisions about where they want to go to college way

3    before they're ready to do it.  Because oftentimes in the

4    senior year, you learn a lot.

5            We've never had binding early decision because we

6    want people to have the whole year.  But we have also just

7    thought it kind of truncated -- the whole early process could

8    truncate the senior year, could make the whole senior year

9    less meaningful.

10           So we cannot talk to other colleges because of

11   antitrust issues, you know, if we decide to make any changes.

12           So we just jumped out there and did it on our own,

13   hoping that many of our competitors, frankly, would come with

14   us.  Princeton did and the University of Virginia did, but

15   none of our other -- UNC, but none of the others did.  That

16   was the backdrop.

17           The other thing is that we were very concerned that

18   because students from poor and modest economic backgrounds

19   often have way less access to college advising.  There are

20   plenty of high schools out there now where there are no

21   guidance counselors whatsoever.  In the average public high

22   school, it's about 500 to 1.  In some states the ratio is 8

23   or 900 to 1 counselee to counselor.

24           So in that world, we felt that people from the

25   other side of the tracks were probably less likely to be able

1    to get into early pools.  So it's a bunch of different

2    reasons that really kind of cross all the social classes.

3    **Q.**  And at the end when no -- when only Princeton and UVA

4    followed, did you make a decision as to what Harvard needed

5    to do?

6    **A.**  Yeah.  We started to worry because we did that.  Of

7    course one of the things we were concerned about is students

8    who come from less-resourced backgrounds.  Ironically, they

9    were frankly being recruited out of our -- into early

10   decision pools and early action pools at other places.

11          So we could begin to see a real problem, and we

12   were probably really going to start losing great kids across

13   the board if we didn't switch back.  So reluctantly we did

14   switch back.

15   **Q.**  And to be specific to this case, did you see that

16   minority students, highly qualified minority students, were

17   being recruited into the early action pools of other schools?

18   **A.**  Absolutely.  They're among the most avidly recruited,

19   once -- because we were on the sidelines on early.

20   **Q.**  Let's go to a different topic.  Turn, if you would, to

21   Tab 12 which is P555, the OCR statement of findings.

22   **A.**  Yes.

23   **Q.**  Mr. Hughes spent some time with you on this and read

24   certain portions to you.  Do you recall that?

25   **A.**  Yes.

1    **Q.** So I'd like to just sort of fill in -- this is in

2    evidence, but I want to fill in some of the blanks left by

3    the portions read to you previously.

4         So let's look at the first page and the first

5    paragraph.

6    **A.** Mm-hmm.

7    **Q.** First let's talk about what the concern was that

8    intimated the OCR investigation.

9         Do you see four lines down -- well, we start three

10   lines down.

11        "As articulated in numerous media reports and

12   journal articles, the basic thrust of the concern has been

13   that despite superior academic credentials in terms of high

14   school performance and standardized test scores,

15   Asian-Americans have been admitted to selective schools at a

16   rate lower than white applicants and other minority group

17   applicants."

18        Have I read that correctly?

19   **A.** You have.

20   **Q.** And did you understand that that was the articulated

21   concern that led to the investigation?

22   **A.** Yes, absolutely.

23   **Q.** Turn to page 46, and let's look at the conclusion after

24   the investigation that you described to Mr. Hughes.

25   **A.** I see it.

1   **Q.**  All right.  So at the end of the entire report, at the

2   end of the portions that Mr. Hughes read to you and some

3   other texts, would you read to us the conclusion of this

4   two-and-a-half-year investigation?

5   **A.**  Right at the end.  Okay.

6          "As a result of this compliance review, it is OCR's

7   overall conclusion that Harvard did not discriminate against

8   Asian-American applicants to its undergraduate program in

9   violation of Title VI of the Civil Rights Act of 1964 or its

10  implementing Regulation 34 C.F.R. Part 100."

11  **Q.**  Is the admissions process that OCR reviewed basically the

12  same admissions process as Harvard uses today?

13  **A.**  It is.

14  **Q.**  Let's talk about some of the similarities and some of the

15  other portions of the report.  Would you turn to page 0006 in

16  P555.

17  **A.**  Which tab are we here?

18  **Q.**  I'm sorry.  Same tab.  My apologies.  Same tab.  So we're

19  still at P555.

20  **A.**  Yep.

21  **Q.**  And page .0006.  Do you have that before you?

22          THE COURT:  They're not numbered like that.

23          THE WITNESS:  I think you mean page 6.

24  BY MR. LEE:

25  **Q.**  I'm sorry.  Page 6 at the top.  My fault.

1    **A.**  I got it.

2    **Q.**  I'm going to take you to the second full paragraph.  Do

3    you see the sentence that reads, "Applicants are?

4    **A.**  Applicants are.  Okay, yes.

5    **Q.**  Would you read that sentence for us, please.

6    **A.**  "Applicants are chosen on the strength of their

7    credentials, but once they are deemed academically

8    admissible, other strong qualities are added that would

9    potentially contribute to the educational experience at

10   Harvard for all students."

11   **Q.**  Was that true in 1990?

12   **A.**  Yes.

13   **Q.**  Is it true today?

14   **A.**  It is.

15   **Q.**  Was the docket system in place at the time OCR conducted

16   its investigation?

17   **A.**  Yes, it was.

18   **Q.**  Was the subcommittee process in place at that time?

19   **A.**  Yes.

20   **Q.**  Was the full committee process in place at that time?

21   **A.**  Yes.

22   **Q.**  Were the preliminary and profile ratings in place at that

23   time?

24   **A.**  Yes.

25   **Q.**  Turn, if you would, to page 6 and look at the final

1    paragraph.

2    **A.**    Page 6.  Okay, yes.  Do you want me to read it?

3    **Q.**    Yes.  I'd like you to read the sentence that begins -- do

4    you see the sentence that reads, "There are four major

5    criteria on which all candidates are recessed:  academic

6    achievement, extracurricular activities, athletics, and

7    personal qualities"?

8    **A.**    Yes.

9    **Q.**    "Criteria are described as standards against which all

10   applicants are measured."

11            Have I read that correctly?

12   **A.**    Yes, you have.

13   **Q.**    Would you read us the next sentence from OCR's findings?

14   **A.**    "In evaluating a candidate's accomplishments against the

15   criteria, Harvard judgments are primarily based on the set of

16   information listed below.  Some items listed are more or less

17   objective while others remain subjective in that they must be

18   measured through individual judgment or discretion.

19            "Examples of objective information are standardized

20   test scores, SATs, grade point average, GPA, and academic

21   distinctions such as National Merit Scholarship.  Subjective

22   items may include such information as teacher or counselor

23   recommendations, essays written by the applicant, and the

24   alumni interview."

25   **Q.**    Was that true in 1990?

1    **A.**  Yes.

2    **Q.**  Is it true today?

3    **A.**  Yes, it is.

4    **Q.**  Is it true with the two application files we reviewed

5    with Her Honor this morning?

6    **A.**  Yes.

7    **Q.**  Turn, if you would, to page 21.  I want to look at some

8    of the portions that Mr. Hughes didn't cover with you that

9    concern the personal rating.

10   **A.**  Okay.

11   **Q.**  Do you recall Mr. Hughes referred you to some statements

12   and asked you whether you condone stereotyping?

13   **A.**  That's correct.  Yeah, I remember.

14   **Q.**  And you said?

15   **A.**  No.

16   **Q.**  Let's see what it says about the personal ratings.  Are

17   you on page 21?

18   **A.**  I am.

19   **Q.**  Do you see the sentence that refers to the personal

20   ratings in OCR's finding that begins "With respect"?

21   **A.**  Yes.

22   **Q.**  Would you read that paragraph for us, please.

23   **A.**  "With respect to the personal qualities ratings, most

24   applicants in our sample, both Asian-American and white, were

25   given between 3- and 2+.  Overall in the classes of 1991 and

1  1992, from which our file samples were drawn, over 98 percent

2  of the applicants received some form of a 2 or 3.  However,

3  between the two groups, 20 percent of Asian-American

4  applicants and 25.5 percent of white applicants received a 2

5  rating in the personal category."

6  **Q.**  So to be clear, the second sentence is the sentence that

7  Mr. Hughes addressed with you, correct?

8  **A.**  Yes.

9  **Q.**  It's preceded by the first sentence that describes the

10  specific findings concerning the classes of 1991 and 1992,

11  correct?

12  **A.**  That's correct.

13  **Q.**  Now, I'm not going to go back to what I asked you about

14  yesterday when we first looked at OCR briefly.

15          Do you recall what OCR found as to whether these

16  few comments by interviewers before 1988, what effect they

17  had on the personal ratings?

18  **A.**  They said they did not have effects on the personal

19  rating.

20  **Q.**  So let's look at the next paragraph.  Do you have that

21  before you?

22  **A.**  I do.

23  **Q.**  Now, do you see the portion that reads, "According to the

24  admissions staff who were interviewed, the personal rating is

25  derived from a variety of elements in the applicant's file.

1    It may be based on the essay written by the applicant, the

2    comments of staff or alumni interviewers, teacher

3    recommendations, or any other information in the file which

4    indicates strength of character."

5         Do you see that?

6    **A.**  I do.

7    **Q.**  Was that true in 1990?

8    **A.**  Yes.

9    **Q.**  It is true today?

10   **A.**  It is.

11   **Q.**  Is it true in the two applications we looked at this

12   morning?

13   **A.**  Yes.

14   **Q.**  Look at the bottom paragraph.  Do you see the sentence

15   that begins "Of the 300 files examined?

16   **A.**  I do.

17   **Q.**  Would you read that sentence and the two sentences that

18   follow for the Court.

19   **A.**  Yes.  "Of the 300 files examined in this phase of the

20   file review, OCR found only one applicant who received a

21   personal rating poorer than 3- on the summary sheet.  The

22   applicant was an Asian-American who was admitted and who

23   ultimately came to Harvard.  The fact that the applicant was

24   admitted despite the low personal rating supported Harvard's

25   position that the readers and committees view the entire

1    application as a whole."

2    **Q.**  Is it still true that the whole person gets reviewed and

3    the decision is made no matter what the personal rating

4    happens to be?

5    **A.**  Yes.

6    **Q.**  I want to ask you a couple of questions about a paragraph

7    that Mr. Hughes drew your attention to.  It's at the bottom

8    of page 15.  Could you get to that page.

9    **A.**  Okay.  I have it.

10   **Q.**  Do you have it before you?

11   **A.**  I do.

12   **Q.**  And he asked you some questions about the sentence that

13   begins, "Other readers indicated that ethnicity was a factor

14   considered throughout the admissions process" -- "the entire

15   admissions process.  They stated that it could be reflected

16   in the four reader rating areas as well as in the POR during

17   the subcommittee and committee meeting discussions."

18            Have I read that correctly?

19   **A.**  Yes.

20   **Q.**  Now, my notes indicate that Mr. Hughes asked you some

21   questions about whether this applied to the personal rating.

22            Do you recall those questions from him?

23   **A.**  I do.

24   **Q.**  Is this portion of the OCR report limited to the personal

25   rating?

1  **A.**  No.  I'm having trouble following.  Where did you read

2  from the beginning?  Other readers?

3  **Q.**  Bottom of the page 15 where it says "Other readers

4  indicated."  It's on the screen now.

5  **A.**  I see.  And then went on to the next page.  Sorry.

6  **Q.**  Right.  Is this portion of the report we're referring to

7  just the personal rating or to all four ratings?

8  **A.**  Let me just read it again.  So what's your question

9  again?

10  **Q.**  I want to draw your attention to the portion that says

11  "They stated that it could be reflected in the four reader

12  rating areas.

13  **A.**  The personal rating, yes.

14  **Q.**  Are the four reader rating areas the profile ratings?

15  **A.**  Yes.  But ethnicity is only going to be considered in the

16  overall.

17  **Q.**  Great.

18  **A.**  If I get the thrust of the question.

19  **Q.**  Turn, if you would, to page 45 of this exhibit.

20  **A.**  45.  Okay.

21  **Q.**  There's a portion that Mr. Hughes covered with you that

22  concerns -- it starts, "Utilizing ten years of quantitative

23  data."  Do you see that?

24  **A.**  No.  But I'll get there.

25  **Q.**  Let us highlight for you.  It's in the last paragraph.

1    I'm not going to go over it in detail because you and

2    Mr. Hughes spent some time on it.

3    **A.**  Right at the bottom.

4    **Q.**  This is a person that refers to legacies and athletes,

5    correct?

6    **A.**  Yes.

7    **Q.**  Now, are you familiar with the acronym NLNA?

8    **A.**  I am.

9    **Q.**  What does NLNA mean?

10   **A.**  Non-legacy non-athlete.

11   **Q.**  After of the OCR investigation was concluded, did you

12   begin to track statistics on the NLNA pool?

13   **A.**  Yes.

14   **Q.**  Have you looked at those statistics periodically since

15   the OCR statement of findings in 1990?

16   **A.**  Yes.

17   **Q.**  Turn if you would, to Tab 13.

18   **A.**  I have it.

19   **Q.**  Do you find DX42?

20   **A.**  I do.

21   **Q.**  What is it?

22   **A.**  Let's see.  Just a little overall sense.  Across a number

23   of years of demographics of various kinds.  This particular

24   one is looking at ethnicity.

25          MR. LEE:  Your Honor, we offer DX42.

```
 1              MR. HUGHES:  No objection, Your Honor.

 2              THE COURT:  Admitted.

 3              (Defendant Exhibit No. DX42 admitted.)

 4    BY MR. LEE:

 5    Q.  Turn to pages 4 to 9.

 6    A.  4 to 9, okay.

 7    Q.  Tell me when you're there.

 8    A.  I have page 4.

 9    Q.  If you just flip through pages 4 to 9 --

10              THE COURT:  Where are you getting the 4 from?

11              MR. LEE:  I'm sorry, Your Honor, .0004 at the

12    bottom center.

13              THE COURT:  All right.

14    A.  Yes.  I have it.

15    BY MR. LEE:

16    Q.  Do these pages show the applicants it admits overall and

17    also by NLNA?

18    A.  That's correct.

19    Q.  Let's look at page 4, and let's look at the class of

20    2001, if we could.

21    A.  I'm sorry.

22    Q.  2001.  Do you see that?

23    A.  Class of 2001.  On page 4.

24    Q.  Yeah.  It's on the screen, if that's easier.

25              THE COURT:  Right in the middle.
```

1          THE WITNESS:  Here it is.  Okay.  Yes.

2    BY MR. LEE:

3    **Q.**  And I'll ask Mr. Lee to highlight the NLNA admit rate for

4    Asian-American applicants to the class of 2001.  Do you see

5    that?

6    **A.**  I do.

7    **Q.**  What was that rate?

8    **A.**  That was 10.4 percent.

9    **Q.**  What was the admit rate for NLNA white applicants for

10   2001?

11   **A.**  10.3 percent.

12   **Q.**  Let's turn to page 6.  To make it easier, we'll put it up

13   on the screen.

14   **A.**  That would be great.

15   **Q.**  And let's look at the class of 2008.

16   **A.**  Okay.

17   **Q.**  What was the NLNA admit rate for Asian-Americans that

18   year?

19   **A.**  8.9 percent.

20   **Q.**  And what was the white NLNA admit rate for that year?

21   **A.**  8.8.

22   **Q.**  Turn, if you would, to page 7.  Again we'll put it on the

23   screen.  And I want to look at the class of 2011.

24   **A.**  Okay.

25   **Q.**  What was the NLNA admit late for Asian-Americans in 2011?

1    **A.**  8.1 percent.

2    **Q.**  For whites?

3    **A.**  Whites, 7 and a half.

4    **Q.**  Let's turn to the next page and look at the class of

5    2012.  Do you have it before you?

6    **A.**  I do.

7    **Q.**  What was the NLNA admit rate for Asian-Americans?

8    **A.**  7.2 percent.

9    **Q.**  And for whites?

10   **A.**  It looks like 7.1 percent.

11   **Q.**  Turn, if you would, to the next page and let's look at

12   the class of 2016.

13           What was the Asian-American NLNA admit rate for

14   that year?

15   **A.**  5.3.

16   **Q.**  And for whites?

17   **A.**  5.1.

18   **Q.**  All right.  Now, let's stay on that page and go to the

19   class of 2017.  What was the NLNA admit rate for

20   Asian-Americans that year?

21   **A.**  4.9 percent.

22   **Q.**  And for whites?

23   **A.**  4.5 percent.

24   **Q.**  Now, for each of the years we've looked at, the

25   Asian-American NLNA admit rate was higher than the white NLNA

1    admit rate, correct?

2    **A.**   That's correct.

3    **Q.**   Now, it's not exactly the same every single year,

4    correct?

5    **A.**   That's correct.

6    **Q.**   Have you received reports like this after you received

7    the OCR report in the 1990s?

8    **A.**   Yes.

9    **Q.**   Do you continue to receive them today?

10   **A.**   I do.

11   **Q.**   And do you review them?

12   **A.**   I do.

13   **Q.**   Now, has OCR looked into Harvard's admission process

14   after the 1990 compliance review?

15   **A.**   They did.

16   **Q.**   When?

17   **A.**   2001, again in 2012.

18   **Q.**   Let's take 2001.  What led to the 2001 inquiry?

19   **A.**   There was an individual complaint on the part of an

20   Asian-American applicant.

21   **Q.**   Did OCR investigate the claim?

22   **A.**   They did.

23   **Q.**   Was the claim one of discrimination?

24   **A.**   Yes.

25   **Q.**   Turn, if you would, to Tab 14.

```
 1    A.  I'm sorry, Tab --

 2    Q.  -- 14.

 3    A.  We're getting there.

 4    Q.  Tab 14.

 5    A.  Tab 14, yes.

 6    Q.  Do you find DX44?

 7    A.  I do, yep.

 8    Q.  What is it?

 9    A.  It's a letter to President Summers from the Office For

10    Civil Rights.

11    Q.  And it's dated what?

12    A.  The date is we received December 14, 2001.

13              MR. LEE:  Your Honor, we offer DX44.

14              MR. HUGHES:  No objection, Your Honor.

15              THE COURT:  Admitted.

16              (Defendant Exhibit No. DX44 admitted.)

17    BY MR. LEE:

18    Q.  This is approximately ten years after the OCR concluded

19    its review, correct?

20    A.  That's correct.

21    Q.  OCR investigated, correct?

22    A.  They did.

23    Q.  And what was the conclusion?

24    A.  That we did not discriminate.

25    Q.  Now, let me talk a little bit more about the personal
```

Case: 19-2005    Document: 00117632237    Page: 349    Date Filed: 07/30/2020    Entry ID: 6356615
Case 1:14-cv-14176-ADB    Document 635    Filed 04/18/19    Page 107 of 246

107

1    rating.

2           Are you aware that SFFA claims that the personal

3    rating is being used to discriminate against Asian-Americans?

4    **A.**   I am aware.

5    **Q.**   Is that right?

6    **A.**   No.

7    **Q.**   When we looked at these summary sheets and you told me

8    about the first reader?

9    **A.**   Yes.

10   **Q.**   When someone is filling out the boxes for the four

11   profile ratings, is it the same person filling out the boxes?

12   **A.**   Yes.

13   **Q.**   And if it's the second reader, is it the same person

14   filling out the boxes?

15   **A.**   That's correct.

16   **Q.**   Dean Fitzsimmons, how many applications have you reviewed

17   in your time at the admissions office?

18   **A.**   I'm not sure I'd want to count them up, but it's a lot.

19   **Q.**   Is it in the thousands?

20   **A.**   Many, many, many thousands.

21   **Q.**   And for how many applications have you been a member of

22   the 40-person admissions committee?

23   **A.**   I've been there the whole time, sitting in those meetings

24   all but about a year and a half since 1972.

25   **Q.**   And you've attended virtually all the full committee

1    meetings?

2    **A.**   I have attended all of them.

3    **Q.**   In those meetings over that long period of time, have you

4    observed racial bias from any members of the committee?

5    **A.**   Never.

6    **Q.**   Have you observed racial bias by any members of the

7    committee in making decisions?

8    **A.**   Never.

9    **Q.**   Have you observed any bias or discrimination against

10   Asian-Americans?

11   **A.**   Never.

12   **Q.**   Based upon your experience in the committee, what are

13   your reasons for your view that Harvard is not using the

14   personal rating to discriminate?

15   **A.**   I think it's really, again, a process of having readers

16   look at the evidence in the application and really looking at

17   everything in that application, just the way we did as we

18   went through the process.

19           I think also there are so many checks and balances.

20   Again, you know, when you're filling out an application,

21   filling out a profile let's say at 9:00 at night, you know

22   that eventually that 40 people are going to be looking at

23   your work, you know.

24           So we're always vigilant.  Not just every time we

25   read an application but every time we go through applications

1    in committee.  So there are so many different checks and

2    balances on this.

3    Q.  And does the training which you've described provide you

4    some assurance as well?

5    A.  Yes.  The training is certainly -- especially for new

6    staff is very, very important.  It is a training period I

7    always say that isn't just simply a matter of months, but

8    it's really kind of a trial period.  I would say

9    realistically it takes you about three years before you get

10   fully up to speed.  And I think one of the things we --

11   because of the complexity of the job.  So we are really

12   always watching each other essentially, and especially some

13   of the newer members of the staff.

14        But we're also going through constant training

15   every year ourselves through our orientation sessions and

16   through various sessions throughout the year.

17   Q.  And we're going to have Director McGrath tell us about

18   that in more detail.

19        Let me ask you this:  Are you aware of the claim

20   that the personal ratings for Asian-American applicants are

21   on average lower than those for white applicants?

22   A.  I am.

23   Q.  And have you reviewed yourself data regarding the average

24   personal ratings for Asian-American applicants compared to

25   whites?

1    **A.**   I have.

2    **Q.**   And what does that data show?

3    **A.**   That there is a slight difference, that white applicants

4    have slightly stronger personal ratings than Asian-Americans.

5    Again on average.  But the range of course is, even you saw

6    in the OCR report, is quite strong.  So there are many, many

7    strong ratings obviously for Asian-Americans as well as

8    whites.

9    **Q.**   Now, you described it as a small or slight difference,

10   correct?

11   **A.**   I have.

12   **Q.**   Could you remind us what information, what external

13   information goes into those ratings?

14   **A.**   Well, you've had a little bit of a sense as you went

15   through this morning looking at the two applications.

16          And I think it's much easier to see it that way

17   because every single part of that application gives you yet

18   another set of insights into what this person may be like and

19   what may lead you to make a personal qualities rating of one

20   kind or another.

21   **Q.**   And for the information received from these external

22   sources, does Harvard and the admissions office take it as it

23   receives it from the schools, the recommenders, the teachers?

24   **A.**   We do.

25   **Q.**   Now, how many factors does Harvard use in considering an

1    applicant or applicants for the admissions process?

2    **A.**  As many as you can discern.  We went through -- we are a

3    little bit like umpires in baseball or the way a court of law

4    works; that is, we're looking at all the evidence.  And all

5    we can do is respond to what is in that application.  But

6    it's everything that we're looking at.

7    **Q.**  Let me return, to conclude, to the plaintiff's

8    allegations.

9         Dean Fitzsimmons, you've been the dean since 1986?

10   **A.**  That's correct.

11   **Q.**  You understand that SFFA has accused you of intentionally

12   discriminating against Asian-Americans.  Do you understand

13   that?

14   **A.**  I do.

15   **Q.**  Do you take it seriously?

16   **A.**  Absolutely.

17   **Q.**  Is it true?

18   **A.**  No.

19   **Q.**  And how do you know?

20   **A.**  Again, I think there are so many checks and balances that

21   are involved in the process, and there are so many of us

22   involved.  But for all the reasons I said before, I think

23   with all the training that we have in place, I think

24   everything -- we certainly do everything in our power, you

25   know, to treat every applicant completely and fairly.

112

```
 1    Q.   Does the admissions office attempt to ensure that it
 2    admits the same number of applicants from different racial
 3    groups year after year after year?
 4    A.   Not at all.
 5    Q.   Do you attempt to ensure a consistent number of
 6    matriculants by racial group year after year after year?
 7    A.   No.
 8    Q.   Have you ever used quotas?
 9    A.   Never.
10    Q.   Have you ever used floors?
11    A.   Used --
12    Q.   -- floors?
13    A.   No.  No.
14    Q.   Dr. Arcidiacono, the plaintiff's expert, claims that for
15    the classes of 2017 to 2019 you purposefully admitted
16    African-American students at the same level as other domestic
17    applicants.
18              Are you aware of that accusation?
19    A.   I'm aware of the accusation.
20    Q.   Is it true?
21    A.   No, not at all.
22    Q.   How do you know?
23    A.   We don't even think in those terms.  I think that was the
24    first time I ever saw anybody suggest that somehow you would
25    sort of peg something to some other thing.  It just isn't the
```

1    way we work.

2    **Q.**  Dean Fitzsimmons, you entered Harvard College in 1963?

3    **A.**  That's correct.

4    **Q.**  What was the gender composition of your class?

5    **A.**  About 4 to 1.

6    **Q.**  4 men for every woman?

7    **A.**  (Witness nods in the affirmative.)

8    **Q.**  And what was the ethnic and racial makeup of your class,

9    in general?

10   **A.**  There were virtually no students of color.

11   **Q.**  Has the diversity both in terms of gender, race, and

12   ethnicity changed under your leadership since 1986?

13   **A.**  It has changed dramatically.  And again not just under my

14   leadership.  But this was a total institutional effort across

15   the board on the part of faculty, administrators, and

16   students and alumni.

17   **Q.**  Is Harvard a more diverse community today?

18   **A.**  Vastly more diverse.

19   **Q.**  In your view, is it a better community today?

20   **A.**  It's an infinitely better place.

21   **Q.**  Are you proud of your contribution to the diversity of

22   Harvard?

23   **A.**  I am proud that Harvard over time, with all the different

24   parts of Harvard, have really opened the gates of Harvard in

25   all kinds of ways to a much wider range of talent in the

 1    United States and the world.

 2            And people who will bring you excellences and life

 3    experiences of all sorts, it is a vastly different

 4    institution.  It's a work in progress.  We always feel we can

 5    do better.  But we're working hard.  There's a lot of talent

 6    out there in the country that needs to be encouraged through

 7    all the means necessary to get them to all of the

 8    institutions of higher education.

 9    **Q.**  That includes Harvard but also many other colleges and

10    universities, correct?

11    **A.**  Absolutely.  And I think one of the big things is we're

12    so lucky, a lot of people around the world would say that

13    American colleges and universities are really the gold

14    standard now.  And I think one of the great things is you can

15    have choices.  You can decide to go to one of the great

16    public universities.  You could decide to go to one of the

17    great small colleges.  You could go to a place like ours.

18            I think one of the great things is that all these

19    places are vastly improved, say, compared to 1986 so that

20    it's a great time for people to be thinking about going on to

21    higher education.

22            And if we do that, I think we have a much better

23    chance of making sure that America continues to have a

24    leadership role in the world and the generations ahead.

25            MR. LEE:  Thank you, Dean Fitzsimmons.

1    Nothing further, Your Honor.

2    MR. HUGHES:  Your Honor, I will be brief, but I

3    need a minute or two to set up, if that's okay.

4    THE COURT:  You don't have to be brief, and you can

5    take as much time as you need to set up, within reason.  So

6    go ahead.

7    MR. HUGHES:  I appreciate both of those comments.

8    Your Honor?

9    THE COURT:  Whenever you're ready.

10    MR. HUGHES:  Thank you, Your Honor.

11                    REDIRECT EXAMINATION

12    BY MR. HUGHES:

13    **Q.**  Good afternoon.

14    **A.**  Good afternoon, Mr. Hughes.

15    **Q.**  I hope to finish here before the lunch hour.  I want to

16    turn first to a subject that you talked with both me and

17    Mr. Lee about yesterday, and that was the information that

18    OIR provided to you in 2013.

19    You recall, I'm sure, our lengthy discussion about

20    that, right?

21    **A.**  I do.

22    **Q.**  And you talked with Mr. Lee yesterday about OIR and your

23    understanding of what was conveyed to you in 2013 by OIR,

24    correct?

25    **A.**  That's correct.

**JA1066**

1   **Q.**   Okay.  I just want to make sure a few things are clear.

2              You are reasonably well informed with modern

3   statistical techniques, correct?

4   **A.**   I would say reasonably.

5   **Q.**   You'd say reasonably?

6   **A.**   (Witness nods in the affirmative.)

7   **Q.**   In fact, you previously taught statistics at the

8   introductory level, correct?

9   **A.**   Yes.  About a thousand years ago.

10  **Q.**   And you have been part of studies at Harvard using

11  logistic regression, correct?

12  **A.**   Yes.  Certainly they've been presented over the years by

13  such parts of Harvard as OIR.

14  **Q.**   And you are very familiar with the term "logistics

15  regression," correct?

16  **A.**   With the term, yes.

17  **Q.**   And focusing back on the information that you were

18  provided by OIR in 2013, you certainly understood the

19  information about Asians in the admissions process that OIR

20  provided to you, correct?

21  **A.**   Well, the thrust of it, yeah.  Remember I taught at Holy

22  Cross, statistics, in the '60s literally, and it was only

23  introductory.  I have a decent grasp of it; but beyond that,

24  no.

25  **Q.**   Dean Fitzsimmons, I'd like to put up page 431 of your

```
 1    deposition on the screen.
 2              MR. LEE:  Which page?
 3              MR. HUGHES:  431.
 4    BY MR. HUGHES:
 5    Q.  You were asked, line 6:
 6              "So did you ignore the information about being
 7    Asian in the admissions process?
 8              "ANSWER:  No.
 9              "QUESTION:  What did you do with it?
10              "ANSWER:  We certainly understood it.  The
11    information was received."
12              Did you give that testimony?
13              MR. LEE:  I object, Your Honor.  This isn't
14    impeachment.
15              THE COURT:  I don't think it's strictly
16    inconsistent.  It's fine.
17              MR. HUGHES:  The question in court, to be clear,
18    was whether he certainly understood the information.
19              THE COURT:  He said that he understood it
20    generally, but I think the import of what he's saying is he
21    understood it but he's not an expert.
22    BY MR. HUGHES:
23    Q.  Let's move on.
24              You talked with Mr. Lee yesterday briefly about
25    Sparse Country, and the Court had a few questions that I hope
```

1    the two of us can clear up.  I want to go back to Plaintiff's

2    Exhibit 2.

3              MR. HUGHES:  I'm going to wait for Her Honor.

4              THE COURT:  I got it.

5    BY MR. HUGHES:

6    Q.  There was an exchange yesterday where Judge Burroughs

7    asked you about, you see there are high scorers men and high

8    scorers women.  Do you see that?

9    A.  I do.

10   Q.  I'm going to blow this up a little differently.  The

11   score ranges there are 1380 to 1600 for men, 1350 to 1600 for

12   women, correct?

13   A.  That's correct.

14   Q.  You and I reviewed this.  There's ethnicity and

15   geographic information in the column to the right of the

16   scores, correct?

17   A.  That's correct.

18   Q.  You and I reviewed that K is when the applicant doesn't

19   fill in their racial or ethnic information, O is other, W is

20   white, correct?

21   A.  Yes.  And then all.

22   Q.  And "all" means all the states, correct?

23   A.  I believe that's true.

24   Q.  And so the Asian applicants are not included in these

25   high scorers men and women.  They're actually included down

1    below in high scorers Asian men, high scorers Asian females,

2    correct?

3    **A.**   That's correct.

4    **Q.**   And we can see that's true because if you look over to

5    the column that I'm going to highlight, those are additional

6    applicants, correct?

7    **A.**   That's right.

8    **Q.**   And then the point that I was making I just want to make

9    sure is clear, with the lower PSAT range for Sparse Country,

10   that includes white applicants, other, and unknown but not

11   Asian applicants for the class years of 2017 and 2018,

12   correct?

13   **A.**   That's correct.

14   **Q.**   I want to look at one more exhibit related to this, and

15   that is P57.  I'll blow this up.  And that's an email from

16   Elizabeth Yong to you, January 29, 2014.  And before I ask

17   you questions, I'd like to offer it into evidence.

18              THE COURT:  Is it Tab 57?

19              MR. HUGHES:  I'm sorry, Your Honor.

20              THE COURT:  I got it.

21              MR. LEE:  No objection, Your Honor.

22              THE COURT:  Admitted.

23              (Plaintiff Exhibit No. 57 admitted.)

24   BY MR. HUGHES:

25   **Q.**   And I'd like to look at the next page.  The last document

1    we were looking at, P2 is for class years '17 and '18.  This

2    is for class year 2019, correct?

3    **A.**  Yes.

4    **Q.**  And here it's a little different.  For the high scorers

5    men and women, we've actually got -- it's just one group.

6    It's Asian, unknown, other, and white, correct?

7    **A.**  That's correct.

8    **Q.**  And we've got the same score range as before, correct?

9    **A.**  That is correct.

10   **Q.**  And just like before in Sparse Country with the lower

11   score range, you're inviting white applicants, other

12   applicants, and unknown applicants to apply with scores as

13   low as 1310 but Asian applicants are not included in that

14   category, correct?

15   **A.**  That appears to be correct.

16   **Q.**  And then I want to show you, and then we'll leave this

17   topic, Plaintiff's Exhibit 50, which Mr. Lee showed you and I

18   believe is already admitted into evidence.  If we look at the

19   fifth page of that.

20           THE COURT:  Not in your book, right?  In his book?

21           MR. HUGHES:  I think it was in my book.  It's not

22   in my book?  It's in Mr. Lee's book.

23           MR. LEE:  I can get it for you.  It's Tab 25 in our

24   notebook.

25           THE COURT:  Okay.  Got it.

```
 1   BY MR. HUGHES:
 2   Q.  The last two exhibits we looked at related to searches
 3   for the classes of 2017, 2018, and 2019, correct?
 4   A.  That's correct.
 5   Q.  This relates to the search for the class of 2016,
 6   correct?
 7   A.  It appears to, yes.
 8   Q.  We've still got the same -- this time we've got high
 9   scorers at the top not differentiated by gender, correct?
10   A.  Yes.
11   Q.  And we've got the same Sparse Country score range and
12   ethnicities, correct?
13   A.  That's correct.
14   Q.  All right.  And then if we go down -- I think Mr. Lee
15   looked at this with you yesterday.  In 2016, there was
16   actually an Asian level 2 category that went down to 1300,
17   correct?
18   A.  That's correct.
19   Q.  And Harvard evidently made a decision to stop using that
20   category as of the class of 2017, '18, and ' 19 that we just
21   looked at, correct?
22   A.  Yeah.  I'm not sure who the Harvard was, to be honest.
23   Because Elizabeth Yong was in charge of our search, and we
24   obviously talked to Elizabeth.  But there are sometimes
25   complexities in ordering search materials from the ACT or the
```

1    SAT, but I don't remember being involved in that decision.

2    It's possible maybe I was.  It's also possible that

3    Elizabeth, who also didn't just order our search but she also

4    did our research, may for some reason have made the decision.

5    **Q.**   Okay.  But somebody made the decision?

6    **A.**   Precisely, right.

7    **Q.**   So as of 2017, the Asian level 2 no longer appears in

8    search, correct?

9    **A.**   That's what appears to be the case, yes.

10   **Q.**   Now, you talked about the docket.  You've got a big

11   docket there in front of you, right?

12   **A.**   Yes, I do.

13   **Q.**   Subcommittee process with Mr. Lee, correct?

14   **A.**   I did.

15   **Q.**   And you actually chair the P docket, correct?

16   **A.**   I do.  Currently and really for quite a few years.

17   **Q.**   Okay.  The dockets are a big, voluminous documents,

18   correct?

19   **A.**   They are.

20   **Q.**   So I'd like to look at Defendant's Exhibit 50 with you,

21   which is the docket.  It's a 1,500-page exhibit which I have

22   a printout of, but we're not going to look at more than a few

23   pages of the P, R, and S dockets.  Do you see that?

24   **A.**   I do.

25   **Q.**   If we just flip through --

1    **A.**  Is this somewhere in here?

2    **Q.**  It is not.  I've got it right there for you, if you want

3    the actual full paper binder.

4    **A.**  I might, but let's see what we can do to save time.

5    **Q.**  As you see on the screen, this is kind of what a docket

6    likes like, right?

7    **A.**  That's correct.

8    **Q.**  I'm looking at page 3.  And this is an entry for the P

9    docket for the Harvard College class of 2018, correct?

10             MR. LEE:  Your Honor, could we turn the gallery

11   screen off?  These are not redacted.

12             MR. HUGHES:  I'm sorry, Mr. Lee.  That's fine.

13             THE WITNESS:  I think especially because we're in

14   the local area.

15             THE COURT:  You turned mine off, too.

16             MR. HUGHES:  I took it down.  I think we're okay

17   now.

18             THE WITNESS:  I think it would be very useful for

19   Your Honor to see it.

20   BY MR. HUGHES:

21   **Q.**  You can see it now on the screen, right?

22   **A.**  I can see it.

23   **Q.**  So here we have the P docket, correct?

24   **A.**  That's correct.

25   **Q.**  And this is for early action for the Harvard class of

1    2018, correct?

2    **A.**   That's true.

3    **Q.**   And I see some handwriting on the side.  Do you see

4    there's an S?  What does S stand for?

5    **A.**   This is my hideous handwriting.  I put "music" with an

6    exclamation mark because it seemed to be significant.  This

7    was the Harvard book winner and the person also plays the

8    saxophone.

9    **Q.**   For the P docket, you're the guy that's making the

10   handwritten notes?

11   **A.**   Yes.  Also remember there's another official docket, too,

12   number 2.  Somebody else will do that, but almost always it

13   will be my handwriting in the official number 1, it's called.

14   **Q.**   The letters to the side, does A stand for admit?

15   **A.**   Yes.

16   **Q.**   If you look above, I didn't have it highlighted, but what

17   does S stand for?

18   **A.**   That's defer.

19   **Q.**   That means you're going to defer them into the regular

20   action?

21   **A.**   That's correct.

22   **Q.**   I think we may look at a couple of other pages.  There's

23   a WL notation.  What does that stand for?

24   **A.**   Wait list.

25   **Q.**   And that means probably not getting admitted?

1    **A.**  No, not necessarily.  We've had years where we've

2    admitted over 200 off the wait list, the year we returned

3    from not having early action.  So it's not at all a dead

4    issue.

5    **Q.**  Okay.  But it's not as good as a deferral or an admitted,

6    generally speaking?

7    **A.**  A defer could end up admitted but they could also end up

8    rejected.  I would say on average "wait list" means you're

9    pretty close.

10    **Q.**  I want to just take a little side detour here.

11           You testified earlier that the stereotyping

12    comments we saw in the OCR report that Mr. Lee just reviewed

13    with you are abhorrent.

14           Do you agree with that?

15    **A.**  Yes.

16    **Q.**  I want to look at what those comments were just so we

17    have that stereotypical language was in mind.  So I'm going

18    to go back to Exhibit 555, page 24.  I'll read it in the

19    record.

20           So here on page 24 of the OCR report, "OCR's

21    concern for the potential stereotyping of Asian-American

22    applicants prompted a review of reader comments for negative

23    characterizations which could have an impact on the

24    admissions decision and ratings.

25           "On its face, reader comments revealed several

1    recurring characterizations attributed to Asian-American

2    applicants.  Quite often Asian-American applicants were

3    described as being quiet/shy, science/math oriented, and

4    hard-working.  For example, one reader's comment embraced all

5    of these in describing an Asian-American applicant when she

6    wrote, 'applicant seemed like a reserved, hard-working,

7    aspiring woman scientist/doctor.'

8         "While such descriptions may not seem damaging, OCR

9    was conscious that problem of model minority stereotypes

10   could negatively impact Asian-American applicants as a whole.

11   This concern was also raised when OCR's file review came upon

12   comments such as, 'He's quiet and, of course, wants to be a

13   doctor?'"

14        Do you see that text before you?

15   **A.**  I do.

16   **Q.**  Some of that stereotypical language associated with

17   Asian-Americans that you say you abhor are quiet/shy, hard

18   workers, reserved, hard-working, quiet.  Agree?

19   **A.**  Actually earlier today I actually talked about hard

20   working as perhaps one of the best descriptions you could

21   have for anyone.

22        I referenced one of our Asian-Americans alums,

23   Angela Duckworth, and her great book on grit and the

24   importance of hard work in terms of succeeding in any kind of

25   an endeavor.

**JA1077**

 1          So I would hardly say -- in my own mind at least

 2   say that someone who's a hard worker that -- I would consider

 3   it to be a huge compliment.  But that's just me.

 4   **Q.**  These are the stereotypical language that you agreed

 5   yesterday that you abhorred, correct?

 6   **A.**  My statement was that I would abhor any stereotypical

 7   comments.

 8   **Q.**  Let's look at Plaintiff's D50, page 56.

 9          THE COURT:  Are you going to move this into

10   evidence?

11          MR. HUGHES:  Sure.  I offer D50 into evidence.

12          MR. LEE:  Could we have a copy?

13          MR. HUGHES:  This was on Harvard's list of

14   documents.

15          MR. LEE:  What page?

16          MR. HUGHES:  Page 356.  I've also got it on the

17   screen.  I've also got a motion to move this into evidence.

18          MR. LEE:  There's no objection, Your Honor.

19          THE COURT:  Admitted.

20          (Defendant Exhibit No. D50 admitted.)

21   BY MR. HUGHES:

22   **Q.**  So this is docket P?

23   **A.**  Yes.

24   **Q.**  I want to look at the bottom that I've got highlighted.

25   This is an applicant that we've got -- what is the ethnicity

1    for this applicant?

2    **A.**   That would be Asian and then Chinese.

3    **Q.**   What is the course of action that's proposed as wait

4    list, correct?

5    **A.**   Yes.  At that time.

6    **Q.**   And this is your handwriting, correct?

7    **A.**   That's correct.

8    **Q.**   And you described the applicant.  There's only two

9    descriptive words, and they are "very quiet," correct?

10   **A.**   That's correct.

11   **Q.**   I've got one more.

12          MR. HUGHES:  Now, Mr. Lee, I'm on page 186.

13   BY MR. HUGHES:

14   **Q.**   Dean Fitzsimmons, can you see the page of the docket that

15   I've got up in front of you?

16   **A.**   I can, yes.

17   **Q.**   And again, this is your handwriting, correct?

18   **A.**   That's correct.

19   **Q.**   It's a P docket, correct?

20   **A.**   That is correct.

21   **Q.**   And what is the ethnicity of the applicant that I have

22   highlighted?

23   **A.**   That would be Asian and Chinese.

24   **Q.**   And the activity proposed in subcommittee is wait list,

25   correct?

1    **A.**  That's correct.

2    **Q.**  And you described that applicant as quiet and strong,

3    correct?

4    **A.**  I did.

5            MR. HUGHES:  No further questions.

6                        RECROSS-EXAMINATION

7    BY MR. LEE:

8    **Q.**  Dean Fitzsimmons, have you interviewed white candidates

9    who you described as quiet?

10   **A.**  I certainly have.

11   **Q.**  African-American candidates you described as quiet?

12   **A.**  Yes.

13   **Q.**  Hispanic candidates you've described as quiet?

14   **A.**  Yes.

15   **Q.**  Asian-Americans you've described as quiet?

16   **A.**  Yes.

17   **Q.**  Is that stereotyping by ethnicity?

18   **A.**  No.

19   **Q.**  Have you interviewed Asian-American candidates you

20   described as outgoing?

21   **A.**  Yes.

22   **Q.**  And the document that was just put in front of you is

23   1,592 pages, correct?

24   **A.**  That's correct.

25   **Q.**  It has handwritten notations by you on a variety of the

 1    pages, correct?

 2    **A.**   That's correct.

 3    **Q.**   Now, when OCR was referring to stereotyping, it was

 4    referring to phrases that were used to characterize someone's

 5    ethnicity, correct?

 6    **A.**   That's correct.

 7    **Q.**   Is that what you were doing in these 1,592 pages?

 8    **A.**   No.

 9    **Q.**   Last couple of questions.  You were asked some more

10    questions about OIR.

11    **A.**   Yes.

12    **Q.**   I think you told us a lot of this started or part of it

13    started with the Unz article?

14    **A.**   Yes.

15    **Q.**   And as Mr. Hughes said, there was some controversy about

16    Asian-American admits, correct?

17    **A.**   That's correct.

18    **Q.**   Was there also controversy among the Harvard Jewish

19    community?

20    **A.**   Very much so.

21    **Q.**   Because?

22    **A.**   Because of the Unz article.

23    **Q.**   Right.  Now, at the end of this six months and all of the

24    different presentation memos you saw, you did see the model

25    you discussed with Her Honor, correct?

131

1    **A.**  Yes.

2    **Q.**  Did it tell you anything that was inconsistent with what

3    you had understood before the OCR investigation, after it,

4    right through the date you got those reports?

5    **A.**  No.  Perfectly consistent with everything we've known.

6                MR. LEE:  Thank you, Your Honor.

7                MR. HUGHES:  I have nothing further, Your Honor.

8                THE COURT:  Dean Fitzsimmons, you are excused.

9                THE WITNESS:  Thank you, Your Honor.

10               MR. MORTARA:  Your Honor, Adam Mortara.  Would you

11   remind me of the time you wanted to take lunch?

12               THE COURT:  I was planning on taking lunch from

13   quarter of 1:00 to 1:30.

14               MR. MORTARA:  I would suggest we do it right now

15   because I'm going to be right in the middle of my direct

16   examination of Christopher Looby.  I would be happy to do it

17   now.

18               THE COURT:  I need until 1:30 today.  Why don't we

19   do some of these deposition designations at sidebar before we

20   take a break.

21               (The following was held at sidebar.  Present are

22   Attorneys Katherine L.I. Hacker, Krista J. Perry, Meg E.

23   Fasulo, Denise W. Tsai, and Felicia H. Ellsworth.)

24               THE COURT:  Who do you want to start with?  Do you

25   want to start with Ortiz?

```
 1              MS. HACKER:  Sure.

 2              THE COURT:  I think the easiest way is page by

 3      page.

 4              MS. ELLSWORTH:  That's fine.

 5              MS. HACKER:  Yes.

 6              THE COURT:  The first one is on page 2.  That's

 7      overruled.

 8              MS. ELLSWORTH:  That's withdrawn.  Sorry about

 9      that.

10              THE COURT:  Page 3 is overruled.  This one is

11      harder to do.  Everything on page 6 comes in.  This one I had

12      to stop because I wasn't sure -- the top half of page 7 comes

13      in.  So page 7 comes in.  Now, on page 8, I couldn't really

14      understand this without an email.  I don't really know what

15      it is and all this talk about planning on using it next week.

16      Using it for what?  I'm just not sure what this is about.

17              MS. FASULO:  Your Honor, Meg Fasulo for SFFA.  This

18      is discussing an email chain between Ms. Ortiz and Ms. Bever

19      having to do with the distribution of SAT scores that

20      Ms. Ortiz was planning on using in a presentation to other

21      admission officers.

22              THE COURT:  Other admissions officers at Harvard?

23              MS. FASULO:  That's correct.

24              THE COURT:  That comes in.

25              MS. ELLSWORTH:  And I believe the exhibit came in.
```

**JA1083**

         1          MS. FASULO:  That's correct.  The exhibit was
         2   unobjected to.
         3          THE COURT:  Everything on page 8 comes in.  So then
         4   on page 10, my highlighting at least starts right in the
         5   middle of a question.  So I'm assuming that --
         6          MS. FASULO:  That was a mistake.  The whole part
         7   should be highlighted.
         8          THE COURT:  You're objecting to the answer?  Start
         9   on page 9.  Is that what's being objected to, that answer
        10   that begins at line 18?
        11          MS. ELLSWORTH:  The one that says, "Were I to
        12   guess".
        13          THE COURT:  That's sustained.  That question does
        14   not come in.  The next question does come in, do you recall.
        15   She says I don't recall.  That question and answer comes in.
        16   And then the next question and answer, the objection is
        17   sustained.
        18          Page 11, that objection is sustained.  So on page
        19   12, this kind of lost me again.  The answer comes in, I don't
        20   recall.  The next question, the objection is sustained.  I
        21   wasn't sure what you're objecting to.  The answer comes in,
        22   but the question is out.
        23          MS. ELLSWORTH:  I don't think the answer is the
        24   next thing.  This is where it's confusing.  I'm not sure if
        25   we objected to this or not.  I think it shouldn't come in

1    because it's speculation.

2             THE COURT:  What's in is "Would you have conveyed

3    this information?".  That's a legitimate question.  She says

4    she doesn't know.

5             MS. ELLSWORTH:  It's the question that says what is

6    the type of context that an admissions officer should have

7    taken away --

8             THE COURT:  That's sustained.

9             MS. ELLSWORTH:  So the answer should not come in

10   either, right?

11            THE COURT:  Right.  The next objection that says it

12   was help for me.  That's overruled.  And then -- and that

13   last answer comes in which is on the bottom of page 12.

14            MS. ELLSWORTH:  Got it.

15            THE COURT:  The next one is -- do you want to talk

16   about Zuluaga here?  We can just do the objections here and

17   not hear the argument on who they want to keep out in their

18   entirety.

19            MS. HACKER:  I'm happy to do it all right now since

20   Your Honor has time before your lunch.

21            THE COURT:  Let met check my phone.  Okay.  There's

22   this one and another one.  One of them is from Stuyvesant and

23   the other is from Thomas Jefferson.  What I think on these, I

24   actually looked at Zuluaga and Pedrick.  My thinking on it

25   changed a little on it after I went back and did Pedrick.

1    Most of this stuff is not coming in through this witness,

2    right?  All the stuff about are Asians different, different

3    socioeconomic backgrounds, are they the same as each other,

4    that's just not coming in.

5           That being said, if you want to put in some

6    information about Thomas Jefferson, how many students they

7    have and what the gender is, what the ethnic breakdown is, I

8    can see letting that in if it's going to be linked up later.

9    It it's not going to be linked up, it's irrelevant.

10           MS. HACKER:  Whatever Harvard's position was going

11    into trial over the past few days, what we heard from Dean

12    Fitzsimmons is and this is a quote, "You know, the one thing

13    we do know, for example, and again speculation, and it's a

14    fact that the strength of the teacher recommendations and the

15    counselor recommendations for Whites is somewhat stronger

16    than those for Asian-Americans."

17           Dean Fitzsimmons is saying that the schools who

18    support these students do have a different belief, different

19    ratings for Whites versus Asians.  And what we're hearing

20    from these schools is directly relevant to contradict that

21    testimony.

22           THE COURT:  What I heard him say is that they're

23    looking at the evaluations and they're seeing that the

24    evaluations for White students are higher than for Asian

25    students.  So if you want to prove that up, you have to show

```
 1   me some guidance counselor recommendations, not just this
 2   like subjective kind of, oh, no, our recommendations would
 3   never show anything like that.
 4         MS. HACKER:  And we asked for those in discovery,
 5   Your Honor, but we were denied --
 6         THE COURT:  You were offered the opportunity to
 7   come back and nobody ever did.  If you want to put this in
 8   and then you have some other statistical breakdown later
 9   about how kids from this high school are treated, that's one
10   thing.  But just this thing from the guidance counselor about
11   do we have too many Asians and are Asians different from each
12   other, it's not substantiated by anything.
13         MS. HACKER:  We will have data later that shows
14   there is no difference.  Whites are not better in school
15   support ratings than Asian-Americans.  This testimony
16   confirms that that is what these high school representatives
17   believe.  These were 30(b)(6) witnesses on behalf of these
18   high schools.
19         THE COURT:  It has to be an actual student.  It
20   can't be just general.  I don't even know which of these
21   people applied to Harvard.  And one of them says -- I think
22   one of them even equivocates -- I think the questions were
23   asked differently.  It's like are Asian students
24   well-rounded.  It was like more or less, basically, right?
25   It's like saying some are, some aren't which is probably
```

**JA1087**

```
 1    fair.  Some whites are -- the questions are asked
 2    differently.  It doesn't link up to what Harvard is doing.
 3           If you want to put in through these people the
 4    demographic breakdown of the school, you can have that.  So
 5    we can go through it and sort of -- but the rest of it just
 6    doesn't come in.  So do you know the breakdown, how many
 7    students, how many boys, how many girls, racial breakdown.
 8    So that gets you to the top of page 2.
 9           MS. ELLSWORTH:  I'm just getting the actual
10    subpoena served to Thomas Jefferson.  I think it's also
11    outside the scope of what they were to speak on.
12           THE COURT:  I didn't look at the scope.  My initial
13    take on this is it was coming out.  None of it was coming in.
14    I went back and looked at Pedrick, I thought if you're going
15    to link up those numbers later --
16           MS. ELLSWORTH:  This is the Thomas Jefferson
17    30(b)(6) notice.  Racial composition of applicants, admitted
18    persons, or enrollees to Harvard; Harvard's use of race in
19    the admissions process; communications to, from or copying
20    Harvard regarding the use of race in the admissions process;
21    alleged discrimination by Harvard against persons of Asian
22    descent from Thomas Jefferson High School for Science &
23    Technology in the college admissions process; and
24    communications concerning SFFA, the plaintiff, and its
25    representatives, including but not limited to Edward Blum or
```

**JA1088**

 1    the complaint or this action."

 2              This is outside the scope.  I don't know that this

 3    is actually competent evidence about the racial or ethnic

 4    breakdown of Thomas Jefferson high school.  The witness

 5    wasn't put forward on that.

 6              MS. PERRY:  Krista Perry for SFFA, Your Honor.

 7              THE COURT:  Hold on.  Let me just look at this.

 8    She's right about the scope.  Let me what you say about that.

 9              MS. PERRY:  I was just going to say that the

10    information about the schools themselves goes to the

11    foundation of the witness being a 30(b)(6) witness in the

12    first place.  To the extent they would have information about

13    discrimination against Asian-Americans to Harvard, it would

14    be through their experience with their students who apply.

15              THE COURT:  I think they are sort of foundational

16    questions on the 30(b)(6).

17              MS. ELLSWORTH:  We also requested documents which I

18    don't believe Thomas Jefferson agreed to provide.  Again the

19    documents are relating to enrollees to Harvard.  They just

20    didn't ask for this in the 30(b)(6) to get the breakdown.

21    I'm not sure these numbers are right.

22              THE COURT:  They're much vaguer here than they are

23    in Pedrick.

24              MS. HACKER:  To be clear, Your Honor, on the data,

25    there was some discussion going into these depositions of

     1   whether or not the schools needed to produce the data because

     2   it was data we already had from Harvard.  So there was an

     3   agreement that the schools didn't need to produce the data

     4   separately.

     5          MS. ELLSWORTH:  The data from Harvard is the data

     6   of whoever applied.  It's not the actual breakdown of Thomas

     7   Jefferson.

     8          THE COURT:  For example, does the information about

     9   the school that Harvard would have on these two schools

    10   include the ethnic breakdown of the schools?

    11          MS. ELLSWORTH:  Not the school.  Just the

    12   applicants to Harvard.

    13          THE COURT:  Just the applicants?

    14          MS. ELLSWORTH:  Right.

    15          THE COURT:  I think this is so marginal.

    16          MS. HACKER:  The last thing I'd say on that, Your

    17   Honor, given the low bar relevance, we do not plan on

    18   spending much time on this.  Mr. Zuluaga's transcript is 10

    19   minutes and Ms. Pedrick's is 20.  Given the low bar

    20   relevance, and this directly contradicts what we've heard

    21   from Dean Fitzsimmons, we do think it should come in.

    22          THE COURT:  I know you think it should come in.

    23   That's why we're standing here.

    24          MS. ELLSWORTH:  It's not the timing to which we

    25   object.

**JA1090**

1          THE COURT:  I didn't read anything except what's

2     objected to.  You didn't object to everything.

3          MS. ELLSWORTH:  We objected to it in its entirety.

4          THE COURT:  I didn't read the whole testimony.  Or

5     did I?  Let me see.

6          MS. ELLSWORTH:  The ones we didn't object to

7     related to actually topics of the 30(b)(6).  The suggestion

8     that Thomas Jefferson did not have enough black and Latino

9     students.  We think the entire designation and the entire

10    deposition is irrelevant.

11         THE COURT:  I'm going to exclude the testimony.

12    I'm going to exclude the witness.  What's next?

13         MS. HACKER:  Was that related to Mr. Zuluaga?

14         THE COURT:  Yes.  Zuluaga is all the way out.

15         MS. HACKER:  Casey Pedrick.

16         THE COURT:  I just want to look at the last pages.

17    This is -- what I was going to let in was, and we can discuss

18    this again in light of Zuluaga, everything on page 2,

19    everything on page 3, everything to "the most competitive

20    high school in the country."  I was going to let that in and

21    I was going to stop right there.  I was going to let in page

22    29 and stop at page 30.

23         MS. ELLSWORTH:  Your Honor, we have the same scope

24    objection.  The subpoena was identical in terms of didn't ask

25    for the admissions criterion or anything like that or

```
 1    statistics related to applicants to Harvard.

 2              THE COURT:  Once you're keeping out their

 3    subjective impressions of the Asian population, the rest of

 4    it just becomes sort of irrelevant.  If they were all

 5    applying to Harvard and none of them are getting in, that

 6    might be relevant.  But until you know who is applying and

 7    who isn't and what percentage of them getting in, it's just

 8    kind of floating out there.

 9              MS. PERRY:  It seems to me just as an individual

10    student might be an instructive example, an individual

11    guidance counselor's impression and just as Dean

12    Fitzsimmons's general impressions of how the system works.

13    It's important to know whether the guidance counselor ratings

14    are objectively different or whether they're being scored

15    differently.

16              THE COURT:  I completely agree that that would be

17    admissible testimony.  So if you want to put it in, get a

18    guidance counselor on the stand and say this is the

19    application that I did for a White person and this is the

20    recommendation that I did for an Asian person, and I view

21    them to be equally strong, and they got different ratings,

22    that's a specific -- but this is like generally our Asian

23    students are great.  It doesn't get you to what Harvard --

24    You don't even know if all the Asian students she thinks are

25    great, you don't know if any of them applied to Harvard.
```

**JA1092**

 1      It's just not limited to their applicant pool in any way.

 2              MS. PERRY:  Although she does describe her role as

 3      a guidance counselor, and presumably she does know which set

 4      of students does apply to Harvard.

 5              THE COURT:  No recommendations were put in front of

 6      her, at least from what I have in front of me.  So she could

 7      look at them and say this is an Asian student that I thought

 8      was fantastic and they didn't get in.  And this White student

 9      that I thought was significantly less qualified did.  There's

10      no way to glean any of that from this.  So this one's out,

11      too.  Who's next?

12              MS. FASULO:  Grace Chang.

13              THE COURT:  Page 3, the objection is overruled.

14      Page 5, it's sustained.  Page 7, they're all sustained.  The

15      top one.  So page 8 is sustained.  The next ones are all

16      overruled on that page.  Overruled on page 9 and the top of

17      page 10.  On the bottom of page 10, so it's two questions and

18      two answers.  The first two answers and the first question

19      come in.  The last question, "Why did Dean Simmons ask you to

20      make that call?" is out.  Sustained on page 11.  Overruled on

21      page 12.

22              MS. ELLSWORTH:  Your Honor, just to be clear, the

23      top of page 11 comes out obviously.

24              THE COURT:  Yes.  The whole thing comes out.  Page

25      12, that top part is overruled.  The bottom part is

 1    overruled.  Page 13, overruled.  Page 16, it's all overruled.

 2    Page 17, it's all overruled.  Page 18 overruled.  So page 19

 3    and 20 and 21, I was once again lost.  I can't see what we're

 4    talking about.  It's a 50-page chart.

 5              MS. ELLSWORTH:  If I may, Your Honor, a version of

 6    the Dean's Interest List, one of which was just introduced

 7    into evidence through Dean Fitzsimmons that the witness --

 8              THE COURT:  Let's see.  Chance to review it.  Yes.

 9    50-page chart.  She reviews the document.  So this is where

10    she says it's not familiar to her.  So I'm not really sure

11    what we're doing here.  You mark it.  She says she's reviewed

12    it.  Right?  You want that out where she says she's reviewed

13    it?

14              MS. ELLSWORTH:  What page are we on?

15              THE COURT:  19.

16              MS. FASULO:  On page 19 we have Exhibit 12 which is

17    actually an email that was sent from Ms. Chang.  And then on

18    page 20 starting at page 22, that's a separate exhibit which

19    is the Dean's List.

20              THE COURT:  But there's no question about

21    Exhibit 12.

22              MS. ELLSWORTH:  Let me just look for it, Your

23    Honor.

24              MS. FASULO:  We were just using Ms. Chang as a way

25    to bring Exhibit 12 into evidence.

```
 1            MS. ELLSWORTH:  This is a document we've objected
 2    to because it contains a lot of hearsay.
 3            MS. FASULO:  Your Honor, this is not hearsay.  This
 4    is an email that was written by Grace Chang about her
 5    impressions and reactions to an alumni event.
 6            THE COURT:  Do you have it?
 7            MS. FASULO:  Yes, I can grab it.
 8            THE COURT:  While she's getting that, so the next
 9    one -- it's marked.  You ask her to look at it.  Her answer
10    is -- as far as I'm concerned she can look at it.  And then
11    she says -- It's not coming in through her, it's not familiar
12    to her.
13            MS. ELLSWORTH:  These are our counters.  That's why
14    it's not objected to.
15            THE COURT:  I see.  I guess I don't really get
16    this.  If I leave it in, the document's not coming in.  If I
17    leave it out, the document's not coming in.  Do you want to
18    just have her read that she's shown a document for
19    identification?
20            MS. HACKER:  And offer it into evidence, yes, Your
21    Honor.
22            THE COURT:  I'm not going to let it come into
23    evidence because she says it's not familiar to her.
24            MS. FASULO:  She was familiar enough with the
25    docket to be able to identify that it was a Dean's List.
```

**JA1095**

```
 1              THE COURT:  No.  "I'd like to mark it as an
 2     exhibit.  It's a 50-page chart.  Witness reviews document."
 3     Then what happens?  The next thing that I have is you
 4     represent that the metadata indicates when it was created.
 5     "Have you seen documents in this format before?  No.  This is
 6     not familiar to you?  Correct.
 7              MS. FASULO:  That's fine.
 8              THE COURT:  So that one is out.  Let's just finish
 9     the last one, and then we'll go back to the one we just
10     skipped.  "Document 16 is an email chain marked for
11     identification.  Have you reviewed it?  Yes."
12              MS. FASULO:  Again Your Honor, this is an email
13     that Grace Chang sent and received.  We're just using Grace
14     Chang as a way to get this email in.
15              THE COURT:  Are you objecting to that.
16              MS. ELLSWORTH:  We are objecting in part.  There's
17     a lot of hearsay at the bottom of it.
18              THE COURT:  Let me see 16 and 12.
19              MS. FASULO:  This is 16 and this is 12.  Oh, my
20     gosh.  I need better glasses.  What are you objecting to,
21     that this is hearsay?
22              MS. ELLSWORTH:  It's further down, Your Honor.
23     It's on the third page.  Somebody wrote on the message board
24     called College Confidential.  It's right there.  And there's
25     discussions back and forth.
```

**JA1096**

1          MS. FASULO:  Your Honor, these are discussions

2     between Ms. Chang and an alumni interviewer in her role as an

3     alumni interviewer.  We're offering this -- that is not

4     hearsay.  We're just offering this statement that

5     Ms. Ellsworth has pointed out for its effect on Ms. Chang.

6          THE COURT:  I'll let this come in but not for the

7     truth, just that that's what they're responding to.

8          MS. FASULO:  Yes.

9          MS. ELLSWORTH:  Your Honor, I think the alumni

10    interviewer statements also come in not for the truth.

11         THE COURT:  Yes.  They'll come in for context on

12    what she's saying.  And then this is 12.

13         MS. FASULO:  Your Honor, this is an email.  The

14    lower email is sent from Grace Chang.  She's recounting an

15    event, an alumni event, and all of her impressions of what

16    happened.  And then you can see at the top she's forwarded it

17    to another admissions officer.

18         MS. ELLSWORTH:  And it's the bottom part, the long

19    part of the email where she recounts various statements from

20    people.  It could come in not for the truth.

21         THE COURT:  That can come in not for the truth.

22         MS. ELLSWORTH:  And then the top part, that's her

23    statement as an employee.  That's fine.

24         THE COURT:  That should get us through today.  I

25    have to go and meet my husband.  Who does that leave?

1          MS. HACKER:  It leaves us I believe with

2    Ms. Howrigan, Ms. Weaver and Mr. Walsh.

3          THE COURT:  Who does it leave?  Howrigan.

4          MS. HACKER:  Mr. Walsh, Ms. Weaver.

5          MS. FASULO:  And Ms. Lopez.

6          MS. ELLSWORTH:  Lopez is the only one remaining

7    that we have an objection in full to the witness.

8          THE COURT:  I did a bunch of them last night, then

9    got your email this morning and your email this morning and

10   tried to do a bunch more.  She's the one I haven't done.  So

11   I'll try and do it.

12          (End of sidebar.)

13          (Court recessed at 1:02 p.m.)

14               ***  AFTERNOON SESSION  ***

15          MR. LEE:  Your Honor, Ms. Conley will be presenting

16   the witness for us.

17          THE COURT:  Whenever you're ready.

18          MR. MORTARA:  Your Honor, Students for Fair

19   Admissions calls Christopher Looby.

20          THE CLERK:  Can you please raise your right hand.

21          (CHRISTOPHER LOOBY duly sworn by the Deputy Clerk.)

22          THE CLERK:  Thank you.  You may be seated.  Can you

23   please state your name and spell your last name for the

24   record.

25          THE WITNESS:  Sure.  My first name is Christopher.

**JA1098**

<table>
<tr><td>1</td><td>My last name is Looby.  It's L-O-O-B-Y.</td></tr>
</table>

```
 1    My last name is Looby.  It's L-O-O-B-Y.

 2              MR. MORTARA:  Before we begin, Your Honor, I'm told

 3    the gallery monitors are off.

 4              THE COURT:  They're off because there's nothing on,

 5    right?

 6                         DIRECT EXAMINATION

 7    BY MR. MORTARA:

 8    Q.  Good afternoon, Mr. Looby.  I'm Adam Mortara.  Nice to

 9    meet you.

10    A.  Nice to meet you.

11    Q.  Can you tell the Court about your educational background

12    after high school?

13    A.  Sure.  I went to Ithaca College where I graduated in

14    1996.  And then after that, I received my master's degree in

15    school counseling from Suffolk University.

16    Q.  I want to focus our time together, it will be brief, on

17    your work at the Harvard admissions office.  How long have

18    you been working there?

19    A.  I've been with the admissions office -- financial aid and

20    admissions for about ten years.

21    Q.  And when did you start working for the Harvard admissions

22    office exactly?

23    A.  Harvard admissions, about eight years ago.

24    Q.  What's your title today?

25    A.  I'm a senior admissions officer.
```

**JA1099**

1    **Q.**  You've been reading applications in accordance with

2    Harvard's admissions procedures for about eight years; is

3    that right?

4    **A.**  That's correct.

5    **Q.**  And I understand you work on the N docket, which is

6    Connecticut, Rhode Island, and New York; is that right?

7    **A.**  That is correct, yes.

8    **Q.**  That's Upstate New York, not New York City; is that

9    correct?

10   **A.**  That's right.

11   **Q.**  And you also work on the D docket, which is Austin and

12   West Texas?

13   **A.**  Correct.

14   **Q.**  And in particular, in Texas you work on the city of

15   Austin.  You know those high schools pretty well?

16   **A.**  I do.

17   **Q.**  Like Westlake High School, for instance.  And you've done

18   that since about a year after you started at admissions

19   and -- financial aid and admissions?

20   **A.**  Yes.

21   **Q.**  Now, Mr. Looby, you can't recall any way in which Harvard

22   admits students changing over the eight years you've been

23   reading applications, can you?

24   **A.**  Can you repeat that, please?

25   **Q.**  You can't recall in any way by which the process by which

1    Harvard admits students has changed since you've been reading

2    applications, correct?

3    **A.**   That's correct.

4    **Q.**   And you personally have read applications the same way

5    for the eight years you've been doing it, right?

6    **A.**   That's correct.

7    **Q.**   When you were a new reader, when you first started doing

8    it, who read over your shoulder?  Who was your second reader?

9    **A.**   When I first started, the first 50 actual applications

10   that I read would be parsed out to higher-level admissions

11   folks.  So it would be a number of individuals, not one

12   specific person.

13   **Q.**   Did Rosemary Green read any of your applications?

14   **A.**   She was the chair of D docket, yes, she did.

15   **Q.**   Did Sally Harty read any of your applications?

16   **A.**   She did.  She was the chair of N docket.

17   **Q.**   The Rosemary Green was the chair of D docket and she read

18   some of your first 50, correct?

19   **A.**   I don't specifically again.  It was a number of people in

20   the office.

21   **Q.**   But Rosemary Green and Sally Harty would have had some

22   influence in you over how you read applications.  Is that

23   fair to say?

24   **A.**   That's fair, yes.

25   **Q.**   Now I'm going to put on the screen Plaintiff's

```
 1    Exhibit 71, which you also have in front of you, sir.  Unlike
 2    the last witness, I think we're only going to maybe discuss
 3    one document.  So that's all you're going to need.
 4              MR. MORTARA:  And I'm going to offer
 5    Plaintiff's 71.
 6              MS. CONLEY:  No objection, Your Honor.
 7              THE COURT:  Admitted.
 8              (Plaintiff Exhibit No. 71 admitted.)
 9    BY MR. MORTARA:
10    Q.  Mr. Looby, you see that these are the 2019 reading
11    procedures?
12              THE COURT:  Is this the same notebook?
13              MR. MORTARA:  It's the same as Plaintiff's
14    Exhibit 1, effectively.
15              THE COURT:  It's fine.  I just wanted to know if it
16    was in the book.  I'll just look on the screen.
17              MR. MORTARA:  We're not going to do all that much.
18    BY MR. MORTARA:
19    Q.  You were asked about this document in your deposition,
20    right?
21    A.  That's correct.
22    Q.  Now, this is the only document you recall that discusses
23    how you should consider race in the Harvard admissions
24    process, correct?
25    A.  That is not correct.
```

**JA1102**

1    **Q.**  Mr. Looby, I'm going to hand you a copy of your

2    deposition.

3          MR. MORTARA:  May I approach, Your Honor?

4          THE COURT:  Of course.

5    BY MR. MORTARA:

6    **Q.**  Mr. Looby, to help you understand, I'm going to orient

7    you to your deposition by turning to page 27 first so you can

8    see what document is being discussed.

9          MR. MORTARA:  Your Honor, I'm not going to put this

10   on the screen just yet because this isn't the actual

11   impeachment.

12   BY MR. MORTARA:

13   **Q.**  It says Exhibit 1 marked.  Do you see that at line 16?

14   **A.**  Yes.

15   **Q.**  And then you see the next page 28 at lines 2 to 5 it

16   says:  Can you describe to me generally what that is, and

17   that's the reading procedures, class of '19.

18          Do you see that?

19   **A.**  I do see that, yes.

20   **Q.**  And then I want you to turn to page 46 of your

21   deposition, line 7.

22          At line 7 it says, "Do you recall ever reading a

23   document that outlines how you as an admissions officer

24   should use race in the admissions process?

25          "ANSWER:  This is the only document that I can

1    recall that discusses how we should consider race."

2         Was that your sworn testimony?

3    **A.**   That was, yes.

4    **Q.**   But the fact is there isn't actually any discussion in

5    this document about how you should use race in the admissions

6    process, is there?

7    **A.**   I see prompts that involve race in this, so I would

8    categorize that as instructions on how to use race.

9    **Q.**   Would you please turn to the previous page of your

10   deposition.

11        Do you see at line 5 it says, "Was there any

12   discussion in this document about how you should use race in

13   the admissions process?

14        "ANSWER:  Not that I recall, no."

15        Do you see that?

16   **A.**   I do.

17   **Q.**   That was your sworn testimony?

18   **A.**   It was.

19   **Q.**   Mr. Looby, there are no written training materials about

20   how to use race in Harvard's admissions process, are there?

21   **A.**   I believe there's much more than written instructions

22   with regards to using race in our process.

23   **Q.**   Please focus on my question.

24        There are no written training materials about how

25   to use race in Harvard's admissions process, correct?

1    **A.**  Again, I view this document as something that discusses

2    race and how to categorize that.  So I would say that that is

3    actually not a correct statement.

4    **Q.**  Take a look at the document.  Please tell me where on the

5    document it tells you how to use race, sir.

6    **A.**  In terms of coding the application.

7    **Q.**  I'm asking you how race affects whether somebody gets

8    admitted or not.  Did you not understand my question before?

9    Let me rephrase it.

10            Are there any written materials that tell Harvard

11    admissions officers, like you, how to use race insofar as it

12    affects somebody's admissions prospects?

13   **A.**  Well, there's far more than just race that affects

14   someone's chances of being admitted.

15            MR. MORTARA:  Your Honor, I move to strike the

16   answer as nonresponsive.

17            THE COURT:  I am not going to strike the answer.

18   The lawyers from Harvard are going to have a chance to go

19   back at you and clarify anything that you feel like it's not

20   clear.  So while it's his turn to ask you questions, you

21   should just listen to the question and answer to the best of

22   your ability the question that he's asking.

23   BY MR. MORTARA:

24   **Q.**  Insofar as it affects whether someone is admitted or not,

25   there are no written training materials telling admissions

1    officers how to use race in the process, correct?

2    A.   I'm not sure.

3    Q.   Is there any written guidance in Plaintiff's Exhibit 71

4    on how to use race as to whether someone is admitted or not

5    in Harvard's admission process?

6    A.   I think all of the information in this document is

7    related to who exactly has the potential to be admitted.

8    Q.   Mr. Looby, please focus on my question.  I'm only asking

9    about the use of race as it pertains to whether someone is

10   admitted or not.

11           Can you just tell me whether there's anything in

12   Plaintiff's Exhibit 71 that tells you how to use race in

13   making that decision?

14   A.   Again, I see this as all information tied to how we make

15   these decisions.

16   Q.   Mr. Looby, please identify where in Exhibit 71 it tells

17   you how to you use race to decide whether to admit somebody.

18           MS. CONLEY:  Objection.  Asked and answered.

19           THE COURT:  Well, it has been asked.  I don't think

20   it's exactly been answered.  I'll give him another shot at

21   it.

22   BY MR. MORTARA:

23   Q.   Just page through it as long as you need to, sir.  Find

24   where it tells you how you to use race in deciding whether to

25   admit somebody.

**JA1106**

1   **A.**  Again, race is not something that is solely responsible

2   for admitting anyone.

3   **Q.**  I understand that, Mr. Looby.  My question is, is there

4   any written guidance given to Harvard admissions officers

5   instructing them how to use race in making their admissions

6   decisions?

7   **A.**  Again, I think this is a solid guideline that helps us

8   make these decisions.  I don't see anything specific that

9   points to this is how you should use it when admitting a

10  student.

11  **Q.**  Now let's break that down a little bit.

12          That means there's no written guidance on how to

13  use race in the ratings Harvard assigns, including the

14  overall rating, which appears at the top of page 5 of this

15  document.  No written guidance on how to use race in

16  assigning that rating, correct?

17  **A.**  We don't use -- that's correct.  I strike that.

18  **Q.**  No written guidance on how to use race in the academic

19  rating, correct?

20  **A.**  We don't use race when we're assigning academic.

21  **Q.**  Mr. Looby, does it say anything about using race one way

22  or the other on Plaintiff's Exhibit 71 when it's talking

23  about the academic rating?

24  **A.**  No, it does not.

25  **Q.**  No written guidance about whether to use race one way or

1    the other on the extracurricular rating, correct?

2    **A.**   That is correct.

3    **Q.**   No written guidance on whether to use race one way or the

4    other whether it comes to the athletic rating, correct?

5    **A.**   That is correct.

6    **Q.**   No written guidance when it comes to how to use race one

7    way or the other when it comes to the personal rating,

8    correct?

9    **A.**   That is correct.

10   **Q.**   And the same for school support.  No written guidance one

11   way or the other being on how to use race with the school

12   support, correct?

13   **A.**   That is correct.

14   **Q.**   Do you think one priority of your work in admissions is

15   to make sure that everyone is getting a fair shake?

16   **A.**   I do, yes.

17   **Q.**   And making sure that everyone is treated fairly requires

18   making sure as much as is possible that the reading guidance

19   and the written instructions you're given are applied in a

20   consistent way.  Is that fair?

21   **A.**   Absolutely, yes.

22   **Q.**   And that's why you have the reading procedures.  So if we

23   go back to academics, there's some guidance here to make sure

24   that the ratings are applied in a consistent way, right?

25   **A.**   That's correct.

Case: 19-2005   Document: 00117683237   Page: 400   Date Filed: 07/30/2026   Entry ID: 6356615
Case 1:14-cv-14176-ADB   Document 635   Filed 04/18/19   Page 158 of 246

158

1   **Q.** Now, you've worked in a few other professional

2   environments, right?

3   **A.** I have, yes.

4   **Q.** You worked at ESPN?

5   **A.** I did.

6   **Q.** And you worked at Major League Baseball?

7   **A.** I did.

8   **Q.** Did you have training at those jobs?

9   **A.** I did.

10  **Q.** Do you remember some of your training from those jobs?

11  **A.** Vaguely.

12  **Q.** Do you remember some of the important topics that were

13  discussed in those trainings or in the written materials you

14  received?

15  **A.** Vaguely.

16  **Q.** You don't need to get into specifics, although we might

17  all want to know about what you get trained in when you work

18  at Major League Baseball, but do you remember what was

19  important to Major League Baseball with respect to your job

20  there?

21  **A.** I do.

22  **Q.** Was there written guidance on company procedures?

23  **A.** Yes.

24  **Q.** Now, when you started reading applications, did you think

25  it was strange that there was no written guidance on how to

1    use race in the consideration of whether to admit a Harvard

2    applicant?

3    **A.**  I did not.

4    **Q.**  I mean, you saw the written guidance here for academic.

5    We saw written guidance for extracurricular and for athletic.

6    You saw all those, right?

7    **A.**  I did.

8    **Q.**  You didn't think it was odd that there was no written

9    guidance on how to use race?

10   **A.**  Not at the time, no.

11   **Q.**  You understand race can be a sensitive issue in America,

12   right?

13   **A.**  I sure do, yes.

14   **Q.**  You understand that it's a sensitive issue when you're

15   dealing with college admissions, right?

16   **A.**  I do, yes.

17   **Q.**  And I don't know whether you do or not, but do you have

18   some idea that there's considerable legal boundaries on what

19   can be done with the use of race in college admissions?

20   **A.**  I do, yes.

21   **Q.**  Did you have those understandings when you started

22   reading applications?

23   **A.**  I believe I did, yes.

24   **Q.**  And you didn't think it was odd that there was nothing in

25   writing that was given to you about how to use race in

1    deciding whether to admit someone?

2    **A.**   I didn't think it was odd because, while it wasn't

3    written, it was certainly a topic that was discussed at great

4    length in person.

5    **Q.**   Mr. Looby, you've been reading applications for eight

6    years, right?

7    **A.**   That's right.

8    **Q.**   And in those eight years, you can't even remember anyone

9    ever teaching you how to use race in the admissions process

10   when you were making your admissions decisions; isn't that

11   right?

12   **A.**   That is not right.

13   **Q.**   Please turn to your deposition at page 46, sir.  At the

14   bottom at line 123 there's a question.  Do you see that?

15   **A.**   I do.

16   **Q.**   "Did anyone ever teach you how to use race in the

17   admissions process when you were making your admissions

18   decisions?

19            "ANSWER:  I don't recall."

20            Was that your sworn testimony a year ago?

21   **A.**   It was, yes.

22   **Q.**   Now, Mr. Looby, I want to stop here and talk about the

23   time that's passed since you gave your sworn deposition in

24   this case.

25   **A.**   Mm-hmm.

 1  **Q.**  You gave your sworn deposition in, what, about June 2017?

 2  **A.**  That's correct.

 3  **Q.**  That was taken by my friend Mr. Connolly over here?

 4  **A.**  Correct.

 5  **Q.**  About a month later -- let's back up.  That was on page

 6  46 and 47 of your deposition, right?

 7  **A.**  Correct.

 8  **Q.**  And how many pages of your deposition do you have in

 9  front of you?  About 226 of your testimony?

10  **A.**  That's correct.

11  **Q.**  And how long did your deposition last, sir?

12  **A.**  Quite a long time.

13  **Q.**  So in the first 46 pages, you told my friend Mr. Connolly

14  that you couldn't remember anyone ever teaching you how to

15  use race in the admissions process, correct?

16  **A.**  That's what it says here.

17  **Q.**  And then you sat there for hours and gave more testimony,

18  correct?

19  **A.**  That's correct.

20  **Q.**  There were breaks, correct?

21  **A.**  That's correct.

22  **Q.**  You could have come back and told Mr. Connolly you'd

23  spoken in error and you'd remembered something, correct?

24  **A.**  That's correct.

25  **Q.**  And then you filled out what's called and errata sheet.

 1    Do you know what that is, sir?

 2    **A.**   I believe I do.

 3    **Q.**   I'm going to hand you a copy.

 4            MR. MORTARA:  Your Honor, may I approach?

 5            THE COURT:  You may.

 6    BY MR. MORTARA:

 7    **Q.**   I'm going to put it up on the screen.  Is that your

 8    signature on this errata sheet, which is August 9, 2017?

 9    **A.**   Yes, it is.

10    **Q.**   And in fact, you made some changes to your deposition

11    testimony, didn't you?

12    **A.**   I did, yes.

13    **Q.**   So a month later, you carefully read your deposition and

14    you made changes where you even needed to clarify your

15    testimony, right?

16    **A.**   Correct.

17    **Q.**   And you did not clarify your testimony that you couldn't

18    remember anyone teaching you how to use race in Harvard's

19    admissions process, did you?

20    **A.**   I did not, no.

21    **Q.**   And here we are, it's about 14 months later, correct?

22    **A.**   Correct.

23    **Q.**   Did you reach out to Mr. Connolly or anybody and tell

24    them that you had new testimony or wanted to change your

25    testimony?  Did you do that?

Case: 19-2005    Document: 00147682237    Page: 405    Date Filed: 07/30/2020    Entry ID: 6356615
Case 1:14-cv-14176-ADB   Document 635   Filed 04/18/19   Page 163 of 246

163

1   **A.**   No, I did not.

2   **Q.**   Okay, Mr. Looby, let's get back on track.  I want to talk

3   to you about the dockets you read in and what you see when

4   you read applications.

5           Now, we pulled the numbers from the Austin docket,

6   but you're the one who really knows.  I'm just going to ask

7   you about your experience.  Okay?

8           Is the Austin docket quite racially diverse?

9   **A.**   Yes.

10  **Q.**   There are a lot of Asian-American applicants in the

11  Austin docket, aren't there?

12  **A.**   I believe there are.  I think there's a number of

13  different types of folks applying from that docket.

14  **Q.**   I'm going to go through -- fair number, there's a fair

15  number, sizeable percentage of Asian-American applicants in

16  the Austin docket, correct?

17  **A.**   Correct.

18  **Q.**   Would you agree with me it's about 30 percent?

19  **A.**   I don't know.

20  **Q.**   Does it sound good to say it's more than 10 percent?

21  **A.**   That's fair.

22  **Q.**   And there's a fair number of African-American applicants,

23  too, right?

24  **A.**   Yes.

25  **Q.**   And of course a large number of Hispanic applicants,

1    being Texas, correct?

2    A.   Yes.

3    Q.   And there's a lot of white applicants, too, actually.

4    It's kind of a mix, isn't it?

5    A.   It is, yes.

6    Q.   And how long have you been reading the Austin docket,

7    again?

8    A.   I believe seven years.

9    Q.   And you've reviewed a lot of applications from the Austin

10   docket from Asian-American students, correct?

11   A.   The Texas docket, yes, I have.

12   Q.   Hundreds?  Thousands?

13   A.   Probably thousands.

14   Q.   Thousands of applications from Asian-Americans?

15   A.   Over a thousand, I should say.

16   Q.   Over a thousand applications from Asian-American students

17   from the Austin docket.  Have you seen Asian-American

18   applications from the D docket, from Austin, where the

19   applicant has perfect or near-perfect SAT or ACT scores?

20   A.   I've seen a number of students in general that fit that

21   criteria.

22   Q.   From say Westwood High School.  Have you seen a lot of

23   Asian-American applicants with perfect or near-perfect ACT or

24   SAT scores?

25   A.   Again, I've seen a number of students that present those

**JA1115**

1    credentials.

2    **Q.**  I'll get there.  I understand that not all the students

3    can be admitted.  I get where you're going.  I'm just asking

4    you have you seen a fair number of Asian-American

5    applications with near-perfect or perfect ACT and SAT scores?

6    **A.**  I believe I've seen quite a few, yes.

7    **Q.**  And sometimes those applicants get wait-listed or

8    rejected because they lack what you call distinguishing

9    excellence, right?

10    **A.**  Just like other applicants, yes.

11    **Q.**  Would you say in your experience on the D docket that

12    there are more Asian-American applications with near-perfect

13    or perfect SAT or ACT scores than there are white applicants

14    with those kind of marks?

15    **A.**  I can't say for certain, no.

16    **Q.**  Would you say that there are more Asian-American

17    applicants with perfect or near-perfect SAT or ACT scores

18    than there are African-Americans with those kind of marks?

19    **A.**  I couldn't say that as well.  I couldn't say that either.

20    **Q.**  I want to talk to you about something I saw in the reader

21    guidance, and it's over at page 12.  Are you there, sir?

22    **A.**  Yes.

23    **Q.**  It's something about prose comments.  It says, "When

24    making prose comments, first readers" --

25            That's you, right?

1    **A.**   That is, yes.

2    **Q.**   -- "should note the important academic and

3    extracurricular accomplishments that are particularly

4    pertinent to the case.  It is also helpful to reference

5    teacher reports or other items that may be crucial to our

6    evaluation.  In addition to numerical ratings, readers should

7    try to summarize the strengths and weaknesses of the folder

8    in brief paragraphs or comments.  Avoid slang and jargon and

9    remember," all caps, "your comments may be open to public

10   view at a later time."

11           Do you see that?

12   **A.**   I do, yes.

13   **Q.**   How do you take that instruction?  What do you think it

14   means?

15   **A.**   Just be careful with what you write.

16   **Q.**   Because somebody might look at it later, right?

17   **A.**   Someone may look at it later.

18   **Q.**   Now let's talk -- even though there aren't any written

19   instructions about how you use race, you usually discover the

20   race of a student from a data point or box on the

21   application, correct?

22   **A.**   If self-identified, yes.

23   **Q.**   And if race is provided to you on the application, that

24   means you will include it in your decision-making, correct?

25   **A.**   Just like with everything else in that application, it's

1    something we consider.

2    **Q.**   Now, you see applications where you know the student's

3    race, but the student's race wasn't discussed anywhere else

4    on the application, correct?

5    **A.**   That could be the case.

6    **Q.**   And in those situations, you take the student's race into

7    account when making your admission decision by what you call

8    thinking of the whole person, correct?

9    **A.**   We review the whole person, that's correct.

10   **Q.**   You would take the student's race into account even

11   though the only place the student put race on their

12   application was the box check on the common application,

13   correct?

14   **A.**   Again, we take everything that's included in the

15   application.  If that's included, it would be something that

16   we would consider, absolutely.

17   **Q.**   I want to make sure we got the record clear.  A student

18   applies to Harvard.  They check the box.  They say I am

19   Asian-American.  They don't write anything about their race

20   or ethnicity anywhere else on their application.

21        You, Christopher Looby, will take that into account

22   in making your admissions ratings and decisions, correct?

23   **A.**   Not specifically.  We take socioeconomic status, the

24   family's socioeconomic status into consideration.  We would

25   take the school support into consideration.  We would take

 1    their extracurriculars into consideration.  I mean, it's one

 2    of many factors that we would consider.

 3    Q.  And you take their race into consideration as well,

 4    correct?

 5    A.  If provided, it might be something that we might

 6    consider.

 7    Q.  If provided by checking the box on the common

 8    application, correct?

 9    A.  It may be something that we consider.

10    Q.  Correct?  Yes?

11    A.  It may be something that we consider.

12    Q.  If a student checks the box on the common application and

13    indicates their race, you will take that into account no

14    matter what the rest of the application says, correct?

15            MS. CONLEY:  Your Honor, asked and answered.

16            THE COURT:  I'll let him have it.

17            MR. MORTARA:  Could you read it back, Ms. Daly.

18            (The reporter read back as requested.)

19            THE WITNESS:  That's not the case.

20    BY MR. MORTARA:

21    Q.  Tell me about all the times you have not taken race into

22    account when the student checked the box on the application.

23    A.  There may be other factors involved when deciding the

24    outcome of that particular application.

25    Q.  I thought you understood Harvard's admissions process to

1   be about the whole person; is that correct?

2   **A.**   That is.

3   **Q.**   And somebody's race is part of the whole person, correct?

4   **A.**   That's correct.

5   **Q.**   And you take that into account when somebody provides

6   that information, correct?

7   **A.**   It may not be a component that is what is driving us to

8   make a certain decision.

9   **Q.**   I'm not asking you why you make your decisions.  I'm

10  asking you what you take into account in making them.

11          You take an applicant's race into account when that

12  information is provided, correct?

13  **A.**   Again, we may.  We may.  It's not a yes-or-no answer.

14  **Q.**   Do you sometimes decide not to take an applicant's race

15  into account?

16  **A.**   No.  Sometimes it's not a factor that again is driving

17  the decision.  So it's not --

18  **Q.**   I'm not asking you about factors that drive the decision.

19  I'm asking you about things you think about or take into

20  account of.  You may take them into account and reject them.

21  You may take them into account and admit them.

22          Do you take applicant's race into account when they

23  provide it to Harvard?

24  **A.**   It depends on the individual.

25  **Q.**   Now, you told us a little while ago -- withdrawn.

1          You learned -- the first place you learned that

2     race was a factor for you to consider in admissions was

3     actually the first page of the reading guidance we're looking

4     at, Plaintiff's 71.  Isn't that correct?

5     **A.**  I don't recall if that's the first place that I learned

6     it.

7     **Q.**  Well, how did you learn that race is one of the many

8     factors you should use in the admissions process?

9     **A.**  It could have been a discussion prior to reading this

10    guideline.

11    **Q.**  Please turn to page 47 of your deposition, line 18.

12         "QUESTION:  Yes, but there's no discussion here

13    about how you should use race when reviewing an application.

14    So how did you learn that race is one of many factors that

15    you should use in the admissions process?

16         "ANSWER:  It's on the first page here.  It's one of

17    the components of the reading procedures."

18         Was that your sworn testimony?

19    **A.**  It was, yes.

20    **Q.**  14 months ago, correct?

21    **A.**  That's correct.

22    **Q.**  To Mr. Connolly, my friend?

23    **A.**  That's right.

24    **Q.**  And a month later you had an errata sheet and didn't

25    change that either.

1    **A.**   Correct.

2    **Q.**   And 14 months later we're here, correct?

3    **A.**   Correct.  If I could say one thing.  What you asked me

4    was what was the first thing that you learned about that.

5    I'm saying here that it was on the first page.  I didn't say

6    anywhere that it was the first thing that I learned about how

7    race should be used.

8    **Q.**   The record will be clear about what I asked, sir, so we

9    can go back and look at it.  If I confused you, then I'm

10   deeply sorry.

11        Now I want to talk about the eight years you've

12   been there reading applications.  You've been there for eight

13   years reading applications, and you have can't even remember

14   anyone teaching you to use race in the admissions process.

15   We talked about that, right?

16   **A.**   I don't view it that way.

17   **Q.**   You don't know if other admissions officers use race the

18   way you do, do you?

19   **A.**   I do know that others use race the way that I do.

20   **Q.**   Please turn to page 49 of your deposition, sir.

21        Line 6, "Do you know if this is how other

22   admissions officers use race in the admissions process?

23        "ANSWER:  I don't know."

24        That was your testimony 14 months ago to

25   Mr. Connolly, my friend, correct?

**JA1122**

1    **A.**  That's correct.

2    **Q.**  And a month later you did an errata sheet, a sworn errata

3    sheet.  You didn't change this either, did you?

4    **A.**  No, I did not.

5    **Q.**  And 14 months go by and you don't tell anybody you're

6    going to change your testimony, do you?

7    **A.**  That's correct.

8    **Q.**  Now I need to stop again.  You spent 15 hours preparing

9    for your deposition with Harvard's lawyers; isn't that right?

10   **A.**  Approximately.

11   **Q.**  Do you want me to the refresh your recollection with your

12   deposition?  Please look at page 6, lines 21 to 23.  I'll

13   leave it off the screen.

14        You spent 15 hours with Harvard's lawyers getting

15   ready for your deposition 14 months ago, correct?

16   **A.**  Yeah.  Approximately.

17   **Q.**  And then you spent some hours reviewing your transcript

18   for the errata sheet we talked about several times.  How many

19   do you think that was?

20   **A.**  I don't know.

21   **Q.**  Two?

22   **A.**  Approximately.

23   **Q.**  Let's call that two.  How many days were you meeting with

24   Harvard's lawyers to get ready for your testimony in court

25   today?

1    **A.**  A number.

2    **Q.**  How many?

3    **A.**  Eight, ten.

4    **Q.**  Eight or ten days with Harvard's lawyers.  How many hours

5    a day?

6    **A.**  It's varied tremendously.  It hasn't been a consistent

7    number.

8    **Q.**  Let's go through as best as you can recollect, sir.  I

9    want to get for the record how many hours you spent with

10   Harvard's lawyers getting ready to testify here for about

11   30 minutes today.

12            How many hours on the first day?

13   **A.**  I don't recall.

14   **Q.**  You don't have any recollection of how many hours you

15   spent?  And who were the lawyers there?

16   **A.**  The lawyers were represented over at this table here.

17   **Q.**  Who are you identifying?

18   **A.**  Danielle, Denise.  I believe there were others back at

19   the law firm.

20   **Q.**  How many lawyers did you meet with on the first day when

21   you can't remember how long you met with them?

22   **A.**  I really don't recall.

23   **Q.**  Was it more than two or three?

24   **A.**  I believe so, yes.

25   **Q.**  So you met with more than two or three lawyers for some

1    undetermined number of hours on one day.  Same for the next

2    day.  Do you remember how many hours that was?

3    **A.**  I don't know.

4    **Q.**  Did you meet yesterday with lawyers?

5    **A.**  I did.

6    **Q.**  How many lawyers did you meet with yesterday?

7    **A.**  I believe three or four.

8    **Q.**  For how many hours yesterday did you meet with lawyers?

9    **A.**  About three, I believe.

10   **Q.**  Was that about the same amount of time you met with them

11   on the previous days?

12   **A.**  No.  I believe previous days was a bit longer.

13   **Q.**  So let's call it conservatively three hours a day for

14   conservatively eight days.  By my count, that's 24 hours.  So

15   you've now spent over 40 hours thinking about your testimony

16   in this case; is that right?

17   **A.**  Yes.  Well, I would say just thinking about this

18   testimony far more than 40 hours.

19   **Q.**  And you spent 39 hours with Harvard's lawyers, correct?

20   **A.**  Yep.

21   **Q.**  And you spent at least, probably more than 24 hours with

22   groups of Harvard's lawyers before you came in here and

23   changed about five or six different items in your deposition

24   testimony we've already been through.  Isn't that right?

25   **A.**  I don't believe I've changed on all of these answers.

1    **Q.**  Do you disagree that you answered things like "I don't

2    know" in your deposition and you're coming in here and you're

3    saying now you do know?

4    **A.**  I believe I did not know at that time, yes.

5    **Q.**  And between then and now, you spent 24 hours at least in

6    rooms with Harvard -- multiple lawyers from Harvard getting

7    ready to tell the truth under oath here, correct?

8    **A.**  I have told the truth in my deposition as well.

9    **Q.**  I want to talk to you about things related to the

10   personal rating, but first I want to talk about the other

11   ratings.

12           Do you see on Plaintiff's Exhibit 71 overall,

13   academic, extracurricular, athletic, personal?  Do you see

14   all that?  And then there's school support.  You know those

15   ratings?

16   **A.**  I do.

17   **Q.**  And you would give every student who had completed an

18   application a score in one of those six categories, correct?

19   **A.**  I would, yes.

20   **Q.**  And when we talked to you before under oath, you told us

21   that you didn't know any other document that would describe

22   how an admissions officer would score candidates in these

23   categories, did you?

24   **A.**  I believe I did.

25   **Q.**  The description in each of these categories aligns with

1    how you would rate an applicant, correct?

2    **A.**   Provides a solid framework, yes.

3    **Q.**   It aligns with how you would rate an applicant in each of

4    these categories, correct?

5    **A.**   It could.

6    **Q.**   You'd say generally speaking it does, right?

7    **A.**   It could.

8    **Q.**   Mr. Looby, please turn to your deposition, page 39.

9          "QUESTION:  And after reviewing these pages, does

10   the description in each of these categories align with how

11   you would rate an applicant for each of these categories?"

12         Then your lawyer objected.

13         "ANSWER:  Generally speaking, yes."

14         Did you see that?

15   **A.**   I do.

16   **Q.**   Did you read your deposition before you came here today,

17   sir?

18   **A.**   I did.

19   **Q.**   How may times?

20   **A.**   I believe I read it when I signed this piece of paper.

21   **Q.**   That was 14 months ago or about, right?

22   **A.**   Yes.

23   **Q.**   Did you read it in the last couple of weeks?

24   **A.**   I did, yes.

25   **Q.**   Did you discover that there were things that were wrong

1    in it?

2    **A.**   No.

3    **Q.**   Mr. Looby, now let's talk about the scores again, and I

4    want to ask you when you assign a score in any of these

5    categories, you take race into account, don't you?

6    **A.**   If we were to take race into account when rating any of

7    these, it may very well be the overall.

8    **Q.**   Please turn to your deposition, same page, 39, sir.

9         "QUESTION:  When you would score students in these

10   categories, would you take a student's race into account when

11   assigning him a score in any of these categories?"

12        And your lawyer objected.

13        "ANSWER:  It's one of my factors that I consider.

14        "QUESTION:  For every category?

15        "ANSWER:  I'm looking at the applicant as a whole.

16        Race is one of the factors you consider --

17   withdrawn.

18        That was your sworn testimony, sir, wasn't it?

19   **A.**   It was indeed, yes.

20   **Q.**   And race is one of the factors you consider when

21   assigning an applicant a score in any of the categories,

22   correct?

23   **A.**   That would be, again, the overall.

24   **Q.**   Sir, it doesn't say "overall" on your deposition, does

25   it?  It says any of these categories.  That's what it says,

1    right?

2    **A.**  It does not say that exactly.  It says when you would

3    score students in these categories.

4    **Q.**  Keep reading the question, sir.

5    **A.**  Would you take a student's race into account when

6    assigning him a score in any of these categories?

7    **Q.**  "ANSWER:  It's one of my factors that I consider."

8              When you were reading your deposition, did you

9    discover that you maybe testified in error and wanted to say

10   it was the overall score?

11   **A.**  No.  I answered the question as I heard it.  That's not

12   what I was trying to convey.

13   **Q.**  You misheard the question but then you read it and you

14   did the errata sheet.  You didn't clarify your answer to this

15   question, did you?

16   **A.**  I answered the question as I heard it.

17   **Q.**  Sir, when you did your errata sheet, you weren't

18   listening to the deposition on an audio tape, were you?

19   **A.**  No, I was not.

20   **Q.**  You were reading it just like we're reading it right here

21   in court.  And you didn't fix it, did you?

22   **A.**  I did not, no.

23   **Q.**  You didn't tell my friend Mr. Connolly that you were

24   going to change your testimony, did you, or that you misheard

25   the question, did you?

**JA1129**

```
 1    A.   I thought I understood the question.  What I was trying
 2    to convey is that race is one factor of many when trying to
 3    assess the applicant as a whole.  If you're trying to say
 4    that I use race when assigning any of the four components of
 5    the profile, that would not be accurate.
 6    Q.   We'll come back to that, sir.
 7              Now I want to talk about the personal rating.  And
 8    what I'm hoping to do is not have to use your deposition
 9    while I just ask you some simple questions that go into it.
10              MS. CONLEY:  Objection, Your Honor.  Argumentative.
11              THE COURT:  Ask a question.
12              MR. MORTARA:  Ms. Daly and I have organized a
13    procedure.  She's going to come over there by the flip chart,
14    and I'm going to draw on it a few things.  I'm going to take
15    my outline and your deposition, and I have Ms. Daly's
16    permission to ask questions from over there, if I have the
17    Court's.
18              THE COURT:  Is there a microphone over there or are
19    you going with him?
20              THE REPORTER:  I'm going with him because there's
21    no microphone there.
22    BY MR. MORTARA:
23    Q.   So let's talk about the personal rating, Mr. Looby.  Are
24    you ready?
25    A.   Yes.
```

1    **Q.**  I understand when you assign a personal rating, you're

2    looking at who that person is, correct?

3    **A.**  Correct.

4    **Q.**  So I'm going to make a title here, "Personal Rating."

5    And the first thing I'm going to write is who that person is.

6    And by that, you mean what a person brings to the community,

7    right?

8    **A.**  Could be.

9    **Q.**  Positive contributions that you're looking for include an

10   ability to work well with others and create meaningful

11   relationships with peers, right?

12   **A.**  Yes.

13   **Q.**  And I'm writing those on the flip chart.  I'll write

14   "meaningful relationships" and "work well with others."

15           And I'm running out of room.  Look at that.

16           You're looking for where others like to be around

17   him or her.  You'd say that?

18   **A.**  I would, yes.

19   **Q.**  Can we call that likability?

20   **A.**  Sure.

21   **Q.**  And you'd call that a positive personality, wouldn't you,

22   positive personality characteristics?

23   **A.**  All of those?

24   **Q.**  No.  Just generally.  You're looking for a positive

25   personality or like ability?

```
 1   A.  Could be.

 2   Q.  And I put that up there, too.

 3           MR. MORTARA:  Ms. Daly, we can go back.

 4   BY MR. MORTARA:

 5   Q.  Is race a part of who someone is or who the that person

 6   is?

 7   A.  I don't think so necessarily, no.

 8   Q.  Race is not a part about who someone is, huh?

 9   A.  A person's race could inform us of characteristics that

10   tell us a bit about their personality.

11   Q.  And someone's race could also tell you something about

12   what they're going to bring to the Harvard community, right?

13   A.  Not necessarily.

14   Q.  It doesn't tell you what they might bring to the Harvard

15   community at all?  Why is Harvard using race in admissions

16   exactly?  I'll withdraw the question.

17           Why is Harvard using race in the college admissions

18   process?

19   A.  Could you repeat that, please?

20   Q.  Yeah.  Why is Harvard College using race as part of its

21   college admissions process?

22   A.  Again, I think it goes back to the whole-person review.

23   It allows us to get a good understanding of the applicant as

24   a whole.

25   Q.  And what is Harvard trying to get for itself from that?
```

**JA1132**

1    Trying to make a good and diverse community maybe?

2    **A.**  Absolutely, yes.

3    **Q.**  So does somebody's race tell you a little bit about what

4    they're going to bring to the community?

5    **A.**  I think it depends on the individual.

6    **Q.**  But it can, right?

7    **A.**  It could.

8    **Q.**  And you take a student's race into account when assessing

9    his or her personal qualities as one factor to consider.

10   Isn't that right, Mr. Looby?

11   **A.**  That is not right.

12   **Q.**  Please turn to your deposition again, sir, at page 51.

13   We're going to go to line 12 this time.

14          "QUESTION:  Would you take a student's race into

15   account when assessing his or her personal qualities?

16          "Just like with the academic rating, it's one

17   factor of my consider."

18          That was your sworn testimony, right?

19   **A.**  Correct.

20   **Q.**  15 hours with Harvard's lawyers before you gave it,

21   right?

22   **A.**  Correct.

23   **Q.**  A month went by afterwards, you spent at least two hours

24   reading this, signed a sworn errata, didn't change it.

25   Right?

1    **A.**   That's correct.

2    **Q.**   Since then in getting ready for trial you spent at least

3    24 hours with three or four, maybe even five, Harvard lawyers

4    getting ready to come in here and testify when I asked you

5    questions, right?

6    **A.**   That's correct.

7              MR. MORTARA:  No more questions, Your Honor.

8              Your Honor, we're going to mark the demonstrative

9    Plaintiff's Demonstrative Exhibit 21.  We'll sticker it and

10   send you a picture.  It looks horrible.

11             THE COURT:  What did you say was the number?

12             MR. MORTARA:  Plaintiff's 21.

13             MS. CONLEY:  Your Honor, can we take that down?

14             THE COURT:  Sure.

15                       CROSS-EXAMINATION

16   BY MS. CONLEY:

17   **Q.**   Good afternoon, Mr. Looby.

18   **A.**   Good afternoon.

19   **Q.**   Mr. Looby, do you consider this a serious case?

20   **A.**   Very serious.

21   **Q.**   And do you consider these to be serious issues?

22   **A.**   Absolutely I do.

23   **Q.**   And you're taking your testimony today seriously,

24   correct?

25   **A.**   I sure am, yes.

1  **Q.**  Now, Mr. Mortara walked you through various ratings that

2  an admissions officer assigns when evaluating an application

3  for admission and asked you if you consider assigning those

4  ratings.  Do you recall that?

5  **A.**  Yes.

6  **Q.**  Mr. Looby, do you consider race when assigning an

7  applicant a personal rating?

8  **A.**  No.

9  **Q.**  Do you consider race when assigning an applicant an

10  academic rating?

11  **A.**  No, I do not.

12  **Q.**  Do you consider race when assigning an applicant an

13  extracurricular rating?

14  **A.**  No, I do not.

15  **Q.**  Do you consider race when assigning an applicant an

16  athletic rating?

17  **A.**  No, I do not.

18  **Q.**  Do you recall when Mr. Mortara showed you your deposition

19  testimony regarding whether you take race into account when

20  assessing an applicant's personal qualities?

21  **A.**  I do, yes.

22  **Q.**  Let's take a quick look at that deposition testimony,

23  page 51, lines 12 through 17.  You were asked whether you

24  would take a student's race into account when assessing his

25  or her personal qualities.

1          And your answer was, "Just like with the academic

2     rating, it's one factor of many I consider."

3          Is that right?

4     **A.**   That's correct.

5     **Q.**   And you told Mr. Mortara that your testimony at your

6     deposition was -- you answered in a way that you understood

7     the question?

8          MR. MORTARA:  Your Honor, I object.  That wasn't

9     the question I was reading when he said that.  That was the

10    other question about all the ratings when he said he misheard

11    me about any of the factors.  Not even the same question.  I

12    object.

13         THE COURT:  I'm going to overrule it because "I

14    don't like it" is not the same thing as a legitimate

15    objection.  You have to give me a rule on an objection.

16    There's no rule that prohibits what she just did.  I will

17    listen to the evidence.  I got it.

18    BY MS. CONLEY:

19    **Q.**   What did you mean when you told Mr. Mortara that that's

20    how you understood the question?

21    **A.**   Again, what I was trying to convey is how I used race as

22    one factor of many within the application when assessing an

23    applicant's overall rating.

24    **Q.**   Stepping back for a minute, when you were deposed in this

25    case 14 months ago, was it your first deposition?

1    **A.** Yes.

2    **Q.** And were you nervous?

3    **A.** Extremely nervous, yes.

4    **Q.** Now, Mr. Looby, at the time that you were deposed

5    14 months ago, did you, as an admissions officer, consider

6    race when assigning an applicant a personal rating?

7    **A.** No.

8    **Q.** And sitting here today as an admissions officer, do you

9    consider race when assigning an applicant a personal rating?

10   **A.** No.

11   **Q.** Mr. Looby, what is the preliminary overall rating?

12   **A.** The preliminary overall rating would be a rating that is

13   assigned by an admissions officer, and that would be an

14   indication of how that officer views the strength of that

15   particular application relative to the applicant pool.

16   **Q.** And would you consider an applicant's race when assigning

17   an applicant a preliminary overall rating?

18   **A.** We certainly could.

19   **Q.** Under what circumstances might you consider an

20   applicant's race when assigning the POR or preliminary

21   overall rating?

22   **A.** So at that point we'd be looking at, you know, many, many

23   very qualified applicants.  And it may be that for a

24   particular applicant it ultimately winds up being a tip that

25   pushes him or her into the admitted applicant pool.

```
 1   Q.  Now, Mr. Mortara also showed you P71, which were the

 2   reading procedures from the class of 2019.  Do you recall

 3   that?

 4   A.  I do, yes.

 5   Q.  And he asked you whether there was any written guidance

 6   with respect to the use of race in that particular document;

 7   is that right?

 8   A.  That's correct.

 9   Q.  Mr. Looby, let me just back up and ask you, as an

10   admissions officer, have you received training on how to use

11   race in the admissions process?

12   A.  I absolutely have, yes.

13   Q.  And can you describe to Your Honor what training you've

14   received with respect to how to use race in the admissions

15   process?

16   A.  Sure.  So as mentioned earlier, when I first began

17   working as an admissions officer, I worked with a number of

18   colleagues also beginning.

19           And we would meet as a small committee and go over

20   the reading instructions.  We'd go over how to read a

21   particular file.  We would go over how the committee process

22   works.

23           And at that point, once the application is cleared,

24   they became actual applications.  We would then read those,

25   we would rate those, and they would be passed along randomly
```

1    to upper-level admissions folks who would then circle back

2    and talk to us about things we may have -- things we could

3    have added, different things we could have looked at, weighed

4    more heavily.

5              Outside of that, we've also received training

6    through some colleagues.  We have also been addressed by a

7    member of the office of general counsel to talk about issues

8    related to higher ed and race, and I've also attended

9    professional development seminars.

10             I think it's important to know, too, that I work

11   with a number of folks who have spent decades upon decades in

12   higher ed in admissions offices.  The person next to me in

13   the office has been doing this at Harvard for 40-plus years.

14   My N docket chair, Sally Harty, she's been doing this for

15   over 30 years.  And the docket chair, the D docket chair was

16   the longtime former admissions director at Brown.

17             So these are -- it's a constant education.  It

18   continues to be a constant education.

19   **Q.**   Mr. Looby, Mr. Mortara pointed you to one piece of your

20   deposition testimony about whether you recalled, whether you

21   were taught about the use of race.

22             Do you recall when he did that?

23   **A.**   I do.

24   **Q.**   Okay.  I want to take a look at a piece of your

25   deposition testimony that he didn't show you regarding this

Case: 19-2005    Document: 00117632237    Page: 434    Date Filed: 07/30/2020    Entry ID: 6356615
Case 1:14-cv-14176-ADB   Document 635   Filed 04/18/19   Page 189 of 246

189

1    same topic.  Can you take a look at page 48.

2              MR. MORTARA:  Objection, Your Honor.  She can ask a

3    question.  She can't lead the witness with his own

4    deposition.  She can ask a question.  There was no

5    completeness objection when I impeached him.  Just to be

6    clear, my objection is one cannot lead a witness with his own

7    deposition.

8              THE COURT:  Yes.  I understand.  I think she's just

9    trying to orient him.  Is this meant to be his direct and his

10   cross?  Is he on your list as well?  What are we doing here?

11             MR. MORTARA:  Your Honor, we have an agreement that

12   witnesses will only be called once, so she can go outside the

13   scope.

14             THE COURT:  So you're not making a scope objection.

15             MR. MORTARA:  No.

16             THE COURT:  I think she's just trying to orient

17   him.  But don't lead.

18             MR. MORTARA:  My objection is leading.

19             THE COURT:  Yes.

20   BY MS. CONLEY:

21   Q.  Do you recall testifying at your deposition other times

22   when -- excuse me.  Withdrawn.

23             Do you recall testifying at your deposition whether

24   you had ever learned about how to use race in the admissions

25   process?

1    **A.**  I do.

2    **Q.**  Do you recall Mr. Mortara showing you a piece of your

3    deposition with respect to whether you had ever learned about

4    the use of race in the admissions process?

5    **A.**  I do.

6    **Q.**  And did he show you all of your deposition testimony

7    related to that topic?

8    **A.**  I don't believe that he did.

9    **Q.**  Okay.  Can you turn to page 48 of your deposition

10   testimony.

11        MR. MORTARA:  Your Honor, objection sustained.

12   Leading.  If counsel obviously wanted to read more of the

13   deposition when I impeached him, the objection is

14   completeness.  Now this is leading with his former testimony.

15   I'm actually happy for the Court to take a look at it but not

16   during the exam, showing the guy his deposition and then

17   saying --

18        THE COURT:  You're trying to make the point that he

19   was testifying inconsistently --

20        MS. CONLEY:  Exactly.

21        THE COURT:  -- here with what he said in his

22   deposition.

23        So I think that entitles her to go back and show

24   portions of the deposition that were consistent in response

25   to your --

1          MR. MORTARA:  I understand your ruling, Your Honor.

2     However, what I would say is why not just ask the question

3     and get the answer.

4          THE COURT:  Hypothetically speaking, right?  We

5     have his answer here today.  You're saying his answer here

6     today is different than his answer yesterday.  She's trying

7     to show that the answer yesterday was also consistent with

8     what he said today.  That's fair game.

9          MR. MORTARA:  Again to be clear, I'm going to stand

10    up in a few seconds again and say the question isn't the

11    same.

12         THE COURT:  Okay.

13    BY MS. CONLEY:

14    **Q.**  Mr. Looby, can you turn to page 48 of your deposition

15    testimony.  At line 16 you were asked, "Can you recall from

16    your time at Harvard anyone ever telling you that race is one

17    factor among many that you should use in the admissions

18    process?"

19         And what was your answer?

20    **A.**  "I believe so."

21         MR. MORTARA:  Your Honor, and again my objection is

22    my question was about learning how to use race, and this was

23    about -- and I'll be argumentative for one moment longer,

24    Your Honor.

25         This is about Harvard's pablum about race being one

**JA1142**

1    factor in admissions.  This is not the testimony about how he

2    learned how to use race, which is what I examined him about.

3              THE COURT:  Someone telling him that race is a

4    factor is part of telling him how to use race.

5              MR. MORTARA:  We'll respectfully disagree on that.

6              THE COURT:  Okay.  That's fine.

7    BY MS. CONLEY:

8    **Q.**  So, Mr. Looby, with respect to the training that you

9    received, that you were just discussing, did you specifically

10   receive feedback on how to evaluate applications?

11   **A.**  Yes.

12   **Q.**  And in the process of receiving that feedback on how to

13   evaluate applications, did you receive feedback on how to

14   consider race when evaluating applications?

15   **A.**  Yes.

16   **Q.**  Just stepping back for a minute, Mr. Looby, I just want

17   to talk to you a little bit about your background and how you

18   came to Harvard College.  You have mentioned that you

19   graduated from college in 1996, right?

20   **A.**  That's correct.

21   **Q.**  What did you do after you graduated?

22   **A.**  I worked at ESPN in Bristol, Connecticut.

23   **Q.**  After ESPN, what did you do next?

24   **A.**  I worked for Major League Baseball.

25   **Q.**  How long were you at Major League Baseball?

1    **A.**   I was at Major League Baseball for about eight years.

2    **Q.**   What did you do after you left Major League Baseball?

3    **A.**   I left Major League Baseball on a Friday and the

4    following Monday was employed by Boston Public Schools as a

5    paraprofessional.

6    **Q.**   What led to your decision to leave Major League Baseball

7    and join Boston Public Schools?

8    **A.**   So there were a number of factors involved.  I felt as

9    though my career in the professional sports entertainment

10   industry, I felt as though the time had come for me to pursue

11   other endeavors.

12           I think a big factor was my now wife.  She and I

13   had been dating for two years.  She was living here in Boston

14   and I was working in Manhattan.  So I had talked to a number

15   of people.  I have talked to family members, you know, began

16   to start considering education.

17           And then I had a powerful event happen where -- you

18   know, go back years earlier.  I was a tennis instructor at a

19   summer club and became close with a number of the students I

20   was teaching, family members, and so on.  There was one

21   family in particular where I was drawn to them because the

22   two boys reminded me a lot of my brother and myself.

23           So fast-forward again.  Now my time is at Major

24   League Baseball, and I receive a call from my mother who is a

25   teacher in my hometown.  And she said that the younger son

**JA1144**

1   had been tragically killed in a car accident, which certainly

2   shook me.  So I went home and I went to the wake.  And it was

3   at the wake that I learned he was in line to become the

4   captain of my high school tennis team, which I also was.  His

5   first job was my first job at a local tennis club.  And I

6   also learned that, you know, I had a profound impact on this

7   young man.

8            And for me to hear that, you know, thinking back to

9   when I was a college kid teaching tennis and just enjoying

10  the summer, I didn't think I was having an impact on anyone's

11  life.  And I felt as though maybe my calling was to work in

12  an industry helping others.  And I felt like education was

13  the right path.

14  Q.  And so you mentioned you started with Boston Public

15  Schools as paraprofessional?

16  A.  That's correct.

17  Q.  What is a paraprofessional?

18  A.  I was hired to work as a one-to-one aide with a student

19  in one of the Boston Public Schools.

20  Q.  When you were working with this particular student, what

21  sort of services were you providing?

22  A.  This student was involved in a gang-related incident and

23  was left paralyzed on one side of his body, so he was not

24  able to write.  So I was essentially his scribe.  I went to

25  all of his classes with him.  I would help him with his

1    homework.  I would call him at night and help him with his

2    homework, help him take his exams, and so on.

3    **Q.**  And were you doing anything else at the time that you

4    were working with the Boston Public Schools system?

5    **A.**  I was enrolled in Suffolk University's school counseling

6    graduate program.

7    **Q.**  And what type of coursework were you taking in that

8    counseling program?

9    **A.**  Primarily psychology courses along with adolescent

10   development courses.

11   **Q.**  At some point you left Boston Public Schools?

12   **A.**  I did, yes.

13   **Q.**  What did you do next?

14   **A.**  I was hired by Harvard to work in the financial aid

15   office.

16   **Q.**  And when was that?

17   **A.**  That was 2008, the summer of 2008, I believe.

18   **Q.**  And, Mr. Looby, what led you to join the Harvard

19   admissions office?

20   **A.**  Again, there were a number of things in play there.  I

21   felt as though having just moved to Boston and working in a

22   completely new industry, finances were certainly tough.  I

23   also, more importantly, felt as though this could lead to a

24   career that directly tied into my college counseling or my

25   school counseling coursework.  So I felt as though the move

1    made sense on a number of levels.

2    **Q.**   And do you like what you do in the admissions office at

3    Harvard?

4    **A.**   Very much so, I do.

5    **Q.**   What do you like about it?

6    **A.**   I feel like I make an impact or I help make an impact on

7    people's lives.  You know, our students, I feel as though it

8    extends beyond just the individuals.  I feel as though -- you

9    know, in many cases I hear how it impacts direct family

10   members.  And on a larger scale, I've heard how a student

11   being accepted to Harvard College, it impacts a community.

12           I've got great stories that I enjoy telling people,

13   you know.  Certainly my time at Major League Baseball I could

14   sit down and tell you stories about conversations I've had

15   with Hall of Famers, you know, like just amazing people.

16           But nothing, nothing comes close to calling a

17   student and telling him or her that not only are they -- have

18   they been accepted to Harvard College but perhaps they're not

19   paying anything for their freshman year because of their

20   financial situation.

21   **Q.**   Earlier you mentioned that you've worked as an admissions

22   officer for about eight years.  Is that right?

23   **A.**   That's correct, yes.

24   **Q.**   And in those eight years, approximately how many

25   subcommittee meetings did you attend?

1    **A.**   Probably close to 100.

2    **Q.**   And in that same eight-year period, how many full

3    committee meetings did you attend?

4    **A.**   Probably close to 50.

5    **Q.**   And in that time period, how many times have you seen an

6    admissions officer show bias against an applicant because of

7    the applicant's race?

8    **A.**   Never.

9    **Q.**   Mr. Looby, when you're determining whether to admit an

10   applicant, is race ever used as a negative factor?

11   **A.**   No.

12   **Q.**   And in your eight years in the admissions office, have

13   you ever seen any of your colleagues treat an applicant's

14   race as a negative factor?

15   **A.**   No.

16   **Q.**   Mr. Looby, have you ever been instructed to admit a

17   target number of any particular racial or ethnic group in the

18   admissions process?

19   **A.**   Absolutely not.  We don't work with targets.

20   **Q.**   And, Mr. Looby, have you ever discriminated against an

21   applicant because of his or her race?

22   **A.**   Certainly not, no.

23         MS. CONLEY:  No further questions.

24         THE COURT:  Redirect?

25         MR. MORTARA:  No redirect, Your Honor.

```
 1              THE COURT:  You're excused, Mr. Looby.

 2              Your next witness?

 3              MR. McBRIDE:  Your Honor, Scott McBride for

 4    Students for Fair Admissions.  Our next witness is Erica

 5    Bever.  May we have a moment to set up?

 6              THE COURT:  Yes, of course.

 7              MR. McBRIDE:  Your Honor, I have a binder of

 8    exhibits that I can hand up to you and opposing counsel and

 9    for the witness.

10              THE CLERK:  Can you please stand and raise your

11    right hand.

12              (ERICA BEVER duly sworn by the Deputy Clerk.)

13              THE CLERK:  Can you please state your name and

14    spell your last name for the record.

15              THE WITNESS:  It's Erica Bever.  B as in boy, E, V

16    as in Victor, E-R.

17              MR. McBRIDE:  Your Honor, may I approach the

18    witness?

19              THE COURT:  Yes, of course.

20              MR. McBRIDE:  Your Honor, we have a number of

21    exhibits for which there are no objections.  In the interest

22    of efficiency, if I can just go through and read them and get

23    confirmation from counsel and get them admitted into evidence

24    to streamline the examination, if that's acceptable to you.

25              THE COURT:  It's fine with me if it's fine with
```

 1    them.

 2            MS. ELLSWORTH:  Your Honor, I'd prefer to do them

 3    when they come up.  I don't know if they're all going to come

 4    up in the examination or not.

 5                        DIRECT EXAMINATION

 6    BY MR. McBRIDE:

 7    **Q.**  Good afternoon, Ms. Bever.  How are you?

 8    **A.**  I'm fine, thank you.

 9    **Q.**  I'm Scott.  I'd like you to look at first Plaintiff's

10    Exhibit 43, if you could, please.  Let me know when you've

11    found it.

12    **A.**  I'm there.

13    **Q.**  Is Plaintiff's Exhibit 43 an August 28, 2014, email with

14    attachments from you to Lucerito Ortiz?

15    **A.**  It is.

16            MR. McBRIDE:  I'd like to admit this into evidence.

17            MS. ELLSWORTH:  No objection.

18            THE COURT:  Admitted.

19            (Plaintiff Exhibit No. 43 admitted.)

20    BY MR. MORTARA:

21    **Q.**  Could you turn to Plaintiff's Exhibit 44, please.

22    Plaintiff's Exhibit 44, this is an August 2, 2014, email with

23    attachments, from you to Lucerito Ortiz as well?

24            MR. McBRIDE:  Your Honor, I'd like to move

25    Plaintiff's 44 into evidence.

```
1              MS. ELLSWORTH:  No objection.
2              THE COURT:  Admitted.
3              (Plaintiff Exhibit No. 44 admitted.)
4    BY MR. MORTARA:
5    Q.  Thank you.  That was just a little bit of housekeeping,
6    Ms. Bever.
7              Where do you work currently?
8    A.  I currently work in the Harvard College office of
9    admissions and financial aid.
10   Q.  What's your position there?
11   A.  I'm the director of research for admissions and financial
12   aid and a senior admissions officer.
13   Q.  You've been working there for how long in the admissions
14   office?
15   A.  I've been there for about four years.
16   Q.  Prior to going there four years ago, where did you work?
17   A.  I worked in the Harvard University office of
18   institutional research.
19   Q.  OIR?
20   A.  Correct.
21   Q.  When did you start in OIR?
22   A.  In July of 2007.
23   Q.  And if you had been working in the admissions office for
24   about four years, is it correct that you left OIR sometime in
25   the summer of 2014?
```

**JA1151**

1   **A.**  That's correct.

2   **Q.**  Which means you spent seven years in OIR?

3   **A.**  Yes.

4   **Q.**  How many admission cycles, then, have you done since you

5   joined the office?

6   **A.**  I'm about to begin my fourth.

7   **Q.**  Begin your fourth.  So you've completed three admission

8   cycles?

9   **A.**  Yes.

10  **Q.**  I noticed that your counsel had identified a number of

11  application files as exhibits to your examination today.  So

12  I wanted to talk to you first briefly about your experience

13  as an admissions officer over the last four years.

14          Is it correct that as a new admissions officer one

15  of the ways you are trained is that you have someone who is

16  rereading the first 50 to 100 files that you are reading as

17  part of your work?

18  **A.**  Yes.  During my initial period there were -- the first 50

19  of my applications were reread by a second reader.  But of

20  course, all the applications I pass to a chair of any

21  subcommittee I served on were also read by that chair and

22  provided feedback that way.

23  **Q.**  Who provided you the second reading on the first 50 files

24  that were part of your training?

25  **A.**  I believe it was various colleagues who are senior on the

**JA1152**

1   admissions committee in tenure to me.

2   **Q.**  Do you remember anyone specifically?

3   **A.**  It certainly would have been people like Grace Chang.  It

4   could have been other colleagues who'd been on the committee

5   longer.

6   **Q.**  In a given admissions cycle, about how many admission

7   applications or application files do you read?

8   **A.**  Currently I read about 500 a year.

9   **Q.**  Has that been true for the first three years or the first

10   three cycles that you did?

11   **A.**  In my first year on the admissions committee, I served on

12   two subcommittees, and I read over a thousand that year and

13   after that have read about 500.

14   **Q.**  Why the reduction in the number?

15   **A.**  To balance out my own workload.

16   **Q.**  And when you go into the subcommittee and the committee

17   stages, which we've heard about from other witnesses, about

18   how many files do you then have to review and examine as part

19   of that work?

20   **A.**  Generally we review all of them in preparation for

21   subcommittee.  Sometimes that's a cursory glance to see what

22   new information has come in.  Sometimes it's a more thorough

23   reread to prep for presentation in subcommittee.

24   **Q.**  When you're in subcommittee and committee, do you review

25   the application files of other examiner or other readers who

1    are bringing those files to subcommittee?

2    **A.**  Yes.

3    **Q.**  So about how many files -- other than the 1,000 or 500

4    that are part of your group of files, how many of those other

5    files do you then read and review for the subcommittee and

6    the committee process each year?

7    **A.**  Well, again, I couldn't really estimate how many are

8    discussed in subcommittee and full committee.  But every one

9    that's presented.  We're essentially seeing the full file as

10   we are reviewing them.

11   **Q.**  Now, we've heard there are a number of different ratings

12   that admissions officers like you assign when reviewing an

13   application.  You're familiar with those ratings?

14   **A.**  I am.

15   **Q.**  So for example, the profile ratings, as I understand it,

16   are the academic, the extracurricular, the athletic, the

17   overall, and a personal rating, right?

18   **A.**  Yes.

19   **Q.**  And you as the reader, you assign those scores in the

20   applicant's files?

21   **A.**  I assign the first reader ratings, yes.

22   **Q.**  And if a second reader reads the file, the ratings are

23   made by that second reader?

24   **A.**  That's correct.

25   **Q.**  And it's true the personal rating is the rating by which

1  you assess an applicant's personal qualities and character?

2  **A.**  Yes.

3  **Q.**  There are also some school support ratings, as I

4  understand it, from teachers and guidance counselors?

5  **A.**  Correct.

6  **Q.**  And you as the reader, you also assign those teacher and

7  counselor ratings to the applicant's files?

8  **A.**  Yes.  I read their letters and I assign a rating based on

9  the review given in those letters.

10  **Q.**  So it's correct, then, that the teacher and guidance

11  counselor, the so-called school support ratings, you assign

12  those based on your reading of the text of the teacher

13  recommendation and the counselor letter?

14  **A.**  Yes.  And the forms that they submit that go along with

15  those letters.

16  **Q.**  I'm sorry.  What?

17  **A.**  There are forms that come with their letters that often

18  provide some rating information as well from the teachers and

19  guidance counselors.

20  **Q.**  And you rely on that from the teachers in forming the

21  rating that you give in the school support measures?

22  **A.**  Exactly.

23  **Q.**  Did you receive any instruction about whether or not race

24  should ever be incorporated into the personal score when you

25  were trained as an admissions officer?

1   **A.**   No, I didn't receive specific instruction about putting

2   race into the personal rating.

3   **Q.**   Did you receive any instruction about whether or not race

4   should ever be incorporated into the personal score when you

5   were trained as an admissions officer?

6   **A.**   No.  There was a lot of feedback about how the personal

7   rating should be used but not specifically about race per se.

8   **Q.**   However, you do look at race as one of many factors in

9   evaluating an application, right?

10   **A.**   That is correct.

11   **Q.**   And as part of your process, what you say is that if a

12   student indicates race somewhere on the application, you

13   would note that as you would note their birthday, gender,

14   where they're from, what their high school is, and what the

15   grades are, right?

16   **A.**   Certainly I would know all that information as I was

17   evaluating their application.

18   **Q.**   And you would note that along with race?

19   **A.**   I would make note of it, yes.

20   **Q.**   And you can't ever recall factoring in a student's race

21   when you assign them an overall rating, right?

22   **A.**   The overall rating, as I see it, is the strength of the

23   application has a whole.  Certainly if their race played a

24   role in how strong I viewed that application, then the

25   overall rating might reflect something about their race in

1    the strength of their case.

2              MR. McBRIDE:  Your Honor, may I approach?

3              THE COURT:  Sure.

4    BY MR. McBRIDE:

5    **Q.**  Ms. Bever, I'm going to hand you a copy of your

6    deposition.  Do you remember your deposition on -- I believe

7    it was in July 13 of 2017.

8    **A.**  I do.

9    **Q.**  And do you remember before you began the deposition you

10   raised your right hand, like you did here, and swore to tell

11   the truth?

12   **A.**  I did.

13   **Q.**  And you gave truthful testimony at your deposition?

14   **A.**  Yes.

15   **Q.**  Could you please turn to page 301.  I put that up on the

16   screen.  I'd like to look at lines 22 to 25.

17             Do you recall at your July 13, 2017, deposition you

18   were asked the question:

19             "Do you -- can you recall ever factoring in a

20   student's race when you assigned them an overall rating?

21             "ANSWER:  I cannot."

22             Do you recall being asked that question and giving

23   that answer?

24   **A.**  Yes.

25   **Q.**  You also, you can't say how race would weigh on your

Case: 19-2005    Document: 00117623235    Page: 449    Date Filed: 07/30/2020    Entry ID: 6356615
Case 1:14-cv-14176-ADB   Document 635   Filed 04/18/19   Page 207 of 246

207

1    ultimate decision as to whether or not to recommend

2    admission, right?

3    **A.**   Again, race might play a role in how strongly I feel the

4    applicant will compare to others in the application pool.

5    **Q.**   Well, how would it weigh on your ultimate decision as to

6    whether or not to recommend admission?

7    **A.**   I cannot say per se how it would impact my decision.

8    Race plays a role among many factors in how strongly I might

9    view a case, a particular applicant's case.

10    **Q.**   Do you think race is more or less relevant than the

11    applicant's birthday?

12    **A.**   It's just different.

13    **Q.**   Can you say whether it's more or less relevant than the

14    applicant's birthday?

15    **A.**   Race is one of many factors.  Perhaps their birthday

16    played a role in their case, and that would be important for

17    a particular applicant.  Race can play a different role in a

18    different applicant's case.

19    **Q.**   Could you turn to page 303, please?

20    **A.**   300 and what?

21    **Q.**   303.  And look at lines 9 through 12.  Do you recall at

22    your deposition being asked --

23         MS. ELLSWORTH:  Your Honor, I object.  This is not

24    impeachment.

25         MR. McBRIDE:  Your Honor, I asked the question and

1    she did not say I don't know because it might be important.

2           THE COURT:  I don't think it's directly

3    contradicting, but I don't see any harm in the question

4    either.

5    BY MR. McBRIDE:

6    **Q.**  Were you asked the question, "Do you think it's more or

7    less relevant than the birthday?"

8           Ms. Ellsworth objected.

9           "ANSWER:  I don't know."

10          Were you asked that question and did you give that

11   answer?

12   **A.**  Yes.

13   **Q.**  You don't believe you've ever counted a student's race as

14   a negative in their application, do you?

15   **A.**  No, I do not.

16   **Q.**  But you don't know whether you ever counted race as

17   positive in their application, do you?

18   **A.**  I can recall cases where a student's race played a role

19   in how I viewed their application and how strongly I viewed

20   their application.

21   **Q.**  Have you ever counted race as a positive?

22   **A.**  Again, it's one factor among many.  I don't think of it

23   that way.

24   **Q.**  Could you please turn to 302 for me of your deposition,

25   looking at lines 21 to 24.

1        "QUESTION:  Have you ever counted it as a positive?

2        "ANSWER:  I do not know."

3        Were you asked that question and did you give that

4   answer in your sworn testimony?

5        MS. ELLSWORTH:  Your Honor, I'll lodge the same

6   objection.  I don't think this is proper impeachment.

7        THE COURT:  I understand the objection.  In front

8   of a jury, I may make a different ruling.  But I'm making the

9   decisions, and I don't see any harm to the question.  I heard

10  the first question and I see the question in the deposition.

11  I don't think they're strictly contradictory, but they are

12  different, and I'll let him have it.

13        MS. ELLSWORTH:  Thank you, Your Honor.

14        MR. McBRIDE:  Thank you, Your Honor.

15  BY MR. McBRIDE:

16  **Q.**  Is it possible for you to say whether in all your time

17  reading files race has ever made a difference in whether

18  someone got admitted or not?

19  **A.**  I couldn't say.

20  **Q.**  I'm sorry?

21  **A.**  I couldn't say.

22  **Q.**  I want to turn to your time at the office of

23  institutional research, OIR, if I could, please.  And I want

24  to look at Plaintiff's Exhibit 465.

25        MR. McBRIDE:  Your Honor, I offer Plaintiff's

1    Exhibit 465 into evidence.

2              MS. ELLSWORTH:  No objection.

3              THE COURT:  Admitted.

4              (Plaintiff Exhibit No. 465 admitted.)

5    BY MR. McBRIDE:

6    **Q.**  You see at the top this is the website for OIR.  Do you

7    recognize that?

8    **A.**  Yes.

9    **Q.**  And you see at the top the objectives of OIR is to offer

10   accurate, timely, and digestible research, tailored to

11   diverse audiences, with the goal of promoting informed

12   decision-making and furthering the core missions of the

13   university."

14   **A.**  Yes.

15   **Q.**  That's the standard you followed when you worked at OIR?

16   **A.**  I believe this is the same objective statement we had

17   when I was in the office.

18   **Q.**  And is that the standard that you followed at OIR to

19   offer accurate, timely, and digestible research?

20   **A.**  Yes.

21   **Q.**  And you tried to do a good job, the best job you were

22   able to do when you were at OIR?

23   **A.**  I did.

24   **Q.**  And it was your practice to prepare complete assessments

25   on questions that you looked into, right?

**JA1161**

1    **A.**  Most often.

2    **Q.**  Did you ever not try to do that?

3    **A.**  Occasionally we had meetings that were preliminary in

4    nature, and we would try and ask for more information in the

5    middle of a process or project.

6    **Q.**  Was it your habit when you worked at OIR to prepare

7    incomplete assessments on the questions you were asked to

8    look into?

9    **A.**  Again, projects took many months, sometimes years.  So we

10   would have checked in periodically.

11   **Q.**  Could you please turn to page 131 of your deposition,

12   lines 12 to 16.

13        "QUESTION:  Did you -- was it your habit when you

14   worked at OIR to prepare incomplete assessments on questions

15   you were asked to look into?"

16        There was an objection.

17        "ANSWER:  No."

18        Were you asked that question and did you give that

19   answer at your deposition?

20   **A.**  Yes.

21   **Q.**  It was your practice to provide reliable work product to

22   your Harvard decision-makers, right?

23   **A.**  Yes.

24   **Q.**  So I want to look at some of the work from when you were

25   at OIR.  Turn to Plaintiff's Exhibit 12, which I believe is

1    already in evidence, Your Honor.

2            This is an OIR report from February of 2013; is

3    that right?

4    **A.**  It is a presentation that appears to be from

5    February 2013.

6    **Q.**  And if you turn to the third page, you see that one of

7    the questions in this presentation was under the heading

8    "Access" on a page titled "Recent Admissions and Financial

9    Aid Questions Raised Was 'Does the Admissions Process

10   Disadvantage Asians?'"

11           Do you see that?

12   **A.**  I do.

13   **Q.**  I don't want to go through this whole deck, but I would

14   like to orient you.  If you could, turn to Slide 31.  You see

15   it's a section on evaluating factors that play a role in

16   Harvard College admission?

17   **A.**  I see that.

18   **Q.**  It goes on for about six or seven slides through to

19   around -- I think this section ends on Slide 38.  Do you see

20   that?

21   **A.**  Yes.

22   **Q.**  And Slide 32 has, as you see on the screen under the

23   methods, it has the goal, the strategy, and the notes.  Do

24   you see that?

25   **A.**  Yes.

1    **Q.**  And in summary, what's being described here is creating

2    some logistic regression models that OIR had created?

3    **A.**  Yes, I believe so.

4    **Q.**  And at the bottom, it does note here in the notes

5    section, "The following analysis is preliminary and for

6    discussion."  Do you see that?

7    **A.**  I do.

8    **Q.**  And this caveat, that was something that was applied to

9    reports that you would do at OIR generally, wasn't it?

10    **A.**  Again, there were things that were preliminary and often

11    for discussion, yes.

12    **Q.**  And it was something that was applied to reports that you

13    would do at OIR generally, right?

14    **A.**  Again, I think we tried to apply that label when things

15    were preliminary and for discussion.

16    **Q.**  I'd like to turn to your deposition again, if you would,

17    please.  If you could go to page 114.  I'll just read this

18    one.

19           On page 114 at around line 17, it says, "Okay.  The

20    next bullet point says, 'The following analysis is

21    preliminary and for discussion.'  Did I read that correctly?

22           "You did," is the answer.

23           "QUESTION:  Is that -- do you remember -- do you

24    remember that -- do you remember that caveat being applied to

25    reports that you would do at OIR generally?"

1          Next page.

2          "ANSWER:  Yes."

3          Were you asked that question and did you give that

4     answer?

5     **A.**   Yes.

6     **Q.**   You included that caveat because almost everything you

7     did at OIR was up for discussion and review, right?

8     **A.**   Many things, yes.

9     **Q.**   Almost everything was, right?

10    **A.**   Certainly everything was up for discussion, yes.

11    **Q.**   And review?

12    **A.**   Yes.

13    **Q.**   So over the next few slides here in Plaintiff's

14    Exhibit 12, you agree this is presenting the results of the

15    modeling of Harvard's admissions process that was done?

16    **A.**   I agree that it's presenting models of the admission

17    rate.

18    **Q.**   And you see on Slide 35 it has some showing of how

19    projected admit rates in the model would change as you add

20    more factors.  Do you agree?

21    **A.**   Yes.  For the few factors that was included in this

22    model.

23    **Q.**   And to be clear, your only memory of this section of

24    slides is of Mark Hansen sitting in your office and showing

25    you these slides?

1    **A.**  I remember a couple of these slides from a meeting with

2    Mark Hansen.  This is not one of the slides I recall.

3    **Q.**  And you have no recollection of any critique you had of

4    the slides that Mark showed you?

5    **A.**  That is correct.

6    **Q.**  And you don't have a memory of any concerns you had about

7    mistakes in the slides?

8    **A.**  That is correct.

9    **Q.**  But Mark Hansen, he worked for you at OIR at that time,

10   right?

11   **A.**  He did.

12   **Q.**  And in your experience, he did quality work?

13   **A.**  He did.

14   **Q.**  And you were responsible for his performance evaluations,

15   right?

16   **A.**  I was.

17   **Q.**  And you don't remember ever giving him a negative

18   performance evaluation?

19   **A.**  That's true.

20   **Q.**  But you do remember giving him positive performance

21   evaluations when he worked for you?

22   **A.**  Yes.

23   **Q.**  And you thought highly enough of Mr. Hansen's work in

24   Plaintiff's Exhibit 12 to pass it along to others?

25   **A.**  That may be the case, yes.

1    **Q.**  I'd like to look at some of the times that you passed

2    Mr. Hansen's work along to others while you were at OIR.  If

3    you could, turn to Plaintiff's Exhibit 15.

4            MR. McBRIDE:  I'd like to move Plaintiff's

5    Exhibit 15 into evidence.

6            MS. ELLSWORTH:  No objection.

7            THE COURT:  Admitted.

8            (Plaintiff Exhibit No. 15 admitted.)

9    BY MR. McBRIDE:

10   **Q.**  So Plaintiff's Exhibit 15, this is an email from you to

11   Mark Hansen and Erin Driver-Linn on February 20, 2013; is

12   that right?

13   **A.**  That's correct.

14   **Q.**  I understand she's Ms. Driver-Linn, not Dr. Driver-Linn.

15   Is that correct?

16   **A.**  I always referred to her as Erin.

17   **Q.**  Okay.  I won't do that.  Ms. Driver-Linn, was she your

18   boss at this time?

19   **A.**  She was.

20   **Q.**  And Mark, as we already established, he worked for you or

21   Mr. Hansen worked for you?

22   **A.**  Yes.

23   **Q.**  If you look at the first two sentences, you say, "Hi,

24   Mark and Erin.  Attached is my shot at pulling together much

25   of the work related to admissions.  Since I'm still not sure

1    what Fitz and Sally have seen, I'd welcome your thoughts on

2    what we should add (especially related to the Unz article)."

3              Do you see that?

4    **A.**   I do.

5    **Q.**   "Fitz," is that the shorthand you'd use for Dean

6    Fitzsimmons?

7    **A.**   Yes.

8    **Q.**   And who is Sally?

9    **A.**   In this case I'm probably referring to Sally Donahue who

10   was our director of financial aid.

11   **Q.**   It mentions the Unz article.  During your time at OIR,

12   you were familiar with that article?

13   **A.**   A little bit.

14   **Q.**   And you recall it came up in late fall, early winter of

15   2012-2013?

16   **A.**   I believe that's correct.

17   **Q.**   And you understand you were out of the office on leave

18   for part of that, for maternity leave?

19   **A.**   That's correct.

20   **Q.**   But you were aware that the Unz article made assertions

21   about the way Harvard treated Asian-Americans in the

22   admissions process?

23   **A.**   Yes.

24   **Q.**   And specifically that it alleged Harvard discriminated

25   against Asian-Americans in the admissions process?

**JA1168**

1    **A.**   Yes.

2    **Q.**   And you recall that when David Brooks wrote about that in

3    the New York Times, it caused a bit of a stir at Harvard

4    among the decision-makers above you?

5    **A.**   I was on leave during that period.  I wasn't really aware

6    of what discussions were happening during that time.

7    **Q.**   Now, if you see here, there are a series of attachments.

8    I think there are two attachments here in Excel and a

9    PowerPoint?

10   **A.**   Yes.

11   **Q.**   I notice that in each of them they have a name.  For

12   example, admissions_20120220_EB.pptx.

13            Do you see that?

14   **A.**   Yes.

15   **Q.**   And does this reflect a naming convention you used for

16   documents that you prepared?

17   **A.**   Yes.  It's how we dealt with version control.

18   **Q.**   By version control, then you include this reverse date

19   notation?

20   **A.**   Correct.

21   **Q.**   And you would also include your initials, EB?

22   **A.**   Yes.

23   **Q.**   And that would reflect that you had had a hand in

24   preparing or editing that version of the document?

25   **A.**   Either I created it or edited it.

1    **Q.**  And would you agree that this date here appears to be --

2    the thing I always do, which is for the first two months of a

3    year I use the wrong year when I label a document.

4              So this from 2013 is actually from 220 -- 2013

5    where it says 2012?

6    **A.**  That's possible, but I don't recall.

7    **Q.**  And if you look at the document that's attached, we page

8    forward, here's the Excel sheet for the first few pages.  And

9    then it begins here on what is it about the ninth page of the

10   document, even though it says Slide 1.

11             Do you see we're starting a PowerPoint?

12   **A.**  Yes.

13   **Q.**  And take a moment, but would you agree that this is a

14   version, close version of the PowerPoint that we had just

15   looked at at Plaintiff's Exhibit 12?

16   **A.**  It appears to be a version.  I don't recall everything

17   that was in that document.

18   **Q.**  You have both exhibits there.  So please take your time.

19   I would like to make sure that we're clear for the record

20   that what you are forwarding to your boss, Erin Driver-Linn,

21   is a version of the PowerPoint we just looked at at

22   Plaintiff's Exhibit 12.

23   **A.**  We can agree to that.

24   **Q.**  Specifically if you look at the third slide here in this

25   Plaintiff's Exhibit 15, you'll note that it is, in fact,

Case: 19-2005 Document: 00117638237 Page: 462 Date Filed: 07/30/2020 Entry ID: 6356615
Case 1:14-cv-14176-ADB Document 635 Filed 04/18/19 Page 220 of 246

220

1    asking not exactly the same but a very similar question as

2    what we saw in the previous one.  I think the last one said

3    does it disadvantage Asians.  Here the question is, is there

4    bias against Asians in college admissions?

5           Do you see that?

6    **A.**  I see that.

7    **Q.**  And then if you look on, you'll see starting at around

8    Slide 30 and 31, we have the same series of seven or eight

9    slides that we saw earlier in Plaintiff's Exhibit 12

10   reflecting a logistic regression model?

11   **A.**  Yes.

12   **Q.**  And what you were pulling together for your boss relating

13   to admissions was the OIR PowerPoint that include Mark

14   Hansen's slides with the logistic regression modeling the

15   effect of certain factors on admit rates at Harvard, right?

16   **A.**  Yes.  I was pulling together a number of slides that

17   included Mark's analysis.

18   **Q.**  The same slide deck basically as P12?

19   **A.**  This one appears a little bit rougher.  There are notes

20   on it.

21   **Q.**  I understand that other than what's written in the email,

22   you say that you don't actually have a recollection of the

23   discussions that the email refers to.  Is that right?

24   **A.**  That's correct.

25   **Q.**  But we can agree that at least with respect to what you

**JA1171**

1    wrote in your email to Ms. Driver-Linn, you did not criticize

2    the work of Mark Hansen that you pulled together for her.  Is

3    that right?

4    **A.**  This email does not include any criticism.  That's

5    correct.

6    **Q.**  You did not tell her, for example, in this email that the

7    work Mark had done in those slides was somehow unreliable or

8    incomplete?

9    **A.**  That's correct.

10   **Q.**  I'm sorry.  Did I interrupt you?  I apologize.

11   **A.**  I was just saying the email does not say that.

12   **Q.**  And you did not tell her in your email that this

13   reflected anything other than the complete and reliable work

14   that you normally did when you were at OIR, did you?

15   **A.**  All it says is that I pulled together much of our work.

16   It doesn't even say it's complete.

17   **Q.**  And it definitely doesn't say it's incomplete or

18   unreliable or don't rely on this, right?

19   **A.**  That's correct.  It does not say that.

20   **Q.**  So I'd like to move forward in time.  If you could look

21   at Plaintiff's Exhibit 25 for me, please.

22         MR. McBRIDE:  I'd like to offer Plaintiff's

23   Exhibit 25 into evidence.

24         MS. ELLSWORTH:  No objection.

25         THE COURT:  Admitted.

```
 1              (Plaintiff Exhibit No. 25 admitted.)
 2    BY MR. McBRIDE:
 3    Q.   So Plaintiff's Exhibit 25, is this an April 30 email from
 4    you, again to Ms. Driver-Linn, copying Mark Hansen?
 5    A.   It is.
 6    Q.   And again, this is another instance where you have sent
 7    around OIR analysis that relates to race and admissions,
 8    right?
 9    A.   I believe this memo was intended to address the issue of
10    economics, socioeconomic status in admissions.
11    Q.   We'll take a look at what you've got here in this email
12    in a second.
13              What you wrote is, "Hi, Erin.  Mark and I have
14    updated the memo and exhibits based on your comments,
15    including adding the new exhibit.  Please let us know if you
16    would suggest additional changes."
17              Do you see that?
18    A.   I do.
19    Q.   Again, all the files here have your naming convention
20    with EB in your name?
21    A.   The first file does.  The second does not.
22    Q.   Correct.  I see that.  So the analysis memo, that has
23    your initials in the file name?
24    A.   Yes.
25    Q.   Now, if we go to the next page, this is the first page of
```

1    the memo that you referenced.  And this is a draft memo from

2    you, Ms. Driver-Linn, and Mr. Hansen to Dean Fitzsimmons,

3    right?

4    **A.**   That's what it appears, yes.

5    **Q.**   And it has as the subject line, "Harvard College

6    admissions and low-income students."

7          Do you see that?

8    **A.**   Yes.

9    **Q.**   I don't want to go through this in excruciating detail.

10   We've seen versions of this previously.

11          But would you agree that this memo reflects the

12   results of some logistic regressions that OIR ran for Dean

13   Fitzsimmons relating to admissions and low-income status?

14   **A.**   Yes, that's correct.

15   **Q.**   And if you look on the last -- I'm sorry -- on the next

16   page, which is the third page of the document altogether, I

17   just want to look at the bottom paragraph there.

18          You wrote in this memo that you were sending to

19   your boss at this time, this draft, "To get a sense of the

20   size of the admissions advantage conferred to low-income

21   applicants relative to other groups of applicants, the

22   so-called thumb on the scale, we include low-income status in

23   a second logistic regression model.  The table below is

24   sorted based on the effect size of each of the variables

25   included in the model.  The variables with the largest

1    effects on the probability of admission are athletic rating,

2    personal rating, and legacy status.  Compared to athletes and

3    legacies, the size of the advantage for low-income students

4    is relatively small."

5          Do you see that?

6    **A.**  I do.

7    **Q.**  And the table with the results that the memo is

8    describing here, those are on the next page; is that right?

9    **A.**  Yes.

10   **Q.**  And on the next page this table is a table titled

11   "Logistic Regression Predicting Admission."

12         Do you see that?

13   **A.**  I do.

14   **Q.**  And it's a table with variables along the left,

15   coefficient estimates in the middle, and P values on the

16   right?

17   **A.**  Yes.

18   **Q.**  And the coefficient, that reflects the probability of a

19   particular outcome, right?

20   **A.**   It reflects the correlation between that variable and the

21   outcome of interest.

22   **Q.**  And by "correlation," you mean how it affects the

23   probability of that outcome occurring?

24   **A.**  Yes.

25   **Q.**  And a positive -- and the outcome here is probability of

**JA1175**

1  admission, to be complete?

2  **A.**  I believe so, yes.

3  **Q.**  And a positive coefficient means there is a positive

4  relationship between that variable and admissions outcomes?

5  **A.**  Yes.

6  **Q.**  In other words, "positive" means makes it more likely

7  you'll be admitted --

8  **A.**  Yes.

9  **Q.**  -- according to the model?

10  **A.**  According to this model with a limited set of variables,

11  yes.

12  **Q.**  And a negative coefficient means there is a negative

13  relationship between that variable and the possibility of

14  admissions, right?

15  **A.**  Between that particular variable, yes.

16  **Q.**  And if you go down the chart, we see what the memo is

17  describing, that the biggest effect is athletic rating 1

18  because it has the highest positive coefficient?

19  **A.**  Yes.  The biggest effect in this model.

20  **Q.**  And the next biggest effect shown in this model is

21  personal rating of 1 or 2?

22  **A.**  Yes.

23  **Q.**  And then legacy?

24  **A.**  Yes.

25  **Q.**  And so on.  And if you go down the columns, what we see

1    here is that near the very bottom we see Asian, and Asian has

2    a negative coefficient, right?

3    **A.**   It does.

4    **Q.**   And the negative coefficient here means that the model

5    says that being an Asian-American applicant has a negative

6    effect on your probability of admission, according to this

7    model?

8    **A.**   According to this model with limited set of variables, it

9    says that being Asian in this model is negatively correlated

10   with the admission rate.

11   **Q.**   And P value, that represents statistical significance,

12   right?

13   **A.**   It does.

14   **Q.**   The P value of zero, that means it is statistically

15   significant?

16   **A.**   That's correct.

17   **Q.**   And we see that for everything all the way down through

18   Asian until the very last two variables, all of those values

19   the model finds to be statistically significant?

20   **A.**   Yes.

21   **Q.**   Now, in fairness to you, I'm going to turn back to the

22   previous page.  Because you do in this draft memo that you're

23   sending to your boss, Ms. Driver-Linn, you reflect on some

24   limitations that the model has.

25           And you state, "This approach has several

1    limitations.  We picked a small set of variables that would

2    factor in admissions decisions.  The selection of a wider set

3    of variables might result in a better fitting model, one that

4    accounts for more of the variation in individual applicants

5    and their potentially unique contributions to the entering

6    class.  For example, the model does not capture exceptional

7    talent in art or music explicitly, although ratings may

8    capture some aspects of these attributes.  In addition, our

9    model is limited to main effects, not examining interactions

10    between variables.  Our analysis should not be considered

11    exhaustive."

12         Do you see that?

13    **A.**   I do.

14    **Q.**   However, you'll note that if you continue down, the next

15    thing you say is, "In spite of these limitations, the

16    logistic regression model results are consistent with the

17    descriptive analysis described above and shown in Exhibits 1

18    and 2," right?

19    **A.**   Yes.

20    **Q.**   To be fair, you understood that there was more data on

21    additional variables available in Harvard's database, right?

22    **A.**   I think I was aware that there was more data available,

23    yes.  But I had no understanding of the admissions process at

24    the time.

25    **Q.**   I apologize.  You were in OIR at that time.  You hadn't

**JA1178**

Case: 19-2005    Document: 00117683237    Page: 470    Date Filed: 07/30/2020    Entry ID: 6356615
Case 1:14-cv-14176-ADB   Document 635   Filed 04/18/19   Page 228 of 246

228

1    yet become a reader?

2    **A.**   That's correct.

3    **Q.**   But you understood you could go to Elizabeth Yong, who

4    managed the database, and you could secure more data on more

5    variable if you wanted it, right?

6    **A.**   I don't specifically recall that, but that may be the

7    case.

8    **Q.**   And generally when you had wanted to get more data on a

9    process, you went to Elizabeth Yong to get it, correct?

10   **A.**   I think that's correct, yes.

11   **Q.**   You could also have expanded the model to include

12   interaction between variables, as you noted here, right?

13   **A.**   Yes.

14   **Q.**   Like interacting race and disadvantaged status?

15   **A.**   Yes.

16   **Q.**   You don't remember anyone at the time of this memo

17   raising concerns about the way a logistic regression was

18   being used here, do you?

19   **A.**   I don't recall any discussions about that memo.

20   **Q.**   Which means you don't -- no one raised any concerns about

21   the use of a regression, that you recall?

22   **A.**   I don't recall any discussions about this memo.

23   **Q.**   And you don't recall anyone critiquing the analysis that

24   was employed here generally?

25   **A.**   Yes.  I don't recall discussing it.

1    **Q.**  But ultimately you did finalize this memo and you sent it

2    on to Dean Fitzsimmons, right?

3    **A.**  I believe we sent a version, yes.

4    **Q.**  Hopefully a final version?

5    **A.**  I think it was final.

6    **Q.**  But first before we do that, I wanted to look at just one

7    more draft of this memo here.

8            MR. McBRIDE:  I'm going to put Plaintiff's

9    Exhibit 23 up on the screen and offer it into evidence.

10           MS. ELLSWORTH:  No objection.

11           THE COURT:  It's admitted.

12           (Plaintiff Exhibit No. 23 admitted.)

13   BY MR. McBRIDE:

14   **Q.**  If you take a look at what is in your binder, it's

15   Plaintiff's Exhibit 23 as well as here on the screen.  I just

16   want to establish first this is a markup redline draft of the

17   same memo we looked at before.

18   **A.**  Yeah.  It appears to have track changes.

19   **Q.**  I'll represent to you that the metadata for this shows

20   that it's titled "analysis memo_20130426_EB."

21           If you would accept that representation, you'd

22   agree that this is from April 26 of 2013?

23   **A.**  Yes.

24   **Q.**  And that would be a few days before the April 30 memo we

25   just saw?

1    **A.**   Yes.

2    **Q.**   I want to focus on the last page of this memo.  If you

3    look at the last page, first just confirm that this earlier

4    memo here, it has the same chart of coefficients, albeit at

5    the very end of the memo?

6    **A.**   I think it does, yeah.

7    **Q.**   And if we look up at the top, there's a final paragraph

8    here.  I just want to highlight some of the text here while

9    we read it.

10          So what you write here in this draft from before

11   April 30, the April 26 draft, it says, "While we find that

12   low-income students clearly receive a tip in the admissions

13   process, our model also shows that the tip for legacy

14   athletes, etc., is larger.

15          "On the flip side, we see a negative effect of

16   being Asian.  These realities have also received intense

17   scrutiny from critics like Bowen or more recently Unz, as we

18   have discussed at length.  To draw attention to the positive

19   benefit that low-income students receive may also draw

20   attention to the more controversial findings around Asians or

21   the expected results around legacies and athletes."

22          Do you see how you wrote that in that draft?

23   **A.**   I see that that's written here.  I don't recall writing

24   it.

25   **Q.**   I want to look at the final version of the memo that you

1    then sent to Dean Fitzsimmons.  So if you could, turn to

2    Plaintiff's Exhibit 26.  I believe 26 is in evidence.

3              So this is an email from you to Dean Fitzsimmons on

4    May 1, the day after the first memo draft that we looked at.

5    Is that true?

6    **A.**  Yes.

7    **Q.**  And you copy his assistant as well as Ms. Driver-Linn and

8    Mr. Hansen?

9    **A.**  Yes.

10   **Q.**  And you say, "Dear Fitz.  Attached is a memo describing

11   our recent analysis of low-income admissions.  In the memo we

12   describe our approach and results.  At your suggestion, we

13   reviewed a small sample of literature to put this in context

14   and realized our approach was consistent with what others

15   have done.  We'd appreciate any comments or suggestions you

16   have."

17             Do you see how you wrote that?

18   **A.**  Yes.

19   **Q.**  And if you take a look, you would agree that if we page

20   through the rest of the memo that it is very similar to both

21   of the drafts that we saw before, more closely related to the

22   April 30 draft obviously.  Would you agree?

23   **A.**  Yes.

24   **Q.**  And it has the same chart of coefficients for Dean

25   Fitzsimmons that we saw before?

```
 1    A.  Yes.
 2    Q.  And other than the email that sent this memo, you don't
 3    recall discussing the memo or its findings with Dean
 4    Fitzsimmons, do you?
 5    A.  That's correct, I do not.
 6    Q.  You don't remember any discussions with Dean Fitzsimmons
 7    about the findings in the memo about the effect of being
 8    Asian-American, right?
 9    A.  I don't recall discussing this memo with Dean
10    Fitzsimmons.
11    Q.  And you say that you actually don't remember much about
12    the specific analysis that was done in this memo; is that
13    right?
14    A.  I don't really remember the analysis of this work, but
15    I'd be happy to comment on it today.
16    Q.  I'm sure your lawyers will be happy to ask you.
17            But I'm going to ask you instead that you don't
18    remember the analysis about the extent to which the
19    admissions process fell negatively on Asian-Americans, right?
20    A.  I don't remember any discussion about this analysis.
21    Q.  This wasn't the last time, though, that you were sending
22    Dean Fitzsimmons OIR analysis on race, low income, and
23    admissions probabilities, though, was it?
24    A.  I don't recall.
25    Q.  Would you turn to Plaintiff's Exhibit 29.
```

 1              MR. McBRIDE:  Your Honor, if I may just check in.

 2    I can't remember how long you said we were going, if we were

 3    going until 4:00 or 3:30.

 4              THE COURT:  I have another hearing at 3:30.

 5              MR. McBRIDE:  This is a new document.  I don't know

 6    if you'd -- --

 7              THE COURT:  I'd like us to use the time.

 8              MR. McBRIDE:  I'll keep going.

 9    BY MR. McBRIDE:

10    Q.  Plaintiff's Exhibit 29 is in evidence.  This is an email

11    that you sent to Dean Fitzsimmons on Monday, June 3?

12    A.  Yes.

13    Q.  And this is about a month after the low-income admissions

14    and admissions memo we just saw?

15    A.  Yes.

16    Q.  And what you say -- you say, "Hi, Fitz.  This note is a

17    follow-up from our last conversation on income and admissions

18    with Jeff Neal.  We've put together several exhibits that

19    examine the interaction between race and low-income status."

20              Do you see that?

21    A.  I do.

22    Q.  And you don't recall what the last conversation is that

23    this is referring to?

24    A.  I don't.

25    Q.  And it notes an attachment here at the bottom, an

**JA1184**

Case: 19-2005    Document: 00117632237    Page: 436    Date Filed: 07/30/2020    Entry ID: 6356615
Case 1:14-cv-14176-ADB   Document 635   Filed 04/18/19   Page 234 of 246

234

1    attachment in the form of a download file titled

2    "Demographics & Income_20130603."

3            Do you see that?

4    **A.**   I do.

5    **Q.**   I want to look at the attachment which you'll find just

6    before this at Plaintiff's Exhibit 28, if you would, please.

7    And that is, I believe, in evidence.

8            Do you see Exhibit 28?

9    **A.**   Yes.  I am at 28.

10   **Q.**   And if you will page through this for me, please, you'll

11   see that around Slides 7 and 8, what you've provided to Dean

12   Fitzsimmons are additional tables of results from logistic

13   regression models that you did on modeling the predicted

14   probability of admissions, in this case for the classes of

15   2009 to 2016.

16           Do you see that?

17   **A.**   I do.

18   **Q.**   And if we can look at both of those, both Slide 7, there

19   we see again the coefficient for Asian is negative,

20   reflecting a negative correlation to the probability of

21   admission?

22   **A.**   The coefficient for Asian is negative.  The coefficient

23   for being Asian and low income is positive.

24   **Q.**   The way you work with those, as you know, is that if you

25   want to find out what that means for the overall coefficient

235

1   for a low-income Asian applicant is you add those two

2   together?

3   **A.**   That's correct.

4   **Q.**   So if you were to do that in this instance, what you

5   would find -- Asian and low income, that's an interaction

6   term, to be correct?

7   **A.**   Yes.

8   **Q.**   And what you do is if you want to ask the question, What

9   is the coefficient for a low-income Asian applicant? is that

10  you take .282 positive and you add it to the overall

11  coefficient for Asian of negative .429, right?

12  **A.**   And then you add the coefficient for it being low income,

13  which is .899.

14  **Q.**   Your testimony is that in order to determine what a

15  low-income Asian applicant is that you add all three

16  variables?

17  **A.**   I think that's correct.  I'd have to check.

18  **Q.**   I agree that I think you should go back and check that.

19          For now, we'll leave that for the experts to

20  resolve later --

21  **A.**   Okay.

22  **Q.**   -- since you're not sure.

23          But we can agree on one thing, that this purely

24  Asian coefficient here is negative .429?

25  **A.**   Yes.

**JA1186**

1    **Q.**  And it's more negative than what we saw before?

2    **A.**  Controlling for a few other things, yes.

3    **Q.**  Yes.  So adding more controls has made this Asian

4    coefficient more negative?

5    **A.**  In this particular model.

6    **Q.**  In this particular model, right.

7         And regardless of our disagreement or uncertainty

8    about how exactly you put these numbers together to get to a

9    low-income Asian applicant, you'd agree this number here

10   reflects now a non low-income Asian applicant?

11   **A.**  Relative to whatever the omitted group is, yes.

12   **Q.**  And for a non-low-income Asian applicant, this model is

13   showing an even more negative correlation with admission?

14   **A.**  In this particular model, yes.

15   **Q.**  And you'd agree that when we look at the number of Asians

16   who are not in the low-income category, it's over 80 percent

17   of the applicants, right?

18   **A.**  Over 80 percent of Asian applicants?  I'd have to check.

19   **Q.**  We'll go back because I believe you helpfully provided us

20   some information in this draft.  This is back on Slide 4.

21        This is a slide which I've conveniently blocked the

22   title so you can't see it.  "Percent of Applicants With

23   Incomes Less Than 60,000 by Race/Ethnicity."

24        Do you see that?

25   **A.**  Yes.

Case: 19-2005    Document: 00117638237    Page: 479    Date Filed: 07/30/2020    Entry ID: 6356615
Case 1:14-cv-14176-ADB   Document 635   Filed 04/18/19   Page 237 of 246

237

1    **Q.**  What it shows here is that for the Asian-American

2    applicants it is 18 percent, right?

3    **A.**  Yes.

4    **Q.**  And so that means that 82 percent of Asian-American

5    applicants are in the non-low-income category associated with

6    the negative .4-something coefficient in the model?

7    **A.**  During this time period, yes.

8    **Q.**  And if we look on page 8, just to wrap things up, here

9    you have what you've done on this page 8 is you've actually

10   done additional interactions not just between Asian and low

11   income, but you've interacted all races and ethnicities with

12   low income and now provided resulting coefficients?

13   **A.**  Yes.

14   **Q.**  And in fact, what you find here is that for

15   non-low-income Asians, this model shows a negative

16   correlation with admissions in a coefficient of the form

17   negative .418.

18          Do you see that.

19   **A.**  Yes.

20   **Q.**  And you say that you don't recall why you would be

21   sending this to Dean Fitzsimmons at the time?

22   **A.**  I don't recall having a conversation in between sending

23   the initial memo and sending this document.

24   **Q.**  And you don't recall any discussions about the

25   information in this chart in June of 2013 or at any point

Case: 19-2005    Document: 00117682237    Page: 480    Date Filed: 07/30/2020    Entry ID: 6356615
Case 1:14-cv-14176-ADB   Document 635   Filed 04/18/19   Page 238 of 246

238

1    thereafter, right?

2    **A.** I do not.

3    **Q.** But as was your practice when at OIR, you would only have

4    sent him analysis that you believed to be accurate and

5    reliable, right?

6    **A.** Yes.

7    **Q.** I want to move forward now from June of 2013 to October

8    of 2013.  I'm going to move to a new exhibit.  This is

9    Plaintiff's Exhibit 35.

10           MR. McBRIDE:  And I'd like to move that into

11    evidence, please.

12           MS. ELLSWORTH:  I'm sorry.  Mr. Lee was distracting

13    me.  No objection.

14           THE COURT:  Admitted.

15           (Plaintiff Exhibit No. 35 admitted.)

16           THE COURT:  She threw you right under the bus.  Not

17    even a moment of hesitation.

18           MR. LEE:  I'm not saying anything any longer.

19           MS. ELLSWORTH:  It's not going to be the last time.

20    BY MR. McBRIDE:

21    **Q.** Ms. Bever, Plaintiff's Exhibit 35 is an email from

22    Monday, October 7, from you to Ms. Driver-Linn?

23    **A.** Yes.

24    **Q.** And you're attaching something that is also, on the

25    subject line, called "Admissions Simulation 20130114_MH"?

1    **A.**   Yes.

2    **Q.**   What you say in your email is, "Hi, Erin.  So Mark did

3    quite a bit of work, and his slides attached here essentially

4    answer the questions posed.  Although we could do a bit more

5    using socioeconomic status and ZIP Code, which were mentioned

6    of interest, I won't have time to get to that before

7    tomorrow.  So we might just bring these slides."

8            Do you see that?

9    **A.**   I do.

10   **Q.**   The MH and Mark, that both refers to Mark Hansen here?

11   **A.**   I assume so, yes.

12   **Q.**   When you say the work, you're referring to the attachment

13   with his initials in it?

14   **A.**   I imagine so.

15   **Q.**   And if you look at the attachment, we'll see again there

16   are some very familiar slides here, some of the slides we've

17   seen going all the way back to February 2013?

18   **A.**   Yes.  This seems to be a draft.

19   **Q.**   You agree this is another draft of the logistic

20   regression model that we first began our discussion with in

21   the February 2013 time period?

22   **A.**   Yes.

23   **Q.**   Your email doesn't offer any criticism of the quite a bit

24   of work that Mark did, does it?

25   **A.**   It does not.

1   **Q.**  Your email doesn't say that Mark's answer to the

2   questions posed are somehow flawed or unreliable, does it?

3   **A.**  It doesn't, but it says we could do some more.

4   **Q.**  It says you could do more, but it doesn't say what you've

5   done is flawed or unreliable, does it?

6   **A.**  No.

7   **Q.**  In fact, you're saying we might just bring these slides,

8   right?

9   **A.**  Yes.

10  **Q.**  You don't bring slides to someone else out of OIR unless

11  they are reliable and digestible and accurate, right?

12  **A.**  That would be true, although we bring preliminary work to

13  discuss with someone to get their feedback and thoughts.

14  **Q.**  Of course.  As you said, all OIR work is preliminary and

15  up for discussion, right?

16  **A.**  Yes.

17  **Q.**  And on your website, I'm assuming that you are accounting

18  for that when you say we provide accurate, reliable, and

19  digestible research, right?

20  **A.**  Yes.

21  **Q.**  Now, you say that you don't remember where you were

22  bringing these slides to or who you were meeting with,

23  though, do you?

24  **A.**  I don't.

25  **Q.**  Look at Plaintiff's Exhibit 36, if you would, please.

```
1              MR. McBRIDE:  Offer that into evidence.

2              MS. ELLSWORTH:  No objection.

3              THE COURT:  Admitted.

4              (Plaintiff Exhibit No. 36 admitted.)

5    BY MR. McBRIDE:

6    Q.  Plaintiff's Exhibit 36 is a meeting invite out of

7    Microsoft Outlook, for Tuesday, October 8.  Do you see that?

8    A.  Yes.

9    Q.  That's the next day.  That's the tomorrow from your

10   email, so to speak?

11   A.  Yes.

12   Q.  And it is a meeting organized by Robert Iuliano.  That's

13   the general counsel of Harvard?

14   A.  Yes.

15   Q.  And you were one of the required attendees at this

16   meeting?

17   A.  I think that's the default in Outlook, but yes.

18   Q.  And the subject of the meeting was *Fisher v. University

19   of Texas*, Discussion Number 2.  Do you see that?

20   A.  Yes.

21   Q.  And you're familiar with the *Fisher* decision?

22   A.  Yes.

23   Q.  You know that was an important Supreme Court decision on

24   affirmative action in this general time period?

25   A.  Yes.
```

**JA1192**

1    **Q.**  And the other people you see here who were required

2    attendees, what departments do they represent?

3    **A.**  The admissions office, institutional research, financial

4    aid, our office of general counsel, Harvard College IR.

5    **Q.**  So you have people from the OGC, OIR, admissions,

6    financial aid, and Harvard IR meeting to talk about

7    affirmative action on the day after you forwarded around

8    slides that you say essentially answered some kind of

9    questions posed.  Is that right?

10   **A.**  I don't know what we discussed at this meeting.  I don't

11   remember it.

12   **Q.**  And isn't it possible that the event that you refer in

13   your meeting to happening tomorrow was the *Fisher* meeting?

14   **A.**  It could have been.

15   **Q.**  And isn't it possible that the questions essentially

16   answered by Mark Hansen's admissions models were questions

17   about the effect of Harvard's use of race in admissions?

18   **A.**  I don't think that's what necessarily that analysis

19   answers, but it could have been something we might have

20   wanted to discuss at this meeting.

21   **Q.**  And isn't it possible that in your October 7 email to

22   your boss you were proposing bringing the slides modeling the

23   effect of race in Harvard's admissions process to the *Fisher*

24   meeting the next day?

25   **A.**  It is possible that's what that email was suggesting,

1    that I would bring those slides.

2            MR. McBRIDE:  Your Honor, we're ready to move on to

3    a new document, a new exhibit, and I've hit 3:30 pretty

4    closely.

5            THE COURT:  Yes, you have.

6            We can recess for the day.  We can start tomorrow

7    at 9:30, if you want, or we can go back to 10:00.  I think I

8    can go to 4:00 tomorrow, right, Karen?

9            THE CLERK:  Yes.

10           THE COURT:  I'm happy to go to 4:00 unless any of

11   you people have to travel, in which case I'm willing to

12   recess whatever works for you all.

13           MR. MORTARA:  Depending on how long they're going

14   to be, I think we can get all four of our witnesses on and

15   off tomorrow, if we start at 9:30 and go to 4:00.

16           THE COURT:  That's a long day, but if that schedule

17   works for everyone, I'm happy to do it.  Any objections?

18           MR. LEE:  No.

19           MR. MORTARA:  No.

20           THE COURT:  So we'll see everyone tomorrow at 9:30

21   tomorrow.

22           (Court recessed at 3:32 p.m.)

23

24

25

Case: 19-2005    Document: 00117628237    Page: 486    Date Filed: 07/30/2020    Entry ID: 6356615
Case 1:14-cv-14176-ADB    Document 635    Filed 04/18/19    Page 244 of 246

244

```
1                   - - - - - - - - - - -

2                      CERTIFICATION

3

4          I certify that the foregoing is a correct

5  transcript of the record of proceedings in the above-entitled

6  matter to the best of my skill and ability.

7

8

9

10  /s/ Joan M. Daly              October 18, 2018

11  _____          _____

12  Joan M. Daly, RMR, CRR        Date
    Official Court Reporter
13

14

15

16

17

18

19

20

21

22

23

24

25
```

INDEX OF WITNESSES

WITNESS                                                        PAGE

WILLIAM FITZSIMMONS

    Cross-Examination (Resumed) by Mr. Lee..............   8
    Redirect Examination by Mr. Hughes.................. 115
    Recross-Examination by Mr. Lee...................... 129

CHRISTOPHER LOOBY

    Direct Examination by Mr. Mortara................... 148
    Cross-Examination by Ms. Conley.................... 183

ERICA BEVER

    Direct Examination by Mr. McBride.................. 199

```
1                        E X H I B I T S

2

3           Defendant Exhibit                 Received

            SA-2        .....................     51
4
            DX41        .....................     14
5
            DX42        .....................    102
6
            DX44        .....................    106
7
            D50         .....................    127
8
            DX55        .....................     63
9
            DX56        .....................     19
10
            DX97        .....................     86
11
            DX293       .....................     22
12

13

14          Plaintiff Exhibit                 Received

15            15        .....................    216

16            23        .....................    229

17            25        .....................    222

18            35        .....................    238

19            36        .....................    241

20            43        .....................    199

21            44        .....................    200

22            57        .....................    119

23            71        .....................    151

24           465        .....................    210

25
```

1            UNITED STATES DISTRICT COURT

2              DISTRICT OF MASSACHUSETTS

3    _____

4    STUDENTS FOR FAIR ADMISSIONS, INC.,

5                 Plaintiff,          Civil Action
                                      No. 14-14176-ADB
6    v.
                                      October 19, 2018
7    PRESIDENT AND FELLOWS OF HARVARD
     COLLEGE, et al.,                 Pages 1 to 261
8
                 Defendants.
9    _____

10

11

12            TRANSCRIPT OF BENCH TRIAL - DAY 5
          BEFORE THE HONORABLE ALLISON D. BURROUGHS
              UNITED STATES DISTRICT COURT
13           JOHN J. MOAKLEY U.S. COURTHOUSE
                  ONE COURTHOUSE WAY
14               BOSTON, MA  02210

15

16

17

18

19

20

21

22            JOAN M. DALY, RMR, CRR
          KELLY MORTELLITE, RMR, CRR
23            Official Court Reporter
          John J. Moakley U.S. Courthouse
24        One Courthouse Way, Room 5507
              Boston, MA  02210
25            joanmdaly62@gmail.com

```
 1     APPEARANCES:

 2
       COUNSEL FOR THE PLAINTIFF:
 3

 4            ADAM K. MORTARA, ESQUIRE
              J. SCOTT McBRIDE, ESQUIRE
 5            KRISTA J. PERRY, ESQUIRE
              Bartlit Beck Herman Palenchar & Scott
 6            54 West Hubbard Street
              Suite 300
 7            Chicago, Illinois 60654
              312.494.4400
 8            adam.mortara@bartlit-beck.com
              scott.mcbride@bartlit-beck.com
 9            krista.perry@bartlit-beck.com

10            JOHN M. HUGHES, ESQUIRE
              MEG E. FASULO, ESQUIRE
11            Bartlit Beck Herman Palenchar & Scott
              1801 Wewatta Street
12            Suite 1200
              Denver, Colorado 80202
13            303.592.3100
              john.hughes@bartlit-beck.com
14            meg.fasulo@bartlit-beck.com

15            KATHERINE L.I. HACKER, ESQUIRE
              Bartlit Beck Herman Palenchar & Scott
16            1899 Wynkoop Street
              Suite 800
17            Denver, Colorado 80202
              303.592.3100
18            kat.hacker@bartlit-beck.com

19            JOHN MICHAEL CONNOLLY, ESQUIRE
              THOMAS R. McCARTHY, ESQUIRE
20            WILLIAM S. CONSOVOY, ESQUIRE
              Consovoy McCarthy Park PLLC
21            3033 Wilson Boulevard
              Suite 700
22            Arlington, Virginia 22201
              703.243.9423
23            mike@consovoymccarthy.com
              tom@consovoymccarthy.com
24            will@consovoymccarthy.com

25
```

**JA1199**

```
 1    APPEARANCES (cont.):

 2
              PATRICK STRAWBRIDGE, ESQUIRE
 3            Consovoy McCarthy Park PLLC
              Ten Post Office Square
 4            8th Floor, South, PMB #706
              Boston, Massachusetts 02109
 5            617.227.0548
              patrick@consovoymccarthy.com
 6
              MICHAEL H. PARK, ESQUIRE
 7            Consovoy McCarthy Park PLLC
              3 Columbus Circle
 8            15th Floor
              New York, New York 10024
 9            646.456.4432
              park@consovoymccarthy.com
10
              PAUL M. SANFORD ESQUIRE
11            BENJAMIN C. CALDWELL, ESQUIRE
              Burns & Levinson LLP
12            One Citizens Plaza
              Suite 110
13            Providence, Rhode Island 02903
              401.831.8330
14            psanford@burnslev.com
              bcaldwell@burnslev.com
15

16    COUNSEL FOR THE DEFENDANT:

17            WILLIAM F. LEE, ESQUIRE
              FELICIA H. ELLSWORTH, ESQUIRE
18            ANDREW S. DULBERG, ESQUIRE
              ELIZABETH C. MOONEY, ESQUIRE
19            SARAH R. FRAZIER, ESQUIRE
              Wilmer Cutler Pickering Hale and Dorr LLP
20            60 State Street
              Boston, Massachusetts 02109
21            617.526.6556
              william.lee@wilmerhale.com
22            felicia.ellsworth@wilmerhale.com
              andrew.dulberg@wilmerhale.com
23            elizabeth.mooney@wilmerhale.com
              sarah.frazier@wilmerhale.com
24

25
```

```
 1     APPEARANCES (cont.):

 2
             SETH P. WAXMAN, ESQUIRE
 3           DANIELLE CONLEY, ESQUIRE
             DANIEL WINIK, ESQUIRE
 4           BRITTANY AMADI, ESQUIRE
             PAUL R.Q. WOLFSON, ESQUIRE
 5           Wilmer Cutler Pickering Hale and Dorr LLP
             1875 Pennsylvania Ave, NW
 6           Washington, DC 20006
             202.663.6006
 7           seth.waxman@wilmerhale.com
             danielle.conley@wilmerhale.com
 8           daniel.winik@wilmerhale.com
             brittany.amadi@wilmerhale.com
 9           paul.wolfson@wilmerhale.com

10           DEBO P. ADEGBILE, ESQUIRE
             Wilmer Cutler Pickering Hale and Dorr LLP
11           7 World Trade Center
             250 Greenwich Street
12           New York, New York 10007
             212.295.6717
13           debo.adegbile@wilmerhale.com

14           ARA B. GERSHENGORN, ESQUIRE
             Harvard Office of the General Counsel
15           Smith Campus Center
             Suite 980
16           1350 Massachusetts Avenue
             Cambridge, Massachusetts 02138
17           617.495.8210
             ara_gershengorn@harvard.edu

18

19     COUNSEL FOR AMICI STUDENTS:

20           JON M. GREENBAUM, ESQUIRE
             BRENDA L. SHUM, ESQUIRE
21           GENEVIEVE BONADIES TORRES, ESQUIRE
             KRISTEN CLARKE, ESQUIRE
22           1500 K Street NW, Suite 900
             Washington, DC 20005
23           202.662.8315
             jgreenbaum@lawyerscommittee.org
24           bshum@lawyerscommittee.org
             gtorres@lawyerscommittee.org
25           kclarke@lawyerscommittee.org
```

```
1    APPEARANCES (cont.):

2

3            LAWRENCE CULLEEN, ESQUIRE
             EMMA DINAN, ESQUIRE
             Arnold & Porter LLP
4            555 Twelfth Street, NW
             Washington, DC 20004
5            202.942.5477
             gina.dean@aporter.com
6            emma.dinan@aporter.com

7

     COUNSEL FOR AMICI ORGANIZATIONS:
8

9            JENNIFER A. HOLMES, ESQUIRE
             CARA McCLELLAN, ESQUIRE
             JIN HEE LEE, ESQUIRE
10           MICHAELE M. TURNAGE YOUNG, ESQUIRE
             RACHEL N. KLEINMAN, ESQUIRE
11           NAACP Legal Defense and Educational Fund, Inc.
             700 14th Street NW
12           Suite 600
             Washington, DC 20005
13           jholmes@naacpldf.org
             cmcclellan@naacpldf.org
14           jlee@naacpldf.org
             myoung@naacpldf.org
15           rkleinman@naacpldf.org

16           KENNETH N. THAYER, ESQUIRE
             KATE R. COOK, ESQUIRE
17           Sugarman Rogers
             101 Merrimac Street
18           Suite 900
             Boston, Massachusetts 02114
19           617.227.3030
             thayer@sugarmanrogers.com
20           cook@sugarmanrogers.com

21

22

23

24

25
```

**JA1202**

<u>P R O C E E D I N G S</u>

1

2              (The following proceedings were held in open

3      court before the Honorable Allison D. Burroughs, United

4      States District Judge, United States District Court, District

5      of Massachusetts, at the John J. Moakley United States

6      Courthouse, One Courthouse Way, Boston, Massachusetts, on

7      October 19, 2018.)

8              THE COURT:  How are you?

9              MR. McBRIDE:  Doing well.  How are you?

10             THE COURT:  I told Mr. Mortara yesterday my back is

11     starting to bother me.  I don't know if your backs are

12     starting to bother you, but you can all feel free to stand up

13     and back and move around a little bit if we're sitting too

14     long, and I may be back and forth doing the same.

15             In terms of this morning's schedule, I have a

16     conference in another case at noon.  I'm not doing it in this

17     courtroom.  I moved it to another courtroom so that we didn't

18     disrupt the function or the paperwork in here or whatever.

19     So I'm happy to go straight through to a few minutes before

20     12:00.  I'm also happy to take a morning break, so do

21     whatever you all want.  But the afternoon break will be from

22     like five of 12:00 to, hopefully I can hold it to 45 minutes.

23     Okay.  But it might be a little bit longer.  So if you want a

24     break, go ahead and let me know and take one.  But if you

25     want to go straight through, that's fine, too.

```
 1              Just a reminder, you're still under oath okay.
 2              THE WITNESS:  Yes.
 3              (ERICA BEVER previously sworn by the Deputy Clerk.)
 4                     EXAMINATION (resumed)
 5     BY MR. McBRIDE:
 6     Q.  Good morning, Ms. Bever.
 7     A.  Good morning.
 8     Q.  I want to move ahead from October of 2013 into 2014.
 9              MR. McBRIDE:  And I'm going to put on the screen
10     Plaintiff's Exhibit 41.  And I'd like to offer that into
11     evidence, please.
12              MS. ELLSWORTH:  No objection.
13              THE COURT:  It's admitted.
14              (Plaintiff Exhibit No. 41 admitted.)
15     BY MR. McBRIDE:
16     Q.  And do you recall that in July of 2014, before you left
17     OIR, Dean Khurana took his current position as the dean of
18     Harvard College?
19     A.  Yes.
20     Q.  I have here Plaintiff's Exhibit 41 on the screen.  This
21     is an email from you to Erin Driver-Linn on July 10 of 2014.
22     A.  Yes.
23     Q.  And it copies your colleagues, John Scanlon and Liam
24     Schwartz?
25     A.  Yes.
```

1  **Q.**  This email, this was about a meeting that you had the

2  next day with Dean Khurana to introduce him to your office

3  and the work OIR had done relating to Harvard?

4  **A.**  Yes.

5  **Q.**  And you see here you've written, "Hi, Erin.  I've

6  attached a draft agenda for tomorrow's meeting with Dean

7  Khurana.  Does this look right to you?  I'm also attaching

8  the additional college-related materials we should probably

9  share with him."

10        Do you see that?

11  **A.**  I do.

12  **Q.**  The other people who attended the meeting with Dean

13  Khurana was your boss, Erin Driver-Linn, as well as the two

14  co-workers listed here, Mr. Scanlon and Mr. Schwartz?

15  **A.**  Yes, I believe that's correct.

16  **Q.**  And you see that the email list four attachments:  agenda

17  for Khurana, document low-income admission memo final,

18  factors in admission, and athletes project.

19        Do you see those attachments?

20  **A.**  I do.

21  **Q.**  If you page to the next page in Plaintiff's Exhibit 41 --

22  I'll blow it up here on the screen.  Is this the agenda

23  that's attached for the meeting with Dean Khurana the next

24  day?

25  **A.**  It appears to be, yes.

1    **Q.**  You see the three main points that you are proposing

2    discussing with Dean Khurana are additional OIR analysis on

3    Harvard College students?  That's the first bullet point?

4    **A.**  Yes.

5    **Q.**  And under there what you've written is --

6             THE COURT:  Mr. McBride, I have a bunch of redacted

7    pages.  Do I have the wrong exhibit?

8             MR. McBRIDE:  No, Your Honor.  You have the correct

9    exhibit.  But the very second page after the email is the

10   agenda I'm looking at.

11            THE COURT:  I see that double-sided.  Okay.  Go

12   ahead.  Sorry.

13   BY MR. McBRIDE:

14   **Q.**  Under the additional OIR analysis on Harvard College

15   students, the subpoints are athletes, evaluating factors in

16   admissions, and low-income admissions memo.  Do you see that?

17   **A.**  I do.

18   **Q.**  And then the next two main bullet points are trends in

19   higher education for the Harvard Corporation, and finally

20   discussion of OIR work and potential new projects.  You see

21   that?

22   **A.**  Yes.

23   **Q.**  And if you would page through with me, as Her Honor

24   noted, there's a number of redacted pages of the additional

25   attachments going back.  Do you see that?

1    **A.**   Yes.

2    **Q.**   But if you go to page 47 -- and we've provided some page

3    numbers there at the very bottom pages.  This one, for

4    example, is on page 24 of 66.  But if you go to page 47, we

5    have some unredacted pages.  Do you see that?

6    **A.**   Yes.

7    **Q.**   And this is the evaluating factors PowerPoint that

8    relates to that first agenda item, second subpoint,

9    evaluating factors in admission?

10   **A.**   Yes.

11   **Q.**   And these are familiar slides, correct?  We were looking

12   at these yesterday in Plaintiff's Exhibit 12?

13   **A.**   Yes.

14   **Q.**   And the third subpoint under that first bullet says,

15   "Low-income admissions memo on the agenda."

16            You attached slides for that as well, correct?

17            If you go to page 59, that might help you.

18   **A.**   Thank you.  Yes.

19   **Q.**   And here, page 59, you've attached the same May 1 memo

20   that we looked at yesterday, Plaintiff's Exhibit 26, that you

21   had previously prepared for Dean Fitzsimmons, right?

22   **A.**   Yes.

23   **Q.**   And that was what was meant by that third sub-bullet

24   point, low-income admissions memo?

25   **A.**   Yes.

 1    **Q.**  Now, you don't recall Dean Khurana at your meeting on

 2    July 11th criticizing the analyses that you had sent to him,

 3    do you?

 4    **A.**  My memory of that meeting does not discuss any specific

 5    discussion of our work.

 6    **Q.**  And so you don't have any specific discussion of or you

 7    don't have any specific recollection of a discussion with

 8    Dean Khurana where he criticized either of the analyses that

 9    were P12 and P26 that you had sent to him, correct?

10    **A.**  No.  My memory of that meeting is that he shared sort of

11    his vision admission for the college and what he was planning

12    to do as dean.  And I don't remember discussing any of the

13    work we had shared with him that day.

14    **Q.**  And if you go back to the agenda, the third bullet point,

15    as we noted, was discussion of OIR work and potential new

16    projects.  You see that?

17    **A.**  Yes.

18    **Q.**  And you don't recall there being any discussion with Dean

19    Khurana at this July 2014 meeting about any new OIR project

20    to further investigate a possible Asian penalty in

21    admissions?

22            MS. ELLSWORTH:  I'm going to object on foundation

23    for that question.  I don't think it's been established.

24            MR. McBRIDE:  It was a "you don't recall" question.

25            THE COURT:  It's overruled.

**JA1208**

| | |
|---|---|
| 1 | THE WITNESS:  Can you repeat the question? |
| 2 | BY MR. McBRIDE: |
| 3 | **Q.**  Sure.  You don't recall there being any discussion with |
| 4 | Dean Khurana at this July 2014 meeting about a new OIR |
| 5 | project to further investigate a possible Asian penalty in |
| 6 | the admissions at Harvard? |
| 7 | **A.**  No.  Again, my memory of that meeting is we discussed |
| 8 | Dean Khurana's vision for his role at the college. |
| 9 | **Q.**  And you don't recall anyone taking any action with |
| 10 | respect to these reports after this meeting in July of 2014? |
| 11 | **A.**  I don't remember any subsequent discussion of these |
| 12 | analyses, no. |
| 13 | **Q.**  Or any subsequent action with respect to them? |
| 14 | **A.**  I don't remember any subsequent work, no. |
| 15 | **Q.**  Now, we can agree that OIR did some logistic regression |
| 16 | models of the Harvard admissions starting in at least |
| 17 | February of 2013 that we have reviewed, right? |
| 18 | **A.**  Yes.  They did a limited analysis with a limited number |
| 19 | of variables, yes. |
| 20 | **Q.**  And you forwarded those to your co-workers in Boston OIR |
| 21 | in February of 2013.  We saw that? |
| 22 | **A.**  We did. |
| 23 | **Q.**  And you sent a memo to Dean Fitzsimmons using those |
| 24 | models in May of 2013.  We saw that? |
| 25 | **A.**  We saw similar models and a new memo, yes. |

1    **Q.**  And we also saw you sent additionally updated versions to

2    Dean Fitzsimmons in June of 2013?

3    **A.**  Yes.

4    **Q.**  And you collected them and sent them again to your boss,

5    Erin Driver-Linn, in October of 2013 just before the

6    scheduled meeting with respect to the *Fisher* case?

7    **A.**  Yes.

8    **Q.**  And ultimately you passed them along to the new Dean

9    Khurana in July of 2014 as part of orienting him to the OIR's

10   work?

11   **A.**  Yes.  It was part of a series of, you know, analyses we

12   shared with him.  I think we shared over 300 pages of our

13   work with Dean Khurana when he started as dean.

14   **Q.**  None of these times when you collected and drafted and

15   forwarded these models did you tell the recipients that the

16   models you were sending were incomplete or unreliable, did

17   you?

18   **A.**  No.

19   **Q.**  And you never told them anything other -- you never said

20   anything -- there was anything other than the accurate,

21   timely and digestible research that was your standard at OIR,

22   did you?

23   **A.**  Yes.  Although we often shared the limitations that we

24   knew of of our work.

25   **Q.**  And you don't have any specific recollection here of

1    having shared those limitations because you don't recall the

2    discussions and meetings in question?

3    **A.**  Well, we looked at some of the memos which lists the

4    limitations of our work.

5    **Q.**  Correct.  We looked at that in P26, right.  But

6    otherwise, you never told them this was anything other than

7    the accurate, timely, and digestible research that was your

8    standard at OIR.  Is that right?

9    **A.**  At the time of those communications we reviewed, that's

10   correct, yes.

11              MR. McBRIDE:  No further questions, Your Honor.

12                           EXAMINATION

13   BY MS. ELLSWORTH:

14   **Q.**  Good morning, Ms. Bever.

15   **A.**  Good morning.

16   **Q.**  Ms. Bever, do you recall discussing your analysis in

17   Exhibit P12 with Mr. McBride yesterday?

18   **A.**  Yes.

19   **Q.**  And specifically the pages of that analysis that relate

20   to evaluating factors in Harvard College admissions?

21   **A.**  Yes.

22   **Q.**  You recall discussing the analysis in P26 relating to

23   low-income students and Harvard College admissions with

24   Mr. McBride?

25   **A.**  Yes.

Case: 19-2005    Document: 00117629337    Page: 503    Date Filed: 07/30/2020    Entry ID: 6356615
Case 1:14-cv-14176-ADB   Document 636   Filed 04/18/19   Page 15 of 201

15

1    **Q.**  Mr. McBride characterized that analysis as an analysis

2    about the extent to which the admissions process fell

3    negatively on Asian-Americans.  Do you recall that?

4    **A.**  I do.

5            THE COURT:  Can you bend that microphone down a

6    little bit more.

7            MS. ELLSWORTH:  Sure can.  Is that better?

8            THE COURT:  Yes, thank you.

9    BY MS. ELLSWORTH:

10   **Q.**  Do you agree with that characterization?

11           MR. McBRIDE:  Objection, Your Honor.  Can we have a

12   sidebar, please?

13           THE COURT:  Yes.

14           [Sidebar sealed and redacted.]

15   BY MS. ELLSWORTH:

16   **Q.**  I believe my question to you, Ms. Bever, was relating to

17   Mr. McBride's characterizations of the two exhibits

18   yesterday, P12 and P26.

19           Do you have that in mind?

20   **A.**  Yes.

21   **Q.**  Mr. McBride characterized the analysis in P12 as an

22   analysis about the extent to which the admissions process

23   fell negatively on Asian-Americans.  Do you recall that?

24   **A.**  Yes.

25   **Q.**  Do you agree with that characterization?

1    **A.**  No.  I would say the analysis shows the relationship

2    between a number of variables and their correlation with the

3    outcome of interest.

4    **Q.**  Was Mr. McBride's characterization of the work in P12 an

5    accurate characterization of the work that you did while you

6    were in OIR?

7    **A.**  I would not agree that it's an accurate characterization.

8    **Q.**  Could you speak up a little bit, please?

9    **A.**  I would not agree that it's an accurate characterization.

10   **Q.**  Thank you.

11            Mr. McBride also characterized the analysis as an

12   analysis that answers questions about the effect of Harvard's

13   use of race in admissions.  Do you recall that testimony

14   yesterday?

15   **A.**  I do recall that.

16   **Q.**  Do you agree with that characterization by Mr. McBride?

17   **A.**  No.  I would say the analysis that was done is missing a

18   number of the factors and cannot capture the process we use

19   in admissions, and so it's not doing that.

20   **Q.**  And Mr. McBride also this morning characterized the OIR

21   work that was shared with Dean Khurana as showing an Asian

22   penalty.  Do you recall that characterization?

23   **A.**  I do.

24   **Q.**  Do you agree with that characterization?

25   **A.**  I do not.

1    **Q.**  Is it an accurate characterization?

2    **A.**  No.

3    **Q.**  Ms. Bever, how long did you work at OIR?

4    **A.**  Seven years.

5    **Q.**  And during your seven years at OIR, how many of your

6    colleagues had experience working in the Harvard College

7    admissions office?

8    **A.**  None of us did.

9    **Q.**  And how many of your colleagues from OIR in the seven

10   years that you worked there had worked in any college

11   admissions office?

12   **A.**  I don't think any of us had ever worked in admissions.

13   **Q.**  Would you look, please, at Tab 1 in your binder that was

14   just provided to you by Harvard, which is Exhibit P12.

15   **A.**  Yes.  Just give me a moment.  You said Tab 1?

16   **Q.**  Yes.  Do you have P12 in front of you?

17   **A.**  I do.

18   **Q.**  All right.  Have you had a chance to review the analysis

19   in P12 in connection with this litigation?

20   **A.**  Yes.

21   **Q.**  Can you turn to Slide 33, please.

22   **A.**  Okay.

23   **Q.**  What does Slide 33 of Exhibit P12 show?

24   **A.**  It shows of the specifications for four models.

25   **Q.**  In the four models on Slide 33, which model includes the

1    most variables?

2    **A.**   Model 4.

3    **Q.**   And how many variables are included in Model 4?

4    **A.**   Eight.

5    **Q.**   Now, how long have you worked in the Harvard College

6    admissions office, Ms. Bever?

7    **A.**   Four years.

8    **Q.**   And in that time, have you -- you've participated in

9    three separate admission cycles, right?

10   **A.**   That's correct.

11   **Q.**   Approximately how many application files have you been

12   the first reader on?

13   **A.**   Over 2,000.

14   **Q.**   And approximately how many admissions files or -- and

15   applicants for admission have you discussed in subcommittee?

16   **A.**   I could not count.

17   **Q.**   Is it more than the files you've read?

18   **A.**   Yes.

19   **Q.**   More than a thousand?

20   **A.**   Certainly more than a thousand.

21   **Q.**   More than 2,000?

22   **A.**   Certainly more than 2,000.

23   **Q.**   How many application files have you discussed in the full

24   committee process in your three years in the Harvard College

25   admissions office?

1    **A.**  I could not count.

2    **Q.**  More than 2,000?

3    **A.**  Certainly more than 2,000.

4    **Q.**  Okay.  Since your time in admissions, have you come to

5    learn about the factors that are important to Harvard College

6    in assessing an applicant for admission?

7    **A.**  Yes.

8    **Q.**  And having the benefit of having worked in the admissions

9    office, are the factors that are important to evaluating

10   Harvard College admission reflected on page 33?

11          MR. McBRIDE:  Objection, Your Honor.  We're well

12   into leading territory now.

13          MS. ELLSWORTH:  I'll withdraw and retry.

14          MR. McBRIDE:  Also, Your Honor, again we are

15   eliciting undisclosed opinion testimony.

16          THE COURT:  Well, it's not undisclosed opinion

17   testimony.  She's agreed to rephrase the question, so . . .

18   BY MS. ELLSWORTH:

19   **Q.**  Based on your experience in admissions, how many factors

20   does the admissions office consider in evaluating an

21   applicant?

22   **A.**  Hundreds.  And lots of narrative text that can't be

23   captured in qualitative variables.

24   **Q.**  And how do those hundreds of factors compare to the

25   variables listed on Slide 33 of Exhibit P12?

1   **A.**   Certainly this is a very small subset of the things we

2   review when we review applicants.

3   **Q.**   What's an example of some factors that are admitted and

4   not listed on Slide 33 of Exhibit P12?

5   **A.**   There are a number of ratings we provide during our

6   process that are not captured here, such as ratings of the

7   school support, alumni interviews, staff interviews, music

8   evaluations, faculty evaluations, and things like that.

9   **Q.**   Are all of the factors that are considered by Harvard

10  College in admissions decisions quantified in data?

11  **A.**   No, not all of them are.

12  **Q.**   What are some examples of factors considered in Harvard

13  College admissions that are not quantified in data?

14  **A.**   So the personal essay comes to mind.  Often faculty

15  provide feedback that is not quantified.  The narrative piece

16  that is described in letters and things like that is rated

17  but not always quantifiable.

18  **Q.**   Are all of those factors you just listed important to the

19  admissions process?

20  **A.**   Very important.

21  **Q.**   Let's take a look at Slide 36 of P12, please.  What is --

22  what does Slide 36 show?

23  **A.**   Slide 36 shows -- it says what we have learned, and it

24  sort of describes what they have done and also what is

25  missing and what's not captured.

1    **Q.**  Did OIR list factors not included in the models in
2    Exhibit P12 on Slide 36?
3    **A.**  They did.
4    **Q.**  What factors are listed?
5    **A.**  Exceptional talent, parentheses, music, art, writing, the
6    role of context cases, the role of the personal statement
7    essay, measures of socioeconomic status such as HFAI flag,
8    low-income flag.
9    **Q.**  Knowing what you now know from your time in admissions,
10   are those factors important?
11   **A.**  Very, yes.
12   **Q.**  When you review an application to Harvard College, what's
13   the goal of your review of that file?
14   **A.**  To assess the overall strength of that particular
15   applicant and their likelihood of admission in comparison
16   with others.
17   **Q.**  And what are some of the examples of the types of forms
18   of strength an application could exhibit?
19   **A.**  Some of the things listed here, such as exceptional
20   talent or a passion for a particular type of community
21   service.  It can be athletic strength.  It can be overcoming
22   challenges and background.  It can be a variety of things.
23   **Q.**  And how does your assessment of those various forms of
24   strengths you just listed compare to the OIR model shown in
25   Exhibit P12?

1    **A.**   Some of those things are very difficult to capture in

2    data, and so they're just not included in that.  It would be

3    difficult to include them in a model.

4    **Q.**   Do you understand that Harvard has retained an economist

5    named David Card to conduct an analysis of Harvard's

6    admissions data in this litigation?

7    **A.**   Yes.

8    **Q.**   And you understand he created a model of the Harvard

9    admissions process?

10   **A.**   Yes.

11   **Q.**   Have you seen the list of factors included in Dr. Card's

12   model?

13   **A.**   I have.

14   **Q.**   Between OIR's model in P12 and Dr. Card's model, which

15   model captures more of the information you use in the

16   admissions office in making decisions?

17   **A.**   I believe Dr. Card's model has many more factors

18   included.

19   **Q.**   Have you seen any OIR analysis that models as many

20   factors in the admissions process as Dr. Card modeled?

21   **A.**   I have not.

22   **Q.**   Let's turn back to your background for a minute,

23   Ms. Bever.

24          Could you tell us a bit about your education,

25   beginning with college?

1    **A.**  I was educated at Wellesley College.

2    **Q.**  Do you have any degrees after --

3         THE COURT:  Can I interrupt for a second?

4         You say Model 4 sort of is very incomplete.  But it

5    still really closely approximates the actual, right?

6         THE WITNESS:  So it approximates, if I recall, the

7    demographics but not the actual students that would have been

8    selected for admission.  So we don't know who those students

9    are in that final bar.

10   BY MS. ELLSWORTH:

11   **Q.**  And I think if we look at Slide 34, is that the bar graph

12   that you're referring to?

13   **A.**  Yes.

14        THE WITNESS:  Is that what you mean?

15        THE COURT:  It is what I mean, but --

16        THE WITNESS:  So we don't know that the students

17   that are selected in this bar are the actual students who

18   were selected for admission, if that makes sense.

19        THE COURT:  I guess you're saying that Model 4 is

20   incomplete.  But it seems like whatever variables you did

21   include were good markers because they so closely reflected

22   actual.

23        THE WITNESS:  They so closely reflect the

24   demographic breakdown but not who was actually selected

25   for -- I don't know who was actually selected for admission

 1   and how closely aligned those two things are.

 2            THE COURT:  Okay.

 3   BY MS. ELLSWORTH:

 4   Q.  Ms. Bever, I'm sorry.  I believe my question was, after

 5   Wellesley did you have any additional education?

 6   A.  Yes.  I have a master's degree in education.

 7   Q.  When did you start working at Harvard?

 8   A.  In July of 2007.

 9   Q.  Why did you decide to work at Harvard?

10   A.  I was interested in the work of institutional research,

11   and there was a one-year fellowship position that I felt

12   would give me a good introduction to Harvard.  I have some

13   family connections to Harvard, so I was in interested in

14   working there as well.

15   Q.  By "family connections," what are you referring to?

16   A.  My grandfather attended Harvard College.  He was the same

17   class as John F. Kennedy.

18   Q.  You had fond memories of Harvard from growing up?

19   A.  Harvard changed his life and I heard a lot about it as a

20   child.  No one else in my family went to Harvard, but it had

21   been very important to him.

22   Q.  And when you joined that fellowship program, that was in

23   the office of institutional research, right?

24   A.  It was.

25   Q.  How many -- withdrawn.

 1              What positions have you held over your 11 years at

 2    Harvard?

 3    A.   So I began as a management fellow and then I served as a

 4    research analyst and an assistant director in the office of

 5    institutional research before joining the office of

 6    admissions in my current role.

 7    Q.   And what is your current role and title?

 8    A.   I'm the director of research for Harvard College

 9    admissions and financial aid.

10    Q.   And are you also a senior admissions officer?

11    A.   I am a senior admissions officer, yes.

12    Q.   You told Mr. McBride that you read 500 files in an

13    admission cycle.  Is that right?

14    A.   About that, yes.

15    Q.   Is that a lower number than other senior admissions

16    officers read?

17    A.   Yes.  I have about a quarter load of admissions files.

18    Q.   And why do you have a quarter load of admissions files?

19    A.   Because of the other duties I have in the office.

20    Q.   Remind me, please, when did you join the admissions

21    office?

22    A.   I joined the office in August of 2014.

23    Q.   And you're a member of the 40-person admissions

24    committee?

25    A.   I am.

1    **Q.**  So you have experience both in OIR and in the admissions

2    office, correct?

3    **A.**  Yes.

4    **Q.**  And do you still conduct research in the admissions

5    office relating to Harvard College admissions data?

6    **A.**  I do.

7    **Q.**  I'd like to ask you to turn to Tab 3, please, which is

8    Exhibit P17.  This is a document Mr. McBride didn't show you.

9    Do you have it in front of you?

10   **A.**  I do.

11   **Q.**  Do you recognize P17?

12   **A.**  Yes.

13   **Q.**  What is this document?

14   **A.**  It is an email from my former colleague Mark Hansen to

15   Elizabeth Yong.  The subject is "Admissions data."

16           MS. ELLSWORTH:  Your Honor, I'd move the admission

17   of P17.

18           MR. McBRIDE:  No objection, Your Honor.

19           THE COURT:  Admitted.

20           (Plaintiff Exhibit No. P17 admitted.)

21   BY MS. ELLSWORTH:

22   **Q.**  What is the date of the email in P17?

23   **A.**  It's Tuesday, February 26, 2013.

24   **Q.**  Can you please read the first sentence of the email in

25   P17?

1    **A.**   It says, "Hello, Elizabeth.  Thank you for coming over

2    and meeting with us yesterday."

3    **Q.**   Can you please read the sentence -- withdrawn, actually.

4            Who is Ms. Yong?

5    **A.**   I'm not sure what Ms. Yong's title was when she was in

6    admissions, but she was the person in admissions we would

7    contact about admissions data.

8    **Q.**   And Mr. Hansen worked for you at this time?

9    **A.**   Yes.

10   **Q.**   Can you please read the sentence beginning with "I've

11   attached."

12   **A.**   Where are you?  Thank you.

13           "I've attached the most recent file specification

14   so that you can see the most complete set of variables we

15   have."

16   **Q.**   And does Exhibit P17 have an attachment?

17   **A.**   It does.

18   **Q.**   And can you please turn to the attachment.  It's a little

19   hard to read so Mr. Lee has blown it up on the screen for you

20   there.

21           What does the attachment contain?

22   **A.**   It contains a list of -- looks like data from admissions

23   that includes demographics and family background, a lot of

24   SAT scores, some of the main ratings we use.

25   **Q.**   And are the factors listed in P17 the data that were

1    available to OIR in 2013?

2    **A.**   Based on this email, it appears so, yes.

3    **Q.**   Is the -- does the exhibit -- the attachment to

4    Exhibit P17 contain a comprehensive list of the factors

5    important to admissions decisions?

6    **A.**   No, it does not.

7    **Q.**   Can you turn back, please, to the first page of P17, to

8    the email.  Please read the sentence at the bottom of the

9    first paragraph that begins "In addition to."

10   **A.**   "In addition to the variables we have in the file

11   specification, we'd like to request the following variables

12   if they exist:  One, disadvantaged flag; two, HFAI search

13   flag; three, faculty staff flag; four, docket; five, some

14   kind of reader ID; six, veteran status; seven, language

15   spoken at home."

16   **Q.**   What does this portion of the email in P17 tell you about

17   the data sources to which OIR had access in 2013?

18   **A.**   They were limited, and they were aware that they were

19   incomplete.

20   **Q.**   And when you say they were aware, do you mean OIR?

21   **A.**   Oh, yes.

22   **Q.**   Do the factors that are listed or requested by Mr. Hansen

23   from Ms. Yong in P17 play a role in the admissions process?

24   **A.**   They can, yes.

25   **Q.**   Are the missing factors listed in P17 important to the

1    actual admissions process?

2             MR. McBRIDE:  Your Honor, I object.  We're getting

3    well into leading territory again.

4             THE COURT:  I don't think that's a leading

5    question.  It's overruled.

6             THE WITNESS:  Sorry.  Could you repeat the

7    question?

8    BY MS. ELLSWORTH:

9    Q.  Are the missing factors important to the actual

10   admissions process?

11   A.  Yes.

12   Q.  Can you please read the sentence after the list of seven

13   factors OIR was requesting, beginning "If you can think"?

14   A.  "If you can think of any other variables that are

15   important in making admissions decisions, please let me

16   know."

17   Q.  What does this Exhibit P17 tell you about OIR's

18   understanding of the Harvard College admissions process in

19   February 2013?

20   A.  So it seems that they were aware -- OIR was aware that

21   there were variables that were missing and that they still

22   didn't know all the things that admissions might be using in

23   the process.

24   Q.  Is there a difference between admissions data and the

25   admissions process?

1    **A.**   Yes.

2    **Q.**   What's the difference?

3    **A.**   The data reflects those things that can be quantified.

4    But it is difficult to capture the amount of time and

5    additional information that comes in throughout the process,

6    the committee procedures, the subcommittee meetings, full

7    committee meetings in which applications are discussed.

8    **Q.**   Is there information that is important in making

9    admissions decisions beyond what OIR had that we've reviewed

10   in these exhibits?

11   **A.**   Is there -- yes.

12   **Q.**   And based on the four years that you've been an

13   admissions officer, could you make an admissions decision as

14   to a particular applicant if you had only the information

15   listed in Exhibit P17?

16   **A.**   No, nor would I want to.

17   **Q.**   You recall speaking with Mr. McBride about the May 1st,

18   2013, memo that's Exhibit P26 relating to low-income

19   admissions?

20   **A.**   Yes.

21   **Q.**   You can take a look at it in your binder.  P26.  It might

22   be in Mr. McBride's binder.

23   **A.**   Okay.

24   **Q.**   I think it's Tab 4 in the binder we gave you.

25   **A.**   Where should I look?

1    **Q.**  Tab 4 in our binder.  Sorry.

2            Are you there at P26?

3    **A.**  Yes.  Sorry.

4    **Q.**  In this memorandum that was sent to Dean Fitzsimmons, did

5    OIR tell Dean Fitzsimmons that the analysis showed

6    discrimination against Asian-Americans?

7    **A.**  It did not.

8    **Q.**  Did the memorandum tell Dean Fitzsimmons that the data

9    showed bias against Asian-Americans?

10   **A.**  No.

11   **Q.**  Why did OIR draft the May 1st, 2013, memorandum?

12   **A.**  My recollection is that Dean Fitzsimmons left a voicemail

13   for either Erin or myself in which he asked us to look at

14   whether or not there was a low-income tip for -- in the

15   admissions process.

16   **Q.**  And did you recall that voicemail at the time you were

17   deposed in this case?

18   **A.**  No.  I remembered it after the fact.

19   **Q.**  What was OIR's conclusion in response to Dean

20   Fitzsimmons' question?

21   **A.**  That we could see a tip for low-income students in the

22   admissions process.

23   **Q.**  Let's take a look at the third page of P26, which is the

24   second page of the memo.  23549 is the Bates.  It's also in

25   front of you on the screen.

 1    **A.**   Yes.

 2    **Q.**   Can you please read the second paragraph starting with

 3    "We implement"?

 4    **A.**   Where are you?  Sorry.  Okay.

 5            "We implement a logistic regression model to

 6    predict the probability of admission, controlling for

 7    demographic characteristics and a variety of metrics used to

 8    assess qualification for admission.  Demographic

 9    characteristics include gender and race ethnicity.

10    Qualifications used in admission include academic index,

11    academic rating, extracurricular rating, personal rating,

12    athletic rating, and legacy status."

13    **Q.**   Are the qualifications used in admissions that you just

14    read from P26 the same factors included in that February 2013

15    analysis that's in Exhibit P12?

16    **A.**   I think so, yes.

17    **Q.**   And does that list include all factors important to the

18    admissions process?

19    **A.**   No.

20    **Q.**   Are the factors listed in this paragraph in Exhibit P26

21    the only qualifications used in Harvard College admissions?

22    **A.**   No.  There are many others.

23            THE COURT:  I should have asked this of the dean

24    yesterday, but I didn't think of it until last night.  So

25    here you are.

**JA1229**

1        THE WITNESS:  Okay.  Can I be dean for a day?

2        THE COURT:  So I take from this that you can have a

3   tip that's like a conscious tip, like, you know, economic

4   status or whatever.  And then you can have something that

5   turns out to be a tip but you don't realize it's a tip until

6   after you look at the data.

7        THE WITNESS:  You mean after we read the

8   application?

9        THE COURT:  No.  After you do a regression

10  analysis -- like he's asking -- he asked initially if there's

11  a tip for low income.

12       THE WITNESS:  Yeah.

13       THE COURT:  So is he trying to verify that you are

14  having the tip that he wants for low income, or is he trying

15  to figure out that there's a tip at all?

16       THE WITNESS:  So we had talked about this a lot,

17  sort of the low income, right.

18       He was asking whether the data would show that we

19  do -- his statement was:  We do give a tip for low-income

20  students in our process.  Can we show that?  Right?

21       It's hard to describe.  That's why we're here.

22  It's hard to describe, right, how the process works.  So we

23  wanted to be able to point to something to say, look, I'm

24  giving a tip for low-income students.  But I think he was

25  aware that that's what the process was doing.  And again, you

1    need to be in the discussion to get a tip, right?

2              THE COURT:  Well, are there times when you don't

3    realize that you're tipping for something or like

4    anti-tipping for something and then you go to the data and it

5    shows that there actually is a tip that you didn't really

6    intend or know about?

7              THE WITNESS:  That's a good -- I have never looked

8    at that.  I don't know if that's true.  Again, what we're

9    trying to do in our admissions process is assess the

10   strength, and sometimes the fact that a student comes from a

11   disadvantaged background and we can see that in their

12   application will make that case stronger than a student who

13   appears similarly situated but, say, didn't overcome that.

14   And so that's how that would play out in the actual process.

15   And maybe for that student, if we looked at the data, it

16   would show the strong correlation between their low-income

17   status and being admitted.

18             THE COURT:  Okay.  Sorry.

19             MS. ELLSWORTH:  That's fine, Your Honor.

20   BY MS. ELLSWORTH:

21   Q.  Ms. Bever, just following up on the Court's question, do

22   you all do data analysis in the admissions office to try and

23   see whether you're giving tips?

24   A.  No.  Not outside of this litigation.

25   Q.  Do you -- when you're considering an applicant for

1   admission, do you think about how that's going to end up

2   looking reflected in the data after the fact?

3   **A.**   No.

4   **Q.**   What are you trying to do when you consider an applicant

5   for admission?

6   **A.**   We're trying to admit a student who will use Harvard well

7   and benefit from Harvard and find the best class we can.

8   **Q.**   Looking back at this P26 that we have in front of you,

9   the factors that are listed here that you read off, are those

10  the same factors that were included in Dr. Card's model that

11  you reviewed?

12  **A.**   These factors at the bottom of this paragraph?

13  **Q.**   Yes.

14  **A.**   I believe he includes these factors.  But of course there

15  are many others in his model.

16  **Q.**   Dr. Card's model includes many more factors than this OIR

17  analysis in P26?

18  **A.**   Yes.

19  **Q.**   And were any of the three OIR individuals working on P26

20  Ph.D. economists?

21  **A.**   No.

22  **Q.**   Between OIR's model and P26 and Dr. Card's, which model

23  captures more of the information used in making admissions

24  decisions at Harvard College?

25  **A.**   I believe Dr. Card's model includes more.

1    **Q.**  And you looked at the listing of factors that are

2    included in his model, right?

3    **A.**  I have.

4    **Q.**  If you can, look, please, at the next paragraph down on

5    P26, beginning with "This approach," and if you could read

6    the first two sentences.

7    **A.**  "This approach has several limitations.  We picked a

8    small set of variables that would factor in admissions

9    decisions.  The selection of a wider set of variables might

10   result in a better fitting model, one that accounts for more

11   of the variation in individual applicants and their

12   potentially unique contributions to the entering class."

13   **Q.**  Is that true?

14   **A.**  I believe so, yes.

15   **Q.**  Mr. McBride asked you several questions about whether the

16   work of OIR he showed you was complete and reliable.  Do you

17   remember that testimony?

18   **A.**  Yes.

19   **Q.**  And you agree that OIR tried to do complete and reliable

20   work, right?

21   **A.**  I believe we did, yes.

22   **Q.**  Can work be complete and reliable and still be

23   preliminary?

24   **A.**  Yes.

25   **Q.**  Can work be complete and reliable and still be limited?

1    **A.**   Yes.

2    **Q.**   Let's look at the last sentence of the same paragraph,

3    beginning "In addition."  Could you please read that.

4    **A.**   "In addition, our model is limited to the main effects,

5    not examining interactions between variables.  Our analysis

6    should not be considered exhaustive."

7    **Q.**   Is that true?

8    **A.**   Yes.

9    **Q.**   The prior sentences that you were reading noted that the

10   model contained a small set of variables.  Do you see that

11   above?

12   **A.**   Yes.

13   **Q.**   And you've had a chance to review the chart that's in

14   Exhibit P26 on the next page?

15   **A.**   Yes.

16   **Q.**   Do you agree with the statement in the OIR memo that this

17   model uses a small set of variables?

18   **A.**   It does.

19   **Q.**   Why did OIR include a description of the limitations of

20   the analysis in this memorandum?

21   **A.**   I think it's fairly standard practice in doing this sort

22   of work where you would acknowledge the things that cannot be

23   measured in a model or that you don't have data for.

24   **Q.**   Do you recall yesterday just before we broke Mr. McBride

25   asking you questions about some earlier drafts of this

1    memorandum?

2    **A.**  I do.

3    **Q.**  He asked about some sentences that were edited in the

4    final version?

5    **A.**  Yes.

6    **Q.**  Did the drafts that you looked at yesterday, Exhibits P26

7    and P25, did those ever go to Dean Fitzsimmons?

8    **A.**  I don't think they did.

9    **Q.**  Did OIR conduct any follow-up analysis after P26 was sent

10   to him on May 1st, 2013?

11   **A.**  I believe we did, yes.

12   **Q.**  And what follow-up analysis did OIR conduct?

13   **A.**  I think Dean Fitzsimmons asked us to look at the

14   interaction between race, ethnicity, and low-income status.

15   **Q.**  Did that follow-up analysis include all the factors that

16   the actual admissions process involves?

17   **A.**  It did not.

18   **Q.**  Was that another example of OIR doing reliable work that

19   might still be limited?

20   **A.**  Yes.

21   **Q.**  And again, Ms. Bever, have you seen any OIR study that

22   models all factors in the admissions process?

23   **A.**  No.

24   **Q.**  Mr. McBride asked you this morning about the meeting you

25   had with Dean Khurana in July of 2014.  Do you remember that?

1   **A.**   I do.

2   **Q.**   And you referenced that you believed you had sent over

3   300 pages of work to Dean Khurana when he first became dean.

4   Do you recall that?

5   **A.**   I do.

6   **Q.**   Could you turn to Tab 9, please, which is Exhibit P288.

7   **A.**   Yes.

8   **Q.**   Do you recognize P288?

9   **A.**   I do.

10  **Q.**   What is P288?

11  **A.**   P288 is a cover memo that accompanied our -- the actually

12  fairly exhaustive set of work we shared with Dean Khurana

13  when he became dean.

14  **Q.**   And the date of the memo is?

15  **A.**   May 30, 2014.

16  **Q.**   It is from Ms. Driver-Linn, correct?

17  **A.**   It is.

18  **Q.**   Were you involved in drafting this memo?

19  **A.**   I think so.

20  **Q.**   Were you involved in compiling the exhibits that

21  accompanied this memo?

22  **A.**   I think so, yes.

23          MS. ELLSWORTH:  Your Honor, I move to admit P288.

24          MR. McBRIDE:  No objection Your Honor.

25          THE COURT:  It's admitted.

```
 1              (Plaintiff Exhibit No. P288 admitted.)
 2    BY MS. ELLSWORTH:
 3    Q.  Can you just describe at a general level -- it's a large
 4    exhibit -- what was included in the documents sent to Dean
 5    Khurana in December of 2014?
 6    A.  I think we were aiming for completeness, and we tried to
 7    include as many examples of our work as we could.
 8    Q.  Was all of OIR's work relating to Harvard College
 9    attached to the memo?
10    A.  I can't say for certain that it was all, but it was
11    certainly most.
12    Q.  And you recall discussing with Mr. McBride this morning a
13    few additional analyses that were sent closer in time to
14    another meeting, right?
15    A.  Yes.
16    Q.  Did you -- withdrawn.
17              Why did you meet with Dean Khurana in July 2014?
18    A.  My recollection of that meeting is that the purpose was
19    to introduce him to our office and for us to be able to meet
20    him.
21    Q.  And you testified in response to Mr. McBride's questions
22    that you don't recall discussing with Dean Khurana any
23    specific analyses, right?
24    A.  I don't recall discussing our work with him in any
25    detail.
```

1    **Q.**   You do recall the meeting with Dean Khurana, right?

2    **A.**   I do.

3    **Q.**   And your memory is there was no discussion of the

4    substantive work provided by OIR?

5    **A.**   That's correct.

6    **Q.**   Was the purpose of the July 2014 meeting to show Dean

7    Khurana OIR's current works in progress?

8    **A.**   I don't think so, no.

9    **Q.**   Were you seeking Dean Khurana's input on any of the

10   analyses you showed him?

11   **A.**   No.

12   **Q.**   Were you seeking his reaction to any of the analysis you

13   showed him?

14   **A.**   I don't think we showed him anything, and I don't think

15   we were asking for feedback.

16   **Q.**   Are there -- is there more than one institutional

17   research office in Harvard University?

18   **A.**   There is.

19   **Q.**   Is there an institutional research department for Harvard

20   College as well?

21   **A.**   Yes.

22   **Q.**   And Dean Khurana is the dean of Harvard College, right?

23   **A.**   Yes.

24   **Q.**   The institutional research for Harvard College is

25   different than OIR, right?

1   **A.**   That's correct.

2   **Q.**   And is the difference between college research and the

3   office of institutional research some of what you were trying

4   to discuss with Dean Khurana in July 2014?

5   **A.**   It may have been.  I don't specifically recall.

6   **Q.**   Were you trying to alert Dean Khurana to any findings of

7   discrimination in sending him any of the material that you

8   did?

9   **A.**   I don't believe so.

10   **Q.**   Were you trying to alert Dean Khurana to any findings of

11   bias in sending him the information?

12   **A.**   No.

13   **Q.**   Let's switch gears and talk a little bit about your work

14   in the admissions office.  Okay?

15   **A.**   Okay.

16   **Q.**   Why did you want to move from OIR to admissions?

17   **A.**   The work I had done on the affordability initiative at

18   Harvard and the return to early action was some of the work I

19   most enjoyed.  So when I saw the job posting for the director

20   of research role, I decided I would like to try that.

21   **Q.**   And do you enjoy your work in admissions?

22   **A.**   I love my job.

23   **Q.**   You recall Mr. McBride asking you a little bit about

24   training that you received when you joined the office?

25   **A.**   Yes.

Case: 19-2005    Document: 00117629237    Page: 531    Date Filed: 07/30/2020    Entry ID: 6356615
Case 1:14-cv-14176-ADB   Document 636   Filed 04/18/19   Page 43 of 201

43

1    **Q.**   Can you describe the form of the training that you had

2    when you first joined admissions?

3    **A.**   I had a month-long orientation period where I met with

4    colleagues from across the office of admissions and financial

5    aid.

6    **Q.**   And who conducted the training, the orientation?

7    **A.**   Yeah.  I think it was Grace Cheng who organized the

8    training and conducted some of the sessions.  But I met with

9    colleagues from -- many colleagues from across the office who

10   performed different roles and work on different parts of our

11   process.

12   **Q.**   What types of information did you learn in your

13   admissions orientation?

14   **A.**   So everything from how our recruiting groups function to,

15   you know, how we read an application, to our yield

16   activities, to the subcommittee process, and things like

17   that.

18   **Q.**   And what specific training did you receive relating to

19   reading and reviewing application files?

20   **A.**   So we had a specific training where we were given some of

21   our case book files to read and review after going through

22   what's called the reading procedures that describes how to

23   read a file and talking about how we do that initial

24   assessment.

25            And then we did a mock committee where we presented

1    cases and discussed them as if we were actually in the

2    admissions process.

3    Q.   And why does the admissions office conduct its training

4    in the manner you just described?

5    A.   I think part of what we do is best learned by actually

6    doing it, actually reading an application file, seeing all

7    the pieces of information there are, trying to make an

8    initial assessment, using the ratings, and then figuring out

9    how you're going to share that information with your

10   colleagues and committee.

11   Q.   And you discussed with Mr. McBride a little bit the fact

12   that somebody read your initial files after you when you were

13   new in the admissions office.  Do you remember that?

14   A.   Yes.

15   Q.   What type of feedback did you receive from those second

16   reviewers?

17   A.   The second reviewers provide ratings of their own and

18   then often write up a narrative themselves of what they see

19   the particular strengths of that application are, any missing

20   pieces of information, whether they -- you know, some of them

21   might have agreed, just said I agree with everything you've

22   said here.  Some of them would have said, you know, we're

23   going to need the following pieces of information before we

24   might bring this further.

25           So it's written feedback mostly that helps me, as

1   the newer reader, understand how other colleagues might see

2   that file.

3   **Q.**  And did you take that feedback into account when

4   reviewing additional files after you received the feedback?

5   **A.**  Yes.

6   **Q.**  How so?

7   **A.**  Again, I think I went through every single file and read

8   how my colleagues either saw me, my own read.  And it helped

9   refine what I was doing, how I was -- refined what I wrote on

10  the application, and helped me think about what's going to

11  make a strong applicant.

12  **Q.**  Since that initial training that you've just described,

13  have you received additional on-the-job training?

14  **A.**  Yes.  We have ongoing sessions and things like that.

15  **Q.**  Have you received any training relating to the Supreme

16  Court's guidance on the use of race in college admissions?

17  **A.**  We have.

18  **Q.**  Who conducted those trainings?

19  **A.**  Our general counsel, Bob Iuliano.

20  **Q.**  How frequently do those trainings occur?

21  **A.**  Annually.

22  **Q.**  Without getting in the substance, what were topics of

23  Mr. Iuliano's annual trainings in the years that you've been

24  in the office?

25  **A.**  So they vary, but his discussion of considerations in the

1   admissions process.

2   **Q.**  Does the admissions office conduct any professional

3   development activities for admissions officers?

4   **A.**  It does.

5   **Q.**  What are some examples?

6   **A.**  So we often have professional development sessions where

7   we invite faculty or other senior leaders from the university

8   to come talk to us about things that are changing at Harvard.

9   Sometimes we have external speakers, people doing research

10  that's relevant to our work, things like that.

11  **Q.**  Have you had any professional development sessions

12  related to how files are reviewed and rated?

13  **A.**  Yes.  At our annual retreats.

14  **Q.**  And what is the -- what is an example of a professional

15  development session at your retreat relating to the topic of

16  reviewing and rating files?

17  **A.**  So we've done some joint reading of files and discussion

18  of how we use the ratings.  This past year we had a

19  discussion about how we used the top ratings and the idea

20  that perhaps we should be using the top ratings more than we

21  have been.

22  **Q.**  And by the "top ratings," you mean the 1s?

23  **A.**  The 1s, yes.

24  **Q.**  In those professional development activities you just

25  described, what have you learned?

1    **A.**  Again, I think some of them are just helpful to have the

2    discussion about how others see the ratings, how they use

3    them in the process, what they are trying to signal, and they

4    help inform my own reading of an application.

5    **Q.**  Who participated in those professional development

6    activities you just described?

7    **A.**  Generally it's all the staff in retreats.

8    **Q.**  And that means all 40 admissions officers who sit on

9    committee?

10    **A.**  Yeah, and more.

11    **Q.**  Let's turn quickly to the subject of how race is used in

12    the process.

13          So as a senior admissions officer, you're the first

14    reader on approximately 500 applications, right?

15    **A.**  Yes.

16    **Q.**  Can an applicant's race make his or her case for

17    admission more compelling?

18    **A.**  Again, it can be part of their case, yes.

19    **Q.**  And it can be a part of their case that might make their

20    application more compelling?

21    **A.**  Yes.

22    **Q.**  Is race the only factor that might make an application

23    more compelling?

24    **A.**  No.  There are many factors that make for compelling

25    applications.

1    **Q.**  What are some of the other factors that may make an

2    application more compelling for admission?

3    **A.**  Everything from geography to socioeconomic status to

4    exceptional talent.

5    **Q.**  When you're assigning ratings to an application file,

6    does race ever factor into an applicant's academic rating?

7    **A.**  It does not.

8    **Q.**  Does race ever factor into an applicant's extracurricular

9    rating?

10   **A.**  Not per se.

11   **Q.**  Does race ever factor into an applicant's personal

12   rating?

13   **A.**  Not per se.

14   **Q.**  When you say "not per se," what do you mean?

15   **A.**  I mean not the fact that they are a particular race, but

16   certainly students might write about their background and

17   things like that that would inform my personal rating or what

18   I give in the personal rating.

19   **Q.**  When a student writes about their background in a way

20   that informs the personal rating, it's not their racial

21   background that's informing the rating.  Is that your

22   testimony?

23   **A.**  That's my testimony.

24   **Q.**  Have you ever assigned an applicant a lower rating

25   because of his or her race?

1    **A.**   No.

2    **Q.**   Have you -- withdrawn.

3            Can you please describe the preliminary overall

4    rating?

5    **A.**   So we use -- I -- I should speak for me.

6            I use the preliminary overall rating to give my

7    assessment of how strong I think that particular applicant

8    is.  So it's intended to capture the whole, if one can, in a

9    rating.

10   **Q.**   And does the preliminary overall rating differ from the

11   four profile ratings?

12   **A.**   Yes.

13   **Q.**   How so?

14   **A.**   Again, it's trying to capture all of the pieces and give

15   an overall assessment of how strong that applicant is.

16   **Q.**   Does race ever factor into an applicant's preliminary

17   overall rating?

18   **A.**    Insofar as their race plays a role in how strongly I

19   might view a case, then yes.

20   **Q.**   Let's talk take a look, if we can, at an application

21   file.

22            MS. ELLSWORTH:  Your Honor, I'd like to show an

23   application that we'll be moving into evidence under seal, so

24   I'd like to ask the gallery monitors to be turned off,

25   please.

```
 1              THE COURT:  That's fine.
 2   BY MS. ELLSWORTH:
 3   Q.  Let's pull up SA1, please.  That's at Tab 6 in your
 4   binder.  Do you have SA1 in front of you, Ms. Bever?
 5   A.  Yes.
 6   Q.  Do you recognize SA1?
 7   A.  I do.
 8   Q.  What is that?
 9   A.  It is an application file.
10   Q.  How do you recognize this exhibit?
11   A.  This is the summary sheet that appears at the beginning
12   of our application reader, which is an online tool we use to
13   read applications.
14   Q.  And did you read this application file?
15   A.  I did.
16   Q.  Were you the first reader?
17   A.  I was.
18   Q.  Now, this applicant's name is not redacted, correct?
19   A.  That's correct.
20   Q.  And you're aware that that applicant is a current Harvard
21   student who will testify in this case?
22   A.  I am.
23   Q.  What is the name of this student?
24              THE COURT:  Where does it show on here that you
25   were the first reader?
```

Case: 19-2005    Document: 00117629937    Page: 538    Date Filed: 07/30/2020    Entry ID: 6356615
Case 1:14-cv-14176-ADB   Document 636   Filed 04/18/19   Page 51 of 261

51

1          THE WITNESS:  So there is certain information on

2     this particular page that is associated with where we are in

3     the process now, and there is certain information that's tied

4     to the applicant.  So my initials actually aren't here.  This

5     has been changed to reflect who currently reads this high

6     school.  But I remember this applicant.

7          MS. ELLSWORTH:  And if you look at SA1 0005, it may

8     have the correct reader information on it.

9          THE COURT:  Because normally it would have your

10    initials.  It would have your initials under that rating,

11    right, because you did it?

12         MS. ELLSWORTH:  Sorry.  It's not 5.  40 is where

13    the reader sheet is.

14         THE WITNESS:  Yes.  So you can see I was actually

15    the first rater who submitted the form.  The way our slate --

16    our CRM works is that this is being generated at the moment.

17    So because somebody else covers this high school now, her

18    initials are reflected, even though the data show my ratings

19    which happened in the past.

20    BY MS. ELLSWORTH:

21    **Q.**  And Ms. Bever, following up on Her Honor's question, are

22    there other aspects of the first page of this and other files

23    from the cycle that have incorrect information on them

24    because of the way they were pulled?

25    **A.**  Yes.

1    **Q.**  What are those?  What are the portions of the summary

2    sheet that have inaccurate information because of the way

3    they were pulled?

4    **A.**  So for example, it says "Harvard Class of 2022" at the

5    top of it, and then above that it says "2015, Regular

6    Action."

7           The regular action was when this student actually

8    applied, but it was pulled at the time at which we were

9    reviewing applications from the class of 2022.  So that's why

10   it says "Harvard Class of 2022."

11   **Q.**  Other than -- the reader initials are incorrect on the

12   first page of the summary sheets for some these files,

13   correct?

14   **A.**  Yes.

15   **Q.**  They're correct on the reader rating sheet at the back?

16   **A.**  Yes.  The first reader rating form at the back reflects

17   who actually submitted the form and the rating.

18   **Q.**  Did you pull these application files yourself to produce

19   them for purposes of this litigation?

20   **A.**  I did.

21   **Q.**  Are you aware, Ms. Bever, that SA1 is the application of

22   a current Harvard student who will testify in this case?

23   **A.**  Yes.

24   **Q.**  Who is this student's name?

25   **A.**  Sally Chen.

1    **Q.**  And you're aware Ms. Chen has agreed to have her

2    application file used in this litigation, right?

3    **A.**  Yes.

4            MS. ELLSWORTH:  I'd move to admit Exhibit SA1.

5            MR. McBRIDE:  No objection, Your Honor.

6            THE COURT:  It's admitted.

7            (Defendant Exhibit No. SA1 admitted.)

8    BY MS. ELLSWORTH:

9    **Q.**  Let's take a look at this, the reader rating sheet that's

10   at page 40 that has your actual initials on it.

11           What ratings did you provide to Ms. Chen on her

12   academic profile?

13   **A.**  I gave her a 2.

14   **Q.**  And what preliminary overall rating did you assign to

15   Ms. Chen?

16   **A.**  A 3+.

17   **Q.**  Ms. Chen attended Lowell High School; is that right?

18   **A.**  She did.

19   **Q.**  And you read all the application files from Lowell High

20   School?

21   **A.**  In that cycle, I read all the applications from Lowell

22   High School.

23   **Q.**  How did Ms. Chen's application compare to the academic

24   credentials of other applicants from Lowell High School?

25   **A.**  Lowell is a very strong school in the city of San

1  Francisco.  I think I got between 30 and 50 applications from

2  Lowell in any given year.

3          Her academic credentials, her scores were a little

4  bit lower than many of her peers, and I would have seen many

5  perfect transcripts, meaning straight As, all four years.

6  **Q.**  Let's take a look at page 22 of Exhibit SA1.  What's

7  shown on page 22?

8  **A.**  Page 22 is a teacher evaluation.

9  **Q.**  And does this teacher comment on Ms. Chen's academic

10  abilities?

11  **A.**  She does.  She writes a beautiful letter about her

12  academic qualifications.

13  **Q.**  Does she -- the final sentence in the first paragraph,

14  could you please read that, "I was happy."

15  **A.**  "I was happy to see that Sally fits the pattern her older

16  sisters had established, combining exceptionally strong

17  academic strengths with the commitment to the communities

18  around her, including, in Sally's case, by working for a

19  mentor in the school's peer resources program, a role she is

20  particularly well suited for."

21  **Q.**  Looking at the second paragraph of this teacher

22  recommendation, what does the teacher say about Ms. Chen's

23  academic work in the second paragraph?

24  **A.**  She writes a very nice description of Sally's academic

25  work.  The way she pulls ideas together, sort of her -- the

Case 1:14-cv-14176-ADB   Document 636   Filed 04/18/19   Page 55 of 261

1    way she thinks about herself.  Her critical thinking and

2    writing skills were exceptional, she says.  So she sort of

3    rounds out her academic skills for us.

4    **Q.**   Did the information provided in this letter of

5    recommendation from a teacher factor into your academic

6    rating of Ms. Chen?

7    **A.**   I think this letter and others sort of showed the

8    academic strength Sally was bringing or would bring to

9    Harvard, yes.

10   **Q.**   Let's take a look back at page SA5 of this application.

11   What does page SA5 -- what is the information provided on

12   page SA5?

13   **A.**   It shows her family background.

14   **Q.**   Does it include information about her parents'

15   occupations?

16   **A.**   It does.

17   **Q.**   What were the occupations of Ms. Chen's parents?

18   **A.**   It says her father is a chef, employed, and her mother is

19   a homemaker.

20   **Q.**   Is that information that you take into account when

21   reviewing an application file?

22   **A.**   Yes.

23   **Q.**   Is that information you took into account when reviewing

24   and assigning ratings to Ms. Chen's application file?

25   **A.**   It certainly would have played a role, again, in sort of

1    my overall picture of her.

2    **Q.**   And why is this information that's taken into account in

3    the admissions process?

4    **A.**   Family background can play a role in sort of the choices

5    you are able to make, what you're doing.  She writes about

6    her family in her essay in a way that helps us understand

7    sort of what she has to do for them.  I think she talks about

8    translating for her family and her father working despite --

9    I think he had an injury.  And all of that plays a role in

10   sort of who she is and how strong, sort of all the things

11   she's been able to accomplish.

12   **Q.**   Does an applicant's parents' occupation provide

13   information just beyond the applicant's socioeconomic status?

14   **A.**   Yes.

15   **Q.**   What are some examples?

16   **A.**   Again, a parent can play a role in sort of the type of

17   opportunities a student can get.  Again, sort of what their

18   home duties might be, whether or not a student had access to

19   internships or other opportunities like that.

20   **Q.**   Where is the information that's shown on this page 5 of

21   SA1, where does that information come from relating to parent

22   occupation?

23   **A.**   It comes from -- in this case, it came from the common

24   app.

25   **Q.**   And the common application is a standard-form

1    application?

2    **A.**   Yes.

3    **Q.**   Does Harvard control the way the common application codes

4    its information?

5    **A.**   It does not.

6    **Q.**   Does the common application ever change the coding fields

7    relating to parent occupation?

8    **A.**   The common app makes changes to its application every so

9    often, yes.

10   **Q.**   Do those changes in the coding fields affect the

11   admissions office's ability to consider the information an

12   applicant provides via that application?

13   **A.**   No.  We use the information as we see it.

14   **Q.**   Have the changes made by the common application to the

15   parent occupation field affected -- prevented the admissions

16   office from considering an applicant's parents' occupation?

17   **A.**   No.  We would have used the information as it was

18   presented to us.

19   **Q.**   And so as an admissions officer, you would have used the

20   information on page 5 of SA1?

21   **A.**   Yes.

22   **Q.**   Let's turn back to page 40 where the reader rating form

23   is.

24            What extracurricular rating did you assign to

25   Ms. Chen?

Case: 19-2005    Document: 00117629237    Page: 546    Date Filed: 07/30/2020    Entry ID: 6356615
Case 1:14-cv-14176-ADB  Document 636   Filed 04/18/19   Page 58 of 261

58

1   **A.**  I gave her a 2.

2   **Q.**  And while we are on this page, what is the rating that

3   you assigned to Ms. Chen's teacher recommendation that you

4   were previously discussing?

5   **A.**  Was that teacher -- can I look?  Sorry.

6   **Q.**  Take your time.

7   **A.**  What page was that?  Do you remember?

8   **Q.**  22 and 23.

9   **A.**  Yeah, so I gave that a 1.

10  **Q.**  And that reflected your view that it was a strong --

11  excuse me -- a strong recommendation?

12  **A.**  Yes.

13  **Q.**  Keeping your 2 extracurricular rating in mind, please

14  turn to page 8 of Exhibit SA1.  What does page 8 show?

15  **A.**  So page 8 is what we call the extracurricular grid.  It

16  includes a list of the activities that she was participating

17  in, how much time she spent, what academic years she

18  participated in them, and a description of them.

19  **Q.**  And what does the information on page 8 of Ms. Chen's

20  application tell you about her extracurricular involvement?

21  **A.**  So the first thing she lists is she was the first

22  violinist, which is obviously an important role in the

23  orchestra.  She was also the Lowell student association

24  president.

25          So she had a number of research roles -- or

1    leadership roles.  I'm sorry.  She was doing research

2    mentoring.  She had found some roles doing some research

3    as -- or work as a web designer.  She was radio producer.

4    She had a lot of different interests.  She was doing a lot of

5    different things.

6    Q.  Can you turn please to page 20 of Exhibit SA1, which is

7    the guidance counselor recommendation.

8    A.  Yes.

9    Q.  Does this guidance -- are you there?

10   A.  Yes.

11   Q.  Does the guidance counselor's recommendation provide

12   information relating to Ms. Chen's extracurricular

13   involvement?

14   A.  Yes.

15   Q.  And what type of information?

16   A.  So it talks about her internship at UCSF Mission Bay.  It

17   provides some -- it actually -- I think this letter wasn't

18   the most helpful, but it does sort of describe some of the

19   things Sally had already described in her application.  So at

20   least it reaffirmed her participation in some of these

21   things.

22   Q.  I'm sorry.  I didn't catch the end of it.

23   A.  It just reaffirmed her participation in some of these

24   things.

25   Q.  Did you factor that information into the extracurricular

60

1    rating you assigned her?

2    **A.**  Yes.

3    **Q.**  You read all the files for Lowell High School that year,

4    correct?

5    **A.**  I did.

6    **Q.**  Did the guidance counselor provide a letter for every

7    single applicant?

8    **A.**  Lowell is a big school with just a few counselors, and so

9    they are unable to provide letters for every student, even

10   sometimes their top students.

11   **Q.**  But they did provide a letter for Ms. Chen, correct?

12   **A.**  They did provide a letter for her.

13   **Q.**  Did that provide you information about what the school

14   thought of Ms. Chen?

15   **A.**  Yes.

16   **Q.**  Did the fact that they wrote a letter in this case

17   provide you information about what the school thought of

18   Ms. Chen?

19   **A.**  Yes, that they knew her was important.

20   **Q.**  Looking back at page 40, the rating sheet, what personal

21   rating did you assign to Ms. Chen?

22   **A.**  I gave her a 2.

23   **Q.**  And looking back at page 20 which has the guidance

24   counselor recommendation, did the guidance counselor's

25   recommendation provide information about Ms. Chen other than

1    the extracurricular information you just discussed?

2    **A.** Yes. I mean, it talks at the very top, she's a

3    well-spoken, ambitious, and humorous person. So throughout

4    the letters, there are descriptions of her personal

5    qualities.

6    **Q.** Turning to page 27, please, of the application.

7         Is this another teacher recommendation letter?

8    **A.** It is.

9    **Q.** Can you please read the third paragraph from the bottom,

10    beginning "Sally"?

11    **A.** It says. "Sally fits no mold. She is her own person and

12    pursues her interests with great vigor. Sally manages to

13    master new skills and knowledge with ease."

14    **Q.** Can you read the next sentence at the beginning of the

15    next paragraph?

16    **A.** "Sally is truly an exceptional student in so many ways.

17    She is highly capable academically, clearly in the top few

18    percent of all college-bound students I have taught."

19    **Q.** Did these recommendations inform the personal rating you

20    assigned to Ms. Chen?

21    **A.** Yes.

22    **Q.** Did the guidance counselor letter that you were just

23    discussing inform the personal rating that you assigned to

24    Ms. Chen?

25    **A.** Yes.

 1    **Q.**  The profile ratings we've just been discussing, are those

 2    the only factors that the admissions office considered about

 3    Sally's application?

 4    **A.**  No.  We would have looked at all of her application.

 5    **Q.**  Take a look back at the first page of the application

 6    file, which is page 1.  Are there profile ratings from the

 7    docket chair for Ms. Chen's case?

 8    **A.**  There is just an overall rating.

 9    **Q.**  Do you know why?

10    **A.**  Yes.

11    **Q.**  Tell us why, please.

12    **A.**  So my recollection of Sally is that we were in

13    subcommittee and we were going through all of the applicants

14    from Lowell High School.  And my colleague Roger Banks

15    stopped us and said, "Erica, you read this application quite

16    strongly, but it doesn't look like you passed it" -- there

17    would have been no 2 there.  "Can we take a closer look?"

18            And so in subcommittee we went through it page by

19    page, all of us reading it.  And when I read it, she was

20    missing an interview, which I was hoping would set her apart

21    and help further set her apart.

22            And we all read it together and agreed that it came

23    together quite nicely.  And again, I think at that point the

24    subcommittee made a preliminary recommendation to admit her,

25    and she hung on.

1          So Christine went back in and would have put an

2     overall.  But since she read it in committee, she may not

3     have put in all of the ratings.

4     **Q.**  You mentioned that the interview information had not come

5     in when you first read the file.  Do I have that right?

6     **A.**  Yes.

7     **Q.**  Is that a common occurrence?

8     **A.**  It very much depends on when your subcommittee is meeting

9     and when you're doing readings.  So it looks like I read this

10    on January 18, and that's pretty early in our process.  Our

11    interviewers probably had not read or interviewed most of our

12    students at that point.

13    **Q.**  When you're referring to the interviewer, you're

14    referring to the alumni interviewer?

15    **A.**  Yes.

16    **Q.**  If you look at page 29 of SA1, is there an alumni

17    interview report?

18    **A.**  Hold on.  Yes.

19    **Q.**  And did the Harvard alumnus who met with Sally write a

20    positive account of their interview?

21    **A.**  They did.  It was very helpful.

22    **Q.**  And did you take that into account in the subcommittee

23    process in discussing Ms. Chen's file?

24    **A.**  We would have, yes.

25    **Q.**  Did the subcommittee ultimately recommend Ms. Chen for

1    admission?

2    **A.**   Yes.

3    **Q.**   And ultimately she was admitted, right, and attends

4    Harvard?

5    **A.**   She was, yes.

6    **Q.**   Were you concerned that you had originally not passed

7    Ms. Chen's file on to your docket chair?

8    **A.**   I think I was.  But you know, that's why we have the

9    committee review process and we can all go through and see

10   and have someone else catch it.

11   **Q.**   Ms. Bever, in your time working in the admissions office,

12   how many times have you seen another admissions officer

13   demonstrate bias against an applicant because of the

14   applicant's race?

15   **A.**   I've never seen that happen.

16   **Q.**   When considering whether to admit an applicant, is an

17   applicant's race ever a negative factor?

18   **A.**   No.

19   **Q.**   Have you ever admitted an applicant because of his or her

20   race?

21   **A.**   I could not say that, no.

22   **Q.**   Have you ever rejected an applicant because of his or her

23   race?

24   **A.**   No.

25   **Q.**   In your view, is it important that Harvard has a diverse

1    student community?

2    **A.**   It is.

3    **Q.**   Why?

4    **A.**   I think it's important that we as students learn from

5    each other, and students of different background bring

6    different perspectives to issues that are important.

7    **Q.**   In your view, does racial diversity have benefits?

8    **A.**   It does.

9    **Q.**   What are those benefits?

10   **A.**   Again, I think we learn from people who come from

11   different places and different perspectives, and that's part

12   of who we should be, as educated.

13   **Q.**   Have you ever been instructed to admit a target number of

14   students from any racial or ethnic background?

15   **A.**   No.

16   **Q.**   Based on your years working in the admissions office,

17   what is your view of the evaluation process employed by

18   Harvard in the admissions office?

19   **A.**   It's incredibly labor-intensive.  It takes incredible

20   care and time in order to find exceptional students.  There

21   are moments that are very difficult when we have to, you

22   know, reject students who are exceptional.  But we make

23   choices, and it always feels great when you get to see the

24   sort of final students who come through and meet us during

25   our visiting program.  It feels worth it.

1          MS. ELLSWORTH:  Thank you.  No further questions.

2                        FURTHER EXAMINATION

3     BY MR. McBRIDE:

4     Q.   Ms. Bever, just a few more questions for you.

5          You talked about parental occupation and admissions

6     with Ms. Ellsworth.

7     A.   Yes.

8     Q.   And I heard you talking about things that were in the

9     common application that you were relying on with relationship

10    to parental occupation?

11    A.   Yes.

12    Q.   And I understood you to be saying that you rely on the

13    category of occupation from the common application?

14    A.   So there's a number of things that are printed here.  It

15    includes often an actual category.  It includes an employment

16    status.  Sometimes there's more information.

17    Q.   The common application also allows an applicant to

18    identify, for example, the parents' employer.  Is that right?

19    A.   So at the moment, I'm not recalling.  That may be the

20    case.

21    Q.   Well, then that can come through to your summary sheet as

22    well, right, what's in the common application with respect to

23    the employer?

24    A.   I don't think it appears on our summary sheet.

25    Q.   So it doesn't appear on your summary sheet, who the

```
 1    parents' employer is?

 2    A.  I don't think so.  I think their education comes through.

 3    And it's not on this one, yeah.  I'm not --

 4    Q.  Does it matter to you, then, whether -- what the parents'

 5    employer is if you do have that information on the summary

 6    sheet?

 7    A.  Again, I'm not sure it's on the summary sheet.

 8    Q.  Well, let me ask you this.  You consider the whole person

 9    when you're looking at these applicants; is that correct?

10    A.  That's correct.

11    Q.  And you're looking at the parental occupation associated

12    with that whole person's -- sorry, withdrawn.

13          You are looking at the whole person with respect to

14    what those parents do; is that right?

15    A.  Whole -- I'm not sure what you mean.

16    Q.  Withdrawn.

17          Just to clear up for the record, do you know

18    whether or not the parents' employer is included on the

19    common application?

20    A.  I'm sorry.  At the moment I can't remember whether the

21    employer is actually included.

22    Q.  If you get the information with respect to the parents'

23    employer off the common application or some other way, if

24    that appears on the summary sheet, would you consider that as

25    part of your whole person evaluation?
```

1    **A.**  Again, if we can see the information we might take it

2    into account, if it was important for that particular

3    applicant.

4    **Q.**  And would it be important if that parents' employer, for

5    example, were a small business owner, say the owner of a

6    small grocery store, as opposed to a business owner who owned

7    a large corporation?

8    **A.**  Again, if it was important to the student and the student

9    elevated that as a part of their experience, then it might

10   matter.

11          MR. McBRIDE:  No further questions.

12          MS. ELLSWORTH:  Nothing further, Your Honor.

13          THE COURT:  You're excused.

14          THE WITNESS:  All right.  Thank you.

15          MS. HACKER:  Your Honor, if we could have a few

16   minutes.  We can take our morning break if you want or --

17          THE COURT:  Either way.  Do you all want a break?

18   Either way is fine with me.

19          MS. ELLSWORTH:  I think we're fine to go ahead.

20          MS. HACKER:  Your Honor, at this time SFFA calls

21   Erin Driver-Linn.

22          (ERIN DRIVER-LINN duly sworn by the Deputy Clerk.)

23          COURTROOM CLERK:  Would you please state your name

24   spell your last name for the record.

25          THE WITNESS:  Erin Driver-Linn.  D-R-I-V-E-R hyphen

1    L-I-N-N.

2                         EXAMINATION

3    BY MS. HACKER:

4    **Q.**  Good morning, Ms. Driver-Linn.  My name is Kat Hacker.

5    We haven't had a chance to meet before.  Thank you for being

6    here today.  I want to start by talking about your background

7    that led you to become involved in the office of

8    institutional research.

9             You have a doctorate degree in social psychology,

10   right?

11   **A.**  Yes, I do.

12   **Q.**  You got that degree from Harvard?

13   **A.**  I did.

14   **Q.**  To get your doctorate, you took classes in statistical

15   analysis methods, correct?

16   **A.**  I did.

17   **Q.**  Let me take a step back for a second.

18             I understand you prefer to be called

19   Ms. Driver-Linn despite the fact that you have a doctorate?

20   **A.**  Yes.

21   **Q.**  I just want to make sure I'm using your preference.

22             Before joining OIR, you had almost a decade of

23   experience in statistical analysis, correct?

24   **A.**  Correct, roughly.

25   **Q.**  Then in 2008, you got the job as director of the office

1    of institutional research?

2    **A.**   That's right.

3    **Q.**   In that job, you were responsible for overseeing OIR?

4    **A.**   That's right.

5    **Q.**   You maintained that responsibility from 2008 until fairly

6    recently, right?

7    **A.**   Yes, that's correct.

8    **Q.**   So for about ten years, you were the person in charge at

9    OIR?

10   **A.**   That's correct.

11   **Q.**   Ms. Driver-Linn, before we get into talking about the

12   substance of your work with OIR today, I'd like to spend a

13   few minutes talking about a committee that you served on back

14   in 2014.

15   **A.**   Okay.

16   **Q.**   What I've put on the screen for you is Exhibit P299.

17   I'll blow it up so you can see it.

18           Do you recognize this as an email that you received

19   on June 13, 2014?

20   **A.**   I do.  Would it be okay if I look at the binder?

21   **Q.**   Of course.  Every exhibit we're going to look at today is

22   in that binder.  If you want to look at a hard copy, please

23   feel free.  It's P299.

24           Do you have that in front of you, Ms. Driver-Linn?

25   **A.**   I do.

Case: 19-2005 Document: 00117629237 Page: 559 Date Filed: 07/30/2020 Entry ID: 6356615
Case 1:14-cv-14176-ADB Document 636 Filed 04/18/19 Page 71 of 261

71

1    **Q.**  Is this an email that you received on June 13, 2014?

2    **A.**  Yes.

3    **Q.**  And this was sent from Mr. Iuliano's assistant.  Is that

4    right?

5    **A.**  That's correct.

6    **Q.**  Mr. Iuliano is Harvard's general counsel?

7    **A.**  That's right.

8             MS. HACKER:  Your Honor, SFFA offers P299.

9             MS. ELLSWORTH:  No objection.

10            THE COURT:  It's admitted.

11            (Plaintiff Exhibit No. P299 admitted.)

12   BY MS. HACKER:

13   **Q.**  Now, you see the subject of this email is "Ryan

14   Committee," right?

15   **A.**  I do.

16   **Q.**  Then we're going to scroll down to the bottom, the first

17   email in this chain.  And it says, 'On behalf of President

18   Faust and Dean Ryan, thank you again for agreeing to serve on

19   the committee."  Do you see that?

20   **A.**  I do.

21   **Q.**  You did, in fact, serve on the Ryan Committee?

22   **A.**  Yes.

23   **Q.**  And then in this top email, it says, "Our first meeting

24   will be June 26, 2014."  Is that right?

25   **A.**  Yes.

1   **Q.**  So that is the first meeting of the Ryan Committee,

2   correct?

3   **A.**  To the best of my knowledge, yes.

4   **Q.**  Then do you remember there being a second meeting of the

5   Ryan Committee that occurred on August 27, 2014?

6   **A.**  I don't have a specific memory of that meeting.

7   **Q.**  Let me show you a document and see if it helps refresh

8   your recollection.  And you can flip to it if you want.  It's

9   P303.  And what I'd like you to look at I've highlighted here

10  on the screen.  That may help make things go a little bit

11  faster.

12          Do you see the entry that says "Ryan Subcommittee"

13  and the date is August 27, 2014?

14  **A.**  I do.

15  **Q.**  Does that refresh your recollection that there was a

16  meeting of the Ryan Committee on that date?

17  **A.**  No, it doesn't.

18  **Q.**  You don't remember having a meeting on that date?

19  **A.**  I don't have a specific memory.

20  **Q.**  Let's look together at P300 next, and I'd actually like

21  to start on the second page of this document, put it up on

22  our screen.

23          THE COURT:  You want to move to admit 299?

24          MS. HACKER:  No, Your Honor.  Just used it to

25  refresh her recollection.

**JA1269**

```
 1              THE COURT:  Okay.
 2    BY MS. HACKER:
 3    Q.   Are you with me, Ms. Driver-Linn?
 4    A.   Sorry.  The second page.
 5    Q.   You see here there's an email from James Ryan?
 6    A.   Yes.
 7    Q.   And that email gets sent to you and a number of other
 8    people?
 9    A.   Yes.
10              MS. HACKER:  Your Honor, SFFA offers P300.
11              MS. ELLSWORTH:  Your Honor, the first page of this
12    document this witness has no foundation for.  The second page
13    we don't object to.  I'm not sure how you'd like to handle
14    that.
15              MS. HACKER:  Let me just try to address this.
16    BY MS. HACKER:
17    Q.   Ms. Driver-Linn, do you see the first page of this
18    document?  I've blown it up on your screen.
19    A.   Yes.
20    Q.   And then down here at the bottom it says, "Attachments,
21    correspondence."  Do you see that?
22    A.   I do.
23    Q.   And the attachment is, in fact, this correspondence that
24    you received, correct?
25    A.   I assume so.  I don't know.
```

1   **Q.**  Do you assume you received these documents together?  Is

2   it typical to get memos with attachments within Harvard?

3            MS. ELLSWORTH:  Your Honor, this is

4   mischaracterizing the document.  It's a briefing for somebody

5   that is not Ms. Driver-Linn.  I have no objection to the

6   second page.  It's just the first page.

7            THE COURT:  Clearly you get the second page.  You

8   don't have the first page yet.  I don't know if you can get

9   her there or not.  But if you don't need the first page,

10  maybe you just want to move on.  But if you do need it,

11  you're going to have to keep working at her.

12           MS. HACKER:  That's fine.  Let's -- how about we

13  offer P300, the second page, Your Honor.

14           THE COURT:  Yes, admitted.

15           (Plaintiff Exhibit No. P300 admitted.)

16  BY MS. HACKER:

17  **Q.**  Let's focus on the second page.  Do you see this as an

18  email from James Ryan?

19  **A.**  I do.

20  **Q.**  And the subject of this email is "Diversity committee

21  meeting."  Do you see that?

22  **A.**  Yes, I do.

23  **Q.**  And we already went over this.  You're on this email and

24  there's a number of other people in the "To" and "CC" lines.

25  Do you see that?

1    **A.**  I do.

2    **Q.**  Were these other people in the "To" lines the other

3    members of the Ryan Committee as of December 3rd, 2014?

4    **A.**  I couldn't be sure.  I'd have to compare the names.  I

5    think so.

6    **Q.**  And Mr. Ryan was the chair of this committee, correct?

7    **A.**  Yes.

8    **Q.**  What I'm going to show you now is demonstrative.  It's

9    marked PD19.  Do you see that on your screen?

10   **A.**  Yes.

11   **Q.**  Now, you can see what I've done is I've taken all the

12   names -- and you have P300 in front of you on the hard

13   copy -- we've taken all of those names and we've put them

14   into this slide.

15           You see James Ryan there at the top, right?

16   **A.**  I do.

17   **Q.**  And back in December of -- he was the dean of Harvard's

18   graduate school of education?

19   **A.**  That's right.

20   **Q.**  And the people below it, are these the other people who

21   you served on the Ryan Committee with?

22           MS. ELLSWORTH:  Your Honor, I've already informed

23   Ms. Hacker we object to the demonstrative only to the extent

24   the witness is not able to verify whether these are, in fact,

25   members of the Ryan Committee, which she just testified to.

1    It's a demonstrative.  I'm fine to have her go to through it,

2    but I just wanted to lodge that objection.

3            THE COURT:  She's asked if these are the people who

4    are on the Ryan Committee, and her answer is going to be her

5    answer.  They're not moving to admit it, so it doesn't need

6    to be authenticated.

7    BY MS. HACKER:

8    Q.  Ms. Driver-Linn, do you recognize these people on this

9    slide as the people you served on the Ryan Committee with?

10   A.  I really am not sure.  I can't remember serving on a

11   committee with all of these people and being in a room

12   together with them.

13   Q.  That's fair.  So you just didn't meet with them enough to

14   be able to recognize all of these people now?

15   A.  I'm not sure that's how I'd characterize it.  I just

16   couldn't tell you for sure if this is the membership of the

17   Ryan Committee and if we were all in a room together meeting.

18   Q.  Now, we talked -- we saw in P300, the second page of it,

19   that there was a meeting of the Ryan Committee in December

20   of 2014.  Was the committee in fact disbanded after that

21   point?

22   A.  I'm not sure about being disbanded.  I know we stopped

23   meeting at some point.

24   Q.  And did you stop meeting at the end of 2014?

25   A.  I think so.

1    **Q.**  Did anyone ever explain to you why you stopped meeting

2    after that point?

3    **A.**  I don't think it was explained to me.

4    **Q.**  And the Ryan Committee met so few times you don't recall

5    whether you ever discussed race-neutral alternatives to the

6    admissions process, correct?

7    **A.**  I have a hazy recollection of a number of large committee

8    meetings right around that timeframe.  I don't feel confident

9    that I can say with certainty whether we discussed

10   race-neutral alternatives.

11   **Q.**  You don't recall specifically whether you discussed

12   race-neutral alternatives?

13   **A.**  I don't recall specifically.

14   **Q.**  And you don't recall ever being asked as part of the Ryan

15   Committee to do any analysis of the alternatives to using

16   race in the college admissions process?

17   **A.**  I'm sorry.  Could you repeat the question?

18   **Q.**  Sure.  You don't recall ever being asked as part of the

19   Ryan Committee to do any analysis of the alternatives to

20   using race in the college admissions process?

21   **A.**  I believe that the team did some work, under privilege.

22   **Q.**  The team did some work.  And I'm sorry I couldn't hear

23   you.

24   **A.**  Under direction of counsel.

25   **Q.**  But you don't recall ever being asked as part of the Ryan

1    Committee to do any analysis of the alternatives to using

2    race in the college admissions process?

3    **A.**  I don't recall that specifically.

4    **Q.**  Now, let's turn to talking about some of the work OIR did

5    in early 2013.  I first want to make sure we're on the same

6    page in terms of the context of that work.

7            You're familiar with the article that Ron Unz

8    wrote, called "The Myth of American Meritocracy," right?

9    **A.**  Generally.

10   **Q.**  One of the claims, among other things, that Unz's article

11   focused on was a claim that Harvard was capping

12   Asian-American admissions?

13   **A.**  I can't remember specifically if that was one of the

14   exact claims.

15   **Q.**  You don't remember whether Ron Unz's article discussed

16   whether Harvard caps Asian-American admissions?

17   **A.**  I remember that article making a number of claims.  I

18   remember that Harvard's name was in them.

19   **Q.**  And the Unz article was picked up by the New York Times

20   on Christmas Eve in 2012, right?

21   **A.**  Yes.

22   **Q.**  That got the attention of a number of people at Harvard,

23   including people at OIR?

24   **A.**  Yes.  I believe we were -- that was brought to our

25   attention in that timeframe.

1    **Q.**  Do you remember sending and receiving a number of emails

2    over the holidays concerning the Unz article?

3    **A.**  I don't have a specific memory of those email exchanges.

4    **Q.**  Well, Ms. Driver-Linn, what I'd like you to do is turn to

5    P460 in your binder in front of you and see if we can help

6    refresh your memory about the number and dates of those

7    emails so we can piece together a timeline of what was going

8    on back then.  Let me know when you have it.

9    **A.**  Okay.  I have it.  Yes.

10   **Q.**  Now, what you have in front of you is something called a

11   privilege log that Harvard's attorneys provided to us.  I

12   don't want to talk about the substance of any of these emails

13   because they're privileged.  But I'd like to walk through

14   just how many emails you were sending and receiving on this

15   topic back then.

16           So if you flip with me to the second page, we see

17   there is an email between you and Dean Fitzsimmons on

18   December 28, 2012.  Do you see that?

19   **A.**  I do.

20   **Q.**  And the subject of that email is "American Conservative

21   article."  Is that right?

22   **A.**  Yes, I see that.

23   **Q.**  You understand that to be referring to Mr. Unz's article

24   that was published in American Conservative?

25   **A.**  Yes, I do.

1    **Q.**  And then if you flip to the next page, page 3, at the

2    very top we see two more emails between you and Dean

3    Fitzsimmons on December 28, 2012.  Right?

4    **A.**  Yes, I see that.

5    **Q.**  Those are also about Unz's article?

6    **A.**  They also have "The American Conservative article" as the

7    file subject name.

8    **Q.**  And if we go down the page, there are 13 more emails back

9    and forth between you and other Harvard employees on

10   December 29, 2012?

11   **A.**  I see that.

12   **Q.**  All of those emails are also about Unz's article, right?

13   **A.**  They all have that same subject line.

14   **Q.**  And some of the people you were emailing with on this day

15   include Dean Fitzsimmons?

16   **A.**  Yes.

17   **Q.**  Some of these emails are between you and Alan Garber?

18   **A.**  I see that.

19   **Q.**  He's the provost at Harvard, right?

20   **A.**  That is correct.

21   **Q.**  He's one of the top officials in the entire university?

22   **A.**  Yes.

23   **Q.**  Is he -- was he at the time your boss's boss's boss?  Is

24   that right, three levels up?

25   **A.**  No.  Two.

**JA1277**

1    **Q.**  How often did you email directly with Mr. Garber?

2    **A.**  It's difficult to answer that question with any

3    precision.  Can you be more specific?

4    **Q.**  Was it not that often that you'd email with Mr. Garber?

5    Were you emailing with him every day?

6    **A.**  I don't think every day.  I don't think it's unusual for

7    me to have emailed with him.

8    **Q.**  And you're also emailing around this time a number of

9    people within your office, OIR, right?

10   **A.**  That's correct.

11   **Q.**  Including Ms. Bever?

12   **A.**  Yes, I see that.

13   **Q.**  And Mr. Hansen?

14   **A.**  Yes.

15   **Q.**  And then on the next page we see some more emails you're

16   continuing to send and receive, again related to the Unz

17   article, right?

18   **A.**  Yes.  They still have that same subject line.

19   **Q.**  And it looks to me like there's about ten more emails

20   between December 29 and January 2 on this page?

21   **A.**  I see that the subject line does change.

22   **Q.**  Do you believe these emails were still related to the Unz

23   article?

24   **A.**  I can't be sure.

25   **Q.**  And if you look down to the entry that's number --

1    Document Number 20, you see that that is an email you sent to

2    the folks at OIR on New Year's Eve, 2012.  Is that right?

3    **A.**   December 31, yes.

4    **Q.**   And you sent it at about 9:20 p.m. on New Year's Eve?

5    **A.**   It looks like it.

6    **Q.**   I hope that's pretty unusual for you to be working that

7    late on a holiday.

8    **A.**   I'm not sure.

9    **Q.**   Did you try not to bother your employees on a holiday if

10   you didn't have to?

11   **A.**   I would typically try to not bother my employees on a

12   holiday.

13   **Q.**   And then if you flip with me through the next five pages,

14   pages 5 through 10.  I don't want to walk through each one

15   individually.  But now we're into the new year in 2013,

16   right?

17   **A.**   Yes.

18   **Q.**   And if you count pages 5 through 10, it looks to me like

19   you send or receive 61 more emails in January of 2013 related

20   to these issues.

21   **A.**   I see a number of highlights with my name.  And I think I

22   see the subject line changing some.

23   **Q.**   61 looks about right?  60?

24   **A.**   I'll take your word for it.

25   **Q.**   Some of those emails again were to Provost Garber?

**JA1279**

 1    **A.**  I don't see any others to Provost Garber.

 2    **Q.**  Look with me on page 5, Ms. Driver-Linn.

 3            You see about four entries from the top there's

 4    another email, two emails between you and Dean Fitzsimmons

 5    and Provost Garber?

 6    **A.**  Yes.

 7    **Q.**  Some of these emails are also back and forth between all

 8    of the OIR employees, right?

 9    **A.**  Yes.

10    **Q.**  And some of these emails, a few of them are with someone

11    named Elizabeth Yong.  Is that right, on page 6?

12    **A.**  Yes, I see that.

13    **Q.**  Part of her job at Harvard was to maintain the database

14    of admissions data, right?

15    **A.**  I don't -- I don't know what her job description is.  I

16    know she had some work that she did with admissions data in

17    the office of admissions and financial aid.

18    **Q.**  And when people at OIR needed admissions data, would you

19    often reach out to Ms. Yong?

20    **A.**  Ms. Yong was often our contact person for that.

21    **Q.**  Given all the emails we see going back and forth between

22    Christmas 2012 and January 2013, it's fair to say that this

23    article got some attention from Harvard's leaders, right?

24    **A.**  Sure.

25    **Q.**  So turning to 2013.  In the beginning of 2013, OIR was

1    doing work related to Harvard's admissions process that

2    concerned the question of Harvard's treatments of whites as

3    compared to Asian-American applicants, right?

4    **A.**  I'm sorry.  Could you repeat that question?

5    **Q.**  Sure.  In the beginning of 2013, OIR was doing work

6    related to Harvard's admissions process that concerned the

7    question of Harvard's treatment of white applicants versus

8    Asian-American applicants, right?

9    **A.**  No.  I don't think that's how I'd characterize it.

10   **Q.**  Well, the reason OIR was looking at that difference was

11   because there was a concern about Harvard potentially

12   treating those two groups, white applicants and

13   Asian-American applicants, differently, right?

14   **A.**  No.  At that time my understanding is we were doing some

15   work under direction of counsel, and we were -- the office

16   was doing other work that was not at the direction of

17   counsel.

18   **Q.**  I'm not focused on who directed the work.

19           But in early 2013, there was -- OIR was looking at

20   the difference between white and Asian-American applicants,

21   right?

22   **A.**  We did analytic work that included looking at different

23   groups and the admissions process.

24   **Q.**  And you were doing that work because there was a concern

25   about the difference between Asian and white applicants at

1    the time?

2    **A.**   My sense of what we were doing is, in the work that

3    wasn't under direction of counsel, was roughly in response to

4    the Unz article, that it was sort of in the ether at the

5    time.

6    **Q.**   It was in the -- that was a concern because it was in the

7    popular press at the time?

8    **A.**   That's correct.

9    **Q.**   So to take a look at the issue, OIR put together a

10   regression analysis, right?

11   **A.**   No.

12   **Q.**   OIR put together a logistic regression model?

13   **A.**   The part I was referring to is to address a particular

14   question.

15          I think, if I'm understanding what you're talking

16   about, the work that you're talking about, there were a

17   series of models that were being looked at to try to model

18   the admissions process.

19   **Q.**   And you're generally familiar with logistic regression

20   analysis?

21   **A.**   Generally.

22   **Q.**   OIR has used these types of analyses before?

23   **A.**   Yes.

24   **Q.**   And there are people in OIR who can competently execute

25   logistic regression analyses, right?

1    **A.**  I'd say the office can competently do logistic

2    regression.

3    **Q.**  Let's take a look together at P9.  It's also in your

4    binder if you'd like to take a look at the hard copy.

5         Ms. Driver-Linn, you recognize this document,

6    right?

7    **A.**  I do.

8         MS. HACKER:  Your Honor, SFFA offers P9.

9         MS. ELLSWORTH:  Your Honor, I think I need a little

10   more foundation on this.

11        THE COURT:  Isn't it already admitted?

12        MS. ELLSWORTH:  This is not admitted.

13        MS. HACKER:  This has been used with another

14   witness, Your Honor, so that we didn't have to recall Dean

15   Fitzsimmons.  But it actually hasn't been admitted into

16   evidence yet.

17   BY MS. HACKER:

18   **Q.**  Ms. Driver-Linn, you were designated as Harvard's

19   corporate representative to talk about OIR reports at your

20   deposition, right?

21   **A.**  That's right.

22   **Q.**  And this is one of the documents you reviewed to prepare

23   to testify on Harvard's behalf about OIR reports; is that

24   right?

25   **A.**  I'm sorry.  I can't quite remember which part of the

1    deposition was as the corporate representative and which part

2    was not.

3    Q.   Do you remember being designated as a corporate

4    representative to talk about OIR reports and this report

5    specifically at your deposition?

6    A.   I remember talking about this document specifically at

7    the deposition.

8            MS. HACKER:  Your Honor, SFFA offers P9.

9            MS. ELLSWORTH:  Your Honor, I'm not sure being a

10   corporate representative at deposition lays foundation.  The

11   witness testified at her deposition she didn't recall the

12   document from 2013.  She can certainly speak to it.  We don't

13   object it to being used in the same way with Dean

14   Fitzsimmons.  I'm just not sure that a foundation has

15   actually been laid.

16           THE COURT:  I am going to let her testify about it.

17           MS. HACKER:  If I may, just one more question on

18   this.  I think I may be able to clear this up.

19           THE COURT:  I'm wondering who is going to be able

20   to lay a foundation for them.  And the document seems fair

21   game.

22           MS. ELLSWORTH:  There is an individual who will be

23   testifying later who is the person who created the document

24   who would be the likely person to lay a foundation with.

25           THE COURT:  So you can get it now through her, or

**JA1284**

1    we'll do it through a later witness.  But you can certainly

2    question her about it now.  If you want to try and get it in

3    through her, that's fine.

4    BY MS. HACKER:

5    **Q.**  Ms. Driver-Linn, you've seen this document or one very

6    much like it, correct?

7    **A.**  Yes, I have.

8            MS. HACKER:  Your Honor, this witness has

9    foundation.  She's seen the document.  She reviewed it for

10   her deposition.  She oversaw the office of institutional

11   research that created this document for ten years.  She

12   certainly has foundation to testify about it.

13           THE COURT:  Well, I'm going to let her testify

14   about it.  I'm not sure you've elicited -- you may be able to

15   elicit a foundation based on the fact that she oversaw the

16   work of the office during that time period and what her

17   responsibilities were in that way, but I don't think you've

18   laid it yet.  Or that you have a chance to lay it with her or

19   they're representing that the author of the document will be

20   on later.  So you can try it through her.  And if it doesn't

21   come in through her, it will come in later.  I don't think

22   they're objecting to you putting it up on the screen now, in

23   any event.

24           MS. ELLSWORTH:  No, and the witness can be

25   questioned on it.  No objection on that.  It's just a

 1  foundation issue.

 2  BY MS. HACKER:

 3  **Q.**  Ms. Driver-Linn, let's start with the date on the first

 4  page of this document.  You see that it says February 14,

 5  2012, right?

 6  **A.**  I do see that.

 7  **Q.**  But this document was actually created in February

 8  of 2013?

 9  **A.**  I believe so.

10  **Q.**  And you believe it's likely that this document was

11  created by Erica Bever and/or Mark Hansen?

12  **A.**  No.  I believe it was Mark Hansen.

13  **Q.**  Ms. Bever -- I'm sorry.

14         Ms. Driver-Linn, you remember testifying in a

15  deposition in this case, right?

16  **A.**  I do.

17  **Q.**  You were under oath during that deposition?

18  **A.**  Yes.

19  **Q.**  In fact, the very same oath you're under today?

20  **A.**  Yes.

21         MS. HACKER:  Permission to approach, Your Honor?

22         THE COURT:  Yes.

23  BY MS. HACKER:

24  **Q.**  Ms. Driver-Linn, I'd like you to turn with me in your

25  deposition to page 99 where -- I've put it up here on the

1    screen if you'd like to take a look at that.  I'd like you to

2    look at with me lines 12 through 22.

3              "Who prepared this document?

4              "I'm not sure.

5              "QUESTION:  You don't have any idea who prepared

6    this document?

7              "ANSWER:  That's not what I said.

8              "QUESTION:  What do you know about who prepared

9    this document?

10             "ANSWER:  I think it likely involved Erica Bever

11   and/or Mark Hansen."

12             Were you asked those questions and did you give

13   those answers at your deposition?

14   **A.**  Yes.

15   **Q.**  Now let's go back to P9.  And in this document, OIR used

16   data from the classes of 2007 through 2016; is that right?

17   **A.**  Sorry, that's -- are we looking at a particular page?

18   **Q.**  You can look at the pages if you'd like.  I think page 3

19   shows those years.  Do you see those here at the bottom?

20   **A.**  Yes, I do.

21   **Q.**  So that's ten years of data, right?

22   **A.**  Yes.

23   **Q.**  And I'd like to look at page 5 together.  This page shows

24   us the difference in average test scores and ratings for

25   white and Asian applicants, right?

1    **A.**   That's the title on the graphic, yes.

2    **Q.**   I'd like to start here at the bottom in these notes.  We

3    see here that this excludes legacies and athletes, correct?

4    **A.**   Yes.  It also says OIR doesn't have the ratings for all

5    years.

6    **Q.**   But it does exclude legacies and athletes?

7    **A.**   Yes.

8    **Q.**   If we zoom in on this chart so we can all see it

9    together, we have a line going down right here at zero,

10   right?

11   **A.**   Yes.

12   **Q.**   And the way this works is anything to the right of the

13   line means that Asians are higher, on average, right?

14   **A.**   Yes.

15   **Q.**   And anything to the left of the line means whites are

16   higher?

17   **A.**   That's the way this graphic is labeled and how it's

18   organized.

19   **Q.**   We see for the first two variables that Asian-American

20   applicants do better on both SAT II averages and SAT

21   averages, right?

22   **A.**   They have a higher rating.

23   **Q.**   And then if we go down to the third variable,

24   Asian-American applicants have a higher rating on the alumni

25   rating 2, as well?

 1    **A.**   Yes.   This particular graphic and this exercise, that's

 2    what you see.

 3    **Q.**   Is that the alumni personal rating versus the alumni

 4    overall rating?

 5    **A.**   I don't know what these ratings are.   I don't think we

 6    can tell from this.

 7    **Q.**   Then if we go down, the next four categories were pretty

 8    close to even between white applicants and Asian-American

 9    applicants, right?

10    **A.**   Those ratings are smaller.

11    **Q.**   And then if we focus down on this personal rating, here

12    we see this is the only variable where white applicants score

13    a good deal better than Asian-American applicants to Harvard,

14    right?

15    **A.**   This is a -- that's what you see on this chart.

16    **Q.**   And you don't believe that this difference between white

17    and Asian applicants on the personal rating is based on any

18    errors in analysis of data by OIR, right?

19    **A.**   I don't think this is a product that has errors, so to

20    speak.   But I do think it's a very exploratory and limited

21    graphic.

22    **Q.**   But you don't believe this chart is based on any errors

23    in analysis of the data?

24    **A.**   I don't have any reason to believe it's based on an

25    error.

1    **Q.**  Now, let's move on to February of 2013.  You met with

2    Dean Fitzsimmons and some others from OIR on February 25,

3    2013, right?

4    **A.**  Yes.

5    **Q.**  And the work that OIR had done analyzing how race factors

6    into admissions at Harvard was shared with Dean Fitzsimmons

7    during that February 25 meeting?

8    **A.**  I'm sorry.  Could you repeat the question?

9    **Q.**  Sure.  The work that OIR had done analyzing how race

10   factors into admissions at Harvard was shared with Dean

11   Fitzsimmons during the February 25 meeting?

12   **A.**  That's not how I'd characterize that, the work that was

13   shared with Dean Fitzsimmons that day.

14   **Q.**  The work that OIR had been doing was shared with Dean

15   Fitzsimmons that day, right?

16   **A.**  That's my understanding.

17   **Q.**  And you would have reviewed that work and made any

18   comments you thought were appropriate before presenting it to

19   Dean Fitzsimmons?

20   **A.**  I think that's likely.

21   **Q.**  You certainly didn't knowingly share any analysis with

22   Dean Fitzsimmons that you believed to be incorrect?

23   **A.**  No, I wouldn't share something we knew was incorrect.

24   **Q.**  You wouldn't have shared work with Dean Fitzsimmons that

25   you considered shoddy?

1    **A.**  No.

2    **Q.**  And since you were the head of OIR, you doubt anyone

3    would have shared information with Dean Fitzsimmons if you

4    had objected to it?

5    **A.**  I don't think so.

6    **Q.**  You felt comfortable sharing OIR's analysis with Dean

7    Fitzsimmons because Dean Fitzsimmons loved to talk about

8    statistics?

9    **A.**  I think I felt comfortable sharing work with Dean

10   Fitzsimmons for a number of reasons.  One is that he did like

11   to talk about data.

12   **Q.**  During that February 25, 2013 meeting, you don't recall

13   Dean Fitzsimmons disagreeing with the models created by OIR,

14   right?

15   **A.**  I do not.

16   **Q.**  You don't recall anyone asking any follow-up questions

17   during or after that February 25 meeting?

18   **A.**  I don't have specific memories of that meeting.

19   **Q.**  You don't recall taking any steps after the February 25

20   meeting to correct anything in OIR's analysis that was shared

21   with Dean Fitzsimmons?

22   **A.**  I'm sorry.  Could you repeat that again?

23   **Q.**  Sure.  You don't recall taking any steps after the

24   February 25 meeting to correct anything in OIR's analysis

25   that was shared with Dean Fitzsimmons?

1    **A.**  I do remember that there were exchanges around trying to

2    refine and increase the variables that we might have in our

3    data.  So I do think there were steps taken to work on some

4    of the things that were presented that day.

5    **Q.**  But there were no steps taken to correct anything in the

6    reports shared with Dean Fitzsimmons, right?

7    **A.**  I'm not -- I don't think of this as a report, this kind

8    of work that we were sharing.  I think there may have been

9    work to try to improve and continue working on some of what

10   was shared that day.

11   **Q.**  Ms. Driver-Linn, if you could, turn to page 203 in your

12   deposition.  I've blown it up on the screen so you can see

13   it.

14        "QUESTION:  Did you take any steps after the

15   meeting on February 25 to correct anything in this report?

16        "ANSWER:  Not that I recall."

17        Were you asked that question and did you give that

18   answer at your deposition?

19   **A.**  Yes.

20   **Q.**  And you don't recall anyone from admissions asking you to

21   dig deeper into the issue of whether there was a bias in

22   Harvard's admissions process against Asian-Americans, right?

23   **A.**  I don't recall that.

24   **Q.**  So now we've gotten through the end of February 2013.

25   Let's fast-forward a month to April 2013.  I'm going to show

1    you P604.  You see this is an email from someone named

2    Christine Heenan to you, right?

3    **A.**  I do see that.

4    **Q.**  And this was sent to you on April 29, 2013?

5    **A.**  Yes.

6              MS. HACKER:  SFFA offers P604.

7              MS. ELLSWORTH:  No objection.

8              THE COURT:  It's admitted.

9              (Plaintiff Exhibit No. P604 admitted.)

10    BY MS. HACKER:

11    **Q.**  I'd like to start on the second page where the email

12    chain begins, and we can scroll down here to the bottom.

13    Ms. Heenan says to you -- sorry.

14              You say to Ms. Heenan, "Would like to give you a

15    heads-up about some analysis and correspondence we've been

16    having with Fitz."

17              Do you see that?

18    **A.**  Yes.

19    **Q.**  It goes on, "He's" -- and the "he" there is Dean

20    Fitzsimmons, right?

21    **A.**  Yes.

22    **Q.**  So, Dean Fitzsimmons -- "excited to share more broadly.

23    I believe is going to be in touch with Jeff Neal tomorrow,

24    but I'd like to make sure you've had a chance to think

25    through implications.  Not entirely straightforward."

1          Do you see that?

2     **A.**   I do.

3     **Q.**   And when you're emailing Ms. Heenan here -- by the way,

4     Ms. Heenan, she's involved in media relations, right?

5     **A.**   At that time I believe she was vice president for Harvard

6     public affairs and communications.

7     **Q.**   So she dealt with media relations generally?

8     **A.**   Among other things, yes.

9     **Q.**   Now let's take a look at what Ms. Heenan says in response

10    to your email.

11          She asks, "Re Fitz, what is the issue?"

12          And if we go back to the first page and see how

13    this conversation continues, you respond to Ms. Heenan, "Fitz

14    asked us to do some analysis of thumb on the scale for low

15    income.  Could be a positive message but has implications for

16    need-blind policy as well as opening the door to Unz-like

17    requests for info about other thumbs on the scale."

18          Do you see that?

19    **A.**   Yes, I do.

20    **Q.**   Then in the next sentence you say, "Team is putting

21    together a memo to send to Fitz, copy you and Jeff, to put

22    this in context."

23          And the team you're talking about there is OIR,

24    right?

25    **A.**   Yes, I think so.

Case: 19-2005    Document: 00117629937    Page: 586    Date Filed: 07/30/2020    Entry ID: 6356615
Case 1:14-cv-14176-ADB   Document 636   Filed 04/18/19   Page 98 of 261

98

1    **Q.**   Then Ms. Heenan asks you, "Thumbs on the scale meaning

2    extra weight we give to those students?  If so, you are

3    right.  There are upsides and downsides of being public about

4    that analysis."

5            Do you see that?

6    **A.**   Yes, I do.

7    **Q.**   You reached out to Harvard's media relations person,

8    Ms. Heenan, because you were concerned that there were

9    upsides and downsides of being public about admissions

10   decisions?

11   **A.**   My sense of reaching out to Christine was that Dean

12   Fitzsimmons wanted to make a public statement and that it

13   would be good for her to know about that.  And that when you

14   take admissions analysis and you look at it without the

15   context and without the nuance, it can get looked at

16   narrowly, and that could be problematic.

17   **Q.**   So there are upsides and potentially downsides of it

18   being public?

19   **A.**   Of it being looked at narrowly.

20   **Q.**   So in this April 29 email, you say, "OIR is working on a

21   memo to share with Dean Fitzsimmons, among others."

22           You believe that you've reviewed drafts of that

23   memo as it was being created, right?

24   **A.**   Yes, I do.

25   **Q.**   So let's look at a draft together.  And this is P24.  Do

1    you have P24 in front of you?

2    **A.**   Yes, I do.

3    **Q.**   And this is a draft of the memo that you and some others

4    sent to Dean Fitzsimmons, right?

5    **A.**   Yes.

6    **Q.**   You agree that it's possible you wrote some portion of

7    this memo?

8    **A.**   I do think it's possible.

9    **Q.**   And at the very least, you reviewed it before it went to

10   Dean Fitzsimmons?

11   **A.**   I think so.

12   **Q.**   Because you were ultimately responsible at OIR?

13   **A.**   That's correct.

14            MS. HACKER:  Your Honor, SFFA offers P24.

15            MS. ELLSWORTH:  No objection.

16            THE COURT:  It's admitted.

17            (Plaintiff Exhibit No. P24 admitted.)

18   BY MS. HACKER:

19   **Q.**   Now, we see in addition to Dean Fitzsimmons at the top,

20   this is also addressed to Jeff Neal and Christine Heenan.

21   They both are folks who deal with public relations for

22   Harvard?

23   **A.**   They're both -- they were both at that time in public

24   relations in communications.

25   **Q.**   We have Nina Collins.  She's in the dean's office, right?

Case: 19-2005    Document: 00117632237    Page: 588    Date Filed: 07/30/2020    Entry ID: 6356615
Case 1:14-cv-14176-ADB   Document 636   Filed 04/18/19   Page 100 of 261

100

1    **A.**   Yes.

2    **Q.**   Then we have Sally Donahue.  She was the financial aid

3    director at this time, right?

4    **A.**   That's correct.

5    **Q.**   So let's see what this says to Dean Fitzsimmons on page

6    3.  I want to start with this chart here.  Zoom in so we can

7    all see it.

8          Now, this chart shows us something called

9    coefficient estimates, right?

10   **A.**   Yes.

11   **Q.**   The higher the coefficient estimate means essentially a

12   stronger effect on someone's chances of admission?

13   **A.**   This is the output of a regression analysis looking at

14   the probability of admissions.  And the coefficient estimates

15   are looked at relative to one another in relationship to that

16   particular analysis.

17   **Q.**   And because they're relative to one another, the higher

18   the estimate means a stronger effect on someone's chances of

19   admission?

20   **A.**   This is really a modeling exercise.  It's not speaking

21   directly to a chance for admission.  But in this analysis,

22   you have a -- the probability of admission in this model, the

23   coefficient estimates, if they're higher, that it is a

24   stronger probability.

25   **Q.**   And that probability could either be positive or

1    negative, right?

2    **A.**   Yes.

3    **Q.**   A positive relationship would indicate that a student is

4    more likely to be admitted?

5    **A.**   Again, this is a sort of hypothetical modeling.  It's not

6    speaking to the actual admissions process.  But in this, if

7    it's a positive effect, it would be the probability is more

8    positive in this model.  And negative, it would be negative.

9    **Q.**   In this model, to be clear, negative means there's a

10   negative.  A student is less likely to be admitted to

11   Harvard, right?

12   **A.**   I just don't feel comfortable with the movement from this

13   model to the probability of getting admitted in the class

14   because it is a hypothetical.

15   **Q.**   But you understand that a negative in this model shows a

16   negative relationship between that variable and the chance of

17   a student's admission to Harvard, right?

18   **A.**   Yes, in this model.

19   **Q.**   And according to this model, if we look down here at the

20   bottom, there's a negative effect of being Asian on an

21   applicant's chance of admission, right?

22   **A.**   The coefficient estimate is negative .37.

23   **Q.**   And that means an applicant's chance of admission is

24   lower because of being Asian-American, right?

25   **A.**   I just -- the leap to an applicant's chance is lower in

1    this model, yes.

2    **Q.**  And then if we look at the text above this chart, let's

3    zoom in on that.  We see the same thing reflected in the

4    text.  On the flip side, we see a negative effect for Asian

5    applicants.

6              Do you see that?

7    **A.**  I see that sentence, yes.

8    **Q.**  And then it goes on to say, "These realities have also

9    received intense scrutiny from critics like Bowen or more

10   recently Unz, as we have discussed at length."

11             Do you see that?

12   **A.**  I do.

13   **Q.**  And you believe the reference to discussions at length

14   refers to the February 2013 meeting with Dean Fitzsimmons,

15   right?

16   **A.**  I'm not sure.

17   **Q.**  Well, let's see if we can refresh your recollection.

18   Turn to page 252 with me in your deposition, and read to

19   yourself lines 5 through 13.  Let me know when you've

20   finished.

21   **A.**  (Witness reviews document.)  I'm finished.

22   **Q.**  So you believe that the conversations being referred to

23   having been discussed at length, you expect that references

24   the meeting in February with Dean Fitzsimmons, right?

25   **A.**  Yes, I see the line here.

**JA1299**

1    **Q.**  And whoever wrote this sentence described the negative

2    effect for Asian-American applicants as a reality?

3    **A.**  I'm sorry.  Could you point out what you're referring to?

4    **Q.**  You see this, "These realities"?

5    **A.**  Yes.  Yes, I do.

6    **Q.**  And then this continues, "To draw attention to the

7    positive benefit that low-income students receive may also

8    draw attention to the more controversial findings around

9    Asians."

10           Do you see that?

11   **A.**  Yes.

12   **Q.**  That was a concern that you had?

13   **A.**  I don't remember having that concern.

14   **Q.**  Ms. Driver-Linn, let's look at your deposition page 253.

15   And I'd like for us to look at lines 8 through 19 together.

16           "QUESTION:  It goes on to say to, 'To draw

17   attention to the positive benefit that low-income students

18   receive may also draw attention to the more controversial

19   findings around Asians or the expected results around legacy

20   and athletes.'  Did I read that correctly?

21           "ANSWER:  Yes.

22           "QUESTION:  Was that a concern you had?

23           "ANSWER:  Based on the preparation for today's

24   deposition, I do believe it was a concern I had."

25           Were you asked those questions and did you give

104

1    those answers?

2    **A.**   I do.  And it goes on to say that I was referring to the

3    Christine Heenan email as a way to --

4    **Q.**   Referring to your concerns about these issues?

5    **A.**   Yeah.  I think my sense of this is that in the deposition

6    exchange I was thinking back to the Christine Heenan email

7    and thinking of it being a concern that I had raised with

8    her.

9    **Q.**   Focusing back on this memo, P24, you didn't say anywhere

10   in here that the analysis is unreliable, did you?

11   **A.**   No.  In this draft memo, I don't remember saying that.

12   **Q.**   You didn't warn Dean Fitzsimmons in this memo that what

13   was sent to him, OIR's analysis, was inaccurate?

14   **A.**   I don't recall that in this draft or the other drafts.

15   **Q.**   Instead, you wrote about the concerns of negative effects

16   on Asian-American applicants and your concern about them

17   getting publicized?

18   **A.**   I'm sorry.  Could you repeat the question?

19   **Q.**   Instead of writing about how OIR's analysis might be

20   inaccurate, you wrote about the concerns of negative effects

21   on Asian-American applicants getting publicized?

22   **A.**   I don't think these memos talk about the concern.  I

23   think the concern was in the previous email.

24   **Q.**   You don't remember looking at page 3 right here and

25   talking about these concerns about drawing attention to the

**JA1301**

 1    more controversial findings around Asians?

 2    **A.**   I just don't see the word "concern" there.

 3    **Q.**   So after sending this memo to Dean Fitzsimmons, you don't

 4    recall him expressing any concerns about the findings in this

 5    memo regarding Asian-Americans and Harvard's admissions

 6    process, do you?

 7    **A.**   I don't think this is a memo that went to Dean

 8    Fitzsimmons.

 9    **Q.**   Let's look at the final memo that's P26.  It's already in

10    evidence.

11            Do you see that this is an email from Ms. Bever to

12    Dean Fitzsimmons?

13    **A.**   Yes.

14    **Q.**   And you see the memo is included there as an attachment?

15    **A.**   It's an edited version of the draft we were looking at.

16    **Q.**   After sending this final memo, P26, to Dean Fitzsimmons,

17    you don't recall him expressing any concern about the

18    findings in this memo regarding Asian-Americans and Harvard's

19    admissions process?

20    **A.**   No, I don't.

21    **Q.**   You don't recall Dean Fitzsimmons raising any criticisms

22    about the implications of OIR's analysis with respect to

23    being Asian and how it was negatively associated with

24    admissions outcomes?

25    **A.**   I don't recall any criticisms.

1    **Q.** And you don't remember any requests for further follow-up

2    research on that particular question about the negative

3    effect on Asian applicants, right?

4    **A.** This memo was about low-income students, and there was a

5    follow-up request related to low-income students, low-income

6    analysis.

7    **Q.** But there was no follow-up request on the particular

8    question about the negative effect on Asian applicants,

9    right?

10   **A.** There was not a follow-up question. That was not the

11   subject of this analysis.

12   **Q.** I understand that you believe that was not the subject of

13   this analysis. But what my question is, is directed not on

14   the low-income analysis.

15          But you don't remember any requests for further

16   follow-up about the question of the negative effect on

17   Asian-American applicants after this memo was sent to Dean

18   Fitzsimmons?

19          MS. ELLSWORTH: Your Honor, I object. I think this

20   question has been asked and answered about two or three times

21   now.

22          THE COURT: I'll let her have it. I'm sure it's

23   been asked. I'm not totally sure it's been answered.

24          THE WITNESS: I'm sorry. Could you repeat it?

25   BY MS. HACKER:

1    **Q.**  Of course.  You don't remember any requests for further

2    follow-up research on the particular question about the

3    negative effect on Asian applicants, right?

4    **A.**  I don't recall a request for that particular question.

5            MS. HACKER:  Pass the witness.

6            MS. ELLSWORTH:  Your Honor, what time to you need

7    to break?

8            THE COURT:  Five of 12:00.

9            MS. ELLSWORTH:  Five of?  Okay.

10                          EXAMINATION

11   BY MS. ELLSWORTH:

12   **Q.**  Good morning, Ms. Driver-Linn.

13   **A.**  Good morning.

14   **Q.**  Ms. Hacker was just asking you about a question of the

15   negative effect of Asian-American ethnicity on admission.  Do

16   you recall that phrasing?

17   **A.**  Yes, I do.

18   **Q.**  Is that the question that the low-income memo, Exhibit

19   P26, was attempting to address?

20   **A.**  No, it is not.

21   **Q.**  What was the subject of the P -- Exhibit P26 memorandum?

22   **A.**  The -- whether or not low-income students, we had any

23   evidence of highly rated low-income students having a tip in

24   the admissions process.

25   **Q.**  And that was a question Dean Fitzsimmons had asked OIR to

```
 1   look into?

 2   A.   Yes.

 3   Q.   And that was the question you answered in the P26?

 4   A.   That is correct.

 5   Q.   You testified that Dean Fitzsimmons did ask for follow up

 6   on the subject matter of that memorandum, the low-income

 7   analysis, right?

 8   A.   Yes, he did.

 9   Q.   And what did he ask OIR to follow up on?

10   A.   He asked to follow up on whether or not there was an

11   interaction between low income and Asian ethnicity.

12   Q.   And did OIR conduct that follow-up work?

13   A.   Yes, it did.

14   Q.   And what did OIR conclude?

15   A.   OIR, I don't know that we would say concluded, but we

16   looked at the relationship between low income and other kinds

17   of ethnicities, and we saw that low-income Asian students did

18   receive a positive tip toward the probability of admission.

19   Q.   And were the results of that analysis passed on to Dean

20   Fitzsimmons?

21   A.   Yes.

22   Q.   Ms. Hacker was asking you several questions about whether

23   the work that you performed at OIR you considered it to be

24   reliable.  Do you recall that?

25   A.   Yes.
```

```
 1   Q.  She asked whether you considered it to be complete or
 2   correct.  Do you recall that?
 3   A.  Correct, yes.  I'm not sure about complete.
 4   Q.  You recall her asking you whether OIR's work was
 5   generally correct when it was passed along, right?
 6   A.  Yes.
 7   Q.  And do you agree that OIR tried to do correct work when
 8   you were the leader of the office?
 9   A.  I think the office tried to do the best work it could
10   under time pressures, data limitations.  We always tried to
11   do our best.
12   Q.  And OIR always tried to do reliable work as well, right?
13   A.  Yes.
14   Q.  Can work be correct and reliable and still be
15   preliminary?
16   A.  Yes.
17   Q.  Could OIR's work be correct and reliable and still be
18   preliminary?
19   A.  Yes.
20   Q.  Could OIR's work be correct and reliable and still be
21   limited?
22   A.  Yes.
23   Q.  And what are some of the limitations to the work that OIR
24   is able to do, in a general sense?
25   A.  Data completeness, data quality, the other kind of work
```

1    that might be going on in the office.  I think also we could

2    do analytic work that didn't take into account the kind of

3    subject matter expertise of what it might be we were looking

4    at.

5    **Q.**  Is that how you would characterize the work that was in

6    Exhibit P26?

7    **A.**  Yes, I think that's fair.

8    **Q.**  And is that how you would characterize the work that's in

9    Exhibit P12 that Ms. Hacker showed you briefly?

10   **A.**  I'm sorry.  P12 is the --

11   **Q.**  Actually, Ms. Hacker may not have shown you P12, so let's

12   take a look at it.  It is in your binder at Tab 1.  Do you

13   have P12 in front of you?

14   **A.**  I do.

15   **Q.**  Do you recall discussing with Ms. Hacker a meeting in

16   February of 2013 with Dean Fitzsimmons?

17   **A.**  Yes.

18   **Q.**  And what prompted that meeting?

19   **A.**  I think I reached out to Dean Fitzsimmons and asked for a

20   meeting.

21   **Q.**  And is Exhibit P12 a version of the slide deck that was

22   shown at that meeting?

23   **A.**  Yes.

24   **Q.**  Ms. Hacker asked you about Exhibit P9.  Do you recall

25   that?

1    **A.**   Yes.

2    **Q.**   And could you take a look, please, at Exhibit P9, which

3    is in your binder at Tab 2?

4    **A.**   I see it.

5    **Q.**   Were you involved in creating Exhibit P9?

6    **A.**   No.

7    **Q.**   Do you recall reviewing Exhibit P9 in or around January

8    of 2013?

9    **A.**   No.

10   **Q.**   Have you reviewed it since then?

11   **A.**   Yes.

12   **Q.**   Have you reviewed it outside of the context of this case?

13   **A.**   No.

14   **Q.**   Was P9 ever shared outside of the office of institutional

15   research?

16   **A.**   Not to my knowledge.

17   **Q.**   Did OIR ever show Exhibit P9 to Dean Fitzsimmons?

18   **A.**   No.

19   **Q.**   How do you know that?

20   **A.**   I know that we showed P12 to him during that February 25

21   meeting, and there's just no record of P9 being shown to

22   anyone outside of the office, and I have no memory of it.

23   **Q.**   Are there other aspects of Exhibit P9 that contribute to

24   your conclusion it was not shown outside of the office of

25   institutional research?

1    **A.**   Yes.

2    **Q.**   And what are those?

3    **A.**   It's just so preliminary in the formatting.  It's the --

4    you know, the title is off.  Some of these exhibits have the

5    data flipped.  There's pages that are blank.  It seems to me

6    to be a very -- like an internal document of people working

7    out what they were looking at.

8    **Q.**   So let's take a look at some of those pages.  We have the

9    title page up on the screen.  You've already responded in

10   response to Ms. Hacker's questions that the title of this

11   exhibit is Admissions Part II subtitle.  Do you recall that?

12   **A.**   Yes.

13   **Q.**   And is that the type of title of a work product that

14   would have been shared outside of the office of institutional

15   research?

16   **A.**   No.

17   **Q.**   Why not?

18   **A.**   Even though we would maybe not get things perfect, the

19   typical -- even with -- even with people we might meet with

20   to have working meetings would be to have had someone check

21   and complete things like the title, not have blank pages.

22   **Q.**   And the date on this document, is that the correct date?

23   **A.**   No.

24   **Q.**   You testified earlier that it's a 2013 document, not a

25   2012, right?

 1   **A.**   That's correct.

 2   **Q.**   Take a look at Slide 3 of Exhibit P9, please, and focus

 3   in particular on the chart at the bottom of the page, if you

 4   could.

 5         Do the labels on this chart accurately reflect the

 6   data shown in the graph?

 7   **A.**   They do not.   The graphic doesn't match with the table

 8   below.

 9   **Q.**   Did OIR have a practice for how to check the accuracy of

10   work before it was finalized?

11   **A.**   Typically a member of a team who might put together

12   something like this might ask for other members of the team

13   to review and help catch errors.   But even that -- I don't

14   think this would have been gotten -- I don't even think this

15   would have gotten to that stage of having someone double

16   check it.   I think someone who created this would have caught

17   these errors before sharing it.

18   **Q.**   And to the extent that work had been checked, would it

19   have errors like this with the data being mislabeled?

20   **A.**   I don't think so.

21   **Q.**   You mentioned some blank slides in this presentation.

22   Can you look please at Slides 13 and 14.

23         Are those the blank slides you were referring to?

24   **A.**   Yes.

25   **Q.**   Take a look back, please, at Slide 5 of Exhibit P9.   You

1    discussed this with Ms. Hacker.

2              Does Slide 5 show the output from a model of any

3    sort?

4    **A.**   I don't think so.

5    **Q.**   Is there any logistic regression analysis going on in

6    Slide 5?

7    **A.**   No.

8    **Q.**   Is Slide 5 descriptive statistics?

9    **A.**   Yes, I believe so.

10   **Q.**   And you pointed out, when Ms. Hacker was questioning you

11   about this slide, some labels on the bottom.  Do you recall

12   that?

13   **A.**   Yes, I do.

14   **Q.**   And what was the -- what does the second bullet at the

15   bottom of Slide 5 say?

16   **A.**   "OIR doesn't have all ratings for all years, so number of

17   applicants differs for each rating test score."

18   **Q.**   Do you recall ever reviewing Slide 5 when you worked in

19   the office of institutional research?

20   **A.**   No.

21   **Q.**   Do you recall reviewing Slide 5 in 2013?

22   **A.**   No.

23   **Q.**   When is the first time you remember --

24             THE COURT:  P12 went to the dean, though?

25             THE WITNESS:  P12, yes, Your Honor.

1           THE COURT:  Okay.

2    BY MS. ELLSWORTH:

3    Q.  Why don't we turn to P12 right now.  It is Tab 1 in your

4    binder.  And in particular, can you look at the slides

5    beginning on 31.

6    A.  I'm there.

7    Q.  Actually, let's look at 32, please.  Does this describe

8    the analysis that's being shown in Exhibit P12?

9    A.  This is a methods page describing the subsequent models.

10   Q.  And can you describe what the models that are shown on

11   the subsequent pages were attempting to do?

12   A.  Yes.  They were attempting to -- in a highly simplified

13   way try to look at whether we understood the admissions

14   process by doing a series of logistic regressions that would

15   be a modeling exercise to kind of look at the probability of

16   admissions with very limited factors, sort of one at a time,

17   to see whether or not we understood the admissions process in

18   a simplified way.

19   Q.  Let's take a look at Slide 34, which has the output from

20   the model.

21           MS. ELLSWORTH:  And can we zoom in on that a

22   little, please, Mr. Lee?

23   Q.  Do the models on Slide 34 measure the effect of any

24   particular factor on an applicant 's chance of admission?

25   A.  No.

1    **Q.**  Do the models on Slide 34 show the effect of any tip in

2    the Harvard's admission process?

3    **A.**  No.

4    **Q.**  Do the models that are shown on Slide 34 reflect a

5    hypothetical admitted student pool?

6    **A.**  Models 1 through 4 are a simulation, and it's not meant

7    to actually be an analysis of a tip or anything.  The -- I'm

8    sorry.

9    **Q.**  If we can go back a slide to Slide 33, which describes

10   the inputs for the models, and looking first at Model 1, can

11   you explain, please, how Model 1 operates in the context of

12   this logistical regression?

13   **A.**  What I think was done here is you took the pooled set of

14   applicants for the years that were being looked at.  And in

15   Model 1, you look just at those two variables, academic

16   index, academic rating, and you do a logistic regression to

17   get the probabilities of admission just with those two

18   variables and then take an arbitrary cutoff of 2,100

19   applicants that had the highest probability in this

20   simulation.

21        And then in the graphic on page 34, it would be

22   taking the output of that 2,100 -- the 2,100 with the highest

23   probability and saying what was the race ethnicity breakdown

24   of them.

25        MS. ELLSWORTH:  Your Honor, I know we have

1    questions on these slides, but I do see it's five of.  We can

2    resume after the break.

3              THE COURT:  I would like to resume at quarter of

4    1:00.  It might be a little ambitious, so head for quarter of

5    1:00 but walk slowly.  Okay?

6              (Recess taken 11:55 a.m.)

1              *** AFTERNOON SESSION ***

2              THE COURT:  Whenever you're ready, Ms. Ellsworth.

3              MS. ELLSWORTH:  Thank you, Your Honor.

4    BY MS. ELLSWORTH:

5    **Q.**  Ms. Driver-Linn, can you turn to Tab 11 in your binder,

6    please.  Do you have in front of you Exhibit P13?

7    **A.**  Yes, I do.

8    **Q.**  What do you recognize Exhibit P13 to be?

9    **A.**  A version of the presentation that we were looking at

10   before.  I believe it was P12.

11   **Q.**  Is this a version of the presentation that was shown to

12   Dean Fitzsimmons in February of 2013?

13   **A.**  Yes.

14   **Q.**  Does this version have your handwritten notes on it?

15   **A.**  Yes, it does.

16              MS. ELLSWORTH:  Your Honor, I'd move to admit P13.

17              MS. HACKER:  No objections.

18              (Plaintiff Exhibit No. P13 admitted.)

19   BY MS. ELLSWORTH:

20   **Q.**  You can put that to the side, Ms. Driver-Linn.  We were

21   talking about Exhibit P12 before we broke for lunch.  I'd

22   like you to open your binder to Exhibit P12, which is Tab 1,

23   and look back at Exhibit P9, which is what Ms. Hacker was

24   discussing with you this morning.  So keep your binder open

25   and we'll put P9 up on the screen.  And we'll just do P9.

**JA1315**

1    Thank you.

2            Do you know who created Exhibit P9?

3    **A.**   I believe Mark Hansen.

4    **Q.**   Do you know why Mr. Hansen created this document?

5    **A.**   I think he was interested in learning more about

6    modelling statistics.  Prior to this particular era in the

7    office, he had been more involved in kind of data collection,

8    data architecture, and he was teaching himself a lot of

9    things about statistics and additional kinds of analytic

10   techniques.  And I believe he did it because he was aware of

11   the kind of Unz-like issues that had been discussed.

12   **Q.**   If we can look at Slide 5 of Exhibit P9.  You can keep

13   P12 open in front of you.  We'll keep 5 on the screen.  You

14   recall discussing this slide with Ms. Hacker?

15   **A.**   Yes.

16   **Q.**   Does Slide 5 show the output of a logistic regression

17   model?

18   **A.**   No.

19   **Q.**   Does Slide 5 show what you would term descriptive

20   statistics?

21   **A.**   Yes.

22   **Q.**   What is the difference between descriptive statistics and

23   logistic regression?

24   **A.**   A descriptive statistic tends to be just showing a

25   number, an average, or a trend.  Logistic regression is a

1   technique, a modelling technique where you output a number of

2   different variables in using this technique, look at them

3   relative to one another and the outcome.

4   **Q.**   Slide 5 that's shown here does not show the output of the

5   model like the one you just described, right?

6   **A.**   I don't think so.

7   **Q.**   Looking at the version of P12 or P12 which you have in

8   your binder, is Slide 5 from Exhibit Plaintiff's 9, does that

9   appear anywhere in P12?

10  **A.**   No.

11  **Q.**   Turn, if you would, please, to Slides 8 and 9 of

12  Exhibit P9.  Do you recall seeing Slides 8 and 9 in

13  Exhibit 13?

14  **A.**   No.

15  **Q.**   Are Slides 8 and 9 of Exhibit P9 contained within P12,

16  the version shown to Dean Fitzsimmons?

17  **A.**   No.

18  **Q.**   Had you seen Slides 8 or 9 of Exhibit P9 prior to your

19  deposition in this case?  I'll withdraw the question to make

20  it clear.

21           Prior to this litigation?

22  **A.**   No.

23  **Q.**   What is your reaction to the information on Slides 8 and

24  9 in Exhibit P9?

25  **A.**   I think that Mark was using these in an exploratory way

1    to try to understand the relationship of variables with one

2    another, kind of as an understanding the data.  And I find

3    them, in terms of an analysis that you would look at to try

4    to interpret, very difficult to interpret.

5              THE COURT:  What do the class years on there mean?

6              THE WITNESS:  I believe that they are the variables

7    that represent the students in this applicant pool that were

8    applying for that class year.

9              And, Your Honor, this is one of the reasons I find

10   this confusing as output to try to determine is that it's

11   difficult to imagine that you're looking at the class of 2012

12   and saying you're more likely to get in if you're in the

13   class of 2012 than these other years.  They're not the same

14   as the other kinds of variables.

15   BY MS. ELLSWORTH:

16   **Q.**  Ms. Driver-Linn, looking at the information shown on

17   Slides 8 and 9 in Exhibit P9, does the information in those

18   slides show any discrimination against Asian-Americans in the

19   Harvard College admissions process?

20   **A.**  No.  These exploratory models are looking at data, a kind

21   of data set, and trying to understand the variables in

22   relationship to one another.  They are not meant to show

23   anything about the admissions process.

24             MR. LEE:  Your Honor, we've lost the realtime.

25             (Off the record.)

BY MS. ELLSWORTH:

Q.   Ms. Driver-Linn, which slides in Exhibit P9 are included in Exhibit P12, which is the version that was shown to Dean Fitzsimmons?  And I'll have Mr. Lee flip through them on the screen.

A.   A version of this but not this exact.

Q.   Of Slide 10?

A.   Slide 10.

Q.   Let's look at Slide 11, please.

A.   A version of this but not this exact exhibit.

Q.   And Slide 12?

A.   A version of this but not this exact exhibit.

Q.   And what's the next slide, Slide 13?

A.   No.

Q.   Slide 14?

A.   No.

Q.   Slide 15?

A.   No.

Q.   Slide 16?

A.   No.

Q.   Slide 17?

A.   No.

Q.   Slide 18?

A.   Some of the same information on Slide 17 might be.  I don't remember.

1    **Q.**  Slide 18?  Is that the last slide?  Okay.

2         How would you describe the information in

3    Exhibit P9?

4    **A.**  I think it's exploratory, trying to work out what the

5    analyst was exploring and trying to see.

6    **Q.**  So I'm going to turn our attention back to Exhibit P12.

7    Before I ask you any more questions about that exhibit,

8    though, I'd like to just understand a little built more about

9    the Office of Institutional Research.

10        Does OIR receive requests for analysis from outside

11   of the office?

12   **A.**  Yes.

13   **Q.**  And from whom does OIR receive requests?

14   **A.**  The office receives requests from people across the

15   university and outside of the university.

16   **Q.**  And does OIR ever initiate an analysis on its own?

17   **A.**  Yes.

18   **Q.**  Under what circumstances?

19   **A.**  Often we would do an analysis or do analytic work when we

20   knew that the university was going to be needing that kind of

21   work.

22        For example, when we knew that the institution was

23   going to be experiencing the comprehensive accreditation

24   visit, the office decided to do work related to student

25   outcomes across the university, knowing that that work would

1    need to be looked at.

2    **Q.**  And are there times when OIR initiates analysis on its

3    own that are different from the circumstance you just

4    described?

5    **A.**  Yes.

6    **Q.**  And what are some examples of that?

7    **A.**  Well, we would do additional work if we had the capacity

8    in the office to explore our understanding of particular data

9    sets.  We would do work -- mostly it would be imagining that

10   someone in the university would need it at some point.

11   **Q.**  In your time as the director of OIR, did you ever count

12   or track the unable of separate analyses being conducted at

13   OIR in a given period?

14   **A.**  We did at one time.  I asked the team to keep track of

15   the number of requests we got.  We call them ad hoc requests.

16   And in that year, we had 750 requests.

17   **Q.**  At any given time during the time that you led the

18   office, how many ongoing projects did OIR have?

19   **A.**  A typical sort of project list would include 30 or so

20   projects of different sizes and lengths in time.

21   **Q.**  Could you describe the approach that OIR takes to its

22   analytic work?

23   **A.**  We often describes our work as always iterative, always

24   trying to refine.  We would explore questions from multiple

25   angles, trying to look at it from different points of view.

1            We often would approach our work by scoping out

2     questions and then inviting what we would call content

3     experts or subject-matter experts to talk with us so that we

4     would understand the background of what we were trying to

5     look at, ask them more questions.

6     Q.   Who outside OIR might you consult with as a content

7     expert, as you just mentioned?

8     A.   Many people would typically be those on the ground who

9     had some expertise.  So for example, if we were doing a

10    project related to the staff across the university, we would

11    ask members of HR, who understood the full sort of work force

12    data, to come and talk with us.

13    Q.   Who would be the context experts in connection with work

14    being doing relating to Harvard College admissions data?

15    A.   Dean Fitzsimmons, Dean Donahue.  We had Janet Irons, I

16    believe, someone who deeply understood the financial aid

17    data.  We might consider someone like Elizabeth Yong, a

18    content expert, but much less about the process, much more

19    about understanding the data.

20    Q.   At what point in the analytic process would you typically

21    consult with people outside of OIR?

22    A.   Usually multiple points.  We might early in a process, as

23    I was just mentioning, and then periodically as we were

24    iterating to get their feedback on what we would be doing.

25    Q.   So let's focus again on P12 and in particular Slide 5 of

1    Exhibit P12, please.  What does Slide 5 show?

2    **A.**  It's a kind of outline.  It's entitled "Part 1 Access,"

3    and it has the three sort of chapters in this set of

4    exhibits.

5    **Q.**  Does Slide 5 show all three topics that were discussed

6    with Dean Fitzsimmons at the February 2013 meeting?

7    **A.**  Yes.

8    **Q.**  Focusing just first on the first topic, who requested the

9    analysis that OIR performed relating to the return to early

10   action?

11   **A.**  I think of this one as -- we would have always known that

12   we wanted to come back to that.  We had done some earlier

13   work on early action.  And then as the policy was reinstated,

14   that we would want to look at the data again.  We may have

15   discussed it as a request from Dean Fitzsimmons and others,

16   but I think the team imagined we would be doing this, and we

17   might not have actually gotten a question.

18   **Q.**  What is the second topic on Slide 5 of P12?

19   **A.**  Shift in the gender balance and impact of concentration

20   choice.

21   **Q.**  Who requested the analysis on gender balance and

22   concentration choice?

23   **A.**  Dean Fitzsimmons.

24   **Q.**  And what's the third topic?

25   **A.**  Evaluating factors that play a role in Harvard College

1  admission.

2  **Q.**  Who requested the work on evaluating factors that play a

3  role?

4  **A.**  No one.

5  **Q.**  What is the origin of the evaluating factors analysis?

6  **A.**  Mark Hansen did this work, and we brought it forward to

7  discuss it with Dean Fitzsimmons.

8  **Q.**  Do you recall discussing earlier in response to some

9  questions from Ms. Hacker the entries on Harvard's privilege

10  log relating to Mr. Unz's article?

11  **A.**  Yes, I do.

12  **Q.**  Did OIR conduct an analysis at the direction of Harvard's

13  counsel that arose out of those privilege log entries?

14  **A.**  Yes.

15  **Q.**  Is that the analysis shown in Exhibit P12?

16  **A.**  No.

17  **Q.**  Was the analysis contained in Exhibit P12 concerning

18  evaluating factors that play a role in Harvard College

19  admission part of an investigation into discrimination

20  against Asian-American applicants?

21  **A.**  No.

22  **Q.**  Were all three topics shown on Slide 5 discussed at the

23  meeting with Dean Fitzsimmons?

24  **A.**  To the best of my understanding, yes.

25  **Q.**  Let's take a look at the evaluating factors portion of

1    this deck, and Slide 32 in particular, please.  The last

2    bullet point on Slide 32 says, "The following analysis is

3    preliminary and for discussion."

4            Do you see that?

5    **A.**   I do.

6    **Q.**   And "preliminary" is bolded and underlined?

7    **A.**   Yes.

8    **Q.**   Does that underlining and bolding signify anything it?

9    **A.**   I think we meant to convey that it was very preliminary,

10   as we were getting ready to show this to the content experts.

11   **Q.**   And why did OIR want to convey the fact that this

12   analysis was very preliminary in this deck?

13   **A.**   I believe because we understood that it was a highly

14   simplified version of the way that someone who was a content

15   expert like Dean Fitzsimmons and others would think about

16   their admissions process.

17   **Q.**   Why did you share your work with Dean Fitzsimmons at this

18   stage of the analysis?

19   **A.**   I think we wanted to get his feedback, and I think we

20   wanted to see if we could ask about further variables that we

21   could look at and see if there were other ways of thinking

22   about the process that we could use.

23   **Q.**   Look, please, at the second bullet under "Strategy" on

24   this Slide 32, beginning with "Generate."  Could you please

25   read that?

1    **A.**  "Generate fitted probabilities of admissions.  Given an

2    applicant's characteristics, how likely are they to be

3    admitted (0 or 1)?"

4    **Q.**  And can you describe how OIR constructed the model to

5    generate these fitted probabilities of admissions?

6    **A.**  I think the way that this was done was to take this pool

7    of data from 2007 to 2016 and step by step in these models

8    look at just those variables that are listed and generate the

9    probabilities.

10           And then, as I was saying earlier, taking a kind of

11   arbitrary 2,100 and designating those applicants that had the

12   highest probabilities in that 2,100 up and then looking at

13   the demographics of those.

14           Some of those in this modelling exercise may have

15   actually been admitted, and many of them may not have been

16   admitted.

17           THE COURT:  How do you get the 2,100?

18           THE WITNESS:  I think that the reason for the 2,100

19   cutoff would have been --

20           THE COURT:  No, not the cut off, but how do you

21   identify the 2,100?

22           THE WITNESS:  Oh.  I believe that as you did the

23   logistic regression and you got the probability, you take the

24   highest probability 2,100 and above.

25   BY MS. ELLSWORTH:

1    **Q.**  We talked before the break about how that would have

2    worked in the context of Model 1.  So if you can look at

3    Slide 33 which has the inputs to the model.  Are you there?

4    **A.**  Yes.

5    **Q.**  To the models, I should say.  In connection with Model 2,

6    what are the factors of the variables that were included?

7    **A.**  Academic index, academic rating, legacy, athlete.

8    **Q.**  How did the model that you just described operate in the

9    context of Model 2?

10    **A.**  The same as I just described.  But the variables that

11    would be used to fit the probabilities would include all four

12    of those as opposed to just the two in the prior model.

13    **Q.**  And then looking at Slide 34, which has the bar charts,

14    and particularly focusing on Model 2, what is Model 2 showing

15    in terms of -- what is Slide 34 showing in terms of the

16    results of Model 2?

17    **A.**  You take that hypothetical, the highest probability is

18    the 2,100, and then look at what were the race/ethnicities of

19    those in that 2,100 and look at the percentages.

20    **Q.**  And the percentage is broken down by ethnic group,

21    correct?

22    **A.**  Correct.

23    **Q.**  And looking back at Slide 33 for Model 3, would you add

24    in these two additional ratings into the modelling process?

25    **A.**  Yes.

1    **Q.**  And so can you once again describe how Model 3 works in

2    the context of this particular regression analysis?

3    **A.**  So you'd do the same modelling exercise, add in those

4    additional variables, and then again get the probabilities

5    and take the top 2,100.  And then in the next page show the

6    racial ethnicity, the race and ethnicity of those that were

7    in that 2,100.

8    **Q.**  Back to Slide 33, please.  And focusing again on Model 3

9    which you were just discussing, does Model 3 show the effect

10   of any of those six factors on the probability of admission

11   to Harvard College?

12   **A.**  No.  And we don't see the coefficients or any one of

13   these -- any one of these variables in these exhibits.

14   **Q.**  You've mentioned that the models create a hypothetical

15   admitted class.  Do I have that right?

16   **A.**  That's correct.

17   **Q.**  And can you please just explain what that means, a

18   hypothetical admitted class.

19   **A.**  So we're fitting these probabilities as a kind of

20   simulation.  And then you take this cutoff of 2,100 and look

21   above, but it's not necessarily the actual students that were

22   admitted.

23   **Q.**  And so does it mean that there are students who may have

24   had other factors that contributed to their admission to

25   Harvard that are not measured by these models and that the

1    impact of those factors is not demonstrated in these models?

2    A.   Definitely these are a very limited number of factors.

3    Q.   Are there more factors that are considered in the Harvard

4    admissions process than the factors included in Model 4,

5    which is the model that includes the highest number of

6    factors in this exercise?

7    A.   Many more.

8    Q.   Does the modelling exercise shown on Slides 33 and 34

9    take into account any impact of socioeconomic status on

10   Harvard College admissions?

11   A.   No.

12   Q.   And when you say that there are different individuals who

13   may have been actually admitted than are shown in these

14   models, does the identity of the individuals who may have

15   been admitted, would that be impacted by the way in which

16   Harvard College considers or weights factors for admission?

17   A.   I'm sorry.  Could you repeat that again?

18   Q.   Sure.  The fact that there are -- there's a difference

19   between those who are actually admitted and those shown in

20   the results of Model 4.  What contributes to that difference?

21   A.   It could be any number of things.  I mean, many different

22   things could have contributed to the way that the actual

23   admissions process works.  Here, we're just looking at with

24   this limited number of variables can we get to a kind of

25   demographic -- not demographic, but race/ethnicity background

1    that is close to the actual admitted classes.

2    **Q.**  And in Model 4, the gender and ethnicity of applicants is

3    included in the modelling process, correct?

4    **A.**  Yes.

5    **Q.**  And does inclusion of the gender and ethnicity of the

6    applicants in Model 4 contribute to the fact that Model 4 is

7    the closest approximation of the gender and ethnic breakdown

8    of the actual admitted class?

9    **A.**  Yes.

10   **Q.**  Do the models on Slides 33 and 34 show the effect of any

11   particular tip that may be given in Harvard's admissions

12   process?

13   **A.**  No.

14   **Q.**  And even as to the eight factors that are showing on

15   Slide 33, do the models on Slides 33 and 34 show the effect

16   of any one of those factors on or around admissions outcomes?

17   **A.**  No.  They don't show this year.

18          THE COURT:  Are you saying is it a coincidence that

19   Model 4 and actual are the same, or are you saying that

20   you're trying to build a model that approximates actual?

21          THE WITNESS:  Your Honor, I don't think it's a

22   coincidence.  I think we were trying to model something to

23   see if we could get as close as we could to the actual.

24   BY MS. ELLSWORTH:

25   **Q.**  And can you explain why you were trying to do that?

1    **A.**   To understand the -- to understand the admissions process

2    and to understand the way that these different variables may

3    as a whole contribute to the probability of admission.

4    **Q.**   Why did you present the results of these models to Dean

5    Fitzsimmons in February of 2013?

6    **A.**   To show him what we were doing and to get his input and

7    feedback and to ask questions about additional variables that

8    could be used in a modeling exercise like this.

9    **Q.**   Do you recall testifying in response to Ms. Hacker's

10   question that OIR had, in fact, obtained some additional

11   information from admissions after attending this meeting with

12   Dean Fitzsimmons?

13   **A.**   Yes.

14   **Q.**   And was OIR able to work with the additional data that it

15   received?

16   **A.**   I think we were able to use the additional data for

17   different strands of work for admissions and financial aid,

18   but I don't think we did anything more with these modeling

19   exercises.

20   **Q.**   When you first saw the models contained on Slides 33 and

21   34 of Exhibit P12 in 2013, did you interpret them to show

22   evidence of bias or discrimination?

23   **A.**   No.

24   **Q.**   Did you tell Dean Fitzsimmons in 2013 that you thought

25   the modeling exercise on Slides 33 and 34 showed evidence of

1  bias or discrimination?

2  **A.**  No.

3  **Q.**  Do you interpret them today to show evidence of bias or

4  discrimination?

5  **A.**  No.

6  **Q.**  Why not?

7  **A.**  They weren't designed to look for evidence of bias or

8  discrimination.  They were trying to model in a highly

9  simplified way the admissions process so that we could

10  understand.

11  **Q.**  Are you aware that both Harvard and SFFA have retained

12  experts to give testimony in this case?

13  **A.**  Yes.

14  **Q.**  And are you aware that both parties' experts conducted

15  statistical analyses of Harvard's admissions data?

16  **A.**  Yes.

17  **Q.**  Have you reviewed some of that analysis?

18  **A.**  Yes, I have.

19  **Q.**  How many factors did the experts include in their

20  analysis?

21  **A.**  I didn't count them.  Many, many more than are here.

22  **Q.**  And what does that fact tell you about OIR's modelling

23  analysis on Exhibit P12?

24         MS. HACKER:  Objection, Your Honor.  This is

25  improper undisclosed expert opinion testimony.

 1            MS. ELLSWORTH:  Your Honor, I think the witness,

 2    being the head of OIR at the time of these documents, which

 3    have been the subject of extensive questioning from SFFA, is

 4    entitled to provide some reactions to how they compare.

 5            THE COURT:  I'll give you some latitude on it.  But

 6    let me just interrupt you because I'm probably embarrassed to

 7    be asking this question, because I'm sure I'm being thick

 8    about this.

 9            I don't understand.  You pick 2,100 random people,

10    right?  Hypothetical people, right?

11            THE WITNESS:  No, Your Honor.  Let me just say I

12    think these are very hard to understand.

13            THE COURT:  You're being very kind.

14            THE WITNESS:  What I believe is that you take the

15    full applicant pool from 2007 to 2016, and that's the kind of

16    data set.  And in the data set, we know who was actually

17    admitted.  But you use all the applicants and you kind of

18    leave aside knowing whether they were admitted or not.  You

19    do a logistic regression to kind of understand the

20    probabilities of these individual factors and then draw a

21    cutoff line.  Look at those probabilities and then show what

22    is the demographic -- or the race/ethnicity makeup of those

23    one by one as a modelling exercise.  I don't know if that

24    answers your question.

25            THE COURT:  It doesn't.  I'm sure it does, but I

 1    still can't understand it.

 2            You have the actual class.  You take a bunch of

 3    variable that come up with the ones most likely to be

 4    admitted, right?  Is that what you're saying, that the

 5    hypothetical class is the 2,100?

 6            THE WITNESS:  The 2100 would be the hypothetical.

 7            THE COURT:  Most likely to be admitted based on

 8    what criteria?

 9            THE WITNESS:  On just those variables.  So for

10    example, in Model 1 it would be the highest likelihood,

11    highest probability of admission just based on academic index

12    and academic rating.  And that might be -- I'm sure it would

13    be a very different -- not very, but it would be a different

14    2,100 than the 2,100 after you add in legacy and athlete.

15            THE COURT:  So it's not the same 2,100.

16            THE WITNESS:  No.  It would be different.  You'd

17    get these different probabilities based on each of these

18    modelling exercises, draw the cutoff.  And then on this

19    exhibit with Model 4, that particular exercise is shown right

20    next to the actual admitted students in that pool.

21            THE COURT:  How does it come out that actual ends

22    up being -- so actual -- demographics is --

23            MS. ELLSWORTH:  If you look at Slide 33, I think

24    that provides a little information.  Maybe it would be

25    helpful, Your Honor, if I could have Ms. Driver-Linn try and

1    walk through an example using the model of how it was done.

2            THE COURT:  That's fine.  I guess I don't

3    understand how actual and the last model come out so close to

4    each other if you're dealing with a random 2,100,

5    hypothetical 2,100.

6            THE WITNESS:  I don't think of them as random.

7    Once you put in the eight variables in this data set in

8    Model 4 and then you take that resulting 2,100 that is this

9    hypothetical and you look at their race/ethnicity breakdown,

10   the percentages mapped on pretty nicely to the actual.

11           And if you look at the difference between Model 3

12   and Model 4, the two variables that are being added in are

13   gender and ethnicity.  So that made a difference to get it

14   closer to the actual.

15           THE COURT:  I have to think about that.

16   BY MS. ELLSWORTH:

17   Q.  Let me try this.  Ms. Driver-Linn, let's take a look at

18   Model 3 and on Slide 33.  What are the six factors that were

19   included in Model 3?

20   A.  Academic index, academic rating, legacy, athlete,

21   personal rating, extracurricular rating.

22   Q.  How did those -- how were those six variables used in

23   constructing the output of Model 3?

24   A.  The variables would be included in the regression model.

25   You get an algorithm that creates the kind of probability.

1   The probabilities are used to then rank those in the pool --

2   not rank -- yeah, rank -- rank them in the pool and then take

3   that 2,100 and say let's now look at the race/ethnicity of

4   that arbitrary class.

5   **Q.**   And so looking at the output from the model on Slide 34,

6   which takes those rank-ordered 2,100, right?

7   **A.**   Yes.

8   **Q.**   And it identifies the racial and ethnic breakdown of that

9   rank-order 2,100, right?

10  **A.**   Yes.

11  **Q.**   Could the output from Model 4 be shown using some

12  different breakdown?  For example, any one of the variables

13  as opposed to ethnicity?

14  **A.**   I'm sorry?

15  **Q.**   Could the output of Model 3 be shown in a way that shows

16  those who have an academic rating of X, Y, or Z?

17  **A.**   I don't know.  The academic rating was used in all of

18  these models.

19  **Q.**   So the depiction on Slide 34 is just showing those 2,100

20  schools cut along racial or ethnic lines, right?  The 2,100

21  applicants.  Excuse me.

22  **A.**   Yes.

23  **Q.**   So the 2,100 applicants could be cut on any other lines

24  that are available in the data, right, to show how that

25  makeup would have been?

Case: 19-2005  Document: 00117683235  Page: 628  Date Filed: 07/30/2020  Entry ID: 6356615
Case 1:14-cv-14176-ADB  Document 636  Filed 04/18/19  Page 140 of 261

140

1    **A.**  Yes.

2         THE COURT:  Why wouldn't you do that with the

3    actual admitted students?

4         THE WITNESS:  That's what was done in that line

5    that says "actual."

6         THE COURT:  Okay.

7         THE WITNESS:  And then we compared with the model

8    that was hypothetical, Hypothetical 1 through 4.

9         THE COURT:  The actual has all those other

10   variables built into it, too, or just the race and ethnicity?

11        THE WITNESS:  Just race/ethnicity.

12        THE COURT:  Couldn't you do this with taking the

13   actual instead of 2,100?

14        THE WITNESS:  So this would take the students that

15   were actually admitted in those years and then look at the

16   race/ethnicity breakdown without looking at any of the

17   factors and how they might have been used.  I guess as a

18   modelling exercise it's just trying to understand how these

19   particular simplified factors result in a class.

20   BY MS. ELLSWORTH:

21   **Q.**  So the fact that the Model 4 output and the actual look

22   similar, they're similar in terms of racial breakdown,

23   correct?

24   **A.**  Correct.

25   **Q.**  Are there any other similarities that you can discern

1   between the results of Model 4 and the actual class from this

2   exercise?

3   **A.**   From this exercise, you cannot.

4   **Q.**   Could the applicants shown to be the highest probability

5   of admission in Model 4 be all male or all female, for

6   example?

7   **A.**   Hypothetically they could.

8   **Q.**   Could the applicants shown in the output of Model 4 be

9   all from a high socioeconomic status and not low

10  socioeconomic status?

11  **A.**   They could.

12  **Q.**   Could the applicants in the output of Model 4 be all from

13  the State of Montana?

14  **A.**   I don't think so.

15          MR. HUGHES:  Come on.

16          MR. WAXMAN:  Counsel doesn't have enough kids yet.

17  BY MS. ELLSWORTH:

18  **Q.**   Could the applicants from the output of Model 4 be all

19  from the Northeast?

20  **A.**   Yes.

21          THE COURT:  The first thing he said during the

22  entire week, you know.

23          MS. ELLSWORTH:  Your Honor, do you have any more

24  questions about the slides?

25          THE COURT:  Not that I'm willing to admit.

**JA1338**

 1   BY MS. ELLSWORTH:

 2   **Q.**   Let's look at Slide 36 of this exhibit.  What is Slide 36

 3   summarizing?

 4   **A.**   It's saying from this exercise, from this modelling

 5   exercise, here's what we've learned.  And then there's a

 6   variety of factors that are missing or that ratings do not

 7   capture, and in particular at this time saying we'd like to

 8   better understand exceptional talent, role of context cases,

 9   role of the personal statement/essay, measures of

10   socioeconomic status.

11   **Q.**   And are those all -- is that all information that was not

12   included in the modelling process that OIR conducted?

13   **A.**   It was not included.

14   **Q.**   That information that may play a role in the Harvard

15   College admissions process?

16   **A.**   Yes, I believe so.

17   **Q.**   Are applicants to Harvard College who may have exhibited

18   exceptional talent, which was the reason for their admission,

19   are those applicants necessarily going to be included in that

20   output of Model 4 that we were just looking at?

21   **A.**   No.

22   **Q.**   Applicants to Harvard College who wrote a compelling

23   personal statement that may have played a role in their

24   admission, would they necessarily be included in that output

25   to Model 4 that we were just looking at?

Case: 19-2005    Document 00117638235    Page: 634    Date Filed: 07/30/2020    Entry ID: 6356615
Case 1:14-cv-14176-ADB   Document 636   Filed 04/18/19   Page 143 of 261

143

1    **A.**   Not necessarily.

2    **Q.**   And applicants to Harvard College who may have come from

3    a more modest socioeconomic background and that may have

4    played a role in their admission to Harvard College, would

5    they be reflected in that output of Model 4 we were just

6    looking at?

7    **A.**   Not necessarily.

8    **Q.**   What does the information on this Slide 36 tell you about

9    OIR's modelling analysis in 2013?

10   **A.**   That we were wanting to get further insight from having

11   additional factors and variables and trying to ask questions

12   of the content experts to see if there were things we weren't

13   capturing and wanted to -- would help us to understand the

14   admissions process.

15   **Q.**   Can you draw any conclusion from the modelling exercise

16   in Exhibit P12 about the effect of race on Harvard College

17   admissions decisions?

18   **A.**   No.

19   **Q.**   Did you draw any conclusion in 2013 from Exhibit P12

20   about the effect of race on admissions decisions?

21   **A.**   No.

22   **Q.**   Did you tell Dean Fitzsimmons in 2013 that the models

23   contained in Exhibit P12 provided any information about the

24   effect of race on admissions decisions?

25   **A.**   No.

 1   **Q.**  Can you draw any conclusion from Exhibit P12 about the

 2   effect of the personal rating on admissions decisions?

 3   **A.**  No.

 4   **Q.**  Did you tell Dean Fitzsimmons in 2013 that you could draw

 5   any conclusion from P12 about the effect of the personal

 6   rating on admissions decisions?

 7   **A.**  Not that I recall.

 8   **Q.**  Can you draw any conclusions from the modelling exercise

 9   in P12 about the effect of any single factor on admissions

10   decisions?

11   **A.**  No, you cannot.

12   **Q.**  You discussed the meeting you had in February 2013 with

13   Ms. Hacker.  Do you recall that?

14   **A.**  Yes.

15   **Q.**  Did Dean Fitzsimmons tell you during that meeting to stop

16   working on the modelling analysis?

17   **A.**  No.

18   **Q.**  At any point after the meeting did Dean Fitzsimmons tell

19   you to stop working on the modelling analysis?

20   **A.**  No.  No one has ever told us to stop working on anything.

21   **Q.**  Did anyone ever tell you to stop working on this

22   particular analysis?

23   **A.**  No.

24   **Q.**  In fact, you testified earlier that OIR did try and do

25   some additional work on this analysis, right?

1    **A.**   I think the team did some additional work on things that

2    were in this presentation.

3    **Q.**   Did you believe in 2013 that the analysis in Exhibit P12

4    showed discrimination against Asian-Americans in the Harvard

5    College admissions process?

6    **A.**   No.

7    **Q.**   Did you tell Dean Fitzsimmons in 2013 that you thought

8    the modelling exercise in P12 showed discrimination against

9    Asian-Americans?

10   **A.**   No.

11   **Q.**   Do you believe today that this analysis in P12 shows

12   discrimination against Asian-Americans in the Harvard College

13   admissions process?

14   **A.**   No.

15   **Q.**   Let's look, please, at Exhibit P26, which is Tab 3 in

16   your binder.  You discussed some earlier drafts of this memo

17   with Ms. Hacker.  Do you remember that?

18   **A.**   I do.

19   **Q.**   If you can, take a look at the second and third page of

20   Exhibit P26.  The discussion in P26 relates to a logistic

21   regression model, correct?

22   **A.**   I'm sorry.  Could you repeat the question?

23   **Q.**   Sure.  There's a discussion in the bottom of the first

24   page of P26 about a logistic regression model.

25   **A.**   Yes.

Case: 19-2005    Document: 00117683237    Page: 634    Date Filed: 07/30/2020    Entry ID: 6356615
Case 1:14-cv-14176-ADB   Document 636   Filed 04/18/19   Page 146 of 261

146

1    **Q.**  Is this the same regression model as the one we were

2    discussing in P12?

3    **A.**  No, I don't -- no, it's not.

4    **Q.**  Is this a different model?

5    **A.**  This is a different modelling exercise, yes.

6    **Q.**  Is the modelling exercise in Exhibit P26 a refinement of

7    the model in P12?

8    **A.**  No.  I don't see it that way.

9    **Q.**  Does the modelling exercise in Exhibit P26 rely on the

10   same data set as Exhibit P12?

11   **A.**  No.  It says this is classes 2009 through 2016.  Those

12   aren't the same exact years.

13   **Q.**  Was the analysis in P26 conducted at Dean Fitzsimmons'

14   request?

15   **A.**  Yes.

16   **Q.**  And what was the purpose of the analysis in Exhibit P26?

17   **A.**  He had been interested in some of the popular press

18   around being able to get highly qualified low-income students

19   to apply for admissions and wanted to understand whether in

20   the Harvard College admissions process there was a tip given

21   to low-income students.

22   **Q.**  On page 23549 of this memo, which is the second page of

23   the actual memo, in the middle of the third paragraph does

24   OIR point out any limitations to the analysis?

25   **A.**  Yes.

1    **Q.**  And beginning with "this approach," can you please read

2    some of the limitations that were pointed out in this

3    memorandum?

4    **A.**  "This approach has several limitations.  We picked a

5    small set of variables that would factor in admissions

6    decisions.  The selection of a wider set of variables might

7    result in a better-fitting model, one that accounts for more

8    of the variation in individual applicants and their

9    potentially unique contributions to the entering class.

10             "For example, the model does not capture

11   exceptional talent in art or music explicitly, although

12   ratings may capture some aspect of these attributes.  In

13   addition, our model is limited to main effects, not in

14   examining interactions between variables.

15             "Our analysis should not be considered exhaustive."

16   **Q.**  Do you agree with those limitations that you've just laid

17   out in that memo?  Are those correct?

18   **A.**  Yes, I do.

19   **Q.**  Did those limitations affect the analysis that OIR

20   conducted in Exhibit P26?

21   **A.**  Yes.

22   **Q.**  How so?

23   **A.**  They were limited and not including the factors, as we

24   listed here.

25   **Q.**  And how does that affect the extent to which conclusions

1    can be drawn from this analysis?

2    **A.**   I think of these as being able to show some signal of the

3    variables relative to one another, not beyond just the

4    modelling exercise.

5    **Q.**   Why did you list the limitations to the methodology and

6    data sources in the memo sent to Dean Fitzsimmons?

7    **A.**   I think we wanted to make sure he understood that this

8    was a limited modelling exploration to try to answer his

9    question.

10   **Q.**   Do you recall speaking earlier with Ms. Hacker about an

11   email exchange you had with Ms. Heenan around the time of

12   this memo?

13   **A.**   I do.

14   **Q.**   And if you could look, please, at the first page of the

15   memorandum, the first sentence.  If you can please read "As

16   you have discussed with us.

17   **A.**   "As you have discussed with us, there may be value in

18   responding to recent press about the rate of admission for

19   low-income students at elite institutions and in particular

20   for Harvard College."

21   **Q.**   So was it your understanding that the analysis you were

22   conducting was potentially to be released publicly?

23   **A.**   Yes.

24   **Q.**   And Ms. Heenan, you testified in response to Ms. Hacker's

25   questions, was involved in Harvard public affairs and

1    communications at the time?

2    **A.**   Yes.

3    **Q.**   Why did you discuss this analysis with Ms. Heenan?

4    **A.**   I think you would want, if there was something to be made

5    public, for them to be involved.  And in addition, I think I

6    was aware that taking any individual factor and not having it

7    in context could be construed in narrow ways and in ways that

8    could be problematic.

9    **Q.**   Does the analysis in Exhibit P26 evaluate whether Harvard

10   discriminates against Asian-Americans in its admissions

11   process?

12   **A.**   No.

13   **Q.**   What was of the main focus of this memo?

14   **A.**   The main focus was on understanding the so-called tip for

15   low-income students.

16   **Q.**   When you sent this memorandum to Dean Fitzsimmons in

17   2013, did you believe it showed discrimination against

18   Asian-American applicants?

19   **A.**   No.

20   **Q.**   And when you reviewed the memo yourself in 2013, did you

21   believe it showed discrimination against Asian-American

22   applicants?

23   **A.**   No.

24   **Q.**   In 2013, did you believe this analysis showed bias

25   against Asian-American applicants?

1    **A.**  No.

2    **Q.**  Did you tell Dean Fitzsimmons that you thought this

3    memorandum showed bias against Asian-American applicants?

4    **A.**  No.

5    **Q.**  Do you recall Ms. Hacker asking you some questions about

6    earlier drafts of this memorandum?

7    **A.**  Yes.

8    **Q.**  Did you or anyone else at OIR show those earlier drafts

9    to Dean Fitzsimmons?

10   **A.**  No, I don't think so.

11   **Q.**  Did Dean Fitzsimmons request follow-up on the analysis in

12   this memo?

13   **A.**  Yes, he did.

14   **Q.**  Let's take a look at Exhibit P29, which is already in

15   evidence.

16   **A.**  Sorry, where --

17   **Q.**  I'm sorry.  It's at Tab 5.  Are you there?

18   **A.**  I am.

19   **Q.**  What is P29, please?

20   **A.**  P29 is a cover email and an attached exhibit or set of

21   exhibits entitled "Demographics and Income."

22   **Q.**  Is this the follow-up analysis that Dean Fitzsimmons

23   requested?

24   **A.**  Yes.

25   **Q.**  And this email was sent to Dean Fitzsimmons, correct?

1    **A.**  It is.

2    **Q.**  What information did Ms. Bever include in her email to

3    Dean Fitzsimmons about that follow-up analysis?

4    **A.**  She describes that "In these slides you'll see low-income

5    applicants are more diverse than all applicants to Harvard

6    College.  Likewise, a greater share of minority applicants

7    are low income than white applicants.  Across all

8    race/ethnicity groups, low-income students are admitted at a

9    higher rate."

10   **Q.**  Let's take a look, please, at Exhibit P28, which is Tab 6

11   in your binder.  Is this the slide deck that was transmitted

12   via P29?

13   **A.**  Yes.

14   **Q.**  Take a look at page 2, please, of P28.

15           And does page 2 of P28 contain the same general

16   information as Ms. Bever had included in her email to Dean

17   Fitzsimmons?

18   **A.**  Generally, yes.

19   **Q.**  Let's take a look at page 3 of P28, please.  What does

20   page 3 show?

21   **A.**  It shows two pie charts.  The first is all applicants by

22   ethnicity for the classes of 2009 through 2016.  And the

23   second, applicants with incomes less than 60K by ethnicity.

24   **Q.**  And what does page 3 show with respect to Asian-American

25   applicants to Harvard during the years in question?

1    **A.**   In the first with all applicants, Asians represent

2    23 percent of the total and in the second represent

3    31 percent of the total.

4    **Q.**   And can we look, please, at slide -- I believe it's

5    Slide 3 or 4 of P28 -- the next slide, sorry, 5 -- 6.  Sorry.

6           Can we look at Slide 6, please, Mr. Lee?   What

7    does this slide show?

8    **A.**   Admit rates by ethnicity and income broken -- these bar

9    charts are broken down by low income and then income greater

10   than 60K.

11   **Q.**   And does this Slide 6 of Exhibit P28 show the admit rate

12   for low-income Asian applicants as Dean Fitzsimmons had

13   requested?

14   **A.**   Yes.

15   **Q.**   And is that admit rate higher for low-income

16   Asian-American applicants than it is for non-low-income Asian

17   Americans?

18   **A.**   Yes.

19   **Q.**   Was that the analysis Dean Fitzsimmons had requested?

20   **A.**   Yes.  He had, I think, not requested a specific analysis

21   but us to be responsive to that general question.

22   **Q.**   And these slides were sent to Dean Fitzsimmons in

23   Exhibit P29, correct?

24   **A.**   Correct.

25   **Q.**   Ms. Driver-Linn, do you think that any of the OIR

1   analyses that we've looked at today or that Ms. Hacker showed

2   you showed discrimination or bias against Asian-Americans in

3   the Harvard College admissions process?

4   **A.**   No.

5   **Q.**   Why not?

6   **A.**   I don't believe that they -- I believe all of them are

7   explorations and models that can't speak to the actual

8   admissions process.  They are trying to be informing,

9   understanding, and all of them were very limited in the

10  number of variables and factors that were used.

11  **Q.**   Did you ever tell Dean Fitzsimmons in 2013 or any time

12  after that you thought any of OIR's modelling analyses showed

13  any sort of discrimination or bias against Asian-Americans in

14  the admissions process?

15  **A.**   No.

16  **Q.**   Did Dean Fitzsimmons ever ask you to stop any analysis

17  that you were conducting related to Harvard College

18  admissions process?

19  **A.**   No.

20  **Q.**   Did anyone ever ask OIR to stop conducting any analysis

21  relating to Harvard College admissions process?

22  **A.**   No.

23  **Q.**   If you thought that any OIR analysis showed evidence of

24  discrimination or bias, what steps would you take?

25  **A.**   I'm not sure exactly, but I would definitely go up the

Case: 19-2005    Document: 00117632237    Page: 642    Date Filed: 07/30/2020    Entry ID: 6356615
Case 1:14-cv-14176-ADB   Document 636   Filed 04/18/19   Page 154 of 261

154

1    food chain and try to let people know.

2    **Q.**   When you say "go up the food chain," what do you mean by

3    that?

4    **A.**   I mean talk with those who are higher than me in the

5    hierarchy of the university.

6    **Q.**   And to whom do you directly report or did you as the head

7    of OIR?

8    **A.**   As the head of OIR, it was to the deputy provost who then

9    reported to the provost.

10   **Q.**   Did you contact either the deputy provost or the provost

11   in 2013 to alert them about any analysis you thought showed

12   discrimination or bias?

13   **A.**   No.

14   **Q.**   Why not?

15   **A.**   I wasn't concerned.  I didn't feel that there was a need

16   to raise any alarm.

17           MS. ELLSWORTH:  Thank you.  I have no further

18   questions.

19           MS. HACKER:  Your Honor, SFFA has no further

20   questions for this witness.

21           THE COURT:  You're excused.

22           MR. MORTARA:  Your Honor, Students for Fair

23   Admissions will call Director Marlyn McGrath.

24           Can we have a five-minute break to set up?

25           THE COURT:  Sure.

Case: 19-2005    Document: 00117682237    Page: 643    Date Filed: 07/30/2020    Entry ID: 6356615
Case 1:14-cv-14176-ADB   Document 636   Filed 04/18/19   Page 155 of 261

155

```
 1              (Court recessed at 1:45 p.m.)
 2              THE CLERK:  Can you please stand and raise your
 3    right hand.
 4              (MARLYN McGRATH duly sworn by the Deputy Clerk.)
 5              THE CLERK:  Thank you.  You may be seated.  Can you
 6    please state your name and spell your last name for the
 7    record.
 8              THE WITNESS:  My name is Marlyn McGrath,
 9    M-C-G-R-A-T-H.
10              THE COURT:  I'm ready when you are.
11                        EXAMINATION
12    BY MR. MORTARA:
13    Q.  Good afternoon, Director McGrath.  My name is Adam
14    Mortara.  It's nice to meet you.
15              I think you might have answered my first question
16    already, which is what do I call you.  Sometimes in my head I
17    call you Director McGrath.  Sometimes I call you Director
18    McGrath Lewis, sometimes I call you Ms. McGrath, Dr. McGrath.
19    A.  You can call me anything you like.  Marlyn is fine.
20    Q.  Don't go that far, ma'am.  I'm going to stick to Director
21    McGrath most of the time.  I just want to make sure I got it
22    the way you want.
23              I understand you're a Harvard graduate yourself or,
24    more technically maybe, a Radcliffe graduate.  Is that right?
25    A.  Yes.
```

1    **Q.**  What's the difference, for slightly younger people

2    like --

3    **A.**  How much time do you have?  There's no difference.  I am

4    from an era when the degree was granted originally by

5    Radcliffe College.  I have a Harvard degree.

6    **Q.**  You have a master's and a Ph.D. from Harvard, right?

7    **A.**  Correct.

8    **Q.**  When did you get those?

9    **A.**  My Ph.D. was in 1978.

10   **Q.**  That's in English literature, if I remember right?

11   **A.**  In Celtic languages and literatures.

12   **Q.**  Can you tell us what you did after you got all these

13   degrees up until you became director of admissions in I think

14   it's 1987.  If I got that wrong, correct me.

15   **A.**  I was various kinds of dean.  I was a residential dean.

16   I was a lecturer in Celtic languages, and I worked in

17   academic departments in academic planning in the faculty of

18   arts and sciences.  In 1987, I became director of admissions

19   for Harvard College -- Harvard and Radcliffe College.

20   **Q.**  Residential dean at Harvard.  Is that right?

21   **A.**  Yes.

22   **Q.**  What does a residential dean do?  Do you live amongst the

23   students?

24   **A.**  Yes.

25   **Q.**  You so you got to know the students very well.  What

1    years were those?

2    **A.**   1978 to 1981.

3    **Q.**   Did you enjoy it?

4    **A.**   I loved it.

5    **Q.**   So your job as director of admissions today and going

6    back to 1987 -- and if it's different, let me know -- is to

7    oversee the work of the admissions office, correct?

8    **A.**   Yes.

9    **Q.**   And in addition to that -- withdrawn.

10           To explain, Director McGrath, I've read about a

11   thousand of your documents.  What I perceive is that in

12   addition to that, you have an internal university role in

13   that many Harvard personnel, including faculty and

14   administrators, turn to you with questions about the

15   admissions process.  Is that right?

16   **A.**   That is correct.

17   **Q.**   And you also I think have, from what I've seen, a

18   public-facing role that you've spoken externally to groups

19   about Harvard admissions, correct?

20   **A.**   Yes.

21   **Q.**   For instance, I think you went to England in 2013 and

22   spoke at something called the Suffolk Institute.  Is that

23   right?

24   **A.**   The Sutton Trust.

25   **Q.**   Sutton Trust.  That's it.

1          The public-facing role also sometimes concerns

2     responding to people from the outside world, no connection to

3     Harvard, with inquiries about Harvard admissions?

4     **A.**   Yes, that's true.

5     **Q.**   That can even be students who email the admissions office

6     with questions about how it works?

7     **A.**   Yes.

8     **Q.**   And part of your job in sort of a mix of that

9     internal-external role is receiving inquiries from alumni

10    about Harvard admissions; is that right?

11    **A.**   Yes.

12    **Q.**   And you respond to those, too, right?

13    **A.**   Yes.

14    **Q.**   Now, we've talked -- you weren't here because you weren't

15    here, but you heard about -- you were here for my opening,

16    right?

17    **A.**   I was, yes.

18    **Q.**   And you listened to it?

19    **A.**   Yes.

20    **Q.**   I hope it wasn't boring.  But we've heard a lot -- to

21    give you a narrative, we've heard a lot about the Unz

22    article.  You read the Unz article when it came out in 2012,

23    right?

24    **A.**   Yes.

25    **Q.**   I'm not sure you remember, but I think you might have

```
 1   read it between about 1:00 and 8:00 p.m. on November 28,
 2   2012.  Does that sound about right?
 3   A.  I can't challenge that.
 4   Q.  I'm going to help you remember that.  If you would, turn
 5   in your binder that's in front of you there.
 6            Or did anybody get you the binder?
 7   A.  Do I have a binder?  I don't think I do.
 8   Q.  I'll get you a binder, Director McGrath.  There's a few
 9   things I can be helpful with.
10            MR. MORTARA:  Your Honor, may I approach the
11   witness?
12            THE COURT:  Of course, yes.
13   BY MR. MORTARA:
14   Q.  For the record, Director McGrath, there's some tabs here.
15   You can turn to all the document.  They're labeled by
16   plaintiff's and defendants's numbers, and I'll use P and D.
17   If you have trouble finding something, just let me know.
18   A.  I will.
19            THE COURT:  Mr. Mortara, I have another
20   not-very-smart question.
21            Dean of admissions versus director of admissions?
22            THE WITNESS:  I work for Bill Fitzsimmons.  There
23   is on the other side of the house a director of financial
24   aid.  It's not explainable much beyond that.  We divide work.
25   BY MR. MORTARA:
```

1  **Q.**  Let me see if I can help.  There's an office that's the

2  office of admissions and financial aid or financial aid and

3  admissions.  Which is it?

4  **A.**  Admissions and financial aid.

5  **Q.**  Dean Fitzsimmons is the head of that unit, correct?

6  **A.**  Yes.

7  **Q.**  And then underneath there's admissions and then there's

8  financial aid, right?

9  **A.**  Yes.

10  **Q.**  And you're in charge of admissions?

11  **A.**  I oversee the office, yes.

12  **Q.**  All right.  Now, if you would, turn to Plaintiff's

13  Exhibit 220.  Plaintiff's Exhibit 220 is a series of emails

14  to and from you.  I want to see if this refreshes your

15  recollection first about whether you read the Unz article

16  sometime on November 28, 2012.

17  **A.**  Yes, I see this.

18          MR. MORTARA:  I'm going to offer Plaintiff's

19  Exhibit 220.

20          MR. LEE:  I would object if it's being offered for

21  its truth.  There's hearsay within the document itself, for

22  which there's no exception.

23          MR. MORTARA:  Your Honor, you're looking at the

24  email, I hope.

25          THE COURT:  I have the email in front of me.

```
 1              MR. MORTARA:  I can go through with you right now.
 2   There's plenty of statements in here from Director McGrath
 3   herself.  She's a party.  There those are party admissions.
 4   There's an inquiry coming in form somebody else at Harvard;
 5   she's answering it, talking about the Unz article.
 6              THE COURT:  I'm just reading this quick, but
 7   there's no -- I don't see any hearsay on the first page.
 8              MR. LEE:  It would be the third page, Your Honor.
 9   The bottom half of the third page is the hearsay within the
10   document.  I'm not objecting to Director McGrath's
11   statements.
12              THE COURT:  Are you talking about Ted Gilman?
13              MR. LEE:  It's a summary of Unz's article that's at
14   the bottom half under the RD.
15              MR. MORTARA:  I'm not going to ask her about it,
16   Your Honor.
17              MR. LEE:  But it shouldn't come in for its truth.
18              MR. MORTARA:  I'm not offering it for its truth.
19   It's the entire email chain that she saw and responded to.
20              THE COURT:  The email chain is admitted.  To the
21   extent that there's hearsay in it, I won't consider it for
22   the truth of the matter asserted.
23              MR. LEE:  That's fine, Your Honor.
24              (Plaintiff Exhibit No. 220 admitted.)
25   BY MR. MORTARA:
```

1    **Q.**  With that out of the way, let's talk about Plaintiff's

2    Exhibit 220.  This is an email chain.  When you get to the

3    end of it, it starts with somebody called Robert Dujarric.

4    Am I pronouncing that correctly?  Do you even know him?

5    **A.**  I do not know him.

6    **Q.**  Neither one of us will know if we're pronouncing his name

7    correctly unless you know how it's pronounced.  Do you?

8    **A.**  I have no idea.

9    **Q.**  So we're just going to call him Robert D so that if he

10   reads the transcript someday neither one of us --

11              MR. LEE:  Your Honor, if we could have a little

12   less of the commentary and just have questions?  We're going

13   to be here until Thanksgiving.

14              MR. MORTARA:  I heard about Mr. Lee's cousin

15   yesterday.  I'm going to try to be conversational, if that's

16   okay.

17              THE COURT:  Don't you want to wait for my answer?

18              MR. MORTARA:  I said if that's okay.

19              THE COURT:  And you kept right on going.

20              MR. MORTARA:  You're right.

21              THE COURT:  It would be fine for this afternoon.

22              I take your point, Mr. Lee, but it does help break

23   up the day.

24              MR. MORTARA:  Thank you, Your Honor.  I'll try to

25   keep it limited.

**JA1359**

Case: 19-2005    Document: 00117638237    Page: 654    Date Filed: 07/30/2020    Entry ID: 6356615
Case 1:14-cv-14176-ADB   Document 636   Filed 04/18/19   Page 163 of 261

163

```
 1    BY MR. MORTARA:
 2    Q.  And it starts off with this email from Robert D, and he's
 3    writing to Ted Gilman and some others.
 4           Who is Ted Gilman?
 5    A.  Ted Gilman is an administrator at the Reischauer
 6    Institute For Japanese Studies At Harvard.
 7    Q.  He's forwarding some concerns about the Unz article.  I
 8    don't want to get into what other people said.  I kind of
 9    want to get into what you said.  So let's delete that and
10    come back up.  We'll go to the previous page.
11           Now you can see Ted Gilman's email to you.  Let's
12    get where you get involved here.  All right?  Do you see
13    that?
14    A.  Yes.
15    Q.  November 28, 2012, 8:46 a.m.?
16    A.  Yes.
17    Q.  Are you with me?
18    A.  Yes.
19    Q.  "Dear Marlyn.  I hope your fall term is going smoothly.
20    How did December get here so quickly?  An alum and friend,
21    Robert D, '83 below, sent the following email.  The sniff
22    test suggests the piece is a witch hunt.  It's written by Ron
23    Unz, college '83, and is published in The American
24    Conservative, full text link below."
25           And then he goes on with some criticisms that he
```

1   has of the Unz piece, correct?

2   **A.**   Yes.

3   **Q.**   I take it that means that Mr. Unz is, in fact, a graduate

4   of Harvard College as well?

5   **A.**   I can't confirm or deny that.  We have what we have in

6   front of us.  I have no reason to doubt it.

7   **Q.**   Is that what you understood Mr. Gilman to be saying here,

8   that Unz was a graduate of the college?

9   **A.**   That is what I understood.

10   **Q.**   Up at the top, we have your response.  I'll try to blow

11   it up just a little bit more.  It comes in at 1:36 p.m.  Do

12   you see that?

13   **A.**   Yes.

14   **Q.**   And it says, "Ted, I shook my head at this, too."

15           Do you see that?

16   **A.**   I do.

17   **Q.**   And then, "We are in the throws of EA committees" --

18           That's early action committees, right?

19   **A.**   Right.

20   **Q.**   -- "and can't be helpful with deconstruction or comment

21   but will do in due course."

22           Do you see that?

23   **A.**   Yes.

24   **Q.**   "Thanks so much for looking out for us all.  M."

25           That's you, right, Marlyn McGrath?

1    **A.**   Yes.

2    **Q.**   Then right above that, Mr. Gilman or Dean Gilman responds

3    and says, "I apologize for bothering you."

4            Do you see that?

5    **A.**   I do.

6    **Q.**   And now let's go back to the second page.  I'm going to

7    try to blow up your email there.  Here we go.  And you then

8    at 8:33 p.m. on the same day respond to Ted Gilman, correct?

9    **A.**   Yes.

10   **Q.**   Your first statement to Ted in your response is, "Just

11   had a chance to read this," right?

12   **A.**   Yes.

13   **Q.**   Now, we know you probably read the article sometime on

14   the afternoon or evening of November 28, right?

15   **A.**   This probably refers to that document, yes, I would

16   assume.

17   **Q.**   The Unz article.  Okay.  And "After I emerged from

18   committee and it is what I thought, a hodgepodge of old

19   chestnut arguments."

20           Do you see that?

21   **A.**   Yes.

22   **Q.**   I want to talk to you about a lot of what's written here.

23   And I think that Mr. Lee will have a chance to talk about it

24   if he wants to as well.  I'm going to come back to this

25   several times.  We'll use it as a kind of launching-off point

1    for discussions.  The first thing I wanted to talk about was

2    a comment you make at the bottom.

3          When faculty and other stakeholders of Harvard ask

4    you questions or engage you with questions about the

5    admissions process, do you try to be accurate and truthful in

6    your responses?

7    **A.**  Yes, I do.

8    **Q.**  And so I want to ask you about the highlighted statement

9    on the screen at the end of your email to Mr. Gilman.  And it

10   says, "We look for the people with the most promise for the

11   future and we make every decision on the basis of

12   achievement, in the context of what the applicant has done

13   with what he has had, etc."

14          Is that statement accurate?

15   **A.**  You read it correctly, and I -- yes.

16   **Q.**  It's an accurate statement about how Harvard admissions

17   at Harvard College works?

18   **A.**  Yes.

19   **Q.**  Director McGrath, I want to take this off the screen and

20   I just want to ask you a general question.

21          Is it true that sometimes when you speak to people

22   about admissions like when you're at the Sutton Trust --

23          Is it in England?

24   **A.**  Sutton Trust, yes.

25   **Q.**  You spoke about admissions.  I actually watched --

1   anyway.  Spoke about admissions at the Sutton Trust, correct?

2   **A.**   Yes.

3   **Q.**   And it's true sometimes when you speak to people about

4   Harvard admissions, you do so in generalities that might not

5   be completely accurate.  Is that fair to say?

6   **A.**   Do you have an example in mind?

7   **Q.**   I think we're going to get to one.  What I'm trying to

8   help you with -- what I'm trying to say is, do you sometimes

9   speak about Harvard admissions at sort of a level of

10  generality, like maybe what we just saw with Mr. Gilman, that

11  doesn't tell the complete truth or the complete picture?

12  **A.**   When I speak about Harvard admissions, I speak about it

13  accurately in the context of the people -- as I understand

14  the context of the people I'm speaking with.

15  **Q.**   And that includes the statement to Ted Gilman, "We look

16  for the people with the most promise for the future, and we

17  make every decision on the basis of achievement."

18          You believe that Harvard College makes every

19  admission decision on the basis of achievement; is that

20  right?

21  **A.**   We make every admission decision on the basis of

22  achievement and a good many other factors as well.  I think

23  there's no decision we make to admit someone that does not

24  include a measure of achievement.

25  **Q.**   What's the Z list?

1    **A.**   The Z list is shorthand for a list of people for whom at

2    the end of each cycle -- this has been true in recent years;

3    I can't tell you when it began -- are people who we wish to

4    admit and for whom we do not offer a place for the coming

5    year.  We may not have room.

6              It is a list of people who are admitted but for a

7    subsequent year.

8    **Q.**   And about how many people get in off the Z list each

9    year?

10   **A.**   Several dozen.  It has varied somewhat from year to year.

11   I can't tell you precise numbers.

12   **Q.**   Is one factor considered on whether to admit an applicant

13   under the Z list is whether they're a child or relative of a

14   major donor?

15   **A.**   We take lots of things into account in decisions not just

16   for the Z list but at other times, and that may be in a given

17   case something that is considered by the committee, yes.

18   **Q.**   You take lots of things into account.  But one of the

19   things you might take into account in putting somebody on the

20   Z list is whether the applicant is a child or relative of a

21   major donor; is that correct?

22   **A.**   It may be part of a strong case, and it may help us

23   decide to admit the person.

24   **Q.**   Can it be part of a terrible case?

25   **A.**   It could be part of a terrible case.  But that person is

1   unlikely to be admitted, in my experience.

2   **Q.**   We'll talk about that in a second.

3           Can somebody's being a celebrity or the daughter or

4   son or relative of a celebrity be a reason that they get on

5   the Z list?

6   **A.**   What do you mean by "celebrity"?

7   **Q.**   Oh, I don't know.  Movie star or somebody who is big in

8   business, whatever you think.

9   **A.**   I can recollect no such case.  But I can't tell you that

10  it's never happened.

11  **Q.**   Could somebody's relationship to perhaps a politician be

12  a reason that they get on the Z list?

13  **A.**   Not in and of itself.

14  **Q.**   Could it be one of the many things you look at when

15  deciding to put somebody on the Z list?

16  **A.**   Without having a case in mind, I suppose it could.

17  **Q.**   Now I need to get into some subjects, some things out of

18  the way, and they're going to involve some of your other

19  emails.  And I want to get something clear.  I am sure that

20  sometimes you've written emails never ever thinking they were

21  going to come out in a public setting like this.  Isn't that

22  right?

23  **A.**   That's true.

24  **Q.**   I think that's true frankly of all of us.  So what I'm

25  going to try to do is we're going to turn off the gallery

 1    screen now, if that's okay, Your Honor, and I'm going to talk

 2    to you about Plaintiff's Exhibit 257 in your binder.

 3              MR. LEE:  Your Honor, we have no objection to the

 4    screen being turned on.  I think it suggests more with the

 5    screen off than to let --

 6              THE COURT:  Hold on a second.  Let me just read it.

 7              MR. MORTARA:  I'm happy to turn the screen on if

 8    Director McGrath wants it on.

 9              THE COURT:  Why don't we leave that up to Director

10    McGrath.  I'm fine with it on the screen.  You're fine with

11    it on the screen.  Why don't you take a look at it and see

12    what your preference is.

13              THE WITNESS:  Thank you for that, Your Honor.  I

14    will take the advice of my counsel.

15              MR. MORTARA:  And you would like it displayed.

16              THE WITNESS:  I would defer to their advice.  I

17    have no objection.

18              THE COURT:  Displayed?

19              MS. ELLSWORTH:  Yes.

20              THE WITNESS:  Thank you.

21    BY MR. MORTARA:

22    Q.  Director McGrath, now what we have on the screen, in the

23    middle of the screen is an email written I think by you,

24    July 24, 2013, at 8:44 a.m.  Do you see all that?  And it's

25    signed "X, Mum."  Do you see that?

1    **A.**  I do.

2    **Q.**  I'm going to get into the content of this.  This is an

3    email exchange you had with your daughter; is that right?

4    **A.**  That's correct.

5    **Q.**  And your daughter is involved in the Harvard D.C. Club;

6    is that right?

7    **A.**  Yes.

8    **Q.**  She interviews candidates for admission as part of

9    Harvard's alumni interviewing program, right?

10   **A.**  Yes.

11   **Q.**  And down at the bottom, this starts off with a forwarded

12   message from David Evans to a bunch of redacted email

13   address, subject line, "Wait-list applicant offered a Z."

14          Do you see that?

15   **A.**  Yes, I do.

16   **Q.**  Who is David Evans?

17   **A.**  David Evans is my colleague who was one of the admissions

18   officers who handles candidates from D.C., from the greater

19   D.C. area.

20   **Q.**  "Just a note to inform you that the admissions offered

21   so-and-so of so-and-so a Z; that is, a place in the class of

22   2018."

23          That's a notification that someone was offered a Z

24   list acceptance, correct?

25   **A.**  Yes.

 1   **Q.**  And then up above, from context I think you can tell this

 2   is an email from your daughter to you.  Can you tell that

 3   from context?

 4   **A.**  Yes, I can tell that from context.

 5   **Q.**  Your daughter says, "This is interesting.  I am not a

 6   huge fan of the mother who just started interviewing for us a

 7   couple of years ago.  Harvard really cleaned up even before

 8   this at" -- redacted -- "and I'm not sure he was terribly

 9   strong."

10         Do you see that?

11   **A.**  I do.

12   **Q.**  And then you respond to your daughter right here.  And

13   the first thing, very first thing you say is what?

14   **A.**  "Terrible case."

15   **Q.**  This is a terrible case that got admission off the Z

16   list, right?

17   **A.**  Well, "terrible case" may refer to the case itself.  I

18   don't recall doing this email, though I have no doubt that

19   it's mine.

20   **Q.**  You were asked about -- excuse me.  Go ahead.

21   **A.**  It may also have referred to the terrible situation of a

22   mother on the inside but not on the inside.  But I actually

23   don't know.  But yes, I see those words and that's what I

24   wrote.

25   **Q.**  And to be fair to you, you saw this document at your

1    deposition, right?

2    **A.**  I did, yes.

3    **Q.**  And the next sentence says, "We did it entirely for

4    contingent reasons" -- "We did it for entirely contingent

5    reasons."  Do you see that?

6    **A.**  I do.

7    **Q.**  What were the entirely contingent reasons, if you

8    remember them?

9    **A.**  I don't remember them from memory.  I think that it was

10   what was described in the email below, an alum mother who was

11   also involved in the schools committee.

12   **Q.**  So it was the influence of a Harvard alum got this

13   terrible case admitted that your daughter said was not sure

14   he was terribly strong; is that right?

15   **A.**  It may have been taking into account the mother's

16   involvement.  I don't know for certain.

17   **Q.**  Director McGrath, I really hate to do this.  Did you

18   suggest earlier that the "terrible case" comment may have had

19   something to do with this applicant's mother or the

20   situation?

21   **A.**  I don't remember what it was referring to.  I was giving

22   you a sense of what it might refer to.

23   **Q.**  Your daughter then criticizes the mother of this

24   applicant, correct?

25   **A.**  I only have in front of me her email, and that's what she

1    seems to be doing.

2    **Q.**  And you respond to that criticism at the top, correct?

3    **A.**  Yes.

4    **Q.**  All right.  I'll put that down.

5         Do you agree that what's being communicated here is

6    that Harvard has let in a candidate who was not terribly

7    strong, for whatever you described as contingent reasons,

8    correct?

9    **A.**  I don't see anything here that suggests that the

10   candidate had no strengths.

11   **Q.**  Your daughter told you that her belief was that the

12   candidate was not terribly strong, correct?  She said that?

13        MR. LEE:  Your Honor, I'm going to object.  This

14   has gone way beyond the point of being relevant.  It has

15   nothing to do with discrimination against Asian-Americans.

16        MR. MORTARA:  Your Honor --

17        THE COURT:  I think he's trying to impeach the

18   witness.

19        MR. MORTARA:  There is that.

20        MR. LEE:  With her daughter's statement.

21        MR. MORTARA:  That's not being offered for the

22   truth.  It's being offered for what it said.

23        And Your Honor, part of our case is that Harvard is

24   not entirely truthful about its admissions process, including

25   that it is totally meritocratic.

**JA1371**

1          THE COURT:  I will give you some latitude on it,

2     but you are pushing the edges of it.  I think you made your

3     point with this email.

4          MR. MORTARA:  I'm going to move on, then, Your

5     Honor.

6          THE COURT:  Go ahead.

7     BY MR. MORTARA:

8     Q.  I want to talk to you about staff interviews.  How are

9     staff interviews offered to applicants?

10    A.  How are staff interviews offered to applicants?  In

11    several ways.  They are offered or have been in some years on

12    a first-come, first-serve basis typically during the summer.

13    They are also offered from time to time in certain

14    circumstances.  Shall I describe one?

15    Q.  Sure.

16    A.  A candidate who's coming from a long distance or an area

17    of the country where we think there will not be an alumni

18    interview available.  We interview people or speak with

19    people sometimes when they have parents who are involved and

20    they would like their child to come by and meet an admissions

21    officer.

22          There are various other kinds of times when we see

23    candidates interviewed by staff in our office.  Also they can

24    be interviewed elsewhere; when staff are traveling, often we

25    meet people.

**JA1372**

1    **Q.**  Would it be particularly accurate to say staff interviews

2    come on a first-come, first-serve basis?

3    **A.**  The first case I mentioned, yes.  We post a certain

4    number of available interviews and members of the public may

5    sign up for them in advance.  That was the first example I

6    gave.

7    **Q.**  About how many of these staff interviews take place in a

8    given admit cycle, in a given year?  Would 500 sound about

9    right?

10   **A.**  To be honest, I don't -- I can't give you a number and I

11   can't confirm that one.

12   **Q.**  So who organizes all the staff interviews?  That's under

13   admissions, right, where you're in charge?

14   **A.**  It is under admissions.  And my staff use their judgment

15   about people from their area visiting.  Sometimes we have to

16   assign someone who happens to be in the office and available.

17   I keep no tally, and I don't arrange most of them myself.

18   **Q.**  Do you do any of them?

19   **A.**  I don't do interview-interviews.  I do meet people from

20   time to time, but I don't substitute for an official

21   interview.

22   **Q.**  How about this:  Are there thousands of staff interviews

23   in an admit cycle?

24   **A.**  I don't think so, but I don't -- I can't confirm that.  I

25   can't deny it.  I don't know.

1    **Q.**  Would you be comfortable with maybe there's hundreds?

2    **A.**  Probably.

3    **Q.**  All right.  It's going to be a small percentage of the

4    applicants that get a staff interview, right?

5    **A.**  Thousands or tens of thousands of people have an official

6    interview, an alumni interview, as part of the application

7    process.  So that would be a much larger number, yes.

8    **Q.**  I'm talking about staff interviews.

9    **A.**  I understand.  But you said a percentage of, which is why

10    I mentioned the larger number that includes -- that adds up

11    to the large number of interviews we offer.

12    **Q.**  Sure.  Let me try to make sure we're getting a clear

13    record here.

14            Most people, the vast majority of applicants to

15    Harvard do some kind of interview, right?

16    **A.**  Most people who apply have an alumni interview.

17    **Q.**  A very small portion of the applicant pool interview with

18    a member of your staff, right?

19    **A.**  Yes.  A much smaller number.

20    **Q.**  And on your website, you talk about staff interviews,

21    right?

22    **A.**  I think we do.

23    **Q.**  Do you want me to refresh your recollection?  I have it

24    right here.

25    **A.**  Fine.

Case: 19-2005    Document: 00117638237    Page: 666    Date Filed: 07/30/2020    Entry ID: 6356615
Case 1:14-cv-14176-ADB   Document 636   Filed 04/18/19   Page 178 of 261

178

 1            MR. MORTARA:  Your Honor, may I approach the

 2    witness?

 3            THE COURT:  Of course, yes.

 4    **A.**  Thank you.

 5    BY MR. MORTARA:

 6    **Q.**  And this is just from your website, and I'm putting it up

 7    on the screen.  And it says "Have a conversation with an

 8    alumni interviewer."

 9            Do you recognize this from your website?

10    **A.**  Yes, now that I see it, I do.

11    **Q.**  And it says, "We also offer a limited numbered of

12    on-campus interviews from September through November."

13            Do you see that?

14    **A.**  Yes.

15    **Q.**  And does that refresh your recollection about how you

16    advertise interviews?

17    **A.**  Yes.

18    **Q.**  And you see here that there's an encouragement to do the

19    official local interview.  Do you see that?

20    **A.**  Yes.

21    **Q.**  And that's because space is scarce for the staff

22    interview, right?

23    **A.**  Yes.

24    **Q.**  What's the admission rate for somebody that gets one of

25    these scarce staff interviews?

**JA1375**

1    **A.**  I have no idea, I'm sorry to say.

2    **Q.**  Would it surprise you in any way if I told you the

3    admission rate for people who come on campus and interview

4    with one of your staff is over 50 percent?

5    **A.**  No.

6    **Q.**  Do you have any reason to dispute that that might be the

7    rate, that it might be over 50 percent?

8    **A.**  I have no reason to dispute that.

9    **Q.**  And that would sort of make sense, right, if you meet

10   somebody on the admissions staff and impress them, then you

11   kind of have an internal advocate within the process, right?

12   **A.**  I don't think that's the effect.  I don't think that's

13   the explanation.

14   **Q.**  What's your general admission rate, Director McGrath?

15   **A.**  About 5 percent.

16   **Q.**  So if I'm right -- and we'll put on the evidence later in

17   the case.  I don't want to bother you with it now if you

18   don't have it off of the top of your head.

19          But if the evidence shows that people who get staff

20   interviews get admitted 50 percent of the time and your

21   general admit rate is 5 percent, it means doing a staff

22   interview is pretty helpful, right?

23   **A.**  I don't think you can conclude that it was the having of

24   the interview that made the difference.

25   **Q.**  Let's talk about the people that get interviews.  You

1    were here for my opening, right?

2    **A.**   I was.

3    **Q.**   And you heard me say, and I think you might have heard

4    Mr. Lee say something similar, about 5 percent of your

5    applicant pool are in the recruited athletes, legacies,

6    dean's list, and children of faculty or staff group.  Would

7    you agree with that?

8    **A.**   Yes.

9    **Q.**   And they make up about 30 percent of the admitted class.

10    You agree with that, too, right?

11    **A.**   I have no reason to doubt that.

12    **Q.**   What percentage of the people that get staff interviews

13    are in that ALDC group?

14    **A.**   I don't know.

15    **Q.**   You don't know if they're overrepresented in the group

16    that do staff interviews?

17    **A.**   If who --

18            MR. LEE:  I'm going to object to the question

19    because I don't know what "overrepresented" means.

20            MR. MORTARA:  I was about to explain.  Can I

21    explain, Your Honor?

22            THE COURT:  Yes.

23    BY MR. MORTARA:

24    **Q.**   So they're 5 percent of the general applicant pool.  Are

25    they more than 5 percent of the people that get staff

1    interviews?

2    **A.**  I don't know what the number is.

3    **Q.**  Would it surprise you that nearly half of the staff

4    interviews your office does are from athletes, legacies,

5    dean's list, and the children of faculty or staff?

6    **A.**  I think that's possible.  I can't dispute that.

7    **Q.**  And you wouldn't have any reason to dispute that

8    20 percent of all the ALDC applicants get these staff

9    interviews.  Would you have any reason to dispute that?

10   **A.**  No.

11   **Q.**  And that would be compared to about 1 percent of the

12   regular non-ALDC applicants.  You wouldn't have any reason to

13   dispute that either, would you?

14   **A.**  I would not.

15   **Q.**  Does that seem like a first-come, first-serve system to

16   you?

17   **A.**  What's described here on this website is one group of

18   on-campus interviews which are available to the general

19   public.  Earlier I tried to suggest that we do, in addition

20   to that, a number of in-person interviews as needed, in their

21   broad definition for that, of people who are in town who we

22   need to see or who wish to see us and who we're able to see.

23          That's not the same thing as the thing that I think

24   is being described on this website.

25   **Q.**  This is kind of what I meant earlier.  What you put on

Case: 19-2005    Document 00117638237    Page: 670    Date Filed: 07/30/2020    Entry ID: 6356615
Case 1:14-cv-14176-ADB   Document 636   Filed 04/18/19   Page 182 of 261

182

1   your website is a general statement to the public about

2   interviews, right?

3   **A.**   Yes.

4   **Q.**   Then there's something else.  There's interviews you can

5   get in other ways that are not advertised, correct?

6   **A.**   Yes.  There are interviews we do in other ways?

7   **Q.**   And some of the other ways that you can get interviews is

8   if you're the child or relative of a donor; is that right?

9   **A.**   That may happen.  It does happen.

10   **Q.**   And some of the other ways you can get interviews are,

11   for instance, you set aside a quota of interviews for

12   recruited athletes for each team.

13   **A.**   We do interview a number of athletes for each team, and

14   we do have a target number for that, yes.

15   **Q.**   You have a set-aside number of interview slots for

16   recruited athletes?

17   **A.**   Yes.  We have a number we agree on not doing more than,

18   yes.

19   **Q.**   And you can even get an interview outside of the

20   September-to-November timeframe that you tell the world on

21   the website you can get one if you're in one of these special

22   categories, right?

23   **A.**   Yes.

24   **Q.**   I want to talk more about your holistic admissions.  And

25   that word comes in part from Supreme Court opinions.  You

1   recognize the word, right, Director McGrath?

2   **A.**   Yes.

3   **Q.**   Harvard's been a part of making that word into our

4   Supreme Court law, I think.

5   **A.**   Yes.  I do recognize the word.

6   **Q.**   We've heard a lot -- I wish I wasn't going to say the

7   word *Bakke* because I almost think I'm going to have a

8   response to it, but we've heard a lot about *Bakke* and you've

9   read *Bakke*, haven't you?

10  **A.**   Yes.

11  **Q.**   I understand you're not a lawyer.  I'm not going to try

12  to test your legal acumen, but you've also read the *Grutter*

13  decision, right?

14  **A.**   Yes.

15  **Q.**   I want to just read you a sentence from *Grutter*, not to

16  ask for legal view but to ask you if it reflects Harvard's

17  college admissions.  This is about the Michigan law school.

18          "The law school engages in a highly individualized

19  holistic review of each applicant's file, giving serious

20  consideration to all the ways an applicant might contribute

21  to a diverse educational environment."

22          Does Harvard consider all the ways an applicant

23  might contribute to a diverse educational environment?

24  **A.**   We consider all the ways that we're aware of in which

25  that would be true.

1    **Q.**  Right.  Because of course something that somebody never

2    tells you and is internal to them and you don't know, and

3    they might contribute in some way you never expected, right?

4    **A.**  That's right.

5    **Q.**  One of the aspects of a person that you consider when

6    you're looking at all the ways you can that an applicant

7    might contribute to a diverse educational environment is that

8    person's race or ethnicity, right?

9    **A.**  Yes.

10   **Q.**  Now, Director McGrath, you would agree with me that

11   someone's religion can be as or even more important than

12   their race, wouldn't you?

13   **A.**  Important for what purpose?

14   **Q.**  Important to them.  Important to what they'll teach

15   others.  I'll get into a few examples in a second.

16        But you agree it can be as important to them, for

17   example?

18   **A.**  It certainly could, yes.

19   **Q.**  For instance, I'm white, I'm of somewhat Italian

20   extraction, but I'm also Roman Catholic.  And it might be

21   more important to me that I'm Roman Catholic than it is what

22   my skin color is, right?

23   **A.**  Yes.

24   **Q.**  Now I want to talk about religious diversity.  An

25   applicant might not choose to mention their religious

1   background in their essays, but it still might be something

2   they would bring to Harvard's pluralistic community, right?

3   **A.**  Yes.  Right.

4   **Q.**  I want to use an example based on me.

5           So imagine a young white gentleman from -- young

6   man from Milwaukee.  He goes to college where his best

7   friends are a Muslim, Hindu, and a Catholic.  You agree it's

8   possible that both the identity of those three friends as

9   well as their religious background could really add to this

10  suburban Milwaukee boy's experience, don't you?

11  **A.**  Yes.  I would agree.

12  **Q.**  And this would be true even though the three friends just

13  checked boxes on their application and didn't mention their

14  own ethnicity or their religious preferences anywhere, right?

15  **A.**  Yes.

16  **Q.**  And the Muslim fellow for instance could be a Pakistani

17  or Arab, but maybe the most profound way in which he was an

18  educator of the young boy from Milwaukee is that he was a

19  Muslim.  That's not implausible, is it?

20  **A.**  No, it's not implausible.

21  **Q.**  He's Pakistani, by the way.

22          The Catholic fellow could be Polish-American or

23  Filipino, but maybe the most profound way in which he was an

24  educator of me was that he was Catholic and my confirmation

25  sponsor when I converted in college.  Is that possible?

Case: 19-2005   Document 00117682237   Page: 674   Date Filed: 07/30/2020   Entry ID: 6356615
Case 1:14-cv-14176-ADB   Document 636   Filed 04/18/19   Page 186 of 261

186

1    **A.**   Yes, that's possible.

2    **Q.**   He's Filipino.

3            So religion can be very important to who someone is

4    and what they bring to the community and whether they'll be a

5    great educator of others.  Would you agree with that?

6    **A.**   I would agree that that's possible.

7    **Q.**   But Harvard does not track the religious identity of

8    applicants, do you?

9    **A.**   No, we do not track them.

10   **Q.**   And your paper and online application systems do not

11   allow you to even see the self-proclaimed religious identity

12   of an applicant, correct?

13   **A.**   Correct.

14   **Q.**   That's the case even though there's a place on the common

15   application for religion, self-proclaimed religion, correct?

16   **A.**   Correct.

17   **Q.**   There's a place for it on the application.  Some

18   applicants provide their religious information, and you

19   choose to ignore it by not even having it transfer to your

20   system, correct?

21   **A.**   We have done that on the advice of counsel in

22   Massachusetts.  We are in Massachusetts.

23   **Q.**   Are you suggesting to me that the reason that Harvard

24   does not look at the religious persuasion of its applicants

25   is because its lawyers told them it might be illegal to do

1    so?

2    **A.**  I did not say that Harvard does not look at the religious

3    persuasion of our applicants.

4    **Q.**  Harvard chooses to ignore the self-proclaimed religious

5    affiliation of applicants who provide that information on the

6    common application because that's the advice of counsel.  Is

7    that what you said?

8    **A.**  I would not say that we ignore what we do know, which

9    will not be the information on that box you're referring to.

10          We do take into account, as we say we do,

11   everything we can learn about an applicant.  We do not track

12   or preserve the answer given to that opportunity to check a

13   box.

14   **Q.**  It's not just track or preserve, ma'am.  You don't even

15   allow it to transfer to your system.  Your admissions

16   officers don't see it.

17          MR. LEE:  It's been asked and answered and she said

18   it was on advice of counsel because of Massachusetts law.

19   BY MR. MORTARA:

20   **Q.**  I just want to clear up one thing, which is that it's not

21   just that you don't retain it.  It's that you don't see it.

22   **A.**  We don't see it.

23          MR. LEE:  Right.

24   BY MR. MORTARA:

25   **Q.**  How is that looking at the whole person if you can't see

Case: 19-2005      Document: 00117628237      Page: 676      Date Filed: 07/30/2020      Entry ID: 6356615
Case 1:14-cv-14176-ADB   Document 636   Filed 04/18/19   Page 188 of 261

188

1    something that's as important as religion?

2              MR. LEE:  Your Honor, on the checking the box, she

3    said why they don't transfer the information.  She just said

4    three times they'll look at the information if they find it

5    out otherwise.  There's no foundation for this question.

6              THE COURT:  That's what I understand she's saying.

7    They don't transfer it from the common app.  They don't track

8    it from the common app.  But if it appears elsewhere in the

9    application, they --

10             MR. MORTARA:  They can look at it.  That's

11   completely my understanding to that --

12             THE COURT:  If you're trying to make that point,

13   I've already got the point.  If you're trying to make a

14   different point, ask the question and then I'll decide

15   whether or not it's going to be --

16             MR. MORTARA:  All right.  I'll try to make the

17   point through a question rather than directly to Your Honor.

18             THE COURT:  Perfect.

19   BY MR. MORTARA:

20   Q.   Is this a significant obstruction in looking at whole

21   applicants that you're not able to see their self-proclaimed

22   religious identity in the box checking?  Not in an essay.  I

23   understand if somebody writes "I'm a Catholic and it's really

24   important to me," for instance, I would have written "I'm an

25   atheist and maybe I'm going to meet somebody that's going to

 1    convert me to become a Roman Catholic" or whatever.

 2            You can take into account what they're writing

 3    about themselves in their essays.  You do that, right?

 4    **A.**   Yes.

 5    **Q.**   Okay.  I'm just talking about the fact that you're not

 6    allowed to, for whatever reason, look at someone's

 7    self-identified religion, I am Roman Catholic, I am Muslim.

 8    I am Hindu.  Just in the checking of a box or filling out of

 9    a form, that's the common app.  You got that distinction in

10    your head?

11    **A.**   Yes.  I want to be sure that I understand your question

12    when it comes to, again --

13    **Q.**   Do you consider that to be a significant obstacle in

14    evaluating whole people, that you are not allowed to think

15    about their self-proclaimed religious identity unless they've

16    written about it elsewhere in their application?

17    **A.**   We have not considered that to be a disadvantage.

18    **Q.**   Would you consider it to be a disadvantage if you

19    couldn't consider their race?

20    **A.**   Would I consider it to be a disadvantage if we couldn't

21    consider their race?

22    **Q.**   It's the exact same question.  So I just asked you about

23    religion in the box and if you can't consider that is that an

24    obstacle.  And you said we haven't considered it a

25    disadvantage.

```
 1    A.  We find it an advantage to be able to consider race.

 2    Q.  Right.  But you said it's not a disadvantage that you

 3    can't do religion the same way, right?

 4          MR. LEE:  No.

 5    A.  I did say that.

 6          MR. LEE:  I object to "in the same way."  What are

 7    we talking about?  Checking the box or what's in the

 8    application now?

 9          MR. MORTARA:  Your Honor, that's not even an

10    objection.  I got instructed on this yesterday.

11          THE COURT:  Yes.  It's not an objection.

12          MR. LEE:  I object.  The question is vague and

13    ambiguous because we don't know what he's talking about.

14          THE COURT:  You can just rephrase the question.

15    BY MR. MORTARA:

16    Q.  We'll keep working on this until we get it right.

17          MR. LEE:  You know, Your Honor, there is a limit.

18          THE COURT:  Skip the narrative.  Ask the question.

19    BY MR. MORTARA:

20    Q.  There is a box or there's a form on the common

21    application where someone can say "I am Roman Catholic."  Do

22    you understand that?

23    A.  Yes.

24    Q.  Harvard doesn't look at that answer.  They're not -- they

25    don't do it, for whatever reason, right?
```

**JA1387**

1    **A.**  Correct.

2    **Q.**  Forgetting about what people say on their essays and all

3    that, I asked you do you find it to be a disadvantage that

4    Harvard doesn't get that information about self-proclaimed

5    religious identity from the common application.  And you said

6    we don't find it to be a disadvantage.  Do you remember that?

7    **A.**  Yes.

8    **Q.**  My question is, would Harvard find it to be a

9    disadvantage if they couldn't consider race?

10   **A.**  I think we would.

11   **Q.**  In the same way, on the box in the application.  So it's

12   different between religion and race.  That's your testimony?

13   **A.**  Yes.

14   **Q.**  Why is it different?

15   **A.**  Because we have, as you're aware, a practice of giving

16   special consideration to ethnic identity as submitted on

17   those check box materials.

18   **Q.**  But you have that special practice of considering ethnic

19   identity in order to get the educational benefits that flow

20   from racial diversity, right?

21   **A.**  That's correct.

22   **Q.**  Are there educational benefits that flow from religious

23   diversity?

24   **A.**  Yes.

25   **Q.**  So why isn't it a disadvantage that you can't consider

Case: 19-2005    Document: 00117682235    Page: 680    Date Filed: 07/30/2020    Entry ID: 6356615
Case 1:14-cv-14176-ADB   Document 636   Filed 04/18/19   Page 192 of 261

192

1   the self-proclaimed religious identity of someone who puts

2   that in on the common application?

3   **A.**   When we know it as provided through the other aspects of

4   the candidacy, we may well consider it.

5   **Q.**   This is my point.  You say it's not going to be a

6   disadvantage that you don't get to see what someone puts in

7   the box on religion, right?

8   **A.**   Yes.

9   **Q.**   But it is going to be a disadvantage if you can't see

10  their race?

11  **A.**   We have found it helpful to know what racial identity a

12  student has given us.

13  **Q.**   Would you find it helpful to know the religious identity

14  a student give you?

15  **A.**   When it is disclosed to us in the application, we often

16  find it helpful.

17  **Q.**   Would you find it helpful if you carried through the

18  information from the common application, just like you carry

19  through the information about race from the common

20  application?

21  **A.**   I can't tell you whether we would or not, but we don't.

22  **Q.**   You could choose not to carry through the information

23  about race on the common application, just like you've

24  elected to not carry through the information about religion,

25  right?

```
 1    A.   We have made that choice with the advice of counsel.
 2    Q.   I don't want to know why you made the choice.
 3              My point is you could make the choice not to carry
 4    through that information about race, just like you've made
 5    the choice for whatever reason not to carry through that
 6    information about religion, correct?
 7    A.   Yes, that choice could be made.
 8    Q.   You don't even have a hunch as to whether or not a
 9    race-blind admissions process would be beneficial or
10    detrimental to diversity on campus at Harvard; isn't that
11    right?
12    A.   I have a hunch that we would have a different college
13    without taking that factor into account.
14    Q.   You don't have a hunch as to whether it would be
15    beneficial or detrimental, do you?
16    A.   I do.
17    Q.   Could you please turn to your deposition?  I'm going to
18    get it for you because you don't have it yet.
19              MR. MORTARA:  Your Honor, may I approach?
20              THE COURT:  Yes.
21              MR. LEE:  Which one?
22              MR. MORTARA:  We've got it all in one.  It's
23    consecutive.  When I use a page, you'll know which one.
24    BY MR. MORTARA:
25    Q.   Would you turn to page 255, Director McGrath, and let me
```

Case: 19-2005    Document 00117632237    Page: 682    Date Filed: 07/30/2020    Entry ID: 6356615
Case 1:14-cv-14176-ADB   Document 636   Filed 04/18/19   Page 194 of 261

194

1   know when you're there, ma'am.

2   **A.**   I'm there.

3   **Q.**   At line 21 it says, "Do you have a view as to whether or

4   not a race-blind admissions process would be beneficial or

5   detrimental to diversity on campus?"

6           Your lawyer objected.  Go ahead and answer if you

7   can.

8           You asked your own question, "As the director of

9   admissions?

10          "QUESTION:  Yes."

11          And this is your answer to the question.  "I don't

12  know whether it would.  I can't -- I don't have a hunch on

13  that."

14          Do you see that?

15  **A.**   I do.

16  **Q.**   That was your sworn testimony in this case, right?

17  **A.**   That's right.

18  **Q.**   I want to talk to you about Harvard's historical use of

19  race, just very briefly.  Does Harvard use race in its

20  college admissions process more than it did 15 years ago?

21  **A.**   I don't think so, no.

22  **Q.**   Does Harvard use race less today in its admissions

23  process than it did 15 years ago?

24  **A.**   No, I would not say that.

25  **Q.**   So the use of race in Harvard's admissions process has

1    maintained a steady state over the last 15 years.  Is that
2    about right?
3    **A.**   That is my sense.
4    **Q.**   I want to shift focus now to other aspects of the
5    admissions process.
6                  Before the full committee, the docket subcommittees
7    have already decided who to affirmatively bring up in full
8    committee; is that right?  Correct my language if I'm wrong.
9    **A.**   Would you mind repeating the question?
10   **Q.**   Sure.  There's something called a docket subcommittee.
11   Dean Fitzsimmons was here.  There's something called a docket
12   subcommittee.
13   **A.**   Yes.
14   **Q.**   They produce a list of candidates they want to bring up
15   at full committee.  Is that kind of the way to say it?
16   **A.**   Yes.
17   **Q.**   And before the full committee, those docket subcommittees
18   have decided who they're going to bring up in the full
19   committee, right?
20   **A.**   Yes.
21   **Q.**   Now, at the beginning of the full committee meeting, you
22   discuss the relative breakdown of applicants by race,
23   correct?
24   **A.**   Yes.
25   **Q.**   And at the same time, you and Dean Fitzsimmons actually

1    know the racial makeup of not just the applicant pool but

2    also of those who have been passed out of the subcommittee,

3    right?

4    **A.**   Yes.

5    **Q.**   And the reason you get that information is that it's

6    interesting to you and Dean Fitzsimmons to see what the shape

7    of the group appears to be as it's shaping up, right?

8    **A.**   Yes.

9    **Q.**   And if you or Dean Fitzsimmons saw the numbers coming out

10   of subcommittee showed a particular racial group was

11   underrepresented, you'd talk about it and give it attention,

12   right?

13   **A.**   Yes.  But our typical practice is at that juncture and

14   with that information in hand to give the entire committee an

15   overview of the proportions, the shape of the class as it's

16   shaping up along several dimensions, including race.

17   **Q.**   Now, after the full committee has voted, there's some

18   fine-tuning of the decisions because you'll still have too

19   many admits, right?

20   **A.**   Typically at the beginning of the full committee process,

21   we have some number of applicants in various categories,

22   physical sciences, geography, race and so on.  And those are

23   usually the total number and the total -- we're adding a lot

24   of people, and we're also taking away a lot of people.  So

25   those are very preliminary numbers, and we typically end up

 1    at the end of the process with more people than we have total

 2    in front of you us in that one-pager.

 3    Q.  And so there's some fine-tuning that has to take place,

 4    right?

 5    A.  You can call it fine-tuning, yes.

 6    Q.  If there was a group that was surprisingly or notably

 7    underrepresented, you'd go back and look at those cases,

 8    whether it be engineers or whether it be a racial group,

 9    correct?

10    A.  We might or might not.  Depending on the strength of the

11    cases and the area people's sense of their own cases that

12    might not at that point have yet been admitted or proposed

13    for admission.

14    Q.  What's the sufficient level of specificity the office

15    uses for what constitutes good representation of the class?

16    A.  Well, we don't have a formula or numbers, and we don't

17    have a formulaic way of describing that.  We mostly want

18    people to understand where we are then and to take a look at

19    where we are going ahead.  It doesn't necessarily change the

20    proportions.  It may.

21    Q.  When you say where we're going then and where we're going

22    ahead, that's last year's numbers were X and this year's

23    numbers look like it's Y.  Let's look carefully the these

24    people?

25    A.  No.  What I meant is that people have a sense of where

1    the class is headed at the moment in the context, often, of

2    last year's numbers.  And they're at this moment going back

3    and preparing cases to present again or to strengthen, to

4    confirm to keep in the class.  It's a piece of information

5    that may help area people.

6              And it also helps us as we fine-tune the final

7    total target number.  We do have one target number in our

8    process which is the number of beds in the freshman class.

9    And to yield that number we have to determine or project a

10   total number of candidates to admit.  And that chart may help

11   us do that.

12   Q.  And that clarity is the one-pagers that show all sorts of

13   information, including race?

14   A.  Yes.

15   Q.  Now, your goal is to make sure that you're not having a

16   dramatic drop-off in some group from a certain level that you

17   had last year, right?

18   A.  That's not really a goal.  It's something we would like

19   to be aware, but it's not a goal to prevent it.

20   Q.  Could you look at your deposition at page 269, Director

21   McGrath.

22   A.  Yes.

23   Q.  And at line 11 there's a question and quite a lengthy

24   answer, and I will read the entire answer.  I want to start

25   with the question and the beginning part of the answer.

1          "Is there anything specific about last year's

2     statistics that makes sense, or is the goal to simply ensure

3     there is not too great a deviation from year to year?

4          "ANSWER:  The goal is to make sure -- the goal

5     is -- a goal is to make sure that we're not having a dramatic

6     drop-off in some group who we did at a certain level with

7     last year.  And because the numbers I referred to tell you

8     how many applicants that there are this year, if we're not,

9     you know, underconsidering, as it were, applicants who seem

10    to be admitted or at a higher level this year than we seem

11    likely to do.  We're looking at dramatic differences in a

12    short period of time.  Just as we think about hearing cases

13    at the end, we're talking about this in the context of

14    individual cases, just how members of" -- I think that should

15    be "this" -- "his ethnic group are doing, is this a strong

16    case or perhaps underweighted."

17          Do you see that?

18    **A.**  Yes.

19    **Q.**  And that was your sworn testimony?

20          MR. LEE:  Actually, I think you misread it.  It

21    says "we're looking for dramatic differences."

22          MR. MORTARA:  Thank you, Mr. Lee.

23          MR. LEE:  And you missed the end of the answer

24    which says "is this a strong case that was perhaps

25    underweighted," and the rest is "or is it just not a very

 1   good case, period."

 2   BY MR. MORTARA:

 3   **Q.**  And then the next question is, "The goal at the end of

 4   the day is to avoid a dramatic drop-off among minority

 5   representation within a particular class on any given year?

 6           "ANSWER:  A goal would be to avoid it by

 7   inadvertence or lack of care.  Some things can't be avoided."

 8           Do you see that?

 9   **A.**  And that's what I should have said in the first place to

10   your question, your initial question, previous question.

11   **Q.**  That's no problem, Director McGrath.

12           You remember we were talking about the Unz article,

13   and it was published in late 2012, right?

14   **A.**  Yes.

15   **Q.**  And you remember that David Brooks mentioned it in the

16   New York Times in December 2012, do you?

17   **A.**  Yes, I do.

18   **Q.**  And you got some email and some discussions about Unz.

19   We've already looked at one of them.

20           But you also got some emails and discussions about

21   the Unz article in the early 2013 timeframe, right?

22   **A.**  Yes.

23   **Q.**  We'll get into that in a little bit.

24           But in that early 2013 timeframe, data about

25   whether Harvard's admissions process was discriminating

1   against Asian-Americans would have been interesting to you?

2   **A.**   The press coverage of it was of interest to us.

3   **Q.**   But would data about whether or not Harvard's admissions

4   process was discriminating against Asian-Americans been

5   interesting to you at that time?

6   **A.**   It would be of interest to us to know what was being

7   published.  Yes.

8   **Q.**   I don't mean to quibble with you.

9   **A.**   Yes.

10  **Q.**   I'm just talking about you.  I want to just talk about

11  you.

12          Would data about whether or not Harvard's

13  admissions process was discriminating against Asian-Americans

14  been interesting to you in early 2013?

15  **A.**   If I understood the data, yes.  I'm always interested to

16  look at data.

17  **Q.**   And of course, in the course of this case you became

18  aware that in 2013 Harvard's 's Office of Institutional

19  Research had done some work related to this topic, correct?

20  **A.**   No, I was not aware of that.

21  **Q.**   Are you aware today of work that the Office of

22  Institutional Research was doing in January, February of 2013

23  to analyze whether Harvard's admissions process was biased

24  against Asian-Americans?

25  **A.**   I have become aware of those data and that work during

1    the course of preparation for this trial.

2    **Q.**  And to be clear, you did not see reports or PowerPoints

3    or memos from OIR on this subject matter in 2013, did you?

4    **A.**  I have seen from time to time and had seen from time to

5    time data they had produced for various questions.  I frankly

6    don't remember on what topics.  They have done research for

7    the president for a long time.

8    **Q.**  But you did not see -- you personally did not see any

9    reports or PowerPoints or memos from OIR purporting to

10   analyze the question of Asian-American discrimination in

11   early 2013, did you?

12   **A.**  You know, I'm not sure what I saw in what year, but I

13   don't recollect that.

14   **Q.**  And you don't remember having any discussions with Dean

15   Fitzsimmons about that work back in early 2013, do you?

16   **A.**  About which?  About OIR's work?

17   **Q.**  About the work that you've become aware of through the

18   course of preparing for this trial that OIR did on the

19   subject of Asian-American discrimination.

20   **A.**  I do not recollect anything back then that we discussed.

21   **Q.**  Can you think of any reason today why Dean Fitzsimmons

22   would not have included you in the loop with respect to work

23   that OIR was doing on admissions?

24   **A.**  I don't know why he didn't.

25   **Q.**  I want to go back to that November 28 email chain,

1    Plaintiff's Exhibit 220.

2              MR. MORTARA:  And I haven't offered it yet, Your

3    Honor.  I am going to offer Plaintiff's 220 now.

4              MR. LEE:  I thought it was offered.  This is the

5    one with the hearsay within the hearsay.

6              MR. MORTARA:  That's my fault.  I forgot it's been

7    offered and admitted against the hearsay uses that I said I

8    wasn't going to make.  Sorry about that, Mr. Lee.

9              THE COURT:  I'm not sure it ever was moved in.

10             THE CLERK:  Yes, it was.

11             THE COURT:  I didn't have it marked off either.

12   Karen did.

13   BY MR. MORTARA:

14   **Q.**  And looking back at your email -- thank you, Ms. Folan.

15             Looking back at your email, we can agree it's a

16   fair thing to say in your email response to Mr. Gilman that

17   the thrust of your email is you don't agree with what Unz is

18   saying, right?

19   **A.**  I don't take the question of the data on directly in that

20   email.  I introduce some variables that I think would make it

21   hard to interpret them very simply.  I certainly don't

22   provide other data that are better or more accurate.

23   **Q.**  I perhaps made the question a little bit more complicated

24   than I should.

25             You don't agree with the thesis of the Unz article,

1    do you?

2    **A.**  No, I don't.

3    **Q.**  Right.  And now I want to clear up something that's in

4    the email.

5         It says, "The only numbers we disclose to the

6    public are in our regular press releases, and we furthermore

7    provide to IPEDS and to the census bureau and related federal

8    offices.  None of them would support the more crazy

9    speculations here, though some of it is correct."

10        And I wanted to give you an opportunity and maybe

11   the next couple sentences would help to explain what you

12   thought was correct about the Unz article.

13   **A.**  You know, I actually don't remember it.  I do remember it

14   was a busy time, and I remember reading this quite quickly.

15   I probably should not have seemed to confirm that it was

16   correct.  I did say that.

17   **Q.**  Thanks for that clarification.  I want to focus you on

18   the paragraph above where you say, "One can argue endlessly,

19   and people do, about the criteria they wish to use for

20   Harvard admission."

21        Do you see that?

22   **A.**  Yes, I do.

23   **Q.**  Sorry.  Were you finished?

24   **A.**  Yes.

25   **Q.**  You said several times that many, many people attempt to

Case: 19-2005    Document 00117688237    Page: 698    Date Filed: 07/30/2020    Entry ID: 6356615
Case 1:14-cv-14176-ADB    Document 636    Filed 04/18/19    Page 205 of 261

205

1    lecture Harvard about how they should be deciding who gets

2    in.  I think you said that several times, haven't you?

3    **A.**   Yes, I think I have.

4    **Q.**   Do you consider Students for Fair Admissions to be

5    lecturing Harvard about how it should do its admissions

6    process?

7    **A.**   I'm not sure that I would be quick to use the word

8    "lecturing," but I do know that people have various opinions.

9    **Q.**   And you say, "As you know, these criteria have also been

10    of interest to the OCR and the courts."

11           Do you see that?

12    **A.**   Yes.

13    **Q.**   And the OCR refer to the Office of Civil Rights, right?

14    **A.**   Yes.

15    **Q.**   And down at the bottom it says, "And we have been

16    examined by OCR most fully about 22 years back when we had a

17    full compliance review about Asian-American bias which

18    resulted in a very gratifying finding of approbation.  It

19    appears that that chapter is known to the author."

20           Do you see that?

21    **A.**   Yes.

22    **Q.**   One of the reasons you were comfortable conveying to

23    Mr. Gilman that you thought little of the Unz allegations was

24    that OCR had cleared Harvard previously, right?

25    **A.**   That was part of my context, yes.

1    **Q.**  And you frequently relied on the OCR investigation in

2    discussing the question of Asian-American discrimination with

3    others internally to Harvard and externally.  Is that fair?

4    **A.**  Yes.  From time to time I do.

5    **Q.**  I'd like you to turn now to Plaintiff's Exhibit 225.

6    Plaintiff's Exhibit 225 is another email chain on which you

7    are participating.  Do you see that?

8    **A.**  Yes.

9            MR. MORTARA:  We are going to offer

10   Plaintiff's 225.

11           MR. LEE:  Same thing.  Second page has hearsay

12   embedded in the email.  I assume it's not being offered for

13   its truth.

14           MR. MORTARA:  It is not.

15           THE COURT:  Okay.  With that caveat, it's admitted.

16           (Plaintiff Exhibit No. 225 admitted.)

17   BY MR. MORTARA:

18   **Q.**  And it starts off with an email from our previous

19   participant, Robert D.  Do you see him?

20   **A.**  I do.

21   **Q.**  And he writes to Kathryn Vidra.  Who is she?

22   **A.**  She is a colleague of mine who is in financial aid and

23   admissions and may have, although I can't be certain, been an

24   admissions area person for some area that this Robert D is

25   concerned.  She knows him somewhere, but she's a colleague of

1    mine, a senior colleague of mine in the admissions office.

2    Q.  This is occurring in December 2012.  Do you see that?

3    A.  Yes.

4    Q.  Is it a fair characterization to say Robert is emailing

5    Ms. Vidra, again passing along the Unz article and asking

6    questions?

7    A.  Yes.

8    Q.  And then Ms. Vidra forwards the email to you and Dean

9    Fitzsimmons.  It says, "Hi, WRF" --

10              That's Dean Fitzsimmons, right?

11   A.  Yes.

12   Q.  -- "/Marlyn.  Do we have a response?  Thanks for any

13   advice."

14              Do you see that?

15   A.  Yes.

16   Q.  You don't have any reason to doubt you got this email,

17   right?

18   A.  I have no reason to doubt that.

19   Q.  And then at the top is your response which also copies

20   Dean Fitzsimmons, right?

21   A.  Yes.

22   Q.  Do you see that?  And it says, "Kitty, I have been

23   telling people that that set of views is nothing new, etc.  I

24   often mention that we have had opportunities to show the OCR,

25   the courts, and others how our process works and that the OCR

1   has found us in compliance with the law and with general

2   principles of fairness."

3          Do you see that?

4   **A.**   I do.

5   **Q.**   And again, there you're mentioning the Office of Civil

6   Rights review, right?

7   **A.**   Yes.

8   **Q.**   And down below it says, "Fitz may have more specific

9   talking points to offer, but I have found that a pretty

10  simple response seems to shut up anyone not already loaded

11  for bear, and one can do little with the latter except point

12  out that many people have views about how we should do

13  admissions."

14         Do you see that?

15  **A.**   I do.

16  **Q.**   Did you ever see any talking points that Dean Fitzsimmons

17  drafted in response to the Unz article?

18  **A.**   Did I ever see any?  I don't remember when or what they

19  were, but I think yes, I did.

20  **Q.**   Now I want to talk to you about some correspondence that

21  you were involved with with somebody from outside of Harvard.

22  And I'm going to use Plaintiff's Exhibit 279 which is in your

23  binder.

24         And you recognize this letter to Drew Faust, right,

25  Director McGrath?

1    **A.**  I'm looking at it.  If I could have just a moment.  I'm

2    sorry.  I'm slow here.  I want to be sure that --

3              MR. MORTARA:  Your Honor, could we have an

4    afternoon break?  Because now would be a perfect time.

5              THE COURT:  I could use the break myself.  So why

6    don't we take a 10- or 15-minute break.  What do you want?

7              MR. MORTARA:  15 would be great.

8              THE COURT:  Five past 3:00.

9              MR. LEE:  Your Honor, how late are we going today?

10             THE COURT:  We've done a lot today.  So I am

11   available until 4:00, but I'm happy to stop earlier if you

12   want.

13             MR. MORTARA:  I've got about, I'm going to guess,

14   25 to 30 minutes left.

15             MR. LEE:  I just have to talk to her about her

16   expectations.  She was supposed to get on and off today.  It

17   looks like that's not going to happen.

18             THE COURT:  He says he has another -- say he goes

19   to something like 3:30.  How long do you all think you have

20   with her.

21             MR. LEE:  Can I talk to her?

22             THE COURT:  Yes.  Let me tell you this:  If her

23   schedule, if it means something to her to get off today and

24   we take a break now, I can sit past 4:00.

25             MR. LEE:  Let me talk to her and I'll see what I

Case: 19-2005  Document: 00117628237  Page: 698  Date Filed: 07/30/2020  Entry ID: 6356615
Case 1:14-cv-14176-ADB  Document 636  Filed 04/18/19  Page 210 of 261

210

 1    can do.

 2         MR. MORTARA:  Your Honor, just for the record, if

 3    we can clear up right now, I'd want to move P257 into

 4    evidence.  That was the Z list email.

 5         THE COURT:  257, the emails between her and her

 6    daughter.

 7         MR. LEE:  I'm not sure it's relevant, but we'll

 8    deal with it on cross.

 9         THE COURT:  He's just moving to admit it.  Now it's

10    been shown and discussed.  So I think the prudent thing is to

11    admit it.

12         MR. LEE:  Fine.

13         THE COURT:  I can go as long as we need to today if

14    it's important for her to get off the stand today.

15         MR. LEE:  Can I confer with her about that at the

16    break?

17         THE COURT:  Yes.  Do it at the break and we'll come

18    back at five past, which is now 13 minutes.

19         (Court recessed at 2:53 p.m.)

20         (Plaintiff Exhibit No. P257 admitted.)

21    BY MR. MORTARA:

22    Q.  Hello again, Director McGrath.  When we left, I had asked

23    you to turn to --

24         THE COURT:  Hold on one a second.

25         What do you want to do about scheduling?

```
 1              MR. LEE:  Your Honor, I think we'll see how long
 2      SFFA goes.  Then I'll make a judgment.
 3              THE COURT:  That's fine.  And as I say, I have some
 4      flexibility.  I'll say 5:00 is my outside limit or Joan will
 5      shoot me.
 6              MR. LEE:  I think the likelihood is I won't be able
 7      to get through it, but I'll tell you that as soon as I get
 8      up.  If I can't, we'll suspend at 4:00.  I think she can come
 9      back Monday afternoon.
10              THE COURT:  As I say, I'm happy to go another
11      couple of hours if that makes anybody's life easier.
12      BY MR. MORTARA:
13      Q.  Dr. McGrath, before you left, I asked you to turn to
14      P279, which is a letter from a redacted name to Draw Faust.
15              And my first question is, do you recall having this
16      letter in your files?
17      A.  From preparation for the trial, I recall the letter.  I
18      mean I've seen the letter.  I don't recall it, but I see it
19      now and I've seen it in preparation.
20      Q.  And I'm just going to point out some elements of the
21      letter.  Just first, you understand that this is a letter
22      from what appears to be a self-identified Asian-American high
23      school student to President Faust on the subject the Unz
24      article and the possibility that Harvard was discriminating
25      against Asians, correct?
```

 1    **A.**  Yes.  I see that that's the topic.

 2    **Q.**  It says, "My name is" -- redacted -- "and I am a junior

 3    at" -- redacted.  "Part of our AP English curriculum includes

 4    drafting an activism letter inspired by Thoreau's 'Civil

 5    Disobedience' and Dr. Martin Luther King Jr's 'Letter From

 6    Birmingham Jail.'  I have chosen to write to you, the

 7    president of the Harvard Corporation, because I believe you

 8    may have some authority and can address my concerns about

 9    inequality in Ivy League admissions."

10            Do you see that?

11    **A.**  Yes.

12    **Q.**  And it goes on to discuss concerns about Asian-American

13    discrimination, doesn't it?

14    **A.**  Yes.

15    **Q.**  And this is from April 2014, correct?

16    **A.**  Yes.

17    **Q.**  Would you agree with me this is a very well-written and

18    thoughtful letter?

19    **A.**  Yes.

20    **Q.**  And you were involved in discussing the response to this

21    letter, correct?

22    **A.**  Yes.

23            MR. MORTARA:  And I would offer Plaintiff's 279,

24    Your Honor.

25            MR. LEE:  I'd object to it as it's offered for its

**JA1409**

```
 1   truth.  The fact that it was sent is fine.
 2            MR. MORTARA:  I'm not offering it for the truth.
 3            THE COURT:  That's fine.
 4   BY MR. MORTARA:
 5   Q.  Can you turn now to Plaintiff's 287?
 6   A.  Yes.
 7   Q.  This is an email chain which includes Robin Bernhard and
 8   you and several others.  Do you see that?
 9   A.  Yes.
10   Q.  And it's also from April 2014, correct?
11   A.  Yes.
12   Q.  Do you recognize it?
13   A.  I do from preparation for the trial.
14            MR. MORTARA:  Your Honor, we offer Plaintiff's 287.
15            MR. LEE:  No objection.
16            THE COURT:  Admitted.
17            (Plaintiff Exhibit No. 287 admitted.)
18   BY MR. MORTARA:
19   Q.  And on the second page you can see the first email is
20   from Robin Bernhard to Jeff Neal.  You ultimately are copied
21   in on the chain.  The subject is, "Letter to President Faust
22   from high school student re admissions diversity, April 14."
23            Do you see that?
24   A.  Yes, I do.
25   Q.  "Dear Jeff.  I'm working on a response to the attached
```

1    letter, and Marilyn McGrath suggested that I get in touch

2    with you as you are already dealing with the issue" --

3    blank -- "writes about."

4            Redacted there is, I believe, the student's name.

5    Do you see that?

6    **A.**  Yes.

7    **Q.**  You suggested to Robin Bernhard that she get in touch

8    with Jeff Neal about how to respond to this high school

9    student's essay and letter to President Faust on

10   Asian-American discrimination?

11   **A.**  That's what this is, I have no reason to doubt it.

12   **Q.**  And Jeff Neal, he works in public relations for Harvard,

13   right?

14   **A.**  He did, yes, at this time.

15   **Q.**  And now you can see Mr. Neal's response, which starts on

16   the previous page.  And I'll split it over two on my screen

17   here.

18           Do you see the response from Mr. Neal?

19   **A.**  Yes, I do.

20   **Q.**  At the top he says, "Hi, Robin.  This is a tough one.

21   Seems extraordinarily well-written for a high school

22   student."

23           Do you understand this to be a compliment to the

24   letter?

25   **A.**  I'm only seeing what I'm reading.  I have no idea what he

1    meant.  I can't read his mind.

2    **Q.**  And you see down at the bottom he says, "Frankly, I worry

3    that this letter is a bit of a straw man for the folks

4    seeking to stage anti-affirmative action lawsuit against

5    Harvard."

6            Do you see that?

7    **A.**  Yes, I do.

8    **Q.**  Did you have those same feelings, or did you take the

9    letter at face value?

10   **A.**  I don't remember.  I probably took it at face value.

11   **Q.**  And then in the middle you see Mr. Neal making a comment,

12   "More broadly, Harvard was, in fact, investigated by OCR for

13   just this allegation in the 1980s."

14           Do you see that?

15   **A.**  Yes.

16   **Q.**  That's the Office of Civil Rights again, right?

17   **A.**  I assume so, yes.

18   **Q.**  "OCR found that adjusting for legacy and athletics, the

19   percentage of Asian-American students admitted to Harvard

20   College was in line with what would be expected."

21           Do you see that?

22   **A.**  I do.

23   **Q.**  "That is not a fact that we point to regularly.  Largely

24   many folks would also disagree with our policies around

25   admitting athletes and giving a tip to sons and daughters of

1    alums."

2           Do you see that?

3    **A.**  Yes.

4    **Q.**  It goes on to say, "But it is true that we have been

5    exonerated of these charges that our athletic and legacy

6    admissions policies are perfectly legal and nothing has

7    substantially changed since then."

8           Do you see that?

9    **A.**  Yes.

10   **Q.**  And here, I just want to ask you about "That is not a

11   fact that we point to regularly."

12          Is this an example of what I was getting at in the

13   beginning of our discussion together about how Harvard talks

14   about its admissions process but sometimes doesn't highlight

15   certain features of it?

16   **A.**  I have no idea whether this is an example of that.

17   **Q.**  When you have spoken about Harvard's admissions process,

18   for instance when you were at the Sutton Trust in England,

19   did you talk about Harvard's preferences for legacies?

20   **A.**  I don't remember.  I may have.

21   **Q.**  Do you know whether Mr. Neal had seen anything from the

22   Office of Institutional Research on Asian-American

23   discrimination when he was writing these things in 2014?

24   **A.**  I'm sorry.  I don't know that either.

25   **Q.**  Now, we're just going to get to the part where you get

1   directly involved in the chain.  The bottom email comes from

2   Robin Bernhard.  Who's she?

3   **A.**   She was in the president's office, and she was one of the

4   personnel who handled a good deal of President Faust's

5   correspondence.

6   **Q.**   And she says, "Dear Marlyn.  I'm writing to share Jeff

7   Neal's response below with you in case" -- blank -- "contacts

8   admissions after she gets our letter.  I'll also BCC you on

9   the outgoing."

10          Do you see that?

11  **A.**   I do.

12  **Q.**   You have no reason to doubt you were blind-carboned on

13  the outgoing, right?

14  **A.**   I have no reason to doubt that.

15  **Q.**   In the middle, I want to get to this.  You say, "Sounds

16  just right.  No going on the record.  And we are always happy

17  to give our own dumb answer if she contacts us.  Thanks very

18  much for your care with this.  Best, M."

19          Do you see that?

20  **A.**   I do.

21  **Q.**   And by "dumb answer", you don't mean stupid.  You mean a

22  stock answer to these types of inquiries?

23  **A.**   I mean our simple, basic answer, yes.  Stock answer, yes.

24  **Q.**   Form or stock answer?

25  **A.**   Probably.

1   **Q.**  Did that stock answer when you gave it sometimes include

2   a mention of the OCR investigation by the Department of

3   Education?

4   **A.**  Yes.  And it may in any stock answer.  It certainly was

5   an available idea that was helpful to us.

6   **Q.**  I want you now to turn to Plaintiff's Exhibit 265.

7           MR. MORTARA:  Your Honor, did I offer 287?

8   Ms. Hacker said I did, so I did.

9           THE COURT:  Yes, you did.

10  BY MR. MORTARA:

11  **Q.**  Plaintiff's Exhibit 265 is another email course exchanged

12  between you and your daughter, correct?

13  **A.**  Yes.

14  **Q.**  You were e-mailing your daughter here in her capacity as

15  an alumni interviewer for Harvard, correct?

16  **A.**  Yes.

17          MR. MORTARA:  Your Honor, we offer Plaintiff's 265.

18          MR. LEE:  No objection.

19          THE COURT:  Admitted.

20          (Plaintiff Exhibit No. 265 admitted.)

21  BY MR. MORTARA:

22  **Q.**  And here you are forwarding to your daughter an email,

23  which you see at the bottom, from the Utah schools committee.

24  Do you see that?

25  **A.**  I do.

**JA1415**

Case: 19-2005    Document 00117632235    Page: 797    Date Filed: 07/30/2020    Entry ID: 6356615
Case 1:14-cv-14176-ADB   Document 636   Filed 04/18/19   Page 219 of 261

219

1    **Q.**  Let's just take a look.  This is a January 25, 2014, to

2    Ian Anderson, copy -- is that your email address?

3    **A.**  Yes.

4    **Q.**  Who is Ian Anderson other than the lead singer of Jethro

5    Tull?

6    **A.**  That's new information to me.  The information that I

7    have is my Ian Anderson is my colleague who at this time was

8    serving as area person for the state of Utah.

9    **Q.**  All right.  And what happens here is the Utah schools

10   committee sends you a list of applicants that they have

11   ranked in their order of perception of the applicant's

12   quality for admission to Harvard, correct?

13   **A.**  Yes.

14   **Q.**  And we can see that there's a lot of redactions here.

15   The names are redacted, but the applicants are grouped.  Do

16   you see that?

17   **A.**  Yes.

18   **Q.**  And down below, the committee makes special

19   recommendation of several specific students.  Do you see

20   that?

21   **A.**  Yes.

22   **Q.**  And you forwarded on to your daughter.  "Sending this

23   along for your amusement.  Pure Utah."

24           Do you see that?

25   **A.**  Yes.

Case: 19-2005     Document 00117632237     Page: 708     Date Filed: 07/30/2020     Entry ID: 6356615
Case 1:14-cv-14176-ADB   Document 636   Filed 04/18/19   Page 220 of 261

220

1    **Q.**   What was so funny about this?

2    **A.**   It's part -- this exchange was part of a continuing

3    discussion I've had with the people in Utah actually who run

4    a very elaborate ranking process and a couple of other

5    schools committee chairs around the country who have been

6    trying to learn from Utah's experience.  Elizabeth, my

7    daughter, was one of them.  And I thought it was a good

8    example of what the end product of that was.  So there was a

9    certain continuation of a correspondence in this exchange.

10   **Q.**   And your daughter responds to you, "Ha, ha, ha.  Very

11   thorough," which you probably took to be a recognition of

12   that ongoing conversation you were having with her, right,

13   about the thoroughness?

14   **A.**   Yes, I think so.

15   **Q.**   And then it says, "I also love that the top-tier list is,

16   as you've told me before, all Asians except for a couple."

17           Do you see that?

18   **A.**   I do.

19   **Q.**   You have remarked to your daughter that the Utah

20   committee ranks as their top-tier candidates predominantly

21   Asians, correct?

22   **A.**   I probably have.  I know that I have pointed out

23   repeatedly that the group from Utah is more diverse than

24   people expect it will be.

25   **Q.**   But you know that, for instance, Salt Lake City has a

1    significant Asian population, don't you?

2    **A.**   I do.

3    **Q.**   But you thought your daughter would find it amusing, in

4    part, that the Utah committee had put all Asians at the top

5    of their list?

6    **A.**   I thought it would be notable, yes.

7    **Q.**   Why did you think it would be okay to remark to your

8    daughter on the ethnicity of the top tier of the Utah

9    committee recommendations based exclusively on their race?

10   **A.**   Because it confounds the stereotype that many people have

11   of the population of Utah.

12   **Q.**   Could you now turn to Plaintiff's Exhibit 461.

13   **A.**   Yes.

14   **Q.**   In April of 2012, you were involved in responding to

15   another letter sent to President Faust, weren't you?

16   **A.**   Yes.

17   **Q.**   And before we look at your response which is here in

18   Plaintiff's Exhibit 461, the actual letter is also in the

19   back.  It comes after your response, attached to an email

20   from Andrea Balian.

21          Do you see that?

22   **A.**   Yes.

23   **Q.**   And so Ms. Balian, who is she?

24   **A.**   She's my staff assistant.

25   **Q.**   And you were sent this by Rachel Partin.  Do you see

 1   that?

 2   **A.**   Yes.

 3   **Q.**   From the office of the president?

 4   **A.**   Yes.

 5   **Q.**   It says, "Hi, Marlyn.  President Faust received the

 6   attached letter from an alumnus regarding admissions

 7   practices.  Given the nature of the suggestions, I was

 8   wondering if your office wouldn't mind responding on behalf

 9   of the president.  Let me know what you think."

10           Do you see that?

11   **A.**   I do.

12   **Q.**   What follows from that is a letter from a fairly elderly

13   alum of Harvard, correct?

14   **A.**   Yes.

15   **Q.**   And you recognize all these documents, both your response

16   the email and the letter from the alum?

17   **A.**   I recognize them from preparation for this trial.

18           MR. MORTARA:  Your Honor, we move Plaintiff's 461.

19           MR. LEE:  As long as it's not for the truth.  The

20   Harvard response is fine.  The letter from the alum is

21   definitely not for its truth.

22           THE COURT:  Yes.

23           (Plaintiff Exhibit No. 461 admitted.)

24   BY MR. MORTARA:

25   **Q.**   Let's turn to the letter from the alum.  His name has

223

```
 1    been redacted.  It's dated April 4, 2012.  Do you see that?
 2    A.  Yes.
 3    Q.  It's to President Faust.  And the writer first says that
 4    he's from the Harvard class of 1942.  Do you see that?
 5    A.  Yes.
 6    Q.  And on the second page -- he has a variety of suggestions
 7    about Harvard in the two-page letter, right?
 8    A.  He does, yes.
 9    Q.  And on the second page, I want to blow up some of the
10    suggestions he has.  And he says he's got -- "The reason for
11    my letter is to make comments with regard to the college's
12    admissions policy."
13              Do you see that?
14    A.  Yes, I do.
15    Q.  And down below he says, "Another aspect of the admissions
16    policy should, in my mind, be based on informal quotas."
17              Do you see that?
18    A.  Yes.
19    Q.  And he says, "I think it is also important to have a
20    quota based on religious affiliation and skin color."
21              Do you see that?
22    A.  Yes.
23    Q.  And in a sentence prior to that he says, "I would limit
24    the number of Japanese students to a certain percentage or
25    number."
```

**JA1420**

 1          Do you see that?

 2     **A.**   Yes.

 3     **Q.**   And he says, "None of this, of course, has to go beyond

 4     the confines of the dean's office."

 5          That's the suggestion from this alum?

 6     **A.**   Yes.

 7     **Q.**   Then he says, "The last time I was in Cambridge it seemed

 8     to me that there were a large number of Oriental students,

 9     for example.  I think they probably should be limited to

10     5 percent, as should other criteria."

11          Do you see that?

12     **A.**   I do.

13     **Q.**   You would not call Asian-American students at Harvard

14     Oriental students, would you?

15     **A.**   I never have.  I wouldn't.

16     **Q.**   Neither would I, if I weren't reading this.  So we'll

17     stop doing that now.

18          I want to talk about how you responded to this alum

19     at President Faust -- was it at President Faust's direction

20     or her office's direction that you responded?

21     **A.**   Yes.

22     **Q.**   And I want to talk about your response.  Here it is.

23     April 19, 2012.

24          And you start off with, "President Faust has asked

25     me to respond to your April 4 letter in which you offer many

**JA1421**

1    thoughtful observations about Harvard College students and

2    the results of the admissions process."

3              Do you see that?

4    **A.**   I do.

5    **Q.**   And this wasn't your true thinking about it.  You were

6    being polite, right?

7    **A.**   Thank you.  Yes, it was a polite response to an elderly

8    alumnus.

9    **Q.**   And elderly alumnus making what we I think can all agree

10   are shocking suggestions, correct?

11   **A.**   Yes.

12   **Q.**   And at the end of the letter you say, "All of us at

13   Harvard appreciate your thoughtful letter, as well as your

14   loyalty over the years."

15             Do you see that?

16   **A.**   Yes, I do.

17   **Q.**   Ms. McGrath, I want to explore this only in minor detail.

18   In your view, this was an appropriate response, correct?

19   **A.**   I thought it was of the polite response that I would

20   send.

21   **Q.**   I want to talk about this.  This is just something that I

22   want to just ask you, and I want to do it -- I'm going to try

23   and do it this way:  Do you think in our culture we're more

24   polite about stereotypes about Asians and Asian

25   discrimination than we would be about stereotypes or comments

1    made about other minority groups?  Do you think that that's

2    true in American society?

3    **A.**  I don't.

4    **Q.**  You think we react just as negatively to the use of

5    "Oriental" as we would to the use of the N word?

6    **A.**  Yes.

7    **Q.**  Would this have been an appropriate response if the alum

8    had complained about the number of N words on campus, to

9    thank him for his thoughtful comments?

10   **A.**  I might have sent the same response.  I don't know that

11   it would be a more or less appropriate response.

12   **Q.**  Would you have sent the same response if the alum had

13   complained about the number of Jewish students on campus?

14   **A.**  I can't tell you what I would have done, but I don't know

15   that I wouldn't have also tried to end the correspondence

16   with a perhaps too-polite response.

17   **Q.**  Do you think that we as a society are less sensitive to

18   stereotypes or archaic words being used to describe

19   Asian-Americans than we are to other minority groups?

20   **A.**  I don't think that.

21   **Q.**  I'm going to shift focus now.  I think you've told us

22   about a lot of things that can go in the personal rating in

23   your deposition, right?  And I want to talk to you about some

24   of those.

25        You weren't here, Director McGrath, yesterday,

1    where we had an episode where I had to walk across the

2    courtroom, and I promised the court that I was going to use

3    the computer because my handwriting was terrible.  It was a

4    big waste time in terms of the walking back and forth, at

5    least.

6              I want to ask you if the following list of things

7    are included in analysis of the personal rating.  All right?

8    **A.**  Sure.

9    **Q.**  Is like likability something you look at for the personal

10   rating?

11   **A.**  That might be a factor.

12   **Q.**  What about whether that person is a good person to be

13   around?

14   **A.**  That's possibly part of the consideration.

15   **Q.**  You told us it was part of the consideration, right?

16   **A.**  Yes.

17   **Q.**  What about integrity?

18   **A.**  Yes.  Very important.

19   **Q.**  And helpfulness?

20   **A.**  Yes.

21   **Q.**  What about courage?

22   **A.**  Yes.

23   **Q.**  And kindness?

24   **A.**  Yes.

25   **Q.**  And those are some of the things you told us were

1    involved in the personal rating in your deposition, right?

2    **A.**  Yes.

3    **Q.**  Now, I know you told us that a person's race or ethnicity

4    should not be included in one of the factors that would weigh

5    into the personal rating, right?

6    **A.**  Yes.

7    **Q.**  Your words were "should not," right?

8    **A.**  Should not in itself.

9    **Q.**  You also told us that race or ethnic background is not

10   supposed to be considered in assessing the scores in any of

11   these areas, right?

12   **A.**  Yes.

13   **Q.**  Now I'm going to ask you to refer to Plaintiff's

14   Exhibit 1.

15         MR. MORTARA:  Your Honor, we're going to mark this

16   as plaintiff's demonstrative 22.  We're going to provide a

17   copy just so it's a record of what I put up on the

18   demonstrative.

19         THE WITNESS:  I'm sorry.  Which one are you

20   directing me to?

21   BY MR. MORTARA:

22   **Q.**  Plaintiff's Exhibit 1.

23   **A.**  I got it.

24   **Q.**  Right at the beginning.

25   **A.**  Yes.

Case: 19-2005    Document: 00117638235    Page: 717    Date Filed: 07/30/2020    Entry ID: 6356615
Case 1:14-cv-14176-ADB   Document 636   Filed 04/18/19   Page 229 of 261

229

1   **Q.**  This is your reading guidance, right?

2   **A.**  That's what it's called.  It's called "Reading

3   Procedures."  It really, in fact, is, as you will have seen,

4   I think, a guide to coding.  It's what you take from reading

5   the application and make sure it gets put into the electronic

6   records system.  But it's called "Reading Procedures."

7   **Q.**  And it's got a little bit more than that.

8   **A.**  It does.  But its fundamental thing is it's a how-to

9   note.

10  **Q.**  And also it's got some guidance on how to score things?

11  **A.**  Yes, it does.

12  **Q.**  And you're responsible for the content of this document

13  ultimately?

14  **A.**  Yes, I am.  A group of us develop it every year, change

15  it every year.

16  **Q.**  Please go to the section of the personal rating that's on

17  page 5.

18  **A.**  Yes.

19  **Q.**  Does it say anywhere in this document that race should

20  not be used in assessing the personal rating?

21  **A.**  I do not think so.

22  **Q.**  Now I've got a broader question.

23        Does it say anywhere in the admissions office, in

24  any written form, training material, memo, email, or any kind

25  of writing down to a Post-it on the coffee maker, that race

1    should not be used in the personal rating?  Is it written

2    anywhere?

3    **A.**   In written form, no.  It is the subject of a great deal

4    of discussion and attention in our training process.

5    **Q.**   Did you finish, ma'am?  Sorry.

6    **A.**   I'm finished.

7    **Q.**   And we talked about OCR and your reliance on OCR in

8    communications several times today, right?

9    **A.**   Yes.

10   **Q.**   You reviewed the OCR findings when they cleared Harvard

11   in 1990, correct?

12   **A.**   Yes.

13   **Q.**   Please turn to Plaintiff's Exhibit 555.  Are you there,

14   ma'am.

15   **A.**   I am.

16   **Q.**   Plaintiff's Exhibit 555 is the statement of findings.

17   You're familiar with this document, right?

18   **A.**   Yes.

19   **Q.**   And over on page 15 I want you to focus on the statement

20   at the bottom that is now not displaying properly.  Oh.

21   **A.**   Yes.

22   **Q.**   We'll do our best here.  There we go.  And it carries

23   over -- putting ing on the screen.  Oh, I did it again.  Not

24   as good as Ms. Hacker with this thing.  There we go.

25            There's a statement highlighted on the screen.  I'm

1    going to read the whole thing.  This is part of the OCR

2    investigation.  OCR actually interviewed a bunch of people

3    that worked in the admissions office, right?

4    **A.**  Yes, they did.

5    **Q.**  Were you interviewed?

6    **A.**  Yes, I think I was.

7    **Q.**  And here's one of OCR's findings.  "We found that the

8    readers had several different views as to where and whether

9    Asian-American ethnicity was given positive weight or a tip

10   in the admissions process.  Some readers explained that when

11   ethnicity was deemed to be a significant factor in an

12   application, it was reflected in the POR and during

13   discussions at subcommittee and committee meetings."

14          Do you see that?

15   **A.**  I do.

16   **Q.**  And I understand that to be Harvard's position about how

17   it works today, is that right, that ethnicity or race is

18   reflected in the preliminary overall rating and in

19   discussions?

20   **A.**  Yes.  That it may be, yes.

21   **Q.**  Then it says, "Other readers indicated that ethnicity was

22   a factor considered throughout the entire admissions process.

23   They stated that it could be reflected in the four reader

24   rating areas as well as in the POR and during the

25   subcommittee and committee meeting discussions."

Case: 19-2005    Document: 00117632237    Page: 720    Date Filed: 07/30/2020    Entry ID: 6356615
Case 1:14-cv-14176-ADB   Document 636   Filed 04/18/19   Page 232 of 261

232

```
 1              You see that, right?
 2    A.   I see that, yes.
 3    Q.   And that is in part a reflection of what you say should
 4    not happen which is people using race in assigning the
 5    personal rating, correct?
 6    A.   Yes.
 7    Q.   Now, do you think -- after you read the OCR findings that
 8    maybe it would have been a good idea to develop written
 9    guidance so you could ensure the consistency of people using
10    race in Harvard's admissions process?
11    A.   I did not I think react at the time nor would I now to
12    think that the right remedy for that is more written
13    guidance.
14    Q.   Did you suggest the development of written guidance?
15    A.   I don't believe I did.  I don't remember.
16    Q.   Did anyone?
17    A.   I don't remember following this.
18    Q.   Now, there is approximately 40 members of the admissions
19    committee year in and year out; is that right?
20    A.   Yes.
21    Q.   You do the hiring in the admissions office, right?
22    A.   Yes.
23    Q.   And a lot of your hires are recent college graduates,
24    right?
25    A.   Yes.
```

1   **Q.**  In fact, most of your hires in recent years have been

2   recent college graduates?

3   **A.**  Yes.  The majority probably these days.

4   **Q.**  Now, since you're in charge of hiring, can you give the

5   Court an idea of what the turnover is like in the people that

6   read applications?

7   **A.**  Yes.  We have some very long serving members of our

8   committee.  We also have a cohort of more junior people who I

9   would say typically stay three to six or seven years.  It's

10  hard to generalize, but there's a range.

11  **Q.**  I want to go through -- I want to do a who's still left

12  from the spring of 2011 with you.  If you turn to defendant's

13  Exhibit -- it's not a memory test, Director.  Don't worry.

14  **A.**  Good.  Because I won't get it right.

15  **Q.**  Defendant's Exhibit 25, we're going to go through some

16  together.  And the first thing on defendant's Exhibit 25 is

17  actually a letter.

18  **A.**  I'm sorry.  I want to make sure.  Defense 25.  Yes.

19  **Q.**  I'm trying to move it along because I know you want to be

20  somewhere and I want to be somewhere.  I'm sorry, Director.

21  Please take your time.

22  **A.**  You're sending many he to D25.

23  **Q.**  D25.

24  **A.**  I have that.

25  **Q.**  The first thing is actually a letter.  This document is a

1    massive collection of things.  I'm just going to zoom through

2    it.  It's actually I think from your files and consists of

3    several manila folders.  Do you have recognize some of these

4    documents?

5    **A.**  Yes, I do.  And from preparation for this trial.

6           MR. MORTARA:  Your Honor, we're going to offer

7    Defendant's 25.

8           MR. LEE:  It's in evidence already.

9           MR. MORTARA:  Sorry.

10          THE CLERK:  No.

11          MR. LEE:  Okay.  Then no objection.

12          (Plaintiff Exhibit No. DX 25 admitted.)

13   BY MR. MORTARA:

14   **Q.**  I'd like you to find, it make take you a little while,

15   page 117 of this file of yours.

16   **A.**  Can you tell me on what part of the page the number

17   appears?

18   **Q.**  It's at the bottom, the very bottom.  Do you see DX 025

19   dot and there's a number.

20   **A.**  What's the last number?

21   **Q.**  117.

22   **A.**  That's fine.  I'll have it in a moment.  I have it now.

23   Thank you.

24   **Q.**  What you see here is Admissions Committee Members Spring

25   2011.

1    **A.**   Yes.  Good.  Yes.

2    **Q.**   I want to go through some of these with you.  And we

3    don't have to go through them one by one.  I've tried to do

4    my best to identify who's there and who isn't.  Ian Anderson.

5    He was on the committee in 2011, correct?

6    **A.**   Yes.

7    **Q.**   He's still at the admissions office, correct?

8    **A.**   Yes.

9    **Q.**   Roger Banks was on the admissions committee in 2011,

10   correct?

11   **A.**   Yes.

12   **Q.**   He's still at the admissions office, correct?

13   **A.**   Yes.

14   **Q.**   Valerie Bielensen was on the committee in 2011 but is no

15   longer at Harvard admissions, correct?

16   **A.**   Correct.

17   **Q.**   Okay.  I'm going to cross her name off.  Jessica Clark

18   was on the committee in 2011.  She is still there, correct?

19   **A.**   Yes.

20   **Q.**   Now we go through Monica Del Toro Brown was on the

21   committee in 2011 but is no longer there, correct?

22   **A.**   Correct.

23   **Q.**   The same is true of Sarah Donahue, no longer there,

24   recently retired?

25   **A.**   Yes.

```
1    Q.   And then Devery Doran also no longer there?

2    A.   Correct.

3    Q.   Danielle Early also no longer there?

4    A.   Correct.

5    Q.   Precious Eboigbe also no longer there?

6    A.   Correct.

7    Q.   Ellis Eckhard also no longer there?

8    A.   Correct.

9    Q.   Bronwyn Evans also no longer there?

10   A.   Correct.

11   Q.   Now we'll turn to the second page.  Okay?

12   A.   Yes.

13   Q.   At the top is David Evans.  In 2011 according to this

14   chart he had been there for 41 years; is that right?

15   A.   Yes.

16   Q.   And he's still there, isn't he?

17   A.   He is.

18   Q.   Still at the admissions office.  He was around for the

19   OCR investigation, correct?

20   A.   Yes.

21   Q.   Chad Faeber, he's no longer there, correct?

22   A.   Yes.

23   Q.   William Fitzsimmons, who is he?

24   A.   I think you met him yesterday or I should say Monday.

25   Q.   That was my poor attempt at a joke.  Natalie Galindo,
```

Case: 19-2005    Document: 00117682337    Page: 725    Date Filed: 07/20/2020    Entry ID: 6356615
Case 1:14-cv-14176-ADB   Document 636   Filed 04/18/19   Page 237 of 261

237

1    she's no longer there?

2    **A.**   Correct.

3    **Q.**   Jennifer Gandi no longer there?

4    **A.**   Correct.

5    **Q.**   Rosemary Green, she's no longer there, but she was around

6    for the OCR investigation, correct?

7    **A.**   Correct.

8    **Q.**   Sally Harty is still there, correct?

9    **A.**   Yes.

10   **Q.**   She was around for the OCR investigation?

11   **A.**   Yes.

12   **Q.**   I'm going the wrong way.  Marcy Homer is no longer there?

13   **A.**   Correct.

14   **Q.**   Kaitlin Howrigan is no longer there?

15   **A.**   Correct.

16   **Q.**   Janet Irons still works there, correct?

17   **A.**   Yes.

18   **Q.**   And she was around for the OCR investigation, right?

19   **A.**   Yes.

20   **Q.**   Jonathan Kaufman and Charlene Kim still work in the

21   office, correct?

22   **A.**   Yes.

23   **Q.**   On the next page we start off at the top, Amy Crilcaldi,

24   she's no longer there?

25   **A.**   Correct.

**JA1434**

```
 1    Q.   Sean Logan is no longer there?
 2    A.   Correct.
 3    Q.   Christopher Looby is still working at the admissions
 4    office today?
 5    A.   Yes.
 6    Q.   Mary Magnuson is still at the admissions office?
 7    A.   Yes.
 8    Q.   Christine Mascolo is still at the admissions office?
 9    A.   Yes.
10    Q.   Then there's you?
11    A.   Yes.
12    Q.   Sophia Meeze is still at the admissions office?
13    A.   Yes.
14    Q.   She's gone, I think, sorry.
15    A.   She's gone, yes.
16    Q.   My fault.
17    A.   She's been gone.
18    Q.   Dwight Miller is still at the admissions office and has
19    been there for 44 years in the spring of 2011; is that right?
20    A.   That's right.
21    Q.   And he was around when the OCR investigation happened,
22    correct?
23    A.   He was.
24    Q.   Lucerito Ortiz is no longer there?
25    A.   Right.
```

**JA1435**

```
 1    Q.  The Elizabeth Pabst is no longer there?

 2    A.  Right.

 3    Q.  James Pautz is no longer there?

 4    A.  Right.

 5    Q.  And on the last page Rick Rice is still at the office,

 6    correct?

 7    A.  He is.

 8    Q.  Margaret Swift is no longer there?

 9    A.  No longer.

10    Q.  Kathryn Vidra had been there for 27 years in 2011.  She's

11    still there, correct?

12    A.  Yes.

13    Q.  And she was around for the OCR investigation, right?

14    A.  She was.

15    Q.  And Paris Woods is no longer with the office, correct?

16    A.  Yes.

17    Q.  So we've been through the whole list --

18    A.  And Robin Worth, the last person.

19    Q.  Sorry.  Robin Worth is it still there?

20    A.  Yes.

21    Q.  Sorry.  We've been through the whole list.  There's been,

22    would you agree, a fair amount of turn over in those seven

23    years.  I think I counted 22 out of 39 people are no longer

24    there from seven years ago?

25    A.  Right.
```

**JA1436**

1    **Q.**  You'd agree with me there's a fair amount of turnover,

2    right?

3    **A.**  Yes.

4    **Q.**  I just have a few questions.  Going back to the first

5    page.  Are you certain whether or not Precious Eboigbe was

6    using race in her assignment of the personal rating?

7    **A.**  I cannot be certain of that.

8    **Q.**  You also can't be certain whether Monica Del Toro-Brown

9    was using race in the personal rating?

10   **A.**  I can't be certain.  I have no reason to believe that in

11   either case.

12   **Q.**  But you can't be certain, can you?

13   **A.**  I can't.

14   **Q.**  One of the reasons you can't be sure whether these

15   individuals and others considered race in the personal rating

16   is Harvard had no written guidance on whether to use race in

17   the personal rating?

18   **A.**  No.  The reason I can't be sure is that I haven't seen

19   evidence of it one way or another.

20   **Q.**  You've been reading applications for nearly 40 years,

21   right?

22   **A.**  Yes.

23   **Q.**  Going back to our list of things you told us go into the

24   personal rating.  In your experience do Asian-Americans as a

25   group lack attractive personal characteristics compared to

**JA1437**

1    other applicants?

2    **A.**  Not in my experience.

3    **Q.**  And none of the characteristics that we've talked about

4    have any correlation with race, do they?

5    **A.**  No.  Not per se.  They may be revealed in a racial

6    context, but they have nothing to do with race per se.

7    **Q.**  None of these characteristics we've talked about have any

8    correlation with race, do they?

9    **A.**  No.

10    **Q.**  Thank you.  I have no further questions, Director

11    McGrath.

12              MR. LEE:  Your Honor, in answer to your question I

13    think what I'll do is start and then go until 4:00.

14              THE COURT:  Okay.  If you decide at 4 you're

15    feeling energized and wish to push on, just let me know.

16              MR. LEE:  Okay.

17              THE COURT:  I just missed some of these names.

18    Natalie Galindo still at the office?

19              THE WITNESS:  No, she is not.

20              THE COURT:  What about Marcy Homer?

21              THE WITNESS:  She is not.

22              THE COURT:  Irons?

23              THE WITNESS:  Yes.

24              THE COURT:  Kaufman?

25              THE WITNESS:  Yes.

```
 1                 THE COURT:  And Kim.
 2                 THE WITNESS:  Yes.
 3                 THE COURT:  Sorry.  I just missed a couple.
 4                 THE WITNESS:  Not at all.  Thank you.
 5                          EXAMINATION
 6      BY MR. LEE:
 7      Q.  Actually let me provide one more question.  May I
 8      proceed, Your Honor?
 9                 THE COURT:  Yes.
10      BY MR. LEE:
11      Q.  Mr. Mortara suggested Sally Donahue was no longer
12      involved in admissions; is that correct?
13      A.  She has retired from her professional role.  She will
14      help us in admissions not as a regular staff member, I think.
15      So I just let that go.
16      Q.  And is she still reading folders?
17      A.  I think she will be this fall.
18      Q.  Now, Mr. Mortara began his conversation by suggesting,
19      and I have a quote, "I've read about a thousand of your
20      documents."
21                 Do you remember he said that at the beginning?
22      A.  Of my documents is what he said.  I may have misheard.
23      Q.  Documents.  Now, let's see what he came up with after he
24      read these thousands of documents.  He came up with PX257
25      which is an email chain between you and your daughter,
```

Case: 19-2005   Document 00117682237   Page: 734   Date Filed: 07/30/2020   Entry ID: 6356615
Case 1:14-cv-14176-ADB   Document 636   Filed 04/18/19   Page 243 of 261

243

1    correct?

2    **A.**   Correct.

3    **Q.**   And he came up with PX265 which is another email with

4    your daughter, correct?

5    **A.**   Correct.

6    **Q.**   And he came up with a letter to a 90-year old alum who

7    was making completely inappropriate comments.  That's what he

8    came up with, correct?

9    **A.**   Yes.  Correct.

10   **Q.**   Let's talk about the three things he came up with from

11   these thousands of documents.  The emails between you and

12   your daughter, do you recall PX257, the first one?

13   **A.**   I'll have to remind myself which one it was.

14   **Q.**   It would be on the screen.

15   **A.**   257.  I'd rather look at the -- yes, I see it.

16   **Q.**   This is a document he discussed with you about the Z list

17   email?

18   **A.**   Yes.  Yes.

19   **Q.**   This email exchange between you and your daughter, did

20   you ever expect it to see the light of day in a federal

21   courthouse?

22   **A.**   No, I did not.

23   **Q.**   Now, does the email concern discrimination against any

24   Asian-American applicant at all?

25   **A.**   Not that I can see.

1    **Q.**  Does it concern an Asian-American applicant period?

2    **A.**  Not that I can see.

3    **Q.**  So that's number one of his list.  Let's look at number

4    two, PX265.

5    **A.**  Yes.

6    **Q.**  Do you have that before you?

7    **A.**  I do.

8    **Q.**  This is another email with your daughter, correct?

9    **A.**  Yes.

10   **Q.**  And this is the one on the Utah schools committee,

11   correct?

12   **A.**  Yes.

13   **Q.**  And he asked you specifically about the word "amusement".

14   Do you recall that?

15   **A.**  Yes.

16   **Q.**  Were you criticizing or casting aspersions on any of the

17   applicants mentioned in those emails?

18   **A.**  No, I was not.

19   **Q.**  Did you criticize or cast aspersions on any individual

20   applicant in any of the two emails with your daughter?

21   That's a poor question because it has both.

22          Let's just stay focused on 265.  Did you cast

23   aspersions or criticize any applicant in the emails that are

24   P265?

25   **A.**  No.

 1    **Q.**  Do you understand that SFFA contends and has suggested

 2    these emails somehow suggest that you have a bias against

 3    Asian-Americans.  Are you aware of that?

 4    **A.**  I'm aware of that.

 5    **Q.**  Is that true?

 6    **A.**  No.

 7    **Q.**  Now, let's look at his third document from your thousands

 8    of documents.  It's PX461.  Do you have that?

 9    **A.**  I do.

10    **Q.**  Now, this is a letter from an elderly alum, correct?

11    **A.**  Yes.

12    **Q.**  And do you condone his criticisms of different racial or

13    ethnic groups?

14    **A.**  I do not.

15    **Q.**  Do you condone his suggestion of quotas?

16    **A.**  No.

17    **Q.**  Do you condone the views he expressed about what the

18    Harvard campus should look like?

19    **A.**  No.

20    **Q.**  Would you tell us why you decided to give a 90-year old

21    alum a polite response rather than getting into a war of

22    words with him?

23    **A.**  Because he is a 90-year old alum, and I thought it was a

24    polite institutional thing to do.  And I took a mild and

25    modest stab in paragraph three of my own letter to provide a

1    context in which we do admissions knowing that it wouldn't

2    make any difference to him.

3    Q.   In fact, I wanted to ask you about that.  Would you look

4    at the paragraph that you talked about and go to the third

5    paragraph.  What you say to him is, "Our ambition to educate

6    future leaders has made Harvard appealing to the most

7    talented and ambitious students across America.  As a result

8    the college has been more representative of the ethnic and

9    economic diversity of the country and, the university

10   believes, better positioned to make significant contributions

11   to the country.  We have been pleased by our graduates'

12   success and their leadership in their communities and

13   professions following college."

14              That was part of your response, correct?

15   **A.**   Yes, it was.

16   **Q.**   The polite response that you provided, correct?

17   **A.**   Yes.

18   **Q.**   Now, so we've looked at the three documents that

19   Mr. Mortara asked you about.  Two emails with your daughter

20   and a polite response to an alum, correct?

21   **A.**   Yes.

22   **Q.**   And incidentally, did the alum's letter have anything to

23   do with an Asian-American applicant to Harvard College?

24   **A.**   I do not think so.

25   **Q.**   Let me ask you about a different topic he asked you about

1    now which is religious diversity.  If an application

2    discloses an applicant's religion and discusses the

3    importance of the religion, as Mr. Mortara discussed his with

4    us, would you take that into account in evaluating the

5    application?

6    **A.**  I think we would.  Normally we would.

7    **Q.**  Do students, in fact, disclose that type of information?

8    **A.**  Quite often.

9    **Q.**  Is the Harvard campus a religiously diverse campus today?

10   **A.**  It is very diverse.

11   **Q.**  And have you been able to assemble a religiously diverse

12   class?

13   **A.**  I think we have.  We do not have data on religion.

14   **Q.**  To the extent you have information, is it because

15   applicants have self-disclosed and described the importance

16   themselves, correct?

17   **A.**  Yes.

18   **Q.**  Next topic, and I'm going to come back to going through

19   some of the issues I want to go through with you on a

20   discipline basis.  But I want to before the end of the week

21   take care of a few things Mr. Mortara asked you about.

22          Mr. Mortara asked you about your deposition about

23   alternative ways to achieve racial diversity.  Do you

24   remember that?  The date of the deposition was June 18, 2015?

25   **A.**  Yes.

248

1    **Q.**  And your answers were correct as of that time?

2    **A.**  Yes.

3    **Q.**  Has there been the issuance of a report by race neutral

4    alternatives committee after the date of your deposition?

5    **A.**  I have heard that there was, yes.

6    **Q.**  And that was by the college, correct?

7    **A.**  Yes.

8    **Q.**  Now, let me go and ask you to look at PX220 which

9    Mr. Mortara also asked you about.  I just want to talk about

10   a couple of things that he didn't review with you.  Tell me

11   when you're there.

12   **A.**  220, yes.

13   **Q.**  220.  Do you have that before you?

14   **A.**  I do.

15   **Q.**  Now, he covered some portion of this.  I'd like to sort

16   of complete the picture if we could.  In the email that you

17   actually drafted yourself, that's in the second half of the

18   first page, correct?

19   **A.**  Yes.

20   **Q.**  And I want to be sure first we have the correct reading

21   of the sentence that refers to the OCR report.  Do you see

22   the sentence that reads, "And we have".  We'll highlight it

23   here.

24   **A.**  Yes.  I see that sentence.

25   **Q.**  And would you read that sentence?

Case: 19-2005    Document: 00117628237    Page: 737    Date Filed: 07/30/2020    Entry ID: 6356615
Case 1:14-cv-14176-ADB   Document 636   Filed 04/18/19   Page 249 of 261

249

1    **A.**  "And we have had been examined by OCR most fully about 20

2    years back when we had a full compliance review about

3    Asian-American bias which resulted in a very gratifying

4    finding of approbation.  It appears that that chapter is

5    known to this author."

6    **Q.**  The word is approbation rather than probation, correct?

7    **A.**  Correct.

8    **Q.**  Now, go to the next paragraph.

9    **A.**  Yes.

10   **Q.**  I'm going to bring your attention to the last sentence of

11   your email, and this follows a sentence or two that

12   Mr. Mortara asked you about.  Do you see the portion that

13   reads, "We do not run a single-factor admissions system.  Nor

14   do we have any interest in inner and outer rings, etc.  We

15   look for the people with the most promise for the future and

16   we make every decision on the basis of achievement in the

17   context of what an applicant has done and what he has had,

18   etc."

19          Have I read that correctly?

20   **A.**  Yes.

21   **Q.**  Is that, in fact, true?

22   **A.**  Yes.

23   **Q.**  And has it been consistently true during the period of

24   time that you have been the director of admissions?

25   **A.**  During my time, yes.

1    **Q.**  Director McGrath, you began working at Harvard in what

2    year?

3    **A.**  My first professional job began in 1978.

4    **Q.**  And when did you become the director of admissions?

5    **A.**  In 1987.

6    **Q.**  Do you serve as the chair of any dockets today?

7    **A.**  Yes.  Two dockets.

8    **Q.**  Which dockets are you the chair of?

9    **A.**  B which is the Mountain West, not California.  And the

10   other docket is T which is New York City and Westchester

11   County and Rockland County.

12   **Q.**  What are your duties and responsibilities as the docket

13   chair?

14   **A.**  The chairman of the docket organizes and leads the review

15   of candidates.  I'm the final reader, at least the senior

16   reader, of all of the candidates who will be discussed in the

17   committee.  I do a good deal of work with the alumni who in

18   New York City especially do a lot of recruitment, and we're

19   trying to do more of that in the west.

20          And I also organize and chair and lead the

21   committee discussions of candidates for admission and various

22   other duties as well.

23   **Q.**  When you read applications as the docket chair, do you

24   assign ratings?

25   **A.**  Yes.

1    **Q.**  Has a first reader also assigned ratings?

2    **A.**  Yes.

3    **Q.**  Now, Her Honor has heard a great deal about the ratings

4    from Dean Fitzsimmons.  Let me just ask you a few questions

5    that go to questions Mr. Mortara asked you about.

6            Does Harvard consider the personal qualities and

7    characteristics of the candidates in the admissions process?

8    **A.**  Yes, we do.

9    **Q.**  And why?

10   **A.**  Well, we're aware, for one thing, that we will be

11   bringing into Harvard individual people, not records of

12   achievement.  We want to invest our opportunities in people

13   who have -- seem likely to us -- of course this is a

14   projection.  Who seem likely to us to use their talents and

15   education for the benefit of society.

16           We're really firm about hoping for that and hoping

17   to identify those people.  Personal qualities are part of

18   that calculation on our part.

19   **Q.**  What are the sources of information you use to make that

20   judgment?

21   **A.**  Well, there are a number of sources.  The first one is

22   chronologically in reading a folder, the first one you

23   encounter is the student's own self-presentation, whatever

24   she said in her essay, what whatever she says about her

25   interests, whatever she characterizes as important.  She

1    starts the reading process for us or he, we start where the

2    candidate is.

3            In addition to that there are a number of other

4    sources or voices in the folder.  There are teacher letters,

5    a couple typically, maybe more.  There is a letter from

6    somebody representing the school.  It could be the guidance

7    counselor, the headmaster, whoever writes for students who

8    are heading out.

9            We often have letters in the folder from the rabbi

10   or the boss or the grandfather's best friend or godfather.

11   We have lots of people who feel encouraged to write to us

12   about candidates for admission.  We may have the opinions of

13   coaches, either their coach or our coach, or the music

14   teacher.

15           And we normally have also, we always have, some

16   kind of report from the interviewer, typically the alumni

17   interviewer who helped us.  There may be other voices, too.

18   But there are lots of people from outside the Harvard world

19   who are giving us their impression of any aspect they want to

20   talk about about any candidate.

21   **Q.**  Now, Mr. Mortara asked you some questions about the role

22   of race in the different ratings.  Do you recall that?

23   **A.**  Yes.

24   **Q.**  And I think I wrote down correctly your answer was "race

25   alone" is or is not a factor?

1    **A.**  Yes.

2    **Q.**  The phrase you used was "race alone", correct?

3    **A.**  That was of the phrase I used.

4    **Q.**  Let me ask you these questions.  Does the applicant's

5    race alone factor into the personal rating?

6    **A.**  No, it should not.

7    **Q.**  The does an applicant's race alone factor into any of the

8    profile ratings?

9    **A.**  No, it should not.

10   **Q.**  Does an applicant's race alone factor into the

11   preliminary overall rating?

12   **A.**  It may be a factor, in a good case we may be adding that

13   into our consideration in the overall rating, yes.

14   **Q.**  Now, can experiences of an applicant that are related to

15   race be reflected or believe considered in assigning a

16   profile rating?

17   **A.**  Yes.

18   **Q.**  Can you give us an example?

19   **A.**  Yes.  I'm making this up as I go.  A candidate who was

20   the, let's say, only member of his or her race in a school

21   that was predominantly something else and had felt himself --

22   we actually see a number of these candidates -- who felt

23   himself to be marked throughout his school experience as

24   different from other people, and yet, making up this

25   fictional case, may have been elected school body president,

1    might have been valedictorian and felt watched as he achieved

2    those things, may write about it and help us understand

3    persistence, courage, self-confidence.

4            Sometimes the situation that a student was born

5    into is in his narrative part of his explanation of who he is

6    and who he hopes to be and what he's done already.

7    **Q.**   Now, Mr. Mortara asked you along the same lines whether

8    there were written directives of precisely how to use race in

9    the process.

10           Do you remember that?

11   **A.**   I do.

12   **Q.**   He also asked you some questions about whether you were

13   familiar with some of the Supreme Court decisions?

14   **A.**   Yes.

15   **Q.**   I know you're not a lawyer, but are you familiar with the

16   concept of race being used flexibly and not mechanically?

17   **A.**   Yes, I am.

18   **Q.**   As opposed to according to some directive?

19   **A.**   Right.  Yes, I am familiar with that.

20   **Q.**   So I want to ask you about that.  When you were asked

21   those questions you said to Mr. Mortara that you discussed

22   this quite a bit in training, correct?

23   **A.**   Yes.

24   **Q.**   Does the admissions office provide training for new

25   admissions officers?

1    **A.**   Yes.

2    **Q.**   When does that training start?

3    **A.**   Well, it starts at the beginning.  Their first day of

4    work they're hit with about a month of training in a kind of

5    series of meetings accompanied by an enormous amount of

6    reading.  The first month there is intense.

7    **Q.**   Are there different phases of the training?

8    **A.**   Yes.  So the first month is reading and meeting with

9    people and mastering the various aspects of our business.  I

10   think of the training period -- I think of the first year as

11   being an apprentice year.  I think the first year really does

12   extend -- the first training extends through the year because

13   in a way, our new hires know this, they don't get to do much

14   alone.

15        They read folders, the first 50 folders or so they

16   read are always read by another person after they had read

17   them even if they thought they might not be worthy of further

18   consideration.  During the times that they're in committee

19   that first year, they're pretty intensely monitored by the

20   chair of the committee, perhaps by other committee members as

21   well.

22        When they begin to do their group sessions, which

23   is group information sessions where we recruit people who

24   come to Cambridge and we speak with them in groups, we always

25   make sure at the beginning that there's another staff member

1    there to watch and give feedback.  It's a feedback-giving

2    process.

3    **Q.**  Go ahead.

4    **A.**  So some of the most important parts of what people learn

5    in what I think of as an apprentice year are not the kind of

6    thing that we think can be very effectively taught in

7    something in a handbook.  Things like the handling of race or

8    the handling of character and personality, the interpretation

9    of family circumstances of various kinds, the assessment of

10    very granular skills, that's stuff that we teach people in

11    conversation over that first year.

12           Staff meetings, subcommittee meetings, specific

13    meetings on topics.  We also send around, perhaps too much,

14    but a lot of material to people on topics that are salient to

15    our work.  The first year there is a supervised experience.

16    **Q.**  We're getting close to 4:00.  I want to ask you just a

17    few questions, and then we'll be at a good stopping point for

18    the week.

19           The first is this:  There are written materials

20    that you use for the training, correct?

21    **A.**  Yes.

22    **Q.**  And they include among them the exhibit that Mr. Mortara

23    showed you on how to fill in the numbers, correct?

24    **A.**  Yes, they could.

25    **Q.**  Is there also an interview handbook?

1    **A.**  There is.

2    **Q.**  Is there also case books?

3    **A.**  Yes.

4    **Q.**  Now, as lawyers we're accustomed to being trained by case

5    books.  Are they used to train admissions officers?

6    **A.**  Yes.  They're important.

7    **Q.**  Are there guides to how you use the case books?

8    **A.**  Yes.  There are guides to how to use the case books so

9    that whoever is doing the training can hit all the notes.

10   Yes, there are guides.

11   **Q.**  I'm going to next week take you through each so Her Honor

12   can see the training.

13           Are there written guidelines for admissions

14   officers on how to judge someone's integrity?

15   **A.**  No written guidelines that I can recall.

16   **Q.**  Is there any written guideline on how to judge someone's

17   creativity?

18   **A.**  There are guidelines on the process for getting

19   assessments of that which includes faculty reviews, for

20   example.

21   **Q.**  But in terms of guidelines that tell you specifically how

22   to judge someone's creativity and incorporate it in the

23   process, is there a written guideline?

24   **A.**  Well, my favorite yes response to that, and the only one

25   I can really offer, is a letter that's part of the packet

**JA1454**

1    that we give to new people to discuss is a letter from a

2    member of our faculty, Helen Vendler who writes about less

3    tangible creative aspects.  And that's a very important

4    document forever for our staff to come to grips with.

5    **Q.**  Is there any portion in the handbook that tells someone

6    how to judge someone's grit?

7    **A.**  I don't think so specifically directly.

8            MR. LEE:  Your Honor, this would be a good place to

9    stop and then I can move to the documents on Monday.

10           THE COURT:  Yes, that's fine.  Do you want to start

11   at 9:30 or 10 on Monday?

12           MR. LEE:  9:30 would be great if it's possible.  I

13   know they want to get Mr. Kahlenberg off and on.

14           MR. MORTARA:  9:30 would be preferable.

15           THE COURT:  9:30 is fine.  I think we've moved

16   everything to our afternoon beginning at 3:30.

17           MR. LEE:  I think what's going to happen,

18   Mr. Hughes is going to talk about this briefly.  We'll

19   interrupt Director McGrath, let Mr. Kahlenberg go on and off,

20   and then we'll bring her back to finish.  If that's all right

21   with Your Honor.

22           THE COURT:  That's fine with me.

23           (Court recessed at 4:00 p.m.)

24

25

**JA1455**

```
 1                    - - - - - - - - - - -

 2                         CERTIFICATION

 3

 4          I certify that the foregoing is a correct

 5   transcript of the record of proceedings in the above-entitled

 6   matter to the best of my skill and ability.

 7

 8

 9

10   /s/ Joan M. Daly                 October 19, 2018

11   _____              _____

12   Joan M. Daly, RMR, CRR           Date
     Official Court Reporter
13

14

15

16

17

18

19

20

21

22

23

24

25
```

1                           INDEX OF WITNESSES

2    WITNESS                                                    PAGE

3

     ERICA BEVER
4
         Examination (Resumed) By Mr. McBRIDE...............   7
5        Examination By Ms. Ellsworth......................   14
         Further Examination By Mr. McBRIDE................   66
6

7    ERIN DRIVER-LINN

8        Examination By Ms. Hacker.........................   69
         Examination By Ms. Ellsworth......................  107
9

10   MARLYN MCGRATH

11       Examination By Mr. Mortara........................  155
         Examination By Mr. Lee............................  242
12

13

14

15

16

17

18

19

20

21

22

23

24

25

Case: 19-2005   Document: 00117682237   Page: 749   Date Filed: 07/30/2020   Entry ID: 6356615
Case 1:14-cv-14176-ADB   Document 636   Filed 04/18/19   Page 261 of 261

261

```
 1                          E X H I B I T S

 2
        Defendant Exhibit                              Received
 3
          SA1          ...................................    53
 4

 5

 6

 7      Plaintiff                                      Received
        Exhibit
 8
          P13          ...................................   118
 9
          P17          ...................................    26
10
          P24          ...................................    99
11
          41           ...................................     7
12
          220          ...................................   161
13
          225          ...................................   206
14
          P257         ...................................   210
15
          265          ...................................   218
16
          287          ...................................   213
17
          P288         ...................................    40
18
          P299         ...................................    71
19
          P300         ...................................    74
20
          461          ...................................   222
21
          P604         ...................................    96
22

23

24

25
```

## CERTIFICATE OF SERVICE

I mailed copies of this appendix to the Court and to the following counsel:

William F. Lee
Felicia H. Ellsworth
Andrew S. Dulberg
Elizabeth Connell Mooney
Joseph H. Mueller
WILMER CUTLER PICKERING
HALE AND DORR LLP
60 State Street
Boston, MA 02109
Tel: (617) 526-6687
Fax: (617) 526-5000
william.lee@wilmerhale.com
felicia.ellsworth@wilmerhale.com
andrew.dulberg@wilmerhale.com
elizabeth.mooney@wilmerhale.com
sarah.frazier@wilmerhale.com
joseph.mueller@wilmerhale.com


Dated: February 18, 2020                    *s/ William S. Consovoy*