No. 19-2005

## UNITED STATES COURT OF APPEALS
## FOR THE FIRST CIRCUIT

STUDENTS FOR FAIR ADMISSIONS, INC.,
*Plaintiff-Appellant,*

v.

PRESIDENT AND FELLOWS OF HARVARD COLLEGE,
*Defendant-Appellee.*

On Appeal from the United States District Court
for the District of Massachusetts

## JOINT APPENDIX
## VOLUME V

Adam K. Mortara
J. Scott McBride
Krista J. Perry
BARTLIT BECK LLP
54 W. Hubbard St., Ste. 300
Chicago, IL 60654
(312) 494-4469

John M. Hughes
Katherine L.I. Hacker
Meg E. Fasulo
BARTLIT BECK LLP
1801 Wewatta St., Ste. 1200
Denver, CO 80202
(303) 592-3140

William S. Consovoy
Thomas R. McCarthy
J. Michael Connolly
Cameron T. Norris
CONSOVOY MCCARTHY PLLC
1600 Wilson Blvd., Ste. 700
Arlington, VA 22209
(703) 243-9423
will@consovoymccarthy.com

Patrick Strawbridge
CONSOVOY MCCARTHY PLLC
10 Post Office Sq., 8th Fl., PMB #706
Boston, MA 02109
(617) 227-0548

*Counsel for Appellant Students for Fair Admissions, Inc.*

# TABLE OF CONTENTS

**Volume I**

Docket Sheet ..................................................................................................JA1

Notice of Appeal (Doc. 674) .......................................................................JA106

Complaint (Doc. 1) ......................................................................................JA108

Dispositive Motion Exhibits

    Motion to Dismiss for Lack of Subject-Matter Jurisdiction

        Declaration of William S. Consovoy

            Exhibit I (Doc. 205-9) ......................................................................JA228

    Cross-Motions for Summary Judgment

        Declaration of Felicia H. Ellsworth

            Exhibit 2 (Doc. 419-2) ....................................................................JA230

            Exhibit 85 (Doc. 419-85) ................................................................JA244

            Exhibit 86 (Doc. 419-86) ................................................................JA251

            Exhibit 87 (excerpts) (Doc. 419-87) ..............................................JA254

            Exhibit 88 (excerpts) (Doc. 419-89) ..............................................JA285

            Exhibit 89 (Doc. 419-89) ................................................................JA330

            Exhibit 91 (Doc. 419-91) ................................................................JA347

            Exhibit 92 (Doc. 419-92) ................................................................JA370

        Declaration of Michael Connolly

            Exhibit 237 (Doc. 421-237)............................................................JA399

            Exhibit 238 (Doc. 421-238)............................................................JA418

            Exhibit 239 (Doc. 421-239)............................................................JA425

            Exhibit 240 (Doc. 421-240)............................................................JA427

            Exhibit 241 (Doc. 421-241)............................................................JA431

            Exhibit 242 (Doc. 421-242)............................................................JA434

            Exhibit 250 (Doc. 421-250)............................................................JA436

            Exhibit 251 (Doc. 421-251)............................................................JA440

Trial Transcripts

    Day 1 (Doc. 631) ................................................................................JA443

    Day 2 (Doc. 632) ................................................................................JA630

**Volume II**

Trial Transcripts (cont.)

    Day 3 (Doc. 633) ................................................................................JA722

    Day 4 (Doc. 635) ................................................................................JA952

    Day 5 (Doc. 636) ................................................................................JA1198

**Volume III**

Trial Transcripts (cont.)

    Day 6 (Doc. 638) ................................................................................JA1459

    Day 7 (Doc. 640) ................................................................................JA1690

    Day 8 (Doc. 642) ................................................................................JA1918

**Volume IV**

Trial Transcripts (cont.)

    Day 9 (Doc. 644) ................................................................................JA2163

    Day 10 (Doc. 646) ..............................................................................JA2413

    Day 11 (Doc. 648) ..............................................................................JA2535

    Day 12 (Doc. 650) ..............................................................................JA2752

## Volume V

Trial Transcripts (cont.)

    Day 13 (Doc. 652) ............................................................JA2937

    Day 14 (Doc. 654) ............................................................JA3143

    Day 15 (Doc. 656) ............................................................JA3404

    Closing Arguments (Doc. 666).........................................JA3559

Trial Exhibits

  Plaintiff's Trial Exhibits

    Request for Judicial Notice (excerpts) (Doc. 577).......................................JA3688

    Notice of Deposition Designations Played in Court (Doc. 597-1).............JA3708

## Volume VI

  Plaintiff's Trial Exhibits (cont.)

    PX1 ..................................................................................JA3723

    PX2 ..................................................................................JA3741

    PX9 ..................................................................................JA3742

    PX12 ................................................................................JA3759

    PX13 ................................................................................JA3802

    PX14 ................................................................................JA3845

    PX15 ................................................................................JA3848

    PX16 ................................................................................JA3940

    PX17 ................................................................................JA3941

    PX19 ................................................................................JA3943

    PX21 ................................................................................JA3944

    PX23 ................................................................................JA3948

    PX24 ................................................................................JA3951

    PX26 ................................................................................JA3954

    PX28 ................................................................................JA3963

PX29 .................................................................................................. JA3971

PX35 .................................................................................................. JA3972

PX36 .................................................................................................. JA3979

PX41 (excerpts) ................................................................................ JA3980

PX50 .................................................................................................. JA4002

PX57 .................................................................................................. JA4008

PX68 .................................................................................................. JA4011

PX71 .................................................................................................. JA4012

PX72 .................................................................................................. JA4028

PX75 .................................................................................................. JA4075

PX81 .................................................................................................. JA4079

PX88 (excerpts) ................................................................................ JA4080

PX95 .................................................................................................. JA4084

PX96 .................................................................................................. JA4090

PX99 .................................................................................................. JA4097

PX106 ................................................................................................ JA4109

PX111 ................................................................................................ JA4110

PX147 ................................................................................................ JA4112

PX148 ................................................................................................ JA4113

PX149 ................................................................................................ JA4115

PX150 ................................................................................................ JA4116

PX152 ................................................................................................ JA4124

PX153 ................................................................................................ JA4128

PX154 ................................................................................................ JA4130

PX155 ................................................................................................ JA4131

PX156 ................................................................................................ JA4132

PX157 ................................................................................................ JA4133

PX163 ................................................................................................ JA4134

PX164 ................................................................................................ JA4138

PX165 ................................................................................................ JA4142

PX167 ................................................................................................ JA4145

PX177 ................................................................................................ JA4147

PX182 ................................................................................................ JA4154

PX200 ................................................................................................ JA4156

PX218 ................................................................................................ JA4158

PX225 ................................................................................................ JA4196

PX227 ................................................................................................ JA4199

PX230 ................................................................................................ JA4200

PX236 ................................................................................................ JA4201

PX238 ................................................................................................ JA4203

PX265 ................................................................................................ JA4206

PX279 ................................................................................................ JA4209

PX287 ................................................................................................ JA4212

PX288 (excerpts) .............................................................................. JA4214

PX299 ................................................................................................ JA4382

PX300 ................................................................................................ JA4389

PX302 ................................................................................................ JA4390

PX312 ................................................................................................ JA4412

PX316 ................................................................................................ JA4413

PX319 ................................................................................................ JA4432

PX324 ................................................................................................ JA4449

## Volume VII

Plaintiff's Trial Exhibits (cont.)

PX340 ................................................................................................................... JA4451

PX461 ................................................................................................................... JA4454

PX465 ................................................................................................................... JA4460

PX467 ................................................................................................................... JA4461

PX509 ................................................................................................................... JA4464

PX555 ................................................................................................................... JA4475

PX604 ................................................................................................................... JA4521

PX618 ................................................................................................................... JA4523

PX619 ................................................................................................................... JA4524

PX620 ................................................................................................................... JA4525

PX621 ................................................................................................................... JA4527

PX622 ................................................................................................................... JA4528

PX623 ................................................................................................................... JA4530

PX624 ................................................................................................................... JA4531

PX625 ................................................................................................................... JA4532

PX626 ................................................................................................................... JA4533

PX628 ................................................................................................................... JA4534

PX629 ................................................................................................................... JA4535

PX630 ................................................................................................................... JA4536

PX631 ................................................................................................................... JA4537

PX633 ................................................................................................................... JA4538

PX634 ................................................................................................................... JA4558

PX656 ................................................................................................................... JA4559

PX657 ................................................................................................................... JA4561

PX659 ................................................................................................................... JA4562

PX696 ................................................................................................................... JA4563

PX705 ..............................................................................................JA4564

PX720 ..............................................................................................JA4565

PX721 ..............................................................................................JA4566

PX722 ..............................................................................................JA4585

PX723 ..............................................................................................JA4586

PX741 ..............................................................................................JA4606

PX749 ..............................................................................................JA4607

PX755 ..............................................................................................JA4625

PX767 ..............................................................................................JA4627

Defendant's Trial Exhibits

DX2 ..............................................................................................JA4628

DX3 (excerpts) ...............................................................................JA4738

DX4 ..............................................................................................JA4888

DX5 ..............................................................................................JA4889

DX12 ..............................................................................................JA4936

DX13 ..............................................................................................JA4939

DX19 ..............................................................................................JA4978

DX24 ..............................................................................................JA5031

DX25 ..............................................................................................JA5044

DX26 ..............................................................................................JA5205

## Volume VIII

Defendant's Trial Exhibits (cont.)

DX27 ...................................................................................................JA5244

DX36 ...................................................................................................JA5272

DX39 ...................................................................................................JA5346

DX40 ...................................................................................................JA5376

DX41 ...................................................................................................JA5462

DX42 ...................................................................................................JA5463

DX44 ...................................................................................................JA5479

DX47 ...................................................................................................JA5484

DX53 ...................................................................................................JA5508

DX55 ...................................................................................................JA5546

DX56 ...................................................................................................JA5596

DX60 ...................................................................................................JA5597

DX76 ...................................................................................................JA5598

DX79 ...................................................................................................JA5599

DX80 ...................................................................................................JA5600

DX81 ...................................................................................................JA5601

DX82 ...................................................................................................JA5602

DX83 ...................................................................................................JA5603

DX84 ...................................................................................................JA5611

DX100 ..................................................................................................JA5612

DX103 ..................................................................................................JA5615

DX106 ..................................................................................................JA5617

DX109 ..................................................................................................JA5620

DX119 ..................................................................................................JA5623

DX133 ..................................................................................................JA5633

DX139 ..................................................................................................JA5647

DX669 ................................................................................................JA5684

DX670 ................................................................................................JA5685

DX671 ................................................................................................JA5686

DX672 ................................................................................................JA5689

DX673 ................................................................................................JA5690

DX674 ................................................................................................JA5691

DX677 ................................................................................................JA5692

DX678 ................................................................................................JA5693

DX679 ................................................................................................JA5694

DX680 ................................................................................................JA5696

DX681 ................................................................................................JA5697

DX683 ................................................................................................JA5699

DX685 ................................................................................................JA5701

DX686 ................................................................................................JA5702

DX688 ................................................................................................JA5706

DX692 ................................................................................................JA5711

DX694 ................................................................................................JA5720

DX695 ................................................................................................JA5721

DX699 ................................................................................................JA5722

DX702 ................................................................................................JA5723

DX703 ................................................................................................JA5725

DX704 ................................................................................................JA5726

DX705 ................................................................................................JA5728

DX706 ................................................................................................JA5731

DX707 ................................................................................................JA5732

DX708 ................................................................................................JA5733

DX709 ................................................................................................JA5734

DX711 ................................................................................................JA5735

DX713 ..................................................................................................JA5743

DX715 ..................................................................................................JA5745

DX716 ..................................................................................................JA5746

DX718 ..................................................................................................JA5747

DX720 ..................................................................................................JA5748

DX721 ..................................................................................................JA5749

DX722 ..................................................................................................JA5754

DX723 ..................................................................................................JA5759

DX724 ..................................................................................................JA5764

DX725 ..................................................................................................JA5765

DX726 ..................................................................................................JA5767

DX727 ..................................................................................................JA5772

DX728 ..................................................................................................JA5776

DX729 ..................................................................................................JA5779

DX730 ..................................................................................................JA5791

DX740 ..................................................................................................JA5793

DX742 ..................................................................................................JA5875

DX743 ..................................................................................................JA5892

DX744 ..................................................................................................JA5908

DX746 ..................................................................................................JA5926

## Volume IX

Amici's Exhibits

AO4    ..................................................................................................JA5927

AO6    ..................................................................................................JA5978

AO17 ..................................................................................................JA5979

AO28 ..................................................................................................JA5980

AO31 ..................................................................................................JA5981

Trial Demonstratives

Plaintiff's Demonstratives

PD20 ........................................................................JA5982

PD25 ........................................................................JA5983

PD27 ........................................................................JA5984

PD29 ........................................................................JA5985

PD31 ........................................................................JA5986

PD32 ........................................................................JA5987

PD33 ........................................................................JA5988

PD38 (excerpts) ........................................................JA5989

Defendant's Demonstratives

DD1 (excerpts) ........................................................JA6030

DD10 (excerpts) ......................................................JA6032

DD10A ....................................................................JA6156

DD10B ....................................................................JA6157

DD12 ......................................................................JA6158



1                    UNITED STATES DISTRICT COURT

2                     DISTRICT OF MASSACHUSETTS

3        _____

4        STUDENTS FOR FAIR ADMISSIONS, INC.,

5                       Plaintiff,          Civil Action
                                            No. 14-14176-ADB
6        v.
                                            October 31, 2018
7        PRESIDENT AND FELLOWS OF HARVARD
         COLLEGE, et al.,                   Pages 1 to 206
8
                        Defendants.
9        _____

10

11                 TRANSCRIPT OF BENCH TRIAL - DAY 13
             BEFORE THE HONORABLE ALLISON D. BURROUGHS
12                  UNITED STATES DISTRICT COURT
                  JOHN J. MOAKLEY U.S. COURTHOUSE
13                       ONE COURTHOUSE WAY
                       BOSTON, MA  02210
14

15

16

17

18

19

20                    JOAN M. DALY, RMR, CRR
21                   KELLY MORTELLITE, RMR, CRR
                     Official Court Reporter
22                 John J. Moakley U.S. Courthouse
                   One Courthouse Way, Room 5507
23                       Boston, MA  02210
                     joanmdaly62@gmail.com
24

25

```
 1     APPEARANCES:

 2
       COUNSEL FOR THE PLAINTIFF:
 3

 4           ADAM K. MORTARA, ESQUIRE
             J. SCOTT McBRIDE, ESQUIRE
 5           KRISTA J. PERRY, ESQUIRE
             Bartlit Beck Herman Palenchar & Scott
 6           54 West Hubbard Street
             Suite 300
 7           Chicago, Illinois 60654
             312.494.4400
 8           adam.mortara@bartlit-beck.com
             scott.mcbride@bartlit-beck.com
 9           krista.perry@bartlit-beck.com

10           JOHN M. HUGHES, ESQUIRE
             KATHERINE L.I. HACKER, ESQUIRE
11           MEG E. FASULO, ESQUIRE
             Bartlit Beck Herman Palenchar & Scott
12           1801 Wewatta Street
             Suite 1200
13           Denver, Colorado 80202
             303.592.3100
14           john.hughes@bartlit-beck.com
             meg.fasulo@bartlit-beck.com
15           kat.hacker@bartlit-beck.com

16           JOHN MICHAEL CONNOLLY, ESQUIRE
             THOMAS R. McCARTHY, ESQUIRE
17           WILLIAM S. CONSOVOY, ESQUIRE
             Consovoy McCarthy Park PLLC
18           3033 Wilson Boulevard
             Suite 700
19           Arlington, Virginia 22201
             703.243.9423
20           mike@consovoymccarthy.com
             tom@consovoymccarthy.com
21           will@consovoymccarthy.com

22

23

24

25
```

APPEARANCES (cont.):

        PATRICK STRAWBRIDGE, ESQUIRE
        Consovoy McCarthy Park PLLC
        Ten Post Office Square
        8th Floor, South, PMB #706
        Boston, Massachusetts 02109
        617.227.0548
        patrick@consovoymccarthy.com

        MICHAEL H. PARK, ESQUIRE
        Consovoy McCarthy Park PLLC
        3 Columbus Circle
        15th Floor
        New York, New York 10024
        646.456.4432
        park@consovoymccarthy.com

        PAUL M. SANFORD ESQUIRE
        BENJAMIN C. CALDWELL, ESQUIRE
        Burns & Levinson LLP
        One Citizens Plaza
        Suite 110
        Providence, Rhode Island 02903
        401.831.8330
        psanford@burnslev.com
        bcaldwell@burnslev.com


COUNSEL FOR THE DEFENDANT:

        WILLIAM F. LEE, ESQUIRE
        FELICIA H. ELLSWORTH, ESQUIRE
        ANDREW S. DULBERG, ESQUIRE
        ELIZABETH C. MOONEY, ESQUIRE
        SARAH R. FRAZIER, ESQUIRE
        Wilmer Cutler Pickering Hale and Dorr LLP
        60 State Street
        Boston, Massachusetts 02109
        617.526.6556
        william.lee@wilmerhale.com
        felicia.ellsworth@wilmerhale.com
        andrew.dulberg@wilmerhale.com
        elizabeth.mooney@wilmerhale.com
        sarah.frazier@wilmerhale.com

Case: 19-2005    Document: 00117629240    Page: 16    Date Filed: 03/30/2020    Entry ID: 6356615
Case 1:14-cv-14176-ADB   Document 652   Filed 04/18/19   Page 4 of 206

4

1    APPEARANCES (cont.):

2

3            SETH P. WAXMAN, ESQUIRE
             DANIELLE CONLEY, ESQUIRE
             DANIEL WINIK, ESQUIRE
4            BRITTANY AMADI, ESQUIRE
             PAUL R.Q. WOLFSON, ESQUIRE
5            Wilmer Cutler Pickering Hale and Dorr LLP
             1875 Pennsylvania Ave, NW
6            Washington, DC 20006
             202.663.6006
7            seth.waxman@wilmerhale.com
             danielle.conley@wilmerhale.com
8            daniel.winik@wilmerhale.com
             brittany.amadi@wilmerhale.com
9            paul.wolfson@wilmerhale.com

10           DEBO P. ADEGBILE, ESQUIRE
             Wilmer Cutler Pickering Hale and Dorr LLP
11           7 World Trade Center
             250 Greenwich Street
12           New York, New York 10007
             212.295.6717
13           debo.adegbile@wilmerhale.com

14           ARA B. GERSHENGORN, ESQUIRE
             Harvard Office of the General Counsel
15           Smith Campus Center
             Suite 980
16           1350 Massachusetts Avenue
             Cambridge, Massachusetts 02138
17           617.495.8210
             ara_gershengorn@harvard.edu

18

19    COUNSEL FOR AMICI STUDENTS:

20           JON M. GREENBAUM, ESQUIRE
             BRENDA L. SHUM, ESQUIRE
21           GENEVIEVE BONADIES TORRES, ESQUIRE
             KRISTEN CLARKE, ESQUIRE
22           1500 K Street NW, Suite 900
             Washington, DC 20005
23           202.662.8315
             jgreenbaum@lawyerscommittee.org
24           bshum@lawyerscommittee.org
             gtorres@lawyerscommittee.org
25           kclarke@lawyerscommittee.org

APPEARANCES (cont.):

        LAWRENCE CULLEEN, ESQUIRE
        EMMA DINAN, ESQUIRE
        Arnold & Porter LLP
        555 Twelfth Street, NW
        Washington, DC 20004
        202.942.5477
        gina.dean@aporter.com
        emma.dinan@aporter.com


COUNSEL FOR AMICI ORGANIZATIONS:

        JENNIFER A. HOLMES, ESQUIRE
        CARA McCLELLAN, ESQUIRE
        JIN HEE LEE, ESQUIRE
        MICHAELE M. TURNAGE YOUNG, ESQUIRE
        RACHEL N. KLEINMAN, ESQUIRE
        NAACP Legal Defense and Educational Fund, Inc.
        700 14th Street NW
        Suite 600
        Washington, DC 20005
        jholmes@naacpldf.org
        cmcclellan@naacpldf.org
        jlee@naacpldf.org
        mturnageyoung@naacpldf.org
        rkleinman@naacpldf.org

        KENNETH N. THAYER, ESQUIRE
        KATE R. COOK, ESQUIRE
        Sugarman Rogers
        101 Merrimac Street
        Suite 900
        Boston, Massachusetts 02114
        617.227.3030
        thayer@sugarmanrogers.com
        cook@sugarmanrogers.com

Case: 19-2005    Document: 00117629240    Page: 18    Date Filed: 03/30/2020    Entry ID: 6356615
Case 1:14-cv-14176-ADB    Document 652    Filed 04/18/19    Page 6 of 206

6

1                    P R O C E E D I N G S

2                    (The following proceedings were held in open

3    court before the Honorable Allison D. Burroughs, United

4    States District Judge, United States District Court, District

5    of Massachusetts, at the John J. Moakley United States

6    Courthouse, One Courthouse Way, Boston, Massachusetts, on

7    October 31, 2018.)

8                    THE COURT:  Good morning, everyone.  Happy

9    Halloween.  Give me two seconds.

10                   MR. MORTARA:  We have a very short issue Mr. Waxman

11   and I would like to raise.

12                   THE COURT:  That is fine.

13                   [Sidebar sealed and redacted.]

14                   THE COURT:  When you're ready, Mr. Waxman.

15                   MR. WAXMAN:  Thank you, Your Honor.

16                   Just one housekeeping matter.  I am not clear -- we

17   had offered Defense Exhibit 685, which is at Tab 13, Volume

18   2.  My records don't indicate whether the Court admitted it

19   or not.

20                   MR. MORTARA:  Your Honor, to the extent there needs

21   to be any record on this, no objection.

22                   THE COURT:  All right.  My record shows it's been

23   admitted.  Karen's records.

24                   MR. WAXMAN:  Thank you.

25   EXAMINATION BY MR. WAXMAN: (Continued)

1    **Q.**   Good morning, Professor Card.

2    **A.**   Good morning.

3    **Q.**   I believe that the last question I asked you was whether

4    or not you were concerned that your model was overfitted, and

5    that you said -- do you have any concern, and you said, I

6    don't, no.  Which was then clarified as, I don't, period, no.

7            THE COURT:  I like the whole Oxford comma debate.

8            MR. WAXMAN:  Yes.

9    **Q.**   Why do you have no concern that your model is overfitted?

10           MR. MORTARA:  Your Honor, I object.  We have to

11   return to the sidebar.

12           THE COURT:  Okay.

13           [Sidebar sealed and redacted.]

14   BY MR. WAXMAN:

15   **Q.**   Professor Card, do you recall my last question?

16   **A.**   Yes, I do, I think.

17   **Q.**   So why -- when you said you didn't have any concerns

18   about your model being overfitted, why do you have no

19   concerns?

20   **A.**   Well, the primary interest in my analysis is on the

21   average marginal effect of Asian-American ethnicity.  And

22   with regard to that marginal effect, I don't think that

23   there's any particular problem with, for example, including

24   many, many variables that represent academic strength, for

25   example, even though it might be hard to distinguish the

1    individual contributions of any one of them.

2            So you might say, for example, that if one was

3    focusing on the SAT, it might not be appropriate or might be

4    a concern to worry about them, that particular variable being

5    -- or that set of variables being potentially rather rich.

6            But for my purposes of estimating the effect on the

7    average marginal effect of Asian-Americans relative to

8    whites, which is the entire purpose of this exercise, I'm not

9    worried about that.

10   **Q.**  Let's turn to parental occupation.  And Mr. Lee, can you

11   take us to Demonstrative 10.47.

12           Can you walk us through this, please, Professor

13   Card?

14   **A.**  Yes.  So this is actually a summary of the four main

15   factors that are omitted from Professor Arcidiacono's model,

16   which, I believe, are, in fact, important variables in the

17   admissions process that help inform the way that admission

18   officers evaluate different candidates in terms of their

19   context and how they should be compared against other

20   students.

21           And in each case, the reason why the white sheet to

22   the left is shown, that's the summary sheet that goes along

23   with each application folder and shows kind of a summary of

24   some of the main information about the students, which my

25   understanding is that the admissions officers could easily

 1    refer to quickly to find some of the most salient aspects of

 2    a student.

 3              And in each case, all four of these variables are,

 4    in fact, included on this summary sheet.  So parental

 5    occupation.  A student's intended career, whether or not they

 6    had a staff interview, and, of course, the personal rating

 7    are all included here.

 8              So I'm trying to emphasize that not only are these

 9    variables potentially salient for lots of different reasons,

10    but they're, in fact, directly on the summary sheet.

11    **Q.**  So let's turn to the next demonstrative, 10.48, and talk

12    about parental occupation.

13              Is parental occupation considered in the admissions

14    process?

15    **A.**  Yes.  My understanding from, for example, some of the

16    training materials that are distributed to the interviewers

17    and the case studies mention specifically parental

18    occupation, I actually, in a conversation call with the Dean,

19    actually directly asked him about this because it seemed like

20    it was important, and he strongly confirmed that.  And my

21    understanding is that it is, in fact, part of the process.

22    **Q.**  And did you also hear testimony in this courtroom by

23    admissions officers to that effect?

24    **A.**  Yes, I did.  Mm-hmm.

25    **Q.**  In the field of economics, is occupation considered a

1   useful variable to include in modeling?

2   **A.**   Yes, in both economics and sociology, parental occupation

3   is one of the most important variables for understanding,

4   especially, intergenerational issues; issues of how a

5   family's background might translate to some outcome for

6   children of the next generation.

7           I guess it's no accident that many -- in many

8   cultures last names are based on occupations.  My own last

9   name is actually an occupation.

10          And I think when an admissions officer -- so

11  there's a huge literature on that, in economics and

12  sociology.  And when an officer was thinking about looking at

13  a student, it would be almost inconceivable that they

14  wouldn't think about that as one of the most important

15  variables in putting the students' achievement in context.

16  **Q.**   In reviewing the data, did you determine that parental

17  occupation is one of the variables that varies by race?

18  **A.**   Yes, I did.

19  **Q.**   Please turn to Tab 11 in your binder, Volume 2, and tell

20  me when you've found Defense Exhibit 681.

21  **A.**   Yes.

22  **Q.**   What does this show?

23  **A.**   So it's two slides showing -- or two exhibits showing

24  mother's occupation and father's occupation by

25  race/ethnicity.

1          MR. WAXMAN:  Your Honor, we offer Defense Exhibit

2    681.

3          MR. MORTARA:  No objection.

4          THE COURT:  It's admitted.

5          (Defendant Exhibit 681 admitted into evidence.)

6    **Q.**  Mr. Lee, let's turn to Demonstrative 10.49.

7          And Professor Card, let me ask you what this is

8    showing.

9    **A.**  So this is an illustration -- this is a selected number

10   of mothers' occupations and fathers' occupations.  The way

11   that I've classified them, there's over 20 of each of these,

12   so these are three for mothers and two for fathers that are

13   notably different for white students and Asian-American

14   students.

15         So one place where they differ is in terms of the

16   fraction of the mothers who are elementary and secondary

17   school teachers.  So ten percent of all white applicants,

18   their mother is a -- is that kind of a teacher, or a

19   librarian, where, like, half as many Asian-Americans.

20         In terms of lawyers and judges, four percent of

21   white applicants are -- their mother is a lawyer or a judge

22   versus less than one percent of Asian-Americans.

23         Offsetting that you can see a stark difference in

24   terms of mothers who are in the computer and

25   mathematical-type occupations, which is much, much higher for

1    Asian-American kids.

2           On the father's side, business executive is much

3    more prominent among white applicants versus architecture and

4    engineering for fathers of Asian-Americans.

5    **Q.**  And Professor Card, given that you found that parental

6    occupations varied by race, does that -- does omitting that

7    variable give rise to any concern about omitted variable

8    bias?

9    **A.**  Yes, I think it would be a very important concern.

10          First, recall when we're talking about omitted

11   variable bias, there's really two things that are

12   particularly salient.  One is, does the omitted variable

13   potentially differ by race groups, in this case whites and

14   Asian-Americans, and the answer clearly is yes.

15          And the second is, is that variable itself

16   important in the process.  And the answer, again, is clearly

17   yes.

18          So this is exactly the situation where one would

19   be, I think, extremely concerned that excluding this variable

20   or the set of variables could give rise to omitted variable

21   bias, yeah.

22   **Q.**  Did you hear Dr. Arcidiacono testify that he excluded

23   this variable because of what he says are year-to-year

24   fluctuations?

25   **A.**  Yes.

1    **Q.**  Let's turn to -- I guess it's Plaintiff's Demonstrative

2    38, slide 42.

3          Can you remind us -- this is one of Dr.

4    Arcidiacono's demonstratives.  Can you remind us what this

5    shows?

6    **A.**  So this is showing five occupational categories that

7    Professor Arcidiacono has noted vary somewhat in terms of the

8    fraction of applicants that are classified with their mother

9    or father and in that occupation group from year to year.

10         I would emphasize that most of the other groups are

11   much more stable than this, so these are the ones that he has

12   sort of highlighted as being the problematic ones.

13   **Q.**  And are fluctuations like this common in economic data?

14   **A.**  Yes.  Actually, this kind of problem arises quite often,

15   and I've had to deal with it many times in my own research.

16         For instance, parental occupation is classified in

17   a different way in some of the older data sets that we use,

18   and then one has to try and make a concordance between the

19   way it's classified in one and in another.  And oftentimes

20   that concordance is somewhat incomplete, and there's --

21   that's just an inevitable consequence of the fact that on the

22   one hand, this is a somewhat complicated variable and

23   classification systems change over time.

24         And that's exactly what's -- part of the reason why

25   results that we see here are arising.

1    **Q.**  Let me ask you first.  When you say fluctuations like

2    this in the data that you have to analyze over years in which

3    the system for coding or inputting occupations varies, does

4    this mean that including this data in your model is that the

5    data itself are unreliable?

6    **A.**  No, not at all.  Actually, the same thing happened with

7    the docket.  So the docket changed, they introduced a new

8    docket in one year, and saw a bunch of states and parts of

9    states got moved, and so we have to deal with a change in the

10   classification system.

11          That's what -- you know, that's the kind of thing

12   that one has to do all the time in real research.

13   **Q.**  Mr. Lee, can we have the next demonstrative.

14          And here I'm highlighting a couple of numbers from

15   2014 that Professor Arcidiacono focused on.  Do you see those

16   changes in low-skilled and self-employed?

17   **A.**  I do, yes.

18   **Q.**  Do you know what explains the changes from the 2014 to

19   the 2015 cycle?

20   **A.**  Yes.  So occupations in the NEVO database are -- most of

21   them are coded in one of two types of systems.  It's sort of

22   like the way students' standardized tests are reported in the

23   SAT or the ACT.

24          And so what happens is that in 2014 -- after 2014,

25   one of these systems is used more widely.  And so the set of

1    parents who are coded in this one bucket of low skill goes

2    down.

3            Now, of course, that same kind of information is

4    actually being presented to the application officers or

5    admissions officers, so in some sense, they are dealing with

6    the same process when they're making their evaluation of each

7    student in context.

8    **Q.**  So let me just make sure the record is clear about what

9    you're talking about when you're saying that the applicants

10   in 2014 had one system, which I gather you mean one form of

11   application in which they were given one series of choices to

12   report occupations, and then in 2015, there were two

13   different systems available that -- for applicants to use in

14   order to indicate their parents' occupation.

15           Is that correct?

16   **A.**  There's a switch in the preponderance of the two systems,

17   yes.

18   **Q.**  Okay.  Let's turn to the next demonstrative.  And here

19   I've highlighted a couple of numbers from the classes of 2018

20   and 2019 that SFFA focused on.

21           Do you know what explains the changes from the 2017

22   cycle to those cycles?

23   **A.**  Yes, it's, again, a similar kind of problem.

24           So when one is asking someone their occupation,

25   sometimes the way that's done is one first asks if they have

1    a job; and if they do, they ask if you're unemployed --

2    excuse me, if you're unemployed, they don't ask any further

3    about your occupation, so the occupation then becomes

4    unemployed.

5         Another system that's actually used in most

6    government surveys is if one doesn't have a current job, one

7    is asked about the job they had most recently, and that's the

8    -- that's -- my understanding is that's exactly what's

9    happened here.

10        So, again, this is a kind of thing that would be

11   represented in the data that would be presented to the

12   admission officers themselves.  So they -- I think they would

13   understand or would notice that there's no longer anybody

14   unemployed.

15        Now, of course that doesn't mean that they suddenly

16   got rid of unemployment in the economy for that class.  What

17   it means is that those people -- the information that's being

18   captured in the system has changed a little bit.

19        Because I fit my model separately year by year,

20   this is of no particular consequence because the -- I'm

21   allowing presence of a student's mother or father to be in a

22   certain bucket to have a slightly different effect in

23   different years depending on what kind of classification,

24   who's moved around, exactly like I do with the docket.

25        So before the J docket was introduced, the other

Case: 19-2005    Document: 00117628240    Page: 29    Date Filed: 07/30/2020    Entry ID: 6356615
Case 1:14-cv-14176-ADB    Document 652    Filed 04/18/19    Page 17 of 206

17

 1    dockets are kind of absorbing those students.  Once the J

 2    docket is introduced, that set of students who are in that

 3    docket are treated separately.  The fact we have different

 4    docket coefficients in different years, those variables are

 5    separate and it allows the model to capture that.

 6    **Q.**  And is the effect of fitting your model year to year,

 7    that the model is actually evaluating the parental occupation

 8    choices, indicators that the admissions office itself is

 9    looking at and considering?

10    **A.**  Yeah, largely, yes.

11    **Q.**  Did you do anything else to address the variation in

12    occupation coding systems year by year?

13    **A.**  Yes.  So in response to concerns that Professor

14    Arcidiacono raised, I did a very standard kind of check that

15    one would do in this kind of analysis.  So I took, first of

16    all, the low-skilled type occupations, so some of the

17    low-skilled occupations are amongst the ones that have a --

18    some fluctuations from year to year, and I made that into all

19    one group, a larger bucket across all the years.

20           And then I took the occupations that would include

21    unemployed, homemaker, other and put them in another bucket

22    that's constant across all the years.

23           And I evaluated what would happen to my model if

24    instead of using the slightly more granular information I was

25    to use those two classifications one at a time or together,

Case: 19-2005   Document: 00117628246   Page: 30   Date Filed: 07/30/2020   Entry ID: 6356615
Case 1:14-cv-14176-ADB   Document 652   Filed 04/18/19   Page 18 of 206

18

 1   and the results are extremely similar, virtually identical to

 2   what I get with my main model.

 3   **Q.**  Well, let's look now, if you can, at Tab 12 of -- by the

 4   way, I believe all of these are in Volume 2.  So Tab 12 of

 5   Volume 2.

 6            And let me ask you this, when you've found Defense

 7   Exhibit 683.

 8   **A.**  Yes.

 9   **Q.**  And is this showing the results of the sensitivity check

10   that you just described?

11   **A.**  Yes, there's two sets of sensitivity checks in these two

12   sets of exhibits.  Average marginal effect of Asian-American

13   ethnicity, after parental occupation variables are modified,

14   yes.

15            MR. WAXMAN:  Your Honor, we offer Defense Exhibit

16   683 into evidence.

17            MR. MORTARA:  No objection.

18            THE COURT:  Admitted.

19            (Defendant Exhibit 683 admitted into evidence.)

20   **Q.**  And so looking at Defense Exhibit 683, can you just show

21   what your conclusion was?

22   **A.**  Right.  So --

23   **Q.**  Mr. Lee?  Thank you.

24   **A.**  So recall for -- in my main specification, the one that

25   we've been focusing on, the average marginal effect across

1    all the years was minus 0.05, not statistically significant,

2    and this is minus 0.07, which is essentially a trivial change

3    in the estimated marginal effect.  And the same is true year

4    to year.

5    **Q.**  Let me ask you to suppose that the occupation data were

6    as unreliable as Dr. Arcidiacono has opined.  Would including

7    that data in the regression ruin the results?

8    **A.**  Well, as I -- no.  As I pointed out, I think when we were

9    talking about my hypothetical case of retirement, if you were

10    to include in our regression model some variable that's truly

11    garbage, it's truly, you know, so poorly measured that it

12    just doesn't represent anything useful, that doesn't hurt a

13    regression model.  The regression model will just essentially

14    set that variable to have zero effects on everything and say,

15    well, you've given me garbage so I'm going to give you a zero

16    on that.  And that then does not lead to any change in

17    anything else in the model.  Especially with the kinds of

18    sample size I have here.

19    **Q.**  So to be clear, Professor Card, you included parental

20    occupation in your model, correct?

21    **A.**  I did, yes.

22    **Q.**  Let's talk about intended career and look at

23    Demonstrative 10.53.

24            Is the applicant's intended career considered in

25    the admissions process?

**JA2955**

1    **A.**  Yes.  Again, it's a variable that's included directly on

2    the summary sheet as shown in this slide.  It's also a

3    variable that is -- comes up in discussions in the training

4    materials and case studies.  It's also a variable that I

5    understand from depositions is important in evaluating and

6    comparing different candidates.

7    **Q.**  And is intended career also a variable that varies by

8    race?

9    **A.**  Yes.

10   **Q.**  Would you please turn to Tab 7 in your binder.

11            Do you have it?

12   **A.**  I do, yes.

13   **Q.**  This is Defense Exhibit 677.  And what is this document?

14   **A.**  It's a summary of differences in intended career for

15   Asian-American and white applicants.

16            MR. WAXMAN:  Your Honor, we offer Defense Exhibit

17   677.

18            MR. MORTARA:  No objection, Your Honor.

19            THE COURT:  It's admitted.

20            (Defendant Exhibit 677 admitted into evidence.)

21   **Q.**  Turn, please, to Tab 8 in your binder, the next tab.

22            Do you find Defense Exhibit 678?

23   **A.**  I do, yes.

24   **Q.**  What is this?

25   **A.**  It's a summary of intended concentration for

1    Asian-American and white applicants.

2              MR. WAXMAN:  Your Honor, we offer Defense Exhibit

3    678 into evidence.

4              MR. MORTARA:  No objection, Your Honor.

5              THE COURT:  Admitted.

6              (Defendant Exhibit 678 admitted into evidence.)

7    **Q.**  Please turn to Tab 10 in your binder.

8    **A.**  Yes.

9    **Q.**  What is this document -- well, this is on Defense Exhibit

10   680.

11             And what is it, please?

12   **A.**  This is a summary of primary extracurricular activities

13   by race.

14             MR. WAXMAN:  Your Honor, we offer Defense Exhibit

15   680 into evidence.

16             MR. MORTARA:  No objection.

17             THE COURT:  Admitted.

18             (Defendant Exhibit 680 admitted into evidence.)

19   **Q.**  Mr. Lee, please project Demonstrative 10.54 on the

20   screen.

21             And let me ask you, Professor Card, what does this

22   show?

23   **A.**  Well, this is showing in simple graphical form some of

24   the information contained in those documents that were just

25   admitted.  So it's showing the share of applicants, white and

1    Asian-American, on the average across the six years in my

2    sample who state that their intended careers are medicine or

3    health, science, undecided, government or law, arts,

4    communications, design or social science.  And this is a

5    selection of the possible careers they can list.

6          And you can see that there are some notable

7    differences.  For example, white students are quite a bit

8    more likely to say that they intend to pursue a career in

9    government or law.  They're also more likely to be undecided.

10   They're about equal in terms of their intention to pursue a

11   career in science.

12         And on the other hand, Asian-American students are

13   quite a bit more likely to say that they would intend to

14   pursue a career in medicine or health.

15   **Q.**  So why are these differences on average between the two

16   groups important?

17   **A.**  They're important because Harvard is thinking about

18   trying to get a set of students -- or my understanding, at

19   least, is Harvard is trying to get a set of students who will

20   have lots of diversity.  And I think, for instance, having a

21   large fraction of students who all intend to pursue, for

22   example, a career in medicine would be -- would not

23   accomplish that goal.  So, you know, they want to have

24   students who are, for instance, interested in pure science,

25   applied science, social science, humanities, political

1    science, government, things like that, and so having a too

2    unbalanced class would be a problem, I think.

3    Q.   Mr. Lee, can you please project Plaintiff's Demonstrative

4    38, slide 34.

5           And Professor Card, I'm showing you this from one

6    of the demonstratives that Dr. Arcidiacono projected and

7    discussed.

8           Can you remind us what this shows?

9    A.   Yes.  So this is a selection of some of the intended

10   careers and the numbers of applicants classified as stating

11   that intended career from year to year from Professor

12   Arcidiacono's testimony.

13   Q.   And Mr. Lee, can we have the next demonstrative.

14          I'm highlighting a couple of careers that I believe

15   Mr. Arcidiacono pointed out fluctuated significantly in one

16   or more years.

17          Do you see that?

18   A.   Yes.

19   Q.   And what does it show?

20   A.   Well, it's showing -- this is a -- kind of an interesting

21   example of the kind of thing that happens in any kind of

22   coding system like this.

23          So it seems clear that in 2018, for some reason,

24   medicine was essentially not available.  Now, I should remind

25   you that there are a very small number of students who are

1    filling in applications, pencil and paper and things like

2    that, so there's always, interestingly enough, a very small

3    number of students doing that even in this day.  So you can

4    get rise of a very small number, not a complete zero.

5        But virtually everybody, it seems, that previously

6    would have said they're intending a career in medicine seems

7    to have moved to health.  And you can see that in 2019 it

8    moves back.

9        Now, my understanding is that this is, in fact, the

10   kind of information that, again, the admissions officers

11   would themselves be seeing.  So, and, of course, they know

12   that many, many students are intending a career in medicine

13   so they know that didn't suddenly disappear.  So I think they

14   would fully understand the situation.

15       And so my understanding is that that's all that's

16   happened, is that one bucket has been relabeled.  And, again,

17   because my model is fit year to year with separate variables

18   representing each of these intended careers, the variable

19   that represents health in 2018 is more or less taking the

20   place of the variable that represents medicine in all the

21   other years.  So I think this is, again, not a concern.  This

22   is, again, the kind of thing that arises in lots of other

23   situations, and economists and other social scientists have

24   to deal with and regularly deal with.

25   Q.  So does this, the variation that we see here, give you

1    any greater degree of concern than the fluctuations we

2    discussed in parental occupation categories?

3    **A.**   No, not at all.

4    **Q.**   And to be clear, you included intended career in your

5    model, correct?

6    **A.**   Yes, I did.

7    **Q.**   Now let's talk, switch gears and talk about the staff

8    interview indicator.  And may we have Demonstrative 57,

9    please.

10          What is the -- what is a staff interview again?

11    **A.**   So students who are applying to Harvard can request, at

12    their kind of initiative, an interview with an admissions

13    staff member, an admissions officer.  And my understanding is

14    historically that was done at the campus and nowadays more

15    and more of it is done by Skype interview, but it's entirely

16    a process that's initiated by the student.

17          So the student -- there's information on how you

18    can request such a thing and the student would do that.

19    **Q.**   And why do you include this variable in your model?

20    **A.**   Well, again, there's, first of all, the fact that the

21    staff interview is indicated on the admissions file in the

22    summary sheet I think is important.  If a student has had a

23    staff interview, it means that one of these admissions

24    officers has actually talked to that student in person.

25          And just like when Professor Arcidiacono was

1    mentioning how Duke had moved to a process of trying to

2    interview students for their graduate program, I think that

3    kind of personal information and insight by someone who is

4    going to be present at the subcommittee and committee can

5    really fill in some holes about that student and help explain

6    or understand some issues, and that person could well turn

7    out to be an advocate for that person or potentially the

8    opposite.  And so I think that it makes a lot of sense that

9    this would be an important variable.

10           Moreover, you know, as an empirical matter, it is

11    an important variable in the admissions process.

12    **Q.**   Did you hear Dr. Arcidiacono explain that he excluded the

13    staff interview because ALDC applicants are

14    disproportionately likely to receive them?

15    **A.**   Yes.

16    **Q.**   Is that a reason to exclude the variable?

17    **A.**   No, not at all.  I mean, first of all, lots of other

18    non-ALDC students are interviewed.  There is something like

19    500 students a year are interviewed.  So when you think about

20    the burden on the admissions staff, quite a large amount of

21    interviews, and the ALDCs are in no way a majority of those

22    interviews.

23           And just because one group has a higher

24    representation I don't think is any reason -- in my model of

25    admissions, I'm going to actually have, of course, controls

1    for whether you're an A or an L or a D or a C.  So that's

2    going to be itself represented by those variables, and then

3    any importance of the staff variable is going to be a

4    separate variable in the regression model.

5         And so both for ALDCs and for non-ALDCs, I'm going

6    to be identifying any additional impact of having had the

7    staff interview on the admissions rate.  So it's a separate

8    variable in my model.

9    **Q.**  Let me ask you to turn to Tab 30 in your binder and tell

10   me when you've found Defense Exhibit 708.

11   **A.**  Yes.

12   **Q.**  What is this?

13   **A.**  This is a share of applicants who received staff

14   interviews who are ALDC categories.

15        MR. WAXMAN:  Your Honor, we offer Defense Exhibit

16   708.

17        MR. MORTARA:  No objection.

18        THE COURT:  Admitted.

19        (Defendant Exhibit 708 admitted into evidence.)

20   **Q.**  Did you hear Dr. Arcidiacono explain that Asian-American

21   applicants received staff interviews at a rate lower than

22   white applicants?

23   **A.**  Yes.

24   **Q.**  Is that a reason to include or exclude the variable?

25   **A.**  No, not at all.  First --

Case: 19-2005   Document: 00117632246   Page: 40   Date Filed: 07/30/2020   Entry ID: 6356615
Case 1:14-cv-14176-ADB   Document 652   Filed 04/18/19   Page 28 of 206

28

1  **Q.**  Not at all as to include or exclude or neither?

2  **A.**  My apologies.  It's not --

3  **Q.**  I just want to make sure I understand the answer.

4  **A.**  Not at all a reason to exclude it.

5      First of all, about 16 percent of Asian-Americans

6  receive a staff interview.  So it's not a trivial fraction --

7  excuse me, 16 percent of all people who get an interview are

8  Asians.  Excuse me.  So it's not completely out of line with

9  their share in the overall admission pool, which is in the

10  20s.

11      And lots of other variables differ substantially

12  between Asian-Americans and whites.  For example, the share

13  in California, a lot of these parental occupation variables

14  we noted are different.  The fraction of female applicants

15  amongst Asians, nearly half of the applicants are female, and

16  amongst whites it's only 45 percent.  So there's a fairly

17  large gap even in that variable.

18      So there's lots of gaps between the Asian and white

19  applicants and so I don't think that's at all a reason to

20  exclude it.  In fact, if we're concerned about omitted

21  variable bias, which I am, it's an important reason to

22  include it because it is a variable that differs, it is

23  important in the process, and so excluding it necessarily

24  leads to, in my view necessarily leads to omitted variable

25  bias.

1    **Q.**  Did you hear Dr. Arcidiacono explain also that applicants

2    who receive staff interviews are disproportionately likely to

3    be admitted?

4    **A.**  Yes.

5    **Q.**  More likely to be admitted than applicants who do not

6    request and receive a staff interview?

7    **A.**  Yes.

8    **Q.**  Is that a reason to exclude the variable?

9    **A.**  No, not at all.  I mean, we don't exclude somebody who

10   has an academic rating of 1, which have very high admission

11   rates.  So just because that's true is no basis for excluding

12   it.  It makes no sense to me.

13          It's going to be included in the regression model

14   along with other variables, a lot of these other positive

15   tips, for example, or benefits or preferences or factors that

16   help influence admission officers' decisions, so I think it's

17   important to include it.

18   **Q.**  Did you look at what would happen if you did exclude the

19   staff interview rating variable from your model?

20   **A.**  I did, yes.

21   **Q.**  Please turn to Tab 22 in your binder and tell me when

22   you've found Defense Exhibit 698.

23   **A.**  Yes.

24   **Q.**  What is it?

25   **A.**  It's an exhibit from one of my reports showing the

1    average marginal effect of Asian-American ethnicity when they

2    exclude the staff interview.

3    **Q.**  So is this the analysis that you just described?  This

4    represents the results of the analysis you just described?

5    **A.**  Yes.

6            MR. WAXMAN:  Your Honor, we offer Defense Exhibit

7    698 into evidence.

8            MR. MORTARA:  No objection.

9            THE COURT:  It's admitted.

10           (Defendant Exhibit 698 admitted into evidence.)

11   **Q.**  And what is the result?

12   **A.**  Well, as you would expect, I think, the effect of

13   Asian-American ethnicity becomes slightly more negative, but

14   year to year and, again, overall, it's not statistically

15   significant.

16           So if one, for some reason, really wanted to

17   exclude it or felt that it was useful to find out what would

18   happen if one excluded it, it does not make any of the

19   estimated marginal effects statistically significant, and the

20   overall effect remains relatively small and negative, but --

21   **Q.**  And to be clear, you did include the staff interview

22   rating in your model, correct?

23   **A.**  I did, yes.

24   **Q.**  Let's turn to --

25           MR. MORTARA:  Can I object just a little bit?  I

1    think you meant to say staff interview rating indicator, not

2    rating.

3              MR. WAXMAN:  Thank you, Counsel.

4    **Q.**  You included this variable in your model?

5    **A.**  Yes.  In fact, precisely as Mr. Mortara has said.  This

6    is an indicator for whether a student got a staff interview.

7    **Q.**  Let's turn now to the personal rating.  And may we see

8    the next demonstrative, which is 10.58.

9              Why did you include the personal rating in your

10   model?

11   **A.**  Well, the personal rating is one of the four ratings that

12   are conducted or made by admissions officers.  My

13   understanding is that it's one of the important variables

14   that are evaluated and considered in the admissions process.

15   Every student who is admitted -- or every student who is

16   evaluated, excuse me, every student who has got an

17   application, they're given a personal rating, and my

18   understanding is that it's an extremely important part of the

19   overall process.

20   **Q.**  What does the personal rating capture?

21   **A.**  Well, my understanding is the personal rating is meant to

22   capture a wide variety of factors that the admissions

23   officers characterize as personal qualities.  So they're

24   looking for evidence, I think, of issues like personal

25   integrity.  I think Harvard is very concerned about admitting

Case: 19-2005   Document: 00117622246   Page: 44   Date Filed: 07/30/2020   Entry ID: 6356615
Case 1:14-cv-14176-ADB   Document 652   Filed 04/18/19   Page 32 of 206

32

1   students who have a high level of personal integrity.

2   They're looking for evidence of leadership skills.  They're

3   extremely interested in leadership skills and trying to

4   educate leaders of the future.  They're looking for

5   evidence -- one of the personal qualities that I think is

6   definitely mentioned in the training materials, and the

7   testimony has emphasized, they're looking for evidence that

8   an individual is someone who can interact with a group and

9   try and create groups and create cohesion among students.

10  And with their emphasis on that in all of their applications,

11  I think that's an example of an important variable for them.

12  **Q.**  Does the personal rating reflect a range of information

13  in the application file and available to and considered by

14  the admissions officers that otherwise isn't quantified in

15  the -- in your model or Professor Arcidiacono's model?

16  **A.**  Yes, clearly.  Actually, I think all of the ratings

17  include information like that.

18          So, in fact, even the academic rating, which

19  there's a lot of quantified information, I've emphasized

20  before, I think yesterday, that even the academic rating has

21  a large component that isn't quantified.  And the same is

22  true with the other ratings, but particularly for the

23  personal rating, my understanding is a lot of that

24  information about the presence of personal qualities is

25  coming from the teacher letters and narratives of the -- what

1    the teacher says about a student, what the guidance counselor

2    says, coming from the letter that an alumni interviewer is

3    providing, coming in many cases from additional kinds of

4    letters of support from community leaders and religious

5    leaders and things like that.

6              So that's going to be not quantified directly in my

7    dataset.

8    **Q.**   And would the dataset otherwise quantify what the

9    admissions officer considers or gleans about the applicant

10   from the applicant's essays or personal statement?

11   **A.**   It does include some quantification of that, and we're

12   going to talk about that in a moment.

13   **Q.**   Okay.  In your opinion, can a model that excludes the

14   personal rating accurately model Harvard's admissions process

15   and decisions?

16   **A.**   No.  My opinion is that if one looks at, for example,

17   analysis of the probabilities of admission, one can see very

18   clearly that having like a 2 or better on a personal rating

19   is extremely important.  It's one of those four strengths I

20   was talking about when I talked about having one strength

21   versus two strengths versus three versus four.  And very,

22   very clearly, someone who is rated with a personal rating of

23   2 versus someone who is rated with a personal rating of 3 is

24   assessed differently by the committee.  And that's just a

25   very important feature that is helping them to distinguish

Case: 19-2005    Document: 00117628246    Page: 46    Date Filed: 07/30/2020    Entry ID: 6356615
Case 1:14-cv-14176-ADB   Document 652   Filed 04/18/19   Page 34 of 206

34

1  candidates.

2  **Q.**  In addition to Dr. Arcidiacono's main model, do you

3  understand that he also constructed regression models of the

4  academic, extracurricular and personal ratings?

5  **A.**  Yes.

6  **Q.**  Let's talk first about his model for the personal rating.

7  Does it support a conclusion that the personal rating is

8  affected by race?

9  **A.**  No, not in my opinion at all.

10  **Q.**  Let's turn, Mr. Lee, please, to the next demonstrative

11  and ask you, please, to walk through this demonstrative for

12  us.

13  **A.**  Well, this is a summary of four things that I'd like to

14  try and raise about Dr. Arcidiacono's personal rating

15  conclusions and my personal rating conclusions.

16  **Q.**  Excuse me, we'll go through these separately, but at the

17  outset, could you just explain at a high level the four

18  reasons -- your four conclusions?

19  **A.**  Yes.  So as I'm going to show next, Dr. Arcidiacono's

20  model explains very little of the variation in the personal

21  rating.

22          Secondly, I'm going to point out that Dr.

23  Arcidiacono's academic and extracurricular models, the models

24  he's developed for those ratings, actually show statistically

25  significant positive effects of Asian-American ethnicity.

1        I'm going to show -- third, I'm going to show that

2    Asian-American applicants are less strong on average than

3    white applicants on non-academic factors in the data.

4        And finally, I'm going to show, as a kind of

5    analysis, if one was concerned about bias in the ratings as a

6    whole, taking account of the fact that there's a positive and

7    statistically significant Asian-American gap in two of the

8    ratings and a negative gap in one of the ratings, if one was

9    concerned about bias as a whole, rather than throw out the

10   ratings, what one could do is adjust each of the ratings for

11   that racial component and then use the racially adjusted

12   ratings in the model.

13       And I'll show that when I do that, again, one gets

14   essentially the same results as I got in my main model.

15   **Q.**  All right.  Well, let's start with number one.

16       And let me ask you, what type of information cannot

17   be captured in Dr. Arcidiacono's personal rating model?

18       You mentioned a couple of things like the teacher

19   evaluations.  But can you speak more generally about the

20   kinds of information that is in the file and considered by

21   the admissions committee that is not captured in his personal

22   rating model?

23   **A.**  Yes.  So one -- obviously one set of variables is a close

24   reading of the teacher letters and the guidance counselor

25   letters, as I mentioned before.

1          A second very important component emphasized in the

2     admissions materials and in the testimony is the individual's

3     personal essay and personal statement.  And so a lot of

4     students spend a lot of time writing these personal essays

5     and trying to particularly emphasize things like obstacles

6     that they have overcome or special accomplishments that they

7     have made, and these -- my understanding is that those kind

8     of -- that kind of information would be very important in

9     evaluating some of these personal qualities.

10    **Q.**  So let me just ask you a question about the teacher

11    evaluations and the guidance counselor evaluations.  Each one

12    of these evaluations independently gets a rating by the first

13    reader, correct?

14    **A.**  Yes, and potentially by second readers.  It would be

15    updated if a second reader felt it should be updated.

16    **Q.**  And why doesn't that fully capture whatever is in those

17    recommendations about the personal qualities of the

18    applicant?

19    **A.**  So that's an extremely important question.

20          The rating is assigned to the teacher letter as a

21    whole.  The teacher letter, of course, is trying to get

22    across these multiple dimensions of the student.  So the

23    teacher is writing probably about the academic

24    accomplishments of the students.  That would be the natural

25    thing they would probably write in many cases first just to

**JA2972**

1    reassure Harvard that this is a very strong academic

2    candidate because that's, of course, primary, first order

3    concern for Harvard.

4         Then they would be talking about potentially their

5    extracurricular or athletic accomplishments.

6         And then they would be talking about -- not

7    necessarily in this order, of course, but then they would be

8    talking about their personal qualities, things like, are they

9    a leader, have they had a leadership role in some kind of

10   activity on campus or even off campus in some personal

11   community.

12        And so the letter has -- the rating for the teacher

13   letter, for example, teacher letter -- teacher 1, has to kind

14   of summarize all four of those dimensions.  So just looking

15   at it by itself, it's got a combination of those four

16   features.

17   **Q.**  Now let's talk for a minute about the academic and

18   extracurricular ratings which Dr. Arcidiacono also modeled.

19        Do those two ratings, academic and extracurricular,

20   also reflect factors that are outside the data?

21   **A.**  Yes, very much so.  As I mentioned with reference to

22   academic, for instance, the kind of information that's used

23   to distinguish particularly an academic 1 or 2 would include

24   much more than just test scores and GPA because, of course,

25   there's many, many students, many more students applying to

1    Harvard that have virtually perfect, only one or two

2    questions wrong on the SAT or ACT, virtually perfect GPA than

3    there is gets an academic 1 or 2.

4         And that difference is driven by things like some

5    information about the student's context and information about

6    the high school that they're in, which the admissions

7    officers are normally -- especially for any high school that

8    has a significant number of students going to Harvard or

9    applying to Harvard over -- in the past, the admissions

10   officers normally specialize in individual schools and know a

11   lot about that context.  And they would be able to know if

12   this student has these kind of accomplishments from that

13   school is that, like, really an outstanding accomplishment.

14   If the student came from a disadvantaged high school and has

15   very good test scores, very good standardized test scores,

16   that's a really important accomplishment; whereas if they

17   came from an upper middle class high school in a place where

18   lots and lots of students have very high test scores, that's

19   a much different kind of accomplishment.

20        So that kind of understanding of the credentials --

21   the quantified credentials, I think, is just crucial in

22   translating quantified credentials into a rating.  And the

23   same thing, of course, is true with extracurricular.

24   **Q.**  Before we turn to extracurricular, let me just ask you,

25   did you hear testimony in this case, or did you see from your

1    review of the application files, indications in files that an

2    applicant had, you know, won the national math contest or had

3    written a publishable paper or had had her work evaluated by

4    a faculty member?

5    **A.**   Yes.

6    **Q.**   And would any of that information be part of the

7    quantifiable data that is captured in the -- in Professor

8    Arcidiacono's model of the academic rating?

9    **A.**   No.

10   **Q.**   Okay.  I interrupted you before you got to the

11   extracurricular rating.

12          Why is there information about the extracurricular

13   rating that's not captured in the data?

14   **A.**   Well, my understanding is that, again, it would be things

15   like, not just are you a participant in junior varsity sports

16   or something like that, but what level of accomplishment you

17   had, what role you played in a team, things like that.  And

18   that would be pretty important in assessing extracurricular

19   strengths.

20   **Q.**   Would you please turn to Tab 15 of your binder, and tell

21   me when you've found Defense Exhibit 688.

22   **A.**   I've got it, yeah.

23   **Q.**   What is this?

24   **A.**   This is a series of exhibits, average marginal effect of

25   Asian-American ethnicity on profile ratings, pseudo R-squared

1    for the profile ratings models, average marginal effect in

2    Professor Arcidiacono's regression models, and average

3    marginal effect on receiving a personal rating of 2 or

4    higher, modifying Professor Arcidiacono's model.

5    **Q.**  And are these all exhibits that you've prepared based on

6    data obtained and from evaluating Professor Arcidiacono's

7    models?

8    **A.**  Yes.

9         MR. WAXMAN:  Your Honor, we offer Defense Exhibit

10   687.

11        MR. MORTARA:  No objection.

12        THE COURT:  It's admitted.

13        (Defendant Exhibit 687 admitted into evidence.)

14   **Q.**  Mr. Lee, can we have, please, Demonstrative 61.

15        And we may have to take a little bit of a deep

16   breath here because I'm noticing a concept that I may have

17   forgotten to ask you about in the retirement hypothetical.

18        But let me just ask you at a general level, what is

19   this showing?

20   **A.**  Yes.  So this is showing the concept of each of these

21   different models that's somewhat important in understanding

22   the model.  And that is on the vertical axis, there's a scale

23   between zero and 100 percent, and the -- that representation

24   of what's called -- and I apologize for the jargon, it's

25   called an R-squared or even a pseudo R-squared.  And it's a

 1    summary representation between zero and 100 percent of the

 2    fraction of the variation from student to student in the

 3    particular thing we're looking at.

 4         So, for example, in the first column we're looking

 5    at the academic rating.  And so this is a summary of the

 6    variation from student to student and whether they're

 7    assigned a 1, or a 2, or a 3, or a 4 academically that can be

 8    explained by the factors included in Professor Arcidiacono's

 9    model.  So that would be the yellow components.  So in the

10    case of academic rating it's 57 percent.

11         And then, of course, the other balance of the 100

12    percent, or 43 percent in this case, is attributed to factors

13    outside the model.  So that would be the components like

14    national competitions, like the evaluation in context, like

15    variables that Professor Arcidiacono has not included in his

16    models, parental occupation or something like that that could

17    potentially be informing the determination of the rating but

18    are not in the data as he used it.

19         THE COURT:  This is just the qualitative versus the

20    quantitative?

21         THE WITNESS:  Yes, that's one way to think about

22    it.  It's the part of the qualitative that's not quantifiable

23    in the data, yes.

24         THE COURT:  And how do you come up with that

25    percentage?

 1              THE WITNESS:  So the result of the estimation, it's

 2     one of the things that comes out when you run -- estimate one

 3     of these models.  It actually tells you this number.  Or it's

 4     possible to calculate it very straightforwardly.

 5              So loosely speaking, it's taking the predictions

 6     from the model and comparing them to who actually got what

 7     actual score, actual rating, trying to make an assessment of

 8     how often it got -- how closely it was able to reproduce the

 9     right answer.

10     Q.  Let me ask a question just to make sure I'm fully

11     understanding this.

12              So with respect to the academic rating regression,

13     is this R-squared statistic, tell me if I'm wrong, the

14     R-squared statistic shows that of the data that is captured

15     in Dr. Arcidiacono's model, it will explain 57 percent of the

16     actual rating that an applicant receives by the reader?

17     A.  I would state it slightly differently.  I think it would

18     be helpful to get this straight.

19     Q.  Fine.

20     A.  So think of -- there's lots of different students.

21     There's 150,000 students here in this -- he's pooling the six

22     years.  And so there's an enormous range of variation as we

23     emphasized in the individual variation in the ratings.  And

24     this is saying, okay, think of a way to summarize -- think of

25     a quantitative summary statistic that you could develop of

Case: 19-2005   Document: 00117628246   Page: 55   Date Filed: 07/30/2020   Entry ID: 6356615
Case 1:14-cv-14176-ADB   Document 652   Filed 04/18/19   Page 43 of 206

43

1    how much variation there is from student to student on this 1

2    to 4 scale.  And now what fraction of that student-to-student

3    variation is explainable by the factors in the model.

4    **Q.**   And what do we see with respect to the personal rating

5    regression and the extracurricular rating regression?

6    **A.**   Well, one can see a very important difference.

7            The quantifiable factors in the model are strongest

8    or most richest with respect to academic variables.  When we

9    get to the personal rating regression, the factors in

10   Professor Arcidiacono's model can only explain about 29

11   percent of the overall student-to-student variation.  And

12   when we get to the extracurricular, it only explains 13

13   percent.

14           So there's a much wider range of these unobserved

15   factors -- unquantifiable qualitative factors that Your Honor

16   was talking about.  And so that's 71 percent of the personal

17   rating and 87 percent of the extracurricular rating.

18   **Q.**   Would it be fair to say, maybe not, that what the

19   R-squared calculation is -- is measuring is the explanatory

20   power of the model, how much of the observed outcome the

21   model can explain?

22   **A.**   That would be absolutely, precisely correct.  And

23   oftentimes when someone says, you know -- an economist says

24   to another economist, what's the explanatory power of your

25   model, I would respond what the R-squared was.

 1   **Q.**   Why is it important to think about the magnitude of the
 2   unexplained variance?
 3   **A.**   Yes.  So this is getting back to a question that Your
 4   Honor asked yesterday.
 5        When the unexplained component is larger, it means
 6   that more of the variation from student to student is being
 7   determined by unobserved factors, as far as my model is
 8   concerned.  It doesn't mean that the application officers --
 9   admissions officers don't see them.  They see this amazing
10   range of material that I don't see.
11        So it means that more and more the variation is
12   being determined by factors outside of my particular data, or
13   our particular data.  Professor Arcidiacono and I have access
14   to the same data.  But, and that opens up more and more of a
15   possibility that those unobserved factors are leading to
16   inadvertent omitted variable biases in the model.  Because
17   now with 71 percent of the variation unexplained, there's
18   just a lot more possibilities for things that we're not
19   measuring driving any difference that we're seeing attributed
20   to variables inside the model; for example, the difference
21   between Asian-American and white students.
22   **Q.**   Mr. Lee, can we have Demonstrative 62, please.
23        Let's now focus, Professor Card, on the second of
24   four reasons that you mentioned.  Did Dr. Arcidiacono
25   conclude that there is an effect of Asian-American ethnicity

1    for the other ratings he modeled?

2    **A.**   Yes, his models show statistically significant effects of

3    Asian-American ethnicity on all three ratings.  Positive

4    effects for academic and extracurricular ratings.

5    **Q.**   Can we have Demonstrative 63, please.

6             Can you explain using this demonstrative what he

7    found?

8    **A.**   Yes.  So in the upper right panel, I'm showing a kind of

9    illustration of the -- of the Asian-American average marginal

10   effect in academic rating, the extracurricular rating, and

11   the personal rating.

12            So the average marginal effect, or the magnitude of

13   the effect associated with being Asian-American relative to

14   white in the academic rating, all three of these are

15   statistically significant, is positive.  The magnitude for

16   the extracurricular rating is also positive but bigger, quite

17   a bit bigger.  And the personal rating is comparable to the

18   extracurricular rating but negative.

19            And what I'm showing down below there is the

20   ratings themselves.  And the way that I think about this is

21   the following:  What's going on is an admissions officer is

22   looking at a file, and they've got the quantitative

23   information that I have and they've got the qualitative

24   information that they in addition see.  And when it comes to

25   on average, again, on average, comparing Asian-American

1    students and white students, they're able to see and they
2    successfully report that qualitative information, which is on
3    average leading them to give a higher score to -- higher
4    rating to Asians than whites on the academic dimension.
5          So they're digging into the file and finding
6    information that is assuring that -- or giving them the
7    impression, leading them to conclude that this student is
8    better than the quantitative information indicates.
9          And on average that's what they're finding for
10   Asian-Americans, they're finding that they're better than the
11   quantitative information than whites.
12         And when we come to the extracurricular, they're
13   doing the same thing.  So they're looking through the file
14   material.  They're seeing information on the qualitative
15   side, which is giving them information so that they reach a
16   conclusion that the Asian-American students are better than
17   the white students conditional on the quantitative
18   information that I have.
19         And then what will Professor -- and Professor
20   Arcidiacono is arguing, and I agree with that, that that's
21   the right interpretation of those two variables.
22   **Q.**  Which is what interpretation?
23   **A.**  The interpretation that there's unobserved factors that
24   they're seeing in the qualitative information.
25         But then when it comes to the personal rating, what

1    he's asserting is that the same officers are digging into the

2    file, they've previously found positive information on the

3    academic dimension, positive information on the

4    extracurricular dimension relative to the quantitative

5    information, but then they're, in some sense, suppressing or

6    even putting a negative spin on things so that they --

7    they're actually exerting a bias against Asian-American

8    students in assigning the personal rating.

9          So that's how he is interpreting this exercise,

10   which I find very, very hard to understand or believe.

11   **Q.**  Okay.  Can you explain why?

12   **A.**  Well, for the reasons I've just said.  I don't think --

13   it just doesn't seem plausible to me that an officer who is

14   going through the file and looking at the individual by

15   individual, looking at students and on the average finding

16   very positive unobserved features about extracurricular

17   dimensions and academic dimensions and reporting that so that

18   on average the Asian students appear to be, or are coded as

19   more strong than can be justified on the basis of the

20   quantitative information.

21         And yet, that same officer is going and somehow

22   exerting bias against Asian-Americans when it comes to

23   assigning the personal rating.  So it's like there's some

24   kind of schizophrenia going on.  They're somehow on the one

25   hand positively giving boosts to Asian-Americans, but then on

1    the other hand giving them this negative animus, basically,

2    in assigning the personal rating.

3            And I just don't find -- I just do not find that

4    understandable or consistent.

5    **Q.**  Did you hear Dr. Arcidiacono testify that he reached the

6    conclusion that because Asian-Americans are stronger on

7    factors that are captured in the data that affect the -- I'm

8    sorry.  Withdraw the question.

9            Did you hear Dr. Arcidiacono testify that he

10   reached the conclusion that because Asian-Americans are

11   stronger on factors captured in the data that affect the

12   personal rating?

13           Did you hear that conclusion?  His conclusion that

14   the personal rating average marginal effect -- that one

15   reason why he reached the conclusion that the average

16   marginal effect for the personal rating was lower is that he

17   found that Asian-Americans are stronger on factors, those

18   factors that are quantifiable that affect the personal

19   rating?

20   **A.**  Yes.  He asserts that they are stronger on those.

21   **Q.**  Do you agree with that?

22   **A.**  No.

23   **Q.**  Why not?

24   **A.**  Well, I'm going to look, in the next series of slides,

25   I'm going to look carefully at the kinds of information, this

1    qualitative information and information that's summarized in

2    the teacher evaluations and the alumni interviewer

3    evaluations, and I'm going to show that that's not correct.

4    **Q.**  Did you see Dr. Arcidiacono present various statistics

5    showing personal ratings of applicants of different races

6    within academic index deciles?

7    **A.**  Yes.

8    **Q.**  Are those analysis illuminating?

9    **A.**  Not in my opinion, no.  And the reason why is that it's

10    true that those academic index variables, which is GPA and

11    SAT, inform, you know, and are very highly related to

12    academic index, but when it comes to the personal -- academic

13    rating.  When it comes to the personal rating, those

14    variables are almost uninformative.  And so making that

15    comparison is not very informative at all.

16    **Q.**  Mr. Lee, can we please show Plaintiff's Demonstrative

17    38.11 and 38.117 next to each other.

18            I'm showing you two of Dr. Arcidiacono's

19    demonstratives.

20            What does this show?

21    **A.**  Well, the left panel shows the percentage of applicants

22    receiving a 1 or a 2 by academic decile, on the academic

23    rating, and if you focus on the top six deciles, which are

24    the top half of the class, and, of course, there's such a

25    large group of students applying to Harvard that that's kind

Case: 19-2005   Document: 00117632246   Page: 62   Date Filed: 07/30/2020   Entry ID: 6356615
Case 1:14-cv-14176-ADB   Document 652   Filed 04/18/19   Page 50 of 206

50

1    of the relevant group, you can see that when you go from --

2    Mr. Lee -- yeah, there.

3            When you go from the sixth to the tenth decile, in

4    fact, the fraction of students who are classified as having

5    an academic 1 or 2 virtually doubles.  So there's a very

6    strong relationship between the academic index and the

7    academic rating.  Not perfect, but it's correlated.

8    **Q.**  And what about the next demonstrative of Professor

9    Arcidiacono?

10   **A.**  So this demonstrative -- let me point out one important

11   thing about this demonstrative.  The scale of this

12   demonstrative is no longer zero to 100 percent.  The scale of

13   this demonstrative is only zero to 30 percent.  So it's, in

14   my view, a slightly -- one has to interpret this extremely

15   carefully.

16   **Q.**  Can we see the two side by side again?

17   **A.**  So if you look at the one on the left, it's zero to 100.

18   You look at the one on the right, it's zero to 30.

19   **Q.**  Okay.

20   **A.**  So then focusing on the one on the right with the

21   personal rating, again, focusing on the top six deciles of

22   the academic index, you notice that when you go from the

23   sixth decile to the tenth decile, where the fraction of

24   students who get classified as a 1 or 2 academically has gone

25   up substantially.  The fraction of students who get

Case: 19-2005    Document: 00117632246    Page: 63    Date Filed: 07/30/2020    Entry ID: 6356615
Case 1:14-cv-14176-ADB    Document 652    Filed 04/18/19    Page 51 of 206

51

1    classified with a higher personal rating has only gone up by

2    a very small amount.

3            So illustrating this very extremely important point

4    that that academic decile or academic variables alone are not

5    particularly informative about the personal rating.  It's a

6    different dimension of students.  And I think it's not very

7    helpful to focus on the relationship between the academic

8    decile and the personal rating because they're different

9    things.

10   **Q.**  Mr. Lee, can we have Demonstrative 65, please.

11           What is this showing?

12   **A.**  So this is putting them now on the same scale.  So this

13   is showing the academic deciles from 6 to 10, now in the 100

14   percent scale, and it's comparing what happens to the

15   fraction of students within academic rating of 1 or 2, which

16   is rising as we've just shown, from around 50 percent to 98

17   percent.  Whereas the personal rating, the fraction of

18   students with the personal rating of 1 or 2, has gone from 22

19   to 25 percent.

20           So there's very, very different content from

21   academic variables like SAT and GPA in the academic dimension

22   represented by the academic rating versus the personal

23   dimension represented by the personal rating.

24           THE COURT:  Wait, sorry.  You just lost me.

25           So you're saying that the personal ratings --

1    you're basically just saying they're pretty flat across the

2    academic rating so there's no correlation between the two.

3               Is that what you said?

4               THE WITNESS:  Yes, Your Honor.  Thank you.

5               They're not -- there's a slight correlation.

6    You've gone from 22 to 25.5, but it's not anything like the

7    correlation with academic.  And this difference is pretty

8    small, the 21.7 to 25.5.  So there's a small component, but

9    it's just not the first order of things that's going on.

10   **Q.**  Let's turn, please, to the next demonstrative, 66.  And

11   we're going to focus on the third conclusion that you drew

12   with respect to Professor Arcidiacono's model.

13              Professor Arcidiacono, I think you said you heard

14   him testify that he had some confidence in his bias

15   conclusion that when you look at Asian-Americans, generally,

16   they are stronger than whites on those non-academic factors

17   that are in the data.

18              And I want to ask you again whether you agree or

19   disagree with that conclusion.

20   **A.**  I disagree with that.

21   **Q.**  And why is this important?

22   **A.**  Well, it's important because my understanding is it's the

23   basis of Professor Arcidiacono's conclusion that there's

24   animus against Asians in assigning the personal rating, and

25   so this is really a fundamental fact in his conclusion.

1    **Q.**  Can we -- can you please turn to Tab 16 in your binder.

2           Do you see Defense Exhibit 692?

3    **A.**  I do, yes.

4    **Q.**  What is that document?

5    **A.**  It's a series of exhibits showing share of applicants in

6    top decile of non-academic admissions indexes by race;

7    percentage of Asian-American and white applicants with

8    profile ratings of 1 or 2; percentage of Asian-American and

9    white applicants with school support and alumni rating of 2

10   or better by academic rating; share of applicants who

11   collectively receive strong school support, alumni interview,

12   and non-academic profile ratings; share of Asian-American and

13   white applicants with strong non-academic ratings;

14   distribution of some with school support scores; distribution

15   of some with school support and alumni interview scores.

16   **Q.**  Are these all exhibits that you prepared in order to

17   evaluate Dr. Arcidiacono's claim that the non-academic

18   factor -- that Asian-American applicants are stronger than

19   white applicants on the observed non-academic factors in the

20   model?

21   **A.**  Yes.

22   **Q.**  And so does this summary fairly reflect the strength of

23   Asian-American applicants across the various non-academic

24   factors?

25   **A.**  Across the observable components, yes.

Case: 19-2005    Document: 00117628246    Page: 66    Date Filed: 07/30/2020    Entry ID: 6356615
Case 1:14-cv-14176-ADB    Document 652    Filed 04/18/19    Page 54 of 206

54

1          MR. WAXMAN:  Your Honor, we offer Defense
2     Exhibit 692.
3               MR. MORTARA:  No objection, Your Honor.
4               THE COURT:  Admitted.
5               (Defendant Exhibit 692 admitted into evidence.)
6     **Q.**  May we have the Demonstrative 67, please.
7               What does this show?
8     **A.**  So now I'm going to focus on three very important
9     variables that we've discussed in some aspects before in my
10    testimony and also other people have talked about.  Excuse
11    me.  And that is the teacher 1 recommendation, the teacher 2
12    recommendation rating, and the guidance counselor
13    recommendation.
14              So these are the three ratings which together
15    Harvard calls the school support ratings.  So each applicant
16    gets a letter of recommendation from two teachers and from a
17    guidance counselor, and so this is the summary of the ratings
18    that are assigned to those three letters.
19    **Q.**  And do those ratings inform the personal rating?
20    **A.**  Yes, I think that's very clear they do, yes.
21    **Q.**  Let's look at the next Defense Demonstrative, 68.
22              What does this show?
23    **A.**  Excuse me.
24              So this shows the -- for each groups of students
25    classified by their academic rating of having a 1, so that's

1    the two columns on the left, or having an academic rating of

2    2, that's the two columns in the middle, or groups of

3    students that have academic rating of 3, on the right, I'm

4    showing within each of those groups the fraction of white

5    students and Asian-American students for whom the sum of

6    these three school support ratings -- excuse me.

7    **Q.**  Take your time.

8    **A.**  Excuse me.  I'm not used to talking this long.

9    **Q.**  Your lectures may be shorter than my oral arguments.

10   **A.**  Yes.

11         So this is showing the sum of those school support

12   ratings.  So to remind you, each of the ratings is from 1 to

13   4.  And 1 is good -- 1 is outstanding, 2 is quite good, 3 is

14   kind of, pretty good, and 4 is not so good.

15         And so a student that got, for example, on the

16   three ratings, got three 2s would get a 6, and that would be

17   a quite a strong rating.  A student who got, of course, three

18   1s would be a 3.  That would be almost unheard of.  But a

19   student who got, say, two 2s and a 3, they would get 7.

20         So I'm going to classify as having two 2s and a 3

21   or better.  And that's what this shows.  So the fraction --

22   amongst students who get an academic rating of 2, the

23   fraction of white students in that bucket who have the sum of

24   the school support ratings, these three ratings that's less

25   than 7, is around 43 percent, and the fraction of Asian

1    students in that category is -- who have that sum of ratings

2    less than 7 is around 37 percent.

3    **Q.**  And does that relationship, the relative percentage of

4    the white applicants versus Asian-American applicants also

5    hold for those applicants who got an academic rating of 1 and

6    an academic rating of 3?

7    **A.**  Yes, you can see that in the graph quite clearly.

8    **Q.**  And what do you conclude from those results?

9    **A.**  Well, it's important to classify the students by academic

10   rating.

11   **Q.**  And why is that?

12   **A.**  Well, the reason why is because, remember, as we talked

13   about a moment ago, the teacher -- the rating that's assigned

14   to the teacher letter is a single rating, but the teacher

15   letter is containing information about academic and

16   non-academic factors.

17           So what I'm trying to do by classifying conditional

18   academic rating of 2, for example, focusing on the middle

19   panel, I'm saying, well, imagine that the teacher has --

20   excuse me -- the admissions officer has pulled out of that

21   teacher letter the academic information in that letter and

22   putting that together with other information has decided that

23   this student is an academic 2, then the other components of

24   what's left after we hold constant to that is informing these

25   non-academic qualities.

 1          So the non-academic qualities for students who are

 2    assigned an academic 2 are obviously higher for white

 3    students than for Asian students.

 4    **Q.**  Now, I see in your next demonstrative that we have a

 5    little shading around academic rating 2.  Can you tell us why

 6    or what you're going to do with that?

 7    **A.**  I can, yes.

 8    **Q.**  Why, and what are you going to do with it?

 9    **A.**  Well, one might be concerned that I've somehow fixed --

10    chosen the 7 number strategically.  And so what I'm going to

11    do is I'm going to take the students that are assigned an

12    academic rating of 2, and I'm going to show the full

13    distribution of the sum of the school support scores.

14    **Q.**  All right.  May we have the next demonstrative, please,

15    68 -- or 69.

16          So what is this showing?

17    **A.**  So recall, the school support, the 3 ratings could be 3

18    for unbelievably outstanding student.  They could be 4 if you

19    got two 1s and a 2 all the way up to 7, as I mentioned

20    before, which would be two 2s and a 3.

21          And we can see in each of these sort of better

22    ratings buckets white students are overrepresented relative

23    to Asian students who are more likely to be in that set of

24    categories amongst the students who have an academic rating

25    of 2.

1    **Q.**  And what does the next demonstrative show?

2    **A.**  So it shows that that preponderance of white students in

3    the better side of the distribution is offset or balanced out

4    by a preponderance of Asian students on the lower side.

5          So Asian students are, in particular, much more

6    represented in the 9 category, which would be three 3s, which

7    would still be quite a good category but not nearly as good

8    as the others.

9    **Q.**  Did you conduct the same analysis for students with an

10   academic rating of 1 and an academic rating of 3?

11   **A.**  Yes.

12   **Q.**  And what did you find?

13   **A.**  I found that the pictures look very, very similar.

14   **Q.**  And are those results reflected in Defense Exhibit 692 in

15   evidence?

16   **A.**  Yes, they are.

17   **Q.**  Did you hear Dr. Arcidiacono testify that white and

18   Asian-American applicants actually have similar school

19   support ratings?

20   **A.**  Yes.

21   **Q.**  How did he reach that conclusion?

22   **A.**  Well, one very important thing he did was he focused

23   entirely on the non-ALDC group.  And so that's an important

24   group which I believe should be included, and when we're --

25   we know that's almost 30 percent of all the admitted

Case: 19-2005    Document: 00117638246    Page: 71    Date Filed: 07/30/2020    Entry ID: 6356615
Case 1:14-cv-14176-ADB    Document 652    Filed 04/18/19    Page 59 of 206

59

1    students, and so this is a very large group in terms of high

2    performers in the admissions pool.

3              And so by excluding them, it gives, in my view, a

4    biased picture of the difference between whites and Asians.

5    **Q.**  And did he -- did his analysis look, as you did, within

6    different academic ratings or different academic index

7    deciles?

8    **A.**  Not that I recall, no.

9    **Q.**  So even though virtually all of his other analyses are

10   keyed to the academic index or the academic ratings, in this

11   respect he did not do that control, correct?

12   **A.**  Yes, that's absolutely correct, yes.

13   **Q.**  Did you consider how Asian-American applicants fare on

14   other factors that inform the personal rating?

15   **A.**  Yes.  So I went and looked at the two ratings variables

16   that are provided by the alumni interviewer.

17   **Q.**  And do those also inform the personal rating?

18   **A.**  Yes.  My understanding is one of those ratings is, in

19   fact, the alumni interviewer's ratings of personal qualities

20   of the student and the other is an overall rating of the

21   student.

22   **Q.**  Let's look at Demonstrative 71, please, Mr. Lee.

23              What is this showing?

24   **A.**  So this shows from the summary sheet for each student the

25   location of the alumni interviewer information.  So the

1    alumni interviewer scores the students on the same scale, and

2    that one of the reasons for that document, that interviewer

3    guide, is really for purposes of alumni interviewers to

4    understand the Harvard process.

5    **Q.**   And the next demonstrative, please.

6    **A.**   So what I'm going to do now is I'm going to sum the three

7    ratings for the school support variables, so teacher 1,

8    teacher 2, guidance counselor, and I'm going to add to those

9    three the alumni interviewer rating and the alumni

10   interviewer overall rating and the alumni personal rating.

11   So now there's going to be five scores that can be -- again,

12   I mean, it's technically possible to have five 1s.  So it's

13   possible that somebody actually has a 5.  A very good score

14   would be something like four 2s and a 3, which would be

15   around 11.  So I'm going to --

16   **Q.**   Can we look at the next demonstrative.  I think this may

17   help in your explanation.

18            So what is this showing?

19   **A.**   So now I'm going to focus, as I did before, but now

20   adding in two more ratings, so now there's five ratings.  And

21   I'm going to look at the fraction of students who have the

22   five ratings summing to 11 or lower, so equivalent to four 2s

23   and a 3 or better.  So quite a strong rating.  But I'm going

24   to do that, again, for the same reasons as before, because I

25   want to try and isolate the component of the school support

1    and alumni evaluation that's apart from their academic

2    evaluation.  And I'm going to compare -- within each of the

3    1s, the 2s and the 3s, I'm going to compare the fraction of

4    Asian-American and white students that have 11 or lower of

5    scores.

6            And you can see across the three buckets that white

7    students are more likely to get the better sum of scores.

8    Q.  And did you review how Asian-American -- strike that.

9            Can we have the -- well, there we go.

10           THE COURT:  Hold on one second.

11           (Discussion off the record.)

12   Q.  So you've now highlighted, again, the comparison among

13   applicants who have an academic rating of 2.  And, again, why

14   have you done that, and what are we going to see next?

15   A.  Well, we're going to look at the full histogram, the full

16   representation of sums of scores again.

17   Q.  Okay.  May we have the next demonstrative, Mr. Lee.

18           So on Demonstrative 74, what are we seeing?

19   A.  So here we're seeing is the sum of school support; again,

20   focusing on Asian and white students who receive an academic

21   rating of 2, and I'm showing the fractions of students who

22   get 5.  There are, you know, some students with a 5, 6, 7, 8,

23   9, 10, 11, 12.  So that would be the better ratings.  And you

24   can see on the -- kind of the better half of the

25   distribution, white students are uniformly more represented

1    there.  So more likely to get a 9 than Asian students, more

2    likely to get a 10 and so on.

3              And if we go to the right side of the graph --

4    **Q.**  Can we have Demonstrative 75, please?

5              Yes, thank you.

6    **A.**  -- we can see that the opposite pattern is there.

7              So, again, the white students are represented more

8    in the higher end of the ratings with better ratings and the

9    Asian students are represented in the lower end.

10   **Q.**  And did you conduct a similar analysis with respect to

11   applicants who received an academic rating of 1 and an

12   academic rating of 3?

13   **A.**  Yes, I did.

14   **Q.**  And is that analysis reflected in Defense Exhibit 692?

15   **A.**  Yes.

16   **Q.**  And what did you conclude?

17   **A.**  I concluded that the same pattern is present in both --

18   in those other groups as well.

19   **Q.**  Did you analyze whether the data that show the school

20   support ratings and the alumni ratings inform the personal

21   ratings?

22   **A.**  I did, yes.

23   **Q.**  And can we have Defense Demonstrative 76, please.

24              What is this showing?

25   **A.**  Yes, so this is a way to show how different variables in

1    the context of Professor Arcidiacono's model of the personal

2    rating contribute to the overall explanatory power of that

3    model.

4         So just to remind you, that's the extent to which

5    the model can successfully explain the student-to-student

6    variability in the personal rating.

7         So he presents a series of five models.  And,

8    again, the -- the height of each bar is representing the

9    explanatory power of the model.

10         So if we start with just demographics, so just

11    focusing only on differences across the race groups, that

12    explains 6.8 percent of the variation.  If we add in academic

13    information, all those different academic variables that

14    Professor Arcidiacono uses, it rises a little bit to 9.5

15    percent.

16         And this illustrates the point we were making

17    before that academic variables, despite their richness and

18    availability in the dataset, explain a relatively modest

19    fraction of the overall variation in the personal rating.

20         If we add in the interaction variables that

21    Professor Arcidiacono often uses in his specifications, you

22    can see it really doesn't make that much difference to that

23    specification.

24         If we add in the context variables, so these are

25    the variables representing information from the college board

Case: 19-2005   Document: 00117638246   Page: 76   Date Filed: 07/30/2020   Entry ID: 6356615
Case 1:14-cv-14176-ADB   Document 652   Filed 04/18/19   Page 64 of 206

64

1    and schools and neighborhoods, that adds some more to the

2    data.

3           Finally, though, the big jump is when we add in

4    these ratings variables.  And I'd like to try and explain a

5    little bit more clearly how that works.  And I think it would

6    be helpful to go back to my hypothetical of retirement.

7           So imagine that I have the model that I call the

8    sparse model over here, with just age and salary, and then I

9    think about adding in health as a new variable.  The

10   explanatory power that health will add to the model is the

11   part of health that can't already be explained by age.  So

12   when you add a new variable to a regression model with other

13   variables in the model, the additional contribution to the

14   explanatory power represents the contribution of the part of

15   that new set of variables that are added that couldn't be

16   explained by the variables that were already in the model.

17   So it would be the component of health that if I adjusted

18   health for age, it's that component of health.  Not the part

19   that is correlated perfectly with age but the other part.

20          And so exactly what's going on here is when we add

21   in the information from the ratings variables, the part of

22   that that's not explained by academics and context and so on,

23   that's when we get this big jump in explanatory power.

24          So one can see that more than twice as much of the

25   personal rating, explanatory powers -- or twice as much of

1    the explanatory power is coming from those variables as, for

2    example, than demographics and academics alone.

3           So much more of the personal rating is driven by

4    this academics-adjusted addition of the ratings variables.

5           MR. WAXMAN:  Thank you.

6           Your Honor, this is a good stopping point.

7           THE COURT:  Wait.  Hold on a second.

8           It's driven by the academics adjusted addition?

9           THE WITNESS:  Yeah, so -- Your Honor, as I was

10   trying to make the case with the hypothetical, so if I took

11   my sparse model and added health --

12          THE COURT:  Yeah.

13          MR. WAXMAN:  I think you mean the richer model.

14          THE WITNESS:  Excuse me, the richer model.

15          -- and I added health, then the R-squared would go

16   up by the amount of information contained; age-adjusted

17   health.  Because age was already in the model and it was

18   trying to do the best it could with just age.

19          I add in health, the part of that that's adding to

20   the explanatory power is the part of health that can't be

21   explained by age.

22          And so in this context with the personal rating,

23   it's the part of these ratings variables that I've added to

24   the model that couldn't be explained by the academics.

25          THE COURT:  So you're saying that the difference in

Case: 19-2005    Document: 00117632246    Page: 78    Date Filed: 07/30/2020    Entry ID: 6356615
Case 1:14-cv-14176-ADB    Document 652    Filed 04/18/19    Page 66 of 206

66

1  the personal ratings between Asian applicants and white

2  applicants is being driven by the school support and alumni

3  rating?

4          Is that what we're talking about?

5          THE WITNESS:  This is the overall explanatory power

6  only.

7          THE COURT:  You just lost me where you're

8  explaining it's the part not explained by anything else but

9  the part of what?

10          THE WITNESS:  The part of the variable you added

11  in, the new variable you've added in.

12          THE COURT:  Well, adding to what?

13          THE WITNESS:  Oh, to the model.

14          THE COURT:  But which factor are -- are we talking

15  about the personal rating here, just the personal rating?

16          THE WITNESS:  Yes.  Excuse me.  So these are

17  different versions of Professor Arcidiacono's model of the

18  personal rating.  I apologize for not making that clear.

19          THE COURT:  So you're saying that the difference

20  between white applicants and Asian applicants is being

21  largely driven by the ratings variables.

22          THE WITNESS:  I'm not saying that in this graph

23  here.  This graph here is just about the overall explanatory

24  power of the model.

25          So we were talking about, like, how much can the

Case: 19-2005    Document: 00117632246    Page: 79    Date Filed: 07/30/2026    Entry ID: 6356615
Case 1:14-cv-14176-ADB    Document 652    Filed 04/18/19    Page 67 of 206

67

 1    model explain, and I was pointing out that it had relatively

 2    low explanatory power and so on.

 3              THE COURT:  Yeah.

 4              THE WITNESS:  I'm trying to sort of separate just

 5    assessing the explanatory power of the model in this stage.

 6    I'm going to come back, you know, after the break and talk

 7    about how that's related to the gaps, but for now I'm just

 8    trying to assess the explanatory power.  And I'm saying if

 9    you take a model that only has --

10              THE COURT:  Of his model, right?

11              THE WITNESS:  Yes, these are all his models, yes.

12              THE COURT:  Okay.  I think I have it.

13              MR. WAXMAN:  Your Honor, after the break, we're

14    going to be looking at a line graph representation of this

15    that I think, I hope, will make clear to both of us the

16    difference between average marginal effect and explanatory

17    power in this context.

18              THE COURT:  All right.  Thank you.

19              (Recess, 11:11 a.m.)

20              THE COURT:  So I feel like the most important

21    decision I make every day is about what time we're having

22    lunch.  It's certainly what everyone is most interested in.

23              So is everyone all right with a half-hour lunch

24    break today to just try and make up some of the time we're

25    losing at the other end?  Will that give everybody enough

```
 1    time?

 2             How about you?  Can you manage with a half an hour

 3    break?

 4             THE WITNESS:  Yeah, sure.

 5             THE COURT:  We'll recess a little early this

 6    afternoon.  It's a national holiday.

 7             THE WITNESS:  Yes.  That would be fine.

 8             THE COURT:  So let's go till 12:30 and we'll recess

 9    from 12:30 to 1:00.

10             MR. WAXMAN:  Very good, Your Honor.

11    BY MR. WAXMAN:

12    Q.  So Professor Card, this issue that Her Honor was asking

13    about I think I will come back to somewhat later.  But let me

14    just ask you a couple of questions that perhaps will clarify

15    what this means and doesn't mean.

16             To be clear, in addressing the court's question,

17    are you saying that the difference in the ratings that are

18    quantified in the data explains the average differences

19    across race in the personal rating?

20    A.  No.

21    Q.  Do you believe that the effect of Asian-American

22    ethnicity on the personal rating that's estimated by Dr.

23    Arcidiacono's model reflects a genuine effect of race or

24    rather the effects of factors outside of the data?

25    A.   I believe it reflects factors outside of the data.
```

**JA3004**

1    **Q.**  And so what do you learn from the factors in the data

2    like ratings about those factors outside the data?

3    **A.**  So what we're trying to do is follow this logic of a

4    pattern which is often true; that the observable factors

5    inside the data that most inform the personal rating, which

6    are as shown in this slide here, those school support and

7    alumni interview ratings, those factors are stronger for

8    white students than for Asian students when we hold constant

9    academic factors.

10   **Q.**  Did you also compare Asian-American and white applicants

11   on other factors besides the five that we've already talked

12   about, on other factors that inform the personal rating?

13   **A.**  Yes, I did.  I actually took Professor Arcidiacono's

14   model 5 and added some additional contextual-type variables,

15   parental occupation and so on, and showed that those

16   variables also lead to an increase in explanatory power.

17   **Q.**  Did you conduct an analysis that looks at all of the

18   non-academic measures in the data?

19   **A.**  Oh, yes, I did.

20   **Q.**  And why is it relevant to look at non-academic factors in

21   general?

22   **A.**  Well, as we've been talking about, I think, extensively,

23   there's obviously differences across candidates on average.

24   So Asian-American students are stronger in academic factors,

25   white students are stronger on non-academic factors, and so

1    trying to understand differences, particularly as they inform

2    the personal rating.  What I've shown here is that personal

3    rating is representing mostly non-academic factors, and so

4    what I did was I took my overall admissions model and I

5    isolated all the factors in that model that are non-academic

6    components.  And I used just those components to rank the

7    students by their strength.  So this would be some

8    combination of all the factors in my model except the

9    academic variables.

10   **Q.**  And then if we may have Defense Demonstrative 10.77,

11   please.

12            What is this showing?

13   **A.**  So this shows when I look at this total combination of

14   all non-academic factors that white students are

15   substantially more highly represented in the top three

16   deciles.

17   **Q.**  And to be clear, these are the top three deciles of the

18   non-academic index?

19   **A.**  Yes.  So these -- as I said, the personal rating is

20   largely informed by these non-academic factors.  So in

21   understanding how the observable features differ between

22   whites and Asians, I use this construct of the total summary

23   of their non-academic strengths.  And one can see very

24   clearly that the white students are stronger on these

25   non-academic dimensions.

Case: 19-2005    Document: 00117628246    Page: 83    Date Filed: 07/30/2021    Entry ID: 6356615
Case 1:14-cv-14176-ADB   Document 652   Filed 04/18/19   Page 71 of 206

71

1    **Q.**  Now, does your analysis -- in creating the non-academic

2    index, did you also include the personal factor as a

3    non-academic factor?

4    **A.**  The personal rating, yes.

5    **Q.**  Yes.

6          And did you also include the ALDC attributes as

7    non-academic factors?

8    **A.**  I did, yes.

9    **Q.**  What happens if you remove the ALDC attributes and the

10   personal rating as factors?

11   **A.**  So I did that exercise as shown on the next slide.

12   **Q.**  Can we have Demonstrative 78, please.

13          And what is this showing?

14   **A.**  It shows the same pattern still persists.  So even when

15   you take all these non-academic factors but turn off any

16   preference given to the As or Ls or Ds or Cs, so that that's

17   no longer part of any difference, and completely throw out

18   the personal rating, which I believe is an overly extreme

19   assumption, but do that, it's still the case, and on the

20   remaining non-academic dimensions white students are more

21   highly represented in the top deciles than Asian students.

22   **Q.**  Does Dr. Arcidiacono analyze the non-academic index as

23   well?

24   **A.**  I believe he does, yes.

25   **Q.**  And does he agree with you that white applicants are

1    stronger than Asian applicants on the non-academic index?

2    **A.**  Well, again, the analysis that he presents focuses on a

3    subset of white students and Asian students, the non-ALDC

4    students.  And, of course, what I showed before was ALDC

5    students on many, many non-ALDC components are much stronger.

6    And so throwing away that group gives rise to, in my view, a

7    biased perception of the non-academic strengths of white

8    students versus Asian students.

9              THE COURT:  Okay.  Stop for a second.

10             So non-academic, you've taken out the academic

11   rating, you've taken out the personal rating.  What's left in

12   here is just extracurriculars and --

13             THE WITNESS:  No, Your Honor.  There's a whole

14   range of variables, all of the school support and variables

15   like that and all of the contextual variables, parental

16   occupation, things like that.

17             THE COURT:  So you've left everything in except the

18   ALDC effects and the personal rating?

19             THE WITNESS:  And the academic variables per se,

20   SAT and GPA and so on.  Yes.

21   BY MR. WAXMAN:

22   **Q.**  I had a question based on your last answer, but I can't

23   remember what the answer is, so let me just ask you.

24             Among the group -- I think you've testified that

25   among the ALDC applicants, independent of any tip that they

 1    receive, I believe we saw a chart showing that on every

 2    measure, every rating they get substantially higher ratings

 3    than non-ALDCs; is that correct?

 4    **A.**   Yes.  And they're also -- when you combine ratings, one

 5    also sees that, remember, that they are more multidimensional

 6    and so they are a much stronger group, yes.

 7    **Q.**   And what percentage, approximately, of the ALDCs are

 8    white applicants?

 9            This isn't a memory game.  If you don't remember,

10    you can just give an adjective.

11    **A.**   A relatively high fraction.  I actually have a document

12    we've prepared, but I don't quite remember off the top of my

13    head.

14    **Q.**   Do you recall what share of the ALDC applicants are

15    Asian-American?

16    **A.**   I know that only two percent of all -- two or three

17    percent of all Asian-Americans are ALDCs, which is a slightly

18    different question.

19    **Q.**   Yeah.

20            So what is -- what is the effect in terms of being

21    able to compare really strong white applicants with really

22    strong Asian applicants if you exclude all ALDCs?

23    **A.**   Well, in my view, that gives an inappropriate assessment

24    of the white applicant pool because, of course, amongst the

25    strongest people in the white applicant pool are the ALDC

1    groups.

2              So when I do this non-academic comparison -- again,

3    let me emphasize, in that second set of charts I was turning

4    off any particular tip given for A or L or D or C.  So I was

5    just trying to isolate these other components of strength as

6    represented here.

7    **Q.**  And so to sum up, Professor Card, what is your view about

8    the relative strength of white and Asian-American applicants

9    on factors in the data that inform the personal rating?

10   **A.**  My assessment is that they are stronger.  The white

11   students are stronger than Asian-American students on the

12   factors that are most relevant for informing the personal

13   rating, the observable factors.

14   **Q.**  And why is that important?

15   **A.**  Well, as I said, economists often argue that if the

16   observed factors inside the data that inform a particular

17   variable are in one direction, then the unobserved factors

18   may well be in that same direction.

19   **Q.**  And is that, in fact, the reasoning that Dr. Arcidiacono

20   uses in his interpretation of the positive average marginal

21   effect for Asian-American ethnicity that he observed in

22   modeling the academic rating and the extracurricular rating?

23   **A.**  Yes, precisely.

24   **Q.**  Did you do any other analysis to examine that conclusion?

25   **A.**  Yes, I did.

**JA3010**

1    **Q.**   Can we have Defense Demonstrative 10.79.

2              And let me ask you what this shows.

3    **A.**   Well, I think this is going to more directly address Her

4    Honor's question about the average marginal effect between

5    Asian-Americans and whites in these different models that

6    Professor Arcidiacono developed for explaining the personal

7    rating.

8              So what I've done here is I've taken each of his

9    models from 2, 3, 4, 5, so model 2 starts with just

10   demographic variables and academic variables and goes on.

11   And what I've shown is the average marginal effect for

12   Asian-American ethnicity relative to whites and the

13   probability of receiving a personal rating of 2 or better.

14             And so according to his model 2, for example, this

15   very sparse model that only has demographics and academic

16   variables, there's a seven percentage point gap in the

17   probability of receiving a 2 or better between

18   Asian-Americans and whites.

19   **Q.**   This is a 2 or better on the personal rating?

20   **A.**   2 or better on the personal rating, yes.

21   **Q.**   What are you indicating by the R-squared value for model

22   2?

23   **A.**   Well, we saw that before the break.  The slide that we

24   were talking about shows the R-squared of that model is quite

25   low.  In fact, when I showed that slide, I showed that that's

 1    mostly the demographic factors.  The academic variables

 2    themselves don't add much at all to the personal rating, and

 3    that's the point we've tried to emphasize earlier in my

 4    testimony as well.

 5           So the academic variables per se don't really

 6    inform the personal rating very much.

 7           So that's the starting point.

 8           If you go to model 3, this is the model that he

 9    shows that adds some of the interaction variables that he

10    uses in many of his models.  Of course that doesn't change

11    the average marginal effect for Asians versus whites much.

12           When we add the contextual variables, so these are

13    the variables representing high school and neighborhood

14    variables, we can see an important change.  Now instead of

15    seven percent it goes down to six percent, so it's 15

16    percent, 16 percent smaller effect.  And so those variables

17    are -- they're also adding some explanatory power to the

18    model, but importantly, those variables are different and are

19    helping to explain the gap.

20           But then when we go to model 5 where we add in the

21    personal variables, so now we're adding the variables, the

22    observed variables that are most relevant for determining the

23    personal rating, we can see not only does the R-squared go

24    up, which is -- the previous slide showed, but importantly,

25    now the unexplained gap between Asian-Americans and whites is

1    only half as big as it started before.

2         So this is the kind of analysis that economists

3    often do.  They take a model and add more and more of the

4    observable variables that they have and they say, well, this

5    is a situation where as I add more variables, and

6    particularly when I add these variables that are most

7    informative to the personal rating, I see that I have removed

8    a very large component of the average marginal effect of

9    Asians and whites.

10         And I would be concerned because there are so many

11   unobserved factors left out, I would be concerned that if I

12   had access to more and more of that information, this trend

13   would continue and one could easily, in my view, logically

14   conclude that it may well be that it's a zero if you could

15   account for all of those factors.

16         So the observed variables are moving in this

17   direction.  There's a very large unobserved component.  If,

18   following Professor Arcidiacono's logic, the unobserved

19   variables move in the same direction as the observed

20   variables, then this would tend -- this trend would continue

21   and could reach the ceiling.

22   **Q.**  Can you summarize your conclusion regarding factors

23   outside the data and the personal rating?

24   **A.**  So my view is that just as factors outside the data

25   account for the unobserved positive average marginal effect

1    for Asian-Americans in the academic rating, and account for

2    the large positive unobserved gap between Asian-Americans and

3    whites, the average marginal effect in the extracurricular

4    rating, so there's unobserved factors that the admissions

5    officers are finding on top of the -- any kind of

6    quantitative factors, my interpretation is that exact same

7    explanation is the most logical and sensible for the negative

8    personal rating.

9    **Q.**  Let's turn to Defense Demonstrative DD 10.80.  And let's

10   focus on the last personal rating conclusion.

11            And let me ask you to assume now, contrary to the

12   conclusion that you've expressed, that race really does

13   influence the ratings in ways estimated by Dr. Arcidiacono's

14   models.

15            And let me ask you first, would that justify

16   throwing the ratings out?

17   **A.**  No.  I don't think that would be the right thing to do at

18   all.

19   **Q.**  What would -- why wouldn't you throw the ratings out?

20   **A.**  Well, because the ratings include all of this information

21   and they capture some of the information that I can't

22   quantify.  And so if one was concerned about that, it

23   wouldn't make sense to throw them out entirely.

24   **Q.**  And so what did you do?

25   **A.**  So instead of throwing them out entirely, what I did was

1  I took Professor Arcidiacono's models for these three ratings

2  variables, and they all have a component -- an Asian-American

3  effect, and I turned off that effect.

4  **Q.**  So let's see the next demonstrative, if we could.

5           And what is this -- is this -- this is showing the

6  effects, the estimated average marginal effect of

7  Asian-American ethnicity on the three ratings that

8  Dr. Arcidiacono modeled?

9  **A.**  Right.  So just to remind you, for instance, the

10  extracurricular effect here is representing the fact that

11  controlling for all of the observed variables in the model

12  that Professor Arcidiacono, his model 5, his most complete

13  model, richest model for the extracurricular rating, there is

14  still a large, or relatively large unexplained Asian-American

15  effect.  So they're getting higher extracurricular ratings

16  than can be explained by factors in the data.  Similar for

17  the academic rating and similar for the personal rating.

18  **Q.**  What does the next slide show?

19  **A.**  The next slide visually illustrates that I turned them

20  off.  So I take those three components, but only the race

21  components of the three variables, the three ratings

22  variables, and I turn off that, but leave in all the other

23  components in his prediction models.

24  **Q.**  Would you please turn to Tab 18 in your volume?

25  **A.**  Yes.

1    **Q.**  And what is -- this is document Defense Exhibit 694.

2          What is it?

3    **A.**  So it's average marginal effect of Asian-American

4    ethnicity in my models with profile ratings adjusted to

5    remove what Professor Arcidiacono claims to be racial

6    effects.

7    **Q.**  Does this reflect the analysis you just described?

8    **A.**  Yes.

9          MR. WAXMAN:  Your Honor, we'd offer Defense Exhibit

10   694.

11         MR. MORTARA:  No objection.

12         THE COURT:  It's admitted.

13         (Defendant Exhibit 694 admitted into evidence.)

14   **Q.**  Mr. Lee, if we can have Demonstrative 83, please.

15         So what is this showing?

16   **A.**  So this shows if I take Professor Arcidiacono's models,

17   turn off these race components for the ratings, the three

18   ratings variables, and then predict each person's ratings

19   from his models with what's left after taking out these

20   potential effects of race, then include those variables as

21   the ratings in the model, so these would be ratings that are

22   in some sense purged of any unexplained racial differences.

23         When I do that analysis, I get average marginal

24   effects from year to year that look quite similar to the

25   estimates I had before.  None of them are individually

1    significant.  Some are positive, some are negative.  The

2    average marginal effect across all the years is minus .011.

3    So eleven one-hundredths of a percentage point.  Not

4    statistically significantly different from zero.

5              So my conclusion is from that that if one believed

6    that the right thing to do was to turn off the race component

7    on the ratings, to imagine that there's some kind of racial

8    bias that's generating these phenomena, then I would get --

9    in fact, after taking off the race component of the three

10   ratings, I would get more or less the same results as I get

11   from my main specifications.

12   **Q.**   Which is in every -- if I'm correct, in every instance

13   results that are not statistically significant than zero?

14   **A.**   Not statistically significantly different from zero, and

15   especially, for example, the overall rating is quite small in

16   magnitude and could have easily occurred by chance.  Would be

17   quite consistent with there, in fact, being no difference at

18   all.

19   **Q.**   Did you hear Mr. Mortara speak during his opening

20   statement about a different analysis that you conducted in

21   your opening report in which you did entirely throw the

22   personal rating out of the model?

23   **A.**   I did, yes.

24   **Q.**   Why did you do that analysis?

25   **A.**   Well, it's like the kind of analysis I did in the chart

Case: 19-2005    Document: 00117623246    Page: 84    Date Filed: 07/30/2020    Entry ID: 6356615
Case 1:14-cv-14176-ADB    Document 652    Filed 04/18/19    Page 82 of 206

82

1    where we walk from my model, which I believe is the correct

2    model and includes all the variables that should be included,

3    and make the series of changes that Professor Arcidiacono

4    makes.

5         So one way to start that analysis and to understand

6    the differences between his model and my model would be to

7    exclude the personal rating altogether.  So it's a way to

8    understand how important is the personal rating to my

9    conclusions and what are the differences when I have that

10    model -- it's not that I'm endorsing that model; it's that

11    I'm trying to understand how one gets from my model to

12    Professor Arcidiacono's model.

13    Q.  So how would you compare that analysis to the one that we

14    just discussed and is in your rebuttal report in which you

15    use the adjusted ratings?

16    A.  Well, I don't think they're really the same thing.  I

17    think that what we've just discussed, if one believed that

18    the ratings variables were affected by race, then I think

19    what we've just discussed is by far the appropriate thing.

20         The analysis where I throw out the personal rating

21    is not really that type of exercise.  It's an exercise to

22    understand the extreme bound of throwing out the personal

23    rating altogether.

24    Q.  Now, Dr. Card, your model doesn't consider the

25    preliminary overall rating; is that right?

**JA3018**

1    **A.**  That's right, yes.

2    **Q.**  And why did you not include the overall -- the

3    preliminary overall rating but did include the personal

4    rating?

5    **A.**  Well, my understanding from a variety of testimony in the

6    case is that the personal -- excuse me, the preliminary

7    overall rating, the POR, is assigned by the first reader, or

8    the second reader, but is assigned as kind of an estimate by

9    that reader of the likelihood of admission given what

10   materials they have at that time, which may, of course, not

11   be the complete set of materials, and is meant to incorporate

12   sort of their overall assessment and may well include

13   information about the race and ethnicity.

14          So, for instance, if a student was a URM, an

15   underrepresented minority, and was highly competitive in

16   other dimensions, the preliminary overall rating could easily

17   include the potential that that would be another one of their

18   many strengths for that kind of student.  So it would be, in

19   some sense, affected directly by race per se for that set of

20   candidates.

21          And so I didn't want to include a variable like

22   that that's affected by race per se.

23   **Q.**  Let me ask you just a few final questions on the personal

24   rating.

25          Mr. Lee, may we have Plaintiff's Demonstrative 38,

**JA3019**

1   slide 19.

2          Do you recall when Dr. Arcidiacono showed this

3   slide?

4   **A.**   Yes, I did.

5   **Q.**   And do you recall his testimony that the slide showed

6   that the personal rating was affected by race?

7   **A.**   Yes.

8   **Q.**   Was he correct?

9   **A.**   I don't think so at all.  I think what -- remember, these

10   are -- each of these panels is an academic decile, 7, 8, 9,

11   the top four deciles now, and as I've pointed out with regard

12   to the personal rating, once you're comparing decile 7,

13   decile 8, decile 9, decile 10, there's virtually no

14   difference because going across these deciles doesn't really

15   inform the personal rating.

16          So it's not very surprising that the gaps across

17   the different race groups look the same as we go from decile

18   10 to decile 9 to decile 8 because, as I've shown, the

19   personal rating really doesn't depend on the academic index.

20          So I find this completely uninformative about any

21   issue with the personal rating.

22   **Q.**   Mr. Lee, can we project the trial transcript from October

23   25 at page 205, line 14 through page 206, line 6.

24          Were you here when Mr. -- when Dr. Arcidiacono gave

25   the following testimony:

1          "Question:  You don't claim that Harvard

2     discriminated against Asian-American applicants who are

3     recruited athletes, correct?

4          "Correct.

5          "You don't claim that Harvard discriminates against

6     Asian-American applicants who are legacies, correct?

7          "Correct.

8          "You do not claim that Harvard discriminates

9     against Asian-American applicants on the dean's or director's

10    list, correct?

11         "Correct.

12         "You do not claim that Harvard discriminates

13    against Asian-American applicants who are the children of

14    faculty, correct?

15         "Correct.

16         "You do not claim that Harvard discriminates

17    against Asian-Americans who are the children of staff,

18    correct?

19         "Correct."

20         You heard that testimony, correct?

21    **A.**  I did, yes.

22    **Q.**  So Dr. Arcidiacono claims that Harvard discriminates

23    against some Asian-American applicants but not Asian-American

24    ALDC applicants.

25         Is that what you understand?

Case: 19-2005    Document: 00117622246    Page: 98    Date Filed: 07/30/2020    Entry ID: 6356615
Case 1:14-cv-14176-ADB  Document 652  Filed 04/18/19  Page 86 of 206

86

1    **A.**   That's my understanding, yes.

2    **Q.**   And do you recall Her Honor asking Dr. Arcidiacono about

3    the personal ratings of ALDC applicants?

4    **A.**   I do, yes.

5    **Q.**   How do the personal ratings of Asian-American ALDC

6    applicants compare to the personal ratings of white ALDC

7    applicants?

8    **A.**   Well, in fact, they, on average, have a lower personal

9    rating than white ALDCs.  And the gap between Asian-American

10   ALDCs and white ALDCs and the fraction with a personal rating

11   of 1 or 2 is slightly bigger than the gap between

12   Asian-American and whites who are non-ALDC.

13   **Q.**   So what does that tell you?

14   **A.**   I find that extremely hard or impossible to reconcile

15   with Professor Arcidiacono's claim that the personal rating

16   is the mechanism by which discrimination against Asians is

17   operating, and that there's no discrimination against ALDCs.

18   Because on the one hand if there's no discrimination against

19   ALDCs, then the personal rating should be fine.  On the other

20   hand if there's -- if there's -- it just doesn't make any

21   sense.

22   **Q.**   So just to put a fine point on it, if Dr. Arcidiacono is

23   right, that there's no discrimination against Asian-American

24   ALDC applicants, what would that tell us about the personal

25   rating?

1    **A.**  Well, as far as I can understand what that would mean is

2    their personal rating is not tainted by bias.

3    **Q.**  In light of everything that you've seen and everything

4    that you've done in this case, is the personal rating an

5    instrument of discrimination against Asian-American

6    applicants?

7    **A.**  Well, as this exercise with the comparison between the

8    ALDCs and non-ALDCs show, I just don't think that makes any

9    sense.  So I don't believe that that's the correct

10   interpretation of the data at all.

11   **Q.**  Let's turn briefly to the issue of interactions.

12          Did you hear Dr. Arcidiacono testify that you

13   should have included an interaction term between race and

14   disadvantaged status?

15   **A.**  Yes.

16   **Q.**  And, again what is an interaction term?

17   **A.**  So an interaction term is a term that allows the effect

18   of one variable to depend on another variable in the model.

19   **Q.**  And did you run your model including Dr. Arcidiacono's

20   interaction terms, including the one between race and

21   disadvantaged status?

22   **A.**  Yes, I did.

23   **Q.**  Please turn to Tab 23 in your binder and tell me when

24   you've found Exhibit 699.

25   **A.**  Tab -- excuse me.

Case: 19-2005    Document: 00117629240    Page: 100    Date Filed: 07/30/2020    Entry ID: 6356615
Case 1:14-cv-14176-ADB   Document 652   Filed 04/18/19   Page 88 of 206

88

1    **Q.**  23.

2    **A.**  23.  Oh, excuse me.  Okay.

3          Yes.

4    **Q.**  Is this showing the results of the model that you just

5    described?

6    **A.**  This is showing the results of a model where I don't

7    include all the interactions that Professor Arcidiacono has

8    in his model but just the interactions with race.

9                MR. WAXMAN:  We offer Defense Exhibit 699.

10               MR. MORTARA:  No objection.

11               THE COURT:  It's admitted.

12               (Defendant Exhibit 699 admitted into evidence.)

13   **Q.**  And what does this show?

14   **A.**  This shows that the average marginal effect of

15   Asian-American ethnicity in a model that includes that set of

16   interactions, not his full set but that set of his

17   interactions, is minus 0.14.  Not statistically significant

18   across all the years, so very comparable to my overall model.

19   And, again, none of the individual estimates from year to

20   year are different.

21   **Q.**  So let's look in sum at Defense Demonstrative 10.84.

22               And will you remind us again what this shows?

23   **A.**  Yes.  So this is kind of a summary of the set of

24   exclusions that Professor Arcidiacono has made from my model,

25   in my view the right model of the overall admissions process,

1    to get to his model.

2           So we start with the -- it's showing or summarizing

3    the average marginal effect, the estimated marginal effect

4    for Asian-Americans relative to whites in each case.

5           So I start with my model, which I believe is the

6    best representation of the overall admissions process, so

7    I've included all the groups, and I've included the variables

8    that are relevant, and I have a minus 0.05 average marginal

9    effect.  Not statistically significant across all the years.

10   I've estimated the models separately over the years as well.

11          If I include the interaction variables that

12   Professor Arcidiacono includes in his specifications, so this

13   would be disadvantaged status times race, but in addition

14   disadvantaged -- or excuse me, gender times race and so on,

15   if I include that set of variables, the average marginal

16   effect across all years is minus 0.08, which in my view is

17   not fundamentally or even incrementally different than my

18   overall model.

19          So that, I don't think that's a substantively

20   important issue in comparison of his model and my model

21   looking at that full set of interactions.

22          If I include -- or if I now then, starting from

23   that base, for example, if I was to make the exclusions he

24   makes, so excluding the intended career and staff interview,

25   and excluding parental occupation, which I don't believe is

1    the right thing to do and I think is inconsistent with the

2    way the application admissions procedure works, inconsistent

3    with the use of those variables, what I'm exhibiting here is

4    that one could get to a minus 0.38 by that set of exclusions,

5    which, in my view, represents an effect of omitted variable

6    bias.

7              If in addition one was to exclude the personal

8    rating, which I don't think makes sense, which I don't think

9    is legitimate for the model, but if one was to do that, then

10   one would get to an average marginal effect of minus 0.79,

11   which includes an -- which shows an additional omitted

12   variable bias.

13             If one was to take that model and estimate the

14   model in a pooled framework, which Professor Arcidiacono

15   does, essentially it doesn't make any difference, so one is

16   still there.

17             But if one was to make one final exclusion, which

18   is to exclude the ALDCs, which, again, I think doesn't make

19   any sense, given the admissions process, given that they're

20   part of the overall process, that they're almost 30 percent

21   of all admitted students, that they're particularly strong in

22   these combinations of skills and so on, but if one was to do

23   that, one could get to minus 1.02, which is his preferred

24   model.

25             THE COURT:  You're basically saying that the

 1    difference between -- what accounts for the fact that you

 2    conclude one thing and he concludes another thing is the

 3    inclusion of the personal rating and the ALDCs.

 4            THE WITNESS:  Inclusion of the personal rating,

 5    yes, Your Honor.  Inclusion of the -- actually, inclusion of

 6    the other variables:  The parental occupation and staff

 7    interview, intended career variables.

 8            THE COURT:  But that doesn't have much of an

 9    effect, right?

10            THE WITNESS:  Well, that gets him to minus 0.38.

11    What is statistically significant --

12            THE COURT:  But the things that really are driving

13    your different conclusions are the personal rating and the

14    ALDCs?  Or no?

15            THE WITNESS:  Well, it's a combination of the three

16    things, actually, Your Honor.

17            THE COURT:  Parental occupation, personal rating,

18    ALDCs.

19            THE WITNESS:  Yeah, parental occupation and the

20    intended career and staff interview, together, the three.

21            My recollection is if I just exclude the ALDCs,

22    that the average marginal effect is not statistically

23    significant, but I may be incorrect on that.

24    Q.  Just to clarify, when Her Honor was asking you the

25    question yesterday whether the order matters and whether you

**JA3027**

 1    can sort of estimate what the model will show about average

 2    marginal effect irrespective of what order they're in, do you

 3    recall that in his testimony Dr. Arcidiacono used to explain

 4    his view of this point a table that is from your report?

 5    **A.**   Yes.

 6    **Q.**   So focusing on the disputed modeling choices here, did

 7    Dr. Arcidiacono make any modeling choice that makes his

 8    estimate of Asian-American effect less negative?

 9    **A.**   No.

10    **Q.**   And what does that tell you about his model?

11    **A.**   Well, it suggests that these exclusions are very

12    one-sided.

13    **Q.**   Can we have Defense Demonstrative 85, please.

14           And just very briefly summarize the differences

15    between your model and Dr. Arcidiacono's modeling choices

16    with respect to the actual process that Harvard uses.

17    **A.**   Right.  So in my view, the actual admissions process

18    includes all the applicants in the process, so that includes

19    the ALDCs.  It's a separate process across years for a

20    variety of reasons that I mentioned before.  And these sets

21    of factors, including the personal rating and then the other

22    set of factors, parental occupation, intended career, and

23    staff interview, are all important ingredients of the

24    admissions process.

25           So in my view, that's the actual process, and

 1    that's what I've tried to do in my model.

 2             Professor Arcidiacono, on the other hand, has

 3    excluded the ALDCs, fit a model -- single model and excluded

 4    these factors.

 5    **Q.**   Did you examine which model, that is, yours or his,

 6    better explains the actual admissions decisions?

 7    **A.**   Yes, I did.

 8    **Q.**   Please turn to Tab 24 in your binder and tell me when

 9    you've found Defense Exhibit 702.

10    **A.**   Yes.

11    **Q.**   What is this document?

12    **A.**   The first document shows the standard error of his model

13    and my model in different years for his model, and then

14    pooled and then my model pooled, talking about this issue of

15    power that we talked about yesterday.

16             And the second shows the R-squared for his model

17    and my model.

18             MR. WAXMAN:  Your Honor, we'd offer Defense Exhibit

19    702 in evidence.

20             MR. MORTARA:  No objection, Your Honor.

21             THE COURT:  It's admitted.

22             (Defendant Exhibit 702 admitted into evidence.)

23    **Q.**   Mr. Lee, may we have slide 86, please.

24             What does this demonstrative show?

25    **A.**   So this is showing the difference in explanatory power of

1    my preferred model and Professor Arcidiacono's preferred

2    model in terms of how they're explaining the variation.

3         So my model has about 64 percent of the overall

4    variation from student to student and whether they're

5    admitted or not, explained by the factors in the model.  So

6    importantly still 36 percent is omitted, and that is a higher

7    fraction, a notably higher fraction than Professor

8    Arcidiacono's model, which is only 56 percent.

9    **Q.**  So in your view, is this a significantly different -- is

10   this a significant difference in the explanatory power of

11   your model versus Dr. Arcidiacono's model?

12   **A.**  In my view, this is a very important difference.  And

13   quite notable.

14   **Q.**  Let me now turn to one other topic before we leave the

15   personal rating.

16        Did you hear Dr. Arcidiacono testify about the

17   phrase "standard strong" as applied to certain applicants?

18   **A.**  I did, yes.

19   **Q.**  And Mr. Lee, may we please have Plaintiff's Demonstrative

20   38.41.

21        Do you recall Dr. Arcidiacono showing this chart to

22   suggest that Asian-Americans with comments indicating

23   standard strong are stronger than white applicants who

24   receive that evaluation?

25   **A.**  I do, yes.

1    **Q.**   Is it true?

2    **A.**   Not in my view, no.  The problem is that Professor

3    Arcidiacono is looking, most importantly, here, in terms of

4    math, SAT math, SAT verbal, academic index, academic rating

5    of 2 or better.  So he's, again, kind of focusing on the

6    academic dimension.

7              And as I've tried to emphasize, it's a

8    multidimensional admissions process.  And what's really

9    important in understanding different students is that overall

10   strength on these multiple dimensions.  So this chart doesn't

11   even show the fraction rated athletic 2 or better, which I've

12   shown is a very important additional component.

13   **Q.**   Please turn to Tab 31 of your binder and tell me when you

14   find Defense Exhibit 709.

15   **A.**   I found it, yes.

16   **Q.**   What is this document?

17   **A.**   It's the average sum of profile ratings for

18   Asian-American and white students who are described as

19   standard strong.

20   **Q.**   So does this include all four of the profile ratings as

21   opposed to Dr. Arcidiacono's demonstrative?

22   **A.**   Yes.

23   **Q.**   And what does it show?

24   **A.**   Well, evaluating students in terms of their combinations

25   of these four strengths, it shows that amongst the students

 1   who are labeled as standard strong, the sum of the ratings

 2   for Asian-American and white students is essentially the

 3   same.  It's very, very far from statistically significant

 4   difference and very, very small in magnitude.

 5           So my understanding of this, my interpretation of

 6   this is that effectively on -- in terms of their overall

 7   evaluation on the multiple dimensions that Harvard values,

 8   they're identical.

 9           MR. WAXMAN:  Your Honor, we offer Defense Exhibit

10   709 in evidence.

11           MR. MORTARA:  No objection.

12           (Defendant Exhibit 709 admitted into evidence.)

13   **Q.**  Mr. Lee, can you please project Defense Demonstrative 89?

14           THE COURT:  Can I ask one more question?

15           MR. WAXMAN:  Oh, I'm sorry.

16           THE COURT:  Did you look at the admissions data for

17   the standard strongs?

18           THE WITNESS:  Thank you, Your Honor.

19           No, I couldn't really do that because there was

20   just a set of files that had standard strong.  There was a

21   relatively small number of such files, but I don't believe

22   that we had a measure of whether, like, any, you know, in the

23   overall 150,000, we didn't have a variable that indicated

24   whether standard strong appeared.  Just like we didn't have

25   any of the other marginal comments or anything like that.

Case: 19-2005    Document: 00117629240    Page: 109    Date Filed: 07/30/2020    Entry ID: 6356615
Case 1:14-cv-14176-ADB   Document 652   Filed 04/18/19   Page 97 of 206

97

1    **Q.**  Do you recall whether the Office of Civil Rights, when it

2    did its two-year study, did do something like that?

3    **A.**  They mention that in their report, yes.

4    **Q.**  So looking at -- can we have Defense Demonstrative 89,

5    please.

6            And what does this show?

7    **A.**  Well, this shows what we just reviewed.

8            So this is a simplified summary of the previous --

9    the exhibit.  And it shows the sum of the four ratings among

10   students who are labeled standard strong and the set of files

11   that were pulled out that had standard strong mentioned.

12   **Q.**  And what do you conclude from this with respect to

13   Dr. Arcidiacono's demonstrative?

14   **A.**  Well, I think it's an incomplete representation of the

15   actual relative strengths of Asians and whites who are

16   labeled standard strong.

17           If you look closely at their overall combination of

18   strengths, they're virtually identical.

19   **Q.**  Bottom line, does Harvard admissions office treat Asian

20   applicants any different than white applicants?

21   **A.**  In my view, no.  In my view, the statistical evidence

22   strongly supports the conclusion that there's no difference

23   between them.  There's no statistically significant

24   difference.  The magnitude of the average marginal effect in

25   the admissions model taken as a whole across all the years is

1    very small in size, very far from statistically significant.

2    None of the individual years is statistically significant.

3    They bounce around, some positive, some negative.  So it's

4    exactly the kind of pattern of findings that one would expect

5    if there was truly a zero difference between the two.  And

6    that's what I conclude.

7    **Q.**  Have you seen any evidence to suggest that Harvard

8    discriminates against Asian-American applicants?

9    **A.**  I don't believe any statistical evidence support that

10   claim, and I'm not aware of any evidence from testimony or

11   evidence of actual process of discrimination.

12   **Q.**  Let's turn to Defense Demonstrative 10.92.

13            It's been a while since we've had this up.  We have

14   to retrieve it from archives, I think.

15            And let's focus on the second question that you

16   were asked to address in this case.  How did you go about

17   analyzing the extent to which race plays a role in Harvard's

18   admissions process?

19   **A.**  Well, the main things I did were two.  First, I looked at

20   the individual effect or the specific effect of race

21   variables alone in the admissions procedure and compared that

22   to the effects of other single sets of variables, for

23   example, variables like parental occupation or variables like

24   the ratings of teachers and the alumni interviewers.

25            And then I used my model, my admissions model, to

1    look at the magnitude of the tip that is offered to different

2    race groups across different groups of students.

3    **Q.**   Well, let's start with the first analysis.  How did you

4    analyze the extent to which race alone can predict admission

5    outcomes?

6    **A.**   What I did was along the same lines of some of the

7    exercises we've seen before.  I looked at the overall

8    explanatory power of race alone in explaining

9    student-to-student admissions decisions relative to the

10   overall explanatory power of other types of factors in

11   explaining student-to-student admissions outcomes.

12   **Q.**   And would you turn to your -- in your binder to Tab 34.

13   **A.**   Yes.

14   **Q.**   What is Defense Exhibit 715?

15   **A.**   It's pseudo R-squared values of various admissions

16   models -- of admission models containing various controls.

17            MR. WAXMAN:  We offer Defense Exhibit 715 into

18   evidence.

19            MR. MORTARA:  No objection.

20            THE COURT:  Admitted.

21            (Defendant Exhibit 715 admitted into evidence.)

22   **Q.**   Please turn, Professor Card, to Tab 35.

23   **A.**   Yes.

24   **Q.**   Do you find Defense Exhibit 716?

25   **A.**   I do, yes.

1    **Q.**   And what is that?

2    **A.**   It's changes in explanatory power of my model of

3    admissions when the effects of different variables are

4    removed.

5            MR. WAXMAN:  Your Honor, we offer Defense Exhibit

6    716 into evidence.

7            MR. MORTARA:  No objection.

8            THE COURT:  Admitted.

9            (Defendant Exhibit 716 admitted into evidence.)

10   **Q.**   Mr. Lee, let's please display 10.93 on the screen.

11           And Professor Card, what does this show?

12   **A.**   So this is the graphical illustration of this first

13   exercise I did to assess the magnitude or importance of race

14   in the admissions decision.

15           So each of these is the R-squared -- each of these

16   bars represents the R-squared or the fraction of explained

17   variability from student to student in the yes-no decision of

18   whether a student is admitted.

19           So starting on the left, I show what fraction of

20   that would be explained if one only used the four profile

21   ratings, nothing else.  So none of the other contextual

22   variables, no race information, nothing else.  And one can

23   see that those four variables alone would explain about 38

24   percent of the overall differences from student to student in

25   probability of admission.

1          The next bar shows the teacher and guidance

2     counselor ratings alone.  So these are just the three school

3     support ratings variables, and those variables alone, you can

4     see, have a fairly high explanatory power.  So those three

5     variables alone explain about 19 percent of the outcome.

6          The alumni interviewer ratings, the next bar,

7     explain about 13 percent.

8          The next bar shows explanatory power of a set of

9     contextual factors from the college board data on

10    characteristics of high schools and neighborhoods.  Those

11    variables explain about 6 percent.

12         And this is individually, I emphasize.  So in each

13    case I'm using these variables alone in my model, nothing

14    else.

15         So when I get -- docket explains about 2 percent,

16    so there's these domestic dockets we've talked about.

17         Intended career one of the variables we talked

18    about explains about 1 percent, that in itself.  Intended

19    major explains about 1 percent.  And by comparison, race by

20    itself explains 0.2 percent.  So relative to all these other

21    factors, race per se is a very, very small component of

22    explanatory power.

23    **Q.**  So does that mean that race has no effect on admissions?

24    **A.**  No, not at all.

25    **Q.**  How so?

1    **A.**  Well, this is an example of the fact that any individual

2    factor in the admissions process can be important but only

3    for students who are highly competitive, exactly the kind of

4    point I was making in my hypothetical example where I looked

5    at the S-curve relationship for retirement and pointed out,

6    for example, that presence of a spouse at home, for instance,

7    would not necessarily have much effect on retirement except

8    for people who are in kind of the bubble range.  And for that

9    group of people, there can be an effect, even though on

10   average the effect across everyone is relatively small, or

11   that variable doesn't explain very much of the outcome.

12   **Q.**  And the bubble range for purposes of this case is what?

13   **A.**  For purposes of this case, the bubble range is going to

14   be for students who have at least, I would argue, one

15   strength and possibly two strengths, are in the upper group

16   of the entire admissions pool in terms of their combination

17   of strengths.

18   **Q.**  So when we talk about the upper range, are we talking

19   about applicants who are highly competitive on many

20   dimensions?

21   **A.**  We are, yes.

22   **Q.**  So turning to the second analysis that you mentioned,

23   comparing race to other factors for competitive applicants,

24   how did you determine which applicants were the most

25   competitive?

1    **A.**   So I used my admissions model and I constructed -- or I

2    thought about it in terms of exactly the same kind of

3    framework as we're thinking about in this hypothetical with

4    retirement.

5          So I used my admissions model, and I looked at the

6    overall strength of an applicant, taking account of all of

7    their different features.  So there's the school support,

8    their profile ratings, the contextual factors and all of that

9    additional information, and then I tried to -- but in the

10   case of race, what I would do is I would ignore or turn off

11   any impact of race in that evaluation.  So I'd rank all the

12   students by that characteristic and then proceed.

13   **Q.**   Okay.  Can you turn to Tab 2 of Volume 2?

14   **A.**   Yes.

15   **Q.**   Do you find Defense Exhibit 670?

16   **A.**   Yes.

17   **Q.**   What is this?

18   **A.**   So this is four -- this is the cumulative distribution of

19   applicants' predicted probability of admission.

20          MR. WAXMAN:  Your Honor, we offer Defense Exhibit

21   670 into evidence.

22          MR. MORTARA:  No objection.

23          THE COURT:  It's admitted.

24          (Defendant Exhibit 670 admitted into evidence.)

25   **Q.**   Turning now, Mr. Lee, to Defense Demonstrative 94.

1          What is this showing?

2     **A.**   So this is showing, based on the -- exactly the previous

3     document that just went into evidence, this is showing the

4     predicted probability of admission for students when I use

5     the procedure I was describing of ranking students by their

6     strength.

7          And one can see that it's got the same kind of

8     S-curve relationship or logistical curve relationship as we

9     saw in my simple hypothetical.

10          So for something like the bottom two-thirds of the

11    admissions pool, their predicted probability of admissions is

12    essentially zero.  So that group of students is out of the

13    money.  There's no combination -- there's no single variable

14    that can have any effect on their admissions probability.  So

15    that's the first group.

16          The next group of students -- we can see that

17    contrary to my retirement example, there really aren't any

18    students who have extraordinarily high probabilities.

19    There's like a couple of students who are in the 90s.

20    **Q.**   We're now talking about the right hand?

21    **A.**   The right hand, yes.  So we can say there's a group of

22    students who I would say are on the bubble, and that's

23    starting around the 75th percentile of academic strength.  So

24    when I take all the applicants and order them by their

25    strength, I get to the 75th percentile.

1          And the point that's important to take away from

2     this graph is, while it's the case that for students with low

3     probabilities of admission, some feature like one more

4     strength or going to a single type of strength or being from

5     sparse country or being of a particular racial group, for

6     those students with low probabilities of admission, we have

7     essentially a negligible effect.

8          But when we get to the bubble range, now when I

9     take a student, for example, at around, say, the 90th

10    percentile -- remember, only seven percent of all students

11    are going to get in.  So the 90 percentile group on average

12    is not too good.  They're only the tenth percent -- they're

13    out of the money.

14         But for that group students at the 90th percentile,

15    if I could give them one more factor that would push them up

16    from the 90th percentile to the 93rd or 94th percentile, one

17    can see that could have a very large effect on the

18    probability of admission.

19         And so this is an extremely important point:  That

20    once a student has some combination of strengths, then one

21    more can really make a big marginal difference.  So that one

22    additional strength can have a very large effect relative to

23    the set of previous strengths that they had.

24         Now, importantly, which of those strengths -- so

25    suppose a student has -- I talked about this before.  But

1    suppose a student has three strengths and I move them to

2    four.  Which of the ones is the one that caused them to have

3    the high probability is entirely unclear because it's one of

4    many.

5           So this kind of illustrates this concept of when

6    students are highly competitive and in the bubble range, it's

7    really due to a combination of strengths, and it's -- the

8    isolating effect of any one of many has to be put in that

9    context.

10   Q.  Would you please turn to Tab 36 in your binder.

11   A.  Yes.

12   Q.  What is Defense Exhibit 718?

13   A.  So it's average marginal effects of various factors by

14   admissions index decile.

15   Q.  Is this a summary of the analysis you just described?

16   A.  In part.

17          MR. WAXMAN:  Your Honor, we offer Defense Exhibit

18   718 into evidence.

19          MR. MORTARA:  No objection.

20          THE COURT:  It's admitted.

21          (Defendant Exhibit 718 admitted into evidence.)

22   Q.  Turn, please, Mr. Lee, to Demonstrative 97.

23          What is this showing?

24   A.  So now what I'm going to do is I'm going to focus on the

25   marginal effect of African-American or Hispanic or other

 1    ethnicity.  And I apologize, I'm going to say Hispanic

 2    sometimes when I mean Hispanic or other.  So in my analysis

 3    and Professor Arcidiacono's analysis, the Hispanic group

 4    includes some other people of other ethnicities, Hawaiian,

 5    Alaskan-American and stuff like that.  So that's the group

 6    we're talking about.

 7            And so what I've done on the axis, as before, I've

 8    ranked all the students in the application pool, all the

 9    students, not just African-American students, but all the

10    students in the application pool, including the

11    African-American students, by their strength of admission and

12    from 1 to 10 deciles but not using any tip for race.

13            So when we get to the sixth or seventh decile,

14    we're into a range wherein students are getting to be having

15    some combination of strengths already.  And one can see when

16    one gets -- first of all, when one is in the bottom half of

17    the distribution, when a student is in the bottom half of the

18    distribution, there really is no effect of race on the

19    additional probability of admission.

20            But when one gets to, say, like the eighth decile,

21    now one is well into the bubble range, independent of any tip

22    associated with race.  So now a student would probably have,

23    say, two or even three strengths.

24            And now one of those in that case, having that base

25    of strength, being in addition an African-American applicant

 1    would increase the probability of admission by an additional

 2    25 percent.  Being a Hispanic would increase their

 3    probability of admission by 8 or 9 percent.

 4              And similarly, if one goes now to the ninth decile,

 5    now one is into the very steep part of the S-curve.

 6    **Q.**  Just to be clear, the ninth decile is from -- is the 80th

 7    to the 89th percent highest group of applicants?

 8    **A.**  Yes.  89.999 percent, yes.

 9    **Q.**  Sorry.  We lawyers are not good with decimal points, but

10    I take your point.

11    **A.**  Yes.  But it goes all the way up but does not touch.

12    **Q.**  So the tenth decile is the decile between 90 and 100?

13    **A.**  Yes, yes.

14    **Q.**  Okay.

15    **A.**  So if we focus on students -- now we're ranking all the

16    students -- I want to emphasize very clearly that I'm ranking

17    all the students by all of their strengths except race.  So

18    there's some 200 factors in this model.  So all 200 are in

19    there except any effect of race.

20              I'm putting these into these different groups.  And

21    now in the ninth decile, this is the group of students who

22    are at the very steepest part of the S-curve.  For that group

23    of students, if at that point I turn on the effect of being

24    African-American, then I'm going to increase their

25    probability of admission by about 50 percentage points.  And

1    if I take an Hispanic student, for those students in the

2    ninth decile with these very strong combination of skills,

3    then I'm going to increase their probability of admission by

4    around 21 or 22 percentage points.

5    **Q.**   And is this result that we're seeing here consistent with

6    what you would expect?

7    **A.**   Yes, it's driven by this important feature of the S-curve

8    that I talked about yesterday in regard to the retirement

9    hypothetical.

10           So it's driven by the fact that, first of all,

11   very, very many students are out of the money.  And when one

12   gets to the upper deciles, in particular the upper two or

13   three deciles, those are the students that have a combination

14   of strengths.  And then with that base of, say, good

15   academics and a good extracurricular, then one additional

16   factor could make a substantial difference.

17           And that's exactly I believe how the admissions

18   process works.

19   **Q.**   And these -- what we're showing here are marginal

20   effects, correct, not coefficients?

21   **A.**   Yes.  Again, these are average marginal effects across

22   all the students in that decile.

23   **Q.**   And can you just remind us again of the difference

24   between the two?

25   **A.**   Yes.  So I want to emphasize that the average effect does

1    not mean that this is an effect for any given individual.

2    So, for example, in the ninth decile or eighth decile,

3    there's going to be students who get in and students who

4    don't get in.  So the individual is always much different

5    than the average.

6    **Q.**  What's termed --

7            THE COURT:  I'm sorry, Mr. Waxman.  Did you do this

8    analysis for Asians?

9            THE WITNESS:  No, Your Honor, because there's no

10   tip for Asians in my model.  It's minus .05, yeah.

11           THE COURT:  Okay.

12   BY MR. WAXMAN:

13   **Q.**  Mr. Lee, can we please have Demonstrative 98.

14           What is this showing?

15   **A.**  This is a set of graphs very similar in setup meant to

16   contextualize or help interpret the bumps or boosts that we

17   see for African-American and Hispanic students in different

18   deciles compared to other important attributes of students.

19           So, for example, focusing on the lineage case in

20   the middle upper panel, what I've done is taken all the

21   students in the admissions pool from my admissions model and

22   I've turned off lineage.  I said, I'm going to ignore lineage

23   and rank them by all other strengths.

24           Then for students in the eighth or ninth decile, by

25   that overall measure of combination of strengths, I'm going

**JA3046**

1    to look at what would be the increase in admissions

2    probability if, say, starting in the ninth decile in this

3    very sharp S-curve part of the relationship, what would be

4    the effect of being a lineage student and, similarly, what

5    would be the effect of different ratings combinations.

6          Now, in the case of the ratings combinations, what

7    I've done is I've taken a student, for example, with an

8    academic rating of 1.  I've taken all of those students and

9    I've turned them down to a 3, which is kind of the base group

10   for academics.  Similarly for extracurricular or similarly

11   for personal.

12         So taking all the students but turning down the

13   academic 1s to an academic 3, re-rank them into the groups,

14   and now turn on their academic 1.  And so this is the result

15   showing the average marginal effect, for instance, if a

16   student with -- who would otherwise be an academic 1, but

17   I've put them into, say, the eighth decile by turning off

18   their academic 1, and then I turn on their academic 1, it's

19   going to increase their probability of admission if they're

20   in the eighth decile with all these other strengths up to

21   around 65 percent or so.

22   **Q.**  And, again, why do any of these factors have such a large

23   marginal effect for competitive applicants when the process

24   considers so many, many different factors?

25   **A.**  Well, as I tried to emphasize, once one gets into the

Case: 19-2005    Document: 00117632246    Page: 124    Date Filed: 07/30/2020    Entry ID: 6356615
Case 1:14-cv-14176-ADB    Document 652    Filed 04/18/19    Page 112 of 206

112

 1    bubble range, those are going to be students that have a

 2    combination of strengths.  So they're going to have two,

 3    three, four strengths.

 4            So when you're in that range, first of all, there's

 5    a base of strength -- thank you -- and so you're starting,

 6    let's say, around the 90th percentile.  So one more factor

 7    that pushes you up a relatively small amount in terms of

 8    going, say, from the 90th to the 93rd percentile can have

 9    quite a large effect on your probability of admission.  So

10    that's a characteristic.

11            It's a combination of the fact that it's a multiple

12    dimensional admissions procedure.  So there's multiple

13    factors, any one of which, if it was considered the marginal

14    one, could have a big positive effect.

15    Q.   Can we go back to the previous demonstrative, 98, and

16    let's focus, and use, for example, the lineage applicants.

17    Let's consider a lineage applicant in decile 9.  This would

18    be the applicants in the decile between 80 percent

19    probability of admission and 89 if I have you right, .999

20    percent?

21    A.   Yes.

22    Q.   What is roughly the average marginal effect of lineage

23    status for that applicant?

24    A.   Reading off the graph, it's around 31 or 32 percentage

25    points.

Case: 19-2005    Document 00117638246    Page: 125    Date Filed: 07/30/2020    Entry ID: 6356615
Case 1:14-cv-14176-ADB    Document 652    Filed 04/18/19    Page 113 of 206

113

1    **Q.**  Does that mean that the applicant is likely to be

2    admitted?

3    **A.**  It means that I don't, off the top of my head, know the

4    average -- the underlying average probability of admission.

5    It would mean that the probability of admission is far below

6    1.  So any given individual, even in that group and even with

7    the lineage turned on, would not be assured admission.

8    **Q.**  And so is lineage -- would this mean, this increase in

9    their probability of admission mean that lineage status is

10   decisive for that applicant?

11   **A.**  No, not at all because you recall to get to the ninth

12   decile they would have to have a combination of these other

13   strengths.  So if I took a student who, say, is an academic

14   2, an extracurricular 2 and an athletic 2, got them into the

15   ninth decile and then turned on their lineage, then I would

16   see an effect like a 30 percent point.

17         But if I gave them the lineage and the academic 2

18   and the extracurricular 2 and turn on the athletic 2, I would

19   see a similar boost.  So any one of those four factors would

20   have this large marginal effect because I'm starting with a

21   base of three other factors that are strong.

22   **Q.**  Consider an African-American applicant in decile 9.  What

23   is, roughly, the average marginal effect of race for that

24   applicant?

25   **A.**  It's just over 50 percentage points.

**JA3049**

1    **Q.**  And does that mean that race is decisive for that

2    applicant?

3    **A.**  No, not at all.  Because there are other factors that are

4    contributing to getting them to the ninth decile and at that

5    point, on average, it's true that there's an increase in

6    probability, big increase in the probability of admission for

7    that group, but that's on top of this other base.

8            And even accounting for that increase in

9    probability, there is still uncertainty as to whether they're

10   going to get in or not.

11   **Q.**  Is it possible to think of these graphs as showing the

12   magnitude of the various, quote, tips for highly competitive

13   applicants?

14   **A.**  Yes.  This is showing that the magnitude of any specific

15   tip taken individually, one at a time, can appear to be quite

16   large in a process which values many dimensions of strength

17   when one gets into the bubble range.

18           THE COURT:  Why are the tips in the ninth

19   percentile worth more than in the tenth percentile?

20           THE WITNESS:  Good question, Your Honor.

21           The reason why is by reference to the S-curve.

22   When you're up to the high end, if you're really high, like,

23   let's say, someone who gets an academic rating of one 1 --

24   thank you Mr. Lee -- if you're at an academic -- if you're in

25   the tenth decile without your academic 1, an academic 1 is

 1    going to put you to 100 percent.  So the marginal boost --

 2    they're so strong already that it doesn't have far to go.

 3              THE COURT:  Sorry.  Flagging.

 4              MR. WAXMAN:  Did that answer Your Honor's question?

 5              THE COURT:  Yes.  Doesn't make any difference for

 6    them because they're already getting in, basically.

 7              THE WITNESS:  They're at the upper part of the

 8    S-curve, so the gap that they can possibly go up is smaller,

 9    yes.

10    BY MR. WAXMAN:

11    **Q.**  If somebody doesn't have one of these tips, say the

12    legacy tip, does that person suffer a penalty?

13    **A.**  Well, again, that's not my interpretation of the process.

14    My interpretation is that there's kind of a baseline group,

15    and then from that base, anybody who has a valuable attribute

16    like an extracurricular rating of 1 gets a tip.  Or, you

17    know, more specifically thinking of somebody who has a very

18    specific skill like a very high level of academic

19    achievement, those individuals can get a tip.

20              But that doesn't mean that the other people are

21    being disadvantaged by the presence of those highly talented

22    people, in my view.

23    **Q.**  Do these graphs show, for example, that Harvard

24    discriminates against non-legacy applicants?

25    **A.**  That would not be my interpretation, no.

1    **Q.**  Did you hear Dr. Arcidiacono concede that under his

2    analysis there is a white penalty?

3    **A.**  I heard him say that, yes.

4    **Q.**  Do you agree that there is a white penalty?

5    **A.**  That would -- no.  No, that's not the way I would pose

6    it, no.

7    **Q.**  Can you please summarize your conclusions regarding the

8    effect of race in the admissions process?

9    **A.**  Yes.  So I have two rather straightforward summary

10   points.

11        The first is that if one looks just at race per se

12   as a variable, it has a very, very small, almost negligible

13   effect on the overall probability of admission.

14        So race in isolation has almost no contribution to

15   the overall explanatory power, is very, very small, and much

16   below many, many other factors, including variables like

17   contextual factors and certainly including variables like the

18   profile ratings.  So that's the first conclusion.

19        The second conclusion is that when you get to

20   highly competitive applicants in the upper ranges of skill of

21   the applicant pool who have characteristics that already put

22   them in the bubble and already put them in a range where

23   they're competitive, then the presence of being an

24   African-American or being an Hispanic can be one more factor

25   that increases their probability of admission in some cases

1    by a notable amount.

2    **Q.**  Thank you.

3         Before we turn to the racial balancing claim that

4    is Count 3 of the complaint, I just want to return you back

5    to the personal rating because my even older partner,

6    Mr. Lee, thinks that I have not asked questions that

7    clarified something sufficiently.

8         So that he's clarified, let me just beg your

9    indulgence on a couple of questions.

10        Professor Arcidiacono claims that the way Harvard

11   discriminates against Asian-Americans is by the personal

12   rating.  Do you understand that?

13   **A.**  Yes, I believe he has asserted that that's one of the

14   primary or the primary mechanism by which they do it, yes.

15   **Q.**  Now, let me focus you on the gap between whites and

16   Asian-Americans on the personal rating.  Do you have that in

17   mind?

18   **A.**  Yes.

19   **Q.**  For both the ALDC and the non-ALDC applicants, the

20   Asian-American personal ratings were lower than for whites.

21   Correct?

22   **A.**  Yes, that's correct.

23   **Q.**  Was the difference greater for the ALDCs or the

24   non-ALDCs?

25   **A.**  Well, the difference is actually greater.  In other

1   words, the Asian-American ALDCs are further behind the white

2   ALDCs than is the case for the non-ALDCs, yes.

3   **Q.** But you understand that Professor Arcidiacono has

4   conceded that there is no discrimination against

5   Asian-American applicants who are in the ALDC group?

6   **A.** Yes, that's my understanding, yes, clearly.

7   **Q.** And the gap is smaller between Asian-Americans and whites

8   for the non-ALDC group; is that correct?

9   **A.** The gap in the personal rating is smaller for the

10  non-ALDC group, yes.

11  **Q.** But in that instance, his contention is there is

12  discrimination against Asian-Americans, correct?

13  **A.** Yes.

14        MR. WAXMAN:  Is that quite clear to you, Mr. Lee?

15        MR. LEE:  It is now.  It happens with age.

16  **Q.** Let's turn now to the racial balancing claim, Count 3 of

17  the complaint.  And can we have Demonstrative 99 and the

18  third question you examined:  Whether statistics support

19  SFFA's claim of racial balancing.

20        Did you hear or review testimony earlier in this

21  trial on the use of one-pagers?

22  **A.** I did, yes.

23  **Q.** And you heard -- did you hear Mr. Mortara argue in his

24  opening statement that Harvard uses the one-pagers, what are

25  referred to as the one-pagers to, quote, match up the racial

| | |
|---|---|
| 1 | composition of the class to the prior year? |
| 2 | Did you hear that? |
| 3 | **A.**  I recall that, yes. |
| 4 | **Q.**  Did you do any statistical analysis that sheds light on |
| 5 | whether Harvard actually acted in that way? |
| 6 | **A.**  I did, yes. |
| 7 | **Q.**  And what did you find? |
| 8 | **A.**  Well, what I found is that, in my view, there's no |
| 9 | evidence that that's going on. |
| 10 | **Q.**  Can you please turn to Tab 32 in your binder and tell me |
| 11 | when you've found Defense Exhibit 711. |
| 12 | **A.**  Yes. |
| 13 | **Q.**  And what is this document? |
| 14 | **A.**  So this is the annual percentage change in various race |
| 15 | groups in the proportion of admitted students and annual |
| 16 | percentage change in various race groups in the proportion of |
| 17 | matriculating students. |
| 18 | MR. WAXMAN:  Your Honor, we offer Defense Exhibit |
| 19 | 711 into evidence. |
| 20 | MR. MORTARA:  No objection. |
| 21 | THE COURT:  Admitted. |
| 22 | (Defendant Exhibit 711 admitted into evidence.) |
| 23 | **Q.**  Mr. Lee, let's display demonstrative 100. |
| 24 | And what is this showing? |
| 25 | **A.**  So this is meant to directly address the question of |

1    whether there's somehow year-to-year balancing in the

2    composition of the admitted pool of students, racial

3    composition of the admitted pool of students at Harvard.

4            So what I've done for each of these four racial

5    groups is I've -- and I'm using here data that is not -- it's

6    a combination of other data because I'm able to go back all

7    the way to 2001 for using some aggregated data that Harvard

8    has made available.

9            So I'm showing, for example, the percentage change

10   in the share of one of these racial groups from the previous

11   year to the current year.

12   **Q.**  So can you illustrate that by showing us a few -- pick

13   out a few years?

14   **A.**  Yes.  So let's start with the African-American admitted

15   students 2001, minus 4 percent.  It would say that relative

16   to the previous year, the share of African-American students

17   in the admitted pool of students, all the students who are

18   admitted, their share fell by 4 percent.

19            In 2002, between -- that's relative to 2001.

20            From 2001 to 2002 it then rose by 14 percent.  If

21   one looks, for example, at the Asian-American graph, one can

22   see from 2000 to 2001, their share, the Asian-American share

23   in the admitted pool, rose by 5 percent between 2000 and

24   2001.  It rose by another 5 percent between 2001 and 2002.

25   Then it fell by 8 percent between 2002 and 2003.

**JA3056**

 1          And one can see if one looks at this graph a

 2    pattern of often fairly large changes in the year-to-year

 3    shares of each race group in the admitted pool.

 4    **Q.**  And if Harvard were trying to match the racial

 5    composition of the prior class, what do these charts suggest?

 6    **A.**  Well, they're not doing a very good job, I guess, would

 7    be one way of putting it.  Another way to say it would be it

 8    doesn't seem like that that could possibly be going on

 9    because these changes -- these are big percentage changes in

10    year to year.

11    **Q.**  So in addition to analyzing the year-to-year changes in

12    the pool of students who get acceptance letters, did you also

13    analyze the change in the share of the matriculating class,

14    that is, the students who actually attend?

15    **A.**  I did, yes.

16    **Q.**  And please display 101.

17          And what is this showing?

18    **A.**  So this is an exactly parallel analysis now focusing on

19    the shares of matriculating students.  So the students who

20    are offered admission and decide to take it up and come to

21    Harvard, agree to come, from year to year for each of the

22    four racial groups.

23          So, for example, focusing on the Asian-American in

24    the upper left from 2000 to 2001, the Asian-American share of

25    the matriculating students rose by 5 percent; 2002, rose by

1    7; '3, fell by 7 and so on.

2    **Q.**   So what do you conclude based on the data that we've just

3    discussed?

4    **A.**   Well, again, it seems there's not any evidence of trying

5    to stabilize the year-to-year racial shares of the

6    matriculating class.

7    **Q.**   Did you look at any other data on these issues?

8    **A.**   Yes, I looked at a broader perspective on the actual

9    levels of the shares of each of the race groups over time.

10   **Q.**   Can you please turn to Tab 33 in your book and tell me

11   when you've found Defense Exhibit 713.

12   **A.**   Yes.

13   **Q.**   What does that show?

14   **A.**   It's two exhibits, the Asian-American, African-American

15   and Hispanic shares of applicants to the class of 2018 [sic]

16   to 2019, and the shares admitted to the class of 2018 [sic]

17   to 2019.

18   **Q.**   When you said it's two exhibits, I think what you meant

19   to say is it's two pages to the exhibit.

20   **A.**   Two pages, sorry.

21           MR. WAXMAN:  Your Honor, we offer Defense 713

22   into evidence.

23           MR. MORTARA:  No objection.

24           THE COURT:  Admitted.

25           (Defendant Exhibit 713 admitted into evidence.)

1    **Q.**  Let's turn to slide 102, please, Mr. Lee.  What is this

2    showing?

3    **A.**  Okay.  So this is showing the share -- the applicant

4    pool.  So this is the share of all the students who apply to

5    Harvard who are in different racial groups between 1970 and

6    2019.  And this is the share overall, including in the

7    denominator, international students.  So slightly different

8    than some of the shares that we've talked about before or

9    things we've talked about before.

10   **Q.**  Let's turn now to Defense Demonstrative 10.103.

11        And what is this showing?

12   **A.**  This is showing the share of admitted -- the share -- the

13   different race groups in the admitted class from 1980 to

14   2019.

15   **Q.**  Now, Mr. Lee, if you can display slide 104.  I think

16   we'll see the two graphs together on one page.

17        Looking particularly at the years in question in

18   this case, which chart shows more year-to-year variation?

19   **A.**  To me it seems clear that, for instance, looking at

20   Hispanic and African-American, you can see wide swings from

21   year to year, particularly in the Hispanic share, but also

22   the African-American share of admitted students, whereas the

23   shares of applicants are a little bit more stable.  So this

24   is the opposite pattern than one would expect to see if

25   Harvard was trying to stabilize the admitted students

1    relative to the students who apply.

2            So if they were really trying to stabilize the

3    shares of admitted students, then they would take kind of a

4    noisy share of applicants and create a smooth or constant

5    share of admitted students.  And the pattern is actually

6    completely contrary to that.

7    **Q.**  Let's turn to Demonstrative 105, please.

8            And let's look now at the last question you

9    addressed in this case.

10           MR. WAXMAN:  Your Honor, it's 12:30 and we are at

11   great stopping point.

12           THE COURT:  We will recess until 1:00.  Thank you,

13   all.

14           (Recess taken 12:33 p.m.)

15

16

17

18

19

20

21

22

23

24

25

1              **** AFTERNOON SESSION ****

2              THE CLERK:  All rise.  Court is in session.  Please

3        be seated.

4              THE COURT:  Did you get lunch?

5              MR. WAXMAN:  I did, thank you.

6              THE COURT:  Did you get lunch, Dr. Card?

7              THE WITNESS:  Yes, I did.

8              THE COURT:  All right.  Excellent.  When you're

9        ready.

10             MR. WAXMAN:  Thank you.

11       BY MR. WAXMAN:

12       **Q.**  Looking at demonstrative 105 and the last question you

13       were asked to address in this case, the effect that

14       eliminating race on the admissions process would have on the

15       composition of Harvard's class.

16             Before we discuss your analysis, Professor Card,

17       are you expressing any view on what characteristics Harvard

18       should value in an admitted class?

19       **A.**  No.

20       **Q.**  Did you review the report produced by the committee to

21       study race-neutral alternatives in Harvard College admission?

22       **A.**  Yes, I did.

23       **Q.**  And what was your understanding of the division of labor

24       between you and the committee?

25       **A.**  My understanding was that I was to try and do essentially

 1    the calculations involved in evaluating alternative

 2    race-neutral alternatives, first to find some of them, to

 3    look at the ones that Mr. Kahlenberg had done, and then

 4    provide the numbers that the committee could then use.

 5    **Q.**   Was it your job or the committee's job to decide whether

 6    classes with those characteristics would or would not satisfy

 7    Harvard's educational objectives?

 8    **A.**   That was entirely the committee's job.

 9    **Q.**   Let's look at demonstrative 106, please.  Can you please

10    walk us through the steps of your analysis.

11    **A.**   Yes.  So there's three basic steps.  The first step is to

12    consider the composition of the class if Harvard were to

13    remove consideration of race entirely in the admissions

14    process.

15        The second step would be to evaluate how the

16    composition of the class would change if it employed various

17    race-neutral alternatives.

18        And the third step was to evaluate how the

19    composition of the class would change if it used the approach

20    preferred by Mr. Kahlenberg.

21    **Q.**   So let's start with the effect of eliminating race.

22        Did you hear Dean Fitzsimmons and others testify

23    about Harvard's existing race-neutral efforts to promote

24    diversity?

25    **A.**   I did, yes.

**Q.** If Harvard were to continue with all of those efforts but
then eliminate all consideration of race, would the racial
composition of its class change?

**A.** Yes, I think so.

**Q.** How did you calculate that?

**A.** So what I did was I -- for today's purposes, I'm going to
focus on the class of 2019, which is the last of the six
years in the data set that we've analyzed.

**Q.** May I interrupt you? Is that also the class that
Mr. Kahlenberg identified and focused on?

**A.** Yes.

**Q.** Okay.

**A.** So what I did is I took my model for that class, and I
used the exact model that I developed earlier and we've
talked about extensively, and I took that model and
effectively turned off all of the preference or whatever
effects associated with race and then, using that analysis,
recalculated the probabilities of admission for each student
without any race tips or whatever. And then considered
through simulation methods the characteristics of the class
that would result in that case.

**Q.** All right. If we could have Slide 107, please.

     What is this showing?

**A.** So this is showing two charts. The left chart is the
racial composition of the actual admitted class for the class

 1   of 2019.  And I'm showing the five racial categories that

 2   we've been using throughout the analysis and is employed in

 3   all of my statistical models and so on.  So that class was

 4   40 percent white, 24 percent Asian-American, 14 Hispanic or

 5   other, 14 percent African-American, and 8 percent of those

 6   students had race missing.

 7           And the second bar --

 8   **Q.**  Thank you.

 9   **A.**  -- is my estimate.  I should say this is an estimate

10   under the assumptions that the set of students who actually

11   apply to Harvard stayed the same in 2019, but the procedures

12   and admissions were changed to remove consideration of race.

13   So that class would be 48 percent white, 27 percent Asian,

14   9 percent Hispanic, 6 percent African-American, and

15   10 percent missing race.

16   **Q.**  Now, what data did you use for this analysis?  This is

17   again the class of 2019.

18   **A.**  Yes.  I'm using the NEVO database for the actual

19   characteristics of the students who applied to the class,

20   merged with the College Board data on information on the

21   characteristics of schools and neighborhoods.

22   **Q.**  Did you do a similar analysis for the class years in this

23   case other than 2019?

24   **A.**  Yes, I did.  I did an analysis for all of the other

25   years.

1   **Q.**  And were the results similar?

2   **A.**  Yes.  Broadly similar, yes.

3   **Q.**  Let's turn to Slide 108 and look at the second step.  Can

4   you remind us what the second step of your analysis was?

5   **A.**  Right.  So the second step of my analysis is to try and

6   evaluate how the composition of the class would change if

7   Harvard employed various race-neutral alternatives.

8   **Q.**  And how did you decide which alternatives to examine?

9   **A.**  Well, some of them were the kind of race-neutral

10  alternatives that have been proposed or discussed in the

11  existing literature.

12          There is an existing literature in this area.  Most

13  often the existing literature is evaluating proposals that

14  have been implemented or have been considered being

15  implemented in different settings, typically not a

16  Harvard-type setting.

17          And then I also used -- looked at the kind of

18  proposals that were in Mr. Kahlenberg's report.

19  **Q.**  Were there proposals that you considered from the

20  literature that were not in Mr. Kahlenberg's report?

21  **A.**  Yes.  In fact, I do consider one of those.

22  **Q.**  Which is that?

23  **A.**  I considered the possibility of eliminating the use of

24  the SAT in evaluating students, which is -- a number of even

25  fairly elite schools are doing that or have considered doing

**JA3065**

1   that and a number of other schools as well.

2   **Q.**  Mr. Kahlenberg and SFFA have not proposed that; is that

3   correct?

4   **A.**  That's correct, yes.

5   **Q.**  Now, let's look at demonstrative 109, please.  And could

6   you identify the first -- can you identify the categories of

7   race-neutral alternatives that you explored?

8   **A.**  Right.  First I'm going to show what happens if in

9   addition to eliminating the effect of race in the admissions

10   process Harvard were also to eliminate policies that -- in

11   particular that Mr. Kahlenberg has alleged to benefit white

12   applicants.

13        Then I'm going to evaluate what would happen if

14   Harvard tried to change the admissions process and put more

15   weight on candidates with lower levels of socioeconomic

16   status as measured by the variables that are available in the

17   NEVO database.

18        Then I'm going to look at a couple of policies that

19   Mr. Kahlenberg points to that may -- that he argues could

20   promote diversity.

21        And then I'm going to look -- at the end, the

22   fourth thing I'm going to do is look at place-based-type

23   admissions policies.

24   **Q.**  Let's look at the first.  Can you identify the category

25   of practices that you analyzed under policies that allegedly

1  benefit white applicants?

2  **A.**  Well, the main thing I'm doing here is I'm turning off

3  any tip associated with ALDC groups.  So I'm taking --

4  eliminating ALDC.  I'm going to look at the effect of ending

5  early action, which Harvard did and then restored, and I'm

6  going to consider eliminating consideration of standardized

7  test scores.

8  **Q.**  So looking at demonstrative 112, please.  Let's start

9  with eliminating ALDC consideration.  First of all, can you

10  please turn to Tab 37 of your binder --

11  **A.**  Yes.

12  **Q.**  -- and tell me when you've found Defense Exhibit 720.

13  **A.**  720 is the simulated racial composition of the admitted

14  class after removing consideration of race, lineage, athletic

15  recruit status, whether an applicant's parents are Harvard

16  faculty and staff, or on the dean's or director's interest

17  list.

18         MR. WAXMAN:  Your Honor, we offer Defense

19  Exhibit 720.

20         MR. MORTARA:  No objection.

21         THE COURT:  Admitted.

22         (Defendant Exhibit No. 720 admitted.)

23         MR. WAXMAN:  Mr. Lee, may we have Slide 112 again?

24  BY MR. WAXMAN:

25  **Q.**  What is this showing?  First of all let me just ask you,

Case: 19-2005    Document: 00117682840    Page: 144    Date Filed: 07/30/2020    Entry ID: 6356615
Case 1:14-cv-14176-ADB   Document 652   Filed 04/18/19   Page 132 of 206

132

1     are the left-hand bar and the middle bar the same as the two

2     bars that we had previously; that is, the actual admitted

3     class and then what happens if you remove consideration of

4     race, what the model would predict would happen to the ethnic

5     and racial composition of the class if you remove

6     consideration of race?  Is that right?

7     **A.**  Yes.

8     **Q.**  And is that right for all of these slides we're going to

9     be seeing for the next few minutes?

10    **A.**  Yes.  So as a benchmark, all of the slides will always

11    have the actual admitted -- the racial composition of the

12    actual admitted class and then the racial composition if one

13    was to remove consideration of race.  And then from there,

14    I'm going to proceed.

15    **Q.**  Okay.  So what does the third column here add.

16    **A.**  That shows the racial composition if, in addition to

17    removing consideration of race, one were to turn off the tips

18    associated with ALDC.

19            And one can see a couple of important features.

20    First in terms of the race-missing group, no large effect.

21    African-American fraction would fall slightly from 6 percent

22    to 5 percent.  Hispanic and other fraction would be about

23    constant.  Asian fraction would rise by about 4 percentage

24    points and the white fraction would fall about 4 percentage

25    points.

1  **Q.**  Are you aware of the claim in this case that the children

2  of donors or potential donors may be on the dean's or

3  director's interest list?

4  **A.**  Yes.

5  **Q.**  And to be clear, when you simulated eliminating the

6  consideration of the ALDC attributes, one of the things you

7  included was eliminating consideration of the interest list.

8  Am I right?

9  **A.**  Yes.  Because that's included in the D of the ALDC group.

10 **Q.**  Do you recall that Mr. Kahlenberg also suggested that

11 Harvard eliminate what it calls the Z list or the offer of

12 deferred admission for certain applicants?

13 **A.**  Yes.

14 **Q.**  Did you simulate that?

15 **A.**  Well, actually, yes.  It's simulated here directly, in

16 the sense that I'm simulating the actual set of people who

17 were admitted in 2019, including anybody who was admitted for

18 deferred admission.  So I'm essentially assuming there's one

19 admissions decision.

20 **Q.**  Let's turn to early action.  How did you assess the

21 effect of eliminating early action?

22 **A.**  Well, as I think has been clear from some of the earlier

23 testimony, in the case of early action, there's direct and

24 empirical evidence available from the record because Harvard

25 had early action for quite a long time and then eliminated it

 1    for a number of years and then restored it.  So one can use

 2    comparisons of characteristics of the class when early action

 3    is in place and when it's been eliminated.

 4    **Q.**  And did you look at whether the racial composition of the

 5    applicant and admit pools changed when early action was

 6    eliminated?

 7    **A.**  Excuse me for a second.  Yes, I did.

 8    **Q.**  And what did you find?

 9    **A.**  I found that there doesn't seem to be any discernible

10    shift in either of those.

11    **Q.**  Did anything change?

12    **A.**  Yes.

13    **Q.**  What was that?

14    **A.**  What changed very consistently -- and this was, in fact,

15    noted by an evaluation done by Harvard itself -- was that the

16    matriculation rate of certain students fell.

17    **Q.**  Would you please turn to Tab 45 of your binder.

18    **A.**  Yes.

19    **Q.**  What is Defense Exhibit 728?

20    **A.**  728 is share of applicants by race before and after

21    changes to early admission and share of admitted students by

22    race before and after changes to early admission.

23            MR. WAXMAN:  Your Honor, we offer Defense

24    Exhibit 728 in evidence.

25            MR. MORTARA:  No objection, Your Honor.

 1           THE COURT:  Admitted.

 2           (Defendant Exhibit No. 728 admitted.)

 3    BY MR. WAXMAN:

 4    Q.  Mr. Lee, turning to demonstrative 113, what does this

 5    show?

 6    A.  So this is a before, during, and after comparison of the

 7    period when Harvard had early action available, 2000 to 2011,

 8    during the period when it had abolished that and then during

 9    the period when it restored it.

10           I'm focusing on the matriculation rate, which is

11    the fraction of students who were offered admission who come

12    to Harvard.  And so I'm showing it for these four groups:

13    whites, Asian-Americans, African-American, Hispanic or other,

14    and unknown.

15    Q.  And what do you find?

16    A.  One can see that there's potentially no change in, for

17    example, the Asian-American matriculation rate.  But there's

18    a pretty large and discernible drop in the fraction of

19    African-American and Hispanics or other students who

20    matriculate.  They're already the lowest of the groups.  So

21    their matriculation rate compared to the earlier period and

22    compared to the later period falls by 5 to 6 percentage

23    points, which is something like nearly a 10 percent drop in

24    the matriculation rate.

25    Q.  Did you review documents in this case about why Harvard

1    actually decided to reinstate early action?

2    **A.**   Yes.

3    **Q.**   And did you hear or review testimony on that issue

4    earlier in this trial?

5    **A.**   Yes, I did.

6    **Q.**   Is your analysis of the data consistent with those

7    historical documents and the testimony in this court?

8    **A.**   Yes.  I think all of us find that all of that analysis is

9    totally consistent with this analysis and suggests that

10   elimination of early action would -- if it had any effect,

11   the main effect it would be would be to reduce the fraction

12   of African-American and Hispanic students who are in the

13   Harvard class.

14   **Q.**   So did you draw any conclusion from these data about the

15   likely effect if Harvard were to eliminate early action

16   again, as Mr. Kahlenberg thinks it should?

17   **A.**   My conclusion is that that would work contrary to the

18   goal of trying to increase the representation of these

19   underrepresented groups.  So my conclusion is it works in the

20   wrong direction.

21            MR. WAXMAN:  Mr. Lee, can we have demonstrative

22   115, please.

23   **Q.**   Let's turn now to your analysis of increasing

24   socioeconomic preferences.  How did you conduct that

25   analysis?

 1   **A.**  Well, this is a highly -- at least somewhat artificial

 2   exercise.  It's comparable to exercises that have been done

 3   in the literature.  I'm going to take information that's

 4   available in the database about a number of indicators of low

 5   socioeconomic status.  I'm going to, for short, call it "SES"

 6   because I am going to stumble over socioeconomic.

 7        So I'm going to look at a set of factors that are

 8   associated with low-SES status.  And I'm going to imagine

 9   simulations where I change the Harvard admissions procedure

10   and consider what would happen if in addition to what they're

11   currently doing for evaluating low-SES students, which as far

12   as I can tell already in my model that they're already giving

13   them some boost, I'm going to increase the boost that this

14   group of students gets.

15        MR. WAXMAN:  Mr. Lee, may we see Slide 116?

16   **Q.**  Can you walk us through this slide?

17   **A.**  Yes.  What I'm going to do is I'm going to consider four

18   factors.  Each of these is a simple yes/no about individuals.

19        Are you identified as disadvantaged?  In other

20   words, was that a flag in the admissions file which we've

21   been using in my admissions model?

22        Are you a first-generation college student?  So did

23   neither of your parents go to college.

24        Did you apply for a fee waiver, which is an

25   indicator of relatively low-SES status.

1           And finally from the College Board data, are you

2     coming from a neighborhood where family income is 65,000 or

3     below, which is the -- in 2019 was -- for the class of 2019

4     was the reference point.  Anybody whose family income was

5     $65,000 or below essentially got to go to Harvard for free

6     with no parental contribution.

7           And I'm going to combine these four and I'm going

8     to sum.  A student that has all four of these, I will

9     consider them to have a 1X, one times boost.  A student who

10    has two of these will get a .5X.  The student who has just

11    one will be a quarter of an X.

12          And then what I'm going to do is I'm going to

13    gradually go from 1X to 2X to 3X and multiply up this

14    combined set of factors.

15          MR. WAXMAN:  May we have Slide 117, please.

16    **Q.**   What is this showing?

17    **A.**   This is helping to understand what does it mean to impose

18    a 1X boost.  So with my actual model but on average across

19    all domestic students, the average application rate --

20    average acceptance rate is 7 percent.

21          And for a student that had a 1X boost -- in other

22    words, all four of these components were turned on, and I was

23    in a 1X simulation -- their probability of admission would

24    rise to 36 percent.  So as we've been talking about before,

25    the average marginal effect of a 1X boost for someone who has

 1    all four categories of low-SES status would be 29 percentage

 2    points.

 3             I'm going to show some simulations that also

 4    increase that boost up to ranges of 4 and far beyond that.

 5    So at a 4X boost, in other words, four times the boost that

 6    I'm calling a standard boost.

 7    **Q.**   That is the boost that Harvard is currently giving it?

 8    **A.**   Harvard is currently giving a 0X boost.

 9             THE COURT:  I'm sorry.  Where does the 29 come

10    from?

11             THE WITNESS:  The difference between 7 and 36, Your

12    Honor.

13             THE COURT:  I see it.  Thank you.

14             THE WITNESS:  I'm speaking a little too quickly in

15    anticipation of --

16    BY MR. WAXMAN:

17    **Q.**   -- of finishing.  Sorry.  Finishing with me.  He's so

18    eagerly anticipating his dialog with you, Mr. Mortara, as are

19    we all.

20    **A.**   On the right panel, I'm showing when I increased the

21    boost for this combined set of factors to a 4 times or 4X

22    level, so again as a benchmark, the average probability of

23    admissions is 7 percent for domestic students.

24             And in my current model there's no boost.  Now,

25    that doesn't mean that disadvantaged students aren't getting

 1    some benefit, but this means there's no extra boost.  So this

 2    is the extra boost.

 3             With 7X -- excuse me -- with 4X boost, somebody who

 4    would be kind of at a 7 percent probability of admission

 5    would rise to 100 percent.  At a 4X boost, these four factors

 6    essentially allow to you get in with certainty.

 7    **Q.**   So in other words, an applicant who had simply an average

 8    probability of admission of all applicants, 7 percent, now

 9    slightly less, if the applicant were given what you're

10    calling a 4X boost over the current boost that Harvard gives

11    would be admitted, period?

12    **A.**   Yes.

13    **Q.**   Just by virtue of that?

14    **A.**   Yes.

15    **Q.**   Did you analyze -- when you were analyzing the low-SES

16    boost, were you analyzing it in isolation or combined with

17    other race-neutral alternatives?

18    **A.**   No.  So I'm going to start by turning off all of the race

19    tips and then eliminating the preference for ALDC groups.

20    **Q.**   Please turn to Tab 38 of your volume, please, and tell me

21    when you've found Defense Exhibit 721.

22    **A.**   Yes.

23    **Q.**   Does this show the results of the various simulations you

24    just described?

25    **A.**   Yes, it does.

 1              MR. WAXMAN:  Your Honor, we offer Defense

 2     Exhibit 721 into evidence.

 3              MR. MORTARA:  No objection.

 4              THE COURT:  Admitted.

 5              (Defendant Exhibit No. 721 admitted.)

 6              MR. WAXMAN:  Mr. Lee, would you please display --

 7     yes, thank you -- Slide 118.

 8     BY MR. WAXMAN:

 9     Q.  There's a lot of columns here.  What does Slide 118 show?

10     A.  Yes.  As before, the first two columns are ones we've

11     seen before, so actual composition of the class, just

12     removing of the effect of race.

13              And then as we go across from there, I'm

14     simultaneously removing ALDC consideration and offering a 1X,

15     2X, 3X, and so on boost for low-SES students.  I'm seeing

16     what that kind of simulated admission model, what the racial

17     composition of the class would be under that simulation, each

18     of those simulations.

19     Q.  And so what SES boost would you calculate would be

20     required after eliminating consideration of race, removing

21     any ALDC consideration in order to have a class with a

22     combined level of African-American and Hispanic

23     representation comparable to the class of 2019?

24     A.  Yes.  So the class of 2019 is about 28 percent combined

25     African-American, Hispanic, or other.  And so looking across

1    the columns, one can see if I get to something like a 4X

2    boost, it's about 27 percent, the combined fraction.

3            So I'll use that as an illustrative benchmark in

4    the next slide.

5    **Q.**   And if I recall your testimony, that is the boost that

6    essentially automatically puts in any applicant among the

7    entire applicant pool with an average probability of

8    admission?

9    **A.**   Yes.

10   **Q.**   And what boost would be required, according to your

11   model, what your model predicts, to simulate a class that

12   would have a share of the admitted class represent the share

13   of the African-American share of the 2019 class?

14   **A.**   Yes.  So the 2019 class is about 14 percent

15   African-American.  And according to these simulations, one

16   would have to go out to something like a 10X boost to get

17   that share.

18   **Q.**   Now, under these simulations, would other characteristics

19   of the class change if you applied a large low-SES boost?

20   **A.**   Yes.

21           MR. WAXMAN:  Please turn, Mr. Lee, to Slide 118.

22   I'm sorry, 119.  Yes.

23   **Q.**   What does Defense Demonstrative 10.119 show?

24   **A.**   So this is summarizing characteristics of the class in

25   terms of these four key profile ratings.

1          If compared to the current class, so the actual

2     classes fractions of the four types of strengths is shown in

3     blue.  So for instance, 75 percent or so of the actual

4     admitted class had an academic 1 or 2.  And this would show

5     what would happen to those fractions of 1 or 2 rating on

6     academic, extracurricular, personal, and athletic under that

7     simulated admissions system with a 4X boost for low-SES

8     students.

9     **Q.**   So if I'm understanding this correct with respect to, for

10    example, the academic rating, the predicted class with a 4X

11    boost, that is the boost that you estimated would be required

12    in order to achieve a share of the admitted class comprising

13    African-Americans, Hispanics, and other that are represented

14    in the class of 2019, would produce -- is predicted to

15    produce a class with 13 percent fewer academic 1s and 2s,

16    correct?

17    **A.**   Yes.  9 percent fewer extracurricular 1 or 2s, 11 percent

18    fewer with the personal rating at 1 or 2, and 33 percent

19    lower with the athletic rating 1 or 2.

20    **Q.**   Do you know what would happen with a 10X boost?

21    **A.**   It would be in the same direction but bigger drops in

22    these components.

23    **Q.**   Let's turn to the alternative of eliminating

24    consideration of standardized test scores.  That is a

25    simulation, if I understand your testimony, that

1    Mr. Kahlenberg didn't propose but has been proposed and done

2    in some institutions, correct?

3    **A.**   Yes.  My understanding is a number of schools have

4    already done it and are talking about it, yes.

5    **Q.**   And did you simulate eliminating test score --

6    standardized test score consideration?

7    **A.**   Yes, I did.

8    **Q.**   And did you do so on its own or combined with alternative

9    practices?

10   **A.**   So I did it building on the previous simulations.  So I

11   did all of the things I'd done in the previous simulations

12   and now in addition remove any consideration of SAT.

13   **Q.**   Would you please turn to Tab 39.

14   **A.**   Yes.

15   **Q.**   Does this show the results of the simulations you just

16   described?

17   **A.**   Yes.

18            MR. WAXMAN:  You were, we offer Defense

19   Exhibit 722.

20            MR. MORTARA:  No objection.

21            THE COURT:  You've broken Mr. Mortara's spirit.

22            MR. MORTARA:  For the record, Your Honor, I think

23   you'll see he hasn't.

24            MR. WAXMAN:  It's not even a goal of mine.  May it

25   be admitted, Your Honor?

 1              THE COURT:  Yes, it may.

 2              (Defendant Exhibit No. 722 admitted.)

 3    BY MR. WAXMAN:

 4    Q.   Please turn to demonstrative 120 and tell us what this

 5    shows.

 6    A.   So this is a set of simulations very similar to the

 7    previous one.  So the first is the actual class, the second

 8    is just removing the consideration of race, and then from

 9    then on I'm eliminating any ALDC preferences.  I'm

10    eliminating the use of standardized test components in the

11    admissions model, and I'm imposing a 1X to 10X low-SES boost

12    as before.

13    Q.   What level of boost would be required in order to

14    simulate a class that had a share -- an admitted class that

15    had a share of African-American, Hispanic, or other students

16    comparable to the actual admitted class of 2019?

17    A.   Again, the admitted class was about 28 percent, those

18    combined groups.  And so looking across the columns here, one

19    would need to go to something like a 3X boost to get to

20    around that level.

21    Q.   And what boost does the model predict would be required

22    in order to produce an African-American share of the admitted

23    class similar to the class of 2019?

24    A.   That would be like a 5 or 6 X SES boost.

25    Q.   And would other characteristics of the class change if

1   you did that?

2   **A.**   Yes.  As before.

3   **Q.**   Let's look at Slide 120, please.  And what is this

4   showing?

5   **A.**   This shows that relative to the actual class in terms of

6   their fractions with an academic 1, 2, or extracurricular 1,

7   2, and so on, the simulated class, if I was to do this

8   combination of policies, the fraction with an academic rating

9   of 1 or 2 would fall by 17 percent; extracurricular rating

10  would fall by 7 percent; personal rating would fall by

11  7 percent; athletic rating by 27 percent.

12          MR. WAXMAN:  Mr. Lee, please put up 122.

13  **Q.**   Now, let's turn back to category C.  You said earlier

14  that you also assessed policies that Mr. Kahlenberg has

15  suggested might promote diversity.  Correct?

16  **A.**   Yes.

17  **Q.**   What policies did you assess?

18  **A.**   They're the three shown below there.

19          I looked at the possible, potential impact of

20  increasing the number of transfer students who are admitted

21  to Harvard, of trying to increase recruiting of disadvantaged

22  students, and increasing financial aid.

23  **Q.**   Let's turn to -- well, how did you assess the effect of

24  increasing transfer admissions?

25  **A.**   So here we've got some empirical evidence because we have

1    a number of students who applied over the sample period who

2    were actually applying from other colleges and universities.

3    And so I take a look at their characteristics relative to the

4    existing class.

5    **Q.**   In order to show what?

6    **A.**   In order to show first how they compare in terms of race

7    and ethnicity differences; and second, how they compare in

8    terms of characteristics like academic 1, 2, and so on.

9    **Q.**   Please turn to Tab 47 in your binder.

10   **A.**   Yes.

11   **Q.**   What does Defense Exhibit 730 show?

12   **A.**   It shows academic and demographic characteristics of

13   transfer applicants and other applicants.

14           MR. WAXMAN:  Your Honor, we offer Defense

15   Exhibit 730.

16           MR. MORTARA:  No objection.

17           THE COURT:  Admitted.

18           (Defendant Exhibit No. 730 admitted.)

19           MR. WAXMAN:  Mr. Lee, please display demonstrative

20   124.

21   BY MR. WAXMAN:

22   **Q.**   Professor Card, what is this showing?

23   **A.**   This is a side-by-side comparison of the racial

24   composition of students who in the sample had applied as

25   transfer applicants, in yellow, and the actual composition of

```
 1    other students who are non-transfers.  So they would be -- I
 2    guess you would call them first-time freshmen, prospective
 3    first-time freshmen.
 4              When looking across these categories, one can see
 5    in terms of the white share it's about the same.  In terms of
 6    other groups, African-American and Hispanic or others, it's
 7    about the same.  The one difference is more of the transfers
 8    have race missing and fewer are Asian-American.
 9    Q.  When you say fewer are Asian-American, in other words,
10    fewer applicants in the transfer pool are Asian-Americans
11    than applicants in the regular pool?
12    A.  Correct, yes.
13    Q.  Turning to demonstrative 125, what is this showing?
14    A.  So this is a side-by-side comparison of the fractions of
15    transfer and non-transfer applicants with academic rating of
16    1 or 2, personal rating 1 or 2, extracurricular rating 1 or
17    2, athletic rating 1 or 2.
18    Q.  And what do you conclude from those data?
19    A.  That shows that the transfer students are relatively
20    weaker on all four of these dimensions.  So they would be
21    substantially less strong than the existing class in terms of
22    those dimensions if more of them were admitted, yes.
23    Q.  Now let's turn to recruiting.
24    A.  Could I just say one thing?
25    Q.  Of course.
```

Case 1:14-cv-14176-ADB   Document 652   Filed 04/18/19   Page 149 of 206

149

 1    **A.**  Because on the one hand these students are weaker, on the

 2    other hand they have about the same fraction of

 3    African-American and Hispanic students.  Increasing the

 4    number of transfers would have very little effect on the

 5    racial diversity of the campus in terms of the

 6    underrepresented racial groups, but it would lower the

 7    quality of the student pool.

 8              So again, I think that would be kind of in the

 9    wrong direction for the kind of thing that Mr. Kahlenberg

10    would like to promote.

11    **Q.**  Thank you.

12              THE COURT:  This assumes that the caliber of your

13    transfer applicants will be the same as the caliber of the

14    applicants in your regular pool, right?

15              THE WITNESS:  Thanks for clarifying, Your Honor.

16              It assumes that the caliber of the transfer

17    applicants will be the same as they have been in the past.

18    There have been transfer applicants in the past, and so this

19    is their average characteristics.  This is not a simulation.

20    This is historical data.

21              THE COURT:  Okay.  Thanks.

22    BY MR. WAXMAN:

23    **Q.**  Just to be clear, on demonstrative 125, if you look at

24    the academic ratings of non-transfer applicants, am I

25    understanding that 39.4 percent of non-transfer applicants

Case: 19-2005    Document: 00117632240    Page: 162    Date Filed: 07/30/2020    Entry ID: 6356615
Case 1:14-cv-14176-ADB   Document 652   Filed 04/18/19   Page 150 of 206

150

1    have an academic rating of 1 or 2?  Correct?

2    **A.**   Yes.  We've talked a lot about that, that there's a large

3    abundance of highly qualified students in the overall

4    application pool.

5    **Q.**   And if you look at the profile, the academic profile

6    rating of non-transfer applicants, only 18.2 percent have an

7    academic rating of 1 or 2?

8    **A.**   Yes.  You have slightly misspoke.  This is the transfer

9    applicants.

10   **Q.**   I'm sorry.

11   **A.**   They are half as likely to be an academic 1 or 2, yes.

12   **Q.**   Now let's turn to recruiting.

13            First, did you develop an understanding of

14   Harvard's current recruiting efforts?

15   **A.**   I developed some understanding of it, yes.

16   **Q.**   And how did you do that?

17   **A.**   Well, some of it is actually well known.  They're

18   constantly stealing good students from California.

19            But some of it is known from other information that

20   was provided in terms of evidence of what they actually do.

21   And then there's testimony of the dean and director of

22   admissions.

23   **Q.**   Did Mr. Kahlenberg adopt a particular approach to

24   simulating the effects of increased recruitment?

25   **A.**   Yes, he did.

**Q.** What did he do?

**A.** So what he did was he assumed that by some form of outreach, without specifying specifically what that was, but by some form of expanded effort and outreach, Harvard could double the number of students in its application pool who would be disadvantaged while maintaining exactly the same characteristics of those disadvantaged students.

And so the way that's done in the simulation is I take every single person in the existing application pool for the class of 2019 who is disadvantaged, and I clone them or I create a double of them.

And then I imagine the admission pool has now this extra boost of people who are all disadvantaged that look exactly like the other disadvantaged people that were already there.

**Q.** Do you think it's reasonable to think that Harvard could double the number of disadvantaged students without loss of applicant quality?

**A.** I think that's an extreme bound.  I think that would be like the most optimistic bound that one could have.  Normally I think most economists and others would think if you reached further, especially given in light of -- for example, all the mailing and contact that Harvard does with highly qualified students, you would reach down the pool and their characteristics would decline.  But this provides kind of an

 1    upper bound on the effect.

 2    **Q.**  And I think, if I understand your testimony, that you did

 3    nonetheless simulate Mr. Kahlenberg's proposal that by some

 4    mechanism Harvard could double the number of equally

 5    qualified disadvantaged students?

 6    **A.**  Yes.

 7    **Q.**  And did you do that alone or in combination with other

 8    race-neutral alternatives?

 9    **A.**  So again I basically built on the previous simulation.

10    So I took all of the things that were in the previous

11    simulation.  So turning off ALDCs, eliminating consideration

12    of race, not using standardized test scores, and now on top

13    of that I'm going to add in this extra group of disadvantaged

14    students.

15    **Q.**  Please turn to Tab 40 in your book and tell me when

16    you've found Defense Exhibit 723.

17    **A.**  Yes.

18    **Q.**  I'm not going to ask you to read the title.  Does this

19    show the results of the various simulations that you just

20    described?

21    **A.**  Yes.

22    **Q.**  We offer 723, Your Honor.

23             MR. MORTARA:  No objection, Your Honor.

24             THE COURT:  Admitted.

25             (Defendant Exhibit No. 723 admitted.)

**JA3088**

1          MR. WAXMAN:  Mr. Lee, may we have demonstrative

2     126.

3     BY MR. WAXMAN:

4     **Q.**  What is this showing?

5     **A.**  So again, exactly as all the previous charts of this

6     type, we begin with the actual admitted class's racial

7     composition.  We then show what would happen if there was

8     elimination of consideration of race.  And then from then on,

9     I show what would happen if they, in addition to eliminating

10    ALDC, eliminated the use of tips, eliminated the use of

11    standardized testing, doubled the number of disadvantaged

12    students effectively by cloning each one that's in the

13    existing data set, and imposing various low-SES boosts.

14    **Q.**  And what does this show about the level of boosts that

15    would be required to get a combined level of African-American

16    and Hispanic other representation comparable to the class of

17    2019?

18    **A.**  Well, again, in the overall, in the class of 2019, about

19    28 percent were Hispanic or African-American.  So looking

20    across the columns, one would get to something like a 2X

21    boost to get back the 28 percent as a benchmark.

22    **Q.**  And what boost would be required to get to a comparable

23    level of African-American representation?

24    **A.**  Looking across the columns to get to 14 percent, one

25    would have to get to something around the range of a 5X

1    boost.

2    **Q.** And would that change other characteristics of the class?

3    **A.** Yes.

4           MR. WAXMAN:  Please turn, Mr. Lee, to Defense

5    Demonstrative 127.

6    **Q.** And what is this showing?

7    **A.** Well, this is showing that with that combined set of

8    features in the simulation -- so eliminating ALDC,

9    eliminating standardized test scores, doubling the

10   disadvantaged applicants, and applying a 2X low-SES boost --

11   the fraction of students with an academic rating of 1 or 2

12   would fall about 17 percent relative to the existing class.

13   The fraction with an extracurricular rating of 1 or 2 would

14   fall just a little bit, about 1 percent.  The fraction with a

15   personal rating of 1 or 2 would rise a little bit, by about

16   3 percent.  The fraction with an athletic rating of 1 or 2

17   would fall by 27 percent.

18   **Q.** Do you know what would happen if you did the same -- if

19   you showed the same slide for the 5X boost that would be

20   required to replicate the African-American share of the 2019

21   class?

22   **A.** Yes.  The most important thing that could happen is the

23   fraction with the academic rating with 1 or 2 would fall

24   further.

25   **Q.** Let's move to the effect of increasing financial aid.

1    How did you assess that effect?

2    **A.**   Well, in a way similar to what I was able to do

3    considering the effect of early action.  Because Harvard has

4    changed its financial aid program in the past, I was able to

5    analyze how those previous changes in the past had

6    empirically affected characteristics of the students and use

7    that to try and consider what additional effort would do.

8    **Q.**   What past expansions in financial aid are you referring

9    to?

10        MR. WAXMAN:  And perhaps, Mr. Lee, we could have

11   Slide 128 to help Professor Card.

12   **A.**   Yes.  The first major change in this is an effort that

13   was started for the class of 2008.  At that point, Harvard --

14   I believe this was a very, very important thing in American

15   higher education -- introduced the HFAI program.

16        So students with family income less than $40,000

17   didn't pay anything at Harvard.  And for students with up to

18   $60,000 in family income would pay, at most, 10 percent of

19   their family income.

20   **Q.**   And what is the next change that you looked at?

21   **A.**   For the class of 2010, the $40,000 was raised to $60,000,

22   and the $60,000 was raised to $80,000.  So this was

23   increasing the range of students who would receive these

24   benefits.

25   **Q.**   What's the third change?

1    **A.**   The third change is another major change in the program.

2    They introduce what they call the affordability initiative.

3          They didn't change the zero family contribution

4    limit.  That stayed constant at $60,000, but they expanded

5    substantially the range of family incomes who were eligible

6    for very low parental contribution.

7          So now into the new program if families had income

8    under 180,000, so between 60 and 180,000, they would pay no

9    more than 10 percent of their average income or their income

10   as tuition.

11   **Q.**   What is the last change that you examined?

12   **A.**   Excuse me.  And I meant to mention they also eliminated

13   loans for those groups, which is an important consideration

14   these days.

15   **Q.**   It was an important consideration in my day, but it

16   didn't exist.  Sorry.

17          What is the last change?

18   **A.**   Finally, there was another change for the class of 2016.

19          They raised the lower limit and somewhat lowered

20   the 10 percent or lower family contribution limit.  So the

21   zero 0 PC limit went from 60 to 65 importantly.

22   **Q.**   Now let's turn to -- did you look at the effects of those

23   changes on the applicant pool?

24   **A.**   Yes.  What I tried to do was look at historical data on

25   the racial composition of the applicant pool, along the lines

1    of data we've looked at before, and how that may or may not

2    have changed as these various initiatives were introduced.

3    **Q.**  Can you turn to Tab 44 in your binder, please.

4    **A.**  Yes.

5    **Q.**  Do you find Defense Exhibit 727?

6    **A.**  I do, yes.

7    **Q.**  And what is this?

8    **A.**  It's a series of charts with information on shares of

9    race before and after various financial policies and shares

10   of admitted students and so on.

11        MR. WAXMAN:  Your Honor, we offer Defense

12   Exhibit 727.

13        MR. MORTARA:  No objection.

14        THE COURT:  Admitted.

15        (Defendant Exhibit No. 727 admitted.)

16        MR. WAXMAN:  Mr. Lee, would you please display

17   slide 132.

18   BY MR. WAXMAN:

19   **Q.**  Professor Card, what is this showing?

20   **A.**  This is showing the timeline up to 2012.  So this is

21   incorporating the first of the three changes in the financial

22   aid program that were introduced by Harvard.

23   **Q.**  The first or the first two?

24   **A.**  Sorry.  It's only showing the first two.  Sorry.  Thank

25   you.

1    **Q.** Yeah.

2    **A.** And I'm showing how those changes to the 2008 and then

3    the 2010 changes are related to the fraction of students in

4    the applicant pool who are Asian-American, which is

5    unfortunately mislabeled on this graph. Asian-Americans is

6    the red one at the top.

7    **Q.** Okay. We'll substitute the right one.

8    **A.** The green one is the share of African-American,

9    Hispanic -- no, that's not right. My mistake. I'm getting

10   confused.

11        So the green one is the share of Asian-American,

12   Hispanic or other, the blue one is the share of

13   Asian-Americans, and the red one is the share of whites.

14        Sorry. My apologies.

15   **Q.** What is this showing?

16   **A.** This is showing first when Harvard introduced its first

17   HFAI program with the zero for parental contribution limit,

18   we can see just prior to that the fraction of, for example,

19   African-American and Hispanic students was around

20   19-20 percent. And thereafter it starts to rise. And when

21   they additionally raise the zero parental contribution limit

22   from 40,000 to 60,000, it looks like that rise continued for

23   the fraction of African-American or Hispanic students.

24        So it looks like there was a notable increase in

25   the share of those two groups applying to Harvard, from

1    around a base of 19 or 20 percent to something like

2    27 percent as a result of these two changes in the policy.

3          For Asian-Americans, it doesn't look like there was

4    that kind of an effect.

5    **Q.**  Can we turn to the next slide, which is defense 133.

6          What are we now seeing?

7    **A.**  So now we're seeing -- now we're looking at the

8    affordability initiative, which was in some sense a middle

9    class or upper middle class program, looking at the effect of

10   that and looking at the effect of the most recent adjustment

11   to the HFAI parameters to raise the zero parental

12   contribution limit to $65,000.

13         One can see just before that a set of changes, the

14   fraction of the applicant pool that was African-American or

15   Hispanic was around 27 percent, and that more or less stays

16   constant through these two subsequent changes.

17         So my conclusion from that is that the first two

18   initiatives had some effect; in fact, a notable effect on the

19   fraction of African-American and Hispanic students in the

20   application pool.  But subsequent adjustments, including the

21   affordability initiative, did not have that kind of effect at

22   all.

23   **Q.**  Do you draw any conclusion from those data about how

24   further expansions of financial aid would be likely to affect

25   the diversity of the applicant pool?

1    **A.**   Yes.   My conclusion would be, for example, if one was to

2    further raise the zero parental contribution limit another

3    $5,000 or so that it probably would have the kind of effect

4    it had in 2016.   In other words, no effect on the fraction of

5    underrepresented minorities who apply.

6    **Q.**   So currently no parental contribution is required for

7    applicants with families $65,000 or below, correct?

8    **A.**   Yes.

9    **Q.**   Would raising that threshold to $75,000 be likely to

10   increase the number of African-American and Hispanic

11   applicants?

12   **A.**   No.   As I said, no for two reasons, in my view, or

13   unlikely at least.

14            And one is that the previous increase of that zero

15   parental contribution from 60 to 65 didn't seem to do much.

16   And also I went and looked at the family income distribution

17   data using information from the American Community Survey,

18   which is a U.S. government survey that's used to estimate

19   these things.   And there's a relatively modest fraction of

20   underrepresented minority families in the range between 65

21   and 75,000.   So the set of people who could be affected by

22   that change is quite small.

23   **Q.**   Did you also look at how past expansions of financial aid

24   have affected matriculation rates?

25   **A.**   I did, yes.

1    **Q.**  And what did you find?

2    **A.**  I did not find any systematic pattern there.

3    **Q.**  Let's turn now to Slide 134 and ask about the final

4    race-neutral alternative, the final category of race-neutral

5    alternatives employing place-based admissions.

6         First of all, what is a place-based policy?

7    **A.**  So a place-based admissions policy is a policy that

8    offers preferences to students in the admissions process

9    based on where they live or where their school is.  And such

10   policies have been adopted by a couple of states.  California

11   and Texas both have such programs, or California has had such

12   a program.

13        And so that's an example of how they work.

14   **Q.**  And which place-based policies did you assess?

15   **A.**  I looked at policies that could be directed at a

16   student's high school, individual high school, at the ZIP

17   Code that they live in, and then finally I looked at based on

18   which particular of the College Board neighborhood clusters

19   that their school was situated in.

20   **Q.**  And was each of those three place-based policies a

21   suggestion of Mr. Kahlenberg?

22   **A.**  Yes.

23   **Q.**  Did you hear Mr. Kahlenberg acknowledge that admitting

24   the top student from each ZIP Code or the top student from

25   each high school would not be feasible at Harvard?

Case: 19-2005    Document: 00117638240    Page: 174    Date Filed: 07/30/2020    Entry ID: 6356615
Case 1:14-cv-14176-ADB    Document 652    Filed 04/18/19    Page 162 of 206

162

1    **A.**   Yes.

2    **Q.**   Please turn to Tab 41 in your book.

3           What does Defense Exhibit 724 show?

4    **A.**   It shows the number of high schools and the number of ZIP

5    codes relative to the number of actual admitted students at

6    Harvard.

7           MR. WAXMAN:  We offer 724 into evidence.

8           MR. MORTARA:  No objection.

9           THE COURT:  Admitted.

10          (Defendant Exhibit No. 724 admitted.)

11          MR. WAXMAN:  Mr. Lee, may we have Slide 135.

12   BY MR. WAXMAN:

13   **Q.**   What does this show, Professor Card?

14   **A.**   This shows -- by way of benchmark, the yellow line at the

15   bottom is the total number of admitted domestic students for

16   the class of 2019.

17   **Q.**   And that's 1,719?

18   **A.**   Yes.  And then by comparison, there's around 4,100 or so

19   public and private high schools in the United Sates.

20   **Q.**   I think you meant to say 41,000?

21   **A.**   41,000.  Excuse me.

22          And there's around 3,300 ZIP Codes in the United

23   States.

24   **Q.**   Again, 33,000?

25   **A.**   33,000 ZIP Codes in the United States.

**JA3098**

1          And even if one looks inside the Harvard database

2     at high schools that had at least one student apply at some

3     time over the six years in my sample, there's about 7,561 of

4     those high schools.  All three of those numbers swamp the

5     number of available slots at Harvard.

6     **Q.**  So obviously it's infeasible for a college that is

7     admitting 1,700 students a year to take the "top" student

8     either from all high schools or even the high schools that

9     currently send one or more applicants to Harvard.

10          But can you imagine a policy in which Harvard would

11    say, well, we will look at how many top students we get, one

12    from each high school, and just have some sort of lottery

13    that would pick 1,719 of them?  Do you have that hypothetical

14    in mind?  Mr. Kahlenberg hasn't suggested it, but I'd like

15    you to consider it.

16    **A.**  Yes.  I have considered that, yes.

17    **Q.**  And thinking of that, did you try to identify the

18    characteristics of the top student from each of the schools

19    that applied to the class of 2019?

20    **A.**  I did, yes.

21    **Q.**  And how did you do that?

22    **A.**  I used some of their profile ratings.

23    **Q.**  Please turn to Tab 42 of Volume 2.

24          What does Defense Exhibit 725 show?

25    **A.**  So this shows the racial composition of top students from

Case: 19-2005    Document: 00117632840    Page: 176    Date Filed: 07/30/2020    Entry ID: 6356615
Case 1:14-cv-14176-ADB    Document 652    Filed 04/18/19    Page 164 of 206

164

1    each high school and then characteristics of academic and

2    other characteristics of that group.

3    **Q.**  Thank you.

4            MR. WAXMAN:  We offer Defense Exhibit 725.

5            MR. MORTARA:  No objection.

6            THE COURT:  Admitted.

7            (Defendant Exhibit No. 725 admitted.)

8    BY MR. WAXMAN:

9    **Q.**  Did you look at what would happen to the characteristics

10   of the admitted class if you admitted from among the top

11   student in each high school?

12   **A.**  Yes.

13   **Q.**  Can we have Slide 136, please.

14           And what does this show?

15   **A.**  So this is a comparison.  Taking this kind of

16   probabilistic or lottery-based admissions system, so we

17   somehow got the top student ranked from each high school

18   based on some of their profile ratings and then

19   probabilistically admitted that group.

20           It would show what would happen to the fraction of

21   the admitted class that had academic 1 or 2, extracurricular

22   1 or 2, personal 1 or 2, and athletic 1 or 2 ratings.

23   **Q.**  What does it show?

24   **A.**  It shows on all four dimensions there would be a notable

25   decline in the fractions with these higher profile ratings.

1   **Q.**  And if Harvard were taking the top student from a

2   representative sample of high schools, why would that occur?

3   Why would you see such a pronounced decline in the quality of

4   applicants on all four profile measures?

5   **A.**  Yes.  It's a very unfortunate feature of our American

6   education system that many, many high schools have relatively

7   disadvantaged and not very highly performing students.

8          And so this is just a set of high schools that

9   actually had an applicant that came to Harvard, an applicant

10  who applied to Harvard.  And even in that group of schools,

11  the top student from those schools is typically not really

12  competitive at Harvard in many cases.

13  **Q.**  So under this policy, do you understand that Harvard

14  would be precluded from accepting the second-top or third-top

15  or fourth-top high school students from any school regardless

16  how well the school was preparing students for college or

17  regardless how qualified the applicants from that school

18  would be?

19  **A.**  If Harvard were to -- yes.  If Harvard were to base their

20  admissions decision entirely on this type of method, then

21  that would preclude that, yes.

22  **Q.**  And you said you also assessed a policy also suggested by

23  Mr. Kahlenberg under which Harvard would admit students in

24  equal shares from the neighborhood clusters maintained by the

25  College Board; is that correct?

Case: 19-2005    Document: 00117638240    Page: 178    Date Filed: 07/30/2026    Entry ID: 6356615
Case 1:14-cv-14176-ADB    Document 652    Filed 04/18/19    Page 166 of 206

166

1    **A.**   Yes.

2    **Q.**   What are these clusters?

3    **A.**   So clusters -- what the College Board does is it actually

4    does an analysis of data of students who are applying for

5    college and other characteristics of students based on other

6    data.  And it classifies those neighborhoods along various

7    dimensions, including income and race most importantly.

8        And so a cluster would be defined by some degree of

9    similarity in the income and race of students from that

10   cluster, and it would include neighborhoods from all around

11   the country that were sort of similar on those key clustering

12   dimensions.

13   **Q.**   And did you simulate what the model would predict the

14   admitted class would be if Harvard had a plan to accept from

15   each of the 33 neighborhood clusters the same number of

16   students, which I think would be something like 53 or 54

17   students from each cluster?

18   **A.**   Yes.

19   **Q.**   Did you do that in isolation or in combination with the

20   other practices we've discussed?

21   **A.**   No.  What I did was I did it in combination with all the

22   other practices, kind of consistent with what I've been doing

23   so far.

24   **Q.**   Please turn to Tab 43 of your binder.

25   **A.**   Yes.

**JA3102**

 1    **Q.**  Does this show the results of the simulations that you

 2    just described?

 3    **A.**  Yes.

 4            MR. WAXMAN:  Your Honor, we offer Defense

 5    Exhibit 726.

 6            MR. MORTARA:  No objection.

 7            THE COURT:  Admitted.

 8            (Defendant Exhibit No. 726 admitted.)

 9            MR. WAXMAN:  Mr. Lee, please put up Slide 137.

10    BY MR. WAXMAN:

11    **Q.**  What does this show, Professor Card?

12    **A.**  So this is again -- and I believe this is the last of the

13    slides that I'll be showing -- what the actual racial

14    composition of the class of 2019 as a benchmark, the class

15    removing any consideration of race, and then the simulated or

16    predicted composition at various levels of the low-SES boost

17    after eliminating standardized test scores, eliminating

18    consideration of ALDCs, doubling the number of disadvantaged

19    applicants basically from each cluster, then changing the

20    low-SES preference and admitting something like 51 or 52

21    students per cluster.

22    **Q.**  And what does this show?  What kind of a boost above the

23    boost that Harvard already gives if it implemented this

24    mother of all race-neutral alternatives would be required in

25    order to replicate the African-American, Hispanic, and other

Case: 19-2005    Document: 00117623240    Page: 459    Date Filed: 07/30/2020    Entry ID: 6356615
Case 1:14-cv-14176-ADB    Document 652    Filed 04/18/19    Page 168 of 206

168

1  share of the admitted class?

2  **A.**  So in this case, one can see that a 1X boost gets to --

3  fairly close to the existing class.

4  **Q.**  And if you pursued that set of practices, would the

5  composition of the admitted class change in other ways?

6  **A.**  Yes.

7  **Q.**  May we have the next demonstrative, 138, please.

8          What is this showing?

9  **A.**  So this shows if Harvard were to somehow adopt this

10  admissions procedure, my simulation suggests that the

11  fraction of students who would have an academic 1 or 2 would

12  fall about 17 percent.  The fraction with extracurricular

13  rating of 1 or 2 would fall about 3 percent.  The fraction

14  with the personal rating 1 or 2 would rise by about

15  3 percent.  The fraction of students with an athletic rating

16  1 or 2 would fall about 25 percent.

17          MR. WAXMAN:  Mr. Lee, can we please have

18  demonstrative 139.

19  BY MR. WAXMAN:

20  **Q.**  What is the third analysis that you conducted?

21  **A.**  So the third analysis is I did a very similar analysis

22  but looking at the approach that Mr. Kahlenberg says is his

23  preferred approach.

24  **Q.**  And can you turn in your exhibit binder to Tab 46,

25  please.

1    **A.**   Yes.

2    **Q.**   What is Defense Exhibit 729 showing?

3    **A.**   It's a series of tables showing an analysis of

4    Mr. Kahlenberg's Simulations 1 through 7.

5             MR. WAXMAN:  Your Honor, we offer Defense

6    Exhibit 729.

7             MR. MORTARA:  No objection.

8             THE COURT:  Admitted.

9             (Defendant Exhibit No. 729 admitted.)

10            MR. WAXMAN:  Mr. Lee, can we have Slide 140,

11   please.

12   BY MR. WAXMAN:

13   **Q.**   What's displayed here?

14   **A.**   This is a summary of the racial composition arising in

15   the class, first as usual, the first two bars, the actual

16   admitted class and with removing consideration of race.  And

17   then under Mr. Kahlenberg's Simulation 6.

18   **Q.**   And why did you choose Simulation 6?

19   **A.**   Well, my understanding is that that is one of his

20   preferred simulations.

21   **Q.**   And what do we see?

22   **A.**   We can see that under that simulation the fraction of

23   African-American students is about 10 percent.  The fraction

24   of Hispanic and other students is around 20 percent.

25   **Q.**   And did you also look at how preferred Simulation 6 would

**JA3105**

1  be expected to change the class in other ways?

2  **A.**  I did, yes.

3          MR. WAXMAN:  Can we have slide 141, Mr. Lee.

4  **Q.**  And what is this showing?

5  **A.**  This is showing under that simulation the fraction of

6  students with an academic 1 or 2 would fall about 19 percent,

7  the fraction with an extracurricular rating would fall about

8  13 percent, the fraction with a personal 1 or 2 rating would

9  fall about 13 percent, and the fraction with an athletic

10  rating 1 or 2 would fall by about 26 percent.

11  **Q.**  So would Simulation 6, Mr. Kahlenberg's preferred

12  simulation, achieve either comparable diversity or comparable

13  quality of the admitted class?

14  **A.**  Well, it certainly does not achieve comparable quality to

15  the admitted class.

16          It achieves a level of combined African-American

17  and Hispanic diversity that's comparable to the existing

18  class.  It does not achieve the same level in terms of the

19  fraction of African-American students.

20  **Q.**  So based on the analyses that we've discussed today, how

21  would eliminating the consideration of race in admissions

22  affect Harvard's class?

23  **A.**  So in my opinion, all of the simulations show the same

24  thing, which is one can achieve some level of racial

25  diversity comparable to the existing class by imposing or

1    using these various race-neutral alternatives.  But

2    inevitably that involves some decline in particular in the

3    academic quality of the class and in many cases in other

4    dimensions as well.

5    **Q.**  And is that conclusion consistent with all of the

6    literature that you've reviewed on this issue?

7    **A.**  Yes.  My understanding of the existing literature is that

8    for elite colleges, colleges that are focusing on highly

9    qualified students, that's been the empirical conclusion in

10   the past.  And there's also theoretical literature which

11   suggests this would also be true.

12          MR. WAXMAN:  Mr. Lee, can we please have

13   demonstrative 10.2.

14   **Q.**  I'll end where we began and ask again, are these the

15   questions that you addressed in this case?

16   **A.**  Yes.

17   **Q.**  And at a high level, will you summarize your opinions on

18   these questions for the Court?

19   **A.**  Yes.  First, I was asked if statistical evidence supports

20   the plaintiff's claim that Harvard discriminated against

21   Asian-American applicants.  And my opinion is that the

22   evidence does not support that claim.

23          Second, I was asked to what extent does race affect

24   admissions decisions at Harvard.  In my view, the evidence

25   shows that race does have an effect on admissions decisions

**JA3107**

1    at Harvard.  For students who are highly qualified on other

2    dimensions, race can be one of the many factors that are

3    associated with a higher probability of admission, comparable

4    in size to other favorable tips that Harvard awards in the

5    admissions process.

6            For the third question, is there statistical

7    evidence that Harvard has engaged in racial balancing, my

8    opinion is that there's no statistical evidence of that.

9            And finally, for the fourth question, how would the

10   admitted class change if Harvard eliminated consideration of

11   race and pursued race-neutral alternatives.  My opinion is

12   that if Harvard were to do so, it would potentially be

13   possible to achieve some level of diversity comparable to the

14   level of diversity in the current class, but that would

15   necessarily entail a trade-off and a reduction in several

16   dimensions, several important dimensions in the quality of

17   the class.

18   **Q.**  And can we have demonstrative 10.30.

19           Would you tell Her Honor why you don't think

20   Harvard admissions process discriminates against

21   Asian-American applicants?

22   **A.**  Yes.  So to reiterate an argument, a point I've made

23   before, when I take my admissions model, which I believe is

24   the best representation of the actual admissions process that

25   Harvard uses, taking account of the weight it puts on

1    multidimensionality, taking account of the way it uses

2    information and so on, using all of the data, so including

3    the ALDCs, my model shows that year by year there's no

4    statistically significant difference in the admission rate

5    between Asian-Americans and whites.

6           On average across the six years, three of the

7    estimates are positive, three of them are negative.  And then

8    if one looks averaging across the years, the average of these

9    effects is minus 0.05, this average marginal effect, which

10   means that the difference between the admission rates of

11   Asian-Americans and whites, controlling for all the

12   observable factors in my model, is about 5/100 of a

13   percentage point, not statistically significant.

14          So I believe the evidence strongly supports the

15   view that there's no statistical evidence of discrimination.

16          MR. WAXMAN:  Thank you, Dr. Card.  Pass the

17   witness.

18          THE WITNESS:  Could I take a break?

19          MR. MORTARA:  No problem for me, Your Honor.  We

20   can get set up.  Ten minutes?

21          THE COURT:  Ten minutes.

22          (Court recessed at 2:11 p.m.)

23          [Sidebar sealed and redacted.]

24          MR. MORTARA:  Whenever you're ready, I think I'm

25   ready, Your Honor.

1    THE COURT:  I am ready when you are.

2                    EXAMINATION

3    BY MR. MORTARA:

4    **Q.**  Good afternoon, Professor Card.  My name is Adam Mortara.

5    It's really nice to meet you.  I'm hoping that we'll spend a

6    few hours together getting to know each other.

7            I got to get a few questions out of the way I was

8    genuinely surprised Mr. Waxman didn't ask you.

9            You've been in court on and off a lot for the last

10   couple of weeks, right?

11   **A.**  Yes, I have.

12   **Q.**  And you know about the *Bakke* decision, don't you?  You

13   actually mentioned it in one of your articles?

14   **A.**  I know a little bit about it.  I am in no way an expert

15   on the law.

16   **Q.**  Did you know that the *Bakke* decision, actually just the

17   opinion of one member of the Court, described the Harvard

18   admissions system as an illuminating example in 1978?  Did

19   you know that?

20   **A.**  I think I've heard someone use that phrase.

21   **Q.**  More than once, huh?

22   **A.**  Yes.

23   **Q.**  Did you take that into account when preparing your

24   opinions in this case?

25   **A.**  No.

1   **Q.** All right. Let's hit a few things out of the gate before

2   delving more deeply into your opinions.

3           You testified on direct that race was a small

4   factor in admissions, and you used this slide that I'm

5   showing on the screen, which is DD 10.93, right?

6   **A.** No. I said that -- no.

7   **Q.** You didn't say race was a small factor in admissions?

8   **A.** No. I believe I said that alone and by itself, race was

9   a small factor in admissions.

10  **Q.** Great. Thanks for that clarification.

11          And you also gave a nice discussion in your direct

12  about the importance of average marginal effect. Do you

13  recall talking about that quite a bit?

14  **A.** Yes.

15  **Q.** But you discussed your computation of the average

16  marginal effect of Asian-American ethnicity across your whole

17  admissions model. That was one of the last things you went

18  through with Mr. Waxman, right?

19  **A.** Yes.

20  **Q.** You didn't actually discuss your computation of the

21  average marginal effect of African-American race or Hispanic

22  ethnicity, did you?

23  **A.** I didn't directly present it, no.

24  **Q.** It's in your report. Your reports are right next to you,

25  sir, for your review. This is in your opening report. I'm

1    going to go to it.  It's on page 81 of your opening report,

2    Figure 26.

3            You can look at it on the screen or you can look at

4    it in your report.  Your choice.  Do you see that?

5    **A.**  Yes.

6    **Q.**  The average marginal effects are at the bottom.  Plus

7    6 percent for African-Americans, plus 3.73 percent for

8    Hispanics.  Do you see that?

9    **A.**  Yes.

10   **Q.**  You know that this represents an over 300 percent

11   increase in the chances of admission on average for an

12   African-American, correct?

13   **A.**  No.  I don't think that calculation sounds rights to me.

14   **Q.**  You don't think that's right.  What percentage do you

15   think it is, sir?  What do you think the base is?  The base

16   is about 3 percent, isn't it?

17   **A.**  The overall fraction of admission -- it's possible that's

18   right, yes.

19   **Q.**  And you know it represents an over 200 percent increase

20   in the chances of admission for a Hispanic applicant,

21   correct?

22   **A.**  I don't know that for a fact, but I'll trust you on it.

23   **Q.**  You can come back and let me know tomorrow if it was

24   incorrect.  You can think about that if you want or we'll go

25   through it some more in a little bit.

1          I want to talk about some, I'm not going to say

2     mistakes, but some inaccuracies on your slides.  We'll go

3     back to this one.

4          This is the one I showed you where we talked about

5     race, if it was the only thing not being a big factor.  Do

6     you remember that?  It was just three minutes ago.

7     **A.**  Yes.

8     **Q.**  You got this thing over here, R-squared.  Do you see

9     that?

10    **A.**  Yes.

11    **Q.**  That's a mistake, isn't it?

12    **A.**  Well, yes, technically.  But as I think I explained early

13    on to the Court, I would be using R-squared and pseudo

14    R-squared interchangeably.

15    **Q.**  Okay.  Well, I'm glad we cleared that up, but there is

16    actually a difference between them, right?

17    **A.**  Yes.  They're calculated differently, yes.

18    **Q.**  And let's just quickly go through all the slides where

19    you said R-squared but you meant pseudo R-squared.  So here

20    we are at DD 10.93.  You said R-squared, but you meant pseudo

21    R-squared, right?

22    **A.**  Yes.

23    **Q.**  You did that again on -- you substituted 76 today.  But

24    DD 10.76, you did it again.  I don't have it in my computer.

25    We'll get to that tomorrow.  You did it again on this graph.

1    You showed 79.  You've got R-squareds here in a couple of
2    places.  Those are actually pseudo R-squareds, right?
3    **A.**  Yes.  As I said, I think to save space and not jargon up
4    my presentation, I tried to explain that that's what I was
5    going to be doing.
6    **Q.**  That's great.  We're going to talk about the difference
7    in a second.
8          And you did it over here on DD 10.86.  Do you see
9    that?
10   **A.**  Yes.
11   **Q.**  That's a pseudo R-squared, right?
12   **A.**  Yes.
13   **Q.**  And you did it again on 93.  We already did that one.  So
14   you did it in a few places, right?
15   **A.**  Yes.
16   **Q.**  Now, you know for a discrete choice model you don't use
17   R-squared, you use pseudo R-squared.  Don't you know that?
18   **A.**  I do know that, yes.
19   **Q.**  And you're well aware of the difference between the two,
20   right?
21   **A.**  Yes, I believe I am, yes.
22   **Q.**  Who is Daniel McFadden?
23   **A.**  Daniel McFadden is an emeritus professor at Berkeley,
24   formerly my colleague.  He was a very well-known figure in
25   the field in various aspects of economics.

Case: 19-2005   Document 00117638246   Page: 191   Date Filed: 07/30/2020   Entry ID: 6356615
Case 1:14-cv-14176-ADB   Document 652   Filed 04/18/19   Page 179 of 206

179

1    **Q.**  He was your colleague.  He won a Nobel Prize?

2    **A.**  He did, yes.

3    **Q.**  All right.  So in your binder at C121 is an article by

4    your former colleague, Professor McFadden?

5            THE COURT:  Do I have a copy of this?

6            MR. MORTARA:  No, Your Honor.  I'm always terrible

7    with binders for you.  There you are.

8            THE COURT:  I don't have enough.

9            MR. MORTARA:  It's got 90 percent of everything I'm

10   going to use except the awesome stuff that I like to hand up.

11   BY MR. MORTARA:

12   **Q.**  If you could, turn to C121, please, Professor.

13   **A.**  Yes.

14   **Q.**  This is a paper by McFadden.  You've seen it before,

15   right?

16   **A.**  Yes.

17   **Q.**  If you turn to page 34 in the McFadden paper, there's a

18   footnote double star at the bottom.  Just tell me when you're

19   there, sir.

20   **A.**  Yes.

21   **Q.**  And it carries over to the next page, and I've got it on

22   the screen.

23            It says, "While the R-squared is a more familiar

24   concept to planners who are experienced in ordinary

25   regression analysis, it is not as well-behaved a statistic as

**JA3115**

1    the" --

2              And that means pseudo R-squared.  That's a Greek

3    rho, isn't it?

4    **A.**  I'll have to read the whole thing to know what he's

5    referring to precisely.  If you give me a second.

6    **Q.**  You know that pseudo R-squared is sometimes written as

7    rho squared, right?

8    **A.**  No.  To tell you the truth, in my profession rho usually

9    refers to the correlation.  And so it would be -- and in

10   fact, R-squared is the same as the squared correlation.  So

11   I'm finding it a bit confusing.

12   **Q.**  Sir, this came up in your expert report, remember?  You

13   criticized Professor Arcidiacono's models for having a low

14   pseudo R-squared and he cited the McFadden paper and he said

15   exactly what's going to be said right here, which is that --

16   for example, values of .2 to .4 represent an excellent fit.

17             Do you remember you talked about that in your

18   expert report, right?

19   **A.**  I did say that.  I do remember that, yes.

20   **Q.**  And what you remember is that there was a debate between

21   you and Professor Arcidiacono about whether .2 to .4

22   represents an excellent fit.

23             Do you remember that from the McFadden paper?

24   **A.**  Yes.  I remember words to that effect.

25   **Q.**  So Professor McFadden here, saying, as you remember from

1    your expert reports, .2 to .4 is an excellent fit on the

2    pseudo R-squared, correct?

3    **A.**   That's what it -- yes, that's what it says here.  In my

4    view -- I mean, this paper was written in 1977, before the

5    era of modern computer.

6    **Q.**   Mr. Waxman can ask you questions when I'm done.  My

7    question was correct.

8               THE COURT:  You sit down.  You let him finish his

9    answer.

10              You finish your answer.

11              THE WITNESS:  Well, I was going to say this paper

12   was written in 1977, possibly even before that, back in the

13   day before modern computing methods.

14              And at that time, it was very difficult to estimate

15   especially discrete choice for multinomial logit models or

16   logit models with more than several dozen variables on large

17   data sets.  And so I think at that time that might have been

18   what he was thinking of in his experience.

19              I don't know whether I would say that that would

20   qualify today with modern data sets and modern methods.

21   BY MR. MORTARA:

22   **Q.**   All right.  So here's a question for you.

23              How many articles have you written that use

24   discrete choice models and report a pseudo R-squared.  Only a

25   handful, right?

1    **A.**  I'm not entirely sure, actually.

2    **Q.**  Glad you asked.  So let's go into my folder here for

3    David Card articles.  I've got a lot.  Let's just search

4    "pseudo" and see what comes back.

5            Do you see those articles there on the screen, what

6    to editors maximize, the effect of firm level contracts.  Do

7    you see that?

8            MR. WAXMAN:  Your Honor, I'm not exactly sure what

9    we're doing here.  If this is meant to be a demonstrative,

10   it's not disclosed.

11           MR. MORTARA:  It's not meant to be a demonstrative.

12           MR. WAXMAN:  He's using it as a demonstrative.

13   Maybe it's not meant to be, but it's being used as a

14   demonstrative.

15           MR. MORTARA:  I haven't even asked a question yet.

16           THE COURT:  You have it up on the screen.  That

17   means you are demonstrating it, which makes it a

18   demonstrative.

19   BY MR. MORTARA:

20   **Q.**  Do you see that?

21           MR. MORTARA:  It's also being done live, which I

22   don't need to disclose.  Under the pretrial memorandum, live

23   demonstratives don't need to be disclosed.  This is a live

24   demonstrative.

25           MR. WAXMAN:  I don't understand how this live

```
 1    demonstrative is any different than the demonstratives that

 2    we provided them in advance that he objected to and

 3    successfully excluded yesterday.

 4              THE COURT:  Let me hear what his question is, but I

 5    take your point.  What is your question?

 6    BY MR. MORTARA:

 7    Q.  There's a handful of titles of articles on the screen.

 8    Do you see that?

 9    A.  I do see a handful of articles, yes.  I don't really

10    understand how this was constructed, what exactly you did to

11    get this list of articles.

12    Q.  Don't worry.  If you think of more than five or six

13    articles that you have a pseudo R-squared, you can come back

14    tomorrow and tell me, and I'll ask you first thing.

15              The question I have is, what's this article you

16    wrote from 2018 on editor gender bias, "Are Referees and

17    Editors in Economics Gender Neutral?"

18              Do you see that?

19    A.  I'm confused because you've got something here called

20    "Editor Gender Bias."

21    Q.  I'll clarify your confusion.

22              THE COURT:  If you have a copy of the article, why

23    don't you put it in front of him.

24              MR. MORTARA:  I intend to.  May I approach, Your

25    Honor?
```

**JA3119**

```
 1                THE COURT:  Yes, of course.

 2                MR. MORTARA:  There's one for you, too.

 3     BY MR. MORTARA:

 4     Q.  Does this refresh your recollection that last week you

 5     published an article called "Are Referees and Editors in

 6     Economics Gender Neutral?"

 7     A.  I distributed such an article to a number of my friends

 8     and colleagues, yes.  I didn't publish it.

 9                MR. WAXMAN:  May I just inquire whether this was

10     disclosed to us?

11                MR. MORTARA:  It's not, Your Honor.  It's

12     impeachment of the opinion I just got on pseudo R-squared.

13                THE COURT:  He doesn't have to disclose things that

14     he's using to impeach.

15                MR. WAXMAN:  It's not impeachment.

16                MR. MORTARA:  I was just told that the standards

17     for pseudo R-squareds have changed since the 1970s.  I'm

18     about to inquire.

19                THE COURT:  I thought he said the precision had

20     changed since the '70s.  But go ahead.

21     BY MR. MORTARA:

22     Q.  Sure.  So this is a paper where you found, among other

23     things, possible evidence of discrimination against female

24     economists in the refereeing of articles for journals; is

25     that right?
```

1    **A.**  Could you give me a second to review exactly the wording

2    we used?

3    **Q.**  Let me see if I can help you.  Turn to page 26.  And at

4    the top you'll see.  Just want to get a sense of what the

5    article is about.

6         Do you see that at the top what I've got

7    highlighted?  "Our findings are consistent with the presence

8    of some discrimination towards female economists"?

9    **A.**  Yes.  But if you read the context it says, "What accounts

10   for these patterns?  While we do not have direct evidence, we

11   envision three main explanations.  First, our findings are

12   consistent with the presence of some discrimination towards

13   female economists," and so on.

14         "Second, it could be that female economists submit

15   papers with somewhat different characteristics than those of

16   male authors," and so on.

17         And "A third possibility is that female economists

18   wait longer for submission," and so on.

19   **Q.**  Sure.  One of the possibilities of your findings in this

20   paper that you published last week is that there's some

21   discrimination towards female economists in reviewing.  One

22   of the possibilities.  Is that fair?

23   **A.**  Well, first I don't claim to have published this paper

24   last week.  This paper was distributed to some friends.  This

25   is still -- this has not been submitted.  This paper is still

1    in active editing stage, to tell the honest truth.

2    **Q.**  Great.  Well, let's take a look at what's on page 46,

3    Table 7.

4    **A.**  Yes.

5    **Q.**  You've got a bunch of models, and I just want to focus

6    you on the pseudo R-squareds of the models here.  Do you see

7    those?

8    **A.**  Yes.

9    **Q.**  And every one of them is between .2 and .4, correct?

10   **A.**  Well, to tell you the truth, this is a combination of

11   R-squared and pseudo R-squared.  So some of these models are

12   actually linear regression models.  In fact -- in fact, it's

13   possible that all of these are linear regression models, in

14   fact, reflecting the fact that this is a work in progress.

15           I believe, if I remember correctly, that all of

16   these are actually linear regressions, according to the top

17   heading.  So it isn't -- actually, it's a misstatement on me

18   and my coauthors here.

19   **Q.**  Let me go back to McFadden.

20           He said, the goodness of fit range for pseudo

21   R-squared was lower than regular R-squared, right?  That's

22   the standard in your industry; isn't that right?  So if these

23   are R-squareds, they're between .2 and .4, too, aren't they?

24   **A.**  No.  What he said was he said those unfamiliar with the

25   rho squared index should be forewarned that its values tend

Case: 19-2005   Document 20-47 Page: 199   Date Filed: 07/30/2020   Entry ID: 6356615
Case 1:14-cv-14176-ADB   Document 652   Filed 04/18/19   Page 187 of 206

187

1    to be considerably lower than an R-squared index.

2    **Q.**  What's the standard for regular R-squared for goodness of

3    fit, as far as you're concerned?

4    **A.**  Well, actually there is no real standard for goodness of

5    fit.  For example, one could have a model based on data from

6    year to year for the national economy, and it could have a

7    very high R-squared because those kind of variables tend to

8    correlate together very highly.  And yet many, many, many,

9    hundreds and thousands of those kinds of models are estimated

10   all the time and most people kind of think of them as junk or

11   very uninformative.

12         On the other hand, one could have data from an

13   experimental design, for example, where one had randomly

14   assigned some covariate of interest.

15         Like I could assign, for example, some kind of a

16   blinded resume that I send in for jobs.  And some of them

17   could be African-American candidates or names and some of

18   them could have non African-American names.  And there you

19   could have potentially quite a low R-squared and yet the

20   model could be extremely informative because of the design,

21   because of the randomized design.

22         So there isn't really a connection between

23   R-squared and whether a model is good or bad necessarily.

24   **Q.**  I'm just a little confused.  You were talking about the

25   explanatory power of several of Professor Arcidiacono's

1    models and you had a chart on the screen showing R-squareds.

2    Do you remember that?  You weren't testifying that the lower

3    R-squareds meant they had lower explanatory power?

4    **A.**   I was saying that lower pseudo R-squareds meant lower

5    explanatory power, yes.

6    **Q.**   So the junk models, you're talking about the national

7    economy where they have super high R-squareds, they have real

8    good explanatory power, but they're still junk, right?

9    **A.**   I wouldn't necessarily say that they're always junk, but

10   some models with high explanatory power could be very

11   informative; some models with low could be not very

12   informative.

13   **Q.**   And some models with low explanatory power could be very

14   informative; isn't that right?

15   **A.**   Yes, I would certainly agree to that.

16   **Q.**   All right.

17          You spent a lot of time in your direct testimony

18   trying to explain the difference between white and Asian

19   applicants to Harvard in the personal rating.  Do you

20   remember that?

21   **A.**   I do, yes.

22   **Q.**   I want to be clear about a few things.  As of the time

23   you were deposed, you had not constructed your own model of

24   the personal rating, did you?

25   **A.**   I believe that's correct, yes.

1    **Q.**  And you didn't disclose any model of the personal rating

2    in your expert reports, correct?

3    **A.**  I'm not entirely sure because I believe that I had done

4    some extensions of Professor Arcidiacono's model.

5    **Q.**  We're going to talk about those in just a little bit.

6           You used Professor Arcidiacono's models and you did

7    some extensions where you added some variables, right?

8    **A.**  I did, I believe, report some of those models.  Whether

9    those are my models or his models I guess is a matter of some

10   art.

11   **Q.**  You referred to, in your report, in "unexplained gap"

12   between whites and Asians in the personal rating," right?

13   Your rebuttal report.

14   **A.**  Yes.

15   **Q.**  And I've got it on the screen, just 35 and 36, your

16   rebuttal report.  It says "unexplained gap" four times.  If

17   you just want to see it on the screen, I'm just going to

18   stop.  I'm not going to use any more of it.

19   **A.**  Just a second while I look at the rebuttal report.  What

20   page are we on?

21   **Q.**  Paragraph 35 and 36.  It's on page 19, sir.  The question

22   is, have I highlighted and underlined "unexplained gap" four

23   times?

24   **A.**  Yes.  I used those words there, correct.

25   **Q.**  But you can't actually rule out racial bias as the

1   explanation for that gap, can you?

2   **A.**  No, not on the basis purely of statistical evidence, no.

3   **Q.**  Now, you did a lot of summing of the scores with

4   Mr. Waxman to try to show that whites were better than Asians

5   on the personal rating.

6          Do you remember all those sums you did, some less

7   than 7, some less than 11?  Do you remember those?

8   **A.**  I remember those scores, yes.

9   **Q.**  You did some charts with sort of bar charts, histograms

10  of who got 7 or less.  Do you remember those?

11  **A.**  Yep.

12  **Q.**  You've been here for a while.  You've listened to a lot

13  of Harvard witnesses.

14         Have you ever heard one single sentence of

15  testimony in this trial or before in discovery that anyone at

16  Harvard ever sums up profile ratings ever?

17  **A.**  I've never heard that.  But I've never heard they fit

18  logistic regression models either, the people on the

19  admissions committee for sure.

20  **Q.**  To be clear, you weren't fitting a logistic regression

21  model when you showed those histograms of who got a sum less

22  than 7 or 11.  You weren't doing a logistic regression model,

23  were you?

24  **A.**  No.  They're just sums.

25  **Q.**  Right.  And everybody can add?

1   **A.**   Yes.  It's surprising how often mistakes can come in, but

2   yes, almost everybody can add, I think.

3   **Q.**   And you've seen no evidence in the dozen or so

4   depositions you've read with hundreds of hours of testimony

5   maybe and all the time you've been here listening to Harvard

6   witnesses that anyone ever once summed a profile rating,

7   correct?

8   **A.**   No.  I didn't hear that or I don't remember hearing it,

9   but I am not sure I was looking for it.

10   **Q.**   If you are remember, you can let me know tomorrow.

11        And the effect of the summing that you did is to

12   treat each rating equally and each point on those ratings

13   equally.  So having a 1 and a 2 and a 3 on school support is

14   the same as 2, 2, 2, even though 1s are far more rare.  Is

15   that right?

16   **A.**   It does just add them up, that's true, yes.

17   **Q.**   I'm trying to find one of those histograms for you, sir,

18   just so that we can -- this is one of them.  I've just got

19   one on the screen so we all know what we're talking about.

20        So it treats 1, 2, 3 the same as a 2, 2, 2, right?

21   **A.**   Yes.

22   **Q.**   And you didn't construct any model in your reports that

23   would tell you if, in fact, the ratings should all be treated

24   equally and each point in the ratings should be treated

25   equally, did you?

**JA3127**

1   **A.**  No, I didn't.  But I didn't believe that that was

2   necessary for illustrating the points here.

3   **Q.**  You just did a bunch of arithmetic and then you showed

4   these descriptive statistics; is that right?

5   **A.**  Well, this is descriptive statistics, and it does involve

6   adding these scores.  That's correct, yes.

7   **Q.**  I want to show you Defendant's 692, which you also used

8   today, and you were talking about this non-academic

9   admissions index.  Do you remember that?

10  **A.**  Can I take a look at the whole thing?

11  **Q.**  Sure.  You have a big binder in front of you, sir.

12  Defendant's 692 is in there.

13  **A.**  So that's D 692?

14  **Q.**  Correct.

15          THE COURT:  I don't think I have 692.

16          MR. MORTARA:  You don't, Your Honor?  You should.

17          THE WITNESS:  I don't think I do either.

18  BY MR. MORTARA:

19  **Q.**  So that's okay.  Why don't we use your slide.  This is

20  it.  Do you remember this one?

21  **A.**  Yes, I do.  Yes.

22  **Q.**  Do you see down at the bottom it says Defendant's 692.

23  Do you see that.

24  **A.**  Yes.

25  **Q.**  And that's where it comes from, right?

1    **A.**   Yes.

2    **Q.**   And you constructed this non-academic index decile thing,

3    and it shows these higher percentages for whites and lower

4    percentages for Asians.

5         Do you see that?

6    **A.**   In each of the deciles, yes.

7    **Q.**   And it's your opinion that this explains, in part, or

8    maybe in whole, the unexplained gap in the personal rating

9    between whites and Asians?

10   **A.**   No.

11   **Q.**   Does it explain any of it?

12   **A.**   No.  That's not what I was saying that this explained.

13   **Q.**   What do you think this explains?

14   **A.**   Well, as I tried to explain, a central hypothesis that

15   Professor Arcidiacono is putting forth is that Asian students

16   are stronger than white students on the observed factors that

17   contribute toward the personal rating and then using that to

18   make some argument about the unobserved factors, which are,

19   of course, the things that are represented in the unexplained

20   gap or what's measured by the average marginal effect.

21        So what I'm trying to do in this slide is take a

22   look at the combination of all the non-academic observed

23   factors, weighting them by the way that they enter into the

24   admissions model, and look at how they differ for students in

25   the top several deciles between whites and Asians in terms of

1    the fractions, for example, in the ninth decile here.

2    **Q.**   And your basic point is that what we're looking at on the

3    screen, which now has the personal rating and ALDC effects

4    removed, it's DD 10.78, your basic point is that because

5    whites are doing better than Asians on these observable

6    characteristics, the gap between whites and Asians in the

7    personal rating may be explained by that.

8         Is that your basic point?

9    **A.**   Yes.  So the basic -- following on exactly the same kind

10   of logic that Professor Arcidiacono is using to explain, say,

11   the significant positive Asian-American average marginal

12   effect in the academic rating with a significant positive

13   Asian-American effect in the extracurricular rating.

14        He's asserting that that's due to unobserved

15   characteristics of the Asian-Americans and arguing that

16   that's consistent or -- consistent with this idea that the

17   observed characteristics of Asian-Americans that contribute

18   to each of those two variables are somewhat higher than the

19   observed characteristics for white students.

20        So I'm trying to evaluate that same kind of

21   argument when we look at the personal rating.  And so when we

22   look at the personal rating, what's really relevant because I

23   showed that personal rating is hardly at all affected by

24   academic factors, was to look at these non-academic factors.

25        So that's what I'm trying to do here and take a

1    look at whether the non-academic factors when they're

2    weighted by the way that they enter into the admissions

3    process are higher for whites than Asians.  And I believe

4    that's what it shows.

5    **Q.**  Thank you.  Are you done?

6         MR. WAXMAN:  Your Honor, it's one thing for counsel

7    to be asking questions.  It's another thing for counsel to be

8    making snide remarks like this.  Now, I suggest it reflects

9    more on the questioner than the witness, but I object.

10         THE COURT:  All right.  The speech isn't required.

11    Ask the question.  Skip the narrative.

12         MR. MORTARA:  Your Honor, I will happily do so.

13    But next time we get three paragraphs after a "yes," I'm

14    going to move to strike and ask you to intervene.  That's

15    what I'm trying to move it along.

16         THE COURT:  My experience in this trial is that

17    experts often answer questions with three paragraphs instead

18    of one.  Yours did the same thing.  Okay?

19         MR. MORTARA:  Your Honor, respectfully, he didn't.

20    And that's the problem.  But we'll come back.  I'll keep

21    going.  Thank you, Your Honor.

22         MR. WAXMAN:  Just for the record, the question that

23    he asked was something like, well, what is this showing or

24    isn't this what you mean?  It was a question that required an

25    explanation, and an explanation was provided.

Case: 19-2005    Document: 00117632246    Page: 208    Date Filed: 07/30/2020    Entry ID: 6356615
Case 1:14-cv-14176-ADB    Document 652    Filed 04/18/19    Page 196 of 206

196

```
 1              MR. MORTARA:  Moving on.
 2              THE COURT:  Yes.
 3   BY MR. MORTARA:
 4   Q.  You showed this graph in your direct testimony with
 5   Mr. Waxman, didn't you?
 6   A.  Yes.
 7   Q.  And in fact, I think you and I were just talking about it
 8   with respect to you said you added some additional variables
 9   onto Professor Arcidiacono's models, and you discovered
10   that -- I think you said something like we could almost hit
11   the ceiling eventually, the ceiling would be zero, which is
12   no difference between Asians and whites, right?
13   A.  No.  I didn't say that at all.
14   Q.  You didn't say we might almost hit the ceiling?
15   A.  I didn't say with the addition of the variables that I
16   added to his model that we almost hit the ceiling.  No, I
17   didn't say that.
18   Q.  I understand.  I'm not trying to quibble with you.
19              What you said was, if we kept adding variables, we
20   would almost hit the ceiling, right?
21   A.  I said something like that, yes.
22   Q.  I think you have this in your binder.  You have
23   Defendant's Exhibit 688.  Take a look to make sure you got
24   it.  I'm told that you do.
25   A.  I found it.  Here it is.
```

Case: 19-2005    Document: 00117633240    Page: 209    Date Filed: 07/30/2020    Entry ID: 6356615
Case 1:14-cv-14176-ADB    Document 652    Filed 04/18/19    Page 197 of 206

197

1    **Q.**  You found it.  Great.  Something is working.

2         Defendant's 688 has that analysis.  It actually has

3    a version of this graph in it, right?  Just confirm that for

4    you, sir.

5    **A.**  It has the information that is used to construct this

6    graph, yes.

7    **Q.**  It's also got the information about the additional

8    variables you added, right?  Keep flipping pages.  I think

9    it's on a subsequent page.  It's got your graph in there, the

10   one I've got on the screen, and it's got the additional

11   numbers, right?

12   **A.**  Yes.

13   **Q.**  Staying with the graph that's on the screen, just looking

14   at Professor Arcidiacono's Model 5, you spent a lot of time

15   with the histograms about the school support rating, right,

16   looking at the differences between whites and Asians,

17   correct?

18   **A.**  I did spend some time going through them.  They're not --

19   I don't quite understand what that has to do with Model 5.

20   **Q.**  Those involve the school support ratings, correct?

21   **A.**  Yes, that's correct.  Sorry.

22   **Q.**  Some of them involved the alumni ratings, correct?

23   **A.**  Yes.

24   **Q.**  And the school support and the alumni ratings are all

25   included in Professor Arcidiacono's Model 5?

1   **A.**   Right.  My understanding is other rating variables are

2   also included in that model, yes.

3   **Q.**   But the ones that you talked about with Mr. Waxman in the

4   histogram, school support, alumni ratings, they're included

5   in Arcidiacono's Model 5, correct?

6   **A.**   Yes.

7   **Q.**   Now, if you look at the fourth page of Defendant's 688,

8   it has those numbers we've been talking about when you added

9   variables, and the average marginal effect went down, right?

10  **A.**   Yes.  It becomes smaller in magnitude.  It actually goes

11  up because it's becoming more positive.  It becomes smaller

12  in magnitude.

13  **Q.**   Smaller magnitude.  Thanks for the correction.

14          And the first set of variables you added where you

15  ran it year by year, which is your preferred way of doing the

16  model, right?

17  **A.**   It's my preferred way of doing the admissions model, yes.

18  **Q.**   And you added additional card model variables.  Do you

19  see that?  Do you see that, sir?

20  **A.**   Yes.

21  **Q.**   And those variables are -- I'm highlighting on the

22  screen -- intended career, indicator for a staff rating,

23  parental occupations, measures of participation in

24  extracurricular activities and indicators for being born in

25  the United States and having lived outside of the United

1    States.

2            Those were the variables you added in the first

3    round, right?

4    **A.**  Yes.

5    **Q.**  And then you added still more variables.  That was the

6    additional extracurricular variables, right?

7    **A.**  Yes.

8    **Q.**  And so you got these two numbers there, right?

9            Now, just a quick question.  Are those

10   statistically significant still?

11   **A.**  Which numbers are you referring to?  There's three

12   numbers there.  Which numbers?

13   **Q.**  All of them.  Any of them.

14   **A.**  Yes, I believe they are.

15   **Q.**  They all are.  But that's not here on your

16   Defendant's 688.  Okay.  Now let's go back to your

17   demonstrative.  You could have graphed those two additional

18   points that you have on your demonstrative, couldn't you?

19   **A.**  Yes.

20   **Q.**  Let's do that.  See I've got the version of your graph

21   right here on the screen, sir?

22   **A.**  Yes.

23   **Q.**  All right.  I'm going to call the number 2 one you did

24   card 2, and that was minus 3.23, right?

25   **A.**  Yes.

Case: 19-2005    Document: 00117638240    Page: 212    Date Filed: 07/30/2020    Entry ID: 6356615
Case 1:14-cv-14176-ADB    Document 652    Filed 04/18/19    Page 200 of 206

200

1    **Q.**  And the other one is going to be called card 3.  That was

2    minus 3.01; right?  Do you see that I've entered that on the

3    Excel spreadsheet on my computer?

4    **A.**  Yes.

5    **Q.**  Let's see what that looks like now.  Do you see that I've

6    added your two additional layering on of variables, and we

7    look at what the graph looks like now?  Do you see that?

8    **A.**  Yes.

9    **Q.**  And you see that I've created an axis of zero.  That's

10   where the ceiling is, right?  That's no effect, correct?

11   **A.**  Yes.

12   **Q.**  And when you added on as many variables as you had,

13   basically every variable you had available to you, what

14   happened here is that the average marginal effect of the

15   difference between Asians and whites on the personal rating,

16   it didn't head to the ceiling, did it?

17   **A.**  No.  Well, first of all, I would say two things about

18   this graph.

19          First of all, if one were to include all of those

20   variables and go directly from Model 5 to card 3, the graph

21   would look different, first of all.

22          Secondly, I wasn't actually asserting that adding

23   additional observed variables would make it go to the

24   ceiling.

25          MR. MORTARA:  Your Honor, we're going to mark this

1    as Plaintiff's Demonstrative 40.  We'll submit it and offer

2    it into evidence.

3              MR. WAXMAN:  Well, I'm going to -- he's obviously

4    made it as a demonstrative.  We object to it being in

5    evidence because the witness just said if he were calculating

6    his -- I can't remember what it's being called here, card

7    Model 3, the graph would not look like that.  So I don't

8    think there's a foundation for offering it into evidence.

9              MR. MORTARA:  Your Honor, the foundation is I just

10   made it, and we just agreed that demonstratives go back into

11   evidence.  I thought we had a rule about demonstratives now.

12             MR. WAXMAN:  We had a rule about disclosed

13   demonstratives.  This is a demonstrative again created on the

14   fly, and there's no agreement.

15             THE COURT:  This is what I'm going to do.  We'll

16   sort this out tomorrow morning.  I'm tired.  I'm sure

17   Dr. Card is tired.  It's 3:00.  It's been a long day.

18             We will resume tomorrow.  What time would you all

19   like to start?  Karen, do we have anything before this?

20             What time would you guys like to start tomorrow?

21             MR. MORTARA:  As early as the Court could

22   accommodate us.

23             MR. LEE:  9:30, if you could, Your Honor.

24             THE COURT:  Let's start at 9:30.  All right.  And

25   we will take this up.  I think there is an agreement about

 1   demonstratives, but he's called into question the accuracy of

 2   this demonstrative.  The witness hasn't adopted it.  We can

 3   sort out some way to deal with that, but it's not going to

 4   come in as a demonstrative that's been accepted as having

 5   accuracy.

 6           MR. MORTARA:  Sure.

 7           THE COURT:  So we'll figure out some other way like

 8   demonstrative marked for identification rather than --

 9           MR. MORTARA:  That's fine.

10           THE COURT:  We'll get back to all those angels on

11   the head of a pin.  We'll see everyone tomorrow.  Okay?

12           MR. MORTARA:  Thank you, Your Honor.

13           MR. LEE:  Thank you, Your Honor.

14           (Court recessed at 3:04 p.m.)

15

16

17

18

19

20

21

22

23

24

25

```
 1                  - - - - - - - - - - -

 2                      CERTIFICATION

 3

 4          I certify that the foregoing is a correct

 5   transcript of the record of proceedings in the above-entitled

 6   matter to the best of my skill and ability.

 7

 8

 9

10   /s/ Joan M. Daly                 October 31, 2018

11   _____             _____

12   Joan M. Daly, RMR, CRR           Date
     Official Court Reporter
13

14

15

16

17

18

19

20

21

22

23

24

25
```

INDEX OF WITNESSES

WITNESS                                                      PAGE

DAVID CARD


    Examination By Mr. Waxman .........................   6
    Examination By Mr. Mortara.........................  174

EXHIBITS

Defendant Exhibit                                        Received

670    ....................................    103

677    ....................................     20

678    ....................................     21

680    ....................................     21

681    ....................................     11

683    ....................................     18

687    ....................................     40

692    ....................................     54

694    ....................................     80

698    ....................................     30

702    ....................................     93

708    ....................................     27

709    ....................................     96

713    ....................................    122

715    ....................................     99

716    ....................................    100

718    ....................................    106

720    ....................................    131

721    ....................................    141

722    ....................................    145

723    ....................................    152

724    ....................................    162

725    ....................................    164

726 ..................................... 167

727 ..................................... 157

728 ..................................... 135

729 ..................................... 169

730 ..................................... 147

699 ..................................... 88



```
 1                  UNITED STATES DISTRICT COURT

 2                   DISTRICT OF MASSACHUSETTS

 3    _____

 4    STUDENTS FOR FAIR ADMISSIONS, INC.,

 5                    Plaintiff,         Civil Action
                                         No. 14-14176-ADB
 6    v.
                                         November 1, 2018
 7    PRESIDENT AND FELLOWS OF HARVARD
      COLLEGE, et al.,                   Pages 1 to 261
 8
                    Defendants.
 9    _____

10

11

12             TRANSCRIPT OF BENCH TRIAL - DAY 14
            BEFORE THE HONORABLE ALLISON D. BURROUGHS
13               UNITED STATES DISTRICT COURT
               JOHN J. MOAKLEY U.S. COURTHOUSE
14                   ONE COURTHOUSE WAY
                     BOSTON, MA  02210
15

16

17

18

19

20

21             JOAN M. DALY, RMR, CRR
             KELLY MORTELLITE, RMR, CRR
22               Official Court Reporter
            John J. Moakley U.S. Courthouse
23          One Courthouse Way, Room 5507
                  Boston, MA  02210
24              joanmdaly62@gmail.com

25
```

Case: 19-2005    Document 00117628340    Page: 229    Date Filed: 07/30/2020    Entry ID: 6356615
Case 1:14-cv-14176-ADB    Document 654    Filed 04/18/19    Page 2 of 261

2

```
 1    APPEARANCES:

 2
      COUNSEL FOR THE PLAINTIFF:
 3

 4            ADAM K. MORTARA, ESQUIRE
              J. SCOTT McBRIDE, ESQUIRE
 5            KRISTA J. PERRY, ESQUIRE
              Bartlit Beck Herman Palenchar & Scott
 6            54 West Hubbard Street
              Suite 300
 7            Chicago, Illinois 60654
              312.494.4400
 8            adam.mortara@bartlit-beck.com
              scott.mcbride@bartlit-beck.com
 9            krista.perry@bartlit-beck.com

10            JOHN M. HUGHES, ESQUIRE
              MEG E. FASULO, ESQUIRE
11            KATHERINE L.I. HACKER, ESQUIRE
              Bartlit Beck Herman Palenchar & Scott
12            1801 Wewatta Street
              Suite 1200
13            Denver, Colorado 80202
              303.592.3100
14            john.hughes@bartlit-beck.com
              meg.fasulo@bartlit-beck.com
15            kat.hacker@bartlit-beck.com

16            JOHN MICHAEL CONNOLLY, ESQUIRE
              THOMAS R. McCARTHY, ESQUIRE
17            WILLIAM S. CONSOVOY, ESQUIRE
              Consovoy McCarthy Park PLLC
18            3033 Wilson Boulevard
              Suite 700
19            Arlington, Virginia 22201
              703.243.9423
20            mike@consovoymccarthy.com
              tom@consovoymccarthy.com
21            will@consovoymccarthy.com

22

23

24

25
```

**JA3144**

```
 1    APPEARANCES (cont.):

 2

 3            PATRICK STRAWBRIDGE, ESQUIRE
              Consovoy McCarthy Park PLLC
              Ten Post Office Square
 4            8th Floor, South, PMB #706
              Boston, Massachusetts 02109
 5            617.227.0548
              patrick@consovoymccarthy.com
 6
              MICHAEL H. PARK, ESQUIRE
 7            Consovoy McCarthy Park PLLC
              3 Columbus Circle
 8            15th Floor
              New York, New York 10024
 9            646.456.4432
              park@consovoymccarthy.com
10
              PAUL M. SANFORD ESQUIRE
11            BENJAMIN C. CALDWELL, ESQUIRE
              Burns & Levinson LLP
12            One Citizens Plaza
              Suite 110
13            Providence, Rhode Island 02903
              401.831.8330
14            psanford@burnslev.com
              bcaldwell@burnslev.com
15

16    COUNSEL FOR THE DEFENDANT:

17            WILLIAM F. LEE, ESQUIRE
              FELICIA H. ELLSWORTH, ESQUIRE
18            ANDREW S. DULBERG, ESQUIRE
              ELIZABETH C. MOONEY, ESQUIRE
19            SARAH R. FRAZIER, ESQUIRE
              Wilmer Cutler Pickering Hale and Dorr LLP
20            60 State Street
              Boston, Massachusetts 02109
21            617.526.6556
              william.lee@wilmerhale.com
22            felicia.ellsworth@wilmerhale.com
              andrew.dulberg@wilmerhale.com
23            elizabeth.mooney@wilmerhale.com
              sarah.frazier@wilmerhale.com
24

25
```

Case: 19-2005    Document 00117628340    Page: 222    Date Filed: 07/30/2020    Entry ID: 6356615
Case 1:14-cv-14176-ADB    Document 654    Filed 04/18/19    Page 4 of 261

4

```
 1    APPEARANCES (cont.):

 2
              SETH P. WAXMAN, ESQUIRE
 3            DANIELLE CONLEY, ESQUIRE
              DANIEL WINIK, ESQUIRE
 4            BRITTANY AMADI, ESQUIRE
              PAUL R.Q. WOLFSON, ESQUIRE
 5            Wilmer Cutler Pickering Hale and Dorr LLP
              1875 Pennsylvania Ave, NW
 6            Washington, DC 20006
              202.663.6006
 7            seth.waxman@wilmerhale.com
              danielle.conley@wilmerhale.com
 8            daniel.winik@wilmerhale.com
              brittany.amadi@wilmerhale.com
 9            paul.wolfson@wilmerhale.com

10            DEBO P. ADEGBILE, ESQUIRE
              Wilmer Cutler Pickering Hale and Dorr LLP
11            7 World Trade Center
              250 Greenwich Street
12            New York, New York 10007
              212.295.6717
13            debo.adegbile@wilmerhale.com

14            ARA B. GERSHENGORN, ESQUIRE
              Harvard Office of the General Counsel
15            Smith Campus Center
              Suite 980
16            1350 Massachusetts Avenue
              Cambridge, Massachusetts 02138
17            617.495.8210
              ara_gershengorn@harvard.edu

18

19    COUNSEL FOR AMICI STUDENTS:

20            JON M. GREENBAUM, ESQUIRE
              BRENDA L. SHUM, ESQUIRE
21            GENEVIEVE BONADIES TORRES, ESQUIRE
              KRISTEN CLARKE, ESQUIRE
22            1500 K Street NW, Suite 900
              Washington, DC 20005
23            202.662.8315
              jgreenbaum@lawyerscommittee.org
24            bshum@lawyerscommittee.org
              gtorres@lawyerscommittee.org
25            kclarke@lawyerscommittee.org
```

**JA3146**

```
 1    APPEARANCES (cont.):

 2
            LAWRENCE CULLEEN, ESQUIRE
 3          EMMA DINAN, ESQUIRE
            Arnold & Porter LLP
 4          555 Twelfth Street, NW
            Washington, DC 20004
 5          202.942.5477
            gina.dean@aporter.com
 6          emma.dinan@aporter.com

 7
      COUNSEL FOR AMICI ORGANIZATIONS:
 8
            JENNIFER A. HOLMES, ESQUIRE
 9          CARA McCLELLAN, ESQUIRE
            JIN HEE LEE, ESQUIRE
10          MICHAELE M. TURNAGE YOUNG, ESQUIRE
            RACHEL N. KLEINMAN, ESQUIRE
11          NAACP Legal Defense and Educational Fund, Inc.
            700 14th Street NW
12          Suite 600
            Washington, DC 20005
13          jholmes@naacpldf.org
            cmcclellan@naacpldf.org
14          jlee@naacpldf.org
            mturnageyoung@naacpldf.org
15          rkleinman@naacpldf.org

16          KENNETH N. THAYER, ESQUIRE
            KATE R. COOK, ESQUIRE
17          Sugarman Rogers
            101 Merrimac Street
18          Suite 900
            Boston, Massachusetts 02114
19          617.227.3030
            thayer@sugarmanrogers.com
20          cook@sugarmanrogers.com

21

22

23

24

25
```

**JA3147**

Case: 19-2005    Document: 00117628340    Page: 224    Date Filed: 07/30/2020    Entry ID: 6356615
Case 1:14-cv-14176-ADB    Document 654    Filed 04/18/19    Page 6 of 261

6

|       |                                                                           |
|-------|---------------------------------------------------------------------------|
| 1     | P R O C E E D I N G S                                                     |
| 2     | (The following proceedings were held in open                             |
| 3     | court before the Honorable Allison D. Burroughs, United                  |
| 4     | States District Judge, United States District Court, District            |
| 5     | of Massachusetts, at the John J. Moakley United States                   |
| 6     | Courthouse, One Courthouse Way, Boston, Massachusetts, on                 |
| 7     | November 1, 2018.)                                                        |
| 8     | THE COURT:  Good morning, everyone.  Give me one                         |
| 9     | second here.                                                             |
| 10    | All right.  Mr. Mortara, when you're ready.                              |
| 11    | MR. MORTARA:  Thank you, Your Honor.                                     |
| 12    | EXAMINATION BY MR. MORTARA:   (Continued.)                               |
| 13    | Q.  Good morning, Professor Card.                                        |
| 14    | A.  Good morning.                                                        |
| 15    | Q.  Do you remember we talked yesterday about this article,              |
| 16    | "Our Referees and Editors in Economics Gender-Neutral"?  Do              |
| 17    | you remember that?                                                       |
| 18    | A.  Yes.                                                                 |
| 19    | Q.  Who is Stefano Della Vigna?                                          |
| 20    | A.  He's my colleague.                                                   |
| 21    | Q.  Did you know that Stefano Della Vigna put this article on            |
| 22    | his personal web page at U.C. Berkeley?                                  |
| 23    | A.  I didn't know that until yesterday, yes.                             |
| 24    | Q.  You know it now?                                                     |
| 25    | A.  I do.                                                                |

1   **Q.**  You used this slide in your direct examination.  It's DD

2   10.35, right?

3   **A.**  Yes.

4   **Q.**  Do you remember the conversation you had, actually two

5   separate conversations with the court, and the court was

6   asking about both the order and the magnitude of the effects

7   on this slide.  Do you remember that?

8   **A.**  Yes.

9   **Q.**  And do you remember at one point I stood up and I said I

10  really wanted to know about what would happen if you just

11  took your model and removed the personal rating.  Do you

12  remember I said that?

13  **A.**  Yes.

14  **Q.**  And Mr. Waxman said you were going to get to that.

15  Remember?

16  **A.**  Yes.

17  **Q.**  You actually mentioned it yesterday in your direct

18  testimony?

19  **A.**  Yes.

20  **Q.**  You did that calculation in your opening report, correct?

21  **A.**  Yes.

22  **Q.**  And you didn't show it, though, did you?

23  **A.**  Not that I recall.

24  **Q.**  If you would turn in your opening report, please, to page

25  72.  Are you there, sir?

1          And I have it on the screen.  This is a calculation

2    of your logit model of admissions removing the personal

3    rating, correct?

4    **A.**  Yes.

5    **Q.**  And it concludes --

6              THE COURT:  What page of his report?

7              MR. MORTARA:  Sorry, Your Honor.  It is 72 of the

8    opening report.  May I proceed, Your Honor?

9    **A.**  Yes.

10   **Q.**  And you see that the overall marginal effect you

11   calculated was minus .34 percent and it was statistically

12   significant, correct?

13   **A.**  Yes.

14   **Q.**  And for the record, for the year 2014, the effect was

15   minus .76, correct?

16   **A.**  Yes.

17   **Q.**  And the effect for 2015 was minus .37, correct?

18   **A.**  Yes, not statistically significant.

19   **Q.**  And the effect for 2016 is minus .45, correct?

20   **A.**  Yes, again, not statistically significant.

21   **Q.**  And the effect for 2017 is positive 0.05, correct?

22   **A.**  Yes.

23   **Q.**  And the effect for 2018 is minus .68, and that is

24   statistically significant on its own, correct?

25   **A.**  Yes, that's the only individual year that is, yes.

1    **Q.**  At the effect for 2019 is positive .14, correct?

2    **A.**  Yes.

3    **Q.**  Now, this is your model with all the ALDCs in it,

4    correct?

5    **A.**  Yes.  The model is slightly different in my rebuttal

6    report, but yes, this is my model.

7    **Q.**  We'll get to that in just a second.  But this is your

8    model with all the ALDCs in it, correct?

9    **A.**  Yes.

10   **Q.**  This is your model with intended career and staff

11   interview indicator, correct?

12   **A.**  Yes.

13   **Q.**  This is your model with parental occupation, correct?

14   **A.**  Yes.

15   **Q.**  This is a yearly model, not a pooled model, correct?

16   **A.**  Yes.

17   **Q.**  So if you do all of the things that you talked about,

18   your differences with Professor Arcidiacono, and you just

19   remove the personal rating, your preferred model shows a

20   statistically significant Asian penalty just like it does

21   right here in Exhibit 21 from your opening report, right?

22   **A.**  Yes, on average, although only one year is statistically

23   significant, yes.

24   **Q.**  You said you had a slightly updated model, correct?

25   **A.**  Yes.

1    **Q.**  But that's true of the slightly updated model, too, isn't

2    it?

3    **A.**  I believe so, yes.

4    **Q.**  I want to talk about your research for a little while.

5    The focus in your research is labor economics, correct?

6    **A.**  Yes.

7    **Q.**  And you frequently run regression models in your

8    research, correct?

9    **A.**  Yes.

10   **Q.**  And the type of model that you created for Harvard's

11   admissions model -- I think we've gone over this -- is called

12   a discrete choice model; is that right?

13   **A.**  Yes.

14   **Q.**  And you talked a few times about the number of variables

15   that you used in your yearly models, right?

16   **A.**  Yes.

17   **Q.**  And it's over 200 variables, isn't that correct?

18   **A.**  Yes.

19   **Q.**  How many papers have you published that involve discrete

20   choice models with over 200 variables?

21   **A.**  Off the top of my head, I don't know the answer to that.

22   **Q.**  Can you name one?

23   **A.**  Can I look at my CV for a second?

24   **Q.**  Sure.

25   **A.**  So none are coming to mind other than some current work

1    I'm working on, but yeah.

2    **Q.**   Okay.  I'm going to go through some of your papers, a

3    couple of the discrete model choice papers that you've done.

4    If those are ones that you think have over 200 variables,

5    please let me know, okay?

6    **A.**   Sure.

7    **Q.**   Now I want to go over an article that you wrote with

8    Professor Giuliano about peer effects.  It's in your binder

9    at C82.

10   **A.**   Yes.

11   **Q.**   And this is an article called "Peer Effects and Multiple

12   Equilibria in the Risky Behavior of Friends."  It's by David

13   Card and Laura Giuliano.  Who is Laura Giuliano?

14   **A.**   She's one of my former Ph.D. students who is now a

15   professor at the University of California Santa Cruz.

16   **Q.**   And what were you studying in this article with Laura

17   Giuliano?

18   **A.**   We're studying, looking at young people who are followed

19   over time in a dataset known as ed health.  We're studying

20   behavior of best friend pairs in the initiation of various

21   kinds of risky behaviors.

22   **Q.**   And did you run regression models in this article?

23   **A.**   A variety of different kinds of models, mostly what are

24   called probits and logits.

25   **Q.**   And logit models are the type you ran in this case,

1    right?

2    **A.**  Actually, nearly all the models in this paper are

3    probits.  There is a logit as a specification test.

4    **Q.**  And probit is another type of regression model, correct?

5    **A.**  Yes.

6    **Q.**  And I'm showing you Table 3 from page 1137, and that

7    includes some of the coefficients from the co-variants you

8    used in some of your regressions, correct?

9    **A.**  Yeah.  Excuse me.  My screen is so fuzzy.  I prefer to

10   look here.

11   **Q.**  It's no problem, Professor Card.  I think everyone

12   prefers to use paper.

13   **A.**  Yes.

14           THE COURT:  The old people do.  Right, Mr. Waxman?

15           MR. WAXMAN:  Even the no-so-old.

16           MR. MORTARA:  I have no quip.  I have no come back

17   to that.  There's nothing.

18           MR. WAXMAN:  I think Your Honor should be looking

19   at Mr. Lee.

20           MR. LEE:  That's okay.  I'll accept.

21           THE COURT:  He hasn't disparaged my age yet.

22   **Q.**  So while we're on this page, I want to ask you something.

23   You were here for Mr. Lee's cross of Professor Arcidiacono,

24   right?

25   **A.**  Yes.

1   **Q.**  And you heard him talk about a number of Professor

2   Arcidiacono's papers on affirmative action and other issues

3   that touch on race, correct?

4   **A.**  Yes.

5   **Q.**  And actually, in this paper, if you go back to the front,

6   you actually thanked Professor Arcidiacono in this paper,

7   didn't you?

8   **A.**  Yes, I did.

9   **Q.**  Now, if you go back to the page we were on, 1137, I just

10  want to ask you one quick question about something you

11  concluded at the lower right column at the bottom four and

12  five lines up.  Are you there?

13  **A.**  Yes.

14  **Q.**  It says, "Other factors that increase the likelihood of

15  initiating sexual activity include age, black race," it goes

16  on, "physical development and self-reported attitude toward

17  risk."  Do you see that?

18  **A.**  Yes.

19  **Q.**  That was a finding from the data that you made, correct?

20  **A.**  Yes.

21  **Q.**  You were in no way attempting to make any kind of

22  statement about causality between black race and the

23  likelihood to initiate sexual activity, were you?

24  **A.**  No.

25  **Q.**  Let's go back to the data.  If you just go to 1148, I

1    just have a very quick question here.

2    **A.**   Same paper?

3    **Q.**   Yes, same paper.  Sorry, Professor Card.  Are you there?

4    **A.**   Yes.

5    **Q.**   And you provide here in the back in the appendices all of

6    the coefficients from your models for this paper, correct?

7         You see in Table A3 you actually have the

8    coefficients for black race.  We just talked about that,

9    right?

10   **A.**   I believe so, but let me check the footnotes because

11   sometimes we don't report all the coefficients.

12   **Q.**   Well, I'll revise the question so we can move on.  You

13   report many, many of the coefficients here, don't you?

14   **A.**   Yes.

15   **Q.**   All right.  Let's look at another paper, if you would

16   turn to Tab C89.  And it's "What Works?  A Meta Analysis of

17   Recent Active Labor Market Program Evaluations."

18   **A.**   Yes.

19   **Q.**   Just a thumbnail, what's this paper about?

20   **A.**   Well, a meta analysis is a statistical analysis of

21   research papers.  So it tries to develop a model of the set

22   of results reported in different research papers, and these

23   research papers all concern active labor market programs

24   which are programs to try and help disadvantaged workers or

25   unemployed workers.

1   **Q.**  And if you go to page 914, you report some results of

2   some regression models, correct, in Table 5?

3   **A.**  Yes.

4   **Q.**  You report coefficients on the variables in your

5   regression models there, correct?

6   **A.**  Yes.

7   **Q.**  And then down in the notes, I've got it highlighted on

8   the screen, it says, "Models are linear regressions with the

9   effect size as a dependent variable.  Coefficients of

10  additional control variables are reported in Table 7."  Do

11  you see that?

12  **A.**  Yes.

13  **Q.**  And if you go to Table 7, which appears at page 917, you

14  report many, many more coefficients, correct?

15  **A.**  Yes.

16  **Q.**  I'd like to turn now to C101, Professor Card.

17  **A.**  Yes.

18  **Q.**  And that is an article called, "Does gifted education

19  work?  For which students?"  Again, by you and Professor

20  Giuliano, correct?

21  **A.**  Yes.

22  **Q.**  And this is an article that actually has a logistic

23  regression of a discrete choice model, right?

24  **A.**  Let me check.

25  **Q.**  I can guide you to Appendix Table 1 towards the back.

1    Please take your time.

2    **A.**  Appendix Table 1, yes.

3    **Q.**  Sadly, the a appendices tables are not page-numbered, so

4    you have to go through all the graphs, after page 36, all the

5    graphs and then you get to --

6    **A.**  Yes, I found it.

7    **Q.**  Now, my question is --

8            THE COURT:  Wait a second.  I haven't.

9            MR. MORTARA:  Sorry, Your Honor.

10           THE COURT:  Appendix Table 1.  Is that after

11   Figures 1 and 2?

12           MR. MORTARA:  Yes, it's after all the graphs.

13           THE COURT:  Appendix --

14           MR. MORTARA:  So Tables 1 through 7 and then

15   Appendix Table 1.  That was a lot of effort for not much.

16   This is an article that you have that actually uses a

17   logistic regression and discrete choice model, right?

18   **A.**  In this table it's using a conditional logit model, yes.

19   **Q.**  And you provided the coefficients, didn't you?

20   **A.**  Yes.

21   **Q.**  It's pretty standard in reporting on econometric models

22   in the literature to provide coefficients for your regression

23   models, correct?

24   **A.**  Yes.

25   **Q.**  And you said two days ago when you started your direct

1   testimony that you approached your work in this case, quote,

2   following basically the same procedure as you would in any

3   kind of research enterprise.  Do you remember that?

4   **A.**   I believe so, yes.

5   **Q.**   But in your research when you report on your regression

6   models you always report the coefficients of your model when

7   you publish them, isn't that right?

8   **A.**   So I'm not sure -- I would normally do so, but I wouldn't

9   necessarily always do that.

10  **Q.**   Well, we talked -- you talked about the award you got

11  from Econometrica in your direct testimony, right?

12  **A.**   Yes.

13  **Q.**   Can you name any paper you've ever published in

14  Econometrica when you did a regression model of your own work

15  and did not publish your coefficients?

16  **A.**   Most of the coefficients, yes.

17  **Q.**   And can you name any paper on your CV -- take your

18  time -- where you did a regression model in your own work and

19  didn't publish your coefficients?

20  **A.**   Not -- I can't think of any.

21  **Q.**   And one reason that economists, econometricians provide

22  the coefficients on their regressions in their published

23  articles and the reason the community insists they be

24  provided is so that others can critique the models, correct?

25  **A.**   Yes, I would agree with that.

Case: 19-2005    Document: 00117629240    Page: 236    Date Filed: 07/30/2020    Entry ID: 6356615
Case 1:14-cv-14176-ADB   Document 654   Filed 04/18/19   Page 18 of 261

18

1   **Q.**  And that's so others can look at it, look at the models

2   to see if there's odd findings or other issues that might

3   provide for new research or even criticisms of the models

4   that have been published, right?

5   **A.**  Right, although in the case of -- yes, but in the case of

6   choice models, discrete choice models, oftentimes people

7   will -- because the coefficients are difficult to interpret,

8   they'll oftentimes have additional analysis or even additions

9   to the table which show how those coefficients translate into

10  differences across groups.

11  **Q.**  And that's what you've done, right?

12  **A.**  I've certainly done that in some cases, yes.

13  **Q.**  Now, you know that your expert reports in this case have

14  been made public through briefing that happened over the

15  summer, right?

16  **A.**  Yes, I do.

17  **Q.**  But neither of your expert reports in this case provide

18  any coefficients from your models, correct?

19  **A.**  Well, they're available in the workpapers, yes.

20  **Q.**  You provided them to Students For Fair Admissions in the

21  form of program files that you could run in Stata to generate

22  your coefficients; is that right?

23  **A.**  Yes.

24  **Q.**  Would you recognize your coefficients if I showed them to

25  you?

1    **A.**  Well, yes.  They're all digits between zero and nine; but

2    other than that, I can't say for sure.

3    **Q.**  We'll get there in just a second.  In your direct

4    testimony you did not discuss or provide any information on

5    the coefficients from your admissions models, correct?

6    **A.**  No.

7    **Q.**  And just to be clear, you frequently analyze the

8    coefficients of your regression models in your own research;

9    when you're talking about your models, you talk about both

10   the average marginal effect or the effects on the

11   coefficients, right?

12   **A.**  Yes, sometimes.

13   **Q.**  Well, turn to C100.  We'll just quickly do an example.

14   **A.**  C100.

15   **Q.**  Sure.

16   **A.**  Okay.

17   **Q.**  This is a paper on the elimination of mandatory

18   retirement.  "Did the Elimination of Mandatory Retirement

19   Affect Faculty Retirement," with Orley Ashenfelter and David

20   Card, correct?

21   **A.**  Yes.

22   **Q.**  And Orale Ashenfelter was your Ph.D. advisor?

23   **A.**  Yes.

24   **Q.**  And just very briefly, what's this article about?

25   **A.**  I think that it's exactly about what the title says it's

1    about, studying the effect of eliminating mandatory

2    retirement.

3    **Q.**  And in this paper you used a logistic regression model

4    for the discrete choice of retirement -- funny that -- he

5    used the example of retirement in your own testimony.  If you

6    turn to 971, you can see some results of that.  Do you see

7    that?

8    **A.**  Yes.

9    **Q.**  And you showed all sorts of coefficients here in Table 4

10   on page 971, correct?

11   **A.**  Yes.  And I also show at the bottom of the table what

12   amount to the average marginal effects for reaching age 70

13   and 71, yes.

14   **Q.**  So in this published research article with Orley

15   Ashenfelter you disclosed your coefficients and the average

16   marginal effect, right?

17   **A.**  Yes.

18   **Q.**  And on the previous page, 970, I want to direct your

19   attention to the first full paragraph on the page that

20   begins, "The coefficients."  Do you see that?

21   **A.**  Yes.

22   **Q.**  And you make a remark, "The coefficients of the key

23   covariates show some interesting patterns."  Do you see that?

24   **A.**  Excuse me.

25   **Q.**  First full paragraph on the left side.  The coefficients

1    of the key covariates" --

2    **A.**  Yeah.

3    **Q.**  Then you go on to make several observations about the

4    coefficients showing some interesting patterns.  Do you see

5    that?

6    **A.**  Yes.

7    **Q.**  And in the next paragraph, you turn to the coefficients

8    of the individual faculty characteristics, and you make

9    several observations about those, correct?

10   **A.**  Yes.

11   **Q.**  But in your reports in this case you did not provide

12   coefficients anywhere or remark about any interesting

13   patterns, correct?

14   **A.**  Well, as I said, the coefficients were certainly

15   available in the workpapers.  And of course something like

16   the statistical significance of the average marginal effect

17   is exactly related to the statistical significance of the

18   coefficient.  So in terms of the issue of statistical

19   significance, it's really the same thing.

20   **Q.**  Can sometimes values for coefficients give you warning

21   signs that there's something wrong with your model; say if

22   it's statistically significant when you think it shouldn't

23   matter, like some of the hat size things you were talking

24   about?

25   **A.**  Well, that can happen.  Yes, that can happen; sometimes

1    it can happen by accident.  So for instance, one -- if five

2    times out of 100, if you estimate something that should be

3    zero, you'll get a significant result at the 5 percent level.

4    **Q.**  Can another warning sign in your coefficients when you

5    run a model be something that you would expect to be

6    associated with a strongly negative effect showing it being

7    associated with a strongly positive effect?

8    **A.**  Yes.  Actually, there's an example of that in actually

9    like some of Professor Arcidiacono's models where, because

10   there's academic index and SAT and so on, sometimes when you

11   look at the individual coefficients, SAT will seem to have a

12   negative effect, but that's because there's so many variables

13   representing different aspects of academic quality that one

14   has to interpret the whole batch of them carefully.

15   **Q.**  Yeah.  I think you actually mentioned this yesterday,

16   didn't you?  I think I caught this concept yesterday, similar

17   concept.

18           A lot of collinear variables means that you're

19   going to get a lot of noise in the coefficients but the

20   average marginal effect will still be fine?

21   **A.**  Well, what I said --

22   **Q.**  If I mischaracterized what you said, please tell me.

23   **A.**  Yeah, but that was in regards -- that's what I said, but

24   that was in regard to the average marginal effect for Asians,

25   not the average marginal effect, for instance, of SAT in that

1    model.

2    **Q.**  Yes.  And let's be clear.  The only average marginal

3    effects you calculated and showed in your direct testimony

4    was the average marginal effect of being Asian both in your

5    overall model and then in some modified models and subgroups,

6    correct?

7    **A.**  Correct.  But I mean, for instance in his appendix,

8    Professor Arcidiacono does not report all of his coefficients

9    either, so --

10   **Q.**  We'll get there.

11   **A.**  Okay.

12   **Q.**  Also we talked yesterday about the average marginal

13   effect of being African-American or Hispanic, right?

14   **A.**  Yes.

15   **Q.**  Now, I can put it on the screen if you need it or you can

16   look -- you have Professor Arcidiacono's reports right there.

17   Professor Arcidiacono reports hundreds and hundreds of

18   coefficients in the back of his expert reports, doesn't he?

19   **A.**  Let me just refresh my memory of what we're talking about

20   here.

21   **Q.**  You can look at the rebuttal report because it's got all

22   the latest models if you want and just turn to the back.

23         There's tables starting in the B.6.2R range and

24   going on for pages and pages with coefficients, right?

25   **A.**  Yes.  But, for example, as I recall, some of the

1    variables that are included in the model, the coefficients

2    are not reported here.

3    **Q.**  You didn't report any, correct?

4    **A.**  Not in my report, no.

5    **Q.**  And Professor Arcidiacono reported many; is that fair?

6    **A.**  Yes.

7    **Q.**  Now I want to talk to you about your use of parental

8    occupation in your model.  I think you listed the variables

9    in your model.  I just want to put on the screen a list.

10              Will you take me down for one second.

11              COURTROOM CLERK:  Sure.

12              MR. MORTARA:  Thank you.  I just want to -- I

13   probably ruined the screen now by taking myself down for a

14   second.  Okay.  You can put it back up.

15   **Q.**  Do you see the list of parental occupation variables on

16   the screen, other, homemaker, unemployed, skilled trades.  Do

17   you see that?

18   **A.**  I do.  I'm not sure what I'm looking at, though.

19   **Q.**  Well, just, do you remember the list of parental

20   occupations you used?

21   **A.**  It's a long list and -- could I check?

22   **Q.**  You can look at your reports, too, if you need to.  I

23   just want to know if this is the list.

24              MR. WAXMAN:  Your Honor, the witness has already

25   said he doesn't know what he's looking at.  So perhaps my

 1    friend could either show him the paper or show him on the

 2    screen what this is.

 3              MR. MORTARA:  Your Honor, I'm happy to give it to

 4    him.  It's a huge printout.  I'm just looking at the list of

 5    variables.

 6              THE COURT:  That's fine.  He is attempting to

 7    refresh his recollection the way he's doing it.  If it does,

 8    it does; and if it doesn't, you can show him something else.

 9    **Q.**  I just want to know --

10    **A.**  So this is something that I -- it comes from my

11    workpapers?

12              MR. MORTARA:  Sure.  Your Honor, may I approach?

13              THE COURT:  Yes.

14    **Q.**  Professor Card, you remember me asking you if you

15    recognize the coefficients as you saw them, right?

16              What I've handed to you is a log file from Stata.

17    It's tabbed.  If you look at the tabs, the tabs have year

18    numbers on.  I really just do not want to spend that much

19    time on this, but I will put Defendant 685 up on the screen,

20    which has your average marginal effect and your 95 percent

21    confidence intervals.

22              And if you go through the years in the document I

23    handed you, and each tab tells you a year.  Blue tabs tell

24    you I think the year and the red tabs tell you the average

25    marginal effect.  You could maybe help yourself confirm that

1   what you're looking at is the log from your model.  But all I

2   want to ask you is the list of parental occupations.

3   **A.**   The thing is this is a very complicated thing to analyze.

4   I can't actually tell just in a few minutes whether this is

5   actually -- what data it's accessing, the sample sizes and

6   things like that.  I'm reluctant to make any conclusions

7   from --

8   **Q.**   My only --

9   **A.**   I have no idea where it came from.

10  **Q.**   My only question is what were the parental occupations in

11  your model.

12  **A.**   Oh, I can answer that.

13  **Q.**   Great.

14  **A.**   If we go to my direct report, my first report.

15  **Q.**   Take your time.  Tell me what page it's on.

16  **A.**   So a list would be in Appendix C of my main report, and I

17  would have --

18  **Q.**   Do you have the page number for me, sir?  I can put it up

19  on the screen for everybody.

20  **A.**   Yes.  Page 178 would be mothers' occupations.

21  **Q.**   No, sir.  These aren't the variables, are they?  Did you

22  have 24 variables?

23  **A.**   I believe that these are the set of occupations that I

24  use in my model, yes.

25  **Q.**   So you had 24 separate occupation variables?

1    **A.**  Well, there's variables for the mother and there's

2    variables for the father.

3    **Q.**  I understand.  So for each parent you had 24 separate

4    occupation variables.  Is that what you're saying?

5    **A.**  Well, of course there would be one omitted, but to the

6    best of my knowledge, that's correct, yes.

7    **Q.**  Okay.  If it turns out that that's not right, you can

8    come back and Mr. Waxman will lead you through it.

9           But putting aside the number of parental occupation

10   variables, these categories that you've got here, assuming

11   they are your variables, that's not what Harvard sees

12   necessarily on applications, is it?

13   **A.**  Well, so, of course students are applying through a

14   variety of mechanisms to Harvard, including the universal

15   application, the common application, and I think I mentioned

16   there's even some paper versions, and I believe there might

17   even be a Harvard application specifically.  So there's a

18   variety of mechanisms, and that information is then

19   translated into some kind of computerized database.

20   **Q.**  And then you pulled that information from the

21   computerized database, and you didn't use it directly.  You

22   converted it to a bunch of categories from a Bureau of Labor

23   Statistics database, right?

24   **A.**  I'm using a part of a BLS dataset, yes, that's correct,

25   yes.

1   **Q.**  I want to put on the screen some of your testimony with

2   Mr. Waxman.  And this is when you're talking about the

3   mothers' and fathers' occupations.  And you started to say,

4   "Variables representing the mothers' and fathers'

5   occupations," but then you said "Categorizations."  And what

6   you meant there was you didn't take the variables directly

7   out of Harvard's database and use them; you made your own

8   categories of these variables using the Bureau of Labor

9   Statistics categories and converted them yourself, like you

10  said you've done in other research from time to time, right?

11  **A.**  Yes, and almost inevitably when you use occupation data

12  you have to do this because of course there's many, many

13  codes.  Depending on the dataset there could be hundreds or

14  even thousands of occupation codes, yes.

15  **Q.**  And that's what you said yesterday?

16  **A.**  Yes.

17  **Q.**  And if you would turn to your rebuttal report now.

18  **A.**  Sure.

19  **Q.**  Because I think you showed a table of your conversions on

20  page 110 of your rebuttal report.

21  **A.**  Yes.

22  **Q.**  And this is a Table Exhibit 28.  It goes on to the next

23  page and it talks about how you took the codes that are on

24  the right and converted them to what's called a Card

25  category, right?

1   **A.**   Yes.  So exactly, yes.

2   **Q.**   And to be clear, these Card categories, those are named

3   after you, right?

4   **A.**   Yes.

5   **Q.**   And just to lighten the mood, you mentioned yesterday

6   that your name is also the name of a profession.  And I had

7   to look it up.  Do you want to tell everybody what it was?

8   Because I was a little surprised.

9   **A.**   It's something to do with wool.

10  **Q.**   Carding wool, huh?

11  **A.**   Yes.

12  **Q.**   I thought that was interesting.

13          Okay.  Back to the news.  Here we have your Card

14  categories -- nothing to do with wool -- and the categories

15  you created do not come directly from the Harvard database,

16  do they?

17  **A.**   No.  That's right.

18  **Q.**   And what you made is a virtual map.  You took the codes

19  you had from the database and you virtually mapped them to

20  create your Card category codes, right?

21  **A.**   Yes.  I largely followed the BLS hierarchy.  The Bureau

22  of Labor Statistics of course has developed many hierarchies

23  of occupations, so I followed that as closely as possible.

24  **Q.**   And BLS statistics are used by the Bureau of Labor

25  Statistics.  There's no evidence in this case that Harvard

1    uses BLS statistics for admissions, right; or have you seen

2    any?

3    **A.**   No, no.

4    **Q.**   So I want to just talk about --

5    **A.**   Excuse me.  I meant to say they're using the BLS

6    occupation -- the database has some categories and BLS

7    occupation codes.

8    **Q.**   They didn't do the Card, virtual thing with the Card

9    categories, did they?

10   **A.**   No, they didn't do that.

11   **Q.**   So let's talk about that.  On the right side of the

12   bottom of Number 5, you code everyone who is a business owner

13   or proprietor as self-employed, correct?

14   **A.**   Yes.

15   **Q.**   That means you code the owner of a small convenience

16   store the same way you would code one of the Koch brothers,

17   correct?

18   **A.**   Yes.

19   **Q.**   And do you think Harvard admissions officers would treat

20   those the same way?

21   **A.**   Well, they would have additional information about the --

22   so remember that the occupation -- I don't think they would.

23   The reason why is because, just like in my model, there's a

24   lot of other information.  There would be the education of

25   the parents, both parents.  There would be their occupation.

 1    And so there would be what neighborhood they live in and so

 2    on.  So there would be a way to contextualize that.

 3    **Q.**    There would be a lot of differences that Harvard

 4    admissions officers could use to draw the distinction I just

 5    did, right?

 6    **A.**    Yes, and my model would do some of that, yes.

 7    **Q.**    Some of it?

 8    **A.**    Yes.

 9    **Q.**    But your Card categories don't draw that distinction,

10    right?

11    **A.**    No, not in this case.

12    **Q.**    Let's just do one more with your Card categories.  Go to

13    number 6 on the next page.  You code --

14    **A.**    Yes.

15    **Q.**    -- everybody who is a policy-maker in government as a

16    business executive/management/administrator.  Do you see

17    that?

18    **A.**    This is category 7?

19    **Q.**    6.

20    **A.**    6.  Excuse me.

21    **Q.**    Do you see that?

22    **A.**    Yes.

23    **Q.**    And so if your father is the Secretary of Energy, and you

24    live in the suburbs of D.C., that's going to get you the same

25    code as someone whose dad is a regional sales manager for

Case: 19-2005    Document: 00117629240    Page: 250    Date Filed: 07/30/2020    Entry ID: 6356615
Case 1:14-cv-14176-ADB   Document 654   Filed 04/18/19   Page 32 of 261

32

1    Dunder Mifflin living down the street?

2    **A.**   Yes.  Exactly the way the BLS would make them in their

3    hierarchy, yes.

4    **Q.**   Do you think Harvard admissions officers would treat the

5    son of the Secretary of Energy the same way they would treat

6    the son of a regional sales manager for Dunder Mifflin when

7    they're looking at parental occupation and deciding how that

8    affects admissions prospects?

9    **A.**   No.  But of course they would have other contextual

10   variables, some of which are included in my model as well.

11   **Q.**   Now, yesterday -- and maybe the day before -- I can't

12   remember.  You talked very confidently about overfitting, and

13   you said that you had no concerns that your model was

14   overfit.  Do you remember that?

15   **A.**   Yes.

16   **Q.**   But overfitting and the concept of overfitting is not

17   discussed anywhere in your expert reports, is it?

18   **A.**   I don't believe so, but I believe it came up in Professor

19   Arcidiacono's testimony.

20   **Q.**   But it's not in your reports.  That's my only question.

21   **A.**   I don't believe so, no.

22   **Q.**   Overfitting is the production of an analysis that

23   corresponds too close or exactly to a particular set of data

24   and may therefore fail to fit additional data or predict

25   future observations reliably, correct?

1    **A.**   That sounds like one textbook definition.

2    **Q.**   An overfitted model is a statistical model that contains

3    more variables than can be justified by the number of events.

4    Would you agree with that?

5    **A.**   In part.

6    **Q.**   Well, we've just exhausted my knowledge of overfitting,

7    which comes from Wikipedia.  So I think we can move on a

8    little bit.  But I've got one test on the hat-size thing.

9         We talked a little bit yesterday about explanatory

10   power, and I don't know if you used the word junk or I used

11   the word junk to describe some models of the economy that can

12   have really high R-squareds but they're not really good

13   models.  Do you remember that discussion you and I -- that

14   sort of exchange we had when it was late in the day; both of

15   us were tired?

16   **A.**   I certainly do.

17   **Q.**   Okay.  I want to talk about maybe a related concept as it

18   pertains to the admissions model.  You have about 2,000

19   admits in one of your yearly models, 2,000 yes decisions; 1s

20   versus 0s?

21   **A.**   Around that, including nondomestic admits.  But for the

22   datasets we're looking at, it's more like 1750.

23   **Q.**   Great.  Let's do 1750.  And you talked a couple of times

24   about hat size and junk variables.  I want to give you a junk

25   variable and ask you if it would perfectly predict Harvard's

1     admissions process.

2             Social security number.  If you had the nine-digit

3     Social Security number for every student that got in and

4     coded that as a variable, yes or no, do you have this

5     nine-digit Social Security?  So you had 1750 admits and you

6     had 1750 variables.  And the variables were just -- you just

7     happened to know the Social Security numbers of the people

8     who got in.  Are you following me?  And it was, Do you have

9     this social security number?  That model, using only social

10    security numbers, would perfectly predict the Harvard

11    admissions process?

12    **A.**   I don't understand your hypothetical completely.

13    **Q.**   I'm going to work on it.

14    **A.**   Okay.

15    **Q.**   I'm not an economist, and I'm a worse teacher than -- I

16    teach law, and I don't think my students -- we could ask

17    Ms. Perry, but I don't think I'm the greatest teacher when I

18    teach law.

19            MR. WAXMAN:  Neither do I.

20            MR. MORTARA:  We could have a student-off between

21    me and Mr. Waxman and Professor Card.  And I'm not sure who

22    is going to win.  But if it's economics, I think Professor

23    Card would win.  Then we can bring Professor Arcidiacono's

24    students in and this can be like a brawl from Anchorman with

25    the news teams.

 1          But back to serious stuff, Your Honor -- I know, I

 2   get carried away.  Can we reduce the number of admits so we

 3   can make the hypothetical a little less onerous.  So it's 100

 4   admits.

 5   **A.**  So if I could explain a little bit.  I'm having a problem

 6   with like what -- if one is trying to model admissions, one

 7   needs variables for both the people who are admitted and the

 8   people who are not admitted.

 9   **Q.**  This is kind of my point.  And I'm not trying to create a

10   good model.  I'm trying to create a really bad one that

11   perfectly predicts the process.  1750 people get in.

12   **A.**  Yes.

13   **Q.**  You run a regression model that happens to use 1750

14   variables that are, Do you have this social security number

15   for 1750 times, and each of the Social Security numbers

16   happens to be the social security number of the people that

17   got in.  You don't know anything else.  That model perfectly

18   predicts Harvard's admission process, right?

19   **A.**  Yes.  Yes, I understand.

20   **Q.**  It would also be completely junk, right?

21   **A.**  Well, it would be an example of in some sense a totally

22   circular model, yes.

23   **Q.**  In fact, it would be overfit.  It would be the definition

24   of overfit.  You have one observation for each variable?

25   **A.**  I can't -- I hesitate to say that -- there are some

1    circumstances where models would use -- there would be a set

2    of perfect predicts that would be perfectly okay.

3    **Q.**   I'm just talking about the hypothetical I've constructed

4    for you where we know -- we can all agree on one thing about

5    the Harvard admissions office.  They don't rely on Social

6    Security numbers.  And I constructed the model in order to

7    actually -- I used post hoc reasoning to construct the model.

8    That's an overfit model, isn't it?

9    **A.**   I think it could be described that way for some

10   circumstances but maybe not for others.  It would depend on

11   the setting.

12   **Q.**   And one indicator, one indicator that you should be

13   worried about an overfit model is when your number of

14   observations compared to your number of variables is pretty

15   small, right?  The hypothetical I've got is one to one.

16   That's a danger zone, right?

17   **A.**   No.  You've got 1756 variables but 25,000 people in the

18   admissions pool.

19   **Q.**   Okay.  You're saying that the number of observations

20   includes the number of rejects?

21   **A.**   Yes.  The model is fit on both the people who are

22   accepted and the people who are rejected.  So there's

23   really -- driving a model in any given year, for instance in

24   the Harvard admissions process, there could be 25,000

25   observation units.

1    **Q.**   And I want to be just completely clear.  You're saying

2    that -- withdrawn.

3              I said when you have a number of observations

4    that's low relative to or -- number of observations low

5    relative to number of variables, that's a danger sign for

6    overfit.  That's what I said, right?

7    **A.**   Yes.

8    **Q.**   And then you said, yeah, but in my admissions model, I've

9    got 25,000 observations, rejects and admits, and I think you

10   were essentially implying I've got 225 variables, so I'm not

11   worried about it, right?  I mean, I wasn't really asking you

12   about your model, but that's what you were trying to say.

13   **A.**   Yes.  I mean, in a pure accounting sense, whether one

14   would be worried or not would depend very much on the

15   context.

16   **Q.**   Sure.  But in terms of the sort of danger zone of

17   overfitness, in a logistic regression model, sort of a

18   discrete choice situation, it's your testimony that when

19   you're trying to compare the number of observations to the

20   number of variables, you look at all the observations, not

21   just the less frequent of the two events.  That's what you're

22   telling me?

23   **A.**   Not precisely, no.

24   **Q.**   In fact, when you're looking for the danger zone of an

25   overfitness in a logistic regression model where you've got

1    discrete choices, zero or one, the number of observations

2    that you look at to see if your model might be overfit is the

3    lower frequency event.

4         So for example, say you're doing a paper on the

5    likelihood of death after cesarean delivery and you have

6    500,000 observations but only 500 deaths.  You get worried

7    about overfittedness because you only have 500 deaths when

8    you have models trying to predict death versus life, right?

9    **A.**  Certainly.

10   **Q.**  In fact, you have a paper like that, don't you?

11   **A.**  I do, yes.

12   **Q.**  We're going to get to it in a little bit.  So you look at

13   the lower frequency event when you're talking about number of

14   observations versus variables, when you're thinking about

15   being concerned about overfitness.  That's what you did in

16   your paper on cesarean deliver, right?

17   **A.**  That's what I did in that context.  I'm hesitating to

18   draw a generalization.

19   **Q.**  Sure.  Let's just go through.  You have a few papers

20   where you discuss overfitting, right?

21   **A.**  I believe so, yes.

22   **Q.**  Well, we're just going to go through three of them.

23   **A.**  Okay.

24   **Q.**  If you go to C89, we're back to "What Works?"  Are you

25   there?

1   **A.**   Yes.

2   **Q.**   And I'm going to refer you to page 925.  At the very

3   bottom of the page, you'll see a sentence beginning, "A

4   concern."

5   **A.**   Yes.

6   **Q.**   And you say, "A concern with the specification in column

7   3 is that the average number of program estimates per country

8   is small.  Many countries only have two or three estimates,

9   leading to potential overfitting."  Do you see that?

10  **A.**   Yes.

11  **Q.**   That's referring to the number of observations you have

12  compared to the number of variables, and you're talking about

13  how for some of the countries you only have two or three

14  observations, right?

15  **A.**   Yes.  In this context we're including a variable that's

16  country-specific, GDP growth, and there's only two or three

17  observations per country, yes.

18  **Q.**   And your solution to that was to take the countries with

19  only a couple of estimates out of the model and re-estimate

20  the model with what you had left, increasing the ratio of

21  observations to variables -- if you just read on, goes to the

22  next page.  Right?

23  **A.**   Yes.

24  **Q.**   That was your solution, and then you compared that model

25  you did on a subgroup with the countries you had more data on

1    to the first model you measured, and you saw they were about

2    the same, resolving your concerns, right?

3    **A.**    Yes.

4    **Q.**    And that is a diagnostic technique for overfitting called

5    cross-validation, correct?

6    **A.**    No.

7    **Q.**    What's it called?

8    **A.**    I'm not sure this particular procedure has a name.  This

9    is a pretty standard thing where we look at a subgroup and

10    see if the model estimates are similar and if -- our main

11    concern is the coefficients on the top of this table.  And

12    we're trying to see if those coefficients are affected by how

13    we treat the other variables.  And so it would be kind of

14    similar in my report to, when I look at California and

15    applicants from California, female applicants, and say is the

16    average marginal effect for Asian ethnicity different for

17    those subgroups.  It's more like that, actually.

18    **Q.**    Except in this paper you compare coefficients and you

19    didn't do any comparison or any discussion of coefficients in

20    your expert reports, right?

21    **A.**    Well, in this paper, this is not a logit model, so these

22    are regression models, and these coefficients directly

23    translate into a effect of higher GNP growth on

24    effectiveness.

25    **Q.**    Let's get to a logit model then.  If you turn to Tab 88,

1    you'll find your cesarean delivery paper.

2    **A.**  Sure.  Okay.

3    **Q.**  This is the health effects of cesarean delivery for

4    low-risk first births by you and others.  I have I think

5    page-numbered this on the bottom right because it's like many

6    of the papers I got from you.  If you see at the bottom

7    right, there's page numbers, 1 of 86.  Do you see that?

8    **A.**  Yes.

9    **Q.**  This will help us get through here.  You had a concern

10   that one of your models in here was overfit as well, didn't

11   you?

12   **A.**  I don't remember the specific wording.

13   **Q.**  Turn to page 32.

14   **A.**  Okay.  Yes.

15   **Q.**  Excuse me.  Wrong document.  77.  Here we go.  Sorry,

16   sir.  Table 9.

17        MR. WAXMAN:  What page are we on?

18        MR. MORTARA:  77.

19        MR. WAXMAN:  The same document?

20        MR. MORTARA:  Yes.

21        THE WITNESS:  Page 77?

22        MR. MORTARA:  Correct.  It's Table 9.

23   **Q.**  While you're looking, in this paper you have a model of

24   the effects of hospital practices on neonatal and

25   post-neonatal mortality, right?

```
 1   A.   In this table, that's true, but I don't see the
 2   overfitting reference.
 3   Q.   Just give me a second.
 4   A.   Okay.
 5   Q.   And in this table, Table 9, you present the coefficients
 6   from your model in standard errors, correct?
 7   A.   Yes.
 8   Q.   And then down at the bottom you have a note.  Do you see
 9   that?
10   A.   Yes.
11   Q.   And this is the discussion we were just having.  500,000
12   observations.  But I think in this model you only have about
13   600 deaths, right, something --
14   A.   Yes, around that, yes.
15   Q.   Very rare event, right?
16   A.   Yes, yes.
17   Q.   And so like admission to Harvard is pretty rare, but even
18   rarer, right?
19   A.   Yes.  But the predictions that are done and the risk of
20   overfitting has to do with how I classify these two groups.
21   I could explain in more detail if you'd like.
22   Q.   I only have a real simple question.
23   A.   Okay.
24   Q.   You had a huge number of observations, small number of
25   deaths, right?
```

 1   **A.**   Yes.  But I just want to make clear the overfitting

 2   doesn't have to do with like the coefficients in this model.

 3   It has to do with how we choose the groups with low risk and

 4   high risk of death.

 5   **Q.**   Sure.

 6   **A.**   Okay.

 7   **Q.**   But the one thing you did to try to make sure you didn't

 8   have a problem with overfitting was use 10-fold

 9   cross-validation, correct?

10   **A.**   Well, we use -- yes, I used 10-fold cross-validation but

11   not for focusing on the coefficients but rather -- I'm going

12   to have to explain this in some detail.

13          So we wanted to focus on high-risk and low-risk

14   babies, and there's a well-known concern when one uses -- we

15   don't have a natural indicator of risk, so we fit a logit

16   model for risk.  But if you use the same logit model to then

17   classify who is high risk and low risk and then fit a model

18   inside of each of those two populations, there's a problem

19   there.  A little bit like a circularity problem.

20          And so what one does is use nine-tenths of the data

21   to predict risk and then, using that, classify each

22   individual.  It's rather complicated, and I don't want to

23   take too much of Your Honor's time.

24   **Q.**   That's okay.  Yesterday I got in trouble for asking

25   again.  I'm waiting.  I'm not going to ask.  But is that

Case: 19-2005    Document: 00117629240    Page: 262    Date Filed: 07/30/2020    Entry ID: 6356615
Case 1:14-cv-14176-ADB   Document 654   Filed 04/18/19   Page 44 of 261

44

1    sufficient?  Because I would like to move on.

2    **A.**  Yes, I just want to emphasize --

3    **Q.**  Go ahead.

4    **A.**  This is not anything to do with the kind of overfitting

5    issue in, say, what you were talking about before.

6    **Q.**  Yesterday you said -- I think it might have been two days

7    ago.  Hold on.  Trial Day 12.  I think it was two days ago.

8    I'm losing track of my days.  You said on the transcript at

9    158 that, "One of the problems with Professor Arcidiacono's

10   model is that he wasn't looking at the actual applicant

11   pool."  You said that, right?

12   **A.**  Right.

13   **Q.**  That's one of your criticisms?

14   **A.**  I can't remember the context.  Could I see the whole --

15   **Q.**  I'll take it off.  Is one of your criticisms of Professor

16   Arcidiacono that he didn't use the, quote, actual applicant

17   pool?

18   **A.**  Yes.  That's certainly a very important one of my

19   criticisms, that he's excluding the ALDC.

20   **Q.**  But you excluded a very large group of applicants from

21   your analysis, didn't you?

22   **A.**  Which group are you talking about?

23   **Q.**  You don't remember excluding a large group of applicants?

24   **A.**  Do you mean the foreign applicants?

25   **Q.**  Yes.  International citizens.  You excluded that group of

1    applicants from your model, correct?

2    **A.**   Yes, as did Professor Arcidiacono.

3    **Q.**   I'm just talking -- you tried to build the best model of

4    Harvard admissions as you can, right?

5    **A.**   Yes.

6    **Q.**   So let's just talk about your model.  You excluded

7    international citizens, non-U.S. citizens from your model,

8    correct?

9    **A.**   Roughly speaking, yes.

10   **Q.**   Even though many of those non-U.S. citizens actually go

11   to U.S. high schools and participate on the domestic dockets

12   and are discussed in subcommittee and full committee and get

13   profile ratings, right?

14   **A.**   My understanding is that they're on international

15   dockets.

16   **Q.**   Well, maybe I can refresh your memory.  There's

17   international dockets for people who live outside of the

18   United States?

19   **A.**   Yes.

20   **Q.**   Then there's foreign nationals who live in America who go

21   to U.S. high schools who are on the domestic dockets.  Does

22   that sound right?

23            If you don't know, you don't know, sir.  That's

24   fine.

25            MR. WAXMAN:  Your Honor, I want to object at this

**JA3187**

 1    point.  Both sides agreed at the outset, and it's reflected

 2    in Professor Arcidiacono's original report, that the

 3    comparisons would be -- because the allegation of

 4    discrimination is against domestic applicants who are

 5    Asian-American, that the models would look at domestic

 6    applicants and not at foreign applicants.

 7             THE COURT:  Well, okay.  Just now clarify this for

 8    me.  So you're saying that they are excluding the

 9    international docket, or they agreed to also exclude

10    foreign-born on the domestic docket?

11             MR. MORTARA:  It's both, Your Honor, but that's not

12    the -- not even the point of this at all.

13             THE COURT:  Now I want to understand it.

14             MR. MORTARA:  I can explain for our side.

15             THE COURT:  Okay.

16             MR. MORTARA:  Professor Arcidiacono did not use

17    people living in other countries, international citizens --

18    foreign nationals who live in other countries, and did not

19    use foreign nationals that go to U.S. high schools who

20    participate on the domestic dockets.  That's true.

21             Professor Card has offered a criticism that you

22    can't take information out of the model.  As you can I think

23    apprehend, I'm not talking about Professor Arcidiacono.  I'm

24    talking about what's good and bad to do.  And he also took a

25    bunch of information out of the model, and that's the point

1    of this cross, which I'm sure you already got.  This has

2    nothing to do with who did what and when and agreements.  It

3    has to do with crossing the witness about the approach.

4        THE COURT:  The cross-examination is perfectly

5    appropriate.  On a separate point, I now want to understand

6    whether we have excluded foreign-born -- if foreign-born

7    students who go to U.S. --

8        MR. MORTARA:  They're not U.S. citizens.

9        THE COURT:  So it has to -- the international

10   docket is defined by citizenship?

11       MR. MORTARA:  No.  So as far as I understand it,

12   and Mr. Waxman can correct me, there are international

13   dockets that are devoted to people who live outside of the

14   United States.  They were excluded.

15       THE COURT:  Yes.

16       MR. MORTARA:  There are also domestic dockets where

17   foreign nationals, i.e., a citizen of, say, El Salvador can

18   go to a U.S. high school and apply from his U.S. high school

19   with all the same information that you've seen a zillion

20   times, and they participate on the domestic docket, so for

21   instance if they're in Los Angeles, they're on the C docket

22   and they're discussed in subcommittee and full committee in

23   exactly the same way.  Neither expert used them.

24       THE COURT:  How are those people even extracted?

25       MR. MORTARA:  There's a citizenship code in the

 1    database.

 2              THE COURT:  Are we agreed that -- what did you say,

 3    it was citizenship?

 4              MR. MORTARA:  Yeah, it's based on citizenship.

 5              MR. WAXMAN:  The parties agreed that we'd be

 6    looking at the sets of applicants as to whom there's alleged

 7    discrimination.  Dr. Arcidiacono ran his model in the way

 8    that I believe Mr. Mortara has accurately represented, and

 9    Dr. Card did the same thing.  So when the argument is that he

10    excluded people from the model, the model was the model of

11    the universe of applicants as to whom there is an allegation

12    of discrimination.

13              THE COURT:  Okay.  So he's not responsible, as it

14    turns out, for what is included in the model, but you are

15    free to cross-examine him on what the decision to leave those

16    people out did to the model.

17              MR. MORTARA:  Sure.  Thank you.  That's perfect.

18              THE COURT:  So then I'm perfect?  Can someone note

19    the date and time?

20              MR. MORTARA:  Your Honor, if you're going to

21    provide an opportunity for me to praise you on the record,

22    then I could go on.  I have a prepared speech that will last

23    15 and a half minutes.

24              MR. LEE:  If he does that, then we're definitely

25    not closing Monday.

 1          MR. WAXMAN:  Your Honor, of course all of Your

 2     Honor's rulings --

 3          THE COURT:  I know --

 4          MR. WAXMAN:  -- ruling on them are, quote, perfect

 5     as Mr. Mortara says.  We can provide the court, in fact I can

 6     provide the court now the citations to Professor Card's

 7     report where he explains this.

 8          MR. MORTARA:  Can he do that on redirect?

 9          THE COURT:  I just want to understand.  I wanted to

10     make sure we were working off the same dataset, and I wanted

11     to know who was excluded.  But this area for

12     cross-examination is appropriate.  If he wants to look at

13     what the effect that agreement might have had on the

14     analysis, that's fine.

15          MR. MORTARA:  Sure.  I'm ready to keep going now.

16          THE COURT:  I'm sure you are.  Go ahead.

17     Q.  All right.  Now that we've got that out of the way,

18     Professor Card, we were talking about non-U.S. citizens who

19     apply to Harvard.  And the funny thing is you made this

20     comment on day one about how if you were applying to Harvard,

21     you wouldn't have gotten an academic 2 or something that

22     like.  Do you remember what you said about that?  Do you

23     remember that, this reference you made to yourself?  I

24     remember it.  Do you remember that?

25     A.  I said I wasn't sure I would get a 2 on anything, yes.

1    **Q.**   Yeah, and I thought to myself, I think, if Professor Card

2    had applied to Harvard, he wouldn't even be in the model,

3    would you?  And the reason is -- and I'm delighted to report

4    that you've rectified the situation, but I think when you

5    applied to college, were you only a citizen of Canada?

6    **A.**   Yes.

7    **Q.**   And now you're a dual citizen, right?

8    **A.**   Yes.

9    **Q.**   So you wouldn't have even been in the database because

10   you were a foreign national.  Great.

11            Now, do you know the percentage of applicants that

12   were excluded from your model that are foreign nationals; do

13   you know the percentage of overall applicants?  Is it bigger

14   or smaller than the ALDCs?

15   **A.**   The number of applicants excluded -- I'm just looking at

16   my report.  Could you give me a few seconds?

17   **Q.**   Sure.

18   **A.**   So for example, it's going to be something like 10,000

19   students per year in the more recent years, I think, around

20   that order of magnitude.

21   **Q.**   If you could turn in your binder to Tab P319, I've got

22   the numbers up there for you.

23            THE COURT:  What was the exhibit?

24            MR. MORTARA:  P319.  Then I'm going to move on,

25   Your Honor.

**JA3192**

1    **Q.**  Do you see it's about 5,000 applications, 16.4 percent of

2    applications.  Do you see that?

3    **A.**  Yes.  I also see -- I think this is an extremely

4    important point, that's only 194 admits.  So it's a

5    relatively small number of admits, whereas the ALDCs of

6    course are almost 30 percent of the admits.

7    **Q.**  It's the same number of admits as Hispanic?

8    **A.**  Hispanic-American students -- Hispanic or other American

9    students.

10   **Q.**  Yeah, 195.  Do you see it on the thing right there?

11   **A.**  Yes.

12   **Q.**  Okay.  Let's now focus on ALDCs and talk about the

13   process that they participated in.  Staff interviews,

14   Professor Card.  Do you think staff interviews are given out

15   in the same process to ALDCs and non-ALDCs?

16   **A.**  Well, my understanding of staff interviews is that they

17   can be requested by a student; and if there's someone

18   available to do it, then it's a student-driven thing.

19   **Q.**  You think it's the same process, there's no special

20   treatment for ALDCs?

21   **A.**  I'm not sure what you mean by "special treatment."

22   **Q.**  Were you here for my cross-examination of Director

23   McGrath, sir?

24   **A.**  I was not, no.

25   **Q.**  So you don't know that Director McGrath testified that

 1   there's a set-asides for interviews for the children of

 2   donors, legacies and athletes?  You didn't know that?

 3              MR. WAXMAN:  Objection.  That's mischaracterizing

 4   the testimony.  Perhaps we could see what Director McGrath

 5   said.

 6              THE COURT:  You can either show him what Director

 7   McGrath said, or you can rephrase the question.

 8   **Q.**  Starting at the bottom of the screen, line 25, I'll just

 9   read it, Professor Card.

10              "And some of the other ways you can get interviews

11   is if you're the child or relative of a donor, is that

12   right?"

13              "That may happen.

14              "It does happen.  And some of the other ways you

15   could get interviews are, for instance, you set aside a quota

16   of interviews for recruited athletes for each team."

17              Answer:  "We do interview a number of athletes for

18   each team, and we do have a target number for that."

19              Question:  "You have a set-aside number for

20   interview slots for recruited athletes?"

21              Answer:  "Yes.  We have a number, we agree, of not

22   doing more than, yes."

23              Do you see that?

24   **A.**  Yes.

25   **Q.**  Do you see all of that?  I read it to you.  That's what

Case: 19-2005   Document: 00117629340   Page: 271   Date Filed: 07/30/2020   Entry ID: 6356615
Case 1:14-cv-14176-ADB   Document 654   Filed 04/18/19   Page 53 of 261

53

1    Director McGrath said.  Then it goes on, "And you can even

2    get an interview outside of the September to November

3    timeframe that you tell the world on the website you can get

4    one in if you're in one of these special categories?"

5           Answer:  "Yes."

6           Do you see that?

7    **A.**  I see what you're saying.  I would really like to read

8    the whole thing to understand it better.

9    **Q.**  Great.  But here is now my question.

10   **A.**  Okay.

11   **Q.**  If ALDCs have special access to interviews, quotas for

12   athletes outside of the normal timeframe, that's not the same

13   process, is it?

14   **A.**  My understanding is that, first of all, the number of

15   students on the dean's list is quite small.  They're omitted.

16   So my understanding is that there could be a process that

17   gives interviews for recruited athletes.  That's a very small

18   number of students.  So I don't think that's necessarily

19   meaning that other students can't ask for an interview.  And

20   my understanding is if you ask for an interview and it's

21   possible to schedule one, they'll do one even by Skype.

22   **Q.**  First come/first served, but there are special privileges

23   for ALDCs, set-aside quotas and outside of the normal

24   timeframe?

25           MR. WAXMAN:  Objection.  That completely

**JA3195**

 1  mischaracterizes even the testimony that Mr. Mortara has --
 2  there's nothing here about set-asides for ALDCs.
 3          THE COURT:  Okay.  That's true.  Rephrase the
 4  question.  And what's the exhibit number on the staff
 5  interviews?
 6          MR. MORTARA:  This is PD 38.3.  It's one of
 7  Professor Arcidiacono's demonstratives.  Your Honor, it also
 8  comes from admitted Plaintiff's Exhibit 619.  I'm about to
 9  get into this, as I think you're anticipating, Your Honor.  I
10  will move on.
11  **Q.**  20 percent of ALDCs get staff interviews.  You saw that
12  Professor Arcidiacono presented that information, right?
13  **A.**  Yes.
14  **Q.**  You don't have any dispute with that, do you?
15  **A.**  I don't, but as I said, I think, in discussing these, I
16  have -- in my admissions models, I have separate controls for
17  ALDC as well as for staff interview, so they're kind of
18  separate factors in the model.
19  **Q.**  Feel free to explain as much as you need to.  That's not
20  really where I'm going, but we'll get there.  20 percent of
21  ALDCs get staff interviews, correct?
22  **A.**  That's what this says, yes.
23  **Q.**  And only 1.3 percent of non-ALDCs get the privilege of a
24  staff interview, correct?
25  **A.**  Well, I would hesitate to use "the privilege."  My

1  understanding is it's a student-driven process.

2  **Q.**  Well, the admission rate for people that get staff

3  interviews is pretty good, right?

4  **A.**  Well, of course, as you show here, for instance, many of

5  them are ALDCs, so they have high interview -- admission

6  rates.  And they may have other characteristics.  For

7  instance, my guess would be many of them are from

8  Massachusetts.  Many of them might be from nearby prep

9  schools.

10  **Q.**  Sure.  So the only point I'm trying to make is about 45

11  percent of the people who get interviews are ALDCs.  Do you

12  agree with that?  Just looking at the numbers.  Do you want

13  me to do it, 1366 divided by 3043, 44.9 percent.

14  **A.**  I'm actually not seeing where you get the 3043.

15  **Q.**  It's at the bottom.  I'll move my little window for you.

16  Do you see that, total applicants interviewed?

17  **A.**  Okay.  Thank you.  Yeah.

18  **Q.**  45 percent of the people who get interviews are ALDCs;

19  that's right, isn't it?

20  **A.**  Yes, so less than half.

21  **Q.**  And you think that happens because it's a student-driven

22  process, not because of any special treatment ALDCs are

23  getting; that's your testimony?

24  **A.**  Well, my understanding is other students are free to

25  apply and they try to accommodate them, yeah.

1    **Q.**  Do you understand that non-ALDCs can get interviews

2    outside of the September to November timeframe that's

3    advertised on Harvard's website?

4    **A.**  I'm not aware of the complete details of that, no.

5    **Q.**  So 45 percent of the interviews go to ALDCs.  And they're

6    only 5 percent of the applicant pool, right?

7    **A.**  Roughly, correct, yes.

8    **Q.**  Now, you mentioned yesterday a view of yours, that Asian

9    ALDCs receive lower personal scores than white ALDCs.  Do you

10   remember that?

11   **A.**  I wouldn't characterize it as a view.  It's an empirical

12   fact.

13   **Q.**  You didn't use a slide or exhibit or anything like that,

14   did you?

15   **A.**  No.

16   **Q.**  And those numbers aren't in your reports or in any

17   exhibit that you used, are they?

18   **A.**  No.

19   **Q.**  You did not show the court any analysis supporting your

20   view that you expressed to Mr. Waxman, did you?

21   **A.**  No.

22   **Q.**  Because there is no such analysis in your report, is

23   there?

24   **A.**  No.  We were responding -- I was trying to respond to a

25   question from the court, as I recall.  I believe she asked --

 1   Your Honor asked that question more or less directly.

 2   **Q.**  Fair enough.  Fair enough, Professor Card.

 3           Now, did you happen to notice -- I'm going to put

 4   up Plaintiff 619.  It's been previously admitted.  It's in

 5   your binder, sir, if you want to look at it.

 6           Did you happen to notice when you were reviewing

 7   the data --

 8   **A.**  Yeah, since this is so fuzzy I prefer to look at it.  So

 9   where is it?

10   **Q.**  Sure.  It's in your binder.  It should be at P619.

11           THE COURT:  I don't actually have that one.

12           MR. WAXMAN:  I don't have it either.

13           MR. MORTARA:  I think he's got it.  I've got

14   copies.

15           THE WITNESS:  I don't believe I have it either.

16           MR. MORTARA:  I've got copies for everyone.  May I

17   approach everyone?

18           THE COURT:  Of course.

19   **Q.**  Plaintiff 619 is some more information about who gets

20   interviewed.  And you see that the rate of interviews for

21   Asian ALDCs is a little lower than whites.  That's the top

22   row.  Do you see all of that?

23   **A.**  Yes.

24   **Q.**  And you see the admission rates for ALDCs that get

25   interviewed is a whopping 80 percent, sometimes more than 80

1    percent across the board.  Do you see that?

2    **A.**  Yes.  Although I expect this is partially driven by the

3    preponderance of those students who might be athletes.

4    **Q.**  And athletes have a super-high admission rate, don't

5    they?

6    **A.**  Yes.  Of course, that's one of the reasons why I did that

7    analysis in my report of taking out the athletes, but yes.

8    **Q.**  And this is my question.  You talked with Mr. Waxman

9    yesterday about some review of the data in response to some

10   of the court's questions that wasn't in your report.  And you

11   didn't show any numbers, you didn't show any exhibits.

12        Did you happen to notice when you were reviewing

13   the data and coming to conclusions that are nowhere in your

14   reports or any slide or exhibit you used --

15        MR. WAXMAN:  Your Honor, hold on one second.  If

16   counsel wants to ask a question, of course, if it's proper,

17   we don't object.  This running commentary about his

18   impressions of what it is that is in his mind are

19   inappropriate as questions on cross-examination.

20        THE COURT:  I'm going to take that to be an

21   objection, and I'm going to sustain it.

22        MR. WAXMAN:  Yes.  I'm sorry.

23        THE COURT:  Skip the narrative.

24   **Q.**  Did you happen to notice in any analysis you did whether

25   Asians who got staff interviews got higher personal scores

1    than Asians who did not get staff interviews?

2    **A.**   No, I didn't look at that, I don't believe.

3    **Q.**   There is a staff interview personal rating, isn't there,

4    that's separate from the profile rating, correct?

5    **A.**   Yes.  I don't use that information, but I believe there

6    is such a variable.

7    **Q.**   You didn't use the staff interview profile -- you didn't

8    use the staff interview personal rating in your model, did

9    you?

10   **A.**   No, I didn't.

11   **Q.**   I didn't hear you do any analysis of how whites and

12   Asians are treated on those staff interview personal ratings,

13   did you?

14   **A.**   I don't -- no, correct.

15   **Q.**   Would you agree that applicants who get a staff interview

16   and a face-to-face meeting with an admissions officer are

17   less likely to face the risk of implicit bias and

18   stereotyping because they've had that opportunity for a

19   face-to-face meeting?

20   **A.**   I hesitate to say exactly because I'm not really an

21   expert on all the mechanisms of stereotyping biases.

22   **Q.**   I'm just asking you as a sort of fellow citizen, do you

23   think that bias goes down, including racial bias, when you

24   get a chance to meet somebody?

25   **A.**   You know, unfortunately that's not necessarily my

 1   experience.

 2   **Q.**   Do you agree that one racial stereotype about

 3   Asian-Americans is that many of them are immigrants?

 4   **A.**   Again, I don't really know.

 5   **Q.**   Well, you study immigration, right?

 6   **A.**   I do, yes.

 7   **Q.**   And you know that Asians are the fastest-growing

 8   immigrant group, don't you?

 9   **A.**   In the United States, yes.

10   **Q.**   So would you agree that one stereotype that might be held

11   about Asian-Americans is that they're immigrants?

12   **A.**   Yes, you know, they also -- a large fraction live in

13   California, so that's another stereotype, I guess, if that's

14   what a stereotype is.

15   **Q.**   Do you think that the stereotype I'm asking about, the

16   stereotype of being an immigrant, would apply equally to

17   Asian-American legacy applicants to Harvard?

18   **A.**   I don't know.

19   **Q.**   Well, you probably agree the majority of Asian-American

20   legacy applicants to Harvard will not be immigrants, right?

21   Their parents are in the Harvard Club.

22   **A.**   I don't -- I can't agree with that necessarily because I

23   know more about Princeton where I used to teach, and there

24   were many -- and at Berkeley where I teach now, and there's

25   many alums who live in Asia and send their children -- for

1    instance, some of our major donors are from Hong Kong, and a

2    really important booster for our campus is that group.  So I

3    don't know whether you could really characterize it that way.

4    **Q.**  You think that the majority of Princeton alumni are not

5    United States citizens?

6    **A.**  No.

7    **Q.**  The vast majority of Princeton alumni are United States

8    citizens, right?

9    **A.**  I would assume so, yes.

10   **Q.**  Same with Harvard, right?

11   **A.**  I would assume so, yes.

12   **Q.**  And even the vast majority of Asian alumni of Harvard are

13   United States citizens.  You'd agree with that too, right?

14   **A.**  You know, I don't know about that.  I might be surprised.

15   **Q.**  I'll move on.

16          Two days ago -- I want to talk to you a little bit

17   more about stereotypes.  Two days ago you actually testified

18   that white applicants to Harvard were more multidimensional

19   than Asian-American applicants, didn't you?

20   **A.**  Yes.

21   **Q.**  You do realize that accusations of being one-dimensional

22   are an archaic racial stereotype about Asian-Americans, don't

23   you?

24   **A.**  No, I didn't know that.

25   **Q.**  Well, can you turn to Plaintiff's 555 in your binder.

**JA3203**

1    It's the OCR statement of findings.

2    **A.**  Yes.

3    **Q.**  And if you turn to page 39, you briefly touched on this

4    with Mr. Waxman yesterday, this document anyway.

5              THE COURT:  I'm sorry.  Where are you?

6              MR. MORTARA:  Page 39 of the OCR.

7              THE COURT:  555.

8              MR. MORTARA:  Plaintiff 555.

9    **A.**  Yes.

10   **Q.**  And you see that here in 1990, the Department of

11   Education Office of Civil Rights is talking about stereotypes

12   of Asian-Americans and including that they are

13   one-dimensional.  Do you see that?

14   **A.**  Yes.  So the sentence says stereotypically

15   one-dimensional math/science type applicants.  So this could

16   be one of those -- I believe this is when Your Honor was

17   speaking about the Oxford comma.  So I'm not entirely sure

18   whether they're one-dimensional math/science types or whether

19   it's one-dimensional more generally.

20   **Q.**  Understood, sir.  You can actually see on this page, one

21   of the things that's being discussed is how a lot of

22   Asian-Americans are CJ-ers, which means they're interested in

23   medicine as their career goal.  Do you see that?

24   **A.**  Yes.

25   **Q.**  We'll talk about that in a second.

 1              Now, you were not deploying that stereotype.
 2     You're just telling us that that's just what you see in the
 3     data, that Asians are less multidimensional than whites in
 4     the Harvard applicant pool?
 5     **A.**  Yes.  I was trying to define it precisely in terms of
 6     these ratings in that analysis.
 7     **Q.**  And you used this slide DD 10.9 to illustrate that point.
 8     You talk about number of strengths.  Do you remember that?
 9     You showed whites are better than Asians; they're more
10     multidimensional.  That's in the data; that's what you said,
11     right?
12     **A.**  Yes.
13     **Q.**  And I want to just look at what you said.  By the way,
14     this demonstrative that you created, DD 10.9, that includes
15     the personal rating, doesn't it?
16     **A.**  Yes.
17     **Q.**  I want to just take a look at what you said.  At the
18     top -- I've got your testimony.  I'm going to read it and
19     just make sure these are your views.
20              "And so when you put these three, four pieces
21     together, the multidimensional advantage coming for the white
22     students is coming because there's a higher academic strength
23     than the Asian students, there's a higher personal and higher
24     athletic strength in the white students, and that adds to a
25     multidimensional strength."  Right?

1  **A.**  Yes.  And the sentence continues on, "More balanced."

2  **Q.**  "The more balanced set of students," right?

3  **A.**  Yes.  By that I meant -- so what's important for

4  multidimensionality is not just the individual strengths but

5  also whether they're present together in a given student.

6  **Q.**  Let's go back to DD 10.9.  Who assigns the ratings you

7  were using to come to this conclusion about

8  multidimensionality?

9  **A.**  The admissions officers.

10  **Q.**  I want to make sure I get this right.  You have adopted a

11  conclusion that Asian-American applicants to Harvard are more

12  one-dimensional than whites, less multidimensional, right?

13  That's your conclusion?

14  **A.**  My conclusion is that based on these -- yes, my

15  conclusion is based on the presence of these four profile

16  ratings, which I believe are very, very important inputs to

17  the Harvard admissions process.

18  **Q.**  Will you acknowledge that one-dimensionality is an

19  archaic stereotype about Asian-Americans, that you just

20  happened to find data here supporting that it's true in this

21  instance?

22  **A.**  Well, it's your claim that that's an archaic stereotype.

23  I would hesitate to say that.

24  **Q.**  Fair enough.  It's my claim it's an archaic stereotype.

25  And this data confirms what I'm claiming is an archaic

1  stereotype about Asian-Americans?

2  **A.**  I disagree with that.

3  **Q.**  What does it confirm then?

4  **A.**  It confirms that -- if I look at these four dimensions of

5  ratings that are all very important in the Harvard process,

6  as I mentioned before, the academic dimension is the most

7  common, just distinguishing by that basis, it would be

8  impossible to choose a class, and moreover that's not what

9  Harvard wants to do.  So looking at these four dimensions,

10  Asian students have a slightly lower rate of having three or

11  more of those profile ratings above 2.

12  **Q.**  And the phrase you used in your testimony with Mr. Waxman

13  was that whites are more multidimensional, right?

14  **A.**  Yes, but I think the understanding was I was talking

15  about these profile ratings.

16  **Q.**  And the profile ratings are assigned by Harvard

17  admissions officers, correct?

18  **A.**  Yes.

19  **Q.**  So it's Harvard admissions officers determining that

20  whites are more multidimensional in the way that you're

21  showing here on the slide, right?

22  **A.**  In this way, yes.

23  **Q.**  Do you think it's possible that Harvard admissions

24  officers are deploying racial stereotyping when they create

25  the dataset that you conclude shows that Asians are more

1    one-dimensional than whites?  Is that possible?

2    **A.**  Well, based purely on statistical analysis, I can never

3    say that something is impossible.  And that's what I've done

4    in the case.  But I don't think it's that likely, no.

5    **Q.**  So that's a yes, it is possible?

6    **A.**  It is possible, yes.

7    **Q.**  I want to engage you with another hypothetical and ask if

8    your model was built to detect the use of other stereotypes.

9    Going back to P555, that page we were looking at, the part

10   that I didn't highlight, it was about how Asian-Americans

11   were CJ-ers.  Do you remember that?

12   **A.**  Yes.

13   **Q.**  And that's a stereotype about Asians that they want to be

14   doctors.  Are you familiar with that stereotype?

15   **A.**  To tell you the truth, I wasn't.  On our campus, that

16   doesn't -- I've never really heard that.

17   **Q.**  Never heard that one?  Huh.  Then if you go back to page

18   24 of that document.

19   **A.**  Yes.

20   **Q.**  There's another comment pulled from a Harvard admissions

21   officer of that era.  "He's quiet and, of course, wants to be

22   a doctor."  Do you see that on the screen?  This is from the

23   OCR findings.

24   **A.**  Yes.

25   **Q.**  So would you accept that at least the Department of

```
 1   Education believed that there was a stereotype about Asians
 2   that they wanted to be doctors?
 3   A.   Yes.  But my understanding from reading their report was
 4   that they ultimately concluded that that stereotyping bias
 5   wasn't affecting the admissions of Asians and whites.
 6   Q.   That was from two weeks ago.  Great.  I'm just asking if
 7   it is a stereotype.
 8            MR. WAXMAN:  I'm sorry.  Again, the commentary.
 9   What was from two weeks ago?  And what does that have to do
10   with the question that this witness is being asked?
11            MR. MORTARA:  Your Honor, if I may?
12            THE COURT:  Hold on.  Let me reread it.  All right.
13   A marginal violation.
14            MR. MORTARA:  It's a yes or no question.
15            THE COURT:  "That was from two weeks ago, great."
16   Then you went back and asked the question, "I'm just asking
17   if that is a stereotype."  So the question is, is that a
18   stereotype.
19   Q.   Is it a stereotype of Asians that they want to be
20   doctors?
21            MR. WAXMAN:  Asked and answered, Your Honor.
22   A.   Yes.
23            THE COURT:  He can have the question.
24   Q.   That was a yes?
25   A.   As I said, I don't actually know the answer to that.
```

Case: 19-2005    Document: 00117629240    Page: 286    Date Filed: 07/30/2020    Entry ID: 6356615
Case 1:14-cv-14176-ADB    Document 654    Filed 04/18/19    Page 68 of 261

68

1    **Q.**  Well, you put up a slide yesterday, or the day before, DD

2    10.54, and you wanted to show the court something, and it

3    included that Asians are significantly more interested in a

4    medicine- or health-intended career than whites.  Do you see

5    that?

6    **A.**  Yes.

7    **Q.**  Could you engage me with a hypothetical, sir.  Imagine

8    that Harvard through racial stereotyping imposes a penalty on

9    Asians who want to do medicine by valuing their applications

10   less, so they impose a penalty on Asians who want to do

11   medicine, but they don't impose that that penalty on whites.

12   Do you have that hypothetical?

13   **A.**  Yes.

14   **Q.**  The way you would determine that in your statistical

15   model would be to interact medicine with race, right?

16   **A.**  I guess one might be able to do that.  I'm not aware that

17   the -- this is an empirical fact, not a stereotype that

18   Asian-American -- Asian applicants to Harvard are more likely

19   to say they want to take medicine or health as an intended

20   career.

21   **Q.**  And my hypothetical was Harvard punishes Asian students

22   through implicit or unconscious bias for conforming to a

23   racial stereotype, and that would show up; if you interacted

24   the variables of medicine and race, you would see a lower

25   coefficient or average marginal effect for Asians, a negative

1    one, and zeroes for other races?  If my hypothetical were

2    true.  I'm not saying you did that.

3    **A.**  I would have to see the entire specification to agree

4    that's a valid test of that, but I could see that that would

5    be a test.

6    **Q.**  And you didn't do it, did you?

7    **A.**  I didn't, no.

8    **Q.**  Just one more on this one issue.  Withdrawn.

9         One more on this issue.  You also showed something

10   about parental occupations varying by race.  Do you see that?

11   **A.**  Yes.

12   **Q.**  This is slide 49.  And you pointed out that

13   Asian-Americans have a larger percentage of moms that are in

14   the computer and mathematical fields.  Do you see that?

15   **A.**  Yes.

16   **Q.**  And it's the same issue with the intended career in

17   medicine.  If Harvard was imposing a penalty on Asians who

18   conformed to a stereotype, say having a mom or even dad that

19   was involved in the computer and mathematical profession, but

20   not on whites, the way you'd figure that out is by

21   interacting parental occupation with race.  And you did not

22   do that, correct?

23   **A.**  Well, I did not do that, correct.  But I would not

24   necessarily agree that such a specification would be

25   dispositive on that issue.

1   **Q.**  You know that there's been a great deal of debate about

2   where and how Harvard has been using race in its admissions

3   process, correct?

4   **A.**  Yes.

5   **Q.**  I want to focus first on the overall rating.  You've

6   heard during this trial that the overall rating is quite

7   important in the reading of Harvard applications, haven't

8   you?

9   **A.**  No, that would not be what I understood from them.

10  **Q.**  You don't believe that the overall rating is important?

11  **A.**  Well, my understanding was that it's a preliminary

12  assessment made by the first reader and that when a file gets

13  to later stages at the docket or subcommittee level and then

14  later to the committee level, just like the other ratings

15  variables, the ratings themselves don't necessarily have much

16  effect.  It's more the actual materials in the file.

17  **Q.**  So it's at least equally as important to, say, the

18  athletic rating or personal rating or extracurricular rating.

19  Would you at least agree with that?

20  **A.**  No, I don't agree with that.

21  **Q.**  Why not?

22  **A.**  Because I don't -- my understanding of the process is

23  that it's an assessment.  It's like -- for example, in my

24  hypothetical of retirement, it would be like asking someone's

25  supervisor if they think someone is likely to retire.

1    **Q.**  And what you mean by that is shown here on the screen

2    from Trial Day 5 from Ms. Bever's testimony.

3              Question:  "Can you please describe the preliminary

4    overall rating?"

5              Answer:  "I use the preliminary overall rating to

6    give my assessment of how strong I think that particular

7    applicant is" --

8    **A.**  I --

9    **Q.**  -- "in a whole, if one can, in a rating."  Do you see

10   that?  That's what you're trying to say, right?  That's

11   agreeing with you, isn't it?

12   **A.**  I guess so, yes.

13   **Q.**  The overall rating includes an analysis of every single

14   thing, as far as you know, in Harvard's holistic admissions

15   process, right?  You heard that testimony, too.  That's what

16   we just showed.  It's the whole, right?

17   **A.**  No.

18   **Q.**  It's intended to capture the whole?

19   **A.**  Yes, but it's made -- the overall rating is made by the

20   readers at a time when they may not have all the information

21   that ultimately will be available.

22   **Q.**  Let's ask a few questions.  The overall rating takes into

23   account the teacher recommendations, right?

24   **A.**  I believe so.

25   **Q.**  The overall rating takes into account the guidance

Case: 19-2005    Document: 00117629240    Page: 290    Date Filed: 07/30/2020    Entry ID: 6356615
Case 1:14-cv-14176-ADB   Document 654   Filed 04/18/19   Page 72 of 261

72

1    counselor recommendations, correct?

2    **A.**  It could.

3    **Q.**  The overall rating takes into account the essays that are

4    written, correct?

5    **A.**  I believe it would, yes.

6    **Q.**  The overall rating, if the alumni interview has taken

7    place, the overall rating will take into account the alumni

8    interview ratings, correct?

9    **A.**  Yes, I believe it -- it would try to take account of all

10   those factors --

11   **Q.**  The overall -- sorry.

12   **A.**  -- when the person is trying to make their assessment of

13   this candidate's overall strength.

14   **Q.**  The overall rating will take into account

15   extracurriculars, right?

16   **A.**  Yes, to the extent they have all the letters at the time

17   they do it.

18   **Q.**  The overall rating would take into account athletics,

19   correct?

20   **A.**  Yes, again, same caveat.

21   **Q.**  Subject to your caveat, it will take into account

22   academics, correct?

23   **A.**  Yes.

24   **Q.**  That includes SAT, GPA, those kind of things, correct?

25   **A.**  Right.  But remember, this is just one of the reader's

1    early assessments.

2    **Q.**    And it also takes into account all the observables we

3    talked about, say, for academics, like national awards and

4    how many AP classes you took or AP scores; it takes all of

5    that into account, right?

6    **A.**    Yes.  To the extent it's available at that time.  And

7    again, subject to the fact that this is just one reviewer and

8    in the ultimate admissions decision, there's 40 votes.

9    **Q.**    Yeah, but the personal rating is also the view of one

10   reviewer, right?

11   **A.**    Or the second, yes, agreed.

12   **Q.**    Same thing with the overall rating?

13   **A.**    Agreed.

14   **Q.**    Nothing different from the personal rating so far?

15   **A.**    Yes.

16   **Q.**    Great.  It could also take into account geography?

17   **A.**    Yes, I believe so.

18   **Q.**    And the quality of the high school?

19   **A.**    Yes, I believe so.

20   **Q.**    And socioeconomic status?

21   **A.**    Yes, I think so.

22   **Q.**    And so far we've gone through a big list of things that

23   the overall rating includes, and the personal rating takes

24   into account potentially all those, too, although I will

25   acknowledge your testimony that you think academics are less

1    important, right?

2              MR. WAXMAN:  Objection.  That mischaracterizes the

3    testimony.

4    **Q.**  Please answer whatever way you see fit.  The personal

5    rating takes into account all of these things as well,

6    correct?

7    **A.**  I think the personal rating would -- I'm having a hard

8    time remembering the full list of questions you've asked me.

9    **Q.**  I'll give you a big list.  And then --

10   **A.**  I think it would take into account all these guidance

11   counselor letters and so on, yes.

12   **Q.**  And extracurriculars, athletics, geography, quality of

13   the high school, socioeconomic status and even a little bit

14   of academics, right?

15   **A.**  I'm not entirely sure about athletics.

16   **Q.**  Okay.  With that caveat?

17   **A.**  For example, for example -- I'm just giving an example --

18   I'm not entirely sure I agree with that.

19   **Q.**  The overall rating also includes consideration of

20   Harvard's confessed use of race, correct?

21             MR. WAXMAN:  Objection.  Again, can we have

22   questions instead of freighted conclusions like "confessions

23   of the use of race."  Harvard proclaims that it takes race

24   into account in its admissions process and that that factor

25   is included in the preliminary overall rating and not the

Case: 19-2005    Document: 00117629240    Page: 293    Date Filed: 07/30/2020    Entry ID: 6356615
Case 1:14-cv-14176-ADB   Document 654   Filed 04/18/19   Page 76 of 261

75

1   other -- not the four profile ratings.

2           MR. MORTARA:  Your Honor --

3           THE COURT:  Overruled.

4           MR. MORTARA:  Thank you.  And I would ask that the

5   coaching stop, but here we go.

6           MR. WAXMAN:  This is not coaching.  This is

7   embedding in a question a freighted conclusion that Harvard

8   has, quote, confessed to something.  The rest of the question

9   is not objectionable.

10          MR. MORTARA:  I'll rephrase the question to resolve

11  the objection.

12          THE COURT:  The question -- if you want to give me

13  a big explanation about why the question is objectionable,

14  let's do it at sidebar.  If you just want to object, all you

15  have to do is stand up and object and give me either the rule

16  or two sentences -- two words on mischaracterizes, for

17  example.

18  **Q.**  All right.  The preliminary overall rating also includes

19  Harvard's admitted use of race.  You've heard a bunch of

20  Harvard witnesses testify and admit they use race in the

21  overall rating, correct?

22  **A.**  Yes.  My understanding is, of course, that race is not a

23  factor in many students' cases, but it could be -- for highly

24  competitive cases, it could be a factor, yes.

25  **Q.**  I want to talk about your work on the overall rating in

```
 1    your reports.  Are you ready?
 2    A.   Yes.
 3    Q.   There isn't any work on the overall rating in your
 4    reports, is there?
 5    A.   There is no models of the overall rating, no.
 6    Q.   You did no work on the overall rating in your reports,
 7    did you?
 8    A.   I believe the word would be mentioned in my reports.
 9    Q.   But you did no analysis or work related to the overall
10    rating in your expert reports, correct?
11    A.   I did not report any analysis in my reports.
12    Q.   I'm only asking about things you've reported.
13    A.   Yes, yes.
14    Q.   And that's because you decided very early on that the
15    evidence suggested that the overall rating already included
16    some potential race-based tips so you did almost no careful
17    analysis of it, correct?
18    A.   Yes, that was true at the time of my deposition.  Since
19    then --
20              MR. MORTARA:  Your Honor, I'm going to ask him to
21    stop.  I only want disclosed opinions.  My question is very
22    clear.
23              THE COURT:  Well, you asked him -- you said you did
24    almost no careful analysis of it, correct, with no timeframe
25    on it, and he said, yes, that was true at the time of his
```

 1   deposition.

 2           MR. MORTARA:  That's the answer.  I didn't ask for

 3   undisclosed expert opinion, Your Honor.

 4           THE COURT:  Well, I don't think he was giving you

 5   an undisclosed expert opinion.  I think he was trying to take

 6   your question which did not have a timeframe and say this was

 7   then and that was at a different time.  Either you can ask a

 8   follow-up question or they can ask it when it's their turn.

 9   Q.  Go ahead, sir.

10   A.  I'll stay with that answer if you want.

11   Q.  Tell me whatever it is that you wanted to tell me.

12   A.  I was going to say I've looked at the issue in much

13   greater detail since then.

14           MR. MORTARA:  Your Honor, could I have a sidebar?

15           THE COURT:  Yes.  Do you guys want a morning break,

16   or do you want to keep going until noon?  How about a

17   15-minute break so we can talk for five minutes and then you

18   can have a ten-minute break, so we'll be back at 11:25.

19           [Sidebar sealed and redacted.]

20           (Recess taken.)

21   BY MR. MORTARA:

22   Q.  Professor Card, you did not include the overall rating in

23   any of the admissions models in your expert reports, correct?

24   A.  Correct, yes.

25   Q.  And that's since your analysis seeks to isolate the

Case: 19-2005    Document: 00117629240    Page: 296    Date Filed: 07/30/2020    Entry ID: 6356615
Case 1:14-cv-14176-ADB    Document 654    Filed 04/18/19    Page 78 of 261

78

 1    incremental effect of race on admissions decisions, it is

 2    inappropriate to include any variables that themselves can be

 3    affected by race, correct?

 4    **A.**  Yes.

 5    **Q.**  You agree that if one of Harvard's ratings, such as the

 6    overall rating, may be influenced by an applicant's race,

 7    then it should not be included in any model that is

 8    attempting to estimate the effect of race, correct?

 9    **A.**  Not precisely, no.

10    **Q.**  Could you turn to your first expert report.  At page 63,

11    sir.

12            (Pause.)

13    **Q.**  Are you there?

14    **A.**  Yes.

15    **Q.**  And over to the top of 64 in paragraph 132, it says, The

16    second row also relies on Professor Arcidiacono's model six

17    but removes the overall rating.  Do you see that?

18    **A.**  Yes.

19    **Q.**  Professor Arcidiacono's model six had included the

20    overall rating, correct?

21    **A.**  Yes.

22    **Q.**  And you say, comma, which should not be included in any

23    model that is attempting to estimate the effect of race

24    because, as discussed above, the overall rating may be

25    influenced by an applicant's race.  That's in your expert

1    report, right?

2    **A.**  It is, yes.  But the "as discussed above" is trying to

3    make the point that it's about, like, race per se has an

4    effect on the rating rather than race may be a contextual

5    factor.

6    **Q.**  "Per se," that's not a phrase that appears anywhere in

7    your expert reports in connection with this issue, is it?

8    **A.**  I don't actually know.

9    **Q.**  You think a rating cannot be used in your model even if

10   the influence of race in that rating may be just a positive

11   one, in other words, only a tip being given to

12   African-Americans, Hispanics, and other groups, right?

13   **A.**  Yes.  If it was a pure tip based on the race alone, yes,

14   I would say it should be excluded.  Yes, I agree.

15   **Q.**  And because you decided very early on that the evidence

16   suggested that the overall rating already included some

17   potential race-based tips, at the time of your deposition you

18   had done almost no careful analysis of it, correct?

19   **A.**  Yes.

20   **Q.**  So we've got may be influenced by race, can be affected

21   by race, and potential race-based tips in the overall rating,

22   correct?

23   **A.**  I don't quite understand the question.

24   **Q.**  The overall rating may be influenced by race, correct?

25   **A.**  Yes.

1    **Q.**   The overall rating can be affected by race, correct?

2    **A.**   Yes.

3    **Q.**   The overall rating contains some potential race-based

4    tips, correct?

5    **A.**   Yes.

6    **Q.**   And that corresponds -- I know you were here for Dean

7    Fitzsimmons' testimony -- to what Dean Fitzsimmons said on

8    page 50 of day 4, putting it on the screen at line 7.

9         "Q.   How could race be considered in the

10   preliminary overall rating?

11        "A.   If as the -- you're doing your preliminary

12   overall rating if you think that this might be an additional

13   little element that might be helpful in terms of making a

14   case that this person, as I say, might be an unusual educator

15   of others, the person might decide to factor that into the

16   preliminary overall rating."

17        Did you hear Dean Fitzsimmons give that testimony?

18   **A.**   I believe I did, yes.

19   **Q.**   In preparing your reports in this case, you relied on

20   Dean Fitzsimmons and a personal phone call you had with him

21   for your view that race was not influencing the personal

22   rating, correct?

23   **A.**   Among other materials, yes.

24   **Q.**   And as of your deposition, you did nothing to verify what

25   Dean Fitzsimmons told you, correct?

**A.**   Correct, yes.

**Q.**   Now, we showed earlier the results of your model from Exhibit 21 of your opening report, if you remove the personal rating.  And what you told me was, the overall average marginal effect is statistically significant and negative.  Correct?

**A.**   Yes.

**Q.**   If the personal rating may be influenced by race, per se, whatever way that you think it applies to the overall rating, then removing it from your model results in the finding of a statistically significant Asian penalty, correct?

**A.**   Yes, excluding it entirely, which I don't think it would be the right thing to do, but, yes.

**Q.**   Now I want to talk about the modified ratings model you showed yesterday.  This is your slide DD 10.83.  No significant effect of Asian-American ethnicity using modified ratings.  Do you see that?

**A.**   Yes.

**Q.**   And this is where you used Professor Arcidiacono's ratings models for the personal extracurricular and academic ratings to try to remove any effect of race from them, and then you substituted those recalculated ratings for the real ones in the database and ran your model again.  Do I have that right?

**A.**   Yes.

1   **Q.**  And to be clear, you were no longer using the actual

2   ratings that Harvard reviewers assigned, you were using these

3   mapped or virtual ratings that you had computed using the

4   ratings models, right?

5   **A.**  Yes, that's what I've done here.  I have done it the

6   other way as well.

7   **Q.**  The regular way, which is your preferred model, right?

8   **A.**  No, I have done it the other way where I actually take

9   the actual rating and subtract off the effect of race.

10   **Q.**  Is that what this is?

11   **A.**  No.

12   **Q.**  What is this?

13   **A.**  This is using the predicted ratings, as you said,

14   precisely as you said.

15   **Q.**  I want to make sure I understand here.  You removed the

16   Asian effect from the ratings when you did this modified

17   ratings model, right?

18   **A.**  I removed the effects of race from all three of the

19   ratings, yes.

20   **Q.**  Okay.  Just want to make sure we have that.

21        I'm sorry, Professor Card, now I lost my train of

22   thought.  I'll get it back in just ten seconds.

23        You didn't use the ratings from Harvard's database,

24   you substituted modified ratings, correct?  In what's showing

25   on DD 10.83?

1    **A.**  Yes.  That would be a way to summarize it, yes.

2    **Q.**  All right.  Now you removed the effect of race that you

3    were talking about yesterday with Mr. Waxman on the three

4    profile ratings -- academic, extracurricular, and personal --

5    when you made these modified ratings, right?

6    **A.**  Yes.

7    **Q.**  And what that really means is so on academic, there was a

8    positive Asian coefficient, right, and you associated that

9    with unobservables like national awards and other things,

10   right?

11   **A.**  My belief is that's the correct interpretation of that.

12   Just as my interpretation of all the racial gaps is like

13   that.  But in this exercise I'm not making a stand on what

14   the source of this difference is.  I'm just subtracting it

15   off.

16   **Q.**  You were playing even-Stevens with all the three ratings,

17   right?  You just took out race in all of them.

18   **A.**  Yes.

19   **Q.**  And what that means is that because there was a positive

20   effect of being Asian on the academic rating which you

21   associated with unobservables, you would end up moving some

22   Asians from a 1 to 2 and some from a 2 to 3.  That's what

23   it means to pull out a positive effect, right?

24   **A.**  Yes.

25   **Q.**  And same thing with extracurricular, although the effect

1    was smaller, some would go from a 1 to a 2 and some would go

2    from a 2 to a 3, right, for Asians?

3    **A.**   No, that's not correct.  The effect is bigger for

4    extracurricular.

5    **Q.**   Oh, okay.  There are still some that go from 1 to 2 and 2

6    to 3, right?

7    **A.**   Yes.

8    **Q.**   And then for personal, it kind of runs the other way.

9    Same Asians would go from 3 to 2s and some would go from 2 to

10   1s, right?

11   **A.**   Yes.

12   **Q.**   So you've reduced the Asian ratings on two of the ratings

13   and raised them on one, and then you recalculate -- you've

14   done it for everybody else, too, for whatever race effects

15   there are, whites, blacks, Hispanic and other, right?

16   **A.**   Yes.

17   **Q.**   Then you recalculated it, and these are were the results

18   that you got, right?

19   **A.**   Yes.

20   **Q.**   And I think you already said this, but in this instance,

21   you were assuming that the race effects seen in the academic

22   and extracurricular ratings were actually because of race,

23   because Professor Arcidiacono has concluded that the race

24   effects in the personal rating are because of race, right?

25   **A.**   I don't remember my precise wording.

1    **Q.**   Use your own words.

2    **A.**   Okay.  So what I was trying to do was if one was

3    concerned about the effect of race influencing each of these

4    three ratings for some reason other than unobservable

5    characteristics, so animus against Asians, for example, or

6    some kind of stereotyping bias, whatever that means, then I

7    tried to adjust all three on an equal basis from the model

8    that he had developed his model 5 in each case.

9    **Q.**   And just to be clear for the record, you don't actually

10   believe that the academic and extracurricular models have an

11   Asian boost that comes from race, just like you don't believe

12   that the personal rating has an Asian penalty, right?

13   **A.**   That's right.  I think that -- that's right, yes.

14   **Q.**   Now, you used Professor Arcidiacono's ratings models to

15   do this, right?

16   **A.**   Yes.

17   **Q.**   But you criticized Professor Arcidiacono's ratings models

18   for their low explanatory power, right?  That's what's shown

19   here on DD 10.61, particularly the personal rating and

20   extracurricular rating.  You spent some time yesterday

21   criticizing the low explanatory power of Professor

22   Arcidiacono's rating models, right?

23   **A.**   I pointed out that they have low explanatory power.  As I

24   said I think yesterday very clearly, simply having a low R

25   squared or pseudo R squared isn't necessarily the damaging

1    criticism.  What is important to realize, though, is when

2    there's a low R squared or pseudo R squared, there's an

3    enormous influence of unobserved factors, and that opens up

4    the door for potential omitted variable bias.

5    **Q.**  Okay.  So now we have your virtual rating on modified

6    rating analysis, it's a rating where Asians get lower

7    academic ratings than they should have because you took out

8    the unobservable effects, right?

9    **A.**  On the average across all the Asians there would be some

10   reduction in their academic scores, yes.

11   **Q.**  And that means that this modified model will potentially

12   explain some Asian rejections based on this modified lowering

13   of the academic rating, correct?

14   **A.**  Well, all three are done at once.

15   **Q.**  I'm going to go through all three.

16   **A.**  All right.

17   **Q.**  But that's correct, right, about the academic rating?

18   **A.**  So it's going to lower their ratings, and then the model

19   is going to be re-estimated to see how different candidates

20   compare against each other, yes.

21   **Q.**  And with the lower academic rating, it will explain Asian

22   rejections on the basis of that modified rating -- I'm going

23   to do all the ratings, all three of them.

24              THE COURT:  What's the slide number on this?  I

25   know it's ten --

1          MR. MORTARA:  This one, Your Honor, is DD 10.61.

2          Let me go back to the modified ratings analysis at

3     some point.

4     Q.  All right, so I'll ask my question again.  What it means

5     is your virtual ratings analysis model will potentially

6     explain Asian rejections based on an artificially lowered

7     academic rating, correct?

8     A.  No.

9     Q.  Well, what's wrong with what I said?

10    A.  Well, it's not artificially lower.  It's subtracting off

11    the component of that rating, precisely the component of that

12    rating, each of the ratings, that Professor Arcidiacono's

13    model explains as being unobservably different between

14    Asian-Americans and whites controlling for all the other

15    factors in his model.

16    Q.  And just to be clear, you don't think race is influencing

17    the academic or extracurricular ratings, right?

18    A.  I think the most likely -- correct.  My mostly likely

19    explanation is unobserved characteristics, yes.

20    Q.  But you substituted lower academic and extracurricular

21    ratings for Asians because of the unobservable

22    characteristics effect Professor Arcidiacono found, right?

23    In your modified reason analysis, that's what you did.

24    A.  Right.  So as I said -- correct.  His models find that,

25    for whatever reason, the raters, the readers of the file are

1    assigning a higher academic and extracurricular rating than

2    can be predicted by the observables, just as they find a

3    lower personal rating than can be explained by the

4    observables.  So I took all three at once, yes.

5    **Q.**  Thank you, Professor Card.  Sorry it took so long.

6           Professor Card, you did not address anywhere in

7    your expert reports or your deposition Professor

8    Arcidiacono's model of the teacher and guidance counselor

9    ratings, did you?

10   **A.**  I don't believe I have any written commentary on that,

11   but I certainly thought about them.

12   **Q.**  I'm only asking about what you've disclosed to us, okay.

13          But you were here when Professor Arcidiacono talked

14   about his findings that race influenced those ratings,

15   weren't you?

16   **A.**  I was here when he said something about that, yes.

17   **Q.**  Your modified rating analysis did not deploy the teacher

18   ratings, did it?  It didn't change them.  It used them as

19   they were in the database, did not remove any race effects

20   from the teacher ratings, correct?

21   **A.**  Correct.

22   **Q.**  And one other thing about your virtual rating analysis,

23   the overall rating, you did not use the overall rating in the

24   modified rating analysis, did you?

25   **A.**  No.

1    **Q.**  Now, you understand that Professor Arcidiacono has a

2    ratings model of the overall rating, correct?

3    **A.**  Yes.

4    **Q.**  You could have used Professor Arcidiacono's ratings model

5    of the overall rating to also modify it in your modified

6    rating model, correct?

7    **A.**  Yes, I could have.  And of course, we weren't using --

8    neither of us was using the overall rating in the model, so

9    that didn't seem to be a first order of concern.

10   **Q.**  I just want to get something straight.  The purpose of

11   the modified ratings analysis is to try to get out the

12   effects of race from Harvard's admissions process and see

13   what it looks like working from, in the first instance,

14   Professor Arcidiacono's models, right?  That's the purpose of

15   it.

16   **A.**  Working on the three profile ratings, yes.

17   **Q.**  But there's an effect of race in Harvard's admissions

18   process in the overall rating, correct?

19   **A.**  In his models there is, yes.

20   **Q.**  I mean, Harvard admits it uses race in the overall

21   rating, right?

22   **A.**  Yes.

23   **Q.**  And you did not take out the effect of race from the

24   overall rating and then use it in your modified ratings

25   analysis even though you could have, right?

**JA3231**

1    **A.**  I didn't report that, but, actually, I did that exercise.

2    **Q.**  You didn't disclose it to us, did you?

3    **A.**  Well, I didn't because it's actually more favorable -- it

4    makes the Asian-American ethnicity effect even smaller,

5    closer to zero.

6              MR. MORTARA:  Your Honor, I move to strike the last

7    answer.

8              MR. WAXMAN:  It's totally responsive.

9              MR. MORTARA:  It's a yes or no question.

10             THE COURT:  No, it's not responsive.  The answer is

11   struck.

12             The question was:  You didn't disclose it to us,

13   did you?

14   **Q.**  Now, Professor Card, the admissions models you made are

15   discrete choice models as we've discussed, right?

16   **A.**  Yes.

17   **Q.**  And you teach discrete choice modeling at Berkeley,

18   right?

19   **A.**  Yes.

20   **Q.**  You teach discrete choice modeling in your labor

21   economics course, correct?

22   **A.**  Sometimes, yes.

23   **Q.**  And when you teach discrete choice modeling in your labor

24   economics course, you assign your students as recommended

25   reading works by Professor Michael Keane, correct?

1    **A.**  I don't actually remember but, perhaps, yes.

2    **Q.**  Let me see if I can refresh your memory.

3              MR. MORTARA:  May I approach, Your Honor?

4              THE COURT:  Sure.

5    **Q.**  What I've handed you, Professor Card, is a partial course

6    outline and reading list for Economics 250A.  This is the

7    course outline and reading list for your labor economics

8    course.

9    **A.**  Well, I haven't taught this particular course for several

10   years, but, yes.

11   **Q.**  And if you turn to the third page, you'll see there's a

12   lecture on structural modeling?

13   **A.**  Yes.

14   **Q.**  And there's two articles, including one that's

15   double-starred by Michael Keane, double-star indicating that

16   you recommend reading that, correct?

17   **A.**  Yes.

18   **Q.**  And Professor Keane is a recognized leader in the field

19   of discrete choice modeling, isn't he?

20   **A.**  I think that's fair to say, yes.

21   **Q.**  And in fact, in your handbook of labor economics that you

22   edit, the discrete choice modeling chapter is by Michael

23   Keane, correct?

24   **A.**  Yes, with a co-author, I believe.

25   **Q.**  It's co-authored by Michael Keane, correct?

1    **A.**  Yes.

2    **Q.**  And you heard Mr. Lee talk with Professor Arcidiacono

3    about a group of economists who wrote a brief to this Court

4    agreeing with you.  Do you remember that?

5    **A.**  Yes.

6    **Q.**  It was actually an exchange between Professor Arcidiacono

7    and Mr. Lee, and Mr. Lee said something like Janet Yellen --

8    Dr. Card agrees with Janet Yellen, and I think Professor

9    Arcidiacono said, I'd actually say it's more like she agrees

10   with Professor Card.  Do you remember that?

11   **A.**  I remember some exchange.  I don't remember the precise

12   words.

13   **Q.**  And Mr. Lee mentioned Janet Yellen, and you referred to

14   two Nobel Prize winners, who are George Akerlof and Robert

15   Solow, right?

16   **A.**  Yes.

17   **Q.**  Did you share the results of your model, including all

18   the coefficients, with Janet Yellen?

19   **A.**  No.

20   **Q.**  Do you assign articles about discrete choice modeling

21   written by Janet Yellen to your students?

22   **A.**  No, they're not on my -- no.

23   **Q.**  I didn't think so.

24            So now let's look at C70.  I'm going to hand that

25   to you right now.  It's your binder.  You've got it in your

1    binder.  They've got it in their binder.  No one needs it to

2    be handed to them.

3             And this is a brief filed by economists, including

4    Michael Keane -- and that's the same Michael Keane whose

5    readings you assign when you teach discrete choice modeling

6    at Berkeley, correct?

7    **A.**  Yeah, one of his papers, yes.

8    **Q.**  And there's another gentleman here, named Fang Hanming,

9    Hanming Fang as he's also called, is a professor of economics

10   at the University of Pennsylvania, correct?

11   **A.**  I don't quite see where are we.

12   **Q.**  Second name on the screen, C 70 in your binder.

13   **A.**  I'm sorry, give me a second.

14   **Q.**  Sorry, take your time, sir.

15   **A.**  Okay.  I'm sorry.

16   **Q.**  Do you have it?  Just the front page.

17            I'm asking you about Fang Hanming, or Hanming Fang,

18   professor at University of Pennsylvania.  You know him, too,

19   right?

20   **A.**  I know of him.  I know of him a little bit.  I don't

21   think I've ever met him personally.

22   **Q.**  And he works on discrete choice modeling, too?

23   **A.**  He may have.  I think of him more as a theorist.

24   **Q.**  Well, let's stick with Professor Keane then.  Let's see

25   what these economists said about your work.  Just turn to

1    page 3.

2            Beginning is, Harvard's personal rating scores are

3    significantly biased against Asian-Americans.

4            Then it says, Dr. Arcidiacono persuasively shows

5    that Harvard's personal rating scores are biased against

6    Asian-Americans.

7            This is the brief by Michael Keane, who, when you

8    teach discrete choice modeling to your labor economics

9    course, you assign his articles.  That's what it says, right?

10   **A.**  He certainly signed the brief, and he certainly -- I've

11   used his papers in my class, apparently, yes.

12   **Q.**  And then, if you turn to the next page in the middle

13   paragraph, I'll read you another section.  "This issue is

14   critical.  The inclusion or exclusion of the personal rating

15   has the largest effect of any modeling decision on the

16   estimated degree of discrimination against Asian-American

17   applicants.  If the personal rating is biased, then all the

18   sensitivity analyses performed by Dr. Card to confirm there

19   is no evidence of discrimination are invalid, for they all

20   include the personal rating."

21           That's what Michael Keane -- that's what his brief

22   that he signed says, right?

23   **A.**  Yes.  I don't know how they would know that this has the

24   largest effect, because, like I showed in that analysis where

25   I go from my model to Professor Arcidiacono's model, there's

**JA3236**

1    effects of excluding parental occupation and so on.  Those
2    set of variables that's -- I don't exactly know whether it
3    would be larger or smaller than the effect of removing the
4    personal rating.
5    **Q.**   Could you please turn to page 8?
6    **A.**   Yes.
7    **Q.**   And at the bottom, before the subheading 1, Professor
8    Keane's brief says, "Here it is unreasonable to infer that
9    missing data could be causing the racial disparities in
10   personal rating scores.  No plausible, nondiscriminatory
11   reason explains why Harvard rates Asian-American applicants
12   as less personally appealing than applicants in other racial
13   groups."  Do you see that?
14   **A.**   I do, yes.
15   **Q.**   Professor Keane, whose work you assign when you teach
16   discrete choice modeling in your labor economics class,
17   signed a brief that says that, correct?
18   **A.**   He did, but I certainly very strongly disagree with his
19   opinion.
20   **Q.**   Turn to page 12, over to 13.  There's a paragraph
21   bridging those two paragraphs that I want to talk about.
22          This is where Professor Keane and his colleagues
23   are talking about your comparison of Professor Arcidiacono's
24   findings on the academic and extracurricular ratings and his
25   findings on the personal rating.

 1             It says at the top, "Dr. Card's claim of selective

 2     reasoning is mistaken."

 3             Do you see that?

 4     **A.**  Excuse me.  I can't read the screen.

 5     **Q.**  It's on page 16.  Go on the hard copy.

 6     **A.**  16, I'm sorry.

 7             MR. MORTARA:  I believe it's 16.

 8             MR. WAXMAN:  I believe it's 12.

 9             MR. MORTARA:  12, I'm sorry.

10             THE COURT:  16 of 24 at the top or 12 on the

11     bottom.

12             MR. MORTARA:  Thank you, Your Honor.

13     **Q.**  Do you see, "Dr. Card's claim of selective reasoning is

14     mistaken."  Have you found that?

15     **A.**  I see that statement, yes.

16     **Q.**  And then the paragraph that bridges the two pages is,

17     "This argument is premised on a false dichotomy.  It makes

18     sense to infer that missing data may explain the gap favoring

19     Asian-Americans in the academic and extracurricular rating

20     scores relative to their test scores because Asian-Americans

21     objectively outperform all other applicants in academic and

22     extracurricular measures.  It does not make sense to infer

23     that missing data explains away the much starker racial

24     disparity disfavoring Asian-Americans in the subjective

25     personal rating scores because no observable data justifies

1    that inference."

2           And I understand you disagree.  My question is, is

3    this what Professor Keane said?

4    **A.**   That's what he signed.  I believe it's a completely false

5    statement, but it's what he signed, yeah.

6    **Q.**   Have you talked to him about it?

7    **A.**   No.

8    **Q.**   Over here on page 15, Michael Keane also agrees with

9    Professor Arcidiacono and disagrees with you in the question

10   of interaction with disadvantaged status, right?

11   **A.**   That's what this heading says, yes.

12   **Q.**   And over on page 17, you can see a discussion of the ALDC

13   issue, right?  And it summarizes your arguments and concludes

14   that on the ALDC issue, Dr. Arcidiacono has the better

15   argument, right?  That's what professor Keane concluded.

16   **A.**   That's -- he writes that sentence, precisely, yes.

17   **Q.**   And then on the next page, I want to talk about one of

18   the results in that conclusion.

19          He talks about the staff interview issue you and I

20   had discussed earlier.  And he says, "The personalized

21   treatment afforded special category applicants provides a

22   logical reason to think that Asian-Americans in that group,

23   ALDCs, are less likely to suffer from stereotyping and

24   implicit bias than are other Asian-American applicants, and

25   provides a sound justification for excluding special category

1    applicants from the sample."

2              That's what Professor Keane said, right?

3    A.   That's what he said.  Of course, I -- as before, I

4    disagree strongly with this interpretation.

5    Q.   And you assign his articles in your labor economics

6    course when you're teaching discrete choice modeling,

7    correct?

8    A.   When I did, yes.

9    Q.   And the Harvard admissions models that you and Professor

10   Arcidiacono created are discrete choice models, correct?

11   A.   They are, yes.

12             MR. MORTARA:  I have no further questions, Your

13   Honor.

14             MR. WAXMAN:  My turn?

15             THE COURT:  Your turn.

16   RE-EXAMINATION BY MR. WAXMAN:

17   Q.   Good afternoon, Professor Card.

18   A.   Yes, thank you.

19   Q.   Was there a brief filed in this case supporting your

20   conclusions?

21   A.   There was, yes.

22   Q.   And how many economists signed that brief?

23   A.   I don't remember.

24   Q.   Does the number 16 sound about right?

25   A.   Yes.

1    **Q.** And as we've heard from Mr. Mortara, that brief, the

2    signatures included Janet Yellen, correct?

3    **A.** Yes.

4    **Q.** Is she a respected economist in this country and in the

5    world?

6    **A.** Yes.

7    **Q.** And it is also signed by two Nobel Prize winners in

8    economics; is that correct?

9    **A.** Yes.  George Akerlof and Bob Solow, both of whom have

10   made very important contributions in the areas of labor

11   economics.

12   **Q.** I want to ask you a couple of questions following up on

13   Mr. Mortara's examination about the treatment of

14   international students, and I want to ask Mr. Lee to please

15   pull up page 21 of Dr. Arcidiacono's report.

16           And would you highlight the sentence that begins,

17   "I limited the focus."

18           Can you please read that sentence from Professor

19   Arcidiacono's report?

20   **A.** Right.  "To start, I limited the focus to domestic,

21   non-transfer applications."  Do you want me to keep going?

22   **Q.** Yes, please, the next sentence.

23   **A.** "Harvard's internal tracking of applicant race treats

24   international applicants as their own category, so I likewise

25   excluded them from my analysis."

1    **Q.**  And now let me ask Mr. Lee to pull up page 13, footnote

2    eight of your report.

3           Would you please read the first sentence of that

4    footnote in your report?

5    **A.**  Yes.  "I follow Professor Arcidiacono by defining

6    domestic applicants as those who are U.S. citizens or

7    permanent residents and am limiting my analysis to domestic

8    applicants."

9           Could I just emphasize permanent residents is quite

10   important.

11   **Q.**  Okay.  Let me now ask you some questions about the

12   personal rating.  Mr. Mortara asked you about an analysis

13   that you -- that you, sorry, conducted in your opening report

14   in which you entirely threw out the personal rating, correct?

15   **A.**  Yes.

16   **Q.**  Now, you talked about this in your direct, but would you

17   remind Her Honor if the personal rating reflects some effect

18   of race, is throwing that rating out of the model the right

19   thing to do?

20   **A.**  No, not at all because, of course, there's lots of -- the

21   amount of variability in the personal rating that is driven

22   by race is quite small compared to the variability driven by

23   all the other factors.  And so, in my view, it would make

24   sense if one was concerned about these issues of racial

25   biases in the ratings to correct for the small components due

Case: 19-2005    Document: 00117628240    Page: 319    Date Filed: 07/30/2020    Entry ID: 6356615
Case 1:14-cv-14176-ADB    Document 654    Filed 04/18/19    Page 101 of 261

101

1    to race in each case, and then -- but try and retain as much

2    as possible the other information.

3    **Q.**   Mr. Lee, would you please pull up Professor Card's

4    opening report on page 71, paragraph 152.

5             And apologies for -- I believe you have your

6    reports there if you can't read this.

7             But am I right that you describe the analysis that

8    Mr. Mortara discussed with you as, quote, very conservative?

9    **A.**   Yes.

10   **Q.**   And why was it very conservative?

11   **A.**   Well, I think, as we just discussed, it's -- in my view,

12   this is a much too extreme idea of throwing out the entire

13   rating but -- so in that sense it's conservative, yes.

14   **Q.**   Now, Mr. Mortara asked you if you relied on a

15   conversation with Dean Fitzsimmons in determining that the

16   applicant's race is not directly considered in the personal

17   rating.  Do you remember that?

18   **A.**   Yes.

19   **Q.**   And you said, if my notes are correct, that you relied on

20   it among other materials, correct?

21   **A.**   Yes.

22   **Q.**   What else did you do to arrive at your conclusion that

23   the personal rating doesn't reflect the applicant's race?

24   **A.**   Well, I was able to review the testimony of -- and

25   depositions, excuse me, of quite a few other admissions

1    officers, including his own deposition, and there were some

2    additional materials, obviously, from Harvard.

3    **Q.**  Mr. Mortara also asked you some questions about your

4    modified ratings analysis, right?

5    **A.**  Yes.

6    **Q.**  And let's just be clear.  Do you think that race is

7    driving the correlations that Dr. Arcidiacono found for any

8    of the three profile ratings he modeled: academic,

9    extracurricular or personal?

10   **A.**  No.  I don't think -- I think the most likely

11   interpretation is not that at all, no.

12   **Q.**  So in your modified ratings analysis, are you making an

13   assumption contrary to that actual conclusion?  In other

14   words, now you're assuming, contrary to your conclusion, that

15   race actually does affect those ratings, whether by

16   stereotypical views about Asian-Americans and whites or

17   otherwise?

18   **A.**  Right.  So if you think that -- if -- contrary to my

19   view, if you think that race is driving these for some

20   stereotypical or animus basis of bias, then I think the right

21   thing to do is exactly what I did, which is to subtract off

22   that component from all three ratings, yes.

23   **Q.**  And remind us, again, what did you find when you used

24   those adjusted ratings in your model?

25   **A.**  What I found is that I get an estimated effects year by

1    year that are very similar to the estimates I got in my main

2    model, and the average marginal effect across all the years

3    is similar; and also, none of these are statistically

4    significant, so the substantive conclusions are not affected

5    by that.

6    **Q.**   Now, Mr. Mortara also showed you some numbers that showed

7    that ALDCs are more likely to receive staff interviews,

8    correct?

9    **A.**   Yes.

10   **Q.**   And I'm going to ask Mr. Lee to bring up the chart that

11   he showed, which I believe is Plaintiff Demonstrative 38,

12   slide 3.

13              Do you recognize this?

14   **A.**   Yes.

15   **Q.**   And let's look at the raw numbers.  Would you tell us how

16   many non-ALDC applicants received interviews?

17   **A.**   1,711.

18   **Q.**   1,711?

19   **A.**   Yes.

20   **Q.**   And how many ALDC applicants received interviews?

21   **A.**   1,366.

22   **Q.**   So I don't want to trust my ability to do math on the

23   fly, or even not on the fly.  Am I right that that means that

24   well over half the people who receive staff interviews are

25   not ALDCs?

1    **A.**   Yes.

2    **Q.**   Now, ALDCs are likelier to receive staff interviews than

3    non-ALDCs, right?

4    **A.**   Yes.

5    **Q.**   Is that a reason to throw out the staff indicator

6    variable?

7    **A.**   No, not in my view at all.  Because, again, the model

8    includes -- the model -- my admissions model includes

9    separate tips for each of the A and L and D and C, and then,

10   in addition, an indicator for whether one has an interview or

11   not.  So the variable for one having a staff interview or not

12   is an independent factor in the model and is -- because more

13   than half the people who get a staff interview are non-ALDCs,

14   is identifying differences across both ALDC and non-ALDC

15   students who get an interview.

16   **Q.**   So switching to a new topic, you testified that average

17   marginal effects or AMEs are more useful to refer to in this

18   case than coefficients, correct?

19   **A.**   I did, yes.

20   **Q.**   And would you remind us why?

21   **A.**   Yes.  Well, it has to do this with this S curve that

22   luckily is still sitting here.  I didn't realize it would be

23   so useful.  So it has to do with the fact that if one has --

24   as one has in the admissions setting such differences in the

25   underlying characteristics of students that two-thirds of

**JA3246**

1    students are effectively out of the money completely, then

2    it's extremely important to think about the effects of

3    variables in a model which is a logistic type model as being

4    different for people who are in the bubble range.  And for

5    those people in the bubble range, as I tried to show in my

6    hypothetical and again mentioned in discussion of this issue,

7    for those people, any tip or benefit, like having a high

8    rating in some dimension or being from some sparse country or

9    having a particular other characteristic that's valued by the

10   admissions committee, that effect will be magnified in the

11   bubble range.  And so understanding the magnitudes of these

12   effects is quite important, and it particularly interacts

13   with multidimensionality issues.

14           So as I showed very simply, I think, or tried to

15   show very simply in one of my earliest slides, if one has a

16   student with only one strength, the value of that -- the

17   admission rate for students with one strength is only 2

18   percent.  So somebody who has got an academic 2 but nothing

19   else has only got a 2 or 3 percentage point probability of

20   admission.

21           Somebody who has two strengths goes up by to like a

22   14 percent probability.  So that second strength has a much

23   larger effect, independent of which one it is, when the first

24   one is already in play.  And again, when one goes to the

25   third, the same thing happens.  So if one has two strengths

1   and gets a third, then the probability goes up even more, and

2   that's exactly the kind of pattern that comes from these

3   models, and it's important in interpreting just about

4   everything in this case.

5          For example if one looks at so called tips for

6   African-Americans as a whole, African-Americans as a whole

7   have a tip that would be -- they're starting, in the absence

8   of that tip, at a base rate of admission of around 3 or so

9   percentage points, which is comparable to a student that has

10  one strength.

11         And just like in the case when I give a second

12  strength, the admission probability for the students with two

13  strengths goes up to 14 percent, just exactly like that.

14  When a student has one degree of strength and gets, say, a

15  tip for being African-American, it's as if we've given them a

16  second strength and their probability of admission rises

17  quite substantially.  It doesn't rise quite as much, it

18  doesn't rise all the way to 14 percent as these other

19  strengths but it rises.

20         So it's just fundamental to understanding the

21  admissions process and the way the characteristics interact

22  that one understands these average marginal effects.

23  **Q.**  If all that you knew or used was the coefficient, would

24  you be able to determine any of what you just explained?

25  **A.**  It's possible if somebody was an incredible expert in

1    understanding logit models and had great intuition, but in my

2    experience, no.

3    **Q.**   Now Mr. Mortara suggested that you were being misleading

4    by not reporting all of your coefficients.  Do you recall

5    that?

6    **A.**   He seemed to be suggesting that, I think.

7    **Q.**   Did you disclose to SFFA your dataset and code?

8    **A.**   Yes.

9    **Q.**   And that included every coefficient that arose from your

10   model, correct?

11   **A.**   They could construct every model that I estimated, yes.

12   **Q.**   Did you provide everything you would have provided to

13   your professional colleagues to assess your work?

14   **A.**   Yes.  In fact, what we do these days is we post an

15   appendix with all of the data and all of the programs, that's

16   standard protocol.

17   **Q.**   And SFFA could see all your coefficients by running that

18   code, correct?

19   **A.**   Yes.

20   **Q.**   Did you ever hear that SFFA was having difficulty in

21   doing so?

22   **A.**   No.

23   **Q.**   And now let me ask you, Mr. Mortara pointed out that Dr.

24   Arcidiacono reported a number of his coefficients in his

25   appendices, right?

1    **A.**   Yes.

2    **Q.**   Did he report all of them?

3    **A.**   No, not at all.

4    **Q.**   Do you recall any that he left off?

5    **A.**   Yes.  I specifically remember from his admissions models

6    that he leaves off the SAT variables, and some of those other

7    variables.  And some of those, as I mentioned before, have

8    this pattern that one might be a little surprised by it.

9    **Q.**   And in what respect?

10   **A.**   Well, certain of those models, the SAT variable itself

11   will have a negative effect.  It has a negative coefficient.

12   Excuse me.  Just looking at it in isolation.

13   **Q.**   Did it strike you as curious that Dr. Arcidiacono left

14   only those coefficients off the list?

15   **A.**   I wondered why, but --

16   **Q.**   Let me switch to another topic.

17          Mr. Mortara suggested that your coding of the

18   occupations was misleading or incorrect.  Do you recall that?

19   **A.**   Yes.

20   **Q.**   And I think you said your specialty was labor economics,

21   right?

22   **A.**   Yes.

23   **Q.**   Is this sort of thing, coding occupations, something that

24   you have expertise in?

25   **A.**   I have done it many, many times in many, many papers,

1    yes.

2    **Q.** And did you do it in this case the same way that you

3    would do it in your academic work?

4    **A.** Yes. Normally I would try and follow as closely as

5    possible the BLS hierarchy so that's what we did, I did.

6    **Q.** Another topic. Do you recall Mr. Mortara's questioning

7    you about your decision to compare the sums of various

8    ratings for white and Asian-American applicants?

9    **A.** Yes, I do.

10   **Q.** Do you have Dr. Arcidiacono's rebuttal report there? If

11   not, I'm sure we have --

12   **A.** I do, yes.

13   **Q.** Okay. I want to ask Mr. Lee to pull up and for you to

14   look at Table 5.5R from Dr. Arcidiacono's rebuttal report.

15   And you can either see it on the screen or you can see it in

16   the report, but do you recognize this?

17   **A.** Yes.

18   **Q.** And does this show the proportion of applicants of

19   different races receiving teacher 1, teacher 2, and guidance

20   counselor ratings of 2 or better by academic index decile?

21   **A.** Yes.

22   **Q.** And, Mr. Lee, would you highlight the white and

23   Asian-American columns? What does this show?

24   **A.** Well, if one compares different levels of the academic

25   index, which is one of the ways -- seems to be largely

 1    Professor Arcidiacono's preferred way of looking at academic

 2    strength, you can see, for instance, among students in the

 3    top decile, the academic index, so that would be the top 10

 4    percent of applicants, that the whites in that category have

 5    a higher probability of receiving a 2 on school support from

 6    teacher 1 than Asian-Americans, so 50.17 versus 46.64.  For

 7    teacher 2, same pattern, so 47.11 versus 43.10.  Same for the

 8    guidance counselor rating, so 44.63 versus 38.34.  And the

 9    same pattern one can see across each of the deciles I think,

10    or almost all of the deciles.

11  **Q.**  I would say -- is it true that white applicants on

12    average are stronger than Asian applicants on each individual

13    rating in all but a handful of the lowest deciles?

14  **A.**  Yes, I believe that's a fair characterization, yes.

15  **Q.**  All right.  Now stick with the same report.

16         Mr. Lee, can you pull up Dr. Arcidiacono's Table

17    5.6R from his report -- his rebuttal report.

18         And would you please highlight the alumni personal

19    rating?

20         Do you recognize this, Professor Card?

21  **A.**  Yes.  It's a very similar kind of exercise.

22  **Q.**  And again, I'm going to ask Mr. Lee to highlight the

23    white and Asian-American columns.

24         What does this show?

25  **A.**  So it's -- again, each row represents a different row of

1    the academic index decile, and so the bottom row is the top

2    decile.  And it shows in each in most of these rows, at least

3    just looking at it quickly and trying to remember what I knew

4    about this, one can see that whites have a higher probability

5    of getting an alumni personal rating of 2 or better in each

6    of the academic deciles.

7    **Q.**  In fact, it's true in every decile, except the lowest

8    decile, correct?

9    **A.**  Yes.  And of course, the lowest decile students are

10   largely out of the money.

11   **Q.**  Largely out of the money?

12   **A.**  I believe so, yes.

13   **Q.**  Very largely out of the money.

14          Mr. Lee, would you now display Dr. Arcidiacono's

15   rebuttal Table 5.7R, and would you highlight the alumni

16   overall rating table.

17          Do you recognize this?

18   **A.**  Yes.

19   **Q.**  And again, Mr. Lee, would you highlight the white and

20   Asian-American columns.

21          And what does this show?

22   **A.**  Well, it shows the same kind of pattern in most cases.

23   For example, at the top decile there's a small difference,

24   but when we go to the second decile, there's a bigger

25   difference, the third decile.  And so decile by decile, as

1    far as I can see, with the exception of the bottom decile,

2    whites are more likely to get a higher overall rating than

3    Asians, conditional on their academic index decile.

4    **Q.**  And just to be clear, were these all for Dr.

5    Arcidiacono's baseline dataset?

6    **A.**  I believe they are, yes.

7    **Q.**  So, in fact, this is showing -- this is even for the

8    dataset that excludes ALDCs, correct?

9    **A.**  Yes.

10   **Q.**  So were your results dependent in any way on the decision

11   to calculate the sums of the various ratings?

12   **A.**  No, not at all.

13   **Q.**  Now, do you recall Mr. Mortara asking you to agree that

14   your analysis can't completely rule out the possibility of

15   racial bias?

16   **A.**  Yes.

17   **Q.**  Can any statistical analysis of real world data as

18   opposed to a randomized experiment actually show or disprove

19   bias?

20   **A.**  No, never.

21   **Q.**  Have you seen anything in your entire analysis that

22   suggests racial bias against Asian-American applicants?

23   **A.**  No.

24           MR. WAXMAN:  No further questions.

25           MR. MORTARA:  Your Honor, I have about five to ten

 1    minutes of recross if that's okay.

 2              THE COURT:  Mr. Mortara, do you want those red

 3    marks off the screen?

 4              MR. MORTARA:  Is that the court technology?

 5              THE COURT:  Do you want those gone.  You can go and

 6    show him, Karen.

 7              THE WITNESS:  My apologies.

 8              If I touch this screen, it will --

 9              THE COURT:  Yeah, you're trying to highlight

10    something on the screen, that's how you can do it.  I just

11    didn't want him to have to live with his highlighting marks.

12    I'm not criticizing you at all for putting them on there.

13              THE WITNESS:  Thank you, Your Honor.

14              THE COURT:  Just giving you a clean slate to start

15    over again.

16              MR. MORTARA:  It's no problem.  Whenever you're

17    ready.

18              THE COURT:  Go ahead.

19    RE-EXAMINATION BY MR. MORTARA:

20    Q.  We meet again, Professor Card, very briefly for our last

21    time.

22              You talked with Mr. Waxman about how you relied on

23    depositions and other materials in addition to your phone

24    call with Dean Fitzsimmons for your conclusion that Harvard

25    didn't use race in the personal rating.  That just happened a

Case: 19-2005   Document 00117632246   Page: 352   Date Filed: 07/30/2020   Entry ID: 6356615
Case 1:14-cv-14176-ADB   Document 654   Filed 04/18/19   Page 114 of 261

114

 1   few minutes ago, you remember that, right?

 2   **A.**   Yes.

 3   **Q.**   One of the things you reviewed was the sworn testimony of

 4   someone called Christopher Looby, or Chris Looby.  Do you

 5   remember reading that deposition?

 6   **A.**   Yes, I do.

 7   **Q.**   And do you remember what Mr. Looby said about his use of

 8   race in the personal rating?

 9   **A.**   I do, but perhaps it would be useful to bring it up.

10   **Q.**   You do remember?

11   **A.**   I'm quite old, my memory isn't as good as it used to be.

12   **Q.**   I'm going to refrain.

13            MR. MORTARA:  Your Honor, may I approach?

14            THE COURT:  Yes.

15   **Q.**   I've got excerpts of the Looby deposition, and I'd like

16   you to turn to what is marked page 51.

17            This is a deposition you read when you were

18   preparing your expert reports, correct?

19   **A.**   Yes.

20   **Q.**   Question, line 12:  "Would you take a student's race into

21   account when assessing his or her personal qualities?

22            "A.  Just like with the academic rating, it's one

23   factor of many I consider."

24            That's what Mr. Looby said under oath in his

25   deposition, correct?

1    **A.**   Yes.

2    **Q.**   And you reviewed that when you prepared your expert

3    reports, correct?

4    **A.**   Yes.

5    **Q.**   But you did not, in fact, mention that Mr. Looby had said

6    that anywhere in your expert reports, did you?

7    **A.**   I don't recall, but my interpretation is -- I certainly

8    was aware of it.

9    **Q.**   Okay.  Let's look at P 555 again.  That's the OCR

10   findings.  And on page 15 over to 16, is a highlighted

11   version on the screen that we've seen many times, and what it

12   says is that the Office of Civil Rights in the Department of

13   Education found in 1990 that Harvard's admissions officers,

14   some of them, were using race in the profile ratings,

15   correct?

16   **A.**   It could be reflected in the four ratings areas, yes.

17   **Q.**   And that's the profile ratings, correct?

18   **A.**   Yes.

19   **Q.**   You did not cite the Office of Civil Rights' findings in

20   your expert reports when you said race wasn't involved in the

21   personal rating based in part on the phone call, right?

22   **A.**   I didn't.  I had never seen that at the time I did my

23   reports.

24   **Q.**   You saw it here in court when Dean Fitzsimmons was

25   crossed for the first time, right?

Case: 19-2005    Document: 00117632240    Page: 334    Date Filed: 07/30/2020    Entry ID: 6356615
Case 1:14-cv-14176-ADB    Document 654    Filed 04/18/19    Page 116 of 261

116

1    **A.**  Sometime around then, yes.

2    **Q.**  And then the last document is P 509, also in your binder.

3    **A.**  P 509?

4    **Q.**  Yeah.  Take your time, sir.

5    **A.**  Okay, I found it.  I may have found it, yes.

6    **Q.**  It's a letter from Harvard's Office of the General

7    Counsel to the Office of Civil Rights.  And just at page 2,

8    there's a paragraph in the middle of the page, and I've got

9    some information highlighted that also came up during Dean

10   Fitzsimmons' cross.  This is a 2012 letter where Harvard

11   said, "The information that OCR gathered during the course of

12   that compliance review, and in subsequent cases, regarding

13   Harvard College's criteria for admission, its use of race as

14   a factor in admissions decisions, and its general policies

15   and procedures for selecting students for admission in its

16   undergraduate program is still accurate today."

17          You saw that during Dean Fitzsimmons' testimony,

18   correct?

19   **A.**  Yes.  I also saw the sentence above, "Nor did we find

20   that Asian-Americans were treated differently than white

21   applicants in the implementation of these processes."

22   **Q.**  You did not cite this letter with the OCR finding that

23   Harvard admissions officers used race in the profile ratings

24   in your expert reports, did you?

25   **A.**  No, I didn't.

          1            MR. MORTARA:  No more questions.

          2            MR. WAXMAN:  Just a few more before lunch.

          3            THE COURT:  We really only allow two rounds each,

          4     right?  We haven't had any re-redirect.

          5            I will give you a very brief re-redirect, but he

          6     will have his re-recross.

          7            MR. MORTARA:  I will not take a re-recross, I'm

          8     sure.

          9            THE COURT:  I won't hold you to that.

         10            MR. WAXMAN:  There won't be any material covered

         11     other than a small subset of what my friend Mr. Mortara just

         12     raised on cross-examination.

         13     RE-EXAMINATION BY MR. WAXMAN:

         14     **Q.**  With respect to the testimony of Christopher Looby, were

         15     you here for Mr. Looby's testimony or did you review

         16     Mr. Looby's testimony in this case?

         17     **A.**  I did review it.  I wasn't here for it.

         18     **Q.**  And do you recall him testifying about the way that he

         19     used race in all of the profile ratings?

         20     **A.**  Yes, I did.

         21     **Q.**  And was that testimony here consistent with your

         22     understanding of what he meant in his deposition, which you

         23     reviewed prior to issuing your report, about how he uses race

         24     in the evaluation of the various profile ratings?

         25     **A.**  Yes.  My understanding is that exactly as he clarified in

Case: 19-2005   Document 00117683246   Page: 336   Date Filed: 07/30/2020   Entry ID: 6356615
Case 1:14-cv-14176-ADB   Document 654   Filed 04/18/19   Page 118 of 261

118

1    his testimony, that he used race as a contextual factor to

2    evaluate, for example, opportunities for students and

3    segregation and other features that would be important

4    background factors, but not using race per se as a separate

5    factor.

6    **Q.**  And just referring briefly to the portion of the 1990 OCR

7    report that Mr. Mortara just directed you to, there was a

8    sentence in that report in which the OCR reflected that a

9    couple of the admissions officers indicated that they

10   considered race in all four of the profile ratings.  Did you

11   recall that sentence that Mr. Mortara reviewed with you?

12   **A.**  Yes.

13   **Q.**  And indeed, in that report, OCR observed through its

14   regression analysis that Asian-Americans were scoring lower,

15   I believe 20 percent lower, than white applicants on the

16   personal rating, correct?

17   **A.**  Yes.  It was a gap about like that, yes.

18   **Q.**  Did OCR infer racial bias from that difference?

19   **A.**  No.

20   **Q.**  Did they in fact conduct a full audit study in which they

21   read the admissions files, about 200 admissions files or

22   maybe it was 400, and 2,000 summary sheets in order to

23   actually investigate whether racial bias was infecting the

24   personal rating?

25           MR. MORTARA:  Your Honor, I object, leading.

1          MR. WAXMAN:  I'll rephrase.

2          THE COURT:  It's not leading; it's overruled.

3    **A.**  Yes, I'm -- I was aware that they had done a -- both a

4    careful side-by-side audit study of an equal number of white

5    and Asian application folders, equally split by whether they

6    were admitted or not, and tried to compare, and that was I

7    think the primary thing that they were using to conclude that

8    the two groups of students were treated -- evaluated fairly

9    or equally on the basis of, for instance, finding personal

10   qualities and not -- and also this extended sample that they

11   looked, yes.

12   **Q.**  And have you seen anything in your preparation for this

13   case or in the trial of this case indicating or suggesting in

14   any way the result either whether SFFA or Professor

15   Arcidiacono did such an audit analysis or the results of that

16   analysis?

17   **A.**  No.

18          MR. WAXMAN:  No further questions.

19          MR. MORTARA:  As promised, Your Honor.

20          THE COURT:  All right.  We will break for lunch.

21   Why don't we go back to the 45-minute lunch just to give

22   everyone a little break.  So 1:15.  You are excused.

23          THE WITNESS:  Thank you, Your Honor.

24          THE COURT:  I know you're sad to be leaving us.

25          (Recess taken 12:29 p.m.)

| | |
|---|---|
| 1 | **** AFTERNOON SESSION **** |
| 2 | THE CLERK:  Court is in session.  Please be seated. |
| 3 | MR. McBRIDE:  Your Honor, before we get started |
| 4 | with the next witness.  We have some summary exhibits that we |
| 5 | want to put in evidence.  May I approach? |
| 6 | THE COURT:  Sure. |
| 7 | MR. McBRIDE:  This is summary exhibit, Plaintiff's |
| 8 | Exhibit 634, that we offer into evidence. |
| 9 | MR. LEE:  No objection, Your Honor. |
| 10 | THE COURT:  It's admitted. |
| 11 | (Plaintiff Exhibit No. 634 admitted.) |
| 12 | MR. LEE:  This is a summary exhibit.  It's designed |
| 13 | to answer some of the questions you asked President Simmons |
| 14 | two days ago. |
| 15 | MR. McBRIDE:  No objection. |
| 16 | (Defendant Exhibit No. 746 admitted.) |
| 17 | MR. MORTARA:  May I proceed, Your Honor? |
| 18 | THE COURT:  Of course. |
| 19 | MR. MORTARA:  Your Honor, the plaintiffs call |
| 20 | Marlyn McGrath. |
| 21 | THE COURT:  Director McGrath, we are going to |
| 22 | reswear you in.  I'm not sure if it's actually necessary, |
| 23 | but -- |
| 24 | THE CLERK:  Can you raise your right hand, please. |
| 25 | (MARLYN McGRATH duly sworn by the Deputy Clerk.) |

```
 1                THE CLERK:  Thank you.  You may be seated.

 2                THE COURT:  I'm sure you're delighted to be back.

 3                THE WITNESS:  I am delighted to be back.

 4                MR. MORTARA:  I handed up -- for once, Your Honor,

 5      you have the binder in advance.

 6                THE COURT:  Thank you, Mr. Mortara.  Give me one

 7      second.  I neglected to -- I need a little room.  Okay.  Go

 8      ahead.  I'm ready.

 9                             EXAMINATION

10      BY MR. MORTARA:

11      Q.   Nice to see you again, Director McGrath.

12      A.   Good to see you.

13      Q.   How are you today?

14      A.   Fine, thank you.

15      Q.   I'm putting on the screen and in your binder in front of

16      you on your left is Plaintiff's Exhibit 1, the reading

17      procedures for the class of 2018.

18                You're responsible for the content of the reading

19      procedures and a group of you develop and change it every

20      year, correct?

21      A.   Yes, that is correct.

22      Q.   Please go to the section on personal rating that is on

23      page 5.

24      A.   I just want to be certain I'm looking at the right thing.

25      This is P1 is the tab?
```

Case: 19-2005    Document: 00117632240    Page: 340    Date Filed: 07/30/2020    Entry ID: 6356615
Case 1:14-cv-14176-ADB    Document 654    Filed 04/18/19    Page 122 of 261

122

1    **Q.**  P1.

2    **A.**  This is not paginated, but I can count.

3    **Q.**  Just go until personal appears at the bottom.

4    **A.**  Yes.

5    **Q.**  It does not say anywhere in this document that race

6    should not be used in the personal rating, correct?

7    **A.**  I think that's correct.

8    **Q.**  I've got a broader question.

9            Does it say anywhere in the admissions office in

10   any written form, training material, memo, email, or any kind

11   of writing down to a Post-it on the coffee maker that race

12   should not be used in the personal rating?  Is it written

13   anywhere?

14   **A.**  For this document?

15   **Q.**  I'll read the question again.

16   **A.**  Yes.  Thank you.

17   **Q.**  It's a broader question.

18           Does it say anywhere in the admissions office in

19   any written form, training material, memo, email, or any kind

20   of writing, down to a Post-it on the coffee maker, that race

21   should not be used in the personal rating?  Is it written

22   anywhere?

23   **A.**  It has been written in more recent reading instructions.

24   **Q.**  Could you please turn to the binder on your right.  And

25   your trial testimony is there.  It's open to Tab 5 already.

1    And if you turn to page 231.

2    **A.**  Yes.

3    **Q.**  And this is when you and I were talking about things just

4    a couple of weeks ago on Friday, October 18, correct?

5    **A.**  Yes.

6    **Q.**  And I asked you, at line 15, 231:  "Now I've got a

7    broader question.  Does it say anywhere in the admissions

8    office in any written form, training material, memo, email,

9    or any kind of writing, down to a Post-it on the coffee

10   maker, that race should not be used in the personal rating?

11   Is it written anywhere?"

12           And you answered:  "In written form, no.  It is the

13   subject of a great deal of discussion and attention in our

14   training process."

15           Was that your sworn testimony?

16   **A.**  That was my sworn testimony.  And I had --

17   **Q.**  Go ahead.

18   **A.**  Sorry.  Go ahead.

19   **Q.**  I'm going to run through some basic facts and then I'm

20   going to give you an opportunity to fully explain in as much

21   detail as you like the discrepancy that we've just gone

22   through.

23           At least as of September 12, 2018, you have had

24   brand-new draft reading procedures that included an

25   instruction not to use race in the personal rating that you

 1    had seen, correct?

 2    **A.**   Yes.  We had in the 2018 September version, yes.

 3    **Q.**   And at least as of September 19, 2018, your office issued

 4    new reading procedures for the class of 2023 to all

 5    admissions officers that included an instruction not to use

 6    race in the personal rating, correct?

 7    **A.**   Yes.

 8    **Q.**   Then revised new reading procedures again issued on

 9    October 5, 2018, that still included an instruction not to

10    use race in the personal rating, correct?

11    **A.**   Yes.

12    **Q.**   And on October 18, nearly two weeks after those last

13    procedures formally issued and nearly a month after the first

14    draft of the class of 2023 reading procedures, you told me

15    there was no written document at the admissions office that

16    said race should not be used in the personal rating.  That's

17    what you said, right?

18    **A.**   I said that because I had in mind the preparation

19    materials and what I had understood to be the focus of this

20    trial for the classes of 2014 to 2019.  I was not, in my

21    answer to you, referring to anything more current than that.

22    **Q.**   Is there anything else you'd like to tell us to explain

23    the discrepancy in the testimony that we've just gone

24    through?

25              MR. LEE:  Your Honor, I object to the form.

 1    "Discrepancy" is his word, not hers.  It's argument.

 2          THE COURT:  That's fair.  Why don't you just change

 3    "discrepancy" to "difference."

 4    BY MR. MORTARA:

 5    **Q.**  Is there anything else you'd like to tell the Court to

 6    explain the difference between your trial testimony on

 7    October 18 and the way you answered the same question today?

 8    **A.**  The reason I gave a different answer when we were here

 9    before was that I had in mind those earlier reading

10    instructions, which I had understood -- which had been the

11    subject of my review and preparation for my testimony.

12    **Q.**  As far as you know, was Dean Fitzsimmons aware of the new

13    reading procedures when this trial began?

14    **A.**  As far as I know, he was aware that we were developing

15    new reading procedures.

16    **Q.**  Do you know if he was aware of the content of those new

17    reading procedures?

18    **A.**  I do not know.

19    **Q.**  Is the reason that you interpreted my question as being

20    limited in time in some way that Harvard's lawyers instructed

21    you to avoid bringing up the class of 2023 reading procedures

22    when you were here under oath the last time?

23    **A.**  No, I did not.

24          MR. LEE:  I'm going to let her answer the question,

25    but I don't want it to be a waiver of the attorney-client

**JA3267**

1    privilege.

2            THE COURT:  All right.  So --

3            MR. MORTARA:  I think if she does answer, it is a

4    waiver, which is why --

5            MR. LEE:  Well, then I object.

6            THE COURT:  I think you've embedded the waiver in

7    your question.  So why don't you ask whether she got any such

8    instructions from the lawyers, any instructions --

9            MR. MORTARA:  Your Honor, I was going for the

10   objection and instruction not to answer.  If that's what I

11   get, that's what I want.

12           MR. LEE:  She answered the question.

13           THE COURT:  She did answer the question.

14           MR. MORTARA:  We can strike the answer.

15           THE COURT:  I'm not going to strike the answer.

16   She's answered the question and it doesn't implicate the

17   attorney-client privilege.  So forge forward.

18   BY MR. MORTARA:

19   Q.  Did you have any discussions with Harvard's lawyers about

20   the class of 2023 reading procedures when you were preparing

21   for this trial?

22   A.  No, not about those for this trial.

23   Q.  Did you have any discussions about the drafts when

24   preparing for this trial?

25   A.  Preparing for the trial?  Not previous to my prior

1    testimony.

2    Q.   I want to be clear now, the oath you've taken is to tell

3    the whole truth and nothing but the truth in response to my

4    questions.  Do you understand that?

5    A.   I do.

6    Q.   You cannot modify my questions in your head and answer

7    questions other than the one I'm asking.  Do you understand?

8              MR. LEE:  I object.  Your Honor, those were

9    instructions for you to give, not for him to give.

10             MR. MORTARA:  If they're wrong, Your Honor, then

11   I'm happy to be corrected.

12             THE COURT:  Well, you need to rephrase the

13   question.

14   BY MR. MORTARA:

15   Q.   Do you understand the nature of the oath that you took?

16   A.   Yes.

17   Q.   Now let's get into the substance.

18             You have in front of you a binder including

19   Defendant's Exhibit 744.  Would you please turn to it, D744.

20   Are you there?

21   A.   No.

22   Q.   You don't have the D744?  Can I assist maybe?  There's Ps

23   and Ds, director.

24   A.   This goes from 741 to 749.

25             THE COURT:  It's today's binder, second tab.

```
 1                    MR. MORTARA:  We have an extra, just in case.
 2                    THE COURT:  Just make sure she has the right binder
 3        in front of her.
 4                    THE WITNESS:  Yes, I do.  I see it toward the
 5        beginning.  They're not in order.  Yes.  Thank you.
 6        BY MR. MORTARA:
 7        Q.   These are the reading procedures for the class of 2022,
 8        correct?
 9        A.   Correct.
10        Q.   This class was selected in the spring of 2018, correct?
11        A.   Yes.
12        Q.   I want to start with this as the baseline.
13                    MR. MORTARA:  I'm going to offer Defendant's 744 at
14        this time.
15                    MR. LEE:  No objection.
16                    THE COURT:  It's admitted.
17                    (Defendant Exhibit No. 744 admitted.)
18        BY MR. MORTARA:
19        Q.   If you would, turn to the third page.  This one actually
20        has page numbers.  I'm going to refer you to the discussion
21        of the overall rating.
22                    Do you see that?
23        A.   Yes.
24        Q.   There's no instruction about the use of race here, is
25        there?
```

1    **A.** That's correct.

2    **Q.** Please turn to the next page and take a look at the

3    personal rating.

4    **A.** Yes.

5    **Q.** The text is slightly different from the 2018 version we

6    were looking at, Plaintiff's Exhibit 1, correct?

7    **A.** Yes.

8    **Q.** There's no instruction about the use of race in the 2022

9    reading procedures, Defendant's Exhibit 744, is there?

10   **A.** That's correct.

11   **Q.** And just very briefly, Director McGrath, above we have

12   the athletic rating.

13   **A.** Yes.

14   **Q.** Remember you and I had that discussion about my daughter,

15   the figure skater?

16   **A.** We did.

17   **Q.** And you talked about some potential changes to the

18   athletic rating that were being discussed?

19   **A.** Yes.

20   **Q.** And you see Number 1 here that there's no change there.

21   It's still about Harvard sports and varsity athletics, right?

22   **A.** Yes.

23   **Q.** I want to go through now with you the process of revision

24   that led to the written changes to the reading procedures in

25   the class of 2023 version.

Case: 19-2005    Document: 00117632240    Page: 348    Date Filed: 07/30/2020    Entry ID: 6356615
Case 1:14-cv-14176-ADB   Document 654   Filed 04/18/19   Page 130 of 261

130

1              In the first week of June of this year, there was a

2      retreat of some kind where the admissions office got together

3      to discuss, amongst other things, suggestions for changing

4      the reading guidance; is that right?

5      **A.**   That's correct.

6      **Q.**   Amongst the things that were discussed actually was an

7      update about this case, right?

8      **A.**   I was not at that retreat.

9      **Q.**   Turn to Plaintiff's 696, please, in your binder.

10     **A.**   Yes.

11     **Q.**   This is an email dated June 12, 2018, from Christy

12     Mascolo to Jessica Bryan, subject line, "All staff retreat

13     followup."

14             Do you see that?

15     **A.**   Yes.

16             MR. MORTARA:  Your Honor, we offer Plaintiff's 696.

17             MR. LEE:  No objection, Your Honor.

18             THE COURT:  Admitted.

19             (Plaintiff Exhibit No. 696 admitted.)

20     BY MR. MORTARA:

21     **Q.**   Who is Jessica Bryan?

22     **A.**   She is my colleague who is a financial aid officer and

23     admissions officer.

24     **Q.**   And who is Tim?

25     **A.**   Tim I believe is Tim Smith, who was an admissions

**JA3272**

1    officer.

2    **Q.**   And is it your understanding that they led the discussion

3    about the personal rating at the retreat?

4    **A.**   That is my understanding.

5    **Q.**   I want to focus in on the middle paragraph there.

6    There's a sentence, "I would suggest sending a draft to your

7    whole group so they can weigh in before producing a final

8    recommendation by July 9.  Then these will go to WRF, MEM,

9    and others, including OGC."

10             Do you see that?

11   **A.**   I do.

12   **Q.**   And Jessica and Tim led the discussion about the personal

13   qualities rating at the retreat, correct?

14   **A.**   Yes.

15   **Q.**   And then there's a discussion here indicating that draft

16   edits will go to WRF.  That's Dean Fitzsimmons, correct?

17   **A.**   Yes.

18   **Q.**   MEM, that is you, correct?

19   **A.**   Yes.

20   **Q.**   And others, including OGC, that's the office of general

21   counsel at Harvard, correct?

22   **A.**   Yes.

23   **Q.**   Do you remember hearing anything about the discussions

24   around the personal rating at this retreat?

25   **A.**   I do not remember hearing anything about it at the time.

 1   **Q.** All right.  Let's move forward in time.  Please turn to

 2   Plaintiff's 705 in your binder.

 3   **A.** Yes.

 4   **Q.** This is an email from Christine Mascolo to Dean

 5   Fitzsimmons and you, copy I believe your assistants.  The

 6   subject line is "Potential changes to reading instructions."

 7   It's dated July 23, 2018.

 8            Do you see that?

 9   **A.** Yes.

10            MR. MORTARA:  We offer Plaintiff's 705.

11            MR. LEE:  No objection.

12            THE COURT:  Admitted.

13            (Plaintiff Exhibit No. 705 admitted.)

14   BY MR. MORTARA:

15   **Q.** Director McGrath, you'll notice the attachments to the

16   email are in the tab right behind it.  They are 706, 707, and

17   708.

18            MR. MORTARA:  We will also offer those.

19            MR. LEE:  No objection.

20            THE COURT:  Those are admitted also.

21            (Plaintiff Exhibit Nos. 706, 707, and 708

22   admitted.)

23   BY MR. MORTARA:

24   **Q.** The email says, "Hi, Fitz and Marlyn.  Attached you will

25   find suggested revisions to the reading instructions born out

1   of our retreat in early June.  These include the academic,

2   EC, and athletics section only.  There will be no suggested

3   changes for PQs and support at this time."

4          Do you see that?

5   A.  Yes.

6   Q.  Christine Mascolo was communicating to you that as of

7   July 23, 2018, there wasn't any plan to change the personal

8   rating or personal qualities section of the reading guidance?

9   A.  Yes, that's what this says.

10  Q.  And then the next sentence says, "My plan is to share

11  with both of you for any edits/thoughts you may have and then

12  to share with Ara, of course, as I do every year."

13         Do you see that?

14  A.  Yes.

15  Q.  Who is Ara?

16  A.  Ara is Ara Gershengorn, one of my attorneys.

17  Q.  Ara Gershengorn, she's in the office of general counsel,

18  correct?

19  A.  Yes.

20  Q.  Let's take a look at the drafts.  You see here there's a

21  markup of the academic rating, Plaintiff's 706?

22  A.  Yes.

23  Q.  And there's several changes here, including some

24  additional recommendations from the group discussion?

25  A.  Yes.

1    **Q.**  And on Plaintiff's 707, there's some changes to the EC

2    rating, relatively less comprehensive?

3    **A.**  Yup.

4    **Q.**  And then on 708 there's a few changes to the olympic

5    rating -- sorry -- the athletic rating.

6    **A.**  Yes.

7    **Q.**  And you see here, there is a change here sort of

8    responsive to the discussion you and I had about the figure

9    skating.  "Now you can get an athletic 1 if you have

10   recognition for individual athletic achievements,

11   championships at the national, world, or olympic level."

12   **A.**  Yes.

13   **Q.**  You didn't raise with me the fact that this change has

14   already been instituted last time, did you?

15   **A.**  I said it was a discussion, consideration of discussion.

16   How it's applied will remain to be seen.

17   **Q.**  I want to move forward now to August 13 and

18   Plaintiff's 755.

19   **A.**  Yes.

20   **Q.**  Plaintiff's 755 is an August 13, 2018, email from you to

21   Christine Mascolo, copy Dean Fitzsimmons.

22            Do you see that?

23   **A.**  Yes.

24            MR. MORTARA:  We'd offer Plaintiff's 755.

25            MR. LEE:  No objection, Your Honor.

 1              THE COURT:  It's admitted.

 2              (Plaintiff Exhibit No. 755 admitted.)

 3    BY MR. MORTARA:

 4    Q.  Here if you look in the middle of the page, there's a

 5    part of an email from August 13, 2018, at 10:53 a.m.  And

 6    Christine Mascolo had emailed your and said, "Just FYI, there

 7    may be more updates to the reading instructions."  Then we

 8    have a redaction.  "I will work with the group that

 9    considered PQS during the retreat and make some

10    recommendations I will share with you both."

11              Do you see that?

12    A.  Yes.

13    Q.  On August 13, Christine Mascolo informed you that there

14    were going to be some proposed revisions to the personal

15    rating section of the reading guidance, correct?

16    A.  Yes.

17    Q.  And you responded, "Sounds just right to me.  Thank you.

18    And thanks for checking with" -- help me.

19    A.  Ara.

20    Q.  Ara.  Thank you.

21              And this email chain you can see is heavily

22    redacted.  Do you see that?

23    A.  I do.

24    Q.  It starts out with an exchange between Ms. Mascolo and

25    Ms. Gershengorn, correct?

1   **A.**  Yes.

2   **Q.**  Let's move forward in time to August 20, Plaintiff's 657.

3   **A.**  Yes.

4   **Q.**  Plaintiff's 657 is an email from Ms. Mascolo to Dean

5   Fitzsimmons and you.  It is dated August 20.

6           Do you see that?

7   **A.**  Yes.

8           MR. MORTARA:  We offer Plaintiff's 657.

9           MR. LEE:  I object.  This wasn't part of the

10  disclosure.  In fact, it was withdrawn.

11          MR. MORTARA:  I'm being told it is part of the

12  disclosure.

13          MR. LEE:  I don't think so.

14          THE COURT:  Hold on.

15          MR. LEE:  Your Honor, I'm pretty sure we have it

16  right that it was withdrawn.  But if what he wants to do is

17  offer it, in the interest of time, let's just go ahead.  No

18  objection.

19          THE COURT:  Just looking at it, it seems unlikely

20  he would have withdrew it, given the exercise here.

21          MR. MORTARA:  I'll offer it with its attachment,

22  Plaintiff's 658.

23          MR. LEE:  No objection.

24          (Plaintiff Exhibit Nos. 657 and 658 admitted.)

25  BY MR. MORTARA:

1    **Q.**  It's an email from Ms. Mascolo to you and Dean

2    Fitzsimmons.  It says, "Hi Fitz and Marlyn.  Attached you

3    will find updates to the reading instructions.  Thanks to Tim

4    and Jessica."

5            Do you see that?

6    **A.**  I do.

7    **Q.**  Tim and Jessica were the ones who worked on the personal

8    rating at the retreat, correct?

9    **A.**  Yes.

10   **Q.**  And the attachment, 658, is a draft for the personal

11   qualities.  Do you see that?

12   **A.**  Yes.

13   **Q.**  And there's some -- how would you characterize the number

14   of changes here?  Significant?  Moderate?

15   **A.**  Moderate.

16   **Q.**  So there's some moderate changes here, correct?

17   **A.**  Yes.

18   **Q.**  There's still no instructions on the use of race one way

19   or the other here in this draft, correct?

20   **A.**  Yes, that's correct.

21   **Q.**  Would you please turn to Plaintiff's Exhibit 767.

22   **A.**  Yes.

23   **Q.**  Plaintiff's Exhibit 767 is a September 7 email from you

24   to Ms. Mascolo and Dean Fitzsimmons.

25            Do you see that?

Case: 19-2005   Document: 00117638240   Page: 356   Date Filed: 07/30/2020   Entry ID: 6356615
Case 1:14-cv-14176-ADB   Document 654   Filed 04/18/19   Page 138 of 261

138

1    **A.**   I do.

2    **Q.**   The subject is "Privileged and confidential reading

3    instructions."

4            MR. MORTARA:  We offer Plaintiff's 767.

5            MR. LEE:  No objection.

6            THE COURT:  Objection?

7            MR. LEE:  No objection.  I'm sorry.

8            THE COURT:  It's admitted.

9            (Plaintiff Exhibit No. 767 admitted.)

10   BY MR. MORTARA:

11   **Q.**   Your response in here says, "Good to have."  Correct?

12   **A.**   Yes.

13   **Q.**   Please turn -- this is September 7.  Please turn to

14   Plaintiff's Exhibit 749.

15   **A.**   Yes.

16   **Q.**   And Plaintiff's Exhibit 749 appears to be a hard-copy

17   document.  There are the initials CJM and the date

18   September 11 in the upper right-hand corner.

19            Who is CJ -- CGM?

20   **A.**   That's Christine Mascolo.

21            MR. MORTARA:  We offer Plaintiff's 749.

22            MR. LEE:  No objection.

23            THE COURT:  Admitted.

24            (Plaintiff Exhibit No. 749 admitted.)

25   BY MR. MORTARA:

1    **Q.**  There are some handwritten edits in several areas of this

2    document.  I want to focus on why we're here.  If you go to

3    page 3, there's some highlighted language I'd like you to

4    take a look at surrounding the overall rating.  Let me know

5    when you're ready.

6    **A.**  Yes.  I'm ready.

7    **Q.**  In the first highlighting we see some changes in the

8    discussion of race, and it says, "However, readers should

9    have not be taking an applicant's race or ethnicity into

10   account in making any of the ratings other than the overall

11   rating, as discussed further below."

12           Do you see that?

13   **A.**  Yes.

14   **Q.**  That's a change, isn't it, an explicit written

15   instruction?

16   **A.**  Yes.

17   **Q.**  And the next highlighting says, "The consideration of

18   race or ethnicity may be considered only as one factor among

19   many."

20           Do you see that?

21   **A.**  Yes.

22   **Q.**  And it goes on and it says, "In addition, the

23   consideration of race or ethnicity should be in connection

24   with the application's discussion of the effect an

25   applicant's race or ethnicity has had on the applicant, not

1    simply the fact alone that an applicant has identified as a

2    member of a particular race or ethnicity."

3              Did I read that correctly?

4    **A.**   You did.  I see that here in this draft.

5    **Q.**   I want to now revisit a discussion we had the last time

6    you were here.

7              Remember we had a discussion about Harvard's use or

8    not use of religion in evaluating applicants?  Do you

9    remember that?

10   **A.**   I do.

11   **Q.**   And you said that while there's a box on the form on the

12   common application where someone can say "I am Roman

13   Catholic," Harvard doesn't look at that answer.

14             Do you remember that?

15   **A.**   I do.

16   **Q.**   But you did say Harvard would take into account religion

17   if an applicant mentioned that in their writing about

18   themselves in their essays, for example?

19   **A.**   That we might, yes.

20   **Q.**   And then you said that it wasn't a disadvantage to

21   Harvard to not be able to consider someone's self-proclaimed

22   religious identity unless they've written about it in one of

23   their essays, right?

24   **A.**   Would you mind repeating that?

25   **Q.**   You said you didn't consider it to be a disadvantage that

1    Harvard didn't get the information from the box on the common

2    application and they didn't consider -- you didn't consider

3    religion unless an applicant had written about it himself,

4    right?

5    **A.**   Yes.

6    **Q.**   That's exactly the instruction that's being given here in

7    the draft guidance we just read out.  "Consider race only if

8    the applicant discussed the effect of race or ethnicity on

9    the applicant and not when they just checked the box,"

10   correct?

11   **A.**   This is a draft.  That was an incorrect instruction.  It

12   does not reflect our practice.

13   **Q.**   This is what the instruction said, correct?

14   **A.**   That is what the instruction says in this draft, yes,

15   you're correct.

16   **Q.**   And please go to the personal rating.

17   **A.**   Yes.

18   **Q.**   And comparing this to the previous year's version, class

19   of 2022, would you characterize this as moderate or

20   significant changes?

21   **A.**   I would say moderate.

22   **Q.**   And there's including things like, "Think about what kind

23   of contribution would the person make to the dining hall

24   conversation."

25           That's new, isn't it?

Case: 19-2005   Document: 00117632240   Page: 360   Date Filed: 07/30/2020   Entry ID: 6356615
Case 1:14-cv-14176-ADB   Document 654   Filed 04/18/19   Page 142 of 261

142

1    **A.**  As a recommendation, it's new, yes.

2    **Q.**  And the last sentence says, "As noted above, though, an

3    applicant's race or ethnicity should not be considered in

4    assigning the personal rating."

5            Do you see that?

6    **A.**  Yes.

7    **Q.**  Now, this is the first time in any draft that you've seen

8    in chronological order that we have an express statement not

9    to use race in the personal rating; is that right?

10   **A.**  I think that's correct, yes.

11   **Q.**  And this would be the first time you've seen that written

12   down in your 30 years in the Harvard's admissions office,

13   correct?

14   **A.**  I can't say that I've never seen that sentence before

15   somewhere.

16   **Q.**  But as far as you can remember, this is the first time

17   you've seen an express written instruction not to use race in

18   the personal rating, correct?

19   **A.**  This is the first time I remember seeing it explicitly

20   written that way in the reading instructions.  Yes, that's

21   correct.

22   **Q.**  In any document?

23   **A.**  I can't say that honestly.

24   **Q.**  Do you remember any specific document saying it?

25   **A.**  No.

**Q.**  And this document is dated September 11, just about a
month before this trial, right?

**A.**  Yes.

**Q.**  Let's go forward to September 12, Plaintiff's 659.  Are
you there?

**A.**  Yes.

**Q.**  Plaintiff's 659 is an email from Ms. Mascolo to you, Dean
Fitzsimmons, and Ms. Gershengorn.  Subject line is "Reading
instructions."

        And then it says, "Hi, everyone.  Input from all
previous drafts is captured in this document.  The only new
line everyone should look at is on page 5 in red."

        And its attachment is Plaintiff's 660.  We would
offer them both.

        MR. LEE:  No objection, Your Honor.

        THE COURT:  They're admitted.

        MR. MORTARA:  Thank you, Your Honor.  Sorry.

        (Plaintiff Exhibit Nos. 659 and 660 admitted.)

BY MR. MORTARA:

**Q.**  You received this draft on September 12, 2018, correct?

**A.**  Yes.

**Q.**  Did you review it?

**A.**  I think I did not.

**Q.**  You did not review the draft?

**A.**  I may not have.  I was delegating until we had something

 1    final.  I don't remember whether I did.  I think I may not

 2    have.

 3    Q.  Let's go look at the change that Ms. Mascolo was talking

 4    about, over on page 5.  First let's go to page 3.  Sorry.

 5         Let's just confirm the language we talked about

 6    from the September 11 draft is still there.  "Don't take race

 7    into account in any of the ratings other than the overall

 8    rating, and only consider race when someone mentions it on

 9    their application, not just because they self-identify."

10         Those two instructions we saw in the September 11

11    draft are still in there?

12    A.  In this draft they are still here, yes.

13    Q.  Now going to the red text Ms. Mascolo asked everyone to

14    read.

15         It says, and it's added to the previous version,

16    "It is important to keep in mind that characteristics not

17    always synonymous with extroversion are similarly valued.

18    Applicants who seem to be particularly reflective,

19    insightful, and/or dedicated should receive higher personal

20    ratings as well."

21         Do you see that?

22    A.  I do.

23    Q.  What's your definition of "extroverted"?

24    A.  I don't think I have a ready definition.  I think it's a

25    person who is -- there are lots of adjectives that you could

1    use in connection:  vivacious, outgoing.  Different people

2    would -- you asked me for mine.  Those are two.

3    **Q.**  Do you agree with me that some racial stereotypes that

4    are deployed against Asian-Americans is that they're quiet,

5    withdrawn, or one-dimensional?

6    **A.**  I think that's true, yes.

7    **Q.**  Do you think extroverted and quiet are the same thing or

8    perhaps more on opposite sides?

9    **A.**  I don't think they're the same thing, they're not exactly

10   opposites, but they're very different.

11   **Q.**  You're also using the word "reflective" here in

12   contradistinction to "extroverted."

13           Do you think "reflective" has a meaning closer to

14   "quiet" or "introverted"?

15   **A.**  I would not find it in contrast to extroversion.  It can

16   accompany an outgoing personality.  I think it's a different

17   aspect of personality, myself, my opinion.

18   **Q.**  Director McGrath, could a reasonable person looking at

19   this come to the view that this language was designed to make

20   sure that your admissions officers did not fall prey to

21   implicit bias or racial stereotyping about Asians?

22   **A.**  It's the kind of thing we always try to remind our staff

23   about when they're considering applications or people.  I

24   guess the most important thing I see about it is that it

25   captures a longstanding practice that was not included in

1    these terms in the reading instructions before this.

2    Q.  And it's in red here, the language Ms. Mascolo asked you

3    to look at, right?

4    A.  Yes.  Because it was an addition.

5    Q.  And my question, and I'll ask it again:  Could a

6    reasonable person looking at this believe that this

7    instruction was designed to help ensure that your admissions

8    officers did not fall prey to implicit bias or racial

9    stereotyping against Asians?

10            MR. LEE:  Objection, Your Honor.

11   A.  That would be a reasonable --

12            THE COURT:  Sustained.

13   BY MR. MORTARA:

14            MR. MORTARA:  I'll ask again in a different way.

15   BY MR. MORTARA:

16   Q.  Director McGrath, is it your view that this instruction

17   is designed to make sure that your admissions officers do not

18   fall prey to implicit bias or racial stereotyping about

19   Asians, in part?

20   A.  It would have that effect, and that would be desirable.

21   I don't think it's a new idea.  As I say, it memorializes a

22   long tradition of our office to work very hard to get beyond

23   stereotypes.

24   Q.  But this is the first time this kind of instruction has

25   ever appeared in writing anywhere, correct?

1   **A.**  I can't say ever anywhere, but it's the first time in

2   those words it appeared, to my knowledge, in the reading

3   instructions.

4   **Q.**  Just to be clear, to your knowledge, this is the first

5   time there's ever been any written guidance that's in red

6   here in the admissions office.  You can't remember any other

7   time?

8            MR. LEE:  I object.  Asked and answered.

9            THE COURT:  He can have the question.  It has been

10   asked and answered, but --

11   **A.**  I would add that you may have seen in previous exhibits

12   part of what we call the packet for new members of the staff,

13   the training packet.

14            One text that we use for discussion is an essay

15   written by a Professor Helen Vendler on the subject of

16   student's interests and the range of personalities that may

17   do well at Harvard.  It includes a number of these ideas and

18   is not unfamiliar to our committee.  I can't tell you --

19   because I don't think they she used exactly these words, but

20   it's not a new idea.

21   BY MR. MORTARA:

22   **Q.**  You subsequently thanked Ms. Mascolo for this draft,

23   correct?

24   **A.**  I did.

25   **Q.**  And that's Plaintiff's Exhibit 741, an email, September

Case: 19-2005   Document: 00117632240   Page: 366   Date Filed: 07/30/2020   Entry ID: 6356615
Case 1:14-cv-14176-ADB   Document 654   Filed 04/18/19   Page 148 of 261

148

1    2, from you to Ms. Mascolo, Dean Fitzsimmons, and

2    Ms. Gershengorn.

3                MR. MORTARA:  We'd offer Plaintiff's 741.

4                MR. LEE:  No objection.

5                THE COURT:  Admitted.

6                (Plaintiff Exhibit No. 741 admitted.)

7    BY MR. MORTARA:

8    **Q.**  You sent this from your iPhone, correct?  You said "Thank

9    you"?

10   **A.**  Yes.

11   **Q.**  But you're not sure you reviewed the draft she sent or

12   the language in red; is that right?

13   **A.**  That's right.

14   **Q.**  Let's move forward to Plaintiff's 720 and 721.

15   **A.**  Yes.

16   **Q.**  Plaintiff's 720 is an email from Ms. Mascolo to an email

17   list, admfao_officers-list@lists.fas.harvard.edu.  Subject,

18   "Reading instructions."

19          Do you see that?

20   **A.**  I do.

21   **Q.**  Sent on September 19.  Who is on that email list?

22   **A.**  Admissions and financial aid officers.

23   **Q.**  Does it include you?

24   **A.**  It does.

25   **Q.**  Does it include Dean Fitzsimmons?

1    **A.**   It does.

2    **Q.**   Does it include Ms. Gershengorn?

3    **A.**   I don't think so.  That list does not.

4           MR. MORTARA:  We offer Plaintiff's Exhibit 720 and

5    its attachment, 721.

6           MR. LEE:  No objection.

7           THE COURT:  Admitted.

8           (Plaintiff Exhibit Nos. 720 and 721 admitted.)

9    BY MR. MORTARA:

10   **Q.**   The email says, "Hi, everyone.  Attached please find the

11   updated reading instructions for the year.  The middle of the

12   document is taken directly from the Ivy League annual memo

13   which will not come out for another week or so, so you can

14   skip pages 8 to 14."

15          After the parenthetical it says, "That said, please

16   make sure you read the rest of the document thoroughly as

17   there are several updates/additions.  Many thanks to all of

18   you who helped in the editing process."

19          Do you see that?

20   **A.**   Yes.

21   **Q.**   And Ms. Mascolo has bolded thoroughly, correct?

22   **A.**   Yes.

23   **Q.**   Did you read the document when it was sent on

24   September 19?

25   **A.**   I think I did not.

Case: 19-2005    Document: 00117638240    Page: 368    Date Filed: 07/30/2026    Entry ID: 6356615
Case 1:14-cv-14176-ADB   Document 654   Filed 04/18/19   Page 150 of 261

150

1    **Q.** Let's take a look at the attachment.  Again starting with

2    the overall rating section that we've been through before, I

3    just want to point out to you on page 3 it has the same

4    language we've been through before.

5              Don't use race in the ratings other than the

6    overall rating and don't use race unless the applicant brings

7    it up on his application in discussing it.  Don't use race

8    just when the applicant self-identifies as a member of a

9    particular race or ethnicity.

10             Those are the instructions before and they're still

11   here in the September 19 version, correct?

12   **A.** Yes.  In this draft, they are still here.

13   **Q.** Just to be clear, Charlene Kim would have gotten this

14   email?

15   **A.** Yes.

16   **Q.** Erica Bever would have gotten this email?

17   **A.** Yes.

18   **Q.** Chris Looby would have gotten this email?

19   **A.** Yes.

20   **Q.** Roger Banks would have gotten this email?

21   **A.** Yes.

22   **Q.** Moving forward to the personal rating, this version also

23   has the language that was in red on the draft, correct?

24   **A.** Yes.

25   **Q.** The red language which in the previous draft said, "It is

Case: 19-2005    Document: 00117682240    Page: 369    Date Filed: 07/30/2020    Entry ID: 6356615
Case 1:14-cv-14176-ADB    Document 654    Filed 04/18/19    Page 151 of 261

151

1    important to keep in mind the characteristics not always

2    synonymous with extroversion are similarly valued.

3    Applicants who seem to be particularly reflective,

4    insightful, and/or dedicated should receive higher personal

5    ratings as well."

6    **A.**  Yes.

7    **Q.**  After the guidance was distributed on September 19, they

8    were released again on October 5 with a change, correct?

9    **A.**  Yes.

10   **Q.**  That's Plaintiff's 722.

11   **A.**  Yes.

12   **Q.**  Again an email from Ms. Mascolo to this list.  Same list

13   as before, correct?

14   **A.**  Yes.  Same list.

15   **Q.**  Dated October 5, 2018, 7:00 p.m.?

16         MR. MORTARA:  We offer Plaintiff's 722 and its

17   attachment, Plaintiff's 723.

18         MR. LEE:  No objection.

19         THE COURT:  Admitted.

20         (Plaintiff Exhibit Nos. 722 and 723 admitted.)

21   BY MR. MORTARA:

22   **Q.**  The text from Ms. Mascolo says, "Attached.  Please use

23   this version and disregard all previous versions," right?

24   **A.**  Yes.

25   **Q.**  This version was operative when you testified, talked to

1    me and we asked those questions that we went over at the

2    beginning, correct?

3    **A.**  It was operative for our current work, yes, that's

4    correct.

5    **Q.**  Let's talk about the big change that was made or a change

6    that was made, again in the overall section.

7         It says still "Readers should not take an

8    applicant's race or ethnicity into account in making any of

9    the ratings other than the overall rating."

10        But down below the instruction to only consider

11   race when an applicant brings it up as opposed to

12   self-identifying has disappeared, correct?

13   **A.**  That's correct.

14   **Q.**  And I've now got the earlier version on the top of the

15   screen with the restriction that we talked about.

16        Do you see that?

17   **A.**  I do.

18   **Q.**  And that restriction is a restriction to only consider

19   race when an applicant brings it up and talks about it and

20   not just when the applicant checks the box, correct?

21   **A.**  That was incorrect advice, and that's correct.

22   **Q.**  It's correct that the restriction was there on

23   September 19, September 12, and September 11, correct?

24   **A.**  Yes.

25   **Q.**  And the restriction is gone from the reading guidance

1    issued on October 5, correct?

2    **A.**  Yes.

3    **Q.**  Where did the idea come from to eliminate the restriction

4    we saw earlier?  Who suggested it?

5    **A.**  I don't know where the idea came from in the first place,

6    that proposal, which is now gone.

7            I have always regarded it as improper advice, not

8    reflecting our practice.  And I don't know at what point in

9    the process, we know the dates that it was between, it was

10   caught and eliminated.

11   **Q.**  Who suggested its elimination?

12   **A.**  I don't know.

13   **Q.**  Is it possible that the person who suggested its

14   elimination was a lawyer?

15           MR. LEE:  Your Honor, I object.  It's possible I'll

16   believe 7 foot 2 tomorrow, and it's not relevant.

17           THE COURT:  It is?

18           MR. LEE:  I won't be.

19           THE COURT:  The objection is sustained.  You can

20   withdraw the question.  In any event, she's not going to

21   answer it.

22   BY MR. MORTARA:

23   **Q.**  How did you find out that this language had been removed?

24   Who told you?

25   **A.**  I think I found out when I took up the looking at this

1   text and I noticed that it was gone, which is what was

2   appropriate.  I don't remember exactly.

3   **Q.**  So, Director McGrath, you just testified that you looked

4   at the text and noticed the restriction was gone.  That means

5   at some point you had noticed the restriction, correct?

6   **A.**  Yes.  I noticed the restriction at some point, but it may

7   not been very long before October because I actually don't

8   remember when.

9   **Q.**  Did you write anybody an email saying the restriction was

10  wrong?

11  **A.**  I don't think so.

12  **Q.**  Did you tell anybody the restriction was wrong?

13  **A.**  I don't remember because I don't remember what group

14  conversations I was in.

15  **Q.**  At some point you did read the restriction.  And as far

16  as you can remember, you didn't write anybody or tell anybody

17  you thought it was wrong, correct?

18  **A.**  I don't remember whether I did.  I think I may not have.

19  We had a system for reviewing this, and when it reached the

20  final stage, which I did see, I saw that it seemed to be

21  correct.

22  **Q.**  And then let's go back to P723.  Sorry.  If you go to

23  page 5 under the personal rating, it still has the red text,

24  correct, the October 5 version, It is important to keep in

25  mind that characteristics that are not always synonymous with

1    extroversion are similarly valid and so forth.  The red text

2    that's there in the October 5 version, correct?

3    **A.**  Let me just check where I am.  Yes.

4    **Q.**  I'm showing you now at the top of the screen the

5    October 5 version, and then on the bottom of the screen the

6    September 12 draft with the red text, just to confirm that.

7    **A.**  Yes.

8    **Q.**  Do you remember our discussion of the Office of Civil

9    Rights review from a few weeks ago?

10    **A.**  Yes.

11    **Q.**  You told me that after OCR came out with its findings --

12    withdrawn.

13          Do you remember our discussion of OCR's findings

14    that some of your readers were using race in assigning of the

15    profile ratings?  Do you remember that?

16    **A.**  Yes.

17    **Q.**  And do you remember that OCR said that your readers were

18    using race in different ways, including some using race in

19    the profile ratings?

20          Do you remember that?

21    **A.**  Yes.

22    **Q.**  And you said to me at the time you did not support

23    written guidance on this subject.  Do you remember that?

24    **A.**  That's right, yes.  I did say that.

25    **Q.**  In fact, you told me that you did not think even on

Case: 19-2005    Document: 00117638240    Page: 374    Date Filed: 07/30/2026    Entry ID: 6356615
Case 1:14-cv-14176-ADB    Document 654    Filed 04/18/19    Page 156 of 261

156

 1  October 19, 2018, that the right remedy for inconsistent use
 2  of race was more written guidance.  That's what you told me?
 3  **A.**  Yes.
 4  **Q.**  I want to just make this clear.
 5           The OCR report came out in 1990, correct?
 6  **A.**  Yes.
 7  **Q.**  We looked at the reading guidance for the class of 2022,
 8  which is 32 years later -- no, 28 years later because 2022
 9  was selected this year, right?
10  **A.**  Right.
11  **Q.**  So 28 years later and there still wasn't any instruction
12  on how to use race.  OCR found there wasn't any written
13  instruction on how to use race, right?
14  **A.**  Right.
15  **Q.**  And here we are 28 years later and there still isn't any
16  written instruction in 2022 on how to use race, correct?
17  **A.**  Correct.
18  **Q.**  So we have 28 years in the admissions office having no
19  writing anywhere on how to use race in the reading guidance,
20  and then a few weeks ago it gets added for the first time,
21  correct?
22  **A.**  Yes.  We make changes every year, some large, some small
23  in our reading instructions.
24  **Q.**  My question is do you think it's a pretty big change to
25  depart from 28 years of no written guidance on a subject and

1   then all of a sudden do it?

2   **A.**  It memorializes our normal practice which has been pretty

3   much the same all of these years.  And to add it seemed to

4   members of my staff helpful.

5   **Q.**  Let's return to the discussion of the red text from the

6   draft from September 11 -- September 12.  Excuse me.  I want

7   to refer you to Plaintiff's Exhibit 656.  Going a little bit

8   back in time.

9   **A.**  Yes.  I'm there.

10   **Q.**  And Plaintiff's Exhibit 656 is an email from you to

11   Ms. Mascolo and Dean Fitzsimmons, dated August 13.

12        Do you see that?

13   **A.**  Yes.

14        MR. MORTARA:  We offer Plaintiff's 656.

15        MR. LEE:  No objection.

16        THE COURT:  Admitted.

17        (Plaintiff Exhibit No. 656 admitted.)

18   BY MR. MORTARA:

19   **Q.**  And down below is another email from you to Ms. Mascolo

20   and Dean Fitzsimmons.  And then further below there's a lot

21   of redactions.  So let's start with the August 13, 2018,

22   email from Ms. Mascolo.  That's the one we saw before.

23        "Just FYI, there may be more updates to the reading

24   instructions", right?  Do you remember that one?

25   **A.**  Yes.

1    **Q.**  Then you respond, "P.S. to my previous.  There may be

2    some helpful text in the handbooks for IVers/chairs.  Back

3    when Kevin Bolan did a thorough re-do, we tried to provide a

4    broad context for the PQ stuff.  Let me know if I can help.

5    Thanks, M."

6              Do you see that?

7    **A.**  Yes.

8    **Q.**  Did Ms. Mascolo ask for your help?

9    **A.**  Yes.

10   **Q.**  And she responds, "This is great.  We'll take a look."

11             And you just said, "I'm just hoping it's helpful,"

12   right?

13   **A.**  Yes.

14   **Q.**  And that refers to the alumni interviewer handbook.  I

15   think you looked at that with Mr. Lee the last time you were

16   here, right?

17   **A.**  Yes.

18   **Q.**  And you're suggesting that Ms. Mascolo look at the

19   interviewer handbook for guidance on what personal qualities

20   Harvard is looking for in applicants, correct?

21   **A.**  Yes.

22   **Q.**  Please turn to Defendant's Exhibit 5.

23   **A.**  Yes.

24   **Q.**  When you were here before, you explained that you used

25   the interviewer handbook in the training material for your

1    regular new staff when they arrived, correct?

2    **A.**  Yes.

3    **Q.**  And you told us that this includes factors that might be

4    used as tips in the admissions process, correct?

5    **A.**  Yes.

6    **Q.**  If you turn to the document page 10, there's some of

7    those categories here, students that might receive tips.

8         Do you see that?

9    **A.**  Yes.

10   **Q.**  And one of them is "unusually appealing personal

11   qualities."  Do you see that?

12   **A.**  Yes.

13   **Q.**  You discussed this section with Mr. Lee, remember?

14   **A.**  Yes.

15   **Q.**  And you see the mention here of "effervescence."  That's

16   a character trait usually considered to be synonymous with

17   "extroversion," isn't it?

18   **A.**  Yes.

19   **Q.**  There's no mention of reflective or insightful or

20   introversion, is there?

21   **A.**  Not in here at this place, no.

22   **Q.**  Dr. McGrath, we've looked at changes implemented in the

23   reading guidance over the summer with the particular focus on

24   the overall and personal ratings.

25         Do you agree that the idea to make changes to the

Case: 19-2005    Document: 00117628246    Page: 378    Date Filed: 07/30/2020    Entry ID: 6356615
Case 1:14-cv-14176-ADB   Document 654   Filed 04/18/19   Page 160 of 261

160

1    personal rating wasn't in the first draft distributed but

2    came sometime between mid July and mid August?

3    **A.**  Yes, that's when it was produced, this recommendation.

4    **Q.**  To the best of your knowledge, what was the most

5    important news event going on over the summer for the Harvard

6    admissions office?

7    **A.**  With respect to the preparation of this document, I would

8    say that it has to do with the retreat where everybody wanted

9    to have a go at giving people better training and advice.  I

10   think that was the event that kicked this off.

11   **Q.**  I think you might have misheard me or I misspoke.

12              For people working in the Harvard admissions

13   office, what was the most important national news going on

14   about how they did their jobs over the summer?

15              MR. LEE:  I object.  I don't know -- for 40 people?

16              THE COURT:  Right.  You can rephrase the question.

17   BY MR. MORTARA:

18   **Q.**  For you, what was the most important thing going on in

19   the national media as it pertained to your job as director of

20   admissions at Harvard?

21   **A.**  At what point?

22   **Q.**  Over the summer.

23   **A.**  I was in Montana.  The newspapers are terrible.

24   **Q.**  Mr. Hughes is from Montana.

25   **A.**  I learned that the other day and I wanted to take that up

1    with him.

2    Q.  Did you read the newspapers over the summer?

3    A.  I look at newspapers over the summer, but I wasn't really

4    following.

5    Q.  Did you read the news reports about this case over the

6    summer?

7    A.  Not much over the summer.  I don't remember reading any

8    over the summer.  There may have been some, but I don't think

9    I read them.

10   Q.  Are you aware that a lot of information about Harvard's

11   admissions process became public with filings over the

12   summer?

13   A.  I am.

14        MR. LEE:  Your Honor, I object.  This is a limited

15   recall to go to these events on the reading procedures.  Now

16   we're well beyond that.

17        THE COURT:  I know the question sounds broad, but I

18   think he's trying to figure out, and I think it's legitimate

19   to ask her whether these changes were a reaction to this

20   case.

21   BY MR. MORTARA:

22   Q.  I'm just asking if you were aware that there was a lot of

23   national media coverage about details of Harvard's admissions

24   process that became public because of this case.

25   A.  Yes, I'm aware of that.

Case: 19-2005    Document: 00117632248    Page: 380    Date Filed: 07/30/2020    Entry ID: 6356615
Case 1:14-cv-14176-ADB    Document 654    Filed 04/18/19    Page 162 of 261

162

1    **Q.** Did you know that the expert reports from this case

2    became public over the summer?

3    **A.** I wouldn't remember when they became public.

4    **Q.** Did you learn over the summer that both experts had found

5    a gap between Asians and whites on the personal rating at --

6            MR. LEE:  Your Honor, I object.

7            THE COURT:  Sustained.

8    BY MR. MORTARA:

9    **Q.** Director McGrath, I only have a few more questions.

10           Has the admissions office or anyone in the

11   admissions office conducted or received bias training?

12           MR. LEE:  Your Honor, I object.  This is a limited

13   recall.  There was a discovery period that went through

14   August of 2014.  This is well beyond the scope of the recall.

15           MR. MORTARA:  If I may respond?  Or if it's going

16   to be overruled, then I don't need to respond.

17           THE COURT:  You can ask if there's been any other

18   changes between 2014 and now on this topic.

19           MR. MORTARA:  That's kind of what I'm getting at.

20   We had a problem last time where my questions were being

21   interpreted in a timeframe that --

22           MR. LEE:  Your Honor --

23           MR. MORTARA:  Your Honor, this is exactly what

24   happened last time.  I want to find out what's happened.

25           THE COURT:  Do you guys want to discuss this at

1    sidebar?

2            MR. LEE:  I just don't want to say anything in

3    front of the witness.  I'm happy to have him ask another

4    question.

5            MR. MORTARA:  I want to ask the question I asked.

6            MR. LEE:  I'll object.

7            MR. MORTARA:  I can ask it from 2014 forward.

8            THE COURT:  Let me see the exact wording of the

9    question.  Hold on.

10           MR. MORTARA:  Maybe we should sidebar this, if you

11   don't mind.

12           THE COURT:  Let me just look at the last question.

13   If you rephrase the question with the time period, that will

14   be fine.

15   BY MR. MORTARA:

16   Q.  Okay.  Director McGrath, has the admissions office or

17   anyone in the admissions office conducted or taken bias

18   training in the last year?

19           MR. LEE:  I object.

20           MR. MORTARA:  Could we have a sidebar, Your Honor?

21           THE COURT:  Are you objecting because it's beyond

22   the scope of her knowledge?

23           MR. LEE:  No.

24           THE COURT:  Then come to sidebar.

25           [Sidebar sealed and redacted.]

Case: 19-2005    Document: 00117632240    Page: 382    Date Filed: 07/30/2020    Entry ID: 6356615
Case 1:14-cv-14176-ADB    Document 654    Filed 04/18/19    Page 164 of 261

164

 1           MR. MORTARA:  Your Honor, may I proceed?

 2           THE COURT:  You may.

 3   BY MR. MORTARA:

 4   **Q.**  Director McGrath, has there been official admissions

 5   office implicit bias training?

 6   **A.**  Not formally.

 7   **Q.**  Has there been informal admissions office implicit bias

 8   training?

 9   **A.**  Yes.

10   **Q.**  When did that happen for the first time?

11   **A.**  I can't tell you for the first time.  When I took this

12   job 30-something years ago, there was already much discussion

13   about the importance of not stereotyping candidates.  I think

14   we didn't have the language "implicit bias" in those days.

15   We certainly had the language for bias.  That's been, in my

16   whole experience, a subject of training and a subject of

17   staff discussion.

18           In addition, we have more recently, though we

19   haven't had formal instruction or seminars, we have sent

20   around as part of our continuing education program to staff

21   an article or two on this subject.  Professor Banaji in our

22   own faculty has written a good deal.  We have sent at least a

23   news article around about that.

24   **Q.**  About implicit bias?

25   **A.**  She works on that, yes.

Case: 19-2005    Document: 00117632240    Page: 383    Date Filed: 07/30/2020    Entry ID: 6356615
Case 1:14-cv-14176-ADB    Document 654    Filed 04/18/19    Page 165 of 261

165

1    **Q.** And when were these documents and articles sent around to

2    the admissions office on implicit bias?

3    **A.** Sometime within the past ten years. Not very recently, I

4    think.

5            MR. MORTARA: Thank you, Your Honor. I have no

6    more questions.

7            MR. LEE: Your Honor, could we have the flip chart?

8            THE COURT: Yes. That's fine.

9            MR. LEE: Your Honor, may I proceed?

10           THE COURT: You may.

11                              EXAMINATION

12   BY MR. LEE:

13   **Q.** Director McGrath, good afternoon.

14   **A.** Good afternoon.

15   **Q.** Let me ask you a few questions and see if we can fill in

16   the blanks on some things that Mr. Mortara did not ask you

17   about.

18           Was there a specific period of time for which

19   Harvard had to produce documents in this case?

20   **A.** Yes.

21   **Q.** What was that period of time, as far as you know?

22   **A.** Well, 2012 to 2014. But for the classes of 2014 to 2019

23   were the --

24   **Q.** Let's take both parts.

25           So the documents that were produced in this case

1    went from the period 2012 to the period 2014; is that right?

2    **A.**  Yes.

3    **Q.**  And the classes were the classes of what?

4    **A.**  2014 to 2019.

5    **Q.**  And for the class of 2019, when would the information

6    have been generated that would apply to that class?

7    **A.**  In the summer or the fall of 2015.

8    **Q.**  So the parties agreed that the relevant body of

9    information was six classes, 2014 to 2019, correct?

10   **A.**  Yes.

11   **Q.**  And the parties agreed that the relevant documents were

12   for the period 2012 to 2014, correct?

13   **A.**  Yes.

14   **Q.**  Now, Mr. Mortara has spent the afternoon asking you about

15   documents from 2018, correct?

16   **A.**  Yes.

17   **Q.**  Four years later, correct?

18   **A.**  Yes.

19   **Q.**  Now, during your direct testimony a couple of weeks

20   ago --

21            Do you remember that?

22   **A.**  I do.

23   **Q.**  -- 29 exhibits were admitted during your testimony.  Do

24   you recall that?

25   **A.**  Yes.

Case: 19-2005    Document: 00117632248    Page: 385    Date Filed: 07/30/2020    Entry ID: 6356615
Case 1:14-cv-14176-ADB   Document 654   Filed 04/18/19   Page 167 of 261

167

 1   **Q.**  It's true, is it not, that every single one of those

 2   exhibits was dated in the period 2012 to 2014, correct?

 3   **A.**  Yes, I think so.

 4   **Q.**  Now, as you told us, the discovery or the information

 5   provided by the parties to each other ended with the class of

 6   2019, correct?

 7            MR. MORTARA:  Your Honor, this has been leading

 8   from the start.

 9            THE COURT:  I think he's just orienting her to the

10   next question.  Then you can watch the leading for me,

11   please.

12            MR. LEE:  Sure.

13   BY MR. LEE:

14   **Q.**  Is that right?

15   **A.**  Yes.

16   **Q.**  Did the Harvard admissions office go out of business

17   after the class of 2019?

18   **A.**  No.

19   **Q.**  How many classes have you admitted since that period of

20   time?

21   **A.**  Three.  Three classes.

22   **Q.**  And the class of 2023 would be the fourth, correct?

23   **A.**  That be would the fourth.

24   **Q.**  So let's talk about the reading procedures that

25   Mr. Mortara asked you about.  Would you remind us what are

168

1    the reading procedures?

2    **A.**   They are a guide to the coding used in the database and

3    on the materials in the folders, and they offer some

4    suggestions about reading and evaluating folders.

5    **Q.**   Do the admissions office officers receive guidance in

6    addition to the reading procedures?

7    **A.**   Yes.

8    **Q.**   And we discussed that the last time you were here,

9    correct?

10   **A.**   Yes, we did.

11   **Q.**   Now, how often does the admissions office update the

12   reading procedures?

13   **A.**   Annually.

14   **Q.**   Every year?

15   **A.**   Every year.

16   **Q.**   So Mr. Mortara asked you about one for the class of 2019

17   and then skipped ahead to the class of 2022.  Do you recall

18   that?

19   **A.**   Yes.

20   **Q.**   Were there revisions to the reading procedures in the

21   intervening period?

22   **A.**   Yes.  In each year.

23   **Q.**   In every year?

24   **A.**   Yes.

25   **Q.**   So let's take a look at some of those revisions after the

1    period of discovery in this case.  Turn, if you would, to

2    Tab 5 in your notebook.

3    **A.**  I have that.

4    **Q.**  Do you see DX743?

5    **A.**  Yes.

6    **Q.**  What are these?

7    **A.**  This is the reading procedures for the class of 2020.

8                MR. LEE:  Your Honor, we offer DX743.

9                MR. MORTARA:  No objection.

10               THE COURT:  Admitted.

11               (Defendant Exhibit No. DX743 admitted.)

12    BY MR. LEE:

13    **Q.**  Now, Mr. Mortara didn't show you these reading

14    procedures, did he?

15    **A.**  No.

16    **Q.**  Let's turn, if you would, to Tab 4 in your notebook.

17    **A.**  I that.

18    **Q.**  Do you see DX742?

19    **A.**  Yes.

20    **Q.**  What are they?

21    **A.**  Reading procedures for the class of 2021.

22               MR. LEE:  Your Honor, we offer DX742.

23               MR. MORTARA:  No objection.

24               THE COURT:  Admitted.

25               (Defendant Exhibit No. DX742 admitted.)

**JA3311**

1    BY MR. LEE:

2    Q.   Now again, Mr. Mortara didn't show you the reading

3    procedures for the class of 2021, correct?

4    A.   Correct.

5    Q.   To be clear, they're after the discovery period in this

6    case, correct?

7    A.   Yes.

8    Q.   Now, did the admissions office make changes to the

9    reading procedures between the class of 2020 and the class of

10   2021?

11   A.   Yes.

12   Q.   Have you helped us prepare a redline that would

13   demonstrate the changes that were made from the class of 2020

14   to the class of 2021?

15   A.   I'm sorry.  What was the beginning of that question?

16   Q.   Have you helped us prepare a demonstrative redline to

17   show the changes between those two sets of reading

18   procedures?

19   A.   Yes.

20   Q.   Turn, if you would, to Tab 7 in your notebook.

21   A.   Yes.

22   Q.   Do you find DD 12?

23   A.   Yes.

24   Q.   What is it?

25   A.   This is reading procedures for the class of 2021 based

 1    on -- original text is the reading procedures for the class

 2    of 2020, and this includes the proposed changes for the next

 3    set, the class of 2021.  You can see both versions here, two

 4    colors.

 5    **Q.**   There are a host of changes, but I want to explore a few

 6    so we can fill in the period of time that was not addressed

 7    by Mr. Mortara.

 8            Turn, if you would to page 3.

 9    **A.**   Yes.

10    **Q.**   And I'll put it on the screen.  It's DD 12.3 in the

11    bottom right-hand corner.  Do you see that?

12    **A.**   Yes.

13    **Q.**   Do you see the section "Coding Guidelines For Summary

14    Sheets"?

15    **A.**   Yes.

16    **Q.**   Were changes made in the coding guidelines for the

17    summary sheets between these two classes?

18    **A.**   Yes.

19    **Q.**   Turn to page 4, 12.4 in the bottom right-hand corner.

20    **A.**   Yes.

21    **Q.**   Do you see the section "Academic"?

22    **A.**   Yes.

23    **Q.**   And do you see the redlines or track changes indicating

24    changes?

25    **A.**   Yes.

Case: 19-2005  Document: 00117632240  Page: 390  Date Filed: 07/30/2020  Entry ID: 6356615
Case 1:14-cv-14176-ADB  Document 654  Filed 04/18/19  Page 172 of 261

172

 1   **Q.**  Were changes made to the procedures for coding the
 2   academic rating between class of 2020 and class of 2021?
 3   **A.**  Yes.
 4   **Q.**  Were changes also made to the coding of the
 5   extracurricular rating, if I just move a little bit further
 6   down the page?
 7   **A.**  Yes.
 8   **Q.**  If I turn you to the next page, were changes made to the
 9   procedures for coding the athletic rating between the classes
10   of 2020 and 2021?
11   **A.**  Yes.
12   **Q.**  And if I take you done a little further, were changes
13   made to the procedures for ending coding for personal rating
14   between the classes of 2020 and 2021?
15   **A.**  Yes.
16   **Q.**  Now, were there other changes made to the reading
17   procedures as well between the class of 2020 and 2021?
18   **A.**  Yes.
19   **Q.**  You told us that changes are made on an annual basis?
20   **A.**  Yes.
21   **Q.**  If we just look at these changes that are indicated here,
22   for each of the different ratings and for other subjects, was
23   the magnitude of these changes unusual in your year-to-year
24   revisions?
25   **A.**  No.  We make a lot of changes every year.

1    **Q.**   Turn, if you would, to Tab 6.

2    **A.**   Yes.

3    **Q.**   Mr. Mortara discussed Tab 6 with you?

4    **A.**   Yes.

5    **Q.**   And what are these?

6    **A.**   Reading procedures for the class of 2022.

7    **Q.**   Now, so we're clear on the timing, when will the

8    admissions office begin reading files for the class of 2023?

9    **A.**   We have begun already.

10   **Q.**   And it's this fall?

11   **A.**   Yes.

12   **Q.**   Who was responsible for updating the reading procedures

13   for the class of 2023?

14   **A.**   My colleague Christine Mascolo.

15   **Q.**   Who is Ms. Mascolo?

16   **A.**   She is associate director of admissions, and she

17   oversees, among other things, the training program for new

18   staff.

19   **Q.**   Now, you mentioned a retreat in June.  Do you recall

20   that?

21   **A.**   I do.

22   **Q.**   Would you tell Her Honor what the retreat was about?

23   **A.**   The retreat had a number of topics.  It was about all

24   kinds of different things.  Procedures about interviewing,

25   alumni relations, how to think about academic assessments.

Case: 19-2005    Document: 00117632246    Page: 392    Date Filed: 07/30/2020    Entry ID: 6356615
Case 1:14-cv-14176-ADB   Document 654   Filed 04/18/19   Page 174 of 261

174

1    And in the back of many people's minds was translating some

2    of the discussion in various categories in a more explicit

3    way into the reading instructions.

4    **Q.**  Was the retreat caused by or the result of the fact that

5    SFFA sued us, sued Harvard?

6    **A.**  No.  We do retreats every year, have for a number of

7    years.

8    **Q.**  Right.  Was SFFA's lawsuit or any publicity about it the

9    reason there was a retreat?

10   **A.**  No.

11   **Q.**  Was anyone other than Ms. Mascolo involved in updating

12   the reading procedures for the class of 2023?

13   **A.**  She was the manager of the document, but a number of our

14   staff helped her with some of the proposed language.  We've

15   had some discussion about that today.

16   **Q.**  Now, turn, if you would, to Tab 1.  Do you have it before

17   you?

18   **A.**  I do.

19          MR. LEE:  And actually before we get to Tab 1, let

20   me ask Mr. Lee to bring up P720.

21   **Q.**  Do you recall Mr. Mortara discussing this with you?

22   **A.**  Yes.

23   **Q.**  And it has a date of September 19, 2018?

24   **A.**  Yes.

25   **Q.**  Do you see under "Attachments" it says, Reading

1    procedures 2018.19 draft, and then it goes on, correct?

2    **A.**  Yes.

3    **Q.**  Now, were these the final -- was this the final version

4    of the reading procedures for the class of 2023?

5    **A.**  No.

6    **Q.**  Now let's turn to Tab 1.  Do you find P633?

7    **A.**  Yes.

8    **Q.**  What is P633?

9    **A.**  I believe this is the final official text.

10   **Q.**  The final version of the reading procedures for the class

11   of 2023?

12   **A.**  I think so, yes.

13   **Q.**  When were they distributed to the admissions office?

14   **A.**  I think they were distributed to everybody on October 5.

15   **Q.**  About a week before this trial started?

16   **A.**  Yes.

17   **Q.**  Now turn, if you would, to the page that says

18   HARV 0097938.

19          Do you see the section that says "Overall"?

20   **A.**  Yes.

21   **Q.**  Let me draw your attention to the last paragraph of that

22   section.  Could you read those two sentences to us, please.

23   **A.**  "In assigning the overall rating, readers may consider

24   whether a student's background, including his or her race or

25   ethnicity, may contribute to the educational benefits of

**JA3317**

 1   diversity at Harvard College.  The consideration of race or

 2   ethnicity may be considered only as one factor among many."

 3   **Q.**  Is that paragraph consistent with how the Harvard

 4   admissions office has considered race in the admissions

 5   process?

 6   **A.**  Yes.

 7   **Q.**  For how long a period of time?

 8   **A.**  For many years, certainly throughout my tenure.

 9   **Q.**  And is it consistent with the description you provided to

10   Her Honor when you have testified a couple of weeks ago?

11   **A.**  Yes.

12   **Q.**  Turn, if you would, to page HARV 0097940.

13        Do you see the section titled "Personal"?

14   **A.**  Yes.

15   **Q.**  Were there updates to this section of the reading

16   procedures for the class of 2023?

17   **A.**  Yes.

18   **Q.**  Were there updates to other sections for the other

19   profile ratings also?

20   **A.**  Yes.

21   **Q.**  Let me direct your attention to the sentence at the end

22   of the first paragraph under personal.  It begins, "It is

23   important."

24        Do you see it?

25   **A.**  Yes.

1    **Q.**  Mr. Mortara asked you about this.  I want to go through

2    it a little bit more slowly.  Would you read the two

3    sentences to us, please.

4    **A.**  "It is important to keep in mind that characteristics not

5    always synonymous with extroversion are similarly valued.

6    Applicants who seem to be particularly reflective,

7    insightful, and/or dedicated should receive higher personal

8    ratings as well."

9    **Q.**  Does what you just read represent a change in Harvard's

10   admissions policy?

11   **A.**  Not -- no, it does not.

12   **Q.**  How long has it been Harvard's admissions policy?

13   **A.**  That has been our approach throughout my tenure also.

14   **Q.**  And is it consistent with your description of the policy

15   that you provided to Her Honor two weeks ago?

16   **A.**  Yes, it is.

17   **Q.**  Would you read the next sentence which begins "As noted

18   above."

19   **A.**  "As noted above, though, an applicant's race or ethnicity

20   should not be considered in assigning the personal rating."

21   **Q.**  And how does that compare to what you told Her Honor two

22   weeks ago about how race is considered in the admissions

23   office?

24   **A.**  That is the same message.

25   **Q.**  Now, Mr. Mortara asked you about the reading procedures

1    for the years 2013 to 2014.  It was DX5 in his notebook.  So

2    if I could ask you to switch notebooks for a second, go back

3    to his notebook and get DX5.  Do you have it?

4    **A.**  Yes, I do.

5    **Q.**  If we could have the cover, this is the interviewer

6    handbook for 2013 to 2014, correct?

7    **A.**  Yes.

8    **Q.**  Now, to be clear, this is one of the documents in the

9    period of time for discovery in this case, correct?

10   **A.**  Yes.

11   **Q.**  And when Mr. Mortara examined you a couple of weeks

12   allege, this is a document that he put in front of you,

13   correct?

14   **A.**  Yes.

15   **Q.**  He just asked you some questions about what this document

16   said about extroverts and introverts.  Do you remember?

17   **A.**  Yes.

18   **Q.**  Let's look at a portion that he didn't address.  If you

19   turn to the second page, do you see a section called "Valuing

20   the Creative and the Reflective"?

21   **A.**  Yes.

22   **Q.**  And this is a letter written -- or this is a piece

23   written by a woman named Helen Vendler?

24   **A.**  Yes.

25   **Q.**  Who was Helen Vendler?

 1    **A.**   This is the piece I referred to earlier.  She is a

 2    university professor, professor of English literature.  She

 3    was a member of our admissions committee.  I think her tenure

 4    on our committee ended in the year 2000, and I believe that's

 5    when she wrote this essay at my request.

 6    **Q.**   And this essay is the introduction to the interviewer

 7    handbook for 2013 to 2014?

 8    **A.**   Yes.

 9    **Q.**   Turn, if you would, to the page that's page 3.

10    **A.**   Yes.

11    **Q.**   Now, you had mentioned to Mr. Mortara that the issue of

12    introverts and extroverts actually had been addressed in

13    written materials in admissions office previously, correct?

14    **A.**   Yes.

15    **Q.**   So let's look at a couple of the things that were said a

16    decade or so ago.  Go to the third paragraph on page 3.

17    **A.**   Yes.

18    **Q.**   Would you read the sentence that begins "The truth" and

19    continues down to "do we have room for."

20    **A.**   "The truth is that many future poets, novelists, and

21    screenwriters are not likely to be straight A students either

22    in high school or in college.  The arts through which they

23    will discover themselves prize creativity, originality, and

24    intensity above academic performance; they value

25    introspection above extroversion, insight above rote

Case: 19-2005    Document: 00117632340    Page: 398    Date Filed: 07/30/2020    Entry ID: 6356615
Case 1:14-cv-14176-ADB   Document 654   Filed 04/18/19   Page 180 of 261

180

1    learning.  Yet such unusual students may be in the long run

2    the graduates of whom we will be most proud."

3    **Q.**  And would you then read for me the very next sentence.

4    **A.**  "Do we have room for the reflective introvert as well as

5    for the future leader? "

6    **Q.**  When you told Mr. Mortara that Harvard had addressed the

7    question of introverts and extroverts years ago, was this one

8    of the things you had in mind?

9    **A.**  Yes, it is.

10   **Q.**  Let's see what else was said in this letter -- this

11   article.  Could you go down to the last paragraph on this

12   page.

13   **A.**  Yes.

14   **Q.**  Do you see the sentence that says, "Do we ask an

15   introverted student"?

16   **A.**  Yes.

17   **Q.**  Would you read that sentence for us.

18   **A.**  "Do we ask an introverted student which issues most

19   occupy his mind or suggest something, justice and injustice

20   in her high school, for her to discuss?"

21           Shall I continue?

22   **Q.**  No.  That's good.  Thank you.  Is this one of the

23   portions that you had in mind when you were answering

24   Mr. Mortara's questions?

25   **A.**  Yes.

1    **Q.**  Has Professor Vendler's article remained in the

2    interviewer handbook?

3    **A.**  Yes.

4    **Q.**  Right through today?

5    **A.**  Yes.

6    **Q.**  And would you remind us how many people get the

7    interviewer handbook with Professor Vendler's essay?

8    **A.**  Over 10,000 of our alumni.

9    **Q.**  Every year?

10   **A.**  Yes.  It's updated every year.

11   **Q.**  Now, Mr. Mortara asked you whether you had seen the class

12   of 2023 reading procedures before you testified a couple of

13   weeks ago.

14   **A.**  Yes.

15   **Q.**  And he showed you your testimony where you said that you

16   had not seen -- in answer to his specific question, you had

17   not seen them in written form, correct?

18   **A.**  Right.  Yes.

19   **Q.**  We've now seen the class of 2023 reading procedures.

20   Would you explain to us why you answered his question in the

21   manner that you did?

22   **A.**  When I testified before, I was referring to what I

23   thought was the period of time that was the principal focus

24   of this file and of the materials which I had reviewed in

25   preparation for my testimony.

```
 1    Q.  And when you were pointing over to my hand scratchings on

 2    the chart, you were referring to the period through 2014?

 3    A.  Yes.

 4    Q.  And the classes through 2019?

 5    A.  Yes.

 6    Q.  If you knew that his question was intended to come right

 7    up through October the 15th or whatever day you were here,

 8    would you have answered it differently?

 9    A.  Yes.

10    Q.  Thank you.

11            MR. LEE:  Nothing further, Your Honor.

12            THE COURT:  Go.

13                          FURTHER EXAMINATION

14    BY MR. MORTARA:

15    Q.  You just looked at some pages from the alumni interviewer

16    handbook and an essay, correct?

17    A.  Yes.

18    Q.  And part of the essay had a question.  Do we ask the

19    introverted student about injustice in their high school, or

20    something to that effect, correct?

21    A.  Yes.

22    Q.  And that's talking about interviewing people, isn't it?

23    Did we ask questions?

24    A.  It's talking about interviewing people, and it's

25    talking -- yes.
```

```
 1   Q.  Can you ask an introverted student who submits a paper
 2   application and is not interviewed by anyone in your office
 3   how they feel about injustice?
 4   A.  Not necessarily.  But the interviewers who read this
 5   essay in preparation for their interviewing of -- official
 6   interviewing of our candidates that might be able to think
 7   more deeply about the interview.
 8   Q.  That's your alumni interviewers, correct?
 9   A.  Correct.
10   Q.  Not your admissions officers who assign personal ratings
11   without interviewing many, many, many applicants, correct?
12   A.  Correct.
13   Q.  Thank you.
14                        FURTHER EXAMINATION
15   BY MR. LEE:
16   Q.  Director McGrath, do you consider yourself an introvert
17   or an extrovert?
18   A.  Good heavens.  You will have a better view than I will.
19             Probably an introvert.
20   Q.  Thank you.
21             MR. MORTARA:  Your Honor, could we have a
22   ten-minute break to confer?
23             THE COURT:  Yes.  Ten minute break.  We'll be back
24   at five of.
25             MR. LEE:  Your Honor, can the witness be excused?
```

**JA3325**

Case: 19-2005   Document: 00117638246   Page: 402   Date Filed: 07/30/2020   Entry ID: 6356615
Case 1:14-cv-14176-ADB   Document 654   Filed 04/18/19   Page 184 of 261

184

```
 1                THE COURT:  I'm sorry.  You're excused, Director

 2    McGrath.

 3                (Court recessed at 2:44 p.m.)

 4                THE COURT:  Next witness, please.  Mr. Hughes,

 5    you're standing up.

 6                MR. HUGHES:  Your Honor, can we have a brief

 7    sidebar.

 8                THE COURT:  Yes.

 9                [Sidebar sealed and redacted.]

10                THE COURT:  Joan was just reminding me that the

11    sidebars have been sealed throughout as a matter of course

12    except for the parties.

13                Just so it is clear to everybody, I can't recollect

14    the number of the motion, but the agreed upon motion that

15    concerned judicial notice of historical documents is granted.

16                And Exhibits -- what's been marked for

17    identification as Exhibits 221, 512, and 513 are not

18    admitted.

19                MR. HUGHES:  Thank you, Your Honor.  Those are

20    P221, P512, and P513.

21                THE COURT:  Yes.  P221, P512, and P513.  And I have

22    under advisement the last two exhibits, and I'll give you the

23    ruling on that in the morning because I know you both have

24    submitted writings on that, and I haven't had a chance to

25    read them.
```

```
 1              MR. HUGHES:  Thank you, Your Honor.  The plaintiffs
 2    rest, and I'll turn it over to Mr. Lee.
 3              MR. LEE:  Your Honor, Harvard calls Drew Faust.
 4              THE CLERK:  Can you please raise your right hand.
 5              (DREW FAUST duly sworn by the Deputy Clerk.)
 6              THE CLERK:  Thank you.  You may be seated.
 7              Can you please state your name and spell your last
 8    name for the record.
 9              THE WITNESS:  My name is Drew Faust, F-A-U-S-T.
10              THE COURT:  I see you leaning forward.  That whole
11    microphone can pull towards you if it's easier.
12              THE WITNESS:  Thank you.
13                             EXAMINATION
14    BY MR. LEE:
15    Q.  Good afternoon, President Faust.
16    A.  Good afternoon.
17    Q.  Would you introduce yourself to Her Honor?
18    A.  Your Honor, I am Drew Faust.
19              THE COURT:  Nice to meet you.
20              THE WITNESS:  Nice to meet you, too.
21    BY MR. LEE:
22    Q.  President Faust, by whom are you currently employed?
23    A.  I'm employed by Harvard University.
24    Q.  Were you the president of Harvard?
25    A.  Yes, I was.
```

**JA3327**

1    **Q.**  Would you very briefly describe your educational

2    background for the Court.

3    **A.**  I grew up and attended elementary school in Virginia and

4    then graduated from Concord Academy here in Massachusetts

5    then got a bachelors degree from Bryn Mawr College then an MA

6    and Ph.D. from the University of Pennsylvania.

7    **Q.**  In what year did you receive your Ph.D.?

8    **A.**  1975.

9    **Q.**  What was the subject of your dissertation?

10   **A.**  Of my dissertation?

11   **Q.**  Yes.

12   **A.**  I was in a program in American civilization, and I wrote

13   a dissertation on the defense of slavery in the pre Civil War

14   South.

15   **Q.**  What did you do after earning your Ph.D.?

16   **A.**  I joined the Pennsylvania faculty.

17   **Q.**  And how long were you a member of the faculty at Penn?

18   **A.**  I was on the faculty there for 25 years.

19   **Q.**  What is the field in which your academic work has

20   concentrated?

21   **A.**  My academic work has been concentrated in the study of

22   the pre Civil War South and the Civil War.

23   **Q.**  Has your academic work educated your view of race in

24   America?

25   **A.**  It has.  Those are central issues to the work I have

187

1    undertaken.

2    **Q.**  Now I'm going to ask you to be immodest for a moment on

3    your own behalf.

4             Have you received any formal recognition for your

5    academic work in this field?

6    **A.**  I have.

7    **Q.**  Would you just give us a couple of examples?

8    **A.**  I recently was awarded the Kluge Prize in the study of

9    humanity by the Library of Congress.  My most recent book was

10   a finalist for the Pulitzer Prize and the National Book Award

11   and was named by The New York Times as one of the ten best

12   books of 2008.

13   **Q.**  What was the title of that book?

14   **A.**  That book was entitled "This Republic of Suffering: Death

15   and the American Civil War."

16   **Q.**  At some point did you leave the University of

17   Pennsylvania?

18   **A.**  I did.

19   **Q.**  Where did you go?

20   **A.**  I went to Harvard University.

21   **Q.**  In what capacity?

22   **A.**  I became the dean of the Radcliffe Institute For Advanced

23   Study.

24   **Q.**  And what is the Radcliffe Institute?

25   **A.**  The Radcliffe Institute is the unit of Harvard that was

1    created when Harvard and Radcliffe merged in 1999.  And what

2    had been Radcliffe College, a college for women, was

3    incorporated into the Harvard entity.  It was transformed at

4    that point into an institute for advanced study, and I was

5    the founding dean.

6    **Q.**  When did you begin serving as the president of Harvard

7    University?

8    **A.**  I began in that role in 2007, on July 1, 2007.

9    **Q.**  When did you complete your service as president?

10   **A.**  I completed my service as president on June 30 of this

11   year.

12   **Q.**  What is your current position at Harvard?

13   **A.**  I am the Lincoln professor of history.

14   **Q.**  What were your duties and responsibilities as president

15   of Harvard?

16   **A.**  I was responsible for everything at the university.

17   **Q.**  Were you involved in all the day-to-day decisions and

18   activities of the university?

19   **A.**  Yes.  I was ultimately responsibile.  But the day-to-day

20   decisions were not ones I engaged in universally across the

21   university.

22   **Q.**  Let me ask you some questions about the structure and

23   mission of Harvard University.

24           As president of Harvard University, were you

25   ultimately responsible for the oversight of Harvard College?

**JA3330**

1  **A.**  Yes, ultimately I was.

2  **Q.**  Was Harvard College the only academic institution you

3  oversaw as president?

4  **A.**  No, it was not.

5  **Q.**  Turn, if you would, in the notebook that we've put before

6  you to Tab 14.

7  **A.**  Yes.

8  **Q.**  Do you see DD 11.2?

9  **A.**  I do.

10  **Q.**  It's also on the screen in front of you, if that makes it

11  easier.  Can you tell us what this slide describes?

12  **A.**  This slide lists the various academic units that make up

13  Harvard University.

14  **Q.**  Would you just tell us what they are?

15  **A.**  They are Harvard College, Harvard Graduate School of Arts

16  and Sciences, Harvard John A. Paulson School of Engineering

17  and Applied Sciences, the Radcliffe Institute for Advanced

18  Study, Harvard Business School, Harvard Divinity School,

19  Harvard School of Dental Medicine, Harvard Graduate School of

20  Design, Harvard Graduate School of Education, Harvard Kennedy

21  School, Harvard Law School, Harvard Medical School, and

22  Harvard T.H. Chan School of Public Health.

23  **Q.**  On a day-to-day basis, who is responsible for overseeing

24  each of these schools?

25  **A.**  Each of these schools has a dean.

1    **Q.**  Excluding the schools within the faculty of arts and
2    sciences and the dental school, to whom did the deans report?
3    **A.**  The deans reported to me.
4    **Q.**  Who is responsible for the day-to-day operations of
5    Harvard College?
6    **A.**  The dean of Harvard College is Rakesh Khurana, and he has
7    that responsibility.
8    **Q.**  And during your time as president, to whom did Dean
9    Khurana report?
10   **A.**  Dean Khurana reported to the dean of the faculty of arts
11   and sciences, Mike Smith.
12   **Q.**  And to whom did Dean Smith report?
13   **A.**  Dean Smith reported to me.
14   **Q.**  And who was responsible for undergraduate admissions
15   during their tenure?
16   **A.**  Dean Fitzsimmons.
17   **Q.**  And to whom did he report?
18   **A.**  He reported to Mike Smith, the dean of the faculty of
19   arts and sciences.
20   **Q.**  Were you involved in the day-to-day work of the
21   admissions office of Harvard College?
22   **A.**  No, I was not.
23   **Q.**  Were you involved in the day-to-day work of the
24   admissions offices of any of the other units of Harvard
25   University?

Case: 19-2005    Document: 00117632240    Page: 409    Date Filed: 07/30/2020    Entry ID: 6356615
Case 1:14-cv-14176-ADB   Document 654   Filed 04/18/19   Page 191 of 261

191

1    **A.**   No, I was not.

2    **Q.**   Let's turn back to Harvard College.  Does Harvard College

3    have a mission statement?

4    **A.**   It does.

5    **Q.**   Turn, if you would, to Tab 1 in your binder.  Do you find

6    DX109?

7    **A.**   I do.

8    **Q.**   What is it?

9    **A.**   It's the mission, vision, and history of Harvard College.

10   **Q.**   And under the mission, would you read for us the first

11   two sentences of the mission of Harvard College?

12   **A.**   "The mission of Harvard College is to educate the

13   citizens and citizen-leaders for our society.  We do this

14   through our commitment to the transformative power of a

15   liberal arts and sciences education."

16   **Q.**   Was that the mission of Harvard College during your

17   tenure as president?

18   **A.**   It was.

19   **Q.**   Turn, if you would, to the second sentence of the next

20   paragraph.  And I'll ask Mr. Lee to highlight it.  Could you

21   read that sentence for us?

22   **A.**   "Through a diverse living environment, where students

23   live with people who are studying different topics, who come

24   from different walks of life and have evolving identities,

25   intellectual transformation is deepened and conditions for

Case: 19-2005    Document: 00117638240    Page: 410    Date Filed: 07/30/2020    Entry ID: 6356615
Case 1:14-cv-14176-ADB   Document 654   Filed 04/18/19   Page 192 of 261

192

1    social transformation are created."

2    **Q.**  Do you agree with that statement?

3    **A.**  I do.

4    **Q.**  While you were president, was diversity important to

5    fulfilling Harvard's mission?

6    **A.**  Diversity was a central element of fulfilling Harvard's

7    mission.

8    **Q.**  Why was it a central element of fulfilling Harvard's

9    mission?

10    **A.**  We are a residential college, at Harvard College, and

11    that means that we bring people together from a wide range of

12    places and backgrounds to educate one another as well as to

13    benefit from the formal education that they may receive from

14    our faculty and staff.  And so having people who are able to

15    educate one another about differences, bring different

16    elements to that community, is an essential part of the

17    experience of Harvard College.

18    **Q.**  What types of diversity are important to fulfilling

19    Harvard College's mission?

20    **A.**  There are a wide range of types of diversity that matter

21    to us.  We look for geographic diversity, diversity of

22    ethnicity, of race, of religion, of intellectual focus.  We

23    want students who will pursue different fields and have --

24    engaged with different questions intellectually before they

25    come.  We look for people with a variety of talents across a

 1  spectrum of areas.

 2  **Q.** And racial diversity is one of the types of diversity

 3  that you seek?

 4  **A.** Yes, it is.

 5  **Q.** Why is racial diversity important to achieving the

 6  college's mission?

 7  **A.** Racial diversity is important because race is an element

 8  in our society of importance, and it also can be a defining

 9  element in how our students understand themselves and how

10  they understand the experiences of their lives and what they

11  bring to the Harvard College community.

12  **Q.** During your 11 years as president, did the diversity of

13  the Harvard College class change?

14  **A.** It did.

15  **Q.** In what ways?

16  **A.** It became more diverse in a variety of dimensions.

17  Socioeconomic diversity was a very important one because of

18  our expansions of financial aid, and that, in part, enabled a

19  more diverse class overall.

20  **Q.** And did it change in terms of racial diversity?

21  **A.** It did.

22  **Q.** Geographic diversity?

23  **A.** Yes, it did.

24  **Q.** And in other ways?

25  **A.** Yes, it did.

1    **Q.**  And as someone who was the president and who walked

2    across the campus on a daily basis for 11 years, did that

3    changed diversity change the campus and the community?

4    **A.**  It did.  It was a campus in which we saw students

5    bringing different elements of their own experiences to share

6    with their fellow students.

7            We saw, for example, in the arts, which was a real

8    interest and focus of mine, the kinds of diversity that

9    different ethnic and racial backgrounds enabled students to

10   represent through their artistic performances.  South Asian

11   dance or festival and so forth was just a symbol of the kind

12   of cultural differences that flourished on the campus as we

13   had more representation from more different groups,

14   geographic groups and ethnic groups and racial groups.

15   **Q.**  Is it your experience as an educator that students learn

16   from each other as well as from the faculty?

17   **A.**  Absolutely.  That's a fundamental assumption of our

18   educational model.

19   **Q.**  Is the diversity of the student body important to that

20   portion of the learning model?

21   **A.**  It absolutely is.

22   **Q.**  Now, has Harvard College ever evaluated the importance of

23   student body diversity?

24   **A.**  Yes, it has.

25   **Q.**  Has it made public its views on the importance of

Case: 19-2005    Document 00117633246    Page: 413    Date Filed: 07/30/2020    Entry ID: 6356615
Case 1:14-cv-14176-ADB    Document 654    Filed 04/18/19    Page 195 of 261

195

1    diversity?

2    **A.**  Yes, it has.

3    **Q.**  And, in fact, has it shared its views on the importance

4    of diversity with the Supreme Court?

5    **A.**  Yes, it has.

6    **Q.**  When has it done so?

7    **A.**  It did so in 1977 in an amicus brief in the *Bakke* case.

8    It did so again in 2002 in an amicus brief submitted in the

9    *Grutter* case.  It did so again in the *Fisher* case.  There

10   have been a number of times that it has done this.  *Fisher*

11   one and two.

12   **Q.**  In addition to filing amicus briefs with the Supreme

13   Court, has Harvard made other formal statements on the

14   importance of diversity?

15   **A.**  It has.

16   **Q.**  Turn, if you would, to Tab 2 in your notebook.  Do you

17   find DX40?

18   **A.**  I do.

19   **Q.**  Tell us what it is.

20   **A.**  This is a president's report from President Neil

21   Rudenstine that is focused on the issue of the importance of

22   diversity to learning and education.

23            MR. LEE:  Your Honor, we offer DX40.

24            MR. HUGHES:  No objection.

25            THE COURT:  Admitted.

```
 1              (Defendant Exhibit No. DX40 admitted.)

 2   BY MR. LEE:

 3   Q.   Who is Neil Rudenstine?

 4   A.   Neil Rudenstine is one of my predecessors as president of

 5   Harvard.  He served from 1991 to 2001.

 6   Q.   Was he the president at the time this report was issued?

 7   A.   Yes, he was.

 8   Q.   Turn, if you would, to the page that says DX040.004 at

 9   the bottom.  And I'm going to focus you on the first full

10   paragraph of this page.

11              Do you see it?

12   A.   I do.

13   Q.   Would you read to us the first sentence of that page.

14   A.   Beginning "In the pages?

15   Q.   Yes, please.

16   A.   "In the pages that follow, I discuss the emergence of

17   student diversity as an important idea in American higher

18   education, especially as it relates to learning that takes

19   place beyond the classroom and the formal curriculum."

20   Q.   Would you go to the last sentence of that paragraph and

21   read it for us, please.

22   A.   "Finally, I indicate why the goal of diversity remains so

23   important to the actual quality and breadth of education for

24   all our students, and why our existing policies continue to

25   offer the most effective and promising pathway to the
```

Case: 19-2005    Document: 00117632840    Page: 415    Date Filed: 07/30/2020    Entry ID: 6356615
Case 1:14-cv-14176-ADB   Document 654   Filed 04/18/19   Page 197 of 261

197

```
 1    future."

 2    Q.   Do these statements fairly summarize president

 3    Rudenstine's report?

 4    A.   They do.

 5    Q.   Turn, if you would, to Tab 3 in your binder.  Do you find

 6    DX14?

 7    A.   I do.

 8    Q.   What is DX14?

 9    A.   This is a report that was issued by a committee in the

10    faculty of arts and sciences, chaired by Rakesh Khurana, to

11    study the importance of student body diversity.  It was

12    submitted to the faculty of arts and sciences for discussion

13    and consideration.

14    Q.   What is the date of the report?

15    A.   It's 2015.

16    Q.   Was the report provided to you?

17    A.   It was.

18    Q.   And who participated in addition to Dean Khurana in the

19    creation of the report?

20    A.   There was a committee of FAS faculty listed at the end of

21    the report.

22    Q.   When you say "FAS," do you mean --

23    A.   Faculty of arts and sciences, yes.

24    Q.   Now, did the committee reach any conclusions?

25    A.   The committee did.
```

1    **Q.**   Let me draw your attention to page 22.  Do you have that?

2    **A.**   I do.

3    **Q.**   Do you see the concluding paragraph?

4    **A.**   I do.

5    **Q.**   Would you read that to us, please.

6    **A.**   "We emphatically embrace and reaffirm the university's

7    long-held view that student body diversity, including racial

8    diversity, is essential to our pedagogical objectives and

9    institutional mission.  It enhances the education of all of

10   our students.  It prepares them to assume leadership roles in

11   the increasingly pluralistic society into which they will

12   graduate.  And it is fundamental to the effective education

13   of the men and women of Harvard College."

14   **Q.**   Do you agree with that statement?

15   **A.**   I do.

16   **Q.**   And did you agree with that statement as president of

17   Harvard University?

18   **A.**   I did.

19   **Q.**   Now, what was done with the report?

20   **A.**   The report was submitted by the committee to the faculty

21   as a whole and was discussed in two faculty meetings and then

22   voted on.

23   **Q.**   And was it approved?

24   **A.**   It was approved unanimously.

25   **Q.**   Now, we've discussed President Rudenstine's report in

1    1996 and Dean Khurana's report in 2015.  Are these the only

2    statements Harvard has made about the importance of

3    diversity?

4    **A.**   Harvard has made, many, many statements about the

5    importance of diversity in presidential speeches, decanal

6    speeches.  And other predecessors, President Derek Bok

7    published a book called "The Shape of the River," which is

8    a -- together with Bill Bowen; they were coauthors.  And

9    that's a major statement and analysis about the importance of

10   diversity.  So there are many places in which these

11   statements have been made.

12   **Q.**   And have you yourself made statements publicly about the

13   importance of diversity?

14   **A.**   I have.

15   **Q.**   And generally in what context?

16   **A.**   The context perhaps would be a talk at commencement which

17   I gave every year, I think.  Many of these were focused on

18   diversity.  I always gave a talk on the first day of classes

19   in morning prayers, and a number of those were focused on

20   diversity.  There were occasions in the course of the year

21   when I would emphasize diversity in either a formal or

22   informal talk, but it was a constant theme.

23   **Q.**   While you were the president, did Harvard College take

24   steps to ensure that it had a diverse student body?

25   **A.**   It did.

Case: 19-2005    Document: 00117632240    Page: 418    Date Filed: 07/30/2020    Entry ID: 6356615
Case 1:14-cv-14176-ADB   Document 654   Filed 04/18/19   Page 200 of 261

200

1    **Q.**  And what mechanism did it use to ensure it had a diverse

2    student body?

3    **A.**  Well, there were many mechanisms in the admissions

4    process, the kind of outreach, recruitment, identification of

5    talented students.  That was a very important dimension of

6    the admissions process.

7         But we also changed our financial aid policy as a

8    way of making Harvard more affordable and accessible to a

9    diverse number of students, a diverse population of

10    prospective students.

11    **Q.**  I'd like to ask you a little bit more about the

12    developments in the financial aid program.

13         Before you became the president, did Harvard take

14    any steps to expand financial aid?

15    **A.**  This has been a theme at Harvard for quite some time,

16    actually.  Right after World War II, the then president James

17    Conant created a national scholar system because he

18    recognized that it was important that Harvard reach out

19    beyond its usual population and bring in a more economically

20    diverse body of students.

21         But in more recent times -- and we've had over the

22    years a need-blind admissions policy of financial aid.

23         But in 2004, we made significant advances before my

24    presidency with the introduction of a Harvard financial aid

25    program that we now call HFAI for the lowest income group and

1    then expanded on that in 2007 when I became president.

2    **Q.**  When the program was expanded when you became president

3    in 2007, what were the elements of the program?

4    **A.**  The elements of the program were, first of all, we had no

5    loans.  There were to be no loans for families that made

6    below a certain income.  And we've tweaked it a little bit

7    since then.  I'll describe it as it currently is formulated.

8         Families below $65,000 a year in income paid no

9    parental contribution.  For families up to about $150,000,

10   the rubric was that the family would pay no more than

11   10 percent of income for tuition and room and board.

12        And then we have financial aid going up further in

13   the income level, dependent on family need and family

14   resources.  So students well into the middle class could have

15   assistance from Harvard financial aid to make education

16   affordable.

17   **Q.**  So to give us just an idea of the magnitude of the

18   financial aid program, let me ask you this:  Before your

19   presidency, how much was Harvard spending annually, each

20   year, on financial aid for the college?

21   **A.**  At the beginning of my presidency it was about

22   $90 million a year in the college.

23   **Q.**  At the end of your presidency this June, how much was

24   Harvard spending on financial aid at the college?

25   **A.**  It's close to 200 million.

1    **Q.**  Why did you expand financial aid so substantially during

2    your presidency?

3    **A.**  It seemed to me and to others in leadership roles and

4    throughout the university that this was an absolutely

5    essential act in order to be able to commit ourselves to our

6    fundamental purposes, those being attracting people of talent

7    regardless of their financial circumstances, attracting

8    people across a wide range of origins and identities and

9    ethnicities and races, making sure that people understood

10   they should not see financial impediments to being able to be

11   part of this community and to bring their extraordinary

12   talents to it.

13   **Q.**  Now, your decision to expand the financial aid program

14   came about close to the time of the recession, correct?

15   **A.**  It did.

16   **Q.**  Did the financial crisis have any impact on the Harvard

17   College financial aid program?

18   **A.**  The program was announced in December 2007, and then of

19   course the following fall, by September of 2008, we faced

20   really serious financial headwinds and began looking at

21   budgets and cutting expenditures in a variety of areas.

22          But we determined we were not going to do that in

23   the financial aid program.  In fact, we increased our

24   financial aid commitments because there were so many families

25   that found themselves more needy because of the circumstances

 1   of the recession.

 2   **Q.** Was pressure brought to bear on you to actually reduce

 3   the financial aid program because of that recession?

 4   **A.** Yes, there was.

 5   **Q.** What did you decide?

 6   **A.** I decided that we should not do that.  We should maintain

 7   our commitment to the financial aid program.

 8   **Q.** And under Harvard's current financial aid program, what

 9   percentage of undergraduates have zero parental contribution

10   and zero loans?

11   **A.** It's about 20 percent.

12   **Q.** Approximately what percentage of the class receives

13   financial aid?

14   **A.** It varies a bit from year to year, but between 55 and

15   60 percent receive financial aid.

16   **Q.** For those undergraduates receiving financial aid of some

17   kind, what is the average cost of attending Harvard on an

18   annual basis?

19   **A.** It's about $12,000.  That's tuition and room and board, I

20   think is important to explain.

21   **Q.** So it's tuition, room, and board and on average $12,000?

22   **A.** Total cost.

23   **Q.** What percentage of the incoming class are

24   first-generation college graduates?

25   **A.** That's about 17 percent now.

1   **Q.**  Now, we've talked about the changes in the expansion of

2   the financial aid program, correct?

3   **A.**  We have.

4   **Q.**  In addition to yourself, was there a person or persons at

5   Harvard who were the real drivers of the expansion of the

6   financial aid program?

7   **A.**  The longtime champion of this commitment and the person

8   who really devised the various methods and worked with

9   administration in Mass. Hall, the president's office, to

10  advance this was Dean Fitzsimmons.

11  **Q.**  Over many years?

12  **A.**  Over many, many years.  This has been a passion for him,

13  the openness and access question.

14  **Q.**  Has Harvard made progress achieving all of its

15  diversity-related goals?

16  **A.**  We've made progress, but there is still work to be done.

17  **Q.**  Let's talk about some of the progress that's been made.

18          Today, what is the approximate gender composition

19  of the Harvard class?

20  **A.**  It's close to 50-50.

21  **Q.**  What is the approximate racial composition of Harvard's

22  class?

23  **A.**  That again is close to 50-50, 50-50 white and nonwhite.

24  **Q.**  Has the Asian-American share of the admitted class

25  changed over time?

Case: 19-2005    Document: 00117632246    Page: 423    Date Filed: 07/30/2020    Entry ID: 6356615
Case 1:14-cv-14176-ADB    Document 654    Filed 04/18/19    Page 205 of 261

205

1    **A.**  It has.

2    **Q.**  How has it changed?

3    **A.**  Well, if we go back to 1980, I believe that the

4    percentage of the class was around 3 percent.  In 2010 it was

5    around 18 percent.  It's currently in 2008 about 23 percent.

6    So we can see significant change both in the shorter term and

7    in the longer term.

8    **Q.**  Now, we just focused on students, correct?

9    **A.**  Yep.

10   **Q.**  Let me turn to faculty.

11          Has the diversity of the Harvard faculty changed

12   over time?

13   **A.**  It has.

14   **Q.**  Has the racial diversity of the Harvard faculty changed

15   over time?

16   **A.**  It has.

17   **Q.**  And specifically has the number of Asian-American faculty

18   on the faculty of arts and sciences changed over time?

19   **A.**  It has.

20   **Q.**  How much approximately?

21   **A.**  I believe that the tenured faculty, Asian-American

22   faculty, has increased by about 50 percent over the past

23   decade.

24   **Q.**  And do you know how much the faculty at large has

25   increased?

Case: 19-2005    Document: 00117638240    Page: 424    Date Filed: 07/30/2020    Entry ID: 6356615
Case 1:14-cv-14176-ADB   Document 654   Filed 04/18/19   Page 206 of 261

206

1    **A.**   That number is not right on the tip of my tongue.

2    **Q.**   The tenured faculty has about a 50 percent increase?

3    **A.**   Yes, it has.

4    **Q.**   We've heard during the course of the trial about the

5    concept of diversity and inclusion.  You're familiar with

6    both terms?

7    **A.**   I am.

8    **Q.**   What is the difference between the two?

9    **A.**   Diversity is about presence, who's present, what is the

10   demographic makeup of a group of a campus, of a community.

11            Inclusion is about the experience of those

12   individuals within that community.

13   **Q.**   Can Harvard achieve the benefits of diversity without

14   inclusion?

15   **A.**   Inclusion is a critical element of fully benefiting from

16   diversity, yes.

17   **Q.**   During your tenure as president, did students express

18   concerns to you about the inclusiveness of the Harvard

19   community?

20   **A.**   Yes, they did.

21   **Q.**   And did you respond to those concerns?

22   **A.**   I did.

23   **Q.**   Did you meet with them?

24   **A.**   I did.

25   **Q.**   Now, has Harvard taken systematic or more formal actions

1    to promote inclusion?

2    **A.**  Yes, it has.

3    **Q.**  Turn, if you would, to Tab 14 in your notebook, and I'm

4    going to put on the screen DD 11.3.  Do you see that?

5    **A.**  I do.

6    **Q.**  And you see we've listed a number of the different

7    committees and working groups during your tenure as president

8    of the university, correct?

9    **A.**  Yes.

10   **Q.**  Let's start with the first one, the college working group

11   on diversity and inclusion.  Who convened that working group?

12   **A.**  That group was convened in the college and chaired by

13   Professor Jonathan Walton.

14   **Q.**  Who is Professor Jonathan Walton?

15   **A.**  Professor Jonathan Walton is the Pusey Minister in

16   Memorial Church and the Plummer Professor of Christian

17   Morals.

18   **Q.**  What did his working group do?

19   **A.**  That working group looked at a number of quite specific

20   concerns of undergraduates that had been some of them under

21   discussion, some of them talked about for some time, but they

22   looked at them comprehensively and made some direct

23   recommendations for direct interventions.

24   **Q.**  Turn, if you would, to Tab 4 in your notebook.  Do you

25   have DX13?

1    **A.**  I do.

2    **Q.**  What is it?

3    **A.**  That is the report of the working group.

4          MR. LEE:  Your Honor, I think it may already be in

5    evidence.  It is in evidence.

6    BY MR. LEE:

7    **Q.**  President Faust, what recommendations did this report

8    contain?

9    **A.**  This report contained a number of recommendations in

10   different areas.  It recommended, for example, that we

11   provide spring break meals for students who were unable to

12   travel home and that we keep the dining halls open during

13   spring break.  It also recommended that we pay more attention

14   to mental health services for students.

15         Other recommendations about the curriculum, noting

16   that for students who came from less advantaged backgrounds,

17   perhaps they'd come from someplace that had no lab science,

18   and we needed to take action to make sure that laboratory

19   sciences, the way concentrations, majors were structured at

20   Harvard, they would be open to students who had not had that

21   kind of experience in high school.

22         It also had some administrative recommendations

23   about training of staff and faculty and asked that we look at

24   some of the different groups of individuals who were assigned

25   roles relating to diversity and what those roles entail.

```
 1                And then it also asked that this college work be
 2   supplemented by a look at the university more broadly and the
 3   context within which the college sat on these issues.
 4   Q.   Turn, if you would, to Tab 5 in your notebook.  Do you
 5   have DX100?
 6   A.   I do.
 7   Q.   What is it?
 8   A.   This is a charge that I issued to a subsequent task force
 9   on inclusion and belonging that was at the universitywide
10   level.
11                MR. LEE:  Your Honor, we offer DX100.
12                MR. HUGHES:  No objection.
13                THE COURT:  Admitted.
14                (Defendant Exhibit No. DX100 admitted.)
15   BY MR. LEE:
16   Q.   How did this task force differ from Professor Walton's
17   working group.
18   A.   This group was meant to look at the questions on
19   universitywide basis, so the members of this group came from
20   all over the university.  It also was asked to look at
21   questions relating to staff and faculty and students so that
22   all of those groups were participating as representatives or
23   as examples of the experience of their groups.
24                It also asked that we address some of the questions
25   of universitywide structures, policies, and administrative
```

Case: 19-2005    Document: 004766838240    Page: 428    Date Filed: 07/20/2020    Entry ID: 6356615
Case 1:14-cv-14176-ADB    Document 654    Filed 04/18/19    Page 210 of 261

210

1    realities and ask how those could be more supportive of the

2    mission of inclusion and belonging.

3    **Q.**  What was the result of the task force work?

4    **A.**  The task force issued a report in the spring of this

5    year.

6    **Q.**  Turn, if you would, to Tab 6 in your notebook.  Do you

7    find DX740?

8    **A.**  I do.

9    **Q.**  What is it?

10   **A.**  This is the report that was issued by that task force.

11           MR. LEE:  Your Honor, we offer DX740.

12           MR. HUGHES:  No objection.

13           THE COURT:  Admitted.

14           (Defendant Exhibit No. DX740 admitted.)

15   BY MR. LEE:

16   **Q.**  Did you receive this report?

17   **A.**  I did.

18   **Q.**  Did you respond to the report?

19   **A.**  I did.

20   **Q.**  Turn, if you would, to Tab 7 in your binder.

21   **A.**  Yes.

22   **Q.**  Do you find DX83?

23   **A.**  I do.

24   **Q.**  What is DX83?

25   **A.**  This is my response to the community and to the task

```
 1    force recommendations.

 2              MR. LEE:  Your Honor, we offer DX83.

 3              MR. HUGHES:  No objection.

 4              THE COURT:  Admitted.

 5              (Defendant Exhibit No. DX83 admitted.)

 6    BY MR. LEE:

 7    Q.  Can you summarize your response to the task force

 8    recommendations?

 9    A.  This response came in March of this year, and I had only

10    a few months left in my presidency at that point.  So I

11    wanted to respond in a way that would make some -- take some

12    initial actions in response to things that could be acted

13    upon right away but also set up some momentum for moving

14    forward in a general sense on the more long-range issues.

15              I did that, of course, in close consultation with

16    my successor.  I didn't want to do anything that would be at

17    cross-purposes with his intentions.  But we agreed that if we

18    could get some momentum going, then he would be able to pick

19    up this issue as he settled into his new role.

20              So one of the things this did was to bring someone

21    into the president's office, John Wilson, who is here today,

22    to be kind of the point person for the pursuing of the

23    recommendations that I was unable to meet right away.

24              But right away we instituted some changes in

25    symbols and the alma mater.  I committed presidential
```

1    resources to create faculty recruitment.  We also committed

2    resources to support innovative ideas in bringing teaching

3    and learning across the campus into a place where it could

4    take account of the findings of the task force.

5            And the task force had also recommended to faculty

6    committees to inquire into academic dimensions of inclusion

7    and belonging, and I appointed the chairs of those committees

8    to get them underway.

9    **Q.**  So he doesn't feel left out, who is your successor as the

10   president?

11   **A.**  My successor is Lawrence Bacow.

12   **Q.**  You mentioned John Wilson as the person that you put in

13   place to spearhead or lead some of these efforts.  Who is

14   Dr. Wilson?

15   **A.**  Dr. Wilson is a graduate of our school of education.  He

16   served as a member of the board of overseers, one of the

17   governing boards.  He's taking a leave of that at this time

18   to serve in the president's office.  He's the former

19   president of Morehouse College, and he's also someone who has

20   worked on diversity issues throughout his career, including

21   early in his career at MIT with Lawrence Bacow.

22   **Q.**  What did you ask Dr. Wilson to do other than to come to

23   court today?  What did you ask him to do?

24   **A.**  That was his idea coming to court.

25            I asked him to take up the agenda that the task

Case: 19-2005    Document: 00117632240    Page: 454    Date Filed: 07/30/2020    Entry ID: 6356615
Case 1:14-cv-14176-ADB    Document 654    Filed 04/18/19    Page 213 of 261

213

1    force report had put forth and pursue how to implement the

2    parts of it that seemed worthy of implementation immediately,

3    to figure out -- some of the things that the task force

4    recommended were things like strategic planning and setting

5    up structures to enable the schools to look in a longer view

6    at their goals for inclusion and belonging.  So this required

7    organizational skill and organizational interventions that

8    Dr. Wilson has committed himself to.

9           Another issue was that I felt as president -- and

10   the task force believed this, too -- there needed to be a

11   function in the central administration, a point person in the

12   central administration looking at these issues on a permanent

13   basis.

14          But how to structure that role, what that job

15   should be, that's something that Dr. Wilson is also thinking

16   about during his time in the interim role in this position.

17   **Q.**  Has Harvard finished implementing the recommendations of

18   the task force?

19   **A.**  I would not expect it has.  I'm not president anymore,

20   but I would think a lot of these are very long term in their

21   demands.

22   **Q.**  Let me turn to a different topic.

23          Have you heard of the concept of race-neutral

24   alternatives?

25   **A.**  I have.

1    **Q.**  Has Harvard ever considered race-neutral alternatives

2    through a committee?

3    **A.**  Yes, it has.

4    **Q.**  When did Harvard first consider race-neutral alternatives

5    through a committee?

6    **A.**  That would be the Ryan committee, I believe, that was

7    formed in the spring of 2014.

8    **Q.**  And I'm going to bring up DD 11.3 again just so we can

9    orient ourselves.  This is the committee labeled the Ryan

10    committee.

11    **A.**  Mm-hmm.

12    **Q.**  Before we come back to the Ryan committee, let me ask you

13    this:  Before the formation of the Ryan committee, had

14    Harvard shared its views on race-neutral alternatives with

15    the United States Supreme Court?

16    **A.**  Yes, it had.

17    **Q.**  Turn, if you would, in your notebook to Tab 8.

18    **A.**  Tab 8?

19    **Q.**  Tab 8.  Do you have that before you?

20    **A.**  I do.

21    **Q.**  Do you find DX55?

22    **A.**  I do.

23    **Q.**  What is it?

24    **A.**  This is an amicus brief of Harvard University and other

25    universities in the case of California versus Allan *Bakke*.

1    **Q.**  Turn if you would to the page at the bottom which says

2    DX055.020.

3    **A.**  Mm-hmm.

4    **Q.**  Do you see the last paragraph?

5    **A.**  I do.

6    **Q.**  Would you read the first sentence to us.

7    **A.**  "The educational goals discussed above cannot be realized

8    by any racially neutral procedure known to us."

9    **Q.**  This is a statement made by Harvard and other

10   universities in 1977 or so, correct?

11   **A.**  It is.

12   **Q.**  Turn, if you would, to Tab 9 in your binder.  Do you find

13   DX53?

14   **A.**  I do.

15   **Q.**  What is it?

16   **A.**  It's an amicus brief of Harvard University and other

17   universities in the case of *Grutter v. Bollinger*.

18            MR. LEE:  Your Honor, we offer DX53.

19            MR. HUGHES:  No objection.

20            THE COURT:  Admitted.

21         (Defendant Exhibit No. DX53 admitted.)

22   BY MR. LEE:

23   **Q.**  Turn, if you would, to the page at the bottom that says

24   .0029.  And I'm going to draw your attention to the first

25   paragraph.  Do you have that before you?

 1    **A.**  I do.

 2    **Q.**  And could you read for us the third and fourth sentences

 3    of that first paragraph.

 4    **A.**  Beginning with "But the decisive fact"?

 5    **Q.**  Yes.

 6    **A.**  "But the decisive fact is that all of the suggested

 7    race-neutral factors and many more besides already enter into

 8    admissions decisions."

 9    **Q.**  And the next sentence.

10    **A.**  "Consideration of those factors alone does not achieve

11    the distinctly racial diversity that amici seek in their

12    student bodies."

13    **Q.**  Had Harvard considered race-neutral alternatives before

14    the filing of this brief?

15    **A.**  Yes, it had.

16    **Q.**  What had it concluded about the viability of race-neutral

17    alternatives?

18    **A.**  It concluded that it could not, using only those

19    race-neutral alternatives, accomplish the diversity, racial

20    diversity in its student body that it saw as essential to its

21    educational mission.

22    **Q.**  Turn, if you would, to Tab 10 in your binder.  Do you

23    find DX26?

24    **A.**  I do.

25    **Q.**  What is this?

**A.**   This is an amicus brief of Harvard and other universities

in the case of *Fisher versus the University of Texas.*

   MR. LEE:   Your Honor, we offer DX26.

   MR. HUGHES:   No objection.

   THE COURT:   Admitted.

   (Defendant Exhibit No. DX26 admitted.)

BY MR. LEE:

**Q.**   Now turn, if you would, to the page at the bottom .0023.

**A.**   Mm-hmm.

**Q.**   In the last paragraph, do you see the sentence which

begins "Amici also engage"?

**A.**   I do.

**Q.**   I'm not going to have you read the sentence because it's

now in evidence, but let me just ask you this:   Do those

sentences accurately describe Harvard's experience with

race-neutral alternatives at the time this brief was filed?

**A.**   They do.

**Q.**   And do each of the amicus briefs we've just looked at

accurately characterize or summarize Harvard's experience

with race-neutral alternatives at the time?

**A.**   They do.

**Q.**   Now, you mentioned the Ryan committee earlier.

   Who chaired that committee?

**A.**   That committee was chaired by Jim Ryan, who was then the

dean of the school of education at Harvard.

1   **Q.**  And he is today --

2   **A.**  -- the president of the University of Virginia.

3   **Q.**  Did you play any role in convening Dean Ryan's committee?

4   **A.**  I did.

5   **Q.**  What was your role?

6   **A.**  I invited the various individuals to serve on that

7   committee.

8   **Q.**  Did you consult with anybody in convening the committee?

9   **A.**  I did.

10   **Q.**  Who?

11   **A.**  I consulted with a wide range of individuals about who

12   would be appropriate and a good member of the committee.

13   **Q.**  And did you consult with Dean Ryan himself?

14   **A.**  I did.

15   **Q.**  Turn, if you would, to Tab 11 in your binder.  Do you

16   find DX12?

17   **A.**  I do.

18   **Q.**  What is it?

19   **A.**  This is a letter to one of the members, prospective

20   members of that committee from me, inviting that individual

21   to serve.

22   **Q.**  Does it include your charge to the committee?

23   **A.**  It does.

24          MR. LEE:  Your Honor, we offer DX12.

25          MR. HUGHES:  No objection.

**JA3360**

```
 1              THE COURT:  Admitted.
 2              (Defendant Exhibit No. DX12 admitted.)
 3    BY MR. LEE:
 4    Q.  What did you ask the committee to do?
 5    A.  I asked the committee to focus on two issues.  One is the
 6    value of diversity, to assess the value of diversity as part
 7    of the educational experience.
 8              And the second charge was to explore the viability
 9    of race-neutral alternatives in achieving that diversity.
10    Q.  Did the Ryan committee complete its work?
11    A.  No, it did not.
12    Q.  Why not?
13    A.  We ended the Ryan committee when the SFFA lawsuit was
14    begun.
15    Q.  Why?
16    A.  We felt that in the course of accumulating information
17    and evidence and analysis for this lawsuit there would be a
18    number of very helpful elements that would enable us to study
19    race-neutral alternatives very effectively.  And so we wanted
20    to postpone our consideration of that question until that
21    data was on hand.
22    Q.  Now, you told us that the Ryan committee was asked to
23    address two questions, correct?
24    A.  Yes.
25    Q.  Has Harvard College now addressed both of those
```

1    questions?

2    **A.**   Yes.  The first question, the question of the value of

3    diversity, is the one that was addressed by the Khurana

4    committee that we discussed a few minutes ago.

5            And the second question, the race-neutral

6    alternatives question, was taken up once again when the data

7    for this case became available.  And it was taken up in the

8    spring of 2017 by another committee.

9    **Q.**   Did you play any role in convening that committee?

10   **A.**   I did.

11   **Q.**   What was your role?

12   **A.**   I discussed with Dean Michael Smith of the faculty of

13   arts and sciences the creation of that committee.

14   **Q.**   Did you ask him to chair the committee?

15   **A.**   I did.

16   **Q.**   Did you discuss with Dean Smith the other members of the

17   committee?

18   **A.**   We discussed how to structure the committee, yes.

19   **Q.**   Why did you ask Dean Smith to chair the committee?

20   **A.**   Well, a couple of things.  One is that the lawsuit

21   focused on the college rather than the university as a whole.

22   So the Ryan committee had a wide representation from the

23   whole university, but it was clear that we needed to look at

24   this question very explicitly within the structure of the

25   college.

1          And so Dean Smith, as the long-serving dean and

2     academic leader of the faculty of arts and sciences, seemed a

3     very good choice to undertake the task at hand.  He had been

4     responsible as the dean of FAS for the admissions office

5     which operates beneath him for ten years at that point, was

6     very experienced in these matters.

7     **Q.**  Who else was on the committee?

8     **A.**  The other two members of the committee were the dean of

9     the college, Rakesh Khurana, and the dean of admissions,

10    William Fitzsimmons.

11    **Q.**  In your view, were they the right people for the task?

12    **A.**  They were.  Dean Khurana deals with issues in the college

13    every day.  He's also a Ph.D. in sociology who has very

14    sophisticated abilities in statistical analysis, social

15    science data.  So we knew that the accumulation of all the

16    data that had occurred as a result of work on the case would

17    be something that he would be very adept at dealing with.

18         And Dean Fitzsimmons has been involved in these

19    questions for 40 years as dean of admissions at Harvard.  And

20    so it seemed there could be few people imaginable who would

21    be better suited to look at admissions questions.

22         I also thought, and Dean Smith agreed, that one of

23    the big issues was how do you implement policies, how do you

24    operationalize them.  And these were all people who were very

25    familiar with questions like how does the financial aid

1    policy work, or how would you undertake some of the measures

2    that have been advanced as possible race-neutral

3    alternatives.  They would understand how they would operate

4    within the system.

5            And so it seems that they were really well suited

6    to assess that because of their administrative experience as

7    well as their scholarly experience.

8    **Q.**   Now, SFFA has suggested that the committee for some

9    reason had too few members.  Do you agree?

10   **A.**   I think a committee should have the number of members it

11   needs to do the work that it's assigned to do, and I felt

12   that this committee was well suited to undertake that work.

13   **Q.**   Did Dean Smith's committee generate a report?

14   **A.**   It did.

15   **Q.**   Was it submitted to you?

16   **A.**   It was.

17   **Q.**   Did you review it?

18   **A.**   I did.

19   **Q.**   What conclusions did the committee reach?

20   **A.**   The committee looked very carefully at the variety of

21   suggested race-neutral alternatives and analyzed why they

22   would not be effective in establishing the kind of student

23   body diversity that we believed essential to our educational

24   mission without sacrificing some of the other essential parts

25   of our educational commitments.

1    **Q.**  Did the committee make any recommendation for future

2    work?

3    **A.**  It did.  It said we should look at these questions again

4    in five years.

5    **Q.**  Did you agree?

6    **A.**  I will certainly agree, yes.

7    **Q.**  Now, President Faust, I want to ask you a few questions

8    about issues that have come up during the course of the

9    litigation.

10           At the pretrial conference, there was a suggestion

11   that you denied the fact that Harvard discriminated against

12   Jewish applicants in the 1920's.  Is that true?

13   **A.**  No.

14   **Q.**  Have you ever denied that?

15   **A.**  I have never denied that.

16   **Q.**  Was it a proud chapter in Harvard's history?

17   **A.**  It was not a proud chapter in Harvard's history.

18   **Q.**  And have you taken steps during your tenure to ensure it

19   would not happen again?

20   **A.**  I feel that my tenure has been committed in considerable

21   part to expanding openness, access to Harvard, to making sure

22   that every individual who can thrive in our community has the

23   opportunity to apply and be included, welcomed, and to

24   flourish in our community.  There's no place for

25   discrimination of any kind at Harvard.

1    **Q.**   Now, President Faust, how long have you known Dean

2    Fitzsimmons?

3    **A.**   I'm not sure exactly when I met him, but it was soon

4    after I arrived at Radcliffe as the dean because our

5    geographic location -- the Radcliffe Institute was very

6    closely located to the admissions office.

7    **Q.**   And how long have you known Director McGrath?

8    **A.**   I met her soon after that, I think, as well.  So the very

9    early aughts, 2003, 2004, something like that.

10   **Q.**   So for each of them, you've known them for more than

11   15 years?

12   **A.**   Yes.

13   **Q.**   I'll represent to you that SFFA has suggested that both

14   or either has been less than truthful in this case.

15             Do you have an opinion on their truthfulness and

16   honesty?

17             MR. HUGHES:  Your Honor, I object.  I don't think

18   her opinion on this is relevant to what's happened here at

19   trial.  It's vouching character testimony.  It's completely

20   improper.

21             MR. LEE:  It's actually admissible under Rule 608.

22             THE COURT:  Give me a minute.

23             Admissible.  Evidence of truthful character

24   admissible once a witness' character for truthfulness has

25   been attacked.

1          So that certainly gets us to Director McGrath.  I'm

2    not sure it covers Dean Fitzsimmons at this point.

3          MR. HUGHES:  That's just what I was about to say.

4          MR. LEE:  If that's, in fact, the representation,

5    I'll limit myself to Director McGrath.

6          MR. HUGHES:  I'm not going to limit what I'm going

7    to say in closing by any means.  I want to make sure that the

8    question isn't connected to what's happened here at trial,

9    which she can't possibly know about.

10          MR. LEE:  I'm not going to ask anything about what

11    occurred during the trial.  I have represented to her,

12    because she was sequestered, that this has occurred.  I am

13    now asking her for opinion independent of that under 608.

14          THE COURT:  If you're not going to limit your

15    closing, then I'll let him have the question for Dean

16    Fitzsimmons as well.

17          MR. HUGHES:  I'm definitely not limiting my

18    closing.  So we should let him have the question.

19          THE COURT:  Okay.

20    BY MR. LEE:

21    **Q.**  So, President Faust, let me start again.

22          I'll represent to you that SFFA has attacked Dean

23    Fitzsimmons and Director McGrath and their honesty.  Do you

24    have that in mind?

25    **A.**  I do.

```
 1    Q.  I know you haven't been here.  Do you have an opinion

 2    about the honesty and the credibility of these two folks who

 3    you've known for 15 years?

 4    A.  I regard both of them as people with the very highest

 5    integrity.

 6    Q.  And honesty?

 7    A.  And honesty, yes.

 8    Q.  During the 15 years that you've known them, have you ever

 9    heard anyone challenge their honesty and integrity other than

10    SFFA?

11    A.  No, I have not.

12    Q.  And what is your reaction to SFFA's suggestion during

13    this trial that these folks lack integrity and honesty?

14    A.  I find it not credible.  They are people who believe in

15    values above all.

16    Q.  And is that what you've seen during your 15 years?

17    A.  It is.

18    Q.  Now, you also are aware of the allegations that were made

19    against Harvard in this case?

20    A.  Yes, I am.

21    Q.  And you know that SFFA claims that Harvard intentionally

22    discriminates against Asian-Americans?

23    A.  I know that.

24    Q.  As the president, what is your reaction to those

25    assertions?
```

Case: 19-2005  Document 00117628240  Page: 445  Date Filed: 07/30/2020  Entry ID: 6356615
Case 1:14-cv-14176-ADB  Document 654  Filed 04/18/19  Page 227 of 261

227

 1   **A.**   Those assertions seem to me completely at odds with the

 2   history of Harvard over recent decades as it has opened up

 3   its doors more widely, has searched avidly to include people

 4   from every background and every group, and has committed

 5   itself to the notion of a community that is strengthened and

 6   indeed dependent on its openness to people of all races and

 7   backgrounds.

 8          That has been a driving force in the identity of

 9   Harvard College and Harvard University, and we would not

10   undermine that by discriminating.  It's totally at odds with

11   who we are, what we believe, and what we think makes us

12   strong.

13          MR. LEE:  Thank you, President Faust.

14          Nothing further, Your Honor.

15          MR. HUGHES:  Your Honor, may I approach the

16   witness?

17          THE COURT:  Yes.

18                        EXAMINATION

19   BY MR. HUGHES:

20   **Q.**  Good afternoon, President Faust.

21   **A.**  Good afternoon.

22   **Q.**  You've won the prize for being the last witness in the

23   case.

24          My name is John Hughes.  I'm a lawyer for SFFA.

25   I'm just going to ask you a few questions.

Case: 19-2005    Document: 00117638240    Page: 446    Date Filed: 07/30/2020    Entry ID: 6356615
Case 1:14-cv-14176-ADB   Document 654   Filed 04/18/19   Page 228 of 261

228

 1          The first is I'd like to ask you if you agree with

 2    the following statement:  Do you agree that race is a factor

 3    that has an impact on the formation of a personality of a

 4    human being, could have an influence on a set of perspectives

 5    that an individual may have?  It is one of many

 6    characteristics of an individual that contribute to the

 7    person who is presented to us in an admissions folder at

 8    Harvard.

 9          Do you agree with that?

10    **A.**   I do.

11    **Q.**   Now, you talked with Mr. Lee about some historical events

12    in Harvard's past and Harvard's treatment of Jewish

13    applicants to Harvard in the 1920's, right?

14    **A.**   Yes.

15    **Q.**   And you recall that you were asked some questions about

16    that when we took your deposition in this case?

17    **A.**   Yes.

18    **Q.**   And do you recall your deposition was on March 10, 2017?

19    **A.**   I recall it was in 2017.

20    **Q.**   It's sitting right there.  I'll just refresh your memory

21    it was in March of 2017.

22    **A.**   Okay.

23    **Q.**   So as of the date of your deposition, did you know

24    whether Harvard had ever acknowledged that its holistic

25    admissions process was used to discriminate against Jewish

 1    applicants in the early 20th century?

 2    **A.**  I recall that I was asked that question, and I wasn't

 3    sure what was meant by "acknowledge."  I wasn't sure whether

 4    you meant a formal public statement, so I wasn't sure how

 5    exactly to answer.  I certainly knew that Harvard had

 6    discriminated against Jews.

 7    **Q.**  You recall your answer to that question at the deposition

 8    was that you didn't know?

 9    **A.**  I can't remember exactly the words.  I said I didn't

10    recall, perhaps.  I'm not sure what I said.  And it was in

11    response to the question had I -- had Harvard acknowledged.

12    **Q.**  Let me ask you a different question.

13          As of the date of your deposition, were you

14    generally aware that the holistic admissions process was used

15    for a time in the 20th century to discriminate against Jewish

16    applicants?

17    **A.**  I was aware that there were procedures in effect during

18    the presidency of President Lowell, but I'm not sure that we

19    could call those the holistic admissions process as we

20    currently understand it.

21    **Q.**  Let me direct you -- you've got your deposition there --

22    **A.**  I do.

23    **Q.**  -- on the table in front of you.  Let me direct you to

24    page 30 of your deposition.  I'm going to put it up on the

25    screen.  Do you see line 15, President Faust?

1    **A.**  I do.

2    **Q.**  "QUESTION:  Are you -- are you generally aware that the

3    holistic admissions process was used for a time in the 20th

4    century to discriminate against Jewish applicants?"

5              And there was an exchange between counsel, then:

6              "QUESTION:  Do you know whether that's true?"

7    **A.**  I see that.

8    **Q.**  And then on the next page:

9              "ANSWER:  I'm a historian.  I would not rely on the

10   interpretation of a single historian unchallenged.  I have

11   not done that historical work myself, and therefore I would

12   not presume to make judgment about its accuracy."

13             Was that your sworn testimony?

14             MR. LEE:  Your Honor, in fairness, he needs to read

15   the question at line 13 and 14, the question and answer that

16   precedes it, actually beginning at line 10.  Because

17   otherwise you don't know who the single historian is on the

18   next page.

19             MR. HUGHES:  I'm happy to do that since it

20   clarifies.  Where did you want me to go, Mr. Lee?

21             MR. LEE:  I think if you started, Mr. Hughes, at

22   page 30, line 10, "Are you familiar with."

23   BY MR. HUGHES:

24   **Q.**  So we asked you:  "Are you familiar with the work of

25   Jerome Karabel?"

1           And you answered "Yes."

2           And then we asked:  "Are you familiar with his book

3     "The Chosen"?

4           You said:  "I am.  I have not read it.  I know of

5     it."

6           And then we asked you:  "Are you -- are you

7     generally aware that the holistic admissions process was used

8     for a time in the 20th century rich to discriminate against

9     Jewish applicants?  Do you know whether that's true?"

10          And then you answered, "I'm a historian.  I would

11    not rely on the interpretation of a single historian

12    unchallenged.  I have not done that historical work myself,

13    and therefore I would not presume to make judgment about its

14    accuracy."

15          That was your sworn testimony, correct?

16    **A.**  Yes, it was.

17    **Q.**  And do you know -- or at the time of your deposition, did

18    you know whether prior Harvard presidents had acknowledged

19    that the use of a holistic admissions process was

20    inappropriate with respect to Jewish applicants during the

21    20th century?

22    **A.**  I'm sorry.  Your question is?

23    **Q.**  At the time of your deposition, did you know whether

24    prior Harvard presidents had acknowledged that the use of a

25    holistic admissions process was inappropriate with respect to

Case: 19-2005    Document 00117632240    Page: 450    Date Filed: 07/30/2020    Entry ID: 6356615
Case 1:14-cv-14176-ADB    Document 654    Filed 04/18/19    Page 232 of 261

232

1    Jewish applicants during the 20th century?

2    **A.**  I knew and my predecessors as presidents knew.  And Neil

3    Rudenstine in that very document that we were talking about a

4    moment ago talked about discrimination against Jews.

5         What I was trying to say here is I did not know the

6    nature of the admissions process as you described it as

7    holistic.

8         It was a characterization that you have given it.

9    I don't know exactly how that admissions process worked.  Was

10   it the holistic admissions process that you equate with the

11   one today?  I was very uncomfortable with the way you -- not

12   you -- but your predecessors were asking me to describe this

13   process.  And I felt it was not adequately complicated in its

14   approach to historical materials.

15   **Q.**  Are you aware that Harvard adopted its holistic

16   admissions policy in the 1920s, in part, to limit the number

17   of Jewish students on its campus?  Are you aware of that?

18        MR. LEE:  We are way beyond the couple of questions

19   and way beyond the judicial notice.

20        MR. HUGHES:  It's the last question.  And we asked

21   Dean Khurana this exact question.

22        THE COURT:  That's fine.  He can have it.

23   BY MR. HUGHES:

24   **Q.**  I'll ask it again because of all the interruptions.

25   **A.**  I lost track.

Case: 19-2005    Document: 00117683240    Page: 454    Date Filed: 07/30/2020    Entry ID: 6356615
Case 1:14-cv-14176-ADB   Document 654   Filed 04/18/19   Page 233 of 261

233

1    **Q.**  Are you aware that Harvard adopted its holistic

2    admissions process in the 1920s in part to limit the number

3    of Jewish students at Harvard?

4    **A.**  Harvard adopted an admissions process in the 1920s to

5    limit the number of Jewish students.  How to characterize

6    that precisely and to make an equation between that process

7    and the one that has been in effect in recent years is not

8    something that I am comfortable assenting to.

9         I would never doubt -- I would not ever want to

10   express a doubt that there had been discrimination against

11   Jews in the 1920s.  That is clear.  But the particulars of

12   how that admissions process worked are not known to me, and I

13   don't think I could say that they are equivalent to what we

14   today call the holistic admissions process.

15   **Q.**  All right.  Let's shift gears to a new topic.

16        Would you agree that implicit bias is a concept

17   that has been studied extensively by individuals on Harvard's

18   campus and other campuses and it's an important consideration

19   to take into account when one makes judgments?

20   **A.**  Yes.

21   **Q.**  Would you agree that the research on implicit bias shows

22   that everybody has some implicit bias?

23   **A.**  Yes.

24   **Q.**  And do you believe that the institution of Harvard has a

25   responsibility to ensure that bias is not leaking into its

1    admissions decision-making process in any form?

2    **A.**   I believe that Harvard should do its utmost to address

3    questions of bias, yes.

4    **Q.**   Last topic.

5            At a certain point during your presidency, Harvard

6    decided to bring back the early-action program to its

7    admissions process, right?

8    **A.**   That's correct.

9    **Q.**   And that happened in 2011, correct?

10   **A.**   That's correct.

11   **Q.**   And the decision to bring back early action in admissions

12   was a sufficiently important decision that the board had to

13   weigh in, right?

14   **A.**   That's correct.

15   **Q.**   Can you describe just a little bit the relationship of

16   the board to the college at a very high level?

17   **A.**   Harvard actually has two governing boards, the board of

18   overseers and the Harvard Corporation, and they jointly

19   oversee the university.  It's generally seen that the group

20   with the more direct fiduciary engagement is the corporation,

21   and they have the final say on anything in which they would

22   choose to be engaged.

23           But in most instances there's quite a respectful

24   division between management and governance.  And so a lot

25   takes place through consultation and advice and consent

1    rather than direct exertion of control by that governing

2    board.

3            Is that what you wanted to know?

4    **Q.**  It does.  I'm just trying to get to the point that the

5    corporation board had to approve -- did approve the return --

6    bringing back early action.  Is that right?

7    **A.**  It did.  It's unclear whether they would have had to, but

8    I felt it was important that they be on board because this

9    was a significant decision.  And so I wanted their

10   concurrence in it.

11   **Q.**  And you sought their concurrence on important issues, not

12   everyday issues?

13   **A.**  Yes.  Exactly.

14   **Q.**  So now I want to show you a document that's Plaintiff's

15   Exhibit P62.  It should be in that binder right there.  I'm

16   going to put it up on the screen.  And you see this is a

17   memorandum to the members of the corporation from you and

18   Mike Smith, correct?

19   **A.**  Yes.

20   **Q.**  And it concerns the proposed changes in admissions

21   policy, right?

22   **A.**  It does.

23   **Q.**  And it's from February 2, 2011, correct?

24   **A.**  Mm-hmm.

25   **Q.**  You're familiar with this document, right?

**JA3377**

```
 1    A.  I am.

 2           MR. HUGHES:  I move the admission, if we haven't

 3    already, of P62.

 4           MR. LEE:  No objection.

 5           THE COURT:  It's admitted.

 6           (Plaintiff Exhibit No. P62 admitted.)

 7    BY MR. HUGHES:

 8    Q.  You actually presented this memo to the board during a

 9    meeting with them, right?

10    A.  Yes.

11    Q.  And you would have reviewed P62 before you did that

12    presentation, correct?

13    A.  Yes, I would have.

14    Q.  And the idea of the memo is it basically captures the

15    reasons why you and Dean Smith were recommending that Harvard

16    reinstate early action, correct?

17    A.  That's correct.

18    Q.  And you know, you're familiar with the Harvard Office of

19    Institutional Research, correct?

20    A.  I am.

21    Q.  Sometimes referred to as OIR, right?

22    A.  Yes.

23    Q.  Okay.  And OIR is an office within the provost's office

24    that does data analytics on whatever dimension of Harvard

25    that Harvard needs data analytics on, right?
```

1    **A.**   That's correct.

2    **Q.**   Did you work with OIR a fair amount when you were

3    president?

4    **A.**   I did.

5    **Q.**   And you came to rely on their work?

6    **A.**   I did.

7    **Q.**   And that was a serious office with serious people that

8    did reliable work?

9    **A.**   Yes, it was.

10   **Q.**   Okay.  And some of the pages that are in P62 are pages

11   that were prepared by OIR; is that right?

12   **A.**   Yes, it is.

13   **Q.**   I'd like to just turn and show a few of those to you.

14   I'm going to go to page 10 on the screen.  You're welcome to

15   follow along with me on paper.

16          This would be one of the pages prepared by OIR,

17   correct?

18   **A.**   The screen is sort of blurry, so I'm going to --

19   **Q.**   Look at the papers.  You're not the first witness to make

20   that comment.

21   **A.**   I was thinking it was my eyes.

22   **Q.**   It's not your glasses.

23   **A.**   Good.

24   **Q.**   What you've got there on the paper, page 10 is one of the

25   pages or slides prepared by OIR, correct?

1    **A.**  Yes.

2    **Q.**  And you see up at the right-hand corner it says

3    "Preliminary Draft"?

4    **A.**  Yes.

5    **Q.**  And then on the next page the same thing, page 11 we've

6    got another OIR slide, correct?

7    **A.**  Yes.

8    **Q.**  It says "Preliminary Draft"?

9    **A.**  Mm-hmm.

10   **Q.**  Is that right?

11   **A.**  It does.

12   **Q.**  Then if we turn to page 15 of this presentation to the

13   board to bring back early action, again we have some analysis

14   from OIR, correct?

15   **A.**  Wait a minute.  Yes.

16   **Q.**  Again it says "Preliminary Draft," correct?

17   **A.**  It does.

18   **Q.**  And if we go to page 20, again we've got another OIR

19   slide, correct?

20   **A.**  I've got all kinds of things in the middle here.  Yes.

21   **Q.**  It says "Preliminary Draft"?

22   **A.**  Mm-hmm.

23   **Q.**  Is that a yes?

24   **A.**  Yes.

25   **Q.**  Same thing with page 21, correct?

1    **A.**  Yes.

2    **Q.**  Same thing with page 22, analysis from OIR with the

3    "Preliminary Draft" in the upper right, correct?

4    **A.**  Yes.

5    **Q.**  Same thing with the next page, more analysis from OIR,

6    also says "Preliminary Draft," correct?

7    **A.**  Yes.

8    **Q.**  And same thing again with the next page, more analysis

9    from OIR.  Also says "Preliminary Draft," correct?

10   **A.**  Yes.

11   **Q.**  And when you sent these slides from OIR to the board with

12   the designation of "Preliminary Draft," you weren't sending

13   unreliable or incomplete analysis to Harvard's board, were

14   you?

15   **A.**  Were these sent to the board in this form?

16   **Q.**  This is your memo, ma'am.  P62, this is your document.

17   This is the memorandum that I believe you told us you sent to

18   the board.

19   **A.**  It would surprise me that we were sending preliminary

20   drafts to the board.  Often materials were circulated within

21   the administrative units beforehand, and they were usually

22   formalized before they went to the board.  So I'm a little

23   puzzled why we would have sent preliminary material to the

24   board.

25   **Q.**  Let me direct you -- I'm going to direct you to part of

Case: 19-2005 Document: 00117632240 Page: 458 Date Filed: 07/30/2020 Entry ID: 6356615
Case 1:14-cv-14176-ADB Document 654 Filed 04/18/19 Page 240 of 261

240

1   your deposition, just to see if we can refresh your

2   recollection.  If you can, look to page 148 of your

3   deposition.  Actually if you start at page 147, and you see

4   here we're talking about Exhibit 4 in your deposition?

5   **A.**   Yes.

6   **Q.**   And you see on the screen Exhibit 4 to your deposition is

7   the same document I'm showing you, Plaintiff's Exhibit 62.

8   **A.**   Okay.

9   **Q.**   Do you see that?

10  **A.**   Mm-hmm.

11  **Q.**   And then if you look at page, at the bottom of page 148,

12  line 22.  Kind of read from the bottom of page 148 over to

13  149, line 1 actually, the top of 149, line 1.  And I'll ask

14  you a question.

15  **A.**   Yes.

16  **Q.**   So now that you've looked at your testimony, do you agree

17  you presented the information contained in P62 to the board?

18  **A.**   I don't know if I did or not.  In my deposition we didn't

19  focus on the preliminary -- whatever it says, preliminary

20  report part of it, which puzzles me.

21          So I would expect that we presented some version of

22  this to the board, but we're not usually in the habit of

23  presenting preliminary drafts to the board.  During the

24  deposition we didn't talk about that.  And perhaps I didn't

25  notice that it said "Preliminary Draft."

Case: 19-2005    Document: 00117623240    Page: 459    Date Filed: 07/30/2020    Entry ID: 6356615
Case 1:14-cv-14176-ADB   Document 654   Filed 04/18/19   Page 241 of 261

241

1          You've made such an emphasis on it here that now

2     I'm thinking did we give this to the board in preliminary

3     form.

4     **Q.**  Maybe I went too far.  But you agreed in your deposition

5     that you did provide the information contained in P62 to the

6     board, correct?

7     **A.**  We gave information about statistics related to early

8     action to the board, yes.

9     **Q.**  Is there anything that you can see just from the face of

10    this document that would lead you to believe it wasn't the

11    final document?

12    **A.**  Well, that it says "Preliminary Draft."

13          MR. HUGHES:  Thank you, President Faust.

14          No further questions.

15          MR. LEE:  Nothing further, Your Honor.

16          THE COURT:  You're excused.  Thank you.

17          THE WITNESS:  Thank you.

18          THE COURT:  We have left the deposition testimony?

19          MR. LEE:  That's it.

20          THE COURT:  I'm game for forging through today and

21    we can get to closings tomorrow.

22          MR. LEE:  It's very short.  Ms. Ellsworth is going

23    to be the examiner.  I'm going to be the witness.

24          MS. ELLSWORTH:  Harvard calls the former associate

25    director of admissions Grace Cheng.  And her name and address

Case: 19-2005   Document 00117628249   Page: 460   Date Filed: 07/30/2020   Entry ID: 6356615
Case 1:14-cv-14176-ADB   Document 654   Filed 04/18/19   Page 242 of 261

242

1    is actually in the record.

2              (GRACE CHENG, deposition read in court)

3                         EXAMINATION

4    BY MS. ELLSWORTH:

5    **Q.**   Ms. Cheng, how does an applicant's GPA play a role in

6    Harvard's admissions process?

7    **A.**   It is just one piece of data that is available.

8    **Q.**   Okay.  Now, let me ask the question replacing GPA with

9    race.  What's your answer on that?

10   **A.**   I would give the same answer.

11   **Q.**   Did you use the numbers of minorities from prior years

12   classes as targets from an admissions cycle?

13   **A.**   No.

14   **Q.**   Within the Z docket, we talked earlier about targets, how

15   you received a number of applicants to recommend which you

16   were to bring to the full committee meeting; is that right?

17   **A.**   Yes.  A recommended preliminary target.

18   **Q.**   And did you account for diversity by ethnicity or gender

19   or otherwise in arrival at that target number?

20   **A.**   No.

21   **Q.**   So your subcommittee was not focused on the number of men

22   and women, African-Americans, Asian-Americans, and others by

23   number in reaching the target in your subcommittee?

24   **A.**   Correct.

25   **Q.**   Okay.  So then let's go forward to the full committee.  I

1  guess each subcommittee then brings a recommended number of
2  applications.  How then is the class shaped by gender,
3  ethnicity, and otherwise?
4  **A.**  So once the committee enters full committee, as I
5  mentioned before, the targets become irrelevant and area
6  people advocate for individual cases to be admitted in the
7  full committee process without keeping track of specific
8  categories like you mentioned.
9          At the end of the full committee process, we then
10  are told the total number of still preliminary admitted
11  students.  We are told whether we need to pull out a certain
12  number according to the procedures we talked about earlier.
13  **Q.**  Okay.  So then at what point did Dean Fitzsimmons
14  communicate to the full committee that numbers by groups
15  needed to be adjusted?
16  **A.**  So approximately three days before the end of the full
17  committee process, the full committee would be notified how
18  many students needed to come out of the class.  They would
19  come out of each docket.
20  **Q.**  So the first time the full committee saw numbers by
21  subgroups such as ethnicity and gender was three days before
22  the end of the process?
23  **A.**  No.  To clarify, we never saw numbers by those
24  categories.  We only saw numbers by docket.
25  **Q.**  Okay.  At that point, is the full committee aware of the

Case: 19-2005    Document: 00117638240    Page: 462    Date Filed: 07/30/2020    Entry ID: 6356615
Case 1:14-cv-14176-ADB    Document 654    Filed 04/18/19    Page 244 of 261

244

1   subcategories of numbers?

2   **A.**   No.

3   **Q.**   So what guidance are the subcommittees given in terms of

4   how to narrow their pool?

5   **A.**   They are just given number of applicants that they need

6   to identify to pull out of the class.

7   **Q.**   And this is the lop process?

8   **A.**   Correct.

9   **Q.**   Were you ever given guidance in terms of a group being

10   too underrepresented?

11   **A.**   Not that I remember.

12   **Q.**   Did you know the numbers by race of the preliminarily

13   admitted class before the lopping process began?

14   **A.**   No.

15   **Q.**   Do you know if that information was tracked during the

16   admissions process?

17   **A.**   I don't know.

18   **Q.**   After that process, what was the committee's information

19   about groups by race of the prospectively admitted class at

20   that point?

21   **A.**   From what I remember, we were never told the breakdown.

22   **Q.**   So when did you learn the breakdown of an admitted class

23   by race?

24   **A.**   Usually in the press release to the public once the class

25   was admitted.

1   **Q.** So is it your testimony that from the beginning of the

2   process until the press release, the full committee did not

3   have in front of it the numbers of the prospectively admitted

4   class by race?

5   **A.** From what I recall, yes.

6   **Q.** Okay. The lopping process, just to finish that subject,

7   who made the final decisions about who was lopped? Was that

8   also a full committee vote for each prospectively or

9   preliminarily admitted applicant or was the process different

10  for the lopping?

11  **A.** The process was not different. It came down to the full

12  committee vote.

13  **Q.** So for each person on the lop list, there was a full

14  committee vote?

15  **A.** Yes.

16          (End of GRACE CHENG deposition reading.)

17          MS. ELLSWORTH: Harvard calls former admissions

18  officer Caroline Weaver.

19          (CAROLINE WEAVER, deposition read in court)

20                  EXAMINATION

21  BY MS. ELLSWORTH:

22  **Q.** And you worked at the admissions office at Harvard from

23  approximately August of 2013 to August 2015; is that

24  accurate?

25  **A.** I believe so, yes.

1    **Q.**  So you worked there during two admission cycles, correct?

2    **A.**  Correct.

3    **Q.**  And that would be for the class of 2018 and the class of

4    2019, correct?

5    **A.**  Correct.

6    **Q.**  Were there guidelines circulated to you as to what -- as

7    to how to score within these four subcategories that we just

8    mentioned?

9    **A.**  Admissions officers receive training on how to read and

10   review an application file.

11   **Q.**  Which included how to properly score each subcategory

12   that we just mentioned?

13   **A.**  The scoring was included in the training, yes.

14   **Q.**  And you had that training at the beginning of your time

15   at the Harvard admissions office?

16   **A.**  There was a -- an official training that we went through.

17   However, we were constantly receiving feedback.

18   **Q.**  Going back to the personal score, what goes into that

19   score?

20   **A.**  Personal qualities would be decided based on many

21   different things that were covered in the application.

22   **Q.**  Such as what?

23   **A.**  A student teacher's recommendations could play a role.

24   **Q.**  Would you agree that an applicant's race can sometimes

25   factor into the personal score?

1    **A.**   No.

2    **Q.**   Why not?

3    **A.**   An individual's personal qualities are separate from the

4    race.

5    **Q.**   Have you seen -- have you seen applicants with legacy

6    status get in who, in your opinion, would not have been

7    admitted if not for their legacy status?

8    **A.**   Legacy status would not be a reason why a student was

9    either admitted or not admitted.

10   **Q.**   And you have no personal knowledge what, if any,

11   different treatment the list of applicants on the list for

12   Dean Fitzsimmons, which you just mentioned, had compared to

13   the other applicants.  You don't know one way or the other,

14   correct?

15   **A.**   My experience in the admissions office was that all

16   candidates were reviewed in the same form.

17   **Q.**   If an applicant has a familial or personal connection to

18   a Harvard employee, is that fact considered as part of the

19   admissions process?

20   **A.**   There is a place on the student's application where they

21   can check whether or not they're related to a faculty or

22   staff member at Harvard.

23   **Q.**   How is -- how significant is that factor considered?

24   **A.**   It is one small factor among a list of many that are

25   considered for the student's candidacy.

Case: 19-2005    Document 00117632246    Page: 466    Date Filed: 07/30/2020    Entry ID: 6356615
Case 1:14-cv-14176-ADB   Document 654   Filed 04/18/19   Page 248 of 261

248

1    **Q.**  Do you recall an instance of where an applicant who has a

2    familial or personal connection to a Harvard employee,

3    whether that fact increased his or her chances of getting

4    into Harvard based on that?

5    **A.**  Again, it's one very small component, and it would depend

6    entirely on the individual applicant.  But that -- a

7    connection to staff or faculty alone would not be reason

8    enough to grant a student admission.

9    **Q.**  You mentioned that if an applicant noted his or her race

10   in an application, that would be noted on the applicant's

11   folder, correct?

12   **A.**  The student could elect to share their race or ethnicity

13   with the admissions department by checking a box on their

14   application.

15   **Q.**  Right.  When you receive the folder as a first reader,

16   where is that noted on within the application folder?

17   **A.**  It would be one of many pieces of information captured on

18   the summary sheet.

19   **Q.**  What does the term "standard strong" mean within the

20   admissions office?

21   **A.**  "Standard strong" would be a term used to describe an

22   applicant who is very well qualified academically and likely

23   has a good deal of extracurricular involvement as well but

24   isn't distinguished in Harvard's incredibly, incredibly

25   competitive applicant pool.

**Q.**  Based on your experience has an admissions officer over
two years, was it your impression that the term "standard
strong" or "SS" was used disproportionately to Asian
applicants, to describe Asian applicants?

**A.**  I don't have that impression.

**Q.**  In comparing applicants at the subcommittee meeting
stage, how was race used to justify full committee
consideration for one candidate over another?

**A.**  Race wouldn't have been a reason to justify full
committee consideration.

**Q.**  Was it used as a reason to influence full committee
consideration?

**A.**  Race was just one factor of many factors that were
considered in an applicant's folder.  It was very individual
and depended completely on the applicant.

**Q.**  During the subcommittee review process, to what extent
are the admissions officers aware of the racial diversity in
percentages of the prior year's class?

**A.**  I can't speak for other admissions officers.  In my
experience, no one told me the breakdown of the previous
class.  That information was public.  I could look it up if I
had wanted to.  It's published every year at the end of the
process.

**Q.**  In your experience, do the subcommittees that you were a
part of, did they try to ensure that the racial diversity of

250

1    the present year's class that was up for consideration was

2    reflective of the racial diversity in the prior year's class?

3    **A.**   When I was there, diversity was something that was

4    important to the university.  However, there was no effort

5    made to make sure that one particular year's diversity

6    reflected that of a previous year's.

7    **Q.**   For an applicant to be considered by the full committee,

8    does the subcommittee need to have a majority vote on that

9    applicant?

10   **A.**   A majority of subcommittee members would have to vote

11   that they would like to admit that individual student for the

12   student to then progress to full committee.  That's usually

13   the process when I was there.

14   **Q.**   After making decisions at the subcommittee level, did any

15   of the subcommittees you participated in ever go back and

16   reevaluate cases?

17   **A.**   Yes.

18   **Q.**   How often is that process triggered by a certain racial

19   group being underrepresented?

20   **A.**   That wouldn't have been the reason we would have reviewed

21   cases.

22   **Q.**   In your experience?

23   **A.**   In my experience, we did not go back and review an

24   application in subcommittee again because of your proposed

25   racial imbalance.  Yes.

Case: 19-2005    Document: 00117632240    Page: 469    Date Filed: 07/30/2020    Entry ID: 6356615
Case 1:14-cv-14176-ADB    Document 654    Filed 04/18/19    Page 251 of 261

251

1    **Q.** In the full committee setting, how often is there

2    discussion about a particular racial group being

3    underrepresented compared to last year's class?

4    **A.** I don't remember that being a focus of the full committee

5    process at all.

6    **Q.** Based on your experiences as an admissions officer, how

7    could the admissions process be manipulated if someone wanted

8    to achieve a certain percentage of Asian admittees in a given

9    year?

10   **A.** Based on my experience, I can't think of a way in which

11   the process could be manipulated.

12   **Q.** What about through the lop list that we discussed

13   earlier?

14   **A.** A lop list is not intended nor can I think of a way in

15   which it would be designed to manipulate the admissions

16   process.

17   **Q.** Well, if students were listed by their ethnicity on a lop

18   list, couldn't that be used as a way potentially to lop

19   students off of a certain ethnicity?

20   **A.** You're proposing that it's possible. I'm telling you

21   that in my experience in the two years that I was working,

22   that's not how the lop list was used.

23   **Q.** Understood. But it's possible that it would be could be

24   used that way, correct?

25   **A.** I don't think it's possible because individuals who were

Case: 19-2005    Document: 00117638240    Page: 470    Date Filed: 07/30/2020    Entry ID: 6356615
Case 1:14-cv-14176-ADB    Document 654    Filed 04/18/19    Page 252 of 261

252

1    submitted on a lop list were not necessarily lopped.  And the

2    entire full committee then reviewed the individual

3    application before a student was voted to stay in the class

4    or remove from the class.

5    **Q.**   But the individuals on the lop list, their ethnicity is

6    tracked on that list, correct?

7    **A.**   You showed me a document that was collected from Harvard.

8    That was not a document that I was familiar with.

9    **Q.**   You'd agree that those documents, you're referring to the

10   lop list exhibits that were previously marked, correct?

11   **A.**   Yes.

12   **Q.**   You'd agree that both those documents had the

13   abbreviation ETH on them, correct?

14   **A.**   They had that as a column header.

15   **Q.**   Do you agree that the bar is set higher for Asian

16   students as opposed to students from other races at Harvard?

17   **A.**   I personally do not agree with that.

18   **Q.**   Why do you think Asian-Americans are admitted at a lower

19   rate than other applicants at Harvard College?

20   **A.**   I don't know that they are admitted at a lower rate.

21   **Q.**   Do you agree that during your time at Harvard admissions,

22   the admission rate for Asian-Americans and whites were lower

23   than the admission rates for Hispanic and African-American

24   students?

25   **A.**   I don't know the numbers.

Case: 19-2005    Document 00117632246    Page: 471    Date Filed: 07/30/2020    Entry ID: 6356615
Case 1:14-cv-14176-ADB    Document 654    Filed 04/18/19    Page 253 of 261

253

1    **Q.**  Do you think the way race is used in Harvard's admissions

2    process is inappropriate?

3    **A.**  No, I do not think it's inappropriate.  It's a small

4    factor that's considered for some applicants depending on the

5    student's individual application.

6              (End of CAROLINE WEAVER deposition reading.)

7              MS. ELLSWORTH:  Harvard calls former admissions

8    officer Brock Walsh.

9              THE COURT:  Hold on.  Let me just get caught up

10   here.

11             MS. ELLSWORTH:  Brock Walsh.

12             (BROCK WALSH, deposition read in court)

13                        EXAMINATION

14   BY MS. ELLSWORTH:

15   **Q.**  Could you please state your name and business address?

16   **A.**  Brock Walsh.  And my business address is 740 21st Street,

17   Santa Monica, California.

18   **Q.**  And what were you ultimately trying to decide when

19   assigning a personal rating?

20   **A.**  Whether the student would contribute to the class,

21   classroom, roommate group, to the class as a whole.  Their

22   human qualities.

23   **Q.**  When making that determination, would you take the

24   student's race into account?

25   **A.**  No.

Case: 19-2005    Document: 00117638246    Page: 452    Date Filed: 07/30/2020    Entry ID: 6356615
Case 1:14-cv-14176-ADB    Document 654    Filed 04/18/19    Page 254 of 261

254

1    **Q.**  Would you ever take a student's race into account when

2    deciding whether the student should be lopped?

3    **A.**  No.

4    **Q.**  Why not?

5    **A.**  The deliberations of the lop discussion were no different

6    from any other discussion.  We discussed the whole candidate

7    no matter -- no one matter is more important than the other.

8    We tell their story.  You advocate for them as best you can

9    as their area admissions person, and then you put it to a

10   vote.

11   **Q.**  Why was knowing a student's race helpful for you in

12   deciding whether he or she should be admitted to Harvard?

13   **A.**  It's one part of their story that they choose to share.

14   I honor their application and all the care they put into it.

15   And anything they decide to include I honor by taking all

16   that information in and doing my best to understand them as

17   fully as possible and render my best decision.

18              (End of BROCK WALSH deposition reading.)

19              MR. LEE:  Your Honor, Harvard rests.

20              THE COURT:  So we have concluded the evidentiary

21   portion of the case.  We'll go to closing arguments tomorrow.

22              Does 9:30 make sense for everybody?

23              MR. LEE:  That would be great.

24              THE COURT:  Any representatives from the amici

25   here?

```
 1              AMICI REPRESENTATIVE:  Yes, Your Honor.

 2              THE COURT:  You all can close orally if you want.

 3    We will go SFFA, Harvard.

 4              I think you're going to reserve some rebuttal time?

 5              MR. HUGHES:  We've agreed we'll get 90 minutes.

 6    We'll split ours up.  I'm going to talk for about a minute --

 7    no.  It will it be 60 or 70 minutes, and then we'll have the

 8    remainder as rebuttal.

 9              THE COURT:  So close, close, rebuttal, and then the

10    two Amici groups can have their 15 minutes to close as well.

11    Okay?

12              AMICI REPRESENTATIVE:  Thank you, Your Honor.

13              MS. ELLSWORTH:  Your Honor, I've discussed with

14    counsel for SFFA coming up with a schedule for the posttrial

15    briefing and an argument date.  We've conferred with

16    Ms. Folan, and we'll ask for some dates potentially in

17    February for argument and back out the schedule from there.

18              So we'll submit it in writing after the closings,

19    if that's all right with you.

20              THE COURT:  Yes.  How are you planning on doing the

21    findings of fact and conclusions of law?  One and then the

22    other or both at the same time?

23              MS. ELLSWORTH:  What we had been discussing was

24    simultaneous submissions.  Two rounds, but simultaneous for

25    each of them.
```

1          MR. HUGHES:  This isn't my area.  I'm going to

2     trust that Ms. Ellsworth --

3          THE COURT:  You're thinking about February for

4     closing arguments?

5          MS. ELLSWORTH:  That was the thinking based on some

6     scheduling constraints on both ends.

7          MR. WAXMAN:  Including your end.

8          THE COURT:  All right.  Let me think about that.

9     We have a trial that's scheduled for 14 weeks beginning at

10    the end of January.  And we will either take a day off from

11    that, depending on how it's going, or sit for a half day on

12    that and then have you do the closings in the afternoon.

13         I would like to take a separate day for this, but I

14    need to see where they are because I am very tightly

15    controlling their time.

16         MR. WAXMAN:  14 weeks?  How tight is that?

17         THE COURT:  14 weeks, not including jury selection,

18    which they claim to need all of.  I'm concerned about a jury.

19    If we take two weeks off in there, I'm trying to have it be

20    the two school vacation weeks in hopes that that increases

21    the jury pool.

22         I'm not sure -- we'll pick a day and then we'll

23    pick the time of day as we get closer to and I can figure out

24    what's going on in that case.  14 weeks does seem adequate

25    for almost anything.  So that's fine.  So we'll do that.

Case: 19-2005  Document: 00117628240  Page: 475  Date Filed: 07/30/2020  Entry ID: 6356615
Case 1:14-cv-14176-ADB  Document 654  Filed 04/18/19  Page 257 of 261

257

1          Will you all just be mindful tomorrow, I've had

2     some concerns expressed -- I guess it can be hard for the

3     audience to hear what you all are saying, particularly when

4     you're facing me.  So if those closing could be mindful of

5     their volume in getting the microphone closer to their mouth,

6     I think the viewing audience would appreciate that.

7               All right.  Anything else for today?

8               MR. HUGHES:  Thank you, Your Honor.

9               MR. LEE:  Thank you, Your Honor.

10              THE COURT:  We'll see you tomorrow.

11              (Court recessed at 4:30 p.m.)

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                      - - - - - - - - - - -

2                         CERTIFICATION

3

4           I certify that the foregoing is a correct

5     transcript of the record of proceedings in the above-entitled

6     matter to the best of my skill and ability.

7

8

9

10    /s/ Joan M. Daly                 November 1, 2018

11    _____      _____

12    Joan M. Daly, RMR, CRR           Date
      Official Court Reporter
13

14

15

16

17

18

19

20

21

22

23

24

25

INDEX OF WITNESSES

WITNESS                                                        PAGE

DAVID CARD (continued)

     Examination By Mr. Mortara ........................   6
     Re-Examination By Mr. Waxman .......................  98
     Re-Examination By Mr. Mortara ..................... 113
     Re-Examination By Mr. Waxman ...................... 117


MARLYN MCGRATH

     Examination By Mr. Mortara........................ 121
     Examination By Mr. Lee............................ 165
     Further Examination By Mr. Mortara................ 182
     Further Examination By Mr. Lee.................... 183


DREW FAUST

     Examination By Mr. Lee............................ 185
     Examination By Mr. Hughes......................... 227


GRACE CHENG, DEPOSITION READ IN COURT

     Examination ...................................... 242


CAROLINE WEAVER, DEPOSITION READ IN COURT

     Examination ...................................... 245


BROCK WALSH, DEPOSITION READ IN COURT

     Examination ...................................... 253

**JA3401**

Case: 19-2005    Document: 00117628240    Page: 478    Date Filed: 07/30/2020    Entry ID: 6356615
Case 1:14-cv-14176-ADB   Document 654   Filed 04/18/19   Page 260 of 261

260

```
 1                      E X H I B I T S

 2
     Defendant Exhibit                                Received
 3
        DX12      ...................................    219
 4
        DX26      ...................................    217
 5
        DX40      ...................................    196
 6
        DX53      ...................................    215
 7
        DX83      ...................................    211
 8
        DX100     ...................................    209
 9
        634       ...................................    120
10
        DX740     ...................................    210
11
        DX742     ...................................    169
12
        DX743     ...................................    169
13
        744       ...................................    128
14

15

16

17   Plaintiff Exhibit                                Received

18      P62       ...................................    236

19      634       ...................................    120

20      656       ...................................    157

21      657       ...................................    136

22      658       ...................................    136

23      659       ...................................    143

24      660       ...................................    143

25      696       ...................................    130
                  ...................................    132
```

**JA3402**

Case: 19-2005    Document: 00117638246    Page: 479    Date Filed: 07/30/2020    Entry ID: 6356615
Case 1:14-cv-14176-ADB   Document 654   Filed 04/18/19   Page 261 of 261

261

| | | | |
|---|---|---|---|
| 1 | 705 | .................................... | |
| 2 | 706 | .................................... | 132 |
| 3 | 707 | .................................... | 132 |
| 4 | 708 | .................................... | 132 |
| 5 | 720 | .................................... | 149 |
| 6 | 721 | .................................... | 149 |
| 7 | 722 | .................................... | 151 |
| 8 | 723 | .................................... | 151 |
| 9 | 741 | .................................... | 148 |
| 10 | 749 | .................................... | 138 |
| 11 | 755 | .................................... | 135 |
| 12 | 767 | .................................... | 138 |

**JA3403**



1              UNITED STATES DISTRICT COURT

2              DISTRICT OF MASSACHUSETTS

3    _____

4    STUDENTS FOR FAIR ADMISSIONS, INC.,

5              Plaintiff,           Civil Action
                                    No. 14-14176-ADB
6    v.
                                    November 2, 2018
7    PRESIDENT AND FELLOWS OF HARVARD
     COLLEGE, et al.,               Pages 1 to 155

8              Defendants.

9    _____

10

11

12
              TRANSCRIPT OF BENCH TRIAL – DAY 15
13                     CLOSING ARGUMENTS
         BEFORE THE HONORABLE ALLISON D. BURROUGHS
14            UNITED STATES DISTRICT COURT
           JOHN J. MOAKLEY U.S. COURTHOUSE
15              ONE COURTHOUSE WAY
                 BOSTON, MA  02210

16

17

18

19

20

21              JOAN M. DALY, RMR, CRR
             KELLY MORTELLITE, RMR, CRR
22              Official Court Reporters
            John J. Moakley U.S. Courthouse
23          One Courthouse Way, Room 5507
                 Boston, MA  02210
24             joanmdaly62@gmail.com

25

**JA3404**

Case: 19-2005    Case 1:14-cv-14176-ADB    Document 656    Filed 04/18/19    Page 2 of 155    Entry ID: 6356615
Document: 00117628340    Page: 461    Date Filed: 07/30/2020

2

```
 1    APPEARANCES:

 2
      COUNSEL FOR THE PLAINTIFF:
 3

 4            ADAM K. MORTARA, ESQUIRE
              J. SCOTT McBRIDE, ESQUIRE
 5            KRISTA J. PERRY, ESQUIRE
              Bartlit Beck Herman Palenchar & Scott
 6            54 West Hubbard Street
              Suite 300
 7            Chicago, Illinois 60654
              312.494.4400
 8            adam.mortara@bartlit-beck.com
              scott.mcbride@bartlit-beck.com
 9            krista.perry@bartlit-beck.com

10            JOHN M. HUGHES, ESQUIRE
              KATHERINE L.I. HACKER, ESQUIRE
11            MEG E. FASULO, ESQUIRE
              Bartlit Beck Herman Palenchar & Scott
12            1801 Wewatta Street
              Suite 1200
13            Denver, Colorado 80202
              303.592.3100
14            john.hughes@bartlit-beck.com
              meg.fasulo@bartlit-beck.com
15            kat.hacker@bartlit-beck.com

16            JOHN MICHAEL CONNOLLY, ESQUIRE
              THOMAS R. McCARTHY, ESQUIRE
17            WILLIAM S. CONSOVOY, ESQUIRE
              Consovoy McCarthy Park PLLC
18            3033 Wilson Boulevard
              Suite 700
19            Arlington, Virginia 22201
              703.243.9423
20            mike@consovoymccarthy.com
              tom@consovoymccarthy.com
21            will@consovoymccarthy.com

22

23

24

25
```

**JA3405**

Case: 19-2005    Document: 00117628340    Page: 482    Date Filed: 07/30/2020    Entry ID: 6356615
Case 1:14-cv-14176-ADB    Document 656    Filed 04/18/19    Page 3 of 155

3

```
 1    APPEARANCES (cont.):

 2
              PATRICK STRAWBRIDGE, ESQUIRE
 3            Consovoy McCarthy Park PLLC
              Ten Post Office Square
 4            8th Floor, South, PMB #706
              Boston, Massachusetts 02109
 5            617.227.0548
              patrick@consovoymccarthy.com
 6
              MICHAEL H. PARK, ESQUIRE
 7            Consovoy McCarthy Park PLLC
              3 Columbus Circle
 8            15th Floor
              New York, New York 10024
 9            646.456.4432
              park@consovoymccarthy.com
10
              PAUL M. SANFORD ESQUIRE
11            BENJAMIN C. CALDWELL, ESQUIRE
              Burns & Levinson LLP
12            One Citizens Plaza
              Suite 110
13            Providence, Rhode Island 02903
              401.831.8330
14            psanford@burnslev.com
              bcaldwell@burnslev.com
15

16    COUNSEL FOR THE DEFENDANT:

17            WILLIAM F. LEE, ESQUIRE
              FELICIA H. ELLSWORTH, ESQUIRE
18            ANDREW S. DULBERG, ESQUIRE
              ELIZABETH C. MOONEY, ESQUIRE
19            SARAH R. FRAZIER, ESQUIRE
              Wilmer Cutler Pickering Hale and Dorr LLP
20            60 State Street
              Boston, Massachusetts 02109
21            617.526.6556
              william.lee@wilmerhale.com
22            felicia.ellsworth@wilmerhale.com
              andrew.dulberg@wilmerhale.com
23            elizabeth.mooney@wilmerhale.com
              sarah.frazier@wilmerhale.com
24

25
```

```
 1    APPEARANCES (cont.):

 2
              SETH P. WAXMAN, ESQUIRE
 3            DANIELLE CONLEY, ESQUIRE
              DANIEL WINIK, ESQUIRE
 4            BRITTANY AMADI, ESQUIRE
              PAUL R.Q. WOLFSON, ESQUIRE
 5            Wilmer Cutler Pickering Hale and Dorr LLP
              1875 Pennsylvania Ave, NW
 6            Washington, DC 20006
              202.663.6006
 7            seth.waxman@wilmerhale.com
              danielle.conley@wilmerhale.com
 8            daniel.winik@wilmerhale.com
              brittany.amadi@wilmerhale.com
 9            paul.wolfson@wilmerhale.com

10            DEBO P. ADEGBILE, ESQUIRE
              Wilmer Cutler Pickering Hale and Dorr LLP
11            7 World Trade Center
              250 Greenwich Street
12            New York, New York 10007
              212.295.6717
13            debo.adegbile@wilmerhale.com

14            ARA B. GERSHENGORN, ESQUIRE
              Harvard Office of the General Counsel
15            Smith Campus Center
              Suite 980
16            1350 Massachusetts Avenue
              Cambridge, Massachusetts 02138
17            617.495.8210
              ara_gershengorn@harvard.edu

18

19    COUNSEL FOR AMICI STUDENTS:

20            JON M. GREENBAUM, ESQUIRE
              BRENDA L. SHUM, ESQUIRE
21            GENEVIEVE BONADIES TORRES, ESQUIRE
              KRISTEN CLARKE, ESQUIRE
22            1500 K Street NW, Suite 900
              Washington, DC 20005
23            202.662.8315
              jgreenbaum@lawyerscommittee.org
24            bshum@lawyerscommittee.org
              gtorres@lawyerscommittee.org
25            kclarke@lawyerscommittee.org
```

**JA3407**

Case: 19-2005    Document: 00117628340    Page: 484    Date Filed: 07/30/2020    Entry ID: 6356615
Case 1:14-cv-14176-ADB   Document 656   Filed 04/18/19   Page 5 of 155

5

```
 1    APPEARANCES (cont.):

 2
              LAWRENCE CULLEEN, ESQUIRE
 3            EMMA DINAN, ESQUIRE
              Arnold & Porter LLP
 4            555 Twelfth Street, NW
              Washington, DC 20004
 5            202.942.5477
              gina.dean@aporter.com
 6            emma.dinan@aporter.com

 7
      COUNSEL FOR AMICI ORGANIZATIONS:
 8
              JENNIFER A. HOLMES, ESQUIRE
 9            CARA McCLELLAN, ESQUIRE
              JIN HEE LEE, ESQUIRE
10            MICHAELE M. TURNAGE YOUNG, ESQUIRE
              RACHEL N. KLEINMAN, ESQUIRE
11            NAACP Legal Defense and Educational Fund, Inc.
              700 14th Street NW
12            Suite 600
              Washington, DC 20005
13            jholmes@naacpldf.org
              cmcclellan@naacpldf.org
14            jlee@naacpldf.org
              mturnageyoung@naacpldf.org
15            rkleinman@naacpldf.org

16            KENNETH N. THAYER, ESQUIRE
              KATE R. COOK, ESQUIRE
17            Sugarman Rogers
              101 Merrimac Street
18            Suite 900
              Boston, Massachusetts 02114
19            617.227.3030
              thayer@sugarmanrogers.com
20            cook@sugarmanrogers.com

21

22

23

24

25
```

**JA3408**

```
 1                    P R O C E E D I N G S

 2                    (The following proceedings were held in open

 3      court before the Honorable Allison D. Burroughs, United

 4      States District Judge, United States District Court, District

 5      of Massachusetts, at the John J. Moakley United States

 6      Courthouse, One Courthouse Way, Boston, Massachusetts, on

 7      November 2, 2018.)

 8                    THE COURT:  Good morning, everyone.  Can I see the

 9      parties at sidebar for one second.

10                    [Sidebar sealed and redacted.]

11                    THE COURT:  All right.  So for the audience, we

12      were just discussing scheduling up at sidebar.  Mr. Hughes is

13      going to close first.  He's going to reserve some time, so we

14      will take a break after his opening closing, and then we will

15      hear from Harvard.  That should take us right to the lunch

16      break.  We'll break for lunch, and then we'll come back for

17      SFFA's rebuttal and the two Amici closings.

18                    Mr. Hughes, I know we discussed this yesterday, but

19      try and keep your voice up because you have a cast of

20      thousands wanting to hear what you say this morning.

21                    MR. HUGHES:  I'll try to be very loud, Your Honor.

22                    THE COURT:  Excellent.

23                    MR. HUGHES:  Thank you, Your Honor.

24                    **PLAINTIFF CLOSING ARGUMENT**

25                    MR. HUGHES:  John Hughes for SFFA.
```

Case: 19-2005    Document: 00117628840    Page: 486    Date Filed: 07/30/2020    Entry ID: 6356615
Case 1:14-cv-14176-ADB    Document 656    Filed 04/18/19    Page 7 of 155

7

 1          Your Honor, all of the claims here in this case are
 2    important, but we're going to spend most, if not all, of our
 3    time today in closing on Claim 1, the question of intentional
 4    discrimination against Asian-Americans, and we'll give more
 5    fulsome treatment to the other claims in our post-trial
 6    briefing.
 7          I want to start with what everyone knew going into
 8    this case.  Asian-Americans continue to face racial bias and
 9    are often falsely stereotyped as shy and reserved, book smart
10    and one-dimensional, perpetual foreigners or model
11    minorities.  How did that play out here at Harvard?
12          Harvard has a personal rating that is important to
13    admissions that is designed to measure how outgoing or
14    personable its applicants are, measuring subjective character
15    traits such as likability or effervescence.  And what the
16    undisputed evidence shows is that Harvard's system for the
17    years at issue in this case, the Harvard classes of 2014 to
18    2019, the Harvard admissions office awarded Asian-American
19    applicants statistically significantly lower personal scores
20    than it did for white applicants.
21          Harvard does not and cannot dispute this.  Lower
22    personal scores, statistically significant, critical to
23    admissions.
24          There are two possible explanations here.  There's
25    SFFA's explanation, that bias and stereotyping explain the

1    disparity, not a racist conspiracy, but bias and stereotypes

2    that even well-meaning people are susceptible to deploying.

3    And the law is clear, in a subjective process with proof of

4    statistical discrimination, evidence of bias and stereotyping

5    can suffice to show intentional discrimination.

6              This is particularly true in a system like

7    Harvard's that is not race-neutral.  And here, even though

8    Harvard has a race-conscious admission system where it claims

9    to consider the race of every applicant who provides it, it

10   did not provide bias training.  It did nothing to address or

11   debunk commonly held stereotypical beliefs about

12   Asian-Americans or other racial or ethnic groups.

13             And this remained true even after Harvard received

14   repeated warnings from the Harvard Office of Institutional

15   Research that its admissions system might be imposing an

16   Asian penalty.

17             And even if we give Harvard the benefit of the

18   doubt on the Office of Institutional Research, maybe this was

19   just a preliminary warning, its response is not what you

20   would expect from an institution committed to preventing

21   discrimination against Asian applicants.

22             Dean Fitzsimmons, despite receiving repeated

23   analysis from OIR showing an Asian penalty, told no one else

24   in the admissions, not Director McGrath, no one.  Didn't tell

25   his boss.  Didn't tell anybody.  Didn't follow up.  Just

**JA3411**

Case: 19-2005   Document: 00117628340   Page: 488   Date Filed: 07/30/2020   Entry ID: 6356615
Case 1:14-cv-14176-ADB   Document 656   Filed 04/18/19   Page 9 of 155

9

1     plowed on ahead.  SFFA's explanation that intentional

2     discrimination is the reason for the undisputed disparity in

3     the personal score is the likely one.

4          Then we have Harvard's explanation.  Harvard's

5     explanation buys into these stereotypes that the Asian

6     penalty is the result of Asian-American applicants not being

7     sufficiently multidimensional:  the words of Dr. Card,

8     Harvard's expert.  Harvard suggests that Asian-American

9     applicants are a group of one-dimensional academic

10    superstars, many of whom Harvard has decided don't have the

11    right personal qualities for Harvard.  Book smart, not

12    personable.  That's Harvard's explanation based on the

13    ratings that Harvard's admissions officers determine.

14         Two possible explanations but only one persuasively

15    lines up with the evidence.  And what hopefully we all know

16    in our hearts, Asian-Americans do not have worse personal

17    qualities than any other group.  Harvard's explanations must

18    and should be rejected.

19         Now I want to turn to the evidence.  And it brings

20    us to the most important issue in the case in terms of both

21    the modeling and the statistical fight and the evidence

22    beyond that of intentional discrimination, and that is the

23    personal score.

24         It is important for two independent reasons, and I

25    want to make sure this is crystal clear.  First, if race

1    influenced the personal score in any meaningful way, even if

2    only as an avenue for Harvard to award preferences to

3    African-American and Hispanic applicants, it must come out of

4    Dr. Card's model.  Because at that point it is not

5    distinguishable from the overall rating.  I'll say more about

6    that in a minute.

7            And the reason why this is so important to the case

8    is that Dr. Card admits that if you take the personal rating

9    out of either the model that he reported in his original

10   report or the model that he or reported in his rebuttal

11   report, there is a statistically significant Asian-American

12   penalty.  So if you resolve that factual question in our

13   favor, it ends the statistical case.

14           And now I want to talk about how we need to compare

15   the treatment of the overall score, how Dr. Card and

16   Dr. Arcidiacono treated that, and then line that up with the

17   evidence about the personal score.  And what I'm hoping to do

18   is to connect the dots and show you that the way race is used

19   in the overall score, a score that's supposed to consider all

20   the information in the application and race is only a small

21   part of that; and even so, both experts agree it has to come

22   out.

23           The evidence is just as strong that race plays at

24   least a similarly powerful role in awarding the personal

25   score.  And once we connect those dots and win that factual

1    dispute, the statistical case is over.

2              So let's look in particular, before we get to the

3    evidence of the personal score, about what Dr. Card admitted

4    yesterday to Mr. Mortara about the overall score.

5              First of all, we just had some basic questions

6    about the overall score that Dr. Card admitted.  The overall

7    rating may be influenced by race; he agreed.  Can be affected

8    by race; he agreed.  Contain some potential race-based tips;

9    he agreed.

10             Then we followed up.  We asked him, "Since your

11   analysis seeks to isolate the incremental effect of race on

12   admissions decisions, it is inappropriate to include any

13   variable that themselves can be affected by race, correct?"

14   And he agreed, and that any variable admission applies

15   equally to the overall score as it does to the personal score

16   if we demonstrate that race is influencing the personal

17   score.

18             And the last piece I want to make sure that we

19   focus on is that Dr. Card agrees that if race is influencing

20   a score only where Harvard is administering its preferences

21   for African-American and Hispanic candidates, if it's doing

22   that, it has to come out, and Harvard is going to have no

23   answer that that is happening in both the overall and

24   personal scores and that is the testimony that I've got on

25   the screen that's at slide 4 in your binder where Dr. Card

1    agrees that if race is being used to administer preferences

2    in a particular rating, it's got to come out of the model.

3    That's what he agreed in his sworn testimony.

4            So now I want to focus on the evidence about

5    whether or not race is influencing the personal score, the

6    dispute relevant to the big modeling choice in this case.  I

7    want to start with Plaintiff's Trial Exhibit 631, which is

8    slide 5 in your binder, Your Honor.  This is a slide that

9    shows comparably qualified academic candidates to Harvard

10   stratified by academic decile.  We've talked about that a

11   number of times during the trial.  At the top of my chart are

12   the most competitive candidates by GPA and SAT score, and it

13   goes down from there.

14           And the first thing I want to draw Your Honor's

15   attention to is the total column over here on the right-hand

16   side, and we see that it is reasonable to look at the award

17   of high personal scores stratified by academic qualification

18   because there's a correlation between getting a high personal

19   score and academic qualification.  You can see it starts at

20   26.  2 percent for the top academically qualified candidates

21   and then marches down from there.  So that's the reason this

22   is a good way to look at evidence about the personal score.

23           And then we turn to the racial distribution of the

24   personal score and we see something very interesting.  We see

25   that for comparably qualified academic candidates to Harvard

Case: 19-2005    Document: 00117629240    Page: 482    Date Filed: 07/30/2020    Entry ID: 6356615
Case 1:14-cv-14176-ADB    Document 656    Filed 04/18/19    Page 13 of 155

13

1    at every single decile all along the way African-Americans

2    get the most personal scores of 2 or higher by a significant

3    percentage.  First place, every time.

4         Then if we look at the column for Hispanic

5    applicants to Harvard, they get on average -- they're in

6    second place in terms of getting a personal score of 2 or

7    higher every single time.  Then we turn to the white

8    applicants, third place every time.  And the Asian-American

9    applicants, dead last every single time.  We think this is

10   strong evidence that race is being used in the personal score

11   for all of these different ethnicities, and it's evidence of

12   an Asian penalty.  But I want to draw your attention to the

13   point that I've already made; that this is clearly a place

14   where Harvard is administering its racial preferences, the

15   tips that it gives to African-Americans and Hispanic.  And

16   remember, Harvard has admitted -- they agree in this case --

17   that African-American applicants to Harvard get more of a tip

18   than Hispanic applicants, and we can see that relationship

19   right here in the personal score data.

20         So now I want to turn to the comparison between the

21   overall rating and the personal score in terms of this

22   descriptive data that comes right of out of Harvard's open

23   database.  This is Plaintiff's Exhibit 38.  It's page 19 of

24   your deck, Your Honor.  What I've got at the top, I've

25   limited this to the top four academic deciles, the top 40

Case: 19-2005   Document: 00117623240   Page: 493   Date Filed: 07/30/2020   Entry ID: 6356615
Case 1:14-cv-14176-ADB   Document 656   Filed 04/18/19   Page 14 of 155

14

1   percent of the academically competitive candidates to

2   Harvard.  And I'm comparing the overall rating distribution

3   by race of a personal score of 2 or higher to the same thing

4   with the personal score.  And what we see is that there's a

5   very important lining-up of the distribution of these

6   personal scores.

7         So in the overall rating, where Harvard admits that

8   it uses race to give tips and preferences to African-American

9   and Hispanic candidates, we see that just like on the last

10  slide that we looked at in the overall rating,

11  African-Americans are leading the way.  They're getting the

12  highest overall ratings compared to similarly academically

13  qualified candidates.  Hispanics in second place.  Whites in

14  third.  Asians last every single time.  And we see that that

15  lines up with the personal rating in terms of the pattern of

16  that distribution, which is strong evidence that just like

17  race is used in the overall score to award preferences, it's

18  also used in the personal rating, and just like in the

19  overall score, Asian-American applicants are getting awarded

20  lower scores than similarly academically qualified applicants

21  from other groups, the same thing is turning up in the

22  personal score.

23        And the last thing I'll say on this slide is that

24  when Your Honor asked Professor Arcidiacono whether these

25  differences were statistically significant he explained that

1    they were, which is yet further evidence that we've got race

2    both in the overall score where they admit that it's used and

3    in the personal rating.

4          So now I want to turn to the last piece of data or

5    statistical evidence that supports our view that race is

6    influencing the personal score.  That is the model that Dr.

7    Arcidiacono ran to analyze this very issue.  And I want to

8    make sure Your Honor is clear.  Now I'm on slide 31, Your

9    Honor, Plaintiff's Demonstrative 38.  I want to be clear.

10   Dr. Arcidiacono ran a number of different models.  The one we

11   talked the most about was his preferred model, sometimes

12   referred to model 5, which looked at the ultimate admissions

13   outcome penalty on Asian-Americans.  What I'm talking about

14   here is a different model where he tried to determine whether

15   or not race was the thing that was driving the differences

16   that we just saw in the last two slides in the personal score

17   among the four different groups that the experts analyzed in

18   this case.

19         And so what Dr. Arcidiacono did is he ran a

20   logistic regression model that controlled for everything that

21   Harvard says explains the difference between Asian-Americans

22   and white applicants:  school rating support, teacher rating,

23   interview ratings and so forth, controlled for all of that

24   and yet found a statistically significant difference in the

25   awarding of personal scores based on race.

**JA3418**

1          And he had a discussion about the explanatory

2     power.  That was the whole pseudo R-squared discussion that I

3     think Mr. Mortara resolved in his cross-examination.  His

4     model at a minimum has strong explanatory power for the

5     difference in the distribution of personal scores based on

6     race.

7          And what he found was that Asian-Americans in the

8     personal score have a penalty based on race based on his

9     model, and that just like Harvard admits that there are

10    preferences, there's a boost for African-American applicants

11    and there's a boost for Hispanic applicants, and that

12    relative boost, African-Americans doing better than

13    Hispanics, which Harvard admits, we see right here in the

14    evidence.

15         And Dr. Card, other lobbing criticisms about pseudo

16    R-squared, he doesn't have a model on the other side of this.

17    He didn't try to model and isolate whether or not race was

18    influencing the personal score.  Only SFFA's expert did that.

19    They basically got nothing on the other side.

20         Now I want to turn to the evidence from the

21    admissions office about whether or not race was influencing

22    the personal score.  But before I do that, I want to make two

23    last points.  Neither Dr. Card nor any Harvard witness gave

24    any testimony explaining, disproving or even attempting to

25    explain the differences that we see in terms of the racial

1    distribution of the overall score and the personal score in

2    terms of Hispanic and African-Americans doing significantly

3    better than the white applicants and Asian applicants, which

4    is alone sufficient to prove that race is infecting the

5    personal score.

6            Dr. Card has zero opinions on that.  No testimony

7    on that.  And no Harvard witness came in to explain that.

8    All the evidence has gone to trying to explain the difference

9    between Asian applicants and white applicants.  And we'll

10   have more on that later.  But the fact dispute of whether

11   race influences the personal score, they've got nothing on

12   that point.

13           So now let's turn to the Harvard witness testimony

14   about whether or not race is influencing the personal score

15   and has to come out of Dr. Card's model.  Mr. Lee said in

16   opening that nothing has changed, nothing meaningful has

17   changed about Harvard's admissions process since the Supreme

18   Court blessed it in the <u>Bakke</u> decision back in the '70s and

19   certainly nothing changed since OCR did a two-year

20   investigation of Harvard's admissions office looking at the

21   issue of Asian-American discrimination in 1990 and issued a

22   50-some-odd- page report.

23           And then we had carefully studied OCR's finding and

24   wanted to make sure we understood Harvard's position on that.

25   So when Dean Fitzsimmons came to testify, I asked him, "Do

Case: 19-2005    Document: 00117629240    Page: 497    Date Filed: 07/30/2020    Entry ID: 6356615
Case 1:14-cv-14176-ADB   Document 656   Filed 04/18/19   Page 18 of 155

18

```
 1    you think the description of how Harvard uses race in the
 2    1990 OCR report is still accurate?"  And he said, "Certainly
 3    the general description in the outlining, yes."  And then we
 4    went one step further.  And I asked an improper question
 5    about whether they'd ever stopped.  Then I rephrased and I
 6    asked him, I said, "Since you've been dean, have Harvard
 7    admissions officers ever used race in awarding personal
 8    scores?"  And he answered, "Not to my knowledge."  We're
 9    looking now, Your Honor, at the testimony on slide 9.
10            And the reason that was important, Dean Fitzsimmons
11    was dean way before the OCR investigation, and he's saying
12    not to my knowledge, no one's ever used race in awarding a
13    personal score, and his testimony is unequivocal.  But it
14    turns out that that's not what his own admissions officers
15    told the OCR investigators in the late 1980s and in 1990.
16    And we've looked at this portion of Plaintiff's Exhibit P555
17    many times.  What it says is that some readers would award --
18    consider race in the overall score in the committee process
19    while other readers indicated that ethnicity was a factor
20    considered throughout the entire admissions process.  They
21    stated that it could be reflected in the four reiterating
22    areas, which Your Honor knows includes the personal score.
23    And then the other set of folks that talked to OCR said they
24    would only ever consider race or ethnicity if the candidate
25    indicated it was important somehow in their application.  So
```

1    people doing it different ways, but certainly people

2    admitting that they were using it in the personal score.

3            And Harvard's reaction to this is important.  They

4    didn't institute any new guidelines after this or make any

5    changes after this.  What they did is actually, years later,

6    doubled down on it in 2012 when the Harvard Office of General

7    Counsel went back to OCR in 2012 responding to a claim of

8    Asian-American discrimination and told OCR that the

9    description OCR had put in that statement of findings that we

10   looked at about how race is used in the Harvard admissions

11   process was still accurate as of 2012.

12           And I want to try to pause and see if we can make a

13   little sense of this incongruity about what Harvard says

14   today and about what Harvard told OCR in the past.  Harvard

15   wants to suggest today that it's had an iron-clad prohibition

16   on the consideration of race in the personal score from time

17   in memorial.  The OCR evidence just fundamentally disproves

18   that, as does Harvard's reaction to the OCR evidence.

19           And the reason this can make sense is that it would

20   not be, Your Honor, automatically unlawful for Harvard to use

21   race in the personal score if they did it in a defined and

22   narrowly tailored way.  If that's how they decided they

23   wanted to award their preferences for the candidates that

24   they have determined need tips, if they did it within the

25   confines of the law, they could do it that way.  And it turns

1    out the evidence shows that's what they've been doing.  We

2    see the substantial preferences for African-Americans and

3    Hispanic applicants in the personal score.

4         The reason that this has turned into such a big

5    deal in this case is because once the experts were hired and

6    everybody starting to crunch the numbers, people realized

7    that if Harvard admitted that it was using race both in the

8    overall score where it has admitted that it has done so

9    forever, and in the personal score, then they had a real

10   problem with the statistical analysis in this case.  So now

11   Harvard is trying to build this defense that race isn't used

12   in the personal score, but it's not consistent with the

13   things that it said in the past.  And I think that gives a

14   little explanatory power to what we've seen in term of the

15   evidence of OCR.

16        Now I want to turn to the evidence about what

17   Harvard's admissions officers said about the use of race in

18   the personal score.  And now I'm on slide 12, Your Honor.

19   And I've got some clips of testimony from some of the

20   witnesses that came to testify here at trial on this issue.

21   And I think we all remember Mr. Mortara's cross-examination

22   of Mr. Looby, who came in here and changed his testimony on

23   things from his deposition many times.  And I want to get

24   into the specifics of what he said on the personal score in a

25   minute, but I want to frame the credibility of what happened

1   with Mr. Looby, who went to a deposition, and all he had to

2   do was tell the truth about how he does his job, the thing he

3   does every day.  Not that hard to do.

4          And he was asked questions about how he considered

5   race, which is what this case is about, and other things

6   about how he did his job.  And he gave honest answers because

7   it's not hard to give honest answers about how you do your

8   job.  But some of the things he said were a real problem for

9   Harvard, like what we've got on the screen right here, where

10  we're impeaching him with his deposition at trial, and his

11  deposition testimony was, "You were asked whether you would

12  take a student's race into account when assessing his or her

13  personal qualities," and his answer was, "Just like with the

14  academic rating, it's one factor of many I consider."  And he

15  said it in other places, too, and Mr. Mortara had to impeach

16  him over and over again.

17         And what we learned is that even though he had an

18  errata and a chance to correct that testimony, that never

19  happened.  Instead he spent ten days with Wilmer lawyers for

20  three plus hours a day to come in and give the testimony that

21  he gave, and you can judge the credibility of what happened

22  there.

23         But then we get to the next witness, which is

24  Charlene Kim, and I thought she gave some pretty important

25  and interesting testimony on this issue which illustrates how

Case: 19-2005    Document: 00117629240    Page: 501    Date Filed: 07/30/2020    Entry ID: 6356615
Case 1:14-cv-14176-ADB   Document 656   Filed 04/18/19   Page 22 of 155

22

1    race is used in the personal score.  Mr. Strawbridge asked

2    her, "When considering the personal score, you also think

3    about how the applicant will add to the community, correct?"

4    She says, "Yes," and gave an explanation.  The very next

5    question we asked her, "You would agree, right, that a

6    student's race or ethnicity is part of how they can help add

7    to the community?"  And she says, "Yes."  So she's connecting

8    those dots between the things that she's considering in terms

9    of personal score, how will they add to the community, which

10   is consonant with all the subjective characterizations that

11   we've heard of what the personal score is trying to measure.

12        And one of those things that admissions officers at

13   Harvard have in mind is that the reason they use race in the

14   admission system is to add to their community in terms of

15   making a diverse campus.  And so it's hard, I think, to

16   disentangle the consideration of race and the considerations

17   that go into awarding the personal score.  And that's exactly

18   what we see from Charlene Kim's testimony.

19        And the last example that I've got here on the

20   slide is the testimony of Erica Bever.  And we asked her,

21   Mr. McBride asked her, "Does race ever factor into an

22   applicant's personal rating?"  And the answer we got was one

23   that you heard over and over again.  We, in our war room,

24   called it Harvard's slogan, was "No, not per se."  We heard

25   that from Dean Fitzsimmons, and even Dr. Card picked up on

1     it.  But what she explained was, she said, "I may not -- the

2     fact that they're a particular race but certainly students

3     might write about their background and things like that that

4     would inform my personal rating and what I give in the

5     personal rating."

6                And the reason this is important is remember back

7     to Dr. Card's admissions on the overall score, what we need

8     to demonstrate is that there's an influence of race on the

9     personal score one of the many things people are considering

10    in awarding that score, just like in the overall score.  And

11    if we connect those dots, it should come out of the model

12    because Dr. Card agrees any variable that's influenced has to

13    come out.

14                And the reason Ms. Bever's testimony is important

15    and other witnesses that gave testimony like it, is that we

16    know that many applicants to Harvard are writing about their

17    experiences facing discrimination, their identity in terms of

18    ethnicity or race, and we heard a lot of that testimony on

19    the day that we had the students testify, which is evidence

20    that that is in front of these admissions officers in many

21    instances and is necessarily, based on the kind of testimony

22    that we saw from witnesses like Ms. Bever, going to lead to

23    the consideration of race in the personal score.

24                And any doubt about all of this is resolved I think

25    by the testimony that Dean Fitzsimmons gave on both these

Case: 19-2005  Document: 00117629240  Page: 503  Date Filed: 07/30/2020  Entry ID: 6356615
Case 1:14-cv-14176-ADB  Document 656  Filed 04/18/19  Page 24 of 135

24

1    issues, on the overall score on the one hand and the personal

2    rating on the other hand.  And I've got that testimony on the

3    screen, and it's slide 13.  And he was asked about the

4    overall rating.  "How can race be considered in the

5    preliminary overall rating?"  And he answered, "If as the --

6    you're doing your preliminary overall rating, if you think

7    that this might be an additional little element that might be

8    helpful in terms of making a case that this person, as I say,

9    might be an unusual educator of others, the person might

10   decide to factor that into the preliminary overall rating."

11   So a very hedged view of how race might affect the

12   preliminary overall rating.  But that kind of relationship

13   between race and the preliminary overall rating was

14   sufficient for both experts to determine that variable was

15   influenced by race and it had to come out.

16        And we see the same kind of thing when he's asked

17   on the personal rating, "Can circumstances related to

18   someone's race or ethnicity result in facts, circumstances or

19   events that are useful in assigning the personal rating," he

20   answered, "Sure," and then goes on to give an answer similar

21   to Ms. Bever about people writing about overcoming

22   discrimination and other life experiences.

23        So there's really no way to differentiate the role

24   that race is playing in these two scores, which is why the

25   personal rating has to come out of Dr. Card's model, and the

 1     statistical case is over once you resolve that factual
 2     dispute in our favor.
 3             And the last point that I'll make here is that
 4     Harvard's new reading procedures that we talked about with
 5     Director McGrath yesterday, we view, are remedial measures
 6     prohibiting the use of race in the personal score, and that
 7     evidence is probative of Harvard's use of race in the
 8     personal score in the past.  I'll have more to say on the new
 9     reading procedures in a bit.
10             So that brings us to Dr. Arcidiacono's model.  And
11     I've got the results of his admissions outcome model on the
12     screen.  And this is the model that he ran.  It was called
13     his preferred model, sometimes referred to as model 5, with
14     all of his variables to determine whether Asian-American
15     students were facing an admissions penalty, outcome penalty,
16     in applying to Harvard.  And he ran it on both the baseline
17     dataset which excluded the athletes, the legacies, the
18     children of faculty and staff and dean's list, ALDCs, and he
19     ran it on the expanded dataset which included everybody but
20     the 1300 athletes that were included in the dataset.  And in
21     both of those analyses he showed a statistically significant
22     outcome penalty on Asian-American students for admission to
23     Harvard.  And as Your Honor knows, this model leaves in the
24     preferences for African-American and Hispanics.  It's just
25     measuring the Asian penalty.

Case: 19-2005 Document: 00117629340 Page: 505 Date Filed: 07/30/2020 Entry ID: 6356615
Case 1:14-cv-14176-ADB Document 656 Filed 04/18/19 Page 26 of 135

26

1      So then we get to Dr. Card's criticisms of this

2   model.  And I'm going to talk about how Dr. Arcidiacono

3   addressed those criticisms.  Dr. Card criticized Dr.

4   Arcidiacono for removing the personal rating for failure to

5   include parental occupation and intended career variables.

6   And, Your Honor, I'm on slide 15 right now, looking at

7   Plaintiff's Demonstrative 38.  And he had some other

8   criticisms.  And what Dr. Arcidiacono did is he did a

9   robustness check on his model and addressed most of the

10   criticisms that Dr. Card made, and he still found the

11   statistically significant Asian penalty.

12      And this now brings us to the issue of the ALDCs,

13   because this robustness check, the evidence that you have in

14   front of you, was only run on the baseline set.  It's where

15   the ALDCs were removed.  And so in terms of the statistical

16   case and the modeling choices, Your Honor, the ALDC issue is

17   really only relevant at this point, from our perspective, to

18   two things.  One is the reliability of the robustness check

19   because it's run without those in the group; and two, if you

20   decide that it's appropriate or at least a reasonable choice

21   to exclude the ALDCs from the pool, it increases the size of

22   the Asian penalty, but it's not required to get us there

23   under Dr. Card's model or under Dr. Arcidiacono's model

24   either.

25      So let me say, let me now try to address the ALDC

Case: 19-2005   Document: 00117620340   Page: 506   Date Filed: 07/30/2020   Entry ID: 6356615
Case 1:14-cv-14176-ADB   Document 656   Filed 04/18/19   Page 27 of 155

27

1    issue, which has been the subject of testimony and questions

2    from the court on a number of different instances.  And first

3    I've just got Plaintiff's Exhibit 634 up on the screen, which

4    just kind of sets the stage with some basic data about this

5    group, which is that, on average, the admission rates you can

6    see across the bottom, whites are admitted 43 percent of the

7    time, Asians 44, African-Americans 46 and so forth, the admit

8    rate amongst the groups is very similar, and the group is

9    overwhelmingly white.  5,000 white applicants.  Only 840

10   Asian applicants in the group.  So that's what we're seeing

11   in the group.

12          But there's been maybe some confusion or at least

13   some confusion on my part as I listened to the evidence on

14   this issue and how it relates to the issues in the case that

15   Your Honor needs to decide.  So let me see if I can clear up

16   what the experts had to say here.  First, the experts agreed

17   that the evidence in the case shows that Asian ALDCs are

18   awarded lower personal scores than white ALDCs; the bias and

19   stereotyping runs pool-wide.  Second, the experts agree,

20   including Dr. Arcidiacono, that there is not a statistically

21   significant admissions outcome difference for Asian ALDCs.

22   In other words, even though there's a penalty on the personal

23   score for Asians in this group, the models don't show that

24   the applicants from this group are facing a statistically

25   significant outcome penalty.  In other words, they're getting

Case: 19-2005    Document: 00117629240    Page: 507    Date Filed: 07/30/2020    Entry ID: 6356615
Case 1:14-cv-14176-ADB   Document 656   Filed 04/18/19   Page 28 of 155

28

1    admitted to Harvard.  And the way discrimination works in
2    this case is if you're not admitted to Harvard on the basis
3    of your race, which is why we're not claiming that there's
4    discrimination in that pool for this very small amount of
5    Asian-American applicants because we can't see a
6    statistically significant outcome penalty notwithstanding the
7    difference that we see in the personal score.

8            And let me try to put a little meat on the bone for
9    why that might be true.  We'll return to Dr. Card's "on the
10   bubble" demonstrative that's on slide 17 in your binder.  And
11   what he explained is that when you're up on the right-hand
12   side, up on the top of the bubble, that's when you've got a
13   really good chance of getting in, and that's when some of
14   these preferences can really help you.

15           And we've heard evidence about how very qualified a
16   lot of these ALDC applicants are, they're very strong.  And
17   what we see is they're going to be at the high end of that
18   bubble, many of them.  And we see on Dr. Card's next slide,
19   which is on page 18 of your binder, there's a very
20   significant bump-up for lineage for ALDCs, particularly at
21   the top of the bubble.  That's what we're seeing in the
22   eight, nine and ten columns in his bar graph.  And I think it
23   turns out that the boost of all the applicants in the ALDC
24   group, including the Asian-Americans, is overwhelming of
25   relatively smaller personal score penalty that we're seeing

1    for Asian-Americans in that group.  And there may be other

2    things going on as well.  As you can see from the

3    demographics slide, there's not that many Asian-Americans in

4    the ALDC group.  There may be other things about them.  But

5    for whatever reason, we're not seeing a statistically

6    significant outcome penalty in terms of admissions to

7    Harvard, which is why we're not claiming a discrimination for

8    that part of the applicant pool.

9         Now, turning to the modeling question, which is a

10   different question, whether it's appropriate to remove ALDCs

11   from the group and analyze the rest of the pool.  And the

12   reason we say that it is is that these applicants are

13   categorically different than the rest of the applicants to

14   Harvard.  They get in at about, on average, 45 percent admit

15   rate versus about a four and a half to five percent admit

16   rate to the rest of the pool.  Many of them have ties to the

17   college.  Many of them get a staff interview.  They're just

18   engaged.  They're a different group than everyone else.  And

19   what that means is by including them in the group in terms of

20   the modeling effect, Dr. Arcidiacono explained this, it

21   dilutes the power of Harvard's ratings because Harvard's

22   ratings turn out not to matter as much for this group that's

23   getting in at a wildly higher rate than the rest of the pool,

24   and removing them helps us to give an apples-to-apples

25   comparison for the vast majority of Asian applicants are not

Case: 19-2005    Document: 00117629240    Page: 508    Date Filed: 07/30/2020    Entry ID: 6356615
Case 1:14-cv-14176-ADB  Document 656  Filed 04/18/19  Page 30 of 155

30

1    in that part of the pool, and we want to compare them to

2    similarly situated applicants, not to the ALDCs, which are

3    kind of categorically different.

4          And the last thing I'll have to say on the modeling

5    choice is that Harvard's suggestion that this is somehow a

6    methodologically flawed approach is a bit in tension with how

7    it's treated the OCR report from 1990.  It's held that up as

8    exonerating them and is good evidence for them.  And what

9    happened there is that Harvard told OCR to look at and

10   analyze the question of Asian-American discrimination by

11   removing ALDCs from the group.  And this happened a long time

12   ago in the trial, but I want to remind Your Honor, looking at

13   slide 19, that what OCR did with its logistic regression

14   model is it ran one on the whole group and then another one

15   by removing ALDCs from the pool that it ran its logistic

16   regression model and conclusions from that, and Harvard has

17   touted those conclusions and even basically encouraged OCR to

18   take this approach, so the suggestion that there's some fatal

19   methodological flaw for doing that doesn't really hold up.

20   And as I've explained, at the end of the day, it turns out to

21   be not all that important for the modeling in this case.

22         So now I want to turn to our additional evidence of

23   intentional discrimination beyond the statistical evidence.

24   And here I want to start with the evidence from the Office of

25   Institutional Research.  I want to begin by putting that

1    evidence in context.  The evidence is important for two

2    reasons, Your Honor.  First and foremost, Harvard's lack of

3    response to evidence of potential discrimination against

4    Asian-American applicants is evidence of intentional

5    discrimination.

6              And we're not going to focus on the law much, at

7    least I'm not today, but I've got a case up on the screen,

8    Columbus Board of Education, that gets at that basic point.

9    "Actions having foreseeable and anticipated disparate impact

10   are relevant evidence to prove the ultimate fact, forbidden

11   purpose."  And the point is here that the OIR evidence is

12   evidence of intent, even if you concluded that it does not

13   definitively establish an Asian penalty in fact, even if it

14   doesn't ultimately answer the statistical evidence, because

15   it's evidence of a potential problem that Harvard knew about

16   in its admission systems.  And as we'll walk through in a

17   minute, the response of Dean Fitzsimmons and Harvard to that,

18   forging ahead, is evidence of intentional discrimination.

19             And the second reason it's relevant, we do think it

20   puts a thumb on the scale for the ultimate fact question on

21   whether there is an Asian penalty because they found one, as

22   we'll talk about in a moment, and that was done before any

23   lawsuits were filed or anybody with a point of view hired an

24   expert.  So it's something that was done before litigation

25   that happens to line up on our side with Dr. Arcidiacono,

 1    done by a group that everybody, including President Faust,

 2    admitted yesterday did solid, reliable work that's relied on

 3    all the time by people at Harvard.

 4         So now let's turn to the evidence about OIR.  We've

 5    fought long and hard to get P9 into evidence, Your Honor.

 6    Harvard says Dean Fitzsimmons didn't see it and that it was

 7    an early draft.  We don't think that's particularly credible.

 8    We think he did see it and that it does show an Asian

 9    penalty, including in the personal score.  But we don't need

10    P9 to prove our case, so I'm not going to focus on it today.

11         I'm going to start with P12 in terms of what we're

12    going to focus on, and there's no dispute -- and now I'm on

13    slide 22, Your Honor -- that Dean Fitzsimmons saw this at the

14    February 25, 2013 meeting with the people from OIR, Erin

15    Driver-Linn, Erica Bever and Mark Hansen.  And I want to put

16    the timing of this meeting in context because, as Your Honor

17    knows, in late 2012 there was the Unz article and the David

18    Brooks article on Christmas Eve in the New York Times raising

19    the issue of whether or not Harvard is discriminating against

20    Asian-American applicants.  And that set off a firestorm

21    within Harvard, emails going to the provost, to the

22    president, to all the top deans, to Dean Fitzsimmons, to

23    people within OIR, emails flying back and forth all over the

24    holiday break and into the new year.

25         And we saw additional evidence that alumni and

Case: 19-2005   Document: 00117629240   Page: 512   Date Filed: 07/30/2020   Entry ID: 6356615
Case 1:14-cv-14176-ADB   Document 656   Filed 04/18/19   Page 33 of 155

33

 1    donors were getting in touch with Dean Fitzsimmons, looking

 2    for a response, asking what they were doing.  So the context

 3    of the February 25 meeting has to be viewed in light of the

 4    fact that there was significant focus amongst not only people

 5    within Harvard administration but also from the alumni and

 6    donor network focused on precisely this issue of whether or

 7    not Harvard was discriminating against Asian-American

 8    applicants to Harvard.

 9         So I want to walk through P12.  But before we get

10    into what it says and go through it one last time together, I

11    want to show Your Honor how Harvard described this document

12    in its summary judgment papers and then what Dean Fitzsimmons

13    had to say about it when he came to testify here under oath

14    at trial.

15         In the summary judgment papers, Harvard said the

16    documents originated within OIR were not in response to a

17    request from the admissions office; that the analysis in

18    question was not directed to whether there is bias against

19    Asians in college admissions at Harvard; no person outside of

20    OIR asked OIR to conduct the analysis; the work done by OIR

21    employees was not intended to address whether Asian-American

22    applicants were experiencing discrimination, and did not

23    answer the question.

24         Then when I asked Dean Fitzsimmons about this

25    evidence at trial, he agreed that it was part of the work

1    that his office, the admissions office, was coordinating on

2    with Harvard's Office of Institutional Research at least in

3    part related to the concerns about, that came around the Unz

4    article and discrimination against Asian-Americans.  He said

5    that would certainly be part of it, and that OIR ran logistic

6    regressions model for the admissions office.  I'll leave you

7    to judge the credibility of the incongruity of these two

8    descriptions.  But we think it goes to the spin that Harvard

9    is trying to put on the OIR story, both back at the summary

10   judgment stage and here at trial.

11           So the question of whether or not this was a study

12   into whether Asians were being disadvantaged in Harvard's

13   admissions process is actually answered on the third page of

14   Plaintiff's Exhibit 12, which is slide 24 in your binder.

15   And one of the things that it analyzed in this document is

16   does the admissions process disadvantage Asians.  And the

17   interesting thing about this language is it was put into this

18   PowerPoint presentation by Mark Hansen, who came here to

19   testify.  And when I asked him questions on the stand here

20   about whether he was doing analysis about whether the process

21   disadvantaged Asians, he wouldn't give me answers that were

22   straight with his testimony.  I had to impeach him two times

23   with his deposition on language that came right out of the

24   document that he edited, which is just more evidence about

25   Harvard's credibility or lack thereof on this issue.

Case: 19-2005    Document: 00117629240    Page: 514    Date Filed: 07/30/2020    Entry ID: 6356615
Case 1:14-cv-14176-ADB   Document 656   Filed 04/18/19   Page 35 of 135

35

1          So what did P12 actually show?  Well, turn to page

2     34 of P12, and we've looked at this a lot.  And what it shows

3     is that Asians are disadvantaged by the personal score and

4     demographics.  That's because if you look at model 3, when

5     extracurricular and personal score are put into the model,

6     the Asian percentage of the class goes substantially down.

7     And when this evidence was provided to Dean Fitzsimmons, he

8     admitted on the stand that he knew that as a group

9     Asian-American applicants were doing better on the

10    extracurricular scores, so what was doing the work here was

11    the personal score operating as an Asian penalty.  And we see

12    that the Asian percent of the class goes down once ethnicity

13    and race is included in model 4.

14          So Dean Fitzsimmons understood what was happening

15    here.  He understood that OIR did serious reliable work.  And

16    if there were any doubt about what the results of this study

17    raised in terms of the possibility of whether Harvard's

18    process was biased against Asian-Americans, that doubt is

19    entirely put to rest by page 38 of P12, which questions

20    raised about admissions, is there bias against Asian in

21    college admissions.  That's the question that OIR is raising

22    here.

23          And Harvard's response to this document is not in

24    my mind credible.  First Harvard says the study was

25    preliminary.  It does say that with bold and underlined on a

Case: 19-2005    Document: 00117629240    Page: 515    Date Filed: 07/30/2020    Entry ID: 6356615
Case 1:14-cv-14176-ADB    Document 656    Filed 04/18/19    Page 36 of 155

36

1    page that we've seen many times.  And evidently, to Harvard,

2    that's a word that captures all sorts of unstated criticisms

3    to the model, even though no one wrote any of those

4    criticisms down at the time or can even remember anyone

5    verbalizing them today.  And of course we saw yesterday that

6    the word "preliminary" appears on lots of OIR work, including

7    work that potentially went to the board.

8         And Dean Fitzsimmons' response was not one you

9    would expect of an institution concerned with whether there

10   was an Asian penalty, especially in light of all the

11   attention this issue was getting -- this issue was getting at

12   Harvard at the time.  The response to a preliminary warning

13   would be at least to tell Director McGrath who he'd worked

14   with 30 years to try to see if there was a problem, but he

15   didn't do that or tell anyone else.  The only response is the

16   study merely confirmed what he already knew, but that's not

17   much of an answer at all because the study showed

18   Asian-Americans were being penalized in the admissions

19   process and raised the possibility of bias right here on the

20   screen.

21        So the suggestion that this lined up with

22   expectations is at best evidence of willful blindness to a

23   serious discrimination problem or worst evidence that Harvard

24   knew about the problem all along.  But even if you give Dean

25   Fitzsimmons and Harvard full credit, 100 percent credit for

1     their explanation to P12 and what was going on February 25

2     when this was delivered to Dean Fitzsimmons, and even if you

3     forgive the description of this document at summary judgment,

4     there is no way Harvard can get past the rest of the OIR

5     evidence that shows an Asian penalty.

6          And I want to go to a timeline here that I've made

7     starting on page 28.  And what we've got here is that on

8     April 15 -- April 15, 2013, Dean Fitzsimmons is asking OIR to

9     analyze whether low-income applicants to Harvard are getting

10    a tip or a boost in admissions to Harvard, and that was kind

11    of similar to the Asian-American discrimination issue.  At

12    the same time there were articles in the press criticizing

13    elite institutions like Harvard for failing to do enough to

14    get low-income students admitted to their campuses.  So Dean

15    Fitzsimmons asked the same researchers at OIR that prepared

16    P12 to take a look and see whether low-income students were

17    getting a tip to Harvard.

18         And he got his answer on Plaintiff's Exhibit 21 on

19    April 22.  And he was supplied some slides, three slides in

20    that exhibit, Your Honor, including one that showed the

21    output of the logistic regression model.  And when I asked

22    him what this showed, and the testimony is here on the

23    screen, is that what these slides showed to him from the

24    logistic regression model, it's very similar to the model

25    that was in P12, is that it was in fact empirical proof of a

1    tip for low-income applicants.  No qualifications, no

2    hedging, empirical proof that there's a tip, which is just

3    the opposite of a penalty, and we'll get into that in a

4    minute.

5         And he was gratified.  He was happy to receive

6    these results because Harvard laudably does want to give a

7    tip to low-income students, and he wanted to share that

8    information more broadly, a fact that he shared with Erin

9    Driver-Linn.  But Dr. Driver-Linn, the director of OIR, had

10    some concerns about sharing that information more broadly, so

11    she got in touch with the top PR person, Christine Heenan, at

12    Harvard, one of the top PR people, on April 28.  And she said

13    that Dean Fitzsimmons is excited to share this information,

14    but there may be some concerns.  And she explains to

15    Christine Heenan that Fitz asked us to do some analysis of

16    thumb on the scale for low income.  It could be a positive

17    message but has implications for need-blind policy as well as

18    opening the door for Unz-like requests for information about

19    other thumbs on the scale.

20         So why was Ms. Driver-Linn concerned that the

21    information that Dean Fitzsimmons was providing on April

22    26 -- April 22, why was she concerned that would open up the

23    door to the Unz-like Asian-American discrimination requests?

24    We see that in the draft of the memo that was ultimately

25    provided to Harvard on May 1.  And I've got it here on the

1    screen, Your Honor, it's on slide 31 in your deck,

2    Plaintiff's Demonstrative 41.  And this is the draft that OIR

3    is writing.  And they say "On the flip side, we see a

4    negative effect for Asian applicants."  This is in the same

5    study about low income.  "These realities have also received

6    intense scrutiny from critics like Bowen or more recently Unz

7    as we have discussed at length.  To draw attention to the

8    positive benefit that low-income students receive may also

9    draw attention to the more controversial findings around

10   Asians or the expected results around legacies and athletes."

11   This is the draft memo by OIR addressed to Dean Fitzsimmons.

12          And when Dr. Driver-Linn came here to testify at

13   trial, she admitted the realities that were discussed at

14   length concerning the negative effect on Asian-American

15   applicants.  That discussion occurred at the February 25,

16   2013 meeting.  That's her testimony, and this is her

17   contemporaneous memorialization of what happened at the time,

18   which is considerably more credible than the explanations

19   we're getting now, is that no one saw the Asian penalty in

20   these documents.

21          Which brings us to the final memo that was

22   delivered to Dean Fitzsimmons on May 1, which is Plaintiff's

23   Exhibit 26.  And again it has -- this is the edits to that

24   narrative that we just looked at, but it still makes clear

25   that there are demographic groups that have negative effects,

1    and the only demographic group in P26, as we'll see in a

2    minute, that has a negative effect are Asian-Americans.

3           So what happened when we discussed this evidence at

4    trial?  I reminded Dean Fitzsimmons that he had agreed that

5    the logistic regression model here provided empirical

6    evidence of a low-income tip, and in asking him about Exhibit

7    26, I said, "It provides more empirical evidence about how

8    the Harvard admissions process works," and then he agreed

9    with that.  And then we went to look at that additional

10   empirical evidence, and this is the table in P26 that appears

11   just above the narrative about negative effects on certain

12   demographic groups, and Dean Fitzsimmons was ready to admit

13   he understood that the estimate coefficient that we have here

14   for the low income of .98 was positive associated with

15   admission to Harvard, unqualified yes testimony.

16          And then when I asked him whether the coefficient

17   for Asian, which has a negative sign in front of it, was a

18   sign that there was a negative relationship between being

19   Asian and admission to Harvard, he suggested that he couldn't

20   interpret that because he wasn't an expert in statistics.  I

21   don't think it requires that much expertise to interpret

22   that.  But we learned the next day after I went back and

23   reviewed his deposition is that he was reasonably

24   well-informed with modern statistical techniques.  He had

25   previously taught a course in statistics, admittedly a long

1    time ago, and that he had been part of studies at Harvard

2    using logistic regression in the past.  He was very familiar

3    with the term "logistic regression."  And we read some

4    testimony in from Dr. Driver-Linn's deposition that's part of

5    the record in this case, and she volunteered in her

6    deposition that they felt comfortable showing preliminary

7    work to Dean Fitzsimmons because he loved to talk about

8    statistics and he presumably still does.

9           So the idea that that Asian penalty that's reported

10   right there in P26 wasn't understood by Dean Fitzsimmons is

11   not credible.  It's from the same regression model that they

12   admit provides evidence of a tip for low income.  The same

13   regression model shows a penalty, a negative association with

14   being Asian to admission to Harvard.  And if there is any

15   debate about what that negative coefficient means, it's fully

16   resolved in the two paragraphs below the table which say it

17   shows a negative effect on certain demographic groups.  The

18   only demographic group that is there are Asians that are

19   treated negatively.

20          And what Harvard says about this document is, well,

21   it wasn't meant to study whether there was a negative effect

22   of being Asian in the Harvard admissions process.  The

23   assignment was to go out and study whether or not there was a

24   tip for low income.  So we can I guess then just ignore the

25   evidence about an Asian-American penalty.  But that excuse

Case: 19-2005    Document: 00117629240    Page: 521    Date Filed: 07/30/2020    Entry ID: 6356615
Case 1:14-cv-14176-ADB   Document 656   Filed 04/18/19   Page 42 of 155

42

1   doesn't add up.

2          If you tell OIR to do an assignment, and it finds

3   like what you like on the one hand with a tip for low income

4   and what you don't want to focus on that you don't like on

5   the other hand, you don't just get to ignore racial

6   discrimination because the original assignment had to do with

7   something else.

8          So here we have OIR communicating about the Asian

9   penalty.  And what happened next?  What happens next is that

10  Dean Fitzsimmons asked for a follow-up to see whether or not

11  there was a tip for low-income Asian-American applicants.

12  And that gets into P28.  And I think, Your Honor, something

13  in my mind pretty incredible that happened here at trial is

14  that Mr. Lee, in opening and then again when he was examining

15  Dean Fitzsimmons, they both represented to this court that

16  P28 shows a boost, a benefit, a tip for low-income Asian

17  applicants to Harvard.  And there are some ways to read that

18  document which suggests that that could be true.

19          But what the document also definitively

20  unquestionably shows from the same regression analysis

21  performed by OIR is that for 82 percent of the Asian

22  applicants to Harvard who are not low income -- and I've got

23  the demographic data right from that exhibit -- for those 82

24  percent in the same document where they say low-income Asian

25  applicants get a tip, it shows that the 82 percent that apply

1    get hammered with a penalty.

2            And there's no way they can have it both ways.  So

3    they knew there was a penalty.  They did nothing about it,

4    and that is alone sufficient for us to carry our burden and

5    have proof of intentional discrimination, especially in the

6    face of the reaction where no one in the admissions office

7    was told, not Director McGrath, not anybody, no further steps

8    were taken to look into this and dig into it deeper.  After

9    this, it was just business as usual.

10           So the OIR evidence shows there's a real

11   possibility of bias in the system, a statistically

12   significant penalty for Asian-Americans.  Harvard ignores it.

13           Now I'd like to review the evidence of bias in

14   Harvard's admissions process.  And I want to start with just

15   a brief touch-and-go on the law.  Now I'm on slide 32, the

16   Thomas Weisman Kodak case, which is that we don't have to

17   prove racist cabal.  I don't think the evidence would support

18   that.  What we have here is the ultimate question of whether

19   the employee has been treated disparately because of race.

20           This is regardless of whether the employer

21   consciously intended to base the evaluations on race or

22   simply did so because of unthinking stereotypes or bias.  And

23   that's what we think the evidence lines up with in this case.

24   So what I want to focus on now is the evidence of bias, both

25   implicit evidence of bias and explicit evidence of bias.  And

Case: 19-2005    Document: 00117629340    Page: 523    Date Filed: 07/30/2020    Entry ID: 6356615
Case 1:14-cv-14176-ADB   Document 656   Filed 04/18/19   Page 44 of 155

44

1   I want to start with explicit evidence of intentional

2   discrimination against Asian-American applicants that happens

3   in the recruiting process at the very front end.  And this

4   brings us back to where we started the trial:  to sparse

5   country.  And what happens here is that Harvard spends out

6   invitations to people to apply to Harvard as part of its

7   important recruitment techniques.  And Harvard admits that

8   these recruiting efforts are part of how Harvard consciously

9   shapes its class.

10         And here what Harvard does is that it invites white

11  applicants to apply to Harvard in sparse country with scores

12  as low as 1310, but Asian men and Asian women from those same

13  states, from those same schools, have to have a 1370 if

14  you're a man, 1350 if you're a woman to get applied.  And

15  there is no reason to do this, other than race.  It's the

16  only difference, and that is intentional race discrimination

17  plain and simple.  No other explanation.

18         And the interesting thing, when I confronted Dean

19  Fitzsimmons with this testimony, I actually thought he might

20  say, Gee, I didn't know about this.  We should take a look at

21  it.  There's not that many people in sparse country, although

22  there are significant Asian communities in Phoenix and Las

23  Vegas and New Orleans and other places, but instead he gave

24  an innocence answer that I thought was very interesting.  He

25  explained, when I confronted him with this evidence, that

1    there were some people in sparse country who have only lived

2    in a sparse country state for a year or two.  Let's say that

3    can happen.  Then on the other hand there are people who have

4    lived there for their entire lives.  And this is precisely

5    the kind of stereotyping and bias this case is about.

6    Because the new arrivals in this answer are the Asian

7    students, stereotyped as perpetually foreign, while the folks

8    who have lived in sparse country forever are the white kids

9    that Harvard is expressly preferring in this situation.

10           Now that brings us to the part of the process that

11   starts once applications are being reviewed.  Where do we see

12   the evidence of bias or stereotyping?  We come back to the

13   personal score.  We've talked about how it's important to the

14   statistical analysis, but it's also independently important

15   of evidence of discrimination within Harvard's admissions

16   process because it's at least in part based on subjective

17   determinations by the admissions office about personality.

18           And Mr. Mortara made a couple of demonstratives

19   with the witnesses on this subject during the testimony.

20   I've got the one that he made with Mr. Looby on the screen,

21   which I believe is slide 45 in your notebook, Your Honor.

22   And they went through that the personal rating gets at who

23   the person is, what the person brings to the community, which

24   I'll remind you connects right back to why Harvard uses race

25   in its admissions process, whether they work well with

1    others, meaningful relationships, likability, positive

2    personality, all subjective characteristics.  And then he

3    made a similar demonstrative with Director McGrath, same

4    kinds of things, likability, good person, integrity,

5    helpfulness, courage, kindness.

6          We've seen all of this, very subjective

7    determinations, that Your Honor knows by and large the

8    admissions officers in the Harvard admissions office are

9    awarding this personal score on a cold record, on paper,

10   without having met anybody.  And that's precisely where bias

11   can creep into a system where race is considered for every

12   applicant who provides it and throughout the process.  And we

13   actually heard testimony about this bias issue from several

14   of Harvard's witnesses.  We heard about it yesterday from

15   President Faust, and she agreed that research on implicit

16   bias shows that everybody has some implicit bias.  And she

17   even agreed that Harvard has a responsibility to ensure that

18   bias is not leaking into its admissions decisionmaking

19   process in any form.  She said Harvard should do its utmost

20   to address questions of bias.

21          And we also heard from Dr. Simmons, when she was

22   asked about some research that she and others had done on how

23   women were treated in higher education.  And we confronted

24   her with decades of cognitive psychology research reveals

25   that most of us carry prejudice of which we are unaware and

1    nonetheless plays a large role in our evaluation of people,

2    and that in every study that's been examined there's a

3    significant effect of bias based on the gender or race of the

4    person being evaluated.

5           So this is all true in our world.  And we know that

6    there are the stereotypes that we talked about at the

7    beginning.  And when you have a subjective process and we

8    know that bias is possible, bias around race, bias around

9    gender, the fact that Asian-American applicants face a

10   statistically significant penalty on the subjective personal

11   rating year after year is pretty strong evidence that bias

12   has crept into, leaked into the system.  And it's particular

13   true when you analyze that in the context of some of the

14   admissions officers that we asked about this issue.

15          We actually asked, Mr. Strawbridge asked Charlene

16   Kim when she came to testify.  She's been there eight or nine

17   years.  And he asked her, "You would have no explanation if

18   Asian-Americans were to receive year after year lower

19   personal scores than white applicants, for example, correct?"

20          "That's not what I see as a member of the

21   committee."

22          "That's not been your experience during your nine

23   years on the admissions committee, has it?"

24          "It has not."

25          And the reason that's important is we know there's

Case: 19-2005    Document: 00117629240    Page: 527    Date Filed: 07/30/2020    Entry ID: 6356615
Case 1:14-cv-14176-ADB    Document 656    Filed 04/18/19    Page 48 of 155

48

 1   a statistically significant difference in that score.  Her

 2   expectation is that she wouldn't see that.  She's not

 3   pointing to personal scores or teacher supports or some kind

 4   of difference that she observes kind of categorically about a

 5   group by the data.  She says we wouldn't expect to see that.

 6   And that's evidence that bias has crept into the system, even

 7   if it's implicit or unconscious bias.  That's what we see

 8   here.  And we've got similar testimony from Director McGrath

 9   along the same lines that it wouldn't be her experience,

10   again, evidence of bias.  So when the empirical disparity is

11   incongruous with the expectations of long-time admissions

12   officers, that's when you know you might have a problem.

13          So what is the bias that is creeping into the

14   process?  We actually heard some interesting testimony on

15   this from Dr. Chin, who is an Asian-American studies

16   professor who is an alumni interviewer who came here to

17   testify on Monday.  And she actually wrote an article that

18   you may remember in 1983 looking at this issue of how bias

19   could affect personal ratings in admissions to Harvard.

20          And, she in that article, and we talked about it

21   with her on the stand, helpfully categorized some of those

22   stereotypes or biases that have been deployed over the years

23   against Asian-Americans.  And one of them was this concept of

24   over-representation, the idea that Asian-Americans are only 5

25   or 6 percent of the population as a whole but have a

Case: 19-2005    Document: 00117629240    Page: 528    Date Filed: 07/30/2020    Entry ID: 6356615
Case 1:14-cv-14176-ADB    Document 656    Filed 04/18/19    Page 49 of 155

49

1    significantly greater percentage of the admitted class at

2    elite institutions like Harvard.  That's one of the things

3    that she identified as a stereotype.

4         And it was interesting to us that Dr. Arcidiacono

5    was questioned on this very issue for reasons that were

6    unclear to us.  But again, this is the kind of thing that Dr.

7    Chin identified.  And then the other types of bias that we've

8    seen in this case, one is the idea that there is a

9    career-focus bias.  And we've seen that in this idea that

10   Asian-Americans are stereotyped as being overly interested in

11   math or science or doctors.  That's a bias that can creep

12   into the system and one that's potentially crept into Dr.

13   Card's analysis in his intended-career variable where he says

14   that explains the discrimination against Asian-Americans, and

15   yet we see that variable shows that a lot of Asian-American

16   applicants to Harvard do want to be scientists or doctors.

17        And then we've got the next stereotype that's been

18   identified both by Dr. Chin in her article and in the OCR,

19   this idea of passive personalities, shy and so forth, yet

20   another stereotype that's been identified.  And finally we've

21   got this idea of the model minority, which again was

22   identified both by Dr. Chin and in the OCR report.  And to

23   round it out, we connected the dots with Dr. Chin and we

24   asked her, you know, "Vestiges of this history remain.  Today

25   Asian-Americans continue to face racial bias and are often

1    falsely stereotyped as timid, exotic perpetual foreigners or

2    model minorities."  And we asked her what this means is that

3    Asian-American still face some of the same kinds of

4    stereotyping that you wrote about in your 1993 article, and

5    she said, "Some of them, yes."

6              So that's the kind of bias that can leak into the

7    system here.  And that brings us back to the new reading

8    procedures, which is an important piece of the evidence for

9    Your Honor to consider.  Of course we know now, Your Honor,

10   that there were some problems with the testimony of Dean

11   Fitzsimmons and Director McGrath on the existence of written

12   guidance around the use of race in the admissions office when

13   they came to testify the first time.

14             Your Honor is familiar with that testimony.  And

15   whether you ascribe a sinister motive or not to what happened

16   here, the fact of the matter is that the new guidance is

17   powerful evidence for our case for a couple of reasons.

18             I'll talk about why.  As we discussed, Charlene

19   Kim, Director McGrath, we just looked at the testimony, they

20   did not expect to see a personal score disparity, but it's in

21   the data nonetheless.  It's statistically significant.  So

22   what we had happen here is Harvard took corrective action.

23   It changed its reading procedures to ban the consideration of

24   race in the personal score and more importantly to the

25   stereotyping issue that we've been talking about, exhorting

**JA3453**

Case: 19-2005    Document: 00117629240    Page: 536    Date Filed: 07/30/2020    Entry ID: 6356615
Case 1:14-cv-14176-ADB   Document 656   Filed 04/18/19   Page 51 of 135

51

1    readers not to overvalue extraversion.

2            And I've got here now on slide 57 at your deck,

3    reading procedures for the class of 2023 that Mr. Mortara and

4    Director McGrath talked about yesterday.  And again, it says,

5    "It is important to keep in mind that characteristics not

6    always synonymous with extraversion are similarly valued.

7    Applicants who seem to be particularly reflective, insightful

8    and/or dedicated should receive higher personal ratings as

9    well."  A corrective step to combat some of the bias and

10   stereotypes that leaked into the Harvard admissions office.

11   We know they leaked in because of the statistically

12   significant disparity in the personal score.

13           And Director McGrath, to her credit, admitted that

14   this instruction is designed to make sure that your

15   admissions officers do not fall prey to implicit bias or

16   racial stereotyping about Asians in part.  She said it would

17   have that effect and then went on to say that it's not a new

18   idea, it's been memorialized in the past.

19           But what I think we can see from a fair reading of

20   the evidence is that this bias did creep in.  We have the

21   statistically significant disparity.  There's no other good

22   explanation other than stereotyping and bias.  And to

23   Harvard's credit, they actually finally did something about

24   it in 2023.  It's a step in the right direction, and this I

25   think is an admission as much.  And this was a necessary step

Case: 19-2005    Document: 00117629240    Page: 531    Date Filed: 07/30/2020    Entry ID: 6356615
Case 1:14-cv-14176-ADB   Document 656   Filed 04/18/19   Page 52 of 155

52

 1    because we did see some concrete instances of Harvard
 2    admissions officers deploying the kind of stereotyping that
 3    we talked about.

 4          And I won't belabor the anecdotal evidence because
 5    we don't think it's particularly important in a statistical
 6    case with a bunch of data.  But we've got P116 on the screen.
 7    I think you'll remember a discussion of this from Dr.
 8    Arcidiacono's testimony that the person got a personal score
 9    of 3, notwithstanding being a professional figure skater,
10    amazing life story, a lot of hardship, overwhelming teacher
11    support and alumni interviewer report, Asian applicant to
12    Harvard, given a personal score of 3, labeled a standard
13    strong, no evidence that the application was ever considered
14    again.

15          And then again we saw some evidence in the record
16    that Asian-American applicants to Harvard were labeled as
17    quiet or shy.  It's not that there's something inherently
18    wrong about labeling somebody as quiet or shy, but that's a
19    stereotype that's deployed against Asian-Americans that
20    doesn't really apply to other groups.  That's why it's a
21    stereotype.  And it's evidence that bias has leaked into the
22    system.

23          So Harvard took a small step in the right direction
24    with the new reading procedures to address this, but it
25    didn't even go as far as some of its supporters have

Case: 19-2005    Document: 00117629240    Page: 532    Date Filed: 07/30/2020    Entry ID: 6356615
Case 1:14-cv-14176-ADB   Document 656   Filed 04/18/19   Page 53 of 135

53

1    suggested in this case.  And we're back to the testimony of

2    Dr. Chin, the professor of Asian-American studies.  And she

3    says she exhorted Harvard to increase training on cultural

4    bias and to be educated on the stereotypes that work against

5    Asian-American applicants.  And the evidence that Harvard did

6    that in this case is minimal, no more, evidently, than

7    sending around an article on implicit bias years ago.

8              And the final piece of the puzzle in the new

9    reading procedures is something that came up many times

10   during the trial.  Before the new reading procedures, Harvard

11   had no written instructions on how or where to use race.  And

12   we go back here to a document that we visited many times.

13   I'm on slide 62 now.  This is Plaintiff's Exhibit 555, the

14   OCR report.  And we've got this sentence.  "There are no

15   formulas or specific criteria for measuring or assessing

16   ethnicity."  That's fine.  Next half of the sentence is

17   important.  "Nor are there instructions for determining how

18   much weight is given to ethnicity or where the weight is to

19   be applied in the admissions process."  This goes all the way

20   back to 1990.  And we saw in the same document admissions

21   officers were using race in different parts of the process,

22   assigning it different relative importance.  We saw that all

23   the way back in 1990, and that persisted all the way to

24   today.

25              And to the extent that Harvard -- well, didn't have

Case: 19-2005   Document: 00117629340   Page: 533   Date Filed: 07/30/2020   Entry ID: 6356615
Case 1:14-cv-14176-ADB   Document 656   Filed 04/18/19   Page 54 of 155

54

 1     written instructions before September.  To the extent they

 2     had oral instructions, the evidence in this case is that they

 3     weren't that memorable, at least for the people who testified

 4     at their deposition when they were testifying honestly about

 5     how they do their job.  And we've got the admission here on

 6     the screen from Chris Looby that he didn't recall anyone ever

 7     teaching him how to use race.  We've got the testimony from

 8     Lucerita Ortiz where she doesn't recall the specific

 9     substance of any training.  And you can see the other

10     admissions that we've got here on the slide.

11          So to the extent that Harvard had oral training, it

12     wasn't memorable, and it certainly didn't provide the kind of

13     guidance that the new reading procedures had.  So Harvard had

14     a problem, and they tried to fix it with the new reading

15     procedures, which again, we think is evidence of a

16     recognition that there was bias and stereotypes and a problem

17     with the way Harvard used race in its admissions process.

18          Now, the last thing I want to do is address

19     Harvard's explanation for the new reading procedures, because

20     I think it just confirms our point.

21          What Harvard says happened here with the new

22     reading procedures is that a group of admissions officers got

23     together over this past summer in 2018 and made changes,

24     including to the directions of the personal score.  And the

25     people who did this work were led by Christine Mascolo, who

Case: 19-2005    Document: 00117629240    Page: 534    Date Filed: 07/30/2020    Entry ID: 6356615
Case 1:14-cv-14176-ADB   Document 656   Filed 04/18/19   Page 55 of 155

55

1    is the associate director of the admissions office, who has

2    been there for 17 years.  And she worked with others who have

3    been there for a while as well.

4           And they assembled reading procedures, and they

5    sent them out to everybody in the admissions office on

6    September 19, 2018, and they said, "Attached please find the

7    updated reading instructions for the year."  And they told

8    everybody to read the document thoroughly, and they thanked

9    everybody who had helped in the editing process, and they

10   didn't suggest there was any problem with the document they

11   circulated or that it was in any way incomplete.  And what

12   Harvard wants us to believe is that these experienced people

13   who had been there in some instances as long as 17 years,

14   they just went out to memorialize what everybody knew all

15   along about how Harvard used race in its admissions process

16   and in the personal score.

17          And what Harvard wrote, what these people wrote in

18   this draft was that in the directions on considering race in

19   the overall to score was to only consider it if an applicant

20   writes about it, makes an issue of it in its application,

21   just like they consider religion.  That's what the people who

22   were seeking to memorialize how to use race said in this

23   document.

24          Of course Harvard can't admit that that's true for

25   a number of reasons, and issued an updated guidance on

|    |                                                              |
|----|--------------------------------------------------------------|
| 1  | October 5 striking that language.  And Director McGrath       |
| 2  | testified yesterday that the language that was included in    |
| 3  | P720 and its attachment was dead-bang wrong.  But the reason  |
| 4  | that's important for our case is because it shows that even   |
| 5  | experienced people in the Harvard admissions office have no   |
| 6  | idea how race had been used, how it's supposed to be used,    |
| 7  | and when you have lack of controls in a system that's using   |
| 8  | race, considering it with every applicant, and you have       |
| 9  | evidence of statistical disparity for Asian-Americans in the  |
| 10 | subjective personal score, those lack of controls are         |
| 11 | evidence of yet further bias.                                 |
| 12 | I'm going to wrap up now, Your Honor, and save some           |
| 13 | time for Mr. Mortara to come back later.  Before I do, I'd    |
| 14 | just like to thank you for all the effort and attention that  |
| 15 | you've put into this case and everybody else here.  Thank you |
| 16 | very much.                                                    |
| 17 | THE COURT:  All right.  Finished right on time,               |
| 18 | Mr. Hughes.  Why don't we take a 15-minute break and we'll    |
| 19 | come back at 11:00.                                           |
| 20 | (Recess taken, 10:45 a.m.)                                    |
| 21 | MR. LEE:  Thank you, Your Honor.  May I proceed,              |
| 22 | Your Honor?                                                   |
| 23 | THE COURT:  You may.                                          |
| 24 | **DEFENDANT CLOSING ARGUMENT**                               |
| 25 | MR. LEE:  On behalf of the faculty, students,                 |

Case: 19-2005    Document: 00117639340    Page: 536    Date Filed: 07/30/2020    Entry ID: 6356615
Case 1:14-cv-14176-ADB   Document 656   Filed 04/18/19   Page 57 of 155

57

1    administration and staff and the many members of the Harvard

2    community, I begin by thanking the Court and all of the court

3    staff for the opportunity to address the very serious

4    accusations by SFFA.  We thank you for your close attention

5    to what has been at times very detailed evidence, and we

6    thank you for your patience.

7          SFFA began its opening statement by contending

8    that, and I'm quoting, the wolf of racial bias is at

9    Harvard's door.

10         On this, we agree.  The wolf of racial bias is at

11   Harvard's door and at the door of this courthouse.  That wolf

12   is not intentional discrimination by anybody in the Harvard

13   admissions office.  That wolf comes in the form of SFFA and

14   its experts.  It is those who would turn back the clock.  It

15   is those who would eviscerate the progress we have made by

16   pursuing not just sanctioned but lauded, race-conscious

17   admissions policies.  It is those who would reduce

18   dramatically the number of African-American students and

19   Hispanic students on our college and university campuses

20   today.

21         Now, to be sure, Your Honor, the vehicle SFFA has

22   manufactured to pursue its goal is a claim that Harvard

23   intentionally discriminates against Asian-American

24   applicants.  As we said at the outset of our opening, Harvard

25   does not discriminate against Asian-American applicants.

1    Harvard has not discriminated against Asian-American

2    applicants.

3          What the evidence has demonstrated is that Harvard

4    has worked over the years tirelessly to create a vibrant

5    educational environment that includes students from all walks

6    of life.  We do not admit simply GPAs and board scores.

7          We admit people.  We admit people from a variety of

8    backgrounds who bring to the campus a range of experiences,

9    talents, and perspectives.  This effort to create a community

10   that is diverse, including, to be sure, racially diverse, is

11   very much deliberate.  It is very much intentional and, as

12   Your Honor has heard, it is critical to Harvard's mission of

13   preparing students to contribute to our increasingly diverse

14   society.

15         Now, Your Honor has heard directly from the people

16   that SFFA has accused of discrimination.  And as I'll come to

17   later, the precise claim of discrimination has been a moving

18   target over a long period of time.

19         But you heard from President Faust, Dean

20   Fitzsimmons, Dean Khurana, Dean Smith, Director McGrath, and

21   current and former admissions officers Roger Banks, Erica

22   Bever, Chris Looby, Charlene Kim, Tia Ray, and Elizabeth

23   Yong.

24         These folks came to court.  They sat in that

25   witness chair.  They subjected themselves to the crucible of

1     cross-examination and explained just why SFFA's accusations

2     are not only wrong but unfounded and very unfair.

3           You heard those admissions officers explain how

4     they carefully and thoroughly evaluate each and every

5     applicant and how they take into account a multitude of

6     factors when making admissions decisions.  You heard that

7     race can make a highly competitive applicant's application

8     even more compelling, continuing that applicant into the

9     admitted pool, just as being from Sparse Country or being an

10    extraordinary musician or being an extraordinary intellect

11    could tip you into the applicant pool.

12          And, Your Honor, you heard from some of the

13    remarkable students and alumni who were admitted as a result

14    of this holistic and comprehensive process.  You heard how

15    diversity inside and outside the classroom at Harvard has had

16    a profound impact on their educational experience.

17          In contrast to all of this, what did you hear from

18    SFFA?  The next slide are the fact witnesses representing the

19    plaintiff.  It's blank.  Not a single member of SFFA took the

20    stand.

21          In fact, Your Honor, no one who testified, no one

22    who took the oath had ever met with or spoken with any one of

23    the SFFA members who claim to have been denied admission at

24    Harvard.  Not one of their application files was introduced

25    into evidence.  Dr. Arcidiacono had them all, and not a

1  single file was introduced into evidence for any of their

2  standing members.

3          If there was an application file after all of this

4  that showed discrimination, wouldn't we have seen it?  The

5  fact that none was introduced actually leads to the contrary

6  conclusion there is none.

7          So where does that leave SFFA?  It leaves it, Your

8  Honor, candidly, with an illogical, contradictory, meritless

9  discrimination claim.

10          The evidence has made clear just what you would

11  have to believe from SFFA to credit their claim of

12  discrimination.  You would have to conclude that Harvard

13  actively recruits Asian-American students only to

14  discriminate against them once they apply.  You would have to

15  conclude that the process that involves multiple readers of

16  applications, multiple subcommittee reviews, multiple full

17  committee reviews, and decisions made openly by a group of 40

18  people is somehow being manipulated to discriminate against

19  Asian-Americans.

20          You would have to conclude that Harvard's

21  admissions office is favoring Asian-Americans who happen to

22  be athletes, legacies, faculty children, staff children, on

23  the dean's list or the director's list.  But then for some

24  inexplicable reason, the same admissions officers are

25  discriminating against Asian-American applicants who are not

Case: 19-2005    Document: 00117629240    Page: 546    Date Filed: 07/30/2020    Entry ID: 6356615
Case 1:14-cv-14176-ADB   Document 656   Filed 04/18/19   Page 61 of 155

61

 1    in these categories.

 2         You would have to conclude that Harvard is not

 3    discriminating against Asian-American women or

 4    Asian-Americans in California but are discriminating against

 5    other Asian-Americans.

 6         And you would have to conclude that to carry out

 7    this bizarre scheme of discriminating against some but not

 8    all Asian-Americans, the admissions officers assigning the

 9    academic and extracurricular ratings which are on the screen

10    now, ratings, Your Honor, that everyone agrees reflect

11    subjective judgment, are giving Asian-American applicants

12    better scores on those ratings than the objective or the mere

13    quantifiable data would justify.

14         To be clear, it is not that Asian-Americans are

15    being scored higher on these ratings just because they have

16    better board scores or better GPAs or because they have more

17    extracurricular activities.  The admissions officers who are

18    reading these files are scoring Asian-Americans higher in

19    these categories on the nonobservable, nonquantifiable

20    factors.

21         But to believe SFFA, that same admissions officer

22    then moves two boxes down on the same form, as we've shown on

23    the next slide.  And then for some reason -- and according to

24    SFFA, it is to discriminate against that applicant -- it

25    gives that person a lower personal rating.  That would be a

1    peculiar form of intentional discrimination.

2          And you would have to conclude, Your Honor, that

3    the admissions officer managed to implement this complicated

4    scheme, a scheme with inconsistencies and illogical

5    consequences without leaving behind a single indication, a

6    single email, a single memo, a single presentation that would

7    tell the 40 admissions officers just how to navigate these

8    contradictions and these illogical inconsistencies.

9          But the problems with the plaintiff's

10   discrimination claim don't end there.  There are a host of

11   other inconsistencies.

12         For instance, as the trial progressed we moved from

13   intentional discrimination and at the end we're coming to

14   something that seems to be focusing on implicit bias.  And

15   I'll come back to implicit bias because there's been

16   virtually no evidence of that.

17         But the fact that SFFA now resorts to implicit bias

18   demonstrates yet another inconsistency.  It's entirely

19   inconsistent with the proposition that Harvard is

20   discriminating against some Asian-Americans but favoring

21   others.  How do you implicitly discriminate for someone and

22   then implicitly discriminate against someone?  Another

23   logical inconsistency.

24         And then to focus on SFFA's primary focus on the

25   personal rating, the personal rating which they say is a

Case: 19-2005   Document: 00117629240   Page: 542   Date Filed: 07/30/2020   Entry ID: 6356615
Case 1:14-cv-14176-ADB   Document 656   Filed 04/18/19   Page 63 of 155

63

1   vehicle to carry out the intentional discrimination.  The

2   very same differences in the personal rating, on average --

3   now, we're just talking about averages here because there are

4   some Asian-Americans with spectacularly good personal

5   ratings.

6          But the very same difference they're focusing on on

7   average is the difference that the ALDC Asian-American

8   applicants also have.  Their personal ratings are also on

9   average lower, yet they concede there's no discrimination.

10  Again just another logical inconsistency.

11         Why would they sponsor such a claim?  It's a claim

12  predicated on data mining.  It's a claim omitting variables.

13  It is a claim just ripe with self-defeating inconsistencies.

14         But now the answer is clear, and I would suggest

15  much clearer than it was at the outset.

16         The answer is that the goal of SFFA is to eliminate

17  all consideration of race in admissions.  The founder of SFFA

18  pursued that goal in *Fisher* 1.  He was unsuccessful.  He

19  pursued that goal on behalf of white plaintiffs in *Fisher* 2.

20  He was unsuccessful.

21         So what did he do?  Mr. Kahlenberg told us.  He

22  advertised for Asian-American plaintiffs, but the goal

23  remained the same, and that became manifest during the

24  evidence.

25         Your Honor, the plaintiff's own slides, one that

1    Mr. Hughes didn't show you, tell the entire story.  Here is

2    Plaintiff's Demonstrative 38, Slide 40.

3            You may recall that we cross-examined

4    Dr. Arcidiacono on this slide.  This tells the entire story.

5    If we were to accept SFFA's proposition that race be

6    eliminated from consideration, the number of

7    African-Americans would decrease by 150 a class or 600 over

8    four-year classes.  If we were to accept their analysis, the

9    number of Hispanics would decrease by 125 per class or about

10   500.  To accept their analysis, the number of

11   African-American and Hispanic students of color would be

12   reduced by 1,000 on Harvard's campus.

13           How does SFFA address this?  What it says is in

14   their analysis, and I'm now quoting from Dr. Arcidiacono, the

15   winners are the Asian-Americans and whites, and the losers

16   are the African-Americans and Hispanics.

17           Your Honor, he could not be more wrong.

18           If that is the circumstance, we all lose, every

19   single one of us loses.

20           Now, before we turn to each of SFFA's claims, let

21   me address why diversity, including racial diversity, is so

22   critical to the educational experience at Harvard and other

23   colleges and universities.

24           The plaintiff suggested in its opening that

25   diversity and its benefits is not on trial here.  But as that

1    chart I just showed you indicates it is.  If you accept their

2    proposition, it couldn't be more on trial.

3              In fact, Dr. Arcidiacono spent as much of his time

4    attacking the tips for African-American and Hispanic students

5    as he did trying to move the Asian-American penalty.

6              To the plaintiffs, Your Honor, these things are two

7    sides of the same coin.  As their expert said, a tip for

8    African-Americans and Hispanics is a penalty for

9    Asian-Americans.  That's his use of the word "penalty."

10             But he went one step further.  He said a tip, a tip

11   for whites, for African-Americans, and Hispanics is a white

12   penalty.  That's how they're using these terms.

13             Now, as an initial matter to suggest that one

14   student is being penalized because another student is

15   receiving a tip based on her or Hispanic racial background

16   assumes that the student who received the tip was not

17   qualified.

18             Nothing could be further from the truth.  As the

19   evidence established, every single student admitted to

20   Harvard is quite qualified.  And as the evidence showed, the

21   applicant's race may provide a boost only to those very

22   highly qualified competitive candidates in the pool.

23             That is like many other boosts like geography, like

24   socioeconomic status, like a music talent.  None of these

25   boosts is imposing a penalty on someone else.  And the racial

**JA3468**

1    boost benefits everyone on the Harvard campus.

2              Harvard, as you've heard, has long recognized that

3    the quality, and I'm now quoting from Dean Fitzsimmons'

4    testimony in *Bakke*.  Harvard has long recognized that the

5    quality of the educational experience of all the students at

6    Harvard College depends in part on the differences in

7    background and outlook that the students bring with them to

8    campus.

9              That was true in 1977 at the time of *Bakke* and is

10   true today.  That is why in 2016, Your Honor, Harvard's

11   faculty of arts and sciences unanimously endorsed the

12   conclusion of a committee chaired by Dean Khurana that

13   reaffirmed, and I quote, "The university's long-held view

14   that student body diversity, including racial diversity, is

15   essential to our pedagogical objectives and institutional

16   mission."

17             This commitment to diversity is shared at the

18   highest level of the university.  But more importantly, Your

19   Honor, it is lived by the Harvard students.  You heard

20   firsthand from those Harvard students who have experienced

21   firsthand both the benefits and some of the burdens of a

22   diverse student body.

23             Their testimony on Monday was powerful.  They were

24   people who volunteered to take the stand and be examined and

25   cross-examined.  They told us why the diversity of Harvard

1    was important to their decision to apply to and attend

2    Harvard and to their learning while on campus.

3             And most importantly, Your Honor, if we go to the

4    next slide, Slide 13, they shared how devastating it would be

5    if the reduction in the diversity, racial diversity, that

6    would result from plaintiff's so-called alternatives would

7    come to pass.

8             These students are living proof that Harvard has a

9    compelling interest in student body diversity.  These

10   students are living proof that taking a thousand

11   African-American, Hispanic students off the campus in the

12   guise of an illogical discrimination claim is not the right

13   result.

14            And as you know, Your Honor, Harvard does not stand

15   alone on this issue in American higher education

16   institutions.  You heard from President Ruth Simmons, whose

17   life's story and life's work embodies the meaning, the

18   importance, the benefits, and the triumph of racial

19   diversity.

20            As she put it, and I quote, "Diversity provides an

21   opportunity to deepen that learning, to give students

22   firsthand experience with difference.  Which allows students

23   to test themselves, to test their background, to test their

24   ideas, and to challenge assumptions."

25            So with that in mind, let me turn to SFFA's claims.

**JA3470**

1    And I'll turn first to the intentional discrimination claim.

2           The law on what's required is clear.  And this was

3    not among Mr. Hughes' slides.  The burden is on SFFA to prove

4    first that Harvard discriminated on the basis of race, to

5    prove second that the discrimination was intentional, and to

6    prove third that the discrimination was a substantial and

7    motivating factor for Harvard's actions.

8           SFFA must prove racial animus, prove it as a

9    necessary component of the claim.  In other words, the

10   plaintiffs must show that a committee comprised of roughly 40

11   people at any given time is intentionally trying to

12   discriminate against some but not all Asian-Americans because

13   some of those folks are Asian-Americans.

14          Now, SFFA suggests in its opening because Harvard

15   considers one factor in its admissions process, once the --

16   and I'm quoting now -- statistically significant Asian

17   penalty has been shown, the burden is on Harvard to explain

18   these differences.

19          Quite honestly, Your Honor, that's not the law.

20   It's confusing the burden of production with the burden of

21   persuasion.  The law is perfectly clear that the ultimate

22   burden of persuasion remains with SFFA.

23          Now, on the intentional discrimination claim, there

24   are fundamentally two questions.  The first is -- and I'm

25   going to take them in the order that Mr. Hughes took them --

1    has plaintiff proven discrimination.  Because if it's not,

2    the rest becomes irrelevant.

3            And the second is, has the plaintiff proven the

4    discriminatory animus required by the law.

5            The answer to both is no.

6            Mr. Waxman will address the evidence that

7    demonstrates the plaintiff has failed to prove

8    discrimination, and then I'll return to address the second

9    question in the remaining claims.

10           I'm going to hand the mic off now.

11           [Microphone technical issues.]

12           MR. WAXMAN:  I could see Joan's face.

13           MR. LEE:  I realize that folding my arms was a bad

14   idea.

15           THE COURT:  I'll even give you permission to take

16   your jacket off, if that would help you, if you could talk

17   without a jacket.

18           MR. WAXMAN:  I don't know if I can talk in a court

19   without a jacket.

20           [Microphone technical issues.]

21           MR. WAXMAN:  May I proceed?

22           THE COURT:  You may.

23           MS. HACKER:  As Your Honor is aware, the plaintiff

24   relies on statistics to prove its claim of discrimination.

25   Mr. McBride, in the passage here, even said that there's no

Case: 19-2005   Document: 00117629240   Page: 549   Date Filed: 07/30/2020   Entry ID: 6356615
Case 1:14-cv-14176-ADB   Document 656   Filed 04/18/19   Page 70 of 155

70

1    question that the central issue in this case is being

2    determined on the basis of statistical analysis.  That's

3    plaintiff's claim because it has nothing else.

4          Of course it is not true that statistics can decide

5    the question of either discrimination or intentional

6    discrimination because, as Professor Card explained and

7    Dr. Arcidiacono did not disagree, the most that statistics

8    and statistical modeling can prove is a correlation.  It can

9    never prove causation in the real world.

10         But even the bloodless statistics don't support

11   SFFA's claim.

12         Now, the experts agree that any statistical

13   analysis can only go so far in modeling Harvard's admissions

14   process.  There are many, many factors that admissions

15   officers and the admissions committee consider in the process

16   that simply can't be reduced to numbers and thus can't be

17   accounted for in any statistical analysis.

18         But as you heard from Professor Card, he tried to

19   get as close as possible.  He included all domestic

20   applicants in his model, and he included all the relevant

21   data that he had.  And when he did that, he found that

22   Asian-American ethnicity had no statistically significant

23   effect in the Harvard admissions process.  It had no effect

24   in any of the six years he looked at or even when he averaged

25   the six years.

**JA3473**

1          Professor Card also found that for applicants who

2     are female or applicants from California, there was actually

3     a positive effect associated with being Asian-American.  Now

4     again, these results aren't statistically significant, but

5     they would surely be a bizarre outcome for an admissions

6     office trying to discriminate against Asian-Americans.

7          Now, Dr. Arcidiacono reached a different

8     conclusion.  He testified that for some, but not all,

9     Asian-American applicants he found a penalty.  There is a

10    simple explanation for why two economists using the same type

11    of model and the same data reached different conclusions, and

12    it is this:  For one methodological issue after another,

13    Professor Card made the choice that allowed his model of the

14    admissions process to resemble the actual admissions process

15    as closely as possible.

16         Dr. Arcidiacono, on the other hand, made choices

17    that took him further and further away from Harvard's actual

18    process.  He made the choices that instead allowed him to

19    find the result the plaintiff was looking for.

20    Dr. Arcidiacono, a proclaimed proponent of the mismatch

21    theory, who believes, in his own words, in a "more efficient

22    sorting of minority students" manipulated the data to support

23    his desired result.

24         Now, let me start with the issue of which

25    applicants are included in the model.  Professor Card

Case: 19-2005    Document: 00117629240    Page: 551    Date Filed: 07/30/2020    Entry ID: 6356615
Case 1:14-cv-14176-ADB   Document 656   Filed 04/18/19   Page 72 of 155

72

1    included all domestic applicants, which is the group that

2    both sides agree is relevant here.

3            Dr. Arcidiacono threw out of his model a group that

4    accounts for almost 30 percent of admitted students:  the

5    recruited athletes, the legacy applicants, the applicants who

6    are on the dean or director's list, and the children of

7    Harvard faculty and staff, the so-called ALDC applicants.

8            Now, there are two important questions to ask about

9    why Dr. Arcidiacono made that choice.  The first, why did he

10   claim to do it.  The answer you heard him give is that the

11   ALDC applicants received tips in the admissions process.  But

12   of course so many other groups receive tips, and yet he

13   didn't exclude any of those applicants from his model.

14           Dr. Arcidiacono also said that he excluded ALDC

15   applicants because they have high admission rates.  He told

16   Your Honor that he needed to exclude the ALDCs so he could

17   compare "apples to apples."

18           That is nonsense.  One might as well say that

19   people with low SAT scores can't be compared as apples to

20   apples with people with high SAT scores.

21           The whole point of a regression is to allow

22   apples-to-apples comparisons among people with different

23   characteristics by controlling for those characteristics.

24           Now, the second question is why did Dr. Arcidiacono

25   actually choose to exclude ALDC applicants.  And I think here

**JA3475**

1    the answer is pretty clear.  He did it because doing so

2    produced the result he wanted.  He did it because among ALDC

3    applicants he agrees that Asian-American applicants are

4    admitted at a higher rate than white applicants.

5        That is why the first sentence of the plaintiff's

6    opening statement in this case is what you see on the screen.

7    The evidence in this trial will show that Harvard College

8    discriminates against Asian-American applicants, specifically

9    those applicants ineligible for Harvard's sizeable

10    professions for recruited athletes, the children of its

11    alumni, major donors, and its faculty.

12        As Your Honor recognized, Asian-Americans are not

13    only not being discriminated against in these categories,

14    they're actually being favored.

15        As Professor Card testified, for legacy applicants,

16    the largest component of the ALDC group by far, that

17    advantage is a statistically significant one.

18        That is a fact that Mr. Hughes tried deftly to

19    obscure in his statements this morning.  Were there any doubt

20    about Dr. Arcidiacono's motives for removing the ALDC

21    applicants from his file, that issue was put to rest when

22    Mr. Lee asked him about the early action applicants.

23        You may recall that Dr. Arcidiacono said that the

24    reason he removed ALDC applicants was their high admission

25    rates.

Case: 19-2005    Document: 00147629240    Page: 553    Date Filed: 07/30/2020    Entry ID: 6356615
Case 1:14-cv-14176-ADB   Document 656   Filed 04/18/19   Page 74 of 155

74

1          Now, early action applicants also have high

2     admission rates, between six and seven times higher than

3     regular applicants.  And in fact, Dr. Arcidiacono initially

4     excluded those applicants from his model for that very stated

5     reason.  But then he put those early action applicants back

6     into his model after he realized that Asian-Americans were

7     not being admitted at higher rates within that group.

8          He quite simply went looking across the data.  He

9     saw some groups where Asian-Americans did better than white

10    applicants.  He saw some groups where they did worse.

11         And rather than analyzing all of those groups

12    together, as Professor Card did, he decided to throw out the

13    groups where the Asian-American applicants did better.

14         That is unabashed data mining, and the result is

15    that because Dr. Arcidiacono excluded ALDCs from his

16    analysis, SFFA has no statistical evidence of discrimination

17    against Asian-Americans in the applicant pool as a whole.

18    Absolutely none.

19         The sole theory of discrimination that SFFA has

20    advanced is that Harvard discriminates against only those

21    Asian-Americans who are not athletes, not legacies, not on

22    the dean's or director's list, and not children of Harvard

23    faculty or staff.

24         As Your Honor's questions to Dr. Arcidiacono

25    recognized, that theory makes no sense.  If Harvard really

 1    bore discriminatory animus or even implicit bias towards

 2    Asian-American applicants, a premise on which SFFA's theory

 3    depends, why would it discriminate against only

 4    Asian-Americans who are not ALDCs?  That is a fatal weakness

 5    in SFFA's case.

 6            And indeed, if as it now appears from Mr. Hughes'

 7    statement this morning, the plaintiff is relying only on a

 8    theory of implicit bias in admissions, its concession that

 9    admissions officers do not discriminate against ALDC

10    applicants renders that theory incoherent.

11            Now, before I move on, I want to address something

12    else we've heard from the plaintiff, which is the suggestion

13    that ALDCs are not as strong as other applicants or that

14    academic or other success matters less for their admissions

15    chances.

16            That is simply not true.  ALDCs as a group are

17    rated higher, much higher on every dimension in the data.

18            Now let me turn briefly to the issue of pooling;

19    that is, the question of whether it's proper to run a single

20    model for all six years of data or to model each year

21    separately.

22            Professor Card, as Your Honor will recall, ran his

23    model separately for each admissions cycle because that's how

24    the process works.  The applicants in each year compete

25    against other applicants in that year.  They don't compete

1    against applicants in other years.  And running a model

2    year-by year, Dr. Card explained, also allows him to examine

3    the effect of early action because for some years Harvard did

4    have early action.  For others it did not.  And with respect

5    to changes in the coding of parental occupation categories,

6    it also allows his model to see exactly what the admissions

7    officers saw in each year as opposed to a pool model which

8    does not.

9           Now, the only reason that Dr. Arcidiacono gives for

10    his approach is he says it gave his model more statistical

11    power or made it more precise.

12           But as you heard Professor Card explain, that's

13    just not true.  Professor Card doesn't just use his

14    year-by-year models, he also averages the results from those

15    models across all six years.  And when he does that, his

16    estimates are actually more precise and his model actually

17    has more statistical power than Dr. Arcidiacono's.

18           Let me turn next to the issue of omitted variables,

19    and I'll ask by -- I'll start by asking Your Honor to think

20    back to the hypothetical that Professor Card described on the

21    whiteboard about the likelihood that somebody will retire in

22    the next year.

23           The point that example was trying to illustrate is

24    that if a regression does not include every variable that

25    would affect the outcome, then you can't infer from any

1    regression estimate that the factor in question actually

2    caused the estimated change.  That is why it is so important

3    that Professor Card includes in his model so many of the

4    factors for which data exists.

5        By contrast, Dr. Arcidiacono did not.  He omitted

6    four factors:  intended career, parental occupation, whether

7    the applicant received a staff interview, and the personal

8    rating.  Those four factors have one thing in common.  They

9    turn out to make a big difference in the results.

10        Let me talk first about the parental occupation and

11   intended career.  Dr. Arcidiacono admits that parental

12   occupation and intended career are factors that are

13   considered by the admissions office.  They're on the summary

14   sheet.  And so here, too, by choosing to omit those variables

15   he was taking his model farther away from the actual process.

16        His supposed reason for excluding those factors was

17   the fact that some of the data vary from year to year.  But

18   other categories also vary from year to year, but

19   Dr. Arcidiacono did not exclude them.  He excluded those

20   other ones.

21        And as you heard Professor Card explain,

22   year-to-year variation is a commonplace feature of data like

23   this.  It is no reason to exclude these factors which the

24   evidence shows are important factors in the admissions

25   decision.

Case: 19-2005    Document: 00117629240    Page: 557    Date Filed: 07/30/2020    Entry ID: 6356615
Case 1:14-cv-14176-ADB   Document 656   Filed 04/18/19   Page 78 of 155

78

         1           Now, Dr. Arcidiacono also excluded the fact of
         2    whether an applicant had a staff interview.  His reason for
         3    doing that was that ALDC applicants are more likely to
         4    receive staff interviews than non-ALDC applicants.
         5           But that's not a reason to exclude the factor any
         6    more than it's a reason to exclude any other factor that is
         7    correlated with ALDC status, because it is a reason to
         8    include that factor so that the ALDC effect can be controlled
         9    and because the fact of a staff interview does affect
        10    admissions decisions.
        11           The effect of pulling each of these variables out
        12    of his model was that it allowed Dr. Arcidiacono to find an
        13    increasingly negative effect of Asian-American ethnicity.
        14           And now let me turn to the personal rating, which
        15    it now appears is all of the plaintiff's case here.
        16           Mr. Hughes has suggested that the differences
        17    between average ratings of applicants by race indicates bias.
        18    But as our demonstrative 10.10, which is on the screen,
        19    shows, there are differences in all four ratings, and that
        20    does not mean there is bias.
        21           By removing the personal rating, Dr. Arcidiacono
        22    was able to make the negative effect even greater.
        23           Now, the personal rating has obviously been a focus
        24    for both parties from the start, and the reason is that it is
        25    important.  As you've heard from all of the admissions

Case: 19-2005   Document: 00117629240   Page: 558   Date Filed: 07/30/2020   Entry ID: 6356615
Case 1:14-cv-14176-ADB   Document 656   Filed 04/18/19   Page 79 of 155

79

1    officers, one of the things that they are trying to assess is

2    what type of classmate or roommate an applicant might make.

3    What qualities does she or he bring to the campus.

4         The admissions officers pour over essays,

5    recommendation letters, alumni interview reports, and other

6    materials in an effort to learn more about who the applicants

7    are.  The personal qualities expressed in those materials and

8    reflected in the personal rating and nowhere else are

9    critically important to deciding who will be admitted.  And

10   because the information reflected in the personal rating is

11   so important to the process, it makes a big difference to the

12   result of the model whether or not that rating is included.

13        Removing the personal rating means depriving the

14   model of a plethora of information about what admissions

15   officers actually consider.

16        But by removing the personal rating from his model,

17   Dr. Arcidiacono was able to find the Asian penalty he was

18   looking for.  There is no justification for removing it.

19        Both experts agree that if race is directly taken

20   into account in determining a variable, that variable should

21   be excluded in a model that is trying to assess the effect of

22   one's race.  That is why both experts excluded the

23   preliminary overall rating in constructing their models

24   because admissions officers have clearly stated that race

25   itself may be considered in that factor.

Case: 19-2005   Document: 00117629240   Page: 559   Date Filed: 07/30/2020   Entry ID: 6356615
Case 1:14-cv-14176-ADB   Document 656   Filed 04/18/19   Page 80 of 155

80

1          That is emphatically not true of the personal

2     rating.  Every single admissions officer testified that an

3     applicant's race itself is not considered when assigning the

4     personal rating.  That testimony was consistent and

5     undisputed.

6          The personal rating does not reflect the fact that

7     an applicant has self-identified as belonging to a particular

8     race.

9          The fact that admissions officers may consider

10    whether an applicant has overcome discrimination or other

11    things when assigning the personal rating is not considering

12    the applicant's race when assigning that rating.  It's

13    considering qualities such as the applicant's determination,

14    perseverance, grit, and many other personal qualities that

15    are revealed in that instance.

16         Now, Dr. Arcidiacono says he removed the personal

17    rating because he inferred that the rating itself reflected

18    bias against Asian-Americans.  To be clear, what he found was

19    that Asian-American ethnicity was associated with slightly

20    lower personal ratings on average.  He found on average a

21    negative correlation.

22         That is decidedly not the same thing as finding

23    that the correlation he observed could properly be attributed

24    to bias, as OCR's own report which noticed the same negative

25    correlation and nonetheless concluded that there was no

1   evidence of bias in the admissions process against

2   Asian-Americans.

3          Importantly, Dr. Arcidiacono also found that

4   Asian-American ethnicity was associated with better academic

5   and extracurricular ratings, controlling for the factors in

6   his model.  That means that his rating models show that

7   Asian-Americans are getting higher academic ratings, higher

8   extracurricular ratings than equally situated white

9   applicants, but slightly lower personal ratings.

10         The question is whether the correlations

11  Dr. Arcidiacono found in these ratings are attributable to

12  racial bias or just reflect factors that aren't controlled

13  for in the model.

14         So let's think for a moment about what it would

15  mean if the correlations really did reflect the consideration

16  of race.

17         As Mr. Lee showed you earlier and Dr. Arcidiacono

18  agreed, this means that admissions officers are giving

19  Asian-American applicants better ratings in the first two

20  boxes than can be explained by any data in the model.

21  Remember, it's the same admissions officer filling out all

22  four boxes.

23         Dr. Arcidiacono would have you believe that the

24  same admissions officer is deliberately -- or exercising some

25  stereotypical bias, deliberately giving Asian-American

1    applicants a better academic rating, a better extracurricular

2    rating only to move two boxes over and give them a worse

3    personal rating than the data can explain.

4         16 leading economists, including two Nobel Prize

5    winners and Janet Yellen, the former chair of the federal

6    reserve, agreed that that conclusion is nonsense.  They

7    explained in a brief to this Court, and I'm quoting,

8    "Dr. Arcidiacono's finding are implausible because they would

9    indicate that Harvard discriminates against Asian-American

10   applicants on one subscore only to turn around and

11   discriminate in their favor on two others.

12        "The better and more plausible explanation of these

13   findings," they conclude, "is that Dr. Arcidiacono's

14   regression models are simply not reliable enough to measure

15   most of the applicant qualities that drive Harvard's

16   assignment of these ratings."

17        And that indeed is the very interpretation that

18   Dr. Arcidiacono himself gave for the positive correlations he

19   found in his models of the academic and extracurricular

20   ratings.  He didn't attribute the better academic and

21   extracurricular ratings that admissions officers give to

22   Asian-American applicants as an Asian preference.  He said

23   simply that those better scores reflect factors that aren't

24   captured in the data.

25        And the reason he said that is because that

1    Asian-American applicants are stronger than white applicants

2    on measures of academic and extracurricular excellence in the

3    data like SAT scores.  As he explained, economists generally

4    operate under the assumption that observable characteristics

5    operate in a similar manner to unobservable characteristics.

6            So because he found that Asian-American applicants

7    were stronger on measures of academic and extracurricular

8    strength in the data, he assumed they must also be strong on

9    measures of strength in those areas outside the data which

10   would account for the positive correlations he found.

11           He was right about that.  Professor Card doesn't

12   disagree.  And Dr. Arcidiacono should have interpreted the

13   personal rating regression in the same way.

14           But instead, Dr. Arcidiacono interpreted the

15   negative effect of Asian-American ethnicity that he found in

16   his personal rating regression to be the result of bias.

17           Now, what reasons did he give for those

18   inconsistent interpretations?  He said that for the personal

19   rating, like the academic and extracurricular ratings,

20   Asian-American applicants are stronger on the factors in the

21   data that affect the rating.  So they're presumably also

22   stronger on the many factors admissions considers that are

23   outside the data.

24           That is just not true.  Asian-American applicants,

25   as Dr. Card painstakingly demonstrated, are not stronger on

1    the non-academic factors in the data that affect the personal

2    rating.  Professor Card showed you slide after slide

3    explaining how the data disproved Dr. Arcidiacono on this

4    point.  He showed you that Asian-American applicants have

5    weaker school support ratings, the teacher and guidance

6    counselor ratings, than white applicants of equal academic

7    strengths.

8           Those teacher and guidance counselor ratings inform

9    the personal rating.  The same holds true if you add alumni

10   ratings to the school support ratings.  Asian-American

11   applicants do slightly less well than white applicants.  And

12   he showed you that if you look across all of the observable

13   non-academic factors in the model, Asian-American applicants

14   are less strong than white applicants of equal academic

15   strength.

16          Now let me reiterate.  Dr. Arcidiacono's

17   explanation for why he concluded the personal rating was

18   bias, why he threw it entirely out of his model, was his

19   conclusion that Asian-American applicants are stronger on the

20   factors in the data that inform the personal rating.

21          And he therefore inferred that only bias, not

22   factors outside the data, could explain the negative

23   association between Asian-American ethnicity and the personal

24   rating.

25          But Asian-American applicants are not stronger on

1    the factors in the data that inform the personal rating.

2    Applying the same generally accepted economic principle that

3    he applied to the academic and extracurricular ratings, the

4    conclusion that Dr. Arcidiacono should have drawn, the one

5    that Professor Card properly drew, is that the explanation

6    for why Asian-Americans do less well on the personal rating

7    is not bias.  It is the many, many factors considered by

8    admissions that the model cannot control for.

9          But finally, as Dr. Card explained, let's just

10   suppose he is wrong about this and suppose that the

11   correlations that Dr. Arcidiacono found for the three ratings

12   actually are attributable to race, racial bias, or racial

13   stereotyping and not simply factors outside the data.  Would

14   the ratings have to be thrown out of the model?  The answer

15   is no.

16         You repeatedly heard Mr. Hughes tell you this

17   morning that the answer is yes.  That is just not correct.

18         As Professor Card explained, throwing out the

19   ratings would discard a great deal of helpful information

20   about the applicant that both experts agree is important to

21   the process.  Is the applicant a leader?  Does she offer

22   assistance to her peers?  Does he have a determined spirit?

23         Rather than throwing out that information, the

24   right approach is to simply remove the effect of race found

25   in Dr. Arcidiacono's models from the ratings, keeping the

1    remainder of the ratings intact.

2         When Professor Card did that and used the adjusted

3    ratings in his admissions model, the results were entirely

4    consistent with those of his main model.  He still found no

5    evidence of bias.

6         Now, let me emphasize two -- before I turn the

7    podium over to Mr. Lee, emphasize two additional points

8    regarding the personal rating.

9         Number one, Mr. Hughes and Dr. Arcidiacono hinged

10   their claim of personal rating bias on the charts that showed

11   that Mr. -- that Mr. Hughes showed again this morning,

12   comparing the personal ratings to the academic index.

13        But as Dr. Card explained conclusively, the

14   personal rating has almost no correlation at all to the

15   academic index or to academics at all.  And that is revealed

16   on, I believe, our demonstrative 65.

17        One additional point -- yes, here it is.  The

18   correlation that his misleading charts purported to show

19   between the academic index decile and the personal rating, in

20   fact, when revealed on the proper same scale shows almost no

21   correlation whatsoever between the personal rating and the

22   academic index or academics more generally.

23        Now, one additional point that Dr. Card raised

24   regarding the personal rating, and that is the fact that for

25   both the ALDC and the non-ALDC applicants, Asian-American

1   applicants have lower personal ratings than white applicants.

2   Mr. Lee touched on this, and let me just expand a little bit.

3        The difference in the gap on personal ratings

4   between Asian-American applicants and white applicants is --

5   not only exists in the ALDC group, it is greater for the ALDC

6   group.  In other words, the Asian-American ALDCs are farther

7   behind the white ALDCs in terms of the personal rating than

8   is true for the non-ALDC applicants.

9        That again drains any coherence from SFFA's claim

10  that the personal rating is the vehicle being used to

11  discriminate against Asian-American applicants.  It's simply

12  inconceivable to think that the personal rating is being used

13  as an engine for discrimination.  When Asian-Americans who

14  are ALDCs, a group that SFFA concedes Harvard does not

15  discriminate against -- that was Mr. Mortara's very first

16  sentence in this trial -- they are also getting even lower

17  personal ratings than their white counterparts.

18       Now, I acknowledge, and I'm sure both parties

19  regret the fact that a lot of data has been thrown at Her

20  Honor in this case.  But all you really need to take away is

21  that one expert was trying to model the process and the other

22  was not.

23       Professor Card is the expert who tried to model the

24  process.  The result was a durable finding that there was no

25  evidence of discrimination.

1          Dr. Arcidiacono, on the other hand, made choice

2     after choice after choice after choice designed to move

3     further away from the actual admissions process in order to

4     find evidence of discrimination.  His findings would not be

5     sufficient to support a finding of intentional discrimination

6     or discrimination even if they were reliable.

7          But they are not reliable.  They are manipulated.

8     Dr. Arcidiacono selectively, purposefully eliminated

9     legitimate factors in the admissions process in order to

10    suggest an illegitimate outcome.

11          MR. LEE:  I promise not to fold my arms.

12          Your Honor, now that Mr. Waxman has explained that

13    the evidence is not sufficient for SFFA to carry its burden

14    to show that Harvard is discriminating, let me turn to the

15    question of discriminatory intent.

16          Now, to state the obvious, if there was

17    discriminatory animus, why would it be directed only to

18    certain categories of Asian-American applicants?  Why would

19    athletes, legacies, dean's list, director's list, faculty

20    children, children of staff, Asian-American women,

21    Asian-Americans from California, why would they not be

22    discriminated against but others are?

23          Probably more importantly, where is the evidence

24    that shows that this bizarre scheme was implemented in any

25    intentional or even unintentional way.  We would suggest that

Case: 19-2005    Document: 00117629240    Page: 568    Date Filed: 07/30/2020    Entry ID: 6356615
Case 1:14-cv-14176-ADB   Document 656   Filed 04/18/19   Page 89 of 155

89

 1    having seen the witnesses you've seen, you've seen the

 2    opposite of intentional discrimination.

 3            The officer, the admissions officers took the

 4    stand.  They have testified unequivocally that they have

 5    never witnessed any discrimination or bias in the admissions

 6    process.  These admissions officers, everyone from Ms. Bever

 7    who's been in the office for four years to, say, Mr. Banks

 8    who's been there for closer to 40, described an open,

 9    collaborative, iterative process designed to ensure that each

10    applicant gets a full and fair review.

11            Every one of the 40,000 applicants can be put back

12    into play at any point in the process.  Any admissions

13    officer can at any point in the process request that any

14    application be discussed.  And when they are, they're

15    discussed in subcommittee and committee openly with all of

16    the information, quantitative and qualitative, available to

17    everyone.

18            In fact, you heard Ms. Bever describe just what

19    happened with Ms. Sally Chen's application.  In the interests

20    of time I'm not going to go through the details, but it was a

21    wonderful example of the consideration of an application by a

22    group of people who ultimately came to the correct decision

23    and admitted Ms. Chen.  But it was only the result of an

24    iterative and open process.

25            This is not a process where discrimination and

Case: 19-2005    Document: 00117629240    Page: 563    Date Filed: 07/30/2020    Entry ID: 6356615
Case 1:14-cv-14176-ADB    Document 656    Filed 04/18/19    Page 90 of 155

90

1  racial animus could go unnoticed.  It is a process replete

2  with checks and balances.  It is a process that relies upon

3  transparency and open discussion.  It is a process that

4  relies upon 40 votes of individuals, many of whom Your Honor

5  saw and got to see testify.

6       Now, as part of this process, the admissions office

7  considers all the information available.  If the applicant

8  chooses to provide information about his or her race, that

9  fact is considered alongside all the other pieces of

10  information in the file.  Race is considered as one of many

11  factors.

12       For some competitive applicants, the tip of race

13  may make a difference.  The admissions officers were

14  consistent.  But race is never used to deny admission to

15  anyone.  Race is never a negative factor.  The admissions

16  officers don't think in Dr. Arcidiacono's terms of winners

17  and losers.

18       This very process was praised in *Bakke* by the

19  Supreme Court as an illuminating example.  Now, I understand

20  that SFFA thinks that this is somehow humorous or a joke, but

21  it's not.  It's law of the land.  They might want it to be

22  different, but it is our law.  This process is the same

23  process that was examined by the Department of Education's

24  Office For Civil Rights in 1990.

25       Now, SFFA has yanked from context a sentence here,

Case: 19-2005    Document: 00117629240    Page: 570    Date Filed: 07/30/2020    Entry ID: 6356615
Case 1:14-cv-14176-ADB    Document 656    Filed 04/18/19    Page 91 of 155

91

1    a sentence there, and tried to tie it to deposition testimony

2    and suggest something other than what the document says.

3              Your Honor has it.

4              What the document is, is this:  OCR reviewed 400

5    application files, they reviewed 2,000 application summary

6    sheets, they interviewed 10 admissions officers, and they had

7    data on 110,000 applicants and even did their own regression

8    analysis.

9              After all that, at the end of the document which

10   had the statements that Mr. Hughes relied upon, what did it

11   find?  Harvard did not discriminate against Asian-Americans.

12             Now, to be clear, OCR's analysis found, just as the

13   experts have found in this case, that there was on average a

14   slight difference in the personal ratings for Asian-American

15   and white applicants.  On average, Asian-Americans received a

16   slightly lower personal ratings, the difference between 25

17   and 20 percent.

18             But then, Your Honor, OCR did what SFFA didn't

19   bother to do.  OCR didn't just notice a negative coefficient

20   of Asian-American ethnicity and then say we assume bias.  It

21   conducted an audit of hundreds of admissions files, hundreds

22   of summary sheets, looking for actual evidence of bias.  It

23   found none.

24             They compared the ratings assigned to the

25   application materials they reviewed, and here's their

Case: 19-2005    Document: 00117629240    Page: 571    Date Filed: 07/30/2020    Entry ID: 6356615
Case 1:14-cv-14176-ADB    Document 656    Filed 04/18/19    Page 92 of 155

92

1  finding:  "Our comparison of the personal qualities ratings

2  to the supporting material in the applicant files revealed no

3  apparent inconsistencies between the ratings and the

4  underlying documentation."

5       That is the way to investigate a claim of bias, not

6  to simply jump to the conclusion that bias is the answer.

7       When OCR did the real work, it concluded, just as

8  Dr. Card did, that there is no evidence that this discrepancy

9  was the result of any discrimination.

10      To reiterate, Your Honor, they had the files that

11  Your Honor ordered produced.  They had the files for their

12  standing members.  If they wanted to do this audit to support

13  their claim, they could have done it.

14      Dr. Arcidiacono could have put those files into

15  evidence.  They did not.  And there's only one inference that

16  can be drawn from that is that those files would not support

17  the convoluted claim they're offering you today.

18      Now, Harvard's current admissions process is, in

19  general, the same process that's described as we said

20  repeatedly.  It's the same process that was examined again in

21  2001 when there was another complaint.  It's the same process

22  that was mentioned favorably in *Grutter*.  And it is largely

23  the same process today.

24      Now, confronted with this unbroken line endorsement

25  of Harvard's process over 50 years, where does that leave

1    SFFA?  It's left with the suggestion that Harvard's process

2    is not formulaic enough.  It's not specific enough.  They're

3    not stringent written directives.

4        I would suggest that if they had stringent written

5    directives, they would be making the other claim, which is

6    they're too mechanical and not flexible enough.

7        For two weeks, the plaintiffs asked admissions

8    officer after admissions officer about the fact that there

9    were no specific guidelines to take into consideration as

10   part of Harvard's whole-person review.

11       For the discovery period, Your Honor, which

12   extended though August 2014 and the class of 2019, everybody

13   testified consistently and it's consistent with the record.

14   There was nothing addressed in this specific issue.  At the

15   very end, the reading procedures for the class of 2023 became

16   an issue.

17       It is true that after SFFA sued, the admissions

18   office did not go out of business.  It is true that they

19   continued to review applications.  It is true, as Your Honor

20   learned yesterday, that every year the reading procedures

21   were revised.

22       And it's true that on October 5 of this year a new

23   set of reading procedures were issued that said that race can

24   be considered in the preliminary overall rating as one factor

25   among many but that it cannot be considered in the personal

Case: 19-2005    Document: 00117629340    Page: 573    Date Filed: 07/30/2020    Entry ID: 6356615
Case 1:14-cv-14176-ADB   Document 656   Filed 04/18/19   Page 94 of 155

94

1    rating.

2            It is nothing more than a codification of what Your

3    Honor heard the admissions officers testify had been the

4    practice before.

5            Now, I just want to say one additional thing about

6    the reading procedures.  For the first time today in this

7    case, there was argument that somehow the reading procedures

8    are relevant to liability.

9            Your Honor allowed the recall of witnesses to the

10   extent it might demonstrate some indication of a witness'

11   credibility.

12           Rule 407 precludes the very argument they made

13   today.  They cannot make that argument.  It's an argument

14   that is precluded by the rules of evidence that govern this

15   case.

16           But the reading procedures at the end are only a

17   small part of the admissions officer's training.  You've

18   learned a lot about it.  You've learned that the new

19   admissions officers receive training at the outset, that

20   their first 50 to 100 files are reviewed by another reader.

21   You learned about the casebook and the casebook guidance.

22           And we walked you through an example in the

23   casebook, two examples, one of a student named Grace, who is

24   on Slide 54, and one who is a student named Peter, on

25   Slide 55.

Case: 19-2005   Document: 00117629240   Page: 574   Date Filed: 07/30/2020   Entry ID: 6356615
Case 1:14-cv-14176-ADB   Document 656   Filed 04/18/19   Page 95 of 155

95

1          I'm not going to walk through them today because we

2     did it during the course of the evidence.  But the suggestion

3     that these casebook examples and the casebook guidance don't

4     provide the instruction on how to employ the multifactor test

5     is simply incorrect.

6          In fact, for all of us as lawyers, we largely learn

7     by case studies.  We learn from looking at specific case

8     studies and drawing conclusions from them.  That is precisely

9     what happens at the Harvard admissions office.  These are

10    real cases drawn from real applicants with their names

11    changed.  And then the casebook allows the admissions

12    officers to determine just how the multifactor test should be

13    applied.

14         The admissions officers also receive the

15    interviewer handbook which have the tips that they are to be

16    looking for.  And each year the entire office receives

17    training from the Harvard office of the general counsel

18    concerning the legal limitations on how race can properly be

19    considered in the admissions process.

20         And in addition, Your Honor, periodically the

21    office gives trainings like those discussed by Ms. Ray in her

22    testimony that provide information to admissions officers

23    giving the experience of students of color in the United

24    States so they have the benefit of their context of the

25    discussions.

1          It is through all of these materials and all of

2     this training and all of this collaborative work that the 40

3     individuals would do the admissions process come together to

4     vote and admit each of the incoming Harvard classes.

5          Now, the one thing that SFFA points to as evidence

6     of discrimination are the search lists.

7          It's a really -- respectfully, and I respect

8     Mr. Hughes a great deal.  It's a disingenuous argument.

9          The exhibit that they gave you has a top and a

10    bottom.  The bottom has the ACT cutoff levels.

11         As Dean Fitzsimmons testified, for people in Sparse

12    Country, particularly in rural portions of Sparse Country,

13    the ACT is the more common test.  On the very same document

14    that they claim is discriminatory, the ACT cutoff is the same

15    at 30.

16         And in the document that Dean Fitzsimmons talked

17    about that followed, we saw another year where the cutoff

18    actually for Asian-Americans was lower than whites in Sparse

19    Country.  This is no evidence of discriminatory intent.

20         So let me now turn to a big focus of what SFFA has

21    focused on, and that's OIR.  Now, to be clear, Your Honor,

22    this has been a moving target.  And I think the fact that

23    it's been a moving target speaks volumes.

24         In opening statements, SFFA showed you these pages

25    from Exhibit 9.  They pointed you to these two slides in

 1   opening.  These are the same pages that SFFA cross-examined

 2   Mr. Hansen about.

 3          And in opening, this is what SFFA said about these

 4   pages.  "Harvard's own researchers told Dean Fitzsimmons

 5   there was a statistically significant penalty on

 6   Asian-Americans applying to Harvard," referring to these

 7   specific pages.

 8          We now know that's simply not true.  Dean

 9   Fitzsimmons never saw these pages.  That is undisputed.

10          Mr. Hughes's conjecture about other evidence that

11   might have indicated that he did is simply that.  The

12   information on the very slides that was the core of their

13   opening never got to the dean.  Period.

14          Now, there are models that were, in fact, shown to

15   Dean Fitzsimmons, and Your Honor has seen them and we've

16   talked about them repeatedly.  The work that OIR did was work

17   regarding the demographics of Harvard's admitted class, and

18   it was to be sure, in part, prompted by the Unz article.

19          That article, as Your Honor now knows, was very

20   controversial.  It criticized people of all ethnic,

21   religious, and racial backgrounds equally.

22          As Dean Fitzsimmons explained, he heard from many

23   alumni who were particularly upset and concerned about the

24   deeply anti-Semitic comments in the article.  Many of the

25   privilege log entries are dealing not with just

1    Asian-American penalties on their face, but the Unz article,

2    and the Unz article had broader implications.

3           Now, OIR did do some work.  And what it found, as

4    Your Honor now knows, is that Model 1 demonstrated if

5    admissions decisions were based only on academic factors, the

6    admitted class would have a higher percentage of

7    Asian-American students than it does.  No one has ever

8    disagreed with that or disputed that.

9           Models 2 and 3 show that the more factors that are

10   added, the representation -- the more factors that are added

11   results in the representation of Asian-Americans decreasing.

12   No one has ever disputed that as well.

13          Now, Model 4 got a lot of attention, but I think at

14   the end of the day we realize that that model itself is a

15   little circular.  Its input is demographics, its output is

16   demographics, and that's the reason, as was explained to Your

17   Honor, that the results are so close to the actual class.

18          But as Dean Fitzsimmons said, when he saw this, it

19   was not inconsistent with what he understood before, which is

20   if it were just grade point averages and board scores, there

21   would be more Asian-Americans.  He's never disagreed with

22   that, and he said it on the stand.

23          But he also said that the more factors you add

24   in -- and this is only a handful of factors -- the closer you

25   get to the class that Harvard has.

**JA3501**

Case: 19-2005    Document: 00117629240    Page: 578    Date Filed: 07/30/2020    Entry ID: 6356615
Case 1:14-cv-14176-ADB   Document 656   Filed 04/18/19   Page 99 of 155

99

 1              Against the backdrop of *Bakke*, the OCR

 2      investigation, the second OCR investigation, and everything

 3      else that had occurred, this didn't tell Dean Fitzsimmons

 4      something that he didn't know before.  And as he's testified

 5      and as even Mr. Kahlenberg, their expert, has acknowledged,

 6      Dean Fitzsimmons has a reputation for having been a pioneer

 7      in opening up the admissions office of educational

 8      institutions to people of different ethnicities and different

 9      socioeconomic backgrounds.

10              The idea that he would take this and have an alarm

11      bell go off and do nothing is simply implausible.

12              In fact, what he did do is in late 2013 he asked

13      OIR to do an analysis to confirm that the admissions office

14      was giving a tip to low-income applicants.  He got that.

15              But then he went another step.  After receiving

16      that analysis, he specifically asked for follow-up regarding

17      whether the tip for low-income applicants was being applied

18      consistently across all racial and ethnic groups.  The answer

19      was it was.

20              In fact, the results showed that Asian-Americans

21      were getting as large a tip for being low income as almost

22      any group.  As Slide 64 demonstrates, the admit rates for

23      low-income Asian-Americans was 10 percent as compared to

24      7 percent for non-low-income Asian-Americans, a 3 percent

25      increase.

1          Now, we can quarrel about who got the larger

2     increase and who didn't, but this is just another place that

3     demonstrates the illogic in SFFA's claims.  If Harvard were

4     trying to discriminate against Asian-Americans, why would it

5     give the largest percentage tip to low-income

6     Asian-Americans?

7          Now, SFFA has suggested Dean Fitzsimmons should

8     have done more, that he should have commissioned or requested

9     the full analysis that Dr. Card has now done.

10         There are three responses to this.  Dean

11    Fitzsimmons testified that he has been vigilant about

12    ensuring that his process is not infected by bias and

13    discrimination.

14         When he got this information, he knew that what he

15    needed to do was to continue what he had done before, and he

16    told you that he did.  No one suggested to him that these

17    results showed discrimination.  No one suggested that these

18    results proved discrimination.  No one involved in the

19    process sounded the alarm bell that SFFA seems to think

20    should have gone off.

21         The second thing is that to the extent SFFA wants a

22    more thorough analysis, it's been done now.  It was done by

23    Dr. Card.  And Dr. Card concluded that there is no evidence

24    of discrimination against Asian-Americans.

25         But the third is this:  This effort to cobble

 1    together a line from a deposition here, a line from a

 2    document here over a period of 10 or 15 years and suggests

 3    that, ah-ha, this is evidence of intentional discrimination

 4    just doesn't work.

 5            This is Monday morning quarterbacking looking back

 6    at a series of events that occurred before and saying I can

 7    ignore the context, I can ignore what the dean knew.

 8            I can pull out a sentence or two here and say he

 9    should have done more.  Or he should have done more, even if

10    they're right, isn't intentional discrimination.

11            Let me briefly address two issues that the

12    plaintiff has raised late in the trial.  The first is

13    implicit bias.  Mr. Waxman and I both touched on this.  Let

14    me say three things:

15            First, there was no evidence to suggest that anyone

16    in Harvard's admissions office harbored any implicit bias

17    against Asian-Americans.  There are experts in implicit bias.

18    We didn't hear one.  The only person to basically bring

19    together the implicit bias case was Mr. Hughes.  But that's

20    insufficient to carry their burden of showing implicit bias.

21            Second, the claim makes no sense.  How do you

22    implicitly bias yourself against some Asian-Americans but

23    implicitly or explicitly bias yourself in favor of other

24    Asian-Americans?  If it sounds like it doesn't make sense,

25    it's because it doesn't.

**JA3504**

Case: 19-2005    Document: 00117632240    Page: 554    Date Filed: 07/30/2020    Entry ID: 6356615
Case 1:14-cv-14176-ADB   Document 650   Filed 04/18/19   Page 102 of 155

102

 1              Now, third, the law that they've showed you

 2     actually is incorrect.

 3              Mr. Hughes put on the screen a citation from the

 4     *Columbus Board of Education v Penick*.  He argued that actions

 5     having a foreseeable despaired impact are relevant to proving

 6     an unconstitutional purpose.

 7              What you didn't hear, Your Honor, is on the very

 8     same page of that case, at 443 U.S. 464, the Supreme Court

 9     reemphasized that disparate impact in foreseeable

10     consequences without more do not establish a violation.

11              And the court, the Supreme Court, made the very

12     same in the same year in *Massachusetts v Feeney*.  There

13     aren't slides because we didn't quite know this was coming

14     up, but it's 442 U.S. 254 where the Supreme Court stressed

15     that intentional discrimination occurs only when the

16     decision-maker acts -- and I now quote -- "because of, not

17     merely in spite of, adverse effects on an identifiable

18     group."

19              In other words, it's not enough for SFFA to show

20     Harvard might have been aware of differential outcomes or

21     even that someone has suggested that they could be

22     differential outcomes.  SFFA needs to prove that Harvard

23     acted for the deliberate purpose of obtaining that result,

24     and they cannot do that.

25              The last point, Your Honor, on intentional

1    discrimination is this:  I want to turn to the attack on the

2    credibility that we've heard this morning of the Harvard

3    leadership, of the Harvard admissions officers, and near as I

4    can tell, Harvard's lawyers.

5           There's an old saying among trial lawyers, which

6    Her Honor as heard before, if the facts are on your side,

7    argue the facts.  If the law is on your side, argue the law.

8    If you have neither the facts or the law, attack, attack,

9    attack.

10          And that's what we've had today and for three

11   weeks.  It's what the plaintiff has done at every turn.  It

12   is easy to attack when you yourself are never going to get on

13   the stand and be cross-examined.  It has attacked Harvard, it

14   has attacked Harvard's witnesses, and apparently now counsel.

15          But, Your Honor, again, if you trace the history,

16   the attacks speak volumes themselves.  In its summary

17   judgment filings, the plaintiff accused Dean Khurana of

18   killing the work done by OIR, and I quote, "burying the

19   reports."  But as Your Honor now knows, it turns out not to

20   be true.

21          At the pretrial conference, the plaintiff claimed

22   that President Faust's credibility was in doubt and could not

23   be trusted because of a statement she made about Jewish

24   discrimination in the 1920s.  That too was a meritless attack

25   on the reputation of a dedicated academic leader.

 1              It alleged that Dean Smith led a sham committee, to

 2      quote them.  I think the evidence demonstrates that's false

 3      as well.

 4              And then yesterday it was the suggestion that

 5      Marlyn McGrath didn't bring out facts about the October 5

 6      email and reading procedures, reading procedures that are

 7      good for Harvard, that demonstrate in this case which

 8      requests only prospective relief that Harvard is acting just

 9      as it said it has acted.

10              And you've heard the plaintiff attack Dean

11      Fitzsimmons, whom SFFA has accused of intentionally

12      discriminating against Asian-Americans.

13              Now, before SFFA was formed, before *Fisher* 2 was

14      law, Mr. Kahlenberg actually had something to say about Dean

15      Fitzsimmons.  And what did he say?  He said, "This is a

16      leader in higher education who has," and I quote, "worked

17      doggedly to open the doors of higher education to individuals

18      from a broader range of racial and ethnic background."

19              This is the person they're now attacking.  As

20      President Faust said yesterday, no one in the 15 years that

21      she's been working with Dean Fitzsimmons has ever questioned

22      his honesty, has ever questioned his integrity, has ever

23      questioned his truthfulness.  No one until SFFA decided to

24      make its claims.

25              Your Honor saw the witnesses.  The credibility of a

1    witness is not determined by how many times I can impeach a

2    witness with a deposition.  Certainly two times doesn't make

3    a lack of credibility.  It depends upon their overall

4    testimony and the manner in which they communicated to you.

5         Your Honor saw it.  We trust Your Honor's

6    assessment of the credibility of these folks.  They were

7    honest.  They were straightforward.  They admitted when

8    things weren't good for us.  They were clear when things were

9    good for us.

10        The attack on the credibility is just an effort to

11   cobble together and support an illogical claim.

12        Now I am going to briefly address the other claims

13   that Mr. Hughes didn't.  Let me say this on racial balancing.

14   Slide 66 has the legal framework, and I'm not going to go

15   into it.

16        This claim in some ways is easier to resolve for

17   this reason.  If we just look at the experts on racial

18   balancing, Dr. Arcidiacono conceded that he had an opinion in

19   his report on racial balancing.  He conceded that he was not

20   giving that testimony in this case, and he didn't.

21        So as a consequence, the only expert to testify on

22   this issue of racial balancing was Professor Card, who showed

23   you what is now Slide 67, DD 10.100, which showed that there

24   had been significant variations year to year in the racial

25   composition of Harvard's admitted students.

1           As Professor Card put it, if Harvard is trying to

2    racially balance year to year, it's not doing a very good

3    job.  There are significant variations year to year.  And,

4    Your Honor, this is precisely what you would expect from the

5    process that I've described to you and that you've heard

6    about repeatedly.

7           When you look at the side by side -- when you look

8    side by side at the composition of the applicant pool on the

9    left-hand side of Slide 69 and the admitted class pool on the

10   right-hand side, the composition of the admitted class has

11   fluctuated more than the composition of the applicant pool.

12   That's exactly the opposite of what you would expect.

13          Now, I think the argument that should be made here

14   on rebuttal is about the one-pagers.  I'm just going to say

15   this:  During the course of the examination of Elizabeth

16   Yong, there was a demonstrative instruction that had a series

17   of one-pagers, and the suggestion seems to be that's too many

18   one-pagers.  That doesn't make a racial balancing claim.

19          The one-pagers, as Your Honor now knows, if we go

20   to Slide 70, contain more information than just race.  They

21   have information about gender and geography, intended major

22   and race.  The one-pagers are not used, if I move to

23   Slide 72, to set quotas or floors on any group, racial or

24   otherwise.

25          On this point, Harvard's evidence is

1    uncontroverted.  Each and every one of the officers who came

2    to court, as shown in Slides 73 and 74, testified that there

3    are no targets, there are no floors.

4         Instead what the undisputed evidence demonstrated

5    was that these one-pagers are distributed to three people --

6    Dean Fitzsimmons, Director McGrath, and at the time Sally

7    Donahue -- during the course of the process so that they can

8    evaluate the likely yield of the class.  To the extent the

9    information is useful, it's communicated orally to the

10   admissions officers during the full committee process.

11        But as Your Honor now knows, at the tend of the

12   process in every admissions cycle, in every year, if I go to

13   Slide 76, the committee goes through the lop process.

14        And they've been directed explicitly by Dean

15   Fitzsimmons in a memo written to guide them.  I doubt he ever

16   thought it would see the light of day in a federal

17   courthouse.  What he says is at the end of the day, at the

18   end of the day the quality of the case is what counts.

19        Now, I'm just going to very quickly address race is

20   more than a plus factor.  I don't think there's any dispute

21   about what *Grutter* and *Bakke* says.  Race can be used.  It can

22   be used as a plus factor.  It can be used as a tip.

23        Now, this is interesting particularly given that

24   the fundamental predicate of Dr. Arcidiacono's opinion is

25   that a tip for someone is a penalty for someone else.

**JA3510**

1          Harvard's process, Harvard's admissions process

2     meet the standards set forth on Slide 77.  In that process,

3     race may be a factor to a particular candidate's admission.

4     It is never the factor.  Tips for race come into play only

5     for candidates that are otherwise highly competitive.

6     Candidates who are qualified and not just academically, but

7     across a wide series of dimensions.

8          Once again, the testimony to Your Honor was

9     consistent.  Race can make a difference, but it's just one of

10    many tips in the process that can make a difference.

11         And, Your Honor, if I would bring you to Slide 80,

12    the data confirmed that.  First the experts agreed that race

13    does not make a difference in the admissions decision for a

14    majority of applicants.  A large number of applicants to

15    Harvard would be rejected without ever having their race

16    considered.  And there is a group that are so qualified

17    they'll be admitted without the race being considered.

18         Second, if I move to Slide 81, Your Honor, when

19    race does come into play, it's only for applicants who are

20    highly qualified and highly competitive.  This is the chart,

21    and it demonstrates that race matters but only to candidates

22    who have a high probability of admission to begin with.

23         Now, Your Honor, to be sure, there are some

24    African-American applicants for whom the tip of race can make

25    a difference.  And I want to pause here for a minute to

1    emphasize something that at least to me personally is very

2    important.

3            Contrary to Dr. Arcidiacono's charts and

4    implications, all the students that are admitted to Harvard

5    are qualified.  All the African-American students admitted to

6    Harvard are eminently qualified, all the Hispanic students

7    are eminently qualified, and so too are the Asian-Americans

8    and whites.

9            The suggestion that African-American and Hispanic

10   students at Harvard are somehow less qualified or were

11   admitted only because they got a tip of race is not true.

12   It's actually offensive.  For highly competitive candidates

13   race can make a difference, but only if you have many other

14   factors that get you there first.  Dr. Card explained that

15   yesterday.

16           Every dimension of the candidate matters.  Multiple

17   dimensions matter.

18           The fact is that Harvard's pool is, fortunately for

19   Harvard, highly competitive on many dimensions.  In this

20   competitive pool, the presence of any additional factor,

21   including race for some candidates, can make a difference.

22           Lastly, race-neutral alternatives, which Mr. Hughes

23   didn't address.  So let me try to summarize our position so

24   Your Honor has it.  And we'll brief it more fully.

25           First, the process.  While there was some

```
 1    discussion of the Ryan committee, my bet is you've heard more
 2    about the Ryan committee than you might want to hear.  So
 3    let's talk about the committee that did do the work.
 4         I would say this on the Ryan committee:  The idea
 5    that you have a committee and then you get sued and someone
 6    is making precisely the claim that the committee is going to
 7    consider, suspending the work of the committee is not a
 8    illogical thing to do.
 9         But the committee was -- for the college was
10    reconvened later, and it had three people:  Dean Smith, Dean
11    Khurana, Dean Fitzsimmons.  They were the right people for
12    the job because they were the people responsible for
13    precisely the alternatives that might be considered.
14         Dean Smith described to you the work of the
15    committee.  They met seven times.  They worked outside of the
16    committee room.  They reviewed literature.  They reviewed
17    expert reports from this case.  They considered and evaluated
18    every race-neutral alternative Mr. Kahlenberg proposed and
19    more.  They considered, for instance, elimination of the
20    consideration of SATs.
21         And at the end, it was the judgment of these three
22    senior leaders of Harvard, after looking at all of this
23    material, after looking at simulations from both expert
24    witnesses, that at this time race-neutral alternatives could
25    substitute no -- no race-neutral alternative could substitute
```

 1    for the consideration of race as one consideration among

 2    many.

 3            They looked.  They reached this conclusion by

 4    looking at what would happen in those simulations.  Not just

 5    to racial diversity, Your Honor, but to all kinds of

 6    diversity on the Harvard campus and what it would do from an

 7    intellectual and excellence point of view.

 8            And they found that the plaintiff's suggested

 9    alternatives resulted in decreases in the student body

10    excellence, decreases in diversity, decreases that were

11    simply not acceptable to Harvard.

12            Now, as Your Honor now knows, Harvard has had a lot

13    of experience with race-neutral alternatives.  It addressed

14    the issues with the Supreme Court back as far as *Bakke*.  Dean

15    Fitzsimmons is one of the people who has been working on

16    race-neutral alternatives for socioeconomically disadvantaged

17    folks.

18            Here is what I referred to earlier on Slide 88 that

19    Mr. Kahlenberg said in 2010, four years before the complaint

20    was filed, about what Dean Fitzsimmons has done.

21            You've also heard about the Harvard financial aid

22    initiative.  You've also heard about the extensive

23    recruitment effort, including the efforts to recruit

24    Asian-American students.  You've heard about the increase in

25    tenured faculty on the campus, Asian-American tenured faculty

Case: 19-2005    Document: 00117628240    Page: 591    Date Filed: 07/30/2020    Entry ID: 6356615
Case 1:14-cv-14176-ADB   Document 656   Filed 04/18/19   Page 112 of 155

112

1    by 50 percent.

2            Now, Mr. Kahlenberg was the one witness who came in

3    to address this issue.  He's never worked in a college

4    administration.  He's never implemented a minority

5    recruitment program.  He never implemented a financial aid

6    program.  He never worked in a college admissions office.

7    He's never been retained by a college or university anywhere

8    to consult on any of these things.  But he said, I've got

9    some alternatives for you to consider.

10            But Harvard has considered financial aid in its

11    expansion.  Harvard has considered eliminating early action.

12    Harvard has increased its effort to recruit socioeconomically

13    disadvantaged students.  Harvard has increased its efforts to

14    recruit students of color.

15            With all this backdrop, Dean Smith's committee

16    determined that the impact of the simulations which would

17    have resulted in a decrease in African-Americans on campus by

18    close to 40 percent was unacceptable.

19            Now, I want to say just another word or two about

20    Mr. Kahlenberg.  Mr. Kahlenberg was paid to consult on the

21    complaint in this case.  He was paid to work on a complaint

22    that alleged that Harvard should be using race-neutral

23    alternatives instead of race.

24            As Your Honor now knows, the day after the

25    complaint was filed, before Harvard had even been served,

1    he's giving an interview and he's pronouncing judgment that

2    Harvard should lose.  This is not the work of an independent

3    expert.  It's not the work of someone who's gone through a

4    deliberative process.  It's the work of an advocate.

5         He had a result in mind when the complaint was

6    filed.  He had a result in mind the next day when he gave his

7    interview.  And by coincidence, his opinion four years later

8    happened to be the same one he gave to Fox News.

9         Now, what do we know about his opinion?  We now

10   know that, to Mr. Kahlenberg, considerable racial and ethnic

11   diversity means a decrease of African-American representation

12   on the Harvard campus by at least 30 percent.

13        And, Your Honor, as you go back to this, we would

14   ask you not to be fooled by his charts.  What he did is he

15   grouped African-Americans and Hispanics in an effort to show

16   that the decrease was less than might worry folks.  Only if

17   you separate out the two do you see the true implications for

18   what he is suggesting.

19        To be clear, a drop of 14 percent to 10 percent

20   would mean 340 fewer African-American undergraduates on the

21   Harvard campus.  Now, Dean Smith told you that he could not

22   overestimate the harm that change would have to the student

23   experience.

24        But, Your Honor, you don't need to take Dean

25   Smith's word for it, and I wouldn't take his word alone.

1          Because we heard from the students themselves.  We
2    heard from the students who are living diversity every day.
3    We heard them tell us the importance of the current levels of
4    diversity.  And even with those levels of diversity that have
5    increased in the last decade or two, there are still feelings
6    of isolation, discomfort, and the lack of inclusion.

7          The impact that the plaintiff's alternatives, as
8    they call them, would have on these students, if they even
9    got to remain on campus and be part of the student body,
10   would be, to quote one of the students, devastating.

11         Let me conclude our closing, Your Honor, as I did
12   our opening.  Then I reflected on how much had changed since
13   I walked into this District Court for the first time 42 years
14   ago.  That change was manifest in the courtroom that day.
15   That change was manifest when the students came to testify.
16   That change is manifest in the crowd behind me today.

17         The demographics of those here with us today as
18   this trial ends reflect the enormous progress we have made in
19   becoming a more diverse and inclusive society and community.

20         The plaintiff wants to turn back that clock.  The
21   plaintiff thinks, as they told us under oath, in terms of the
22   efficient allocation of minority students and winners and
23   losers.  Those are not my words, Your Honor.  Those are the
24   words of Dr. Arcidiacono, winners and losers.

25         But the institutions and people who have

1    contributed to the enormous progress and the positive changes

2    that we witnessed in this courtroom and that we see on the

3    university campuses today don't think in terms of winners and

4    losers.

5          They are thinking, as President Faust told you

6    yesterday, about taking steps to ensure that everybody is a

7    winner; that our communities win; that societies win; that

8    it's not a situation like Dr. Arcidiacono would like to have

9    where whites and Asian-Americans are winners and

10   African-Americans and Hispanics are, to use his term, losers.

11         Dr. Simmons put it the best, and I would just quote

12   her.  "How can we imagine a world in which we are not

13   creating leaders and citizens who have the capacity to

14   mediate differences?  I cannot imagine it.  And so it's with

15   great conviction that I say that we must continue to offer

16   diverse undergraduate education to our young people to save

17   our nation."

18         The wolf of racial bias is indeed at our door.  We

19   ask the Court to turn the wolf out.  As we said, much

20   progress has been made.  There remains much to be done.

21         Thank you, Your Honor.

22         THE COURT:  All right.  Thank you all.  We will

23   break for lunch.  How long a break would you all like?

24         MR. MORTARA:  However long works for Your Honor.

25   30 minutes works.

**JA3518**

1              THE COURT:  Why don't we come back how about at

2     like -- let's just make it 1:30.  We probably only have about

3     an hour left, right?

4              MR. MORTARA:  We only have 20 minutes.

5              THE COURT:  We have two more after you.

6              MR. MORTARA:  Plus the 30 from amici.

7              THE COURT:  About an hour.  Let's come back at

8     1:30.  That will give everyone a break.

9              (Court recessed at 12:38 p.m.)

10             THE CLERK:  Court is in session.  Please be seated.

11             MR. MORTARA:  Your Honor, I have a couple of

12    additional slides for you here.  Your Honor, you'll know when

13    you get to those.  There's only two.

14             THE COURT:  You're going back to the first

15    notebook?

16             MR. MORTARA:  Yes, sure.  I might use some of

17    Harvard's, but we'll muddle through.

18             THE COURT:  Do you have that microphone on,

19    Mr. Mortara?

20             MR. MORTARA:  I believe it is.

21             THE COURT:  When you're ready.

22                  **PLAINTIFF REBUTTAL CLOSING ARGUMENT**

23             MR. MORTARA:  Thank you, Your Honor.  It's been

24    three weeks since I was here in front of you the last time,

25    and it's been an experience, to say the least.

**JA3519**

Case: 19-2005    Document: 00117638240    Page: 596    Date Filed: 07/30/2020    Entry ID: 6356615
Case 1:14-cv-14176-ADB   Document 656   Filed 04/18/19   Page 117 of 155

117

1          I want to just briefly begin with the class of 2023

2     reading procedures and Mr. Lee's late assertion of Rule 407.

3     That was waived when they relied on it.  We will brief it.

4     Rule 407 has been waived here.

5          The law is absolutely clear that application of

6     racial stereotypes is intentional discrimination, and that is

7     our claim.  And we heard that sort of bias over the weeks,

8     suggestions that Asians are one-dimensional or just book

9     smart or are recent arrivals, as Mr. Hughes pointed out.

10         I want to address first the supposed

11    inconsistencies as to racial stereotyping with respect to the

12    ALDCs.  Yes, the evidence is the ALDC Asians received

13    somewhat lower personal ratings than white ALDCs.  That is

14    absolutely consistent with the idea that racial stereotypes

15    are at work.

16         But we don't see discriminations in admissions

17    outcomes.  That's what discrimination means.  You were denied

18    admission.  Lower personal scores, but they weren't denied

19    admission, at least not in a statistically significant sense

20    in the small population of Asians that are ALDCs.

21         Why is that?  No one has ever said that Harvard

22    wants zero Asian-Americans on campus.  That's not their goal.

23    They just don't want overrepresentation, too many.

24         If you're going to let in some Asian-American

25    students, where do you pick first?  You go to your donor

1    base, the children of your alumni, the children of your major

2    donors.  So it makes sense that being a legacy overcomes the

3    personal rating hit that the Asian-Americans ALDCs take

4    because of racial stereotyping.

5         I'm going to put up on the screen a slide that the

6    defendants used.  Here you see very high marginal effect for

7    the lineage applicants.  You see 30 percent boost, over

8    30 percent boost when they're in the higher chances of

9    getting in.  Very high effects that swamp out the minor

10   effect or the more minor effect, if you will, of the personal

11   rating hilt.

12        And there's been some suggestion that you can't

13   make a claim of discrimination as to a subgroup, as if

14   there's something wrong with that.  I think Your Honor may be

15   familiar with or we will make you familiar with, through the

16   briefing, the so-called sex-plus case law where subsets of

17   women are discriminated against because they have children or

18   because they behave in a gender nonconforming way.  That's

19   the PriceWaterhouseCoopers case.  We will get to all that in

20   briefing.

21        But it absolutely is possible to discriminate on

22   the basis of race against a subset just like it's possible to

23   discriminate on the basis of sex against a subgroup.

24        I want to get back to what matters, which is the

25   personal rating.  Dr. Card admitted that if you take the

**JA3521**

Case: 19-2005    Document: 00117628240    Page: 598    Date Filed: 07/30/2020    Entry ID: 6356615
Case 1:14-cv-14176-ADB    Document 656    Filed 04/18/19    Page 119 of 155

119

1    personal rating out of his model, both his model from his

2    opening report and his model from his rebuttal report -- we

3    walked through these numbers in the transcript; that's the

4    extra slide I just gave you, Your Honor -- he admitted that

5    you find a statistically significant Asian penalty.

6            He admits that if race is involved, you've got to

7    take it out.  We've proven race is involved in the personal

8    rating.  Take it out.  Statistically significant penalty.

9            But let's deal with his proposed alternative first

10   that Mr. Waxman talked about, the virtual ratings analysis.

11           This is where he tried to remove race from the

12   academic and extracurricular and personal ratings.  But

13   Dr. Card admitted that race isn't what causes the observed

14   difference in academic and extracurricular ratings.  He did

15   that under oath when I was talking to him.

16           And just to be clear, you don't think race is

17   influencing the academic or extracurricular ratings, right?

18           ANSWER:  I think the most likely -- correct, my

19   most likely explanation is unobserved characteristics.

20           This is day 14 at 87.

21           And then Professor Card admitted he didn't even

22   finish the job on his virtual ratings analysis because

23   Professor Arcidiacono had pointed out that race affects the

24   overall rating and that race affects the teacher ratings as

25   well.

1          And yet when I asked him, on the very next page,
2    page 88, Professor Card said -- I said:  You were here when
3    Professor Arcidiacono talked about his findings that race
4    influenced those ratings, weren't you?
5          He said he was here.
6          Your modified rating analysis did not deploy the
7    teacher ratings, didn't change them.
8          Correct?
9          And one other thing about your virtual rating
10   analysis, the overall rating, you didn't use that either?
11         No.
12         So you either have to have it one way or the other.
13   You do it the way he said it in his first report, which is
14   that race influences the personal rating.  You yank it out
15   just, like you did with the overall rating, or you do a
16   complete virtual ratings analysis where you remove the effect
17   of race from all the ratings.  He did not do that.  He didn't
18   even try.  He did half a loaf.  And just like the SAT, your
19   first answer is best.  Pull the rating out if race influences
20   it.
21         And I want to get a little bit to this idea that
22   there's something funny about Professor Arcidiacono's
23   analysis because the same reader is giving Asians a boost on
24   academic and extracurricular and then punishing them through
25   racial stereotyping on the personal score.

Case: 19-2005    Document: 00117638240    Page: 600    Date Filed: 07/30/2020    Entry ID: 6356615
Case 1:14-cv-14176-ADB    Document 656    Filed 04/18/19    Page 121 of 155

121

1          That's not true, and Professor Arcidiacono

2     explained as much.  He pointed out that unobservables track

3     the observables.  So what you see on the right with the

4     academic and EC ratings is what Professor Card admitted to.

5          All the bumps and arrows, the observable goes in

6     one direction, the race influence goes in the same direction.

7     You see it on the right.

8          On the left you see the opposite effect in the

9     overall rating and the personal rating.  You see the

10     observables go one way for Asian-Americans in the overall

11     rating, but they go -- but the coefficient goes the other

12     way.  That's what's proving the Asian penalty.

13          And simultaneously you see it for African-Americans

14     and Hispanics, proving the existence.

15          Tips, the tips that are admitted in the overall

16     rating.  And Harvard has still -- despite the fact Mr. Hughes

17     was talking for a while about it, Harvard has still said

18     nothing about the tips that are blatantly apparent in the

19     personal rating.

20          I want to go there now and talk about Harvard's

21     denials that race is used in the personal rating.

22          Mr. Hughes went over OCR and Mr. Looby and the

23     comparison between that evidence and what Harvard's witnesses

24     said in court.

25          I want to also point out what Director McGrath said

1    to me the first time she was here.  I talked to her about a

2    bunch of people that worked in the admissions office, and I

3    said, Do you know whether this person had used race in the

4    personal rating?

5           She said she didn't.  One of the reasons she didn't

6    is that they didn't have any written guidance.  No one could

7    be sure what anyone was doing.  I rattled off 29 people or

8    something from the spring of 2011 in our dataset, in our

9    dataset those people, 29 of those people are gone.  And

10   Director McGrath had no idea whether they used race in the

11   personal rating.  One reason she had no idea is because no

12   one had written anything down about how to do it.

13          We've shown you the data where African-Americans

14   and Hispanics trounce whites and Asians in the personal

15   rating.  Harvard has yet to explain how it is that racial

16   preferences are not being applied in the personal rating.

17   And Mr. Hughes showed you those stunning differences in his

18   slide and showed you the same pattern as the personal rating.

19   That was Slide 19 or 6.  I can't tell.  I think 6.

20          All Harvard and Professor Card want to talk about

21   is admitted variable bias and how it might explain the

22   differences between whites and Asians.  You've heard

23   absolutely nothing about African-Americans and Hispanics with

24   respect to the personal rating.

25          And that's important both because if you pull the

Case: 19-2005    Document: 00117632846    Page: 662    Date Filed: 07/30/2020    Entry ID: 6356615
Case 1:14-cv-14176-ADB    Document 656    Filed 04/18/19    Page 123 of 155

123

1    rating out, we win, but also because Harvard's failure to

2    dispute the African-Americans and Hispanics get tips proves

3    that Harvard isn't telling the whole truth about the use of

4    race in the personal rating.

5           If Harvard dissembles and says race is not used at

6    all and we can see that it is, how can we trust them when

7    they say that stereotyping is not lowering the personal

8    ratings of Asians?

9           And I want to just briefly go through Dr. Card's

10   histograms.  I'm showing you DD 10.69.  I'm trying to show

11   you DD 10.69.  These histograms were used.  And I don't know

12   if you notice, this is the school support.  This is

13   Dr. Card's cherry-picked set of observables.  Not all of

14   them.

15          Mr. Waxman said all.  It's not.  I don't know if

16   you noticed, he never put African-Americans or Hispanics on

17   these charts, never once.  Because if he did, he would see

18   that his cherry-picked observables do not explain that

19   African-Americans and Hispanics do significantly better than

20   whites on the personal rating.  He never once did it.

21          And Harvard only has one document, the backup

22   document to Dr. Card's slides, Defendant's 692.  This is the

23   only document anywhere where they compared anything that

24   might be related to the personal rating for African-Americans

25   and Hispanics.

1          And when you take a look at it, Your Honor, you can

2     see that in any of these quadrants there is absolutely no

3     explanation when you look at these percentages for why

4     African-Americans and Hispanics do better than whites.  They

5     do about the same or sometimes a little bit worse than

6     Asians.  They never do better than whites.  These data do not

7     explain the racial distribution in the personal rating.  And

8     that's because they don't use all the observables.

9          Professor Arcidiacono created a model that used

10    more of the data.  You see this here in Plaintiff's

11    Demonstrative 40, which I used with Professor Card.  Model 5

12    has all the ratings in it, has the teacher ratings, has the

13    school support, has the alumni interview ratings.

14         And then Professor Card went out and he added every

15    single variable he could possibly find, and he still couldn't

16    make this go away.  He couldn't make the gap disappear.  He

17    told me it was statistically significant.

18         So when you combine on one hand evidence from OCR

19    through the 2012 Harvard letter to OCR saying some readers

20    use race in the personal rating with Mr. Looby telling the

21    truth at his deposition before he spent ten days getting

22    prepped to testify here, and then with Director McGrath's

23    testimony that she had no idea how these 29 people who had

24    left the admissions office who were applying the ratings that

25    are in our dataset used race or not in the personal rating.

1        And then the sudden need for written prohibitions

2   on using race in the personal rating after 28 years of

3   refusing to write anything down.  You combine all that with

4   the powerful statistical evidence Professor Arcidiacono

5   assembled, the evidence is inescapable that race is used in

6   the personal rating.

7        And if race is used in the personal rating, the

8   statistical battle, Your Honor, is over.  There is a

9   statistically significant Asian penalty.

10        This is a model Professor Card did.  It has all the

11   ALDCs.  It has parental occupation, intended career.  It has

12   every single variable Professor Card wanted to throw in here.

13   It has every interaction he wanted to do, excludes every

14   interaction he didn't want to do.  It's a model in every

15   respect the way that Professor Card wants it except one:

16   pull the personal rating out because the evidence is

17   overwhelming that race is influencing it.

18        Harvard didn't even answer us on how the racial

19   tips be are being applied in the personal rating.  Didn't

20   even respond.

21        I want to touch briefly on Harvard's anecdotal

22   evidence.  The war of summary sheets and applications is not

23   helpful to the Court because it doesn't represent an

24   even-handed sampling or cross-section of what looking at all

25   the applications would give us.

**JA3528**

1          Your Honor will recall that each side got to pick

2     applications that were produced.  And of course you know we

3     picked based on just the database and the numbers you can see

4     in the database.

5          Harvard got to look at the applications before they

6     picked them.  Got to fully vet and pick out everything it

7     wanted to put in front of you.  And then Harvard also got to

8     work with its admissions personnel in the same respect that

9     they worked with Mr. Looby so they worked with them to

10    remember every single detail of these applications that were

11    just a couple of the thousands these admissions officers had

12    reviewed over the past six years.

13         Anecdotes are not persuasive evidence when Harvard

14    has had the opportunity to cherry-pick and set up testimony

15    on rails about what they got to select for you to see.  And

16    even to the extent that anecdotes are relevant, you know, I

17    want to remind you of the professional figure skater in

18    Plaintiff's 116.  This is an Asian student that was so

19    cursorily and shabbily treated by Harvard's admissions

20    officers, she was awarded a standard strong and a personal

21    rating of 3, almost as if her application wasn't even read.

22         I'm going to wrap up pretty soon, Your Honor.  And

23    I want to take this opportunity to thank the Court, Joan,

24    Kelly, Karen, the law clerks, Mr. Dereau and the IT staff,

25    and I want to even thank the CSOs and the people down in the

**JA3529**

1    cafeteria.  We have never been treated better in any

2    courthouse in America trying a case than we have here.  I

3    don't know that I'll ever be treated better again.  The

4    experience has been absolutely tremendous.

5            My partners and co-counsel have given me the

6    privilege of talking last, for which I also thank them.

7            And I want to talk a little bit about why I am

8    here.  I've alluded to it a few times in my more

9    conversational moments.  Count I in this case speaks to me

10   because of my personal experience.  I'm here because of my

11   three best friends in college:  Mike Gomez, Kalpesh Patel,

12   and Saleem Zafar.

13           They have all have kids my daughter's age.  I'm

14   here because of my daughter Juliet's godmothers, Sharon and

15   Diya.  They have children my daughter's age, Asian children.

16   Asian children who deserve the same chance to go to Harvard

17   that my white daughter has.

18           I'm here because of an incredible young

19   Chinese-American, my friend Rebecca Kuang who was in our

20   dataset but did not get to attend Harvard.  To meet her is to

21   know that her personal qualities deserved a 1.  And that's

22   before you learn that she wrote her first novel at 19,

23   recently published.

24           I am here because I spent a significant chunk of my

25   formative years in China and studying Mandrin back in the

1   early 1990s when few suburban boys from Milwaukee did such

2   things.

3          And I'm here on behalf of 20,000 members of

4   Students For Fair Admissions and our standing members who

5   brought this suit.

6          And even with all that, in another part of my life

7   I have personal experience reviewing paper applications and

8   assessing people based on a written record.  People every bit

9   as astounding as those who are on the bubble in applying to

10  Harvard.  I look at grades, test scores, recommendations, and

11  I know how hard it is to judge someone's personality from the

12  written record.  You have to be vigilant about implicit bias

13  and stereotyping well beyond e-mailing an article around once

14  every few years.

15         Harvard has not been vigilant and Asian-American

16  applicants paid the price.

17         Your Honor, I don't envy the job in front of you.

18  I have no idea how I'd respond to the historic task you have.

19  But what I do know is that in our judicial system this Court

20  may have the first and last word as a factual matter on what

21  happened here at Harvard, and that's because no one knows

22  what changes in the law are ahead of us as the case moves on.

23         Your Honor may remember I mentioned in my first

24  cross-examination of Director McGrath the perception that

25  racially charged language, stereotypes, or even

1    discrimination may be perceived in our country as less

2    important or less harmful when they're directed at

3    Asian-Americans than when directed at other minorities.  At

4    some level, this is because of the model minority stereotype

5    and the overrepresentation canard we saw deployed during

6    Professor Arcidiacono's examination.

7            The question is whether Asian-Americans will be

8    told some time next year that, yes, this did happen here,

9    that racial stereotyping and bias led to a penalty at

10   Harvard, or whether they get the news that even though

11   Harvard's own researchers found an Asian penalty before there

12   ever was a lawsuit, Harvard can pay for enough variables to

13   make it all go away as long as you pretend the personal

14   rating has nothing to do with race that is.

15           Some day this will be written about in the history

16   books, and those books will say there was Asian

17   discrimination at Harvard.  Of that, I'm confident.  Those

18   books might say that Harvard let the wolf of racial bias in

19   through the front door, as I put it a few weeks ago and

20   Mr. Lee paraphrased.  They might point out that this summer

21   Harvard took a small step to start to close that door.

22           We hope those books will say this Court slammed the

23   door shut.  Thank you, Your Honor.

24           THE COURT:  Thank you, Mr. Mortara.

25           The Amici closings.

1                    **AMICI STUDENT CLOSING ARGUMENT**

2            MS. TORRES:  Hi.  Genevieve Bonadies Torres, and I

3    represent the --

4            THE COURT:  Voice way up.  I can barely hear you

5    and you're facing me.

6            MS. TORRES:  I represent the student Amici in this

7    case.  This case may involve Harvard's admissions policy, but

8    the impacts are felt most directly by students.  The outcome

9    impacts what students can express and have considered by

10   Harvard and elite colleges across the country.  It impacts

11   whether students' experiences will be valid, and it impacts

12   the educational environment students will encounter.

13           Students are at the heart of the issues in this

14   case, and their testimony is telling both for what the

15   students say and for where they are silent.

16           The Court did not hear from any of SFFA's students

17   nor review any of their files.  The only testimony came from

18   student amici and student organization amici on Monday.  And

19   this student testimony and their application files speak to

20   both sets of claims before this Court.

21           As this Court knows, the first set of claims

22   challenges Harvard's appreciation of race and ethnicity to

23   promote diversity.  Here, the students' testimony and

24   application files provide proof that Harvard's use of race is

25   both constitutionally acceptable and wise.

Case: 19-2005    Document: 00117632240    Page: 610    Date Filed: 07/30/2020    Entry ID: 6356615
Case 1:14-cv-14176-ADB   Document 656   Filed 04/18/19   Page 131 of 155

131

1          With regard to plaintiff's claim of intentional

2    discrimination, the students' application files illustrate

3    that Harvard's admissions officers view Asian-American

4    ethnicity in a positive light, not a negative one.

5          I'm going to focus nearly entirely on plaintiff's

6    challenge to race-conscious admissions.

7          Three weeks ago the plaintiff's counsel stood

8    before you and stated diversity and its benefits are not on

9    trial here.  But make no mistake, diversity is what is at

10   stake in this case.  That's because SFFA is seeking a remedy

11   where race would be erased in the application process.

12         This type of erasure threatens to ignore diverse

13   experiences that applicants offer, and it also threatens to

14   suppress diversity on campus.  The students spoke to these

15   troubling consequences, and their application files show why

16   such an outcome is not constitutionally required.

17         Specifically they affirmed that Harvard more than

18   satisfies two aspects of the narrow tailoring standard.

19         First, individualized review.  Our four students'

20   files arguably are the best illustration of what Harvard's

21   admissions officers have said again and again.  One, our

22   students and all admitted students to Harvard are

23   exceptional; two, to the extent race is considered, it is one

24   of many factors, and it is only viewed as a positive,

25   including for Asian-American students; three, it is flexibly

Case: 19-2005    Document: 00117632240    Page: 611    Date Filed: 07/30/2020    Entry ID: 6356615
Case 1:14-cv-14176-ADB    Document 656    Filed 04/18/19    Page 132 of 155

132

1    applied and not formulaic.

2            All four of our student amici -- Itzel Libertad

3    Vasquez-Rodriguez, Sarah Cole, Thang Diep, and Sally Chen --

4    discuss why their racial and ethnic background throughout the

5    application process was important to them.  Why?  Because

6    it's inextricably intertwined with their experiences and

7    can't be extricated.  It's critical to appreciate their

8    achievements and contributions.

9            Take Thang.  He has a strong GPA and commitment to

10   social justice.  But in his words "I don't think they can be

11   necessarily understood without taking into account the fact

12   that I moved here when I was eight, I didn't speak English,

13   and I excelled despite the racial prejudice I encountered."

14           All four of the application files show that race

15   was only considered alongside a multitude of other factors

16   and never provided any preset advantage or disadvantage.

17           Take Itzel's application.  The extensive comments

18   in her file make it clear that her admission was based upon

19   having multiple strengths.  Her file was marked up with notes

20   about how she has a strong set of AP scores, how she was

21   demonstrably a hard worker with a nearly perfect GPA, how she

22   was editor of her newspaper, how she had athletic success as

23   a runner, and how her guidance counselor highlighted her

24   "electric personality."

25           While there is reference to her ethnicity, she is,

 1    quote, connected with her heritage after a period of

 2    disconnect.  This appears alongside the variety of other

 3    strengths Itzel offers.

 4          Importantly, our students' files show that this

 5    limited, positive consideration of race is equally applied to

 6    students of Asian-American heritage.  Like Itzel, Sally and

 7    Thang also received positive comments by Harvard's reviewers

 8    associated with their racial and ethnic backgrounds.

 9          For Thang, the same reviewer who noted his

10    Vietnamese identity and use of pencils to improve his English

11    also positively noted his commitment to pushing himself

12    academically and socially.

13          For Sally, the interviewer noted how her upbringing

14    in a culturally Chinese home where she served as a translator

15    reflected positively on her responsibility to take care of

16    others.

17          The students' files and testimony also show that

18    having a relatively lower academic score does not make an

19    applicant academically unqualified or undeserving in

20    admission.

21          Three of our four students received an academic

22    rating of a 3 or a 3+ despite stellar accomplishments.  Sarah

23    received straight As and A-pluses at a premiere prep school.

24    Itzel took 10 AP tests and scored the top score on 7.  And

25    Thang was valedictorian at an intensive magnet program.

Case: 19-2005    Document: 00117638246    Page: 613    Date Filed: 07/30/2020    Entry ID: 6356615
Case 1:14-cv-14176-ADB    Document 656    Filed 04/18/19    Page 134 of 155

134

1    Proof that they were academically qualified, they thrived at

2    Harvard and beyond, becoming, in Harvard's words, citizen

3    leaders.

4         Sarah graduated with a 3.6 GPA and has committed

5    herself to serving our public school system.  Itzel graduated

6    cum laude with a 3.7 and now serves as a California assembly

7    fellow.  Indeed, our students are a reminder that merit

8    cannot be measured by academic ratings.  Their contribution

9    to Harvard's campus were extensive, and some of those

10   contributions did flow from their perspectives as ethnoracial

11   minorities.

12        For example, Sarah led the Black Students

13   Association during a time when Harvard, like our country, was

14   grieving the slew of police shootings of black people.  In

15   this role, she worked with Harvard's administrators and white

16   student groups, Latino student groups, and others to help

17   them, quote, think through just what was black lives matter

18   and how they could be better allies.

19        She responded to calls from Dean Khurana to draft

20   emails for the entire student body to guide them and console

21   them in the aftermath of yet another shooting.  Her actions

22   took time and represent tangible contributions.  Indeed, she

23   recounted how countless classmates and professors thanked her

24   for sharing her perspective shaped by her race.

25        There is nothing wrong with an admissions system

 1    valuing this along with the myriad of other contributions

 2    Sarah offered.

 3            Our students' files put on full display that

 4    Harvard is genuinely engaged in an individualized review that

 5    values all ethnoracial backgrounds, whether Chinese or

 6    Chicana, and that it does so in a limited, flexible way to

 7    develop a class that is diverse across a range of dimensions.

 8            Moving on to the second aspect of narrow tailoring

 9    that students affirm, there is no workable race-neutral

10    alternative available because such alternatives reduce the

11    depth of diversity on Harvard's campus.  This is clear from

12    what's undisputed at trial.

13            Harvard's counsel talked about this briefly, but

14    I'll just restate because it's important to the students that

15    there is no dispute that if you ended the consideration of

16    race, the number of black, Latinx, and other minority

17    students would plummet by about 50 percent in terms of sheer

18    numbers.

19            Plaintiffs have tried to soften the blow with their

20    proposed race-neutral alternatives, but even their preferred

21    alternative would cause the number of admitted

22    African-American students to drop by about 30 percent in

23    terms of numbers.

24            More than this, the students have offered

25    undisputed testimony that these projections likely

1    underestimate the actual decline.  The students testified

2    that if Harvard stopped considering race, it's likely that,

3    one, fewer students of color would apply.

4         You heard Itzel forthrightly state, "Honestly I

5    probably would not have applied to Harvard if they didn't

6    take race into account."  And Sarah Cole affirmed that this

7    type of likelihood by saying that it would signal to students

8    that they weren't welcome and reduce applications from

9    students of color.

10         Two, testimony also suggested that fewer students

11    of color would accept.  Sarah testified that her choice to

12    accept Harvard's offer was substantially influenced by

13    encountering a strong presence of other black students on

14    Harvard's campus.  If that presence declined, there's a

15    substantial risk that the acceptance rate would decline, too.

16         The plaintiff's expert on race-neutral

17    alternatives, Richard Kahlenberg, tried to downplay this

18    decline in two ways:  First, he emphasized how his

19    alternative would yield greater socioeconomic diversity.  But

20    all four student amici testified that the educational

21    benefits that flow from socioeconomic diversity cannot be

22    equated with those flowing from racial diversity.

23         As Itzel expressed, ethnoracial diversity is

24    something that's more visibly salient.  "When I walked

25    through campus, I didn't feel judged or discriminated against

1    because of my socioeconomic status.  I felt discriminated

2    against because of my ethnoracial identity."

3            Itzel shared that it was only in spaces with Latinx

4    and Native American students that she felt that she could,

5    quote finally breathe.  Socioeconomic diversity does not on

6    its own provide that space.

7            Second, Kahlenberg downplayed this decline by

8    emphasizing how the overall numbers of black, Latinx, and

9    other minority students stayed relatively steady, but this

10   ignores other dimensions of diversity.

11           Overall representation is important, but so is the

12   representation of each particular racial group.  A decline in

13   any one group can be problematic, and this is particularly

14   true when that group is already marginalized and relatively

15   low in numbers.

16           Take Sarah Cole's experience.  When Harvard's

17   newspaper published an article saying that, quote, admitting

18   black students to Harvard is like teaching a blind person to

19   be a pilot.  At that moment and the many others when Sarah

20   encountered racial prejudice specifically targeted at the

21   black community, it was the strong presence of other black

22   students on Harvard's campus that mattered to Sarah.  There

23   needed to be enough in terms of numbers for her to, quote,

24   lean on and form a true community.

25           And it was this support system that allowed Sarah

Case: 19-2005    Document: 00117638240    Page: 647    Date Filed: 07/30/2020    Entry ID: 6356615
Case 1:14-cv-14176-ADB    Document 656    Filed 04/18/19    Page 138 of 155

138

1    and other black students to, quote, remain steadfast in our

2    confidence and thrive, despite bigoted comments that they and

3    an entire race of people did not deserve to be at Harvard.

4         Interracial diversity represents another concern.

5    As the amici organization member Madison Trice reflected, she

6    and other students have benefited from having, quote, every

7    nearby of black identity celebrated, and so it has a space on

8    campus.  It's this diversity within the black students that

9    makes it, quote, harder to have stereotypes because you can

10   learn about the different shapes that blackness can take.

11        A 30 percent reduction in the number of black

12   students would likely reduce such interracial diversity, as

13   would Kahlenberg's mechanical race-neutral preferences across

14   all racial groups.

15        And the harms would flow to all students, including

16   white and nonwhite students.  Such a reduction would, even if

17   limited to the black community, be, in the words of Itzel,

18   fairly catastrophic.

19        As a Vietnamese student, Thang similarly shared a

20   30 percent decline in the black student population would,

21   quote, hurt his education dramatically, as the efforts led by

22   black students have allowed him to better, quote, understand

23   issues affecting a different community and better understand

24   his own.

25        Turning very briefly to plaintiff's claim that

**JA3541**

1    Harvard intentionally discriminates against Asian-Americans,

2    the student amici observed that Sally and Thang's admissions

3    files strongly indicate Harvard is only considering race in a

4    positive light.

5         Both Sally and Thang openly and extensively

6    discussed their ties to their Asian heritage.  Both files

7    contain comments indicating their ethnic identities were seen

8    as a strength, and both received personal scores of 2 or a

9    2-, relatively high scores.

10        Sally and Thang's files show that Harvard's policy

11    of appreciating race in admissions is not discriminating

12    against Asian-Americans.  In fact, it oftentimes helps such

13    applicants and can cultivate diversity within the admitted

14    group of Asian-American students by appreciating distinctions

15    in their immigration and cultural histories.

16        Sally's testimony serves as a reminder that a

17    policy that appreciates race is one of many factors is just

18    as important for applicants from culturally Chinese homes.

19    As Sally stated, quote, I decided to write about being

20    Chinese-American and being from a working-class immigrant

21    family precisely because I felt like stories like mine were

22    fading under this model minority myth.

23        She continued, "I think that there was no way in

24    which flat numbers and a resume could have gotten across how

25    much of a whole person that I am.  And I that that it's truly

Case: 19-2005   Document 00117623246   Page: 619   Date Filed: 07/30/2020   Entry ID: 6356615
Case 1:14-cv-14176-ADB   Document 656   Filed 04/18/19   Page 140 of 155

140

1    incredible to have been seen and have been heard for who I am

2    and valued for it."

3            On behalf of all of our students, I thank this

4    Court for letting them share their stories about how this

5    policy has positively impacted them and better prepared them

6    to positively impact others.  Thank you.

7            THE COURT:  Thank you, Ms. Torres.

8            MS. McCLELLAN:  May I proceed, Your Honor?

9            THE COURT:  Yes.  Get that microphone right up to

10   your mouth.

11           **ORGANIZATION AMICI CLOSING ARGUMENT**

12           MS. McCLELLAN:  Good afternoon, Your Honor,

13   counsel.  My name is Cara McClellan, and I represent 25

14   Harvard student and alumni organizations as amici curiae in

15   support of Harvard's ability to consider race as one of many

16   factors in its holistic admissions process.

17           In the words of Dean Fitzsimmons, race is one part

18   of a person's life that may lead that person to be a great

19   educator of others, about how to be a good citizen and

20   citizen leader, not just at Harvard, but later.

21           During this divisive time for our country, the need

22   for citizen leaders, educated in diverse settings, remains as

23   urgent as ever.  My clients include thousands of Harvard

24   students and alumni who are black, white, Latinx, Native

25   American, and Asian-American.  Some grew up in public housing

1  and were the first in their families to attend college.

2  Others come from families that have achieved financial

3  success and impressive educational credentials yet still

4  experience the effects of persistent racial discrimination in

5  our country.

6          You have heard from:  Professor Margaret Chin, a

7  Chinese-American alumna, a founding board member of the

8  Coalition For a Diverse Harvard, and a member of the Harvard

9  Asian-American Alliance.

10         Catherine Ho, a Vietnamese-American sophomore and

11  copresident of the Harvard-Radcliffe Asian-American woman's

12  association.

13         Madison Trice, a black sophomore, political action

14  chair of the Association of Black Harvard Women, and a member

15  of the Harvard-Radcliffe Black Students Association.

16         And Cecilia Nunez, a black and Mexican-American

17  junior, vice president of Fuerza Latina, and a board member

18  of the Phillips Brooks House Association.

19         You have also heard from four additional Harvard

20  students and alumni:  Itzel Libertad Vasquez-Rodriguez, Sarah

21  Cole, Thang Diep, and Sally Chen.

22         In contrast, no students have come forward to

23  testify in support of ending race-conscious admissions.

24         SFFA has not met its burden of proving that Harvard

25  can fulfill its educational admission which requires that it

1   put together an exceptional, racially diverse class without

2   considering race.

3           Instead the stories that you heard this past Monday

4   from Harvard students and alumni first demonstrate that race

5   is an indelible part of their lives, their educational

6   experiences, and their long-term professional goals.

7           Second, each witness described how black, Latinx,

8   and Asian-American students and alumni and the organizations

9   they form are indispensable to Harvard's ability to reap the

10  educational benefits of diversity.

11          And third, their testimony also made clear that the

12  dramatic reduction of black and Latinx students on campus

13  from the loss of race conscious admission estimated at

14  50 percent would be devastating for all Harvard students.

15          As one of my clients, Catherine Ho, put it,

16  diversity allows for more opportunities to organically learn

17  from other people, listening to their stories and listening

18  to their perspectives.

19          But if their perspectives and stories aren't

20  present on campus, who are we supposed to be learning from?

21          First, the evidence unequivocally shows that

22  race-conscious admissions must be preserved to completely and

23  holistically evaluate individual student applicants.

24          For many students of color, early experiences

25  related to race are a formative part of their identity, and

Case: 19-2005    Document 00117628246    Page: 622    Date Filed: 07/30/2020    Entry ID: 6356615
Case 1:14-cv-14176-ADB    Document 656    Filed 04/18/19    Page 143 of 155

143

1    they include this in their application.

2           For some, memories of discrimination or observed

3    inequality are at the root of what motivates them to work

4    hard and to advocate for change.  This is evident in the

5    amici witnesses testimony about their educational experiences

6    in college application essays.

7           Catherine Ho testified that her ethnoracial

8    identity is a core part of who she is and became the focus of

9    all three personal essays she submitted to Harvard.  In one

10   essay, the Vietnamese language, a language that has no past

11   tense, provided a metaphor for how she understands her

12   parents don't-look-back attitude.  As refugees from Vietnam,

13   her parents overcame many barriers.  Their strength is what

14   drives her to push forward despite obstacles.

15          When Catherine viewed her application file and

16   learned that her Vietnamese heritage was an aspect of her

17   identity that Harvard valued, she rushed to tell her father.

18   Although her father's refugee story is not always

19   appreciated, she believes she carries important lessons

20   because of this history, a contribution the Harvard

21   admissions committee recognized she would bring before she

22   even arrived.

23          In addition to impacting the development of

24   applicants' individual identity, race systematically impacts

25   the opportunities and resources that applicants can access

Case: 19-2005    Document: 00117628246    Page: 623    Date Filed: 07/30/2020    Entry ID: 6356615
Case 1:14-cv-14176-ADB   Document 656   Filed 04/18/19   Page 144 of 155

144

1    before they apply to college.  Too often the resources

2    available in a school correlate with the racial makeup of the

3    school.

4           Sarah Cole described how her predominantly white

5    college prep school included standardized test prep in its

6    curriculum, while her friends at the majority black local

7    public high school were offered no such opportunities.

8           As Tia Marie Ray, director of the undergraduate

9    minority recruitment program, explained, Harvard recognizes

10   that resources impact students' performance on SATs.  Even in

11   wealthy, high-performing schools, students of color face bias

12   that can limit academic opportunities.

13          Madison Trice testified about facing the bigotry of

14   low expectations.  Her elementary school teacher discouraged

15   her from entering her school's gifted program, despite her

16   excellent grades, until her parents intervened to challenge

17   an arbitrary entrance examination and requirement that only

18   seemed to apply to her, the so-called 10 perfect score rule.

19          Once enrolled in more advanced courses, Madison

20   spent most of her academic life as one of the only black

21   students in her class, facing bullying and social isolation

22   because she was different.

23          As Dean Fitzsimmons' testimony made clear,

24   Madison's experience is not uncommon.  Many students of color

25   who apply to Harvard come from academic environments where

Case: 19-2005    Document: 00117632846    Page: 624    Date Filed: 07/30/2020    Entry ID: 6356615
Case 1:14-cv-14176-ADB    Document 656    Filed 04/18/19    Page 145 of 155

145

1    they feel isolated as minorities and write about this

2    experience to help the admissions office contextualize the,

3    quote, persistence, courage, and self-confidence that went

4    into their remarkable achievements.

5          Indeed, Madison wrote in her personal essay that

6    the different treatment she endured led to her aspirations to

7    pursue a career in foreign service and work on behalf of

8    marginal communities experiencing oppression abroad.

9          Preventing her from speaking about her race would

10   inhibit her ability to fully describe what motivates her

11   intellectual and professional ambitions.

12         SFFA would prohibit universities from considering

13   race as part of a holistic review while allowing colleges to

14   consider other aspects of an applicant's identity such as

15   socioeconomic status, gender, sexual orientation, or their

16   disability.  However, pretending to be race blind when

17   reviewing applications will only disadvantage applicants of

18   color, including Asian-American students whose full stories

19   would be ignored.

20         Second, amici witnesses' testimony provides real

21   life validation for why the Supreme Court has repeatedly

22   affirmed that the pursuit of the educational benefits of

23   diversity is a compelling interest that colleges and

24   universities may seek.  As the Supreme Court recognized in

25   *Fisher*, a diverse student body promotes cross-racial

1   understanding and the lessening of racial isolation and

2   stereotypes.

3         At Harvard, student affinity groups help facilitate

4   these benefits by advocating for inclusivity and creating

5   opportunities for students of all backgrounds to engage in

6   cross-cultural exchange.  Affinity of groups provide critical

7   support that allow students of color to feel comfortable

8   being their authentic selves.  This happens when a student

9   who was once bullied for being different opens the

10  Association of Black Harvard Women survival guide and reads

11  that black hair is beautiful and versatile.

12        Cultural organizations also challenge the broader

13  Harvard community to become more culturally literate and

14  respectful of difference.  Like when La Fuerza successfully

15  advocated for more culturally competent mental health

16  providers on campus or when the Asian-American Women's

17  Association hosted a workshop to address anti-black bias.

18        Diversity within the vibrant affinity groups on

19  campus matters.  It relieves students of color from feeling

20  like representatives of their entire race and allows

21  flexibility to explore different aspects of their identity

22  and culture.  It combats stereotypes as students see multiple

23  representation of what it means to be a particular race.

24        Importantly, diversity within groups requires a

25  holistic approach that considers the multifaceted identities

Case: 19-2005    Document: 00117628240    Page: 626    Date Filed: 07/30/2020    Entry ID: 6356615
Case 1:14-cv-14176-ADB   Document 656   Filed 04/18/19   Page 147 of 155

147

1    of applicants beyond just checking a box.  By serving Harvard

2    for decades in this way, affinity groups and the individual

3    students who form them improve the community's critical

4    thinking skills, communication skills, and civic engagement,

5    among other things.

6          Unfortunately, without race-conscious admissions, a

7    substantial reduction in black and Latinx students would

8    threaten the continued existence of cultural organizations

9    and the benefits they provide.  Some organizations would have

10   to reduce the size of their leadership boards or the

11   programming they offer.

12         Other organizations and their subgroups would

13   suffer such a stark reduction in their membership that they

14   would cease to exist or no longer have the capacity to be

15   effective.

16         Because collaboration across organizations is

17   essential, even organizations whose membership ranks are not

18   significantly reduced would no longer be able to provide the

19   same experiences for their members and for the larger Harvard

20   community.

21         As Cecilia Nunez testified, the idea that there

22   would be a much smaller pool of Latinx students on campus is

23   concerning as it calls into question whether Fuerza Latina as

24   an organization can exist.  In addition, she continued, it

25   would impact the well-being of our constituents.  That could

1    mean even more students feeling that much more alone on

2    campus.

3         As student amici pointed out, the witnesses we

4    heard from explained that racial diversity was a crucial

5    factor in why they applied to and ultimately decided to

6    attend Harvard.

7         For Professor Margaret Chin, Harvard was not even

8    on her radar until she attended a college fair in Chinatown

9    and heard from Asian-American Harvard students that she

10   should apply.

11        Roger Banks, who served as director of the

12   undergraduate minority recruitment program for 20 years,

13   explained that, quote, typically the leaders of various

14   minority groups and communities on campus became recruitment

15   coordinators and host students during Visitas, a prospective

16   student weekend.  This allows students to, quote, really see

17   what its like as a student of color at Harvard.

18        Cecilia Nunez considered it very important to be in

19   a school that had a diverse student body.  Visiting Harvard

20   during Visitas weekend affirmed that Harvard would be a good

21   fit.

22        While the undergraduate minority recruitment

23   program is a key tool, what ultimately attracts many students

24   of color to Harvard is the diversity itself.  Without this

25   diversity, admissions officers and student ambassadors could

1    not be as persuasive and successful in their recruitment

2    efforts.

3              As Cecilia explained, "If Harvard hadn't felt like

4    it was a space that would be welcoming to people of color and

5    if it hadn't felt like a very diverse space, it probably

6    would have affected my decision to go."

7              The diversity attained through race-conscious

8    admissions must be preserved in order to attract future

9    classes of diverse students.

10             Finally, our witnesses' testimony makes clear that

11   Dr. Kahlenberg is wrong.  Race-neutral alternatives cannot

12   provide meaningful full diversity, and the educational

13   benefits currently conveyed would be lost under an admissions

14   program that does not actually consider race.

15             In all of Kahlenberg's simulations of race-neutral

16   alternatives, the racial group that bore the greatest burden

17   was black students.  The percentage of black students

18   declined dramatically in each simulation.  And in some, the

19   result was a 40 percent reduction of the number of black

20   students on campus.

21             Dr. Kahlenberg did not talk to a single Harvard

22   student or faculty member about how a reduction of black

23   students would affect the quality of a Harvard education.

24             But Your Honor has had the benefit of hearing from

25   eight amici witnesses, each of whom testified that a loss of

1    black students of this magnitude would fundamentally alter

2    the educational experience for all students.

3            In addition, each amici witness testified that

4    while socioeconomic status is important, it is not a

5    substitute for understanding and addressing race.

6            Race remains a visible marker that cannot be

7    ignored.  Cecilia Nunez described how she faced bias growing

8    up that was based on race and entirely unrelated to her

9    socioeconomic status.  She grew up in an upper middle class

10    family, her parents are both doctors, yet people often

11    assumed that her family wasn't educated or -- and I'm

12    quoting -- that they were in some way less than other

13    families in their city.

14            In elementary and middle school, classmates were

15    not allowed to come over to play at her house because their

16    parents made false assumptions that her family would be a bad

17    influence.  Assumptions like these are wrong regardless of a

18    family's socioeconomic status, but Cecelia's experience show

19    how these assumptions persist for families of color, even

20    when they've achieved financial comfort.

21            Importantly, Dr. Kahlenberg parts ways with SFFA.

22    It acknowledges that racial discrimination faced by

23    applicants of color should be considered as part of the

24    admissions process, and he further concedes that employing

25    race is, by definition, the most efficient method of

Case: 19-2005    Document: 00117638246    Page: 630    Date Filed: 07/30/2020    Entry ID: 6356615
Case 1:14-cv-14176-ADB    Document 656    Filed 04/18/19    Page 151 of 155

151

1    promoting racial diversity.  On this point, we agree.

2              Behind the dueling statistical models in this case

3    are real people directly impacted by Harvard's race-conscious

4    admissions policy.  Students and alumni for whom diversity

5    and inclusion that it fosters remain a pressing concern that

6    cannot be taken for granted.

7              We heard painful stories that show the harsh ways

8    race continues to impact the experiences of Harvard students.

9    A Chinese-American student assumed to be a tourist and asked

10   to leave the common room.  A black student labeled

11   threatening and treated violently by Cambridge police.  A

12   group of Latinx students called wetbacks while walking around

13   campus with friends.

14             The stereotypes and prejudice experienced by these

15   students varied, but the hostile and alienating message was

16   always clear.  Students and alumni who have been committed to

17   diversity and inclusion for decades, like Professor Chin,

18   advocate for race conscious solutions.

19             Plaintiffs mention Dr. Chin's article from 35 years

20   ago but failed to mention its conclusion that race-conscious

21   solutions are necessary to address any bias against

22   Asian-American applicants.

23             Your Honor has also heard stories of the

24   transformation that happens when some of our country's

25   brightest young people have the opportunity to engage with

 1    classmates who are different from them, sometimes for the

 2    first time in their lives.

 3            The benefits of diversity can be found in the

 4    late-night conversations between two roommates.  One black

 5    whose family is from Ghana, one Asian-American whose family

 6    is from Vietnam, assigned to live together in a dorm room

 7    where they fall asleep talking to each other at night.

 8            For Catherine Ho, the experience of living with her

 9    roommate opened her eyes to how police brutality impacts

10    black students, making her personally connected to a social

11    problem from which she previously had the privilege of being

12    relatively removed.

13            Harvard has embraced its educational mission of

14    preparing the future citizen leaders of our country to

15    address the enduring schisms and problems that plague our

16    society.  How, Dr. Ruth Simmons asked, can we expect our

17    future leaders to remediate these schisms if we don't prepare

18    them to do so?

19            Similarly, as a leader in the Phillips Brooks House

20    Association, Cecilia Nunez explained that, quote, it's very

21    important that we have people who understand our

22    constituents' diverse experience.  Her comments referred to

23    her volunteer activities, but the same principles apply to

24    the future work of citizen leaders after college.

25            Harvard's diversity puts students in an environment

```
 1    where people of different backgrounds stop being faceless
 2    others and become classmates, teammates, lab partners, and
 3    friends.  In this process, stereotypes are undermined,
 4    cross-cultural relationships grow, and deeper understandings
 5    of complex social problems are formed.
 6            The testimony you have heard makes clear, racial
 7    diversity is one of the most meaningful aspects of the
 8    preparation that Harvard students receive.  Harvard must be
 9    permitted to pursue the benefits of diversity if it is to
10    fulfill its educational mission.  Thank you.
11            THE COURT:  All right.  Thank you all.
12            I think what remains is a schedule for findings of
13    fact and conclusions of law.  Do you want to submit that in
14    the next few days?  Does that make the most sense?
15            MS. ELLSWORTH:  Yes, Your Honor.  We can confer
16    with SFFA and submit something in writing if that works for
17    you.
18            THE COURT:  Welcome back, Mr. Consovoy.  Your voice
19    has been missing.
20            So we have finished.  I know I said this at the
21    midpoint, but I really want to thank you all.  To echo
22    something that Mr. Mortara said, I really feel privileged to
23    have participated in a trial where the lawyering by
24    everybody, the lawyer for both parties and the amici, has
25    been so exceptional.
```

**JA3556**

```
 1          I don't know if I will have another case in my
 2  career where I can say that the presentation has been as
 3  exceptional and professional and thoughtful as it has been in
 4  this case.  So I want to thank you for all of that.
 5          Obviously the issues raised by this case are
 6  incredibly important both for the parties to the case but
 7  also sort of for the world, or at least for students in the
 8  United States.  And I take the charge seriously and will wait
 9  for your findings of fact and conclusions of law.
10          And we'll have another closing session.  I suspect
11  that most of you know in this courtroom how difficult it is
12  to try the hours we've been trying and keep the rest of the
13  docket afloat.  So my thanks also to Joan and Karen and the
14  law clerks who have all been exceptional throughout this.
15          But again, I really can't compliment you enough for
16  the job that's been done throughout this trial.  It's really
17  been a privilege.  And I hope that our final work product on
18  it is worthy of the effort that you all have put into it.  So
19  thank you very much.
20          We will reconvene, but in the meantime the case is
21  recessed.
22          (The Court adjourned at 2:25 p.m.)
23
24
25
```

```
 1                 - - - - - - - - - - -

 2                      CERTIFICATION

 3

 4          I certify that the foregoing is a correct

 5     transcript of the record of proceedings in the above-entitled

 6     matter to the best of my skill and ability.

 7

 8

 9

10     /s/ Joan M. Daly              November 2, 2018

11     _____          _____

12     Joan M. Daly, RMR, CRR        Date
       Official Court Reporter
13

14

15

16

17

18

19

20

21

22

23

24

25
```

**JA3558**

1     UNITED STATES DISTRICT COURT

2     DISTRICT OF MASSACHUSETTS

3     _____

4     STUDENTS FOR FAIR ADMISSIONS, INC.,

5                     Plaintiff,          Civil Action
                                          No. 14-14176-ADB
6     v.
                                          February 13, 2019
7     PRESIDENT AND FELLOWS OF HARVARD
      COLLEGE, et al.,                    Pages 1 to 129
8
                      Defendants.
9     _____

10

11

12              TRANSCRIPT OF CLOSING ARGUMENTS
         BEFORE THE HONORABLE ALLISON D. BURROUGHS
13             UNITED STATES DISTRICT COURT
             JOHN J. MOAKLEY U.S. COURTHOUSE
14                 ONE COURTHOUSE WAY
                   BOSTON, MA   02210
15

16

17

18

19

20

21

22              JOAN M. DALY, RMR, CRR
23              Official Court Reporter
            John J. Moakley U.S. Courthouse
24          One Courthouse Way, Room 5507
                  Boston, MA   02210
25              joanmdaly62@gmail.com

Case: 19-2005   Case 1:14-cv-14176-ADB   Document-001176283340   Document 666   Filed 07/01/19   Page 2 of 129   Date Filed: 07/30/2020   Entry ID: 6356615

2

1    APPEARANCES:

2

     COUNSEL FOR THE PLAINTIFF:

3

4            ADAM K. MORTARA, ESQUIRE
             J. SCOTT McBRIDE, ESQUIRE
5            KRISTA J. PERRY, ESQUIRE
             Bartlit Beck Herman Palenchar & Scott
6            54 West Hubbard Street
             Suite 300
7            Chicago, Illinois 60654
             312.494.4400
8            adam.mortara@bartlit-beck.com
             scott.mcbride@bartlit-beck.com
9            krista.perry@bartlit-beck.com

10           JOHN M. HUGHES, ESQUIRE
             MEG E. FASULO, ESQUIRE
11           Bartlit Beck Herman Palenchar & Scott
             1801 Wewatta Street
12           Suite 1200
             Denver, Colorado 80202
13           303.592.3100
             john.hughes@bartlit-beck.com
14           meg.fasulo@bartlit-beck.com

15           JOHN MICHAEL CONNOLLY, ESQUIRE
             THOMAS R. McCARTHY, ESQUIRE
16           WILLIAM S. CONSOVOY, ESQUIRE
             CAMERON T. NORRIS, ESQUIRE
17           Consovoy McCarthy Park PLLC
             3033 Wilson Boulevard
18           Suite 700
             Arlington, Virginia 22201
19           703.243.9423
             mike@consovoymccarthy.com
20           tom@consovoymccarthy.com
             will@consovoymccarthy.com
21

22

23

24

25

Case: 19-2005    Document-00117628340    Page: 637    Date Filed: 07/30/2020    Entry ID: 6356615
Case 1:14-cv-14176-ADB    Document 666    Filed 07/01/19    Page 3 of 129

3

```
 1    APPEARANCES (cont.):

 2
              PATRICK STRAWBRIDGE, ESQUIRE
 3            Consovoy McCarthy Park PLLC
              Ten Post Office Square
 4            8th Floor, South, PMB #706
              Boston, Massachusetts 02109
 5            617.227.0548
              patrick@consovoymccarthy.com
 6

 7    COUNSEL FOR THE DEFENDANT:

 8            WILLIAM F. LEE, ESQUIRE
              FELICIA H. ELLSWORTH, ESQUIRE
 9            ANDREW S. DULBERG, ESQUIRE
              ELIZABETH C. MOONEY, ESQUIRE
10            SARAH R. FRAZIER, ESQUIRE
              Wilmer Cutler Pickering Hale and Dorr LLP
11            60 State Street
              Boston, Massachusetts 02109
12            617.526.6556
              william.lee@wilmerhale.com
13            felicia.ellsworth@wilmerhale.com
              andrew.dulberg@wilmerhale.com
14            elizabeth.mooney@wilmerhale.com
              sarah.frazier@wilmerhale.com
15
              SETH P. WAXMAN, ESQUIRE
16            DANIELLE CONLEY, ESQUIRE
              DANIEL WINIK, ESQUIRE
17            Wilmer Cutler Pickering Hale and Dorr LLP
              1875 Pennsylvania Ave, NW
18            Washington, DC 20006
              202.663.6006
19            seth.waxman@wilmerhale.com
              danielle.conley@wilmerhale.com
20            daniel.winik@wilmerhale.com

21            DEBO P. ADEGBILE, ESQUIRE
              Wilmer Cutler Pickering Hale and Dorr LLP
22            7 World Trade Center
              250 Greenwich Street
23            New York, New York 10007
              212.295.6717
24            debo.adegbile@wilmerhale.com

25
```

Case: 19-2005   Document: 00117628840   Page: 666   Date Filed: 07/30/2020   Entry ID: 6356615
Case 1:14-cv-14176-ADB   Document 666   Filed 07/01/19   Page 4 of 129

4

```
 1    APPEARANCES (cont.):

 2
              ARA B. GERSHENGORN, ESQUIRE
 3            ROBERT IULIANO, ESQUIRE
              Harvard Office of the General Counsel
 4            Smith Campus Center, Suite 980
              1350 Massachusetts Avenue
 5            Cambridge, Massachusetts 02138
              617.495.8210
 6            ara_gershengorn@harvard.edu
              Robert_iuliano@harvard.edu
 7

 8    COUNSEL FOR AMICI STUDENTS:

 9            JON M. GREENBAUM, ESQUIRE
              BRENDA L. SHUM, ESQUIRE
10            GENEVIEVE BONADIES TORRES, ESQUIRE
              1500 K Street NW, Suite 900
11            Washington, DC 20005
              202.662.8315
12            jgreenbaum@lawyerscommittee.org
              bshum@lawyerscommittee.org
13            gtorres@lawyerscommittee.org

14            EMMA DINAN, ESQUIRE
              Arnold & Porter LLP
15            555 Twelfth Street, NW
              Washington, DC 20004
16            202.942.5477
              emma.dinan@aporter.com
17

18    COUNSEL FOR AMICI ORGANIZATIONS:

19            JENNIFER A. HOLMES, ESQUIRE
              CARA McCLELLAN, ESQUIRE
20            MICHAELE M. TURNAGE YOUNG, ESQUIRE
              RACHEL N. KLEINMAN, ESQUIRE
21            CATHERINE BULLOCK, ESQUIRE
              NAACP Legal Defense and Educational Fund, Inc.
22            700 14th Street NW, Suite 600
              Washington, DC 20005
23            jholmes@naacpldf.org
              cmcclellan@naacpldf.org
24            mturnageyoung@naacpldf.org
              rkleinman@naacpldf.org
25
```

1      APPEARANCES (cont.):

2

3              KATE R. COOK, ESQUIRE
               Sugarman Rogers
               101 Merrimac Street
4              Suite 900
               Boston, Massachusetts 02114
5              617.227.3030
               cook@sugarmanrogers.com
6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1                    P R O C E E D I N G S

 2              (The following proceedings were held in open court

 3    before the Honorable Allison D. Burroughs, United States

 4    District Judge, United States District Court, District of

 5    Massachusetts, at the John J. Moakley United States

 6    Courthouse, One Courthouse Way, Boston, Massachusetts, on

 7    February 13, 2019.)

 8              THE CLERK:  All rise.  Court is in session.  Please

 9    be seated.  This is Civil Action 14-14176, Students for Fair

10    Admissions.

11              Will counsel identify yourselves for the record.

12              MR. MORTARA:  Your Honor, Adam Mortara for Students

13    for Fair Admissions.  With me are my colleagues Will

14    Consovoy, John Hughes, Meg Fasulo, Michael Connolly, Cameron

15    Norris, Patrick Strawbridge, Thomas McCarthy, Krista Perry,

16    and Scott McBride.  Excused absences for Ms. Hacker, who is

17    full-term now and cannot travel, and Mr. Michael Park who had

18    the great honor of appearing in front of the Senate Judiciary

19    Committee this morning in connection with his nomination to

20    the United States Court of Appeals for The Second Circuit.

21              MR. LEE:  Good afternoon, Your Honor.  Bill Lee

22    from Wilmer Hale for Harvard.  With me are my partners Seth

23    Waxman, Danielle Conley, Felicia Ellsworth, Debo Adegbile and

24    Daniel Winik.  And from Harvard, Bob Iuliano and Ara

25    Gershengorn.
```

Case: 19-2005    Document: 00117628340    Page: 646    Date Filed: 07/30/2020    Entry ID: 6356615
Case 1:14-cv-14176-ADB  Document 666  Filed 07/01/19  Page 7 of 129

7

1          MS. TORRES:  Good afternoon, Your Honor.  Genevieve

2     Bonadies --

3          THE COURT:  I knew you were here someplace.

4          MS. TORRES:  Genevieve Bonadies Torres representing

5     the student Amici in this case.  From the Lawyers Committee,

6     I'm joined by Brenda Shum and Jon Greenbaum.  And I am joined

7     by my colleagues at Asian Americans Advancing Justice, Nicole

8     Gon Ochi and Arnold & Porter -- somebody.  Thank you.

9          MS. HOLMES:  Good afternoon, Your Honor.  Jennifer

10    Holmes from the NAACP Legal Defense Fund here on behalf of

11    the Amici organizations.  I'm joined by our local counsel,

12    Kate Cook, and also my colleagues Michelle Turnage Young,

13    Rachel Kleinman, Cara McClellan, and Catherine Bullock.

14          THE COURT:  Excellent.  So each party has an hour.

15    The two Amici have 15 minutes.  I'm happy to do this however

16    you would like.

17          MR. MORTARA:  Your Honor, I'll be presenting in our

18    opening piece for Students for Fair Admissions.  We have one

19    small request changing up from the last closing.

20          We would like, with Your Honor's permission, to

21    have the plaintiff's traditional opportunity to have the last

22    word.  So if you wouldn't mind, we'd like our rebuttal piece

23    to go after the amicus parties.

24          THE COURT:  I'm fine with that.  Any objection from

25    Harvard?

```
 1              MR. LEE:  Not from Harvard, Your Honor.
 2              THE COURT:  How much time are you reserving,
 3      Mr. Mortara?
 4              MR. MORTARA:  15 minutes.
 5              THE COURT:  Karen, you got that?  45 minutes for
 6      him and then he can have his last 15.
 7              Wasn't sure you were going to make it back,
 8      Mr. Mortara.
 9              MR. MORTARA:  Your Honor, I just couldn't quit this
10      case.
11              THE COURT:  The people that are standing in back,
12      you're welcome to stand.  But you have to have a wall because
13      you're blocking all those people that you're standing in
14      front of.  Or a floor, you can have a floor, too.
15              When you're ready.
16              MR. MORTARA:  You should have a binder, Your Honor,
17      that has all of my demonstratives that I'm going to show.  I
18      know you like to follow along in paper.
19              THE COURT:  Yes.  I appreciate that.  Thank you.
20              MR. MORTARA:  I'll try to tell you the tabs that
21      are numbered.  They're not all consecutive because they
22      correspond to some things I'm showing on the screen or in my
23      outline, but I'll direct you to the tabs as needed as we roll
24      through.  There's also some duplicates, but that's because
25      I'm rolling through.  So please don't be alarmed by
```

1     duplicates.  Luckily nothing fell out this time.

2               With your permission, Your Honor, I'll begin.

3               THE COURT:  Go.

4               MR. MORTARA:  Your Honor, in preparing your opinion

5     in this case, the Court will have the opportunity to explain

6     the undisputed facts, decide the disputed facts, and of

7     course apply the law to both.

8               Perhaps the most important undisputed fact is that

9     Asian-Americans received dramatically statistically

10    significantly lower personal ratings from Harvard, lower than

11    whites, lower than African-Americans, and lower than Hispanic

12    applicants.

13              And perhaps the most important question in the case

14    is, why is that happening?

15              It's no exaggeration to say that entire communities

16    of Americans, millions of them, await this Court's important

17    answer to that question.  And the case also turns on the

18    answer, as the Court knows.

19              If the Court finds that Harvard imposed a racial

20    penalty in the personal rating against Asian-Americans,

21    Harvard loses this case on Count I.

22              And Your Honor, as we did in the previous closing,

23    we're happy to rest on our papers on the other counts.

24    Should Your Honor have questions on those other counts,

25    Mr. Hughes is here to answer them, and we'll take up our time

 1    to do so should we need to.

 2              There's only two possible answers to that important

 3    question, Your Honor.  Either Asian-Americans actually

 4    deserve those lower personal ratings because, in fact, they

 5    have less integrity, kindness, grit, and likability and all

 6    the things that Harvard says it's looking for; they actually

 7    have inferior personal qualities.  Or Harvard admissions

 8    officers have fallen prey to human frailty and racial

 9    stereotyping.

10              The Court can side with Harvard and write into law

11    that Asian-Americans are actually just one dimensional and

12    book smart.  Those are Harvard's terms.

13              Or the Court can find that through some mechanism,

14    whether it was inadequate supervision, inadequate training,

15    or inadequate written guidance, racial stereotyping crept

16    into Harvard's process.

17              As Mr. Hughes said the last time we were here, the

18    statistical battle in this case boils down to whether or not

19    you find race influences the personal rating.

20              If it does, even as just a tip, Professor Card

21    admitted it should be removed from the admissions model.

22    Your Honor knows the testimony.

23              Please excuse me while I relaunch my computer.

24              Your Honor knows the testimony.  He said it.  It's

25    behind Tab 1 in your binder.  It's inappropriate to include

Case: 19-2005    Document: 00117629340    Page: 645    Date Filed: 07/30/2020    Entry ID: 6356615
Case 1:14-cv-14176-ADB   Document 666   Filed 07/01/19   Page 11 of 129

11

```
 1        any variables that can themselves be affected by race.

 2                And behind Tab 2, he said it again.  Even if the

 3        rating is influenced by race only in the form of a tip.

 4                Those are clear admissions.

 5                THE COURT:  Can I interrupt you for a second?

 6        Don't I have to find it was intentional for Count I?

 7                MR. MORTARA:  Absolutely not, Your Honor.  Unless

 8        by "intentional" you mean animus.

 9                THE COURT:  That or intentionality.  Or are you

10        relying on Teamsters?

11                MR. MORTARA:  We are relying on pattern or

12        practice, absolutely.  Obviously it's an intentional

13        discrimination case.  You have to find intentional

14        discrimination.

15                The First Circuit has been very clear that

16        intentional discrimination doesn't mean animus.  The Supreme

17        Court has been very clear about that in all of the equal

18        protection cases going back to the '90s that you do not need

19        to find animus to find intentional discrimination.

20        Intentional discrimination can come from racial stereotypes

21        or unthinking bias.  That's what the First Circuit said in

22        Thomas against Eastman Kodak.

23                THE COURT:  Go ahead.

24                MR. MORTARA:  In Professor Card's own model, when

25        the personal rating was removed, again as Your Honor knows,
```

**JA3569**

Case: 19-2005   Document: 00117629240   Page: 646   Date Filed: 07/30/2020   Entry ID: 6356615
Case 1:14-cv-14176-ADB   Document 666   Filed 07/01/19   Page 12 of 129

12

1    he himself found in Harvard's admissions model a

2    statistically significant Asian penalty.

3            And you would expect then, since Professor Card

4    testified that if race influences the personal rating and if

5    it comes out of his model, it should come out of his model.

6    And if it does come out of his model, he himself found an

7    Asian penalty, that he would have told you, given you an

8    opinion, that race was not affecting the personal rating at

9    all.

10           But he did not.  He did not give you an expert

11   opinion as an economist crunching any numbers or present any

12   analysis that showed race wasn't influencing the personal

13   rating.  He instead chose to take Harvard's word for it.

14           Dean Fitzsimmons had a telephone call with him and

15   said we have never used race in the personal ratings, and

16   Professor Card accepted that representation.

17           The only model of the personal rating came from

18   Professor Arcidiacono, which showed significant effects of

19   race.  Negative on Asians, positive for African-Americans and

20   Hispanics.  That's behind Tab 4 in your binder.  You'll

21   remember this slide from Professor Arcidiacono, and in the

22   lower left pane of that slide you'll see the personal rating

23   model.  Negative penalty for Asians.  Large tips for

24   African-Americans and Hispanics.

25           Professor Card and Harvard, now through hundreds of

Case: 19-2005    Document: 00117629240    Page: 647    Date Filed: 07/30/2020    Entry ID: 6356615
Case 1:14-cv-14176-ADB   Document 666   Filed 07/01/19   Page 13 of 129

13

1    pages of posttrial briefing, have made no effort whatsoever

2    to explain the massive boost for African-Americans and

3    Hispanics found here and shown in the raw data.

4          Card never once talked about it, even though if

5    those tips are present, the personal rating will be just like

6    the overall rating and should be removed from the admissions

7    model, by his own testimony.

8          Harvard hasn't even tried to offer a rationale for

9    why African-Americans and Hispanics just have better personal

10   qualities than Asians or whites, why they would be more

11   likeable or have greater kindness, integrity, or grit.

12   Because they don't.  Because your skin color doesn't

13   determine your personal qualities.

14         In answering Professor Arcidiacono's model, Harvard

15   focused exclusively on the first third, the Asian penalty

16   that Professor Arcidiacono found.  But all the analysis

17   Professor Card did could not make it go away.

18         You'll remember, Your Honor, this demonstrative I

19   have created with Professor Card during the

20   cross-examination.  This is behind Tab 5 in your binder.  He

21   had shown the first four dots in his direct exam Professor

22   Arcidiacono's models of the personal rating, including model

23   5 which includes all the variables, the ratings variables,

24   context variables, interactions, demographics, academics.

25         And then he said, and I added some more variables

1    and I made the Asian penalty smaller.  And if I kept adding

2    variables, it might just go to the ceiling.

3            When I got to talk to him, we put in his results

4    and showed that even throwing in all the variables he could

5    at the personal rating model, he could not make the Asian

6    penalty go away.  Far from going to the ceiling, it's

7    plateauing at a statistically significant level.  He said his

8    own analysis showed a statistically significant Asian

9    penalty.  He didn't make it go away.

10           Harvard has some answers to this.  First, Harvard

11   repeats like a mantra the idea that because Asians outperform

12   white and other applicants on the extracurricular and

13   academic ratings, that must mean that Professor Arcidiacono

14   found a positive racial bias in those ratings.

15           And behind Tab 6 you have again Professor

16   Arcidiacono's models of the ratings, and I'll just blow up on

17   the screen the academic rating.  The point Harvard is making

18   here is because of this modest positive coefficient on

19   Asian-Americans, that must be mean that Professor Arcidiacono

20   should have been saying there's a positive bias in the

21   academic rating, as we have explained many many times.

22           There are observables in the data like SAT scores,

23   for example, important for the academic rating.  There's also

24   data about the applicant that Harvard has that don't go into

25   the model either because we don't have enough of it or

 1    because it's hard to program into the model.

 2              One example of the former is the number of AP exams

 3    a student may have taken.  There's also evidence in the

 4    record that Asian applicants take more AP exams than white

 5    applicants to Harvard.

 6              An example of the latter would be the type and

 7    quality of academic awards that an applicant got.  That's

 8    hard to code into the data.

 9              The directionality you see here is consistent with

10    the idea that Asian-Americans are superior to white

11    applicants on the observable data like SATs, GPAs, the like.

12    And they're also superior on the unobservables like number of

13    AP scores, number of AP tests, and academic awards.

14              It's when these arrows move in starkly opposite

15    directions that you know there's a problem like you see in

16    the lower left with the personal rating, arrows and the bars

17    moving in opposite directions.

18              Now, Harvard likes to use jargon like

19    omitted-variable bias or other unobservables as some sort of

20    mystical explanation for why Asians are getting penalized on

21    the personal score that isn't itself race.

22              I just gave you the example of the number of AP

23    scores and the academic awards.  What are Harvard's omitted

24    variables that will tell us Asian applicants really have less

25    integrity, grit, kindness or likability?  To even ask the

1    question proves that Harvard's invocation of terms like
2    omitted-variable bias and other unobservables just repackages
3    racial stereotypes and cloaks them in scientific sounding
4    phrases.
5         And to the surprise of no one, other than Harvard,
6    perhaps, the law is defendants cannot win discrimination
7    cases by saying it must be some other variable, without
8    telling us what that variable is, and providing evidence that
9    would support a race-neutral reason.
10        Harvard didn't do that.  A case that says that,
11   Your Honor, is the *Palmer* case from the D.C. Circuit cited in
12   our briefs.
13        Where is the evidence that white applicants to
14   Harvard write essays that just make them seem more likeable
15   than Asian applicants?  Harvard cannot even start to answer
16   that question without invoking still more casual racist
17   stereotypes, adding to the list of loaded terms like
18   "one-dimensional" and "book smart" that we heard during the
19   trial.
20        The law and common sense tells us that skin color
21   has nothing to do with your personal qualities or likability.
22        Harvard's second answer to this is that, even
23   though Professor Arcidiacono's model 5, shown here on the
24   screen, includes all the ratings variables, Harvard now says
25   that because whites do slightly better on school support

1     ratings, that answers everything.

2              But it answers absolutely nothing, Your Honor.

3     Harvard's admissions officers themselves assigned the school

4     support ratings.  And there was unrebutted and undisputed

5     testimony from Professor Arcidiacono that he also found an

6     Asian penalty in those ratings.

7              Moreover, there was testimony, including from Dean

8     Fitzsimmons, that the personal rating is not only based on

9     school support or alumni interview ratings.  Harvard admits

10    extracurriculars and how a student performs in them weigh

11    into the personal rating.  And we know Asians massively

12    outperform white applicants on the extracurricular rating.

13             All Harvard did was cherry-pick one sliver of the

14    data, one spot where whites do slightly better, and then

15    tried to drive that through the entire explanation of the

16    observed Asian penalty.  But without an actual statistical

17    model, it proves nothing.  And the only regression analysis

18    we have is the one on the screen and the iterations Professor

19    Card did afterwards, all of which show a statistically

20    significant Asian penalty.

21             And as Professor Arcidiacono testified, and the

22    amicus brief at page 7 says, the relatively small white Asian

23    school support gap cannot explain the observed raw data

24    personal score gap that we see both in the raw data and in

25    the regression model.

1          And what about African-Americans and Hispanics?

2     Two-thirds of the pane you're looking at with these massive

3     boosts going in the opposite direction of the observables,

4     they do so much better on the personal rating than whites and

5     Asians.

6          Did Professor Card and Harvard show you how school

7     support or alumni interview ratings explained that?  No, they

8     didn't because they're not explaining the racial distribution

9     of the personal rating at all.  They're not giving you

10    evidence that race doesn't influence the personal rating.

11         Harvard wants you to believe that it's just a

12    coincidence that the racial pattern on the personal rating

13    looks just like the racial pattern on the overall rating,

14    which you'll see behind Tab 7.

15         Harvard wants you to think they admit using race in

16    the overall rating, admit giving a preference to

17    African-Americans and Hispanics in the overall rating.

18         There's undisputed testimony, unrebutted by

19    Harvard, unrebutted by Card, in this case that there's an

20    Asian penalty in the overall rating.  And they want you to

21    look at the same distribution in the personal rating and

22    believe them that race has never been used and race does not

23    influence the personal rating.

24         One thing Harvard is very good at is something that

25    some people call, colloquially, don't believe your lying

1    eyes, but we can also learn about in George Orwell's 1984.

2    Two plus two equals five.  Don't believe what you're seeing.

3    Don't believe what you're looking at, the same pattern

4    between overall and personal.  Believe us, trust us.  Race

5    has never been used in the personal rating.

6            And, Your Honor, that's before we get to all the

7    nonstatistical evidence on the personal rating where we see

8    more of this type of argument.

9            Some examples.  Christopher Luby.  We're supposed

10   to believe that Mr. Luby testified credibly at trial that he

11   never used race in the personal rating.  That's Harvard's

12   word from their posttrial brief, "credibly," even though he

13   said the opposite under oath at his deposition in the first

14   hour.  Then he sat there for hours answering additional

15   questions from my friend Mr. Connolly, didn't change his

16   testimony.

17           Then a month later he got the written transcript

18   and spent hours looking at that, reading what had been asked

19   and what he had answered, changing dozens of things,

20   substantive things about his testimony.  Didn't change it

21   then.

22           But then we're supposed to believe, you and I, that

23   after 40 hours spent with Harvard's counsel, he suddenly

24   discovered the truth about how he'd been doing his job all

25   along and that he'd never used race in the personal rating

1     ever.

2             Two plus two equals five, Your Honor.  Trust us.

3             We're supposed to believe that even though the

4     Department of Education's Office of Civil Rights found in a

5     report in 1990 that Harvard's admissions offices, at least

6     some of them, had been using race in the personal ratings, a

7     finding that has never once been disputed by Harvard in

8     hundreds of pages of posttrial briefings.  They've never once

9     even answered it or addressed it.

10            And then everyone from Mr. Lee to Director McGrath

11    to Dean Fitzsimmons came to court and told us nothing had

12    changed about Harvard's use of race since that finding.

13            And as you know, and behind Tab 8 you will find

14    Plaintiff's Exhibit 509, Harvard's own lawyers are writing

15    letters to the Department of Education, telling them those

16    earlier findings are still accurate today as late as 2012.

17            And no one remembers ever training or admonishing

18    anyone about not using race in the personal rating, even

19    after DOE made those findings.  Yet we are now supposed to

20    believe Harvard's made-for-litigation excuse that no one has

21    ever used race in the personal rating, despite the fact that

22    the United States Government found that they did.  And then

23    they told that same government nothing had changed as late as

24    2012.

25            Two plus two equals five, Your Honor.  Trust us.

**JA3578**

Case: 19-2005    Document: 00117629240    Page: 655    Date Filed: 07/30/2020    Entry ID: 6356615
Case 1:14-cv-14176-ADB   Document 666   Filed 07/01/19   Page 21 of 129

21

1    It's never happened.

2              And what about what happened last summer?  We're

3    supposed to believe that Director McGrath was in Montana and

4    she didn't read the deluge of national press about this case

5    created by the summary judgment filings and the revelations

6    about the personal rating that were all over the press.

7              Mr. Hughes is from Montana.  His parents in

8    Whitefish had no trouble following the case.

9              We're supposed to believe that even though before

10   that summary judgment briefing the admissions office had

11   gotten together at a retreat and they decided to make no

12   changes to the personal rating guidance.

13             But somehow Harvard would have us believe that sua

14   sponte in August, after all that press, the admissions office

15   embarked on a process that ultimately added 872 percent more

16   words to the instructions on the personal rating than had

17   existed before.

18             That's depicted behind Tab 9, Your Honor.  You see

19   the class of 2022 reading procedures, Defendant's 744,

20   compared to the class of 2023, Plaintiff's 633.  This thing

21   had not changed in such a material way in decades.

22             Behind the next tab, Your Honor, 10, you'll see the

23   reading procedures guidance from the 1980s contained in the

24   OCR report compared to 2022 compared to what they did in

25   August.  And of course that had nothing to do with this case,

1    nothing to do with the revelations in the press, nothing to

2    do with this upcoming trial.  Nothing at all.  That's what

3    Harvard wants you to believe.  That's what they've said.

4         Now, we're told these massive revisions actually

5    changed nothing at all, and this is just a codification of

6    uniform historical practice that no one has ever deviated

7    from.  Right.  Because you don't change something for nearly

8    40 years in any appreciable way, and the system is working

9    perfectly, and no one uses race in the personal rating even

10    though the Department of Education found they did, but you

11    need to add 872.5 percent more words to make sure everything

12    stays the same.  And you have to add the first ever

13    injunction against using race in the personal rating

14    appearing in writing ever.

15         And of course the key language added that we all

16    know is designed to fight caricature and stereotypes of

17    Asians.

18         Appearing behind Tab 11, of course, at the top,

19    you'll see the reading procedures and the language that

20    you'll well remember was in red in one of the drafts, Your

21    Honor, compared to the OCR report which found, amongst other

22    things, that Harvard admissions officers had used

23    stereotypical language about Asian applicants.

24         We need to talk a little bit about how this came to

25    light, Your Honor.  First Director McGrath and Dean

1    Fitzsimmons testify inaccurately about whether there's

2    written guidance on the personal rating on race in this

3    court.  That's what happened.  The questions could not have

4    been clearer, and they got the answers dead wrong.

5             Remember my question.  Down to a sticky note on the

6    coffee pot, I asked Director McGrath, is it written anywhere

7    at the admissions office not to use race in the personal

8    operating?

9             She said, no, it's not.

10            We found out later when Director McGrath came back

11   that she had imposed an unverbalized qualification on my

12   question to be limited to the discovery period.

13            But putting aside Director McGrath's confusion

14   about my question, after that, Harvard knew, Harvard's

15   lawyers knew inside and outside, Your Honor, they knew those

16   answers were inaccurate.

17            And they did nothing to correct that false factual

18   testimony even though every rule in the book says that when

19   your witness in your case says something that is not true and

20   you know it's not true, whether or not the witness made a

21   mistake, you have a duty to tell the Court and to tell the

22   other side, but they didn't.

23            Then when the last admissions officer was on the

24   stand in a throwaway rehabilitation attempt of Tia Ray, we

25   find out about the new reading procedures.

1          Caught now with the McGrath and Fitzsimmons'

2     inaccurate testimony and the Court's immediate order to

3     produce the reading procedures, Harvard first assures me and

4     assures you that these new reading procedures actually help

5     Harvard's case.

6          Two plus two equals five, Your Honor.  Trust us.

7          These reading procedures, once we get them, end up

8     helping Harvard so much that by the time of closing Harvard

9     is telling the Court they're not admissible to support a

10    liability finding under Federal Rule of Evidence 407,

11    Subsequent Remedial Measures.

12          Just like I told you at my closing, Your Honor,

13    that argument has disappeared from the posttrial briefing

14    because it was waived when Harvard allowed the reading

15    procedures into evidence without objection.

16          I know you know this, Your Honor, but Rule 407 does

17    not exist because subsequent remedial measures are not

18    probative of liability.  They're extremely probative of

19    liability.  Rule 407 exists because of the public policy

20    matter.  We want cities to fill potholes after there are

21    accidents without fear that the filling of them will be used

22    in a very effective way to acknowledge they should have been

23    filled in the first place.

24          We want universities to fix broken admissions that

25    are broken down because of racial stereotyping and add new

Case: 19-2005    Document: 00117629240    Page: 659    Date Filed: 07/30/2020    Entry ID: 6356615
Case 1:14-cv-14176-ADB   Document 666   Filed 07/01/19   Page 26 of 129

25

1    instructions to people that read those applications without

2    fear that those new reading procedures won't be marched into

3    court to prove, because they do, that they knew there was a

4    problem.

5           But because of our hands were trapped in the cookie

6    jar over the earlier erroneous testimony, Harvard waived

7    Rule 407, and now we can see just about the most powerful

8    evidence you can imagine of a recognition of a problem by at

9    least some of Harvard's own rank and file admissions

10   personnel after everything came out in public over the

11   summer.  And a fundamental rewrite of the reading procedures

12   on the personal rating ensued.

13          But this is no big deal, Your Honor.  872 percent

14   more words, first ever injunction about race in the personal

15   rating, had hardly changed for decades, but we were supposed

16   to believe it just codifies uniform existing practice, Your

17   Honor.

18          Trust us.  Two plus two equals five.

19          There's also a little bit of legal two plus two

20   equals five going on, Your Honor, and you alluded to it

21   earlier in your question.  Harvard wants to tell you that we

22   have to prove evil racist intent in the hearts and minds of

23   admissions personnel in order to make out a case of

24   intentional discrimination.

25          I want to dispel that right here and right now with

 1  binding First Circuit precedent behind Tab 12.  It's the

 2  *Thomas vs Eastman Kodak* case from Judge Lynch.  The ultimate

 3  question is whether the employee has been treated disparately

 4  because of race.

 5          This is so regardless of whether the employer

 6  consciously intended to base the evaluations on race or

 7  simply did so because of unthinking stereotypes or bias.  And

 8  it goes on.

 9          And what does this mean?  It means when Harvard's

10  admissions personnel come in here and tell you from the heart

11  that they're not discriminating while at the same time none

12  of them can explain why Asians are getting dramatically lower

13  personal ratings than whites, they may quite well have fallen

14  prey to racial stereotyping.  And it doesn't make them evil.

15  It makes them human.

16          What else does it mean, Your Honor?  It means if

17  you find in our favor on Count I, you do not need to find,

18  behind Tab 13, that the admissions officers came here and

19  lied and perjured themselves.  That is a straw man.  You

20  don't need to do that.  We don't have to look into the hearts

21  of these admissions officers to see exactly why they

22  systematically gave Asians lower personal ratings,

23  undisputedly penalized Asians on the overall rating, no

24  rebuttal from Card.  And undisputedly penalized Asians on the

25  school support ratings.  Again, no rebuttal.

Case: 19-2005    Document: 00117629240    Page: 661    Date Filed: 07/30/2020    Entry ID: 6356615
Case 1:14-cv-14176-ADB  Document 666   Filed 07/01/19   Page 27 of 129

27

1    The models produced by both experts tell us it's

2    happening, and that's sufficient to make out our prima facie

3    case of intentional discrimination by itself under the

4    pattern or practice method.

5    Behind Tab 14 is again Professor Card's own model

6    with the personal rating out and the statistically

7    significant Asian penalty.  Recall this model includes all

8    the things Harvard wants included except the personal rating.

9    ALDCs, intended careers, parental occupations, everything

10   that Professor Card wanted except that racially influenced

11   personal rating.

12   Under the pattern or practice method, we need to

13   show no more than this, this gross disparity to make out our

14   case.

15   Now, Your Honor, Harvard does like to make a little

16   bit of this gross disparity language that appears throughout

17   the cases, but the cases also make clear that it's synonymous

18   with the little asterisk at the bottom of the screen, a

19   statistical significance.  *Hazelwood* at Footnote 14 talks

20   about the difference being two or three standard deviations.

21   Two standard deviations means a p-value of less than 0.05,

22   which is what we call a statistical significance, and it is

23   right there in the asterisk.

24   The First Circuit said as much in *Jones against*

25   *City of Boston*, at Footnote 9.  That's a disparate impact

 1    case.  The D.C. Circuit has said it multiple times, including

 2    in *Segar* and *Palmer against Schultz*, cited in our briefs.

 3            We, of course, had our own statistical analyses.

 4    It wasn't just Harvard's that showed an Asian penalty.

 5    Professor Arcidiacono's analysis showed an Asian penalty.

 6    And you recall the robustness checks that he had on that

 7    analysis.  And this one little change to Professor Card's,

 8    removal, as he testified you should, of a rating that is

 9    influenced by race gives what all the courts call prima facie

10    evidence of intentional discrimination, statistically

11    significant penalty.

12            Going to the law, Harvard now has two options.

13    They can dispute the analysis or provide a race-neutral

14    explanation.  But it's hard for Harvard to dispute the

15    analysis and model of their own expert coupled with the

16    single finding that race influenced the personal rating.

17    They can only try to convince you, no, no, no, ignore what's

18    going on with the African-Americans and Hispanics, look only

19    at the school support ratings, or whatever other excuse they

20    have.  Race isn't influencing the personal rating.  Put aside

21    what the United States Government said in the OCR report.

22            And Harvard has yet to come up with any

23    race-neutral explanation for the Asian penalty in the

24    personal rating.  I'll ask again for Harvard to be explicit.

25    Tell the whole world that Asian applicants to Harvard

1   actually deserved statistically significantly lower ratings

2   than whites, African-Americans, and Hispanics.  Say they

3   deserved it.

4          But you know what, Your Honor, that will just be

5   lawyer argument, even if they're willing to say it, because

6   no Harvard admissions officer was willing to come in here and

7   testify as to why this is happening.

8          In fact, the idea that Asians deserve lower

9   personal ratings will be news to every Harvard admissions

10  officer that testified, from Director McGrath to Charlene

11  Kim.  They universally said they wouldn't expect Asians to

12  have worse personal qualities.

13         Your Honor, there is some discussion about the

14  pattern or practice method and some discussion of waiver,

15  some confusion about this.  And Harvard seemed surprised to

16  see reference to this method of proof in our brief.

17         But behind Tab 15 you will find Harvard's summary

18  judgment brief, docket 418.  And over on page 36, which is

19  also behind that tab, Your Honor, at the top you'll see

20  Harvard knew exactly what was going on here.

21         Harvard told you that lacking direct support for an

22  intentional discrimination claim -- of course almost all

23  discrimination claims are circumstantial.  Rarely do you find

24  the smoking gun letter saying what we're really trying to do

25  is limit the number of non-ALDC Asians on campus.

1          SFFA can make a prima facie case based on

2     statistics only if it can show gross disparities of the kind

3     and degree sufficient to give rise to an inference that the

4     nonuniform individualized analyses reflects a pattern or

5     practice of discrimination.

6          Citing what?  A Third Circuit Title VII case on

7     pattern or practice.  Citing what else?  The *Hazelwood* case.

8     What's that?  A Title VII case on pattern and practice.

9          This is Harvard's summary judgment brief.  This is

10    no surprise to them.  We had told you, Your Honor, and them

11    in discovery motions way before that, including back in April

12    of 2017.  Behind Tab 18 you'll find one of our briefs, a

13    reply brief on a discovery dispute, where we said SFFA

14    alleges that Harvard engaged in a pattern or practice of

15    discrimination under Title VI.  Citing what?  The *Teamsters*

16    case, first case where the Supreme Court held private

17    plaintiffs could bring a pattern or practice method of proof

18    claim.

19          And then also *Indiana Harbor Belt Railroad*, which

20    is the Northern District of Indiana case, that holds that an

21    association like SFFA, like a union, can bring pattern or

22    practice method of proof to bear.

23          We did, Your Honor, refer to the *Arlington Heights*

24    framework and move on that basis an alternative legal theory

25    in our summary judgment motions.  It's true.  But one does

```
 1    not have to move on all the bases for relief in a summary
 2    judgment motion.
 3              And moreover, we did not have the cross-examination
 4    of Professor Card wherein he admitted that in all of his
 5    admissions models, including the very last one he did, if you
 6    pulled out the personal rating you got a statistically
 7    significant Asian penalty.
 8              We didn't waive pattern or practice method.
 9              But Harvard has still more arguments.  They're now
10    telling you the pattern or practice method of proof is either
11    not available in associational standing cases like this one
12    or not available under Title VI.  The problem with both those
13    arguments is there is actually zero authority for either of
14    them.
15              We cited the only case to address the question of
16    associational standing cases, *Indiana Harbor Belt Railroad*;
17    that's the Northern District of Indiana case.  No case holds
18    to the contrary.
19              And there's not a lot of case law on this, for
20    obvious reasons, Your Honor.  The very premise of an
21    associational standing case, as you've observed several times
22    in orders in this case, is that we are not bringing claims
23    one by one on behalf of individuals.  We're not deploying the
24    individual method of proof or the *McDonnell Douglas*
25    framework.  We're not doing that.  We're alleging systematic
```

1    discrimination.

2            The courts have held that individual plaintiffs

3    bringing a *McDonnell Douglas*-type claim cannot also resort to

4    the pattern or practice method.  That is true.  Those were

5    not the types of claims we were bringing.

6            And Harvard tried to tell you, in its opposition

7    brief at page 9, that the Second Circuit had held that

8    associations could not use pattern or practice proof in the

9    *Chin* case, which is behind Tab 20.

10           And it takes only a few minutes to look at the *Chin*

11   case to realize that that is a mischaracterization.  Over at

12   the very first paragraph, which is also in your binder, Your

13   Honor -- I'll just put it on the screen -- you will see, and

14   then in the pages that follow, the only claims that were

15   tried in that case were claims by 11 Asian-American

16   individuals.

17           There had been an association as part of the case

18   earlier, Your Honor.  They got the right to sue letter from

19   the EEOC.  But no associational standing claims were tried in

20   that case, none at all.  It was all individual evidence, Your

21   Honor.

22           Of course the Second held, as all circuits had,

23   that individual plaintiffs cannot bring pattern or practice

24   method cases.  That's not what we're doing.  This is an

25   associational standing case.

1          Your Honor, Harvard also says that you can't bring

2     pattern or practice under Title VI.  Precisely zero authority

3     supports that.

4          And behind Tab 22 -- this only came up in Harvard's

5     reply brief, Your Honor, you'll find some supplemental

6     authority, which is the Title VI legal manual from the United

7     States Department of Justice, which on the very first page

8     tells you in the table of contents that, yes, you can use the

9     pattern or practice method in a Title VI case.

10         And it goes on on pages 22 and 23, which you can

11    also find in there, to discuss the legal bases for that,

12    citing all sorts of Title VII cases.

13         And on page 23, Your Honor, you will find

14    supplemental authority, the *Melendres* versus the infamous

15    Sheriff Joe Arpaio case from the Ninth Circuit, which is a

16    Title VI case deploying the pattern or practice method of

17    proof.

18         And, Your Honor, lest you think this is newly

19    minted Justice Department guidance on Title VI, we actually

20    made some effort to try to track back how long the Justice

21    Department has been telling everyone that they think you can

22    bring pattern or practice claims and prove intentional

23    discrimination under Title VI.  It goes back at least as far,

24    potentially began at the time when Mr. Waxman was Solicitor

25    General of the United States in the Justice Department in the

1    Clinton administration.

2            We can bring a pattern or practice method.  And

3    that means statistics alone, contrary to what Harvard says,

4    can prove our case.  A regression analysis is what every

5    pattern or practice method says is sufficient to show

6    intentional discrimination, to get that statistical

7    significance mark.

8            But even if that weren't true, Your Honor, even if

9    we're under *Arlington Heights*, there's a mountain of

10   circumstantial evidence.  I've already touched on the Office

11   of Civil Rights findings that Harvard used stereotypes and

12   was using race in the personal rating.  The ultimate finding

13   there wasn't discrimination, but it didn't take long for it

14   to mature into a statistically significant Asian penalty.

15           I touched on Mr. Luby's frankly not at all credible

16   trial testimony and I talked about the new reading

17   procedures, such dynamite evidence of liability that

18   Rule 407, had Harvard been timely about it, would have kept

19   it out.

20           And, of course, there's the issue of Sparse

21   Country, Your Honor, and Dean Fitzsimmons's revealing and

22   frankly saddening testimony justifying why Asian students

23   living in New Orleans and Salt Lake City needed to get higher

24   PSAT scores to get a letter inviting them to Harvard.

25           Harvard points out in their brief it's not illegal

1      to discriminate on the basis of race in terms of who you

2      invite to apply.  We agree, that is not illegal.  What it is

3      probative of is Harvard didn't want any more Asians to apply.

4              What is more important is the direct evidence

5      behind Tab 25 that was right here in court when Dean

6      Fitzsimmons, in struggling to explain why this was going on,

7      over 20 pages of transcript finally says, well, there's some

8      people who might have only recently arrived in Sparse Country

9      and other people have been there forever.

10             We all know what was meant by that.  It's what

11     Dr. Chin called the stereotype of Asians as the perpetual

12     foreigner.  Mr. Hughes talked about it in his closing.

13             And what about what Dean Fitzsimmons did not do in

14     response to the findings of the Office of Institutional

15     Research?  Here we have perhaps the worst instances of two

16     plus two equals five in the case.

17             Harvard, its witnesses, and its lawyers have stood

18     here and told you the following incoherent concepts.  On the

19     one hand, everyone in admissions, including all the recent

20     college graduates they have, Miss Tia Ray, and Chris Luby,

21     they're perfectly trained on how to use race, even though

22     many of them couldn't remember that they'd ever been trained

23     on it.  Essentially, they don't get any written guidance,

24     they never make mistakes ever or succumb to racial

25     stereotyping in assigning the personal rating.  And, Your

1    Honor, to quote The Lego Movie, the first one, everything is

2    awesome.

3            But to use another literary reference, over at the

4    Office of Institutional Research, the Ph.D.'s who crunch

5    numbers for Harvard to submit to the United States

6    Government, they are the gang that couldn't shoot straight

7    because their work is so poor no one should believe it.

8            But in order to know they're the gang that couldn't

9    shoot straight, you have to first understand what they're

10    telling you.  And there we're treated to potentially the most

11    extreme two plus two equals five moment of the case, and

12    that's Plaintiff's Exhibit 26, Your Honor, behind Tab 26 in

13    your binder, the May 1 memo from OIR.  Not just Mark Hansen,

14    the junior staffer off on a lark --

15            THE COURT:  I don't have Tab 26.

16            MR. MORTARA:  It might be Tab 27, Your Honor.

17            THE COURT:  No.  27 is something different.

18            MR. MORTARA:  It might be Tab 28.  It might not be

19    there.

20            THE COURT:  It's not there.

21            MR. MORTARA:  As is usual, Your Honor.  Technical

22    details.

23            You know the document very well, Your Honor.  And

24    as you see, a memo from all of OIR, not just Mark Hansen, but

25    Dr. Driver-Linn herself at the head, and you know what it

1    told Dean Fitzsimmons:  They did a regression model, and he

2    looked at it.

3         Dean Fitzsimmons used to teach statistics.  He

4    loved talking about statistics, and he's conversant in modern

5    statistical methods like regression analyses.

6         And here's the table.  What did do we see in the

7    table?  What did it tell Dean Fitzsimmons?  If you have an

8    athletic rating of 1, you're a recruited athlete.  Harvard

9    wants you there.  You get a big tip.  I know that.  We intend

10   to recruit athletes.  We intend to given legacies a big tip.

11   It's a big part of this case.  We've heard a lot about it.

12   We intend to give African-Americans a big tip.  We intend to

13   give Hispanics a big tip.  We intend to give low-income

14   applicants a tip.

15        And this is empirical proof of that, said Dean

16   Fitzsimmons.  And then he got to the Asian penalty, minus

17   .37, p-value zero.  He says, I don't know what that means.

18        That's what we're being told, that he got to the

19   bottom, intent to help athletes, intent to help legacies,

20   intent to help African-Americans, intent to help Hispanics,

21   intent to help low-income folks, proves empirical proof.

22   What's that?  I don't know what that means.  Even though OIR

23   told him what it meant.  There are demographic groups that

24   have negative effects.

25        Your Honor, he understood what this meant.  There's

1    some dispute about the law here about cases like *Personal*

2    *Administrator Against Phoebe*, the idea that you can proceed

3    in the face of a known disparate impact and that doesn't mean

4    you're discriminating on the basis of race.

5            Your Honor will recall that involved a preference

6    for veterans, which obviously falls unequally, at least at

7    the time, less so now, between men and women.  We could still

8    have that preference.  That's not discriminatory intent.

9    Absolutely true, Your Honor.

10           But that's not what this memo shows.  A regression

11   analysis of this type in every single pattern or practice

12   method case is considered proof not of a disparate impact but

13   of intentional discrimination.

14           And that's what Professor Fitzsimmons, former

15   teacher of statistics, got in a memo.  Not a memo saying

16   we've got disparate outcomes.  A memo saying we have an Asian

17   penalty, intentional discrimination, the same as if an owner

18   of a business got a memo from a manager, saying I think we're

19   invidiously discriminating against African-Americans, boss,

20   what do you think?

21           What did Dean Fitzsimmons think?  Not enough to

22   tell anybody about it or do anything else.

23           Your Honor, Harvard has its own accusations, to be

24   fair, of inconsistency on our part.  Even though Professor

25   Card found that Asian penalty in the personal rating once he

1    removed -- Asian penalty in the admission outcome once he

2    removed the personal rating, Harvard points out that Students

3    for Fair Admissions went one step further and proved that

4    that Asian admissions penalty is only affecting the

5    98 percent of Asian applicants that aren't ALDCs.  Your Honor

6    will recall that Professor Card's model includes all the

7    ALDCs, so that's kind of not an issue.

8         But we went a step further and said, no, this is

9    really falling heavily on the 98 percent of applicants that

10   are not in those preferred groups.  Harvard calls it

11   incoherent that the 2 percent of Asian applicants who are

12   ALDCs are not treated on admissions outcomes statistically

13   significantly different from whites.

14        That should be behind Tab 28, Your Honor.  And you

15   can see the admissions rates, they're slightly higher for

16   Asian-Americans.  And Dr. Card actually said if you add back

17   in the athletes and peel apart the ALDCs, Professor

18   Arcidiacono's model shows there may even be a tip for Asian

19   legacies over white legacies.

20        But the absence of an Asian penalty for ALDCs or

21   even a preference for them is not inconsistent with a penalty

22   in the 98 percent of Asian applicants who don't fall into

23   those special categories.

24        It's not incoherent.  It's, in fact, so coherent

25   legally there's an entire body of case law, typically in sex

 1   discrimination, directed to this concept, saying plaintiffs

 2   can prove illegal discrimination against a subgroup.

 3          And it's not so coherent factually.  Your Honor,

 4   it's happened before.  The law of the so-called sex-plus or

 5   race-plus cases is absolutely clear.  You can't defend a

 6   discrimination charge by pointing to another subgroup of the

 7   protected class you didn't discriminate against.

 8          Imagine a scenario where 98 percent of the women

 9   who apply to a job have children and 2 percent don't.  The

10   employer discriminates against the 98 percent of the women

11   with children, for whatever reason, and does not discriminate

12   against the 2 percent that do not have children or maybe even

13   gives them a preference.

14          Why would they do that?  There could be many

15   different and equally awful reasons.  Maybe they think women

16   without children are more likely to participate in company

17   social activities, they'll fit in better, be more patriotic

18   towards the company.  Maybe they prefer having women in the

19   workplace who they perceive don't always talk about their

20   children.

21          Maybe they even prefer the 2 percent childless

22   women and hire as many as they can so that they can justify

23   to the EEOC or someone else who comes along and makes charges

24   of sex discrimination based on the raw numbers.  They want to

25   be able to say we don't discriminate; look at all these women

1    we hire.  Maybe when they get sued, they will say your sex
2    discrimination theory is incoherent.  We hired all these
3    childless women; we even gave them a preference.
4            Too bad for them and for Harvard.  The law is
5    crystal clear that this is unlawful discrimination, and
6    incoherency is not an excuse.  That's exactly what happened
7    here.  Just like an employee in my hypothetical, Harvard
8    imposes no admission penalty on Asian ALDCs but does impose
9    the penalty on those it deems less desirable, the non-ALDC
10   Asians.
11           This makes perfect sense.  This would be an easy
12   case if Harvard hadn't ever let in any Asian-American
13   applicant.  We would have won this on a Rule 12 summary
14   judgment.  It would be an easy case if they let in zero of
15   that 98 percent of Asian non-ALDCs.
16           Harvard is always going to admit some
17   Asian-American applicants.  We all know that.  And the fact
18   that in their virtual draft they prioritize the wealthy and
19   connected may be somewhat embarrassing to Harvard, but after
20   the evidence at trial, it's hardly surprising.  It makes
21   perfect sense.
22           Asian ALDCs are certainly less likely to be the
23   perpetual foreigner that Dean Fitzsimmons was alluding to.
24   They're the children of Harvard alumni, after all.  They have
25   something more, the Harvard DNA that Harvard likes so much.

1    It makes perfect sense.  Asian alumni of Harvard are
2    Harvard's donor and support base.  Why risk angering them and
3    losing those donations and support?
4          Makes perfect sense, Your Honor.  It's happened
5    before.  And I know you've expressed reticence, to put it
6    mildly, to invoke history here.  But I can point out that
7    several institutions of higher education in the last century
8    had the very same unlawful discriminatory policy that Harvard
9    today calls incoherent.  They had discriminated against Jews
10   who were not legacies while treating legacy Jewish applicants
11   more fairly.  They even enlisted the support of prominent
12   Jewish alumni to justify their schemes to keep the numbers of
13   undesirable Jewish students down.
14         And why did they do this?  Because of stereotypes
15   about those Jewish students, as among other things recent
16   emigrants or perpetual foreigners.  It's right in Jerome
17   Karabel's book at page 98.
18         You're right, Your Honor.  It's not terribly
19   relevant in the identity sense which institutions ran this
20   perfectly coherent if morally repugnant, sick system of
21   discrimination.  It's not terribly relevant that they
22   included Williams, Dartmouth, and Harvard.
23         But the history does tell us it's perfectly
24   coherent to prefer a subgroup of the unpreferred group to
25   cover one's tracks by allowing more of the desirable Asian or

1    Jewish applicant and less of the undesirables and to provide

2    a fig leaf of a justification to enroll the support of alumni

3    members of that unpreferred group.

4        It happened before, and it's happening again.  It's

5    about as far, sadly, from incoherent as one could imagine.

6        But Harvard tells you it's incoherent to accuse

7    someone that it and others have done before.  What scofflaw

8    employers of in violation of Title VII have done typically in

9    the sex discrimination context and which sadly and perversely

10   makes sense.

11       Two plus two equals five again.

12       Your Honor, I've reached the end of my initial time

13   with you.  I'm going to come back again and tell you that

14   Asian applicants didn't deserve lower personal ratings.  Will

15   Harvard explain to all of us why they did, or will they hide

16   behind omitted-variable bias and unidentified unobservables

17   without telling us on what omitted unobservable variable

18   Asians do so much worse than not just white applicants but

19   African-American and Hispanic applicants, too?

20       The school support ratings, they're in the model.

21   All the ratings are in the model.  Every variable Card could

22   find could not make the racial penalty on Asians go away.

23   Harvard never once has tried to explain what's going on in

24   the personal rating with African-Americans and Hispanics.  We

25   know what's going on.  It's a preference just like there's a

 1      penalty for Asians.

 2              The Court, however, does not have the luxury of

 3      silence.  For it to rule in favor of Harvard on Count I, it

 4      must explain why Asians deserved lower personal ratings.

 5              It's now Harvard's turn, finally, here at the end

 6      of all things, to tell us why.

 7              THE COURT:  I have three questions for you.  I want

 8      you to answer all three of them in less than two minutes.

 9              MR. MORTARA:  I can do it.

10              THE COURT:  I'm going to give you all three of them

11      so you can allocate your time.

12              To find for you, which is largely a statistical

13      argument you're making, must I find Harvard's witnesses not

14      credible?

15              MR. MORTARA:  No.

16              THE COURT:  That's number one.

17              Number two, what am I to do with the fact that you

18      haven't shown me any students that you think should have

19      gotten in instead of the non-Asian students that did get in?

20              And number three, what are we doing with *Goodman*

21      and its requirement --

22              MR. MORTARA:  I am ready.  I have *Goodman* to put up

23      on the screen.  I'll take the last one first, Your Honor.

24              The language you talked about from *Goodman* is up on

25      the screen now, Your Honor.  It is very clear from the

Case: 19-2005    Document: 00117629340    Page: 678    Date Filed: 07/30/2020    Entry ID: 6356615
Case 1:14-cv-14176-ADB   Document 666   Filed 07/01/19   Page 45 of 129

45

 1      context that racial animus is here being used just as

 2      interchangeably with intentional discrimination.

 3              But I don't even need to get there.  The Supreme

 4      Court held in *Gratz*, they found a Title VI violation in *Gratz*

 5      by the University of Michigan when there was absolutely no

 6      animus whatsoever.  That's a Supreme Court decision.

 7              Decisions both before and after *Goodman*, including

 8      *Croson* and *Adarand* say in the equal protection context, your

 9      motives don't matter.  You don't have to have animus to make

10      out an equal protection violation.

11              As you know, the Supreme Court's incorporated those

12      equal protection concepts into Title VI, and that includes

13      cases that postdate *Goodman*, like *Cooper*, cited in our brief.

14      No court has ever said that Title VI bizarrely sits out in

15      the family of Section 1981, 1983, Title VII, Title IX, and

16      the equal protection as the one anti-discrimination law we

17      have in this country where you have to prove evil racist

18      intent.

19              *Goodman* certainly does not say that.  If it did say

20      that, Your Honor, it's been overruled by subsequent Supreme

21      Court precedent.  *Gratz*, no one said -- no one said the

22      University of Michigan had invidious intent.  And there was a

23      Title VI violation found in that case.

24              Your Honor's first question was do you need to find

25      Harvard's witnesses were not credible or lied?

```
 1            Absolutely not, Your Honor.  Obviously we believe
 2    Mr. Luby wasn't credible on the use of race in the personal
 3    rating.  But I understood your question to be more general.
 4    Absolutely not.  *Thomas* against Eastman Kodak said that.
 5            There was a premise in your first question saying
 6    our evidence was largely statistical.  I have to quibble a
 7    little bit with you there.  I really like those new reading
 8    procedures, OIR, and I know there's pieces of evidence I
 9    didn't talk about that Your Honor has indicated are not
10    terribly persuasive to you.  But we are not running away from
11    them.  There are some emails and some jokes, including some
12    jokes you didn't let us put into evidence, that I think
13    support our case.
14            The second question is escaping me.
15            THE COURT:  You haven't showed me any students --
16            MR. MORTARA:  Sorry, Your Honor.  Because you told
17    us we didn't have to.  The answer to that one is you told us
18    that we didn't need to bring individual students in here and
19    prove their claims.
20            The *Segar* case from the D.C. Circuit is really
21    great on this.  It's true that circumstantial evidence can
22    give life and meaning, to breathe life into the statistics.
23    That's true.  But there is absolutely no requirement to bring
24    it.
25            We also gave you some anecdotal evidence.  We
```

**JA3604**

1    showed you that ice skater.  Remember the ice skater with the

2    low personal rating and everything else was out of sight

3    about that Asian applicant, yet that person did not get in.

4         We don't need to do it.  *Segar* says we don't need

5    to do it.  The very premise of associational standing cases

6    is we don't need to do it.

7         Thank you, Your Honor.

8         MR. LEE:  May I proceed, Your Honor?

9         THE COURT:  You may.

10        MR. LEE:  Good afternoon.  As we did in our closing

11   argument after trial, Mr. Waxman and I are going to split the

12   closing for the next hour.  After I offer an introduction,

13   Mr. Waxman will address the intentional discrimination claim

14   and the claim that Harvard does not use race as more than a

15   plus factor.

16        I will then address the claim of racial balancing

17   and the race-neutral alternatives.  Although SFFA hasn't

18   addressed those claims, they are important claims and they

19   were tried and litigated and we think they should be

20   addressed.

21        Let me begin again by thanking the Court and the

22   courtroom staff for the time and careful attention you've

23   given to this case.  As the Court noted at the very end of

24   the trial, the issues raised in this case are incredibly

25   important, not only for the parties but also for the future

Case: 19-2005    Document: 00117629340    Page: 682    Date Filed: 07/30/2020    Entry ID: 6356615
Case 1:14-cv-14176-ADB   Document 666   Filed 07/01/19   Page 48 of 129

48

1      of higher education.  And of course those issues are

2      critically important to Harvard's health.

3              And here with us in the courtroom today are the new

4      president of Harvard, Larry Bacow, Dean Fitzsimmons who you

5      know, and Director McGrath who you know.

6              We have trials for a reason, Your Honor, as you

7      know.  And it's not a coincidence that Harvard asked for a

8      trial in this case.  We have trials because cases should be

9      decided on the facts and evidence elicited under oath, not by

10     unsupported accusation and vitriol directed at lawyers or

11     individuals.  We have trials because of facts and the truth

12     matter.

13              Thirteen current and former Harvard employees and

14     administrators appeared in this courtroom and subjected

15     themselves to the crucible of cross-examination.  At the end,

16     we submit they left a singular and indelible impression.

17     They are good and dedicated people faced with the

18     exceptionally difficult task of selecting from an

19     extraordinary group of applicants in admitting a class of

20     students who are individually excellent and who collectively

21     form a diverse and robust community.

22              They make those decisions, as Your Honor knows, as

23     a result of a long process involving many checks and

24     balances, and ultimately as a group of 40 after reviewing the

25     entire applicant's file and understanding the applicant

**JA3606**

1    entirely.

2              The record of the trial that I was at is thousands

3    of pages and hundreds of exhibits.  But that collective

4    record demonstrates, we submit, that Harvard does not

5    discriminate against Asian-Americans or any other racial or

6    ethnic group; that Harvard does not consider race as more

7    than one among many factors in evaluating an applicant; that

8    Harvard does not and has not engaged in racial balancing; and

9    that it could not achieve its educational mission without

10   considering race as one of many factors in admissions

11   process.

12             Now, before we go into the claims in detail, I

13   would like to take a moment to discuss what is missing from

14   the record and answer Your Honor's third question to SFFA.

15             It is really remarkable.  The cases we have talked

16   to Your Honor about *Bakke*, *Grutter*, *Grace*, *Fisher*, *Fisher* 1,

17   *Fisher* 2.  They have those names because there was a

18   plaintiff.  There was an individual.  There was someone who

19   claimed to be discriminated against.

20             What you have is really remarkable.  No member of

21   SFFA testified.  Not a single one of its standing members

22   testified.  Not a single Asian-American applicant to Harvard

23   who was denied admission testified.  Not a single application

24   of any one of their standing members went into evidence.

25             And with the truly unexceptional -- truly

```
 1    insignificant exception, and I'll explain why in a second, of
 2    one file that its expert discussed, the plaintiff presented
 3    nothing.  And when their expert presented that one file that
 4    SFFA just referred Your Honor to, the expert conceded on
 5    cross-examine that it did not prove discrimination.
 6          Even after Your Honor in the middle of trial raised
 7    the issue and invited the plaintiff to reconsider the absence
 8    of any individuals who have been discriminated against, it
 9    offered nothing.  In a case alleging widespread intentional
10    discrimination across multiple years, 160,000 applicants, the
11    plaintiff's failure to produce a single individual claiming
12    to have suffered as a result of that discrimination or a
13    single file reflecting a discriminatory outcome is truly
14    remarkable.
15          Now, there were fact witnesses who did testify, and
16    they showed just how and why Harvard's admissions system
17    works and why it complies with the law.  Just like the
18    testimony of the trial witnesses in *Grutter* described in the
19    *Grutter* opinion, those witnesses confirmed that Harvard
20    considers an applicant's race along with all other factors;
21    that Harvard does not seek to admit any particular number or
22    percentage of underrepresented minorities; and that the
23    extent to which race is considered in admissions, to quote
24    from the case, varies from one applicant to another.
25          Now, as a result of the absence of this proof, the
```

 1       absence of any real-world proof that would bring to life

 2       their allegations and accusations, their claim has become a

 3       constantly moving target, which is why SFFA at the end of

 4       their closing just now spent so much time trying to justify

 5       their change in positions.

 6                   Let me give you two examples.  In opening

 7       statement, the plaintiff claimed at the outset that Harvard,

 8       Harvard's admissions office, bore intentional discriminatory

 9       animus against some Asian-American applicants.

10                   By closing, having failed to address any evidence

11       of animus, it retreated to the claim of, and I quote,

12       implicit or unconscious bias, and suggested it had crept into

13       the system.

14                   Now, in the posttrial briefing and in the closing

15       today, recognizing that there was no proof of unconscious

16       bias from an expert or otherwise, the plaintiff argues that

17       because people in the United States stereotype

18       Asian-Americans, Harvard has a burden to show that it has

19       uniquely escaped the infiltration of that bias.

20                   That's not the law, and Mr. Waxman will address it

21       specifically.

22                   THE COURT:  Can I interrupt you?  You can put this

23       off to Mr. Waxman, if you want, later.

24                   MR. WAXMAN:  Thank you, Your Honor.

25                   MR. LEE:  It depends how difficult it is, Your

Case: 19-2005    Document: 00117629240    Page: 686    Date Filed: 07/30/2020    Entry ID: 6356615
Case 1:14-cv-14176-ADB    Document 606    Filed 07/01/19    Page 52 of 129

52

1   Honor.

2        THE COURT:  If one were to believe that there was

3   implicit bias or unconscious bias of some sort or another, is

4   there no remedy for that?

5        MR. LEE:  Your Honor, I don't think -- I have two

6   parts to that, and I think Mr. Waxman will address it

7   specifically.  Let me give you my answer and maybe his will

8   be better.

9        The first thing is on this record there's just no

10  proof.  And the concept of -- and I think Your Honor got this

11  even as it started to creep into the trial, precisely what

12  implicit or unconscious bias is.

13       It's not some easily defined concept.  The question

14  of whether things that might fall within someone's rubric of

15  unconscious or implicit bias might, might satisfy the intent

16  requirement is something that I don't think Your Honor needs

17  to decide.  It's something that can't be decided on this

18  record.  And the whole concept doesn't have sufficient

19  specificity to decide it in the abstract.

20       I think the important part here is to go to Your

21  Honor's first question to Mr. Mortara.  They do have to

22  proffer intentional discrimination.  That's the claim.  The

23  fact that the claim has evolved to where it is today says a

24  lot about the evidence at trial.

25       And it's not just, Your Honor, the claim that's

 1    evolved.  It's the specifics of the claim.  Your Honor will

 2    recall in opening, if I go to Slide 4 of our presentation,

 3    the very first thing that SFFA said to the Court, to the

 4    public, was that it was not alleging that Harvard

 5    discriminates against Asian-American ALDC applicants.  Those

 6    literally were the first words of the trial.

 7            Why?  Because as we found out on cross-examination

 8    of their expert, he was not claiming that Harvard

 9    discriminates against Asian-Americans.  And I took him

10    through each category specifically.  It's on Slide 5.  He

11    agreed that Asian-Americans in those categories, if I move to

12    Slide 6, were actually admitted at higher rates than those --

13    than identical white applicants.  For legacy applicants, he

14    conceded on cross-examination the difference was

15    statistically significant.

16            It is very difficult to square that testimony or

17    that accusation of discrimination against some but not all

18    with an intentional discrimination case.

19            It's even harder, to go to Your Honor's question,

20    to square that with an unconscious bias or an implicit bias

21    case.  How does that work?  The plaintiff knows that, which

22    is why you heard what you heard in this closing.  What they

23    did is they have changed their theory 180 degrees.  They now

24    have claimed in their final filings that, oh, wait, actually

25    Harvard does discriminate against ALDCs, but they have a

1    problem.

2          First, it's just a 180-degree change in position.

3    The second is, if I take you to Slide 8, Professor

4    Arcidiacono testified that even taking into account any tip

5    given for being an ALDC applicant, Asian-Americans in these

6    categories are admitted at higher rates than white

7    applicants.  It is a concession that is inconsistent with the

8    intentional discrimination claim.

9          So, Your Honor, if I could, just on Slide 9s, let's

10   just compare what SFFA said when the trial started and what

11   it said last week.  When the trial started, Harvard did not

12   discriminate, according to them, against ALDCs.  They had to

13   say that because their expert actually conceded that ALDCs

14   were favored.  Asian-American ALDCs were favored.

15         Now, recognizing that that is a fatal flaw in their

16   argument, what do they say at the bottom?  Factually Harvard

17   does discriminate against ALDCs.

18         A 180-degree turn.  Recognizing that they have to

19   make these turns, change in theory, change in law, change in

20   facts, what did they do?  The same thing they did and I

21   mentioned to you at the closing three months ago, they

22   attacked the witnesses.  They attacked the lawyers.  They

23   attacked them in ways for which there's no justification.

24         So as we move into the specific claims, Your Honor,

25   let me start with important proof in the case that

1       Mr. Mortara didn't address, and that is Harvard's compelling

2       interest in achieving educational diversity and the benefits

3       of that diversity.  That's important because it is the

4       predicate for what Harvard's done.  It is a predicate for

5       what the Supreme Court has said.

6               So if I turn to Slide 10, the Supreme Court has

7       told us in *Fisher* 2 that once a university gives a reasoned,

8       principled explanation for its decision to pursue those

9       benefits, that decision on the compelling interest of

10      diversity gets some deference.

11              On this record, we submit that Harvard has supplied

12      a reasoned and principled explanation for its decision to

13      pursue the educational and community benefits of diversity.

14              Harvard's commitment to the benefits of diversity

15      and its articulation of those benefits, on Slide 11, can be

16      found in the mission of Harvard College.  It can be found on

17      Slide 12 in the report from President Rudenstine.  And most

18      recently, it can be found on Slide 13 in the report of Dean

19      Khurana's committee, adopted unanimously by the full faculty

20      of arts and sciences, concluding that that student-body

21      diversity, including racial diversity, is essential to

22      Harvard's pedagogical mission, pedagogical objectives, and

23      institutional mission.

24              Perhaps more importantly, Your Honor, this interest

25      in a diverse student body was reflected by the day devoted to

**JA3613**

Case: 19-2005   Document: 00117629240   Page: 690   Date Filed: 07/30/2020   Entry ID: 6356615
Case 1:14-cv-14176-ADB   Document 666   Filed 07/01/19   Page 56 of 129

56

1    the testimony of the Harvard students themselves.  Your Honor

2    heard from several of those students.  You heard their own

3    stories and how they and their classmates have benefited from

4    living and learning from each other in a diverse community.

5         These students, these eight students who came to

6    testify and took the stand, are living proof that Harvard has

7    a compelling interest and we all have a compelling interest

8    in communities that are diverse and inclusive.

9         Let me now turn the podium over to Mr. Waxman to

10   turn to the intentional discrimination count.

11        MR. WAXMAN:  Good afternoon, Your Honor.  I'll

12   start first with the claim of intentional discrimination and

13   then cover the race is more than a plus factor count of the

14   complaint, which is not addressed in the closing argument but

15   is something that Your Honor needs to rule on.

16        THE COURT:  And I have some questions on that.  So

17   I would appreciate it.

18        MR. WAXMAN:  So the legal standard on intentional

19   discrimination, as Your Honor already adverted to, is pretty

20   straightforward.  It's the one that Your Honor stated in

21   denying summary judgment.  It's from *Goodman*, and it says

22   that to state a claim for intentional discrimination under

23   Title VI, the plaintiff, quote, must demonstrate that the

24   defendant discriminated on the basis of race, the

25   discrimination was intentional, and the discrimination was a

**JA3614**

1    substantial or motivating factor for the defendant's actions.

2         There wasn't any dispute about that until SFFA

3    filed its first posttrial brief.  Before then, SFFA agreed

4    with the Court and with Harvard on two fundamental points:

5    number one, the plaintiff bears the burden to prove

6    intentional discrimination; and number two, the *Arlington*

7    *Heights* standard governs the inquiry.

8         Now, SFFA has now tried to change course on both

9    points.  Those new arguments are obviously inconsistent with

10   the Court's prior ruling, and they are incorrect.  But they

11   are also largely irrelevant, given the evidence adduced at

12   trial.

13        First, as to the burden.  SFFA's basic argument in

14   its posttrial briefs is that because Harvard considers race

15   in its admissions process, Harvard bears the burden to show

16   that its practices survive strict scrutiny.

17        But that argument doesn't distinguish between the

18   consideration of race in pursuit of diversity, which Harvard

19   does engage in, and the allegation in Count I that Harvard

20   discriminates intentionally against Asian-American applicants

21   relative to white applicants, which we vociferously dispute

22   and which would, in any event, have nothing to do with the

23   pursuit of diversity.

24        SFFA's claim in Count I depends on that second

25   disputed proposition, and SFFA bears the burden to prove it.

Case: 19-2005   Document: 00117629240   Page: 692   Date Filed: 07/30/2020   Entry ID: 6356615
Case 1:14-cv-14176-ADB   Document 666   Filed 07/01/19   Page 58 of 129

58

1    It can't evade its burden to prove intentional discrimination

2    against Asian-American applicants relative to white

3    applicants simply because it's undisputed that the admissions

4    process considers race as a plus factor in other ways.

5         This level of confusion in their part -- and maybe

6    it's just confusion -- was reiterated just now when my friend

7    cited the Supreme Court's decision in *Gratz* as evidence that

8    intentional discrimination doesn't require intentionality.

9         Let's be very clear.  *Gratz* was not a case about

10   intentional discrimination.  *Gratz* was a case in which the

11   University of Michigan undergraduate program was concededly

12   using race pursuant to a diversity rationale, and the Supreme

13   Court held that it failed strict scrutiny.  It had nothing to

14   do with any burden to prove intentional discrimination.

15        Now, second, as to *Teamsters*.  There are several

16   reasons why it's essentially irrelevant whether *Teamsters* or

17   *Arlington Heights* applies.  One is that no one disputes that

18   SFFA can seek to rely on aggregate statistical evidence as

19   part of its claim.  So the only serious question is whether

20   the Court should apply the *Teamsters* burden shifting

21   framework in evaluating that statistical evidence.

22        Even if that framework did apply, and even if

23   Dr. Arcidiacono's analysis were reliable and stark enough to

24   establish a prima facie case of intentional discrimination,

25   which as I'll explain it certainly is not, even in that

**JA3616**

```
 1    event, Harvard's only burden in response would be one of
 2    production, to put in evidence a competing analysis that
 3    calls Dr. Arcidiacono's into question.  We've obviously done
 4    that.
 5              So at the end of the day under Teamsters or
 6    Arlington Heights, the Court still has to resolve the
 7    question whether Harvard intended to discriminate, and it
 8    still has to do that by considering all the evidence,
 9    nonstatistical and statistical.  And under either standard,
10    statistical evidence isn't enough unless it is far, far more
11    stark than anything here.
12              The Supreme Court cases that -- the Supreme Court
13    subsequent later cases and circuit court cases have talked
14    about without exception are Yick Wo and Gomillion, which are
15    cases in which the disparity was so incredible, they rezoned
16    the City of Tuskegee to exclude all black people and include
17    all white people, that the Court said in that rare instance
18    the proof of a statistical disparity can in and of itself be
19    evidence of intentional discrimination.
20              THE COURT:  What am I to do with the statistical
21    analysis that shows a penalty on the personal rating?  Or if
22    you're going to get to that, keep going.
23              MR. WAXMAN:  It would be a criminal default for me
24    not to get to it, given the emphasis.  I'm happy to answer
25    any questions.
```

**JA3617**

        1              THE COURT:  You can go in your orderly way.  They

        2       have the no-victim problem, but you guys have the personal

        3       rating.

        4              MR. WAXMAN:  Absolutely.  What I want to say here

        5       is that even if the Court were to credit Dr. Arcidiacono's

        6       methodology and accept his model, that would not carry SFFA's

        7       burden under Count I.

        8              Now, let me start -- I'll talk about the

        9       nonstatistical evidence and then I'll talk about the

       10       statistical evidence.

       11              SFFA has told this Court in its posttrial

       12       briefings, and it said as much during the trial, that it

       13       views its nonstatistical evidence of intentional

       14       discrimination as "not particularly important."

       15              That is an incredible concession.  SFFA received

       16       more than 100,000 pages of documents.  It took dozens of

       17       depositions of witnesses of its choice.  By its own

       18       admission, it has little, if anything, to show for that.

       19              What the evidence showed is that Harvard engages in

       20       a dedicated effort to recruit students from all states,

       21       across all socioeconomic strata, and of all races.  It showed

       22       that Asian-Americans are one of the five demographic groups

       23       targeted by the undergraduate minority recruitment program.

       24       It showed an admissions process that is driven by open

       25       discussion among 40 people, a process in which every

1      admissions officer has complete access to every application
2      file, a process in which the ratings that the initial readers
3      assign are not used to decide who gets in and who does not
4      but rather as an initial shorthand reflection of some of the
5      information that admissions officers consider in making their
6      decisions.
7              You heard live testimony from eight members of the
8      admissions office.  SFFA says that those witnesses can't be
9      believed, that there is no reason for Your Honor to believe
10     them.
11             Each described the same process.  They consistently
12     explained that they based their decisions on the full range
13     of information that is available to them.  They consistently
14     explained that everything in the application file matters,
15     with race as one of many factors that is considered.  And
16     they consistently explained that they have never seen any
17     evidence of bias or discrimination in the process.  That is
18     the nonstatistical record in this case, which is why SFFA
19     wishes that it were "not particularly important."
20             Now, SFFA keeps telling us that the law doesn't
21     require it to produce smoking-gun evidence.  That is true,
22     But it is equally true that the absence of any direct
23     evidence of discrimination is a powerful indication of the
24     absence of discrimination especially in a process that has so
25     many participants as Harvard's does.

**JA3619**

 1          It's not just that SFFA has failed to supply a

 2   smoking gun.  They failed to provide evidence of a single

 3   victim of discrimination.  They have failed to find a single

 4   current or former employee who has witnessed even one

 5   instance of discrimination.  In a case in which SFFA says

 6   that scores of Asian-American applicants are denied admission

 7   each year because of intentional discrimination, where is the

 8   evidence?

 9          Well, SFFA's expert, who said that he read 480

10   files and many more summary sheets, discussed, as we heard

11   again today, the figure skater, a single application that in

12   his view might suggest discrimination because a qualified

13   Asian-American candidate was denied admission.

14          As Your Honor knows, literally thousands of

15   students with perfect scores and/or perfect GPAs are denied

16   admission every year.  Applicants of all races with

17   compelling stories and competitive credentials are not

18   admitted.  Tellingly, SFFA asked no Harvard witness, not a

19   single one of them, about that rejected applicant or any

20   other.

21          So what does SFFA point to?  Pardon me.  I'm on

22   what I hope is the back end of the flu.

23          THE COURT:  Is it your Marco Rubio moment?

24          MR. WAXMAN:  Excuse me?

25          THE COURT:  Is it your Marco Rubio moment?

1          MR. WAXMAN:  So first of all, SFFA says that

2    Harvard discriminates in its recruiting practices against

3    Asian-Americans who live in what the admissions office calls

4    Sparse Country.

5          Here are the relevant facts.  For the classes of

6    2014 to 2016, Harvard sent recruiting letters to

7    Asian-American students across the country who scored lower

8    on the PSAT than the white students who received those

9    letters.  For the classes of 2017 through 2019, in most

10   states Harvard sent recruiting letters to Asian-American and

11   white students at identical thresholds.

12         In those three years, in the Sparse Country states,

13   Harvard sent recruiting letters to white students who

14   received lower PSAT scores than Asian-Americans, but at the

15   same time Harvard applied an identical cutoff on the ACT for

16   sending recruiting letters to Asian-American and white

17   students in Sparse Country.  And as Your Honor heard, the ACT

18   is by far the dominant test in those states.

19         That is their grand recruiting conspiracy.  There

20   was no evidence that the difference in the PSAT cutoff for

21   those three years was intentional, there was no evidence that

22   it was a result of unconscious bias, and there was no

23   evidence that it mattered.  Harvard does not provide an

24   admission tip to applicants who receive recruiting letters.

25         Now, next let me address the work of Harvard's

 1    Office of Institutional Research.  SFFA says that OIR's work

 2    provides key support for its intentional discrimination claim

 3    and that Dean Fitzsimmons's reaction to OIR's work

 4    establishes deliberate indifference to discrimination.  Those

 5    assertions bear no relation to reality.

 6          You'll recall that initially SFFA focused much of

 7    its attention on a document prepared by Mark Hansen, who you

 8    heard.  This is Plaintiff's Exhibit 9.  But at trial,

 9    Mr. Hansen explained that the document comprised his working

10    notes, that he doubted he ever shared it with anyone,

11    including his boss, Ms. Driver-Linn, and certainly not Dean

12    Fitzsimmons, which is unsurprising because it's full of

13    errors.  The subtitle is "Subtitle."  The date is wrong by a

14    year.  Entire pages of these working notes, including notably

15    the conclusion page, are blank.

16          For her part, Ms. Driver-Linn testified she'd never

17    even seen Exhibit 9 before this litigation and certainly

18    didn't show it to Dean Fitzsimmons.

19          And yet, unconstrained by the record, in its

20    posttrial briefings SFFA continues to insist that Dean

21    Fitzsimmons saw this document.  In its finding of fact 118,

22    SFFA says, "OIR gave this report to Fitzsimmons."

23          In its response, SFFA doubles down, claiming in

24    Paragraphs 175 through 177 that "Fitzsimmons was shown

25    Exhibit 9 before this litigation, as were Driver-Linn and

**JA3622**

1   Bever, and that it "provided Fitzsimmons with extensive

2   statistical evidence that Harvard penalizes Asian-Americans."

3          Not only does SFFA have no evidence to support

4   those assertions, the evidence at trial flatly contradicts

5   them.  Now, OIR did show Dean Fitzsimmons the four models

6   that so preoccupied us all at trial to simulate what the

7   admitted class would look like under certain oversimplified

8   admissions practices.

9          As Mr. Hansen explained those models, which were

10  his very first effort ever at using statistical regression,

11  were not meant to show the effect of any given factor in the

12  admissions process.  They omitted far too many factors to do

13  so.

14          And as Your Honor heard, the fact that the racial

15  composition of the simulated class so closely matches that of

16  the actual class signified nothing.  It's simply a function

17  of the circularity of the model that Mr. Hansen used which

18  used the racial composition of the actual class in order to

19  predict the racial composition of the hypothetical class.

20          For his part, since this is all about Dean

21  Fitzsimmons, Dean Fitzsimmons testified that his takeaway

22  from this was simple.  The more factors you add to a model of

23  the admissions process, the more closely you resemble

24  reality.  He certainly did not view OIR's work as evidence of

25  discrimination.

1          SFFA then invokes the memorandum that OIR sent Dean

2    Fitzsimmons about low-income applicants, claiming that the

3    dean did nothing in response.

4          Once again, that's not true.  In response to that

5    memorandum, the dean asked OIR to look into whether

6    low-income Asian-American applicants received a tip.  The

7    answer was, yes, a low-income tip as large or larger than the

8    one given to applicants of any other race.  The dean

9    explained to you under oath why he was reassured.

10         Your Honor, this is an intentional discrimination

11   case.  Why on God's green earth, in a system that intended to

12   discriminate against Asian-American applicants, would the

13   dean ask for, receive, and then be reassured by data that

14   showed him and he was told that Asian-American applicants

15   receive perhaps the most significant low-income tip of any

16   group?

17         In other words, the reason Dean Fitzsimmons didn't

18   sound the alarm in response to the documents, as SFFA says he

19   should have, is that he didn't understand the documents even

20   to show smoke, let alone a fire.

21         Now, in its posttrial brief the plaintiff has

22   offered an explanation for how to interpret the chart of

23   coefficients that are attached to the low-income memo.  On

24   their face, P28 offers no such explanation.  There is no

25   evidence from which the Court can infer that Dean Fitzsimmons

1    should have understood those charts as SFFA claims they were

2    meant to be understood.  Even Ms. Bever, who was the deputy

3    director of OIR and was involved in the creation of this

4    document, disagreed that SFFA's interpretation -- that is,

5    Dr. Arcidiacono's interpretation -- was the correct one.

6    That is on pages 234 to 236 of the transcript of October 18.

7           Even if SFFA were correct that Dean Fitzsimmons

8    should have done more in response to OIR's work, that would

9    get SFFA no closer to proving intentional discrimination.

10   Even if this Court were to import the deliberate indifferent

11   standard from Section 1983 cases into the Title VI context,

12   SFFA would still have to show that the dean actually knew

13   that the admissions office was actually discriminating but

14   chose to do nothing.

15          Now, we've seen on the chart the coefficient that

16   Mr. Mortara showed you with a negative 0.37 attached to

17   Asian.  He says that showed Dean Fitzsimmons, who apparently

18   taught introductory statistics in the 1960s, that this was

19   discrimination.  But Dean Fitzsimmons wouldn't have learned

20   much about statistics if he thought that that showed

21   discrimination.  It doesn't.  It shows a weak correlation

22   with between Asian-American ethnicity and outcomes in a very,

23   very incomplete model.  Just as, Your Honor, OCR found a

24   disparity between Asian-Americans and white applicants, and

25   yet doing the work of -- doing the heavy work of auditing the

1      files found no evidence of discrimination.

2              SFFA did not argue, nor could it, that the dean

3      actually knew that the admissions office was actually

4      discriminating.  Its theory, at most, is that OIR's work put

5      Dean Fitzsimmons on notice of the possibility of

6      discrimination.  Under the case law, a failure to investigate

7      a possibility of discrimination, even if proven, which it was

8      not, does not establish intentional discrimination.

9              So now let me turn to another focus of what has

10     morphed into SFFA's case about intentional discrimination,

11     which is stereotypes.

12             SFFA says that Harvard, through no fault of the

13     good people in the admissions office, are engaging in anti

14     Asian-American stereotypes.  As Mr. Lee observed earlier,

15     this is the latest in SFFA's progression of theories of

16     discrimination in search of facts.  But here again, there is

17     just no evidence of stereotyping.  None apparently that SFFA

18     could find in the hundreds of application files and summary

19     sheets that were produced.

20             That's why SFFA spent so much time in its posttrial

21     findings about a handful of comments that the Office of Civil

22     Rights found in files that it reviewed in the late 1980s.

23     It's why its posttrial briefs cite a government report in

24     multiple law review articles for the proposition that

25     stereotyping occurs in the world.  That's why SFFA quotes at

1    length in its posttrial filings, and in the present tense,

2    from an article that Margaret Chin prepared 36 years ago,

3    without bothering to acknowledge Ms. Chin's testimony in this

4    very court about the immense strides that have been made

5    since then, not just generally but at Harvard in particular.

6            SFFA did all that because it has no actual evidence

7    of stereotyping in Harvard's admissions process.  It points

8    to a handful of comments in a single docket binder that

9    itself contains handwritten notes with respect to between

10   four and 5,000 applicants.  It deemed two of those notes

11   important enough to feature at trial.

12           In one comment, the applicant is noted as "very

13   quiet."  And in another comment, "quiet and strong."  Those

14   two applicants cherry-picked out of this binder happened to

15   be Asian-American.

16           What SFFA did not do was to ask Dean Fitzsimmons,

17   or for that matter, any of the other seven witnesses from the

18   admissions office, about other comments in the same docket

19   binder that describe white, African-American, and Hispanic

20   applicants as "shy," "understated," "quiet."  There is no

21   reason to believe that any of these notations are anything

22   other than accurate characterizations of the applicants.

23           I guess I'd better get going.

24           When OCR did its review, it noted that certain

25   comments that might be characterized as stereotypical had,

**JA3627**

1    quote, actually originated from the interviews, teacher or

2    counselor recommendations, or self-descriptions given by the

3    applicant.  But when it went on to examine the files, it

4    found no evidence of discrimination by stereotype.  Here SFFA

5    hasn't even tried to tie any supposed stereotypical language

6    to any adverse outcomes.

7            The charge that Harvard is engaged in racial

8    stereotyping, a practice that Dean Fitzsimmons characterized

9    as aberrant and deeply offensive, is utterly unsupported by

10   the record.

11           Let me now turn to the statistical evidence.  And

12   for the sake of relative simplicity, I'll focus on two

13   issues, the descriptive statistics and the personal rating.

14           SFFA has given up lots of descriptive statistics

15   showing differences in rating or admission outcomes by race,

16   generally focusing on the academic index deciles, which just

17   compare applicants with similar high school grades and SAT

18   scores.

19           Those statistics don't try to analyze the effect of

20   a given factor controlling for others.  That's what a

21   regression does.

22           Because SFFA's statistics don't control for the

23   many noneconomic factors that matter so much in the process,

24   or even for the academic factors beyond high school scores,

25   they tell you very little.  To a very significant degree, the

1    descriptive statistics just reflect Harvard's persistent and

2    wrong-headed view that the admissions process is all about

3    high school grades and test scores.

4         Let's turn now to the regression analysis.  The

5    main dispute having to do with the regression analysis, the

6    only one we really heard today, has to do with the personal

7    ratings.  You have heard sworn testimony in which admissions

8    officers sat in that witness chair and testified over and

9    over again that they do not consider race in assigning the

10   personal rating.

11        Here are just a few of the key pieces of testimony.

12   Their testimony was consistent and credible, and nothing in

13   the class of 2023 reading procedures is to the contrary.

14        Those procedures, as Director McGrath testified,

15   simply codify Harvard's consistent practice.  So the real

16   question in this case as to the personal rating, Your Honor,

17   is whether there is enough statistical evidence that race

18   is -- race per se is considered in the personal rating for

19   Your Honor to conclude that those admissions officers are all

20   either lying or mistaken.  The answer to that question is no,

21   and it is not close.

22        First, recall that OCR found a very similar

23   difference between the average personal rating of

24   Asian-American and white applicants.  OCR did not find,

25   nonetheless, on a further review of the files that race was

**JA3629**

1    an element of the personal rating.  It told you -- it stated

2    in its report that it went and did the actual file review to

3    determine whether racial differences observed in the rating

4    factors could reflect racial bias.  It did the work that SFFA

5    either didn't do or didn't tell us about, and it issued a

6    report concluding that the answer was no.

7            SFFA is relying on Dr. Arcidiacono's regression

8    model of the personal rating.  But as Dr. Card explained,

9    there is a difference between correlation and causation.

10   Regression estimates can't measure causal effects unless the

11   model controls for all factors that are correlated with a

12   variable of interest and that affect the outcome.

13           A regression just spits out a number.  And if the

14   regression is missing information that could help explain the

15   outcome, then the number that the regression spits out simply

16   doesn't tell you whether that factor is actually causing the

17   estimated effect.  That's what Dr. Card showed you with his

18   whiteboard example about how age and salary affected a

19   worker's likelihood of retirement.

20           Now, SFFA, in its posttrial briefings, makes what

21   is really an astonishing assertion, which is the assertion

22   that if the effect that is estimated by a regression is

23   statistically significant, then it must be a genuine causal

24   effect.

25           I can't even begin to tell you how wrong that is.

 1    If a regression is missing relevant factors, it may estimate

 2    statistically significant effects that are not genuine causal

 3    effects.  Nobody versed in statistics could possibly agree.

 4    I am certain that if Dr. Arcidiacono were on that stand

 5    today, he'd tell you how wrong it is.

 6            So now back to the personal rating.  Everyone

 7    agrees that there are many, many factors that are not

 8    included in the model that affect the personal rating.

 9    Indeed, the factors in Dr. Arcidiacono's model explain only

10    29 percent of the variation in the personal rating.

11    71 percent of the information that goes into determining what

12    the personal rating would be is unobserved.  It is not

13    available in the data.

14            The question for Your Honor with respect to this

15    point is whether the negative effect that is estimated by

16    Dr. Arcidiacono's model can be attributed to those factors,

17    the 71 percent that is outside the record.

18            SFFA says no.  And the reason it gives is that

19    Asian-American applicants are supposedly stronger than white

20    applicants on the factors that are in the data that affect

21    the personal rating.  If that's true, SFFA says, it's fair to

22    assume that they are also stronger on factors outside the

23    data.  And if that's true, then the negative estimate that

24    Dr. Arcidiacono's model produced may not be attributable to

25    the 71 percent of factors that are outside the data.

1          The problem with this entire hypothesis of

2     Dr. Arcidiacono is that SFFA is wrong about the premise.  The

3     applications submitted by Asian-American applicants are not

4     stronger than those of white applicants on the factors in the

5     data that affect the personal rating.  As Dr. Card showed,

6     precisely the opposite is true.  White applicants on average

7     scored higher than Asian-American applicants on the school

8     support ratings.  The same was true for the alumni ratings.

9          And Dr. Card showed the very same thing for the

10    combination of all non-academic factors in the model.  And he

11    did it twice, both with a slide with the personal rating and

12    the ALDC characteristics included, and then with a slide with

13    those two things excluded.

14         The reason that Dr. Arcidiacono obtained a contrary

15    result was because he removed the ALDC applicants who are

16    mostly white and indeed are many of the very strongest white

17    applicants.  And by larding into his model academic data,

18    even though the personal rating reflects non-academic

19    factors, not academic factors, the Court -- in answer to

20    Mr. Mortara's rhetorical challenge here, the Court doesn't

21    have to find the reason, as if there is the reason, that

22    these Asian-American applicants in the database received

23    marginally lower personal ratings on average.  It just has to

24    find that SFFA has failed to prove that the cause of this

25    disparity was racial bias.  When one after another admissions

1    officer testified that they don't consider race, and when, as

2    Dr. Card explained, Dr. Arcidiacono's model of the personal

3    rating didn't come close to proving a causal effect of race.

4            Now, one last point on the personal rating.  SFFA

5    keeps saying, as if repetition will make it true, that if the

6    personal rating is somehow affected by race, that it has to

7    be removed completely from the model.

8            Dr. Card explained in detail why that isn't right.

9    Even if the personal rating were affected to some degree by

10   race, it nonetheless captures a tremendous amount of

11   information that isn't affected by race and that is otherwise

12   unobservable, like applicant essays, for example, or

13   recommendation letters other than the two teacher letters and

14   the guidance counselor letters.

15           So even if a hypothetical situation in which a

16   portion of the personal rating could be fairly attributed to

17   racial bias, that is the marginal effect that Dr. Arcidiacono

18   found, the right thing wouldn't be to throw out the personal

19   rating entirely, it would be just to take out the part that

20   is supposedly affected by race.

21           And as you saw when Dr. Card adjusted the profile

22   ratings from that way, he found again no evidence of bias

23   against Asian-American applicants.  That is the analysis that

24   SFFA really doesn't want you to think about, which is why

25   they keep saying incorrectly that the only option is to take

1       the rating out.

2              Their exclusion of the personal rating is just

3       emblematic of the consistent difference between their

4       analysis and ours.  Harvard's analysis tries to model the

5       actual admissions process, and they don't.  Their preferred

6       model excludes the ALDCs, fully 30 percent of the admitted

7       students.  It ignores factors that demonstratively matter to

8       the admissions outcomes, like the staff interview, parental

9       occupation, intended career, and of course the vast

10      information that is reflected in the personal rating.

11             By contrast, Harvard's analysis includes the data

12      that SFFA wishes to ignore, although the admissions committee

13      considers.  It includes the applicants that SFFA wishes to

14      ignore, and its faithfulness to the process leads to a more

15      reliable measure of the effective race.  That analysis shows

16      that race has no effect on the admission of Asian-American

17      applicants relative to white applicants.

18             That was true, as Your Honor saw in Dr. Card's main

19      model, which I've just described.  It is true when you allow

20      the effects of the ALDC characteristics to vary by race and

21      vice versa, which SFFA insisted should be done.  Same

22      results.  It's true when you exclude recruited athletes,

23      which are -- SFFA said somehow their inclusion biases the

24      result because for athletes things like academics don't

25      matter that much.  He excluded the recruited athletes, same

1    result.

2            And it's true when you modify the profile ratings

3    to remove the supposed effects of race, that is the marginal

4    effects that Dr. Arcidiacono found when modeling the factors.

5            So to sum up, even if in theory an intentional

6    discrimination case could be based only on statistics, a

7    circumstance that is reserved under governing case law not

8    for any case in which some expert can come up with a

9    statistically significant effect, but for exceptionally stark

10   cases like *Yick Wo* and *Gomillion*, the statistical evidence in

11   this case doesn't even establish a correlation between

12   Asian-American ethnicity and admissions outcomes, much less

13   that Harvard intentionally discriminates against

14   Asian-American applicants.

15           So in my remaining three to four minutes, I'll

16   address the more than a plus factor count.  Again let me

17   start by summarizing the law, which is largely undisputed, at

18   least in its broad outlines.  I've displayed the key points

19   on the slides here.

20           The Supreme Court has held that a university may

21   consider race only as a plus in a particular applicant's file

22   without insulating the individual from comparison with all

23   other candidates for available seats.  It's held that when

24   using race as a plus factor, a university's admissions

25   program must remain flexible enough to ensure that each

Case: 19-2005    Document: 00117629240    Page: 712    Date Filed: 07/30/2020    Entry ID: 6356615
Case 1:14-cv-14176-ADB   Document 666   Filed 07/01/19   Page 78 of 129

78

 1    applicant is evaluated as an individual, not in a way that

 2    makes the applicant's race or ethnicity the defining feature.

 3            And the Court has forbidden, quote, mechanical

 4    predetermined diversity bonuses based on race or ethnicity,

 5    but conversely, it's made clear that race can make a

 6    difference as to whether an application is accepted or

 7    rejected.

 8            The evidence in this case showed that Harvard's

 9    consideration of race satisfies those requirements in every

10    respect.  Admissions officers took the stand one after

11    another, and they testified that they consider race as only

12    one among many other factors.  They don't award any fixed or

13    formulaic preferences, and they consider race in an

14    individualized way in the context of each applicant's life

15    story.

16            SFFA tries to support its contrary argument by

17    relying on statistical evidence.  But let's look at the full

18    story on those statistics, which are essentially undisputed.

19            First, the statistics show that knowing an

20    applicant's race tells you almost nothing about whether he or

21    she will be admitted.  I'm sure Your Honor -- well, I'm not

22    sure.  In light of Your Honor's recent labors, maybe you

23    don't remember the slide.

24            But then that takeaway is if you know the

25    applicant's race and nothing more, you can explain 2/10 of

**JA3636**

1    1 percent of the probability that that person will be

2    admitted.  That is an incredible number, and it proves that

3    race is anything but the defining feature of the admissions

4    process.

5            Secondly, the statistics show that for highly

6    competitive applicants who would be on the bubble for

7    admission, no matter what their race, any number of factors,

8    including but by no means limited to race, have a meaningful

9    effect.

10            To understand why, recall again Dr. Card's

11    retirement example.  If you're 40, growing a year older isn't

12    going to significantly affect your likelihood of retirement.

13    If you are 78, the same is true, you're probably going to

14    retire anyway.  If you are 67 or 68 and right on the bubble

15    of retirement, then the additional year may mean a lot.  And

16    the same is true for admission to Harvard.

17            Here is the graph that Dr. Card used, showing that

18    there are basically no applicants who are assured of

19    admission to Harvard.  There are lots of applicants who

20    effectively have no chance.  There are about 25 percent who

21    are, as he called it, on the bubble.  That is, given the

22    constellation of the strengths in their application,

23    competitive enough that any one additional factor can push

24    them over the top, it's for those people that race can and

25    does have a meaningful effect and so can many other factors.

1          That's shown by the graphs on the next slide.  For

2     most applicants, race has no effect whatsoever on their

3     likelihood of admission.  It has a meaningful effect only for

4     candidates who would be competitive for admission no matter

5     what their race.  And for those candidates, the effect of

6     race isn't disproportionate to the effect of other factors

7     like academic excellence, extracurricular excellence, or

8     excellent personal qualities.

9          Every additional factor has a large effect for

10    highly competitive candidates.

11         Now, SFFA likes to emphasize that in the aggregate

12    the consideration of race significantly increases the number

13    of African-American and Hispanic students at Harvard.  That

14    is true.  That is a feature of the system, not a bug.  It's

15    not only permitted by the Supreme Court's jurisprudence, it's

16    expressly envisioned by it.

17         The Supreme Court recognized in *Fisher* 2 that race

18    can "make a difference to whether an application is accepted

19    or rejected."  It raised that the whole point of considering

20    race is to increase the admission of minority students who

21    otherwise "might not be represented in meaningful numbers."

22         Indeed, the Court in *Fisher* pointed favorably to

23    the fact that the consideration of race in that case caused a

24    54 percent increase in Hispanic candidates and 94 percent

25    increase in African-American candidates enrolled through the

1   University of Texas's holistic review program, an effect the

2   Court called "meaningful if still limited."

3           And in *Parents Involved*, a case that SFFA loves to

4   invoke, the Court pointed favorably to the fact that in

5   *Grutter*, consideration of race was necessary to achieve

6   diversity because doing so tripled minority enrollment.

7           I'm ready to turn the podium over to the marvelous

8   Mr. Lee.

9           MR. LEE:  Your Honor, let me turn to the claim that

10  Harvard engages in racial balancing.

11          Again, as Mr. Waxman did in each of the claims, let

12  us set out what the law is.  In Slide 48, we have what the

13  Supreme Court explained that a university is not permitted to

14  define diversity as some specified percentage of a particular

15  group merely because of the race or ethnic origin of the

16  group.  But the Court also explained that some attention to

17  numbers without more does not transform a flexible admissions

18  system into a rigid quota.  The evidence shows that Harvard

19  complies with just this longstanding precedent.

20          At Slide 49, each and every admissions officer who

21  testified consistently that there are no targets, there are

22  no quotas, on Slide 50.  There are no floors on Slide 51.

23  And Dean Fitzsimmons confirmed that for the entirety of the

24  time he's been there.

25          That testimony is also supported by the statistical

Case: 19-2005    Document: 00117629340    Page: 716    Date Filed: 07/30/2020    Entry ID: 6356615
Case 1:14-cv-14176-ADB    Document 666    Filed 07/01/19    Page 82 of 129

82

1    evidence, largely uncontested, which shows meaningful

2    year-to-year differences in the racial composition of

3    Harvard's admitted and matriculating classes.

4         The plaintiff, Your Honor, disputed none of this,

5    not today in closing, not in the first closing, and not

6    during the course of the trial.  To remind Your Honor, their

7    expert had an opinion on racial balancing in his report.  He

8    did not offer it.  He did not offer it at all, or any other

9    opinion.

10        So having no expert opinion, what does SFFA rely

11   upon?  It relies upon the recruitment letters for Sparse

12   Country, which Mr. Waxman has already addressed, and I'm not

13   going to reiterate the chronology of those letters.

14        And the one-pagers.  So let me talk really quickly

15   about the one-pagers.  At Slide 56, Your Honor, we have the

16   different categories that the one-pagers include.

17        There is, as Your Honor knows, much more

18   information than just race.  They include information on

19   gender, geography, intended major, legacy status, residency,

20   and financial aid.  They're used to keep a rough tab or rough

21   finger on how the composition of the tentatively admitted

22   class compares to that of prior classes across all of these

23   different dimensions.

24        Now, the plaintiff suggests that the fact that

25   these one-pagers were created as key milestones in the

1     admissions cycle is evidence that too much attention is being

2     paid to the numbers.  It is not.  It is not surprising that

3     the dean and director of admissions want to be aware if there

4     is a dramatic drop-off in the diversity of the class in any

5     dimension.

6            That's exactly the kind of attention to numbers the

7     Supreme Court expressly held does not transform a flexible

8     admissions system into a rigid quota.  And if Your Honor

9     considers the *Grutter* decision, you will see that the dean of

10    admissions was receiving daily one-pager reports during the

11    height of the admissions season in exactly the same way that

12    Harvard does.

13           As Your Honor has heard, the primary purpose of the

14    one-pagers is to ensure that Harvard, a residential college

15    with a fixed number of beds, does not admit more students

16    than it has room for.  The yield rate, the percentage of

17    admitted students who then decide to come to Harvard, varies

18    by categories, and the category is listed on the one-pagers.

19           If the tentatively admitted class has more students

20    than the prior year in a category with historically lower

21    yield rates, the dean knows there is room to admit a few more

22    students.

23           Conversely, if a tentatively admitted class has

24    more students in groups with historically higher yield rates,

25    the dean knows that fewer overall students can be admitted.

1          This has simply nothing to do with racial

2     balancing.  That's why the plaintiff's expert offered no

3     opinion on racial balancing.  That's why he didn't contest

4     Dr. Card's presentation on racial balancing.  The proportion

5     of African-American students, Hispanic-American students, and

6     Asian-American students, as you can see from Slide 57, has

7     steadily risen over several decades.  And those percentages

8     have varied significantly from year to year.  That is

9     anything other than racial balancing.

10          Now, the final claim concerns race-neutral

11     alternatives.  Again the law.  The Court has been clear that

12     universities need not, and I quote, "exhaust every

13     conceivable race-neutral alternative to a race-conscious

14     admissions process."

15          The burden on us in this circumstance is to show

16     that the race-neutral alternatives that are both available

17     and workable would not suffice to achieve the diversity and

18     the educational objectives of Harvard.

19          Critically, the Supreme Court has said, and we

20     quote it on Slide 59, that the university does not need,

21     cannot be forced to choose between maintaining its reputation

22     for academic excellence and fulfilling its equally important

23     commitment to provide educational opportunities for members

24     of all racial groups.

25          The evidence shows no combination of race-neutral

**JA3642**

Case: 19-2005    Document: 00117629240    Page: 718    Date Filed: 07/30/2020    Entry ID: 6356615
Case 1:14-cv-14176-ADB    Document 666    Filed 07/01/19    Page 85 of 129

85

1      practices would allow Harvard to achieve a comparably diverse

2      class without compromising the academic excellence of the

3      class.

4              That is precisely what the Smith committee

5      examined.  They looked at the proposed alternatives more than

6      Mr. Kahlenberg suggested.  They looked at what happened when

7      these proposed alternatives were implemented.  They looked at

8      the history of alternatives like dispensing with early action

9      or increased financial aid and what happened.  They looked at

10     the literature and they evaluated the effect of those

11     alternatives:  an intellectual excellence at Harvard, the

12     broader excellence at Harvard in many dimensions, and the

13     diversity of the class.

14             What did the plaintiff offer in response?  Just

15     Mr. Kahlenberg.  Mr. Kahlenberg testified that the committee

16     considered the right race-neutral alternatives.  He testified

17     that the committee considered them according to the right

18     criteria.  In the end, he just disagrees with the judgment of

19     the committee.

20             Now, although he didn't do it, the plaintiff

21     attacks the process.  And I quote this because I think it's

22     unfair.  They describe the committee's work or composition as

23     almost comical.

24             You heard Dean Smith, Dean Khurana, Dean

25     Fitzsimmons, collectively a group of people with nearly five

1    decades of experience in university administration and

2    admissions.  We think that it's clear that they didn't

3    deserve the vitriolic attack that their work is almost

4    comical.

5            Compare that to Mr. Kahlenberg, who had never been

6    in university admissions, who had never implemented a

7    minority recruitment program, who had never implemented

8    financial aid program, who had never been retained by a

9    college or a university to consult on a race-neutral

10   alternative.

11           Mr. Kahlenberg, who was paid to consult on the

12   drafting of the complaint.  Mr. Kahlenberg, who the day after

13   the complaint was filed before there had been a single

14   document produced, a single deposition, a single expert

15   report, went on Fox News and pronounced judgment on Harvard,

16   a judgment that he stuck to.  And his judgment was that there

17   are race-neutral alternatives that wouldn't compromise the

18   academic integrity of Harvard and the diversity of Harvard.

19           Mr. Kahlenberg, as you now know, has vastly

20   different conceptions of what the academic excellence is that

21   is the core of Harvard's mission, and he has a radically

22   different view of what diversity is and should be at a

23   university.

24           On academic excellence, he had a very narrow set of

25   simulations based only upon test scores and GPAs.  And as

1      Your Honor knows, those are not the drivers for the

2      composition of the Harvard class.  The Harvard admissions

3      officers consider much more.

4              Dr. Card showed that if you took Mr. Kahlenberg's

5      alternatives and other alternatives, you would significantly

6      reduce the number of students on campus with academic ratings

7      of 1 or 2.  You would significantly reduce the academic

8      excellence of the class.

9              Mr. Kahlenberg's definition of what is racially

10     diverse and what is acceptable as racial diversity was

11     equally off the mark.  Every one of his complicated

12     alternatives and some of his alternatives, as Your Honor

13     knows, are based upon assumptions that are just not --

14     they're just not based in reality -- show a drop in the

15     proportion of African-American students on campus from 14 to

16     10 percent.

17             Now, that's not a drop of 4 percent, as they

18     suggest to you in their filings.  That's a drop of

19     30 percent.  The plaintiff is confusing a drop, a percentage

20     drop with absolute percentage points.  A drop from 14 percent

21     to 10 percent of the African-Americans on campus would reduce

22     the number of African-Americans by 320.

23             How does Mr. Kahlenberg and SFFA address that?

24             MR. MORTARA:  Your Honor, we're five minutes over.

25     As long as I get them, I'm fine.

**JA3645**

1        THE COURT:  You are over.

2        MR. LEE:  I'm close.  Can I have three minutes?

3        MR. MORTARA:  Can I have eight, Your Honor?

4        THE COURT:  Do you really need all eight?

5        MR. MORTARA:  I probably won't, Your Honor, but

6    this also happened in opening.  The Harvard rules for Harvard

7    and SFFA rules for SFFA gets a little tiresome.

8        THE COURT:  You can have eight.  I'm going to let

9    the Amici go before you go, though.

10        MR. LEE:  I'm not even going to dignify the

11    suggestion there have been different rules for Harvard and

12    for SFFA with a response.  It's not entitled to one.

13        How did they respond?  They say that a 30 percent

14    decrease in number of African-Americans is a slight decrease.

15    That's their response to you.  But the Smith committee told

16    you it's not slight.  More importantly, the students you saw

17    have told you that it's not slight.

18        So as we finish what we began in October, let me

19    suggest it would be useful to step back from all of the

20    detail, the statistical detail, the nonstatistical detail,

21    and look more broadly.  What do we see?

22        At Slide 62 on the screen, we can see what has

23    happened to the number of Asian-Americans at Harvard College

24    over time, from 3 percent in 1980 to the 20-some percent

25    where it is today.  These numbers have increased

1    substantially.  But at the same time, the number of

2    African-Americans and Hispanic students have increased as

3    well.

4            The plaintiffs nevertheless claim that

5    discrimination has affected hundreds of Asian-American

6    students over six years and 160,000 applications.  They

7    suggest to you that there have been hundreds of

8    Asian-American applicants that have been discriminated

9    against and disadvantaged.

10           And as Mr. Waxman and I have both pointed out

11   repeatedly, they have not identified one.  They have failed

12   to produce a single rejected applicant who claims

13   discrimination.  They have failed to produce a single file.

14           Now, Your Honor, Harvard, like many other

15   institutions of higher education, has recognized, as I said,

16   the compelling interest in creating communities through

17   diverse in many respects.  Those institutions -- not us

18   alone, but many other institutions of higher education have

19   invested enormous time, effort, and energy over many years in

20   recruiting and enrolling students from a wide variety of

21   racial, ethnic, socioeconomic, geographic, and other

22   backgrounds.

23           As President Simmons testified, and I quote on

24   Slide 65, how can we imagine a world in which we are not

25   creating leaders and citizens who have the capacity to

1    mediate differences?  I cannot imagine it.

2         And as President Faust testified, on Slide 66,

3    we've made progress, but there much to be done.

4         That is why the plaintiff's expert conceded, as

5    shown on Slide 67 that SFFA's analysis and his analysis is

6    one where there are winners -- whites and Asian-Americans --

7    and one where there are losers -- African-Americans and

8    Hispanics.

9         Buried in two footnotes in SFFA's briefing is the

10   evidence of SFFA's real ambition, to ask the Supreme Court to

11   change the law and forbid the consideration of race by

12   Harvard and other universities like it.

13        As the plaintiff's own slide show -- and I'm

14   putting now up on Slide 69 one of the slides from their own

15   expert's testimony -- at Harvard College, without any of the

16   ineffective race-neutral alternatives Mr. Kahlenberg

17   proposes, the elimination of race would result in a drastic

18   reduction of the number of African-American and Hispanic

19   students on campus.  That result would be wrong bigly; it

20   would be wrong morally.

21        Your Honor, the course the plaintiff urges you to

22   take is one that would undercut the considered judgment of

23   educators at Harvard and elsewhere that diversity enhances

24   the community and the learning that takes place in

25   classrooms, around the dining tables, and on playing fields.

1    It would leave generations of young Americans less equipped

2    to thrive in and to confront the challenges in an

3    increasingly complex world.  And it would send the message

4    and it would create the reality that American universities

5    are no longer the cradles of opportunity and its beacons of

6    social mobility.

7            Congress cannot have possibly intended that

8    Title VI, a statute enacted to expand opportunity, would be

9    used to contract the opportunity that's been made available

10   to so many people who have not historically had that

11   opportunity.

12           Thank you.

13           THE COURT:  Thank you.

14           Mr. Mortara, how many extra minutes do you get?

15           MR. MORTARA:  According to Mr. Hughes, it will be

16   ten.  I am certain I will not use it, but I won't be rushed.

17           THE COURT:  I'm going to give you some time to

18   figure out how to use your extra ten minutes and let the

19   Amici go next.

20           MR. MORTARA:  That's great.

21           MS. TORRES:  Your Honor, we have prepared slide

22   deck copies, if you would like one, as well as for the

23   parties.

24           And if I can quickly correct myself, I am joined by

25   Emma Dinan from Arnold & Porter and from MJ Rosner, one of

1    our co-counsel in the case.

2              Race-blind admissions is an act of erasure.  To try

3    to not see my race is to try to not see me.

4              It was on the witness stand right there that Sarah

5    Cole shared this sentiment, and Sarah was not alone.  Eight

6    Harvard students and alum testified at trial for student

7    Amici:  Thang, Sally, Itzel, and Sarah, along with

8    organizational Amici.

9              All eight shared their ethnicity with Harvard when

10   applying because all eight felt it was an integral aspect.

11   All eight testified that Harvard's racial diversity, a

12   product of its admissions process, positively shaped their

13   educational experience.  They engaged in cross-racial

14   conversations that were mind opening, met other students of

15   color who were their saving grace and learned lessons that

16   made them better physicians, teachers, policy makers, and

17   citizens.

18             SFFA did not challenge these facts.  And at points,

19   it outright agreed that race and racial diversity remains

20   vitally important in today's society.

21             Instead, the plaintiffs have engaged in their own

22   act of erasure.  They did not call a single student to

23   testify, and its experts did not consult a single student to

24   form their opinions.  The plaintiffs have tried to erase

25   countless student stories by placing undue emphasis on its

1    flawed statistical analysis and by ignoring the wealth of

2    evidence in the students' application files.  That evidence

3    is persuasive proof that Harvard's appreciation of race is

4    lawful and critical for cultivating citizen leaders.

5           As this Court knows, the plaintiffs tried to

6    achieve its singular goal of banning the consideration of

7    race by advancing two distinct legal theories, starting with

8    the claims against Harvard's policy promoting diversity.

9           The legal standard is straightforward.  Harvard

10   must show that it is both necessary and individualized.

11          Necessity is established by three undisputed facts.

12   The first, race provides critical context for accurately

13   assessing many applicants' strengths and contributions.  This

14   was true for Itzel, whose personal essay, entitled

15   "Different," told Harvard about how she initially felt like

16   an ethnic outsider because of her Latina heritage.  When she

17   used advanced vocabulary, she was made fun of for talking

18   white.  But she returned to her roots.  She ultimately

19   embraced her heritage because it made her stronger, more

20   empathetic, a more critical thinker.

21          She told Harvard that she discovered her life's

22   ambition to represent her heritage and that she would carry

23   that pride with her to college if admitted.

24          And the evidence shows that Harvard took note, not

25   of a single fact about Itzel but of a complex picture, of a

 1    complex young woman who Harvard decided would be a good fit.

 2            The plaintiffs don't say that that these strengths

 3    should not be valued, but their requested remedy would compel

 4    universities to blind themselves to any reference to race.

 5    This would systematically undervalue the contributions like

 6    Itzel.

 7            The harm would cut just as deep for American

 8    students like Thang.  Thang told Harvard that when he was

 9    growing up, his Vietnamese identity felt lost in translation.

10    He told Harvard about his transformative growth, placing

11    pencils between his teeth to improve his pronunciation.  And

12    he told Harvard that he reconnected with his Vietnamese

13    identity because it showed he had a strong sense of self.

14    Erasing Thang's ethnicity from his application file would

15    undercount his strengths as well.

16            The plaintiff's own expert agreed.  Mr. Kahlenberg

17    conceded that admissions offices should be able to consider

18    whether an applicant has overcome racial discrimination.

19            Furthermore, the students show that even the

20    demographic check box can offer meaningful information.

21            Sarah wrote her essay on combatting gun violence in

22    Kansas City.  She committed herself to this cause after a

23    close acquaintance was killed.  And she presented the mayor

24    with six recommendations to end youth violence.  Sarah never

25    mentioned her race in her essay, but she did mark the box

1    that she was African-American.  This provides additional

2    context for Sarah's advocacy, and at trial Sarah agreed.

3           The second undisputed fact is that racial diversity

4    enriches the educational environment for all students.  Every

5    single student testified to this fact.  Thang explained that

6    his interactions with racially diverse students gave him a

7    tool set to think about cultural sensitivity which will make

8    him a better doctor.  And this diversity benefits nonminority

9    students, too.

10          Sarah told this court that she was repeatedly

11   thanked by classmates for her contributions, including when

12   she specifically framed them as a black woman.  Racial

13   diversity also matters for combatting racial hostility.

14          While Harvard has taken steps to better support

15   students of color, Itzel still felt stereotyped by classmates

16   who constantly questioned her:  Were you born here?  Are you

17   a citizen?

18          A staff member kicked Sally out of a student

19   lounge, presuming she was a trespassing tourist, making Sally

20   feel like a perpetual foreigner.

21          Cecelia Nunez shared about how a classmate called

22   her and her friends a bunch of wetbacks.  The number of

23   minority students matters in these moments.  Cecelia shared

24   that they could laugh off the racial slur because they were a

25   large group of students, but she acknowledged that they had

**JA3653**

1    likely felt threatened had their numbers been lower.

2          The plaintiffs have suggested that these benefits

3    could be achieved without considering race, but they are

4    wrong because of the third undisputed fact.

5          Eliminating the consideration of race would sharply

6    reduce the number of black, Hispanic, and other minority

7    students on campus.  Harvard's expert estimated that their

8    numbers would be cut in half, and the plaintiff's expert said

9    that their numbers would be cut by roughly 1,000 students on

10   campus.

11         All students would lose out from this decline.  As

12   Sarah shared, there would be less learning because black and

13   Latinx students offer perspectives that make classes so much

14   richer.  And Itzel explained that students of color are

15   driving many of the positive changes on Harvard's campus.

16         SFFA's expert, Mr. Kahlenberg, tries to erase these

17   harms by saying Harvard could achieve comparable benefits by

18   using race-neutral alternatives.  But his alternatives do not

19   make up for the losses.

20         All of them reduce the share of black students.

21   This reduction would undoubtedly harm Harvard's

22   African-American students.  Sarah needed a sufficient number

23   of same-race peers to lean on when Harvard's newspaper

24   published a racially bigoted article suggesting that

25   admitting black students to Harvard was like teaching a blind

 1    person to be a pilot.  This is a group that is already highly
 2    marginalized on Harvard's campus.  But this decline also
 3    hurts every student.
 4          Thang testified that the decline in black students
 5    would hurt his education dramatically because it's their
 6    advocacy that taught him how to build coalitions and how to
 7    better address the health needs of people of color, including
 8    his own Vietnamese community.
 9          Another shortcoming, socioeconomic status cannot
10    serve as a proxy for race.  As Itzel testified, ethnoracial
11    diversity is more visibly salient.  When she entered a
12    classroom, she took note mentally of the number of nonwhite
13    students, and she intentionally sought out spaces with more
14    students of color because there she could finally breathe.
15          Kahlenberg himself admits that the most efficient
16    method for cultivating racial diversity is considering race,
17    not socioeconomic status.
18          Another major pitfall.  It threatens to reduce the
19    diversity within each racial group.  Asian-Americans vary
20    widely in their immigration histories, educational
21    opportunities, and countless other characteristics.  As Thang
22    testified, Southeast Asian representation is lacking at
23    Harvard with fewer underrepresented Vietnamese students.
24    This often makes him feel erased.  Thang explained
25    race-conscious admissions allows Harvard to take his

1    Vietnamese immigration history into account.

2            As a final problem, it's likely that the decline

3    would be even greater than estimated.  Several students said

4    that if Harvard stopped considering race, minority students

5    would be less likely to apply and less likely to accept.

6            Taken together, these facts demonstrate racial

7    considerations are necessary.  The remaining question is

8    whether Harvard's manner of considering it is individualized.

9            This question should also be resolved in their

10   favor based on three facts:  Admitted black and Hispanic

11   students are eminently qualified regardless of race; Harvard

12   considers all pertinent elements of diversity; and Harvard

13   flexibly applies its positive appreciation of race across

14   students of all backgrounds.  It does not award predetermined

15   points, and it is never a negative factor.

16           The plaintiffs say that race is the predominant

17   factor in admitting black and Hispanic students.  The claim

18   is false, and Sarah's file shows why.

19           Harvard's readers made no comment about Sarah's

20   race.  They do comment extensively on Sarah's extraordinary

21   achievements.  And I've just pulled out a few highlights.

22   They praised Sarah's stellar academics and wide-ranging

23   extracurriculars.  She earned straight As and A pluses in

24   high school while holding down a part-time job.  The comment

25   about her character attributes are all backed up by glowing

1   recommendations.

2          And notably for this case, Harvard's readers

3   underlined that she exhibited leadership of a subtler,

4   quieter type, proof that "quiet" can be a positive term.  The

5   comments also show Harvard's valuing a full range of

6   diversity attributes, noting Sarah's socioeconomic status,

7   her geographic ties, and even her parents' occupations, a

8   sign that Harvard does consider this information.  And

9   Dr. Card's model is stronger for considering it, too.

10          Izel's application reflects a similar pattern.  It

11   is full of detailed commentary about the full spectrum of her

12   strengths.  For Itzel, Harvard's readers did make two

13   references to her ethnicity, noting that she was connected to

14   her heritage after a period of disconnect, see PE.

15   Presumably PE is her personal essay entitled "Different."

16   This shows when Harvard's considering ethnicity, they're

17   viewing it in context.

18          To be clear, race may have played a limited role in

19   Itzel and Sarah's admission, but the plaintiff's argument

20   that race is the predominant factor is not only incorrect, it

21   unfairly erases the great weight of their accomplishments.

22          Just as importantly, there is nothing wrong with

23   considering race in a limited, reasonable way.  Harvard is

24   admitting minority students who are making concrete

25   contributions to its educational goals based in part on their

**JA3657**

Case: 19-2005    Document: 00117632840    Page: 734    Date Filed: 07/30/2020    Entry ID: 6356615
Case 1:14-cv-14176-ADB    Document 666    Filed 07/01/19    Page 100 of 125

100

1    race.   Itzel vowed in her application to carry her Latina

2    pride to college, and she made good on this promise.   She led

3    a coalition of students who established an ethnic studies

4    track at Harvard.

5            The recommendation letter from Sarah's school

6    counselor, including her response in a prior survey saying

7    that her greatest contribution in high school was loosening

8    the strong hold of stereotypes by providing her classmates

9    with an example of a working-class black woman who strives

10   for academic excellence.

11           Sarah continued to challenge stereotypes at

12   Harvard.   She co-authored a diversity report.   She served as

13   president of the Black Students Association.   And when the

14   campus was shaken by the deaths of Michael Brown, Eric

15   Garner, and the slew of police shootings that followed, Sarah

16   led the rest of the campus in finding a path for her to mourn

17   and make meaning of the fact that black lives matter and how

18   to be better allies.

19           It's clear on this record that Harvard's process is

20   both necessary and highly individualized.

21           Turning briefly to the plaintiff's second legal

22   theory of intentional discrimination, the students offer

23   three observations.

24           First, the plaintiffs cannot evade the burden of

25   proving intent, and strict scrutiny does not apply.

**JA3658**

 1    Harvard's counsel covered this.  So I'm going to move on to
 2    the second observation.

 3            The application files of the Asian-American student
 4    Amici corroborate the testimony of Harvard's witnesses.  If
 5    Asian-American ethnicity is taken into account, it's always
 6    seen in a positive light.

 7            The reviewer who noted Thang's Vietnamese identity
 8    and use of pencils used to improve his English also favorably
 9    praised him for pushing himself academically and personally.

10            For Sally, the only reference to her Chinese
11    heritage were positive, and they were always tied to context.

12            The plaintiffs cannot erase entirely the
13    significance of these examples.

14            A third observation:  The plaintiff's method of
15    proof overlooks the importance of non-academic factors.  The
16    plaintiff's arguments about the personal score are not
17    persuasive because they overemphasize academic metrics.
18    Their expert throws out the personal score based on two
19    flawed analyses.

20            First, he points to differences in the personal
21    score when students are arranged by academic index, a score
22    based entirely on standardized test scores and grades.  While
23    there may be racial variants, this does not show racial bias.
24    It simply demonstrates that the academic index is not
25    strongly related to the personal score.  And those applicants

1    with midrange scores are more than academically qualified.

2            Take our students.  Among the four, Thang had the

3    lowest academic index at 220, probably because of his

4    lower-end SAT score.  According to the plaintiff's table,

5    this places him in the 5th decile.  The plaintiffs have

6    derisively referred to this as a middle-of-the-pack score.

7            But Thang was more than academically qualified.  He

8    had straight As in high school, graduated first in his

9    prestigious magnet program, and was a national AP scholar

10   with distinction.  That's what qualifies as underqualified in

11   the SFFA model.

12           His academic index also says nothing about the

13   attributes relevant to the personal score, such as reaction

14   to setbacks and concern for others.  Here, Thang excelled.

15   He overcame language barriers, and his school recommendations

16   stressed that he was an unusually caring individual with an

17   infectiously happy personality.

18           There's also nothing suspicious about variation by

19   race.  The academic index is highly driven by standardized

20   test scores which track privilege more than talent.  Test

21   scores are racially skewed in large part because of racial

22   variation in wealth, which impacts who has access to

23   expensive test-prep programs.

24           Grades and coursework can also be racially skewed.

25   Several student Amici testified that teachers were less

Case: 19-2005    Document: 00117682240    Page: 767    Date Filed: 07/30/2020    Entry ID: 6356615
Case 1:14-cv-14176-ADB   Document 666   Filed 07/01/19   Page 103 of 129

103

1    likely to identify black and Latino students for gifted

2    coursework.

3           Dr. Arcidiacono also justifies throwing out his

4    personal score based on his regression analysis.  But his

5    method selectively ignores some racial associations but not

6    others.  All three of the rating regressions showed

7    associations with race.  All three had no explanatory power.

8    They should be treated consistently.

9           Dr. Card did this.  He adjusted his model for the

10   racial associations across all three of the ratings, and he

11   found no sign of discrimination.

12          Harvard's admissions system is not perfect.  To be

13   clear, Asian-Americans overcome setbacks, display courage,

14   and make great leaders.  But because of biases in the K-12

15   system, such attributes may show up in students' application

16   files at varying rates.

17          Teachers and counselors may offer effusive praise

18   of Asian-American students, but that praise may focus more on

19   their academic strengths and less on their reaction to

20   setbacks.

21          Think of Sally Chen.  Her college counselor told

22   her not to write about her family's Asian immigrant story

23   because it was overdone.  Fortunately, Sally did not heed

24   this advice.  She wrote about it, received a high personal

25   score, and got in.  But imagine if the counselor had

 1    convinced Sally.  And these are the very same counselors who

 2    are writing recommendation letters for students.

 3              Instead of perpetuating inequalities,

 4    race-conscious admissions is one of the most important tools

 5    for counterbalancing such biases.  Harvard should continue to

 6    refine its system to promote greater equity.  It should

 7    continue to train its staff to be more sensitive to the

 8    challenges of all minority students.  And it should and

 9    legally may use race-conscious admissions as one of these

10    tools.

11              In sum, the plaintiffs cannot erase student stories

12    from the record, and it should not be permitted to erase the

13    appreciation of race in admissions.

14              The students trust that this Court's holistic

15    review of the evidence, much like Harvard's holistic

16    race-conscious process will honor their stories and preserve

17    diversity on Harvard's campus to cultivate the citizen

18    leaders that we need to lead in this stunningly diverse

19    world.

20              Thank you.

21              MS. HOLMES:  Good afternoon, Your Honor, counsel.

22    I represent 25 Harvard student and alumni organizations as

23    Amici.  These organizations represent thousands of

24    Asian-Americans, black, white, Latinx, and native students

25    and alumni who support Harvard's ongoing consideration of

Case: 19-2005    Document: 00117632240    Page: 769    Date Filed: 07/30/2020    Entry ID: 6356615
Case 1:14-cv-14176-ADB    Document 666    Filed 07/01/19    Page 105 of 125

105

1   race as one of many factors in its holistic admissions

2   system.

3            Your Honor heard from a few of these members who

4   testified during trial, as well as from witnesses from the

5   student Amici.

6            By contrast, as has been pointed out, no student

7   testified in support of SFFA's claims.  The Court has our

8   proposed findings of fact and conclusions of law, but I would

9   like to highlight three crucial points in a case that has

10  become largely dominated by the battles of statistics.

11           First is to give a concrete picture of what is

12  meant by the educational benefits of diversity.  In other

13  words, what would be lost should Harvard no longer be able to

14  cultivate this diversity.

15           The second is to expose the fallacy of race-neutral

16  alternatives.  They have been studied, attempted, and

17  simulated.  And the evidence in the record shows that there

18  are no workable alternatives through which Harvard can

19  generate sufficient educational benefits of diversity

20  compared to the limited consideration of race in admissions.

21           And finally, SFFA's push for a race-blind

22  admissions system disproportionately harms applicants and

23  students of color, including Asian-Americans.

24           One goal of the organizations I represent is to

25  make concrete what a diverse student body looks like.  And

1    I'm focusing here on racial and ethnic diversity, although it

2    is true that other types of diversity are also important and

3    Harvard does consider those other types of diversity.

4            Our witnesses demonstrated how learning in a

5    racially diverse student environment shaped their educational

6    experiences.  Their firsthand experience offers real-world

7    examples of the concepts described by Dr. Ruth Simmons, an

8    educator with decades of experience in college pedagogy and

9    administration, that, in her words, encountering difference

10   deepens student's learning, influences their academic and

11   career paths, and breaks down stereotypes to prepare them for

12   a future in a pluralistic and diverse society.

13           To highlight a few examples from the record, a

14   racially diverse student body enhances academic study.  You

15   heard this from Thang Diep, who recalled hearing from a black

16   student in his public health class which helped open his eyes

17   to how medical studies can be racially biased and forming his

18   plans to be a pediatrician.

19           Or take Cecelia Nunez, whose experience before

20   Harvard was primarily with her own Mexican-American community

21   but came to Harvard and discovered other Latinx students from

22   a range of ethnic backgrounds and was inspired to focus on

23   Latin-American studies to explore the full breadth of this

24   diaspora.

25           Harvard as an institution also depends on a diverse

1    student body to become a school that is more responsive to

2    the needs of its students.  For example, Harvard

3    administrators reached out to Sarah Cole, the president of

4    the Black Students Association, during a period of police

5    shootings of unarmed black men for help in communicating with

6    the student body about this sensitive issue.

7            Diversity on campus also fosters feelings of

8    representation, recognition, and solidarity.  Madison Trice

9    spent years being the only black student in her high school

10   honors courses but was elated to arrive at Harvard and be

11   welcomed into an organization that celebrates black women and

12   all their multidimensional identities.

13           Diversity allows for coalition building and coming

14   together to tackle difficult topics.  A group of

15   Asian-American students at Harvard started a coalition of

16   multiple student groups of color to push the Harvard

17   admiration to establish an ethnic studies track and an ethnic

18   studies program, efforts that continue today.

19           And diversity promotes moments of interpersonal

20   revelation.  Through late-night conversations with her black

21   roommate after an incident of police brutality against a

22   black student took place just steps from campus, Catherine Ho

23   learned about the emotional total that the episode had taken

24   on the black student community.

25           This is precisely what the Supreme Court meant when

**JA3665**

1    it says, in *Bakke*, "The atmosphere of speculation,

2    experiment, and creation so essential to the quality of

3    higher education is widely believed to be promoted by a

4    diverse student body."  Justice Powell continued, "It is not

5    too much to say that the nation's future depends upon leaders

6    trained through wide exposure to the ideas and mores of

7    students as diverse as this nation of many peoples."

8            Without a diverse student body, the conversations,

9    educational epiphanies, moments of solidarity, challenges to

10   prior assumptions, or feelings of finally belonging cannot

11   happen.  These educational experiences cannot be taught in

12   the classroom.  Indeed, much of the work of translating

13   diversity into these benefits is shouldered by our client

14   organizations which bring people together across racial lines

15   for socializing, educational events, dialogue, and activism.

16           Even though they can't be quantified, the evidence

17   showed that these benefits are more than abstract concepts

18   and have real, lasting effects on students' educational

19   experiences and future potential.  And we should tread very

20   carefully when we consider dismantling an admissions system

21   that has made them possible.

22           Turning to race-neutral alternatives, I will start

23   by pointing out that on the stand Mr. Kahlenberg agreed to

24   the eminently simple concept that the best and most efficient

25   method of promoting racial diversity in a student body is to

Case: 19-2005   Document: 00117632240   Page: 743   Date Filed: 07/30/2020   Entry ID: 6356615
Case 1:14-cv-14176-ADB   Document 666   Filed 07/01/19   Page 109 of 125

109

1    consider race in admissions.  The evidence in the record

2    takes this further, demonstrating that it is a fallacy that

3    race-neutral alternatives are enough to produce a

4    sufficiently diverse class to foster the educational benefits

5    of diversity.

6            First, Harvard already employs numerous

7    race-neutral alternatives, such as an immense and targeted

8    recruitment apparatus, one of the most generous financial aid

9    programs in the country, strong consideration of low-income

10   and disadvantaged status in admissions, and extensive

11   resources put towards convincing admitted students to

12   matriculate.

13           Even if these practices remained in place,

14   according to Dr. Arcidiacono, if Harvard eliminated the

15   consideration of race in admissions, the number of black and

16   Latinx admitted students would fall by nearly 1,100 across

17   all four years.  That is roughly half.

18           Mr. Kahlenberg agreed that this is unacceptable,

19   but his own proposals of race-neutral alternatives do not

20   fare much better.  In each of his four main simulations, the

21   share of admitted black students would drop by nearly

22   one-third.  And we must remember that this is the percentage

23   of admitted students, so the actual share of black student

24   enrollment would be even lower, in the single-digit

25   percentages, especially given that black students yield at a

1    lower rate.

2            As Mr. Lee mentioned, SFFA repeatedly characterizes

3    this reduction as slight.  And shockingly, SFFA touts this

4    marginalization of Harvard's black student community as an

5    increase in diversity, claiming that there will be increases

6    to the Latinx or Asian-Americans share of admits.  Our

7    clients would support this increase but not at the cost of

8    losing one-third of their black classmates.

9            In SFFA's view, apparently, diversity means that

10   people of color are fungible.  You don't need a robust mix of

11   people from different backgrounds.  You don't care about

12   diversity within each racial group, and you can squeeze out

13   one-third of the black community and pat yourself on the back

14   for increasing diversity.

15           Thankfully, under *Fisher*, Harvard and not SFFA has

16   a First Amendment right to define its educational mission and

17   pursue the type of robust diversity that supports that

18   vision.

19           But SFFA's ultimate failure here is that it does

20   not go past the numbers to consider the effect on actual

21   students.  SFFA and Mr. Kahlenberg offer no evidence about

22   how the loss of one-third of admitted black students would

23   affect the educational benefits of diversity at Harvard.

24           Mr. Kahlenberg did not speak to any students,

25   faculty, or educational experts about this.  And SFFA

1    presented no evidence on this issue.  In its brief, SFFA

2    simply scoffed at the idea that there could be a negative

3    effect, calling it "not credible."

4         But the unrebutted evidence at trial shows

5    otherwise.  Amici witnesses described their participation in

6    or their engagement with the black student community and the

7    detrimental effects a significant reduction in this community

8    would have on their Harvard experience.

9         These effects include fewer opportunities for

10   meaningful interactions that break down stereotypes, more

11   isolation of black students, and feelings of tokenism in the

12   classroom, a potential increase in racial hostility, less

13   diversity within the black student community because a

14   smaller community will likely not reflect the full range of

15   black experiences, fewer black students to help recruit and

16   welcome prospective students, and less capacity of cultural

17   organizations to promote dialogue and education that helps

18   expose students to people of different backgrounds and issues

19   faced by different communities.

20        On this last point, many black student

21   organizations such as our clients, the Black Students

22   Association and the Kuumba singers, for example, are some of

23   the more established organizations on campus with decades of

24   leadership at Harvard.  They have served as models and paved

25   the way for a proliferation of cultural organizations.  For

**JA3669**

1    these organizations to lose membership and capacity would

2    have effects that reach beyond the black community, but it

3    would affect this entire network and also affect Harvard's

4    relationship with its students of color.

5         Harvard still has progress to make to become a more

6    inclusive place.  There are still classes and spaces that

7    feel overwhelmingly white.  Harvard still lacks an ethnic

8    studies program.  There are still incidents of racial

9    hostility, and many complained about the school's inadequate

10   response to an incident of police brutality.

11        A significant reduction in the black student

12   community is antithetical to making progress on these issues.

13        And thus, Your Honor should reject SFFA's claims

14   that it has identified a race-neutral solution that works

15   about as well as the consideration of race in admissions

16   because there is no evidence that these alternatives can

17   foster diversity sufficient to reach -- sufficient to reap

18   its educational benefits.

19        Finally, at every step of this case, SFFA has

20   pursued its claims in ways that disadvantage students of

21   color.  First, SFFA's intentional discrimination claim relies

22   heavily on comparing applicants on academic measures of

23   grades and test scores.  But Harvard has never claimed that

24   these are the most important metrics in its admissions

25   determinations, especially when distinguishing between highly

1    competitive applicants.

2         One reason is because Harvard recognizes the

3    realities of our K-12 educational system in which black and

4    Latinx students disproportionately face barriers to

5    educational opportunity that may limit the degree to which

6    grades and test scores reflect their full academic potential.

7         And yet, SFFA overemphasizes grades and test scores

8    in its analysis, constantly comparing applicants by academic

9    index, even though Harvard does not even consider the

10   academic index in its admissions.

11        You've heard from student witnesses of many races,

12   and they are all highly qualified with stellar academic and

13   non-academic credentials.  Hearing their pre-Harvard

14   accomplishments, scores, and resumes, it is clear that to the

15   extent that race was considered this their admission, it was

16   simply a plus factor that helped add context to their

17   stories, the cherry on top of a great application.

18        But SFFA's focus on academic measures devalues the

19   non-academic strengths of those applications, which are can

20   sometimes be the credentials that allow black and Latinx

21   applicants to show their full potential.

22        Second, race-conscious admissions allow Harvard to

23   consider the full lived experiences of applicants of color,

24   whose experiences may often be illuminated by their racial or

25   ethnic identity.  If Harvard no longer considered race in

Case: 19-2005   Document: 00117638246   Page: 748   Date Filed: 07/30/2020   Entry ID: 6356615
Case 1:14-cv-14176-ADB   Document 666   Filed 07/01/19   Page 114 of 125

114

1     admissions, it could signal to these applicants that the

2     school doesn't value these experiences or might not even

3     consider compelling stories of adversity or identity or

4     immigrant background that are inextricably tied to race.

5            This would hurt Asian-American applicants just as

6     much as other applicants of color.

7            Finally, under all the expert analysis in this

8     case, Dr. Card, Dr. Arcidiacono, and Mr. Kahlenberg, if you

9     remove the consideration of race, almost any way you slice

10    the data, the groups that suffer in the admissions process

11    are primarily black and Latinx applicants.

12           SFFA's claim is premised on alleged discrimination

13    against Asian-American applicants compared to white

14    applicants.  And yet white applicants do not bear the brunt

15    of the burdens of their proposed alternatives or remedies.

16    Indeed, in some of the analyses, white applicants are the

17    primary beneficiaries.

18           It is hard to believe that SFFA has pursued this

19    case in order to turn away the wolf of racial bias when

20    SFFA's claims, analyses, and remedies seem so slanted against

21    students and applicants of color.

22           On a final note, since its inception, my

23    organization, the NAACP legal defense fund, as well as the 25

24    organizations we represent, has been committed to racial

25    equality.  We unequivocally denounce discrimination against

Case: 19-2005    Document: 00117632246    Page: 749    Date Filed: 07/30/2020    Entry ID: 6356615
Case 1:14-cv-14176-ADB    Document 666    Filed 07/01/19    Page 115 of 125

115

1    any group.  We are also well aware of the burden that civil

2    rights plaintiffs shoulder in bringing intentional

3    discrimination cases under Title VI.

4         SFFA bears that burden in this case, but it has

5    attempted to evade its obligation by twisting the law to

6    argue that the burden should shift onto Harvard to disprove

7    discrimination simply because Harvard has a race-conscious

8    admissions policy, even though that policy has been approved

9    by Supreme Court precedent.

10         SFFA's legal gymnastics are revealing because this

11    case is not really about intentional discrimination.  It is

12    an attack on Harvard's ability to provide a racially

13    inclusive and diverse educational environment from which all

14    students benefit.  The subtext of SFFA's argument is that any

15    race-conscious admissions policy is tantamount to

16    discrimination.  But that premise is not borne out by the

17    evidence in this case and conflicts with Supreme Court

18    precedent.

19         And it is deeply ironic that under the guise of

20    Title VI of the Civil Rights Act of 1964, SFFA would attempt

21    to ban a civil rights policy that is intended to advance

22    equity in higher education, without which Harvard would be a

23    of whiter, more closed institution.

24         Thank you.

25         MR. MORTARA:  Your Honor, subject to the computer,

1    I'm ready to go.

2              Ms. Daly, are you?

3              Your Honor, while the screen is adjusting, I think

4    you've learned a little bit about me personally in the course

5    of this case.  I hadn't told you yet that my wife, Mary

6    Swietnicki, and I have ten nieces and nephews.  Four of them

7    are Chinese-Americans.  My daughter has four Chinese-American

8    cousins.  Mary's brother married a Chinese-American woman.

9              And I'm here to tell you I'm part of the community

10   of Americans waiting to hear why it is that Asian-Americans

11   got not marginally lower personal ratings, statistically

12   significantly lower personal ratings than white applicants.

13   It is undisputed in this case, and we still haven't been told

14   why.

15             I get it, Your Honor, from listening to Mr. Waxman

16   in particular, I have failed my own family because we are the

17   gang that can't shoot straight.  We allegedly have told you

18   all sorts of inconsistent things.

19             But if you remember Tab 12 of your binder and the

20   *Thomas* case, it is not inconsistent to talk about intentional

21   discrimination.  I will say it again.  Harvard intentionally

22   discriminated in this case.  It's not inconsistent to follow

23   that up with statements that it could have happened because

24   of implicit bias, and it could have happened because of

25   racial stereotyping.

1          None of those things are inconsistent with one

2     another.  The *Thomas* versus Eastman Kodak case says they are

3     all the same.  And I'll say it all again.  Harvard

4     intentionally discriminated in this case against

5     Asian-American applicants.

6          And right behind that, Your Honor, you know you

7     don't have to find that Harvard's witnesses were liars and

8     perjurers, even when they said they never used race in the

9     personal rating.

10          That's what *Thomas* is all about.  Cognitive biases

11     that cause people to do things that they come in here and

12     they can't even explain.

13          None of them could explain why Asians were getting

14     lower personal ratings, but they are.  How is it happening?

15     Why is it happening?  We still haven't heard.

16          What we have heard is a lot of confusion and more

17     two plus two equals five about the law.  I heard Mr. Waxman

18     say that *Gratz* is not an intentional discrimination case.

19          Let's check.  Here's the Supreme Court decision in

20     *Gratz*, and I just am going to go to the very beginning of

21     Chief Justice Rehnquist's majority opinion.  This is a case

22     about alleged violations of the equal protection clause and

23     what Title VI of the Civil Rights Act of 1964.

24          And what's the conclusion?  The program in the

25     University of Michigan *Gratz* case violated these

**JA3675**

1    constitutional and statutory provisions.

2            The last I checked, Title VI only bans intentional

3    discrimination.  *Gratz* absolutely is an intentional

4    discrimination case.  All we heard just now was another

5    episode of two plus two equals five.  And Harvard is even

6    move confused about other areas of discrimination law.

7            If you took seriously everything they were saying,

8    they'd be overturning about 40 years of discrimination case

9    law or trying to make Title VI different from Title VII in

10   some way nobody could possibly explain.  They're right next

11   to each other, in the same act and are modeled after one

12   another.

13           First, we somehow need to show you direct evidence

14   of discrimination?  Not according to the Third Circuit in

15   *Aman v Cort Furniture*.  Let's take a look at that.  This is

16   *Aman v Cort Furniture Rental* from the Third Circuit.  And

17   what did they say on the subject where we were criticized for

18   no direct evidence.

19           Here's what they said:  "As one court has

20   recognized, defendants of even minimal sophistication will

21   neither admit discriminatory animus or leave a paper trail

22   demonstrating it."

23           I think we can all agree Harvard and its admission

24   personnel are more than minimal sophistication.  We need to

25   have anecdotal evidence?  Really?  What did the D.C. Circuit

Case: 19-2005    Document: 00117638246    Page: 753    Date Filed: 07/30/2020    Entry ID: 6356615
Case 1:14-cv-14176-ADB    Document 666    Filed 07/01/19    Page 119 of 125

119

1    say about that in the *Segar* case.  This is the *Segar* case

2    from the D.C. Circuit.

3         And over in that case, around about Headnote 36,

4    statistics of course are not irrefutable, citing *Teamsters*,

5    but when a plaintiff's statistical methodology focus on the

6    right things, the appropriate labor pool, and generates

7    evidence of discrimination at a statistically significant

8    level, no sound policy reason exists for subjecting the

9    plaintiff to the additional requirement of either providing

10   anecdotal evidence or showing further gross disparities.

11   Such a rule would reflect little more than a superstitious

12   hostility to statistical proof, a preference for the

13   intuitionistic and individualistic over the scientific and

14   systematic.

15        We are rolling back the decades in employment

16   discrimination law every time Harvard stands up, or we're

17   just deciding that Title VI is somehow different.  Courts

18   cite Title VII cases and Title VI cases interchangeably every

19   single week in this country.

20        Now, Your Honor, I did say something -- I did say

21   we didn't think much of the anecdotes because Harvard's

22   cherry-picked set of applications that they gave us --

23   remember, we picked applications from behind the veil of

24   ignorance as to what they said.  They had all the

25   applications when they picked them.

1          The anecdotes don't mean of because we didn't get a

2     statistically relevant sample of applications.  And I did say

3     that.  We don't think much of the anecdotal evidence, and

4     that includes the ice skater, Your Honor, to be candid.  I

5     never once said, we never once said our nonstatistical

6     evidence doesn't amount to much.

7          Your Honor, maybe we've got disagreements between

8     the Court and SFFA.  We certainly have them with our friends

9     from Harvard.  But we produced a mountain of nonstatistical

10    evidence.  OIR, the new reading procedures, the emails, Utah,

11    etc., the stereotypical notes on the dockets.  It's different

12    to call an Asian-American applicant quiet than to call a

13    Hispanic applicant quiet.  One is a racial stereotype, one

14    isn't.  What OCR found.

15         Your Honor, we are constantly being told that we

16    should have dragged Students for Fair Admissions standing

17    members in here and put them on the stand.  I know no one

18    from Harvard or its legal team would have done the kinds of

19    things that Ms. Fisher experienced for her being a plaintiff

20    in a case like this.

21         But I think you can understand -- I think everyone

22    here can understand what people online -- what the online

23    community has done and the way things have gotten in our

24    country and what would have happened to these young people.

25         We all know -- none of us in here would have done

Case: 19-2005    Document: 00117632240    Page: 755    Date Filed: 07/20/2020    Entry ID: 6356615
Case 1:14-cv-14176-ADB    Document 666    Filed 07/01/19    Page 121 of 125

121

```
 1    it, but somebody would have done something horrible to one of
 2    our students if they'd stood there and done that.  And we
 3    didn't have to, and we didn't.  Nothing in the law says we
 4    had to bring our kids in here to suffer the slings and arrows
 5    rather than the adulation that is poured on others who
 6    support Harvard.
 7              And we're very proud of the students who testified
 8    as well.
 9              There's room for disagreement about these deep,
10    deep questions.  But I think we can put aside the idea that
11    legally or for any other reason we needed to have our members
12    testify.
13              I want to move on to the Office of Institutional
14    Research because I just heard that Plaintiff's Exhibit 28,
15    the so-called follow-up analysis, put Dean Fitzsimmons at
16    ease.
17              Let's take a look at that.  Here's the follow-up
18    analysis.  We did not see the coefficients on the screen,
19    Your Honor.  Follow-up analysis tells you basically the same
20    story, intent to help athletes, intent to help
21    African-Americans.  I won't do the whole staccato
22    presentation again.
23              There's the thing allegedly put Dean Fitzsimmons at
24    ease.  Oh, we gave a plus to low-income Asians.
25              Right down below is a massive minus for
```

 1    non-low-income Asians.  82 percent of the Asian applicants to

 2    Harvard are not low income.  And this is not a statistically

 3    significant finding of a correlation, not at all.

 4    Statistical significance in a regression model equals intent.

 5    Wrong again, Harvard.

 6            Let's take a look at *Fudge v Providence Fire* from

 7    the First Circuit.  "When statistical tests sufficiently

 8    diminish chance as a likely explanation, it can then be

 9    presumed that an apparently substantial difference in pass

10    rates here is attributable to discriminatory bias."

11            Regressions show intent.  Not just disparate

12    impact.  Dean Fitzsimmons knew that.  He saw those

13    coefficients.  He wasn't put at ease by a plus for low-income

14    Asians.  Standing right next to it is an even bigger, even

15    bigger minus for non-low-income Asians.  Instead of being

16    minus .037 now, it's minus .46789, even bigger.

17            Your Honor, I'm going to wrap up, not even taking

18    close to my time, but I am going to talk a little bit about

19    the personal rating.

20            I cannot make Harvard answer our questions.  But

21    you have not heard any answer to the racial pattern in the

22    personal rating.  Will someone please tell us why

23    African-Americans and Hispanics get these huge boosts in the

24    personal rating?  It's undisputed they do better than

25    everyone else, whites and Asians.  No one has ever adequately

 1    explained that to you.  You weren't shown school support

 2    ratings or non-academic ratings or anything else explaining

 3    the racial pattern in the personal rating.  You were given,

 4    at best, a partial explanation for the differences between

 5    Asians and whites.  But it's incomplete, for the reasons I

 6    gave.

 7            Professor Arcidiacono's model showed you all the

 8    ratings variables going into his model of the personal

 9    rating.  And it's true, Your Honor, a little bit, that the

10    academic ratings don't matter as much for the personal

11    rating.  That's all taken into account in the model.  Let me

12    take you back there.

13            You see the model that just includes academic

14    variables, model 2?  It's not very good.  R-squared value, a

15    pseudo R-squared value of .2, it's considered the gold

16    standard.  That's the McFadden paper I discussed with

17    Professor Card.

18            Once you get above .2, that's a good fit.  The

19    first model with just the academic variables isn't a great

20    fit.  The model takes into account the relatively weak

21    correlation, if there still is one, the relatively weak

22    correlation between academics and the personal rating.  And

23    it rolls it all in.

24            So by the time you get to model 5, you've got

25    whatever contribution academics makes, small though it may

1   be, and all the contributions of school support, alumni

2   interview, and everything else that Mr. Waxman called

3   non-academic, none of which explained the rank hierarchy

4   we've shown you time and time again.

5         They have never bothered to tell you why it is

6   African-Americans do better than Hispanics, do better than

7   whites, do better than Asians.  Not once.  There is no

8   explanation other than what Mr. Luby said the first time when

9   he told the truth, Harvard uses race in the personal rating.

10         And if so, I don't know what else we need to do

11   other than keep putting up Professor Card's own testimony

12   about how he treated the overall rating.

13         And now we're given the story that the personal

14   rating has all this good, extra data in it, and why would we

15   get it out of the model.  The overall rating has all sorts of

16   good, extra data in it.  It's the admissions officers

17   assessment of the ultimate likelihood that the candidate will

18   be admitted taken into account every single thing in the

19   application.

20         Nevertheless, because Harvard told Professor Card

21   that they were using preferences in the overall rating as

22   opposed to what they hid from him about the personal rating,

23   Card pulled it out of his model.  There's no rationale for

24   not doing the same thing to the personal rating that he did

25   to the overall rating.  I've shown it dozens of times.

1          So now what do we get?  We get the virtual rating

2     model.  This is a model no one believes is accurate.  You

3     have to give Asians artificially low academic ratings and

4     artificially low extracurricular ratings while boosting the

5     ratings of other groups like African-Americans and Hispanics,

6     giving everybody false ratings.

7          At the same time, you don't bother to racially

8     correct the overall rating where there's an undisputed Asian

9     penalty, and you don't bother to racially correct the school

10    support ratings where there's an undisputed racial penalty.

11         The virtual rating model is junk.  Dr. Card had it

12    right when he talked the first time about the overall rating

13    and why he took it out.  And by implication, if you find race

14    influences the personal rating, it's got to come out.

15         I want to close on what we heard from Harvard.

16    Instead of omitted-variable bias, it's now missing relevant

17    factors.

18         Your Honor, the law in discrimination cases is that

19    a defendant cannot look at a statistical analysis like

20    Dr. Card's own analysis without the personal rating or like

21    Professor Arcidiacono's models of the personal rating, and

22    say that doesn't prove anything, it must be some other

23    variable.

24         And don't just take my word for it, like Mr. Waxman

25    standing up here and telling you *Gratz* is not an intentional

1    discrimination case.  Let's look at the *Palmer* case from the

2    D.C. Circuit.  We'll go there together.

3           This is *Palmer v Schultz* from the D.C. Circuit.  As

4    I said, decades of discrimination law.  It's discussing the

5    *Bazemore* case from the Supreme Court, a pattern or practice

6    case involving race discrimination.

7           *Bazemore* instructs lower courts to be cautious

8    about dismissing plaintiff's statistical studies as not

9    probative simply because Harvard offers some

10   nondiscriminatory explanation for the disparity shown.

11          Implicit in the *Bazemore* holding is the principle

12   that a mere conjecture or assertion on Harvard's part that

13   some missing factor would explain the existing disparities

14   between Asians and white applicants generally cannot defeat

15   the inference of discrimination created by plaintiff

16   statistics.

17          To be sure, as the Supreme Court acknowledged in

18   *Bazemore*, there may be a few instances in which the relevance

19   of a factor to the selection process is so obvious that the

20   defendants merely pointing to its omission can defeat the

21   inference of discrimination created by plaintiff statistics.

22          The logic of *Bazemore*, however, dictates that in

23   most cases what a defendant cannot rebut statistical evidence

24   by mere conjectures or assertions without introducing

25   evidence to support the contentions that the missing factor

1    can explain the disparities as a product of a legitimate,

2    nondiscriminatory selection criterion without introducing

3    evidence that Asian essays are worse than whites, without

4    introducing evidence that something in these recommendation

5    letters tells Harvard that Asian applicants are less

6    likeable, kind, have less integrity, less grit, or just have

7    inferior personal qualities.

8              I asked a question.  We are asking a question.  Why

9    did Harvard give Asian applicants lower personal ratings?  We

10   have not yet received an answer other than answers that

11   decades of discrimination case law say are not good enough.

12             Your Honor, I have to address the ALDC point.

13   We're all big fans of PowerPoint in here, but one thing you

14   can do with PowerPoint is you can cut off statements and

15   conceal the full context, and that's exactly what happened

16   with the ALDC issue from our findings of fact.

17             As Your Honor knows, we don't allege that the ALDC

18   Asians suffer a discriminatory admissions outcome penalty.

19   Everyone agrees they suffered some kind of personal rating

20   penalty, which we say just proves our point about stereotypes

21   being applied.

22             And then later on when they get into full committee

23   or subcommittee, wherever it is, somebody says let's pull

24   that candidate up, he's one of us, he's one of ours, he's or

25   she's got that Harvard DNA.

1    Mr. Lee put on the screen -- I can't remember if it

2    was Mr. Lee or Mr. Waxman -- Harvard does discriminate

3    against Asian ALDCs, pulled completely out of context from

4    Paragraph 274 of our brief where we acknowledge that there is

5    no admissions penalty outcome on Asian ALDCs, but there is a

6    penalty on the personal rating.

7    It's right here.  If you take a look, Harvard does

8    not appear to impose an admissions penalty on Asian-American

9    ALDCs.

10    We are not the gang that cannot shoot straight.  We

11    have not been inconsistent.  And I hope we have not failed

12    and I have not failed my nieces and nephews.

13    Thank you, Your Honor.

14    THE COURT:  All right.  Thank you all again.  As

15    usual, the arguments were of the highest caliber and

16    edifying.  Thank you.  We'll get to work on this.  Thanks,

17    everyone.

18    (Court recessed at 4:32 p.m.)

19

20

21

22

23

24

25

```
1                  - - - - - - - - - - -

2                      CERTIFICATION

3

4            I certify that the foregoing is a correct

5     transcript of the record of proceedings in the above-entitled

6     matter to the best of my skill and ability.

7

8

9

10    /s/ Joan M. Daly              February 14, 2019

11    _____   _____

12    Joan M. Daly, RMR, CRR        Date
      Official Court Reporter
13

14

15

16

17

18

19

20

21

22

23

24

25
```

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS
BOSTON DIVISION**

| | |
|---|---|
| STUDENTS FOR FAIR ADMISSIONS, INC., <br>        Plaintiff, <br>    v. <br> PRESIDENT AND FELLOWS OF HARVARD COLLEGE, <br>        Defendant. | Civil Action No. 1:14-cv-14176-ADB |

## REQUEST FOR JUDICIAL NOTICE

Plaintiff Students for Fair Admissions, Inc. files this request for judicial notice as the Court invited in its Memorandum and Order on Cross-Motions for Summary Judgment (D.I. 566 at 29 n.18) and during the pretrial conference.[1] Pursuant to Federal Rule of Civil Procedure 201(b), SFFA asks the Court to take judicial notice of the following:

The Report of the College Working Group on Diversity and Inclusion at Harvard, issued in November 2015, stated that "[u]nder the presidency of Abbott Lawrence Lowell (1909-1933), the Harvard administration restricted the numbers of Jewish students." (DX-13.)

The Harvard President's Report: 1993-1995 stated that "President A. Lawrence Lowell . . . called for quotas on the number of Jewish students admitted to Harvard." (DX-40.)

In 1926, the Board of Overseers of Harvard College adopted a recommendation that "the rules for the admission of candidates be amended to lay greater emphasis on selection based on character and fitness, and the promise of the greatest usefulness in the future as a result of a Harvard education." (P500.)

---

[1] Harvard does not oppose this motion, without prejudice to Harvard's continuing objection to the relevance of these judicially noticeable facts to SFFA's claims.

**JA3688**

Dated: October 8, 2018                Respectfully submitted,

/s/ Adam K. Mortara
Adam K. Mortara
J. Scott McBride
Krista J. Perry
Bartlit Beck Herman Palenchar & Scott LLP
54 West Hubbard Street, Suite 300
Chicago, IL 60654
312.494.4400
adam.mortara@bartlit-beck.com
scott.mcbride@bartlit-beck.com
krista.perry@bartlit-beck.com

John M. Hughes
Katherine L.I. Hacker
Meg E. Fasulo
Bartlit Beck Herman Palenchar & Scott LLP
1801 Wewatta Street, Suite 1200
Denver, CO 80202
303.592.3100
john.hughes@bartlit-beck.com
kat.hacker@bartlit-beck.com
meg.fasulo@bartlit-beck.com

William S. Consovoy
Thomas R. McCarthy
Michael H. Park
J. Michael Connolly
CONSOVOY MCCARTHY PARK PLLC
3033 Wilson Boulevard, Suite 700
Arlington, Virginia 22201
703.243.9423
will@consovoymccarthy.com
tom@consovoymccarthy.com
park@consovoymccarthy.com
mike@consovoymccarthy.com

Patrick Strawbridge BBO #678274
CONSOVOY MCCARTHY PARK PLLC
Ten Post Office Square
8th Floor South PMB #706
Boston, MA 02109
617.227.0548
patrick@consovoymccarthy.com

**JA3689**

AT A MEETING OF THE

# BOARD OF OVERSEERS OF HARVARD COLLEGE



TRIAL EXHIBIT

P500

SFFA v. Harvard

IN CAMBRIDGE,  January 11,    1926.

Mr. James presented the report of the Special Committee on the Limitation of the Size of the Freshman Class, and after debate thereon, the Board voted to accept said report, and to adopt the following recommendations:

1. That, during the next three years, 1926-27 to 1928-29, the limit of 1,000 Freshmen shall include dropped Freshmen as well as those newly admitted to the College and Engineering School, but not thereafter, save with the approval of the Governing Boards.

2. That the application of the rule concerning candidates from the first seventh of their school be discretionary, both as to schools and candidates, with the Committee on Admission.

3. That the rules for the admission of candidates be amended to lay greater emphasis on selection based on character and fitness, and the promise of the greatest usefulness in the future as a result of a Harvard education.

and further that said report and recommendations appear to the Board to be wise, but that they be referred to the Faculties of Arts and Sciences, and of Engineering, for advice.

The Board also voted that the Committee be discharged with the thanks of the Board for its excellent and comprehensive report.

A true copy of record,

Attest:  *Winthrop H. Wade, Secy.*

*Ðc. 1925*

*Su Faculty Jan. 19 | 1926*
*Records*

*Page 17.*

**Strictly Confidential until all Boards
and Faculties concerned have acted**

# REPORT OF THE SPECIAL COMMITTEE APPOINTED
## TO CONSIDER THE LIMITATION OF NUMBERS

To the Board of Overseers of Harvard College: —

The purpose of this report is to present facts bearing upon different aspects of the question of numbers in the College and to offer certain conclusions for the consideration of the Overseers.

It will be recalled that a provisional limitation was sanctioned by the Overseers, by the following action on February 25, 1924:

> *Voted* — That the Board give its consent to the vote of the President and Fellows which defines a limit of size for the Freshman Class "for the present," with the understanding that this limitation is temporary in its nature and will be reconsidered at the earliest possible time.

At the same time the Board created this Special Committee to report —

> . . . on numbers in relation to equipment, personnel, standards, and the scope and function of the College.

Thus the vote establishing a limit of 1,000 "for the present" was precautionary. During the few years following the War and preceding the vote, numbers had been increasing with unparalleled rapidity. They had already begun to cause difficulties. Therefore, although Freshman enrollments had not yet reached the limit that was chosen, it was feared that they might soon pass it and that the College would not be able to stand the strain. Being conceived as precautionary the limitation was considered by all to be expedient, and it was adopted without long discussion. But it was understood that the subject would be canvassed more fully.

I

Since the limit of 1,000 was established, two Freshman classes have come to Cambridge. The limit set "for the present" has about been reached.

The general rate of growth which has, but for the war-time, prevailed for Harvard College during more than 50 years, and which is shown in Tables 1 and 5, is so nearly constant that it

Case: 19-2005 Case: 19-2005 Document 141764 Document 537-3 Filed: 10/08/1930 Page 3 of Entry ID: 6356615

looks like a normal which it would be unreasonable not to consider in making estimates or forecasts. The recent noticeable augmentation of college enrollment throughout the country is even greater and looks as if our own normal would be borne upward rather than depressed by the tendencies in the country at large. (See Table 2.) The curves would lead one to expect that the number of qualified applicants for admission to the College may considerably exceed 1,000 in a few years unless some limitation is enforced.

Hitherto Harvard has always taken care of as many qualified students as the community wanted to send here. Now, however, we are asking the question whether we are not subjecting ourselves to a strain which will impair the quality of our work, whether we can go on, and if not, then what rate of growth we can permit ourselves, or at what point we must assign a stopping place. It is obvious that we are considering a very important question of policy.

## II

Equipment, physical and financial, has been pointed to as a limiting factor. Data in Table 3 bear on this, and indicate the situation 20 years ago as compared with that in 1924–25. The situation with respect to *lecture rooms* is further elucidated by the analysis of the state of things at the opening of the current year, 1925–26, which will be found in Table 4.

To illustrate some of the limitations now imposed by conditions which are beyond the Faculty's control by reason of the shortage of rooms for class meetings and the difficulty of lecturing effectively to very large classes, it will be sufficient to cite the following instances of forced limitation:

English 41, History of English Literature; limited to 300.
Biology 1, Life and its Environment; limited to 300.
Geology 4, Introduction to Geology; limited to 300.
Meteorology 1[1], Elementary Meteorology; limited to 100.
Psychology 1[1], Introduction to Experimental Psychology; limited to 80.

All these are courses fundamental to their subjects; and naturally they are desired by students concentrating in other fields. Practically all Freshmen have been excluded from Biology 1 this year. From the educational point of view an uninterrupted use of lecture rooms is not economical. Large lecture halls cannot empty and refill immediately without curtailing the lecture periods, and

the entry of a new class at the close of each lecture stops the question-and-conference episode which normally follows each lecture and may last for from 15 minutes to as much as an hour, if the lecturer can remain in the room with the students who gather about his desk to question him. The economical remedy might be to provide small conference rooms next to lecture rooms. At present, however, there are almost none such, except in Sever Hall, where a few are conveniently placed. These few are regularly used for conferences. If there is no available place in or close to the lecture room for a student to remain and confer with the professor after a class meeting, he must seek the professor later in the Widener Library or at his house — which means, in most cases, that he does not consult him. We believe that the after-lecture conference is a most important item in the curriculum, and that it ought to be provided for. Moreover, the need of rooms for tutorial conferences is a serious one which requires to be met.

The foregoing facts and figures suggest the following conclusions:

Space and physical equipment, if they were the only bar to the admission of numbers, could perhaps be provided if money could be found; but the last 20 years' experience indicates that it is not easy to obtain money for laboratories and lecture rooms promptly. Although it is true that in many ways, and on the whole, Harvard's physical and financial equipment is better adapted to the education of the present student body than its equipment of 20 years ago was to the tasks of that day, we believe that, before more students can be accommodated, more lecture rooms, laboratories, and dormitories must be provided. The housing situation in Cambridge requires the last, and we conceive that more biological laboratories especially are essential. Additional lecture rooms, tutorial and conference rooms will also be required.

It appears at first sight that a good deal of lecture space is perforce vacant in the afternoon. The reason is that experience has seemed to show that the afternoon is best fitted for laboratory work, which requires continuous meetings of two hours or more. Only a few advanced courses meet in the evening. Whether a reorganization of the tabular view would relieve the situation has not been made evident. The question has been studied by the Faculty, which — to date — has not thought reorganization wise or practicable; but further attention to the problem appears desirable to this Committee.

JA3692

Case: 19-2005 Case ... 1:17-cv-11134-ADB Document 577-3 ... Filed 10/08/18 ... Page 4 of 5 ... Entry ID: 6356615

4

III

Teaching-personnel, standards, and function can hardly be discussed separately.

Educational methods and college policies are always changing. In the last 20 years the emphasis at Harvard has shifted from the course as the unit of instruction to the individual as the unit, and the technique for dealing with an unlimited number of student-units has not yet been found.

The conception used to be that if a large and liberal menu of opportunities in the way of courses was spread before the student, the main thing had been done for him. The old policy respecting physical training and exercise was typical of the then new theory of the College; a gymnasium was provided, and also playing fields, but after that about everything was left to the option of the student, who took as much advantage of these facilities as he liked, or none at all. In his studies he had to get through a certain number of courses if he wanted to keep in standing and graduate, but otherwise his education was nearly as much an affair of his own adventure as was his physical development. Lectures being the chief means of instruction, organization and methods were about as compatible with large as with small numbers of students.

During the last two decades, however, the College has increasingly undertaken to guide and stimulate the undergraduate's choices and ambitions, in the belief that all parts of the College which touch the undergraduate's life, whether physical, moral, or intellectual, should work in sympathetic accord. Obviously this imposes a much heavier task upon instructors and deans; and, the individual being the ultimate unit of education, success cannot help being more and more difficult as numbers grow.

The function of the College as thus conceived is exemplified by numerous changes or reforms which have been devised and successfully put into effect; but about these so much has been said elsewhere that it is needless to do more than enumerate them here. The concentration requirement; the general examination; the tutorial system, and along with it the diminished reliance upon lectures as the chief means of instruction; also the numerous measures intended to carry the Freshman through his transition from school to college — among them the Freshman dormitories, and a considerable development of services of information and guidance connected with the Dean's office; compulsory physical exercise; increased provision for dormitory accommodation; and various

5

improved facilities of a more or less social order, such as the Harvard Union, the reading-rooms in the Library, and others. The most striking evidence that these changes are combining toward one good effect is the way in which the number of students who graduate with distinction has been rising. In the period between 1915-16, the year when General Final Examinations were first given, and 1919-20, the percentage of men who won distinction by the examinations was 17.4; in 1924-25 the percentage had risen to 21.4. To this we should add the men who gained distinction in those departments in which no General Final Examination is given, and those who won distinction in general studies. When this is done we find that 29.8 per cent of those who graduated in last year's class had secured distinction in their studies.

It hardly needs saying that the present conception of Harvard as a residential college rather than just a University department implies a belief that there must be a greater degree of intimacy between teacher and student and between student and environment than there used to be. Crowds do not favor intimacy. Although the figure at which, for Harvard's purposes, overcrowding begins cannot be defined by any process of reasoning, we are persuaded that the Faculty — by whose sense of the situation the Governing Boards must be largely guided in such matters — already feels that there are now as many undergraduates as its present number of teachers and rooms allows it to cope with adequately. Many, indeed, feel that the limit of 1,000 is too high.

Is it feasible to remove one difficulty simply by enlarging the teaching force and multiplying assistant deans? The following comparisons between 20 years ago and today show how largely the teaching force has already been augmented, and yet by how small a margin it has gained on the students with whom it is trying to deal more personally. There are several Divisions which may still adopt the tutorial system — the Division of Mathematics will do so in 1926-27 — and their budgets for salaries will then have to be enlarged. In the departments of Natural Science there are, as yet, neither General Final Examinations nor tutors. Moreover, assistants in laboratories are normally paid less than tutors with the rank of instructor. It is possible that laboratory instruction might be distinctly improved by a more liberal policy. However, laboratory assistants can hardly be expected to have acquired the breadth of view which a tutor must possess, for assistants are selected for their ability to assist students in a very limited field. Nevertheless a larger expenditure of money for assistants appears

JA3693

Case: 19-2005   Case 1:14-cv-14176-ADB   Document: 770-3   Date Filed: 10/08/18   Page 5 of   Entry ID: 6356615

desirable, and the budgets of the scientific departments should be enlarged accordingly. As a matter of fact, they are now being increased for this very purpose as rapidly as the funds allow.

| | 1904–05 | 1924–25 |
|---|---|---|
| Number of teachers of professorial rank in the Faculty of Arts and Sciences ... | 112[1] | 172 |
| Increase .................... | | 53.5+% |
| Number of teachers of non-professorial rank in the Faculty of Arts and Sciences ... | 184[1] | 233 |
| Increase .................... | | 26.6% |
| Number of students under the Faculty of Arts and Sciences (College and Graduate School of Arts and Sciences) ... | 2905 | 3804 |
| Increase .................... | | 30.9+% |
| Average number of students to each teacher of professorial rank in the Faculty of Arts and Sciences ... | 25.9:1 | 22+:1 |
| Average number of students to all teachers in the Faculty of Arts and Sciences ... | 9.8:1 | 9.4:1 |

From these figures it is clear that no substantial gain has been made in reducing the ratio of students to the whole number of teachers in the Faculty of Arts and Sciences, although the proportion of teachers of higher rank has increased. The individual student is, however, receiving more personal attention than is evident from the figures, because there has been no material increase in the number of courses offered, but a large increase in the number of men who give much of their time as tutors, instructors, and assistants to individuals or small groups.

It is obvious that, without any expansion in the number of subjects taught, an increase in the number of teachers is greatly to be desired. But before the teaching body is expanded to teach larger numbers, it will be necessary to finance larger budgets for the departments which have not yet adopted the general Final Examination and to increase salaries of professors and instructors all along the line, if Harvard is to hold her eminent position among the universities and colleges of America. Indeed, this will have to be done whether we expand or not. It is said that Chicago is now establishing a number of $10,000-a-year professorships. Harvard's maximum in the Faculty of Arts and Sciences is still $8,000. Justice and fairness, as well as competition in Cambridge and expediency, require a better salary scale. Conditions in Cambridge are becoming more and more difficult for men who are de-

[1] The Faculty of Arts and Sciences included the Lawrence Scientific School at this date.

pendent on the present salaries. In the long run it is the quality of its Faculties which mainly determines the position of a university. If that is not attended to, buildings, endowments, organization, and even traditions will prove to be of little avail.

Therefore, considerations of personnel, finance, and equipment all point to the necessity of maintaining a limitation of numbers in Harvard College for the present.

These are all what might be called internal considerations. It will be well to look at the situation of the College from the outside, too.

IV

The size of the College relative to the University and its other departments has not been constant, and may alter materially when the College stops growing. For many years the University as a whole has been increasing faster than the College anyway, though not so much faster as the creation of entirely new graduate schools might have led one to expect. The Graduate School of Arts and Sciences, which is in many respects an advanced department of the College, has been swelling in size more rapidly than the College itself, and faster than the University as a whole (see Table 11). The signs of the times indicate that this will probably continue (see Tables 5, 6, 7, and Figs. 2, 3, 4, 5); and this is desirable, for the Graduate School is the source from which most of the young teachers are drawn.

Table 8 shows which departments of the University are now restricting their size, and also those which have no present purpose of limiting it.

Even if the College should contain a smaller proportion of the total University enrollment than now, this in itself need not be deplored, for there is no necessarily right proportion. The influence of the departments under the Faculty of Arts and Sciences — namely, the College and the Graduate School — will always depend on the eminence of the teachers and the quality of the students' work. Since the College, through its graduates, does much to set the scholastic standard in all the graduate departments of the University, its influence is likely to remain predominant.

It may be feared by some that the College will receive less from the Treasury of the University as the students in the several graduate schools increase in number. But it must be remembered that, barring the Endowment Fund raised by the graduates since the War, the free funds at the disposal of the Corporation are small

Case: 19-2005    Case: Document: 141767A0384    Document: 26    Page: 6 of 81    Entry ID: 6356615    Date Filed: 10/08/19    Page: 771

8

in proportion to those that are restricted; and the history of the financial management by the Corporation gives every reason to believe that the College will not be overlooked in the future. It is true that if the College stands still in size while the other departments become bigger and more expensive, it will be more and more necessary to uncover new fountains of financial aid, and the graduates of the professional schools will have to assume more responsibility than in the past.

With reference to the Graduate School of Arts and Sciences, the Committee believes that from the point of view of the College the School can be a great deal bigger and still give more in the way of stimulation to both Faculty and students than it takes away by its drafts upon equipment and personnel; for this School is concerned not so much with what is particular and empirical as with what is fundamental and general. Philosophy, the so-called moral and social sciences; the fine arts and the humanities in their deepest and broadest senses; physics, chemistry, and mathematics, which underlie all our modern scientific progress, are there cultivated most eagerly and advanced most successfully. In short, although most of the students in the School are preparing for a particular profession, that of teaching, they are all engaged in liberal studies. What goes on in the Graduate School fertilizes the life of the whole institution — the College included — and draws together all its scholars into a true university. If it is in any way difficult for that School and the College to be closely associated — and it must be admitted that there are difficulties — the remedy is not to be sought in a jealous restriction of the School.

The extent to which the College prepared students for work in the graduate schools and professional schools is indicated by Table 12.

V

It was remarked at the beginning that Harvard College has, until now, allowed itself to grow with the community. It is a striking fact that there has recently been a great increase in the proportion of the population seeking college education. Nothing yet indicates that the desire for college education will soon decline again, or even stop spreading. Forty years ago a high-school training was coveted by people of small means. Today the same large class has generally adopted a college as its goal. Furthermore, in the northeastern states many other colleges have limited numbers. Table 9 presents a situation which warrants serious

9

discussion, if not public anxiety. If all the endowed colleges in this part of the country decide to stand pat, or if most of them stick close to the existing size standards, to what institutions will this community which wants more opportunities for higher education, and waxes continually, send its boys?

We have all heard lately from within our own circle that our entrance requirements are "too high." If we are to turn away a greater and greater number of potentially qualified applicants who come from schools and communities which have hitherto supposed they could count on Harvard, we must be prepared to meet more and more such complaints.

If and when complaints are thrust at us, it seems to this Committee that the answer will be twofold. First, it is not for us but for the country to meet a general shortage of facilities by means of junior colleges and other diversifications in the field of higher education, or otherwise. Second, Harvard participates actively, not passively, in the general welfare of college education in the United States.

We must not forget that Harvard College is still, as it always has been, an explorer and pathfinder. It has lately again developed a new type of instruction, is thereby giving its undergraduates a distinctly better education than they have ever received before, and in this it is being imitated by other colleges. This furnishes a very potent reason for limiting our students to a number with which this system can be efficiently carried on until it has been perfected, rather than allowing that number to increase to a point that will interfere seriously with what we are trying to do.

VI

It will be well, however, to ask the question, how the applicants for admission to the Freshman Class are selected from a considerably larger number. The Committee is not prepared to make a full report now concerning this difficult matter or to propose anything new. But as this report is primarily informative and intended to supply data for later discussion it will be appropriate to make certain explanations and comments.

First, it is probably wise to release certain changes in the methods of admission which have recently been introduced, and to summarize the results to date.

Some of these changes have raised the minimum of admission in the past twenty years; more have simplified and lightened the

10

burden for all but the very lazy or incompetent. The chief items under the first are the requirements that (1) a candidate under the old plan must pass ⅔ of the examinations required; (2) that he must pass ⅔ of the total with satisfactory grades (70 per cent or higher); and (3) that he must write satisfactory English. Among the simplifying changes, some of which actually make admission easier, must be named:

(1) The New Plan, established in 1911–12, whereby candidates are admitted on a combination of school record and four examinations. Each case is considered individually, and the personality of the candidate may be given greater weight than under the Old Plan.

(2) All candidates, whether by the Old or New Plan, are now admitted without admission conditions, provided they satisfy the minimum requirements.

(3) Candidates who stand, at graduation, among the highest seventh of the boys in the graduating class of a regularly organized school, and who have the strong recommendation of the head master, are admitted without examination, provided they have satisfactory school records corresponding to the requirements of the New Plan.

(4) The examinations of the College Entrance Examination Board are now used exclusively for all candidates who present themselves in June under the Old or New Plan.

The following shows the admissions by the different plans for 1924 and 1925:

|  | 1924 | 1925 |
|---|---|---|
| Under Old Plan | 371 | 469 |
| Under New Plan | 196 | 191 |
| Under Honor Plan (1/7) | 309 | 314 |
| Total | 876 | 974 |

It will be seen that nearly one third of the Freshman Class is now entering on the so-called Honor Plan. When this plan was adopted, its primary purpose was to open admission to brilliant boys in schools that do not ordinarily prepare for Harvard; but the Admission Committee has felt that the vote was mandatory rather than permissive, and has believed that it had no discretion in the administration of it. The Committee which is making this report thinks, however, that it may be better *not* to extend this privilege of recommending boys under the honor system to large Eastern schools and similar institutions that regularly prepare boys

11

for entrance examinations, and it believes that the application of the rule should be left to the discretion of the Committee on Admission. This will not diminish the value of the school record of the candidates or of the personal estimates of their fitness on the part of the school masters. Table 14 shows how "Honor" Freshmen have been distributed geographically.

Few graduates realize that admission to Harvard College today is based not only on the records made in entrance examinations, when they are taken, but also on the school records and the judgment of school officials who have known the boys for some time. The value of the two latter is especially emphasized in the application of the honor system.

The vote which established a provisional limit went on to prescribe that —

From the remaining candidates[1] the Committee on Admission shall fill up the quota, so far as it may be advantageously filled, by selecting those who, having satisfied the minimum requirements for admission, in the judgment of the Committee have best proved their competence.

Thus far there has been no opportunity to try the process of selection here contemplated, for the quota set has not been exceeded or even reached, and therefore there has been no chance to test the machinery for weeding out the excess of lower-grade men by inspection. When this clause goes into full operation it may affect about one-third of the candidates for admission.

Although the Committee is not prepared to make suggestions as to the methods of admission except on the single point mentioned above, it wishes to state —

(1) That it believes that it is neither feasible nor desirable to raise the standards of the College so high that none but brilliant scholars can enter and remain in regular standing. The standards ought never to be too high for serious and ambitious students of average intelligence.

(2) That it believes that standards, whether of admission or of work in the College, have not in fact been raised beyond this point, nor to such a point that there is any present prospect of their being made too difficult for such men. This is stated with confidence, in spite of certain complaints which have recently been heard.

(3) That, on the other hand, it sees no reason whatsoever for thinking that it would be a reproach to Harvard if it became

[1] Those whose admission records do not place them on an equality with Harvard undergraduates in the first four groups of the Rank List.

somewhat harder for a student to enter here than to enter elsewhere — always providing that standards are not above the level just indicated.

## VII

To conclude — it will have been made clear that the three chief difficulties in the way of dealing with large numbers are: (1) the lack of a sufficient number of teachers; (2) the lack of rooms to hold classes; (3) the difficulty of lecturing effectively to very large classes. The first two difficulties could probably be remedied in a few years by an adequate expenditure of money. But for the moment they are so insurmountable that this Committee is convinced that the restriction on numbers is truly necessary for the present. The Committee will go further, however. The difficulties just spoken of and the importance of working out to their logical conclusions the very promising experiments which the College is making in new methods of instruction, lead the Committee to advise that, in reckoning the Freshmen who are to be included in the thousand, "dropped" Freshmen should be reckoned as well as others. This was recommended by the Faculty in 1923. Dropped Freshmen are students who are taking a large part of their work in Freshman courses, and have always been registered as Freshmen.

The Committee presents the following recommendations which, if adopted by the Board of Overseers, are to be referred to the Faculty of Arts and Sciences for consideration and action:

(1) That, during the next three years, 1926–27 to 1928–29, the limit of 1,000 Freshmen shall include dropped Freshmen as well as those newly admitted to the College and Engineering School, but not thereafter, save with the approval of the Governing Boards on the recommendation of the Faculties concerned.

(2) That the application of the rule concerning candidates from the first seventh of their school be discretionary with the Committee on Admission.

COMFORT A. ADAMS,
JAMES BYRNE,
CHESTER N. GREENOUGH,
HENRY JAMES, *Chairman,*
A. LAWRENCE LOWELL,
CLIFFORD H. MOORE,
WILLIAM S. THAYER,
*Committee.*

## APPENDIX

In the writer's mind there is *one outstanding reason* for the limitation of numbers in Harvard College, and although this reason is implied at one point in the main report (where reference is made to the pioneer work of Harvard and to an improved type of instruction), the importance of the *real objective* seems to the writer to be of such dominant importance as to warrant a brief explanation, which has received the approval of the other members of the Committee.

The enormous strides made in our knowledge of the material universe during the past generation or two have introduced problems of coöperation between larger and larger groups, not only within the nation but of world-wide extent, the solution of which makes absolutely necessary a new kind of education — in fact, something more nearly corresponding to the original meaning of the word education.

Man is largely guided by his habits of thought: traditions, customs, hatreds, desires, prejudices, etc.; for the most part he does not know what it means to think for himself. He has the habit of accepting facts and arguments, however incomplete, superficial, or misleading they may be. He allows pictures to be painted in his mind by the promoter or the propagandist without demanding sound evidence of the so-called facts or making sure that the facts presented are reasonably comprehensive for the purpose in hand. Hence the enormous annual loss in crooked or unwise investments; hence the large predominance of failures of corporations and other business enterprises; hence the frightful and wasteful confusion of international relations.

The solution of these problems demands a kind of thinking or analysis which is new to the vast majority of even our educated class, a habit of mind which refuses to accept a biased presentation of facts; which withholds judgment until all the returns are in, and even then allows something for the probable incompleteness of the returns; which refuses to entertain prejudices and hatreds; which keeps its perspective free from anything but logic, justice, and truth.

No course of reasoning can yield more than is covered by the premises; it can only transform the facts or assumptions of the premises into a more useful form. Therefore, to reach a sound conclusion involves sound premises and sound reasoning, whether

JA3697

Case: 19-2005 Case 1:19-cv-14176-ADB Document 577-3 Filed 10/08/18 Page 9 of 19 Entry ID: 6356615

14

this be through the medium of words or of mathematics, which is merely quantitative logic.

It is not claimed that these ideals are new or original, but, unfortunately, they are not applied to any appreciable extent in our educational institutions. For the most part, our students listen, accept, and try to remember; rarely do they know what it means to demand sound evidence of the facts underlying their problem, to understand thoroughly the principles involved, and then to think carefully and surefootedly without the twist of bias or prejudice; they are mostly occupied with the endeavor to meet certain tests which are unfortunately too often tests of memory rather than of mental power; they rarely know the joy of making a subject their own, of thinking for themselves and of seeing the worth-while results of their own work.

Such a habit of mind is absolutely essential to the solution of the great problems confronting civilization today.

It is to the development of this habit in our students that Harvard College has set itself; but the task is a difficult one and takes time for its development. Teachers with this ideal are rare and must be developed; we cannot go out into the open market and hire them. We need time to imbue the present staff with the spirit of the movement and to develop the best technique and organization, without being so pressed for increase of staff and equipment as to fail in our major purpose, which is quality rather than quantity.

As the difficulty of forming new habits of mind increases with the age of the students, the undergraduate departments are the centre of attack, but even there the task is a difficult one, and demands a closer contact between student and instructor and much more work on the part of the instructing staff.

However, the objective is worthy of every possible effort and sacrifice. A thousand graduates with this habit of mind are worth more than ten thousand without it, no matter how well stocked with useful information or conventional knowledge the minds of the latter may be.

COMFORT A. ADAMS.

15

TABLE 1. CONSISTS OF THE FIGURES UPON WHICH FIGURE 1 IS BASED

(see page 28)

TABLE 2

POPULATION OF THE UNITED STATES EXCLUSIVE OF OUTLYING POSSESSIONS

| Year | Population |
|---|---|
| 1870 | 38,558,371 |
| 1880 | 50,155,783 |
| 1890 | 62,947,714 |
| 1900 | 75,994,575 |
| 1910 | 91,972,266 |
| 1920 | 105,710,620 |

ENROLLMENT OF MEN AND WOMEN IN COLLEGES, UNIVERSITIES, AND PROFESSIONAL SCHOOLS IN THE UNITED STATES

| Year | Number | Source |
|---|---|---|
| 1870 | 60,798 | From Rept. of Commissioner of Education |
| 1880 | 84,991 | " |
| 1880 | 109,664 | " |
| 1900 | 176,435 | " |
| 1910 | 338,018 | " |
| 1920 | 521,754 | From World Almanac, 1924 |

TABLE 3. NUMBERS, BUILDINGS, AND INCOME

| | 1904–05 | | 1924–25 | |
|---|---|---|---|---|
| | Number | Percentage | Number | Percentage |
| University enrollment, total | 4136 | ... | 7075 | ... |
| College enrollment | 2539[1] | ... | 3041 | ... |

*Dormitories*

| | 1904–05 | | 1924–25 | |
|---|---|---|---|---|
| | Number | Percentage | Number | Percentage |
| Undergraduates housed in dormitories owned by the College | 623 | 24.5+ | 1570 | 51.6+ |
| Dormitories in process in 1924–25 or planned and financed, not including Medical School and Business School buildings, are expected to provide for an additional | ... | ... | 358 | ... |

*Libraries*

Widener Library opened in 1914

*Laboratories* (additions)

Coolidge (Chemistry) 1913
Gibbs (Chemistry) 1913
Cruft (Physics) 1914
Research laboratory in connection with Farlow Botanical Library and Herbarium
Additions now financed and in process —
Fogg Art Museum  $1,000,000
Chemical Lab.  $2,000,000
(NOTE: Biological laboratories are especially needed)

JA3698

Case: 19-2005  Document: 00117676824  Filed: 08/30/2019  Page: 10 of 19  Entry ID: 6356615

16

## TABLE 3 (continued)

### Lecture Rooms or Class Rooms
### Music Building, 1914

| Income | 1904-05 | 1924-25 |
|---|---|---|
| Income bearing funds for University | $18,036,025 | $66,024,462 |
| Total Expenditure for Faculty of Arts and Sciences | 563,048 | 1,486,194 |
| Expenditure for salaries in Faculty of Arts and Sciences | 408,887 | 1,077,402 |
| Expenditure for salaries per student under Faculty of Arts and Sciences | 140.75 | 283.23 |

[1] This includes the Lawrence Scientific School which in 1904-05 was under the Faculty of Arts and Sciences.

TABLE 4. COMPARISON OF ACTUAL AND POSSIBLE USE OF ROOMS,[1] 1925-26

### A. Number of Hours during which Rooms are in Use

| Available Rooms Capacity | No. | Total 1-hr. periods possible per week | 8-9 | 9-10 | 10-11 | 11-12 | 12-1 | 1-2 | 2-3 | 3-4 | 4-5 | 5-6 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 12-30 | 2 | 12 | 0 | 4 | 7 | 5 | 1 | 0 | 0 | 3 | 3 | 1 |
| 31-50 | 16 | 96 | 0 | 80 | 87 | 89 | 67 | 10 | 29 | 14 | 2 | 0 |
| 51-75 | 10 | 60 | 4 | 58 | 59 | 35 | 45 | 14 | 26 | 8 | 2 | 4 |
| 76-100 | 5 | 30 | 0 | 29 | 29 | 29 | 20 | 6 | 12 | 6 | 4 | 4 |
| 101-125 | 3 | 18 | 0 | 18 | 15 | 17 | 12 | 0 | 10 | 3 | 1 | 0 |
| 126-150 | 1 | 6 | 3 | 6 | 6 | 6 | 6 | 0 | 0 | 0 | 0 | 0 |
| 151-200 | 2 | 12 | 0 | 11 | 12 | 9 | 8 | 2 | 4 | 5 | 0 | 0 |
| 201-300 | 2 | 12 | 0 | 12 | 12 | 12 | 10 | 0 | 5 | 0 | 0 | 0 |
| 301-400 | 1 | 6 | 0 | 6 | 5 | 6 | 6 | 0 | 0 | 1 | 0 | 0 |
| 900 | 1 | 6 | 0 | 6 | 3 | 6 | 6 | 0 | 2 | 1 | 0 | 0 |
| Total | 43 | 258[2] | 7 | 230 | 235 | 233 | 175 | 32 | 95 | 42 | 12 | 5 |
| Per cent of 258 | | | .02 | .89 | .91 | .90 | .67 | .12 | .36 | .16 | .04 | .01 |

[1] This report covers the class rooms in the following buildings only: Emerson (not including 23 and 27, Psych. Lab.), New Lecture Hall, Sever (not including 25 [Class. Arch. Mus.] or tower rooms); Harvard Hall.
Two hundred and three meetings were held outside above buildings 1925-26; 137 in 1923-24.
[2] Multiplying this by 5 x 7 to get a weekly total for the hours from 9 to 1 and 2 to 5 on 5 week-days and the hours from 9 to 1 on Saturdays gives 1438.
The total of "periods in use" for these hours, when added together, gives 1022, which is 71% of 1438.

17

TABLE 4. COMPARISON OF ACTUAL AND POSSIBLE USE OF ROOMS, 1925-26 (continued)

### B. Percentage of Available Rooms Utilized

| Available Rooms Capacity | No. | Total periods possible per week | 8-9 | 9-10 | 10-11 | 11-12 | 12-1 | 1-2 | 2-3 | 3-4 | 4-5 | 5-6 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 12-30 | 2 | 12 | 0.0 | 33.3 | 58.3 | 41.7 | 8.3 | 0.0 | 16.7 | 16.7 | 25.0 | 8.3 |
| 31-50 | 16 | 96 | 0.0 | 83.4 | 90.6 | 92.8 | 69.8 | 10.4 | 30.2 | 14.6 | 3.3 | 0.0 |
| 51-75 | 10 | 60 | 6.7 | 96.7 | 98.3 | 91.6 | 75.0 | 23.3 | 43.4 | 13.3 | 13.3 | 6.7 |
| 76-100 | 5 | 30 | 0.0 | 96.7 | 96.7 | 96.7 | 66.6 | 20.0 | 40.0 | 30.0 | 5.5 | 0.0 |
| 101-125 | 3 | 18 | 0.0 | 100.0 | 83.4 | 94.4 | 66.6 | 0.0 | 55.6 | 16.7 | 0.0 | 0.0 |
| 126-150 | 1 | 6 | 50.0 | 100.0 | 100.0 | 100.0 | 83.4 | 0.0 | 83.4 | 0.0 | 0.0 | 0.0 |
| 151-200 | 2 | 12 | 0.0 | 91.6 | 100.0 | 75.0 | 66.6 | 16.7 | 33.3 | 0.0 | 0.0 | 0.0 |
| 201-300 | 2 | 12 | 0.0 | 100.0 | 100.0 | 100.0 | 83.4 | 0.0 | 41.7 | 41.7 | 0.0 | 0.0 |
| 301-400 | 1 | 6 | 0.0 | 100.0 | 83.4 | 100.0 | 0.0 | 0.0 | 0.0 | 16.7 | 0.0 | 0.0 |
| 900 | 1 | 6 | 0.0 | 100.0 | 50.0 | 100.0 | 100.0 | 0.0 | 33.3 | 16.7 | 0.0 | 0.0 |

In the last two years there has been an increase of 400 students under the Faculty of Arts and Sciences. In this period there has been an increase of 72 in the number of class meetings per week. This increase does not include additional meetings arranged by departments in their own departmental buildings, for example, additional Chemistry courses in Boylston Hall, etc. Twenty-two of these 72 additional class meetings have gone into the four main class-room buildings at the crowded hours 9 to 1; 26 have gone into these four buildings at other hours (that is, 7.45 to 8.45 A.M., or after-noons). The other 14 additional class meetings have been taken care of by the use of class rooms in buildings assigned for departmental uses (for example, Semitic Museum, Geological Lecture Room, etc.). All but two of these fourteen take place in the morning in the 9 to 1 hours.

It does not appear likely that the increase in the next two years will be smaller than in the last two. We are now using in the morning hours, from 9 to 1, 84.6 per cent of the capacity of the four main class-room buildings. Even if questions of health and safety were not involved it is unlikely, because of the impossibility of forecasting demands, that we could make 100 per cent utilization of our capacity. It does not seem feasible to crowd in more courses in the morning hours. Assuming that the Business School moves all of its class meetings across the river in the next few years, very small relief will be given since there are only fourteen meetings of Business School courses in our four main class-room buildings in the 9 to 1 hours.

JA3699

Case: 19-2005   Case 1:14-cv-14176-ADB   Document 576.3   Filed 11/08/18   Page 11 of 19   Entry ID: 6356615

### Table 4 (continued)

C. Enrollment in Largest Courses, 1924-25 and 1925-26

| Name of Course | Under 400 1924-25 | Under 400 1925-26 | Over 400 1924-25 | Over 400 1925-26 |
|---|---|---|---|---|
| English A | | | 815 | 893 |
| "  28 | 223 | 240 | | |
| "  41 | 269 | 281 | | |
| "  2 | 193 | 190 | | |
| German A | | | 649 | 580 |
| French 2 | | | 453 | 543 |
| Mathematics A | 192 | 287 | | |
| Mathematics C | 206 | 233 | | |
| Physics C | 229 | 280 | | |
| Biology 1 | 243 | 264 | | |
| History 1 | | | 649 | 750 |
| Government 1 | | | 417 | 525 |
| Economics A | | | 405 | 485 |
| Philosophy A | | | 347 | 407 |

### Table 5. Attendance, 1870–1925 — Harvard College and University

| Year | Col. | Univ. | Year | Col. | Univ. |
|---|---|---|---|---|---|
| 1870-71 | 608 | 1316 | 1898-99 | 1551 | 3901 |
| 1871-72 | 620 | 1214 | 1899-1900 | 1902 | 4091 |
| 1872-73 | 635 | 1039 | 1900-01 | 1992 | 4288 |
| 1873-74 | 706 | 1167 | 1901-02 | 1983 | 4142 |
| 1874-75 | 716 | 1199 | 1902-03 | 2109 | 4261 |
| 1875-76 | 776 | 1290 | 1903-04 | 2073 | 4328 |
| 1876-77 | 821 | 1370 | 1904-05 | 2009 | 4136 |
| 1877-78 | 813 | 1344 | 1905-06 | 1899 | 3945 |
| 1878-79 | 819 | 1350 | 1906-07 | 2247 | 4026 |
| 1879-80 | 813 | 1356 | 1907-08 | 2277 | 4012 |
| 1880-81 | 828 | 1365 | 1908-09 | 2238 | 3918 |
| 1881-82 | 823 | 1382 | 1909-10 | 2265 | 4046 |
| 1882-83 | 928 | 1450 | 1910-11 | 2217 | 4123 |
| 1883-84 | 972 | 1526 | 1911-12 | 2262 | 4203 |
| 1884-85 | 1006 | 1594 | 1912-13 | 2308 | 4279 |
| 1885-86 | 1068 | 1669 | 1913-14 | 2359 | 4366 |
| 1886-87 | 1077 | 1688 | 1914-15 | 2473 | 4604 |
| 1887-88 | 1138 | 1812 | 1915-16 | 2519 | 5226 |
| 1888-89 | 1180 | 1899 | 1916-17 | 2642 | 5656 |
| 1889-90 | 1271 | 2079 | 1917-18 | 1720 | 3684 |
| 1890-91 | 1339 | 2271 | 1918-19 | 2221 | 3894 |
| 1891-92 | 1456 | 2658 | 1919-20 | 2602 | 5273 |
| 1892-93 | 1598 | 2969 | 1920-21 | 2609 | 5667 |
| 1893-94 | 1656 | 3156 | 1921-22 | 2745 | 6073 |
| 1894-95 | 1667 | 3290 | 1922-23 | 2787 | 6357 |
| 1895-96 | 1771 | 3600 | 1923-24 | 2980 | 6733 |
| 1896-97 | 1754 | 3674 | 1924-25 | 3041 | 7075 |
| 1897-98 | 1819 | 3859 | | | |

### Table 5 (continued)

| Percent Increase: | 1870-71 to 1924-25 | 1900-01 to 1924-25 |
|---|---|---|
| University | 437.61 | 64.99 |
| College | 400.16 | 52.66 |

### Table 6. Population and College Enrollment in the Northeastern States

Population Northeastern States (New England, New York and New Jersey)

| | |
|---|---|
| 1870 | 8,776,779 |
| 1880 | 10,224,516 |
| 1890 | 12,143,531 |
| 1900 | 14,744,580 |
| 1910 | 18,203,462 |
| 1920 | 20,942,036 |
| 1925 | 22,495,502 [1] |

Registration — Colleges and Universities

| | Harvard | Yale | Columbia | Princeton | Brown | Amherst |
|---|---|---|---|---|---|---|
| 1870 | 1,316 | 755 | 776 | 364 | 220 | 261 |
| 1880 | 1,365 | 1,087 | 1,532 | 488 | 247 | 339 |
| 1890 | 2,271 | 1,645 | 1,671 | 850 | 352 | 352 |
| 1900 | 4,288 | 2,542 | 3,176 | 1,277 | 1,026 | 400 |
| 1910 | 4,123 | 3,282 | 5,117 | 1,450 | 935 | 502 |
| 1920 | 5,667 | 3,820 | 9,117 | 1,967 | 1,867 | 503 |
| 1925 | 7,075 | 5,143 | 13,230 | 2,412 | 2,032 | 615 |

| | Dartmouth | Williams | Bowdoin | Tufts | Cornell | Total |
|---|---|---|---|---|---|---|
| 1870 | 436 | 141 | 121 | 74 | 609 | 5,073 |
| 1880 | 429 | 227 | 157 | 84 | 399 | 6,304 |
| 1890 | 462 | 311 | 185 | 145 | 1,390 | 9,634 |
| 1900 | 741 | 375 | 252 | 802 | 2,521 | 17,400 |
| 1910 | 1,229 | 543 | 338 | 1,142 | 4,412 | 23,073 |
| 1920 | 1,888 | 579 | 403 | 2,128 | 5,668 | 33,107 |
| 1925 | 2,138 | 750 | 500 | 2,021 | 5,697 | 41,613 |

Freshman Class — Harvard College

| Year | Total Registration | No. from Northeastern States |
|---|---|---|
| 1870 | 189 | 159 |
| 1880 | 243 | 191 |
| 1890 | 366 | 301 |
| 1900 | 537 | 421 |
| 1910 | 671 | 538 |
| 1920 | 621 | 494 |
| 1924 | 944 | 735 |

[1] Estimated, World Almanac, 1924.

Case: 19-2005    Document: 00117674224    Page: 12    Filed: 08/30/2024    Entry ID: 6356615

20

### Table 7. Enrollment in the University and Parts of the University, 1900-25.

| | 1900-01 | 1901-02 | 1902-03 | 1903-04 | 1904-05 | 1905-06 |
|---|---|---|---|---|---|---|
| College [1] | 1992 | 1983 | 2109 | 2073 | 2009 | 1899 |
| Grad. School of Arts and Sciences | 341 | 312 | 316 | 402 | 366 | 394 |
| All Depts. except College | 2296 | 2159 | 2152 | 2255 | 2037 | 2046 |
| Whole University [2] | 4288 | 4142 | 4261 | 4328 | 4136 | 3945 |

| | 1906-07 | 1907-08 | 1908-09 | 1909-10 | 1910-11 | 1911-12 |
|---|---|---|---|---|---|---|
| College [1] | 2247 | 2277 | 2238 | 2265 | 2217 | 2262 |
| Grad. School of Arts and Sciences | 387 | 400 | 403 | 425 | 463 | 454 |
| All Depts. except College | 1779 | 1735 | 1680 | 1781 | 1906 | 1941 |
| Whole University [2] | 4026 | 4012 | 3918 | 4046 | 4123 | 4203 |

| | 1912-13 | 1913-14 | 1914-15 | 1915-16 | 1916-17 | 1917-18 |
|---|---|---|---|---|---|---|
| College [1] | 2308 | 2359 | 2473 | 2519 | 2642 | 1720 |
| Grad. School of Arts and Sciences | 463 | 497 | 532 | 598 | 605 | 296 |
| All Depts. except College | 1971 | 2007 | 2131 | 2707 | 3014 | 1964 |
| Whole University [2] | 4279 | 4366 | 4604 | 5226 | 5656 | 3684 |

| | 1918-19 | 1919-20 | 1920-21 | 1921-22 | 1922-23 | 1923-24 | 1924-25 |
|---|---|---|---|---|---|---|---|
| College [1] | 2221 | 2602 | 2609 | 2745 | 2787 | 2980 | 3041 |
| Grad. School of Arts and Sciences | 359 | 531 | 532 | 582 | 648 | 670 | 763 |
| All Depts. except College | 1673 | 2671 | 3058 | 3328 | 3570 | 3753 | 4034 |
| Whole University [2] | 3894 | 5273 | 5667 | 6073 | 6357 | 6733 | 7075 |

Percent Increase:

| | |
|---|---|
| College | 52.66 |
| Graduate School of Arts and Sciences | 123.75 |
| All Departments except College | 75.69 |
| Whole University | 64.99 |

[1] Lawrence Scientific School not included, but, beginning 1906-07, special students formerly registered with Lawrence Scientific School now registered in Harvard College, on account of a change in the administration of the S.B. degree.
[2] University Extension and Summer School students not included.

21

### Table 8. Enrollment — Harvard University, 1924-25.

*The College* (total enrollment, 1924-25, *3041*). A limit of 1,000 in each Freshman Class has been fixed.

*The Graduate School of Arts and Sciences* (total enrollment, 1924-25, *763*). No limit desired.

*The Law School* (total enrollment, 1924-25, *1201*). Increased facilities for expanding numbers being planned without intention of limitation.

*The School of Education* (total enrollment, 1924-25, *273*). Coeducational; no limit proposed.

*The Graduate School of Business Administration* (total enrollment, 1924-25, *614*). First-year class entering September, 1924, limited to 335 — that in February, 1925, to 150. This limitation will prevail until the new buildings are completed.

*The Medical School* (total enrollment, 1924-25, *506*). Limited to 125 in each of the first two years, 135 in each of the second two years — total 520. Limit dictated by optimum use of existing laboratory space, clinical facilities and instructing staff. More students apply for admission than can be accepted, and the selection is made chiefly on the basis of an examination of the candidate's previous work — preference being given to men who have already prepared themselves in subjects which would more or less specially fit them for medical studies.

*School of Public Health* (total enrollment, 1924-25, *30*). No limitation.

*The Dental School* (total enrollment, 1924-25, *204*). No limitation.

*Engineering School* (total enrollment, 1924-25, *268*). No limitation.

*The Theological School* (total enrollment, 1924-25, *74*). No limitation.

*School of Architecture and Landscape Architecture* (total enrollment, 1924-25, *48* (Architecture) and *39* (Landscape Architecture)).

JA3701

Case: 19-2005  Document: 117-3  Page: 13 of 19  Filed: 08/30/2019  Entry ID: 6356615

TABLE 9.  LIMITATION OF NUMBERS IN ENDOWED COLLEGES OF NORTHEASTERN STATES

| College or University | Limitation | Lee-way | When Adopted | Number Admitted in fall of 1924 |
|---|---|---|---|---|
| Amherst | No formal limitation. Will probably accept 230 in the fall of 1925 | ... | ... | 210 |
| Bowdoin | Freshman Class limited to about 150. (500 for College) | 50 | ... | 136 |
| Brown | No rigid limitation. Try to limit Freshman Class to about 400 men (about 150 for Women's College) | 0 | ... | 422 Men [1] |
| Columbia | Total registration for College limited to about 2,000 | 0 | ... | 474 |
| Cornell | Limited to 500 (applies only to candidates for B.A. degree). College of Architecture limited to about 45. Other Schools not rigidly limited | 0 | Beginning with fall of 1925 | 490 (as candidates for B.A.) |
| Dartmouth | Trustee provision that total registration be limited to 2,000. The number admitted each year depends on size of upper classes | 0 | About 1918 | 673 |
| Princeton | Limited to 600 | 0 | ... | Slightly over 600 |
| Tufts | ? | ... | ? | 108 [1] |
| Williams | About 225 | 50 | 1924 | 254 |
| Yale | Limited to 850 | 50 | 1923 | 880 |

[1] Size of Freshman Class.

TABLE 10.  GROWTH OF ENROLLMENTS AND ENDOWMENTS IN ELEVEN UNIVERSITIES AND COLLEGES

A. *Attendance*

| | 1900–01 College | 1900–01 University | 1923–24 College | 1923–24 University |
|---|---|---|---|---|
| Amherst | 400 | ... | 561 | ... |
| Bowdoin | 254 | ... | 503 | ... |
| Brown [1] | 920 | 920 | ... | 2,013 |
| Dartmouth | 741 | ... | 2,060 | ... |
| Tufts | 802 | ... | 2,094 | ... |
| Williams | 375 | ... | 694 | ... |
| Columbia | 476 | 3,419 | 2,005 | 13,230 |
| Harvard | 1,992 | 4,288 | 2,980 | 6,733 |
| Princeton | 1,168 | 1,277 | 2,231 | 2,448 |
| Yale | 1,190 | 2,542 | 2,005 | 4,447 |
| Cornell | ... | 2,521 | ... | 5,588 |
| | 8,318 | | | 15,133 |

[1] Women included.

B. *Income-Bearing Funds*

| | 1900 | 1924 |
|---|---|---|
| Amherst | $1,600,000.00 | $7,340,000.00 |
| Bowdoin | 660,416.86 | 3,541,164.77 |
| Brown | 1,297,227.56 | 8,209,057.83 |
| Dartmouth | 2,500,000.00 [1] | 6,000,000.00 |
| Tufts | 48,926.00 (Income) [1] | 167,304.00 (Income) |
| Williams | 1,050,850.00 | 4,543,972.00 |
| Columbia | 435,000.00 (Income) | 1,975,000.00 (Income) [2] |
| Harvard | 12,614,448.19 | 66,624,462.12 |
| Princeton | 2,455,400.00 | 14,322,147.08 |
| Yale | 4,942,166.04 | 35,764,883.97 [2] (Exclusive of Sterling Bequest) |
| Cornell | ? | ? |

[1] 1901       [2] 1923

JA3702

### Table 10 (continued)

**C. Percentage Increase in**

| | Attendance in College 1900–24 | Attendance in whole University incl. College 1900–24 | Income-Bearing Funds, Whole University 1900–24 |
|---|---|---|---|
| Amherst | 40.25 | ... | 358.75 |
| Bowdoin | 93.03 | ... | 436.20 |
| Brown University | ... | 118.84[1] | 532.81 |
| Dartmouth | 178.00 | ... | 140.00[2] |
| Tufts | 161.09 | ... | 241.53[3] (Income) |
| Williams | 85.06 | ... | 332.41 |
| Columbia | 321.21 | 286.95 | 354.02[3] (Income) |
| Cornell | ... | 121.65 | ? |
| Harvard | 49.59 | 57.19 | 428.15 |
| Princeton | 91.01 | 91.69 | 408.33 |
| Yale | 65.48 | 74.94 | 623.66[3] |

[1] Placed in this column in deference to the name; but might fairly be in column 1.
[2] 1901–24.
[3] 1900–23.

### Table 11. Enrollment in Departments of Harvard University, 1916–17 to 1925–26

| | 1916–17 | 1917–18 | 1918–19 | 1919–20 | 1920–21 | 1921–22 | 1922–23 | 1923–24 | 1924–25 | 1925–26 |
|---|---|---|---|---|---|---|---|---|---|---|
| The College[2] | 2642 | 1720 | 2221 | 2602 | 2609 | 2745 | 2787 | 2980 | 3041 | 3279 |
| Grad. School of Arts and Sciences | 605 | 296 | 359 | 531 | 532 | 582 | 648 | 670 | 763 | 732 |
| Law School | 856 | 296 | 436 | 879 | 944 | 999 | 1019 | 1097 | 1201 | 1282 |
| School of Education | ... | ... | ... | ... | 121 | 153 | 241 | 285 | 272 | 236 |
| Grad. School of Bus. Administration | 222 | 93 | 159 | 394 | 442 | 466 | 468 | 539 | 614 | 675 |
| Medical School | 355 | 386 | 404 | 419 | 439 | 472 | 499 | 494 | 506 | 502 |
| School of Public Health | ... | ... | ... | ... | ... | 30 | 16 | 29 | 30 | 30 |
| Dental School | 240 | 211 | 154 | 189 | 232 | 205 | 219 | 191 | 204 | 186 |
| Engineering School | 577[3] | 591[3] | 59 | 126 | 214 | 257 | 253 | 258 | 283 | |
| Mining School | 4 | ... | 7 | 10 | 15 | 20 | 16 | 16 | 25 | 16 |
| Bussey Institution | 16 | 6 | 7 | 11 | 13 | 16 | 16 | 86 | 74 | 69 |
| Theological School | 73 | 59 | 51 | 58 | 53 | 61 | 95 | 92 | 93 | 87 |
| School of Arch. and Landscape Arch. | 63 | 25 | 44 | 65 | 66 | 79 | 92 | 93 | 87 | 91 |
| Total | 5656 | 3684 | 3894 | 5273 | 5667 | 6073 | 6357 | 6733 | 7075 | 7381 |

[1] On October 1, 1925.
[2] Including Special Students.
[3] In combination with Massachusetts Institute of Technology.

### Table 12. Harvard College as a Feeder to the Other Departments

Degrees conferred in Harvard College, June 1923

*(From Rept. of President and Treasurer, 1923–24, p. 322)*

| | |
|---|---|
| (1) A.B. | 400 |
| A.B. O:C. | 56 |
| A.B. for Honorable Service in the War | 9 |
| S.B. | 108 |
| S.B. O:C. | 17 |
| S.B. for Honorable Service in the War | 2 |
| Total | 592 |
| (2) Total number continuing in post-graduate work in Harvard University | 185 |
| Total number that did not go on to post-graduate work in Harvard University | 407 |
| (3) Proportion continuing in post-graduate work in Harvard University | 31.25% |

### Table 13. Harvard University — Analysis of Enrollment, 1924–25

**Geographical Distribution**

| | College | | Graduate and Professional Schools | | Per cent of Total Population of U.S. area, (1920) |
|---|---|---|---|---|---|
| | No. | Per cent | No. | Per cent | |
| **North Atlantic** | | | | | |
| New England | 1717 | 56.46 | 1518 | 37.63 | ... |
| N.Y., N.J., Pa., Del. | 697 | ... | 773 | ... | 28.3 |
| | 2414 | 79.38 | 2291 | 56.79 | |
| **South Atlantic** | | | | | |
| Va., W. Va., Ga., Fla., N. C., S. C., D. C., Md. | 76 | 2.50 | 240 | 5.95 | 13.0 |
| **Western** | | | | | |
| Colo., Calif., N. Mex., Ore., Mont., Wash., Ariz., Utah, Nev., Idaho, Wyo. | 87 | 2.86 | 304 | 7.54 | 8.4 |
| **North Central** | | | | | |
| S. D., N. D., Ill., Mich., Minn., Iowa, Mo., Wis., Ohio, Ind., Nebr., Kans. | 357 | 11.74 | 740 | 18.34 | 32.2 |
| **South Central** | | | | | |
| Ala., Tenn., Tex., Okla., Ark., Ky., La., Miss. | 55 | 1.81 | 198 | 4.91 | 18.1 |
| U.S. Territories and Foreign | 52 | 1.71 | 261 | 6.47 | ... |
| Total | 3041 | 100.00 | 4034 | 100.00 | 100.0 |

[1] In this column the Territories and Foreign Possessions do not enter into the 100 per cent; so there is a slight discrepancy in comparing it with percentages in columns 1 and 2.

Case: 19-2005   Document: 14-7   Page: 14   Filed: 03/04/2020   Entry ID: 6356615

26

TABLE 14. TABLE SHOWING GEOGRAPHICAL DISTRIBUTION OF CANDIDATES ADMITTED IN 1925
*Under the Old, New, and Honor Plans*

| | Honor | New Plan | Old Plan | Total | Honor Admissions % of Total |
|---|---|---|---|---|---|
| *North Atlantic* | | | | | |
| Maine | 6 | 2 | 1 | 9 | |
| New Hampshire | 5 | 2 | 3 | 10 | |
| Vermont | 1 | 1 | 1 | 3 | |
| Massachusetts | 154 | 77 | 307 | 538 | |
| Connecticut | 11 | 0 | 8 | 19 | |
| Rhode Island | 3 | 3 | 3 | 9 | |
| Total, New England States | 180 | 84 | 324 | 588 | 30.6% |
| New York | 38 | 55 | 62 | 155 | |
| New Jersey | 12 | 8 | 13 | 33 | |
| Pennsylvania | 13 | 9 | 17 | 39 | |
| | 243 | 156 | 416 | 815 | 29.77% |
| *South Atlantic* | | | | | |
| Florida | 0 | 1 | 0 | 1 | |
| Virginia | 2 | 1 | 0 | 3 | |
| Georgia | 3 | 1 | 0 | 4 | |
| District of Columbia | 3 | 0 | 2 | 5 | |
| West Virginia | 1 | 0 | 1 | 2 | |
| South Carolina | 1 | 0 | 0 | 1 | |
| | 10 | 3 | 3 | 16 | 62.5% |
| *Western* | | | | | |
| California | 2 | 10 | 4 | 16 | |
| Washington | 2 | 0 | 1 | 3 | |
| New Mexico | 0 | 1 | 0 | 1 | |
| Colorado | 0 | 1 | 1 | 2 | |
| Utah | 1 | 1 | 0 | 2 | |
| Idaho | 1 | 0 | 0 | 1 | |
| | 6 | 13 | 6 | 25 | 24% |
| *North Central* | | | | | |
| North Dakota | 1 | 0 | 0 | 1 | |
| South Dakota | 0 | 1 | 0 | 1 | |
| Illinois | 14 | 4 | 8 | 26 | |
| Michigan | 3 | 1 | 3 | 7 | |
| Minnesota | 2 | 1 | 3 | 6 | |
| Iowa | 0 | 1 | 2 | 3 | |
| Missouri | 2 | 0 | 10 | 12 | |
| Wisconsin | 3 | 2 | 1 | 6 | |
| Ohio | 15 | 8 | 6 | 29 | |
| Indiana | 3 | 0 | 0 | 3 | |
| Nebraska | 1 | 0 | 0 | 1 | |
| | 44 | 18 | 33 | 95 | 46.3% |

27

TABLE 14 (*Continued*)

| | Honor | New Plan | Old Plan | Total | Honor Admissions % of Total |
|---|---|---|---|---|---|
| *South Central* | | | | | |
| Alabama | 1 | 0 | 0 | 1 | |
| Tennessee | 4 | 0 | 1 | 5 | |
| Texas | 1 | 0 | 1 | 2 | |
| Oklahoma | 1 | 0 | 2 | 3 | |
| Kentucky | 4 | 0 | 0 | 4 | |
| | 11 | 0 | 4 | 15 | 73.3% |
| Total for North Atlantic States plus Illinois and Ohio (schools which make a specialty of fitting for colleges like Harvard being numerous in these states) | 272 | 168 | 430 | 870 | 31.26% |
| Total for remainder of Continental United States | 42 | 22 | 32 | 96 | 43.7% |
| Total, Continental United States | 314 | 190 | 462 | 966 | 32.5% |
| *Insular Territories* | | | | | |
| Hawaii | 0 | 0 | 1 | 1 | |
| Porto Rico | 0 | 0 | 1 | 1 | |
| | 0 | 0 | 2 | 2 | |
| *Foreign* | | | | | |
| Bermuda | 0 | 0 | 1 | 1 | |
| Canada | 0 | 0 | 2 | 2 | |
| Cuba | 0 | 0 | 1 | 1 | |
| Guatemala | 0 | 0 | 1 | 1 | |
| Jamaica | 0 | 1 | 0 | 1 | |
| Norway | 0 | 0 | 1 | 1 | |
| Peru | 0 | 0 | 1 | 1 | |
| | 0 | 1 | 7 | 8 | |
| Total, Insular Territories and Foreign Countries | 0 | 1 | 9 | 10 | |
| Grand total | 314 | 191 | 471 | 976 | 32.17% |

In the fall of 1925–26 no candidates were admitted from the following states: Delaware, Maryland, North Carolina, Louisiana, Mississippi, Arkansas, Kansas, Arizona, Wyoming, Oregon.

Case: 19-2005  Case: 14-cv-14176-ADB  Document 597-3  Filed 11/03/18  Page 16 of 19  Entry ID: 6356615



Fig. 2. Population in the U. S. (Exclusive of Outlying Possessions) Compared with Enrollment (Men and Women) in Universities, Colleges, and Professional Schools

Added Below — Registration of Harvard Freshman Class in Hundreds



Fig. 1. College Attendance — 1870-71 to 1924-25

Case: 19-2005   Case 1:14-cv-14176-ADB   Document 577-3   Filed 07/30/18   Page 17 of 19   Entry ID: 6356615



Fig. 4.   Certain Comparisons of the Rate of Growth of Population and College Enrollment

"Population in Millions" is that of the New England States plus New York and New Jersey. "Registration in Thousands" is the total for Harvard, Yale, Columbia, Princeton, Brown, Cornell, Amherst, Dartmouth, Williams, Bowdoin, Tufts. "Registration in Hundreds" is (above) that of the Harvard Freshman Class, (below) that of students from above named states in the Harvard Freshman Class.



Fig. 3.   The Rate of Growth of the College Compared with that of the University

Case: 19-2005 Case: 14-cv-14976-ADB Document 597-3 Filed 10/03/18 Page 18 of Entry ID: 6356615




Fig. 5. Comparison of Rates of Growth of Harvard University and Certain Departments

## Fitzsimmons W MERGED PA DC on 10-25 PLAYED on 10-26

| Designation | Source | Tx Duration | Remains | Barcode |
|---|---|---|---|---|
| **46:5 -46:17** | Fitzsimmons, William 2017-08-03    00:00:57 | | 00:27:39 | V1.1 |

| | | |
|---|---|---|
| 46:5 | Q. Do you know what the annual budget is for | |
| 46:6 | the admissions office? | |
| 46:7 | A. We -- you know, we don't have a -- we | |
| 46:8 | submit a budget every year.  I don't have an exact | |
| 46:9 | amount to give you.  What we are told is that our | |
| 46:10 | mission is clear that we need to get, you know, the | |
| 46:11 | best, most interesting students who will be the | |
| 46:12 | best educators of others during the four years and | |
| 46:13 | beyond from all backgrounds.  We are not given a | |
| 46:14 | rigid limit on the amount of financial aid that | |
| 46:15 | we -- we would be -- we'd have to meet. | |
| 46:16 | Q. Ballpark, not the exact number, do you | |
| 46:17 | know what that annual budget is? | |

| Designation | Source | Tx Duration | Remains | Barcode |
|---|---|---|---|---|
| **46:20 -46:25** | Fitzsimmons, William 2017-08-03    00:00:18 | | 00:26:42 | V1.2 |

| | |
|---|---|
| 46:20 | A. I don't have an exact number.  The |
| 46:21 | financial aid budget these days for one year for |
| 46:22 | Harvard College is around $180 million. |
| 46:23 | Q. That's money to be distributed through |
| 46:24 | financial aid, or does it also include the |
| 46:25 | financial aid operations? |

| Designation | Source | Tx Duration | Remains | Barcode |
|---|---|---|---|---|
| **47:3 -47:4** | Fitzsimmons, William 2017-08-03    00:00:06 | | 00:26:24 | V1.3 |

| | |
|---|---|
| 47:3 | A. That would be money going directly to |
| 47:4 | undergraduate for financial aid. |

| Designation | Source | Tx Duration | Remains | Barcode |
|---|---|---|---|---|
| **48:21 -49:10** | Fitzsimmons, William 2017-08-03    00:00:45 | | 00:26:18 | V1.4 |

| | |
|---|---|
| 48:21 | Q. I'm sorry.  I meant -- I thought you |
| 48:22 | referred to recruitment groups as they reached out |
| 48:23 | to people who were prospective candidates for |
| 48:24 | admission who they thought would be eligible for |
| 48:25 | HFAI? |
| 49:1 | FITZSIMMONS |
| 49:2 | A. Our own students who are part of HFAI, our |
| 49:3 | current undergraduates, they would reach out to |
| 49:4 | students in general we think might be eligible for |
| 49:5 | the largest financial grants, if that's what you |
| 49:6 | mean. |
| 49:7 | Q. Yes.  And so those students who are |
| 49:8 | identified as potentially eligible, do they receive |
| 49:9 | an admissions benefit by dint of their potential |
| 49:10 | eligibility? |

| Designation | Source | Tx Duration | Remains | Barcode |
|---|---|---|---|---|
| **49:12 -49:18** | Fitzsimmons, William 2017-08-03    00:00:27 | | 00:25:33 | V1.5 |

## JA3708

| | | | | | |
|---|---|---|---|---|---|
| | 49:12 | A. The fact that they would be eligible for | | | |
| | 49:13 | HFAI typically would be 80,000 or under.  And, | | | |
| | 49:14 | particularly, 65,000 or under would be one factor | | | |
| | 49:15 | among all the other factors that, you know, you | | | |
| | 49:16 | would find in any single application.  That would | | | |
| | 49:17 | certainly be one factor that would be taken into | | | |
| | 49:18 | account. | | | |

| **134:14 - 134:22** | Fitzsimmons, William 2017-08-03 | 00:00:12 | 00:25:06 | | V1.6 |
|---|---|---|---|---|---|
| | 134:14 | Q. Does Harvard intend to stop using race in | | | |
| | 134:15 | its admissions process? | | | |
| | 134:16 | A. No. | | | |
| | 134:17 | Q. No? | | | |
| | 134:18 | A. I'm sorry.  I didn't realize you didn't | | | |
| | 134:19 | finish your question.  I apologize. | | | |
| | 134:20 | Q. That's okay.  The answer is no? | | | |
| | 134:21 | A. No. | | | |
| | 134:22 | Q. At any point in time? | | | |

| **134:24 - 135:3** | Fitzsimmons, William 2017-08-03 | 00:00:10 | 00:24:54 | | V1.7 |
|---|---|---|---|---|---|
| | 134:24 | A. There is no evidence for that. | | | |
| | 134:25 | Q. And what evidence would it take to | | | |
| | 135:1 | FITZSIMMONS | | | |
| | 135:2 | convince you that Harvard should no longer use race | | | |
| | 135:3 | in the admissions process? | | | |

| **135:5 - 135:6** | Fitzsimmons, William 2017-08-03 | 00:00:06 | 00:24:44 | | V1.8 |
|---|---|---|---|---|---|
| | 135:5 | A. I haven't seen any evidence, and I don't | | | |
| | 135:6 | know what form such evidence might take. | | | |

| **142:2 - 142:5** | Fitzsimmons, William 2017-08-03 | 00:00:10 | 00:24:38 | | V1.9 |
|---|---|---|---|---|---|
| | 142:2 | Q. If Harvard wanted to, could it ensure that | | | |
| | 142:3 | readers of files did not receive information about | | | |
| | 142:4 | the box that the applicant checked with respect to | | | |
| | 142:5 | racial identity? | | | |

| **142:7 - 142:15** | Fitzsimmons, William 2017-08-03 | 00:00:21 | 00:24:28 | | V1.10 |
|---|---|---|---|---|---|
| | 142:7 | A. You mean mechanically? | | | |
| | 142:8 | Q. Yes. | | | |
| | 142:9 | A. I use the summary sheet, reader sheet, the | | | |
| | 142:10 | one we talked about before.  Could we not provide | | | |
| | 142:11 | it mechanically?  Yes. | | | |
| | 142:12 | Q. You could screen off that information from | | | |
| | 142:13 | being available to those reading the file, whether | | | |
| | 142:14 | they checked the box or not or what they identified | | | |
| | 142:15 | as? | | | |

| **142:17 - 142:23** | Fitzsimmons, William 2017-08-03 | 00:00:11 | 00:24:07 | | V1.11 |
|---|---|---|---|---|---|
| | 142:17 | A. Mechanically, yes. | | | |

**JA3709**

|  |  |  |  |  |
|---|---|---|---|---|
| | 142:18 | Q. So in some cases it might still come | | |
| | 142:19 | through from the essay or the personal statement or | | |
| | 142:20 | some recommendation, right? | | |
| | 142:21 | A. In any number of different ways. | | |
| | 142:22 | Q. All right.  Do you think that's always | | |
| | 142:23 | true? | | |

| **142:25 - 143:6** | Fitzsimmons, William 2017-08-03 | 00:00:06 | 00:23:56 | V1.12 |
|---|---|---|---|---|
| | 142:25 | A. In every case? | | |
| | 143:1 | FITZSIMMONS | | |
| | 143:2 | Q. Yes. | | |
| | 143:3 | A. No. | | |
| | 143:4 | Q. Do you know how many applications, on | | |
| | 143:5 | average, contain that information in those | | |
| | 143:6 | statements? | | |

| **143:8 - 143:8** | Fitzsimmons, William 2017-08-03 | 00:00:03 | 00:23:50 | V1.13 |
|---|---|---|---|---|
| | 143:8 | A. There's no way to estimate that. | | |

| **153:10 - 153:21** | Fitzsimmons, William 2017-08-03 | 00:00:24 | 00:23:47 | V1.14 |
|---|---|---|---|---|
| | 153:10 | Q. Is Harvard attempting to obtain critical | | |
| | 153:11 | mass of any particular ethnic group at the college? | | |
| | 153:12 | A. I'm not sure what you would mean by | | |
| | 153:13 | critical mass. | | |
| | 153:14 | Q. Have you heard that term before? | | |
| | 153:15 | A. I've heard it in physics.  I've heard it | | |
| | 153:16 | in, you know, in -- you know, I've heard the term | | |
| | 153:17 | before. | | |
| | 153:18 | Q. Have you heard it used with respect to the | | |
| | 153:19 | use of race in college admissions? | | |
| | 153:20 | A. Occasionally. | | |
| | 153:21 | Q. Is it ever used at Harvard? | | |

| **153:23 - 154:5** | Fitzsimmons, William 2017-08-03 | 00:00:13 | 00:23:23 | V1.15 |
|---|---|---|---|---|
| | 153:23 | A. I have never used it. | | |
| | 153:24 | Q. Have you ever used it to describe what | | |
| | 153:25 | Harvard's attempting to achieve? | | |
| | 154:1 | FITZSIMMONS | | |
| | 154:2 | A. No. | | |
| | 154:3 | Q. I take it, then, that Harvard does not | | |
| | 154:4 | have its own definition of what constitutes | | |
| | 154:5 | critical mass? | | |

| **154:7 - 154:11** | Fitzsimmons, William 2017-08-03 | 00:00:15 | 00:23:10 | V1.16 |
|---|---|---|---|---|
| | 154:7 | A. I certainly don't. | | |
| | 154:8 | Q. And if I understand your testimony | | |
| | 154:9 | previously, you can't provide any range or | | |
| | 154:10 | quantification of what level of racial diversity is | | |
| | 154:11 | sufficient to achieve Harvard's educational goals? | | |

## JA3710

Fitzsimmons W MERGED PA DC on 10-25 PLAYED on 10-26

| | | | | |
|---|---|---|---|---|
| **154:13 - 154:13** | Fitzsimmons, William 2017-08-03 | 00:00:01 | 00:22:55 | V1.17 |
| | 154:13    A. That would be correct. | | | |
| **180:10 - 180:13** | Fitzsimmons, William 2017-08-03 | 00:00:09 | 00:22:54 | V1.18 |
| | 180:10    Q. Are you aware of any formal analysis on | | | |
| | 180:11        paper that purports to analyze how these could be | | | |
| | 180:12        used and what the result of them would be instead | | | |
| | 180:13        of using race? | | | |
| **180:15 - 180:18** | Fitzsimmons, William 2017-08-03 | 00:00:11 | 00:22:45 | V1.19 |
| | 180:15    A. Formal analysis? | | | |
| | 180:16    Q. Something in writing. | | | |
| | 180:17    A. Something that doesn't -- nothing as | | | |
| | 180:18        specific as what you're describing comes to mind. | | | |
| **180:21 - 180:22** | Fitzsimmons, William 2017-08-03 | 00:00:03 | 00:22:34 | V1.20 |
| | 180:21        Since this lawsuit, are you aware of any | | | |
| | 180:22        such formal analysis? | | | |
| **181:5 - 181:9** | Fitzsimmons, William 2017-08-03 | 00:00:17 | 00:22:31 | V1.21 |
| | 181:5    A. I think the answer to that question would | | | |
| | 181:6        be in the interrogatory regarding -- I believe, if | | | |
| | 181:7        I understand your question, the Ryan committee and | | | |
| | 181:8        then the committee that Dean Khurana and Dean Smith | | | |
| | 181:9        and I are on. | | | |
| **204:13 - 204:18** | Fitzsimmons, William 2017-08-03 | 00:00:08 | 00:22:14 | V1.22 |
| | 204:13    Q. Do you know -- do you think that Harvard | | | |
| | 204:14        is doing all it can to achieve socioeconomic | | | |
| | 204:15        diversity? | | | |
| | 204:16    A. Yes. | | | |
| | 204:17    Q. Do you think there's anything else it can | | | |
| | 204:18        do? | | | |
| **204:20 - 204:21** | Fitzsimmons, William 2017-08-03 | 00:00:03 | 00:22:06 | V1.23 |
| | 204:20    A. Not at the moment, but we stay open to | | | |
| | 204:21        possibilities. | | | |
| **213:5 - 213:9** | Fitzsimmons, William 2017-08-03 | 00:00:12 | 00:22:03 | V1.24 |
| | 213:5    Q. When was the Ryan committee formed? | | | |
| | 213:6    A. I'm not sure precisely, but I would guess | | | |
| | 213:7        2014. | | | |
| | 213:8    Q. Okay.  Do you know why the Ryan committee | | | |
| | 213:9        was formed? | | | |
| **213:14 - 213:22** | Fitzsimmons, William 2017-08-03 | 00:00:25 | 00:21:51 | V1.25 |
| | 213:14    A. Just from looking at the charge of the | | | |
| | 213:15        committee, that's how I would know. | | | |
| | 213:16    Q. What was your role in the Ryan committee? | | | |
| | 213:17    A. One of, you know, any number of members. | | | |

**JA3711**

**Fitzsimmons W MERGED PA DC on 10-25 PLAYED on 10-26**

| | | | | | |
|---|---|---|---|---|---|
| | 213:18 | Q. And what was the charge of the Ryan | | | |
| | 213:19 | committee? | | | |
| | 213:20 | A. It had do with race-neutral admissions. | | | |
| | 213:21 | Q. And, in particular, what did it have to do | | | |
| | 213:22 | with race-neutral admissions? | | | |
| **213:24 - 214:3** | Fitzsimmons, William 2017-08-03 | 00:00:11 | 00:21:26 | | V1.26 |
| | 213:24 | A. I can't recall specifically, you know, | | | |
| | 213:25 | other than the general -- the general topic. | | | |
| | 214:1 | FITZSIMMONS | | | |
| | 214:2 | Q. And do you know why the Ryan committee was | | | |
| | 214:3 | asked to look at race-neutral admissions? | | | |
| **214:7 - 214:14** | Fitzsimmons, William 2017-08-03 | 00:00:33 | 00:21:15 | | V1.27 |
| | 214:7 | A. I don't really know, based -- I don't know | | | |
| | 214:8 | what discussions, you know, Dean Ryan had with | | | |
| | 214:9 | others, so I simply don't know. | | | |
| | 214:10 | Q. How often did the Ryan committee meet? | | | |
| | 214:11 | A. I believe it met perhaps three times. | | | |
| | 214:12 | Q. Before the Ryan committee, are you aware | | | |
| | 214:13 | of any other committee at Harvard that was tasked | | | |
| | 214:14 | with analyzing race-neutral admissions? | | | |
| **214:16 - 214:20** | Fitzsimmons, William 2017-08-03 | 00:00:16 | 00:20:42 | | V1.28 |
| | 214:16 | A. No committee with that specific charge. | | | |
| | 214:17 | Q. Are you aware of any committee that | | | |
| | 214:18 | specifically discussed race-neutral admissions to | | | |
| | 214:19 | replace the use of race in Harvard's admissions | | | |
| | 214:20 | process? | | | |
| **214:22 - 214:25** | Fitzsimmons, William 2017-08-03 | 00:00:07 | 00:20:26 | | V1.29 |
| | 214:22 | A. I don't. | | | |
| | 214:23 | Q. Do you expect that you would be aware of | | | |
| | 214:24 | any such committee, given your role as dean of | | | |
| | 214:25 | admissions? | | | |
| **215:3 - 215:3** | Fitzsimmons, William 2017-08-03 | 00:00:01 | 00:20:19 | | V1.30 |
| | 215:3 | A. Yes. | | | |
| **260:16 - 261:19** | Fitzsimmons, William 2017-08-03 | 00:01:43 | 00:20:18 | | V1.31 |
| | 260:16 | Q. Are you familiar with the phrase "standard | | | |
| | 260:17 | strong" as it's used in the reading process? | | | |
| | 260:18 | A. I am familiar with the phrase. | | | |
| | 260:19 | Q. What does standard strong mean? | | | |
| | 260:20 | A. I would say pretty much what the words | | | |
| | 260:21 | mean in standard usage.  We have, as I indicated | | | |
| | 260:22 | before, many, many strong candidates and many | | | |
| | 260:23 | people who present extremely strong standardized | | | |
| | 260:24 | tests and grades, so that would certainly be a -- | | | |

**JA3712**

| | | | | | |
|---|---|---|---|---|---|
| | 260:25 | someone who might be described as standard strong. | | | |
| | 261:1 | FITZSIMMONS | | | |
| | 261:2 | It's not a term that I use myself, particularly, | | | |
| | 261:3 | but it certainly indicates, you know, some real | | | |
| | 261:4 | strength to be in that pool, to be standard strong. | | | |
| | 261:5 | Q. What makes it standard? | | | |
| | 261:6 | A. There may not yet be something that might | | | |
| | 261:7 | make that person quite as strong an educator of | | | |
| | 261:8 | others or quite as strong as an applicant overall | | | |
| | 261:9 | as some others because it is, you know, it is a | | | |
| | 261:10 | competition where there's lots of strength.  But | | | |
| | 261:11 | that would probably be the best description I could | | | |
| | 261:12 | give. | | | |
| | 261:13 | Q. Is that something else, that other thing, | | | |
| | 261:14 | sometimes referred to in the admissions office as a | | | |
| | 261:15 | "distinguishing excellence"? | | | |
| | 261:16 | A. It could be. | | | |
| | 261:17 | Q. Or DE? | | | |
| | 261:18 | A. It could be. | | | |
| | 261:19 | Q. What's a distinguishing excellence? | | | |

| **261:21 - 262:2** | Fitzsimmons, William 2017-08-03 | 00:00:26 | 00:18:35 | V1.32 |
|---|---|---|---|---|
| | 261:21 | A. It would be -- it could be an excellence | | |
| | 261:22 | of any kind one could imagine, but it would be an | | |
| | 261:23 | additional factor that might help the admissions | | |
| | 261:24 | committee understand better what kind of a | | |
| | 261:25 | contribution this particular applicant might make | | |
| | 262:1 | FITZSIMMONS | | |
| | 262:2 | to the -- to fellow classmates. | | |

| **263:15 - 264:13** | Fitzsimmons, William 2017-08-03 | 00:01:16 | 00:18:09 | V1.33 |
|---|---|---|---|---|
| | 263:15 | Q. What's a CJer? | | |
| | 263:16 | A. A CJer used to be a person who was | | |
| | 263:17 | interested in biological sciences which, I recall, | | |
| | 263:18 | was the C.  And the J, I believe, was medicine. | | |
| | 263:19 | So that would be a person who was interested in, | | |
| | 263:20 | perhaps, something medical and who might be | | |
| | 263:21 | interested in one of the various biological | | |
| | 263:22 | sciences as a possible concentration. | | |
| | 263:23 | Q. To borrow your phrase earlier, this | | |
| | 263:24 | strikes me as it must be some form of | | |
| | 263:25 | Harvard-speak.  Why would C and J be associated | | |
| | 264:1 | FITZSIMMONS | | |
| | 264:2 | with biological sciences and medical? | | |
| | 264:3 | A. Simply because the coding used to use | | |
| | 264:4 | alphabetic -- you know, use the alphabet to | | |
| | 264:5 | indicate certain concentrations.  I'm not sure | | |

Case: 19-2005    Document: 00117625340    Page: 790    Date Filed: 07/30/2020    Entry ID: 6356615
Case 1:14-cv-14176-ADB   Document 597-1   Filed 10/27/18   Page 7 of 15

Fitzsimmons W MERGED PA DC on 10-25 PLAYED on 10-26

| 264:6 | those are the same letters that are used today, but |
| 264:7 | certainly there are people around who would use |
| 264:8 | that.  I think, B, I think, was humanities for |
| 264:9 | example.  I may be wrong on that. |
| 264:10 | Q. But that's an artifact, essentially, of |
| 264:11 | the former database system? |
| 264:12 | A. Yes, it probably is an artifact at this |
| 264:13 | point. |

| **279:17 -279:19** | Fitzsimmons, William 2017-08-03 | 00:00:07 | 00:16:53 | V1.34 |

| 279:17 | Q. Before the subcommittee process begins, |
| 279:18 | does each docket receive a target number? |
| 279:19 | A. Yes. |

| **279:21 -281:3** | Fitzsimmons, William 2017-08-03 | 00:02:14 | 00:16:46 | V1.35 |

| 279:21 | Q. And how is that target number calculated? |
| 279:22 | A. It's the roughest of rough estimates based |
| 279:23 | on the quality of the applicants the previous year |
| 279:24 | from that area with the information about number of |
| 279:25 | applicants, the number of people admitted from that |
| 280:1 | FITZSIMMONS |
| 280:2 | particular area, which would be a measure of the |
| 280:3 | quality. |
| 280:4 | And then you would have the information |
| 280:5 | this year of any variations in the application |
| 280:6 | numbers.  And then, depending on where you are in |
| 280:7 | the process, you would have the admits so far, |
| 280:8 | which would be, again, a rough measure of -- this |
| 280:9 | is on, say, a one-pager as we had talked about |
| 280:10 | before. |
| 280:11 | So it's a very, very, very rough way to |
| 280:12 | start, just to -- but because our recruiting is so |
| 280:13 | comprehensive and because every year we are |
| 280:14 | writing, as you know, and communicating with |
| 280:15 | thousands and thousands of applicants in very much |
| 280:16 | the same way from year to year, we will tend to |
| 280:17 | have -- from one year to the next, you tend to have |
| 280:18 | the roughly the same number and then roughly the |
| 280:19 | same quality from an area. |
| 280:20 | Although, and the reason I use the word |
| 280:21 | rough, very rough to describe the targets is that |
| 280:22 | until you actually read the applications, you -- |
| 280:23 | and go through committee, you don't really know |
| 280:24 | what the quality is this year. |
| 280:25 | So the targets are just a starting point |
| 281:1 | FITZSIMMONS |
| 281:2 | that we all know may end up not at all representing |

## JA3714

**Fitzsimmons W MERGED PA DC on 10-25 PLAYED on 10-26**

|  |  |  |  |  |  |
|---|---|---|---|---|---|
|  | 281:3 | the quality this year versus last year. |  |  |  |
| **285:11 - 285:17** | Fitzsimmons, William 2017-08-03 | | 00:00:15 | 00:14:32 | V1.36 |
|  | 285:11 | Q. So the targets that get generated through |  |  |  |
|  | 285:12 | this series of assumptions and calculations you |  |  |  |
|  | 285:13 | just described, those are distributed to each |  |  |  |
|  | 285:14 | docket chair? |  |  |  |
|  | 285:15 | A. Yes. |  |  |  |
|  | 285:16 | Q. And are those docket chairs, do they |  |  |  |
|  | 285:17 | consider those to be hard or soft targets? |  |  |  |
| **285:19 - 285:19** | Fitzsimmons, William 2017-08-03 | | 00:00:02 | 00:14:17 | V1.37 |
|  | 285:19 | A. I would say generally hard. |  |  |  |
| **285:20 - 287:8** | Fitzsimmons, William 2017-08-03 | | 00:02:39 | 00:14:15 | V1.38 |
|  | 285:20 | Q. They're expected to come to the full |  |  |  |
|  | 285:21 | committee meeting -- |  |  |  |
|  | 285:22 | A. Oh, I see what you're saying. I'm sorry. |  |  |  |
|  | 285:23 | When I said hard, I thought you meant difficult to |  |  |  |
|  | 285:24 | meet. Sorry. |  |  |  |
|  | 285:25 | We look -- the way I would look at them is |  |  |  |
|  | 286:1 | FITZSIMMONS |  |  |  |
|  | 286:2 | that they are -- we know that the targets are the |  |  |  |
|  | 286:3 | roughest of estimates, and so we tell our -- and we |  |  |  |
|  | 286:4 | know that every docket has far more attractive |  |  |  |
|  | 286:5 | students on the docket to admit than they have room |  |  |  |
|  | 286:6 | to admit, given the targets. |  |  |  |
|  | 286:7 | So we tell the dockets that here is the |  |  |  |
|  | 286:8 | target, this is a number, but we also would like to |  |  |  |
|  | 286:9 | know who are the strongest students who didn't make |  |  |  |
|  | 286:10 | it at this time; who are the weakest students who |  |  |  |
|  | 286:11 | did make it; who are the students who look |  |  |  |
|  | 286:12 | promising, but perhaps we need additional |  |  |  |
|  | 286:13 | information. |  |  |  |
|  | 286:14 | And, occasionally, we'll even say to them |  |  |  |
|  | 286:15 | in addition to that, we'll say to a subcommittee or |  |  |  |
|  | 286:16 | a docket that -- we'll say, look, we know we'll be |  |  |  |
|  | 286:17 | reviewing you in full committee. It'll be better |  |  |  |
|  | 286:18 | for everyone if we just give you some more spaces |  |  |  |
|  | 286:19 | now because we know -- I might, for example, read |  |  |  |
|  | 286:20 | some of these cases, and I know how strong, based |  |  |  |
|  | 286:21 | on my overview of the situation. |  |  |  |
|  | 286:22 | There are also dockets that will sometimes |  |  |  |
|  | 286:23 | come under target, so that they will keep lists of |  |  |  |
|  | 286:24 | the strongest ones in, the weakest ones out. They |  |  |  |
|  | 286:25 | may have people for whom they need additional |  |  |  |
|  | 287:1 | FITZSIMMONS |  |  |  |

**JA3715**

**Fitzsimmons W MERGED PA DC on 10-25 PLAYED on 10-26**

| | 287:2 | information, so they would say at this time we will | | | |
|---|---|---|---|---|---|
| | 287:3 | prefer to come in under target, and we'll get the | | | |
| | 287:4 | late information and see where all this goes. | | | |
| | 287:5 | Q. In the full committee process, can some | | | |
| | 287:6 | spots shift between dockets, so one docket ends up | | | |
| | 287:7 | with more than what their initial target was and | | | |
| | 287:8 | one docket ends up with less? | | | |

| **287:10 - 287:11** | Fitzsimmons, William 2017-08-03 | 00:00:02 | 00:11:36 | V1.39 |
|---|---|---|---|---|
| | 287:10 | A. Yes. | | |
| | 287:11 | Q. Does that happen a lot? | | |

| **287:13 - 287:13** | Fitzsimmons, William 2017-08-03 | 00:00:01 | 00:11:34 | V1.40 |
|---|---|---|---|---|
| | 287:13 | A. Yes. | | |

| **291:19 - 292:5** | Fitzsimmons, William 2017-08-03 | 00:00:26 | 00:11:33 | V1.41 |
|---|---|---|---|---|
| | 291:19 | MR. STRAWBRIDGE: Hand you a document | | |
| Link > P177.1 | 291:20 | marked as Exhibit 5. | | |
| | 291:21 | Q. Do you recognize this document? | | |
| | 291:22 | A. Yes. | | |
| Link > P177.1.1 | 291:23 | Q. Is this the copy of the target report that | | |
| | 291:24 | would be prepared for the regular action cycle for | | |
| | 291:25 | the class of 2018? | | |
| | 292:1 | FITZSIMMONS | | |
| | 292:2 | MS. ELLSWORTH: Why don't you look at the | | |
| | 292:3 | whole document. | | |
| | 292:4 | A. Can I look at the whole document first? | | |
| | 292:5 | Q. If you need to. | | |

| **292:6 - 292:12** | Fitzsimmons, William 2017-08-03 | 00:00:17 | 00:11:07 | V1.42 |
|---|---|---|---|---|
| | 292:6 | A. Yes. | | |
| | 292:7 | Q. Yes, this is the target for the class of | | |
| | 292:8 | 2018? | | |
| | 292:9 | A. Yes. | | |
| | 292:10 | Q. Okay. And is this typical of the reports | | |
| | 292:11 | that you receive during the process of setting the | | |
| | 292:12 | targets? | | |

| **292:14 - 292:17** | Fitzsimmons, William 2017-08-03 | 00:00:07 | 00:10:50 | V1.43 |
|---|---|---|---|---|
| | 292:14 | A. It's certainly what we received this | | |
| | 292:15 | particular year. | | |
| | 292:16 | Q. I mean, does this look different than what | | |
| | 292:17 | you're used to getting? | | |

| **292:19 - 293:3** | Fitzsimmons, William 2017-08-03 | 00:00:25 | 00:10:43 | V1.44 |
|---|---|---|---|---|
| | 292:19 | A. It looks, you know, I don't have another | | |
| | 292:20 | one to look at, but it looks, certainly, relatively | | |
| | 292:21 | similar. | | |
| | 292:22 | Q. On the page of this document that begins | | |

**JA3716**

Fitzsimmons W MERGED PA DC on 10-25 PLAYED on 10-26

| | | | | | |
|---|---|---|---|---|---|
| Link > P177.4 | 292:23 | in the lower right-hand corner with the suffix | | | |
| Link > P177.4.1 | 292:24 | 4101, there is information broken up by ethnicity? | | | |
| | 292:25 | A. Yes. | | | |
| | 293:1 | FITZSIMMONS | | | |
| | 293:2 | Q. So would you review this when the target | | | |
| | 293:3 | information comes along? | | | |

| **293:5 - 294:6** | Fitzsimmons, William 2017-08-03 | 00:01:45 | 00:10:18 | V1.45 |
|---|---|---|---|---|
| | 293:5 | A. It would be something I would look at |
| | 293:6 | along with all the other information, and -- but |
| | 293:7 | this is the information that I referred to |
| | 293:8 | previously.  This information that, you know, |
| | 293:9 | historically has been prepared is, you know, is |
| | 293:10 | interesting information, giving you variations, |
| | 293:11 | you know, from one year to the next.  But, |
| | 293:12 | realistically, what, you know, would really be |
| | 293:13 | important is where you ended up with last year. |
| | 293:14 | And as you can see, for example, with docket A, |
| | 293:15 | you know, it's -- you know, that's the kind of |
| | 293:16 | information that -- it essentially helps you to |
| | 293:17 | understand in summary fashion what happened, |
| | 293:18 | considering all the factors way beyond, you know, |
| | 293:19 | the things on the -- on this set of documents, you |
| | 293:20 | know, which would include ethnic information, |
| | 293:21 | information about lineage, athletes, information |
| | 293:22 | about economic background, you know, other |
| | 293:23 | information, that all of that is in a sense |
| | 293:24 | summarized by looking at where things ended up the |
| | 293:25 | previous year. |
| | 294:1 | FITZSIMMONS |
| | 294:2 | Q. Those aren't the only factors that Harvard |
| | 294:3 | considers in its admissions process? |
| | 294:4 | A. All factors are considered. |
| | 294:5 | Q. Right.  These are just the ones that are |
| | 294:6 | put on this report? |

| **294:8 - 294:8** | Fitzsimmons, William 2017-08-03 | 00:00:03 | 00:08:33 | V1.46 |
|---|---|---|---|---|
| | 294:8 | A. Yes, in this, yes. |

| **296:11 - 296:12** | Fitzsimmons, William 2017-08-03 | 00:00:03 | 00:08:30 | V1.47 |
|---|---|---|---|---|
| | 296:11 | Q. Do you have conversations about the racial |
| | 296:12 | changes by docket? |

| **296:14 - 296:16** | Fitzsimmons, William 2017-08-03 | 00:00:06 | 00:08:27 | V1.48 |
|---|---|---|---|---|
| | 296:14 | A. Occasionally.  On any of the variables, |
| | 296:15 | you know, there can be variations from year to |
| Link > Hide | 296:16 | year. |

| **323:25 - 323:25** | Fitzsimmons, William 2017-08-03 | 00:00:03 | 00:08:21 | V1.49 |
|---|---|---|---|---|

**JA3717**

|  |  |  |  |  |
|---|---|---|---|---|
| | 323:25 | Q. Do ethnicities yield at different rates? | | |
| **324:3 - 324:5** | Fitzsimmons, William 2017-08-03 | 00:00:04 | 00:08:18 | V1.50 |
| | 324:3 | A. Generally, yes. | | |
| | 324:4 | Q. Does Harvard track yield rate by | | |
| | 324:5 | ethnicity? | | |
| **324:7 - 324:9** | Fitzsimmons, William 2017-08-03 | 00:00:07 | 00:08:14 | V1.51 |
| | 324:7 | A. We're aware of it. | | |
| | 324:8 | Q. Does it actually keep tabs and make | | |
| | 324:9 | projections based on yield rate by ethnicity? | | |
| **324:11 - 324:13** | Fitzsimmons, William 2017-08-03 | 00:00:18 | 00:08:07 | V1.52 |
| | 324:11 | A. Be one of many factors that we would look | | |
| | 324:12 | at in trying to come in with a class that would | | |
| | 324:13 | meet the 1,662 ultimate goal. | | |
| **325:6 - 325:7** | Fitzsimmons, William 2017-08-03 | 00:00:03 | 00:07:49 | V1.53 |
| | 325:6 | Q. Is this information that's unusual | | (Edited) |
| | 325:7 | for you to receive at Harvard? | | |
| **325:9 - 325:10** | Fitzsimmons, William 2017-08-03 | 00:00:04 | 00:07:46 | V1.54 |
| | 325:9 | A. I have not seen it, I don't think, in this | | |
| | 325:10 | form. | | |
| **325:20 - 325:21** | Fitzsimmons, William 2017-08-03 | 00:00:03 | 00:07:42 | V1.55 |
| | 325:20 | Q. You don't know why this particular report | | |
| | 325:21 | was prepared? | | |
| **325:23 - 325:23** | Fitzsimmons, William 2017-08-03 | 00:00:01 | 00:07:39 | V1.56 |
| | 325:23 | A. No. | | |
| **326:14 - 327:15** | Fitzsimmons, William 2017-08-03 | 00:00:59 | 00:07:38 | V1.57 |
| Link > P324.1.1 | 326:14 | Q. The bottom sort of third of this chart, | | |
| | 326:15 | does that display yield rates by ethnicity for the | | |
| | 326:16 | classes of 2014 through 2017? | | |
| | 326:17 | MS. ELLSWORTH: Which page are you on? | | |
| | 326:18 | THE WITNESS: Page one? | | |
| | 326:19 | MR. STRAWBRIDGE: The first page. | | |
| | 326:20 | MS. ELLSWORTH: 1859? | | |
| | 326:21 | MR. LEE: Yes. | | |
| | 326:22 | MS. ELLSWORTH: Okay. | | |
| | 326:23 | Q. Do you see that? | | |
| | 326:24 | A. Yes. | | |
| | 326:25 | Q. All right. And so, for example, let's | | |
| | 327:1 | FITZSIMMONS | | |
| | 327:2 | just look at the most recent class on this chart, | | |
| Link > P324.1.2 | 327:3 | the class of 2017. That indicated that Asian | | |
| | 327:4 | Americans had an 83.8 percent yield that year? | | |
| | 327:5 | A. Yes. | | |

**JA3718**

**Fitzsimmons W MERGED PA DC on 10-25 PLAYED on 10-26**

| Link > P324.1.3 | 327:6 | Q. And the prior year it was 87.5 percent for |
| | 327:7 | Asian Americans? |
| | 327:8 | A. Yes. |
| Link > P324.1.4 | 327:9 | Q. And it was over 80 percent for both the |
| | 327:10 | classes of '14 and '15, was it not? |
| | 327:11 | A. Yes. |
| Link > P324.1.5 | 327:12 | Q. And African American yield in 2017 was 67 |
| | 327:13 | percent, correct? |
| | 327:14 | A. Yes. |
| | 327:15 | Q. 16 points lower? |

| **331:5 - 331:6** | Fitzsimmons, William 2017-08-03 | 00:00:03 | 00:06:39 | V1.58 |
| | 331:5 | Q. Well, isn't that what this is doing?  I |
| | 331:6 | mean, you track yield rate, correct? |

| **331:8 - 331:14** | Fitzsimmons, William 2017-08-03 | 00:00:14 | 00:06:36 | V1.59 |
| | 331:8 | A. Yes. |
| | 331:9 | Q. And you predict yield rate to set the |
| | 331:10 | targets at the beginning of the process? |
| | 331:11 | A. Yes. |
| | 331:12 | Q. And if -- the prediction is based on the |
| | 331:13 | prior year's statistics, right? |
| | 331:14 | A. Yes. |

| **331:15 - 331:22** | Fitzsimmons, William 2017-08-03 | 00:00:25 | 00:06:22 | V1.60 |
| Link > Hide | 331:15 | Q. And those predictions, in turn, those |
| | 331:16 | statistics reflect significant differences by |
| | 331:17 | ethnicity in yield rates, then does it stand to |
| | 331:18 | reason if the final 1,660 some-odd people selected |
| | 331:19 | by the full committee is significantly more Asian |
| | 331:20 | American than last year, you're going to have more |
| | 331:21 | people accept their offers of admission than you |
| | 331:22 | were planning? |

| **331:24 - 332:10** | Fitzsimmons, William 2017-08-03 | 00:00:54 | 00:05:57 | V1.61 |
| | 331:24 | A. It's possible.  But, again, one of the |
| | 331:25 | things we do in our recruiting process is look for |
| | 332:1 | FITZSIMMONS |
| | 332:2 | people from a wide range of backgrounds, including |
| | 332:3 | ethnicity, so that it's unlikely, if you continue |
| | 332:4 | to do the kind of strong recruitment that we have |
| | 332:5 | done, that you would end up in exactly the |
| | 332:6 | situation we've been in. |
| | 332:7 | Q. So your expectation based on the |
| | 332:8 | recruiting that you do is that you're going to end |
| | 332:9 | up with a pool and a final class that's similar to |
| | 332:10 | what you've had before? |

| **332:12 - 332:20** | Fitzsimmons, William 2017-08-03 | 00:00:45 | 00:05:03 | V1.62 |

**JA3719**

**Fitzsimmons W MERGED PA DC on 10-25 PLAYED on 10-26**

| | |
|---|---|
| 332:12 | A. Given the strength of the recruitment |
| 332:13 | efforts across the board which we have described in |
| 332:14 | various ways today and in the interrogative, we |
| 332:15 | would expect to get an extremely strong and diverse |
| 332:16 | applicant pool.  And given the vital importance of |
| 332:17 | having a class that is diverse ethnically and in |
| 332:18 | every other way for the educational value of our |
| 332:19 | undergraduates, it is very unlikely that the |
| 332:20 | hypothetical that you raise would ever occur. |

---

**336:16 - 336:16**    Fitzsimmons, William 2017-08-03    00:00:03    00:04:18    V1.63

| | |
|---|---|
| 336:16 | Q. Why do you track yield rates by ethnicity? |

---

**336:18 - 337:7**    Fitzsimmons, William 2017-08-03    00:00:55    00:04:15    V1.64

| | |
|---|---|
| 336:18 | A. It's simply important for us to understand |
| 336:19 | not just what might happen if a class turns out to |
| 336:20 | be a particular -- have a particular composition |
| 336:21 | ethnically, but we would look at other factors, |
| 336:22 | geography, for example, as well. |
| 336:23 | So it wouldn't simply be the only factor. |
| 336:24 | But we, again -- once the meetings, you know, are, |
| 336:25 | you know, completed, we, you know, we want to make, |
| 337:1 | FITZSIMMONS |
| 337:2 | you know, as we go through the process, we want to |
| 337:3 | be certain that we have given everybody a careful |
| 337:4 | review and that in the end, based on what we can |
| 337:5 | see, have a reasonable expectation that we would be |
| 337:6 | close to our target number of residents once the |
| 337:7 | yield is completed. |

---

**337:14 - 338:6**    Fitzsimmons, William 2017-08-03    00:01:07    00:03:20    V1.65

| | |
|---|---|
| 337:14 | Q. As I understood your question is -- the |
| 337:15 | question was why do you track ethnicity yield rates |
| 337:16 | by ethnicity.  And I understood your answer to be |
| 337:17 | that as you go through the process and you give |
| 337:18 | everyone consideration, you want to make sure at |
| 337:19 | the end you have an idea as to how many people are |
| 337:20 | going to come. |
| 337:21 | A. So if -- I think the -- certainly, we are |
| 337:22 | under an obligation to make certain that we're at |
| 337:23 | or close to our resident target.  But, you know -- |
| 337:24 | and if at the end of the process one of the things |
| 337:25 | that you would -- if you found yourself, for |
| 338:1 | FITZSIMMONS |
| 338:2 | example, as an example, people from the South tend |
| 338:3 | to yield at a lower rate.  If you had more people |
| 338:4 | from the South, you could then say you might feel |

**JA3720**

**Fitzsimmons W MERGED PA DC on 10-25 PLAYED on 10-26**

| | | | |
|---|---|---|---|
| | 338:5 | free to admit more people right at the end of the | |
| | 338:6 | process, if that answers the question. | |

| **451:23 - 452:5** | Fitzsimmons, William 2017-08-03 | 00:00:17 | 00:02:13 | V1.66 |
|---|---|---|---|---|
| | 451:23 | Q. Do you know what ABAFAOILSS is? | |
| | 451:24 | A. Yes. | |
| | 451:25 | Q. Does Harvard send a representative to | |
| | 452:1 | FITZSIMMONS | |
| | 452:2 | ABAFAOILSS meetings? | |
| | 452:3 | A. Usually. | |
| | 452:4 | Q. And does that representative participate | |
| | 452:5 | in the round-robin exchange at those meetings? | |

| **452:7 - 452:16** | Fitzsimmons, William 2017-08-03 | 00:00:32 | 00:01:56 | V1.67 |
|---|---|---|---|---|
| | 452:7 | A. I'm not sure specifically whether every | |
| | 452:8 | year our representative has participated in the | |
| | 452:9 | round-robin. | |
| | 452:10 | Q. In the past has data from the round-robin | |
| | 452:11 | been given to you following the ABAFAOILSS | |
| | 452:12 | meetings? | |
| | 452:13 | A. I can recall some years getting some data. | |
| | 452:14 | Q. What did you do with that data? | |
| | 452:15 | A. Simply noted it. | |
| | 452:16 | Q. And why did you note it? | |

| **452:18 - 452:23** | Fitzsimmons, William 2017-08-03 | 00:00:26 | 00:01:24 | V1.68 |
|---|---|---|---|---|
| | 452:18 | A. As information that it would be useful in | |
| | 452:19 | getting to know what happens beyond Harvard and our | |
| | 452:20 | profession. | |
| | 452:21 | Q. Is it useful for you to understand the | |
| | 452:22 | context of what other Ivy League schools are doing | |
| | 452:23 | with respect to their admissions? | |

| **452:25 - 453:4** | Fitzsimmons, William 2017-08-03 | 00:00:09 | 00:00:58 | V1.69 |
|---|---|---|---|---|
| | 452:25 | A. It could be useful. | |
| | 453:1 | FITZSIMMONS | |
| | 453:2 | Q. Does that include it's useful to have | |
| | 453:3 | information about the ethnic composition of their | |
| | 453:4 | admitted classes? | |

| **453:6 - 453:8** | Fitzsimmons, William 2017-08-03 | 00:00:06 | 00:00:49 | V1.70 |
|---|---|---|---|---|
| | 453:6 | A. It could be useful. | |
| | 453:7 | Q. And to what use do you recall putting that | |
| | 453:8 | data from ABAFAOILSS? | |

| **453:10 - 453:12** | Fitzsimmons, William 2017-08-03 | 00:00:15 | 00:00:43 | V1.71 |
|---|---|---|---|---|
| | 453:10 | A. Simply to have this information. And, of | |
| | 453:11 | course, this information would almost always be | |
| | 453:12 | publicly available. | |

**JA3721**

**Fitzsimmons W MERGED PA DC on 10-25 PLAYED on 10-26**

| | | | | | |
|---|---|---|---|---|---|
| **453:13 - 453:15** | Fitzsimmons, William 2017-08-03 | 00:00:11 | 00:00:28 | | V1.72 |

453:13    Q. Does the ABAFAOILSS information include
453:14       information about the applications that were filed
453:15       by various ethnic applicants?

| | | | | | |
|---|---|---|---|---|---|
| **453:17 - 453:21** | Fitzsimmons, William 2017-08-03 | 00:00:19 | 00:00:19 | | V1.73 |

453:17    A. I don't recall specifically whether
453:18       institutions would provide that data per se.
453:19    Q. Do you know whether admission rate
453:20       information is provided?
453:21    A. I do not.

Play Time for this Script:    **00:27:39**

Total time for all Scripts in this report:    **00:27:39**

**CERTIFICATE OF SERVICE**

I mailed copies of this appendix to the Court and to the following counsel:

William F. Lee
Felicia H. Ellsworth
Andrew S. Dulberg
Elizabeth Connell Mooney
Joseph H. Mueller
WILMER CUTLER PICKERING
HALE AND DORR LLP
60 State Street
Boston, MA 02109
Tel: (617) 526-6687
Fax: (617) 526-5000
william.lee@wilmerhale.com
felicia.ellsworth@wilmerhale.com
andrew.dulberg@wilmerhale.com
elizabeth.mooney@wilmerhale.com
sarah.frazier@wilmerhale.com
joseph.mueller@wilmerhale.com


Dated: February 18, 2020                _s/ William S. Consovoy_____