No. 19-2005

## UNITED STATES COURT OF APPEALS
## FOR THE FIRST CIRCUIT

STUDENTS FOR FAIR ADMISSIONS, INC.,
*Plaintiff-Appellant,*

v.

PRESIDENT AND FELLOWS OF HARVARD COLLEGE,
*Defendant-Appellee.*

On Appeal from the United States District Court
for the District of Massachusetts

## JOINT APPENDIX
## VOLUME VII

Adam K. Mortara
J. Scott McBride
Krista J. Perry
BARTLIT BECK LLP
54 W. Hubbard St., Ste. 300
Chicago, IL 60654
(312) 494-4469

John M. Hughes
Katherine L.I. Hacker
Meg E. Fasulo
BARTLIT BECK LLP
1801 Wewatta St., Ste. 1200
Denver, CO 80202
(303) 592-3140

William S. Consovoy
Thomas R. McCarthy
J. Michael Connolly
Cameron T. Norris
CONSOVOY MCCARTHY PLLC
1600 Wilson Blvd., Ste. 700
Arlington, VA 22209
(703) 243-9423
will@consovoymccarthy.com

Patrick Strawbridge
CONSOVOY MCCARTHY PLLC
10 Post Office Sq., 8th Fl., PMB #706
Boston, MA 02109
(617) 227-0548

*Counsel for Appellant Students for Fair Admissions, Inc.*

# TABLE OF CONTENTS

**Volume I**

Docket Sheet ...................................................................................................JA1

Notice of Appeal (Doc. 674) ........................................................................JA106

Complaint (Doc. 1) ......................................................................................JA108

Dispositive Motion Exhibits

    Motion to Dismiss for Lack of Subject-Matter Jurisdiction

        Declaration of William S. Consovoy

            Exhibit I (Doc. 205-9).......................................................JA228

    Cross-Motions for Summary Judgment

        Declaration of Felicia H. Ellsworth

            Exhibit 2 (Doc. 419-2) .....................................................JA230

            Exhibit 85 (Doc. 419-85)..................................................JA244

            Exhibit 86 (Doc. 419-86)..................................................JA251

            Exhibit 87 (excerpts) (Doc. 419-87) ................................JA254

            Exhibit 88 (excerpts) (Doc. 419-89) ................................JA285

            Exhibit 89 (Doc. 419-89)..................................................JA330

            Exhibit 91 (Doc. 419-91)..................................................JA347

            Exhibit 92 (Doc. 419-92)..................................................JA370

        Declaration of Michael Connolly

            Exhibit 237 (Doc. 421-237)..............................................JA399

            Exhibit 238 (Doc. 421-238)..............................................JA418

            Exhibit 239 (Doc. 421-239)..............................................JA425

            Exhibit 240 (Doc. 421-240)..............................................JA427

            Exhibit 241 (Doc. 421-241)..............................................JA431

            Exhibit 242 (Doc. 421-242)..............................................JA434

            Exhibit 250 (Doc. 421-250)..............................................JA436

            Exhibit 251 (Doc. 421-251)..............................................JA440

Trial Transcripts

    Day 1 (Doc. 631) ...................................................................................JA443

    Day 2 (Doc. 632) ...................................................................................JA630

**Volume II**

Trial Transcripts (cont.)

    Day 3 (Doc. 633) ...................................................................................JA722

    Day 4 (Doc. 635) ...................................................................................JA952

    Day 5 (Doc. 636) .................................................................................JA1198

**Volume III**

Trial Transcripts (cont.)

    Day 6 (Doc. 638) .................................................................................JA1459

    Day 7 (Doc. 640) .................................................................................JA1690

    Day 8 (Doc. 642) .................................................................................JA1918

**Volume IV**

Trial Transcripts (cont.)

    Day 9 (Doc. 644) .................................................................................JA2163

    Day 10 (Doc. 646) ...............................................................................JA2413

    Day 11 (Doc. 648) ...............................................................................JA2535

    Day 12 (Doc. 650) ...............................................................................JA2752

**Volume V**

Trial Transcripts (cont.)

    Day 13 (Doc. 652) ........................................................................JA2937

    Day 14 (Doc. 654) ........................................................................JA3143

    Day 15 (Doc. 656) ........................................................................JA3404

    Closing Arguments (Doc. 666)...................................................JA3559

Trial Exhibits

    Plaintiff's Trial Exhibits

        Request for Judicial Notice (excerpts) (Doc. 577).......................JA3688

        Notice of Deposition Designations Played in Court (Doc. 597-1)............JA3708

**Volume VI**

    Plaintiff's Trial Exhibits (cont.)

    PX1    .....................................................................................JA3723

    PX2    .....................................................................................JA3741

    PX9    .....................................................................................JA3742

    PX12   .....................................................................................JA3759

    PX13   .....................................................................................JA3802

    PX14   .....................................................................................JA3845

    PX15   .....................................................................................JA3848

    PX16   .....................................................................................JA3940

    PX17   .....................................................................................JA3941

    PX19   .....................................................................................JA3943

    PX21   .....................................................................................JA3944

    PX23   .....................................................................................JA3948

    PX24   .....................................................................................JA3951

    PX26   .....................................................................................JA3954

    PX28   .....................................................................................JA3963

PX29 ................................................................................................JA3971

PX35 ................................................................................................JA3972

PX36 ................................................................................................JA3979

PX41 (excerpts) ...........................................................................JA3980

PX50 ................................................................................................JA4002

PX57 ................................................................................................JA4008

PX68 ................................................................................................JA4011

PX71 ................................................................................................JA4012

PX72 ................................................................................................JA4028

PX75 ................................................................................................JA4075

PX81 ................................................................................................JA4079

PX88 (excerpts) ...........................................................................JA4080

PX95 ................................................................................................JA4084

PX96 ................................................................................................JA4090

PX99 ................................................................................................JA4097

PX106................................................................................................JA4109

PX111................................................................................................JA4110

PX147................................................................................................JA4112

PX148................................................................................................JA4113

PX149................................................................................................JA4115

PX150................................................................................................JA4116

PX152................................................................................................JA4124

PX153................................................................................................JA4128

PX154................................................................................................JA4130

PX155................................................................................................JA4131

PX156................................................................................................JA4132

PX157................................................................................................JA4133

PX163................................................................................................JA4134

PX164 .................................................................................................................JA4138

PX165 .................................................................................................................JA4142

PX167 .................................................................................................................JA4145

PX177 .................................................................................................................JA4147

PX182 .................................................................................................................JA4154

PX200 .................................................................................................................JA4156

PX218 .................................................................................................................JA4158

PX225 .................................................................................................................JA4196

PX227 .................................................................................................................JA4199

PX230 .................................................................................................................JA4200

PX236 .................................................................................................................JA4201

PX238 .................................................................................................................JA4203

PX265 .................................................................................................................JA4206

PX279 .................................................................................................................JA4209

PX287 .................................................................................................................JA4212

PX288 (excerpts) ...............................................................................................JA4214

PX299 .................................................................................................................JA4382

PX300 .................................................................................................................JA4389

PX302 .................................................................................................................JA4390

PX312 .................................................................................................................JA4412

PX316 .................................................................................................................JA4413

PX319 .................................................................................................................JA4432

PX324 .................................................................................................................JA4449

**Volume VII**

Plaintiff's Trial Exhibits (cont.)

PX340................................................................................................JA4451

PX461................................................................................................JA4454

PX465................................................................................................JA4460

PX467................................................................................................JA4461

PX509................................................................................................JA4464

PX555................................................................................................JA4475

PX604................................................................................................JA4521

PX618................................................................................................JA4523

PX619................................................................................................JA4524

PX620................................................................................................JA4525

PX621................................................................................................JA4527

PX622................................................................................................JA4528

PX623................................................................................................JA4530

PX624................................................................................................JA4531

PX625................................................................................................JA4532

PX626................................................................................................JA4533

PX628................................................................................................JA4534

PX629................................................................................................JA4535

PX630................................................................................................JA4536

PX631................................................................................................JA4537

PX633................................................................................................JA4538

PX634................................................................................................JA4558

PX656................................................................................................JA4559

PX657................................................................................................JA4561

PX659................................................................................................JA4562

PX696................................................................................................JA4563

PX705 ................................................................................JA4564

PX720 ................................................................................JA4565

PX721 ................................................................................JA4566

PX722 ................................................................................JA4585

PX723 ................................................................................JA4586

PX741 ................................................................................JA4606

PX749 ................................................................................JA4607

PX755 ................................................................................JA4625

PX767 ................................................................................JA4627

Defendant's Trial Exhibits

DX2   ................................................................................JA4628

DX3 (excerpts) ...............................................................JA4738

DX4   ................................................................................JA4888

DX5   ................................................................................JA4889

DX12 ................................................................................JA4936

DX13 ................................................................................JA4939

DX19 ................................................................................JA4978

DX24 ................................................................................JA5031

DX25 ................................................................................JA5044

DX26 ................................................................................JA5205

**Volume VIII**

Defendant's Trial Exhibits (cont.)

DX27 ....................................................................................................................JA5244

DX36 ....................................................................................................................JA5272

DX39 ....................................................................................................................JA5346

DX40 ....................................................................................................................JA5376

DX41 ....................................................................................................................JA5462

DX42 ....................................................................................................................JA5463

DX44 ....................................................................................................................JA5479

DX47 ....................................................................................................................JA5484

DX53 ....................................................................................................................JA5508

DX55 ....................................................................................................................JA5546

DX56 ....................................................................................................................JA5596

DX60 ....................................................................................................................JA5597

DX76 ....................................................................................................................JA5598

DX79 ....................................................................................................................JA5599

DX80 ....................................................................................................................JA5600

DX81 ....................................................................................................................JA5601

DX82 ....................................................................................................................JA5602

DX83 ....................................................................................................................JA5603

DX84 ....................................................................................................................JA5611

DX100 ..................................................................................................................JA5612

DX103 ..................................................................................................................JA5615

DX106 ..................................................................................................................JA5617

DX109 ..................................................................................................................JA5620

DX119 ..................................................................................................................JA5623

DX133 ..................................................................................................................JA5633

DX139 ..................................................................................................................JA5647

DX669 ........................................................................................................JA5684

DX670 ........................................................................................................JA5685

DX671 ........................................................................................................JA5686

DX672 ........................................................................................................JA5689

DX673 ........................................................................................................JA5690

DX674 ........................................................................................................JA5691

DX677 ........................................................................................................JA5692

DX678 ........................................................................................................JA5693

DX679 ........................................................................................................JA5694

DX680 ........................................................................................................JA5696

DX681 ........................................................................................................JA5697

DX683 ........................................................................................................JA5699

DX685 ........................................................................................................JA5701

DX686 ........................................................................................................JA5702

DX688 ........................................................................................................JA5706

DX692 ........................................................................................................JA5711

DX694 ........................................................................................................JA5720

DX695 ........................................................................................................JA5721

DX699 ........................................................................................................JA5722

DX702 ........................................................................................................JA5723

DX703 ........................................................................................................JA5725

DX704 ........................................................................................................JA5726

DX705 ........................................................................................................JA5728

DX706 ........................................................................................................JA5731

DX707 ........................................................................................................JA5732

DX708 ........................................................................................................JA5733

DX709 ........................................................................................................JA5734

DX711 ........................................................................................................JA5735

DX713 ................................................................................JA5743

DX715 ................................................................................JA5745

DX716 ................................................................................JA5746

DX718 ................................................................................JA5747

DX720 ................................................................................JA5748

DX721 ................................................................................JA5749

DX722 ................................................................................JA5754

DX723 ................................................................................JA5759

DX724 ................................................................................JA5764

DX725 ................................................................................JA5765

DX726 ................................................................................JA5767

DX727 ................................................................................JA5772

DX728 ................................................................................JA5776

DX729 ................................................................................JA5779

DX730 ................................................................................JA5791

DX740 ................................................................................JA5793

DX742 ................................................................................JA5875

DX743 ................................................................................JA5892

DX744 ................................................................................JA5908

DX746 ................................................................................JA5926

## Volume IX

Amici's Exhibits

AO4   ................................................................................JA5927

AO6   ................................................................................JA5978

AO17 ................................................................................JA5979

AO28 ................................................................................JA5980

AO31 ................................................................................JA5981

Trial Demonstratives

Plaintiff's Demonstratives

    PD20 ...........................................................................JA5982

    PD25 ...........................................................................JA5983

    PD27 ...........................................................................JA5984

    PD29 ...........................................................................JA5985

    PD31 ...........................................................................JA5986

    PD32 ...........................................................................JA5987

    PD33 ...........................................................................JA5988

    PD38 (excerpts) ...........................................................JA5989

Defendant's Demonstratives

    DD1 (excerpts) .............................................................JA6030

    DD10 (excerpts) ...........................................................JA6032

    DD10A ..........................................................................JA6156

    DD10B ..........................................................................JA6157

    DD12 ............................................................................JA6158

# THE CHRONICLE
### of Higher Education





**ADMISSIONS & STUDENT AID**

# Affirmative-Action Foe Plans Campaigns Against 3 Universities

*By Eric Hoover* | APRIL 07, 2014

[*Updated (4/7/2014, 7:26 p.m.) with comment from North Carolina and Wisconsin.*]

The Project on Fair Representation, a nonprofit legal organization, is seeking plaintiffs for potential lawsuits challenging the race-conscious admissions policies at Harvard University, the University of North Carolina at Chapel Hill, and the University of Wisconsin at Madison. The organization announced the effort on Monday.

The project has created three nearly identical Web sites (HARVARDnotFair.org, UNCnotFair.org, and UWnotFair.org) that invite rejected applicants at each of the three institutions to contact the organization. The Harvard-specific site, for instance, asks, "Were you denied to Harvard? It may be because you're the wrong race."

In a news release, the organization said it believes that Harvard "is discriminating against Asian-American students by using a 'quota' or 'ceiling' to limit their admission to the university."

*The Chronicle* requested comment on Monday from the three universities. By late Monday, North Carolina and Wisconsin had responded with a defense of their policies.

Case: 19-2005     Document: 0011762242     Page: 14     Date Filed: 07/30/2020     Entry ID: 6356615

Since the U.S. Supreme Court's ambiguous ruling in *Fisher v. University of Texas at Austin* (No. 11-345) last June, colleges that consider applicants' race and ethnicity have reassessed their admissions policies, hoping to insulate them from legal challenges.

On the heels of the ruling, Edward Blum, director of the Project on Fair Representation, predicted "a wave of litigation against colleges." Now his organization—which provided legal counsel to Abigail Noel Fisher, the plaintiff in the Texas case—is poised to make more waves.

The organization is also encouraging anyone with "firsthand knowledge" of the use of race in admissions policies and practices at the three colleges "to come forward and speak up as well," the news release says.

## A Matchmaker

Mr. Blum, who is not a lawyer, has characterized himself as a matchmaker. He seeks plaintiffs to challenge policies, and then links them up with lawyers who are willing to represent them at little or no cost. Mr. Blum found Ms. Fisher, the daughter of an old friend, more than two years after he started his search (he had created a website similar to those that he unveiled on Monday). Ms. Fisher contends that Texas rejected her because she is white.

It was not immediately clear why Mr. Blum's organization had singled out Harvard, North Carolina, and Wisconsin. Each of the three websites makes the same assertion: "It is our belief that [the college] has not followed the Supreme Court's instructions and it is vulnerable to a lawsuit."

Mr. Blum said last year that he interpreted the *Fisher* ruling to mean colleges must first try out a race-neutral admissions policy before adopting a race-conscious one. But other legal experts have rejected that interpretation.

**JA4452**

In September, Catherine E. Lhamon, assistant secretary in the Education Department's Office for Civil Rights, said the *Fisher* ruling did not mean colleges must go so far as to adopt race-neutral alternatives before considering race-conscious policies. "They don't have to be tried and used first," she said.

In the *Fisher* case, North Carolina had submitted an amicus brief describing how Chapel Hill's admissions office had studied the potential effects of adopting a race-neutral plan. If the university had guaranteed admission to all students in the top tenth of their high-school class, the brief said, the number of nonwhite and underrepresented minority students would have risen slightly, yet other measures of academic quality, such as test scores and grade-point averages, would have fallen.

In its response on Monday, the university said it "stands by the statements in that amicus brief, as well as the legality and fairness of the current undergraduate admissions policy and process."

Paul M. DeLuca Jr., the provost at Madison, said in a written statement that the Wisconsin flagship had reviewed its holistic admissions policy in the wake of the *Fisher* decision and earlier Supreme Court rulings, and believes its approach "is appropriate and consistent with the law."

Copyright © 2017 The Chronicle of Higher Education

**JA4453**



TRIAL EXHIBIT
P461
SFFA v. Harvard



HARVARD COLLEGE | Office of Admissions and Financial Aid



EXHIBIT
FAUST    8
JAS 3/10/17

April 19, 2012

Redacted:
PII/SPI

New York, NY 10022

Dear [Redacted: PII/SPI]

President Faust has asked me to respond to your April 4 letter, in which you offer many thoughtful observations about Harvard College students and the results of the admissions process. We appreciate your efforts to help us continually to improve the quality of our student body, particularly through your support of the New York Harvard Club Scholarship Committee. As you know, we continue to depend on the Club's support of many kinds.

Your comments on the importance of attracting a strong representation of students from Massachusetts resonates well in the Admissions Committee. We have worked hard—and successfully—at that goal. Currently over twelve percent of Harvard College students are Massachusetts residents. You might be interested to know that the Harvard Clubs of Boston and of Worcester have been active in helping us to recruit significant members of strong students through outreach of various forms and with scholarship support, as have our smaller local Harvard Clubs. Alumni efforts have made a huge positive contribution to our success not just locally but around the world. Although, as you note, Harvard is indeed a global institution, we have never forgotten our Cambridge and Boston roots, nor our aspirations, so well articulated at the 1936 tercentenary, to be America's University.

Our ambition to educate future leaders has made Harvard appealing to the most talented and ambitious students across America. As a result the College has become more representative of the ethnic and economic diversity of the country and, the University believes, better positioned to make significant contributions to the country. We have been pleased by our graduates' success and their leadership in their communities and professions following college.

I am personally delighted to learn of your great interest in our squash program. As you note, we have had a number of excellent players from abroad but most have been—and are today—from the US. Of this year's 21 men, 5 came from outside the US (one is from Canada), and the women's team of 15 includes three from outside the US (two are Canadian.) This has been another great year in squash, and we are optimistic about the future.

Continued

Administrative Office 86 Brattle Street · Cambridge, Massachusetts 02138
Visitor Center Agassiz House · Radcliffe Yard · 5 James Street · Cambridge, Massachusetts 02138

CONFIDENTIAL

HARV00029940

Page 2
April 19, 2012

     All of us at Harvard appreciate your thoughtful letter, as well as your loyalty over the years. Congratulations on the seventieth anniversary of your graduation from the College.

     With best wishes,

                           Yours sincerely,

                           Marlyn E.McGrath
                           Director of Admissions

Cc:    President Drew G. Faust

MEM/alb

HARV00029941

.**Balian, Andrea**

| | |
|---|---|
| **From:** | Partin, Rachel Katherine [rachel_partin@harvard.edu] |
| **Sent:** | Tuesday, April 17, 2012 3:14 PM |
| **To:** | McGrath, Marlyn |
| **Cc:** | Balian, Andrea |
| **Subject:** | Letter from Alumnus re Quotas |
| **Attachments:** | 12.04.06 Reda DGF Notification – Harvard should have predominantly U.S. Nationality students.pdf |

Hi Marlyn,

President Faust received the attached letter from an alumnus regarding admissions practices.  Given the nature of his suggestions, I was wondering if your office wouldn't mind responding on behalf of the president.  Let me know what you think.

Thanks!
Rachel

Rachel Partin
Office of the President
Harvard University
617.496.3716

1

CONFIDENTIAL

**JA4456**

HARV00029942

Redacted:
PII/SPI

NEW YORK, N.Y. 10022

April 4, 2012

Mrs. Drew Gilpin Faust, President
Harvard University
Office of the President
Massachusetts Hall
Cambridge, MA 02138

**RECEIVED**

APR  6 2012

Dear Mrs. Faust:

   I graduated from Harvard with the class of 1942, some time ago.
Incidentally, I have known your brother, [Redacted:] a charming fellow whom I have not seen
in about fifty years.

   The reason for my letter regards the makeup of Harvard's male
undergraduates. When I attended the college there was only one dean dealing with
admissions, namely Dean Gummere, of the approximately one thousand male freshmen.
I would venture that about 750 of these were top notch individuals, both academically
and otherwise. The remaining 250 were not of such high caliber. I remember sitting next
to a fellow freshman in the Union dining hall the night I arrived at Cambridge and
learning from him that he was attending Harvard, having been turned down by Brown. In
those days, it was virtually impossible to be turned down by Brown and accepted by
Harvard. It shows that Harvard was in need of some public relations which it got
eventually in part from graduates who embarked on the local School Committees and
projected Harvard to their local community including the local high schools.

   I was active also some years ago in the scholarship program and was
chairman of the New York Harvard Club Scholarship Committee and increased the
amount contributed by members of the Club from $5,000 a year to $50,000 a year, which
made the Club the largest scholarship contributor next to the college itself. You will,
accordingly, note that I maintain an interest in Harvard and have made an effort to
increase the caliber of the undergraduates – no longer so necessary!

**JA4457**

HARV00029943

Mrs. Drew Gilpin Faust, President            -2-            April 4, 2012

      The reason for my letter is to make comments with regard to the college's admissions policy. Since Harvard is located in Massachusetts, my strong feeling is that a reasonable number of students should necessarily come from Massachusetts. Harvard can consider itself a "global" institution but it is necessary to have strong ground roots and these ground roots, of course, are in the state in which the college is located, namely Massachusetts.

      Another aspect of the admissions policy should, in my mind, be based on informal quotas. Other colleges I know have quotas. The quotas would include foreign students and the country of their origin. For example, I would limit the number of Japanese students to a certain percentage or number. I think it is also important to have a quota based on religious affiliation and skin color. None of this, of course, has to go beyond the confines of the dean's office.

      The last time I was in Cambridge it seemed to me that there were a large number of oriental students, for example. I think they probably should be limited to 5% as should other criteria.

      I know, in fact, that other colleges actually do have stated quotas and I see no reason that Harvard should not have private informal quotas.

      For example, on the athletic front, it is of course a well-known fact that the president of Trinity College, a former advertising executive, upon becoming the head of Trinity, made a decision that in order for Trinity to achieve some national recognition to do this was through an athletic endeavor. He chose squash (the number of participants is small). He recruited and, I presume, paid the tuition of individual students from Pakistan, India, Egypt, etc. They constituted the entire squash team at Trinity and upended Harvard's proud tradition by winning 9-0 almost every year recently. There have not been any U.S. players on their squash teams – too bad. Harvard in turn has had a few foreign players on the squash team but, to its credit, has not gone out as Trinity has actively to acquire squash players from other countries. I feel strongly that participating on a college team adds a certain feature to the education at Harvard which would otherwise be lacking. I was the captain of the squash team and follow that sport. Clearly, it is a good idea to have local American students constitute as much of the team as possible and I have, in fact, suggested that foreign nationals constitute only one-third of the actual squash team. This gives the local boys a chance.

      Basically, I think Harvard should have predominately U.S. nationality students.

CONFIDENTIAL

**JA4458**

HARV00029944

Mrs. Drew Gilpin Faust, President          -3-          April 4, 2012

I would appreciate hearing what you might think of my comments.

Sincerely yours,

Redacted:
PII/SPI

Redacted:
PII/SPI

CONFIDENTIAL

**JA4459**

HARV00029945

oir.harvard.edu



## Office of Institutional Research




**TRIAL EXHIBIT**

**P465**

SFFA v. Harvard

### Our Mission

To collect, synthesize, and analyze institutional data to fulfill mandatory reporting requirements and support University decision-making.

### Our Objectives

To offer accurate, timely, and digestible research, tailored to diverse audiences, with the goal of promoting informed decision-making and furthering the core missions of the University.

### Our Scope

- Primary source for major University facts and figures: Fact Book, Common Data Set, IPEDS, and other major reporting
- Support for key University-wide committees
- Systems analysis and information-sharing partnerships within Harvard and among peer institutions.
- Planning and policy analysis; evidence-based recommendations

### Our Audiences

*At Harvard*

- University Leadership in the Office of the President and Provost
- The Governing Boards
- Senior Leadership in the Schools
- Others, on a request-by-request basis

*Outside Harvard*

- Federal Government Agencies
- Peer Institutions and Consortia
- General Public

**JA4460**

8/28/2018                                    Key Points | Harvard Admissions Lawsuit

HOME / THE LAWSUIT /

# Key Points



TRIAL EXHIBIT

P467

SFFA v. Harvard

## The law of the land, supported broadly

Harvard's lawful admissions policies consider many factors, including race, to evaluate each applicant as a whole person with the goal of seeking excellence, expanding opportunity, and bringing together profoundly different students to live with and learn from one another. The Supreme Court has consistently recognized that a class that is diverse on multiple dimensions, including on race, transforms the educational experience of students from every background and prepares graduates for an increasingly pluralistic world, and that an applicant's race can be considered as one of an array of factors in assessing the entirety of a student's application. There is broad support for those goals. In a recent Pew survey, 71% of Americans said efforts to embrace diverse student bodies were 'a good thing'. And two-thirds of Asian-Americans in a recent Gallup poll indicated support for consideration of race in admissions.

## A strong commitment to diversity

Harvard College directs extraordinary resources and staff to recruiting and admitting a student body that is diverse and high achieving, for example, investing deeply in financial aid to allow every admitted student to attend regardless of ability to pay.

## An extraordinary applicant pool

The large majority of the 40,000+ applicants to Harvard College are academically qualified, requiring the College to consider more than grades and test scores. In a recent admissions cycle (in which there are fewer than 2,000 available slots): more than 8,000 domestic applicants had perfect GPAs; over 3,400 applicants had perfect SAT math scores; and over 2,700 applicants had perfect SAT verbal scores.

## Increase in Asian-Americans

The percentage of Asian-Americans in Harvard College's admitted classes has grown significantly (by 27%) since 2010, and Asian-Americans comprise nearly 23% of the 2022 admitted class.

## Expert analysis supports Harvard

Professor David Card, a nationally recognized expert and economics professor at the University of California at Berkeley, comprehensively analyzed Harvard

## JA4461

College's admissions database and concluded there was no discrimination against Asian-Americans.

## One person, one vote

Harvard admissions officers evaluate each applicant individually and assign ratings on a variety of metrics, such as academic qualifications, personal attributes, extracurricular activities, and athletic activities based on a whole person review. Admissions decisions are made by a simple majority vote, and each member of Harvard's diverse 40-person admissions committee has one vote.

## Race-neutral means less diverse

After studying more than a dozen race-neutral alternatives, a Harvard committee found that none of these practices "could promote Harvard's diversity-related educational objectives as well as Harvard's ... admissions program while also maintaining the standards of excellence that Harvard seeks in its student body."

## Office of Institutional Research documents: A preliminary and incomplete analysis

The OIR documents represent a preliminary and incomplete analysis OIR was conducting without the benefit of the full admissions database or a full understanding of the admissions process. The OIR documents themselves directly acknowledge various missing data and aspects of the admissions process that are not taken into account, and the OIR staff have confirmed that the work was preliminary and incomplete. This work was not part of any "internal investigation," and none of the documents cited in the summary judgment papers was created at the request of Harvard's Office of the General Counsel. Again, SFFA attempts to distort and mislead in its suggestions that the analysis showed discrimination or was somehow improperly stopped. As Dr. Card's analysis shows, when all the data and information are included and analyzed, no evidence of discrimination exists.

## Personal rating

The personal rating reflects a wide range of valuable information in the application, such as an applicant's personal essays, responses to short answer questions, recommendations from teachers and guidance counselors, alumni interview reports, staff interviews, and any additional letters or information provided by the applicant. Harvard uses this information to understand the applicant's full life story, for example, where the student grew up, what opportunities or challenges they faced in their families, communities, and secondary school, and what impact they might have both here at Harvard and after they graduate, as citizens and citizen-leaders of our society.

**JA4462**

Alumni interviewer and admissions officer personal ratings, although similar in name, vary widely because they are based on different information. Thousands of Harvard alumni perform an extremely valuable service as volunteers interviewing applicants to Harvard College from their communities. The alumni interviewer personal rating reflects what the interviewer has learned about the applicant during the interview, while the admissions officer rating considers the full range of information in the application (listed above). Any alumni interviewer also sees only a tiny percentage of the applicants in the pool. They evaluate these applicants in comparison to those few other applicants they have interviewed, while the admissions committee has before it a much fuller range of the talented applicants Harvard is fortunate enough to attract.

## A faulty statistical model

Mr. Blum's case hinges on a statistical model that deliberately ignores essential factors, such as personal essay or teacher recommendations, and omits entire swaths of the applicant pool (such as recruited athletes or applicants whose parents attended Harvard) to achieve a deliberate and pre-assumed outcome. Months of investigation failed to produce any documentary or testimonial support for SFFA's accusation that Harvard intentionally seeks to limit the number of Asian-Americans or discriminates against them. To the contrary, the evidence forcefully demonstrates that Harvard values the diversity and myriad contributions that Asian-American students—like students of all other backgrounds— bring to its campus, and that Harvard seeks and succeeds in recruiting and enrolling exceptional Asian-American students as well as students of all other backgrounds.

## An obligation to protect applicant privacy

Harvard, like every college and university across this country, has an obligation to protect the extensive personal information applicants entrust to us in the admissions process. Sensitive student information has been produced in this litigation, and while names and directly identifying information have been redacted, other information remains that could lead to outside parties identifying specific students. Not one page of 100,000 pages of internal Harvard documents reflects any systematic effort to discriminate against Asian-Americans. In seeking to protect the confidentiality of a small fraction of these 100,000 pages of documents, Harvard also shares the reasonable expectation of our alumni that their private correspondence with the University should remain private, rather than be used by SFFA to drive sensational headlines that seek to distract from the complete lack of actual evidence supporting their claims.

## JA4463



TRIAL EXHIBIT
**P509**
SFFA v. Harvard



## HARVARD UNIVERSITY
### Office of the General Counsel

Heather M. Quay
*University Attorney*

heather_quay@harvard.edu

Holyoke Center, Suite 980
1350 Massachusetts Avenue
Cambridge, Massachusetts 02138-3834

t.617.495.1434
f.617.495.5079

February 2, 2012

Ms. Nicole Merhill
Office for Civil Rights
U.S. Department of Education, Region I
5 Post Office Square
8th Floor
Boston, MA 02109

Re:   Complaint No. 01-11-2078

Dear Ms. Merhill:

Thank you again for your courtesy in allowing me extra time to prepare the response of President and Fellows of Harvard College ("Harvard") to the above-referenced complaint.

According to [Redacted: PII/SPI] letter dated January 11, 2012, the Complainants allege that Harvard denied their son admission to Harvard College on the basis of his national origin. Specifically, they allege that Harvard set a limit on the number of Asian American students admitted to the University and applied a higher standard to their son's application than it did to applications submitted by White Americans. Although [Redacted] letter does not name the Complainants, they have identified themselves to Harvard in a separate letter to William R. Fitzsimmons, Dean of Admissions and Financial Aid for Harvard College, alerting him that their complaint to OCR was accepted. This letter, dated January 13, 2012, is the latest in a series of letters between the Complainants and Harvard, all of which are attached as part of this submission. Thus, because the Complainants, who are the parents of [Redacted: PII/SPI], have made their identity known to Harvard, this response will in part address specifically the context and reasons for Harvard's decision on [Redacted: PII/SPI] application. As the following narrative and attached materials amply demonstrate, Harvard did not discriminate against [Redacted: PII/SPI] in any way.

**JA4464**

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

Ms. Nicole Merhill
February 2, 2012
Page 2

As has been explained to the Complainants, admission to Harvard College is highly
competitive. In 2010-2011, the College received almost 35,000 applications for the
roughly 1660 possible places for newly entering freshmen.[1]  Just over six percent of the
applicants were admitted. (Because some students choose not to attend the College, the
number of admitted students is somewhat larger than the number of spots available.)

In no way did Harvard subject [Redacted: PII/SPI] to different treatment in the
admissions process on the basis of national origin, as the complaint alleges. As you
know, OCR has in the past conducted an extensive compliance review of Harvard
College's admission process, particularly with respect to Asian American applicants
(OCR Compliance Review 01-88-6009). As OCR reported to Harvard at the end of that
review: "We found no evidence of the existence or use of quotas, nor did we find that
Asian Americans were treated differently than white applicants in the implementation of
the admissions process." *See* October 4, 1990 letter from Thomas J. Hibino to Derek
Bok, enclosed as Attachment A. The information that OCR gathered during the course of
that compliance review (and in subsequent cases) regarding Harvard College's criteria for
admission, its use of race as a factor in admissions decisions, and its general policies and
procedures for selecting students for admission to its undergraduate program is still
accurate today. The only difference, as noted above, is in the dramatically increased
numbers of applicants, which has made the competition for places in each undergraduate
class even more fierce.

The Office of Admissions estimates that approximately 85% of its applicants are
academically qualified for admission – that is, 85% of those who apply would likely be
able to handle the academic work. *See* the Office of Admissions 2011-2012 Interviewer
Handbook, enclosed as Attachment B, page 10. But given that the College can only
admit approximately 6% of its applicants, it is clear that academic qualifications are
necessary but not sufficient to obtain an offer of admission. Like other highly
competitive colleges and universities, Harvard admits only those applicants who present
truly exceptional records of academic, extracurricular, and personal accomplishments.
Harvard considered [Redacted: PII/SPI] application in accordance with its standard
admissions process. While his application demonstrated that he is an intelligent and well-
rounded young man, ultimately the College determined that other candidates presented
stronger qualifications for admission. In short, the College felt that his application, while
within the pool of applicants who met the fundamental requirements, ultimately did not
display any particular areas of excellence that set him apart from the many thousands of
other qualified applicants.

I have responded separately below to the individual items listed in the Data Request
attached to [Redacted: PII/SPI] letter.

---

[1] When returning students are included, the freshman class size is approximately 1685.

**JA4465**

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY                                          HARV00018453

Ms. Nicole Merhill
February 2, 2012
Page 3

1. *The name, title, business address, email address and telephone number (including fax number) of: (a) The University's contact person for this complaint; and (b) The person authorized to resolve this complaint.*

Please consider me the University's contact person for this complaint. My contact information is as follows:

Heather Quay
University Attorney
Harvard University
Office of the General Counsel
1350 Massachusetts Avenue, Suite 980
Cambridge, MA 02138
Email: heather_quay@harvard.edu
Telephone: (617) 495-1280
Fax: (617) 495-5079

The person authorized to resolve this complaint is:

William R. Fitzsimmons
Harvard College
Dean of Admissions and Financial Aid
86 Brattle Street
Cambridge, MA 02138
Email: wrf@fas.harvard.edu Telephone: (617) 495-1551
Fax: (617) 495-8321

2. *A complete description of the University's admissions policies and procedures for applicants to the University's class of 2015.*

The hallmark of Harvard College's admissions process is that it is highly individualized, flexible, and holistic. Members of the Admissions Committee carefully review each application, giving serious consideration both to the student's potential to achieve academic excellence and to contribute to a diverse educational environment. As the Office of Admissions website advises potential applicants: "There is no formula for gaining admission to Harvard. Students with vastly different credentials come from thousands of secondary schools across the country and around the world. What unifies our students are the talents they bring to Harvard and the passion to explore its vast resources." http://www.admissions.college.harvard.edu/apply/index.html

**JA4466**

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Ms. Nicole Merhill
February 2, 2012
Page 4

In a section entitled "What We Seek," the website continues:

> Applicants can distinguish themselves for admission in a number of ways.
> Some show unusual academic promise through experience or
> achievements in study or research. Many are "well rounded" and have
> contributed in various ways to the lives of their schools or communities.
> Others are "well lopsided" with demonstrated excellence in a particular
> endeavor—academic, extracurricular or otherwise. Still others bring
> perspectives formed by unusual personal circumstances or experiences.
>
> Academic accomplishment in high school is important, but we also seek
> people with enthusiasm, creativity and strength of character.
>
> Most admitted students rank in the top 10–15 percent of their graduating
> classes, having taken the most rigorous secondary school curriculum
> available to them.

http://www.admissions.college.harvard.edu/apply/index.html

Further information about the College's application process, as well as a set of detailed
"Frequently Asked Questions" for high school students considering Harvard can also be
found on the Office of Admissions website. Among other things, these materials reiterate
in a number of ways both the holistic nature of the application review and the fact that the
Admissions Committee does not use quotas of any kind.

http://www.admissions.college.harvard.edu/index.html
http://www.admissions.college.harvard.edu/apply/faq.html

Notably, the internal guidance documents created by the Office of Admissions for its
committee members and others who participate in the admissions process, such as alumni
interviewers, are entirely consistent with the materials it makes publicly available. I have
attached the following for your review:

- *The Harvard College Office of Admissions 2011-2012 Interviewer Handbook*
  (Attachment B);
- *The Harvard College Office of Admissions 2011-2012 Schools Committee
  Chairperson Handbook* (Attachment C);
- *The 2011-2012 Standing Committee on Admissions and Financial Aid in
  Harvard College Information Sheet* (Attachment D); and
- *Reading Procedures, Class of 2016* (Attachment E).[2]

---

[2] I have provided the current iteration of this document, which is virtually identical to the previous years'
version.

**JA4467**

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY                                                                                    HARV00018455

Ms. Nicole Merhill
February 2, 2012
Page 5

The 2011-2012 Interviewer Handbook, enclosed as Attachment B, has a section entitled
"Admissions Standards," a large portion of which is devoted to an explanation of the
College's "Search for 'Distinguishing Excellences'" – a narrative description of the very
individualized approach Admissions Committee members take as they "scrutinize"
applications not just for indications of academic excellence, but in an attempt to discern
applicants' "intellectual imagination, strength of character and… ability to exercise good
judgment." Given the extraordinary strength of the pool, the salient question posed by
the Committee in considering an individual candidate is: "What makes him or her
distinctive?" The Committee has identified a number of broad factors, or "distinguishing
excellences" that, when considering a group already winnowed to those with a "high
level of merit," might help to positively "tip" a candidate. These are: (1) outstanding and
unusual intellectual ability; (2) unusually appealing personal qualities; (3) outstanding
capacity for leadership; (4) creative ability; (5) athletic ability; (6) Harvard and Radcliffe
parentage; and (7) geographic, ethnic and economic factors. With respect to the last
factor, the Committee quotes former Harvard President Neil Rudenstine, who described
diversity as essential to the life of an academic community: "It is the substance from
which much human learning, understanding, and wisdom derive. It offers one of the
most powerful ways of creating the intellectual energy and robustness that lead to greater
knowledge, as well as the tolerance and mutual respect that are so essential to the
maintenance of our civil society." Finally, the Committee notes that it must proceed with
"care, discretion and humility" in making these admittedly subjective judgments,
appreciating that "no one can predict with certainty what an individual will accomplish
during college or beyond." *See* Attachment B, pages 9-11.

Harvard considered [Redacted: PII/SPI] application in accordance with its standard
admissions process, in which each applicant's folder receives extensive individual
evaluation. The first reader is generally an "area" admissions officer, who is a staff
member assigned to a particular geographic area of the country. In some cases,
applications also may be sent to a second reader for further assessment.

The readers rate applicants on a scale of one to four (with one being the highest and four
the lowest) in four categories: academic achievement, extracurricular activities, athletics,
and personal qualities. There are no numerical equivalents or formulas in the rating
system. The academic rating, for example, is derived from a subjective assessment of a
number of factors, including test scores, class rank, teacher recommendations, and
responses to questions on the application. An applicant with perfect 800 SAT scores
could be rated as a one, two or even a three academically based on teacher reports and
other academic information. The reader also gives each applicant a preliminary overall
rating (POR) that reflects the reader's judgment as to the applicant's likelihood of
admission based on the applicant's other ratings and the reader's sense of the relative
strength of the application.

**JA4468**

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY                                        HARV00018456

Ms. Nicole Merhill
February 2, 2012
Page 6

After folders have been read, they are considered by a subcommittee. The
subcommittees generally consist of four to eight people, including area admissions
officers, and, as Chair, a senior member of the admissions office staff. Subcommittees
are formed around geographical areas (called "dockets") so that staff members come to
know the schools, guidance counselors, and special characteristics of the region. At the
subcommittee meeting, all members of the subcommittee have a summary of the readers'
evaluations, while the first reader has the entire folder present for reference as needed.
The subcommittee makes a recommendation, which is then considered at a full meeting
of the Admissions Committee. The Admissions Committee, which consists of 38 people,
including all admissions officers and other high level administrators of the College,[3]
reviews all subcommittee recommendations and votes on final outcomes.

In accordance with these procedures, [Redacted: PII/SPI] application was read
carefully by the admissions officer responsible for his area. The subcommittee then
considered it along with the applications of other candidates in the "C Docket," which
includes southern California (specifically the Greater Los Angeles area), Hawaii, and
Guam and other U.S. possessions. The final decision not to admit [Redacted: PII/SPI]
was taken by the full Admissions Committee by the standard majority vote process.

3. ***Statistical information regarding the number of non-minority, Indian American
and Asian American applicants, from each group, that applied for admission to the
University's class of 2015, and the respective number of applicants from each
group that was admitted or waitlisted.***

Attached are a number of spreadsheets that provide the information you have requested,
as described and summarized below:

- Enclosed as Attachment F is a chart labeled "Class of 2015 – Overall" that
  provides the applicant data that you have requested. Please note that this chart
  provides statistical information only for those applicants who chose to self-
  identify as Asian Americans (both as a whole and according to the specific
  designations provided by the applicants) and for those who chose to self-identify
  as White Americans. It does not include statistical information for any other
  demographic group. As noted earlier, the overall admit rate is 6.3%.

- Enclosed as Attachment G is a chart labeled "Class of 2015 – C Docket" that
  provides the applicant data that you have requested for the docket in which [Re da]

---

[3] A Faculty committee, the Standing Committee on Admissions and Financial Aid for Harvard College,
meets several times a year to discuss broad topics relating to Admissions policy. In addition, these faculty
members may be asked to serve as expert readers when a particular applicant has expressed an interest that
relates to their academic discipline. If they wish, they may attend and vote at subcommittee or full
committee meetings, but in practice do so only rarely.

**JA4469**

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

HARV00018457

Ms. Nicole Merhill
February 2, 2012
Page 7

Redacted: PII/SPI application initially was considered. Again, this chart provides statistical information only for applicants who chose to self-identify as Asian Americans and White Americans, and not for any other demographic group. Although Harvard does not impose any kind of quotas – either by docket or any other measure – it nonetheless may be useful for you to consider the allegation that has been made within the general context of the relevant docket subcommittee's work, given that Redacted: PII/SPI parents claim that his application was considered less favorably than those submitted by White American applicants. Of particular note is the fact that the overall admit rate for this group is 5.6%, which is equal to the admit rate for candidates who self-identify as Asian American (also 5.6%), and *higher* than the admit rate for candidates who self-identify as White American (5.1%).

- Enclosed as Attachment H is a chart labeled "Class of 2015 – NLNA Overall." Again limited as described above to data for self-identified Asian Americans and White Americans, this chart shows the applicant numbers and admissions rates for "Non Legacy/Non-Athlete" candidates – in other words, for those applicants who would not be eligible for a "tip" either because one of their parents went to Harvard or Radcliffe or because of their exceptional athletic ability. These data show that, consistent with OCR's previous findings about Harvard's admissions practices, once applicant data is limited to "Non Legacy/Non-Athlete" candidates, the admit rates between Asian Americans and White Americans are far closer. Further, as you know, at the conclusion of its prior compliance review, OCR specifically found that "the reasons or goals provided by Harvard for giving preferences to children of alumni and recruited athletes are legitimate institutional goals, and not a pretext for discrimination against Asian Americans." *See* October 4, 1990 OCR letter, enclosed as Attachment A. For the "NLNA" group, the overall admit rate is 5.4%.

- Enclosed as Attachment I is a chart labeled "Class of 2015 – NLNA C Docket." These data show that the overall admit rate for the "Non Legacy/Non-Athlete" applicants in the C Docket is 5.1%, *lower* than the admit rate for candidates in that group who self-identify as Asian American (5.3%), and *higher* than the admit rate for candidates in that group who self-identify as White American (4.1%).

4. *The names and titles of all individuals involved in the class of 2015 admissions process regarding applicants who attended* Redacted: PII/SPI Redacted: PII/SPI *Pacific Palisades, California 90272, during the 2010-2011 school year. For each individual identified, please also provide: (a) The number of years each individual has been involved in the admissions process; (b) A description of the role each individual has in the admissions process (e.g., reader, subcommittee*

**JA4470**

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

HARV00018458

Ms. Nicole Merhill
February 2, 2012
Page 8

*member, full committee member, etc.); (c) The credentials of each member; and (d) The individual's race, color and national origin.*

Enclosed as Attachment J is a chart providing the information about the Admissions Committee that you have requested. The initial reader for all applications from the [Redacted: PII/SPI] was Danielle Early. In addition to Ms. Early, the members of the subcommittee with responsibility for the C Docket were: Precious Eboigbe, Nathalie Galindo, Lucerito Ortiz, Elizabeth Pabst, and Sarah Donahue (Chair). As noted above, the full Admissions Committee reviews and votes on all subcommittee recommendations.

5. *A copy of the complete application files for all applicants to the University's class of 2015 who attended* [Redacted: PII/SPI] *during the 2010-2011 school year.*

As we have discussed, Harvard will make all necessary arrangements for you to review the files you have requested at a time and place that is convenient for you. We will not provide copies of these files, which are highly personal to the applicants, and in which the applicants have a strong expectation of privacy, in light of our concern that these files might be requested subsequently under the Freedom of Information Act.

However, because the Complainants allege that Harvard engaged in unlawful discrimination in deciding not to extend an offer of admission to [Redacted: PII/SPI], a more full discussion of the way in which the Admissions Committee made that determination is appropriate. In short, as stated above, Harvard denied [Redacted: PII/SPI] application because, viewed as a whole, it did not exhibit areas of excellence distinctive enough to set him apart from the many thousands of students who applied.

As Dean Fitzsimmons explained to [Redacted: PII/SPI] father last July, approximately 48 percent of the 2010-2011 applicant pool presented SAT I scores totaling 1400 or higher. Nearly 4,175 scored a perfect 800 on the SAT Mathematics test and over 3,050 recorded an 800 Verbal SAT. As has been the case for many years, the number of applicants who were valedictorians of their high schools (3,598) was more than twice the number of places in the freshman class. Further, 52% of the applicant pool was in the top ten percent of their respective high school classes.

[Redacted: PII/SPI] file was read and evaluated by Danielle Early, Admissions Officer and Director of Internet Communications. Ms. Early, who served on the Admissions Committee for five years, was responsible for the initial evaluation of applicants from [Redacted: PII/SPI] geographic area, the "C Docket," which includes southern California (specifically the Greater Los Angeles area), Hawaii, and Guam and other U.S.

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY                                                                 HARV00018459

Ms. Nicole Merhill
February 2, 2012
Page 9

possessions. As described above, readers rate applicants on a scale of one to four (with one being the highest and four the lowest) in four categories: academic achievement, extracurricular activities, athletics, and personal qualities.[4] Ms. Early recognized Red Redacted: PII/SPI strong academic record, giving him a rating of "2" in that category. This rating indicates "Magna potential: Excellent student with superb grades and mid- to high-700 scores." *See* Attachment E, at page 5 for Harvard's coding guidelines. The median academic rating for admitted students in his applicant pool also was "2." *See* "Class of 2015 – Admits, Median Ratings," enclosed as Attachment K.

However, the Admissions Committee also looks for candidates who have distinguished themselves from the many other academically talented candidates by demonstrating excellence outside of the classroom. Although Redacted: PII/SPI was involved in a number of extracurricular activities and played a sport, his accomplishments did not rise to the level of excellence displayed by other candidates. In each of the remaining three categories, Redacted: PII/SPI only received a rating of "3," which translates to: "Solid participation but without special distinction" (extracurricular activities); "Active participation" (athletics); and "Generally positive" (personal qualities). *See* Attachment E, at page 6. In contrast, the median extracurricular, athletic, and personal ratings for admitted students were "2", "3", and "2" respectively. *See* Attachment K. A rating of "2" in extracurricular activities is defined as "Strong secondary school contribution in one or more areas such as class president, newspaper editor, etc. Local or regional recognition; major accomplishment(s)." A rating of "2" in personal qualities is defined as "Very strong." *See* Attachment E, at page 6.

Further, while Redacted: PII/SPI letters of recommendation were positive, they were not notably more positive than those of many other applicants. His teacher recommendations were coded as "2" and "3+" and his guidance counselor support was coded as "2-." A rating of "2" translates to: "Very strong support. 'One of the best' or 'the best this year," while a rating of "3" translates to "Above average positive support." *See* Attachment E, at page 6. The median ratings for admitted students were "2," "2" and "2." *See* Attachment K. Redacted: PII/SPI also received an overall rating of "3+" from the alumnus who conducted his personal interview. The interviewer noted: "as strong as he is across many areas, I'm not sure there is any one thing that gives him a decided edge among our highly competitive group of applicants."

On balance, after a careful and individualized evaluation and consideration of all of the information presented by Redacted: PII/SPI the reader did not feel that he was one of the candidates who stood out above the rest. On the back of the summary sheet for Redacted Redacted: PII/SPI Ms. Early noted his academic strengths but commented generally that she was "not sure what would keep him in the class." Consequently, she gave him a

---

[4]  The "personal" category takes into account the applicant's letters of recommendation, essays, interview, and other personal data.

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY                                          HARV00018460

Ms. Nicole Merhill
February 2, 2012
Page 10

preliminary overall rating of "3," reflecting the opinion that he was a "Solid contender:
An applicant with good credentials and support." In contrast, the median POR for all
admitted applicants in 2011 was "2," defined as "Strong credentials but not quite tops."
*See* Attachment E, at page 5; Attachment K.

**6.** *A copy of the application(s), including all supplemental forms for admission for the
class of 2015. Please also indicate the number of years the University has used the
particular application(s) and/or forms.*

Harvard accepts both the Common Application and the Universal College Application,
and also requires applicants to submit an Application Supplement unique to Harvard. A
copy of the *Application to Harvard College for Fall 2011 Entrance* is enclosed as
Attachment L. This includes information for applicants, the Common Application,
Harvard's Application Supplement, and teacher and school report and evaluation forms.

**7.** *Any other information including documentation that the University believes may be
helpful in OCR's understanding of the allegation presented in this complaint.*

As noted above, the Complainants corresponded with the Office of Admissions
throughout the summer. A copy of this correspondence is enclosed, in chronological
order, as Attachment M.

#### *Conclusion*

As you know, Harvard College's general policies and practices on admissions have been
extensively reviewed in the past by OCR, and have been found to meet the requirements
of the law. Every student is evaluated as an individual and no quotas of any kind – either
to exclude or to include – exist. While an overwhelming number of applicants could
handle Harvard's academically rigorous undergraduate program, the Admissions
Committee engages in a flexible and highly individualized review of all applicants,
attempting to select students whose achievements and personal qualities make them most
likely to contribute to and benefit from Harvard's multi-faceted educational environment.

In closing, I reiterate that the undergraduate admissions process at Harvard is
extraordinarily competitive and highly selective. In 2010-2011 Harvard was able to offer
admission to only 6.3% of its nearly 35,000 applicants, which necessarily meant that the
Admissions Committee had to make a series of difficult choices and turn away thousands
of qualified applicants. All things considered, the Admissions Committee determined
that [ Redacted: PII/SPI ] application simply was not as compelling as those of other

**JA4473**

Ms. Nicole Merhill
February 2, 2012
Page 11

candidates who applied. In light of those circumstances, and given the absence of any evidence of discrimination, the Complainants' charge should be dismissed.

Please do not hesitate to contact me if you have any questions or would like additional information.

Very truly yours,

Heather M. Quay

cc:    William R. Fitzsimmons, Harvard College Dean of Admissions and Financial Aid
Marlyn E. McGrath, Harvard College Director of Admissions

**JA4474**

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY                                            HARV00018462


Entry ID: 6356615
TRIAL EXHIBIT

P555

SFFA v. Harvard

STATEMENT OF FINDINGS

## BACKGROUND

During the past few years, there has been growing concern within the Asian American community over the possibility of discrimination in the selection of applicants for admission by some of the most prestigious colleges and universities in the country. As articulated in numerous media reports and journal articles, the basic thrust of the concern has been that, despite superior academic credentials in terms of high school performance and standardized test scores, Asian Americans have been admitted to selective schools at a rate lower than white applicants and other minority group applicants. Charges that schools are setting quotas to limit the number of Asian American students admitted in the face of their growing numbers of applicants, have been leveled by community leaders and reported in the media. Although administrators at most private, selective universities deny discriminatory practices or the use of quotas, at least two, Brown and Stanford, formed committees to review their own policies and practices. Brown concluded that there was evidence of discrimination in their admissions process which adversely affected Asian American applicants. At Stanford, a committee found that they could not completely explain why Asian Americans were admitted at a lower rate than white applicants, although they found no evidence of conscious bias or implicit quotas.

While the possibility of discriminatory admissions practices continues to be debated, there is general consensus that, since the mid-1970s, the number of Asian Americans applying to colleges and universities has nearly doubled. Further, it is recognized that Asian Americans collectively represent a highly qualified group of applicants; in some areas such as Scholastic Aptitude Test (SAT) Math, Asian American students score higher than white students.

At Harvard, interest in the admission of Asian American students dates back to the mid-1970s, when Asian American and other minority groups sought to increase the recruitment and admission of minority applicants. A major objective of the Harvard Asian American student group then was to be recognized by Harvard as a minority group, and included in the affirmative action programs of the Admissions Office. By 1983, student concerns included their belief that stereotypes of Asian Americans held by Admissions Officers contributed to the low percentage of applicants admitted, a rate below that for all other ethnic groups, including whites. A further concern was the small number of Asian Americans from disadvantaged backgrounds who were admitted.

In the Spring 1987 issue of The Public Interest, Bunzel and Au suggested, based primarily on their review of published SAT scores, that the lower Asian American admission rate at institutions including Harvard could not be explained by a less qualified Asian American applicant pool. Further, they asserted that there was insufficient evidence that Asian American applicants scored lower on other criteria, such as extracurricular activities and other non-academic areas, which might account

**JA4475**

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY                                                                    HARV00023650

for the lower admission rate. Similarly, they were not persuaded that special consideration given to certain groups of applicants, such as geographical preferences, children of alumni or faculty, or minorities sought through affirmative action programs, fully explained the disparity between white and Asian American admit rates.

In January 1988, Harvard, through the Dean of Admissions and Financial Aid, issued a "Statement on Asian American Admissions at Harvard-Radcliffe" which, in part, responded to concerns raised about "under-representation" of Asian Americans at Harvard and rumors of quotas. In light of the vigorous efforts to recruit Asian Americans, and the new record set each year of the last decade in the number of Asian American students admitted, Harvard felt that claims that the school might be limiting Asian American opportunities were unfounded. The difference in admission rates for Asian Americans and whites, about 3.7% (13.3% vs. 17.0%) over a 10 year period, including the Classes of 1982 through 1991, was explained as follows:

> While Asian Americans are slightly stronger than whites on academic criteria, they are slightly less strong on extracurricular criteria. In addition, there are very few Asian Americans in our applicant pool who are alumni/ae children or prospective varsity athletes. When all these factors are taken into account, the difference in admission rates for the two groups disappears. Those with comparable extracurricular and athletic credentials are admitted at the same rates. This is also true for Asian American alumni/ae children.

The issue of possible discrimination against Asian American applicants to selective colleges and universities came to the attention of the Office for Civil Rights (OCR) from a number of sources, including various individuals and Asian American organizations, the multitude of media reports, and articles contained in scholarly journals. In addition, specific concerns about the undergraduate admissions program at Harvard were raised directly to the Department of Education (Department) and to OCR. Consequently, OCR decided to initiate a compliance review to determine whether Harvard was complying with Title VI of the Civil Rights Act of 1964, which prohibits discrimination on the bases of race and national origin by institutions receiving Departmental funds.

In this review OCR first sought to determine whether Asian Americans were admitted to Harvard at a significantly lower rate than whites. If true, we would then seek to explain why the disparity existed, and whether any explanations, or the admissions process itself, indicated discrimination against Asian Americans, in violation of Title VI. Included in our review was an examination of the alleged quota issue, and also the general treatment of Asian Americans in the admissions process.

**JA4476**

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 3 - Statement of Findings, Compliance Review 01-88-6009

## LEGAL AND INVESTIGATIVE APPROACH

The regulation implementing Title VI at 34 C.F.R. Sections 100.3 (a) and (b)(2) proscribes:

(a)     General. No person in the United States shall on the ground of race, color, or national origin be excluded from participation in, be denied the benefits of, or be otherwise subjected to discrimination under any program to which this part applies.

(b)(2)  Specific discriminatory actions prohibited.

A recipient, in determining the . . . class of individuals to whom, or the situations in which, . . . services, financial aid, other benefits, or facilities will be provided . . . or the class of individuals to be afforded an opportunity to participate in any such program, may not, directly or through contractual or other arrangements, utilize criteria or methods of administration which have the effect of subjecting individuals to discrimination because of their race, color or national origin, or have the effect of defeating or substantially impairing accomplishment of the objectives of the program as respect individuals of a particular race, color, or national origin.

To assess compliance with 34 C.F.R. 100.3 (a), OCR sought to determine whether Harvard treated Asian American students differently from non-minority (white) students in its admissions process for Harvard-Radcliffe's undergraduate program. First, we established that Asian American applicants were admitted at a significantly lower rate than white applicants. Next, we tried to ascertain whether this lower admit rate was the result of intentional discrimination. Towards this end, we reviewed Harvard's undergraduate admissions policies and procedures, as described through written documents and interviews, to understand the methods and criteria used to select applicants for an entering class, including any major policy or procedural changes over a ten year period of review affecting the Classes of 1983 through 1992. Specifically, we looked for any differences in the established procedures for the evaluation of Asian American applicants in comparison to white applicants.

In addition, OCR considered whether the admissions process was applied in the same manner to Asian American students and white students. Through interviews and review of applicant files, we assessed the implementation of the admissions process, including staff (reader) ratings, preference categories, and committee deliberations. Different treatment could be established, for example, if Admissions staff gave lower ratings to Asian American than white applicants with similar records or achievements.

**JA4477**

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY                                                    HARV00023652

In addition to investigating whether Harvard applied its procedures in the same manner to white and Asian American applicants, OCR sought to determine, under 34 C.F.R. 100.3 (b), whether there were one or more criteria or factors which had a disparate effect on Asian Americans. OCR reviewed the results of the overall admissions process by conducting various statistical analyses on admit rates and related factors. Analyses were conducted to try to determine any criteria or factors which accounted for the disparity in Asian American and white admit rates. The lower rate might be explained, for example, if Asian American applicants as a group were less qualified than white applicants, or if the use of neutral criteria, such as non-academic accomplishments, had an adverse impact on Asian Americans. For each procedure, criterion, or factor which OCR determined accounted for the lower admit rate for Asian Americans, OCR investigated whether it could be justified in terms of institutional goals or legitimate educational purposes, or whether it was a pretext for discrimination.

### INITIAL ANALYSIS

We began by examining ten years of summary data provided by Harvard for the Classes of 1983 to 1992, which identified Asian American and white applicants and admits (applicants who were offered admission.) As shown in Table 1 below, in each of the last seven years, Asian Americans were admitted at a statistically significant lower rate, utilizing a z test. Statistical significance is shown where the p value is smaller than .05.

**TABLE 1**

**NUMBER OF APPLICANTS, NUMBER OF ADMITTED, AND PERCENT ADMITTED
(ASIAN AMERICAN AND WHITE, CLASSES OF 1983 THROUGH 1992)**

| | Asian American | | | White | | | Significance | |
|-------|-------------------------|--------------------|---------|-------------------------|--------------------|---------|------|--------|
| Class | Number of Applicants | Number Admitted | Percent | Number of Applicants | Number Admitted | Percent | z | p |
| 1992 | 2,263 | 291 | 12.9% | 9,157 | 1,453 | 15.9% | 3.55 | 0.0006 |
| 1991 | 2,168 | 267 | 12.3% | 9,270 | 1,474 | 15.9% | 4.20 | 0.0001 |
| 1990 | 2,054 | 232 | 11.3% | 9,196 | 1,623 | 17.6% | 6.96 | 0.0001 |
| 1989 | 1,731 | 220 | 12.7% | 9,561 | 1,596 | 16.7% | 4.17 | 0.0001 |
| 1988 | 1,605 | 204 | 12.7% | 9,219 | 1,629 | 17.7% | 4.93 | 0.0001 |
| 1987 | 1,391 | 199 | 14.3% | 8,855 | 1,707 | 19.3% | 4.45 | 0.0001 |
| 1986 | 1,351 | 180 | 13.3% | 9,715 | 1,755 | 18.1% | 4.35 | 0.0001 |
| 1985 | 1,161 | 167 | 14.4% | 9,849 | 1,607 | 16.3% | 1.67 | 0.0953 |
| 1984 | 1,015 | 153 | 15.1% | 10,708 | 1,642 | 15.3% | 0.17 | 0.8660 |
| 1983 | 784 | 118 | 15.1% | 10,344 | 1,744 | 16.9% | 1.30 | 0.1936 |

Another way of looking at the difference between the admit rates of the two groups is to view the lower Asian American rate as a percentage of the white rate. In this comparison, as shown in Table

**JA4478**

HARV00023653

2, the Asian American admit rate ranged from a low of 64% of the white rate for the Class of 1990 to 81.04% for the Class of 1992, in the seven years Asian Americans were admitted at a statistically significant lower rate.

**TABLE 2**

| Class | 1992 | 1991 | 1990 | 1989 | 1988 | 1987 | 1986 |
|---|---|---|---|---|---|---|---|
| Asian American Admit Rate as a Proportion of the White Admit Rate | 81.04% | 77.45% | 64.00% | 76.14% | 71.93% | 74.21% | 73.75% |

## QUOTAS

OCR found that the numerical data did not support the existence of a quota limiting the number of Asian Americans. We found that the number of Asian American applicants increased each year in the ten years we studied, such that in the Class of 1992 there were almost three times as many Asian Americans applicants as in the Class of 1983. As the size of the applicant pool increased, the number of Asian American applicants admitted has also grown. By the Class of 1992, 291 Asian Americans were admitted in comparison to 118 ten years earlier. The table below shows the proportion of each class which was Asian American.

**TABLE 3**

| Class | 1992 | 1991 | 1990 | 1989 | 1988 | 1987 | 1986 | 1985 | 1984 | 1983 |
|---|---|---|---|---|---|---|---|---|---|---|
| Asian American % of Class | 14.2% | 12.9% | 11.5% | 10.9% | 10.4% | 9.6% | 8.5% | 8.5% | 7.5% | 5.5% |

OCR found that this pattern of growth of Asian Americans as a percentage of the Class continued in the two most recent class year admission cycles. We found that Asian Americans constitute 17.2% of the Class of 1993 and we were informed by the Dean of Admissions that Asian Americans constitute 19.7% of the Class of 1994.

In addition to reviewing the data, OCR reviewed documents, and interviewed ten members of the Harvard Admissions staff regarding any goals or quotas that Harvard might use in the admissions process. Each of the staff members interviewed stated that he or she had never heard any numerical quotas or goals mentioned in the admissions process with respect to the admission of Asian Americans or members of any other racial or ethnic group. We also interviewed Harvard alumni, who served on alumni admissions committees, who similarly stated that they knew of no numerical goals or quotas used by Harvard with respect to the admission of specific racial or ethnic minority

**JA4479**

HARV00023654

Case: 19-2005    Document: 00117622242    Page: 42    Date Filed: 07/30/2020    Entry ID: 6356615

groups. Additionally, we interviewed former Harvard Admissions staff, and former students who worked with the Admissions office minority programs and were knowledgeable about admissions practices. Finally, we interviewed numerous Asian American community leaders who were involved with the issue of Asian American admissions. None of the individuals interviewed had any evidence or information to suggest that Harvard imposed numerical restrictions or quotas limiting the admission of Asian American students.

## ADMISSIONS POLICY

Over the past 30 years Harvard has moved decidedly away from making the criterion of scholarly excellence the sole or predominant determinant for admissions. It has instead sought a variety of "interests, talents, backgrounds and career goals," which contribute to a diverse student body, which is believed to be an essential ingredient in the educational process. Harvard's goal, therefore, is to ensure that its student body is both excellent and diverse.

Described as "complex, subjective and difficult to comprehend," the admissions process seeks to identify qualities in its students that would contribute to the vitality, intellectual excellence, and quality of the educational experience. The Official Register of Harvard University, 1988-1989 points out that "no one pattern guarantees success for Harvard/Radcliffe applicants." What characterizes each entering class is "diversity." Applicants are chosen on the strength of their credentials, but once they are deemed academically admissible, other strong qualities are considered that would potentially contribute to the educational experience at Harvard for all students. The critical criteria, therefore, "are often individual qualities or experiences," and, therefore, in each class the geographic distribution, ethnic make-up and correspondent talents will vary from year to year. See, Brief of Amici Curiae, California Board of Regents v. Bakke, 438 U.S. 265 (1977) Harvard seeks students who are well rounded and who excel generally, but who also show special interests, achievements or skills.

Harvard explained that one of its objectives in admissions is to select a diverse group of students from a wide range of socio-economic, cultural, racial and ethnic backgrounds. In fact, Harvard's catalogue states that "diversity is the hallmark of the Harvard/Radcliffe experience." Harvard maintains that such diversity enhances the educational experience of all students because students in the college environment learn so much from each other.

There are four major criteria on which all candidates are assessed: academic achievement, extracurricular activities, athletics, and personal qualities. "Criteria" are described as standards against which all applicants are measured. In evaluating a candidate's accomplishments against the criteria, Harvard judgments are primarily based on the set of information listed below. Some items listed are

**JA4480**

HARV00023655

more or less "objective," while others remain "subjective" in that they must be measured through individual judgment or discretion. Examples of "objective" information are standardized tests scores (SAT's), grade point average (GPA), and academic distinctions such as National Merit Scholarship. "Subjective" items may include such information as teacher or counselor recommendations, essays written by the applicant, and the alumni interview.

I.  ACADEMIC

    A.  Scholastic Aptitude Tests (SATs)
        1. Verbal
        2. Quantitative
        3. Achievement  Tests (3)

    B.  Class rank or GPA
    C.  Academic Distinctions
    D.  Special Academic Problems
    E.  Teacher Recommendation Report
    F.  Strength of high school attended
    G.  Academic Goals at Harvard/Radcliffe
    H.  Response to questions on application
    I.  Alumni/Staff interview

II.  EXTRACURRICULAR

    A.  School Activities
    B.  Summer Activities
    C.  Non-Academic Distinctions
    D.  Community activities
    E.  Employment
    F.  Teacher and/or Counselor Recommendation Report
    G.  College Activities Interests

III.  ATHLETICS

    A.  Varsity high school
    B.  Jr. Varsity high school
    C.  Harvard coach's recommendations
    D.  College athletics interests
        1. Varsity
        2. Jr. Varsity
        3. Intramural
        4. Recreational

IV.  PERSONAL

    A.  Teacher and/or Counselor Recommendation Report
    B.  Application essay
    C.  Alumni/Staff interview
    D.  Other personal data

We note that while some of the items fall into categories quite naturally, others may actually influence more than one categorical area as raters make evaluations of a candidate's strengths. For example, a teacher recommendation is considered under academic achievement. It invariably

**JA4481**

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

HARV00023656

influences the personal qualities category and, if the teacher were a sponsor of a school club or activity, the recommendation could also have influence on the extracurricular rating category.

In addition to these criteria which affect all applicants, there may be other elements that influence the admissions process and decisions, but do not necessarily apply to all candidates. The individual circumstances or facts about a particular applicant may come to be weighed in the overall admissions decision. For example, if an applicant overcame a severely disadvantaged background, his/her performance might be rated higher than similar performance of an applicant from a more privileged background. Another situation could occur when more than one applicant comes from the same high school, which might cause Harvard to consider the impact on the school if the one with the weaker academic record is accepted for other reasons. The most important factor, which affects only certain categories of applicants, is the positive weight given in the admissions process in the form of preferences.

### PREFERENCES

Based on interviews with Admissions staff and documentation submitted by Harvard, we learned that Harvard gives preferences, sometimes called "tips," to certain categories of applicants. In general, Harvard stated that a "tip" is a preference which:

> may help in some situations where all other factors are substantially equal for two candidates, but it does not ensure admission. The admissions process is not based on a mathematical formula, and the tips have no numerical weight. All Admissions Officers are aware of the policy regarding tips and take that into consideration throughout the process.

With this concept of "tips" in mind, OCR found that there are three major categories of applicants for whom preferences or "tips" are given: 1) Racial/ethnic groups, 2) children of alumni, and 3) recruited athletes.

With respect to the racial/ethnic groups preference or "ethnic tip", as it is called, Harvard's Admissions staff stated that ethnicity is simply one of many considerations in the admissions process which may serve as a positive factor in reviewing an application. There are no formulas or specific criteria for measuring or assessing ethnicity, nor are there instructions for determining how much weight is given to ethnicity, or where the weight is to be applied in the admissions process.

Harvard indicated that it also gives positive weight in the admissions process to children of alumni, or "legacies." They stated that there are no separate instructions describing how the preference is

**JA4482**

given to legacies. However, all legacy applicants are routinely referred to the Dean of Admissions for reading, according to Harvard's procedures.

In addition, Admissions staff explained that a recruited (talented) athlete, like the child of an alumnus or the member of an ethnic minority group, is given special weight or consideration in the admissions process. Athletes are recruited based upon their athletic accomplishments, talents and their predicted ability to contribute to the athletic programs at Harvard. Harvard's coaches develop lists of priority applicants for their respective teams, and these lists are considered or weighed by the Admissions subcommittees and the full admissions committee in making their decisions. Other than to suggest that the higher an applicant was on a coach's priority list, the greater the weight attributed in the admissions process, Harvard did not have specific guidelines governing the preference given to recruited athletes.

While ethnic groups, legacies and recruited athletes are the largest groups of applicants who receive "tips" or preferences, Harvard stated that there were several other groups who were also given positive weight in the admissions process. Specifically, Harvard stated that "in light of its [Harvard's] responsibility to the local communities, tips are also given to residents of Boston and Cambridge. In addition, tips are given to children of staff and faculty, whose commitment and dedication are also critical to the University's smooth functioning."

As with other "tips," the tips for faculty and staff children, as well as for Boston and Cambridge residents, are not based upon any formula or equation. They are merely positive factors which are considered in determining whether or not to admit applicants. It should be noted that Harvard maintained that all applicants were viewed in light of what they would bring or contribute to the University, and that all, ultimately had to demonstrate that they were qualified for admission to Harvard in the eyes of the full committee.

ADMISSIONS PROCESS

To gain an understanding of the admissions process and procedures, OCR obtained and reviewed copies of Harvard's application for admissions as well as all printed brochures describing the admissions process. We also reviewed ten years of annual reports on Admissions from the Office of Admissions and Financial Aid, as well as written descriptions of the admissions process that were submitted by the Dean of Admissions in response to our data request. Applicant files were reviewed in order to be familiar with the material considered by Harvard in the selection process. Finally, OCR interviewed 10 members of the Admissions staff about their roles as "readers" and as "subcommittee and full committee members" in the admissions process, including their methods for evaluating individual applicants. The 10 staff members interviewed included the Dean of Admissions

**JA4483**

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

HARV00023658

Page 10 - Statement of Findings, Compliance Review 01-88-6009

and Financial Aid, Director of Admissions, Senior Admissions Officers, Admissions Officers whose geographical areas included many Asian American applicants, and three "ethnic" readers who read Asian American and black applicant files. All of these individuals served as readers during the admissions process.

Although Harvard explained that recruitment of the best pool of applicants is the first step in the admissions process, OCR did not investigate this aspect of the process. Part of the reason for this decision was the self-selective nature of the decision to apply, and also the tremendous increase in Asian American applicants during the period under review. In addition, Harvard has included Asian Americans in its minority recruitment efforts, particularly from among segments of the Asian American population which have not traditionally applied to Harvard, such as recent immigrants or individuals from "blue collar" backgrounds.

The second step in the admissions process, student selection, is designed to select the best, most promising students from among the applicant pool. Harvard estimates that between 80% and 90% of its 11,000 plus applicants could probably do the academic work at Harvard, and 50%-60% could do superb work. Consequently, the selection process is one of choosing the best applicants from a highly qualified group of applicants.    Because of the limited number of spaces available (approximately 1,600), some extremely well-qualified applicants are necessarily rejected. It is this selection process which was the main focus of our investigation.

THE APPLICATION

As the first step in the admissions process, each undergraduate applicant is required to submit a completed Admissions Application. Harvard reviews applications in two stages - Early Action and Regular Action. Since procedurally, both stages are similar, for the purposes of this review, no distinction has been made between the groups of applicants.

The application contains a Personal Data Form (PDF) which requests basic information on the applicant, including the applicant's name, address, high schools attended, tentative fields of study in college, intended occupation, activities of interest and whether he/she intends to request financial aid. The applicant may also choose to indicate his/her race. Also, information must be provided on the applicant's family, including parents' names, education levels and professions, and the names and ages of brothers and sisters and the colleges that they have attended. This portion of the application also asks the applicant to list principal extra-curricular activities, participation in athletics, and employment and summer activities. Finally, the applicant is asked to indicate awards, honors and distinctions that are non-academic.

**JA4484**

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

The application also includes an Application and Essay form. This form, which is filled out by the applicant, requests such general information as the SAT and Achievement test scores, as well as, information on special courses that were taken which might qualify an applicant to take certain College Board Advanced Placement Tests. It also requests the applicant to list the books he or she has read in the past 12 months, or to list and write briefly on the four or five books which have had the greatest impact on the applicant.

The Application and Essay form asks the applicant to list all languages he or she speaks, reads and/or writes. It also asks the applicant to write several essays on various subjects including the one or two academic experiences which were most significant to the applicant, the applicant's academic goals at Harvard and Radcliffe; the applicant's one or two most significant extracurricular work or community activities; and the one or two non-academic activities that the applicant would most like to pursue at Harvard and Radcliffe. The form also includes a space for the applicant to make additional comments on material which has not been adequately addressed elsewhere in the application. Finally, the Application and Essay form requires the applicant to write a 200-500 word essay on any topic of the applicant's choosing. The instructions indicate that "any subject of direct personal importance to the applicant would be a good choice."

The next part of the application is the Secondary School Report, which is completed by the applicant's high school. This Report is supposed to include a copy of the applicant's transcript, SAT math and verbal and three achievement test scores. Most of the Secondary School Report is actually a recommendation form filled out by the Guidance Counselor in the high school. It includes a section for the Counselor to rate the applicant in such non-academic areas as emotional maturity, warmth of personality, leadership, self-confidence, personal initiative, sense of humor and concern for others.

In addition to the Counselor's report, the applicant is required to submit two Teacher Reports (recommendations). Harvard provides its own form for these, although teachers may write up their own letters of recommendation in their own format.

An applicant's folder should also contain a Personal Interview Report, which is completed by Harvard alumnus/a. This Report describes the results of an alumnus/a interview of the applicant. Alumni/ae interviewers give numerical ratings (1-5 or 1-6) in four areas and write narrative comments to assess applicants. The four numerical rating categories are: academic, extra-curricular/athletic, personal qualities, and an overall rating. Included on this Report form is general guidance to interviewers on what constitutes the 1-6 numerical ratings for applicants in the four areas.

**JA4485**

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

### READER SYSTEM

Individual applications are grouped for administrative purposes by geographic areas called "dockets". In addition, there are dockets for categories such as "prep schools" and "Americans abroad". Within dockets there are smaller geographic subdivisions called "areas". Individual Admissions staff persons are assigned to one or more areas, which determines which set of applications they will read.

Based on staff interviews and data submitted by Harvard, including the "Reading Procedures" provided to Admissions staff, OCR found that all applications go through a reading process consisting of reviews of the application by individual readers. The length of time to review a file varied by reader, but generally it took between 10-30 minutes. While individual readers had their personal methods and sequence for reviewing applicant folders, there appeared to be some consistency. Generally, readers began their review by reading the PDF, which provides background information on the applicant, as well as specific information on extracurricular and athletic activities in high school, and on anticipated activities in college. Readers would also be able to determine from the PDF an applicant's race, interest in financial aid, and whether the applicant had a Harvard connection through parents or siblings. Next, readers would read the application and essay, which would describe academic accomplishments, including SAT scores, books read, and personal statements on academic and non-academic experiences. Then the readers would read the remaining items in the folder, the Secondary School and Teachers' Reports, and the alumni interview. Some readers stated that they would review the entire file prior to rating the applicant, others stated that they rated some areas such as extracurriculars or athletics while reading the PDF.

An application may get anywhere from one to four or more readings depending on the applicant's background and experiences. OCR learned that the first reader, who is generally the assigned area person, is responsible for organizing the applicant file and filling out a "Summary Sheet" which is placed in each applicant's folder. The Summary Sheets, through a coding system, contain biographical information such as the ethnicity of the applicant, citizenship and sex of the applicant, as well as whether the applicant is applying Early Action or Regular Action, applying for financial aid, plans on commuting to Harvard, has parents who are alumni/ae or faculty of Harvard/Radcliffe, has a physical handicap that requires special attention, or is a potential athlete in whom coaches might be interested. Additionally, the first reader is expected to verify the applicant's test scores and the code for his or her high school.

First readers, after reviewing all information in the applicant folder, fill in numerical ratings on the Summary Sheet on the criteria of academics, extracurricular activities, athletics and personal qualities. They also give ratings for two teacher recommendations, a guidance counselor's recommendation and any interviews that may have been held with the applicant by alumni or admissions staff. A

**JA4486**

HARV00023661

preliminary overall rating (POR) is made on the Summary Sheet which reflects the reader's judgment as to the applicant's likelihood of admission, based on a combination of the other ratings along with the reader's sense of how strong or weak the applicant is. Ratings range from 1-4 or 1-6, one representing the highest or best rating, four or five representing the lowest, and six indicating that something is missing, or that there is an extenuating circumstance justifying little or no activity in a given area.

In addition, first readers (and subsequent readers) write brief narrative summaries of applicants' strengths and weaknesses on the Summary Sheets. They should also note important academic and extracurricular accomplishments so that subsequent readers may more easily assess the strengths of the applicant.

An application is sent to a second reader when the first reader a) wants a second opinion; b) would like an application to have three readings because it is a complex case; or c) wants the second reader to provide extra support for an applicant. Applications that go to a second reader are usually borderline cases that are not clear admits and not clear rejects. Second readers, like first readers, also fill out numerical ratings and write brief narrative summaries about the applicants. Additionally, second readers sometimes serve as the advocate for a case instead of the first reader. In some instances folders go directly from the first to third reader, principally when the applicant is exceptionally strong.

According to the Reading Procedures, if a reader finds that a folder does not meet the criteria above for a second or third read, then the folder may be "coded out." OCR verified from Harvard that "coding out" a folder means that the reader enters his or her ratings onto a profile sheet without passing the folder to another reader. Thus, weaker applications may be read by only one reader, although the Procedures explain that first readers "must be doubly certain to check all late information prior to the Committee meetings which might make a difference to the case."

The third reader is either the Dean of Admissions or the Chairperson of a subcommittee. The third reader generally is responsible for giving the four numerical reader ratings to an applicant which are entered into the data base (the PORs assigned by the first and second readers are also entered) and printed out on docket strips. Harvard explained that these numerical ratings are subject to change as new information on an applicant is received. Third readers also provide written narratives on the Summary Sheets.

The fourth reader is considered a "specialty" reader. Some fourth readers are faculty members who read and evaluate an application to assess an applicant's accomplishments in a particular subject or field. (For example, a biology professor might read an application of a student who won a science

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY                                                                 HARV00023662

Page 14 - Statement of Findings, Compliance Review 01-88-6009

award for his/her research in biology.) Other fourth readers serve as "ethnic" readers who review large numbers of applications from a specific minority group. By doing this, "ethnic" readers develop a greater awareness of the overall attributes of the particular minority group in an applicant class. Harvard uses ethnic or fourth readers for Asian American, Black, Hispanic and Native American applicants. The primary purpose of the Asian American "ethnic" read (reading) is to provide an additional or different sensitivity to the review of the application. The ethnic read is designed to ensure that no special cultural or ethnic factors are overlooked which might prevent an Asian American applicant's background from being fully understood. Those applicants who are exceptionally strong and likely to be admitted anyway, or are so weak as to have virtually no chance of admission, may not be reviewed by an ethnic reader. According to the Dean of Admissions, the Asian American reader reviews folders of Asian American applicants who "have a chance", perhaps 80% of the applicants.

The readers were all fairly consistent in describing the levels of participation and accomplishment which warranted specific ratings in the various categories. The responses given as to how folders were read and rated were consistent with the written guidelines from the Reading Procedures below, which are provided to readers:

Overall

1 =   Tops for admission:  very strong objective and subjective support (99+% admission).
2 =   Clear admit:  strong credentials but not quite tops (80-90% admission).
3 =   Solid contender:  good credentials and support (20-40% admission).
4 =   Marginal:  reasonable credentials but strengths generally below those of other candidates (0-5% admission).
6 =   Unrated:  incomplete folder or special case.

Academic

1 =   Potential summa or highest magna: creative, high grades, top scores (700's) and strong support.
2 =   Potential magna:  strong record and scores (680-750).
3 =   Solid candidate:  potential honors:  good record and scores (600's).
4 =   Fair ability:  decent record and modest scores (500's).
5 =   Marginal academic ability.
6 =   Special case requiring review:  used to be only in special cases of unusually strong candidates in other respects who have marginal but possibly acceptable academic credentials or candidates whose academic strength lies in one area only.

Extracurricular

1 =   Unusual strength in one or more areas.  Possible state or national level achievement.  A potential major contributor at Harvard and Radcliffe.
2 =   Strong secondary school contribution in one or more areas such as class president, newspaper editor, etc.
3 =   Solid participation but without special distinction.
4 =   Little significant activity.

**JA4488**

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY                                                                  HARV00023663

6 =     Physical condition, work or family circumstances prevent significant activity.

Athletic

1 =     Unusually strong prospect for varsity sports at Harvard and Radcliffe.
2 =     Strong abilities and interest which will probably continue in college.
3 =     Active participation.
4 =     Little or no interest.
6 =     Physical condition, work or family circumstances prevent significant activity.

Personal

1 =     Outstanding.
2 =     Very Strong.
3 =     Generally positive.
4 =     Bland or somewhat negative or immature.

School Support

1 =     Strikingly unusual support, "Best in ten years."
2 =     Very strong support, "One of the best this year."
3 =     Generally positive.
4 =     Lukewarm or negative.

OCR questioned readers as to how ethnicity was used as a factor in reviewing applications. All of the readers indicated that Asian American ethnicity is simply one of many considerations which may serve as a positive factor or "plus", but never serves as a negative weight or factor. A majority of the staff stated that Asian American ethnicity is only a factor to the extent that it has influenced or impacted on the applicant's life. Several readers indicated that simply being Asian American would not be significant. All of the readers agreed that the positive weight given to an Asian American applicant was most significant when the applicant demonstrated that he or she overcame severe obstacles related to the ethnic background. For example, an applicant who came to the United States as a refugee, learned English as a second language, rose to the top of his class academically, and became involved in school activities or worked to help support his or her family, would receive great positive weight. Also, applicants who demonstrate a strong commitment to the Asian American community or interest in their heritage by getting involved in community activities or by describing the influence of ethnicity on their lives, will tend, generally, to get positive weight in the admissions process.

We found that the readers had several different views as to where and whether Asian American ethnicity was given positive weight or a "tip" in the admissions process. Some readers explained that when ethnicity was deemed to be a significant factor in an application, it was reflected in the POR and during discussions at subcommittee and committee meetings. Other readers indicated that ethnicity was a factor considered throughout the entire admissions process. They stated that it could

**JA4489**

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 16 - Statement of Findings, Compliance Review 01-88-6009

be reflected in the four reader rating areas, as well as in the POR, and during the subcommittee and committee meeting discussions. Still other readers stated that ethnicity was not a factor at all unless the effect of that ethnicity on the applicant was evident from the applicant's file. They indicated that ethnicity was only considered a "plus" when the applicant wrote about or indicated the significance of his or her heritage, or when there was some other indicia in the file of the applicant's involvement with ethnic community organizations or groups.

In addition to reading Asian American files, the Asian American ethnic reader also makes informal comparisons between similarly-situated applicants within the ethnic group. One of the purposes of this comparison is to provide first readers (as advocates) additional information to be used when presenting cases in subcommittee. (See SUBCOMMITTEES below.) Admissions staff stated, however, that ultimately, each applicant is compared to all other applicants seeking admission to the class.

Also, the Reading Procedures designate which staff members serve as ethnic readers, to whom the various ethnic cases should be referred after they have been coded out by the final reader. The categories to which coordinating staff members are assigned are: Blue Collar Asians, Chicanos, Puerto Ricans, Native Americans, and Blacks. (Through subsequent questioning Harvard clarified the Procedures, indicating that the Asian American reader had broader responsibilities than just "Blue Collar" Asian American applicants.)

The Reading Procedures provide that all folders of Harvard and Radcliffe Alumni/ae children and faculty and staff children are to be given to the Dean of Admissions for reading. Additionally, readers are instructed to refer folders to the Dean if the folders are "particularly sensitive or controversial, or raise issues of fundamental Admissions or Financial Aids policy."

The Reading Procedures require final readers to fill out "profile sheets" which contain the numerical ratings that are entered into the computer. The final reader also insures that an accurate class rank for applicants is coded, and that an ethnic code is noted for all minority applicants. Finally, first readers are instructed to follow up on missing material and incomplete folders, and all readers are instructed on where to return misfiled materials.

SUBCOMMITTEES

After applications are reviewed by the individual readers and the ratings have been entered into the computer, the applications are sent to subcommittees for discussion and consideration. A particular subcommittee covers all applications from one docket. Admissions staff who are assigned to read folders from a particular docket make up that subcommittee. Included on the subcommittee are the

**JA4490**

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 17 - Statement of Findings, Compliance Review 01-88-6009

area admissions officers from the docket, who are usually the first readers of applications, and who consequently serve as advocates for those applicants in subcommittee discussions. They present cases (applicants) to the assembled subcommittee, emphasizing each applicant's strengths and reasons for admission. In addition to the first readers, second readers assigned to the area sit on the subcommittee, as well as the chairperson of the subcommittee. Additionally, faculty members may sit on subcommittees and participate in the discussions and decision-making. According to Harvard, the number of people on a subcommittee varies from as few as three to as many as twelve but, generally, there are between four and eight members. Harvard explained that the primary purpose or objective of the subcommittees is to provide a set of recommendations on the applications to the full committee. Generally, the subcommittees collectively recommend approximately 2000 applicants for admission each year.

Prior to subcommittee deliberations, the Dean of Admissions and Financial Aid and senior Admissions Officers set "targets" for each subcommittee. These targets represent the total number of applicants who should be recommended for admission from a given docket. Harvard explained that one purpose of the target system is to ensure that collectively, all of the students admitted from the various dockets do not exceed the total number that should be recommended for acceptance at the subcommittee level. More importantly, targets are used to ensure that applicants from each docket have a comparable opportunity to be admitted. By considering the strength of the applicants in one docket versus other dockets, for example, adjustments in the targets could ensure that an applicant from a very strong docket would not be unfairly disadvantaged in comparison to an applicant from a relatively weak docket. Harvard explained that the targets are developed, in part, based on factors other than the strength of the applicant pool, including the number of applicants from preference categories, as well as on several minor factors such as the historic yield rate (percentage of applicants accepted who are expected to come to Harvard) for a given docket or preference category. Harvard explained that race is only used as a positive factor to increase the number of applicants to be admitted from a given docket; it is never used negatively, or to set a goal or benchmark for the number of applicants to be admitted from a given race for a given docket.

When the subcommittees discuss applications, they have before them a copy of the computerized docket sheets which show the POR ratings from one, two or three readers depending upon how many have reviewed the applicant's folder. The docket sheet also shows the ratings entered by the third reader for extracurricular, athletics, personal qualities, two teacher recommendations, guidance counselor recommendations and alumni/ae and staff interviews. It is these numbers with which the subcommittee members work when they make decisions on whom to recommend for admission. In addition, the applicant's whole folder is available for review by subcommittee members.

**JA4491**

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY                                     HARV00023666

During the subcommittee meetings, the advocates make oral presentations on individual candidates. The subcommittee members may refer to the actual applicant folder if necessary. The readers explained, however that most often the committee members rely on the numerical information from the docket sheets and the information provided by the advocate, when voting to recommend admission or rejection of applicants. Consequently, the numerical ratings or the docket sheets, while not decisive, can be very influential in affecting the voting of the subcommittee members.

The subcommittees review applicants by docket, and within each docket, by high school. Each applicant in the docket is reviewed, and the subcommittee decides either by formal vote, or by informal consensus, whether to recommend the applicant for admission or rejection. Harvard explained that the strength of applicants who are recommended for admission are distinguished by the subcommittees from strongest to weakest as: straight A (A = admit), A• (A - dot), A* (A - star), A** (A - double star), and A**** (A star galaxy). These various designations of admitted applicants generally represent the degree of consensus among the subcommittee members on the recommendation to admit. They also serve as further guidance to the full committee on how strongly the subcommittee felt about a given applicant.

Additionally, strong "rejected" applicants might be circled on the docket printout to alert other members of the subcommittee. Still other applicants might be noted as "W.L." for wait list or "I" for incomplete. According to Harvard, these applicants may still be admitted if they are revived by the full committee. Harvard explained that throughout the entire admissions process there is late-breaking information which can cause a "straight A" applicant to be rejected, or a "rejected" applicant to be admitted. These decisions, however, occur in the full committee.

## FULL COMMITTEE

After the subcommittees are finished meeting, they submit their list of recommendations to the full admissions committee. The full committee, which includes all Admissions officers, Financial Aid staff, and some faculty and administrators, consists of approximately 45 people.

The full committee has the responsibility for making the final admissions decisions. Basically, they begin with the results of the subcommittees, which generally recommend for admission approximately 2,000 applicants which is 200 less than the roughly 2200 who will ultimately get admitted. "Rerun" meetings are held by the full committee during which the stronger "reject" applicants and weaker "admit" applicants from the subcommittee recommendations are reviewed for final action. In addition, the full committee can fill the 200 remaining places. The last "rerun" meeting, known as the "lop" session is when all final admissions decisions are completed. Voting on each applicant is done by

**JA4492**

majority rule. The Dean of Admissions indicated that up until the final day in the process, decisions to admit and reject applicants are "fluid" and subject to change.

## IMPLEMENTATION OF POLICIES AND PROCEDURES

To determine whether Harvard's admissions policies and procedures were implemented as described, we first reviewed applicant files from the Classes of 1991 and 1992. Initially, we reviewed a sample of 100 applicant files to familiarize ourselves with the contents of a folder prior to questioning the readers about the reading and rating process. Subsequent to the interviews, we reviewed 300 more full applicant files, 150 each from the Classes of 1991 and 1992. An equal number of Asian American and white files were examined and for each Class approximately 30% of the applicants were accepted and 70% rejected. Specifically, the 300 files consisted of 76 applicants who were admitted (38 Asian Americans and 38 whites) and 224 applicants who were rejected (112 Asian Americans and 112 whites). Within these parameters the files were randomly selected. In addition, we looked at reader Summary Sheets from approximately 2000 additional applicant files, which contained individual reader ratings, reader comments, and other information.

Separate from the file review, we analyzed information provided regarding the implementation of subcommittee and full committee procedures. Finally, we studied the implementation of all of the admissions procedures through the conduct of statistical analyses on applicant data provided by Harvard.

## FULL FILE REVIEW

The primary purpose of the file review was to determine whether reader ratings in the four areas: academic, extracurricular, athletic, and personal qualities, as well as the POR, were consistent with the documentation in the file for both Asian American and white applicants. In addition, we looked to see whether there was any evidence of readers' lack of awareness or insensitivity to the culture or background of Asian American applicants, such that they were at a disadvantage in the admissions process. Also, given the subjective nature of the admit/reject decision in light of the varied information contained in a folder, we sought to identify the considerations or "hooks", which appeared to separate the admitted vs. rejected students from among many strong candidates. In this regard we looked closely for indications of the use and impact of the "tips", including the Asian American ethnic tip, in the evaluation of applicants.

OCR read each file in its entirety and noted the various reader's comments and ratings which had been recorded on Summary Sheets found in each file. Although the Reading Procedures described

**JA4493**

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

a rating system containing only whole numbers (1-6), many files showed finer gradations, such as a "3+" or "2-", or even ratings such as "2/3".

It was readily apparent that the pool of applicants, both Asian American and white, was extremely bright and talented. Academically, the norm appeared to be applicants with SAT scores above the middle 600s, with scores in the 700s quite common. Similarly, the class rank of applicants was usually in the top 10 percent, while many were class valedictorians. Most students had numerous extracurricular and athletic activities, as well as academic and non-academic honors and awards. The required essays were, more often than not, so interesting, insightful, or moving, that it was hard to imagine that they were prepared by 17 year olds. In fact, given the overall strength of the applicant pool, it sometimes seemed as if the students who stood out were the ones who scored below the 600s on their SATS, were not in the top 10% percent of their class, or were not extremely well-rounded.

OCR's review of complete files showed that there was the greatest consistency among readers' ratings in the academic and extracurricular categories. We found that the readers consistently applied the standards found in the Reading Procedures in these areas. For example, in the academic area, OCR noted that those applicants with test scores in the upper 700's, as well as a very high rank in class and exceptionally strong teacher recommendations received a 1 academic rating, those with test scores in the high 600's to low 700's, high ranks and very strong teacher support received a 2, etc. OCR found no evidence of Asian American applicants being given lower academic ratings than white applicants for similar academic credentials and accomplishments.

Although the academic rating area was in some ways the easiest in which to assess the consistency of reader ratings, OCR also found similar ratings of the quantity, duration, and quality of participation in extracurricular activities. For instance, readers appeared to be mindful not only of the number of activities in which an applicant was involved, but the number of hours per week, the nature and significance of the accomplishments in a given activity, and the number of years of commitment to, or active involvement in the activity. Again, OCR found consistency in the ratings of Asian American and white applicants with similar credentials. It should be noted, however, that almost all (over 95%) of the applicants received some form of a 2 or 3 rating in this category. Hence, there was not a great deal of differentiation in the ratings in the extracurricular area.

OCR found less consistency among readers' ratings in the athletic and personal categories. For example, several applicants listed nothing on their applications under athletic activities. Different readers would give either a 6 or a 4 as a rating where nothing was listed. A 6 rating indicates either that something is missing from a file or that there is some extenuating circumstance which precluded an applicant's participation. A rating of 6 is not a negative rating. OCR found several cases where one reader would give a 6 rating when nothing was written down on the application, and another

**JA4494**

HARV00023669

reader would give the same case a 4. Additionally, it was clear that several readers had differing views of what level athletic activities constituted a 3 rating and what level constituted a 4. Some applicants with only recreational participation during high school received a better athletic rating than applicants who participated on varsity teams in high school.

OCR questioned Harvard regarding the apparent inconsistencies among reader ratings in the athletic category. Harvard explained that some readers did have different views of what levels of athletic participation constituted a 3 versus a 4 athletic rating, however, the individual readers were consistent in rating all applications they read. Further, Harvard asserted, and we confirmed through an analysis of the data provided, that a 3 versus a 4 athletic rating made little difference in an applicant's chance for admission. OCR looked closely at individual reader's athletic ratings of both Asian American and white applicants and found that in almost all cases, there appeared to be consistency in the ratings. In other words, if a particular reader seemed to give worse athletic ratings than other readers, OCR found that that reader treated Asian American and white applicants similarly by giving all applicants a poor rating.

With respect to the personal qualities ratings, most applicants in our sample, both Asian American and white, were given between 3- and 2+. Overall, in the Classes of 1991 and 1992, from which our file samples were drawn, over 98% of the applicants received some form of a 2 or 3. However, between the two groups, 20% of Asian American applicants and 25.5% of white applicants received a 2 rating in the personal category.

In reviewing files, we found that the differences between some 3 and 2 ratings, such as a 3- and 2+, were not clearly discernable. According to the Admissions staff who were interviewed the personal rating is derived from a variety of elements in the applicant's file. It may be based on the essay written by the applicant, the comments of staff or alumni interviewers, teacher recommendations or any other information in the file which indicates strength of character. It could also be reflected in extracurricular activities, such as when an applicant has spent significant time doing community volunteer work.

Because the information which went into the personal qualities rating could come from a variety of sources in an application, it was virtually impossible for OCR to identify exactly on what information a given reader based his/her personal rating of an applicant. Of the 300 files examined in this phase of the file review, OCR found only one applicant who received a personal rating poorer than a 3- on the summary sheet. The applicant was an Asian American who was admitted, and who ultimately came to Harvard. The fact that the applicant was admitted despite the low personal rating supported Harvard's position that the readers and committees view the entire application as a whole. Admissions staff explained that generally, with the exception of perhaps a very low academic rating

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

which might indicate an inability to perform the academic work at Harvard, weaknesses in some areas could be overcome by strengths in other areas. Our comparison of the personal qualities ratings to the supporting material in the applicant files revealed no apparent inconsistencies between the ratings and the underlying documentation. In all cases where an applicant received a 2 or better personal rating, there was some evidence either in the reader's narrative comments or the supporting documentation with the application (such as a Teacher's recommendation) which suggested that the applicant had unusually strong personal qualities.

In light of the lower ratings for Asian Americans and the subjective nature of the personal category, we looked for evidence of stereotyping, and for indications that cultural differences, which might have placed Asian American applicants at a disadvantage, were overlooked. Basically, as discussed more fully in the following section, we found little evidence of negative stereotyping of Asian American applicants. With respect to cultural differences, it was not apparent from readers' comments or from the ratings themselves, how, if at all, ethnic or cultural background was taken into account. Perhaps more importantly, however, numerous Asian American files did not reflect review by the Asian American reader, raising the potential that cultural differences in areas affecting the personal rating, such as leadership style, for example, may not have been fully considered.

With respect to the POR, which Harvard stated represented an applicant's likelihood of admission based on all factors and information (not simply the four major rating areas), OCR found only a handful of Asian American cases from the sample of 300 in which one or two readers appeared to give a POR which did not seem to reflect the documentation in the applicant folder, and did not appear to be consistent with the PORs assigned by other readers of the same folders. We found that the readers who gave the lower PORs, however, gave individual ratings in the four major rating areas that were comparable to the individual ratings of other readers of the same Asian American folders and that appeared to be consistent with the applicant's achievements as documented in the folder. OCR was informed by Harvard that the POR represents an individual reader's personal view of the likelihood of admission of a particular applicant, and consequently, it appears that the lower PORs in the handful of cases simply reflected the individual reader's perception that a given applicant was not as strong or deserving of being admitted as other applicants with similar individual ratings. While the disparity in the POR ratings, was not significant enough for OCR to conclude that the readers were discriminating against Asian Americans, OCR noted there were several Asian American files read by only one reader which received a 3 POR (defined as a "Solid Contender" by the Reading Procedures). These appeared to be worthy of further consideration, at least by the Asian American ethnic reader. Most of these files had no evidence reflecting that they had been reviewed by the Asian American ethnic reader.

**JA4496**

HARV00023671

The final phase of the file review consisted of reviewing approximately 2,000 Summary Sheets containing comments and numerical ratings from the readers. For the Class of 1991, OCR received and reviewed 950 Summary Sheets, 219 admitted students and 731 rejected candidates. Similarly, for the Class of 1992, a total of 1,020 Summary Sheets were reviewed, 260 admitted students 760 applicants who were rejected. Within each category there were approximately an equal number of Asian American and white applicants.

Although our review of the applicant information contained on Summary Sheets did not provide a basis for determining whether reader ratings were supported by file documentation, we used the Sheets to conduct a more detailed analysis of possible differences between readers in assessing Asian American and white folders. We looked to see whether one or more readers appeared to treat Asian American applicants more harshly than other readers reviewing the same candidate. Also, we sought to determine how the Asian American reader ratings and comments on Asian American applicants differed from other readers. Through a review of the comments by the readers we checked for any evidence of bias or insensitivity towards Asian American applicants. Finally, also from the comments, we tried to determine what actually "tipped" the balance in favor of admitting individual applicants.

We found that of the 989 Summary Sheets from Asian American applicant files, only 189 or approximately 19.1% had been read by the Asian American ethnic reader. OCR's review of the Summary Sheets, therefore, did not support Harvard's initial contention that the ethnic reader reads "most" of the Asian American applicants, or that she reads "all" or nearly all of the Vietnamese and Filipino applicants. OCR observed several applicants who were noted by the reader as Vietnamese refugees or of Filipino heritage, for whom there was no evidence of the ethnic read. Additionally, most of the Asian American cases that were read by the ethnic reader were not read by her as an "extra" or "4th" reader, but rather as a first reader who was assigned to read the case because it was on her docket.

However, Harvard indicated that the Asian American ethnic reader was assigned to dockets and sits on subcommittees which included over half of all Asian American applicants. Consequently, Harvard asserts that in addition to those applicant files in which OCR found evidence of the Asian American ethnic read, the Asian ethnic reader reviews files and participates in discussions at subcommittee and full committee meetings on many more Asian American applicants for which there is no written evidence of her input.

In order to see whether the Asian American ethnic reader's rating or comments were any different than other readers, we looked separately at Summary Sheets from all Asian American and white applicants in our sample which she had read. OCR found that there was no discernable distinction in either the nature or tone of her comments for Asian American and white applicants. Her

**JA4497**

HARV00023672

Page 24 - Statement of Findings, Compliance Review 01-88-6009

comments addressed, generally, the strengths and weakness of each applicant. There was also no discernable difference between her comments and those of other readers in terms of any cultural or experiential differences faced by Asian American applicants. Put another way, it would be no easier to tell from her comments than from any other reader's comments, that the applicant being reviewed was Asian American or that the reader reviewing it was a fourth or ethnic reader. Similarly, the ratings, themselves, suggest little if any difference between the Asian American ethnic reader's numerical ratings of Asian American applicants and other reader's numerical ratings of Asian American applicants. Harvard asserted that the Asian American ethnic reader played an important role, not only in reviewing applicant files, but in sharing useful information about Asian American applicants with other readers. They claimed that she generally heightened staff awareness of Asian American issues which could help Asian American applicants in the admission process.

While our file review did not support Harvard's assertion that the Asian American ethnic reader reviews "most" or all files of Asian American applicants who "have a chance," we could not conclude that the lack of an ethnic read put Asian Americans at a disadvantage. However, the Asian American ethnic reader's role, in part, was to ensure that no cultural or ethnic differences pertaining to Asian Americans were overlooked. To the extent that she is unable to review Asian American files as a reader, the possibility exists that some ethnically-related factors might be overlooked.

In addition to examining the ethnic reader's comments, OCR's concern for the potential stereotyping of Asian American applicants prompted a review of reader comments for negative characterizations which could have an impact on the admissions decision and ratings. On its face, reader comments revealed several recurring characterizations attributed to Asian American applicants. Quite often Asian American applicants were described as being quiet/shy, science/math oriented, and hard workers. For example, one reader's comment embraced all of these in describing an Asian American applicant when she wrote:

". . . [applicant] seems like a reserved, hard-working, aspiring woman scientist/doctor."

While such descriptions may not seem damaging, OCR was conscious that problems of "model minority" stereotypes could negatively impact Asian American applicants as a whole. This concern was also raised when OCR's file review came upon comments such as:

"He's quiet and, of course, wants to be a doctor . . ."

**JA4498**

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

HARV00023673

Page 25 - Statement of Findings, Compliance Review 01-88-6009

suggesting that most or all Asian American applicants "want to be a doctor." Or more pointedly:

> ". . . [applicant]'s scores and application seem so typical of other Asian applications
> I've read: extraordinarily gifted in math with the opposite extreme in English."

OCR noted that in a number of cases, Asian American applicants were described as "quiet, shy, reserved, self-contained, soft spoken" and that these characteristics were underlined for added emphasis by the reader. While white applicants were similarly described, OCR found such descriptions ascribed to Asian American applicants more frequently. In some cases these comments actually originated from the interviews, teacher or counselor recommendations, or self-descriptions given by the applicant. For instance, in one case, an interviewer wrote:

> ". . . he comes across as the hard worker rather than the really outstanding potential
> scholar."

In another, a teacher reports:

> ". . . [applicant] has naturally reserved qualities."

OCR recognized that reader comments were also sometimes echoes of other reviewers' commentaries related to the applicant. OCR also noted a few cases in which the readers referred to an applicant as "a classic V.N. [Vietnamese] bootstrap case" or "a classic BC/NC (blue collar/non-college background) Asian American from the inner-city." While it was clear from the context of the statement that the readers were not criticizing the applicants, and that there was no negative intention, the comments do suggest a tendency to stereotype by calling the applicants "classic."

Additionally, OCR found another reader's comment which suggested a degree of insensitivity on the part of the reader. The file received five reads, including an ethnic read. Reader one gave a 3+/2-POR, reader two gave a 2-/3+ POR and the ethnic reader gave a 2- POR. The third reader, however, gave a 3/4 POR. The applicant was listed as a "BCNC" applicant, whose parents owned and operated a grocery store. The third reader wrote the following comment to the other readers: "Don't romanticize, by the way - the grocery may be profitable - they are back in the middle-class suburb, remember." This comment suggests that the fact that the applicant's family grocery store was doing well enough for the family to live in the "middle-class" suburb, somehow, detracted from, or operated to the disadvantage of the applicant. The comment also illustrates the distinction drawn between socio-economic status ("BCNC"), and ethnicity.

**JA4499**

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

OCR also found some evidence of the readers' sensitivity to the obstacles facing Asian Americans, especially new immigrants. For example, one reader commented on a low alumnus interview score (4/5) and mediocre teacher support by saying "IV [the interview] and TRs [teacher recommendations] say [the applicant] is reserved, this may be the Filipino culture that others don't quite understand." Additionally, there were numerous comments justifying lower verbal SAT and Achievement scores for Asian American applicants because English was a second language which was not spoken at home. In many of these cases, the readers looked more closely at the teacher recommendations and essays written by the applicant, rather than the verbal SAT score to determine whether the applicant had sufficient language and writing skills to succeed at Harvard.

OCR found that while some reader comments could be construed to negatively affect the case of Asian American applicants, the ratings given to the applicant, where these comments did occur, did not reflect a lower than expected score. For example, in the aforementioned interviewer's comment on "hard worker" versus the "outstanding potential scholar," the reader rated the applicant's academic area a "2," consistent with his test scores and class standing. Similarly, applicants who were deemed to be "quiet/shy" were often rated "3" or better in the POR.

OCR concluded that, while descriptions of Asian American applicants were found that could have implications for the stereotyping of Asian American applicants, they could not be shown to have negatively impacted the ratings given to these applicants.

In reviewing Summary Sheets for indication of specific factors which appear in a general sense to positively or negatively affect admissions, OCR found that the most frequent comments indicating why an applicant was rejected stated that an applicant was "hookless", "not special", "standard", "flat", or otherwise "not unique in the H/R pool," and, thus, would have difficulty getting admitted. The second most frequent comment for rejected applicants was that they were weak academically, in comparison to other applicants. On the plus side, the most clear indication of positive weight which appeared to significantly increase an applicant's chance of admissions was found in comments on recruited athlete and legacy files.

OCR found information in the readers' comments on the Summary Sheets which illustrated the significance of the weight given to recruited athletes. The following readers' comments from applicants who were admitted to the classes of 1991 and 1992, illustrate the weight and significance that athletics can play in the admissions process:

> "A shaky record and so-so scores don't bode well for [the applicant's] case, . . . nice personal qualities, and he'd make a fine addition to the team if the coaches go all out for him, but that's what it would take."

**JA4500**

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 27 - Statement of Findings, Compliance Review 01-88-6009

> ". . . a straightforward case hanging on athletic ability. Easy to do if a needed '1' [athletic rating], pretty ordinary if not."

> "As a swimmer who could 'help the program' she is special. If she isn't really special, the case will be difficult to make."

> "I fear that this may be tough without a field hockey push."

> "If she's a '1' [athlete] she's one to compare on 'the list'. Otherwise I'm afraid the mediocre scores will work against her."

These comments suggest that an applicant's athletic ability and Harvard's need for such an athlete on its teams (reflected in the coaches' "lists"), can be crucial if not decisive in determining whether or not to admit the applicant.

OCR noted that both Asian Americans and white applicants received positive weight for athletic "tips". There was no evidence in the Summary Sheets to suggest that the implementation of an athletic preference or "tip" was in any way designed to negatively treat or affect Asian American applicants.

Similarly, our review of the readers' comments on the Summary Sheets illustrated the significance of being a Harvard/Radcliffe legacy in the admissions process. OCR observed the following readers' comments on applicants who were ultimately admitted to the classes of 1991 and 1992 which illustrate the positive weight given for being a legacy:

> "Well, not much to say here. [Applicant] is a good student, w/average EC's [extracurricular], standard athletics, middle-of-the-road scores, good support and 2 legacy legs to stand on . . . . Let's see what alum thinks and how far the H/R [Harvard/Radcliffe] tip will go."

> "Dad's . . . connections signify lineage of more than usual weight. That counted into the equation makes this a case which (assuming positive TRs and Alum IV) is well worth doing."

> "This is a good folder, but without the lineage it seems shy of an absolutely clear hook."

> "We'll need confirmation that dad is a legit, S&S [Alumni Schools and Scholarship Committee participant] because this is a "luxury" case otherwise.

> "Without lineage, there would be little case. With it, we will keep looking."

**JA4501**

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 28 - Statement of Findings, Compliance Review 01-88-6009

"Not a great profile but just strong enough #'s and grades to get the tip from lineage."

It is evident from some of these readers' comments that being the son or daughter of an alumnus of Harvard/Radcliffe was the critical or decisive factor in admitting the applicant. It is clear that the "lineage tip" can work to the advantage of an applicant by offsetting weaker credentials in virtually any of the rating categories. There is also some evidence to suggest that certain alumni parents' status may be weighed more heavily than others. For instance, the distinction made between alumni and "S&S" alumni suggests that legacies whose parent(s) participates on the Schools and Scholarship Committee are likely to get a bigger "tip" (more positive weight) in the admissions process than legacies whose parents are not as active with Harvard or Radcliffe.

OCR concluded from the file review that both Asian American and white legacy applicants were given "tips" for their legacy status. OCR observed, however, that there were significantly fewer Asian American applicants than white applicants in our sample of approximately 2,000 Summary Sheets, who had the legacy status, and fewer still, who had several generations of lineage at Harvard.

With respect to the positive weight or "tip" assertedly given to Asian American applicants, there were few comments in the approximately 1000 Summary Sheets which reflected this. The only comment suggesting an ethnic tip was found on a Filipino applicant's Summary Sheet which stated: "The number of Phillipino students in the pool is very small. - Given the scores and support I don't see a problem." It should be noted that this applicant received a 2 POR and had strong ratings in all individual rating categories.

OCR found no readers' comments which suggested that an applicant's Asian ethnicity was a significant or important factor in deciding to admit the applicant in the same way that being a legacy or a recruited athlete was instrumental in admitting numerous applicants. This conclusion was best exemplified by the comments of the third reader on an Asian American applicant whose folder showed that he was both clearly influenced by his ethnicity and a good athlete:

"He is more the hard worker than the scholar but if the soccer talents are competitive at H/R then he is special."

The applicant's Asian American ethnicity is not recognized and he would only be considered "special" based on his athletic talent. While the various "tips" or preferences could not be weighed or defined precisely, it was clear that the ethnic tip for Asians was significantly less instrumental, and present less often than tips for legacies and recruited athletes.

**JA4502**

## SUBCOMMITTEES AND FULL COMMITTEE

In addition to reviewing files to determine how the reader system was implemented, OCR sought to examine the implementation of the subcommittee and full committee portion of the admission process. As described previously, both the subcommittees and full committee conduct oral deliberations followed by a voting process on each and every applicant. In addition to interviewing staff, we reviewed the limited available data on subcommittee and full committee actions to determine whether Asian Americans might have been adversely affected by these processes. Also, we assessed the effect of the development of targets on Asian American applicants.

During interviews with Admissions staff, OCR was told that the Asian American "ethnic tip" could be reflected in the subcommittee and full committee meetings. When asked exactly how this tip would come up in such meetings, none of those interviewed could think of, or remember a single case in which an applicant's Asian American ethnicity was cited as the "tip" which resulted in that applicant being admitted over a substantially equal white applicant.

OCR requested information from Harvard specifying the admit/reject status of applicants at the end of the subcommittee meetings in order to compare those figures to the final admit/reject decisions which resulted from the full committee meetings. In this way, we could determine how Asian American applicants were affected by the subcommittee deliberations in comparison to the full committee. Unfortunately, Harvard was only able to provide data on the subcommittee results for the Class of 1993. The information below represents the number of potential admits resulting from subcommittee deliberations, which was compiled just prior to the full committee meetings.

Class of 1993

| | |
|---|---|
| Total Admitted: | 1959 |
| Admitted Asian Americans: | 292 |
| Admitted Others: | 1263 |
| Admitted Lineage*: | 261 |
| Admitted Athletes*: | 216 |

In comparison, after full committee deliberations, the results in terms of the final admitted class are below:

| | |
|---|---|
| Total Admitted: | 2255 |
| Admitted Asian Americans: | 341 |
| Admitted Others: | 1428 |

**JA4503**

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 30 - Statement of Findings, Compliance Review 01-88-6009

| Admitted Lineage*: | 290 |
| Admitted Athletes*: | 300 |

*Harvard noted that these statistics do not break down lineage and athletes by race, and therefore, one applicant may show up more than once in the statistics.

Without similar data for several years, OCR was unable to find any patterns or trends in the admission of Asian Americans versus whites from these figures. We did note that the number of Asian Americans admitted to the Class of 1993, rose by 49 from the Subcommittee decisions to the final decisions of the full committee. Consequently, from this limited data, OCR found no evidence to suggest that Asian Americans were being restricted or hindered during the final full committee meetings. In fact, at least during the 1993 class year, proportionally, Asian Americans made greater gains than Other (white) applicants and than lineage applicants during the full committee process.

To assess the effect of subcommittee deliberations on Asian American applicants, we tried to determine whether the development of targets could adversely affect Asian Americans. If the targets reflected different proportions of applicants to be admitted in different dockets (subcommittees), we looked to see whether those dockets with disproportionately large numbers of Asian Americans had smaller targets.

TABLE 4

| | CLASS OF 1991 | | CLASS OF 1992 | |
|---|---|---|---|---|
| DOCKET | TARGET AS % OF ALL APPS. IN DOCKET | % OF ASIAN AMERICAN APPS. IN DOCKET | TARGET AS % OF ALL APPS. IN DOCKET | % OF ASIAN AMERICAN APPS IN DOCKET |
| A | 14.1% | 27.1% | 12.7% | 26.4% |
| C | 12.6% | 30.3% | 11.3% | 33.8% |
| M | 28.6% | 5.3% | 28.7% | 5.7% |
| All Dockets | 14.6% | 15.2% | 14.1% | 15.7% |

As shown in Table 4 above, OCR evaluated Dockets A and C, which represented the States of California and Hawaii, because they contained large percentages of Asian American applicants in the Classes of 1991 and 1992, but appeared to have relatively low percentages of total applicants targeted for admission. Harvard explained that the targets were set based largely upon the strength and quality of applicants in the docket, as well as the number of special interest of preference group applicants. In part, to determine whether the lower targets in A and C dockets were justified, OCR

**JA4504**

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

HARV00023679

conducted an analysis described in the following Statistical Analyses section which showed that Californian applicants were somewhat weaker than non-Californian applicants. However, it also appears that the large number of Asian Americans in these dockets did not have a strong positive effect on the target size, which is consistent with our conclusion that there is little if any Asian American "tip."

Additionally, we observed that Docket M (New England Preparatory Schools) had a high percentage of applicants targeted for admission, and a low percentage of Asian Americans in the applicant pool. OCR notes that the high targets for dockets such as M reflected not only the strong qualifications of the applicants from the prestigious New England preparatory schools, but also, quite possibly, a large number of legacy applicants from the docket as well. From all of the above, we concluded that Asian Americans did not appear to be disadvantaged through the establishment of docket targets.

## STATISTICAL ANALYSES

As stated previously, the admit rate for Asian American applicants over the last seven years (Classes of 1986 to 1992) was significantly lower than for white applicants. In the Implementation section above, OCR determined that Harvard implemented its admissions procedures, particularly the process of reviewing application folders and assigning reader ratings, in a manner which did not treat Asian Americans differently (except as previously noted). Nonetheless, it was impossible to determine exactly why, and on what basis, any individual applicant was accepted or rejected. Harvard maintained that this decision was not based on any formula which mechanically used the reader ratings or any other information contained in the folders. Instead, all information was taken into account through a succession of individual (reader) and group (subcommittee and full committee) assessments to ensure that each applicant is excellent and well-rounded, and would contribute to a diverse student body.

Consequently, OCR sought an explanation through statistical analyses on all ten Classes (1983-1992), including virtually all (approximately 110,000) Asian American and white applicants for those years, using information contained on a computer data tape provided by Harvard. The tape included the following applicant information:

1.    Personal data

      Home state
      Sex
      Financial aid applicant
      Tentative field of study
      Prospective occupation
      Prospective college activities

**JA4505**

HARV00023680

Page 32 - Statement of Findings, Compliance Review 01-88-6009

```
        Parents' occupation
        Parents' college background
        Recruited athlete
```

2.    Academic record

```
        SAT and achievement test scores
        Class rank and class size
```

3.    Ratings

```
        Reader -         Overall
                         Academic
                         Extracurricular
                         Athletic
                         Personal
        Teacher
        Staff interview
        Alumni interview
```

We note that there were slight differences between analyses conducted from the computer generated data and the "hard copy" information provided by Harvard. For example, in Table 11 in this section, 2,236 Asian American applicants are shown for the Class of 1992. Table 1 on page 4, based on the "hard copy", indicates that there were 2,263 Asian American applicants for the same class. The difference can be attributed to our decision to utilize, for this section's analyses only, applicants for whom an admit or reject decision was reflected on the computer tape data, without including applicants who may have filed an initial application, but did not complete the admission process (less than 3% of our sample). Consequently, the Asian American and white admit rates described in Table 8 are different from the rates that can be calculated from Table 1.

It was explained by Harvard that this data tape was compiled for administrative purposes, as opposed to research. It is generally used by Harvard to provide a "shorthand" summary in numerical form of each of the thousands of applicants in a given year. However, reader ratings in the data base are only described in whole numbers, in contrast to the finer gradations on Summary Sheets, which we observed during the file review. Also, some applicant information is obtained late in the admissions process, most notably alumni interview ratings, and might not get entered into the data base, although considered in making the admissions decision. Consequently, while there was information on over 111,000 Asian American and white applicants on the tape, there was complete data on a much smaller number, approximately one-fourth of the total records. The incomplete records in almost all instances lacked only the alumni interview. Our analyses appeared to show little bias associated with the presence or absence of this information.

More importantly, perhaps, is the understanding that, while there is a great deal of information relevant to the admit/reject decision contained in the quantitative variables we analyzed, there may be other unmeasured variables which affect the decision. For example, the importance or weight of

**JA4506**

HARV00023681

Page 33 - Statement of Findings, Compliance Review 01-88-6009

the "tips" given to certain applicants would not be necessarily be quantified in the tape data. In addition, there are two substantive steps in the admissions process, the subcommittee and full committee deliberations, which would not be reflected in the information on the data tape. Finally, it is clear both from Harvard's statements, and our investigation, that there is no formula by which the quantitative information analyzed is translated into an admissions decision for any or all candidates.

Our first task was to determine whether the Asian American and white applicant pools were similarly qualified. If the white applicants were, on average, superior to Asian American applicants, then it is reasonable to expect that whites would be admitted at a higher rate. A simple way to compare the two groups is to view the mean scores of Asian American and white applicants over the ten year period on ten admissions criteria central to the admit/reject decision. As shown in Table 5 below, while the two groups were found to be significantly different on many of the variables, they appear overall to be comparably qualified when viewing their means. (Note that for reader ratings a 1 represents the best rating and 4 or 5 represents the worst rating.)

### TABLE 5

#### MEAN SCORES OF ASIAN AMERICAN AND WHITE APPLICANTS
#### TEN YEARS

| VARIABLE | ETHNIC GROUP HIGHER | ASIAN | WHITE | SIGNIFICANCE |
|----------|---------------------|-------|-------|--------------|
| . Academic Rating | Asian American | 2.81 | 2.97 | s |
| Athletic Rating | White | 3.33 | 3.06 | s |
| Extracurr. | - | 2.77 | 2.75 | ns |
| Personal Rating | White | 2.84 | 2.79 | s |
| SAT Math | Asian American | 683 | 661 | s |
| SAT Verbal | White | 606 | 623 | s |
| Counselor Rating | - | 2.63 | 2.66 | ns |
| Class Percent (Rank) | Asian American | 93.46 | 91.46 | s |
| Alumni Rating | - | 2.68 | 2.63 | ns |
| Teacher Rating | Asian American | 2.58 | 2.61 | s |

Another more sophisticated way of examining the issue of comparability of applicant pools is to employ a discriminant function analysis. This multivariate technique indicates whether, on specified admissions criteria, the two applicant groups are statistically different and, if so, which criteria or variables best distinguish between the two groups, controlling for the other variables. By controlling for the effect of the other variables, one avoids inappropriately attributing a unique effect to one. For example, it allows us to measure the individual effect of each of four academic measures (academic rating, SAT Math and Verbal, Class Percent), which are basically measuring similar things, that is, aspects of academic performance. The same ten admissions variables shown in the mean

**JA4507**

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

HARV00023682

scores comparison above from the data tape were selected. The results of this discriminant analysis showed that the groups were different on eight of the ten variables as shown in Table 6 below. Generally, Asian Americans had higher academic scores, whites, higher non-academic scores. While the eight admissions criteria did significantly discriminate between Asian Americans and whites, the magnitude of the difference between the two groups was small as indicated by the small partial $r^2$ values for each variable. Hence, it appears from this analysis as well, that the Asian American and white applicant pools are similar in overall quality.

### TABLE 6

#### DISCRIMINANT ANALYSIS
#### TEN YEARS
#### ALL APPLICANTS

| ETHNIC GROUP HIGHER | VARIABLE | PART. $r^2$ | Significance |
|---|---|---|---|
| White | 1. Athletic Rating | .0180 | s |
| Asian American | 2. SAT Math | .0125 | s |
| White | 3. SAT Verbal | .0180 | s |
| Asian American | 4. Class Rank | .0035 | s |
| White | 5. Personal Rating | .0010 | s |
| Asian American | 6. Counselor Rating | .0008 | s |
| White | 7. Extracurricular Rating | .0005 | s |
| Asian American | 8. Academic Rating | .0002 | s |

From the above analyses we could not conclude that the disparity in Asian American and white admit rates was attributable to differences in the quality of the respective applicant pools.

We then employed logistic regression to try to identify which of the ten admissions variables could account for the admit rate disparity. Logistic regression is a multivariate technique which can determine not only whether specific admissions criteria, in fact, influence the admissions decision, but more importantly, whether their impact is different for Asian American applicants as compared to white applicants. Through this technique, we identified six variables which appeared to negatively impact Asian Americans, that is, those variables on which Asian Americans received less benefit in the admit/reject decision than white applicants with similar scores. These were three of the reader ratings: academic, extracurricular and personal, along with the Counselor and Alumni ratings, and SAT Math. Since Harvard asserted that the preference given to legacy and recruited athlete applicants explained the admit rate disparity, we next reran the logistic regressions without these two groups. When recruited athletes and legacies were removed from the analysis, all of these race effects disappeared, with the exception that one variable, the reader academic rating, continued to have a small adverse effect on Asian Americans. The effect size, however, was too small to explain the disparity in overall Asian American and white admit

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

Page 35 - Statement of Findings, Compliance Review 01-88-6009

rates. Harvard's assertion, therefore, that the differential admit rate between whites and Asian Americans is a function of the preference given to recruited athletes and legacies, was supported. Conversely, we could not conclude from the logistic regression analysis that any of the tested admissions variables explained the disparity in Asian American and white admit rates.

We looked further at the treatment of legacies and recruited athletes, two groups that get a "tip" in the admissions process. Harvard's assertion that the admit rate disparity could be attributed to these groups was based on the low number of Asian Americans in these groups, which had higher admit rates in comparison to other applicants. As shown in Table 7 below, over the eight years for which data were available for both alumni children and recruited athletes, the admit rate for all applicants was 16.9%. (Note that "All Applicants" in Table 7 and "Total Applicants" in Table 12 reflect Asian American and white applicants only.) In the same period, alumni children were admitted at a 35.7% rate and recruited athletes at a 48.7% rate. While Asian Americans comprised 15. 7% of all applicants over the eight years, they represented only 3.5% of the alumni children pool and 4.1% of the recruited athlete pool. We separately viewed the Classes of 1991 and 1992, as these were the classes from which our file review samples were drawn. The data from these classes were consistent with the eight year totals.

TABLE 7

|  | ADMIT RATE BY CATEGORY | TOTAL # APPLICANTS | AA's in TOTAL APPS. |
|---|---|---|---|
| CLASSES OF 1985-1992 (8 Yrs.) |  |  |  |
| ALL APPLICANTS | 16.9% | 86437 | 13562 (15.7%) |
| CHILDREN OF ALUMNI | 35.7% | 9927 | 344 ( 3.5%) |
| RECRUITED ATHLETES | 48.7% | 3747 | 153 ( 4.1%) |
| CLASS OF 1992 |  |  |  |
| ALL APPLICANTS | 15.6% | 11182 | 2236 (20.0%) |
| CHILDREN OF ALUMNI | 35.2% | 1198 | 42 ( 3.5%) |
| RECRUITED ATHLETES | 41.0% | 541 | 23 ( 4.2%) |
| CLASS OF 1991 |  |  |  |
| ALL APPLICANTS | 15.5% | 11231 | 2149 (19.1%) |
| CHILDREN OF ALUMNI | 33.4% | 1165 | 46 ( 3.9%) |
| RECRUITED ATHLETES | 39.4% | 619 | 26 ( 4.2%) |

**JA4509**

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 36 - Statement of Findings, Compliance Review 01-88-6009

The effect of legacies and recruited athletes on the comparative admit rate between Asian Americans and white applicants is most easily shown by viewing the rates of admission with and without these two groups.

TABLE 8

| CLASS YEAR | ALL APPLICANTS | | | NO ALUMNI OR REC. ATHS. | | |
|---|---|---|---|---|---|---|
| | AA ADMIT RATE | WHITE ADMIT RATE | SIGNIFICANCE | AA ADMIT RATE | WHITE ADMIT RATE | SIGNIFICANCE |
| 1992 | 13.0% | 16.2% | s | 12.5% | 11.0% | s |
| 1991 | 12.4% | 16.2% | s | 12.0% | 11.3% | ns |
| 1990 | 11.4% | 18.0% | s | 10.5% | 12.4% | s |
| 1989 | 12.8% | 17.1% | s | 11.7% | 12.8% | ns |
| 1988 | 12.9% | 18.1% | s | 11.4% | 12.6% | ns |
| 1987 | 14.4% | 19.8% | s | 13.5% | 14.2% | ns |
| 1986 | 13.7% | 18.9% | s | 12.9% | 13.7% | ns |
| 1985 | 14.6% | 16.8% | ns | 14.1% | 11.9% | s |
| 1984 | 15.3% | 15.8% | ns | 15.1% | 13.2% | ns |
| 1983 | 15.2% | 17.3% | ns | 14.2% | 14.3% | ns |
| Total | 13.2% | 17.4% | | 12.5% | 12.8% | |

The above table demonstrates that the disparity in admit rates is virtually eliminated over the ten year period when removing legacies and recruited athletes from the sample. In fact, for three classes, including the Classes of 1991 and 1992, Asian Americans were admitted at a higher rate than white applicants without these groups.

Evidence of the weight or "tip" given to legacies and recruited athletes can be shown by a comparison of the strength of legacy and recruited athlete applicants who were admitted with non-legacy/non-athlete admitted applicants. In Table 9 below, the mean scores over the ten years (Classes of 1983 to 1992) are described:

**JA4510**

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

HARV00023685

Page 37 - Statement of Findings, Compliance Review 01-88-6009

TABLE 9

MEAN SCORES OF RECRUITED ATHLETES
CHILDREN OF ALUMNI AND NON ATHLETE/NON ALUMNI
FOR ADMITTED APPLICANTS
ALL YEARS
ALL ADMITTED APPLICANTS

|  | RECRUITED ATHLETES | CHILDREN OF ALUMNI | NON ATHLETE/ NON ALUMNI |
|---|---|---|---|
| SAT Math | 67.02 | 69.50 | 71.77 |
| SAT Verbal | 60.30 | 67.41 | 68.67 |
| Athletic Rating | 1.31 | 3.08 | 3.11 |
| Academic Rating | 3.00 | 2.40 | 2.19 |
| Extracurr. Rating | 2.90 | 2.52 | 2.43 |
| Personal Rating | 2.52 | 2.53 | 2.44 |
| Teacher Rating | 2.43 | 2.32 | 2.08 |
| Counselor Rating | 2.43 | 2.34 | 2.14 |
| Alumni Rating | 2.35 | 2.25 | 2.06 |
| Class Rank | 92.30 | 92.47 | 96.73 |

With the exception of the athletic rating, non-legacy/non-athletes scored better than legacies and recruited athletes in all areas of comparison. In addition, the differences between non-legacy/non-athletes and legacies and, separately, between non-legacy/non-athletes and recruited athletes was found, in each category, to be statistically significant.

It is clear from these analyses that the "tip" given to legacies and recruited athletes is weighted quite significantly in the admissions process. The comparison shows that on average, the admitted non-athlete/non-legacy applicants scored more than 130 points higher on the combined math and verbal SATs than the admitted recruited athletes, and 35 points higher than the legacies. Still, although recruited athletes score relatively low on the SATs in comparison to other Harvard applicants, their scores would place them in the top percentiles of all students taking them.

Having determined that legacies and recruited athletes are favorably treated in the admissions process, we evaluated whether Asian American and white applicants within these pools were similarly treated. The overall pattern of mean scores below suggests that the Asian Americans and whites are similarly qualified within the legacy and recruited athlete categories.

**JA4511**

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 38 - Statement of Findings, Compliance Review 01-88-6009

TABLE 10

MEAN SCORES OF RECRUITED ATHLETES
CHILDREN OF ALUMNI AND NON ATHLETE/NON ALUMNI BY RACE
ALL YEARS - ALL APPLICANTS

| | RECRUITED ATHLETES | | CHILDREN OF ALUMNI | | NON ATHLETE/ NON ALUMNI | |
|---|---|---|---|---|---|---|
| | Asian Amer. | White | Asian Amer. | White | Asian Amer. | White |
| SAT Math | 67.42 | 64.85 | 68.47 | 66.33 | 68.70 | 66.16 |
| SAT Verbal | 58.74 | 57.83 | 62.24 | 63.72 | 60.91 | 62.34 |
| Athletic Rating | 1.48 | 1.40 | 3.27 | 3.10 | 3.35 | 3.15 |
| Academic Rating | 3.05 | 3.30 | 2.83 | 2.89 | 2.86 | 2.97 |
| Extracurr. Rating | 2.92 | 2.99 | 2.74 | 2.71 | 2.77 | 2.75 |
| Personal Rating | 2.77 | 2.66 | 2.83 | 2.75 | 2.84 | 2.81 |
| Teacher Rating | 2.58 | 2.59 | 2.64 | 2.62 | 2.57 | 2.61 |
| Counselor Rating | 2.60 | 2.62 | 2.74 | 2.67 | 2.62 | 2.67 |
| Alumni Rating | 2.70 | 2.55 | 2.52 | 2.54 | 2.68 | 2.65 |
| Class Rank | 90.79 | 88.25 | 88.51 | 86.29 | 93.65 | 88.25 |

Further, Table 11 below shows that in each of the last six years (prior to which there were so few Asian American recruited athletes that comparison was not feasible) there was no significant difference in the admit rates of Asian American and white recruited athlete applicants. In terms of legacies, in only one year was there a significant difference. These data appear to indicate that Asian American and white applicants are similarly treated within the legacy and recruited athlete pools.

TABLE 11

| | RECRUITED ATHLETES | | | CHILDREN OF ALUMNI | | |
|---|---|---|---|---|---|---|
| CLASS YEAR | AA ADMIT RATE | WHITE ADMIT RATE | SIGNIFICANCE | AA ADMIT RATE | WHITE ADMIT RATE | SIGNIFICANCE |
| 1992 | 34.8% | 41.3% | ns | 26.2% | 35.6% | ns |
| 1991 | 34.6% | 39.6% | ns | 19.6% | 34.0% | s |
| 1990 | 42.9% | 44.2% | ns | 28.9% | 39.8% | ns |
| 1989 | 45.8% | 44.2% | ns | 35.6% | 32.0% | ns |
| 1988 | 68.4% | 58.1% | ns | 37.8% | 34.9% | ns |
| 1987 | 52.9% | 53.1% | ns | 26.2% | 38.6% | ns |

In addition, we reviewed two other sub-groups of applicants: California residents; and students who anticipated majoring in the biological sciences towards a career in medicine. One hypothesis to explain the lower admit rate for Asian American applicants is that categories of applicants in which Asian Americans are heavily represented are admitted at a lower rate. The sub-group of applicants from California was studied because Asian Americans were overrepresented in this group and, as shown below in Table 12, the admit rate was significantly lower than the admit rate for applicants in general. The

**JA4512**

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

HARV00023687

Page 39 - Statement of Findings, Compliance Review 01-88-6009

biological science/pre-med majors group was chosen because it was clear from the file review that readers often noted that Asian American applicants were "CJers", Admissions shorthand for students who indicated biological sciences as their anticipated major and medicine as their career goal. One way bias against Asian Americans might be manifested is through the use of stereotypes. If Asian American applicants are seen stereotypically as one-dimensional, math/science types, applicants who fit this pattern might be evaluated more negatively. As described in Table 12, Asian Americans are disproportionately represented among "CJ" applicants who, as a group also get admitted at a lower rate than other applicants.

TABLE 12

|  | TOTAL APPLICANTS | ASIAN AMERICAN APPLICANTS | | TOTAL APPLICANTS ADMITTED | |
| --- | --- | --- | --- | --- | --- |
|  |  | # | % | # | % |
| **CLASS OF 1992:** |  |  |  |  |  |
| All Categories | 11182 | 2236 | 20.0 | 1744 | 15.6 |
| Calif | 1593 | 555 | 34.8 | 195 | 12.2 |
| Non Calif | 9589 | 1691 | 17.5 | 1547 | 16.1 |
| Bio & Med ("CJ") | 1433 | 543 | 37.9 | 143 | 10.0 |
| Non CJ | 9749 | 1693 | 17.4 | 1601 | 16.4 |
| **CLASS OF 1991:** |  |  |  |  |  |
| All Categories | 11231 | 2149 | 19.1 | 1741 | 15.5 |
| Calif | 1573 | 509 | 32.4 | 192 | 12.2 |
| Non Calif | 9658 | 1640 | 17.0 | 1549 | 16.1 |
| Bio & Med ("CJ") | 1585 | 621 | 39.2 | 185 | 11.7 |
| Non CJ | 9646 | 1528 | 15.9 | 1556 | 16.1 |

Through logistic regression analysis, we tested whether the large number of Asian American applicants in the California and CJ pools were adversely affected. For the Classes of 1991 and 1992, we found there was no California or CJ effect on Asian American applicants, that is, these applicants were similarly treated to non-California and non-CJ Asian American applicants. It appears, therefore, that the extent to which Asian American applicants in the California and CJ pools were admitted at a lower rate than other Asian American applicants is a reflection of their weaker qualifications. The view that Asian American applicants from California might be weaker than those from other areas of the country was also expressed by an Alumni Admissions committee member in southern California. Through additional logistic regression analyses on white applicants in the California and CJ pools, we were able to determine that Asian Americans are not disadvantaged in comparison to white within these two pools. Thus, we concluded that, although Asian American applicants from California and in the CJ pool are admitted at

**JA4513**

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY    HARV00023688

a lower rate than other Asian American applicants, there was no evidence of intentional or unintentional bias.

From all of the analyses performed, OCR found a strong and distinct correlation between the preferences or positive weight given to children of alumni and recruited athletes, and the disparity in Asian American and white admit rates. No other criteria or factors appeared to substantively contribute to the disparity. As a result of these analyses, taken together with the file review, we have concluded that the disparity in admit rates between Asian American and white applicants for the most part can be explained by this preference given to legacies and recruited athletes - groups that are predominantly white. The adverse effect on the Asian American admit rate was quite clear. Consequently, OCR examined Harvard's reasons for giving these preferences.

## JUSTIFICATION FOR PREFERENCES

OCR learned that Harvard has been giving a preference to applicants who are children of alumni and to talented athletes at least back to the beginning of the century. OCR noted that these preferences were given long before there was a significant number of Asian American applicants. Also, it is clear that preferences for legacies and athletes are not unique to Harvard. Consequently, we found no evidence to suggest that these preferences were instituted to intentionally or deliberately limit the number of Asian Americans at Harvard. Because of the disparate impact that these preferences have on Asian Americans, however, OCR proceeded to analyze the legitimacy of their use in the admissions process.

Harvard explained that the preference for alumni children was given because:

Harvard alumni support the college by devoting immense amounts of time in recruiting and other volunteer activities, by contributing financially, and by informing other people, be they potential students, parents, donors, or community leaders, about the College. Those alumni are naturally, very interested in the college choices of their own children. If their children are rejected by Harvard, their affection for and interest in the college may decline; if their children are admitted, their involvement with the College is renewed. Having children share the parent's college affiliation stimulates those three aspects of contribution: of service, of money, and of community relations.

Additionally, in response to OCR's query whether alternatives had been considered which would serve Harvard's institutional and educational goals, but which might have a less severe impact on Asian American applicants, Harvard responded that:

**JA4514**

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

> . . . in our judgment, and in the judgment of many of our fellow institutions, tips for lineage . . . could not be eliminated without a severe effect on the strength and vitality of the institutions and their ability to achieve their educational objectives.

OCR asked Harvard for documentation supporting their assertion that alumni contribute both financially and through service to the University. Information submitted indicated that alumni provide the bulk of the scholarship funds provided to all students. In addition, Harvard demonstrated the extent to which alumni serve on the Schools and Scholarship Committee and other alumni organizations which are extremely important to the operation of the Admissions Office and other components of the University.

With respect to athletic preferences, Harvard explained that its athletic programs, like the academic programs at Harvard sought the very best applicants who could contribute to those programs. Consequently, in the same way that unusually strong math or science scholars would be looked upon favorably in the admissions process for the contributions they could make to the math or science programs, talented athletes are looked upon favorably for the contributions they could make to the athletic programs. Further, Harvard maintained that a varsity sports program was an integral part of American college life, benefiting athletes and other students as well.

Specifically, regarding the "tip" for athletics, Harvard stated that:

> Excellence in athletic ability is only one of the excellences that the Committee looks for, of course, and reflects the Committee's continual quest for diverse abilities to contribute ·to the life of the community. At Harvard, athletes are not admitted by a different committee, nor are they subject to a different process, nor do they receive athletic scholarships; they are viewed like the other students with whom they will live and study, and are distinctive only in the nature of their particular excellence. Dedicated athletes wish to compete with athletes of similar dedication, and that kind of intensity is valued in all candidates. Our coaches tell us again and again that it would be impossible to field a varsity level team without recruiting athletes and giving their athletic excellence the kind of positive weight we give a myriad of other non-athletic excellences in the admissions process. There is no alternative to a "tip" if Harvard wishes to have a competitive varsity athletic program.

In evaluating Harvard's justifications for providing "tips" to legacy and recruited athlete applicants, OCR took into account court decisions related to this matter. While there is no case law which directly addresses the legitimacy of a private University admissions preferences to children of alumni, there is at least one case in which a court upheld such a preference for out-of-state children of alumni at a State University. In Rosenstock v. Board of Governors of University of North Carolina, 423 F. Supp. 1321

**JA4515**

HARV00023690

Page 42 - Statement of Findings, Compliance Review 01-88-6009

(1976), a Federal district court found that "defendants showed that the alumni provide monetary support for the University and that out-of-state alumni contribute close to one-half of the total given." Id. at 423 p. 1327. The court concluded that "to grant children of this latter group a preference then is a reasonable basis and is not constitutionally defective." Id. That case involved an Equal Protection challenge to a State University's preference to out-of-state applicants who were children of alumni. While Harvard is a private University, and we are reviewing its undergraduate admissions program under Title VI of the Civil Rights Act of 1964, the Rosenstock case does indicate one court's willingness to recognize the legitimacy of a link between a University's economic interests, and admissions preference to alumni children based on the fact that alumni donate large sums of money to the University.

In addition to the Rosenstock case, one Justice on the U.S. Supreme Court at least mentioned the fact that a preference is given to children of alumni and recruited athletes. Justice Blackmun, in his separate opinion in Bakke supra., stated that:

> It is somewhat ironic to have us so deeply disturbed over a program where race is an element of consciousness, and yet to be aware of the fact, as we are, that institutions of higher learning, albeit more on the undergraduate than graduate level, have given conceded preferences up to a point to those possessed of athletic skills, to the children of alumni, to the affluent who may bestow their largess on the institutions, and to those having connections with celebrities, the famous and the powerful. Bakke, 438 U.S. Rep. at 404.

Justice Blackmun went on to defer such matters to the expertise of educators, and to presume the good faith of the institutions administering such policies. There is no definitive authority, therefore, to suggest that such preferences are unlawful in and of themselves.

With respect to alumni preferences, OCR asked Harvard to provide some evidence of their support and contributions to the University. Harvard provided information showing that last year, for example, alumni contributed over 36 million dollars to the Harvard College Fund, much of which goes to providing financial aid and scholarships to needy students. Additionally, Harvard provided data which indicated that over 4,000 alumni serve on schools and scholarship committees, and that the more than 37,000 dues-paying members of the Harvard and Radcliffe Clubs contribute to the University by raising scholarship funds and sponsoring schools and scholarship committees. Harvard maintained that the direct financial support from alumni was an essential component of the financial aid that enables the University to maintain its "needs-blind" admissions policy and achieve its important educational objective of diversity in its student body. Data supplied by Harvard substantiated Harvard's assertion that alumni time, energy, money and intellectual resources were essential to maintaining the excellence of the institution.

**JA4516**

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY                                                    HARV00023691

OCR's review of current case law found no legal authority to suggest that giving preferences to legacies and recruited athletes was legally impermissible. In fact, the case law suggests that if schools are to possess a desirable diversity, officials must retain wide discretion, with respect to the manner of selecting students. The courts have generally been reluctant, if not unwilling to dictate what considerations or methods of selection are to be given priority in college admissions. OCR finds that the reasons or goals provided by Harvard for giving preferences to children of alumni and recruited athletes are legitimate institutional goals, and not a pretext for discrimination against Asian Americans. Additionally, Harvard asserted, and OCR accepts, that there are no alternatives to these preferences that could effectively accomplish the same legitimate goals. In light of the evidence, and the lack of any legal authority suggesting that such preferences are impermissible, OCR finds that Harvard's use of preferences for children of alumni and recruited athletes, while disproportionately benefitting white applicants, does not violate Title VI of the Civil Rights Act of 1964 or its implementing regulation at 34 C.F.R. Part 100.

Based upon the entirety of OCR's review, and Harvard's explanations of its preferences for alumni children and recruited athletes, OCR drew the following conclusions.

## CONCLUSION

OCR established that Asian American applicants to Harvard-Radcliffe were accepted at a statistically significant lower rate than non-minority (white) applicants in each of the last seven years covered by our review (Classes of 1986-1992). Our investigation found, however, no evidence of the use of a quota to limit the number of Asian Americans at Harvard, which might explain the disparity in admit rates. During the entire ten year period studied (Classes of 1986-1993), in each succeeding year both the number of Asian American applicants and the number accepted were greater than in the previous year. In addition, an extensive review of the literature, documentation provided by Harvard, and extensive interviews of both Harvard staff and other knowledgeable individuals, revealed no information attesting to the existence or use of quotas by Harvard.

Consequently, we turned to Harvard's admissions policy and process for an explanation of the disparity between Asian American and white acceptance rates. After review of files and documentation submitted by Harvard, supplemented by interviews with Admissions staff, we found several policies and procedures in Harvard's admission process which indicated different treatment of Asian American applicants on the basis of race.

First, Harvard indicated that it provides an extra "ethnic" read for Asian American applicants. Our investigation found, however, that the "ethnic" read was an affirmative step designed to ensure a full understanding of the different backgrounds of Asian American applicants by having the applicant file read by an Admissions Officer who was knowledgeable and sensitive to the Asian American cultures and

**JA4517**

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY                                      HARV00023692

Page 44 - Statement of Findings, Compliance Review 01-88-6009

experiences. Second, Harvard stated unequivocally that Asian American ethnicity is a factor in the admissions process which can weigh in favor of the admission of a specific applicant. We found that Harvard's intent was for race or ethnicity to be considered only as one positive factor in evaluating Asian American applicants, which might make a difference in a situation where all other factors were substantially equal. Third, Harvard stated that some Asian American applicants are compared to other similarly-situated Asian American applicants during the admissions process. We found, however, that to the extent certain Asian American applicants were compared to other similar applicants, they were not ultimately shielded from comparison to all other applicants. Finally, Harvard stated that race is a factor in determining targets for the total number of applicants to be admitted from each docket. After further inquiry, OCR found that race was simply one, positive consideration in the development of a target for each docket, and that there were no targets for specific racial or ethnic groups of applicants.

OCR concluded, to the extent that they treat Asian Americans differently from whites, Harvard's admissions policies and procedures intended race to be used in a manner which benefitted, not harmed, Asian American applicants. The "ethnic" read and the within group comparisons were designed to ensure that differences in culture or background did not place Asian American applicants at an unfair disadvantage. The ethnic "tip" and the development of targets provided an opportunity for Asian American ethnicity to be positively weighted in the admissions process.

OCR notes that Justice Powell, in dicta in the Bakke case stated that ethnic diversity is "one element in a range of factors a university may properly consider in attaining the goal of a heterogeneous student body" Bakke 438 U.S. at p. 314. The key, according to Powell, is that while "race or ethnic background may be deemed a "plus" in a particular applicant's file, . . . it does not insulate the individual from comparison with all other candidates for the available seats." (Id. at p.317.) OCR found no evidence to suggest that Harvard's admissions policies and procedures intended race or ethnicity to be the decisive or sole factor, rather than one of many factors which might weigh in favor of admitting a particular applicant. Consequently, OCR finds that Harvard's policies and procedures for admissions, themselves, while not racially neutral, are consistent with the legal requirements of Title VI of the Civil Rights Act of 1964 and its implementing regulations at 34 C.F.R. Part 100.

OCR's analysis of Harvard's stated admissions policies and procedures, did not provide an explanation for the lower Asian American admit rate. Therefore, OCR next evaluated the implementation of those policies and procedures to determine whether Asian American applicants were somehow disadvantaged in the admissions process. We interviewed staff, reviewed files, and analyzed data provided by Harvard regarding both the reader rating process and the decisions to admit or reject applicants.

As a result, we have reached a number of conclusions with respect to the disparity in admit rates between Asian American and white applicants from our review of Harvard's implementation of the admissions

**JA4518**

HARV00023693

Page 45 - Statement of Findings, Compliance Review 01-88-6009

process. First, we could not conclude that the reader rating process was implemented in a manner that unfairly treated Asian American applicants. Given the subjective nature of the process, however, it was almost impossible to determine that a rating was inaccurate. OCR could not determine, for example, whether an applicant, based on all the information in a file, should have received a "1" rather than a "2" on "personal qualities", when a 1 was defined in the Reading Procedures as "Outstanding" and a 2 as "Very Strong". Nonetheless, it appeared that Asian American and white applicants received similar ratings from readers for similar accomplishments. In addition, our data analyses showed that Asian Americans and whites had similar mean scores in the reader rating categories, which also supports the conclusion that the reader ratings did not treat Asian Americans differently.

Also, we looked carefully at Asian American applicant information for indications of stereotyping, or insensitivity to their background or culture, which might place them at a disadvantage in comparison to white applicants. While there was some evidence that readers stereotyped some groups of Asian American applicants, it did not appear to result in unfairly low ratings. Although in only a small number of cases did readers note an Asian American applicant's background or experience, we could not conclude that readers failed to adequately take into account Asian American ethnicity when rating files. On the other hand, our file review did not support Harvard's assertion that the Asian American ethnic reader reviewed most of the competitive Asian American applicant files. To the extent that Asian American applicants do not receive the benefit of an "ethnic read", the possibility exists that cultural or ethnic differences may be overlooked. Also, there was little evidence from the file review, that Asian Americans received a "tip" in the assignment of reader ratings, or in the overall rating.

While some aspects of the reader rating process might disadvantage some Asian American applicants, we concluded that, taken as a whole, there was no significant difference between the treatment of Asian American applicants and the treatment of white applicants. Further, in light of the small number of cases found where there was any indication of possible disadvantage, it clearly could not explain the disparity between Asian American and white admit rates overall.

Since OCR had little information to evaluate the treatment of Asian American applicants during subcommittee and full committee meetings, we addressed the final results of these processes, that is, the ultimate decision to admit or reject. We first conducted analyses to determine the relative qualifications of Asian American and white applicants, based on summary information on each applicant, which was available to subcommittee and full committee members. It was our conclusion that the two groups were similarly qualified. Therefore, a hypothesis that the admit rate disparity could be explained by a weaker Asian American applicant pool was not supported by the evidence.

Utilizing ten years of quantitative data supplied by Harvard for all individual Asian American and white applicants, it appeared that Asian Americans were at a small but statistically significant disadvantage in

**JA4519**

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY HARV00023694

the admissions process. However, this disadvantage is virtually eliminated if legacies and recruited athletes (groups with few Asian Americans), are removed from the Asian American and white samples. This finding is consistent with the results of our file review, which revealed clear evidence of a "tip" for legacies and recruited athletes. Further evidence of the effect of the preference for these groups on Asian Americans was demonstrated by the comparable Asian American and white admit rates when legacies and recruited athletes were removed from the sample.

At the same time, there was no evidence from these sources of any "tip" for Asian Americans. Although this finding contradicts Harvard's stated policy, OCR concludes that the lack of a "tip" in the admissions process does not, in itself constitute discrimination in violation of Title VI or its implementing regulation.

Having determined that the primary cause of the lower Asian American admit rate in comparison to white applicants is the "tip" or preference given to legacies and recruited athletes, we sought to determine Harvard's reasons for these preferences, and whether they could be justified in terms of institutional or educational goals.

According to information provided by Harvard, the primary reasons for giving a preference to children of alumni were to 1) encourage alumni volunteer services; 2) to encourage alumni financial contributions; and, 3) to maintain community relations. With respect to recruited athletes, Harvard likened the preference given to excellence in athletics to excellence in any particular field. Further, they asserted that varsity sports are an integral part of college life. OCR finds that these reasons or goals provided by Harvard are legitimate institutional goals, and not a pretext for discrimination against Asian Americans. Thus, OCR concludes that Harvard's use of preferences for children of alumni and recruited athlete, while disproportionately benefiting white applicants, does not violate Title VI.

As a result of this compliance review, it is OCR's overall conclusion that Harvard did not discriminate against Asian American applicants to its undergraduate program in violation of Title VI of the Civil Rights Act of 1964 or its implementing regulation at 34 C.F.R. Part 100.

**JA4520**

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

HARV00023695



**TRIAL EXHIBIT**

**P604**

SFFA v. Harvard

| | |
|---|---|
| **From:** | Heenan, Christine M [/O=HARVARD UNIVERSITY/OU=FIRST ADMINISTRATIVE GROUP/CN=RECIPIENTS/CN=CMH191] |
| **Sent:** | Monday, April 29, 2013 3:50:44 PM |
| **To:** | Driver-Linn, Erin |
| **Subject:** | RE: two quick things |
| **Categories:** | Strategy - Liam |

Gotcha. I spend very little time in Admissions land!

Christine M. Heenan
Vice President, Public Affairs and Communications
Harvard University
Massachusetts Hall
Cambridge, MA 02138

Phone: 617-495-1703
email : christine_heenan@harvard.edu

**From:** Driver-Linn, Erin
**Sent:** Monday, April 29, 2013 11:48 AM
**To:** Heenan, Christine M
**Subject:** RE: two quick things

Yes, extra weight for admissions decisions. Usual categories in admissions conversations include gender, race, legacy, athlete, etc.

**From:** Heenan, Christine M
**Sent:** Monday, April 29, 2013 11:45 AM
**To:** Driver-Linn, Erin
**Subject:** RE: two quick things

Thumbs on the scale? Meaning extra weight we give to those students? If so, you are right – there are upsides and downsides of being public about that analysis...

Christine M. Heenan
Vice President, Public Affairs and Communications
Harvard University
Massachusetts Hall
Cambridge, MA 02138

Phone: 617-495-1703
email : christine_heenan@harvard.edu

**From:** Driver-Linn, Erin
**Sent:** Monday, April 29, 2013 11:37 AM
**To:** Heenan, Christine M
**Subject:** RE: two quick things



**EXHIBIT**

19

7.17.

Okay great—Tippi is unfortunately sick today, so I'll have Liam call Monica.

Fitz asked us to do some analysis of "thumb on the scale" for low income. Could be a positive message, but has implications for need blind policy as well as opening the door to Unz-like requests for info about other thumbs on the scale. Team is putting together a memo to send to Fitz, copy you and Jeff to put this in context, but I guess I am aware that part of the wonderful thing about Fitz is he has a lot of friends and likes to talk about his work...

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY    **JA4521**    HARV00075051

**From:** Heenan, Christine M
**Sent:** Monday, April 29, 2013 10:43 AM
**To:** Driver-Linn, Erin
**Subject:** RE: two quick things

| Redacted: |
|---|
| Redacted |

Sounds good re: Fitz — what is the issue?

---
Christine M. Heenan
Vice President. Public Affairs and Communications
Harvard University
Massachusetts Hall
Cambridge, MA  02138

Phone: 617-495-1703
email :  christine_heenan@harvard.edu

**From:** Driver-Linn, Erin
**Sent:** Sunday, April 28, 2013 1:59 PM
**To:** Heenan, Christine M
**Subject:** two quick things

Hi Christine,

Hope all is well.
| Redacted: |
|---|
| Redacted |

Also, would like to give you a heads up about some analysis and correspondence we've been having with Fitz. He's excited to share more broadly, I believe is going to be in touch with Jeff Neal tomorrow, but I'd like to make sure you've had a chance to think through implications, not entirely straightforward.

If you think a good idea, I'll have Tippi connect with Monica to try to find time for a short phone call. All best,

-Erin

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY            **JA4522**                                    HARV00075052

# Admit Rates of ALDCs Versus Non-ALDCs

| Academic Rating | | Non-ALDC | Athletes | Legacy, Dean's List, Children of Faculty or Staff |
|---|---|---|---|---|
| 1 | Number of Applicants | 612 | 1 | 60 |
| | Number of Admits | 405 | 1 | 58 |
| | Admit Rate | 66.18% | 100.00% | 96.67% |
| 2 | Number of Applicants | 59,731 | 303 | 3,118 |
| | Number of Admits | 5,986 | 291 | 1528 |
| | Admit Rate | 10.02% | 96.04% | 49.01% |
| 3 | Number of Applicants | 57,874 | 821 | 2,444 |
| | Number of Admits | 1,390 | 716 | 442 |
| | Admit Rate | 2.40% | 87.21% | 18.09% |
| 4 | Number of Applicants | 18,176 | 210 | 373 |
| | Number of Admits | 3 | 167 | 13 |
| | Admit Rate | 0.02% | 79.52% | 3.49% |
| 5 | Number of Applicants | 6,335 | 8 | 46 |
| | Number of Admits | 0 | 4 | 0 |
| | Admit Rate | 0.00% | 50.00% | 0.00% |

**JA4523**

Expanded Dataset Plus Athletes

exhibitsticker.com

TRIAL EXHIBIT

P618

SFFA v. Harvard


TRIAL EXHIBIT

P619

SFFA v. Harvard

## Applicants Interviewed and Admitted

| | White | Asian American | African American | Hispanic | Total (Including All Races/Ethnicities) |
|---|---|---|---|---|---|
| # ALDC Applicants | 5,002 | 841 | 440 | 413 | 7,384 |
| # ALDC Applicants Interviewed | 1,035 | 144 | 113 | 73 | 1,478 |
| % ALDCs Interviewed Out of ALDC Applicants | 20.69% | 17.12% | 25.68% | 17.68% | 20.02% |
| # ALDCs Interviewed and Admitted | 797 | 114 | 94 | 64 | 1,161 |
| % ALDCs Admitted Out of ALDCs Interviewed | 77.00% | 79.17% | 83.19% | 87.67% | 78.55% |
| # Non-ALDC Applicants | 57,582 | 40,415 | 15,664 | 17,970 | 142,728 |
| # Non-ALDC Applicants Interviewed | 928 | 350 | 199 | 181 | 1,801 |
| % Non-ALDCs Interviewed Out of Non-ALDC Applicants | 1.61% | 0.87% | 1.27% | 1.01% | 1.26% |
| # Non-ALDCs Interviewed and Admitted | 244 | 101 | 89 | 58 | 531 |
| % Non-ALDCs Admitted Out of Non-ALDCs Interviewed | 26.29% | 28.86% | 44.72% | 32.04% | 29.48% |
| # Total Applicants | 62,584 | 41,256 | 16,104 | 18,383 | 150,112 |
| # Total Applicants Interviewed | 1,963 | 494 | 312 | 254 | 3,279 |
| % Applicants Interviewed Out of All Applicants | 3.14% | 1.20% | 1.94% | 1.38% | 2.18% |
| # Total Applicants Interviewed and Admitted | 1,041 | 215 | 183 | 122 | 1,692 |
| % Applicants Admitted Out of All Applicants Interviewed | 53.03% | 43.52% | 58.65% | 48.03% | 51.60% |

**JA4524**

Expanded Dataset Plus Athletes

**TRIAL EXHIBIT**

**P620**

SFFA v. Harvard

## Number and Share of Applicants Admitted and Rejected

JA4525

| Rating | Level | White Admitted | White Rejected | White Total | Asian Am. Admitted | Asian Am. Rejected | Asian Am. Total | African Am. Admitted | African Am. Rejected | African Am. Total | Hispanic Admitted | Hispanic Rejected | Hispanic Total | All Applicants Admitted | All Applicants Rejected | All Applicants Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Overall Rating** | 1 | 24 | 0 | 24 | 31 | 0 | 31 | 8 | 0 | 8 | 5 | 0 | 5 | 77 | 0 | 77 |
| | 2 | 1,656 | 873 | 2,529 | 1,261 | 664 | 1,925 | 694 | 126 | 820 | 550 | 142 | 692 | 4,498 | 1,975 | 6,473 |
| | 3 | 1,131 | 39,975 | 41,106 | 780 | 29,306 | 30,086 | 485 | 6,137 | 6,622 | 552 | 9,340 | 9,892 | 3,206 | 92,782 | 95,988 |
| | ≥4 | 3 | 13,920 | 13,923 | 0 | 8,373 | 8,373 | 0 | 8,214 | 8,214 | 0 | 7,381 | 7,381 | 3 | 40,187 | 40,190 |
| **Academic Rating** | 1 | 124 | 47 | 171 | 229 | 141 | 370 | 2 | 6 | 8 | 7 | – | 7 | 405 | 207 | 612 |
| | 2 | 2,374 | 23,532 | 25,906 | 1,727 | 22,236 | 23,963 | 703 | 733 | 1,436 | 717 | 2,285 | 3,002 | 5,986 | 53,745 | 59,731 |
| | 3 | 315 | 25,501 | 25,816 | 116 | 12,737 | 12,853 | 481 | 5,794 | 6,275 | 383 | 8,209 | 8,592 | 1,390 | 56,484 | 57,874 |
| | ≥4 | 1 | 5,688 | 5,689 | 0 | 3,229 | 3,229 | 1 | 7,949 | 7,950 | 0 | 6,369 | 6,369 | 3 | 24,508 | 24,511 |
| **Extracurricular Rating** | 1 | 75 | 98 | 173 | 75 | 75 | 150 | 7 | 11 | 18 | 11 | 11 | 22 | 192 | 228 | 420 |
| | 2 | 1,980 | 11,866 | 13,846 | 1,547 | 9,713 | 11,260 | 610 | 1,806 | 2,416 | 616 | 2,386 | 3,002 | 5,179 | 28,223 | 33,402 |
| | 3 | 736 | 40,689 | 41,425 | 446 | 27,757 | 28,203 | 560 | 11,473 | 12,033 | 466 | 13,437 | 13,903 | 2,357 | 101,002 | 103,359 |
| | 4 | 3 | 1,735 | 1,738 | 0 | 659 | 659 | 3 | 1,012 | 1,015 | 1 | 859 | 860 | 9 | 4,560 | 4,569 |
| **Athletic Rating** | 1 | – | – | – | – | – | – | – | – | – | – | – | – | – | – | – |
| | 2 | 590 | 6,774 | 7,364 | 149 | 1,794 | 1,943 | 169 | 900 | 1,069 | 169 | 1,180 | 1,349 | 1,175 | 11,644 | 12,819 |
| | 3 | 1,260 | 29,248 | 30,508 | 911 | 18,384 | 19,295 | 576 | 7,144 | 7,720 | 474 | 8,272 | 8,746 | 3,497 | 68,329 | 71,826 |
| | ≥4 | 810 | 17,416 | 18,226 | 915 | 17,415 | 18,330 | 387 | 5,773 | 6,160 | 394 | 6,817 | 7,211 | 2,716 | 51,400 | 54,116 |
| **Personal Rating** | 1 | 19 | 8 | 27 | 3 | 1 | 4 | 1 | 2 | 3 | 1 | 1 | 2 | 26 | 13 | 39 |
| | 2 | 2,338 | 9,884 | 12,222 | 1,515 | 5,610 | 7,125 | 882 | 2,093 | 2,975 | 861 | 2,493 | 3,354 | 6,037 | 21,771 | 27,808 |
| | 3 | 457 | 44,629 | 45,086 | 554 | 32,538 | 33,092 | 304 | 12,309 | 12,613 | 245 | 14,283 | 14,528 | 1,721 | 112,496 | 114,217 |
| | ≥4 | 0 | 247 | 247 | 0 | 194 | 194 | 0 | 73 | 73 | 0 | 86 | 86 | 0 | 664 | 664 |
| **Teacher 1 Rating** | 1 | 476 | 1,118 | 1,594 | 328 | 715 | 1,043 | 61 | 83 | 144 | 81 | 152 | 233 | 1,019 | 2,273 | 3,292 |
| | 2 | 1,702 | 14,222 | 15,924 | 1,218 | 10,183 | 11,401 | 646 | 1,892 | 2,538 | 622 | 3,024 | 3,646 | 4,531 | 31,947 | 36,478 |
| | 3 | 636 | 37,503 | 38,139 | 525 | 26,357 | 26,882 | 480 | 10,804 | 11,284 | 404 | 12,186 | 12,590 | 2,232 | 94,123 | 96,355 |
| | ≥4 | 0 | 301 | 301 | 0 | 191 | 191 | 0 | 144 | 144 | 0 | 140 | 140 | 0 | 833 | 833 |
| **Teacher 2 Rating** | 1 | 465 | 934 | 1,399 | 298 | 570 | 868 | 72 | 71 | 143 | 76 | 119 | 195 | 984 | 1,844 | 2,828 |
| | 2 | 1,638 | 12,584 | 14,222 | 1,210 | 8,999 | 10,209 | 589 | 1,587 | 2,176 | 635 | 2,555 | 3,190 | 4,406 | 28,078 | 32,484 |
| | 3 | 627 | 30,908 | 31,535 | 492 | 22,706 | 23,198 | 474 | 8,142 | 8,616 | 351 | 9,597 | 9,948 | 2,117 | 77,591 | 79,708 |
| | ≥4 | 0 | 214 | 214 | 1 | 165 | 166 | 0 | 79 | 79 | 0 | 102 | 102 | 1 | 597 | 598 |
| **Counselor Rating** | 1 | 307 | 579 | 886 | 265 | 443 | 708 | 47 | 51 | 98 | 65 | 80 | 145 | 751 | 1,260 | 2,011 |
| | 2 | 1,832 | 11,836 | 13,668 | 1,251 | 8,193 | 9,444 | 640 | 1,433 | 2,073 | 581 | 2,233 | 2,814 | 4,651 | 25,831 | 30,482 |
| | 3 | 648 | 39,137 | 39,785 | 541 | 27,858 | 28,399 | 492 | 11,057 | 11,549 | 444 | 12,780 | 13,224 | 2,307 | 98,452 | 100,759 |
| | ≥4 | 0 | 329 | 329 | 0 | 236 | 236 | 0 | 254 | 254 | 0 | 196 | 196 | 0 | 1,089 | 1,089 |
| **Alumni Personal Rating** | 1 | 1,232 | 6,658 | 7,890 | 866 | 4,707 | 5,573 | 438 | 1,405 | 1,843 | 454 | 1,607 | 2,061 | 3,236 | 15,657 | 18,893 |
| | 2 | 1,342 | 19,515 | 20,857 | 1,035 | 13,734 | 14,769 | 604 | 4,286 | 4,890 | 558 | 4,818 | 5,376 | 3,838 | 46,097 | 49,935 |
| | 3 | 162 | 13,447 | 13,609 | 130 | 9,665 | 9,795 | 106 | 3,802 | 3,908 | 71 | 4,213 | 4,284 | 517 | 33,741 | 34,258 |
| | ≥4 | 14 | 3,165 | 3,179 | 7 | 2,532 | 2,539 | 13 | 1,120 | 1,133 | 3 | 1,214 | 1,217 | 38 | 8,684 | 8,722 |
| **Alumni Overall Rating** | 1 | 1,009 | 3,790 | 4,799 | 894 | 3,649 | 4,543 | 257 | 440 | 697 | 317 | 682 | 999 | 2,684 | 9,434 | 12,118 |
| | 2 | 1,427 | 14,787 | 16,214 | 978 | 11,006 | 11,984 | 615 | 1,952 | 2,567 | 570 | 2,674 | 3,244 | 3,910 | 33,319 | 37,229 |
| | 3 | 287 | 15,849 | 16,136 | 154 | 10,509 | 10,663 | 259 | 3,646 | 3,905 | 178 | 4,253 | 4,431 | 941 | 37,196 | 38,137 |
| | ≥4 | 23 | 7,868 | 7,891 | 9 | 5,119 | 5,128 | 26 | 4,247 | 4,273 | 20 | 3,944 | 3,964 | 82 | 22,655 | 22,737 |

All Applicants = Including All Races/Ethnicities

Baseline Dataset

| Rating | # | White Share Admitted | White Share Rejected | White Share Total | Asian American Share Admitted | Asian American Share Rejected | Asian American Share Total | African American Share Admitted | African American Share Rejected | African American Share Total | Hispanic Share Admitted | Hispanic Share Rejected | Hispanic Share Total | All Applicants Share Admitted | All Applicants Share Rejected | All Applicants Share Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Overall Rating | 1 | 0.85% | 0% | 0.04% | 1.50% | 0% | 0.08% | 0.67% | 0% | 0.05% | 0.45% | 0% | 0.05% | 0.99% | 0% | 0.05% |
| | 2 | 58.85% | 1.59% | 4.39% | 60.80% | 1.73% | 4.76% | 58.47% | 0.87% | 5.23% | 49.68% | 0.84% | 3.85% | 57.79% | 1.46% | 4.54% |
| | 3 | 40.19% | 72.99% | 71.39% | 37.64% | 76.43% | 74.44% | 40.86% | 42.39% | 42.28% | 49.86% | 55.39% | 55.05% | 41.19% | 68.76% | 67.25% |
| | ≥4 | 0.11% | 25.42% | 24.18% | 0% | 21.84% | 20.72% | 0% | 56.74% | 52.44% | 0% | 43.77% | 41.07% | 0.04% | 29.78% | 28.16% |
| Academic Rating | 1 | 4.41% | 0.09% | 0.30% | 11.05% | 0.37% | 0.92% | 0.17% | 0.01% | 0.02% | 0.63% | 0% | 0.04% | 5.20% | 0.15% | 0.43% |
| | 2 | 84.36% | 42.97% | 44.99% | 83.35% | 57.59% | 59.29% | 59.22% | 5.06% | 9.17% | 64.77% | 13.55% | 16.71% | 76.90% | 39.83% | 41.85% |
| | 3 | 11.19% | 46.56% | 44.83% | 5.60% | 33.22% | 31.80% | 40.52% | 40.02% | 40.06% | 34.60% | 48.68% | 47.81% | 17.86% | 41.86% | 40.55% |
| | ≥4 | 0.04% | 10.39% | 9.88% | 0% | 8.42% | 7.99% | 0.08% | 54.91% | 50.75% | 0% | 37.77% | 35.44% | 0.04% | 18.16% | 17.17% |
| Extracurricular Rating | 1 | 2.68% | 0.18% | 0.30% | 3.63% | 0.20% | 0.37% | 0.59% | 0.05% | 0.12% | 1.01% | 0% | 0.12% | 2.48% | 0.17% | 0.30% |
| | 2 | 70.87% | 21.82% | 24.21% | 74.81% | 25.42% | 27.96% | 51.69% | 12.63% | 15.61% | 56.31% | 14.29% | 16.88% | 66.94% | 21.06% | 23.56% |
| | 3 | 26.34% | 74.81% | 72.44% | 21.57% | 72.65% | 70.03% | 47.46% | 80.22% | 77.72% | 42.60% | 80.49% | 78.16% | 30.46% | 75.37% | 72.92% |
| | 4 | 0.11% | 3.19% | 3.04% | 0.00% | 1.72% | 1.64% | 0.25% | 7.08% | 6.56% | 0.09% | 5.15% | 4.83% | 0.12% | 3.40% | 3.22% |
| Athletic Rating | 2 | 22.18% | 12.68% | 13.13% | 7.54% | 4.77% | 4.91% | 14.93% | 6.51% | 7.15% | 16.30% | 7.25% | 7.79% | 15.90% | 8.86% | 9.24% |
| | 3 | 47.37% | 54.73% | 54.38% | 46.13% | 48.90% | 48.76% | 50.88% | 51.70% | 51.64% | 45.71% | 50.85% | 50.54% | 47.33% | 52.01% | 51.76% |
| | ≥4 | 30.45% | 32.59% | 32.49% | 46.33% | 46.33% | 46.33% | 34.19% | 41.78% | 41.67% | 37.99% | 41.90% | 41.67% | 36.76% | 39.13% | 39.00% |
| Personal Rating | 1 | 0.68% | 0.01% | 0.05% | 0.14% | 0% | 0.01% | 0.08% | 0.01% | 0.02% | 0.09% | 0% | 0.01% | 0.33% | 0.01% | 0.03% |
| | 2 | 83.08% | 18.05% | 21.23% | 73.12% | 14.63% | 17.63% | 74.30% | 14.46% | 18.99% | 77.78% | 14.78% | 18.66% | 77.56% | 16.13% | 19.48% |
| | 3 | 16.24% | 81.49% | 78.30% | 26.74% | 84.86% | 81.88% | 25.61% | 85.02% | 80.52% | 22.13% | 84.70% | 80.85% | 22.11% | 83.36% | 80.02% |
| | ≥4 | 0% | 0.45% | 0.43% | 0% | 0.51% | 0.48% | 0% | 0.50% | 0.47% | 0% | 0.51% | 0.48% | 0% | 0.49% | 0.47% |
| Teacher 1 Rating | 1 | 16.92% | 2.10% | 2.85% | 15.84% | 1.91% | 2.64% | 5.14% | 0.64% | 1.02% | 7.32% | 0.98% | 1.40% | 13.09% | 1.76% | 2.40% |
| | 2 | 60.48% | 26.76% | 28.46% | 58.81% | 27.19% | 28.85% | 54.42% | 14.64% | 17.99% | 56.19% | 19.51% | 21.95% | 58.22% | 24.73% | 26.63% |
| | 3 | 22.60% | 70.57% | 68.16% | 25.35% | 70.39% | 68.03% | 40.44% | 83.60% | 79.97% | 36.50% | 78.61% | 75.80% | 28.68% | 72.86% | 70.35% |
| | ≥4 | 0% | 0.57% | 0.54% | 0% | 0.51% | 0.48% | 0% | 1.11% | 1.02% | 0% | 0.90% | 0.84% | 0% | 0.64% | 0.61% |
| Teacher 2 Rating | 1 | 17.03% | 2.09% | 2.95% | 14.89% | 1.76% | 2.52% | 6.34% | 0.72% | 1.30% | 7.16% | 0.96% | 1.45% | 13.11% | 1.71% | 2.45% |
| | 2 | 60.00% | 28.19% | 30.02% | 60.47% | 27.74% | 29.64% | 51.89% | 16.06% | 19.76% | 59.79% | 20.65% | 23.74% | 58.68% | 25.97% | 28.10% |
| | 3 | 22.97% | 69.24% | 66.57% | 24.59% | 69.99% | 67.36% | 41.76% | 82.42% | 78.23% | 33.05% | 77.56% | 74.05% | 28.20% | 71.77% | 68.94% |
| | ≥4 | 0% | 0.48% | 0.45% | 0.05% | 0.51% | 0.48% | 0% | 0.80% | 0.72% | 0% | 0.82% | 0.76% | 0.01% | 0.55% | 0.52% |
| Counselor Rating | 1 | 11.02% | 1.12% | 1.62% | 12.88% | 1.21% | 1.83% | 3.99% | 0.40% | 0.70% | 5.96% | 0.52% | 0.89% | 9.74% | 1.00% | 1.50% |
| | 2 | 65.73% | 22.81% | 25.00% | 60.82% | 22.31% | 24.35% | 54.28% | 11.20% | 14.83% | 53.30% | 14.61% | 17.18% | 60.33% | 20.40% | 22.69% |
| | 3 | 23.25% | 75.44% | 72.78% | 26.30% | 75.85% | 73.22% | 41.73% | 86.42% | 82.65% | 40.73% | 83.59% | 80.74% | 29.93% | 77.75% | 75.00% |
| | ≥4 | 0% | 0.63% | 0.60% | 0% | 0.64% | 0.61% | 0% | 1.99% | 1.82% | 0% | 1.20% | 1.20% | 0.01% | 0.86% | 0.81% |
| Alumni Personal Rating | 1 | 44.80% | 15.56% | 17.33% | 42.49% | 15.36% | 17.06% | 37.73% | 13.24% | 15.65% | 41.80% | 13.56% | 15.93% | 42.42% | 15.03% | 16.90% |
| | 2 | 48.80% | 45.61% | 45.80% | 50.79% | 44.83% | 45.20% | 52.02% | 40.38% | 41.53% | 51.38% | 40.65% | 41.55% | 50.31% | 44.25% | 44.66% |
| | 3 | 5.89% | 31.43% | 29.89% | 6.38% | 31.55% | 29.98% | 9.13% | 35.82% | 33.11% | 6.54% | 35.55% | 33.11% | 6.78% | 32.39% | 30.64% |
| | ≥4 | 0.51% | 7.40% | 6.98% | 0.34% | 8.26% | 7.77% | 1.12% | 10.55% | 9.62% | 0.28% | 10.24% | 9.41% | 0.50% | 8.34% | 7.80% |
| Alumni Overall Rating | 1 | 36.74% | 8.96% | 10.65% | 43.93% | 12.05% | 14.06% | 22.21% | 4.28% | 6.09% | 29.22% | 5.90% | 7.90% | 35.24% | 9.19% | 10.99% |
| | 2 | 51.97% | 34.96% | 36.00% | 48.06% | 36.34% | 37.08% | 53.15% | 18.98% | 22.43% | 52.53% | 23.15% | 25.67% | 51.33% | 32.47% | 33.78% |
| | 3 | 10.45% | 37.47% | 35.83% | 7.57% | 34.70% | 32.99% | 22.39% | 35.45% | 34.13% | 16.41% | 36.81% | 35.06% | 12.35% | 36.25% | 34.60% |
| | ≥4 | 0.84% | 18.60% | 17.52% | 0.44% | 16.90% | 15.87% | 2.25% | 41.29% | 37.34% | 1.84% | 34.14% | 31.37% | 1.08% | 22.08% | 20.63% |

All Applicants header note: (Including All Races/Ethnicities)

JA4526

TRIAL EXHIBIT
P621
SFFA v. Harvard

**Case: 19-2005** — Number and Share of Applicants Admitted and Rejected — **Entry ID: 6356615**

JA4527

Baseline Dataset

## White

| Rating | | Admitted # | Admitted % | Rejected # | Rejected % | Total # | Total % |
|---|---|---|---|---|---|---|---|
| Overall Rating | 1 | 24 | 0.85% | 0 | 0% | 24 | 0.04% |
| | 2 | 1,656 | 58.85% | 873 | 1.59% | 2,529 | 4.39% |
| | 3 | 1,131 | 40.19% | 39,975 | 72.99% | 41,106 | 71.39% |
| | ≥4 | 3 | 0.11% | 13,920 | 25.42% | 13,923 | 24.18% |
| Academic Rating | 1 | 124 | 4.41% | 47 | 0.09% | 171 | 0.30% |
| | 2 | 2,374 | 84.36% | 23,532 | 42.97% | 25,906 | 44.99% |
| | 3 | 315 | 11.19% | 25,501 | 46.56% | 25,816 | 44.83% |
| | ≥4 | 3 | 0.04% | 5,688 | 10.39% | 5,689 | 9.88% |
| Extra-curricular Rating | 1 | 75 | 2.68% | 98 | 0.18% | 173 | 0.30% |
| | 2 | 1,980 | 70.87% | 11,866 | 21.82% | 13,846 | 24.21% |
| | 3 | 736 | 26.34% | 40,689 | 74.41% | 41,425 | 72.44% |
| | ≥4 | 3 | 0.11% | 1,735 | 3.19% | 1,738 | 3.04% |
| Athletic Rating | 1 | 590 | 22.18% | 6,774 | 12.68% | 7,364 | 13.13% |
| | 2 | 1,260 | 47.37% | 29,248 | 54.73% | 30,508 | 54.38% |
| | 3 | 810 | 30.45% | 17,416 | 32.59% | 18,226 | 32.49% |
| | ≥4 | 0 | 0% | 247 | 0.45% | 247 | 0.43% |
| Personal Rating | 1 | 19 | 0.68% | 8 | 0.01% | 27 | 0.05% |
| | 2 | 2,338 | 83.08% | 9,884 | 18.05% | 12,222 | 21.23% |
| | 3 | 457 | 16.24% | 44,629 | 81.49% | 45,086 | 78.30% |
| | ≥4 | 0 | 0% | 247 | 0.45% | 247 | 0.43% |
| Teacher 1 Rating | 1 | 476 | 16.92% | 1,118 | 2.10% | 1,594 | 2.80% |
| | 2 | 1,702 | 60.48% | 14,222 | 26.76% | 15,924 | 28.46% |
| | 3 | 636 | 22.60% | 37,503 | 70.57% | 38,139 | 68.16% |
| | ≥4 | 0 | 0% | 301 | 0.57% | 301 | 0.54% |
| Teacher 2 Rating | 1 | 465 | 17.03% | 934 | 2.09% | 1,399 | 2.95% |
| | 2 | 1,638 | 60.00% | 12,584 | 29.24% | 14,222 | 30.00% |
| | 3 | 627 | 22.97% | 30,908 | 69.24% | 31,535 | 66.57% |
| | ≥4 | 0 | 0% | 214 | 0.48% | 214 | 0.45% |
| Counselor Rating | 1 | 307 | 11.02% | 579 | 1.12% | 886 | 1.62% |
| | 2 | 1,832 | 65.73% | 11,836 | 22.73% | 13,668 | 25.08% |
| | 3 | 648 | 23.25% | 39,137 | 75.44% | 39,785 | 72.78% |
| | ≥4 | 14 | 0.63% | 329 | 0.63% | 329 | 0.60% |
| Alumni Personal Rating | 1 | 1,232 | 44.80% | 6,658 | 15.56% | 7,890 | 17.33% |
| | 2 | 1,342 | 48.80% | 19,515 | 45.61% | 20,857 | 45.80% |
| | 3 | 162 | 5.89% | 13,447 | 31.43% | 13,609 | 29.89% |
| | ≥4 | 14 | 0.51% | 3,165 | 7.40% | 3,179 | 6.98% |
| Alumni Overall Rating | 1 | 1,009 | 36.74% | 3,790 | 8.96% | 4,799 | 10.65% |
| | 2 | 1,427 | 51.97% | 14,787 | 34.96% | 16,214 | 36.00% |
| | 3 | 287 | 10.45% | 15,849 | 37.47% | 16,136 | 35.83% |
| | ≥4 | 23 | 0.84% | 7,868 | 18.60% | 7,891 | 17.52% |

## Asian American

| Rating | | Admitted # | Admitted % | Rejected # | Rejected % | Total # | Total % |
|---|---|---|---|---|---|---|---|
| Overall Rating | 1 | 31 | 1.50% | 0 | 0% | 31 | 0.08% |
| | 2 | 1,261 | 60.86% | 664 | 1.73% | 1,925 | 4.76% |
| | 3 | 780 | 37.64% | 29,306 | 76.43% | 30,086 | 74.44% |
| | ≥4 | 0 | 0% | 8,373 | 21.84% | 8,373 | 20.72% |
| Academic Rating | 1 | 229 | 11.05% | 141 | 0.37% | 370 | 0.92% |
| | 2 | 1,727 | 83.35% | 22,236 | 57.99% | 23,963 | 59.29% |
| | 3 | 116 | 5.60% | 12,737 | 33.22% | 12,853 | 31.80% |
| | ≥4 | 0 | 0% | 3,229 | 8.42% | 3,229 | 7.99% |
| Extra-curricular Rating | 1 | 75 | 3.63% | 75 | 0.20% | 150 | 0.37% |
| | 2 | 1,547 | 74.81% | 9,713 | 25.42% | 11,260 | 27.90% |
| | 3 | 446 | 21.57% | 27,757 | 72.65% | 28,203 | 70.03% |
| | ≥4 | 0 | 0% | 659 | 1.72% | 659 | 1.64% |
| Athletic Rating | 1 | 149 | 7.54% | 1,794 | 4.77% | 1,943 | 4.91% |
| | 2 | 911 | 46.10% | 18,384 | 48.90% | 19,295 | 48.76% |
| | 3 | 915 | 46.33% | 17,415 | 46.33% | 18,330 | 46.33% |
| | ≥4 | 0 | 0% | 194 | 0.51% | 194 | 0.48% |
| Personal Rating | 1 | 3 | 0.14% | 10 | 0.03% | 13 | 0.03% |
| | 2 | 1,515 | 73.12% | 5,610 | 14.63% | 7,125 | 17.63% |
| | 3 | 554 | 26.72% | 32,538 | 84.86% | 33,092 | 81.88% |
| | ≥4 | 0 | 0% | 194 | 0.51% | 194 | 0.48% |
| Teacher 1 Rating | 1 | 328 | 15.84% | 715 | 1.91% | 1,043 | 2.64% |
| | 2 | 1,218 | 58.81% | 10,183 | 27.19% | 11,401 | 28.85% |
| | 3 | 525 | 25.35% | 26,357 | 70.39% | 26,882 | 68.03% |
| | ≥4 | 0 | 0% | 191 | 0.51% | 191 | 0.48% |
| Teacher 2 Rating | 1 | 298 | 14.89% | 570 | 1.61% | 868 | 2.52% |
| | 2 | 1,210 | 60.47% | 8,999 | 27.74% | 10,209 | 29.64% |
| | 3 | 492 | 24.59% | 22,706 | 69.99% | 23,198 | 67.36% |
| | ≥4 | 1 | 0.05% | 165 | 0.51% | 166 | 0.48% |
| Counselor Rating | 1 | 265 | 12.88% | 443 | 1.21% | 708 | 1.83% |
| | 2 | 1,251 | 60.82% | 8,193 | 22.31% | 9,444 | 24.35% |
| | 3 | 541 | 26.30% | 27,858 | 75.85% | 28,399 | 73.22% |
| | ≥4 | 0 | 0% | 236 | 0.64% | 236 | 0.61% |
| Alumni Personal Rating | 1 | 866 | 42.49% | 4,707 | 15.56% | 5,573 | 17.06% |
| | 2 | 1,035 | 50.79% | 13,734 | 44.83% | 14,769 | 45.20% |
| | 3 | 130 | 6.38% | 9,665 | 31.55% | 9,795 | 29.98% |
| | ≥4 | 7 | 0.34% | 2,532 | 8.26% | 2,539 | 7.77% |
| Alumni Overall Rating | 1 | 894 | 43.93% | 3,649 | 12.05% | 4,543 | 14.06% |
| | 2 | 978 | 48.06% | 11,006 | 36.34% | 11,984 | 37.08% |
| | 3 | 154 | 7.57% | 10,509 | 34.70% | 10,663 | 32.99% |
| | ≥4 | 9 | 0.44% | 5,119 | 16.90% | 5,128 | 15.87% |

## African American

| Rating | | Admitted # | Admitted % | Rejected # | Rejected % | Total # | Total % |
|---|---|---|---|---|---|---|---|
| Overall Rating | 1 | 8 | 0.67% | 126 | 0.87% | 134 | 0.86% |
| | 2 | 694 | 58.47% | 6,137 | 42.39% | 6,831 | 43.60% |
| | 3 | 485 | 40.86% | 7,949 | 54.91% | 8,434 | 53.83% |
| | ≥4 | 3 | 0.25% | 265 | 1.83% | 268 | 1.71% |
| Academic Rating | 1 | 2 | 0.17% | 733 | 5.06% | 735 | 4.72% |
| | 2 | 703 | 59.22% | 5,794 | 40.02% | 6,497 | 41.73% |
| | 3 | 481 | 40.52% | 7,144 | 54.91% | 7,625 | 48.97% |
| | ≥4 | 1 | 0.08% | 144 | 0.08% | 145 | 0.08% |
| Extra-curricular Rating | 1 | 7 | 0.59% | 560 | 0.25% | 3 | 0.25% |
| | 2 | 560 | 47.45% | 7,144 | 51.69% | | |
| | 3 | 576 | 48.82% | 5,773 | 41.76% | | |
| | ≥4 | 3 | 0.25% | | | | |
| Athletic Rating | 1 | 169 | 14.93% | 900 | 6.51% | 1,069 | 7.15% |
| | 2 | 576 | 50.88% | 7,144 | 51.89% | 7,720 | 49.64% |
| | 3 | 387 | 34.19% | 5,773 | 41.76% | 6,160 | 41.21% |
| | ≥4 | | | | | | |
| Personal Rating | 1 | | | | | | |
| | 2 | 882 | 74.30% | 2,093 | 14.46% | 2,975 | 18.99% |
| | 3 | 304 | 25.61% | 12,309 | 83.60% | 12,613 | 80.52% |
| | ≥4 | | | 73 | 0.50% | 73 | 0.47% |
| Teacher 1 Rating | 1 | 81 | 7.32% | 83 | 0.64% | 144 | 1.02% |
| | 2 | 646 | 54.42% | 1,892 | 14.46% | 2,538 | 17.99% |
| | 3 | 480 | 40.44% | 10,804 | 83.60% | 11,284 | 79.97% |
| | ≥4 | | | 144 | 1.11% | 144 | 1.02% |
| Teacher 2 Rating | 1 | 72 | 6.34% | 89 | 0.72% | 143 | 1.30% |
| | 2 | 589 | 51.89% | 1,587 | 16.00% | 2,176 | 19.70% |
| | 3 | 474 | 41.76% | 8,142 | 82.42% | 8,616 | 78.23% |
| | ≥4 | | | 79 | 0.80% | 79 | 0.72% |
| Counselor Rating | 1 | 640 | 3.99% | 53 | 0.40% | 98 | 0.70% |
| | 2 | 492 | 54.28% | 1,433 | 11.20% | 2,073 | 14.83% |
| | 3 | | 41.73% | 11,057 | 86.42% | 11,549 | 82.65% |
| | ≥4 | | | 254 | 1.99% | 254 | 1.82% |
| Alumni Personal Rating | 1 | 438 | 37.73% | 1,405 | 13.24% | 1,843 | 15.65% |
| | 2 | 604 | 52.02% | 4,286 | 40.38% | 4,890 | 41.53% |
| | 3 | 106 | 9.13% | 3,802 | 35.82% | 3,908 | 33.19% |
| | ≥4 | 13 | 1.12% | 1,120 | 10.56% | 1,133 | 9.62% |
| Alumni Overall Rating | 1 | 257 | 22.21% | 440 | 4.28% | 697 | 6.09% |
| | 2 | 615 | 53.15% | 1,952 | 18.98% | 2,567 | 22.43% |
| | 3 | 259 | 22.39% | 3,646 | 35.45% | 3,905 | 34.13% |
| | ≥4 | 26 | 2.25% | 4,247 | 41.29% | 4,273 | 37.34% |

## Hispanic

| Rating | | Admitted # | Admitted % | Rejected # | Rejected % | Total # | Total % |
|---|---|---|---|---|---|---|---|
| Overall Rating | 1 | 5 | 0.45% | 0 | 0% | 5 | 0.03% |
| | 2 | 550 | 49.68% | 142 | 0.84% | 692 | 3.85% |
| | 3 | 552 | 49.86% | 9,340 | 55.39% | 9,892 | 55.05% |
| | ≥4 | 0 | 0% | 7,381 | 43.77% | 7,381 | 41.07% |
| Academic Rating | 1 | 7 | 0.63% | 2,285 | 13.55% | 3,002 | 16.71% |
| | 2 | 717 | 64.77% | 8,209 | 48.68% | 8,592 | 47.81% |
| | 3 | 383 | 34.60% | 6,369 | 37.77% | 6,369 | 37.77% |
| | ≥4 | | | | | 22 | 0.12% |
| Extra-curricular Rating | 1 | 11 | 1.01% | 1,180 | 1.01% | 22 | 0.12% |
| | 2 | 616 | 56.31% | 2,386 | 14.29% | 3,002 | 16.88% |
| | 3 | 466 | 42.60% | 13,437 | 80.49% | 13,903 | 78.16% |
| | ≥4 | 11 | 0.09% | 859 | 5.15% | 860 | 4.83% |
| Athletic Rating | 1 | 169 | 16.30% | 1,180 | 7.25% | 1,349 | 7.79% |
| | 2 | 466 | 45.71% | 7,227 | 43.21% | 8,746 | 50.54% |
| | 3 | 394 | 37.99% | 6,817 | 41.90% | 7,211 | 41.67% |
| | ≥4 | | | | | | |
| Personal Rating | 1 | 1 | 0.09% | 1 | 0.01% | 2 | 0.01% |
| | 2 | 861 | 77.78% | 2,493 | 14.80% | 3,354 | 18.66% |
| | 3 | 245 | 22.13% | 14,309 | 84.70% | 14,528 | 80.85% |
| | ≥4 | | | 86 | 0.51% | 86 | 0.48% |
| Teacher 1 Rating | 1 | 81 | 7.32% | 152 | 0.98% | 233 | 1.40% |
| | 2 | 622 | 56.19% | 3,024 | 19.51% | 3,646 | 21.99% |
| | 3 | 404 | 36.50% | 12,186 | 78.61% | 12,590 | 75.80% |
| | ≥4 | | | 140 | 0.90% | 140 | 0.84% |
| Teacher 2 Rating | 1 | 76 | 7.16% | 119 | 0.89% | 195 | 1.45% |
| | 2 | 635 | 59.79% | 3,059 | 20.65% | 3,190 | 22.64% |
| | 3 | 351 | 33.05% | 9,597 | 77.56% | 9,948 | 74.05% |
| | ≥4 | | | 102 | 0.82% | 102 | 0.76% |
| Counselor Rating | 1 | 581 | 5.96% | 80 | 0.53% | 145 | 0.89% |
| | 2 | 444 | 53.30% | 2,233 | 14.61% | 2,814 | 14.83% |
| | 3 | | 40.73% | 12,780 | 83.59% | 13,224 | 80.74% |
| | ≥4 | | | 196 | 1.28% | 196 | 1.20% |
| Alumni Personal Rating | 1 | 454 | 41.80% | 389 | 11.80% | 2,061 | 15.65% |
| | 2 | 558 | 51.38% | 4,818 | 40.65% | 5,376 | 41.55% |
| | 3 | 71 | 6.54% | 4,213 | 35.55% | 4,284 | 33.11% |
| | ≥4 | 3 | 0.28% | 1,214 | 10.24% | 1,217 | 9.41% |
| Alumni Overall Rating | 1 | 317 | 29.22% | 682 | 5.90% | 999 | 7.90% |
| | 2 | 570 | 52.53% | 2,674 | 23.15% | 3,244 | 25.67% |
| | 3 | 116 | 10.69% | 4,253 | 36.81% | 4,431 | 35.06% |
| | ≥4 | 20 | 1.84% | 3,944 | 34.14% | 3,964 | 31.37% |

## All Applicants (Including All Races/Ethnicities)

| Rating | | Admitted # | Admitted % | Rejected # | Rejected % | Total # | Total % |
|---|---|---|---|---|---|---|---|
| Overall Rating | 1 | 77 | 0.99% | 0 | 0% | 77 | 0.05% |
| | 2 | 4,498 | 57.79% | 1,975 | 1.46% | 6,473 | 4.54% |
| | 3 | 3,206 | 41.19% | 92,782 | 68.76% | 95,988 | 67.25% |
| | ≥4 | 3 | 0.04% | 24,508 | 29.78% | 24,511 | 17.17% |
| Academic Rating | 1 | 405 | 5.20% | 207 | 0.15% | 612 | 0.43% |
| | 2 | 5,986 | 76.90% | 53,745 | 39.83% | 59,731 | 41.85% |
| | 3 | 1,390 | 17.86% | 56,484 | 41.86% | 57,874 | 40.55% |
| | ≥4 | 3 | 0.04% | 24,508 | 18.16% | 24,511 | 17.17% |
| Extra-curricular Rating | 1 | 192 | 2.48% | 228 | 0.17% | 420 | 0.30% |
| | 2 | 5,179 | 66.94% | 28,223 | 20.93% | 33,402 | 23.56% |
| | 3 | 2,357 | 30.46% | 100,359 | 75.37% | 103,359 | 72.92% |
| | ≥4 | 9 | 0.12% | 4,560 | 3.40% | 4,569 | 3.22% |
| Athletic Rating | 1 | 1,175 | 15.90% | 11,644 | 8.66% | 12,819 | 9.24% |
| | 2 | 3,497 | 47.33% | 68,329 | 52.01% | 71,826 | 51.76% |
| | 3 | 2,716 | 36.76% | 51,400 | 39.13% | 54,116 | 39.00% |
| | ≥4 | | | | | | |
| Personal Rating | 1 | 26 | 0.33% | 13 | 0.01% | 39 | 0.03% |
| | 2 | 6,037 | 77.56% | 21,771 | 16.13% | 27,808 | 19.48% |
| | 3 | 1,721 | 22.11% | 112,446 | 83.36% | 114,167 | 80.02% |
| | ≥4 | 0 | 0% | 664 | 0.49% | 664 | 0.47% |
| Teacher 1 Rating | 1 | 1,019 | 13.09% | 2,273 | 1.76% | 3,292 | 2.40% |
| | 2 | 4,531 | 58.22% | 31,947 | 24.73% | 36,478 | 26.60% |
| | 3 | 2,232 | 28.68% | 94,123 | 72.86% | 96,355 | 70.35% |
| | ≥4 | 0 | 0% | 833 | 0.64% | 833 | 0.61% |
| Teacher 2 Rating | 1 | 984 | 13.11% | 1,844 | 1.71% | 2,828 | 2.45% |
| | 2 | 4,406 | 58.68% | 23,698 | 25.97% | 28,104 | 28.10% |
| | 3 | 2,117 | 28.20% | 77,591 | 71.77% | 79,708 | 68.94% |
| | ≥4 | 1 | 0.01% | 597 | 0.55% | 598 | 0.52% |
| Counselor Rating | 1 | 751 | 9.74% | 1,260 | 1.00% | 2,011 | 1.50% |
| | 2 | 4,651 | 60.33% | 25,831 | 20.40% | 30,482 | 22.69% |
| | 3 | 2,307 | 29.93% | 98,452 | 77.75% | 100,759 | 75.00% |
| | ≥4 | 0 | 0% | 1,089 | 0.86% | 1,089 | 0.81% |
| Alumni Personal Rating | 1 | 3,236 | 42.42% | 15,035 | 15.03% | 18,893 | 16.90% |
| | 2 | 3,838 | 50.31% | 46,097 | 44.25% | 49,935 | 44.66% |
| | 3 | 517 | 6.78% | 33,741 | 32.39% | 34,258 | 30.64% |
| | ≥4 | 38 | 0.50% | 8,494 | 8.34% | 8,532 | 7.80% |
| Alumni Overall Rating | 1 | 2,684 | 35.24% | 9,434 | 9.19% | 12,118 | 10.99% |
| | 2 | 3,910 | 51.33% | 33,319 | 32.47% | 37,229 | 33.78% |
| | 3 | 941 | 12.35% | 37,196 | 36.25% | 38,137 | 34.60% |
| | ≥4 | 82 | 1.08% | 22,655 | 22.08% | 22,737 | 20.63% |

TRIAL EXHIBIT

P622

SFFA v. Harvard

exhibitsticker.com

# Number and Share of Applicants Admitted and Rejected

JA4528

Expanded Dataset

| Rating | Level | White Adm. | White Rej. | White Total | Asian Am. Adm. | Asian Am. Rej. | Asian Am. Total | African Am. Adm. | African Am. Rej. | African Am. Total | Hispanic Adm. | Hispanic Rej. | Hispanic Total | All Applicants Adm. | All Applicants Rej. | All Applicants Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Overall Rating | 1 | 38 | 0 | 38 | 34 | 0 | 34 | 10 | 0 | 10 | 8 | 0 | 8 | 104 | 0 | 104 |
| | 2 | 2,422 | 973 | 3,395 | 1,426 | 682 | 2,108 | 743 | 133 | 876 | 608 | 146 | 754 | 5,644 | 2,121 | 7,765 |
| | 3 | 1,707 | 42,221 | 43,928 | 882 | 29,671 | 30,553 | 515 | 6,250 | 6,765 | 613 | 9,523 | 10,136 | 4,067 | 96,007 | 100,074 |
| | ≥4 | 9 | 14,287 | 14,296 | 0 | 8,447 | 8,447 | 0 | 8,308 | 8,308 | 0 | 7,424 | 7,424 | 10 | 40,816 | 40,826 |
| Academic Rating | 1 | 157 | 48 | 205 | 242 | 141 | 383 | 2 | 1 | 3 | 7 | 1 | 8 | 463 | 209 | 672 |
| | 2 | 3,408 | 24,682 | 28,090 | 1,945 | 22,465 | 24,410 | 738 | 743 | 1,481 | 803 | 2,343 | 3,146 | 7,514 | 55,335 | 62,849 |
| | 3 | 600 | 26,863 | 27,463 | 155 | 12,928 | 13,083 | 527 | 5,899 | 6,426 | 419 | 8,341 | 8,760 | 1,832 | 58,486 | 60,318 |
| | ≥4 | 11 | 5,888 | 5,899 | 0 | 3,266 | 3,266 | 1 | 8,048 | 8,049 | 0 | 6,408 | 6,408 | 16 | 24,914 | 24,930 |
| Extracurricular Rating | 1 | 99 | 102 | 201 | 80 | 77 | 157 | 7 | 11 | 18 | 13 | 11 | 24 | 228 | 236 | 464 |
| | 2 | 2,716 | 12,578 | 15,294 | 1,705 | 9,823 | 11,528 | 655 | 1,852 | 2,507 | 675 | 2,436 | 3,111 | 6,281 | 29,240 | 35,521 |
| | 3 | 1,332 | 42,615 | 43,947 | 552 | 28,092 | 28,644 | 595 | 11,633 | 12,228 | 525 | 13,606 | 14,131 | 3,249 | 103,863 | 107,112 |
| | 4 | 8 | 1,796 | 1,804 | 0 | 669 | 669 | 4 | 1,019 | 1,023 | 3 | 868 | 871 | 18 | 4,656 | 4,674 |
| Athletic Rating | 1 | 970 | 7,286 | 8,256 | 198 | 1,853 | 2,051 | 192 | 924 | 1,116 | 198 | 1,215 | 1,413 | 1,706 | 12,343 | 14,049 |
| | 2 | 1,914 | 30,727 | 32,641 | 1,048 | 18,628 | 19,676 | 610 | 7,271 | 7,881 | 535 | 8,399 | 8,934 | 4,473 | 70,503 | 74,976 |
| | 3 | 1,120 | 18,081 | 19,201 | 995 | 17,562 | 18,557 | 410 | 5,830 | 6,240 | 422 | 6,875 | 7,297 | 3,221 | 52,434 | 55,655 |
| Personal Rating | 1 | 23 | 8 | 31 | 3 | 1 | 4 | 1 | 3 | 4 | 2 | 1 | 3 | 32 | 14 | 46 |
| | 2 | 3,290 | 10,594 | 13,884 | 1,678 | 5,705 | 7,383 | 947 | 2,147 | 3,094 | 938 | 2,552 | 3,490 | 7,419 | 22,789 | 30,208 |
| | 3 | 861 | 46,623 | 47,484 | 661 | 32,898 | 33,559 | 320 | 12,466 | 12,786 | 289 | 14,452 | 14,741 | 2,372 | 115,460 | 117,832 |
| | ≥4 | 2 | 256 | 258 | 0 | 196 | 196 | 0 | 75 | 75 | 0 | 88 | 88 | 2 | 681 | 683 |
| Teacher 1 Rating | 1 | 562 | 1,164 | 1,726 | 346 | 720 | 1,066 | 63 | 87 | 150 | 86 | 154 | 240 | 1,149 | 2,335 | 3,484 |
| | 2 | 2,462 | 14,930 | 17,392 | 1,362 | 10,293 | 11,655 | 697 | 1,919 | 2,616 | 673 | 3,078 | 3,751 | 5,643 | 32,952 | 38,595 |
| | 3 | 1,152 | 39,419 | 40,571 | 633 | 26,690 | 27,323 | 508 | 10,977 | 11,485 | 470 | 12,355 | 12,825 | 3,031 | 96,979 | 100,010 |
| | ≥4 | - | - | 316 | - | - | 194 | - | - | 146 | - | - | 141 | - | - | 856 |
| Teacher 2 Rating | 1 | 548 | 980 | 1,528 | 312 | 572 | 884 | 74 | 73 | 147 | 82 | 124 | 206 | 1,105 | 1,905 | 3,010 |
| | 2 | 2,338 | 13,241 | 15,579 | 1,340 | 9,127 | 10,467 | 629 | 1,611 | 2,240 | 695 | 2,599 | 3,294 | 5,437 | 29,024 | 34,461 |
| | 3 | 1,128 | 32,519 | 33,647 | 598 | 22,983 | 23,581 | 502 | 8,285 | 8,787 | 403 | 9,748 | 10,151 | 2,878 | 80,003 | 82,881 |
| | ≥4 | - | - | 225 | - | - | 166 | - | - | 82 | - | - | 102 | 3 | 613 | 616 |
| Counselor Rating | 1 | 352 | 606 | 958 | 277 | 448 | 725 | 48 | 51 | 99 | 75 | 83 | 158 | 836 | 1,300 | 2,136 |
| | 2 | 2,631 | 12,478 | 15,109 | 1,410 | 8,285 | 9,695 | 686 | 1,459 | 2,145 | 645 | 2,287 | 2,932 | 5,829 | 26,722 | 32,551 |
| | 3 | 1,153 | 41,107 | 42,260 | 638 | 28,208 | 28,846 | 525 | 11,235 | 11,760 | 492 | 12,948 | 13,440 | 3,068 | 101,414 | 104,482 |
| | ≥4 | - | - | 338 | - | - | 236 | - | - | 256 | - | - | 197 | - | - | 1,102 |
| Alumni Personal Rating | 1 | 1,585 | 7,097 | 8,682 | 953 | 4,779 | 5,732 | 456 | 1,432 | 1,888 | 498 | 1,651 | 2,149 | 3,813 | 16,303 | 20,116 |
| | 2 | 2,106 | 20,724 | 22,830 | 1,178 | 13,930 | 15,108 | 651 | 4,368 | 5,019 | 623 | 4,906 | 5,529 | 4,947 | 47,826 | 52,773 |
| | 3 | 346 | 14,126 | 14,472 | 159 | 9,780 | 9,939 | 120 | 3,864 | 3,984 | 78 | 4,275 | 4,353 | 785 | 34,761 | 35,546 |
| | ≥4 | 30 | 3,303 | 3,333 | 13 | 2,566 | 2,579 | 14 | 1,132 | 1,146 | 5 | 1,225 | 1,230 | 64 | 8,900 | 8,964 |
| Alumni Overall Rating | 1 | 1,272 | 4,025 | 5,297 | 974 | 3,703 | 4,677 | 262 | 447 | 709 | 342 | 699 | 1,041 | 3,112 | 9,775 | 12,887 |
| | 2 | 2,171 | 15,800 | 17,971 | 1,112 | 11,145 | 12,257 | 661 | 2,006 | 2,667 | 643 | 2,743 | 3,386 | 5,002 | 34,725 | 39,727 |
| | 3 | 562 | 16,727 | 17,289 | 194 | 10,660 | 10,854 | 284 | 3,717 | 4,001 | 197 | 4,337 | 4,534 | 1,343 | 38,521 | 39,864 |
| | ≥4 | 54 | 8,190 | 8,244 | 19 | 5,186 | 5,205 | 30 | 4,294 | 4,324 | 21 | 3,977 | 3,998 | 134 | 23,163 | 23,297 |

| Rating | | White | | | Asian American | | | African American | | | Hispanic | | | All Applicants (Including All Races/Ethnicities) | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | Share Admitted | Share Rejected | Share Total | Share Admitted | Share Rejected | Share Total | Share Admitted | Share Rejected | Share Total | Share Admitted | Share Rejected | Share Total | Share Admitted | Share Rejected | Share Total |
| Overall Rating | 1 | 0.91% | 0% | 0.06% | 1.45% | 0% | 0.08% | 0.79% | 0% | 0.06% | 0.65% | 0% | 0.04% | 1.06% | 0% | 0.07% |
| | 2 | 58.00% | 1.69% | 5.51% | 60.89% | 1.76% | 5.12% | 58.60% | 0.91% | 5.49% | 49.47% | 0.85% | 4.12% | 57.45% | 1.53% | 5.22% |
| | 3 | 40.88% | 73.45% | 71.25% | 37.66% | 76.47% | 74.26% | 40.62% | 42.54% | 52.06% | 49.88% | 55.71% | 55.32% | 41.39% | 69.10% | 67.27% |
| | ≥4 | 0.22% | 24.86% | 23.19% | 0% | 21.77% | 20.53% | 0% | 56.55% | 42.39% | 0% | 43.43% | 40.52% | 0.10% | 29.38% | 27.44% |
| Academic Rating | 1 | 3.76% | 0.08% | 0.33% | 10.33% | 0.36% | 0.93% | 0.16% | 0.01% | 0.02% | 0.57% | 0.01% | 0.04% | 4.71% | 0.15% | 0.45% |
| | 2 | 81.61% | 42.94% | 45.56% | 83.05% | 57.90% | 59.33% | 58.00% | 5.06% | 9.28% | 65.34% | 13.71% | 17.17% | 76.48% | 39.83% | 42.25% |
| | 3 | 14.37% | 46.73% | 44.54% | 6.62% | 33.32% | 31.80% | 41.56% | 40.15% | 40.27% | 34.09% | 48.80% | 47.81% | 18.65% | 42.09% | 40.54% |
| | ≥4 | 0.26% | 10.24% | 9.57% | 0% | 8.42% | 7.94% | 0.08% | 54.78% | 50.44% | 0% | 37.49% | 34.97% | 0.16% | 17.93% | 16.76% |
| Extracurricular Rating | 1 | 2.38% | 0.18% | 0.33% | 3.42% | 0.20% | 0.38% | 0.56% | 0.05% | 0.11% | 1.07% | 0.01% | 0.13% | 2.33% | 0.17% | 0.31% |
| | 2 | 65.37% | 22.03% | 24.97% | 72.96% | 25.41% | 28.12% | 51.94% | 12.76% | 15.89% | 55.51% | 14.40% | 17.15% | 64.25% | 21.19% | 24.04% |
| | 3 | 32.06% | 74.64% | 71.75% | 23.62% | 72.66% | 69.87% | 47.18% | 80.14% | 77.51% | 43.17% | 80.41% | 77.91% | 33.23% | 75.27% | 72.49% |
| | 4 | 0.19% | 3.15% | 2.95% | - | 1.73% | 1.63% | 0.32% | 7.02% | 6.48% | 0.25% | 5.13% | 4.80% | 0.18% | 3.37% | 3.16% |
| Athletic Rating | 1 | 24.23% | 12.99% | 13.74% | 8.84% | 4.87% | 5.09% | 15.84% | 6.59% | 7.32% | 17.14% | 7.37% | 8.01% | 18.15% | 9.12% | 9.71% |
| | 2 | 47.80% | 54.78% | 54.31% | 46.76% | 48.97% | 48.84% | 50.33% | 51.84% | 51.72% | 46.32% | 50.94% | 50.63% | 47.59% | 52.12% | 51.82% |
| | 3 | 27.97% | 32.23% | 31.95% | 44.40% | 46.16% | 46.07% | 33.83% | 41.57% | 40.95% | 36.54% | 41.69% | 41.36% | 34.27% | 38.76% | 38.47% |
| Personal Rating | 1 | 0.55% | 0.01% | 0.05% | 0.13% | 0% | 0.01% | 0.08% | 0.02% | 0.03% | 0.16% | 0.01% | 0.03% | 0.33% | 0.01% | 0.03% |
| | 2 | 78.78% | 18.43% | 22.52% | 71.65% | 14.70% | 17.95% | 74.68% | 14.61% | 19.39% | 76.32% | 14.93% | 19.05% | 75.51% | 16.40% | 20.31% |
| | 3 | 20.62% | 81.11% | 77.01% | 28.22% | 84.79% | 81.57% | 25.24% | 84.85% | 80.12% | 23.52% | 84.55% | 80.46% | 24.14% | 83.10% | 79.20% |
| | ≥4 | 0.05% | 0.45% | 0.42% | 0% | 0.51% | 0.48% | 0% | 0.51% | 0.47% | 0% | 0.51% | 0.48% | 0.02% | 0.49% | 0.46% |
| Teacher 1 Rating | 1 | 13.46% | 2.08% | 2.88% | 14.78% | 1.90% | 2.65% | 4.97% | 0.66% | 1.04% | 7.00% | 0.98% | 1.42% | 11.70% | 1.75% | 2.44% |
| | 2 | 58.96% | 26.74% | 28.98% | 58.18% | 27.16% | 28.97% | 54.97% | 14.62% | 18.17% | 54.76% | 19.57% | 22.12% | 57.45% | 24.75% | 27.00% |
| | 3 | 27.59% | 70.61% | 67.61% | 27.04% | 70.43% | 67.90% | 40.06% | 83.61% | 79.77% | 38.24% | 78.55% | 75.63% | 30.86% | 72.85% | 69.96% |
| | ≥4 | 0% | 0.57% | 0.53% | 0% | 0.51% | 0.48% | 0% | 1.11% | 1.01% | 0% | 0.90% | 0.83% | 0% | 0.64% | 0.60% |
| Teacher 2 Rating | 1 | 13.65% | 2.09% | 3.00% | 13.86% | 1.74% | 2.52% | 6.14% | 0.73% | 1.31% | 6.95% | 0.73% | 1.50% | 11.73% | 1.71% | 2.49% |
| | 2 | 58.22% | 28.19% | 30.56% | 59.53% | 27.79% | 29.82% | 52.20% | 16.03% | 19.90% | 58.90% | 20.67% | 23.95% | 57.70% | 26.02% | 28.49% |
| | 3 | 28.09% | 69.24% | 66.00% | 26.57% | 69.97% | 67.19% | 41.66% | 82.43% | 78.07% | 34.15% | 77.53% | 73.81% | 30.54% | 71.72% | 68.51% |
| | ≥4 | 0.05% | 0.47% | 0.44% | 0.04% | 0.50% | 0.44% | 0% | 0.82% | 0.73% | 0% | 0.81% | 0.74% | 0.03% | 0.55% | 0.51% |
| Counselor Rating | 1 | 8.51% | 1.11% | 1.63% | 11.91% | 1.21% | 1.84% | 3.81% | 0.39% | 0.69% | 6.19% | 0.53% | 0.94% | 8.59% | 1.00% | 1.52% |
| | 2 | 63.61% | 22.88% | 25.75% | 60.65% | 22.29% | 24.54% | 54.49% | 11.22% | 15.04% | 53.22% | 14.74% | 17.53% | 59.89% | 20.47% | 23.21% |
| | 3 | 27.88% | 75.39% | 72.04% | 27.44% | 75.87% | 73.02% | 41.70% | 86.42% | 82.47% | 40.59% | 83.45% | 80.35% | 31.52% | 77.69% | 74.49% |
| | ≥4 | 0% | 0.62% | 0.58% | 0% | 0.63% | 0.60% | 0% | 1.97% | 1.80% | 0.42% | 1.08% | 1.18% | 0% | 0.84% | 0.79% |
| Alumni Personal Rating | 1 | 38.97% | 15.68% | 17.60% | 41.38% | 15.39% | 17.18% | 36.74% | 13.26% | 15.68% | 41.36% | 13.69% | 16.21% | 39.68% | 15.12% | 17.13% |
| | 2 | 51.78% | 45.80% | 46.29% | 51.15% | 44.86% | 45.29% | 52.46% | 40.46% | 41.70% | 51.74% | 40.69% | 41.69% | 51.48% | 44.37% | 44.95% |
| | 3 | 8.51% | 31.22% | 29.34% | 6.90% | 31.49% | 29.79% | 9.67% | 35.79% | 33.10% | 6.48% | 35.46% | 32.83% | 8.17% | 32.25% | 30.28% |
| | ≥4 | 0.74% | 7.30% | 6.76% | 0.56% | 8.26% | 7.73% | 1.13% | 10.49% | 9.52% | 0.42% | 10.16% | 9.28% | 0.67% | 8.26% | 7.64% |
| Alumni Overall Rating | 1 | 31.34% | 9.00% | 10.85% | 42.37% | 12.06% | 14.18% | 21.18% | 4.27% | 6.06% | 28.43% | 5.95% | 8.03% | 32.45% | 9.21% | 11.13% |
| | 2 | 53.47% | 35.31% | 36.83% | 48.37% | 36.31% | 37.15% | 53.44% | 19.17% | 22.79% | 53.45% | 23.33% | 26.13% | 52.15% | 32.70% | 34.31% |
| | 3 | 13.85% | 37.39% | 35.43% | 8.44% | 34.73% | 32.90% | 22.96% | 55.52% | 34.19% | 16.38% | 36.89% | 34.99% | 14.00% | 36.28% | 34.43% |
| | ≥4 | 1.33% | 18.30% | 16.89% | 0.83% | 16.90% | 15.78% | 2.43% | 41.04% | 36.95% | 1.75% | 33.83% | 30.85% | 1.40% | 21.81% | 20.12% |

JA4529

Expanded Dataset

TRIAL EXHIBIT
P623
SFFA v Harvard

Case: 19-2005   Number and Share of Applicants Admitted and Rejected   Entry ID: 6356615

JA4530

Expanded Dataset

**White**

| Rating | | ADMITTED Number | ADMITTED Share | REJECTED Number | REJECTED Share | TOTAL Number | TOTAL Share |
|---|---|---|---|---|---|---|---|
| Overall | 1 | 38 | 0.91% | 0 | 0% | 38 | 0.06% |
| | 2 | 2,422 | 58.00% | 973 | 1.69% | 3,395 | 5.51% |
| | 3 | 1,707 | 40.88% | 42,221 | 73.45% | 43,928 | 71.25% |
| | ≥4 | 9 | 0.22% | 14,282 | 24.86% | 14,291 | 23.15% |
| Academic | 1 | 157 | 3.76% | 48 | 0.08% | 205 | 0.33% |
| | 2 | 3,408 | 81.61% | 24,682 | 42.94% | 28,090 | 45.56% |
| | 3 | 600 | 14.37% | 26,863 | 46.73% | 27,463 | 44.54% |
| | ≥4 | 11 | 0.26% | 5,888 | 10.24% | 5,899 | 9.57% |
| Extracurricular | 1 | 99 | 2.38% | 102 | 0.18% | 201 | 0.33% |
| | 2 | 2,716 | 65.37% | 12,578 | 22.03% | 15,294 | 24.97% |
| | 3 | 1,332 | 32.06% | 42,615 | 74.64% | 43,947 | 71.75% |
| | ≥4 | 8 | 0.19% | 1,796 | 3.15% | 1,804 | 2.95% |
| Athletic | 1 | — | — | — | — | — | — |
| | 2 | 970 | 24.23% | 7,286 | 12.99% | 8,256 | 13.74% |
| | 3 | 1,914 | 47.80% | 30,727 | 54.78% | 32,641 | 54.31% |
| | ≥4 | 1,120 | 27.97% | 18,081 | 32.23% | 19,201 | 31.95% |
| Personal | 1 | 23 | 0.55% | 8 | 0.01% | 31 | 0.05% |
| | 2 | 3,290 | 78.78% | 10,594 | 18.43% | 13,884 | 22.52% |
| | 3 | 861 | 20.62% | 46,623 | 81.11% | 47,484 | 77.01% |
| | ≥4 | 2 | 0.05% | 256 | 0.45% | 258 | 0.42% |
| Teacher 1 | 1 | 562 | 13.46% | 1,164 | 2.08% | 1,726 | 2.88% |
| | 2 | 2,462 | 58.96% | 14,930 | 26.64% | 17,392 | 28.98% |
| | 3 | 1,152 | 27.59% | 39,419 | 70.61% | 40,571 | 67.61% |
| | ≥4 | 0 | 0% | 316 | 0.57% | 316 | 0.53% |
| Teacher 2 | 1 | 548 | 13.65% | 980 | 2.09% | 1,528 | 2.52% |
| | 2 | 2,338 | 58.09% | 13,241 | 28.19% | 15,579 | 25.75% |
| | 3 | 1,128 | 28.09% | 32,519 | 69.24% | 33,647 | 66.00% |
| | ≥4 | 2 | 0.05% | 223 | 0.47% | 225 | 0.44% |
| Counselor | 1 | 352 | 8.51% | 606 | 1.11% | 958 | 1.63% |
| | 2 | 2,631 | 63.64% | 12,478 | 22.88% | 15,109 | 25.75% |
| | 3 | 1,153 | 27.88% | 41,107 | 75.39% | 42,260 | 72.04% |
| | ≥4 | 2 | 0.05% | 338 | 0.62% | 340 | 0.58% |
| Alumni Personal | 1 | 1,585 | 38.97% | 15,689 | 15.68% | 17,274 | 17.60% |
| | 2 | 2,106 | 51.78% | 20,724 | 20.70% | 22,830 | 46.29% |
| | 3 | 346 | 8.51% | 14,126 | 14.12% | 14,472 | 29.34% |
| | ≥4 | 30 | 0.74% | 3,303 | 3.30% | 3,333 | 6.76% |
| Alumni Overall | 1 | 1,272 | 31.34% | 4,025 | 9.00% | 5,297 | 10.85% |
| | 2 | 2,171 | 53.49% | 15,800 | 35.31% | 17,971 | 36.83% |
| | 3 | 562 | 13.85% | 16,727 | 37.39% | 17,289 | 35.43% |
| | ≥4 | 54 | 1.33% | 8,190 | 18.31% | 8,244 | 16.89% |

**Asian American**

| Rating | | ADMITTED Number | ADMITTED Share | REJECTED Number | REJECTED Share | TOTAL Number | TOTAL Share |
|---|---|---|---|---|---|---|---|
| Overall | 1 | 34 | 1.45% | 0 | 0% | 34 | 0.08% |
| | 2 | 1,426 | 60.89% | 682 | 1.76% | 2,108 | 5.12% |
| | 3 | 882 | 37.66% | 29,671 | 76.47% | 30,553 | 74.26% |
| | ≥4 | — | — | 8,447 | 21.77% | 8,447 | 20.53% |
| Academic | 1 | 242 | 10.33% | 141 | 0.36% | 383 | 0.93% |
| | 2 | 1,945 | 83.05% | 22,465 | 57.90% | 24,410 | 59.33% |
| | 3 | 155 | 6.62% | 12,928 | 33.32% | 13,083 | 31.80% |
| | ≥4 | — | — | 3,266 | 8.42% | 3,266 | 7.94% |
| Extracurricular | 1 | 80 | 3.42% | 77 | 0.20% | 157 | 0.38% |
| | 2 | 1,705 | 72.96% | 9,823 | 25.41% | 11,528 | 28.12% |
| | 3 | 552 | 23.62% | 28,092 | 72.66% | 28,644 | 69.87% |
| | ≥4 | — | 0% | 669 | 1.73% | 669 | 1.63% |
| Athletic | 1 | — | — | — | — | — | — |
| | 2 | 198 | 8.84% | 1,853 | 4.87% | 2,051 | 5.09% |
| | 3 | 1,048 | 46.54% | 18,628 | 48.97% | 19,676 | 48.84% |
| | ≥4 | 995 | 44.00% | 17,562 | 46.16% | 18,557 | 46.07% |
| Personal | 1 | 3 | 0.13% | 1 | 0% | 4 | 0.01% |
| | 2 | 1,678 | 71.65% | 5,705 | 14.70% | 7,383 | 17.95% |
| | 3 | 661 | 28.22% | 32,898 | 84.79% | 33,559 | 81.57% |
| | ≥4 | — | 0% | 196 | 0.51% | 196 | 0.48% |
| Teacher 1 | 1 | 346 | 14.78% | 720 | 1.90% | 1,066 | 2.65% |
| | 2 | 1,381 | 58.18% | 10,293 | 27.14% | 11,655 | 28.97% |
| | 3 | 633 | 27.04% | 26,690 | 70.43% | 27,323 | 67.90% |
| | ≥4 | 0 | 0% | 194 | 0.51% | 194 | 0.48% |
| Teacher 2 | 1 | 312 | 13.86% | 572 | 1.77% | 884 | 2.52% |
| | 2 | 1,340 | 59.53% | 9,127 | 27.79% | 10,467 | 29.82% |
| | 3 | 598 | 26.57% | 22,983 | 69.97% | 23,581 | 67.19% |
| | ≥4 | 1 | 0.04% | 165 | 0.50% | 166 | 0.47% |
| Counselor | 1 | 277 | 11.91% | 448 | 1.21% | 725 | 1.84% |
| | 2 | 1,410 | 60.65% | 8,285 | 22.79% | 9,695 | 24.54% |
| | 3 | 638 | 27.44% | 28,208 | 75.87% | 28,846 | 73.02% |
| | ≥4 | 1 | 0.04% | 236 | 0.63% | 237 | 0.60% |
| Alumni Personal | 1 | 953 | 41.38% | 4,779 | 15.39% | 5,732 | 17.18% |
| | 2 | 1,178 | 51.15% | 13,930 | 44.86% | 15,108 | 45.29% |
| | 3 | 159 | 6.90% | 9,780 | 31.49% | 9,939 | 29.79% |
| | ≥4 | 13 | 0.56% | 2,566 | 8.26% | 2,579 | 7.73% |
| Alumni Overall | 1 | 974 | 42.37% | 3,703 | 12.06% | 4,677 | 14.18% |
| | 2 | 1,112 | 48.37% | 11,145 | 36.31% | 12,257 | 37.15% |
| | 3 | 194 | 8.44% | 10,660 | 34.73% | 10,854 | 32.90% |
| | ≥4 | 19 | 0.83% | 5,186 | 16.90% | 5,205 | 15.78% |

**African American**

| Rating | | ADMITTED Number | ADMITTED Share | REJECTED Number | REJECTED Share | TOTAL Number | TOTAL Share |
|---|---|---|---|---|---|---|---|
| Overall | 1 | 10 | 0.79% | 0 | 0% | 10 | 0.06% |
| | 2 | 743 | 58.66% | 133 | 0.91% | 876 | 5.49% |
| | 3 | 515 | 40.62% | 6,250 | 42.54% | 6,765 | 42.39% |
| | ≥4 | — | — | 8,308 | 56.55% | 8,308 | 52.06% |
| Academic | 1 | 2 | 0.16% | 7 | 0.05% | 9 | 0.06% |
| | 2 | 738 | 58.20% | 743 | 5.06% | 1,481 | 9.28% |
| | 3 | 527 | 41.58% | 5,899 | 40.15% | 6,426 | 40.27% |
| | ≥4 | 1 | 0.08% | 8,048 | 54.80% | 8,049 | 50.44% |
| Extracurricular | 1 | 7 | 0.56% | 11 | 0.08% | 18 | 0.11% |
| | 2 | 655 | 51.94% | 1,852 | 12.66% | 2,507 | 15.89% |
| | 3 | 595 | 47.18% | 11,633 | 80.41% | 12,228 | 77.15% |
| | ≥4 | 8 | 0.32% | 1,019 | 7.02% | 1,023 | 6.48% |
| Athletic | 1 | — | — | — | — | — | — |
| | 2 | 192 | 15.84% | 924 | 6.59% | 1,116 | 7.32% |
| | 3 | 610 | 50.33% | 7,271 | 49.84% | 7,881 | 51.24% |
| | ≥4 | 410 | 33.83% | 5,830 | 41.57% | 6,240 | 40.95% |
| Personal | 1 | 1 | 0.08% | 3 | 0.02% | 4 | 0.03% |
| | 2 | 947 | 74.68% | 2,147 | 14.61% | 3,094 | 19.39% |
| | 3 | 289 | 22.79% | 12,466 | 84.55% | 12,786 | 80.12% |
| | ≥4 | 31 | 2.45% | 75 | 0.51% | 75 | 0.47% |
| Teacher 1 | 1 | 63 | 4.97% | 87 | 0.60% | 150 | 1.04% |
| | 2 | 697 | 54.97% | 1,919 | 13.06% | 2,616 | 18.17% |
| | 3 | 508 | 40.06% | 10,977 | 83.61% | 11,485 | 79.77% |
| | ≥4 | — | 0% | 146 | 1.11% | 146 | 1.01% |
| Teacher 2 | 1 | 74 | 6.14% | 51 | 0.39% | 99 | 0.69% |
| | 2 | 629 | 52.20% | 1,459 | 11.22% | 2,145 | 15.04% |
| | 3 | 502 | 41.66% | 11,235 | 86.42% | 11,760 | 82.47% |
| | ≥4 | — | 0% | 256 | 1.97% | 256 | 1.80% |
| Counselor | 1 | 456 | 36.74% | 1,432 | 13.26% | 1,888 | 13.66% |
| | 2 | 651 | 52.46% | 4,368 | 40.46% | 5,019 | 41.70% |
| | 3 | 120 | 9.67% | 3,864 | 35.79% | 3,984 | 33.10% |
| | ≥4 | 1 | 1.13% | 1,142 | 10.16% | 1,146 | 9.52% |
| Alumni Personal | 1 | 262 | 21.18% | 447 | 4.27% | 709 | 6.06% |
| | 2 | 661 | 53.44% | 2,006 | 19.17% | 2,667 | 22.79% |
| | 3 | 284 | 22.96% | 3,717 | 35.52% | 4,001 | 34.19% |
| | ≥4 | 30 | 2.43% | 4,294 | 41.04% | 4,324 | 36.95% |

**Hispanic**

| Rating | | ADMITTED Number | ADMITTED Share | REJECTED Number | REJECTED Share | TOTAL Number | TOTAL Share |
|---|---|---|---|---|---|---|---|
| Overall | 1 | 8 | 0.65% | 0 | 0% | 8 | 0.04% |
| | 2 | 608 | 49.47% | 146 | 0.85% | 754 | 4.12% |
| | 3 | 613 | 49.88% | 9,523 | 55.71% | 10,136 | 55.32% |
| | ≥4 | — | — | 7,424 | 43.43% | 7,424 | 40.52% |
| Academic | 1 | 7 | 0.57% | 2 | 0.01% | 9 | 0.04% |
| | 2 | 803 | 65.34% | 2,343 | 13.71% | 3,146 | 17.17% |
| | 3 | 419 | 34.09% | 8,341 | 48.80% | 8,760 | 47.81% |
| | ≥4 | 1 | 0.07% | 6,408 | 37.49% | 6,409 | 34.97% |
| Extracurricular | 1 | 13 | 1.07% | 11 | 0.07% | 24 | 0.13% |
| | 2 | 675 | 55.51% | 2,436 | 14.40% | 3,111 | 17.15% |
| | 3 | 531 | 43.17% | 14,131 | 83.41% | 14,662 | 80.41% |
| | ≥4 | 3 | 0.25% | 868 | 5.13% | 871 | 4.80% |
| Athletic | 1 | — | — | — | — | — | — |
| | 2 | 198 | 17.14% | 1,215 | 7.37% | 1,413 | 8.01% |
| | 3 | 673 | 46.32% | 8,399 | 50.97% | 9,072 | 50.63% |
| | ≥4 | 529 | 36.54% | 6,875 | 41.69% | 7,297 | 41.36% |
| Personal | 1 | 2 | 0.16% | 1 | 0% | 3 | 0.02% |
| | 2 | 938 | 76.32% | 2,552 | 14.93% | 3,490 | 19.05% |
| | 3 | 289 | 23.52% | 14,553 | 84.55% | 14,741 | 80.44% |
| | ≥4 | — | 0% | 88 | 0.51% | 88 | 0.48% |
| Teacher 1 | 1 | 86 | 7.00% | 154 | 0.98% | 240 | 1.42% |
| | 2 | 673 | 54.76% | 3,078 | 19.58% | 3,751 | 22.12% |
| | 3 | 470 | 38.24% | 12,355 | 78.55% | 12,825 | 75.63% |
| | ≥4 | — | 0% | 141 | 0.90% | 141 | 0.83% |
| Teacher 2 | 1 | 75 | 6.95% | 124 | 0.99% | 206 | 1.50% |
| | 2 | 695 | 58.90% | 2,599 | 20.57% | 3,294 | 23.55% |
| | 3 | 403 | 34.15% | 9,748 | 77.53% | 10,151 | 73.81% |
| | ≥4 | — | 0% | 102 | 0.81% | 102 | 0.74% |
| Counselor | 1 | 75 | 6.19% | 83 | 0.53% | 158 | 0.94% |
| | 2 | 645 | 53.22% | 2,287 | 14.41% | 2,932 | 17.53% |
| | 3 | 492 | 40.59% | 12,948 | 83.45% | 13,440 | 80.55% |
| | ≥4 | — | 0% | 197 | 1.27% | 197 | 1.18% |
| Alumni Personal | 1 | 498 | 41.36% | 1,651 | 13.69% | 2,149 | 13.69% |
| | 2 | 623 | 51.74% | 4,906 | 40.69% | 5,529 | 41.69% |
| | 3 | 78 | 6.48% | 4,275 | 35.46% | 4,353 | 32.83% |
| | ≥4 | 5 | 0.42% | 1,225 | 10.16% | 1,230 | 9.28% |
| Alumni Overall | 1 | 342 | 28.43% | 699 | 5.95% | 1,041 | 8.03% |
| | 2 | 643 | 53.45% | 2,743 | 23.33% | 3,386 | 26.13% |
| | 3 | 197 | 16.38% | 4,337 | 36.89% | 4,534 | 34.99% |
| | ≥4 | 21 | 1.75% | 3,977 | 33.83% | 3,998 | 30.85% |

**All Applicants (Including All Races/Ethnicities)**

| Rating | | ADMITTED Number | ADMITTED Share | REJECTED Number | REJECTED Share | TOTAL Number | TOTAL Share |
|---|---|---|---|---|---|---|---|
| Overall | 1 | 104 | 1.06% | 0 | 0% | 104 | 0.07% |
| | 2 | 5,644 | 57.45% | 2,121 | 1.53% | 7,765 | 5.22% |
| | 3 | 4,067 | 41.39% | 96,007 | 69.10% | 100,074 | 67.27% |
| | ≥4 | 10 | 0.10% | 40,816 | 29.38% | 40,826 | 27.44% |
| Academic | 1 | 463 | 4.71% | 209 | 0.15% | 672 | 0.45% |
| | 2 | 7,514 | 76.48% | 55,335 | 39.83% | 62,849 | 42.25% |
| | 3 | 1,832 | 18.65% | 58,486 | 42.09% | 60,318 | 40.54% |
| | ≥4 | 16 | 0.16% | 24,914 | 17.93% | 24,930 | 16.76% |
| Extracurricular | 1 | 228 | 2.33% | 236 | 0.17% | 464 | 0.31% |
| | 2 | 6,281 | 64.25% | 29,240 | 21.19% | 35,521 | 24.04% |
| | 3 | 3,249 | 33.23% | 103,863 | 75.27% | 107,112 | 72.49% |
| | ≥4 | 18 | 0.18% | 4,656 | 3.37% | 4,674 | 3.16% |
| Athletic | 1 | — | — | — | — | — | — |
| | 2 | 1,706 | 18.15% | 12,343 | 9.12% | 14,049 | 9.71% |
| | 3 | 4,473 | 47.59% | 70,503 | 52.12% | 74,976 | 51.82% |
| | ≥4 | 3,221 | 34.27% | 52,434 | 38.76% | 55,655 | 38.47% |
| Personal | 1 | 32 | 0.33% | 14 | 0.01% | 46 | 0.03% |
| | 2 | 7,419 | 75.51% | 22,789 | 16.40% | 30,208 | 20.31% |
| | 3 | 2,372 | 24.14% | 113,160 | 81.10% | 115,532 | 79.20% |
| | ≥4 | — | 0.02% | 681 | 0.49% | 683 | 0.46% |
| Teacher 1 | 1 | 1,149 | 11.70% | 2,335 | 1.75% | 3,484 | 2.44% |
| | 2 | 5,643 | 57.45% | 32,952 | 24.75% | 38,595 | 27.00% |
| | 3 | 3,031 | 30.86% | 96,969 | 72.85% | 100,010 | 69.96% |
| | ≥4 | — | 0% | 856 | 0.64% | 856 | 0.60% |
| Teacher 2 | 1 | 1,105 | 11.73% | 1,905 | 1.71% | 3,010 | 2.49% |
| | 2 | 5,437 | 57.70% | 24,024 | 22.04% | 28,499 | 28.49% |
| | 3 | 2,878 | 30.54% | 80,003 | 75.47% | 82,881 | 68.51% |
| | ≥4 | 1 | 0.03% | 613 | 0.55% | 616 | 0.51% |
| Counselor | 1 | 836 | 8.59% | 1,300 | 1.00% | 2,136 | 1.52% |
| | 2 | 5,829 | 59.89% | 26,722 | 20.47% | 32,551 | 23.21% |
| | 3 | 3,068 | 31.52% | 101,414 | 77.69% | 104,482 | 74.49% |
| | ≥4 | — | 0% | 1,102 | 0.84% | 1,102 | 0.79% |
| Alumni Personal | 1 | 3,813 | 39.68% | 16,303 | 15.12% | 20,116 | 17.13% |
| | 2 | 4,947 | 51.48% | 47,826 | 44.37% | 52,773 | 44.95% |
| | 3 | 785 | 8.17% | 34,761 | 32.25% | 35,546 | 30.28% |
| | ≥4 | 64 | 0.67% | 8,900 | 8.26% | 8,964 | 7.64% |
| Alumni Overall | 1 | 3,112 | 32.45% | 9,775 | 9.21% | 12,887 | 11.13% |
| | 2 | 5,002 | 52.15% | 34,725 | 32.70% | 39,727 | 34.31% |
| | 3 | 1,343 | 14.00% | 38,521 | 36.28% | 39,864 | 34.43% |
| | ≥4 | 134 | 1.40% | 23,163 | 21.81% | 23,297 | 20.12% |

# Number and Share of Applicants by Academic Index

| Academic Index Range | White | | Asian American | | African American | | Hispanic | | Total | |
|---|---|---|---|---|---|---|---|---|---|---|
| | Number Applicants | Share Applicants | Number Applicants | Share Applicants | Number Applicants | Share Applicants | Number Applicants | Share Applicants | Number Applicants | Share Applicants |
| 236.0 – 240.0 | 4,963 | 8.64% | 7,225 | 17.92% | 132 | 0.85% | 380 | 2.12% | 13,989 | 9.83% |
| 232.8 – 235.8 | 5,717 | 9.95% | 6,532 | 16.21% | 196 | 1.26% | 539 | 3.01% | 14,303 | 10.05% |
| 229.9 – 232.5 | 6,478 | 11.28% | 5,316 | 13.19% | 326 | 2.09% | 820 | 4.57% | 14,253 | 10.01% |
| 226.8 – 229.5 | 7,053 | 12.28% | 4,527 | 11.23% | 445 | 2.85% | 949 | 5.29% | 14,145 | 9.94% |
| 223.3 – 226.5 | 5,924 | 10.31% | 3,614 | 8.97% | 508 | 3.26% | 1,077 | 6.01% | 12,110 | 8.51% |
| 218.8 – 223.0 | 7,658 | 13.33% | 3,874 | 9.61% | 897 | 5.75% | 1,719 | 9.59% | 15,426 | 10.84% |
| 213.3 – 218.5 | 6,359 | 11.07% | 3,020 | 7.49% | 1,285 | 8.24% | 2,182 | 12.17% | 13,865 | 9.74% |
| 205.8 – 213.0 | 6,073 | 10.57% | 2,644 | 6.56% | 2,291 | 14.68% | 2,926 | 16.32% | 15,014 | 10.55% |
| 193.8 – 205.5 | 4,404 | 7.67% | 2,045 | 5.07% | 3,600 | 23.08% | 3,755 | 20.94% | 14,658 | 10.30% |
| 100.0 – 193.5 | 2,822 | 4.91% | 1,511 | 3.75% | 5,921 | 37.95% | 3,583 | 19.98% | 14,593 | 10.25% |

**JA4531**



TRIAL EXHIBIT

**P624**

SFFA v. Harvard

exhibitsticker.com

Baseline Dataset

## Number and Share of Applicants by Academic Index

| Academic Index Range | White | | Asian American | | African American | | Hispanic | | Total | |
|---|---|---|---|---|---|---|---|---|---|---|
| | Number Applicants | Share Applicants | Number Applicants | Share Applicants | Number Applicants | Share Applicants | Number Applicants | Share Applicants | Number Applicants | Share Applicants |
| ≥220 | 36,054 | 62.76% | 30,248 | 75.04% | 2,259 | 14.48% | 5,011 | 27.95% | 80,647 | 56.65% |
| <220 | 21,397 | 37.24% | 10,060 | 24.96% | 13,342 | 85.52% | 12,919 | 72.05% | 61,709 | 43.35% |

JA4532

TRIAL EXHIBIT

P625

SFFA v. Harvard

exhibitsticker.com

Baseline Dataset

# Number and Share of Applicants by Academic Index



TRIAL EXHIBIT

**P626**

SFFA v. Harvard

exhibitsticker.com

| Academic Index Range | White | | Asian American | | African American | | Hispanic | | Total | |
|---|---|---|---|---|---|---|---|---|---|---|
| | Number Applicants | Share Applicants | Number Applicants | Share Applicants | Number Applicants | Share Applicants | Number Applicants | Share Applicants | Number Applicants | Share Applicants |
| 236.0 – 240.0 | 5,303 | 8.62% | 7,321 | 17.84% | 138 | 0.87% | 401 | 2.19% | 14,512 | 9.78% |
| 232.8 – 235.8 | 6,160 | 10.01% | 6,631 | 16.16% | 197 | 1.24% | 564 | 3.09% | 14,939 | 10.07% |
| 229.9 – 232.5 | 6,940 | 11.28% | 5,406 | 13.17% | 330 | 2.08% | 850 | 4.65% | 14,891 | 10.03% |
| 226.8 – 229.5 | 7,556 | 12.28% | 4,613 | 11.24% | 462 | 2.91% | 984 | 5.38% | 14,843 | 10.00% |
| 223.3 – 226.5 | 6,421 | 10.44% | 3,698 | 9.01% | 519 | 3.26% | 1,118 | 6.12% | 12,818 | 8.64% |
| 218.8 – 223.0 | 8,196 | 13.32% | 3,968 | 9.67% | 944 | 5.94% | 1,764 | 9.65% | 16,224 | 10.93% |
| 213.3 – 218.5 | 6,832 | 11.11% | 3,087 | 7.52% | 1,315 | 8.27% | 2,228 | 12.19% | 14,556 | 9.81% |
| 205.8 – 213.0 | 6,475 | 10.52% | 2,696 | 6.57% | 2,335 | 14.69% | 2,974 | 16.27% | 15,632 | 10.53% |
| 193.8 – 205.5 | 4,690 | 7.62% | 2,087 | 5.09% | 3,659 | 23.02% | 3,799 | 20.78% | 15,130 | 10.20% |
| 100.0 – 193.5 | 2,948 | 4.79% | 1,528 | 3.72% | 5,997 | 37.73% | 3,600 | 19.69% | 14,847 | 10.01% |

JA4533

Expanded Dataset

# Number and Share of Applicants Receiving a 2 or Higher on Personal Rating

| Academic Index Range | White | | Asian American | | African American | | Hispanic | | Total | |
|---|---|---|---|---|---|---|---|---|---|---|
| | Number Applicants | Share Applicants | Number Applicants | Share Applicants | Number Applicants | Share Applicants | Number Applicants | Share Applicants | Number Applicants | Share Applicants |
| 236.0 – 240.0 | 1,470 | 29.62% | 1,604 | 22.20% | 62 | 46.97% | 130 | 34.21% | 3,562 | 25.46% |
| 232.8 – 235.8 | 1,614 | 28.23% | 1,363 | 20.87% | 79 | 40.31% | 163 | 30.24% | 3,539 | 24.74% |
| 229.9 – 232.5 | 1,691 | 26.10% | 953 | 17.93% | 129 | 39.57% | 264 | 32.20% | 3,306 | 23.20% |
| 226.8 – 229.5 | 1,593 | 22.59% | 820 | 18.11% | 178 | 40.00% | 285 | 30.03% | 3,114 | 22.01% |
| 223.3 – 226.5 | 1,346 | 22.72% | 595 | 16.46% | 178 | 35.04% | 306 | 28.41% | 2,627 | 21.69% |
| 218.8 – 223.0 | 1,562 | 20.40% | 608 | 15.69% | 304 | 33.89% | 440 | 25.60% | 3,171 | 20.56% |
| 213.3 – 218.5 | 1,184 | 18.62% | 430 | 14.24% | 372 | 28.95% | 445 | 20.39% | 2,622 | 18.91% |
| 205.8 – 213.0 | 987 | 16.25% | 356 | 13.46% | 535 | 23.35% | 520 | 17.77% | 2,576 | 17.16% |
| 193.8 – 205.5 | 554 | 12.58% | 264 | 12.91% | 567 | 15.75% | 494 | 13.16% | 1,989 | 13.57% |
| 100.0 – 193.5 | 229 | 8.11% | 121 | 8.01% | 562 | 9.49% | 304 | 8.48% | 1,285 | 8.81% |

**JA4534**



exhibitsticker.com

TRIAL EXHIBIT

P628

SFFA v. Harvard

Baseline Dataset

# Share of Applicants Receiving a 2 or Higher on Personal Rating



TRIAL EXHIBIT

P629

SFFA v. Harvard

exhibitsticker.com

| Academic Index Range | White | Asian American | African American | Hispanic | Total |
|---|---|---|---|---|---|
| 236.0 – 240.0 | 29.62% | 22.20% | 46.97% | 34.21% | 25.46% |
| 232.8 – 235.8 | 28.23% | 20.87% | 40.31% | 30.24% | 24.74% |
| 229.9 – 232.5 | 26.10% | 17.93% | 39.57% | 32.20% | 23.20% |
| 226.8 – 229.5 | 22.59% | 18.11% | 40.00% | 30.03% | 22.01% |
| 223.3 – 226.5 | 22.72% | 16.46% | 35.04% | 28.41% | 21.69% |
| 218.8 – 223.0 | 20.40% | 15.69% | 33.89% | 25.60% | 20.56% |
| 213.3 – 218.5 | 18.62% | 14.24% | 28.95% | 20.39% | 18.91% |
| 205.8 – 213.0 | 16.25% | 13.46% | 23.35% | 17.77% | 17.16% |
| 193.8 – 205.5 | 12.58% | 12.91% | 15.75% | 13.16% | 13.57% |
| 100.0 – 193.5 | 8.11% | 8.01% | 9.49% | 8.48% | 8.81% |

**JA4535**

Baseline Dataset

# Number and Share of Applicants Receiving a 2 or Higher on Personal Rating



exhibitsticker.com

**TRIAL EXHIBIT**

**P630**

SFFA v. Harvard

| Academic Index Range | White | | Asian American | | African American | | Hispanic | | Total | |
|---|---|---|---|---|---|---|---|---|---|---|
| | Number Applicants | Share Applicants | Number Applicants | Share Applicants | Number Applicants | Share Applicants | Number Applicants | Share Applicants | Number Applicants | Share Applicants |
| 236.0 – 240.0 | 1,623 | 30.61% | 1,647 | 22.50% | 67 | 48.55% | 146 | 36.41% | 3,805 | 26.22% |
| 232.8 – 235.8 | 1,833 | 29.76% | 1,413 | 21.31% | 80 | 40.61% | 173 | 30.67% | 3,846 | 25.74% |
| 229.9 – 232.5 | 1,911 | 27.54% | 995 | 18.41% | 132 | 40.00% | 275 | 32.35% | 3,603 | 24.20% |
| 226.8 – 229.5 | 1,822 | 24.11% | 849 | 18.40% | 188 | 40.69% | 303 | 30.79% | 3,421 | 23.05% |
| 223.3 – 226.5 | 1,555 | 24.22% | 628 | 16.98% | 183 | 35.26% | 320 | 28.62% | 2,921 | 22.79% |
| 218.8 – 223.0 | 1,787 | 21.80% | 628 | 15.83% | 330 | 34.96% | 460 | 26.08% | 3,493 | 21.53% |
| 213.3 – 218.5 | 1,377 | 20.16% | 450 | 14.58% | 387 | 29.43% | 466 | 20.92% | 2,896 | 19.90% |
| 205.8 – 213.0 | 1,107 | 17.10% | 369 | 13.69% | 553 | 23.68% | 530 | 17.82% | 2,762 | 17.67% |
| 193.8 – 205.5 | 629 | 13.41% | 268 | 12.84% | 584 | 15.96% | 509 | 13.40% | 2,109 | 13.94% |
| 100.0 – 193.5 | 249 | 8.45% | 125 | 8.18% | 582 | 9.70% | 306 | 8.50% | 1,339 | 9.02% |

JA4536

# Share of Applicants Receiving a 2 or Higher on Personal Rating



TRIAL EXHIBIT

P631

SFFA v. Harvard

exhibitsticker.com

| Academic Index Range | White | Asian American | African American | Hispanic | Total |
|---|---|---|---|---|---|
| 236.0 - 240.0 | 30.61% | 22.50% | 48.55% | 36.41% | 26.22% |
| 232.8 - 235.8 | 29.76% | 21.31% | 40.61% | 30.67% | 25.74% |
| 229.9 - 232.5 | 27.54% | 18.41% | 40.00% | 32.35% | 24.20% |
| 226.8 - 229.5 | 24.11% | 18.40% | 40.69% | 30.79% | 23.05% |
| 223.3 - 226.5 | 24.22% | 16.98% | 35.26% | 28.62% | 22.79% |
| 218.8 - 223.0 | 21.80% | 15.83% | 34.96% | 26.08% | 21.53% |
| 213.3 - 218.5 | 20.16% | 14.58% | 29.43% | 20.92% | 19.90% |
| 205.8 - 213.0 | 17.10% | 13.69% | 23.68% | 17.82% | 17.67% |
| 193.8 - 205.5 | 13.41% | 12.84% | 15.96% | 13.40% | 13.94% |
| 100.0 - 193.5 | 8.45% | 8.18% | 9.70% | 8.50% | 9.02% |

**JA4537**

Expanded Dataset



Entry ID: 6356615
TRIAL EXHIBIT

P633

exhibitsticker.com

SFFA v. Harvard

# Reading Procedures – Class of 2023

### I.      SUMMARY SHEET APPLICATION DATA

The Summary Sheet captures information as supplied on the application and can be updated as new information is added. Late information can change the likelihood of admission and updates can be provided later for those initially considered less competitive. If any information is **missing** or **incorrect** for competitive candidates, changes should be made on the First Reader Rating Form and noted with prose in the reader comments or "Notes for Summary Sheet" box. This prose will feed onto the Summary Sheet when the rating form is submitted.

<u>One exception</u>: School code changes are NOT made on the First Reader Rating Form; see instructions below on how to do this.

<u>**PLEASE NOTE**</u>:  The accuracy of our citizenship coding is CRUCIAL.  Miscoding affects many of the important statistics we are required to compile, and we need to keep careful track of who needs a visa to study in the United States.

- **SCHOOL CODE**:  If an applicant is coded to the wrong school, please use the Admin Problems update form and route this to the Admin Problems bin immediately so that the operations team can ensure that the interview is reassigned to the appropriate club and group.

- **GENDER**:  Occasionally the gender designation reported on the application is coded incorrectly in our system.  This should be corrected by submitting the Admin Problems form and routing the file to the Admin Problems bin.
- **RACE/ETHNICITY**: We report exactly what the applicant reports as ethnicity on the application.  The ethnic codes on the Summary Sheet come from the demographic fields the candidate checked on the application. **Note that foreign citizens are listed as such. If they opted to check an identifying ethnic code it will appear but is not used for statistics and reporting.**

- **CITIZENSHIP CODE / COUNTRY OF CITIZENSHIP**:  There are four options on the application that can be checked: (1) U.S. Citizenship, (2) U.S. Dual Citizenship, (3) U.S. permanent resident and (4) "Other" or foreign citizen.

   <u>The applicant holds only American citizenship</u>:

   *APP*: Citizenship status will be "US Citizen or US National" and no other country of citizenship will be listed.

   *SUMMARY SHEET*:  Should read "Citizenship:  United States"

   <u>The applicant is a dual U.S. citizen</u> (a citizen of both the U.S. and another country).

   *APP*: Citizenship status will be "Dual US Citizen"-Other citizenships will show a country (e.g. Sweden)

   *SUMMARY SHEET*:  Should read "Citizenship:  United States/<other country>"

   <u>The applicant is a U.S. Permanent Resident</u>.

   *APP*: Citizenship status will be "U.S. Permanent Resident or Refugee" and Other

Citizenships will list one or more countries checked with another country listed.

*SUMMARY SHEET*:  Should read "Citizenship:  PR / <other country>"

*Caveat*:  If an applicant has checked the U.S. Permanent Resident box but notes that his or her application for permanent residency (or "green card") is <u>pending</u>, that applicant should be recoded as "Other citizenship."  Request this change by using the Admin Problems update form. We must prepare an I-20 form if the applicant is admitted and the application for residency is still pending, and the citizenship code is the only way we know to do this.

<u>The applicant is a foreign citizen</u>:

*APP*: Citizenship status will be "Other (Non-US)".  Other citizenship will show a country (e.g. Poland)

*SUMMARY SHEET*:  Should read "Citizenship:   <other country>"

- **LINEAGE:**  This flag appears if the applicant included Harvard College in the education field for at least one parent/guardian. The folder should be read by WRF ("4ᵗʰ" bin) following the normal reading process if appropriate or if another reading might be helpful.  Errors in coding should be noted with specific details about the error using the Admin Problems Form and routed to the Admin Problems bin.

- **ATHLETE**: Be sure the appropriate sport is listed as the first extracurricular activity. Changes can be made on the App Update tab on the Student Record. **DO NOT CHANGE ANY PRE-CODED ATHLETE**.

- **INDICATORS FOR ECONOMIC STATUS:** It has long been a priority for Harvard to seek talented students from all backgrounds, including those extraordinary individuals who are able to transcend economic disadvantages and achieve unusual academic distinction.  We utilize several indicators to understand the economic background of applicants. They are:
  - <u>Low Income Predictor (Low Inc on Summary Sheet):</u> A value between 0 and 1 based on application information that predicts how likely a student is to be low income and have a $0 parent contribution.  The higher the value (closer to 1) the more likely the student will be low income.
  - <u>IM Pell Estimate (IMP-Est on Summary Sheet):</u> An indication if the student is likely to qualify for a Pell Grant, based solely on IM data. This information will only be available if a student has submitted CSS Profile, allowing Financial Aid to estimate whether the student may be eligible for a Pell Grant.
  - FH info ("Yes, Likely, Unlikely, No" on the summary sheet): After subcommittee meetings, if information is available, a simple indication of a student's possible eligibility for the Harvard Financial Aid Initiative (HFAI) may be present on the summary sheet.
  - FEE STATUS**:** An indicator of whether the applicant received a fee waiver for their application.

- **SCORES**: By checking their Applicant Status website applicants can see whether their scores requirement has been fulfilled though not all scores will be listed.  They can report scores (which will be marked 'self-reported' in the student record) as they like.  You can check scores by looking under the "Scores" tab in each Student Record

of an applicant. The Summary Sheet will reflect the highest verified or self-reported scores.

Matriculating students will be responsible for changing 'unofficial' scores to 'official.' Only scores sent to us directly from the testing services electronically are considered official. Paper copies of scores sent via fax, email attachment or U.S. mail are not considered official.

We receive secure web downloads of scores, so we do not have to wait for the scores to be mailed to us.  Applicants are told not to use 'rush reports,' but if they do, they will arrive electronically as soon as they are scored.


## II.    Reader Rating Forms

**When a file in in your queue, you will be able to select the "First Reader Form" or the "Chair Form" depending on the file's bin. The form includes the following fields:**

Reader ratings: All readers must code a preliminary overall rating and a profile (using the codes below and pluses and minuses) for all candidates. Writing prose comments is left to the discretion of the reader and should generally be done only for competitive candidates, those who might become competitive later, or those who might be of interest to the Committee.

For all categories, use "+" and "- "primarily in the 2 and 3 range to indicate relative strength. A rating of 2+ or 3+ is stronger and very different from a 2- or 3- respectively. Readers should take many factors into account as they assign ratings. E.g, students who have taken a strong academic program and/or present other positive evidence of academic achievement should receive higher academic ratings: an applicant with low 700 scores could be rated a 2- rather than a 3+ in some instances especially if there is academic strength in a particular field. However, readers should not take an applicant's race or ethnicity into account in making any of the ratings other than the Overall rating, as discussed further below.


Overall
1. Tops for admission:  Exceptional – a clear admit with very strong objective and subjective support
2. Very strong credentials but not an inevitable admit
3. Solid contender: An applicant with good credentials and support
3- Somewhat Neutral: Respectable credentials
4. Neutral: Generally respectable credentials
5. Negative: Credentials are generally below those of other candidates

In assigning the Overall rating, readers may consider whether a student's background, including his or her race or ethnicity, may contribute to the educational benefits of diversity at Harvard College.  The consideration of race or ethnicity may be considered **only** as one factor among many.

Academic

1. A potential major academic contributor; Summa potential.  Genuine scholar; near-perfect scores and grades (in most cases combined with unusual creativity and

possible evidence of original scholarship, often substantiated by our faculty or other academic mentors.) Possible national or international level recognition in academic competitions.

2. Magna potential.  Excellent student with top grades and,
   a. SAT and SAT Subject tests: mid 700 scores and up
   b. 33+ ACT
   c. Possible local, regional or national level recognition in academic competitions
3. Solid academic potential; Cum laude potential: Very good student with excellent grades and
   a. SAT and SAT Subject tests: mid-600 through low-700 scores
   b. 29 to 32 ACT
4. Adequate preparation. Respectable grades and low-to mid-600 scores on SAT and subject tests or 26 to 29 ACT.
5. Marginal potential. Modest grades and 500 scores on SAT and subject tests (25 and below ACT).


Extracurricular, Community Employment, Family Commitments

1. Unusual strength in one or more areas.  Possible national-level achievement or professional experience.  A potential major contributor at Harvard.  Truly unusual achievement.
2. Strong secondary school contribution in one or more areas such as class president, newspaper editor, concertmaster etc.  and/or significant involvement in organizations outside of school. Possible local or regional recognition; major accomplishment(s) that have had an impact outside of the classroom. Can include significant term-time work or family responsibilities coupled with extracurricular engagement.
3. Solid participation but without special distinction. (Upgrade 3+ to 2- in some cases if the e/c is particularly extensive and substantive.)
4. Little or no participation.
5. Substantial commitment outside of conventional EC participation such as family obligations, term-time work or a significant commute (Important: should be included with other e/c to boost the rating or left as a "5" if that is more representative of the student's commitment).
6  Special circumstances limit or prevent participation (e.g. a physical condition, gap year(s), compulsory service of some kind).


Athletic

   Please note: to determine whether an activity should be considered a sport or an extracurricular activity, readers should defer to the student's characterization of the activity on his or her application. Those activities the student lists as "sports" should be considered as part of the athletic rating.

1. Unusually strong prospect for varsity sports at Harvard, possibly desired by Harvard coaches or recognition for individual athletic achievement/championships at the national, international or Olympic level.
2. Strong and long-standing (3-4 years) of secondary school and/or travel team contribution in one or more sports; leadership role(s) such as captain or co-captain; possible individual recognition at the state or regional level; possible walk-on to a

varsity team; has an IRF of a 4 from a Harvard coach

3. Active participation, possibly some leadership and/or recognition for individual accomplishments at the local or conference level.
4. Little or no participation (this is not a negative).
5. Substantial commitment outside of conventional extracurricular activities such as family obligations or term-time work (should be included with other e/c to boost the rating or left as a "5" if it is more representative of the student's commitment).
6. Physical condition or other special circumstances prevent significant activity.

<u>Personal</u>

The Personal rating should be an assessment made by the readers of what kind of effect the student might have on others at Harvard and beyond.  It should be based on an assessment of what kind of positive effect this person might have throughout his or her life based on what we have seen so far in the student's application materials.  This should include such considerations as what kind of contribution would the person make to the dining hall conversation, to study groups, and to society as a whole after graduation.  In assigning the personal rating, readers should consider information we receive from teachers, counselors, applicants, other recommenders, interviewers, and others as well as the applicant's essays, extracurricular activities, and other items in the application file—what the applicant shows us about him or herself and what the applicant has done or accomplished for others. It is important to keep in mind that characteristics not always synonymous with extroversion are similarly valued. Applicants who seem to be particularly reflective, insightful and/or dedicated should receive higher personal ratings as well

As noted above, though, an applicant's race or ethnicity should not be considered in assigning the personal rating.

We understand that students are multidimensional and ever evolving. Many applicants have grown enormously between the time when they apply in the fall or winter or their senior year and when they arrive in Cambridge the following September. Additionally, we are aware that we work with incomplete information.

1. Truly outstanding qualities of character; student may display enormous courage in the face of seemingly insurmountable obstacles in life. Student may demonstrate a singular ability to lead or inspire those around them. Student may exhibit extraordinary concern or compassion for others. Student receives unqualified and unwavering support from their recommenders.
2. Very strong qualities of character; student may demonstrate strong leadership. Student may exhibit a level of maturity beyond their years. Student may exhibit uncommon genuineness, selflessness or humility in their dealings with others. Students may possess strong resiliency. Student receives very strong support from their recommenders.

3+   Above average qualities of character; Student may demonstrate leadership. Student may exhibit commitment, good judgment, and positive citizenship. Student may exercise a spirit and camaraderie with peers. Student receives positive support from their recommenders.

3. Generally positive, perhaps somewhat neutral qualities of character

4. Questionable or worrisome qualities of character

School Support

1. Strikingly unusual support. "The best of a career," "one of the best in many years," truly over the top.
2. Very strong support. "One of the best" or "the best this year."
3+ Well above average, consistently positive
3. Generally positive, perhaps somewhat neutral or generic
3- Somewhat neutral or slightly negative.
4. Negative or worrisome report.
6. For teacher reports: prose is not in the file.
8. Placeholder for teacher reports.
9. For secondary school report: transcript is in the file but there is no SSR prose.

PLEASE NOTE:  School support ratings for teacher one, teacher two and a counselor are mandatory ratings for competitive candidates. Teacher three and teacher four are optional, if applicable.

**BRIEF ANNOTATIONS FOR SUMMARY SHEET:**

You may choose to insert information about a case – a maximum of three lines – which will appear on the second page of the summary sheet at the top and on the printed docket (unlike prose comments below). These notes should be informational only and not evaluative. They can aid in your preparation of cases. Examples could be: PE on grandmother, Harvard Book, or international credentials not easily captured elsewhere (A level est, Physics A, Math A, Lit A – etc.).

**PROSE COMMENTS**:

When making prose comments, first readers should note the important academic and extracurricular accomplishments that are particularly pertinent to the case.  It is also helpful to reference teacher reports or other items that may be crucial to our evaluation.  In addition to numerical ratings, readers should try to summarize the strengths and weaknesses of the folder in brief paragraphs or comments.  Avoid slang and jargon and REMEMBER - your comments may be open to public view later.

**INTERVIEW PROFILE (IVP):**

Below is the language for uniform implementation of the Interview Profile number (IVP) for use with all Schools and Scholarship Chairs. The IVP will serve as a guide for chairs to know when our office needs the reports, and therefore how quickly they need to be assigned. All interviewers will be told that they should submit their interview report no later than two weeks after receiving the interview assignment.

1. An applicant for whom the committee needs more information to reach a decision - please have interview report in as soon as possible.
2. An applicant for whom more information would be very helpful during our deliberations - please have interview report in by the sub-committee deadline.
3. Please have interview report in by December 1 (EA) or March 1 (RA).
4. Based on the materials currently available, the committee needs no additional information at this time.

**JA4543**

HARV00097941

This language has been distributed to the S&S chairs via email and can also be found in the updated handbook and website instructions. (Please ask Bryce Gilfillian if you need help accessing the site). **Please have a conversation with your chairs to determine if you wish to use the IVP, and please make clear that this information should not be shared with other interviewers or applicants.** If your chairs have additional clerical or operational questions about the IVP, please direct them to email Bryce/alum assistant at SSinfo@fas.harvard.edu.

When reading, please input your IVP code on the First Reader Rating Form. You should input an IVP for all cases for clubs that use this system or if the coding could be helpful for your own interview tracking purposes. Continue to pass on the folder to your chair and/or code out to Committee Review bin.

- **FIRST-GEN:** First readers should check this box on the first reader rating form if the student is of the first generation in the family to graduate from a four-year higher education institution. If first readers do not, chairs should do so on the chair rating form.

- **STAFF DISADVANTAGED**
  After reviewing the file, if the reader has evidence that the applicant may be from a modest economic background, please check "Yes" under Staff Disadvantaged on the Reader Rating Form. In the past, admitted students who has been identified as "Disadvantaged=Y" were found to be economically needy 78% of the time.

- **FACULTY, STAFF**: Code <u>ONLY</u> children of professors at <u>the Faculty of Arts and Sciences</u> as an "F"; children of faculty from other parts of the University as well as children of administrative staff should be coded "S". If an update is needed, use the First Reader rating form. **Please be careful to apply faculty and staff coding where appropriate as we need to keep accurate statistics on these applicants. All "F" and "S" folders should be routed to the "4th bin" (WRF) after the normal reading process has been completed.**

- **ACCESSIBLE EDUCATION OFFICE (AEO) REFERRALS**: Code all applicants who may require special accommodations due to disabilities or special needs with the AEO flag in the Student record. We can then work with the AEO and DOS when appropriate. As you know, a student's disability may not be considered in connection with his or her application. Anyone for whom the AEO flag is used should also be flagged for an advising form.

- **FYRE:** Use this to indicate a student whom you think might benefit from the First Year Retreat and Experience (FYRE), a no cost pre-orientation program designed to introduce students to Harvard's resources and give them a solid foundation on which to begin their college careers.

**ASTAT**: If, after reviewing an application you feel that the student may be of interest to one of our athletic teams, but is not a recruited athlete, you can use this flag to indicate to a coach that this student could be a recruit for their sport. Please use a "7" in these cases.

**GPA and GPA Scale**:
We must try to report an Academic Index to the IVY LEAGUE for EVERY matriculant.
If grades are available, please report a GPA and GPA Scale for your strongest candidates.

**JA4544**

The Academic Index is calculated using GPA and GPA Scale. These will be converted automatically to the 20 to 80 scale in Slate.

Here are the rules according to the AI instructions provided by the Ivy League and sent to staff separately:

### ACADEMIC INDEX CALCULATIONS: CGS

1. **GPAs generally:** As noted in ¶B-7 above, the secondary school GPA should be taken as presented on the secondary school transcript; when both unweighted and weighted GPAs are presented, the unweighted GPA should be used. (If there is a question as to whether the school is using an unweighted or weighted system, the scale should be defined as unweighted, based on what the A grade earns in a regular course.) Other questions in providing the GPA are addressed in this section.

2. **GPA scales and conversions from Table II:** Table II, the "CGS General Conversion Tables" should be used for the GPA scales shown (100-points, 11.0/12.0, 7.0, 6.0, 4.0, A-D) even if the transcript or secondary school profile provides a conversion to a Table II scale.

   - The "4.0 Weighted" scale applies to any 4.0 based GPA that is weighted. It should be used only when Unweighted GPA is not available.
   - The" 4.0 Unweighted Scale" applies to any 4.0 based GPA that is unweighted.
   - Note Table II includes a scale to use to convert International Baccalaureate GPAs to a CGS.

3. **Scales not provided on Table II:** Given the relatively small number of admitted and matriculated students for whom Table II scales are not provided, it is preferable not to create new scales if possible. In such cases, a GPA on a 4.0 scale should be calculated using the following formula, and a CGS then derived using the 4.0 scale on Table II: HSGPA/HSGPA scale = "x"/4.0, where "x" becomes the value from which the CGS is derived. For example, if on a 5.0 scale a student has a 4.8 GPA (whether the scale's top grade is A or A+), the formula is 4.8/5.0 = x/4.0, x-3.84 and the CGS = 73.

4. **Calculating GPA when not provided by the secondary school:** When the secondary school does not calculate/report a GPA, the institution should calculate an unweighted GPA based on the secondary school's grading scale, using all courses for which grades and credit hours are provided, and weighting semester grades as one-half full-year grades.
   > NOTE: the following grade scale is used to convert grades on a non-traditional scale to a 4.0 Unweighted Scale: HH- 4.0, H- 3.5, HP- 2.5, P- 1.5, U- 0

5. **GPA period:** GPA data always should be for more than one year, including 10th and 11th grades, 9th grade when available, and official trimester or semester grades (as opposed to term grades) in the student's current year if available at the time the athlete's decision is made. If "official" grades from

the current year are available but not counted  in the school's cumulative GPA, they should be added to the cumulative GPA and  weighted appropriately: e.g., grades for first semester or trimester of senior year would be weighted as one-half or one-third year.

6. **GPAs from multiple schools and repeat years:** When a student has attended multiple  secondary schools (including a post-graduate year), all GPAs provided by the schools   should be used to the extent possible and weighted as in #5 above.  If the institution  believes this result is not logical and fair, it should describe what approach it believes is  better, subject to the Admissions Committee's agreement.

7. **Transfer students:** CGS should be calculated using 50% secondary school GPA and  50% college GPA

**JA4546**

CONFIDENTIAL

HARV00097944

INTERNATIONAL-SYSTEM GPA CALCULATIONS

1. **Generally:** Each school should calculate GPAs from international schools using the attached Appendix of International Calculations. If an international country is not listed on the Appendix, we should calculate an AI as it seems most appropriate. (In this circumstance, we should default to the Committee, using the NCAA International Standards as a reference point, but not necessarily a policy.)

2. **Canadian systems:** Table IIA, for establishing value of CGS of Canadian Students should be used to determine CGS based on the Province of the secondary school. Provinces where a passing grade is 50% use the first column on Table II A (Alberta, British Columbia, Manitoba, Newfoundland, NW Territories, Nova Scotia, Nunavut, Ontario, Prince Edward Island, Saskatchawan, Yukon); Provinces where a passing grade is 60% use the second column on Table IIA (New Brunswick, Quebec).

1. British systems:

   Count all GCSE (= O Level), AS and A level results in order to calculate a GPA:

   A* (same as A+) = 4.3

   A = 4.0

   B = 3.0

   C = 2.0

   D = 1.0

   - If the applicant is taking a gap year, actual A-Level results should be used.
   - A Level scores are given double the weight of AS and GCSE scores.
   - Internal grades are usually not available and should <u>not</u> be used if they are.
   - Predicted A-Level scores should be used when available.
   - All courses should be included in calculating the GPA, including physical education courses if the student receives a grade and credit for the course.

2. Pre-U:

   **The scale for Pre-U were decided on as follows, for Principal Subjects only:**

   D1 = A+/4.3
   D2 = A+/4.3
   D3 = A/4.0
   M1 =
   B+/3.3 M2
   = B/3.0 M3
   = B-/2.7 P1
   = C-/1.7 P2
   = D/1.0 P3
   = D-/0.7

**JA4547**

CONFIDENTIAL                                                                     HARV00097945

5. **International Baccalaureate systems:**

Average grades from the last two years of the IB program are preferred to calculate a GPA:
7 = A+ = 4.3
6 = A = 4.0
5 = B = 3.0
4 = C = 2.0
3 = D = 1.0

- If the applicant is still in school, use one year for Early applicants and one year plus one term for Regular applicants.
- If the applicant is taking a gap year, actual two-year IB results are used.
- Use IB predicted grades if available, and only if not available use internal grades.
- For IB schools in the U.S., use the course values given on the transcript; for IB schools outside the U.S., double the weight for Higher Level courses (as opposed to the Subsidiary Level courses).
- All Higher Level/Subsidiary Level courses will be counted from international schools.
- Scales: When IB predictions give split results, use the average of the split (i.e., 5/6 is given, use 5.5 for calculation).

6. **Notes on Selected Countries (added fall 2010):**

<u>Australia</u> – Require schools to provide a transcript of some sort, but if all else fails and they give the state final exam result or prediction (ex: UAI for NSW, OP for Queensland, usually out of 99.95) use that.

<u>New Zealand</u> – The scale for NZ is as follows…but ONLY for courses in which there is the possibility to get more than Achieved (Achieved/Not Achieved is basically Pass/Fail so we won't count those courses):

> [E] Excellent =
> A/4.0 [M] Merit =
> B/3.0 [A]
> Achieved = C/2.0
> [N] Not Achieved = F/0

<u>Singapore</u> – for schools using standard Junior College grading conventions – Include H1(General Paper, Project, etc.) & H2 predictions on a 4.0 scale to calculate GPA. Double weight for H2 marks.

For H3, the scale is:

> Distinction =
> A/4.0 Merit =
> B/3.0    Pass =
> C/2.0 Double
> H3s as well.

If provided, include O Level/GCSE marks in calculation of GPA with a single weight like we do with the British System.

**JA4548**

HARV00097946

General notes – For all national curriculums, the general rule of thumb is to include all courses as part of the GPA calculations.

'

**7.**<u>Additional International Scales for Relevant Countries</u>

For GPA scales of other countries, Table III has been sent separately and is included in the Ivy League Academic Index Memo. Please see CGM if you need a copy.

**JA4549**

CONFIDENTIAL

HARV00097947

| TABLE II: For establishing value of CGS | | | | | | | |
|---|---|---|---|---|---|---|---|
| APPROVED SEPTEMBER 2016 | | | | | | | |
| Percentage Average | 11.0/12.0 Scale | 6.0 | 5.0 | 4.0 Weighted GPA | Grade Equivalent to 4.0 | 4.0 Unweighted | CGS |
| 98.00 and above | 12.00 and | 6.5 and | 6.00 and | 4.30 and above | A+ | 4.0 and above | 80 |
| 97.00 - 97.99 | 11.70 - | 6.30 - | 5.70 - | 4.20 - 4.29 | | 3.91 - 3.99 | 79 |
| 96.00 - 96.99 | 11.40 - | 6.15 - | 5.40 - | 4.10 - 4.19 | | 3.81 - 3.90 | 78 |
| 95.00 - 95.99 | 11.00 - | 6.00 - | 5.00 - | 4.00 - 4.09 | A | 3.72 - 3.80 | 77 |
| 94.00 - 94.99 | 10.70 - | 5.85 - | 4.90 - | 3.90 - 3.99 | | 3.63 - 3.71 | 75 |
| 93.00 - 93.99 | 10.40 - | 5.70 - | 4.80 - | 3.80 - 3.89 | | 3.53 - 3.62 | 73 |
| 92.00 - 92.99 | 10.00 - | 5.55 - | 4.70 - | 3.70 - 3.79 | A- | 3.44 - 3.52 | 71 |
| 91.00 - 91.99 | 9.80 - | 5.40 - | 4.60 - | 3.60 - 3.69 | | 3.35 - 3.43 | 70 |
| 90.00 - 90.99 | 9.50 - | 5.25 - | 4.50 - | 3.50 - 3.59 | | 3.26 - 3.34 | 69 |
| 89.00 - 89.99 | 9.30 - | 5.10 - | 4.40 - | 3.40 - 3.49 | | 3.16 - 3.25 | 68 |
| 88.00 - 88.99 | 9.00 - | 4.95 - | 4.30 - | 3.30 - 3.39 | B+ | 3.07 - 3.15 | 67 |
| 87.00 - 87.99 | 8.70 - | 4.80 - | 4.20 - | 3.20 - 3.29 | | 2.98 -3.06 | 66 |
| 86.00 - 86.99 | 8.40 - | 4.65 - | 4.10 - | 3.10 - 3.19 | | 2.88 - 2.97 | 65 |
| 85.00 - 85.99 | 8.00 - | 4.50 - | 4.00 - | 3.00 - 3.09 | B | 2.79 - 2.87 | 63 |
| 84.00 - 84.99 | 7.70 - | 4.35 - | 3.90 - | 2.90 - 2.99 | | 2.70 - 2.78 | 61 |
| 83.00 - 83.99 | 7.40 - | 4.20 - | 3.80 - | 2.80 - 2.89 | | 2.61 - 2.69 | 59 |
| 82.00 - 82.99 | 7.00 - | 4.05 - | 3.70 - | 2.70 -2.79 | B- | 2.51 - 2.60 | 57 |
| 81.00 - 81.99 | 6.75 - | 3.90 - | 3.60 - | 2.60 - 2.69 | | 2.42 - 2.50 | 55 |
| 80.00 - 80.99 | 6.50 - | 3.75 - | 3.50 - | 2.50 - 2.59 | | 2.33 - 2.41 | 53 |
| 79.00 - 79.99 | 6.25 - | 3.60 - | 3.40 - | 2.40 - 2.49 | | 2.23 - 2.32 | 51 |
| 78.00 - 78.99 | 6.00 - | 3.45 - | 3.30 - | 2.30 - 2.39 | C+ | 2.14 - 2.22 | 49 |
| 77.00 - 77.99 | 5.70 - | 3.30 - | 3.20 - | 2.20 - 2.29 | | 2.05 - 2.13 | 48 |
| 76.00 - 76.99 | 5.40 - | 3.15 - | 3.10 - | 2.10 - 2.19 | | 1.95 - 2.04 | 47 |
| 75.00 - 75.99 | 5.00 - | 3.00 - | 3.00 - | 2.00 - 2.09 | C | 1.86 - 1.94 | 46 |
| 74.00 - 74.99 | 4.70 - | 2.85 - | 2.90 - | 1.90 - 1.99 | | 1.77 - 1.85 | 45 |
| 73.00 - 73.99 | 4.40 - | 2.70 - | 2.80 - | 1.80 - 1.89 | | 1.67 - 1.76 | 44 |
| 72.00 - 72.99 | 4.00 - | 2.55 - | 2.70 - | 1.70 - 1.79 | C- | 1.58 - 1.66 | 42 |
| 71.00 - 71.99 | 3.5 - 3.99 | 2.40 - | 2.60 - | 1.60 - 1.69 | | 1.49 - 1.57 | 40 |
| 70.00 - 70.99 | 2.5 - 3.49 | 2.25 - | 2.50 - | 1.50 - 1.59 | D+ | 1.40 - 1.56 | 38 |
| Below 70.00 | Below 2.5 | Below | Below | Below 1.5 | D | Below 1.4 | 35 |

**JA4550**

HARV00097948

**Table IIA- CGS Canadian Conversion Table**

| TABLE II-A:  For establishing value of CGS of Canadian Students | | | | |
|---|---|---|---|---|
| **Revised May 2015** | | | | |
| **United States  100 Point Scale** | **Letter Grade Equivalent** | **Canada Where passing grade is 50%** [1] | **CanadaWhere passing grade is 60%** [2] | **CGS** |
| 98.00 and above | A+ | 90.00 and above | 88.00 and above | 80 |
| 97.00 - 97.99 | | 88.00 - 89.99 | 87.00 - 87.99 | 79 |
| 96.00 - 96.99 | | 86.00 - 87.99 | 86.00 - 86.99 | 78 |
| 95.00 - 95.99 | A | 84.00 - 85.99 | 85.00 - 85.99 | 77 |
| 94.00 - 94.99 | | 82.00 - 83.99 | 84.00 - 84.99 | 75 |
| 93.00 - 93.99 | | 80.00 - 81.99 | 83.00 - 83.99 | 73 |
| 92.00 - 92.99 | A- | 79.00 - 79.99 | 82.00 - 82.99 | 71 |
| 91.00 - 91.99 | | 78.00 - 78.99 | 81.00 - 81.99 | 70 |
| 90.00 - 90.99 | | 77.00 - 77.99 | 80.00 - 80.99 | 69 |
| 89.00 - 89.99 | | 76.00 - 76.99 | 79.00 - 79.99 | 68 |
| 88.00 - 88.99 | B+ | 75.00 - 75.99 | 78.00 - 78.99 | 67 |
| 87.00 - 87.99 | | 74.00 - 74.99 | 77.00 - 77.99 | 66 |
| 86.00 - 86.99 | | 73.00 - 73.99 | 76.00 - 76.99 | 65 |
| 85.00 - 85.99 | B | 72.00 - 72.99 | 75.00 - 75.99 | 63 |
| 84.00 - 84.99 | | 71.00 - 71.99 | 74.00 - 74.99 | 61 |
| 83.00 - 83.99 | | 70.00 - 70.99 | 73.00 - 73.99 | 59 |
| 82.00 - 82.99 | B- | 69.00 - 69.99 | 72.00 - 72.99 | 57 |
| 81.00 - 81.99 | | 68.00 - 68.99 | 71.00 - 71.99 | 55 |
| 80.00 - 80.99 | | 67.00 - 67.99 | 70.00 - 70.99 | 53 |
| 79.00 - 79.99 | | 66.00 - 66.99 | 69.00 - 69.99 | 51 |
| 78.00 - 78.99 | C+ | 65.00 - 65.99 | 68.00 - 68.99 | 49 |
| 77.00 - 77.99 | | 64.00 - 64.99 | 67.00 - 67.99 | 48 |
| 76.00 - 76.99 | | 63.00 - 63.99 | 66.00 - 66.99 | 47 |
| 75.00 - 75.99 | C | 62.00 - 62.99 | 65.00 - 65.99 | 46 |
| 74.00 - 74.99 | | 61.00 - 61..99 | 64.00 - 64.99 | 45 |
| 73.00 - 73.99 | | 60.00 - 60.99 | 63.00 - 63.99 | 44 |
| 72.00 - 72.99 | C- | Below 60.00 | 62.00 - 62.99 | 42 |
| 71.00 - 71.99 | | | 61.00 - 61..99 | 40 |
| 70.00 - 70.99 | D+ | | 60.00 - 60.99 | 38 |
| Below 70.00 | D | | Below 60.00 | 35 |

14

**JA4551**

[1] Passing grade is 50% for the following Provinces: Alberta, British Columbia, Manitoba, Newfoundland, NW Territories, Nova Scotia, Nunavut, Ontario, Prince Edward Island, Saskatchawan, Yukon

[2] Passing grade is 60% for the following Provinces: New Brunswick, Quebec

**JA4552**

CONFIDENTIAL                                                                    HARV00097950

### III.   FILE ROUTING

**INADVERTENTLY CLEARED FILES**:  Occasionally, files will be mistakenly "cleared" (considered complete) and placed in your first read bin.  Open the Admin Problems Form, note the issue <u>and to which bin the folder should be routed when the problem is solved</u>.  Then route the file to the Admin Problems bin.

**FILES SHOULD BE READ AND PASSED IN A TIMELY FASHION**: Readers should take care not to allow files to pile up.  First readers need to read files from all assigned dockets as they clear, not just those whose subcommittee meets first.  However, because all files will clear regardless of round, readers should read early action files first, as soon as possible. Regular action files can generally wait until after December 1st, but you can read them prior to that if you are able to. <u>This is important, and we will monitor reading progress centrally.</u>  If you need help keeping up for whatever reason, let us know immediately.  Readers should code out files to the Committee Review bin or pass to the docket chair.  First-time readers will use the Optional Additional bin for their first 50-100 files during Early Action. Those files will be redistributed to experiences readers by the operations staff.

**SECOND READERS (OPTIONAL ADDITIONAL READER)**: Except for new readers (for whom special routing instructions are provided below), second readings should be used only in the rarest of instances:

A)  If three readings are needed for a complex case.

B)  If the case raises issues of policy.

C)  If the case would be greatly helped by a second reading from the former area person or someone with special knowledge of an area or type of case.

No second reader will ordinarily be assigned.  If you want/need a second reading, consult the enclosed docket assignment sheet to identify other readers on your docket. Try not to burden one person inordinately. You should choose "Optional Additional Reader" as the next bin and enter the name of that person which will place the file in their queue. You can add a note for the second reader such as "Please give V docket context" You should also send an email to special second readers to alert them to your requested reading. If you have received a file as a second read for a new reader, please read it as quickly as possible and put it back in the queue of the new reader.

**FIRST-TIME READERS**:  New readers should have their first fifty to one hundred Early Action files passed to the Optional Additional Reader bin or to the chair bin, based on relative strength. Some chairs may wish to use different approaches for first year readers.

**GENERAL ROUTING RULES:**

**JA4553**

CONFIDENTIAL                                      HARV00097951

1) A file should be passed <u>directly</u> to the chair:

- If the first reader rates a file a "2-" or better (i.e. a case the first reader thinks has a very good chance of being admitted)

- If the case will likely (or almost certainly) be discussed in Committee.

- If you want the docket chair's opinion or want simply to have the docket chair informed about the case.

   **If the first reader has a significant degree of uncertainty about how to proceed with the case, he or she should consult the docket chair.**

2) A case rated a 3+ overall **may** be passed to the chair or routed straight to the Committee Review bin.  The first reader should consider carefully the likelihood that additional anticipated information (e.g., a superior music rating) will make the case more compelling, in which case the folder should be passed to the chair.  If there is no further information anticipated and the case is qualitatively a 3+ (a strong case but like many others), an experienced first reader does not need to pass it on.

3) Typically, a case rated a 3 or lower with no particular attribute that would make it competitive can be routed directly to the Committee Review bin. Obviously late information or school context could change this initial evaluation.  The first reader, as an advocate, must be certain to check all late information that might make a difference to the case prior to the Committee meetings.  This is particularly important for candidates whose outstanding personal qualities become evident once we have the alumni/ae interview.

Readers new to a docket should discuss with the docket chair any special guidelines about which files should be passed on and which files should not.

**BINS**
In Slate, various "bins" are used to track an application file's progress through the application cycle. Bins are used for ease of day-to-day work -  they do not represent final decisions. The layout of bins can be viewed in the Slate Reader using the Browse tab (Note: the "Freshman Only" preset filter in Reader displays all freshman applicants and previous admits in the current application period).

Each bin column represents a different phase of the application cycle, and generally, work flows from left to right:
- Pre-Review: Folders are incomplete, incorrectly coded, or withdrawn
- Reads: Folders are complete ("cleared") and ready for review by readers
- Committee: Folders are ready for discussion by committee

17

**JA4554**

HARV00097952

- Working Decision: Folders have been discussed by the committee and a decision has been recommended
- Final Decision: Decisions have been checked and confirmed; ready for decision release (**Note: Files should only be moved to final decision bins on Decision Day by the Slate team. Prior to Decision Day, files should remain in Working Decision bins.**

## CHANGING BIN ASSIGNMENTS

Readers normally change a folder's bin assignment during the reading process using the Review Form in the Slate Reader. Occasionally it will be necessary to change a folder's bin assignment after the Review Form has been submitted. In these cases, the bin assignment can be changed in the Student Record. To edit a bin assignment in the Student Record, click the "Edit Application Details" tab on the right, and select the desired bin from the Bin dropdown menu.

## CLEARING INCOMPLETES

**Readers should be sure to check the "Not Cleared" bin before each of their subcommittee code-out deadlines and then periodically before decisions are final to check for any cases that could be read with the materials in the file. Sometimes, transcripts may be in various tabs aside from the "SSR" tab. Readers should use their discretion or consult with their chairs but in general, a file that has an application and a transcript can be read and evaluated.**

## SPECIAL READINGS

- WRF should see cases that could be particularly sensitive or controversial or that raise issues of fundamental policy.  When in doubt, send the file on by routing to the 4th reader bin.

- Folders of <u>competitive</u> candidates who attended secondary school outside the U.S. and Canada may be passed on to the appropriate U, V or W docket area person or RMW if help in assessing foreign credentials is needed. <u>Be selective</u>- don't pass on a case unless you are sure the applicant is competitive or has some <u>unusual</u> attributes.

- A faculty readings memorandum will be distributed later regarding specific procedures.

- Supplemental music/art/dance/academic materials of <u>clearly competitive</u> candidates with an unusually strong talent may be assessed through a supplementary process - through Slideroom (for music and dance) or through the faculty read process (for art or academic work). Handling of this material will be addressed through memoranda over the course of the fall.

**JA4555**

CONFIDENTIAL                                    HARV00097953

## IV. OTHER ITEMS

- Slate is made up of data downloaded from the application and supplemental forms. We currently do not have the ability to enter all the information by hand for those applicants who do not submit their forms on-line. However, the data entry staff will enter the most critical bio/demo information as they have in the past. This means that the dockets will be correct, but the summary sheets for these applicants will be primarily blank. You should double-check the data that is important - i.e. parent education, ethnicity, aid status, etc. - basically every field that's on the summary sheet. About 1% of all our applicants will fall into this category.

- <u>Acknowledgments to guidance counselors, teachers, and others</u>: The area person may occasionally feel it worthwhile to acknowledge unusually helpful TRs and SSRs by writing a note to the author. The note should acknowledge that the candidate may or may not be admitted. **Supplementary letters of recommendation may have already been acknowledged with a card or letter, but if not, particularly with recommenders who are alumni or others about whom Harvard might be concerned, you should call the letter to the attention of MEM or WRF and an acknowledgment will be sent. This is important!**

- <u>Support Materials:</u> ALL manually submitted support material should be dropped into the appropriate basket in the mailroom for sorting and scanning.

- <u>Misfiled and Missing materials</u>: If a teacher report, school report or any other material that would be helpful to a competitive candidate is missing, first readers should request a copy be re-sent. Files should be sent on to other readers unless the missing pieces are crucial. In such cases, first readers should hold onto the file by routing the file to the "Area Person Follow Up" bin. Detailed instructions on how to add new materials to an applicant's file can be found in the "Documentation" tab of the Slate welcome page.

- <u>File items that require attention</u>: Unanswered letters should be handled by first readers where appropriate or others including MEM or WRF.

## V. SCANNING AND INDEXING

There is a basket in the mailroom to collect and sort hard-copy documents received. The forms collected in these baskets should have content that is \*specific\* to the admission decision of the applicant and are marked as such - for example, mailed applications or supplements, letters of support, teacher reports, Harvard evaluation, (coach, arts, music, Harvard faculty), midyear reports, SSR's etc. We will scan almost everything. If that is not possible, an "oversized support" form will be scanned and added to the file to let you know there is material sitting in the bookcase in Conference Room 5.

19

**JA4556**

HARV00097954

Relevant emails to officers from applicants or about an applicant should be saved as a PDF file and indexed directly into the applicant file by the officer. To do so, go into the student record in Slate select the current round tab and scroll down to the "Materials" header. Click to add new material and make the appropriate selection from the drop-down menu. If you receive materials both electronically and in paper, you do not need to have the paper material scanned.

Documents displayed in the Reader are named by the document type that follows the menu down the left side of the Slate e-reader.

- Application (and supplement)
- SSR
- TRs
- Interviews
- Additional academic (additional transcripts, etc.)
- Midyear
- Final Report (potentially greyed out until admitted)
- Ratings Forms (includes IRFs)
- Miscellaneous (notes from family/friends, alums, correspondence, noting of oversized support, etc.)
- Waitlist
- Previous App
- Portfolio (NOTE: a tab in Slate we do not use at this time).

20

**JA4557**

CONFIDENTIAL                                                      HARV00097955

| | White | | | Asian American | | | African American | | | Hispanic | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | Number Applicants | Number Admits | Admit Rate | Number Applicants | Number Admits | Admit Rate | Number Applicants | Number Admits | Admit Rate | Number Applicants | Number Admits | Admit Rate |
| Athlete | 927 | 817 | 88.13% | 114 | 101 | 88.60% | 145 | 124 | 85.52% | 69 | 57 | 82.61% |
| Legacy | 3061 | 1079 | 35.25% | 463 | 163 | 35.21% | 233 | 67 | 28.76% | 281 | 97 | 34.52% |
| Child of Faculty or Staff | 167 | 80 | 47.9% | 81 | 39 | 48.15% | 9 | 2 | 22.22% | 19 | 8 | 42.11% |
| Dean or Director's Interest List | 1625 | 700 | 43.08% | 279 | 133 | 47.67% | 85 | 29 | 34.12% | 154 | 66 | 42.86% |
| All ALDC's | 5002 | 2179 | 43.56% | 841 | 371 | 44.11% | 440 | 205 | 46.59% | 462 | 191 | 41.34% |

JA4558

Expanded Dataset Plus Athletes



TRIAL EXHIBIT

P634

SFFA v. Harvard

exhibitsticker.com

TRIAL EXHIBIT

P656

SFFA v. Harvard

Message

| From: | McGrath, Marlyn E. [/O=EXCHANGELABS/OU=EXCHANGE ADMINISTRATIVE GROUP (FYDIBOHF23SPDLT)/CN=RECIPIENTS/CN=EBE4F7EB9F69460199E54E5CDF63552C-MMCG] |
|---|---|
| Sent: | 8/13/2018 5:23:35 PM |
| To: | Mascolo, Christine Collette [/o=ExchangeLabs/ou=Exchange Administrative Group (FYDIBOHF23SPDLT)/cn=Recipients/cn=c61c8c86863f4a31b11d8b770041b093-mascolo] |
| CC: | Fitzsimmons, William R. [/o=ExchangeLabs/ou=Exchange Administrative Group (FYDIBOHF23SPDLT)/cn=Recipients/cn=7c9507805d49473598925d032af30d42-User_e3990d] |
| Subject: | Re: Proposed changes to reading instructions |

I'm just hoping it's helpful……

On Aug 13, 2018, at 1:16 PM, Mascolo, Christine Collette <mascolo@fas.harvard.edu> wrote:

This is great – will take a look!

**From:** McGrath, Marlyn E.
**Sent:** Monday, August 13, 2018 1:15 PM
**To:** Mascolo, Christine Collette
**Cc:** Fitzsimmons, William R.
**Subject:** Re: Proposed changes to reading instructions
PS to my previous:
There may be some helpful text in the handbooks for IVers/chairs. Back when Kevin Bolan did a thorough re-do we tried to provide a broad context for the PQ stuff.
Please let me know if I can help!
Thanks, M

On Aug 13, 2018, at 10:53 AM, Mascolo, Christine Collette <mascolo@fas.harvard.edu> wrote:
Just FYI that there may be more updates to the reading instructions ▮▮▮▮▮▮▮▮▮ I will work with the group that considered PQS during the retreat and make some recommendations I will share with you both.

**From:** Gershengorn, Ara
**Sent:** Friday, August 10, 2018 1:56 PM
**To:** Mascolo, Christine Collette
**Subject:** RE: Proposed changes to reading instructions

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

Thanks so much. Hope you have a great weekend.
Best,
Ara

**From:** Mascolo, Christine Collette
**Sent:** Friday, August 10, 2018 1:40 PM
**To:** Gershengorn, Ara <ara_gershengorn@harvard.edu>
**Subject:** RE: Proposed changes to reading instructions
Thanks so much Ara.

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

**JA4559**

CONFIDENTIAL



Thanks again and I hope you have a great weekend!
Christine

**From:** Gershengorn, Ara
**Sent:** Friday, August 10, 2018 1:18 PM
**To:** Mascolo, Christine Collette
**Subject:** RE: Proposed changes to reading instructions

Hi Christine,

Best,
Ara

**From:** Mascolo, Christine Collette
**Sent:** Wednesday, August 08, 2018 4:15 PM
**To:** Gershengorn, Ara <ara_gershengorn@harvard.edu>
**Subject:** Proposed changes to reading instructions

Hi Ara,

Thanks very much,
Christine

**JA4560**

CONFIDENTIAL                                                      HARV00098054

TRIAL EXHIBIT

**P657**

SFFA v. Harvard

Message

| | |
|---|---|
| **From**: | Mascolo, Christine Collette [/O=EXCHANGELABS/OU=EXCHANGE ADMINISTRATIVE GROUP (FYDIBOHF23SPDLT)/CN=RECIPIENTS/CN=C61C8C86863F4A31B11D8B770041B093-MASCOLO] |
| **Sent**: | 8/20/2018 2:27:56 PM |
| **To**: | Fitzsimmons, William R. [/o=ExchangeLabs/ou=Exchange Administrative Group (FYDIBOHF23SPDLT)/cn=Recipients/cn=7c9507805d49473598925d032af30d42-User_e3990d]; McGrath, Marlyn E. [/o=ExchangeLabs/ou=Exchange Administrative Group (FYDIBOHF23SPDLT)/cn=Recipients/cn=ebe4f7eb9f69460199e54e5cdf63552c-mmcg] |
| **Subject**: | FW: Message from "RNP002673BF8318" |
| **Attachments**: | 20180820104022848.pdf |

```
Hi Fitz and Marlyn,
Attached you will find updates to the reading instructions, thanks to Tim and Jessica, along with the
language from last year to compare.
I can also leave copies in your mailboxes if that would be helpful.
Thank you!
Christine


-----Original Message-----
From: Scan.Admissions@fas.harvard.edu <Scan.Admissions@fas.harvard.edu>
Sent: Monday, August 20, 2018 10:40 AM
To: Mascolo, Christine Collette <mascolo@fas.harvard.edu>
Subject: Message from "RNP002673BF8318"

This E-mail was sent from "RNP002673BF8318" (MP 2554).

Scan Date: 08.20.2018 10:40:22 (-0400)
Queries to: Scan.Admissions@fas.harvard.edu
```

**JA4561**

CONFIDENTIAL

TRIAL EXHIBIT

P659

SFFA v. Harvard

Message

**From:** Mascolo, Christine Collette [/O=EXCHANGELABS/OU=EXCHANGE ADMINISTRATIVE GROUP (FYDIBOHF23SPDLT)/CN=RECIPIENTS/CN=C61C8C86863F4A31B11D8B770041B093-MASCOLO]
**Sent:** 9/12/2018 6:33:31 PM
**To:** Fitzsimmons, William R. [/o=ExchangeLabs/ou=Exchange Administrative Group (FYDIBOHF23SPDLT)/cn=Recipients/cn=7c9507805d49473598925d032af30d42-User_e3990d]; McGrath, Marlyn E. [/o=ExchangeLabs/ou=Exchange Administrative Group (FYDIBOHF23SPDLT)/cn=Recipients/cn=ebe4f7eb9f69460199e54e5cdf63552c-mmcg]
**CC:** Gershengorn, Ara [/o=ExchangeLabs/ou=Exchange Administrative Group (FYDIBOHF23SPDLT)/cn=Recipients/cn=9a0cb8cff09f4879bfb563d076abc882-abg290]
**Subject:** Reading instructions
**Attachments:** Reading Procedures2018.19DRAFT9.11.18.docx

Hi everyone,
Input from all previous drafts is captured in this document. The only new line everyone should look at is on page 5, in red.
Thank you,
Christine

CONFIDENTIAL                                                              HARV00098058

TRIAL EXHIBIT

P696

SFFA v. Harvard

Message

| | |
|---|---|
| **From:** | Mascolo, Christine Collette [/O=EXCHANGELABS/OU=EXCHANGE ADMINISTRATIVE GROUP (FYDIBOHF23SPDLT)/CN=RECIPIENTS/CN=C61C8C86863F4A31B11D8B770041B093-MASCOLO] |
| **Sent:** | 6/12/2018 5:55:51 PM |
| **To:** | Jessica Bryan [jessica.r.clark@gmail.com] |
| **Subject:** | All staff retreat follow-up |

Hi Jess and Tim,

Thank you again for leading the discussion about the personal qualities rating last week and for presenting on behalf of your group. It seemed like you had a very good conversation, but like much of what we do, there are lots of "it depends!"

I'm hoping that you will get us started on recommendations (if any) for changes in the reading instructions for the EC section. Then I would suggest sending a draft to your whole group so they can weigh in before producing a final recommendation by July 9. Then, these will go to WRF, MEM and others, including OGC, and we will see where we land. I have pasted what we currently say for overall coding and for the academic rating below. If you are comfortable using track changes that would be great since I think it is particularly helpful for OGC to view things this way.

## I.    CODING GUIDELINES FOR SUMMARY SHEETS

All readers must code a preliminary overall rating and a profile (using the codes below and pluses and minuses) for all candidates. Writing prose comments is left to the discretion of the reader and should generally be done only for competitive candidates, those who might become competitive later, or those who might be of interest to the Committee.

For all categories, use "+" and "-" primarily in the 2 and 3 range to indicate relative strength. A rating of 2+ or 3+ is stronger and very different from a 2- or 3- respectively. Readers should take all factors into account as they assign ratings. E.g, students who have taken a strong academic program and/or present other positive evidence of academic achievement should receive higher academic ratings: an applicant with low 700 scores could be rated a "2-" rather than a "3+" in some instances especially if there is academic strength in a particular field.

Personal
1. Rare personal appeal and character
2+ or 2 Extremely strong personal appeal and character
2- Very strong personal appeal and character
3+ Above average personal appeal and character; positive
3. Generally positive, perhaps somewhat neutral
3- Slightly negative impression
4. Distinctly poor impression; questionable or worrisome

Thank you both so much, and please let me know if I can help,
Christine

CONFIDENTIAL

TRIAL EXHIBIT

P705

SFFA v. Harvard

Message

| | |
|---|---|
| **From:** | Mascolo, Christine Collette [/O=EXCHANGELABS/OU=EXCHANGE ADMINISTRATIVE GROUP (FYDIBOHF23SPDLT)/CN=RECIPIENTS/CN=C61C8C86863F4A31B11D8B770041B093-MASCOLO] |
| **Sent:** | 7/23/2018 5:30:49 PM |
| **To:** | Fitzsimmons, William R. [/o=ExchangeLabs/ou=Exchange Administrative Group (FYDIBOHF23SPDLT)/cn=Recipients/cn=7c9507805d49473598925d032af30d42-User_e3990d]; McGrath, Marlyn E. [/o=ExchangeLabs/ou=Exchange Administrative Group (FYDIBOHF23SPDLT)/cn=Recipients/cn=ebe4f7eb9f69460199e54e5cdf63552c-mmcg] |
| **CC:** | Balian, Andrea [/o=ExchangeLabs/ou=Exchange Administrative Group (FYDIBOHF23SPDLT)/cn=Recipients/cn=c7673844b4cc4dbd866edbdf53db2041-balian]; Pacholok, Olesia [/o=ExchangeLabs/ou=Exchange Administrative Group (FYDIBOHF23SPDLT)/cn=Recipients/cn=c61540411ce64f4e86fc6be998d563e8-pacholok] |
| **Subject:** | Potential changes to reading instructions |
| **Attachments:** | Academic Coding Guidelines suggested edits 2018 v2.docx; EC guideline suggestions (2).docx; athletic ratings proposal.docx |

Hi Fitz and Marlyn,

Attached you will find suggested revisions to the reading instructions born out of our retreat in early June. These include the academic, EC and athletics sections only. There will be no suggested changes for PQs and support at this time. My plan is to share with both of you for any edits/thoughts you may have and then to share with Ara of course as I do every year.

I asked people to use track changes so you could easily compare these suggestions with what was written in last year's instructions. The group which considered the academic rating section also posed a few questions we may or may not want to consider which you will see at the bottom of that document.

I can print as well (though a color printer may be better for this).

Please let me know if you have any questions.

Thank you!

C

CONFIDENTIAL

HARV00098171



Message

| **From:** | Mascolo, Christine Collette [/O=EXCHANGELABS/OU=EXCHANGE ADMINISTRATIVE GROUP (FYDIBOHF23SPDLT)/CN=RECIPIENTS/CN=C61C8C86863F4A31B11D8B770041B093-MASCOLO] |
|---|---|
| **Sent:** | 9/19/2018 1:28:45 PM |
| **To:** | admfao_officers-list@lists.fas.harvard.edu |
| **Subject:** | Reading instructions |
| **Attachments:** | Reading Procedures2018.19DRAFT9.11.18.docx |

Hi everyone,

Attached please find the updated reading instructions for the year. The middle of the document is taken directly from the Ivy League annual memo which will not come out for another week or so you can skip pages 8-14 (starting at "Here are the rules according to the AI instructions provided by the Ivy League and sent to staff separately).

That said, please make sure you read the rest of the document **thoroughly** as there are several updates/additions. Many thanks to all of you who helped in the editing process.

Please let me know if you have any questions.

Christine

**JA4565**



TRIAL EXHIBIT

P721

SFFA v. Harvard

# Reading Procedures - Class of 2023

## I.    SUMMARY SHEET APPLICATION DATA

The Summary Sheet captures information as supplied on the application and can be updated as new information is added.  Late information can change the likelihood of admission and updates can be provided later for those initially considered less competitive. If any information is **missing** or **incorrect** for competitive candidates, changes should be made on the First Reader Rating Form and noted with prose in the reader comments or "Notes for Summary Sheet" box. This prose will feed onto the Summary Sheet when the rating form is submitted.
One exception: School code changes are NOT made on the First Reader Rating Form; see instructions below on how to do this.

**PLEASE NOTE**:  The accuracy of our citizenship coding is CRUCIAL.  Miscoding affects many of the important statistics we are required to compile, and we need to keep careful track of who needs a visa to study in the United States.

- **SCHOOL CODE**:  If an applicant is coded to the wrong school, please use the Admin Problems update form and route this to the Admin Problems bin immediately so that the operations team can ensure that the interview is reassigned to the appropriate club and group.

- **GENDER**:  Occasionally the gender designation reported on the application is coded incorrectly in our system.  This should be corrected by submitting the Admin Problems form and routing the file to the Admin Problems bin.
- **RACE/ETHNICITY**: We report exactly what the applicant reports as ethnicity on the application.  The ethnic codes on the Summary Sheet come from the demographic fields the candidate checked on the application. **Note that foreign citizens are listed as such. If they opted to check an identifying ethnic code it will appear but is not used for statistics and reporting.**

- **CITIZENSHIP CODE / COUNTRY OF CITIZENSHIP**:  There are four options on the application that can be checked: (1) U.S. Citizenship, (2) U.S. Dual Citizenship, (3) U.S. permanent resident and (4) "Other" or foreign citizen.

  The applicant holds only American citizenship:

  *APP*: Citizenship status will be "US Citizen or US National" and no other country of citizenship will be listed.
  *SUMMARY SHEET*:  Should read "Citizenship:  United States"

  The applicant is a dual U.S. citizen (a citizen of both the U.S. and another country).

  *APP*: Citizenship status will be "Dual US Citizen"-Other citizenships will show a country (e.g. Sweden)
  *SUMMARY SHEET*:  Should read "Citizenship:  United States/<other country>"

  The applicant is a U.S. Permanent Resident.

CONFIDENTIAL                                          HARV00098207

*APP*: Citizenship status will be "U.S. Permanent Resident or Refugee" and Other Citizenships will list one or more countries checked with another country listed.

*SUMMARY SHEET*:   Should read "Citizenship:  PR / <other country>"

*Caveat*:  If an applicant has checked the U.S. Permanent Resident box but notes that his or her application for permanent residency (or "green card") is <u>pending</u>, that applicant should be recoded as "Other citizenship."  Request this change by using the Admin Problems update form. We must prepare an I-20 form if the applicant is admitted and the application for residency is still pending, and the citizenship code is the only way we know to do this.

<u>The applicant is a foreign citizen</u>:

*APP*: Citizenship status will be "Other (Non-US)".  Other citizenship will show a country (e.g. Poland)

*SUMMARY SHEET*:   Should read "Citizenship:   <other country>"

- **LINEAGE:**  This flag appears if the applicant included Harvard College in the education field for at least one parent/guardian. The folder should be read by WRF ("4th" bin) following the normal reading process if appropriate or if another reading might be helpful.  Errors in coding should be noted with specific details about the error using the Admin Problems Form and routed to the Admin Problems bin.

- **ATHLETE**: Be sure the appropriate sport is listed as the first extracurricular activity. Changes can be made on the App Update tab on the Student Record. **DO NOT CHANGE ANY PRE-CODED ATHLETE.**

- **INDICATORS FOR ECONOMIC STATUS:** It has long been a priority for Harvard to seek talented students from all backgrounds, including those extraordinary individuals who are able to transcend economic disadvantages and achieve unusual academic distinction.  We utilize several indicators to understand the economic background of applicants. They are:
  - <u>Low Income Predictor (Low Inc on Summary Sheet)</u>: A value between 0 and 1 based on application information that predicts how likely a student is to be low income and have a $0 parent contribution.  The higher the value (closer to 1) the more likely the student will be low income.
  - <u>IM Pell Estimate (IMP-Est on Summary Sheet)</u>: An indication if the student is likely to qualify for a Pell Grant, based solely on IM data. This information will only be available if a student has submitted CSS Profile, allowing Financial Aid to estimate whether the student may be eligible for a Pell Grant.
  - FH info ("Yes, Likely, Unlikely, No" on the summary sheet): After subcommittee meetings, if information is available, a simple indication of a student's possible eligibility for the Harvard Financial Aid Initiative (HFAI) may be present on the summary sheet.
  - FEE STATUS**:** An indicator of whether the applicant received a fee waiver for their application.

- **SCORES**: By checking their Applicant Status website applicants can see whether their scores requirement has been fulfilled though not all scores will be listed.  They can report scores (which will be marked 'self-reported' in the student record) as they

CONFIDENTIAL                                                                                      HARV00098208

like. You can check scores by looking under the "Scores" tab in each Student Record of an applicant. The Summary Sheet will reflect the highest verified or self-reported scores.

Matriculating students will be responsible for changing 'unofficial' scores to 'official.' Only scores sent to us directly from the testing services electronically are considered official. Paper copies of scores sent via fax, email attachment or U.S. mail are not considered official.

We receive secure web downloads of scores, so we do not have to wait for the scores to be mailed to us. Applicants are told not to use 'rush reports,' but if they do, they will arrive electronically as soon as they are scored.

## II.    Reader Rating Forms

**When a file in in your queue, you will be able to select the "First Reader Form" or the "Chair Form" depending on the file's bin. The form includes the following fields:**

Reader ratings: All readers must code a preliminary overall rating and a profile (using the codes below and pluses and minuses) for all candidates. Writing prose comments is left to the discretion of the reader and should generally be done only for competitive candidates, those who might become competitive later, or those who might be of interest to the Committee.

For all categories, use "+" and "- "primarily in the 2 and 3 range to indicate relative strength. A rating of 2+ or 3+ is stronger and very different from a 2- or 3- respectively. Readers should take many factors into account as they assign ratings. E.g, students who have taken a strong academic program and/or present other positive evidence of academic achievement should receive higher academic ratings: an applicant with low 700 scores could be rated a 2- rather than a 3+ in some instances especially if there is academic strength in a particular field. However, readers should not take an applicant's race or ethnicity into account in making any of the ratings other than the Overall rating, as discussed further below.

Overall
1. Tops for admission: Exceptional – a clear admit with very strong objective and subjective support .
2. Very strong credentials but not an inevitable admit .
3. Solid contender: An applicant with good credentials and support .
3- Somewhat Neutral: Respectable credentials.
4. Neutral: Generally respectable credentials.
5. Negative: Credentials are generally below those of other candidates.

In assigning the Overall rating, readers may consider whether a student's background, including his or her race or ethnicity, may contribute to the educational benefits of diversity at Harvard College. The consideration of race or ethnicity may be considered **only** as one factor among many. In addition, the consideration of race or ethnicity should be in connection with the application's discussion of the effect an applicant's race or ethnicity has had on the applicant, not simply the fact alone that an applicant has identified as a member of a particular race or ethnicity.

CONFIDENTIAL                                                                                 HARV00098209

Academic

1. A potential major academic contributor; Summa potential. Genuine scholar; near-perfect scores and grades (in most cases combined with unusual creativity and possible evidence of original scholarship, often substantiated by our faculty or other academic mentors.) Possible national or international level recognition in academic competitions.
2. Magna potential. Excellent student with top grades and,
   a. SAT and SAT Subject tests: mid 700 scores and up
   b. 33+ ACT
   c. Possible local, regional or national level recognition in academic competitions
3. Solid academic potential; Cum laude potential: Very good student with excellent grades and
   a. SAT and SAT Subject tests: mid-600 through low-700 scores
   b. 29 to 32 ACT
4. Adequate preparation. Respectable grades and low-to mid-600 scores on SAT and subject tests or 26 to 29 ACT.
5. Marginal potential. Modest grades and 500 scores on SAT and subject tests (25 and below ACT).

Extracurricular, Community Employment, Family Commitments

1. Unusual strength in one or more areas. Possible national-level achievement or professional experience. A potential major contributor at Harvard. Truly unusual achievement.
2. Strong secondary school contribution in one or more areas such as class president, newspaper editor, concertmaster etc. and/or significant involvement in organizations outside of school. Possible local or regional recognition; major accomplishment(s) that have had an impact outside of the classroom. Can include significant term-time work or family responsibilities coupled with extracurricular engagement.
3. Solid participation but without special distinction. (Upgrade 3+ to 2- in some cases if the e/c is particularly extensive and substantive.)
4. Little or no participation.
5. Substantial commitment outside of conventional EC participation such as family obligations, term-time work or a significant commute (Important: should be included with other e/c to boost the rating or left as a "5" if that is more representative of the student's commitment).
6. Special circumstances limit or prevent participation (e.g. a physical condition, gap year(s), compulsory service of some kind).

Athletic

Please note: to determine whether an activity should be considered a sport or an extracurricular activity, readers should defer to the student's characterization of the activity on his or her application. Those activities the student lists as "sports" should be considered as part of the athletic rating.

CONFIDENTIAL                                                                                                    HARV00098210

1. Unusually strong prospect for varsity sports at Harvard, possibly desired by Harvard coaches or recognition for individual athletic achievement/championships at the national, international or Olympic level.
2. Strong and long-standing (3-4 years) of secondary school and/or travel team contribution in one or more sports; leadership role(s) such as captain or co-captain; possible individual recognition at the state or regional level; possible walk-on to a varsity team; has an IRF of a 4 from a Harvard coach
3. Active participation, possibly some leadership and/or recognition for individual accomplishments at the local or conference level.
4. Little or no participation (this is not a negative).
5. Substantial commitment outside of conventional extracurricular activities such as family obligations or term-time work (should be included with other e/c to boost the rating or left as a "5" if it is more representative of the student's commitment).
6. Physical condition or other special circumstances prevent significant activity.

<u>Personal</u>

The Personal rating should be an assessment made by the readers of what kind of effect the student might have on others at Harvard and beyond.  It should be based on an assessment of what kind of positive effect this person might have throughout his or her life based on what we have seen so far in the student's application materials.  This should include such considerations as what kind of contribution would the person make to the dining hall conversation, to study groups, and to society as a whole after graduation.  In assigning the personal rating, readers should consider information we receive from teachers, counselors, applicants, other recommenders, interviewers, and others as well as the applicant's essays, extracurricular activities, and other items in the application file—what the applicant shows us about him or herself and what the applicant has done or accomplished for others. It is important to keep in mind that characteristics not always synonymous with extroversion are similarly valued. Applicants who seem to be particularly reflective, insightful and/or dedicated should receive higher personal ratings as well

As noted above, though, an applicant's race or ethnicity should not be considered in assigning the personal rating.

We understand that students are multidimensional and ever evolving. Many applicants have grown enormously between the time when they apply in the fall or winter or their senior year and when they arrive in Cambridge the following September. Additionally, we are aware that we work with incomplete information.

1. Truly outstanding qualities of character; student may display enormous courage in the face of seemingly insurmountable obstacles in life. Student may demonstrate a singular ability to lead or inspire those around them. Student may exhibit extraordinary concern or compassion for others. Student receives unqualified and unwavering support from their recommenders.
2. Very strong qualities of character; student may demonstrate strong leadership. Student may exhibit a level of maturity beyond their years. Student may exhibit uncommon genuineness, selflessness or humility in their dealings with others. Students may possess strong resiliency. Student receives very strong support from their recommenders.

CONFIDENTIAL                                                                                          HARV00098211

   3+   Above average qualities of character; Student may demonstrate leadership. Student may exhibit commitment, good judgment, and positive citizenship. Student may exercise a spirit and camaraderie with peers. Student receives positive support from their recommenders.

3.  Generally positive, perhaps somewhat neutral qualities of character

4.  Questionable or worrisome qualities of character

School Support
1.  Strikingly unusual support. "The best of a career," "one of the best in many years," truly over the top.
2.  Very strong support. "One of the best" or "the best this year."
3+ Well above average, consistently positive
3.  Generally positive, perhaps somewhat neutral or generic
3- Somewhat neutral or slightly negative.
4.   Negative or worrisome report.
6.  For teacher reports: prose is not in the file.
8.  Placeholder for teacher reports.
9.  For secondary school report: transcript is in the file but there is no SSR prose.

PLEASE NOTE:  School support ratings for teacher one, teacher two and a counselor are mandatory ratings for competitive candidates. Teacher three and teacher four are optional, if applicable.

**BRIEF ANNOTATIONS FOR SUMMARY SHEET:**

You may choose to insert information about a case – a maximum of three lines – which will appear on the second page of the summary sheet at the top and on the printed docket (unlike prose comments below). These notes should be informational only and not evaluative. They can aid in your preparation of cases. Examples could be: PE on grandmother, Harvard Book, or international credentials not easily captured elsewhere (A level est, Physics A, Math A, Lit A – etc.).

**PROSE COMMENTS**:
When making prose comments, first readers should note the important academic and extracurricular accomplishments that are particularly pertinent to the case.  It is also helpful to reference teacher reports or other items that may be crucial to our evaluation.  In addition to numerical ratings, readers should try to summarize the strengths and weaknesses of the folder in brief paragraphs or comments.  Avoid slang and jargon and REMEMBER - your comments may be open to public view later.

**INTERVIEW PROFILE (IVP):**
Below is the language for uniform implementation of the Interview Profile number (IVP) for use with all Schools and Scholarship Chairs. The IVP will serve as a guide for chairs to know when our office needs the reports, and therefore how quickly they need to be assigned. All interviewers will be told that they should submit their interview report no later than two weeks after receiving the interview assignment.

CONFIDENTIAL
HARV00098212

1. An applicant for whom the committee needs more information to reach a decision - please have interview report in as soon as possible.
2. An applicant for whom more information would be very helpful during our deliberations - please have interview report in by the sub-committee deadline.
3. Please have interview report in by December 1 (EA) or March 1 (RA).
4. Based on the materials currently available, the committee needs no additional information at this time.

This language has been distributed to the S&S chairs via email and can also be found in the updated handbook and website instructions. (Please ask Bryce Gilfillian if you need help accessing the site). **Please have a conversation with your chairs to determine if you wish to use the IVP, and please make clear that this information should not be shared with other interviewers or applicants.** If your chairs have additional clerical or operational questions about the IVP, please direct them to email Bryce/alum assistant at { HYPERLINK "mailto:SSinfo@fas.harvard.edu" }.

When reading, please input your IVP code on the First Reader Rating Form. You should input an IVP for all cases for clubs that use this system or if the coding could be helpful for your own interview tracking purposes. Continue to pass on the folder to your chair and/or code out to Committee Review bin.

- **FIRST-GEN:** First readers should check this box on the first reader rating form if the student is of the first generation in the family to graduate from a four-year higher education institution. If first readers do not, chairs should do so on the chair rating form.

- **STAFF DISADVANTAGED**
  After reviewing the file, if the reader has evidence that the applicant may be from a modest economic background, please check "Yes" under Staff Disadvantaged on the Reader Rating Form. In the past, admitted students who has been identified as "Disadvantaged=Y" were found to be economically needy 78% of the time.

- **FACULTY, STAFF**: Code <u>ONLY</u> children of professors at <u>the Faculty of Arts and Sciences</u> as an "F"; children of faculty from other parts of the University as well as children of administrative staff should be coded "S". If an update is needed, use the First Reader rating form. **Please be careful to apply faculty and staff coding where appropriate as we need to keep accurate statistics on these applicants. All "F" and "S" folders should be routed to the "4th bin" (WRF) after the normal reading process has been completed.**

- **ACCESSIBLE EDUCATION OFFICE (AEO) REFERRALS**: Code all applicants who may require special accommodations due to disabilities or special needs with the AEO flag on the First Reader Rating Form. We can then provide a list to assist the AEO and DOS in providing accommodations when appropriate. As you know, a student's disability may not be considered in connection with his or her application.

- **FYRE:** Use this to indicate a student whom you think might benefit from the First Year Retreat and Experience (FYRE), a no cost pre-orientation program designed to

CONFIDENTIAL                                                                  HARV00098213

introduce students to Harvard's resources and give them a solid foundation on which to begin their college careers.

**ASTAT**: If, after reviewing an application you feel that the student may be of interest to one of our athletic teams, but is not a recruited athlete, you can use this flag to indicate to a coach that this student could be a recruit for their sport. Please use a "7" in these cases.

**GPA and GPA Scale**:
We must try to report an Academic Index to the IVY League for EVERY matriculant.
If grades are available, please report a GPA and GPA Scale for your strongest candidates.

The Academic Index is calculated using GPA and GPA Scale. These will be converted automatically to the 20 to 80 scale in Slate.

Here are the rules according to the AI instructions provided by the Ivy League and sent to staff separately:

A. ACADEMIC INDEX CALCULATIONS: CGS

1. **GPAs generally:** The secondary school GPA should be taken as presented on the secondary school transcript; when both unweighted and weighted GPAs are presented, the unweighted GPA should be used. (If there is a question as to whether the school is using an unweighted or 'what the A grade earns in a regular course.*not a complete sentence – check that new Ivy memo language is ok) Other questions in providing the GPA are addressed in this section.

2. **GPA scales and conversions from Table II:** Table II, the "CGS General Conversion Tables" should be used for the GPA scales shown (100-points, 11.0/12.0, 7.0, 6.0, 4.0, A-D) even if the transcript or secondary school profile provides a conversion to a Table II scale.

   - **The "4.0 Weighted" scale applies to any 4.0 based GPA that is weighted. It should be used only when Unweighted GPA is not available.**
   - **The" 4.0 Unweighted Scale" applies to any 4.0 based GPA that is unweighted.**
   - **Note Table II includes a scale to use to convert International Baccalaureate GPAs to a CGS.**

3. **Scales not provided on Table II:** Given the relatively small number of admitted and matriculated students for whom Table II scales are not provided, it is preferable not to create new scales if possible. In such cases, a GPA on a 4.0 scale should be calculated using the following formula, and a CGS then derived using the 4.0 scale on Table II: HSGPA/HSGPA scale = "x"/4.0, where "x" becomes the value from which the CGS is derived. For example, if on a 5.0 scale a student has a 4.8 GPA (whether the scale's top grade is A or A+), the formula is 4.8/5.0 = x/4.0, x-3.84 and the CGS = 73.

4. **Calculating GPA when not provided by the secondary school:** When

CONFIDENTIAL                                                                                    HARV00098214

the secondary   school does not calculate/report a GPA, the institution should calculate an unweighted   GPA based on the secondary school's grading scale, using all courses for which grades   and credit hours are provided, and weighting semester grades as one-half full-year   grades.

> NOTE:  the following grade scale is used to convert grades on a non-traditional scale to a 4.0 Unweighted Scale:  HH- 4.0, H- 3.5, HP- 2.5, P- 1.5, U- 0

5. **GPA period:** GPA data always should be for more than one year, including 10th and 11th grades, 9th grade when available, and official trimester or semester grades (as opposed   to term grades) in the student's current year if available at the time the athlete's   decision is made.  If "official" grades from the current year are available but not counted   in the school's cumulative GPA, they should be added to the cumulative GPA and   weighted appropriately: e.g., grades for first semester or trimester of senior year would   be weighted as one-half or one-third year.

6. **GPAs from multiple schools and repeat years:** When a student has attended multiple   secondary schools (including a post-graduate year), all GPAs provided by the schools   should be used to the extent possible and weighted as in #5 above.  If the institution   believes this result is not logical and fair, it should describe what approach it believes is   better, subject to the Admissions Committee's agreement.

7. **Transfer students:** CGS should be calculated using 50% secondary school GPA and   50% college GPA **.**

CONFIDENTIAL

HARV00098215

B. <u>INTERNATIONAL-SYSTEM  GPA  CALCULATIONS</u>

1. **Generally:** Each school should calculate GPAs from international schools using the  attached Appendix of International Calculations. If an international country is not listed   on the Appendix, we should calculate an AI as it seems most appropriate. (In this  circumstance, we should default to the Committee, using the NCAA International  Standards as a reference point, but not necessarily a policy.)

2. **Canadian systems:** Table IIA, for establishing value of CGS of Canadian Students should be used  to determine CGS based on the Province of the secondary school.  Provinces where a passing grade is 50% use the first column on Table II A (Alberta, British Columbia, Manitoba, Newfoundland, NW Territories, Nova Scotia, Nunavut, Ontario, Prince Edward Island, Saskatchawan, Yukon); Provinces where a passing grade is 60% use the second column on Table IIA (New Brunswick, Quebec).

1. <u>British systems</u>:

   Count all GCSE (= O Level), AS and A level results in order to calculate a GPA:  A* (same as A+) = 4.3

   A = 4:0

   B = 3.0

   C = 2.0

   D = 1.0

   - If the applicant is taking a gap year, actual A-Level results should be used.
   - A Level scores are given double the weight of AS and GCSE scores.
   - Internal grades are usually not available, and should <u>not</u> be used if they are.
   - Predicted A-Level scores should be used when available.
   - All courses should be included in calculating the GPA, including physical  education courses if the student receives a grade and credit for the course.

2. <u>Pre-U</u>:

   **The scale for Pre-U were decided on as follows, for Principal Subjects only:**

   D1 = A+/4.3

   D2 = A+/4.3

   D3 = A/4.0

   M1 = B/3.0

   M2 – B/3.0

CONFIDENTIAL                                                                                    HARV00098216

M3 = B-/2.7
P1 – C-/1.7
P2 – D/1.0
P3 – D-/0.7

5. <u>International Baccalaureate systems</u>:

Average grades from the last two years of the IB program are preferred to calculate a GPA:
7 = A+ = 4.3
6 = A = 4.0
5 = B = 3.0
4 = C = 2.0
3 = D = 1.0

- If the applicant is still in school, use one year for Early applicants and one year plus one term for Regular applicants.
- If the applicant is taking a gap year, actual two-year IB results are used.
- Use IB predicted grades if available, and only if not available use internal grades.
- For IB schools in the U.S., use the course values given on the transcript; for IB schools outside the U.S., double the weight for Higher Level courses (as opposed to the Subsidiary Level courses).
- All Higher Level/Subsidiary Level courses will be counted from international schools.
- Scales: When IB predictions give split results, use the average of the split (i.e., 5/6 is given, use 5.5 for calculation).

6.**<u>Notes on Selected Countries (added fall 2010):</u>**

<u>Australia</u> – Require schools to provide a transcript of some sort, but if all else fails and they give the state final exam result or prediction (ex: UAI for NSW, OP for Queensland, usually out of 99.95) use that.

<u>New Zealand</u> –The scale for NZ is as follows…but ONLY for courses in which there is the possibility to get more than Achieved (Achieved/Not Achieved is basically Pass/Fail so we won't count those courses):
[E] Excellent = A/4.0
[M] Merit = B/3.0
[A] Achieved = C/2.0
[N] Not Achieved = F/0

<u>Singapore</u> – for schools using standard Junior College grading conventions – Include H1(General Paper, Project, etc.) & H2 predictions on a 4.0 scale to calculate GPA. Double weight for H2 marks.

For H3, the scale is:

CONFIDENTIAL                                                                                 HARV00098217

Distinction = A/4.0
Merit = B/3.0
Pass – C/2.0
Double H3s as well

If provided, include O Level/GCSE marks in calculation of GPA with a single weight like we  do with the British System.

General notes – For all national curriculums, the general rule of thumb is to include all courses as part of the GPA calculations.
'

### 7. Additional International Scales for Relevant Countries

For GPA scales of other countries Table III has been sent separately and is include in the Ivy League Academic Index Memo. Please see CGM if you need a copy.

CONFIDENTIAL                                                                     HARV00098218

| TABLE II: For establishing value of CGS | | | | | | | |
| --- | --- | --- | --- | --- | --- | --- | --- |
| Revised May 2015/UPDATED AUGUST 2016 | | | | | | | |
| Percentage Average | International Baccalaureate | 11.0/12.0 Scale *USE FOR WEIGHTED AND UNWEIGHTED GPAS WHERE A= 11.0 AND A+ >11.0* | 5.0/6.0 Scale *USE FOR WEIGHTED AND UNWEIGHTED GPAS WHERE A= 5.0 AND A+ >5.0* | 4.0 Scale WEIGHTED *USE ONLY WHEN UNWEIGHTED NOT AVAILABLE* | Letter Grade Equivalent to 4.0 | 4.0 Scale UNWEIGHTED | CGS |
| 98.00 and above | 7 | 12.00 and above | 6.00 and above | 4.30 and above | A+ | 4.0 | 80 |
| 97.00 - 97.99 | 6/7 | 11.70 - 11.99 | 5.70 - 5.99 | 4.20 - 4.29 | | 3.91 - 3.99 | 79 |
| 96.00 - 96.99 | | 11.40 - 11.69 | 5.40 - 5.69 | 4.10 - 4.19 | | 3.81 - 3.90 | 78 |
| 95.00 - 95.99 | 6 | 11.00 - 11.39 | 5.00 - 5.39 | 4.00 - 4.09 | A | 3.72 - 3.80 | 77 |
| 94.00 - 94.99 | | 10.70 - 10.99 | 4.90 - 4.99 | 3.90 - 3.99 | | 3.63 - 3.71 | 75 |
| 93.00 - 93.99 | | 10.40 - 10.69 | 4.80 - 4.89 | 3.80 - 3.89 | | 3.53 - 3.62 | 73 |
| 92.00 - 92.99 | 5/6 | 10.00 - 10.39 | 4.70 - 4.79 | 3.70 - 3.79 | A- | 3.44 - 3.52 | 71 |
| 91.00 - 91.99 | | 9.80 - 9.99 | 4.60 - 4.69 | 3.60 - 3.69 | | 3.35 - 3.43 | 70 |
| 90.00 - 90.99 | | 9.50 - 9.79 | 4.50 - 4.59 | 3.50 - 3.59 | | 3.26 - 3.34 | 69 |
| 89.00 - 89.99 | | 9.30 - 9.49 | 4.40 - 4.49 | 3.40 - 3.49 | | 3.16 - 3.25 | 68 |
| 88.00 - 88.99 | | 9.00 - 9.29 | 4.30 - 4.39 | 3.30 - 3.39 | B+ | 3.07 - 3.15 | 67 |
| 87.00 - 87.99 | | 8.70 - 8.99 | 4.20 - 4.29 | 3.20 - 3.29 | | 2.98 - 3.06 | 66 |
| 86.00 - 86.99 | | 8.40 - 8.69 | 4.10 - 4.19 | 3.10 - 3.19 | | 2.88 - 2.97 | 65 |
| 85.00 - 85.99 | 5 | 8.00 - 8.39 | 4.00 - 4.09 | 3.00 - 3.09 | B | 2.79 - 2.87 | 63 |
| 84.00 - 84.99 | | 7.70 - 7.99 | 3.90 - 3.99 | 2.90 - 2.99 | | 2.70 - 2.78 | 61 |
| 83.00 - 83.99 | | 7.40 - 7.69 | 3.80 - 3.89 | 2.80 - 2.89 | | 2.61 - 2.69 | 59 |
| 82.00 - 82.99 | 4/5 | 7.00 - 7.39 | 3.70 - 3.79 | 2.70 - 2.79 | B- | 2.51 - 2.60 | 57 |
| 81.00 - 81.99 | | 6.75 - 6.99 | 3.60 - 3.69 | 2.60 - 2.69 | | 2.42 - 2.50 | 55 |
| 80.00 - 80.99 | | 6.50 - 6.74 | 3.50 - 3.59 | 2.50 - 2.59 | | 2.33 - 2.41 | 53 |
| 79.00 - 79.99 | | 6.25 - 6.49 | 3.40 - 3.49 | 2.40 - 2.49 | | 2.23 - 2.32 | 51 |
| 78.00 - 78.99 | | 6.00 - 6.24 | 3.30 - 3.39 | 2.30 - 2.39 | C+ | 2.14 - 2.22 | 49 |
| 77.00 - 77.99 | | 5.70 - 5.99 | 3.20 - 3.29 | 2.20 - 2.29 | | 2.05 - 2.13 | 48 |
| 76.00 - 76.99 | | 5.40 - 5.69 | 3.10 - 3.19 | 2.10 - 2.19 | | 1.95 - 2.04 | 47 |
| 75.00 - 75.99 | 4 | 5.00 - 5.39 | 3.00 - 3.09 | 2.00 - 2.09 | C | 1.86 - 1.94 | 46 |
| 74.00 - 74.99 | | 4.70 - 4.99 | 2.90 - 2.99 | 1.90 - 1.99 | | 1.77 - 1.85 | 45 |
| 73.00 - 73.99 | | 4.40 - 4.69 | 2.80 - 2.89 | 1.80 - 1.89 | | 1.67 - 1.76 | 44 |
| 72.00 - 72.99 | 3/4 | 4.00 - 4.39 | 2.70 - 2.79 | 1.70 - 1.79 | C- | 1.58 - 1.66 | 42 |
| 71.00 - 71.99 | | 3.5 - 3.99 | 2.60 - 2.69 | 1.60 - 1.69 | | 1.49 - 1.57 | 40 |
| 70.00 - 70.99 | | 2.5 - 3.49 | 2.50 - 2.59 | 1.50 - 1.59 | D+ | 1.40 - 1.56 | 38 |
| Below 70.00 | 3 | Below 2.5 | Below 2.5 | Below 1.5 | D | Below 1.4 | 35 |

CONFIDENTIAL                                                                                          HARV00098219

| TABLE IIA:  For establishing value of CGS of Canadian Students |
| :---: |
| Revised May 2015, Effective for Class Entering Fall 2017 |

| United States  100 Point Scale | Letter Grade Equivalent | Canada Where passing grade is 50% [1] | Canada Where passing grade is 60% [2] | CGS |
| :---: | :---: | :---: | :---: | :---: |
| 98.00 and above | A+ | 90.00 and above | 88.00 and above | 80 |
| 97.00 --- 97.99 | | 88.00 --- 89.99 | 87.00 --- 87.99 | 79 |
| 96.00 --- 96.99 | | 86.00 --- 87.99 | 86.00 --- 86.99 | 78 |
| 95.00 --- 95.99 | A | 84.00 --- 85.99 | 85.00 --- 85.99 | 77 |
| 94.00 --- 94.99 | | 82.00 --- 83.99 | 84.00 --- 84.99 | 75 |
| 93.00 --- 93.99 | | 80.00 --- 81.99 | 83.00 --- 83.99 | 73 |
| 92.00 --- 92.99 | A--- | 79.00 --- 79.99 | 82.00 --- 82.99 | 71 |
| 91.00 --- 91.99 | | 78.00 --- 78.99 | 81.00 --- 81.99 | 70 |
| 90.00 --- 90.99 | | 77.00 --- 77.99 | 80.00 --- 80.99 | 69 |
| 89.00 --- 89.99 | | 76.00 --- 76.99 | 79.00 --- 79.99 | 68 |
| 88.00 --- 88.99 | B+ | 75.00 --- 75.99 | 78.00 --- 78.99 | 67 |
| 87.00 --- 87.99 | | 74.00 --- 74.99 | 77.00 --- 77.99 | 66 |
| 86.00 --- 86.99 | | 73.00 --- 73.99 | 76.00 --- 76.99 | 65 |
| 85.00 --- 85.99 | B | 72.00 --- 72.99 | 75.00 --- 75.99 | 63 |
| 84.00 --- 84.99 | | 71.00 --- 71.99 | 74.00 --- 74.99 | 61 |
| 83.00 --- 83.99 | | 70.00 --- 70.99 | 73.00 --- 73.99 | 59 |
| 82.00 --- 82.99 | B--- | 69.00 --- 69.99 | 72.00 --- 72.99 | 57 |
| 81.00 --- 81.99 | | 68.00 --- 68.99 | 71.00 --- 71.99 | 55 |
| 80.00 --- 80.99 | | 67.00 --- 67.99 | 70.00 --- 70.99 | 53 |
| 79.00 --- 79.99 | | 66.00 --- 66.99 | 69.00 --- 69.99 | 51 |
| 78.00 --- 78.99 | C+ | 65.00 --- 65.99 | 68.00 --- 68.99 | 49 |
| 77.00 --- 77.99 | | 64.00 --- 64.99 | 67.00 --- 67.99 | 48 |
| 76.00 --- 76.99 | | 63.00 --- 63.99 | 66.00 --- 66.99 | 47 |
| 75.00 --- 75.99 | C | 62.00 --- 62.99 | 65.00 --- 65.99 | 46 |
| 74.00 --- 74.99 | | 61.00 --- 61..99 | 64.00 --- 64.99 | 45 |
| 73.00 --- 73.99 | | 60.00 --- 60.99 | 63.00 --- 63.99 | 44 |
| 72.00 --- 72.99 | C--- | Below 60.00 | 62.00 --- 62.99 | 42 |
| 71.00 --- 71.99 | | | 61.00 --- 61..99 | 40 |
| 70.00 --- 70.99 | D+ | | 60.00 --- 60.99 | 38 |
| Below 70.00 | D | | Below 60.00 | 35 |

[1] Passing grade is 50% for the following Provinces: Alberta, British Columbia, Manitoba,  Newfoundland, NW Territories, Nova Scotia, Nunavut, Ontario, Prince Edward Island,  Saskatchawan, Yukon

[2] Passing grade is 60% for the following Provinces: New Brunswick, Quebec

**JA4579**

CONFIDENTIAL                                    HARV00098220

III.  **FILE ROUTING**

**INADVERTENTLY CLEARED FILES**:  Occasionally, files will be mistakenly "cleared" (considered complete) and placed in your first read bin.  Open the Admin Problems Form, note the issue <u>and to which bin the folder should be routed when the problem is solved</u>.  Then route the file to the Admin Problems bin.

**FILES SHOULD BE READ AND PASSED IN A TIMELY FASHION**: Readers should take care not to allow files to pile up.  First readers need to read files from all assigned dockets as they clear, not just those whose subcommittee meets first.  However, because all files will clear regardless of round, readers should read early action files first, as soon as possible. Regular action files can generally wait until after December 1st, but you can read them prior to that if you are able to. <u>This is important, and we will monitor reading progress centrally.</u>  If you need help keeping up for whatever reason, let us know immediately.  Readers should code out files to the Committee Review bin or pass to the docket chair.  First-time readers will use the Optional Additional bin for their first 50-100 files during Early Action. Those files will be redistributed to experiences readers by the operations staff.

**SECOND READERS (OPTIONAL ADDITIONAL READER)**: Except for new readers (for whom special routing instructions are provided below), second readings should be used only in the rarest of instances:

A)  If three readings are needed for a complex case.

B)  If the case raises issues of policy.

C)  If the case would be greatly helped by a second reading from the former area person or someone with special knowledge of an area or type of case.

No second reader will ordinarily be assigned.  If you want/need a second reading, consult the enclosed docket assignment sheet to identify other readers on your docket. Try not to burden one person inordinately. You should choose "Optional Additional Reader" as the next bin and enter the name of that person which will place the file in their queue. You can add a note for the second reader such as "Please give V docket context" You should also send an email to special second readers to alert them to your requested reading. If you have received a file as a second read for a new reader, please read it as quickly as possible and put it back in the queue of the new reader.

**FIRST-TIME READERS**:  New readers should have their first fifty to one hundred Early Action files passed to the Optional Additional Reader bin or to the chair bin, based on relative strength. Some chairs may wish to use different approaches for first year readers.

**GENERAL ROUTING RULES:**

[ PAGE ]

**JA4580**

CONFIDENTIAL                                                                                    HARV00098221

1) A file should be passed <u>directly</u> to the chair:

- If the first reader rates a file a "2-" or better (i.e. a case the first reader thinks has a very good chance of being admitted)

- If the case will likely (or almost certainly) be discussed in Committee.

- If you want the docket chair's opinion or want simply to have the docket chair informed about the case.

   **If the first reader has a significant degree of uncertainty about how to proceed with the case, he or she should consult the docket chair.**

2) A case rated a 3+ overall **may** be passed to the chair or routed straight to the Committee Review bin.  The first reader should consider carefully the likelihood that additional anticipated information (e.g., a superior music rating) will make the case more compelling, in which case the folder should be passed to the chair.  If there is no further information anticipated and the case is qualitatively a 3+ (a strong case but like many others), an experienced first reader does not need to pass it on.

3) Typically, a case rated a 3 or lower with no particular attribute that would make it competitive can be routed directly to the Committee Review bin. Obviously late information or school context could change this initial evaluation.  The first reader, as an advocate, must be certain to check all late information that might make a difference to the case prior to the Committee meetings.  This is particularly important for candidates whose outstanding personal qualities become evident once we have the alumni/ae interview.

Readers new to a docket should discuss with the docket chair any special guidelines about which files should be passed on and which files should not.

**BINS**
In Slate, various "bins" are used to track an application file's progress through the application cycle. Bins are used for ease of day-to-day work -  they do not represent final decisions. The layout of bins can be viewed in the Slate Reader using the Browse tab (Note: the "Freshman Only" preset filter in Reader displays all freshman applicants and previous admits in the current application period).

Each bin column represents a different phase of the application cycle, and generally, work flows from left to right:
- Pre-Review: Folders are incomplete, incorrectly coded, or withdrawn
- Reads: Folders are complete ("cleared") and ready for review by readers
- Committee: Folders are ready for discussion by committee

[ PAGE ]

**JA4581**

CONFIDENTIAL

HARV00098222

- Working Decision: Folders have been discussed by the committee and a decision has been recommended
- Final Decision: Decisions have been checked and confirmed; ready for decision release

**(Note: Files should only be moved to final decision bins on Decision Day by the Slate team. Prior to Decision Day, files should remain in Working Decision bins.**

## CHANGING BIN ASSIGNMENTS

Readers normally change a folder's bin assignment during the reading process using the Review Form in the Slate Reader. Occasionally it will be necessary to change a folder's bin assignment after the Review Form has been submitted. In these cases, the bin assignment can be changed in the Student Record. To edit a bin assignment in the Student Record, click the "Edit Application Details" tab on the right, and select the desired bin from the Bin dropdown menu.

## CLEARING INCOMPLETES

**Readers should be sure to check the "Not Cleared" bin before each of their subcommittee code-out deadlines and then periodically before decisions are final to check for any cases that could be read with the materials in the file. Sometimes, transcripts may be in various tabs aside from the "SSR" tab. Readers should use their discretion or consult with their chairs but in general, a file that has an application and a transcript can be read and evaluated.**

## SPECIAL READINGS

- WRF should see cases that could be particularly sensitive or controversial or that raise issues of fundamental policy. When in doubt, send the file on by routing to the 4th reader bin.

- Folders of <u>competitive</u> candidates who attended secondary school outside the U.S. and Canada may be passed on to the appropriate U, V or W docket area person or RMW if help in assessing foreign credentials is needed. <u>Be selective</u>- don't pass on a case unless you are sure the applicant is competitive or has some <u>unusual</u> attributes.

- A faculty readings memorandum will be distributed later regarding specific procedures.

- Supplemental music/art/dance/academic materials of <u>clearly competitive</u> candidates with an unusually strong talent may be assessed through a supplementary process - through Slideroom (for music and dance) or through the faculty read process (for art or academic work). Handling of this material will be addressed through memoranda over the course of the fall.

## IV. OTHER ITEMS

[ PAGE ]

**JA4582**

HARV00098223

- Slate is made up of data downloaded from the application and supplemental forms. We currently do not have the ability to enter all the information by hand for those applicants who do not submit their forms on-line. However, the data entry staff will enter the most critical bio/demo information as they have in the past. This means that the dockets will be correct, but the summary sheets for these applicants will be primarily blank. You should double-check the data that is important - i.e. parent education, ethnicity, aid status, etc. - basically every field that's on the summary sheet. About 1% of all our applicants will fall into this category.

- <u>Acknowledgments to guidance counselors, teachers, and others</u>: The area person may occasionally feel it worthwhile to acknowledge unusually helpful TRs and SSRs by writing a note to the author. The note should acknowledge that the candidate may or may not be admitted. **Supplementary letters of recommendation may have already been acknowledged with a card or letter, but if not, particularly with recommenders who are alumni or others about whom Harvard might be concerned, you should call the letter to the attention of MEM or WRF and an acknowledgment will be sent. This is important!**

- <u>Support Materials:</u> ALL manually submitted support material should be dropped into the appropriate basket in the mailroom for sorting and scanning.

- <u>Misfiled and Missing materials</u>: If a teacher report, school report or any other material that would be helpful to a competitive candidate is missing, first readers should request a copy be re-sent. Files should be sent on to other readers unless the missing pieces are crucial. In such cases, first readers should hold onto the file by routing the file to the "Area Person Follow Up" bin. Detailed instructions on how to add new materials to an applicant's file can be found in the "Documentation" tab of the Slate welcome page.

- <u>File items that require attention</u>: Unanswered letters should be handled by first readers where appropriate or others including MEM or WRF.

### V. SCANNING AND INDEXING

There is a basket in the mailroom to collect and sort hard-copy documents received. The forms collected in these baskets should have content that is *specific* to the admission decision of the applicant and are marked as such - for example, mailed applications or supplements, letters of support, teacher reports, Harvard evaluation, (coach, arts, music, Harvard faculty), midyear reports, SSR's etc. We will scan almost everything. If that is not possible, an "oversized support" form will be scanned and added to the file to let you know there is material sitting in the bookcase in Conference Room 5.

[ PAGE ]

**JA4583**

CONFIDENTIAL

Relevant emails to officers from applicants or about an applicant should be saved as a PDF file and indexed directly into the applicant file by the officer. To do so, go into the student record in Slate select the current round tab and scroll down to the "Materials" header. Click to add new material and make the appropriate selection from the drop-down menu. If you receive materials both electronically and in paper, you do not need to have the paper material scanned.

Documents displayed in the Reader are named by the document type that follows the menu down the left side of the Slate e-reader.
- Application (and supplement)
- SSR
- TRs
- Interviews
- Additional academic (additional transcripts, etc.)
- Midyear
- Final Report (potentially greyed out until admitted)
- Ratings Forms (includes IRFs)
- Miscellaneous (notes from family/friends, alums, correspondence, noting of oversized support, etc.)
- Waitlist
- Previous App
- Portfolio (NOTE: a tab in Slate we do not use at this time).

**JA4584**

CONFIDENTIAL

HARV00098225



Message

| | |
|---|---|
| **From**: | Mascolo, Christine Collette [/O=EXCHANGELABS/OU=EXCHANGE ADMINISTRATIVE GROUP (FYDIBOHF23SPDLT)/CN=RECIPIENTS/CN=C61C8C86863F4A31B11D8B770041B093-MASCOLO] |
| **Sent**: | 10/5/2018 7:06:10 PM |
| **To**: | admfao_officers-list@lists.fas.harvard.edu |
| **Subject**: | Updated reading instructions |
| **Attachments**: | Reading Procedures2018.19FINAL.docx |

Attached.
Moving forward, please use this versions and disregard all previous versions.

CONFIDENTIAL                                                                HARV00098226



# Reading Procedures - Class of 2023

## I.     SUMMARY SHEET APPLICATION DATA

The Summary Sheet captures information as supplied on the application and can be updated as new information is added.  Late information can change the likelihood of admission and updates can be provided later for those initially considered less competitive. If any information is **missing** or **incorrect** for competitive candidates, changes should be made on the First Reader Rating Form and noted with prose in the reader comments or "Notes for Summary Sheet" box. This prose will feed onto the Summary Sheet when the rating form is submitted.
<u>One exception</u>: School code changes are NOT made on the First Reader Rating Form; see instructions below on how to do this.

**<u>PLEASE NOTE</u>**:  The accuracy of our citizenship coding is CRUCIAL.  Miscoding affects many of the important statistics we are required to compile, and we need to keep careful track of who needs a visa to study in the United States.

- **SCHOOL CODE**:  If an applicant is coded to the wrong school, please use the Admin Problems update form and route this to the Admin Problems bin immediately so that the operations team can ensure that the interview is reassigned to the appropriate club and group.

- **GENDER**:  Occasionally the gender designation reported on the application is coded incorrectly in our system.  This should be corrected by submitting the Admin Problems form and routing the file to the Admin Problems bin.
- **RACE/ETHNICITY**: We report exactly what the applicant reports as ethnicity on the application.  The ethnic codes on the Summary Sheet come from the demographic fields the candidate checked on the application. **Note that foreign citizens are listed as such. If they opted to check an identifying ethnic code it will appear but is not used for statistics and reporting.**

- **CITIZENSHIP CODE / COUNTRY OF CITIZENSHIP**:  There are four options on the application that can be checked: (1) U.S. Citizenship, (2) U.S. Dual Citizenship, (3) U.S. permanent resident and (4) "Other" or foreign citizen.

  <u>The applicant holds only American citizenship</u>:

  *APP*: Citizenship status will be "US Citizen or US National" and no other country of citizenship will be listed.
  *SUMMARY SHEET*:  Should read "Citizenship:  United States"

  <u>The applicant is a dual U.S. citizen</u> (a citizen of both the U.S. and another country).

  *APP*: Citizenship status will be "Dual US Citizen"-Other citizenships will show a country (e.g. Sweden)
  *SUMMARY SHEET*:  Should read "Citizenship:  United States/<other country>"

  <u>The applicant is a U.S. Permanent Resident</u>.

  *APP*: Citizenship status will be "U.S. Permanent Resident or Refugee" and Other

**JA4586**

Citizenships will list one or more countries checked with another country listed.

*SUMMARY SHEET*:   Should read "Citizenship:  PR / <other country>"

*Caveat*:  If an applicant has checked the U.S. Permanent Resident box but notes that his or her application for permanent residency (or "green card") is <u>pending</u>, that applicant should be recoded as "Other citizenship."  Request this change by using the Admin Problems update form.  We must prepare an I-20 form if the applicant is admitted and the application for residency is still pending, and the citizenship code is the only way we know to do this.

<u>The applicant is a foreign citizen</u>:

*APP*: Citizenship status will be "Other (Non-US)".  Other citizenship will show a country (e.g. Poland)

*SUMMARY SHEET*:   Should read "Citizenship:   <other country>"

- **LINEAGE:**  This flag appears if the applicant included Harvard College in the education field for at least one parent/guardian.  The folder should be read by WRF ("4ᵗʰ" bin) following the normal reading process if appropriate or if another reading might be helpful.  Errors in coding should be noted with specific details about the error using the Admin Problems Form and routed to the Admin Problems bin.

- **ATHLETE**: Be sure the appropriate sport is listed as the first extracurricular activity.  Changes can be made on the App Update tab on the Student Record. **DO NOT CHANGE ANY PRE-CODED ATHLETE**.

- **INDICATORS FOR ECONOMIC STATUS:** It has long been a priority for Harvard to seek talented students from all backgrounds, including those extraordinary individuals who are able to transcend economic disadvantages and achieve unusual academic distinction.  We utilize several indicators to understand the economic background of applicants. They are:
  - <u>Low Income Predictor (Low Inc on Summary Sheet):</u> A value between 0 and 1 based on application information that predicts how likely a student is to be low income and have a $0 parent contribution.  The higher the value (closer to 1) the more likely the student will be low income.
  - <u>IM Pell Estimate (IMP-Est on Summary Sheet):</u> An indication if the student is likely to qualify for a Pell Grant, based solely on IM data. This information will only be available if a student has submitted CSS Profile, allowing Financial Aid to estimate whether the student may be eligible for a Pell Grant.
  - FH info ("Yes, Likely, Unlikely, No" on the summary sheet): After subcommittee meetings, if information is available, a simple indication of a student's possible eligibility for the Harvard Financial Aid Initiative (HFAI) may be present on the summary sheet.
  - FEE STATUS**:** An indicator of whether the applicant received a fee waiver for their application.

- **SCORES**: By checking their Applicant Status website applicants can see whether their scores requirement has been fulfilled though not all scores will be listed.  They can report scores (which will be marked 'self-reported' in the student record) as they like.  You can check scores by looking under the "Scores" tab in each Student Record

CONFIDENTIAL

of an applicant. The Summary Sheet will reflect the highest verified or self-reported scores.

Matriculating students will be responsible for changing 'unofficial' scores to 'official.' Only scores sent to us directly from the testing services electronically are considered official. Paper copies of scores sent via fax, email attachment or U.S. mail are not considered official.

We receive secure web downloads of scores, so we do not have to wait for the scores to be mailed to us. Applicants are told not to use 'rush reports,' but if they do, they will arrive electronically as soon as they are scored.


## II.    Reader Rating Forms

**When a file in in your queue, you will be able to select the "First Reader Form" or the "Chair Form" depending on the file's bin. The form includes the following fields:**

Reader ratings: All readers must code a preliminary overall rating and a profile (using the codes below and pluses and minuses) for all candidates. Writing prose comments is left to the discretion of the reader and should generally be done only for competitive candidates, those who might become competitive later, or those who might be of interest to the Committee.

For all categories, use "+" and "- "primarily in the 2 and 3 range to indicate relative strength. A rating of 2+ or 3+ is stronger and very different from a 2- or 3- respectively. Readers should take many factors into account as they assign ratings. E.g, students who have taken a strong academic program and/or present other positive evidence of academic achievement should receive higher academic ratings: an applicant with low 700 scores could be rated a 2- rather than a 3+ in some instances especially if there is academic strength in a particular field. However, readers should not take an applicant's race or ethnicity into account in making any of the ratings other than the Overall rating, as discussed further below.


Overall
1. Tops for admission:  Exceptional – a clear admit with very strong objective and subjective support
2. Very strong credentials but not an inevitable admit
3. Solid contender: An applicant with good credentials and support
3- Somewhat Neutral: Respectable credentials
4. Neutral: Generally respectable credentials
5. Negative: Credentials are generally below those of other candidates

In assigning the Overall rating, readers may consider whether a student's background, including his or her race or ethnicity, may contribute to the educational benefits of diversity at Harvard College.  The consideration of race or ethnicity may be considered **only** as one factor among many.

Academic

1. A potential major academic contributor; Summa potential.  Genuine scholar; near-perfect scores and grades (in most cases combined with unusual creativity and

JA4588

possible evidence of original scholarship, often substantiated by our faculty or other academic mentors.) Possible national or international level recognition in academic competitions.

2. Magna potential.  Excellent student with top grades and,
   a. SAT and SAT Subject tests: mid 700 scores and up
   b. 33+ ACT
   c. Possible local, regional or national level recognition in academic competitions
3. Solid academic potential; Cum laude potential: Very good student with excellent grades and
   a. SAT and SAT Subject tests: mid-600 through low-700 scores
   b. 29 to 32 ACT
4. Adequate preparation. Respectable grades and low-to mid-600 scores on SAT and subject tests or 26 to 29 ACT.
5. Marginal potential. Modest grades and 500 scores on SAT and subject tests (25 and below ACT).

Extracurricular, Community Employment, Family Commitments

1. Unusual strength in one or more areas.  Possible national-level achievement or professional experience.  A potential major contributor at Harvard.  Truly unusual achievement.
2. Strong secondary school contribution in one or more areas such as class president, newspaper editor, concertmaster etc.  and/or significant involvement in organizations outside of school. Possible local or regional recognition; major accomplishment(s) that have had an impact outside of the classroom. Can include significant term-time work or family responsibilities coupled with extracurricular engagement.
3. Solid participation but without special distinction. (Upgrade 3+ to 2- in some cases if the e/c is particularly extensive and substantive.)
4. Little or no participation.
5. Substantial commitment outside of conventional EC participation such as family obligations, term-time work or a significant commute (Important: should be included with other e/c to boost the rating or left as a "5" if that is more representative of the student's commitment).
6. Special circumstances limit or prevent participation (e.g. a physical condition, gap year(s), compulsory service of some kind).

Athletic

    Please note: to determine whether an activity should be considered a sport or an extracurricular activity, readers should defer to the student's characterization of the activity on his or her application. Those activities the student lists as "sports" should be considered as part of the athletic rating.

1. Unusually strong prospect for varsity sports at Harvard, possibly desired by Harvard coaches or recognition for individual athletic achievement/championships at the national, international or Olympic level.
2. Strong and long-standing (3-4 years) of secondary school and/or travel team contribution in one or more sports; leadership role(s) such as captain or co-captain; possible individual recognition at the state or regional level; possible walk-on to a

**JA4589**

HARV00098230

varsity team; has an IRF of a 4 from a Harvard coach

3. Active participation, possibly some leadership and/or recognition for individual accomplishments at the local or conference level.
4. Little or no participation (this is not a negative).
5. Substantial commitment outside of conventional extracurricular activities such as family obligations or term-time work (should be included with other e/c to boost the rating or left as a "5" if it is more representative of the student's commitment).
6. Physical condition or other special circumstances prevent significant activity.

Personal

The Personal rating should be an assessment made by the readers of what kind of effect the student might have on others at Harvard and beyond.  It should be based on an assessment of what kind of positive effect this person might have throughout his or her life based on what we have seen so far in the student's application materials.  This should include such considerations as what kind of contribution would the person make to the dining hall conversation, to study groups, and to society as a whole after graduation.  In assigning the personal rating, readers should consider information we receive from teachers, counselors, applicants, other recommenders, interviewers, and others as well as the applicant's essays, extracurricular activities, and other items in the application file—what the applicant shows us about him or herself and what the applicant has done or accomplished for others. It is important to keep in mind that characteristics not always synonymous with extroversion are similarly valued. Applicants who seem to be particularly reflective, insightful and/or dedicated should receive higher personal ratings as well

As noted above, though, an applicant's race or ethnicity should not be considered in assigning the personal rating.

We understand that students are multidimensional and ever evolving. Many applicants have grown enormously between the time when they apply in the fall or winter or their senior year and when they arrive in Cambridge the following September. Additionally, we are aware that we work with incomplete information.

1. Truly outstanding qualities of character; student may display enormous courage in the face of seemingly insurmountable obstacles in life. Student may demonstrate a singular ability to lead or inspire those around them. Student may exhibit extraordinary concern or compassion for others. Student receives unqualified and unwavering support from their recommenders.
2. Very strong qualities of character; student may demonstrate strong leadership. Student may exhibit a level of maturity beyond their years. Student may exhibit uncommon genuineness, selflessness or humility in their dealings with others. Students may possess strong resiliency. Student receives very strong support from their recommenders.
3+   Above average qualities of character; Student may demonstrate leadership. Student may exhibit commitment, good judgment, and positive citizenship. Student may exercise a spirit and camaraderie with peers. Student receives positive support from their recommenders.

3. Generally positive, perhaps somewhat neutral qualities of character

4. Questionable or worrisome qualities of character

**JA4590**

School Support
1. Strikingly unusual support. "The best of a career," "one of the best in many years," truly over the top.
2. Very strong support. "One of the best" or "the best this year."
3+ Well above average, consistently positive
3. Generally positive, perhaps somewhat neutral or generic
3- Somewhat neutral or slightly negative.
4. Negative or worrisome report.
6. For teacher reports: prose is not in the file.
8. Placeholder for teacher reports.
9. For secondary school report: transcript is in the file but there is no SSR prose.

PLEASE NOTE:  School support ratings for teacher one, teacher two and a counselor are mandatory ratings for competitive candidates. Teacher three and teacher four are optional, if applicable.


**BRIEF ANNOTATIONS FOR SUMMARY SHEET:**

You may choose to insert information about a case – a maximum of three lines – which will appear on the second page of the summary sheet at the top and on the printed docket (unlike prose comments below). These notes should be informational only and not evaluative. They can aid in your preparation of cases. Examples could be: PE on grandmother, Harvard Book, or international credentials not easily captured elsewhere (A level est, Physics A, Math A, Lit A – etc.).

**PROSE COMMENTS**:
When making prose comments, first readers should note the important academic and extracurricular accomplishments that are particularly pertinent to the case.  It is also helpful to reference teacher reports or other items that may be crucial to our evaluation.  In addition to numerical ratings, readers should try to summarize the strengths and weaknesses of the folder in brief paragraphs or comments.  Avoid slang and jargon and REMEMBER - your comments may be open to public view later.

**INTERVIEW PROFILE (IVP):**
Below is the language for uniform implementation of the Interview Profile number (IVP) for use with all Schools and Scholarship Chairs. The IVP will serve as a guide for chairs to know when our office needs the reports, and therefore how quickly they need to be assigned. All interviewers will be told that they should submit their interview report no later than two weeks after receiving the interview assignment.

1. An applicant for whom the committee needs more information to reach a decision - please have interview report in as soon as possible.
2. An applicant for whom more information would be very helpful during our deliberations - please have interview report in by the sub-committee deadline.
3. Please have interview report in by December 1 (EA) or March 1 (RA).
4. Based on the materials currently available, the committee needs no additional information at this time.

CONFIDENTIAL                                                                                      HARV00098232

This language has been distributed to the S&S chairs via email and can also be found in the updated handbook and website instructions. (Please ask Bryce Gilfillian if you need help accessing the site). **Please have a conversation with your chairs to determine if you wish to use the IVP, and please make clear that this information should not be shared with other interviewers or applicants.** If your chairs have additional clerical or operational questions about the IVP, please direct them to email Bryce/alum assistant at { HYPERLINK "mailto:SSinfo@fas.harvard.edu" }.

When reading, please input your IVP code on the First Reader Rating Form. You should input an IVP for all cases for clubs that use this system or if the coding could be helpful for your own interview tracking purposes. Continue to pass on the folder to your chair and/or code out to Committee Review bin.

- **FIRST-GEN:** First readers should check this box on the first reader rating form if the student is of the first generation in the family to graduate from a four-year higher education institution. If first readers do not, chairs should do so on the chair rating form.

- **STAFF DISADVANTAGED**
  After reviewing the file, if the reader has evidence that the applicant may be from a modest economic background, please check "Yes" under Staff Disadvantaged on the Reader Rating Form. In the past, admitted students who has been identified as "Disadvantaged=Y" were found to be economically needy 78% of the time.

- **FACULTY, STAFF**: Code ONLY children of professors at the Faculty of Arts and Sciences as an "F"; children of faculty from other parts of the University as well as children of administrative staff should be coded "S". If an update is needed, use the First Reader rating form. **Please be careful to apply faculty and staff coding where appropriate as we need to keep accurate statistics on these applicants. All "F" and "S" folders should be routed to the "4th bin" (WRF) after the normal reading process has been completed.**

- **ACCESSIBLE EDUCATION OFFICE (AEO) REFERRALS**: Code all applicants who may require special accommodations due to disabilities or special needs with the AEO flag in the Student record. We can then work with the AEO and DOS when appropriate. As you know, a student's disability may not be considered in connection with his or her application. Anyone for whom the AEO flag is used should also be flagged for an advising form.

- **FYRE:** Use this to indicate a student whom you think might benefit from the First Year Retreat and Experience (FYRE), a no cost pre-orientation program designed to introduce students to Harvard's resources and give them a solid foundation on which to begin their college careers.

**ASTAT**: If, after reviewing an application you feel that the student may be of interest to one of our athletic teams, but is not a recruited athlete, you can use this flag to indicate to a coach that this student could be a recruit for their sport. Please use a "7" in these cases.

**GPA and GPA Scale**:
We must try to report an Academic Index to the IVY League for EVERY matriculant.
If grades are available, please report a GPA and GPA Scale for your strongest candidates.

**JA4592**

HARV00098233

The Academic Index is calculated using GPA and GPA Scale.  These will be converted automatically to the 20 to 80 scale in Slate.

Here are the rules according to the AI instructions provided by the Ivy League and sent to staff separately:

### ACADEMIC INDEX CALCULATIONS:  CGS

1.  **GPAs generally:**  As noted in ¶B-7 above, the secondary school GPA should be taken as  presented on the secondary school transcript; when both unweighted and weighted  GPAs are presented, the unweighted GPA should be used.  (If there is a question as to  whether the school is using an unweighted or weighted system, the scale should be  defined as unweighted, based on what the A grade earns in a regular course.)  Other  questions in providing the GPA are addressed in this section.

2.  **GPA scales and conversions from Table II:**  Table II, the "CGS General Conversion  Tables" should be used for the GPA scales shown (100-points, 11.0/12.0, 7.0, 6.0, 4.0, A-D) even if the transcript or secondary school profile provides a conversion to a Table II  scale.

    - The "4.0 Weighted" scale applies to any 4.0 based GPA that is weighted. It should be  used only when Unweighted GPA is not available.
    - The" 4.0 Unweighted Scale" applies to any 4.0 based GPA that is unweighted.
    - Note Table II includes a scale to use to convert International Baccalaureate GPAs to  a CGS.

3.  **Scales not provided on Table II:**  Given the relatively small number of admitted and  matriculated students for whom Table II scales are not provided, it is preferable not to  create new scales if possible.  In such cases, a GPA on a 4.0 scale should be calculated  using the following formula, and a CGS then derived using the 4.0 scale on Table II:  HSGPA/HSGPA scale = "x"/4.0, where "x" becomes the value from which the CGS is  derived.  For example, if on a 5.0 scale a student has a 4.8 GPA (whether the scale's top  grade is A or A+), the formula is $4.8/5.0 = x/4.0$, x-3.84 and the CGS = 73.

4.  **Calculating GPA when not provided by the secondary school:**  When the secondary  school does not calculate/report a GPA, the institution should calculate an unweighted  GPA based on the secondary school's grading scale, using all courses for which grades  and credit hours are provided, and weighting semester grades as one-half full-year  grades.
    > NOTE:  the following grade scale is used to convert grades on a non-traditional  scale to a 4.0 Unweighted Scale:  HH- 4.0, H- 3.5, HP- 2.5, P- 1.5, U- 0

5.  **GPA period:**  GPA data always should be for more than one year, including 10th and 11th  grades, 9th grade when available, and official trimester or semester grades (as opposed  to term grades) in the student's current year if available at the time the athlete's decision is made.  If "official" grades from

**JA4593**

the current year are available but not counted in the school's cumulative GPA, they should be added to the cumulative GPA and weighted appropriately: e.g., grades for first semester or trimester of senior year would be weighted as one-half or one-third year.

6. **GPAs from multiple schools and repeat years:** When a student has attended multiple secondary schools (including a post-graduate year), all GPAs provided by the schools should be used to the extent possible and weighted as in #5 above. If the institution believes this result is not logical and fair, it should describe what approach it believes is better, subject to the Admissions Committee's agreement.

7. **Transfer students:** CGS should be calculated using 50% secondary school GPA and 50% college GPA

**JA4594**

CONFIDENTIAL

INTERNATIONAL-SYSTEM GPA CALCULATIONS

1. **Generally:** Each school should calculate GPAs from international schools using the attached Appendix of International Calculations. If an international country is not listed on the Appendix, we should calculate an AI as it seems most appropriate. (In this circumstance, we should default to the Committee, using the NCAA International Standards as a reference point, but not necessarily a policy.)

2. **Canadian systems:** Table IIA, for establishing value of CGS of Canadian Students should be used to determine CGS based on the Province of the secondary school. Provinces where a passing grade is 50% use the first column on Table II A (Alberta, British Columbia, Manitoba, Newfoundland, NW Territories, Nova Scotia, Nunavut, Ontario, Prince Edward Island, Saskatchawan, Yukon); Provinces where a passing grade is 60% use the second column on Table IIA (New Brunswick, Quebec).

1. British systems:

   Count all GCSE (= O Level), AS and A level results in order to calculate a GPA:

   A* (same as A+) = 4.3

   A = 4.0

   B = 3.0

   C = 2.0

   D = 1.0
   - If the applicant is taking a gap year, actual A-Level results should be used.
   - A Level scores are given double the weight of AS and GCSE scores.
   - Internal grades are usually not available and should <u>not</u> be used if they are.
   - Predicted A-Level scores should be used when available.
   - All courses should be included in calculating the GPA, including physical education courses if the student receives a grade and credit for the course.

2. Pre-U:

   **The scale for Pre-U were decided on as follows, for Principal Subjects only:**

   D1 = A+/4.3
   D2 = A+/4.3
   D3 = A/4.0
   M1 =
   B+/3.3 M2
   = B/3.0 M3
   = B-/2.7 P1
   = C-/1.7 P2
   = D/1.0 P3
   = D-/0.7

**JA4595**

CONFIDENTIAL                                          HARV00098236

5. **International Baccalaureate systems**:

Average grades from the last two years of the IB program are preferred to calculate a GPA:

7 = A+ = 4.3
6 = A = 4.0
5 = B = 3.0
4 = C = 2.0
3 = D = 1.0

- If the applicant is still in school, use one year for Early applicants and one year plus one term for Regular applicants.
- If the applicant is taking a gap year, actual two-year IB results are used.
- Use IB predicted grades if available, and only if not available use internal grades.
- For IB schools in the U.S., use the course values given on the transcript; for IB schools outside the U.S., double the weight for Higher Level courses (as opposed to the Subsidiary Level courses).
- All Higher Level/Subsidiary Level courses will be counted from international schools.
- Scales: When IB predictions give split results, use the average of the split (i.e., 5/6 is given, use 5.5 for calculation).

6. **Notes on Selected Countries (added fall 2010)**:

Australia – Require schools to provide a transcript of some sort, but if all else fails and they give the state final exam result or prediction (ex: UAI for NSW, OP for Queensland, usually out of 99.95) use that.

New Zealand –The scale for NZ is as follows…but ONLY for courses in which there is the possibility to get more than Achieved (Achieved/Not Achieved is basically Pass/Fail so we won't count those courses):

[E] Excellent =
A/4.0 [M] Merit =
B/3.0 [A]
Achieved = C/2.0
[N] Not Achieved = F/0

Singapore – for schools using standard Junior College grading conventions – Include H1(General Paper, Project, etc.) & H2 predictions on a 4.0 scale to calculate GPA. Double weight for H2 marks.

For H3, the scale is:

Distinction =
A/4.0 Merit =
B/3.0    Pass =
C/2.0 Double
H3s as well.

If provided, include O Level/GCSE marks in calculation of GPA with a single weight like we do with the British System.

**JA4596**

CONFIDENTIAL                                                                 HARV00098237

General notes – For all national curriculums, the general rule of thumb is to include all courses as part of the GPA calculations.
'

### 7. Additional International Scales for Relevant Countries

For GPA scales of other countries, Table III has been sent separately and is included in the Ivy League Academic Index Memo. Please see CGM if you need a copy.

**JA4597**

CONFIDENTIAL
HARV00098238

**TABLE 42 For establishing Value of CGS**

**APPROVED SEPTEMBER 2016**

| Percentage Average | 11.0/12.0 Scale | 6.0 | 5.0 | 4.0 Weighted GPA | Grade Equivalent to 4.0 | 4.0 Unweighted | CGS |
|---|---|---|---|---|---|---|---|
| 98.00 and above | 12.00 and | 6.5 and | 6.00 and | 4.30 and above | A+ | 4.0 and above | 80 |
| 97.00 - 97.99 | 11.70 - | 6.30 - | 5.70 - | 4.20 - 4.29 | | 3.91 - 3.99 | 79 |
| 96.00 - 96.99 | 11.40 - | 6.15 - | 5.40 - | 4.10 - 4.19 | | 3.81 - 3.90 | 78 |
| 95.00 - 95.99 | 11.00 - | 6.00 - | 5.00 - | 4.00 - 4.09 | A | 3.72 - 3.80 | 77 |
| 94.00 - 94.99 | 10.70 - | 5.85 - | 4.90 - | 3.90 - 3.99 | | 3.63 - 3.71 | 75 |
| 93.00 - 93.99 | 10.40 - | 5.70 - | 4.80 - | 3.80 - 3.89 | | 3.53 - 3.62 | 73 |
| 92.00 - 92.99 | 10.00 - | 5.55 - | 4.70 - | 3.70 - 3.79 | A- | 3.44 - 3.52 | 71 |
| 91.00 - 91.99 | 9.80 - | 5.40 - | 4.60 - | 3.60 - 3.69 | | 3.35 - 3.43 | 70 |
| 90.00 - 90.99 | 9.50 - | 5.25 - | 4.50 - | 3.50 - 3.59 | | 3.26 - 3.34 | 69 |
| 89.00 - 89.99 | 9.30 - | 5.10 - | 4.40 - | 3.40 - 3.49 | | 3.16 - 3.25 | 68 |
| 88.00 - 88.99 | 9.00 - | 4.95 - | 4.30 - | 3.30 - 3.39 | B+ | 3.07 - 3.15 | 67 |
| 87.00 - 87.99 | 8.70 - | 4.80 - | 4.20 - | 3.20 - 3.29 | | 2.98 -3.06 | 66 |
| 86.00 - 86.99 | 8.40 - | 4.65 - | 4.10 - | 3.10 - 3.19 | | 2.88 - 2.97 | 65 |
| 85.00 - 85.99 | 8.00 - | 4.50 - | 4.00 - | 3.00 - 3.09 | B | 2.79 - 2.87 | 63 |
| 84.00 - 84.99 | 7.70 - | 4.35 - | 3.90 - | 2.90 - 2.99 | | 2.70 - 2.78 | 61 |
| 83.00 - 83.99 | 7.40 - | 4.20 - | 3.80 - | 2.80 - 2.89 | | 2.61 - 2.69 | 59 |
| 82.00 - 82.99 | 7.00 - | 4.05 - | 3.70 - | 2.70 - 2.79 | B- | 2.51 - 2.60 | 57 |
| 81.00 - 81.99 | 6.75 - | 3.90 - | 3.60 - | 2.60 - 2.69 | | 2.42 - 2.50 | 55 |
| 80.00 - 80.99 | 6.50 - | 3.75 - | 3.50 - | 2.50 - 2.59 | | 2.33 - 2.41 | 53 |
| 79.00 - 79.99 | 6.25 - | 3.60 - | 3.40 - | 2.40 - 2.49 | | 2.23 - 2.32 | 51 |
| 78.00 - 78.99 | 6.00 - | 3.45 - | 3.30 - | 2.30 - 2.39 | C+ | 2.14 - 2.22 | 49 |
| 77.00 - 77.99 | 5.70 - | 3.30 - | 3.20 - | 2.20 - 2.29 | | 2.05 - 2.13 | 48 |
| 76.00 - 76.99 | 5.40 - | 3.15 - | 3.10 - | 2.10 - 2.19 | | 1.95 - 2.04 | 47 |
| 75.00 - 75.99 | 5.00 - | 3.00 - | 3.00 - | 2.00 - 2.09 | C | 1.86 - 1.94 | 46 |
| 74.00 - 74.99 | 4.70 - | 2.85 - | 2.90 - | 1.90 - 1.99 | | 1.77 - 1.85 | 45 |
| 73.00 - 73.99 | 4.40 - | 2.70 - | 2.80 - | 1.80 - 1.89 | | 1.67 - 1.76 | 44 |
| 72.00 - 72.99 | 4.00 - | 2.55 - | 2.70 - | 1.70 - 1.79 | C- | 1.58 - 1.66 | 42 |
| 71.00 - 71.99 | 3.5 - 3.99 | 2.40 - | 2.60 - | 1.60 - 1.69 | | 1.49 - 1.57 | 40 |
| 70.00 - 70.99 | 2.5 - 3.49 | 2.25 - | 2.50 - | 1.50 - 1.59 | D+ | 1.40 - 1.56 | 38 |
| Below 70.00 | Below 2.5 | Below | Below | Below 1.5 | D | Below 1.4 | 35 |

**JA4598**

CONFIDENTIAL

HARV00098239

**Table IIA- CGS Canadian Conversion Table**

<table>
<tr><td colspan="5"><b>TABLE II-A:  For establishing value of CGS of Canadian Students</b><br><b>Revised May 2015</b></td></tr>
<tr><th>United States 100 Point Scale</th><th>Letter Grade Equivalent</th><th>Canada Where passing grade is 50% [1]</th><th>Canada Where passing grade is 60% [2]</th><th>CGS</th></tr>
<tr><td>98.00 and above</td><td>A+</td><td>90.00 and above</td><td>88.00 and above</td><td>80</td></tr>
<tr><td>97.00 - 97.99</td><td></td><td>88.00 - 89.99</td><td>87.00 - 87.99</td><td>79</td></tr>
<tr><td>96.00 - 96.99</td><td></td><td>86.00 - 87.99</td><td>86.00 - 86.99</td><td>78</td></tr>
<tr><td>95.00 - 95.99</td><td>A</td><td>84.00 - 85.99</td><td>85.00 - 85.99</td><td>77</td></tr>
<tr><td>94.00 - 94.99</td><td></td><td>82.00 - 83.99</td><td>84.00 - 84.99</td><td>75</td></tr>
<tr><td>93.00 - 93.99</td><td></td><td>80.00 - 81.99</td><td>83.00 - 83.99</td><td>73</td></tr>
<tr><td>92.00 - 92.99</td><td>A-</td><td>79.00 - 79.99</td><td>82.00 - 82.99</td><td>71</td></tr>
<tr><td>91.00 - 91.99</td><td></td><td>78.00 - 78.99</td><td>81.00 - 81.99</td><td>70</td></tr>
<tr><td>90.00 - 90.99</td><td></td><td>77.00 - 77.99</td><td>80.00 - 80.99</td><td>69</td></tr>
<tr><td>89.00 - 89.99</td><td></td><td>76.00 - 76.99</td><td>79.00 - 79.99</td><td>68</td></tr>
<tr><td>88.00 - 88.99</td><td>B+</td><td>75.00 - 75.99</td><td>78.00 - 78.99</td><td>67</td></tr>
<tr><td>87.00 - 87.99</td><td></td><td>74.00 - 74.99</td><td>77.00 - 77.99</td><td>66</td></tr>
<tr><td>86.00 - 86.99</td><td></td><td>73.00 - 73.99</td><td>76.00 - 76.99</td><td>65</td></tr>
<tr><td>85.00 - 85.99</td><td>B</td><td>72.00 - 72.99</td><td>75.00 - 75.99</td><td>63</td></tr>
<tr><td>84.00 - 84.99</td><td></td><td>71.00 - 71.99</td><td>74.00 - 74.99</td><td>61</td></tr>
<tr><td>83.00 - 83.99</td><td></td><td>70.00 - 70.99</td><td>73.00 - 73.99</td><td>59</td></tr>
<tr><td>82.00 - 82.99</td><td>B-</td><td>69.00 - 69.99</td><td>72.00 - 72.99</td><td>57</td></tr>
<tr><td>81.00 - 81.99</td><td></td><td>68.00 - 68.99</td><td>71.00 - 71.99</td><td>55</td></tr>
<tr><td>80.00 - 80.99</td><td></td><td>67.00 - 67.99</td><td>70.00 - 70.99</td><td>53</td></tr>
<tr><td>79.00 - 79.99</td><td></td><td>66.00 - 66.99</td><td>69.00 - 69.99</td><td>51</td></tr>
<tr><td>78.00 - 78.99</td><td>C+</td><td>65.00 - 65.99</td><td>68.00 - 68.99</td><td>49</td></tr>
<tr><td>77.00 - 77.99</td><td></td><td>64.00 - 64.99</td><td>67.00 - 67.99</td><td>48</td></tr>
<tr><td>76.00 - 76.99</td><td></td><td>63.00 - 63.99</td><td>66.00 - 66.99</td><td>47</td></tr>
<tr><td>75.00 - 75.99</td><td>C</td><td>62.00 - 62.99</td><td>65.00 - 65.99</td><td>46</td></tr>
<tr><td>74.00 - 74.99</td><td></td><td>61.00 - 61..99</td><td>64.00 - 64.99</td><td>45</td></tr>
<tr><td>73.00 - 73.99</td><td></td><td>60.00 - 60.99</td><td>63.00 - 63.99</td><td>44</td></tr>
<tr><td>72.00 - 72.99</td><td>C-</td><td>Below 60.00</td><td>62.00 - 62.99</td><td>42</td></tr>
<tr><td>71.00 - 71.99</td><td></td><td></td><td>61.00 - 61..99</td><td>40</td></tr>
<tr><td>70.00 - 70.99</td><td>D+</td><td></td><td>60.00 - 60.99</td><td>38</td></tr>
<tr><td>Below 70.00</td><td>D</td><td></td><td>Below 60.00</td><td>35</td></tr>
</table>

**JA4599**

CONFIDENTIAL

HARV00098240

[1] Passing grade is 50% for the following Provinces: Alberta, British Columbia, Manitoba, Newfoundland, NW Territories, Nova Scotia, Nunavut, Ontario, Prince Edward Island, Saskatchawan, Yukon

[2] Passing grade is 60% for the following Provinces: New Brunswick, Quebec

**JA4600**

CONFIDENTIAL                                                                HARV00098241

### III. FILE ROUTING

**INADVERTENTLY CLEARED FILES**: Occasionally, files will be mistakenly "cleared" (considered complete) and placed in your first read bin. Open the Admin Problems Form, note the issue <u>and to which bin the folder should be routed when the problem is solved</u>. Then route the file to the Admin Problems bin.

**FILES SHOULD BE READ AND PASSED IN A TIMELY FASHION**: Readers should take care not to allow files to pile up. First readers need to read files from all assigned dockets as they clear, not just those whose subcommittee meets first. However, because all files will clear regardless of round, readers should read early action files first, as soon as possible. Regular action files can generally wait until after December 1st, but you can read them prior to that if you are able to. <u>This is important, and we will monitor reading progress centrally.</u> If you need help keeping up for whatever reason, let us know immediately. Readers should code out files to the Committee Review bin or pass to the docket chair. First-time readers will use the Optional Additional bin for their first 50-100 files during Early Action. Those files will be redistributed to experiences readers by the operations staff.

**SECOND READERS (OPTIONAL ADDITIONAL READER)**: Except for new readers (for whom special routing instructions are provided below), second readings should be used only in the rarest of instances:

A) If three readings are needed for a complex case.

B) If the case raises issues of policy.

C) If the case would be greatly helped by a second reading from the former area person or someone with special knowledge of an area or type of case.

No second reader will ordinarily be assigned. If you want/need a second reading, consult the enclosed docket assignment sheet to identify other readers on your docket. Try not to burden one person inordinately. You should choose "Optional Additional Reader" as the next bin and enter the name of that person which will place the file in their queue. You can add a note for the second reader such as "Please give V docket context" You should also send an email to special second readers to alert them to your requested reading. If you have received a file as a second read for a new reader, please read it as quickly as possible and put it back in the queue of the new reader.

**FIRST-TIME READERS**: New readers should have their first fifty to one hundred Early Action files passed to the Optional Additional Reader bin or to the chair bin, based on relative strength. Some chairs may wish to use different approaches for first year readers.

**GENERAL ROUTING RULES:**

{ PAGE }

**JA4601**

1) A file should be passed <u>directly</u> to the chair:

- If the first reader rates a file a "2-" or better (i.e. a case the first reader thinks has a very good chance of being admitted)

- If the case will likely (or almost certainly) be discussed in Committee.

- If you want the docket chair's opinion or want simply to have the docket chair informed about the case.

   **If the first reader has a significant degree of uncertainty about how to proceed with the case, he or she should consult the docket chair.**

2) A case rated a 3+ overall **may** be passed to the chair or routed straight to the Committee Review bin.  The first reader should consider carefully the likelihood that additional anticipated information (e.g., a superior music rating) will make the case more compelling, in which case the folder should be passed to the chair.  If there is no further information anticipated and the case is qualitatively a 3+ (a strong case but like many others), an experienced first reader does not need to pass it on.

3) Typically, a case rated a 3 or lower with no particular attribute that would make it competitive can be routed directly to the Committee Review bin. Obviously late information or school context could change this initial evaluation.  The first reader, as an advocate, must be certain to check all late information that might make a difference to the case prior to the Committee meetings.  This is particularly important for candidates whose outstanding personal qualities become evident once we have the alumni/ae interview.

Readers new to a docket should discuss with the docket chair any special guidelines about which files should be passed on and which files should not.

**BINS**
In Slate, various "bins" are used to track an application file's progress through the application cycle. Bins are used for ease of day-to-day work -  they do not represent final decisions. The layout of bins can be viewed in the Slate Reader using the Browse tab (Note: the "Freshman Only" preset filter in Reader displays all freshman applicants and previous admits in the current application period).

Each bin column represents a different phase of the application cycle, and generally, work flows from left to right:
- Pre-Review: Folders are incomplete, incorrectly coded, or withdrawn
- Reads: Folders are complete ("cleared") and ready for review by readers
- Committee: Folders are ready for discussion by committee

{ PAGE }

**JA4602**

- Working Decision: Folders have been discussed by the committee and a decision has been recommended
- Final Decision: Decisions have been checked and confirmed; ready for decision release
**(Note: Files should only be moved to final decision bins on Decision Day by the Slate team. Prior to Decision Day, files should remain in Working Decision bins.**

## CHANGING BIN ASSIGNMENTS

Readers normally change a folder's bin assignment during the reading process using the Review Form in the Slate Reader. Occasionally it will be necessary to change a folder's bin assignment after the Review Form has been submitted. In these cases, the bin assignment can be changed in the Student Record. To edit a bin assignment in the Student Record, click the "Edit Application Details" tab on the right, and select the desired bin from the Bin dropdown menu.

## CLEARING INCOMPLETES

**Readers should be sure to check the "Not Cleared" bin before each of their subcommittee code-out deadlines and then periodically before decisions are final to check for any cases that could be read with the materials in the file. Sometimes, transcripts may be in various tabs aside from the "SSR" tab. Readers should use their discretion or consult with their chairs but in general, a file that has an application and a transcript can be read and evaluated.**

## SPECIAL READINGS

- WRF should see cases that could be particularly sensitive or controversial or that raise issues of fundamental policy.  When in doubt, send the file on by routing to the 4th reader bin.

- Folders of competitive candidates who attended secondary school outside the U.S. and Canada may be passed on to the appropriate U, V or W docket area person or RMW if help in assessing foreign credentials is needed. Be selective- don't pass on a case unless you are sure the applicant is competitive or has some unusual attributes.

- A faculty readings memorandum will be distributed later regarding specific procedures.

- Supplemental music/art/dance/academic materials of clearly competitive candidates with an unusually strong talent may be assessed through a supplementary process - through Slideroom (for music and dance) or through the faculty read process (for art or academic work). Handling of this material will be addressed through memoranda over the course of the fall.

**JA4603**

CONFIDENTIAL                                                                                   HARV00098244

## IV. OTHER ITEMS

- Slate is made up of data downloaded from the application and supplemental forms. We currently do not have the ability to enter all the information by hand for those applicants who do not submit their forms on-line. However, the data entry staff will enter the most critical bio/demo information as they have in the past. This means that the dockets will be correct, but the summary sheets for these applicants will be primarily blank. You should double-check the data that is important - i.e. parent education, ethnicity, aid status, etc. - basically every field that's on the summary sheet. About 1% of all our applicants will fall into this category.

- <u>Acknowledgments to guidance counselors, teachers, and others</u>: The area person may occasionally feel it worthwhile to acknowledge unusually helpful TRs and SSRs by writing a note to the author. The note should acknowledge that the candidate may or may not be admitted. **Supplementary letters of recommendation may have already been acknowledged with a card or letter, but if not, particularly with recommenders who are alumni or others about whom Harvard might be concerned, you should call the letter to the attention of MEM or WRF and an acknowledgment will be sent. This is important!**

- <u>Support Materials:</u> ALL manually submitted support material should be dropped into the appropriate basket in the mailroom for sorting and scanning.

- <u>Misfiled and Missing materials</u>: If a teacher report, school report or any other material that would be helpful to a competitive candidate is missing, first readers should request a copy be re-sent. Files should be sent on to other readers unless the missing pieces are crucial. In such cases, first readers should hold onto the file by routing the file to the "Area Person Follow Up" bin. Detailed instructions on how to add new materials to an applicant's file can be found in the "Documentation" tab of the Slate welcome page.

- <u>File items that require attention</u>: Unanswered letters should be handled by first readers where appropriate or others including MEM or WRF.


## V. SCANNING AND INDEXING

There is a basket in the mailroom to collect and sort hard-copy documents received. The forms collected in these baskets should have content that is *specific* to the admission decision of the applicant and are marked as such - for example, mailed applications or supplements, letters of support, teacher reports, Harvard evaluation, (coach, arts, music, Harvard faculty), midyear reports, SSR's etc. We will scan almost everything. If that is not possible, an "oversized support" form will be scanned and added to the file to let you know there is material sitting in the bookcase in Conference Room 5.

{ PAGE }

**JA4604**

CONFIDENTIAL                                                                 HARV00098245

Relevant emails to officers from applicants or about an applicant should be saved as a PDF file and indexed directly into the applicant file by the officer. To do so, go into the student record in Slate select the current round tab and scroll down to the "Materials" header. Click to add new material and make the appropriate selection from the drop-down menu. If you receive materials both electronically and in paper, you do not need to have the paper material scanned.

Documents displayed in the Reader are named by the document type that follows the menu down the left side of the Slate e-reader.
- Application (and supplement)
- SSR
- TRs
- Interviews
- Additional academic (additional transcripts, etc.)
- Midyear
- Final Report (potentially greyed out until admitted)
- Ratings Forms (includes IRFs)
- Miscellaneous (notes from family/friends, alums, correspondence, noting of oversized support, etc.)
- Waitlist
- Previous App
- Portfolio (NOTE: a tab in Slate we do not use at this time).

**JA4605**

CONFIDENTIAL                                    HARV00098246

TRIAL EXHIBIT

**P741**

SFFA v. Harvard

Message

| | |
|---|---|
| **From**: | McGrath, Marlyn E. [/O=EXCHANGELABS/OU=EXCHANGE ADMINISTRATIVE GROUP (FYDIBOHF23SPDLT)/CN=RECIPIENTS/CN=EBE4F7EB9F69460199E54E5CDF63552C-MMCG] |
| **Sent**: | 9/12/2018 7:24:54 PM |
| **To**: | Mascolo, Christine Collette [/o=ExchangeLabs/ou=Exchange Administrative Group (FYDIBOHF23SPDLT)/cn=Recipients/cn=c61c8c86863f4a31b11d8b770041b093-mascolo] |
| **CC**: | Fitzsimmons, William R. [/o=ExchangeLabs/ou=Exchange Administrative Group (FYDIBOHF23SPDLT)/cn=Recipients/cn=7c9507805d49473598925d032af30d42-User_e3990d]; Gershengorn, Ara [/o=ExchangeLabs/ou=Exchange Administrative Group (FYDIBOHF23SPDLT)/cn=Recipients/cn=9a0cb8cff09f4879bfb563d076abc882-abg290] |
| **Subject**: | Re: Reading instructions |

Thank you!

Sent from my iPhone

On Sep 12, 2018, at 2:33 PM, Mascolo, Christine Collette <mascolo@fas.harvard.edu> wrote:

Hi everyone,
Input from all previous drafts is captured in this document. The only new line everyone should look at is on page 5, in red.
Thank you,
Christine

**JA4606**

CONFIDENTIAL

HARV00098275



TRIAL EXHIBIT

**P749**

SFFA v. Harvard

## Reading Procedures - Class of 2023

### I.   SUMMARY SHEET APPLICATION DATA

The Summary Sheet captures information as supplied on the application and can be updated as new information is added.  Late information can change the likelihood of admission and updates can be provided later for those initially considered less competitive. If any information is **missing** or **incorrect** for competitive candidates, changes should be made on the First Reader Rating Form and noted with prose in the reader comments or "Notes for Summary Sheet" box. This prose will feed onto the Summary Sheet when the rating form is submitted.

<u>One exception</u>: School code changes are NOT made on the First Reader Rating Form; see instructions below on how to do this.

**PLEASE NOTE**:  The accuracy of our citizenship coding is CRUCIAL.  Miscoding affects many of the important statistics we are required to compile, and we need to keep careful track of who needs a visa to study in the United States.

- **SCHOOL CODE**:  If an applicant is coded to the wrong school, please use the Admin Problems update form and route this to the Admin Problems bin immediately so that the operations team can ensure that the interview is reassigned to the appropriate club and group.
- **GENDER**:  Occasionally the gender designation reported on the application is coded incorrectly in our system.  Such a coding error should be corrected by submitting the Admin Problems form and routing the file to the Admin Problems bin.
- **RACE/ETHNICITY**: We report exactly what the applicant reports as ethnicity on the application.  The ethnic codes on the Summary Sheet will come from the demographic fields the candidate checked on the application. **Note that foreign citizens are listed as such. If they opted to check an identifying ethnic code it will appear but is not used for statistics and reporting.**

- **CITIZENSHIP CODE / COUNTRY OF CITIZENSHIP**:  There are four options on the application that can be checked: (1) U.S. Citizenship, (2) U.S. Dual Citizenship, (3) U.S. permanent resident and (4) "Other" or foreign citizen.

<u>The applicant holds only American citizenship</u>:

*APP*: Citizenship status will be "US Citizen or US National" and no other country of citizenship will be listed.

*SUMMARY SHEET*: Should read "Citizenship:  United States"

<u>The applicant is a dual U.S. citizen</u> (a citizen of both the U.S. and another country).

*APP*: Citizenship status will be "Dual US Citizen"-Other citizenships will show a country (e.g. Sweden)

*SUMMARY SHEET*:  Should read "Citizenship:  United States/<other country>"

<u>The applicant is a U.S. Permanent Resident</u>.

1

**JA4607**

CONFIDENTIAL

HARV00098286

*APP*: Citizenship status will be "U.S. Permanent Resident or Refugee" and Other Citizenships will list one or more countries checked with another country listed.

*SUMMARY SHEET*:  Should read "Citizenship:  PR / <other country>"

*Caveat*:  If an applicant has checked the U.S. Permanent Resident box but notes that his or her application for permanent residency (or "green card") is <u>pending</u>, that applicant should be recoded as "Other citizenship."  Request this change by using the Admin Problems update form. We must prepare an I-20 form if the applicant is admitted and the application for residency is still pending, and the citizenship code is the only way we know to do this.

<u>The applicant is a foreign citizen</u>:

*APP*: Citizenship status will be "Other (Non-US)".  Other citizenship will show a country (e.g. Poland)

*SUMMARY SHEET*:  Should read "Citizenship:  <other country>"

- **LINEAGE:**  This flag appears if the applicant included Harvard College in the education field for at least one parent/guardian. The folder should be read by WRF ("4ᵗʰ" bin) following the normal reading process if appropriate or if another reading might be helpful.  Errors in coding should be noted with specific details about the error using the Admin Problems Form and routed to the Admin Problems bin.

- **ATHLETE**: Be sure the appropriate sport is listed as the first extracurricular activity. Changes can be made on the App Update tab on the Student Record. **DO NOT CHANGE ANY PRE-CODED ATHLETE.**

- **INDICATORS FOR ECONOMIC STATUS:** It has long been a priority for Harvard to seek talented students from all backgrounds, including those extraordinary individuals who are able to transcend economic disadvantages and achieve unusual academic distinction.  We utilize several indicators to understand the economic background of applicants. They are:
   - <u>Low Income Predictor (Low Inc on Summary Sheet)</u>: A value between 0 and 1 based on application information that predicts how likely a student is to be low income and have a $0 parent contribution.  The higher the value (closer to 1) the more likely the student will be low income.
   - <u>Pell Grant (P on Summary Sheet)</u>: An indication if the student is likely to qualify for a Pell Grant. This information will only be available if a student has submitted a CSS profile, allowing Financial Aid staff to estimate whether the student may be eligible to receive a Pell grant.
   - FH info ("Yes, Likely, Unlikely, No" on the summary sheet): After subcommittee meetings, if information is available, a simple indication of a student's possible eligibility for the HFAI Initiative may be present on the summary sheet.
   - FEE STATUS: An indicator of whether the applicant received a fee waiver for their application.

- **SCORES:** ~~Applicants will know by~~ checking their Applicant Status website whether their scores requirement has been fulfilled though not all scores will be listed.  They can report scores (which will be marked 'self-reported' in the student record) as they

2

CONFIDENTIAL

HARV00098287

like. You can check scores by looking under the "Scores" tab in each Student Record of an applicant. The Summary Sheet will reflect the highest verified or self-reported scores.

Matriculating students will be responsible for changing 'unofficial' to 'official,' which they can only do by getting scores sent by CEEB/ACT. Paper copies of scores sent via fax, email attachment or U.S. mail are not considered official.

*[handwritten annotations: "only" above "Matriculating"; "scores" above "official"; "only scores sent directly from the College Board or ETS are considered official."]*

We receive secure web downloads of scores, so we do not have to wait for the scores to be mailed to us. Applicants are told not to use 'rush reports,' but if they do, they will arrive electronically as soon as they are scored.

## II.    Reader Rating Forms

**When a file in in your queue, you will be able to select the "First Reader Form" or the "Chair Form" depending on the file's bin. The form includes the following fields:**

Reader ratings: All readers must code a preliminary overall rating and a profile (using the codes below and pluses and minuses) for all candidates. Writing prose comments is left to the discretion of the reader and should generally be done only for competitive candidates, those who might become competitive later, or those who might be of interest to the Committee.

For all categories, use "+" and "- "primarily in the 2 and 3 range to indicate relative strength. A rating of 2+ or 3+ is stronger and very different from a 2- or 3- respectively. Readers should take many factors into account as they assign ratings. E.g, students who have taken a strong academic program and/or present other positive evidence of academic achievement should receive higher academic ratings: an applicant with low 700 scores could be rated a 2- rather than a 3+ in some instances especially if there is academic strength in a particular field. However, readers should not be taking *[handwritten: "take"]* an applicant's race or ethnicity into account in making any of the ratings other than the Overall rating, as discussed further below.

Overall
1. Tops for admission: Exceptional – a clear admit with very strong objective and subjective support .
2. Very strong credentials but not an inevitable admit .
3. Solid contender: An applicant with good credentials and support .
3- Somewhat Neutral: Respectable credentials.
4. Neutral: Generally respectable credentials.
5. Negative: Credentials are generally below those of other candidates.

In assigning the Overall rating, readers may consider whether a student's background, including his or her race or ethnicity, may contribute to the educational benefits of diversity at Harvard College. The consideration of race or ethnicity may be considered **only** as one factor among many. In addition, the consideration of race or ethnicity should be in connection with the application's discussion of the effect an applicant's race or ethnicity has had on the applicant, not simply the fact alone that an applicant has identified as a member of a particular race or ethnicity.

3

**JA4609**

CONFIDENTIAL

HARV00098288

Academic

1. Summa potential. Genuine scholar; near-perfect scores and grades (in most cases combined with unusual creativity and possible evidence of original scholarship, often substantiated by our faculty.)
2. Magna potential. Excellent student with top grades and,
   SAT and SAT Subject tests: mid 700 scores and up
   a.

   b. 33+ ACT

3. Cum laude potential: Very good student with excellent grades and,
   a. SAT and SAT Subject tests: mid-600 through low-700 scores

   b. 29 to 32 ACT
4. Adequate preparation. Respectable grades and low-to mid-600 scores on SAT and subject tests or 26 to 29 ACT.
5. Marginal potential. Modest grades and 500 scores on SAT and subject tests (25 and below ACT).

Extracurricular, Community Employment, Family Commitments

1. Unusual strength in one or more areas. Possible national-level achievement or professional experience. A potential major contributor at Harvard. Truly unusual achievement.
2. Strong secondary school contribution in one or more areas such as class president, newspaper editor, concertmaster etc. and/or significant involvement in organizations outside of school. Possible local or regional recognition; major accomplishment(s) that have had an impact outside of the classroom. Can include significant term-time work or family responsibilities coupled with extracurriculars.
3. Solid participation but without special distinction. (Upgrade 3+ to 2- in some cases if the e/c is particularly extensive and substantive.)
4. Little or no participation.
5. Substantial activity outside of conventional EC participation such as family commitments, term-time work or a significant commute (Important: should be included with other e/c to boost the rating or left as a "5" if that is more representative of the student's commitment).
6 Special circumstances limit or prevent participation (e.g. a physical condition, gap year(s), compulsory service of some kind).

Athletic

1. Unusually strong prospect for varsity sports at Harvard, desired by Harvard coaches.
2. Strong secondary school and/or travel team contribution in one or more sports; leadership role(s) such as captain or co-captain; possible walk-on to a varsity team; potentially has an IRF of a 4 from a Harvard coach
3. Active participation, possible leadership role.
4. Little or no participation (this is not a negative).

4

**JA4610**

CONFIDENTIAL

HARV00098289

5. Substantial activity outside of conventional EC participation such as family commitments or term-time work (could be included with other e/c to boost the rating or left as a "5" if it is more representative of the student's commitment).
6. Physical condition or other special circumstances prevent significant activity.

<u>Personal</u>
The Personal rating should be an assessment made by the readers of what kind of effect the student might have on others at Harvard and beyond.  It should be based on an assessment of what kind of positive effect this person might have throughout his or her life based on what we have seen so far in the student's application materials.  This should include such considerations as what kind of contribution would the person make to the dining hall conversation, to study groups, and to society as a whole after graduation.  In assigning the personal rating, readers should consider information we receive from teachers, counselors, applicants, other recommenders, interviewers, and others as well as the applicant's essays, extracurricular activities, and other items in the application file—what the applicant shows us about him or herself and what the applicant has done or accomplished for others.  As noted above, though, an applicant's race or ethnicity should not be considered in assigning the personal rating.

1.  Rare personal appeal and character
2+ or 2 Extremely strong personal appeal and character
2-  Very strong personal appeal and character
3+  Above average personal appeal and character; positive
3.  Generally positive, perhaps somewhat neutral
3-  Slightly negative impression
4.  Distinctly poor impression; questionable or worrisome personal qualities

<u>School Support</u>
1. Strikingly unusual support. "The best ever," "one of the best in many years," truly over the top.
2. Very strong support. "One of the best" or "the best this year."
3+ Well above average, consistently positive
3. Generally positive, perhaps somewhat neutral or generic
3- Somewhat neutral or slightly negative.
4.  Negative or worrisome report.
6. For teacher reports: prose is not in the file.
8. Placeholder for teacher reports.
9. For secondary school report: transcript is in the file but there is no SSR prose.

<u>PLEASE NOTE</u>:  School support ratings for teacher one, teacher two and a counselor are mandatory ratings for competitive candidates. Teacher three and teacher four are optional, if applicable.

**BRIEF ANNOTATIONS FOR SUMMARY SHEET:**

You may choose to insert information about a case – a maximum of three lines – which will appear on the second page of the summary sheet at the top and on the printed docket (unlike

5

**JA4611**

CONFIDENTIAL                                                                                              HARV00098290

prose comments below). These notes should be informational only and not evaluative. They can aid in your preparation of cases. Examples could be: PE on grandmother, Harvard Book, or international credentials not easily captured elsewhere (A level est, Physics A, Math A, Lit A – etc.).

**PROSE COMMENTS:**
When making prose comments, first readers should note the important academic and extracurricular accomplishments that are particularly pertinent to the case. It is also helpful to reference teacher reports or other items that may be crucial to our evaluation. In addition to numerical ratings, readers should try to summarize the strengths and weaknesses of the folder in brief paragraphs or comments. <u>Avoid slang and jargon</u> and <u>REMEMBER - your comments may be open to public view later.</u>

**INTERVIEW PROFILE (IVP):** 
Below is the language for uniform implementation of the Interview Profile number (IVP) for use with all Schools and Scholarship Chairs. The IVP will serve as a guide for Chairs to know when our office needs the reports, and therefore how quickly they need to be assigned. All interviewers will be told that they should submit their interview report no later than two weeks after receiving the interview assignment.

1. An applicant for whom the committee needs more information to reach a decision - please have interview report in as soon as possible.
2. An applicant for whom more information would be very helpful during our deliberations - please have interview report in by the sub-committee deadline.
3. Please have interview report in by December 1 (EA) or March 1 (RA).
4. Based on the materials currently available, the committee needs no additional information at this time.

This language has been distributed to the S&S chairs via email and can also be found in the updated handbook and website instructions. (Please ask Bryce Gilfillian if you need help accessing the site). **Please have a conversation with your chairs to determine if you wish to use the IVP, and please make clear that this information should not be shared with other interviewers or applicants.** If your chairs have additional clerical or operational questions about the IVP, please direct them to email Bryce/alum assistant at SSinfo@fas.harvard.edu.

When reading, please input your IVP code on the First Reader Rating Form. You should input an IVP for all cases for clubs that use this system or if the coding could be helpful for your own interview tracking purposes. Continue to pass on the folder to your chair and/or code out to Committee Review bin.

- **FIRST-GEN:** First readers should check this box on the first reader rating form if the student is of the first generation in the family to graduate from a four-year higher education institution. If first readers do not, chairs should do so on the chair rating form.

- **STAFF DISADVANTAGED**
After reviewing the file, if the reader has evidence that the applicant may be from a modest economic background, please check "Yes" under Staff Disadvantaged on the Reader Rating Form. In the past, admitted students who has been identified as "Disadvantaged=Y" were found to be economically needy 78% of the time.

6

**JA4612**

HARV00098291

- **FACULTY, STAFF**:  Code <u>ONLY</u> children of professors at <u>the Faculty of Arts and Sciences</u> as an "F"; children of faculty from other parts of the University as well as children of administrative staff should be coded "S".  If an update is needed, use the First Reader rating form. **Please be careful to apply faculty and staff coding where appropriate as we need to keep accurate statistics on these applicants.  All "F" and "S" folders should be routed to the "4th bin" (WRF) after the normal reading process has been completed.**

- **ACCESSIBLE EDUCATION OFFICE (AEO) REFERRALS**: Code all applicants who may require special accommodations due to disabilities or special needs with the AEO flag on the First Reader Rating Form.  We can then provide a list to assist the AEO and DOS in providing accommodations when appropriate. As you know, a student's disability may not be considered in connection with his or her application.

- **FYRE:**  Use this to indicate a student whom you think might benefit from the First Year Retreat and Experience (FYRE), a no cost pre-orientation program designed to introduce students to Harvard's resources and give them a solid foundation on which to begin their college careers.

**ASTAT**: If, after reviewing an application you feel that the student may be of interest to one of our athletic teams, but is not a recruited athlete, you can use this flag to indicate that this student could be a recruit for their particular sport. *Please use a "7" in these ~~its~~ cases.*

**GPA and GPA Scale**:
We must try to report an Academic Index to the IVY League for EVERY matriculant.
If grades are available, please report a GPA and GPA Scale for your strongest candidates.

The Academic Index is calculated using GPA and GPA Scale.  These will be converted automatically to the 20 to 80 scale in Slate.

Here are the rules according to the AI instructions provided by the Ivy League and sent to staff separately:

A. <u>ACADEMIC INDEX CALCULATIONS: CGS</u>

1. **GPAs generally:**  The secondary school GPA should be taken as presented on the secondary school transcript; when both unweighted and weighted  GPAs are presented, the unweighted GPA should be used. (If there is a question as to  whether the school is using an unweighted or 'what the A grade earns in a regular course.*not a complete sentence – check that new Ivy memo language is ok) Other  questions in providing the GPA are addressed in this section.

2. **GPA scales and conversions from Table II:** Table II, the "CGS General Conversion  Tables" should be used for the GPA scales shown (100-points, 11.0/12.0, 7.0, 6.0, 4.0, A-D) even if the transcript or secondary school profile provides a conversion to a Table II  scale.

7

**JA4613**

HARV00098292

- The "4.0 Weighted" scale applies to any 4.0 based GPA that is weighted. It should be used only when Unweighted GPA is not available.
- The" 4.0 Unweighted Scale" applies to any 4.0 based GPA that is unweighted.
- Note Table II includes a scale to use to convert International Baccalaureate GPAs to a CGS.

3. **Scales not provided on Table II:** Given the relatively small number of admitted and matriculated students for whom Table II scales are not provided, it is preferable not to create new scales if possible. In such cases, a GPA on a 4.0 scale should be calculated using the following formula, and a CGS then derived using the 4.0 scale on Table II: HSGPA/HSGPA scale = "x"/4.0, where "x" becomes the value from which the CGS is derived. For example, if on a 5.0 scale a student has a 4.8 GPA (whether the scale's top grade is A or A+), the formula is 4.8/5.0 = x/4.0, x-3.84 and the CGS = 73.

4. **Calculating GPA when not provided by the secondary school:** When the secondary school does not calculate/report a GPA, the institution should calculate an unweighted GPA based on the secondary school's grading scale, using all courses for which grades and credit hours are provided, and weighting semester grades as one-half full-year grades.
   NOTE: the following grade scale is used to convert grades on a non-traditional scale to a 4.0 Unweighted Scale: HH- 4.0, H- 3.5, HP- 2.5, P- 1.5, U- 0

5. **GPA period:** GPA data always should be for more than one year, including 10th and 11th grades, 9th grade when available, and official trimester or semester grades (as opposed to term grades) in the student's current year if available at the time the athlete's decision is made. If "official" grades from the current year are available but not counted in the school's cumulative GPA, they should be added to the cumulative GPA and weighted appropriately: e.g., grades for first semester or trimester of senior year would be weighted as one-half or one-third year.

6. **GPAs from multiple schools and repeat years:** When a student has attended multiple secondary schools (including a post-graduate year), all GPAs provided by the schools should be used to the extent possible and weighted as in #5 above. If the institution believes this result is not logical and fair, it should describe what approach it believes is better, subject to the Admissions Committee's agreement.

7. **Transfer students:** CGS should be calculated using 50% secondary school GPA and 50% college GPA.

**JA4614**

CONFIDENTIAL

HARV00098293

B. <u>INTERNATIONAL-SYSTEM  GPA  CALCULATIONS</u>

1.  **<u>Generally</u>:** Each school should calculate GPAs from international schools using the  attached Appendix of International Calculations. If an international country is not listed   on the Appendix, we should calculate an AI as it seems most appropriate. (In this  circumstance, we should default to the Committee, using the NCAA International  Standards as a reference point, but not necessarily a policy.)

2.  **<u>Canadian systems</u>:** Table IIA, for establishing value of CGS of Canadian Students should be used  to determine CGS based on the Province of the secondary school.  Provinces where a passing grade is 50% use the first column on Table II A (Alberta, British Columbia, Manitoba, Newfoundland, NW Territories, Nova Scotia, Nunavut, Ontario, Prince Edward Island, Saskatchawan, Yukon); Provinces where a passing grade is 60% use the second column on Table IIA (New Brunswick, Quebec).

1.  <u>British systems</u>:

Count all GCSE (= O Level), AS and A level results in order to calculate a GPA:  A* (same as A+) = 4.3

A = 4:0

B = 3.0

C = 2.0

D = 1.0

- If the applicant is taking a gap year, actual A-Level results should be used.
- A Level scores are given double the weight of AS and GCSE scores.
- Internal grades are usually not available, and should <u>not</u> be used if they are.
- Predicted A-Level scores should be used when available.
- All courses should be included in calculating the GPA, including physical  education courses if the student receives a grade and credit for the course.

2.  <u>Pre-U</u>:

**The scale for Pre-U were decided on as follows, for Principal Subjects only:**

D1 = A+/4.3

D2 = A+/4.3

D3 = A/4.0

M1 = B/3.0

M2 – B/3.0

9

CONFIDENTIAL

HARV00098294

M3 = B-/2.7
P1 – C-/1.7
P2 – D/1.0
P3 – D-/0.7

5. International Baccalaureate systems:

Average grades from the last two years of the IB program are preferred to calculate a GPA:
7 = A+ = 4.3
6 = A = 4.0
5 = B = 3.0
4 = C = 2.0
3 = D = 1.0

- If the applicant is still in school, use one year for Early applicants and one year plus one term for Regular applicants.
- If the applicant is taking a gap year, actual two-year IB results are used.
- Use IB predicted grades if available, and only if not available use internal grades.
- For IB schools in the U.S., use the course values given on the transcript; for IB schools outside the U.S., double the weight for Higher Level courses (as opposed to the Subsidiary Level courses).
- All Higher Level/Subsidiary Level courses will be counted from international schools.
- Scales: When IB predictions give split results, use the average of the split (i.e., 5/6 is given, use 5.5 for calculation).

6. **Notes on Selected Countries (added fall 2010):**

Australia – Require schools to provide a transcript of some sort, but if all else fails and they give the state final exam result or prediction (ex: UAI for NSW, OP for Queensland, usually out of 99.95) use that.

New Zealand –The scale for NZ is as follows…but ONLY for courses in which there is the possibility to get more than Achieved (Achieved/Not Achieved is basically Pass/Fail so we won't count those courses):
[E] Excellent = A/4.0
[M] Merit = B/3.0
[A] Achieved = C/2.0
[N] Not Achieved = F/0

Singapore – for schools using standard Junior College grading conventions – Include H1(General Paper, Project, etc.) & H2 predictions on a 4.0 scale to calculate GPA. Double weight for H2 marks.

For H3, the scale is:

10

**JA4616**

CONFIDENTIAL

HARV00098295

Distinction = A/4.0
Merit = B/3.0
Pass – C/2.0
Double H3s as well

If provided, include O Level/GCSE marks in calculation of GPA with a single weight like we  do with the British System.

General notes – For all national curriculums, the general rule of thumb is to include all courses as part of the GPA calculations.

7. Additional International Scales for Relevant Countries

For GPA scales of other countries Table III has been sent separately and is include in the Ivy League Academic Index Memo. Please see CGM if you need a copy.

11

**JA4617**

CONFIDENTIAL

HARV00098296

| TABLE II: For establishing value of CGS | | | | | | | |
|---|---|---|---|---|---|---|---|
| Revised May 2015/UPDATED AUGUST 2016 | | | | | | | |
| Percentage Average | International Baccalaureate | 11.0/12.0 Scale *USE FOR WEIGHTED AND UNWEIGHTED GPAS WHERE A= 11.0 AND A+ >11.0* | 5.0/6.0 Scale *USE FOR WEIGHTED AND UNWEIGHTED GPAS WHERE A= 5.0 AND A+ >5.0* | 4.0 Scale WEIGHTED *USE ONLY WHEN UNWEIGHTED NOT AVAILABLE* | Letter Grade Equivalent to 4.0 | 4.0 Scale UNWEIGHTED | CGS |
| 98.00 and above | 7 | 12.00 and above | 6.00 and above | 4.30 and above | A+ | 4.0 | 80 |
| 97.00 - 97.99 | 6/7 | 11.70 - 11.99 | 5.70 - 5.99 | 4.20 - 4.29 | | 3.91 - 3.99 | 79 |
| 96.00 - 96.99 | | 11.40 - 11.69 | 5.40 - 5.69 | 4.10 - 4.19 | | 3.81 - 3.90 | 78 |
| 95.00 - 95.99 | 6 | 11.00 - 11.39 | 5.00 - 5.39 | 4.00 - 4.09 | A | 3.72 - 3.80 | 77 |
| 94.00 - 94.99 | | 10.70 - 10.99 | 4.90 - 4.99 | 3.90 - 3.99 | | 3.63 - 3.71 | 75 |
| 93.00 - 93.99 | | 10.40 - 10.69 | 4.80 - 4.89 | 3.80 - 3.89 | | 3.53 - 3.62 | 73 |
| 92.00 - 92.99 | 5/6 | 10.00 - 10.39 | 4.70 - 4.79 | 3.70 - 3.79 | A- | 3.44 - 3.52 | 71 |
| 91.00 - 91.99 | | 9.80 - 9.99 | 4.60 - 4.69 | 3.60 - 3.69 | | 3.35 - 3.43 | 70 |
| 90.00 - 90.99 | | 9.50 - 9.79 | 4.50 - 4.59 | 3.50 - 3.59 | | 3.26 - 3.34 | 69 |
| 89.00 - 89.99 | | 9.30 - 9.49 | 4.40 - 4.49 | 3.40 - 3.49 | | 3.16 - 3.25 | 68 |
| 88.00 - 88.99 | | 9.00 - 9.29 | 4.30 - 4.39 | 3.30 - 3.39 | B+ | 3.07 - 3.15 | 67 |
| 87.00 - 87.99 | | 8.70 - 8.99 | 4.20 - 4.29 | 3.20 - 3.29 | | 2.98 - 3.06 | 66 |
| 86.00 - 86.99 | | 8.40 - 8.69 | 4.10 - 4.19 | 3.10 - 3.19 | | 2.88 - 2.97 | 65 |
| 85.00 - 85.99 | 5 | 8.00 - 8.39 | 4.00 - 4.09 | 3.00 - 3.09 | B | 2.79 - 2.87 | 63 |
| 84.00 - 84.99 | | 7.70 - 7.99 | 3.90 - 3.99 | 2.90 - 2.99 | | 2.70 - 2.78 | 61 |
| 83.00 - 83.99 | | 7.40 - 7.69 | 3.80 - 3.89 | 2.80 - 2.89 | | 2.61 - 2.69 | 59 |
| 82.00 - 82.99 | 4/5 | 7.00 - 7.39 | 3.70 - 3.79 | 2.70 - 2.79 | B- | 2.51 - 2.60 | 57 |
| 81.00 - 81.99 | | 6.75 - 6.99 | 3.60 - 3.69 | 2.60 - 2.69 | | 2.42 - 2.50 | 55 |
| 80.00 - 80.99 | | 6.50 - 6.74 | 3.50 - 3.59 | 2.50 - 2.59 | | 2.33 - 2.41 | 53 |
| 79.00 - 79.99 | | 6.25 - 6.49 | 3.40 - 3.49 | 2.40 - 2.49 | | 2.23 - 2.32 | 51 |
| 78.00 - 78.99 | | 6.00 - 6.24 | 3.30 - 3.39 | 2.30 - 2.39 | C+ | 2.14 - 2.22 | 49 |
| 77.00 - 77.99 | | 5.70 - 5.99 | 3.20 - 3.29 | 2.20 - 2.29 | | 2.05 - 2.13 | 48 |
| 76.00 - 76.99 | | 5.40 - 5.69 | 3.10 - 3.19 | 2.10 - 2.19 | | 1.95 - 2.04 | 47 |
| 75.00 - 75.99 | 4 | 5.00 - 5.39 | 3.00 - 3.09 | 2.00 - 2.09 | C | 1.86 - 1.94 | 46 |
| 74.00 - 74.99 | | 4.70 - 4.99 | 2.90 - 2.99 | 1.90 - 1.99 | | 1.77 - 1.85 | 45 |
| 73.00 - 73.99 | | 4.40 - 4.69 | 2.80 - 2.89 | 1.80 - 1.89 | | 1.67 - 1.76 | 44 |
| 72.00 - 72.99 | 3/4 | 4.00 - 4.39 | 2.70 - 2.79 | 1.70 - 1.79 | C- | 1.58 - 1.66 | 42 |
| 71.00 - 71.99 | | 3.5 - 3.99 | 2.60 - 2.69 | 1.60 - 1.69 | | 1.49 - 1.57 | 40 |
| 70.00 - 70.99 | | 2.5 - 3.49 | 2.50 - 2.59 | 1.50 - 1.59 | D+ | 1.40 - 1.56 | 38 |
| Below 70.00 | 3 | Below 2.5 | Below 2.5 | Below 1.5 | D | Below 1.4 | 35 |

12

**JA4618**

 HARV00098297

**TABLE IIA: For establishing value of CGS of Canadian Students**

**Revised May 2015, Effective for Class Entering Fall 2017**

| United States 100 Point Scale | Letter Grade Equivalent | Canada Where passing grade is 50% [1] | Canada Where passing grade is 60% [2] | CGS |
|---|---|---|---|---|
| 98.00 and above | A+ | 90.00 and above | 88.00 and above | 80 |
| 97.00 --- 97.99 | | 88.00 --- 89.99 | 87.00 --- 87.99 | 79 |
| 96.00 --- 96.99 | | 86.00 --- 87.99 | 86.00 --- 86.99 | 78 |
| 95.00 --- 95.99 | A | 84.00 --- 85.99 | 85.00 --- 85.99 | 77 |
| 94.00 --- 94.99 | | 82.00 --- 83.99 | 84.00 --- 84.99 | 75 |
| 93.00 --- 93.99 | | 80.00 --- 81.99 | 83.00 --- 83.99 | 73 |
| 92.00 --- 92.99 | A--- | 79.00 --- 79.99 | 82.00 --- 82.99 | 71 |
| 91.00 --- 91.99 | | 78.00 --- 78.99 | 81.00 --- 81.99 | 70 |
| 90.00 --- 90.99 | | 77.00 --- 77.99 | 80.00 --- 80.99 | 69 |
| 89.00 --- 89.99 | | 76.00 --- 76.99 | 79.00 --- 79.99 | 68 |
| 88.00 --- 88.99 | B+ | 75.00 --- 75.99 | 78.00 --- 78.99 | 67 |
| 87.00 --- 87.99 | | 74.00 --- 74.99 | 77.00 --- 77.99 | 66 |
| 86.00 --- 86.99 | | 73.00 --- 73.99 | 76.00 --- 76.99 | 65 |
| 85.00 --- 85.99 | B | 72.00 --- 72.99 | 75.00 --- 75.99 | 63 |
| 84.00 --- 84.99 | | 71.00 --- 71.99 | 74.00 --- 74.99 | 61 |
| 83.00 --- 83.99 | | 70.00 --- 70.99 | 73.00 --- 73.99 | 59 |
| 82.00 --- 82.99 | B--- | 69.00 --- 69.99 | 72.00 --- 72.99 | 57 |
| 81.00 --- 81.99 | | 68.00 --- 68.99 | 71.00 --- 71.99 | 55 |
| 80.00 --- 80.99 | | 67.00 --- 67.99 | 70.00 --- 70.99 | 53 |
| 79.00 --- 79.99 | | 66.00 --- 66.99 | 69.00 --- 69.99 | 51 |
| 78.00 --- 78.99 | C+ | 65.00 --- 65.99 | 68.00 --- 68.99 | 49 |
| 77.00 --- 77.99 | | 64.00 --- 64.99 | 67.00 --- 67.99 | 48 |
| 76.00 --- 76.99 | | 63.00 --- 63.99 | 66.00 --- 66.99 | 47 |
| 75.00 --- 75.99 | C | 62.00 --- 62.99 | 65.00 --- 65.99 | 46 |
| 74.00 --- 74.99 | | 61.00 --- 61.99 | 64.00 --- 64.99 | 45 |
| 73.00 --- 73.99 | | 60.00 --- 60.99 | 63.00 --- 63.99 | 44 |
| 72.00 --- 72.99 | C--- | Below 60.00 | 62.00 --- 62.99 | 42 |
| 71.00 --- 71.99 | | | 61.00 --- 61.99 | 40 |
| 70.00 --- 70.99 | D+ | | 60.00 --- 60.99 | 38 |
| Below 70.00 | D | | Below 60.00 | 35 |

[1] Passing grade is 50% for the following Provinces: Alberta, British Columbia, Manitoba, Newfoundland, NW Territories, Nova Scotia, Nunavut, Ontario, Prince Edward Island, Saskatchawan, Yukon

[2] Passing grade is 60% for the following Provinces: New Brunswick, Quebec

13

**JA4619**

CONFIDENTIAL

HARV00098298

III.   **FILE ROUTING**

**INADVERTENTLY CLEARED FILES**: Occasionally, files will be mistakenly "cleared" (considered complete) and placed in your first read bin. Open the Admin Problems Form, note the issue and to which bin the folder should be routed when the problem is solved. Then route the file to the Admin Problems bin.

**FILES SHOULD BE READ AND PASSED IN A TIMELY FASHION**: Readers should take care not to allow files to pile up. First readers need to read files from all assigned dockets as they clear, not just those whose subcommittee meets first. However, because all files will clear regardless of round, readers should read early action files first, as soon as possible. Regular action files can generally wait until after December 1st but you can read them prior to that if you are able to. This is important, and we will monitor reading progress centrally. If you need help keeping up for whatever reason, let us know immediately. Readers should code out files to the Committee Review bin or pass to the Chair. First-time readers will use the Optional Additional bin for their first 50-100 files during Early Action. Those files will be redistributed to experiences readers by the operations staff.

**SECOND READERS (OPTIONAL ADDITIONAL READER)**: Except for new readers (for whom special routing instructions are provided below), second readings should be used only in the rarest of instances:

   A)  If three readings are needed for a complex case.

   B)  If the case raises issues of policy.

   C)  If the case would be greatly helped by a second reading from the former area person or someone with special knowledge of an area or type of case.

No second reader will ordinarily be assigned. If you want/need a second reading, consult the enclosed docket assignment sheet to identify other readers on your docket. Try not to burden one person inordinately. You should choose "Optional Additional Reader" as the next bin and enter the name of that person which will place the file in their queue. You can add a note for the second reader such as "Please give V docket context" You should also send an email to special second readers to alert them to your requested reading. If you have received a file as a second read for a new reader, please read it as quickly as possible and put it back in the queue of the new reader.

**FIRST-TIME READERS**: New readers should have their first fifty to one hundred Early Action files passed to the Optional Additional Reader bin or to the chair bin, based on relative strength. Some chairs may wish to use different approaches for first year readers.

**GENERAL ROUTING RULES:**

14

**JA4620**

CONFIDENTIAL

HARV00098299

1) A file should be passed <u>directly</u> to the chair:

- If the first reader rates a file a "2-" or better (i.e. a case the first reader thinks has a very good chance of being admitted)

- If the case will likely (or almost certainly) be discussed in Committee.

- If you want the docket chair's opinion or want simply to have the docket chair informed about the case.

   **If the first reader has a significant degree of uncertainty about how to proceed with the case, he or she should consult the docket chair.**

2) A case rated a 3+ may be passed to the chair or routed straight to the Committee Review bin. The first reader should consider carefully the likelihood that additional anticipated information (e.g., a superior music rating) will make the case more compelling, in which case the folder should be passed to the chair. If there is no further information anticipated and the case is qualitatively a 3+ (a strong case but like many others), an experienced first reader does not need to pass it on.

3) Typically, a case rated a 3 or lower with no particular attribute that would make it competitive can be routed directly to the Committee Review bin. Obviously late information or school context could change this initial evaluation. The first reader, as an advocate, must be doubly certain to check all late information that might make a difference to the case prior to the Committee meetings. This is particularly important for candidates whose outstanding personal qualities become evident once we have the alumni/ae interview.

Readers new to a docket should discuss with the docket chair any special guidelines about which files should be passed on and which files should not.

**BINS**
In Slate, various "bins" are used to track an application file's progress through the application cycle. Bins are used for ease of day-to-day work - they do not represent final decisions. The layout of bins can be viewed in the Slate Reader using the Browse tab (Note: the "Freshman Only" preset filter in Reader displays all freshman applicants and previous admits in the current application period).

Each bin column represents a different phase of the application cycle, and generally, work flows from left to right:
- Pre-Review: Folders are incomplete, incorrectly coded, or withdrawn
- Reads: Folders are complete ("cleared") and ready for review by readers
- Committee: Folders are ready for discussion by committee

15

**JA4621**

CONFIDENTIAL

HARV00098300

- Working Decision: Folders have been discussed by the committee and a decision has been recommended
- Final Decision: Decisions have been checked and confirmed; ready for decision release
**(Note: Files should only be moved to final decision bins on Decision Day by the Slate team. Prior to Decision Day, files should remain in Working Decision bins.**

## CHANGING BIN ASSIGNMENTS

Readers normally change a folder's bin assignment during the reading process using the Review Form in the Slate Reader. Occasionally it will be necessary to change a folder's bin assignment after the Review Form has been submitted. In these cases, the bin assignment can be changed in the Student Record. To edit a bin assignment in the Student Record, click the "Edit Application Details" tab on the right, and select the desired bin from the Bin dropdown menu.

## CLEARING INCOMPLETES

**Readers should be sure to check the "Not Cleared" bin before each of their subcommittees~~/~~ _deadlines_ and then periodically before decisions are final to check for any cases that could be read with the materials in the file. Sometimes, transcripts may be in various tabs aside from the "SSR" tab. Readers should use their discretion or consult with their chairs but in general, a file that has an application and a transcript can be read and evaluated.**

## SPECIAL READINGS

- WRF should see cases that could be particularly sensitive or controversial or that raise issues of fundamental policy.  When in doubt, send the file on by routing to the 4th reader bin.

- Folders of <u>competitive</u> candidates who attended secondary school outside the U.S. and Canada may be passed on to the appropriate U, V or W docket area person or RMW if help in assessing foreign credentials is needed. <u>Be selective</u>- don't pass on a case unless you are sure the applicant is competitive or has some <u>unusual</u> attributes.

- A faculty readings memorandum will be distributed later regarding specific procedures.

- Supplemental music/art/dance/academic materials of <u>clearly competitive</u> candidates with an unusually strong talent may be assessed through a supplementary process - through Slideroom (for music and dance) or through the faculty read process (for art or academic work). Handling of this material will be addressed through memoranda over the course of the fall.

## IV. OTHER ITEMS

16

**JA4622**

CONFIDENTIAL

HARV00098301

*bold?*

- Slate is made up of data downloaded from the application and supplemental forms. We currently do not have the ability to enter all the information by hand for those applicants who do not submit their forms on-line. However, the data entry staff will enter the most critical bio/demo information as they have in the past. This means that the dockets will be correct, but the summary sheets for these applicants will be primarily blank. You should double-check the data that is important - i.e. parent education, ethnicity, aid status, etc. - basically every field that's on the summary sheet. About 1% of all our applicants will fall into this category.

- Acknowledgments to guidance counselors, teachers, and others: The area person may occasionally feel it worthwhile to acknowledge unusually helpful TRs and SSRs by writing a note to the author. The note should acknowledge that the candidate may or may not be admitted. Supplementary letters of recommendation may have already been acknowledged with a card or letter, but if not, particularly with recommenders who are alumni or others about whom Harvard might be concerned, you should call the letter to the attention of MEM or WRF and an acknowledgment will be sent. This is important!

- Support Materials: ALL manually submitted support material should be dropped into the appropriate basket in the mailroom for sorting and scanning.

- Misfiled and Missing materials: If a teacher report, school report or any other material that would be helpful to a competitive candidate is missing, first readers should request a copy be re-sent. Files should be sent on to other readers unless the missing pieces are crucial. In such cases, first readers should hold onto the file by routing the file to the "Area Person Follow Up" bin. Detailed instructions on how to add new materials to an applicant's file can be found in the "Documentation" tab of the Slate welcome page.

*not addressed*

- File items that require attention: Unanswered letters should be handled by first readers where appropriate or others including MEM or WRF.

## V. SCANNING AND INDEXING

There is a basket in the mailroom to collect and sort hard-copy documents received. The forms collected in these baskets should have content that is *specific* to the admission decision of the applicant and are marked as such—for example, mailed applications or supplements, letters of support, teacher reports, Harvard evaluation, (coach, arts, music, Harvard faculty), midyear reports, SSR's etc. We will scan almost everything. If that's not possible, an "oversized support" form will be scanned and added to the file to let you know there is material sitting in the bookcase in Conference Room 5.
Relevant emails to officers from applicants or about an applicant should be saved as a PDF file and indexed directly into the applicant file by the officer. To do so, go into the student record in

17

**JA4623**

                    HARV00098302

Slate select the current round tab and scroll down to the "Materials" header. Click to add new material and make the appropriate selection from the drop-down menu. If you receive materials both electronically and in paper, you do not need to have the paper material scanned.

Documents displayed in the Reader are named by the document type that follows the menu down the left side of the Slate e-reader.
- Application (and supplement)
- SSR
- TRs
- Interviews
- Additional academic (additional transcripts, etc)
- Midyear
- Final Report (potentially greyed out until admitted)
- Ratings Forms (includes IRFs)
- Miscellaneous (notes from family/friends, alums, correspondence, noting of oversized support, etc)
- Waitlist
- Previous App
- Portfolio (NOTE: a tab in Slate we do not use at this time).

18

**JA4624**

TRIAL EXHIBIT

P755

SFFA v. Harvard

Message

| | |
|---|---|
| **From:** | McGrath, Marlyn E. [/O=EXCHANGELABS/OU=EXCHANGE ADMINISTRATIVE GROUP (FYDIBOHF23SPDLT)/CN=RECIPIENTS/CN=EBE4F7EB9F69460199E54E5CDF63552C-MMCG] |
| **Sent:** | 8/13/2018 5:07:27 PM |
| **To:** | Mascolo, Christine Collette [/o=ExchangeLabs/ou=Exchange Administrative Group (FYDIBOHF23SPDLT)/cn=Recipients/cn=c61c8c86863f4a31b11d8b770041b093-mascolo] |
| **CC:** | Fitzsimmons, William R. [/o=ExchangeLabs/ou=Exchange Administrative Group (FYDIBOHF23SPDLT)/cn=Recipients/cn=7c9507805d49473598925d032af30d42-User_e3990d] |
| **Subject:** | Re: Proposed changes to reading instructions |

Sounds just right to me. Thanks you— and for checking with Ara.


On Aug 13, 2018, at 10:53 AM, Mascolo, Christine Collette <mascolo@fas.harvard.edu> wrote:

Just FYI that there may be more updates to the reading instructions █████████████ I will work with the group that considered PQS during the retreat and make some recommendations I will share with you both.

**From:** Gershengorn, Ara
**Sent:** Friday, August 10, 2018 1:56 PM
**To:** Mascolo, Christine Collette
**Subject:** RE: Proposed changes to reading instructions

████████████████████████████████████████████████████

Best,
Ara

**From:** Mascolo, Christine Collette
**Sent:** Friday, August 10, 2018 1:40 PM
**To:** Gershengorn, Ara <ara_gershengorn@harvard.edu>
**Subject:** RE: Proposed changes to reading instructions
Thanks so much Ara.

████████████████████████████████████████████████████

Thanks again and I hope you have a great weekend!
Christine

**JA4625**

CONFIDENTIAL

**From:** Gershengorn, Ara
**Sent:** Friday, August 10, 2018 1:18 PM
**To:** Mascolo, Christine Collette
**Subject:** RE: Proposed changes to reading instructions

Hi Christine,

Best,
Ara

**From:** Mascolo, Christine Collette
**Sent:** Wednesday, August 08, 2018 4:15 PM
**To:** Gershengorn, Ara <ara_gershengorn@harvard.edu>
**Subject:** Proposed changes to reading instructions

Hi Ara,

Thanks very much,
Christine

**JA4626**

CONFIDENTIAL                                                          HARV00098353



TRIAL EXHIBIT

**P767**

SFFA v. Harvard

Message

| | |
|---|---|
| **From**: | McGrath, Marlyn E. [/O=EXCHANGELABS/OU=EXCHANGE ADMINISTRATIVE GROUP (FYDIBOHF23SPDLT)/CN=RECIPIENTS/CN=EBE4F7EB9F69460199E54E5CDF63552C-MMCG] |
| **Sent**: | 9/7/2018 7:26:47 PM |
| **To**: | Mascolo, Christine Collette [/o=ExchangeLabs/ou=Exchange Administrative Group (FYDIBOHF23SPDLT)/cn=Recipients/cn=c61c8c86863f4a31b11d8b770041b093-mascolo] |
| **CC**: | Fitzsimmons, William R. [/o=ExchangeLabs/ou=Exchange Administrative Group (FYDIBOHF23SPDLT)/cn=Recipients/cn=7c9507805d49473598925d032af30d42-User_e3990d]; Balian, Andrea [/o=ExchangeLabs/ou=Exchange Administrative Group (FYDIBOHF23SPDLT)/cn=Recipients/cn=c7673844b4cc4dbd866edbdf53db2041-balian]; Pacholok, Olesia [/o=ExchangeLabs/ou=Exchange Administrative Group (FYDIBOHF23SPDLT)/cn=Recipients/cn=c61540411ce64f4e86fc6be998d563e8-pacholok] |
| **Subject**: | Re: Privileged and confidential: RE: Reading instructions |

Good to have. Thank you. M

Sent from my iPhone

On Sep 7, 2018, at 3:02 PM, Mascolo, Christine Collette <mascolo@fas.harvard.edu> wrote:

See Ara's edits and message.

**From:** Gershengorn, Ara
**Sent:** Friday, September 07, 2018 10:43 AM
**To:** Mascolo, Christine Collette <mascolo@fas.harvard.edu>
**Subject:** Privileged and confidential: RE: Reading instructions
Hi Christine,

█████████████████████████████████████████████████████████

Best,
Ara

**From:** Mascolo, Christine Collette
**Sent:** Tuesday, September 4, 2018 1:45 PM
**To:** Gershengorn, Ara <ara_gershengorn@harvard.edu>
**Subject:** Reading instructions
Hi Ara,
I hope you were able to enjoy at least some of the long weekend!

█████████████████████████████████████████████████████████

Thanks very much,
Christine

**JA4627**



2012 Casebook

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

United States District Court
District of Massachusetts

**DX 2**

Case No. _____1:14-cv-14176 (ADB)_____
Date Entered_____
By_____
Deputy Clerk

HARV00000212

**JA4628**

DX002.0001

# Sergei Liukin

**School:** Hillridge High School
**Description:** Independent private school on the East Coast, 100% of graduates go on to attend four-year colleges, many AP courses offered
**Ethnicity:** (left blank); dual citizen with the Russian Federation

**Mother:** licensed practical nurse
**College:** associates degree
(divorced in 1995)

**Father:** Computer engineer
**College:** B.A. foreign university,
PhD from American university

**Siblings:** none

**Tentative field of study:** Mathematics
**Commitment:** 2 (1-5 scale: 1, absolutely certain; 5, undecided)
**Intended occupation:** Academic
**Commitment:** 1 (1-5 scale: 1, absolutely certain; 5, undecided)
**College activities:** Writing/literary magazine, orchestra
**Commitment:** 2 (1-5 scale: 1, absolutely certain; 5, undecided)

**Class rank:** none provided, but highest GPA listed is Sergei's, 64 students
**SAT I:** 800/800/800
**SAT II:**        800 Chemistry        800 Math II        800 US History
                      800 French Reading    790 World History

**Extracurricular Activities:**
Independent math research (11-12)
        6 hrs/week, 52 weeks/year
MIT summer research program (11)
        144 hours/week, 6 weeks/year
        Top ten presenter
Math clubs (11, 12)
        1.5 hours/week, 40 weeks/year
        President
International club (9-12)
        1 hour/week, 12 weeks/year

**Athletics:**
Weightlifting (11-12)
JV tennis (11)
6 hours/week; 8 weeks/year

**Employment:**
Math tutoring
2 hours/week

**Academic Honors:**
Cum Laude Society
National Merit Semi-Finalist
Top Scholar, Class of 2009
Mu Alpha Theta
National Honor Society

**Summer Activities:**
Research at MIT (11th)

**Advanced Placement Test Results:**

| | |
|---|---|
| Physics B | 5 |
| History of Art | 5 |
| Eng Lang & Comp | 5 |
| World History | 5 |
| Calculus BC | 5 |
| French Language | 5 |
| Chemistry | 5 |
| United States History | 5 |

Liukin 1

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

**Short answer (most meaningful activity)**

In spring of my sophomore year, I began studying analysis under the guidance of a professor at my local university. At first, I studied its fundamentals, learning the basics of two major subfields: real analysis and complex analysis. After several months of reading textbooks, I began to read about current areas of research, so by the spring of my junior year I had the background to work on unresolved problems. Last summer at MIT, I obtained results that characterized the behavior of a generalized version of a complex mathematical process. Working on research has at times been a trying experience, but the intellectual stimulation it gives me—along with the opportunity to make new discoveries and the joy of progressing towards the desired results—has made it a worthwhile endeavor.

**Personal Statement**

Almost everyone knows Thoreau's *Walden*. That is, they know that it was written by some guy in the nineteenth century who went to live in the woods but still returned home often enough to let his mother wash his clothes (supposedly). But what is truly fascinating about Thoreau's account is not the details of his life in the woods, but the central question that runs through it: What's it all about? Thoreau noticed that most people spend their lives in a daze, always aiming to acquire some new possession—be it house, carriage, or car—or a new, apparently better, position in life, without really knowing what they want, or why they are breaking their backs to pay, for instance, a mortgage for a house they might not have really wanted in the first place.

When I first read the book, in the hot and hectic final days of my junior year, it struck me that the situation is no better—in fact, far worse—in modern times. The quantity and variety of purchasable goods has increased exponentially, as has their availability, while the lot of most people has improved only slightly. So, naturally, I asked myself what *I* was in it for? What did *I* want? What's it all about for *me*?

Thoreau spent twenty-six months in the woods, simplifying his life as much as he could, in search of an answer to that question. And he filled up a book with an account of that time, so that others might—not follow his example, but be inspired to find their own path. I have not yet taken so extreme a measure, but I realized that I too had been searching for a more simple life, for a certain spareness and bareness that might allow me to see the world and myself more clearly. To see the world clearly, to see ourselves and our fellows in a true light: these are not small things, mere trifles to be cast aside as worthless; these are the things that I most want, because it is only with clarity of sight that we can attain real understanding.

As mathematicians are wont to do, I started with the simpler case—myself. Strange as it is, even that case is not so easy to determine, and certainty comes only in fleeting moments. I spent the summer at MIT, working on mathematics, one of my favorite things to do. Late one night, wide awake with the desire to solve the open problem I was researching, I withdrew to a quiet room that had been abandoned by my sleeping comrades. I sat and I read and I scribbled and crossed out equations, filling up page after page after page of my notebook, whose pages were already rough and ridged from having been wet. The clock ticked, and before I knew it, it was midnight. But the problem—even the particular subproblem I had set out to solve that night—still stood its ground. Time wore on, but, at last, my scribbling went for a page without the line of attack failing; at two pages,

Liukin 2

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

HARV00000214

I was in full swing, my hand racing across the page and down lines with the speed of a rocket; at three pages, my heart began to beat in double time; and at five, when I wrote QED, the universally acknowledged way of ending a handwritten mathematical proof, I felt excited beyond words. I returned to my room in a daze, to find my roommate already asleep, his small digital clock reading one a.m. Yes, I thought, clambering into bed, still thrilled by the experience I had just had, this is it.

Anne Dillard writes about a similar experience. Frequently, in her book *Pilgram at Tinker Creek*, she writes about "the tree with the lights in it," the image she associates with the moments of ecstasy when—to paraphrase her—the world seems to be infused with a light that can be nothing but divine. "I live for it," she writes, "for the moment when the mountains open and the new light roars in spate through the crack, and the mountains slam." Yes, I think, reading this line for what must be the hundredth time. Yes: I, too, live for these moments. I'm in it for the moments when incomprehension falls like a blindfold from in front of my straining eyes, when the mental darkness passes like a covering cloud, and a full, bright light shines, and the problem that seemed impossible, or the proof that seemed infinitely out of reach, comes within my grasp, for the moments when I share Dillard's rapture, when the difficulty is overcome and I feel on top of the world.

They can come in many forms, these moments, but my favorite variety is the kind that stems from a difficulty surmounted or a problem solved. This is part of what attracts me to mathematics: here is one of the oldest areas of human thought but one that is still, in the words of Ian Stewart, "bristling with open problems." Many of these open problems are fascinating, sometimes by virtue of their sheer simplicity. One famous assertion, long believed to be true by most mathematicians, remains unproved in spite of its extreme accessibility; it is known as the twin prime conjecture and can easily be stated: there are infinitely many prime numbers $p$ (numbers with no factors but themselves and the number 1) such that $p + 2$ is also prime. These kinds of problems hold a powerful allure for me, as they do for many mathematicians. Mathematics also attracts me because it offers an opportunity to contribute significantly to human thought, to leave an intellectual mark—be it ever so small—on human civilization. And it is very important to me to make such a contribution.

None of this necessarily lets me see the world and myself as clearly as is possible. But the search for understanding cannot terminate so soon; it lasts, I suspect, until the thread of life is cut and death is nigh. It is unlikely that Thoreau left his little house by Walden Pond with all his questions answered or without the appearance of new ones, but some of his questions *were* answered, and the questions he experienced doubtless helped him understand himself and the world better. Likewise, doing mathematics—and understanding *why* I love to do it—helps me know myself better as, in the words of Thoreau, I "go about my business," always looking to see more clearly and understand more fully.

**Secondary School Report**

Maturity beyond his years, intellectual curiosity beyond the ordinary, and promise beyond limits are qualities that define Sergei Liukin's character, his choices, and his future. Serge is the consummate student, one who is lead by his passion for learning and never limited by conventional education. He takes advantage of every opportunity to expand his opportunities, to leap into new learning environments and to open every learning door. From independent study, to travel, to research at MIT, Serge builds upon his high school

Liukin 3

experience and reaches out for more. Serge is a voracious reader; he enriches his formal education experiences with his eclectic choice of books and publications. Serge simply loves to learn, to share his knowledge and ideas, and to pursue intellectual development. But Serge does not limit himself to academia. Instead, he delights in sharing his expertise and reaching beyond the classroom.

At first glance, president of Mu Alpha Theta/Math Club may not evoke an image of excitement. But here, his team of "math-letes" are a dynamic group of competitors. As leader of this eclectic group, Serge has made membership and math competition fun. On any given Saturday members travel to regional and state contests and garner accolades and awards for Hillridge. Serge is a leader who inspires confidence. He sets an example of excellence and hard work with the addition of a sense of genuine accomplishment. Serge has made being in the Math Club an honor. Whether a leader or team member, Serge is committed to his responsibilities. As a two-year member of National Honor Society he is a much sought after math tutor. NHS tutors work closely with middle school students to assist them in the transition to the Upper Division academic program. Serge never turns down a request and has accrued an impressive record of service with the program.

The honors and accolades that Serge has earned at Hillridge range from Cum Laude Society, a place on the JV tennis team, Co-President of the Class of 2009, first place in the National French Exam, level five, to National Merit Semi-finalist. His academic interest is math but Serge is never limited to one discipline. As far as I can determine, Serge is the only student who will graduate from Hillridge with 13 AP courses to his credit, ranging from Calculus BC to AP Music Theory. His choices cover every academic discipline and he plunges into each subject with eagerness and a curiosity for knowledge. There is a mutual appreciation between Serge and his teachers. His teachers delight in his energy and intellect that he brings into the classroom and Serge has genuine respect and admiration for his teachers. The litany of praise across the curriculum includes, "Serge makes every day of teaching worthwhile." , "I commend Serge for his work ethic and the high standards he sets for himself.", "Serge is a remarkable student whose intelligence is enhanced by his insatiable curiosity and willingness to learn." , "Serge possesses a keen and nuanced understanding of the material we cover.", "Serge approaches learning with curiosity, a positive attitude, and a sense of humor." , "Serge is the student who always asks higher level questions that stimulate class discussion." All of these observations are right on target! But perhaps the most overreaching comment is offered by Serge's "Math-mentor", Mr. Zupan who writes, "Serge is the caliber of student that comes along once in a lifetime, if ever, to a teacher, or for that matter, to a school. I am privileged to be a part of his intellectual growth."

It would be the perfect "story-book" scenario to say that the road to intellectual growth, academic accolades, firm friendships, and amazing experiences has been smooth and straight. But that is not the case for Serge. He came to Hillridge early in his freshman year to finally settle down after moving 10 times and attending four different schools. His hesitation and tentativeness melted away as Serge began to embrace his new home. Serge's years of changes brought him a valued characteristic, independence. This independence has given Serge the ability to explore mathematics well beyond the limits of our curriculum, to teach himself tennis, to attain the highest score on the National French exam, fifth level after three formal years of study, and to reach for his highest goal: "I am to become one of the great contributors to human thought." He is a life-long learner who will take advantage of every opportunity in the classroom and in the community at Harvard, to live, learn, and contribute. Like his teachers and peers, I am privileged to know Serge and to have the opportunity to recommend him to the Admissions Committee at Harvard University.

Liukin 4

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

HARV00000216

**JA4632**

DX002.0005

## Hillridge Transcript

| Grade 9 | Final | Grade 10 | Final |
|---|---|---|---|
| English 9 H | A+ | English 10 H | A+ |
| Algebra II H | A+ | AP Calculus BC | A+ |
| AP Physics | A | Chemistry H | A+ |
| Western Civilizations | A+ | Contemporary Issues | A |
| French I | A+ | World Religions | A+ |
| Health/Fitness | A | French III H | A+ |
| | | AP Art history | A+ |
| | | Concert Band | A+ |

| Grade 11 | Final | Grade 12 | Final |
|---|---|---|---|
| AP English Language | A+ | AP English Literature | |
| Adv. Topics in Mathematics | A+ | Independent Study Math | |
| Biology H | A+ | Abstract Algebra | |
| AP Chemistry | A+ | AP Biology | |
| AP U.S. History | A+ | AP European History | |
| AP French Language | A+ | AP French Literature | |
| Concert Band | A+ | AP Music Theory | |

## Teacher Recommendation 1

I have known Serge for two years, first as his AP Calculus BC teacher in his sophomore year, and as the teacher/mentor of his independent studies class entitled "Advanced Studies in Mathematics" in his junior year. Before I get into substantiating details, I would like to immediately express the nature of my recommendation.

Prior to my two years at Hillridge, I taught BC Calculus for five years in a large public high school, and eight years in two of the most prestigious independent schools in the D.C. area. I taught the strongest math students those schools had to offer. I had many very successful and several truly brilliant students. I do not exaggerate when I say that none of them could hold a candle to the genius of Serge Liukin. Serge is far and away the most talented math student I have ever had the pleasure of knowing, as well as being the most enthusiastic, the most creative, the most rigorous, the most disciplined, the most curious, the most intrinsically motivated, and the most accomplished. Add to this the fact that he is almost humble in his demeanor, always with a quick smile on his face and a kind word to others. He is the caliber of student that comes once in a lifetime, if ever, to a teacher, or for that matter, to a school.

Serge is a voracious student of mathematics. As a freshman, he read a Calculus text on his own. As a BC student in his sophomore year he became interested in Real Analysis and under my guidance read a text on that subject, and solved all of its problems. Towards the end of that year Serge became interested in entering the Siemens Competition in Math, Science & Technology. To that end, he spent his junior year working with a professor of mathematics at a nearby university. Under his guidance, Serge devoured a Linear Algebra text and a Complex Analysis text, and, in attempting to narrow down his choice of a topic

Liukin 5

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

HARV00000217

**JA4633**
DX002.0006

for the competition, read a series of published papers on Complex Analysis. Also in his junior year Serge read a text on Mathematical Logic and began one on Abstract Algebra in my independent studies class. I have a bachelors and a masters degree in mathematics, and I stand in awe of the level of expertise Serge has developed in so short a time. Serge seems to have everything he studies at his finger tips; he has got an almost photographic memory. He has the natural ability to recall in minute detail practically any proof or solution he has ever read or composed himself. He has developed into an accomplished mathematician, writing beautifully structured, elegant and creative proofs, and almost effortlessly finds solutions to the most obtuse and complex problems. In recognition of his genius, Serge was accepted into a prestigious summer program at MIT. He completed that program this summer and produced a paper which is clearly on the level of an advanced mathematics graduate student.

When I reread this recommendation it seems like hyperbole, but I assure you it is not. Serge is a world-class intellect not yet in full bloom, but growing incredibly. Serge will make a great name for himself in the world of mathematics. It is an historic opportunity for a university to be a part of guiding his growth and success.

| No basis | | Below average | Average | Good (above average) | Very Good (well above average) | Excellent (top 10%) | Outstanding (top 5%) | One of the top few I've encountered in my career. (top 1%) |
|---|---|---|---|---|---|---|---|---|
| | Academic achievement | | | | | | | X |
| | Intellectual promise | | | | | | | X |
| | Quality of writing | | | | | | | X |
| | Creative, original thought | | | | | | | X |
| | Productive class discussion | | | | | | | X |
| | Respect accorded by faculty | | | | | | | X |
| | Disciplined work habits | | | | | | | X |
| | Maturity | | | | | | | X |
| | Motivation | | | | | | | X |
| | Leadership | | | | | | | X |
| | Integrity | | | | | | | X |
| | Reaction to setbacks | | | | | | | X |
| | Concern for others | | | | | | | X |
| | Self-confidence | | | | | | | X |
| | Initiative, independence | | | | | | | X |
| | OVERALL | | | | | | | X |

Liukin 6

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

HARV00000218

**JA4634**

DX002.0007

**Teacher Recommendation 2**

Mr. Serge Liukin has asked me to write you a letter of recommendation, and I am thrilled to comply. Knowing that you read hundreds, possibly thousands of student applications, and most of them glowing, complimentary accounts of the students they represent, I am at a loss how to make my letter stand out enough to do Serge real justice. You will be able to see by his record that he is an outstanding student, in every way truly gifted intellectually. I am unsure what I might add to that record, but I'll do my best. Let me touch briefly on what I see as Serge's greatest assets, what I see as one of his few weaknesses, and an example of his intellectual caliber.

As to Serge's strengths, they are many, but the sheer power and clarity of his mind is probably the greatest among his many qualifications. I am in my thirtieth year of teaching, and Serge may be one of the half dozen most intellectually gifted students I've ever taught. Probably most people's initial assessment would see Serge as a mathematical and scientific ace, but I teach him currently in AP Literature, and taught him last year in AP Language and Composition, and in both courses he was at the top of the class. His writing is not stylistically innovative, but it's amazingly mature both in terms of his command of mechanics and in terms of his understanding of the issues. As you'll see in his record, he got a five on the AP Language exam last May, and so far this year it looks like he's a shoo-in for a five on the AP Literature exam this coming May. I am hesitant to use a heavily loaded term like "genius," but Serge way well qualify. For real.

As to weaknesses. Unfortunately, like many people of his caliber, Serge can be intellectually arrogant. With stronger teachers he will form a tight bond of admiration and (probably mutual) respect. But he has no tolerance at all for weaker teachers who cannot command his respect. In his tenth grade year he was seriously considering circulating a petition to have his then English teacher dismissed. In many was she was (despite some strengths) not the best teacher for Serge, but he did not show a willingness to work with her and support her, as he well could have. And in class he can sometimes dominate class discussions. Still, I think these are areas of emotional maturity that he may be as of yet too young to have accomplished. I'd like to hope that there would eventually emerge a compassion and a love of humanity the equal of his intellectual gifts.

I recall last year after we had read an essay by Barbara Lawrence called "Four-Letter Words Can Hurt You," Serge and I had a spirited exchange of essays, completely aside from schoolwork, on the topic of the intrinsic badness of certain four-letter words, especially the "f-bomb." I maintained, and still do maintain, that this word is a bad word because of what it means, because that meaning is base and evil. Serge, the young moral relativist, held to the position that words are only bad because our "thinking makes them so," to steal Hamlet's words. Which of us is "right" is not the point of my illustration. The point is that a student, on a strictly volunteer basis, took up the project of arguing with his teacher in a very well reasoned way. Serge probably wrote at least three essays in response to my own—or, rather, we wrote in response to each other. We argued the fine points of meanings, took up or took issue with the dictionary, debated the whole concept of "intrinsic" meaning, and for Serge's part, he did so in fluid prose that soundly argued a well-reasoned thesis. At the end of the day I think his position is mistaken, but how many students would step up like that to an intellectual challenge?

All in all, I cannot recommend Serge Liukin too highly. If a college education will instill in him the sense of humanity to match his brilliance, we will have a major contributor on the world stage.

Liukin 7

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY                    HARV00000219

**JA4635**

DX002.0008

| No basis | | Below average | Average | Good (above average) | Very Good (well above average) | Excellent (top 10%) | Outstanding (top 5%) | One of the top few I've encountered in my career. (top 1%) |
|---|---|---|---|---|---|---|---|---|
| | Academic achievement | | | | | | | X |
| | Intellectual promise | | | | | | | X+ |
| | Quality of writing | | | | | | | X |
| | Creative, original thought | | | | | | X | |
| | Productive class discussion | | | X | | | | |
| | Respect accorded by faculty | | | | | | X | |
| | Disciplined work habits | | | | | | X | |
| | Maturity | | | | X | | | |
| | Motivation | | | | | | | X |
| | Leadership | | X | | | | | |
| | Integrity | | X | | | | | X |
| | Reaction to setbacks | | X | | | | | |
| | Concern for others | | X | | | | | |
| | Self-confidence | | | | | | | X |
| | Initiative, independence | | | | | | | X |
| | OVERALL | | | | | | X | |

**Additional materials**

Three letters of recommendation (two from math professors/mentors), math research paper.

**Faculty Evaluation**

A blue-chipper. The paper he submits is terrific. One of his recommenders calls it "publishable in a serious journal...could be part of a Ph.D. thesis"—and this is by MIT standards, and the recommender is typically very restrained. Mathematically, I haven't seen many folders stronger than this. I'd put him at the same level as the two others I reviewed above, which is to say exceptional.

Liukin 8

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

HARV00000220

**JA4636**

DX002.0009

**Alumni Interview Report**

**Academic (1)**
*Genuine scholar, Summa potential, top grades, high 700 and 800 scores combined with evidence of original scholarship*
       Love of Learning—'outstanding'
       Intellectual Curiosity—'outstanding'
       Intellectual Originality—'outstanding'

       Serge is doing original work in theoretical mathematics about the behavior of molecules in non-compressable liquids being forced through a little opening. It is an extension of an equation which predicts the behavior of fluids in such a situation but not at the molecular level. He spent six weeks at MIT working on this problem. He looks forward to a career in academia. I am not competent enough to judge the legitimacy of his work, but I'm 99% sure he wasn't trying to snow me under. He's into some really esoteric stuff!!

**Extracurricular, Athletic, Community, Employment, Family Commitments (4+)**
*Some but not extensive participation*

       Serge plays violin in the school concert band. (His school is too small for both a band and an orchestra.) He was the sole violin when he joined the band. This year there are four violins. Serge has played interscholastic tennis, both singles and doubles. He's undecided whether he will play this year.

**Personal Qualities (2+)**
*Rare personal appeal and character*
       Openness to new ideas and new people—'outstanding
       Contribution to college life—'outstanding
       What kind of roommate would this student be?—'truly unusual

       Our hour together was relaxed and comfortable. Serge is articulate and thoughtful. His mathematics, of course, blew me away. So I asked him about other subjects. He talked about a report he did on the French Revolution. "I found it fascinating to consider that point when the revolution devolved from idealism into terror," he said. He struck me as down-to-earth and easy to talk to. His curiosity (and passion) for mathematics evoked my question , "Is your love of mathematics a search for truth with a capital 'T'?" He said, "I think it's truth of some kind, but it's certainly not going to answer all the questions of my life. I see mathematics as the 'art of science.'" A person could get into some very interesting conversations with Serge.

**Overall (1)**
*Absolutely superior for admissions; truly unusual in the entire applicant pool*
       Easy flow of conversation

       Serge is probably a mathematics genius. He took calculus in 10th grade and has worked with a math professor for the past two years. (I had a classmate who was truly a math genius, but he was a little odd.) Serge is very ordinary, in a good way. He's not a nerd. He is not pretentious. I think he'd be a terrific addition to the class of 2013!

                                                             Liukin 9

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

HARV00000221

# Thomas Smith

**School:** Roseville Senior High School
**Description:** public school on the East Coast; 95% of graduates attend four-year colleges; many AP courses offered
**Ethnicity:** Caucasian

**Mother:** Sales Representative
**College:** State university (BA, MA)

**Father:** Unemployed
**College:** Private four-year college;
          JD at private university

**Siblings:** Aaron (16), Michael (14)

**Tentative field of study:** Social Studies
**Commitment:** 3 (1-5 scale: 1, absolutely certain; 5, undecided)
**Intended occupation:** Law
**Commitment:** 4 (1-5 scale: 1, absolutely certain; 5, undecided)
**College activities:** Political Groups, Writing/LitMag
**Commitment:** 2 (1-5 scale: 1, absolutely certain; 5, undecided)

**Class rank:** 95%/318
**SAT I:** 750/700/800
**SAT II:** 800 U.S. History        720 Math 1            740 Physics

| **Extracurricular Activities:** | **Athletics:** | **Employment:** |
|---|---|---|
| Political Digest (9-12) | None | Summer (~ 35-50 hrs/week) |
|     2 hrs/week | | Term time: Myclassguides.com |
|     Secretary, Publisher | | |

Model Congress (10-12)
    1 hr/week
    Gavel Award
    Presidential Candidate at Princeton Model Congress
Student Government (9-12)
    3 hrs/week
    President of Roseville High School Student Council
    President of Senior Class
    Previously VP of Freshman, Sophomore, Junior classes
Myclassguides.com – a business Thomas started to provide study guides for AP exams
Crisis Center Volunteer (11-12)
    4 hrs/week
    Counselor's Assistant
B'nai B'rith Youth Organization, Roseville Chapter (10-11)
    2 hrs/week
    VP for Programming

Smith 1

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

HARV00000222

**JA4638**
DX002.0011

| Academic Honors: | Advanced Placement Test Results: | |
|---|---|---|
| NMSF | US History | 5 |
| National Honor Society | European History | 5 |
| AP Scholar with Honors | Eng Lang & Comp | 5 |
| NCTE | Physics B | 5 |
| George Washington Book Award | | |
| HOBY | | |

**Summer Activities**

Work (Jefferson County Democratic Committee and Board of Elections)
Care-Taker at Greenway Country Day School
Seeds of Peace International Camp (2007)

**Activities (most meaningful)**

I always prefer to work at the Crisis Center at night. My duties are relaxed, and by 10pm most of the hotline pranksters have either moved on to more productive activities or simply tired themselves out. Our privacy policy disallows Assistants from hearing the voices of our clients, so, in my quiet contemplation, my mind pictures the callers speaking to the Counselors around me. The mother beaten by her husband; the teenager terrified to reveal his sexuality; the couch-surfing, transient 20-something unable to hold a job or a home. No longer is it the story in the newspaper or item in the police blotter: these strangers are only a circuit breaker away. We never learn the fates of our callers, and that scares me a little. But I am satisfied that we actually did improve somebody's life, if even for but one phone call.

**Personal Statement**

*"I'm going to kill you."*
It struck me that that in the depths of a human faced with unbearable frustration, in our case heated and ceaseless debate over the virtues and terrors of suicide bombing, there germinates the completely irrational, the unimaginably absurd. My friend, the tall and brooding Palestinian teenager with whom previously I had only shared *Bamba* and laughter, had come to see that his logic was completely lost on me, his cause unlovable, and his beliefs rebuffed. In a moment his own intimate understanding of the world and its workings became completely and utterly distorted by realization; it was as if he walked into a house of mirrors, looked at the caricatured and deformed figures projected on the walls all around, and then discovered that the images in the mirrors were in fact reality and all his previous self-conceptualizations were nothing more than naiveté. He was threatened, and out of fear his defense was to strike fear into his opposition. My world and his world were not one; his was unacceptable to me, and mine was simply incomprehensible to him.

My view was and is simple: I rejected categorically killing of any kind. I rejected the deaths caused by IDF soldiers, scared and tired after an eight-hour bungled security operation, numbed and foolish enough to shoot at a threatening mob. I also rejected those caused by the soldiers of the *Intifadah*, longing to exert some type of force on the static events around them, who blew themselves up in the middle of crowded markets. Whereas the Israelis and the Palestinians saw two different armies shrouded in two different ideologies, two methods of warfare, fighting for two different gods, protecting two very separate peoples, I saw two armies staffed with and employing the very same weapons:

Smith 2

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

HARV00000223

human labor. I could not at the time conceptualize that there were two groups of human beings so engorged in hatred of the other, especially when the two had similar-sounding names, common tastes in music and entertainment, and comparable value systems favoring the family and strong personal codes of honor. Did they not realize that the land they were fighting for was worthless without the great energies and potential stored within both its very inhabitants? Logic is difficult to find in a swirling sea of emotion.

I told Mohammad that the Israeli soldier who killed the young, praying Muslim girl was just as heinous and wretched as the terrorist who looked into a video camera, told his countrymen he was fulfilling their desires, and then proceeded to walk onto a bus filled with Israeli families wearing a belt of explosives tied to his waist.

Mohammad was not a humanist as I was for he did not have a love of man but rather a love for a certain kind of man, that fashioned from the blood of his very descendents, who spoke his unique language, and who suffered only as he had known suffering. *I'm going to kill you*, he said, omitting what gave the sentence its true significance and to me the key to every struggle between peoples on this planet, *in order so that I do not have to question myself.*

My tenure at the Seeds of Peace Camp was not just an experiment in living communally with factions of children whose governments were, for all intents and purposes, in a state of undeclared war with one another. It was also a period of time during which I threatened all conceptions I had previously harbored toward the formation of feelings, personalities, worldviews, and friendships. Epic treatises on existence have been written about lesser instances of knowledge than I purchased over those four weeks of glorious summer; novels of hundreds of pages would not even be capable of expressing the range of emotions I contended with; no pool of verbosity or well of poetic reticence would do my experience justice either. Yet I learned something fundamental in those wooded hollows that forever changed me.

I had come to realize there is no greater scar across the face of our humanity than that of national sovereignty. It is the force that breeds nationalism, and the wars of attrition and other crimes that ensue when an oversimplified and blinded love of country is allowed to dominate reason; it is a vision of the world as irreparably fragmented and disjointed, with tribe, language, common and uncommon history, and successive victories and defeats creating boundaries in no absolute sense except that which, ultimately, we are incapable of denying: by the order and decree of our state.

My three weeks as a charlatan diplomat acquainted me with the realities of living in a world of nation-states rather than that of simply people. We subscribe to a mentality where happenstance of birthplace shades perception of character and worth. The steadfastly green woods of Maine were an asylum in which I heard many voices: that of Dana the Israeli, father a chief in one of the security services, groping to justify the "protective" acts of her nation against those threatening it; or of Noor the Palestinian refugee from Jenin, brother killed by Jewish soldiers because of extremist ties, yelling so loud that that there almost seemed to be a bridge between her emotion and her logic; or of Nayef the Arab-Israeli, father killed while in the service of the IDF, whose summer culminated in a speech of sobs and tears that captured every enmity, every drop of bitterness, and every intricacy of identity woven into the Palestinian-Israeli conflict. Each voice held a new and unique pain, and yet each ignored the others because conventionalism had taught them that suffering could be monopolized behind borders.

I have hope, though that this new century may hold more promise for peace than the millennia preceding it because the realities of the world are shifting. New forces are coming

Smith 3

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

HARV00000224

to bear on the relationships between nations – globalization, foreign investment, instantaneous and uninhibited links of communication, migrations of workers – binding them together yet tearing apart the status quo. A *tabula rasa* is before us, and it will be the task of a new generation of statesmen, businessmen, technologists, and dreamers to construct the global institutions – whether they be politically, economically, or socially focused – that will have the clout and ability to leverage change, negotiate peace, unite disparate peoples, fight poverty, combat hunger, sustain and conserve our natural resources, and adapt to the changing needs of a maturing world. The basic governmental unit of the nation-state will not be eradicated in my time or at any time in the near future, but the repression of enmities amongst peoples is increasingly necessary for any single country to secure its success in our new, interwoven order of the world. Out of the requirement to co-operate grows promise of progress toward collective amicability.

*"I'm going to love you, regardless"*, I wish I had told Mohammad, but I was a victim of those human emotions called anger and pride. Our nations, those growing, adapting, vibrant things they are, are susceptible to allowing those same base feelings to infect their policies and priorities. In turn, citizens begin to move beyond simply supporting their own country and begin to actively seek the destruction and weakening of others. But, with the advances in communications and growing international economic ties, it is possible that those reactionary channels will come with an increasingly steep price. Peace may very well be within reach if there is a united enough front seeking its promotion. Following my experiences at Seeds camp I am committed to no other end.

## Supplement

Myclassguides.com was a website I founded last year as a business that combined my passion for technology with the content I have produced for two of my school classes. Course textbooks in these subjects were synthesized into original chapter outlines that proved to be a supplement to class materials and an important aid in preparation for the year-end AP Examinations.

Looking for a way to capitalize on the hours I had spent creating meticulous outlines of course textbook material, it was important that my work be used to benefit both my fellow students and myself at the same time. Myclassguides provided both a means of providing personal income while at the same time acting as an impetus for the 5's I have received on the AP exams. My classmates were thankful for the study aids and review materials as well. The site is publicly available because the content is supported by advertising sales and referrals.

Founded in November of 2007, the site has posed significant challenges in the form of webpage design, content creation, and revenue production. It has been a rewarding experience learning to overcome these difficulties while refusing to sacrifice the integrity of the content provided and the quality of the visitor experience to the site.

## Secondary School Report

It is truly my pleasure to write this letter of recommendation on behalf of Thomas Smith. As his school counselor, I have had the privilege of witnessing his growth into the confident, engaging and exceptional young man he is today. He possesses determination, self-discipline, intellectual inquisitiveness and genuine human concern far superior to that of

Smith 4

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

HARV00000225

his peers. I have most admired his remarkable ability to excel in all that he does in spite of extraordinarily difficult family circumstances he manages as the oldest child, day after day.

Academically, Thomas will have completed the most rigorous course of study possible at this high achieving high school. His transcript is flawless boasting several AP courses, all 5's on his AP exams, impressive standardized test scores and a near perfect GPA, upon graduation. Even more notable is that Thomas attained all of his success without any outside tutoring or assistance; his accomplishments are the direct result of his tenacity. He is a member of numerous Honor Societies, a national merit scholar semi finalist, an AP scholar with distinction and has been repeatedly selected to attend several different leadership conferences, including the HOBY conference which only allows every school to select one candidate. The truth is Thomas's innate drive for knowledge is not limited to the A+, but to learn for the sake of understanding. He has no interest in memorizing material as he prefers the benefit to understanding how and why things happen. Moreover, he earned both the silver and bronze medal for the National Latin Exam Competition, won third place in National History Day Research Competition, has published poetry and countless other academic accomplishments. The truth is, Thomas has never needed formal instruction to grasp new material; in fact, many of his teachers rely on his initiation of classroom discussions to enhance their daily lessons. As founder of Myclassguides.com, he has published course outlines of textbook materials for the extremely rigorous AP social studies courses aimed at assisting students currently enrolled. Thomas's soft-spoken demeanor and tolerant disposition often lead his peers to actively seek his feedback and guidance on their projects and assignments. It is Thomas's constant thirst for knowledge that has earned him the respect and admiration of all of his teachers and his peers.

Passionate about politics, he hopes for a career in law and/or as a Public Policy Expert. While his peers thrive on Hollywood gossip and sports seasons, Thomas's sustenance comes from the commentary pages of the New York Times, the anchors of MSNBC and the pen bloggers across the Net. In school Thomas has utilized his natural leadership ability to implement his passion as a way of enhancing some of our schools organizations. Earning himself an official position in the Political Science Club since ninth grade, he has solicited volunteers to work with him at phone banks for the Presidential campaign in support of Hillary Clinton, encouraged support for other local campaigns, organized field trips to the National Model United Nations Conference and created the first ever politically-centered newspaper of our high school. Even more impressive are his political experiences outside of school. A Democratic IT Assistant, an intern for the Jefferson County Democratic Committee, a volunteer for the Clinton and Edwards presidential campaigns, a staffer at several fundraisers and committed to assisting at phone banks whenever he is asked, his unwavering energy and political enthusiasm is tireless.

Academic and political success is only a fraction of who Thomas is. Incessantly seeking out other enriching experiences in a multitude of areas, Thomas will truly leave an indelible mark on our high school. A natural born leader, he has been elected as President of his class by his peers each year since ninth grade. While most class presidents campaign for increased driving privileges or open campus, Thomas, in typical Thomas fashion, has chosen to take on much broader concerns in an effort to bring the entire school community together, faculty, administrators and students collectively. This year he has founded a forum in which representatives from the teacher's union and from the senior class work together to enhance the social and academic environment of our school. In addition, as the President of our Student Council, he has plans to commit resources toward educating his peers on not only the law, but particularly their rights and responsibilities as students. Moreover, he is a

Smith 5

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

HARV00000226

**JA4642**

DX002.0015

committed member of the debate club, Latin club and has earned himself the Gavel award at Princeton's Model Congress and Honorable Mention at UPenn's Model Congress.

One of the most sensitive, selfless and compassionate students I have had the pleasure of working with, Thomas has spent countless hours and summers working with those far less fortunate then he has been. Whether he is traveling to rebuild homes in New Orleans, volunteering as a Counselor Assistant at the Crisis Center or acting as Chairman or Vice-President for B'nai Brith Youth Organization, his contributions are endless. Most impressive is Thomas's experience as a SEED. Selected to attend the Seeds of Peace International Camp, he had the invaluable experience of spending quality time with other students from the US, Israel and the Middle East. The goal is to create a safe environment for these kids to share their world views with one another in the hope of finding common ground. The students who attend these programs are often the leaders in their communities as with Thomas. While the experience was significant, it is the relationships that are formed that seam to be vital. As these generations mature, the hope is that many of the SEEDS will become prominent world leaders, whether politically, economically or socially, and be able to rekindle what they have learned from one another over the years, in turn vying for world peace. This opportunity is truly the essence of who Thomas is.

I would be remiss if I did not discuss Thomas's notable ability to persevere through enormous family hardships. In this economically fortunate community, Thomas's family has endured a tumultuous divorce between his parents fueled by terrible financial distress. For years, Thomas, the oldest of three boys, has been shuffled between parents, grandparents, aunts and uncles. He has been dragged to court more times then he can count and has a court appointed legal guardian who represents him and his brothers in court. It is not uncommon for him to be home and have the lights turned off or the bank show up to foreclose, forcing another move. The only stability Thomas knew were his grandparents and sadly his grandfather died last year and recently his grandmother has been ill. Thomas and I often discuss his home life and I am always amazed at how mature and adult like he is at being able to put things in perspective. Thomas and his brothers are truly surviors, everything he has attained, he has done on his own through applying for scholarships for summer programs or just investigating the resources that are available to him.

Thomas Smith has already accomplished more then most people twice his age. He has the rare ability to inspire those around him and I sincerely appreciate his generous spirit and personal warmth. He never presents as too overwhelmed and is always approachable and well-mannered. Thomas is a true gentleman in every sense of the word. He shows a level of honesty, initiative and intelligence I so rarely see amongst seventeen year olds. His integrity is unquestionable, his drive is unbelievable and his promise is unlimited. On a personal note, I will truly miss Thomas next year though I look forward to witnessing his abilities thrive as he enters the next phase of his life. He genuinely deserves this next step in his education! Thomas has earned my highest recommendation to your University and I guarantee, if accepted, he will be one of your most prominent superstars.

**Roseville High School Transcript**

| Grade 9 | | Grade 10 | |
|---|---|---|---|
| English I | A+ | AP European | A+ |
| Global History I | A+ | Chemistry A | A+ |
| Living Environment A | A+ | College Prep Writing | A+ |

Smith 6

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

HARV00000227

| Math A Pt3A | A+ | | English II | A+ |
| Math B Pt1A | A+ | | Latin II | A+ |
| Spanish II A | A+ | | Math B Pts2&3A | A+ |
| | | | Soc Sci Research 10 | A+ |
| | | | Spanish III A | A+ |

**Grade 11**            **Grade 12**

| **Grade 11** | | | **Grade 12** | |
| AP Composition | A+ | | AP Calculus BC | |
| AP Physics | A+ | | AP Latin | |
| AP US Hist & Gov | A+ | | AP Literature | |
| Latin III | A | | AP Physics C | |
| Pre Calc Research | A | | AP US Government | |
| Prin. Macro Econ | A | | Adv. Spanish Conv. | |
| Soc Sci Research 11 | A+ | | Soc Sci Research 12 | |
| Spanish IV A | A+ | | | |

**Teacher Recommendation 1**

    I have known Thomas Smith for two years, and am honored to write his recommendation. He was a student of mine in 10th grade English, 10th grade College Preparation Writing, and 11th grade Advanced Placement English Language and Composition. These were highly demanding, rigorously structured English courses, and Thomas excelled in all three. In AP, Thomas was only one of a handful of students to earn an "A+" as a final course grade, and his "5" on the AP exam was testament to his writing skills. Just a week ago, Thomas received the Certificate of Superior Writing in the 2008 National Council of Teachers of English Annual Writing Contest, one of 525 juniors in the nation (1,789 students entered the competition) to receive this award.

    I remember reading Thomas's writing as a sophomore in September 2007, and knowing that I was reading the words of an extraordinarily talented writer. But what makes a good writer? Not only the skill, but the mind as well, and the passion and drive, the interest in events outside of your immediate world. This quality in a teenager is rare indeed. In his junior year, Thomas and a group traveled to New Hampshire to witness Hillary Clinton's campaign. Thomas's essay on his experience was a beautiful piece – an astonishing piece – that could easily have been published in *The New York Times*. This is true. He also has a wit that is unmatched. For his Description of Place essay, his topic was "inside the Head of an English Teacher." In my 15 years as an English Teacher, I can easily say that he is one of the top three writers I have seen, not just in my class, but in all the AP classes here.

    Thomas is an incredibly motivated student, juggling a rigorous academic schedule with extracurriculars, jobs, and three Honor Societies. He is bright, an excellent writer, a true leader, and is respected by both his peers and the faculty; Thomas has a fine sense of humor, and has great continuing potential for growth. Thomas has the necessary qualifications – intelligence, ambition, compassion, and integrity – to become an asset to your school. *Thomas is a doer, one who will energize your campus!* I will truly miss Thomas. Our high school is better because of him. Therefore, I recommend Thomas Smith without reservation. If I can be of further assistance, please let me know.

                                                                        Smith 7

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY                                    HARV00000228

**JA4644**
DX002.0017

| No basis | | Below average | Average | Good (above average) | Very Good (well above average) | Excellent (top 10%) | Outstanding (top 5%) | One of the top few I've encountered in my career. (top 1%) |
|---|---|---|---|---|---|---|---|---|
| | Academic achievement | | | | | | | X |
| | Academic Potential | | | | | | | X |
| | Character/ Personal Qualities | | | | | | | X |
| | Overall Rating | | | | | | | X |

### Teacher Recommendation 2

It is indeed an honor to write this letter on behalf of Thomas Smith. I have known him for three years in my capacity as a teacher and club advisor at Roseville High School. Without question, Thomas Smith is among the best students that I have had the pleasure to teach in a career that spans twenty years. He is truly an outstanding student of history and politics and is an actively engaged young man who has great aspirations. He is intelligent, confident, and keenly interested in challenging himself to be the best that he can be.

While I had known Thomas since the tenth grade, it was during his junior year as a member of my Advanced Placement United States History class that I was first able to interact with him on a daily basis. What I witnessed was remarkable. From the outset Thomas demonstrated a knowledge and interest in history and politics that put him head and shoulders above most of the other students. He consistently asked insightful questions and wrote clear, concise, and thoughtful essays. Thomas clearly went above and beyond the expectations of the course; in fact he began is own history website (Myclassguides.com) in which he outlined entire chapters in our text. This effort not only showed great diligence but entrepreneurship as well. Many of his colleagues found the site of great use in preparing for exams throughout the year. There was little doubt that Thomas would score well on the AP exam. In fact I used his essays more than once as a model to show how a particular question should be addressed. For his efforts Thomas received recognition for his scholarship. Beyond the classroom, I have had the opportunity to watch Thomas at several Model Congresses. Once again Thomas showed a command of the content and a willingness to participate and share ideas. Additionally, in the past year Thomas has gained a great wealth of experience by actively campaigning during the recent primary season.

Aside form his academic attributes, Thomas Smith is fully immersed in our school community. He is currently the president of the senior class and has been active in school government since the ninth grade. He gives freely of his time to a variety of extracurricular organizations many of which help those that are less fortunate. He has traveled to New Orleans as a volunteer and attended the Seeds of Peace International Camp. Yet while Thomas has earned many honors, he remains humble. He is a well adjusted "down to earth" young man who is easy to know and talk to. He is well respected by his teachers and his peers and is looking forward to the challenges that lie ahead.

Smith 8

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

HARV00000229

| No basis | | Below average | Average | Good (above average) | Very Good (well above average) | Excellent (top 10%) | Outstanding (top 5%) | One of the top few I've encountered in my career. (top 1%) |
|---|---|---|---|---|---|---|---|---|
| | Academic achievement | | | | | | | X |
| | Academic Potential | | | | | | | X |
| | Character/ Personal Qualities | | | | | | | X |
| | Overall Rating | | | | | | | X |

Smith 9

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

HARV00000230

**JA4646**
DX002.0019

### Thomas Smith—Alumni Interview Report

#### Academic (2+)
*Excellent grades and low to mid 700 scores*
    Intellectual Curiosity – 'outstanding'

      Thomas has seen the "famous kids" and he is not afraid. He has the capacity to compete on the next level and he will enjoy every minute. He wants to go to law school but not to practice law. He knows he's going somewhere; he's just not sure where.

#### Extracurricular, Athletic, Community, Employment, Family Commitments (3+)
*Above average activity or participation*

      Thomas is very political and politically active both personally and volunteering for state and national campaigns. Although some of his volunteer activities appear to be mechanical, his commitment to politics is indisputable.

#### Personal Qualities (3+)
*Above average appeal and character*
    Openness to new ideas and new people – 'outstanding'
    Contribution to college life – 'outstanding'

      The adjectives that come to mine when I reflect on my conversation with Thomas are: aggressive, resourceful, self-confident and astute. When his petition to get his name on the ballot for School President failed, he won Class President. Thomas turned his camp experience into a research paper on Civil Liberties by conducting an international survey. Thomas is so proud of his AP 5's he has a website to help others do the same. And finally, Thomas believes he has found a new source of income – trading stocks.

#### Overall (3+)
    Strong candidate
    Easy flow of conversation

Smith 10

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

HARV00000231

**JA4647**
DX002.0020

# Melissa Guzman De Jesus

**School:** Cold Creek High School
**Description:** Suburban regional high school on the East Coast; 40% of graduates attend four-year colleges; several AP courses offered
**Ethnicity:** Hispanic; U.S. Permanent Resident (also citizen of the Dominican Republic)

**Mother:** Homemaker         **Father:** Unemployed         **Legal Guardian:** Aunt
**College:** None              **College:** None             **College:** Dental tech. training

**Siblings:** Juan (16), Anthony (14), Pablo (13), Maribel (12), Alex (8), Michael (8), Eric (11), Anthony (4), Susana (2)

**Tentative field of study:** Humanities
**Commitment:** 2 (1-5 scale: 1, absolutely certain; 5, undecided)
**Intended occupation:** Medicine
**Commitment:** 1 (1-5 scale: 1, absolutely certain; 5, undecided)
**College activities:** Ethnic groups, volleyball
**Commitment:** 2 (1-5 scale: 1, absolutely certain; 5, undecided)

**Class rank:** 1/583
**SAT I:** 670/700/680
**SAT II:** 800 Spanish         740 World History         640 French Listening

**Extracurricular Activities:**        **Athletics:**         **Employment:**
Rise up youth ministries (9-12)        None                   Summer (20-45 hrs/week)
        6 hrs/week
        Founder
State park ground crew volunteer (9-12)
        5 hrs/week
        Activities aide
Future Business Leaders of America (9-12)
        6 hrs/week
        School president
Interact Club (11-12)
Hispanic-American Club (9-12)
Student Council (10-12)
French Club (9-12)
        President

**Academic Honors:**                   **Advanced Placement Test Results:**
Varsity Scholar                        US History        5
National Honor Society                 Biology           4
AP Scholar with Distinction            Eng Lang & Comp   4
National Hispanic Scholar              World History     5
Principal High Honors                  Psychology        5

Guzman de Jesus 1

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

HARV00000232

**Summer Activities**

Work (hostess)
Volunteer
State park recreation program guide

### Short essay (most meaningful activity)

Working with troubled inner-city youth has turned into my passion. I first became aware of the effects of drugs when a childhood friend died of a cocaine overdose at age twelve. Witnessing how my friends slowly succumbed to the unforgiving underworld of sex, drugs and "easy" cash compelled me to take action and reject the role of an oblivious bystander.

Rise Up Youth Ministries is a church-based, youth-run organization formed with the purpose of ministering to the needs of the rejected teenage community of my town. We present teen mothers, gangbangers, illegal immigrants, prostitutes and drug addicts with the gift of friendship, love, and family. R.U.Y.M. calls young adults to arise from the state of slumber that is slowly poisoning our society and work together to provide troubled youth with the opportunity to embark on the difficult journey towards a rewarding life.

### Personal Statement

While living in crimelands like Miami, Fl and Santo Dominigo, DR, falling asleep to the sound of street fights and reminding myself to avoid eye-contact with Alberto, the perverted town junkie, were everyday things. In 2002, my family decided to move up north and leave Florida behind. We settled here hoping to find a place where the schools did not send a five-page, double-sided list of registered sex offenders living two doors down. We wanted sweeter neighbors. Adjusting to a life where I was often the only colored child in rooms flooded with cheery white faces, was not easy, but it was a much-needed start. I never fathomed getting asked to go surfing before tourists started crowding the beach, "hanging out" in front of Wawa, or riding a bike to "Auntie M's" (Mary's Pizza). I did not have the slightest clue what they were talking about. Auntie M's? Wawa? My life consisted of hooking up with the girls after-school and getting a slurpee at 7-Eleven if we managed to find enough change to buy one we could all share. Riding a bike outside was only recommended if you wanted to get shot, and surfing was something you did if you were white. Point blank, that is how things were supposed to be and nothing was going to change me. I soon realized "hooking up" referred to something totally different from what I meant and "point blank" did not help make my argument any more clearer.

I, slowly, acknowledged that God was bestowing me with the gift of embarking on a journey that would take me somewhere special. An opportunity to take on the challenge of becoming somebody and leaving my old antics in the past. Though hesitant, I embraced this chance and I regained my faith in the Lord for I knew that He was preparing me to combat the vile institution that had bereaved so many people of their loved ones, that hellish world known as "the life." I thought pre-teen pregnancies were only a problem in Florida, until one of my best friends confided to me that she had had eight abortions done before the age of thirteen; her mother was not even aware her daughter was not a virgin. After hearing more stories like hers, I was convinced that this was a national problem—and should be treated like one. I am exhausted by how people look the other way upon encountering a

Guzman de Jesus 2

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

HARV00000233

child in despair, rejected by her/his family, and involved in a life that could only end in tragedy. Thirteen-year old prostitutes, ten-year old gangbangers, and twelve-year old drug addicts do not constitute an issue only pertinent to a city, a race, or a "bad" family. The degradation of society's young ones should be the nation's concern, for it is everyone's future that lies in peril when tomorrow's adults decided to drop out of school because selling their bodies for two or three hundred dollars appears more rewarding.

With much help from my family and friends, in 2005, I was able to found a youth-run organization that would minister to the emotional and physical needs of the forgotten teenage community where we live. Rise Up Youth Ministries is kept alive by the determination of an elite group of adolescents that share a desire to help others in their community. We make it our mission to befriend those that society has ignored and show them that a brighter future lies in deciding to abandon a life of crime. These lost souls are capable of becoming brilliant individuals given the right resources and teaching them could not be any more gratifying. We involve them in drama clubs, worship teams, and give them responsibilities, for they are valuable members of society and should be treated as leaders-in-training. Helping others realize that there is more to life has been an extremely rewarding experience and I can only imagine the magnificent work that could be done if more people joined the fight against "the life." One can do the greatest good when showing others their own potential to be great. The wealth, power, or fame we have in this lifetime are gone once we expire, but the work we have done towards the benefit of mankind has a chance of being immortal. As Anthony Robbins once said, "Life is a gift, and it offers us the privilege, opportunity, and responsibility to give something back by becoming more."

### Secondary School Report

Melissa Guzman is the perfect fit for Harvard College and it is with great pleasure that I enthusiastically recommend her for acceptance into your freshman class.

Melissa's academic record is proof enough that she is very mature and able to handle a great deal of responsibility. Over the course of her high school journey, Melissa has taken some of our most demanding classes such as Advanced Placement Biology and Advanced Placement World History. That is especially true this year as Melissa is currently taking Advanced Placement English and Calculus. Melissa has a grade point average of 105 on a 100 scale, which is the highest GPA of her graduating class. She is ranked number 1 out of 607 students. It is quite an accomplishment.

In addition, please note that although Melissa is enrolled in Honors French 4 she is also voluntarily staying after school to be tutored in Advanced Placement French 5. Unfortunately, Melissa was unable to take AP French 5 for credit; however, the Foreign Language Supervisor tells me she is by far the best French student she has ever seen. It is Melissa's intention to take the Advanced Placement French Exam in May.

Melissa is an exceptional young lady both academically and socially. Melissa has been an active participant in our school's internationally recognized Key Club Organization, the Hispanic-American Club, Class Council, and so many more. Melissa also spends a lot of time volunteering with her church and church sponsored activities. She is a Youth Advisor and Drama Club Director, and also the Director of the Sabbath School. Melissa takes on many responsibilities. The difference is, when Melissa commits herself to something she always follows through. This only further demonstrates what an asset she would make at your institution.

Guzman de Jesus 3

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

HARV00000234

Melissa is such a strong, motivated, intelligent young woman who by far has earned the respect of both her peers and administration. She is a student who has the potential to accomplish her wildest dreams. I have no doubt that she will do just that. It is because of these reasons that I again recommend Melissa with great enthusiasm. By accepting Melissa into your freshman class, you will be allowing her the opportunity to become that much closer to achieving all of her lifelong dreams. I know she will make you as proud as he has made me.

## Cold Creek High School Transcript

| **Grade 9** | | **Grade 10** | |
|---|---|---|---|
| HN English | 94 | HN English | 94 |
| CP Comp Workpl Read | 97 | CP French 2 | 97 |
| CP French I | 98 | HN Algebra 2 | 96 |
| HN Geometry | 92 | HN Chemistry | 97 |
| HN Biology | 94 | AP World History | 98 |
| HN World Cult/Wrld Hist | 96 | HN US Hist I | 95 |

| **Grade 11** | | **Grade 12** | |
|---|---|---|---|
| AP Biology | 95 | AP Calculus 1 | 90 |
| AP Eng 3, Lang & Comp | 95 | HN French 4 | 100 |
| AP Psychology | 98 | HN Physics | 94 |
| AP US History 2 | 96 | AP English 4 | 94 |
| HN French 3 | 95 | AP European History | 93 |
| HN Pre-Calculus | 100 | | |

## Teacher Recommendation 1

It is with confidence that I recommend Melissa Guzman for acceptance into your fine institution. I had the pleasure of having Melissa in my Advanced Placement Psychology class in her junior year. Melissa is a young woman with exceptional ability. Her test scores and class average were among the highest I have seen. In addition to her outstanding academic performance, Meli was an active member of the class. She consistently contributed perceptive comments and welcomed constructive criticism. During group activities, Meli would willingly accept the leadership role and she was well respected by her peers. She demonstrates an intuitive grasp of human nature yet is humble and unassuming. Meli is truly one of the most exceptional students I have encountered and I am certain she has a promising future.

In addition to her outstanding academic performance, Melissa is an active member of some of Cold Creek's finest clubs. She has assumed leadership roles in the Hispanic-American Club, Student Council and the Future Business Leaders of America. The fact that she was a team captain of the Academic Challenge Club in her sophomore year is indicative of her ability to combine superior intelligence with leadership skills. She is a strong leader who is organized and thorough. In the community, Meli is an active member of her church and has utilized her mastery of Spanish and English to organize many community events.

Guzman de Jesus 4

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

HARV00000235

**JA4651**

DX002.0024

Melissa is a well-rounded and highly motivated student who will make a wonderful addition to your fine institution. Please feel free to contact me if you would like to further discuss Melissa's accomplishments.

| | | Below average | Average | Good (above average) | Very Good (well above average) | Excellent (top 10%) | Outstanding (top 5%) | One of the top few I've encountered in my career. (top 1%) |
|---|---|---|---|---|---|---|---|---|
| No basis | | | | | | | | |
| | Academic achievement | | | | | | | X |
| | Intellectual promise | | | | | | | X |
| | Quality of writing | | | | | | | X |
| | Creative, original thought | | | | | | | X |
| | Productive class discussion | | | | | | | X |
| | Respect accorded by faculty | | | | | | | X |
| | Disciplined work habits | | | | | | | X |
| | Maturity | | | | | | | X |
| | Motivation | | | | | | | X |
| | Leadership | | | | | | | X |
| | Integrity | | | | | | | X |
| | Reaction to setbacks | | | | | | | X |
| | Concern for others | | | | | | | X |
| | Self-confidence | | | | | | | X |
| | Initiative, independence | | | | | | | X |
| | OVERALL | | | | | | | X |

## Teacher Recommendation 2

I am a teacher and coach at Cold Creek High School, and have known Meli Guzman for three years of her time here. Meli is currently a student of mine on A.P. Calculus. I have developed a good relationship with Meli over these past three years, and feel confident that I can give you an accurate depiction of both the personal and academic qualities. She is interested in attending your institution.

Meli is self-motivated and very disciplined in her efforts to achieve her goals in the classroom. She is a diligent worker who takes her personal and academic responsibilities seriously. Meli is also a very personable young lady, who makes friends easily, and is well respected among both her teachers and peers.

Guzman de Jesus 5

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

HARV00000236

Having had the privilege teaching Meli for two years, I have found that she exhibits many of the qualities necessary for success at the college level. Among them are a mature response to constructive criticism, and a willingness to accept difficult challenges. She is a leader who leads by example, and an unselfish individual who gives her time to help others.

Meli is well rounded. She is involved in a number of school sponsored activities as well as community groups. Among these are Student Council, the Hispanic American Club, the Key Club and the Future Business Leaders of America. She is also a member of the Academic Challenge Club, the Interact Club, and the Biology League among others. Meli also gets involved in the community. She participated in several charity drives and has volunteered for multiple activities to help youths in her church.

In the thirty years that I have been teaching and, few names come to mind of individuals who possess the same personal and academic qualities that Meli has. She is truly an outstanding student, and a quality person. Meli Guzman will be a great addition to any college campus, and will help create a positive environment wherever she attends.

It is with great pride, and extreme confidence, that I recommend Meli. Please accept this letter as my highest evaluation, and know that these words represent a sincere and accurate appraisal. Thank you for your consideration in this matter.

| No basis | | Below average | Average | Good (above average) | Very Good (well above average) | Excellent (top 10%) | Outstanding (top 5%) | One of the top few I've encountered in my career. (top 1%) |
|---|---|---|---|---|---|---|---|---|
| | Academic achievement | | | | | | X | |
| | Intellectual promise | | | | | | X | |
| X | Quality of writing | | | | | | | |
| | Creative, original thought | | | | | | X | |
| | Productive class discussion | | | | | | X | |
| | Respect accorded by faculty | | | | | | | X |
| | Disciplined work habits | | | | | | X | |
| | Maturity | | | | | | | X |
| | Motivation | | | | | | | X |
| | Leadership | | | | | | | X |
| | Integrity | | | | | | | |
| | Reaction to setbacks | | | | | | | X |
| | Concern for others | | | | | | | |
| | Self-confidence | | | | | | X | |
| | Initiative, independence | | | | | | | X |
| | OVERALL | | | | | | | X |

Guzman de Jesus 6

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

HARV00000237

**JA4653**

DX002.0026

**Melissa Guzman de Jesus—Alumni Interview Report**

**Academic (3+)**
*Good grades and mid 600 to low 700 scores*
> Love of Learning—'outstanding'
> Intellectual Curiosity—'outstanding'
> Intellectual Originality—'outstanding'

**Extracurricular, Athletic, Community, Employment, Family Commitments (2+)**
*Local or regional recognition; major accomplishments*

Melissa is extremely active in youth outreach activity in association with her church. She developed and pretty much runs a program of counseling and various activities for adolescents in the community who would otherwise be susceptible to gangs and drugs. The group numbers between 30 and 50. Melissa describes it as her way to "relax."

**Personal Qualities (1-)**
*Rare personal appeal and character*
> Openness to new ideas and new people—'truly unusual'
> Contribution to college life—'outstanding'
> What kind of roommate would this student be?—'outstanding'

One of the most enjoyable interviews I have ever conducted. If there is such a thing as "the right stuff," Melissa has it to burn.

**Overall (2)**
*Clear Admit; one to recruit*
> Easy flow of conversation
> Diamond in the Rough
See narrative report

**Additional Comments**

1) If the question is whether Melissa is ready for Harvard, the answer, in my opinion, is an unequivocal yes. I spent an hour and a half with her, and I've rarely enjoyed myself more. This young woman has brains, poise, insightfulness and energy to burn. She has consistently profited from situations that could easily have defeated a less determined person. I think she would make the most of the opportunities Harvard presents. I urge her admission.

2) Melissa has an unusual background, to put it mildly. Melissa has turned this situation, which could have made her bitter and disaffected, into a positive. She is determined to make something of herself, and in the process to help others from falling into the trap she might have otherwise fallen into. She is active in her church, and has developed and runs a sort of "youth ministry," which conducts outreach to kids in the area who are being tempted by drugs and gangs. She is fascinated by how people's minds work—what makes them do what

Guzman de Jesus 7

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

HARV00000238

they do, and says she wants to be a psychiatrist because "that's how you can really put what you learn about people to work, to help them."

Melissa is not naïve about things. She talked openly about her father, who appears to have lived a sort of rootless existence and who shows up from time to time and tries to re-establish his connection to his daughter. "We try to have a father-daughter relationship," she said. "We do the best we can. It's not perfect, but it's something, and I appreciate that he tries."

Melissa seemed sincere when she said this, and I was impressed by the generosity, and the resilience of character, the statement suggested. At the same time, Melissa realizes that she has been affected by her upbringing. "I suppose that's why I'm so career-oriented now," she said, when I asked how her background had shaped her life. "At least right now, I don't see myself getting married, having a family, having children."

The point of all this is that while she may be a bit rough around the edges, Melissa is quite savvy in the ways of the world. She is well-grounded morally, something she attributes to her grandmother, who raised her, and her commitment to her church. And she is an extremely quick study. I assure you this young woman will have no trouble "adjusting" to Harvard, or of dealing with anything Harvard might throw at her.

3) Melissa seems sincerely committed to making the most of every opportunity she gets. She does not seem afraid of challenge or difficulty. "I want to go to a college with classes that take me out of my comfort zone," she said. A number of her comments during the interview were variations on that theme: "I need a place to grow." "I want something different, something that challenges me."

These may be conventional-sounding sentiments, but Melissa really means them. She discovered the joy of learning later than most "bright" kids do—not until she moved to South Jersey and got into a school that took her seriously. In Miami, she said, she went to a school where the teachers didn't care and where she was expected to fail—"to become pregnant before I turned 15," she said. Only when she moved to here did she encounter adults—outside her family—who recognized her ability and encouraged her to make the most of it. "I started to see that it was worthwhile to learn things," she said. "Once I figured that out, I didn't want to stop."

4) One of the most impressive things about Melissa is that she recognizes how lucky she is, and wants her life to reflect that fact. Melissa is clearly intelligent—she is quick-witted, and has the ability to observe the world around her and think about what she has seen. When I asked her why she wanted to go into psychiatry, she told me about how many of her friends, in both Miami and here, had been diagnosed with personality disorders and simply dosed with drugs rather than counseling and careful attention to their personalities. "That's not right," she said. "It's an easy way out." In other words, she is insightful enough to see that there are moral consequences to the way people do things, as well as to what they do. In my experience, that's not something every 18-year-old can do.

5) Melissa is fun to talk to. She is full of what, in another time, would have been called "spunk." She has confidence in herself and her abilities, and just enough "attitude." She comes across as engaged but not obnoxious; she looks you in the eye and tells you what she thinks about things. "This town is a dump," she said at one point, when she was discussing her youth outreach work there. "You hear 'resorts' and you think it will be this fabulous place, but it's not."

Guzman de Jesus 8

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

HARV00000239

She can also laugh at herself. She described how her grandmother won't let her get too wrapped up in her aspirations. "She always makes me do the chores, first thing when I come home from school," she said. "She thinks I have to be prepared to be a wife and mother. I'll say I have two papers to do or some college to apply to and she'll say, 'Okay, fine, but first wash the dishes.'"

6) Melissa is first in her class and has acceptable board scores, but I think the most impressive thing about her, intellectually, is her combination of focus and balance about her studies. She works hard, and makes the most of her ability, but she does not obsess about it. She has an exceptionally mature, workmanlike attitude toward her studies. "If I have a task, I think about it and do it," she said. "I think about what I would expect if someone were doing the work for me, and that's why I try to give my teachers." She viewed some of her more competitive classmates with healthy amusement. "I let them worry," she said. "I just move on through." She demonstrated that characteristic throughout our interview. There was not a topic we discussed—and the topics ranged from the inner city to politics to choral music—which she hadn't thought about and on which she didn't have something interesting to say. She was a good listener, as well—I had the sense (which I don't get with every interviewee) that I was talking to an adult, or at least a "near-adult."

7) In sum, I was very impressed with Melissa. She may be a bit of a risk, but not as much as you might think, and in any event a risk that could pay enormous dividends. She is smart enough, and self-possessed enough, to do well at Harvard, but most of all, she is genuine enough to be there. I recommend her admission.

Guzman de Jesus 9

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

HARV00000240

**JA4656**

DX002.0029

# Giang Nguyen

**School:** Washington HS
**Description:** Large magnet public high school in a major mid-Western city; 85% of graduates attend four-year colleges; many AP courses offered
**Ethnicity:** Asian American (Vietnamese first language, language primarily spoken at home)

**Mother:** Manicurist    **Father:** Manicurist
**College:** None       **College:** None

**Siblings:** Dai (10), Ha (2)

**Tentative field of study:** Biological Sciences
**Commitment:** 3 (1-5 scale: 1, absolutely certain; 5, undecided)
**Intended occupation:** Medicine
**Commitment:** 2 (1-5 scale: 1, absolutely certain; 5, undecided)
**College activities:** Vocal music, track/cross-country
**Commitment:** 4 (1-5 scale: 1, absolutely certain; 5, undecided)

**Class rank:** 17/1108

**ACT:** English: 30   Math: 33   Reading: 30   Science: 26   Composite: 30   (Writing: 8/12)
**SAT II:** 780 Chemistry        740 Math II        770 World History

| **Extracurricular Activities:** | **Athletics:** | **Employment:** |
|---|---|---|
| Math competitions (9-12) | | |
|     Co-captain | | |
|     4 hours/wk | | |
| Chinese Club, Korean Club, | | |
| Vietnamese Club (9-12) | | |
|     Treasurer | | |
|     5 hours/wk | | |
| Key Club (10, 11) | | |
| Book Club (9) | | |
| NHS (11, 12) | | |

**Academic Honors:**
National Honor Society
Washington Scholar

**Advanced Placement Test Results:**

| | |
|---|---|
| Eng Lang & Comp | 3 |
| AB Calculus | 5 |
| Chemistry | 5 |

**Summer Activities:**
Service learning
Helping uncle with business
Travel to Vietnam

Nguyen 1

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY          HARV00000241

**JA4657**
DX002.0030

**Short answer (most meaningful activity)**

Of all the extracurricular activities I've gotten involved in, I have always liked Math Team best. We meet twice a week, and work on challenging problems from previous competitions. Our coaches would also show us some math tricks, which are very useful. However, it is not only the math problems and competitions that I enjoy, it is the bonds that I have created in the team during these years. I have been in the team for three years now, and went from a member to one of the Captains. It is the place where I have met my best friend, and we are still the best of friends. It is the place where I found a teacher that was "my second mother" in school; she was also my AP Calculus teacher junior year. As nerdy as it sounds, Math Team has created an unforgettable high school memory for me.

**Personal Statement**

Everyone has that someone in their life that is important to them, but that person might seem irrelevant to others. This someone might be an ordinary person, not worth paying attention to or even mentioning. However, this individual had such a big influence on me and did so much for her family that not even words can be enough to show what a hero she is. This person is my grandmother.

Throughout her life, my grandma never complained about her hardships. When my grandpa died in the Vietnam War, my grandma became a widow only at the age of 30. She was left with seven kids, including my mom, to raise on her own. Living in the countryside, farming was her main source of income which proved not to be enough.

She desperately struggled to find work anywhere and everywhere, leaving the children to take care of themselves or having a neighbor check on them when she was gone. In a matter of a month, she became a farmer, a fisherman, and a merchant. Her typical work day started at two in the morning. Having gathered wood the day before, she made the 20-mile trip to the nearest city to sell it. When the sun rose, she came back home and immediately set out for the ocean. She worked along with the other fishermen earning her share of the catch. Then she would sell the fish at the market. Returning home, she ate her only meal of the day. After finishing her plain meal, my grandma walked down toward her small farmland, where she toiled under the burning sun until evening. At night, she came home to the children, who had been waiting for her all day.

After a few years of hard work, she was able to save up enough money to build a bigger house for her growing children. As my aunts and uncles grew older, most of them moved away and started their own families. Throughout these years, my grandma had to endure the deaths of three of her children. She did not show any weakness. Instead, she continued to raise my youngest uncle and my mom, who were still living with her. Then my mom had me, who was another mouth to feed. When my mother could not find any job in the countryside, she moved to the city to find a job. I was left under the care of my grandma. It was not easy living with her. Sometimes we would skip meals or eat as little as possible, because she was stingy with money. My grandma tried her best to provide me with food, shelter, and an education. I did not even realize this until I left her side, immigrating to the United States.

When my family was allowed to come to America, my grandma lent us the money for paperwork and transportation. When we went around borrowing money to go to America, nobody would trust us, and in the end, it was only my grandma that supported us

Nguyen 2

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

HARV00000242

financially until we arrived in America. Therefore, now I am determined to study hard, be successful, and repay her for all that she has done for me and my family. She was my inspiration throughout school. She tells me to dream big dreams and achieve them. However, she has also influenced my personality, making me a more thoughtful and conservative person.

My grandma was always a positive woman, and she looks out for her family's happiness rather than her own. She sacrificed her life and energy to raise the lives of many, including my own. She once said this when I came back to visit her, "You live your life only once. Therefore, make the most of it and study hard now so that in the future you won't regret anything." This has been my motto since then. When I was still living with her, I was not mature enough to know how grateful I should have been. Now, I know that she is one of the most important people in my life.


**Secondary School Report**

I am pleased to offer this letter of recommendation on behalf of Giang Nguyen. I have known Giang for 4 years as her counselor. She separates herself from the rest of her peers because of her extreme determination and focus. I am confident that she will continue her tradition of hard work and dedication this academic school year and apply it to her post secondary education. Giang's story starts from the rural countryside of Vietnam.

Giang's mother left her to live with her grandmother because there were better opportunities for work in the city during post-Vietnam War society. Giang's grandmother held three different jobs including a fisherman, farmer and merchant. They had little for food, and because of this, Giang quickly learned not to be wasteful. She also learned the value of an education because school is not always free in Vietnam. Giang's family soon decided to move to the United States for better educational opportunities.

Giang quickly learned English and was able to attend Washington. She began to excel in all of her classes and immediately became an "A" student. She loved her Chorus class because she was able to express her love for music. She took Latin for two years where she played fun games that helped her to learn Latin. Math has always been an academic strength for Giang. She has taken the most challenging Math course within our school, which is AP Calculus/Analytical Geometry. This year will also be filled with challenging courses, including both AP Biology and Physics. Giang hopes to eventually major in a Pre-Medical program or Biology and Chemistry. Giang wishes to pursue a career as a Pediatrician because she loves both children and science.

Giang also involves herself within our school environment and in her community. She has been a member of the Math Team, danced during our International Day Festival, and been a member of various ethnic organizations including the Korean, Chinese and Vietnamese Club. She also enjoyed our school's book club her freshman year and has been very active in two of our school's most important service organizations as a member of the National Honors Society and the Key Club. She also enjoys playing badminton, listening to music, and reading excellent novels. She has achieved 102 service learning hours within her community by serving her local park district, tutoring at her elementary school, and volunteering at a local nursing home.

Giang has also won various awards and distinctions with our school. She has won the Perfect Attendance Award during her freshman and junior years here. She has been a Washington Scholar since the end of her sophomore year, which is a distinction only given

Nguyen 3

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

HARV00000243

**JA4659**

DX002.0032

to students whose grade point averages are in the top 50 of their class during any given semester. Giang has also received distinctions for participating in academic competitions such as the Latin Olympics and Math Team.

There are only a few students who I would label as "exceptional" in the areas of service, academics, and overall hard work and dedication to their school environment. I recommend her enthusiastically to your academic institution.

### Washington High School Transcript

| Grade 9 | | Grade 10 | |
|---|---|---|---|
| Survey Lit | A/A | H Amer Lit | A/A |
| World Studies | A/A | H US Hist | A/A |
| Biology | A/A | H Chemistry | A/A |
| Geometry | A/A | Adv Alg/Trg | A/A |
| Drafting | B/A | H Latin I | A/A |
| H Comp Info Tech | A/A | | |

| Grade 11 | | Grade 12 | |
|---|---|---|---|
| AP Eng Lang & Comp | A/A | AP Biology | |
| H Early World Hist | A/A | AP Physics | |
| H Sci Lab Chemistry | A/A | AP Psychology | |
| AP Chemistry | A/A | AP Microeconomics | |
| AP Calc-Analytical | A/A | AP English IV | |
| Latin II | A/A | | |

### Teacher Recommendation 1

It is an honor for me to be writing in support of Giang Nguyen's application. My name is Heather Griffin and I am a history teacher at Washington College High School, which is where I had the privilege of teaching Giang Nguyen.

Over the years I have written dozens of letters of recommendation for students applying to college and for scholarships. I have always believed in their abilities and potential, or I would not have written the letters, but being asked to write this letter was the first time I was afraid that I would not be able to write the letter she deserves. Giang is the ideal student. She is honest, kind, and brilliant. Giang is the most deserving of students and there is no doubt in my mind that she will accomplish great things in her life and it is my sincerest wish to help her in any way I can.

Everyone that knows Giang, teachers and students alike, agree that she is hard working, intelligent, and uniquely patient. Toward the end of the last school year I found myself discussing outstanding students with Ms. Howrigan, the AP chemistry teacher. As the conversation progressed Ms. Howrigan and I realized that the students we were both bragging about and praising were in fact the same student, Giang Nguyen. To our even greater surprise I learned that Ms. Howrigan used Giang's tests the same way I did, to check for mistakes in our answer key. Giang routinely earned perfect test scores, so when the first time missed a question it was worth double-checking the answer key. Sure enough, the first time

Nguyen 4

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

**JA4660**
DX002.0033

Giang missed a test question, I found out that I had made mistake on the answer key and that Giang had earned another perfect score. In the five years I have been teaching here, Giang is the only student to have inspired this much confidence and trust in her teachers.

I first met Giang in the fall of her junior year when she enrolled in my honors Early World History course. In a school of over 5,000 students it can take some time to get to know all of your students and after a few years it is difficult for teachers to remember all of their former students, but Giang is one student that none of her teachers will forget. Giang earned over 100 percent in my honors Early World History course, in which the average grade was an 85 percent, and she did such an outstanding job on her projects that I saved several to use as examples in future classes. After looking at a copy of her transcript and speaking to other teachers, I know she will be missed by many of the faculty next year.

In addition to being an excellent student, Giang is also a well-rounded individual who is volunteered in a wide variety of activities at Washington. Giang has participated in activities ranging from Math Team and the book club to a number of culture clubs including Chinese Club, Korean Club, and Vietnamese Club. Giang has also demonstrated her concern for the community with her involvement in the Key Club.

For anyone to truly recognize what an amazing young woman Giang is, it is necessary to understand her past and her family as well. Giang was born in rural Vietnam and out of financial necessity, raised primarily by her grandmother while her parents worked in Saigon and Hong Kong to earn money to help support the family. When Giang was nine years old, she was reunited with her parents and shortly there after they moved to the United States. In the years since arriving in the United States, Giang has not only mastered the English language, she has risen to the top of her class at a highly selective school and become the hope of her entire family.

I feel privileged to have met this extraordinary young woman and I recommend her without hesitation. If you have any questions, please call me or email me.

| No basis | | Below average | Average | Good (above average) | Very Good (well above average) | Excellent (top 10%) | Outstanding (top 5%) | One of the top few I've encountered in my career. (top 1%) |
|---|---|---|---|---|---|---|---|---|
| | Academic achievement | | | | | | | X |
| | Intellectual promise | | | | | | | X |
| | Quality of writing | | | | | | X | |
| | Creative, original thought | | | | | | X | |
| | Productive class discussion | | | | | | | X |
| | Respect accorded by faculty | | | | | | | X |
| | Disciplined work habits | | | | | | | X |
| | Maturity | | | | | | | X |
| | Motivation | | | | | | | X |

Nguyen 5

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

HARV00000245

JA4661

DX002.0034

| | | | | | | | | X | |
|---|---|---|---|---|---|---|---|---|---|
| Leadership | | | | | | | X | |
| Integrity | | | | | | | | X |
| Reaction to setbacks | | | | | | | | X |
| Concern for others | | | | | | | | X |
| Self-confidence | | | | | | | X | |
| Initiative, independence | | | | | | | | X |
| OVERALL | | | | | | | | X |

**Teacher Recommendation 2**

Giang Nguyen is a student at Washington College Prep High School for whom I have had the great pleasure and privilege to know since her freshman year of High School. As her Math Team coach since her freshman year and her AP Calculus teacher last year I am privy to her most recent academic abilities and potential.

Giang clearly displays academic excellence, as shown by her grades. She consistently earned the highest grade out of 50 students in my two AP Calculus classes, and received the highest score one can achieve (5) on the AP test. Ever present, and hard-working, she is a committed and helpful leader or member of any group, team, or club she belongs to. Giang Nguyen is really one of THE BEST math students I have taught in 5 years. I have had conversations with her AP Chemistry teacher (another AP class where she earned a 5) regarding her performance, and she resoundingly concurs with my opinion of Giang as well. While her spoken English is perfect, it is noted that her writing and reading scores are less strong than her other test scores (which are still very high). I expect that has to do with English being her second language, yet I still see her put as much effort into English as math and science, even though it may be more challenging.

Giang is easy to work with and unassuming. I have seen her grow so much as the captain of the math team, and become a true example of leadership—not only with her skill, but also with her demeanor and ability to guide other students through challenging problems. She has participated in and led the math team every year in high school, and also been a part of our International Days festival by participating in a different ethnic group's (Chinese, Korean, and Vietnamese clubs) performance to broaden her exposure to diversity each year. She is never boastful or overly proud of her many accomplishments.

Giang is a lovely young lady to interact with around the school. It is clear to me that she has exceptional natural intelligence, yet it is her outstanding work ethic that I think brings her true academic excellence. She is always searching for the right way to do every problem in math team or Calculus class, and is the type of student who can be shown a technique just once, and then can apply it again on her own in different situations. She learns from her mistakes, and has a desire to improve upon every single one of them. Not only smart, she is also a kind, considerate, and committed student to her friends and teachers alike. You would be well-served to admit this extremely talented student into your class.

| No basis | | Below average | Average | Good (above average) | Very Good (well above | Excellent (top 10%) | Outstanding (top 5%) | One of the top few I've encountered in my |
|---|---|---|---|---|---|---|---|---|

Nguyen 6

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

HARV00000246

| | | | | | average) | | | career. (top 1%) |
|---|---|---|---|---|---|---|---|---|
| | Academic achievement | | | | | | | X |
| | Intellectual promise | | | | | | | X |
| X | Quality of writing | | | | | | | |
| X | Creative, original thought | | | | | | | |
| | Productive class discussion | | | | | | | X |
| | Respect accorded by faculty | | | | | | | X |
| | Disciplined work habits | | | | | | | X |
| | Maturity | | | | | | X | |
| | Motivation | | | | | | | X |
| | Leadership | | | | | | X | |
| | Integrity | | | | | | | X |
| X | Reaction to setbacks | | | | | | | |
| | Concern for others | | | | | | | X |
| | Self-confidence | | | | | | X | |
| | Initiative, independence | | | | | | | X |
| | OVERALL | | | | | | | X |

**Alumni Interview Report**

**Academic (1+)**
*Genuine scholar, Summa potential, top grades, high 700 and 800 scores combined with evidence of original scholarship*
>    Love of Learning—'outstanding'
>    Intellectual Curiosity—'outstanding'
>    Intellectual Originality—Rating—'outstanding'

**Extracurricular, Athletic, Community, Employment, Family Commitments (1+)**
*State, national, or international recognition; truly unusual achievement*

**Personal Qualities (1+)**
*Rare personal appeal and character*
>    Openness to new ideas and new people—'outstanding'
>    Contribution to college life—'outstanding'
>    What kind of roommate would this student be?—'outstanding'

Nguyen 7

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY                                                    HARV00000247

**JA4663**
DX002.0036

**Overall (1+)**
*Absolutely superior for admissions; truly unusual in the entire applicant pool*
   Rare and rewarding exchange of ideas
   Easy flow of conversation
   Diamond in the Rough

**Additional Comments**

   I had the distinct pleasure of meeting Ms. Giang Nguyen in my office. Giang is a bright, engaging young woman whose life to date has been to say the least, interesting. She has overcome a number of challenges to get her to the point that she can apply to Harvard.

   Giang was born in Vietnam where she and her mother lived for some time. For most of this time, her father was in a refugee camp elsewhere in Asia. Fortunately, her family was able to emigrate to the United States when Giang was 9. They ultimately settled in a working class neighborhood here.

   Both of Giang's parent's work long hours, six days a week as manicurists/nail technicians. As a consequence, after school Giang must retrieve her 2-year old sister from day care and watch and feed both the 2-year old and their 10-year old brother while both parents work late into the evening. Giang studies during this time. When I asked Giang if she ever goes out, she replied that she was planning to "hang out" with her friends but that she would have to take her sister and brother along.

   Through all of this, Giang has done outstandingly well. Her class standing, SAT, ACT, and AP scores speak for themselves. The tests do reflect that English is her second language but I can guarantee that she communicates directly and clearly.

   As a consequence of her family's circumstances, Giang's extracurricular activities have been limited for the most part due to school hours. She is a 4-year member of the Math Team of which she's presently Co-Captain. She enjoys learning about other cultures and is presently a member of not only the Vietnamese Club (of which she is Treasurer), she has also participated in the Korean Club and the International Dance Day. We did agree in our conversation that she might consider participating in the Mexican Club, one of Washington's other ethnic clubs. Of course, she is a member of both the National Honor Society and the Key Club; she participates in the school and community projects of both. These include guiding prospective students during open house, collecting the food for the homeless and gathering toys for tots.

   Giang has been able to take out time from her family responsibilities to contribute to our local community. She tutors fourth graders in reading and has served as a day camp counselor on the mayor's park program for kids. As we discussed these endeavors, it became clear to me how interested and committed Giang is to nurturing children.

Nguyen 8

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

HARV00000248



# Evelyn Satmar

**School:** Independence High School
**Description:** Large public high school in the Northeast; 60% of graduates attend four-year colleges; many AP courses offered
**Ethnicity:** Other ("mixed")

| **Mother:** | Homemaker | **Father:** | Physician or surgeon |
| --- | --- | --- | --- |
| **Education:** | B.A., state university | **Education:** | B.A., Ivy League College |
| | M.A., Ivy League University | | M.D., state university |

**Siblings:** Hannah (12)

**Tentative field of study:** Biological Sciences
**Commitment:** 4 (1-5 scale: 1, absolutely certain; 5, undecided)
**Intended occupation:** Undecided
**Commitment:** 4 (1-5 scale: 1, absolutely certain; 5, undecided)
**College activities:** Swimming, Diving; Writing/Literary Magazine
**Commitment:** 4 (1-5 scale: 1, absolutely certain; 5, undecided)

**Class rank:** 2/437

| **SAT:** | 800/700/770 | 800/720/730 |
| --- | --- | --- |
| **SAT subject tests:** | 800 Literature | 780 French Reading |
| | 750 Math II | 740 Molecular Biology |

| **Extracurricular Activities:** | **Athletics:** | **Employment:** |
| --- | --- | --- |
| Literary Magazine (9-12) | Swimming/diving (9-12) | Babysitting |
|     Editor-in-chief (12) |     Captain, rookie of the year | Swim coach |
|     10 hours/week, 48 weeks/year |     10 hours/week, 48 weeks/year | |
| Environmental Club (10-12) | | |
|     1 hour/week, 20 weeks/year | | |
| Science League (9-12) | | |
|     Executive officer | | |
|     4 hour/week, 10 weeks/year | | |
| Interact Club (9-12) | | |
|     1 hour/week, 20 weeks/year | | |
| Foreign language club (9-12) | | |
|     1 hour/week, 15 weeks/year | | |
| Gray's Anatomy challenge (10-12) | | |

**Academic Honors:**
National Merit Scholarship Semifinalist
AP Scholar with Honor
Accepted into state's governor's school
    for engineering and technology
Attended state's Summer Scholars Program

**Advanced Placement Test Results:**

| | |
| --- | --- |
| Eng Lang & Comp | 5 |
| French Language | 5 |
| Biology | 5 |
| Psychology | 5 |

Satmar 1

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

HARV00000249

**JA4665**
DX002.0038

**Short Answer (most meaningful activity)**

I do not think I will ever forget the stillness of the room as I leaned forward to speak into the microphone. This was my moment, my chance to spill forth everything I had painstakingly acquired after two months of after-school sessions, perusing papers infused with heavily scientific jargon. It was the 2007 Gray's Anatomy Challenge.

Having now participated in both the 2007 and 2008 challenges, January and February have become synonymous with three hundred pages and bulging packets. My teammates and I consume facts as we scramble to absorb everything from the symptoms for angina pectoris to the millimeter count for vital lung capacity. We hold conversations while swapping words like tachycardia and orthopnea. As the returning champions, I look forward to defending our title in this year's competition. Yet regardless of the outcome, I will always cherish the confidence and the memories I have gained.

**Personal Statement**

In my household, names are everything. They are almost alive, imbued with such meaning I nearly expect them to crumble from the weight. There is such depth to those strings of letters, a scattered trail of wishes and dreams, lineage, and even a pinch of ambition. I like to think that being named after my great-grandparents was strategic, meant to provide me with twice the amount of spirit. For when I was born, "Evelyn Amalia" was boldly scrawled upon my birth certificate. And in that moment, I was handed much more than a name. I gained a chunk of identity—with enough growing room to wriggle my toes.

Even in my earliest memories, I can recall an abundance of titles. "Evelyn" rarely surfaced, obscured as it was by a masquerade of monikers. If not, I was păpușă (pa-POO-sha), or doll, to my Romanian grandparents, and eventually even Jie Jie, an older sister.

Yet no matter what I was called, I understood what each and every name embodied, along with all its expectations. Which is why I was started to receive a new, unfamiliar nickname in grade school. There are, in fact, two theories as to how I first acquired my nickname at the age of seven. In one account, I was bestowed "Evie" by my second grade teacher. She had noted our potential rhyming relationship; her own nickname was "Jenny". The second theory involves my swim coach. He is a man with no time for trifles: one who responds to all medical complaints with a bellowing "Swim it out!" When we first met, he grinned and said, "Evelyn's too serious. How about Evie?" I had hardly dipped in my feet before he too had affixed a name tag that would last for years.

And for some time, I was content with being Evie—or păpușă, or Jie Jie, or even Tang-Shan-Yu. But one day in third grade, I learned about palindromes, and they improbably altered my world. That night I discovered, with jealous alarm, that my younger sister, Hannah, possessed a name worthy of that privileged title: a palindrome. Although she is five years younger than I, my sister has grown to become my closest confidante. However, we both thrive on healthy competition—and that third grade grammar lesson was intriguing. I was fascinated by the sublime symmetry of the letters. So when I detected Hannah's palindrome, I sought my own with a vengeance. For the first time in my life, I created my own name. And with a quick removal of the "i" my nickname became Eve.

It was the one that endured for another five years. Still, I was curious to see what would happen upon entering high school. I was leaving my Quaker school where every teacher knows your name, your entire family, and all of your pets. Of my seventeen former

Satmar 2

HARV00000250

**JA4666**

DX002.0039



classmates, none would accompany me to my next destination. The words "Independence High School" conjured ghastly imagery for months and at six thirty on that first breezy morning, even the school bus looked menacing. I seemed to pick up new names wherever I ventured and wondered what I could possibly adopt in such a dreadful place.

Luckily, Independence was very different from what I had envisioned. But what most struck me in those early days was that my nickname followed me. I remained Eve, or at least something like it. My nickname has prevailed throughout these past four years of high school. Perhaps it is because I chose it myself that it dictates no roles and carries no restrictions. Perhaps, I am more certain of my identity than I previously thought.

There was a time when I collected nicknames. In fact, if Shakespeare had asked me, "What's in a name?" my seven-year-old self would have replied "*everything*." Yet lately, I have caught an enticing peek into the prospects ahead. It is true that I will always, to some extent, be an Eve. But I have gained a sense of self that no longer relies on labels or words. While recently skimming the Common Application, I came across a section entitled "Preferred Name." My fingers paused on the keys, thoughts aflutter with possibilities. But there is something so appealing in the unknown, and a new start. So for now, I am leaving that space blank.

**Secondary School Report**

I would like to take the opportunity to recommend Evelyn Satmar, a senior at Independence High School, as she seeks admission to your prestigious institute. I have worked with Evelyn as her School Counselor and I have found her to be an extraordinarily gifted student and a warm, personable individual. I have worked in secondary education for the past twenty-seven years and there are a few individuals that compare with Evelyn in terms of academic potential and actual achievement. As successful as she has been at the high school level, I am confident that her best work is still in the future. Evelyn has it all; poise, intelligence, personality and confidence. She is one of those students that only come around once or twice in a career, if you are lucky.

Evelyn is a superior student who has remained in our most rigorous college prep curriculum while at Independence. She has a genuine thirst for knowledge and is always trying to improve her skills. She presents as an individual who is much more mature than her years. Evelyn has the natural ability to think on her feet and handle any situation that confronts her with confidence. She works well with both adults and her peers and brings a positive, enthusiastic approach to whatever she is pursuing. By the time Evelyn graduates she will have accumulated 156 credits and 25 academic units. Please note the strength of her curriculum and the number of honors/AP classes she has taken. To underscore her academic achievement, Evelyn is a regular recipient of the school's annual departmental academic awards. Given the size of her class, it is quite an achievement to have received seven of these awards before her senior year commenced. Evelyn is Independence's only National Merit Semifinalist for the class of 2009, hoping to be a finalist. She was also invited to attend our state's very prestigious scholars program, a wonderful summer experience for the very best students. Just a quick look at Evelyn's list of accomplishments and activities indicates that she is tops among top students.

Evelyn has involved herself with many activities during her stay at Independence High School. To list her activities, awards and community service projects would be too extensive for a letter of this nature. Her extensive involvements are all the more remarkable

Satmar 3

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

HARV00000251

when one considers her academic caseload. Obviously her time management skills are first rate. This is a student that has an emotional IQ to match her intellectual IQ. She relates well with her peers and has made a major difference at Independence High School.

I believe Evelyn will be an excellent addition to your student body and I would like to give her my unqualified recommendation. If you need additional information, please do not hesitate to contact me.

**Transcript**

**Grade 9**

| English 1 | A |
|---|---|
| French 2 | A |
| Latin 2 | A |
| Spanish 1/2 | A |
| Geometry | A |
| Biology/Lab | A |
| World Civ | A |
| Phys Educ | A |
| Health Ed | A |

**Grade 10**

| English 2 | A |
|---|---|
| French 3 | A |
| French 4 | A |
| Algebra 2 | A |
| Adv Bio/Lab | A |
| US History 1 | A |
| Art 1 | A |
| Photography | A |
| Phys Educ 2 | A |
| Health Educ 2 | A |

**Grade 11**

| AP Eng Lan & Comp | A |
|---|---|
| AP French Language | A |
| Pre-Calculus | A |
| Chemistry/Lab | A |
| Genetics/Lab | A |
| U.S. History 2 | A |
| AP Psychology | A |
| Phys Educ 3 | A |
| Health Ed 3 | A |

**Grade 12**

AP Eng Lit & Comp
Latin 3
AP Calculus AB
AP Chemistry
AP Physics B
World Cultures
Phys Educ 4
Health 4

**Teacher Recommendation 1**

With more than thirty years of teaching experience, I have had the pleasure of working with many wonderful young adults who have made my career choice the perfect one. One of the most outstanding students and one of the kindest teenagers I have encountered during my career is Evelyn Satmar. She is one of a kind.

I have known Evelyn since her freshman year when she became a member of the French Club for which I was the advisor until my retirement this past June. Evelyn was a student in my French III honors class during her sophomore year and was enrolled in the French AP Language course I was teaching during her junior year. Evelyn's unique and genuine passion for the study of World Languages was truly evident when she practically taught herself French IV over the summer between her sophomore and junior years. Over only seven sessions of one hour's instruction each, she completed the entire complex French

Satmar 4

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

HARV00000252

IV curriculum including reading the novel *Le Petit Prince*. In this way, Evelyn was able to move from the French III program into the AP course which was not going to be taught during her senior year. Evelyn took both the mid-term and final exams, earning a 98%. I was truly impressed with her self-motivation and diligence to complete all the work even though she received no formal high school credit for this commitment. Evelyn's academic achievement was beyond compare. In both the French III and AP classes, Evelyn earned a high A each marking period, sometimes a 100%, and was always the student with the highest average in class. Her hard work paid off when she scored a 5 on the AP exam.

Evelyn pursues everything with both cheerful enthusiasm and intellectual inquisitiveness. In addition to her ability to remember every complex grammatical concept and every new word spoken in class, Evelyn's oral proficiency skills are superb. I enjoyed listening to her AP taped speaking journal since her accent is so beautiful. Evelyn was always ready to work and learn something new. Whenever in doubt, she was not shy about asking insightful questions. Evelyn's exuberance was contagious and she was a delight to have in class. It is a pleasure to teach someone who is upbeat every day and has such a positive attitude toward school.

Evelyn has always shown interest in the French language and culture. Although very involved in many other extracurricular activities that occupied a great deal of her time, she was an extremely active member of the French Club. She participated in a large number of our activities, events and field trips. I was happy when she was able to join us because her warm personality and impeccable character make her a pleasure to be around. At the end of her sophomore year, Evelyn was inducted into the French National Honor Society. She was immediately elected to the executive committee and still holds that position this year. As an officer, she was and is still directly involved in the planning, organizing, and completion of the many activities. In both organizations, Evelyn was someone on whom I could count when needed. Her dedication and leadership skills were great assets to the club, the honor society, and to me as the advisor.

Evelyn has had the opportunity to travel to other countries, including France, with her family. She loves to immerse herself in another culture and learn about the differences from her own. She hopes to return to France one day and use what she has learned about the language and culture in her classes.

A student like Evelyn comes along only once in a great while. She is a mature, congenial, cooperative and caring person. She has the respect of both the faculty and her peers. Evelyn sets high standards for herself and will add to the academic environment of whichever college she attends. I was fortunate to be Evelyn's teacher not only because she is an excellent student but also because I have learned from her. Evelyn is a beautiful person inside and out, and she has my enthusiastic recommendation.

| No basis | | Below average | Average | Good (above average) | Very Good (well above average) | Excellent (top 10%) | Outstanding (top 5%) | One of the top few I've encountered in my career. (top 1%) |
|---|---|---|---|---|---|---|---|---|
| | Academic achievement | | | | | | | X |
| | Intellectual promise | | | | | | | X |
| | Quality of | | | | | | | X |

Satmar 5

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

HARV00000253

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| writing | | | | | | | |
| Creative, original thought | | | | | | | X |
| Productive class discussion | | | | | | | X |
| Respect accorded by faculty | | | | | | | X |
| Disciplined work habits | | | | | | | X |
| Maturity | | | | | | | X |
| Motivation | | | | | | | X |
| Leadership | | | | | | | X |
| Integrity | | | | | | | X |
| Reaction to setbacks | | | | | | | X |
| Concern for others | | | | | | | X |
| Self-confidence | | | | | | | X |
| Initiative, independence | | | | | | | X |
| OVERALL | | | | | | | X |

**Teacher Recommendation 2**

I am pleased and proud to write a recommendation for a fine young woman, Evelyn Satmar. I have known Evelyn since her freshman year—both in and out of the classroom—and can attest to her excellence as a student as well as the strength of her character. As a freshman in my honors Biology class, I knew that Evelyn had deep intellectual curiosity. She would ask questions that showed she was really thinking about the concepts behind the material being taught. Her work always went beyond what was expected or required. Evelyn had a tremendous aptitude for science, and I learned that she approached all of her classes with the same level of commitment to excellence. Evelyn not only had a challenging course load her freshman year, but she became active in many of Independence's clubs and activities, including the Science League, the competitive team of which I am the Advisor. What I noted about Evelyn, even then, is that she is always smiling, serene and kind to everyone, and I remember thinking that this was truly a remarkably positive character trait for someone with her demanding schedule.

Evelyn took my genetics class during her junior year. This course is an honors elective typically taken by seniors. Evelyn's performance in this class was nothing short of stellar. She was focused and attentive in class, again asking questions that demonstrated the depth of her understanding. Her written assignments were always thoughtfully and thoroughly researched and written. She has meticulous lab skills—she was always very careful to follow protocol and handle lab equipment and data correctly. I found that Evelyn was able to work well by herself, but more importantly she was excellent within a lab group. She would take on the leadership role; yet all the while keep her team moving forward and patiently working with others who did not have her intellectual ability or lab skill. Each Friday in class we would discuss "Genome" by Matt Ridley in a Socratic-seminar type

Satmar 6

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

HARV00000254

format. Evelyn was able to pick out the themes discussed in each chapter and contribute meaningful insights, as well as stimulate conversation within the group. I was able to get to know Evelyn on a more personal level when the entire class went on the senior class trip leaving Evelyn, the junior, behind. We would talk about school, friends, all sorts of teenage things, and I found her to be a mature, funny, caring, interesting, well-balanced young woman, with a very strong sense of ethics and integrity.

Evelyn has been a member of the Science League for four years, and is one of four students on the Gray's Anatomy Challenge Team. Gray's Anatomy Challenge is a college bowl-type competition that is locally televised each February, where a panel of physicians asks graduate level anatomy/physiology/medical questions to the students. The Independence High School team has won this competition for the last three years. Our successes have been a true team effort, led by Evelyn's preparation and poise under tremendous pressure. As an officer this year, Evelyn can be relied on to follow through with whatever needs to be done—and I can trust her word implicitly.

Besides her commitment to science, she is a dedicated athlete—a competitive swimmer not only for Independence but also for a community championship team. She is also an accomplished musician, performing at the local arts center. Evelyn is also an active and contributing member to many other clubs, including being the Editor-in-Chief of the school's literary magazine. She has won numerous awards and has been recognized for her scholastic excellence. She takes on tremendous responsibility both in and out of the classroom, and is able to prioritize all of her commitments. I have never seen her miss a deadline, nor have I ever seen her lose her composure. Evelyn has tremendous time-management skill, and has mastered effective study strategies.

I urge you to accept Evelyn Satmar for admission to your school. She will thrive with the intellectual demands than an academically challenging education will offer her, and will be a valued member of the residential community. Evelyn will proudly represent Independence High School and her University as she establishes her professional identity in the future.

| No basis | | Below average | Average | Good (above average) | Very Good (well above average) | Excellent (top 10%) | Outstanding (top 5%) | One of the top few I've encountered in my career. (top 1%) |
|---|---|---|---|---|---|---|---|---|
| | Academic achievement | | | | | | | X |
| | Intellectual promise | | | | | | | X |
| | Quality of writing | | | | | | | X |
| | Creative, original thought | | | | | | | X |
| | Productive class discussion | | | | | | | X |
| | Respect accorded by faculty | | | | | | | X |
| | Disciplined work habits | | | | | | | X |

Satmar 7

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

| | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| Maturity | | | | | | | | X |
| Motivation | | | | | | | | X |
| Leadership | | | | | | | | X |
| Integrity | | | | | | | | X |
| Reaction to setbacks | | | | | | | | X |
| Concern for others | | | | | | | | X |
| Self-confidence | | | | | | | | X |
| Initiative, independence | | | | | | | | X |
| OVERALL | | | | | | | | X |

Satmar 8

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

HARV00000256

### Evelyn Satmar—Alumni Interview Report

**Academic (1)**
*Genuine scholar, Summa potential, top grades, high 700 and 800 scores combined with evidence of original scholarship*

>    Love of Learning—'truly unusual'
>    Intellectual Curiosity—'outstanding'
>    Intellectual Originality—'outstanding'

Evelyn is the editor-in-chief of her school's literature magazine and enjoys writing poetry. She is also an officer in her school's science league team, which has won the Gray's Anatomy contest in cardiovascular science competition for the last 3 years. She is excited about trying to win the fourth straight competition soon. She also is in her school's Chemistry Charter Club, which teaches seminars for younger students.

I liked her methodical approach to her future intellectual pursuits. She is looking for an interdisciplinary experience in school and her career and is currently most interested in Environmental Science and Public Policy.

She's really very close to "truly unusual" in intellectual curiosity and originality, which is why I gave her a 1 overall.

**Extracurricular, Athletic, Community, Employment, Family Commitments (2+)**
*Local or regional recognition; major accomplishments*

What I really like about Evelyn was that she has a handful of interests outside of school and has focused in on those for which she has a true passion.

She has been swimming competitively for many years and is on her high school's varsity team, primarily now doing individual medleys and the backstroke. Her team is apparently very competitive regionally. She also volunteers as a swimming coach for an 8U team on weekends and during the summer.

She has several officer positions in extracurricular clubs and activities. She is the editor-in-chief of her school literary magazine and enjoys writing poetry. She is president of the Environment Club. She is an officer of her school Science League team, which has won several competitions (see Academic). She is also an officer for Interact, a community service club that does fundraisers and volunteers at shelters and retirement homes. She is also an officer in her school's Chemistry Charter Club, which teaches younger students.

Evelyn has also traveled to some interesting places, including her parents' countries of origin, China and Romania, as well as Israel and Greece. She has enjoyed those experiences and feels that they have positively influenced her thinking and approach to different types of people.

**Personal Qualities (1)**
*Rare personal appeal and character*

>    Openness to new ideas and new people—'outstanding'
>    Contribution to college life—'outstanding'
>    What kind of roommate would this student be?—'truly unusual'

Satmar 9

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

HARV00000257

**JA4673**
DX002.0046

Evelyn ranks very high in all of the example characteristics listed above. She has a unique blend of poise, confidence, sincerity, and humility in her demeanor. She is thoughtful and expresses her ideas very clearly. More than most students her age, she was able to engage in a two-way discussion on a wide variety of topics; she was very interesting to speak with. I enjoyed the time speaking with her and am completely convinced that she will contribute greatly to her college, both in the classroom and through her extracurricular involvement and social interactions.

### Overall (2+)

*Clear admit; one to recruit*
>Rare and rewarding exchange of ideas
>Easy flow of conversation

While I hold the ranking of 1 for a once in a lifetime type of candidate, I must say that Evelyn was probably the best candidate for Harvard that I have met in about 8 years of interviewing. She might not be the absolute best in any given candidate, but I really liked how well rounded she is and how much she has to offer in every regard.

### Additional Comments

Evelyn visited Harvard's campus and sat in on some classes. She was enthusiastic when telling me about one of the classes. She also has thought carefully about what she is looking for in a school, including the scholastic, community, geographical, and social aspects. When she says that she is looking for a diverse group of students and experiences, I don't think she's memorized it from the Harvard brochure—I think she is truly looking for and ready for what Harvard has to offer. She will be an asset if accepted for admission.

Satmar 10

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

HARV00000258

# Megan Turner

**School:** Mountain High School
**Description:** Small, regional high school serving the students of several towns in one of the Mountain States. Located on the corner of a Native American Reservation. Approximately 60% of students attend four-year colleges. Few AP courses offered.
**Ethnicity:** Native American and Caucasian

**Mother:** Teacher/tutor              **Father:** Financial consultant
**College:** State college            **College:** State university

**Siblings:** Jenna (13)

**Tentative field of study:** Social Studies
**Commitment:** 2 (1-5 scale: 1, absolutely certain; 5, undecided)
**Intended occupation:** Government/Politics
**Commitment:** 3 (1-5 scale: 1, absolutely certain; 5, undecided)
**College activities:** Journalism and Crew
**Commitment:** 2 (1-5 scale: 1, absolutely certain; 5, undecided)

**Class rank:** 1/90

**SAT I:** 730/740/800
**SAT II:** 780 World History          640 Math II          780 Literature

| **Extracurricular Activities:** | **Athletics:** | **Employment:** |
| --- | --- | --- |
| School newspaper (9-12) | JV Cross-country (9-12) | Freelance writer |
|    Editor in chief | IM Basketball (9-12) |    4 hours/wk |
|    7 hours/wk | | Intern at Chamber of |
| Lincoln-Douglas Debate (9-12) | |    Commerce |
|    Captain | | |
|    8 hours/wk | | |
| Constitution team (9-12) | | |
|    Captain | | |
|    3 hours/wk | | |
| Community service (9-12) | | |
|    President | | |
|    5 hours/wk | | |

**Academic Honors:**                 **Advanced Placement Test Results:**
National Merit Semifinalist          Eng Literature 5
Quill and Scroll Review Award
Youth Editors of America Award
Various excellence awards from school

**Summer Activities:**
Telluride Summer Program

Turner 1

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY                          HARV00000259

**JA4675**
DX002.0048

Honors institute at State College
Journalism camp

**Short answer (most meaningful activity)**

The phrase "power of the press" has different meaning for me. Journalism stripped the fat from my writing and created my leadership skills.

My press pass allows me to satisfy my curiosity on all sorts of subjects, admitting me to the offices of the city, county, and officials so that I can explore my passion for politics firsthand or behind the superintendent's desk for information no other students have. My awareness of what's going on around me must always be super-high; otherwise, we'll be scooped. And while I'm honing my nose for news, I have to keep an eye out for trouble. After all, if I expect my staff to follow the schedule I set or accept the grades I give, I have to earn their affection—or at least respect. It's obvious that Machiavelli never ran a newspaper. He'd have had a lot of empty space on his hands.

As much as I love the advantages journalism has given me, my affection goes deeper. There's just something about boiling down information for public consumption. It's lovely to think of myself as part of the grand tradition of the fourth estate. The way a page falls into place in my head before I can arrange in on screen is priceless. Journalism is my art, my altered state of consciousness. I could never, ever give it up.

**Personal Statement**

"I'm going to grow up and be just like Dagny Taggart!"

It's another one of those days. You know, one of those useless chunks of light sandwiched between fodder for cheesy skyscapes, the sort of day where it just doesn't seem worth it to get out of bed and drag through another day of school…until my mantra creeps into my consciousness. The vision of what I might become is enough to send me to the shower without another murmur.

Dagny (I always think of her by her first name, as though we were best friends and I occasionally drop by for tea) is everything I always vaguely imagined myself as at some future date. The heroine of Ayn Rand's *Atlas Shrugged* is a business tycoon who is completely consumed by a job she loves, struggling against purposeless red tape and bureaucratic inefficiency while hanging around in nicely tailored Italian suits; who could ask for more? I have always envisioned myself with a corner office, spike heels crunching intimidatingly on tiles scattered with the fragments of a glass ceiling. Throw in a few gentlemen friends like my dear Ms. Taggart's, and I've got a euphoric life ahead of me.

Of course, there are a few facets to my capitalist compadre that I willfully ignore…like the fact that she sleeps around, miraculously avoiding all of the usual consequences thereof. Her sudden conversion to happy housemaid upon introduction to John Galt doesn't sit too well, either. Her flaws, though, are forgivable. I need an idol and she's ready-made for the purpose, stripped of human frailty and that nasty propensity to make mistakes. She's easier to ensconce in alabaster than a real human being, someone who will undoubtedly shift around a little bit and make cracks in my nice casting. Something in me needs that mental vision of what my life ought to be like. Only she can provide it.

We share so much, that figment of a bitter Russian woman's delusions of grandeur and I. I empathize strongly with Dagny's feeling that no one around her understands what

Turner 2

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

HARV00000260

makes her tick or is similar to her in the least. I got my first taste of Galt's Gulch this summer under the auspices of the Telluride Association; I am again praying that my story will parallel Dagny's, foreshadowing my return into a more complete paradise.

Dagny is defined and complemented by her job, willing to sacrifice everything to her beautiful productivity. It gives me infinite hope that I might grab hold of a career that fulfills my promise instead of filling my time. I have found temporary substitutes for her megalomania, immersing myself in the logic of economics, the beautiful guesswork of theoretical physic, the ivory towers cobbled together by dead white men with lots of time on their hands. All the while, I know that it is a prelude to something, something that I will stumble into and that fits in ways I am powerless to describe. Like Dagny, I'll be right where I belong. Unlike her, I won't spring fully formed from my own head. I'll have to claw my way upwards, with all of the mistakes and pain that implies. That's precisely why I need her. Those mornings when the snail's pace of my classes is getting me down or when I'm ready to settle for a profession instead of a passion, I can hold her in my mind as an example of what my future can and will be like. Dagny existed, at least in someone's head. That's a constant comfort to me—and a perpetual reminder that I must keep sprinting forward full-bore regardless of what gets in my way. Even if that obstacle is myself.

## Supplementary Essay

High school is, inevitably, a disillusioning experience. For most people, the moment comes when it's apparent that puppy love isn't true or friendships aren't forever. For me, it happened the moment I sat down in freshman English and was assigned a book I'd read in second grade.

Obviously, high school wasn't the haven of academia I'd been expecting. I was disappointed, but not crushed; I could always continue reading nonstop. That did, however, give a crazy, grapeshot pattern to my education. Some areas were covered in excruciating detail, some glossed over entirely. I was sure high school would give me focus, direction, maybe even a class that presented a daily challenge. Whoops.

My gifted and talented teacher set to work immediately. Even before my high school career began, she'd managed to get me admitted to a debate camp. I was in my element. I uncovered a definite flair for argumentation, as well as an interest in philosophy that persists to this day.

Debate saved my freshman year, giving me something to focus on. My work paid off with more than just a winning record; I was invited onto the senior-only "We the People: The Citizen and Constitution" team as a sophomore. Here, I found another one of the great passions of my life. Case law is fascinating and accessible, an easy target for someone bent on self-education.

I spent my sophomore summer taking a college English course at our State University. It was better than I had come to expect in high school, but it still didn't ring a four-alarm in my head. On the bright side, it did allow me to bypass junior-level English in favor of a senior "advanced placement" course. On the first day of school, our teacher told us that "If you get a five on the AP exam, they give you a pair of wings and incorporate you into heaven." No one in his class had ever done it, more than enough to make me consider it a personal challenge. I'm still waiting for the wings, but I snagged the score.

Meanwhile, I tried to capture that college feeling again that fall. An outreach program that had fizzled at our high school for lack of interest still offered classes at the

Turner 3

**JA4677**
DX002.0050

town down the road. Although I discovered that sociology definitely wasn't for me, I had grounding in the subject and a new weapon in my debate arsenal.

The Telluride Association stepped in to save me from boredom or despair, offering a summer program focused on environmental policy. It not only fell right in with my passion for politics but had direct bearing on my part of the world. Seminar was exactly what I've always thought a class should be. There was extensive reading required, to be sure, but the professors added detail and context to it in class. There were few enough of us that they could focus on our particular interests; my professor ferreted out several textbooks in environmental economics so that I could pursue my specialty. I learned as much fro the people around me as I did in class; folks who had immersed themselves in everything from anarchist theory to the intricacies of the Falun Gong movement were willing to discuss it with me—often all night long. I look back on my time at TASP as the happiest, most productive time of my learning life. There mere thought of it keeps me trudging through high school.

In the interim, though, I am far from bored. My gifted and talented teacher and I secured a grant for experimental online courses in the subjects that interest me; I'm currently pursuing AP macroeconomics. I have been able to design my own curriculum to pursue interests in philosophy and American history. I can still throw myself into journalism and debate with characteristically excessive enthusiasm. Through it all, college is still my Nirvana. I'm expecting to be incorporated anytime soon.

## Secondary School Report

Enthusiastically, and without a single reservation, I am pleased to recommend Megan Turner for admission to Harvard University.

By every standard, Megan has been an exceptional student and citizen at Mountain High School. She is an independently motivated student, who possesses a keen intelligence and an inquisitive curiosity for knowledge. Megan has not only followed the Honors Curriculum; she has supplemented it with opportunities for independent study in journalism, constitutional law, and advanced studies. She has also taken two college courses, earning A's in both. Megan has held a perfect 4.0 GPA, while taking the most academically challenging curriculum offered at Mountain High School, holding leadership positions, and actively participating in the extracurricular program. Within these courses and extracurricular activities, she has developed the ability to listen to concerns, view issues with an open mind, and express her ideas effectively and convincingly through written and oral communication. Over the past four years, Megan has made an invaluable contribution to the school newspaper, serving as editor and earning several awards as noted within her application. She is held in high regard by the staff and she has become a leader among her peers due to her ability to get the job done.

Ingenuity, determination, and intellectual curiosity are all qualities that have earned Megan the respect of her peers and teachers. For example, Megan has severe asthma, but she has not let this deter her from participating in physical education and athletic events. She joined the cross-country team immediately. Even though she is usually last in competition, she has never walked a step, and more importantly, she is a role model for her peers. Understandably, Megan is revered by her teammates and coach for her courage and determination.

Based on my own work with Megan, I know that she has faced frustrations in attempting to find a curriculum that will challenge her sufficiently. Although she has been

Turner 4

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY                                        HARV00000262

**JA4678**
DX002.0051

frank with me about the fact that she cannot wait to escape high school in order to move on to college, she is careful never to make these comments around her peers. Instead, she has sought to find every outlet possible for her abundance of energy and desire to learn.

In summary, Megan is an extraordinarily adept "student." She self-challenges. She reads in-depth to strengthen her understanding of issues and ideas. And, she strives diligently to be balanced in all academic areas. Her intellectual ability coupled with her commitment to excellence make Megan and exceptional candidate for Harvard.

### Mountain High School Transcript

| Grade 9 | | Grade 10 | |
|---|---|---|---|
| Earth Science | A+ | Biology | A |
| English 9 | A | English 10 | A+ |
| Geometry | A+ | Math 3 | A |
| World History | A | Spanish 1 | A |
| Journalism | A+ | Journalism | A |
| PE/Health | A | Econ/Constit Law | A |
| | | PE/Health | A |

| Grade 11 | | Grade 12 | |
|---|---|---|---|
| AP Eng | A+ | AP Government | A |
| Adv Studies | A | Adv Topics | A |
| Adv Math/Stats | A | Calculus | A- |
| Chemistry | A | IndSt AP Econ | A |
| Math 4 | A | IndSt Spanish 3 | A |
| Spanish 2 | A | Physics | A |
| US History | A | Journalism | A |
| Journalism | A | | |

### Teacher Recommendation 1

Megan Turner is unique in my 26-year teaching career. Throughout her four years at Mountain High School she has consistently impressed me and I am delighted to recommend her to you for your consideration.

Her command of the written language is unparalleled. Megan writes with clear, precise, comprehensive style with the ability to entertain so a reader chuckles out loud, enlighten so the reader knows that she has just learned something important or persuade so that the reader will think differently. She tackles stories for our school's nationally award-winning newspaper about issues such as conflict on our reservation with interviews from the tribal chairman and the county commissioners. Both sides found that Megan's stories were better handled, more objective and thorough than the professional press. She writes nostalgic, moving reviews such as her account of the Bob Dylan concert last year which she attended with her parents. Her news stories regularly run on the front page and her editorials provide a strong student voice and school leadership, often provoking action or needed change. Each time she writes for the regional newspaper, where she serves on the student editorial board with other high school students from throughout the western part of the state, we are flooded with reader letters of congratulations. Megan's writing grabs

Turner 5

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

HARV00000263

readers. Her writing has earned her state (first place at the state level for the last three years) and national recognition (Quill and Scroll Society, American Scholastic Press Association, US News and World Reports, and recently the Society of Young Newspaper Professionals).

Recognized as extremely bright and beyond her peers' academic capabilities throughout her educational career here, Megan's work on the newspaper has allowed her to grow and develop personal and leadership skills. It has been a joy to watch her take on challenges and work until she masters them. Her efforts in helping others write satisfactory stories has also been a challenge she has met exceedingly well. Younger students regularly come to Megan for help with stories, how to work the computer, and general advice on how to do their jobs on the newspaper. She now commands an award winning newspaper as editor-in-chief who confidently guides her staff to new heights. Her capacity to grow and her coach-ability make her a delight for any teacher. She is a joy to have in class.

Her superb intellect, capacity for growth, and ability to absorb information is phenomenal. Megan delights in learning and often is the one to "think outside the box" when we tackle problems or issues. Her intellectual capacity is beyond that of any student with whom I have thus far come in contact. She challenges herself to read thought-provoking books on a wide variety of topics, take Advanced Placement courses on-line beyond what is offered at our school, engage in intellectual debates for the fun of it, and to do everything in her capacity to broaden her knowledge and understanding.

As for a hardship she has overcome, her ability to now deal with her severe asthma stands out in my mind. Megan battled severe asthma during her freshman year and missed several days, spent time in the hospital, and could have easily succumbed to depression over this entire ordeal. She did not. After each bout, she made up all work in a timely fashion and carried on. After attending a 3-week asthma clinic out of state, she came back with knowledge about how to deal with her problems herself and was undaunted by the fact that on troubled days she needs to wear to school a pouch with her medications and give herself shots if they become necessary. Many students would find this embarrassing, but Megan takes it all in stride. She will readily discuss her problems if asked about them. She will share her knowledge with others suffering similar troubles. I firmly believe she has a handle on her medical problem and it will not slow her down in any future endeavor. She did this through persistence, commitment to a goal, and personal fortitude.

Once again, Megan is an exceptional person. Her character, integrity, and her personal qualities are exemplary. She provides leadership to students, the school, and the community by her service to the newspaper, her strong writing, and her helping of others. Her public speaking, discussion skills, and debating experience have honed her into an exceptional communicator. She is goal-oriented, committed to her learning, and has the intellectual capacity to do anything she sets her mind to. She is well-liked and respected by her peers and the teaching staff here. She is the type of individual who will make her mark on the world. I believe Megan Turner is an ideal candidate for Harvard and recommend her to you and vehemently urge you to accept her as an applicant to your school.

| No basis | | Below average | Average | Good (above average) | Very Good (well above average) | Excellent (top 10%) | Outstanding (top 5%) | One of the top few I've encountered in my career. (top 1%) |
|---|---|---|---|---|---|---|---|---|
| | Academic achievement | | | | | | | X |

Turner 6

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

HARV00000264

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| Intellectual promise | | | | | | | X |
| Quality of writing | | | | | | | X |
| Creative, original thought | | | | | | | X |
| Productive class discussion | | | | | | | X |
| Respect accorded by faculty | | | | | | | X |
| Disciplined work habits | | | | | | | X |
| Maturity | | | | | | | X |
| Motivation | | | | | | | X |
| Leadership | | | | | | | X |
| Integrity | | | | | | | X |
| Reaction to setbacks | | | | | | | X |
| Concern for others | | | | | | | X |
| Self-confidence | | | | | | | X |
| Initiative, independence | | | | | | | X |
| OVERALL | | | | | | | X |

**Teacher Recommendation 2**

For the past six years, I've had the privilege and honor of working with one of those rare students every teacher dreams of challenging. The brilliance, determination, motivation, intellect, and energy found in Megan Turner are extraordinarily uncommon and exceptional. She is without equal.

As the K-12 Gifted and Talented Teacher/Coordinator for our school district, I work with many gifted and highly able students, but Megan is a standout even among the standouts. I have known and worked with her since I arrived in our town six years ago, when she was a seventh-grader. Throughout that time, I have been Megan's GT teacher, as well as her Debate coach and mentor.

I have learned more new words from Megan than I ever did from my own English teachers! Reading, writing, expressing, thinking, and ideas are as much a part of Megan as is her eye color. She devours books and wishes she had her own library filled with them, floor to ceiling, wall to wall. I love to read myself and look forward to the day when I can reach onto a shelf and pull off a book by Megan. There isn't a doubt in my mind that it will happen. For my Great Books class, which Megan took as an eighth-grader, one of the assignments was a short project that included a two-page minimum written requirement. Megan handed in 23 typed pages…a story that answered all the necessary questions and even some I had not anticipated. Last year for my Advanced Studies class at the high school (self-directed study), she further expanded and developed her incredible abilities. She read the works of various philosophers and philosophies (Ayn Rand, Kant, Nietzsche, the Bible, and

Turner 7

HARV00000265

**JA4681**
DX002.0054

others), wrote comparative summaries of their ideas, and concluded by writing her own philosophical credo! What most of us would consider a daunting task, Megan saw as a delicious opportunity to do what she loves and does so well: read, think, and write. Megan is a true THINKER. She analyzes and evaluates as calmly, easily, and naturally as the rest of us breathe. "Wisdom is knowledge digested," she once said. Megan digests everything and has, as a result, a level of wisdom that is rare even among adults.

A National Merit Finalist who participated in the Telluride Program this summer, Megan doesn't take her natural abilities for granted; rather, she develops them, fine tunes them, and challenges herself to use her abilities for the pursuit of personal interests and community gain. Megan is definitely not one to settle for "good enough." She instead searches for countless and creative solutions to make something not just better, but the best. Megan is the kind of scholar who will seek opportunities and create them where none exist, and she will forge for herself an active and innovative purpose for her years at Harvard University. While working with Megan these past six years, I have been consistently impressed with her ability to perfect and polish that which is already outstanding. With great determination and a rare level of brilliance, Megan brings to her pursuits a flair for creative and undaunted success. She is one to search for and find the possibilities that others are not willing or able to see. Megan knows that success in any area often means creating or discovering that which everyone else said was impossible or ridiculous. She is a true visionary.

Megan readily recognizes her adversities as straightforwardly as she does her vast abilities. She'll be the first to admit that while she excels academically, she is not athletically inclined. Add to this her battles with very severe asthma, for which she has been hospitalized numerous times, and one would think she has plenty of reason to avoid exercise. Yet, Megan is tremendously persistent, never allowing these weaknesses to get the better of her. She works out regularly, runs every step the other girls do in PE, plays intramural basketball, and even joined the cross-country team. What would have been a convenient excuse to others has been an engaging challenge to Megan. She strives to overcome what she can and to learn to deal with what she cannot. That is why her former PE teacher will honestly say, "Megan is my hero."

Another adversity Megan has overcome is her early years of schooling. She began school in another district where she was mistakenly identified in the first grade for their special education program. (They apparently placed her in there because in the process of writing a ten-page story—clearly pretty rare for a six-year-old!—she wrote some of the letters backwards—something naturally common for six-year-olds.) This placement is obviously not where she should have been, yet she spent months there writing her name in the sand and being asked to perform various other tasks far below her actual abilities. I marvel today that the experience did not ruin her outlook on school. Far too many highly and profoundly gifted students will drop out of school after similar circumstances. Yet Megan bounced back with her indomitable determination and unbeatable optimism. Rather than be jaded about what had happened, she prefers to laugh at the irony and to tell the fascinating stories of how she played mind tricks with the teachers to keep herself challenged.

I also work with Megan as the head coach for our high school's Speech, Debate, and Drama team, for which Megan is a Lincoln-Douglas debater. Debate is a passion for Megan, as well as another voice. Her dedication, hard work, and desire to learn contribute to her impressive 88% record, a #1 (top seed) ranking in the Western Division, and a 7th place finish at the State tournament, a reflection not only of her hard work and dedication, but of

Turner 8

HARV00000266

her great analytical and communication skills as well. Through working with Megan on the Debate Team, I have also had many opportunities to observe her leadership skills. As an upper-level team member, she can always be counted on to be a great role model for the younger members of the team. She even devotes energy to priming the new debaters for competition, and assists me each spring in coaching the debaters on our middle school team. She easily finds the balance between establishing rapport and setting high standards. As a result, the younger debaters have tremendous respect for her and have learned debate skills, tact, communication, and leadership from her.

Beyond everything else, Megan is truly herself at an age when most kids struggle with identity. It is a comfort level hard-won for her, as her peers have often ridiculed her for her obvious intelligence and unique idiosyncrasies: "I don't really have fear of rejection by my peers anymore. I used to be rejected all the time and have gradually outlived it. (Maybe I've outgrown it!!!) I figure, if they don't like me the way I am, that's their problem." Megan is full of sparkle, life, curiosity, depth, and messages. I would describe her as determined, insightful, intelligent, creative, honest, innovative, responsible, funny, independent, honorable, sincere, original, hard-working, perceptive, energetic, thoughtful, confident, rare, brilliant, motivated, analytical, and real. Megan is a national treasure.

I truly do not know of anyone more worthy of admittance to your esteemed University. I offer this recommendation with the deepest sincerity and the highest hopes. Please feel free to contact me if you have any further questions. I would be thrilled to do whatever else I can for Megan. With my greatest enthusiasm…

| No basis | | Below average | Average | Good (above average) | Very Good (well above average) | Excellent (top 10%) | Outstanding (top 5%) | One of the top few I've encountered in my career. (top 1%) |
|---|---|---|---|---|---|---|---|---|
| | Academic achievement | | | | | | | X |
| | Intellectual promise | | | | | | | X |
| | Quality of writing | | | | | | | X |
| | Creative, original thought | | | | | | | X |
| | Productive class discussion | | | | | | | X |
| | Respect accorded by faculty | | | | | | | X |
| | Disciplined work habits | | | | | | | X |
| | Maturity | | | | | | | X |
| | Motivation | | | | | | | X |
| | Leadership | | | | | | | X |
| | Integrity | | | | | | | X |
| | Reaction to setbacks | | | | | | | X |
| | Concern for | | | | | | | X |

Turner 9

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

HARV00000267

| others | | | | | | | |
|--------|--|--|--|--|--|--|--|
| Self-confidence | | | | | | | X |
| Initiative, independence | | | | | | | X |
| OVERALL | | | | | | | X |

### Teacher Recommendation 3

Last summer I team-taught a seminar on environmental policy for eighteen exceptional high school juniors. Winners of national competition, students in previous seminars matriculated at Ivy League and other elite institutions with few exceptions. Sponsored by the Telluride Foundation, the class met for three hours every weekday for six weeks. Each student wrote short papers, delivered a term paper, and participated in discussions. The quality of the work generally was equal to that of students in my senior honors seminar at my own university. Teaching this seminar was both satisfying and exhausting for me, a political science professor, currently on leave and directing a program elsewhere.

Writing a recommendation for Megan Turner is not easy because she is easy to caricature. That caricature is of a bright young woman angry with her parents for not making more money and for putting her in a mediocre high school because they live in one of the Mountain States. Megan strongly asserted her belief in markets as the solution to almost every imaginable public problem. In the first weeks of the seminar, Megan was given to *ad hominum* comments and to dismiss any criticisms of her views as mindlessly ideological.

By the end of the summer, Megan had learned to avoid *ad hominum* comments and respond with appropriate logic and arguments to critics. She even admitted that there were instances where government interventions were needed. Her final paper, an analysis of the possibility of sustainable development, was a fine well-documented paper. Based upon her written work, I would rank Megan Turner around the fourth or fifth best student in the seminar. Based upon the quality of her oral participation, she would rank lower.

Ms. Turner has baggage. She is unreasonably obsessed with gaining admittance to your university. She cannot articulate why Harvard would be better for her than other good universities and colleges, beyond an assertion that Harvard is the best. If you accept her, Megan will likely resemble some other bright students from the inner city, i.e. wanting to escape by landing at Harvard with all Harvard means, yet also missing home and its comforts. Megan's challenge is to trust her own abilities and to open herself to liberal learning. She has much to gain from a Harvard education.

### Alumni Interview Report

#### Academic (1)
*Genuine scholar, Summa potential, top grades, high 700 and 800 scores combined with evidence of original scholarship*

Love of Learning—'outstanding'
Intellectual Curiosity—'outstanding'
Intellectual Originality—Rating—'outstanding'

### Extracurricular, Athletic, Community, Employment, Family Commitments (2+)

Turner 10

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

HARV00000268

*Local or regional recognition; major accomplishment(s).*

**Personal Qualities (1)**
*Rare personal appeal and character*
> Openness to new ideas and new people—'outstanding'
> Contribution to college life—'outstanding'

**Overall (1)**
*Absolutely superior for admissions; truly unusual in the entire applicant pool*
> Rare and rewarding exchange of ideas
> Easy flow of conversation
> Diamond in the Rough

### Additional Comments

Megan is a student of unusual ability, with a wide range of interests both in and out of school, a lot of confidence and ambition, which, in her case, seem justified and realistic, as well as an engaging personality that made the interview enjoyable as well as productive for the interviewer. To summarize a little early in this report, I think she would do splendidly at Harvard both academically and in other activities. Harvard would really give this young woman from our rural state the opportunities she needs.

Megan made two remarks during the interview that I think revealed a lot about the seriousness of her interest in Harvard. One was, "going to Harvard is the one thing I've known I want to do just about all my life It's the one place where I've thought I could follow up on all my interests." The other quote was, "I've been reading the Crimson on the web for many months, and I think it's head and shoulders above any other college paper I've seen. I would love to work there if I go to Harvard." She has some credentials for this evaluation and remark since she has numerous writing awards, is the editor of her school paper and was editor of her middle-school paper before that. Among these awards is a national Youth Editors of America award for a concert review written for the daily paper in our capital; a Quill and Scroll award; and an American Scholastic Press Association outstanding investigative journalism award given for a story in the high-school paper about safety and security at her school relating the topic to the Columbine School attack in Colorado.

Megan is also a top high-school debater in the state and co-captain of the school debate team. Because the team has no official coach, Megan says, "I function somewhat in that role also." She was undefeated in debate this school year until two weeks ago. Outside of high school activities, she has coached middle-school debate, helped teach a fifth-grade gifted and talented class in middle school, and been a tutor for third-grade students. She seems like a generous and "giving" person.

She mentioned two summer programs that she said had a big influence on her interests in school as well as her thoughts about the future. One was a program this past summer called "We the People" sponsored by the US Congress to promote study of the US Constitution and the laws derived from it, and the other was a program called the Telluride Association Summer Humanities Program which seems to be a project bringing together good students interested in humanities, encourage study and research, and produce some writing.

Turner 11

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

HARV00000269

About the first one, Megan said, "I was fascinated by the law cases interpreting the intent of the Constitution. If law school is like that, I could easily see myself there." She added that she really hadn't thought about law as a serious interest before being in the program. "I'm thrilled to have discovered so many new interests of mine!" About the Telluride program, she said, "it was the teachers and other students that made the program." She said that the discussions she had with teachers and students were "the best kind of school experience I have ever had." She produced a paper about "Sustainable Development in the World Today."

Megan has a 4.0 GPA, is getting A's in all her classes currently and is a National Merit Finalist. Her writing interest was reinforced by a summer program in which she took English classes and participated in a workshop for high-school students writing for newspapers which was run by the School of Journalism at our state university.

When we talked about possible fields of study in college, and the future in general, she said she is interested in writing, but also mentioned being attracted to business and particularly economics as a possible college major. She followed this by saying, "you know there is such a tremendous influence of economics on the important events in the world."

Actually, she ended up by saying she could see herself quite content in such fields as news writing, government, politics, economics, law, and maybe even history r medicine. I would give her a very good chance of being successful in any of these fields and, more importantly for this report, of making a significant contribution in a college environment like that at Harvard.

Turner 12

HARV00000270

**JA4686**

DX002.0059



# Tracey Eckham

**School:** Cantor School
**Description:** Small, private, college-preparatory day school for girls located in metropolitan area in the mid-Atlantic (partnership with "brother school"); 100% of students attend four-year colleges.
**Ethnicity:** Unknown

**Mother:** Homemaker
**College:** BA from an Ivy League college
　　　　　JD from State School

**Father:** Headmaster
**College:** BA from an Ivy League College
　　　　　EdD from Ivy League Ed School

**Siblings:** Jack (15)

**Tentative field of study:** Physical Science
**Commitment:** 2 (1-5 scale: 1, absolutely certain; 5, undecided)
**Intended occupation:** Undecided
**Commitment:** 5 (1-5 scale: 1, absolutely certain; 5, undecided)
**College activities:** Varsity crew and visual arts
**Commitment:** 1 (1-5 scale: 1, absolutely certain; 5, undecided)

**Class rank:** 85%/71

**SATI:** 730/720/740
**SAT II:** 790 Physics          770 Math II          720 World History

| **Extracurricular Activities:** | **Athletics:** | **Employment:** |
|---|---|---|
| Art and Writing (9-12) | Year-round crew (9-12) | Camp counselor |
| Amnesty International (11-12) | 　Varsity, All Metro | (summers) |
| Habitat for Humanity (12) | 　State Champs | |
| | Cross-country (11-12) | |
| | 　Captain | |

**Academic Honors:**
Writer's Prize (English Department)
National Merit Commended

**Advanced Placement Test Results:**
Eng Lang & Comp　　4
Physics B　　　　　　5
US History　　　　　　4

**Summer Activities:**
Not provided.

**Short answer (most meaningful activity)**

　　My dad taught me how to scull when I was eleven. Since that time, crew has become one of my most important commitments. It has taught me the value of working hard for

Eckham 1

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

HARV00000271

what you want. At the same time, it has also brought me closer to my dad. Crew is a sport that constantly challenges and often disappoints. However, the result is that it has made me more confident and more independent. It forces me to rely on myself for motivation. No one else can do an erg piece or run up the Exorcist stairs (common crew workouts) for me. Crew is meaningful for me because it has given me the courage that has made me a stronger person.

Recently, I raced with my dad in a parent-child double on his fifty-first birthday. Because he had originally taught me how to scull in a double, it brought back memories of when I still relied on him for balance and guidance on the water, and how even now sometimes I still do. I know that he will be proud of me no matter what the outcome of any race, and that he respects me for my dedication to this sport. Thus, crew is meaningful for me because it has strengthened me both personally and my bond with my father.

### Personal Statement

Last year, after taking half a semester of regular physics, I was offered the opportunity to switch into the AP class. I had originally tried to be in that class, but it was already full. By second quarter a space had opened up. Knowing that I was unhappy in the non-AP class, the science department gave me a choice. I could stay where I was and endure the rest of the year, or I could switch into the AP class and face the prospect of not only the harder work load but of making up a quarter's worth of work as well. Switching into an AP class midway through the semester was unprecedented in any department. Therefore, I had no way of knowing how this could turn out. I only knew at the time that this was what I desperately wanted to do. The science department drew up an agreement stating that if I accepted the switch I would be completely caught up in the class by Thanksgiving, two weeks away, and that I understood the risk involved. Accepting this opportunity could have had serious repercussions on my grade in both physics and in my other classes. But I was not thinking of my grades. I needed a class in which my mind could be fully engaged, and regular physics was not the answer. I signed the contract.

The immediate effects of my decision were not good. According to the agreement I had to drop my art class in order to have more time to make up the extra work. Meanwhile, the class had just started learning about momentum, applying what they knew about conservation of energy. In my old class we had been learning about light and sound. I would sit in class feeling slightly dazed while the other students worked on collision problems. After school two days a week and on Sundays I would meet with my math teacher, whom my parents had hired as a tutor. She spoke with a thick Russian accent, and it was hard for me to understand what she was saying. However, without her help I never could have learned a thing. By Thanksgiving I was completely caught up with my work; what mattered now was how much of it I could retain.

Looking back on my decision, I do not think I could have made any other choice. At the time I did not fully realize the risk I had just committed myself to. My grades did drop. I often felt overloaded with work. Also, physics does not come easily to me. It would take me a while to understand even basic concepts. At no one point do I remember regretting my decisions. Physics became my favorite class. I cannot imagine going through a school year without it. For this reason I am now taking AP Physics C. I am the only girl in a class of seventeen guys, most of whom have already taken AP Calculus. It's a hard class, and sometimes I feel as though I know nothing about physics at all. But the challenge motivates me to work harder. Being in a class with all guys simply gives me more incentive.

Eckham 2

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

HARV00000272

Any risk has its rewards and downsides. My decision to switch classes was no exception. I realized that it was up to me whether or not the rewards came up on top. In the end, my work and sacrifice paid off, which I think is true of any risk where one is willing to put in the effort. Putting something on the line and then being willing to fight for it is admirable in any circumstance. I'm thankful that the opportunity presented itself to me, and for the foresight to immediately realize in which class I was better off.

**Secondary School Report**

Tracey's AP US History teacher, who teaches most Cantor students by the time they graduate, describes her simply as "very, very smart." Tracey isn't always as focused as she could be, but he offers an example of her powers of concentration. He always gives a big multiple-choice test just before the AP exam, and Tracey appeared 10 minutes late, looking a bit distracted and apologizing for not having studied sufficiently. She had forgotten that the test was that day. She took it nonetheless, finished with the rest of the class, and scored 96%. He was astonished, although (he says) he should probably not have been, knowing Tracey. While doing well academically engages her, she is clearly passionate about two interests: writing and lightweight crew. Last year, Tracey, a National Merit Commended Scholar, produced some excellent critical and creative work, winning the 11th grade Writers' Prize, and she received the highest accolades from her crew coach for her athletic and leadership skills. "Tracey is the only Senior to be in Varsity for three years straight," the coach notes, "She deserves it."

As Tracey's Foundations of American Literature teacher points out, "She has sophisticated critical powers, and she can marshal them to ace exams." Whereas some students falter under pressure, Tracey thrives. She says it's her competitive spirit. Her crew coach laughs that one reason she has Tracey rowing in bow is that "She makes the boat fast, there. It's a very good feeling as a coach to shove a crew off for finals with a rower who'll be unhappy with anything but gold in the first seat to cross the line." Athletically and academically, Tracey is energized by a challenge. She was determined to study Chinese, despite the complicated logistics of taking a language consortium class at the Sidney School. Mastering a particularly difficult language interests Tracey. She says, "I just don't like limiting myself. I know I do better when I'm faced with something difficult, and I don't mind the learning curve." Her Chinese teacher compliments Tracey on "very good listening and speaking skills, and excellent class work," though she reminds her to "keep practicing those characters!"

Given Tracey's intellect and temperament, it isn't surprising that she began her Junior year in regular Physics, felt she needed a greater challenge, and talked her way into the AP class in the second quarter. She was warned that moving up would require a great deal of dedication to physics, given that she had to master current material as she caught up on the work she had already missed. Her AP Physics teacher says dryly, "To say this was an unusual year in science for Tracey would be an understatement. I hope she feels, as I do, that she accomplished a great deal, and that the year has been a success." Tracey was pleased to earn a 5 on the AP exam.

Tracey's summers are filled with crew camps and competitions. A year ago, for example, she competed at the National Championships and at the Canadian Henley International. She is also Senior co-captain of the cross-country team. She has also for two years been a counselor at a nearby adventure-camp program, teaching younger students to climb, hike, and raft Year-round, Tracey works on art projects: in Advanced Drawing her

Eckham 3

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

HARV00000273

work was "excellent." Tracey will make her mark at her chosen college. She has our unqualified support and very strong recommendation.

**Cantor School Transcript**

| Grade 9 | Sem1 | Sem2/Fin | | Grade 10 | Sem1/Sem2/Fin | | |
|---|---|---|---|---|---|---|---|
| English | B+ | B+ | B+ | English | B+ | A- | A- |
| Chinese I | A- | B+ | A- | Chinese II | B+ | B+ | B+ |
| Accel Geom | B | B | B | Alg2/Trig | A- | A- | A- |
| World Hist IIC | B+ | A- | A- | Geography | B | B+ | B |
| Biology | B+ | A- | A- | Chemistry | B | A- | B+ |
| | | | | Drawing | B+ | | |

| Grade 11 | Sem1/Sem2/Fin | | | Grade 12 | Sem1/Sem2/Fin | | |
|---|---|---|---|---|---|---|---|
| Found Am Lit | A | | | Comp Lit I | B+ | | |
| Travel Narr | B+ | | | AP Calc AB | B+ | | |
| Chinese III | B- | B+ | B+ | AP E. Hist | A | | |
| Precalc | B+ | A- | B+ | AP Phy. C | A- | | |
| AP US History | B+ | B+ | B+ | Religion | B+ | | |
| AP Physics B | B- | B+ | B | Adv Draw | A | | |

**Teacher Recommendation 1**

I am delighted to write this letter of recommendation for Tracey Eckham. I was Sophomore Dean when Tracey was a sophomore and Junior Dean when Tracey was a junior, and I have gotten to know her quite well over the past three years. She is full of talent and promise, and I recommend her to you with enthusiasm.

First and foremost, Tracey is smart. Her grades attest to her prowess in the classroom, but they only tell half the story. Tracey is the kind of person who pursues her interest and accomplishes what she sets out to do. For example, Tracey is interested in writing and consequently received the Writer's Prize for Creative Writing. She loves science and added AP Physics B several months into her junior year and then received a 5 on the AP. She is currently taking AP Physics C and is enjoying it immensely. Likewise, Tracey pursued Chinese, which is only offered at Sidney (a member of our consortium of schools).

Tracey has also been a student of mine her sophomore year in Algebra 2/Trigonometry (accelerated) and is currently in my AB Calculus AP class. In the classroom, Tracey takes learning in stride. She listens, absorbs quickly and moves on to the next concept. I frequently select her to solve the problem for homework, she generally comes up with a creative solution as she approaches the problem with a fresh look. Tracey is fully able to recall ideas from other courses and can integrate them effectively into current material. Her strong foundation in physics serves her well in calculus.

Tracey's favorite activity is crew; she loves being on the water. She has been on the Varsity crew team for the last 3 years (the only senior who has done this in crew). She received the Coach's Award Freshman Year, competed nationally and internationally, was part of All Metro #1 boat junior year, ranked third in cross-country, and placed first in the area for two years in a row. She is also Captain of the Cross-Country Team.

Eckham 4

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

HARV00000274

Tracey describes herself as independent, relaxed, and unique; I concur. One of her special traits is how mellow she is. Few students, who are as busy as she, have such grace under pressure. Tracey has integrity; she is well known as an academician; and she is an excellent athlete. Tracey receives my strongest recommendation.

| No basis | | Below average | Average | Good (above average) | Very Good (well above average) | Excellent (top 10%) | Outstanding (top 5%) | One of the top few I've encountered in my career. (top 1%) |
|---|---|---|---|---|---|---|---|---|
| | Academic achievement | | | | | | | |
| | Intellectual promise | | | | | | | |
| | Quality of writing | | | | | | | |
| | Creative, original thought | | | **School policy prohibits the use of checkboxes.** | | | | |
| | Productive class discussion | | | | | | | |
| | Respect accorded by faculty | | | | | | | |
| | Disciplined work habits | | | | | | | |
| | Maturity | | | | | | | |
| | Motivation | | | | | | | |
| | Leadership | | | | | | | |
| | Integrity | | | | | | | |
| | Reaction to setbacks | | | | | | | |
| | Concern for others | | | | | | | |
| | Self-confidence | | | | | | | |
| | Initiative, independence | | | | | | | |
| | OVERALL | | | | | | | |

### Teacher Recommendation 2

It is a very great pleasure to write on behalf of Tracey Eckham who was my student in 9th grade World History, who has been my advisee since 10th grade, and who is currently taking my AP European History course as a senior. Knowing Tracey and her parents very well as I do, I can feel very confident in recommending Tracey in the highest possible terms as a very bright student with a first-rate mind and also as a person who has shown tremendous determination and grit in all four years of upper school crew, which has been her major area of commitment outside of academics.

Tracey stood out in many ways as a 9th grade history student. The area assigned to her and her partner for her year-long project was the Middle East. She became interested in

Eckham 5

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

HARV00000275

the plight of the Kurds and brought in many weekly news stories on this subject. She did her term paper on a Kurdist terrorist who was finally arrested and tried in Turkey and became an expert on him. Her paper turned out very well. Tracey is now an excellent writer, as is clearly evident from her last two papers turned into me thus far in AP European History. She has a very clear style; her essays are very well organized and supported. But what really sets her apart from other students is the quality and originality of her thinking. Tracey is a very independent thinker who often approaches an issue from an unusual angle. Her logic is very impressive and her evidence is compelling as well. Tracey is that rare student nowadays who is a reader who reads for pleasure, often choosing very demanding philosophical works like those of the French existentialists. She has deep interests and may have the makings of a real scholar. When she gets really interested in something like the Kurds, she really goes the whole hog! Another interest which sets Tracey apart has been her dedication to the study of the Chinese language which she has continued since 9th grade. Very few US kids have this great advantage; it is a great asset which I am sure she will use in college and thereafter. Tracey is multi-talented; she won an award for creative writing and is also an excellent artist who has considerable talent. She definitely marches to her own drummer, however, and has to be deeply engaged in projects of her own choosing. A lot of very difficult concepts in science come easily to her. Last year, she was placed in a far too easy science section. After intervention on my part as her advisor, she was placed in a really difficult advanced section at a great disadvantage from having started late, etc. That is the kind of challenge that really gets Tracey fired up and she definitely rose to the occasion, finishing the course in a very strong fashion. One final example: having taken only the second half of the normal world history curriculum, Tracey elected to take the achievement test which covered the whole course. She did really well—an amazing accomplishment. Tracey IS really brilliant and would flourish in a very challenging college environment, especially with a lot of freedom to choose her courses.

Tracey's biggest commitment outside of academics at Cantor has been to the crew team. I have read the coach's comments over the past years—and she is truly an excellent coach. They have been incredibly positive. Tracey has gained so much self-confidence, skill, strength, and pride from this sport. It has literally been a life-transforming experience for her. Her achievements speak for themselves and are truly remarkable. I have been teaching for thirty-six years now and I have NEVER seen a student work harder at the sport. I used to really worry about the raw state of her hands several years ago, but she has managed to cope with every difficulty and challenge. Her posture and upper body strength have visibly benefited from her many, many hours of hard work. It has helped form her character in so many ways. She is a gentle and patient person, rather soft spoken, and naturally good with small children. I would like to see her devote a lot more time to her art—I found her 9th grade work very promising. She has managed to find some time to pursue it, but I hope she can develop her considerable talent much more fully in college.

Tracey is a genuinely independent thinker and a resolute individualist. She has a very strong will, as her dedication to crew clearly demonstrates. She prides herself on her uniqueness and creativity, but is not overbearing about it. She demands to be taken seriously and to be accepted for who she is, which has made her a bit of a loner. Living pretty far away from school has not made her social situation an easy one. However, she has a very warm and supportive family and has received a lot intellectual stimulation at home. Her father is a headmaster and a remarkable man himself. She resembles him a lot. Tracey is not a follower and does what she thinks is right. However, despite being such a maverick in some ways, she was able to commit herself so totally to crew which is so much a team sport.

Eckham 6

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

HARV00000276

I believe that Tracey is a rather remarkable kid in her fierce determination to truly be herself and not worry about being popular. Cantor kids do respect her and do accept her for who she is.

In conclusion, I recommend Tracey Eckham as a brilliant student with great potential and as a very determined and unique individual with many talents and true grit.

| No basis | | Below average | Average | Good (above average) | Very Good (well above average) | Excellent (top 10%) | Outstanding (top 5%) | One of the top few I've encountered in my career. (top 1%) |
|---|---|---|---|---|---|---|---|---|
| | Academic achievement | | | | | | | |
| | Intellectual promise | | | | | | | |
| | Quality of writing | | School policy prohibits the use of checkboxes. | | | | | |
| | Creative, original thought | | | | | | | |
| | Productive class discussion | | | | | | | |
| | Respect accorded by faculty | | | | | | | |
| | Disciplined work habits | | | | | | | |
| | Maturity | | | | | | | |
| | Motivation | | | | | | | |
| | Leadership | | | | | | | |
| | Integrity | | | | | | | |
| | Reaction to setbacks | | | | | | | |
| | Concern for others | | | | | | | |
| | Self-confidence | | | | | | | |
| | Initiative, independence | | | | | | | |
| | OVERALL | | | | | | | |

## Teacher Recommendation 3

I have been Tracey's rowing coach for over two years now, and although two years seem a short time, we often joke that given our rigorous November through June practice schedule—we meet five and six days a week, at least two hours at a time—I see Tracey more than her parents do at home. My exposure to and understanding of Tracey is even stronger than it is for some of her teammates, since Tracey is in the habit of arriving early and staying late for practice, squeezing in extra stretching beforehand and additional meters or miles when the rest go home. Tracey is one dedicated athlete. She is my only senior oarswoman

Eckham 7

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

HARV00000277

who has been in the first varsity eight since the day she graduated from the novice program, and this year in winter training she is our clear leader, in both commitment and scoring.

For the last two seasons Tracey has been sitting in a bow seat, balancing and powering the boat as our front wheel drive, the first across the line in a series of medal-winning championship races. Tracey is terrific in that position, my first choice for that important seat. But ever ambitious, Tracey has her mind set on stroking the boat, on being the first in line leading all the rowers in intensity and form, rating and rhythm. To that end, Tracey and I regularly discuss her rowing technique and the small tweaks she can make to be the technical leader of the boat. Eager to improve and tough enough to take criticism, Tracey readily receives and incorporates constructive feedback. That said, I find myself giving Tracey less of it than she craves, coaching her with fewer directions than I give some of the other girls, in part because she is already extremely motivated to perform, holding herself to extremely high standards. My challenge as a coach is to get her to relax, to turn down her anxiety and her psychoanalysis of whether she is the best or not while her body carries out what she has trained herself to be able to do in her sleep. Tracey is no extrovert but rather the quietly driven leader-by-example, the lone wolf whom no one fully comprehends but whom the whole team respects, admires, and wants in their boat.

Tracey and I talk the most when we do long runs together during the winter training sessions, and I find her to be philosophical, humble, and kind. She weighs her words carefully before she speaks, and she considers other people generously, as if she is perhaps observing them wistfully from a ship where she can see them and their larger horizons, but wouldn't presume to know their true or more elusive selves. My sense is that she is wise, and from her sleeping and eating patterns, maybe a little depressed, and yet she is also determined to pull herself along and do the maximum that her considerable talents will allow. Tracey is particularly close with her father, who once rowed on the lightweight national team and now overextends himself by serving as principal of an independent middle school and president of our super-active crew council. For you to understand Tracey, I ought to note, respectfully, that Tracey and her dad really carry the family: Tracey's younger brother has big trouble with depression, bouncing from school to school when he can get out of bed, and Tracey's mom is a nice but nervous woman with a squeaky presence, uncertain in conversation, and frightened in public. That Tracey is the pleasant and productive young woman she is within these and other privately tough familial circumstances says loads about her ability to keep her focus, shoulder responsibility, and be independent.

Finally, I want to say that I appreciate Tracey as a caring young friend, not simply as a skilled athlete in our ranks. On a personal level, Tracey was kindly supportive of me last year when I lost my brother in a boating accident: she flew up to New York to attend his memorial service and quietly helped get one of our team's new racing hulls named after my brother, a man she has never met. Tracey acted, I believe, out of compassion, as well as a sharp understanding of what family is supposed to mean. I recommend her highly and hope that you will recognize and honor the progress she has already worked so hard to produce as a student and an athlete. In my view, Tracey has truly earned the privilege of a first-rate education. Thanks for considering her.

**Athletic Rating**

Tracey is highly recruited by the crew team. She would contribute immediately and would be a fantastic addition to the team. She is one of our top recruits this year.

Eckham 8

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

HARV00000278



### Tracey Eckham—Alumni Interview Report

**Academic (3+)**
*Good grades and mid 600 to low 700 scores*
> Love of Learning—'fair'
> Intellectual Curiosity—'fair'

**Extracutricular, Athletic, Community, Employment, Family Commitments (2+)**
*Local or regional recognition; major accomplishment(s).*

**Personal Qualities (3/3+)**
*Above average personal appeal and character*
> Openness to new ideas and new people—'good'
> Contribution to college life—'fair'
> What kind of roommate would this student be?—'fair'

**Overall (3+)**
*Strong candidate*

### Additional Comments

There are times when I believe that my interview report will contribute a great deal to the understanding of an applicant's personality, intellect, fitness for Harvard, etc., times when I am bowled over by a student's intellectual curiosity or passion, and other times, when I think my report will be less useful, when I am dulled by a student's intellectual tepidness. Alas, I suspect that this report will fall into the latter category.

Tracey Eckham is a young woman who seems bright enough, well-rounded in her interests—from physics to poetry to art to rowing crew competitively, and perfectly pleasant and unobjectionable in her manner and presentation. For me, however, there appeared to be a lack of a spark or enthusiasm or any particularly compelling or appealing quality. Tracey made a weak, limp impression on me, and, while she may be academically qualified for Harvard, and may be an asset to the women's crew team (for which, I understand, she is being recruited), I am not able to recommend Tracey for admission.

Tracey's academic performance seems good, if not stellar—low 700s on her SAT Is and high 700s on her SAT IIs, and good grades. In our conversation, she verbalized an interest in academic and intellectual things—switching from general physics to AP physics half-way through the semester (because she wanted to be challenged among other reasons), enrolling in Physics C after completing Physics B because she enjoyed the in-depth study of certain aspects of physics, setting up an independent study on "existential writing" to explore themes present in existentialist texts, and spending three years studying Chinese. However, none of these discussions or descriptions seemed to have any deep interest or intellectual satisfaction behind them.

Tracey expressed an interest in writing, and explains that she submits some of her poetry for the school literary magazine, and that she won the award for her class for writing. But again, this description was bland and almost disinterested. She also expressed

Eckham 9

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

HARV00000279

enjoyment of art, although she gave up her art class when she switched physics classes last year.

Tracey spent five summers as a counselor at an adventure day camp held on the campus of a local school at which her father is headmaster. She learned to rock climb as a camper at the camp, and now teaches rock climbing there, although she does not engage in the activity except for the time she spends at camp. She spent the summer after her sophomore year rowing crew on a club team, and competing in various races. She has been on varsity crew for four years, and expects to continue rowing throughout college. This may be the most notable thing about Tracy, although again, her discussion of crew is limited and uncompelling.

Tracey's affect is muted and sort of quiet. Whether she was talking about her high school, her family, books she's read, art, or rowing, there is a lack of any great zest for life or strength of interest. Perhaps that is just a superficial personality characteristic, but I was unable to engage Tracey in any sort of intellectual conversation of any substance, and did not perceive that Tracey would add much as a classmate at Harvard.

Eckham 10

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

HARV00000280

**JA4696**

DX002.0069

# Mandisi Botlhoko

**School:** International School
**Description:** Selective international school in Africa, many ethnicities represented, majority of students go on to University
**Nationality:** Botswana
**Citizenship:** F-1 Student
**First language/primary language spoken at home:** Setswana

| **Mother:** | Maid or housekeeping cleaner | **Father:** | Deceased |
|---|---|---|---|
| **Education:** | None | **Education:** | None |

**Siblings:** Mandla (24)

**Tentative field of study:** Social Sciences
**Commitment:** 1 (1-5 scale: 1, absolutely certain; 5, undecided)
**Intended occupation:** Health (Non-Medical)
**Commitment:** 1 (1-5 scale: 1, absolutely certain; 5, undecided)
**College activities:** Track, Cross-Country; Social Service
**Commitment:** 2 (1-5 scale: 1, absolutely certain; 5, undecided)

**Class rank:** Top 10/120

| **SAT:** | 460/650/520 | | |
|---|---|---|---|
| **SAT subject tests:** | 750 Math II | 710 Chemistry | 700 Physics |

| **Extracurricular Activities:** | **Athletics:** | **Employment:** |
|---|---|---|
| Culture Club (11) | Cross-country (10-12) | |
| Secretary | Captain | |
| 3hrs/wk | 10hrs/wk | |
| | JV/Varsity Soccer (11-12) | |
| | 3hrs/wk | |

**Academic Honors:**

School Commendation for Achievement (11 & 12)

**Short Answer (most meaningful activity)**

It was not until late last year that I fully understood the impact of the AIDS pandemic in Botswana. Through the first aid training program offered at school, I learnt and discovered a number of shocking facts about the effect of AIDS in Botswana. This activity, for the rather short duration it lasted, had a significant and long-lasting effect on my character and on the way I hope to contribute to my community in the future. I also learnt other practical skills during our first aid training program, and in May this year, I was able to

Botlhoko 1

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

HARV00000281

administer CPR to a soccer player who had collapsed in the middle of a game when no one else could think of doing it. I take great satisfaction in the knowledge that I may have saved another person's life.

**Additional Information**

Even though I have been told several times that there is nothing I can do to change the current situation in Botswana socially and politically, I still believe that something can be done to make things better not only in Botswana but in Africa as a whole. The main reason I seek after quality higher education is to acquire the necessary skills to be able to address such issues. I want to prove every one who thinks the current situation in Africa is permanent, wrong.

I feel that one can not just expect to get everything from society without giving something back. So, as much as I want to gain knowledge, I also want to share what I have with the community I will be living in for the next four years or more. Whereas in the past I used to believe that there is no way in which anyone who is financially unstable can give back to society, I now know that a person can in fact be productive in a number of ways.

*(Mailed Fee Waiver Request)*

**Personal Statement**

I was never discouraged by the fact that I came from an economically-disadvantaged family. My father had been employed as a miner in South Africa until he was diagnosed with Autoimmune Multiple Endocrine Failure and consequently sent home. I was in primary school then. As he was no longer earning a wage, he was only able to keep us in school for the next years and I would have dropped out of school except that I was ready to do anything to stay in school. I remember one day in Form 2 where the Principal was sending home everyone whose fees had not been paid and I was one of them. I could not leave the class when I was told to; I cried and obstinately held on to my desk because I understood that without education, none of my dreams would ever come true. Some teachers were touched by this and they offered to pay my fees for that year. Then I heard about a certain organization which paid my school fees until my completion year—a year after which my father passed away. I later realized, however, that education was broader than just being in a classroom.

I always worked very hard during the day at school for I usually did not get the chance to do so at home where candles were only occasionally available. With hard work, I was always at the top in my class and the school as a whole. This is why the very same year I was supposed to drop out of school, I came first in my class and I was commended for academic excellence. Through the help of the St. Augustine de John Bursary Fund, I completed secondary school three years later, where I obtained the second best O-level aggregate in the country. I look back at these days with pride as they always remind me of my determination, self-discipline and many of life's lessons I learnt during this time. For example, I had had to work during the holidays in order to have money for bus fare. I would ask to clean someone's home for a small payment which I would reserve for bus fare. There were times when I would go to school on an empty stomach and with no pocket money and even though I starved for days at times, I never gave up on school. To be successful in life, I always told myself, required one to make sacrifices.

Botlhoko 2

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

HARV00000282



The two years I have spent at International School have been the most crucial in building the person I am today. It is here that I have had the opportunity to participate in extra-curricular activities both within and outside of school. This is where I became aware that the education experience extends beyond the classroom. During my first year of IB, I partook in the culture club where I was elected for the secretarial position. I was responsible for organizing meetings and venues and noting important discussion points raised in meetings. In the process of sharing my culture and view of life, I got the chance to learn a lot from the different nationalities and cultural backgrounds we had in the club. I learnt, for example, to view life issues from a slightly broader perspective in order to accommodate people from all walks of life, something which I never had considered before. I also taught Botswanan national dances to a number of interested students for performances on the International Culture Day in our school. This did not stop me from taking part in sporting activities as well. I became one of the most dedicated athletes, and participated in a number of national races and one half-marathon race. Early in my final year, I was elected captain of the school athletics team where I was responsible for the organization of training sessions—a task that taught me a range of ways of dealing with people diverse in a number of respects.

The community service program also played a significant role in spurring the deepest passions of service in me. I realized that I could in fact give back to the society in a number of ways. Consequently, I voluntarily took the task of visiting students on behalf of the St. Augustine de John Bursary Fund and, due to the lack of publicity of such a helpful organization, I proposed to create a website for them (link included). This is a task I focused much on during term breaks. Also, during this time I offered mathematics and science study/help sessions at my former secondary school and other surrounding community schools. Because of my interest in the sciences, I joined the 'Healthy Senses' community service project. Here, as students we go around local primary schools and perform screens on children to ensure that they are in a good state to learn. I was also involved in a first aid training program in our school. It was quite an experience for me, especially because the lessons were mostly about caring for the HIV positive, which is one of Botswana's primary concerns.

Over the years, I have learnt a lot from the people I have lived with and I have developed a number of qualities I pride myself in. My family background in particular has been one motivational factor to my academic progress. It serves as a perpetual reminder that I have to work hard in order to improve the lives of the people back home. I have come to realize, however, that to be able to do that, one needs the appropriate armor, which is an informed mind.

**Additional Essay: An Unusual Circumstance in My Life**

My father was sick for the first five years of my secondary school education. Because of his medical condition he was functionally paralyzed. I was in primary school when he fell sick and, because I still had a long way, my parents thought it was economical to have me drop out of school and let my older brother continue as he was half-way through with his secondary school education. They tried to explain their reasoning to me but I could not understand anything except that I thought they liked my brother better. However, I did find help on my own and it is because of that assistance that I am here today. I am neither angry at my mother nor upset with my brother because I can understand now. I sometimes feel I should be grateful I went through this, because although it was a difficult time for me, I learnt a lot from this experience.

Botlhoko 3

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

HARV00000283

**For Students Applying From School Outside the U.S. and Canada:**
*What specific plans to you have, if any, for using the education you hope to receive?*

I do not wish to see any family or anyone go through what I went through. My education will not only be of worth to me, but also, to the many people out there who have not had the opportunity to receive an education. I feel that I need to work hard for the betterment of the many disadvantaged lives, not just here in Botswana but in Africa as a whole. More than anything, I am keen to join forces with the world in fighting socio-economic crises which affect everyone in this world.

**Secondary School Report**

Mandisi joined International School last year with some of the best O level results in the whole of Botswana. He was selected by the International School Botswana National Committee in a highly selective process and he has proved to be an excellent choice. I have never taught him but feel that I know him well as he has been very thoughtful, engaging and proactive in the University application process. Mandisi has a total predicated score of 42 IB diploma points which ranks him in the top 10 of this talented cohort of students.

His teachers are consistent and unanimous in their high praise of his ability, approach and personality. He has excellent powers of analysis and synthesis and his levels of motivation are second to none. He has truly made the most of his academic experience here relishing his first experience in the science laboratories and in the ICT centre. Indeed his IT skills are now so well advanced that he was commissioned by a local voluntary group that had sponsored his high school education to design a website for them to attract more donors. This is a perfect example of how prepared he is to "give back" and do something meaningful with his talents.

Mandisi is a fine athlete, particularly a long distance runner, where his exceptional dedication and perseverance coupled with his natural fitness have seen him compete strongly in both domestic and international half marathons. His community service project has involved testing the vision of local primary school children—a role that he has performed with great diligence and commitment. Mandisi is a selfless character who in his own unassuming style has really contributed much to both the International School community as well as his own highly impoverished rural community in Botswana.

We recommend him warmly for the most selective of colleges for both his academic potential and quality personality. He is one of our most deserving students.

**IB Results**

| Subject | Predicted | Actual |
|---|---|---|
| Setswana A1 EE | A | A |
| Setswana A1 SL | 7 | 6 |
| English A2 SL | 7 | 7 |
| ITGS SL in English | 6 | 6 |
| Chemistry HL in English | 6 | 6 |
| Physics HL in English | 7 | 7 |
| Maths. Sets HL in English | 6 | 4 |
| Theory Knowl in English | B | B |

**O-Level Results**

| Subject | Grade |
|---|---|
| English Lang | A |
| Setswana | A |
| Mathematics | A |
| Additional Maths | A |
| Agriculture | A |
| Biology | A |
| Science (Chem, Phys) | A |
| Commerce | A |

Botlhoko 4

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

HARV00000284

*Grades*

| 7 Excellent | 3 Mediocre |
| 6 Very Good | 2 Poor |
| 5 Good | 1 Very Poor |
| 4 Satisfactory | N No Grade Awarded |

**Teacher Recommendation 1**

I have been Mandisi's teacher for Higher Mathematics since he won a bursary to study here on the International Baccalaureate Diploma programme two years ago.

Mandisi's life story is one of faith and overcoming adversity. After losing his father soon after starting secondary school, often going hungry and not having light to work by in the evenings, Mandisi proved himself by coming top in his class. He was supported by the St. Augustine de John Society and eventually won one of a handful of funded places available at International School, from literally hundreds of applicants.

Our decision to take him as been absolutely justified. Mandisi could realistically achieve a diploma score of 40 points. In Mathematics, he has always shown excellent technique, thorough recall and confident ability to tackle unfamiliar problems. He is, of course, hardworking and tenacious. He contributes helpfully to question and answer discussions in class and has enjoyed the sometimes philosophical forays we have made into the fundamentals of abstract Mathematics.

Character-wise, Mandisi has been shaped equally by hardship and love. He truly values all the support he has been shown and given in recent years. Crucially however, he shows his appreciation through action. As soon as he had the capacity and opportunity to help others, he did so. He travelled by bus around Botswana to visit and monitor other students being supported by the St. Augustine de John Society. He volunteered to teach Maths at a neighboring High School and immediately gained a reputation as a "very good teacher." On International School's Community Service programme, he has taken a major interest in our Healthy Senses project to test and assist children at rural schools around the country. As well as weekly school visits, he played a major part in fund-raising by organising a team to take part in a sponsored run. Mandisi himself is a very good athlete, having taken part in a half-marathon and organised training for the school athletics team (which he captained).

Mandisi's commitment is "to work hard to improve the lives of the people back home." He well-knows that Botswana is ravaged by HIV/AIDS and that he could well be one of the people who could do most about it for future generations. He is quiet and humble yet ambitious to get things done, rather than being ambitious for himself.

With his excellent personal qualities, Mandisi will adapt readily to student life in another country. He will give at least as much as he takes. He is a very able student, utterly reliable and one whom I recommend highly.

| No basis | | Below average | Average | Good (above average) | Very Good (well above average) | Excellent (top 10%) | Outstanding (top 5%) | One of the top few I've encountered in my career. (top 1%) |
|---|---|---|---|---|---|---|---|---|
| | Academic achievement | | | | | X | | |

Botlhoko 5

HARV00000285

**JA4701**
DX002.0074

| | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| Intellectual promise | | | | | | X | | |
| Quality of writing | | | X | | | | | |
| Creative, original thought | | | | X | | | | |
| Productive class discussion | | | | X | | | | |
| Respect accorded by faculty | | | | | | X | | |
| Disciplined work habits | | | | | | | X | |
| Maturity | | | | | | | X | |
| Motivation | | | | | | | X | |
| Leadership | | | | X | | | | |
| Integrity | | | | | | | X | |
| Reaction to setbacks | | | | | | | X | |
| Concern for others | | | | | | | X | |
| Self-confidence | | | | | | X | | |
| Initiative, independence | | | | | | | X | |
| OVERALL | | | | | | | X | |

**Teacher Recommendation 2**

Mandisi has a mature approach to his work and an enquiring mind which doesn't allow him to settle for a less than complete understanding of any topic. He works methodically and pays attention to detail and the quality of his written work is very high. His dry sense of humor has entertained us in many a class.

Mandisi completed a website for a local charity organisation, the Augustine de John bursury fund, as his ITGS project. The fund supplies bursaries for students to undertake secondary education studies. During this process he needed to consult with the organisation to gather information about the organisation and the requirements for the website. The comments I had back from the organisation were about how impressed they were with the professional approach Mandisi took to the whole process. The final outcome was a testament to Mandisi's good work ethic and displayed both his technical skill and his ability to manage a project of this kind.

Mandisi's commitment to giving back to his community is also evident in the many community service projects he has undertaken, both through the school and of his own volition. He has been employed as a teacher at his former school and has given reading and mathematics classes to various groups. His commitment to furthering the understanding of his cultural beliefs and practices within the school is also commendable as he has taken part in traditional dancing and organised Botswanan evenings in the hostel. He is also a talented runner over long distances and a soccer player.

Botlhoko 6

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

HARV00000286

**JA4702**
DX002.0075



Mandisi is a proud and very capable young man, committed to making the best of the opportunities that he is given. I am sure that he will continue to excel academically, in the sporting arena and, most importantly, in the way that he gives back to the community from which he came and who have supported him through the years.

| No basis | | Below average | Average | Good (above average) | Very Good (well above average) | Excellent (top 10%) | Outstanding (top 5%) | One of the top few I've encountered in my career. (top 1%) |
|---|---|---|---|---|---|---|---|---|
| | Academic achievement | | | | | | X | |
| | Intellectual promise | | | | | | X | |
| | Quality of writing | | | | | X | | |
| | Creative, original thought | | | | X | | | |
| | Productive class discussion | | | | X | | | |
| | Respect accorded by faculty | | | | | | X | |
| | Disciplined work habits | | | | | X | | |
| | Maturity | | | | | | X | |
| | Motivation | | | | | | X | |
| | Leadership | | | | | X | | |
| | Integrity | | | | | X | | |
| | Reaction to setbacks | | | | | X | | |
| | Concern for others | | | | X | | | |
| | Self-confidence | | | | | | X | |
| | Initiative, independence | | | | | | X | |
| | OVERALL | | | | | | X | |

### Admissions Officer Interview Report

**Personal Qualities (2)**
*Strong personal appeal and character*

**Overall (3+)**
*Strong candidate*

Of the ten impressive students I interviewed here, Mandisi had the greatest depth and substance. Very mature, thoughtful and grateful for the opportunities he's been given. He told me a heart-wrenching story about his family's inability to pay his school fees and the

Botlhoko 7

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

HARV00000287

day that he was to be removed from the school. He held on his desk so tightly that they couldn't carry him out and cried so hard that his teachers took pity on him and pitched in to pay his fees. What did his schooling cost for a year?...Somewhere around $4. While M. may initially be a bit dismayed to learn that people routinely pay $4 for a cup of coffee, he knows his teachers effectively saved his life, and he seems all about giving back and demonstrating his gratitude through his actions.

Without education, he might well have ended up like his dad who worked in a mine in South Africa and died a painful death as a result of the substances to which he had been exposed at work. Typical of the local community, he has many "relations" --- half-siblings, vaguely related cousins. While he was not critical of anyone, it's clear that he has set out on a different path, one that places emphasis on education and responsibility. Although he is not his mother's oldest son, he appears to be the child most attentive and supportive.

While he is a few years older than most of his classmates, he looks younger— probably the result of substandard nutrition. He apparently is a good runner, and his leadership skills led to his election as team captain. He ran a half marathon in 95 minutes at altitude, so I would think he could walk on to our cross-country team, and the track team would provide a nice "family" for him.

Some might balk at his verbal score, but I doubt this fellow had a single book written in English in his home growing up. He is predicted to get a top score on his IB exam, and he was very articulate in conversation.

I really liked and admired Mandisi. I think he would add a great deal to his classmates, who have probably never envisioned that $4 could so determine the trajectory of a life. There's no question in my mind that he would use his education to the benefit of many others and could emerge as a real leader and a force for good.

Botlhoko 8

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

HARV00000288

# Carrie Miller

**School:** Cherokee High School
**Description:** Large suburban public high school, 92% go onto college (74% to four year colleges)
**Ethnicity:** Caucasian

**Mother:** Social worker
**College:** B.A. from public university

**Father:** Television editor
**College:** B.A. from public university

**Siblings:** Stephen (27), James (23)—both at another Ivy League institution

**Tentative field of study:** Social Studies
**Commitment:** 2 (1-5 scale: 1, absolutely certain; 5, undecided)
**Intended occupation:** Communications (Media, Film, Advertising, Journalism)
**Commitment:** 2 (1-5 scale: 1, absolutely certain; 5, undecided)
**College activities:** Arts, Visual Arts; Dance
**Commitment:** 2 (1-5 scale: 1, absolutely certain; 5, undecided)

**Class rank:** does not rank/630 (4.43/4.5 GPA)
**SAT I:** 670/620/720
        600/660/750
        640/630/640
**SAT II:** 710 Biology    660 Math I    580 World History    670 U.S. History

**Extracurricular Activities:**
Documentary Filmmaking (9-12)
    10 hrs/wk, 48 wks/yr
    Researched, produced, wrote & edited
    4 award-winning documentaries
Campaign for Young Adult Involvement (11-12)
    2 hrs/wk, 50 wks/yr
    Caucus member, youth council member
County Youth Council (12)
    2 hrs/wk, 42 wks/yr
    Advise county exec. & develop legislative agenda
School Newspaper (9-12)
    5 hrs/wk, 42 wks/yr
    Head copy ed, opinions ed, columnist
Ballet (9-12)
    4 hrs/wk, 52 wks/yr
Oboist (9-12)
    6 hrs/wk, 40 wks/yr
    Orchestra, wind ensemble
School Grading Subcommittee (10-11)
    1 hr/wk, 24 wks/yr

**Work Experience**
Ice cream server/cashier (11-present)
    16 hrs/wk, summer & school year
Freelance videographer (10-present)
    3 hrs/wk, summer & school year
    Flower clerk
    16 hrs/wk, summer

Miller 1

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

HARV00000289

**JA4705**
DX002.0078

**Academic Honors:**                    **Advanced Placement Test Results:**

| | |
|---|---|
| 3rd place winner, National History Day | World History    4 |
| 6th place ntl. finalist National History Day | U.S. History    4 |
| 1st place Chicago Film Fest (Youth) | Biology    4 |
| New England Rep at anniversary webcast | Eng. Lang. & Comp.  3 |
| Film catalogued at Modern Art Film Study Cnt. | |

#### Short essay (most meaningful activity)

For the past six years, I have been taking a two-hour ballet class every Tuesday and Wednesday night. I enjoy ballet because the intense concentration that proper technique requires helps me to relax. From the moment I begin putting on my tights and leotard, I can feel my mind clearing itself of the day's events. By the time I enter class, I am in my "ballet world" where I can connect with my body and rejuvenate my mind. The application of proper technique has taught me a lot about how the human body moves and has helped me respect my body and keep it strong and healthy. After class is over, my improved physical and mental well-being stays with me outside the studio. I hope to continue dancing in college and to explore different forms of dance through the on-campus, student-run dance groups.

#### Personal Statement

I sat in a tiny apartment in Brooklyn, riveted by Albert Montag's story. It was November many decades later, but his vivid memories pulled me back to August 1968. "The police lost control," he told me. "I held up my press pass, yelling 'Press! Press! Press!' and the more I yelled, the harder they hit." He was a reporter covering the Democratic National Convention in Chicago when violence broke out between anti-war protestors and police. It was impossible to understand why anyone, especially an officer of the law, would want to hurt the frail man who sat in front of me. I was horrified, but I also felt a rush of excitement. It was the excitement I get from being catapulted back in time, to live in a moment from the past as if I were there. And I knew I'd be able to share that moment, because I was capturing it all on video.

I have been making historical documentaries for five years. It was during the production of my third film, while screening archival footage of the 1968 convention, that I first saw Mr. Montag. He lay in a bed, bandaged and bloodied after the beating, and when a reporter asked his name, I wrote it down. Then I thought, what if I could find this guy and interview him today, more than 30 years later? So armed with his name and Google, I set out to find Mr. Montag. As it turned out, he lived in New York and agreed to meet me.

By the time of the interview, I had already read books, newspaper accounts and magazine articles. I interviewed a college professor who was an expert on the era and screened hours upon hours of archival news footage. I was confident that I was well prepared. I wasn't prepared, however, for how angry Mr. Montag's story would make me feel. I couldn't stop thinking about it. I wanted to find a police officer who was there and confront him with what I'd heard. So, I contacted police associations in Chicago and was put in touch with David Griffin, a retired Chicago police officer who was involved in the so-called police riot. However, when we spoke, he painted just as vivid a picture as Mr. Montag had, only he described being taunted by the crowd, having bricks and even bags of human

Miller 2

HARV00000290

**JA4706**
DX002.0079



feces hurled at him. "We didn't riot," insisted Mr. Griffin. He said the police believed they were under attack, and acted to protect themselves.

After those two interviews, I couldn't decide who was right or who was wrong, but I did know I would never again rely only on books or even experts to get my information. Mr. Montag and Mr. Griffin had dropped me in the middle of a riot, and suddenly, I felt like history was alive.

In my subsequent films, I interviewed as many people as possible who could provide first-hand accounts. These individuals, and their experiences, give my films something my other research cannot. They give the viewer a connection. Nothing is more powerful than seeing a soldier's face as he describes how he lost his leg, or listening to a reporter describe a piece of history he witnessed. Without that emotional connection, history can seem distant and irrelevant.

I hope that when people watch my documentaries, they not only learn something, but feel something. Working on my films has taught me about the importance of preserving history. Conducting these interviews has helped me to see that everyone is a part of history, and everyone has a story. Sharing these stories through my documentaries gives me the chance to be a part of the process of keeping history alive.

**Additional Essay**

Starting in eleventh grade, I joined the Campaign for Young Adult Involvement (CFYAI). What convinced me to join CFYAI was that, unlike other community service activities I have been involved in, CFYAI's youth members came up with all the project ideas and made all the decisions. Everyone was encouraged to voice his or her opinion. Last year we developed a workshop to educate middle school students about the negative consequences of cliques. In this collaborative atmosphere, I began to see a change in myself. I was never an outspoken person, but now I was contributing ideas and steering discussions. My approach to the world was changing too, but I would realize how until, a few months later, I began serving ice cream.

Last summer, I started working at an ice cream store. One night, an hour before closing, the store suddenly emptied out. Normally, I would welcome the break, but there was a problem: my co-worker hadn't shown up and I was alone. Someone driving into the shopping center would see one open store, a small redhead, and a cash register. This did not sit well with me. When I spoke to my boss, she promised it wouldn't happen again. It did.

Over the next few weeks, I had three realizations. First, my complaint might never be addressed. Second, this might be because there were no regulations at the ice cream store regarding minors working alone at night. And third, what if this problem went beyond the ice cream store and me? I did some research and discovered I was right. There were no such regulations anywhere.

When I returned to CFYAI in the fall, I presented my findings as a possible topic for the year's project. Believing that this was beyond the program's scope, CFYAI's advisors redirected me to the County Youth Council, a group of teenagers that acts as an advisory committee to the County Executive. Each year, the council builds a legislative agenda addressing a pressing issue among youth in the county and presents it to the County Executive. I applied for a seat on the council and was accepted. Combining my research with my personal experience, I developed a presentation and successfully convinced the council members that this year's focus should be safety for minors in the workplace.

Miller 3

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

HARV00000291

**JA4707**
DX002.0080

When my proposal was accepted, I felt a strong sense of accomplishment, but more importantly, I felt empowered. I realized that I had the ability to influence the organizations I interact with, from school committees, to the workplace, to local government. My experiences with CFYAI and Youth Council have enabled me to grow into a more outspoken, active person, and with this newfound confidence I have been able to look beyond myself and my own concerns and see the concerns of the broader community. The world will never be perfect, but I now see that if I speak up, I can work toward making it better.

**Secondary School Report**

It is a pleasure to write this letter on behalf of Carrie Miller, a truly outstanding young woman who has distinguished herself from her peers in many ways. As is evident from her transcript, Carrie is an exceptional student, maintaining an 'A' average (just shy of an A+!) in the most rigorous courses offered at our school. As opposed to those who easily earn such grades, Carrie truly works for each and every one. She is intellectually curious and actively engaged in her own learning, delving deep into material to go beyond what is being presented. Carrie is consistently prepared, an active participant in classroom discussions and can always be counted on to provide well thought out and substantiated written work. What is unusual is that Carrie is able to let these qualities shine through as she works every day to overcome an affliction called Sensory Integration Disorder.

Sensory Integration Disorder is a condition that exists when sensory signals do not get organized into appropriate responses, making it difficult to process and act upon information received through the senses. Carrie, for example, has difficulty with fine motor skills, visual tasks and attention and concentration. Carrie has learned to compensate for her deficits (for example, relying on the computer rather than her own handwriting to complete assignments), and has been able to realize her full potential as an accelerated and advanced placement student.

Carrie's SAT scores do not necessarily match her overall academic achievement; however, her standardized tests have traditionally not correlated with her classroom work and achievement. For example, when entering the middle school, Carrie participated in testing for entry into the accelerated program. Her scores did not automatically place her into the program; however suspecting that these scores were not indicative of her potential, Carrie's parents asked that she be placed in the program anyway. Carrie excelled in these advanced and enriched classes and has continued to do so. I have no doubt that Carrie has the ability, determination and analytical thinking to thrive in your academically demanding and dynamic environment. She will undoubtedly contribute positively to your classrooms and campus community. While her grades have been superior and all the more impressive due to her unique issues, it is her extracurricular pursuits that really set Carrie apart from her equally academically impressive peers.

Carrie's most notable achievement related to academics is her involvement in National History Day. She has participated in this program for the last five years, placing either first or second in the regional and state competitions four of the five years, qualifying her for the national level. Carrie's documentaries, in which she interviewed television journalists, college professors and individuals who lived through the events on which she reported, have earned her being recognized at this national level *three* times! In addition, her films have won documentary film awards in international film festivals and have been

Miller 4

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

HARV00000292



included in programs offered by The Muller Museum of Art, the City Public Library's Center for the Research of African-American Culture, and the Applebaum Museum of Art.

Another activity that distinguishes Carrie from her peers is her involvement with the County's Campaign for Young Adult Involvement (CFYAI), a community service learning program in which participants work together to develop workshops to education county youth about timely issues for adolescents. She recently collaborated on a program for middle school students about "cliques," including the effects and prevention, and helped develop a web site this summer called "clicks for cliques." Based on her participation, Carrie was asked to join the County Youth Board; while interning for the Board this summer, she worked on CFYAI recruitment and helped plan the annual fall retreat.

In addition to these two time consuming aspects of her life, Carrie has been a member of two important school district committees, in which she collaborated with administrators and parents while representing her fellow students on grading and ranking policies that affect the entire student body, and has worked as a Staff Writer, Opinions Editor and currently the Head Copy Editor of the school newspaper. She has held a part time job for the last two summers, the last of which she has continued into the fall. Carrie has developed excellent time management skills as she has balanced a demanding high school program with a plethora of time intensive extracurricular activities. I have no doubt she will continue to find this balance at the college level.

Carrie truly stands out amongst the students I have worked with in the past fifteen years and continues to serve as a role model for her peers as a student and young woman who contributes to the school and community in a meaningful way. As you strive to comprise a diverse class, I hope you will recognize Carrie's potential contribution!

I wholeheartedly recommend Carrie Miller!

### Cherokee High School Transcript

| Grade 9 | | Grade 10 | |
|---|---|---|---|
| English 9 Pre-AP | A | English 10 Pre-AP | A |
| Cadet Band | A+ | Computer Art & Design | A+ |
| Spanish II Accelerated | A+ | Band | A+ |
| Math Course II Acc | A | Orchestra | A+ |
| Project Science | A+ | Spanish 3 Accelerated | A+ |
| Biology Acc w/lab | A+ | Math Course III Acc | A |
| Social Studies 9 Pre-AP | A | Chemistry w/lab | A+ |
| Health | A+ | Soc Stud 10 Honors AP | A |
| Phys Ed | A | Phys Ed | A- |

| Grade 11 | | Grade 12 | |
|---|---|---|---|
| English 11 AP | A | Fashion Mktg | |
| Band | A+ | Eng 13-AP | |
| Orchestra | A+ | Wind Ensemble | |
| Spanish 4 Accelerated | A+ | Spanish 13 AP | |
| Precalculus Accelerated | A | AP Calc BC | |
| Biology 13 AP | A+ | Physics w/lab | |
| Forensic Science | A+ | Economics 12 AP | |
| Soc Stud 11 AP | A | Government 12 AP | |
| Phys Ed | A | Contemporary Issues | |

Miller 5

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY                                    HARV00000293

**Teacher Recommendation 1**

It is my pleasure to recommend Carrie Miller to your up and coming undergraduate class. I first met Carrie in my Advanced Placement US History class during her junior year. However, I knew Carrie by reputation due to her long standing work in National History Day. Carrie is an excellent student with a sincere desire to live up to her highest potential. Carrie is an especially hard worker with an intellectual skill to match.

Early in the school year, Carrie expressed concern over every last detail of her study, often asking for constructive criticism in any way to help her improve her AP studies. Carrie dutifully came to extra help and put constructive criticism into practice. As the year progressed I watched her gain a stronger grasp on the material and participate in class confident of her knowledge in US History. This is evident when you examine Carrie's grades. She achieved college credit with a score of 4 on the Advanced Placement exam in US History and scored a 99 on the US History state examination.

Carrie's most significant contributions to her studies in history are her efforts in National History Day. She has won awards in all three years of her high school education as well as numerous international film festivals and has been exhibited at the Muller Museum in Philadelphia. I used one of her films when teaching a lesson on the Korean War. The students and I both learned a lot from her work.

Carrie's accomplishments in my class are even more noteworthy in that she balances her academics against a formidable extracurricular schedule. Carrie has made numerous contributions to the school newspaper, is an accomplished oboe player and has contributed a significant amount of her time toward community service by volunteering at the Campaign for Young Adult Involvement.

I highly recommend Carrie Miller to your freshman class. I believe other professors will find her to be as exceptional as I have found her.

| No basis | | Below average | Average | Good (above average) | Very Good (well above average) | Excellent (top 10%) | Outstanding (top 5%) | One of the top few I've encountered in my career. (top 1%) |
|---|---|---|---|---|---|---|---|---|
| | Creative, original thought | | | | | | X | |
| | Motivation | | | | | | X | |
| | Self-confidence | | | | | | X | |
| | Independence, initiative | | | | | | | X |
| | Intellectual ability | | | | | | X | |
| | Academic achievement | | | | | | X | |
| | Written expression of ideas | | | | | | X | |
| | Effective class discussion | | | | | X | | |

Miller 6

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

**JA4710**
DX002.0083

| | | | | | X | |
|---|---|---|---|---|---|---|
| Disciplined work habits | | | | | X | |
| Potential for growth | | | | | X | |

### Teacher Recommendation 2

It is with distinct pleasure that I take this opportunity to share with you my perception of Carrie Miller. Carrie was a student in my Advanced Placement English Language class as a junior last year, and she is currently enrolled in my AP English Literature class. These Advanced Placement courses are the most challenging English courses offered at Cherokee. In the language courses, students read both fiction and non-fiction, learning to examine rhetorical style, giving as much attention to a writer's technique as to his content. The course culminates in the Advanced Placement Examination in English Language and Composition, which challenges the students to analyze complex written passages for style and purpose, as well as to write their own rhetorical arguments. In the literature course, students are expected to engage in close analyses of higher-level literature, including Joyce, Shakespeare, and nineteenth and twentieth century poetry.

Carrie is one of the hardest working students I have taught in my twenty-year careers. By her own admission, English is not her strongest subject, but over the course of the last year, and continuing into this year, her growth as a critical thinker and writer has been impressive. Never one to be satisfied with mediocrity, Carrie has always insisted on knowing the "why" of each criticism I might make in an essay, and in the "how" of improving it. While she is, like any high-performing student, interested in improving her grade, I continue to be impressed by her intrinsic motivation to improve; Carrie demands excellence of herself and is willing to sacrifice in order to achieve it. This motivation manifested itself in her work on her final assignment of the year. As a culminating project in the AP Language class last year, the students chose a controversial topic, researched it, wrote an argument thesis, and then defended their thesis in a presentation to the class. Carrie chose to argue for a ban on processed sugar products. Rather than work on the project all in one weekend, Carrie came to my classroom after school on a regular basis, working through the project, making frequent revisions, and seeking advice, all to ensure that her paper and presentation were up to her standards. Not surprisingly, her paper and presentation were both among the finest in the class, and the A that Carrie achieved in that class was a testament, not only to her talent, but to her remarkable tenacity.

On a personal note, Carrie, with all of her innate ability and remarkable talents, is highly receptive to criticism and is always willing to learn. On more than one occasion, she has spent time after school simply to refine her understanding of difficult points. Her thirst for knowledge and her willingness to strive to achieve that knowledge make her a most deserving candidate. She will be a credit to any institution fortunate enough to receive her acceptance.

| No basis | | Below average | Average | Good (above average) | Very Good (well above average) | Excellent (top 10%) | Outstanding (top 5%) | One of the top few I've encountered in my career. (top 1%) |
|---|---|---|---|---|---|---|---|---|
| | | | | | | | | |

Miller 7

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

HARV00000295

**JA4711**
DX002.0084

| | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| Creative, original thought | | | | | | | X | |
| Motivation | | | | | | | | X |
| Self-confidence | | | X | | | | | |
| Independence, initiative | | | | | | X | | |
| Intellectual ability | | | | | | X | | |
| Academic achievement | | | | | | | X | |
| Written expression of ideas | | | | | | X | | |
| Effective class discussion | | | | | | X | | |
| Disciplined work habits | | | | | | | | X |
| Potential for growth | | | | | | | X | |

**Additional Letter of Recommendation**

It is my absolute pleasure to write this letter of recommendation for Ms. Carrie Miller. For the past five years she has participated in the State and National History Day programs.

Over the several years, Carrie has produced stunning documentary films that showcase the in-depth research and analysis she conducted on her subject matter. Carrie's work has been recognized and honored nationally.

In June, I saw Carrie's documentary as she competed at the National History Day competition. Her film left me speechless. In ten short minutes, Carrie effectively demonstrated that a well-known film was a triumph of artistic filmmaking, yet also a tragedy for the racial bias and subsequent civil unrest it incited. In addition, her film editing, choice of music, and narration were impeccable; I hung on every work and every image, and I felt emotionally connected to her story.

With an annotated bibliography that spanned twenty-four pages, Carrie's project was well –researched. She effectively used period newspaper articles, film industry publications, the NAACP's newsletter, interviews with film historians, and journal articles on African-American and film history to develop and support her thesis. As I thumbed through her bibliography at the competition, I was amazed by the hard work and determination that Carrie's project embodied.

Carrie won third place in the nation for her documentary that year. I share this story with you for one simple reason. Carrie possesses talent and skills that I rarely saw from my classmates when I was an undergraduate history student. She has already developed the critical thinking, time-management, and organizational skills that she needs to succeed at a highly selective university. Moreover, she is a self-starter, is highly motivated and, in short, embodies every quality that should make her an exemplary candidate for enrollment in your institution.

Miller 8

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

HARV00000296

**JA4712**
DX002.0085

**Alumni Interview Report #1**

**Academic (3)**
*Good grades and mid 600 to low 700 scores*
       Love of Learning—'no rating'
       Intellectual Curiosity—'no rating'
       Intellectual Originality—'no rating'

**Extracurricular, Athletic, Community, Employment, Family Commitments (3)**
*Above average activity or participation*

**Personal Qualities (3)**
*Above average personal appeal and character*
       Openness to new ideas and new people—'no rating'
       Contribution to college life—'no rating'
       What kind of roommate would this student be?—'no rating'

**Overall (3)**
*Strong candidate*

    This candidate is a very pleasant, open, interesting, affable individual. She expresses herself quite well. Her main activity has been making documentary films. Evidently a year or two ago she was #3 in the country and she has obtained a second place in national competition for this activity. She is very interested in people and exerting herself with history as a means to best understand and predict future events in the world. She is quite sincere in these feelings. It was enjoyable speaking with her. She appeared quite fluid in her presentation, however, discussing off the beaten track theoretical subjects she appeared to not have the depth and ability to interpolate what I have seen in other students that I have interviewed. She probably would make a good student at Harvard, however, I do feel that a more structured environment could possibly lead to less frustration for her in the future. She probably will develop more fully to her potential in such an academic environment.

Miller 9

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

HARV00000297

**JA4713**
DX002.0086

**Alumni Interview Report #2**

**Academic (3)**
*Good grades and mid 600 to low 700 scores*
> Love of Learning—'outstanding'
> Intellectual Curiosity—'outstanding'
> Intellectual Originality—'outstanding'

Carrie Miller is a vivacious young woman who attends a large high school and seems to have enjoyed her experience there. She is taking a full course load of honors physics, AP Spanish, BC calculus, government and economics, and literature and composition. She also has a course in fashion marketing. She has particularly enjoyed her government and economics class which seems to be held on alternate days. Her teacher has done a wonderful job of including current events into the curriculum and Carrie feels that she has a much better understanding of the current economic situation. She never liked poetry, but is now enjoying it very much. She made me want to take the class.

She shines when she talks about film making and history. Apparently she started with a seventh and eighth grade assignment and was hooked on it. I could relate to that assignment because one of my granddaughters was involved in such a project and did research on her grandfather. I am not certain who had the most fun. Carrie just continued on her own and hopes to concentrate in film-making and history in college.

**Extracurricular, Athletic, Community, Employment, Family Commitments (2)**
*Local or regional recognition; major accomplishment(s)*

Carrie has spread her time between school and community activities. She has participated in the orchestra, wind ensemble, and marching band all four years of high school, playing the oboe in the orchestra and wind ensemble, and the cymbals in the marching band. She also spends time as the head copy writer for the school newspaper, was a columnist last year and a staff writer in the previous year. The administration must have confidence in her because she served on school-based decision making committees. We spoke a bit about her thoughts on the grade class-rank subcommittee. I also had served on such a committee in my local school district and knew how much the few student's opinions were valued.

She has spent four hours a week on ballet, but does not perform in any productions. The small class seems to be made up of members from a wide age group, but she loves to dance.

Her filmmaking seems to be more of an intense extracurricular activity that is not done in conjunction with school. She has won honors on the national and state level, finished first place in a film festival and has had her films catalogued in several museums. I am certain that you have the complete list, but her enthusiasm and interest in this area is amazing. I am certain that we will be hearing more about her in the years to come. She brought pictures of the many people who agreed to be interviewed by her. I must admit I was impressed with her ability to get these people to give her time for her short ten minute film.

She applied and was accepted to the County Campaign for Young Adult Involvement and is a member of the County Youth Council. She enjoys meeting students

Miller 10

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

HARV00000298

from other parts of the County and working with them to come up with ideas from the youth perspective.

During the summer she works at a local ice cream shop and enjoys meeting so many people. It seems many of them love to talk with her. She has to be a good listener and observer.

## Personal Qualities (2)
*Strong personal appeal and character*
    Openness to new ideas and new people—'outstanding'
    Contribution to college life—'outstanding'
    What kind of roommate would this student be?—'outstanding'

Carrie is a warm, caring individual. She has two older brothers, one lives in the city and works for an advertising agency. On the side he is also interested in theater. I teased her about following in her brother's footsteps, but she was quick to tell me that it was a recent interest of hi, but a long-time interest of hers. Her other brother lives at home and seems to be doing well. He has Asperger's, but functions quite well. Her mother is a social worker with the state Department of Mental Health and works with parents trying to find the best resources for their children with problems. Her father is a TV news editor who allows her to use his editing program on his laptop.

She seems to have a number of friends and care about them. I think that she would bring her enthusiasm and skills to the College.

## Overall (2-)
*Clear admit; one to recruit*
    Rare and rewarding exchange of ideas
    Easy flow of conversation

This interview is a second one for Carrie. She was so disturbed with her first interview that her counselor called the Admissions Office and I agreed to see her. I liked Carrie and think that she would thrive at Harvard.

Miller 11

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

HARV00000299

# Grace Blake Cheng

**School:** Riverside School
**Description:** Independent K-12 day school for girls on the West Coast; 100% of students continue onto university
**Ethnicity:** Chinese and Afro-Caribbean

| | | | |
|---|---|---|---|
| **Parents:** | Never married, lives with both | | |
| **Mother:** | Child care worker | **Father:** | Psychiatric aide |
| **Education:** | High school degree | **Education:** | Some college |

**Tentative field of study:** Engineering
**Commitment:** 1 (1-5 scale: 1, absolutely certain; 5, undecided)
**Intended occupation:** Government/Politics
**Commitment:** 2 (1-5 scale: 1, absolutely certain; 5, undecided)
**College activities:** Debate; Harvard Engineers Without Borders
**Commitment:** 2 (1-5 scale: 1, absolutely certain; 5, undecided)

**Class rank:**    School does not rank; 65 students in the graduating class

| | | |
|---|---|---|
| **SAT:** | 720/700/690 | |
| **SAT subject tests:** | 690 Physics | 760 Math II |

**Extracurricular Activities:**
City Police Youth Advisory (10-12)
    Youth rep. and liaison
    Wrote and produced PSA
    3.5 hours/week, 42 weeks/year
Public Housing Cooperative (9-12)
    Member, initiated youth group
    2 hours/week, 52 weeks/year
Peer Mentorship Group (10-12)
    Founder, organizer
    2 hours/week, 40 weeks/year
Student body president (12)
    5 hours/week, 40 weeks/year
Referee (10-12)
    3 hours/week, 24 weeks/year
Violin, tenor sax, clarinet (9-12)
    3 hours/week, 40 weeks/year
Debate (9-12)
    3rd place in state
    1 hour/week, 40 weeks/year

**Athletics:**
Soccer (9-12)
    Goalkeeper
Capoeira
Yoga
Kayaking

**Employment:**
Research Intern (eng.)
40 hrs/week, summer

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

HARV00000300

Cheng 2

**Academic Honors:**
National Merit Scholarship Semifinalist
Secondary school scholarship (100% of fees)
Community leadership award finalist

**Advanced Placement Test Results:**
Computer Science     5

**Short answer (most meaningful activity)**

After completing the intensive Rockies Institute summer program, I was placed at Pinecrest Wireless Networking (PWN) for a summer internship. During my 5 weeks at PWN, I worked on improving the accuracy of PWN product performance test procedures. While I appreciated the technical aspect of my task, I was particularly proud of the improved customer service aspect of my proposed solution. Additionally, I redesigned an internal database for all of PWN's projects. My version of the database was published to the online server, to be used by PWN managers around the world. In my capacity as an intern, I used my logic, creativity, and problem solving skills while demonstrating my proficiency with Microsoft Access as well as my ability to communicate effectively in a team environment.

**Personal Statement**

As a teenager, I have a love-and-hate relationship with social networking sites. While I am passionate about using technology to advance our lives, I am concerned about the risks that youth face while on the Internet. Presenting my extensively researched speech about youth and social networking sites to adults and teenagers at state championships debate banquet, I was met with resistance from most teenagers to discuss the topic, and denial from adults who did not believe in the alarming statistics I brought up. During my speech, a young woman loudly scoffed at my statements. It was obvious that my topic was not discussed often, but never did I cease spreading my message—I knew it was too important to abandon. I knew that a third of teenagers online have been contacted by a stranger and that online words can leave deep wounds. I knew many people who had suffered, and continue to be hurt by online interactions with both friends and strangers; I have consoled many as they thanked me for being so open to discussing this highly emotional topic. The youth I talked to felt vulnerable, alone, and targeted. I was more motivated than ever before to continue promoting safer online interactions. Steadfast to my commitments of creating dialogue and promoting safe online experiences for youth, I returned home and decided to approach my school about the possibility of conducting workshops for the student body about safe online interactions. As Technology Head at my school, I was given opportunities to meet with staff to discuss my concerns, but never the student body. However, I made sure that whenever possible, I reminded my peers not to accept a friend request from a stranger, and I strongly discouraged posting inappropriate photos, videos, and derogatory comments online—once, I grabbed hold of a computer to delete a degrading picture as it was being uploaded onto Facebook.

The social risks that I take are miniscule in severity when contrasted to the risks that my friends and peers encounter while online. I truly believe my actions to stop cyberbullying and other inappropriate conduct online is the right thing to do; I know I will see the benefits of my actions in the future. I also know that I cannot stop all the online misconduct and cyberbullying. This fall, on a Friday night, a serious cyberbullying incident took place,

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

HARV00000301

Cheng 3

involving my entire school and damaging the integrity of students and staff. At that point, I took the initiative to contact the technology staff at Riverside and then proceeded to counsel those that were extremely hurt. Also, I wrote a speech, which I then presented to the entire student body on Monday morning during an impromptu assembly, without teachers present. Turning my speech into an interactive workshop, I submitted to the entire student body that instituting safe technology use was an important aspect of developing a caring school community. Afterwards, I led students to draft a declaration committing to promoting safer online presence. I am currently modifying this workshop, as I have been invited to deliver it at several elementary schools in the area. I have also had the extreme privilege to discuss and work on the declaration with a police officer who specializes in computer forensics.

It was so rewarding to be able to finally express myself; it was even more rewarding when people approached me privately to thank me for my words and what I had to say, confiding that they were too shy to speak their mind but wished for me to continue speaking mine. Later that week, a Social Studies teacher told me that for an essay assignment about leadership and leadership qualities, several eighth-grade students wrote about me. I have never been so touched. I believe such rewards and honors came my way because I was following my passion and truly believe in my message. Through my initiatives I hope to have conveyed my passion for safe online interactions and my belief that conducting oneself with integrity is at all times crucial. My experiences have already taught me that the topic I have chosen to champion is one not freely talked about, and 'taboo' to some; however the response to it must not be censorship nor denial but rather an open mind and a willingness to listen. Throughout my workshops, speeches, and discussions, I have begun a controversial but necessary conversation with my school and community at large about a pressing topic that poses many dangers. I have shared my message in a way that suits my passions and consequently, have had countless rewarding experiences.

Despite risking social isolation due to my stance against inappropriate online behavior, I remain confident that what I am doing will benefit my community. Having a safe community, especially for youth, is undoubtedly essential. These safe communities must exist both in the real world as well as in the virtual one.

**Additional Essay**

Living in a healthy, vibrant community in the Traditions Cooperative Housing Development, the spirit of giving is a constant source of inspiration and hope. My own experiences of community service are truly invaluable and I cherish opportunities to help others. Before we moved into subsidized housing, my family suffered financial and emotional setbacks resulting from a serious accident. Unable to continue my expensive violin lesions, a neighbor offered me free sessions. Fueled by this gesture of kindness, I am inspired to tutor younger children in my neighborhood. I hope I can share with them the passion to create beautiful music. I am proud that they come to me ready to clap rhythms and practice scales. Inside the gates at Traditions, you can hear a handful of violinists playing their own unique tunes.

There are numerous ways to help out at Traditions. From helping an ill neighbor take out their garbage, to cooking meals for a family with a newborn baby, to putting on seasonal events for the young children, I make sure that I not only contribute to the best of my ability, but also take the initiative to help my community in new ways. With respect to

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

HARV00000302

**JA4718**
DX002.0091

my interests in youth mentorship and sustainability, I have introduced several projects at Traditions.

The rising cost of fresh produce and the economic downturn affects everyone, particularly families with lower incomes. With an interest in sustainability, I researched and implemented deck-top gardening and transformed our common areas of green space into pots of tomatoes, herbs, lettuce, blueberries, squash, corn, peas, beans, and carrots, and pumpkins. This summer, cultivating the interests of youth and seniors alike, Traditions members turned "green thumbs" and discovered that I make a delicious tomato/basil orzo salad! Recognizing that we were using more water, I encouraged establishing a grey-water system. In a meeting, I explained why collecting grey-water to water our gardens and pots would benefit Traditions as well as the environment. I organized and collected grey-water from each housing unit and soon other youth (including four and five year olds) started doing the same. It because one of the most fun activities at Traditions. After that, I realized that the youth at Traditions had so much energy to give that I designed more initiatives for us to undertake.

At Traditions, the adults participated through committees and the young children got involved through various co-op celebrations. Traditions didn't have a committee for pre-teens and teenagers to fully engage in our community. With weekly homework-help sessions, offering free music lessons, and general membership opportunities, I formed the Traditions Youth Committee. Recently, my state's department of housing and community services recognized that one of the mandates for the co-op housing movement is a focus on the next generation. I have been invited to attend the next national co-op housing meeting where I will be discussing youth engagement.

Truthfully, one cannot measure the value of cooking and freezing a week's worth of soup for a neighbor who has had a family member pass away, or the value of younger children coming up to my door knowing that they can get homework help. Living in my co-op is not just about helping others in times of need—it's also about celebrations and thriving in a supportive community. Co-op living is amazing to be a part of: everyone knows their neighbors, we work together for good causes, and depend on each other—all for the benefit of our healthy community. Each member can, and does, offer something unique to the co-op. With my participation at Traditions Housing, I believe that I have made a valuable contribution to my community. The true beauty and importance of living and contributing to such a community as my housing development is that every action that benefits your community benefits you as well. Traditions is a wonderful community that I am so honored to live in.

## Secondary School Report

Grace Blake Cheng received the Gold Scholarship as an entering student at Riverside. This is a full-tuition scholarship presented to a new eighth grade student. The criteria for this need-based scholarship are demonstrated excellence in academics, citizenship and extracurricular activities. I have known Grace for the past five years in my role as her academic advisor.

As demonstrated by her outstanding academic achievement, Grace is a highly capable student. With her postsecondary goal being engineering, Grace has focused on the sciences in her high school program. She has taken the highest level of courses offered by our school in the physical sciences and mathematics. Grace is equally talented in the

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

HARV00000303

Cheng 5

humanities and languages. This year Grace is taking AP Microeconomics and AP English Literature, in addition to AP Chemistry and AP Calculus. She is expected to obtain a score of "5" in all her AP exams. Grace was unable to fit in French in her junior year so she took the course through Distance Education. Throughout Grace's high school years, her teachers have commented on her ability to grasp concepts with ease, on her sharp analytical and critical thinking skills as well as on her ability to problem solve. Whether it is in a Law class or a Physics class, Grace's contributions are thoughtful, meaningful, intelligent and insightful. Grace is extremely creative. She is able to express profound thought with facility; and can do so in diverse and creative ways. When Grace appears before an audience; be it to address an assembly, deliver a recitation or a speech at a public speaking contest; there is a hushed anticipation among the audience knowing that it will be a moving, powerful or entertaining speech, poem or reading as suited to the occasion.

Grace is truly an exemplary leader, a voice in the community and an advocate for numerous causes. She has been a member of her local subsidized housing board, an HIV/AIDS action committee, a youth representative on the local police chief's youth advisory committee and a representative to the state attorney general's youth crime advisory committee. At school, she has been debate president—her skill and talent leading her to represent the school at events such as the state debate championships (earning 3rd place overall) and the International Public Speaking Tournament in 2010. In the spring this year, Grace was elected by the student body to be the student body president her senior year. Grace has already demonstrated her initiative and tremendous leadership in this role. One aspect of her role has been her involvement in the new student orientation. Riverside had a record number of students this year. Grace has been most involved in helping new students, who have come from a variety of different schools and countries, adjust to their new life at Riverside. I have heard from parents of new students about how Grace has reached out to students even outside of school, involving them in social activities; thus making sure they feel welcome at the school. One of Grace's tremendous leadership qualities is that no task is too big or small for her—she will take on a major challenge, yet pay attention to the smaller details.

There isn't enough room to talk about this very special young woman. She is one of the most exceptional students that I have met in my career. Grace's incredible academic talents, her creativity, her ability to express herself most succinctly are qualities that are complemented and enhanced by her extremely compassionate, gentle and warm nature. Grace is a person of the highest integrity; who is not afraid to defend her values and to speak out against injustice and wrongdoing at any forum whether it is an assembly or a public meeting—her delivery is always gracious, forthright and sincere. I feel honored to recommend Grace to your institution; she has my highest recommendation.

## Transcript

| Grade 9 | | | Grade 10 | | |
|---|---|---|---|---|---|
| Personal Health 9 | 91 | | English 10 | 95 | |
| English 9 | 97 | | Social Studies 10 | 95 | |
| Social Studies 9 | 96 | | Math 10 | 94 | |
| Mathematics 9 | 95 | | Math Enriched 10 | 89 | |
| Math Enriched 9 | 89 | | Science 10 | 91 | |
| Science 9 | 92 | | Spanish 10 | 93 | |
| Programming 9 | 100 | | Physical Edu 10 | 91 | |

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

HARV00000304

**JA4720**
DX002.0093

Cheng 6

| | | | | |
|---|---|---|---|---|
| Ethics 9 | 97 | | Band 10 | 93 |
| French 9 Hon | 93 | | Programming 11 | 96 |
| Spanish 9 | 96 | | French 11 Pre AP | 87 |
| Physical Edu 9 | 91 | | | |
| Art 9 New Media | 99 | | | |
| Band 9 | 96 | | | |

| | | | | |
|---|---|---|---|---|
| **Grade 11** | | | **Grade 12 (Term 1)** | |
| Social Studies 11 | 96 | | AP Eng Lit & Comp | 89 |
| Math 11 | 97 | | AP Macroeconomics | 96 |
| Math Hon 11 | 89 | | Math Accelerated 12 | 89 |
| Chemistry 11 | 97 | | AP Calculus 12 | 95 |
| Physics 11 | 98 | | Chemistry 12 | 95 |
| English 12 | 96 | | Physics 12 | 97 |
| Law 12 | 96 | | AP Chemistry 12 | 95 |
| French 12 | 99 | | | |
| Film 11/12 | 97 | | | |
| International Studies 11 | 98 | | | |
| English 11 | 96 | | | |
| AP Programming 12 | 96 | | | |
| Planning 10 | 100 | | | |

**Teacher Recommendation 1**

I have learned many lessons from the students I teach and those that I coach in our school debate club. To write this letter I made a list of the lessons that I have learned from Grace Blake Cheng, and I find within it a long list of examples of instances when her intelligence has moved me to examine things more deeply. Her strength of character has inspired me to more frequently take a stand, or to see that a stand could and should be taken. Her consistency of action for those who have a quieter voice to find a way to amplify their own voice, has been unwavering. Grace challenges me to be the best person I can be.

Grace has been a student in my classroom for three years of the last five years. In her first year of transition from a multi-age cluster class in the public school system to eighth grade in an independent school for girls, she spoke with maturity and wit about the social dynamics of this new environment, and of learning within such different paradigms. She came to this school with an established interest in others' safety, security, and development. She has witnessed and thought about social and economic injustice for a long time, and she responds to this world with realism that is tempered with a healthy optimism. In my Ethics 9 class and Social Studies 8 and 10 classes, this theme of seeking social justice, through actions and words, has remained constant for Grace. She is an unyielding advocate for fairness, regardless of the personal sacrifice she might need to make to do what is right.

I have continued to know Grace in her junior and senior years outside of the classroom, and in a manner that is perhaps more attached to the real world. Grace is a tremendously strong public speaker and debater, as her resume attests. Her competitive pursuits in this area have not only given her a literal stage on which to perform formidably, but they have also given her a tremendous number of circumstances within which she was forced to personally grow, and to embody and advocate for the morals that she spoke of in

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

HARV00000305

her speeches. Traveling both nationally and internationally for public speaking and debate competitions has presented Grace with experiences from which other students might have shrunk.

While Grace's in-class strengths as an academic are most notable, her out of school pursuits in debate and service to others, have spoken loudly and positively to her intellectual and personal strengths as a responsible member of a community. Involvement in debate has provided Grace with the opportunity to think and query the best possible of application of policies for which she had already been advocating in the real world. Through her service on the police advisory committee, as a mentor and tutor within her housing co-operative, and on committees across the city that celebrate and support those in our community who need health supports (HIV/AIDS Action and the American Cancer Society), pursue green initiatives, and coordinate the annual celebration of Black History Month, Grace has put her abilities to the test.

It is very easy to recall, celebrate, and describe those in history who have chosen the right path, not the easy one. But to be held accountable by a student whose actions mirror that concept as a rule, is most notable in this era. Please let me recommend to you this most exceptional young woman.

| No basis | | Below average | Average | Good (above average) | Very Good (well above average) | Excellent (top 10%) | Outstanding (top 5%) | One of the top few I've encountered in my career. (top 1%) |
|---|---|---|---|---|---|---|---|---|
| | Academic achievement | | | | | | X | |
| | Intellectual promise | | | | | | X | |
| | Quality of writing | | | | | | X | |
| | Creative, original thought | | | | | | X | |
| | Productive class discussion | | | | | | | X |
| | Respect accorded by faculty | | | | | | | X |
| | Disciplined work habits | | | | | | X | |
| | Maturity | | | | | | | X |
| | Motivation | | | | | | | X |
| | Leadership | | | | | | | X |
| | Integrity | | | | | | | X |
| | Reaction to setbacks | | | | | | X | |
| | Concern for others | | | | | | | X |
| | Self-confidence | | | | | | X | |
| | Initiative, independence | | | | | | | X |
| | OVERALL | | | | | | | X |

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

HARV00000306

### Teacher Recommendation 2

I agreed to write this reference letter because I hold Grace in the highest regard possible. Her character is exemplary; I trust her implicitly.

I have had the pleasure of teaching Grace for the past 4 years. Last year I taught her AP Computer Science and prior to that I taught her Programming 11 and Programming 9. The first year I taught Grace, she stood out from her peers; her desire for knowledge is vast and her ability to grasp difficult concepts is impressive. She continued to develop her analytical skills in subsequent courses. Grace is a creative thinker, frequently coming up with a solution that others wouldn't think of, or approaching a problem in a way that facilitated understanding by the entire class. Often Grace would enhance programs beyond the assignment's requirements because she was passionate about her creations. She was always at the top of her class. In AP Computer Science she continued to excel, helping others and filling the class with pertinent, probing questions. She scored a 5 (full credit) for the college level course while still in her junior year, and received the Computer Science Award for top academics in the subject. Grace is a bright individual with a great work ethic; she is extremely reliable and meticulous in everything she pursues.

Grace's academic excellence is unquestionable, but it is only one facet of the impressive individual she is. She has a larger than life personality, strong moral character, and a natural charisma that have made her an exemplary leader. She is the school's student body president. Her problem-solving expertise is not limited to programming genius. I witnessed her leadership last weekend when a cyber-bullying event had a dramatic effect on a number of our students. In the midst of the chaos that had some students in tears and others out for revenge, Grace sent out a message to calm her peers and bring them together as a community. She then asked the schools administration for a special assembly with her peers to discuss the issues that were brought up in the messages: racism, classism, and libel. She, alone, led a discussion with 300 students and allowed them to vent their frustrations and work towards resolving the conflict. It was amazing. An event that could have had the school in turmoil was quelled with a calm voice and a message of building community.

Grace came to this school as a scholarship student and she exemplifies all of the aspects of a true scholar. Sometimes the stigma of being a scholarship student at a school of privilege is daunting. I have known a number of students who really struggled to fit into the culture of the school. Grace was not one of them. She has never let anything stand in the way of her excellence and her peers have embraced her as a leader and friend.

In short, I have been teaching for 9 years and have taught Presidential Scholars and students who have gone on to Ph.D.s and M.D.s—elite students. I can say, definitively, that Grace has the most potential of any student I have ever taught. She is a highly capable individual and will be an invaluable asset to your school. She will take whatever opportunity you give her and parlay it into greatness.

| No basis | | Below average | Average | Good (above average) | Very Good (well above average) | Excellent (top 10%) | Outstanding (top 5%) | One of the top few I've encountered in my career. (top 1%) |
|---|---|---|---|---|---|---|---|---|
| | Academic achievement | | | | | | | X |
| | Intellectual | | | | | | | X |

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

HARV00000307



Cheng 9

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| promise | | | | | | | |
| Quality of writing | | | | | | | X |
| Creative, original thought | | | | | | | X |
| Productive class discussion | | | | | | | X |
| Respect accorded by faculty | | | | | | | X |
| Disciplined work habits | | | | | | | X |
| Maturity | | | | | | | X |
| Motivation | | | | | | | X |
| Leadership | | | | | | | X |
| Integrity | | | | | | | X |
| Reaction to setbacks | | | | | | X | |
| Concern for others | | | | | | X | |
| Self-confidence | | | | | | | X |
| Initiative, independence | | | | | | | X |
| OVERALL | | | | | | | X |

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

HARV00000308

**JA4724**
DX002.0097

### Alumni Interview Report

### Academic (2)
*Magna potential. Excellent grades and mid- to high-700 scores (33+ ACT)*
> Love of Learning—'truly unusual'
> Intellectual Curiosity—'truly unusual'
> Intellectual Originality—'outstanding'

Grace appears to be a motivated intellectual. Though I didn't ask her for test scores or grades, so I am unable to report on her academic success in those terms, we did discuss her approach to academics, which she has clearly taken control of over the course of her high school years. Upon entering Riverside School in eighth grade, Grace researched and planned the academic path she would follow to ensure she could maximize her classroom opportunities. She accelerated her learning such that she was able to finish the standard senior year requirements either in her junior, or as early as possible in her senior year. For instance, she churned through all Riverside had to offer in one major area of interest, Computer Science, by her junior year. This left her the opportunity to enroll in as many extra classes as she could handle with her busy sporting and extracurricular life (see below). Understanding how busy she is in day-to-day life, taking a large class load as she has and performing well in those classes demonstrates a natural intellectual ability. On this note, I would have marked her academic numerical rating higher if I had the numbers to support it.

To further expand her academic pursuits above and beyond what Riverside had to offer she also took the initiative to join the Rockies Institute program (a four-week summer enrichment program where high school students live on a college campus with various areas of focus, Grace's being "entrepreneurship"). She was especially excited about her opportunity to work on/learn about a water purification project for remote villages in Ghana through "Engineers Without Borders". What struck me as progressive for a high school student was her interest and understanding of how the most difficult hurdle to overcome for this project was overcoming cultural and ethnic differences to achieve local buy-in for the system. The biggest obstacles weren't technical, they were cultural. She expressed a significant interest to continue her work with Engineers Without Borders at Harvard.

### Extracurricular, Athletic, Community, Employment, Family Commitments (2+)
*Substantial school-wide, regional or state recognition; major contribution/leadership*

This is where Grace really shines. While we only had an hour to talk, Grace could write a book on her extracurricular activities which include soccer, debate, public speaking, involvement with school projects and plays (with a recent production with funds raised donated to Haiti), the violin, and much more. When she first arrived at Riverside School she joined ten extracurricular clubs her first semester before scaling back to a more manageable number! Though I heard success stories in many of these areas I would rather focus on her community involvement and interest in public policy driven through her desire to better the world she lives in.

When she was very young, her early love of dogs and police officers led her to get involved in organizing a "police dog demo day" for local kids' sports teams. This grew to include other police-community related events such as police motorcycle demos, etc. Over time her involvement in Police-Community related projects only grew stronger. Today she

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

HARV00000309

sits on two wide-ranging advisory councils – she is on the local police chief's youth advisory committee and a representative to the state attorney general's youth crime advisory committee.

We discussed the local committee in more depth. Her role, in her words, is to expand both the police department's and the community's sense of "cultural competency." *(Here is some background from my own experience, not from Grace. Our local police departments are going through some of their worst public opinion polls after repeated scandals, abuses, etc. over the last few years. The distrust from the public combined with a scattered mix of various ethnic communities in the city, many of whom don't speak English, leads to an often tense, untrustworthy relationship.* ). Grace acts as an intermediary between the community and the police departments, as well as between the various ethnic communities themselves. Her role is to build trust and communication between the two groups through education and awareness initiatives as well as act as a resource for community youth to talk to. As she put it, she "mends broken cultural bridges." She has been able to combine her love of computer science to use social media and written/video communication devices to aid in this role.

Further demonstrating her devotion to the community are two more examples:

1) Five years ago she spearheaded a group of residents in her cooperative housing unit to plant a community garden (a garden that is open to either all the residents within a building complex, neighbourhood, or even the public at large). Her goal was to decrease her neighbourhood's carbon footprint by living within the "100 mile diet" with the help of a local vegetable garden. She was successful at navigating both the political and technical difficulties and built the garden, which is still growing strong today. Along the way she realized she could do even better "environmentally" by building a rainwater collection system to water the garden, reducing the dependence on and use of city water.

2) At the age of eight, Grace started playing the violin (after begging her parents to start when she was five). Soon after her mother had a serious injury which prevented Grace's family from being able to afford her music lessons. The community supported her family to the extent that they banded together to ensure Grace could continue her lessons. She explained that she learned two valuable lessons through that experience – the power and strength of both music and community, and that music should be accessible to all. She lives both these lessons by offering free violin lessons to others in the community.

### Personal Qualities (1)
*Rare personal appeal and character*

Openness to new ideas and new people—'truly unusual'
Contribution to college life—'outstanding'
What kind of roommate would this student be?—'truly unusual'

Grace is a confident, engaged, community-minded individual. Her experience in public speaking/debating combined with her vast volunteer experience in the community around her finds her comfortable in, I imagine, just about any situation. I couldn't see any indication she was nervous entering the interview and I certainly see her as the type of person who would tackle a freshman year at Harvard head-on. She lives life as a participant and leader, not as an observer. With her specific volunteer experience in areas such as communication and conflict resolution, I imagine she would make for a fantastic roommate.

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

Though I have a bias to this particular subject, I was especially impressed with her community and environmental focus. From an early age she has delved into the community in every possible way to unite those around her in a positive, peaceful way. Admirably, she is concerned with far more than just her own personal success.

**Overall (2)**
*Clear admit; one to recruit*
> Rare and rewarding exchange of ideas
> Easy flow of conversation
> Diamond in the rough

By this point you will not be surprised to read that I fully endorse Grace for acceptance to Harvard. If I were sitting on the admissions committee and deciding between herself and myself when I applied to Harvard, I would have hands-down picked Grace. The class will be better off for it. I left the interview with the feeling I had been talking more to a Harvard classmate than a high school student.

**Additional Comments**

Grace has experience with four languages:

English (Primary) – Fluent
French – Fluent
Spanish – Conversational
Cantonese – Introductory

A note on my numerical ratings: As this is the beginning of my involvement with the interviewing process for Harvard, I can't say I have a strong sense of where my ratings should sit. While I understand that Grace is clearly an exceptional applicant, I also understand that Harvard sees 30,000+ exceptional applications a year. I am inclined to list her as all "1s" – but have tried to show where I think her strengths especially lie (also considering I do not know her grades or test scores).

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

HARV00000311

# Peter Duran

**School:** Island High School
**Description:** Highly ranked public school on the West Coast; 75% of graduates attend four-year colleges; many AP courses offered
**Ethnicity:** Hispanic (Guatemala) and Caucasian

**Mother:** Speech language pathologist          **Father:** Physician
**College:** State university (BA, MA)          **College:** State university (BA, MD)

**Siblings:** Robert (15)

**Tentative field of study:** Engineering
**Commitment:** 2 (1-5 scale: 1, absolutely certain; 5, undecided)
**Intended occupation:** Academic (Teaching, Research, Administration)
**Commitment:** 2 (1-5 scale: 1, absolutely certain; 5, undecided)
**College activities:** Debate, Social Service
**Commitment:** 5 (1-5 scale: 1, absolutely certain; 5, undecided)

**Class rank:** 95%/700 (4.9 wtd GPA)
**SAT I:** 800/760/800
**SAT II:** 800 U.S. History          800 Chemistry          780 Physics
          800 Math II

| Extracurricular Activities: | Athletics: | Employment: |
|---|---|---|
| University IWST (12) | None | None |
|     5 hrs/wk, 40 wks/yr | | |
| FIRST Robotics (11) | | |
|     Team captain | | |
|     15 hrs/wk, 6 wks/yr | | |
| Robotics courses (9, 11) | | |
|     3 courses at community college | | |
|     7 hrs/wk, 20 wks/yr | | |
| Volunteer computer technician (9-12) | | |
|     2 hrs/wk, 40 wks/yr | | |
| V.A. Hospital Volunteer (11) | | |
|     20 hrs/wk, 4 wks/yr | | |
| Regional Science & Engineering Fairs (9) | | |
|     6 hrs/wk, 4 wks/yr | | |
| Special Education Teaching Asst. | | |
|     20 hrs/wk, 4 wks/yr | | |

Duran 1

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

HARV00000312

**JA4728**
DX002.0101

**Academic Honors:**
Principal's High Honor Roll
National Merit Scholarship Semifinalist
Science & Engineering Fair Awards
National Honor Society

**Advanced Placement Test Results:**

| | |
|---|---|
| US History | 5 |
| European History | 5 |
| Chemistry | 5 |
| Physics B | 5 |
| History of Art | 4 |

**Summer Activities**
Biology 1H & Science Research
Community Service
University Computer Science IWST Scholar (1/15 chosen from metro area)

**Activities (most meaningful)**

I led our FIRST Robotics team to the semi-finals, winning 6th place among 57 teams in the city regional competition. It was the first time that our school had entered, and we lacked any experience. As captain, I was charged with forging a team from a group of bright but independent volunteers. I began by proposing a simple design which we could perfect, while others wanted sophistication. It took lengthy discussions, listening, compromise, and a few firm edicts to get things going. We were way off schedule, but we persevered, working feverishly many nights and week-ends. By the time we placed our robot in its shipping crate, we had become a truly cohesive team. As the ten of us ran onto the stage to receive the "Best Newcomers Award" my excitement was surpassed by the pride of having led and inspired my team towards our common goal.

**Personal Statement**

For eight weeks this summer, I participated in a program that changed me in unanticipated ways. When I first entered the University Institute for Wireless Sensor Technology (IWST) I did not know what to expect. I was one of fifteen High School Scholars who, according to the website, would have, "a chance to gain first-hand knowledge in a university setting, conducting revolutionary research on wireless sensor technology." I knew that the program was highly competitive and that I would receive a stipend, but I was unclear of what wireless sensor technology entailed.

Under the supervision of a staff researcher and a graduate student, we were charged with tailoring the university-designed EnvoPDA software to support the coastal monitoring project. I became apprehensive when I realized how much computer programming was involved; my knowledge was self taught and limited. My concern grew when I heard some of the other students describe their extensive coding experience. How much programming do they think I know? What have I gotten myself into? Just then the Nike slogan, "just do it" came to mind and I resolved to plunge in.

I arrived every morning at 6:30 to beat the traffic and to enjoy some time to gather my thoughts and experiment with the code. By 7:30 the others started trickling in, filling the room with greetings, animated conversations, exclamations of frustration, and bursts of laughter. We were a diverse group, more guys than girls, some more knowledgeable than others, but all enthusiastic and willing to help one another. With their assistance, I learned quickly and discovered that I had an aptitude for programming. I valued the camaraderie, the sense of teamwork and the feeling of accomplishment.

Duran 2

HARV00000313

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

To my surprise, the focus on teamwork and the resolution to "just do it" also helped me to overcome a personal barrier. When I discovered that one of our first icebreakers was a physical challenge course, I immediately started planning my escape. I have never been good at sports and I certainly did not want to make a fool of myself! However, when the time came, I again decided to "just do it." Predictably, I was a liability to the group. Not only did I come crashing down repeatedly when trying to maneuver on a log, but I also brought two or three others with me. Everyone laughed, but this time, I laughed too. Having exposed my sport inadequacies up front, I later felt free to enter in the weekly games of Ultimate Frisbee and soccer. I came to appreciate that casual sports are about attitude rather than aptitude.

On August 17th, I was proud to present our final results to the IWST faculty and guests. I was struck by how much I had learned, not just about programming, but about myself. I had discovered a whole new passion in the field of computer science, and had conquered my fear of being ridiculed at sports. Most importantly, I learned that it pays off to put misgivings aside and "just do it."

**Additional Essay**

There are three themes that run through my family, influence my college goals, and lead me to seek the best possible college education. The first is that education is a way to get ahead in life. The second is learning adds enjoyment to your life. The third is a commitment to people and relationships. A Harvard education is the best at providing all three. There is no questioning the real-world value of a Harvard degree, the opportunity to experience the breadth of fields way beyond my interests in computers and engineering, and Harvard's tradition of infusing students with a commitment to service.

Higher education has had a major impact on my family. My father, the son of uneducated Guatemalan immigrants, is a prime example. His parents came to this country without high school degrees yet they infused their children with the value of education as the key to success. My grandparents saw their dream realized when three of their four children obtained doctorate degrees. Early on, I became committed to carry on the dream.

My home also taught me that education and learning is pursued not only for success, but for pure enjoyment. For instance, on our vacations, we often visit famous, and sometimes, quite unique museums. I will never forget my father's frenzied pursuit around Boston in search of a skull of a man, who, 160 years ago, survived a one inch diameter steel rod piercing his head. In spite of our protests, my father would not give up until we found the skull in the Warren Anatomical Museum on the fifth floor of Harvard's Countway Library of Medicine. Experiencing my generally reserved father, gush with excitement as he told the unabridged story of Phineas Gage, made me realize how a passion for learning can keep a person young. I hope to emulate this passion in my own life.

My mother and her family bring another set of qualities. She is a speech language pathologist who works with severely impaired children. Two summers ago I volunteered at her school, mostly to fulfill community service hours, and not expecting the personal satisfaction I gained from the experience. When one of the boys started to greet me each day by shouting, "Mr. Peter is here, Mr. Peter is here!", I understood why my mother loves her job and why my hours spent in the classroom had become so gratifying. The sense of commitment to others also reaches into my immediate family. When my maternal grandfather was diagnosed with Alzheimer's disease we all needed to adjust. Nowadays we all contribute; I visit often, listen to him when he repeats himself, and gladly spend time with

Duran 3

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

HARV00000314

him on his terms. Instead of causing alienation, his illness brought our family closer together.

Thus, my background has not only shaped my aspirations, but has given me a solid foundation for college and beyond. Like my parents, I plan to pursue a graduate degree and to make learning an integral part of my life. As someone oriented to science and engineering, I see a Harvard education as not only a vehicle to a good job or career, but the best way to develop a lifelong appreciation of history, literature, art, and so many other areas. It is a challenge to find a better university where I can combine engineering with the humanities and nurture my commitment to community and others. This is my family tradition, and I hope to transmit these set of values to my own family some day.

### Secondary School Report

Peter is an impressive young man, deserving of great respect for both his high academic accomplishments and his success outside of the classroom. I give Peter my highest recommendation for many reasons; he shows enormous potential as a college student, scientist, computer programmer and as a contributor to society. Peter represents the very best that Island has to offer and has proven successful in all of his endeavors. Part of what makes him so successful is that he is not afraid of a challenge, and more importantly, he is not afraid of failure. He is always seeking opportunities to challenge himself and takes advantage of all the resources available to him. At a young age he has already proven that he thrives in a challenging environment by taking so many honors and AP courses at one of the most competitive high schools in the country.

Island High School is a very competitive, high achieving school academically and was recently ranked among the top 200 high schools in the *Newsweek* national rankings. Although the majority of our students are high-achieving and dedicated to excel, Peter has performed above and beyond his peers in everything he has pursued. He has maintained an exceptional weighted GPA of 4.9 while taking eleven AP classes and nine Honors classes. Peter has exhausted all that we have to offer him at IHS and the maturity that he has demonstrated leads me to believe he is capable of tremendous success in college and beyond.

While succeeding in all his courses, he finds time to participate on the two different Robotics teams, is actively involved in Science Research Program, and Science Olympiad. Moreover, despite his busy schedule, he finds time to volunteer as an aide during the summer in a basic skills class and volunteers his computer programming skills to the American Institute of Women in Higher Education organization. He has also used his summers to further explore his options for college and define his major through programs like Carnegie Mellon's "Expanding Opportunities in Math, Science and Technology" program.

Most importantly, I believe Peter will be an invaluable addition to your university. He is definitely ready or should I say has been ready for some time now to take on the academic demands at the college level. I envision him accomplishing his many dreams and goals and having an extremely successful future. It is with great pleasure that I give my full support and highest recommendation to Peter Duran's application for admission to your university.

Duran 4

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

HARV00000315

**JA4731**
DX002.0104

**Island High School Transcript**

| Grade 9 | | | Grade 10 | |
|---|---|---|---|---|
| English 1H | A | | English 2H | A |
| Geometry H | A | | Algebra 2H | A |
| Sci Research | A | | Sci Research | A |
| World Hist H | A | | Chemistry 1H | A |
| Spanish 2 | A | | AP English | A |
| PE | A | | PE | A |

**Grade 9 (Summer School)**

| Sci Research | A |
|---|---|
| Biology 1H | A |

| Grade 11 | | | Grade 12 | |
|---|---|---|---|---|
| English 3H | A | | Internship | |
| PreCalculus H | A | | English 4AP Lit | |
| Sci Research | A | | Calculus BC AP | |
| Chemistry 2 AP | A | | Envir Sci AP | |
| Physics B AP | A | | Physics C AP | |
| US History AP | A | | Economics AP | |
| Art History AP | A | | Am Govern AP | |

**Teacher Recommendation 1**

I have had the pleasure of having Peter Duran as a student in my AP Chemistry class and in my science research program at Island High School. My experience with Peter, and my appreciation for his qualities and promise, leads me to write you this letter of recommendation for admission to your university/college.

My classes are known for their rigor and only high achieving students enroll in them. Peter certainly qualified for this self-selected group. He is intellectually curious, quick to grasp concepts and eager to challenge himself. His grades reflect his abilities; he is a National Merit Scholarship Semi-finalist, and through his high school career he has remained on the Principal's High Honor roll and National Honor Society. He certainly has the ability to succeed as an undergraduate student and in graduate school. I have no doubt that Peter will pursue education beyond the undergraduate level.

While interested in history and literature, he is particularly passionate about science, computers, and technology where he has shown exceptional talent and aptitude. Under my supervision, he worked on science projects submitted for local competition. The first experiment involved the improvement of robotic vision through the optimization of contrast spatial sensitivity. This freshman project received the Certificate of Achievement for Outstanding Science or Engineering Fair Project from the United States Military. The project had a different focus and studied post-traumatic amnesia in head injury. It also received Honorable Mention. Prior to high school, Peter participated in the Metro-Area County Fair with an entry that involved the analysis of the amount of lift in the hovercraft as a function of the number of air outlets. His solutions to these experimental problems were both original and creative.

Duran 5

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

HARV00000316

During his junior year Peter was selected as team captain of the school's entry into the FIRST Robotics competition. Peter led his team to win the Best Newcomers Award at state competition. This was an incredible achievement since it was the school's first entry and yet the team placed sixth in a field of 57. Peter not only designed the robot but also demonstrated outstanding leadership and a clear sense of purpose in leading the team.

Most recently, Peter was selected as a High School Scholar for a paid summer internship at the University Institute for Wireless Sensor Technology (IWST), a program sponsored by the National Science Foundation. For eight weeks he gained first-hand experience in a university setting, conducting cutting-edge research on wireless sensor technology. He speaks enthusiastically about this extraordinary experience and the skills he acquired. "More than ever, I am convinced that I want to work in a research lab" he states. His experience was so successful that Peter has been asked by his IWST mentor to continue his internship throughout this school year. Peter has arranged to do this through a Work Experience Education Internship through our school. I have no doubt that he will do an excellent job and that he will continue learning about programming and conducting research.

In addition to his academic achievements Peter has excellent personal qualities. He is respectful, conscientious and mature. He is well liked by his peers, works well in groups and in spite of his academic standing does not show any sign of arrogance. I understand he has worked with impaired children, volunteered in a brain-injured program, and tutored friends with academic problems. All of these characteristics add to his value as a potential contributor to a university setting.

In sum, I would like to enthusiastically support Peter Duran's application.

| No basis | | Below average | Average | Good (above average) | Very Good (well above average) | Excellent (top 10%) | Outstanding (top 5%) | One of the top few I've encountered in my career. (top 1%) |
|---|---|---|---|---|---|---|---|---|
| | Academic achievement | | | | | | X | |
| | Creative/original thought | | | | | | X | |
| | Intellectual curiosity | | | | | | X | |
| | Intellectual ability | | | | | | X | |
| | Self-confidence | | | | | | X | |
| | Independence/ initiative | | | | | | X | |
| | Concern for others | | | | | | X | |
| | Leadership/ influence | | | | | | X | |
| | Work ethic | | | | | | X | |
| | Emotional maturity | | | | | | X | |
| | Motivation | | | | | | X | |
| | Reaction to setbacks | | | | | | X | |
| | Written | | | | | | X | |

Duran 6

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

HARV00000317

**JA4733**
DX002.0106

| | | | | | | |
|---|---|---|---|---|---|---|
| expression of ideas | | | | | | |
| Warmth of personality | | | | | X | |
| Disciplined work habits | | | | | X | |
| Sense of humor | | | | | X | |
| Effective class discussion | | | | | X | |
| Respect accorded by peers | | | | | X | |
| Respect accorded by faculty | | | | | X | |
| Potential for growth | | | | | X | |
| OVERALL | | | | | X | |

### Teacher Recommendation 2

I have the great honor of writing this letter on behalf of Peter Duran. I was his Advanced Placement United States History teacher during his junior year. He received A's both semesters and achieved a score of 5 on the AP Exam in U.S. History. I am also currently his AP Government teacher. He is doing exceptionally well at this time (my top student)!

I have just started this year's round of letters recommending my best and brightest to you, and the first on my list is Peter Duran. Peter made an impression on me within the first few days of the semester last year. His attentiveness, inquisitiveness, and outstanding class preparation made him stand out immediately. AP U.S. History (APUSH) is easily one of the most demanding courses that Island High School offers, yet even with the large work load, Peter never fell behind. He always had his key identifiers done and verbally demonstrated that he had read the chapters before the lecture. Peter is one of those more reserved students that took me by surprise during our first classroom debate (Patriots v. Loyalists). He jumped right in there and offered up well-reasoned arguments that got right to the point and easily won over his peers. He admitted later to feeling a little nervous, but during the debate no one could tell. As the year progressed, Peter grew enormously, both as a writer and in enthusiasm for the subject matter. His essays went from 5s at the beginning of the year to 8s-9s by the end. I am an AP Reader and believe me, getting an 8 or a 9 is a *very* rare academic accomplishment! He was particularly drawn to learning about the twentieth century since it tied in so well with his own family's personal narrative. He extended his discussions with me regarding the classroom topics (war, gender and other social issues, economic development) with his family members. There were many occasions when Peter would go home and share what we had just covered in class and bring back a family story the next day that pulled me into *his* world of history. I remember Peter sharing his story about how he had relatives that fought on both sides of World War I and how he grew so much closer to his grandfather when his grandfather shared his personal recollections of World War II. While Peter is extraordinarily gifted in the math and science curricula, I wanted you to know that he is passionate about everything he learns in school. He looks

Duran 7

HARV00000318

**JA4734**
DX002.0107

beyond what is taught in the classroom and ties it in to life. He will be a life long learner I am sure. He even listens to the history *Great Courses* tapes just for fun!

This year, Peter is in my block AP Government and AP Economics class (I teach the government part). Peter has brought with him the same level of zeal for learning that I saw last year. Over the summer, Peter and his mother tracked the election very carefully and listened to both conservative and liberal radio commentators. As a consequence, he came in to the class in September so much better prepared than some of his peers. There are 18 National Merit Semifinalist Scholars in my block class, yet even with this kind of competition, Peter is the only one with a nearly 100% (99.68) average in the course. This is unheard of! I have been teaching for 18 years and have never had a student with this high of a percentage in AP Government (and neither has the other AP Government teacher). Should you choose to accept Peter for admittance to Harvard, rest assured that you will truly be getting one of the best students I have ever had. He is brilliant, articulate, passionate, extremely curious, and thoroughly a joy to teach. I believe he would fit right in.

For all of the reasons I have given above, it is with great confidence and enthusiasm that I recommend Peter Duran for admittance to Harvard University.

| No basis | | Below average | Average | Good (above average) | Very Good (well above average) | Excellent (top 10%) | Outstanding (top 5%) | One of the top few I've encountered in my career. (top 1%) |
|---|---|---|---|---|---|---|---|---|
| | Academic achievement | | | | | | | X |
| | Intellectual promise | | | | | | | X |
| | Quality of writing | | | | | | X | |
| | Creative, original thought | | | | | | | X |
| | Productive class discussion | | | | | | X | |
| | Respect accorded by faculty | | | | | | X | |
| | Disciplined work habits | | | | | | | X |
| | Maturity | | | | | | X | |
| | Motivation | | | | | | | X |
| | Leadership | | | | | | X | |
| | Integrity | | | | | | | X |
| | Reaction to setbacks | | | | | | | X |
| | Concern for others | | | | | | X | |
| | Self-confidence | | | | | | | X |
| | Initiative, independence | | | | | | | X |
| | OVERALL | | | | | | X | |

Duran 8

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

HARV00000319

### Peter Duran—Alumni Interview Report

#### Academic (1+)
*Genuine scholar, Summa potential, top grades, high 700 and 800 scores combined with evidence of original scholarship*

Intellectual curiosity – 2-
Love of learning – 1
Intellectual originality – 3

Has an obvious passion for engineering but is also fascinated by history and global politics.

"A modern engineer needs to have a broader understanding of social issues in order to make a difference in the world. Otherwise you end up in a cubicle, working for people who have their own views, and that's not what I want.

You could come out of MIT or Cal Tech with technical skills but I don't think you come out with knowledge. I don't think you've been enriched by the experience, you've been trained."

He has some dyslexia which makes him read a bit slower than others but he claims that this actually helps him by giving him more time to think about the text.

His parents are both from Latin America and he understands Spanish but cannot speak it. I found this surprising, especially considering his SAT verbal results.

#### Extracurricular, Athletic, Community, Employment, Family Commitments (3+)
*Above average activity or participation*

No sports except fishing and hiking on family vacations.

"I'm at peace in nature or out on the lake. I was also happiest when I was with my peers doing an internship at an engineering school. I learned a lot from working with intelligent people, peers and mentors. It wasn't the kind of education you get in high school."

Is passionate about robotics and has been robotics team leader for the past two years.

"What really excites me is building things, solving problems, I like using and applying knowledge."

#### Personal Qualities (3+)
*Above average appeal and character*

Openness to new ideas and new people – 2
Contribution to college life – 3
What kind of roommate would this student be? – 3

I liked him and found him to be friendly, cheerful, confident and sincere. Seems like he would be a positive influence on others and I think he would do well at Harvard. His parents both work to help people with mental problems and he also seems like a compassionate and thoughtful person.

Duran 9

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

HARV00000320

**JA4736**
DX002.0109

"I tend to be low-key and mellow. I'm very liberal but I live like a social conservative. I like to keep things neat and organized. I would be an easy roommate to deal with unless you are extremely messy.

I was raised Catholic but fell away and could describe myself as an agnostic. It's important to be open to all sides and then come up with solutions. If you are knowledgeable then you can find common ground."

### Overall (1-)
*Absolutely superior for admissions; truly unusual in the entire applicant pool*

Good exchange of ideas and easy flow of conversation.

He seems intelligent, well informed and motivated to achieve.

If you could travel anywhere where would you go?

"I would go to Italy and see the Florence cathedral, or to Rome, or anywhere in Italy. I did an art history class and really enjoyed it. Most of my favorite art is in Italy."

Who is your favorite artist?

"Gauguin."

Have you been looking at my paintings?

"Yes. We did look at your website."

Gauguin hoped to find a sort of Garden of Eden still existing somewhere in this world. There are perhaps a few tribes in the Amazon or New Guinea that are still unaware of the outside world. What do you think of missionaries going in and changing things?

"That's a very hard question. I can see the arguments on both sides. We cannot go into primitive cultures like an imperialist. On the one hand we want them to have a better quality of life. On the other hand we need to preserve their languages and record as much as possible about their customs and knowledge. What I mean is that we can't be aware of things like female circumcision and allow people to suffer."

"You could be a renaissance man but I want to be a renaissance engineer."

He was knowledgeable about current events and we were able to talk in some detail about the Arab/Israeli conflict. I asked him why this conflict is important to the United States and the world and he determined that it was our dependence on oil.

We then talked about global warming.

"Life will go on, humanity will find a way to survive but it is so easy to prevent this disaster."

I asked him what he could do as an engineer that might help to solve these political and ecological problems. Gradually he came to the conclusion that we needed "infinitely renewable sources of energy." We talked about the pros and cons of all energy sources and the challenges of making engines that run on hydrogen.

I think he would do well at Harvard and has the potential to make positive contribution to the world.

Duran 10

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

( Summer start )

## New Staff Training Schedule

**WEEK ONE**

**Monday, August 4**

| | |
|---|---|
| 9:15am | Welcome |
| 10:30am | HR Orientation with Ben Norton<br>*Small Conference Room* |
| 11:30am | Tour of 86 Brattle Street offices/Agassiz |
| | Lunch? |
| 4:00pm | Settle into office |

**Tuesday, August 5**

| | |
|---|---|
| 9:15am | Review of training schedule, preview of the year (GSC)<br>*Large Conference Room* |
| 10am | Attend info session in Sanders Theatre |
| 11am | Attend campus tour led by student tour guide |
| 2:30pm | Overview of admissions and financial aid cycle timeline (GSC & JLI)<br>*Large Conference Room* |
| | The Path of an Admissions File (GSC) and roles in the office<br>*Large Conference Room* |
| 3:30pm | Introduction to confidentiality/digital security/IT overview (CBT, Eric Wong) followed by account setups<br>*Large Conference Room* |

**Wednesday, August 6**

| | |
|---|---|
| 10am | Intro mtg with EBY |

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

United States District Court
District of Massachusetts

**DX 3**

Case No. _____ 1:14-cv-14176 (ADB)
Date Entered_____
By_____
Deputy Clerk

HARV00000347

**JA4738**

Presentation by summer HFAI student coordinators on incoming freshmen
*Large Conference Room*

2:00pm                   Alumni relations and website with Liz Adams (ECA) and Brock Walsh (BPW)
*Small Conference Room*

**Thursday, August 7**

10am                     Attend Tia Ray's info session in Sanders Theatre

11am                     Attend campus tour led by student tour guide

2:30pm                   Office Finances 101 with Cheryl Frodermann
*Large Conference Room*

4:00pm                   Jolly up! (Sendoff for Liz Adams and Sophia Meas)
*86 Brattle St Lobby*

4:30pm                   Complete corporate credit card application to Cheryl; Sign up for corporate Egencia account; complete finance homework

**Friday, August 8**

9:30am                   Conducting interviews (TJS)
*Large Conference Room*

11:00am                  Preview of Week 2, Intro to casebooks (GSC)
*Large Conference Room*

Fri PM                   Afternoon time to debrief, make contact with alumni clubs, finish finance homework, Read up on old area reports, familiarize yourself with your areas

**WEEK TWO**

**Monday, August 11**

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

HARV00000348

| 9:30am | "From Prospect to Applicant" with Kaitlin Howrigan (KAH) |
| | *Large Conference Room* |

| 10:30am | Intro to fileroom/mailroom with Ian Anderson (IAN), Mollie Dickerson, Haley Shore (HFS) |
| | *Fileroom/Fileroom Annex/Mailroom* |

| 11:15am | Intro to Recruitment Strategies (TJS, KAH, JAF, BJG, LLO) |
| | *Large Conference Room* |

| 1:30pm | Intro to Digital Communications with Amy Lavoie |
| | *Large Conference Room* |

| 3:00pm | VISITAS/Virtual Visitas (TJS) |
| | *Large Conference Room* |

**Tuesday, August 12**

| 10am | Attend Bryce Gilfillian's info session in Agassiz |

| 11:30am | Office finances 102 with Sage Suorsa and Kate Lebel |
| | *Large Conference Room* |

| 3pm | Financial Aid 101 with Sally Donahue (SCD) |
| | *Large Conference Room* |

| 3:30pm | Freshman Team (FRET) and Net Price Calculator (NPC) with Jake Kaufmann (JMK) and Chris Plumb (CCP) |
| | *Large Conference Room* |

| 4:30pm | Intro to Reading Procedures with GSC |
| | *Large Conference Room* |

**Wednesday, August 13**

*Full-time admissions officers: Work on information session template*
*All: Work on finance homework for Thursday's session*

| 10am | Financial Aid staff meeting |

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

HARV00000349

*Large Conference Room*

2pm            Financial Aid reconsideration (recon) meeting
*Large Conference Room*

3:30pm         Reading Procedures Part 2
*Small Conference Room*

**Thursday, August 14**

10am            Attend Christine Mascolo's info session in Agassiz

11:30am        Office Finances 103 with Sage Suorsa and Kate Lebel
*Large Conference Room*

2:45pm         Reading Procedures Part 3
*Large Conference Room*

4:00 pm        Jolly up!

**Friday, August 15**

10am            Attend Jake Foley's info session in Agassiz

4:00pm         Recap of Week 2, preview of Week 3 (GSC)
Start to make travel arrangements if corporate credit card received
*Large Conference Room*

**WEEK THREE**

**Monday, August 18**

2:30pm         Undergraduate Admissions Council with Jake Foley (JAF)
*Large Conference Room*

3:30pm         Publications (NAJ)
*Large Conference Room*

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

HARV00000350

**JA4741**
DX003.0004

**Tuesday, August 19**

| | |
|---|---|
| 9:30am | Financial Aid 102 with Mary Magnuson (MWM)<br>*Large Conference Room* |
| 1:30pm | International Admissions with Robin Worth (RMW) and Judy Partington (JCP)<br>*Large Conference Room* |
| 3:00pm | Reading procedures Part 4 (GSC)<br>*Large Conference Room* |

**Wednesday, August 20**

| | |
|---|---|
| 10:00am | Financial Aid Staff Meeting<br>*Large Conference Room* |
| 11:00am | Student Employment Office: Federal Work Study and Research with Meg Brooks Swift (MBS) and Allison Flynn (ALF)<br>*Small Conference Room* |
| 2pm | Financial Aid Recon Meeting<br>*Large Conference Room* |
| 3:30pm | Undergraduate Minority Recruitment Program with Lucerito Ortiz (LLO), Tia Ray (TMR) and Roger Banks (RXB)<br>*Small Conference Room* |

**Thursday, August 21**

*Work on information session template or*

| | |
|---|---|
| 10am | Attend Jenn Gandy's info session in Agassiz |
| 1:00pm | HFAI Orientation with Charlie Kim (CSK), Kaitlin Howrigan (KAH), and Pharen Bowman (PFB)<br>*Large Conference Room* |
| 2:30pm | Distribution of last year's cases for mock committee<br>*Large Conference Room* |

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

HARV00000351

**JA4742**
DX003.0005

| 4:00pm | Jolly Up! |

**Friday, August 22**

| 10am | Attend Kaitlin Howrigan's info session in Agassiz |

| 2pm | Attend Lucerito Ortiz's info session in Agassiz |

| 3:15pm | Recap mtg with GSC |
| | *Large Conference Room* |

**WEEK FOUR**

**Monday, August 25**

*All: Case reading in the morning*

| 3:15 pm | Mock subcommittee preparation |
| | *Large Conference Room* |

**Tuesday, August 26**

| 10am | Attend Max Dikkers' information session in Agassiz |

| 2:00pm | Attend Rachel Brown's information session in Agassiz |

| 3:15pm | Crash course on NEVO/NOLIJ/officer spreadsheet/database/systems and our web presence with Eric Wong and Kaitlin Howrigan (KAH) |
| | *Large Conference Room* |

**Wednesday, August 27**

| 10am | Financial Aid Staff Meeting |
| | *Large Conference Room* |

| 11am | Overview of Scholarship Funding with Kitty Vidra (KAV) |
| | *Kitty's Office* |

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

HARV00000352

| | |
|---|---|
| 2pm | Financial Aid Recons |
| 3:15pm | Presentation of cases in mock sub-committee<br>*Small Conference Room* |

**Thursday, August 28**

| | |
|---|---|
| 3:00pm | Presentation of cases in mock sub-committee<br>*Large Conference Room* |
| 4:00pm | Jolly Up! |

**Friday, August 29**

| | |
|---|---|
| 9:15am | What I wish I had known in my first year – with second year officers<br>*Large Conference Room* |
| 11am | Finish presentation of cases, Recap meeting with GSC<br>*Large Conference Room* |

**WEEK FIVE**

**Monday, September 1**

LABOR DAY – ENJOY THE DAY OFF!  (You won't have another one until Thanksgiving!)

**Tuesday, September 2**

| | |
|---|---|
| 10:30 | Overview of Aid at Other Colleges/Countries + Resources with Janet Irons (JLI)<br>*Small Conference Room* |

Rest of this week left for:
Preparation for Joint Travel presentations
Making contact with alumni clubs
Making all travel arrangements

**Thursday, September 4**

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

HARV00000353

| Morning | Attend a class – it's shopping week! |
| Noon | Coaches' luncheon |
| 4:00pm | Jolly Up! |

**Friday, September 5 – ALL STAFF ORIENTATION (see separate schedule)**

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

HARV00000354

**JA4745**
DX003.0008

**JANUARY 2015**

**Monday, January 5**

9:00am – 12:30pm      Harvard New Staff Orientation (breakfast at 8:45am)
                      Center for Workplace Development, Rm. 3318
                      124 Mt. Auburn St.

2:00pm                Touch base on reading procedures (GSC)
                      *Grace's Office*

**Tuesday, January 6**

10:00am               ~~Attend info session in Agassiz House~~
                      ~~*Lyman or Gilman Room (depending on attendance size)*~~

**Wednesday, January 7**

10am                  Sit in on Financial Aid staff meeting
                      *Large Conference Room*

2pm                   Sit in on Financial Aid reconsideration (recon) meeting
                      *Large Conference Room*

**Every Thursday**

4pm                   Jolly-up
                      *86 Brattle lobby*

**To Do in January along with reading/passing folders:**

Attend more info sessions (10am in Agassiz) and work on your own information session script and presentation style

Make contact with alumni clubs when appropriate

Touch base with your docket chairs with any docket-specific questions:
                      B docket – Marlyn McGrath (MEM)
                      E docket – Jake Kaufmann (JMK)
                      J docket – Mary Magnuson (MWM)
                      L docket – Kitty Vidra (KAV)

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

HARV00000355

### Additional Topics usually covered in training – TBD for TJH

Office finances 101 with Cheryl Frodermann, Sage Suorsa and Kate Lebel
*(Finance Office)*    (Just need to get you trained before you go out on joint travel ~ April 2015)

Intro to Financial Aid with Sally Donahue (SCD) and Mary Magnuson (MWM)

Financial Aid Freshman Team (FRET) and Net Price Calculator (NPC) with Jake Kaufmann (JMK)
        and Chris Plumb (CCP)

Intro to Recruitment Strategies (TJS, KAH, JAF, BJG, LLO)

Undergraduate Minority Recruitment Program with Lucerito Ortiz (LLO), Tia Ray (TMR) and
        Roger Banks (RXB)

HFAI Orientation with Charlie Kim (CSK) and Pharen Bowman (PFB)

Intro to Digital Communications with Amy Lavoie and Victoria Marzilli

Undergraduate Admissions Council with Max Dikkers (MDD)

Publications (REB)

International Admissions with Robin Worth (RMW) and Judy Partington (JCP)

Student Employment Office:  Federal Work Study and Research with Meg Brooks Swift (MBS) and
        Ilya Luvish

What I wish I had known in my first year – with second year officers

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

HARV00000356

**Additional Topics usually covered in training** ( TBD )

Office finances 101 with Cheryl Frodermann, Sage Suorsa and Kate Lebel
*(Finance Office)*   (Just need to get you trained before you go out on joint travel ~ April 2015)

Intro to Financial Aid with Sally Donahue (SCD) and Mary Magnuson (MWM)

Financial Aid Freshman Team (FRET) and Net Price Calculator (NPC) with Jake Kaufmann (JMK)
    and Chris Plumb (CCP)

Intro to Recruitment Strategies (TJS, KAH, JAF, BJG, LLO)

Undergraduate Minority Recruitment Program with Lucerito Ortiz (LLO), Tia Ray (TMR) and
    Roger Banks (RXB)

HFAI Orientation with Charlie Kim (CSK) and Pharen Bowman (PFB)

Intro to Digital Communications with Amy Lavoie and Victoria Marzilli

Undergraduate Admissions Council with Max Dikkers (MDD)

Publications (REB)

International Admissions with Robin Worth (RMW) and Judy Partington (JCP)

Student Employment Office:  Federal Work Study and Research with Meg Brooks Swift (MBS) and
    Ilya Luvish

What I wish I had known in my first year – with second year officers

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

HARV00000357

### New Staff "Homework" Checklist

☐ Complete corporate card application (hard copy in binder).  The form can be found under the corporate card tab on the intranet (you will need your ID and PIN to log in here: http://isites.harvard.edu/icb/icb.do?keyword=k80096&pageid=icb.page421471

   GSC will sign off as supervisor.  Submit form to the Inbox in the finance office (to Cheryl, Sage, or Kate)

☐ Upon receiving your ID and PIN, log into the Intranet to review finance pages in advance of meeting with Cheryl.
   o Review:
     ▪ Harvard University Travel Policy
     ▪ FAS Travel Policy Addendum
     ▪ Harvard Corporate Card
     ▪ Manage Your Account
     ▪ Corp Card FAQs
     ▪ Travel and Reimbursement Tab
        • Expense reimbursement Forms
        • Important Policies
        • Booking Travel
        • Local Travel and Reimbursement Tips
           o Travel Reminders March 2014
           o Travel Training, Fall 2013 PowerPoint
        • Helpful Travel Reminders

   http://isites.harvard.edu/icb/icb.do?keyword=k92564&tabgroupid=icb.tabgroup157773

☐ Set up an Egencia account if you do not already have one: www.egencia.com
   You will have to use Egencia to book all corporate travel and you can use it for personal travel anytime as well!

☐ Review admissions/financial aid/college website:
                         https://college.harvard.edu/admissions

☐ Make contact with alumni chairs to introduce yourself and read any old area reports to learn more about your areas (hard copy reports from Class of 2018 in the binder under AREA/SCHEDULES tab.

☐ Read Handbook for Interviewers under the ALUMNI tab.

                         **Welcome to 86 Brattle!**

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY                                    HARV00000358

## JA4749
DX003.0012

AREAS +
SCHEDULES

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

HARV00000367

## TRAVEL ASSIGNMENTS 2014-2015

| | | |
|---|---|---|
| **ALABAMA** | CAW | |
| **ALASKA** | JAF | |
| **ARIZONA** | DDM | |
| **ARKANSAS** | TMR | |
| **CALIFORNIA** | BPW/CSK/KAH/ | |
| | LLO/NAJ | *Los Angeles* |
| | REB | *San Diego* |
| | EJB | *Marin, North Bay,* |
| | | *San Francisco,* |
| | | *San Mateo* |
| | KPR/JWG | *Orange County* |
| | MDD | *Monterey, South Bay* |
| | KEC | *Sacramento,* |
| | | *Santa Barbara* |
| | | *San Joaquin Valley* |
| | MDD/RXB | *East Bay Area* |
| **COLORADO** | JWG | |
| **CONNECTICUT** | CJL | *Northern* |
| | TJS | *Fairfield County* |
| | MMS/CJL | *Southern* |
| **DELAWARE** | KAH | |
| **D.C.** | DLE | |
| **FLORIDA** | PFB | *Broward County* |
| | BJG | *Miami* |
| | PFB | *Jacksonville* |
| | KLW | *Gainesville, Orlando,* |
| | | *Sarasota, Tallahassee,* |
| | | *Tampa* |
| | BJG | *Palm Beach* |
| | CAW | *Pensacola* |
| **GEORGIA** | BPW/CAW | |
| **HAWAII** | NAJ | |
| **IDAHO** | IAN | |
| **ILLINOIS** | MBS/TJS | |
| **INDIANA** | JRC | |
| **IOWA** | MFE | |
| **KANSAS** | CSK | *Lawrence & East* |
| | REB | *West of Lawrence* |
| **KENTUCKY** | REB | |
| **LOUISIANA** | KEC | |
| **MAINE** | CAW | |
| **MARYLAND** | DLE | *D.C. Suburbs* |
| | KAH | |
| **MASSACHUSSETTS** | KPR | *Quincy, Norfolk* |
| | DLE | *Cambridge* |
| | JAF | *North Shore* |
| | JLI | *Springfield, Western* |
| | KAV | *Hingham, Old Colony* |
| | JAF | *Andover, Lowell* |
| | HFS | *Cape Cod, Southeastern* |
| | MWM | *Concord, Lexington* |
| | | *Groton* |
| | TJS | *Central, Worcester* |
| **GREATER BOSTON** | DLE/KPR/HFS/KAV/MBS/SWH | |
| **MICHIGAN** | JAF | *Eastern* |
| | MFE | *Central, Western* |
| **MINNESOTA** | TMR | |
| **MISSISSIPPI** | TMR | |

| | | |
|---|---|---|
| **MISSOURI** | CSK | |
| **MONTANA** | IAN | |
| **NEBRASKA** | MFE | |
| **NEVADA** | IAN | |
| **NEW HAMPSHIRE** | MWM | |
| **NEW JERSEY** | JRC/NAJ/MDD | *North 07* |
| | BPW/JRC/MDD | *South 08* |
| **NEW MEXICO** | DDM | |
| **NEW YORK** | CJL | *Mid-Hudson, Utica* |
| | MMS | *Albany* |
| | TJS | *Western Long Island* |
| | JAF | *Buffalo, Rochester* |
| | TMR | *Binghamton, Ithaca,* |
| | | *Syracuse* |
| | MDD | *Eastern Long Island* |
| | RXB | *Rockland County,* |
| | | *Westchester County* |
| **NEW YORK CITY** | CGM/KAH/RXB | |
| **NORTH CAROLINA** | BJG/CAW | |
| **NORTH DAKOTA** | MFE | |
| **OHIO** | JRC | *Cincinnati, Columbus,* |
| | | *Dayton* |
| | CAW | *Akron, Canton,* |
| | | *Cleveland, Toledo,* |
| | | *Warren* |
| **OKLAHOMA** | TMR | |
| **OREGON** | JAF | |
| **PENNSYLVANIA** | MMS | *Central, Western* |
| | GSC | *Philadelphia* |
| | TMR | *Northeastern* |
| **RHODE ISLAND** | MMS | |
| **SOUTH CAROLINA** | CAW | |
| **SOUTH DAKOTA** | MFE | |
| **TENNESSEE** | TMR | *Memphis* |
| | REJ | *Nashville* |
| **TEXAS** | BJG | *Dallas, Fort Worth* |
| | CJL | *Austin, Midland* |
| | LLO | *Corpus Christi, El Paso,* |
| | | *San Antonio* |
| | REB | *Galveston, Houston* |
| **UTAH** | IAN | |
| **VERMONT** | CAW | |
| **VIRGINIA** | CGM/KLW | |
| **WASHINGTON** | JAF | *Eastern* |
| | TMR | *Seattle, Western* |
| **WEST VIRGINIA** | REB | |
| **WISCONSIN** | PFB | |
| **WYOMING** | IAN | |
| **PUERTO RICO/VI** | PFB | |
| **CANADA** | SHG | *Toronto, Ottawa, Quebec* |
| | MDD | *British Columbia* |
| | | *Maritimes, Manitoba,* |
| | | *Saskatchewan* |
| **TRANSFERS** | CGM/DDM/RMG/RMW/WRF | |
| **OVERSEAS** | RMW with: | |
| | BJG/JCP/JLI/JMK/JWG/EJB/KLW/LLO/MFE/REJ/TJS | |

June 17, 2014

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

HARV00000368

| DOCKET - AREA PERSON AND CHAIR ASSIGNMENTS | | |
| 2014-2015 | | |
| DOCKET | AREA PERSON | CHAIR |
|---|---|---|
| A | EJB, MDD, RXB | CGM |
| B | DDM, IAN, JAF, JWG, TMR | MEM |
| C | BPW, CSK, KAH, LLO, NAJ | SCD |
| D | BJG, CJL, LLO, REB | RMG |
| E | JAF, MFE, PFB, TMR | JMK |
| F | CAW, JRC, MBS, TJS | KAH |
| G | BJG, KLW, PFB | CGM |
| H | BJG, BPW, CAW, KFC | DLE |
| I | CGM, DLE, KAH, KLW | DLE |
| J | CSK, JAF, REB, REJ, TMR | MWM |
| K | GSC, MMS, TMR | SWH |
| L | CAW, DDM, JAF, JLI, MWM | KAV |
| N | CJL, MMS, TJS | SWH |
| P | DLE, HFS, KAV, KPR, MBS, MWM, SWH | WRF |
| R | MDD, RXB, TJS | DDM |
| S | BPW, JRC, MDD, NAJ | MBS |
| T | CGM, KAH, RXB | MEM |
| U | JLI, LLO, MDD, SHG, TJS | RMW |
| V | BJG, EJB, JCP, JLI, JMK, JWG, KLW, MFE, REJ | RMW |
| Z | JWG, KEC, KPR, REB | GSC |

7/22/2014

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

HARV00000369

**JA4752**
DX003.0023

| DOCKETS - 2014 - 2015 | | | | | | | |
|---|---|---|---|---|---|---|---|
| A | California | i | Delaware | S | New Jersey | | |
| | - San Francisco | | District of Columbia | | | | |
| | - Bay Area | | Maryland | T | New York City | | |
| | - Monterey | | Virginia | | | | |
| | | | | U | Australia | | |
| B | Alaska | J | Arkansas | | Canada | | |
| | Arizona | | Kansas | | Caribbean | | |
| | Colorado | | Kentucky | | Ireland | | |
| | Idaho | | Mississippi | | Latin America | | |
| | Montana | | Missouri | | New Zealand | | |
| | Nevada | | New York - Western | | South America | | |
| | New Mexico | | Oklahoma | | United Kingdom | | |
| | Oregon | | Tennessee | | | | |
| | Utah | | West Virginia | V | Africa | | |
| | Washington | | | | Asia | | |
| | Wyoming | K | New York - Upstate | | Europe | | |
| | | | Pennsylvania | | | | |
| C | Greater Los Angeles | | | Z | California | | |
| | Guam & US Possesions | L | Maine | | - Orange County | | |
| | Hawaii | | Massachusetts | | - Sacramento | | |
| | | | - Andover and Lowell | | - San Diego | | |
| D | Texas | | - North Shore | | - San Joaquin Valley | | |
| | | | - Western - Springfield and Berkshires | | - Santa Barbara | | |
| E | Iowa | | New Hampshire | | | | |
| | Michigan | | Vermont | | | | |
| | Minnesota | | | | | | |
| | Nebraska | N | Connecticut | | | | |
| | North Dakota | | Massachusetts - Central | | | | |
| | South Dakota | | New York | | | | |
| | Wisconsin | | - Central | | | | |
| | | | - Eastern | | | | |
| F | Illinois | | - Mid-Hudson | | | | |
| | Indiana | | Rhode Island | | | | |
| | Ohio | | | | | | |
| | | P | Massachusetts | | | | |
| G | Florida | | - Greater Boston | | | | |
| | Puerto Rico | | - South Shore | | | | |
| | Virgin Islands | | - Cape Code and Islands | | | | |
| | | | - Southeastern - New Bedford, Fall River | | | | |
| H | Alabama | | | | | | |
| | Florida - Pensacola | R | New York | | | | |
| | Georgia | | - Long Island | | | | |
| | Louisiana | | - Westchester County | | | | |
| | North Carolina | | - Rockland County | | | | |
| | South Carolina | | | | | | |

7/22/2014

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

HARV00000370

JA4753

DX003.0024

| REGULAR ACTION MEETING SCHEDULE - CLASS OF 2019 | | | |
|---|---|---|---|
| Jan 22-26 | **C Docket (SCD)** | **G Docket (CGM)** | **N Docket (SWH)** |
| | BPW CSK KAH LLO NAJ | BJG KLW PFB | CJL MMS TJS |
| Jan 27-30 | **E Docket (JMK)** | **P Docket (WRF)** | **U Docket (RMW)** |
| | JAF MFE PFB TMR | DLE HFS KAV KPR MBS MWM SWH | JLI LLO MDD SHG TJS |
| Jan 31-Feb 4 | **A Docket (CGM)** | **D Docket (RMG)** | |
| | EJB MDD RXB | BJG CJL LLO REB | |
| Feb 5 - 9 | **I Docket (DLE)** | **K Docket (SWH)** | **L Docket (KAV)** |
| | CGM DLE KAH KLW | GSC MMS TMR | CAW DDM JAF JLI MWM |
| Feb 10-13 | **H Docket (DLE)** | **J Docket (MWM)** | **R Docket (DDM)** |
| | BJG BPW CAW KEC | CSK JAF REB REJ TMR | MDD RXB TJS |
| Feb 14-18 | **B Docket (MEM)** | **F Docket (KAH)** | |
| | DDM IAN JAF JWG TMR | CAW JRC MBS TJS | |
| Feb 19-23 | **S Docket (MBS)** | **T Docket (MEM)** | **Z Docket (GSC)** |
| | BPW JRC MDD NAJ | CGM KAH RXB | JWG KEC KPR REB |
| Feb 24-28 | **V Docket (RMW)** | | |
| | BJG EJB JCP JLI JMK JWG KLW MFE REJ | | |
| Mon, Mar 2 | Docket Prep for Review | | |
| Tue, Mar 3 | Athletics & General review | | |
| Wed, Mar 4 | C  G | | |
| Thu, Mar 5 | N  E | | |
| Fri, Mar 6 | U  P | | |
| Sat, Mar 7 | A  D | | |
| Mon, Mar 9 | I  K | | |
| Tue, Mar 10 | L  R | | |
| Wed, Mar 11 | J  H | | |
| Thu, Mar  12 | B  F | | |
| Fri, Mar 13 | S  T | | |
| Sat, Mar 14 | Z  V | | |
| Mon, Mar 16 | CLEAN UP | | |
| Mar 17 - 18 | Final Review Prep | | |
| Mar 19 - 21 | FINAL REVIEW | | |
| Mar 23-28 | FAO CALCS | | |
| Mar 23-30 | Ian & Co. | | |
| Tues, Mar 31 | RA NOTIFICATION | | |

7/22/2014

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

HARV00000371

**JA4754**
DX003.0025

| | Date | Meetings | Prep Day | 1st Reader to 3rd Reader | All Ratings Entered |
|---|---|---|---|---|---|
| REGULAR ACTION READING SCHEDULE - CLASS OF 2019 | | | | | |
| | | | | *10 am Sharp* | *10 am Sharp* |
| Fri | 16-Jan | | | C G N | |
| Tues | 20-Jan | | | | C G N |
| Weds | 21-Jan | | C G N | E P U | |
| Thurs | 22-Jan | C G N | | | |
| Fri | 23-Jan | C G N | | | E P U |
| Sat | 24-Jan | C G N | | | |
| Mon | 26-Jan | C G N | E P U | A D | |
| Tues | 27-Jan | E P U | | | |
| Weds | 28-Jan | E P U | | | |
| Thurs | 29-Jan | E P U | | I K L | A D |
| Fri | 30-Jan | E P U | A D | | |
| Sat | 31-Jan | A D | | | |
| Mon | 2-Feb | A D | | | |
| Tues | 3-Feb | A D | | H J R | I K L |
| Weds | 4-Feb | A D | I K L | | |
| Thurs | 5-Feb | I K L | | | |
| Fri | 6-Feb | I K L | | | H J R |
| Sat | 7-Feb | I K L | | B F | |
| Mon | 9-Feb | I K L | H J R | | |
| Tues | 10-Feb | H J R | | | |
| Weds | 11-Feb | H J R | | | |
| Thurs | 12-Feb | H J R | | S T Z | B F |
| Fri | 13-Feb | H J R | B F | | |
| Sat | 14-Feb | B F | | | |
| Mon | 16-Feb | B F | | | |
| Tues | 17-Feb | B F | | | S T Z |
| Weds | 18-Feb | B F | S T Z | V | |
| Thurs | 19-Feb | S T Z | | | |
| Fri | 20-Feb | S T Z | | | V |
| Sat | 21-Feb | S T Z | | | |
| Mon | 23-Feb | S T Z | V | | |
| Tues | 24-Feb | V | | | |
| Weds | 25-Feb | V | | | |
| Thurs | 26-Feb | V | | | |
| Fri | 27-Feb | V | | | |
| Sat | 28-Feb | V | | | |
| Mon | 2-Mar | Prep for Full Committee Review | | | |
| Tues | 3-Mar | Athletics & General Review | | | |
| Weds | 4-Mar | C G | | | |
| Thurs | 5-Mar | N E | | | |
| Fri | 6-Mar | U P | | | |
| Sat | 7-Mar | A D | | | |
| Mon | 9-Mar | I K | | | |
| Tues | 10-Mar | L R | | | |
| Weds | 11-Mar | J H | | | |
| Thurs | 12-Mar | B F | | | |
| Fri | 13-Mar | S T | | | |
| Sat | 14-Mar | Z V | | | |

7/22/2014

Page 1 of 2

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

HARV00000372

**JA4755**

DX003.0026

| REGULAR ACTION READING SCHEDULE - CLASS OF 2019 | | | | | |
|---|---|---|---|---|---|
| Date | | Meetings | Prep Day | 1st Reader to 3rd Reader | All Ratings Entered |
| | | | | *10 am Sharp* | *10 am Sharp* |
| Mon | 16-Mar | Cleanup | | | |
| 17-Mar | 18-Mar | Final Review Prep | | | |
| 19-Mar | 21-Mar | Final Review | | | |
| 23-Mar | 28-Mar | FAO CALCS | | | |
| 23-Mar | 30-Mar | Ian & Co. | | | |
| Tues | 31-Mar | Emails & Letters Sent | | | |

7/22/2014

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

HARV00000373

**JA4756**
DX003.0027

September 24, 2014

Staff Winter, Spring and Wait List Meetings
Large Conference Room

STAFF MEETINGS:    *(2015)*
JANUARY 13 AND 27         10:30 a.m.

MARCH 24 AND 31           10:30 a.m.

APRIL 7, 14, 21, 28       10:30 a.m.

MAY 5, 12, 19, 26         10:30 a.m.

JUNE 2, 9, 23, 30         10:30 a.m.

WAIT LIST MEETINGS:
MAY 7                    1:00 – 5:00 p.m.
MAY 8, 11                10:00 – 12:30 p.m.; 1:30 – 5:00 p.m.
MAY 12 (STAFF & WL)      10:30 – 12:30 p.m.; 1:30 – 5:00 p.m.
MAY 15                   10:00 – 12:30 p.m.; 1:00 – 5:00 p.m.
MAY 19 (STAFF & WL)      10:30 – 12:30 p.m.; 1:30 – 5:00 p.m.
MAY 21                   1:30 – 5:00 p.m.
MAY 26 (STAFF & WL)      10:30 – 12:30 p.m.

JUNE 2 (STAFF & WL)      10:30 – 12:30 p.m.;   1:30 – 5:00 p.m.
JUNE 4                   1:30 – 5:00 p.m.
JUNE 9 (STAFF & WL)      10:30 – 12:30 p.m.;   1:30 – 5:00 p.m.
JUNE 23 (STAFF & WL)     10:30 – 12:30 p.m.;   1:30 – 5:00 p.m.
JUNE 25                                        1:30 – 5:00 p.m.
JUNE 30 (STAFF & WL)     10:30 – 12:30 p.m.;   1:30 – 5:00 p.m.

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

HARV00000374

**JA4757**
DX003.0028

FYI

| | Date | Meetings Start | Prep Day | 1st Reader to 3rd Reader | All Ratings Entered |
|---|---|---|---|---|---|
| EARLY ACTION READING SCHEDULE - CLASS OF 2019 | | | | | |
| | | | | *10 am Sharp* | *10 am Sharp* |
| Fri | 7-Nov | | | C G N Z | |
| Sat | 8-Nov | | | A D E P U | |
| Mon | 10-Nov | | | H I J K L R | |
| Tues | 11-Nov | | | B F S T V | C G N Z |
| Wed | 12-Nov | | | | A D E P U |
| Thurs | 13-Nov | C G N Z | E P U | | |
| Fri | 14-Nov | E P U | A D | | I K L |
| Sat | 15-Nov | A D | I K L | | H J R |
| Mon | 17-Nov | I K L | H J R | | B F |
| Tues | 18 Nov | H J R | B F | | S T V |
| Wed | 19-Nov | B F | S T V | | |
| Thurs | 20-Nov | S T V | | | |
| Fri | 21-Nov | OVERVIEW - Athletics and C G N | | | |
| Sat | 22-Nov | | | | |
| Mon | 24-Nov | Z E P | | | |
| Tues | 25-Nov | UAD | | | |
| Wed | 26-Nov | | | | |
| Thurs | 27-Nov | THANKSGIVING | | | |
| Fri | 28-Nov | BREAK | | | |
| Sat | 29-Nov | | | | |
| Mon | 1-Dec | I K L | | | |
| Tues | 2-Dec | H J R | | | |
| Wed | 3-Dec | B F S | | | |
| Thurs | 4-Dec | T V | | | |
| Fri | 5-Dec | Final Review | | | |
| Sat | 6-Dec | | | | |
| Mon | 8-Dec | FAO CALCS | | | |
| Tues | 9-Dec | | | | |
| Wed | 10-Dec | Ian & Co | | | |
| Thurs | 11-Dec | EA NOTIFICATION | | | |

7/22/2014

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

HARV00000381

**JA4758**
DX003.0035

## EARLY ACTION MEETING SCHEDULE - CLASS OF 2019

| Day | Date | | | | |
|---|---|---|---|---|---|
| Thurs | 13-Nov | C Docket - SCD<br>BPW, CSK, KAH, LLO, NAJ | G Docket - CGM<br>BJG, KLW, PFB | N Docket - SWH<br>CJL, MMS, TJS | Z Docket - GSC<br>JWG, KEC, KPR, REB<br>-FAO Conference Room |
| Fri | 14-Nov | E Docket - JMK<br>JAF, MFE, PFB, TMR | P Docket - WRF<br>DLE, HFS, KAV, KPR, MBS, MWM, SWH | U Docket - RMW<br>JLI, LLO, MDD, SHG, TJS | |
| Sat | 15-Nov | A Docket - CGM<br>EJB, MDD, RXB | D Docket - RMG<br>BJG, CJL, LLO, REB | | |
| Mon | 17-Nov | I Docket - DLE<br>CGM, DLE, KAH, KLW | K Docket - SWH<br>GSC, MMS, TMR | L Docket - KAV<br>CAW, DDM, JAF, JLI, MWM | |
| Tues | 18-Nov | H Docket - DLE<br>BJG BPW CAW KEC | J Docket - MWM<br>CSK JAF REB REJ TMR | R Docket - DDM<br>MDD RXB TJS | |
| Wed | 19-Nov | B Docket - MEM<br>DDM, IAN, JAF, JWG, TMR | F Docket - KAH<br>CAW, JRC, MBS, TJS | | |
| Thurs | 20-Nov | S Docket - MBS<br>BPW, JRC, MDD, NAJ | T Docket - MEM<br>CGM, KAH, RXB | V Docket - RMW<br>BJG, EJB, JCP, JLI, JMK, JWG, KLW, MFE, REJ | |
| Fri | 21-Nov | Overview - Athletics, General Review, and C G N | | | |
| Mon | 24-Nov | Overview - Z E P | | | |
| Tues | 25-Nov | Overview - U A D | | | |
| Wed | 26-Nov | Thanksgiving Break | | | |
| Thurs | 27-Nov | | | | |
| Fri | 28-Nov | | | | |
| Mon | 1-Dec | Overview - I K L | | | |
| Tues | 2-Dec | Overview - H J R | | | |
| Wed | 3-Dec | Overview - B F S | | | |
| Thurs | 4-Dec | Overview - T V | | | |
| Fri | 5-Dec | Overview - FINAL REVIEW | | | |
| Mon | 9-Dec | FAO CALCS | | | |
| Wed | 10-Dec | Ian & Co. | | | |
| Thurs | 11-Dec | EA NOTIFICATION | | | |

7/22/2014

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

HARV00000382



HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

HARV00000396

*CONFIDENTIAL*

**Reading Procedures, Class of 2019**

**I.    UPDATE PROCEDURES**

The new Summary Sheet captures information as supplied on the application and will be updated as new information is added.  Late information can change the likelihood of admission and updates can be provided later for those initially considered less competitive.  If any information is **missing** or **incorrect** for competitive candidates, changes should be made on the First Reader Rating Form and noted with prose in the reader comments or "Notes for Summary Sheet" box. This prose will feed onto the Summary Sheet when it is refreshed.

One exception: School code changes are NOT made on the First Reader Rating Form; please describe the need for a school code change as an "Admin Problem" if it needs to be coded to another docket and route the folder into the "Admin Problems" bin.  If the school code change does not affect the first reader or docket, note the school code change as a "Follow up To Do Item" and note the school code change under "Other Staff Follow-up To Do".  Route the folder appropriately to the chair or code-out to the "Committee Review" bin.

We report exactly what the applicant reports as ethnicity on the application.  The ethnic codes on the Summary Sheet will come from the demographic fields the candidate checked on the application.

**Readers should make a "note for summary sheet" for competitive candidates regarding Ethnic Codes only if ethnicity is checked on the application, but not recorded on the summary sheet.**

The following list of our existing historical codes is for your reference:

| | |
|---|---|
| **A** - Asian American | **NH** – Native Hawaiian |
| **B** - Black/African American | **NA** - Native American |
| **M** – Mexican American | **O** - Other |
| **H** - Hispanic (not clearly "M" or "P") | **P** - Puerto Rican |
| | **W** - White/Caucasian |

In addition to these previous ethnic categories, the following codes are used by the Common App for more granularity:

- **Hispanic or Latino**
  **XCM**–Central America, **CUB**–Cuba, **MEX**– Mexico , **PRI** – Puerto Rico, **XSM** – South  America, **ESP**–Spain, **XOH**–Other
- **American Indian or Alaska Native**
  **XAN** –Alaska  Native, **XCW** –Chippewa, **XCH** – Choctaw, **XCK**– Cherokee, **XNV**–Navajo, **XSX** – Sioux, **XON** -Other

1

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

- **Asian**
  **CHN** – China, **IND**– India, **JPN** – Japan, **KOR**– Korea, **PAK**–Pakistan,
  **PHL** – Philippines, **VNM**– Vietnam, **XEA** – Other East Asia,
  **XIS** -Other Indian Subcontinent, **XSA** - Other Southeast Asia
- **Black or African American**
  **XAA** - U.S./African American, **XAF** – Africa, **XCB** – Caribbean, **XOA** - Other
- **Native Hawaiian or Other Pacific Islander**
  **GUM**–Guam, **XHI**–Hawaii, **ASM** – Samoa, **XOP**-Other
  Pacific Islands (excluding Philippines )
- **White Options**
  **XEU** –Europe, **XME**- Middle East **XOW** - Other

**Note that foreign citizens are listed as such, (without an ethnic code,) no matter what they have checked on the application.**

- **CITIZENSHIP CODE / COUNTRY OF CITIZENSHIP:** There are four options on the application that can be checked: (1) U.S. Citizenship, (2) U.S. Dual Citizenship, (3) U.S. permanent resident and (4) "Other" or foreign citizen.

  <u>The applicant holds only American citizenship</u>.
  *APP.* The box "U.S citizen" is checked with no other country of citizenship listed.
  *SUMMARY SHEET*: Should read "CITZ: United States of America"

  <u>The applicant is a dual U.S. citizen</u>, (a citizen of both the U.S. and another country).
  *APP.* The box "U.S./dual U.S. citizen" is checked with another country listed to the right.
  *SUMMARY SHEET*: Should read "CITZ: United States/<other country>"

  <u>The applicant is a U.S. Permanent Resident</u>.
  *APP.* The box "U.S. Permanent Resident" is checked with another country listed.
  *SUMMARY SHEET*: Should read "CITZ: PERM RES / <other country>"

  *Caveat*: If an applicant has checked the U.S. Permanent Resident box but notes that his or her application for permanent residency (or "green card") is <u>pending</u>, that applicant should be recoded as "Other citizenship." We must prepare an I-20 form if the applicant is admitted and the application for residency is still pending, and the citizenship code is the only way we know to do this.

2

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

HARV00000398

**JA4762**
DX003.0052

<u>The applicant is a foreign citizen.</u>

*APP*: The box "Other citizenship" is checked with a foreign country listed to the right.

*SUMMARY SHEET*:    Should read "CITZ:    <other country>"

**PLEASE NOTE**:  The accuracy of our citizenship coding is CRUCIAL.  Miscoding affects many of the important statistics we are required to compile (including ethnicity), and we need to keep careful track of who needs a visa to study in the United States.

- **SCHOOL CODE**:  If an applicant is coded to the wrong school, and if the required recoding alters the docket and first reader assignment, please route this to the Admin Problems bin immediately so that the operations team can ensure that the interview is reassigned to the appropriate club and group and the file is available for the appropriate reader to download into his/her queue.  If an applicant is coded to the wrong school but does not alter the docket and first reader, proceed to read and rate the file, but note under "Follow up To Do Items" list that a change in school code is needed, with known details so that the Records Room staff can make the change.

- **GENDER**:  Occasionally the gender designation reported on the Common Application is coded incorrectly in our system.  Such a coding error should be corrected. Please note that gender coding is optional and in the case of an applicant who does not designate a gender on the Common Application, any previous gender designation by that applicant (on tests, etc.) will override a blank gender designation.

- **COMMUTER**:  Readers should use "C" (commuter) or "R" (resident).

- **LINEAGE:**  The folder should be read by WRF ("4th" bin) following the normal reading process if the decision might require special handling or if another reading might be helpful.  Errors can be updated on the Student Record Update tab.

- **FACULTY, STAFF**:  Code <u>ONLY</u> children of professors at <u>the Faculty of Arts and Sciences</u> as an "F"; children of faculty from other parts of the University as well as children of administrative staff should be coded "S".  If an update is needed, use the First Reader rating form. **Please be careful to apply faculty and staff coding where appropriate as we need to keep accurate statistics on these applicants.  All "F" and "S" folders should be routed to the "4th bin" (WRF) after the normal reading process has been completed.**

3

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

HARV00000399

**JA4763**
DX003.0053

- **ACCESSIBLE EDUCATION OFFICE (AEO) REFERRALS**: Code all applicants who may require special accommodations due to disabilities or special needs with the AEO flag on the First Reader Rating Form. We can then provide a list to assist the AEO and FDO in providing accommodations when appropriate.

- **ATHLETE**: Be sure the appropriate sport is listed as the first extracurricular activity. **DO NOT CHANGE ANY PRE-CODED ATHLETE**.

- **FIRST-GEN**: Readers should check this box if the student is of the first generation in the family to graduate from a four-year higher ed institution.

- **SCORES**: Applicants will know by checking the website which scores are in our files. They can report scores (which will be marked 'self-reported' in the student record) as they like. You can check scores by looking under the "Scores" tab in each Student Record of an applicant.

  Applicants are on notice that they are responsible for changing 'unofficial' to 'official,' which they can only do by getting scores sent by CEEB/ACT. Paper copies of scores sent via fax, email attachment or U.S. mail are not considered official.

  We receive secure web downloads of scores, so we do not have to wait for the scores to be mailed to us. Applicants are told not to use 'rush reports,' but if they do, they will arrive electronically as soon as they are scored.

- **FERPA:**
  We will be importing the applicant's FERPA selection as indicated on the Secondary School Report (SSR), alleviating the need for readers to record the FERPA selection. The import is intended to capture all online submitted SSR FERPA selections. A final spot-check on the admitted class (waitlist and deferred included) will then be performed, updating applicant files as needed.

## II.    CODING GUIDELINES FOR SUMMARY SHEETS

All readers must code a preliminary overall rating and a profile (using the codes below and pluses and minuses) for all candidates. The full profile, including the school support, should be coded for all competitive candidates and those who have a reasonable chance of becoming competitive with positive late information. Writing prose comments is left to the discretion of the reader and should generally be done only for competitive candidates, those who might become competitive later, or those who present credentials or have attributes that might be of interest to the Committee.

4

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

**JA4764**
DX003.0054

Overall
1. Tops for admission:  Exceptional – a clear admit with very strong objective and subjective support (90+% admission).
2. Strong credentials but not quite tops (50-90% admission).
3. Solid contender: An applicant with good credentials and support (20-40% admission).
4. Neutral: Respectable credentials.
5. Negative: Credentials are generally below those of other candidates.
6. Unread.

Use "+" and "-" in the 2 and 3 range to indicate relative strength.

Academic
1. Summa potential. Genuine scholar; near-perfect scores and grades (in most cases combined with unusual creativity and possible evidence of original scholarship.)
2. Magna potential: Excellent student with top grades and mid-to high-700 scores (33+ ACT).
3. Cum laude potential: Very good student with excellent grades and mid-600 to low-700 scores (29 to 32 ACT).
4. Adequate preparation. Respectable grades and low-to mid-600 scores (26 to 29) ACT).
5. Marginal potential. Modest grades and 500 scores (25 and below ACT).
6. Achievement or motivation marginal or worse.

Extracurricular, Community Employment, Family Commitments
1. Unusual strength in one or more areas.  Possible national-level achievement or professional experience.  A potential major contributor at Harvard.  Truly unusual achievement.
2. Strong secondary school contribution in one or more areas such as class president, newspaper editor, etc.  Local or regional recognition; major accomplishment(s).
3. Solid participation but without special distinction. (Upgrade 3+ to 2- in some cases if the e/c is particularly extensive and substantive.)
4. Little or no participation.
5. Substantial activity outside of conventional EC participation such as family commitments or term-time work (could be included with other e/c to boost the rating or left as a "5" if it is more representative of the student's commitment).
6. Special circumstances limit or prevent participation (e.g. a physical condition).

Athletic
1. Unusually strong prospect for varsity sports at Harvard, desired by Harvard coaches.

5

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

2. Strong secondary school contribution in one or more areas; possible leadership role(s).
3. Active participation.
4. Little or no interest.
5. Substantial activity outside of conventional EC participation such as family commitments or term-time work (could be included with other e/c to boost the rating or left as a "5" if it is more representative of the student's commitment).
6. Physical condition prevents significant activity.

Personal
1. Outstanding.
2. Very strong.
3. Generally positive.
4. Bland or somewhat negative or immature.
5. Questionable or worrisome personal qualities.


School Support
1. Strikingly unusual support. "The best ever," "one of the best in x years," truly over the top.
2. Very strong support. "One of the best" or "the best this year."
3. Above average positive support.
4. Somewhat neutral or slightly negative.
5. Negative or worrisome report.
6. Neither the transcript nor prose is in the folder.
8. Placeholder.
9. Transcript only. No SSR prose.

PLEASE NOTE: Support is coded teacher one, teacher two, then counselor. <u>These three are mandatory ratings.</u> Teacher three and teacher four are optional, if applicable.

**GPA and GPA Scale:**
We must try to report an Academic Index to the IVY league for EVERY matriculant. If grades are available, please report a GPA and GPA Scale for your strongest candidates.

The Academic Index is calculated using GPA and GPA Scale. These will be converted automatically to the 20 to 80 scale in Slate.

Here are the rules according to the AI instructions:

**1. <u>GPAs generally:</u>** The secondary school GPA should be taken as presented on the

6

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

**JA4766**
DX003.0056

secondary school transcript; when both unweighted and weighted GPAs are presented, the unweighted GPA should be used. The Summary Sheet will indicate if a weighted or unweighted GPA is being pulled onto the summary sheet. Please use the First Reader Rating Form to change the GPA to unweighted GPA if you notice an unweighted GPA being reported on the transcript. (If there is a question as to whether the school is using an unweighted or weighted system, the scale should be defined as unweighted, based on what the A grade earns in a regular course.)

2. **GPA scales and conversions from Table II:** Table II, the "CGS General Conversion Table" (formerly Table III, the values are unchanged), should be used for the GPA scales shown (100-points, 11.0/12.0, 7.0, 6.0, 4.0, A-D) even if the transcript or secondary school profile provides a conversion to a Table II scale.

3. **"High" GPA systems:** Although some secondary school transcripts show that GPAs may be routinely higher than the nominal highest grade on the scale, it is difficult to generalize about these practices. For example, especially with regard to schools that use 4.0 scales, there are high schools in which a high percentage of GPAs may be above 4.0 but also schools in which the highest GPA achieved is routinely far below 4.0. For 2014-15, Table II will continue to provide, based on experience across the league to date, that for some scales the highest nominal GPA will have a CGS below 80 and for others a CGS of 80 will begin at the highest nominal GPA.

4. **Scales not provided on Table II:** Given the relatively small number of admitted and matriculated students for whom Table II scales are not provided, it is preferable not to create new scales if possible. In such cases, a GPA on a 4.0 scale should be calculated using the following formula, and a CGS then derived using the 4.0 scale on Table II: HSGPA/HSGPA scale = "x"/4.0, where "x" becomes the value from which the CGS is derived. For example, if on a 5.0 scale a student has a 4.8 GPA (whether the scale's top grade is A or A+), the formula is 4.8/5.0 = x/4.0. X=3.84 and the CGS = 73.

   *This calculation will be done automatically when you provide the GPA and GPA Scale used by the school.*

5. **Calculating GPA when not provided by the secondary school:** When the secondary school does not calculate/report a GPA, the institution should calculate an unweighted GPA based on the secondary school's grading scale, using all courses for which grades and credit hours are provided, and weighting semester grades as one-half full-year grades. *Enter the GPA and GPA Scale on the Reader Rating Form.*

7

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

HARV00000403

**JA4767**
DX003.0057

6. **GPA period:**  GPA data always should be for more than one year, including 10th and 11th grades, 9th grade when available, and official trimester or semester grades (as opposed to midterm grades) in the student's current year if available at the time the decision is made.  If "official" grades from the current year are available but are not counted in the school's cumulative GPA, they should be added to the cumulative GPA and weighted appropriately:  e.g., grades for first semester or trimester of senior year would be weighted as one-half or one-third year, respectively.∗

7. **GPAs from multiple schools and repeat years:**  When a student has attended multiple secondary schools (including a post-graduate year), all GPAs provided by the schools should be used to the extent possible (see #5 above when a school has not provided a GPA) and weighted as in #6 above.  If the institution believes this result is not logical and fair, it should describe what approach it believes is better, subject to the Ivy League Admissions Committee's agreement.

8. *_For applicants from Canada:_*  For a Canadian GPA where the passing grade is 50%, add 15 points to the academic average before determining the CGS.  If the passing grade is 60% add 10 points.  If the passing grade is 70%, add nothing. *_Please add the extra points to the GPA – i.e., for a GPA of 86 where 50% is passing, 101 should be entered in GPA._*

9. Follow the procedures listed below for AI calculations for students from schools that do not follow the American curricular system.

**"International School" AI calculations**
For all national curricula, unless specified otherwise elsewhere, include all courses as part of the GPA calculations.
**Generally:**  Except as provided here, each school should calculate GPAs from international schools as it seems most appropriate; such calculations then should be reviewed during the spring meetings to determine what standardization might be agreed on.  Institutions are encouraged to circulate questions during the year to determine what other institutions are doing and if a consensus exists that could or should be followed.

1. **International Baccalaureate Systems:**
   Use the following equivalents to calculate a GPA:
   7 = A+ = 4.3
   6 = A = 4.0

---

∗ When institutions calculate "final" all-class AI data for full admit cohorts in the spring and matriculant cohorts in the fall, athletes' AIs should be calculated in the same manner as non-athletes' AIs so that all AIs in the cohort data are calculated identically.  The athlete's individually reported AI will continue to be the AI used at the time s/he received a likely or admissions decision, unless later testing or GPA information raised the AI (see E-8 below).

8

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

HARV00000404

**JA4768**
DX003.0058

```
5 = B = 3.0
4 = C = 2.0
3 = D = 1.0
```

- If the applicant is taking a gap year, actual two-year IB results are used.
- In the absence of final marks, use predicted marks. If predicted marks are not available, use internal grades.
- For IB schools in the U.S., use the course values given on the transcript; for IB schools outside the U.S., double the weight for Higher Level courses as opposed to the Standard Level courses.
- Use the same standards for "domestic" applicants as to "academic" versus "all" courses.

## 2. British systems:
Count all GCSE (= O Level), AS and A level results in order to calculate a GPA:
```
A* (same as A+) = 4.3
A = 4.0
B = 3.0
C = 2.0
D = 1.0
```

- If the applicant is taking a gap year, actual A-Level results should be used.
- A Level grades are given double the weight of AS and GCSE grades.
- Internal grades are usually not available and should not be used if they are.
- In the absence of final marks, predicted A-Level grades should be used when available.

## 3. Pre-U Program (New British System)
Use only Principal Subjects with the following conversions for British Pre-U programs:
```
D1 = A+/4.3
D2 = A+/4.3
D3 = A/4.0
M1 = B+/3.3
M2 = B/3.0
M3 = B-/2.7
P1 = C-/1.7
P2 = D/1.0
P3 = D-/0.7
```

## 4. Singapore schools following standard JC grading conventions
Include H1 (GP, Project, etc.) & H2 predictions on a 4.0 scale to calculate GPA.

9

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

HARV00000405

Double weight for H2 marks.  For H3, the scale is:

- Distinction = A/4.0
- Merit = B/3.0
- Pass = C/2.0

Double H3s as well.  If provided, include O Level/GCSE marks in calculation of GPA with a single weight like we do with the British System.

### 5. Australia
Push schools for a transcript of some sort.  If all else fails and you are given the state final exam result or prediction (ex: UAI for NSW, OP for Queensland), use that.

### 6. New Zealand
For courses in which there is the possibility to get more than a grade of Achieved:

- Excellent = A/4.0
- Merit = B/3.0
- Achieved = C/2.0
- Not Achieved = F/0

For courses graded only Achieved/Not Achieved, we will consider these the same as Pass/Fail, so a mark of Achieved will <u>not</u> be included when calculating GPA.

**TABLE II : Used for calculating Converted Gradepoint Score (CGS)**

| Percentage Average | 11.0/12.0 Scale Average | 7.0 Scale Average | 6.0 Scale Average | 4.0 Scale Average | Letter Grade Equivalent to 4.0 | CGS |
|---|---|---|---|---|---|---|
| 98.00 and above | 12.00 and above | 7.00 and above | 6.00 and above | 4.30 and above | A+ | 80 |
| 97.00 - 97.99 | 11.70 - 11.99 | 6.70 - 6.99 | 5.70 - 5.99 | 4.20 - 4.29 | | 79 |
| 96.00 - 96.99 | 11.40 - 11.69 | 6.40 - 6.69 | 5.40 - 5.69 | 4.10 - 4.19 | | 78 |
| 95.00 - 95.99 | 11.00 - 11.39 | 6.00 - 6.39 | 5.00 - 5.39 | 4.00 - 4.09 | A | 77 |
| 94.00 - 94.99 | 10.70 - 10.99 | 5.90 - 5.99 | 4.90 - 4.99 | 3.90 - 3.99 | | 75 |
| 93.00 - 93.99 | 10.40 - 10.69 | 5.80 - 5.89 | 4.80 - 4.89 | 3.80 - 3.89 | | 73 |
| 92.00 - 92.99 | 10.00 - 10.39 | 5.70 - 5.79 | 4.70 - 4.79 | 3.70 - 3.79 | A- | 71 |
| 91.00 - 91.99 | 9.80 - 9.99 | 5.60 - 5.69 | 4.60 - 4.69 | 3.60 - 3.69 | | 70 |
| 90.00 - 90.99 | 9.50 - 9.79 | 5.50 - 5.59 | 4.50 - 4.59 | 3.50 - 3.59 | | 69 |
| 89.00 - 89.99 | 9.30 - 9.49 | 5.40 - 5.49 | 4.40 - 4.49 | 3.40 - 3.49 | | 68 |
| 88.00 - 88.99 | 9.00 - 9.29 | 5.30 - 5.39 | 4.30 - 4.39 | 3.30 - 3.39 | B+ | 67 |

10

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

HARV00000406

**JA4770**

DX003.0060

| | | | | | | |
|---|---|---|---|---|---|---|
| 87.00 - 87.99 | 8.70 - 8.99 | 5.20 - 5.29 | 4.20 - 4.29 | 3.20 - 3.29 | | 66 |
| 86.00 - 86.99 | 8.40 - 8.69 | 5.10 - 5.19 | 4.10 - 4.19 | 3.10 - 3.19 | | 65 |
| 85.00 - 85.99 | 8.00 - 8.39 | 5.00 - 5.09 | 4.00 - 4.09 | 3.00 - 3.09 | B | 63 |
| 84.00 - 84.99 | 7.70 - 7.99 | 4.90 - 4.99 | 3.90 - 3.99 | 2.90 - 2.99 | | 61 |
| 83.00 - 83.99 | 7.40 - 7.69 | 4.80 - 4.89 | 3.80 - 3.89 | 2.80 - 2.89 | | 59 |
| 82.00 - 82.99 | 7.00 - 7.39 | 4.70 - 4.79 | 3.70 - 3.79 | 2.70 - 2.79 | B- | 57 |
| 81.00 - 81.99 | 6.75 - 6.99 | 4.60 - 4.69 | 3.60 - 3.69 | 2.60 - 2.69 | | 55 |
| 80.00 - 80.99 | 6.50 - 6.74 | 4.50 - 4.59 | 3.50 - 3.59 | 2.50 - 2.59 | | 53 |
| 79.00 - 79.99 | 6.25 - 6.49 | 4.40 - 4.49 | 3.40 - 3.49 | 2.40 - 2.49 | | 51 |
| 78.00 - 78.99 | 6.00 - 6.24 | 4.30 - 4.39 | 3.30 - 3.39 | 2.30 - 2.39 | C+ | 49 |
| 77.00 - 77.99 | 5.70 - 5.99 | 4.20 - 4.29 | 3.20 - 3.29 | 2.20 - 2.29 | | 48 |
| 76.00 - 76.99 | 5.40 - 5.69 | 4.10 - 4.19 | 3.10 - 3.19 | 2.10 - 2.19 | | 47 |
| 75.00 - 75.99 | 5.00 - 5.39 | 4.00 - 4.09 | 3.00 - 3.09 | 2.00 - 2.09 | C | 46 |
| 74.00 - 74.99 | 4.70 - 4.99 | 3.90 - 3.99 | 2.90 - 2.99 | 1.90 - 1.99 | | 45 |
| 73.00 - 73.99 | 4.40 - 4.69 | 3.80 - 3.89 | 2.80 - 2.89 | 1.80 - 1.89 | | 44 |
| 72.00 - 72.99 | 4.00 - 4.39 | 3.70 - 3.79 | 2.70 - 2.79 | 1.70 - 1.79 | C- | 42 |
| 71.00 - 71.99 | 3.5 - 3.99 | 3.60 - 3.69 | 2.60 - 2.69 | 1.60 - 1.69 | | 40 |
| 70.00 - 70.99 | 2.5 - 3.49 | 3.50 - 3.59 | 2.50 - 2.59 | 1.50 - 1.59 | D+ | 38 |
| Below 70.00 | Below 2.5 | Below 3.5 | Below 2.5 | Below 1.50 | D | 35 |

**INTERVIEW PROFILE (IVP):**

Below is the language for uniform implementation of the Interview Profile number (IVP) for use with all Schools and Scholarship Chairs. The IVP will serve as a guide for Chairs to know when our office needs the reports, and therefore how quickly they need to be assigned. All interviewers will be told that they should submit their interview report no later than two weeks after receiving the interview assignment.

1. Please have interview report in as soon as possible.
2. Please have interview report in by the sub-committee deadline.
3. Please have interview report in by December 1 (EA) or March 1 (RD).
4. No additional information needed at this time.

This language has been distributed to the S&S chairs via email and can also be found in the updated handbook and website instructions. (Please ask Brock Walsh if you need help accessing the site). **Please have a conversation with your chairs to determine if you wish to use the IVP, and please make clear that this information should not be shared with other interviewers or applicants.** If your chairs have additional clerical or operational questions about the IVP, please direct them to email Brock/Caroline Weaver at SSinfo@fas.harvard.edu.

When reading, please input your IVP code on the First Reader Rating Form. Continue to pass on the folder to your chair and/or code out to Committee Review bin.

11

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY                    HARV00000407

**PROSE COMMENTS**:
When making prose comments, first readers should note the important academic and extracurricular accomplishments that are particularly pertinent to the case. It is also helpful to reference teacher reports or other items that may be crucial to our evaluation. In addition to numerical ratings, readers should try to summarize the strengths and weaknesses of the folder in brief paragraphs or comments. Avoid slang and jargon and REMEMBER - your comments may be open to public view at a later time.

### III.    FOLDER ROUTING

**INADVERTENTLY CLEARED FOLDERS**: Occasionally, folders will be mistakenly "cleared" (considered complete) and placed in your first read bin. Open the Admin Problems Form and note the issue. Then route the folder back to the Admin Problems bin.

**FOLDERS SHOULD BE READ AND PASSED IN A TIMELY FASHION**: Readers should take care not to allow folders to pile up. First readers need to read folders from all assigned dockets as they clear, not just those whose subcommittee meets first. This is important, and we will monitor reading progress centrally. If you need help keeping up for whatever reason, let us know immediately. Readers should code out folders to the Committee Review bin. First-time readers will use the Optional Additional bin for their first 50 folders during Early Action.

**SECOND READERS (OPTIONAL ADDITIONAL READER)**: Except by new readers (for whom special routing instructions are provided below), second readings should be used only in the rarest of instances:

A) If three readings are needed for a complex case.

B) If the case raises issues of policy.

C) If the case would be greatly helped by a second reading from the former area person or someone with special knowledge of an area or type of case.

No second reader will ordinarily be assigned. If you want/need a second reading, consult the enclosed docket assignment sheet to identify other readers on your docket. Try not to burden one person inordinately. Send an email to special second readers to alert them to your requested reading.

12

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

HARV00000408

**JA4772**
DX003.0062

**FIRST-TIME READERS**:  New readers should have their first fifty Early Action folders passed to the Optional Additional Reader bin as well as any other subsequent folders that might help instruct the new reader in future evaluations.  Some chairs may wish to use different approaches for first year readers.

**GENERAL ROUTING RULES:**

1) A folder should be passed <u>directly</u> to the chair:

  - If the first reader rates a folder a "2-" or better (i.e. a case the first reader thinks should be admitted)

  - If the folder will definitely (or almost definitely) be discussed in Committee.

  - If you want the third reader's opinion or want simply to have the third reader informed about the case.

  **If the first reader has a significant degree of uncertainty about how to proceed with the case, he or she should consult the docket chair.**

2) A case rated a 3+ may be passed to the chair or routed straight to the Committee Review bin.  The first reader should consider carefully the likelihood that additional anticipated information (e.g., a superior music rating) will make the case more compelling, in which case the folder should be passed to the chair.  If there is no further information anticipated and the case is qualitatively a 3+ (a strong case but like many others), an experienced first reader does not need to pass it on.

3) Typically a case rated a "3" or less with no particular attribute that would make it competitive can be routed directly to the Committee Review bin. Obviously late information or school context could change this initial evaluation.  The first reader, as an advocate, must be doubly certain to check all late information that might make a difference to the case prior to the Committee meetings.  This is particularly important for candidates whose outstanding personal qualities become evident once we have the alumni/ae interview.

Readers new to a docket should discuss with the docket chair any special guidelines about which folders should be passed on and which folders should not.

**SPECIAL READINGS**

  - WRF should see cases that could be particularly sensitive or controversial or that raise issues of fundamental policy.  When in doubt, send the folder on.

13

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

HARV00000409

- Folders of <u>competitive</u> candidates who attended secondary school outside the U.S. and Canada may be passed on to the appropriate U or V docket area person or RMW if help in assessing foreign credentials is needed. <u>Be selective</u>- don't pass on a folder unless you are sure the applicant is both competitive and appealing or has some <u>unusual</u> attributes.

- A faculty readings memorandum will be distributed later regarding specific procedures.

- Supplemental music/art/dance/academic materials of <u>clearly competitive</u> candidates with an unusually strong talent may be assessed through a supplementary process - through Portfolio or in a manual fashion.  Handling of this material will be addressed through memoranda over the course of the fall.


IV.    <u>**ECONOMICALLY DISADVANTAGED APPLICANTS**</u>

It has long been a priority for Harvard to seek talented students from all backgrounds, including those extraordinary individuals who are able to transcend economic disadvantages and achieve unusual academic distinction.

- **DISAD?**
  **After thoroughly reviewing the folder, if you believe the applicant is from a very modest economic background, please code a "Y" in the "Disad?" (for staff identified disadvantaged) section on the Reader Rating Form.** In the past, admitted students who had been staff identified as "Disadvantaged=Y" were found to be economically needy 78% of the time.

  We have included other parameters to help with your evaluation of the applicant's economic background.  They are:

- **FEE STATUS**

  *Please note: In addition to the fee waiver forms we currently accept, we now include waivers issued by Expanding College Opportunities (ECO).  ECO is a research initiative aimed at increasing the number of high-achieving, low-income students who apply to selective colleges and universities

- **HRP CALL RATING:** This is a rating assigned by the students from HFAI and UMRP based on the quality of phone conversations they had over the summer and into the fall.  The ratings will be +,-.  The student coordinators are

14

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

encouraged to provide a write-up in Slate.  These ratings <u>do not</u> indicate level of need.

V.    **OTHER ITEMS**

- **Slate is made up of data downloaded from the application and supplement forms.  We currently do not have the ability to enter all the information by hand for those applicants who do not submit their forms on-line.  However, the data entry staff will enter the information that they have in the past.  This means that the dockets will be correct, but the new reader sheets for these applicants will be primarily blank. You should double-check the data that is important  - i.e. parent education, ethnicity, aid status, etc. - basically every field that's on the summary sheet.  About 1% of all our applicants will fall into this category.**

- <u>Acknowledgments to guidance counselors, teachers, and others</u>:  The area person may occasionally feel it worthwhile to acknowledge unusually helpful TRs and SSRs by writing a note to the author.  The note should acknowledge that the candidate may or may not be admitted.  **Supplementary letters of recommendation may have already been acknowledged with a card or letter, but if not, particularly with recommenders who are alumni or others about whom Harvard might be concerned, you should call the letter to the attention of MEM or WRF and an acknowledgment will be sent.  This is important!**

- <u>Support Materials:</u> ALL manually submitted support material should be dropped into the appropriate bucket in the mailroom for sorting and scanning.

- <u>Misfiled and missing materials</u>:  If a teacher report, school report or any other material that would be helpful to a competitive candidate is missing, first readers should request a copy be re-sent. Folders should be sent on to other readers unless the missing pieces are crucial.  In such cases, first readers should hold onto the file by routing the file to the "Area Person Follow Up" bin.

- <u>Folder items that require attention</u>:  Unanswered letters should be handled by first readers where appropriate or others including MEM or WRF.

- <u>Fee Waivers</u>: Any requests for a fee waiver should **not** be removed from the folder. However, if a fee waiver request is in the file and was not recorded on the summary sheet, you should add it to the "notes for summary sheet".

15

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

**JA4775**
DX003.0065

- <u>Twins, etc</u>: Twins may confound our score file. Please be extra careful in checking and in assigning scores in these cases.

## VI.    **SCANNING AND INDEXING**

We have added a basket in the mailroom to collect and sort documents received. The forms collected in these baskets should have content that is *specific* to the admission decision of the applicant and are marked as such. For example, mailed applications or supplements, letters of support, teacher reports, Harvard eval, (coach, arts, music, Harvard faculty), midyear reports, SSR's etc.  We will scan almost everything. If that's not possible, an "oversized support" form will be scanned and added to the file to let you know there is material sitting in the bookcase in the Fileroom Annex.

Documents displayed in the viewer are named by the document type that follows the menu down the left side of the Slate e-reader.
- Application (and supplement)
- SSR
- TRs
- Interviews
- Student Submissions (resume, newspaper clippings, emails, etc)
- Additional academic (additional transcripts, etc)
- Midyear
- Final Report
- Ratings Forms (includes IRFs)
- Miscellaneous (notes from family/friends, alums, noting of oversized support, etc)

16

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

**JA4776**
DX003.0066

**MEMORANDUM**

TO:        Colleagues

FROM:      MFM

RE:        Evaluation of Music Recordings          November 5, 2014

     I want to describe in this memo our approach to the evaluation of music. The general principle is that an evaluation should be arranged when (and only when) there is a good probability that it will make a positive difference in the admission decision (in contrast merely to boosting the case.) In other words, we are seeking to identify "1"s.

     The procedure is as follows:

1.    Each musical submission will be in Slideroom. The Slideroom URL on the "supp materials" tab in Slate is not currently working reliably; please refer directly to Slideroom to verify a submission. Sometimes a CD will be received and logged with an "Oversized Support" sheet in the applicant record on Slate, but Mollie (MAD) will facilitate the conversion of these to Slideroom.

2.    After reading the file, the area person should determine, in consultation with the docket chair, whether the music should be sent for review. Please note: the docket chair must read the file before it is sent off for evaluation. Additionally, two conditions must be met:

    a.    The application must be a strong contender for admission, and

    b.    Evidence in the folder must suggest that the musical talent is superior in Harvard terms (i.e. a good likelihood that it will be a "1"). Please see Instrumental Guidelines attachment to this memo for guidance.

3.    The area person should use the staff "To Do" on the Reader Sheet, or click on "To Do" from the student record in Slate. The area person should choose the "reader requests review of supplemental materials" in the drop-down menu next to "Music Evaluation". The area person must also complete the drop-down for instrument, "Music Type" and "Evidence of Talent" (i.e. what information in the

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

HARV00000413

Continued

Page 2
November 5, 2014

file suggests that this applicant is truly superior.) The area person should also verify that the applicant has submitted material in Slideroom before requesting a review.

4.     Mollie will review the music credentials and, if necessary, the recording. There may be times when music is sent to RXB to verify exceptional talent. Mollie will then pass along the music along for review (see below) and update the Slate "To do" item. The status will now read "staff has notified reviewer". If the request is incomplete or the music is not strong, Mollie will notify the area person by email.

5.     The music department faculty will complete their reviews in Slideroom. Once the evaluation is complete, Mollie will add the rating to Slate, change the status of the "To do" item to "rating/review received", and upload the Slideroom rating form to the student record (If an area person is looking for reviewer comments, they can be found on the uploaded rating form). If the area person is waiting on an evaluation, he or she can also check Slideroom for ratings and/or comments in case the rating has been received very recently.

Evaluations will be made as follows:

1.     Vocal music will be sent to Beth Willer, Director of Choral Activities, and Harris Ipock, Resident Conductor, in the fall. In the spring, vocal music will be sent to Andrew Clark, Director of the Holden Choruses.

2.     Woodwinds, brass, percussion, and jazz will be sent to Mark Olson, Interim Director of Bands.

3.     String instruments will be sent to Federico Cortese, Music Director of the Harvard Radcliffe Orchestra.

4.     Piano will be sent to Heng-Jin Park, Chamber Music Course Assistant.

5.     Compositions will be sent to the Music Department for review by designated representatives of the Music Department.

Please let me—or Mollie—know if you have questions about this procedure. Our aim is to direct our resources very carefully to getting the best information we can about the strongest candidates for admission. We do not want to waste our good will (or reputation for good judgment) with the Music Department. Thank you, once again, for your help.

MEM/mad

updated 2014

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

HARV00000414

MEMORANDUM

TO:        Colleagues

FROM:    MEM

RE:        Faculty Readings

DATE:     November 5, 2014

The full participation of the members of the Faculty Committee is an essential component of our admissions process. In making admissions decisions we rely as much on their perspectives on the College as on their expertise in their respective fields. Just as essential to our work is their role in communicating what we do to their faculty colleagues and to the University at large.

It is therefore crucial to involve faculty members thoughtfully. As you read, we hope you—chairs, particularly—will make a conscious effort to identify folders to be read by faculty members. They should read those folders for which a precise calibration of academic talent will be the key to the case. Folders that are hopeless should not be sent on but very strong folders should often be forwarded.

The docket chair should always determine (or approve) the choice of the faculty reader. Readers are listed by name on the drop-down menu. You may wish to consult the attached list of areas of expertise. Please be sure to allow at least two weeks turnaround time. Last-minute reads are not usually possible. Faculty reads should occur as promptly as possible as we make our way through the reading process.

Please make careful choices about faculty reads. In those rare (I expect) cases in which you want my input, please give me a hard copy of the academic work to be reviewed.

For your convenience we are enclosing three lists. The first is a list of the membership of the Standing Committee, the second lists their preferences and the third list includes my notes on the research interests of those faculty members which you may find helpful in directing folders for review.

Thanks very much for your help, and for your careful attention to timing.

Enclosures

MEM/alb

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

HARV00000415

COMMITTEE ON ADMISSIONS AND FINANCIAL AID, HARVARD COLLEGE/2014-2015

Dr. William R. Fitzsimmons
Dean of Admissions and
Financial Aid
86 Brattle Street
495-1557
wrf@fas.harvard.edu

Professor Ali Asani
Department of Near East Languages
Barker Center 305
495-5755
aliasani@fas.harvard.edu

Dr. Paul Barreira
Director of Harvard University
Health Services
75 Mt. Auburn Street
495-2010
pbarreira@uhs.harvard.edu

Professor Ann M. Blair (LOA-Full Year)
Department of History
CGIS South Building, S437
495-0752
amblair@fas.harvard.edu

Professor Peter J. Burgard
Department of Germanic Languages and
Literature
Barker Center 361
496-4922
burgard@fas.harvard.edu

Dean Thomas A. Dingman
Dean of Freshmen
6 Prescott Street
495-1574
tdingman@fas.harvard.edu

Ms. Sally C. Donahue
Director of Financial Aid
86 Brattle Street
495-1580
sdonahue@fas.harvard.edu

Professor Diana L. Eck
Study of Religion Committee
Barker Center 307, 12 Quincy Street
495-5781
dianaeck@fas.harvard.edu

Professor Edward L. Glaeser (LOA-Spring)
Department of Economics
79 JFK Street, Taubman 318
496-1722
eglaeser@fas.harvard.edu

Professor Benedict H. Gross (LOA-Spring)
Department of Mathematics
Science Center 506
495-9063
gross@math.harvard.edu

Professor Guido Guidotti
Department of Biochemical Sciences
Northwest Bldg, Rm. 140.49, 52 Oxford Street
495-2308
guidotti@fas.harvard.edu

Dean Jay M. Harris
Dean of Undergraduate Education
University Hall 128
495-7546
jharris@fas.harvard.edu

Professor Joseph D. Harris
Department of Mathematics
Science Center 339
495-5335
harris@math.harvard.edu

Professor Robert D. Howe (LOA-Spring)
School of Engineering and Applied Sciences
Pierce Hall 323, 29 Oxford Street
496-8359
howe@seas.harvard.edu

Dr. Thomas Jehn
Director, Expository Writing
8 Prescott Street
495-9103
trjehn@fas.harvard.edu

Dean Rakesh Khurana
Dean of Harvard College
University Hall 119
495-1555
deankhurana@fas.harvard.edu

Professor Nancy E. Kleckner (LOA-Spring)
Department of Molecular and
Cellular Biology
Northwest Bldg. Rm. 140.05, 52 Oxford Street
495-4278
kleckner@fas.harvard.edu

Dean Stephen Lassonde
Dean of Student Life
University Hall
495-1942
slassonde@fas.harvard.edu

Professor Harry R. Lewis
School of Engineering and
Applied Sciences
Maxwell Dworkin 237, 33 Oxford Street
496-2424
lewis@seas.harvard.edu

Ms. Ruth Lingford
Department of Visual and Environmental
Studies
Carpenter Center, 24 Quincy Street
495-9683
lingford@fas.harvard.edu

Professor Richard M. Losick
Department of Molecular and
Cellular Biology
Bio Labs 3023, 16 Divinity Avenue
losick@mcb.harvard.edu

Professor James J. McCarthy
Department of Organismic and
Evolutionary Biology
M.C.Z. Labs 503, 26 Oxford Street
495-2330
jmccarthy@oeb.harvard.edu

Dr. Marlyn E. McGrath
Director of Admissions
86 Brattle Street
495-5339
mmcg@fas.harvard.edu

Professor Louis Menand
Department of English
Barker Center 161
495-8780
menand@fas.harvard.edu

Professor Michael D. Mitzenmacher
School of Engineering and
Applied Sciences
Maxwell Dworkin 331, 33 Oxford Street
496-5508
michaelm@eecs.harvard.edu

Dean Cherry Murray
Dean of the School of Engineering
and Applied Sciences
Pierce Hall 217A, 29 Oxford Street
495-5829
camurray@seas.harvard.edu

Mr. John P. Reardon, Jr.
Executive Director
Harvard Alumni Association
124 Mt. Auburn Street, 6th Floor
495-5327
jreardon@fas.harvard.edu

Mr. Robert L. Scalise
Director of Athletics
Murr Athletic Center
65 North Harvard Street
495-2204
scalise@fas.harvard.edu

Professor Anne C. Shreffler (LOA-Spring)
Department of Music
Music Building, 301S
384-7742
acshreff@fas.harvard.edu

Professor Alison Simmons
Department of Philosophy
Emerson 315
495-0516
asimmons@fas.harvard.edu

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

HARV00000416

Professor Frans Spaepen
School of Engineering
and Applied Sciences
Pierce Hall 207, 29 Oxford Street
495-4460
spaepen@seas.harvard.edu

Professor Richard F. Thomas (LOA-Fall)
Department of the Classics
Boylston 221
496-6061
rthomas@fas.harvard.edu

Professor James H. Waldo
School of Engineering and
Applied Sciences
Maxwell Dworkin 134, 33 Oxford Street
495-1260
waldo@eecs.harvard.edu

Professor Robert M. Woollacott
Department of Organismic and
Evolutionary Biology
M.C.Z. Labs 504, 26 Oxford Street
495-1755
rwoollacott@harvard.edu

Professor Amir Yacoby
Department of Physics
LISE 609
5 Oxford Street
495-1180
yacoby@physics.harvard.edu

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY                    HARV00000417

**JA4781**
DX003.0071

FACULTY READING PREFERENCES/2014-2015

| FACULTY MEMBER | # OF FOLDERS | DOCKETS | OTHER PREFERENCES |
|---|---|---|---|
| Professor Ali Asani | 25 | V,U | Foreign esp. E. Africa, Middle East, South Asia Islamic, Middle Eastern South Asian studies |
| Dr. Paul Barreira | 30 | Anything | None |
| Professor Ann M. Blair | 0 | | On leave full year |
| Professor Peter J. Burgard | 25-50 | A, P, I, N | Foreign students from German and English speaking countries |
| Dean Tom A. Dingman | 25 | Anything | students with compelling circumstances, recruited athletes, students from rural areas |
| Professor Diana L. Eck | 20 | B | MT, ID, WA, Humanities |
| Professor Edward L. Glaeser | 0 | | On leave Spring Term |
| Dean Benedict H. Gross | 25 | Anything | Mathematics, "strange" cases |
| Professor Guido Guidotti | | | |
| Dean Jay M. Harris | 25 | Anything | None |
| Professor Joseph D. Harris | 25 | Anything | |
| Professor Robert D. Howe | 0 | | On leave Spring Term |
| Dr. Thomas Jehn | 25 | Anything | Writers, non-traditional |
| Dean Rakesh Khurana | | | |
| Professor Nancy E. Kleckner | 25 | Anything | On leave Spring Term but happy to read |
| Dean Stephen Lassonde | 35 | Anything | None |
| Professor Harry R. Lewis | 50 | Anything | CS |
| Ms. Ruth Lingford | 25 | U, A, D | Visual Arts |
| Professor Richard M. Losick | 25 | Anything | Whatever is helpful |
| Professor James J. McCarthy | 25 | Anything | Whatever is helpful |

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

HARV00000418

**JA4782**

DX003.0072

| | | | |
|---|---|---|---|
| Professor Louis Menand | 20 | Anything | Availability is scarce |
| Professor Michael D. Mitzenmacher | 20 | Anything | None |
| Dean Cherry A. Murray | 10 | Anything | None |
| Mr. John P. Reardon | 10 | Anything | None |
| Mr. Robert L. Scalise | 10 | Anything | Whatever is helpful |
| Professor Anne C. Shreffler | 20 | D, J, V, E | Music- But has no role in CD evaluations |
| Professor Alison Simmons | 25 | Anything | Humanities |
| Professor Frans Spaepen | 10 | Anything | Would prefer to read after EA |
| Professor Richard F. Thomas | 50 | Anything | On leave in the Fall |
| Professor James H. Waldo | 50 | L, A, B | None |
| Professor Robert M. Woollacott | 50 | Anything | Marine Biology, SCUBA Asian Art |
| Professor Amir Yacoby | 25 | Anything | None |

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

HARV00000419

**JA4783**

DX003.0073

FACULTY BLURBS

Professor Ali Asani
- Professor of Indo-Muslim and Islamic Religion and Cultures
- Aspects of the Islamic traditions
- Sanskrit and Indian Studies

Dr. Paul Barreira
- Psychiatrist, Director of UHS
- Psychiatric/maturational questions

Professor Ann Blair
- Early Modern European history, Intellectual and Cultural
- History of the book
- History of science

Professor Peter Burgard
- German Literature and intellectual history

Professor Diana Eck
- Comparative Religion and Indian Studies
- Religious pluralism

Professor Edward Glaeser
- Glimp Professor of Economics
- Director of Rappaport Institute for Greater Boston
- Urban and social economics and microeconomic theory

Professor Dick Gross
- Number theory
- Representation theory
- Mathematics

Professor Guido Guidotti
- Biochemistry
- membranes, protein complexes

Professor Joe Harris
- Algebraic geometry
- Mathematics

Professor Robert Howe
- Engineering, Computer Science, robotics and control
- Biomechanics, materials science, bioengineering

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

HARV00000420

Professor Thomas Jehn
- Director of Harvard College Writing Program

Dean Rakesh Khurana
- Professor of Leadership Development (HBS)
- Sociology
- Organizational behavior

Professor Nancy Kleckner
- Molecular Biology
- Virology
- Genetics

Professor Harry Lewis
- Computer Science
- Theory of computation
- Mathematical logic
- Communication  and Internet policy
- Privacy and security

Professor Ruth Lingford
- Film animation

Professor Richard Losick
- Molecular and Cellular Biology
- Genetics

Professor James McCarthy
- Comparative Zoology
- Global climate and ecosystem change

Professor Luke Menand
- 19th and 20th century cultural history
- Literary theory
- Higher Education

Professor Michael Mitzenmacher
- Computer Science
- Theory of computation
- Complex systems

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

HARV00000421

Dean Cherry Murray
- Engineering
- Applied Physics
- Nanophotonics
- Soft condensed matter
- Surface and Interface Science

Professor Anne Shreffler
- Historical Musicology
- Twentieth Century and American Music

Professor Alison Simmons
- Philosophy
- Medieval philosophy
- Philosophy of mind
- Philosophy of psychology

Professor Frans Spaepen
- Applied Physics
- Materials Science
- Soft condensed matter
- Surface and interface science

Professor Richard Thomas
- Classics
- Augustan Latin Literature, Vergil
- Bob Dylan

Professor James Waldo
- University Chief Technical Officer
- Computer Science
- Architecture of technology
- Distributed systems

Professor Robert Woollacott
- Marine Biology
- Invertebrates
- Marine species reproduction and environmental cues
- Marine population structure

Professor Amir Yacoby
- Physics
- Condensed matter
- Phenomena of low dimensional systems
- Electrical conduction

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

**JA4786**

DX003.0076



Fyi DATA

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY                    HARV00000427



HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

HARV00000436

*JOINT TRAVEL*

| *CONFIDENTIAL* |
| :---: |
| DO NOT MISPLACE |

### Joint Travel Slide Show Notes
### Fall 2014

*\*You are encouraged to use examples from your own undergraduate experience, or draw on anecdotes from our student greeters.*

**1. Welcome Slide: "Harvard"**
- Welcome to Today's Harvard! We are located on the banks of the Charles River, 10 minutes away from downtown Boston.
- We are America's oldest college, founded in 1636, but this is not the Harvard of 1636! Harvard has been transformed over the past few years by new initiatives that encompass nearly every aspect of the undergraduate experience. Examples:
  - New concentrations
  - iLab
  - Stem Cell Initiative
  - House renewal
  - Newly renovated art museums

**2. John Harvard statue…**
*As we go through this brief presentation, we want to focus on the three "Rs"— but not the usual three "Rs"…*
- Resources: We have the unparalleled resources of a world-class university, a curriculum unsurpassed in its breadth and depth, the world's largest university library system and an unmatched combination of research centers, institutes, museums, and faculty from all parts of Harvard.
- Residential: A specially designed freshman year and America's first residential House system—a home away from home. A setting that provides many aspects of a small residential college, such as personal attention and support that plays a critical role in our 98% graduation rate.
- Region: Boston and Cambridge—America's college town with over 200,000 college students and 50 institutions of higher learning linked by a superb public transportation system.

*One of the best results of coming to Harvard is a fourth "R":*
- Relationships – Harvard students form life-long friendships. Our amazing students and faculty come from all over the nation and the world, from every cultural, ethnic and economic background.

**3. Living at Harvard: Freshman Year**
- Housing is guaranteed all four years, and 97% of students choose to live on campus for all 4 years.
- Freshman year is meant to be a special time for the class to bond as they transition to the rigors of college life.
- All freshmen live in one of 17 freshman dormitories in or around Harvard Yard. They all eat together in Annenberg Dining Hall.

1

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

**JA4789**
DX003.0091

- Personal attention and support are the cornerstones of the first year-experience and to that end there is an entire office dedicated solely to the first-year experience.
- Each freshman has three different types of advisers and the average adviser has 3-6 advisees. There are over 400 faculty and staff who act as academic advisers, nearly 200 peer advising fellows, and 60 resident proctors.

### 4. Living at Harvard: The House System
- After freshman year students move to one of 12 upper-class houses. A great deal of pride and identity develops around one's house, and alums often introduce themselves to each other by saying which house they lived in.
- The House is intended to be a living and learning community, a microcosm of Harvard as a whole.
- Each House is composed of 350 to 500 undergraduates as well as a staff of resident tutors, who act as advisors. A senior faculty member, known as a House Master, serves as the head of each House and lives alongside the students with his or her family.
- Every house has its own dining hall, exercise facilities, and library as well as distinct facilities such as performance spaces, pottery studios, rock climbing walls, squash courts, etc.
- Every house also fields intramural sports teams, has its own mascot, and has its own unique traditions. (This is a great opportunity to give an example!)
- We are currently in the midst of a house renewal project.

### 5. Learning at Harvard
- Over 3,500 courses in 48 different concentrations (our word for major) and a secondary field program (minor) with over 40 areas of study.
- We give students the flexibility to "shop" courses at the start of each term and design a curriculum that best suits their needs. (This is a great opportunity to give an example!)
- General Education program which allows students to explore a broad range of topics and approaches in a variety of disciplines (over 400 courses from which students can choose).
- More than 80 ancient and modern languages, all taught by native speakers.
- 7:1 student/faculty ratio, average course size is 20, median course size is 12.
- Students are also able to cross-register at many of Harvard's graduate schools and MIT.
- Freshman Seminar program includes nearly 130 small seminars designed exclusively for first-year students.

### 6. Academic Resources
- Nearly 100% of classes are taught by faculty. 3 types of classes that are not:
  - Expository Writing: Taught by published authors.
  - Intro math: Taught by PhD students.
  - Foreign language: Taught by native speakers.
- There are numerous opportunities to interact with faculty from the moment you set foot on campus. These include regular office hours, biannual student-faculty dinners that are held in the Houses and one-on-one tutorials, among others.
- The physical resources available to students are extensive:

2

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

HARV00000438

- o Largest university library system in the world with over 16 million volumes (76 libraries)
- o On-campus museums
- o Countless laboratories, research centers and institutes
- o 3,000 acre Harvard Forest
- o Harvard Film Archive
- A new Harvard Innovation Lab, dedicated to supporting start-up ventures and entrepreneurship within the Harvard student body

**7. Science and Research**
- Nearly half of the students entering Harvard intend to concentrate in the physical, natural, or engineering sciences.
- SEAS is a leader in its field and recently introduced two new fields of study: Human Development & Regenerative Biology and Biomedical Engineering.
- There are also a number of student organizations dedicated to the sciences: Women in Computer Science, Women in Science at Harvard-Radcliffe, and many others.
- Examples of significant contributions to the field of science:
  - o Harvard Stem Cell Institute which aims to use the power of stem cell biology to understand and ultimately treat selected diseases and conditions
  - o The Broad Institute, a joint venture between Harvard and MIT, includes many of the scientists who made significant contributions to the Human Genome Project now working together to pioneer a "new model" of collaborative science to transform medicine.
- Tremendous research opportunities available to all undergraduates in all areas of study. A significant portion of students participate in research during the undergraduate years (per MBS: Hard to say an exact %, but she thinks it's likely that 25-33% of students participate in research.)
- This year students received $6M in funding from Harvard sources to pursue their own research interests.
- World leader in the environmental sciences
  - o 75 LEED registered buildings on campus
  - o An undergraduate concentration in Environmental Science and Public Policy
- Engineers and applied scientists at Harvard have and are continuing to make major contributions to the field.
  - o Development of one of the first electromechanical computers
  - o First flight of a robotic fly
  - o Creation of bubbles that last for more than a year
  - o Commercialization of breathable chocolate

**8. Beyond the Classroom**
- Activities are for all levels of ability. You can continue doing something you did in high school or jump in and try something totally new to you.
  - o Our athletics program is a terrific example of this.
- Over 450 student organizations:

3

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

HARV00000439

**JA4791**
DX003.0093

- 42 Division 1 sports teams, the largest program in the nation. Nearly 80% of students participate in athletics – varsity, JV, club, or intramural.
    - You may have recently seen Crimson Basketball competing in the NCAA tournament!
- More than 1,000 students involved in social justice work on campus and in the greater Cambridge/Boston area.
- The Institute of Politics, an organization that connects undergraduates to opportunities and significant figures in public service.
- Numerous cultural groups including the Harvard Foundation for Intercultural and Race Relations.
- Faith-based organizations that serve students from a wide variety of spiritual backgrounds.
- Affinity and interest organizations, including such resources as the Harvard College Women's Center and the Office of BGLTQ Student Life.
- Extensive performing arts offerings: 5 full orchestras, more than a dozen a cappella groups, nearly 100 dance and dramatic ensembles.
- Dozens of publications including The Crimson, the only daily student newspaper on the AP wire.

- Many students gain extensive pre-professional experience through their extracurriculars.
- Involvement can also go far beyond Harvard. We have new offices throughout the world, including a new $100 million gift for study abroad from David Rockefeller which has already been taken advantage of by 500 undergraduates.

### 9. Cambridge, Boston & New England
- More than 50 colleges/universities + 250K college students within 10 miles of downtown Boston.
- Harvard Square is an exciting and dynamic place to be with tons of shops and restaurants, and inexpensive public transportation that allows students to explore the area beyond campus.
- Downtown Boston is just across the Charles River and only 10 minutes away by subway. Students do not need cars to explore all that the city has to offer.
- Greater Boston is home to 5 different professional sports teams, numerous museums, a vast number of performing arts companies and productions, and unparalleled historical sites, to name a few.

### 10. Life After Harvard
- 98% graduation rate, among the highest in the nation (and even the 2% that do not graduate do pretty well—i.e. Bill Gates).
- Very high rates of acceptance to graduate schools at Harvard and beyond.
- Over 15,000 interviewers all over the world helping to interview applicants.
- Harvard Clubs in nearly 80 countries worldwide.

### 11. Financial Aid
- This is a HUGE priority for Harvard.
- The community of students that we bring together is Harvard's greatest asset so we want to bring the best people to Harvard, regardless of their ability to pay.

4

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

HARV00000440

      o  Griffin gift: We recently received an extremely generous alumni gift which is focused primarily on financial aid. It will serve as many as 800 students annually.
- Financial need will never prevent talented students from being admitted and all are encouraged to apply.
- 60% of Harvard families pay an average of only $11,250 per year. 20% of Harvard families pay nothing at all.
- Parents with incomes below $65,000 and assets typical for this income level are not asked to contribute to the cost of sending their children to Harvard. Families earning between $65,000 and below $150,000 and with assets typical for these income levels will be asked to pay 1-10% percent of their incomes.
- Average student aid package for this year is $45,000
- Even some families with incomes greater than $200,000 receive need-based financial aid due to unusually challenging financial circumstances.
- We have no student loan requirement and home equity is excluded from need analysis.
- Financial aid is awarded to domestic and international students on exactly the same basis.
- See online Net Price Calculator for personalized financial aid estimate.

## 12. Learn More...
- We offer a single-choice early action program (non-binding) along with a regular admission timeline.
- Please send in your application as soon as possible so we can start your file.
- An extremely personal admissions process: With multiple readings and committee deliberations that stretch from October through March, we pay close attention to each and every applicant.
- We hope you might be able to come visit us in Cambridge, but if you can't make it, find us online. Check out our website – we've got student blogs, our Net Price Calculator, links to our various social media channels (Tumblr, Instagram, Twitter), and much more.

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

### FAQs

\*A helpful reminder to the audience during the evening session: Encourage students to flip their folders over to the back panel for an overview of "nuts and bolts" for all schools. This answers many of the logistics questions that come up, leaving more airtime for substantive questions.

- What testing do you require?
  - o **PLEASE NOTE THAT THE ECO FOLDER FOR FALL 2014 SAYS THAT WE REQUIRE 2 SUBJECT TESTS.** Please take the opportunity to address our new policy if asked this question.
  - o We require the SAT or the ACT with writing.
  - o (Excerpted from the internal memo that we received in April 2014) In addition, we normally require 2 SAT Subject Tests. You should not submit two Subject Tests in mathematics to meet this requirement. Similarly, if your first language is not English, a Subject Test in your first language is inappropriate. While we normally require two Subject Tests, you may apply without them if the cost of

5

taking the tests represents a financial hardship or if you prefer to have your application considered without them. Standardized tests comprise only one component of our holistic admissions process and your application will be evaluated on the basis of all of the other information you submit. Nevertheless, we always prefer to have more information about your academic attainment.
- o We welcome evidence of academic success from a variety of sources, well beyond the Subject Tests.
- What does "single-choice" or "restrictive" early action mean?
  - o In addition to Harvard, EA applicants may apply early to public institutions with non-binding or rolling admissions programs, or service academies – please visit our website for details.
  - o Applicants who are not admitted early may be either rejected or deferred to be considered again during the regular application process.
- Do I have a better chance of getting in if I apply early?
  - o There are no quotas or targets for the number of students to be admitted early – entirely dependent on the applicant pool.
  - o Students should apply when they feel they can present the strongest application to us.
- What are your deadlines?
  - o Early action candidates apply by Nov 1 and are notified mid-December (along with an estimated financial aid package, if all documents have been received).
  - o Regular decision candidates apply by Jan 1 and hear from us by April 1.

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

### Admission stats from 2013-2014 (c/o '18). PLEASE DO NOT MISPLACE.

| | |
|---|---|
| early apps | 4,693 |
| regular apps | 29,494 |
| total apps | 34,295 |
| | |
| early admitted | 994 |
| Total Admits | 2023 (5.9%) |

### Other important numbers to know

Harvard College's undergraduate population:
- ~ 40% of students identify as people of color
- ~ 14% of students are first generation college students
- Students hail from all 50 states and 80+ countries.

6

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

HARV00000442

DAILY INFO SESSIONS



HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

HARV00000443



Founded in 1636
Location: Cambridge, MA
6,600 Undergraduates
1,665 First-Year Students

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

HARV00000444



Learning at Harvard

3,500+ Courses
48 Concentrations, 40+ Secondary Fields
General Education Curriculum
7:1 Student/Faculty Ratio
Median Class Size: 12

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

HARV00000445



HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

HARV00000446



# General Education

- Aesthetic and Interpretive Understanding
- Culture and Belief
- Empirical and Mathematical Reasoning
- Ethical Reasoning
- Science of Living Systems
- Science of the Physical Universe
- Societies of the World
- United States in the World

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

HARV00000447



Academic Resources

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

HARV00000448



HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

HARV00000449



Living in Harvard Yard: Freshman Year

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

HARV00000450



Undergraduate Advising

Academic Advisers
Residential Advisers
Peer Advisers

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

HARV00000451



Living at Harvard:
The House System

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

HARV00000452



Life Outside the Classroom

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY



Cambridge, Boston & New England

BOSTON

mfa BOSTON

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

HARV00000454



Stay Connected and Involved

200+ Harvard Alumni Clubs
15,000 Alumni Interviewers
Alumni Reunions
Continuing Education
Social and Cultural Events
Professional Networks
Shared Interest Groups

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

HARV00000455

**JA4807**
DX003.0109



# Financial Aid

Students receiving grant aid: ~60%

Average scholarship: ~$45,000

Average parent contribution: ~$11,500

No student loans in aid package

International students eligible for same aid

Quick online Net Price Calculator

**>90%** of American families would pay the same or less to send their children to Harvard as they would a state school.

**20%** of our students' families **pay nothing.**

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

HARV00000456



HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

HARV00000457



Admissions

Early Action: November 1
Notified by December 15

Regular Action: January 1
Notified by April 1

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

HARV00000458

## Learn More...



- Instagram: Harvard_admissions
- Twitter: @applytoharvard
- Tumblr: Harvard.tumblr.com
- Facebook: facebook.com/harvardadmissions
- College website: college.harvard.edu
- Student Blogs

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

Information Session FAQs

Student Life

Do you have fraternities and sororities on campus?

What are the final clubs I heard about in "The Social Network"?

What is the drinking culture like on campus?

What do students do for fun?

Do students actually go into downtown Boston?

Where do students make most of their friends?  In the houses?  In extracurriculars?

How many students study abroad?  What are the opportunities to study abroad?

Academics

Is Harvard really hard?

What percentage of courses are taught by graduate students?

What is the student/faculty ratio?

What is the average class size?

Are courses ever "lotteried"?

Are all of the concentrations open, or do I have to apply to get into one?

How hard is it to switch concentrations?

Can I do a double major?

Standardized Testing

What SAT/ACT score do I need to get in?

Do you prefer the SAT or the ACT?

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

HARV00000460

**JA4812**
DX003.0114

Do you super score?

Do you allow score choice?

Which SAT Subject Tests should I take?

What is the latest I can take a standardized test for it to be considered with my application?

If I am a foreign student applying, do I still have to take the SAT/ACT/SAT Subject Tests if I am taking my home country's college entrance exams (e.g. A Levels)?

<u>Curricular Choices</u>

Do you recalculate GPAs?

How do you consider AP and IB scores?

My school doesn't offer AP or IB courses. Will that hurt my chances?

Do I need to take four years of a language in high school?

Is it better to take the harder class and get a "B" or the easier class and get an "A"?

<u>Admissions Process</u>

*Qualifications*

Do you weed out applications based on test scores, grades, etc.?

Does it look bad if I am "undecided" about what I want to study?

How does legacy status factor into the admissions decision?

Is race a factor in your admissions process?

If I am really good at a sport, will that help my chances? How do I get recruited?

*Early vs. Regular*

Is there an advantage to applying early action vs. regular action?

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

HARV00000461

What does it mean if I am deferred in early action?

What percentage of students are deferred to the regular action pool?

*Procedures*

I am a home school student.  How do I apply?

I was born in the U.S., but now I live abroad.  Do I qualify as a domestic or international applicant?

How do you consider international students?

I am interested in engineering.  Do I need to apply separately to the School of Engineering and Applied Sciences (SEAS)?

*Stats*

How many students do you put on the wait list?

How many students do you take off the wait list?

How many students applied last year?

How many students do you admit each year?

*Interviews*

How do I contact a local alumnus to schedule my interview?

Are the interviews evaluative?  OR  If my interview doesn't go well, will that hurt my chances?

If I am not offered an interview, what does that say about my chances?

*Other*

What is the best essay you have ever read?

Can you give an example of a student you have recently admitted?

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

HARV00000462

What are the reasons why people *don't* choose Harvard?

Who is my area representative, and can I have his/her contact information?

<u>Financial Aid</u>

My parents are divorced, and I live with my mom/dad. Do both parents have to fill out the financial aid forms?

I live with my aunt/uncle/grandparents, and my parents are out of the picture. How do I apply for financial aid?

Do you offer any special scholarship programs (e.g. the Morehead at UNC, the Jefferson at UVA, etc.)?

If I receive outside scholarships from other organizations (e.g. PTSA, Rotary International, Coca Cola), how does that affect my financial aid award?

What if Harvard doesn't award me as much financial aid as I need?

If I have a complicated financial situation that won't work in the Net Price Calculator, can I call and get an estimate from someone in the financial aid office?

Do you have to reapply for financial aid every year?

What if a parent loses a job?

My mom/dad just lost her/his job, but until then, we were living pretty comfortably. Will we be considered for financial aid using her/his new income level?

So what I'm hearing is that I shouldn't take a raise and should stay in a lower income bracket so my kid gets financial aid...

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

HARV00000463

9/4/2014

1









HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

HARV00000464

**JA4816**
DX003.0118









9/4/2014

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

HARV00000465

**JA4817**

DX003.0119

9/4/2014

3









HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

HARV00000466

**JA4818**

DX003.0120

**Guidelines for Exploring College Options Hosts – Fall 2014**

<u>INTRODUCTION (Length: 10 minutes max.)</u>

**Slide 1: Welcome**
- Make a pertinent comment based on location (i.e.: something from the local news, any personal connections you have, etc.)
- Introduce yourself and your institution.
- Have fellow travelers introduce themselves and their institutions.
- Please turn off your cell phones and recording devices (you can call this "hotel policy" if necessary)

**Slide 2: Why do we travel together?**
- Our schools have been traveling together for more than 20 years.
- We thought it would be helpful for families to come to one program instead of 5.
- This is our group's [$1^{st} - 5^{th}$] stop this week. Our colleagues are in other locations throughout the country this week. Between the fall and fall, we visit all 50 states as well as Mexico, Puerto Rico, and the Virgin Islands.
- We are all private, co-ed, medium-sized research universities with a commitment to the liberal arts.
- We are all highly selective, and we have a strong commitment to need-based financial aid.

**Slide 3: A Strong Commitment to Financial Aid**
- Our schools devote most, if not all, of their financial aid budgets to need-based aid rather than merit and athletic scholarships.
- And we meet 100% of family's demonstrated need for four years.
- We want families to be able to attend our institutions if admitted and not see the cost as a barrier.
- Moreover, our schools practice need-blind admission, meaning we do not consider a family's ability to pay when we review a student's admission applications. We focus solely on the merits of the application.

**Slide 4: Preview of Program**
- Each school will do a brief presentation (approx. 7 minutes). We request that you stay in the room for all 5 presentations.
- We'll open up to general questions appropriate for all 5 schools.
- Each representative will be in a different part of the room to answer school-specific questions.
- We present the 5 schools in a rotating order, so **Georgetown will begin followed by Harvard, Penn, Stanford and Duke.**

**Slide 5: General ECO Slide**
- No talking points. On screen as presenters move out of the room and first presenter steps to the podium to begin.

<u>POWER POINT PRESENTATIONS (Length: 35 minutes – 7 minutes each)</u>

<u>GROUP QUESTION & ANSWER SESSION (Length: approx. 30 minutes)</u>
Remind the group that this is the time for general, not school-specific questions. Plus, remind the audience that specific testing requirements, deadlines, etc. are noted on the back of the folders. Invite students to visit the schools' websites for more detailed information.

Also, remind students that our mailing lists were combined—which is how they were invited—but not shared so they need to fill out a card or visit a school's website to make sure they are on the mailing list.

Host will open the floor for questions, using the 3 key topics as examples of the kinds of questions we seek if questions are slow to come in. Travelers should decide ahead of time who will speak on each topic.

- Topic 1: What we look for (both academic and nonacademic) – could be discussed by one presenter or divided between two.
- Topic 2: Early Programs – one person to address early decision; one person to discuss early action, both single-choice and multiple-choice.

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY                                              HARV00000467

**JA4819**
DX003.0121

- Topic 3: Financial Aid – one person will discuss need-blind admissions, meeting 100% of aid, application forms, etc.

Hint: Answering as many questions as possible in the large group while still allowing time for the individual conversations can help keep the "corner" conversations from going on too long.

## SCHOOL-SPECIFIC Q&A SESSION
Assign each representative a corner of the room. Ask the audience to please stay in their seats until the representatives have made it to their designated area. Thank them for attending the session!

The school-specific Q&A should start wrapping up around 9:45PM – 10PM. If there are lingering or extremely persistent families, try to dim the lights or move the conversation towards the exit. We want to be respectful of the hotel staff members who will need to break down the room.

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

HARV00000468

**JA4820**
DX003.0122

# EXPLORING COLLEGE OPTIONS

## Why We Travel Together:

- Private, co-ed, research universities with a liberal arts core
- National universities, drawing students from around the world
- Highly selective admissions criteria
- Strong commitment to need-based financial aid



Duke    Georgetown    Harvard    Penn    Stanford

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

HARV00000469

# EXPLORING COLLEGE OPTIONS

## A Strong Commitment to Financial Aid:

- Primary focus on need-based rather than merit aid

- Meet full need for families who apply for financial aid

- Need-blind for U.S. citizens and permanent residents

- Schools' Net Price Calculators *estimate* the aid a family may receive



Duke     Georgetown     Harvard     Penn     Stanford

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

HARV00000470

# EXPLORING COLLEGE OPTIONS

Tonight's Program:

- Brief presentations by each school
- General questions appropriate for all five schools
- School-specific questions



Duke     Georgetown     Harvard     Penn     Stanford

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

HARV00000471

**JA4823**

DX003.0125

# Exploring College Options

## Master Itinerary — Fall 2014

Last updated 9/4/2014

| Week 1 | City | Venue | Main Phone | Travelers |
|---|---|---|---|---|
| Sept. 7-12 | Burlington VT<br>Sunday, September 07<br>Monday, September 08 | DoubleTree Burlington<br>1117 Williston Rd<br>Burlington, VT 05403 | (802) 658-0250 | D: Susan Waters <susan.waters@duke.edu>, 919.684.0154<br>G: Lauren Geoghegan <lag53@georgetown.edu>, 202.687.8876<br>H: Grace Cheng <gescheng@fas.harvard.edu>, 617.495.8865<br>P: Jayson Weingarten <jaysonw@admissions.upenn.edu>,<br>S: Kyle Briscoe <kbriscoe@stanford.edu>, 650.724.5591 |
| Trip #1 | Hartford CT<br>Monday, September 08<br>Tuesday, September 09 | Hartford/Windsor Marriott Airport<br>28 Day Hill Road<br>Windsor, CT 06095 | (860) 688-7500 | |
| | Worcester MA<br>Tuesday, September 09 (Evening Only) | Mechanics Hall<br>321 Main Street<br>Worcester, MA 01608 | (508) 752-5608 | |
| Planner: Harvard | Worcester MA<br>Wednesday, September 10 (Breakfast Only) | Hilton Garden Inn<br>35 Major Taylor Boulevard<br>Worcester, MA 01608 | (508) 753-5700 | Captain: Harvard |
| Northern New England | Portland ME<br>Wednesday, September 10<br>Thursday, September 11 | Portland Marriott at Sable Oaks<br>200 Sable Oaks Drive<br>South Portland, ME 04106 | (207) 871-8000 | Projector: Penn |
| | Manchester NH<br>Thursday, September 11<br>Friday, September 12 | Best Western Plus Executive Court Inn<br>13500 S Willow Street<br>Manchester, NH 03103 | (603) 627-2525 | Notes: Travelers to stay at Hilton Garden Inn in Worcester. |

| Week 1 | City | Venue | Main Phone | Travelers |
|---|---|---|---|---|
| Sept. 7-12 | Buffalo NY<br>Sunday, September 07<br>Monday, September 08 | Buffalo Marriott Niagara<br>1340 Millersport Highway<br>Amherst, NY 14221 | (716) 689-6900 | D: Susan Coon <susan.coon@duke.edu>, 919.684.0158<br>G: Sarah Fadjian <seh52@georgetown.edu>, 202.687.3410<br>H: Jake Foley <jakefoley@fas.harvard.edu>, 617.495.2863<br>P: Amy Smith <samy@admissions.upenn.edu><br>S: Julianne Fenn <julianne.fenn@stanford.edu>, 650.624.6930 |
| Trip #2 | Rochester NY<br>Monday, September 08<br>Tuesday, September 09 | Rochester Airport Marriott<br>1890 Ridge Road West<br>Rochester, NY 14615 | (585) 225-6880 | |
| | Syracuse NY<br>Tuesday, September 09<br>Wednesday, September 10 | DoubleTree by Hilton Hotel Syracuse<br>6301 New York 298<br>East Syracuse, NY 13057 | (315) 432-0200 | |
| Planner: Penn | Albany NY<br>Wednesday, September 10<br>Thursday, September 11 | Hilton Albany<br>40 Lodge St.<br>Albany, NY 12207 | (518) 462-6611 | Captain: Harvard<br>Projector: Stanford |
| Upstate New York | Allentown PA<br>Thursday, September 11<br>Friday, September 12 | Best Western Lehigh Valley<br>300 Gateway Drive<br>Bethlehem, PA 18017 | (610) 866-5800 | Notes: |

*Evening program at 7:30PM*
*Counselor breakfast at 8:00AM*

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

HARV00000473

# Exploring College Options

**Fall 2014**

**Ma...r Itinerary**

| Week 1 | City | Venue | Main Phone | Travelers |
|---|---|---|---|---|
| **Sept. 7-12** | **Norfolk VA**<br>Sunday, September 07<br>Monday, September 08 | Sheraton Norfolk Waterside Hotel<br>777 Waterside Drive<br>Norfolk, VA 23510 | (757) 622-6664 | D: Margi Strickland <margi.strickland@duke.edu>, 919.684.0170<br>G: Kelly Young <kay3@georgetown.edu>, 202.687.3809<br>H: Kanoe Williams <klum@fas.harvard.edu>, 617.495.6875<br>P: Valerie Marchand Welsh <valeriew@admissions.upenn.edu><br>S: Alana Dong <alanakim@stanford.edu>, 650.723.9415 |
| **Trip #3** | **Richmond VA**<br>Monday, September 08<br>Tuesday, September 09 | Hilton Richmond Hotel & Spa/Short Pump<br>12042 West Broad Street<br>Richmond, VA 23233 | (804) 364-3600 | |
| **Planner:**<br>**Georgetown** | **Roanoke VA**<br>Tuesday, September 09<br>Wednesday, September 10 | Sheraton Roanoke Hotel & Conference Center<br>2801 Hershberger Road NW<br>Roanoke, VA 24017 | (540) 563-9300 | |
| **VA - WV -**<br>**KY** | **Charleston WV**<br>Wednesday, September 10<br>Thursday, September 11 | Charleston Marriott Town Center<br>200 Lee Street East<br>Charleston, WV 25301 | (304) 345-6500 | Captain: Georgetown<br>Projector: Harvard |
| | **Lexington KY**<br>Thursday, September 11<br>Friday, September 12 | Hilton Lexington Downtown<br>369 West Vine Street<br>Lexington, KY 40507 | (859) 231-9000 | *Notes:* |

| Week 1 | City | Venue | Main Phone | Travelers |
|---|---|---|---|---|
| **Sept. 7-12** | **Spokane WA**<br>Sunday, September 07<br>Monday, September 08 | DoubleTree by Hilton Hotel Spokane City Center<br>322 North Spokane Falls Court<br>Spokane, WA 99201 | (509) 455-9600 | D: Stacy Rusak <stacy.rusak@duke.edu>, 919.684.0173<br>G: Jaime Briseño <briseno@georgetown.edu>, 202.687.4145<br>H: Niki Applebaum Johnson <applebaum@fas.harvard.edu><br>617.495.9708<br>P: Jordan Pascucci <jordanpa@admissions.upenn.edu><br>S: Cherry Cachero <ccachero@stanford.edu>, 650.724.7811 |
| **Trip #4** | **Boise ID**<br>Monday, September 08<br>Tuesday, September 09 | The Grove Hotel<br>245 South Capitol Boulevard<br>Boise, ID 83702 | (208) 333-8000 | |
| **Planner:**<br>**Stanford** | **Las Vegas NV**<br>Tuesday, September 09<br>Wednesday, September 10 | Hilton Lake Las Vegas<br>1610 Lake Las Vegas Parkway<br>Henderson, NV 89011 | (702) 567-4700 | Captain: Duke<br>Projector: Georgetown |
| **Rockies -**<br>**HI** | **Travel Day**<br>*Wednesday, September 10* | Travel Afternoon/Evening | | *Internal flights:*<br>**Monday, 9/08:** *GEG-SEA, Alaska (AS) 2235 (11:30A-12:33P);*<br>*Layover 0.42;* **SEA-BOI,** *AS 2148 (1:15-3:42P)*<br>**Tuesday, 9/09: BOI-LAS,** *Southwest (WN) 3228 (12:00-12:40P)*<br>**Wednesday, 9/10: LAS-BLI,** *AS 649 (12:30-3:03P); Layover*<br>*1:37;* **BLI-HNL,** *AS 845 (4:40-7:42P)* |
| | **Honolulu HI**<br>Thursday, September 11 | Hawaii Prince Hotel Waikiki<br>100 Holomoana Street<br>Honolulu, HI 96815 | (808) 956-1111 | *Travelers may select own LAS-HNL itinerary as long as they*<br>*arrive on Wed., 9/20.* |
| | *\*Breakfast & Evening Programs On Same Day* | | | |

*Evening program at 7:30PM*
*Counselor breakfast at 8:00AM*

Last updated 9/4/2014

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

HARV00000474

## Exploring College Options

### Fall '14

Master Itinerary

Last updated 9/4/2014

| Week 2 | City | Venue | Main Phone | Travelers |
|---|---|---|---|---|
| Sept. 14-19 | Sarasota FL<br>Sunday, September 14<br>Monday, September 15 | Hyatt Regency Sarasota<br>1000 Boulevard of the Arts<br>Sarasota, FL 34236 | (941) 953-1234 | D: Kathy Phillips <kathy.phillips@duke.edu>; 919.684.0171<br>G: Sarah Hadjian <sch52@georgetown.edu>; 202.687.3410<br>H: Maxwell Dikkers <mdikkers@fas.harvard.edu>; 617.495.675. |
| Trip #5 | Naples FL<br>Monday, September 15<br>Tuesday, September 16 | Hilton Naples Florida Hotel<br>5111 Tamiami Trail N<br>Naples, FL 34103 | (239) 430-4900 | P: Lara Gricco <larag@admissions.upenn.edu><br>S: Philip Lotze <plotze@stanford.edu>; 650.736.0986 |
| Planner:<br>Harvard | *Travel Day*<br>*Tuesday, September 16* | Travel Afternoon/Evening | | |
| FL -<br>Caribbean | San Juan PR<br>Wednesday, September 17<br>*Breakfast & Evening Programs<br>On Same Day* | Caribe Hilton Hotel<br>1 San Geronimo Street<br>San Juan, PR 00901 | (787) 721-0303 | Captain: Georgetown<br>Projector: Penn |
| | Santo Domingo DR<br>Thursday, September 18<br>Friday, September 19 | JW Marriott Hotel Santo Domingo<br>Winston Churchill Avenue No. 93<br>Ensanche Piantini, Santo Domingo, 10501, DR | (809) 807-1717 | *Internal flights: Tuesday, 9/16 FLL-SJU  Southwest (WN)<br>4921 (3:45-6:25P); Thursday, 9/18 SJU-SDQ  JetBlue (B6)<br>1437 (10:55-11:56A)* |

*Evening program at 7:30PM*
*Counselor breakfast at 8:00AM*

| Week 2 | City | Venue | Main Phone | Travelers |
|---|---|---|---|---|
| Sept. 14-19 | Coralville IA<br>Sunday, September 14<br>Monday, September 15 | Coralville Marriott Hotel & Conference Center<br>300 E 9th Street<br>Coralville, IA 52241 | (319) 688-4000 | D: Solomon Enos <solomon.enos@duke.edu>; 919.684.0175<br>G: Christine Bendorf <ckb34@georgetown.edu>; 202.687.3705<br>H: Rachel Brown <brown@fas.harvard.edu>; 617.495.5379 |
| Trip #6 | Champaign IL<br>Monday, September 15<br>Tuesday, September 16 | Hilton Garden Inn Champaign/ Urbana<br>1501 S Neil Street<br>Champaign, IL 61820 | (217) 352-9970 | P: Landon Reitz <reitzls@admissions.upenn.edu><br>S: Blake Parkinson <blakep@stanford.edu>; 650.723.7376 |
| Planner:<br>Harvard | Indianapolis IN<br>Tuesday, September 16<br>Wednesday, September 17 | Indianapolis Marriott East<br>7202 E 21st Street<br>Indianapolis, IN 46219 | (317) 352-1231 | |
| Central<br>States | South Bend IN<br>Wednesday, September 17<br>Thursday, September 18 | DoubleTree by Hilton Hotel South Bend<br>123 North St. Joseph Street<br>South Bend, Indiana, 46601 | (574) 234-2000 | Captain: Duke<br>Projector: Georgetown |
| | Grand Rapids MI<br>Thursday, September 18<br>Friday, September 19 | JW Marriott Grand Rapids<br>235 Louis St NW<br>Grand Rapids, MI 49503 | (616) 242-1500 | Notes: |

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

HARV00000475

**JA4826**

DX003.0129

Exploring College Options          Fall 2014          Master Itinerary

| Week 2 | City | Venue | Main Phone | Travelers |
|---|---|---|---|---|
| **Sept. 14-19**<br>**Trip #7**<br>**Planner: Duke**<br>**TN - AR** | **Knoxville TN**<br>Sunday, September 14<br>Monday, September 15 | Knoxville Marriott<br>501 Hill Avenue SE<br>Knoxville, TN 37915 | (865) 637-1234 | D: Elizabeth Harlow <elizabeth.harlow@duke.edu> 919.684.0176<br>G: Berkley Braden <bb28@georgetown.edu>, 202.687.5375<br>H: Bryce Gilfillian <gilfillian@fas.harvard.edu>, 617.495.6692<br>S: John Sands <sandsj@admissions.upenn.edu><br>S: Christian Angulo <cangulo@stanford.edu>, 650.725.7875 |
| | **Chattanooga TN**<br>Monday, September 15<br>Tuesday, September 16 | Chattanooga Marriott Downtown<br>2 Carter Plaza<br>Chattanooga, TN 37402 | (423) 756-0002 | |
| | **Nashville TN**<br>Tuesday, September 16<br>Wednesday, September 17 | Embassy Suites Nashville - South/Cool Springs<br>820 Crescent Centre Drive<br>Franklin, TN 37067 | (615) 515-5151 | Captain: Penn<br>Projector: Stanford |
| | **Memphis TN**<br>Wednesday, September 17<br>Thursday, September 18 | Marriott Memphis East<br>5795 Poplar Avenue<br>Memphis, TN 38119 | (901) 682-0080 | |
| | **Little Rock AR**<br>Thursday, September 18<br>Friday, September 19 | Embassy Suites, Little Rock<br>11301 Financial Centre Parkway<br>Little Rock, AR 72211 | (501) 312-9000 | Notes: |

| Week 2 | City | Venue | Main Phone | Travelers |
|---|---|---|---|---|
| **Sept. 14-19**<br>**Trip #8**<br>**Planner: Stanford**<br>**Plains States** | **Tulsa OK**<br>Sunday, September 14<br>Monday, September 15 | Crowne Plaza Tulsa - Southern Hills<br>7902 South Lewis Avenue<br>Tulsa OK, 74136 | (918) 492-5000 | D: Will Niver <will.niver@duke.edu>, 919.684.0665<br>G: Jim Colman <jmc252@georgetown.edu>, 202.687.3577<br>H: Kasee Williams <klum@fas.harvard.edu>, 617.495.6875<br>P: Tina Fragoso <tinap@admissions.upenn.edu><br>S: Anthony Dinh <adinh@stanford.edu>, 650.498.3991 |
| | **Wichita KS**<br>Monday, September 15<br>Tuesday, September 16 | Hyatt Regency Wichita<br>400 West Waterman St.<br>Wichita, KS 67202 | (316) 293-1234 | |
| | **Omaha NE**<br>Tuesday, September 16<br>Wednesday, September 17 | Sheraton Omaha Hotel<br>655 North 108th Avenue<br>Omaha, NE 68154 | (402) 496-0850 | Captain: Georgetown<br>Projector: Harvard |
| | **Sioux Falls SD**<br>Wednesday, September 17<br>Thursday, September 18 | Sheraton Sioux Falls<br>1211 Northwest Avenue<br>Sioux Falls, SD 57104 | (605) 331-0100 | |
| | **Fargo ND**<br>Thursday, September 18<br>Friday, September 19 | Hilton Garden Inn - Fargo<br>4351 17th Avenue South<br>Fargo, ND 58103 | (701) 499-6000 | Notes: |

Last updated 9/4/2014

*Evening program at 7:30PM*
*Counselor breakfast at 8:00AM*

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY                    HARV00000476

Exploring College Options

Fall '14

Ma...r Itinerary

Last updated 9/4/2014

| Week 2 | City | Venue | Main Phone | Travelers |
|---|---|---|---|---|
| Sept. 14-19 | **Anchorage AK** <br> Sunday, September 14 <br> *Sunday Event – 3 PM Start* <br> Monday, September 15 | Anchorage Marriott Downtown <br> 820 West 7th Avenue <br> Anchorage, AK 99501 | (907) 279-8000 | D: Leonard Satterwhite <leonard.satterwhite@duke.edu> <br> 919.684.0157 <br> G: Meg Uysy <mc62@georgetown.edu>, 202.687.5143 <br> H: Kaitlin Ilowrigan <ilowrigan@fas.harvard.edu> |
| Trip #9 | *Travel Day* <br> *Monday, September 15* | Travel Afternoon/Evening | | 617.495.5239 <br> P: Alexandra Feinson <feinson@admissions.upenn.edu> <br> S: Joe Kralick <jkralick@stanford.edu>, 650.736.7561 |
| Planner: Stanford | **Colorado Springs CO** <br> Tuesday, September 16 <br> Wednesday, September 17 | Colorado Springs Marriott <br> 5580 Tech Center Drive <br> Colorado Springs, CO 80919 | (719) 260-1800 | Captain: Harvard <br> Projector: Penn |
| AK – Rockies | **Casper WY** <br> Wednesday, September 17 <br> Thursday, September 18 | Hilton Garden Inn Casper <br> 1150 North Poplar Street <br> Casper, WY 82601 | (307) 266-1300 | *Notes:* <br> *Internal flights: Monday, 9/15: ANC-SEA, Alaska (AS) 84 (12:4(-5:04P); Layover 1:36; SEA-COS, AS 3498 (6:40-10:15P)* |
| | **Billings MT** <br> Thursday, September 18 <br> Friday, September 19 | Crowne Plaza Billings <br> 27 North 27th Street <br> Billings, MT 59101 | (406) 252-7400 | *Drive to Casper WY and Billings MT* |

*Evening program at 7:30PM* <br>
*Counselor breakfast at 8:00AM*

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

HARV00000477

**JA4828**

DX003.0131

Exploring Coll_e_ Options     Fall _4     l_ter Itinerary

Last updated 9/4/2014

| Week 3 | City | Venue | Main Phone | Travelers |
|---|---|---|---|---|
| Sept. 28-<br>Oct. 3 | **Corpus Christi TX**<br>Sunday, September 28<br>Monday, September 29 | Holiday Inn Corpus Christi Downtown Marina<br>707 North Shoreline Boulevard<br>Corpus Christi, TX 78401 | (361) 882-1700 | D. Ashley Taylor <ashley.s.taylor@duke.edu>, 919.684.0169<br>G. Jaime Briseño <brisenoj@georgetown.edu>, 202.687.4145<br>H. Lucerito Ortiz <lortiz@fas.harvard.edu>, 617.495.3634<br>P. Mexico - Jodi Robinson <jodir@admissions.upenn.edu><br>TX - Kimberly Lopez <klopez@admissions.upenn.edu><br>S. Tania Castro Bradt <tcbradt@stanford.edu>, 650.723.3178 |
| Trip #10 | **McAllen TX**<br>Monday, September 29<br>*Evening Only* | McAllen Convention Center<br>700 Convention Center Boulevard<br>McAllen, TX 78501 | (956) 681-3800 | |
|  | **McAllen TX**<br>Tuesday, September 30<br>*Breakfast Only* | Casa de Palmas Renaissance<br>101 N Main Street<br>McAllen, TX 78501 | (956) 631-1101 | |
| Planner:<br>Georgetown | **Laredo TX**<br>Tuesday, September 30<br>Wednesday, October 01<br>*Wed. Event - 7:30 A Start* | Embassy Suites Laredo<br>110 Calle Del Norte Drive<br>Laredo, TX 78041 | (956) 723-9100 | |
| MEXICO -<br>South Texas | **Monterrey MEXICO**<br>Wednesday, October 01<br>*Evening Program - 7:00 P Start*<br>Counselor Dinner to follow Evening Event | American School Foundation of Monterrey<br>Ave. Ignacio Morones Prieto No. 1500<br>Col. San Isidro<br>Santa Catarina, NL.<br>C.P. 66190<br>MEXICO | 52-81-5000-4400 | Captain: Georgetown<br>Projector: Duke |
|  | **Mexico City MEXICO**<br>Thursday, October 02<br>*Evening Program - 7:00 P Start* | American School Foundation - Mexico City<br>Bondojito 215<br>Col. Las Americas<br>Mexico City, Distrito Federal 01120<br>MEXICO | 52-55-5227-4900 | |
|  | **Mexico City MEXICO**<br>Friday, October 03<br>*Counselor Lunch - 1:00 P Start* | Mexico City Marriott Reforma Hotel<br>Paseo de la Reforma 276<br>Col. Juarez<br>Mexico City, Distrito Federal 06600<br>MEXICO | 52-55-1102-7030 | *Internal flights:*<br>**Wednesday, 10/01: LRD-IAH**, *United (UA) 4591 (10:48A-12:01P); Layover 1:10;* **IAH-MTY**, *UA 4497 (1:11-2:40P)* |
|  | **Guadalajara MEXICO**<br>Sunday, October 05<br>*Evening Program - 4:30 P Start*<br>**ONLY Duke, Georgetown, Harvard & Penn** | American School Foundation of Guadalajara<br>Colomos 2100<br>Colonia Providencia<br>Guadalajara, Jalisco México CP 44630<br>MEXICO | 52-55-1102-7030 | **Thursday, 10/02: MTY-MEX**, *Aeromexico (AM) 917 (11:20A-12:57P)* |

*Evening program at 7:30PM*
*Counselor breakfast at 8:00AM*

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY      HARV00000478

Exploring Col... Options                    Fall ... 4                    ... ter Itinerary

| Week 3 | City | Venue | Main Phone | Travelers |
|---|---|---|---|---|
| **Sept. 28·Oct. 3** | **Greenville SC**<br>Sunday, September 28<br>Monday, September 29 | Greenville Marriott<br>1 Parkway East<br>Greenville, SC 29615 | (864) 297-0300 | D: Adam Tomasiello <adam.tomasiello@duke.edu><br>919.684.0160<br>G: Kelly Young <kay3@georgetown.edu>, 202.687.3809 |
| **Trip #11** | **Columbia SC**<br>Monday, September 29<br>Tuesday, September 30 | Embassy Suites Columbia - Greystone<br>200 Stoneridge Drive<br>Columbia, SC 29210 | (803) 252-8700 | H: Tia Ray <tiaray@fas.harvard.edu>, 617.495.7741<br>P: Matthew Pohl <pohlm@@admissions.upenn.edu> |
| **Planner: Duke** | **Charleston SC**<br>Tuesday, September 30<br>Wednesday, October 01 | Charleston Plaza Hotel<br>4770 Goer Drive<br>North Charleston, SC 29406 | (888) 747-1900 | S: Jaime Meline <jmeline@stanford.edu>, 650-725-4732 |
| **SC - FL** | **Savannah GA**<br>Wednesday, October 01<br>Thursday, October 02 | Savannah Marriott Riverfront<br>100 General McIntosh Boulevard<br>Savannah, GA 31401 | (912) 233-7722 | Captain: Georgetown<br>Projector: Harvard |
| | **Jacksonville FL**<br>Thursday, October 02<br>Friday, October 03 | Hyatt Regency Jacksonville Riverfront<br>225 East Coastline Drive<br>Jacksonville FL, 32202 | (904) 588-1234 | Notes: |

| Week 3 | City | Venue | Main Phone | Travelers |
|---|---|---|---|---|
| **Sept. 28·Oct. 3** | **Huntsville AL**<br>Sunday, September 28<br>Monday, September 29 | Huntsville Marriott<br>5 Tranquility Base<br>Huntsville, AL 35805 | (256) 830-2222 | D: Will Dixon <will.dixon@duke.edu>, 919.684.0159<br>G: Jim Colman <jmc252@georgetown.edu>, 202.687.3577 |
| **Trip #12** | **Birmingham AL**<br>Monday, September 29<br>Tuesday, September 30 | Birmingham Marriott<br>3590 Grandview Parkway<br>Birmingham, AL 35243 | (205) 968-3775 | H: David Evans <dlevans@fas.harvard.edu>, 617.495.5375<br>P: Alison Berryman <berryman@admissions.upenn.edu> |
| **Planner: Duke** | **Jackson MS**<br>Tuesday, September 30<br>Wednesday, October 01 | Jackson Marriott<br>200 East Amite Street<br>Jackson, MS 39201 | (601) 969-5100 | S: Sarah Madgic <sjmadgic@stanford.edu>, 650.498.7651 |
| **Gulf Coast** | **Mobile AL**<br>Wednesday, October 01<br>Thursday, October 02 | The Battle House Renaissance Hotel & Spa<br>26 North Royal Street<br>Mobile, AL 36602 | (251) 338-2000 | Captain: Stanford<br>Projector: Penn |
| | **New Orleans LA**<br>Thursday, October 02<br>Friday, October 03 | Renaissance New Orleans Pere Marquette Hotel<br>817 Common Street<br>New Orleans, LA 70112 | (504) 525-1111 | Notes: |

*Evening program at 7:30PM*
*Counselor breakfast at 8:00AM*

Last updated 9/4/2014

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

HARV00000479

Exploring Coll_. Options      Fall _4      ...ter Itinerary

Last updated 9/4/2014

| Week3 | City | Venue | Main Phone | Travelers |
|---|---|---|---|---|
| Sept. 28-Oct. 3 | **Lubbock TX** / Sunday, September 28 / Monday, September 29 | Courtyard Lubbock Downtown / 308 Avenue V / Lubbock, TX 79415 | (806) 368-8403 | D: TBD / G: Lauren Geoghegan <lag53@georgetown.edu>, 202.687.8876 / H: Grace Cheng <gpcheng@fas.harvard.edu>, 617.495.8866 |
| Trip #13 | **Albuquerque NM** / Monday, September 29 / Tuesday, September 30 | Albuquerque Marriott Pyramid North / 5151 San Francisco Rd. NE / Albuquerque, NM 87109 | (505) 821-3333 | P: Frank Cabrera <fcabrera@admissions.upem.edu> / S: Wil Torres <wvtorres@stanford.edu>, 650.725.4624 |
| Planner Penn | **El Paso TX** / Tuesday, September 30 / Wednesday, October 01 | El Paso Marriott / 1600 Airway Boulevard / El Paso, TX 79925 | (915) 779-3300 | |
| Southwest | **Tucson AZ** / Wednesday, October 01 / Thursday, October 02 | Tucson Marriott University Park / 880 East Second St. / Tucson, AZ 85719 | (520) 792-4100 | Captain: Harvard / Projector: Duke |
| | **Palm Springs CA** / Thursday, October 02 / Friday, October 03 | Renaissance Palm Springs Hotel / 888 E Tahquitz Canyon Way / Palm Springs, CA 92262 | (760) 322-6000 | Notes: |

| Week3 | City | Venue | Main Phone | Travelers |
|---|---|---|---|---|
| Sept. 28-Oct. 3 | **Reno NV** / Sunday, September 28 / *Evening Only* | Reno Ballroom / 401 N. Center St. / Reno, NV 89501 | (775) 325-7333 | D: David Schmidt <david.schmidt@dia.duke.edu>, 919.684.0216 / G: Bruce Chamberlin <abc43@georgetown.edu>, 202.687.3442 / H: Tim Smith <tjsmith@fas.harvard.edu>, 617.495.2588 |
| Trip #14 | **Reno NV** / Monday, September 29 / *Breakfast Only* | Courtyard Reno / 6855 South Virginia Street / Reno, NV 89511 | (775) 851-8300 | P: Mollie Weinstein Gould <molliew@admissions.upenn.edu> / S: Reno & Modesto - Matt Proto <mtproto@stanford.edu> / 650.725.2380 |
| | **Modesto CA** / Monday, September 29 / Tuesday, September 30 | DoubleTree by Hilton Modesto / 1150 9th Street / Modesto, CA 95354 | (209) 526-6000 | Fresno, Bakersfield & SB - Joe Kralick <jkralick@stanford.edu> / 650.736.7561 |
| Planner Penn | **Fresno CA** / Tuesday, September 30 / Wednesday, October 01 | Fresno Hotel & Conference Center / 2233 Ventura St. / Fresno, CA 93721 | (559) 268-1000 | |
| Central CA | **Bakersfield CA** / Wednesday, October 01 / Thursday, October 02 | Four Points by Sheraton Bakersfield / 5101 California Avenue / Bakersfield, CA 93309 | (661) 325-9700 | Captain: Penn / Projector: Duke |
| | **Santa Barbara CA** / Thursday, October 02 / Friday, October 03 | The Fess Parker Santa Barbara Hotel / 633 E Cabrillo Blvd / Santa Barbara, CA 93103 | (805) 561-4333 | Notes: Travelers to stay at Courtyard Reno in Reno NV. |

*Evening program at 7:30PM*
*Counselor breakfast at 8:00AM*

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY                HARV00000480



HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

HARV00000485

*FINANCIAL AID*

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY                    HARV00000498

**JA4833**

DX003.0152

## HARVARD COLLEGE FINANCIAL AID PROFILE
### ACADEMIC YEAR 2014 – 2015



**Guiding Principles of Admissions and Financial Aid at Harvard College:**

1. Lack of financial resources or need for financial aid are not impediments to admission.

2. All financial aid awarded by Harvard is **need-based**, and grant eligibility is determined in the same manner for all admitted students, including international students.

3. Harvard meets the **full demonstrated need** of all students applying for financial aid **for all four years**, based on information that we receive from the family for each year.

| Overall Financial Aid Information 2013-2014 | | Typical Package for Freshman Scholarship Holders 2014-2015 | | |
|---|---|---|---|---|
| Students with Harvard Scholarships | 59% | Total Budget | $64,000 | |
| Total Scholarships Awarded | $169,000,000 | Parents' Contribution | $12,150 | 19% |
| Outside Awards | $11,600,000 | Student Assets & Summer | $1,250 | 2% |
| Total Loans | $5,900,000 | Harvard, Federal & Outside Scholarships | $48,850 | 76% |
| Two-thirds of all students receive some form of scholarships, loans and/or jobs | | Job Offer | $1,750 | 3% |

### 2014-2015 Scholarship Holders by Income, all Classes

| | | | |
|---|---|---|---|
| 0-9,999 | 104 | 100K-109,999 | 182 |
| 10K-19,999 | 140 | 110K-119,999 | 148 |
| 20K-29,999 | 183 | 120K-129,999 | 164 |
| 30K-39,999 | 295 | 130K-139,999 | 151 |
| 40K-49,999 | 147 | 140K-149,999 | 166 |
| 50K-59,999 | 208 | 150K-159,999 | 154 |
| 60K-69,999 | 278 | 160K-169,999 | 124 |
| 70K-79,999 | 180 | 170K-179,999 | 112 |
| 80K-89,999 | 157 | 180K-189,999 | 99 |
| 90K-99,999 | 138 | 190K-199,999 | 71 |

*September 15, 2014*

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

HARV00000499

**JA4834**
DX003.0153

*HFAI & First Gen Data*

## Harvard Financial Aid Initiative Program Outline

**Administration** *Phoeen & Charlie*

Two Admissions & Financial Aid Officers – recruit, hire, train and manage student workers, manage payroll, and oversee student projects

Eight term-time student coordinators – oversee outreach, monthly newsletter content, campus event planning and research on trends in financial aid

Four summer student coordinators – continue outreach to search list students and community-based organizations and analyze data of the newly admitted class. Coordinators present their findings at Admissions & Financial Aid staff meeting at the end of the summer

13 Hometown Recruiters- visit 15-20 high schools and middle schools during winter break

**Outreach**

Insert included in mailings to search list outlining financial aid program and inviting students to submit their information if they wish to be contacted by a student coordinator

Student coordinators call and emails to students who request to be contacted, answering questions about applying to Harvard, the financial aid program and student life

Student Coordinators call and email local schools and community-based organizations with invitations to come to campus for tours and information sessions

Research cooperative on the first generation student experience between Harvard, Brown, Georgetown, and Duke

**Recruitment**

Harvard/Yale/Princeton/University of Virginia joint travel program

Tip in the Admissions process

Hometown Recruitment program

HFAI reception during the visiting program, co-sponsored with the First Generation Student Union

Financial aid office walk-in hours during the visiting program.

Call-a-thons to admitted students

Two HFAI student coordinators serving on social media committee to generate content for outreach

Email to newly admitted HFAI students outlining resources – Student Events Fund, Winter Coat Fund, etc.

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

HARV00000500

**JA4835**

Extended Financial Aid Office hours for the entire month of April: 8 am – 8 pm Monday through Thursday

<u>Resources</u>

Host family matching

Assigned Financial Aid Officer

Student Events Fund – free tickets to campus events, free tickets for shuttle to Yale when Harvard-Yale is in New Haven

Winter Coat Fund

Shoestring Guide – tips for living on a budget

Beneficiary Aid program – provides funding for peer tutoring and emergency medical expenses

Computer Loan program

Financial Aid 101 – six sessions held in the fall term hosted by a Financial Aid Officer and a representative from the Harvard University Employees' Credit Union, designed to help freshmen understand financial aid, money management and debt management

Seven monthly newsletters each academic year – include information on free and low-cost opportunities in Harvard Square, Cambridge and Boston

<u>Term-time support</u>

Financial Aid Officer attendance at Parent's Lounge on move-in day

Teacup meeting 1- ensures that HFAI students are matched appropriately with roommates and receive careful advising

Teacup meeting 2- partnership with the Freshman Dean's office to check in on progress of HFAI students during their first semester on campus

HFAI freshman reception held at the Financial Aid Office to introduce freshman to the office and to the staff

Four HFAI dinners per academic year

Occasional film screenings and roundtable discussions on socioeconomic diversity co-sponsored with other campus organizations

Mentoring partnership with First Generation Alumni group, led by [Redacted: Sensitive Persona]

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

**JA4836**

DX003.0155



ALUMNI

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

HARV00000518



# Interviewer Handbook

# 2013 - 2014

*Harvard College*
*Office of Admissions and Financial Aid*
*86 Brattle Street*
*Cambridge, MA 02138*
*Revised Fall of 2013*

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

HARV00000525

Helen Vendler kindly wrote this little essay for us. As a former member of the Faculty Standing Committee on Admissions, she wrote it to inspire us, and to help us be particularly alert to those candidates whose creative sensibilities would be valuable assets to a Harvard class, and would help them support the cultural life of our communities in decades to come. We hope you will find it as enlightening as our Committee does.

## Valuing the Creative and Reflective

Anyone who has seen application folders knows the talents of our potential undergraduates, as well as the difficulties overcome by many of them. And anyone who teaches our undergraduates, as I have done for almost thirty years, knows the delight of encountering them. Each of us has responded warmly to many sorts of undergraduates: I've encountered the top Eagle Scout in the country, a violinist who is now part of a young professional quartet, a student who backpacked solo through Tierra del Fuego, and other memorable writers, pre-meds, theater devotees, Lampoon contributors on their way to Hollywood, and more. They have come from both private and public schools and from foreign countries.

We hear from all sides about "leadership," "service," "scientific passion," and various other desirable qualities that bring about change in the world. Fields receiving the most media attention (economics, biology, psychology, occasionally history) occupy the public mind more than fields— perhaps more influential in the long run—in the humanities: poetry, philosophy, foreign languages, drama. Auden famously said—after seeing the Spanish Civil War—that "poetry makes nothing happen." And it doesn't, when the "something" desired is the end of hostilities, a government coup, an airlift, or an election victory. But those "somethings" are narrowly conceived. The cultural resonance of Greek epic and tragic roles—Achilles, Oedipus, Antigone—and the crises of consciousness they embody—have been felt long after the culture that gave them birth has disappeared. Gandhi's thought has penetrated far beyond his own country, beyond his own century. Music makes nothing happen, either, in the world of reportable events (which is the media world); but the permanence of Beethoven in revolutionary consciousness has not been shaken. We would know less of New England without Emily Dickinson's "seeing New Englandly," as she put it. Books are still considering Lincoln's speeches—the Gettysburg Address, the Second Inaugural—long after the events that prompted them vanished into the past. Nobody would remember the siege of Troy if Homer had not sung it, or Guernica if Picasso had not painted it. The Harlem Renaissance would not have occurred as it did without the stimulus of Alain Locke, Harvard's first Rhodes Scholar. Modern philosophy of mind would not exist as it does without the rigors of Wittgenstein's *Philosophical Investigations*, nor would our idea of women's rights without Woolf's claim for a room of her own.

We are eager to harbor the next Homer, the next Kant, or the next Dickinson. There is no reason why we shouldn't expect such a student to spend his or her university years with us. Emerson did; Wallace Stevens did; Robert Frost did; Frank O'Hara and John Ashbery and Fairfield Porter and Adrienne Rich did; and had universities harbored women in residence when Dickinson came of age, she might have been glad to be here. She and Woolf could be the writers they were because their fathers had extensive private libraries; women without such resources were deprived of the chance to be all they could be. It is important to recall that the makers of culture last longer in public memory than members of Parliament, representatives and senators; they modify the mind of their century more, in general, than elected officials. They make the reputation of a country. Michelangelo outlasts the Medici and the Popes in our idea of Italy; and, as one French poet said, "le buste/ Survit à la cité": art outlives the cities that gave it birth.

2

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

HARV00000526

In the future, will the United States be remembered with admiration? Will we be thanked for our stock market and its investors? For our wars and their consequences? For our depletion of natural resources? For our failure at criminal rehabilitation? Certainly not. Future cultures will certainly be grateful to us for many aspects of scientific discovery, and for our progress (such as it has been) in more humane laws. We can be proud of those of our graduates who have gone out in the world as devoted investigators of the natural world, or as just judges, or as ministers to the marginalized. But science, the law, and even ethics are moving fields, constantly surpassing themselves. To future generations our medicine will seem primitive, our laws backward, even our ethical convictions narrow.

"I tried each thing; only some were immortal and free," wrote our graduate John Ashbery. He decided on the immortal and free things, art and thought, and became a notable poet. Most art, past or present, does not have the stamina to last; but many of our graduates, like the ones mentioned above, have produced a level of art above the transient. The critical question for Harvard is not whether we are admitting a large number of future doctors and scientists and lawyers and businessmen (even future philanthropists): we are. The question is whether we can attract as many as possible of the future Emersons and Dickinsons. How would we identify them? What should we ask them in interviews? How would we make them want to come to us?

The truth is that many future poets, novelists, and screenwriters are not likely to be straight-A students, either in high school or in college. The arts through which they will discover themselves prize creativity, originality, and intensity above academic performance; they value introspection above extroversion, insight above rote learning. Yet such unusual students may be, in the long run, the graduates of whom we will be most proud. Do we have room for the reflective introvert as well as for the future leader? Will we enjoy the student who manages to do respectably but not brilliantly in all her subjects but one—but at that one surpasses all her companions? Will we welcome eagerly the person who has in high school been completely uninterested in public service or sports—but who may be the next Wallace Stevens? Can we preach the doctrine of excellence in an art; the doctrine of intellectual absorption in a field of study; even the doctrine of unsociability; even the doctrine of indifference to money? (Wittgenstein, who was rich, gave all his money away as a distraction; Emily Dickinson, who was rich, appears not to have spent money, personally, on anything except for an occasional dress, and paper and ink.) Can frugality seem as desirable to our undergraduates as affluence—provided it is a frugality that nonetheless allows them enough leisure to think and write? Can we preach a doctrine of vocation in lieu of the doctrine of competitiveness and worldly achievement?

These are crucial questions for Harvard. But there are also other questions we need to ask ourselves: Do we value mostly students who resemble us in talent and personality and choice of interests? Do we remind ourselves to ask, before conversing with a student with artistic or creative interests, what sort of questions will reveal the next T.S. Eliot? (Do we ever ask, "Who is the poet you have most enjoyed reading?" Eliot would have had an interesting answer to that.) Do we ask students who have done well in English which aspects of the English language or a foreign language they have enjoyed learning about, or what books they have read that most touched them? Do we ask students who have won prizes in art whether they ever go to museums? Do we ask in which medium they have felt themselves freest? Do we inquire whether students have artists (writers, composers, sculptors) in their family? Do we ask an introverted student what issues most occupy his mind, or suggest something (justice and injustice in her high school) for her to discuss? Will we believe a recommendation saying, "This student is the most gifted writer I have ever taught," when the student exhibits, on his transcript, C's in chemistry and mathematics, and has absolutely no high-school record of group activity? Can we see ourselves admitting such a student (which may entail not admitting someone else, who may have been a valedictorian)?

3

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

President Drew Faust's new initiative in the arts will make Harvard an immensely attractive place to students with artistic talent of any sort. It remains for us to identify them when they apply—to make sure they can do well enough to gain a degree, yes, but not to expect them to be well-rounded, or to become leaders. Some people in the arts do of course become leaders (they conduct as well as sing, or found public-service organizations to increase literacy, or work for the reinstatement of the arts in schools). But one can't quite picture Baudelaire pursuing public service, or Mozart spending time perfecting his mathematics. We need to be deeply attracted by the one-sided as well as the many-sided. Some day the world will be glad we were hospitable to future artists. Of course most of them will not end up as Yo-Yo Ma or Adrienne Rich; but they will be the people who keep the arts alive in our culture. "To have great poets," as Whitman said, "there must be great audiences too." The matrix of culture will become impoverished if there are not enough gifted artists and thinkers produced: and since universities are the main producers for all the professions, they cannot neglect the professions of art and reflection.

And four years at Harvard can certainly nurture an artist as a conservatory-education cannot. It remains true that great writers have often been deeply (if eccentrically) learned, that they have been bilingual or trilingual, or have had a consuming interest in another art (as Whitman loved vocal music, as Michelangelo wrote sonnets). At Harvard, writers and artists will encounter not only the riches of the course catalogue but also numerous others like themselves; such encounters are a prerequisite for the creation of self-confidence in an art. It is no accident that many of our writers have come out of our literary magazine the Advocate, where they found a collective home. We need comparable student homes for the other arts.

Once we have our potential philosophers, writers, and composers, how will we prepare them for their passage into the wider society? Our excellent students are intensely recruited by business and finance in the fall of their senior year—sometimes even earlier than that. Humanities organizations (foundations, schools, government bureaus) do not have the resources to fly students around the world, or even around the United States, for interviews, nor do their budgets allow for recruiters and their travel expenses. Perhaps money could be found to pay for recruiting trips in the early fall for representatives of humanities organizations. Perhaps we can find a way to convey to our juniors that there are places to go other than Wall Street, and great satisfaction to be found when they follow their own passions, rather than a passion for a high salary. But if we are to be believed when we inform them of such opportunities, we need, I think, to mute our praise for achievement and leadership at least to the extent that we pronounce equal praise for inner happiness, reflectiveness, and creativity; and we need to make being actively recruited as available to students of the humanities as it now is to others.

With a larger supply of creative and reflective admittees on campus, fellow-students will benefit not only from seeing their style of life and attending their exhibits or plays or readings, but also from their intellectual conversation. America will, in the end, be grateful to us for giving her original philosophers, critics, and artists; and we can let the world see that just as we prize physicians and scientists and lawyers and judges and economists, we also are proud of our future philosophers, novelists, composers, and critics, who, although they must follow a rather lonely and highly individual path, are also indispensable contributors to our nation's history and reputation.

Helen Vendler, Arthur Kingsley Porter University Professor

4

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

HARV00000528

**JA4841**
DX003.0182

# Table of Contents

Introduction..........................................................................................................6
    Recommended Reading and Harvard Websites ................................................6
    Eligibility for Schools Committee Work.........................................................8
    Potential Conflicts of Interest as a Member of a Schools Committee...............8
    Confidentiality...............................................................................................8

1. Admissions Standards ..................................................................................9
    The Committee on Admissions and Financial Aid..........................................9
    The Search for "Distinguishing Excellences"..................................................9
    Academic Credentials ...................................................................................11

2. How the Committee Selects a Class ...........................................................13
    Recruiting Prospective Students ...................................................................13
    The Common Application or the Universal College Application.....................14
    Application Deadlines and Decision Dates....................................................15
    Early Action ................................................................................................15
    The Committee Process ...............................................................................16
    The Importance of Timely Interview Reports................................................17
    Ivy League Early Evaluation Program ..........................................................18
    The Wait List ..............................................................................................19
    Transfer Applications ...................................................................................19

3. How Schools Committees Can Recruit Students .........................................20
    College Fairs................................................................................................21
    Acting as Secondary School Liaisons ...........................................................21
    Early Recruitment .......................................................................................22
    Recruiting to Enhance Harvard's Visibility...................................................23
    Recruiting Athletes ......................................................................................24
    Recruiting Admitted Students ......................................................................25

4. Interviewing Applicants .............................................................................27
    Scheduling the Interview...............................................................................27
    Conducting the Interview .............................................................................30
    Writing the Interview Report ........................................................................34
    Sending Your Reports to Cambridge and to Your Chair................................36
    Ranking Meetings........................................................................................36
    Transfer Interviewing ..................................................................................37

5. Sample Interview Reports ..........................................................................38

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY                                    HARV00000529

**JA4842**
DX003.0183

# Introduction

Each year, members of our Schools & Scholarships Committees recruit and evaluate applicants to Harvard College. In the process, they cultivate critical relationships with parents, guidance counselors, other alumni/ae, and the general public. As the competition among colleges for the best students increases, so does our need for your help. We are grateful you have volunteered to join our efforts. You will likely find the work personally rewarding, intellectually stimulating, and occasionally perplexing.

This document addresses four subjects: 1) "Admissions Standards" describes the structure of the Admissions and Financial Aid offices. 2) "How the Committee Selects a Class" explains our criteria and procedures for recruiting students, evaluating them, and voting on their admission. 3) "How Schools Committees Recruit Students" describes recruitment you can do. **The most critical and practical part of this handbook is 4) "Interviewing Applicants," an overview of how to schedule and conduct a personal interview and evaluate students in written reports.** In section 5) "Sample Interview Reports," you will find examples of actual interview reports with our comments describing what was particularly well done and what the interviewer could have improved to make the report more helpful to the Committee.

The Committee has developed these practices over four decades of work with alumni/ae. Please read this document and consult our website (http://www.admissions.college.harvard.edu), which includes an overview of the College. In addition, the publications and web sites referred to below will keep you current on Harvard's academic, extracurricular, and other resources. The Admissions Office's own site is at www.admissions.college.harvard.edu. As always, feel free to contact us (617.495.1551) if we can be of further assistance in this important work. Once again, thank you for all of your help!

## Recommended Reading and Harvard Websites

### Primary sources

**SEAS** outlines programs in the School of Engineering and Applied Sciences (www.seas.harvard.edu)

**Virtual Tour** (www.news.harvard.edu/tour) will guide you around and about Harvard Yard.

**Admissions Video** (http://www.admissions.college.harvard.edu/about/video/index.html)

**Electronic newsletters** are sent to all alumni/ae interviewers, usually 2-3 times a year.

**Freshman Seminar Program** (www.fas.harvard.edu/seminars) describes current seminars.

**Practice and Performance** Office for the Arts (www.fas.harvard.edu/~pandp), lists the facilities, programs, and organizations at Harvard in dance, music, theater, and the visual arts.

**Accessible Education Office** Resources for students with disabilities (www.aeo.fas.harvard.edu)

6

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

HARV00000530

**JA4843**

DX003.0184

<u>Secondary sources</u>
These publications, offered by other sources, can also help:

**Courses of Instruction** (www.registrar.fas.harvard.edu/Courses) is the Faculty of Arts and Sciences course catalog.

**Handbook for Students and Fields of Concentration** (http://handbook.fas.harvard.edu/icb/icb.do )
describes degree requirements and general regulations.

**The Crimson** (www.thecrimson.com) is the daily student-run newspaper.

**Religious Life at Harvard** features a United Ministry directory; call 617.495.5529 or consult (http://chaplains.harvard.edu/)

**Harvard University Gazette** (http://news.harvard.edu/gazette) is published weekly by the University News Office during the academic term and three times over the summer. In addition, an update of Harvard happenings is sent via e-mail <u>each weekday</u> to subscribers. Alumni can register for these e-mail updates on the Gazette's website.

**Office of Career Services** (www.ocs.fas.harvard.edu) offers information about jobs and internships.

**Harvard Magazine** (www.harvard-magazine.com) sends all alumni/ae copies every other month.

**Harvard College Program in General Education** (http://www.generaleducation.fas.harvard.edu/icb/icb.do) offers information about the categories of the new program and the courses offered.

**GoCrimson.com** provides information about Varsity Division I and recreational athletics on Harvard's campus.

Samuel Eliot Morison's ***Three Centuries of Harvard*** (1986) is perhaps the best one-volume history of Harvard.

Henry Rosovsky's ***The University: An Owner's Manual*** (1991) offers a primer on college admissions and the mission of liberal arts colleges.

University President Neil Rudenstine's 1993-95 Report, "Diversity and Learning," surveys Harvard's practice of and commitment to recruiting distinguished students of all backgrounds.

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

HARV00000531

**JA4844**
DX003.0185

## Eligibility for Schools Committee Work

Participation in School Committee work is open to alumni/ae of Harvard College and our graduate schools. Important prerequisites include broad knowledge of the College, enthusiasm for your experience as a student at Harvard, and sincerity of purpose in working with prospective college students, their families, schools, and the general public.

## Potential Conflicts of Interest as a Member of a Schools Committee

As a member of your local Schools Committee, you become a voluntary—but no less official—representative of Harvard University. Accordingly, it is critical to avoid circumstances that might suggest an appearance of inappropriate or duplicitous conduct. For example, alumni/ae who offer college counseling services for a fee are not allowed to participate in Schools Committee work. Interviewers whose children are planning to apply to Harvard are obligated to refrain from doing Schools Committee work for a year, or a least through the full completion of the admissions cycle. (Committee members should alert their Schools Committee Chair to this possibility during the summer before their child's senior year of high school.) We similarly request that individuals refrain from interviewing for Harvard and another undergraduate institution. In addition, of course, you should accept all interviewing assignments with total objectivity, while applying appropriate sensitivity to personal, business or other connections to candidates for admissions.

Should you have any questions about a possible breach of good faith about your role as a volunteer for the Harvard Admissions Office, please contact the Admissions Office to speak with your staff representative.

## Confidentiality

Never discuss what you know about students with anyone, even with school officials. (There is one exception to this rule that can also raise potential problems of confidentiality: holding a ranking meeting or otherwise sharing information about any candidate within a particular Schools Committee. See page 34.) Confidentiality is especially important when working with the general public. Even well-intentioned comments can reveal—sometimes disastrously—more than was intended. For instance, a principal or counselor asking why the Committee denied a student admission needs only to hear that the applicant "was not well supported" to go after teachers.

8

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

HARV00000532

**JA4845**

DX003.0186

# 1. Admissions Standards

*Harvard's admission officers are not dealing with disembodied abstractions but with thousands of very real and very human individuals whose qualities are rarely scientifically measured and labeled unmixed.*

*Wilbur J. Bender*
*Dean of Admissions and Financial Aid*
*Report to the President, 1959-60*

## The Committee on Admissions and Financial Aid

The Harvard College Dean of Admissions and Financial Aid oversees the Admissions Office, the Financial Aid Office, and the Student Employment Office, all of which are located at 86 Brattle Street, Cambridge, MA 02138. The Dean chairs the Standing Committee on Admissions and Financial Aid of the Faculty, which includes more than 25 members of the Faculty of Arts and Sciences (FAS). The Dean and the Standing Committee, acting on behalf of FAS, implement policies on admissions and financial aid. Members of the Standing Committee also review cases that are representative of the entire pool, present strong scholarly credentials, demonstrate exceptional creativity in the arts, or raise questions of admissions policy. Working under the guidelines established by the Standing Committee, the Admissions Committee makes decisions on individual applicants. The Admissions Committee is composed of the Standing Committee of the Faculty and about 40 members from the three offices the Dean supervises.

The Financial Aid Office administers financial aid to eligible students who attend the College. Harvard remains need blind in the admissions process, and Harvard awards financial aid based strictly on need. That is, the Committee makes each admission decision without regard to whether a student has applied for aid, whether a student qualifies for financial aid, and regardless of the amount of financial aid for which a student qualifies. Harvard awards financial aid strictly on the basis of a family's need; we do not award merit scholarships. Thanks to the strong commitment of the Faculty of Arts and Sciences and the continuing generosity of donors, we are committed to providing the financial aid resources necessary to make the College fully accessible to students of promise.

## The Search for "Distinguishing Excellences"[1]

Our goal is to attract the best students to the College. Part of the general public believes "best" ought to be defined by standardized tests, grades, and class rank. It is easy to understand why. In his 1959-1960 Report to the President, Harvard Dean of Admissions and Financial Aid Wilbur J. Bender wrote that "[f]or a harassed admission officer [such a policy] has great appeal because it has

---

[1] This section represents extensive statistical analysis of the Committee's actions and represents accurately the way in which the Committee approaches each case. Our analyses have demonstrated that personal attributes—as represented by the alumni/ae interview, extracurricular rating, and personal rating—are factors in our decision-making that are as significant as academic ability—as represented by rank in class; rigor of high school curriculum; SAT, ACT, and AP/IB scores; and teacher and guidance counselor recommendations.

9

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

**JA4846**

DX003.0187

the merits of apparent simplicity, objectivity, relative administrative cheapness in time and money and worry, a clear logical basis and therefore easy applicability and defensibility."

The Admissions Committee values objective criteria, but holds a more expansive view of excellence. Test scores and grades indicate students' academic aptitude and achievement. The Committee also scrutinizes applications for extracurricular distinction and personal qualities. Students' intellectual imagination, strength of character, and their ability to exercise good judgment—these are other, critical factors in the admissions process, and they are revealed not by test scores but by students' activity outside the classroom, the testimony of teachers and guidance counselors, and by alumni/ae interview reports. Seeking evidence of these three criteria—academic excellence, extracurricular distinction, and personal qualities—the Committee reads with care all the components of each applicant's file: the high school transcript, standardized test scores, extracurricular activities, personal statement, teacher and secondary school recommendations, and the personal interview report.

Attempts to define and to identify precise elements of character, and to determine how much weight they should be given in the admissions process, require discretion and judiciousness. But the Committee believes that the "best" freshman class is more likely to result if we bring evaluation of character and personality into decisions than if we do not. We believe that a diversity of backgrounds, academic interests, extracurricular talents, and career goals among students who live and learn together affects the quality of education as much as a great faculty or vast material resources.

The Committee appreciates the degree to which many admissions decisions hinge on judgment calls. In 2011-2012, 34,285 applicants competed for about 1,600 spots in the entering class. Perhaps 85 percent of our applicants are academically qualified. A significant portion also presents strong personal and extracurricular credentials. When considering an applicant, then, the Committee asks, "What makes him or her distinctive?" The Committee identifies certain broad factors that generally carry weight in this process. These "distinguishing excellences" might "tip" into the class an applicant who presents the Committee solid evidence of academic excellence, extracurricular accomplishment, and strong personal qualities. Tips come into play only at a high level of merit; the Committee never gives enough of a tip to admit an average candidate at the expense of a first-rate one. These are among the most common "tips" by which applicants, presenting distinguished academic and extracurricular records, might distinguish themselves for admission:

**Outstanding and unusual intellectual ability.** Harvard is likely to admit brilliant students of sound character who offer substantial evidence of intelligence at the most elevated level. More than presenting the Committee with superior testing and strong academic records in competitive secondary school classrooms, the applicant admitted primarily for unusual intelligence also presents compelling evidence of creativity and originality.

**Unusually appealing personal qualities.** In certain cases, teacher recommendations, the secondary school report, personal statement, and the alumni/ae interview report offer consistent testimony of an applicant's unusual effervescence, charity, maturity, or strength of character in addition to academic and extracurricular accomplishment. A residential community with strong emphasis on extracurricular participation, Harvard prizes these qualities.

**Outstanding capacity for leadership.** Harvard aims to educate individuals to have broad vision who will be leaders in their chosen fields. Evidence of ability to lead others in positive ways can distinguish an applicant for admission.

**Creative ability.** The Harvard Supplement to the Common Application encourages students "with exceptional talents or interests" to send the Committee music CDs, compositions, dance DVDs, slides of artwork, or selected samples of academic work (including creative writing)

10

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

HARV00000534

**JA4847**
DX003.0188

for faculty evaluation, which can inform admissions decisions. Students' artistic participation and performance help enrich life at Harvard and beyond.

**Athletic ability.** The College has a long tradition of athletic excellence—in competition with our intercollegiate rivals and among our freshman and House communities. Harvard enrolls students who are among the most active in recreational athletics, and we lead all undergraduate institutions in the number of NCAA Division I athletic teams (41). Evidence of a candidate's ability to contribute to one of these teams, and of solid personal qualities and academic abilities, can distinguish a candidate for admission.

**Harvard and Radcliffe parentage.** Among a group of similarly distinguished applicants, the Committee is more likely to admit the sons and daughters of Harvard and Radcliffe alumni/ae than students without these institutional ties when all other factors are equal. Children of alumni/ae generally prove to be highly competitive candidates even without a lineage tip. Their academic credentials – test scores and grades – are nearly identical to those of the entering class as a whole.

**Geographic, ethnic, and economic factors.** The excellence and diversity of our students remain salient attractions for many prospective students. Undergraduates come from every state and more than 80 foreign countries. They have attended public, private, and parochial schools; represent all economic, ethnic, and religious backgrounds; and possess a wide range of academic interests and extracurricular talents. "Such diversity is not an end in itself, or a pleasant but dispensable accessory," University President Neil Rudenstine wrote in his 1993-95 Report, "Diversity and Learning." "It is more substance from which much human learning, understanding, and wisdom derive. It offers one of the most powerful ways of creating the intellectual energy and robustness that lead to greater knowledge, as well as the tolerance and mutual respect that are so essential to the maintenance of our civil society."

These factors are guidelines that are neither comprehensive nor absolute. Some successful candidates present a number of these qualities in their applications and are, in other words, well rounded. Other applicants are successful because they are well lopsided—they demonstrate exceptional distinction in one of these areas. Yet the Admissions Committee denies and offers admission to students who might fit either description.

Our success depends on our ability to attract students of different personalities, academic interests, and extracurricular talents to Harvard. We proceed with care, discretion, and humility because we know we are working with imperfect information, and that no one can predict with certainty what an individual will accomplish during college or beyond. The Committee appreciates the element of subjectivity involved in assessing a candidate's distinction in any one of these categories and in identifying some of the personal qualities we believe these distinctions demonstrate. And, by giving importance to human judgment, by admitting more than just "safe bets," we are aware our decisions become harder to explain with precision. By developing familiarity with the admissions process, you can help us address the public's concerns and misconceptions about recruitment and evaluation at Harvard.

## Academic Credentials

Applicants often ask about the role rank-in-class and standardized tests play in admissions decisions. These comments should inform your responses.

**Rank-in-class.** Rank-in-class (or deciles, quintiles, percentages, etc.) is a helpful, important gauge of academic achievement. Few successful candidates rank below the top 10 to 15 percent of their high school classes, except in the cases of applicants applying from secondary schools that send significant percentages of their graduates to selective four-year colleges. Reassure applicants that

11

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

HARV00000535

they will not be denied admission solely on the basis of a few places in rank; the overall pattern of students' academic performance and the quality of their courses are far more important than their rank. Even when assessing applicants within a high-ranking range, the Committee's decisions might be unrelated to an applicant's class standing because of the weight given other factors.

**Standardized testing.** Harvard requires all applicants to submit the results of the SAT or ACT (with the enhanced writing portion) and the results of two SAT Subject Tests (previously known as the SAT Achievement Tests or SAT II exams). Harvard does not have clearly defined, required minimum scores, but students admitted to the College represent a range of scores from roughly 600 to 800 on each section of the SAT and on the SAT Subject Tests.

Candidates with scores lower than 600 (or a 27 ACT composite) are less likely to be offered admission unless they provide compelling evidence of other unusual talents or accomplishments. At the same time, the Committee does not admit hundreds of applicants who have 700+ scores and fine secondary school records because other candidates appeared stronger in other important ways. Once the Committee determines that an individual is capable of thriving academically at Harvard—a judgment made considering test scores, grades, and recommendations—we are most interested in the person behind the scores.

**Re-centering of College Board scores.** The College Board adjusted the scoring scale of the SAT and SAT Subject Tests in April 1995. Before this change, the national averages for the SAT verbal and math tests were, respectively, 76 and 22 points below the "500 midpoint." The College Board believes it is important that this midpoint be the actual mean for all tests, and they cite a small initial sample of test-takers in 1941 to explain the previously skewed scale. Scores have thus risen considerably; a 420 Verbal has become a "re-centered" 500. Please consider this change when you assess candidates. Re-centering has lowered the floor for an 800 score—on both the SAT and the SAT Subject Tests. What was a "pre-re-centered" 730 verbal SAT became an 800; a "pre-re-centered" 780 math SAT is now 800. Students' expectations for admission might be raised simply because of large increases in the number of "perfect" scores.

12

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

**JA4849**

DX003.0190

## 2. How the Committee Selects a Class

### Recruiting Prospective Students

Many people often ask why, given the thousands of applications Harvard receives every year, we must invest such time, effort, and resources to recruit talented students.[2] Vigorous recruitment, however, has been instrumental to our success. It has broadened Harvard's appeal to a national and international base, and enhanced the College's accessibility. As Bender noted in his first Report to the President (1951-52),

> That the College is engaged [...] in a vigorous recruitment program and that there is a large and growing surplus of qualified applicants confront the Committee on Admission with new problems of fundamental policy. For the first time we can, within limits—and we have to—consciously shape the make-up of our student body instead of allowing natural selection or laissez faire to determine it.

Active recruitment helps sustain the critical opportunity to "consciously shape the make-up of our student body" as colleges compete intensely for the best students.

**Direct mail.** Virtually all college-bound students take the PSAT by their junior year. High school juniors and seniors also take SATs and the ACT, which survey students about their academic experiences and interests. With students' permission, the College Board and the American College Testing Company sell colleges this information. Harvard has identified accomplished students with these searches for many years. We send letters and viewbooks to searched students, and we share Student Search Lists with Schools Committee chairs to craft recruitment plans and to identify students to invite to local presentations. Our research shows that students who qualify for this search are about twice as likely to be admitted as other applicants. Of course, these search lists do not include the names of every student who might be admitted to the College.

**Joint travel/Exploring College Options.** To respond to the increasingly early interest students express in college admissions, the Admissions Committee is concentrating more on spring recruitment. Many officers recruit applicants through joint travel. A group of five admissions representatives—representing Harvard and four other colleges—travels to five cities in five days, speaking in the evening with students and parents and in the morning with guidance counselors. In the last several years, we have traveled with representatives from Duke, Georgetown, MIT, Stanford, the University of Pennsylvania, Princeton, University of Virginia, and Yale, among others. We enhance outreach through well-planned joint travel, which exposes Harvard to a broader audience than do individual school visits. Audiences learn about Harvard even if they attend the session to learn about another college. And by cooperating with other colleges, we enhance the cost-effectiveness of travel. Through spring and fall trips, we visit 130 cities in all 50 states and some international territories and reach approximately 55,000 students and parents, as well as 2000 high school counselors.

---

[2] A little more than 40 years ago, Harvard College received 7,762 applications and selected an entering class of 1,134 men. The Offices of Admissions at Harvard College and at Radcliffe College merged in 1975-76, increasing the number of total spots in the entering class for men and women to 1,600. Applications grew to between 12,000 to 13,000 until 1993-94, when 15,259 students applied to the College. Meanwhile, students admitted to Harvard and Radcliffe have matriculated at higher rates, driving down the raw number of students the Admissions Committee can admit.

With Radcliffe and Harvard's historic announcement in 1999 that Radcliffe would merge with Harvard—and establish the Radcliffe Institute for Advanced Study as an integral part of Harvard University—all applicants from the 1999-2000 admissions cycle on, women as well as men, apply to the fully coeducational Harvard College.

13

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

HARV00000537

**Undergraduate Admissions Council (UAC).** The UAC, working closely with members of the Admissions Committee, offers extensive personal outreach to prospective students. About 300 undergraduates volunteer their time to the UAC to coordinate overnight, on-campus housing for visiting high school seniors throughout the academic year and during our annual April Visiting Program for admitted students. Their efforts can persuade admitted students to matriculate. Through telephone contact, email outreach, student blogs, and visits to hometown high schools, the UAC addresses prospective students' concerns and refers them to other appropriate sources.

**Undergraduate Minority Recruitment Program (UMRP).** The Admissions Office established the UMRP in 1974 to consolidate individual outreach programs to minority students, and this student organization has been part of our successful student recruitment ever since. UMRP's more than 20 undergraduates conduct personal outreach to minority students through on-campus hosting and by extensive telephone, mail, and e-mail contact during the application process and following the Committee's decisions. UMRP members also volunteer a week of their own time to visit high schools and some junior high schools across the country with large concentrations of minority students in order to encourage all students in these areas to apply to college. Undergraduates craft their itineraries through consultation with the appropriate area admissions officer.

**Harvard Financial Aid Initiative (HFAI).** Established during the summer of 2004, the Admissions Office and Financial Aid Office have implemented a coordinated effort to conduct personal outreach to students who may fall within the parameters of the new program. Their work was modeled after the work of the UMRP; accordingly, their recruitment strategies are similar to (and often conducted in concert with) those of the UMRP.

**Interviews and information sessions in Agassiz.** The Admissions Office runs year-round recruitment in Cambridge. From the first week in June to Thanksgiving (with a break in early September as students settle into their high school routines), we offer optional campus interviews to high school seniors. We add interview reports generated here to applicants' files, but Cambridge interviews do not substitute for the alumni/ae interview. We also offer student-led tours and group information sessions throughout the year. Open to the public, the information sessions allow students and their families to ask an admissions officer and current undergraduates questions about life at Harvard and the admissions process. Please visit our website or call us at 617.495.1551 for additional information, including up-to-date schedules and locations.

## The Common Application or the Universal College Application

Harvard adopted the Common Application in 1994-1995 and the Universal Application in 2007-2008. More than 400 colleges and universities use these standardized forms, which we hope benefit applicants and secondary schools. Applicants can focus more time on their academic, extracurricular, and personal lives than on filling out multiple applications. Teachers and counselors can devote more time to writing a single recommendation (and to counseling) and less to redundant paperwork. The Common Application is available free online (www.commonapp.org) and our website); the Universal College Application may be obtained at www.universalcollegeapp.com . In addition to the Common Application or the Universal College Application, we require applicants to complete a short supplement to indicate their interest, and its depth, in a field of study, career, and extracurricular activities—and to submit AP and IB results, an optional additional essay, or tapes, slides, and papers for faculty evaluation.

14

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

## Application Deadlines and Decision Dates

**Mid-October, 2013**

The Admissions Office begins processing applications for Early Action candidates; interview requests sent to School Committee chairs

**November 1, 2013**

Deadline for all Early Action application materials. Students applying for Early Action should submit scores by the October series, although scores from the November series should reach us in time for consideration.

**Early December, 2013**
*We will begin our careful evaluation process for Regular Decision candidates at this time, reading applications in the order in which they are completed.*

We have asked that candidates send at least the Common Application or Universal Application as soon as possible to allow time for them to begin the interviewing process in areas where this is possible. We recognize that students, secondary school teachers, and counselors have many commitments that may preclude early submission of admission materials by this date. Candidates will not be penalized in any way if materials are submitted before the January 1 deadline.

**January 1, 2014**
*Final deadline for application materials for Regular Decision applicants.*

Candidates can complete testing requirements by using the January SAT or February ACT dates, but we hope that they will have their testing completed by the December date.

**Date Decisions Are Sent**
- Early Action decisions are mailed/e-mailed on December 14, 2012.
- Regular Action decisions are mailed/e-mailed on March 28, 2013.
- Common Reply Date, by which applicants in the Early Action and Regular Decision processes must accept or decline the offer of admission, is May 1, 2013. No deposit is required.

## Early Action

Harvard College has restored nonbinding early action as part of its admissions process and significantly enhanced its recruiting program to assist talented students from modest economic backgrounds in navigating the admissions process. Harvard has also increased its investment in undergraduate financial aid to more than $160 million. Currently, more than 60 percent of Harvard College students receive scholarship aid, and the average grant is about $38,000.

In 2007, Harvard eliminated its nonbinding early action program on a trial basis and moved to a single admissions deadline, announcing at the time that it would evaluate the impact of the change after several years.

15

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

HARV00000539

**JA4852**
DX003.0193

"We piloted the elimination of early action out of concern that college admissions had become too complex and pressured for all students, and out of particular concern for students at under-resourced high schools who might not be able to access the early admissions process," said Harvard President Drew Faust. "Over the past several years, however, interest in early admissions has increased, as students and families from across the economic spectrum seek certainty about college choices and financing. Our goal now is to reinstitute an early-action program consistent with our bedrock commitment to access, affordability, and excellence."

"We looked carefully at trends in Harvard admissions these past years and saw that many highly talented students, including some of the best-prepared low-income and underrepresented minority students, were choosing programs with an early-action option, and therefore were missing out on the opportunity to consider Harvard. We have decided that the College and our students will be best served by restoring an early option," said Dean Michael J. Smith of the Faculty of Arts and Sciences.

Harvard's concerns about equity and transparency will continue to guide the structure of its admission program. It will maintain a nonbinding approach, which maximizes freedom and flexibility for students. As in the past, students can apply under the single-choice, early-action program by Nov. 1 and will be notified by Dec. 15, at which point students completing financial aid applications will receive notice of their awards. Regular decision will continue to operate as usual, with applications due on Jan. 1 and notification on April 1. All students, whether admitted under early action or regular decision, will have until May 1 to decide whether to attend.

To ensure that the return to early action serves Harvard's commitment to access and diversity across many dimensions, the change in admissions policy has been accompanied by enhancements in the College's recruiting program, including a new program promoting transparency in college admissions, greater outreach, and targeted staff visits to schools where few students apply early to college; increased involvement of Harvard undergraduates throughout the year in three major recruiting efforts – the Harvard Financial Aid Initiative, the Undergraduate Minority Recruitment Program, and the Undergraduate Admissions Council's Return to High School Program; and enhanced web features providing families with the ability to calculate the likely net cost of sending a child to Harvard, and perspectives from financial aid students on life at Harvard.

"The commitment to including first-generation, low-income , and historically disadvantaged minority students in the full spectrum of admissions options is a key feature of this new early-action option," said Harvard College Dean Evelynn Hammonds. "We have made significant gains in recent years in recruiting larger numbers of these students and in supporting them for success once here. I am very pleased that we are able to re-conceive early action, consistent with these goals, and to work with students based on whatever timetable best meets their needs."

"We continue to be concerned about the pressures on students today, including those associated with college admission," said Harvard College Dean of Admissions and Financial Aid William R. Fitzsimmons. "In all of our work, we will do everything possible to level the playing field in admissions and encourage all students to make thoughtful choices about how they can best contribute to society."

## The Committee Process

The "Docket." Each member of the Admissions Committee represents specific geographic areas, and so we refer to officers as "area representatives." A "docket"—which we also refer to as a "subcommittee"—is a geographical region, designed to be roughly equivalent to each of the other dockets in the number of applicants considered there. There are 20 dockets or subcommittees. Each

16

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

HARV00000540

**JA4853**

DX003.0194

officer sits on at least two dockets to inform comparisons made among candidates across vast geographical lines. Each subcommittee varies in size, but generally includes three to six area representatives, a docket chair (a senior admissions officer), and the docket's faculty readers.

**Who reads folders**. The area person reads all the folders from his or her area—a folder's first read. The first reader records all data, contacts the applicant or his or her school for materials missing from the folder, and comments on the folder's strengths and weaknesses. Reading every folder from their areas enables area persons to present an overview of the relative strengths presented by the applicants there. Second and third readers check factual data recorded on the reader sheet and, more importantly, offer additional interpretations of the folder. The third reader records all evaluations for entry into our database. Folders might receive additional evaluations, whether by other admissions officers or by members of the Faculty Standing Committee. These other evaluations offer more commentary on the strengths of applicants who present special attributes such as those described in section 2.

**Subcommittee meetings**. Once folders have been read, subcommittees meet. The area person, as advocate for each case he or she has read, summarizes to the subcommittee the strengths and weaknesses in each component of each candidate's file. Subcommittee members discuss the case, and then vote on what recommendation to offer the full Committee. The subcommittee examines the entire docket several times, extensively reviewing decisions—and in many cases changing them—to ensure standard scrutiny for all applicants, whether they are presented first or last on a docket. After surveying the docket's breadth of quality, the subcommittee can identify with greater confidence those applicants who appear strongest. Majorities rule, but the degree of support expressed for candidates is always noted—both for candidates the subcommittee will and will not recommend for admission. By identifying applicants this way—"clear admits," "strong rejects," etc.—subcommittees can compare candidates with similarly assessed applicants on other dockets.

Subcommittees then present and defend their recommendations to the full Committee. While looking at or listening to the summary of any case, any Committee member may raise questions about the proposed decision and request a full review of the case. Many candidates are re-presented in full Committee. The Committee compares all candidates across all dockets, and therefore across geographical lines.

This rigorous comparative process strives to be deliberate, meticulous, and fair. It is also labor intensive. But it permits extraordinary flexibility and the possibility of changing decisions virtually until the day the Admissions Committee mails them. This is especially important since the Committee is always receiving new information on candidates. Please convey to applicants the time and care the Committee takes with each individual application.

## The Importance of Timely Interview Reports

Your insights are most valuable if we have them for subcommittee—a case's first hearing. We would, of course, love to read interview reports as we first read applicants' files. But many students still wait to apply by the final deadline, making it virtually impossible for their reports to be here for a folder's first read. **When possible, please contact the student, complete the interview, and file the interview report within two weeks of receiving the interview assignment.** Waiting an extended period before writing the interview report can disadvantage the student, as impressions and important details from the conversation can fade as time passes. As such, a delayed report may fail to accurately capture the student interviewed.

17

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

HARV00000541

**JA4854**

DX003.0195

The committee process works best and most efficiently, then, when we have reports for subcommittee. Subcommittees may discuss a single case for half an hour or even more before voting on a recommendation to offer the full Committee. These conversations are more tentative when critical items are missing—whether they are teacher recommendations or interview reports. And while the full Committee will take just as much time as the subcommittees do discussing a single case, these discussions take more time the more new information we must add to case re-presentations. Subcommittees begin meeting in November for the Early Action process and for three- to four-day shifts in late January until the end of February for the Regular Decision process.

Please consult with your Schools Committee chair about the exact dates of subcommittees for the area in which you will be interviewing. Specific dates for subcommittee meetings depend on several factors. Since each staff member sits on at least two subcommittees, we try to ensure staff members do not have insuperable conflicts. We attempt to make interview requests as early as possible, yet we know there will be some requests we make for interviews after subcommittees have met. Occasionally, applicants' files complete as late as late-November for Early Action and February for Regular Decision. This results, most often, from unavoidable logistical factors. Mail sometimes arrives late. Occasionally, we are overwhelmed with mail to open, materials to enter into our database, and reams of paper to file. Nevertheless, we hope you can fulfill each interview request as quickly as possible so that your Cambridge subcommittee has the benefit of your interviewers' personal insights.

The *last* opportunity for the vast majority of cases to be heard is during full Committee. The Admissions Committee must have all interview reports in hand for full Committee. As you know from reading above, the entire Committee convenes in one room to review all the contenders for admission. Many candidates are re-presented in full Committee, which again may consider a single case for a half hour or more. Full Committee generally meets during the first week of December for Early Action candidates and from the end of the first week of March to the end of the third week of March for Regular Decision candidates.

We are grateful that you do all you can to send us interview reports as early as possible. Clearly, it is vital that we have all interview reports by the full Committee stage. We hope this outline helps you understand that it is critical to complete your interview and report as soon as possible, ideally within two weeks of receiving the assignment from your Schools Committee chair.

## Ivy League Early Evaluation Program

As determined by each institution, admissions offices may advise applicants before the common notification date, in writing, of the probability of admission (e.g. likely, possible, unlikely). If the student is a recruited student-athlete, such notifications may only be made from October 1 through March 15, per Ivy League regulations.

Institutions may issue official "probabilistic" communications only in writing, from the office of admission. Such letters will have the effect of letters of admission, to be confirmed on the common notification date, subject to revocation only on the same terms as letters of admission. (Such communications given by coaches, whether orally or in writing, do not constitute binding institutional commitments.) An applicant who receives one or more such written communications and who has made a decision to matriculate at one institution is encouraged (but not required) to notify all other institutions, and to withdraw all other applications, as promptly as possible.

Such early evaluations are often precipitated by pressure on student-athletes from other institutions requiring an early commitment. In some instances, students are given very little time to

18

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

HARV00000542

**JA4855**
DX003.0196

respond to these offers. Such candidates bring excellences of all kinds in addition to athletics, and the Admissions Committee can vote to notify them that they are likely to be admitted – rather than lose them to other institutions. Alumni/ae Schools and Scholarship Chairs will be informed about such candidates by the staff area person and will be requested to interview them if time allows.

## The Wait List

The Committee places a number of accomplished applicants on the wait list each year. The wait list includes the strongest applicants whom the Committee was not able to admit but might still wish to consider for admission if spots in the entering class open later. Wait-listed students should make definite plans to attend a college to which they have been admitted, since the number of students the Committee has been able to admit from the wait list varies from year to year. In some years, we have admitted no one from the wait list; in others, we have admitted more than 100 candidates from the wait list.

Admitted students have until May 1 to accept or forfeit their spots in the entering class. Should there be spots left in the entering class after the May 1 deadline, the Committee may then select students who have decided to remain on the wait list to fill these spots. The wait list is not ranked. We meet some time after May 1 to select students from the wait list through a rigorous comparative process very similar to the full committee meetings described above.

## Transfer Applications

After a two-year suspension, the transfer admissions program was reinstated during the 2010-2011 admissions cycle. Just under 1500 students applied for 12 transfer spaces. Students interested in applying during the 2012-2013 cycle should check Harvard's website or call the transfer office (617.495.5309) in the fall to verify the status of transfer admissions for this academic year. The application deadline for the transfer process is March 1, 2013, with notification by June 1.

In the transfer process, Harvard considers applications in the spring from students who wish to transfer to Harvard after completing at least one year (and not more than two) of full-time study at another college or university. The Committee selects transfer applicants through a rigorous comparative process and on the basis of their record of academic achievement, the strength of recommendations they receive from college faculty members, and their overall promise. Only the very strongest transfer candidates are selected for alumni interviews; you will be contacted directly by your committee chairperson should we need your help interviewing a candidate for transfer admissions.

19

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

HARV00000543

### 3. How Schools Committees Can Recruit Students

*Admissions involves "salesmanship," politics in the broad sense of the word, human and institutional relationships. It is a matter of who works for you and how they work, of whom you select and whom you reject, of the public image or images of Harvard, which are affected by everything you do or don't do.*

*Wilbur J. Bender*
*Dean of Admissions and Financial Aid*
*Report to the President, 1959-60*

Through your recruitment efforts, you add an indispensable human dimension to what can seem an impersonal process. You also can combat myths about the College, its mission, and its students—myths that can dissuade talented students from applying. This human dimension—and the simple but important fact that you live near the candidates you interview—has become even more important given that we no longer have the financial resources to make a second visit to most areas beyond Joint Travel.

Schools Committee members recruit students as well as interview them—but there is an important distinction between the two. When recruiting, alumni/ae should introduce students to and inform them about the College and the admissions process. They should not act in the capacity of interviewers, who inform applicants about the College and evaluate them for admission. Recruitment efforts should not be performed—or perceived to be performed—as a preliminary screening of prospective or actual applicants. Nevertheless, alumni/ae should use the information presented in section 2 to inform their advice to students.

In most settings in which you recruit students—the college fair or a school visit, for instance—there is little you will know about individual students, except that they are interested in learning more about Harvard. At this introductory stage, then, the task is essentially to present facts about opportunities at the College and to dispel misconceptions students and their families have about it. The Admissions Committee believes strongly that our staff, student workers, and alumni/ae should never disparage another college.

Informal contact occasionally does yield information about an individual that is pertinent to the admissions process. For instance, students sometimes volunteer SAT scores, grade point averages, and class ranks to enable you to assess whether they are "in Harvard's range." No matter how experienced a recruiter or interviewer is, do not make any predictions or impressions, **positive or negative**, about a student's chance of admission. Admissions officers often parry this question by saying, honestly, that they cannot estimate a student's chances until they have read a completed application and can assess the year's competition. And this analysis can only be accomplished with full access to all the material in an applicant's file and through the extensive discussions shared and comparisons made through the full Committee process.

When prospective students do ask about their chances of admission, it can be helpful to describe factually Harvard's selectivity—as well as the selectivity of other liberal arts schools—and the importance of applying to a range of schools. When expressed without unusual emphasis and with a helpful, considerate tone, this advice can help manage better students' and their families' expectations in the increasingly competitive world of college admissions.

20

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

HARV00000544

**JA4857**
DX003.0198

## College Fairs

We receive hundreds of notices from secondary schools, educational consortiums, community organizations, and other colleges soliciting our participation in college fairs. Schools Committee chairs receive copies of these notices and attempt to staff as many of these local events as possible with their alumni/ae members. College fairs vary in format and audience. Some are smorgasbords convening community colleges, technical schools, military academies, state schools of every stripe, and liberal arts colleges in order to address every student interested in any sort of post-secondary education. Other college fairs invite colleges that share many qualities.

College fairs can test your endurance (fairs often run for three hours or more) and versatility. Attending college fairs, for some families, substitutes for studying dozens of college guidebooks. For other families, the college fair is an opportunity to discuss in greater detail with a college representative what they have read in guidebooks and heard from friends. In a given evening, you might be asked everything from, "Where is Harvard?" to "What success do Harvard students have in medical school admissions?"—and you might be asked these questions many times over. This should re-emphasize the importance of being familiar with the College's current resources.

Under the section "Forms/documents" of the alumni interviewer website, you will find resources for alumni attending college fairs, including a "how-to" guide with answers to common questions, a list of new initiatives at Harvard, and a college fair materials request form.

## Acting as Secondary School Liaisons

Acting as a secondary school liaison may be one of the most valuable ways to identify and recruit talented students and to build positive relationships and good will with their families and school officials. Place a call yourself to the guidance department to introduce yourself and to explain your role in the Harvard admissions process—or drop a note with information about how people can contact you. You should tell guidance and other school officials that you are an alumnus/a member of the local Schools Committee, which works closely with the Admissions Committee in Cambridge. While you should apprise schools of the recruitment work Schools Committees do, describe explicitly how you wish to work with the school. Be clear that your mission is to introduce students to the College and to serve as an informational resource. Confirm that the school understands that your desired role is not one of evaluation, assessment, or screening of prospective applicants. This approach can encourage school officials to direct students to you without the fear that contact might affect a final admissions decision.

Depending on the secondary school's own policies, you might have wide latitude in working with schools. Some liaisons allow students to take the initiative in contacting them. They share with school guidance offices their names, addresses, and telephone numbers, and ask the counselors to invite students to contact them to talk about Harvard. Other liaisons visit their schools once or twice each year (usually in the fall and spring). Alumni/ae often also interview applicants from their schools, although they divide interviewing responsibilities with other Schools Committee members if the load is too great for one person. Whatever approach you adopt through consultation with your Schools Committee chair, schools should know whom to call when they have a question about Harvard, and they should feel comfortable contacting you. Open communication will best allow you to introduce a secondary school to the College, describe what the Admissions Committee seeks in strong applicants, and invite the school to identify strong and promising candidates.

21

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

HARV00000545

**Setting up a school visit**. School policies on college representatives and their presence on campus vary. Some schools designate specific visitation times; others prohibit visitation. Guidance staffs are often overworked and have to deal with many college representatives. Untimely or unreasonable demands of their or of students' time should be avoided. No preferential treatment for Harvard should be expected. For these reasons, you will probably find it enormously helpful to speak first with the admissions officer assigned to your region before attempting to schedule visits. He or she can provide advice about what is and is not allowed or expected at certain high schools and introduce you to guidance counselors with whom we have established relationships.

If you wish to visit a school to talk with students, call the guidance department yourself to schedule a time and date to visit that will be mutually convenient for you, the guidance department, and the students. Guidance departments will often help secure a quiet and accessible place on school grounds for you to meet with students. Be explicit with guidance counselors that you welcome any and all students interested in speaking with you about Harvard. Some alumni/ae meet with guidance counselors before or after talking with students or even in place of talking with students. Guidance staff can, in this way, help you to identify students to recruit.

## Early Recruitment

**Early awareness**. Traditional recruitment strategies are now being expanded to increase the pool of qualified high school students—at once helping ourselves and, more importantly, raising students' educational aspirations, whether those aspirations include Harvard or not. Insights we can offer students about those qualities the admissions process values—academic achievement in rigorous curricula; distinction, leadership, or special talent in extracurricular pursuits—is most helpful when shared with students before or at the start of high school. There are many reasons why Schools Committees are well equipped to undertake efforts to raise educational aspirations. We are acquainted with many secondary schools and counselors and therefore have established lines of contact to junior high schools. We have access to recent college graduates, who often make the most effective role models, and to undergraduates who may have attended the very schools we might target for early awareness outreach. Indeed, volunteers for the Undergraduate Minority Recruitment Program (UMRP) include at least two visits to junior high schools in their recruitment travel for the College.

Schools Committees interested in early awareness projects should design programs appropriate for their own settings. In general, however, any outreach should: encourage improved educational achievement in high school, impart greater awareness of different kinds of college opportunities and knowledge about how to prepare for them, and provide students with some understanding of college admissions and financial aid policies.

It is important to include school personnel in the planning stages of any early awareness program, lest our work be perceived as an intrusion by outsiders who do not understand students' needs. Schools Committees interested in establishing early awareness efforts should make a long-term commitment but begin by targeting only one or two schools to fine-tune a feasible program. Schools Committees may wish to combine their resources with those of other college alumni/ae groups—to attract more volunteers and to broaden the program's appeal.

Early awareness efforts should not focus solely on the most gifted students; the program should enhance all students' appreciation for higher education. Moreover, early awareness conducted by Schools Committee members should not give the impression that students' participation in a "Harvard-sponsored" program might improve students' admissions prospects at

22

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

**JA4859**

DX003.0200

the College. Contact your area representative for more information about starting (or expanding) early awareness. We have a variety of publications and a video that might help your planning.

**The Harvard Book Prize.** Since 1910, the Harvard Book Prize has been an important and effective way of attracting the attention of talented young people to opportunities at the College. That the Book Prize now also represents, in more than 1,900 schools, one of the highest awards a school can give to a student in the junior class is a tribute to the effectiveness of the Book Prize Committee, which is part of the Harvard Alumni Association. Indeed, many Harvard Book Prize winners choose to apply to Harvard. To help maintain Harvard's tradition of diversity, it is important to reach schools outside traditionally covered areas. An expanded Harvard Book Prize Program can strengthen relations between Harvard and secondary schools and encourage talented students to consider attending Harvard. Should you have any questions about this program, please call the HAA Clubs Office at 617.495.5732 or 800.654.6494.

## Recruiting to Enhance Harvard's Visibility

I believe that student diversity contributes powerfully and directly to the quality of education in colleges and universities. For more than a century, Harvard has placed a very high value on the creation of a residential community that brings together people with a wide range of backgrounds and experiences. The breadth of views and voices in our university challenges each of us to think harder, to see the different sides of any issue, to confront our own assumptions and preconceptions, and to develop the kind of understanding that can come only when we are willing to test our ideas and arguments in the company of people with very different perspectives. It also gives us the chance to come to know, understand, and respect a remarkable variety of men and women whom we might not otherwise have the opportunity to learn from or even to meet.

*Neil Rudenstine*
*"Diversity and Learning"*
*President's Report, 1993-95*

One of the Admissions Committee's recruiting priorities is making Harvard accessible to students from diverse backgrounds. Here are some of our recruitment methods and objectives.

**Recruiting minority students.** National competition for talented minority students has escalated since the early 1970s, when Harvard expanded minority recruitment efforts. A Better Chance, Upward Bound, the National Scholarship Service and Fund for Negro Students, and the Association of Black Admission and Financial Aid Officers of the Ivy League and Sister Schools— all of these groups work to improve opportunities for minority students. The College also relies on the assertive contributions of alumni/ae. Please apprise students of UMRP and UAC outreach.

Harvard has long recognized the importance of reaching community organizations through which we can inform minority students of our interest and of the admissions process. Contact with school officials, community educational organizations, churches, social clubs, and groups such as the Urban League, the NAACP, and Tribal Councils can be fruitful. Alumni/ae often recruit students through these organizations in a fashion similar to the "school liaison."

It is important for you to know about minority life at the College, but discussions with minority students—whether in the context of recruitment or the personal interview—should not focus on the topic of "being a minority." Alumni/ae should respond to students' questions about multicultural activity at the College, for instance, but should not ask questions that suggest students are being ethnically screened or go through a "special" admissions process.

23

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

HARV00000547

**JA4860**

DX003.0201

Minority recruitment offers perhaps the greatest contemporary challenge and opportunity for creative admissions recruiting. Our success in this area depends heavily on your enthusiasm and effort.

**Recruiting economically disadvantaged students.** The cost of a Harvard education and lack of awareness of our financial aid programs dissuades many outstanding candidates from applying. The Committee seeks to attract these students because of how much a Harvard education might change an individual's life—and the life of our society—for the better. Accomplished students from economically disadvantaged backgrounds have often distinguished themselves without the benefit of the resources enjoyed by more affluent students. High achievement attained without such resources can suggest that a student possesses an unusual degree of motivation and potential to contribute significantly to our community.

Outreach akin to that described for attracting minority students can be constructive in recruiting economically disadvantaged students: visiting schools outside affluent neighborhoods, cultivating relationships with school officials, attending broad-based college fairs, and enlisting HFAI, UAC and UMRP assistance. Familiarity with the College's policies of need-blind admissions policy and need-based financial aid is also critical.

**Recruiting students from sparse country.** Harvard wishes to draw students from all areas of the country—a challenge in sparsely populated areas. The Student Search List and information gleaned from school officials and local newspapers can help you identify potential candidates. A friendly note or phone call to introduce the candidate from sparse country to Harvard can be an important first step. Alumni/ae might also wish to request HFAI, UAC and UMRP assistance.

## Recruiting Athletes

Organized athletics, intercollegiate and intramural, play an important role at the College. A large number of our students participate in intramural athletics, and many Harvard athletes and teams have in the last several years competed for the highest championships in their sports. Most importantly, however, Harvard strives to provide a meaningful athletic experience for those students who elect to matriculate here—not to develop a program for men and women whose sole interest in the College is athletics. From this premise it follows that athletes on campus should be representative of the College in general—representative in their academic qualifications, their academic and professional interests, and representative in their general performance and participation in the life of the College. Such a policy does not in any way mean that excellence in sports is not or should not be a factor in our admissions policy. Extracurricular excellence of all kinds has been and will continue to be extremely important in selecting students from among a large group of qualified applicants.

Harvard works within the regulations of several intercollegiate athletic organizations: the Ivy League, the Eastern College Athletic Conference (ECAC), and the NCAA. As part of the Ivy League, Harvard does not offer athletic scholarships. All financial aid is based solely on need. NCAA rules are complex and occasionally inconsistent with our philosophy of athletics and, in particular, financial aid. While the College challenges rules inimical to our interests, Harvard makes every effort to live within the spirit of the rules, particularly those concerning recruiting. Due to the evolving nature of athletic regulations, we keep alumni/ae informed with annual "update" mailings regarding rule changes and additions.

Alumni/ae may not have contact with athletes that differs in any way from normal Club contact with non-athletic applicants. One point cannot be stressed enough: any violation of the

· 24 ·

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

HARV00000548

principles, policies, rules, and regulations stated herein and in subsequent mailings invites the most severe penalties for Harvard and our student-athletes. Questions or concerns in this area should be directed to: **William R. Fitzsimmons**, Dean of Admissions and Financial Aid, 86 Brattle Street, Cambridge, MA 02138, 617.495.1557; or to **Robert Scalise**, Director of Athletics, Murr Center, 65 North Harvard Street, Boston, MA 02163; 617.495.2204.

If you are likely to have any contact with athletes, please study the basic rules of Harvard, the NCAA, ECAC, and Ivy Group Institutions and specific regulation changes by carefully reading athletic updates from both the Athletic and Admissions Offices. What follows is a primer on NCAA rules (individual rules appearing in bold type):

**All recruiting of prospective student-athletes must be done by institutional staff members.** You are considered a representative of Harvard's athletic interests as an alumnus/a, friend, or donor. This means that any contact you have with current or prospective student-athletes at Harvard can affect the eligibility of individual student-athletes and teams to compete in NCAA and Ivy competition. A "prospect" is any student who has started classes for ninth grade. This means that recruiting a student who has started classes for the ninth grade is subject to NCAA rules.

**Representatives of an institution's athletic interests are prohibited from having any contact with prospective student-athletes.** You may not have contact with a prospect or his or her parents, on or off campus, in person, by telephone or in writing; however, student-athletes do not have to be treated differently from other applicants in the admissions process. If you are assigned to interview students who are also athletes by your Schools Committee chair, you may contact the student for these purposes only. Schools Committee members may not have contact with prospects whom they are not assigned to interview. If a family friend or neighbor is a "prospect," then you may continue to maintain this relationship; however, you may never have a recruiting conversation.

**Prospective and enrolled student-athletes may not be given extra benefits.** An "extra benefit" includes the provision of any transportation, meals, housing, clothes, service, entertainment, or other benefit not available to all students who are not athletes. Under no circumstances may you provide an individual prospect or enrolled student-athlete these benefits. Teams visiting your area for competition may be provided with meals while on a team trip, but you may never take an individual or small group of athletes or prospects to a restaurant for a meal. However, enrolled student-athletes unable to travel home for holidays may be invited for a meal in your home, but not a restaurant. You may not provide transportation for their trip to your home, and this may be done only infrequently and on special occasions. Make sure you have the Athletic Director's permission before extending an invitation. Prospects' trips to campus must be financed by the Athletic Department under specific guidelines, and invitations for such trips may only be made by coaches. Contact the Athletic Director if you would like to contribute to a fund used for this purpose.

## Recruiting Admitted Students

Schools Committees host receptions in April for all admitted students, and often in December as well for Early Action admits. These informal gatherings, which often include parents, should focus on Harvard and students' and their families' questions and concerns about attending the College. One of the most effective recruiting tools is the conscientious avoidance of even slightly disparaging comments about other colleges. Pressure tactics often backfire. Alumni/ae should call to invite admitted students they interviewed to join them at such gatherings. This second meeting can extend the personal outreach alumni/ae offer that has proven so successful to our recruitment

25

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

HARV00000549

**JA4862**
DX003.0203

efforts. If you cannot attend a reception for admitted students in your area, or if you live in an area that does not host such events, we hope you will nevertheless call and/or write to any students you interviewed who were admitted in order to congratulate them and to offer to provide support during the student's college decision-making process.

26

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

HARV00000550

**JA4863**

DX003.0204

## 4. Interviewing Applicants

The interview is perhaps our most important recruiting tool. In recent years, the Admissions Committee has been able to admit only about one of every seventeen applicants to the College, and so alumni/ae interviewers may be the only personal contact applicants have with the Harvard admissions process. Ensuring that the interview experience is positive, comfortable, and helpful is the cornerstone of the critical personal outreach you, as an alumni/ae interviewer and official admissions representative, provide to applicants.

That applicants feel that they have been treated with respect is another expectation the Admissions Office has of the interview. The Committee also relies on your ability to make recommendations for applicants' admission based on these factors: the criteria outlined in section 2, your own perceptions of the student's "match" with the College, and your assessment of how well he or she has taken advantage of available opportunities. Blessed with so many accomplished applicants—many more that we have room to admit—the Committee often makes fine distinctions among candidates. Many of these decisions hinge on intangible factors that alumni/ae can substantiate with interview reports that breathe life into applicants' folders.

### Scheduling the Interview

**Receiving assignments.** To expedite interview assignments, you will receive basic information about each applicant you are to interview: name, address, telephone number, high school. Chairs assign interviews based on interviewer availability and accessibility, among other pragmatic factors. You and your chair should talk about your availability—e.g., in what areas you would prefer to interview applicants, when, and how many—before you commit to Schools Committee work. While the Admissions Committee appreciates the effort it takes to interview even a single applicant, we believe alumni/ae offer more valuable individual assessments by interviewing at least four to six applicants each year. Interviewing several applicants can expand your perspective of individual candidates, the applicant pool, and the admissions process.

**Matching applicants with interviewers.** The Admissions Committee does not recommend a conscious policy of matching interviewers and applicants—by ethnicity, academic or extracurricular interest, or any other factor. Some applicants have reported that they felt they were being "specially screened" by meeting with an alumnus/a of similar ethnicity, for example, and that their racial identity was under scrutiny more than their academic achievements, extracurricular passions, and personal qualities. "Matches" will of course occur in the normal process of assigning interviews, and such assignments should proceed.

**Contacting the applicant.** *Please call the applicant yourself.* We realize that our alumni/ae are often busy and make time for interviewing among many important commitments. Sometimes, for these reasons, alumni/ae have a surrogate contact students. Yet students who describe their interviews as constructive cite the personal interest alumni/ae took in them. *A friendly, casual, and personal phone call can be the first step to a positive interview experience.* Be sure the student has your name and contact information in case there is a change. At the end of the call, slowly repeat your name and the best way to reach you.

While contacting a student via email can be useful, often the logistics can be ironed out more easily in one brief conversation. Be sure to check your email frequently if you do reach out via email, as your message might get misdirected to an applicant's junk folder; follow up with a phone

27

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

HARV00000551

**JA4864**
DX003.0205

call if you do not receive a timely response. No need to persist if two emails and two calls do not produce a response, though please note your effort on the interview form and submit online.

Be clear about family involvement. Families are often eager to play a role in their children's interviews. For instance, many parents will want to arrange the details of the interview with you. *The Committee prefers that you set up your interviews directly with students.* Students—not parents—will be negotiating the day-to-day details of college. Students are often surprised when their parents schedule an interview without consultation. If you have no other option than to schedule the interview with parents, ask them to have the applicant call to confirm the details of your meeting. Parents might also accompany children to interviews. While you should indicate to applicants that their parents are welcome to ask questions after you complete the interview, ensure that parents know not to join you in the interview.

You may also need to reassure parents who are suspicious about the time and the place of the interview. For instance, the Admissions Office receives calls from concerned parents wondering why an alumnus/a has called their daughter to come to his/her apartment in the early evening for a personal interview – please continue to use your good judgment in arranging the time and place for the interview. If a candidate or their parent(s) wish to confirm your affiliation with Harvard, encourage them to call our office (617-495-1551) and we will be happy to do so.

**Selecting setting and time.** When scheduling an interview with an applicant, negotiate a time that is mutually convenient and a place most free of distractions - typically a public place that is quiet, safe, and mutually convenient, like the public library or a quiet coffee shop. Please ask whether a student has adequate transportation to and from the interview. This can affect your arrangements dramatically. While it is generous to offer to provide transportation to an applicant to and from the interview location, we would advise against this arrangement. Instead, give the applicant the opportunity to suggest a location.

Ideally, you should examine your calendar and select those days and times you know you will be available to conduct an interview. Then, on the telephone, you can give the student several options; be sure to ask what is best for them, as well. Generally, the Admissions Committee does not recommend scheduling an interview that will occur during school hours or last beyond 9 p.m. Let the applicant know you plan to spend no more than 60 minutes in a single meeting with them.

If you and the applicant have significant difficulty agreeing to a time and place, it is probably best to have your Schools Committee chair re-assign the interview. Some alumni/ae have thought scheduling complications biased them against a candidate, and others worried that—even if they were not bothered by scheduling difficulties—the student might perceive such bias.

The Committee knows that alumni/ae can, and have, successfully interviewed students in a variety of settings. The candidate will want to make the best impression possible and the interviewer should help provide the setting for him/her to shine. Please be sensitive to the perceptions of "being alone" in a stranger's home (i.e. the interviewer's home); any of the candidate's concerns should be addressed at the time of the initial contact, and any worries put to rest. **That said, we encourage interviewers to conduct interviews in a public place that is quiet, safe, and mutually convenient.**

Of course, adhering to local norms and social customs in your area should be considered and you know best what these might be. While a "Starbucks" locale may serve to be an easy choice in certain areas of the country, this setting could be less than ideal in others. Again, we value your good judgment in your interviews and have every confidence that you will display the same in advance of arranging the interview. Alumni/ae should be aware, however, of the possible drawbacks of holding interviews in particular locations, especially with regard to interviewing in an interviewer's home.

28

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

HARV00000552

**JA4865**

DX003.0206

**Interviewing on "neutral ground."** Some alumni/ae interview on "neutral ground," e.g. the applicant's school or the local public library. This approach usually minimizes transportation complications and appeals to alumni/ae who live with their parents and have small children. Should you wish to interview a student at school, do not schedule your interview at a time that interrupts the student's class schedule or that requires the student to be at school at an unreasonable time. If an applicant is amenable to meeting you at school, call the guidance department to reserve a quiet place to talk. Remember, school policies about the visitation of college representatives vary.

Some Schools Committees arrange for several alumni/ae to interview students one-on-one at a local school on a Saturday morning. With sufficient notice, a school will open the building and reserve two rooms for as many interviews as will be taking place at one time, with an additional room reserved for parents and the second round of applicants. Alumni/ae often add certain amenities (e.g., coffee, juice, donuts) for parents and applicants in the waiting room.

**Interviewing in your home.** Some alumni/ae invite students to interview in their homes, a practice the Admissions Office has increasingly come to discourage. <u>Please note that some students and parents may express discomfort at the prospect of being interviewed in the home of someone they do not know.</u> In fact, some high school guidance counselors explicitly instruct their students to reject offers to meet alumni in their homes. In these cases you should happily suggest an alternative meeting location on neutral ground.

**The Admissions Office suggests that interviewers select locations other than their own homes for interviews when possible.** However, we acknowledge that sometimes it is helpful or necessary to arrange interviews at the interviewer's home, and under these circumstances, it is important to bear in mind several important considerations. Be aware that interviewing in your home may present travel complications. If you do interview a student in your home and send away parents after they have dropped the student off, he or she might nervously watch the clock to make sure parents are not freezing at the curb as they wait for the interview to end. The spouses of some alumni/ae have been incredibly accommodating by entertaining parents over coffee while their children are being interviewed. The Admissions Committee appreciates, but does not expect, such graciousness. We suggest instead that you tell parents to return in forty-five minutes. Beyond considering possible transportation complications, please be aware that a grand house might seem so impressive to a student as to be intimidating. Be conscious, too, of possible distractions, such as the telephone and young children.

**Interviewing in your office.** Many alumni/ae interview applicants at work. But like a beautiful house, the boardroom of a major corporation or firm can be intimidating. Keep distractions at a minimum by letting colleagues know you will not be available for the duration of your interview. Hold your calls or have them directed to your voice mail.

**Interviewing in a local restaurant or coffee shop.** Some alumni/ae interview applicants in these settings, which is fine assuming the applicant agrees. The alumni/ae interview can make many applicants self-conscious, so be aware that some applicants are more self-conscious if they are aware that strangers—and their alumni/ae interviewers—are scrutinizing them.

We do not recommend interviewing students in their own homes. Some students interviewed in their own homes have reported they have felt as if their "family was on trial." Interviewing students at their homes also diminishes the control you would otherwise have over time and possible distractions. In the case of one alumnus who interviewed an applicant in her home, the applicant's mother stayed through most of the meeting and became so involved in conversation that she asked her daughter to answer a ringing phone.

**What applicants should wear to an interview.** Your initial conversation should touch on other issues of protocol and logistics. If applicants ask you what to wear, tell them the Admissions

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

HARV00000553

**JA4866**

DX003.0207

Committee has no policy about how students should dress for interviews, but that we hope applicants wear whatever will help them feel comfortable.

**On asking applicants to bring résumés and other materials.** Some alumni/ae interviewers ask students to bring copies of their extracurricular resumes to the interview. Others give students pre-interview surveys. These materials can be valuable because they yield obvious talking points. But we hope these materials will not be too detailed or burdensome to applicants. Surveys can seem to be redundant forms among so many others over which students have already labored. Students have also reported that it was unclear how the alumnus/a would use the survey or resume. Interviewers should acknowledge and confirm with students that providing a resume or a survey is voluntary and by no means a required part of the admissions process.

**Staffing the interview.** Never interview more than one applicant at a time. One-on-one interviewing is most effective. A single interviewer can direct an interview's course and content more efficiently than a panel of interviewers can. Some Schools Committees, however, successfully have pairs of interviewers assess a single applicant. There are two common multiple-interviewer formats. A group of alumni/ae can simultaneously interview a single applicant or an applicant can interview separately with two alumni/ae in a single morning or evening.

The multiple-interviewer format can offer certain advantages. Post-interview discussions allow alumni/ae of different preferences and temperaments to check their biases when evaluating individual applicants, and these discussions help the alumnus/a writing the interview report to provide a more broadly sympathetic view of the candidate. New Schools Committee members might wish to join a veteran interviewer to develop perspective on the interviewing process. Finally, Schools Committees with a surfeit of interviewers can accommodate the interest of a greater share of their membership by assigning an interview to a group of two or three alumni/ae.

There are pitfalls, too. Being interviewed by more than one person at a time can intimidate students. You must take particular care to set the candidate at ease to prevent the group interview from resembling a polite grilling. The format can also prove a difficult juggling act for interviewers. Interviewers must settle among themselves before the interview begins who will ask which questions when—orchestrations with which single interviewers need not contend. Please consider, too, the efficiency of the multiple-interviewer format for your Committee. Schools Committees with small active memberships might not be able to afford the time it takes two alumni/ae to interview a single candidate.

Whatever approach your Schools Committee adopts, let the applicant know the interview format in advance, and explain why you have chosen it. Each alumnus/a joining the interview should then introduce himself or herself to the applicant at the start of the interview.

## Conducting the Interview

**Length.** Let the applicant know you plan to spend no more than 60 minutes in a single meeting with them—no matter which interview format your Schools Committee uses. A single meeting, for this length of time, offers sufficient opportunity for you to form an impression of the applicant.

**Explaining the purpose of the personal interview.** Your first priority upon starting an interview should be to set the applicant at ease. Sitting face-to-face with an applicant rather than allowing your desk or a large table to fill the space between you are ways you can help the student feel more comfortable.

30

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

HARV00000554

**JA4867**

Beginning an interview with a short introduction about your role in the admissions process can also relax the applicant. You should tell applicants that, as an interviewer, you work closely with the Admissions Office. Add that although the Admissions Office is interested in your written evaluation—which becomes part of a student's file—it will be read in the context of all the other application components: grades, test scores, extracurricular participation, personal essays, and counselor and teacher recommendations. Many alumni/ae then reveal how little they know about the applicant, and that they do not have access to applications. Students will be less likely, then, to assume you know everything about them, and this can encourage them to talk about themselves more freely. You should also encourage the student to ask you questions about anything pertinent to the College, the admissions process, and even your own experiences as a student here.

**Note-taking**. Note-taking can help you recall details about your conversation that will prove valuable in composing an interview report. Approaches to note-taking vary. Some alumni/ae do not write anything down that they would not want applicants to see. Others record more evaluative comments and even quotations. Still others place a pad and paper in the open, but spend the first three-fourths of an interview talking with an applicant and not taking notes. Then, telling applicants they wish to record some basic data, they ask applicants to review their current course work or their extracurricular activities.

Note-taking, however, can prove distracting to an applicant. Asking for academic credentials can put a candidate on the defensive. Asking about test scores and grades first also puts undue emphasis on "the numbers game." **Remember that your objective is not to find out all the facts – the application will disclose them.** Again, the particular value of the alumni/ae interview is the personal outreach it offers applicants and the personal dimension interview reports add to applicants' folders. Never record interviews.

**Asking applicants for academic credentials**. It is never necessary to request academic credentials from students if an interviewer prefers not to do so. However, there can be compelling reasons to ask every applicant about his or her grades and scores. Your approach in asking for this information can help put candidates at ease and reassure them that grades and standardized test scores are by no means the only things the Admissions Committee considers in evaluating applications. Many interviewers ask for this information near the end of the interview in a casual tone: "So I can make sure that the Admissions Committee has all the information it needs in your file, may I ask for your test scores and grade information?" Others ask for the information at the beginning of the interview and place those notes out of sight, moving quickly into a discussion of other things. You are prohibited, however, from contacting the high school for this information. The information must be shared voluntarily by the applicant during the interview. If he or she declines, then please use your best estimate to rank the applicant in the academic category.

**Questions to structure your conversation**. Your conversation should center on an applicant's interests, not yours. Most interviewers begin interviews with questions about simple, factual matters that are easy for applicants to answer:

- Describe your school community.
- What courses are you taking?
- Which courses do you enjoy? Why?
- Which do you least enjoy? Why?
- In which activities are you involved? Why? Which do you most enjoy? Why?
- What are the important activities in your school? Why?
- What do you do in the summer?

31

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

HARV00000555

**JA4868**

DX003.0209

- Do you have a favorite book? Or, which book have you recently read? Do you prefer reading online? What blogs or sites do you read regularly?

These questions can help you structure the interview and allow the student to volunteer information that will help you assess them. These questions can also help you pinpoint ideas, activities, and passions that are of interest to the candidate, which might lead to more specific discussion about those interests.

As you talk about something of importance to the candidate, your questions should point toward discovering motivation, commitment, and level and quality of contribution. Your questions should be open-ended to encourage candidates to provide their own insights and reflections about their experiences. If a student provides merely factual answers, you might wish to draw him or her out by asking, "Why?", "How did you happen to do that?", "Was the result what you expected?" When you talk about an idea or an intellectual concept in a book, play, current event, or research project, encourage the candidate to develop the idea.

**Be a supportive listener.** Regard a candidate's thoughts and feelings with respect and try to appreciate each individual's unique qualities. Hear what is being said and how it is being said, but be wary of trying to guess what is not being said and supplying motive or unsupported insights. It is better to report factually what an applicant said rather than to characterize what they have said. To write, "The applicant never said more than three words at a time, and she looked down at her hands almost the entire time" is more effective and less open to interpretation than, "He was nervous and I think he would be out of place at Harvard."

**Avoid prolonged discussions of political and personal issues.** Interviewers are not usually judgmental about the content of an applicant's political opinions or family situation. They use the interaction to gauge whether the student's ideas are original and well-reasoned or simply parroted from elsewhere. Conversations about family problems can also be cited to provide evidence of a student's maturity and ability to deal with adversity. The information reported can, in fact, be used to boost a student's chance for admission.

Yet students report that prolonged discussions of difficult or sensitive subjects can ruin an interview. Such conversations include probing for opinions on political topics (e.g., welfare, crime, drugs, abortion, capital punishment) or personal issues (e.g., religion, sexuality, family finances, family illness, details of parental relationships and divorces). Students' reflections on these topics can reveal the degree to which they are aware of the world around them, and can yield insights about an applicant's background or personality. But discussing such matters, particularly at length, can reasonably be construed as an invasion of privacy.

**Be wary of asking, "To which schools are you applying?"** Alumni/ae often wish to know what characteristics students seek in a college to measure how well they know and are a match for Harvard. The best way to start this conversation is to ask, "What are you looking for in a college?" rather than, "To which schools are you applying?"

Some colleges make admissions decisions contingent in part on students' perceived commitment to their school. This is not the case at Harvard. Because some students believe they could jeopardize their chances of admission to the College by discussing other schools, the Admissions Committee strongly recommends that your discussions about students' interests in other colleges focus on general characteristics rather than proper names.

**Do not ask, "Is Harvard your first choice?"** The Admissions Committee strongly recommends against asking a student whether Harvard is his or her first choice. The Committee regards a student's application to the College as the most important interest an applicant can express in Harvard. This question puts most applicants in the position of saying Harvard is their first

32

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

HARV00000556

**JA4869**

DX003.0210

choice—perhaps in spite of their actual preferences—out of fear that they might jeopardize their chances of admission by telling you that they might not ultimately make the same decision you did.

**Questions you should ask yourself as you conduct an interview.** It can help you write a valuable interview report if you evaluate students' comments as you interview them by asking yourself these questions:

- Does the candidate have potential?
- Has the candidate reached her maximum growth?
- Has the candidate been stretching himself?
- Has the candidate been working to capacity? In her full-time or part-time employment? In his academic pursuits? In other areas?
- Does the candidate have reserve power to do more?
- How has the candidate used her time?
- Does the candidate have initiative? Is he a self-starter? What motivates her?
- Does the candidate care deeply about anything—intellectual? Personal?
- Is the candidate more concerned about intellectual subjects? Human subjects?
- What has the candidate learned from his interests? What has she done with her interests? How has he achieved results? With what success or failure? Has she learned anything as a result?
- Will the candidate be able to stand up to the pressures and freedoms of Harvard?
- What qualities, strengths, or weaknesses differentiate this candidate from others?
- What choices has the candidate made for himself? Why?
- What is the candidate's intellectual capacity? What has she done with it?
- What is the candidate's personal capacity? What has he done with it?
- What is the candidate's Harvard motivation? Why and how did she pick Harvard? What effort has the candidate made to inform himself about Harvard?
- Is the candidate a late bloomer?
- What is the quality of the candidate's activities?
- Does the candidate have a direction yet? What is it? If not, is she exploring many things? Or is he just letting everything happen to him? Where will the candidate be in one year? Five years? Twenty-five years? Will she contribute something, somewhere, somehow?
- What sort of human being is the candidate now? What sort of human being will she be in the future?
- Will the candidate contribute something to Harvard and to his classmates? Will she benefit from her Harvard experience?
- Would you or other students want to room with this applicant, share a meal, be in a seminar together, be teammates, or collaborate in a closely knit extracurricular group?

**Questions applicants frequently ask interviewers.** Students often ask very specific questions for which you should be prepared either to speak from your own experiences or, if you do not know how to answer their questions, to say so. These are two of the most frequently asked questions:

**"What's Harvard really like?"** This question probably has as many answers as there have been Harvard students. Remind students that you can only provide one perspective of life at Harvard—your own. Sometimes, this question masks other curiosities, many of them about whether Harvard myths are true. Are there a lot of students at Harvard who attended private secondary

33

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

HARV00000557

schools? (Two-thirds of Harvard students attended public secondary schools.) Do you have to be rich to go to Harvard? Is Harvard competitive? Will I be able to do well academically and participate in extracurricular activities? These questions should emphasize how important it is for you to be well informed about the current dynamics of the Harvard experience.

**"What are my chances for admission?"** Students often ask for your assessment of their chances of admission during the course of their interviews. Although the previous section addresses this question, it is worth repeating here. It is very important not to create any impressions or expectations, **positive or negative**, about the student's probability of admission. Even if you think he or she is under-qualified, it is not your place to make suggestions about their college applications. Though well intentioned, it is inappropriate for the interview setting. After all, admissions officers often parry this question by saying, honestly, that they cannot guess at a student's chances until they have read a completed application and can assess the year's competition. And this analysis can only be accomplished with full access to all the material in an applicant's file and through the extensive discussions shared and comparisons made through the Committee process.

## Writing the Interview Report

Your goal in writing a personal interview report should be to help the Committee see the applicant as a human being and to determine whether or not the student has the important intangible strengths that might distinguish him or her in the admissions process and, if admitted, at the College. Here are some pointers:

**Showing is better than telling.** The conclusions expressed by an interviewer can have greater value when the reasons and basis for them are explained in the interview report—with examples proving your points. Try to supply kinds of information that would otherwise be missing from the folder. Comment on the quality of an applicant's interests and commitments to differentiate a particular candidate from the applicant pool.

**Cite only facts that are important to the candidate or that support your judgments.** Assume the candidate has provided general factual background in her application. This allows the best interpretation of the interview report, particularly since the reader will not always know you and be able to accept automatically your conclusions. The interview report should be more than a recitation of activities or the assertion of a conclusion.

**Comment on the quality of a student's experiences with evidence proving the point.** While the combined evidence of the school record, counselor and teacher reports, and results of standardized tests and AP and IB examinations permit the most complete assessment of academic ability, discussions of the content of a candidate's school work, the way it is accomplished, and the pattern and depth of his or her outside reading can yield helpful information. For example, if a student is interested in science, information about long hours spent working in a hospital emergency ward or building a computer can distinguish the quality of an applicant's interest. Does the student participate in athletics? If so, perhaps you can give us local context to help us assess her prowess and potential to play here. Although we defer to the judgment of Harvard coaches when considering a student's athletic ability, information provided in interview reports can help us alert coaches to students they might have overlooked. If he is a performing artist, do you know about the caliber of the groups with which he performs or exhibits his work? Is it unusual for a student from his high school to participate in the arts (because, for example, sports are the dominant extracurricular activity, or the school lacks serious clubs for students interested in the arts)?

34

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

HARV00000558

For students to whom you are giving your support, **approach writing the report as an opportunity to "make a case" for the candidate.** Why should this particular applicant come here? What special contribution might this student make or how might he benefit from the Harvard experience?

**Write candidly.** Interview reports sometimes telegraph impressions out of fear either of quashing a student's chances or of appearing too enthusiastic about them. We hope you consider the global nature of the Committee's assessments; we seek consistency throughout all the materials in a student's folder. By itself, one blemish or even one exceptional quality or credential will neither demand nor prevent admission. In many instances, the interview confirms other evidence in the applicant's file, and it can certainly make a difference in the ultimate decision. Balance this advice with the following note.

**Consider your potential audiences as you write.** Any number of individuals on the Admissions Committee might read your reports—faculty, admissions staff, and other members of our community. Admitted applicants who enroll at Harvard may read their application files through the Family Education Rights and Privacy Act. (Students occasionally do exercise this right.) Be professional in writing about a candidate's strengths and weaknesses. Avoid slang and comments that could be interpreted as derisive.

*An open-minded interviewer, a perceptive judge of people, someone who is aware of the limitations of judging a person on what can be seen in a 60-minute conversation but who is also able to report frankly on what was seen and whether it should strengthen or weaken a student's application is of inestimable value.*

**Length.** Each report should include a summary and indicate whether you feel the student should be admitted or not, and why. Reports should be as brief as possible, but not at the expense of providing helpful information and judgments. Do not feel pressured to polish the prose of a report on a candidate with whom you have not been very impressed. We are far more concerned with the content of the report—and your judgments—than the report's style.

**Be aware of, and suspect, your own biases.** Since no one can really be "objective" in attempting to evaluate another person, be aware of your biases. It is easy to feel that a student who shares your values and enthusiasms is a very strong applicant—or that one whose view of the world is greatly at odds with yours is confused. The good interviewer makes allowances for this, appreciates a point of view on its own merits, and evaluates the interview accordingly. Sometimes interviewers call attention to their own preferences: "This is not the sort of person I most enjoy, but... ," or "I probably favor the student who has had to work hard...." This approach can help the reader interpret the interview report more accurately.

**Numerical ratings.** The Committee does not expect to achieve anything approaching national consistency with the use of numerical ratings, so we use them in the most general way to show whether an interview was favorable or unfavorable. In any case, the Admissions Committee relies more heavily on your prose. Keep in mind that we have recently changed how we ask you to assess candidates. Consider the ranges for all criteria. Interviewers sometimes comment that we do not pay enough attention to their write-ups and numerical ratings. The credibility of your ratings depends on your use of the numerical range when you interview applicants. **You diminish the impact of your support if, for instance, you rate everyone a "1" or "2+" across all categories.**

35

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

**JA4872**
DX003.0213

## Sending Your Reports to Cambridge and to Your Chair

After the results of a spring 2008 web use survey were tallied, numerous requests pointed to enhancing web services available to chairs and interviewers. Suggestions included creating an online submission form, stabilizing website availability, allowing chairs to assign interviews online and creating club management tools for chairs. Responding to your requests, we launched a newly designed web portal in the fall of 2008 and have revised and reorganized it substantially the past two admissions seasons.

Even before you begin submitting interview reports, please feel free to login using your current access code (PIN) and become familiar with the site, download updated information about the College, and generally become familiar with navigating the site. If you don't remember your access code, please use the "Forget your Access Code?" link on the login page in order to have the code sent to your email address on record. As you navigate the site you can be assured that you cannot break anything or accidentally delete yourself!

Please find the site here:

https://admapp.admissions.fas.harvard.edu/hanevo/alumni/haServices.do

Please begin by reviewing your profile and editing your contact information accordingly. We encourage you to use your "post.harvard.edu" address, as this will remain constant even if you decide to forward your mail to a different account. As always, if you have any questions or concerns, please feel free to contact the admissions officer assigned to your region with questions or to provide feedback.

Whenever possible, you should use the online version of the interview report form. If that is not possible, please keep a copy of your report for your records, send a second to your Schools Committee chair, and send a third copy to the Admissions Office. Sending a copy to your Schools Committee chair alerts him or her that you did the interview and enables him or her to give us a copy of the report should we misplace it and not be able to reach you in a timely fashion. We also have several fax lines by which you can send us reports (see Documents and Forms on the website). Finally, you can send reports by mail and priority mail to the Harvard College, Office of Admissions and Financial Aid, 86 Brattle Street, Cambridge, MA 02138. If you choose to file on-line, email, or fax your reports, please remember you do not need to snail-mail them as well. If for some reason they are lost or never arrive, your area representative will contact you.

## Ranking Meetings

After completing all interviews, some Schools Committees hold ranking meetings to compare candidates. These meetings can approximate the Committee process in Cambridge. If the Schools Committee applies roughly the same standard of selectivity as the Admissions Committee, alumni/ae can better understand the strengths necessary for candidates to distinguish themselves in the admissions process. Alumni/ae also have the opportunity to temper their own judgments of candidates when they hear how other alumni/ae have evaluated other candidates.

Candidate rankings are valuable to us for the input they provide and to Schools Committee members for the information they share. Any Schools Committee member who has had a greater-than-usual share of either strong or weak applicants for the year can also put his or her own

36

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

HARV00000560

interviewees in perspective and understand better the decisions made in Cambridge. Ranking meetings also provide valuable exposure for new interviewers.

There are some caveats to consider before initiating a ranking meeting. They require considerable time and effort. Recommendations from ranking meetings are most valuable if every applicant from a given area is interviewed, if all interviewers have the opportunity to introduce any candidate for the Schools Committee's consideration, and if all of this work can be completed before the area person enters subcommittee meetings in Cambridge. Please keep in mind, too, that recommendations Schools Committees make for candidates after a 60-minute interview and ranking meeting discussions are additional elements—but not substantially determinative ones—that the Committee weighs in the context of all other information in an applicant's file.

### Transfer Interviewing

We may ask you to interview transfer applicants after the freshman admissions season ends. We understand these interview requests come when people are both busy and exhausted from finishing the admissions process for the new class. But, unlike interviewing for freshman admission, alumni/ae see only pre-screened candidates. Keep in mind that a typical transfer applicant's extracurricular activities are slightly less important than her academic focus and fit with the Harvard curriculum. Since we have less personal information about these students than we have for freshmen, conveying a sense of the person in an interview report is especially critical. Will the student be happy here? How well do you think they will make the transition—academically, socially—from their current schools to Harvard?

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

HARV00000561

**JA4874**
DX003.0215

## 5. Sample Interview Reports

### Marcus

**Academic (2-)**
*Magna potential. Excellent grades and mid to high-700 SAT scores (33+ ACT).*

Marcus is a top-flight candidate for Harvard. We spent about an hour talking, and I was able to learn quite a bit about this outstanding young man. He is clearly a leader both in the classroom and out. Marcus is very interested in becoming a doctor and has worked hard to achieve a 3.5 grade point average. He has also taken his college tests and has mid-650s on all. Because of his interest in medicine, Marcus did volunteer work in a hospital this summer. We talked for a while about the pre-med program at Harvard.

**Extracurricular, Athletic, Community, Employment, Family Commitments (2)**
*Substantial school-wide, regional or state recognition; major contribution/leadership.*

Extracurricularly, Marcus is a strong high school contributor who could add a good deal at college as well. He has played the clarinet in the school band for three years, takes part in the public service club, and has rowed on the varsity squad for two years as well.

**Personal Qualities (1)**
*Rare personal qualities and appeal.*

Fine young man. Very enjoyable conversation.

**Overall (1)**
*Absolutely superior for admissions; truly unusual in the entire applicant pool*

With this combination of academics and extracurriculars I can't imagine that we could do better. Please hurry and accept this fine young man. He'll make a wonderful alumnus! If you need more information, don't hesitate to call me at the numbers listed below.

---

**Comments:**

The interviewer makes pronouncements without substantiating them. Where is the evidence that Marcus is "a leader both in the classroom and out" or that he is "a strong high school contributor"? What did he do when he volunteered in the hospital? How significant is his contribution to extracurricular activities? Why has he had to work hard to achieve a 3.5 GPA? Is he taking a rigorous academic program? Does he show any signs of intellectual curiosity?

The ratings seem inflated by at least a full number, and far from being a "clear admit," Marcus does not appear to be a particularly strong candidate, based on the information we have here. If there is stronger evidence for Marcus' admission, it should be included in the report itself, not offered to be made available over the phone. The interviewer seems unaware of the competitiveness of our selection process or the strength of our applicant pool.

---

38

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

## JA4875
DX003.0216

### Daniel

**Academic (2)**
*Magna potential. Excellent grades and mid to high-700 SAT scores (33+ ACT).*

Daniel articulates his thoughts and reasoning well, and told me that he's "in the top 5 percent" of his 70-member class at City Prep. His scores, as you know, are almost perfect across the board. He enjoys science (particularly chemistry, "because I love taking a law or technique and applying it to new units and in labs"), English, and history. Although not certain about a career, he is leaning toward medicine. He said he enjoys English but did not seem particularly interested in discussing literature (a particular interest of mine given that I am an English professor), but after talking with him more he came to the conclusion that what really intrigues him about his English classes is the art of composition, rhetoric, and argument. I could tell from the way he speaks that he puts considerable thought into the ideas he puts forth (though he never sounded labored or took large pauses to compose thoughts), so this interest in composition sounds spot-on.

**Extracurricular, Athletic, Community, Employment, Family Commitments (2-)**
*Substantial school-wide, regional or state recognition major contribution/leadership.*

Daniel's mother teaches in one of the inner-city public high schools, and she is the one Daniel credits for his "sense of duty" to others. He is very active and interested in community service, asked many questions about PBH, and promises that he will lead a Boy Scout troop wherever he ultimately attends college. From his questions and the way he described his involvement, I got the sense that his efforts were real and inspired; he's not merely showing up for a few hours one Saturday a semester to fulfill his school's service requirement (my sons went to City Prep, so I'm quite familiar with their service requirement and most students' perfunctory approach to completing it).

Community service is his major interest outside the classroom, followed by Model UN, editing the school paper, and volunteering summers and time during the school year to sundry activities. Daniel is also an Eagle Scout. When I commented that it is unusual to encounter someone his age still involved in scouting, he said there were only four other peers involved and that he feels "duty-bound" to continue his commitment.

**Personal Qualities (3+)**
*Above average personal quality and appeal*

Daniel is more articulate than most young people I have interviewed, and it sounds as if he has had substantial public speaking opportunities through scouting and his work with the Model UN. When we started speaking about the resolutions Daniel had to debate at some simulations, he finally started speaking in a little more animated fashion. For instance, Daniel expressed some emotion when describing his assignment, as a representative from Ireland, to defend a position shared only by the Vatican, whose representative eventually abandoned centuries of church tradition to leave Ireland alone contra contraception. Nevertheless, he soldiered on, though not convincing many others.

39

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

HARV00000563

**JA4876**
DX003.0217

Daniel is very interested in sports, but his involvement has been limited as a result of a torn ACL. Daniel brought a copy of the school paper and some other writing he has done. Through this deed and in many words, too, Daniel seemed a bit aggressive in enumerating his accomplishments. In the course of the interview, however, it came out that a Harvard alumnus at City Prep coached his sales technique. His "real" personality seemed more in evidence when he asked questions such as, "Do I have a chance to get in to Harvard even though I've never invented anything or won the world chess championship?" And he spoke with general admiration and affection for his mother's work and his commitment to Scouting. I enjoyed speaking with Daniel, especially after he became more relaxed.

### Overall (2-)
*Clear admit—one to recruit*

Daniel, with his abundant ambition, would have no problem fitting it at Harvard, but he is still a bit of an awkward fellow. He is obviously competent in getting things done, articulate, and motivated. He would do well in a large research university.

---

**Comments:**

Two factors distinguish this report as particularly helpful. First, the interviewer cites Daniel's activities to substantiate the interviewer's qualitative comments and to justify the extracurricular rating awarded to Daniel. Contrast this with a report that merely lists activities and makes broad conclusions: "Daniel is the strongest applicant for Harvard College I have ever interviewed."

Second, the interviewer quotes Daniel directly or paraphrases specific exchanges to justify her assessment of the quality of his extracurricular participation and his personal qualities. This does not make this interviewer's perspective infallible or doom Daniel's chances for admission, but this report conveys clearly the basis of the interviewer's judgments. The overall rating might be a bit generous, but Daniel sounds like a candidate who will receive serious consideration during our deliberations. This interview report will add an important dimension to those discussions.

---

40

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

**JA4877**

## Evelyn

**Academic (1)**

*Summa potential. Genuine scholar; near-perfect grades and test scores (in most cases) combined with evidence of original scholarship*

Evelyn is the editor-in-chief of her school's literature magazine and enjoys writing poetry. She is also an officer in her school's science league team, which has won the Gray's Anatomy contest in cardiovascular science competition for the last 3 years. She is excited about trying to win the fourth straight competition soon. She also is in her school's Chemistry Charter Club, which teaches seminars for younger students.

I liked her methodical approach to her future intellectual pursuits. She is looking for an interdisciplinary experience in school and her career and is currently most interested in Environmental Science and Public Policy.

She's really very close to "truly unusual" in intellectual curiosity and originality, which is why I gave her a 1 academic rating.

**Extracurricular, Athletic, Community, Employment, Family Commitments (2+)**

*Substantial school-wide, regional or state recognition; major contribution/leadership*

What I really like about Evelyn was that she has a handful of interests outside of school and has focused in on those for which she has a true passion.

She has been swimming competitively for many years and is on her high school's varsity team, primarily now doing individual medleys and the backstroke. Her team is apparently very competitive regionally. She also volunteers as a swimming coach for an 8U team on weekends and during the summer.

She has several officer positions in extracurricular clubs and activities. She is the editor-in-chief of her school literary magazine and enjoys writing poetry. She is president of the Environment Club. She is an officer of her school Science League team, which has won several competitions (see Academic). She is also an officer for Interact, a community service club that does fundraisers and volunteers at shelters and retirement homes. She is also an officer in her school's Chemistry Charter Club, which teaches younger students.

Evelyn has also traveled to some interesting places, including her parents' countries of origin, China and Romania, as well as Israel and Greece. She has enjoyed those experiences and feels that they have positively influenced her thinking and approach to different types of people.

**Personal Qualities (1)**

*Rare personal appeal and character*

Evelyn ranks very high in all of the example characteristics listed above. She has a unique blend of poise, confidence, sincerity, and humility in her demeanor. She is thoughtful and expresses her ideas very clearly. More than most students her age, she was able to engage in a two-way discussion on a wide variety of topics; she was very interesting to speak with. I enjoyed the time speaking with her and am completely convinced that she will contribute greatly to her college, both in the classroom and through her extracurricular involvement and social interactions.

41

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

HARV00000565

**JA4878**
DX003.0219

**Overall (2+)**
*Clear admit; one to recruit*

While I hold the ranking of 1 for a once in a lifetime type of candidate, I must say that Evelyn was probably the best candidate for Harvard that I have met in about 8 years of interviewing. She might not be the absolute best in any given candidate, but I really liked how well rounded she is and how much she has to offer in every regard.

**Additional Comments**

Evelyn visited Harvard's campus and sat in on some classes. She was enthusiastic when telling me about one of the classes. She also has thought carefully about what she is looking for in a school, including the scholastic, community, geographical, and social aspects. When she says that she is looking for a diverse group of students and experiences, I don't think she's memorized it from the Harvard brochure—I think she is truly looking for and ready for what Harvard has to offer. She will be an asset if accepted for admission.

---

**Comments:**

Although the interviewer's academic and extracurricular ratings for Evelyn seem a bit inflated given the accomplishments cited in the report, the thrust of this report is clear: Evelyn is bright, engaged, and engaging, and her interviewer recommends her highly for admission. It would have been helpful to read a few quotes from Evelyn—those things she said that led the interviewer to write, "She is thoughtful and expresses her ideas clearly." What were some of the many topics about which Evelyn could engage in a two-way conversation? What did she say that made her seem especially intellectually curious?

It is helpful to know that Evelyn is the best candidate for Harvard that the interviewer has seen in eight years; it would be even more helpful to know approximately how many candidates the interviewer has seen over this eight-year period (Ten? Forty?).

---

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

HARV00000566

**JA4879**
DX003.0220

Melanie

**Academic (2)**
*Excellent grades and low to mid 700 scores*

**Extracurricular, Athletic, Community, Employment, Family Commitments (3)**
*Above average activity or participation*

Melanie is involved in a number of sports. She herself admits that she is not great at these sports but she likes being active.

**Personal Qualities (3)**
*Above average appeal and character*

Melanie seemed to be interested in a lot of different things but not one or two things in particular. She told me she's very independent, wants to see new places and experience different things. She seems quite mature.

**Overall (3)**
*Strong candidate*

I don't feel there was anything that really stood out for Melanie. It's difficult to write a strong review for her. She is definitely a smart young lady but I don't feel that she necessarily stands out relative to other candidates I have interviewed in the past.

---

**Comments:**

Not every interview report will advocate for a candidate's admission, so it is not the interviewer's lack of support for Melanie's case that gives pause to the admissions officer reading this write-up. Rather, it is the lack of any narrative comment about Melanie's academic rating and the seemingly cursory treatment of her extracurricular involvement that stand out.

It may be the case that the only activity Melanie is involved in is her sports, but this report does not make that clear. Did Melanie mention any other commitments (family, school, or otherwise) or interests that occupy her time? Did the interviewer ask about other involvements? Later in the report the interviewer notes, "Melanie seemed to be interested in a lot of different things but not one or two things in particular," which seems to indicate that Melanie expressed other interests besides sports. To be a competitive candidate for Harvard, a student need not focus exclusively on one or two pursuits (academic or otherwise), which is the impression gleaned from this short report. An extra sentence or two providing more detail in each section would greatly improve this report.

43

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY                                    HARV00000567

## Anthony

### Academic (2-)
*Magna potential. Excellent grades and mid- to high-700 scores (33+ ACT)*

Anthony is the strongest student I've interviewed out of West High (19% to four-year colleges) in at least 10 years. [Redacted: ]2 was probably on par with Anthony, though she was a humanities-minded student, whereas Anthony is more quantitatively strong. Highpoints are his ACT math and science scores (35 and 36, respectively) and SAT Math II (800). Verbally, too, he's light years ahead of the other students I see from his high school. If I had to guess I would say that he's a bit of an academic loner at his school since Anthony admitted that "most of my friends don't get as excited about school as I do…I guess math just comes easy to me, and I like the brain teaser problems the teacher gives us at the end of each class." Anthony will take his first AP tests this year, and he's most excited about calculus and physics, his two favorite classes this year. He was disappointed that West got rid of the AP Chemistry class last year, so he settled for honors. He is also the school's high scorer in the city math league. He was ranked third out of 816 at the end of last year, though he admitted that his class size will probably fall as students continue dropping out throughout the senior year.

Anthony's not a one-trick pony academically, though. I always ask West students about their junior theme for honors English, and Anthony's discussion about his paper was the most interesting I've heard in a long time. He's researching water rights disputes in the city's history, and he's trying to find out how different waves of immigration have changed the tone of the debates or affected arguments for or against city expansion. Anthony's having a hard time finding sources and his interviews aren't going the way he planned, but I give him credit for having a hypothesis and gathering the evidence. We talked about some of the courses I took as a History and Literature concentrator (mostly about France and the U.S.), and he seemed interested in those, too, asking me questions I hadn't thought about since college.

### Extracurricular, Athletic, Community, Employment, Family Commitments (5)
*Substantial activity outside of conventional activities such as major family commitments or term-time work*

Anthony works 20+ hours each week at the local K.F.C., and he doesn't have a lot of time for other activities. He's been working there for almost two years now. He cooks, buses tables, and works the register. The major downside, he says, is "coming home smelling like a bucket of chicken." A lot of the kids I interview at West work part-time, but Anthony works more than most of them and is a better student than almost all of them. I asked him what he spends his money on. He said he tries to save for college but usually ends up helping his mother pay for things around the house, buying all of his own clothing, and paying for everything associated with his car, which he's proud of.

Anthony does a few activities at school that he can do during lunchtime meetings or during his study hall (student government, class day committee). I was impressed that he works in the school tutoring center during his free period, because I imagine he could use that time to do his homework. He wants to sing in college or do more community service, possibly tutoring. I was surprised that he had already heard about PBHA and some of the singing groups on campus. He said he learned about them when a Harvard undergraduate did a presentation in his school last March, and he read more about them on the internet. He sounded excited by the IOP and the

44

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

HARV00000568

**JA4881**
DX003.0222

visiting fellows, but he hadn't heard of it before. Actually, he was excited about everything Harvard has to offer, and I think he'd discover lots of other interests when he's actually on a college campus.

### Personal Qualities (2)
*Strong personal appeal and character*

I was excited to meet Anthony, and it was fun to talk to someone from West who is so clearly interested in his schoolwork and is doing so well. I could tell that he must be good at his KFC job because he has a real presence about him. He makes a very favorable impression.

I do think he was a bit nervous (maybe more excited than nervous) for the first 15 minutes of our interview, but he loosened up completely by the end, and we ended up talking for more than an hour. He also has a self-deprecating, observant sense of humor that would serve him well at a place like Harvard. A highpoint of our interview was when he told me a very funny story about making "bootleg chicken" after hours at KFC! Apparently there are people who make deals with his manager to cook their own chicken in the KFC fryers for events like family reunions and parties because it's much cheaper than buying it from KFC and much easier than doing it at home. I told him he should write a short story about the experience.

### Overall (2-)
*Clear admit—one to recruit*

I think Harvard could use more students like Anthony. He would probably have a bit of an adjustment to Harvard's academics, but he has raw talent in spades, and he's never been in an environment with other students who were eager to learn. Neither of his parents has an education beyond an associate's degree, so he would be the first in his family to go to college. Mom is a front desk manager at the local Radisson. Dad is out of the picture, from what I could gather. Anthony's a role model for his two younger sisters, and he would be a role model for other students at West and in the city if he were accepted.

---

**Comments:**

This detailed report about Anthony, a high-achieving student of modest means with a substantial term-time work commitment, helps paint a nuanced picture of Anthony as a thoughtful, lively person and excellent student. Harvard has long sought to recruit and enroll high achieving students of modest means, and the interviewer helps make a case for why the Committee should consider Anthony's candidacy seriously.

The report is especially helpful for telling us what Anthony's interests are and what he would like to do in College even though he hasn't had time to pursue those interests in high school. From the report it is also clear that the interviewer understands West High School and how exceptional a student like Anthony is coming from the school (at least in terms of applicants to Harvard).

---

45

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

**JA4882**
DX003.0223

Wilbur

**Academic (3+)**
*Cum laude potential. Good grades and mid-600 to low-700 scores*

Wilbur Smith is a young, rather nervous fellow of sixteen (he turns seventeen next month) who used up most of the interview time trying to elicit from me some indication of whether he had a good chance of being admitted to Harvard. No matter how much I tried to steer the conversation to other topics, somehow we always returned to that one. Consequently, my impression of him is a bit vague.

It is unclear to me why Wilbur Smith should manifest such insecurity. He is certainly not a poor candidate: his test scores are all in the low 700s, with the exception of a 610 in chemistry. When we came to the subject of history and government, his intended major, he did seem to manifest a genuine interest in the departments here.

**Extracurricular (3-)**
*Solid participation but without distinction.*

At his school he is active in the Speech Club (preparing and delivering them at tournaments), on the soccer team, and on the football team. He elaborated very little about activities, but focused instead on asking questions. He did not mention any significant leadership roles.

**Personal (4)**
*Somewhat neutral or slightly negative impression.*

I sensed that Wilbur has absorbed the idea of going to an ambitious college more from his atmosphere than from his internal desires. There was a certain immaturity in his questions and the plethora of them alerted me to the fact that perhaps he felt he had to ask them so that I would not think him apathetic.

What struck me though was his nervous manner, his obvious confusion when he blurted out that he had been visiting other colleges, and his embarrassment when he felt that many of his scores, etc., were not up to Harvard's standards. He seemed especially curious about the admissions process, that is, the process behind the scenes.

**Overall (4)**
*Acceptable but perhaps not competitive compared to other applicants.*

I am puzzled by the impression Wilbur gave during this interview. I am not sure whether it was his youth or the fact that he got lost on the way and arrived quite late or perhaps his confusion as to his own aspirations. In any case, I hope his teachers' reports and his essay give a better sense of what he is really like than I have been able to do here.

46

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

HARV00000570

**Comments:**

This is an incredibly helpful report, targeting those personal qualities of the candidate that suggest he would not be a good choice for us. The interviewer acknowledges that perhaps she did not see Wilbur at his best, but she also gives us enough concrete information and examples of his behavior that we feel confident in her evaluation of Wilbur. The report certainly gives us a vivid picture of this young man and provides the type of insight we are unlikely to get elsewhere in the application.

47

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

HARV00000571

**JA4884**

DX003.0225



HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

HARV00000572

HR/Perf Mgmt

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

HARV00000588

**JA4886**

DX003.0242



SLATE

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

HARV00000609

**JA4887**
DX003.0263





**Admissions Staff Orientation**
Friday, September 6, 2013
Location: Agassiz Lyman Room

| | |
|---|---|
| 9:15 AM to 9:30 AM<br>(15 mins) | Welcome & Mission/Vision<br>• Bill Fitzsimmons, Dean, Harvard College Admissions and Financial Aid<br>• Marlyn McGrath, Director, Harvard College Admissions |
| 9:30 AM to 10:15 AM<br>(45 mins) | Selected Topics in Casework and Diversity<br>• Lucerito Ortiz, Senior Admissions Officer<br>• Tia Ray, Admissions Officer |
| 10:15 AM to 11:00 AM<br>(45 mins) | Considerations in the Admissions Process: Fisher vs. Texas<br>• Robert Iuliano, Vice President and General Counsel, Harvard University<br>• Bill Fitzsimmons, Dean, Harvard College Admissions and Financial Aid |
| 11:15 AM to 12:00 PM<br>(45 min) | Results of the Class of 2016 New Student Survey: How does this affect the way we greet and orient new students?<br>• Karen Pearce, Director of Institutional Research |
| 12:00 PM to 1:15 PM<br>(1 hour, 15 mins) | BREAK |
| 1:15 PM to 2:15 PM<br>(1 hour) | Financial Aid and Undergraduate Student Research<br>• Sally Donahue, Director, Harvard College Financial Aid<br>• Meg Brooks Swift, Director, Student Employment Office and Undergraduate Research Programs |
| 2:15 PM to 2:45 PM<br>(30 mins) | Information Security<br>• Christian Hamer, Chief Security Officer, Harvard University Information Technology<br>• Rick Van Rice, Director of IT, Harvard College Admissions and Financial Aid |
| 2:45 PM to 3:30 PM<br>(45 mins) | BREAK |
| 3:30 PM to 4:30 PM<br>(1 hour) | House Renewal at Harvard<br>• Merle Bicknell, Assistant Dean, FAS Physical Resources |
| 5:00 PM | Office BBQ |

CONFIDENTIAL

United States District Court
District of Massachusetts

**DX 4**

Case No. ___1:14-cv-14176 (ADB)___
Date Entered_____
By_____
Deputy Clerk

HARV00000779

**JA4888**
DX004.0001



# Interviewer Handbook

# 2013 - 2014

*Harvard College*

*Office of Admissions and Financial Aid*

*86 Brattle Street*

*Cambridge, MA  02138*

*Revised Fall of 2013*



United States District Court
District of Massachusetts

**DX 5**

Case No. _____1:14-cv-14176 (ADB)_____
Date Entered_____
By_____
Deputy Clerk

CONFIDENTIAL

HARV00001145

Helen Vendler kindly wrote this little essay for us. As a former member of the Faculty Standing Committee on Admissions, she wrote it to inspire us, and to help us be particularly alert to those candidates whose creative sensibilities would be valuable assets to a Harvard class, and would help them support the cultural life of our communities in decades to come. We hope you will find it as enlightening as our Committee does.

## Valuing the Creative and Reflective

Anyone who has seen application folders knows the talents of our potential undergraduates, as well as the difficulties overcome by many of them. And anyone who teaches our undergraduates, as I have done for almost thirty years, knows the delight of encountering them. Each of us has responded warmly to many sorts of undergraduates: I've encountered the top Eagle Scout in the country, a violinist who is now part of a young professional quartet, a student who backpacked solo through Tierra del Fuego, and other memorable writers, pre-meds, theater devotees, Lampoon contributors on their way to Hollywood, and more. They have come from both private and public schools and from foreign countries.

We hear from all sides about "leadership," "service," "scientific passion," and various other desirable qualities that bring about change in the world. Fields receiving the most media attention (economics, biology, psychology, occasionally history) occupy the public mind more than fields—perhaps more influential in the long run—in the humanities: poetry, philosophy, foreign languages, drama. Auden famously said—after seeing the Spanish Civil War—that "poetry makes nothing happen." And it doesn't, when the "something" desired is the end of hostilities, a government coup, an airlift, or an election victory. But those "somethings" are narrowly conceived. The cultural resonance of Greek epic and tragic roles—Achilles, Oedipus, Antigone—and the crises of consciousness they embody—have been felt long after the culture that gave them birth has disappeared. Gandhi's thought has penetrated far beyond his own country, beyond his own century. Music makes nothing happen, either, in the world of reportable events (which is the media world); but the permanence of Beethoven in revolutionary consciousness has not been shaken. We would know less of New England without Emily Dickinson's "seeing New Englandly," as she put it. Books are still considering Lincoln's speeches—the Gettysburg Address, the Second Inaugural—long after the events that prompted them vanished into the past. Nobody would remember the siege of Troy if Homer had not sung it, or Guernica if Picasso had not painted it. The Harlem Renaissance would not have occurred as it did without the stimulus of Alain Locke, Harvard's first Rhodes Scholar. Modern philosophy of mind would not exist as it does without the rigors of Wittgenstein's Philosophical Investigations, nor would our idea of women's rights without Woolf's claim for a room of her own.

We are eager to harbor the next Homer, the next Kant, or the next Dickinson. There is no reason why we shouldn't expect such a student to spend his or her university years with us. Emerson did; Wallace Stevens did; Robert Frost did; Frank O'Hara and John Ashbery and Fairfield Porter and Adrienne Rich did; and had universities harbored women in residence when Dickinson came of age, she might have been glad to be here. She and Woolf could be the writers they were because their fathers had extensive private libraries; women without such resources were deprived of the chance to be all they could be. It is important to recall that the makers of culture last longer in public memory than members of Parliament, representatives and senators; they modify the mind of their century more, in general, than elected officials. They make the reputation of a country. Michelangelo outlasts the Medici and the Popes in our idea of Italy; and, as one French poet said, "le buste/ Survit à la cité": art outlives the cities that gave it birth.

2

**JA4890**
DX005.0002

In the future, will the United States be remembered with admiration? Will we be thanked for our stock market and its investors? For our wars and their consequences? For our depletion of natural resources? For our failure at criminal rehabilitation? Certainly not. Future cultures will certainly be grateful to us for many aspects of scientific discovery, and for our progress (such as it has been) in more humane laws. We can be proud of those of our graduates who have gone out in the world as devoted investigators of the natural world, or as just judges, or as ministers to the marginalized. But science, the law, and even ethics are moving fields, constantly surpassing themselves. To future generations our medicine will seem primitive, our laws backward, even our ethical convictions narrow.

"I tried each thing; only some were immortal and free," wrote our graduate John Ashbery. He decided on the immortal and free things, art and thought, and became a notable poet. Most art, past or present, does not have the stamina to last; but many of our graduates, like the ones mentioned above, have produced a level of art above the transient. The critical question for Harvard is not whether we are admitting a large number of future doctors and scientists and lawyers and businessmen (even future philanthropists): we are. The question is whether we can attract as many as possible of the future Emersons and Dickinsons. How would we identify them? What should we ask them in interviews? How would we make them want to come to us?

The truth is that many future poets, novelists, and screenwriters are not likely to be straight-A students, either in high school or in college. The arts through which they will discover themselves prize creativity, originality, and intensity above academic performance; they value introspection above extroversion, insight above rote learning. Yet such unusual students may be, in the long run, the graduates of whom we will be most proud. Do we have room for the reflective introvert as well as for the future leader? Will we enjoy the student who manages to do respectably but not brilliantly in all her subjects but one—but at that one surpasses all her companions? Will we welcome eagerly the person who has in high school been completely uninterested in public service or sports—but who may be the next Wallace Stevens? Can we preach the doctrine of excellence in an art; the doctrine of intellectual absorption in a field of study; even the doctrine of unsociability; even the doctrine of indifference to money? (Wittgenstein, who was rich, gave all his money away as a distraction; Emily Dickinson, who was rich, appears not to have spent money, personally, on anything except for an occasional dress, and paper and ink.) Can frugality seem as desirable to our undergraduates as affluence—provided it is a frugality that nonetheless allows them enough leisure to think and write? Can we preach a doctrine of vocation in lieu of the doctrine of competitiveness and worldly achievement?

These are crucial questions for Harvard. But there are also other questions we need to ask ourselves: Do we value mostly students who resemble us in talent and personality and choice of interests? Do we remind ourselves to ask, before conversing with a student with artistic or creative interests, what sort of questions will reveal the next T.S. Eliot? (Do we ever ask, "Who is the poet you have most enjoyed reading?" Eliot would have had an interesting answer to that.) Do we ask students who have done well in English which aspects of the English language or a foreign language they have enjoyed learning about, or what books they have read that most touched them? Do we ask students who have won prizes in art whether they ever go to museums? Do we ask in which medium they have felt themselves freest? Do we inquire whether students have artists (writers, composers, sculptors) in their family? Do we ask an introverted student what issues most occupy his mind, or suggest something (justice and injustice in her high school) for her to discuss? Will we believe a recommendation saying, "This student is the most gifted writer I have ever taught," when the student exhibits, on his transcript, C's in chemistry and mathematics, and has absolutely no high-school record of group activity? Can we see ourselves admitting such a student (which may entail not admitting someone else, who may have been a valedictorian)?

3

CONFIDENTIAL

HARV00001147

President Drew Faust's new initiative in the arts will make Harvard an immensely attractive place to students with artistic talent of any sort. It remains for us to identify them when they apply—to make sure they can do well enough to gain a degree, yes, but not to expect them to be well-rounded, or to become leaders. Some people in the arts do of course become leaders (they conduct as well as sing, or found public-service organizations to increase literacy, or work for the reinstatement of the arts in schools). But one can't quite picture Baudelaire pursuing public service, or Mozart spending time perfecting his mathematics. We need to be deeply attracted by the one-sided as well as the many-sided. Some day the world will be glad we were hospitable to future artists. Of course most of them will not end up as Yo-Yo Ma or Adrienne Rich; but they will be the people who keep the arts alive in our culture. "To have great poets," as Whitman said, "there must be great audiences too." The matrix of culture will become impoverished if there are not enough gifted artists and thinkers produced: and since universities are the main producers for all the professions, they cannot neglect the professions of art and reflection.

And four years at Harvard can certainly nurture an artist as a conservatory-education cannot. It remains true that great writers have often been deeply (if eccentrically) learned, that they have been bilingual or trilingual, or have had a consuming interest in another art (as Whitman loved vocal music, as Michelangelo wrote sonnets). At Harvard, writers and artists will encounter not only the riches of the course catalogue but also numerous others like themselves; such encounters are a prerequisite for the creation of self-confidence in an art. It is no accident that many of our writers have come out of our literary magazine the Advocate, where they found a collective home. We need comparable student homes for the other arts.

Once we have our potential philosophers, writers, and composers, how will we prepare them for their passage into the wider society? Our excellent students are intensely recruited by business and finance in the fall of their senior year—sometimes even earlier than that. Humanities organizations (foundations, schools, government bureaus) do not have the resources to fly students around the world, or even around the United States, for interviews, nor do their budgets allow for recruiters and their travel expenses. Perhaps money could be found to pay for recruiting trips in the early fall for representatives of humanities organizations. Perhaps we can find a way to convey to our juniors that there are places to go other than Wall Street, and great satisfaction to be found when they follow their own passions, rather than a passion for a high salary. But if we are to be believed when we inform them of such opportunities, we need, I think, to mute our praise for achievement and leadership at least to the extent that we pronounce equal praise for inner happiness, reflectiveness, and creativity; and we need to make being actively recruited as available to students of the humanities as it now is to others.

With a larger supply of creative and reflective admittees on campus, fellow-students will benefit not only from seeing their style of life and attending their exhibits or plays or readings, but also from their intellectual conversation. America will, in the end, be grateful to us for giving her original philosophers, critics, and artists; and we can let the world see that just as we prize physicians and scientists and lawyers and judges and economists, we also are proud of our future philosophers, novelists, composers, and critics, who, although they must follow a rather lonely and highly individual path, are also indispensable contributors to our nation's history and reputation.

Helen Vendler, Arthur Kingsley Porter University Professor

4

CONFIDENTIAL                                                    HARV00001148

**JA4892**
DX005.0004

# Table of Contents

Introduction ................................................................................................6
    Recommended Reading and Harvard Websites ........................................6
    Eligibility for Schools Committee Work....................................................8
    Potential Conflicts of Interest as a Member of a Schools Committee ............8
    Confidentiality............................................................................................8

1. Admissions Standards .........................................................................9
    The Committee on Admissions and Financial Aid ................................9
    The Search for "Distinguishing Excellences"..........................................9
    Academic Credentials ..............................................................................11

2. How the Committee Selects a Class .............................................13
    Recruiting Prospective Students .............................................................13
    The Common Application or the Universal College Application.............14
    Application Deadlines and Decision Dates..............................................15
    Early Action .............................................................................................15
    The Committee Process ...........................................................................16
    The Importance of Timely Interview Reports.........................................17
    Ivy League Early Evaluation Program .....................................................18
    The Wait List ...........................................................................................19
    Transfer Applications ...............................................................................19

3. How Schools Committees Can Recruit Students .........................20
    College Fairs.............................................................................................21
    Acting as Secondary School Liaisons .....................................................21
    Early Recruitment ...................................................................................22
    Recruiting to Enhance Harvard's Visibility ............................................23
    Recruiting Athletes ..................................................................................24
    Recruiting Admitted Students .................................................................25

4. Interviewing Applicants .....................................................................27
    Scheduling the Interview..........................................................................27
    Conducting the Interview ........................................................................30
    Writing the Interview Report ...................................................................34
    Sending Your Reports to Cambridge and to Your Chair .........................36
    Ranking Meetings ....................................................................................36
    Transfer Interviewing ..............................................................................37

5. Sample Interview Reports .................................................................38

5

**JA4893**
DX005.0005

# Introduction

      Each year, members of our Schools & Scholarships Committees recruit and evaluate applicants to Harvard College. In the process, they cultivate critical relationships with parents, guidance counselors, other alumni/ae, and the general public. As the competition among colleges for the best students increases, so does our need for your help. We are grateful you have volunteered to join our efforts. You will likely find the work personally rewarding, intellectually stimulating, and occasionally perplexing.

      This document addresses four subjects: 1) "Admissions Standards" describes the structure of the Admissions and Financial Aid offices.  2) "How the Committee Selects a Class" explains our criteria and procedures for recruiting students, evaluating them, and voting on their admission.  3) "How Schools Committees Recruit Students" describes recruitment you can do. **The most critical and practical part of this handbook is 4) "Interviewing Applicants," an overview of how to schedule and conduct a personal interview and evaluate students in written reports.**  In section 5) "Sample Interview Reports," you will find examples of actual interview reports with our comments describing what was particularly well done and what the interviewer could have improved to make the report more helpful to the Committee.

      The Committee has developed these practices over four decades of work with alumni/ae. Please read this document and consult our website (http://www.admissions.college.harvard.edu), which includes an overview of the College.  In addition, the publications and web sites referred to below will keep you current on Harvard's academic, extracurricular, and other resources. The Admissions Office's own site is at www.admissions.college.harvard.edu.  As always, feel free to contact us (617.495.1551) if we can be of further assistance in this important work. Once again, thank you for all of your help!

## Recommended Reading and Harvard Websites

### Primary sources

**SEAS** outlines programs in the School of Engineering and Applied Sciences (www.seas.harvard.edu)

**Virtual Tour** (www.news.harvard.edu/tour) will guide you around and about Harvard Yard.

**Admissions Video** (http://www.admissions.college.harvard.edu/about/video/index.html)

**Electronic newsletters** are sent to all alumni/ae interviewers, usually 2-3 times a year.

**Freshman Seminar Program** (www.fas.harvard.edu/seminars) describes current seminars.

**Practice and Performance** Office for the Arts (www.fas.harvard.edu/~pandp), lists the facilities, programs, and organizations at Harvard in dance, music, theater, and the visual arts.

**Accessible Education Office** Resources for students with disabilities (www.aeo.fas.harvard.edu)

6

CONFIDENTIAL

HARV00001150

<u>Secondary sources</u>
These publications, offered by other sources, can also help:

**Courses of Instruction** (www.registrar.fas.harvard.edu/Courses) is the Faculty of Arts and Sciences course catalog.

**Handbook for Students and Fields of Concentration**
(http://handbook.fas.harvard.edu/icb/icb.do )
describes degree requirements and general regulations.

**The Crimson** (www.thecrimson.com) is the daily student-run newspaper.

**Religious Life at Harvard** features a United Ministry directory; call 617.495.5529 or consult
(http://chaplains.harvard.edu/)

**Harvard University Gazette** (http://news.harvard.edu/gazette) is published weekly by the University News Office during the academic term and three times over the summer.  In addition, an update of Harvard happenings is sent via e-mail <u>each weekday</u> to subscribers. Alumni can register for these e-mail updates on the Gazette's website.

**Office of Career Services** (www.ocs.fas.harvard.edu) offers information about jobs and internships.

**Harvard Magazine** (www.harvard-magazine.com) sends all alumni/ae copies every other month.

**Harvard College Program in General Education**
(http://www.generaleducation.fas.harvard.edu/icb/icb.do) offers information about the categories of the new program and the courses offered.

**GoCrimson.com** provides information about Varsity Division I and recreational athletics on Harvard's campus.

Samuel Eliot Morison's **_Three Centuries of Harvard_** (1986) is perhaps the best one-volume history of Harvard.

Henry Rosovsky's **_The University: An Owner's Manual_** (1991) offers a primer on college admissions and the mission of liberal arts colleges.

University President Neil Rudenstine's 1993-95 Report, "Diversity and Learning," surveys Harvard's practice of and commitment to recruiting distinguished students of all backgrounds.

7

CONFIDENTIAL

HARV00001151

**JA4895**
DX005.0007

## Eligibility for Schools Committee Work

Participation in School Committee work is open to alumni/ae of Harvard College and our graduate schools.  Important prerequisites include broad knowledge of the College, enthusiasm for your experience as a student at Harvard, and sincerity of purpose in working with prospective college students, their families, schools, and the general public.

## Potential Conflicts of Interest as a Member of a Schools Committee

As a member of your local Schools Committee, you become a voluntary—but no less official—representative of Harvard University.  Accordingly, it is critical to avoid circumstances that might suggest an appearance of inappropriate or duplicitous conduct.  For example, alumni/ae who offer college counseling services for a fee are not allowed to participate in Schools Committee work. Interviewers whose children are planning to apply to Harvard are obligated to refrain from doing Schools Committee work for a year, or a least through the full completion of the admissions cycle. (Committee members should alert their Schools Committee Chair to this possibility during the summer before their child's senior year of high school.)  We similarly request that individuals refrain from interviewing for Harvard and another undergraduate institution. In addition, of course, you should accept all interviewing assignments with total objectivity, while applying appropriate sensitivity to personal, business or other connections to candidates for admissions.

Should you have any questions about a possible breach of good faith about your role as a volunteer for the Harvard Admissions Office, please contact the Admissions Office to speak with your staff representative.

## Confidentiality

Never discuss what you know about students with anyone, even with school officials. (There is one exception to this rule that can also raise potential problems of confidentiality: holding a ranking meeting or otherwise sharing information about any candidate within a particular Schools Committee. See page 34.) Confidentiality is especially important when working with the general public. Even well-intentioned comments can reveal—sometimes disastrously—more than was intended. For instance, a principal or counselor asking why the Committee denied a student admission needs only to hear that the applicant "was not well supported" to go after teachers.

8

CONFIDENTIAL

HARV00001152

# 1. Admissions Standards

*Harvard's admission officers are not dealing with disembodied abstractions but with thousands of very real and very human individuals whose qualities are rarely scientifically measured and labeled unmixed.*

*Wilbur J. Bender*
*Dean of Admissions and Financial Aid*
*Report to the President, 1959-60*

## The Committee on Admissions and Financial Aid

The Harvard College Dean of Admissions and Financial Aid oversees the Admissions Office, the Financial Aid Office, and the Student Employment Office, all of which are located at 86 Brattle Street, Cambridge, MA 02138. The Dean chairs the Standing Committee on Admissions and Financial Aid of the Faculty, which includes more than 25 members of the Faculty of Arts and Sciences (FAS). The Dean and the Standing Committee, acting on behalf of FAS, implement policies on admissions and financial aid. Members of the Standing Committee also review cases that are representative of the entire pool, present strong scholarly credentials, demonstrate exceptional creativity in the arts, or raise questions of admissions policy. Working under the guidelines established by the Standing Committee, the Admissions Committee makes decisions on individual applicants. The Admissions Committee is composed of the Standing Committee of the Faculty and about 40 members from the three offices the Dean supervises.

The Financial Aid Office administers financial aid to eligible students who attend the College. Harvard remains need blind in the admissions process, and Harvard awards financial aid based strictly on need. That is, the Committee makes each admission decision without regard to whether a student has applied for aid, whether a student qualifies for financial aid, and regardless of the amount of financial aid for which a student qualifies. Harvard awards financial aid strictly on the basis of a family's need; we do not award merit scholarships. Thanks to the strong commitment of the Faculty of Arts and Sciences and the continuing generosity of donors, we are committed to providing the financial aid resources necessary to make the College fully accessible to students of promise.

## The Search for "Distinguishing Excellences"[1]

Our goal is to attract the best students to the College. Part of the general public believes "best" ought to be defined by standardized tests, grades, and class rank. It is easy to understand why. In his 1959-1960 Report to the President, Harvard Dean of Admissions and Financial Aid Wilbur J. Bender wrote that "[f]or a harassed admission officer [such a policy] has great appeal because it has

---

[1] This section represents extensive statistical analysis of the Committee's actions and represents accurately the way in which the Committee approaches each case. Our analyses have demonstrated that personal attributes—as represented by the alumni/ae interview, extracurricular rating, and personal rating—are factors in our decision-making that are as significant as academic ability—as represented by rank in class; rigor of high school curriculum; SAT, ACT, and AP/IB scores; and teacher and guidance counselor recommendations.

9

CONFIDENTIAL

HARV00001153

the merits of apparent simplicity, objectivity, relative administrative cheapness in time and money and worry, a clear logical basis and therefore easy applicability and defensibility."

The Admissions Committee values objective criteria, but holds a more expansive view of excellence. Test scores and grades indicate students' academic aptitude and achievement. The Committee also scrutinizes applications for extracurricular distinction and personal qualities. Students' intellectual imagination, strength of character, and their ability to exercise good judgment—these are other, critical factors in the admissions process, and they are revealed not by test scores but by students' activity outside the classroom, the testimony of teachers and guidance counselors, and by alumni/ae interview reports. Seeking evidence of these three criteria—academic excellence, extracurricular distinction, and personal qualities—the Committee reads with care all the components of each applicant's file: the high school transcript, standardized test scores, extracurricular activities, personal statement, teacher and secondary school recommendations, and the personal interview report.

Attempts to define and to identify precise elements of character, and to determine how much weight they should be given in the admissions process, require discretion and judiciousness. But the Committee believes that the "best" freshman class is more likely to result if we bring evaluation of character and personality into decisions than if we do not. We believe that a diversity of backgrounds, academic interests, extracurricular talents, and career goals among students who live and learn together affects the quality of education as much as a great faculty or vast material resources.

The Committee appreciates the degree to which many admissions decisions hinge on judgment calls. In 2011-2012, 34,285 applicants competed for about 1,600 spots in the entering class. Perhaps 85 percent of our applicants are academically qualified. A significant portion also presents strong personal and extracurricular credentials. When considering an applicant, then, the Committee asks, "What makes him or her distinctive?" The Committee identifies certain broad factors that generally carry weight in this process. These "distinguishing excellences" might "tip" into the class an applicant who presents the Committee solid evidence of academic excellence, extracurricular accomplishment, and strong personal qualities. Tips come into play only at a high level of merit; the Committee never gives enough of a tip to admit an average candidate at the expense of a first-rate one. These are among the most common "tips" by which applicants, presenting distinguished academic and extracurricular records, might distinguish themselves for admission:

**Outstanding and unusual intellectual ability**. Harvard is likely to admit brilliant students of sound character who offer substantial evidence of intelligence at the most elevated level. More than presenting the Committee with superior testing and strong academic records in competitive secondary school classrooms, the applicant admitted primarily for unusual intelligence also presents compelling evidence of creativity and originality.

**Unusually appealing personal qualities**. In certain cases, teacher recommendations, the secondary school report, personal statement, and the alumni/ae interview report offer consistent testimony of an applicant's unusual effervescence, charity, maturity, or strength of character in addition to academic and extracurricular accomplishment. A residential community with strong emphasis on extracurricular participation, Harvard prizes these qualities.

**Outstanding capacity for leadership**. Harvard aims to educate individuals to have broad vision who will be leaders in their chosen fields. Evidence of ability to lead others in positive ways can distinguish an applicant for admission.

**Creative ability**. The Harvard Supplement to the Common Application encourages students "with exceptional talents or interests" to send the Committee music CDs, compositions, dance DVDs, slides of artwork, or selected samples of academic work (including creative writing)

10

CONFIDENTIAL

HARV00001154

**JA4898**
DX005.0010

for faculty evaluation, which can inform admissions decisions. Students' artistic participation and performance help enrich life at Harvard and beyond.

**Athletic ability.** The College has a long tradition of athletic excellence—in competition with our intercollegiate rivals and among our freshman and House communities. Harvard enrolls students who are among the most active in recreational athletics, and we lead all undergraduate institutions in the number of NCAA Division I athletic teams (41). Evidence of a candidate's ability to contribute to one of these teams, and of solid personal qualities and academic abilities, can distinguish a candidate for admission.

**Harvard and Radcliffe parentage.** Among a group of similarly distinguished applicants, the Committee is more likely to admit the sons and daughters of Harvard and Radcliffe alumni/ae than students without these institutional ties when all other factors are equal. Children of alumni/ae generally prove to be highly competitive candidates even without a lineage tip. Their academic credentials – test scores and grades – are nearly identical to those of the entering class as a whole.

**Geographic, ethnic, and economic factors.** The excellence and diversity of our students remain salient attractions for many prospective students. Undergraduates come from every state and more than 80 foreign countries. They have attended public, private, and parochial schools; represent all economic, ethnic, and religious backgrounds; and possess a wide range of academic interests and extracurricular talents. "Such diversity is not an end in itself, or a pleasant but dispensable accessory," University President Neil Rudenstine wrote in his 1993-95 Report, "Diversity and Learning." "It is the substance from which much human learning, understanding, and wisdom derive. It offers one of the most powerful ways of creating the intellectual energy and robustness that lead to greater knowledge, as well as the tolerance and mutual respect that are so essential to the maintenance of our civil society."

These factors are guidelines that are neither comprehensive nor absolute. Some successful candidates present a number of these qualities in their applications and are, in other words, well rounded. Other applicants are successful because they are well lopsided—they demonstrate exceptional distinction in one of these areas. Yet the Admissions Committee denies and offers admission to students who might fit either description.

Our success depends on our ability to attract students of different personalities, academic interests, and extracurricular talents to Harvard. We proceed with care, discretion, and humility because we know we are working with imperfect information, and that no one can predict with certainty what an individual will accomplish during college or beyond. The Committee appreciates the element of subjectivity involved in assessing a candidate's distinction in any one of these categories and in identifying some of the personal qualities we believe these distinctions demonstrate. And, by giving importance to human judgment, by admitting more than just "safe bets," we are aware our decisions become harder to explain with precision. By developing familiarity with the admissions process, you can help us address the public's concerns and misconceptions about recruitment and evaluation at Harvard.

## Academic Credentials

Applicants often ask about the role rank-in-class and standardized tests play in admissions decisions. These comments should inform your responses.

**Rank-in-class.** Rank-in-class (or deciles, quintiles, percentages, etc.) is a helpful, important gauge of academic achievement. Few successful candidates rank below the top 10 to 15 percent of their high school classes, except in the cases of applicants applying from secondary schools that send significant percentages of their graduates to selective four-year colleges. Reassure applicants that

11

they will not be denied admission solely on the basis of a few places in rank; the overall pattern of students' academic performance and the quality of their courses are far more important than their rank. Even when assessing applicants within a high-ranking range, the Committee's decisions might be unrelated to an applicant's class standing because of the weight given other factors.

**Standardized testing**. Harvard requires all applicants to submit the results of the SAT or ACT (with the enhanced writing portion) and the results of two SAT Subject Tests (previously known as the SAT Achievement Tests or SAT II exams). Harvard does not have clearly defined, required minimum scores, but students admitted to the College represent a range of scores from roughly 600 to 800 on each section of the SAT and on the SAT Subject Tests.

Candidates with scores lower than 600 (or a 27 ACT composite) are less likely to be offered admission unless they provide compelling evidence of other unusual talents or accomplishments. At the same time, the Committee does not admit hundreds of applicants who have 700+ scores and fine secondary school records because other candidates appeared stronger in other important ways. Once the Committee determines that an individual is capable of thriving academically at Harvard—a judgment made considering test scores, grades, and recommendations—we are most interested in the person behind the scores.

**Re-centering of College Board scores**. The College Board adjusted the scoring scale of the SAT and SAT Subject Tests in April 1995. Before this change, the national averages for the SAT verbal and math tests were, respectively, 76 and 22 points below the "500 midpoint." The College Board believes it is important that this midpoint be the actual mean for all tests, and they cite a small initial sample of test-takers in 1941 to explain the previously skewed scale. Scores have thus risen considerably; a 420 Verbal has become a "re-centered" 500. Please consider this change when you assess candidates. Re-centering has lowered the floor for an 800 score—on both the SAT and the SAT Subject Tests. What was a "pre-re-centered" 730 verbal SAT became an 800; a "pre-re-centered" 780 math SAT is now 800. Students' expectations for admission might be raised simply because of large increases in the number of "perfect" scores.

CONFIDENTIAL

HARV00001156

## 2. How the Committee Selects a Class

### Recruiting Prospective Students

Many people often ask why, given the thousands of applications Harvard receives every year, we must invest such time, effort, and resources to recruit talented students.[2] Vigorous recruitment, however, has been instrumental to our success. It has broadened Harvard's appeal to a national and international base, and enhanced the College's accessibility. As Bender noted in his first Report to the President (1951-52),

> That the College is engaged [...] in a vigorous recruitment program and that there is a large and growing surplus of qualified applicants confront the Committee on Admission with new problems of fundamental policy. For the first time we can, within limits—and we have to—consciously shape the make-up of our student body instead of allowing natural selection or laissez faire to determine it.

Active recruitment helps sustain the critical opportunity to "consciously shape the make-up of our student body" as colleges compete intensely for the best students.

**Direct mail.** Virtually all college-bound students take the PSAT by their junior year. High school juniors and seniors also take SATs and the ACT, which survey students about their academic experiences and interests. With students' permission, the College Board and the American College Testing Company sell colleges this information. Harvard has identified accomplished students with these searches for many years. We send letters and viewbooks to searched students, and we share Student Search Lists with Schools Committee chairs to craft recruitment plans and to identify students to invite to local presentations. Our research shows that students who qualify for this search are about twice as likely to be admitted as other applicants. Of course, these search lists do not include the names of every student who might be admitted to the College.

**Joint travel/Exploring College Options.** To respond to the increasingly early interest students express in college admissions, the Admissions Committee is concentrating more on spring recruitment. Many officers recruit applicants through joint travel. A group of five admissions representatives—representing Harvard and four other colleges—travels to five cities in five days, speaking in the evening with students and parents and in the morning with guidance counselors. In the last several years, we have traveled with representatives from Duke, Georgetown, MIT, Stanford, the University of Pennsylvania, Princeton, University of Virginia, and Yale, among others. We enhance outreach through well-planned joint travel, which exposes Harvard to a broader audience than do individual school visits. Audiences learn about Harvard even if they attend the session to learn about another college. And by cooperating with other colleges, we enhance the cost-effectiveness of travel. Through spring and fall trips, we visit 130 cities in all 50 states and some international territories and reach approximately 55,000 students and parents, as well as 2000 high school counselors.

---

[2] A little more than 40 years ago, Harvard College received 7,762 applications and selected an entering class of 1,134 men. The Offices of Admissions at Harvard College and at Radcliffe College merged in 1975-76, increasing the number of total spots in the entering class for men and women to 1,600. Applications grew to between 12,000 to 13,000 until 1993-94, when 15,259 students applied to the College. Meanwhile, students admitted to Harvard and Radcliffe have matriculated at higher rates, driving down the raw number of students the Admissions Committee can admit.

With Radcliffe and Harvard's historic announcement in 1999 that Radcliffe would merge with Harvard—and establish the Radcliffe Institute for Advanced Study as an integral part of Harvard University—all applicants from the 1999-2000 admissions cycle on, women as well as men, apply to the fully coeducational Harvard College.

13

CONFIDENTIAL

HARV00001157

**Undergraduate Admissions Council (UAC).** The UAC, working closely with members of the Admissions Committee, offers extensive personal outreach to prospective students. About 300 undergraduates volunteer their time to the UAC to coordinate overnight, on-campus housing for visiting high school seniors throughout the academic year and during our annual April Visiting Program for admitted students. Their efforts can persuade admitted students to matriculate. Through telephone contact, email outreach, student blogs, and visits to hometown high schools, the UAC addresses prospective students' concerns and refers them to other appropriate sources.

**Undergraduate Minority Recruitment Program (UMRP).** The Admissions Office established the UMRP in 1974 to consolidate individual outreach programs to minority students, and this student organization has been part of our successful student recruitment ever since. UMRP's more than 20 undergraduates conduct personal outreach to minority students through on-campus hosting and by extensive telephone, mail, and e-mail contact during the application process and following the Committee's decisions. UMRP members also volunteer a week of their own time to visit high schools and some junior high schools across the country with large concentrations of minority students in order to encourage all students in these areas to apply to college. Undergraduates craft their itineraries through consultation with the appropriate area admissions officer.

**Harvard Financial Aid Initiative (HFAI).** Established during the summer of 2004, the Admissions Office and Financial Aid Office have implemented a coordinated effort to conduct personal outreach to students who may fall within the parameters of the new program. Their work was modeled after the work of the UMRP; accordingly, their recruitment strategies are similar to (and often conducted in concert with) those of the UMRP.

**Interviews and information sessions in Agassiz.** The Admissions Office runs year-round recruitment in Cambridge. From the first week in June to Thanksgiving (with a break in early September as students settle into their high school routines), we offer optional campus interviews to high school seniors. We add interview reports generated here to applicants' files, but Cambridge interviews do not substitute for the alumni/ae interview. We also offer student-led tours and group information sessions throughout the year. Open to the public, the information sessions allow students and their families to ask an admissions officer and current undergraduates questions about life at Harvard and the admissions process. Please visit our website or call us at 617.495.1551 for additional information, including up-to-date schedules and locations.

## The Common Application or the Universal College Application

Harvard adopted the Common Application in 1994-1995 and the Universal Application in 2007-2008. More than 400 colleges and universities use these standardized forms, which we hope benefit applicants and secondary schools. Applicants can focus more time on their academic, extracurricular, and personal lives than on filling out multiple applications. Teachers and counselors can devote more time to writing a single recommendation (and to counseling) and less to redundant paperwork. The Common Application is available free online (www.commonapp.org) and our website); the Universal College Application may be obtained at www.universalcollegeapp.com . In addition to the Common Application or the Universal College Application, we require applicants to complete a short supplement to indicate their interest, and its depth, in a field of study, career, and extracurricular activities—and to submit AP and IB results, an optional additional essay, or tapes, slides, and papers for faculty evaluation.

14

CONFIDENTIAL

**JA4902**

DX005.0014

## Application Deadlines and Decision Dates

**Mid-October, 2013**

The Admissions Office begins processing applications for Early Action candidates; interview requests sent to School Committee chairs

**November 1, 2013**

Deadline for all Early Action application materials. Students applying for Early Action should submit scores by the October series, although scores from the November series should reach us in time for consideration.

**Early December, 2013**
*We will begin our careful evaluation process for Regular Decision candidates at this time, reading applications in the order in which they are completed.*

We have asked that candidates send at least the Common Application or Universal Application as soon as possible to allow time for them to begin the interviewing process in areas where this is possible. We recognize that students, secondary school teachers, and counselors have many commitments that may preclude early submission of admission materials by this date. Candidates will not be penalized in any way if materials are submitted before the January 1 deadline.

**January 1, 2014**
*Final deadline for application materials for Regular Decision applicants.*

Candidates can complete testing requirements by using the January SAT or February ACT dates, but we hope that they will have their testing completed by the December date.

**Date Decisions Are Sent**
- Early Action decisions are mailed/e-mailed on December 14, 2012.
- Regular Action decisions are mailed/e-mailed on March 28, 2013.
- Common Reply Date, by which applicants in the Early Action and Regular Decision processes must accept or decline the offer of admission, is May 1, 2013. No deposit is required.

## Early Action

Harvard College has restored nonbinding early action as part of its admissions process and significantly enhanced its recruiting program to assist talented students from modest economic backgrounds in navigating the admissions process. Harvard has also increased its investment in undergraduate financial aid to more than $160 million. Currently, more than 60 percent of Harvard College students receive scholarship aid, and the average grant is about $38,000.

In 2007, Harvard eliminated its nonbinding early action program on a trial basis and moved to a single admissions deadline, announcing at the time that it would evaluate the impact of the change after several years.

15

CONFIDENTIAL

**JA4903**
DX005.0015

"We piloted the elimination of early action out of concern that college admissions had become too complex and pressured for all students, and out of particular concern for students at under-resourced high schools who might not be able to access the early admissions process," said Harvard President Drew Faust. "Over the past several years, however, interest in early admissions has increased, as students and families from across the economic spectrum seek certainty about college choices and financing. Our goal now is to reinstitute an early-action program consistent with our bedrock commitment to access, affordability, and excellence."

"We looked carefully at trends in Harvard admissions these past years and saw that many highly talented students, including some of the best-prepared low-income and underrepresented minority students, were choosing programs with an early-action option, and therefore were missing out on the opportunity to consider Harvard. We have decided that the College and our students will be best served by restoring an early option," said Dean Michael J. Smith of the Faculty of Arts and Sciences.

Harvard's concerns about equity and transparency will continue to guide the structure of its admission program. It will maintain a nonbinding approach, which maximizes freedom and flexibility for students. As in the past, students can apply under the single-choice, early-action program by Nov. 1 and will be notified by Dec. 15, at which point students completing financial aid applications will receive notice of their awards. Regular decision will continue to operate as usual, with applications due on Jan. 1 and notification on April 1. All students, whether admitted under early action or regular decision, will have until May 1 to decide whether to attend.

To ensure that the return to early action serves Harvard's commitment to access and diversity across many dimensions, the change in admissions policy has been accompanied by enhancements in the College's recruiting program, including a new program promoting transparency in college admissions, greater outreach, and targeted staff visits to schools where few students apply early to college; increased involvement of Harvard undergraduates throughout the year in three major recruiting efforts – the Harvard Financial Aid Initiative, the Undergraduate Minority Recruitment Program, and the Undergraduate Admissions Council's Return to High School Program; and enhanced web features providing families with the ability to calculate the likely net cost of sending a child to Harvard, and perspectives from financial aid students on life at Harvard.

"The commitment to including first-generation, low-income , and historically disadvantaged minority students in the full spectrum of admissions options is a key feature of this new early-action option," said Harvard College Dean Evelynn Hammonds. "We have made significant gains in recent years in recruiting larger numbers of these students and in supporting them for success once here. I am very pleased that we are able to re-conceive early action, consistent with these goals, and to work with students based on whatever timetable best meets their needs."

"We continue to be concerned about the pressures on students today, including those associated with college admission," said Harvard College Dean of Admissions and Financial Aid William R. Fitzsimmons. "In all of our work, we will do everything possible to level the playing field in admissions and encourage all students to make thoughtful choices about how they can best contribute to society."

## The Committee Process

**The "Docket."** Each member of the Admissions Committee represents specific geographic areas, and so we refer to officers as "area representatives." A "docket"—which we also refer to as a "subcommittee"—is a geographical region, designed to be roughly equivalent to each of the other dockets in the number of applicants considered there. There are 20 dockets or subcommittees. Each

16

**JA4904**
DX005.0016

officer sits on at least two dockets to inform comparisons made among candidates across vast geographical lines. Each subcommittee varies in size, but generally includes three to six area representatives, a docket chair (a senior admissions officer), and the docket's faculty readers.

**Who reads folders**. The area person reads all the folders from his or her area—a folder's first read. The first reader records all data, contacts the applicant or his or her school for materials missing from the folder, and comments on the folder's strengths and weaknesses. Reading every folder from their areas enables area persons to present an overview of the relative strengths presented by the applicants there. Second and third readers check factual data recorded on the reader sheet and, more importantly, offer additional interpretations of the folder. The third reader records all evaluations for entry into our database. Folders might receive additional evaluations, whether by other admissions officers or by members of the Faculty Standing Committee. These other evaluations offer more commentary on the strengths of applicants who present special attributes such as those described in section 2.

**Subcommittee meetings**. Once folders have been read, subcommittees meet. The area person, as advocate for each case he or she has read, summarizes to the subcommittee the strengths and weaknesses in each component of each candidate's file. Subcommittee members discuss the case, and then vote on what recommendation to offer the full Committee. The subcommittee examines the entire docket several times, extensively reviewing decisions—and in many cases changing them—to ensure standard scrutiny for all applicants, whether they are presented first or last on a docket. After surveying the docket's breadth of quality, the subcommittee can identify with greater confidence those applicants who appear strongest. Majorities rule, but the degree of support expressed for candidates is always noted—both for candidates the subcommittee will and will not recommend for admission. By identifying applicants this way—"clear admits," "strong rejects," etc.—subcommittees can compare candidates with similarly assessed applicants on other dockets.

Subcommittees then present and defend their recommendations to the full Committee. While looking at or listening to the summary of any case, any Committee member may raise questions about the proposed decision and request a full review of the case. Many candidates are re-presented in full Committee. The Committee compares all candidates across all dockets, and therefore across geographical lines.

This rigorous comparative process strives to be deliberate, meticulous, and fair. It is also labor intensive. But it permits extraordinary flexibility and the possibility of changing decisions virtually until the day the Admissions Committee mails them. This is especially important since the Committee is always receiving new information on candidates. Please convey to applicants the time and care the Committee takes with each individual application.

## The Importance of Timely Interview Reports

Your insights are most valuable if we have them for subcommittee—a case's first hearing. We would, of course, love to read interview reports as we first read applicants' files. But many students still wait to apply by the final deadline, making it virtually impossible for their reports to be here for a folder's first read.  **When possible, please contact the student, complete the interview, and file the interview report within two weeks of receiving the interview assignment.** Waiting an extended period before writing the interview report can disadvantage the student, as impressions and important details from the conversation can fade as time passes.  As such, a delayed report may fail to accurately capture the student interviewed.

17

CONFIDENTIAL

HARV00001161

The committee process works best and most efficiently, then, when we have reports for subcommittee. Subcommittees may discuss a single case for half an hour or even more before voting on a recommendation to offer the full Committee. These conversations are more tentative when critical items are missing—whether they are teacher recommendations or interview reports. And while the full Committee will take just as much time as the subcommittees do discussing a single case, these discussions take more time the more new information we must add to case re-presentations. Subcommittees begin meeting in November for the Early Action process and for three- to four-day shifts in late January until the end of February for the Regular Decision process.

Please consult with your Schools Committee chair about the exact dates of subcommittees for the area in which you will be interviewing. Specific dates for subcommittee meetings depend on several factors. Since each staff member sits on at least two subcommittees, we try to ensure staff members do not have insuperable conflicts. We attempt to make interview requests as early as possible, yet we know there will be some requests we make for interviews after subcommittees have met. Occasionally, applicants' files complete as late as late-November for Early Action and February for Regular Decision. This results, most often, from unavoidable logistical factors. Mail sometimes arrives late. Occasionally, we are overwhelmed with mail to open, materials to enter into our database, and reams of paper to file. Nevertheless, we hope you can fulfill each interview request as quickly as possible so that your Cambridge subcommittee has the benefit of your interviewers' personal insights.

The _last_ opportunity for the vast majority of cases to be heard is during full Committee. The Admissions Committee must have all interview reports in hand for full Committee. As you know from reading above, the entire Committee convenes in one room to review all the contenders for admission. Many candidates are re-presented in full Committee, which again may consider a single case for a half hour or more. Full Committee generally meets during the first week of December for Early Action candidates and from the end of the first week of March to the end of the third week of March for Regular Decision candidates.

We are grateful that you do all you can to send us interview reports as early as possible. Clearly, it is vital that we have all interview reports by the full Committee stage. We hope this outline helps you understand that it is critical to complete your interview and report as soon as possible, ideally within two weeks of receiving the assignment from your Schools Committee chair.

## Ivy League Early Evaluation Program

As determined by each institution, admissions offices may advise applicants before the common notification date, in writing, of the probability of admission (e.g. likely, possible, unlikely). If the student is a recruited student-athlete, such notifications may only be made from October 1 through March 15, per Ivy League regulations.

Institutions may issue official "probabilistic" communications only in writing, from the office of admission. Such letters will have the effect of letters of admission, to be confirmed on the common notification date, subject to revocation only on the same terms as letters of admission. (Such communications given by coaches, whether orally or in writing, do not constitute binding institutional commitments.) An applicant who receives one or more such written communications and who has made a decision to matriculate at one institution is encouraged (but not required) to notify all other institutions, and to withdraw all other applications, as promptly as possible.

Such early evaluations are often precipitated by pressure on student-athletes from other institutions requiring an early commitment. In some instances, students are given very little time to

CONFIDENTIAL

HARV00001162

**JA4906**
DX005.0018

respond to these offers. Such candidates bring excellences of all kinds in addition to athletics, and the Admissions Committee can vote to notify them that they are likely to be admitted – rather than lose them to other institutions.  Alumni/ae Schools and Scholarship Chairs will be informed about such candidates by the staff area person and will be requested to interview them if time allows.

## The Wait List

The Committee places a number of accomplished applicants on the wait list each year. The wait list includes the strongest applicants whom the Committee was not able to admit but might still wish to consider for admission if spots in the entering class open later. Wait-listed students should make definite plans to attend a college to which they have been admitted, since the number of students the Committee has been able to admit from the wait list varies from year to year. In some years, we have admitted no one from the wait list; in others, we have admitted more than 100 candidates from the wait list.

Admitted students have until May 1 to accept or forfeit their spots in the entering class. Should there be spots left in the entering class after the May 1 deadline, the Committee may then select students who have decided to remain on the wait list to fill these spots. The wait list is not ranked. We meet some time after May 1 to select students from the wait list through a rigorous comparative process very similar to the full committee meetings described above.

## Transfer Applications

After a two-year suspension, the transfer admissions program was reinstated during the 2010-2011 admissions cycle.  Just under 1500 students applied for 12 transfer spaces.  Students interested in applying during the 2012-2013 cycle should check Harvard's website or call the transfer office (617.495.5309) in the fall to verify the status of transfer admissions for this academic year. The application deadline for the transfer process is March 1, 2013, with notification by June 1.

In the transfer process, Harvard considers applications in the spring from students who wish to transfer to Harvard after completing at least one year (and not more than two) of full-time study at another college or university. The Committee selects transfer applicants through a rigorous comparative process and on the basis of their record of academic achievement, the strength of recommendations they receive from college faculty members, and their overall promise.  Only the very strongest transfer candidates are selected for alumni interviews; you will be contacted directly by your committee chairperson should we need your help interviewing a candidate for transfer admissions.

19

CONFIDENTIAL

HARV00001163

**JA4907**
DX005.0019

## 3.  How Schools Committees Can Recruit Students

Admissions involves "salesmanship," politics in the broad sense of the word, human and institutional relationships. It is a matter of who works for you and how they work, of whom you select and whom you reject, of the public image or images of Harvard, which are affected by everything you do or don't do.

*Wilbur J. Bender*
*Dean of Admissions and Financial Aid*
*Report to the President, 1959-60*

Through your recruitment efforts, you add an indispensable human dimension to what can seem an impersonal process. You also can combat myths about the College, its mission, and its students—myths that can dissuade talented students from applying.  This human dimension—and the simple but important fact that you live near the candidates you interview—has become even more important given that we no longer have the financial resources to make a second visit to most areas beyond Joint Travel.

Schools Committee members recruit students as well as interview them—but there is an important distinction between the two. When recruiting, alumni/ae should introduce students to and inform them about the College and the admissions process. They should not act in the capacity of interviewers, who inform applicants about the College and evaluate them for admission. Recruitment efforts should not be performed—or perceived to be performed—as a preliminary screening of prospective or actual applicants. Nevertheless, alumni/ae should use the information presented in section 2 to inform their advice to students.

In most settings in which you recruit students—the college fair or a school visit, for instance—there is little you will know about individual students, except that they are interested in learning more about Harvard. At this introductory stage, then, the task is essentially to present facts about opportunities at the College and to dispel misconceptions students and their families have about it. The Admissions Committee believes strongly that our staff, student workers, and alumni/ae should never disparage another college.

Informal contact occasionally does yield information about an individual that is pertinent to the admissions process. For instance, students sometimes volunteer SAT scores, grade point averages, and class ranks to enable you to assess whether they are "in Harvard's range."  No matter how experienced a recruiter or interviewer is, do not make any predictions or impressions, **positive or negative**, about a student's chance of admission.  Admissions officers often parry this question by saying, honestly, that they cannot estimate a student's chances until they have read a completed application and can assess the year's competition. And this analysis can only be accomplished with full access to all the material in an applicant's file and through the extensive discussions shared and comparisons made through the full Committee process.

When prospective students do ask about their chances of admission, it can be helpful to describe factually Harvard's selectivity—as well as the selectivity of other liberal arts schools—and the importance of applying to a range of schools. When expressed without unusual emphasis and with a helpful, considerate tone, this advice can help manage better students' and their families' expectations in the increasingly competitive world of college admissions.

20

HARV00001164

## College Fairs

We receive hundreds of notices from secondary schools, educational consortiums, community organizations, and other colleges soliciting our participation in college fairs. Schools Committee chairs receive copies of these notices and attempt to staff as many of these local events as possible with their alumni/ae members. College fairs vary in format and audience. Some are smorgasbords convening community colleges, technical schools, military academies, state schools of every stripe, and liberal arts colleges in order to address every student interested in any sort of post-secondary education. Other college fairs invite colleges that share many qualities.

College fairs can test your endurance (fairs often run for three hours or more) and versatility. Attending college fairs, for some families, substitutes for studying dozens of college guidebooks. For other families, the college fair is an opportunity to discuss in greater detail with a college representative what they have read in guidebooks and heard from friends. In a given evening, you might be asked everything from, "Where is Harvard?" to "What success do Harvard students have in medical school admissions?"—and you might be asked these questions many times over. This should re-emphasize the importance of being familiar with the College's current resources.

Under the section "Forms/documents" of the alumni interviewer website, you will find resources for alumni attending college fairs, including a "how-to" guide with answers to common questions, a list of new initiatives at Harvard, and a college fair materials request form.

## Acting as Secondary School Liaisons

Acting as a secondary school liaison may be one of the most valuable ways to identify and recruit talented students and to build positive relationships and good will with their families and school officials. Place a call yourself to the guidance department to introduce yourself and to explain your role in the Harvard admissions process—or drop a note with information about how people can contact you. You should tell guidance and other school officials that you are an alumnus/a member of the local Schools Committee, which works closely with the Admissions Committee in Cambridge. While you should apprise schools of the recruitment work Schools Committees do, describe explicitly how you wish to work with the school. Be clear that your mission is to introduce students to the College and to serve as an informational resource. Confirm that the school understands that your desired role is not one of evaluation, assessment, or screening of prospective applicants. This approach can encourage school officials to direct students to you without the fear that contact might affect a final admissions decision.

Depending on the secondary school's own policies, you might have wide latitude in working with schools. Some liaisons allow students to take the initiative in contacting them. They share with school guidance offices their names, addresses, and telephone numbers, and ask the counselors to invite students to contact them to talk about Harvard. Other liaisons visit their schools once or twice each year (usually in the fall and spring). Alumni/ae often also interview applicants from their schools, although they divide interviewing responsibilities with other Schools Committee members if the load is too great for one person. Whatever approach you adopt through consultation with your Schools Committee chair, schools should know whom to call when they have a question about Harvard, and they should feel comfortable contacting you. Open communication will best allow you to introduce a secondary school to the College, describe what the Admissions Committee seeks in strong applicants, and invite the school to identify strong and promising candidates.

21

CONFIDENTIAL

HARV00001165

**JA4909**
DX005.0021

**Setting up a school visit.** School policies on college representatives and their presence on campus vary. Some schools designate specific visitation times; others prohibit visitation. Guidance staffs are often overworked and have to deal with many college representatives. Untimely or unreasonable demands of their or of students' time should be avoided. No preferential treatment for Harvard should be expected. For these reasons, you will probably find it enormously helpful to speak first with the admissions officer assigned to your region before attempting to schedule visits. He or she can provide advice about what is and is not allowed or expected at certain high schools and introduce you to guidance counselors with whom we have established relationships.

If you wish to visit a school to talk with students, call the guidance department yourself to schedule a time and date to visit that will be mutually convenient for you, the guidance department, and the students. Guidance departments will often help secure a quiet and accessible place on school grounds for you to meet with students. Be explicit with guidance counselors that you welcome any and all students interested in speaking with you about Harvard. Some alumni/ae meet with guidance counselors before or after talking with students or even in place of talking with students. Guidance staff can, in this way, help you to identify students to recruit.

## Early Recruitment

**Early awareness.** Traditional recruitment strategies are now being expanded to increase the pool of qualified high school students—at once helping ourselves and, more importantly, raising students' educational aspirations, whether those aspirations include Harvard or not. Insights we can offer students about those qualities the admissions process values—academic achievement in rigorous curricula; distinction, leadership, or special talent in extracurricular pursuits—is most helpful when shared with students before or at the start of high school. There are many reasons why Schools Committees are well equipped to undertake efforts to raise educational aspirations. We are acquainted with many secondary schools and counselors and therefore have established lines of contact to junior high schools. We have access to recent college graduates, who often make the most effective role models, and to undergraduates who may have attended the very schools we might target for early awareness outreach. Indeed, volunteers for the Undergraduate Minority Recruitment Program (UMRP) include at least two visits to junior high schools in their recruitment travel for the College.

Schools Committees interested in early awareness projects should design programs appropriate for their own settings. In general, however, any outreach should: encourage improved educational achievement in high school, impart greater awareness of different kinds of college opportunities and knowledge about how to prepare for them, and provide students with some understanding of college admissions and financial aid policies.

It is important to include school personnel in the planning stages of any early awareness program, lest our work be perceived as an intrusion by outsiders who do not understand students' needs. Schools Committees interested in establishing early awareness efforts should make a long-term commitment but begin by targeting only one or two schools to fine-tune a feasible program. Schools Committees may wish to combine their resources with those of other college alumni/ae groups—to attract more volunteers and to broaden the program's appeal.

Early awareness efforts should not focus solely on the most gifted students; the program should enhance all students' appreciation for higher education. Moreover, early awareness conducted by Schools Committee members should not give the impression that students' participation in a "Harvard-sponsored" program might improve students' admissions prospects at

22

CONFIDENTIAL

HARV00001166

**JA4910**
DX005.0022

the College. Contact your area representative for more information about starting (or expanding) early awareness. We have a variety of publications and a video that might help your planning.

**The Harvard Book Prize**. Since 1910, the Harvard Book Prize has been an important and effective way of attracting the attention of talented young people to opportunities at the College. That the Book Prize now also represents, in more than 1,900 schools, one of the highest awards a school can give to a student in the junior class is a tribute to the effectiveness of the Book Prize Committee, which is part of the Harvard Alumni Association. Indeed, many Harvard Book Prize winners choose to apply to Harvard. To help maintain Harvard's tradition of diversity, it is important to reach schools outside traditionally covered areas. An expanded Harvard Book Prize Program can strengthen relations between Harvard and secondary schools and encourage talented students to consider attending Harvard. Should you have any questions about this program, please call the HAA Clubs Office at 617.495.5732 or 800.654.6494.

## Recruiting to Enhance Harvard's Visibility

I believe that student diversity contributes powerfully and directly to the quality of education in colleges and universities. For more than a century, Harvard has placed a very high value on the creation of a residential community that brings together people with a wide range of backgrounds and experiences. The breadth of views and voices in our university challenges each of us to think harder, to see the different sides of any issue, to confront our own assumptions and preconceptions, and to develop the kind of understanding that can come only when we are willing to test our ideas and arguments in the company of people with very different perspectives. It also gives us the chance to come to know, understand, and respect a remarkable variety of men and women whom we might not otherwise have the opportunity to learn from or even to meet.

*Neil Rudenstine*
*"Diversity and Learning"*
*President's Report, 1993-95*

One of the Admissions Committee's recruiting priorities is making Harvard accessible to students from diverse backgrounds. Here are some of our recruitment methods and objectives.

**Recruiting minority students**. National competition for talented minority students has escalated since the early 1970s, when Harvard expanded minority recruitment efforts. A Better Chance, Upward Bound, the National Scholarship Service and Fund for Negro Students, and the Association of Black Admission and Financial Aid Officers of the Ivy League and Sister Schools— all of these groups work to improve opportunities for minority students. The College also relies on the assertive contributions of alumni/ae. Please apprise students of UMRP and UAC outreach.

Harvard has long recognized the importance of reaching community organizations through which we can inform minority students of our interest and of the admissions process. Contact with school officials, community educational organizations, churches, social clubs, and groups such as the Urban League, the NAACP, and Tribal Councils can be fruitful. Alumni/ae often recruit students through these organizations in a fashion similar to the "school liaison."

It is important for you to know about minority life at the College, but discussions with minority students—whether in the context of recruitment or the personal interview—should not focus on the topic of "being a minority." Alumni/ae should respond to students' questions about multicultural activity at the College, for instance, but should not ask questions that suggest students are being ethnically screened or go through a "special" admissions process.

23

CONFIDENTIAL

HARV00001167

Minority recruitment offers perhaps the greatest contemporary challenge and opportunity for creative admissions recruiting. Our success in this area depends heavily on your enthusiasm and effort.

**Recruiting economically disadvantaged students**. The cost of a Harvard education and lack of awareness of our financial aid programs dissuades many outstanding candidates from applying. The Committee seeks to attract these students because of how much a Harvard education might change an individual's life—and the life of our society—for the better. Accomplished students from economically disadvantaged backgrounds have often distinguished themselves without the benefit of the resources enjoyed by more affluent students. High achievement attained without such resources can suggest that a student possesses an unusual degree of motivation and potential to contribute significantly to our community.

Outreach akin to that described for attracting minority students can be constructive in recruiting economically disadvantaged students: visiting schools outside affluent neighborhoods, cultivating relationships with school officials, attending broad-based college fairs, and enlisting HFAI, UAC and UMRP assistance. Familiarity with the College's policies of need-blind admissions policy and need-based financial aid is also critical.

**Recruiting students from sparse country**. Harvard wishes to draw students from all areas of the country—a challenge in sparsely populated areas. The Student Search List and information gleaned from school officials and local newspapers can help you identify potential candidates. A friendly note or phone call to introduce the candidate from sparse country to Harvard can be an important first step. Alumni/ae might also wish to request HFAI, UAC and UMRP assistance.

## Recruiting Athletes

Organized athletics, intercollegiate and intramural, play an important role at the College. A large number of our students participate in intramural athletics, and many Harvard athletes and teams have in the last several years competed for the highest championships in their sports. Most importantly, however, Harvard strives to provide a meaningful athletic experience for those students who elect to matriculate here—not to develop a program for men and women whose sole interest in the College is athletics. From this premise it follows that athletes on campus should be representative of the College in general—representative in their academic qualifications, their academic and professional interests, and representative in their general performance and participation in the life of the College. Such a policy does not in any way mean that excellence in sports is not or should not be a factor in our admissions policy. Extracurricular excellence of all kinds has been and will continue to be extremely important in selecting students from among a large group of qualified applicants.

Harvard works within the regulations of several intercollegiate athletic organizations: the Ivy League, the Eastern College Athletic Conference (ECAC), and the NCAA. As part of the Ivy League, Harvard does not offer athletic scholarships. All financial aid is based solely on need. NCAA rules are complex and occasionally inconsistent with our philosophy of athletics and, in particular, financial aid. While the College challenges rules inimical to our interests, Harvard makes every effort to live within the spirit of the rules, particularly those concerning recruiting. Due to the evolving nature of athletic regulations, we keep alumni/ae informed with annual "update" mailings regarding rule changes and additions.

Alumni/ae may not have contact with athletes that differs in any way from normal Club contact with non-athletic applicants. One point cannot be stressed enough: any violation of the

24

HARV00001168

principles, policies, rules, and regulations stated herein and in subsequent mailings invites the most severe penalties for Harvard and our student-athletes. Questions or concerns in this area should be directed to: **William R. Fitzsimmons**, Dean of Admissions and Financial Aid, 86 Brattle Street, Cambridge, MA 02138, 617.495.1557; or to **Robert Scalise**, Director of Athletics, Murr Center, 65 North Harvard Street, Boston, MA 02163; 617.495.2204.

If you are likely to have any contact with athletes, please study the basic rules of Harvard, the NCAA, ECAC, and Ivy Group Institutions and specific regulation changes by carefully reading athletic updates from both the Athletic and Admissions Offices. What follows is a primer on NCAA rules (individual rules appearing in bold type):

**All recruiting of prospective student-athletes must be done by institutional staff members.** You are considered a representative of Harvard's athletic interests as an alumnus/a, friend, or donor. This means that any contact you have with current or prospective student-athletes at Harvard can affect the eligibility of individual student-athletes and teams to compete in NCAA and Ivy competition. A "prospect" is any student who has started classes for ninth grade. This means that recruiting a student who has started classes for the ninth grade is subject to NCAA rules.

**Representatives of an institution's athletic interests are prohibited from having any contact with prospective student-athletes.** You may not have contact with a prospect or his or her parents, on or off campus, in person, by telephone or in writing; however, student-athletes do not have to be treated differently from other applicants in the admissions process. If you are assigned to interview students who are also athletes by your Schools Committee chair, you may contact the student for these purposes only. Schools Committee members may not have contact with prospects whom they are not assigned to interview. If a family friend or neighbor is a "prospect," then you may continue to maintain this relationship; however, you may never have a recruiting conversation.

**Prospective and enrolled student-athletes may not be given extra benefits.** An "extra benefit" includes the provision of any transportation, meals, housing, clothes, service, entertainment, or other benefit not available to all students who are not athletes. Under no circumstances may you provide an individual prospect or enrolled student-athlete these benefits. Teams visiting your area for competition may be provided with meals while on a team trip, but you may never take an individual or small group of athletes or prospects to a restaurant for a meal. However, enrolled student-athletes unable to travel home for holidays may be invited for a meal in your home, but not a restaurant. You may not provide transportation for their trip to your home, and this may be done only infrequently and on special occasions. Make sure you have the Athletic Director's permission before extending an invitation. Prospects' trips to campus must be financed by the Athletic Department under specific guidelines, and invitations for such trips may only be made by coaches. Contact the Athletic Director if you would like to contribute to a fund used for this purpose.

## Recruiting Admitted Students

Schools Committees host receptions in April for all admitted students, and often in December as well for Early Action admits. These informal gatherings, which often include parents, should focus on Harvard and students' and their families' questions and concerns about attending the College. One of the most effective recruiting tools is the conscientious avoidance of even slightly disparaging comments about other colleges. Pressure tactics often backfire. Alumni/ae should call to invite admitted students they interviewed to join them at such gatherings. This second meeting can extend the personal outreach alumni/ae offer that has proven so successful to our recruitment

25

**JA4913**

DX005.0025

efforts. If you cannot attend a reception for admitted students in your area, or if you live in an area that does not host such events, we hope you will nevertheless call and/or write to any students you interviewed who were admitted in order to congratulate them and to offer to provide support during the student's college decision-making process.

26

CONFIDENTIAL

HARV00001170

**JA4914**

DX005.0026

## 4. Interviewing Applicants

The interview is perhaps our most important recruiting tool. In recent years, the Admissions Committee has been able to admit only about one of every seventeen applicants to the College, and so alumni/ae interviewers may be the only personal contact applicants have with the Harvard admissions process. Ensuring that the interview experience is positive, comfortable, and helpful is the cornerstone of the critical personal outreach you, as an alumni/ae interviewer and official admissions representative, provide to applicants.

That applicants feel that they have been treated with respect is another expectation the Admissions Office has of the interview. The Committee also relies on your ability to make recommendations for applicants' admission based on these factors: the criteria outlined in section 2, your own perceptions of the student's "match" with the College, and your assessment of how well he or she has taken advantage of available opportunities. Blessed with so many accomplished applicants—many more that we have room to admit—the Committee often makes fine distinctions among candidates. Many of these decisions hinge on intangible factors that alumni/ae can substantiate with interview reports that breathe life into applicants' folders.

### Scheduling the Interview

**Receiving assignments**. To expedite interview assignments, you will receive basic information about each applicant you are to interview: name, address, telephone number, high school. Chairs assign interviews based on interviewer availability and accessibility, among other pragmatic factors. You and your chair should talk about your availability—e.g., in what areas you would prefer to interview applicants, when, and how many—before you commit to Schools Committee work. While the Admissions Committee appreciates the effort it takes to interview even a single applicant, we believe alumni/ae offer more valuable individual assessments by interviewing at least four to six applicants each year. Interviewing several applicants can expand your perspective of individual candidates, the applicant pool, and the admissions process.

**Matching applicants with interviewers**. The Admissions Committee does not recommend a conscious policy of matching interviewers and applicants—by ethnicity, academic or extracurricular interest, or any other factor. Some applicants have reported that they felt they were being "specially screened" by meeting with an alumnus/a of similar ethnicity, for example, and that their racial identity was under scrutiny more than their academic achievements, extracurricular passions, and personal qualities. "Matches" will of course occur in the normal process of assigning interviews, and such assignments should proceed.

**Contacting the applicant**. *Please call the applicant yourself.* We realize that our alumni/ae are often busy and make time for interviewing among many important commitments. Sometimes, for these reasons, alumni/ae have a surrogate contact students. Yet students who describe their interviews as constructive cite the personal interest alumni/ae took in them. *A friendly, casual, and personal phone call can be the first step to a positive interview experience.* Be sure the student has your name and contact information in case there is a change. At the end of the call, slowly repeat your name and the best way to reach you.

While contacting a student via email can be useful, often the logistics can be ironed out more easily in one brief conversation. Be sure to check your email frequently if you do reach out via email, as your message might get misdirected to an applicant's junk folder; follow up with a phone

27

CONFIDENTIAL

HARV00001171

call if you do not receive a timely response.  No need to persist if two emails and two calls do not produce a response, though please note your effort on the interview form and submit online.

Be clear about family involvement. Families are often eager to play a role in their children's interviews. For instance, many parents will want to arrange the details of the interview with you. *The Committee prefers that you set up your interviews directly with students.* Students—not parents—will be negotiating the day-to-day details of college. Students are often surprised when their parents schedule an interview without consultation. If you have no other option than to schedule the interview with parents, ask them to have the applicant call to confirm the details of your meeting. Parents might also accompany children to interviews. While you should indicate to applicants that their parents are welcome to ask questions after you complete the interview, ensure that parents know not to join you in the interview.

You may also need to reassure parents who are suspicious about the time and the place of the interview. For instance, the Admissions Office receives calls from concerned parents wondering why an alumnus/a has called their daughter to come to his/her apartment in the early evening for a personal interview – please continue to use your good judgment in arranging the time and place for the interview.  If a candidate or their parent(s) wish to confirm your affiliation with Harvard, encourage them to call our office (617-495-1551) and we will be happy to do so.

**Selecting setting and time**. When scheduling an interview with an applicant, negotiate a time that is <u>mutually convenient</u> and a place <u>most free of distractions</u> - typically a public place that is quiet, safe, and mutually convenient, like the public library or a quiet coffee shop. Please ask whether a student has adequate transportation to and from the interview. This can affect your arrangements dramatically. While it is generous to offer to provide transportation to an applicant to and from the interview location, we would advise against this arrangement.  Instead, give the applicant the opportunity to suggest a location.

Ideally, you should examine your calendar and select those days and times you know you will be available to conduct an interview. Then, on the telephone, you can give the student several options; be sure to ask what is best for them, as well. Generally, the Admissions Committee does not recommend scheduling an interview that will occur during school hours or last beyond 9 p.m. Let the applicant know you plan to spend <u>no more than 60 minutes in a single meeting with them</u>.

If you and the applicant have significant difficulty agreeing to a time and place, it is probably best to have your Schools Committee chair re-assign the interview. Some alumni/ae have thought scheduling complications biased them against a candidate, and others worried that—even if they were not bothered by scheduling difficulties—the student might perceive such bias.

The Committee knows that alumni/ae can, and have, successfully interviewed students in a variety of settings. The candidate will want to make the best impression possible and the interviewer should help provide the setting for him/her to shine.  <u>Please be sensitive to the perceptions of "being alone" in a stranger's home (i.e. the interviewer's home); any of the candidate's concerns should be addressed at the time of the initial contact, and any worries put to rest.</u>  **That said, we encourage interviewers to conduct interviews in a public place that is quiet, safe, and mutually convenient.**

Of course, adhering to local norms and social customs in your area should be considered and you know best what these might be. While a "Starbucks" locale may serve to be an easy choice in certain areas of the country, this setting could be less than ideal in others.  Again, we value your good judgment in your interviews and have every confidence that you will display the same in advance of arranging the interview.  <u>Alumni/ae should be aware, however, of the possible drawbacks of holding interviews in particular locations, especially with regard to interviewing in an interviewer's home.</u>

28

CONFIDENTIAL

HARV00001172

**JA4916**
DX005.0028

**Interviewing on "neutral ground."** Some alumni/ae interview on "neutral ground," e.g. the applicant's school or the local public library. This approach usually minimizes transportation complications and appeals to alumni/ae who live with their parents or who have small children. Should you wish to interview a student at school, do not schedule your interview at a time that interrupts the student's class schedule or that requires the student to be at school at an unreasonable time. If an applicant is amenable to meeting you at school, call the guidance department to reserve a quiet place to talk. Remember, school policies about the visitation of college representatives vary.

Some Schools Committees arrange for several alumni/ae to interview students one-on-one at a local school on a Saturday morning. With sufficient notice, a school will open the building and reserve rooms for as many interviews as will be taking place at one time, with an additional room reserved for parents and the second round of applicants. Alumni/ae often add certain amenities (e.g., coffee, juice, donuts) for parents and applicants in the waiting room.

**Interviewing in your home**. Some alumni/ae invite students to interview in their homes, a practice the Admissions Office has increasingly come to discourage. <u>Please note that some students and parents may express discomfort at the prospect of being interviewed in the home of someone they do not know</u>.  In fact, some high school guidance counselors explicitly instruct their students to reject offers to meet alumni in their homes.  In these cases you should happily suggest an alternative meeting location on neutral ground.

**The Admissions Office suggests that interviewers select locations other than their own homes for interviews when possible.**  However, we acknowledge that sometimes it is helpful or necessary to arrange interviews at the interviewer's home, and under these circumstances, it is important to bear in mind several important considerations.  Be aware that interviewing in your home may present travel complications. If you do interview a student in your home and send away parents after they have dropped the student off, he or she might nervously watch the clock to make sure parents are not freezing at the curb as they wait for the interview to end. The spouses of some alumni/ae have been incredibly accommodating by entertaining parents over coffee while their children are being interviewed. The Admissions Committee appreciates, but does not expect, such graciousness. We suggest instead that you tell parents to return in forty-five minutes. Beyond considering possible transportation complications, please be aware that a grand house might seem so impressive to a student as to be intimidating. Be conscious, too, of possible distractions, such as the telephone and young children.

**Interviewing in your office**. Many alumni/ae interview applicants at work. But like a beautiful house, the boardroom of a major corporation or firm can be intimidating. Keep distractions at a minimum by letting colleagues know you will not be available for the duration of your interview. Hold your calls or have them directed to your voice mail.

**Interviewing in a local restaurant or coffee shop**. Some alumni/ae interview applicants in these settings, which is fine assuming the applicant agrees. The alumni/ae interview can make many applicants self-conscious, so be aware that some applicants are more self-conscious if they are aware that strangers—and their alumni/ae interviewers—are scrutinizing them.

**We do not recommend interviewing students in their own homes**. Some students interviewed in their own homes have reported they have felt as if their "family was on trial." Interviewing students at their homes also diminishes the control you would otherwise have over time and possible distractions. In the case of one alumnus who interviewed an applicant in her home, the applicant's mother stayed through most of the meeting and became so involved in conversation that she asked her daughter to answer a ringing phone.

**What applicants should wear to an interview**. Your initial conversation should touch on other issues of protocol and logistics. If applicants ask you what to wear, tell them the Admissions

29

CONFIDENTIAL

HARV00001173

**JA4917**
DX005.0029

Committee has no policy about how students should dress for interviews, but that we hope applicants wear whatever will help them feel comfortable.

**On asking applicants to bring résumés and other materials.** Some alumni/ae interviewers ask students to bring copies of their extracurricular resumes to the interview. Others give students pre-interview surveys. These materials can be valuable because they yield obvious talking points. But we hope these materials will not be too detailed or burdensome to applicants. Surveys can seem to be redundant forms among so many others over which students have already labored. Students have also reported that it was unclear how the alumnus/a would use the survey or resume.  Interviewers should acknowledge and confirm with students that providing a resume or a survey is voluntary and by no means a required part of the admissions process.

**Staffing the interview.** Never interview more than one applicant at a time. One-on-one interviewing is most effective. A single interviewer can direct an interview's course and content more efficiently than a panel of interviewers can. Some Schools Committees, however, successfully have pairs of interviewers assess a single applicant. There are two common multiple-interviewer formats. A group of alumni/ae can simultaneously interview a single applicant or an applicant can interview separately with two alumni/ae in a single morning or evening.

The multiple-interviewer format can offer certain advantages. Post-interview discussions allow alumni/ae of different preferences and temperaments to check their biases when evaluating individual applicants, and these discussions help the alumnus/a writing the interview report to provide a more broadly sympathetic view of the candidate. New Schools Committee members might wish to join a veteran interviewer to develop perspective on the interviewing process. Finally, Schools Committees with a surfeit of interviewers can accommodate the interest of a greater share of their membership by assigning an interview to a group of two or three alumni/ae.

There are pitfalls, too. Being interviewed by more than one person at a time can intimidate students. You must take particular care to set the candidate at ease to prevent the group interview from resembling a polite grilling. The format can also prove a difficult juggling act for interviewers. Interviewers must settle among themselves before the interview begins who will ask which questions when—orchestrations with which single interviewers need not contend. Please consider, too, the efficiency of the multiple-interviewer format for your Committee. Schools Committees with small active memberships might not be able to afford the time it takes two alumni/ae to interview a single candidate.

Whatever approach your Schools Committee adopts, let the applicant know the interview format in advance, and explain why you have chosen it. Each alumnus/a joining the interview should then introduce himself or herself to the applicant at the start of the interview.


## Conducting the Interview

**Length.** Let the applicant know you plan to spend no more than 60 minutes in a single meeting with them—no matter which interview format your Schools Committee uses. A single meeting, for this length of time, offers sufficient opportunity for you to form an impression of the applicant.

**Explaining the purpose of the personal interview.** Your first priority upon starting an interview should be to set the applicant at ease. Sitting face-to-face with an applicant rather than allowing your desk or a large table to fill the space between you are ways you can help the student feel more comfortable.

CONFIDENTIAL

HARV00001174

Beginning an interview with a short introduction about your role in the admissions process can also relax the applicant. You should tell applicants that, as an interviewer, you work closely with the Admissions Office. Add that although the Admissions Office is interested in your written evaluation—which becomes part of a student's file—it will be read in the context of all the other application components: grades, test scores, extracurricular participation, personal essays, and counselor and teacher recommendations. Many alumni/ae then reveal how little they know about the applicant, and that they do not have access to applications. Students will be less likely, then, to assume you know everything about them, and this can encourage them to talk about themselves more freely. You should also encourage the student to ask you questions about anything pertinent to the College, the admissions process, and even your own experiences as a student here.

**Note-taking**. Note-taking can help you recall details about your conversation that will prove valuable in composing an interview report. Approaches to note-taking vary. Some alumni/ae do not write anything down that they would not want applicants to see. Others record more evaluative comments and even quotations. Still others place a pad and paper in the open, but spend the first three-fourths of an interview talking with an applicant and not taking notes. Then, telling applicants they wish to record some basic data, they ask applicants to review their current course work or their extracurricular activities.

Note-taking, however, can prove distracting to an applicant. Asking for academic credentials can put a candidate on the defensive. Asking about test scores and grades first also puts undue emphasis on "the numbers game." **Remember that your objective is not to find out all the facts – the application will disclose them.** Again, the particular value of the alumni/ae interview is the personal outreach it offers applicants and the personal dimension interview reports add to applicants' folders. <u>Never record interviews</u>.

**Asking applicants for academic credentials**. It is never necessary to request academic credentials from students if an interviewer prefers not to do so. However, there can be compelling reasons to ask every applicant about his or her grades and scores. Your approach in asking for this information can help put candidates at ease and reassure them that grades and standardized test scores are by no means the only things the Admissions Committee considers in evaluating applications. Many interviewers ask for this information near the end of the interview in a casual tone: "So I can make sure that the Admissions Committee has all the information it needs in your file, may I ask for your test scores and grade information?" Others ask for the information at the beginning of the interview and place those notes out of sight, moving quickly into a discussion of other things. <u>You are prohibited, however, from contacting the high school for this information</u>. The information must be shared voluntarily by the applicant during the interview. If he or she declines, then please use your best estimate to rank the applicant in the academic category.

**Questions to structure your conversation**. Your conversation should center on an applicant's interests, not yours. Most interviewers begin interviews with questions about simple, factual matters that are easy for applicants to answer:

- Describe your school community.
- What courses are you taking?
- Which courses do you enjoy? Why?
- Which do you least enjoy? Why?
- In which activities are you involved? Why? Which do you most enjoy? Why?
- What are the important activities in your school? Why?
- What do you do in the summer?

31

CONFIDENTIAL

HARV00001175

**JA4919**
DX005.0031

- Do you have a favorite book? Or, which book have you recently read? Do you prefer reading online? What blogs or sites do you read regularly?

These questions can help you structure the interview and allow the student to volunteer information that will help you assess them. These questions can also help you pinpoint ideas, activities, and passions that are of interest to the candidate, which might lead to more specific discussion about those interests.

As you talk about something of importance to the candidate, your questions should point toward discovering motivation, commitment, and level and quality of contribution. Your questions should be open-ended to encourage candidates to provide their own insights and reflections about their experiences. If a student provides merely factual answers, you might wish to draw him or her out by asking, "Why?", "How did you happen to do that?", "Was the result what you expected?" When you talk about an idea or an intellectual concept in a book, play, current event, or research project, encourage the candidate to develop the idea.

**Be a supportive listener.** Regard a candidate's thoughts and feelings with respect and try to appreciate each individual's unique qualities. Hear what is being said and how it is being said, but be wary of trying to guess what is not being said and supplying motive or unsupported insights. It is better to report factually what an applicant said rather than to characterize what they have said. To write, "The applicant never said more than three words at a time, and she looked down at her hands almost the entire time" is more effective and less open to interpretation than, "He was nervous and I think he would be out of place at Harvard."

**Avoid prolonged discussions of political and personal issues.** Interviewers are not usually judgmental about the content of an applicant's political opinions or family situation. They use the interaction to gauge whether the student's ideas are original and well-reasoned or simply parroted from elsewhere. Conversations about family problems can also be cited to provide evidence of a student's maturity and ability to deal with adversity. The information reported can, in fact, be used to boost a student's chance for admission.

Yet students report that prolonged discussions of difficult or sensitive subjects can ruin an interview. Such conversations include probing for opinions on political topics (e.g., welfare, crime, drugs, abortion, capital punishment) or personal issues (e.g., religion, sexuality, family finances, family illness, details of parental relationships and divorces). Students' reflections on these topics can reveal the degree to which they are aware of the world around them, and can yield insights about an applicant's background or personality. But discussing such matters, particularly at length, can reasonably be construed as an invasion of privacy.

**Be wary of asking, "To which schools are you applying?"** Alumni/ae often wish to know what characteristics students seek in a college to measure how well they know and are a match for Harvard. The best way to start this conversation is to ask, "What are you looking for in a college?" rather than, "To which schools are you applying?"

Some colleges make admissions decisions contingent in part on students' perceived commitment to their school. This is not the case at Harvard. Because some students believe they could jeopardize their chances of admission to the College by discussing other schools, the Admissions Committee strongly recommends that your discussions about students' interests in other colleges focus on general characteristics rather than proper names.

**Do not ask, "Is Harvard your first choice?"** The Admissions Committee strongly recommends against asking a student whether Harvard is his or her first choice. The Committee regards a student's application to the College as the most important interest an applicant can express in Harvard. This question puts most applicants in the position of saying Harvard is their first

32

**JA4920**
DX005.0032

choice—perhaps in spite of their actual preferences—out of fear that they might jeopardize their chances of admission by telling you that they might not ultimately make the same decision you did.

**Questions you should ask yourself as you conduct an interview.** It can help you write a valuable interview report if you evaluate students' comments as you interview them by asking yourself these questions:

- Does the candidate have potential?
- Has the candidate reached her maximum growth?
- Has the candidate been stretching himself?
- Has the candidate been working to capacity? In her full-time or part-time employment? In his academic pursuits? In other areas?
- Does the candidate have reserve power to do more?
- How has the candidate used her time?
- Does the candidate have initiative? Is he a self-starter? What motivates her?
- Does the candidate care deeply about anything—intellectual? Personal?
- Is the candidate more concerned about intellectual subjects? Human subjects?
- What has the candidate learned from his interests? What has she done with her interests? How has he achieved results? With what success or failure? Has she learned anything as a result?
- Will the candidate be able to stand up to the pressures and freedoms of Harvard?
- What qualities, strengths, or weaknesses differentiate this candidate from others?
- What choices has the candidate made for himself? Why?
- What is the candidate's intellectual capacity? What has she done with it?
- What is the candidate's personal capacity? What has he done with it?
- What is the candidate's Harvard motivation? Why and how did she pick Harvard? What effort has the candidate made to inform himself about Harvard?
- Is the candidate a late bloomer?
- What is the quality of the candidate's activities?
- Does the candidate have a direction yet? What is it? If not, is she exploring many things? Or is he just letting everything happen to him? Where will the candidate be in one year? Five years? Twenty-five years? Will she contribute something, somewhere, somehow?
- What sort of human being is the candidate now? What sort of human being will she be in the future?
- Will the candidate contribute something to Harvard and to his classmates? Will she benefit from her Harvard experience?
- Would you or other students want to room with this applicant, share a meal, be in a seminar together, be teammates, or collaborate in a closely knit extracurricular group?

**Questions applicants frequently ask interviewers.** Students often ask very specific questions for which you should be prepared either to speak from your own experiences or, if you do not know how to answer their questions, to say so. These are two of the most frequently asked questions:

**"What's Harvard really like?"** This question probably has as many answers as there have been Harvard students. Remind students that you can only provide one perspective of life at Harvard—your own. Sometimes, this question masks other curiosities, many of them about whether Harvard myths are true. Are there a lot of students at Harvard who attended private secondary

33

CONFIDENTIAL                                                                    HARV00001177

**JA4921**
DX005.0033

schools? (Two-thirds of Harvard students attended public secondary schools.) Do you have to be rich to go to Harvard? Is Harvard competitive? Will I be able to do well academically and participate in extracurricular activities? These questions should emphasize how important it is for you to be well informed about the current dynamics of the Harvard experience.

**"What are my chances for admission?"** Students often ask for your assessment of their chances of admission during the course of their interviews. Although the previous section addresses this question, it is worth repeating here. It is very important not to create any impressions or expectations, **positive or negative**, about the student's probability of admission. Even if you think he or she is under-qualified, it is not your place to make suggestions about their college applications. Though well intentioned, it is inappropriate for the interview setting. After all, admissions officers often parry this question by saying, honestly, that they cannot guess at a student's chances until they have read a completed application and can assess the year's competition. And this analysis can only be accomplished with full access to all the material in an applicant's file and through the extensive discussions shared and comparisons made through the Committee process.


## Writing the Interview Report

Your goal in writing a personal interview report should be to help the Committee see the applicant as a human being and to determine whether or not the student has the important intangible strengths that might distinguish him or her in the admissions process and, if admitted, at the College. Here are some pointers:

**Showing is better than telling.** The conclusions expressed by an interviewer can have greater value when the reasons and basis for them are explained in the interview report—with examples proving your points. Try to supply kinds of information that would otherwise be missing from the folder. Comment on the quality of an applicant's interests and commitments to differentiate a particular candidate from the applicant pool.

**Cite only facts that are important to the candidate or that support your judgments.** Assume the candidate has provided general factual background in her application. This allows the best interpretation of the interview report, particularly since the reader will not always know you and be able to accept automatically your conclusions. The interview report should be more than a recitation of activities or the assertion of a conclusion.

**Comment on the quality of a student's experiences with evidence proving the point.** While the combined evidence of the school record, counselor and teacher reports, and results of standardized tests and AP and IB examinations permit the most complete assessment of academic ability, discussions of the content of a candidate's school work, the way it is accomplished, and the pattern and depth of his or her outside reading can yield helpful information. For example, if a student is interested in science, information about long hours spent working in a hospital emergency ward or building a computer can distinguish the quality of an applicant's interest. Does the student participate in athletics? If so, perhaps you can give us local context to help us assess her prowess and potential to play here. Although we defer to the judgment of Harvard coaches when considering a student's athletic ability, information provided in interview reports can help us alert coaches to students they might have overlooked. If he is a performing artist, do you know about the caliber of the groups with which he performs or exhibits his work? Is it unusual for a student from his high school to participate in the arts (because, for example, sports are the dominant extracurricular activity, or the school lacks serious clubs for students interested in the arts)?

34

**JA4922**
DX005.0034

**For students to whom you are giving your support, approach writing the report as an opportunity to "make a case" for the candidate**. Why should this particular applicant come here? What special contribution might this student make or how might he benefit from the Harvard experience?

**Write candidly**. Interview reports sometimes telegraph impressions out of fear either of quashing a student's chances or of appearing too enthusiastic about them. We hope you consider the global nature of the Committee's assessments; we seek consistency throughout all the materials in a student's folder. By itself, one blemish or even one exceptional quality or credential will neither demand nor prevent admission. In many instances, the interview confirms other evidence in the applicant's file, and it can certainly make a difference in the ultimate decision. Balance this advice with the following note.

**Consider your potential audiences as you write**. Any number of individuals on the Admissions Committee might read your reports—faculty, admissions staff, and other members of our community. Admitted applicants who enroll at Harvard may read their application files through the Family Education Rights and Privacy Act. (Students occasionally do exercise this right.) Be professional in writing about a candidate's strengths and weaknesses. Avoid slang and comments that could be interpreted as derisive.

*An open-minded interviewer, a perceptive judge of people, someone who is aware of the limitations of judging a person on what can be seen in a 60-minute conversation but who is also able to report frankly on what was seen and whether it should strengthen or weaken a student's application is of inestimable value.*

**Length**. Each report should include a summary and indicate whether you feel the student should be admitted or not, and why. Reports should be as brief as possible, but not at the expense of providing helpful information and judgments. Do not feel pressured to polish the prose of a report on a candidate with whom you have not been very impressed. We are far more concerned with the content of the report—and your judgments—than the report's style.

**Be aware of, and suspect, your own biases**. Since no one can really be "objective" in attempting to evaluate another person, be aware of your biases. It is easy to feel that a student who shares your values and enthusiasms is a very strong applicant—or that one whose view of the world is greatly at odds with yours is confused. The good interviewer makes allowances for this, appreciates a point of view on its own merits, and evaluates the interview accordingly. Sometimes interviewers call attention to their own preferences: "This is not the sort of person I most enjoy, but… ," or "I probably favor the student who has had to work hard…." This approach can help the reader interpret the interview report more accurately.

**Numerical ratings**. The Committee does not expect to achieve anything approaching national consistency with the use of numerical ratings, so we use them in the most general way to show whether an interview was favorable or unfavorable. In any case, the Admissions Committee relies more heavily on your prose. Keep in mind that we have recently changed how we ask you to assess candidates. Consider the ranges for all criteria. Interviewers sometimes comment that we do not pay enough attention to their write-ups and numerical ratings. The credibility of your ratings depends on your use of the numerical range when you interview applicants. **You diminish the impact of your support if, for instance, you rate everyone a "1" or "2+" across all categories**.

35

CONFIDENTIAL

HARV00001179

**JA4923**
DX005.0035

## Sending Your Reports to Cambridge and to Your Chair

After the results of a spring 2008 web use survey were tallied, numerous requests pointed to enhancing web services available to chairs and interviewers. Suggestions included creating an online submission form, stabilizing website availability, allowing chairs to assign interviews online and creating club management tools for chairs. Responding to your requests, we launched a newly designed web portal in the fall of 2008 and have revised and reorganized it substantially the past two admissions seasons.

Even before you begin submitting interview reports, please feel free to login using your current access code (PIN) and become familiar with the site, download updated information about the College, and generally become familiar with navigating the site. If you don't remember your access code, please use the "Forget your Access Code?" link on the login page in order to have the code sent to your email address on record. As you navigate the site you can be assured that you cannot break anything or accidentally delete yourself!

Please find the site here:

https://admapp.admissions.fas.harvard.edu/hanevo/alumni/haServices.do

Please begin by reviewing your profile and editing your contact information accordingly. We encourage you to use your "post.harvard.edu" address, as this will remain constant even if you decide to forward your mail to a different account. As always, if you have any questions or concerns, please feel free to contact the admissions officer assigned to your region with questions or to provide feedback.

Whenever possible, you should use the online version of the interview report form. If that is not possible, please keep a copy of your report for your records, send a second to your Schools Committee chair, and send a third copy to the Admissions Office. Sending a copy to your Schools Committee chair alerts him or her that you did the interview and enables him or her to give us a copy of the report should we misplace it and not be able to reach you in a timely fashion. We also have several fax lines by which you can send us reports (see Documents and Forms on the website). Finally, you can send reports by mail and priority mail to the Harvard College, Office of Admissions and Financial Aid, 86 Brattle Street, Cambridge, MA 02138. If you choose to file on-line, email, or fax your reports, please remember you do not need to snail-mail them as well. If for some reason they are lost or never arrive, your area representative will contact you.

## Ranking Meetings

After completing all interviews, some Schools Committees hold ranking meetings to compare candidates. These meetings can approximate the Committee process in Cambridge. If the Schools Committee applies roughly the same standard of selectivity as the Admissions Committee, alumni/ae can better understand the strengths necessary for candidates to distinguish themselves in the admissions process. Alumni/ae also have the opportunity to temper their own judgments of candidates when they hear how other alumni/ae have evaluated other candidates.

Candidate rankings are valuable to us for the input they provide and to Schools Committee members for the information they share. Any Schools Committee member who has had a greater-than-usual share of either strong or weak applicants for the year can also put his or her own

36

CONFIDENTIAL

HARV00001180

JA4924

DX005.0036

interviewees in perspective and understand better the decisions made in Cambridge. Ranking meetings also provide valuable exposure for new interviewers.

There are some caveats to consider before initiating a ranking meeting. They require considerable time and effort. Recommendations from ranking meetings are most valuable if every applicant from a given area is interviewed, if all interviewers have the opportunity to introduce any candidate for the Schools Committee's consideration, and if all of this work can be completed before the area person enters subcommittee meetings in Cambridge. <u>Please keep in mind, too, that recommendations Schools Committees make for candidates after a 60-minute interview and ranking meeting discussions are additional elements—but not substantially determinative ones—that the Committee weighs in the context of all other information in an applicant's file.</u>

## Transfer Interviewing

We may ask you to interview transfer applicants after the freshman admissions season ends. We understand these interview requests come when people are both busy and exhausted from finishing the admissions process for the new class. But, unlike interviewing for freshman admission, alumni/ae see only pre-screened candidates. Keep in mind that a typical transfer applicant's extracurricular activities are slightly less important than her academic focus and fit with the Harvard curriculum. Since we have less personal information about these students than we have for freshmen, conveying a sense of the person in an interview report is especially critical. Will the student be happy here? How well do you think they will make the transition—academically, socially—from their current schools to Harvard?

37

CONFIDENTIAL

HARV00001181

**JA4925**
DX005.0037

## 5. Sample Interview Reports

### Marcus

**Academic (2-)**
*Magna potential. Excellent grades and mid to high-700 SAT scores (33+ ACT).*

Marcus is a top-flight candidate for Harvard. We spent about an hour talking, and I was able to learn quite a bit about this outstanding young man. He is clearly a leader both in the classroom and out. Marcus is very interested in becoming a doctor and has worked hard to achieve a 3.5 grade point average. He has also taken his college tests and has mid-650s on all. Because of his interest in medicine, Marcus did volunteer work in a hospital this summer. We talked for a while about the pre-med program at Harvard.

**Extracurricular, Athletic, Community, Employment, Family Commitments (2)**
*Substantial school-wide, regional or state recognition; major contribution/leadership.*

Extracurricularly, Marcus is a strong high school contributor who could add a good deal at college as well. He has played the clarinet in the school band for three years, takes part in the public service club, and has rowed on the varsity squad for two years as well.

**Personal Qualities (1)**
*Rare personal qualities and appeal*

Fine young man. Very enjoyable conversation.

**Overall (1)**
*Absolutely superior for admissions; truly unusual in the entire applicant pool*

With this combination of academics and extracurriculars I can't imagine that we could do better. Please hurry and accept this fine young man. He'll make a wonderful alumnus! If you need more information, don't hesitate to call me at the numbers listed below.

---

**Comments:**

The interviewer makes pronouncements without substantiating them. Where is the evidence that Marcus is "a leader both in the classroom and out" or that he is "a strong high school contributor"? What did he do when he volunteered in the hospital? How significant is his contribution to extracurricular activities? Why has he had to work hard to achieve a 3.5 GPA? Is he taking a rigorous academic program? Does he show any signs of intellectual curiosity?

The ratings seem inflated by at least a full number, and far from being a "clear admit," Marcus does not appear to be a particularly strong candidate, based on the information we have here. If there is stronger evidence for Marcus' admission, it should be included in the report itself, not offered to be made available over the phone. The interviewer seems unaware of the competitiveness of our selection process or the strength of our applicant pool.

---

CONFIDENTIAL                                                                    HARV00001182

**JA4926**
DX005.0038

## Daniel

**Academic (2)**
*Magna potential. Excellent grades and mid to high-700 SAT scores (33+ ACT).*

Daniel articulates his thoughts and reasoning well, and told me that he's "in the top 5 percent" of his 70-member class at City Prep. His scores, as you know, are almost perfect across the board. He enjoys science (particularly chemistry, "because I love taking a law or technique and applying it to new units and in labs"), English, and history. Although not certain about a career, he is leaning toward medicine. He said he enjoys English but did not seem particularly interested in discussing literature (a particular interest of mine given that I am an English professor), but after talking with him more he came to the conclusion that what really intrigues him about his English classes is the art of composition, rhetoric, and argument. I could tell from the way he speaks that he puts considerable thought into the ideas he puts forth (though he never sounded labored or took large pauses to compose thoughts), so this interest in composition sounds spot-on.

**Extracurricular, Athletic, Community, Employment, Family Commitments (2-)**
*Substantial school-wide, regional or state recognition major contribution/leadership.*

Daniel's mother teaches in one of the inner-city public high schools, and she is the one Daniel credits for his "sense of duty" to others. He is very active and interested in community service, asked many questions about PBH, and promises that he will lead a Boy Scout troop wherever he ultimately attends college. From his questions and the way he described his involvement, I got the sense that his efforts were real and inspired; he's not merely showing up for a few hours one Saturday a semester to fulfill his school's service requirement (my sons went to City Prep, so I'm quite familiar with their service requirement and most students' perfunctory approach to completing it).

Community service is his major interest outside the classroom, followed by Model UN, editing the school paper, and volunteering summers and time during the school year to sundry activities. Daniel is also an Eagle Scout. When I commented that it is unusual to encounter someone his age still involved in scouting, he said there were only four other peers involved and that he feels "duty-bound" to continue his commitment.

**Personal Qualities (3+)**
*Above average personal quality and appeal*

Daniel is more articulate than most young people I have interviewed, and it sounds as if he has had substantial public speaking opportunities through scouting and his work with the Model UN. When we started speaking about the resolutions Daniel had to debate at some simulations, he finally started speaking in a little more animated fashion. For instance, Daniel expressed some emotion when describing his assignment, as a representative from Ireland, to defend a position shared only by the Vatican, whose representative eventually abandoned centuries of church tradition to leave Ireland alone contra contraception. Nevertheless, he soldiered on, though not convincing many others.

39

CONFIDENTIAL

HARV00001183

**JA4927**
DX005.0039

Daniel is very interested in sports, but his involvement has been limited as a result of a torn ACL. Daniel brought a copy of the school paper and some other writing he has done. Through this deed and in many words, too, Daniel seemed a bit aggressive in enumerating his accomplishments. In the course of the interview, however, it came out that a Harvard alumnus at City Prep coached his sales technique. His "real" personality seemed more in evidence when he asked questions such as, "Do I have a chance to get in to Harvard even though I've never invented anything or won the world chess championship?" And he spoke with general admiration and affection for his mother's work and his commitment to Scouting. I enjoyed speaking with Daniel, especially after he became more relaxed.

**Overall (2-)**
*Clear admit—one to recruit*

Daniel, with his abundant ambition, would have no problem fitting it at Harvard, but he is still a bit of an awkward fellow. He is obviously competent in getting things done, articulate, and motivated. He would do well in a large research university.

---

**Comments:**

Two factors distinguish this report as particularly helpful. First, the interviewer cites Daniel's activities to substantiate the interviewer's qualitative comments and to justify the extracurricular rating awarded to Daniel. Contrast this with a report that merely lists activities and makes broad conclusions: "Daniel is the strongest applicant for Harvard College I have ever interviewed."

Second, the interviewer quotes Daniel directly or paraphrases specific exchanges to justify her assessment of the quality of his extracurricular participation and his personal qualities. This does not make this interviewer's perspective infallible or doom Daniel's chances for admission, but this report conveys clearly the basis of the interviewer's judgments. The overall rating might be a bit generous, but Daniel sounds like a candidate who will receive serious consideration during our deliberations. This interview report will add an important dimension to those discussions.

---

40

CONFIDENTIAL

**JA4928**
DX005.0040

# Evelyn

### Academic (1)

*Summa potential. Genuine scholar; near-perfect grades and test scores (in most cases) combined with evidence of original scholarship*

Evelyn is the editor-in-chief of her school's literature magazine and enjoys writing poetry. She is also an officer in her school's science league team, which has won the Gray's Anatomy contest in cardiovascular science competition for the last 3 years. She is excited about trying to win the fourth straight competition soon. She also is in her school's Chemistry Charter Club, which teaches seminars for younger students.

I liked her methodical approach to her future intellectual pursuits. She is looking for an interdisciplinary experience in school and her career and is currently most interested in Environmental Science and Public Policy.

She's really very close to "truly unusual" in intellectual curiosity and originality, which is why I gave her a 1 academic rating.

### Extracurricular, Athletic, Community, Employment, Family Commitments (2+)

*Substantial school-wide, regional or state recognition; major contribution/leadership*

What I really like about Evelyn was that she has a handful of interests outside of school and has focused in on those for which she has a true passion.

She has been swimming competitively for many years and is on her high school's varsity team, primarily now doing individual medleys and the backstroke. Her team is apparently very competitive regionally. She also volunteers as a swimming coach for an 8U team on weekends and during the summer.

She has several officer positions in extracurricular clubs and activities. She is the editor-in-chief of her school literary magazine and enjoys writing poetry. She is president of the Environment Club. She is an officer of her school Science League team, which has won several competitions (see Academic). She is also an officer for Interact, a community service club that does fundraisers and volunteers at shelters and retirement homes. She is also an officer in her school's Chemistry Charter Club, which teaches younger students.

Evelyn has also traveled to some interesting places, including her parents' countries of origin, China and Romania, as well as Israel and Greece. She has enjoyed those experiences and feels that they have positively influenced her thinking and approach to different types of people.

### Personal Qualities (1)

*Rare personal appeal and character*

Evelyn ranks very high in all of the example characteristics listed above. She has a unique blend of poise, confidence, sincerity, and humility in her demeanor. She is thoughtful and expresses her ideas very clearly. More than most students her age, she was able to engage in a two-way discussion on a wide variety of topics; she was very interesting to speak with. I enjoyed the time speaking with her and am completely convinced that she will contribute greatly to her college, both in the classroom and through her extracurricular involvement and social interactions.

41

HARV00001185

**JA4929**
DX005.0041

**Overall (2+)**
*Clear admit; one to recruit*

While I hold the ranking of 1 for a once in a lifetime type of candidate, I must say that Evelyn was probably the best candidate for Harvard that I have met in about 8 years of interviewing. She might not be the absolute best in any given candidate, but I really liked how well rounded she is and how much she has to offer in every regard.

**Additional Comments**

Evelyn visited Harvard's campus and sat in on some classes. She was enthusiastic when telling me about one of the classes. She also has thought carefully about what she is looking for in a school, including the scholastic, community, geographical, and social aspects. When she says that she is looking for a diverse group of students and experiences, I don't think she's memorized it from the Harvard brochure—I think she is truly looking for and ready for what Harvard has to offer. She will be an asset if accepted for admission.

---

**Comments:**

Although the interviewer's academic and extracurricular ratings for Evelyn seem a bit inflated given the accomplishments cited in the report, the thrust of this report is clear: Evelyn is bright, engaged, and engaging, and her interviewer recommends her highly for admission. It would have been helpful to read a few quotes from Evelyn—those things she said that led the interviewer to write, "She is thoughtful and expresses her ideas clearly." What were some of the many topics about which Evelyn could engage in a two-way conversation? What did she say that made her seem especially intellectually curious?

It is helpful to know that Evelyn is the best candidate for Harvard that the interviewer has seen in eight years; it would be even more helpful to know approximately how many candidates the interviewer has seen over this eight-year period (Ten? Forty?).

---

42

HARV00001186

**JA4930**
DX005.0042

## Melanie

**Academic (2)**
*Excellent grades and low to mid 700 scores*

**Extracurricular, Athletic, Community, Employment, Family Commitments (3)**
*Above average activity or participation*

Melanie is involved in a number of sports. She herself admits that she is not great at these sports but she likes being active.

**Personal Qualities (3)**
*Above average appeal and character*

Melanie seemed to be interested in a lot of different things but not one or two things in particular. She told me she's very independent, wants to see new places and experience different things. She seems quite mature.

**Overall (3)**
*Strong candidate*

I don't feel there was anything that really stood out for Melanie. It's difficult to write a strong review for her. She is definitely a smart young lady but I don't feel that she necessarily stands out relative to other candidates I have interviewed in the past.

---

**Comments:**

    Not every interview report will advocate for a candidate's admission, so it is not the interviewer's lack of support for Melanie's case that gives pause to the admissions officer reading this write-up. Rather, it is the lack of any narrative comment about Melanie's academic rating and the seemingly cursory treatment of her extracurricular involvement that stand out.

    It may be the case that the only activity Melanie is involved in is her sports, but this report does not make that clear. Did Melanie mention any other commitments (family, school, or otherwise) or interests that occupy her time? Did the interviewer ask about other involvements? Later in the report the interviewer notes, "Melanie seemed to be interested in a lot of different things but not one or two things in particular," which seems to indicate that Melanie expressed other interests besides sports. To be a competitive candidate for Harvard, a student need not focus exclusively on one or two pursuits (academic or otherwise), which is the impression gleaned from this short report. An extra sentence or two providing more detail in each section would greatly improve this report.

43

CONFIDENTIAL

HARV00001187

## Anthony

**Academic (2-)**
*Magna potential. Excellent grades and mid- to high-700 scores (33+ ACT)*

Anthony is the strongest student I've interviewed out of West High (19% to four-year colleges) in at least 10 years. [Redacted:] was probably on par with Anthony, though she was a humanities-minded student, whereas Anthony is more quantitatively strong. Highpoints are his ACT math and science scores (35 and 36, respectively) and SAT Math II (800). Verbally, too, he's light years ahead of the other students I see from his high school. If I had to guess I would say that he's a bit of an academic loner at his school since Anthony admitted that "most of my friends don't get as excited about school as I do...I guess math just comes easy to me, and I like the brain teaser problems the teacher gives us at the end of each class." Anthony will take his first AP tests this year, and he's most excited about calculus and physics, his two favorite classes this year. He was disappointed that West got rid of the AP Chemistry class last year, so he settled for honors. He is also the school's high scorer in the city math league. He was ranked third out of 816 at the end of last year, though he admitted that his class size will probably fall as students continue dropping out throughout the senior year.

Anthony's not a one-trick pony academically, though. I always ask West students about their junior theme for honors English, and Anthony's discussion about his paper was the most interesting I've heard in a long time. He's researching water rights disputes in the city's history, and he's trying to find out how different waves of immigration have changed the tone of the debates or affected arguments for or against city expansion. Anthony's having a hard time finding sources and his interviews aren't going the way he planned, but I give him credit for having a hypothesis and gathering the evidence. We talked about some of the courses I took as a History and Literature concentrator (mostly about France and the U.S.), and he seemed interested in those, too, asking me questions I hadn't thought about since college.

**Extracurricular, Athletic, Community, Employment, Family Commitments (5)**
*Substantial activity outside of conventional activities such as major family commitments or term-time work*

Anthony works 20+ hours each week at the local K.F.C., and he doesn't have a lot of time for other activities. He's been working there for almost two years now. He cooks, buses tables, and works the register. The major downside, he says, is "coming home smelling like a bucket of chicken." A lot of the kids I interview at West work part-time, but Anthony works more than most of them and is a better student than almost all of them. I asked him what he spends his money on. He said he tries to save for college but usually ends up helping his mother pay for things around the house, buying all of his own clothing, and paying for everything associated with his car, which he's proud of.

Anthony does a few activities at school that he can do during lunchtime meetings or during his study hall (student government, class day committee). I was impressed that he works in the school tutoring center during his free period, because I imagine he could use that time to do his homework. He wants to sing in college or do more community service, possibly tutoring. I was surprised that he had already heard about PBHA and some of the singing groups on campus. He said he learned about them when a Harvard undergraduate did a presentation in his school last March, and he read more about them on the internet. He sounded excited by the IOP and the

44

CONFIDENTIAL                                                    HARV00001188

visiting fellows, but he hadn't heard of it before. Actually, he was excited about everything Harvard has to offer, and I think he'd discover lots of other interests when he's actually on a college campus.

### Personal Qualities (2)
*Strong personal appeal and character*

I was excited to meet Anthony, and it was fun to talk to someone from West who is so clearly interested in his schoolwork and is doing so well. I could tell that he must be good at his KFC job because he has a real presence about him. He makes a very favorable impression.

I do think he was a bit nervous (maybe more excited than nervous?) for the first 15 minutes of our interview, but he loosened up completely by the end, and we ended up talking for more than an hour. He also has a self-deprecating, observant sense of humor that would serve him well at a place like Harvard. A highpoint of our interview was when he told me a very funny story about making "bootleg chicken" after hours at KFC! Apparently there are people who make deals with his manager to cook their own chicken in the KFC fryers for events like family reunions and parties because it's much cheaper than buying it from KFC and much easier than doing it at home. I told him he should write a short story about the experience.

### Overall (2-)
*Clear admit—one to recruit*

I think Harvard could use more students like Anthony. He would probably have a bit of an adjustment to Harvard's academics, but he has raw talent in spades, and he's never been in an environment with other students who were eager to learn. Neither of his parents has an education beyond an associate's degree, so he would be the first in his family to go to college. Mom is a front desk manager at the local Radisson. Dad is out of the picture, from what I could gather. Anthony's a role model for his two younger sisters, and he would be a role model for other students at West and in the city if he were accepted.

---

**Comments:**

This detailed report about Anthony, a high-achieving student of modest means with a substantial term-time work commitment, helps paint a nuanced picture of Anthony as a thoughtful, lively person and excellent student. Harvard has long sought to recruit and enroll high achieving students of modest means, and the interviewer helps make a case for why the Committee should consider Anthony's candidacy seriously.

The report is especially helpful for telling us what Anthony's interests are and what he would like to do in College even though he hasn't had time to pursue those interests in high school. From the report it is also clear that the interviewer understands West High School and how exceptional a student like Anthony is coming from the school (at least in terms of applicants to Harvard).

---

45

CONFIDENTIAL

**JA4933**
DX005.0045

# Wilbur

### Academic (3+)
*Cum laude potential. Good grades and mid-600 to low-700 scores*

Wilbur Smith is a young, rather nervous fellow of sixteen (he turns seventeen next month) who used up most of the interview time trying to elicit from me some indication of whether he had a good chance of being admitted to Harvard. No matter how much I tried to steer the conversation to other topics, somehow we always returned to that one. Consequently, my impression of him is a bit vague.

It is unclear to me why Wilbur Smith should manifest such insecurity. He is certainly not a poor candidate: his test scores are all in the low 700s, with the exception of a 610 in chemistry. When we came to the subject of history and government, his intended major, he did seem to manifest a genuine interest in the departments here.

### Extracurricular (3-)
*Solid participation but without distinction.*

At his school he is active in the Speech Club (preparing and delivering them at tournaments), on the soccer team, and on the football team. He elaborated very little about activities, but focused instead on asking questions. He did not mention any significant leadership roles.

### Personal (4)
*Somewhat neutral or slightly negative impression.*

I sensed that Wilbur has absorbed the idea of going to an ambitious college more from his atmosphere than from his internal desires. There was a certain immaturity in his questions and the plethora of them alerted me to the fact that perhaps he felt he had to ask them so that I would not think him apathetic.

What struck me though was his nervous manner, his obvious confusion when he blurted out that he had been visiting other colleges, and his embarrassment when he felt that many of his scores, etc., were not up to Harvard's standards. He seemed especially curious about the admissions process, that is, the process behind the scenes.

### Overall (4)
*Acceptable but perhaps not competitive compared to other applicants.*

I am puzzled by the impression Wilbur gave during this interview. I am not sure whether it was his youth or the fact that he got lost on the way and arrived quite late or perhaps his confusion as to his own aspirations. In any case, I hope his teachers' reports and his essay give a better sense of what he is really like than I have been able to do here.

46

CONFIDENTIAL

HARV00001190

**Comments:**

This is an incredibly helpful report, targeting those personal qualities of the candidate that suggest he would not be a good choice for us. The interviewer acknowledges that perhaps she did not see Wilbur at his best, but she also gives us enough concrete information and examples of his behavior that we feel confident in her evaluation of Wilbur. The report certainly gives us a vivid picture of this young man and provides the type of insight we are unlikely to get elsewhere in the application.

47

CONFIDENTIAL

HARV00001191

**JA4935**
DX005.0047

| | |
|---|---|
| **From:** | Faust, Drew Gilpin [/O=HARVARD UNIVERSITY/OU=FIRST ADMINISTRATIVE GROUP/CN=RECIPIENTS/CN=DGF291] |
| **Sent:** | Tuesday, May 27, 2014 6:29:41 PM |
| **To:** | Ely, Robin J. |
| **CC:** | Ryan, James E. |
| **BCC:** | Drew Faust; Farzan, Ranna L |
| **Subject:** | Invitation to Serve on University-wide Committee |
| **Attachments:** | committee charge.pdf |

Dear Robin,

I write to seek your help.

Through our admissions processes, we seek diversity in many facets of our students' lives – their intellectual interests, backgrounds and experiences, areas of accomplishment, geography, socio-economic status, race and ethnicity.

We do this because we believe that a diverse student body is fundamental to the educational experience across the university. Bringing together students from different backgrounds challenges the ways in which we think about ourselves, each other, our beliefs, and the world into which our students will graduate. The result is a deeper and more transformative education that better prepares students for the lives they will lead when they leave Harvard -- as citizens, parents, and potential leaders in their chosen fields.

The United States Supreme Court has acknowledged the importance of student-body diversity, including racial diversity, in higher education. The Court has encouraged universities to articulate a reasoned, principled explanation of why diversity matters to them and to evaluate whether they might achieve those benefits through alternative approaches. With the Supreme Court decisions as a backdrop, I have asked James E. Ryan, Dean of the Harvard Graduate School of Education, to chair a University-wide committee to undertake this important work. A copy of the committee's charge is attached. The committee will include representatives from each of the Schools at Harvard and will consist of faculty, administrators, and students. Because you would bring an important perspective and understanding of Harvard, I hope that you would be willing to serve as a member.

Dean Ryan is hoping to have the initial meeting of the committee before the summer. I would, therefore, appreciate knowing at your earliest convenience whether you would be willing to participate. The committee's work will focus on issues fundamental to our institution and I am confident that it, and Harvard, would be better for your participation.

With all best wishes,

Drew Faust

Δ π EXHIBIT 13
Kahlenberg
Deponent
Date 5/18 Rptr MD
WWW.DEPOBOOK.COM

CONFIDENTIAL

HARV00007396



United States District Court
District of Massachusetts

**DX 12**

Case No. 1:14-cv-14176 (ADB)
Date Entered_____
By_____
Deputy Clerk

Charge to the Committee

Harvard's admissions processes, including the individualized holistic review through which we evaluate applicants, have long been important features of our institution. They are the means by which we have created and maintained a vibrant academic community with students who are talented and diverse in their intellectual interests, backgrounds and experiences, socio-economic status, geography, race and ethnicity, perspectives, and aspirations. Appreciating that our institution may be the first place where many students are exposed to so many others whose backgrounds differ markedly from their own, Harvard seeks students who will broaden and challenge each other not only in our classrooms, but in laboratories and clinics, student organizations and activities, residences and dining halls, on the fields, and on the stage. As a result of their experiences here, we believe that our students leave Harvard better prepared, better educated, and better able to advance knowledge, promote understanding, and serve society.

Harvard has repeatedly expressed its belief that diversity of many kinds, including racial diversity, contributes to the achievement of our educational mission. In the Supreme Court's *Bakke* decision in 1978, Justice Powell's pivotal opinion concluded that the benefits to the educational process flowing from a diverse student body constitute a legally compelling interest sufficient to justify the consideration of race in admissions. Justice Powell specifically pointed to the Harvard College admissions process—then, as now, a highly individualized, holistic review of each application, with an applicant's race potentially considered as one factor among many – as an "illuminating example" of an admissions program that properly advances the compelling educational interest in student diversity. Since that time, the legal framework for evaluating diversity in the context of university admissions has received further attention from the Supreme Court – first, in the 2003 cases involving the University of Michigan (*Grutter* and *Gratz)* and in last year's case from the University of Texas at Austin (*Fisher*). In these decisions, the Court has continued to find that colleges and universities may permissibly consider race as part of an effort to create a diverse student body whose members contribute to one another's educational experience. The Court has asked, however, that universities have a "reasoned, principled explanation for the academic decision" about the educational benefits of diversity and that they evaluate "whether [they] could achieve sufficient diversity without using racial classifications."

As part of Harvard's ongoing efforts to consider these issues, and in view of the Supreme Court's precedent on race-conscious admissions in higher education, the committee is asked to consider the following questions:

- How does a diverse student body, including a racially diverse student body, contribute to Harvard's educational objectives and mission? What influence does the diversity of the student body, including racial diversity, have on how Harvard students learn in the classroom, in extracurricular activities, and in the range of informal interactions that are hallmarks of a principally residential campus? How, if at all, does the exposure of students to diversity while on campus influence their lives after graduation, including in their careers, as active and informed citizens and potential leaders, and in pursuing lives of meaning and of value to society?

1

CONFIDENTIAL

HARV00007397

**JA4937**

DX012.0002

- What are the strengths and limitations of the ways we consider diversity in our current admissions processes?  What alternatives – including alternatives that preclude any consideration of an applicant's race – are there to the current approach, and would those alternatives as effectively achieve the educational benefits of diversity?  Would these alternatives impair Harvard's ability to achieve other important academic, educational, and institutional interests and objectives?  Are alternatives practically feasible?

In considering these questions, the committee should identify appropriate sources of information that might include qualitative information, anecdotal evidence, studies with measurable objectives, internal research, external research, recent scholarship, or historical information.  The committee will also want to determine whose input to seek in considering these questions, including potential outreach to students, faculty, alumni, members of the administration, and others.  The committee is asked to make findings regarding Harvard's current approaches to admissions in keeping with the questions outlined above.  The committee also should consider any recommendations for changes to Harvard's admissions processes and other activities to better achieve our goals.

2

CONFIDENTIAL

HARV00007398

**JA4938**
DX012.0003

# Report of the College Working Group on Diversity and Inclusion



Harvard University
November 2015





United States District Court
District of Massachusetts

**DX 13**

Case No. _____1:14-cv-14176 (ADB)_____
Date Entered_____
By_____
Deputy Clerk

HARV00007944

HARV00007945

**JA4940**
DX013.0002

# Table of Contents

## Introduction

Working Group Members                                      2
The Mission of Harvard College                             4
Historical Context                                         5
Working Group Charge                                       7

## Findings

Evaluation of Peer Institutions                            7
Experiences of Diversity and Inclusion                    15
Curricular Offerings at Harvard College                   22
Administrative Entities Concerned with Diversity          22

## Summary of Recommendations                             27

## Recommendations for Immediate Action

Student Life                                              28
Teaching and Learning                                     30
Administrative Structures                                 31

## Recommendations for Long-Term Interventions

Student Life                                              32
Teaching and Learning                                     34
Administrative Structures                                 35

## Conclusion                                             36

## Bibliography                                           37

## Appendices

Appendix A: Model Dashboard of Peer Institutions
Appendix B: Summary Chart of Diversity Offerings by Department and Percentage of Total
Courses Offered
Appendix C: FAS Curricular Offerings Related to Diversity
Appendix D: Curricular Offerings Related to Diversity in Other Harvard Schools

HARV00007946

# Introduction

## Members of the Working Group on Diversity and Inclusion



**Tommy Amaker**
The Thomas G. Stemberg '71 Family Endowed Coach for Harvard Men's Basketball and Special Assistant to the President



**Olivia Castor**
Student Representative '17



**Emelyn dela Peña**
Assistant Dean of Student Life for Equity, Diversity, and Inclusion



**Martha Franco**
Graduate Research Assistant



**Anne Harrington**
Franklin L. Ford Professor of the History of Science; Director of Undergraduate Studies; House Co-Master of Pforzheimer



**Jennifer Hochschild**
Henry LaBarre Jayne Professor of Government and Professor of African and African American Studies



**Kimiko Matsuda Lawrence**
Student Representative '16



**Robert Mitchell**
Assistant Dean of Diversity Relations and Communications

2

HARV00007947

**JA4942**
DX013.0004



**Fadhal Anthony Moore**
Student Representative '15



**William Oh**
Student Representative '18



**Mayra Rivera Rivera**
Associate Professor of Theology and
Latina/o Studies, HDS



**Sheehan Scarborough**
Graduate Research Assistant



**Kay Kaufman Shelemay**
G. Gordon Watts Professor of Music and
Professor of African and African
American Studies



**Brandon Terry**
Prize Fellow in Economics, History, and
Politics



**Dorothy Villarreal**
Student Representative '15



**Jasmine Waddell**
Resident Dean of Freshmen for
Elm Yard



**Jonathan L. Walton, Chair**
Plummer Professor of Christian Morals,
FAS; Professor of Religion and Society,
HDS

3

HARV00007948

**The Mission of Harvard College**

Harvard College is committed to a broad-based liberal arts education. A quality, well-rounded education combines the best of the philosophical and rhetorical traditions. The philosophical tradition, with its emphasis on inquiry and developing critical skills, cultivates ways of thinking that can expand knowledge through research and analysis. The rhetorical tradition complements the philosophical by fostering an understanding of the past and present through literature, art, music, history, religion, and ethics. As a leading research as well as teaching university, Harvard derives its mission from our motto, *Veritas*, literally "truth." Harvard is committed to expanding both knowledge and ways of knowing; students not only explore subject areas and acquire fresh insights into them but also learn about the ways in which they are part of larger human communities of interest and interdependence and how their membership in these communities affects how it is that they "know."

Thus, Harvard College aims to provide an education that nurtures the whole person while fostering the development of civic-minded, socially engaged, creative, and critical thinkers in an increasingly interconnected world. Of particular relevance to this report, Harvard fosters the ability to see the world through the eyes of others. That ability will position Harvard graduates to serve the broader society in many fields of human endeavor.

Harvard cultivates these abilities in its classrooms and residential environments. The classroom exposes students to innovative perspectives as well as to both new and traditional ways of knowing and understanding. Diverse living environments situate students among peers and elders studying in different fields, who come from different walks and stages of life, and whose developing identities interact with others. This sort of character formation, nurtured by Harvard's heterogeneous campus environment and pedagogical emphasis on intellectual cross-pollination, is intended to inform the choices and habits Harvard graduates will carry into their respective spheres of influence. Therefore, Harvard embraces, and must constantly reaffirm, the notion that a richly diverse student body is essential to its pedagogical objectives and institutional mission.

Harvard College is neither a finishing school nor a luxury good for America's elites. Its primary work does not end with the admissions process but, rather, begins the moment its students enter its gates.

4

HARV00007949

**Historical Context**

A pledge to diversity can be traced to Harvard's founding. The charter of the President and Fellows of Harvard College, authorized by Governor Thomas Dudley in 1650, describes the purpose of the institution as "the education of the English and Indian [male] youth of this country." Harvard established its Indian College, where five American Indians received their education, in 1655. This reveals that Harvard's earliest commitments were informed by a belief in the transformative power of education, even as this education was premised upon what we now recognize as cultural bias regarding who and what was "civilized."

As such an educational paradox shows, Harvard College's aspirations have always run ahead of its realities, for both cultural and structural reasons. Culturally, Harvard College has always been limited by the context and ruling beliefs of its society, even as it has continually tried to push and challenge itself and the world. Thus Harvard's Indian College pedagogy reflected an almost universal European belief in cultural hierarchy, as well as prejudicial notions to the effect that knowledge was to be transmitted to Indian students rather than produced in dialogic exchange. Meanwhile, despite the existence and aims of the Indian College, Harvard remained, for three centuries, committed primarily to educating the sons of New England's elite. Although Radcliffe College traces its origins to 1879, women did not gain full access to Harvard until nearly a century later. Under the presidency of Abbott Lawrence Lowell (1909–1933), the Harvard administration restricted the numbers of Jewish students and barred the handful of African American men at the College from residing in freshman dormitories. (Painter 1971) Sexual minorities, in the meantime—whatever their racial or class origins—were deemed unfit to be members of the Harvard College community: in the 1920s, students believed to have same-sex attraction were tried in secret courts and expelled from the College.

Harvard law professor Randall Kennedy best summarizes the history of Harvard's relationship with students of color when he writes, in *Blacks and the Race Question at Harvard*, "Harvard, too, has been indelibly scarred by slavery, exclusion, segregation, and other forms of racist oppression." The University enrolled few students of color before the 1970s, and even those as talented and ultimately accomplished as Clement Morgan, W.E.B. Du Bois, Alain Locke, William Monroe Trotter, Countee Cullen, and Eva Dykes (among others) experienced isolation and marginalization. As Du Bois described his time at Harvard, he was "in it, but not of it." And it was not until 346 years after Joel Iacoome and Caleb Cheeshahteaumuck completed their studies at the Indian College that another Wampanoag, Tiffany Smalley, graduated from Harvard College, in 2011.

5

HARV00007950

**JA4945**
DX013.0007

Just as Harvard's culture has been closely linked to its societal context, so have its structural inequities. Both survey findings and personal accounts suggest that a gender gap deters potential female math concentrators at Harvard, even as women, and especially women of color, are underrepresented in STEM fields nationally. (Kim 2015) Today's wealth gap in the United States is the widest in three decades, and most wealth gains since the Great Recession of 2007 – 2009 have gone to upper-income families. (Fry 2014) As Harvard University's Robert Putnam argues in *Our Kids: The American Dream in Crisis*, wealth inequality hardens social divisions by diminishing opportunities for youth to interact across social lines. Such inequality also concentrates educational resources and cultural capital.

Harvard College is now committed to cutting against the grain of both structural and cultural sources of inequality. In an *amicus curiae* brief submitted when the Supreme Court addressed affirmative action in the 1978 case *Regents of the University of California v. Bakke*, Harvard argued that, "A primary value of the liberal education should be exposure to new and provocative points of view, at a time in the student's life when he or she has recently left home and is eager for new intellectual experiences." In a subsequent affirmative action case, *Grutter v. Bollinger* (2003), Harvard made a similar argument:

> Diversity helps students confront perspectives other than their own and thus to think more rigorously and imaginatively; it helps students learn to relate better to people from different backgrounds; it helps students to become better citizens. The educational benefits of student diversity include the discovery that there is a broad range of viewpoints and experiences within any given minority community—as well as learning that certain imagined differences at times turn out to be only skin deep.

Underscoring its commitment to diversity that includes both racial and socio-economic background, Harvard, in 2004, launched one of the most generous financial aid initiatives in the nation. Students from households earning less than $65,000 per year pay nothing toward room and board, and students from households earning $65,000 to $150,000 pay ten percent or less of their yearly incomes. Around seventy percent of Harvard students receive financial assistance and over twenty percent pay no tuition at all. Capacious admission standards that take a range of life experiences and fluid identities into consideration, coupled with generous financial aid plans, enable Harvard College to expand opportunity for a widening cross section of students. This is essential for creating the conditions in which Harvard students can learn to be at home in an increasingly interconnected world.

6

HARV00007951

**The Charge of the Working Group on Diversity and Inclusion**

Mindful of the mission and aspirations described above, the Working Group on Diversity and Inclusion, in consultation with the Office of the Dean of the College, drafted a charge in May of 2014. The Working Group was to "assess Harvard College's learning environment in order to ensure that all students benefit equally from its liberal arts educational and service mission." The task included consulting with stakeholders across the University, incorporating research at the intersections of race, ethnicity, socioeconomic status, and other frames of identity and difference, and examining approaches at peer institutions in order to recommend models that might be applied or reimagined on Harvard's campus.

# Findings

**Evaluation of Diversity-Related Practices at Peer Institutions**

Members of the Working Group visited Ivy League campuses between September and December 2014. We met with student leaders and administrators at Brown, Columbia, Princeton, University of Pennsylvania, and Yale, and with administrators at Cornell and Dartmouth. Our goals were to assess pre-orientation programs, mentoring, mental health programs, administrative structures, bias reporting procedures, residential support, multicultural spaces, curricular offerings, and special initiatives. Our findings in these areas provide much food for thought:

Pre-Orientation

Pre-orientation programs tend to function in one of three ways, with some overlap. They provide academic support and advising (Penn's Pre-Freshman Program); instill cultural capital through campus orientation, fostering relationships with faculty, and raising awareness about campus resources for promoting social and academic success  (Yale's Cultural Connections); or develop cultural competency (Brown's Third World Transition Program).

The experiences of these schools show why pre-orientation programs are vital to the success of all students. They provide a shared institutional vocabulary and robust engagement with issues of diversity and cultures of inclusion. They also enable attention to the needs of underrepresented students, especially those who are first generation and socio-economically disadvantaged, while fostering community for the entire population across lines of difference.

7

HARV00007952

Mentoring and Mental Health Programs

The peer institutions consulted vary in how they promote student mentoring and address issues of mental health, but they share a commitment to sustained attention to students' academic, social, physical, and mental wellbeing. Examples of relevant programming and support include:

- Diversity Dialogues (Dartmouth);
- Peer mentoring programs (Brown's Women in Science and Engineering);
- Leadership and skill development (Penn's Intercultural Leadership Program);
- Integrated academic and mental health advising (Dartmouth's sociocultural advising via cultural support groups; the partnership between Brown's Center for Students of Color and its Counseling and Psychological Services).

Athletics and military affairs often provide models for these initiatives. Time demands associated with their sport and NCAA regulations create considerable challenges, and Ivy schools have developed an effective system of assistance from coaches, faculty mentors, and peer advisers. Similarly, institutions such as Columbia and Brown staff veterans affairs offices, since military students are disproportionately from underrepresented groups or are nontraditional, and often have distinctive financial plans and mental health concerns. Harvard could benefit from analyzing how addressing the particular needs of such students encourages success without showing partiality or being perceived as alienating or stigmatizing.

It must also be noted that current trends reveal serious institutional challenges to addressing student mental health in underserved populations. The reasons are many, but include:

- lack of staff diversity and perceived difficulty among underrepresented groups in relating to staff;
- limited professional experience with underserved populations;
- culturally-based stigmas regarding mental health treatment, most significantly in Asian, Latino, African American, and international communities.

It is clear that the programs having the best impacts make clinical support available to students throughout the campus in non-intimidating ways. Such support addresses particular cultural needs, and associated stigmas, even in the absence of staff who share students' backgrounds and identities. When mental health providers review research and design outreach efforts specific to populations that typically stigmatize mental health services and/or have distinct fears and phobias associated with behavioral health, their treatment efforts are more effective, regardless of a caregiver's racial/ethnic background.

8

HARV00007953

Administrative Structure

We identified three administrative models that address the concerns and tensions associated with a diverse campus environment. They are not mutually exclusive but do entail distinct centers of power and governance.

First, some campuses have a *comprehensive office of diversity,* typically led by a vice president or vice provost who reports to the president. The office oversees a variety of smaller offices including, but not limited to, disability services, LGBTQ life, military and veterans, and religious life. Brown University's Office of Institutional Diversity and Dartmouth College's Office of Institutional Diversity and Equity typify this model.

Second, some campuses embrace an *umbrella model* of multiple resource centers within a larger administrative entity, typically the Dean of Students or Office of Student Life. The resource centers have considerable autonomy, as they are often responsible for programming with little structural oversight. Cornell's Center for Intercultural Dialogue and University of Pennsylvania's Office of Equity and Access Programs are examples. Within the larger organizational structure, both fall under student life offices: the Office of the Dean of Students and the Division of the Vice Provost for University Life, respectively. Both house smaller entities such as the LGBTQ Center, Women's Center, Pan-Asian American Community House, Black Cultural Center, and La Casa Latina.

Third, on some campuses, *autonomous cultural centers* run their own programs. They are run by a director (often an assistant dean) and include paid student counselors and peer liaisons. Cultural centers house student organizations and host parties, art exhibits, lectures, and conferences. Often they work collaboratively while seeking to foster cultural identity and solidarity in engagement with the full campus. Peer liaisons are upperclassmen affiliated with each center who help to connect freshmen to resources of the institution, thereby formalizing the mentoring that often takes place among affinity groups. For example, Yale freshmen can identify a student mentor in the Afro-American, Asian American, La Casa Latina, or Native American cultural centers, or in the offices of LGBTQ Resources, International Students and Scholars, or Chaplain.

| Comprehensive Offices of Diversity | Umbrella Model with Multiple Resource Centers | Autonomous Cultural Centers |
|---|---|---|
| Brown University | Columbia University | Yale University |
| Dartmouth College | Cornell University | |
| Princeton | UPenn | |

9

HARV00007954

Our findings here support a key conclusion in the research on diversity in higher education, and one with implications for administrative structures and procedures: fostering diverse cultures of inclusion is a multidimensional effort that exists in, and makes demands on, many divisions of a university. (Smith 2009)  Thus structural accountability, robust communication among offices and diffuse leadership, and face-to-face engagement with students are essential to facilitating a healthy environment.

Robust interoffice communication and structural accountability prevent diversity work from taking place within a campus vacuum or through reliance on a single person or entity, models that compound problems by exempting critical administrative offices from shared responsibility. Moreover, given that students seldom know what kind of support they should seek out, let alone what is available or where resources are most easily accessed, hyperlinked websites and resources manuals cannot supplant ongoing student engagement by dedicated campus professionals.

Bias Reporting

We sought to answer four questions with regard to students' ability to report perceived discrimination, bias, insult, and injury: Who receives the report? Who responds? When specific procedures exist, how do students learn about these procedures? What is the intended outcome of the process?

We found that bias reporting varies across the Ivy League. Most campuses have an online form, yet complaints are handled by different entities. Cornell University, for instance, has an officer in the Department of Inclusion and Workforce Diversity and bias reporting liaisons in each department and entity on campus to respond to bias complaints. This process appears to be driven mainly by Human Resources and addresses the concerns of university staff members. Dartmouth College, in contrast, has a Bias Incident Response Team, run through the Collis Center for Student Involvement, that discusses and adjudicates all bias-related matters. This team seems proactive and pedagogical rather than reactive and punitive. As its statement of purpose says: "The Achieving Community Together Program – Bias Incident Response Team advances the 'Principles of Community.' We work together to raise awareness, create educational and restorative opportunities for growth and responsibility and provide support across our community when incidents of bias are reported."

Similarly, Columbia University has a clearly articulated "Bias and Discrimination Response Protocol" in the Office of Undergraduate Student Life, as well as a Discrimination/Bias Response team comprised of members from across various arenas of student life. After Public Safety files and documents a report, the response team decides on the best means of support based on the nature of the incident, the

10

HARV00007955

student's desire for confidentiality, and/or whether the occurrence targeted an individual or a group. Support may range from a campus judicial process to the Office of Undergraduate Student Life providing town halls and other community dialogue forums.

Well publicized and understood bias reporting procedures create a culture of safety and contribute to an inclusive community of candor regarding acts of discrimination and bias. Not only do students know where to go and what support to expect when specific micro- or macro-aggressions occur; a transparent bias reporting system can inform generative community conversations. It can also foster a campus culture that disapproves of behaviors, whether active or passive, motivated by hostility or willful indifference to others' vulnerabilities in the areas of race, religion, sexual orientation, ethnicity, national origin, gender identity and expression, age, ability, or intersections of the above.

<u>Residential Support</u>

All of our peer institutions share a commitment to ensuring that residential life supports broad-based cultures of learning where students with multiple, and often divergent, needs can feel safe and supported. Each also provides residential mentoring and advising opportunities. Yet the approaches vary. Broadly speaking, residential communities in the Ivy League are divided between campuses that provide a randomized college or house system and those that offer special interest or affinity housing options.

The college/house system is central to student life and to the fostering of community across  difference. In the Ivy League, the number of residential colleges or houses ranges from a half a dozen to around a dozen on each campus, and some models separate freshmen and upperclassmen. Apart from roommates or a limited suite or blocking group, students are randomly assigned to colleges or houses in order to foster heterogeneous environments where students live, study, and dine together across socially constructed categories. The college/house system model is co-curricular insofar as living with and among a diverse group of students is part of the educational process.

Typically, colleges/houses have a faculty master, dean, director of academic advisers, and director of social life. In every case, academic advising takes place through the residence for at least one year. Resident tutors, academic advisers, resident scholars, and peer counselors, who are often field-specific, perform multiple roles as curricular and co-curricular advisers.

HARV00007956

In contrast to colleges/houses, special interest or affinity communities allow students with shared interests to reside in a common living environment. The shared interest is essential to the purpose and functioning of the residence insofar as the particular theme of the residence or floor informs student programming and establishes patterns and rules that guide behavior. Special interest houses include foreign language, STEM, social justice and activism, and spaces where most programs and events are based on the history and culture of a particular group of people. All have a broader vision of preparing residents to be global citizens.

Diman House at Brown University is a special interest house of note. As the Social Action Program house on campus, it is the hub for social activism. Students appeal to their respective fields of study to strategize and organize effective methods for positive social change on the campus, as well as to address pressing social needs through working with organizations such as the Food Recovery Network or contributing to relief efforts for natural disasters such as Hurricane Sandy.

The W.E.B. Du Bois House at University of Pennsylvania is an example of an affinity house. It is an African American theme-based house that celebrates the history and culture of people of the African Diaspora. Du Bois House is the most racially diverse house on Penn's campus—not, according to some students, despite its theme, but because of its forty-year history of championing racial diversity and equality. Du Bois House has earned the nickname "the U.N. at UPenn."

Both types of residential space signify the values of the community. Residential programming, mentoring, co-curricular activities, and staff/peer composition must convey the institution's commitment to cultures of inclusion and appreciation of diversity. This is particularly true in college/house systems that are randomized, lest the historical and cultural defaults of the institution prevail.

### College/House System
Cornell University
Princeton University
Yale University

### Special Interest Communities
Brown
Columbia
Dartmouth
UPenn

HARV00007957

**JA4952**
DX013.0014

Multicultural Spaces

Many multicultural spaces and themed houses developed in response to student protests in the late 1960s and the 1970s. Yale approved its Afro-American Cultural Center in 1969; Princeton and Brown universities opened their Third World Centers in 1971 and 1976, respectively. Several campuses have renamed their centers over the past decade to signal their reconsideration of these centers' purpose and function. Examples include Princeton's Third World Center becoming the Carl Fields Center for Equality and Cultural Understanding in 2008, and Brown's Third World Center becoming the Brown Center for Students of Color in 2014. Yale's cultural centers are currently under review

This rebranding trend raises several interrelated questions. Are such entities cultural resource centers for students of color, or programming offices tasked with engaging the entire student body? More generally, what is the primary constituency for multicultural spaces, and what roles do they play in relation to the larger university? Are these spaces co-curricular extensions that promote multicultural engagement across all lines of difference, or social spaces for minoritized students insulated from the prevailing mores of campus life?

Our peer institutions answer these questions differently. The mission of Dartmouth College's Office of Pluralism and Leadership is to "advance. . . Dartmouth's commitment to academic success, diversity, inclusion, and wellness by engaging all students in the development of identity, community, and leadership." The director and assistant deans of this office are advisers for racial/ethnic affinity groups such as the Pan-Asian student group. Columbia's Intercultural Resource Center (IRC) is similar. Originally the United Minorities Board, the IRC now targets all students on campus through educational forums and diversity discussions and trainings. The IRC understands its primary goal as "the creation of a just campus community, one which celebrates differences and rejoices in collaboration." Dartmouth's Office of Pluralism and Leadership similarly reaches broadly across socially constructed categories to promote the value and virtue of diversity and inclusive cultures.

Individual cultural centers at the University of Pennsylvania, conversely, target minoritized communities. The Greenfield Intercultural Center seeks to enhance intercultural knowledge, competency, and leadership through targeted advising and advocacy on behalf of specific groups. It also supports Native American students and Arab, Turkish, and other international students. Makuu: The Black Cultural Center, La Casa Latina – Center for Hispanic Excellence, and the Pan-Asian American Community House (PAACH) provide resources that promote racial/ethnic solidarity among particular subsets of students. In short, while all centers and offices share a

13

HARV00007958

JA4953

DX013.0015

commitment to conversations regarding diversity and educational programming, they differ in approach.

Our Working Group finds that cultural centers can have a positive impact on their institutions. As campus focal points that foster community, they represent an institutional commitment to a diverse environment while holding the larger campus accountable to its professed aims. As critical sites for activism, advocacy, and mobilization that help to forge alliances based on moral affinity, they are proof against the concern that cultural spaces fragment and further marginalize minoritized students.

Cultural centers can also serve as safe, even therapeutic spaces for underrepresented students; students often refer to them as "home away from home" and "one of the few safe spaces on campus." By providing a distinctive aesthetics of physical space and a community of faculty, staff, and students with which students can readily identify, such centers can counter the implicitly exclusionary messages of the larger campus environment that may be sent through campus artwork, prevailing cultural norms, and the burdens of being "the one" visible minority in a class.

In our visits to other campuses, we also identified some concerns about cultural centers. One is physical location: when cultural centers are removed from the campus core, they send a message to minoritized and other students that diversity is peripheral to the university community's areas of focus. Students at the University of Pennsylvania and Princeton University expressed such concerns about the Greenfield Intercultural Center and the Carl Fields Center, respectively. In contrast, students utilize fully the three cultural centers at the University of Pennsylvania located in the central ARCH building (La Casa Latina, Makuu, and  PAACH). Since ARCH also houses a popular student cafe, classrooms, and multi-use auditoriums, students of all racial and ethnic backgrounds appear to have more contact and comfort accessing the resources and attending the programs of these centers.

Limited or disengaged staffs are a second concern. The more robust and active cultural centers are animated by dedicated staff members who play varied and valuable roles ranging from organizing events, advising and advocating for students, and identifying resources, to preserving institutional memory across otherwise transient student populations. In the absence of dedicated staff, these duties fall upon the shoulders of undergraduates. During the course of our work, for instance, students and alumni of Yale University began circulating a petition to remove the director of their Afro-Cultural Center. According to the petition, "The Afro-American Cultural Center is no longer fulfilling its historic mission of serving as a cultural, social, and academic

14

space for Black students. The apathy and disengagement of the Center Director...is at the center of the issues we face." (Stannard 2015)

Curricular Offerings

Every Ivy League institution has a department, program, or center dedicated to disciplinary offerings in cultural, ethnic, and gender studies. These entities offer students at least the chance to earn a certificate, and some provide the option to major in a particular curricular offering or confer degrees through standalone departments or committees outside of the department, program, or center itself. Uniquely, the University of Pennsylvania makes a course in diversity part of its general education requirement.

We found no institutional requirements for faculty and administrators to demonstrate competency in cultural diversity and sensitivity around matters of inclusion. Nor is there much support in Ivy League schools for requiring a course for students that engages concepts of diversity.

Special Institutional Initiatives

Each campus has initiated a new diversity effort within the past five years. Some are in response to particular events, such as when former New York City Police Commissioner Raymond Kelly was shouted down and prevented from lecturing at Brown University. Other schools are reassessing diversity efforts from previous generations, as is the case at Yale. Cornell, Dartmouth, and Princeton have each developed strategic plans and have presidentially-appointed task forces with the goal of moving the campus forward in a coordinated effort. Such initiatives include reforms of academic pipelines that result in departmental homogeneity, campuswide climate assessments, and faculty recruitment and retention initiatives for women and other underrepresented groups.

**Experiences of Diversity and Inclusion: Input from Students, Tutors, Proctors, and House Masters**

The Working Group held conversations with a wide range of students in order to receive their perception of, and experiences with, matters of identity and difference in the College. We understand that many factors can shape a person's worldview and experience, including but not only race, citizenship, gender identity, sexual orientation, disability, religion, and socioeconomic status. Harvard students may also identify (or be identified with) multiple minoritized groups. Therefore, in order to cast our conversational net widely, the Working Group populated focus groups with students from a range of co-curricular groups, both those that the College recognizes and those

15

HARV00007960

that are officially unrecognized: for example, race/ethnicity affinity groups, student religious organizations, varsity sports teams, the Undergraduate Council, the Institute of Politics, finals clubs, and Greek societies.

Working Group members attended mandatory proctor and tutor training sessions on January 21–22, 2015 to discuss diversity matters. We wanted to hear about proctors' and tutors' challenges and opportunities in fostering inclusive and affirming environments. Insights from these sessions informed questions for focus groups held within the houses. We concluded these conversations at the housemasters' monthly meeting in April, at which we sought views on diversity in the houses and solicited assistance in interpreting students' responses.

Three topics recurred in these conversations: ongoing, multi-generational conversations about diversity; the climate of learning in departments, concentrations and classrooms; and balance in residential life experiences. We consider each topic in turn.

The Need for Intentional, Ongoing Conversations

The proctors and house tutors generally agreed that more frequent and formal conversations are needed around issues of campus diversity. All agree that every proctor and tutor must assume responsibility for helping students through sometimes difficult, yet rewarding, conversations concerning identity and difference. The "race relations" tutor designation, for instance, places an undue burden on the few while exempting the majority; few were happy with this model. Nevertheless, several proctors and tutors expressed reservations about their own competencies. Many regard the diversity training received at orientation as inadequate, and their vocabulary as too limited for sustained dialogue with students in light of inevitable questions and conflicts throughout the year.

Similarly, many encouraged more diversity training opportunities for students. As one tutor noted, "student training is important . . . [incoming students] are becoming a new part of this community. We ought to give them the tools." A proctor observed, "Students want to be led, yet are constantly being asked what they think. They realize that they are 18 and not experts. They don't know basic facts and want to learn more. . . . In our rush to reassure them that they are future leaders, we are not leading by example." There is a general sense that students care deeply about these issues and want to engage, but fear they will come across as inelegant in expression. This hesitancy causes many so-called majority students to opt out, which only reinscribes diversity matters as essentially belonging to the minoritized members of the

HARV00007961

community. Thus, the language of "mandatory" and "required" were recurring recommendations from the community.

Community Conversations provide an example. This one-time event is a facilitator-led discussion based on shared readings among freshmen at the outset of the academic year. The Office of Institutional Research found in 2011–12 that nearly seventy percent of freshmen students agreed (some "strongly") that Community Conversations helped them to appreciate the diversity of the Harvard community. (Pierce 2015) Nevertheless, several participants in Working Group conversations expressed concern about the program's implementation and follow-up. The conversation takes place prior to the rigors of college life that challenge students' conceptions of themselves and perceptions of others; perhaps Community Conversations take place too early for students to apply their insights to daily experiences at Harvard. Thus most participants in Working Group meetings recommended robust administrative follow-up and sustained dialogue throughout a student's academic career. We concur: Community Conversations may be a cornerstone for developing the deliberate dialogue needed for productive learning across lines of difference.

More generally, many proctors, tutors, and undergraduates feel that diversity training and ongoing conversations about difference must not remain at the student level. Staff, faculty, and teaching fellows must also learn how to become more sensitive to students from a wide array of backgrounds and more cognizant of classroom dynamics. All focus group respondents pointed to micro-agressions in the classroom that come from peers, teaching fellows, and faculty members. Many feel that teaching fellows and professors are ill-equipped to facilitate conversations deemed controversial, thus avoiding such subjects or saying simply, "let's move on" when questionable or offensive comments arise.

Bias in Concentrations
Proctors, tutors, and students described some departments as less welcoming to specific groups than others. The STEM fields were of notable concern to women and underrepresented minorities. Our findings suggest implicit and unintentional biases that shape requirements for departmental concentrations such as AP courses in high school, replication of students and faculty in areas and identities in select fields, access to mentors, and study group formations. These dynamics create and codify arbitrary notions of "rigor," "fit," and "excellence."

For instance, pipelines specific to each discipline replicate homogeneity as one advances from an undergraduate to a full professor. Graduate admissions, TF hiring, junior faculty appointments, and tenure promotions all create and reinforce

17

HARV00007962

departmental cultures. Such dynamics contribute to a belief that certain fields privilege particular approaches and areas of interest and deem other scholarly pursuits to be incompatible or "less rigorous." Unless departments are intentional, and self-critical, in promoting a diverse culture, there is little chance of attaining a more diverse student body and set of opinions or research agendas.

Women and underrepresented minorities also told the Working Group about the absence of mentors and sponsors to whom they can comfortably relate. This is a direct reflection of the paucity of women and people of color in certain fields, especially among graduate students. Others spoke bluntly about their difficulties in fields such as math, statistics, biomedical engineering, and in the social sciences. Female upperclassmen in particular concentrations may dissuade incoming freshmen from pursuing concentrations perceived as hostile due to "no recognition within the department that this [gender bias] is an issue."[1] In short, explicit and implicit messages of "you won't do well" lead to a disproportionate number of students opting out of certain concentrations.[2] As the research literature on stereotype threat shows, when students are unable to overcome implicit harmful messages and regard departments as disinclined to disrupt practices deemed exclusionary, avoidance and disengagement are common responses. (Aronson 2002)

In discussions about bias in concentrations, students also raised concerns about lack of faculty diversity, curricular exclusion of underrepresented groups in introductory courses, and the restrictions administrators impose on course offerings from other departments that students argue should count for concentration credit.

Differences in the availability of AP courses at various high schools lead to a different kind of unintended exclusion. Harvard is committed to granting admission to high-achieving students who take advantage of all possibilities available to them, as opposed to students who simply attend the most elite high schools. This is correct and appropriate. Nevertheless, several departments, particularly those in the STEM fields, assume that students will have taken advanced placement courses—at least this

---

[1] One respondent suggested that she is torn about giving such advice since she understands that it will discourage or even prevent other women from entering the concentration, but that the responsibility should be put on the department to change.

[2] A female student told us during a focus group conversation that she went to discuss with her TF how she could do better in biomedical engineering and was told "you won't do well" because of other activities that she was involved in on campus. She expressed her frustration about having "someone tell me point blank that I won't do well, and, 'We know you're a busy person—it won't be an insult if you leave the concentration'" and concluded, "So, fine. I left." Social Studies concentrators voiced frustration that courses dealing with racial justice/politics offered by faculty members on the Committee have not counted for credit in the concentration.

18

HARV00007963

perception is prevalent. AP offerings are very uneven across secondary schools. The Working Group believes that all students admitted to Harvard College should have the opportunity to concentrate in any field of their choice without being precluded due to structural disadvantages. Students can succeed from different curricular entry points, so it is incumbent on each department, as well as the University, to provide students with alternative narratives of success and multiple pathways to fulfilling all departmental requirements.

<u>Residential Life Experiences</u>

The house and resident tutor model plays a powerful co-curricular role at Harvard College. Harvard's decision, in the spring of 1996, to randomize the house selection system to create more diverse environments in the houses followed President Lowell's rationale in creating the house system in the first place: in Lowell's words, "men interested in various fields of thought should be thrown together with a view of promoting a broad and humane culture." The houses were viewed as natural co-curricular extensions of the Harvard College learning experience. In describing randomization, then Dean Harry Lewis noted, "A certain level of discomfort is part of our educational obligation."

While this may be the ideal, students we talked to reported levels and kinds of discomfort not always in keeping with the professed goals of the house system. Repeatedly, students named, or voiced the desire to experience, their houses as "safe spaces." Yet they also consistently pointed to the lack of diversity among resident tutors within the house system, and housemasters have expressed the same concern.[3] Since most resident tutors are graduate students and the positions are field-specific, the homogeneity of the tutor pool is directly related to the lack of racial and gender diversity in particular departments at Harvard. Resident tutors and scholars can be mentors and sponsors, so the lack of diversity in their ranks can work to the real detriment of underrepresented students.

Students and tutors also voiced concerns about perceived inequities and imbalances among houses. Only some houses have diverse resident tutor pools, resident scholars, prestigious named prizes and financial awards for juniors and seniors, and availability of, and access to, house social spaces for student groups. Budgets for student programming around particular events also vary among houses, as housemasters

---

[3] One housemaster expressed what appeared to be the sentiment of many when he declared, "There are just not many diverse candidates out there. We have the same problem in my department."  But another housemaster pushed back forcefully: "They are out there. They may not show up at your door, but we do not have a problem identifying a diverse corps of tutors. We go and look for them."

19

HARV00007964

allocate the funds in their houses' budgets. Overall, students sense that house life depends on the particular housemasters and established house traditions, which invariably leads to inconsistency across the College. Thus the College might want to consider stronger systems of transparency and accountability among the houses to address real or perceived inequality. Areas of particular note, besides the ones listed above, include transparency regarding the system of evaluation for housemasters.

The judgments expressed above are based on anecdotal rather than systematically gathered evidence, and many housemasters disagreed with them. Some housemasters perceive inherited cultures that inform each individual house, while others resisted any suggestion that they shape the culture of the house. Nonetheless, students express an assumption that diversity and inclusion efforts begin and end with housemasters.

The appointment and role of tutors seems especially charged in the context of housemasters' impact. The process of appointing resident tutors and scholars is informal and thus lacks transparency, which leads to mistrust in its integrity. For instance, some resident tutors levied a serious charge of discrimination against one set of housemasters. (Delwiche 2015) Many resident tutors of color voiced frustration that they were burdened with all conflicts stemming from matters of identity and difference, while other tutors could seemingly focus on their academic areas. Other tutors of color expressed surprise and dismay that housemasters had designated them as race relations tutors without their knowledge or consent. These complaints were common among the specialty tutors. One reported that certain housemasters asked him to join the community primarily as an LGBTQ as well as a pre-med tutor. He alleges that when he resisted, saying that he did not consider himself qualified to be an LGBTQ tutor, the housemasters said, "All the other tutors are married. It's very simple. All you have to do is send some emails every now and then."

On a different note, both resident tutors and students pointed to markers of class distinction in life on campus. Programs created to remove financial barriers for students who qualify for financial aid may have unintended stigmatizing consequences. Consider the Student Events Fund (SEF). This program has the admirable aim of affording students the chance to attend up to five campus events each semester at no cost. Yet several students (and, at a different point, alumni) noted how separate lines for SEF ticket pickups marked students to their wealthier classmates; one resident tutor remembered jokes about the "welfare line" or the "poor kids line" during his undergraduate days.

Others had similar feelings about the pre-orientation and school year community detail program known as dorm crew. Several expressed appreciation for the ability to earn a

20

HARV00007965

good wage, as dorm crew is the highest-paying job of any open enrollment option. Dorm crew also provides a very flexible schedule. But other factors have caused dorm crew to be regarded as a program of "incentivized servitude," since many students of humble means feel that they cannot afford to decline the option. This is particularly the case when undergraduates are not respectful of spaces that others are assigned to clean. Some also reported that their school meal plan was not yet activated when they arrived for pre-orientation dorm crew, leading students, according to reports, to walk to the Central Square McDonalds to avoid the higher costs of Harvard Square restaurants. One young man captured the choices and frustrations of students who otherwise appreciate the dorm crew option:

> I knew Harvard had a meal plan and I knew that I had it. When I found out that I didn't qualify until the start of the school year instead of during my pre-orientation program, I was a little disheartened. We had the option to eat in Annenberg, but to me, 20-something dollars is a lot of money to spend on food in one day, and then to have to spend that each day for a week . . . I couldn't do that. I chose dorm crew as a pre-orientation program to make money, not spend it. I needed money. I could have chosen a different pre-orientation program like FAP (Freshman Arts Program) and my financial aid would have covered it, but I needed money. I needed to buy books and not worry as much about spending too much during the school year, surrounded by friends with varying wealth. Annenberg was asking for about two hours' pay of my eight-hour day. I ended up just buying bagels and Pop Tarts. I ate out a few times. I had some Dunkin Donuts gift cards so I ate there too. I wouldn't call it healthy eating. I know it wasn't only me who struggled that week. Some people decided to just eat out every day, while others decided to eat very little. I believe most of the people involved in Fall Clean-Up could really use the money and it would be beneficial if Harvard could provide meals for the workers (even the bagged lunches they make during the year would be amazing).

Finally, students pointed out that all diversity-focused centers (i.e. the Women's Center, the Office of BLGTQ Life, and the Harvard Foundation for Intercultural and Race Relations) are underground. That these spaces are, in the words of one student, "out of

21

HARV00007966

sight and seem inaccessible" sends a message to students about how much the College values diversity initiatives.[4]

**Curricular Offerings at Harvard College**

The Working Group reviewed current course offerings at Harvard to identify those that address issues of diversity in a critical and intentional way. We searched for courses indexed with a wide variety of terms: ethnic, ethnicity, race, gender, sexual orientation, inequality, disability, diversity, diverse, social class, socio-economic status, poor, poverty, first generation, African-American, African American, Black, White, Caucasian, Asian, Asian-American, Latino, Latina, Hispanic, Native, Native American, Indigenous, Indigeneity, and Indian.

From the resulting long list, we identified courses that address critically the relation of the course's primary subject matter to categories of difference and relations of power. Courses that solely engage a particular community commonly considered as underrepresented were not included in the list of diversity offerings. To confirm our choices, the subcommittee emailed the instructor(s) of each selected course to report that the course was included on the list, and to ask the instructor to advise us if this designation was incorrect. We received no requests to remove a course from the list for definitional or philosophical reasons.

The summary charts provide a snapshot of the courses addressing diversity in the Harvard curriculum. Although the numbers are necessarily rough, they provide an overview that can help us to evaluate our current offerings as part of a broad investigation of diversity at Harvard.[5] We also include a count of courses in each departmental listing in order to show the proportion of diversity courses in the full set of a given department's courses.[6]

**Administrative Entities Concerned with Supporting the Needs of a Diverse Student Body**

---

[4] We note, however, that despite its physical location, the Women's Center feels warm and welcoming to many students, both women and men. The nontraditional layout and design enabled many to view it as equally cozy and empowering.

[5] We provide a separate listing of courses touching on diversity offered across the Harvard Schools outside of FAS in Appendices B, C, and D. We attempted to confirm, but cannot guarantee, that all courses listed here are indeed open to undergraduates.   Beyond this list, we cannot draw additional conclusions without more detailed knowledge of the courses.

[6] In assessing General Education courses, we counted only courses in the "front of the book."

22

HARV00007967

With regard to co-curricular entities in support of diversity, the Working Group found a somewhat inchoate structure. Efforts to respond to the many needs and demands of Harvard students have produced many different initiatives that simply cannot be represented coherently in an organizational chart. Adding major administrative offices tasked with matters of campus diversity makes accounting for the institutional structure even more complicated.

We identified relevant offices and programs with two sets of keywords. The first focused on function: academic advising; alumni groups; assault and harassment; athletics; diversity; employee resource groups; faith-based services; faculty; financial services; gender; healthcare, mental health, and disability; international students; public service; race and culture; sexuality; standing committees; student life; and summer research programs and fellowships. The second step identified diversity-related offices and programs with the same keywords used to identify relevant courses.

In general, Harvard has taken an umbrella approach to campus diversity, with multiple resource centers falling under several administrative offices. This model seems to be an outgrowth of what was once a comprehensive office of diversity. Over four decades, several umbrellas have developed independently. Now a plethora of programs and centers complement, overlap, and compete with one another. They are:

Office of the Assistant to the President for Institutional Diversity and Equity
Director: Chief Diversity Officer and Special Assistant to the President
Reporting Line: Executive Vice President and the President
Key Responsibilities: federal and state compliance concerning protected employment categories: i.e., race, disability, veterans, sexual orientation, and gender identity.

The Office was established in 1971 to "lead a sustained University-wide effort and to develop, coordinate, and advance inclusive excellence, diversity, and equal opportunity initiatives, programs, and policies at Harvard University." It specializes in University compliance and promoting staff diversity initiatives through training and innovative recruitment efforts. The Harvard University Administrative Fellowship Program is its signature initiative. The Fellows Program provides twelve-month opportunities to members of underrepresented groups to receive leadership training and exposure at Harvard; the goal is to encourage the mentoring of such individuals in preparation for careers in administration in higher education.

Office for Faculty Development and Diversity
Director: Senior Vice Provost for Faculty Development and Diversity
Reporting Line: Provost

23

HARV00007968

**JA4963**
DX013.0025

Key Responsibilities: faculty development, work-life balance, maintaining data on faculty hiring practices, promotion, and retention among women and underrepresented minorities.

The Office was established in 2005, when women were underrepresented on every faculty at Harvard other than the Graduate School of Education. It has instituted programs to improve the quality of faculty life and assist faculty in developing the skills needed for professional success. The office encourages mentoring, both formal and informal, to introduce junior scholars to the requirements for success. By providing generous maternity/paternity leaves, financial assistance to offset childcare costs, panels to discuss academic publishing, and brown bag lunch conversations that address a wide-range of issues in an informal setting, the Office also aims to provide junior faculty members with resources that foster professional growth and development.

The Working Group is uncertain whether the Office of Faculty Development and Diversity assesses institutional culture and practices that may unwittingly affect the development of minoritized faculty or undermine their scholarly contributions. Such an assessment would require gathering information regarding assumptions that inform the practices of departments, and focusing on how those assumptions might help or hinder particular areas of scholarship.

<u>The Harvard Foundation for Intercultural and Race Relations</u>
Director: Center Director and Assistant Director of the Center
Reporting Line: The Director reports to the Dean of the College; the Assistant Director reports to the Office of Student Life
Key Responsibilities: portraiture project, intercultural understanding intern program, race-relations advisers/tutors in the houses, and large campus/community events such as Cultural Rhythms, the Science Conference, the Humanitarian Award, and the Aloian Awards.

The Foundation was established in 1981 in order to "improve relations among racial and ethnic groups within the University and to enhance the quality of our common life." The Foundation grew out of a faculty/student committee commissioned by President Derek Bok and chaired by the late Reverend Peter Gomes to identify ways the University might improve racial understanding and relations in Harvard's increasingly diverse community. Out of fear of isolating minority students, the committee's report (the Gomes Report) advised against independent cultural centers and theme-based houses or spaces based on racial/ethnic identities. Thus, Harvard established the

24

HARV00007969

Foundation as an agency to serve the needs of minority students while, according to Foundation documents, "integrating them into the College and University as a whole."

Most Foundation programming takes place in the houses. The Harvard Foundation has emerged as an umbrella organization for cultural organizations and affinity groups on campus. Its Student Advisory Committee (SAC) includes up to eighty representatives from racial/ethnic affinity groups on campus. The SAC distributes $25,000 from the Harvard Foundation student grants program to subsidize student-initiated programs and student organizations. In 2005, the House race relations tutors were brought under the purview of the Harvard Foundation. Harvard College Dean Benedict Gross concluded after a review of the system that the race relations tutors were not well organized or effective under the direction of the housemasters. The Foundation also organizes the annual race relations tutor orientation sessions.

The Working Group lacked the time and resources to review the effectiveness of the Harvard Foundation. Some members raised concerns about the theoretical framework informing the Harvard Foundation's founding and continuing mission, based on more recent research arguing that the umbrella model insufficiently acknowledges the particular experiences faced by minoritized students across potentially shifting categories of identity. That is, the theoretical framework undergirding the Gomes Report was based on three assumptions: a) contact among diverse groups equally benefits members of both majority and minoritized groups; b) group-specific spaces isolate minority students; and c) the integrative model of diversity disrupts homogeneous communities and supports full inclusion of minoritized students. In the view of the Working Group, most (though not all) recent social scientific research shows each of these assumptions to be flawed.

First, it is true that an increased number of minorities benefits the numerical majority, as it increases the likelihood of intergroup contact among the latter. Yet it also benefits numerical minorities by providing underrepresented communities a critical mass for intragroup support. With regard to the benefits of contact: research shows that the effects of stereotype threat and other negative characterizations are reduced when those who are negatively stereotyped in a given context have the chance to gather together. Peer advising from women in the STEM fields, for instance, can reduce the negative associations that may lead women to disengage from certain concentrations. Similarly, when Latinx students hear alternative narratives of success from other Latinxes, the cultural cues that narrowly define success on campus (e.g., having no Latinx professors on the faculty, seeing images only of white men in the departmental building, the absence of curricular materials that speak to the histories and experiences of Latinxes) are mitigated.

With regard to concerns about further isolation of minority students versus the benefits of disrupting homogeneous groups of majority students: the assumption that culturally specific spaces or affinity-themed housing will isolate minoritized students is a fallacy of false equivalence, because it suggests that these students are able to exercise the same freedoms (including freedom of association) in the larger society as do members of the majority. This is not the case. Providing a safe space for women to come together within a larger context where their humanity is measured against a masculinist standard is not gender discrimination akin to that exercised by an all-male finals club. To the contrary, it can enable women to deal with intellectual, emotional, and social challenges.

Moreover, it is easier for members of a majority to remain siloed within homogeneous communities than it is for members of a minority. The latter inevitably associate with members of the dominant group due to the demographic composition of the campus. For instance, white students can complete their coursework at Harvard without ever having a Latinx, Native American, or African American professor, TF, coach, housemaster, resident dean, entryway proctor, tutor, or academic adviser. This is not true for Latinx, Native American, or African American students who, to the contrary, must seek out opportunities for engagement with representatives of their own racial/ethnic group. Thus, members of small groups must carry the burden of diversity at all times, while members of more privileged groups must search out courses, faculty members, and mentors from minoritized groups. In short, the umbrella model of integration, as implemented at Harvard, treats minoritized and majority students in unequal ways despite its best intentions.

The problematic assumptions of the umbrella model have led to unintended consequences. Harvard College was not able to effectively integrate diversity programming into the Harvard House structure as recommended by the Gomes Report. As a result, full responsibility was returned to the Harvard Foundation. An office with little more than two full-time staff members and a current programming budget of $25,000 was responsible, at least in theory, for all cultural programs, concerns, and educational initiatives of Harvard College's non-white student population.

<u>Other Positions</u>
Position: Assistant Dean of Diversity Relations and Communication
Reporting Line: VP of Administration (FAS) and dotted line to Office of the Assistant to the President for Institutional Diversity and Equity

HARV00007971

Key Responsibilities: supports all communication efforts for the Harvard Foundation; tasked with creating a coherent picture of diversity for all affiliated groups and organizations.

Position: Assistant Dean of Student Life for Equity, Diversity, and Inclusion
Reporting Line: Office of Student Life
Key Responsibilities: responsible for campus initiatives regarding gender, sexuality, and diversity issues; oversees the Harvard College Women's Center, Office of BGLTQ Student Life, Undocumented Students Working Group, First Generation College Students Working Group, Racial Harassment Hearing Officer for the College.

There are two other positions of note: the Assistant Dean of Diversity Relations and Communication and the Assistant Dean of Student Life for Equity, Diversity, and Inclusion. FAS Dean Michael Smith created the position of Assistant Dean of Diversity Relations and Communication in 2008. This person is a member of the FAS Advisory Committee on Diversity and is tasked with creating a coherent picture of all diversity efforts and initiatives at the College, which include those under the Harvard Foundation, Office of Student Life, and the Office of the Assistant to the President for Institutional Diversity and Equity.

The Office of Student Life created the Assistant Dean of Student Life for Equity, Diversity, and Inclusion in Fall 2014. Though having the support of the Office of Student Life, this assistant dean has oversight of two centers (Women's Center and Office of BGLTQ Student Life) that appear to be larger than the actual office of the assistant dean in terms of staff and resources.

## Summary of Recommendations

The Working Group on Diversity and Inclusion would like to begin this section by thanking University officials for actions already taken based on interim recommendations made during 2014–15. The Office of Student Life published the Working Group's listing of courses related to equity, diversity, and inclusion. The Office of the Dean of the College funded a pilot program to keep two dining halls open through spring break. The latter initiative offsets the food costs incurred by students who, for a range of reasons, do not leave campus for the week. (It also, serendipitously, gave Working Group members an additional, informal point of contact with members of the student body with whom our work was concerned, i.e., international students and/ or students lacking the financial resources to travel.) The Office of Financial Aid issued

HARV00007972

new guidelines concerning SEF tickets, protecting students' anonymity by forbidding ticket lines marked as "SEF."[7]

The Working Group would also like to reaffirm our charge and connect it to similar efforts taking place throughout the University to change the institution's culture. Such efforts include the University Task Force on the Prevention of Sexual Assault and the Working Group on First Generation Students, both of which are addressing challenges of distinct populations and affirming their inherent dignity and value to the University.

We offer two types of recommendations. First, we make recommendations for immediate action addressing three aspects of the College: student life, teaching and learning, and administrative structures. These targeted interventions can support the College's mission and enhance its culture. Second, the Working Group has identified questions and areas of concern that exceed our charge and capacity. We are persuaded that creating a healthy, diverse environment requires the coordinated effort of all departments, schools, administrative offices, and allies across the University. We categorize the long-term interventions we recommend to bring about such a coordinated effort with the same rubrics that we use for our immediate recommendations, although action on the former will require large amounts of time, research, and resources. We urge the constitution of a new committee charged by the Office of the President and engaged over more than one academic year.

## Recommendations for Immediate Action

**Student Life**
Harvard College has a responsibility to promote a shared vocabulary among students around identity and difference, and to shift the optics of the campus from one that privileges particular histories and cultures to one that celebrates the diversity of the student body. Tutors, proctors, and students alike have requested communication across lines of difference aimed at empathy, as well as guidance on how to create a framework for debate and shared vocabulary.

What is more, the ambience of physical spaces transmits cultural cues that influence the participation of underrepresented groups on college campuses. Physical environments serve as signifiers communicating who does or does not belong. Recent research reveals, however, that changing objects in a classroom such, as images on

---

[7]Nevertheless, controversy occurred over separate lines at the quad formal in May 2015. This tells us that the Office of Financial Aid, Office of Student Life, and Harvard Box Office must remain diligent to ensure that all campus entities are aware of and adhere to this new policy.

HARV00007973

the walls, from those that are conventionally associated with the dominant group to objects that minoritized subjects can better relate to is enough to boost participation by the latter. (Cheryan 2009)[8] The University has made strides in this area in recent years. The portraiture project of the Harvard Foundation for Intercultural and Race Relations comes to mind. This is important work. The Working Group believes that the College must further diversify and update the styles, periods, and mediums of its publically displayed artwork to better reflect the diversity of the campus community.

The Working Group recommends that the College take on the following tasks:

1. Request that each house and freshman dean design and implement a cohesive series of co-curricular activities that address the challenges and benefits associated with learning and living in a diverse residential community. The plan should include primary coordinators, strategies for sustainability, and evaluation. Programming should be based on a collective commitment and use a variety of approaches. It might include not just term-time activities but also special winter session or spring break excursions, retreats, or conferences that could offer more intense and/or more experiential opportunities for learning and personal transformation.

2. Establish the "Alain L. Locke '07 AB, '17 PhD Committee on the Arts" to commemorate the centennial anniversary of Locke earning his PhD at Harvard in 1917. The Committee should be tasked with reviewing the art and décor of common spaces and classrooms at the College, and developing recommendations and implementation proposals for common space design and redesign, to create a physical environment in which all members of the community can feel they belong and secure Harvard's role as a leading curator of significant artistic achievements in a wide array of traditions. This committee would collaborate with departments to ensure that they make efforts to make their principal learning spaces feel inclusive, especially for groups that have historically been discouraged from, or underrepresented in, their disciplines. In collaboration with the Harvard Art Museums, this committee would also commission and curate art exhibitions, installations, and performances that

---

[8]Research reveals not only that changing the objects in a classroom to ones to which minoritized students can better relate improves the participation of minority students but also that this has no negative impact on the dominant group. For example, non-computer science-related images on the walls helped women to feel safer and promoted their participation in an otherwise underrepresented field. Yet the change in artwork had no impact on male participation. By simply creating what authors describe as "ambient belonging" for underrepresented groups, they are able to diversify the space without losing any original participants. This is a low cost, win-win recommendation.

29

HARV00007974

cultivate a more inclusive atmosphere. Finally, the Working Group can imagine this committee working with the student population to:

   a. encourage judged "art challenges," modeled on the iLab competitions, to encourage Harvard students and alumni to engage with diversity through artistic creation, with projects exhibited in common spaces in the College;
   b. fund collaborative art projects and initiatives between student groups that have diversity and inclusion as a central theme, with an eye toward house renewal and other campus renovation efforts.

3. Design cultural competency training for all College student-facing staff—including personnel in the Office of Student Life, OCS, FDO, Ad Board, Honor Council, etc.—through a collaborative process with students, faculty and teaching staff, and administrative staff.

4. Address unnecessary markers of social distinction to uphold the dignity of all students. Doing away with special SEF lines is a critical first step, and one that the College must enforce vigorously. Next steps must include reforms to dorm crew. The Working Group recommends that students during the academic year be penalized if bathroom cleanliness drops below a reasonable threshold. This threshold should be established in consultation with Facilities Maintenance Operations and building managers. This will allow students who work dorm crew to have a right of extreme refusal in extreme conditions, which they can document with photos from their cellphones. We also recommend that students who serve on pre-orientation or post-graduation dorm crew be provided with meals or a daily per diem distributed in advance.

**Teaching and Learning**

Harvard College desires that all students have equal access to and opportunity to succeed in all concentrations. The Working Group understands that departmental practices both inform students' choices and reinforce cultures that can contribute to homogeneous pipelines within select fields. These sorts of cultures limit the number of mentors and sponsors to whom underrepresented students may feel comfortable relating, curtail departmental courses whose primary subject matter critically addresses the categories of difference and power, and reduce the prospect of students engaging with themes of human identity and diversity in the classroom.

HARV00007975

**JA4970**
DX013.0032

What is more, according to our findings, five FAS departments or programs offer the bulk of all courses addressing diversity and difference.[9] The majority of the departments/programs emphasizing diversity are in the social sciences, with the humanities and sciences much less well represented. And when measured against the number of courses being offered in FAS (roughly 5,500), the list of 217 courses that, according to our estimate, critically engage with issues of identity and difference is somewhat lean. The Working Group believes that Harvard's commitment to a broad-based liberal arts education would be better served by having a more robust curriculum in this area through increased attention to diversity and difference in the humanities and science departments. The Working Group suggests that the College:

1. Task directors of undergraduate studies in every department with developing pathways through the concentrations that would be attainable for all students, regardless of background. The Working Group understands that high-achieving students from Level 3 or 4 high schools may not have had the same course options available to them as a middling student from an elite prep school. This should not preclude students from Level 3 or 4 schools being able to concentrate in a particular field. Every concentration should have clearly articulated pathways through the major from the most introductory-level course.

2. Encourage all departments to undertake programs designed to promote a more diverse group of concentrators within their departments. In the absence of a comprehensive strategic plan, there are many things departments can do—e.g., create mentoring programs, enhance website materials that share success stories of underrepresented minorities, and provide resources for underrepresented students to attend/participate in events sponsored by organizations such as the National Society of Black Physicists or Society of Women Engineers, to enable these students to expand their networks.

3. Create a system for flagging existing courses dealing with diversity in the new online search system for course selection, so that students can easily find them. Other Ivy League institutions, such as Yale and Brown, use an online course search system that allows students to select a "diverse perspectives" tab that automatically generates a list of courses that fit this category. The 217 courses identified by the Working Group would be a good starting point. The College should create a plan for integrating newly developed courses into the online course selection system.

---

[9] The departments/programs are African and African American Studies, Anthropology, General Education, Sociology, and Studies of Women, Gender, and Sexuality.

31

HARV00007976

4. Request that the General Education Committee develop strategies for strengthening its offerings in areas explicitly addressing diversity. Measures may include actively recruiting faculty to teach courses in particular areas of diversity that are not currently covered and inspiring faculty to develop new courses or enhance existing courses by providing institutional support; e.g., coordinating with the Bok Center to offer research-based resources and faculty programs on effective pedagogical strategies to address issues of diversity.

**Administrative Structures**

Each year the entering freshman class of Harvard College is more racially, ethnically, and socioeconomically diverse than the year before. This is a positive development of which the University should be proud. Harvard's administration, faculty, and staff, however, continue to lag behind in terms of diversity. This lack of diversity frustrates Harvard's efforts to foster a campus environment that diminishes cultural and structural cues of exclusion, minimizes stereotype threats, and provides students from varying backgrounds equal opportunities to succeed in concentrations throughout the arts and sciences. The composition of Harvard's administration, faculty, and staff must reflect the positive strides toward diversity made with the student body in recent years. Thus, the Working Group recommends the College pursue the following immediate actions:

1. Seek to diversify the Ad Board and the new Honor Council, with an eye to ensuring that the people who assess and, in some instances, discipline our students come from backgrounds that, as much as possible, are as diverse as those of the students themselves. There is a reasonable concern that, for instance, without faculty of color or faculty who were first generation students themselves on these bodies, we may be missing crucial sets of experiences and kinds of knowledge that could lead to fairer judgments and penalties. We understand that, in order for Harvard College to achieve fairer representation for the student body, underrepresented members of the faculty may have to be provided with incentives to assume yet another role. Yet the Working Group is confident that immediate action along these lines is necessary and just.

2. Task Counseling and Mental Health Services with developing and implementing a strategic outreach plan for historically underserved populations. As noted above, the most effective mental health outreach plans make clinical support available to students throughout the campus and address particular cultural needs and associated stigmas of targeted groups. Attitudes toward behavioral health care vary among Asian American, African American, Latinx, and veteran

32

HARV00007977

students, as well as among certain communities of faith. We want to help students who identify within or between any underserved populations to have access to appropriate interventions in the most useful settings.

3. Create a University-wide committee charged with studying questions that could lead to more long-term recommendations. We will explain this recommendation in more detail below.

## Recommendations for Long-Term Interventions

**Student Life**

With regard to student life, house life and support for affinity-based student groups are vital areas for further consideration. The Working Group believes that perceived inequities among the houses, both real and imagined, must be examined and addressed. Any perceptions of inequality and lack of accountability compromise the credibility of the house system. The campus witnessed the result of failed transparency toward the end of the 2014–15 academic year, as students levied charges of discrimination against Dunster House.[10] We strongly believe that such charges brought by students are unfortunate for all parties involved. The lack of clear policies, structures of accountability, and consistency across houses puts everyone at risk and erodes trust.

The Working Group wants the university to consider increased ways to support affinity-based student groups on campus, including but not limited to the Harvard-Radcliffe Asian American Association, Harvard-Radcliffe Raza, Harvard Black Student Association, and Harvard Islamic Society. These are critical sites of peer-to-peer mentoring, academic advising, and spiritual support that often take place informally and with minimal institutional support. Our review of peer institutions reveals that more than dedicated physical space, dedicated staff presence is what enables such student groups to flourish. Whether an assistant dean or center director, dedicated staff members improve the quality and consistency of events, help to institutionalize otherwise informal mentoring and advising, and serve as a human point of contact (if not sponsor) for students trying to navigate the byzantine structures of University life.

------

[10] Unfortunately, the perception of homophobia in Dunster House extends back over a decade and is documented in opinion pieces published in the *Harvard Crimson*. (2004). Dunster's Troublesome Closet. The new BGLTS tutors will likely perform a useful service, but much work remains, Harvard Crimson. Levingston, I. B. (2015). Dunster Students Push for Tutor's Return, Harvard Crimson.

33

HARV00007978

Many of the questions that must be asked about the administrative structure of Harvard's diversity initiatives relate to our concerns about student life. With specific respect to house life and student groups, the Working Group desires to know:

- In what ways might we promote greater consistency in standards and their implementation among the houses when it comes to diversity-related matters?
- What role can the houses and freshman deans play in fostering more diverse and inclusive environments?
- What resources might housemasters find valuable in their efforts to recruit, appoint, and retain a more diverse pool of resident scholars and tutors?
- What are current best practices of campus centers such as the Office of BLGTQ Life, Office of the Chaplaincy, or Freshmen Yard Deans that the University might build upon to increase office visibility and address the needs of minoritized students?
- What is the current state of faculty advising for student groups?  What incentives are necessary to ensure appropriate training, support, and, most importantly, positive recognition of junior faculty members engaged with student life during their promotion reviews?

**Teaching and Learning**

Students desire a faculty as diverse and varied in its interests as is the student body. As stated in our findings, the University has made great strides toward diversifying the faculty and improving the faculty climate overall. The Working Group applauds these efforts. The Working Group is not clear, however, on whether any office assesses institutional cultures and/or reviews specific departmental practices that may frustrate the recruitment and retention of underrepresented faculty. A close review of departmental practices would interrogate basic assumptions as to the ways particular disciplines and fields are defined at Harvard University. The Working Group recommends that the University invest in creating sensitive survey instruments that can obtain answers to the following questions from the various schools and departments:

- What approaches to the discipline/field does your school or department currently privilege? What are the theoretical, thematic, geographic, or other categories of intellectual approaches that preclude a wide range of participants from engaging in particular areas of inquiry at Harvard?
- How does diversity fit into the intellectual development of the field?
- How do departments and programs decide on and evaluate their standards for "excellence"?

34

HARV00007979

- How do departments establish intellectual "canons" and/or what constitutes survey/introductory material?
- How can the review of General Education reinforce principles of equity, diversity, and inclusion? What are the mechanisms for enforcing this in the curriculum?
- What are the formal and informal sites of networking, advising, mentoring, and sponsorship within the department?
- What are departments and schools across Harvard doing to ensure that all faculty members continue to receive training in pedagogical approaches that speak to an increasingly diverse demographic at Harvard, and that they are cognizant of, and can offset, explicit and implicit biases and micro-agressions occurring inside and outside the classroom?
- What are the types of bridge, supplemental, advising, pre-orientation, and/or summer programs that might enable students to navigate particular concentrations and foster pathways for success?
- How does the Graduate School of Arts and Sciences understand its role in shaping the culture of teaching and learning at Harvard?

**Administrative Structures**

Successful diversity initiatives require a strategic plan of action and a coherent institutional structure that allows for systems of accountability and assessment. Evidence from both the academic and business spheres points to these truths. A good strategic plan recognizes that all departments, schools, and allied institutions operate according to different logics and metrics, and thus empowers each to develop an individualized plan for diversity. A coherent system of integrated offices committed to diversity efforts ensures that the institution is working toward a common vision with a shared institutional vocabulary. There has to be an identifiable structure of governance to hold all parties accountable to their respective strategic plans, and to assess the value or viability of past initiatives.

Based on our findings, the Working Group believes that it is in Harvard's best interests to recommit itself to streamlining its current structure into a much tighter and integrated set of offices with a greater level of collaboration. This will enable Harvard University to better fulfill its mission and commitment to excellence through diversity. The presence of so many offices and programs that work for the cause of diversity and inclusion, but appear to engage in minimal collaboration, seems both inefficient and ineffective. We suspect that many of these offices and/or positions were created as sincere responses to specific problems. Yet the current decentralized nature of these offices, coupled with an initial conceptual intent that may now be out of sync with shifting demographic and cultural realities, exacerbates fault lines that further threaten

35

HARV00007980

those who are now the most vulnerable on campus: first generation students, students from Level 3 and 4 high schools, and undocumented immigrants. Similarly, diversity initiatives are harder to implement in the absence of robust communication among offices with common purposes. The Working Group is confident that a more tightly organized scheme would better serve many constituencies.

Therefore, the Working Group believes that the University must explore such questions as:

- Is there a common vision for diversity and inclusion across the University? How do varying constituencies across the University define diversity?
- What primary office(s) should have oversight of diversity initiatives?
- Is there consistency across the University with regard to office(s) and positions tasked with promoting diverse cultures of inclusion? Further research needs to determine what each office contributes to the overall mission of diversity and inclusion. What are their specific roles and responsibilities?
- Are there common guidelines and principles that exceed federal compliance but to which all affiliates of the University must adhere? What assessment mechanisms are in place to measure effectiveness? How does the current administrative structure facilitate reassessment?
- What systems/metrics are in place to evaluate structural change? Are sunset provisions in place for offices/programs that have either fulfilled or failed to meet their intended goals?

## Conclusion

The Working Group on Diversity and Inclusion offers these findings, recommendations for immediate action, and recommendations for long-term interventions in hopes for a more diverse and inclusive future for Harvard. The care, respect and thoughtfulness demonstrated by members of the Harvard community inspire us. And we are confident that Harvard has the resources, capacity, and talent to be an innovative world leader in this area. We therefore offer this report as an ethical challenge and impetus for institutional action. In this critical moment, Harvard must commit and recommit itself to the practices that best reflect our institutional mission and ideals.

36

HARV00007981

# Bibliography

(2004). Dunster's Troublesome Closet. The new BGLTS tutors will likely perform a useful service, but much work remains, Harvard Crimson.

Aronson, J., Spencer, Steven and Steele, Claude (2002). "Contending with Group Image: The Psychology of Stereotype and Social Identity Threat." Advances in Experimental Social Psychology 34: 408-410.

Cheryan, S., Davies, Paul G., Plaut, Victoria and Steele, Claude (2009). "Ambient Belonging: How Stereotypical Cues Impact Gender Participation in Computer Science." Journal of Personality and Social Psychology 97(6): 1045-1060.

Delwiche, N. a. L., Ivan (2015). In Dunster, a Search for BGLTQ Support. As students raise concerns about resources in one of harvard's Houses, administrators respond, Harvard Crimson.

Fry, R. a. K., Rakesh (2014). America's wealth gap between middle-income and upper-income families is widest on record. Factank: News in the Numbers, Pew Research Center.

Kim, J. (2015). Panel Discusses Gender Gap in Harvard Math Department, The Harvard Crimson.

Levingston, I. B. (2015). Dunster Students Push for Tutor's Return, Harvard Crimson.

Painter, N. (1971). "Memoranda and Documents: Jim Crow at Harvard: 1923." New England Quarterly 64(4).

Pierce, K. (2015). Harvard College Diversity Survey Items. O. o. I. Research, Harvard University: 4.

Smith, D. (2009). Diversity's Promise for Higher Education: Making It Work, Johns Hopkins University Press.

Stannard, E. (2015). Yale students, alumni want director of Afro-American Cultural Center gone, 140 sign petition, New Haven Register.

HARV00007982

**JA4977**
DX013.0039

# *Selected Topics in Casework and Diversity*

## *Asian American and Black Populations: Implications for Admissions*

United States District Court
District of Massachusetts

**DX 19**

Case No. __1:14-cv-14176 (ADB)__
Date Entered _____
By _____ Deputy Clerk

HARV00013367

DX019.0001

CONFIDENTIAL

HARV00013368

# Agenda

- SAT Performance Data & Demographics
  - Updated information

- Asian Americans
  - Context & Considerations

- Black in America
  - Discrimination & Impact

DX019.0002

CONFIDENTIAL

HARV00013369

# Purpose

- Provide statistics & data to give context to the demographics & experiences of the students we may see in our pool

DX019.0003

CONFIDENTIAL



SAT Performance Data

HARV00013370

DX019.0004

CONFIDENTIAL

HARV00013371

DX019.0005

CONFIDENTIAL





Distributions: Critical Reading

HARV00013372

DX019.0006

CONFIDENTIAL

**JA4983**

# Distributions: Math



HARV00013373

DX019.0007

CONFIDENTIAL

**JA4984**



Distributions: Writing

HARV00013374

DX019.0008

CONFIDENTIAL

**JA4985**

# Approx. # of students scoring above 650

|  | White | Latino | Mex-Am | PR | Black | AAPI | Native-Am |
|---|---|---|---|---|---|---|---|
| Critical Reading | 108,541 | 5,675 | 3,435 | 1,115 | 4,203 | 33,325 | 589 |
| Math | 133,589 | 7,094 | 4,580 | 1,115 | 4,203 | 78,412 | 785 |
| Writing | 100,191 | 5,675 | 2,290 | 836 | 4,203 | 39,206 | 490 |

HARV00013375

DX019.0009

CONFIDENTIAL

JA4986

# Approx. # of students scoring above 700

| | White | Latino | Mex-Am | PR | Black | AAPI | Native-Am |
|---|---|---|---|---|---|---|---|
| Critical Reading | 50,096 | 2,838 | 1,145 | 557 | 2,101 | 17,643 | 294 |
| Math | 50,096 | 2,838 | 1,145 | 278 | 2,101 | 49,008 | 294 |
| Writing | 41,746 | 1,418 | 1,145 | 278 | 2,101 | 21,563 | 196 |

HARV00013376

DX019.0010

CONFIDENTIAL

JA4987

# Asian Americans

## Demographics, Identities & Socioeconomic Characteristics

HARV00013377

DX019.0011

CONFIDENTIAL

# Asian-American Population- 2011

# 18,205,898

## 5.8% of the total U.S. population

HARV00013378

DX019.0012

CONFIDENTIAL



HARV00013379

DX019.0013

CONFIDENTIAL

HARV00013380

# Population Growth

## Fastest growing population in the United States

## Grew by 45.6% from 2000 to 2010

DX019.0014

CONFIDENTIAL

HARV00013381

## Immigrant populations

**Foreign born immigrants make up about 13% of the U.S. population**

**Asians now comprise the largest portion of immigrants at 36%**

DX019.0015

CONFIDENTIAL

HARV00013382



## Immigrant populations

## Meet the New Immigrants: Asians Overtake Hispanics
Percent of immigrants, by year of arrival, 2000-2010

**36%**
31%

HISPANIC ORIGIN

**ASIAN RACE**

59%
55    53    46    42

19%    23    23    29    33

60

0

'00    '02    '04    '06    '08    '10

**JA4993**

DX019.0016

CONFIDENTIAL

HARV00013383

## Immigrant populations

# Immigration is now the largest driver for Asian population growth

# 74% of Asian American adults are foreign born

DX019.0017

CONFIDENTIAL



# Who are Asian Americans?

| Group | Count |
|---|---|
| Chinese (not Taiwanese) | 3,779,732 |
| Filipino | 3,416,840 |
| Indian | 3,183,063 |
| Vietnamese | 1,737,433 |
| Korean | 1,706,822 |
| Japanese | 1,304,286 |
| Other Asian, not specified | 623,761 |
| Pakistani | 409,163 |
| Cambodian | 276,667 |
| Hmong | 260,073 |
| Thai | 237,583 |
| Laotian | 232,130 |
| Taiwanese | 215,441 |
| Bangladeshi | 147,300 |
| Burmese | 100,200 |
| Indonesian | 95,270 |
| Nepalese | 59,490 |
| Sri Lankan | 45,381 |
| Malaysian | 26,179 |
| Bhutanese | 19,439 |
| Mongolian | 18,364 |
| Okinawan | 11,326 |
| Singaporean | 5,347 |

HARV00013384

DX019.0018

CONFIDENTIAL

**JA4995**

HARV00013385

# Problems with Aggregated Data

- ## Huge differences between sub-groups

  - ### Cultural identity

  - ### Socioeconomic characteristics

DX019.0019

CONFIDENTIAL

HARV00013386

# Asian American Identity



14%
AMERICAN

19%
ASIAN/ASIAN
AMERICAN

62%
COUNTRY OF ORIGIN/
COUNTRY OF ORIGIN AMERICAN

DX019.0020

CONFIDENTIAL

HARV00013387

# Asian American Identity

## "Asian–American" Label Doesn't Stick

*% saying they most often describe themselves as …*

- Country of origin/COO American
- Asian/Asian American
- American

### Among U.S. Asians who are…



Foreign born: 69 | 18 | 9

Native born: 43 | 22 | 28

DX019.0021

CONFIDENTIAL

# Asian American Identity

## Are You a Typical American?



**53%**

SAY NO, THEY ARE VERY DIFFERENT. 39% SAY THEY SEE THEMSELVES AS TYPICAL AMERICANS.



Percent who feel like a typical American or very different from a typical American...

| | Typical | Very Different |
|---|---|---|
| Japanese | 50% | 43% |
| Filipino | 49 | 45 |
| Chinese | 36 | 52 |
| Vietnamese | 35 | 61 |
| Indian | 30 | 57 |
| Korean | 29 | 63 |

HARV00013388

DX019.0022

CONFIDENTIAL

**JA4999**



HARV00013389

DX019.0023

CONFIDENTIAL

HARV00013390

# High School Completion Rates- Variability



**JA5001**

DX019.0024

CONFIDENTIAL



**Figure 2:** Educational Attainment for Asian American Sub-Groups, 2008-2010

HARV00013391

DX019.0025

CONFIDENTIAL

HARV00013392



Figure 3: Difference in Median Household Income for Selected Asian American Sub-Groups from the Median Household Income for All Asian Americans, 2008-2010

| Group | Difference |
|---|---|
| Hmong | -$22,144 |
| Bangladeshi | -$20,099 |
| Cambodian | -$19,956 |
| Thai | -$18,023 |
| Korean | -$17,334 |
| Vietnamese | -$15,231 |
| Laotian | -$14,192 |
| Indonesian | -$9,484 |
| Pakistani | -$5,447 |
| Sri Lankan | +$1,127 |
| Chinese | +$1,679 |
| Japanese | +$3,237 |
| Taiwanese | +$4,786 |
| Filipino | +$10,526 |
| Asian Indian | +$21,715 |

DX019.0026

CONFIDENTIAL

HARV00013393

# Campus Life:
# Asian American Cultural Groups



DX019.0027

CONFIDENTIAL

**JA5004**

# Implications

- We must be weary of aggregated data for Asian American student populations

- Honor the nuance of both identity and context

- Ask more questions about the composition of Asian American students in our pool and in our admitted classes

HARV00013394

DX019.0028

CONFIDENTIAL



# Black in America:
## Structural Inequities & Racialized Experiences

HARV00013395

DX019.0029

CONFIDENTIAL

HARV00013396

# Black Population in the U.S.-2010

# 42,020,743

## 13.6% of the total U.S. population

DX019.0030

CONFIDENTIAL

# Geographic Distribution

African American Population

1% 2% 5% 10% 15% 30% 50% 100% No Data

HARV00013397

DX019.0031

CONFIDENTIAL

**JA5008**

# Structural Racism- Indicators

- Socioeconomic characteristics & trends

- Educational inequities

HARV00013398

DX019.0032

CONFIDENTIAL

**JA5009**



Median net worth of households

HARV00013399

DX019.0033

CONFIDENTIAL

**JA5010**

HARV00013400

# Education- HS Graduation Rates

## White students: 75%

## Black students: 54%

DX019.0034

CONFIDENTIAL

HARV00013401

# Education-Disciplinary Actions

## *Black students comprise...*

**16% of Enrolled students**

**33% of students suspended once**

**42% of students suspended multiple times**

**34% of students expelled**

**JA5012**

DX019.0035

CONFIDENTIAL

HARV00013402

# Education-Reading Proficiency

In 2013:

## 17% of African-American 8th grade students were considered proficient in reading exams administered by NAEP

DX019.0036

CONFIDENTIAL

HARV00013403

# Education-Reading Levels

On average,

African American **12**th grade students

read at the same level as

white **8**th grade students

DX019.0037

CONFIDENTIAL

HARV00013404

# Education-Segregation

## 40% of Black students attend schools that are 90% or more students of color

## Black & Latino students are more educationally segregated now than two decades ago

DX019.0038

CONFIDENTIAL

HARV00013405

DX019.0039

CONFIDENTIAL

# Education-AP Classes

## Majority white schools

## are more than **2x** as likely to offer

## a significant number

## of advanced placement classes

## as majority Black or Latino schools

HARV00013406

# Education-AP Tests

## Among Black students with high potential for success in AP math courses, only **3** in **10** took such courses

DX019.0040

CONFIDENTIAL

HARV00013407

# Education-AP Tests

## Black students are the most underrepresented AP test-takers and have the lowest passing rates

DX019.0041

CONFIDENTIAL

# Demographics of the Graduating Class and AP Exam Takers[7] in 2013



Legend:
- Overall Graduating Class
- AP Exam Taker Population
- Population Scoring 3+ on an AP Exam

| Category | Overall Graduating Class | AP Exam Taker Population | Population Scoring 3+ on an AP Exam |
|---|---|---|---|
| White | 58.3% | 55.9% | 61.3% |
| Hispanic/Latino | 18.8% | 18.8% | 16.9% |
| Black/African American | 14.5% | 9.2% | 4.6% |
| Asian/Asian American/Pacific Islander | 5.9% | 10.7% | 12.7% |
| American Indian/Alaska Native | 1.0% | 0.6% | 0.5% |

Percentage of Population

HARV00013408

DX019.0042

CONFIDENTIAL

HARV00013409

# Psychological Pressures

- **Pygmalion effect**
  - Lowered expectations →lower achievement

- **Stereotype threat**
  - Fear of reinforcing negative stereotypes→ compromised performance

DX019.0043

CONFIDENTIAL

HARV00013410



## Implicit Anti-Black bias

### % of Americans* demonstrating anti-Black bias

*Representative sample of American Adults

DX019.0044

CONFIDENTIAL



**Fig. 1.** White and Black respondents' perceptions of anti-White and anti-Black bias in each decade.

HARV00013411

DX019.0045

CONFIDENTIAL

**JA5022**

HARV00013412

## Daily Experiences



#itooamharvard

DX019.0046

CONFIDENTIAL

HARV00013413

# Daily Experiences



My college degree has nothing to do with my humanity.

Neither does my skin color.

DX019.0047

CONFIDENTIAL

**JA5024**



Daily Experiences

HARV00013414

DX019.0048

CONFIDENTIAL

*No challenge has been more daunting than that of improving the academic achievement of African American students. Burdened with a history that includes the denial of education, separate and unequal education, and relegation to unsafe, substandard, inner-city schools, the quest for quality education remains an elusive dream for the African American community.*

-Ladson-Billings

HARV00013415

DX019.0049

CONFIDENTIAL

HARV00013416

# Implications

- Black students in the U.S. have a variety of economic, social, and psychological barriers to overcome in obtaining a quality education

- In aggregate, Black students in the U.S. have fewer educational opportunities and supports

- Regardless of economic background, Black students' experiences are impacted by racial bias, both explicit and implicit

DX019.0050

CONFIDENTIAL

*Thank you*

HARV00013417

DX019.0051

CONFIDENTIAL

# References

- http://iasp.brandeis.edu/pdfs/Author/shapiro-thomas-m/racialwealthgapbrief.pdf
- http://www.pewsocialtrends.org/2013/08/22/50-years-after-the-march-on-washington-many-racial-divides-remain/st_13-08-21_ss_raceinamerica_00/
- http://www.documentcloud.org/documents/229044-achievementgaps-naep.html
- http://ase.tufts.edu/psychology/sommerslab/documents/raceinternortonsommers2011.pdf
- http://www.edtrust.org/sites/edtrust.org/files/TheStateofEducationforAfricanAmericanStudents_EdTrust_June2014.pdf
- http://www.aecf.org/m/resourcedoc/aecf-racemattersEDUCATION-2006.pdf
- http://civilrightsproject.ucla.edu/events/2013/summary-of-new-research-closing-the-school-discipline-gap-research-to-policy/Research_Summary_Closing_the_School_Discipline_Gap.pdf
- http://civilrightsproject.ucla.edu/research/k-12-education/integration-and-diversity/brown-at-60-great-progress-a-long-retreat-and-an-uncertain-future
- http://joshpasek.com/wp-content/uploads/2012/10/2012-Voting-and-Racism.pdf

CONFIDENTIAL

DX019.0052

# References

- http://cdn.americanprogress.org/wp-content/uploads/2014/03/AAPI-report.pdf
- http://www.pewsocialtrends.org/2012/06/19/the-rise-of-asian-americans/
- http://www.census.gov/prod/cen2010/briefs/c2010br-11.pdf
- https://www.insidehighered.com/news/2013/06/07/report-calls-end-grouping-asian-american-students-one-category
- http://aapip.org/files/publication/files/2013_icount_report.pdf
- http://www.wtamu.edu/webres/File/Journals/MCJ/earp.pdf
- http://bmafunders.org/why-bma/
- http://www.pewsocialtrends.org/2011/07/26/wealth-gaps-rise-to-record-highs-between-whites-blacks-hispanics/
- https://maps.google.com/gallery/details?id=z4f-ZuCLmiKg.k8nH9oLT_JXg

HARV00013419

DX019.0053

CONFIDENTIAL



# Discussion Guide

# to the 2012 Casebook

## Harvard College Admissions

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

United States District Court
District of Massachusetts

**DX 24**

Case No. _____ 1:14-cv-14176 (ADB) _____
Date Entered_____
By_____
Deputy Clerk

HARV00018164

**JA5031**

DX024.0001

# Discussion guide to the 2012 casebook

All are admissable cases, but none is clear. Each folder contains information that gives pause and yet offers positive reasons to admit. They illustrate the perennial difficulty—philosophical as well as actual—of responding to individuals of merit, creating the overall mix of a Class, and trying to determine what seems best for each student (i.e., match with Harvard). The importance of essays, recommendations, objective data, and interviews is evident in these cases.

## 1) Sergei Liukin (1 3+ 4 3)

### Appeal
- Extremely bright student across academic fields with very strong faculty support
- Real passion for learning; he would make the most of Harvard academics
- School officials write (generally) very strong letters of recommendation
- Has high aspirations to contribute to academia
- Has done very well despite repeated moves and possible family upheaval (guidance counselor mentions it, though it's not addressed elsewhere)
- Strong interview report with good supporting details

### Pause factors
- Active outside the classroom—a contributor in several areas—but not a bell ringer
- Teacher 2 raises some serious PQ flags (not mentioned elsewhere) about intellectual arrogance and Sergei's difficulties working with others who are less able than he
- What will his transition be like—from big fish in small pond to Harvard—and how will Sergei interact with roommates, classmates, and administrators?

### Other information for your "committee"
- Area person called teacher 2 to find out more about Sergei's personal qualities; teacher stood by his assessment and said that other teachers he's spoken with concur
- Teacher reaffirms Sergei's enormous intellectual potential but can't get 100% behind his case

### Action
- After several lengthy discussions, Sergei was placed on the wait list
- Sergei and alumni from his area wrote in to express his continued interested in Harvard and his hopes to be admitted from the waitlist
- Sergei visited his area officer while in Boston visiting another school in April; officer met with him and found him polite, pleasant enough, and a bit nervous
- Not admitted from waiting list

1

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

HARV00018165

## Discussion guide to the 2012 casebook

### 2) Thomas Smith (2 2 4 2)

**Appeal**
- Bright student with several areas of academic interest
- Harvard offers a lot for students interested in politics, community service, and religious activities; Thomas would make the most of PBH, the IOP, etc.
- Interested in public service law as a possible career—seems like whatever he does, Thomas will continue his tradition of service to others
- Has done well in spite of great family upheaval and financial difficulties
- Student requested a fee waiver, which is generally a very good indicator of high financial need; he may qualify for the Harvard Financial Aid Initiative
- Myclassguides.com seems a good indicator of his self-starting personality
- Teachers and guidance counselor tell us that Thomas is a real doer who makes a strong impact when he gets involved with something

**Pause factors**
- We would like to know more about his note-selling business; would it be in violation of Harvard's principles for academic integrity?
- Academic and extracurricular accomplishment, while very strong, are not unusual for us
- Alumni interview report is not particularly helpful or well-done, though the alumnus seems supportive
- Alum calls him "mechanical" and "aggressive" without elaborating—what does he mean?

**Other information for your "committee"**
- Area person called Thomas to find out more about his business. Thomas says he needed a job that would allow him to help out around the house and watch his younger brothers. He posted the outlines on the internet but didn't sell them (revenue came from ads), and the service was *not* about finding answers to old exams online. He understands that colleges may place greater restrictions on what he's able to do with notes and in study groups, and he hopes to find a different job when on campus.
- Area person called interviewer to flesh out the "mechanical" and "aggressive" comments. Over the phone, the interviewer gives a much stronger endorsement of Thomas' case than the write-up suggests, and says he meant "aggressive" as a good thing: here's a young man who creates his own opportunities and works hard to get things done. By "mechanical" he meant "standard" with regard to his volunteer activities—not that Thomas doesn't care about them or did them just to pad his resume.

**Action**
- Admitted in April
- Enrolled

2

**JA5033**
DX024.0003

# Discussion guide to the 2012 casebook

## 3) Melissa Guzman de Jesus (3+ 2 4 2)

### Appeal

- Very bright Hispanic-American woman
- Modest family background
- Parents have no higher education and her guardian has a dental certificate; she has made the most of her situation and excelled in school without much support from home
- Melissa has balanced work, family, and school commitments well in high school; she seems to have the drive and time-management skills to do very well at Harvard
- The oldest of ten, Melissa's acceptance would mean a lot to her younger siblings and family
- Visible and active in her local community
- Wonderful support and interview

### Pause factors

- Her essay gives pause. Did she write it for shock value? Does she really believe all of the things that she has said in her essay? Is she naïve?
- Pre-med will be an adjustment for her, though her academic credentials are strong and she has the work ethic to do it
- Her extracurricular niche at Harvard is not clear, though she has many interests she could pursue on-campus and off

### Other information for your "committee"

- Interviewers are few where Melissa lives, and scheduling one was difficult for her because her religious beliefs and community commitments keep her busy or unable to interview all weekend. Thus, she moved throughout most of the process without a face-to-face interview until the very end.
- An alumnus and the area person conducted phone interviews with Melissa. Both saw enormous personal appeal and academic substance, but the Committee was hesitant to move forward without a face-to-face interview.
- Area person spoke with Melissa about her essay on the phone. Melissa did not retract her statements; she believed her friend's statements and affirmed her commitment to helping others in similar situations.
- Area person called school counselor and both teachers to find out more about Melissa. All raved about her (as they did in their letters), and her guidance counselor added that Melissa wrote her essay on her own, and that it wasn't passed to her for editing (as some students do). She understood how it would raise some eyebrows, but stands firmly by her conviction that Melissa is a wonderful prospect for Harvard.
- Area person eventually got in touch with an alumnus who did the very thorough face-to-face interview included in the write-up.

### Action

- Interview arrived at the very last minute; Melissa was the last case admitted before letters went out in April
- Enrolled

3

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

HARV00018167

**JA5034**
DX024.0004

Discussion guide to the 2012 casebook

## 4) Giang Nguyen (3 2 6 2)

**Appeal**
- Very bright Vietnamese-American woman with compelling family history
- Modest family background; likely to benefit from our Financial Aid Initiative
- Important family responsibilities
- Blue-collar/no-college background; Giang seems to have done well without much help from her parents or other relatives
- Public school in the heart of a major American city; her acceptance would resonate well in the local community
- Wonderful support
- Interview (even though it is not particularly well done and has inflated ratings) sheds light on Giang's important family responsibilities, which we don't learn about elsewhere

**Pause factors**
- Her extracurricular niche is unclear, especially because she has not had time to pursue much outside of a few academic activities
- Giang's application does not tell us much about her, though we learn of her family's struggles to come to the US and do well (and, by extension, we learn about her values and life history)
- ACT score is modest—but ACT scores do not correlate nearly as strongly with future academic performance as SAT II scores do, and those are quite strong
- Pre-med will be an adjustment for her, though her chemistry and math scores are encouraging

**Action**
- Admitted in April
- Enrolled

4

HARV00018168

**JA5035**
DX024.0005

# Discussion guide to the 2012 casebook

## 5) Evelyn Satmar (2 2- 3 2)

*11 - 2*

**Appeal**
- Very bright, active, appealing personality: a classic "well rounded case"
- Interesting family background, which she writes about and seems interested in sharing
- Charming essay that gives us a sense of her personality (though it was not universally liked by the committee members!)
- Teachers and guidance counselors write extensively about her strong personal qualities
- Strong (though not especially well done or helpfully written) interview; clearly the alum interviewer liked her and saw the same person as the recommenders

**Pause factors**
- While a strong overall candidate, Evelyn's credentials are not unusual in our applicant pool
- She lists swimming and diving as her preferred activity, though her level of talent is probably not at our varsity level: what, exactly, will she do at Harvard?
- Her extracurricular niche at Harvard is not clear, though she has many interests she could pursue on-campus and off

**Action**
- Discussed extensively in subcommittee and full committee meetings
- In and out of the class
- Waitlisted
- Admitted from waiting list
- Enrolled

5

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

HARV00018169

**JA5036**
DX024.0006

Discussion guide to the 2012 casebook

## 6) Megan Turner (2- 2 3 3+)

**Additional Information**

- Admissions Officer called Teacher #3 to flesh out negative recommendation. Professor stood by his assessment of Megan, her *ad hominum* comments, and her "small-town" insecurity. However, the Professor suggested that Officer call the young woman who was a teaching assistant for the course.
- Admissions Officer called the teaching assistant. She had a very different point of view about Megan. She explained that the whole seminar had started off making points using more personal arguments and she could see how someone else might have construed them as "*ad hominum*." She, however, viewed them as immature or not very developed arguments. She sat the seminar down and worked with them on developing a new style of arguing. Megan was among those who were most responsive and worked hardest at improving her style of making a point. As to Megan's choice of colleges, the teaching assistant admitted that at the start of the summer, Megan had asserted that she wanted to go to Harvard but had not really thought it through. During the course of the summer, she pushed Megan to really consider her college choices, and by the end of the summer, Megan had really coherent arguments for why Harvard most suited her own interests. As to possible negative comments about her family, the teaching assistant said she had only heard positive things. The only thing she remembered that might be construed differently was that Megan once explained that it was sometimes hard for her to explain to her family why really wanted new experiences, as they tended to be home-bodies and to not want to leave their home-state. As to Megan's ability to fit in at Harvard and be a positive influence, the teaching assistant felt that she would be a wonderful addition.
- Admissions Officer also called the school guidance counselor to follow up on Megan's personal qualities. Guidance counselor had nothing but praise and insisted that she had never heard Megan be arrogant or dismissive of another student.

**Appeal**

- Native American and Caucasian young woman from rural area of a Mountain States.
- Very bright and very active.
- School leader. School would never understand if this student were not admitted.
- School backs her extremely strongly for academics, leadership, and personal qualities.
- Would have lots of niches at Harvard and Harvard would provide her with a much-needed outlet for all of her many energies.
- Megan has experienced set-backs in her life and appears to have dealt with them well.

**Pause factors**

- Own essays very well-written but can come across as very negative and dismissive of her high school context. Some readers may even find them slightly arrogant.
- Third teacher recommendation raises flags about her personal qualities, her ability to interact with peers, and her "brightness." (TR3 also makes vast generalizations that "committee" may want to flesh out.)
- Big fish in a small pond?
- What will Megan be like as a roommate?

6

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

HARV00018170

**JA5037**

DX024.0007

## Discussion guide to the 2012 casebook

**Action**
- Admissions Officer made various phone-calls after sub-committee discussion and presented information gathered to the full admissions committee.
- After many hours of debate, the student was admitted.
- Student matriculated at Harvard College.

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

HARV00018171

**JA5038**
DX024.0008

Discussion guide to the 2012 casebook

## 7) Tracey Eckham (3+ 3 1 3)

**Appeal**
- One of the top female recruits for women's crew.
- Good scores.
- Many interests outside of academics and crew per activities list.
- Strong academic preparation and challenging curriculum.

**Pause factors**
- Essay makes her sound driven and, at times, unhappy ("how unhappy I was," "endure," etc.).
- Letters refer to her as a bit of a loner ("lone wolf") and quite driven; letter from crew coach even suggests that she may be depressed and is withdrawn at times.
- Personal qualities very hard to assess—who is Tracey Eckham?
- Interview certainly doesn't help us with her personal qualities and doesn't make her sound particularly passionate about anything.
- Grades should be better given scores.

**Action**
- Was wait-listed in April.
- Not admitted from the waiting list.

8

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

HARV00018172

**JA5039**
DX024.0009

# Discussion guide to the 2012 casebook

## 8) Mandisi Botlhoko (3 8 2 2)

### Appeal
- Extremely deserving student who values education above all else
- Inherently very bright; impressive SAT II results despite substandard K-10 education
- Obvious desire and ability to use his education in a way that positively affects others in need; already strong evidence that he has done this and will continue to do so his whole life
- Unusual maturity, resilience and perspective—he will have a real impact on classmates
- Might be able to contribute to our cross-country/track team
- Interview by experienced staff member sees him as special and worth any potential risk

### Pause Factors
- Lower SAT I scores raise concern about English language proficiency. Student is certainly less well-read in English than other successful applicants, and essays are a bit awkward.
- While the package is appealing, the case lacks the "hook" provided by a special academic or extracurricular talent. Not clear whether his running will translate to college competition.
- Adjustment to U.S. and complicated, fast-paced college environment might be challenging

### Other information for your "committee"
- Mandisi's IB math exam didn't go as well as predicted. The admissions officer wrote to the counselor to see if there were extenuating circumstances. The counselor responded:

  *"I have gotten to know Mandisi even better this term as he is actually volunteering here at school in his mini gap year as he waits to hear from his US colleges. He has been extremely helpful in our office. He continues to ooze humility and gentle humour and is one of the highest scorers ever in that 'reaction to setbacks' tick box.*

  *His sister has just passed away, which at her tender age normally means one thing. The Botlhoko family had no way of affording the funeral expenses, the body was impounded by the morgue until our faculty raised funds to pay for a coffin, etc. He was back at work the next day and appears to be coping remarkably well. I asked him why he didn't do as well in Maths earlier in the term. At the time his mother was very sick and had returned to her family home. (His father died years ago). This left Mandisi as the head of the household—he does have older brothers but they are drunkards—and around the time of his Maths exam he was inundated with calls and demands from the extended family back home. He hasn't used this as an excuse, however, and I would not have known about this if I hadn't asked.*

  *All of our previous, successful applicants in my time have done remarkably well, faced hardship, etc. but I think all came from professional (if still poor) families. Mandisi, I feel, and as you have identified, has come even further. He is certainly worth investing in, and we can all count on his using his education to the great benefit of many others."*
- This school really uses the grid which can be much more helpful than simply checking all to one side or not checking any boxes at all.
- Note that while Mandisi only lists one brother on his application, he comes from an extended African family with half-siblings from multiple mothers, many cousins, etc.

### Action
- After long discussion, Mandisi is accepted. He will be roomed and advised carefully. Special care will be taken in assigning him to a host family.

9

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

HARV00018173

**JA5040**
DX024.0010

## Discussion guide to the 2012 casebook

### 9) Carrie Miller (3 2 6 3+)

**Appeal**
- Filmmaking skills really stand out—at least before we get the faculty reading
- Impressive resilience with SID
- She writes enthusiastically about her interests

**Pause Factors**
- Scores not as high as we might hope with all A grades—though counselor gives us some explanation for them
- Why did Carrie think her first interview went so poorly? The interviewer clearly enjoyed meeting with her.

**Other information for your "committee"**
- Carrie's film was sent to a faculty member in Visual and Environmental Studies for review. The professor wrote: "Carrie Miller's film was engaging as I learned something, however dry. I applaud her interest in finding inspiration from political injustices. Good grades. Good recommendations and press." (Ranked 3rd out of 4 films reviewed by that professor.)

**Action**
- Was waitlisted and then not admitted

10

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

HARV00018174

**JA5041**
DX024.0011

## Discussion guide to the 2012 casebook

**10)  Grace Blake Cheng (3 2+ 3 1)**

**Appeal**

- Unusually appealing personal qualities echoed throughout the entire application. Grace's teachers, guidance counselor, and alumni interviewer describe her in terms we rarely read. A true "1 personal"—one of the few we see each year.
- Grace has engaged substantially with various communities (school, housing co-operative, local, state) in meaningful ways.
- From a very modest socioeconomic and ethnic background that we also don't see often in our student body. She would bring a unique life experience to Harvard, and she seems eager to share her story and learn about others in the process.

**Pause Factors**

- While a strong student in her high school, Grace's test scores suggest that she won't be a top engineering student at Harvard. She will have to work hard here (like most students!).

**Other information for your "committee"**

- This case, unlike most in the casebook, is a "clear admit." We include it because it shows the importance that non-academic and non-extracurricular factors in our process (in this case, unusually compelling personal qualities and school praise).

**Action**

- Grace's case was a compelling one upon first read, but the alumni interview report confirmed to the admissions committee that she was a truly special personal in many ways. The committee sent her a "likely letter" in February to show its enthusiasm for her case.
- Accepted and enrolled

11

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

HARV00018175

**JA5042**
DX024.0012

Discussion guide to the 2012 casebook

## 11)    Peter Duran (2 3+ 4 3+)

### Appeal

- Very strong student who would do well in our engineering or science concentrations.
- Peter's mixed-race background is underrepresented at elite colleges—and is a growing demographic in the United States.
- Strong interest in robotics; he could do that in the School of Engineering or Applied Sciences.
- Writes about the importance of education in his family and life; we get the sense that he would make good use of his time at Harvard (though that does not make him unique).

### Pause Factors

- Certainly a strong student, but—believe it or not!—not unusually strong in Harvard's applicant pool. Nothing here elevates Peter into the "1 academic" circle.
- Extracurricular accomplishments are mode modest compared to many of our other applicants. Do we get the sense that he would fall in love with his concentration—or more academic extra-curricular activities (such as robotics)—enough for him to contribute meaningfully here?

### Other information for your "committee"

- What do people think of the interview report? Where might it have been improved? (Point to lack of detail in the extracurricular section. What other things is Peter *interested* in? Sometimes it's as valuable for us to know what he wants to do in college as what he did in high school.)

### Action

- Discussed in subcommittee and full committee. Not admitted.

12



## HARVARD UNIVERSITY
Office of the General Counsel

Heather M. Quay
*University Attorney*

heather_quay@harvard.edu

Holyoke Center, Suite 980
1350 Massachusetts Avenue
Cambridge, Massachusetts 02138-3834

t.617.495.1434
f.617.495.5079

February 2, 2012

Ms. Nicole Merhill
Office for Civil Rights
U.S. Department of Education, Region I
5 Post Office Square
8th Floor
Boston, MA 02109

Re:    Complaint No. 01-11-2078

Dear Ms. Merhill:

Thank you again for your courtesy in allowing me extra time to prepare the response of
President and Fellows of Harvard College ("Harvard") to the above-referenced
complaint.

According to [Redacted: PII/SPI] letter dated January 11, 2012, the Complainants allege that
Harvard denied their son admission to Harvard College on the basis of his national origin.
Specifically, they allege that Harvard set a limit on the number of Asian American
students admitted to the University and applied a higher standard to their son's
application than it did to applications submitted by White Americans. Although [Redacted]
[Redacted:] letter does not name the Complainants, they have identified themselves to
Harvard in a separate letter to William R. Fitzsimmons, Dean of Admissions and
Financial Aid for Harvard College, alerting him that their complaint to OCR was
accepted. This letter, dated January 13, 2012, is the latest in a series of letters between
the Complainants and Harvard, all of which are attached as part of this submission. Thus,
because the Complainants, who are the parents of [Redacted: PII/SPI], have made
their identity known to Harvard, this response will in part address specifically the context
and reasons for Harvard's decision on [Redacted: PII/SPI] application. As the
following narrative and attached materials amply demonstrate, Harvard did not
discriminate against [Redacted: PII/SPI] in any way.

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

HARV00018452

United States District Court
District of Massachusetts

**DX 25**

Case No.    1:14-cv-14176 (ADB)
Date Entered
By
Deputy Clerk

**JA5044**
DX025.0001

Ms. Nicole Merhill
February 2, 2012
Page 2

As has been explained to the Complainants, admission to Harvard College is highly competitive. In 2010-2011, the College received almost 35,000 applications for the roughly 1660 possible places for newly entering freshmen.[1]  Just over six percent of the applicants were admitted.  (Because some students choose not to attend the College, the number of admitted students is somewhat larger than the number of spots available.)

In no way did Harvard subject [Redacted: PII/SPI] to different treatment in the admissions process on the basis of national origin, as the complaint alleges.  As you know, OCR has in the past conducted an extensive compliance review of Harvard College's admission process, particularly with respect to Asian American applicants (OCR Compliance Review 01-88-6009).  As OCR reported to Harvard at the end of that review: "We found no evidence of the existence or use of quotas, nor did we find that Asian Americans were treated differently than white applicants in the implementation of the admissions process."  *See* October 4, 1990 letter from Thomas J. Hibino to Derek Bok, enclosed as Attachment A.  The information that OCR gathered during the course of that compliance review (and in subsequent cases) regarding Harvard College's criteria for admission, its use of race as a factor in admissions decisions, and its general policies and procedures for selecting students for admission to its undergraduate program is still accurate today.  The only difference, as noted above, is in the dramatically increased numbers of applicants, which has made the competition for places in each undergraduate class even more fierce.

The Office of Admissions estimates that approximately 85% of its applicants are academically qualified for admission – that is, 85% of those who apply would likely be able to handle the academic work.  *See* the Office of Admissions 2011-2012 Interviewer Handbook, enclosed as Attachment B, page 10.  But given that the College can only admit approximately 6% of its applicants, it is clear that academic qualifications are necessary but not sufficient to obtain an offer of admission.  Like other highly competitive colleges and universities, Harvard admits only those applicants who present truly exceptional records of academic, extracurricular, and personal accomplishments. Harvard considered [Redacted: PII/SPI] application in accordance with its standard admissions process.  While his application demonstrated that he is an intelligent and well-rounded young man, ultimately the College determined that other candidates presented stronger qualifications for admission.  In short, the College felt that his application, while within the pool of applicants who met the fundamental requirements, ultimately did not display any particular areas of excellence that set him apart from the many thousands of other qualified applicants.

I have responded separately below to the individual items listed in the Data Request attached to [Redacted: PII/SPI] letter.

---

[1] When returning students are included, the freshman class size is approximately 1685.

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

HARV00018453

Ms. Nicole Merhill
February 2, 2012
Page 3

1. *The name, title, business address, email address and telephone number (including fax number) of: (a) The University's contact person for this complaint; and (b) The person authorized to resolve this complaint.*

Please consider me the University's contact person for this complaint. My contact information is as follows:

Heather Quay
University Attorney
Harvard University
Office of the General Counsel
1350 Massachusetts Avenue, Suite 980
Cambridge, MA 02138
Email: heather_quay@harvard.edu
Telephone: (617) 495-1280
Fax: (617) 495-5079

The person authorized to resolve this complaint is:

William R. Fitzsimmons
Harvard College
Dean of Admissions and Financial Aid
86 Brattle Street
Cambridge, MA 02138
Email: wrf@fas.harvard.edu Telephone: (617) 495-1551
Fax: (617) 495-8321

2. *A complete description of the University's admissions policies and procedures for applicants to the University's class of 2015.*

The hallmark of Harvard College's admissions process is that it is highly individualized, flexible, and holistic. Members of the Admissions Committee carefully review each application, giving serious consideration both to the student's potential to achieve academic excellence and to contribute to a diverse educational environment. As the Office of Admissions website advises potential applicants: "There is no formula for gaining admission to Harvard. Students with vastly different credentials come from thousands of secondary schools across the country and around the world. What unifies our students are the talents they bring to Harvard and the passion to explore its vast resources." http://www.admissions.college.harvard.edu/apply/index.html

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

HARV00018454

Ms. Nicole Merhill
February 2, 2012
Page 4

In a section entitled "What We Seek," the website continues:

> Applicants can distinguish themselves for admission in a number of ways. Some show unusual academic promise through experience or achievements in study or research. Many are "well rounded" and have contributed in various ways to the lives of their schools or communities. Others are "well lopsided" with demonstrated excellence in a particular endeavor—academic, extracurricular or otherwise. Still others bring perspectives formed by unusual personal circumstances or experiences.

> Academic accomplishment in high school is important, but we also seek people with enthusiasm, creativity and strength of character.

> Most admitted students rank in the top 10–15 percent of their graduating classes, having taken the most rigorous secondary school curriculum available to them.

http://www.admissions.college.harvard.edu/apply/index.html

Further information about the College's application process, as well as a set of detailed "Frequently Asked Questions" for high school students considering Harvard can also be found on the Office of Admissions website. Among other things, these materials reiterate in a number of ways both the holistic nature of the application review and the fact that the Admissions Committee does not use quotas of any kind.

http://www.admissions.college.harvard.edu/index.html
http://www.admissions.college.harvard.edu/apply/faq.html

Notably, the internal guidance documents created by the Office of Admissions for its committee members and others who participate in the admissions process, such as alumni interviewers, are entirely consistent with the materials it makes publicly available. I have attached the following for your review:

- *The Harvard College Office of Admissions 2011-2012 Interviewer Handbook* (Attachment B);
- *The Harvard College Office of Admissions 2011-2012 Schools Committee Chairperson Handbook* (Attachment C);
- *The 2011-2012 Standing Committee on Admissions and Financial Aid in Harvard College Information Sheet* (Attachment D); and
- *Reading Procedures, Class of 2016* (Attachment E).[2]

---

[2] I have provided the current iteration of this document, which is virtually identical to the previous years' version.

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

HARV00018455

Ms. Nicole Merhill
February 2, 2012
Page 5

The 2011-2012 Interviewer Handbook, enclosed as Attachment B, has a section entitled
"Admissions Standards," a large portion of which is devoted to an explanation of the
College's "Search for 'Distinguishing Excellences'" – a narrative description of the very
individualized approach Admissions Committee members take as they "scrutinize"
applications not just for indications of academic excellence, but in an attempt to discern
applicants' "intellectual imagination, strength of character and… ability to exercise good
judgment." Given the extraordinary strength of the pool, the salient question posed by
the Committee in considering an individual candidate is: "What makes him or her
distinctive?" The Committee has identified a number of broad factors, or "distinguishing
excellences" that, when considering a group already winnowed to those with a "high
level of merit," might help to positively "tip" a candidate. These are: (1) outstanding and
unusual intellectual ability; (2) unusually appealing personal qualities; (3) outstanding
capacity for leadership; (4) creative ability; (5) athletic ability; (6) Harvard and Radcliffe
parentage; and (7) geographic, ethnic and economic factors. With respect to the last
factor, the Committee quotes former Harvard President Neil Rudenstine, who described
diversity as essential to the life of an academic community: "It is the substance from
which much human learning, understanding, and wisdom derive. It offers one of the
most powerful ways of creating the intellectual energy and robustness that lead to greater
knowledge, as well as the tolerance and mutual respect that are so essential to the
maintenance of our civil society." Finally, the Committee notes that it must proceed with
"care, discretion and humility" in making these admittedly subjective judgments,
appreciating that "no one can predict with certainty what an individual will accomplish
during college or beyond." *See* Attachment B, pages 9-11.

Harvard considered [ Redacted: PII/SPI ] application in accordance with its standard
admissions process, in which each applicant's folder receives extensive individual
evaluation. The first reader is generally an "area" admissions officer, who is a staff
member assigned to a particular geographic area of the country. In some cases,
applications also may be sent to a second reader for further assessment.

The readers rate applicants on a scale of one to four (with one being the highest and four
the lowest) in four categories: academic achievement, extracurricular activities, athletics,
and personal qualities. There are no numerical equivalents or formulas in the rating
system. The academic rating, for example, is derived from a subjective assessment of a
number of factors, including test scores, class rank, teacher recommendations, and
responses to questions on the application. An applicant with perfect 800 SAT scores
could be rated as a one, two or even a three academically based on teacher reports and
other academic information. The reader also gives each applicant a preliminary overall
rating (POR) that reflects the reader's judgment as to the applicant's likelihood of
admission based on the applicant's other ratings and the reader's sense of the relative
strength of the application.

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY                                    HARV00018456

Ms. Nicole Merhill
February 2, 2012
Page 6

After folders have been read, they are considered by a subcommittee. The subcommittees generally consist of four to eight people, including area admissions officers, and, as Chair, a senior member of the admissions office staff. Subcommittees are formed around geographical areas (called "dockets") so that staff members come to know the schools, guidance counselors, and special characteristics of the region. At the subcommittee meeting, all members of the subcommittee have a summary of the readers' evaluations, while the first reader has the entire folder present for reference as needed. The subcommittee makes a recommendation, which is then considered at a full meeting of the Admissions Committee. The Admissions Committee, which consists of 38 people, including all admissions officers and other high level administrators of the College,[3] reviews all subcommittee recommendations and votes on final outcomes.

In accordance with these procedures, [Redacted: PII/SPI] application was read carefully by the admissions officer responsible for his area. The subcommittee then considered it along with the applications of other candidates in the "C Docket," which includes southern California (specifically the Greater Los Angeles area), Hawaii, and Guam and other U.S. possessions. The final decision not to admit [Redacted: PII/SPI] was taken by the full Admissions Committee by the standard majority vote process.

3.  *Statistical information regarding the number of non-minority, Indian American and Asian American applicants, from each group, that applied for admission to the University's class of 2015, and the respective number of applicants from each group that was admitted or waitlisted.*

Attached are a number of spreadsheets that provide the information you have requested, as described and summarized below:

- Enclosed as Attachment F is a chart labeled "Class of 2015 – Overall" that provides the applicant data that you have requested. Please note that this chart provides statistical information only for those applicants who chose to self-identify as Asian Americans (both as a whole and according to the specific designations provided by the applicants) and for those who chose to self-identify as White Americans. It does not include statistical information for any other demographic group. As noted earlier, the overall admit rate is 6.3%.

- Enclosed as Attachment G is a chart labeled "Class of 2015 – C Docket" that provides the applicant data that you have requested for the docket in which [Redacted]

---

[3] A Faculty committee, the Standing Committee on Admissions and Financial Aid for Harvard College, meets several times a year to discuss broad topics relating to Admissions policy. In addition, these faculty members may be asked to serve as expert readers when a particular applicant has expressed an interest that relates to their academic discipline. If they wish, they may attend and vote at subcommittee or full committee meetings, but in practice do so only rarely.

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

HARV00018457

Ms. Nicole Merhill
February 2, 2012
Page 7

[Redacted: PII/SPI] application initially was considered. Again, this chart provides statistical information only for applicants who chose to self-identify as Asian Americans and White Americans, and not for any other demographic group. Although Harvard does not impose any kind of quotas – either by docket or any other measure – it nonetheless may be useful for you to consider the allegation that has been made within the general context of the relevant docket subcommittee's work, given that [Redacted: PII/SPI] parents claim that his application was considered less favorably than those submitted by White American applicants. Of particular note is the fact that the overall admit rate for this group is 5.6%, which is equal to the admit rate for candidates who self-identify as Asian American (also 5.6%), and *higher* than the admit rate for candidates who self-identify as White American (5.1%).

- Enclosed as Attachment H is a chart labeled "Class of 2015 – NLNA Overall." Again limited as described above to data for self-identified Asian Americans and White Americans, this chart shows the applicant numbers and admissions rates for "Non Legacy/Non-Athlete" candidates – in other words, for those applicants who would not be eligible for a "tip" either because one of their parents went to Harvard or Radcliffe or because of their exceptional athletic ability. These data show that, consistent with OCR's previous findings about Harvard's admissions practices, once applicant data is limited to "Non Legacy/Non-Athlete" candidates, the admit rates between Asian Americans and White Americans are far closer. Further, as you know, at the conclusion of its prior compliance review, OCR specifically found that "the reasons or goals provided by Harvard for giving preferences to children of alumni and recruited athletes are legitimate institutional goals, and not a pretext for discrimination against Asian Americans." *See* October 4, 1990 OCR letter, enclosed as Attachment A. For the "NLNA" group, the overall admit rate is 5.4%.

- Enclosed as Attachment I is a chart labeled "Class of 2015 – NLNA C Docket." These data show that the overall admit rate for the "Non Legacy/Non-Athlete" applicants in the C Docket is 5.1%, *lower* than the admit rate for candidates in that group who self-identify as Asian American (5.3%), and *higher* than the admit rate for candidates in that group who self-identify as White American (4.1%).

4. *The names and titles of all individuals involved in the class of 2015 admissions process regarding applicants who attended* [Redacted: PII/SPI] *Pacific Palisades, California 90272, during the 2010-2011 school year. For each individual identified, please also provide: (a) The number of years each individual has been involved in the admissions process; (b) A description of the role each individual has in the admissions process (e.g., reader, subcommittee*

Ms. Nicole Merhill
February 2, 2012
Page 8

*member, full committee member, etc.); (c) The credentials of each member; and (d)
The individual's race, color and national origin.*

Enclosed as Attachment J is a chart providing the information about the Admissions
Committee that you have requested. The initial reader for all applications from the
[Redacted: PII/SPI] was Danielle Early. In addition to Ms. Early, the
members of the subcommittee with responsibility for the C Docket were: Precious
Eboigbe, Nathalie Galindo, Lucerito Ortiz, Elizabeth Pabst, and Sarah Donahue (Chair).
As noted above, the full Admissions Committee reviews and votes on all subcommittee
recommendations.

5.  *A copy of the complete application files for all applicants to the University's class of
    2015 who attended* [Redacted: PII/SPI] *during the 2010-2011 school
    year.*

As we have discussed, Harvard will make all necessary arrangements for you to review
the files you have requested at a time and place that is convenient for you. We will not
provide copies of these files, which are highly personal to the applicants, and in which
the applicants have a strong expectation of privacy, in light of our concern that these files
might be requested subsequently under the Freedom of Information Act.

However, because the Complainants allege that Harvard engaged in unlawful
discrimination in deciding not to extend an offer of admission to [Redacted: PII/SPI], a
more full discussion of the way in which the Admissions Committee made that
determination is appropriate. In short, as stated above, Harvard denied [Redacted: Red act]
[Redacted: PII/SPI] application because, viewed as a whole, it did not exhibit areas of
excellence distinctive enough to set him apart from the many thousands of students who
applied.

As Dean Fitzsimmons explained to [Redacted: PII/SPI] father last July, approximately
48 percent of the 2010-2011 applicant pool presented SAT I scores totaling 1400 or
higher. Nearly 4,175 scored a perfect 800 on the SAT Mathematics test and over 3,050
recorded an 800 Verbal SAT. As has been the case for many years, the number of
applicants who were valedictorians of their high schools (3,598) was more than twice the
number of places in the freshman class. Further, 52% of the applicant pool was in the top
ten percent of their respective high school classes.

[Redacted: PII/SPI] file was read and evaluated by Danielle Early, Admissions Officer
and Director of Internet Communications. Ms. Early, who served on the Admissions
Committee for five years, was responsible for the initial evaluation of applicants from
[Redacted: PII/SPI] geographic area, the "C Docket," which includes southern
California (specifically the Greater Los Angeles area), Hawaii, and Guam and other U.S.

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

HARV00018459

Ms. Nicole Merhill
February 2, 2012
Page 9

possessions. As described above, readers rate applicants on a scale of one to four (with one being the highest and four the lowest) in four categories: academic achievement, extracurricular activities, athletics, and personal qualities.[4] Ms. Early recognized [Redacted: PII/SPI] strong academic record, giving him a rating of "2" in that category. This rating indicates "Magna potential: Excellent student with superb grades and mid- to high-700 scores." *See* Attachment E, at page 5 for Harvard's coding guidelines. The median academic rating for admitted students in his applicant pool also was "2." *See* "Class of 2015 – Admits, Median Ratings," enclosed as Attachment K.

However, the Admissions Committee also looks for candidates who have distinguished themselves from the many other academically talented candidates by demonstrating excellence outside of the classroom. Although [Redacted: PII/SPI] was involved in a number of extracurricular activities and played a sport, his accomplishments did not rise to the level of excellence displayed by other candidates. In each of the remaining three categories, [Redacted: PII/SPI] only received a rating of "3," which translates to: "Solid participation but without special distinction" (extracurricular activities); "Active participation" (athletics); and "Generally positive" (personal qualities). *See* Attachment E, at page 6. In contrast, the median extracurricular, athletic, and personal ratings for admitted students were "2", "3", and "2" respectively. *See* Attachment K. A rating of "2" in extracurricular activities is defined as "Strong secondary school contribution in one or more areas such as class president, newspaper editor, etc. Local or regional recognition; major accomplishment(s)." A rating of "2" in personal qualities is defined as "Very strong." *See* Attachment E, at page 6.

Further, while [Redacted: PII/SPI] letters of recommendation were positive, they were not notably more positive than those of many other applicants. His teacher recommendations were coded as "2" and "3+" and his guidance counselor support was coded as "2-." A rating of "2" translates to: "Very strong support. 'One of the best' or 'the best this year," while a rating of "3" translates to "Above average positive support." *See* Attachment E, at page 6. The median ratings for admitted students were "2," "2" and "2." *See* Attachment K. [Redacted: PII/SPI] also received an overall rating of "3+" from the alumnus who conducted his personal interview. The interviewer noted: "as strong as he is across many areas, I'm not sure there is any one thing that gives him a decided edge among our highly competitive group of applicants."

On balance, after a careful and individualized evaluation and consideration of all of the information presented by [Redacted: PII/SPI] the reader did not feel that he was one of the candidates who stood out above the rest. On the back of the summary sheet for [Redacted: PII/SPI] Ms. Early noted his academic strengths but commented generally that she was "not sure what would keep him in the class." Consequently, she gave him a

---

[4] The "personal" category takes into account the applicant's letters of recommendation, essays, interview, and other personal data.

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

Ms. Nicole Merhill
February 2, 2012
Page 10

preliminary overall rating of "3," reflecting the opinion that he was a "Solid contender:
An applicant with good credentials and support." In contrast, the median POR for all
admitted applicants in 2011 was "2," defined as "Strong credentials but not quite tops."
*See* Attachment E, at page 5; Attachment K.

6. *A copy of the application(s), including all supplemental forms for admission for the*
   *class of 2015. Please also indicate the number of years the University has used the*
   *particular application(s) and/or forms.*

Harvard accepts both the Common Application and the Universal College Application,
and also requires applicants to submit an Application Supplement unique to Harvard. A
copy of the *Application to Harvard College for Fall 2011 Entrance* is enclosed as
Attachment L. This includes information for applicants, the Common Application,
Harvard's Application Supplement, and teacher and school report and evaluation forms.

7. *Any other information including documentation that the University believes may be*
   *helpful in OCR's understanding of the allegation presented in this complaint.*

As noted above, the Complainants corresponded with the Office of Admissions
throughout the summer. A copy of this correspondence is enclosed, in chronological
order, as Attachment M.

### *Conclusion*

As you know, Harvard College's general policies and practices on admissions have been
extensively reviewed in the past by OCR, and have been found to meet the requirements
of the law. Every student is evaluated as an individual and no quotas of any kind – either
to exclude or to include – exist. While an overwhelming number of applicants could
handle Harvard's academically rigorous undergraduate program, the Admissions
Committee engages in a flexible and highly individualized review of all applicants,
attempting to select students whose achievements and personal qualities make them most
likely to contribute to and benefit from Harvard's multi-faceted educational environment.

In closing, I reiterate that the undergraduate admissions process at Harvard is
extraordinarily competitive and highly selective. In 2010-2011 Harvard was able to offer
admission to only 6.3% of its nearly 35,000 applicants, which necessarily meant that the
Admissions Committee had to make a series of difficult choices and turn away thousands
of qualified applicants. All things considered, the Admissions Committee determined
that [ Redacted: PII/SPI ] application simply was not as compelling as those of other

Ms. Nicole Merhill
February 2, 2012
Page 11

candidates who applied.  In light of those circumstances, and given the absence of any evidence of discrimination, the Complainants' charge should be dismissed.

Please do not hesitate to contact me if you have any questions or would like additional information.

Very truly yours,

Heather M. Quay

cc:    William R. Fitzsimmons, Harvard College Dean of Admissions and Financial Aid
       Marlyn E. McGrath, Harvard College Director of Admissions

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

HARV00018462

A

CONFIDENTIAL                                          HARV00018463



UNITED STATES DEPARTMENT OF EDUCATION
REGION I
JOHN W. McCORMACK POST OFFICE AND COURTHOUSE, ROOM 222
POST OFFICE SQUARE
BOSTON, MASSACHUSETTS 02109

October 4, 1990

OFFICE FOR
CIVIL RIGHTS

Mr. Derek Bok
President
Harvard University
Massachusetts Hall
Cambridge, Massachusetts  02138

Re:  Compliance Review No. 01-88-6009

Dear President Bok:

I am pleased to inform you that the Office for Civil Rights (OCR) has completed its review of Harvard University's undergraduate admissions program. The purpose of our investigation was to determine whether Harvard discriminated against Asian American applicants to the Harvard-Radcliffe undergraduate program, in violation of Title VI of the Civil Rights Act of 1964, 42 U.S.C. Section 2000d et seq., and its implementing regulation at 34 C.F.R. Part 100 (Title VI). OCR has responsibility for enforcing Title VI, which prohibits discrimination on the basis of race, color, or national origin in programs and activities that receive Federal financial assistance. As a recipient of Federal financial assistance from the U.S. Department of Education, Harvard is subject to the provisions of Title VI.

As discussed more fully below, and in the enclosed Statement of Findings, we have concluded that Harvard has not violated Title VI with respect to the admission of Asian American applicants to the undergraduate program. Over the last ten years Asian American applicants have been admitted at a significantly lower rate than white applicants, however, we have concluded that this disparity is not the result of discriminatory policies or procedures. We found no evidence of the existence or use of quotas, nor did we find that Asian Americans were treated differently than white applicants in the implementation of the admissions process. From information provided by Harvard and our file review and statistical analyses, we determined that the primary cause of the disparity was the preference given to children of alumni and recruited athletes, which adversely affected Asian Americans. However, after examining Harvard's reasons for the preferences, we concluded that they were legitimate and not a pretext for discrimination. Consequently, based on our determination of compliance, we are closing our review as of the date of this letter.

CONFIDENTIAL

HARV00018464

**JA5056**
DX025.0013

Page 2 - Mr. Derek Bok, Compliance Review No. 01-88-6009

SUMMARY OF FINDINGS

OCR determined that Asian American applicants were admitted at a statistically significant lower rate than white applicants in seven out of the last ten years. (OCR reviewed data from the classes of 1983-1992). Over the entire 10 year review period, we found that Asian American applicants were admitted at a 13.2% rate, while whites were admitted at a 17.4% rate. OCR compared the qualifications of Asian American and white applicants to determine whether weaker credentials might have accounted for the lower Asian American admit rate. As a result of comparing SAT scores, secondary school records, and Admissions staff and alumni ratings of Asian American and white applicants, we found that Asian American applicants tended to be slightly stronger on academic criteria, while whites were slightly stronger on non-academic criteria. Overall, statistical analyses suggested that the two groups were similarly qualified, and consequently disparate admit rates could not be explained by weaker credentials.

Accordingly, we then looked at whether the disparity was the result of the use of a numerical quota or ceiling on the number of Asian American applicants who could be admitted. We reviewed documents and interviewed ten members of the Harvard Admissions staff, including the Dean of Admissions, the Director of Admissions, the Minority Recruitment Director, and several senior and other Admissions Officers. Each of the staff members interviewed stated that he or she was unaware of any numerical quotas or goals having been mentioned in the admissions process with respect to the admission of Asian Americans or members of any other racial or ethnic group. We also interviewed Harvard alumni, who served on alumni admissions committees, who similarly stated that they knew of no numerical goals or quotas used by Harvard with respect to the admission of specific racial or ethnic minority groups. Additionally, we interviewed former Harvard Admissions staff, and former students who worked with the Admissions Office minority programs and were knowledgeable about admissions practices. Finally, we interviewed numerous Asian American community leaders who were involved with the issue of Asian American admissions. None of the individuals interviewed provided any substantive evidence or information to suggest that Harvard imposed numerical restrictions or quotas limiting the admission of Asian American students.

Further, in analyzing admission trends, OCR found that both the number of Asian Americans admitted each year, and the percentage of Asian Americans in each freshman class, have increased every year during the 10 year review period. This pattern of increase continued for the classes of 1993 and 1994. The evidence revealed that Asian Americans have gone from being 5.5% of the class in 1983 to being 19.7% of the class of 1994. This data does not support a hypothesis that ceilings are placed on the number of Asian Americans admitted.

OCR next investigated Harvard's established admissions policies and procedures to determine whether Asian Americans were being treated differently than whites in the admissions process. In order to

CONFIDENTIAL

HARV00018465

Page 3 - Mr. Derek Bok, Compliance Review No. 01-88-6009

evaluate Harvard's policies and procedures, we obtained and reviewed copies of Harvard's application for admissions as well as all printed brochures describing the admissions process. We also reviewed ten years of annual reports on Admissions from the Office of Admissions and Financial Aid, as well as written descriptions of the admissions policies and process that were submitted by the Dean of Admissions in response to our data request. Additionally, OCR interviewed ten members of the Admissions staff.

As a result, we found two significant differences in Harvard's policies and procedures in terms of the treatment of Asian Americans. First, Harvard indicated that it provides an extra reading of Asian American applications by an Admissions Officer who is knowledgeable and sensitive to the Asian American cultures and experiences. Second, Harvard stated that Asian American ethnicity can be a positive factor in the admissions process, which might make a difference in a situation where all other factors are considered equal. We determined that these differences in the treatment of Asian Americans were consistent with the requirements of Title VI.

OCR then conducted a comprehensive file review to determine whether Asian American and white applicants were similarly treated in the implementation of established policies and procedures. We reviewed 400 full applicant files randomly selected from the Classes of 1991 and 1992, including an equal number of Asian American and white files. In addition, we reviewed approximately 2,000 Summary Sheets from applicant files, which contained narrative evaluations and numerical ratings developed by the readers. These narratives and ratings summarize the readers' reviews of an applicant file.

The primary purpose of OCR's review of complete files was to determine whether Asian American and white applicants with similar qualifications, as demonstrated by the documentation in the applicants' files, received similar reader ratings. Readers evaluated applicants on the criteria of academics, extracurricular activities, athletics, and personal qualities, and also generated a preliminary overall rating (POR) reflecting a reader's judgment of applicants' likelihood of admission. In addition, the review of Summary Sheets provided additional information on the consideration of ethnicity and other factors in the rating process.

Our review showed that there was the greatest consistency among readers' ratings in the academic and extracurricular categories. We found that the readers consistently applied the standards found in the Reading Procedures in these areas. OCR found that there was less consistency among readers' ratings in the athletic and personal categories. We noted, however, that while different readers' ratings varied slightly from other readers' ratings, there was no evidence to suggest that Asian American applicants and white applicants with similar credentials were given different ratings. With respect to the POR, Harvard explained that it represents a reader's individual judgment of the strength of a candidate based on all factors and information available, not only the four rating areas.

CONFIDENTIAL

HARV00018466

Page 4 - Mr. Derek Bok, Compliance Review No. 01-88-6009

As such, it was difficult to determine exactly why an applicant received a particular POR. Nonetheless, it did not appear that Asian American and white applicants were treated differently in the assignment of PORs.

We next sought to determine whether the disparity between Asian American and white admission rates were due to specific criteria or factors considered in the admissions process which might have a negative impact on Asian American applicants. Through statistical analyses, we concluded that differences between Asian American and white applicants on ten admissions variables (four reader ratings, SAT Math and Verbal, Alumni, Counselor and Teacher ratings, and Class Rank or Percentage) did not account for the disparity.

We then turned our attention to the preferences Harvard gives to certain groups of applicants in the admissions process. One of Harvard's objectives in admissions is to select a diverse group of students from a wide range of varied backgrounds, including those from different socio-economic, racial and ethnic groups. In fact, Harvard's catalogue states that "diversity is the hallmark of the Harvard/Radcliffe experience." In an effort to achieve its goal of diversity among its student body, Harvard actively recruits certain group of applicants and gives members of those groups positive weight or consideration (i.e. "tips") in the admissions process. With respect to "tips" in general, Harvard stated that a "tip" is a preference which may help in some situations where all other factors are substantially equal for two candidates, but it does not ensure admission. Harvard also stated that the admissions process is not based on a mathematical formula, and that the "tips" have no numerical weight.

There are three major categories of applicants for whom preferences or "tips" are given: (1) racial/ethnic minority groups; (2) children of alumni (legacies); and (3) recruited athletes (This category is distinct from the reader "athletic" rating.) With respect to the racial/ethnic groups preference, ethnicity is simply one of many considerations in the admissions process which may serve as a positive factor (but never a negative factor) in reviewing an application. Admissions staff agreed that Asian American ethnicity was most significant when the applicant demonstrated that he or she overcame severe obstacles that resulted from his/her ethnicity, or when the applicant was significantly involved in community organizations and activities, or if the applicant described the influence and effect of ethnicity on his or her life through the application essay. There is no formula or specific criteria for measuring or assessing ethnicity, nor are there instructions for determining how much weight is given to ethnicity, or where the weight is to be applied in the admissions process.

Harvard has no separate instructions describing how the preference is given to legacies. However, all legacy applicants are routinely referred to the Dean of Admissions for reading, according to Harvard's procedures.

CONFIDENTIAL

HARV00018467

Page 5 - Mr. Derek Bok, Compliance Review No. 01-88-6009

A recruited (talented) athlete is given special weight or consideration in the admissions process as follows. Athletes are recruited based upon their athletic accomplishments, talents and their predicted ability to contribute to the athletic programs at Harvard. Harvard's coaches develop lists of priority applicants for their respective teams, and these lists are considered or weighed by the Admissions subcommittees and the full Admissions committee in making their decisions. Other than to suggest that the higher an applicant was on a coach's priority list, the greater the weight attributed in the admissions process, Harvard did not have specific guidelines governing the preference given to recruited athletes. It should be noted that Harvard maintained that all applicants were viewed in light of what they would bring or contribute to the University, and that all ultimately had to demonstrate that they were qualified for admission to Harvard in the eyes of the full committee.

As a result of the file review and interviews with admissions staff, OCR found a great deal of evidence suggesting that the preferences or "tips" given to children of alumni and recruited athletes were significant factors in the admissions process. Conversely, however, OCR also found little or no evidence of an ethnic "tip" being given to Asian American applicants. There were no readers' comments that suggested that an applicant's Asian ethnicity was a significant or important factor in deciding to admit the applicant in the same way that being a legacy or a recruited athlete was instrumental in admitting applicants. While the various "tips" or preferences could not be weighed or defined precisely, it was clear that the ethnic tip for Asians was significantly less instrumental than "tips" for legacies and recruited athletes in the determining whether or not to admit an applicant. Notwithstanding this conclusion, however, the decision to give a "tip" to Asian American applicants is a matter of institutional policy, and the failure to do so does not constitute a violation of Title VI.

OCR conducted several statistical analyses to determine the effect of these preferences on Asian American and white admit rates. Through these analyses, OCR found a strong and distinct correlation between the preferences or positive weight given to children of alumni and recruited athletes, and the disparity in Asian American and white admit rates. Based on these analyses taken together with the file review, we have concluded that the disparity in admit rates between Asian American and white applicants can largely be explained by the preference given to legacies and recruited athletes, groups that are predominantly white. When legacies and recruited athletes are removed from the data, the difference between the Asian American and white admit rates is not statistically significant in seven of the ten years we reviewed. In two of the remaining three years, Asian Americans had significantly higher admit rates than white applicants within the restricted sample.

Because the preferences to legacies and recruited athletes resulted in a disparity in the admit rates between Asian Americans and whites, OCR scrutinized Harvard's reasons for giving these preferences. Harvard has been giving a preference to applicants who are children of alumni and to talented athletes back to at least the beginning of the century. OCR noted that these preferences

CONFIDENTIAL

HARV00018468

Page 6 - Mr. Derek Bok, Compliance Review No. 01-88-6009

were given long before there was a significant number of Asian American applicants. Also, it is clear that preferences for legacies and athletes are not unique to Harvard. Consequently, we found no evidence to suggest that these preferences were instituted to intentionally or deliberately limit the number of Asian Americans at Harvard. Because of the disparate impact that these preferences have on Asian Americans, however, OCR proceeded to analyze the legitimacy of their use in the admissions process.

Harvard asserted that its primary reasons for giving a preference to children of alumni were (1) to encourage alumni volunteer services (such as recruiting prospective students for Harvard), (2) to encourage alumni financial contributions, and (3) to maintain community relations. In support of these assertions, Harvard provided information demonstrating that last year, for example, alumni contributed over 36 million dollars to the Harvard College Fund, much of which is used to provide financial aid and scholarships to needy students. Additionally, Harvard provided data which indicated that over 4,000 alumni serve on Schools and Scholarship Committees that participate in recruitment and admissions activities. Also, Harvard stated that the more than 37,000 dues-paying members of the Harvard and Radcliffe Clubs contribute to the University in a variety of ways, including raising scholarship funds and sponsoring Schools and Scholarship Committees. Harvard maintained that its alumni's time, energy, money and intellectual resources were essential to maintaining the excellence of the institution.

With respect to athletic preferences, Harvard explained that its athletic programs, like the academic programs at Harvard, seek the very best applicants who could contribute to those programs. Consequently, in the same way that unusually strong math or science scholars would be looked upon favorably in the admissions process for the contributions they could make to the math or science programs, talented athletes are looked upon favorably for the contributions they could make to the athletic programs. Further, Harvard maintained that a varsity sports program was an integral part of American college life, benefiting athletes and other students as well.

OCR reviewed current case law and found no legal authority to suggest that giving preferences to legacies and recruited athletes was legally impermissible. In fact, the case law suggests that if schools are to possess a desirable diversity, officials must retain wide discretion, with respect to the manner of selecting students. The courts have generally been reluctant, if not unwilling to dictate what considerations or methods of selection are to be given priority in college admissions. OCR finds that the reasons or goals provided by Harvard for giving preferences to children of alumni and recruited athletes are legitimate institutional goals, and not a pretext for discrimination against Asian Americans. Additionally, Harvard asserted, and OCR accepts, that there are no alternatives to these preferences that could effectively accomplish the same legitimate goals.

CONFIDENTIAL

HARV00018469

Page 7 - Mr. Derek Bok, Compliance Review No. 01-88-6009

In light of the evidence, and the lack of any legal authority suggesting that such preferences are impermissible, OCR finds that Harvard's use of preferences for children of alumni and recruited athletes, while disproportionately benefitting white applicants, does not violate Title VI of the Civil Rights Act of 1964 or its implementing regulation at 34 C.F.R. Part 100. Further, as a result of all the evidence and information evaluated during this compliance review, it is OCR's overall conclusion that Harvard did not discriminate against Asian American applicants to its undergraduate program, in violation of Title VI of the Civil Rights Act of 1964 or its implementing regulation at 34 C.F.R. Part 100. Please be advised that this letter is not intended nor should it be construed to cover any other issues regarding compliance with Title VI not addressed in this letter.

As previously agreed, we are returning the computer data tape and the copies of full and edited Summary Sheets that were provided by Harvard for our mutual administrative convenience. Under the Freedom of Information Act, 5 U.S.C. Section 552, it may be necessary to release this document and related correspondence and records upon request. In the event that OCR receives such a request, we will seek to protect, to the extent provided by law, personal information which, if released, could reasonably be expected to constitute an unwarranted invasion of privacy.

Please express to your staff, particularly Dean William R. Fitzsimmons, my appreciation for the courtesy and cooperation extended to this office throughout the course of our lengthy investigation. If you have any questions regarding this letter, please feel free to telephone me at (617) 223-9662.

Sincerely,

Thomas J. Hibino

Thomas J. Hibino
Acting Regional Director

Enclosures

CONFIDENTIAL

HARV00018470



**B**

CONFIDENTIAL

HARV00018471



# Interviewer Handbook

# 2011 - 2012

*Harvard College*
*Office of Admissions and Financial Aid*
*86 Brattle Street*
*Cambridge, MA 02138*
*Revised Fall of 2011*

CONFIDENTIAL

HARV00018472

Helen Vendler kindly wrote this little essay for us. As a former member of the Faculty Standing Committee on Admissions, she wrote it to inspire us, and to help us be particularly alert to those candidates whose creative sensibilities would be valuable assets to a Harvard class, and would help them support the cultural life of our communities in decades to come. We hope you will find it as enlightening as our Committee does.

### Valuing the Creative and Reflective

Anyone who has seen application folders knows the talents of our potential undergraduates, as well as the difficulties overcome by many of them. And anyone who teaches our undergraduates, as I have done for almost thirty years, knows the delight of encountering them. Each of us has responded warmly to many sorts of undergraduates: I've encountered the top Eagle Scout in the country, a violinist who is now part of a young professional quartet, a student who backpacked solo through Tierra del Fuego, and other memorable writers, pre-meds, theater devotees, Lampoon contributors on their way to Hollywood, and more. They have come from both private and public schools and from foreign countries.

We hear from all sides about "leadership," "service," "scientific passion," and various other desirable qualities that bring about change in the world. Fields receiving the most media attention (economics, biology, psychology, occasionally history) occupy the public mind more than fields—perhaps more influential in the long run—in the humanities: poetry, philosophy, foreign languages, drama. Auden famously said—after seeing the Spanish Civil War—that "poetry makes nothing happen." And it doesn't, when the "something" desired is the end of hostilities, a government coup, an airlift, or an election victory. But those "somethings" are narrowly conceived. The cultural resonance of Greek epic and tragic roles—Achilles, Oedipus, Antigone—and the crises of consciousness they embody—have been felt long after the culture that gave them birth has disappeared. Gandhi's thought has penetrated far beyond his own country, beyond his own century. Music makes nothing happen, either, in the world of reportable events (which is the media world); but the permanence of Beethoven in revolutionary consciousness has not been shaken. We would know less of New England without Emily Dickinson's "seeing New Englandly," as she put it. Books are still considering Lincoln's speeches—the Gettysburg Address, the Second Inaugural—long after the events that prompted them vanished into the past. Nobody would remember the siege of Troy if Homer had not sung it, or Guernica if Picasso had not painted it. The Harlem Renaissance would not have occurred as it did without the stimulus of Alain Locke, Harvard's first Rhodes Scholar. Modern philosophy of mind would not exist as it does without the rigors of Wittgenstein's Philosophical Investigations, nor would our idea of women's rights without Woolf's claim for a room of her own.

We are eager to harbor the next Homer, the next Kant, or the next Dickinson. There is no reason why we shouldn't expect such a student to spend his or her university years with us. Emerson did; Wallace Stevens did; Robert Frost did; Frank O'Hara and John Ashbery and Fairfield Porter and Adrienne Rich did; and had universities harbored women in residence when Dickinson came of age, she might have been glad to be here. She and Woolf could be the writers they were because their fathers had extensive private libraries; women without such resources were deprived of the chance to be all they could be. It is important to recall that the makers of culture last longer in public memory than members of Parliament, representatives and senators; they modify the mind of their century more, in general, than elected officials. They make the reputation of a country. Michelangelo outlasts the Medici and the Popes in our idea of Italy; and, as one French poet said, "le buste/ Survit à la cité": art outlives the cities that gave it birth.

2

HARV00018473

In the future, will the United States be remembered with admiration? Will we be thanked for our stock market and its investors? For our wars and their consequences? For our depletion of natural resources? For our failure at criminal rehabilitation? Certainly not. Future cultures will certainly be grateful to us for many aspects of scientific discovery, and for our progress (such as it has been) in more humane laws. We can be proud of those of our graduates who have gone out in the world as devoted investigators of the natural world, or as just judges, or as ministers to the marginalized. But science, the law, and even ethics are moving fields, constantly surpassing themselves. To future generations our medicine will seem primitive, our laws backward, even our ethical convictions narrow.

"I tried each thing; only some were immortal and free," wrote our graduate John Ashbery. He decided on the immortal and free things, art and thought, and became a notable poet. Most art, past or present, does not have the stamina to last; but many of our graduates, like the ones mentioned above, have produced a level of art above the transient. The critical question for Harvard is not whether we are admitting a large number of future doctors and scientists and lawyers and businessmen (even future philanthropists): we are. The question is whether we can attract as many as possible of the future Emersons and Dickinsons. How would we identify them? What should we ask them in interviews? How would we make them want to come to us?

The truth is that many future poets, novelists, and screenwriters are not likely to be straight-A students, either in high school or in college. The arts through which they will discover themselves prize creativity, originality, and intensity above academic performance; they value introspection above extroversion, insight above rote learning. Yet such unusual students may be, in the long run, the graduates of whom we will be most proud. Do we have room for the reflective introvert as well as for the future leader? Will we enjoy the student who manages to do respectably but not brilliantly in all her subjects but one—but at that one surpasses all her companions? Will we welcome eagerly the person who has in high school been completely uninterested in public service or sports—but who may be the next Wallace Stevens? Can we preach the doctrine of excellence in an art; the doctrine of intellectual absorption in a field of study; even the doctrine of unsociability; even the doctrine of indifference to money? (Wittgenstein, who was rich, gave all his money away as a distraction; Emily Dickinson, who was rich, appears not to have spent money, personally, on anything except for an occasional dress, and paper and ink.) Can frugality seem as desirable to our undergraduates as affluence—provided it is a frugality that nonetheless allows them enough leisure to think and write? Can we preach a doctrine of vocation in lieu of the doctrine of competitiveness and worldly achievement?

These are crucial questions for Harvard. But there are also other questions we need to ask ourselves: Do we value mostly students who resemble us in talent and personality and choice of interests? Do we remind ourselves to ask, before conversing with a student with artistic or creative interests, what sort of questions will reveal the next T.S. Eliot? (Do we ever ask, "Who is the poet you have most enjoyed reading?" Eliot would have had an interesting answer to that.) Do we ask students who have done well in English which aspects of the English language or a foreign language they have enjoyed learning about, or what books they have read that most touched them? Do we ask students who have won prizes in art whether they ever go to museums? Do we ask in which medium they have felt themselves freest? Do we inquire whether students have artists (writers, composers, sculptors) in their family? Do we ask an introverted student what issues most occupy his mind, or suggest something (justice and injustice in her high school) for her to discuss? Will we believe a recommendation saying, "This student is the most gifted writer I have ever taught," when the student exhibits, on his transcript, C's in chemistry and mathematics, and has absolutely no high-school record of group activity? Can we see ourselves admitting such a student (which may entail not admitting someone else, who may have been a valedictorian)?

3

CONFIDENTIAL

HARV00018474

President Drew Faust's new initiative in the arts will make Harvard an immensely attractive place to students with artistic talent of any sort. It remains for us to identify them when they apply—to make sure they can do well enough to gain a degree, yes, but not to expect them to be well-rounded, or to become leaders. Some people in the arts do of course become leaders (they conduct as well as sing, or found public-service organizations to increase literacy, or work for the reinstatement of the arts in schools). But one can't quite picture Baudelaire pursuing public service, or Mozart spending time perfecting his mathematics. We need to be deeply attracted by the one-sided as well as the many-sided. Some day the world will be glad we were hospitable to future artists. Of course most of them will not end up as Yo-Yo Ma or Adrienne Rich; but they will be the people who keep the arts alive in our culture. "To have great poets," as Whitman said, "there must be great audiences too." The matrix of culture will become impoverished if there are not enough gifted artists and thinkers produced: and since universities are the main producers for all the professions, they cannot neglect the professions of art and reflection.

And four years at Harvard can certainly nurture an artist as a conservatory-education cannot. It remains true that great writers have often been deeply (if eccentrically) learned, that they have been bilingual or trilingual, or have had a consuming interest in another art (as Whitman loved vocal music, as Michelangelo wrote sonnets). At Harvard, writers and artists will encounter not only the riches of the course catalogue but also numerous others like themselves; such encounters are a prerequisite for the creation of self-confidence in an art. It is no accident that many of our writers have come out of our literary magazine the Advocate, where they found a collective home. We need comparable student homes for the other arts.

Once we have our potential philosophers, writers, and composers, how will we prepare them for their passage into the wider society? Our excellent students are intensely recruited by business and finance in the fall of their senior year—sometimes even earlier than that. Humanities organizations (foundations, schools, government bureaus) do not have the resources to fly students around the world, or even around the United States, for interviews, nor do their budgets allow for recruiters and their travel expenses. Perhaps money could be found to pay for recruiting trips in the early fall for representatives of humanities organizations. Perhaps we can find a way to convey to our juniors that there are places to go other than Wall Street, and great satisfaction to be found when they follow their own passions, rather than a passion for a high salary. But if we are to be believed when we inform them of such opportunities, we need, I think, to mute our praise for achievement and leadership at least to the extent that we pronounce equal praise for inner happiness, reflectiveness, and creativity; and we need to make being actively recruited as available to students of the humanities as it now is to others.

With a larger supply of creative and reflective admittees on campus, fellow-students will benefit not only from seeing their style of life and attending their exhibits or plays or readings, but also from their intellectual conversation. America will, in the end, be grateful to us for giving her original philosophers, critics, and artists; and we can let the world see that just as we prize physicians and scientists and lawyers and judges and economists, we also are proud of our future philosophers, novelists, composers, and critics, who, although they must follow a rather lonely and highly individual path, are also indispensable contributors to our nation's history and reputation.

Helen Vendler, Arthur Kingsley Porter University Professor

4

CONFIDENTIAL

HARV00018475

# Table of Contents

Introduction..................................................................................6
    Recommended Reading and Harvard Websites ...............................................6
    Eligibility for Schools Committee Work......................................................8
    Potential Conflicts of Interest as a Member of a Schools Committee.......................8
    Confidentiality.................................................................................8

1. Admissions Standards ...............................................................9
    The Committee on Admissions and Financial Aid ...........................................9
    The Search for "Distinguishing Excellences"................................................9
    Academic Credentials ........................................................................11

2. How the Committee Selects a Class ............................................13
    Recruiting Prospective Students ............................................................13
    The Common Application or the Universal College Application.............................14
    Application Deadlines and Decision Dates..................................................15
    Early Action .................................................................................15
    The Committee Process .....................................................................16
    The Importance of Timely Interview Reports...............................................17
    Ivy League Early Evaluation Program ......................................................18
    The Wait List ...............................................................................19
    Transfer Applications ........................................................................19

3. How Schools Committees Can Recruit Students ...........................20
    College Fairs.................................................................................21
    Acting as Secondary School Liaisons .......................................................21
    Early Recruitment ...........................................................................22
    Recruiting to Enhance Harvard's Visibility .................................................23
    Recruiting Athletes ..........................................................................24
    Recruiting Admitted Students ...............................................................25

4. Interviewing Applicants ...........................................................27
    Scheduling the Interview....................................................................27
    Conducting the Interview ...................................................................30
    Writing the Interview Report ...............................................................34
    Sending Your Reports to Cambridge and to Your Chair....................................36
    Ranking Meetings ...........................................................................36
    Transfer Interviewing .......................................................................37

5. Sample Interview Reports .........................................................38

5

CONFIDENTIAL

HARV00018476

**JA5068**
DX025.0025

# Introduction

Each year, members of our Schools & Scholarships Committees recruit and evaluate applicants to Harvard College. In the process, they cultivate critical relationships with parents, guidance counselors, other alumni/ae, and the general public. As the competition among colleges for the best students increases, so does our need for your help. We are grateful you have volunteered to join our efforts. You will likely find the work personally rewarding, intellectually stimulating, and occasionally perplexing.

This document addresses four subjects: 1) "Admissions Standards" describes the structure of the Admissions and Financial Aid offices. 2) "How the Committee Selects a Class" explains our criteria and procedures for recruiting students, evaluating them, and voting on their admission. 3) "How Schools Committees Recruit Students" describes recruitment you can do. **The most critical and practical part of this handbook is 4) "Interviewing Applicants," an overview of how to schedule and conduct a personal interview and evaluate students in written reports.** In section 5) "Sample Interview Reports," you will find examples of actual interview reports with our comments describing what was particularly well done and what the interviewer could have improved to make the report more helpful to the Committee.

The Committee has developed these practices over four decades of work with alumni/ae. Please read this document and consult our website (http://www.admissions.college.harvard.edu), which includes an overview of the College. In addition, the publications and web sites referred to below will keep you current on Harvard's academic, extracurricular, and other resources. The Admissions Office's own site is at www.admissions.college.harvard.edu. As always, feel free to contact us (617.495.1551) if we can be of further assistance in this important work. Once again, thank you for all of your help!

## Recommended Reading and Harvard Websites

**Primary sources**

**SEAS** outlines programs in the School of Engineering and Applied Sciences (www.seas.harvard.edu)

**Virtual Tour** (www.news.harvard.edu/tour) will guide you around and about Harvard Yard.

**Admissions Video** (http://www.admissions.college.harvard.edu/about/video/index.html)

**Electronic newsletters** are sent to all alumni/ae interviewers, usually 2-3 times a year.

**Freshman Seminar Program** (www.fas.harvard.edu/seminars) describes current seminars.

**Practice and Performance** Office for the Arts (www.fas.harvard.edu/~pandp), lists the facilities, programs, and organizations at Harvard in dance, music, theater, and the visual arts.

**Accessible Education Office** Resources for students with disabilities (www.aeo.fas.harvard.edu)

6

HARV00018477

**JA5069**

DX025.0026

**Secondary sources**

These publications, offered by other sources, can also help:

**Courses of Instruction** (www.registrar.fas.harvard.edu/Courses) is the Faculty of Arts and Sciences course catalog.

**Handbook for Students and Fields of Concentration**
(http://handbook.fas.harvard.edu/icb/icb.do )
describes degree requirements and general regulations.

**The Crimson** (www.thecrimson.com) is the daily student-run newspaper.

**Religious Life at Harvard** features a United Ministry directory; call 617.495.5529 or consult
(http://chaplains.harvard.edu/)

**Harvard University Gazette** (http://news.harvard.edu/gazette/) is published weekly by the University
News Office during the academic term and three times over the summer. In addition, an update of Harvard happenings is sent via e-mail each weekday to subscribers. Alumni can register for these e-mail updates on the Gazette's website.

**Office of Career Services** (www.ocs.fas.harvard.edu) offers information about jobs and internships.

**Harvard Magazine** (www.harvard-magazine.com) sends all alumni/ae copies every other month.

**Harvard College Program in General Education**
(http://www.generaleducation.fas.harvard.edu/icb/icb.do) offers information about the categories of the new program and the courses offered.

**GoCrimson.com** provides information about Varsity Division I and recreational athletics on Harvard's campus.

Samuel Eliot Morison's **Three Centuries of Harvard** (1986) is perhaps the best one-volume history of Harvard.

Henry Rosovsky's **The University: An Owner's Manual** (1991) offers a primer on college admissions and the mission of liberal arts colleges.

University President Neil Rudenstine's 1993-95 Report, "Diversity and Learning," surveys Harvard's practice of and commitment to recruiting distinguished students of all backgrounds.

7

CONFIDENTIAL

HARV00018478

**JA5070**

DX025.0027

### Eligibility for Schools Committee Work

Participation in School Committee work is open to alumni/ae of Harvard College and our graduate schools. Important prerequisites include broad knowledge of the College, enthusiasm for your experience as a student at Harvard, and sincerity of purpose in working with prospective college students, their families, schools, and the general public.

### Potential Conflicts of Interest as a Member of a Schools Committee

As a member of your local Schools Committee, you become a voluntary—but no less official—representative of Harvard University. Accordingly, it is critical to avoid circumstances that might suggest an appearance of inappropriate or duplicitous conduct. For example, alumni/ae who offer college counseling services for a fee are not allowed to participate in Schools Committee work. Interviewers whose children are planning to apply to Harvard are obligated to refrain from doing Schools Committee work for a year, or a least through the full completion of the admissions cycle. (Committee members should alert their Schools Committee Chair to this possibility during the summer before their child's senior year of high school.) We similarly request that individuals refrain from interviewing for Harvard and another undergraduate institution. In addition, of course, you should accept all interviewing assignments with total objectivity, while applying appropriate sensitivity to personal, business or other connections to candidates for admissions.

Should you have any questions about a possible breach of good faith about your role as a volunteer for the Harvard Admissions Office, please contact the Admissions Office to speak with your staff representative.

### Confidentiality

Never discuss what you know about students with anyone, even with school officials. (There is one exception to this rule that can also raise potential problems of confidentiality: holding a ranking meeting or otherwise sharing information about any candidate within a particular Schools Committee. See page 34.) Confidentiality is especially important when working with the general public. Even well-intentioned comments can reveal—sometimes disastrously—more than was intended. For instance, a principal or counselor asking why the Committee denied a student admission needs only to hear that the applicant "was not well supported" to go after teachers.

8

CONFIDENTIAL

HARV00018479

**JA5071**
DX025.0028

# 1. Admissions Standards

*Harvard's admission officers are not dealing with disembodied abstractions but with thousands of very real and very human individuals whose qualities are rarely scientifically measured and labeled unmixed.*

*Wilbur J. Bender*
*Dean of Admissions and Financial Aid*
*Report to the President, 1959-60*

## The Committee on Admissions and Financial Aid

The Harvard College Dean of Admissions and Financial Aid oversees the Admissions Office, the Financial Aid Office, and the Student Employment Office, all of which are located at 86 Brattle Street, Cambridge, MA 02138. The Dean chairs the Standing Committee on Admissions and Financial Aid of the Faculty, which includes more than 25 members of the Faculty of Arts and Sciences (FAS). The Dean and the Standing Committee, acting on behalf of FAS, implement policies on admissions and financial aid. Members of the Standing Committee also review cases that are representative of the entire pool, present strong scholarly credentials, demonstrate exceptional creativity in the arts, or raise questions of admissions policy. Working under the guidelines established by the Standing Committee, the Admissions Committee makes decisions on individual applicants. The Admissions Committee is composed of the Standing Committee of the Faculty and about 40 members from the three offices the Dean supervises.

The Financial Aid Office administers financial aid to eligible students who attend the College. Harvard remains need blind in the admissions process, and Harvard awards financial aid based strictly on need. That is, the Committee makes each admission decision without regard to whether a student has applied for aid, whether a student qualifies for financial aid, and regardless of the amount of financial aid for which a student qualifies. Harvard awards financial aid strictly on the basis of a family's need; we do not award merit scholarships. Thanks to the strong commitment of the Faculty of Arts and Sciences and the continuing generosity of donors, we are committed to providing the financial aid resources necessary to make the College fully accessible to students of promise.

## The Search for "Distinguishing Excellences"[1]

Our goal is to attract the best students to the College. Part of the general public believes "best" ought to be defined by standardized tests, grades, and class rank. It is easy to understand why. In his 1959-1960 Report to the President, Harvard Dean of Admissions and Financial Aid Wilbur J. Bender wrote that "[f]or a harassed admission officer [such a policy] has great appeal because it has

---

[1] This section represents extensive statistical analysis of the Committee's actions and represents accurately the way in which the Committee approaches each case. Our analyses have demonstrated that personal attributes—as represented by the alumni/ae interview, extracurricular rating, and personal rating—are factors in our decision-making that are as significant as academic ability—as represented by rank in class; rigor of high school curriculum; SAT, ACT, and AP/IB scores; and teacher and guidance counselor recommendations.

9

CONFIDENTIAL

HARV00018480

the merits of apparent simplicity, objectivity, relative administrative cheapness in time and money and worry, a clear logical basis and therefore easy applicability and defensibility."

The Admissions Committee values objective criteria, but holds a more expansive view of excellence. Test scores and grades indicate students' academic aptitude and achievement. The Committee also scrutinizes applications for extracurricular distinction and personal qualities. Students' intellectual imagination, strength of character, and their ability to exercise good judgment—these are other, critical factors in the admissions process, and they are revealed not by test scores but by students' activity outside the classroom, the testimony of teachers and guidance counselors, and by alumni/ae interview reports. Seeking evidence of these three criteria—academic excellence, extracurricular distinction, and personal qualities—the Committee reads with care all the components of each applicant's file: the high school transcript, standardized test scores, extracurricular activities, personal statement, teacher and secondary school recommendations, and the personal interview report.

Attempts to define and to identify precise elements of character, and to determine how much weight they should be given in the admissions process, require discretion and judiciousness. But the Committee believes that the "best" freshman class is more likely to result if we bring evaluation of character and personality into decisions than if we do not. We believe that a diversity of backgrounds, academic interests, extracurricular talents, and career goals among students who live and learn together affects the quality of education as much as a great faculty or vast material resources.

The Committee appreciates the degree to which many admissions decisions hinge on judgment calls. In 2010-2011, 34,950 applicants competed for about 1,685 spots in the entering class. Perhaps 85 percent of our applicants are academically qualified. A significant portion also presents strong personal and extracurricular credentials. When considering an applicant, then, the Committee asks, "What makes him or her distinctive?" The Committee identifies certain broad factors that generally carry weight in this process. These "distinguishing excellences" might "tip" into the class an applicant who presents the Committee solid evidence of academic excellence, extracurricular accomplishment, and strong personal qualities. Tips come into play only at a high level of merit; the Committee never gives enough of a tip to admit an average candidate at the expense of a first-rate one. These are among the most common "tips" by which applicants, presenting distinguished academic and extracurricular records, might distinguish themselves for admission:

**Outstanding and unusual intellectual ability**. Harvard is likely to admit brilliant students of sound character who offer substantial evidence of intelligence at the most elevated level. More than presenting the Committee with superior testing and strong academic records in competitive secondary school classrooms, the applicant admitted primarily for unusual intelligence also presents compelling evidence of creativity and originality.

**Unusually appealing personal qualities**. In certain cases, teacher recommendations, the secondary school report, personal statement, and the alumni/ae interview report offer consistent testimony of an applicant's unusual effervescence, charity, maturity, or strength of character in addition to academic and extracurricular accomplishment. A residential community with strong emphasis on extracurricular participation, Harvard prizes these qualities.

**Outstanding capacity for leadership**. Harvard aims to educate individuals to have broad vision who will be leaders in their chosen fields. Evidence of ability to lead others in positive ways can distinguish an applicant for admission.

**Creative ability**. The Harvard Supplement to the Common Application encourages students "with exceptional talents or interests" to send the Committee music CDs, compositions, dance DVDs, slides of artwork, or selected samples of academic work (including creative writing)

10

HARV00018481

for faculty evaluation, which can inform admissions decisions. Students' artistic participation and performance help enrich life at Harvard and beyond.

**Athletic ability.** The College has a long tradition of athletic excellence—in competition with our intercollegiate rivals and among our freshman and House communities. Harvard enrolls students who are among the most active in recreational athletics, and we lead all undergraduate institutions in the number of NCAA Division I athletic teams (41). Evidence of a candidate's ability to contribute to one of these teams, and of solid personal qualities and academic abilities, can distinguish a candidate for admission.

**Harvard and Radcliffe parentage.** Among a group of similarly distinguished applicants, the Committee is more likely to admit the sons and daughters of Harvard and Radcliffe alumni/ae than students without these institutional ties when all other factors are equal. Children of alumni/ae generally prove to be highly competitive candidates even without a lineage tip. Their academic credentials – test scores and grades – are nearly identical to those of the entering class as a whole.

**Geographic, ethnic, and economic factors.** The excellence and diversity of our students remain salient attractions for many prospective students. Undergraduates come from every state and more than 80 foreign countries. They have attended public, private, and parochial schools; represent all economic, ethnic, and religious backgrounds; and possess a wide range of academic interests and extracurricular talents. "Such diversity is not an end in itself, or a pleasant but dispensable accessory," University President Neil Rudenstine wrote in his 1993-95 Report, "Diversity and Learning." "It is the substance from which much human learning, understanding, and wisdom derive. It offers one of the most powerful ways of creating the intellectual energy and robustness that lead to greater knowledge, as well as the tolerance and mutual respect that are so essential to the maintenance of our civil society."

These factors are guidelines that are neither comprehensive nor absolute. Some successful candidates present a number of these qualities in their applications and are, in other words, well rounded. Other applicants are successful because they are well lopsided—they demonstrate exceptional distinction in one of these areas. Yet the Admissions Committee denies and offers admission to students who might fit either description.

Our success depends on our ability to attract students of different personalities, academic interests, and extracurricular talents to Harvard. We proceed with care, discretion, and humility because we know we are working with imperfect information, and that no one can predict with certainty what an individual will accomplish during college or beyond. The Committee appreciates the element of subjectivity involved in assessing a candidate's distinction in any one of these categories and in identifying some of the personal qualities we believe these distinctions demonstrate. And, by giving importance to human judgment, by admitting more than just "safe bets," we are aware our decisions become harder to explain with precision. By developing familiarity with the admissions process, you can help us address the public's concerns and misconceptions about recruitment and evaluation at Harvard.

## Academic Credentials

Applicants often ask about the role rank-in-class and standardized tests play in admissions decisions. These comments should inform your responses.

**Rank-in-class.** Rank-in-class (or deciles, quintiles, percentages, etc.) is a helpful, important gauge of academic achievement. Few successful candidates rank below the top 10 to 15 percent of their high school classes, except in the cases of applicants applying from secondary schools that send significant percentages of their graduates to selective four-year colleges. Reassure applicants that

11

HARV00018482

they will not be denied admission solely on the basis of a few places in rank; the overall pattern of students' academic performance and the quality of their courses are far more important than their rank. Even when assessing applicants within a high-ranking range, the Committee's decisions might be unrelated to an applicant's class standing because of the weight given other factors.

**Standardized testing.** Harvard requires all applicants to submit the results of the SAT or ACT (with the enhanced writing portion) and the results of two SAT Subject Tests (previously known as the SAT Achievement Tests or SAT II exams). Harvard does not have clearly defined, required minimum scores, but students admitted to the College represent a range of scores from roughly 600 to 800 on each section of the SAT and on the SAT Subject Tests.

Candidates with scores lower than 600 (or a 27 ACT composite) are less likely to be offered admission unless they provide compelling evidence of other unusual talents or accomplishments. At the same time, the Committee does not admit hundreds of applicants who have 700+ scores and fine secondary school records because other candidates appeared stronger in other important ways. Once the Committee determines that an individual is capable of thriving academically at Harvard—a judgment made considering test scores, grades, and recommendations—we are most interested in the person behind the scores.

**Re-centering of College Board scores.** The College Board adjusted the scoring scale of the SAT and SAT Subject Tests in April 1995. Before this change, the national averages for the SAT verbal and math tests were, respectively, 76 and 22 points below the "500 midpoint." The College Board believes it is important that this midpoint be the actual mean for all tests, and they cite a small initial sample of test-takers in 1941 to explain the previously skewed scale. Scores have thus risen considerably; a 420 Verbal has become a "re-centered" 500. Please consider this change when you assess candidates. Re-centering has lowered the floor for an 800 score—on both the SAT and the SAT Subject Tests. What was a "pre-re-centered" 730 verbal SAT became an 800; a "pre-re-centered" 780 math SAT is now 800. Students' expectations for admission might be raised simply because of large increases in the number of "perfect" scores.

12

CONFIDENTIAL

HARV00018483

**JA5075**
DX025.0032

## 2. How the Committee Selects a Class

### Recruiting Prospective Students

Many people often ask why, given the thousands of applications Harvard receives every year, we must invest such time, effort, and resources to recruit talented students.[2] Vigorous recruitment, however, has been instrumental to our success. It has broadened Harvard's appeal to a national and international base, and enhanced the College's accessibility. As Bender noted in his first Report to the President (1951-52),

> That the College is engaged [...] in a vigorous recruitment program and that there is a large and growing surplus of qualified applicants confront the Committee on Admission with new problems of fundamental policy. For the first time we can, within limits—and we have to—consciously shape the make-up of our student body instead of allowing natural selection or laissez faire to determine it.

Active recruitment helps sustain the critical opportunity to "consciously shape the make-up of our student body" as colleges compete intensely for the best students.

**Direct mail**. Virtually all college-bound students take the PSAT by their junior year. High school juniors and seniors also take SATs and the ACT, which survey students about their academic experiences and interests. With students' permission, the College Board and the American College Testing Company sell colleges this information. Harvard has identified accomplished students with these searches for many years. We send letters and viewbooks to searched students, and we share Student Search Lists with Schools Committee chairs to craft recruitment plans and to identify students to invite to local presentations. Our research shows that students who qualify for this search are about twice as likely to be admitted as other applicants. Of course, these search lists do not include the names of every student who might be admitted to the College.

**Joint travel/Exploring College Options**. To respond to the increasingly early interest students express in college admissions, the Admissions Committee is concentrating more on spring recruitment. Many officers recruit applicants through joint travel. A group of five admissions representatives—representing Harvard and four other colleges—travels to five cities in five days, speaking in the evening with students and parents and in the morning with guidance counselors. In the last several years, we have traveled with representatives from Duke, Georgetown, MIT, Stanford, the University of Pennsylvania, Princeton, University of Virginia, and Yale, among others. We enhance outreach through well-planned joint travel, which exposes Harvard to a broader audience than do individual school visits. Audiences learn about Harvard even if they attend the session to learn about another college. And by cooperating with other colleges, we enhance the cost-effectiveness of travel. Through spring and fall trips, we visit 130 cities in all 50 states and some international territories and reach approximately 55,000 students and parents, as well as 2000 high school counselors.

---

[2] A little more than 40 years ago, Harvard College received 7,762 applications and selected an entering class of 1,134 men. The Offices of Admissions at Harvard College and at Radcliffe College merged in 1975-76, increasing the number of total spots in the entering class for men and women to 1,600. Applications grew to between 12,000 to 13,000 until 1993-94, when 15,259 students applied to the College. Meanwhile, students admitted to Harvard and Radcliffe have matriculated at higher rates, driving down the raw number of students the Admissions Committee can admit.

With Radcliffe and Harvard's historic announcement in 1999 that Radcliffe would merge with Harvard—and establish the Radcliffe Institute for Advanced Study as an integral part of Harvard University—all applicants from the 1999-2000 admissions cycle on, women as well as men, apply to the fully coeducational Harvard College.

13

CONFIDENTIAL

HARV00018484

**Undergraduate Admissions Council (UAC).** The UAC, working closely with members of the Admissions Committee, offers extensive personal outreach to prospective students. About 300 undergraduates volunteer their time to the UAC to coordinate overnight, on-campus housing for visiting high school seniors throughout the academic year and during our annual April Visiting Program for admitted students. Their efforts can persuade admitted students to matriculate. Through telephone contact, email outreach, student blogs, and visits to hometown high schools, the UAC addresses prospective students' concerns and refers them to other appropriate sources.

**Undergraduate Minority Recruitment Program (UMRP).** The Admissions Office established the UMRP in 1974 to consolidate individual outreach programs to minority students, and this student organization has been part of our successful student recruitment ever since. UMRP's more than 20 undergraduates conduct personal outreach to minority students through on-campus hosting and by extensive telephone, mail, and e-mail contact during the application process and following the Committee's decisions. UMRP members also volunteer a week of their own time to visit high schools and some junior high schools across the country with large concentrations of minority students in order to encourage all students in these areas to apply to college. Undergraduates craft their itineraries through consultation with the appropriate area admissions officer.

**Harvard Financial Aid Initiative (HFAI).** Established during the summer of 2004, the Admissions Office and Financial Aid Office have implemented a coordinated effort to conduct personal outreach to students who may fall within the parameters of the new program. Their work was modeled after the work of the UMRP; accordingly, their recruitment strategies are similar to (and often conducted in concert with) those of the UMRP.

**Interviews and information sessions in Agassiz.** The Admissions Office runs year-round recruitment in Cambridge. From the first week in June to Thanksgiving (with a break in early September as students settle into their high school routines), we offer optional campus interviews to high school seniors. We add interview reports generated here to applicants' files, but Cambridge interviews do not substitute for the alumni/ae interview. We also offer student-led tours and group information sessions throughout the year. Open to the public, the information sessions allow students and their families to ask an admissions officer and current undergraduates questions about life at Harvard and the admissions process. Please visit our website or call us at 617.495.1551 for additional information, including up-to-date schedules and locations.

## The Common Application or the Universal College Application

Harvard adopted the Common Application in 1994-1995 and the Universal Application in 2007-2008. More than 400 colleges and universities use these standardized forms, which we hope benefit applicants and secondary schools. Applicants can focus more time on their academic, extracurricular, and personal lives than on filling out multiple applications. Teachers and counselors can devote more time to writing a single recommendation (and to counseling) and less to redundant paperwork. The Common Application is available free online (www.commonapp.org) and our website; the Universal College Application may be obtained at www.universalcollegeapp.com. In addition to the Common Application or the Universal College Application, we require applicants to complete a short supplement to indicate their interest, and its depth, in a field of study, career, and extracurricular activities—and to submit AP and IB results, an optional additional essay, or tapes, slides, and papers for faculty evaluation.

14

HARV00018485

**JA5077**
DX025.0034

## Application Deadlines and Decision Dates

**Mid-October, 2011**

The Admissions Office begins processing applications for Early Action candidates; interview requests sent to School Committee chairs

**November 1, 2011**

Deadline for all Early Action application materials. Students applying for Early Action should submit scores by the October series, although scores from the November series should reach us in time for consideration.

**Early December, 2011**
*We will begin our careful evaluation process for Regular Decision candidates at this time, reading applications in the order in which they are completed.*

We have asked that candidates send at least the Common Application or Universal Application as soon as possible to allow time for them to begin the interviewing process in areas where this is possible. We recognize that students, secondary school teachers, and counselors have many commitments that may preclude early submission of admission materials by this date. Candidates will not be penalized in any way if materials are submitted before the January 1 deadline.

**January 1, 2012**
*Final deadline for application materials for Regular Decision applicants.*

Candidates can complete testing requirements by using the January SAT or February ACT dates, but we hope that they will have their testing completed by the December date.

**Date Decisions Are Sent**
- Early Action decisions are mailed/e-mailed on December 15, 2011.
- Regular Action decisions are mailed/e-mailed on March 29, 2012.
- Common Reply Date, by which applicants in the Early Action and Regular Decision processes must accept or decline the offer of admission, is May 1, 2012. No deposit is required.

## Early Action

Harvard College has restored nonbinding early action as part of its admissions process and significantly enhanced its recruiting program to assist talented students from modest economic backgrounds in navigating the admissions process. Harvard has also increased its investment in undergraduate financial aid to more than $160 million. Currently, more than 60 percent of Harvard College students receive scholarship aid, and the average grant is about $38,000.

In 2007, Harvard eliminated its nonbinding early action program on a trial basis and moved to a single admissions deadline, announcing at the time that it would evaluate the impact of the change after several years.

15

CONFIDENTIAL

HARV00018486

**JA5078**
DX025.0035

"We piloted the elimination of early action out of concern that college admissions had become too complex and pressured for all students, and out of particular concern for students at under-resourced high schools who might not be able to access the early admissions process," said Harvard President Drew Faust. "Over the past several years, however, interest in early admissions has increased, as students and families from across the economic spectrum seek certainty about college choices and financing. Our goal now is to reinstitute an early-action program consistent with our bedrock commitment to access, affordability, and excellence."

"We looked carefully at trends in Harvard admissions these past years and saw that many highly talented students, including some of the best-prepared low-income and underrepresented minority students, were choosing programs with an early-action option, and therefore were missing out on the opportunity to consider Harvard. We have decided that the College and our students will be best served by restoring an early option," said Dean Michael J. Smith of the Faculty of Arts and Sciences.

Harvard's concerns about equity and transparency will continue to guide the structure of its admission program. It will maintain a nonbinding approach, which maximizes freedom and flexibility for students. As in the past, students can apply under the single-choice, early-action program by Nov. 1 and will be notified by Dec. 15, at which point students completing financial aid applications will receive notice of their awards. Regular decision will continue to operate as usual, with applications due on Jan. 1 and notification on April 1. All students, whether admitted under early action or regular decision, will have until May 1 to decide whether to attend.

To ensure that the return to early action serves Harvard's commitment to access and diversity across many dimensions, the change in admissions policy will be accompanied by enhancements in the College's recruiting program, including a new program promoting transparency in college admissions, greater outreach, and targeted staff visits to schools where few students apply early to college; increased involvement of Harvard undergraduates throughout the year in three major recruiting efforts – the Harvard Financial Aid Initiative, the Undergraduate Minority Recruitment Program, and the Undergraduate Admissions Council's Return to High School Program; and enhanced web features providing families with the ability to calculate the likely net cost of sending a child to Harvard, and perspectives from financial aid students on life at Harvard.

"The commitment to including first-generation, low-income , and historically disadvantaged minority students in the full spectrum of admissions options is a key feature of this new early-action option," said Harvard College Dean Evelynn Hammonds. "We have made significant gains in recent years in recruiting larger numbers of these students and in supporting them for success once here. I am very pleased that we are able to re-conceive early action, consistent with these goals, and to work with students based on whatever timetable best meets their needs."

"We continue to be concerned about the pressures on students today, including those associated with college admission," said Harvard College Dean of Admissions and Financial Aid William R. Fitzsimmons. "In all of our work, we will do everything possible to level the playing field in admissions and encourage all students to make thoughtful choices about how they can best contribute to society."

## The Committee Process

The "Docket." Each member of the Admissions Committee represents specific geographic areas, and so we refer to officers as "area representatives." A "docket"—which we also refer to as a "subcommittee"—is a geographical region, designed to be roughly equivalent to each of the other dockets in the number of applicants considered there. There are 20 dockets or subcommittees. Each

16

CONFIDENTIAL

HARV00018487

officer sits on at least two dockets to inform comparisons made among candidates across vast geographical lines. Each subcommittee varies in size, but generally includes three to six area representatives, a docket chair (a senior admissions officer), and the docket's faculty readers.

**Who reads folders.** The area person reads all the folders from his or her area—a folder's first read. The first reader records all data, contacts the applicant or his or her school for materials missing from the folder, and comments on the folder's strengths and weaknesses. Reading every folder from their areas enables area persons to present an overview of the relative strengths presented by the applicants there. Second and third readers check factual data recorded on the reader sheet and, more importantly, offer additional interpretations of the folder. The third reader records all evaluations for entry into our database. Folders might receive additional evaluations, whether by other admissions officers or by members of the Faculty Standing Committee. These other evaluations offer more commentary on the strengths of applicants who present special attributes such as those described in section 2.

**Subcommittee meetings.** Once folders have been read, subcommittees meet. The area person, as advocate for each case he or she has read, summarizes to the subcommittee the strengths and weaknesses in each component of each candidate's file. Subcommittee members discuss the case, and then vote on what recommendation to offer the full Committee. The subcommittee examines the entire docket several times, extensively reviewing decisions—and in many cases changing them—to ensure standard scrutiny for all applicants, whether they are presented first or last on a docket. After surveying the docket's breadth of quality, the subcommittee can identify with greater confidence those applicants who appear strongest. Majorities rule, but the degree of support expressed for candidates is always noted—both for candidates the subcommittee will and will not recommend for admission. By identifying applicants this way—"clear admits," "strong rejects," etc.—subcommittees can compare candidates with similarly assessed applicants on other dockets.

Subcommittees then present and defend their recommendations to the full Committee. While looking at or listening to the summary of any case, any Committee member may raise questions about the proposed decision and request a full review of the case. Many candidates are re-presented in full Committee. The Committee compares all candidates across all dockets, and therefore across geographical lines.

This rigorous comparative process strives to be deliberate, meticulous, and fair. It is also labor intensive. But it permits extraordinary flexibility and the possibility of changing decisions virtually until the day the Admissions Committee mails them. This is especially important since the Committee is always receiving new information on candidates. Please convey to applicants the time and care the Committee takes with each individual application.

## The Importance of Timely Interview Reports

Your insights are most valuable if we have them for subcommittee—a case's first hearing. We would, of course, love to read interview reports as we first read applicants' files. But many students still wait to apply by the final deadline, making it virtually impossible for their reports to be here for a folder's first read. *When possible, please contact the student, complete the interview, and file the interview report within two weeks of receiving the interview assignment.* Waiting an extended period before writing the interview report can disadvantage the student, as impressions and important details from the conversation can fade as time passes. As such, a delayed report may fail to accurately capture the student interviewed.

17

CONFIDENTIAL

HARV00018488

The committee process works best and most efficiently, then, when we have reports for subcommittee. Subcommittees may discuss a single case for half an hour or even more before voting on a recommendation to offer the full Committee. These conversations are more tentative when critical items are missing—whether they are teacher recommendations or interview reports. And while the full Committee will take just as much time as the subcommittees do discussing a single case, these discussions take more time the more new information we must add to case re-presentations. Subcommittees begin meeting in November for the Early Action process and for three- to four-day shifts in late January until the end of February for the Regular Decision process.

Please consult with your Schools Committee chair about the exact dates of subcommittees for the area in which you will be interviewing. Specific dates for subcommittee meetings depend on several factors. Since each staff member sits on at least two subcommittees, we try to ensure staff members do not have insuperable conflicts. We attempt to make interview requests as early as possible, yet we know there will be some requests we make for interviews after subcommittees have met. Occasionally, applicants' files complete as late as late-November for Early Action and February for Regular Decision. This results, most often, from unavoidable logistical factors. Mail sometimes arrives late. Occasionally, we are overwhelmed with mail to open, materials to enter into our database, and reams of paper to file. Nevertheless, we hope you can fulfill each interview request as quickly as possible so that your Cambridge subcommittee has the benefit of your interviewers' personal insights.

The *last* opportunity for the vast majority of cases to be heard is during full Committee. The Admissions Committee must have all interview reports in hand for full Committee. As you know from reading above, the entire Committee convenes in one room to review all the contenders for admission. Many candidates are re-presented in full Committee, which again may consider a single case for a half hour or more. Full Committee generally meets during the first week of December for Early Action candidates and from the end of the first week of March to the end of the third week of March for Regular Decision candidates.

We are grateful that you do all you can to send us interview reports as early as possible. Clearly, it is vital that we have all interview reports by the full Committee stage. We hope this outline helps you understand that it is critical to complete your interview and report as soon as possible, ideally within two weeks of receiving the assignment from your Schools Committee chair.

## Ivy League Early Evaluation Program

As determined by each institution, admissions offices may advise applicants before the common notification date, in writing, of the probability of admission (e.g. likely, possible, unlikely). If the student is a recruited student-athlete, such notifications may only be made from October 1 through March 15, per Ivy League regulations.

Institutions may issue official "probabilistic" communications only in writing, from the office of admission. Such letters will have the effect of letters of admission, to be confirmed on the common notification date, subject to revocation only on the same terms as letters of admission. (Such communications given by coaches, whether orally or in writing, do not constitute binding institutional commitments.) An applicant who receives one or more such written communications and who has made a decision to matriculate at one institution is encouraged (but not required) to notify all other institutions, and to withdraw all other applications, as promptly as possible.

Such early evaluations are often precipitated by pressure on student-athletes from other institutions requiring an early commitment. In some instances, students are given very little time to

18

respond to these offers. Such candidates bring excellences of all kinds in addition to athletics, and the Admissions Committee can vote to notify them that they are likely to be admitted – rather than lose them to other institutions. Alumni/ae Schools and Scholarship Chairs will be informed about such candidates by the staff area person and will be requested to interview them if time allows.

## The Wait List

The Committee places a number of accomplished applicants on the wait list each year. The wait list includes the strongest applicants whom the Committee was not able to admit but might still wish to consider for admission if spots in the entering class open later. Wait-listed students should make definite plans to attend a college to which they have been admitted, since the number of students the Committee has been able to admit from the wait list varies from year to year. In some years, we have admitted no one from the wait list; in others, we have admitted more than 100 candidates from the wait list.

Admitted students have until May 1 to accept or forfeit their spots in the entering class. Should fewer than 1,680 students accept the Committee's offer of admission by the May 1 deadline, the Committee may then select students who have decided to remain on the wait list to fill these spots. The wait list is not ranked. We meet some time after May 1 to select students from the wait list through a rigorous comparative process very similar to the full committee meetings described above.

## Transfer Applications

After a two-year suspension, the transfer admissions program was reinstated during the 2010-2011 admissions cycle. Just under 1500 students applied for 12 transfer spaces. Students interested in applying during the 2011-2012 cycle should check Harvard's website or call the transfer office (617.495.5309) in the fall to verify the status of transfer admissions for this academic year. The application deadline for the transfer process is March 1, 2012, with notification by June 1.

In the transfer process, Harvard considers applications in the spring from students who wish to transfer to Harvard after completing at least one year (and not more than two) of full-time study at another college or university. The Committee selects transfer applicants through a rigorous comparative process and on the basis of their record of academic achievement, the strength of recommendations they receive from college faculty members, and their overall promise. Only the very strongest transfer candidates are selected for alumni interviews; you will be contacted directly by your committee chairperson should we need your help interviewing a candidate for transfer admissions.

19

CONFIDENTIAL

HARV00018490

**JA5082**
DX025.0039

### 3. How Schools Committees Can Recruit Students

Admissions involves "salesmanship," politics in the broad sense of the word, human and institutional relationships. It is a matter of who works for you and how they work, of whom you select and whom you reject, of the public image or images of Harvard, which are affected by everything you do or don't do.

*Wilbur J. Bender*
*Dean of Admissions and Financial Aid*
*Report to the President, 1959-60*

Through your recruitment efforts, you add an indispensable human dimension to what can seem an impersonal process. You also can combat myths about the College, its mission, and its students—myths that can dissuade talented students from applying. This human dimension—and the simple but important fact that you live near the candidates you interview—has become even more important given that we no longer have the financial resources to make a second visit to most areas beyond Joint Travel.

Schools Committee members recruit students as well as interview them—but there is an important distinction between the two. When recruiting, alumni/ae should introduce students to and inform them about the College and the admissions process. They should not act in the capacity of interviewers, who inform applicants about the College and evaluate them for admission. Recruitment efforts should not be performed—or perceived to be performed—as a preliminary screening of prospective or actual applicants. Nevertheless, alumni/ae should use the information presented in section 2 to inform their advice to students.

In most settings in which you recruit students—the college fair or a school visit, for instance—there is little you will know about individual students, except that they are interested in learning more about Harvard. At this introductory stage, then, the task is essentially to present facts about opportunities at the College and to dispel misconceptions students and their families have about it. The Admissions Committee believes strongly that our staff, student workers, and alumni/ae should never disparage another college.

Informal contact occasionally does yield information about an individual that is pertinent to the admissions process. For instance, students sometimes volunteer SAT scores, grade point averages, and class ranks to enable you to assess whether they are "in Harvard's range." No matter how experienced a recruiter or interviewer is, do not make any predictions or impressions, **positive or negative**, about a student's chance of admission. Admissions officers often parry this question by saying, honestly, that they cannot estimate a student's chances until they have read a completed application and can assess the year's competition. And this analysis can only be accomplished with full access to all the material in an applicant's file and through the extensive discussions shared and comparisons made through the full Committee process.

When prospective students do ask about their chances of admission, it can be helpful to describe factually Harvard's selectivity—as well as the selectivity of other liberal arts schools—and the importance of applying to a range of schools. When expressed without unusual emphasis and with a helpful, considerate tone, this advice can help manage better students' and their families' expectations in the increasingly competitive world of college admissions.

20

CONFIDENTIAL

HARV00018491

**JA5083**
DX025.0040

## College Fairs

We receive hundreds of notices from secondary schools, educational consortiums, community organizations, and other colleges soliciting our participation in college fairs. Schools Committee chairs receive copies of these notices and attempt to staff as many of these local events as possible with their alumni/ae members. College fairs vary in format and audience. Some are smorgasbords convening community colleges, technical schools, military academies, state schools of every stripe, and liberal arts colleges in order to address every student interested in any sort of post-secondary education. Other college fairs invite colleges that share many qualities.

College fairs can test your endurance (fairs often run for three hours or more) and versatility. Attending college fairs, for some families, substitutes for studying dozens of college guidebooks. For other families, the college fair is an opportunity to discuss in greater detail with a college representative what they have read in guidebooks and heard from friends. In a given evening, you might be asked everything from, "Where is Harvard?" to "What success do Harvard students have in medical school admissions?"—and you might be asked these questions many times over. This should re-emphasize the importance of being familiar with the College's current resources.

Under the section "Forms/documents" of the alumni interviewer website, you will find resources for alumni attending college fairs, including a "how-to" guide, a list of new initiatives at Harvard, and a college fair materials request form.

## Acting as Secondary School Liaisons

Acting as a secondary school liaison may be one of the most valuable ways to identify and recruit talented students and to build positive relationships and good will with their families and school officials. Place a call yourself to the guidance department to introduce yourself and to explain your role in the Harvard admissions process—or drop a note with information about how people can contact you. You should tell guidance and other school officials that you are an alumnus/a member of the local Schools Committee, which works closely with the Admissions Committee in Cambridge. While you should apprise schools of the recruitment work Schools Committees do, describe explicitly how you wish to work with the school. Be clear that your mission is to introduce students to the College and to serve as an informational resource. Confirm that the school understands that your desired role is not one of evaluation, assessment, or screening of prospective applicants. This approach can encourage school officials to direct students to you without the fear that contact might affect a final admissions decision.

Depending on the secondary school's own policies, you might have wide latitude in working with schools. Some liaisons allow students to take the initiative in contacting them. They share with school guidance offices their names, addresses, and telephone numbers, and ask the counselors to invite students to contact them to talk about Harvard. Other liaisons visit their schools once or twice each year (usually in the fall and spring). Alumni/ae often also interview applicants from their schools, although they divide interviewing responsibilities with other Schools Committee members if the load is too great for one person. Whatever approach you adopt through consultation with your Schools Committee chair, schools should know whom to call when they have a question about Harvard, and they should feel comfortable contacting you. Open communication will best allow you to introduce a secondary school to the College, describe what the Admissions Committee seeks in strong applicants, and invite the school to identify strong and promising candidates.

21

CONFIDENTIAL

HARV00018492

**JA5084**
DX025.0041

**Setting up a school visit**. School policies on college representatives and their presence on campus vary. Some schools designate specific visitation times; others prohibit visitation. Guidance staffs are often overworked and have to deal with many college representatives. Untimely or unreasonable demands of their or of students' time should be avoided. No preferential treatment for Harvard should be expected. For these reasons, you will probably find it enormously helpful to speak first with the admissions officer assigned to your region before attempting to schedule visits. He or she can provide advice about what is and is not allowed or expected at certain high schools and introduce you to guidance counselors with whom we have established relationships.

If you wish to visit a school to talk with students, call the guidance department yourself to schedule a time and date to visit that will be mutually convenient for you, the guidance department, and the students. Guidance departments will often help secure a quiet and accessible place on school grounds for you to meet with students. Be explicit with guidance counselors that you welcome any and all students interested in speaking with you about Harvard. Some alumni/ae meet with guidance counselors before or after talking with students or even in place of talking with students. Guidance staff can, in this way, help you to identify students to recruit.

## Early Recruitment

**Early awareness**. Traditional recruitment strategies are now being expanded to increase the pool of qualified high school students—at once helping ourselves and, more importantly, raising students' educational aspirations, whether those aspirations include Harvard or not. Insights we can offer students about those qualities the admissions process values—academic achievement in rigorous curricula; distinction, leadership, or special talent in extracurricular pursuits—is most helpful when shared with students before or at the start of high school. There are many reasons why Schools Committees are well equipped to undertake efforts to raise educational aspirations. We are acquainted with many secondary schools and counselors and therefore have established lines of contact to junior high schools. We have access to recent college graduates, who often make the most effective role models, and to undergraduates who may have attended the very schools we might target for early awareness outreach. Indeed, volunteers for the Undergraduate Minority Recruitment Program (UMRP) include at least two visits to junior high schools in their recruitment travel for the College.

Schools Committees interested in early awareness projects should design programs appropriate for their own settings. In general, however, any outreach should: encourage improved educational achievement in high school, impart greater awareness of different kinds of college opportunities and knowledge about how to prepare for them, and provide students with some understanding of college admissions and financial aid policies.

It is important to include school personnel in the planning stages of any early awareness program, lest our work be perceived as an intrusion by outsiders who do not understand students' needs. Schools Committees interested in establishing early awareness efforts should make a long-term commitment but begin by targeting only one or two schools to fine-tune a feasible program. Schools Committees may wish to combine their resources with those of other college alumni/ae groups—to attract more volunteers and to broaden the program's appeal.

Early awareness efforts should not focus solely on the most gifted students; the program should enhance all students' appreciation for higher education. Moreover, early awareness conducted by Schools Committee members should not give the impression that students' participation in a "Harvard-sponsored" program might improve students' admissions prospects at

22

CONFIDENTIAL

HARV00018493

the College. Contact your area representative for more information about starting (or expanding) early awareness. We have a variety of publications and a video that might help your planning.

**The Harvard Book Prize.** Since 1910, the Harvard Book Prize has been an important and effective way of attracting the attention of talented young people to opportunities at the College. That the Book Prize now also represents, in more than 1,900 schools, one of the highest awards a school can give to a student in the junior class is a tribute to the effectiveness of the Book Prize Committee, which is part of the Harvard Alumni Association. Indeed, many Harvard Book Prize winners choose to apply to Harvard. To help maintain Harvard's tradition of diversity, it is important to reach schools outside traditionally covered areas. An expanded Harvard Book Prize Program can strengthen relations between Harvard and secondary schools and encourage talented students to consider attending Harvard. Should you have any questions about this program, please call the HAA Clubs Office at 617.495.5732 or 800.654.6494.

## Recruiting to Enhance Harvard's Visibility

I believe that student diversity contributes powerfully and directly to the quality of education in colleges and universities. For more than a century, Harvard has placed a very high value on the creation of a residential community that brings together people with a wide range of backgrounds and experiences. The breadth of views and voices in our university challenges each of us to think harder, to see the different sides of any issue, to confront our own assumptions and preconceptions, and to develop the kind of understanding that can come only when we are willing to test our ideas and arguments in the company of people with very different perspectives. It also gives us the chance to come to know, understand, and respect a remarkable variety of men and women whom we might not otherwise have the opportunity to learn from or even to meet.

*Neil Rudenstine*
*"Diversity and Learning"*
*President's Report, 1993-95*

One of the Admissions Committee's recruiting priorities is making Harvard accessible to students from diverse backgrounds. Here are some of our recruitment methods and objectives.

**Recruiting minority students.** National competition for talented minority students has escalated since the early 1970s, when Harvard expanded minority recruitment efforts. A Better Chance, Upward Bound, the National Scholarship Service and Fund for Negro Students, and the Association of Black Admission and Financial Aid Officers of the Ivy League and Sister Schools—all of these groups work to improve opportunities for minority students. The College also relies on the assertive contributions of alumni/ae. Please apprise students of UMRP and UAC outreach.

Harvard has long recognized the importance of reaching community organizations through which we can inform minority students of our interest and of the admissions process. Contact with school officials, community educational organizations, churches, social clubs, and groups such as the Urban League, the NAACP, and Tribal Councils can be fruitful. Alumni/ae often recruit students through these organizations in a fashion similar to the "school liaison."

It is important for you to know about minority life at the College, but discussions with minority students—whether in the context of recruitment or the personal interview—should not focus on the topic of "being a minority." Alumni/ae should respond to students' questions about multicultural activity at the College, for instance, but should not ask questions that suggest students are being ethnically screened or go through a "special" admissions process.

23

CONFIDENTIAL

HARV00018494

**JA5086**
DX025.0043

Minority recruitment offers perhaps the greatest contemporary challenge and opportunity for creative admissions recruiting. Our success in this area depends heavily on your enthusiasm and effort.

**Recruiting economically disadvantaged students**. The cost of a Harvard education and lack of awareness of our financial aid programs dissuades many outstanding candidates from applying. The Committee seeks to attract these students because of how much a Harvard education might change an individual's life—and the life of our society—for the better. Accomplished students from economically disadvantaged backgrounds have often distinguished themselves without the benefit of the resources enjoyed by more affluent students. High achievement attained without such resources can suggest that a student possesses an unusual degree of motivation and potential to contribute significantly to our community.

Outreach akin to that described for attracting minority students can be constructive in recruiting economically disadvantaged students: visiting schools outside affluent neighborhoods, cultivating relationships with school officials, attending broad-based college fairs, and enlisting HFAI, UAC and UMRP assistance. Familiarity with the College's policies of need-blind admissions policy and need-based financial aid is also critical.

**Recruiting students from sparse country**. Harvard wishes to draw students from all areas of the country—a challenge in sparsely populated areas. The Student Search List and information gleaned from school officials and local newspapers can help you identify potential candidates. A friendly note or phone call to introduce the candidate from sparse country to Harvard can be an important first step. Alumni/ae might also wish to request HFAI, UAC and UMRP assistance.

## Recruiting Athletes

Organized athletics, intercollegiate and intramural, play an important role at the College. A large number of our students participate in intramural athletics, and many Harvard athletes and teams have in the last several years competed for the highest championships in their sports. Most importantly, however, Harvard strives to provide a meaningful athletic experience for those students who elect to matriculate here—not to develop a program for men and women whose sole interest in the College is athletics. From this premise it follows that athletes on campus should be representative of the College in general—representative in their academic qualifications, their academic and professional interests, and representative in their general performance and participation in the life of the College. Such a policy does not in any way mean that excellence in sports is not or should not be a factor in our admissions policy. Extracurricular excellence of all kinds has been and will continue to be extremely important in selecting students from among a large group of qualified applicants.

Harvard works within the regulations of several intercollegiate athletic organizations: the Ivy League, the Eastern College Athletic Conference (ECAC), and the NCAA. As part of the Ivy League, Harvard does not offer athletic scholarships. All financial aid is based solely on need. NCAA rules are complex and occasionally inconsistent with our philosophy of athletics and, in particular, financial aid. While the College challenges rules inimical to our interests, Harvard makes every effort to live within the spirit of the rules, particularly those concerning recruiting. Due to the evolving nature of athletic regulations, we keep alumni/ae informed with annual "update" mailings regarding rule changes and additions.

Alumni/ae may not have contact with athletes that differs in any way from normal Club contact with non-athletic applicants. One point cannot be stressed enough: any violation of the

24

HARV00018495

principles, policies, rules, and regulations stated herein and in subsequent mailings invites the most severe penalties for Harvard and our student-athletes. Questions or concerns in this area should be directed to: **William R. Fitzsimmons**, Dean of Admissions and Financial Aid, 86 Brattle Street, Cambridge, MA 02138, 617.495.1557; or to **Robert Scalise**, Director of Athletics, Murr Center, 65 North Harvard Street, Boston, MA 02163; 617.495.2204.

If you are likely to have any contact with athletes, please study the basic rules of Harvard, the NCAA, ECAC, and Ivy Group Institutions and specific regulation changes by carefully reading athletic updates from both the Athletic and Admissions Offices. What follows is a primer on NCAA rules (individual rules appearing in bold type):

**All recruiting of prospective student-athletes must be done by institutional staff members.** You are considered a representative of Harvard's athletic interests as an alumnus/a, friend, or donor. This means that any contact you have with current or prospective student-athletes at Harvard can affect the eligibility of individual student-athletes and teams to compete in NCAA and Ivy competition. A "prospect" is any student who has started classes for ninth grade. This means that recruiting a student who has started classes for the ninth grade is subject to NCAA rules.

**Representatives of an institution's athletic interests are prohibited from having any contact with prospective student-athletes.** You may not have contact with a prospect or his or her parents, on or off campus, in person, by telephone or in writing; however, student-athletes do not have to be treated differently from other applicants in the admissions process. If you are assigned to interview students who are also athletes by your Schools Committee chair, you may contact the student for these purposes only. Schools Committee members may not have contact with prospects whom they are not assigned to interview. If a family friend or neighbor is a "prospect," then you may continue to maintain this relationship; however, you may never have a recruiting conversation.

**Prospective and enrolled student-athletes may not be given extra benefits.** An "extra benefit" includes the provision of any transportation, meals, housing, clothes, service, entertainment, or other benefit not available to all students who are not athletes. Under no circumstances may you provide an individual prospect or enrolled student-athlete these benefits. Teams visiting your area for competition may be provided with meals while on a team trip, but you may never take an individual or small group of athletes or prospects to a restaurant for a meal. However, enrolled student-athletes unable to travel home for holidays may be invited for a meal in your home, but not a restaurant. You may not provide transportation for their trip to your home, and this may be done only infrequently and on special occasions. Make sure you have the Athletic Director's permission before extending an invitation. Prospects' trips to campus must be financed by the Athletic Department under specific guidelines, and invitations for such trips may only be made by coaches. Contact the Athletic Director if you would like to contribute to a fund used for this purpose.

## Recruiting Admitted Students

Schools Committees host receptions in April for all admitted students, and often in December as well for Early Action admits. These informal gatherings, which often include parents, should focus on Harvard and students' and their families' questions and concerns about attending the College. One of the most effective recruiting tools is the conscientious avoidance of even slightly disparaging comments about other colleges. Pressure tactics often backfire. Alumni/ae should call to invite admitted students they interviewed to join them at such gatherings. This second meeting can extend the personal outreach alumni/ae offer that has proven so successful to our recruitment

25

CONFIDENTIAL

HARV00018496

efforts. If you cannot attend a reception for admitted students in your area, or if you live in an area that does not host such events, we hope you will nevertheless call and/or write to any students you interviewed who were admitted in order to congratulate them and to offer to provide support during the student's college decision-making process.

26

CONFIDENTIAL

HARV00018497

**JA5089**
DX025.0046

## 4. Interviewing Applicants

The interview is perhaps our most important recruiting tool. In recent years, the Admissions Committee has been able to admit only about one of every fourteen applicants to the College, and so alumni/ae interviewers may be the only personal contact applicants have with the Harvard admissions process. Ensuring that the interview experience is positive, comfortable, and helpful is the cornerstone of the critical personal outreach you, as an alumni/ae interviewer and official admissions representative, provide to applicants.

That applicants feel that they have been treated with respect is another expectation the Admissions Office has of the interview. The Committee also relies on your ability to make recommendations for applicants' admission based on these factors: the criteria outlined in section 2, your own perceptions of the student's "match" with the College, and your assessment of how well he or she has taken advantage of available opportunities. Blessed with so many accomplished applicants—many more that we have room to admit—the Committee often makes fine distinctions among candidates. Many of these decisions hinge on intangible factors that alumni/ae can substantiate with interview reports that breathe life into applicants' folders.

### Scheduling the Interview

**Receiving assignments**. To expedite interview assignments, you will receive basic information about each applicant you are to interview: name, address, telephone number, high school. Chairs assign interviews based on interviewer availability and accessibility, among other pragmatic factors. You and your chair should talk about your availability—e.g., in what areas you would prefer to interview applicants, when, and how many—before you commit to Schools Committee work. While the Admissions Committee appreciates the effort it takes to interview even a single applicant, we believe alumni/ae offer more valuable individual assessments by interviewing at least four to six applicants each year. Interviewing several applicants can expand your perspective of individual candidates, the applicant pool, and the admissions process.

**Matching applicants with interviewers**. The Admissions Committee does not recommend a conscious policy of matching interviewers and applicants—by ethnicity, academic or extracurricular interest, or any other factor. Some applicants have reported that they felt they were being "specially screened" by meeting with an alumnus/a of similar ethnicity, for example, and that their racial identity was under scrutiny more than their academic achievements, extracurricular passions, and personal qualities. "Matches" will of course occur in the normal process of assigning interviews, and such assignments should proceed.

**Contacting the applicant**. *Please call the applicant yourself.* We realize that our alumni/ae are often busy and make time for interviewing among many important commitments. Sometimes, for these reasons, alumni/ae have a surrogate contact students. Yet students who describe their interviews as constructive cite the personal interest alumni/ae took in them. *A friendly, casual, and personal phone call can be the first step to a positive interview experience.* Be sure the student has your name and contact information in case there is a change. At the end of the call, slowly repeat your name and the best way to reach you.

While contacting a student via email can be useful, often the logistics can be ironed out more easily in one brief conversation. Be sure to check your email frequently if you do reach out via email, as your message might get misdirected to an applicant's junk folder; follow up with a phone

27

CONFIDENTIAL

HARV00018498

call if you do not receive a timely response. No need to persist if two emails and two calls do not produce a response, though please note your effort on the interview form and submit online.

Be clear about family involvement. Families are often eager to play a role in their children's interviews. For instance, many parents will want to arrange the details of the interview with you. *The Committee prefers that you set up your interviews directly with students.* Students—not parents—will be negotiating the day-to-day details of college. Students are often surprised when their parents schedule an interview without consultation. If you have no other option than to schedule the interview with parents, ask them to have the applicant call to confirm the details of your meeting. Parents might also accompany children to interviews. While you should indicate to applicants that their parents are welcome to ask questions after you complete the interview, ensure that parents know not to join you in the interview.

You may also need to reassure parents who are suspicious about the time and the place of the interview. For instance, the Admissions Office receives calls from concerned parents wondering why an alumnus/a has called their daughter to come to his/her apartment in the early evening for a personal interview – please continue to use your good judgment in arranging the time and place for the interview. If a candidate or their parent(s) wish to confirm your affiliation with Harvard, encourage them to call our office (617-495-1551) and we will be happy to do so.

**Selecting setting and time.** When scheduling an interview with an applicant, negotiate a time that is <u>mutually convenient</u> and a place <u>most free of distractions</u> - typically a public place that is quiet, safe, and mutually convenient, like the public library or a quiet coffee shop. Please ask whether a student has adequate transportation to and from the interview. This can affect your arrangements dramatically. While it is generous to offer to provide transportation to an applicant to and from the interview location, we would advise against this arrangement. Instead, give the applicant the opportunity to suggest a location.

Ideally, you should examine your calendar and select those days and times you know you will be available to conduct an interview. Then, on the telephone, you can give the student several options; be sure to ask what is best for them, as well. Generally, the Admissions Committee does not recommend scheduling an interview that will occur during school hours or last beyond 9 p.m. Let the applicant know you plan to spend <u>no more than 60 minutes in a single meeting with them</u>.

If you and the applicant have significant difficulty agreeing to a time and place, it is probably best to have your Schools Committee chair re-assign the interview. Some alumni/ae have thought scheduling complications biased them against a candidate, and others worried that—even if they were not bothered by scheduling difficulties—the student might perceive such bias.

The Committee knows that alumni/ae can, and have, successfully interviewed students in a variety of settings. The candidate will want to make the best impression possible and the interviewer should help provide the setting for him/her to shine. Please be sensitive to the perceptions of "being alone" in a stranger's home (i.e. the interviewer's home); any of the candidate's concerns should be addressed at the time of the initial contact, and any worries put to rest. **That said, we encourage interviewers to conduct interviews in a public place that is quiet, safe, and mutually convenient.**

Of course, adhering to local norms and social customs in your area should be considered and you know best what these might be. While a "Starbucks" locale may serve to be an easy choice in certain areas of the country, this setting could be less than ideal in others. Again, we value your good judgment in your interviews and have every confidence that you will display the same in advance of arranging the interview. Alumni/ae should be aware, however, of the possible drawbacks of holding interviews in particular locations, especially with regard to interviewing in an interviewer's home.

28

HARV00018499

**JA5091**
DX025.0048

**Interviewing on "neutral ground."** Some alumni/ae interview on "neutral ground," e.g. the applicant's school or the local public library. This approach usually minimizes transportation complications and appeals to alumni/ae who live with their parents or who have small children. Should you wish to interview a student at school, do not schedule your interview at a time that interrupts the student's class schedule or that requires the student to be at school at an unreasonable time. If an applicant is amenable to meeting you at school, call the guidance department to reserve a quiet place to talk. Remember, school policies about the visitation of college representatives vary.

Some Schools Committees arrange for several alumni/ae to interview students one-on-one at a local school on a Saturday morning. With sufficient notice, a school will open the building and reserve rooms for as many interviews as will be taking place at one time, with an additional room reserved for parents and the second round of applicants. Alumni/ae often add certain amenities (e.g., coffee, juice, donuts) for parents and applicants in the waiting room.

**Interviewing in your home**. Some alumni/ae invite students to interview in their homes, a practice the Admissions Office has increasingly come to discourage. Please note that some students and parents may express discomfort at the prospect of being interviewed in the home of someone they do not know. In fact, some high school guidance counselors explicitly instruct their students to reject offers to meet alumni in their homes. In these cases you should happily suggest an alternative meeting location on neutral ground.

**The Admissions Office suggests that interviewers select locations other than their own homes for interviews when possible.** However, we acknowledge that sometimes it is helpful or necessary to arrange interviews at the interviewer's home, and under these circumstances, it is important to bear in mind several important considerations. Be aware that interviewing in your home may present travel complications. If you do interview a student in your home and send away parents after they have dropped the student off, he or she might nervously watch the clock to make sure parents are not freezing at the curb as they wait for the interview to end. The spouses of some alumni/ae have been incredibly accommodating by entertaining parents over coffee while their children are being interviewed. The Admissions Committee appreciates, but does not expect, such graciousness. We suggest instead that you tell parents to return in forty-five minutes. Beyond considering possible transportation complications, please be aware that a grand house might seem so impressive to a student as to be intimidating. Be conscious, too, of possible distractions, such as the telephone and young children.

**Interviewing in your office**. Many alumni/ae interview applicants at work. But like a beautiful house, the boardroom of a major corporation or firm can be intimidating. Keep distractions at a minimum by letting colleagues know you will not be available for the duration of your interview. Hold your calls or have them directed to your voice mail.

**Interviewing in a local restaurant or coffee shop**. Some alumni/ae interview applicants in these settings, which is fine assuming the applicant agrees. The alumni/ae interview can make many applicants self-conscious, so be aware that some applicants are more self-conscious if they are aware that strangers—and their alumni/ae interviewers—are scrutinizing them.

**We do not recommend interviewing students in their own homes.** Some students interviewed in their own homes have reported they have felt as if their "family was on trial." Interviewing students at their homes also diminishes the control you would otherwise have over time and possible distractions. In the case of one alumnus who interviewed an applicant in her home, the applicant's mother stayed through most of the meeting and became so involved in conversation that she asked her daughter to answer a ringing phone.

**What applicants should wear to an interview.** Your initial conversation should touch on other issues of protocol and logistics. If applicants ask you what to wear, tell them the Admissions

29

CONFIDENTIAL

HARV00018500

**JA5092**

DX025.0049

Committee has no policy about how students should dress for interviews, but that we hope applicants wear whatever will help them feel comfortable.

**On asking applicants to bring résumés and other materials**. Some alumni/ae interviewers ask students to bring copies of their extracurricular resumes to the interview. Others give students pre-interview surveys. These materials can be valuable because they yield obvious talking points. But we hope these materials will not be too detailed or burdensome to applicants. Surveys can seem to be redundant forms among so many others over which students have already labored. Students have also reported that it was unclear how the alumnus/a would use the survey or resume. Interviewers should acknowledge and confirm with students that providing a resume or a survey is voluntary and by no means a required part of the admissions process.

**Staffing the interview**. Never interview more than one applicant at a time. One-on-one interviewing is most effective. A single interviewer can direct an interview's course and content more efficiently than a panel of interviewers can. Some Schools Committees, however, successfully have pairs of interviewers assess a single applicant. There are two common multiple-interviewer formats. A group of alumni/ae can simultaneously interview a single applicant or an applicant can interview separately with two alumni/ae in a single morning or evening.

The multiple-interviewer format can offer certain advantages. Post-interview discussions allow alumni/ae of different preferences and temperaments to check their biases when evaluating individual applicants, and these discussions help the alumnus/a writing the interview report to provide a more broadly sympathetic view of the candidate. New Schools Committee members might wish to join a veteran interviewer to develop perspective on the interviewing process. Finally, Schools Committees with a surfeit of interviewers can accommodate the interest of a greater share of their membership by assigning an interview to a group of two or three alumni/ae.

There are pitfalls, too. Being interviewed by more than one person at a time can intimidate students. You must take particular care to set the candidate at ease to prevent the group interview from resembling a polite grilling. The format can also prove a difficult juggling act for interviewers. Interviewers must settle among themselves before the interview begins who will ask which questions when—orchestrations with which single interviewers need not contend. Please consider, too, the efficiency of the multiple-interviewer format for your Committee. Schools Committees with small active memberships might not be able to afford the time it takes two alumni/ae to interview a single candidate.

Whatever approach your Schools Committee adopts, let the applicant know the interview format in advance, and explain why you have chosen it. Each alumnus/a joining the interview should then introduce himself or herself to the applicant at the start of the interview.

## Conducting the Interview

**Length**. Let the applicant know you plan to spend no more than 60 minutes in a single meeting with them—no matter which interview format your Schools Committee uses. A single meeting, for this length of time, offers sufficient opportunity for you to form an impression of the applicant.

**Explaining the purpose of the personal interview**. Your first priority upon starting an interview should be to set the applicant at ease. Sitting face-to-face with an applicant rather than allowing your desk or a large table to fill the space between you are ways you can help the student feel more comfortable.

30

CONFIDENTIAL

HARV00018501

**JA5093**
DX025.0050

Beginning an interview with a short introduction about your role in the admissions process can also relax the applicant. You should tell applicants that, as an interviewer, you work closely with the Admissions Office. Add that although the Admissions Office is interested in your written evaluation—which becomes part of a student's file—it will be read in the context of all the other application components: grades, test scores, extracurricular participation, personal essays, and counselor and teacher recommendations. Many alumni/ae then reveal how little they know about the applicant, and that they do not have access to applications. Students will be less likely, then, to assume you know everything about them, and this can encourage them to talk about themselves more freely. You should also encourage the student to ask you questions about anything pertinent to the College, the admissions process, and even your own experiences as a student here.

**Note-taking**. Note-taking can help you recall details about your conversation that will prove valuable in composing an interview report. Approaches to note-taking vary. Some alumni/ae do not write anything down that they would not want applicants to see. Others record more evaluative comments and even quotations. Still others place a pad and paper in the open, but spend the first three-fourths of an interview talking with an applicant and not taking notes. Then, telling applicants they wish to record some basic data, they ask applicants to review their current course work or their extracurricular activities.

Note-taking, however, can prove distracting to an applicant. Asking for academic credentials can put a candidate on the defensive. Asking about test scores and grades first also puts undue emphasis on "the numbers game." **Remember that your objective is not to find out all the facts – the application will disclose them.** Again, the particular value of the alumni/ae interview is the personal outreach it offers applicants and the personal dimension interview reports add to applicants' folders. Never record interviews.

**Asking applicants for academic credentials**.  It is never necessary to request academic credentials from students if an interviewer prefers not to do so.  However, there can be compelling reasons to ask every applicant about his or her grades and scores. Your approach in asking for this information can help put candidates at ease and reassure them that grades and standardized test scores are by no means the only things the Admissions Committee considers in evaluating applications.  Many interviewers ask for this information near the end of the interview in a casual tone: "So I can make sure that the Admissions Committee has all the information it needs in your file, may I ask for your test scores and grade information?"  Others ask for the information at the beginning of the interview and place those notes out of sight, moving quickly into a discussion of other things. You are prohibited, however, from contacting the high school for this information. The information must be shared voluntarily by the applicant during the interview. If he or she declines, then please use your best estimate to rank the applicant in the academic category.

**Questions to structure your conversation**. Your conversation should center on an applicant's interests, not yours. Most interviewers begin interviews with questions about simple, factual matters that are easy for applicants to answer:

- Describe your school community.
- What courses are you taking?
- Which courses do you enjoy? Why?
- Which do you least enjoy? Why?
- In which activities are you involved? Why? Which do you most enjoy? Why?
- What are the important activities in your school? Why?
- What do you do in the summer?

31

CONFIDENTIAL

HARV00018502

**JA5094**
DX025.0051

- Do you have a favorite book? Or, which book have you recently read? Do you prefer reading online? What blogs or sites do you read regularly?

These questions can help you structure the interview and allow the student to volunteer information that will help you assess them. These questions can also help you pinpoint ideas, activities, and passions that are of interest to the candidate, which might lead to more specific discussion about those interests.

As you talk about something of importance to the candidate, your questions should point toward discovering motivation, commitment, and level of contribution. Your questions should be open-ended to encourage candidates to provide their own insights and reflections about their experiences. If a student provides merely factual answers, you might wish to draw him or her out by asking, "Why?", "How did you happen to do that?", "Was the result what you expected?" When you talk about an idea or an intellectual concept in a book, play, current event, or research project, encourage the candidate to develop the idea.

**Be a supportive listener.** Regard a candidate's thoughts and feelings with respect and try to appreciate each individual's unique qualities. Hear what is being said and how it is being said, but be wary of trying to guess what is not being said and supplying motive or unsupported insights. It is better to report factually what an applicant said rather than to characterize what they have said. To write, "The applicant never said more than three words at a time, and she looked down at her hands almost the entire time" is more effective and less open to interpretation than, "He was nervous and I think he would be out of place at Harvard."

**Avoid prolonged discussions of political and personal issues.** Interviewers are not usually judgmental about the content of an applicant's political opinions or family situation. They use the interaction to gauge whether the student's ideas are original and well-reasoned or simply parroted from elsewhere. Conversations about family problems can also be cited to provide evidence of a student's maturity and ability to deal with adversity. The information reported can, in fact, be used to boost a student's chance for admission.

Yet students report that prolonged discussions of difficult or sensitive subjects can ruin an interview. Such conversations include probing for opinions on political topics (e.g., welfare, crime, drugs, abortion, capital punishment) or personal issues (e.g., religion, sexuality, family finances, family illness, details of parental relationships and divorces). Students' reflections on these topics can reveal the degree to which they are aware of the world around them, and can yield insights about an applicant's background or personality. But discussing such matters, particularly at length, can reasonably be construed as an invasion of privacy.

**Be wary of asking, "To which schools are you applying?"** Alumni/ae often wish to know what characteristics students seek in a college to measure how well they know and are a match for Harvard. The best way to start this conversation is to ask, "What are you looking for in a college?" rather than, "To which schools are you applying?"

Some colleges make admissions decisions contingent in part on students' perceived commitment to their school. This is not the case at Harvard. Because some students believe they could jeopardize their chances of admission to the College by discussing other schools, the Admissions Committee strongly recommends that your discussions about students' interests in other colleges focus on general characteristics rather than proper names.

**Do not ask, "Is Harvard your first choice?"** The Admissions Committee strongly recommends against asking a student whether Harvard is his or her first choice. The Committee regards a student's application to the College as the most important interest an applicant can express in Harvard. This question puts most applicants in the position of saying Harvard is their first

32

**JA5095**
DX025.0052

choice—perhaps in spite of their actual preferences—out of fear that they might jeopardize their chances of admission by telling you that they might not ultimately make the same decision you did.

**Questions you should ask yourself as you conduct an interview**. It can help you write a valuable interview report if you evaluate students' comments as you interview them by asking yourself these questions:

- Does the candidate have potential?
- Has the candidate reached her maximum growth?
- Has the candidate been stretching himself?
- Has the candidate been working to capacity? In her full-time or part-time employment? In his academic pursuits? In other areas?
- Does the candidate have reserve power to do more?
- How has the candidate used her time?
- Does the candidate have initiative? Is he a self-starter? What motivates her?
- Does the candidate care deeply about anything—intellectual? Personal?
- Is the candidate more concerned about intellectual subjects? Human subjects?
- What has the candidate learned from his interests? What has she done with her interests? How has he achieved results? With what success or failure? Has she learned anything as a result?
- Will the candidate be able to stand up to the pressures and freedoms of Harvard?
- What qualities, strengths, or weaknesses differentiate this candidate from others?
- What choices has the candidate made for himself? Why?
- What is the candidate's intellectual capacity? What has she done with it?
- What is the candidate's personal capacity? What has he done with it?
- What is the candidate's Harvard motivation? Why and how did she pick Harvard? What effort has the candidate made to inform himself about Harvard?
- Is the candidate a late bloomer?
- What is the quality of the candidate's activities?
- Does the candidate have a direction yet? What is it? If not, is she exploring many things? Or is he just letting everything happen to him? Where will the candidate be in one year? Five years? Twenty-five years? Will she contribute something, somewhere, somehow?
- What sort of human being is the candidate now? What sort of human being will she be in the future?
- Will the candidate contribute something to Harvard and to his classmates? Will she benefit from her Harvard experience?
- Would you or other students want to room with this applicant, share a meal, be in a seminar together, be teammates, or collaborate in a closely knit extracurricular group?

**Questions applicants frequently ask interviewers**. Students often ask very specific questions for which you should be prepared either to speak from your own experiences or, if you do not know how to answer their questions, to say so. These are two of the most frequently asked questions:

**"What's Harvard really like?"** This question probably has as many answers as there have been Harvard students. Remind students that you can only provide one perspective of life at Harvard—your own. Sometimes, this question masks other curiosities, many of them about whether Harvard myths are true. Are there a lot of students at Harvard who attended private secondary

33

HARV00018504

**JA5096**
DX025.0053

schools? (Two-thirds of Harvard students attended public secondary schools.) Do you have to be rich to go to Harvard? Is Harvard competitive? Will I be able to do well academically and participate in extracurricular activities? These questions should emphasize how important it is for you to be well informed about the current dynamics of the Harvard experience.

**"What are my chances for admission?"** Students often ask for your assessment of their chances of admission during the course of their interviews. Although the previous section addresses this question, it is worth repeating here. <u>It is very important not to create any impressions or expectations, **positive or negative**, about the student's probability of admission. Even if you think he or she is under-qualified, it is not your place to make suggestions about their college applications. Though well intentioned, it is inappropriate for the interview setting.</u> After all, admissions officers often parry this question by saying, honestly, that they cannot guess at a student's chances until they have read a completed application and can assess the year's competition. And this analysis can only be accomplished with full access to all the material in an applicant's file and through the extensive discussions shared and comparisons made through the Committee process.

## Writing the Interview Report

Your goal in writing a personal interview report should be to help the Committee see the applicant as a human being and to determine whether or not the student has the important intangible strengths that might distinguish him or her in the admissions process and, if admitted, at the College. Here are some pointers:

**Showing is better than telling.** The conclusions expressed by an interviewer can have greater value when the reasons and basis for them are explained in the interview report—with examples proving your points. Try to supply kinds of information that would otherwise be missing from the folder. Comment on the quality of an applicant's interests and commitments to differentiate a particular candidate from the applicant pool.

**Cite only facts that are important to the candidate or that support your judgments.** Assume the candidate has provided general factual background in her application. This allows the best interpretation of the interview report, particularly since the reader will not always know you and be able to accept automatically your conclusions. The interview report should be more than a recitation of activities or the assertion of a conclusion.

**Comment on the quality of a student's experiences with evidence proving the point.** While the combined evidence of the school record, counselor and teacher reports, and results of standardized tests and AP and IB examinations permit the most complete assessment of academic ability, discussions of the content of a candidate's school work, the way it is accomplished, and the pattern and depth of his or her outside reading can yield helpful information. For example, if a student is interested in science, information about long hours spent working in a hospital emergency ward or building a computer can distinguish the quality of an applicant's interest. Does the student participate in athletics? If so, perhaps you can give us local context to help us assess her prowess and potential to play here. Although we defer to the judgment of Harvard coaches when considering a student's athletic ability, information provided in interview reports can help us alert coaches to students they might have overlooked. If he is a performing artist, do you know about the caliber of the groups with which he performs or exhibits his work? Is it unusual for a student from his high school to participate in the arts (because, for example, sports are the dominant extracurricular activity, or the school lacks serious clubs for students interested in the arts)?

34

HARV00018505

**JA5097**
DX025.0054

**For students to whom you are giving your support, approach writing the report as an opportunity to "make a case" for the candidate.** Why should this particular applicant come here? What special contribution might this student make or how might he benefit from the Harvard experience?

**Write candidly.** Interview reports sometimes telegraph impressions out of fear either of quashing a student's chances or of appearing too enthusiastic about them. We hope you consider the global nature of the Committee's assessments; we seek consistency throughout all the materials in a student's folder. By itself, one blemish or even one exceptional quality or credential will neither demand nor prevent admission. In many instances, the interview confirms other evidence in the applicant's file, and it can certainly make a difference in the ultimate decision. Balance this advice with the following note.

**Consider your potential audiences as you write.** Any number of individuals on the Admissions Committee might read your reports—faculty, admissions staff, and other members of our community. Admitted applicants who enroll at Harvard may read their application files through the Family Education Rights and Privacy Act. (Students occasionally do exercise this right.) Be professional in writing about a candidate's strengths and weaknesses. Avoid slang and comments that could be interpreted as derisive.

*An open-minded interviewer, a perceptive judge of people, someone who is aware of the limitations of judging a person on what can be seen in a 60-minute conversation but who is also able to report frankly on what was seen and whether it should strengthen or weaken a student's application is of inestimable value.*

**Length.** Each report should include a summary and indicate whether you feel the student should be admitted or not, and why. Reports should be as brief as possible, but not at the expense of providing helpful information and judgments. Do not feel pressured to polish the prose of a report on a candidate with whom you have not been very impressed. We are far more concerned with the content of the report—and your judgments—than the report's style.

**Be aware of, and suspect, your own biases.** Since no one can really be "objective" in attempting to evaluate another person, be aware of your biases. It is easy to feel that a student who shares your values and enthusiasms is a very strong applicant—or that one whose view of the world is greatly at odds with yours is confused. The good interviewer makes allowances for this, appreciates a point of view on its own merits, and evaluates the interview accordingly. Sometimes interviewers call attention to their own preferences: "This is not the sort of person I most enjoy, but… ," or "I probably favor the student who has had to work hard…." This approach can help the reader interpret the interview report more accurately.

**Numerical ratings.** The Committee does not expect to achieve anything approaching national consistency with the use of numerical ratings, so we use them in the most general way to show whether an interview was favorable or unfavorable. In any case, the Admissions Committee relies more heavily on your prose. Keep in mind that we have recently changed how we ask you to assess candidates. Consider the ranges for all criteria. Interviewers sometimes comment that we do not pay enough attention to their write-ups and numerical ratings. The credibility of your ratings depends on your use of the numerical range when you interview applicants. You diminish the impact of your support if, for instance, you rate everyone a "1" or "2+" across all categories.

35

CONFIDENTIAL

HARV00018506

**JA5098**
DX025.0055

## Sending Your Reports to Cambridge and to Your Chair

After the results of a spring 2008 web use survey were tallied, numerous requests pointed to enhancing web services available to chairs and interviewers. Suggestions included creating an online submission form, stabilizing website availability, allowing chairs to assign interviews online and creating club management tools for chairs. Responding to your requests, we launched a newly designed web portal in the fall of 2008 and have revised and reorganized it substantially the past two admissions seasons.

Even before you begin submitting interview reports, please feel free to login using your current access code (PIN) and become familiar with the site, download updated information about the College, and generally become familiar with navigating the site. If you don't remember your access code, please use the "Forget your Access Code?" link on the login page in order to have the code sent to your email address on record. As you navigate the site you can be assured that you cannot break anything or accidentally delete yourself!

Please find the site here:

https://admapp.admissions.fas.harvard.edu/hanevo/alumni/haServices.do

Please begin by reviewing your profile and editing your contact information accordingly. We encourage you to use your "post.harvard.edu" address, as this will remain constant even if you decide to forward your mail to a different account. As always, if you have any questions or concerns, please feel free to contact the admissions officer assigned to your region with questions or to provide feedback.

Whenever possible, you should use the online version of the interview report form. If that is not possible, please keep a copy of your report for your records, send a second to your Schools Committee chair, and send a third copy to the Admissions Office. Sending a copy to your Schools Committee chair alerts him or her that you did the interview and enables him or her to give us a copy of the report should we misplace it and not be able to reach you in a timely fashion. We also have several fax lines by which you can send us reports (see Documents and Forms on the website. Finally, you can send reports by mail and priority mail to the Harvard College, Office of Admissions and Financial Aid, 86 Brattle Street, Cambridge, MA 02138. If you choose to file on-line, email, or fax your reports, please remember you do not need to snail-mail them as well. If for some reason they are lost or never arrive, your area representative will contact you.

## Ranking Meetings

After completing all interviews, some Schools Committees hold ranking meetings to compare candidates. These meetings can approximate the Committee process in Cambridge. If the Schools Committee applies roughly the same standard of selectivity as the Admissions Committee, alumni/ae can better understand the strengths necessary for candidates to distinguish themselves in the admissions process. Alumni/ae also have the opportunity to temper their own judgments of candidates when they hear how other alumni/ae have evaluated other candidates.

Candidate rankings are valuable to us for the input they provide and to Schools Committee members for the information they share. Any Schools Committee member who has had a greater-than-usual share of either strong or weak applicants for the year can also put his or her own

36

interviewees in perspective and understand better the decisions made in Cambridge. Ranking meetings also provide valuable exposure for new interviewers.

There are some caveats to consider before initiating a ranking meeting. They require considerable time and effort. Recommendations from ranking meetings are most valuable if every applicant from a given area is interviewed, if all interviewers have the opportunity to introduce any candidate for the Schools Committee's consideration, and if all of this work can be completed before the area person enters subcommittee meetings in Cambridge. Please keep in mind, too, that recommendations Schools Committees make for candidates after a 60-minute interview and ranking meeting discussions are additional elements—but not substantially determinative ones—that the Committee weighs in the context of all other information in an applicant's file.


## Transfer Interviewing

We may ask you to interview transfer applicants after the freshman admissions season ends. We understand these interview requests come when people are both busy and exhausted from finishing the admissions process for the new class. But, unlike interviewing for freshman admission, alumni/ae see only pre-screened candidates. Keep in mind that a typical transfer applicant's extracurricular activities are slightly less important than her academic focus and fit with the Harvard curriculum. Since we have less personal information about these students than we have for freshmen, conveying a sense of the person in an interview report is especially critical. Will the student be happy here? How well do you think they will make the transition—academically, socially—from their current schools to Harvard?

37

CONFIDENTIAL

HARV00018508

**JA5100**
DX025.0057

## 5. Sample Interview Reports

### Marcus

**Academic (2-)**
*Magna potential. Excellent grades and mid to high-700 SAT scores (33+ ACT).*

Marcus is a top-flight candidate for Harvard. We spent about an hour talking, and I was able to learn quite a bit about this outstanding young man. He is clearly a leader both in the classroom and out. Marcus is very interested in becoming a doctor and has worked hard to achieve a 3.5 grade point average. He has also taken his college tests and has mid-650s on all. Because of his interest in medicine, Marcus did volunteer work in a hospital this summer. We talked for a while about the pre-med program at Harvard.

**Extracurricular, Athletic, Community, Employment, Family Commitments (2)**
*Substantial school-wide, regional or state recognition; major contribution/ leadership.*

Extracurricularly, Marcus is a strong high school contributor who could add a good deal at college as well. He has played the clarinet in the school band for three years, takes part in the public service club, and has rowed on the varsity squad for two years as well.

**Personal Qualities (1)**
*Rare personal qualities and appeal*

Fine young man. Very enjoyable conversation.

**Overall (1)**
*Absolutely superior for admissions; truly unusual in the entire applicant pool*

With this combination of academics and extracurriculars I can't imagine that we could do better. Please hurry and accept this fine young man. He'll make a wonderful alumnus! If you need more information, don't hesitate to call me at the numbers listed below.

---

**Comments:**

The interviewer makes pronouncements without substantiating them. Where is the evidence that Marcus is "a leader both in the classroom and out" or that he is "a strong high school contributor"? What did he do when he volunteered in the hospital? How significant is his contribution to extracurricular activities? Why has he had to work hard to achieve a 3.5 GPA? Is he taking a rigorous academic program? Does he show any signs of intellectual curiosity?

The ratings seem inflated by at least a full number, and far from being a "clear admit," Marcus does not appear to be a particularly strong candidate, based on the information we have here. If there is stronger evidence for Marcus' admission, it should be included in the report itself, not offered to be made available over the phone. The interviewer seems unaware of the competitiveness of our selection process or the strength of our applicant pool.

---

38

CONFIDENTIAL

HARV00018509

**JA5101**
DX025.0058

# Daniel

**Academic (2)**
*Magna potential. Excellent grades and mid to high-700 SAT scores (33+ ACT).*

Daniel articulates his thoughts and reasoning well, and told me that he's "in the top 5 percent" of his 70-member class at City Prep. His scores, as you know, are almost perfect across the board. He enjoys science (particularly chemistry, "because I love taking a law or technique and applying it to new units and in labs"), English, and history. Although not certain about a career, he is leaning toward medicine. He said he enjoys English but did not seem particularly interested in discussing literature (a particular interest of mine given that I am an English professor), but after talking with him more he came to the conclusion that what really intrigues him about his English classes is the art of composition, rhetoric, and argument. I could tell from the way he speaks that he puts considerable thought into the ideas he puts forth (though he never sounded labored or took large pauses to compose thoughts), so this interest in composition sounds spot-on.

**Extracurricular, Athletic, Community, Employment, Family Commitments (2-)**
*Substantial school-wide, regional or state recognition major contribution/leadership.*

Daniel's mother teaches in one of the inner-city public high schools, and she is the one Daniel credits for his "sense of duty" to others. He is very active and interested in community service, asked many questions about PBH, and promises that he will lead a Boy Scout troop wherever he ultimately attends college. From his questions and the way he described his involvement, I got the sense that his efforts were real and inspired; he's not merely showing up for a few hours one Saturday a semester to fulfill his school's service requirement (my sons went to City Prep, so I'm quite familiar with their service requirement and most students' perfunctory approach to completing it).

Community service is his major interest outside the classroom, followed by Model UN, editing the school paper, and volunteering summers and time during the school year to sundry activities. Daniel is also an Eagle Scout. When I commented that it is unusual to encounter someone his age still involved in scouting, he said there were only four other peers involved and that he feels "duty-bound" to continue his commitment.

**Personal Qualities (3+)**
*Above average personal quality and appeal*

Daniel is more articulate than most young people I have interviewed, and it sounds as if he has had substantial public speaking opportunities through scouting and his work with the Model UN. When we started speaking about the resolutions Daniel had to debate at some simulations, he finally started speaking in a little more animated fashion. For instance, Daniel expressed some emotion when describing his assignment, as a representative from Ireland, to defend a position shared only by the Vatican, whose representative eventually abandoned centuries of church tradition to leave Ireland alone contra contraception. Nevertheless, he soldiered on, though not convincing many others.

39

CONFIDENTIAL

HARV00018510

**JA5102**
DX025.0059

Daniel is very interested in sports, but his involvement has been limited as a result of a torn ACL. Daniel brought a copy of the school paper and some other writing he has done. Through this deed and in many words, too, Daniel seemed a bit aggressive in enumerating his accomplishments. In the course of the interview, however, it came out that a Harvard alumnus at City Prep coached his sales technique. His "real" personality seemed more in evidence when he asked questions such as, "Do I have a chance to get in to Harvard even though I've never invented anything or won the world chess championship?" And he spoke with general admiration and affection for his mother's work and his commitment to Scouting. I enjoyed speaking with Daniel, especially after he became more relaxed.

**Overall (2-)**
*Clear admit — one to recruit*

Daniel, with his abundant ambition, would have no problem fitting it at Harvard, but he is still a bit of an awkward fellow. He is obviously competent in getting things done, articulate, and motivated. He would do well in a large research university.

---

**Comments:**

Two factors distinguish this report as particularly helpful. First, the interviewer cites Daniel's activities to substantiate the interviewer's qualitative comments and to justify the extracurricular rating awarded to Daniel. Contrast this with a report that merely lists activities and makes broad conclusions: "Daniel is the strongest applicant for Harvard College I have ever interviewed."

Second, the interviewer quotes Daniel directly or paraphrases specific exchanges to justify her assessment of the quality of his extracurricular participation and his personal qualities. This does not make this interviewer's perspective infallible or doom Daniel's chances for admission, but this report conveys clearly the basis of the interviewer's judgments. The overall rating might be a bit generous, but Daniel sounds like a candidate who will receive serious consideration during our deliberations. This interview report will add an important dimension to those discussions.

40

CONFIDENTIAL

HARV00018511

**JA5103**
DX025.0060

# Evelyn

## Academic (1)
*Summa potential. Genuine scholar; near-perfect grades and test scores (in most cases) combined with evidence of original scholarship*

Evelyn is the editor-in-chief of her school's literature magazine and enjoys writing poetry. She is also an officer in her school's science league team, which has won the Gray's Anatomy contest in cardiovascular science competition for the last 3 years. She is excited about trying to win the fourth straight competition soon. She also is in her school's Chemistry Charter Club, which teaches seminars for younger students.

I liked her methodical approach to her future intellectual pursuits. She is looking for an interdisciplinary experience in school and her career and is currently most interested in Environmental Science and Public Policy.

She's really very close to "truly unusual" in intellectual curiosity and originality, which is why I gave her a 1 academic rating.

## Extracurricular, Athletic, Community, Employment, Family Commitments (2+)
*Substantial school-wide, regional or state recognition; major contribution/leadership*

What I really like about Evelyn was that she has a handful of interests outside of school and has focused in on those for which she has a true passion.

She has been swimming competitively for many years and is on her high school's varsity team, primarily now doing individual medleys and the backstroke. Her team is apparently very competitive regionally. She also volunteers as a swimming coach for an 8U team on weekends and during the summer.

She has several officer positions in extracurricular clubs and activities. She is the editor-in-chief of her school literary magazine and enjoys writing poetry. She is president of the Environment Club. She is an officer of her school Science League team, which has won several competitions (see Academic). She is also an officer for Interact, a community service club that does fundraisers and volunteers at shelters and retirement homes. She is also an officer in her school's Chemistry Charter Club, which teaches younger students.

Evelyn has also traveled to some interesting places, including her parents' countries of origin, China and Romania, as well as Israel and Greece. She has enjoyed those experiences and feels that they have positively influenced her thinking and approach to different types of people.

## Personal Qualities (1)
*Rare personal appeal and character*

Evelyn ranks very high in all of the example characteristics listed above. She has a unique blend of poise, confidence, sincerity, and humility in her demeanor. She is thoughtful and expresses her ideas very clearly. More than most students her age, she was able to engage in a two-way discussion on a wide variety of topics; she was very interesting to speak with. I enjoyed the time speaking with her and am completely convinced that she will contribute greatly to her college, both in the classroom and through her extracurricular involvement and social interactions.

41

CONFIDENTIAL

HARV00018512

**Overall (2+)**
*Clear admit; one to recruit*

    While I hold the ranking of 1 for a once in a lifetime type of candidate, I must say that Evelyn was probably the best candidate for Harvard that I have met in about 8 years of interviewing. She might not be the absolute best in any given candidate, but I really liked how well rounded she is and how much she has to offer in every regard.

**Additional Comments**

    Evelyn visited Harvard's campus and sat in on some classes. She was enthusiastic when telling me about one of the classes. She also has thought carefully about what she is looking for in a school, including the scholastic, community, geographical, and social aspects. When she says that she is looking for a diverse group of students and experiences, I don't think she's memorized it from the Harvard brochure—I think she is truly looking for and ready for what Harvard has to offer. She will be an asset if accepted for admission.

---

**Comments:**

    Although the interviewer's academic and extracurricular ratings for Evelyn seem a bit inflated given the accomplishments cited in the report, the thrust of this report is clear: Evelyn is bright, engaged, and engaging, and her interviewer recommends her highly for admission. It would have been helpful to read a few quotes from Evelyn—those things she said that led the interviewer to write, "She is thoughtful and expresses her ideas clearly." What were some of the many topics about which Evelyn could engage in a two-way conversation? What did she say that made her seem especially intellectually curious?

    It is helpful to know that Evelyn is the best candidate for Harvard that the interviewer has seen in eight years; it would be even more helpful to know approximately how many candidates the interviewer has seen over this eight-year period (Ten? Forty?).

---

42

CONFIDENTIAL

HARV00018513

**JA5105**
DX025.0062

## Melanie

**Academic (2)**
*Excellent grades and low to mid 700 scores*

**Extracurricular, Athletic, Community, Employment, Family Commitments (3)**
*Above average activity or participation*

Melanie is involved in a number of sports. She herself admits that she is not great at these sports but she likes being active.

**Personal Qualities (3)**
*Above average appeal and character*

Melanie seemed to be interested in a lot of different things but not one or two things in particular. She told me she's very independent, wants to see new places and experience different things. She seems quite mature.

**Overall (3)**
*Strong candidate*

I don't feel there was anything that really stood out for Melanie. It's difficult to write a strong review for her. She is definitely a smart young lady but I don't feel that she necessarily stands out relative to other candidates I have interviewed in the past.

---

**Comments:**

Not every interview report will advocate for a candidate's admission, so it is not the interviewer's lack of support for Melanie's case that gives pause to the admissions officer reading this write-up. Rather, it is the lack of any narrative comment about Melanie's academic rating and the seemingly cursory treatment of her extracurricular involvement that stand out.

It may be the case that the only activity Melanie is involved in is her sports, but this report does not make that clear. Did Melanie mention any other commitments (family, school, or otherwise) or interests that occupy her time? Did the interviewer ask about other involvements? Later in the report the interviewer notes, "Melanie seemed to be interested in a lot of different things but not one or two things in particular," which seems to indicate that Melanie expressed other interests besides sports. To be a competitive candidate for Harvard, a student need not focus exclusively on one or two pursuits (academic or otherwise), which is the impression gleaned from this short report. An extra sentence or two providing more detail in each section would greatly improve this report.

43

CONFIDENTIAL

HARV00018514

**JA5106**
DX025.0063

# Anthony

**Academic (2-)**

*Magna potential. Excellent grades and mid- to high-700 scores (33+ ACT)*

    Anthony is the strongest student I've interviewed out of West High (19% to four-year colleges) in at least 10 years. [Redacted: PII/SPI] was probably on par with Anthony, though she was a humanities-minded student, whereas Anthony is more quantitatively strong. Highpoints are his ACT math and science scores (35 and 36, respectively) and SAT Math II (800). Verbally, too, he's light years ahead of the other students I see from his high school. If I had to guess I would say that he's a bit of an academic loner at his school since Anthony admitted that "most of my friends don't get as excited about school as I do...I guess math just comes easy to me, and I like the brain teaser problems the teacher gives us at the end of each class." Anthony will take his first AP tests this year, and he's most excited about calculus and physics, his two favorite classes this year. He was disappointed that West got rid of the AP Chemistry class last year, so he settled for honors. He is also the school's high scorer in the city math league. He was ranked third out of 816 at the end of last year, though he admitted that his class size will probably fall as students continue dropping out throughout the senior year.

    Anthony's not a one-trick pony academically, though. I always ask West students about their junior theme for honors English, and Anthony's discussion about his paper was the most interesting I've heard in a long time. He's researching water rights disputes in the city's history, and he's trying to find out how different waves of immigration have changed the tone of the debates or affected arguments for or against city expansion. Anthony's having a hard time finding sources and his interviews aren't going the way he planned, but I give him credit for having a hypothesis and gathering the evidence. We talked about some of the courses I took as a History and Literature concentrator (mostly about France and the U.S.), and he seemed interested in those, too, asking me questions I hadn't thought about since college.

**Extracurricular, Athletic, Community, Employment, Family Commitments (5)**

*Substantial activity outside of conventional activities such as major family commitments or term-time work*

    Anthony works 20+ hours each week at the local K.F.C., and he doesn't have a lot of time for other activities. He's been working there for almost two years now. He cooks, buses tables, and works the register. The major downside, he says, is "coming home smelling like a bucket of chicken." A lot of the kids I interview at West work part-time, but Anthony works more than most of them and is a better student than almost all of them. I asked him what he spends his money on. He said he tries to save for college but usually ends up helping his mother pay for things around the house, buying all of his own clothing, and paying for everything associated with his car, which he's proud of.

    Anthony does a few activities at school that he can do during lunchtime meetings or during his study hall (student government, class day committee). I was impressed that he works in the school tutoring center during his free period, because I imagine he could use that time to do his homework. He wants to sing in college or do more community service, possibly tutoring. I was surprised that he had already heard about PBHA and some of the singing groups on campus. He said he learned about them when a Harvard undergraduate did a presentation in his school last March, and he read more about them on the internet. He sounded excited by the IOP and the

44

CONFIDENTIAL

HARV00018515

visiting fellows, but he hadn't heard of it before. Actually, he was excited about everything Harvard has to offer, and I think he'd discover lots of other interests when he's actually on a college campus.

### Personal Qualities (2)
*Strong personal appeal and character*

I was excited to meet Anthony, and it was fun to talk to someone from West who is so clearly interested in his schoolwork and is doing so well. I could tell that he must be good at his KFC job because he has a real presence about him. He makes a very favorable impression.

I do think he was a bit nervous (maybe more excited than nervous?) for the first 15 minutes of our interview, but he loosened up completely by the end, and we ended up talking for more than an hour. He also has a self-deprecating, observant sense of humor that would serve him well at a place like Harvard. A highpoint of our interview was when he told me a very funny story about making "bootleg chicken" after hours at KFC! Apparently there are people who make deals with his manager to cook their own chicken in the KFC fryers for events like family reunions and parties because it's much cheaper than buying it from KFC and much easier than doing it at home. I told him he should write a short story about the experience.

### Overall (2-)
*Clear admit—one to recruit*

I think Harvard could use more students like Anthony. He would probably have a bit of an adjustment to Harvard's academics, but he has raw talent in spades, and he's never been in an environment with other students who were eager to learn. Neither of his parents has an education beyond an associate's degree, so he would be the first in his family to go to college. Mom is a front desk manager at the local Radisson. Dad is out of the picture, from what I could gather. Anthony's a role model for his two younger sisters, and he would be a role model for other students at West and in the city if he were accepted.

---

**Comments:**

This detailed report about Anthony, a high-achieving student of modest means with a substantial term-time work commitment, helps paint a nuanced picture of Anthony as a thoughtful, lively person and excellent student. Harvard has long sought to recruit and enroll high achieving students of modest means, and the interviewer helps make a case for why the Committee should consider Anthony's candidacy seriously.

The report is especially helpful for telling us what Anthony's interests are and what he would like to do in College even though he hasn't had time to pursue those interests in high school. From the report it is also clear that the interviewer understands West High School and how exceptional a student like Anthony is coming from the school (at least in terms of applicants to Harvard).

---

45

CONFIDENTIAL

HARV00018516

**JA5108**
DX025.0065

## Wilbur

**Academic (3+)**

*Cum laude potential. Good grades and mid-600 to low-700 scores*

Wilbur Smith is a young, rather nervous fellow of sixteen (he turns seventeen next month) who used up most of the interview time trying to elicit from me some indication of whether he had a good chance of being admitted to Harvard. No matter how much I tried to steer the conversation to other topics, somehow we always returned to that one. Consequently, my impression of him is a bit vague.

It is unclear to me why Wilbur Smith should manifest such insecurity. He is certainly not a poor candidate: his test scores are all in the low 700s, with the exception of a 610 in chemistry. When we came to the subject of history and government, his intended major, he did seem to manifest a genuine interest in the departments here.

**Extracurricular (3-)**

*Solid participation but without distinction.*

At his school he is active in the Speech Club (preparing and delivering them at tournaments), on the soccer team, and on the football team. He elaborated very little about activities, but focused instead on asking questions. He did not mention any significant leadership roles.

**Personal (4)**

*Somewhat neutral or slightly negative impression.*

I sensed that Wilbur has absorbed the idea of going to an ambitious college more from his atmosphere than from his internal desires. There was a certain immaturity in his questions and the plethora of them alerted me to the fact that perhaps he felt he had to ask them so that I would not think him apathetic.

What struck me though was his nervous manner, his obvious confusion when he blurted out that he had been visiting other colleges, and his embarrassment when he felt that many of his scores, etc., were not up to Harvard's standards. He seemed especially curious about the admissions process, that is, the process behind the scenes.

**Overall (4)**

*Acceptable but perhaps not competitive compared to other applicants.*

I am puzzled by the impression Wilbur gave during this interview. I am not sure whether it was his youth or the fact that he got lost on the way and arrived quite late or perhaps his confusion as to his own aspirations. In any case, I hope his teachers' reports and his essay give a better sense of what he is really like than I have been able to do here.

46

CONFIDENTIAL

HARV00018517

**Comments:**

This is an incredibly helpful report, targeting those personal qualities of the candidate that suggest he would not be a good choice for us. The interviewer acknowledges that perhaps she did not see Wilbur at his best, but she also gives us enough concrete information and examples of his behavior that we feel confident in her evaluation of Wilbur. The report certainly gives us a vivid picture of this young man and provides the type of insight we are unlikely to get elsewhere in the application.

47

CONFIDENTIAL

HARV00018518

**JA5110**

DX025.0067

C

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

HARV00018519



# Schools Committee
# Chairperson Handbook

## 2011 – 2012

*Harvard College*
*Office of Admissions and Financial Aid*
*86 Brattle Street*
*Cambridge, MA 02138*
*Revised fall of 2011*

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY                    HARV00018520

# Table of Contents

Introduction .................................................................. 1
1. The Admissions Calendar ............................................ 3
2. Managing Membership .............................................. 5
    Eligibility and Conflict of Interest ................................ 5
    Confidentiality ...................................................... 5
    Maintaining Schools Committee Membership .................... 5
    Training and Updating Committee Volunteers .................. 7
3. Managing Student Recruitment .................................... 10
    The College Fair .................................................... 10
    Joint Travel ........................................................ 10
    Encouraging Alumni/ae to Serve as School Liaisons .......... 11
    The Moratorium .................................................... 11
    Receptions for Students ........................................... 11
    Ivy League Early Notification Program ......................... 13
4. Managing Interview Assignments ................................. 15
    When Do We Need Interview Reports? .......................... 15
    Interview Profile Number ......................................... 15
    Assigning Interviews .............................................. 15
    Ranking Meetings .................................................. 17
    Transfer Interviewing ............................................. 17

## INTRODUCTION

Schools Committees are the backbone of Harvard's admissions outreach. We appreciate the time and effort that you put into this work and hope this document will help you coordinate your Schools Committee efficiently. It assumes familiarity with the 2011-2012 Interviewer Handbook, but several important items are repeated here. Section 1, "The Admissions Calendar," presents a timetable of the admissions season, by which you should schedule your Schools Committee's work. Section 2, "Managing Membership," includes information about eligibility, conflicts of interest, and training new Schools Committee members. It also offers advice on soliciting alumni/ae to join your Schools Committee and on organizing them to recruit and interview students most efficiently. Section 3, "Managing Student Recruitment," focuses on some of the nuts and bolts of that work, and Section 4, "Managing Interview Assignments," focuses on processing interview requests.

As the world of college admissions changes, so do the best approaches to recruitment. Please share your successful recruiting ideas so that we can share them with other chairs. As always, please contact the Admissions Office if there is any way that we can be of assistance. Again, thank you for all of your help.

**Staff resources.** Your usual contact in the Admissions Office is your area admissions representative. In addition, Elizabeth Adams (*SSinfo@fas.harvard.edu*, 617.496.6875, Fax: 617.495.8821) is also a critical contact. Elizabeth supervises the maintenance of interviewing records, from Schools Committee rosters to lists of applicants assigned for interviews in your area.

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

HARV00018521

**The Cambridge Admissions Conference (CAC).** Every fall, we invite you to Cambridge to review admissions and financial aid issues. We host CAC to coincide with the fall HAA meetings and a home football game. CAC allows us to address your concerns, and gives you the opportunity to renew your acquaintance with Cambridge staff, the College, Cambridge, and Schools Committee members from across the country. We hope you share your insights from CAC with your Schools Committee members. This year CAC will be held beginning on October 13th and will continue on the 14th and 15th.

**Schools & Scholarships Committee of the Harvard Alumni/ae Association.** About 50 alumni/ae on the National Schools & Scholarships Committee of the Harvard Alumni/ae Association advise us on matters of both national and local policy three times each year. We communicate any changes in our frequent newsletters to you and in newsletters to all Schools Committee members.

2

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

HARV00018522

## 1. The Admissions Calendar

To help plan your Schools committee's activities, here is an abbreviated admissions calendar.

**JUNE/JULY**
- Survey current interviewers about continuing Schools Committee work; their assessment of their own performance in the preceding season; and for address telephone, and e-mail changes
- Update list of interviewers on S&S website.

**JULY/AUGUST**
- If you wish to increase your Committee's membership, contact Elizabeth Adams for a list of alumni/ae in your area to solicit.
- Order copies of our new recruiting brochure (the "Murr") that your Schools Committee will need for the year's recruitment activities.
- Plan and host an end-of-summer picnic for undergraduates and your Committee.

**AUGUST TO OCTOBER, AND ONGOING**
- Assign club members as liaisons to individual high schools. Schedule school visits or other recruitment events, consulting with area officer as needed.
- Respond to all college fair invitations after recruiting Schools Committee members to cover events. Ensure supply of Murrs and "one-pagers" (available online) to cover these events.
- The Admissions Office sends you and all Schools Committee members an e-mail to indicate that online resources have been updated.

**EARLY SEPTEMBER/OCTOBER**
- Confer with your staff representative in Cambridge about joint travel to your area and events your Schools Committee might sponsor.

- Encourage alumni/ae liaisons to re-connect with assigned schools in your area.
- Hold an organizational meeting for your Schools Committee. If an admissions officer will be in your area on joint travel, meet with him or her and encourage club members to join you.

**OCTOBER THROUGH FEBRUARY**
- Cambridge Admissions Conference (always coincides with the fall HAA meeting).
- Assign interviews as soon as requests arrive from Cambridge. Follow-up with assigned interviewers to ensure interviews occur and reports are sent as soon as possible to Cambridge. Encourage interviewers to submit reports on the S&S website.
- We begin our careful evaluation process of Early Action applicants.

**NOVEMBER**
- November 1: Deadline for application materials for Single Choice Early Action applicants.
- Prioritize interview assignments for Early Action applicants, as subcommittee meetings for Early Action candidates begin in mid-November.
- Confer with your staff representative for the subcommittee and full committee dates that correspond with your area.

**DECEMBER**
- Full committee meetings for Early Action candidates take place the first week of December.
- December 15: Decisions for Early Action candidates are mailed/e-mailed to students.
- Reach out to congratulate students admitted Early Action, and when appropriate, invite to local Harvard Club events.

3

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

HARV00018523

- Begin assigning interviews for Regular Decision candidates.

### JANUARY/FEBRUARY
- Deadline for Regular Decision application materials: Jan. 1.
- Continue to assign interviews as soon as requests come from Cambridge. Follow up with assigned interviewers to ensure interviews occur and reports are sent online as soon as possible to Cambridge.
- Ensure all applicants from your area have been interviewed (ideally by mid-February).
- Confer with your staff representative about applicants from your area.
- Subcommittee meetings begin the first week of February. Please attempt to have all interview reports for candidates sent to Cambridge by the time your subcommittee begins to meet.

### MARCH
- Confer with your staff representative about applicants about whom you have new information. Ensure that all area applicants have been interviewed.
- Full Committee meetings begin the first week of March. The *last* opportunity for the vast majority of cases to be heard is during full Committee. The Admissions Committee must have all interview reports in hand for full Committee.

### LATE MARCH/APRIL
- Decisions sent Thursday, March 29, 2012.
- Following the end of the moratorium on Friday, March 30 at 8 a.m. *candidate's local time*, share with interviewers the Admissions Committee's final decisions on your area's applicants, and encourage them to call to congratulate admitted students they interviewed.
- Hold reception for admitted students and parents.
- Visitas Program for admitted students: Saturday, April 21 to Monday, April 23.
- Assign interviews for transfer applicants if requested by your area officer. Transfer interviews are only conducted for a small number of transfer candidates. Follow up with assigned interviewers to ensure interviews occur and reports are sent quickly to Cambridge.

### MAY
- Admitted students must respond to offer of admission by May 1, 2011.
- Share with interviewers the information about which admitted students have decided to matriculate.

### MAY/JUNE
- Confer with staff representative about wait list candidates in your area, should the Admissions Committee be able to admit students from the wait list.

4

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

HARV00018524

## 2. Managing Membership

**ELIGIBILITY**
      Participation in Schools Committee work is open to alumni/ae of Harvard College as well as our graduate schools. Important prerequisites include broad knowledge of the College, enthusiasm for your experience as a student at Harvard, and sincerity of purpose in working with prospective college students, their families, schools, and the general public.

**POTENTIAL CONFLICTS OF INTEREST**
      As a member of your local Schools Committee, you become a voluntary, but no less official representative of Harvard College. Accordingly, it is critical to avoid circumstances that might suggest an appearance of inappropriate or duplicitous conduct. Alumni/ae who offer college counseling services for a fee, for example, are required to stop Schools Committee work. Interviewers whose children are planning to apply to Harvard College are obligated to refrain from doing Schools Committee work for a year, or a least through the full completion of the admissions cycle. (Your committee members should alert you to this possibility during the summer before the child's senior year of high school.) We similarly request that individuals refrain from interviewing for both Harvard and another undergraduate institution. In addition, of course, you must make all interviewing assignments with total objectivity, while applying appropriate sensitivity to personal, business or other connections to candidates for admissions.
      **Should you have any questions about a possible breach of good faith about your role as a volunteer for the Harvard Admissions Office, please contact the Admissions Office to speak with your staff representative.**

**CONFIDENTIALITY**
      <u>Never discuss what you know about students with anyone, even with school officials.</u> (There is one exception to this rule that can also raise potential problems of confidentiality: holding a ranking meeting or otherwise sharing information about any candidate within a particular Schools Committee.) Confidentiality is especially important when working with the general public. Even well-intentioned comments can reveal—sometimes disastrously—more than was intended. A principal or counselor asking why the Committee denied a student admission needs only to hear the applicant "was not well supported" to go after teachers.

**MAINTAINING SCHOOLS COMMITTEE MEMBERSHIP**
      Interviewing applicants is perhaps the College's most important recruiting tool. Ensuring that the interview experience is positive is the cornerstone of the critical personal outreach you and your Schools Committee members provide to applicants. As a chair, your first priority is ensuring that you attract enough enthusiastic alumni/ae to complete interviews for all candidates from your area. Schools Committees can recruit in other ways, too, and your Schools Committee's success depends largely on how many volunteers you can attract to your Committee.

      **Keeping your list current.** Each fall you should update your interviewers' contact information on the S&S website. Updating e-mail addresses is crucial. Though tedious, maintaining an updated database will help you minimize scheduling snafus in the fall and winter, when you will receive dozens of requests for interviews from us—and for representation at college fairs by local schools. To help your revisions, we suggest sending each of your active Committee members an end-of-the-year survey asking alumni/ae for updated contact information (especially e-mail) as well as these questions:

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

HARV00018525

**JA5117**
DX025.0074

**GENERAL INFORMATION**
1. When between October and February won't you be available to assist in Schools Committee work?
2. In which high school district do you reside?
3. Do you have children attending any area high schools? What are their ages?

**INTERVIEWING**
1. How many interviews can you conduct this year? [The average is 4 to 6.]
2. Where and when can you interview applicants?
3. If you have previously interviewed applicants to Harvard, is there information that would be helpful as you interview future applicants?

**COLLEGE FAIRS**
1. Will you be available to attend any local college fairs?

2. When will you NOT be available to attend college fairs?

**SCHOOL VISITS**
1. Will you act as a liaison to a school community?
2. How many schools can you work with as a liaison?
3. Can you visit high schools during school hours?
4. Are you interested in assisting early awareness efforts?
5. Are you willing to sponsor a Harvard Book Prize at your local or other area high schools?

**COMMITTEE EVENTS**
Can you host any of these Schools Committee events: Summer picnic for area undergraduates; fall orientation meeting; ranking meeting; spring reception for admitted students from your area.

**Rotating Schools Committee responsibilities.** Using the results of volunteer surveys, you can better decide how to assign Schools Committee work. Asking alumni/ae volunteers to assess their own strengths and weaknesses as a recruiter or interviewer offers you the opportunity to redistribute responsibilities accordingly—e.g., you can assign more college nights to alumni/ae who prefer staffing these events or you can assign fewer interviews to alumni/ae who do not provide the Admissions Committee valuable commentary on applicants.

**Recruiting new volunteers.** The Harvard Alumni Association maintains a database of alumni/ae and their addresses and e-mails—a useful data source to recruit new Schools Committee members. Please contact Elizabeth Adams (ssinfo@fas.harvard.edu) to run a list for you. We have been able to tailor lists to various specifications: graduates of the College who live within certain ZIP codes and who graduated within the last 20 years, etc.

Using some method of pre-screening, akin to the annual survey of active members, can be helpful. The Admissions Committee hopes that all alumni/ae involved in recruitment and interviewing are eager to make these experiences positive for prospective students, their parents, and school officials. Moreover, answers to pre-screening surveys can also help you assign Schools Committee work to the most appropriate volunteers.

You may wish to adapt your own solicitation based on this sample:

Dear Alumnus/a:

Each year the Harvard College Admissions Office relies on local alumni/ae to help recruit and interview high school students who apply from (*area*). We are eager this year to expand our alumni/ae team, and we are writing now to invite you to consider helping us interview a growing, exciting, and diverse group of applicants.

Each alumnus/a is assigned to interview four to six applicants on average each year and to provide the Admissions Committee a written report of each interview. This personal outreach can be helpful for the applicant as well as the Admissions Committee, allowing for a thorough admissions process. As part of Schools

6

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

HARV00018526

**JA5118**
DX025.0075

Committee work, you might also be asked to represent Harvard at college fairs, to act as a liaison to a local school, and to assist in other Schools Committee work.

If you are interested in joining us, please complete and return the enclosed survey. There will soon be a meeting of our interviewing group in (*area*) to which you will be invited if you are interested in this important work.

Thank you very much for your support, and we hope to work with you in the coming year.

If you need additional support in recruiting new volunteers, contact Elizabeth Adams.

**Managing membership when you have too many volunteers.** Few Schools Committees attract more volunteers than there is work to assign. But if you face this happy dilemma, consider establishing a rotation of active members for each aspect of Schools Committee work as well as an informal wait list for the balance of interested alumni/ae.

**Managing volunteer complications.** You might wish to assign alumni/ae volunteers who have demonstrated consistent difficulty completing assignments on time *or* who do not present a welcoming or current impression of Harvard to less demanding Schools Committee jobs. We recognize that such re-assignments require discretion and diplomacy; do not hesitate to discuss potential problems with your staff representative.

## TRAINING AND UPDATING SCHOOLS COMMITTEE VOLUNTEERS

**Fall organizational meeting.** We recommend kicking off each admissions season with a meeting of your Schools Committee and those alumni/ae interested in becoming volunteers. (We recommend a separate orientation session, as well, for new volunteers.) Confer with your area representative in advance for an update on any new admissions procedures or policies, or try to schedule your meeting to coincide with a Joint Travel recruitment trip to your area.

Your agenda depends on several mundane factors. How many alumni/ae will attend? How familiar and experienced will your audience be with Schools Committee work? What have members expressed interest in learning more about? Will your staff representative be present? Here are some options to consider:

- Introduce Schools Committee officers and returning members.
- Introduce new Committee members.
- Review preceding admissions season; outline local procedures.
- Review the new publication, the "Murr," and other documents on the S&S website.
- Review financial aid policies.
- Review interviewing practices. Your staff representative can conduct such a session, if present. Otherwise, confer with your area representative about materials you might share with your Schools Committee. Some chairs choose to circulate sample interviews written by members of their own Schools Committees to illustrate helpful and unhelpful aspects of interview reports. Please note that the interviewer's handbook contains sample interview reports.
- Review Harvard news. Review the "What's new at Harvard" document on the S&S website for a list of recent changes—academic, extracurricular, residential, social—at the College. This can provide a valuable supplement to the information offered in our publications and from your contact with undergraduates from your area.
- **Consider printing and distributing the one-page (double-sided) Interviewing Tips Sheet, a condensed version of the interviewer's handbook.**

7

- Host a casebook session. We have selected several applications to the College, protected the anonymity of their authors, and adapted them to a casebook. Admissions officers run casebook sessions for Schools Committees, other alumni/ae, and guidance counselors to simulate how we read, discuss, and vote on individual cases. If an admissions officer will be in the area, it may be possible to conduct a shortened casebook session (perhaps by reviewing just one case and examining how an interview would change the decision) as a training tool.

**Fall orientation meeting for new interviewers/interviewer training.** Depending on your fall meeting's attendance and agenda, you might need to hold a separate orientation meeting for new interviewers. Your orientation should address the process your Schools Committee has established for recruiting students (e.g., attending college fairs, acting as liaisons to local schools, etc.) and for interviewing applicants (e.g., how many alumni/ae interview individual students at a time, whether your Schools Committee holds ranking meetings, etc.). Please review these critical points, too:

**Schools Committee members are considered official representatives of Harvard.** This designation entails three primary responsibilities: 1) The NCAA regulates the recruitment of student-athletes by official college representatives, which we outline in the Interviewer Handbook and in this document on pages 12 to 13. 2) Prospective applicants, their families, and secondary school officials will expect Schools Committee members, as official representatives of Harvard, to be well informed about the experiences of current undergraduates as well as the mechanics of the admissions process. 3) Alumni/ae on Schools Committees should also be aware that, as official representatives, they will personify "Harvard College" to some degree, if not totally. In recent years, the Admissions Committee has been able to admit only about one of every fourteen applicants; alumni/ae interviewers may be the only personal contact applicants have with a Harvard graduate. That prospective students feel they have been treated with respect is one of the most important expectations the Admissions Committee has of alumni/ae volunteers.

**Alumni/ae on Schools Committees recruit students as well as interview them — but there is an important distinction between the two activities.** When recruiting, alumni/ae should introduce students to and inform them about Harvard and the admissions process. They should not act as interviewers, who inform applicants about Harvard but also evaluate them for admission. Recruitment efforts should not be performed—or perceived to be performed—as a preliminary screening of prospective or actual applicants to the College. Nevertheless, alumni/ae should use the information presented in section 2 of the Interviewer Handbook to inform their advice to students.

Even after starting to interview applicants, new interviewers should continue to talk with Schools Committee veterans about conducting interviews, evaluating applicants, and writing reports. Some Schools Committees pair new interviewers with more experienced ones and have them conduct two to three interviews as a team. Post-interview discussions allow alumni/ae to check their biases when evaluating individual applicants for the first time, and they help new interviewers writing reports to provide more broadly sympathetic views of candidates.

8

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

HARV00018528

Be sure interviewers are aware how this approach can affect interview dynamics. Being interviewed by more than one person at a time can intimidate students. The format can prove a difficult juggling act for interviewers. Interviewers must settle among themselves before the interview begins who will ask which questions when—orchestrations with which single interviewers need not contend. Interviewers must also take particular care to set the candidate at ease to prevent the group interview from resembling a polite grilling.

**August picnic.** Several clubs host an August picnic to wish undergraduates from your area well as they prepare to return to Cambridge and, incidentally, to keep current Schools Committee members in touch with life at the College. You might wish to consider scheduling this event before the others above, yet we have listed it last because we believe that it is of lesser priority than, for instance, the orientation meeting.

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

HARV00018529

**JA5121**
DX025.0078

### 3. MANAGING STUDENT RECRUITMENT

Section 3 of the Interviewer Handbook addresses some practical methods to recruit students to the College. We repeat much of that text here for your convenience with more explicit suggestions to assist you in coordinating student recruitment and delegating Schools Committee responsibilities.

**THE COLLEGE FAIR**

Organizations sponsoring college fairs send notices to us year round. We will send copies of these notices to you. Since the Admissions Office receives literally hundreds of these invitations and many are for events far from Cambridge, it is often not feasible for staff members to attend fairs. We hope your Schools Committee will staff as many college fairs as is reasonable and constructive.

**Which fairs are worth attending?** If you have any doubt about which events are worthwhile, confer with your staff representative. As the Interviewer Handbook notes, fairs differ widely (and wildly) in type, size, and turnout. Prospective applicants and families attending college fairs demonstrate a wide range of familiarity with Harvard. Even as some of these factors would not seem to recommend attendance at many college fairs, if Harvard is not represented we often give precisely the aloof and uncaring impression of Harvard we hope to combat. Plus, we can miss attracting students we wish to reach. Many students have noted how an initial encounter with a helpful and enthusiastic alumnus/a sparked their interest in Harvard. Staff representatives appreciate knowing which fairs in their area were attended.

**Who should attend college fairs?** Enthusiastic, high-energy Schools Committee members are often best equipped to staff college fairs. Chairpersons have often found that recent graduates enjoy representing the College and find the fairs a good way to become acquainted with Schools Committee work. College fairs can test endurance (fairs often run three hours or more) and versatility. Attending them, for some families, substitutes for studying dozens of college guidebooks and websites. For other families, the college fair is an opportunity to discuss in detail with a college representative what they have read and heard from friends. In a given evening, you might be asked everything from, "Where is Harvard?" to "What success do Harvard students have in medical school admissions?"—and you might be asked these questions many times over.

**What supplies will you need to attend a college fair?** The Admissions Office can provide a table banner, which will identify Schools Committee members as Harvard representatives. Clubs should keep this and reuse them for future fairs. With enough advanced notice, we can also send you a supply of "Murrs"—the shortened, enhanced version of our guidebook introduced in the summer of 2009. On the S&S website you will also find a one-page informational handout that you can download, print locally, and distribute widely. This publication is especially helpful at larger fairs where representatives may distribute hundreds of handouts.

If you have further questions about College Fairs, please see **Quick Reference for Attending a College Fair** on the website under *Documents and Forms*. This document contains a how-to for attending college fairs, as well as answers questions that students frequently ask about Harvard.

**JOINT TRAVEL—EXPLORING COLLEGE OPTIONS**

To respond to the increasingly early interest students, their parents, and guidance counselors express in college admissions, the Admissions Committee is concentrating more on spring recruitment. Many more officers promote Harvard to prospective applicants through a travel alternative used in spring and fall: joint travel, known as Exploring College Options. A group of five admissions representatives—representing Harvard and four other colleges—travels to five cities in five days, speaking in the evening with students and parents and in the morning with guidance counselors. In the last several years, we have traveled with representatives from Duke, Georgetown,

10

**JA5122**
DX025.0079

MIT, Stanford, the University of Pennsylvania, Princeton, University of Virginia, and Yale, among others. The College enhances outreach through well-planned joint travel, which exposes the College to a broader audience—students, families, and schools—than individual school visits do. Audiences hear about Harvard even as they might have initially been attracted to attend the session because of another college's presence. And by cooperating with other colleges in planning, we enhance the cost-effectiveness of travel.

The admissions officer representing the College in any given joint travel visit might not be the officer assigned to your area. The Admissions Committee recognizes that a joint travel visit often provides the link with Cambridge you need to back up your efforts on our behalf.

According to the guidelines established by the colleges cooperating in joint travel, only two alumni/ae from each school may attend the evening session. While we hope you might be able to recruit two of your Committee members to assist the Harvard area representative, you should also confer with him or her (or the officer who will be traveling in his or her stead) about the possibility of scheduling a meeting with you or even a group of your Committee members. (Some groups gather for an early dinner or a post-event gathering.) Such a meeting can help you become better acquainted with your staff representative and provide a chance to discuss concerns and questions your Schools Committee has about the admissions process.

## ENCOURAGING ALUMNI/AE TO SERVE AS SCHOOL LIAISONS

As we rely increasingly on joint travel as the most efficient method of reaching out to prospective applicants and their families, and in light of the recent budget reductions in the Admissions Office, area representatives will not be visiting individual schools as they have in the past. This shift in recruitment strategy increases the opportunity for alumni/ae to develop relationships with local schools on our behalf. The Interviewer Handbook outlines the methods by which individual alumni/ae can introduce themselves to local schools and explain the role they hope to play with college-bound secondary school students. Schools Committee chairs play an important role encouraging alumni/ae to capitalize on this opportunity and coordinating school assignments.

## THE MORATORIUM

The Ivy League colleges have agreed to honor a three-day period during which official representatives of colleges—including admissions officers, alumni/ae, and coaches—may not talk with applicants. Designed is to give students a respite during which they may think about their college choices without pressure from any number of intensely interested parties, this year's moratorium begins at 5 p.m. *candidate's local time* two days before the mailing date—Wednesday, March 27. It ends the day after decisions are mailed and e-mailed: Friday, March 30, 8 a.m. *candidate's local time.* It is your responsibility to ensure that members of your Schools Committee are aware of this rule and observe this courtesy to our applicants.

## RECEPTIONS FOR STUDENTS

At the very least we hope you and your interviewers will find the time to call to congratulate every admitted student from your area. Some Schools Committees also host receptions for admitted students before students must make their college decisions (May 1). You may also wish to invite students admitted in the Early Action process to Harvard Club sponsored holiday gatherings or other events. You should be aware that the Admissions Office invites all admitted students to our annual Visitas program for admitted students in April, which will be held from Saturday, April 21 to Monday, April 23, 2012. Please try to hold your Schools Committee reception before this event.

Receptions should be informal and include parents. They should focus on Harvard and students' and their families' questions and concerns about attending the College. Pressure tactics often backfire. One of the most effective recruiting tools is the conscientious avoidance of even

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

HARV00018531

slightly disparaging comments about other colleges. Here are some more practical suggestions on setting the right tone at these receptions.

- Alumni/ae should call admitted students they interviewed to invite them to attend such a gathering. They should also try to attend these receptions. A second meeting can extend the personal outreach that has proven so successful to our recruitment efforts.
- You and your interviewers will need to act quickly to invite students, some of whom might have already made up their minds by the time your reception takes place.
- Be sure to check whether a student has access to transportation to the reception.
- Be friendly and welcoming. Choose an easy-to-reach place, and create a relaxed atmosphere. While it is not always true that informal is better than formal, many veteran chairs have reported that they have had better receptions with soda and pizza in a casual place than when they served haute cuisine in a grand space.
- Invite (if possible) current students and recent graduates to talk informally about the College. If you ask some of these people to make individual presentations, keep them as brief as possible. Informal conversations allow the best opportunity for alumni/ae and current students to address questions and concerns individual students and their families might have.
- Avoid formal presentations about the College (there have been enough of those by this time) unless you are lucky enough to have a faculty member in attendance who can talk about studies or some other topic in depth with which students are not already familiar. The one opportunity students might not have had in the college admissions process is that of talking with a faculty member.
- Be sure alumni/ae do not vastly out-number admitted students and families, which can overwhelm families.

Some students will tell you that they are hesitating about committing to Harvard because of financial concerns. If there are questions about a student's financial aid package, please urge the student, as well as his or her family, to contact the Financial Aid Office (617.495.1581) themselves. Do not act as an intermediary in a family's discussions with the Financial Aid Office. While such an offer to help a family is kind and often well intentioned, our financial aid officers will need to ask families specific questions and talk over the financial aid package with access to the student's complete financial aid application. Do not hesitate to show your interest and support, but tell the family that the best and most efficient way to ask for reconsideration of financial aid is to contact us themselves.

**NCAA rules regarding receptions and prospective student-athletes.** As the Interviewer Handbook states, you and your Schools Committee members are considered representatives of Harvard's athletic interests just by being alumni/ae. This means that any contact you have with current or prospective student-athletes at Harvard can affect the eligibility of individual student-athletes and teams to compete in NCAA and Ivy competition.

One of the most salient NCAA rules is that representatives of an institution's athletic interests are prohibited from having any contact with prospective student-athletes, who are also known as "prospects." A prospect, moreover, is any student who has started classes for the ninth grade. This means that recruiting any student who has started classes for the ninth grade is subject to NCAA rules.

There is a narrow exception to this rule in the context of the standard process of college admissions. That is, you and members of your Schools Committee will be assigned to interview students who are also athletes, and the member of your Committee assigned to interview the student may contact him or her for these purposes, but for these purposes only. Schools Committee members may not have contact with prospects whom they are not assigned to interview.

12

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY                                                    HARV00018532

**JA5124**
DX025.0081

These rules raise a number of issues pertaining to receptions as well. This brief battery of questions and answers should inform your Schools Committee activity in regard to student-athletes and receptions.

*May an alumnus/a hold an annual reception only for athletes at the request of a coach?* No, whether or not the coach is involved. All receptions should be conducted in accordance with existing institutional policy. Alumni/ae *may not* hold coach-orchestrated receptions. All receptions must be open to all prospective applicants and students from your area, athletes and non-athletes.

*May a coach give a list of all prospects in an area to the Schools Committee member who will host a Committee reception?* Yes. The list *must* be incorporated into a larger list of all area prospects, and invitations (and the timing of those invitations) to prospects and non-athletes must be identical. The list may not be devised by starting with the list of prospects, and then only inviting applicants from their high schools. All applicants who live within a uniform radius of the event should be invited.

*Is it permissible for the coach to send to the prospects the invitations to this alumni/ae reception?* No. The coach may urge that the prospects attend in any otherwise permissible correspondence, but invitations must be offered through regular Schools Committee channels.

*May alumni/ae call prospects and encourage them to attend the reception?* No. Alumni/ae, including alumni/ae who are members of the Schools Committee, may *never* telephone a prospect *unless* it is directly associated with his or her admissions interview or similar part of the admissions process. Invitations to receptions should be in writing or via email.

*May the university's coach attend the reception?* Yes. Provided the reception falls within a permissible contact period for the coach's sport and is counted as one of the three permissible contacts for *all* athletes in attendance whom the school is recruiting in any sport.

*May high school coaches be invited to attend the reception?* No. High school coaches may *never* be entertained off campus by alumni/ae or coaches.

*May parents of prospects be invited to attend the reception?* Yes, though only on the *same basis* as all parents of *all* applicants invited. If parents of prospects are not charged a fee, then parents of all applicants should not be charged a fee.

*May alumni/ae speak to prospects at the reception even if they are not members of the Schools Committee, which represents admissions?* Yes. At events open to all applicants, prospects need not be treated any differently than other applicants.

## IVY LEAGUE EARLY NOTIFICATION PROGRAM

As determined by each institution, admissions offices may advise applicants before the common notification date, in writing, of the probability of admission (e.g. likely, possible, unlikely). If the student is a recruited student-athlete, such notifications may only be made from October 1 through March 15, per Ivy League regulations.

Institutions may issue official "probabilistic" communications only in writing, from the office of admission. Such letters will have the effect of letters of admission, to be confirmed on the common notification date (in December for Early Action candidates and in March for Regular Decision candidates), subject to revocation only on the same terms as letters of admission. (Such communications given by coaches, whether orally or in writing, do not constitute binding institutional commitments.) An applicant who receives one or more such written communications and who has made a decision to matriculate at one institution is

13

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

HARV00018533

**JA5125**
DX025.0082

encouraged (but not required) to notify all other institutions, and to withdraw all other applications, as promptly as possible.

Such early evaluations are often precipitated by pressure on student-athletes from other institutions requiring an early commitment. In some instances, students are given very little time to respond to these offers. Such candidates bring excellences of all kinds in addition to athletics, and the Admissions Committee can vote to notify them that they are likely to be admitted – rather than lose them to other institutions. Alumni/ae Schools and Scholarship Chairs will be informed about such candidates by the staff area person and will be requested to interview them if time allows.

14

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

HARV00018534

**JA5126**

DX025.0083

## 4. MANAGING INTERVIEW ASSIGNMENTS

The primary work of Schools Committees is to offer personal interviews to applicants to the College. Any organizational structure and process that helps your Schools Committee conduct interviews and send to Cambridge timely reports suits us.

### WHEN DO WE NEED INTERVIEW REPORTS?

The Admissions Committee benefits enormously from reports that help inform our decisions. The value of these reports depends on their timeliness. Given the large number of applications in recent years and the admittedly compressed timing for filing interviews for all these candidates, we offer these considerations to inform you when your Schools Committee's interview reports are most critical to our work in Cambridge.

Alumni/ae insights are most valuable if we have them for subcommittee—a case's first hearing. We would, of course, love to read interview reports as we first read applicants' files. But many students still wait to apply by the final deadline, making it virtually impossible for their reports to be here for a folder's first read. The committee process works best and most efficiently, then, when we have reports for subcommittee. Subcommittees begin meeting in mid-November for Early Action candidates and for three- to four-day shifts from late January through February for Regular Decision candidates. Occasionally, applicants' files complete as late as February. This results, most often, from unavoidable logistical factors.

The *last* opportunity for the vast majority of cases to be heard is during full Committee. The Admissions Committee must have all interview reports in hand for full Committee. The entire Committee convenes in one room to review all the contenders for admission. Many candidates are re-presented in full Committee, which again may consider a single case for a half hour or more. Full Committee generally meets in the first week of December for Early Action and from the end of the first week of March to the end of the third week of March for Regular Decision.

### INTERVIEW PROFILE NUMBER

In some areas, the increase of applicants we have seen in recent years has necessitated the development of new tools and processes to manage incoming requrests. In an effort to aide S&S Chairs burdened by an increasing demand for interviews, we have developed the Interview Profile Number (IVP) system, which may be implemented at the discretion of the local S&S Chair and the corresponding admissions representative. Interviewers will not see the IVP of a candidate.

Admissions officers have the option to assign an applicant an interview profile of 1, 2, 3, or 4. The numbers correspond as listed below:

1 – Please have interview report in as soon as possible.
2 – Please have interview report in by the sub-committee deadline.
3 – Please have interview report in by December 1 (EA) or March 1 (RD).
4 – No additional information needed at this time.

### ASSIGNING INTERVIEWS

**Interviewing Requests.** Please refer to the S&S website's instructions, which are updated each year and during the year with important changes, for instructions about assigning interviews using the site's assigning function. This function replaces the e-mail lists sent to chairs in previous years.

15

HARV00018535

## JA5127

DX025.0084

**Ensuring alumni/ae interview a sufficient number of applicants**. You should talk with each Schools Committee member about his or her interviewing availability—e.g., in which areas he or she would prefer to interview applicants, when, and how many—before he or she commits to interviewing. The Admissions Committee appreciates the effort it takes to interview even a single applicant. Yet, the Committee believes that alumni/ae offer more valuable assessments of applicants if they interview between four and six students—as a minimum, ideal range—in a given admissions season. This can expand interviewers' perspective of individual candidates, the applicant pool, and the admissions process.

While the Admissions Committee prefers that every alumnus/a who interviews meets with between four and six students in a given admissions season, we understand that you will occasionally need to fill interview assignment gaps with ad hoc interviewers when more active interviewers are away on business, vacationing, ill, or even incommunicado.

**"Matching" applicants with interviewers**. The Admissions Committee recommends assigning interviews on the most pragmatic and efficient basis possible. Where does the applicant live or go to school relative to where interviewers live? How many interviews has a particular alumnus/a conducted and do they have time for another? These answers to these questions, above all else, should inform how you assign interviews. The assignment feature of the website does not permit chairs to see an applicant's extracurricular interests, which of course prevents chairs from assigning interviewers candidates based on these interests.

The Admissions Committee recommends *against* a conscious policy of matching interviewers and applicants by race or ethnicity, should the interviewer happen to know an applicant's race or ethnicity. Some applicants have reported to us that they felt as if they were being "specially screened" by meeting with an alumnus/a of similar ethnicity, and that their racial identity—more than their academic achievements, extracurricular passions, and personal qualities—was under scrutiny. "Matches" will occur in the normal process of assigning interviews, however, and such assignments should be allowed to proceed.

**Ensuring interviews have been completed**. As you might recall from the Interviewer Handbook, we encourage all alumni/ae to keep one copy of each of their interview reports for their records, to send a second copy to you, and a third copy to the Admissions Office. We encourage alumni/ae to keep one copy themselves in case we need to contact them for a duplicate or so that they might be able to refer to their reports should the area representative have additional questions about the interview. The Admissions Committee encourages them to provide you a copy for the same reasons. More importantly, the copy you receive might serve as the best notice that an alumnus/a has completed an interview assignment.

**Alumni/ae Web Portal enhancements**. As usual, we are constantly working to improve and enhance the web services available to chairs and interviewers. We hope you will take the time to explore the updates as well as let us know if you have any suggestions for the future.

Please log in to the site using your current access code (PIN) and become familiar with the site. If you don't remember your access code, please use the "Forget your Access Code?" link on the login page in order to have the code sent to your email address on record. As you navigate the site you can be assured that you cannot break anything or accidentally delete yourself. Please find the site at:

https://admapp.admissions.fas.harvard.edu/hanevo/alumni/haServices.do

Please begin by reviewing your profile and edit the contact information accordingly. If you have more than one email address, we would encourage you to use your post.harvard.edu address. Please note that the site bears similarities with its predecessor, but is considerably different given its services and functions. Should you have questions about the site's functionality or suggestions for

16

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

HARV00018536

its improvement, you should first contact Elizabeth Adams, SSinfo@fas.harvard.edu, with questions. You may also contact your local area representative.

Some volunteers object to submitting reports to area chairs and thus (it might so be perceived) subjecting them to "checking." If anyone raises this concern with you, you can point out that reports are going to be read by a fair number of people on the Admissions Committee, often including members of the faculty, and that they should therefore be written, even when negative in content, in a professional manner.

Remind alumni/ae that, for their own sake and for the sake of meeting Committee deadlines promptly, they need not feel pressured to polish the prose of a report on a candidate with whom they have been very impressed. We are far more concerned with the content of reports—and their judgments—than their style.

Despite your pleas, some interviewers will forget to let you know they are vacationing, away on business, or ill, which can often result in reports languishing for two to three weeks. Should you not hear from interviewers or see interview reports for that length of time after assigning them, you should follow-up with the appropriate alumnus/a and, if necessary, re-assign the interview.

## RANKING MEETINGS

After completing all the season's interviewing, some Schools Committees hold ranking meetings to compare the qualifications of local candidates. Comparing candidates within a Schools Committee gives alumni/ae a reasonable approximation of the Committee process in Cambridge. If the Schools Committee applies roughly the same standard of selectivity as the Admissions Committee, alumni/ae can better understand the strengths necessary for candidates to make it successfully through the admissions process. Alumni/ae also have the opportunity to temper their own judgments of candidates when they hear how other alumni/ae have evaluated other students.

Rankings of candidates are valuable to area representatives in Cambridge for the input they provide and to Schools Committee members for the information they share. Any Schools Committee member who has had a greater than usual share of either strong or weak applicants for the year can also put his or her own interviewees in perspective and understand better the decisions made in Cambridge. Ranking meetings also provide valuable exposure for new interviewers.

Holding a ranking meeting requires considerable time and effort. Recommendations from ranking meetings are most valuable if *every* applicant from a given area is interviewed, if all interviewers have the opportunity to introduce any candidate for the Schools Committee's consideration, and if all of this work can be completed *before* subcommittee meetings in Cambridge.

Ranking meetings can provide the Admissions Committee additional perspective on candidates. Alumni/ae should keep in mind that recommendations Schools Committees make for candidates after a 60-minute interview and ranking meeting discussions are additional elements that the Committee weighs in the context of all other information in an applicant's file in Cambridge.

**Suggestions for the meeting**. Should you hold a ranking meeting, use whatever format suits your Schools Committee best (e.g., by area, by subcommittee chairs, etc.). However you choose to structure the meeting, you should approach the ranking meeting in a fashion similar to the Committee process described in the Interviewer Handbook, indicating which candidates received the strongest support, etc., from your Schools Committee. Do not split hairs over numerical ratings as the strongest determinants for where you should rank candidates. As the Interviewer Handbook states, the Admissions Committee does not expect to achieve anything approaching national consistency with the use of numerical ratings, so we use them in the most general way to show whether an interview was favorable or unfavorable.

17

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

## JA5129
DX025.0086

It is just as important to indicate to your area representative which candidates received strong majority support as it is to indicate which candidates received strong support from a minority of the Schools Committee. This information can be useful to the Admissions Committee. And representing strong interest from a minority of Committee members appreciates the hard work they did throughout the year and can reduce possible friction over whose candidates won the most votes.

**Transfer Interviewing**

As a Schools Committee chairperson, you might be asked to arrange an interview for a few transfer applicants in March or April. Unlike interviewing for freshman admission, we do not request an interview unless we have determined, from reading the application, that the student has a very reasonable chance of admission.

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

HARV00018538

D

CONFIDENTIAL

HARV00018539

STANDING COMMITTEE ON ADMISSIONS AND FINANCIAL AID IN
HARVARD COLLEGE
2011-2012

The Standing Committee on Admissions and Financial Aid in Harvard College has responsibility to oversee the admission of students to the College and the administration of the financial aid program which, in recent years, has provided support for seventy percent of undergraduates.

Committee members are appointed by the Dean of the Faculty of Arts and Sciences and must be members of the Faculty. The Dean of Admissions and Financial Aid has traditionally been appointed chairman of the Committee by the Dean of the Faculty.

In practice, the Committee serves a variety of functions, but basic to its efforts is the determination of admissions and financial aid policy. In fact, policy is often derived from practice by the manner in which the Committee votes admission or rejection to the applicants. The decision to admit a student with one set of characteristics over a second applicant with other characteristics creates admissions policy. In addition, the members of the Committee serve as interpreters of the admissions policy to the Faculty at large and in turn bring faculty opinion to the Committee. Members are chosen from each of the three broad areas of scholarship and represent as well such student-sensitive positions as Masterships, the Freshman Dean's Office and athletics.

Few faculty members are able steadily to devote large amounts of time to the Committee's work. The process of representing, recruiting, evaluating, and admitting applicants and determining their financial aid is an extraordinarily arduous and time-consuming task. The day to day operation, therefore, has been carried on largely by the full-time admissions staff. Although it is efficient, this arrangement is far from ideal. The recruitment of members of the Faculty who will be able and willing to spend significant time with the Committee operation is as necessary to the health of the Committee as a successful admissions operation is to the health of the Harvard community. The Committee finds itself obliged to work with multiple constituencies: faculty members, applicants, their teachers, parents, undergraduates, alumni/ae, and government and various special interest groups. The Committee operates best when its collective membership can relate to all these constituencies.

Finally, it should be noted with pride that the Committee has a long tradition of independence from inappropriate pressures. Decisions have always been made solely by the Committee. No one from the Office of the President, the Alumni Office, or anywhere else inside or outside the University has pre-empted the Faculty Committee's responsibility to vote every case. The Harvard admissions operation stands unique in both its vitality and its independence. Without the Faculty Committee's active participation neither would be possible.

Revised by MEM
18 October 2004

CONFIDENTIAL

HARV00018540

**JA5132**
DX025.0089

E

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY    HARV00018541

**Reading Procedures, Class of 2016**

**I.    UPDATE PROCEDURES**

<u>FIRST READERS</u> are expected to verify that the information on the Summary Sheet matches the information supplied by the candidate on the application, paying particular attention to the items highlighted below.  If any information is **missing** or **incorrect**, changes should be made using the UPDATE/PROFILE sheet provided in the folder (sample attached) and noted in the appropriate places on the Summary Sheet.  <u>One exception</u>: School code changes must be made by PDF/KAH (and NOT on the UPDATE/PROFILE sheet).

From now on we will report exactly what the applicant reports as ethnicity on the application.  **Readers should update information regarding Ethnic Codes only if ethnicity is checked on the application, but not recorded on the computer.**

The following list of our existing historical codes is for your reference:

| | |
|---|---|
| **A** - Asian American | **NH** – Native Hawaiian |
| **B** - Black/African American | **NA** - Native American |
| **M** – Mexican American | **O** - Other |
| **H** - Hispanic (not clearly "M" or "P") | **P** - Puerto Rican |
| | **W** - White/Caucasian |

In addition to these previous ethnic categories, the following codes follow the new government reporting guidelines:

- **Hispanic  or  Latino**
  **XCM**–Central America, **CUB**–Cuba, **MEX**– Mexico , **PRI** – Puerto Rico, **XSM** – South  America, **ESP**–Spain, **XOH**–Other
- **American Indian or Alaska Native**
  **XAN** –Alaska  Native, **XCW** –Chippewa, **XCH** – Choctaw, **XCK**–Cherokee, **XNV**–Navajo, **XSX** – Sioux, **XON** -Other
- **Asian**
  **CHN** – China, **IND**– India, **JPN** – Japan, **KOR**–Korea, **PAK**–Pakistan, **PHL** – Philippines, **VNM**– Vietnam, **XEA** – Other East Asia, **XIS** -Other Indian Subcontinent, **XSA** - Other Southeast  Asia
- **Black or African American**
  **XAA** - U.S./African American, **XAF** – Africa,  **XCB** – Caribbean, **XOA** - Other
- **Native Hawaiian or Other Pacific Islander**
  **GUM**–Guam, **XHI**–Hawaii, **ASM** – Samoa, **XOP**-Other
  Pacific Islands (excluding Philippines )
- **White Options**
  **XEU** –Europe, **XME**- Middle East **XOW** - Other

1

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

HARV00018542

**JA5134**
DX025.0091

**Note that foreign citizens are listed as such, (without an ethnic code,) no matter what they have checked on the application.**

In short, the ethnic codes on the Summary Sheet will come from:
- Demographic fields the candidate checked on the application
- Information the student supplied when registering for College Board tests

- **CITIZENSHIP CODE / COUNTRY OF CITIZENSHIP:** Please verify the citizenship code and country of citizenship for each applicant. There are four options on the application that can be checked: (1) U.S. Citizenship, (2) U.S. Dual Citizenship, (3) U.S. permanent resident and (4) "Other" or foreign citizen.

The applicant holds only American citizenship.

*APP:* The box "U.S citizen" is checked with no other country of citizenship listed.

*SUMMARY SHEET:* Should read "CITZ: United States of America"

The applicant is a dual U.S. citizen, (a citizen of both the U.S. and another country).

*APP:* The box "U.S./dual U.S. citizen" is checked with another country listed to the right.

*SUMMARY SHEET:* Should read "CITZ: United States/<other country>"

The applicant is a U.S. Permanent Resident.

*APP:* The box "U.S. Permanent Resident" is checked with another country listed.

*SUMMARY SHEET:* Should read "CITZ: PERM RES / <other country>"

*Caveat:* If an applicant has checked the U.S. Permanent Resident box but notes that his or her application for permanent residency (or "green card") is pending, that applicant should be recoded as "Other citizenship." We must prepare an I-20 form if the applicant is admitted and the application for residency is still pending, and the citizenship code is the only way we know to do this.

The applicant is a foreign citizen.

*APP:* The box "Other citizenship" is checked with a foreign country listed to the right.

*SUMMARY SHEET:* Should read "CITZ: <other country>"

**PLEASE NOTE:** The accuracy of our citizenship coding is CRUCIAL. Miscoding affects many of the important statistics we are required to compile (including ethnicity), and we need to keep careful track of who needs a visa to study in the

2

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

HARV00018543

**JA5135**
DX025.0092

United States.

- **SCHOOL CODE:** If an applicant is coded to the wrong school, please fill out a school code update form and leave the form, along with the folder, in the school code update basket located in the fileroom annex. If the student needs to be read by the chair, first readers should pass the folder on to the chair along with the school code update form, so that the student will be coded out in a timely fashion and the chair will know to submit the folder for recoding. If the required recoding alters the docket and first reader assignment, please turn the folder in immediately and indicate that fact on the school code update form, so that the operations team can ensure that the interview is reassigned to the appropriate club and group and the folder is passed along to the appropriate reader.

- **SEX:** Occasionally the gender designation reported on the Common Application is coded incorrectly in our system. Such a coding error should be corrected. Please note that gender coding is optional and in the case of an applicant who does not designate a gender on the Common Application, any previous gender designation by that applicant (on tests, etc.) will override a blank gender designation.

- **COMMUTER:** Readers should use "C" (commuter) or "R" (resident).

- **LINEAGE:** Folders are occasionally coded incorrectly. Use the UPDATE/PROFILE sheet to change parents' college and/or graduate school. In the case of an H/R College son or daughter, the folder should be read by WRF, following the normal reading process, if the decision might require special handling or if another reading might be helpful.

- **FACULTY, STAFF:** Code <u>ONLY</u> children of professors at <u>the Faculty of Arts and Sciences</u> as an "F"; children of faculty from other parts of the University as well as children of administrative staff should be coded "S" on the UPDATE/PROFILE sheet. **Please be careful to apply faculty and staff coding where appropriate as we need to keep accurate statistics on these applicants. All "F" and "S" folders should be sent to WRF after the normal reading process has been completed.**

- **ACCESSIBLE EDUCATION OFFICE (AEO) REFERRALS:** Code all applicants who may require special accommodations due to disabilities or special needs with the AEO flag on the UPDATE/PROFILE sheet. We can then provide a list to assist the AEO and FDO in providing accommodations when appropriate.

- **ATHLETE:** Use the number "7" to alert coaches to an athlete with potential to play for Harvard. Be sure the appropriate sport is listed as the first extracurricular activity. **DO NOT CHANGE ANY PRE-CODED ATHLETE.**

3

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

- **SCORES:** We hope to relieve readers from having to update the scores of any applicant. Applicants will know by checking the website which scores are in our files. They can report scores (which will be marked 'unofficial') as they like. By the time you are reading, we hope the vast majority of applicants will have checked the website and updated tests. They will be reminded to do so in the acknowledgement letter.

  You can check scores by logging in to the alum portal:

  https://admapp.admissions.fas.harvard.edu/hanevo/alumni-loginHA.do?fp

  Once on the welcome page, you will find a link, (located on the left frame) named "Find Applicants." When chosen, the link takes you to the FAS PIN system login page where you will enter your HUID and FAS PIN. Once your HUID is validated, you will be routed to a search page, allowing you to search for applicants, displaying the results in committee screen fashion. Scores are available beneath the searched applicant.

  You should almost never need to update scores. If you do, they will merely be another set of unofficial tests. Applicants are on notice that they are responsible for changing 'unofficial' to 'official,' which they can only do by getting scores sent by CEEB/ACT. Paper copies of scores sent via fax, email attachment or U.S. mail are not considered official.

  **If, however, you have a case with no scores on the reader sheet that you feel is worth committee discussion, enter the scores as unofficial on the UPDATE/PROFILE sheet. If the scores appear on the transcript, bring the folder to KAH who will be able to note them, mark them as unofficial, and verify them later.**

  We receive secure web downloads of scores, so we do not have to wait for the scores to be mailed to us. Applicants are told not to use 'rush reports,' but if they do, they will arrive electronically as soon as they are scored.

- **FERPA:**
  This year we will be importing the applicant's FERPA selection as indicated on the Secondary School Report (SSR), alleviating the need for readers to record the FERPA selection. The import is intended to capture all online submitted SSR FERPA selections. A final spot-check on the admitted class (waitlist and deferred included) will then be performed, updating applicant files as needed.

4

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

HARV00018545

**JA5137**
DX025.0094

## II.    CODING GUIDELINES FOR SUMMARY SHEETS

All readers must code a preliminary overall rating, a profile, the school support, and the interview(s) (using the codes below and pluses and minuses). Writing prose comments is left to the discretion of the reader.

Overall
1. Tops for admission:  Exceptional – a clear admit with very strong objective and subjective support (90+% admission).
2. Strong credentials but not quite tops (50-90% admission).
3. Solid contender: An applicant with good credentials and support (20-40% admission).
4. Neutral: Respectable credentials.
5. Negative: Credentials are generally below those of other candidates.
6. Unread.

First readers should code "threes" (and "fours" if they wish on occasion) as follows:

3+=673:  Someone for whom late information could easily lead to admission
3  =683:  Standard strong, but could be admitted if substantial new info elevates the case.
3-=693:  Solid but would need unusually strong new information to make it.
4+=x74:
Etc.
X=6 if coded out by the first reader, otherwise it is the third reader's rating. The 7,8,9 rating can be used by the first or third reader, the latter's reading superseding that of the first reader. No overall ratings should be changed in the meetings, but others may be updated.

Academic
1. Summa potential. Genuine scholar; near-perfect scores and grades (in most cases) combined with unusual creativity and possible evidence of original scholarship.
2. Magna potential: Excellent student with superb grades and mid-to high-700 scores (33+ ACT).
3. Cum laude potential: Very good student with excellent grades and mid-600 to low-700 scores (29 to 32 ACT).
4. Adequate preparation. Respectable grades and low-to mid-600 scores (26 to 29) ACT).
5. Marginal potential. Modest grades and 500 scores (25 and below ACT).
6. Achievement or motivation marginal or worse.

Extracurricular, Community Employment, Family Commitments

5

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

HARV00018546

1. Unusual strength in one or more areas.  Possible national-level achievement or professional experience.  A potential major contributor at Harvard.  Truly unusual achievement.
2. Strong secondary school contribution in one or more areas such as class president, newspaper editor, etc.  Local or regional recognition; major accomplishment(s).
3. Solid participation but without special distinction. (Upgrade 3+ to 2- in some cases if the e/c is particularly extensive and substantive.)
4. Little or no participation.
5. Substantial activity outside of conventional EC participation such as family commitments or term-time work (could be included with other e/c to boost the rating or left as a "5" if it is more representative of the student's commitment).
6. Special circumstances limit or prevent participation (e.g. a physical condition).

Athletic
1. Unusually strong prospect for varsity sports at Harvard, desired by Harvard coaches.
2. Strong secondary school contribution in one or more areas; possible leadership role(s).
3. Active participation.
4. Little or no interest.
5. Substantial activity outside of conventional EC participation such as family commitments or term-time work (could be included with other e/c to boost the rating or left as a "5" if it is more representative of the student's commitment).
6. Physical condition prevents significant activity.

Personal
1. Outstanding.
2. Very strong.
3. Generally positive.
4. Bland or somewhat negative or immature.
5. Questionable personal qualities.
6. Worrisome personal qualities.

School Support
1. Strikingly unusual support. "The best ever," "one of the best in x years," truly over the top.
2. Very strong support. "One of the best" or "the best this year."
3. Above average positive support.
4. Somewhat neutral or slightly negative.
5. Negative or worrisome report.
6. Neither the transcript nor prose is in the folder.
9. Transcript only. No SSR prose.

6

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

HARV00018547

<u>PLEASE NOTE</u>: Support is coded teacher one, teacher two, then counselor. Teacher three and teacher four are optional, if applicable.

**GPA and GPA Scale:**

The Academic Index is now calculated using GPA and GPA Scale. Therefore, the area person must provide a GPA AND GPA Scale for each applicant. These will be converted automatically to the 20 to 80 scale in NEVO.

Here are the rules according to the AI instructions:

1. **<u>GPAs generally</u>:** The secondary school GPA should be taken as presented on the secondary school transcript; when both unweighted and weighted GPAs are presented, the unweighted GPA should be used. (If there is a question as to whether the school is using an unweighted or weighted system, the scale should be defined as unweighted, based on what the A grade earns in a regular course.)

2. **<u>GPA scales and conversions from Table II</u>:** Table II, the "CGS General Conversion Table" (formerly Table III, the values are unchanged), should be used for the GPA scales shown (100-points, 11.0/12.0, 7.0, 6.0, 4.0, A-D) even if the transcript or secondary school profile provides a conversion to a Table II scale.

3. **<u>"High" GPA systems</u>:** Although some secondary school transcripts show that GPAs may be routinely higher than the nominal highest grade on the scale, it is difficult to generalize about these practices. For example, especially with regard to schools that use 4.0 scales, there are high schools in which a high percentage of GPAs may be above 4.0 but also schools in which the highest GPA achieved is routinely far below 4.0. For 2011-12, Table II will continue to provide, based on experience across the league to date, that for some scales the highest nominal GPA will have a CGS below 80 and for others a CGS of 80 will begin at the highest nominal GPA.

4. **<u>Scales not provided on Table II</u>:** Given the relatively small number of admitted and matriculated students for whom Table II scales are not provided, it is preferable not to create new scales if possible. In such cases, a GPA on a 4.0 scale should be calculated using the following formula, and a CGS then derived using the 4.0 scale on Table II: HSGPA/HSGPA scale = "x"/4.0, where "x" becomes the value from which the CGS is derived. For example, if on a 5.0 scale a student has a 4.8 GPA (whether the scale's top grade is A or A+), the formula is $4.8/5.0 = x/4.0$. $X=3.84$ and the CGS = 73.

*This calculation will be done automatically in NEVO when you provide the GPA and GPA Scale used by the school.*

7

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

HARV00018548

5. **Calculating GPA when not provided by the secondary school:** When the secondary school does not calculate/report a GPA, the institution should calculate an unweighted GPA based on the secondary school's grading scale, using all courses for which grades and credit hours are provided, and weighting semester grades as one-half full-year grades. ***Enter the GPA and GPA Scale on the update/profile sheet.***

6. **GPA period:** GPA data always should be for more than one year, including 10th and 11th grades, 9th grade when available, and official trimester or semester grades (as opposed to midterm grades) in the student's current year if available at the time the decision is made. If "official" grades from the current year are available but are not counted in the school's cumulative GPA, they should be added to the cumulative GPA and weighted appropriately: e.g., grades for first semester or trimester of senior year would be weighted as one-half or one-third year, respectively. *

7. **GPAs from multiple schools and repeat years:** When a student has attended multiple secondary schools (including a post-graduate year), all GPAs provided by the schools should be used to the extent possible (see #5 above when a school has not provided a GPA) and weighted as in #6 above. If the institution believes this result is not logical and fair, it should describe what approach it believes is better, subject to the Ivy League Admissions Committee's agreement.

8. **For applicants from Canada:** For a Canadian GPA where the passing grade is 50%, add 15 points to the academic average before determining the CGS. If the passing grade is 60% add 10 points. If the passing grade is 70%, add nothing. ***Please add the extra points to the GPA before entering the results on the update/profile sheet – ie.. for a GPA of 86 where 50% is passing, 101 should be entered in GPA.***

9. Follow the procedures listed below for AI calculations for students from schools that do not follow the American curricular system.

**"International School" AI calculations**
For all national curricula, unless specified otherwise elsewhere, include all courses as part of the GPA calculations.
**Generally:** Except as provided here, each school should calculate GPAs from international schools as it seems most appropriate; such calculations then should be

---

* When institutions calculate "final" all-class AI data for full admit cohorts in the spring and matriculant cohorts in the fall, athletes' AIs should be calculated in the same manner as non-athletes' AIs so that all AIs in the cohort data are calculated identically. The athlete's individually reported AI will continue to be the AI used at the time s/he received a likely or admissions decision, unless later testing or GPA information raised the AI (see E-8 below).

8

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY                                        HARV00018549

**JA5141**
DX025.0098

reviewed during the spring meetings to determine what standardization might be agreed on. Institutions are encouraged to circulate questions during the year to determine what other institutions are doing and if a consensus exists that could or should be followed.

1. **International Baccalaureate Systems:**
   Use the following equivalents to calculate a GPA:

   7 = A+ = 4.3
   6 = A = 4.0
   5 = B = 3.0
   4 = C = 2.0
   3 = D = 1.0

   - If the applicant is taking a gap year, actual two-year IB results are used.
   - In the absence of final marks, use predicted marks. If predicted marks are not available, use internal grades.
   - For IB schools in the U.S., use the course values given on the transcript; for IB schools outside the U.S., double the weight for Higher Level courses as opposed to the Standard Level courses.
   - Use the same standards for "domestic" applicants as to "academic" versus "all" courses.

2. **British systems:**
   Count all GCSE (= O Level), AS and A level results in order to calculate a GPA:

   A* (same as A+) = 4.3
   A = 4.0
   B = 3.0
   C = 2.0
   D = 1.0

   - If the applicant is taking a gap year, actual A-Level results should be used.
   - A Level grades are given double the weight of AS and GCSE grades.
   - Internal grades are usually not available and should <u>not</u> be used if they are.
   - In the absence of final marks, predicted A-Level grades should be used when available.

3. **Pre-U Program (New British System)**
   Use only Principal Subjects with the following conversions for British Pre-U programs:

   D1 = A+/4.3
   D2 = A+/4.3
   D3 = A/4.0
   M1 = B+/3.3

9

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

HARV00018550

M2 = B/3.0
M3 = B-/2.7
P1 = C-/1.7
P2 = D/1.0
P3 = D-/0.7

## 4. Singapore schools following standard JC grading conventions

Include H1 (GP, Project, etc.) & H2 predictions on a 4.0 scale to calculate GPA.

Double weight for H2 marks.  For H3, the scale is:

- Distinction = A/4.0
- Merit = B/3.0
- Pass = C/2.0

Double H3s as well.  If provided, include O Level/GCSE marks in calculation of GPA with a single weight like we do with the British System.

## 5. Australia

Push schools for a transcript of some sort.  If all else fails and you are given the state final exam result or prediction (ex: UAI for NSW, OP for Queensland), use that.

## 6. New Zealand

For courses in which there is the possibility to get more than a grade of Achieved:

- Excellent = A/4.0
- Merit = B/3.0
- Achieved = C/2.0
- Not Achieved = F/0

For courses graded only Achieved/Not Achieved, we will consider these the same as Pass/Fail, so a mark of Achieved will not be included when calculating GPA.

**TABLE II : Used for calculating Converted Gradepoint Score (CGS)**

| Percentage Average | 11.0/12.0 Scale Average | 7.0 Scale Average | 6.0 Scale Average | 4.0 Scale Average | Letter Grade Equivalent to 4.0 | CGS |
|---|---|---|---|---|---|---|
| 98.00 and above | 12.00 and above | 7.00 and above | 6.00 and above | 4.30 and above | A+ | 80 |
| 97.00 - 97.99 | 11.70 - 11.99 | 6.70 - 6.99 | 5.70 - 5.99 | 4.20 - 4.29 | | 79 |
| 96.00 - 96.99 | 11.40 - 11.69 | 6.40 - 6.69 | 5.40 - 5.69 | 4.10 - 4.19 | | 78 |
| 95.00 - 95.99 | 11.00 - 11.39 | 6.00 - 6.39 | 5.00 - 5.39 | 4.00 - 4.09 | A | 77 |

10

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY                HARV00018551

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| 94.00 - 94.99 | 10.70 - 10.99 | 5.90 - 5.99 | 4.90 - 4.99 | 3.90 - 3.99 | | | 75 |
| 93.00 - 93.99 | 10.40 - 10.69 | 5.80 - 5.89 | 4.80 - 4.89 | 3.80 - 3.89 | | | 73 |
| 92.00 - 92.99 | 10.00 - 10.39 | 5.70 - 5.79 | 4.70 - 4.79 | 3.70 - 3.79 | A- | | 71 |
| 91.00 - 91.99 | 9.80 - 9.99 | 5.60 - 5.69 | 4.60 - 4.69 | 3.60 - 3.69 | | | 70 |
| 90.00 - 90.99 | 9.50 - 9.79 | 5.50 - 5.59 | 4.50 - 4.59 | 3.50 - 3.59 | | | 69 |
| 89.00 - 89.99 | 9.30 - 9.49 | 5.40 - 5.49 | 4.40 - 4.49 | 3.40 - 3.49 | | | 68 |
| 88.00 - 88.99 | 9.00 - 9.29 | 5.30 - 5.39 | 4.30 - 4.39 | 3.30 - 3.39 | B+ | | 67 |
| 87.00 - 87.99 | 8.70 - 8.99 | 5.20 - 5.29 | 4.20 - 4.29 | 3.20 - 3.29 | | | 66 |
| 86.00 - 86.99 | 8.40 - 8.69 | 5.10 - 5.19 | 4.10 - 4.19 | 3.10 - 3.19 | | | 65 |
| 85.00 - 85.99 | 8.00 - 8.39 | 5.00 - 5.09 | 4.00 - 4.09 | 3.00 - 3.09 | B | | 63 |
| 84.00 - 84.99 | 7.70 - 7.99 | 4.90 - 4.99 | 3.90 - 3.99 | 2.90 - 2.99 | | | 61 |
| 83.00 - 83.99 | 7.40 - 7.69 | 4.80 - 4.89 | 3.80 - 3.89 | 2.80 - 2.89 | | | 59 |
| 82.00 - 82.99 | 7.00 - 7.39 | 4.70 - 4.79 | 3.70 - 3.79 | 2.70 - 2.79 | B- | | 57 |
| 81.00 - 81.99 | 6.75 - 6.99 | 4.60 - 4.69 | 3.60 - 3.69 | 2.60 - 2.69 | | | 55 |
| 80.00 - 80.99 | 6.50 - 6.74 | 4.50 - 4.59 | 3.50 - 3.59 | 2.50 - 2.59 | | | 53 |
| 79.00 - 79.99 | 6.25 - 6.49 | 4.40 - 4.49 | 3.40 - 3.49 | 2.40 - 2.49 | | | 51 |
| 78.00 - 78.99 | 6.00 - 6.24 | 4.30 - 4.39 | 3.30 - 3.39 | 2.30 - 2.39 | C+ | | 49 |
| 77.00 - 77.99 | 5.70 - 5.99 | 4.20 - 4.29 | 3.20 - 3.29 | 2.20 - 2.29 | | | 48 |
| 76.00 - 76.99 | 5.40 - 5.69 | 4.10 - 4.19 | 3.10 - 3.19 | 2.10 - 2.19 | | | 47 |
| 75.00 - 75.99 | 5.00 - 5.39 | 4.00 - 4.09 | 3.00 - 3.09 | 2.00 - 2.09 | C | | 46 |
| 74.00 - 74.99 | 4.70 - 4.99 | 3.90 - 3.99 | 2.90 - 2.99 | 1.90 - 1.99 | | | 45 |
| 73.00 - 73.99 | 4.40 - 4.69 | 3.80 - 3.89 | 2.80 - 2.89 | 1.80 - 1.89 | | | 44 |
| 72.00 - 72.99 | 4.00 - 4.39 | 3.70 - 3.79 | 2.70 - 2.79 | 1.70 - 1.79 | C- | | 42 |
| 71.00 - 71.99 | 3.5 - 3.99 | 3.60 - 3.69 | 2.60 - 2.69 | 1.60 - 1.69 | | | 40 |
| 70.00 - 70.99 | 2.5 - 3.49 | 3.50 - 3.59 | 2.50 - 2.59 | 1.50 - 1.59 | D+ | | 38 |
| Below 70.00 | Below 2.5 | Below 3.5 | Below 2.5 | Below 1.50 | D | | 35 |

**INTERVIEWS**:
The final reader should also record the personal and overall ratings from the most credible staff and alumni interview reports in the folder.

**INTERVIEW PROFILE (IVP):**
Below is the language for uniform implementation of the Interview Profile number (IVP) for use with all Schools and Scholarship Chairs. The IVP will serve as a guide for Chairs to know when our office needs the reports, and therefore how quickly they need to be assigned. All interviewers will be told that they should submit their interview report no later than two weeks after receiving the interview assignment.

1. Please have interview report in as soon as possible.
2. Please have interview report in by the sub-committee deadline.
3. Please have interview report in by December 1 (EA) or March 1 (RD).
4. No additional information needed at this time.

This language has been distributed to the S&S chairs via email and can also be found in the updated handbook and website instructions. (Please ask Liz Adams if you need help accessing the site). **Please have a conversation with your chairs to determine if**

11

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

HARV00018552

**you wish to use the IVP, and please make clear that this information should not be shared with other interviewers or applicants.**  If your chairs have additional clerical or operational questions about the IVP, please direct them to email Liz at SSinfo@fas.harvard.edu.

When reading, please input your IVP code in the relevant spot on the purple code-out sheet.  If you are passing the folder to your chair and you decide that you need the interview ASAP in the meantime, please input your IVP on the orange sheet and hand that in separately.  **In this instance, still record the IVP on the purple sheet so that your chair knows what you have coded.  This will help the data entry team by minimizing the possibility of conflicting numbers.**

**PROSE COMMENTS:**
If the folder will <u>most likely</u> be discussed in Committee, first readers should note on the Summary Sheet important academic and extracurricular accomplishments that are particularly pertinent to the case.  It is also helpful to reference teacher reports or other items that may be crucial to our evaluation of the case.  In addition to numerical ratings, readers should try to summarize the strengths and weaknesses of the folder in brief paragraphs or comments.  Avoid slang and jargon and try to identify the special strength of the candidate, if any.  REMEMBER - your comments may be open to public view at a later time.

### III.    FOLDER ROUTING

**INADVERTENTLY CLEARED FOLDERS:**  Occasionally, folders will be mistakenly "cleared" (considered complete) and placed in your basket.  (The cause is usually an inappropriately pulled inventory card.)  The applicant will not know that the folder is still incomplete, because when he or she checks the application's status on-line, the database will indicate that the folder is complete.  Return the file to the Records Room and give it to Ian/Jenn with a note indicating what is missing.   Do not place wrongly cleared folders into the misfile box. Any material that is misfiled in a folder should be put in the misfile box <u>as soon as possible</u>. The misfile will often be critical to clearing another folder.

**FOLDERS SHOULD BE READ AND PASSED IN A TIMELY FASHION:** Readers should take care to not allow folders to pile up.  First readers need to read folders from all assigned dockets as they clear, not just those whose subcommittee meets first.  <u>This is important, and we will monitor reading progress centrally.</u>  If you need help keeping up for whatever reason, let us know immediately.  Readers should place their

12

HARV00018553

**JA5145**
DX025.0102

completed folders immediately in the basket of the next reader or in the code-out box in the Fileroom Annex.  First-time readers will have a separate code-out box.

**SECOND READERS**: Except by new readers (for whom special routing instructions are provided below), second readings should be used only in the rarest of instances:

    A)  If three readings are needed for a complex case.

    B)  If the case raises issues of policy.

    C)  If the case would be greatly helped by a second reading from the former area person or someone with special knowledge of an area or type of case.

No second reader will ordinarily be assigned.  If you want/need a second reading, consult the enclosed docket assignment sheet to identify other readers on your docket. Try not to burden one person inordinately.

**FIRST-TIME READERS**:  New readers should have their first fifty Early Action folders read by the docket chair as well as any other subsequent folders that might help instruct the new reader in future evaluations.

**GENERAL ROUTING RULES:**

1)  A folder should be passed <u>directly</u> to the third reader:

- If the first reader rates a folder a "2-" or better (ie. a case the first reader thinks should be admitted)

- If the folder will definitely (or almost definitely) be discussed in Committee.

- If you want the third reader's opinion or want simply to have the third reader informed about the case. (Such cases probably should be coded out first.)

    **If the first reader has a significant degree of uncertainty about how to proceed with the case, he or she should consult the docket chair.**

2)  A case rated a 3+ may be coded out or passed to the chair.  The first reader should consider carefully the likelihood that additional anticipated information (e.g., a superior music rating) will make the case more compelling, in which case the folder should be passed to the chair.  If there is no further information anticipated and the case is qualitatively a 3+ (a strong case but like many others), an experienced first reader can code out.

13

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

**JA5146**

DX025.0103

3) Typically a case rated a "3" or less with no particular attribute that would make it competitive can be coded out. Obviously late information or school context could change this initial evaluation.  The first reader, as an advocate, must be doubly certain to check all late information that might make a difference to the case prior to the Committee meetings.  This is particularly important for candidates whose outstanding personal qualities become evident once we have the alumni/ae interview.

Readers new to a docket should feel free to discuss with the docket chair any special guidelines about which folders should be passed on and which folders should be coded out.

All UPDATE/PROFILE sheets should be completed **FULLY (WITH INK IN LEGIBLE FORM)**, pulled from the folder, and returned to the appropriate boxes in Fileroom Annex.

Each folder includes an UPDATE/PROFILE sheet with complete names and high school information so most readers will not have to code these.  However, if you need to fill out a blank sheet, **PLEASE WRITE THE <u>COMPLETE NAME OF THE APPLICANT AS WELL AS THE SCHOOL NAME AND YOUR INITIALS</u> ON A BLANK SHEET AVAILABLE FROM THE FILEROOM ANNEX.**

**SPECIAL READINGS**

- WRF should see cases that could be particularly sensitive or controversial or that raise issues of fundamental policy.

- Folders of <u>competitive</u> candidates who attended secondary school outside the U.S. and Canada may be passed on to the appropriate U or V docket area person or RMW if help in assessing foreign credentials is needed. Be selective- don't pass on a folder unless you are sure the applicant is both competitive and appealing or has some <u>unusual</u> attributes.

- Faculty readings will be done after the folder has been coded out.  A memorandum will be distributed later regarding specific procedures.

- Slides/tapes/CDs/DVDs of <u>clearly competitive</u> candidates with an unusually strong talent may be passed on to appropriate staff/faculty.  Handling of this material will be addressed through memoranda over the course of the fall.


**IV.    <u>ECONOMICALLY DISADVANTAGED APPLICANTS</u>**

14

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

HARV00018555

**JA5147**

DX025.0104

It has long been a priority for Harvard to seek talented students from all backgrounds, including those extraordinary individuals who are able to transcend economic disadvantages and achieve unusual academic distinction. The College Board Descriptor Plus Data is a new search technique that helps to identify through "geodemographic" means outstanding students who appear to come from less affluent communities and socioeconomic backgrounds. A student from the Access Success data search will have a "Y" printed on the reader sheet next to "HFAI Search?"

- **DISAD?**
  **After thoroughly reviewing the folder, if you believe the applicant is from a very modest economic background, please code a "Y" in the "Disad?" (for staff identified disadvantaged) section on the Reader and Update Sheets.** In the past, admitted students who had been staff identified as "Disadvantaged=Y" were found to be economically needy 78% of the time.

  In addition to the HFAI Search flag, we have included other parameters to help with your evaluation of the applicant's economic background. These can be found in the box located in the upper right of the summary sheet. They are:

- **FEE PAID:** Y or N

- **FEE WAIVED:** Y or N  Note: In the past, applying for a fee waiver has been a reliable indicator of high economic need 89% of the time.

  *Please note: In addition to the fee waiver forms we currently accept, we now include waivers issued by Expanding College Opportunities (ECO). ECO is a research initiative aimed at increasing the number of high-achieving, low-income students who apply to selective colleges and universities

- **HRP_REQUESTED_INFO:** Since the summer of 2005, a postcard describing the Harvard Financial Aid Initiative has been included within all search letters mailed to students. Students interested in learning more about financial aid at Harvard were asked to return the postcard or sign up online in order to be contacted by HFAI student coordinators during the summer and fall. If a student has returned the postcard from the search, or has otherwise contacted the HFAI office specifically for information about the program, they will also have a "Y" next to the "HRP_Requested_Info" designation on the reader sheet.

- **HRP:** This is a rating assigned by the students from HFAI and UMRP based on the quality of phone conversations they had over the summer. The ratings will be A, B or C. The student coordinators are supposed to provide a write-up for

15

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

HARV00018556

**JA5148**
DX025.0105

only those student conversations to which they assigned A's (Tops) and C's (Not so great). These ratings do not indicate level of need.

### V.    OTHER ITEMS

- <u>Acknowledgments to guidance counselors, teachers, and others</u>:  The area person may occasionally feel it worthwhile to acknowledge unusually helpful TRs and SSRs by writing a note to the author.  The acknowledgment should bear in mind that the candidate may or may not be admitted.  **Supplementary letters of recommendation may have already been acknowledged with a card or letter, but if not, particularly with recommenders who are alumni or others about whom Harvard might be concerned, you should call the letter to the attention of MEM or WRF and an acknowledgment will be sent.**

- <u>Support Materials:</u> ALL support material should be dropped into the appropriate bucket in the mailroom for sorting and scanning.

- <u>Misfiled and missing materials</u>:  Please write "misfile" on top of any material that has been mistakenly filed into the wrong folder and return it to the misfile box in the Fileroom Annex.  If a teacher report, school report or any other material that would be helpful to a competitive candidate is missing, first readers should request a copy be re-sent. Folders should be sent on to other readers unless the missing pieces are crucial.  In such cases, first readers should hold onto the file and check the red folder.

- <u>Folder items that require attention</u>:  Unanswered letters should be handled by first readers where appropriate.

- <u>Fee Waivers</u>: Any requests for a fee waiver should **not** be removed from the folder. However, if a fee waiver request is in the folder and was not recorded, you should add it to the special notes on the purple Profile sheet.

- <u>Twins</u>:  Twins may confound our score file.  Please be extra careful in checking and in assigning scores in these cases.

### VI.    SCANNING, INDEXING AND THE NOLIJ CONNECT DOCUMENT VIEWER

16

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY                                    HARV00018557

As you know, we have incorporated an image scanning and document viewer system into the admissions process. The system is intended to ease access to documents that have been digitally downloaded and printed but not yet filed into the applicant folder. A second process is also in place and designed to capture documents that are mailed, emailed, faxed or hand delivered. Once these documents are scanned into the system, the document viewer (nolij connect) delivers an electronic copy of the document to your desktop. In the event a critical document is not in the physical folder, more than likely it will be in the image system.

We have added a basket in the mailroom to collect and sort documents received. The forms collected in these baskets should have content that is *specific* to the admission decision of the applicant and are marked as such. For example, mailed applications or supplements, letters of support, teacher reports, Harvard eval, (coach, arts, music, Harvard faculty), midyear reports, SSR's etc. So you know, we don't scan everything sent to us. There is a specific bin called "non-scannable materials." Meg Senuta manages the scanning process and Haley Frampton manages the mailroom/sorting process. Both are able to answer questions about document types if the need arises.

Documents displayed in the viewer are named by the document type. A list of those types are displayed below:
- Application
- Application Supplement
- Personal Essay
- Coach Eval
- Faculty Eval
- Arts and Music Eval
- Fee Waiver
- Interviews (alum)
- Staff Interviews
- Dean/Director Letters
- Likely Letter
- Final Report
- Letters of Support
- Midyear
- Reader Sheet
- SSR
- SSR Part II
- Counselor Eval
- Transcript
- School Profile
- Home School Supplement
- Teacher Report.

17

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

HARV00018558

**JA5150**
DX025.0107

F

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY                    HARV00018559

| Class of 2015 - Overall | | | | | | |
|---|---|---|---|---|---|---|
| | Apps | Admits | Ad Rate | Waitlists | WL Admits** | WL Ad Rate |
| Overall | 34950 | 2188 | 6.3% | 3172 | 31 | 1.0% |
| | | | | | | |
| Asian Americans | 7310 | 385 | 5.3% | 784 | 2 | 0.3% |
| - India | 1781 | 60 | 3.4% | 180 | 1 | 0.6% |
| - Pakistan | 260 | 10 | 3.8% | 14 | 1 | 7.1% |
| - Other Indian Subcontinent | 177 | 9 | 5.1% | 13 | 0 | 0.0% |
| - China | 2570 | 179 | 7.0% | 328 | 0 | 0.0% |
| - Japan | 361 | 20 | 5.5% | 35 | 0 | 0.0% |
| - Korea | 963 | 60 | 6.2% | 126 | 0 | 0.0% |
| - Other East Asia | 315 | 20 | 6.3% | 40 | 0 | 0.0% |
| - Philippines | 412 | 9 | 2.2% | 30 | 0 | 0.0% |
| - Vietnam | 406 | 25 | 6.2% | 24 | 0 | 0.0% |
| - Other SE Asia | 360 | 17 | 4.7% | 29 | 0 | 0.0% |
| | | | | | | |
| White Americans | 14895 | 1082 | 7.3% | 1686 | 22 | 1.3% |
| | | | | | | |
| ** WL Admit numbers included in Admits | | | | | | |
| | | | | | | |

Please note that because the total number of applicants in a particular self-designated group is often small, a minor change in the actual number of students admitted from that group can cause the percentages to vary noticeably.

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

HARV00018560

**JA5152**

DX025.0109

G

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

HARV00018561

| Class of 2015 - C Docket | | | | | | |
|---|---|---|---|---|---|---|
| | Apps | Admits | Ad Rate | Waitlists | WL Admits** | WL Ad Rate |
| C Docket | 2071 | 117 | 5.6% | 183 | 1 | 0.5% |
| | | | | | | |
| Asian Americans | 664 | 37 | 5.6% | 75 | 0 | 0.0% |
| - India | 59 | 1 | 1.7% | 8 | 0 | 0.0% |
| - Pakistan | 10 | 0 | 0.0% | 1 | 0 | 0.0% |
| - Other Indian Subcontinent | 11 | 2 | 18.2% | 0 | 0 | 0.0% |
| - China | 265 | 18 | 6.8% | 35 | 0 | 0.0% |
| - Japan | 70 | 3 | 4.3% | 7 | 0 | 0.0% |
| - Korea | 133 | 9 | 6.8% | 16 | 0 | 0.0% |
| - Other East Asia | 40 | 1 | 2.5% | 10 | 0 | 0.0% |
| - Philippines | 68 | 1 | 1.5% | 3 | 0 | 0.0% |
| - Vietnam | 49 | 3 | 6.1% | 4 | 0 | 0.0% |
| - Other SE Asia | 43 | 1 | 2.3% | 2 | 0 | 0.0% |
| | | | | | | |
| White Americans | 758 | 39 | 5.1% | 85 | 1 | 1.2% |
| | | | | | | |
| ** WL Admit numbers included in Admits | | | | | | |
| | | | | | | |

Please note that because the total number of applicants in a particular self-designated group is often small, a minor change in the actual number of students admitted from that group can cause the percentages to vary noticeably.

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

HARV00018562

**JA5154**
DX025.0111

H

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

HARV00018563

| Class of 2015 - NLNA Overall | | | | | | |
|---|---|---|---|---|---|---|
| | Apps | Admits | Ad Rate | Waitlists | WL Admits** | WL Ad Rate |
| | | | | | | |
| NLNA Overall | 34008 | 1846 | 5.4% | 2894 | 29 | 1.0% |
| | | | | | | |
| Asian Americans | 7225 | 353 | 4.9% | 764 | 2 | 0.3% |
| - India | 1777 | 58 | 3.3% | 179 | 1 | 0.6% |
| - Pakistan | 260 | 10 | 3.8% | 14 | 1 | 7.1% |
| - Other Indian Subcontinent | 175 | 8 | 4.6% | 13 | 0 | 0.0% |
| - China | 2526 | 167 | 6.6% | 316 | 0 | 0.0% |
| - Japan | 341 | 11 | 3.2% | 32 | 0 | 0.0% |
| - Korea | 953 | 56 | 5.9% | 122 | 0 | 0.0% |
| - Other East Asia | 329 | 17 | 5.2% | 38 | 0 | 0.0% |
| - Philippines | 405 | 5 | 1.2% | 29 | 0 | 0.0% |
| - Vietnam | 405 | 24 | 5.9% | 24 | 0 | 0.0% |
| - Other SE Asia | 359 | 17 | 4.7% | 29 | 0 | 0.0% |
| | | | | | | |
| White Americans | 14193 | 840 | 5.9% | 1467 | 20 | 1.4% |
| | | | | | | |
| ** WL Admit numbers included in Admits | | | | | | |
| | | | | | | |

Please note that because the total number of applicants in a particular self-designated group is often small, a minor change in the actual number of students admitted from that group can cause the percentages to vary noticeably.

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

HARV00018564

**JA5156**
DX025.0113

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

HARV00018565

**JA5157**

DX025.0114

| Class of 2015 - NLNA C Docket | | | | | | |
|---|---|---|---|---|---|---|
| | Apps | Admits | Ad Rate | Waitlists | WL Admits** | WL Ad Rate |
| C Docket | 2031 | 104 | 5.1% | 168 | 1 | 0.6% |
| | | | | | | |
| Asian Americans | 656 | 35 | 5.3% | 73 | 0 | 0.0% |
| - India | 58 | 1 | 1.7% | 7 | 0 | 0.0% |
| - Pakistan | 10 | 0 | 0.0% | 1 | 0 | 0.0% |
| - Other Indian Subcontinent | 11 | 2 | 18.2% | 0 | 0 | 0.0% |
| - China | 261 | 17 | 6.5% | 35 | 0 | 0.0% |
| - Japan | 68 | 3 | 4.4% | 6 | 0 | 0.0% |
| - Korea | 132 | 9 | 6.8% | 16 | 0 | 0.0% |
| - Other East Asia | 40 | 1 | 2.5% | 10 | 0 | 0.0% |
| - Philippines | 68 | 1 | 1.5% | 3 | 0 | 0.0% |
| - Vietnam | 48 | 2 | 4.2% | 4 | 0 | 0.0% |
| - Other SE Asia | 43 | 1 | 2.3% | 2 | 0 | 0.0% |
| | | | | | | |
| White Americans | 727 | 30 | 4.1% | 72 | 1 | 1.4% |
| | | | | | | |
| ** WL Admit numbers included in Admits | | | | | | |
| | | | | | | |
| Please note that because the total number of applicants in a particular self-designated group is often small, a minor change in the actual number of students admitted from that group can cause the percentages to vary noticeably. | | | | | | |

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

HARV00018566

**JA5158**

DX025.0115

J

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

HARV00018567

Admissions Committee Members Spring 2011

| NAME | TITLE | YEARS ON ADMISSIONS COMMITTEE | HIGHEST ACADEMIC DEGREE | ETHNICITY |
|---|---|---|---|---|
| ANDERSON, IAN | Senior Admissions Officer & Manager of Record, Mail and Transfer Operations | 9 | Master's Degree | White |
| BANKS, ROGER | Senior Admissions Officer & Director of Recruiting | 22 | Doctorate | African American |
| BEILENSON, VALERIE | Admissions Officer | 4 | Bachelor's Degree | White |
| CLARK, JESSICA | Admissions & Financial Aid Officer | 3 | Bachelor's Degree | White |
| DEL TORO-BROWN, MONICA | Admissions & Financial Aid Officer | 2 | Master's Degree | Hispanic |
| DONAHUE, SARAH | Director of Financial Aid | 14 | Bachelor's Degree | White |
| DORAN, DEVERY | Admissions Officer | 3 | Bachelor's Degree | Hispanic |
| EARLY, DANIELLE | Admissions Officer & Director of Internet Communications | 5 | Master's Degree | White |
| EBOIGBE, PRECIOUS | Admissions & Financial Aid Officer | 2 | Bachelor's Degree | African American |
| EGGART, ELISE | Admissions Officer | 4 | Master's Degree | White |
| EVANS, BRONWEN | Admissions & Financial Aid Officer | 1 | Master's Degree | White |

1

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY　　　　　　　　　　HARV00018568

**JA5160**

DX025.0117

**Admissions Committee Members Spring 2011**

| | | | | |
|---|---|---|---|---|
| EVANS, DAVID | Senior Admissions Officer | 41 | Master's Degree | African American |
| FABER, CHAD | Admissions & Financial Aid Officer | 4 | Master's Degree | White |
| FITZSIMMONS, WILLIAM | Dean of Admissions & Financial Aid | 37 | Doctorate | White |
| GALINDO, NATHALIE | Admissions Officer | 4 | Master's Degree | Hispanic |
| GANDY, JENNIFER | Senior Admissions Officer | 3 | Bachelor's Degree | White |
| GREEN, ROSEMARY | Special Senior Admissions Officer | 33 | Doctorate | White |
| HARTY, SALLY | Admissions Officer & Database Manager | 33 | Bachelor's Degree | White |
| HOMER, MARCY | Special Senior Admissions Officer | 30 | Bachelor's Degree | White |
| HOWRIGAN, KAITLIN | Senior Admissions Officer & Database Administrator | 4 | Bachelor's Degree | White |
| IRONS, JANET | Senior Admissions Officer & Senior Associate Director of Financial Aid | 28 | Master's Degree | White |
| KAUFMANN, JONATHAN | Senior Admissions Officer & Associate Director of Financial Aid | 9 | Master's Degree | White |
| KIM, CHARLENE | Admissions & Financial Aid Officer | 3 | Master's Degree | Asian American |

2

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

HARV00018569

**JA5161**

DX025.0118

Admissions Committee Members Spring 2011

| | | | | |
|---|---|---|---|---|
| KIRKCALDY, AMY | Admissions & Financial Aid Officer | 3 | Master's Degree | White |
| LOGAN, SEAN | Admissions Officer | 1 | Master's Degree | White |
| LOOBY, CHRISTOPHER | Admissions & Financial Aid Officer | 2 | Master's Degree | White |
| MAGNUSON, MARY | Senior Admissions Officer & Assistant Director of Financial Aid for Officer Oversight and Human Resources | 5 | Master's Degree | White |
| MASCOLO, CHRISTINE | Senior Admissions Officer | 10 | Master's Degree | White |
| MCGRATH, MARLYN | Director of Admissions | 24 | Doctorate | White |
| MEAS, SOPHIA | Admissions & Financial Aid Officer | 6 | Master's Degree | Asian American |
| MILLER, DWIGHT | Senior Admissions Officer | 44 | Master's Degree | White |
| ORTIZ, LUCERITO | Admissions Officer | 1 | Bachelor's Degree | Hispanic |
| PABST, ELIZABETH | Admissions Officer | 3 | Master's Degree | White |
| PAUTZ, JAMES | Admissions Officer | 5 | Master's Degree | White |

3

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

HARV00018570

**JA5162**

DX025.0119

**Admissions Committee Members Spring 2011**

| | | | | |
|---|---|---|---|---|
| RICE, RICK | Admissions Officer & Director of Information Systems in Financial Aid | 2 | Master's Degree | African American |
| SWIFT, MARGARET | Senior Admissions Officer & Director of Student Employment | 5 | Two Master's Degrees | White |
| VIDRA, KATHRYN | Senior Admissions Officer & Associate Director of Financial Aid | 27 | JD | White |
| WOODS, PARIS | Admissions & Financial Aid Officer | 1 | Master's Degree | African American |
| WORTH, ROBIN | Senior Admissions Officer & Director of International Admissions | 16 | Doctorate | White |

4

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

HARV00018571

**JA5163**
DX025.0120

K

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

HARV00018572

| Class of 2015 - Admits | |
|---|---|
| Median Ratings | |
| | |
| Academic | 2 |
| Extracurricular | 2 |
| Athletic | 3 |
| Personal | 2 |
| Teacher Report 1 | 2 |
| Teacher Report 2 | 2 |
| SSR - Guidance Counselor | 2 |
| Reader 1 Overall | 2 |

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

**JA5165**

DX025.0122

L

HARV00018574

**JA5166**
DX025.0123



Application to Harvard College for Fall 2011 Entrance

Harvard College  2010-2011

HARVARD

HARV00018575

**For Entrance in Fall 2011 • Application Materials** 

**Thank you for your interest in Harvard College. We know there are many fine colleges and universities from which to choose, and we are happy that you are looking closely at the exciting opportunities available here in Cambridge.**

Our admissions procedures are designed to give you maximum freedom and flexibility to present yourself in your own words. We hope you will respond in whatever ways you feel will best demonstrate your interests and accomplishments. Here are some recommendations we hope you will consider as you complete your application.

- Candidates may complete testing (SAT or ACT with writing and **two** SAT Subject Tests) by using the January SAT or the February ACT dates, but we urge you to have your testing completed by the December date. Please note that in order for your application to be considered complete, your official test scores must submitted directly to Harvard by the testing agency on your behalf.

- We no longer have an early admission program. Please refer to the next page for more information.

- Keep copies of all materials submitted and ask your teachers to do the same. Materials can be lost in the mail.

- Supplementary materials or portfolios may be submitted, but you should do so only if you have an unusual talent. Such materials are neither required nor expected as the required components of the application provide ample basis on which to make our decisions. Because we cannot return materials, applicants should send only duplicates.

- Write about what matters to you. There are no "right" essay topics and no "right" answers.

The answers to many questions about admissions requirements and deadlines are included on the following pages. For an expanded list of frequently asked questions and their answers, please consult the FAQ index on our website: *www.admissions.college.harvard.edu.*

Each admission decision is made without any regard for a candidate's financial need — a policy we call "need-blind admission." Indeed the Admissions Committee may respond favorably to evidence that a candidate has overcome significant obstacles, financial or otherwise. Once an applicant is admitted, we create an individual financial aid package that will enable that student's family to meet the cost of attendance. Providing financial access to Harvard for every admitted student is one of our highest priorities.

We hope you will take every opportunity to explore whether Harvard might be a good match for your academic, extracurricular and personal interests. Advice from your college counselor, your family and the many publications on college admission may help, as might a visit to Cambridge or a conversation with one of our more than 10,000 alumni/ae who help us recruit students in all 50 states and around the world.

Please let us know if we can be of assistance to you during the admissions process. Best wishes for a happy and productive year.


William R. Fitzsimmons
Dean of Admissions and Financial Aid

Marlyn McGrath
Director of Admissions

Sarah C. Donahue
Director of Financial Aid

HARV00018576

**JA5168**
DX025.0125

## For Entrance in Fall 2011 • Application Materials



### A Statement on Early Admission

Harvard College has eliminated its early admission program and has moved to a single application deadline of January 1. The change in policy, which builds on Harvard's efforts over the past several years to expand financial aid and increase openness in admissions, took effect for students who applied in the fall of 2007 for the freshman class entering in September 2008. To read more about the elimination of Early Action at Harvard College, please visit *www.admissions.college.harvard.edu/announcements/earlyadmission.html*.

## For Entrance in Fall 2011 • Application Instructions

### Application Timetable

#### IMMEDIATELY

**Please send:**

- **The Common Application or the Universal College Application.**
- **The $75 application fee or a fee waiver request.**

Without your Common Application/Universal Application, we cannot open your admission file, track supporting documents for your application, or send your name to our alumni/ae for a possible interview in your area.

The Short Answer about one of your activities, the Personal Essay and the Harvard Application Supplement may be sent at a later date.

#### DECEMBER 1

**We will begin our careful evaluation process on this date, reading applications in the order in which they are completed.**

Our alumni/ae interviewers would appreciate your sending the Common Application/Universal Application by this date to allow them to begin the interviewing process where possible.

We recognize that you and your secondary school teachers and counselors have many commitments that may preclude submission of your application materials by December 1. If so, please be assured that you will not be penalized in any way.

#### JANUARY 1

**Final deadline for all application materials.**

### Additional Dates to Consider

**January 22, 2011**
Last SAT Reasoning and Subject testing date.

**February 12, 2011**
Last ACT testing date.
Note: This test date is not available in New York.

**Early April 2011**
Decision letters mailed.

**May 1, 2011**
Reply date for admitted students. No deposit required.

### Applying to Harvard

#### Application Fee

Please attach the check or money order to the first page of the application and ensure that the applicant's name appears on the payment. You may also pay your application fee online with a credit card via the Common Application or the Universal College Application websites.

If paying the application fee would cause a hardship for your family, please request a fee waiver. You or your guidance counselor may use one of the official forms or may simply write a short letter, asking us to waive your fee.

#### Common Application and Universal Application

Harvard accepts the Common Application and the Universal College Application. Both will be treated equally by the Admissions Committee. Please choose one.

You may choose to send your Personal Statement and Short Answer on a separate piece of paper. If you do so, please write your full name, address, birthdate and high school on each page. Please avoid submitting materials in binders or folders.

If you do not receive acknowledgement of your application within two weeks of submitting your application, please write to *college@fas.harvard.edu* or call (617) 495-1551. This is very important, because applications can get lost in the mail.

Please note, we will not begin processing applications until October so the earliest you would receive an acknowledgement is mid-October.

#### School Report and Mid-Year School Report

Please give these forms to your school counselor or other school advisor and ask that the School Report form be completed and returned to our office as soon as possible. The Mid-Year Report should be returned in February 2011 with your latest grades.

If you have attended more than one high school in the past two years, give a second copy of the School Report to your former counselor(s) or school official to complete.

#### Teacher Evaluations

Give the **two** Evaluation forms to teachers in different academic subjects who know you well.

#### Standardized Testing

We require the *SAT Reasoning Test* or *ACT Test with Writing*, as well as **two** *SAT Subject Tests*. Students should not submit two Subject Tests in mathematics to meet this requirement. Candidates whose first language is not English should ordinarily not use a Subject Test in their first language to meet the two Subject Tests requirement.

HARV00018577

## For Entrance in Fall 2011 • Application Materials



Please see our website for further information. Students are free to use the College Board Score Choice option or the similar option offer by the ACT. Our official codes are **3434** for the College Board SAT Reasoning and Subject Tests and **1840** for the ACT.

When registering for tests, please use your name as it will appear on your Harvard application. Using a nickname may prevent your scores from matching up with the rest of your application in our database.

In order for your application to be considered complete, we must have your official test scores submitted directly to Harvard by the testing agency on your behalf. If we do not receive your official scores from the testing agency, we will be unable to make a decision on your file. Please plan accordingly.

Directions for sending your official scores to the admissions office can be found at *www.collegeboard.com/student/testing/sat/scores/sending.html* for the SAT and SAT Subject Tests and *www.actstudent.org/scores/send/* for the ACT. Harvard College official codes are 3434 for the SAT and 1840 for the ACT.

## After You Have Applied

### Personal Interview

When and where possible, applicants may be invited to meet with alumni/ae in or near their school communities. No candidate is at a disadvantage if an interview cannot be arranged.

### Contact Information Update

If you change your mailing address, phone number or e-mail address after submitting your application, please use the applicant status page to correct this information. If you do not have Internet access, please contact the Admissions Office by writing to *fileroom@fas.harvard.edu* and include the phrase "Contact Info Update" in the subject line.

Please be sure to include your full name, date of birth and name of high school when contacting the Admissions Office.

### Application Status Check

All applicants will receive an Application Access Code by e-mail. This code will allow you to check the status of your application materials online. We track applications, supplements, school reports, test scores and teacher evaluations. We do *not* track interviews, essays or supplemental letters of recommendation.

If you do not receive an Application Access Code message within two weeks of submitting your application, you may request your access code electronically by sending an e-mail to *admpin@fas.harvard.edu*. Please write "Access Code" in the subject line and your full name, date of birth and name of high school in the message body. We will send your Access Code to the e-mail address you included on your application.

Please note that we do not begin processing applications until October so the earliest you would receive your access code is mid-October.

To facilitate delivery, please alter your e-mail filters to allow messages from *college@fas.harvard.edu* and *fileroom@fas.harvard.edu* to reach your inbox.

### Application Updates

To send information updates to your application, please write to us or send an e-mail to *fileroom@fas.harvard.edu* with the phrase "Application Update" in the subject line. In the body of the message, please type

your full name and the information you would like to include in your file. We do not open e-mail attachments.

### Test Score Reporting Issues

If you have a concern regarding your standardized test scores as they appear on your status page, please send a brief message describing the issue to us at *scores@fas.harvard.edu*. Please be sure to include your full name, date of birth and name of high school in your message.

### Withdraw Your Application

To withdraw your application, please write to us or send an e-mail to *fileroom@fas.harvard.edu* with the word "Withdraw" in the subject line. In the message body, please type your full name, date of birth and name of high school. You will receive a confirmation via regular mail.

### E-Mail Decisions

You may indicate whether you would like to have your decision sent to you via e-mail. If you choose this option, please alter your e-mail filters to allow messages from *college@fas.harvard.edu* and *fileroom@fas.harvard.edu* to reach your inbox. An official decision letter will be sent via regular mail to all applicants who have received an e-mail notification.

## Applicants Outside the United States

If you are applying from a school outside the United States, you should follow the same procedures and timetables as candidates applying from schools within the U.S. Below we list a few special notes.

### Testing Requirements

Even if you are submitting the results of your school leaving exams (e.g., GCE A-levels, International Baccalaureate, Abitur, etc.) you must submit the results of the SAT Reasoning Test or the ACT (with Writing, if available), as well as the results of *two* SAT Subject Tests by the appropriate deadlines.

A candidate whose first language is *not* English should ordinarily *not* take the SAT Subject test in his or her native language as one of the two required SAT Subject Tests. All students are encouraged to submit additional Subject Tests (which may include one in a student's first language).

Students are not required to take the TOEFL unless they do not have access to other standardized tests.

### Interviews

While we try to make interviews widely available, it will not always be possible to arrange one abroad. In some countries, there are simply too many applicants for our alumni interviewers to see everyone. No candidate is at a disadvantage if an interview cannot be arranged. Please see our website to determine whether an interview is possible in your home country.

### Translations

We appreciate the effort that many applicants make in providing the Admissions Committee with a translation of the recommendations submitted on their behalf. We ask, however, that any translations

HARV00018578

## For Entrance in Fall 2011 · Application Materials



include the name of the translator and that the original untranslated reports be submitted as well.

### Application Fee

You may pay online by credit card via the Common Application or the Universal Application websites. Please be sure that your credit card has been activated for Internet transactions.

If paying by check, we ask that international applicants send us the application fee in the form of a foreign draft—that is, a check in U.S. dollars that is drawn through a U.S. bank, but is generally available at most foreign banks.

If you need to send the fee to us via wire transfer, please send an e-mail to *college@fas.harvard.edu* and we will send instructions on how to do so. Please be sure to include your full name, date of birth and name of high school in your message.

### For More Information

To request missing forms or other information, you may contact us through our website *www.admissions.college.harvard.edu/apply/ international/* or via e-mail: *intladm@fas.harvard.edu.*

## All Applicants

### Harvard Admission Policy

Harvard University makes all decisions concerning applicants, students, faculty and staff on the basis of the individual's qualifications to contribute to Harvard's educational objectives and institutional needs.

Discriminating against individuals on the basis of race, color, gender, sexual orientation, religion, age, national or ethnic origin, political beliefs, veteran status or disability unrelated to course requirements is inconsistent with the purposes of a university and with the law.

### Misrepresentation of Credentials

Occasionally, a candidate for admission will make inaccurate statements or submit false material in connection with his or her application. In most cases, these misrepresentations are discovered during the admission process and the application is rejected. If a misrepresentation is discovered after a candidate has been admitted, the offer of admission normally will be withdrawn.

If a misrepresentation is discovered after a student has registered, the offer of admission normally will be revoked and the student will be required to leave the College. If the discovery occurs after a degree has been awarded, the degree normally will be rescinded.

The determination that an application is inaccurate or contains misrepresentations rests solely with the Admissions Office and will be resolved outside the student disciplinary process.

## Financial Aid Timetable

### Immediately

Please review the financial aid application instructions found on the Prospective Students section of our website.

### February 1

Submit the initial components of your financial aid application, following the instructions found on the Prospective Students section of our website. We realize that you may not have access to your final 2010 tax information by this deadline and ask that you use the best available estimated figures.

### March 1

Final deadline for all application materials, including tax and income documentation.

## Helpful Application Checklist

Requirements for All Applicants:

☐ Official score report from the SAT Reasoning test or ACT with Writing component

☐☐ Official score reports from **two** SAT Subject Tests

☐ Common Application or Universal College Application

☐ Harvard Application Supplement

☐ Application fee of $75 or a request for a fee waiver

☐ Secondary School Report

and

☐ Mid-Year Report

☐☐ **Two** Teacher Evaluations

☐ Financial Aid Application (by February 1, if you plan to apply)

☐ Update address, phone and e-mail if recently changed

HARV00018579



THE **COMMON APPLICATION**
for Undergraduate College Admission

# 2010-11 FIRST-YEAR APPLICATION
**For Spring 2011 or Fall 2011 Enrollment**

## APPLICANT

Legal Name _____
*Last/Family/Sur (Enter name **exactly** as it appears on official documents.)     First/Given     Middle (complete)     Jr., etc.*

Preferred name, if not first name (choose only one) _____     Former last name(s), if any _____

Birth Date _____  ○ Female ○ Male     US Social Security Number, if any _____
*mm/dd/yyyy*     *Optional, unless applying for US Federal financial aid with the FAFSA form*

Preferred Phone ○ Home ○ Cell   Home (_____) _____   Cell (_____) _____
*Area Code*     *Area Code*

E-mail Address _____     IM Address _____

Permanent home address _____
*Number & Street*     *Apartment #*

_____
*City/Town     County/Parish     State/Province     Country     ZIP/Postal Code*

**If different from above**, please give your current mailing address for all admission correspondence.   (from _____ to _____)
*(mm/dd/yyyy)     (mm/dd/yyyy)*

Current mailing address _____
*Number & Street*     *Apartment #*

_____
*City/Town     County/Parish     State/Province     Country     ZIP/Postal Code*

If your current mailing address is a boarding school, include name of school here: _____

## FUTURE PLANS

Your answers to these questions will vary for different colleges.  If the online system did not ask you to answer some of the questions you see in this section, this college chose not to ask that question of its applicants.

College _____     Deadline _____
*mm/dd/yyyy*

Entry Term: ○ Fall (Jul-Dec)   ○ Spring (Jan-Jun)     Do you intend to apply for need-based financial aid?     ○ Yes ○ No

Decision Plan _____     Do you intend to apply for merit-based scholarships?     ○ Yes ○ No

Academic Interests _____     Do you intend to be a full-time student?     ○ Yes ○ No

_____     Do you intend to enroll in a degree program your first year?     ○ Yes ○ No

_____     Do you intend to live in college housing?     ○ Yes ○ No

Career Interest _____     What is the highest degree you intend to earn? _____

## DEMOGRAPHICS

Citizenship Status _____     1.  Are you Hispanic/Latino?

Non-US Citizenship _____     ○ Yes, Hispanic or Latino (including Spain) ○ No

_____     *Please describe your background* _____

_____     2.  Regardless of your answer to the prior question, please indicate how you identify
yourself. (Check all that apply.)

Years lived in the US? _____     ○ American Indian or Alaska Native (including all Original Peoples of the Americas)

Birthplace _____     Are you Enrolled? ○ Yes ○ No If yes, please enter Tribal Enrollment Number _____
*City/Town     State/Province     Country*     *Please describe your background* _____

First Language _____     ○ Asian (including Indian subcontinent and Philippines)

Primary language spoken at home _____     *Please describe your background* _____

Are you proficient in any other languages? _____     ○ Black or African American (including Africa and Caribbean)

*Please describe your background* _____

**Optional** The items with a gray background are optional. No information you     ○ Native Hawaiian or Other Pacific Islander (Original Peoples)
provide will be used in a discriminatory manner.

*Please describe your background* _____

Marital Status _____

Religious Preference _____     ○ White (including Middle Eastern)

US Armed Services veteran? ○ Yes ○ No     *Please describe your background* _____

© 2010 The Common Application, Inc.     AF-1/**2010-11**

HARV00018580

# FAMILY

Please list both parents below, even if one or more is deceased or no longer has legal responsibilities toward you. Many colleges collect this information for demographic purposes even if you are an adult or an emancipated minor. If you are a minor with a legal guardian (an individual or government entity), then please list that information below as well. If you wish, you may list step-parents and/or other adults with whom you reside, or who otherwise care for you, in the Additional Information section.

## Household

Parents' marital status (relative to each other):  ○ Never Married  ○ Married  ○ Widowed  ○ Separated  ○ Divorced (date _____)
_mm/yyyy_

With whom do you make your permanent home?  ○ Parent 1  ○ Parent 2  ○ Both  ○ Legal Guardian  ○ Ward of the Court/State  ○ Other

**Parent 1:** ○ Mother  ○ Father  ○ Unknown

Is Parent 1 living?  ○ Yes  ○ No  (Date Deceased _____)
_mm/yyyy_

| | | | |
|---|---|---|---|
| _Last/Family/Sur_ | _First/Given_ | _Middle_ | _Title (Mr./Ms./Dr., etc.)_ |

Country of birth _____

Home address **if different** from yours

_____

_____

Preferred Phone:  ○ Home  ○ Cell  ○ Work

(_____) _____
_Area Code_

E-mail _____

Occupation _____

Employer _____

College (if any) _____ CEEB _____

Degree _____ Year _____

Graduate School (if any) _____ CEEB _____

Degree _____ Year _____

**Parent 2:** ○ Mother  ○ Father  ○ Unknown

Is Parent 2 living?  ○ Yes  ○ No  (Date Deceased _____)
_mm/yyyy_

| | | | |
|---|---|---|---|
| _Last/Family/Sur_ | _First/Given_ | _Middle_ | _Title (Mr./Ms./Dr., etc.)_ |

Country of birth _____

Home address **if different** from yours

_____

_____

Preferred Phone:  ○ Home  ○ Cell  ○ Work

(_____) _____
_Area Code_

E-mail _____

Occupation _____

Employer _____

College (if any) _____ CEEB _____

Degree _____ Year _____

Graduate School (if any) _____ CEEB _____

Degree _____ Year _____

## Legal Guardian _(if other than a parent)_

Relationship to you _____

| | | | |
|---|---|---|---|
| _Last/Family/Sur_ | _First/Given_ | _Middle_ | _Title (Mr./Ms./Dr., etc.)_ |

Home address **if different** from yours

_____

_____

Preferred Phone:  ○ Home  ○ Cell  ○ Work

(_____) _____
_Area Code_

E-mail _____

Occupation _____

Employer _____

College (if any) _____ CEEB _____

Degree _____ Year _____

Graduate School (if any) _____ CEEB _____

Degree _____ Year _____

## Siblings

Please give names and ages of your brothers or sisters. If they have attended or are currently attending college, give the names of the undergraduate institution, grade level, degree earned, and approximate dates of attendance. If more than three siblings, please list them in the Additional Information section.

| _Name_ | _Age & Grade_ | _Relationship_ |
|---|---|---|

College Attended _____ CEEB _____

Degree earned _____ Dates _____
or expected  _mm/yyyy – mm/yyyy_

| _Name_ | _Age & Grade_ | _Relationship_ |
|---|---|---|

College Attended _____ CEEB _____

Degree earned _____ Dates _____
or expected  _mm/yyyy – mm/yyyy_

| _Name_ | _Age & Grade_ | _Relationship_ |
|---|---|---|

College Attended _____ CEEB _____

Degree earned _____ Dates _____
or expected  _mm/yyyy – mm/yyyy_

© 2010 The Common Application, Inc.

AP-2/2010-11

HARV00018581

# EDUCATION

**Secondary Schools**

Current or most recent secondary school attended _____

Entry Date _____ Graduation Date _____    School Type: ○ Public  ○ Charter  ○ Independent  ○ Religious  ○ Home School
         *mm/yyyy*                    *mm/dd/yyyy*

Address _____    CEEB/ACT Code _____
         *Number & Street*

_____
*City/Town*          *State/Province*     *Country*                    *ZIP/Postal Code*

Counselor's Name (Mr./Ms./Dr., etc.) _____    Counselor's Title _____

E-mail _____    Phone (____) _____    Fax (____) _____
                          *Area Code    Number    Ext.*        *Area Code    Number*

List all other secondary schools you have attended since ninth grade, including summer schools or enrichment programs hosted on a secondary school campus:

| School Name & CEEB/ACT Code | Location (City, State/Province, ZIP/Postal Code, Country) | Dates Attended (mm/yyyy) |
|---|---|---|
| | | |
| | | |

*Please list any community program/organization that has provided free assistance with your application process:* _____

If your secondary school education was or will be interrupted, please indicate here and provide details in the Additional Information section: _____

**Colleges & Universities**  List all colleges you have attended since ninth grade, including summer schools or enrichment programs hosted on a college campus.

| College/University Name & CEEB/ACT Code | Location (City, State/Province, ZIP/Postal Code, Country) | Degree Candidate? Yes No | Dates Attended mm/yyyy – mm/yyyy | Degree Earned |
|---|---|---|---|---|
| | | ○ ○ | | |
| | | ○ ○ | | |
| | | ○ ○ | | |

# ACADEMICS

The self-reported information in this section is not intended to take the place of your official records. Please note the requirements of each institution to which you are applying and arrange for official transcripts and score reports to be sent from your secondary school and the appropriate testing agencies. Where "Best Scores" are requested, please report the highest individual scores you have earned so far, even if those scores are from different test dates.

**Grades**  Class Rank _____ Class Size _____ Weighted? ○ Yes ○ No    GPA _____ Scale _____ Weighted? ○ Yes ○ No
                      *(if available)*                                       *(if available)*

**ACT**  Exam Dates: _____ _____ _____    Best Scores:
         *(past & future)*  *mm/yyyy*  *mm/yyyy*  *mm/yyyy*    *(so far)*   COMP _____ *mm/yyyy*   Eng _____ *mm/yyyy*   Math _____ *mm/yyyy*
                                                                Read _____ *mm/yyyy*   Science _____ *mm/yyyy*   Writing _____ *mm/yyyy*

**SAT**  Exam Dates: _____ _____ _____    Best Scores:
         *(past & future)*  *mm/yyyy*  *mm/yyyy*  *mm/yyyy*    *(so far)*   CritRead _____ *mm/yyyy*   Math _____ *mm/yyyy*   Writing _____ *mm/yyyy*

**TOEFL/**  Exam Dates: _____ _____ _____    Best Score:
**IELTS**  *(past & future)*  *mm/yyyy*  *mm/yyyy*  *mm/yyyy*    *(so far)*   Test _____ Score _____ *mm/yyyy*

**AP/IB/SAT**  Best Scores:
**Subjects**  *(per subject, so far)* *mm/yyyy*   Type & Subject _____ Score _____ *mm/yyyy*   Type & Subject _____ Score _____
                        *mm/yyyy*   Type & Subject _____ Score _____ *mm/yyyy*   Type & Subject _____ Score _____
                        *mm/yyyy*   Type & Subject _____ Score _____ *mm/yyyy*   Type & Subject _____ Score _____
                        *mm/yyyy*   Type & Subject _____ Score _____ *mm/yyyy*   Type & Subject _____ Score _____

**Current Courses**  Please indicate title, level (AP, IB, advanced honors, etc.) and credit value of all courses you are taking this year. Indicate quarter classes taken in the same semester on the appropriate semester line.

| First Semester/Trimester | Second Semester/Trimester | Third Trimester *or additional first/second term courses if more space is needed* |
|---|---|---|
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |

© 2010 The Common Application, Inc.                                              AP-3/2010-11

HARV00018582

**JA5174**
DX025.0131

**Honors** Briefly list any academic distinctions or honors you have received since the 9ᵗʰ grade or international equivalent (e.g. National Merit, Cum Laude Society).

| Grade level or post-graduate (PG) | | | | | Honor | Level of Recognition | | | |
|---|---|---|---|---|---|---|---|---|---|
| 9 | 10 | 11 | 12 | PG | | School | State/ Regional | National | Inter- national |
| ○ | ○ | ○ | ○ | ○ | _____ | ○ | ○ | ○ | ○ |
| ○ | ○ | ○ | ○ | ○ | _____ | ○ | ○ | ○ | ○ |
| ○ | ○ | ○ | ○ | ○ | _____ | ○ | ○ | ○ | ○ |
| ○ | ○ | ○ | ○ | ○ | _____ | ○ | ○ | ○ | ○ |
| ○ | ○ | ○ | ○ | ○ | _____ | ○ | ○ | ○ | ○ |

## EXTRACURRICULAR ACTIVITIES & WORK EXPERIENCE

**Extracurricular** Please list your **principal** extracurricular, volunteer, and work activities **in their order of importance to you.** Feel free to group your activities and paid work experience separately if you prefer. Use the space available to provide details of your activities and accomplishments (specific events, varsity letter, musical instrument, employer, etc.). **To allow us to focus on the highlights of your activities, please complete this section even if you plan to attach a résumé.**

| Grade level or post-graduate (PG) | | | | | Approximate time spent | | When did you participate in the activity? | | Positions held, honors won, letters earned, or employer | If applicable, do you plan to participate in college? |
|---|---|---|---|---|---|---|---|---|---|---|
| 9 | 10 | 11 | 12 | PG | Hours per week | Weeks per year | School year | Summer/ School Break | | |
| ○ | ○ | ○ | ○ | ○ | _____ | _____ | ○ | ○ | _____ | ○ |

Activity _____

| ○ | ○ | ○ | ○ | ○ | _____ | _____ | ○ | ○ | _____ | ○ |

Activity _____

| ○ | ○ | ○ | ○ | ○ | _____ | _____ | ○ | ○ | _____ | ○ |

Activity _____

| ○ | ○ | ○ | ○ | ○ | _____ | _____ | ○ | ○ | _____ | ○ |

Activity _____

| ○ | ○ | ○ | ○ | ○ | _____ | _____ | ○ | ○ | _____ | ○ |

Activity _____

| ○ | ○ | ○ | ○ | ○ | _____ | _____ | ○ | ○ | _____ | ○ |

Activity _____

| ○ | ○ | ○ | ○ | ○ | _____ | _____ | ○ | ○ | _____ | ○ |

Activity _____

| ○ | ○ | ○ | ○ | ○ | _____ | _____ | ○ | ○ | _____ | ○ |

Activity _____

| ○ | ○ | ○ | ○ | ○ | _____ | _____ | ○ | ○ | _____ | ○ |

Activity _____

| ○ | ○ | ○ | ○ | ○ | _____ | _____ | ○ | ○ | _____ | ○ |

Activity _____

| ○ | ○ | ○ | ○ | ○ | _____ | _____ | ○ | ○ | _____ | ○ |

Activity _____

| ○ | ○ | ○ | ○ | ○ | _____ | _____ | ○ | ○ | _____ | ○ |

Activity _____

© 2010 The Common Application, Inc. AP-4 / 2010-11

HARV00018583

**JA5175**
DX025.0132

## WRITING

**Short Answer** Please briefly elaborate on one of your extracurricular activities or work experiences in the space below or on an attached sheet (150 words or fewer).

_____

_____

_____

**Personal Essay** Please write an essay (250 words minimum) on a topic of your choice or on one of the options listed below, and attach it to your application before submission. **Please indicate your topic by checking the appropriate box.** This personal essay helps us become acquainted with you as a person and student, apart from courses, grades, test scores, and other objective data. It will also demonstrate your ability to organize your thoughts and express yourself. NOTE: Your Common Application essay should be the same for all colleges. Do not customize it in any way for individual colleges. Colleges that want customized essay responses will ask for them on a supplement form.

○ ❶ Evaluate a significant experience, achievement, risk you have taken, or ethical dilemma you have faced and its impact on you.

○ ❷ Discuss some issue of personal, local, national, or international concern and its importance to you.

○ ❸ Indicate a person who has had a significant influence on you, and describe that influence.

○ ❹ Describe a character in fiction, a historical figure, or a creative work (as in art, music, science, etc.) that has had an influence on you, and explain that influence.

○ ❺ A range of academic interests, personal perspectives, and life experiences adds much to the educational mix. Given your personal background, describe an experience that illustrates what you would bring to the diversity in a college community, or an encounter that demonstrated the importance of diversity to you.

○ ❻ Topic of your choice.

**Additional Information** If there is any additional information you'd like to provide regarding special circumstances, additional qualifications, etc., please do so in the space below or on an attached sheet.

_____

_____

_____

_____

### Disciplinary History

① Have you ever been found responsible for a disciplinary violation at any educational institution you have attended from 9th grade (or the international equivalent) forward, whether related to academic misconduct or behavioral misconduct, that resulted in your probation, suspension, removal, dismissal, or expulsion from the institution? ○ Yes ○ No

② Have you ever been adjudicated guilty or convicted of a misdemeanor, felony, or other crime? ○ Yes ○ No
Note that you are not required to answer "yes" to this question, or provide an explanation, if the criminal adjudication or conviction has been expunged, sealed, annulled, pardoned, destroyed, erased, impounded, or otherwise ordered by a court to be kept confidential.

If you answered yes to either or both questions, please attach a separate sheet of paper that gives the approximate date of each incident, explains the circumstances, and reflects on what you learned from the experience.

## SIGNATURE

**Application Fee Payment** If this college requires an application fee, how will you be paying it?
○ Online Payment ○ Will Mail Payment ○ Online Fee Waiver Request ○ Will Mail Fee Waiver Request

**Required Signature**

☐ I certify that all information submitted in the admission process—including the application, the personal essay, any supplements, and any other supporting materials—is my own work, factually true, and honestly presented, and that these documents will become the property of the institutions to which I am applying and will not be returned to me. I understand that I may be subject to a range of possible disciplinary actions, including admission revocation or expulsion, should the information I have certified be false.

☐ I acknowledge that I have reviewed the application instructions for each college receiving this application. I understand that all offers of admission are conditional, pending receipt of final transcripts showing work comparable in quality to that upon which the offer was based, as well as honorable dismissal from the school.

☐ I affirm that I will send an enrollment deposit (or equivalent) to only one institution; sending multiple deposits (or equivalent) may result in the withdrawal of my admission offers from all institutions. [Note: students may send an enrollment deposit (or equivalent) to a second institution where they have been admitted from the waitlist, provided that they inform the first institution that they will no longer be enrolling.]

Signature ✍ _____ Date _____
mm/dd/yyyy

> Common Application member institution admission offices do not discriminate on the basis of race, color, ethnicity, national origin, religion, creed, sex, age, marital status, parental status, physical disability, learning disability, political affiliation, veteran status, or sexual orientation.

© 2010 The Common Application, Inc.

AP-5/2010-11

HARV00018584

**For Entrance in Fall 2011 • Application Supplement**



Office of Admissions and Financial Aid
86 Brattle Street
Cambridge, MA 02138

Valid for entrance in September 2011 only. Please submit this form as well as the Common Application or the Universal College Application as soon as possible.

**Please return this form to us by December 1. The final deadline for all application materials is January 1.**

A completed application includes all portions of the Common Application or the Universal College Application, as well as the Harvard Application Supplement, required official testing results, a Secondary School Report, two Teacher Evaluations and a $75 application fee or fee waiver request.

Full legal name
Last/Family          First          Middle          Jr., etc.

Prefer to be called          Date of Birth
                                         (MM/DD/YYYY)

Address
No. and Street          Apt./Unit

City          State/Province          Country          Zip/Postal Code

Telephone Number

Secondary School          CEEB/ACT code

**If you can be reached by fax or e-mail, please provide a fax number or e-mail address and name of the contact person.**

Fax number          Contact person

E-mail address          Contact person

**Would you like your admission decision e-mailed to you? A decision letter will be sent via regular mail to all applicants.**

○ Yes          ○ No

**If you have previously applied for admission to Harvard, please indicate when and for which program you applied.**

○ College (first year)          ○ Summer School          ○ Extension School
Year(s) _____          Year(s) _____          Year(s) _____

Please forward the transcripts for any program in which you enrolled.

For the following question, please place the letter or number indicating your choice in the space provided.

**Of the following fields of study, which are you currently most likely to pursue?**

A  Social Sciences          E  Engineering
B  Humanities              F  Mathematics
C  Biological Sciences     G  Computer Science          First Choice _____
D  Physical Sciences

HARV00018585

**At this time, which two college activities or sports interest you most?**

Our office may send you e-mail announcements about the activities you designate here. These e-mails will be delivered to your e-mail address as provided on page one of the Common or Universal Application.

| | | |
|---|---|---|
| 01 Arts, Visual Arts | 15 Outdoor Activities | 29 Soccer |
| 02 Dramatics | 16 Baseball | 30 Softball |
| 03 Vocal Music | 17 Basketball | 31 Squash |
| 04 Band | 18 Crew–Heavyweight | 32 Swimming, Diving |
| 05 Orchestra | 19 Crew–Lightweight | 33 Tennis |
| 06 Writing / Literary Magazine | 20 Fencing | 34 Track, Cross-Country |
| 07 Journalism | 21 Field Hockey | 35 Volleyball |
| 08 Student Government | 22 Football | 36 Water Polo |
| 09 Debate | 23 Golf | 37 Wrestling |
| 10 Social Service | 24 Hockey | 38 Cheerleading |
| 11 Ethnic Groups | 25 Lacrosse | 39 Martial Arts |
| 12 Religious Groups | 26 Sailing | 40 MUN |
| 13 Political Groups | 27 Ski–Alpine | 41 Gender and Sexuality |
| 14 Dance | 28 Ski–Nordic Racing | |

First Choice _____  Second Choice _____  42 Other _____

**If a sport, indicate intended level of participation.**

○ Intercollegiate      ○ Intercollegiate

○ Club / Intramural / Recreational      ○ Club / Intramural / Recreational

While we recognize that many students' plans change during their college years, we ask you to respond to the following questions (please choose one rating per question):

**How definite do you consider your academic plans to be?**

absolutely certain   1    2    3    4    5    very likely to change

**How definite do you consider your vocational plans to be?**

absolutely certain   1    2    3    4    5    very likely to change

**How definite are your extracurricular and/or athletic interests?**

absolutely certain   1    2    3    4    5    very likely to change

**Please list the cities and countries where you have lived, with years of residence in each.**

_____

_____

_____

_____

**Which languages other than English can you speak, read or write?** (Please indicate with S, R or W.)

_____

_____

_____

**Teacher Evaluations**

This application includes two Teacher Evaluation forms. After completing your portion of the forms, you should give them to teachers in *different academic subjects* who know you well and preferably have taught you during your final two years of school. As a courtesy to your teachers, you might provide them with stamped envelopes addressed to Harvard Admissions.

**To help us check for completeness of your application, please list your teachers' names.**

_____      _____

Teacher Evaluation 1      Teacher Evaluation 2

**OPTIONAL**

*We do not expect or require applicants to submit supplementary materials or additional essays. We simply want to be certain that you have every opportunity to tell us about yourself.*

Harvard Supplement: Side 2 of 3

HARV00018586

**Supplementary Materials**

The required components of the application to Harvard provide an ample basis to make our admission decisions. However, students with exceptional talents or achievements may send music recordings, slides of artwork or selected samples of academic work (e.g., creative writing) for us to consider as part of their application files. At the discretion of the Admissions Committee, submissions may be evaluated by faculty. Supplementary materials are not required or expected—and should be sent only if the applicant's work is unusually advanced. Because we cannot return such materials, applicants should send only duplicates. For more information, please visit our website: *www.admissions.college.harvard.edu/apply/application_process/supplements.html.*

Check here if you are planning to send supplementary materials to be evaluated as part of your application. Please send all supplementary materials to the Admissions Office so that they can be properly labeled and included in your file. DO NOT submit materials directly to academic departments. If you are submitting research materials for review, please include a short statement putting the research project into the context of your academic interests and future plans and clearly indicate the research advisor (if any) with whom you have worked.

○ Academic work

Name of Research Advisor _____ Title (if any) _____

Name of Institution (if any) _____ Phone or E-mail _____

○ Music tape or CD*      ○ Slides of artwork      ○ Other

Instrument _____      Media _____      (Explain) _____

*\*Please note that CD format is preferred, but tapes will still be evaluated. Do not send video recordings of musical performances or recitals.*

**Additional Essays**

Occasionally, students feel that college application forms do not provide a sufficient opportunity to convey important information about themselves or their accomplishments. If you wish to include an additional essay, you may do so.

**Possible Topics:**

- Unusual circumstances in your life
- Travel or living experiences in other countries
- Books that have affected you the most
- An academic experience (course, project, paper or research topic) that has meant the most to you
- A list of books you have read during the past twelve months

FOR STUDENTS APPLYING FROM SCHOOLS OUTSIDE THE U.S. AND CANADA (Regardless of Citizenship)

**SIGNATURE**

Name _____    Date _____    Printed Name _____

Harvard Supplement: Side 3 of 3

HARV00018587

**JA5179**

DX025.0136



# 2010-11 SECONDARY SCHOOL REPORT  SR

### For Spring 2011 or Fall 2011 Enrollment

## TO THE APPLICANT

After completing all the relevant questions below, give this form to your secondary school counselor or another school official who knows you better. **If applying via mail,** please also give that school official stamped envelopes addressed to each institution that requires a Secondary School Report.

○ Female
○ Male

Legal Name _____
    *Last/Family/Sur* (Enter name *exactly* as it appears on official documents.)    *First/Given*    *Middle (complete)*    *Jr., etc.*

Birth Date _____  Social Security # _____
    *mm/dd/yyyy*    *(Optional)*

Address _____
    *Number & Street*    *Apartment #*    *City/Town*    *State/Province*    *Country*    *ZIP/Postal Code*

School you now attend _____  CEEB/ACT Code _____

**Current year courses—please indicate title, level (AP, IB, advanced honors, etc.) and credit value of all courses you are taking this year. Indicate quarter classes taken in the same semester on the appropriate semester line.**

First Semester/Trimester    Second Semester/Trimester    Third Trimester
    *or additional first/second term courses if more space is needed*

_____    _____    _____
_____    _____    _____
_____    _____    _____
_____    _____    _____
_____    _____    _____
_____    _____    _____
_____    _____    _____

**IMPORTANT PRIVACY NOTE:** By signing this form, I authorize all schools that I have attended to release all requested records covered under the Federal Educational Rights and Privacy Act (FERPA) so that my application may be reviewed by the Common Application member institution(s) to which I am applying. I further authorize the admission officers reviewing my application, including seasonal staff employed for the sole purpose of evaluating applications, to contact officials at my current and former schools should they have questions about the school forms submitted on my behalf.

I understand that under the terms of the FERPA, after I matriculate I will have access to this form and all other recommendations and supporting documents submitted by me and on my behalf after matriculating, unless at least one of the following is true:

1. The institution does not save recommendations post-matriculation *(see list at www.commonapp.org/FERPA).*
2. I waive my right to access below, regardless of the institution to which it is sent:
○ Yes, I do waive my right to access, and I understand I will never see this form or any other recommendations submitted by me or on my behalf.
○ No, I do *not* waive my right to access, and I may someday choose to see this form or any other recommendations or supporting documents submitted by me or on my behalf to the institution at which I'm enrolling, if that institution saves them after I matriculate.

Required Signature ✍ _____  Date _____

## TO THE SECONDARY SCHOOL COUNSELOR

Attach applicant's official transcript, including courses in progress, a school profile, and transcript legend. (Check transcript copies for readability.) Use both pages to complete your evaluation for this student. **Be sure to sign below.**

Counselor's Name (Mr./Ms./Dr., etc.) _____
    *Please print or type*

Signature ✍ _____  Date _____
    *mm/dd/yyyy*

Title _____  School _____

School Address _____
    *City/Town*    *State/Province*    *Country*    *ZIP/Postal Code*

Counselor's Phone (_____) _____  Counselor's Fax (_____) _____
    *Area Code*    *Number*    *Ext.*    *Area Code*    *Number*

Secondary school CEEB/ACT code _____  Counselor's E-mail _____

© 2010 The Common Application, Inc.    SR-1/2010-11

HARV00018588

**Background Information**

Class Rank _____ Class Size _____ Covering a period from _____ to _____
*(mm/yyyy)* *(mm/yyyy)*

The rank is ○ weighted ○ unweighted. How many students share this rank? _____

○ We do not rank. Instead, please indicate quartile _____ quintile _____ decile _____

Cumulative GPA: _____ on a _____ scale, covering a period from _____ to _____
*(mm/yyyy)* *(mm/yyyy)*

This GPA is ○ weighted ○ unweighted. The school's passing mark is _____

Highest GPA in class _____ Graduation Date _____
*(mm/dd/yyyy)*

Percentage of graduating class immediately attending: _____ four-year _____ two-year institutions

How many courses does your school offer:
AP _____ IB _____ Honors _____
If school policy limits the number a student may take, please list the maximum allowed:
AP _____ IB _____ Honors _____
Is the applicant an IB Diploma candidate? ○ Yes ○ No
Are classes taken on a block schedule? ○ Yes ○ No
In comparison with other college preparatory students at your school, the applicant's course selection is:
○ most demanding
○ very demanding
○ demanding
○ average
○ below average

How long have you known this student and in what context? _____

What are the first words that come to your mind to describe this student? _____

**Ratings** Compared to other students in his or her class year, how do you rate this student in terms of:

| No basis | | Below average | Average | Good (above average) | Very good (well above average) | Excellent (top 10%) | Outstanding (top 5%) | One of the top few I've encountered (top 1%) |
|---|---|---|---|---|---|---|---|---|
| | Academic achievement | | | | | | | |
| | Extracurricular accomplishments | | | | | | | |
| | Personal qualities and character | | | | | | | |
| | OVERALL | | | | | | | |

**Evaluation** Please provide comments that will help us differentiate this student from others. Feel free to attach an additional sheet or another reference you've prepared for this student. We especially welcome a broad-based assessment and encourage you to consider describing or addressing:
- The applicant's academic, extracurricular, and personal characteristics.
- Relevant context for the applicant's performance and involvement, such as particularities of family situation or responsibilities, after-school work obligations, sibling childcare, or other circumstances, either positive or negative.
- Observed problematic behaviors, perhaps separable from academic performance, that an admission committee should explore further.

① Has the applicant ever been found responsible for a disciplinary violation at your school from 9th grade (or the international equivalent) forward, whether related to academic misconduct or behavioral misconduct, that resulted in the applicant's probation, suspension, removal, dismissal, or expulsion from your institution? ○ Yes ○ No

② To your knowledge, has the applicant ever been adjudicated guilty or convicted of a misdemeanor, felony, or other crime? ○ Yes ○ No
Note that you are not required to answer "yes" to this question, or provide an explanation, if the criminal adjudication or conviction has been expunged, sealed, annulled, pardoned, destroyed, erased, impounded, or otherwise ordered to be kept confidential by a court.

If you answered yes to either or both questions, please attach a separate sheet of paper or use your written recommendation to give the approximate date of each incident and explain the circumstances.

○ **Check here if you would prefer to discuss this applicant over the phone with each admission office.**

**I recommend this student:** ○ No basis ○ With reservation ○ Fairly strongly ○ Strongly ○ Enthusiastically

● 2010 The Common Application, Inc.

SR-2/**2010-11**

HARV00018589

**JA5181**
DX025.0138

**For Entrance in Fall 2011** • School Report Part II



Office of Admissions and Financial Aid                    Please return this form by January 1.
86 Brattle Street
Cambridge, MA 02138

Applicant's Name: _____
                        Please Print

Date of Birth: _____
             (MM/DD/YYYY)

Secondary School: _____    CEEB/ACT Code: _____

### To Counselor or School Head:

We have provided this supplement to the Common Application School Report to give secondary schools the opportunity to offer further information about their students. You may have already provided this information in your report; we are happy to accept letters or photocopied reports and ask only that you staple them to this form. We recognize that not all parts of this form apply equally to all schools, and we understand that many counselors face extraordinarily demanding workloads. We are extremely grateful for your help in assisting students in the transition from secondary school to college.

Representatives of schools outside the U.S. and Canada should refer to additional notes and directions provided on the back page of this form.

The purpose of this recommendation is to assist the Admissions Committee in making a decision and, if the applicant enrolls, to aid in making rooming assignments and to assist the student in other ways. Because inadequate information can sometimes diminish a student's chances for admission, a full and candid report is essential. We ask, therefore, for careful ratings and comments about character and ability by a school official who knows the student well. Your report will be read thoroughly by admissions officers and later reviewed by the Admissions Committee as it votes on the student's case.

**The Transcript**

You may send us any legible transcript form or academic record that your school currently uses. A school profile, including a brief explanation of your grading system, would be especially welcome. The transcript should provide at least the following information:

• **Courses taken, years taken and grades, including courses failed or repeated.**

• **Courses currently in progress.**

• **Indication of honors, accelerated and Advanced Placement courses (if applicable).**

• **Test results, such as SAT Reasoning Test, SAT Subject Tests, ACT, AP, IB and PSAT.**

• **Schools abroad are asked to submit the results or predicted results from their examinations, such as the Abitur, IB and GCE A-Levels.**

#### Numerical Rank in Class

We understand that some schools, as a matter of policy, do not rank their students. However, the Committee feels that it must have some indication of how the student has performed relative to classmates in order to reach a good decision. *We appreciate your cooperation in noting class size and class rank as nearly as possible.* (If precise rank is not available, please estimate decile or give some other indication.)

**Financial Aid**

If the candidate is a U.S. citizen or permanent resident and is planning to apply for financial aid, please direct him or her to immediately apply for federal financial aid, including the Pell Grant and for state awards to which the student is entitled if he or she meets the criteria outlined by the participating states (i.e., Connecticut, District of Columbia, Maine, Maryland, Massachusetts, New Hampshire, Pennsylvania, Rhode Island and Vermont).

International applicants should be encouraged to complete the Financial Statement for Students from Foreign Countries form and to visit the Financial Aid Office website: *www.fao.fas.harvard.edu* to learn more about our financial aid policies and programs.

**Disciplinary Actions**
**and Voluntary Leaves**            ○ Yes            ○ No

If in the past three years the student has incurred serious or repeated disciplinary action or has ever been dismissed, suspended or separated from school, or placed on probation, or has ever been away from school for a period of more than two weeks, including a leave of absence, other than school vacations or due to illness, please check yes above and explain on a separate sheet. (Please note that we ask the same question of the student and need confirmation and explanation of any such circumstance.) If after you have submitted this form, new circumstances alter the student's status at school, you should notify us as soon as possible.

School Report: Side 3 of 4

HARV00018590

## JA5182
DX025.0139

**Additional General Ratings**

| | No basis for judgement | Average or below | Good | Excellent (next 10% this year) | Outstanding (top 10% this year) | One of the top few I have encountered in my career |
|---|---|---|---|---|---|---|
| Intellectual curiosity | ○ | ○ | ○ | ○ | ○ | ○ |
| Intellectual creativity | ○ | ○ | ○ | ○ | ○ | ○ |
| Academic achievement | ○ | ○ | ○ | ○ | ○ | ○ |
| Academic promise | ○ | ○ | ○ | ○ | ○ | ○ |
| Leadership | ○ | ○ | ○ | ○ | ○ | ○ |
| Sense of responsibility | ○ | ○ | ○ | ○ | ○ | ○ |
| Self-confidence | ○ | ○ | ○ | ○ | ○ | ○ |
| Self-reliance | ○ | ○ | ○ | ○ | ○ | ○ |
| Warmth of personality | ○ | ○ | ○ | ○ | ○ | ○ |
| Sense of humor | ○ | ○ | ○ | ○ | ○ | ○ |
| Concern for others | ○ | ○ | ○ | ○ | ○ | ○ |
| Energy | ○ | ○ | ○ | ○ | ○ | ○ |
| Maturity | ○ | ○ | ○ | ○ | ○ | ○ |
| Initiative | ○ | ○ | ○ | ○ | ○ | ○ |
| Reaction to setbacks | ○ | ○ | ○ | ○ | ○ | ○ |
| Respect accorded by faculty | ○ | ○ | ○ | ○ | ○ | ○ |

**TO BE COMPLETED FOR STUDENTS APPLYING FROM SCHOOLS OUTSIDE THE U.S.**

The Admissions Committee realizes that some of the information requested is not readily available to you in the form commonly found in U.S. secondary schools. We appreciate your willingness to answer our questions as best you can. Please feel free to use or amend this form in any appropriate way.

Considering all the factors you feel may be relevant, how would you rate the applicant as a candidate for a university of the highest standing:

In your own country?

Abroad?

Please indicate the applicant's achievement on the examinations he or she has taken to date, in which subjects and at which levels will the applicant be examined immediately prior to leaving your school (such as A-Levels, Abitur and International Baccalaureate)? Also, please estimate, if possible, his or her probable performance on the examination: indicate estimate by "est".

School Report: Side 4 of 4

HARV00018591



THE **COMMON APPLICATION**
*for Undergraduate College Admission*

## 2010-11 TEACHER EVALUATION

**For Spring 2011 or Fall 2011 Enrollment**

**TE**

## TO THE APPLICANT

After completing all the relevant questions below, give this form to a teacher who has taught you an **academic** subject (for example, English, foreign language, math, science, or social studies). **If applying via mail**, please also give that teacher stamped envelopes addressed to each institution that requires a Teacher Evaluation.

Legal Name _____    ○ Female
　　　　　　*Last/Family/Sur (Enter name exactly as it appears on official documents.)    First/Given    Middle (complete)    Jr., etc.*    ○ Male

Birth Date _____    Social Security # _____
　　　　　　*mm/dd/yyyy*    *(Optional)*

Address _____
　　　　　*Number & Street    Apartment #    City/Town    State/Province    Country    ZIP/Postal Code*

School you now attend _____    CEEB/ACT Code _____

> **IMPORTANT PRIVACY NOTICE:** Under the terms of the Family Educational Rights and Privacy Act (FERPA), after you matriculate you *will* have access to this form and all other recommendations and supporting documents submitted by you and on your behalf after matriculating, unless at least one of the following is true:
> 1. The institution does not save recommendations post-matriculation *(see list at www.commonapp.org/FERPA).*
> 2. You waive your right to access below, regardless of the institution to which it is sent:
> ○ Yes, I do waive my right to access, and I understand I will never see this form or any other recommendations submitted by me or on my behalf.
> ○ No, I do *not waive* my right to access, and I may someday choose to see this form or any other recommendations or supporting documents submitted by me or on my behalf to the institution at which I'm enrolling, if that institution saves them after I matriculate.
> **Required Signature** ✍ _____    Date _____

## TO THE TEACHER

The Common Application membership finds candid evaluations helpful in choosing from among highly qualified candidates. You are encouraged to keep this form in your private files for use should the student need additional recommendations. Please submit your references promptly, **and remember to sign below.**

Teacher's Name (Mr./Ms./Dr., etc.) _____    Subject Taught _____
　　　　　　　　　　　　　　　*Please print or type*

Signature ✍ _____    Date _____
　　　　　　　　　　　　　　　　　　　　　　　　　　　　　　　　　　　　*mm/dd/yyyy*

Secondary School _____

School Address _____
　　　　　　*Number & Street    City/Town    State/Province    Country    ZIP/Postal Code*

Teacher's Phone (_____)_____    Teacher's E-mail _____
　　　　　　*Area Code    Number    Ext.*

### Background Information

How long have you known this student and in what context? _____

What are the first words that come to your mind to describe this student? _____

List the courses you have taught this student, noting for each the student's year in school (10th, 11th, 12th; first-year, sophomore; etc.) and the level of course difficulty (AP, IB, accelerated, honors, elective; 100-level, 200-level, etc.).

_____

_____

HARV00018592

## JA5184

DX025.0141

**Ratings** Compared to other students in his or her class year, how do you rate this student in terms of:

| No basis | | Below average | Average | Good (above average) | Very good (well above average) | Excellent (top 10%) | Outstanding (top 5%) | One of the top few I've encountered (top 1%) |
|---|---|---|---|---|---|---|---|---|
| | Academic achievement | | | | | | | |
| | Intellectual promise | | | | | | | |
| | Quality of writing | | | | | | | |
| | Creative, original thought | | | | | | | |
| | Productive class discussion | | | | | | | |
| | Respect accorded by faculty | | | | | | | |
| | Disciplined work habits | | | | | | | |
| | Maturity | | | | | | | |
| | Motivation | | | | | | | |
| | Leadership | | | | | | | |
| | Integrity | | | | | | | |
| | Reaction to setbacks | | | | | | | |
| | Concern for others | | | | | | | |
| | Self-confidence | | | | | | | |
| | Initiative, independence | | | | | | | |
| | OVERALL | | | | | | | |

**Evaluation** Please write whatever you think is important about this student, including a description of academic and personal characteristics, as demonstrated in your classroom. We welcome information that will help us to differentiate this student from others. (Feel free to attach an additional sheet or another reference you may have prepared on behalf of this student.)

HARV00018593

**JA5185**
DX025.0142



# 2010-11 TEACHER EVALUATION

**For Spring 2011 or Fall 2011 Enrollment**

TE

## TO THE APPLICANT

After completing all the relevant questions below, give this form to a teacher who has taught you an **academic** subject (for example, English, foreign language, math, science, or social studies). **If applying via mail**, please also give that teacher stamped envelopes addressed to each institution that requires a Teacher Evaluation.

Legal Name _____    ○ Female
          *Last/Family/Sur  (Enter name exactly as it appears on official documents.)*   *First/Given*   *Middle (complete)*   *Jr., etc.*   ○ Male

Birth Date _____  Social Security # _____
    *mm/dd/yyyy*   *(Optional)*

Address _____
    *Number & Street*   *Apartment #*   *City/Town*   *State/Province*   *Country*   *ZIP/Postal Code*

School you now attend _____  CEEB/ACT Code _____

---

**IMPORTANT PRIVACY NOTICE:** Under the terms of the Family Educational Rights and Privacy Act (FERPA), after you matriculate you *will* have access to this form and all other recommendations and supporting documents submitted by you and on your behalf after matriculating, unless at least one of the following is true:

1. The institution does not save recommendations post-matriculation *(see list at www.commonapp.org/FERPA).*
2. You waive your right to access below, regardless of the institution to which it is sent.

○ Yes, I do waive my right to access, and I understand I will never see this form or any other recommendations submitted by me or on my behalf.
○ No, I do *not waive* my right to access, and I may someday choose to see this form or any other recommendations or supporting documents submitted by me or on my behalf to the institution at which I'm enrolling, if that institution saves them after I matriculate.

**Required Signature** ✍ _____  Date _____

---

## TO THE TEACHER

The Common Application membership finds candid evaluations helpful in choosing from among highly qualified candidates. You are encouraged to keep this form in your private files for use should the student need additional recommendations. Please submit your references promptly, **and remember to sign below.**

Teacher's Name (Mr./Ms./Dr., etc.) _____  Subject Taught _____
    *Please print or type*

Signature ✍ _____  Date _____
    *mm/dd/yyyy*

Secondary School _____

School Address _____
    *Number & Street*   *City/Town*   *State/Province*   *Country*   *ZIP/Postal Code*

Teacher's Phone (_____) _____  Teacher's E-mail _____
    *Area Code*   *Number*   *Ext.*

### Background Information

How long have you known this student and in what context? _____

What are the first words that come to your mind to describe this student? _____

List the courses you have taught this student, noting for each the student's year in school (10th, 11th, 12th; first-year, sophomore; etc.) and the level of course difficulty (AP, IB, accelerated, honors, elective; 100-level, 200-level, etc.).

_____

© 2010 The Common Application, Inc.

TEACHER EVALUATION 2

TE-1/2010-11

HARV00018594

## JA5186
DX025.0143

**Ratings** Compared to other students in his or her class year, how do you rate this student in terms of:

| No basis | | Below average | Average | Good (above average) | Very good (well above average) | Excellent (top 10%) | Outstanding (top 5%) | One of the top few I've encountered (top 1%) |
|---|---|---|---|---|---|---|---|---|
| | Academic achievement | | | | | | | |
| | Intellectual promise | | | | | | | |
| | Quality of writing | | | | | | | |
| | Creative, original thought | | | | | | | |
| | Productive class discussion | | | | | | | |
| | Respect accorded by faculty | | | | | | | |
| | Disciplined work habits | | | | | | | |
| | Maturity | | | | | | | |
| | Motivation | | | | | | | |
| | Leadership | | | | | | | |
| | Integrity | | | | | | | |
| | Reaction to setbacks | | | | | | | |
| | Concern for others | | | | | | | |
| | Self-confidence | | | | | | | |
| | Initiative, independence | | | | | | | |
| | OVERALL | | | | | | | |

**Evaluation** Please write whatever you think is important about this student, including a description of academic and personal characteristics, as demonstrated in your classroom. We welcome information that will help us to differentiate this student from others. (Feel free to attach an additional sheet or another reference you may have prepared on behalf of this student.)

HARV00018595

**JA5187**
DX025.0144



## THE COMMON APPLICATION
*For Undergraduate College Admission*

# 2010-11 MIDYEAR REPORT
### For Spring 2011 or Fall 2011 Enrollment

**MR**

## TO THE APPLICANT

After completing all the relevant questions below, give this form to your secondary school counselor or another school official who knows you better. **If applying via mail**, please also give that school official stamped envelopes addressed to each institution that requires a Midyear Report.

○ Female
○ Male

Legal Name _____
Last/Family/Sur *(Enter name exactly as it appears on official documents.)*   First/Given    Middle (complete)    Jr., etc.

Birth Date _____   Social Security # _____
mm/dd/yyyy                                                (Optional)

Address _____
Number & Street    Apartment #    City/Town    State/Province    Country    ZIP/Postal Code

School you now attend _____   CEEB/ACT Code _____

**Current year courses**—please indicate title, level (AP, IB, advanced honors, etc.) and credit value of all courses you are taking this year. Indicate quarter classes taken in the same semester on the appropriate semester line.

First Semester/Trimester | Second Semester/Trimester | Third Trimester
*or additional first/second term courses if more space is needed*

_____     _____     _____
_____     _____     _____
_____     _____     _____
_____     _____     _____
_____     _____     _____
_____     _____     _____

**IMPORTANT PRIVACY NOTE:** By signing this form, I authorize all schools that I have attended to release all requested records covered under the Federal Educational Rights and Privacy Act (FERPA) so that my application may be reviewed by the Common Application member institution(s) to which I am applying. I further authorize the admission officers reviewing my application, including seasonal staff employed for the sole purpose of evaluating applications, to contact officials at my current and former schools should they have questions about the school forms submitted on my behalf.

I understand that under the terms of the FERPA, after I matriculate I will have access to this form and all other recommendations and supporting documents submitted by me and on my behalf after matriculating, unless at least one of the following is true:

1. The institution does not save recommendations post-matriculation *(see list at www.commonapp.org/FERPA).*
2. I waive my right to access below, regardless of the institution to which it is sent:

○ Yes, I do waive my right to access, and I understand I will never see this form or any other recommendations submitted by me or on my behalf.
○ No, I do *not waive* my right to access, and I may someday choose to see this form or any other recommendations or supporting documents submitted by me or on my behalf to the institution at which I'm enrolling, if that institution saves them after I matriculate.

**Required Signature** ✎_____   Date _____

## TO THE SECONDARY SCHOOL COUNSELOR

Please submit this form when midyear grades are available (end of first semester or second trimester). Attach applicant's official transcript, including courses in progress, a school profile, and transcript legend. (Please check transcript copies for readability.) Use both pages to complete your evaluation for this student. **Be sure to sign below.**

Counselor's Name (Mr./Ms./Dr., etc.) _____
*Please print or type*

Signature ✎_____   Date _____
mm/dd/yyyy

Title _____   School _____

School Address _____
City/Town    State/Province    Country    ZIP/Postal Code

Counselor's Phone (_____) _____   Counselor's Fax (_____) _____
Area Code    Number    Ext.    Area Code    Number

Secondary school CEEB/ACT code _____   Counselor's E-mail _____

© 2010 The Common Application, Inc.

MR-1/**2010-11**

HARV00018596

**JA5188**
DX025.0145

**Background Information** If any of the information on this page has changed for this student since the Secondary School Report was submitted, please enter the new information in the appropriate section below. If your recommendation for this student has changed, please comment in the space below or on a separate sheet. **If nothing has changed, you may leave this page blank.** *However, your signature is still required.*

Class Rank _____    Class Size _____    Covering a period from _____ to _____
*(mm/yyyy)*    *(mm/yyyy)*

The rank is ○ weighted ○ unweighted. How many students share this rank? _____

○ We do not rank. Instead, please indicate quartile _____ quintile _____ decile _____

Cumulative GPA: _____ on a _____ scale, covering a period from _____ to _____
*(mm/yyyy)*    *(mm/yyyy)*

This GPA is ○ weighted ○ unweighted. The school's passing mark is _____

Highest GPA in class _____ Graduation Date _____
*(mm/dd/yyyy)*

Percentage of graduating class immediately attending: _____ four-year _____ two-year institutions

How many courses does your school offer:
AP _____ IB _____ Honors _____

If school policy limits the number a student may take, please list the maximum allowed:
AP _____ IB _____ Honors _____

Is the applicant an IB Diploma candidate? ○ Yes ○ No

Are classes taken on a block schedule? ○ Yes ○ No

In comparison with other college preparatory students at your school, the applicant's course selection is:
○ most demanding
○ very demanding
○ demanding
○ average
○ below average

How long have you known this student and in what context? _____

What are the first words that come to your mind to describe this student? _____

**Ratings** Compared to other students in his or her class year, how do you rate this student in terms of:

| No basis | | Below average | Average | Good (above average) | Very good (well above average) | Excellent (top 10%) | Outstanding (top 5%) | One of the top few I've encountered (top 1%) |
|---|---|---|---|---|---|---|---|---|
| | Academic achievement | | | | | | | |
| | Extracurricular accomplishments | | | | | | | |
| | Personal qualities and character | | | | | | | |
| | OVERALL | | | | | | | |

**Evaluation** Please use this space to elaborate on any changes in the student's academic record, personal demeanor, or status at your school.

① Has the applicant ever been found responsible for a disciplinary violation at your school from 9th grade (or the international equivalent) forward, whether related to academic misconduct or behavioral misconduct, that resulted in the applicant's probation, suspension, removal, dismissal, or expulsion from your institution? ○ Yes ○ No

② To your knowledge, has the applicant ever been adjudicated guilty or convicted of a misdemeanor, felony, or other crime? ○ Yes ○ No
   Note that you are not required to answer "yes" to this question, or provide an explanation, if the criminal adjudication or conviction has been expunged, sealed, annulled, pardoned, destroyed, erased, impounded, or otherwise ordered to be kept confidential by a court.

If you answered yes to either or both questions, please attach a separate sheet of paper or use your written recommendation to give the approximate date of each incident and explain the circumstances.

○ **Check here if you would prefer to discuss this applicant over the phone with each admission office.**

**I recommend this student:** ○ No basis ○ With reservation ○ Fairly strongly ○ Strongly ○ Enthusiastically

© 2010 The Common Application, Inc.                                            MR-2/2010-11

HARV00018597

**JA5189**
DX025.0146

## Helpful Websites

**Harvard Websites:**

Accessible Education Office | www.aeo.fas.harvard.edu

Advanced Standing | www.fas.harvard.edu/~advising/advanced/reqs.html

Advising | www.fas.harvard.edu/~advising

Application | www.admissions.college.harvard.edu/apply/forms/

Athletics | www.gocrimson.com

Bureau of Study Counsel | www.bsc.harvard.edu

Career Services | www.ocs.fas.harvard.edu

Counseling Services | www.college.harvard.edu/services/counseling

Courses of Instruction | www.registrar.fas.harvard.edu/fasro/courses

Departments and Concentrations | www.fas.harvard.edu/home/academics-and-research

Dining | www.dining.harvard.edu

Engineering and Applied Sciences | www.seas.harvard.edu

Financial Aid | www.fao.fas.harvard.edu

Freshman Dean's Office | www.fdo.fas.harvard.edu

Health Services | www.huhs.harvard.edu

International Applicants | www.admissions.college.harvard.edu/apply/international/

Ivy Group Common Admissions Procedure Statement | www.ivyleaguesports.com

Libraries | lib.harvard.edu

Museums | www.harvard.edu/museums

Program in General Education | www.admissions.college.harvard.edu/about/learning/gen_ed.html

Public Service Opportunities | www.fas.harvard.edu/~pbh/psn

Research Opportunities and Student Employment | www.seo.harvard.edu/

Student Organizations and Activities | www.college.harvard.edu/student/activities

Study Abroad | www.fas.harvard.edu/~oip

Taking Time Off | www.admissions.college.harvard.edu/apply/time_off/

Visit | www.admissions.college.harvard.edu/visit/

**Standardized Testing:**

ACT | www.act.org/aap/

AP | www.ets.org

College Board | www.collegeboard.com

GRE | www.ets.org

SAT Registration | www.collegeboard.com/student/testing/sat/reg.html

TOEFL | www.ets.org

**Applying Online:**

The Common Application | www.commonapp.org

The Universal College Application | www.universalcollegeapp.com

HARV00018598

M

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY                                    HARV00018599

**JA5191**

DX025.0148

JUL  8 2011

July 4, 2011

Dean William R. Fitzsimmons
Office of Admissions and Financial Aid
Harvard College
86 Brattle Street
Cambridge, MA 02138

Dear Mr. Fitzsimmons:

I am a professor at UCLA whose son just went through your admissions process. As I
contemplate the meaning of America on its Independence Day, I wanted to write to you regarding
your process. It is agreed upon by most that America is in decline. There are many reasons for
this, but you should not underemphasize the role played by your process in this decline.

I have serious concerns about the rigor and thoughtfulness exhibited by your admissions officers
in bringing recommendations forward. America is supposed to reward hard work, tenacity, and
responsibility. Your process does not reward any of these attributes. Furthermore, it is
disingenuous to the extreme.

1. The common application asks us to check an ethnicity box assuring that no information we
provide will be used in a discriminatory way. It is indeed used in a discriminatory way. Any
time a standard is relaxed or raised based on a checked box or a last name, that's wrong.

2. Courtesy waitlisting of legacies is rampant. This is in my view unethical. Waitlisting is just
that--you need to be a serious candidate if spots open up. I do not believe that many of these
waitlisted candidates are considered seriously.

3. You ask that applicants consider the most rigorous course loads but this is not a criterion used
to break ties between applicants. What is used instead is some other innate nonacademic talent or
skin color.

In fact, my reading of your process is somewhat cynical but may be close to the truth. Take the
top 5-10% of the class, screen them for legacies, skin color (checked box for ethnicity), and
unusual innate talent for things other than academics, then reach out and pull from the lower
ranks to protect your yield.

Let me now tell you a personal story. There was a 22-year old man from India whose household
salary growing up was less than $80 per month. He came on a student visa to the USA in 1984.
He had one suitcase and less than $3000 in cash on him. He worked hard in grad school, married
an Asian Indian girl who came to the USA also with virtually nothing (basically $0) and lived in a
roach-infested apartment struggling to get by. Treating education as sacred, they both worked
day and night on their doctoral degrees, finally becoming faculty members and leaders in their
respective fields. They had two children and education and being positive contributors to their
community was emphasized above all in the household.

One of the children ( [Redacted: PII/SPI] has the following stats:

1. Highest graduating GPA in his public high school of 627 students
2. Toughest curriculum amongst his peers (11 AP classes)
3. All A grades (even as a second semester senior)

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

HARV00018600

**JA5192**

DX025.0149

4. All SAT scores (including subject tests) at 750 or above
5. All AP scores at maximum (score of 5)

On top of that we have:

1. An athlete who played two varsity sports that are not typical of his demographic (how many South Asians play varsity volleyball and basketball?).
2. Leading the news team (news editing) at the school newspaper.
3. Extensively interning at the local city newspaper
4. Winning three national writing awards
5. Extensive volunteering in the community

On top of that we have the following awards at graduation:

1. Rose Gilbert Academic Excellence Award - the highest honor for overall academic excellence in the high school

2. Quill and Scroll Society Honorary Membership Award for excellence in writing/journalism

3. Community Service/Volunteering award for more than a threshold level (one hundred hours) of community service at the high school

4. National Merit Finalist

5. California Scholarship Federation Sealbearer (for high Scholastic Achievement and Service to the Community)

6. Los Angeles Volleyball Coaches Association Academic All Star Player of the Year

7. California Department of Education and California Mathematics Council Award for Exemplary Achievement in Mathematics

Obviously, he loves learning. If anything, people in our ethnic group should also get the breaks in the process. We came barely twenty-five years ago with virtually nothing. Frequently, we don't usually write self-reflective essays (and by the way, if you want such an essay why not make it clear?), we just achieve based on a strong work ethic. What does our kind get in return? Just the usual demoralizing rejection, while others get taken or waitlisted. Check the applicants from this high school [Redacted: PII/SPI] Calif.) and see if who you took or waitlisted truly are the strongest academically or are legacies or people with connections.

What we learn about the process is to not honestly report our ethnicity, not honestly report what we want to do (expressing interest in under-enrolled majors is better), and exaggerate our non-academic pursuits. We also learn that skin color does matter, and it would have been a different outcome had I married someone of a different ethnic group. Is this really the message applicants should be getting at such a young age?

Harvard is first and foremost an academic institution devoted to scholarship. Furthermore, it receives Federal money. Each NIH or NSF grant from which you derive overhead comes out of our tax dollars. Your endowment income, unlike mine is largely tax exempt. The job of admissions officers is not to get excited or entertained, but day in and day out, just reward people

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

HARV00018601

who have achieved at a high level given the opportunities they have had. Stellar academic records with rigorous courseloads do need to either be rewarded or your decisions explained especially when the candidate is from an over-represented minority group. It seems clear that when these types do something outside the ordinary in extra-curriculars they are not rewarded at the same level as others.

As we contemplate involving Federal authorities to protest the violation of our civil rights, we think the reason your process is contributing to America's decline is the lack of candor and thoughtfulness in your process, and the lack of tangible rewards for tenacity, intellectual curiosity, and a strong work ethic. We think America is becoming a joke and this demoralization will cost the country dearly in the next fifty years as our work ethic erodes. That's what it has come down to.

Sincerely,



Los Angeles, CA 90095-1481

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

HARV00018602

**JA5194**
DX025.0151

Redacted:
**PII/SPI**
Pacific Palisades, CA 90272



Dean William R. Fitzsimmons
Office of Admissions and Financial Aid
Harvard College
86 Brattle Street
Cambridge, MA 02138

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

HARV00018603

**JA5195**

DX025.0152



HARVARD COLLEGE | Office of Admissions and Financial Aid

July 21, 2011

> **Redacted:**
> **PII/SPI**

Los Angeles, CA 90095-1481

Dear | **Redacted:** **PII/SPI** |

    I am writing in response to your recent letter to me, dated July 4, 2011, which seems to assert that Harvard College's decision not to admit your son [Redacted:] was a result of ethnic discrimination. I understand that you disagree with the Committee's decision regarding your son's application. While there may be nothing I could say that would alter your opinion, I assure you that the College's admissions process is not biased in the way you suggest or in any other way. Let me take this opportunity to better explain our admissions processes and the context in which your son's application was reviewed.

    As I am sure you realize, admission to Harvard College is highly competitive. This year a record number of applicants (34,950) applied for the 1,662 places in the first year class; of these, we had the capacity to admit only 6.2%. The Admissions Committee, comprising thirty-five faculty members and administrators, reviews applications in a painstaking process that stretches over several months. The Committee can respond only to the various credentials presented by the candidates in their applications, and members of the Committee understand that they therefore have a limited knowledge of each student. Nevertheless, the Committee takes great care in evaluating each of the many applications. Each applicant is reviewed and voted on by the Committee during its admissions meetings.

    There is no precise formula by which admissions decisions are made. The Committee considers many factors in the admissions process, including scholarship and standardized testing. However, the academic credentials of applicants to the College in recent years have made the admissions competition more rigorous than ever. Approximately 48 percent of this year's applicant pool presented SAT I scores totaling 1400 or higher. Nearly 4,175 scored a perfect 800 on the SAT Mathematics test and over 3,050 recorded an 800 Verbal SAT. As has been the case for many years, the number of applicants who were valedictorians of their high schools (3,598) was more than twice the number of places in the freshman class. This year, 52% of the applicant pool were in the top ten percent of their respective high school classes.

Continued

Administrative Office 86 Brattle Street · Cambridge, Massachusetts 02138
Visitor Center Agassiz House · Radcliffe Yard · Cambridge, Massachusetts 02138

CONFIDENTIAL

HARV00018604

Page 2
July 21, 2011

As it does with each candidate, the Committee carefully and fairly evaluated your son's application, and concluded that it would not be able to offer him admission. While I understand that you and your family are disappointed at the outcome, I must reiterate that the College=s decision was reached properly. You certainly have every reason to be proud of your son's accomplishments, which you detail well in your letter. I hope you will extend to [Redacted] my best wishes for every future success.

Sincerely,

William R. Fitzsimmons
Dean of Admissions and Financial Aid

CONFIDENTIAL

HARV00018605

**JA5197**
DX025.0154

July 30, 2011

Dean William R. Fitzsimmons
Office of Admissions and Financial Aid
Harvard College
86 Brattle Street
Cambridge, MA 02138

Dear Mr. Fitzsimmons:

Thank you for your letter of July 21. I have a few final points. While I am willing to consider taking your word that ethnic discrimination is not an issue at Harvard College, I am less willing to accept that your process is not "biased in any other way" as you mention. For example, it has been documented that legacy applications get a personal and careful read from you, and that to me is bias because they are treated differently. Furthermore, affirmative action is likely also a reality of your process (and an admirable one at that).

In any case, you have the right to impose the criteria you want. There is one overriding concern I have and that is the exact role of ethnicity in the process. Your common application states that:

"Common Application member institution admission offices do not discriminate on the basis of race, color, ethnicity, national origin, religion, creed, sex, age, marital status, parental status, physical disability, learning disability, political affiliation, veteran status, or sexual orientation."

I think the above statement is not accurate because discrimination can be positive or negative, and certain races and people of certain parental status (legacies) do get treated differently in the process.

However, let me get back to how the above quote relates to Asian-Americans and the matter of deep concern to me. There is nothing more debasing to the dignity of a human being in a minority group than to be categorized according to a checked box for ethnicity and then have it held against them, even as ONE factor. Dr. Martin Luther King, Jr., in his "I have a dream" speech did NOT have this in mind. I think it is reasonable and just to expect an American citizen applicant to be treated race-neutrally or race-positively at an institution receiving Federal dollars. As you know, my problem is not to do with affirmative action, but relates to the civil rights of Asian-Americans because according to Espenshade's book, they present "stats" higher than those of other races on average, so for diversity reasons they may be discriminated AGAINST. This is an old argument, but is race relevant for races other than under-represented groups? How would your process of evaluation factor the notion that an applicant checked the Asian-American box? What I am asking is that since this group is NOT under-represented, is consideration of its race relevant? If so, why? For example, would the following and similar thoughts be

CONFIDENTIAL

HARV00018606

permissible in a meeting about an Asian American applicant: "We know he will tend to score well in math, what else has he done?"

[Parenthetically, please also be aware that for example, Japanese and Asian Indians are of different races. We as Asian Indians are basically Caucasian with a darker skintone. The process should not club us all into one category for admission purposes. This also is fraught with problems.]

In sum, as a final issue, I would appreciate your confirming that for other than under-represented groups, ethnicity does NOT factor into any admission decisions, discussions, nor thought processes of admission officers (thus possibly resulting in imposition of higher standards for Asian Americans). That is, I would like confirmation that Asian Americans and Whites are treated the same, without any regard for the race box checked in these cases.

I do appreciate your time, and I found your letter to be refreshingly candid and helpful.

Sincerely,

**Redacted:
PII/SPI**

Los Angeles, CA 90095-1481

CONFIDENTIAL

HARV00018607

**JA5199**
DX025.0156



HARVARD COLLEGE | Office of Admissions and Financial Aid

August 3, 2011

Redacted:
PII/SPI

Los Angeles, CA 90095-1481

Dear | Redacted:
PII/SPI

Dean Fitzsimmons is away, but he has asked me to write in response to your most recent letter of July 30. Although I doubt there is much I can helpfully add to Dean Fitzsimmons' earlier letter to you, I should like to comment further on a couple of your particular concerns.

Our admissions process does not proceed on the basis of categories, ethnic or otherwise. As the Supreme Court has repeatedly recognized, college admissions committees may take into account a variety of personal factors including family background—among many others, as they evaluate and compare applicants. Our process is highly individualized in its approach; we have no quotas, targets or goals in choosing a class. We neither limit nor increase the number of admitted students according to ethnicity, geography, gender or field of study although we do consider all of these factors. Indeed, it is worth noting that the model cited approvingly by the Supreme Court in both the Regents of University of California v. Bakke decision of 1978 and the Grutter v. Bollinger decision of 2003—neither of which involved a challenge to Harvard's own admissions process—is the "Harvard Plan," which, as the Court explicitly recognized, is flexible enough to consider all pertinent elements for consideration in each applicant's case for admission.

As to your concern about applicants being asked to identify their ethnicity, I note that the Federal Government requires universities to report ethnicity or race of enrolled students. Accordingly, our application invites, but does not require, applicants to self-identify by selecting one or more ethnic categories. A student is not required to provide that optional information and some applicants do not.

I hope you will find this information helpful.

Yours sincerely,

Marlyn E. McGrath
Director of Admissions

MEM/alb

Administrative Office 86 Brattle Street · Cambridge, Massachusetts 02138
Visitor Center Agassiz House · Radcliffe Yard · Cambridge, Massachusetts 02138

CONFIDENTIAL                                                                    HARV00018608

**JA5200**
DX025.0157

August 10, 2011

Ms. Marlyn E. McGrath
Office of Admissions and Financial Aid
Harvard College
86 Brattle Street
Cambridge, MA 02138

Dear Ms. McGrath:

Thank you for your letter in response to my second letter to Dean Fitzsimmons. Unfortunately, while I appreciate your reply and understand the circumstances in which race can be considered from the two landmark cases you mention I did not receive a reply to my questions, which are just, reasonable, and fair, and deserve a straight answer.

1. Assuming they identify themselves as Asian Americans, are Asian American applicants viewed in the context of the overall application pool or within the pool of other Asian American applications?

2. Do Asian Americans suffer a disadvantage relative to Whites in the admission process?

And two new questions based on your letter:

3. You indicate that checking an ethnicity box is optional. Would failure to check any ethnicity box be construed as a negative signal (e.g., that someone is trying to hide their racial identity)?

4. If someone with a last name indicative of ethnicity, such as "Zhang" or "Rajaratnam" does not check any ethnicity box, would you try to infer the ethnicity based on the last name?

If you can answer these questions I would be delighted. Otherwise, I will conclude that you do not wish to reply. I do not anticipate corresponding further on this matter with you or Dean Fitzsimmons regardless of whether I receive a reply. Thanks once more for your time.

Sincerely,

**Redacted:
PII/SPI**

Los Angeles, CA 90095-1481

Cc: Dean William R. Fitzsimmons

CONFIDENTIAL

HARV00018609

August 22, 2011

Dean William R. Fitzsimmons
Office of Admissions and Financial Aid
Harvard College
86 Brattle Street
Cambridge, MA 02138

Dear Dean Fitzsimmons:

I couldn't resist writing to you one last time. Consider the situation. Your director, Marlyn, is unable to certify either that Asians and Whites are treated the same in the process, or that Asians are not viewed in competition with each other. You are unable to do so as well. There is no reason why Asians and Whites should be treated differently. In this situation, I suppose I should take your word that ethnic discrimination is not an issue for Asian Americans at Harvard in that they are treated the same as Whites? Given this, perhaps you should take my word that as someone who as spent several years in higher education, and has seen thousands of graduate and undergraduate students, my son has a curious and extremely thoughtful scholarly mind (far more thoughtful than mine at a comparable age), and he will prosper at Harvard, and be an active contributor to the community. My son is of sterling character, has the best GPA in his high school class of 627 students, with excellent test scores, two national writing awards and one state level math award, is a two sport varsity athlete, and his editing earned the school newspaper the most coveted national-level medal. This is all true, but will you just take my word for it? I leave this for you to ponder.

Sincerely,

Redacted:
PII/SPI

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

HARV00018610



HARVARD COLLEGE | Office of Admissions and Financial Aid

August 26, 2011

> **Redacted:**
> **PII/SPI**

Los Angeles, California 90095-1481

Dear | **Redacted:** |
|     | **PII/SPI** |

Thank you for your recent letters.  At this point, I can only reiterate what Director McGrath and I already have told you: Harvard College conducts a holistic admissions process.  Ethnicity is one of the many factors we consider when evaluating the thousands of applications we receive (this year the number of applications approached 35,000) from a wide range of excellent candidates.

I understand that you continue to be upset that we were unable to make an offer of admission to your son.  We wish you and [Redacted] every success as he begins his college career.

Sincerely,

William R. Fitzsimmons
Dean of Admissions and
Financial Aid

WRF:oap

Administrative Office 86 Brattle Street · Cambridge, Massachusetts 02138
Visitor Center Agassiz House · Radcliffe Yard · 5 James Street · Cambridge, Massachusetts 02138

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

HARV00018611

**JA5203**
DX025.0160

JAN 1 7 2012

January 13, 2012

Dean William R. Fitzsimmons
Office of Admissions and Financial Aid
Harvard College
86 Brattle Street
Cambridge, MA 02138

Dear Mr. Fitzsimmons:

You will recall our correspondence from last year regarding my son, [Redacted:] [Redacted:] application to Harvard College. I am writing to let you know that the Department of Education's Office of Civil Rights has informed us that they have accepted our complaint alleging that Harvard University's undergraduate admissions office discriminated against our son on the basis of his national origin. My son is now a freshman at [Redacted:] where he continues to be a promising scholar – he earned a 4.0 in his freshman term and has immersed himself in a range of activities and experiences. As you already know, he had the highest GPA of his graduating high school class and a significant record of national, state and other accomplishments. Mr. Dan Golden, the author of "The Price of Admissions," is aware of this development. I believe that my son is of sterling character and would have brought Harvard nothing but credit.

I am writing to ask you if you would like to discuss the case prior to the beginning of the detailed OCR investigation. I would need you to call me at [Redacted:] at your earliest (or you can email me at [Redacted: PII/SPI] ). Thank you for your consideration. The matter remains confidential as of now.

Sincerely,

**Redacted:
PII/SPI**

Los Angeles, CA 90095-1481

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY                        HARV00018612

No. 11-345

IN THE

# Supreme Court of the United States

ABIGAIL NOEL FISHER,

*Petitioner,*

*v.*

UNIVERSITY OF TEXAS AT AUSTIN, *et al.*,
*Respondents.*

ON WRIT OF CERTIORARI TO THE
UNITED STATES COURT OF APPEALS
FOR THE FIFTH CIRCUIT

**BRIEF OF BROWN UNIVERSITY, UNIVERSITY OF
CHICAGO, COLUMBIA UNIVERSITY, CORNELL
UNIVERSITY, DARTMOUTH COLLEGE, DUKE UNI-
VERSITY, HARVARD UNIVERSITY, JOHNS HOP-
KINS UNIVERSITY, MASSACHUSETTS INSTITUTE
OF TECHNOLOGY, UNIVERSITY OF PENNSYL-
VANIA, PRINCETON UNIVERSITY, STANFORD
UNIVERSITY, VANDERBILT UNIVERSITY, AND
YALE UNIVERSITY
IN SUPPORT OF RESPONDENTS**

SETH P. WAXMAN
*Counsel of Record*
PAUL R.Q. WOLFSON
KELLY P. DUNBAR
WILMER CUTLER PICKERING
    HALE AND DORR LLP
1875 Pennsylvania Ave., N.W.
Washington, D.C.  20006
(202) 663-6000
seth.waxman@wilmerhale.com

ADDITIONAL COUNSEL LISTED ON INSIDE COVER

United States District Court
District of Massachusetts

**DX 26**

Case No. _____1:14-cv-14176 (ADB)_____
Date Entered_____
By_____
Deputy Clerk

HARV00018900

**JA5205**
DX026.0001

BEVERLY E. LEDBETTER
VICE PRESIDENT AND
   GENERAL COUNSEL
BROWN UNIVERSITY
110 South Main St.
Providence, RI 02912-1913

BETH A. HARRIS
UNIVERSITY OF CHICAGO
VICE PRESIDENT AND
   GENERAL COUNSEL
5801 S. Ellis Ave., Suite 619
Chicago, IL 60637

JANE E. BOOTH
GENERAL COUNSEL
COLUMBIA UNIVERSITY
535 West 116th St.
New York, NY 10027

JAMES J. MINGLE
UNIVERSITY COUNSEL
CORNELL UNIVERSITY
250 Myron Taylor Hall
Ithaca, NY 14853-4901

ROBERT B. DONIN
GENERAL COUNSEL
DARTMOUTH COLLEGE
63 South Main St.
Hanover, NH 03755

PAMELA J. BERNARD
VICE PRESIDENT AND
   GENERAL COUNSEL
DUKE UNIVERSITY
310 Blackwell St., 4th Floor
Box 104124
Durham, NC 27710

ROBERT W. IULIANO
VICE PRESIDENT AND
   GENERAL COUNSEL
HARVARD UNIVERSITY
Holyoke Center, Suite 980
1350 Massachusetts Ave.
Cambridge, MA 02138-3834

DEREK SAVAGE
INTERIM GENERAL COUNSEL
   AND DEPUTY GENERAL
   COUNSEL
JOHNS HOPKINS UNIVERSITY
113 Garland Hall
3400 N. Charles St.
Baltimore, MD 21218

R. GREGORY MORGAN
VICE PRESIDENT AND
   GENERAL COUNSEL
MASSACHUSETTS INSTITUTE
   OF TECHNOLOGY
77 Massachusetts Ave.
Cambridge, MA 02139-4307

WENDY S. WHITE
SENIOR VICE PRESIDENT
   & GENERAL COUNSEL
UNIVERSITY OF PENNSYLVANIA
133 South 36th St., Suite 300
Philadelphia, PA 19104-3246

PETER G. MCDONOUGH
GENERAL COUNSEL
PRINCETON UNIVERSITY
120 Alexander St., 2nd Fl.
Princeton, NJ 08540

DEBRA ZUMWALT
VICE PRESIDENT AND
   GENERAL COUNSEL
STANFORD UNIVERSITY
Bldg. 170, 3rd Fl., Main Quad
Stanford, CA 94305

DAVID WILLIAMS II
VICE CHANCELLOR FOR
   UNIVERSITY AFFAIRS
   AND ATHLETICS, GENERAL
   COUNSEL AND SECRETARY
   OF THE UNIVERSITY
VANDERBILT UNIVERSITY
2100 West End Ave., Suite 750
Nashville, TN 37203

DOROTHY K. ROBINSON
VICE PRESIDENT AND
   GENERAL COUNSEL
YALE UNIVERSITY
2 Whitney Ave., 6th Fl.
New Haven, CT 06510

HARV00018901

**JA5206**

DX026.0002

## TABLE OF CONTENTS

Page

TABLE OF AUTHORITIES ...........................................iii

INTEREST OF AMICI CURIAE....................................1

SUMMARY OF ARGUMENT.........................................3

ARGUMENT.........................................................6

I.   THIS COURT SHOULD REAFFIRM *GRUT-TER*'S CORE HOLDINGS THAT DIVERSITY IS A COMPELLING INTEREST AND THAT UNIVERSITIES MAY PURSUE DIVERSITY WITHOUT RELYING UPON OSTENSIBLY RACE-NEUTRAL ALTERNATIVES THAT WOULD UNDERMINE OTHER IMPORTANT ASPECTS OF A UNIVERSITY'S MISSION ....................6

    A.   Diversity Remains A Compelling Educational Interest For Amici Institutions...........................................................6

    B.   Mechanistic, Ostensibly Race-Neutral Policies Are Not Constitutionally Required Alternatives For Achieving Diversity...................................................14

II.  PETITIONER'S ARGUMENTS REGARDING THE APPLICATION OF STRICT SCRUTINY ARE DEEPLY FLAWED.................................17

    A.   Petitioner's Reliance On *Parents Involved* Is Unavailing ...........................19

    B.   Petitioner Misapprehends The Educational Mission Of Universities And The Role And Benefits Of Diversity.......................22

(i)

HARV00018902

ii

**TABLE OF CONTENTS—Continued**

Page

C. This Court Has Not Applied And
Should Not Apply A Strong-Basis-In-
Evidence Standard To The Unique
Context Of Higher Education ............................ 27

CONCLUSION .................................................................. 32

HARV00018903

**JA5208**

DX026.0004

iii

## TABLE OF AUTHORITIES

### CASES

Page(s)

*Adarand Constructors, Inc.* v. *Pena*, 515 U.S. 200 (1995) ..................................................18

*Board of Regents of University of Wisconsin System* v. *Southworth*, 529 U.S. 217 (2000) ...........30

*Brown* v. *Board of Education of Topeka*, 347 U.S. 483 (1954) ............................................24

*City of Richmond* v. *J.A. Croson Co.*, 488 U.S. 469 (1989) ................................................27, 28

*Dickerson* v. *United States*, 530 U.S. 428 (2000)...........13

*Gratz* v. *Bollinger*, 539 U.S. 244 (2003) ............................7

*Grutter* v. *Bollinger*, 539 U.S. 306 (2003) .......... 1, *passim*

*Parents Involved in Community Schools* v. *Seattle School District No. 1*, 551 U.S. 701 (2007) ............................................................ 4, *passim*

*Planned Parenthood of Southeastern Pennsylvania* v. *Casey*, 505 U.S. 833 (1992) ......................13

*Regents of University of California* v. *Bakke*, 438 U.S. 265 (1978) ...................................1, 6, 7, 24, 29

*Regents of University of Michigan* v. *Ewing*, 474 U.S. 214 (1985) ...............................................14, 30

*Ricci* v. *DeStefano*, 129 S. Ct. 2658 (2009) .....................28

*Shaw* v. *Reno*, 509 U.S. 630 (1993) ...................................12

*Sweezy* v. *New Hampshire*, 354 U.S. 234 (1957) ...........29

*University of Pennsylvania* v. *EEOC*, 493 U.S. 182 (1990) ....................................................................30

HARV00018904

**JA5209**

DX026.0005

iv

TABLE OF AUTHORITIES—Continued

Page(s)

*Wygant* v. *Jackson Board of Education*, 476
    U.S. 267 (1986) ..................................................27, 28

**OTHER AUTHORITIES**

Byrne, J. Peter, *Academic Freedom: A "Spe-
    cial Concern of the First Amendment"*, 99
    Yale L.J. 251 (1989) ...................................................29

Dartmouth College, *Mission*, *available at*
    http://www.dartmouth.edu/home/about/mis
    sion.html (last visited Aug. 12, 2012).......................23

Harvard College, Office of Admissions, *A Brief
    Profile of the Admitted Class of 2016*,
    *available at* http://www.admissions.college.
    harvard.edu/apply/statistics.html (last vis-
    ited Aug. 12, 2012) ....................................................16

Harvard University, *Frequently Asked Ques-
    tions*, *available at* http://www.harvard.edu/
    faqs/mission-statement (last visited Aug.
    12, 2012) ........................................................................23

Laycock, Douglas, *The Broader Case For Af-
    firmative Action: Desegregation, Aca-
    demic Excellence, and Future Leadership*,
    78 Tul. L. Rev. 1767 (2004)........................................25

Minow, Martha, *After* Brown*: What Would
    Martin Luther King Say?*, 12 Lewis &
    Clark L. Rev. 599 (2008)............................................17

Payton, John, *Post-*Grutter*: What Does Diver-
    sity Mean in Legal Education and Be-
    yond?*, 35 Pepp. L. Rev. 569 (2008)..........................25

HARV00018905

**JA5210**

DX026.0006

v

TABLE OF AUTHORITIES—Continued

Page(s)

Snyder, Thomas D., & Sally A. Dillow, *Digest of Education Statistics 2011* (June 2012), *available at* http://nces.ed.gov/pubs2012/2012001.pdf ................................................................. 15

Stanford University, *The Founding Grant with Amendments, Legislation, and Court Decrees*, *available at* https://ogc.stanford.edu/sites/ogc.stanford.edu/files/Founding%20Grant%20(equivalent%20to%20SU%20Articles%20of%20Incorporation)_22124_1.pdf (last visited Aug. 12, 2012) ................................ 23

Tilghman, Shirley M., *2005 Opening Exercises Greeting and Address* (Sept. 2005), *available at* http://www.princeton.edu/president/speeches/20050911 ...................................................... 10

The Common Application, *2012-2013 First-Year Application*, *available at* https://www.commonapp.org/commonapp/DownloadForms/2013/2013PacketFY_download.pdf (last visited Aug. 12, 2012) ............... 12

Yale University, *University Mission Statement*, *available at* http://www.yale.edu/about/mission.html (last visited Aug. 12, 2012) ........................................................................ 23

HARV00018906

**JA5211**
DX026.0007

## INTEREST OF AMICI CURIAE[1]

Brown University, University of Chicago, Columbia University, Cornell University, Dartmouth College, Duke University, Harvard University, Johns Hopkins University, Massachusetts Institute of Technology, University of Pennsylvania, Princeton University, Stanford University, Vanderbilt University, and Yale University submit this brief as amici curiae in support of respondents. Amici have long used admissions policies similar to the Harvard Plan that Justice Powell approved in *Regents of University of California* v. *Bakke*, 438 U.S. 265 (1978), and the University of Michigan Law School plan this Court upheld in *Grutter* v. *Bollinger*, 539 U.S. 306 (2003). Amici accordingly have substantial experience with admissions policies that consider all aspects of an applicant's background and experience, including in some circumstances the applicant's racial or ethnic background.

Although Amici differ in many ways, they speak with one voice to the profound importance of a diverse student body—including racial diversity—for their educational missions. Amici seek to provide their students with the most rigorous, stimulating, and enriching educational environment, in which ideas are tested and debated from every perspective. They also seek to prepare active citizens and leaders in all fields of human endeavor. Although all Amici have highly selective admissions criteria designed to ensure that all of their

---

[1] Letters consenting to the filing of this brief have been filed with the Clerk of the Court. No counsel for a party authored this brief in whole or in part, and no person, other than amici or their counsel, made any monetary contribution to the preparation or submission of this brief.

HARV00018907

2

students (including minority students) will be prepared for demanding coursework and will graduate successfully, they all recognized long ago that admissions by purely numerical factors such as grade-point averages and standardized test scores would not effectively accomplish their broader educational missions.

Amici therefore examine all aspects of individual applicants to assess potential for both extraordinary achievement and contribution to the university's learning environment. This holistic review is necessary in light of Amici's missions and roles. Each includes undergraduate, graduate, and professional schools. All draw applicants from around the nation and the world. All emphasize collaborative research, teaching, and learning. And all are residentially based communities where learning takes place not just from faculty but also in the broad range of students' interactions with their peers, in the classroom, and in many other settings.

In Amici's experience, a diverse student body adds significantly to the rigor and depth of students' educational experience. Diversity encourages students to question their own assumptions, to test received truths, and to appreciate the spectacular complexity of the modern world. This larger understanding prepares Amici's graduates to be active and engaged citizens wrestling with the pressing challenges of the day, to pursue innovation in every field of discovery, and to expand humanity's learning and accomplishment.

Amici have relied on *Bakke* and *Grutter* in shaping admissions policies designed to achieve these goals. A decision questioning or repudiating the principles in those cases could significantly impair Amici's ability to achieve their educational missions. Although Amici are

HARV00018908

3

private institutions, they are cognizant that Title VI of the Civil Rights Act of 1964 forbids institutions that receive federal funds from engaging in racial "discrimination," and so their ongoing efforts to attain diverse student bodies could be compromised by new limits this Court might place on state university admissions procedures. Amici accordingly urge the Court to interpret the Constitution, consistent with *Bakke* and *Grutter*, to continue to allow educational institutions to structure admissions programs that take account of race and ethnicity as single factors within a highly individualized, holistic review process.

## SUMMARY OF ARGUMENT

This Court held in *Grutter* that diversity in higher education, of which race and ethnicity may be components, is a compelling government interest. This Court also held that the Constitution does not require a university to choose between academic selectivity and diversity, and thus does not require a university to use mechanistic, ostensibly race-neutral admissions plans as its means of obtaining a diverse student body. Petitioner here does not challenge either of those holdings, which remain of exceptional importance. Universities continue to have a compelling interest in ensuring that their student bodies reflect a robust diversity that enables them to offer a learning environment that enriches the educational experience for all students and also prepares them to be active, capable citizens and leaders in a complex and heterogeneous nation and world. A constitutional rule that universities may achieve such diversity only through the use of mechanistic policies would not only be unworkable for Amici institutions but would be fundamentally incompatible with Amici's educational missions. This Court accord-

HARV00018909

**JA5214**
DX026.0010

4

ingly should take pains not to disturb, indeed should emphatically reaffirm, those core holdings of *Grutter*.

The arguments petitioner does make in challenging the admissions policy of the University of Texas ("UT") would have this Court depart significantly from its settled equal protection jurisprudence. Amici write to emphasize three conspicuous errors in petitioner's understanding of strict scrutiny.

First, the decision in *Grutter*, not the various opinions in *Parents Involved in Community Schools* v. *Seattle School District No. 1*, 551 U.S. 701 (2007), supplies the appropriate framework for reviewing race-conscious university admissions policies. *Parents Involved* addressed student assignment policies markedly different from holistic review. The Court emphasized in *Parents Involved* that the policies at issue were structured such that race was effectively the entire classification; the policies employed race in a mechanistic, binary fashion; and the policies called for no individualized consideration of any other aspects of a student. Both the majority opinion and the concurring opinion of Justice Kennedy therefore drew a sharp distinction between the policies at issue in *Parents Involved* and those approved in *Grutter*.

Second, petitioner's understanding of the scope and nature of the educational benefits of diversity is deeply flawed. This Court recognized in *Grutter* that one aspect of the mission of many universities is training future citizens and leaders for a heterogeneous society, and that diversity is vital to that objective. Petitioner's claim (at 26) that diversity is exclusively an "inward-facing" concept misunderstands both precedent and the educational mission of many universities, including Amici. Petitioner's related contention—that any con-

HARV00018910

**JA5215**
DX026.0011

5

sideration by a university of demographics in assessing diversity amounts to racial balancing—is equally misplaced. When a university considers which applicants will best contribute to a vibrant learning environment intended to prepare citizens and leaders for a heterogeneous society in which race remains a salient social factor, the university need not ignore the communities from which its students come and into which its students will graduate, whether it be a single state, the nation, or the world.

Third, contrary to petitioner's contention, this Court has never applied a strong-basis-in-evidence standard to race-conscious university admissions, and it should not do so now. This Court has applied that standard in the public contracting and employment contexts, where race was the predominant consideration in measures ostensibly taken to remedy historical discrimination or to avoid claims of discrimination. Those settings have nothing to do with the consideration of race and ethnicity as single aspects of individualized review in higher education. The application of such a standard to higher education would seriously impair a university's ability to use its educational judgment and experience, developed over decades, in deciding which students to admit. Educational judgment and experience are fundamental components of a university's academic freedom, protected by the First Amendment. Petitioner's proposed standard, moreover, could have a particularly significant impact on Amici: Given the large number of qualified applicants to whom each institution must deny admission every year and the nonquantifiable aspects of individualized, holistic review, it would invite significant litigation and judicial intrusion into university admissions processes and decisions.

HARV00018911

6

## ARGUMENT

I. THIS COURT SHOULD REAFFIRM *GRUTTER*'S CORE HOLDINGS THAT DIVERSITY IS A COMPELLING INTEREST AND THAT UNIVERSITIES MAY PURSUE DIVERSITY WITHOUT RELYING UPON OSTENSIBLY RACE-NEUTRAL ALTERNATIVES THAT WOULD UNDERMINE OTHER IMPORTANT ASPECTS OF A UNIVERSITY'S MISSION

### A. Diversity Remains A Compelling Educational Interest For Amici Institutions

Justice Powell recognized in *Regents of University of California* v. *Bakke*, 438 U.S. 265 (1978), and this Court held unequivocally in *Grutter* v. *Bollinger*, 539 U.S. 306, 328 (2003), that universities "ha[ve] a compelling interest in attaining a diverse student body." The Court in *Grutter* further underscored that the educational benefits of diversity are "substantial" and "not theoretical but real." *Id.* at 330. These are points to which Amici can attest without qualification. Decades of experience with admissions policies based on the Harvard Plan, *Bakke*, and *Grutter* have convinced them that the quality of their students' education is greatly enriched if the student body is diverse in many ways—including racial and ethnic diversity. Diversity encourages students to question their assumptions, to understand that wisdom and contributions to society may be found where not expected, and to gain an appreciation of the complexity of the modern world. In these ways, diversity bolsters the unique role of higher education in "preparing students for work and citizenship" and training "our Nation's leaders" for success in a heterogeneous society. *Id.* at 331, 332; *see Parents Involved in Community Schools* v. *Seattle School District No. 1*, 551 U.S. 701, 783 (2007) ("Diversity … is a compelling educational goal that a school district may pursue.")

HARV00018912

**JA5217**
DX026.0013

7

(Kennedy, J., concurring in part and concurring in the judgment).

Petitioner does not ask this Court to abandon *Grutter*'s holding on this score. *See, e.g.*, Pet. Br. 26 ("*Grutter* … permits race to be used as a factor in admissions decisions to obtain a 'critical mass' of otherwise underrepresented minority students for educational reasons."); JA74a. That acknowledgment is exceptionally important to Amici. The admissions policies of Amici vary somewhat, but each is firmly committed to individualized, holistic review of the type long approved of by this Court.[2] In deciding which students to admit, Amici consider all aspects of their applicants both as individuals and also in relation to other potential members of the incoming class. That review is intended to produce a student body that is talented and diverse in many ways, including in intellectual interests, geography, socio-economic status, background and experience (including race and ethnicity), perspective, and areas of accomplishment.

1. In pursuing an academically excellent and broadly diverse student body, Amici do not place dispositive weight on objective numerical measures such as

---

[2] *See Grutter*, 539 U.S. at 337 (upholding admissions policy because the Law School "engages in a highly individualized, holistic review of each applicant's file"); *Gratz* v. *Bollinger*, 539 U.S. 244, 271 (2003) (identifying constitutional vice in undergraduate admissions as the absence of "individualized consideration"); *id.* at 276 (O'Connor, J., concurring) (flaw in undergraduate admissions was a lack of "meaningful individualized review of applicants"); *Bakke*, 438 U.S. at 315 (Powell, J.) ("The diversity that furthers a compelling state interest encompasses a far broader array of qualifications and characteristics of which racial or ethnic origin is but a single though important element.").

HARV00018913

8

GPA and SAT scores. Certainly, Amici seek students who have the potential to succeed at demanding coursework, but each institution's applicant pool includes many more academically strong candidates than the institution could hope to admit, and even the highest GPA or SAT scores by no means guarantee admission.[3] Thus, in addition to seeking students who are qualified, each institution also looks to compose a student body that is exceptional, complementary, and diverse in many ways. In service of this goal, each institution seeks, and invites applicants to submit, any relevant information about their experiences, accomplishments, and background to understand how the applicant might contribute to the vibrancy of the student body. The individualized, holistic review processes employed by Amici are not ways of ranking candidates from "strong" to "weak" but instead means to assemble an exceptional undergraduate community that exposes

---

[3] Amici's focus on factors beyond objective qualifications reflects both their educational philosophy and the strength of their applicant pools. For example, in the most recent admissions year, one Amicus could have filled more than two full matriculating classes from students ranked first in their high schools. In fact, however, only 12 percent of those applicants were admitted, comprising slightly more than 21 percent of the total number of admitted applicants. For that school, more than eight matriculating classes could have been filled by students in the top ten percent of their high schools. Another Amicus recently admitted only six percent of applicants in the top ten percent of their high school classes and declined to admit nearly two thirds of applicants with perfect SAT scores. And a third Amicus institution has admitted, over the last three admission cycles, fewer than half of applicants with perfect SAT scores. That same institution received applications from 2,272 valedictorians for the class of 2016, but admitted only 294 of those applicants.

HARV00018914

9

students to differences of many kinds: backgrounds, ideas, experiences, talents, and aspirations.

Amici's admissions policies are based on the principle that, in a free society, inquiry proceeds best when views and goals must withstand examination from the widest possible range of perspectives. And Amici's experiences bear this out: A student body that is diverse in many dimensions, including racial and ethnic background, produces enormous educational benefits. Such diversity significantly improves the rigor and quality of students' educational experiences by leading them to examine and confront themselves and their tenets from many different points of view. It also prepares them for life, work, and leadership in a nation and world that are constantly becoming more complex.

This diversity benefits society as well, for it fosters the development of citizens and leaders who are creative, collaborative, and able to navigate deftly in dynamic, diverse environments. Indeed, the university plays a unique and critical role in this respect, for in our society a university educational experience may offer one of the few opportunities for individuals to live and interact on a daily basis with peers from markedly different backgrounds, experiences, and perspectives. As one university president has explained:

Princeton also offers you a once-in-a-lifetime opportunity to connect with men and women whose lives have differed dramatically from your own; who view the world from a different vantage point. Never again will you live with a group of peers that was expressly assembled to expand your horizons and open your eyes to the fascinating richness of the human condition. … The reason [the Admission Office] took such

HARV00018915

**JA5220**
DX026.0016

10

care in selecting all of you—weighing your many talents, your academic and extracurricular interests, your diverse histories—was to increase the likelihood that your entire educational experience, inside and outside the classroom, is as mind-expanding as possible. When you graduate you will enter a world that is now truly global in perspective, and in which success will require that you have a cosmopolitan attitude. You must be equipped to live and work in not one culture, but in many cultures.

Shirley M. Tilghman, *2005 Opening Exercises Greeting and Address* (Sept. 2005), *available at* http://www.princeton.edu/president/speeches/20050911.[4]

Like this Court, Amici look forward to the day when race does not matter. *See Grutter*, 439 U.S. at 343 (anticipating that "25 years from now, the use of racial preferences will no longer be necessary to further the interest" in diversity); *id.* at 346 (Ginsburg, J., concurring) ("one may hope, but not firmly forecast, that over the next generation's span, progress toward nondiscrimination and genuinely equal opportunity will make it safe to sunset affirmative action"). But for now, "the reality is that" "race [does] matter[]." *Parents Involved*, 551 U.S. at 787 (Kennedy, J., concurring in part

---

[4] For Amici, diversity is meant to benefit the student body both inside and outside the classroom. Because Amici are all residential institutions, each strives to create a learning environment in which education occurs both within the classroom and through myriad other student interactions—in residences and dining halls, in performance, artistic, athletic, and recreational spaces, in student organizations and activities, and throughout the campus. Indeed, Amici aim to create an environment in which students learn as much from each other outside as within the classroom.

HARV00018916

11

and concurring in the judgment); *accord Grutter*, 539 U.S. at 332-333. To say that race continues to matter is to acknowledge forthrightly that, for many reasons—including the frustrating persistence of segregated schools and communities—race continues to shape the backgrounds, perspectives, and experiences of many in our society, including Amici's students. *See, e.g., Parents Involved*, 551 U.S. at 798 (Kennedy, J., concurring in part and concurring in the judgment) ("Due to a variety of factors … neighborhoods in our communities do not reflect the diversity of our Nation as a whole.").

For many students, a university may be the first place in which they are exposed to others whose backgrounds are markedly different from their own. Through that exposure, students are encouraged to question their own assumptions and biases and to appreciate the complexity of our society and the world. In Amici's judgment, such exposure will hasten the arrival of the day when race no longer matters.

2. Abandoning *Grutter*'s compelling-interest holding would significantly impair the ability of Amici to fulfill their educational missions. It would also call into question Amici's ability to use individualized, holistic admissions at all. The structure of that review requires that Amici obtain and review copious information regarding the characteristics, life experiences, accomplishments, and talents of each applicant, to assess both the applicant's academic potential and the contribution that the applicant may make to the class as a whole. Such an application process should allow—indeed encourage—applicants to provide any information about themselves, including their background, that the appli-

HARV00018917

12

cant thinks relevant.[5] If an applicant thinks his or her race or ethnicity is relevant to a holistic evaluation—which would hardly be surprising given that race remains a salient social factor—it is difficult to see how a university could blind itself to that factor while also gaining insight into each applicant and building a class that is more than the sum of its parts.

Nor is it at all apparent why universities should, at this point in our nation's evolving understanding of race, be forced to will ignorance with respect to race. As this Court has recognized, race continues to influence our experiences. *See Parents Involved*, 551 U.S. at 787 (Kennedy, J., concurring in part and concurring in the judgment); *accord Grutter*, 539 U.S. at 332-333. In view of that reality, as well as the history and purposes of the Equal Protection Clause, it would be extraordinary to conclude at this time that race is the single characteristic that universities may not consider in composing a student body that is diverse and excellent in many dimensions, not just academically. *Cf. Shaw* v. *Reno*, 509 U.S. 630, 679 (1993) (Stevens, J., dissenting) ("If it is permissible to draw boundaries to provide adequate representation for rural voters, for union members, for Hasidic Jews, for Polish Americans, or for Republicans, it necessarily follows that it is permissible to do to the same thing for members of the very minor-

---

[5] *See, e.g.*, The Common Application, *2012-2013 First-Year Application* (calling for an essay on, among other things, an "experience that illustrates what you would bring to the diversity in a college community" and inviting applicants to "attach a separate sheet if [applicant] wish[es] to provide details of circumstances or qualifications not reflected in the application"), *available at* https://www.commonapp.org/commonapp/DownloadForms/2013/2013PacketFY_download.pdf (last visited Aug. 12, 2012).

HARV00018918

13

ity group whose history in the United States gave birth to the Equal Protection Clause.").

Finally, the societal reliance interests on *Bakke* and *Grutter* counsel against any precipitous abandonment of diversity as a compelling interest. *Cf. Planned Parenthood of Se. Penn.* v. *Casey*, 505 U.S. 833, 861-869 (1992). In the 34 years since *Bakke* and the nine years since *Grutter*, Amici and other selective universities have undertaken a wide range of measures to encourage minority applications and to expand minority admissions. The principle that diversity is a compelling interest, announced in *Bakke*, widely followed in practice, and affirmed in *Grutter*, has provided the framework and foundation for these efforts. The reliance interests of universities, applicants, students, high schools, businesses, and other social actors and institutions on this Court's jurisprudence are substantial. Absent some "special justification"—which is not present here—principles of *stare decisis* require continued adherence to *Grutter*. *See Dickerson* v. *United States*, 530 U.S. 428, 443 (2000) ("even in constitutional cases, [*stare decisis*] carries such persuasive force that we have always required a departure from precedent to be supported by some special justification" (internal quotation marks omitted)).[6]

---

[6] Forbidding race-consciousness in individualized, holistic admissions processes would have many wrenching effects on Amici, including a potential wave of litigation by disappointed applicants. Because admissions officials would doubtless be aware of the race of at least some successful applicants, some applicants not admitted might sue, claiming that race improperly influenced admissions decisions and was responsible for the fact that other students were admitted rather than them. Unlike in other contexts in which allegations of discrimination might be raised, universities

HARV00018919

14

### B. Mechanistic, Ostensibly Race-Neutral Policies Are Not Constitutionally Required Alternatives For Achieving Diversity

In addition to holding that diversity is a compelling interest, this Court in *Grutter* firmly rejected the view that universities must choose between maintaining "excellence or fulfilling a commitment to provide educational opportunities to members of all racial groups." 539 U.S. at 339. The Court declined to hold, as the Solicitor General pressed, that universities must first try mechanistic measures—such as the Texas 10% Plan, which itself depends upon the existence of segregated schools—before it may adopt race-conscious admissions policies. The Court was clear that strategies that "require a dramatic sacrifice of diversity, the academic quality of all admitted students, or both" are not constitutionally required. *Id.* at 340.

Petitioner is not challenging that aspect of *Grutter*. *See* Pet. Br. 35 n.9 ("unlike in *Grutter*, Petitioners [sic] are not attempting to force a percentage plan upon Respondents"). She therefore is not advocating a rule

---

would often not be able to point to specific, objective distinctions between one applicant and another because numerical scores are not determinative of Amici's admissions decisions: All such decisions are to some extent subjective and involve nuanced judgments about the applicant and composition of an entire class. Litigation over the merits of specific admissions decisions would inevitably draw courts into the second-guessing of core educational judgments. *See Regents of Univ. of Mich.* v. *Ewing*, 474 U.S. 214, 226 (1985) (courts are not well-equipped "to evaluate ... academic decisions that are made daily by faculty members of public educational institutions—decisions that require an expert evaluation of cumulative information and are not readily adapted to the procedural tools of judicial ... decisionmaking" (internal quotation marks and brackets omitted)).

HARV00018920

15

that universities must first attempt mechanistic, race-neutral alternatives in pursuing a diverse student body. This concession is crucial to Amici: Mechanistic admissions plans, whether based on guaranteed admissions or other "objective" numerical criteria, would be at war with the educational missions of Amici and unworkable.

As this Court explained in *Grutter*, guaranteed admissions plans are not desirable race-neutral alternatives for many universities because they "preclude the university from conducting the individualized assessments necessary to assemble a student body that is not just racially diverse, but diverse along all the qualities valued by the university." 539 U.S. at 340. For Amici, the assumption embodied in mechanistic alternatives— *i.e.*, that objective numerical measures are the only or even the best measure of an applicant's potential—is profoundly misplaced. As we have explained, Amici rely on individualized, holistic review designed to assess the qualifications of the whole applicant, as well as how the applicant would contribute to fulfilling the educational missions of the institution.

Mechanistic proposals like the Texas 10% Plan are also completely impracticable. Amici receive applications from far more applicants qualified by objective measures than they could hope to admit. *See supra* n.3. Beyond that, Amici have nationally and internationally based student bodies at the undergraduate and graduate level. In the United States alone, there are more than 24,000 public secondary schools and more than 2,700 private secondary schools in addition to more than 14,000 combined elementary and secondary schools. *See* Snyder & Dillow, *Digest of Education Statistics 2011* tbl. 5 (June 2012), *available at* http://nces.ed.gov/pubs2012/2012001.pdf. Were each Amicus to guarantee admission to just the top student

HARV00018921

16

at each of the nation's secondary schools, that would require admitting many more than 20,000 students. Even if only 20 percent of those students matriculated, a class of 4,000-plus students would easily exceed any one of Amici institution's educational resources.[7] Apart from that basic math problem, guaranteed admissions policies would raise profound difficulties with respect to international students and at the graduate level. *See Grutter*, 539 U.S. at 340 (noting the United States did not "explain how [percentage] plans could work for graduate and professional schools"). Again, however, even if these plans were somehow workable for Amici (they are not), Amici would never voluntarily choose to structure their admissions policies in such a mechanistic fashion and with such a focus on a few quantitative measures.

Amici do extensively consider a wide range of race-neutral factors in seeking to compose broadly diverse and excellent student bodies. For example, Amici consider whether the applicant is the first in the family to attend college, whether he or she comes from a disadvantaged background, and whether languages other than English are spoken in the home. Amici also engage in substantial outreach and recruiting efforts aimed at increasing the size and diversity of the applicant pool. Furthermore, Amici have adopted financial aid policies designed to enable a wide variety of admitted students from all backgrounds to attend. These ef-

---

[7] For the class of 2016, for example, Harvard admitted 2,032 students. *See* Harvard College, Office of Admissions, *A Brief Profile of the Admitted Class of 2016, available at* http://www.admissions.college.harvard.edu/apply/statistics.html (last visited Aug. 12, 2012).

HARV00018922

**JA5227**
DX026.0023

17

forts have played an important role in contributing to the diversity, including racial and ethnic, of the student bodies of Amici institutions. But racial and ethnic diversity are a distinct kind of difference in background, and reliance on such race-neutral measures alone cannot substitute for individualized, holistic review that takes account of race and ethnicity of the type approved of by *Grutter*. *See, e.g.*, Minow, *After* Brown: *What Would Martin Luther King Say?*, 12 Lewis & Clark L. Rev. 599, 636 n.192 (2008) (collecting studies showing that reliance on socioeconomic status as an admissions factor alone cannot produce racial diversity).

For these reasons, the Court should reaffirm, and in no way retreat from, the principle of *Grutter*, that the Constitution does not require the use of mechanistic, race-neutral policies before race-conscious admissions approaches may be used.

## II. PETITIONER'S ARGUMENTS REGARDING THE APPLICATION OF STRICT SCRUTINY ARE DEEPLY FLAWED

Petitioner argues that UT's consideration of race in admissions does not satisfy strict scrutiny. UT ably defends the specifics of its admissions system in its brief. Amici write to emphasize that petitioner's arguments amount to a backdoor effort to drain *Grutter* of meaning and would significantly unsettle this Court's equal protection jurisprudence, on which Amici and many other universities have relied. Specifically, petitioner's apparent view that *Parents Involved*, rather than *Grutter*, governs this case is fundamentally misplaced; petitioner's understanding of the scope and nature of the educational benefits of diversity is unfounded; and petitioner's call for a strict-basis-in-evidence standard to review the use of holistic, individualized admissions

HARV00018923

18

processes in higher education finds no support in this Court's precedent and would have highly detrimental implications.

Before proceeding, Amici wish to underscore a crucial threshold point. No Amicus employs race or ethnicity as a *classification* in its admissions policies; no seats in the class are reserved to applicants of any race or ethnic background, nor are applicants of any race or background limited to a certain number of places. Rather, Amici's admissions policies, by considering myriad factors including race and ethnicity, are designed to foster excellence through the admission of a class diverse in multiple dimensions.

In this way, Amici's policies are influenced by the Harvard Plan approved by Justice Powell in *Bakke* and this Court in *Grutter*. Many universities have adopted or reaffirmed such policies in the wake of *Grutter*. In light of this commitment to individualized, holistic review, Amici consider race and ethnicity with extraordinary care and in the most limited fashion necessary to contribute meaningfully to the diversity of their student body. Imposing judicial constraints on such review beyond those set forth in *Grutter* therefore would risk depriving Amici of the ability to compose academically excellent and diverse student bodies that remain vital to achieving Amici's educational missions. *See Grutter*, 539 U.S. at 326-327 ("Although all governmental uses of race are subject to strict scrutiny, not all are invalidated by it."); *Adarand Constructors, Inc.* v. *Pena*, 515 U.S. 200, 237 (1995) ("dispel[ling] the notion that strict scrutiny is strict in theory, but fatal in fact" (internal quotation marks omitted)).

HARV00018924

**JA5229**
DX026.0025

19

### A. Petitioner's Reliance On *Parents Involved* Is Unavailing

At nearly every step of petitioner's argument, she places heavy, if not exclusive, reliance on *Parents Involved*. That reliance is wholly misplaced. This Court has been clear that "[c]ontext matters when reviewing race-based governmental action under the Equal Protection Clause," *Grutter*, 539 U.S. 327, and the differences between *Parents Involved* and this case are stark. In view of the important guidance provided in *Grutter* with respect to structuring narrowly tailored admissions policies—guidance on which Amici and others have heavily relied—this Court should reject any suggestion that *Parents Involved*, rather than *Grutter*, governs review of individualized, holistic admissions processes in the context of higher education.

1. In applying narrow tailoring in *Grutter*, this Court identified the "hallmarks of a narrowly tailored [admissions] plan." 539 U.S. at 334. Those hallmarks are that an "admissions program cannot use a quota system"; an admissions program "may consider race or ethnicity only as a plus in a particular applicant's file, without insulating the individual from comparison with all other candidates for the available seats"; and an admissions program must be "flexible enough to consider all pertinent elements of diversity in light of the particular qualifications of each applicant." *Id.* (internal quotation marks and brackets omitted). The Court found that the program at issue in *Grutter* satisfied those requirements because, among other things, the law school "engage[d] in a highly individualized, holistic review of each applicant's file, giving serious consideration to all the ways an applicant might contribute to a diverse educational environment." *Id.* at 337.

HARV00018925

20

There is a wide gulf between that form of review and the assignment policies at issue in *Parents Involved*. Under the latter, race was a binary factor: One plan "classifie[d] children as white or nonwhite," while the other classified children "as black or 'other.'" 551 U.S. at 710; *see id.* at 723 ("Even when it comes to race, the plans here employ only a limited notion of diversity[.]"). For each plan, moreover, race was effectively the entire classification at issue, and it was applied in a "crude" fashion that failed to give consideration to any other characteristics of students. *See id.* at 789 (Kennedy, J., concurring in part and concurring in the judgment). What is more, the assignment plans were challenged by parents of children "denied assignment to particular schools … *solely* because of their race." *Id.* at 710-711 (emphasis added).

The plans at issue in *Parents Involved* bear no meaningful resemblance to the individualized, holistic review used by Amici and endorsed in *Grutter*. Justice Kennedy, for example, expressly distinguished *Gratz* and *Grutter* on the ground that, unlike the challenged policies before the Court in *Parents Involved*, those cases addressed a "system where race was not the entire classification." 551 U.S. at 792-793. Justice Kennedy further contrasted the assignment plans at issue with *Grutter*-like plans that would give "nuanced, individual evaluation of school needs and student characteristics that might include race as a component." *Id.* at 790. And the majority opinion drew precisely the same distinction in comparing *Grutter* with the policies at issue. *See id.* at 722 ("The entire gist of the analysis in *Grutter* was that the admissions program at issue there focused on each applicant as an individual, and not simply as a member of a particular racial group."); *id.* at 723 ("under each plan[,] when race comes into play, it

HARV00018926

21

is decisive by itself" and "not simply one factor weighed with others in reaching a decision, as in *Grutter*").

In short, both the majority opinion and Justice Kennedy's concurring opinion in *Parents Involved* took pains to emphasize a distinction between policies in which race (applied as a black/white binary distinction) is effectively the entire classification and those in which race and ethnicity are but single factors as part of individualized, holistic review. The Court in *Parents Involved* was clear that the plans before it were "not governed by *Grutter*," 551 U.S. at 725, and the inverse is true here: *Grutter*, and not *Parents Involved*, continues to supply the appropriate benchmarks for assessing the constitutionality of admissions policies of universities, such as Amici, that are structured on *Grutter* and the Harvard Plan.

2.  This basic distinction disposes of petitioner's argument (at 38-41) that the use of race is unconstitutional when it has an insubstantial effect on actual admissions decisions.  To be sure, Justice Kennedy in *Parents Involved* observed that "it is noteworthy that the number of students whose assignment depends on express racial classifications is limited."  551 U.S. at 790.  Those "small number of assignments affected," he reasoned, "suggest[ed] that the schools could have achieved their stated ends through different means," including "facially race-neutral means ... or, if necessary, a more nuanced, individual evaluation of school needs and student characteristics that might include race as a component."  *Id*.  The upshot of Justice Kennedy's analysis, as the Fifth Circuit noted below, was that a state actor, when faced with a racial classification that has little effect in practice, should instead use race-neutral measures or *Grutter*-like policies that evaluate,

HARV00018927

22

in an individualized, holistic manner, a number of factors, including race and ethnicity. *See* Pet. App. 70a.

Contrary to petitioner's insistence, nothing in this Court's precedents suggests that where race and ethnicity play only a small role (or are single factors among many) in influencing decisions in a *Grutter*-like admissions system, the use of race and ethnicity becomes unconstitutional. Such a result would defy common sense: That race and ethnicity, when considered among a multitude of other factors, might have diminishing significance in effecting outcomes should be taken as welcome evidence that a program is carefully crafted to avoid overreliance on race and ethnicity while also achieving a diverse and academically excellent student body.

### B. Petitioner Misapprehends The Educational Mission Of Universities And The Role And Benefits Of Diversity

In challenging UT's decision to reinstate a limited use of race in admissions after *Grutter*, petitioner argues (at 26) that "*Grutter* … endorses an inward-facing concept of diversity focused on enhancing the university experience—not an outward-facing concept of diversity focused on achieving a level of minority enrollment that is in proportion to the general population." To be clear, Amici (apparently like UT[8]) do not seek to

_____

[8] *See* JA131a ("UT Austin has not established a goal, target, or other quantitative objective for the admission and/or enrollment of under-represented minority students for any of the incoming classes admitted in 2003 through 2008."); Pet. App. 44a ("UT has never established a specific number, percentage, or range of minority enrollment that would constitute 'critical mass'" and "there is no indication that UT's *Grutter*-like plan is a quota by another name").

HARV00018928

23

attain levels of enrollment that conform to state, national, or international demographics. But petitioner's proposed distinction between the "inward" and "outward" benefits of diversity is inconsistent with the educational missions of Amici and precedent.

Amici's educational missions are broader than petitioner and her amici would acknowledge. Amici insist that students at their institutions will excel at demanding coursework, but their missions extend beyond that singular goal to developing active and engaged citizens equipped to handle the problems of a complex world and in training city, state, national, and international leaders in every field of endeavor, including the arts, government, science, and business.[9] In order to train

---

[9] *See, e.g.*, Harvard University, *Frequently Asked Questions* ("The Mission of Harvard College": "Education at Harvard should liberate students to explore, to create, to challenge, and to lead. The support the College provides to students is a foundation upon which self-reliance and habits of lifelong learning are built: Harvard expects that the scholarship and collegiality it fosters in its students will lead them in their later lives to advance knowledge, to promote understanding, and to serve society."), *available at* http://www.harvard.edu/faqs/mission-statement (last visited Aug. 12, 2012); Yale University, *University Mission Statement* ("Yale seeks to attract a diverse group of exceptionally talented men and women from across the nation and around the world and to educate them for leadership in scholarship, the professions, and society."), *available at* http://www.yale.edu/about/mission.html (last visited Aug. 12, 2012); Dartmouth College, *Mission* ("Dartmouth College educates the most promising students and prepares them for a lifetime of learning and of responsible leadership, through a faculty dedicated to teaching and the creation of knowledge."), *available at* http://www.dartmouth.edu/home/about/mission.html (last visited Aug. 12, 2012); Stanford University, *The Founding Grant with Amendments, Legislation, and Court Decrees*, at 24 (Stanford University's "chief object is the instruction of students with a view to producing leaders and educators in every field of

HARV00018929

**JA5234**
DX026.0030

24

active citizens and leaders for participation in a diverse nation and world, Amici must be able to compose an appropriately diverse student body.

This Court has long embraced this facet of the educational mission of universities, and has recognized the role diversity plays in advancing it. In *Bakke*, for example, Justice Powell explained that "it is not too much to say that the nation's future depends upon leaders trained through wide exposure to the ideas and mores of students as diverse as this Nation of many peoples." 438 U.S. at 313 (internal quotation marks omitted). Similarly, in *Grutter*, this Court held that "[i]n order to cultivate a set of leaders with legitimacy in the eyes of the citizenry, it is necessary that the path to leadership be visibly open to talented and qualified individuals of every race and ethnicity. All members of our heterogeneous society must have confidence in the openness and integrity of the educational institutions that provide this training." 539 U.S. at 332; *cf. Brown* v. *Board of Educ. of Topeka*, 347 U.S. 483, 493 (1954) (education is "required in the performance of our most basic public responsibilities" and "very foundation of good citizenship").

This understanding of the broad educational mission of universities reveals the basic error in petitioner's insistence (at 27) that any attention to demographics as *a* factor in assessing diversity is "'outright racial balancing.'" *Grutter* recognized that universities train leaders and citizens for a heterogeneous society,

---

science and industry"), *available at* https://ogc.stanford.edu/sites/ogc.stanford.edu/files/Founding%20Grant%20(equivalent%20to%20SU%20Articles%20of%20Incorporation)_22124_1.pdf (last visited Aug. 12, 2012).

HARV00018930

25

and that diversity is vital to that function. It stands to reason that a university may pay some attention to the communities from which its students come and into which its students graduate in pursuing those goals.

In *Parents Involved*, by contrast, the challenged student assignment plans were "tied to each district's specific racial demographics, rather than to *any* pedagogic concept of the level of diversity needed to obtain the asserted educational benefits." 551 U.S. at 726 (plurality opinion) (emphasis added). The plans set a range of enrollment "solely by reference to the demographics of the respective school districts." *Id.* at 729 (plurality opinion). And as explained above, the programs did not employ individualized, holistic review in order to achieve diversity.

Those considerations are not at issue here, where a university has a pedagogic concept of diversity in mind, and as part of its educational mission also pursues *Grutter*'s approved goal of creating a "path to leadership" and citizenship for a "heterogeneous society." 539 U.S. at 332.[10] Indeed, as explained throughout this brief, producing the next generation of citizens and leaders is a core mission of Amici institutions. In aiming for a

---

[10] *See* Laycock, *The Broader Case For Affirmative Action: Desegregation, Academic Excellence, and Future Leadership*, 78 Tul. L. Rev. 1767, 1773 (2004) (*Grutter* embraced a broad justification for diversity that included "bringing more minority young people into the most selective schools and into positions of leadership" to secure the "legitimacy of selective institutions of higher education and the legitimacy of the nation's leadership"); Payton, *Post-*Grutter*: What Does Diversity Mean in Legal Education and Beyond?*, 35 Pepp. L. Rev. 569, 581-582 (2008) (explaining the significance of *Grutter*'s discussion of the relationship between diversity and democracy).

HARV00018931

26

rich and robust concept of diversity consonant with those objectives, it would be illogical to exclude altogether any consideration of demographics, whether municipal, state, national, or international, depending upon the nature and mission of the institution.

As Texas's flagship educational institution, UT's mission is focused in part on training the next generation of leaders for Texas. *See* Resp. Br. 5. That may well affect the manner in which UT assesses the diversity necessary to fulfill its mission. *See* Pet. App. 50a ("The need for a state's leading educational institution to foster civic engagement and maintain visibly open paths to leadership … requires a degree of attention to the surrounding community."). But this aspect of a university's mission is not "racial balanc[ing], pure and simple." *Parents Involved*, 551 U.S. at 726 (plurality opinion). The essence of racial balancing is a goal that functions as a quota, seeking to secure a "specified percentage of a particular group merely because of its race or ethnic origin." *Grutter*, 539 U.S. at 329 (internal quotation marks omitted). Petitioner concedes that is not the goal of UT. *See supra* n.8. Nor, emphatically, is it the goal of these Amici. Amici do not employ quotas, and have no rigid baselines in mind with respect to diversity. Amici's educational objectives are to admit a student body that is diverse across myriad axes, that constitutes more than the sum of its parts, that excels academically, and that prepares a next generation of nationally and internationally engaged citizens and leaders who are equipped to succeed in a remarkably diverse world.

Petitioner largely ignores *Grutter*'s recognition of this paramount role of universities, which the Fifth Circuit found crucial to its analysis. *See* Pet. App. 50a-51a. Petitioner argues (at 29) only that "this Court has

HARV00018932

**JA5237**
DX026.0033

27

always rejected the use of race to advance the general welfare of society." The cases petitioner cites hold that remedying societal discrimination is not a compelling interest. *See, e.g., City of Richmond* v. *J.A. Croson Co.*, 488 U.S. 469, 499 (1989) ("amorphous claim that there has been past discrimination in a particular industry cannot justify the use of an unyielding racial quota"); *Wygant* v. *Jackson Bd. of Educ.*, 476 U.S. 267, 276 (1986) (plurality opinion) ("Societal discrimination … is too amorphous a basis for imposing a racially classified remedy."). That is not even remotely the issue here. The compelling governmental interest in diversity in higher education is quite different from remedying generalized discrimination. The issue here is whether, in assessing diversity, a university may take into account the need (a) to foster conditions for providing the most stimulating learning environment possible and (b) to train effectively citizens and leaders for a heterogeneous society. Justice Powell's opinion in *Bakke* and the decision of this Court in *Grutter* answer that question affirmatively. A retreat now would be a substantial blow to the educational missions of Amici and many universities.

### C. This Court Has Not Applied And Should Not Apply A Strong-Basis-In-Evidence Standard To The Unique Context Of Higher Education

Petitioner argues at length (at 31-37) that, under this Court's precedents, a strong-basis-in-evidence standard applies to university admissions programs, although she says little about the content of this standard. As a matter of precedent, petitioner's claim is wrong, as UT cogently explains (at 49). Amici write to emphasize why this Court should not, for the first time, apply such a standard to higher education.

HARV00018933

**JA5238**
DX026.0034

28

*First*, the reasons the Court has applied a strong-basis-in-evidence standard in other circumstances carry no force here. "Context matters when reviewing race-based governmental action under the Equal Protection Clause." *Grutter*, 539 U.S. at 327. The strong-basis-in-evidence standard has been used to identify when race may be used to remedy historical discrimination. *See Wygant*, 476 U.S. at 277-278; *Croson*, 488 U.S. at 498-499. Whether discrimination has occurred is an objective and measurable fact: For example, did the City of Richmond discriminate in the past in awarding government contracts? In that setting, it would make little sense simply to credit a good-faith judgment by the City that discrimination has occurred because the City would have no special claim to expertise regarding that fact.[11]

By contrast, the educational benefits of diversity and the degree of diversity necessary to obtain those benefits defy easy calculation. Judgments about educational benefits are necessarily at the core of the expertise of universities and inevitably implicate the First Amendment interests in a university's definition of its own educational mission, discussed further below. *See Grutter*, 539 U.S. at 328 ("The Law School's educational judgment that such diversity is essential to its educa-

---

[11] In *Ricci* v. *DeStefano*, 129 S. Ct. 2658 (2009), this Court applied this standard to determine whether a public employer's fear of disparate-impact liability was reasonable. In that setting, too, it arguably made little sense simply to credit the good-faith belief of the employer because the possibility of such liability lies squarely within the competence of the courts to evaluate—unlike the educational benefits to be obtained from particular admissions policies, an area in which the courts have no special expertise and have long deferred to universities' judgments.

HARV00018934

**JA5239**
DX026.0035

29

tional mission is one to which we defer."). In this cru-
cial respect, higher education is far afield from govern-
ment contracting and public employment, in which the
state actors employing the racial classifications would
have no reasonable claim to any special expertise as to
whether historical discrimination has occurred.

*Second*, application of a strong-basis-in-evidence
standard to universities' admissions decisions would
threaten to undermine the First Amendment interests
of universities, as well as the proper deference due uni-
versity officials' educational judgments. This Court has
long acknowledged the special role universities play in
the First Amendment tradition. As Justice Powell ex-
plained, the First Amendment interests of a university
includes the freedom " 'to determine for itself on aca-
demic grounds who may teach, what may be taught,
how it shall be taught, and who may be admitted to
study.' " *Bakke*, 438 U.S. at 312 (Powell, J.) (quoting
*Sweezy* v. *New Hampshire*, 354 U.S. 234, 263 (1957)
(Frankfurter, J., concurring in the result)). This Court
reiterated in *Grutter* that, "given the important pur-
poses of public education and the expansive freedoms of
speech and thought associated with the university en-
vironment, universities occupy a special niche in our
constitutional tradition." *Grutter*, 539 U.S. at 329.[12]

---

[12] *See also Parents Involved*, 551 U.S. at 792 (Kennedy, J.,
concurring in part and concurring in the judgment) ("precedent
support[s] the proposition that First Amendment interests give
universities particular latitude in defining diversity"); Byrne, *Aca-
demic Freedom: A "Special Concern of the First Amendment"*, 99
Yale L.J. 251, 311 (1989) ("[T]he Supreme Court's decisions con-
cerning academic freedom have protected principally and ex-
pressly a First Amendment right of the university itself ... largely
to be free from government interference in the performance of

HARV00018935

**JA5240**
DX026.0036

30

Although this "special niche" of universities has never meant and should not mean that they are immune from judicial review, a strong-basis-in-evidence standard could seriously impair universities' legitimate First Amendment interests. A constitutional rule that required decisions regarding diversity—for example, determinations about the value of diversity, the types of diversity necessary to advance a university's mission, and the contributions of various degrees of diversity to that mission—to be proven by surveys or data sets, and then second-guessed in court, would imperil the First Amendment interests of universities by cabining a university's ability to rely on the nuanced and expert judgments of its officials, faculty, and administrators in assessing such questions. *Cf. Regents of Univ. of Mich.* v. *Ewing*, 474 U.S. 214, 225 (1985) ("When judges are asked to review the substance of a genuinely academic decision, … they should show great respect for the faculty's professional judgment."). And a standard that would afford no or little deference to the educational judgments of universities would be contrary to this Court's recognition of the need to limit intrusive judicial inquiry of university decisionmaking. *See University of Penn.* v. *EEOC*, 493 U.S. 182, 199 (1990) (noting the "importance of avoiding second-guessing of legitimate academic judgments"); *Ewing*, 474 U.S. at 226 n.12, 227 ("Academic freedom … thrives

---

core educational functions."); *cf. Board of Regents of Univ. of Wis. Sys.* v. *Southworth*, 529 U.S. 217, 232 (2000) ("It is not for the Court to say what is or is not germane to the ideas to be pursued in an institution of higher learning.").

HARV00018936

31

on autonomous decisionmaking by the academy itself[.]").[13]

*Third*, application of a strong-basis-in-evidence standard to *Grutter*-like admissions policies could have a particularly substantial impact on Amici. Amici receive applications from far more academically excellent students than they could hope to admit, and they rely exclusively on individualized, holistic review. *See supra* pp. 7-8. In light of that, a standard that demanded rigorous empirical evidence regarding individual admissions decisions or decisions regarding the composition of a student body as a whole could subject Amici to frequent litigation over whether the standard is satisfied. The predictable result would be intrusive discovery and judicial micro-management of admissions decisions and policies. *See supra* n.6 (explaining why a reversal of *Grutter* would have a similar effect). None of this is to say that universities need not carefully evaluate issues of diversity, but often the most probative evidence bearing on the issues will be the expert educational judgments of university officials, admissions officers, and faculty—judgments based on decades of experience with holistic, individualized race-conscious admissions policies. The Constitution should not be read to foreclose reliance on those judgments.

---

[13] This is not, as petitioner paints it (at 22), an argument for "unlimited deference to university administrators." Strict scrutiny is properly demanding, but it should be applied so as not to deprive university officials of the right to exercise responsibly their expert educational judgments. *See Grutter*, 539 U.S. at 328 (strict scrutiny "is no less strict for taking into account complex educational judgments in an area that lies primarily within the expertise of the university").

HARV00018937

32

In short, the framework adopted by this Court in *Grutter* supplies a workable and appropriate standard for reviewing race-conscious university admissions policies. There is no cause for replacing that framework with an ill-defined strong-basis-in-evidence standard that could interfere with the First Amendment interests of and educational judgments by universities and that would be sure to invite unnecessary litigation.

## CONCLUSION

The judgment of the court of appeals should be affirmed.

Respectfully submitted.

SETH P. WAXMAN
   *Counsel of Record*
PAUL R.Q. WOLFSON
KELLY P. DUNBAR
WILMER CUTLER PICKERING
   HALE AND DORR LLP
1875 Pennsylvania Ave., N.W.
Washington, D.C. 20006
(202) 663-6000
seth.waxman@wilmerhale.com

AUGUST 2012

HARV00018938

## CERTIFICATE OF SERVICE

I mailed copies of this appendix to the Court and to the following counsel:

William F. Lee
Felicia H. Ellsworth
Andrew S. Dulberg
Elizabeth Connell Mooney
Joseph H. Mueller
WILMER CUTLER PICKERING
HALE AND DORR LLP
60 State Street
Boston, MA 02109
Tel: (617) 526-6687
Fax: (617) 526-5000
william.lee@wilmerhale.com
felicia.ellsworth@wilmerhale.com
andrew.dulberg@wilmerhale.com
elizabeth.mooney@wilmerhale.com
sarah.frazier@wilmerhale.com
joseph.mueller@wilmerhale.com


Dated: February 18, 2020                    _s/ William S. Consovoy_____